# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA
450 Fifth Street NW, Suite 8000
Washington, DC 20530

COMMONWEALTH OF MASSACHUSETTS
One Ashburton Place, 18th Floor
Boston, MA 02108

DISTRICT OF COLUMBIA
400 Sixth Street NW, Tenth Floor
Washington, DC 20001

STATE OF CALIFORNIA
300 South Spring Street, Suite 1702
Los Angeles, CA 90013

STATE OF MARYLAND
200 St. Paul Place, 19th Floor
Baltimore, MD 21202

STATE OF NEW JERSEY
124 Halsey Street – 5th Floor
Newark, New Jersey 07102

STATE OF NEW YORK
28 Liberty Street, 20th Floor
New York, NY 10005

and

STATE OF NORTH CAROLINA
P.O. Box 629
Raleigh, NC 27602
                    *Plaintiffs*,
    v.

JETBLUE AIRWAYS CORPORATION
27-01 Queens Plaza North
Long Island City, NY 11101

and

SPIRIT AIRLINES, INC.
2800 Executive Way
Miramar, FL 33025

                    *Defendants*.

Civil Action No.: 1:23-cv-10511-WGY

## AMENDED COMPLAINT

JetBlue's proposed $3.8 billion acquisition of Spirit would eliminate the largest and fastest-growing ultra-low-cost carrier in the United States. Spirit's ultra-low-cost business model has increased competition and brought low fares to hundreds of routes across the country, making it possible for more Americans—particularly the most cost conscious—to travel. JetBlue competes hard against Spirit, and views it as a serious competitive threat. But instead of continuing that competition, JetBlue now proposes an acquisition that Spirit describes as "a high-cost, high-fare airline buying a low-cost, low-fare airline."

If the acquisition is approved, JetBlue plans to abandon Spirit's business model, remove seats from Spirit's planes, and charge Spirit's customers higher prices. JetBlue's plan would eliminate the unique competition that Spirit provides—and about half of all ultra-low-cost airline seats in the industry—and leave tens of millions of travelers to face higher fares and fewer options. Spirit itself put it simply: "A JetBlue acquisition of Spirit will have lasting negative impacts on consumers." This acquisition violates Section 7 of the Clayton Act and should be enjoined.

## I.      INTRODUCTION

1.      Spirit has brought a low-cost, no-frills option to air travel that has benefited millions of travelers. Spirit's low unbundled fares, which a senior JetBlue executive has characterized as Spirit's "key weapon," have enabled more consumers to fly, and to fly at a lower price, by providing the opportunity to purchase the products and services they truly value. Spirit unbundles certain features of flying—carry-on baggage, seat assignment, and in-flight snacks, for example—that airlines historically included in the price of a ticket. This approach

helps keep fares low—Spirit has touted that its total prices, including charges for all unbundled services, are 30% less than those of other airlines in the United States.

2.      The rest of the industry—including JetBlue—has been forced to respond to Spirit's innovations and low prices. Spirit estimates that when it starts flying a route, average fares fall by 17%; JetBlue estimates that when Spirit stops flying a route, average fares go up by 30%. Spirit's success—and other airlines' response to it—has led to the "Spirit Effect": when Spirit enters a new route, prices for consumers across all airlines tend to fall and demand for air travel goes up. For years, JetBlue has boasted of its own "JetBlue Effect" when it enters new markets, but JetBlue has recognized that its own fares and revenues on a route drop significantly when Spirit enters. Where JetBlue and Spirit compete, travelers win—customers enjoy the benefits of both the Spirit and JetBlue Effects, fares go down, and more Americans can afford trips they could not before.

3.      Competition between JetBlue and Spirit benefits all types of travelers, but it is particularly important for cost-conscious travelers. As Spirit's CEO has explained, Spirit looks to serve "a particular segment of the traveling public. Those people who have been priced out or find their fares are too expensive to travel with any frequency." Travelers visiting family or taking a hard-earned vacation—whom airlines typically call "leisure" customers—tend to be cost conscious, for instance, because they are usually paying for their own trip, unlike most customers traveling for business, who frequently have their employer footing the bill. Some of these cost-conscious customers would forgo air travel altogether if fares get too expensive, and others would have to make significant changes to their travel plans if ticket prices increase. Many cost-conscious customers prefer to pay lower fares, even if it means they receive fewer amenities, so they can better afford to fly.

3

4.      This acquisition would combine two especially close and fierce head-to-head competitors. JetBlue has recognized that competition from Spirit lowers its fares more than competition from other ultra-low-cost carriers. On dozens of routes serving tens of millions of passengers each year, JetBlue and Spirit are two of the most significant rivals today, and they have such large combined market shares that the transaction is presumptively illegal.

5.      JetBlue's acquisition would also dampen competition with other airlines. Airlines do not always compete as aggressively as they could. Sometimes they take advantage of opportunities to soften competition through coordinated actions—like "follow-the-leader" price increases—that lead to higher fares or reduced capacity. Spirit has recognized it has "no obligation" to "follow the herd" when it comes to collective industry price increases. By contrast, JetBlue has already demonstrated its willingness to follow along with some of those opportunities to coordinate and would have increased incentives to do so if the acquisition goes through.

6.      The acquisition would also stop the growth of Spirit. In the last 10 years, Spirit has doubled its network in size and, before this deal, expected to continue expanding at a quick pace. For example, before the end of 2023, Spirit independently expected to add service in five new cities and increase daily departures from Fort Lauderdale, Orlando, and Los Angeles—all JetBlue focus cities. And over the next five years Spirit plans to add nonstop service to several routes JetBlue flies today. The acquisition stops this future competition before it starts.

7.      Moreover, JetBlue plans to reduce the number of seats on Spirit aircraft, inevitably resulting in many cost-conscious Americans needing to forgo trips they would have otherwise taken. JetBlue has made clear it plans to retrofit Spirit planes to match the current layout of JetBlue aircraft. This would remove 10 to 15% of seats from every Spirit plane in

operation today. Fewer seats means fewer passengers—and higher prices for those who can still afford to make their way onto the plane. This is unlikely to stop business travelers flying on corporate expense accounts, but would put travel out of reach for many cost-conscious travelers.

8.      JetBlue's acquisition of Spirit should not be considered in a vacuum—it is simply the latest step in a trend toward consolidation in the airline industry. A series of mergers left American travelers facing the Big Four: three "legacy" carriers—Delta, United, and American Airlines—that, along with Southwest, control close to 80% of the domestic airline industry, with alliances extending their reach even further. While JetBlue used to warn against this increasing consolidation, the airline has changed its tune in recent years. First, in 2020, JetBlue entered into an alliance with American Airlines—characterized by Spirit as a "de facto merger"—that deprives customers in the northeastern United States of vigorous competition between JetBlue and American Airlines. The United States instituted a separate lawsuit to block that alliance. Before that legal challenge had gone to trial, JetBlue doubled down on consolidation, inking a deal to acquire Spirit that deprives travelers of yet another choice.

9.      To preserve Spirit's unique and disruptive role in the industry, to protect choice and economical access to air travel, especially for millions of cost-conscious Americans, and to prevent hundreds of millions of dollars in annual harm to consumers, the United States and the Commonwealth of Massachusetts, the District of Columbia, the State of California, the State of Maryland, the State of New Jersey, the State of New York, and the State of North Carolina ("Plaintiff States") bring this action to enjoin JetBlue's acquisition of Spirit as a violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.

## II.    THE INDUSTRY AND THE DEFENDANTS

### A.    Consolidation in the Airline Industry

10.    Four major airlines dominate air travel in the United States today. But this was not always the case. Just two decades ago, more than a dozen significant airlines competed domestically. Several legacy carriers, like American Airlines and United Airlines, utilized "hub-and-spoke" systems to offer travelers access to numerous domestic and international destinations. These airlines offered multiple classes of service and a broad range of amenities in order to cater to many different types of travelers. The legacy carriers faced competition from "low-cost carriers" like Southwest, AirTran, and JetBlue. These low-cost carriers typically had a single class of service, fewer amenities, and a smaller network, which enabled them to offer fares that were frequently lower than their competitors. More recently, ultra-low-cost carriers (or "ULCCs") emerged that tend to offer travelers even lower fares by lowering their cost structures, offering simplified onboard experiences, and removing some features traditionally included in the price of an airline ticket.

11.    Consolidation has since reshaped the industry. Between 2001 and 2013, a wave of airline mergers left three legacy carriers: Delta Air Lines (which absorbed Northwest), United Airlines (which absorbed Continental), and American Airlines (which joined forces with TWA, America West, and U.S. Airways). A similar transformation among low-cost carriers began in 2010: Southwest bought AirTran, Alaska purchased Virgin America, and JetBlue allied itself with American Airlines. Today, the domestic airline industry is dominated by the "Big Four" carriers—American, United, Delta, and Southwest—which together control approximately 80% of flights nationwide.

12.    As JetBlue warned in 2019, "[a]ll that power in the hands of a few very deep-pocketed airlines has implications for consumers in the form of reduced options, high fares and

6

often poor service." As discussed later, these implications also include an increased risk of coordination in the oligopolistic airline industry.

**B.      JetBlue's Evolution from Disrupter to Closer Ally of the Big Four**

13.     Defendant JetBlue began service as a low-cost carrier focused on leisure travelers, who JetBlue estimates today still account for about 80% of its passengers. JetBlue came to the airline industry with a plan to distinguish itself from legacy carriers and other low-cost carriers. In particular, JetBlue sought to entice travelers by offering lower fares combined with in-flight television and other amenities.

14.     Today, JetBlue offers flights to more than 100 destinations in the United States, Canada, the Caribbean, Latin America, and the United Kingdom. Within the United States, the airline's footprint is centered on six focus cities: Boston, New York, Los Angeles, Miami/Fort Lauderdale, Orlando, and San Juan. These focus cities account for 97% of JetBlue's flights and 94% of its revenues. Internationally, JetBlue provides significant service to the Caribbean and Latin America, which account for approximately 37% of its capacity.

15.     Recently, JetBlue has chosen to more closely align its interests with the Big Four, particularly through its Northeast Alliance with American Airlines. As part of this "de facto merger," as Spirit has described the Northeast Alliance, JetBlue agreed to align its domestic operations with American Airlines' on almost all routes to and from four major airports in Boston and New York City (Boston Logan International Airport, LaGuardia Airport, John F. Kennedy International Airport, and Newark Liberty International Airport). Approximately 75 percent of JetBlue's total capacity is tied up in the Northeast Alliance. That means JetBlue today coordinates its capacity decisions and shares its revenues with American Airlines on the vast

majority of its flights. In other words, JetBlue no longer competes with American Airlines on those flights—and if this acquisition happens, Spirit won't either.

### C.    Competition from Spirit Leads to Lower Fares and Increased Choices for Travelers

16.    Defendant Spirit is the largest ultra-low-cost carrier in the United States. In 2022, the airline flew more than 30 million passengers to 92 destinations across 16 countries. Like JetBlue, Spirit's domestic network is focused on the eastern half of the United States, the Caribbean, and Latin America. Spirit's service to the Caribbean and Latin America accounted for about 15% of its total capacity in 2022. In 2006, Spirit started implementing its uniquely successful ULCC business model, which enables the airline to offer some of the lowest fares in the industry today.

17.    Spirit's low fares are particularly attractive to cost-conscious travelers. As Spirit's Chief Commercial Officer testified to Congress in 2020: "Spirit's product is designed for highly price-sensitive travelers, mainly ordinary individual consumers, families, and small and medium businesses who pay for their own tickets and face narrower options. This continues to be an underserved segment in today's market and we are proud to fill the need." Spirit estimates that approximately 90% of its passengers are leisure travelers. But its low fares also appeal to certain cost-conscious small business travelers. As Spirit's CEO has explained, Spirit's business travelers are usually "people who are paying for their own ticket . . . . So it's going to be small businesses [or] sole proprietorships, that sort of thing . . . ." Spirit provides a competitive alternative that gives such small businesses a chance to cut costs and supports their competitiveness against their own larger competitors.

18.    Spirit's business model focuses on low costs because that strategy allows it to offer low fares to consumers. For example, Spirit fits more seats on each of its planes, automates

the check-in and baggage drop processes, offers streamlined amenities to passengers once they

board, and maximizes the number of times it uses airplanes or airport gates each day. These

strategies, among others, have allowed Spirit to maintain operating costs that are among the

lowest in the industry and significantly below those of JetBlue and the Big Four.

19.    Historically, almost all airlines sold fares to customers at an all-inclusive price

that bundled together various options, such as an advance seat assignment, boarding group, and

carry-on luggage. Passengers were forced to pay for these features regardless of how much they

used or valued them.

20.    Spirit was among the first domestic airlines to unbundle these features and

empower its cost-conscious travelers to prioritize the aspects of the flying experience they valued

the most. For example, Spirit became one of the first airlines to unbundle carry-on luggage from

the overall price of a ticket. Later, it became one of the first airlines to unbundle advance seat

assignments from the cost of a ticket. In other words, Spirit allowed customers to decide what

amenities and features they valued most while at the same time keeping base fares low. Other

airlines eventually followed suit. Unbundling these features (and others) from the price of a

ticket has enabled Spirit to offer low fares that are particularly attractive to cost-conscious

travelers who want the least expensive way to get to their destination.

21.    Spirit is unique among ULCCs. Spirit is three times more likely than Frontier and

seven times more likely than Allegiant to have at least a daily departure on each route it flies.

The limited frequency of service offered by Allegiant and Frontier makes it difficult for them to

gain traction in new markets, which in turn limits their ability to effectively compete. Once Spirit

starts offering new nonstop service, it also tends to continue offering service for longer than

Frontier. Spirit is also more likely than many other ULCCs to compete head-to-head at hubs or

focus cities dominated by the Big Four, such as Newark, Houston, Atlanta, and Miami. Spirit provides cost-conscious travelers options to far more international destinations from the United States—approximately twice as many—than Frontier, the only other ULCC with significant international service today. These offerings make Spirit attractive to many cost-conscious travelers living in Massachusetts (including those who fly out of Boston Logan Airport), New York (including those who fly out of LaGuardia and Newark airports), and the District of Columbia (including those who fly out of Baltimore/Washington International Thurgood Marshall Airport).

22.    Traveler demand for Spirit's low unbundled fares has led to explosive growth: Spirit is six times larger today than it was in 2010. In contrast, each of the Big Four had a growth rate that was flat or minimal during the same period. Compared to other ULCCs, Spirit added more capacity (as measured in available seat miles) during this period than Frontier, Sun Country, and Allegiant combined.



10

23.     Spirit's low fares have given it an outsized effect on competition when it starts operating on new routes. Spirit calls this impact the "Spirit Effect." Spirit's own analyses found that, on average, industry-wide fares went down by 17% and the number of passengers increased by 30% when the airline started offering new service on a route. Other studies have found similar results. These effects were felt even on routes from major airports that served as hubs for legacy carriers: within a year of Spirit starting service from Newark to George Bush Intercontinental Airport in Houston, for example, total seats on the route increased 20% and average fares for all airline passengers dropped 15%. And the Spirit Effect occurs even in markets where JetBlue operates—in other words, whatever benefit JetBlue entry and the "JetBlue Effect" brings to a market, there is an additional "Spirit Effect" benefit when Spirit enters. Travelers should not have to choose between the two.

24.     Before JetBlue's hostile takeover offer, Spirit planned to grow and compete even more widely and effectively in the future as an independent company. Spirit's airline fleet—the second-youngest in the domestic industry—is growing rapidly. Unlike its larger and smaller competitors, Spirit did not cancel any planned aircraft deliveries during the COVID-19 pandemic. As a result, Spirit expected to grow its fleet by 25% over the course of the next year and double its fleet size by the end of 2025.

## III.   JETBLUE'S TURBULENT PURSUIT OF SPIRIT

25.     JetBlue first considered buying Spirit as early as 2017 and again in 2019, but ultimately abandoned those plans. But after Spirit announced a merger agreement with Frontier in February 2022, JetBlue reinstated its plan. JetBlue had previously informed its Board of Directors that a Frontier-Spirit merger would "limit any potential major inorganic growth opportunity," i.e., consolidation via merger, for JetBlue. And JetBlue had made it clear that it

also feared another airline merging with Spirit because that would leave JetBlue a "smaller and less relevant player in the industry." As a result, on April 5, 2022, JetBlue made an unsolicited offer to acquire Spirit. JetBlue's bid to take over Spirit occurred against the backdrop of the Northeast Alliance, JetBlue's *de facto* merger in Boston and New York City with American Airlines, the largest airline in the United States.[1]

26.     In response to JetBlue's offer, Spirit's Board of Directors retained "top-tier aviation and economic consultants," who engaged for four weeks with "JetBlue and its advisors" to develop an "informed view" of the proposed transaction. Based on that assessment, Spirit's Board of Directors recognized the antitrust and regulatory risks of mergers in an already-consolidated airline industry, and recommended that Spirit shareholders vote to adopt the merger agreement with Frontier instead, concluding that "consummation of the proposed JetBlue combination, with the [Northeast Alliance] remaining in place, seemed almost inconceivable." "Even putting aside the Northeast Alliance," Spirit warned that JetBlue's stated plans to reconfigure Spirit's planes would "significantly diminish[] capacity" and "result in higher prices for consumers." Accordingly, "a court . . . will be very concerned that a JetBlue-Spirit combination will result in a higher-cost/higher fare airline that would eliminate a lower-cost/lower fare airline and remove about half of the [ultra-low-cost] capacity in the United States."

27.     JetBlue, for its part, was not ready to give up its plans to acquire Spirit, and so it launched a hostile takeover bid. On May 16, 2022, JetBlue announced a tender offer for $30 per share—a significant cash premium over Frontier's existing offer—and urged Spirit shareholders

---

[1] That transaction was the subject of an antitrust lawsuit filed in this Court by the Justice Department and seven state Attorneys General that alleged the Northeast Alliance is anticompetitive and violates Section 1 of the Sherman Act, 15 U.S.C. § 1. Complaint, *United States et al. v. American Airlines Grp. Inc., et al.*, 1:21-cv-11558 (D. Mass. Sept. 21, 2021). A decision is pending in that matter after a full trial on the merits.

to reject the proposed Frontier merger. Spirit characterized JetBlue's proposal as a "cynical attempt to disrupt Spirit's merger with Frontier, which JetBlue views as a competitive threat." Spirit later published a presentation, one slide of which is excerpted below, highlighting the harm to competition that would result from an acquisition by JetBlue.



28.     Over the next few months, JetBlue increased its hostile offer several more times in an effort to win over Spirit shareholders. JetBlue's campaign ultimately succeeded: Spirit and Frontier were forced to terminate their proposed merger after it became clear that the transaction did not have sufficient support from Spirit shareholders.

29.     On July 28, 2022, JetBlue and Spirit announced they had reached an agreement that JetBlue would acquire Spirit for $3.8 billion. In announcing the agreement, JetBlue explained that it planned to bring the "JetBlue Experience" to all aircraft. In other words, JetBlue plans to get rid of everything that made Spirit a unique competitor: it would remove between 20 and 28 seats from each Spirit airplane and replace Spirit's ultra-low-cost model with JetBlue's

own higher-cost business model. These efforts are more than a rebranding; should the acquisition be completed, travelers would face increased prices and fewer seats on the routes Spirit flies today.

## IV.  JETBLUE'S ACQUISITION OF SPIRIT WOULD HURT TRAVELERS

30.    Travelers—especially cost-conscious travelers—benefit today from Spirit's competition against JetBlue and other airlines. JetBlue's purchase of Spirit would hurt these travelers in at least three ways. First, it would eliminate vigorous head-to-head competition between JetBlue and Spirit that benefits cost-conscious travelers on hundreds of routes today. Second, because JetBlue plans to abandon Spirit's business model, the airline industry as a whole would lose the largest ultra-low-cost carrier and a competitor that has often gone its own way in an industry characterized by coordinated behavior. JetBlue's elimination of Spirit as an independent company would increase the risk that the remaining airlines—including JetBlue— would cooperate to raise prices or reduce capacity on particular routes where Spirit currently operates. Third, JetBlue's acquisition of Spirit would deprive cost-conscious customers of the option to choose Spirit and its low-priced, unbundled fares wherever Spirit flies today or wherever Spirit's growth plans would have it fly in the near future.

31.    Under controlling Supreme Court precedent interpreting the Clayton Act, JetBlue's acquisition is presumed to have anticompetitive effects on more than 150 routes, or markets, because it would significantly increase concentration and result in highly concentrated markets on these routes. *See United States v. Phila. Nat'l Bank*, 374 U.S. 321, 362–64 (1963); Fed. Trade Comm'n & U.S. Dep't of Justice Horizontal Merger Guidelines § 5.3 (2010) (hereinafter, the "Merger Guidelines"). The presumption of illegality arises because the acquisition would substantially increase JetBlue's market share on routes that already have

limited competition. The more than 150 routes where JetBlue's proposed acquisition of Spirit is presumptively anticompetitive include routes where both carriers offer nonstop service as well as routes where the two airlines offer connecting service. In total, more than 30 million passengers fly on these routes each year, accounting for more than $6 billion in annual revenue for all airlines. On some connecting routes between Florida and Puerto Rico, for example, JetBlue and Spirit are the only airlines offering significant service, such that a merger between them would eliminate virtually all competition on those routes.

32.    The harm would be most directly felt on the more than 40 nonstop routes where the acquisition is presumptively illegal. JetBlue and Spirit compete particularly closely on these routes for cost-conscious travelers paying their own way to visit family or take a vacation, among other reasons. These routes touch cities in the Northeast (for example, Boston, Hartford, and New York City), typical vacation destinations in Florida (for example, Fort Myers, Miami/Fort Lauderdale, Orlando, and Tampa), as well as Los Angeles and Las Vegas further west. In addition, many routes touch destinations in the Caribbean and Latin America where cost-conscious travelers rely on airlines as the only reasonable option to get them to their destination quickly and safely.

33.    A few examples help illustrate the intensity with which JetBlue and Spirit compete on these routes today. On the Boston-Miami/Fort Lauderdale route, which serves about 1.5 million passengers annually, JetBlue and Spirit together currently account for nearly 50% of the market. For service between Boston and San Juan, the two airlines account for nearly 90% of the passengers flying the route today. On some routes, such as between Miami/Fort Lauderdale and Aguadilla, Puerto Rico, JetBlue and Spirit are the only two carriers providing nonstop service. The elimination of competition from Spirit on these and other highly concentrated routes

makes the transaction presumptively illegal. Unless enjoined, the proposed merger of JetBlue and Spirit would result in higher fares and fewer options for travelers.

### A.   The Proposed Acquisition Eliminates Head-to-Head Competition Between JetBlue and Spirit and Would Harm Travelers

34.   Today, JetBlue and Spirit compete vigorously on hundreds of nonstop and connecting routes across the United States. This competition has led to lower fares, increased capacity, more fare options, and greater consumer choice. The merger of JetBlue and Spirit would end this head-to-head competition in at least two areas: (1) routes where both airlines currently compete, and (2) routes where Spirit has plans to start competing with JetBlue in the near future, and vice versa.

#### 1.   *JetBlue's Acquisition of Spirit Would Lead to Higher Fares*

35.   Today, competition between JetBlue and Spirit benefits travelers by reducing fares on routes where the two compete head-to-head. In fact, direct competition between the two airlines intensified in the last five years as Spirit increasingly expanded into markets where JetBlue already offered service. Ultimately, increased competition from Spirit led JetBlue's CEO to conclude that Spirit "now controls the ball" in Fort Lauderdale, where both airlines have a significant presence, and as a result, JetBlue had to ask if it had "the right cost structure to compete if this is the new normal." Moreover, JetBlue concluded that its fares, revenue, and profits had all declined in more than a dozen routes after Spirit started offering service.

36.   Shortly thereafter, JetBlue created a "Spirit Competitive Strategy" with the goal of developing an "integrated strategy to better compete with Spirit," which JetBlue's Head of Revenue and Planning viewed as "critical." This strategy led JetBlue to offer even lower fares—sometimes matched or pushed even lower by other airlines, including Spirit—to cost-conscious travelers. JetBlue ultimately matched many of Spirit's fares on several routes. JetBlue's decision

to compete vigorously with Spirit to win back travelers demonstrates the power and value of competition.

37.    JetBlue frequently responds to competition from Spirit on routes touching Florida where the two airlines closely compete. In one monthly pricing review, JetBlue observed that many of Spirit's "fares remain[ed] below established floors" and that Spirit's growth in Florida was causing JetBlue leisure "headwinds." In another instance, JetBlue observed that Spirit fares were "undercutting [JetBlue] substantially" for flights from Fort Lauderdale to San Jose, Costa Rica. And when Spirit added flights on the Hartford-Orlando route, JetBlue was forced to "lower fares across the board" in order to stay competitive.

38.    JetBlue has recognized that when Spirit has left routes, fares have gone up— which is exactly what would happen if this acquisition proceeds. For example, in 2020, when Spirit stopped flying between Boston and Fort Myers, JetBlue increased its fares. As one JetBlue manager explained, "I don't think we should be selling the [Spirit] fare if [Spirit] is not serving the market." JetBlue's Director of Revenue Management at the time agreed. And in 2022, JetBlue concluded that when Spirit exits a route, fares increase by 30% on average.

39.    Spirit similarly views JetBlue as a close competitor. In 2019, after JetBlue initiated a sale across hundreds of routes in its network, Spirit responded by lowering its fares for multiple routes where the two carriers competed head-to-head. In another instance, when JetBlue started offering discounted sale fares in August 2019, Spirit responded by matching JetBlue's fares for vacationers on 30 domestic routes where the two airlines competed directly. When Spirit was planning to start service on the Orlando-Ponce route in February 2022, the airline initially contemplated offering $99 fares but lowered its initial fares to $79 due to competition from JetBlue.

      2.     *The Proposed Acquisition Would Likely Lead to Less Innovation and Fewer Choices for Travelers*

40.     Spirit's strategy of focusing on cost-conscious travelers has prompted other airlines to follow suit by introducing their own fare options to better compete. For example, in response to increased competition from Spirit and its use of unbundled fares, the three largest airlines in the country—Delta, United, and American Airlines—introduced their "basic economy" fares in 2012, 2016, and 2017 respectively, which offered customers more choice and control over how they spent their money. As Delta's Executive Vice President and Chief Revenue Officer put it in 2015, this new fare type was Delta's "Spirit match fare." Likewise, American Airlines' Senior Vice President of Revenue Management explained at the time that American Airlines would "continue to match [ULCC] pricing with our Basic product." Although the features of basic economy fares vary by carrier, each is designed to provide a fare option that directly competes with Spirit's successful unbundled fare. The broader adoption of Spirit's innovations by the largest airlines benefited cost-conscious travelers, but helped flyers more generally as well.

41.     Spirit's innovations in how to structure fares influenced JetBlue, too. In September 2018, JetBlue announced plans to start offering its own unbundled fare as part of its "Fare Options 2.0" initiative to better compete against Spirit. At the time, JetBlue's existing fare options—Blue, Blue Plus, and Blue Flex—all included some bundled attributes, including free carry-on bags and the ability to choose a seat ahead of time. The new unbundled "Blue Basic" fare gave customers greater choices for which features they wanted to pay JetBlue. This allowed JetBlue to compete more effectively with Spirit for "[h]ighly price-conscious travelers … [who had shown] they [were] willing to give up some of the experience for the lowest fares possible." As JetBlue's Vice President of Sales and Revenue Management at the time concluded: "Spirit's

key weapon is its very low costs and the very low fares they enable. Customers most interested in the absolute lowest fare may find their offer compelling. Fare Options 2.0 will be incredibly valuable in these markets . . . allow[ing] us to offer a lower priced Basic Economy-like option."

42.    Spirit's unbundled fares brought increased consumer choice to the routes Spirit serves. Consumers who prefer a bundled fare option can still seek that out from JetBlue or one of the Big Four. But for consumers who are looking for the lowest fare and more control over how they spend their money, Spirit not only provided that option itself, but also induced other carriers to offer their own similarly unbundled fares. This acquisition, however, would eliminate any chance of future innovations from Spirit—and any need for remaining airlines to respond to those innovations.

43.    JetBlue's acquisition of Spirit would also reduce other aspects of customer choice. Both airlines compete on service, for example, including on-time performance and cancelation rates. Other differences in the policies and offerings of each airline may be more difficult to quantify, yet are nevertheless valued by passengers. These include, for example, frequent flyer programs or similar memberships, like Spirit's unique Saver$ Club; aircraft cleanliness or crew friendliness; in-flight snack options; and pet policies. Today, travelers on routes that both JetBlue and Spirit serve are empowered to compare the two airlines across all these offerings and choose the one that best suits their travel needs. This transaction would deprive travelers of that choice.

**B.    JetBlue's Proposed Acquisition of Spirit Heightens the Risk That Remaining Airlines Would Coordinate To Raise Prices**

44.    Companies have the incentive to maximize their profits. Competitive markets force companies to reduce price or improve products to offer customers better deals than their rivals. Sometimes, however, markets don't work that way—instead of competing fiercely, companies find ways to accommodate their mutual desires for higher profits and take steps to

19

soften competition with each other. This softening of competition—which antitrust law refers to as coordination or coordinated behavior—can come about through formal agreements, implied understandings, or parallel accommodating conduct. Regardless of how it is accomplished, this softening of competition comes at a cost to consumers, who face higher prices or reduced output. That is why the Clayton Act prohibits mergers that increase the risk of such coordinated effects and substantially lessen competition.

45.     The airline industry is vulnerable to coordination. JetBlue has demonstrated a willingness to engage in such coordinated behavior while Spirit has a demonstrated track record of bucking industry trends in order to lower prices and give consumers more choice. JetBlue's proposed acquisition of Spirit would further increase the risk of coordinated behavior by eliminating Spirit's aggressive, disruptive business model from the marketplace and by placing all of Spirit's planes and crews under JetBlue's control. The risk of that coordination also heightens the harmful effects flowing from JetBlue's Northeast Alliance with American Airlines. More generally, removing Spirit as an independent check on JetBlue and other airlines would increase the threat of harmful, coordinated behavior on all routes where Spirit would otherwise operate as an independent competitor.

### 1.     *The Airline Industry Is Vulnerable to Coordination*

46.     Present conditions in the airline industry are ripe for coordinated behavior. Airlines publicly file their fares through the airline-owned Airline Tariff Publishing Company ("ATPCO"), which provides all airlines with detailed, real-time access to other airlines' published fares. Indeed, airlines have a history of using ATPCO to engage in coordinated behavior—conduct that was the subject of a Department of Justice enforcement action and court-ordered injunction in 1992. In addition, airlines utilize data-scraping tools to easily track the

prices and schedules that their competitors offer on their individual websites. Because on most routes there are only a handful of significant competitors, it is easy for airlines to send signals to each other. Many airlines also overlap on multiple routes, which provides opportunities for them to use fare increases or discounts on one route to influence or discipline a rival's behaviors on another route, all in a coordinated pursuit of higher fares. Because the Big Four and JetBlue earn most of their profits from routes to and from certain airports where they have high shares of traffic—including their hubs and focus cities—the airlines have strong incentives to protect high prices on those routes.

47.     These features help make it all the easier to play "follow the leader" in the airline industry, particularly with respect to fare increases. For example, when one airline initiates a price increase, other airlines can often see it immediately and consider following with price increases of their own. The initiating airline will often then check to see if the other airlines matched the increase. If so, the initiating airline is likely to maintain its price increase. If the other airlines did not match the increase, the initiating airline may withdraw the increase shortly thereafter.

48.     JetBlue has already demonstrated a willingness to participate in this follow-the-leader behavior. In May 2020—in the midst of a collapse in demand for air travel as a result of the pandemic—JetBlue proposed a $10 systemwide fare increase. Senior managers approved the plan, but cautioned that it was important to see if competitors followed JetBlue's lead. As JetBlue's Director of Revenue Management put it, he was "eager to see [the] industry response." United matched this increase in all JetBlue markets, and Delta and American Airlines matched the increase in all markets where JetBlue provided nonstop service. Spirit, by contrast, did not match the increase. Similarly, JetBlue has shown a willingness to follow price increases initiated

by legacy airlines: in April of 2022, after Delta increased certain fares by $10 systemwide, JetBlue joined Southwest and American Airlines in following the increase.

49.     JetBlue and other airlines similarly use ATPCO to communicate about pricing intentions. For example, in February 2020, JetBlue received a notification through ATPCO that Delta filed a fare that matched a similar fare JetBlue was offering on the Boston-Philadelphia route, but that Delta's fare was $5 higher. JetBlue responded by raising its fares to match Delta, except for the times of day when a ULCC provided service. In another instance, in February 2020, JetBlue noticed Southwest was offering a lower-priced 14-day advance purchase fare than JetBlue on the route between Boston and Baltimore. To address the issue, JetBlue filed, and then quickly canceled, a fare in ATPCO with the intention of alerting Southwest to the discrepancy in the two airlines' fares. Airlines refer to this type of fare filing activity as "flashing." Both of these are examples of how rivals do not have to communicate directly about pricing to encourage each other to raise fares. They can—and do—coordinate through indirect but equally effective means, which benefits the airlines but harms consumers.

50.     JetBlue and the Big Four also use what are called "cross-market initiatives" to deter aggressive discounting and prevent fare wars. A cross-market initiative can occur where two or more airlines compete against each other on multiple routes. If an airline discounts its fares on one route, an affected competitor often retaliates by offering discounts on another route where the first airline prefers a higher fare. Airlines are most vulnerable to cross-market initiatives involving routes where they are usually the most profitable and popular option: nonstop flights from their hubs and focus cities.

51.     Cross-market initiatives often cause an airline to withdraw fare discounts. For example, in March 2019, American Airlines filed a low fare on the Boston-Los Angeles route,

which prompted JetBlue to respond by filing low fares on several other profitable routes also served by American Airlines. After American Airlines canceled its low fare on the Boston-Los Angeles route, JetBlue followed suit and scrapped its low fares on the other routes served by American Airlines. Neither airline had to directly communicate to jointly force travelers to pay higher fares.

### 2.    An Independent Spirit Is Less Likely To Coordinate with Other Airlines

52.     While many airlines, including JetBlue, regularly engage in this cozy oligopoly behavior, Spirit acts very differently because its unique network, cost, and pricing structure incentivize it to do so. Spirit does not rely as heavily on routes that connect through hubs or focus cities as JetBlue or the Big Four; it has lower costs than those airlines, and its overall fare structure is lower. Thus, Spirit is less incentivized to follow price increases because it is less vulnerable to discipline through ATPCO or cross-market initiatives. Spirit itself recognizes as much. Even though it knows that the other airlines coordinate, it also believes it has "no obligation" to "follow the herd" when it comes to such actions. A Spirit pricing executive acknowledged that when other airlines attempt to initiate price increases, Spirit generally doesn't follow along.

53.     Spirit's presence in a market today can disrupt coordinated behavior initiated by other airlines. Spirit does not typically match JetBlue's price increases, nor does it often use ATPCO to lead fare increases. As one JetBlue analyst observed, Spirit's strategy instead appeared to be to "always have at least one price point lower than the lowest structured fare" offered by competing airlines on a particular route. In other cases, Spirit has observed bigger airlines trying to lead systemwide price increases and—rather than following along—has done "its own thing." Spirit's independence limits how successfully JetBlue and the Big Four can

coordinate to maintain higher fares. The elimination of Spirit as an independent airline removes this important competitive restraint on the remaining airlines.

> 3.  *JetBlue Would Likely Coordinate Even More Often and Effectively After It Acquires Spirit, Especially with American Airlines*

54.     As JetBlue grows into a more sizable airline that behaves more like the Big Four, it has fewer reasons to continue to compete aggressively with them. If JetBlue acquires Spirit, it would have more incentives to coordinate with other airlines on price increases and capacity reductions. For example, JetBlue would be exposed to reactions, including retribution, from other carriers on significantly more flights than it is today. JetBlue would also depend more heavily than ever on some of its focus cities, particularly Fort Lauderdale and Orlando, where its presence would start to rival the bigger airlines' hubs. As a result, like the Big Four, JetBlue would have more to lose from fare wars on routes from its most important airports that it would be incentivized to defend from cross-market initiatives. Taken together, the changes that would follow the proposed acquisition would make JetBlue even more incentivized to coordinate with other airlines than it is today.

55.     JetBlue has already committed itself to American Airlines, the largest airline in the United States, through the Northeast Alliance. The loss of Spirit's disruptive effect is particularly likely to be felt on routes that JetBlue flies with American Airlines pursuant to the Northeast Alliance. Both JetBlue and American Airlines admit that, on these routes—which account for 75 percent of JetBlue's total capacity—they coordinate and do not compete. By folding Spirit into the Northeast Alliance, this proposed acquisition would essentially merge the operations of the three airlines in the northeastern United States, eliminate yet another airline competitor in the span of just a few years, and magnify the anticompetitive effects of the Northeast Alliance.

56.     The acquisition also would reduce competition on routes outside the scope of the Northeast Alliance where Spirit and American Airlines both offer nonstop service today. Because so much of its business is tied up in the Northeast Alliance, JetBlue is less likely than Spirit to compete aggressively with American Airlines going forward. The acquisition would give JetBlue even greater incentives to "pull its punches" on those routes in the future, particularly routes to the Caribbean and Latin America, which both JetBlue and American Airlines currently serve using their major operations in Fort Lauderdale and Miami. Spirit uses its own operations in Fort Lauderdale to offer travelers a third option that avoids the alliances and allegiances of JetBlue and American Airlines. That option would disappear if this acquisition is completed.

### C.     The Elimination of Spirit's Business Model Would Harm Cost-Conscious Customers in Particular

57.     It is not surprising that JetBlue and Spirit compete vigorously: both airlines target and serve especially cost-conscious travelers who value lower prices over additional amenities. These customers would be particularly harmed by JetBlue's plan to remove seats from Spirit aircraft and to eliminate Spirit's low cost, low fare business model.

58.     Spirit's "core value proposition" is serving cost-conscious customers on travel that they have to pay for themselves. Whether it's a vacation to see friends or being able to be at a loved one's side during illness, these customers want "good direct service at the absolute lowest fare as they are paying for the ticket themselves." Spirit has found that it primarily serves cost-conscious passengers who "make their purchase decision based largely on price." Unlike other airlines that serve a wider mix of travelers with different preferences and price sensitivities, Spirit overwhelmingly fills its planes with cost-conscious flyers looking to get to their destinations as economically as possible. For this reason, the "Spirit Effect," which tends to

lower prices for travelers across all airlines when Spirit enters a new market, is particularly beneficial to travelers purchasing the lowest fares who can now afford to travel when they could not before.

59.     These same cost-conscious customers, however, would face increased prices and reduced travel options as a result of the lost competition between JetBlue and Spirit. Some of these customers would no longer be able to afford their airline tickets and would forgo using air travel for that trip altogether. Other travelers who may have a slightly higher ability and willingness to pay for a trip may still travel, but they would have to pay more, and they would lose an option that millions of Americans have chosen to meet their travel needs.

60.     Harm to these cost-conscious travelers would also occur on routes where Spirit competes against other carriers and JetBlue is absent today. JetBlue has been consistent about its plans for the combined company; it plans to retrofit existing Spirit aircraft to match JetBlue configurations, thereby eliminating 10 to 15% of the capacity—approximately 20 to 28 seats— from each plane. Further, in justifying the deal internally and to the company's lenders, JetBlue predicted that it would reap 24% more revenues per seat than Spirit earns today, on the assumption that "customers see value of [the] better product and experience[,] and are glad to adjust." Left unsaid is that if they want to keep flying, the customers who previously preferred Spirit's lower-priced, no-frills service would have little choice but to "adjust" to these higher prices. It is these flyers who pay their own way who are particularly vulnerable if forced to "adjust" to JetBlue's new higher prices; some would no longer be able to afford to travel at all.

## V.     RELEVANT MARKETS FOR ANALYZING JETBLUE'S PROPOSED ACQUISITION OF SPIRIT

61.     Courts define relevant product and geographic markets to help determine which lines of commerce and which areas of the country may be harmed by a merger. In this case,

scheduled air passenger service is a relevant product market and there are hundreds of relevant geographic markets in the form of origin-and-destination pairs.

### A.     Scheduled Air Passenger Service Is a Relevant Product Market

62.     Scheduled air passenger service for all passengers is a relevant product market in which to assess the effects of JetBlue's proposed acquisition of Spirit. Air travel enables travelers to move quickly and efficiently between locations, offering passengers significant time savings and convenience over other potential forms of travel. For example, a flight between New York and Miami takes just over three hours. Driving between the two cities would take approximately 19 hours, and a train trip would take at least 27 hours. For trips with an origin or destination outside the continental United States, scheduled air passenger service is often the only practical form of travel available to most travelers.

63.     Given the time savings and convenience of flying, not enough passengers would substitute other modes of transportation (e.g., car, bus, train, or ship) to defeat a small but significant fare increase. Relative to these other modes of transportation, air travel is widely recognized to feature distinct facilities, competitors, customers, and prices. Scheduled air passenger service, therefore, constitutes a line of commerce and a relevant product market within the meaning of Section 7 of the Clayton Act.

64.     Within this relevant product market, preferences among travelers may differ. For example, some passengers prefer to purchase an unbundled fare versus a more expensive bundled fare option; some passengers strongly prefer nonstop over connecting service because it saves travel time; and some passengers prefer buying tickets far in advance rather than waiting until the last minute. Airlines are aware of these different preferences and use a variety of fare restrictions and rules to raise fares on some of these passengers without necessarily raising fares

for others. For example, airlines typically use advance purchase requirements—typically 21, 14, 7, or 3 days—in order to charge more for tickets as the departure date for a flight approaches. Thus, the competitive effects of JetBlue's acquisition of Spirit may vary somewhat among passengers depending on their particular preferences.

### B.    Origin-and-Destination Pairs Are Relevant Geographic Markets

65.    Origin-and-destination pairs are the appropriate geographic markets for evaluating the competitive effects of JetBlue's proposed acquisition of Spirit. Most travelers book flights with their origins and destinations predetermined. Few travelers who wish to fly from one destination to another would switch to flights between other destinations in response to a small but significant and non-transitory fare increase.

66.    Travelers seek to depart from airports close to where they live and work, and arrive at airports close to their intended destinations. Accordingly, an origin or destination is no broader than all airports in a metropolitan area. For example, many passengers traveling to and from Boston do not consider airports outside of Boston to be reasonable alternatives to Boston Logan International Airport. Not enough passengers who wish to fly to and from Boston would switch to flying to and from other airports to defeat a small but significant and non-transitory price increase by a hypothetical monopolist of service at Boston Logan.

67.    In metropolitan areas with multiple airports, some travelers may prefer one airport over another due to the difference in ground transportation times. Depending on the city, however, travelers—particularly those who are cost-conscious—may consider all airports in a metropolitan area in making their travel plans. In setting prices for service on some origin-and-destination pairs, airlines often consider competing service offered to all airports in a metropolitan area.

68.     Within any geographic market, narrower markets may exist which themselves constitute relevant antitrust markets, and it may be appropriate to consider such narrower markets instead of or in addition to the broader market. The purpose of defining a relevant market is to focus the analysis on what competition may be lost by a proposed transaction. Thus, the geographic markets that are most informative for analyzing competitive effects may differ when considering a merger between airlines that compete more closely for, e.g., corporate travelers than when considering a merger between airlines that compete for more cost-conscious customers because cost-conscious customers may be more willing to travel to more distant airports to get a better deal.

69.     For purposes of evaluating likely competitive effects of JetBlue's acquisition of Spirit, on routes serving metropolitan areas with multiple airports, origins and destinations include all airports in a metropolitan area. For example, origin and destination pairs that involve travel to and from the Miami/Fort Lauderdale metropolitan area, which includes Miami International Airport ("MIA") and Fort Lauderdale-Hollywood International Airport ("FLL"), constitute relevant geographic markets. Most passengers traveling to and from the Miami/Fort Lauderdale metropolitan area will consider both airports, but not more distant airports, to be reasonable options. Not enough passengers wishing to fly to Miami/Fort Lauderdale would switch to flying to other airports to defeat a small but significant price increase by a hypothetical monopolist of service at both MIA and FLL.

70.     Although routes to a specific airport or set of airports within some metropolitan areas may also constitute well-defined narrower geographic markets, it is not necessary to consider them in this case because doing so would not change the conclusion that the effect of the acquisition may be to substantially lessen competition. Origin and destination pairs that

29

involve travel to and from the New York City metropolitan area, for example—which includes John F. Kennedy International Airport ("JFK"), LaGuardia International Airport ("LGA"), and Newark Liberty International Airport ("EWR")—constitute relevant geographic markets for analyzing this acquisition. Not enough passengers wishing to fly to and from the New York City metropolitan area would switch to using more distant airports to prevent a hypothetical monopolist of service on routes involving these three airports from raising prices by a small but significant and non-transitory amount. Many passengers traveling to and from JFK or LGA, however, do not view service to EWR as a reasonable substitute, and vice versa. Accordingly, origin-and-destination pairs that include only JFK/LGA or only EWR may also constitute smaller relevant geographic markets within the broader JFK/LGA/EWR market.

71.     In evaluating the potential anticompetitive effects of this proposed acquisition, there are three categories of relevant markets where the effect of the merger may be to substantially lessen competition. First, origin-and-destination pairs for scheduled air passenger service where both JetBlue and Spirit compete today constitute such relevant markets. Second, origin-and-destination pairs that JetBlue and Spirit would have both served consistent with their standalone growth plans constitute additional relevant markets. Third, origin-and-destination pairs that JetBlue does not serve but where Spirit currently offers nonstop service or planned to enter with nonstop service as an independent competitor also constitute relevant markets.

72.     Each relevant market described in the preceding paragraph satisfies the hypothetical monopolist test, as defined in the Merger Guidelines and constitutes a line of commerce as that term is used in Section 7 of the Clayton Act, 15 U.S.C. § 18. A hypothetical monopolist of air passenger service in each of the origin-and-destination pairs would likely increase prices on that route by at least a small but significant and non-transitory amount, and

therefore each of the relevant markets satisfies the hypothetical monopolist test as defined in the Merger Guidelines.

## VI.   NOTHING REBUTS THE PRESUMPTION OF ANTICOMPETITIVE EFFECTS

### A.   New Entry or Expansion by Existing Competitors Would Not Prevent Harm to Travelers

73.    New entry or expansion by existing airlines into the relevant markets is unlikely to be timely or sufficient in magnitude, scope, or character to fully offset or even deter the proposed acquisition's anticompetitive effects. New entrants into airline markets face significant barriers, including: difficulty in obtaining access to airport facilities or landing rights, particularly at congested airports; existing loyalty to particular airlines; and the risk of aggressive responses to new entry by a dominant incumbent. In addition, current industry-wide constraints on aircraft and pilots make new entry or expansion even more difficult. Finally, because other airlines in the industry—including the Big Four, JetBlue, Alaska, and other ULCCs—each have different combinations of capabilities and profit incentives from Spirit, they are unlikely to replicate the intensity of the competition that would be lost as a result of this acquisition.

### B.   Purported Efficiencies Are Speculative and Anticompetitive

74.    JetBlue contends that its acquisition of Spirit would yield synergies that would enable the airline to better compete against the legacy carriers going forward. Setting aside that JetBlue has already committed itself to American Airlines, the largest of the legacy carriers, many of these purported synergies reflect the fundamental harm of this acquisition. For example, JetBlue forecasts additional revenue the airline would realize by removing Spirit's planes and associated low fares from markets that Spirit serves today and replacing them with JetBlue planes and higher fares. One JetBlue executive acknowledged that this purported synergy comes from charging passengers higher prices for a smaller number of available seats. Similarly,

JetBlue anticipates being able to garner additional revenue as a result of increasing its "relevance" in certain airports—that is, its share of all traffic at the airport—and being able to charge a "premium" for its fares over similar fares offered by competitors with lower share. Neither purported "synergy" would benefit the cost-conscious travelers most likely to be hurt as a result of this deal—instead, JetBlue's so-called "synergies" merely reflect the increased power JetBlue predicts it would have to raise prices and reduce output.

75.     Moreover, JetBlue's acquisition of Spirit would not result in *any* net cost efficiencies that improve the cost-structure of the merged firm; JetBlue currently projects approximately $400M in *increased* costs as a result of the merger, largely resulting from the expense of removing seats from Spirit planes to convert them to a JetBlue configuration.

76.     Defendants have not yet described any procompetitive efficiencies in the alleged relevant markets. Despite announcing the proposed acquisition in July 2022, JetBlue still has not created a network plan for the combined company that would allow an analysis of any purported benefits to travelers. JetBlue points to the increased revenue the combined airline is projected to earn as a result of the acquisition, but after nearly eight months, JetBlue has not provided a meaningful analysis of any cognizable, merger-specific potential benefits to travelers. Regardless, any cognizable, transaction-specific efficiencies in each of the more than 500 relevant markets will not outweigh the significant competitive harm expected in each of those relevant markets that would result from eliminating Spirit as an independent competitor.

## VII.   JETBLUE'S PROPOSED DIVESTITURES ARE HYPOTHETICAL AND WOULD NOT REMEDY THE ANTICOMPETITIVE HARMS FROM THIS TRANSACTION

77.     Any antitrust remedy must immediately, durably, and completely preserve the intensity of competition that exists today between JetBlue and Spirit. Efforts to remedy an

anticompetitive merger through partial divestitures of assets are not likely to be effective because they create unacceptable risks of diluting the intensity of competition—they risk creating companies with less incentive, ability, or resources than the original owner to use the divested assets in competition to benefit the travelers affected by the merger. Remedies—including divestitures—must preserve *all* competition in *all* relevant markets threatened by JetBlue's acquisition of Spirit. Defendants bear the heavy burden of establishing any remedy they propose meets these exacting standards, especially given the substantial threat to competition posed by JetBlue's acquisition of Spirit.

78.     On August 12, 2022, JetBlue and Spirit filed the pre-merger notification and report form with the U.S. Department of Justice and the Federal Trade Commission pursuant to the Hart-Scott-Rodino Antitrust Improvements Act. The transaction notified to the agencies contemplates an agreement and plan of merger between JetBlue and Spirit. It does not identify with specificity any divestitures or other structural changes to JetBlue's or Spirit's assets as a result of the merger.

79.     Essentially conceding the facially anticompetitive nature of this acquisition, and in an effort to secure regulatory approval, JetBlue has indicated it plans to divest Spirit gates, takeoff and landing rights, and some related ground facilities at four airports: (1) Boston Logan, (2) Newark Liberty, (3) LaGuardia, and (4) Fort Lauderdale-Hollywood International Airport. In other words, JetBlue and Spirit claim they would replace the significant lost competition in hundreds of markets across the country, the Caribbean, and Latin America where Defendants compete today through a plan to divest a total of 15 gates, related operating rights, and ground facilities at a handful of airports. The Defendants have not finalized their proposed divestitures

nor identified how those divestitures would likely fully restore the competition lost as a result of this acquisition.

## VIII.   JURISDICTION AND VENUE

80.     The United States brings this action under Section 15 of the Clayton Act, as amended, 15 U.S.C § 25, to prevent and restrain Defendants from violating Section 7 of the Clayton Act, 15 U.S.C. § 18. The Commonwealth of Massachusetts, the District of Columbia, the State of California, the State of Maryland, the State of New Jersey, the State of New York, and the State of North Carolina bring this action under Section 16 of the Clayton Act, 15 U.S.C. § 26, as *parens patriae* on behalf of and to protect their general economies and the health and welfare of their residents and to prevent and restrain the violation by Defendants of Section 7 of the Clayton Act, 15 U.S.C. § 18. This Court has subject matter jurisdiction over this action under Section 15 of the Clayton Act, 15 U.S.C § 25, and 28 U.S.C. §§ 1331, 1337(a), and 1345.

81.     Defendants are engaged in interstate commerce and in activities substantially affecting interstate commerce. JetBlue and Spirit each annually transport millions of passengers across state lines throughout the United States, which generates billions of dollars in annual revenue for both companies.

82.     Venue is proper under Section 12 of the Clayton Act, 15 U.S.C § 22. This Court also has personal jurisdiction over each Defendant. JetBlue is a Delaware corporation with its headquarters in Long Island City, New York, and is found and transacts business in this judicial district. Spirit is a Delaware corporation with its headquarters in Miramar, Florida, and is found and transacts business in this judicial district. Both Defendants agreed to personal jurisdiction for this action in this federal judicial district.

## IX.  VIOLATION ALLEGED

83.  The United States and Plaintiff States hereby incorporate the allegations set forth in paragraphs 1 through 82 above as if set forth fully herein.

84.  Unless enjoined, the proposed acquisition of Spirit by JetBlue may substantially lessen competition in the relevant markets in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.

85.  Among other things, JetBlue's acquisition of Spirit would:

(i)  eliminate current and future head-to-head competition between JetBlue and Spirit;

(ii) lead to higher ticket prices and reduced passenger capacity;

(iii) result in less consumer choice; and

(iv) facilitate increased coordination among JetBlue and its remaining competitors.

## X.  RELIEF

86.  The United States and Plaintiff States request that:

(i)  JetBlue's acquisition of Spirit be adjudged to violate Section 7 of the Clayton Act, 15 U.S.C. § 18;

(ii) Defendants be permanently enjoined and restrained from carrying out this acquisition, or any other transaction in any form that would combine JetBlue and Spirit;

(iii) the United States and Plaintiff States be awarded costs of this action; and

(iv) the United States and Plaintiff States be awarded such other relief as the Court may deem just and proper.

Dated: March 31, 2023

Respectfully submitted,

**FOR PLAINTIFF UNITED STATES OF AMERICA:**


  /s/ Doha Mekki
DOHA MEKKI
Principal Deputy Assistant Attorney
General for Antitrust

  /s/ Michael B. Kades
MICHAEL B. KADES
Deputy Assistant Attorney General for
Antitrust

  /s/ Hetal J. Doshi
HETAL J. DOSHI
Deputy Assistant Attorney General for
Antitrust

  /s/ Ryan Danks
RYAN DANKS
Director of Civil Enforcement

  /s/ Robert A. Lepore
ROBERT A. LEPORE
Chief
Transportation, Energy & Agriculture
Section

  /s/ Patricia C. Corcoran
PATRICIA C. CORCORAN
Assistant Chief
Transportation, Energy & Agriculture
Section

  /s/ Katherine Celeste Speegle
KATHERINE CELESTE SPEEGLE
Assistant Chief
Transportation, Energy & Agriculture
Section

  /s/ Edward W. Duffy
EDWARD W. DUFFY*
  Senior Trial Counsel

ARIANNA MARKEL
MELVIN A. SCHWARZ
AARON M. TEITELBAUM
  Senior Litigation Counsel

DON P. AMLIN
MAISIE A. BALDWIN
MICHAEL D. BATTAGLIA
GRANT A. BERMANN
JOHN M. BRIGGS
MICHAEL B. DERITA
JOHN J. DIMARCO
MICHELLE LIVINGSTON
DANIEL A. LOEVINSOHN
JAMES L. MOORE III
STEPHANIE E. PEARL
SARAH V. RIBLET
BRENDAN SEPULVEDA
JOHN R. THORNBURGH II
GARRETT WINDLE
  Trial Attorneys

United States Department of Justice
Antitrust Division
450 Fifth Street, NW, Suite 8000
Washington, DC 20530
Telephone:  (202) 812-4723
Facsimile:  (202) 307-5802
Email:  edward.duffy@usdoj.gov

*Attorneys for Plaintiff United States of America*

*Attorney of Record

**FOR PLANTIFF COMMONWEALTH OF MASSACHUSETTS:**

ANDREA JOY CAMPBELL
Attorney General

 */s/* William T. Matlack
WILLIAM T. MATLACK (MA BBO No. 552109)
Assistant Attorney General, Chief, Antitrust Division
DANIEL H. LEFF (MA BBO No. 689302)
Assistant Attorney General

Office of the Attorney General
One Ashburton Place, 18th Floor
Boston, MA 02108
Tel: (617) 727-2200
Email: William.Matlack@mass.gov
Email: Daniel.Leff@mass.gov

*Attorneys for Plaintiff Commonwealth of Massachusetts*
*and Local Counsel for the District of Columbia, the State of California, the State of Maryland,*
*the State of New Jersey, the State of New York, and the State of North Carolina*

**FOR PLAINTIFF DISTRICT OF COLUMBIA:**

BRIAN L. SCHWALB
Attorney General for the District of Columbia

JENNIFER C. JONES (DC Bar No. 1737225)
Deputy Attorney General
Public Advocacy Division

 */s/* Adam Gitlin
ADAM GITLIN (DC Bar No. 90004308)
Chief, Antitrust and Nonprofit Enforcement Section
C. WILLIAM MARGRABE (NJ Bar No. 221042017)
Assistant Attorney General

Office of the Attorney General
400 6th Street NW, Suite 10100
Washington, D.C.  20001
Telephone: (202) 727-6294
adam.gitlin@dc.gov
will.margrabe@dc.gov

*Attorneys for Plaintiff District of Columbia*

**FOR PLAINTIFF STATE OF CALIFORNIA:**

ROB BONTA
Attorney General

PAULA BLIZZARD
Senior Assistant Attorney General

NATALIE S. MANZO
Supervising Deputy Attorney General

KOMAL K. PATEL
WINSTON H. CHEN
Deputy Attorneys General

 */s/* Komal K. Patel
KOMAL K. PATEL (CA Bar No. 342765)

California Department of Justice
Office of the Attorney General
300 South Spring Street, Suite 1702
Los Angeles, CA 90013
Tel: (213) 269-6298
Email: Komal.Patel@doj.ca.gov

*Attorneys for Plaintiff State of California*

**FOR PLAINTIFF STATE OF MARYLAND:**

ANTHONY G. BROWN
Attorney General

 _/s/_ Schonette J. Walker_____
Schonette J. Walker (MD Bar No. 0512290008)
Assistant Attorney General
Chief, Antitrust Division

Gary Honick
Assistant Attorney General
Deputy Chief, Antitrust Division

Byron Warren
Assistant Attorney General
Maryland Office of the Attorney General
200 St. Paul Place, 19th Floor
Baltimore, MD 21202
410-576-6470
swalker@oag.state.md.us
ghonick@oag.state.md.us
bwarren@oag.state.md.us

*Attorneys for Plaintiff State of Maryland*

**FOR PLAINTIFF STATE OF NEW JERSEY:**

MATTHEW J. PLATKIN
Attorney General of New Jersey

 _/s/_ Bryan S. Sanchez
BRYAN S. SANCHEZ (NJ Bar No. 300462019)
Deputy Attorney General
ANA ATTA-ALLA (NJ Bar No. 246202017)
Deputy Attorney General

State of New Jersey
Office of the Attorney General
Division of Law
124 Halsey Street – 5th Floor
Newark, New Jersey 07102
Tel: (973) 648-6835
Bryan.Sanchez@law.njoag.gov
Ana.Atta-Alla@law.njoag.gov

_Attorneys for the Plaintiff State of New Jersey_

**FOR PLAINTIFF STATE OF NEW YORK:**

LETITIA JAMES
Attorney General of New York

 _/s/_ Elinor Hoffmann
ELINOR R. HOFFMANN (NY Bar Reg. No. 1350453)
Chief, Antitrust Bureau
CHRISTOPHER D'ANGELO
Chief Deputy Attorney General
Economic Justice Division
OLGA KOGAN
Assistant Attorney General
MORGAN J. FEDER
Assistant Attorney General

New York State Office of the Attorney General
28 Liberty Street, 20th Floor
New York, NY 10005
Phone: (212) 416-8269
Email: Elinor.Hoffmann@ag.ny.gov

_Attorneys for Plaintiff State of New York_

**FOR PLAINTIFF STATE OF NORTH CAROLINA:**

JOSHUA H. STEIN
Attorney General

JASMINE MCGHEE
Special Deputy Attorney General
Director, Public Protection Section

 */s/* Jessica V. Sutton
JESSICA V. SUTTON (NC Bar No. 41652)
Special Deputy Attorney General

North Carolina Department of Justice
Post Office Box 629
Raleigh, North Carolina 27602
Tel: 919-716-6000
E-mail: jsutton2@ncdoj.gov

*Attorneys for Plaintiff State of North Carolina*

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.


/s/ Edward W. Duffy
EDWARD W. DUFFY
Senior Trial Counsel


Dated:  March 31, 2023