# EXHIBIT C



Beatriz Mejia
T: +1 415 693 2145
mejiab@cooley.com


March 17, 2023


Southwest Airlines Co
c/o Corporation Service Company
211 E. 7th Street, Suite 620
Austin, TX 78701

**Re:**     ***United States v. JetBlue Airways Corp., et al.*, Case No. 1:23-cv-10511 (D. Mass.)**

To Whom It May Concern:

        We represent JetBlue Airways Corporation ("JetBlue") in the above referenced matter, which is the Department of Justice's ("DOJ") lawsuit to block the merger between JetBlue and Spirit Airlines, Inc.  Enclosed, please find (1) a subpoena for documents issued by JetBlue and (2) a copy of the DOJ's complaint.  The subpoena requests documents in response to the categories identified in the Schedule A attached to the subpoena.

        The DOJ filed this case on March 7, 2023, and the parties are in the process of negotiating a protective order.  The protective order will contain provisions that cover the production of documents and information by non-parties.  When producing documents in response to the subpoena, it is requested that you (1) stamp each page of each document with a consecutive production number and unique Bates prefix and (2) stamp each document with a confidentiality designation, should you deem one necessary, in compliance with the protective order once entered by the Court.

        It is also requested, that at the time of production in response to the subpoena, you provide a copy of the production to each party listed in the chart below.

| United States of America | Edward W. Duffy (edward.duffy@usdoj.gov)<br>Aaron M. Teitelbaum (aaron.teitelbaum@usdoj.gov)<br>United States Department of Justice<br>Antitrust Division<br>450 Fifth Street, NW, Suite 8000<br>Washington, DC 20530 |
|---|---|



March 17, 2023
Page Two

| Commonwealth of Massachusetts | William T. Matlack (william.matlack@mass.gov)<br>Daniel H. Leff (daniel.leff@mass.gov)<br>Office of the Attorney General<br>One Ashburton Place, 18th Floor<br>Boston, MA 02108 |
|---|---|
| District of Columbia | Adam Gitlin (adam.gitlin@dc.gov)<br>C. William Margrabe (will.margrabe@dc.gov)<br>Office of the Attorney General<br>400 6th Street, NW, Suite 10100<br>Washington, DC 20001 |
| State of New York | Elinor R. Hoffmann (elinor.hoffmann@ag.ny.gov)<br>Morgan J. Feder (morgan.feder@ag.ny.gov)<br>Olga Kogan (olga.kogan@ag.ny.gov)<br>New York State Office of the Attorney General<br>28 Liberty Street, 20th Floor<br>New York, NY 10005 |
| Spirit Airlines, Inc. | Andrew C. Finch (afinch@paulweiss.com)<br>Jay Cohen (jaycohen@paulweiss.com)<br>Kate Wald (kwald@paulweiss.com)<br>Paul, Weiss, Rifkind, Wharton & Garrison LLP<br>1285 Avenue of the Americas<br>New York, NY 10019-6064<br><br>Meredith Dearborn (mdearborn@paulweiss.com)<br>Paul, Weiss, Rifkind, Wharton & Garrison LLP<br>535 Mission Street, 24th Floor<br>San Francisco, CA 94105 |

Because we anticipate this matter will be fast-moving, please let us know as soon as possible when you are available to meet and confer with us regarding Schedule A, the protective order, and the timing and manner of production. Should you have any questions, please do not hesitate to contact me.

Sincerely

*/s/ Beatriz Mejia*

Beatriz Mejia

Enclosures

283071646

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT

for the

District of Massachusetts

| | |
|---|---|
| United States of America, et al. | ) |
| *Plaintiff* | ) |
| v. | ) Civil Action No.   1:23-cv-10511-WGY |
| JetBlue Airways Corporation and Spirit Airlines, Inc. | ) |
| *Defendant* | ) |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:  Southwest Airlines Co.
c/o Corporation Service Company, 211 E. 7th Street, Suite 620, Austin, TX 78701

*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: See attached Schedule.

| Place: 2601 Olive Street, 17th Floor<br>Dallas, TX 75201 | Date and Time:<br><br>03/31/2023 12:00 pm |
|---|---|

❑ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:   03/17/2023

| CLERK OF COURT | | |
|---|---|---|
| | OR | |
| _____ | | /s/ Beatriz Mejia |
| *Signature of Clerk or Deputy Clerk* | | *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*   JetBlue Airways Corporation , who issues or requests this subpoena, are:

Beatriz Mejia, Cooley LLP, 3 Embarcadero Ctr., 20th Fl., San Francisco, CA 94111, mejiab@cooley.com, 415-693-2145

### Notice to the person who issues or requests this subpoena

If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No.  1:23-cv-10511-WGY

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❑  I served the subpoena by delivering a copy to the named person as follows: _____

_____

_____ on *(date)* _____ ; or

❑  I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $     0.00     .

I declare under penalty of perjury that this information is true.

Date: _____                    _____
                                                         *Server's signature*

                                                         _____
                                                         *Printed name and title*

                                                         _____
                                                         *Server's address*

Additional information regarding attempted service, etc.:

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
    **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
    **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
        **(i)** is a party or a party's officer; or
        **(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2)** *For Other Discovery.* A subpoena may command:
    **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
    **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** *Command to Produce Materials or Permit Inspection.*
    **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
    **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
        **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
        **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** *Quashing or Modifying a Subpoena.*
    **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
        **(i)** fails to allow a reasonable time to comply;
        **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
        **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
        **(iv)** subjects a person to undue burden.
    **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
        **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

        **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
    **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
        **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
        **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
    **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
    **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
    **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
    **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** *Claiming Privilege or Protection.*
    **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
        **(i)** expressly make the claim; and
        **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
    **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

# SCHEDULE A

## INSTRUCTIONS

1.      Unless otherwise specified, the documents requested in this schedule are those documents in Your possession, custody, or control that were applicable, effective, prepared, written, sent, dated, or received at any time from January 1, 2013 to the date of compliance with the subpoena.

2.      This subpoena requires You to produce all information, documents, and things that are in Your possession, custody, or control; or are within the possession, custody, or control of Your officers, directors, employees, partners, corporate parent, subsidiaries, affiliates, agents, representatives, present or former contractors, consultants, investigators, or attorneys; or otherwise available to You, regardless of whether the information and documents are possessed directly by You or any of Your employees, agents, representatives, present or former contractors, consultants, investigators, or attorneys.

3.      If any documents are withheld from production based on a claim of privilege, provide a statement of the claim of privilege and all facts relied upon in support thereof, in the form of a log that includes each document's author(s), recipient(s), date, a description of each document, all custodians of the original and any copies, and the request(s) in this schedule to which the document is responsive.  Attachments to a document should be identified as such and entered separately on the log.  For each author, recipient, and custodian, state the person's full name, title, and employer or firm, and denote all attorneys with an asterisk.  The description of the subject matter shall include the number of pages of each document and describe the nature of each document in a manner that, though not revealing privileged information, provides sufficiently detailed information to enable JetBlue Airways Corporation ("JetBlue") to assess the applicability of the privilege claimed.  Submit all non-privileged portions of any responsive document

283103501

(including non-privileged or redacted attachments) for which a claim of privilege is asserted (except where the only non-privileged information has already been produced in response to this instruction), noting where redactions in the document have been made.

4.      To the extent there are no documents in Your possession, custody, or control which are responsive to a request herein, You shall state that fact in Your written response to such request(s).

5.      In the event that any document responsive to any of these requests is no longer in Your possession, custody, or control, identify the document and state when the document was last in Your possession, custody, or control and when and by whom the document was lost or destroyed and the circumstances under which the document was lost, destroyed, or otherwise left Your possession, custody, or control.

6.      Documents responsive to these requests should be produced in conformity with Federal Rules of Civil Procedure 34 and 45.  This means that:  (a) documents provided shall be complete and, unless privileged, unredacted and submitted as found in Your files.  The documents submitted shall be produced in the order in which they appear in Your files and shall not be shuffled or otherwise rearranged; and (b) electronic documents or data maintained by You in electronic form shall be produced in searchable electronic format, along with the accompanying metadata, including any hidden data or notes fields.  Prior to production, the form of production for hard copy documents and electronically stored information, including metadata fields, shall be agreed upon.

7.      These requests shall be deemed continuing.  If, after responding, You acquire additional responsive knowledge or information, JetBlue requests that You, pursuant to Federal

Rule of Civil Procedure 26(e), serve supplemental responses within a reasonable time after acquiring such additional knowledge or information.

8.      If You claim ambiguity in the requests, definitions, or instructions contained in this schedule, such claim shall not form the basis of a refusal to respond, but You may state the claimed ambiguity and Your interpretation of the relevant language in Your response.  Documents shall not be withheld on the grounds that they contain highly sensitive or confidential information. JetBlue intends to seek entry of a protective order that will apply to documents and information produced by non-parties.  Thus, Your production of documents can be designated in accordance with the terms of the protective order once entered by the Court.

## DEFINITIONS

1.      The definitions set forth herein have the broadest possible meaning under the Federal Rules of Civil Procedure.

2.      "Alaska Airlines-Virgin America Transaction" means Alaska Air Group's acquisition of Virgin America in April 2016 whereby Virgin America operated under its own name and brand until it was fully merged into Alaska Airlines in April 2018.

3.      "All" shall be construed as all, each, and any; "each" shall be construed as all, each, and any; and "any" shall be construed as all, each, and any.

4.      "American Airlines-US Airways Transaction" means the merger between AMR Corporation and U.S. Airways announced in February 2013.

5.      "Communication" means " means the transmittal of information (in the form of facts, ideas, inquiries, or otherwise).

6.      "Delta Airlines-Northwest Airlines Transaction" means the merger between Delta Airlines and Northwest Airlines announced in April 2008.

283103501

7.      The term "document" shall be synonymous in meaning and equal in scope to the usage of this term in Federal Rule of Civil Procedure 34(a) and Local Rule 26.5 of the Local Rules of the United States District Court for the District of Massachusetts, and shall mean any written, printed, typed, or other graphic matter of any kind or nature and all mechanical and electronic sound recordings or descriptions in Your possession and/or control or known by You to exist. Without limiting the generality of the foregoing, "document" includes emails, memoranda, correspondence, letters, designs, drawings, agreements, contracts, checks, notes, leases, pledges, accounts, ledgers, endorsements, notices, reports, analyses, worksheets, diaries, statistics, telegrams, telexes, telefaxes, minutes, proposals, studies, statements, bills, receipts, returns, summaries, pamphlets, books, notations of any sort of communications, bulletins, workings, alterations, modifications, changes and amendments of any kind, charts, graphs, videotapes, recordings and motion pictures, and all drafts of the foregoing, including the originals and all non-identical copies or drafts, whether different from the original by reasons of any notation made on such copies or otherwise.  Each draft or non-identical copy, by reasons of any markings, notations or differences, is a separate document within the meaning of this term.

8.      "DOJ" means the United States Department of Justice, including any employee of the United States Department of Justice.

9.      "DOT" means the United States Department of Transportation, including any employee of the United States Department of Transportation.

10.     "JetBlue" means JetBlue Airways Corporation.

11.     "Person" means any natural person, corporate entity, partnership, association, joint venture, government entity or agency, or trust; and any former or current officer, director, employee, agent, or other representative thereof.

4

12.     "Proposed Transaction" means JetBlue's proposed acquisition of Spirit Airlines, Inc. ("Spirit"), which resulted from JetBlue's tender offer for Spirit issued in April 2022, which Spirit accepted in July 2022.

13.     "Slot" means permission given for a planned operation to use the full range of airport infrastructure necessary to arrive or depart at a high-density airport (including but not limited to John F. Kennedy International Airport, LaGuardia Airport, Ronald Reagan Washington National Airport, Chicago O'Hare International Airport, Los Angeles International Airport, Newark Liberty International Airport, Hartsfield-Jackson Atlanta International Airport, George Bush Intercontinental Airport, and San Francisco International Airport) on a specific date and time.

14.     "Southwest Airlines-AirTran Airways Transaction" means Southwest Airlines' acquisition of AirTran Airways in May 2011 whereby AirTran operated under its own name and brand until it was fully merged into Southwest in 2012.

15.     "Spirit" means Spirit Airlines, Inc.

16.     "Strategic Plans" includes all plans, proposals, assessments, and analyses relating to Your strategies, goals, targets, growth, resources, or other aspects of Your business, including but not limited to any growth plans, business plans, revenue targets, or plans related to new routes, new gates, or new target airports.

17.     "United Airlines-Continental Airlines Transaction" means the merger of UAL Corporation and Continental Airlines announced in October 2010.

18.     "United States" means the 48 contiguous states, the District of Columbia, Alaska, Hawaii, and island territories (including Puerto Rico, U.S. Virgin Islands, Guam, Northern Mariana Islands, and American Samoa).

5

19.     "You," or "Your" means Southwest Airlines Co., and any officers, directors, employees, partners, corporate parent, subsidiaries, affiliates, predecessors, agents, representatives, present or former contractors, consultants, investigators and attorneys or anyone subject to the direction and control of, or acting on behalf of, Southwest Airlines Co., both past and present.

20.     The use of the singular form of any word includes the plural and vice versa.

21.     The past tense shall be construed to include the present tense, and vice versa, to make the discovery request inclusive rather than exclusive.

22.     The connectives "and" and "or" are to be construed both disjunctively and conjunctively in order to bring within the scope of these requests the broadest possible set of responses, including responses that might otherwise be construed to be outside the scope.

23.     The terms "regarding," "relating to," or "related to" in regard to a particular subject shall mean, without limitation, assessing, analyzing, constituting, containing, comprising, describing, discussing, embodying, reflecting, evidencing, identifying, mentioning, memorializing, stating, referring directly or indirectly to or in any way relevant to such subject.

## ITEMS SUBPOENAED

1.      All documents referencing competition in air passenger service to, from, or within the United States.

2.      All documents referencing competition with JetBlue.

3.      All documents referencing competition with Spirit.

4.      All documents referencing competition with AirTran, Allegiant Air, Avelo Airlines, Breeze Airways, Frontier Airlines, Go!, Midwest Airlines, Midwest Express, Silver Airways, or Sun Country Airlines.

6

5.      All Strategic Plans prepared by or for any of Your officer(s) or director(s) referencing air passenger service to, from, or within the United States.

6.      All documents referencing Your market share in air passenger service to, from, or within the United States.

7.      All documents referencing Your market power in air passenger service to, from, or within the United States.

8.      All documents referencing barriers to entry or expansion on any route, or for any geographic area, in air passenger service to, from, or within the United States.

9.      All documents referencing the Proposed Transaction.

10.     All documents referencing Your decision to implement or expand the use of basic economy fares.

11.     All documents referencing any competitive initiatives directed at or competitive responses to JetBlue, Spirit, AirTran, Allegiant Air, Avelo Airlines, Breeze Airways, Frontier Airlines, Go!, Midwest Airlines, Midwest Express, Silver Airways, or Sun Country Airlines.

12.     All documents relating to Your communications with any airline, airport authority, union, DOJ, DOT, any state Attorney General, any federal or state legislator, legislative staff member, or legislative committee, or any other federal, state or local regulatory body, concerning any of the following:

　　　　a.      JetBlue;

　　　　b.      Spirit;

　　　　c.      The Proposed Transaction;

　　　　d.      The Delta Airlines-Northwest Airlines Transaction;

　　　　e.      The United Airlines-Continental Airlines Transaction;

7

      f.      The Southwest Airlines-AirTran Airways Transaction;

      g.      The American Airlines-US Airways Transaction; or

      h.      The Alaska Airlines-Virgin America Transaction.

13.     All documents referencing the impact, if any, of the following transactions on competition for air passenger service or on fares, including any effects resulting from asset divestitures:

      a.      The Delta Airlines-Northwest Airlines Transaction;

      b.      The United Airlines-Continental Airlines Transaction;

      c.      The Southwest Airlines-AirTran Airways Transaction;

      d.      The American Airlines-US Airways Transaction; or

      e.      The Alaska Airlines-Virgin America Transaction.

14.     All documents relating to Your decision, if any, to initiate air passenger service, or to expand or withdraw such service, on any route to, from, or within the United States.

15.     All documents referencing Your Slot usage.

16.     All documents referencing levels of Slot utilization, including any decisions to under-utilize Slots in order to avoid losing Slots.

17.     Documents sufficient to show Your network plans for each IATA Scheduling Season showing where You intended to fly and how many seats You intended to fly on any route to, from, or within the United States.

18.     All documents relating to Your strategy for setting Your fares and the method or process You use to determine Your fares on any route to, from, or within the United States.

19.     Your audited financial reports showing balance sheets and profits and losses in the most disaggregated format You maintain.

8

20.     All data regarding revenue and costs for air passenger service to, from, or within the United States, in the most disaggregated format You maintain.

21.     All data reflecting any fares, ancillary fees, or other charges paid by passengers flying to, from, or within the United States, in the most disaggregated format You maintain.

22.     The organizational charts for any unit of Your business that has analyzed, considered, or discussed the impact of the Proposed Transaction on Your business.

23.     All documents referencing service quality of airlines that fly to, from, or within the United States.

24.     All data and documents pertaining to Your frequent flier or other loyalty program(s) and credit card offerings, including the proportion of passengers and revenue associated with members of these programs on flights flying to, from, or within the United States, in the most disaggregated format You maintain.

25.     From January 1, 2013 to present, a list of dates on which You started or stopped nonstop service on any route originating or terminating from any airport in the United States, including on a seasonal basis, and the associated daily flight frequencies on each direction of the route.

283103501

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA
450 Fifth Street NW, Suite 8000
Washington, DC 20530

COMMONWEALTH OF MASSACHUSETTS
One Ashburton Place, 18th Floor
Boston, MA 02108

DISTRICT OF COLUMBIA
400 Sixth Street NW, Tenth Floor
Washington, DC 20001

and

STATE OF NEW YORK
28 Liberty Street, 20th Floor
New York, NY 10005

                    *Plaintiffs*,
     v.

JETBLUE AIRWAYS CORPORATION
27-01 Queens Plaza North
Long Island City, NY 11101

and

SPIRIT AIRLINES, INC.
2800 Executive Way
Miramar, FL 33025

                    *Defendants*.

## <u>COMPLAINT</u>

JetBlue's proposed $3.8 billion acquisition of Spirit would eliminate the largest and

fastest-growing ultra-low-cost carrier in the United States. Spirit's ultra-low-cost business model

has increased competition and brought low fares to hundreds of routes across the country, making it possible for more Americans—particularly the most cost conscious—to travel. JetBlue competes hard against Spirit, and views it as a serious competitive threat. But instead of continuing that competition, JetBlue now proposes an acquisition that Spirit describes as "a high-cost, high-fare airline buying a low-cost, low-fare airline."

If the acquisition is approved, JetBlue plans to abandon Spirit's business model, remove seats from Spirit's planes, and charge Spirit's customers higher prices. JetBlue's plan would eliminate the unique competition that Spirit provides—and about half of all ultra-low-cost airline seats in the industry—and leave tens of millions of travelers to face higher fares and fewer options. Spirit itself put it simply: "A JetBlue acquisition of Spirit will have lasting negative impacts on consumers." This acquisition violates Section 7 of the Clayton Act and should be enjoined.

## I.    INTRODUCTION

1.      Spirit has brought a low-cost, no-frills option to air travel that has benefited millions of travelers. Spirit's low unbundled fares, which a senior JetBlue executive has characterized as Spirit's "key weapon," have enabled more consumers to fly, and to fly at a lower price, by providing the opportunity to purchase the products and services they truly value. Spirit unbundles certain features of flying—carry-on baggage, seat assignment, and in-flight snacks, for example—that airlines historically included in the price of a ticket. This approach helps keep fares low—Spirit has touted that its total prices, including charges for all unbundled services, are 30% less than those of other airlines in the United States.

2.      The rest of the industry—including JetBlue—has been forced to respond to Spirit's innovations and low prices. Spirit estimates that when it starts flying a route, average

fares fall by 17%; JetBlue estimates that when Spirit stops flying a route, average fares go up by 30%. Spirit's success—and other airlines' response to it—has led to the "Spirit Effect": when Spirit enters a new route, prices for consumers across all airlines tend to fall and demand for air travel goes up. For years, JetBlue has boasted of its own "JetBlue Effect" when it enters new markets, but JetBlue has recognized that its own fares and revenues on a route drop significantly when Spirit enters. Where JetBlue and Spirit compete, travelers win—customers enjoy the benefits of both the Spirit and JetBlue Effects, fares go down, and more Americans can afford trips they could not before.

3. Competition between JetBlue and Spirit benefits all types of travelers, but it is particularly important for cost-conscious travelers. As Spirit's CEO has explained, Spirit looks to serve "a particular segment of the traveling public. Those people who have been priced out or find their fares are too expensive to travel with any frequency." Travelers visiting family or taking a hard-earned vacation—whom airlines typically call "leisure" customers—tend to be cost conscious, for instance, because they are usually paying for their own trip, unlike most customers traveling for business, who frequently have their employer footing the bill. Some of these cost-conscious customers would forgo air travel altogether if fares get too expensive, and others would have to make significant changes to their travel plans if ticket prices increase. Many cost-conscious customers prefer to pay lower fares, even if it means they receive fewer amenities, so they can better afford to fly.

4. This acquisition would combine two especially close and fierce head-to-head competitors. JetBlue has recognized that competition from Spirit lowers its fares more than competition from other ultra-low-cost carriers. On dozens of routes serving tens of millions of

passengers each year, JetBlue and Spirit are two of the most significant rivals today, and they have such large combined market shares that the transaction is presumptively illegal.

5.     JetBlue's acquisition would also dampen competition with other airlines. Airlines do not always compete as aggressively as they could. Sometimes they take advantage of opportunities to soften competition through coordinated actions—like "follow-the-leader" price increases—that lead to higher fares or reduced capacity. Spirit has recognized it has "no obligation" to "follow the herd" when it comes to collective industry price increases. By contrast, JetBlue has already demonstrated its willingness to follow along with some of those opportunities to coordinate and would have increased incentives to do so if the acquisition goes through.

6.     The acquisition would also stop the growth of Spirit. In the last 10 years, Spirit has doubled its network in size and, before this deal, expected to continue expanding at a quick pace. For example, before the end of 2023, Spirit independently expected to add service in five new cities and increase daily departures from Fort Lauderdale, Orlando, and Los Angeles—all JetBlue focus cities. And over the next five years Spirit plans to add nonstop service to several routes JetBlue flies today. The acquisition stops this future competition before it starts.

7.     Moreover, JetBlue plans to reduce the number of seats on Spirit aircraft, inevitably resulting in many cost-conscious Americans needing to forgo trips they would have otherwise taken. JetBlue has made clear it plans to retrofit Spirit planes to match the current layout of JetBlue aircraft. This would remove 10 to 15% of seats from every Spirit plane in operation today. Fewer seats means fewer passengers—and higher prices for those who can still afford to make their way onto the plane. This is unlikely to stop business travelers flying on corporate expense accounts, but would put travel out of reach for many cost-conscious travelers.

8.      JetBlue's acquisition of Spirit should not be considered in a vacuum—it is simply the latest step in a trend toward consolidation in the airline industry. A series of mergers left American travelers facing the Big Four: three "legacy" carriers—Delta, United, and American Airlines—that, along with Southwest, control close to 80% of the domestic airline industry, with alliances extending their reach even further. While JetBlue used to warn against this increasing consolidation, the airline has changed its tune in recent years. First, in 2020, JetBlue entered into an alliance with American Airlines—characterized by Spirit as a "de facto merger"—that deprives customers in the northeastern United States of vigorous competition between JetBlue and American Airlines. The United States instituted a separate lawsuit to block that alliance. Before that legal challenge had gone to trial, JetBlue doubled down on consolidation, inking a deal to acquire Spirit that deprives travelers of yet another choice.

9.      To preserve Spirit's unique and disruptive role in the industry, to protect choice and economical access to air travel, especially for millions of cost-conscious Americans, and to prevent hundreds of millions of dollars in annual harm to consumers, the United States and the Commonwealth of Massachusetts, the District of Columbia, and the State of New York ("Plaintiff States") bring this action to enjoin JetBlue's acquisition of Spirit as a violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.

## II.     THE INDUSTRY AND THE DEFENDANTS

### A.      Consolidation in the Airline Industry

10.     Four major airlines dominate air travel in the United States today. But this was not always the case. Just two decades ago, more than a dozen significant airlines competed domestically. Several legacy carriers, like American Airlines and United Airlines, utilized "hub-and-spoke" systems to offer travelers access to numerous domestic and international

5

destinations. These airlines offered multiple classes of service and a broad range of amenities in order to cater to many different types of travelers. The legacy carriers faced competition from "low-cost carriers" like Southwest, AirTran, and JetBlue. These low-cost carriers typically had a single class of service, fewer amenities, and a smaller network, which enabled them to offer fares that were frequently lower than their competitors. More recently, ultra-low-cost carriers (or "ULCCs") emerged that tend to offer travelers even lower fares by lowering their cost structures, offering simplified onboard experiences, and removing some features traditionally included in the price of an airline ticket.

11.     Consolidation has since reshaped the industry. Between 2001 and 2013, a wave of airline mergers left three legacy carriers: Delta Air Lines (which absorbed Northwest), United Airlines (which absorbed Continental), and American Airlines (which joined forces with TWA, America West, and U.S. Airways). A similar transformation among low-cost carriers began in 2010: Southwest bought AirTran, Alaska purchased Virgin America, and JetBlue allied itself with American Airlines. Today, the domestic airline industry is dominated by the "Big Four" carriers—American, United, Delta, and Southwest—which together control approximately 80% of flights nationwide.

12.     As JetBlue warned in 2019, "[a]ll that power in the hands of a few very deep-pocketed airlines has implications for consumers in the form of reduced options, high fares and often poor service." As discussed later, these implications also include an increased risk of coordination in the oligopolistic airline industry.

### B.     JetBlue's Evolution from Disrupter to Closer Ally of the Big Four

13.     Defendant JetBlue began service as a low-cost carrier focused on leisure travelers, who JetBlue estimates today still account for about 80% of its passengers. JetBlue came to the

airline industry with a plan to distinguish itself from legacy carriers and other low-cost carriers. In particular, JetBlue sought to entice travelers by offering lower fares combined with in-flight television and other amenities.

14.     Today, JetBlue offers flights to more than 100 destinations in the United States, Canada, the Caribbean, Latin America, and the United Kingdom. Within the United States, the airline's footprint is centered on six focus cities: Boston, New York, Los Angeles, Miami/Fort Lauderdale, Orlando, and San Juan. These focus cities account for 97% of JetBlue's flights and 94% of its revenues. Internationally, JetBlue provides significant service to the Caribbean and Latin America, which account for approximately 37% of its capacity.

15.     Recently, JetBlue has chosen to more closely align its interests with the Big Four, particularly through its Northeast Alliance with American Airlines. As part of this "de facto merger," as Spirit has described the Northeast Alliance, JetBlue agreed to align its domestic operations with American Airlines' on almost all routes to and from four major airports in Boston and New York City (Boston Logan International Airport, LaGuardia Airport, John F. Kennedy International Airport, and Newark Liberty International Airport). Approximately 75 percent of JetBlue's total capacity is tied up in the Northeast Alliance. That means JetBlue today coordinates its capacity decisions and shares its revenues with American Airlines on the vast majority of its flights. In other words, JetBlue no longer competes with American Airlines on those flights—and if this acquisition happens, Spirit won't either.

**C.     Competition from Spirit Leads to Lower Fares and Increased Choices for Travelers**

16.     Defendant Spirit is the largest ultra-low-cost carrier in the United States. In 2022, the airline flew more than 30 million passengers to 92 destinations across 16 countries. Like

JetBlue, Spirit's domestic network is focused on the eastern half of the United States, the Caribbean, and Latin America. Spirit's service to the Caribbean and Latin America accounted for about 15% of its total capacity in 2022. In 2006, Spirit started implementing its uniquely successful ULCC business model, which enables the airline to offer some of the lowest fares in the industry today.

17.    Spirit's low fares are particularly attractive to cost-conscious travelers. As Spirit's Chief Commercial Officer testified to Congress in 2020: "Spirit's product is designed for highly price-sensitive travelers, mainly ordinary individual consumers, families, and small and medium businesses who pay for their own tickets and face narrower options. This continues to be an underserved segment in today's market and we are proud to fill the need." Spirit estimates that approximately 90% of its passengers are leisure travelers. But its low fares also appeal to certain cost-conscious small business travelers. As Spirit's CEO has explained, Spirit's business travelers are usually "people who are paying for their own ticket . . . . So it's going to be small businesses [or] sole proprietorships, that sort of thing . . . ." Spirit provides a competitive alternative that gives such small businesses a chance to cut costs and supports their competitiveness against their own larger competitors.

18.    Spirit's business model focuses on low costs because that strategy allows it to offer low fares to consumers. For example, Spirit fits more seats on each of its planes, automates the check-in and baggage drop processes, offers streamlined amenities to passengers once they board, and maximizes the number of times it uses airplanes or airport gates each day. These strategies, among others, have allowed Spirit to maintain operating costs that are among the lowest in the industry and significantly below those of JetBlue and the Big Four.

19.     Historically, almost all airlines sold fares to customers at an all-inclusive price that bundled together various options, such as an advance seat assignment, boarding group, and carry-on luggage. Passengers were forced to pay for these features regardless of how much they used or valued them.

20.     Spirit was among the first domestic airlines to unbundle these features and empower its cost-conscious travelers to prioritize the aspects of the flying experience they valued the most. For example, Spirit became one of the first airlines to unbundle carry-on luggage from the overall price of a ticket. Later, it became one of the first airlines to unbundle advance seat assignments from the cost of a ticket. In other words, Spirit allowed customers to decide what amenities and features they valued most while at the same time keeping base fares low. Other airlines eventually followed suit. Unbundling these features (and others) from the price of a ticket has enabled Spirit to offer low fares that are particularly attractive to cost-conscious travelers who want the least expensive way to get to their destination.

21.     Spirit is unique among ULCCs. Spirit is three times more likely than Frontier and seven times more likely than Allegiant to have at least a daily departure on each route it flies. The limited frequency of service offered by Allegiant and Frontier makes it difficult for them to gain traction in new markets, which in turn limits their ability to effectively compete. Once Spirit starts offering new nonstop service, it also tends to continue offering service for longer than Frontier. Spirit is also more likely than many other ULCCs to compete head-to-head at hubs or focus cities dominated by the Big Four, such as Newark, Houston, Atlanta, and Miami. Spirit provides cost-conscious travelers options to far more international destinations from the United States—approximately twice as many—than Frontier, the only other ULCC with significant international service today. These offerings make Spirit attractive to many cost-conscious

travelers living in Massachusetts (including those who fly out of Boston Logan Airport), New York (including those who fly out of LaGuardia and Newark airports), and the District of Columbia (including those who fly out of Baltimore/Washington International Thurgood Marshall Airport).

22.     Traveler demand for Spirit's low unbundled fares has led to explosive growth: Spirit is six times larger today than it was in 2010. In contrast, each of the Big Four had a growth rate that was flat or minimal during the same period. Compared to other ULCCs, Spirit added more capacity (as measured in available seat miles) during this period than Frontier, Sun Country, and Allegiant combined.



23.     Spirit's low fares have given it an outsized effect on competition when it starts operating on new routes. Spirit calls this impact the "Spirit Effect." Spirit's own analyses found that, on average, industry-wide fares went down by 17% and the number of passengers increased by 30% when the airline started offering new service on a route. Other studies have found similar

results. These effects were felt even on routes from major airports that served as hubs for legacy carriers: within a year of Spirit starting service from Newark to George Bush Intercontinental Airport in Houston, for example, total seats on the route increased 20% and average fares for all airline passengers dropped 15%. And the Spirit Effect occurs even in markets where JetBlue operates—in other words, whatever benefit JetBlue entry and the "JetBlue Effect" brings to a market, there is an additional "Spirit Effect" benefit when Spirit enters. Travelers should not have to choose between the two.

24.     Before JetBlue's hostile takeover offer, Spirit planned to grow and compete even more widely and effectively in the future as an independent company. Spirit's airline fleet—the second-youngest in the domestic industry—is growing rapidly. Unlike its larger and smaller competitors, Spirit did not cancel any planned aircraft deliveries during the COVID-19 pandemic. As a result, Spirit expected to grow its fleet by 25% over the course of the next year and double its fleet size by the end of 2025.

## III.   JETBLUE'S TURBULENT PURSUIT OF SPIRIT

25.     JetBlue first considered buying Spirit as early as 2017 and again in 2019, but ultimately abandoned those plans. But after Spirit announced a merger agreement with Frontier in February 2022, JetBlue reinstated its plan. JetBlue had previously informed its Board of Directors that a Frontier-Spirit merger would "limit any potential major inorganic growth opportunity," i.e., consolidation via merger, for JetBlue. And JetBlue had made it clear that it also feared another airline merging with Spirit because that would leave JetBlue a "smaller and less relevant player in the industry." As a result, on April 5, 2022, JetBlue made an unsolicited offer to acquire Spirit. JetBlue's bid to take over Spirit occurred against the backdrop of the

Northeast Alliance, JetBlue's *de facto* merger in Boston and New York City with American Airlines, the largest airline in the United States.[1]

26.     In response to JetBlue's offer, Spirit's Board of Directors retained "top-tier aviation and economic consultants," who engaged for four weeks with "JetBlue and its advisors" to develop an "informed view" of the proposed transaction. Based on that assessment, Spirit's Board of Directors recognized the antitrust and regulatory risks of mergers in an already-consolidated airline industry, and recommended that Spirit shareholders vote to adopt the merger agreement with Frontier instead, concluding that "consummation of the proposed JetBlue combination, with the [Northeast Alliance] remaining in place, seemed almost inconceivable." "Even putting aside the Northeast Alliance," Spirit warned that JetBlue's stated plans to reconfigure Spirit's planes would "significantly diminish[] capacity" and "result in higher prices for consumers." Accordingly, "a court . . . will be very concerned that a JetBlue-Spirit combination will result in a higher-cost/higher fare airline that would eliminate a lower-cost/lower fare airline and remove about half of the [ultra-low-cost] capacity in the United States."

27.     JetBlue, for its part, was not ready to give up its plans to acquire Spirit, and so it launched a hostile takeover bid. On May 16, 2022, JetBlue announced a tender offer for $30 per share—a significant cash premium over Frontier's existing offer—and urged Spirit shareholders to reject the proposed Frontier merger. Spirit characterized JetBlue's proposal as a "cynical attempt to disrupt Spirit's merger with Frontier, which JetBlue views as a competitive threat."

---

[1] That transaction was the subject of an antitrust lawsuit filed in this Court by the Justice Department and seven state Attorneys General that alleged the Northeast Alliance is anticompetitive and violates Section 1 of the Sherman Act, 15 U.S.C. § 1. Complaint, *United States et al. v. American Airlines Grp. Inc., et al.*, 1:21-cv-11558 (D. Mass. Sept. 21, 2021). A decision is pending in that matter after a full trial on the merits.

Spirit later published a presentation, one slide of which is excerpted below, highlighting the harm to competition that would result from an acquisition by JetBlue.



28.     Over the next few months, JetBlue increased its hostile offer several more times in an effort to win over Spirit shareholders. JetBlue's campaign ultimately succeeded: Spirit and Frontier were forced to terminate their proposed merger after it became clear that the transaction did not have sufficient support from Spirit shareholders.

29.     On July 28, 2022, JetBlue and Spirit announced they had reached an agreement that JetBlue would acquire Spirit for $3.8 billion. In announcing the agreement, JetBlue explained that it planned to bring the "JetBlue Experience" to all aircraft. In other words, JetBlue plans to get rid of everything that made Spirit a unique competitor: it would remove between 20 and 28 seats from each Spirit airplane and replace Spirit's ultra-low-cost model with JetBlue's own higher-cost business model. These efforts are more than a rebranding; should the acquisition

be completed, travelers would face increased prices and fewer seats on the routes Spirit flies today.

## IV. JETBLUE'S ACQUISITION OF SPIRIT WOULD HURT TRAVELERS

30. Travelers—especially cost-conscious travelers—benefit today from Spirit's competition against JetBlue and other airlines. JetBlue's purchase of Spirit would hurt these travelers in at least three ways. First, it would eliminate vigorous head-to-head competition between JetBlue and Spirit that benefits cost-conscious travelers on hundreds of routes today. Second, because JetBlue plans to abandon Spirit's business model, the airline industry as a whole would lose the largest ultra-low-cost carrier and a competitor that has often gone its own way in an industry characterized by coordinated behavior. JetBlue's elimination of Spirit as an independent company would increase the risk that the remaining airlines—including JetBlue—would cooperate to raise prices or reduce capacity on particular routes where Spirit currently operates. Third, JetBlue's acquisition of Spirit would deprive cost-conscious customers of the option to choose Spirit and its low-priced, unbundled fares wherever Spirit flies today or wherever Spirit's growth plans would have it fly in the near future.

31. Under controlling Supreme Court precedent interpreting the Clayton Act, JetBlue's acquisition is presumed to have anticompetitive effects on more than 150 routes, or markets, because it would significantly increase concentration and result in highly concentrated markets on these routes. *See United States v. Phila. Nat'l Bank*, 374 U.S. 321, 362–64 (1963); Fed. Trade Comm'n & U.S. Dep't of Justice Horizontal Merger Guidelines § 5.3 (2010) (hereinafter, the "Merger Guidelines"). The presumption of illegality arises because the acquisition would substantially increase JetBlue's market share on routes that already have limited competition. The more than 150 routes where JetBlue's proposed acquisition of Spirit is

14

presumptively anticompetitive include routes where both carriers offer nonstop service as well as routes where the two airlines offer connecting service. In total, more than 30 million passengers fly on these routes each year, accounting for more than $6 billion in annual revenue for all airlines. On some connecting routes between Florida and Puerto Rico, for example, JetBlue and Spirit are the only airlines offering significant service, such that a merger between them would eliminate virtually all competition on those routes.

32.     The harm would be most directly felt on the more than 40 nonstop routes where the acquisition is presumptively illegal. JetBlue and Spirit compete particularly closely on these routes for cost-conscious travelers paying their own way to visit family or take a vacation, among other reasons. These routes touch cities in the Northeast (for example, Boston, Hartford, and New York City), typical vacation destinations in Florida (for example, Fort Myers, Miami/Fort Lauderdale, Orlando, and Tampa), as well as Los Angeles and Las Vegas further west. In addition, many routes touch destinations in the Caribbean and Latin America where cost-conscious travelers rely on airlines as the only reasonable option to get them to their destination quickly and safely.

33.     A few examples help illustrate the intensity with which JetBlue and Spirit compete on these routes today. On the Boston-Miami/Fort Lauderdale route, which serves about 1.5 million passengers annually, JetBlue and Spirit together currently account for nearly 50% of the market. For service between Boston and San Juan, the two airlines account for nearly 90% of the passengers flying the route today. On some routes, such as between Miami/Fort Lauderdale and Aguadilla, Puerto Rico, JetBlue and Spirit are the only two carriers providing nonstop service. The elimination of competition from Spirit on these and other highly concentrated routes

makes the transaction presumptively illegal. Unless enjoined, the proposed merger of JetBlue and Spirit would result in higher fares and fewer options for travelers.

### A. The Proposed Acquisition Eliminates Head-to-Head Competition Between JetBlue and Spirit and Would Harm Travelers

34.     Today, JetBlue and Spirit compete vigorously on hundreds of nonstop and connecting routes across the United States. This competition has led to lower fares, increased capacity, more fare options, and greater consumer choice. The merger of JetBlue and Spirit would end this head-to-head competition in at least two areas: (1) routes where both airlines currently compete, and (2) routes where Spirit has plans to start competing with JetBlue in the near future, and vice versa.

#### 1.     JetBlue's Acquisition of Spirit Would Lead to Higher Fares

35.     Today, competition between JetBlue and Spirit benefits travelers by reducing fares on routes where the two compete head-to-head. In fact, direct competition between the two airlines intensified in the last five years as Spirit increasingly expanded into markets where JetBlue already offered service. Ultimately, increased competition from Spirit led JetBlue's CEO to conclude that Spirit "now controls the ball" in Fort Lauderdale, where both airlines have a significant presence, and as a result, JetBlue had to ask if it had "the right cost structure to compete if this is the new normal." Moreover, JetBlue concluded that its fares, revenue, and profits had all declined in more than a dozen routes after Spirit started offering service.

36.     Shortly thereafter, JetBlue created a "Spirit Competitive Strategy" with the goal of developing an "integrated strategy to better compete with Spirit," which JetBlue's Head of Revenue and Planning viewed as "critical." This strategy led JetBlue to offer even lower fares—sometimes matched or pushed even lower by other airlines, including Spirit—to cost-conscious

travelers. JetBlue ultimately matched many of Spirit's fares on several routes. JetBlue's decision to compete vigorously with Spirit to win back travelers demonstrates the power and value of competition.

37.     JetBlue frequently responds to competition from Spirit on routes touching Florida where the two airlines closely compete. In one monthly pricing review, JetBlue observed that many of Spirit's "fares remain[ed] below established floors" and that Spirit's growth in Florida was causing JetBlue leisure "headwinds." In another instance, JetBlue observed that Spirit fares were "undercutting [JetBlue] substantially" for flights from Fort Lauderdale to San Jose, Costa Rica. And when Spirit added flights on the Hartford-Orlando route, JetBlue was forced to "lower fares across the board" in order to stay competitive.

38.     JetBlue has recognized that when Spirit has left routes, fares have gone up— which is exactly what would happen if this acquisition proceeds. For example, in 2020, when Spirit stopped flying between Boston and Fort Myers, JetBlue increased its fares. As one JetBlue manager explained, "I don't think we should be selling the [Spirit] fare if [Spirit] is not serving the market." JetBlue's Director of Revenue Management at the time agreed. And in 2022, JetBlue concluded that when Spirit exits a route, fares increase by 30% on average.

39.     Spirit similarly views JetBlue as a close competitor. In 2019, after JetBlue initiated a sale across hundreds of routes in its network, Spirit responded by lowering its fares for multiple routes where the two carriers competed head-to-head. In another instance, when JetBlue started offering discounted sale fares in August 2019, Spirit responded by matching JetBlue's fares for vacationers on 30 domestic routes where the two airlines competed directly. When Spirit was planning to start service on the Orlando-Ponce route in February 2022, the airline

17

initially contemplated offering $99 fares but lowered its initial fares to $79 due to competition from JetBlue.

> ### 2. The Proposed Acquisition Would Likely Lead to Less Innovation and Fewer Choices for Travelers

40. Spirit's strategy of focusing on cost-conscious travelers has prompted other airlines to follow suit by introducing their own fare options to better compete. For example, in response to increased competition from Spirit and its use of unbundled fares, the three largest airlines in the country—Delta, United, and American Airlines—introduced their "basic economy" fares in 2012, 2016, and 2017 respectively, which offered customers more choice and control over how they spent their money. As Delta's Executive Vice President and Chief Revenue Officer put it in 2015, this new fare type was Delta's "Spirit match fare." Likewise, American Airlines' Senior Vice President of Revenue Management explained at the time that American Airlines would "continue to match [ULCC] pricing with our Basic product." Although the features of basic economy fares vary by carrier, each is designed to provide a fare option that directly competes with Spirit's successful unbundled fare. The broader adoption of Spirit's innovations by the largest airlines benefited cost-conscious travelers, but helped flyers more generally as well.

41. Spirit's innovations in how to structure fares influenced JetBlue, too. In September 2018, JetBlue announced plans to start offering its own unbundled fare as part of its "Fare Options 2.0" initiative to better compete against Spirit. At the time, JetBlue's existing fare options—Blue, Blue Plus, and Blue Flex—all included some bundled attributes, including free carry-on bags and the ability to choose a seat ahead of time. The new unbundled "Blue Basic" fare gave customers greater choices for which features they wanted to pay JetBlue. This allowed

JetBlue to compete more effectively with Spirit for "[h]ighly price-conscious travelers … [who had shown] they [were] willing to give up some of the experience for the lowest fares possible." As JetBlue's Vice President of Sales and Revenue Management at the time concluded: "Spirit's key weapon is its very low costs and the very low fares they enable. Customers most interested in the absolute lowest fare may find their offer compelling. Fare Options 2.0 will be incredibly valuable in these markets . . . allow[ing] us to offer a lower priced Basic Economy-like option."

42.     Spirit's unbundled fares brought increased consumer choice to the routes Spirit serves. Consumers who prefer a bundled fare option can still seek that out from JetBlue or one of the Big Four. But for consumers who are looking for the lowest fare and more control over how they spend their money, Spirit not only provided that option itself, but also induced other carriers to offer their own similarly unbundled fares. This acquisition, however, would eliminate any chance of future innovations from Spirit—and any need for remaining airlines to respond to those innovations.

43.     JetBlue's acquisition of Spirit would also reduce other aspects of customer choice. Both airlines compete on service, for example, including on-time performance and cancelation rates. Other differences in the policies and offerings of each airline may be more difficult to quantify, yet are nevertheless valued by passengers. These include, for example, frequent flyer programs or similar memberships, like Spirit's unique Saver$ Club; aircraft cleanliness or crew friendliness; in-flight snack options; and pet policies. Today, travelers on routes that both JetBlue and Spirit serve are empowered to compare the two airlines across all these offerings and choose the one that best suits their travel needs. This transaction would deprive travelers of that choice.

**B.** **JetBlue's Proposed Acquisition of Spirit Heightens the Risk That Remaining Airlines Would Coordinate To Raise Prices**

44.     Companies have the incentive to maximize their profits. Competitive markets force companies to reduce price or improve products to offer customers better deals than their rivals. Sometimes, however, markets don't work that way—instead of competing fiercely, companies find ways to accommodate their mutual desires for higher profits and take steps to soften competition with each other. This softening of competition—which antitrust law refers to as coordination or coordinated behavior—can come about through formal agreements, implied understandings, or parallel accommodating conduct. Regardless of how it is accomplished, this softening of competition comes at a cost to consumers, who face higher prices or reduced output. That is why the Clayton Act prohibits mergers that increase the risk of such coordinated effects and substantially lessen competition.

45.     The airline industry is vulnerable to coordination. JetBlue has demonstrated a willingness to engage in such coordinated behavior while Spirit has a demonstrated track record of bucking industry trends in order to lower prices and give consumers more choice. JetBlue's proposed acquisition of Spirit would further increase the risk of coordinated behavior by eliminating Spirit's aggressive, disruptive business model from the marketplace and by placing all of Spirit's planes and crews under JetBlue's control. The risk of that coordination also heightens the harmful effects flowing from JetBlue's Northeast Alliance with American Airlines. More generally, removing Spirit as an independent check on JetBlue and other airlines would increase the threat of harmful, coordinated behavior on all routes where Spirit would otherwise operate as an independent competitor.

### 1.    The Airline Industry Is Vulnerable to Coordination

46.    Present conditions in the airline industry are ripe for coordinated behavior. Airlines publicly file their fares through the airline-owned Airline Tariff Publishing Company ("ATPCO"), which provides all airlines with detailed, real-time access to other airlines' published fares. Indeed, airlines have a history of using ATPCO to engage in coordinated behavior—conduct that was the subject of a Department of Justice enforcement action and court-ordered injunction in 1992. In addition, airlines utilize data-scraping tools to easily track the prices and schedules that their competitors offer on their individual websites. Because on most routes there are only a handful of significant competitors, it is easy for airlines to send signals to each other. Many airlines also overlap on multiple routes, which provides opportunities for them to use fare increases or discounts on one route to influence or discipline a rival's behaviors on another route, all in a coordinated pursuit of higher fares. Because the Big Four and JetBlue earn most of their profits from routes to and from certain airports where they have high shares of traffic—including their hubs and focus cities—the airlines have strong incentives to protect high prices on those routes.

47.    These features help make it all the easier to play "follow the leader" in the airline industry, particularly with respect to fare increases. For example, when one airline initiates a price increase, other airlines can often see it immediately and consider following with price increases of their own. The initiating airline will often then check to see if the other airlines matched the increase. If so, the initiating airline is likely to maintain its price increase. If the other airlines did not match the increase, the initiating airline may withdraw the increase shortly thereafter.

48.      JetBlue has already demonstrated a willingness to participate in this follow-the-leader behavior. In May 2020—in the midst of a collapse in demand for air travel as a result of the pandemic—JetBlue proposed a $10 systemwide fare increase. Senior managers approved the plan, but cautioned that it was important to see if competitors followed JetBlue's lead. As JetBlue's Director of Revenue Management put it, he was "eager to see [the] industry response." United matched this increase in all JetBlue markets, and Delta and American Airlines matched the increase in all markets where JetBlue provided nonstop service. Spirit, by contrast, did not match the increase. Similarly, JetBlue has shown a willingness to follow price increases initiated by legacy airlines: in April of 2022, after Delta increased certain fares by $10 systemwide, JetBlue joined Southwest and American Airlines in following the increase.

49.      JetBlue and other airlines similarly use ATPCO to communicate about pricing intentions. For example, in February 2020, JetBlue received a notification through ATPCO that Delta filed a fare that matched a similar fare JetBlue was offering on the Boston-Philadelphia route, but that Delta's fare was $5 higher. JetBlue responded by raising its fares to match Delta, except for the times of day when a ULCC provided service. In another instance, in February 2020, JetBlue noticed Southwest was offering a lower-priced 14-day advance purchase fare than JetBlue on the route between Boston and Baltimore. To address the issue, JetBlue filed, and then quickly canceled, a fare in ATPCO with the intention of alerting Southwest to the discrepancy in the two airlines' fares. Airlines refer to this type of fare filing activity as "flashing." Both of these are examples of how rivals do not have to communicate directly about pricing to encourage each other to raise fares. They can—and do—coordinate through indirect but equally effective means, which benefits the airlines but harms consumers.

50.     JetBlue and the Big Four also use what are called "cross-market initiatives" to deter aggressive discounting and prevent fare wars. A cross-market initiative can occur where two or more airlines compete against each other on multiple routes. If an airline discounts its fares on one route, an affected competitor often retaliates by offering discounts on another route where the first airline prefers a higher fare. Airlines are most vulnerable to cross-market initiatives involving routes where they are usually the most profitable and popular option: nonstop flights from their hubs and focus cities.

51.     Cross-market initiatives often cause an airline to withdraw fare discounts. For example, in March 2019, American Airlines filed a low fare on the Boston-Los Angeles route, which prompted JetBlue to respond by filing low fares on several other profitable routes also served by American Airlines. After American Airlines canceled its low fare on the Boston-Los Angeles route, JetBlue followed suit and scrapped its low fares on the other routes served by American Airlines. Neither airline had to directly communicate to jointly force travelers to pay higher fares.

### 2.     An Independent Spirit Is Less Likely To Coordinate with Other Airlines

52.     While many airlines, including JetBlue, regularly engage in this cozy oligopoly behavior, Spirit acts very differently because its unique network, cost, and pricing structure incentivize it to do so. Spirit does not rely as heavily on routes that connect through hubs or focus cities as JetBlue or the Big Four; it has lower costs than those airlines, and its overall fare structure is lower. Thus, Spirit is less incentivized to follow price increases because it is less vulnerable to discipline through ATPCO or cross-market initiatives. Spirit itself recognizes as much. Even though it knows that the other airlines coordinate, it also believes it has "no obligation" to "follow the herd" when it comes to such actions. A Spirit pricing executive

acknowledged that when other airlines attempt to initiate price increases, Spirit generally doesn't follow along.

53.     Spirit's presence in a market today can disrupt coordinated behavior initiated by other airlines. Spirit does not typically match JetBlue's price increases, nor does it often use ATPCO to lead fare increases. As one JetBlue analyst observed, Spirit's strategy instead appeared to be to "always have at least one price point lower than the lowest structured fare" offered by competing airlines on a particular route. In other cases, Spirit has observed bigger airlines trying to lead systemwide price increases and—rather than following along—has done "its own thing." Spirit's independence limits how successfully JetBlue and the Big Four can coordinate to maintain higher fares. The elimination of Spirit as an independent airline removes this important competitive restraint on the remaining airlines.

> ### 3. JetBlue Would Likely Coordinate Even More Often and Effectively After It Acquires Spirit, Especially with American Airlines

54.     As JetBlue grows into a more sizable airline that behaves more like the Big Four, it has fewer reasons to continue to compete aggressively with them. If JetBlue acquires Spirit, it would have more incentives to coordinate with other airlines on price increases and capacity reductions. For example, JetBlue would be exposed to reactions, including retribution, from other carriers on significantly more flights than it is today. JetBlue would also depend more heavily than ever on some of its focus cities, particularly Fort Lauderdale and Orlando, where its presence would start to rival the bigger airlines' hubs. As a result, like the Big Four, JetBlue would have more to lose from fare wars on routes from its most important airports that it would be incentivized to defend from cross-market initiatives. Taken together, the changes that would

follow the proposed acquisition would make JetBlue even more incentivized to coordinate with other airlines than it is today.

55.     JetBlue has already committed itself to American Airlines, the largest airline in the United States, through the Northeast Alliance. The loss of Spirit's disruptive effect is particularly likely to be felt on routes that JetBlue flies with American Airlines pursuant to the Northeast Alliance. Both JetBlue and American Airlines admit that, on these routes—which account for 75 percent of JetBlue's total capacity—they coordinate and do not compete. By folding Spirit into the Northeast Alliance, this proposed acquisition would essentially merge the operations of the three airlines in the northeastern United States, eliminate yet another airline competitor in the span of just a few years, and magnify the anticompetitive effects of the Northeast Alliance.

56.     The acquisition also would reduce competition on routes outside the scope of the Northeast Alliance where Spirit and American Airlines both offer nonstop service today. Because so much of its business is tied up in the Northeast Alliance, JetBlue is less likely than Spirit to compete aggressively with American Airlines going forward. The acquisition would give JetBlue even greater incentives to "pull its punches" on those routes in the future, particularly routes to the Caribbean and Latin America, which both JetBlue and American Airlines currently serve using their major operations in Fort Lauderdale and Miami. Spirit uses its own operations in Fort Lauderdale to offer travelers a third option that avoids the alliances and allegiances of JetBlue and American Airlines. That option would disappear if this acquisition is completed.

### C.   The Elimination of Spirit's Business Model Would Harm Cost-Conscious Customers in Particular

57.   It is not surprising that JetBlue and Spirit compete vigorously: both airlines target and serve especially cost-conscious travelers who value lower prices over additional amenities. These customers would be particularly harmed by JetBlue's plan to remove seats from Spirit aircraft and to eliminate Spirit's low cost, low fare business model.

58.   Spirit's "core value proposition" is serving cost-conscious customers on travel that they have to pay for themselves. Whether it's a vacation to see friends or being able to be at a loved one's side during illness, these customers want "good direct service at the absolute lowest fare as they are paying for the ticket themselves." Spirit has found that it primarily serves cost-conscious passengers who "make their purchase decision based largely on price." Unlike other airlines that serve a wider mix of travelers with different preferences and price sensitivities, Spirit overwhelmingly fills its planes with cost-conscious flyers looking to get to their destinations as economically as possible. For this reason, the "Spirit Effect," which tends to lower prices for travelers across all airlines when Spirit enters a new market, is particularly beneficial to travelers purchasing the lowest fares who can now afford to travel when they could not before.

59.   These same cost-conscious customers, however, would face increased prices and reduced travel options as a result of the lost competition between JetBlue and Spirit. Some of these customers would no longer be able to afford their airline tickets and would forgo using air travel for that trip altogether. Other travelers who may have a slightly higher ability and willingness to pay for a trip may still travel, but they would have to pay more, and they would lose an option that millions of Americans have chosen to meet their travel needs.

60.     Harm to these cost-conscious travelers would also occur on routes where Spirit competes against other carriers and JetBlue is absent today. JetBlue has been consistent about its plans for the combined company; it plans to retrofit existing Spirit aircraft to match JetBlue configurations, thereby eliminating 10 to 15% of the capacity—approximately 20 to 28 seats— from each plane. Further, in justifying the deal internally and to the company's lenders, JetBlue predicted that it would reap 24% more revenues per seat than Spirit earns today, on the assumption that "customers see value of [the] better product and experience[,] and are glad to adjust." Left unsaid is that if they want to keep flying, the customers who previously preferred Spirit's lower-priced, no-frills service would have little choice but to "adjust" to these higher prices. It is these flyers who pay their own way who are particularly vulnerable if forced to "adjust" to JetBlue's new higher prices; some would no longer be able to afford to travel at all.

## V.     RELEVANT MARKETS FOR ANALYZING JETBLUE'S PROPOSED ACQUISITION OF SPIRIT

61.     Courts define relevant product and geographic markets to help determine which lines of commerce and which areas of the country may be harmed by a merger. In this case, scheduled air passenger service is a relevant product market and there are hundreds of relevant geographic markets in the form of origin-and-destination pairs.

### A.     Scheduled Air Passenger Service Is a Relevant Product Market

62.     Scheduled air passenger service for all passengers is a relevant product market in which to assess the effects of JetBlue's proposed acquisition of Spirit. Air travel enables travelers to move quickly and efficiently between locations, offering passengers significant time savings and convenience over other potential forms of travel. For example, a flight between New York and Miami takes just over three hours. Driving between the two cities would take

approximately 19 hours, and a train trip would take at least 27 hours. For trips with an origin or destination outside the continental United States, scheduled air passenger service is often the only practical form of travel available to most travelers.

63.     Given the time savings and convenience of flying, not enough passengers would substitute other modes of transportation (e.g., car, bus, train, or ship) to defeat a small but significant fare increase. Relative to these other modes of transportation, air travel is widely recognized to feature distinct facilities, competitors, customers, and prices. Scheduled air passenger service, therefore, constitutes a line of commerce and a relevant product market within the meaning of Section 7 of the Clayton Act.

64.     Within this relevant product market, preferences among travelers may differ. For example, some passengers prefer to purchase an unbundled fare versus a more expensive bundled fare option; some passengers strongly prefer nonstop over connecting service because it saves travel time; and some passengers prefer buying tickets far in advance rather than waiting until the last minute. Airlines are aware of these different preferences and use a variety of fare restrictions and rules to raise fares on some of these passengers without necessarily raising fares for others. For example, airlines typically use advance purchase requirements—typically 21, 14, 7, or 3 days—in order to charge more for tickets as the departure date for a flight approaches. Thus, the competitive effects of JetBlue's acquisition of Spirit may vary somewhat among passengers depending on their particular preferences.

**B.      Origin-and-Destination Pairs Are Relevant Geographic Markets**

65.     Origin-and-destination pairs are the appropriate geographic markets for evaluating the competitive effects of JetBlue's proposed acquisition of Spirit. Most travelers book flights with their origins and destinations predetermined. Few travelers who wish to fly from one

destination to another would switch to flights between other destinations in response to a small but significant and non-transitory fare increase.

66.     Travelers seek to depart from airports close to where they live and work, and arrive at airports close to their intended destinations. Accordingly, an origin or destination is no broader than all airports in a metropolitan area. For example, many passengers traveling to and from Boston do not consider airports outside of Boston to be reasonable alternatives to Boston Logan International Airport. Not enough passengers who wish to fly to and from Boston would switch to flying to and from other airports to defeat a small but significant and non-transitory price increase by a hypothetical monopolist of service at Boston Logan.

67.     In metropolitan areas with multiple airports, some travelers may prefer one airport over another due to the difference in ground transportation times. Depending on the city, however, travelers—particularly those who are cost-conscious—may consider all airports in a metropolitan area in making their travel plans. In setting prices for service on some origin-and-destination pairs, airlines often consider competing service offered to all airports in a metropolitan area.

68.     Within any geographic market, narrower markets may exist which themselves constitute relevant antitrust markets, and it may be appropriate to consider such narrower markets instead of or in addition to the broader market. The purpose of defining a relevant market is to focus the analysis on what competition may be lost by a proposed transaction. Thus, the geographic markets that are most informative for analyzing competitive effects may differ when considering a merger between airlines that compete more closely for, e.g., corporate travelers than when considering a merger between airlines that compete for more cost-conscious

customers because cost-conscious customers may be more willing to travel to more distant airports to get a better deal.

69.     For purposes of evaluating likely competitive effects of JetBlue's acquisition of Spirit, on routes serving metropolitan areas with multiple airports, origins and destinations include all airports in a metropolitan area. For example, origin and destination pairs that involve travel to and from the Miami/Fort Lauderdale metropolitan area, which includes Miami International Airport ("MIA") and Fort Lauderdale-Hollywood International Airport ("FLL"), constitute relevant geographic markets. Most passengers traveling to and from the Miami/Fort Lauderdale metropolitan area will consider both airports, but not more distant airports, to be reasonable options. Not enough passengers wishing to fly to Miami/Fort Lauderdale would switch to flying to other airports to defeat a small but significant price increase by a hypothetical monopolist of service at both MIA and FLL.

70.     Although routes to a specific airport or set of airports within some metropolitan areas may also constitute well-defined narrower geographic markets, it is not necessary to consider them in this case because doing so would not change the conclusion that the effect of the acquisition may be to substantially lessen competition. Origin and destination pairs that involve travel to and from the New York City metropolitan area, for example—which includes John F. Kennedy International Airport ("JFK"), LaGuardia International Airport ("LGA"), and Newark Liberty International Airport ("EWR")—constitute relevant geographic markets for analyzing this acquisition. Not enough passengers wishing to fly to and from the New York City metropolitan area would switch to using more distant airports to prevent a hypothetical monopolist of service on routes involving these three airports from raising prices by a small but significant and non-transitory amount. Many passengers traveling to and from JFK or LGA,

however, do not view service to EWR as a reasonable substitute, and vice versa. Accordingly, origin-and-destination pairs that include only JFK/LGA or only EWR may also constitute smaller relevant geographic markets within the broader JFK/LGA/EWR market.

71.     In evaluating the potential anticompetitive effects of this proposed acquisition, there are three categories of relevant markets where the effect of the merger may be to substantially lessen competition. First, origin-and-destination pairs for scheduled air passenger service where both JetBlue and Spirit compete today constitute such relevant markets. Second, origin-and-destination pairs that JetBlue and Spirit would have both served consistent with their standalone growth plans constitute additional relevant markets. Third, origin-and-destination pairs that JetBlue does not serve but where Spirit currently offers nonstop service or planned to enter with nonstop service as an independent competitor also constitute relevant markets.

72.     Each relevant market described in the preceding paragraph satisfies the hypothetical monopolist test, as defined in the Merger Guidelines and constitutes a line of commerce as that term is used in Section 7 of the Clayton Act, 15 U.S.C. § 18. A hypothetical monopolist of air passenger service in each of the origin-and-destination pairs would likely increase prices on that route by at least a small but significant and non-transitory amount, and therefore each of the relevant markets satisfies the hypothetical monopolist test as defined in the Merger Guidelines.

## VI.     NOTHING REBUTS THE PRESUMPTION OF ANTICOMPETITIVE EFFECTS

### A.     New Entry or Expansion by Existing Competitors Would Not Prevent Harm to Travelers

73.     New entry or expansion by existing airlines into the relevant markets is unlikely to be timely or sufficient in magnitude, scope, or character to fully offset or even deter the

proposed acquisition's anticompetitive effects. New entrants into airline markets face significant barriers, including: difficulty in obtaining access to airport facilities or landing rights, particularly at congested airports; existing loyalty to particular airlines; and the risk of aggressive responses to new entry by a dominant incumbent. In addition, current industry-wide constraints on aircraft and pilots make new entry or expansion even more difficult. Finally, because other airlines in the industry—including the Big Four, JetBlue, Alaska, and other ULCCs—each have different combinations of capabilities and profit incentives from Spirit, they are unlikely to replicate the intensity of the competition that would be lost as a result of this acquisition.

### B.      Purported Efficiencies Are Speculative and Anticompetitive

74.      JetBlue contends that its acquisition of Spirit would yield synergies that would enable the airline to better compete against the legacy carriers going forward. Setting aside that JetBlue has already committed itself to American Airlines, the largest of the legacy carriers, many of these purported synergies reflect the fundamental harm of this acquisition. For example, JetBlue forecasts additional revenue the airline would realize by removing Spirit's planes and associated low fares from markets that Spirit serves today and replacing them with JetBlue planes and higher fares. One JetBlue executive acknowledged that this purported synergy comes from charging passengers higher prices for a smaller number of available seats. Similarly, JetBlue anticipates being able to garner additional revenue as a result of increasing its "relevance" in certain airports—that is, its share of all traffic at the airport—and being able to charge a "premium" for its fares over similar fares offered by competitors with lower share. Neither purported "synergy" would benefit the cost-conscious travelers most likely to be hurt as a result of this deal—instead, JetBlue's so-called "synergies" merely reflect the increased power JetBlue predicts it would have to raise prices and reduce output.

75.     Moreover, JetBlue's acquisition of Spirit would not result in *any* net cost efficiencies that improve the cost-structure of the merged firm; JetBlue currently projects approximately $400M in *increased* costs as a result of the merger, largely resulting from the expense of removing seats from Spirit planes to convert them to a JetBlue configuration.

76.     Defendants have not yet described any procompetitive efficiencies in the alleged relevant markets. Despite announcing the proposed acquisition in July 2022, JetBlue still has not created a network plan for the combined company that would allow an analysis of any purported benefits to travelers. JetBlue points to the increased revenue the combined airline is projected to earn as a result of the acquisition, but after nearly eight months, JetBlue has not provided a meaningful analysis of any cognizable, merger-specific potential benefits to travelers. Regardless, any cognizable, transaction-specific efficiencies in each of the more than 500 relevant markets will not outweigh the significant competitive harm expected in each of those relevant markets that would result from eliminating Spirit as an independent competitor.

## VII.   JETBLUE'S PROPOSED DIVESTITURES ARE HYPOTHETICAL AND WOULD NOT REMEDY THE ANTICOMPETITIVE HARMS FROM THIS TRANSACTION

77.     Any antitrust remedy must immediately, durably, and completely preserve the intensity of competition that exists today between JetBlue and Spirit. Efforts to remedy an anticompetitive merger through partial divestitures of assets are not likely to be effective because they create unacceptable risks of diluting the intensity of competition—they risk creating companies with less incentive, ability, or resources than the original owner to use the divested assets in competition to benefit the travelers affected by the merger. Remedies—including divestitures—must preserve *all* competition in *all* relevant markets threatened by JetBlue's acquisition of Spirit. Defendants bear the heavy burden of establishing any remedy they propose

meets these exacting standards, especially given the substantial threat to competition posed by JetBlue's acquisition of Spirit.

78.    On August 12, 2022, JetBlue and Spirit filed the pre-merger notification and report form with the U.S. Department of Justice and the Federal Trade Commission pursuant to the Hart-Scott-Rodino Antitrust Improvements Act. The transaction notified to the agencies contemplates an agreement and plan of merger between JetBlue and Spirit. It does not identify with specificity any divestitures or other structural changes to JetBlue's or Spirit's assets as a result of the merger.

79.    Essentially conceding the facially anticompetitive nature of this acquisition, and in an effort to secure regulatory approval, JetBlue has indicated it plans to divest Spirit gates, takeoff and landing rights, and some related ground facilities at four airports: (1) Boston Logan, (2) Newark Liberty, (3) LaGuardia, and (4) Fort Lauderdale-Hollywood International Airport. In other words, JetBlue and Spirit claim they would replace the significant lost competition in hundreds of markets across the country, the Caribbean, and Latin America where Defendants compete today through a plan to divest a total of 15 gates, related operating rights, and ground facilities at a handful of airports. The Defendants have not finalized their proposed divestitures nor identified how those divestitures would likely fully restore the competition lost as a result of this acquisition.

## VIII.   JURISDICTION AND VENUE

80.    The United States brings this action under Section 15 of the Clayton Act, as amended, 15 U.S.C § 25, to prevent and restrain Defendants from violating Section 7 of the Clayton Act, 15 U.S.C. § 18. The Commonwealth of Massachusetts, the District of Columbia, and the State of New York bring this action under Section 16 of the Clayton Act, 15 U.S.C. § 26,

as *parens patriae* on behalf of and to protect their general economies and the health and welfare of their residents and to prevent and restrain the violation by Defendants of Section 7 of the Clayton Act, 15 U.S.C. § 18. This Court has subject matter jurisdiction over this action under Section 15 of the Clayton Act, 15 U.S.C § 25, and 28 U.S.C. §§ 1331, 1337(a), and 1345.

81.     Defendants are engaged in interstate commerce and in activities substantially affecting interstate commerce. JetBlue and Spirit each annually transport millions of passengers across state lines throughout the United States, which generates billions of dollars in annual revenue for both companies.

82.     Venue is proper under Section 12 of the Clayton Act, 15 U.S.C § 22. This Court also has personal jurisdiction over each Defendant. JetBlue is a Delaware corporation with its headquarters in Long Island City, New York, and is found and transacts business in this judicial district. Spirit is a Delaware corporation with its headquarters in Miramar, Florida, and is found and transacts business in this judicial district. Both Defendants agreed to personal jurisdiction for this action in this federal judicial district.

## IX.    VIOLATION ALLEGED

83.     The United States and Plaintiff States hereby incorporate the allegations set forth in paragraphs 1 through 82 above as if set forth fully herein.

84.     Unless enjoined, the proposed acquisition of Spirit by JetBlue may substantially lessen competition in the relevant markets in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.

85.     Among other things, JetBlue's acquisition of Spirit would:

> (i)  eliminate current and future head-to-head competition between JetBlue and Spirit;

(ii) lead to higher ticket prices and reduced passenger capacity;

(iii) result in less consumer choice; and

(iv) facilitate increased coordination among JetBlue and its remaining

competitors.

## X.    RELIEF

86.    The United States and Plaintiff States request that:

(i) JetBlue's acquisition of Spirit be adjudged to violate Section 7 of the

Clayton Act, 15 U.S.C. § 18;

(ii) Defendants be permanently enjoined and restrained from carrying out this

acquisition, or any other transaction in any form that would combine

JetBlue and Spirit;

(iii) the United States and Plaintiff States be awarded costs of this action; and

(iv) the United States and Plaintiff States be awarded such other relief as the

Court may deem just and proper.

Dated: March 7, 2023

Respectfully submitted,

**FOR PLAINTIFF UNITED STATES OF AMERICA:**

  /s/ Doha Mekki
DOHA MEKKI
Principal Deputy Assistant Attorney
General for Antitrust

  /s/ Michael B. Kades
MICHAEL B. KADES
Deputy Assistant Attorney General for
Antitrust

  /s/ Hetal J. Doshi
HETAL J. DOSHI
Deputy Assistant Attorney General for
Antitrust

  /s/ Ryan Danks
RYAN DANKS
Director of Civil Enforcement

  /s/ Robert A. Lepore
ROBERT A. LEPORE
Chief
Transportation, Energy & Agriculture
Section

  /s/ Patricia C. Corcoran
PATRICIA C. CORCORAN
Assistant Chief
Transportation, Energy & Agriculture
Section

  /s/ Katherine Celeste Speegle
KATHERINE CELESTE SPEEGLE
Assistant Chief
Transportation, Energy & Agriculture
Section

  /s/ Edward W. Duffy
EDWARD W. DUFFY*
   Senior Trial Counsel

AARON M. TEITELBAUM
   Senior Litigation Counsel

DON P. AMLIN
MAISIE A. BALDWIN
GRANT A. BERMANN
JOHN M. BRIGGS
MICHAEL B. DERITA
JOHN J. DIMARCO
MICHELLE LIVINGSTON
JAMES L. MOORE III
MICHELLE PARK
SARAH V. RIBLET
BRENDAN SEPULVEDA
JOHN R. THORNBURGH II
   Trial Attorneys

United States Department of Justice
Antitrust Division
450 Fifth Street, NW, Suite 8000
Washington, DC 20530
Telephone:  (202) 812-4723
Facsimile:  (202) 307-5802
Email:  edward.duffy@usdoj.gov

*Attorneys for Plaintiff United States of America*

*Attorney of Record

**FOR PLAINTIFF COMMONWEALTH OF MASSACHUSETTS:**

ANDREA JOY CAMPBELL
Attorney General

 */s/* William T. Matlack
WILLIAM T. MATLACK (MA BBO No. 552109)
Assistant Attorney General, Chief, Antitrust Division
DANIEL H. LEFF (MA BBO No. 689302)
Assistant Attorney General

Office of the Attorney General
One Ashburton Place, 18th Floor
Boston, MA 02108
Tel: (617) 727-2200
Email: William.Matlack@mass.gov

*Attorneys for Plaintiff Commonwealth of Massachusetts*
*and Local Counsel for the District of Columbia and the State of New York*

**FOR PLAINTIFF DISTRICT OF COLUMBIA:**

BRIAN L. SCHWALB
Attorney General for the District of Columbia

JENNIFER C. JONES (DC Bar No. 1737225)
Deputy Attorney General
Public Advocacy Division

 */s/* Adam Gitlin
ADAM GITLIN (DC Bar No. 90004308)
Chief, Antitrust and Nonprofit Enforcement Section
C. WILLIAM MARGRABE (NJ Bar No. 221042017)
Assistant Attorney General

Office of the Attorney General
400 6th Street NW, Suite 10100
Washington, D.C.  20001
Telephone: (202) 727-6294
adam.gitlin@dc.gov
will.margrabe@dc.gov

*Attorneys for Plaintiff District of Columbia*

**FOR PLAINTIFF STATE OF NEW YORK:**

LETITIA JAMES
Attorney General of New York

 */s/* Elinor Hoffmann
ELINOR R. HOFFMANN (NY Bar Reg. No. 1350453)
Chief, Antitrust Bureau
CHRISTOPHER D'ANGELO
Chief Deputy Attorney General
Economic Justice Division
JEREMY R. KASHA
Assistant Attorney General
MORGAN J. FEDER
Assistant Attorney General

New York State Office of the Attorney General
28 Liberty Street, 20th Floor
New York, NY 10005
Phone: (212) 416-8269
Email: Elinor.Hoffmann@ag.ny.gov

*Attorneys for Plaintiff State of New York*