# EXHIBIT 6

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

---

UNITED STATES OF AMERICA *et al.*,

*Plaintiffs*,

v.

JETBLUE AIRWAYS CORPORATION
and SPIRIT AIRLINES, INC.,

*Defendants*.

Civil Action No.: 1:23-cv-10511

---

## PLAINTIFFS' FIRST REQUEST FOR PRODUCTION OF DOCUMENTS FROM DEFENDANT SPIRIT AIRLINES, INC.

Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure, Rule 34.1 of the Local Rules of the United States District Court for the District of Massachusetts ("Local Rules"), and subject to the provisions of any Scheduling and Case Management Order agreed by the parties to this Action or entered by the Court (the "CMO"), Plaintiff United States of America ("United States") and the Plaintiff States (collectively, "Plaintiffs"), by their undersigned counsel, hereby serve this First Request for Production of Documents on Defendant Spirit Airlines, Inc., and request that it produce the Documents in accordance with the CMO.

### DEFINITIONS

The terms defined below and used in each of the requests should be construed broadly to the fullest extent of their meaning in a good-faith effort to comply with the Federal Rules of Civil Procedure, the Local Rules, and the CMO.

1

1.      "Action" means the case captioned *United States et al. v. JetBlue Airways Corporation and Spirit Airlines, Inc.*, No. 1:23-cv-10511 (D. Mass.).

2.      "Allegiant" means Allegiant Travel Company, its domestic and foreign parents, predecessors, divisions, subsidiaries, affiliates, partnerships, and joint ventures, and all directors, officers, employees, agents, and representatives of the foregoing.  The terms "parent," "subsidiary," "affiliate," and "joint venture" refer to any Person in which there is partial (25 percent or more) or total ownership or control between Allegiant and any other Person.

3.      "ATPCO" means the Airline Tariff Publishing Company.

4.      "Avelo" means Avelo Airlines, Inc., its domestic and foreign parents, predecessors, divisions, subsidiaries, affiliates, partnerships, and joint ventures, and all directors, officers, employees, agents, and representatives of the foregoing.  The terms "parent," "subsidiary," "affiliate," and "joint venture" refer to any Person in which there is partial (25 percent or more) or total ownership or control between Avelo and any other Person.

5.      "BOS" means Boston Logan International Airport.

6.      "Breeze" means Breeze Aviation Group, Inc., its domestic and foreign parents, predecessors, divisions, subsidiaries, affiliates, partnerships, and joint ventures, and all directors, officers, employees, agents, and representatives of the foregoing.  The terms "parent," "subsidiary," "affiliate," and "joint venture" refer to any Person in which there is partial (25 percent or more) or total ownership or control between Breeze and any other Person.

7.      "Capacity Discipline" means airlines growing capacity at a slower rate than they would have otherwise grown absent awareness of each other's capacity Plans and accommodating and/or interdependent behavior.

8.      "Communication" has the meaning set forth in Local Rule 26.5(c)(1).  For the avoidance of doubt, a "Communication" includes an inquiry, discussion, conference, conversation, negotiation, agreement, understanding, meeting, interview, letter, correspondence, note, presentation, advertisement, announcement, facsimile, electronic mail, text message, instant message, memorandum, writing, or other any other form of transmission of information, in either oral or written form.

9.      "Complaint" means the complaint filed in this Action, No. 1:23-cv-10511 (D. Mass.), ECF No. 1, or any amendment thereto.

10.     "Cross-Market Initiative" means an airline's filing of a fare through ATPCO or other publicly available means in one route as a response to another airline's fares in a different route.

11.     "Discussing" means analyzing, constituting, summarizing, reporting on, considering, recommending, setting forth, or describing a subject.  Documents that contain reports, studies, forecasts, analyses, Plans, proposals, evaluations, recommendations, directives, procedures, policies, or guidelines regarding a subject should be treated as Documents Discussing the subject.

12.     "Divestiture Assets" means any of Spirit's gates, ground facilities, Slots, or other related assets or rights at BOS, FLL, EWR, or LGA.

13.     "Document" has the meaning set forth in Local Rule 26.5(c)(2).  For the avoidance of doubt, "Document" includes electronically stored information, Including all electronic Communications (*e.g.*, emails and attachments, text messages, and instant messages), files, data, and databases.  The term includes all metadata associated with that Document.  A draft or non-identical copy is a separate Document within the meaning of this term.

14.     "EWR" means Newark Liberty International Airport.

15.     "FAA" means the Federal Aviation Administration.

16.     "FLL" means Fort Lauderdale-Hollywood International Airport.

17.     "Frontier" means Frontier Group Holdings, Inc., its domestic and foreign parents, predecessors, divisions, subsidiaries, affiliates, partnerships, and joint ventures, and all directors, officers, employees, agents, and representatives of the foregoing.  The terms "parent," "subsidiary," "affiliate," and "joint venture" refer to any Person in which there is partial (25 percent or more) or total ownership or control between Frontier and any other Person.

18.     "Government Actor" means any international, national, federal, state, local, or municipal governmental official, body, or agency, Including the United States Department of Justice, the Federal Trade Commission, the United States Department of Transportation, the FAA, any state Attorney General (individually or collectively), and their employees, commissioners, attorneys, accountants, economists, staff, consultants, experts, agents, and representatives, and specifically includes any third-party representative or agent, wherever located, acting or purporting to act on their behalf.

19.     "Including" means including, but not limited to.

20.     "Investigation" means the Plaintiffs' pre-Complaint investigation into the Transaction.

21.     "JFK" means John F. Kennedy International Airport.

22.     "JetBlue" means JetBlue Airways Corporation, its domestic and foreign parents, predecessors, divisions, subsidiaries, affiliates, partnerships, and joint ventures, and all directors, officers, employees, agents, and representatives of the foregoing.  The terms "parent,"

4

"subsidiary," "affiliate," and "joint venture" refer to any Person in which there is partial (25 percent or more) or total ownership or control between JetBlue and any other Person.

23.     "LGA" means LaGuardia Airport.

24.     "Person" has the meaning set forth in Local Rule 26.5(c)(6).  For the avoidance of doubt, "Person" includes JetBlue and Spirit, and it means any natural person, corporate entity, partnership, association, joint venture, government entity, or trust.  Any reference to a Person that is a business entity includes: that Person's predecessors (Including any pre-existing Person that at any time became part of that entity after a merger or acquisition), successors, parents, divisions, subsidiaries, affiliates, franchisors, and franchisees; each other Person that is directly or indirectly owned or controlled by any of them; each partnership or joint venture to which any of them is a party; all present and former directors, officers, employees, agents, attorneys, consultants, controlling shareholders (and any entity owned by any such controlling shareholder) of any of them; and any other Person acting for or on behalf of any of them.

25.      "Plan" means a proposal, recommendation, or consideration, whether or not it has been finalized or adopted.

26.     "Potential Acquirer" means Allegiant, Avelo, Breeze, Frontier, Sun Country, or any other Person that has made a proposal, bid, offer, or expression of interest to acquire the Divestiture Assets.

27.     "Relating To" means referring to, concerning, mentioning, reflecting, pertaining to, evidencing, identifying, incorporating, summarizing, involving, describing, Discussing, commenting on, embodying, responding to, supporting, contradicting, containing, or constituting (in whole or in part).

28.     "Second Request" means the Request for Additional Information and Documentary Materials issued to Spirit on September 12, 2022.

29.     "Slot" means take-off or landing rights at FAA-designated Level 3 airports and take-off or landing authorizations at FAA-designated Level 2 airports.

30.     "Spirit," "You," and "Your" mean Spirit Airlines, Inc., its domestic and foreign parents, predecessors, divisions, subsidiaries, affiliates, partnerships, and joint ventures, and all directors, officers, employees, agents, and representatives of the foregoing.  The terms "parent," "subsidiary," "affiliate," and "joint venture" refer to any Person in which there is partial (25 percent or more) or total ownership or control between Spirit and any other Person.

31.     "Sun Country" means Sun Country, Inc., d/b/a Sun Country Airlines, its domestic and foreign parents, predecessors, divisions, subsidiaries, affiliates, partnerships, and joint ventures, and all directors, officers, employees, agents, and representatives of the foregoing.  The terms "parent," "subsidiary," "affiliate," and "joint venture" refer to any Person in which there is partial (25 percent or more) or total ownership or control between Sun Country and any other Person.

32.     "Third Party" means any Person other than Plaintiffs, JetBlue, or Spirit.

33.     "Transaction" means JetBlue's proposed acquisition of Spirit, as set forth in the Agreement and Plan of Merger among JetBlue Airways Corporation, Sundown Acquisition Corp., and Spirit Airlines, Inc., dated July 28, 2022.

34.     "ULCC" stands for ultra-low-cost carrier, and means Allegiant, Avelo, Breeze, Frontier, Spirit, Sun Country, or any other airline operating on an ultra-low-cost business model.

## <u>INSTRUCTIONS</u>

1.      Documents already produced by Spirit in response to the Second Request, or in response to civil investigative demands issued to Spirit during the Investigation and prior to the filing of this Action, need not be produced in response to these Document requests, unless required to comply with any protocols concerning electronically stored information applicable to this Action.

2.      Unless otherwise specified, these requests seek all responsive Documents created, modified, sent, or received during the period from January 1, 2018, to the present.

3.      These requests are continuing in nature, and Your duty to supplement Your production in response to these requests pursuant to Federal Rule of Civil Procedure 26(e) is ongoing.  Plaintiffs specifically reserve the right to seek supplementary responses and additional supplementary production of Documents before trial.

4.      In addition to the specific instructions set forth below, these requests incorporate the instructions set forth in Federal Rules of Civil Procedure 26 and 34, the Local Rules, and the CMO.

5.      Each request shall apply to Documents or materials in Your possession, custody, or control, regardless of whether such Documents or materials are possessed by You or Your present or former, domestic or foreign parents, subsidiaries, divisions, subdivisions, or affiliates; Your predecessor or successor entities; or by any of Your employees, agents, representatives, officers, directors, consultants, lobbyists, or any other Person acting or purporting to act on Your behalf, Including, unless privileged and such privilege has not been waived, Your attorneys, and regardless of where such Documents are located.

6.      In producing Documents, You must produce a legible copy of each Document requested together with all non-identical copies and drafts of that Document.  All metadata of electronic Documents must also be produced.  You must retain all of the original Documents for inspection or copying throughout the pendency of the Action, any appeal(s), and any related proceedings.

7.      Any responsive Document that has been altered, Including by the addition of marginal notes, handwritten notes, underlining, date stamps, received stamps, or endorsed or filed stamps, and any draft, revision, modification, or other version of a responsive Document, is a responsive Document in its own right and must be produced.

8.      If any portion of any Document is responsive to any request, then the entire Document must be produced, Including all attachments and enclosures.

9.      Pursuant to Federal Rule of Civil Procedure 34(b)(2)(E)(i), Documents must be produced either: (a) as they are kept in the usual course of business (in which case, they must be produced in such fashion as to identify the department, branch, or office in whose possession they were located and, where applicable, the natural Person in whose possession they were found or the server or central file in which they were found); or (b) identified as responsive to a specific request enumerated in these requests, with such specific requests identified.

10.      Subject to any protocols concerning electronically stored information agreed to by the Parties or ordered by the Court, electronically stored information and hard copy Documents must be produced in the form of production agreed to with Plaintiffs in relation to the Investigation of the Transaction.  Do not alter the format from that used during the Investigation without first discussing it with Plaintiffs.

11.     All physical Documents must be produced in the file folder, envelope, or other container in which the Documents are kept or maintained.  If, for any reason, the container cannot be produced, produce copies of all labels or other identifying marks.

12.     Documents attached to each other should not be separated.

13.     If identical copies of a Document are in the possession, custody, or control of more than one natural Person or other Document custodian, a copy of that Document must be produced from each such natural Person or other Document custodian.

14.     The fact that a Document is in the possession of Plaintiffs, or is produced by another Person, does not relieve You of the obligation to produce all of Your copies of the same Document, even if Your copies are identical in all respects to a Document produced or held by another Person.

15.     If any Document is withheld based on an objection to any request, all Documents covered by that request, but not subject to the objection, must be produced.

16.     To the extent You contend that responsive Documents in Your possession, custody, or control cannot be produced pursuant to the notice and consent requirements contained in a protective order or agreement, the written response to this request must identify the specific provisions of the protective order or agreement on which You are relying and the efforts that You have and will undertake to provide notice and obtain consents.

17.     Other than redactions of information withheld under a claim of privilege or other legal protection, Documents are to be produced in full.  If any requested Document cannot be produced in full, or if You withhold production of any Document or portion of any Document responsive to the requests based upon any privilege or other legal protection, produce it to the extent possible.

18.     If You are unable to produce a Document that is responsive to a request not due to a claim of privilege or other legal protection, describe the Document, state why it cannot be produced, and, if applicable, state the whereabouts of such Document when last in Your possession.

19.     Subject to any agreed or entered CMO and any protocols concerning privileged Documents applicable to this Action, where a claim of privilege or other protection from discovery is asserted in objecting to a request or sub-part thereof, and any Document is withheld (in whole or in part) on the basis of such assertion, You shall provide a log ("Privilege Log") in Microsoft Excel format that identifies, for each Document:

    a.   whether the Document is being withheld or redacted;

    b.   all claims of privilege or attorney work product applicable to the Document withheld or redacted;

    c.   a description of the specific subject matter of the Document or Communication not produced or disclosed in a manner that, without revealing information itself privileged or protected, will enable other parties and the Court to evaluate the applicability of the privilege; and

    d.   the following non-privileged metadata: all authors, addressees, and recipients of the Document; the subject line (if an email) or the file name (if non-email); date of the Document; type of Document (*e.g.*, .pdf, Excel, .msg); Bates range; family Bates range, if applicable; and custodian(s).  You shall also produce a separate index containing an alphabetical list (by last name) of each name on the Privilege Log, identifying titles (for party employees), company affiliations, the members of any group or email list on the Privilege Log, where practicable (*e.g.*, Board of

Directors), and any name variations used in the Privilege Log for the same individual.

The Privilege Log shall include the full name, title, and employer of each author, addressee, and recipient, denoting each attorney with the letters "ESQ."  You shall also identify all Persons working in a legal capacity with respect to the withheld material other than attorneys, *e.g.*, paralegals and legal secretaries, who appear on the Privilege Log.  Submit all non-privileged portions of any responsive Document (Including non-privileged or redactable attachments, enclosures, cover letters, and cover emails) for which a claim of privilege is asserted, noting where redactions to the Documents have been made.  When responsive, privileged Documents attached to responsive, non-privileged Documents, are withheld from production, insert a placeholder to indicate a Document has been withheld from that family.

20.     Any Documents You produce must be produced in accordance with the terms of any Protective Order in effect in this Action.

21.     In producing videos, for any video publicly available on Your website, or published by You on any other website (Including YouTube), You may in the alternative submit written permission for Plaintiffs to download, preserve, and use any such video through the pendency of this Action.  Should You choose this alternative, in the event Plaintiffs are unable to download and preserve any such video, You agree to produce a copy of it upon written request.

22.     The use of the singular form of any word includes the plural and vice versa.

23.     "And" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the discovery request all responses that might otherwise be construed to be outside of its scope.

24.     "Any," "all," "each," and "every" shall be construed as encompassing any and all.

25.     Documents responsive to this request shall be produced at the following

addresses:

> For Plaintiff United States of America:
>
>> Stephanie E. Pearl
>> Eugenie Boury
>> U.S. Department of Justice
>> Antitrust Division
>> 450 Fifth Street, NW, Suite 8000
>> Washington, DC 20530
>> Phone: (202) 568-3720
>> E-mail: stephanie.pearl@usdoj.gov
>> E-mail: eugenie.boury@usdoj.gov
>
> For Plaintiff Commonwealth of Massachusetts:
>
>> William T. Matlack
>> Daniel H. Leff
>> Office of the Attorney General
>> One Ashburton Place, 18th Floor
>> Boston, MA 02108
>> Phone: (617) 727-2200
>> E-mail: william.matlack@mass.gov
>> E-mail: daniel.leff@mass.gov
>
> For Plaintiff State of New York
>
>> Olga Kogan
>> Morgan J. Feder
>> New York State Office of the Attorney General
>> 28 Liberty Street, 20th Floor
>> New York, NY 10005
>> Phone: (212) 416-8262
>> E-mail: olga.kogan@ag.ny.gov
>> E-mail: morgan.feder@ag.ny.gov
>
> For Plaintiff District of Columbia:
>
>> C. William Margrabe
>> Estefania Torres Paez
>> Office of the Attorney General for the District of Columbia
>> 400 6th Street NW, Suite 10100
>> Washington, DC 20001
>> Phone: (202) 727-6294

E-mail: will.margrabe@dc.gov
E-mail: estefania.torrespaez@dc.gov

**DOCUMENT REQUESTS**

1.      Without regard to custodian, produce one copy of each organization chart and personnel directory that was created at any time after September 12, 2022, for Spirit as a whole and for each of Spirit's facilities or divisions involved in any activity Relating To scheduled air passenger service.

2.      Produce all Documents Relating To the Transaction or any potential combination of, or joint venture between, JetBlue and Spirit, Including all Documents Relating To:

      a.   modifications or amendments to the Agreement and Plan of Merger among JetBlue Airways Corporation, Sundown Acquisition Corp., and Spirit Airlines, Inc., dated July 28, 2022;

      b.   Communications between JetBlue and Spirit Relating To the Transaction before and after the execution of the Transaction;

      c.   Plans, Communications, or any other Documents Relating To Project Exchange, Project Henri, Project Galaxy, or any other project codename used by either JetBlue or Spirit to discuss a potential combination of, or joint venture between, JetBlue and Spirit;

      d.   due diligence materials, Including any work done by any clean teams;

      e.   Communications with, and Documents submitted to or reviewed by, JetBlue's or Spirit's board of directors, Senior Leadership Team or other executive team, investors, consultants, bankers, or lenders, Relating To the Transaction or any potential combination of, or joint venture between, JetBlue and Spirit;

    f.   financial modeling Relating To the Transaction or any potential combination of, or joint venture between, JetBlue and Spirit, Including modeling used to evaluate the Transaction both preceding and after the execution of the Transaction, and all data underlying or referenced in any such Documents;

    g.   all Documents Relating To Spirit's current order book and direct leases for aircraft, Spirit's Plans to exercise options that would expand its order book, and Spirit's Plans to enter into direct leases for aircraft;

    h.   all Documents Discussing the effect or impact of the Transaction on fares, fare levels, existing promotions, loyalty or rewards programs, capacity, service or service improvements, new service or product introduction, product elimination, passenger traffic, airport presence, customer growth, customer acquisition, or marketing strategy, Including any effects the Transaction may have on any customer segment; and

    i.   all Documents Relating To any alternatives to the Transaction.

    3.   Produce Documents sufficient to show the financial incentives or changes in the compensation scheme offered by JetBlue to any officer, director, or employee of Spirit tied to the implementation of, or metrics related to, the Transaction.

    4.   Produce all Documents Relating To any statements by any Person in support of or in opposition to the Transaction or this Action, or otherwise expressing any view about the Transaction or its likely effects on other airlines, passenger traffic, fares, product or service quality, access to inputs (Including labor, real estate, or aircraft) or frequency of service on particular routes, Including declarations, affidavits, statements, or letters in support of or in

opposition to the Transaction or this Action, any drafts or executed versions of each, and any Communications Relating To each declaration, affidavit, statement, or letter.

5.  Produce all Documents Relating To any Communications between Spirit and any Third Party Relating To the Transaction, this Action, the Investigation, or any other Government Actor's investigation or review of the Transaction.  For the avoidance of doubt, such Documents include:

      a.  any presentation or other materials Spirit shared with or delivered to any Government Actor Relating To the Transaction;

      b.  any proposal, offer, or actual or contemplated Plans to facilitate approval of the Transaction by any Government Actor or resolution of this Action;

      c.  Communications with any employee union; and

      d.  Communications with any other airline, Including any actual or potential domestic or foreign partner.

6.  Produce all Documents Relating To any offers or commitments made by Spirit to corporate customers, travel agencies, airport authorities, Government Actors, or any other Third Party, Relating To contract terms, frequency of service, jobs or employment terms, or access to JetBlue's or Spirit's products or services following consummation of the Transaction.

7.  Without regard to custodian, produce all Documents provided by JetBlue to Spirit prior to May 5, 2022, Relating To economic modeling of JetBlue's impact on the fares offered by other airlines, and any Communications Relating To any such Documents.

8.  Produce all minutes (Including attachments) of meetings of Spirit's Board of Directors or any committees thereof and all materials submitted to or reviewed by the Board or any committees thereof.

9. Produce all of Spirit's quarterly and annual earnings statements.

10. Produce all transcripts for Spirit's quarterly and annual earnings calls and any presentations at investor or industry conferences, and any materials prepared for, relied upon, or provided or presented therewith.

11. Without regard to custodian, produce one copy of all videos of presentations by Spirit Discussing scheduled air passenger service at investor or industry conferences.

12. Produce all Documents Relating To estimates or projections of market share, capacity, or revenue of scheduled air passenger service, Including nationally, regionally, by airport, by metro area, or by origin-and-destination pair.

13. Produce all Documents Discussing the effects of route presence, airport presence, network breadth, or network depth on passenger traffic, fares, revenues, or costs; the strategic importance of such effects; and any attempts to quantify such effects, Including benefits or harms to consumers, from route presence, airport presence, network breadth, or network depth.

14. Produce all Documents Discussing Spirit's or any other airline's Plans Relating To scheduled air passenger service, Including:

   a. business Plans;

   b. short-term and long-range strategies and objectives;

   c. budgets, financial projections, and forecasts;

   d. expansion or retrenchment Plans, Including consumer demand models; and

   e. Plans to reduce costs, improve services, introduce new services, or otherwise become more competitive.

15. Without regard to custodian, produce all Five Year Network Plans from 2010 to the present, comparable to NK-2R-00012836.

16

16.     Produce all Documents Relating To actual and forecasted route-level profit-and-loss statements.

17.     Without regard to custodian, produce all Documents Relating To: (a) Spirit's pricing, revenue, and yield management training materials; or (b) Spirit's network-planning and schedule management training materials.

18.     Produce all Documents Relating To Spirit's or other airlines' pricing, revenue, and yield management strategies or policies for scheduled air passenger service, Including Documents Relating To: (a) Spirit's or other airlines' policies, practices, or strategies with respect to the prices it will offer on those routes, Including both fares and ancillary or other fees; (b) Spirit's or other airlines' policies, practices, or strategies with respect to matching or responding to any other airline's pricing on those routes; and (c) the estimated or actual profitability of contemplated or actual fare changes on those routes.

19.     Produce all Documents Relating To systemwide increases or decreases to fares offered by JetBlue, Spirit, or any other airline, Including Documents Discussing the reasons for such systemwide increases or decreases, any responses to those increases or decreases by other airlines, and the likelihood that other airlines would participate in those increases or decreases.

20.     Produce all Documents Discussing the effects of JetBlue's fares, cost structure, or product features on the fares or product features offered by other airlines.

21.     Produce all Documents Discussing the effects of Spirit's fares, cost structure, or product features on the fares or product features offered by other airlines.

22.     Produce all Documents Discussing the effects of the fares, cost structure, or product features of ULCCs other than Spirit on the fares or product features offered by other airlines.

23.     Produce all Documents Discussing the relative strengths and weaknesses of Spirit's or other airlines' scheduled air passenger service, Including pricing, product features, and product quality.

24.     Produce all Documents Relating To Spirit's evaluation of the services offered by ULCCs other than Spirit, Including:

    a.   any Documents Discussing the prices offered by ULCCs other than Spirit, and how those prices compare to Spirit's prices or the prices offered by other airlines;

    b.   any Documents Discussing the costs that ULCCs other than Spirit incur for providing scheduled air passenger service, and how those costs compare to Spirit's costs or the costs of other airlines;

    c.   any Documents Discussing how the cost structures of ULCCs other than Spirit impact their abilities to offer lower fares to consumers;

    d.   any Documents Discussing the impact of entry by ULCCs other than Spirit on fares, service frequency, service, or service quality either generally or with respect to a particular route;

    e.   any Documents Discussing the impact of the frequency of service offered by ULCCs other than Spirit on a route on the fares or product features offered by other airlines on that route;

    f.   any Documents Discussing the factors that impact the likelihood of entry by ULCCs other than Spirit, either generally or with respect to a particular route; and

    g.   any Documents Discussing the differences among ULCCs, Including differences in their business models, strategies, service patterns, quality, prices, and costs.

25.     Produce all analyst reports, market studies, forecasts, surveys, and regularly produced reports Relating To output levels, pricing, sales, or marketing of scheduled air passenger service, Including respondent-level data for all post-flight surveys, post-booking surveys, net-promoter-score surveys, brand-tracker surveys, and brand-awareness surveys.

26.     Produce all reports, studies, or analyses of price elasticities, cross-price elasticities, or price sensitivities Relating To passenger demand, Including: (a) general estimates; (b) estimates related to specific origin-and-destination pairs; (c) estimates Relating To specific passenger segments, such as business or leisure; (d) estimates Relating To passenger preferences for nonstop versus connect service; and (e) estimates Relating To differences based on the type of air carrier (*e.g.*, legacy or ULCC).

27.     Produce all Documents Discussing the differences between business and leisure customers, Including:

   a.  any Documents Discussing certain fare characteristics, Including advanced purchase restrictions and weekend-stay requirements, that either Spirit or other airlines use to identify business or leisure customers;

   b.  any Documents Discussing the price-elasticity of business or leisure customers, Including the differences in price-elasticity of business and leisure customers;

   c.  any Documents Discussing Spirit's or other airlines' efforts to segment customer demand with their fare products, Including by differences in the prices and product qualities Spirit or other airlines offer to segment customer demand; and

   d.  any Documents Discussing the proportion of any customer segment (Including business, leisure, or any subsegment thereof or other categorization) that Spirit or

another airline serves, either on a specific route, on a specific set of routes, or
network-wide.

28.     Produce all Documents Relating To Spirit's network-planning strategies or
policies for scheduled air passenger service, Including Documents Relating To: (a) Spirit's
policies, practices, or strategies with respect to entering new routes or increasing frequency on
existing routes; (b) Spirit's policies, practices, or strategies for adding or reducing its level of
service; (c) Spirit's policies, practices, or strategies for exiting routes or decreasing frequency on
existing routes; and (d) Spirit's Plans for any partnership, codeshare, interline, or similar
agreement between Spirit and another airline.

29.     Produce all Documents Relating To Spirit's Plans to enter routes where JetBlue
provides service or has Plans to provide service, but Spirit does not, or to exit, increase, or
reduce service on routes where both JetBlue and Spirit provide service.

30.     Produce all Documents Relating To any constraints on entry or expansion of
scheduled air passenger service, either generally, or specifically at any airport identified in
Appendix A.

31.     Produce all Documents Relating To Spirit's or any other Person's: (a) attempts to
obtain or lease Slots from the FAA or any other Person; (b) potential or actual release or return
of Slots to the FAA; (c) Communications with the FAA about Slot usage or returning, releasing,
sliding, obtaining, or trading for Slots; (d) efforts to modify, slide, trade, or swap the time of any
Slot with the FAA or any other Person; and (e) compliance with any internal or FAA Slot usage
goals or requirements.

32.     Produce Documents sufficient to show Spirit's use of Slots, Including the number of times or percentage of time in each scheduling season since January 1, 2018, that each of Spirit's allocated Slots have gone unused by Spirit and the reason for Spirit not using such Slots.

33.     Produce all Documents Relating To Spirit's or any other Person's: (a) attempts to obtain or lease gates at any airport identified in Appendix A; (b) potential or actual release or return of gates at any airport identified in Appendix A; (c) Communications with any Person about gate usage or returning, releasing, or obtaining gates at any airport identified in Appendix A; or (d) compliance with any gate usage goals or requirements at any airport identified in Appendix A.

34.     Produce all Documents Relating To the effect of gates or any other airport facilities at any airport identified in Appendix A as a constraint or otherwise as an inhibitor of Spirit's ability, Plans, or efforts to expand, grow, or otherwise increase the quantity or quality of service for scheduled air passenger service departing from or landing at any airport identified in Appendix A.

35.     Produce Documents sufficient to show Spirit's use of gates at any airport identified in Appendix A, Including the number of times or percentage of time that each of Spirit's allocated gates have gone unused by Spirit and the reason for Spirit not using such gates.

36.     Produce all Documents Relating To Spirit's or any other Person's: (a) attempts to obtain international landing rights at FLL (*see, e.g.*, John Patrick Kirby, 30(b)(6) Spirit CID Deposition, 214:19–216:22 (Jan. 12, 2023)); (b) potential or actual release of international landing rights at FLL; (c) Communications with any Person about usage of, or returning, releasing, or obtaining, international landing rights at FLL.

37.     Produce all Documents Relating To the effect of international landing rights at FLL as a constraint or otherwise as an inhibitor of JetBlue's ability, Plans, or efforts to expand, grow, or otherwise increase the quantity or quality of service for scheduled air passenger service departing from or landing at FLL.

38.     Produce all Documents Relating To any potential termination or modification of the Northeast Alliance or any aspect of it, Including any requests by Spirit to terminate or modify the Northeast Alliance, and any consideration by JetBlue of those or similar requests.

39.     Produce all Documents Discussing any effect that the Transaction has had, will have, or may have on the Northeast Alliance.

40.     Produce all Documents Discussing any effect that the Northeast Alliance will have or may have on the Transaction.

41.     Produce all Documents Discussing the effects or potential effects of any actual or potential domestic airline mergers or acquisitions, Including Delta/Northwest, United/Continental, Southwest/AirTran, American/US Airways, and Alaska Airlines/Virgin America, on market shares, market concentration, fares, service levels, capacity, passenger traffic, airport presence, or revenues of scheduled air passenger service.

42.     Produce all Documents Discussing: (a) the need for, benefits of, or the desirability of capacity reductions, Capacity Discipline, or growth limitations by Spirit or any other airline; (b) the undesirability of Spirit or any other airline increasing capacity or increasing capacity at a rate that exceeds Gross Domestic Product; or (c) any relationship between airline consolidation and Capacity Discipline by Spirit or any other airline.

43.     Produce all Documents Relating To any actual or contemplated changes in total network capacity and the strategic rationale for those changes by Spirit or any other airline,

Including: (a) all Documents Relating To Spirit's monitoring of the actions or public statements of other airlines regarding changes in capacity; and (b) Plans for or actual aircraft acquisition and retirement.

44.     Produce all Documents Relating To any Communications between Spirit and any Third Party Discussing Spirit's capacity, industry capacity, Capacity Discipline, the capacity of any other airline, or the effect or impact of capacity changes on airline or industry-wide fares, revenues, or profits.

45.     Produce all Documents Discussing the relationship between industry capacity and fares, Including the impact that increases or decreases in capacity have on the fares offered by Spirit or other airlines.

46.     Produce all Documents, Including drafts, comments, video or audio recordings, and transcripts, Relating To any speeches or presentations Discussing industry consolidation or Capacity Discipline in the airline industry.

47.     Produce all Documents Relating To Cross-Market Initiatives, Including any Cross-Market Initiatives by Spirit or another airline and any response to any such Cross-Market Initiatives by Spirit or another airline.

48.     Produce all Documents Relating To any efforts by Spirit or another airline either to monitor fare actions by other airlines through ATPCO or to prompt a competitive response by filing fares on ATPCO.

49.     Produce all Documents Relating To any actual or potential Plans for the composition of Spirit's fleet, Including any Plans Relating To the layout of passenger accommodations of Spirit's planes.

50.     Produce all Documents Relating To the availability of aircraft for purchase or lease, Including the expected timeframe for Spirit to take possession of such aircraft.

51.     Produce all Documents Discussing JetBlue's or Spirit's utilization rates for aircraft prior to the Transaction, any Plans to or consideration of increasing utilization rates and how JetBlue's or Spirit's utilization rates for aircraft compare to those of other airlines.

52.     Produce all Documents Relating To JetBlue's or Spirit's proposed sale of the Divestiture Assets.  For the avoidance of doubt, Documents responsive to this request include:

    a.  all agreements Relating To the Divestiture Assets between Spirit and any Potential Acquirer of the Divestiture Assets;

    b.  all Documents Relating To Communications between JetBlue and Spirit Relating To the Divestiture Assets;

    c.  all Documents Relating To internal Communications among Spirit's employees or any other Persons acting on Spirit's behalf Relating To the Divestiture Assets;

    d.  any Documents analyzing or Discussing valuation method(s) used to arrive at a sales price for the Divestiture Assets;

    e.  market or competitive analyses Spirit has developed, purchased, or used that pertain to the Divestiture Assets;

    f.  all Documents Relating To Communications between Spirit and any Potential Acquirer of the Divestiture Assets Relating To the Divestiture Assets; and

    g.  bids, offers, letters of intent, expressions of interest, and other materials that Spirit has received from any Potential Acquirer for the Divestiture Assets.

53.     Produce all Documents Relating To any allegation that JetBlue, Spirit, or any other airline is behaving, or has behaved, in an anticompetitive manner, Including customer and

competitor complaints; threatened, pending, or completed lawsuits; or federal or state investigations.

54.     Produce all Documents and Communications Relating To each of the following statements in Spirit's Schedule 14D-9, filed with the U.S. Securities and Exchange Commission on May 19, 2022:

    a.   "In the end, after several weeks and counting, Spirit concluded that the consummation of the proposed JetBlue combination, with the NEA remaining in place, seemed almost inconceivable – especially given the cavalier manner in which JetBlue intends to address the significant regulatory risk."

    b.   "Moreover, Spirit does not believe the DOJ, or a court, will be persuaded that JetBlue should be allowed to form an anticompetitive alliance that aligns its interests with a legacy carrier (American) and then undertake an acquisition that will eliminate the largest ULCC carrier in the U.S. (Spirit)."

    c.   JetBlue is insisting "on prioritizing its position in the NEA as it pursues a Spirit merger."

    d.   "Even putting aside the NEA, Spirit believes the DOJ – and a court – will be very concerned that a JetBlue-Spirit combination will result in a higher-cost/higher fare airline that would eliminate a lower-cost/lower fare airline and remove about half of the ULCC capacity in the United States."

    e.   "The conversion of Spirit aircraft to JetBlue configuration will result in significantly diminished capacity on former Spirit routes, and, as JetBlue has stated, will also result in higher prices for consumers."

f. "JetBlue's proposed divestiture of Spirit assets in New York and Boston does not address the broader competitive implications of effectively merging Spirit into JetBlue's alliance with American."

55.    Without regard to custodian, Produce one copy of each version of the following:

a. 0-3-7 AP Nonstop reviews, comparable to NK-2R-07061301;

b. Close End Booking Fares reviews, comparable to NK-2R-06962159;

c. OA Structure reviews, comparable to NK-2R-06988324;

d. Yaba reports, comparable to those Spirit previously produced in response to Second Request Specification 2(j) (*e.g.*, NK-2R-06989003);

e. Automation spreadsheets, comparable to those previously produced in response to Second Request Specification 2(j) (*e.g.*, Automated_Output2_2022-04-28.csv);

f. Infare daily reports, comparable to those previously produced in response to Second Request Specification 2(d), for example:

    i. NK_010120170700.csv (fare data)

    ii. NK_FC_201804100800.csv (vacation package data – no hotel)

    iii. NK_FH_201804100800.cs (vacation package data w/ hotels)

g. Southwest Snapshots, comparable to those previously produced in response to Second Request Specification 2(d) (*e.g.*, Snapshot2022-01-01.csv);

h. TW - PL Report Comparisons, comparable to NK-2R-06875391;

i. Monthly route-level P&L reports, comparable to those previously produced in response to Second Request Specification 2(a) (*e.g.*, "Specification 2(a) Response-Spirit Confidential");

j.  Pricing Activity Reports, comparable to those previously produced in response to Second Request Specification 26 (*e.g.*, NK-2R-06919242);

k.  Capacity plans, comparable to NK-2R-05102508;

l.  Forecast models, comparable to NK-2R-00010987;

m.  Stimulation models, comparable to NK-2R-06789254;

n.  Mismatch reports, comparable to NK-2R-03464097;

o.  Budget reports, comparable to NK-2R-02975276;

p.  Monthly flight schedules, comparable to NK-2R-01149406; and

q.  Profiling by Trip Type reports, comparable to NK-2R-00709392.

56.   Without regard to custodian, produce passenger bookings and ancillary fee data in the same format previously produced in response to Second Request Specification 2(e), with additional fields indicating: (a) flight departure time; (b) flight number; (c) Free Spirit number, if applicable; (d) taxes; (e) passenger facility charges ("PFCs"); and (f) segment fees.

57.   Without regard to custodian, produce all Documents produced by Spirit during the litigation *United States et al. v. American Airlines Group Inc. et al.*, 1:21-cv-11558-LTS (D. Mass.), as well as the United States' associated investigation of the Northeast Alliance.  You may respond to this request by agreeing that Plaintiffs may use those Documents in this Action as though produced in this Action.

58.   Without regard to custodian, produce all reports that Your retained experts prepared in connection with any cases in which, during the previous four years, they testified as an expert at any hearing or trial, or by deposition.

59.   Without regard to custodian, produce all Documents that You may use to support Your defenses in this Action.

Dated: March 28, 2023

| /s/ Edward W. Duffy | /s/ William T. Matlack |
|---|---|

Edward W. Duffy
  Senior Trial Counsel
Stephanie E. Pearl
  Trial Attorney
Sarah V. Riblet
  Trial Attorney
U.S. Department of Justice
Antitrust Division
450 Fifth Street, NW, Suite 8000
Washington, DC 20530
Phone: (202) 812-4723
E-mail: edward.duffy@usdoj.gov

*Attorneys for Plaintiff United States of America*

William T. Matlack (MA BBO No. 552109)
  Assistant Attorney General
  Chief, Antitrust Division
Daniel H. Leff (MA BBO No. 689302)
  Assistant Attorney General
One Ashburton Place
Boston, MA 02108
Phone: (617) 727-2200
E-mail: william.matlack@mass.gov

*Attorneys for Plaintiff Commonwealth of Massachusetts*

| /s/ Olga Kogan | /s/ C. William Margrabe |
|---|---|

Elinor R. Hoffman
  Chief, Antitrust Bureau
Christopher D'Angelo
  Chief Deputy Attorney General
  Economic Justice Division
Olga Kogan
  Assistant Attorney General
Morgan J. Feder
  Assistant Attorney General
28 Liberty Street, 20th Floor
New York, NY 10005
Phone: (212) 416-8262
E-mail: olga.kogan@ag.ny.gov

*Attorneys for Plaintiff State of New York*

C. William Margrabe
  Assistant Attorney General
400 6th Street NW, Suite 10100
Washington, DC 20001
Phone: (202) 727-6294
E-mail: will.margrabe@dc.gov

*Attorney for Plaintiff District of Columbia*

## APPENDIX A

Austin-Bergstrom International Airport (AUS)
Baltimore/Washington International Thurgood Marshall Airport (BWI)
Boston Logan International Airport (BOS)
Bradley International Airport (BDL)
Cancun International Airport (CUN)
Cleveland Hopkins International Airport (CLE)
El Dorado International Airport (BOG)
Fort Lauderdale-Hollywood International Airport (FLL)
Harry Reid International Airport (LAS)
Hollywood Burbank Airport (BUR)
John F. Kennedy International Airport (JFK)
John Wayne Airport (SNA)
Jorge Chavez International Airport (LIM)
José Joaquín de Olmedo International Airport (GYE)
José María Córdova International Airport (MDE)
Juan Santamaría International Airport (SJO)
LaGuardia Airport (LGA)
Long Beach Airport (LGB)
Los Angeles International Airport (LAX)
Louis Armstrong New Orleans International Airport (MSY)
Luis Muñoz Marín International Airport (SJU)
Mercedita International Airport (PSE)
Miami International Airport (MIA)
Newark Liberty International Airport (EWR)
Norman Manley International Airport (KIN)
Orlando International Airport (MCO)
Philadelphia International Airport (PHL)
Princess Juliana International Airport (SXM)
Punta Cana International Airport (PUJ)
Queen Beatrix International Airport (AUA)
Rafael Hernández International Airport (BQN)
Rafael Núñez International Airport (CTG)
Richmond International Airport (RIC)
Ronald Reagan Washington National Airport (DCA)
Sangster International Airport (MBJ)
Santo Domingo Airport (SDQ)
Southwest Florida International Airport (RSW)
St. Pete-Clearwater International Airport (PIE)
Tampa International Airport (TPA)
Toussaint Louverture International Airport (PAP)
Washington Dulles International Airport (IAD)

## CERTIFICATE OF SERVICE

I certify that on March 28, 2023, I served the foregoing upon all counsel of record via electronic mail.

Dated: March 28, 2023

/s/ Stephanie E. Pearl

Stephanie E. Pearl
 Trial Attorney
U.S. Department of Justice
Antitrust Division
450 Fifth Street, NW, Suite 8000
Washington, DC 20530
Phone: (202) 568-3720
E-mail: stephanie.pearl@usdoj.gov

*Attorney for Plaintiff United States of America*

30