## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, et al., | ) | |
| Plaintiffs, | ) | |
| v. | ) | |
| JETBLUE AIRWAYS CORPORATION and SPIRIT AIRLINES, INC., | ) | Civil Action No. 1:23-cv-10511-WGY |
| Defendants. | ) | |

## DEFENDANT SPIRIT AIRLINES, INC.'S MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL PRODUCTION OF SPIRIT DOCUMENTS

Six weeks after the June 28 close of fact discovery, Plaintiffs filed a motion to compel production of 2,835 privileged communications involving two consulting firms that worked with Spirit's legal counsel in responding to an unprecedented series of merger proposals from Frontier Airlines ("Frontier") and JetBlue Airways Corporation ("JetBlue"). Plaintiffs made their last-minute motion even though they have been in possession of Spirit's privilege log since December 2022. Numerous times in the months after creation of the privilege log, Spirit explained to Plaintiffs that the two advisory firms at issue, FGS Global ("FGS") and Okapi Partners LLC ("Okapi"), were the functional equivalent of Spirit employees, and that their communications with Spirit's counsel were therefore protected from disclosure by the attorney-client privilege. Ultimately, Plaintiffs chose to bring this motion, which is meritless for at least three reasons:

*First*, courts routinely deny discovery motions made after the close of fact discovery, particularly when the movant is on notice of the dispute and offers no good rationale for its delay. Plaintiffs offer no justification for the untimely nature of their motion. Moreover, their delay is prejudicial, as the parties are far along in their trial preparation, having designated depositions, exchanged trial exhibits, and are finalizing objections in connection with the upcoming joint pretrial order. Reopening fact discovery and compelling Spirit to produce thousands of documents at this late stage would necessarily divert resources from preparation for the October 16 trial.

*Second*, Plaintiffs are wrong on the merits. Plaintiffs insist that, because the First Circuit has not officially adopted the "functional equivalent doctrine," this Court should implement a rigid, formalistic distinction between salaried employees and critical third-party advisors retained by Spirit to perform functions that their own employees could not. Plaintiffs also ignore that the functional equivalent doctrine, which is a natural application of the Supreme Court's controlling ruling in *Upjohn Co.* v. *United States*, 449 U.S. 383 (1981), has been adopted by multiple circuit courts of appeal—and none has expressly rejected it. And, although this District has not previously applied the functional equivalent doctrine (nor has the First Circuit rejected it), Plaintiffs' motion blithely ignores the inequity that would flow from adopting its artificially restrictive view of privilege when Spirit's home jurisdiction, the situs of the communications at issue, has adopted the majority view.

*Third*, Plaintiffs' argument that FGS and Okapi do not meet the requirements of the functional equivalent doctrine is incorrect. FGS and Okapi worked hand-in-hand with Spirit's highest-ranking executives and its counsel on the very "sine qua non of the client's

existence"—a transformative merger. As an ultra-low-cost carrier ("ULCC"), Spirit's leanly-staffed executive team lacked the resources, staffing, and expertise to navigate the heavy volume of work and complex issues raised by competing merger proposals from Frontier and JetBlue. Spirit therefore supplemented its team with outside advisors (including FGS and Okapi) who worked together with Spirit executives, with the expectation of confidentiality, to assist Spirit with internal and external communications, disclosure issues, investor relations, and shareholder solicitation. Those functions necessarily required these advisors to work with counsel for Spirit in formulating Spirit's legal strategy in this fast-moving merger battle. There would be no dispute that the advisors' communications with counsel would be privileged if they had been directly employed by Spirit, and Spirit should not be penalized for adopting a ULCC business model that required it to bring on external advisors like FGS and Okapi to coordinate with its legal team to develop and execute Spirit's communications and investor strategy. The weight of the case law squarely recognizes that when advisors such as FGS and Okapi essentially function as Spirit employees, their communications with counsel are privileged and should be protected from disclosure. Plaintiffs' motion should therefore be denied.

## **BACKGROUND**[1]

### A. **Spirit Airlines**

Spirit is a commercial airline headquartered in Miramar, Florida, that operates as an "ultra-low-cost carrier," which depends upon controlling costs and maintaining a lean management team. Haralson Dec. ¶¶ 2–4. Under that model, Spirit routinely outsources

---

[1] Spirit only briefly recites the relevant facts here; for the full background as attested by the parties involved, *see* Haralson Dec. (Spirit); Finch Dec. (Paul Weiss); Gooding Dec. (Debevoise); Weinberg Dec. (FGS); Alexander Dec. (Okapi).

standard business functions that can be performed more economically by outside contractors. *Id.* ¶ 4.

### B. The Competing Merger Proposals

Spirit agreed to merge with Frontier on February 5, 2022. Haralson Dec. ¶ 5. The proposed merger was subject to regulatory review by the United States Department of Justice ("DOJ"). *Id.* Lacking the in-house resources required for a transaction of this magnitude, Spirit assembled a team of third-party advisors to assist it, including communications and investor relations specialists. Haralson Dec. ¶¶ 6–8, 11–12. Specifically, Spirit retained FGS on January 7, 2022, to provide strategic communications and media relations advice, Haralson Dec. ¶ 7; Weinberg Dec. ¶ 4, and Okapi on February 16, 2022, to provide strategic advice with respect to investor response, corporate governance, and proxy solicitation. Haralson Dec. ¶ 8; Alexander Dec. ¶ 3. Spirit expected that FGS and Okapi would communicate—and coordinate—with Spirit and its outside legal counsel, Debevoise & Plimpton LLP and Paul, Weiss, Rifkind, Wharton & Garrison LLP, and Spirit expected those non-public communications to be and remain confidential.[2] Finch Dec. ¶¶ 2, 5–6; Gooding Dec. ¶¶ 2, 5–6; Haralson Dec. ¶¶ 11–14.

On March 29, 2022, JetBlue announced an unsolicited, competing bid for Spirit. JetBlue's bid, and the competition between Frontier and JetBlue to consummate a transaction with Spirit, created a maelstrom of regulatory, media, and investor response demands unlike any Spirit had ever experienced. Haralson Dec. ¶¶ 11–12; Finch Dec. ¶¶ 4–

---

[2] Indeed, FGS and Okapi are obligated by their respective agreements with Spirit to strictly maintain any non-public information shared by Spirit in confidence. Haralson Dec. ¶¶ 7-8; Weinberg Dec. ¶ 12; Alexander Dec. ¶ 12; FGS-CID-00058930, at '931; NK-2R-06685408, at '410.

6; *see* Weinberg Dec. ¶¶ 6–7; Alexander Dec. ¶¶ 4–8. Spirit deputized FGS and Okapi to work closely with Spirit's CEO, high-level corporate executives, and legal counsel to navigate a series of competing merger proposals. Haralson Dec. ¶¶ 11–14; Finch Dec. ¶¶ 5; Weinberg Dec. ¶¶ 8–11; Alexander Dec. ¶¶ 8–10. FGS took a hands-on role in the day-to-day management of media inquiries and communications, being listed as a direct point of contact on Spirit press releases and guiding strategic communications decisions concerning Spirit's perspective on the competing proposals. Weinberg Dec. ¶¶ 8, 10. Okapi stepped into an investor response and corporate governance role, Alexander Dec. ¶¶ 6–11, to supplement Spirit's one-person "team." In these roles, FGS, Okapi, and counsel discussed Spirit's communications strategy, what could be disclosed to shareholders and other stakeholders, and proposed public statements on behalf of Spirit, with counsel providing guidance to FGS and Okapi, including the assessment of regulatory and litigation risk, edits and comments to draft statements and presentation, and advice regarding Spirit's disclosure obligations. Finch Dec. ¶ 5–6; Gooding Dec. ¶ 5; Haralson Dec. ¶¶ 13–14; Weinberg Dec. ¶¶ 9–12; Alexander Dec. ¶¶ 8–11.

## C. Spirit Produces Two Million Documents in Response to the Second Request and Explains That Certain FGS and Okapi Documents Are Privileged

Beginning in spring 2022, the DOJ began investigating the potential mergers with Frontier and, subsequently, with JetBlue. The DOJ issued what is termed a Second Request to Spirit concerning the proposed JetBlue merger on September 12, 2022. Finch Dec. ¶ 7. Spirit ultimately produced more than 2 million documents (spanning more than 7 million pages) in response to the Second Request, including thousands of non-privileged Spirit communications with FGS and/or Okapi. *Id*. ¶ 8. The DOJ also issued a Civil Investigative

Demand ("CID") to FGS directly, to which FGS responded with narrative answers describing its role on October 7, 2022. *Id.* ¶¶ 9, 14.

Spirit first asserted privilege over the communications between its counsel and FGS and Okapi on December 7, 2022 when Spirit submitted a privilege log to the DOJ. *Id.* ¶ 8. On December 22, 2022, the DOJ sent a letter to Spirit, asserting that the privilege log had included third-party organizations that should not have been included, including FGS. *Id.* Spirit responded on December 28, 2022, providing legal precedent for its position that the privilege log entries identifying FGS were indeed privileged and descriptions of the roles of FGS and other third parties. *Id.* ¶ 9. The parties met and conferred on December 30, 2022, and Spirit agreed that the privilege log had inadvertently identified a small number of records involving certain third parties, which Spirit promptly de-privileged and produced.[3] *Id.* ¶¶ 10–11. On January 10, 2023, after further re-review, Spirit's counsel provided another production and supplement to the privilege log, which included a column entitled "Third Party Details" specifying the circumstances supporting the assertion of privilege for each document withheld on that basis over which the DOJ had requested additional review. *Id.* ¶ 11.

In response, the DOJ asked for nothing more than a cumulative privilege log encompassing all of Spirit's supplements to date and did not challenge Spirit's assertion of the privilege during the remainder of its investigation of the proposed JetBlue merger. *Id.*

### D. The DOJ Brings Suit and Reopens the Dormant Privilege Dispute

The DOJ commenced this action on March 7, 2023, to enjoin the merger between Spirit and JetBlue. The parties jointly requested an expedited schedule, and the DOJ served

---

[3] The inadvertent inclusion of third parties was aggravated by the technology-assisted review ("TAR") process as accompanied by reviewer human error. Finch Dec. ¶ 7.

Requests for Production of Documents on March 28, 2023 ("Litigation RFPs"). Spirit produced or logged more than one million additional documents in response to the DOJ's Litigation RFPs. (None of those logged documents, however, are at issue in the motion.)

On May 16, 2023—four months after the last privilege exchange concerning the Second Request documents—the DOJ sent a letter to Spirit, asserting that Spirit had waived the attorney-client privilege by including FGS and/or Okapi in communications with counsel. Finch Dec. ¶ 13. In meet-and-confers between May 21, 2023, and June 9, 2023, Spirit reiterated its position that there was no waiver with respect to those FGS and Okapi communications because both FGS and Okapi were functioning as de facto employees of Spirit under the functional equivalent doctrine. Finch Dec. ¶¶ 14–15.

On June 15, 2023, Spirit submitted a 10-page letter to the DOJ detailing Spirit's position that the FGS and Okapi documents were privileged based on case law and providing specific explanations as to why certain documents were indeed privileged. Dkt. 153, Battaglia Dec. Ex. 17. Spirit's letter invited the DOJ to identify specific entries on the privilege log that concerned the DOJ. *Id*. Fact discovery closed almost two weeks later, on June 28. Dkt. 79. The cutoff for any supplemental fact discovery was July 31. *Id*.

Although the DOJ was aware of Spirit's privilege assertions regarding communications with FGS and Okapi since December 2022, the DOJ did not move to compel production at any point prior to commencing litigation or at any point during the fact discovery period.[4] On July 18, 2023, the DOJ sent a letter to counsel for Spirit

---

[4] The DOJ's only explanation to date attributed its delay to the "staff's decision to use limited investigation resources to pursue tasks other than challenging Spirit's investigation logs in court during the investigation." Finch Dec. Ex. 3 (May 23, 2023, email from Battaglia to Wald).

declaring that the parties had reached an "impasse" with regard to the withheld FGS and Okapi communications dating back to the Second Request. Finch Dec. Ex. 7. On August 18—roughly seven weeks after the close of fact discovery, and one month after the DOJ's declaration of an impasse—Plaintiffs filed this motion, seeking to compel the immediate production of nearly 3,000 communications with FGS and/or Okapi. Dkt. 151–153.

## ARGUMENT

### A. The Motion To Compel Should be Denied as Untimely

Plaintiffs are entitled to no relief because their motion to compel is too late. A motion to compel brought after the close of fact discovery is properly denied as untimely absent some showing of good reason for the delay, rather than movant's "tactical decision or negligence." *Gault v. Nabisco Biscuit Co.*, 184 F.R.D. 620, 622 (D. Nev. 1999); *see Ayala-Gerena v. Bristol Myers-Squibb Co.*, 95 F.3d 86, 94 (1st Cir. 1996) (no abuse of discretion in denying discovery motion where appellants waited more than one month after the discovery deadline had elapsed to properly request an order from the district court); *Burgos-Martinez v. City of Worcester*, 345 F. Supp. 3d 105, 106-07 (D. Mass. 2018); *Pittman v. Experian Info. Sols., Inc.*, 901 F.3d 619, 642-43 (6th Cir. 2018) ("A district court may properly deny a motion to compel discovery where the motion to compel was filed after the close of discovery. . . . This is especially true where the moving party had the information it needed to file the discovery motion and its late filing would prejudice the other party.") (collecting cases)); *Allergan Inc. v. Pharmacia Corp.*, No. Civ. A. 01-141-SLR, 2002 WL 1268047, at *2 (D. Del. May 17, 2002) ("Motions that relate to fact discovery must be filed during fact discovery, especially where, as here, the underlying facts relating to the motion were known to plaintiffs [three months earlier].").

Plaintiffs have no legitimate justification for their delay. The DOJ received Spirit's privilege log asserting privilege over the documents Plaintiffs now seek on December 7, 2022.[5] After initially engaging with Spirit on this issue, Plaintiffs fell silent until May 16, well over halfway through the accelerated fact discovery in this litigation.[6] Plaintiffs attributed their several-months-long delay to the "staff's decision to use limited investigation resources to pursue tasks other than challenging Spirit's investigation logs in court during the investigation."[7] Spirit re-engaged on this issue and repeatedly explained its position in various meet-and-confers and finally at length in writing on June 15, well in advance of the close of fact discovery.[8] Plaintiffs finally declared an "impasse" over a month later—on July 18[9]—and yet Plaintiffs delayed *another* month (until August 18) to file this motion. As Defendants finalize their case for trial based on the long-closed discovery record, and with expert depositions scheduled to conclude in days, Defendants would be prejudiced by reopening fact discovery and disclosing thousands of additional documents "on the eve of trial." *Gault*, 184 F.R.D. at 622; *Buttler v. Benson*, 193 F.R.D. 664, 666 (D. Colo. 2000) ("A party cannot ignore available discovery remedies for months and then, on the eve of trial, move the court for an order compelling production.").

---

[5] Dkt. 153, Battaglia Dec. Ex. 5 (Dec. 28, 2022, Ltr. from St. Matthew-Daniel to Battaglia); Finch Dec. Ex. 1 (Jan. 10 Ltr. from Finch to Riblet and Sepulveda); Finch Dec. ¶ 8. In its initial response in December 2022 and early January 2023, Spirit diligently re-reviewed and produced approximately 360 documents out of over two million produced, some of which involved third parties that had been withheld in error due to the expedited production that the DOJ had requested and Spirit's reliance on a TAR model, to which use the DOJ had consented. Finch Dec. ¶¶ 7, 9–11. These are apparently among the figure of 200 that Plaintiffs misleadingly highlight in their motion. Mot. at 2.
[6] Finch Dec. Ex. 2 (May 21, 2023, Ltr. from Wald to Battaglia); Finch Dec. ¶¶ 9–11.
[7] Finch Dec. Ex. 3 (May 23, 2023, email from Battaglia to Wald).
[8] Finch Dec. ¶¶ 14–15; Dkt. 153, Battaglia Dec. Ex. 17 (Jun. 15, 2023, Ltr. from St. Matthew-Daniel to Battaglia).
[9] Finch Dec. Ex. 7 (Jul. 18, 2023, Ltr. from Battaglia to Finch).

The documents at issue are also far from central to the prosecution of Plaintiffs' case. Although the DOJ says it needs them for expert discovery, the record says otherwise. Spirit long ago produced thousands of *non-privileged* communications between Spirit (on one hand) and FGS or Okapi (on the other), only one of which was introduced by Plaintiffs in deposition, who likewise asked only a few superficial questions about FGS and Okapi's roles in those depositions—nor did Plaintiffs depose any witness from FGS or Okapi. And Plaintiffs have disclosed more than 500 pages of expert reports from two economists without any need for the documents in dispute here. Plaintiffs' lack of diligence is undeniable and should not be rewarded. *See Rossetto v. Pabst Brewing Co.,* 217 F.3d 539, 542 (7th Cir. 2000) (no error in denying plaintiffs' motion to compel filed two months after discovery closed, with "no excuse for their tardiness"); *Burgos-Martinez*, 345 F. Supp. 3d at 107 ("That Plaintiff's counsel was busy is not satisfactory justification for the untimely motion.").

The prejudice to Spirit as a result of Plaintiffs' unfounded delay is aggravated by the drastic overbreadth of the motion. Spirit provided a detailed privilege log prepared to the DOJ's specifications outlining a *prima facie* basis for claiming privilege for every communication with FGS and Okapi listed on the privilege log, and it has submitted multiple supplements to further clarify privilege as to individual entries when requested by the DOJ.[10] Despite Spirit's repeated requests[11] that Plaintiffs specify any privilege log entries involving FGS and Okapi communications of particular concern, Plaintiffs have not

---

[10] Finch Dec. ¶¶ 9–11. Spirit submitted supplements to its Log on Dec. 28, 2022; Jan. 10, 2023; and Jan. 11, 2023.

[11] *See, e.g.*, Finch Dec. Ex. 5 (June 21, 2023, email from Sunshine to Battaglia); Finch Dec. Ex. 4. (May 31, 2023, email from Sunshine to Battaglia).

done so. Instead, they have broadly argued that no possible set circumstances could ever justify the assertion of privilege over communications with advisors like FGS and Okapi. Courts faced with similar wholesale motions to compel have had no trouble denying them for lack of specificity, delay, and overbreadth. *See, e.g.*, *Wells Real Est. Inv. Tr. II, Inc. v. Chardon/Hato Rey P'ship, S.E.*, 615 F.3d 45, 58–59 (1st Cir. 2010) (motion to compel properly denied where discovery request was overly broad and made after discovery deadline had passed); *Foster v. Hunt S. Grp., LLC*, 2019 WL 13128593, at *1 (S.D. Miss. Apr. 2, 2019) (motions to compel lacking "requisite level of specificity for the Court to evaluate the merits of Plaintiffs' generalized objections as they apply to the privilege logs" denied where moving party failed to make "any good faith effort to resolve disputes about specific privilege log entries" or "identify a single privilege log entry that they believe to be deficient lacking in specificity").

### B.  The Motion to Compel Should Be Denied on the Merits

#### 1.  This Court Should Recognize the Functional Equivalent Doctrine

Numerous federal circuits and the Commonwealth of Massachusetts have recognized and applied the functional equivalent doctrine to communications involving third parties like those at issue here.

The fundamental principles for application of the attorney-client privilege in the corporate context were established by the Supreme Court in *Upjohn Co. v. United States*, 449 U.S. 383 (1981), which includes those employees who ordinarily "would have the relevant information needed by corporate counsel if [that counsel] is to adequately to advise the client with respect to such actual or potential difficulties." *Id.* at 391.

Although the Supreme Court's decision concerned corporate employees, numerous courts have interpreted *Upjohn* to extend the privilege to an instrumentality serving an employee-like function. The seminal case is *In re Bieter,* 16 F.3d 929 (8th Cir. 1994), which held that the *Upjohn* rule would apply when a third party is the functional equivalent of an employee for the purpose of the privilege.[12] Although Plaintiffs try to characterize *Bieter* as unique to the Eighth Circuit, in fact, multiple circuit courts have agreed that *Upjohn* itself calls for a test of functional equivalence. *Berisha v. Lawson*, 973 F.3d 1304, 1317-20 (11th Cir. 2020); *United States v. Graf*, 610 F.3d 1148, 1158-59 (9th Cir. 2010); *see also Trustees of Elec. Workers Loc. No. 26 Pension Tr. Fund v. Tr. Fund Advisors, Inc.*, 266 F.R.D. 1, 8 (D.D.C. 2010) (comparing *Bieter* and noting the D.C. Circuit has likewise "rejected an interpretation of the privilege that makes its application a direct function of whether the person providing or receiving the information to or from counsel is employed by the corporation") (citing *Federal Trade Comm'n v. GlaxoSmithKline*, 294 F.3d 141, 148 (D.C. Cir. 2002)).

The First Circuit has not weighed in explicitly, but there is nothing in its jurisprudence to suggest that it would diverge from the consensus application of *Upjohn* by its sister circuits. Instead, the First Circuit in *Lluberes v. Uncommon Productions, LLC*, 663 F.3d 6 (1st Cir. 2011), acknowledged *Bieter's* holding that a "communication between [a] real estate development partnership and developer it retained as an independent

---

[12] Specifically, "that the communication be made for the purpose of seeking legal advice"; (2) "that the person making the communication do so at the direction of his superior"; (3) "that the superior request that the communication be made so that the client could secure legal advice"; (4) "that the subject matter of the communication be within the scope of the representative's duties"; and (5) "that the communication not be disseminated beyond those persons who, because of the structure of the client's operations, need to know its contents." *Id.* at 937–939 (quoting *Diversified Indus. v. Meredith*, 72 F.2d 596 (8th Cir. 1978)).

contractor for both development and subsequent litigation was protected." *Id.* at 24, n.21.[13]
*Lluberes* cited *Bieter's* holding in support of the more general statement that "[i]f the communication contains only client confidences made in pursuit of legal advice—or legal advice based on such client confidences—that communication, if intended to remain confidential, should be covered by the privilege, regardless of whether it came from the client, his attorney, or an agent of either one." Further, in *In re Keeper of Records*, 348 F.3d 16 (2003), the First Circuit tied waiver by the presence of third parties to their "undermin[ing] the needed confidentiality" in the communication. *Id.* at 23. Here, FGS and Okapi were bound by strict contractual confidentiality requirements to Spirit, as all involved knew and depended upon, and thus Spirit and its counsel had the reasonable "expectation of confidentiality" crucially lacking in *Keeper of Records*.[14] *Id.* Nor is *Cavallaro v. United States*, 284 F.3d 236 (1st Cir. 2002) to the contrary, as the proponent did not assert functional equivalence, and the court did not need to address it. *Id.* at 246.

"[A]s a principle of comity, federal courts should recognize state evidentiary privileges where this can be accomplished at no substantial cost to federal substantive and procedural policy." *In re Production of Records to Grand Jury*, 618 F. Supp. 440, 442–443 (D. Mass. 1985) (Young, J.). Indeed, when applying federal common law of privilege in the absence of a controlling decision from the First Circuit, courts in this District have asked two questions: (i) whether Massachusetts courts would treat the disputed materials

---

[13] Plaintiffs incorrectly take issue with Spirit's citation to *Lluberes* in its earlier correspondence, Mot. at 10 n.21. Then as here, Spirit's point was to illustrate that the First Circuit has not rejected *Bieter* and that its treatment of *Bieter*'s principles has not been hostile, Spirit did not argue that the First Circuit has expressly adopted *Bieter* by some attenuated reference.

[14] Finch Dec. ¶ 6; Gooding Dec. ¶ 6; Haralson Dec. ¶ 7-8, 13; Weinberg Dec. ¶¶ 11–12; Alexander Dec. ¶ 12; FGS-CID-00058930, at '931; NK-2R-06685408, at '408.

as privileged, and (ii) whether the asserted application of the privilege is "intrinsically meritorious." *See Tep v. Southcoast Hosps. Grp.*, No. 13-11887-LTS, 2014 U.S. Dist. LEXIS 168052, at *10–11 (D. Mass. Dec. 4, 2014). Courts in this District therefore have been reluctant to conclude that the federal common law of privilege diverges from the law of Massachusetts. *See, e.g., Production of Records*, 618 F. Supp. at 442-43 (adopting a disputed principle of Massachusetts' law of privilege as federal common law).

      The Supreme Judicial Court of Massachusetts has stated that the attorney-client privilege protects statements "made to or shared with necessary agents of the attorney or the client." *Hanover Ins. Co. Rapo & Jepsen*, 449 Mass. 609, 616 (2007) (emphasis added). Following *Hanover*, lower courts in Massachusetts have concluded that the doctrine is indeed part of Massachusetts law. *Misc. Case One Ledgemont LLC v. Town of Lexington Zoning Bd. of Appeals*, No. 13 PS 477585, 2014 Mass. LCR LEXIS 92, at *4 (Mass. Land Ct. June 23, 2014) ("While this functional equivalent analysis is not yet chiseled deeply into the decisions of Massachusetts' appellate courts, there is good reason to conclude that our Supreme Judicial Court, if and when presented with the occasion, would apply and follow this line of Federal Court jurisprudence."); *America's Test Kitchen, Inc. v. Kimball*, No. 1684-cv-03352-BLS2, 2018 Mass. Super. LEXIS 45, at *4-5 (Sup. Ct. Mar. 30, 2018) (citing *Hanover* and concluding that the functional-equivalent doctrine "necessarily follows from the general principle that the privilege encompasses confidential communications made to or shared with necessary agents of the attorney or client." (internal quotations omitted)); *Burke v. General Hosp. Corp.*, No. 1784-cv-02876, 2019 Mass. Super. LEXIS 1188, at *22 (Sup. Ct. May 3, 2019) (assuming that the functional-

equivalent doctrine is part of Massachusetts law). There is no basis here for this Court to depart from these state court precedents.

### 2.   The Functional Equivalent Doctrine Should Apply Here

Application of the privilege to the communications at issue here under the functional equivalent doctrine would be both equitable and "intrinsically meritorious." *Tep v. Southcoast Hosps. Grp.*, No. 13-11887-LTS, 2014 U.S. Dist. LEXIS 168052, at *10–11 (D. Mass. Dec. 4, 2014). In the absence of First Circuit law requiring such an outcome, it would be highly inequitable to apply a rigid construction of privilege that departs from that of the Eleventh Circuit—where Spirit resides—which had squarely embraced the functional equivalent doctrine prior to the communications at issue. *Berisha,* 973 F.3d at 1317–20. At the time of those communications, Spirit could not reasonably have predicted that confidential communications from Florida with counsel and other advisors would one day be sought in discovery in Massachusetts merely because that is where Plaintiffs elected to file suit.

Moreover, FGS and Okapi exemplify proper application of the functional-equivalent doctrine.[15] Spirit's counsel's interactions with FGS and Okapi were essentially the same as counsel's interactions with the employee-members of Spirit's team,[16] and these interactions facilitated the rendering of legal advice to Spirit. Those communications related to (i) Spirit's counsel providing legal advice to Spirit (including FGS and Okapi) regarding the Frontier and JetBlue merger proposals, including their potential paths for regulatory approval and litigation risks, as well as advice regarding Spirit's contractual

---

[15] Spirit explained its basis for so asserting to Plaintiffs in meet and confers. *See* Dkt. 153, Battaglia Dec. Ex. 17 (Jun. 15, 2023, Ltr. from St. Matthew-Daniel to Battaglia).

[16] Finch Dec. ¶ 6; Gooding Dec. ¶¶ 5–6.

obligations and disclosure requirements; (ii) FGS and Okapi developing a communications strategy on behalf of Spirit, informed by counsel's analyses, to communicate Spirit's view of those merger proposals to Spirit's investors, employees, stakeholders, and the public; and (iii) counsel reviewing draft communications prepared by FGS and Okapi on behalf of Spirit and providing additional legal advice and comments regarding those communications.[17]

Rather than face these facts, Plaintiffs simply characterize FGS and Okapi as run-of-the-mill third-party vendors making "routine" communications or offering ordinary public relations advice. Mot. at 6–7, 11. But the facts matter and they show that the roles played by FGS and Okapi were neither routine nor ordinary. Although they were originally retained to advise and represent Spirit in a transaction that was already of unprecedented scope and significance to the company (the Frontier transaction), the unsolicited bid from JetBlue and ensuing hostile tender offer made FGS's and Okapi's already important roles even more critical.[18] Spirit had to rely on the advice and expertise of its outside advisors, including FGS and Okapi, to understand and develop and execute a comprehensive strategy, informed by counsel's analysis of the potential for regulatory clearance and

---

[17] *See* Finch Dec. ¶ 5; Gooding Dec. ¶¶ 2–6; Haralson Dec. ¶¶ 11–12; Weinberg Dec. ¶¶ 9–11; Alexander Dec. ¶¶ 8–10; Plaintiffs emphasize that Spirit asked investors to contact its FGS and Okapi representatives directly, Mot. at 3, 8, but that fact only underscores that FGS and Okapi were instructed to speak for Spirit directly with vital counterparties and accordingly needed to communicate with and be advised by counsel on legal matters in Spirit's interests. *See Schaeffer v. Gregory Vill. Partners, L.P.*, 78 F. Supp. 3d 1198, 1204 (N.D. Cal. 2015) ("When attending public meetings, interacting with neighbors, and otherwise being the face of the company, Gregory Village's attorneys counseled her actions. In all these activities, Craig acted as the public face of the company and provided information to Gregory Village's legal staff that was useful and necessary to evaluate legal strategy for the company going forward. Craig acted as Gregory Village's functional employee for the purposes of the attorney-client privilege.").

[18] Haralson Dec. ¶¶ 10–12; Weinberg Dec. ¶¶ 6–9; Alexander Dec. ¶¶ 5–11.

litigation risk associated with the competing offers, to communicate Spirit's view of those offers to Spirit's investors, employees, stakeholders, and the public.[19] FGS and Okapi took on roles for Spirit concerning the "sine qua non of the client's existence": effecting a transformative merger. *Hope For Fams. & Cmty. Serv., Inc. v. Warren*, No. 3:06-CV-1113-WKW, 2009 WL 1066525, at *10 (M.D. Ala. Apr. 21, 2009) (quoting *Bieter*, 16 F.3d at 934). In those roles, they were "'intimately involved' in efforts to achieve that 'single objective,'" *Id.* (quoting *Bieter*, 16 F.3d at 938), and were regularly included in strategic communications with and amongst Spirit's CEO, senior corporate officers, general counsel and outside counsel.[20]

As demonstrated by the declarations submitted with this opposition, Spirit could not have fairly evaluated the competing merger proposals absent the involvement of third party advisors including FGS and Okapi. Spirit maintains only a skeletal communications and investor relations staff and did not have the in-house resources and expertise to respond to the merger-related events.[21] As a result, Spirit necessarily retained and relied heavily upon an outsourced team, the only practical option it had to quickly staff up to address unprecedented challenges.[22] *See Medversant Technologies, L.L.C. v. Morrisey Associates,*

---

[19] Haralson Dec. ¶¶ 13–14; Weinberg Dec. ¶¶ 5–11; Alexander Dec. ¶¶ 5–11.
[20] Spirit reported to Plaintiffs its analysis from the privilege log of the many thousands of emails involving FGS or Okapi and Spirit's corporate officers, general counsel, or outside counsel at Debevoise and Paul Weiss. Dkt. 153, Battaglia Dec. Ex. 17 at 6–7 n.24. As noted, Spirit also produced many thousands of non-privileged communications involving FGS and Okapi because they did not implicate privilege.
[21] Haralson Dec. ¶¶ 3–6; *see* Weinberg Dec. ¶¶ 6–8; Alexander Dec. ¶¶ 6–8. For example, Deanne Gabel, Spirit's Director of Investor Relations, testified in January 2023 that she had only one person reporting to her, who "just started with the department" and "[t]hings to do with actual merger transactions she's not as involved in because it's too much to get her up to speed. She's got enough on her plate right now." Deanne Gabel Jan. 27, 2023, CID Dep. 19:12–20:10.
[22] Haralson Dec. ¶¶ 4, 6–8, 11–12; *see* Weinberg Dec. ¶¶ 6–8, 10; Alexander Dec. ¶¶ 8, 11.

*Inc.*, No. CV 09-05031, 2011 WL 13124128, at *4-5 (C.D. Cal. July 20, 2011) (finding

public relations firm "essentially functions as Medversant's public relations department");

*Am. Mfrs. Mut. Ins. Co. v. Payton Lane Nursing Home, Inc.*, No. CV 05-5155 SJF/AKT,

2008 WL 5231831, at *3 (E.D.N.Y. Dec. 11, 2008) (construction company recognized as

functional employee where plaintiffs "did not have resources to oversee the day-to-day

operations of the construction project"); *Shopify Inc. v. Express Mobile, Inc.*, No. 20-MC-

80091-JSC, 2020 WL 4732334, at *6–7 (N.D. Cal. Aug. 14, 2020) (investment advisors

held to be functional employees); *FTC v. GlaxoSmithKline*, 294 F.3d 141, 148 (D.C. Cir.

2002) (upholding application of the privilege to communications with public relations

consultants).

Courts have found such "crisis-management" hires fit comfortably within the

functional-equivalent doctrine. *E.g.*, *In re Copper Market Antitrust Litigation*, 200 F.R.D.

213, 218-219 (S.D.N.Y. 2001).[23] For example, *In re Johnson & Johnson Talcum Powder*

*Prod. Mktg., Sales Pracs., & Prod. Liab. Litig.*, No. MDL 2738, 2021 WL 3144945 (D.N.J.

July 26, 2021) upheld the assertion of privilege over communications that had been shared

with three public relations firms hired to advise it in litigation, because there was "little

question the communications with these third parties were made in confidence" and the

clients "hired outside P.R. consultants to assist with work it could not handle in-house,"

---

[23] Plaintiffs note that one court in the District stated that *Copper Market* was overbroad
"[t]o the extent [it] rejects the position that 'third-party consultants come within the scope
of' the attorney-client 'privilege only when acting as conduits or facilitators of attorney-
client communications.'" Mot. at 10. To whatever extent such a rejection was dispositive
to *Copper Market*, it is not here, since Spirit has argued that the entire point of FGS and
Okapi's presence was to facilitate the formulation and execution of Spirit's overall legal
and communications strategy in response to the proposed mergers, which necessarily
required counsel's coordination with FGS and Okapi.

because the clients had "relatively small corporate communications departments and therefore rely on outside consultants to assist with time-intensive and long-term projects." *Id.* at *8–9. The court held that, in such circumstances, "[the client's] attorneys needed to consult and communicate with [its] outside public relations firms so that they could provide informed legal advice about talc matters that could impact [its] defense." *Id.* at *8; *see also NECA-IBEW Pension Tr. Fund v. Precision Castparts Corp.*, No. 3:16-CV-01756-YY, 2019 WL 4750251, at *6 (D. Or. Sept. 27, 2019) (motion to compel denied and privilege upheld where company was hired to provide "public relations counsel and other strategic communications services" for an upcoming acquisition) (internal quotation marks and citation omitted).

In sum, Spirit executives, its counsel, FGS, and Okapi worked hand-in-hand to manage Spirit's communications strategy regarding the proposed Frontier transaction, Spirit's response to the unsolicited JetBlue tender offer and the ensuing shareholder proxy battle,[24] all of which involved the transmission of legal advice among the participants involved with an expectation of confidentiality.[25] Their communications should therefore be deemed privileged and protected from disclosure.

\*       \*       \*

Finally, Spirit notes that Plaintiffs' motion appears to seek without elucidation the compelled disclosure of a document, identified on Spirit's privilege log, over which Spirit has expressly claimed the protection of both the attorney-client privilege and the attorney

---

[24] *See* Finch Dec. ¶¶ 5–6; Haralson Dec. ¶¶ 11–14; Gooding Dec. ¶¶ 2–6; Weinberg Dec. ¶¶ 7–12; Alexander Dec. ¶¶ 7–12.
[25] *See* sources cited *supra* note 14.

work product doctrine.[26] Plaintiffs' motion does not challenge Spirit's assertion that this or any other document so identified on the privilege log are attorney work product, and the Court should deem Plaintiffs as having forfeited any such challenge.[27]

## **CONCLUSION**

For the foregoing reasons, Plaintiffs' motion to compel should be denied.

DATED:  September 1, 2023                    Respectfully submitted,


                                             */s/* Andrew J. Finch
                                             Andrew C. Finch (*Pro Hac Vice*)
                                             Jay Cohen (*Pro Hac Vice*)
                                             Eyitayo St. Matthew-Daniel (*Pro Hac Vice*)
                                             Jared P. Nagley (*Pro Hac Vice*)
                                             Kate Wald (*Pro Hac Vice*)
                                             PAUL, WEISS, RIFKIND, WHARTON &
                                             GARRISON LLP
                                             1285 Avenue of the Americas
                                             New York, NY 10019
                                             Tel: 212-373-3000
                                             Fax: 212-757-3990
                                             afinch@paulweiss.com
                                             jcohen@paulweiss.com
                                             tstmatthewdaniel@paulweiss.com
                                             jnagley@paulweiss.com
                                             kwald@paulweiss.com

                                             Meredith R. Dearborn (*Pro Hac Vice*)
                                             PAUL, WEISS, RIFKIND, WHARTON &
                                             GARRISON LLP
                                             535 Mission Street, 24th Floor
                                             San Francisco, CA 94105
                                             Tel: 628-432-5100
                                             Fax: 628-232-3101
                                             mdearborn@paulweiss.com

---

[26] Finch Dec. Ex. 6 (Jun. 28, 2023, Ltr. from Wald to Pearl) (citing NK-2R-06786552); *see* Dkt. 153, Battaglia Dec. Ex. 1 at 11 (citing NK-2R-06716552).
[27] *Cf.* Finch Dec. Ex. 5 (June 21, 2023, email from Sunshine to Battaglia) (discussing law and facts as well as example of how the work product protection applied to communications involving FGS or Okapi in the course of meet-and-confers).

Samuel N. Rudman (BBO #: 698018)
CHOATE, HALL & STEWART LLP
Two International Place
Boston, MA 02110
(617) 248-4034
srudman@choate.com

*Attorneys for Defendant Spirit Airlines, Inc.*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that this document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing on September 1, 2023.

<u>*/s/ Andrew C. Finch*</u>
Andrew C. Finch *(pro hac vice)*