**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| UNITED STATES OF AMERICA, *et al.*,<br><br>                    *Plaintiffs*,<br><br>    v.<br><br>JETBLUE AIRWAYS CORPORATION and<br>SPIRIT AIRLINES, INC.,<br><br>                    *Defendants*. | Civil Action No. 1:23-cv-10511-WGY |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS'**
**MOTION IN LIMINE TO EXCLUDE TESTIMONY FROM MR. RICHARD SCHEFF**

Plaintiffs respectfully move the Court to exclude the testimony of Defendants' industry expert Richard Scheff pursuant to Federal Rule of Evidence 702 because his opinions and testimony are unreliable. Mr. Scheff is currently a Managing Director at Airline Strategy Group, Inc. ("ASG"), a consulting firm. He submitted an initial report—which he amended twice, including to remedy errors identified by Plaintiffs' expert—and sat for a deposition.[1] Even though Mr. Scheff's amended quantitative analysis actually *supports* Plaintiffs' argument that the proposed acquisition of Spirit by JetBlue is likely to harm competition, it does not meet the legal standards in the Federal Rules of Evidence for admissible, reliable expert testimony because he does not use reliable methodology to determine if the combined airline could—or would— increase its utilization as a result of proposed acquisition.

---

[1] Mr. Scheff's Second Amended Expert Report (the third version of his report) was provided to Plaintiffs on August 30, less than one week before Mr. Scheff's deposition and the night before Defendants deposed Dr. Chipty, Plaintiffs' expert rebutting Defendants' efficiencies arguments.

**LEGAL STANDARD**

An expert's opinion must "have a reliable basis in the knowledge and experience of his discipline." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592 (1993). The expert's proffered opinion must also "rest[] on a reliable foundation." *Ed Peters Jewelry Co. v. C & J Jewelry Co.*, 124 F.3d 252, 259 (1st Cir. 1997) (internal citations omitted). The focus of this analysis is on the soundness of the expert's methodology. *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1318 (9th Cir. 1995) (on remand). In assessing that methodology, a critical issue is whether an expert's method "can be (and has been) tested." *Daubert*, 509 U.S. at 593. The proponent of the expert's testimony has the burden of establishing that the opinions offered are reliable. *In re Neurontin Mktg., Sales Pracs., & Prod. Liab. Litig.*, No. 04-CV-10981-PBS, 2009 WL 3756328, at *3 (D. Mass. Aug. 14, 2009). Where an analysis is superficial and result oriented, it should be rejected. *See, e.g.*, *Bowling v. Hasbro, Inc.*, No. CIV.A. 05-229S, 2008 WL 717741, at *4 (D.R.I. Mar. 17, 2008) (rejecting expert conclusion lacking rigorous application of damages calculations).

**BACKGROUND**

After the proposed acquisition, JetBlue plans to reconfigure Spirit's planes to match JetBlue's current specifications, which requires removing seats from Spirit's aircraft. Decl. of Edward Duffy, Ex. A, Second Amended Scheff Report ¶ 74 ("Second Amended Scheff Report). Mr. Scheff has calculated that this retrofit will result in the loss of 6,185,417 Annual Seat Departures. Second Amended Scheff Report ¶ 74, Figure 17. A "Seat Departure" is a measure of capacity that is equal to one passenger seat on one flight and therefore accounts for the number of seats on an aircraft and the number of flights that aircraft flies. Reducing Seat Departures reduces capacity and reflects potential harm from the acquisition. JetBlue and Spirit retained Mr.

Scheff to opine that increases in "utilization"—that is, how many hours per day JetBlue and Spirit would fly their planes (as a combined company, compared to independently)—would help offset the capacity losses inherent in JetBlue's plans.

Mr. Scheff apparently had a rocky road reaching any conclusion. In his initial report, Mr. Scheff asserted that the combined firm, based on his quantitative analysis, could increase utilization enough to mitigate the capacity reductions that will result from JetBlue's plans for the combined airline. He had to amend his report—not once, but twice—and the second amendment corrected errors in his analysis identified by Dr. Tasneem Chipty, who Plaintiffs retained to address Defendants' efficiencies arguments. Among other critiques, Dr. Chipty explained Mr. Scheff's analysis resulted in a double counting of the Seat Departures Mr. Scheff believed could be gained through higher utilization. Conceding Dr. Chipty's critique was valid, Mr. Scheff amended his report to address the double-counting problem Dr. Chipty identified. After correcting this error, his quantitative analysis predicts a net *reduction* of 380,000 Annual Seat Departures. Scheff Second Amended Report, ¶ 79, Figure 18.

## ARGUMENT

Mr. Scheff analyzed four ways the number of Annual Seat Departures may change due to the proposed acquisition. In the concluding sections of his report, he performs an accounting of the three analyses for which he was able to quantify the changes in the number of seats: (1) aircraft reconfiguration; (2) schedule changes; and (3) fleet optimization. Scheff Second Amended Report, Figure 18 (shown below). The aircraft reconfiguration causes a reduction in approximately 6.1 million Annual Seat Departures, a fact the Parties do not dispute. Mr. Scheff attempts to estimate potential increases in Annual Seat Departures from fleet optimization and schedule changes that could offset the loss of Seat Departures from the reconfiguration. When

taken together, however, Mr. Scheff finds that the proposed acquisition would result in a net *decrease* of 380,000 Annual Seat Departures. This is despite numerous problems in his opinions regarding fleet optimization and schedule changes discussed below, in which he concludes that JetBlue could increase the already-higher Spirit utilization rates across days of the week and months of the year and that a combined fleet would free up fifteen aircraft.

**Second Amended Report Scheff Figure 18**
**Seat Departure Changes Due to Reconfiguration and Utilization Changes**



Source: Estimated totals based on CY 2019 Departures and Production Levels Scaled to 2023 Fleet; Cirium schedule data from Diio Mi; JetBlue and Spirit fleet plan; APGFam Model

Notwithstanding this result, Mr. Scheff concludes that his "opinion is that the combined airline will not decrease output" and—even further—"will likely make *more* seats available for departure." Scheff Second Amended Report ¶ 79 (emphasis added). When asked during his deposition, Mr. Scheff explained his confidence was based on changes he could not quantify and his experience that "there's certainly almost always capability to improve seat production or profit performance through upgauges and downgauges." Decl. of Edward Duffy, Ex. B, Scheff Dep. Tr. at 202:9–203:1 ("Scheff Tr."). But he admitted that he did not have "data to support and justify the specific changes." Scheff Tr. at 198:4–199:15.

I.   **Mr. Scheff's Fleet Optimization Analysis Is Unreliable Because It Is Based On An Apples-To-Oranges Comparison And Is Less Rigorous Than Optimization Analysis Performed Outside Of Litigation**

Mr. Scheff's estimation that fleet optimization would increase Annual Seat Departures by 3.6 million depends on unreliable methodologies. According to Mr. Scheff, a larger combined JetBlue/Spirit fleet, in conjunction with changes to flight departure times (retimings), would allow the combined airline to operate roughly the same flights JetBlue and Spirit now operate independently, but with fewer aircraft, freeing up planes for additional flights. Mr. Scheff developed this estimate using a software tool that he has used to advise clients on fleet optimization, but he used the tool differently when analyzing the standalone and combined fleets, resulting in an unreliable apples-to-oranges comparison. Mr. Scheff compounded this error by

failing to apply this methodology with the same rigor that he and others in the industry follow outside of litigation.

A.   Mr. Scheff's Comparison Of The Standalone and Post-Acquisition Fleets Is
Unreliable Because It Uses An Apples-To-Oranges Comparison Between The
Standalone And Combined Fleets

Mr. Scheff's report attempts "to identify instances where the potential of pooling [JetBlue's and Spirit's] schedules and fleets resulted in a reduction of the total number of planes required to fly the schedule," allowing the combined airline to "free up or 'pop' planes used on existing schedules for new flying." Second Amended Scheff Report ¶ 37. However, his analysis is unreliable because he makes changes to the combined schedule that may facilitate operating the schedule with fewer aircraft but does not investigate whether similar changes could be made to Spirit's and JetBlue's standalone schedules. His approach is therefore an apples-to-oranges comparison, where he uses one method to assess possible fleet optimization for the pooled fleet and an entirely different method for the standalone fleets. As a result, any incremental aircraft availability cannot be attributed to the proposed acquisition. *See Loeffel Steel Prods., Inc. v. Delta Brands, Inc.*, 387 F. Supp. 2d 794, 812 (N.D. Ill. 2005) (explaining that, in order for an expert's comparison to meet "the reliability *Daubert* demands," the expert must "be sure that the comparison is one between 'apples and apples' rather than one between 'apples and oranges'") (quoting *Donnelly v. R.I. Bd. of Governors for Higher Educ.*, 929 F. Supp. 583, 591 (D.R.I. 1996). .

To perform his analysis, Mr. Scheff utilized a tool called a "fleet assignment model" (FAM) that "determines the [sic] how to operate a given flight schedule with the minimum number of aircraft." Second Amended Scheff Report ¶ 2. According to Mr. Scheff, FAMs "are widely used in the airline industry," and the particular FAM he used was the Airline Planning

Case 1:23-cv-10511-WGY   Document 180   Filed 09/11/23   Page 7 of 18

Group FAM ("APG FAM") that Mr. Scheff co-developed. *Id*. Mr. Scheff put "certain of JetBlue's and Spirit's flight and fleet information into" APG FAM. Second Amended Scheff Report ¶ 11.

The "first step" in Mr. Scheff's analysis was using APG FAM to "analyze whether JetBlue and Spirit could fly their July 2023 schedules with fewer planes on a standalone basis." Second Amended Scheff Report ¶ 42. He concluded "that neither JetBlue nor Spirit could operate those schedules with fewer planes on a standalone basis." *Id*.

Next, he "attempted to determine whether combining the fleets would allow the same flights in each carrier's standalone schedule to be flown at similar times with fewer aircraft." Second Amended Scheff Report ¶ 46. To do so, he "used FAM to evaluate retiming flights allowing modest moves forward and backward in increments of 20 minutes up to 60 minutes total." Second Amended Scheff Report ¶ 48. He did not allow retimings for the standalone schedules and fleet plans, despite recognizing that if he had attempted to retime and fully optimize Spirit's standalone schedule, he anticipated he "would find an opportunity." Scheff Tr. at 136:18–137:6, 206:5–207:1. This means that Mr. Scheff's method applied to the combined fleet would tend to free up more aircraft than the method he used for the standalone fleet. By allowing retimings only for the combined post-acquisition fleet, Mr. Scheff implements a fundamentally different method than the one he used to assess whether optimization of the standalone fleets was possible.

Mr. Scheff's analysis is flawed because he did not employ a consistent approach to his evaluation of JetBlue's and Spirit's standalone fleets and schedules versus his evaluation of the combined-firm's fleet and schedule. He did not explain why his inconsistent approach was analytically sound and did not run any robustness check to assess how many planes were freed

up in the combined fleet only because a different method was used. A proper comparative analysis should, to the extent possible, hold constant all conditions other than the change that is being analyzed—in this case, the combination of JetBlue and Spirit fleets that would result from the proposed acquisition. Mr. Scheff's analysis fails to do so and instead reflects an "apples to oranges" comparison that courts have rejected as unreliable and inadmissible. *See, e.g.*, *Nachimovsky v. Nike, Inc*., No. 22-866, 2023 WL 4504461, at *1 (2d Cir. July 13, 2023).

> B. <u>Mr. Scheff's Fleet Optimization Methodology Is Inconsistent With Industry Practice And Mr. Scheff's Own Prior Work</u>

Mr. Scheff used a different methodology in his report than he uses when advising airlines on fleet optimization. He did not include critical inputs to his propriety software that he uses in advising airlines. In fact, Mr. Scheff failed to use the APG FAM tool in a way that Mr. Scheff and others in the field would actually use the tool outside of litigation. This is a further reason why his optimization exercise is unreliable and inadmissible. *See, e.g.*, *Milward v. Acuity Specialty Prod. Grp., Inc*., 639 F.3d 11, 15 (1st Cir. 2011) ("The object of *Daubert* is 'to make certain that an expert, whether basing testimony on professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'") (quoting *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999)). Further, expert testimony must be based on sufficient facts or data to be admissible. Fed. R. Evid. 702(b); *G v. Fay Sch., Inc.*, 282 F. Supp. 3d 381, 391 (D. Mass. 2017) (excluding an expert because her testimony was based on an "unreliable and inconsistent application" of her methodology and was "based on insufficient data"). Here, Mr. Scheff admitted he did not apply the same rigor to his analysis in this litigation as he and others do in the industry and that he did not consider facts that airline planners would consider in optimizing schedules.

The APG FAM model used by Mr. Scheff fails to account for various constraints and other factors that airlines—and even Mr. Scheff himself in his work consulting other clients—consider when optimizing airline fleets. APG FAM has the capability to include many conditions that impact fleet planning, such as constraints related to maintenance time, takeoff and landing authorization (slot) requirements, and crew rest, all of which Mr. Scheff has used in the past, depending on the specific project he was doing. Scheff Tr. at 149:12–150:22. In his work for this case, however, Mr. Scheff failed to consider many of the constraints that APG FAM is capable of incorporating, including constraints related to maintenance, slots, and crew rest, among others. Scheff Deposition Exhibit 7.

Further, Mr. Scheff admits that it is not standard practice in the airline industry to rely solely on the output of the APG FAM model. Instead, airlines conduct further analysis—which Mr. Scheff did not undertake in this instance—to account for numerous important constraints and fleet planning considerations that APG FAM does not have the capabilities to incorporate, such as: (1) the full complexity of scheduling flights to facilitate connections at certain airports; (2) the capacity and availability of terminal assets such as ticket counters or baggage carousels; (3) the availability of grounds crew, such as gate attendants or handlers; and (4) whether there is sufficient demand for the new flight times. Scheff Tr. at 155:13–157:13.

These considerations are typically addressed by network planners in a subsequent, and usually manual, process. As Mr. Scheff noted during his deposition, "[t]he follow-up process from any FAM solution would be to take the solution, and evaluate" the output, and "then iteratively improv[e] and adjust the schedule." Scheff Tr. at 154:10–155:1. Mr. Scheff confirmed that he did not do this "follow up" process with respect to the merged entity's output. Scheff Tr. at 155:2–155:12. As a result, Mr. Scheff's process used in this case falls short of the process he

and others in the industry use in optimizing schedules outside of litigation and he failed to

consider salient facts that airlines and their consultants would consider outside of litigation.

## II.     Mr. Scheff's Schedule Change Analysis Is Inadmissible Because It Does Not Consider Whether JetBlue Could Profitably Increase Flying Across Spirit's Network During Off-Peak Days And Seasons

Mr. Scheff opines that schedule changes after the proposed acquisition would lead to

higher utilization and an additional 1.4 million Annual Seat Departures. According to Mr.

Scheff, the combined airline could increase the utilization of Spirit's fleet in the markets

currently served by Spirit by selectively adopting certain of JetBlue's utilization practices—in

spite of the fact that, by numerous measures, Spirit has higher utilization than JetBlue. Spirit's

current utilization rates vary to a greater degree than JetBlue's across days of the week and from

season to season, and Mr. Scheff contends that the combined airline could increase utilization by

reducing the variability across Spirit's network and fleet. Mr. Scheff did not: (1) undertake any

of the analyses that an airline would employ before making these types of network changes in the

normal course, (2) employ any reliable methodology for determining the viability of his

suggested schedule changes, nor (3) conduct any analyses to support his assumption that the

combined airline could decrease variability. He also failed to consider JetBlue's actual plans for

the combined airline in connection with this analysis.

### A.   Mr. Scheff's Schedule Change Opinions Are Not Based On Sufficient Facts Or Data

Mr. Scheff's estimation of increased utilization due to greater flying on certain days of

the week and during certain months of the year is inadmissible because he did not consider any

evidence that would inform if such increases would be profitable or practical. To be admissible

under Rule 702, an expert's opinions must be based on sufficient facts or data. Fed. R. Evid.

702(b); *G v. Fay Sch., Inc.*, 282 F. Supp. 3d 381, 391 (D. Mass. 2017) (excluding an expert

because her "testimony lack[ed] sufficient facts or data" and "thus [fell] short under Rule 702(b)").

Mr. Scheff has observed that Spirit reduces its flying during certain seasons of the year, and on Tuesdays and Wednesdays. Second Amended Scheff Report ¶ 20. He claims that JetBlue will be able to increase the utilization of Spirit's planes by flying them consistently with JetBlue's seasonal and day-of-week schedule patterns. Second Amended Scheff Report ¶ 20. In other words, Mr. Scheff opines that after the proposed acquisition, JetBlue would fly Spirit's aircraft for even more hours per day, even though Spirit's utilization rate is already higher than JetBlue's. Mr. Scheff conceded that he has not "compared utilization rates across various airlines." Scheff Tr. at 33:12–34:1.

Mr. Scheff calculates the change in Annual Seat Departures that would result from these changes by performing a simple mathematical exercise: increasing the ratio of Spirit's off-peak to peak utilization rates to match the ratio between JetBlue's utilization rates for that month (for seasonality adjustments) or day (for day-of-week adjustments), then multiplying by the now-higher utilization rate. Second Amended Scheff Report ¶¶ 20, 29.

However, Mr. Scheff did not consider whether such increased utilization would be profitable. Scheff Tr. at 111:3–8. Instead, Mr. Scheff simply notes that JetBlue carries a greater number of business travelers than Spirit and that this could allow the combined firm to have less variability in utilization rates for Spirit aircraft. Second Amended Scheff Report ¶¶ 26, 31; Scheff Tr. at 111:10–113:13. However, Mr. Scheff did not establish that greater appeal to business travelers would allow the combined firm to operate additional flights on Spirit's routes profitably. And he conceded in his deposition that he does not "have the full picture" of what went into Spirit's decision to reduce frequencies in certain markets on certain days and that more

leisure-heavy routes might *not* support additional flying, as he "would not assume across the board that there would be demand sufficient to add capacity in every route." Scheff Tr. at 116:22–117:10, 192:8–21. When asked why Spirit reduces its flying in off-peak months, he admitted that he does not "have insight exactly into the demand" nor "profits by day," instead noting that there is some "analysis Spirit makes," without further explanation. Scheff Tr. at 114:4–15.

Mr. Scheff did not analyze or quantify which portion of Spirit routes might be amenable to an increase in off-peak flying, and which portion would not. Scheff Tr. at 195:4–14.  Mr. Scheff merely notes in his report that JetBlue targets a broader range of types of routes than Spirit and that seasonal demand patterns differ between routes with mostly leisure passengers and those with a "balanced" mix of business and leisure passengers. Second Amended Scheff Report ¶¶ 23-25. Yet, his report assumes that Spirit's peak/off-peak pattern is entirely eliminated across all routes, fully adjusting to match the pattern for JetBlue. Mr. Scheff has no basis for this assumption. In fact, Mr. Scheff does not consider at all whether there is adequate demand to increase flying on the specific routes that Spirit serves and, in turn, whether it would be profitable or make business sense for the combined firm to do so. Scheff Tr. at 122:7–16 ("But I have not done an evaluation of the capability of Spirit to – on a very specific basis, to add flights on certain days."); *see also* Scheff Tr. at 130:9–131:2 (Mr. Scheff did not assess the number of passengers in each market or systematically review the number and identity of other competitors on the route).

However, Mr. Scheff conceded that airlines would consider whether schedule changes are profitable before making them. Scheff Tr. at 155:2–12. Given Spirit's focus on markets that have a high percentage of cost-conscious travelers flying for vacation or to visit friends and

relatives, there is good reason why increased flying on days and months with more business traffic might not be profitable or practical. By not considering such factors at all, Mr. Scheff's opinions do not rest on sufficient facts or data and are therefore inadmissible under Rule 702(b).

> B. Mr. Scheff's Schedule Change Opinions Are Not Based On The Facts Because He Does Not Show That JetBlue Is Likely To Change—Or Has Even Considered Changing—Spirit's Seasonal And Day-of-Week Scheduling

Mr. Scheff's analysis is also unreliable because it is not based on JetBlue's actual business plans, and he did not analyze whether JetBlue is likely to change the merged firm's schedule as he suggests. Scheff Tr. at 38:5–16, 106:17–107:8, 118:11–21. In addition to the requirement that expert testimony be based on sufficient facts or data, that expert must also reliably apply the method to the facts of the case. Fed. R. Evid. 702(d). Mr. Scheff did not consider JetBlue's combined network plans for purposes of analyzing increased utilization across days of the week and months of the year. Instead, his analysis was based on comparing patterns of the two standalone fleets, without any consideration of how the larger fleet might be deployed differently and without reference to JetBlue's combined network plans. Instead, he concludes— on an "observational basis"—that he "would think it's very possible" that JetBlue would choose to operate more. Scheff Tr. at 112:16–114:3. Mr. Scheff does not cite any JetBlue testimony or documents, nor any of his prior experience, to provide support for that opinion.

### III. Mr. Scheff Provides Inadequate Support For The "Other Ways" He Opines That The Proposed Transaction Will Increase Utilization

Mr. Scheff asserts, with inadequate support, that JetBlue may increase utilization of the combined fleet in three additional ways that he does not attempt to quantify: (1) increasing the use of Spirit's A321 aircraft for longer flights; (2) increasing the amount of "red-eye" flying; and (3) reducing the number of operational spares (planes held in reserve to allow operations to continue when regularly scheduled aircraft become unavailable for unforeseen reasons, such as

inclement weather or unplanned maintenance), thus freeing additional aircraft to be put to active use. Second Amended Scheff Report Section VI.

Increasing the use of Spirit's A321 aircraft on longer flights is unlikely to increase the number of seat departures. In fact, it is likely to *decrease* seat departures because when an aircraft is used on longer flights, it generally will fly less trips due to it being in the air longer. Mr. Scheff himself has acknowledged that increasing stage length can decrease seat departures. Scheff Tr. at 162:10–163:1. Furthermore, Mr. Scheff does not cite any documents or testimony showing that JetBlue is considering using Spirit's A321s in this way.

Mr. Scheff's assertion that the combined firm can increase red-eye flights is not based on any supporting analysis. Mr. Scheff has not evaluated whether there is additional demand for the incremental red-eye flights he suggests or whether those flights would be profitable. Scheff Tr. at 166:3-19. Nor has he quantified the change in seat departures that would result from adding red eye flights. Second Amended Scheff Report ¶ 64.

Mr. Scheff has not explained why the proposed transaction would allow JetBlue to reduce the number of operational spares. In the paragraphs addressing the topic in his report, the only support he provides for his analysis is that "generally speaking an airline would prefer to reduce the number of spares, because those are aircraft that are incurring costs but not producing any revenue." Second Amended Scheff Report ¶ 70. In fact, he recognizes that determining the appropriate level of spare aircraft can depend on a variety of factors, including on-time performance, the age of aircraft, and the airports at issue, yet he does not attempt to explain why the particular circumstances of the proposed acquisition will facilitate a reduction in spares. Second Amended Scheff Report ¶ 72. Nor does he know how Spirit currently determines the number of spares it maintains. Scheff Tr. at 168:19–169:3. Furthermore, Mr. Scheff does not cite

14

any documents or testimony showing that JetBlue is considering reducing spares post-acquisition—in fact, he confirms that he "did not evaluate JetBlue plans for spares" if the proposed acquisition is consummated. Scheff Tr. at 170:20–171:2. This leaves Mr. Scheff to weakly conclude that the proposed acquisition "*could* . . . potentially free up *an* airplane or some number of airplanes"—suggesting that the number of spares could be reduced by as little as just one, if any, aircraft. Scheff Tr. at 92:2-12 (emphasis added).

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court exclude or limit Mr. Scheff's testimony regarding purported increased fleet utilization by the combined post-acquisition airline.

Dated: September 11, 2023                    Respectfully submitted,

                                             */s/* Edward W. Duffy
                                             Edward W. Duffy
                                             Maisie A. Baldwin
                                             Michael B. DeRita
                                             U.S. Department of Justice, Antitrust Division
                                             450 Fifth Street, NW, Suite 8000
                                             Washington, DC 20530
                                             Phone: 202-812-4723
                                             Facsimile: 202-307-5802
                                             E-mail: edward.duffy@usdoj.gov


                                             */s/* William T. Matlack
                                             William T. Matlack (MA Bar No. 552109)
                                             Office of the Attorney General
                                             One Ashburton Place, 18th Floor
                                             Boston, MA 02108
                                             Telephone: (617) 727-2200
                                             Email: William.Matlack@mass.gov


                                             */s/* C. William Margrabe
                                             C. William Margrabe (*pro hac vice*)
                                             Assistant Attorney General
                                             Office of the Attorney General
                                             400 6th Street NW, Suite 10100
                                             Washington, DC  20001
                                             Telephone: (202) 727-6294
                                             Email: will.margrabe@dc.gov


                                             *Attorneys for the United States of America, the
                                             Commonwealth of Massachusetts, and the District of
                                             Columbia, and on behalf of all Plaintiffs*

## CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1

Pursuant to Local Rule 7.1(a)(2), I hereby certify that Plaintiffs conferred with counsel for Defendants in a good-faith effort to resolve or narrow the issues presented in this motion prior to filing. Defendants confirmed that they oppose the motion.

*/s/* Edward W. Duffy
Edward W. Duffy
U.S. Department of Justice, Antitrust Division
450 Fifth Street, NW, Suite 8000
Washington, DC 20530
Phone: 202-812-4723
Facsimile: 202-307-5802
E-mail: edward.duffy@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing document, which was filed with the Court through the CM/ECF system, will be sent electronically to all registered participants as identified on the Notice of Electronic Filing.

<u>/s/ Edward W. Duffy</u>
Edward W. Duffy
U.S. Department of Justice, Antitrust Division
450 Fifth Street, NW, Suite 8000
Washington, DC 20530
Phone: 202-812-4723
Facsimile: 202-307-5802
E-mail: edward.duffy@usdoj.gov