# EXHIBIT 3

```
 1              UNITED STATES DISTRICT COURT.
               FOR THE DISTRICT OF MASSACHUSETTS
 2
     UNITED STATES OF AMERICA         )
 3   450 Fifth Street NW, Suite 8000  )
     Washington, DC  20530             ) Case No.
 4                                     ) 1:23-cv-10511-
     COMMONWEALTH OF MASSACHUSETTS    ) WGY
 5   One Ashburton Place, 18th Floor  )
     Boston, MA  02108                 )
 6                                     )
     DISTRICT OF COLUMBIA              )
 7   400 Sixth Street NW, Tenth Floor )
     Washington, DC  20001             )
 8                                     )
     STATE OF CALIFORNIA               )
 9   300 South Spring Street          )
     Suite 1702                        )
10   Los Angeles, CA  90013            )
                                       )
11   STATE OF MARYLAND                 )
     200 St. Paul Place, 19th Floor   )
12   Baltimore, MD  21202              )
                                       )
13   STATE OF NEW JERSEY               )
     124 Halsey Street - 5th Floor    )
14   Newark, New Jersey  07102         )
                                       )
15   STATE OF NEW YORK                 )
     28 Liberty Street, 20th Floor    )
16   New York, NY  10005               )
                                       )
17   and                               )
                                       )
18   STATE OF NORTH CAROLINA           )
     P.O. Box 629                      )
19   Raleigh, NC  27602                )
                                       )
20              Plaintiffs,            )
            vs.                        )
21   JETBLUE AIRWAYS CORPORATION       )
     27-01 Queens Plaza North         )
22   Long Island City, NY  11101       )
               and                     )
23   SPIRIT AIRLINES, INC.             )
     2800 Executive Way                )
24   Miramar, FL  33025                )
                                       )
25              Defendants.            )
```

1  this case, correct?
2      A.  No, I didn't.  JetBlue did based
3  on its own analysis.
4      Q.  You didn't do any work to verify
5  that that demand estimation was accurate,
6  correct?
7      A.  I looked at their analysis of
8  entry and exit, and I could see where they got
9  it from.  But no, I didn't do my independent
10 assessment of their study beyond looking at
11 their backup papers.
12     Q.  Did you replicate their analysis?
13     A.  Yeah, I can see exactly how they
14 calculated it.
15     Q.  So in your work you went through
16 every step they went through with the data they
17 used and confirmed that they did it correctly?
18     A.  I don't know what "every step"
19 means.  I didn't repull the data they show in
20 there.  But, sure, I looked at it, and I
21 understood how they came up with it, and it
22 seemed reasonable for what they were doing.
23     Q.  Have you ever heard of the Pareto
24 Principle?
25     A.  Not sure what you mean by it but

1  report analyzes the competition effects of the
2  proposed merger?
3             MR. MOORE:  Objection as to form.
4             THE WITNESS:  What my report does
5         is ask the question whether entry -- or
6         the divestitures -- entry because of the
7         divestitures, either way, entry with or
8         without the divestitures is likely to be
9         capable of offsetting loss competition
10        from Spirit.
11 BY MR. GLASS:
12    Q.    So does that mean your report
13 does or doesn't analyze the competition effects
14 of the proposed merger?
15            MR. MOORE:  Objection to the
16        form.
17            THE WITNESS:  Well, it was
18        Dr. Gowrisankaran's assignment to study
19        the competitive significance of Spirit
20        on prices and so forth and what the
21        nature of that effect would be because
22        of the merger.  And my report
23        essentially goes one step after that,
24        although I have looked at harm directly
25        as embedded in the synergy modeling --

1       you can't not look at it when you look
2       at the synergy modeling -- but the
3       broader effects of the merger are things
4       that I have not studied.  But I
5       understand Dr. Gowrisankaran to have
6       reached the conclusion that there would
7       be loss competition.  And then the
8       question is on the routes where there
9       would be loss competition, is the
10      prospect of entry likely -- could entry
11      be likely, timely and sufficient to
12      address that loss?
13  BY MR. GLASS:
14       Q.    Let's look at Exhibit 2, which is
15  your reply report.  Do you have that in front of
16  you?
17       A.    Yes, I do.
18       Q.    Can you please turn to page 3.
19       A.    I'm there.
20       Q.    So this is the last part of
21  paragraph 4 that I'm focused on, at the top of
22  the page, the first full sentence.  It's on the
23  first line, but I'm starting about 6/8 of the
24  way across the page with "For reasons that I
25  explain in this report ..."

Not Relevant to Motion

BY MR. GLASS:

Q. And the negative .42 demand elasticity comes from the document cited in footnote 355?

A. One of them, yes.

1    Q.    And that document was based on 12
2 historic events where Spirit exited a route?
3    A.    That's correct.
4    Q.    Do you remember what those 12
5 events were?
6    A.    Sitting here, I don't.
7    Q.    In your report did you study
8 those 12 events yourself?
9    A.    No, I did not.
10    Q.    Do you know how many routes
11 Spirit has exited in the past 12 months?
12    A.    I might be able to answer that if
13 you give me a minute.  I'm not sure I can, but I
14 did study Spirit exit and the numbers of Spirit
15 exits versus the number of Frontier exits.
16 (Witness reviews document.)
17         Well, at least in 2018 they were
18 55, and in 2017 they were 33, so they looked at
19 12.
20    Q.    Do you know what year those 12
21 historical Spirit exit events were in?
22    A.    Again, sitting here I don't
23 recall, but these were selected by them as being
24 relevant for their analysis enough to guide
25 their advocacy with their board and their

1  management and their investment banker.  So I
2  don't recall the details, but they selected
3  them, and at one point I had reviewed them.
4          Q.    Did you study the exit events
5  that were not part of the 12 that you knew
6  about?
7                MR. MOORE:  Objection to the
8        form.
9                THE WITNESS:  No, I did not study
10       those.
11 BY MR. GLASS:
12         Q.    Did you do any investigation to
13 inform whether or not the 12 historical events
14 that JetBlue used were, in fact, representative
15 enough for you to rely upon an estimate of
16 demand?
17         A.    So I am following the thread of
18 what the company did in the ordinary course, and
19 I reviewed their calculation.  And I looked at
20 how they used it and the purpose for which they
21 used it, and I had no reason to not factor it
22 into my opinion.
23         Q.    But you didn't study whether or
24 not those 12 events were representative,
25 correct?

1  A. Well, they believed they were
2  representative enough to advocate for the deal
3  and enough to value an annual benefit to JetBlue
4  worth something on the order of -- I think it
5  was  Not Relevant to Motion  a year.
6  Q. So you did not study whether or
7  not those 12 events were representative enough
8  to estimate demand, correct?
9  A. I did not vet their choice of 12,
10 but I put a lot of significance to the fact that
11 they were willing to act given what they know
12 about their business on these 12. And the other
13 modeling they did, it's not just one piece.
14 There's a series of other analysis that goes
15 into it.
16 Q. You would agree with me that
17 estimating demand is actually a hard project for
18 an economist to do?
19         MR. MOORE: Objection to the
20     form.
21 BY MR. GLASS:
22 Q. Right?
23 A. I'm not -- I can't say yes or no.
24 It is something economists do.
25 Q. Have you ever tried to estimate

1  demand in a market?
2        A.    I have estimated demand.
3        Q.    How long did it take you?
4              MR. MOORE:  Objection to the
5        form.
6              THE WITNESS:  Oh, I don't know
7        how to quantify that.  It happens in
8        specific instances, and sometimes it
9        takes less time, and sometimes it takes
10       more time.  I don't know how to answer
11       that.
12             But the fact is that this is the
13       kind of analysis that the companies
14       have -- this company has done, and it's
15       not the only time that they've studied
16       the effective changes from entry or
17       exit.  I've cited other documents in
18       here where they do that.  But in this
19       particular synergy calculation, this is
20       what they selected and relied on.
21 BY MR. GLASS:
22       Q.    Who at JetBlue did the study on
23 those 12 Spirit exits?
24       A.    I don't recall.  I don't know
25 that I ever knew the specific person, but it was

```
 1   likely someone under Mr. Friedman's umbrella,
 2   but I can't be certain.
 3           Q.     Do you know if the person who did
 4   that study was an economist?
 5           A.     I don't know.
 6           Q.     Do you know if the person who did
 7   that study had any training in estimating
 8   demand?
 9           A.     I don't know.
10           Q.     Estimating demand is a
11   data-intensive project, correct?
12           A.     It can be, depending on the
13   nature of the exercise.
14           Q.     Do you know what data JetBlue had
15   when it was studying the 12 Spirit exit?
16           A.     So we'd have to open up the
17   spreadsheet and look at it together.  I can't
18   sit here remembering the details of what was in
19   that spreadsheet, but there was data in the
20   spreadsheet, and we'd have to look at it for me
21   to answer it further.
22           Q.     Do you know where that data came
23   from?
24           A.     Sitting here, I don't remember.
25   We'd have to look at the spreadsheet.
```