# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA, *et al.,* <br><br> *Plaintiffs,* <br><br> v. <br><br> JETBLUE AIRWAYS CORPORATION and SPIRIT AIRLINES, INC., <br><br> *Defendants.* | Civil Action No. 1:23-cv-10511-WGY |

## DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION IN LIMINE TO EXCLUDE TESTIMONY FROM MR. RICHARD SCHEFF

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ................................................................................................... ii

INTRODUCTION ............................................................................................................... 1

LEGAL STANDARD.......................................................................................................... 3

BACKGROUND ................................................................................................................. 3

     A.    Mr. Scheff Has Significant Experience in Network and Fleet Planning .................... 3

     B.    Mr. Scheff's Assignment and Methodologies ............................................................. 4

     C.    Mr. Scheff's Opinions ................................................................................................. 5

ARGUMENT ...................................................................................................................... 7

    I.    MR. SCHEFF'S FAM ANALYSIS IS RELIABLE AND ADMISSIBLE ...................... 8

     A.    Mr. Scheff's Modest Retiming Of The Combined Schedule Is Appropriate And
Methodologically Sound ........................................................................................... 8

     B.    The Configurations Mr. Scheff Used In His FAM Analysis Are Appropriate And
Consistent With The Way He Uses The Tool In Non-Litigation Contexts ......................... 10

    II.    MR. SCHEFF'S OPINION THAT POST-MERGER JETBLUE WILL FLY MORE
LIKE JETBLUE THAN SPIRIT IS ADMISSIBLE ............................................................... 12

    III.    MR. SCHEFF'S OPINIONS THAT THE POST-MERGER JETBLUE CAN
INCREASE UTILIZATION BY UP-AND DOWN-GAUGING AIRCRAFT, INCREASING
REDEYE FLYING, AND REDUCING SPARES ARE ADMISSIBLE ................................. 14

CONCLUSION ................................................................................................................... 15

## **TABLE OF AUTHORITIES**

**CASES**                                                                                    **PAGE(S)**

*58 Swansea Mall Drive, LLC v. Gator Swansea Prop., LLC*,
    No. 15-CV-13538-RGS, 2017 WL 9885338 (D. Mass. Sept. 20, 2017) .................................... 3
*Donnelly v. R.I. Bd. Of Governors for Higher Educ.*,
    929 F. Supp. 583 (D. R.I. 1996) ................................................................... 10
*Equal Emp. Opportunity Comm'n v. Texas Roadhouse, Inc.*,
    215 F. Supp. 3d 140 (D. Mass. 2016) .............................................................. 12
*G v. Fay Sch., Inc. by & through its Bd. of Trustees*,
    282 F. Supp. 3d 381 (D. Mass. 2017) .............................................................. 13
*I.B.E.W. Local Union 380 Pension Fund v. Buck Consultants*,
    2008 WL 2265269 (E.D. Penn. June 3, 2008) ........................................................ 7
*In re Asacol Antitrust Litig.*,
    323 F.R.D. 451 (D. Mass. 2017) ................................................................ 3, 14
*Kumho Tire Co., Ltd. v. Carmichael*,
    526 U.S. 137 (1999) ............................................................................... 7
*Levin v. Dalva Bros., Inc.*,
    459 F.3d 68 (1st Cir. 2006) ....................................................................... 3
*Loeffel Steel Prods., Inc. v. Delta Brands, Inc.*,
    387 F. Supp. 2d 794 (N.D. Ill. 2005) ............................................................. 9
*Milward v. Acuity Specialty Prods. Grp., Inc.*,
    639 F.3d 11 (1st Cir. 2011) ....................................................................... 3
*Nachimovsky v. Nike Inc.*,
    No. 22-866, 2023 WL 4504461 (2d Cir. July 13, 2023) ............................................ 10
*Neural Magic, Inc. v. Meta Platforms, Inc.*,
    No. 20-CV-10444-DJC, 2023 WL 2383172 (D. Mass. Mar. 6, 2023) .................................... 9
*Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co.*,
    161 F. 3d 77 (1st Cir. 1998) ...................................................................... 3
*U.S. v. Monteiro*,
    407 F. Supp. 2d 351 (D. Mass. 2006) ........................................................... 13, 14
*United States v. Baker Hughes, Inc.*,
    908 F.2d 981 (D.C. Cir. 1990) ................................................................... 13

**RULES**

Federal Rule of Evidence 702 ................................................................. 3, 8, 12

## INTRODUCTION

Richard Scheff has nearly four decades of experience working for and assisting airlines in network planning and with fleet management issues, and the opinions he will offer at trial are well-supported and based on reliable methods and a model that is widely-used in the airline industry that Mr. Scheff personally developed.  Contrary to Plaintiffs' misleading assertions, Mr. Scheff's core opinion is that a post-merger JetBlue will be able to increase the utilization of its aircraft beyond the level that either JetBlue or Spirit could achieve on their own and will likely *increase* capacity, even after taking into account the reduction in seats to Spirit's aircraft to conform them to JetBlue's higher-quality, less-dense specifications.  Second Amended Expert Report of Richard Scheff ("Scheff Rpt."), ECF No. 183-1 ¶¶ 11(a)-(d).   More specifically, Mr. Scheff explains that post-merger JetBlue will be able to increase the utilization of the combined firm's aircraft by (a) increasing the utilization of Spirit's aircraft by flying them more on Tuesdays and Wednesdays and in non-peak months, (b) pooling the combined company's aircraft to fly both companies' existing schedules with fewer planes than the standalone companies need to fly those schedules, (c) pooling the combined company's aircraft to put larger planes with more seats on routes at the times where demand is heaviest, and (d) taking advantage of the larger combined network to fly additional red-eye flights.  Scheff Rpt. ¶¶ 23-26, 31-33, 48-52, 58-63, 64, 69.

Mr. Scheff's opinions are inconvenient for Plaintiffs, both because they belie Plaintiffs' narrative that the merger will cause a reduction in output and because Plaintiffs do not have an expert witness qualified to discuss matters relating to network planning or fleet assignment.  For those reasons, Plaintiffs predictably seek to exclude Mr. Scheff's opinions to avoid his testimony coming into evidence at trial.  Plaintiffs' motion should be denied for numerous reasons.

First, Mr. Scheff's use of a fleet assignment model ("FAM") to determine that a merged airline could fly the standalone airlines' July 2023 schedules using fewer aircraft is consistent with the way he has used the FAM tool in non-litigation contexts.  While Plaintiffs portray various assumptions Mr. Scheff used in his analysis as unexplained, the record shows the opposite.  If Plaintiffs want to challenge Mr. Scheff's explanations again at trial (they already elicited testimony at Mr. Scheff's deposition on these points), they are free to do so, but there is no basis to exclude his FAM-related opinions.

Second, Mr. Scheff's opinion that post-merger JetBlue will increase utilization by operating the former Spirit aircraft more like JetBlue operates its own aircraft, including by flying more during non-peak months and days, is admissible.  Plaintiffs' complaint appears to be that Mr. Scheff did not precisely predict on which routes the merged entity would increase flying or determine the extent to which such additional future flying would be profitable for the post-merger entity.  But such precise allocation is neither possible now, nor required to be admissible under *Daubert*.

Finally, Plaintiffs argue that the Court should exclude Mr. Scheff's opinions that post-merger JetBlue will also be able to increase utilization (and the capacity it puts into the market) through certain categories of utilization benefits that Mr. Scheff did not specifically quantify in his report.  This argument, too, must fail, because it is well-settled that not every opinion proffered by an expert witness needs to be quantified.

At bottom, all of Mr. Scheff's opinions fall comfortably within the bounds of admissibility under Federal Rule of Evidence 702 and *Daubert*.  Plaintiffs' motion should be denied.

## LEGAL STANDARD

Federal Rule of Evidence 702 governs the admissibility of expert evidence.  "Rule 702 has been interpreted liberally in favor of the admission of expert testimony." *Levin v. Dalva Bros., Inc.*, 459 F.3d 68, 78 (1st Cir. 2006).  A party offering an expert report "must show only that 'the expert's conclusion has been arrived at in a scientifically sound and methodologically reliable fashion.'"  *Milward v. Acuity Specialty Prods. Grp., Inc.*, 639 F.3d 11, 15 (1st Cir. 2011) (quoting *Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co.*, 161 F. 3d 77, 85 (1st Cir. 1998)).  This is not a heavy burden and is even less stringent in bench trials.  *See 58 Swansea Mall Drive, LLC v. Gator Swansea Prop., LLC*, No. 15-CV-13538-RGS, 2017 WL 9885338, at *1 (D. Mass. Sept. 20, 2017) (denying motion to exclude expert testimony and stating that a "cautious approach [to excluding evidence] is even more warranted in a bench trial.") (internal citations omitted).

An expert's reliance on their own professional experience, information they deem relevant, and ordinary industry practice is enough to create a "sufficiently reliable foundation" for their opinion.  *See In re Asacol Antitrust Litig.*, 323 F.R.D. 451, 467 (D. Mass. 2017), *rev'd and remanded on other grounds*, 907 F.3d 42 (1st Cir. 2018) (industry expert relied on appropriate industry-specific factors to render opinion).   When an expert uses their "professional studies or personal experience" as a basis for their testimony, they must employ "the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."  *Milward*, 639 F.3d at 15.

## BACKGROUND

### A.  Mr. Scheff Has Significant Experience in Network and Fleet Planning

Mr. Scheff has nearly 40 years of experience in the airline industry.  Scheff Rpt. ¶ 1.  He worked in Delta's network planning department for 14 years analyzing and deciding how to deploy Delta's fleet most effectively.  *Id.* ¶ 3.  He developed network planning software that has

3

been broadly used across the airline industry. *Id.* ¶ 2. And for the last 20 years, he has worked as a consultant in the airline industry on a range of projects involving airline network planning and fleet issues. Deposition Transcript of Richard Scheff ("Scheff Tr."), Exhibit A at 11:6-19, 12:13-21.[1]

### B. Mr. Scheff's Assignment and Methodologies

For his engagement in this case, Mr. Scheff analyzed whether the combined, post-merger JetBlue entity would likely increase the utilization of the aircraft in its fleet more than either JetBlue or Spirit could do on a standalone basis. Scheff Rpt. ¶ 6. To do that, Mr. Scheff used public data to analyze the differences in the ways that the two airlines have operated their fleets on a seasonal and day of week basis. *Id.* ¶¶ 21-22. JetBlue does not pull down as much capacity as Spirit does during non-peak months or on non-peak days of the week, and Mr. Scheff quantified the increase in seats that would result from applying JetBlue's service pattern to the Spirit portion of the fleet. *Id.* ¶¶ 26-29, 33-35, 76-77. Because some of Spirit's reduction in non-peak months is caused by a reduction in flying on non-peak days, Mr. Scheff removed that portion of his day of week flying analysis from his seasonality analysis. *Id.* ¶ 30.

Mr. Scheff also used a fleet assignment model ("FAM")—a tool widely used in the airline industry and one that Mr. Scheff routinely uses in his business—to analyze whether JetBlue's and Spirit's July 2023 schedules could be flown with fewer planes when the JetBlue and Spirit fleets were pooled together. *Id.* ¶ 37. For this analysis, Mr. Scheff used the FAM in a mode designed to analyze the minimum number of planes needed to fly a schedule to determine whether the JetBlue or Spirit could fly their July 2023 standalone schedules using fewer planes. He determined that neither airline could do so on its own. *Id.* ¶ 42. He also conducted a

---

[1] Citations to exhibits refer to the exhibits filed with the Declaration of Michael P. Mitchell in Support of Defendants' Opposition to Plaintiffs' Motion In Limine to Exclude Testimony from Mr. Richard Scheff.

sensitivity analysis by allowing turn times (*i.e.*, the time the aircraft sits at the gate between flights) to be reduced to determine whether any planes were on the cusp of being freed-up or "popped" in the standalone schedules. *Id.* No additional planes could be popped even after allowing for reduced turn times. *Id.* Mr. Scheff then combined the two schedules and pooled JetBlue's and Spirit's A320 fleets into one pool and their A321 fleets into another pool. Using the FAM and permitting for modest retiming of flights (up to an hour in 20-minute increments), Mr. Scheff determined that the combined schedules with the pooled A320 fleet and pooled A321 fleet could be flown with fewer aircraft than the standalone schedules. *Id.* ¶ 52. Mr. Scheff explained that FAM analysis he performed was conservative, because it did not allow for pooling of different fleet types (*i.e.*, an A320 could not be pooled with an A321), even though this type of re-gauging very likely would provide additional utilization gains. *Id.* ¶ 47, n.19.

Mr. Scheff also identified other ways that a network planner at the post-merger JetBlue could increase flying of the combined fleet that are not currently quantifiable based on the existing data. *Id.* ¶¶ 57-72. Based on his own experience, a review of JetBlue documents, and discussions with Spirit employees, he determined that the merged company could increase utilization by increasing the usage of Spirit's A321CEO aircraft, increasing red-eye flying, and potentially reducing the number of operational spares in the fleet. *Id.*

### C.  Mr. Scheff's Opinions

After conducting his analyses, Mr. Scheff determined that the combined entity was likely to increase utilization beyond the level either JetBlue or Spirit could achieve on their own. *Id.* ¶ 11(a). The quantitative portion of his analysis showed that JetBlue takes down far less of its capacity on off-peak days and months compared to Spirit. *Id.* ¶¶ 23-25, 31. By applying JetBlue's service pattern to the portion of its fleet comprised of former Spirit aircraft and flying those aircraft on off-peak days and months when they would otherwise be sitting on the ground,

Mr. Scheff calculated that post-merger JetBlue would increase the number of seats available in the market by more than 2 million seats on an annual basis based on Spirit's 2023 fleet size. *Id.* ¶¶ 27-30, 33-36.  In his FAM analysis, he determined that the separate schedules required 430 planes to operate, while the combined schedule could be operated using only 415 planes if a small number (12%) of flights were modestly retimed. *Id.* ¶¶ 49-52.  By "popping" or freeing up these 15 aircraft from having to fly the existing schedules, the post-merger company could use them for other flying, which Mr. Scheff calculated would result in an additional approximately 3.65 million seats of capacity in the market annually. *Id.* ¶ 55.  On the other side of the ledger, Mr. Scheff calculated that retrofitting the Spirit aircraft to JetBlue's higher-quality, less-dense specifications would result in a reduction of approximately 6.2 million seats per year. *Id.* ¶ 74, Figure 17.

While the quantified portions of Mr. Scheff's report discussed above net out nearly[2] the entirety of the seat reduction he calculated as a result of retrofitting Spirit's aircraft, Mr. Scheff made clear both at his deposition and in his report that he expects significantly more utilization gains from the combined airline.  Scheff Rpt. ¶¶ 79-80; Scheff Tr. 199:17-200:1.  Indeed, based on his decades of experience, Mr. Scheff explained that a JetBlue planner who inherited two schedules that had never been optimized would have many tools at his or her disposal to increase utilization well beyond the amount Mr. Scheff quantified.  Scheff Tr. 198:4-199:15.  These tools include allowing for up- and down-gauging of aircraft (*i.e.*, putting larger or smaller aircraft on a given route),  more significant retiming of flights than Mr. Scheff permitted, increasing redeye

---

[2] In Figure 18 of Mr. Scheff's report, which Plaintiffs replicate at page 4 of their motion, the result of his conservative calculations is a net negative figure of approximately 380,000 seats.  As discussed below, notwithstanding this small negative number in Figure 18, Mr. Scheff is confident the post-merger airline will *increase* capacity.  Plaintiffs imply that -380,000 annual seats is a meaningful capacity reduction, but it is not.  Instead, this is the equivalent of less than two A320 aircraft.  Scheff Rpt. ¶ 80 (A320 in JetBlue layout produces approximately 232,000 annual seats).  For additional perspective, the entirety of that reduction would be more than offset if the post-merger airline added only three additional daily red-eye flights on A321 aircraft. *Id.*

flying, and reducing the number of operational spares relative to total fleet size.  Scheff Rpt. ¶ 64-69, 70-72.

Mr. Scheff did not quantify the full extent of the utilization gains likely to be achieved by the post-merger JetBlue, because the necessary data to perform those calculations will not exist until all of Spirit's aircraft have been retrofitted and the fleets have been combined.  *Id.* ¶¶ 28, 33-34, 42, 47.  But notwithstanding that it is not possible to accurately quantify all of those additional utilization gains at this time, Mr. Scheff is confident based on his experience that the post-merger JetBlue will *increase* capacity.  Scheff Rpt. ¶¶ 79-80; Scheff Tr. 202:2-203:13.

## ARGUMENT

Mr. Scheff's opinions are based on his extensive experience and are the product of reliable methods that he has consistently applied in his non-litigation work.  This alone requires the denial of Plaintiffs' motion.  *See* FED. R. EVID. 702 advisory committee's note to 2000 amendment (noting that "experience alone--or experience in conjunction with other knowledge, skill, training or education" may provide "a sufficient foundation for expert testimony," since there are fields where "experience is the predominant, if not sole, basis for a great deal of reliable expert testimony"); *see also Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999) (expert must "employ[ ] in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field").[3]

---

[3] Plaintiffs' brief is replete with references to Mr. Scheff's two amendments to his report.  Br. at 1 n.1, 3.  To be clear, Mr. Scheff made one amendment to correct a few typos that had no bearing on any of Mr. Scheff's opinions. Notably, Plaintiffs experts each issued similar amendments.  Mr. Scheff made a second amendment to correct an error that Plaintiffs expert pointed out.  *I.B.E.W. Local Union 380 Pension Fund v. Buck Consultants*, 2008 WL 2265269, at *2 (E.D. Penn. June 3, 2008) ("There is no stigma attached to such error correction, nor should there be. If anything, it strengthens the quality of the expert report.") (internal citations omitted).

I.    **MR. SCHEFF'S FAM ANALYSIS IS RELIABLE AND ADMISSIBLE**

A.  **Mr. Scheff's Modest Retiming Of The Combined Schedule Is Appropriate And Methodologically Sound**

Plaintiffs' argument for excluding Mr. Scheff's FAM analysis is based on the false assertion that he "did not explain" why he permitted for modest retiming of the combined schedule in his FAM analysis but did not permit retiming of the standalone schedules. Memorandum of Law in Support of Plaintiffs' Motion in Limine to Exclude Testimony from Mr. Richard Scheff ("Br."), ECF No. 180 at 7.   As Mr. Scheff explained, he did not permit retiming of the standalone schedules because those are *actual* and *current* schedules that the existing airlines have *themselves* already optimized and put into place.  Scheff Tr. 136:3-17.  The airlines' standalone schedules reflect "what the two individual airlines decided was the most appropriate, after everything that they looked at, how they wanted to fly, [and] when they wanted to fly." *Id.* 138:4-10.  Mr. Scheff therefore deemed it inappropriate to override the decisions the airlines made for themselves by moving flights to times that the airlines had already decided not to fly.  *See id.* 138:11-14.

The same cannot be said of the combined schedule that was run through the FAM, where no network planner has already optimized the combined schedules of JetBlue and Spirit.  *Id.* 138:14-16.  Even still, Mr. Scheff only allowed for modest retiming forward or backwards in 20-minute increments up to an hour.[4]  Scheff Rpt. ¶ 48.  Because the point of the exercise was to determine the effect of pooling the aircraft while keeping the schedules relatively close to the current schedules chosen by the standalone companies (understanding that post-merger JetBlue

---

[4] As Mr. Scheff repeatedly mentioned, a network planner for the merged entity would be able to make much more substantial timing changes, change aircraft type, and generally be free of the many limitations Mr. Scheff placed on himself in analyzing potential increased utilization, all of which could increase utilization beyond the figures Mr. Scheff has calculated.

would likely make far greater optimization changes), Mr. Scheff's comparison was entirely
appropriate. Plaintiffs disagree and can ask him at trial why he did not allow re-timing of the
standalone schedules (which they already asked him at deposition). But Plaintiffs' assertion that
Mr. Scheff's approach is "apples to oranges" junk science that ought to be excluded is without
merit and should be rejected. *See Neural Magic, Inc. v. Meta Platforms, Inc.*, No. 20-CV-10444-
DJC, 2023 WL 2383172, at *11-13 (D. Mass. Mar. 6, 2023) (where expert "provided a
reasonable explanation" for both the alterations the expert made to the parties' data prior to
analysis and the expert's methodology, the court refused to exclude the expert's opinion, noting
that purported "deficiencies . . . in [the expert's] methodology are matters for cross-examination,
not a *Daubert* challenge.").

The cases Plaintiffs cite in support of their argument to exclude Mr. Scheff on this basis
appear to be chosen solely because they contain the phrase "apples to apples" or "apples to
oranges"—which it appears Plaintiffs determined was a useful rhetorical device—rather than
because of their applicability to this case. In *Loeffel*, for example, the court excluded testimony
from an "expert" with an "admitted lack of expertise" in the relevant industry who sought to
compare the financial condition of the plaintiff to the financial condition of eight companies
chosen at random without any explanation. *Loeffel Steel Prods., Inc. v. Delta Brands, Inc.*, 387
F. Supp. 2d 794, 811-12 (N.D. Ill. 2005). Indeed, the face of the expert's opinion showed that
the eight companies were facially *incomparable* to the plaintiff given that all eight companies'
financial conditions *declined* over the measured period while the plaintiffs' financial condition
*improved*. *Id*. The *Donnelly* opinion was rendered after a bench trial and does not even address
the admissibility of an expert opinion, much less support Plaintiffs' attempt to exclude Mr.

Scheff in advance of testifying.[5]  *Donnelly v. R.I. Bd. Of Governors for Higher Educ.*, 929 F. Supp. 583, 587 (D. R.I. 1996).  And perhaps furthest off the mark is Plaintiffs' reliance on the *Nike* case.  There, Plaintiffs' "apples to oranges" language is mentioned in a recitation of the legal standard, but the expert (a podiatrist) in that case did not seek to compare *anything* and the court unsurprisingly did not consider whether the expert's comparisons were appropriate.  *See Nachimovsky v. Nike Inc.*, No. 22-866, 2023 WL 4504461, at *1 (2d Cir. July 13, 2023).  Rather, the court excluded the expert's opinion because he served "conclusory reports . . . each less than a page long" that asserted with no explanation or support that the shoes at issue in the case were too narrow and were a "major contributing factor" to the plaintiff's injury.  *Id* at *2.

Simply put, the cases on which Plaintiffs rely do not provide a basis to exclude Mr. Scheff's FAM-related opinions.  Mr. Scheff has deep expertise in the airline industry and with the tools and model he used to render his FAM-related opinions.  In addition, he provided detailed, cogent explanations for his approach and the methods he applied.  Nothing in Plaintiffs' cited cases (or any cases) support the exclusion of his opinions.

## B.  The Configurations Mr. Scheff Used In His FAM Analysis Are Appropriate And Consistent With The Way He Uses The Tool In Non-Litigation Contexts

Plaintiffs' argument that Mr. Scheff used the FAM tool in an unusual way for this case by not using certain configurations, once again, is based on their selective reading of the record and omission of facts contrary to their position.  Br. at 8-10.  Mr. Scheff testified that FAM is a complex tool with many settings that can be toggled on or off to account for highly specific analyses that a user may want to do.  Scheff Tr. 148:20-149:10.  After explaining the use of each

---

[5] The substance of the *Donnelly* court's holding is also inapplicable here.  The court determined that it was inappropriate to compare the highest paid disciplines of university faculty to the lowest paid disciplines and then attribute that differential to gender discrimination without any proof that the challenged conduct caused more women to be employed in the disciplines that earned less money.  *Donnelly*, 929 F. Supp. at 591-92.

of these settings, Mr. Scheff testified that he commonly uses FAM with many of the settings

turned off because they are often not applicable. *Id.* 149:19-150:22. As Plaintiffs eventually

admit, Mr. Scheff testified that the precise use of FAM varies depending on the specific project.

Br. at 9. Based on his decades of experience using FAM and analyzing airline fleet usage, he

determined that he need not use many of the settings available in the FAM to analyze the

combination of the JetBlue and Spirit schedules, which is entirely consistent with his work on

non-litigation consulting projects. In fact, Scheff testified that in his consulting work he has used

FAM specifically to analyze whether an airline could "pop" additional aircraft by combining the

schedules of two airlines through a merger, and in doing that project, he did not use the settings

that were not used in this case. Scheff Tr. 151:1-13 ("Q: Did you use any of the constraints in

this screenshot that appear when undertaking that analysis [for a third-party in connection with

an airline merger]? A: I don't believe so."). Plaintiffs inexplicably fail to mention this testimony

in their motion.

Plaintiffs also complain that Mr. Scheff did not "iterate" on the FAM solution to

"improve and adjust the schedule" or account for certain other constraints, like connectivity,

terminal assets, or demand for the retimed flights. Br. at 9-10. This amounts to a criticism that

Mr. Scheff does not have a time machine to take him (and JetBlue) into the future to the post-

merger JetBlue after all of Spirit's aircraft have been retrofitted. The very iterative process

Plaintiffs suggest Mr. Scheff should have undertaken now can only be done after the combined,

post-merger JetBlue is operating the combined schedules with the combined assets, using a

combined in-flight and ground labor force. Scheff Tr. 154:13-155:12, 156:6-17. Here, Mr.

Scheff demonstrated that by pooling JetBlue's and Spirit's aircraft and allowing modest

retiming, post-merger JetBlue would have the equivalent of 15 additional planes while flying the

July 2023 schedules of JetBlue and Spirit, and he explained that to the extent any constraints exist, they are already baked into the existing schedule that the airlines are flying and there is no reason to believe that the modest retimings he allowed would cause any meaningful constraint. Scheff Rpt. ¶¶ 48, 50-51; Scheff Tr. 153:9-19, 154:14-155:1.   Plaintiffs have conjured this concern from whole cloth and point to Mr. Scheff's "failure" to conduct the "iterative process" to suggest something more should have been done.  *See* Br. at 9-10.  Needless to say, neither *Daubert* nor Rule 702 requires an expert to conduct analyses that cannot be done in order to testify about reasonable opinions based on reliable methodologies.  *See, e.g., Equal Emp. Opportunity Comm'n v. Texas Roadhouse, Inc.*, 215 F. Supp. 3d 140, 154-57 (D. Mass. 2016) (rejecting motion to exclude plaintiff's expert testimony that analyzed alternative public data, rather than defendant's incomplete data, because the public data was a "reliable proxy" that enabled the expert to render a relevant opinion on the issues).

## II.   MR. SCHEFF'S OPINION THAT POST-MERGER JETBLUE WILL FLY MORE LIKE JETBLUE THAN SPIRIT IS ADMISSIBLE

Plaintiffs also take issue with Mr. Scheff's opinion that the post-merger JetBlue will fly the Spirit aircraft it acquires and retrofits using the service pattern JetBlue uses on its own fleet. Br. at 10.  Because JetBlue pulls down less capacity in off-peak months and days of the week, applying JetBlue's service pattern to the retrofitted Spirit aircraft will result in an increase in capacity.

The data that Mr. Scheff analyzed reflects that JetBlue *already flies* a flatter service pattern (*i.e.*, it does not dip as much from peak as Spirit does), making Plaintiffs' argument— that Mr. Scheff's opinion is not based on sufficient data—puzzling.[6]  Scheff Rpt. ¶¶ 26, 32;

---

[6] The sole case Plaintiffs' cite in support of this argument has no applicability here.  In that case, the court excluded a causation expert's opinion that the Wi-Fi in the plaintiff's classroom caused plaintiff's symptoms because the

Figure 3, Figure 5.  Plaintiffs also argue that Mr. Scheff's opinion should be excluded because he did not explain why post-merger JetBlue would be able to fly planes on Spirit's current routes at times of the year (and days of the week) that Spirit does not fly.  Br. at 10-13.  This argument is easily rejected, because Mr. Scheff did explain this—there is broader demand for JetBlue's product across consumers of all types.  Scheff Rpt. ¶¶ 23-25, 31. That means that JetBlue can, and does, fly at times when Spirit does not.

Plaintiffs' argument is also based on a misunderstanding of Mr. Scheff's opinions.  While the increased flying that will manifest by applying JetBlue's service pattern to the retrofitted Spirit aircraft very well could occur on Spirit's current routes, the point is that post-merger JetBlue can fly Spirit's aircraft to either the same or new places and at times when Spirit would have them sitting on the ground, which will increase capacity.  Scheff Tr. 106:22-107:4; 121:15-17.  Plaintiffs' seeming demand for Mr. Scheff to precisely identify which routes post-merger JetBlue will fly the retrofitted Spirit aircraft, Br. at 12, is effectively a demand for "perfection" that *Daubert* does not require.  *See U.S. v. Monteiro,* 407 F. Supp. 2d 351, 366 (D. Mass. 2006) ("*Daubert* and *Kumho Tire* do not make the perfect the enemy of the reliable. . . ."); *see also United States v. Baker Hughes, Inc.,* 908 F.2d 981, 992 (D.C. Cir. 1990) (Thomas, J.) (defendants need not trace flow of benefits from merger with exactitude, because doing so would be "forcing a defendant to rebut a probability with a certainty").

Finally, Plaintiffs argue that there is insufficient record evidence that JetBlue plans to change the way Spirit's aircraft are flown post-merger.  Br. at 13.  This is looking at it through the wrong end of the telescope.  The record shows that JetBlue already maintains a flatter service

---

expert did not use any data to confirm that the Wi-Fi, as opposed to any other environmental condition, was the culprit.  *G v. Fay Sch., Inc. by & through its Bd. of Trustees,* 282 F. Supp. 3d 381, 391 (D. Mass. 2017).  Here, Mr. Scheff analyzed the data and confirmed that JetBlue takes down less capacity in off-peak days and seasons as compared to Spirit.

pattern than Spirit, and there is no record evidence that post-merger JetBlue plans to change its current strategy or use the former Spirit aircraft (that will be retrofitted to the JetBlue layout) in a manner different from the rest of its fleet.

### III.   MR. SCHEFF'S OPINIONS THAT THE POST-MERGER JETBLUE CAN INCREASE UTILIZATION BY UP-AND DOWN-GAUGING AIRCRAFT, INCREASING REDEYE FLYING, AND REDUCING SPARES ARE ADMISSIBLE

Plaintiffs argue that because Mr. Scheff did not quantify certain ways post-merger JetBlue will likely increase utilization, his opinions relating to those categories of increased utilization are inadmissible.  Br. 13-15.  Plaintiffs cite no cases in support of this argument, which is unsurprising because it is well-settled that an expert need not quantify each opinion for it to be admissible.  *See, e.g., In re Asacol*, 323 F.R.D. at 466-67 (denying motion to exclude non-quantitative analysis about the likelihood generic pharmaceutical manufacturers would have entered the market that "relied upon industry norms, [and the expert's] experience"); *Monteiro*, 407 F. Supp. 2d at 371 (an expert can rely on their professional experience to offer a subjective, "holistic assessment," even where "ultimate opining is likely to depend in some measure on experiential factors that transcend precise measurement and quantification.").

The remainder of Plaintiffs' arguments against Mr. Scheff's non-quantified categories of increased utilization can be rejected because those arguments incorrectly claim that Mr. Scheff did not offer sufficient explanations for his opinions or look at data.  In addition to relying on his nearly 40 years of relevant experience, Mr. Scheff reviewed data showing the differences between the ways that JetBlue and Spirit operate their A321s, interviewed a Spirit employee about a limitation on Spirit's scheduling of its A321CEO aircraft, and analyzed JetBlue's combined network plan to determine that JetBlue will likely add additional redeye flying.  Scheff Rpt. ¶¶ 58-63, Figures 13(a)-(d) (describing increased use of Spirit's A321s); ¶¶ 64-69, Figures

14-16 (describing increased redeye flying).  All of this led Mr. Scheff to conclude that these categories would provide significant upside in terms of utilization for the merged JetBlue.  *Id.* ¶ 57.  As he explained, he did not believe these categories were appropriate for quantification because the data necessary to perform that quantification does not yet exist.  *Id.*  ¶¶ 58, 64, 72.  For example, to accurately quantify the extent to which post-merger JetBlue could up- or down-gauge aircraft and get more use out of Spirit's A321 fleet, the combined entity would need to know "specific fleet operating cost data" and "day of week and time of day demand forecasts for each flight in a seasonal period."  *Id.* ¶ 58.  Likewise, to know how many additional red-eye flights post-merger JetBlue could fly, the future company would need to know how many aircraft of each type are on the coasts at specific times after the airline is fully merged.  Scheff Rpt. ¶ 64.  That data does not yet exist, because airlines do not put together fleeted schedules five years ahead of time.  Scheff Tr. 118:16-21.  Instead, Mr. Scheff reviewed JetBlue's combined network plan, observed that it reflects JetBlue's plan to significantly increase redeye flying in the future, and concluded from his experience that post-merger JetBlue will have the means to do so with a larger presence and more aircraft on each coast.[7]  Scheff Rpt. ¶ 69; Scheff Tr. 165:15-166:1.

## **CONCLUSION**

For the foregoing reasons, Plaintiffs' motion in limine to exclude Mr. Scheff's testimony should be denied.

Dated: September 20, 2023                          Respectfully submitted,

                                                  */s/ Michael P. Mitchell*
                                                  Michael P. Mitchell (admitted *pro hac vice*)
                                                  Brian Hauser
                                                  Shearman & Sterling LLP

---

[7] Similarly, to analyze the precise number of spares that could be freed up would require a fully fleeted schedule because the number and location of the spares depends on where aircraft are at particular times.  Even still, Plaintiffs seem to acknowledge that at least one spare could be freed up.  Br. at 15.  That would result in an additional 232,000 annual seats of capacity beyond what Mr. Scheff quantified in his report.  Scheff Rpt. ¶ 80.

401 9th St. NW
Suite 800
Washington, DC 20004
(202) 508-8000
michael.mitchell@shearman.com
brian.hauser@shearman.com

Jessica K. Delbaum
Leila R. Siddiky
Richard F. Schwed
Shearman & Sterling LLP
599 Lexington Avenue
New York, NY 10022
(212) 848-4000
jessica.delbaum@shearman.com
leila.siddiky@shearman.com
richard.schwed@shearman.com

Rachel Mossman Zieminski
Shearman & Sterling LLP
2601 Olive St, 17th Floor
Dallas, TX 75201
(214) 271-5777
Rachel.Zieminski@Shearman.com

Ryan A. Shores
Daniel P. Culley
David I Gelfand
Cleary Gottlieb Steen & Hamilton LLP
2112 Pennsylvania Avenue, NW
Washington, DC 20037
(202) 974-1876
Fax: (202) 974-1999
rshores@cgsh.com
dculley@cgsh.com
dgelfand@cgsh.com

Zachary R. Hafer (MA BBO #569389)
Elizabeth M. Wright (MA BBO #569387)
Cooley LLP
500 Boylston Street, 14th Floor
Boston, MA 02116-3736
Tel: 617-937-2300
ewright@cooley.com
zhafer@cooley.com

16

Ethan Glass (*Pro Hac Vice*)
Deepti Bansal (*Pro Hac Vice*)
Matt K. Nguyen (*Pro Hac Vice*)
Cooley LLP
1299 Pennsylvania Avenue NW, Suite 700
Washington, DC 2004-2400
Tel: 202-842-7800
Fax: 202-842-7899
eglass@cooley.com
dbansal@cooley.com
mnguyen@cooley.com

*Attorneys for Defendant JetBlue Airways
Corporation*

/s/ Samuel N. Rudman
Samuel N. Rudman (MA BBO #698018)
Choate, Hall & Stewart LLP
Two International Place
Boston, MA  02110
Telephone:   +1 617 248 4034
srudman@choate.com

/s/ Andrew C. Finch
Andrew C. Finch (*Pro Hac Vice*)
Eyitayo St. Matthew-Daniel (*Pro Hac Vice*)
Jay Cohen (*Pro Hac Vice*)
Jared P. Nagley (*Pro Hac Vice*)
Kate Wald (*Pro Hac Vice*)
Paul, Weiss, Rifkind, Wharton & Garrison
LLP
1285 Avenue of the Americas
New York, NY 10019
Tel: 212-373-3000
Fax: 212-757-3990
afinch@paulweiss.com
tstmatthewdaniel@paulweiss.com
jcohen@paulweiss.com
jnagley@paulweiss.com
kwald@paulweiss.com

Meredith R. Dearborn (*Pro Hac Vice*)
Paul, Weiss, Rifkind, Wharton & Garrison
LLP
535 Mission Street, 24th Floor
San Francisco, CA 94105

17

Tel: 628-432-5100
Fax: 628-232-3101
mdearborn@paulweiss.com

*Attorneys for Defendant Spirit Airlines, Inc.*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that this document was filed through the ECF system on September 20, 2023, and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

*/s/ Michael P. Mitchell*
Michael P. Mitchell
