# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA, et al, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| JETBLUE AIRWAYS CORPORATION and | ) Civil Action No. 1:23-cv-10511-WGY |
| SPIRIT AIRLINES, INC., | ) |
| | ) |
| Defendants, | ) |
| | ) |
| | ) |
| | ) |
| | ) |

**DEFENDANT JETBLUE AIRWAYS CORPORATION AND SPIRIT AIRLINES, INC.'S MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION IN LIMINE <u>REGARDING PURPORTED OUT-OF-MARKET BENEFITS</u>**

## <u>TABLE OF CONTENTS</u>

I.    PLAINTIFFS' MOTION IS PREMATURE BECAUSE THE RELEVANT MARKETS ARE A FACTUAL ISSUE FOR TRIAL ........................................................................ 4

    A.    The Economic and Qualitative Evidence Will Support A Broader Market Than the Government Assumes in Its Motion ................................................................. 6

    B.    Supply-Side Substitution Can Be Part of Market Definition .............................. 9

    C.    A Broader View of the Relevant Market Is Appropriate Because Consumers Fly on Multiple Routes ........................................................................................... 12

II.    EVEN IF THE COURT ACCEPTS THE GOVERNMENT'S MARKET DEFINITION, DEFENDANTS' EVIDENCE IS RELEVANT TO ITS REBUTTAL CASE AT STEP TWO ........................................................................................................................ 13

III.    THE GOVERNMENT OVERSTATES THE VITALITY AND IMPACT OF *PHILADELPHIA NATIONAL BANK* ........................................................................ 18

CONCLUSION ..................................................................................................................... 20

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*,
    65 F.3d 1406 (7th Cir. 1995) ................................................................................ 10

*Chi. Bridge & Iron Co. N.V. v. FTC*,
    534 F.3d 410 (5th Cir. 2008) .................................................................................. 4

*Deslandes v. McDonalds USA, LLC*,
    No. 17 C 4857, 2023 WL 5496957 (7th Cir. Aug. 25, 2023) ............................. 20

*Epic Games, Inc. v. Apple, Inc.*,
    67 F.4th 946 (9th Cir. 2023) ............................................................................... 19

*FTC v. Rag-Stiftung*,
    436 F. Supp. 3d 278 (D.D.C. 2020) ................................................................ 6, 10

*FTC v. Tenet Health Care Corp.*,
    186 F.3d 1045 (8th Cir. 1999) ............................................................................ 5, 9

*Gulf States Reorg. v. Nucor Corp.*,
    822 F. Supp. 2d 1201 (N.D. Ala. 2011) .............................................................. 10

*Kottaras v. Whole Foods Mkt., Inc.*,
    281 F.R.D. 16 (D.D.C. 2012) ...........................................................4, 12, 19-20

*National Collegiate Athletic Ass'n v. Alston*,
    141 S. Ct. 2141 (2021) ........................................................................................ 20

*New York v. Deutsche Telekom AG*,
    439 F. Supp. 3d 179 (S.D.N.Y. 2020) ............................................................... 4, 9

*SBC Commc'ns v. FCC*,
    56 F.3d 1484 (D.D.C. 1995) ............................................................................... 10

*Sullivan v. Nat'l Football League*,
    34 F.3d 1091 (1st Cir. 1994) .............................................................................. 19

*United States v. Anthem, Inc.*,
    236 F. Supp. 3d 171 (D.D.C. 2017) ................................................................. 5

*United States v. Baker Hughes, Inc.*,
    908 F.2d 981 (D.C. Cir. 1990) .............................................................*passim*

*United States v. Gen. Dynamics Corp.*,
    415 U.S. 486 (1974) ................................................................................... 4, 20

*United States v. Grinnell*,
    384 U.S. 563 (1966) ................................................................................... 2, 10

*United States v. Philadelphia National Bank*,
    374 U.S. 321 (1963) ..................................................................................... 3, 5

*United States v. Standard Oil Co. (N.J.)*,
    253 F. Supp. 196 (D.N.J. 1966)........................................................................ 14

*United States v. Topco*,
    405 U.S. 596 (1972) ........................................................................................ 20

*United States v. U.S. Sugar*,
    73 F.4th 197 (3d Cir. 2023)............................................................................ 2, 6

*United States v. U.S. Sugar Corp.*,
    No. 1:21-cv-01644, 2022 WL 4544025 (D. Del. Sept. 28, 2022), *aff'd* 73 F.4th 197
    (3d Cir. 2023) ................................................................................................... 7

*United States v. US Airways Grp., Inc.*,
    38 F. Supp. 3d 69 (D.D.C. 2014) ..................................................................... 9

*United States v. Waste Mgmt., Inc.*,
    747 F.2d 976 (1984) ................................................................................. 14, 16

*Weinberger v. Romero-Barcelo*,
    456 U.S. 305 (1982) ........................................................................................ 16

**Federal Statutes**

Clayton Act § 7..........................................................................................*passim*

Sherman Act § 1 .....................................................................................19-20

**Other Authorities**

Daniel A. Crane, *Balancing Effects Across Markets*, 80 Antitrust L. J. 397 (2015)..................13

Dept. of Justice & Fed. Trade Comm'n, Horizontal Merger Guidelines (2010) .......................14

Gregory J. Werden, *Cross-Market Balancing of Competitive Effects: What is the Law, and What Should It Be?*, 43 J. Corp. L. 120, 122 (2017) ......................................................10

Today, the "Big Four" carriers (United, American, Delta, and Southwest) collectively control approximately 80% of domestic airline travel.  Decl. of Ryan A. Shores (Sep. 20, 2023) ("Shores Decl."), Ex. A (Rebuttal Expert Report of Nicholas Hill ¶ 12 (Aug. 3, 2023)) ("Hill Rebuttal Rep.") (calculating shares based on revenue).  Through its purchase of Spirit, JetBlue will expand its disruptive business model, creating a fifth national challenger to these airlines and enhancing competition throughout the United States.  This is no empty hypothesis.  As the Government itself recently explained, JetBlue's "unique" offering allows it to compete "effectively against the legacy airlines in ways other LCCs and ULCCs" cannot, and its competitive pressure has saved consumers billions of dollars and improved the quality of air travel.  Plaintiffs' Proposed Findings of Fact ¶¶ 27, 28, *United States v. Am. Airlines Grp. Inc.*, No. 1:21-cv-11558 (D. Mass.) (Dec. 2, 2022), ECF No. 332 ("NEA Proposed Findings of Fact").[1]  Through its instant motion, however, the Government wants this Court to ignore these admitted benefits that JetBlue, as a more robust nationwide competitor, will bring to the airline industry without considering *a single piece of evidence* at trial.  The Government's request to prejudge the merger is misguided for multiple reasons.

---

[1] Numerous witnesses, including the parties' competitors, recognize the same. *See, e.g.*, Shores Decl., Ex. B (Trevor Yealy (Avelo) Dep. Tr. 124:4–19 (June 27, 2023)) ("Q. In your view, would a combined JetBlue-Spirit be a stronger competitor for the legacy airlines? . . . THE WITNESS: At the end of the day, a combined JetBlue-Spirit, I think, would be a stronger competitor to the legacy airlines, yes…Q. And why do you think that? It gives the combined entity more size and scale with which to operate out of their airports where they do run into a number of the legacy airlines. It provides them more assets to compete in a much faster manner than they would otherwise have organically."); Shores Decl., Ex. C (Drew Wells (Allegiant) Dep. Tr. 244:8–13 (June 22, 2023)) ("Wells Dep. Tr.") ("Q. And I believe you testified earlier that the merger will help JetBlue gain the scales necessary to better compete against the Big Four; correct?. . . THE WITNESS: I – I'd believe that to be true.").

As a threshold matter, the Government's motion mistakes its alleged "markets" consisting of "origin and destination" pairs or routes (and thus what benefits are "out of market") as settled facts. But it is for this Court, not the Government, to decide the relevant markets on a full record after trial, and then consider how those markets inform the competitive effects analysis. The evidence will show that competition in the airline industry occurs at many levels, including at the national level, at the city level, and at the route level. After hearing the evidence, the Court need not choose the narrowest market "where such 'division does not aid [the court] in analyzing the effects of [a] merger.'" *United States v. U.S. Sugar*, 73 F.4th 197, 207 (3d Cir. 2023) (alterations in original) (quoting *Brown Shoe Co., Inc. v. United States*, 370 U.S. 294, 327 (1962)). Indeed, even where some aspects of competition are local, the Supreme Court has not hesitated to find a broader geographic market where the record reflected competition at the regional and national level. *See United States v. Grinnell*, 384 U.S. 563, 575 (1966) (finding a national market notwithstanding 25-mile catchment area for local facilities where the evidence at trial showed "national planning," agreements "cover[ing] activities in many [s]tates," and a "national schedule of prices, rates, and terms, though the rates may be varied to meet local conditions.").

But even if the Court were to take that highly unusual step of adopting the Government's route-only market definitions as a matter of law before trial, the motion still must be denied. In the modern burden-shifting framework of a Section 7 case, the Government must start by showing increased concentration levels in relevant markets; after that, Defendants need only show these concentration statistics "inaccurately predict[] the relevant transaction's probable effect on future competition." *United States v. Baker Hughes, Inc.*, 908 F.2d 981, 991 (D.C. Cir. 1990). Here, the evidence will show that an enhanced JetBlue will increase

network-wide competition, and that enhanced competition will ripple through the fluid airline industry, where carriers constantly adjust the routes they fly in response to ever-changing competitive dynamics.  Particularly in this evolving competitive environment, there is no requirement that Defendants trace the flow of benefits from this enhanced network-wide competition to particular routes with exactitude.  That would incorrectly "forc[e] a defendant to rebut a probability with a certainty," contrary to Section 7.  *Id*. at 992.

Indeed, the Government's own purported theories and alleged evidence of harm refute what it is requesting here—for this Court to put on blinders and consider individual routes in isolation in judging the competitive implications of this merger.  As the Complaint makes clear, the Government's challenge to this merger is systemwide: by replacing the Spirit business model with the JetBlue model, the Government claims that customers across Spirit's entire current and future network will be harmed by the merger.  *E.g.*, Compl. ¶¶ 6, 29, 30 (Mar. 7, 2023), ECF No. 1 ("Compl.").  To deny Defendants the ability to counter the Government's claims of systemwide harm with evidence of systemwide benefits would be fundamentally unfair and make no sense.  That is even more so given that the Government's expert admits his supposed quantification of harm is only reliable in the aggregate, and not on individual routes.  Shores Decl., Ex. E (Gautam Gowrisankaran Dep. Tr., 280:4–20 (Sept. 1, 2023)) ("Gowrisankaran Dep. Tr.").

Against this backdrop, the Government's reliance on *United States v. Philadelphia National Bank*, 374 U.S. 321 (1963), is misplaced.  In the sixty years since it was decided, *Philadelphia Nat'l Bank* has been "cut [] back sharply" by later Supreme Court cases.  *Baker Hughes*, 908 F.2d at 990.  As courts have repeatedly made clear over the last half century, a merger must "be functionally viewed, in the context of its particular industry" as a whole,

*United States v. Gen. Dynamics Corp.*, 415 U.S. 486, 498 (1974) (quoting *Brown Shoe Co.*, 370 U.S. at 321–22), considering the "totality-of the-circumstances." *Baker Hughes*, 908 F.2d at 984.  Following this command, courts have distinguished *Philadelphia Nat'l Bank* based on its unique facts, including in cases like this one where the same group of customers—like customers for air travel—purchase across multiple alleged markets.  *See Kottaras v. Whole Foods Mkt., Inc.*, 281 F.R.D. 16 (D.D.C. 2012).  In short, given the competitive realities of the airline industry and the context of this merger, the case law not only allows—but *requires*— this Court to analyze the merger's impact on competition *as a whole*, not myopically and mechanically as to individual routes as the Government requests.  The motion should be rejected.

## I.   PLAINTIFFS' MOTION IS PREMATURE BECAUSE THE RELEVANT MARKETS ARE A FACTUAL ISSUE FOR TRIAL

The fallacy of the Government's motion can only be understood against the backdrop of the legal standard the Government omits.  There is a three-step burden-shifting framework for analyzing the likely competitive effects of a merger in a challenge under Section 7 of the Clayton Act.  *See generally Baker Hughes*, 908 F.2d at 981.[2]  At step one, plaintiffs must start by properly identifying a relevant product and geographic market and showing the transaction will lead to increased concentration levels in the relevant market.  *FTC v. Tenet Health Care Corp.*, 186 F.3d 1045, 1051 (8th Cir. 1999).  This "[e]vidence of market concentration simply provides a convenient starting point for a broader inquiry into future competitiveness." *Baker Hughes*, 908 F.2d at 984.

---

[2] Though the First Circuit has not specifically adopted or applied *Baker Hughes*, it is well-established that "[c]ourts generally assess Section 7 cases through [this] three-part burden-shifting framework."  *New York v. Deutsche Telekom AG*, 439 F. Supp. 3d 179, 198–99 (S.D.N.Y. 2020) (quotation marks and citation omitted).

If plaintiffs satisfy their initial burden, then at step two, the "burden of producing evidence to rebut this presumption then shifts to the defendant." *Id.* at 982.  "A defendant can make the required showing by [(1)] affirmatively showing why a given transaction is unlikely to substantially lessen competition, or [(2)] by discrediting the data underlying the initial presumption in the government's favor." *Id*. at 991.  The "quantum of evidence defendants must produce to shift the burden back is relatively low." *United States v. Anthem, Inc.*, 236 F. Supp. 3d 171, 213 (D.D.C. 2017) (citing *Baker Hughes*, 908 F.2d at 991) ("[D]efendants are not required to 'clearly disprove anticompetitive effect,' but rather to make 'a showing.'").  And the court must consider all of a defendant's rebuttal evidence in a "totality of the circumstances approach," not separately considering the individual impact of, for example, entry or efficiencies. *See Baker Hughes*, 908 F.2d at 984.  Finally, if defendants rebut the presumption, then at step three, "the burden of producing additional evidence of anticompetitive effect shifts to the government, and merges with the ultimate burden of persuasion, which remains with the government at all times." *Id.* at 983.

The Government's motion here simply assumes that it has already proven its alleged route-level market definitions are the appropriate lens through which to examine the impact of this merger, the initial step in the analysis, and thus which benefits are "out of market."[3]  The motion should be denied as premature for that reason alone.  As described further below, the

---

[3] The Government points to the language "in any line of commerce in any section of the country" in the text of Section 7.  Mot. at 6.  But this language just refers to market definition. *See, e.g.*, *Philadelphia Nat'l Bank*, 374 U.S. at 355 ("We have no difficulty in determining the 'line of commerce' (relevant product or services market) and 'section of the country' (relevant geographical market) in which to appraise the probable competitive effects of appellees' proposed merger.").

motion also ignores that the evidence the Government deems "out of market" is relevant to the final two stages of the Section 7 inquiry.

A.  **The Economic and Qualitative Evidence Will Support A Broader Market Than the Government Assumes in Its Motion**

Market definition is a fact-specific inquiry.  *See U.S. Sugar*, 73 F.4th at 203.  The Court should wait until hearing that evidence to decide on the appropriate market in which to evaluate the competitive effects of the merger.

The evidence at trial—economic and qualitative—will demonstrate the error in the Government's unduly narrow focus on route-level competition.  The Government's own economic expert, Dr. Gowrisankaran, admits that a national market is one of several that passes the "hypothetical monopolist test" used to evaluate market definition.  Gowrisankaran Dep. Tr. 10:1–3 ("And so a geographic market, such as the United States as a whole, would pass the hypothetical monopolist test."); *see also FTC v. Rag-Stiftung*, 436 F. Supp. 3d 278, 293 (D.D.C. 2020).  Dr. Gowrisankaran likewise agrees the effects of the proposed merger can be analyzed at many different levels, including the national level, Gowrisankaran Dep. Tr. 15:16– 21, and that economics does not require the selection of the narrowest possible market that passes the hypothetical monopolist test.  Gowrisankaran Dep. Tr. 24:11–21 ("Q. You're not opining, are you, Doctor, that we must always choose the narrowest market that passes the hypothetical monopolist test as the relevant antitrust market, are you? A. No, Mr. Culley, that would not be consistent with the principles in the horizontal merger guidelines.").  In fact, Dr. Gowrisankaran recognizes the "criteria for choosing among" candidate markets (e.g., national, city-pairs, airport-pairs) is "not critical," and is more akin to "zoom[ing] in or out" on competitive effects, Shores Decl., Ex. F (Expert Report of Gautam Gowrisankaran ¶ 59, (July 6, 2023)) ("Gowrisankaran Rep."), and Dr. Gowrisankaran did not himself choose the

narrowest market that he identified as passing the hypothetical monopolist test.  Gowrisankaran

Rep. ¶ 84 (selecting city-level pairs after finding that airport-level pairs would pass the

hypothetical monopolist test).

The qualitive evidence at trial likewise will show that important aspects of the airline

competition go beyond the route level and, instead, are national or regional in nature.  For

example:

- ***Network Design and Adjustments***:  Airlines design and frequently adjust their networks, entering and exiting individual routes or increasing or decreasing frequencies in routes, in response to changes in prices and demand across their network.  *Cf. United States v. U.S. Sugar Corp.*, No. 1:21-cv-01644, 2022 WL 4544025, at *24 (D. Del. Sept. 28, 2022), *aff'd* 73 F.4th 197 (3d Cir. 2023) ("Here, the economic reality is that sugar flows easily across the country from areas of surplus to deficit in response to prices and demand.").  As the Government's other economist, Dr. Tasneem Chipty, put it: "[A]irlines do not make entry decisions on a simple route-by-route basis" but instead, "airlines decide which routes to operate based on sophisticated systemwide network optimization."  Shores Decl., Ex G (Expert Report of Tasneem Chipty, Ph.D. ¶ 50, (Jul. 6, 2023)) ("Chipty Rep.").

- ***Business Model and Strategy***:  Airlines design and promote their business model at the national level.  For example, JetBlue utilizes a "low-cost carrier" model throughout the country, primarily flying point-to-point with limited connections and undercutting the legacies (with large connecting networks) on price while offering better quality (like the most legroom in coach).  Spirit and other airlines utilize an "ultra-low cost carrier" model, which offers a stripped down, completely unbundled offering.  Notably, airlines change models; Frontier, for example, transitioned to a ULCC.  Hill Rebuttal Rep.¶ 26; Gowrisankaran Rep. ¶ 33.

- *** Loyalty and Frequent Flyer Programs***:  Airlines compete for customers nationwide through loyalty and frequent flyer programs that are national and influence consumer choice.  Shores Decl., Ex. H (Jayne. O'Brien Dep. Tr. 90:6–91:21, 93:11–94:5 (June 9, 2023)) (explaining that JetBlue considers "general market knowledge" of all competitors' loyalty program offerings when making loyalty-related product decisions).  Drs. Gowrisankaran and Chipty acknowledges this.  Gowrisankaran Rep. ¶ 17; Chipty Rep. ¶ 138.

- ***Fare Offerings and Pricing***:  Airlines design their fare offerings at the national level.  For example, JetBlue offers several fare products (called Blue Basic, Blue, Blue Extra, and Mint) to its customers throughout the country.  Gowrisankaran Rep. ¶¶ 41, 45.  Carriers also make pricing adjustments at a network level by optimizing their ancillary fees, such as those for checked bags, and by making other systemwide price adjustments that influence consumer choice.  Carriers also sometimes implement systemwide or regional fare decreases or increases, depending on supply and demand. Indeed, the Government and its

economist focus on so-called cross-market initiatives, which is pricing behavior across multiple routes. Compl. ¶ 50 ("A cross-market initiative can occur where two or more airlines compete against each other on multiple routes."); Gowrisankaran Dep. Tr. 79:3–12.

- ***Airport and City Presence***: Airlines compete for customers in specific geographies. For example, JetBlue has long sought to be the number one carrier to Bostonians, Shores Decl., Ex. I (JBLU-DOJ-01045588)), and to increase its "relevance" to customers in various cities so it can gain passenger loyalty. Again, the Government's own expert recognizes this aspect of competition. Chipty Rep. ¶ 138 ("As airlines increase their airport presence, they become more relevant to consumers through reputation, information spill-overs, and marketing devices, such as frequent-flyer programs.").

The Government, however, would ignore all of this competition as beyond the route level. Moreover, the Government also assumes no competition *between* routes, despite having done no analysis to demonstrate this. For example, Dr. Gowrisankaran admits that he did not analyze whether leisure travelers might substitute between alternative vacation destinations based on flight prices. Gowrisankaran Dep. Tr. 292:19–293:12. Similarly, while the Government argues that connecting flights compete with nonstop flights, it ignores that connecting flights are often priced using a "sum of locals" method that simply adds the price of individual connecting legs together. Hill Rebuttal Rep. ¶ 256–57 & Fig. 82. Therefore, if the Government is correct, each nonstop route with a connecting alternative is influenced not only by the availability of that connecting flight but by the pricing and competitive conditions on the intermediate flights that determine that connecting route's price, meaning that the government's proffered market shares and concentration statistics significantly understate the competition that exists in these markets on this basis alone.

In the end, the Court will need to determine after trial the scope of competition and, thus, the relevant geographic markets. That inquiry will be driven industry by the dynamics and the context of this transaction. *See Deutsche Telekom AG*, 439 F. Supp. 3d at 232. (holding that courts must evaluate "each merger . . . in the context of its particular industry and unique circumstances"). Indeed, the Government itself has adopted market definitions other

than route-level markets in litigation with airlines to better capture the competitive dynamics of

the acquisition at-issue.  Compl. ¶ 32, *United States v. United Continental Holdings, Inc.*, No.

2:15-cv-07992 (D.N.J. Nov. 10, 2015), ECF. No. 1 ("Given that slots can be used to serve any

route to or from Newark, it is appropriate to aggregate all routes that either originate or

terminate in Newark for the purpose of defining a relevant market in which the transaction will

cause anticompetitive harm."); *see also* Amended Compl. ¶ 31, *United States v. US Airways

Grp., Inc.*, Case No. 1:13-cv-01236 (D.D.C. Sep. 5, 2013), ECF. No. 73 (defining a market for

slots at an airport).[4]  Even if the Court were to be skeptical that a fully nationwide market

definition were appropriate, all that is required for Defendants to prevail is that the

Government fail to carry its burden of proof on the only geographic markets that it has alleged.

*See Tenet Health Care Corp.*, 186 F.3d at 1051.

### B.  Supply-Side Substitution Can Be Part of Market Definition

The Government's proposed route-based markets also ignore a critical aspect of market

definition: supply-side substitution.  Specifically, the Government points to a "flight between

Fort Lauderdale and Grand Rapids, Michigan" as not being substitutable for a consumer "in

Fort Lauderdale wanting to visit family in Lima, Peru," Memorandum of Law in Support of

Plaintiffs' Motion in Limine Regarding Out-of-Market Benefits at 2, (Sept. 23, 2023), ECF No.

181 ("Mot."), implicitly asserting that the only factor that matters for market definition is

whether a consumer views two products as substitutes ("demand-side substitution").  But

---

[4] To the extent the Government relies on its own allegations of route-based markets in other
merger matters (which, not having been contested, are not due any weight), this merger is
distinguishable from other airline merger cases because, here, the Government alleges harm
from a system-wide change in Spirit's business model.  *E.g.*, Compl. ¶¶ 6, 29–30; Proposed
Final Pretrial Order ¶¶ 19–20, (Sept. 15, 2023), ECF No. 191 (claiming that there is harm in
"origin-and-destination pairs where . . . Spirit flies nonstop, but JetBlue does not," because
"JetBlue plans to eliminate Spirit's business model.").

courts recognize that flexibility on the supply side is also relevant to market definition.  *See Grinnell Corp.*, 384 U.S. at 575–76 (finding that relevant geographic market was national because, even though fire and services were provided on a local basis, they were planned, and fees were set, on a national basis); *Rag-Stiftung*, 436 F. Supp. 3d  at 293  ("supply side substitution may be used to aggregate products that are not demand substitutes into one market" and "the cross-elasticity of production facilities may also be an important factor in defining a market." (citing *Brown Shoe Co*, 370 U.S. at 325 n.42 (cleaned up))); *SBC Commc'ns v. FCC*, 56 F.3d 1484, 1983 (D.D.C. 1995) ("Supply substitutability is a well-accepted consideration in market definition."); *see also Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*, 65 F.3d 1406, 1410-11 (7th Cir. 1995) ("The relevant product market cannot be determined without considering the cross-elasticity of supply.") (citing *Virtual Maint., Inc. v. Prime Computer, Inc.*, 11 F.3d 660, 665 (6th Cir. 1993)); *Gulf States Reorg. v. Nucor Corp.*, 822 F. Supp. 2d 1201, 1235 (N.D. Ala. 2011) (discussing need to consider supply-side substitution in defining relevant markets).  Indeed, at the time of *Philadelphia Nat'l Bank*, it was common to consider supply-side substitution in the practice of market delineation.  *See* Shores Decl., Ex. J (Gregory J. Werden, *Cross-Market Balancing of Competitive Effects: What is the Law, and What Should It Be?*, 43 J. Corp. L. 120, 122 (2017)).  Thus, courts at the time *Philadelphia Nat'l Bank* was issued would have understood what common sense suggests: that airlines operating national networks are in the same relevant market because of their substitutability of supply.

The evidence presented at trial will show a high degree of supply substitution in the airline industry.  As noted above, airline networks are fluid.  Airlines maintain network planning teams that regularly evaluate entry, expansion, and exit opportunities across their

respective networks.  Airlines move capacity to new markets and exit markets to capture margin.  *E.g.*, Shores Decl., Ex. K (Barry Biffle (Frontier) CID Dep. Tr. 82:2-7, (Mar. 2, 2023)) ("Biffle (Frontier) CID Dep. Tr."); Shores Decl., Ex. D  Biffle Lit. Dep. Tr. 120:18– 121:10 ("[I]f fares do rise disproportionately, you're going to see a market response to that. You'll see capacity chase—those higher prices sooner rather than later."); Shores Decl., Ex. O (John Patrick Kirby (Spirit) Dep. Tr. 62:17–22, (January 12, 2023)) ("And then we keep a list of opportunities, because the environment is very fluid, very dynamic and what may be an opportunity today may not be – or there may be an opportunity that's new that you maybe shift your plans to because it . . . may be a fleeting opportunity.").  Defendants will show that this leads to a "dynamic" industry where "a pattern of entry and exit [on routes is] commonplace." Shores Decl., Ex. L (Nicholas Hill Dep. Tr. 274:2–5 (Sept. 6, 2023)).

Dr. Gowrisankaran's analysis supports this conclusion.  He identified more than 80 routes where JetBlue or Spirit alone entered over a 3-year time period, and 85% of these routes experienced an exit by another carrier within the year after JetBlue or Spirit entered. Gowrisankaran Dep. Tr. 184:3–20.  Moreover, Dr. Gowrisankaran claims that an airline can have a significant impact on prices even with minimal presence on a route, including because of the risk that the airline further expands its service on that route.  *See* Gowrisankaran Dep. Tr. 200:15–205:9; *see also* Shores Decl., Ex. N (Tasneem Chipty Dep. Tr. 173:17–21 (Aug. 31, 2023)).  In short, even the Government's economic evidence reveals the fallacy of ignoring supply dynamics in defining the relevant scope of competition for market purposes on the facts here.

### C. A Broader View of the Relevant Market Is Appropriate Because Consumers Fly on Multiple Routes

Finally, it would make no sense to review competitive effects as to each route in isolation when the same purchasers are buying tickets across different routes at different times. Artificially segmenting the consideration of positive and negative effects at rigidly drawn route boundaries would harm the interests of the very consumers antitrust law is intended to protect.

*Philadelphia Nat'l Bank* does not compel that odd result. In *Kottaras*, for example, the court rejected the same argument that the Government is advancing here. In that case, plaintiffs relied on *Philadelphia Nat'l Bank* to argue that lowered prices on certain grocery items could not negate the harm caused by increased prices on other items. *Id*. at 24. Rejecting this argument, the court concluded that the facts were distinguishable because *Philadelphia Nat'l Bank* concerned the weighing of harms and benefits between two classes of customers with no substantial interaction (retail and commercial banking customers), whereas in *Kottaras*, each customer would experience the aggregate impact of the merger (the increases and offsetting decreases of grocery items). In *Kottaras*, then, the question was not "whether to offset harms in one market with benefits in another, but whether to count benefits against harms in the same market – indeed the same shopping basket." *Id*. at 25.

Here, too, the evidence at trial will show that air travel presents a situation that is very different from *Philadelphia Nat'l Bank* because the relevant consumers fly on different routes for different reasons at different times. Thus, the competitive effects of this merger must be viewed holistically and account for the *full* impact on effected consumers instead of focusing atomistically and narrowly on the impact to a single consumer in a single transaction at a particular moment in time. Put differently, considering the net effect on air travelers would not pit the interests of one group of consumers against another, but would instead maximize the

interests of consumers as a whole.  Shores Decl., Ex. M (Daniel A. Crane, *Balancing Effects Across Markets*, 80 Antitrust L. J. 397, 405–07 (2015)) (noting that balancing across multiple markets in which the same customers participate does not raise the concerns animating *Philadelphia Nat'l Bank*).  This feature of the airline industry—that consumers fly many different routes at different times—likewise supports looking at the relevant market and effects of the merger more holistically, not in the cramped fashion proposed by the Government.

## II.     EVEN IF THE COURT ACCEPTS THE GOVERNMENT'S MARKET DEFINITION, DEFENDANTS' EVIDENCE IS RELEVANT TO ITS REBUTTAL CASE AT STEP TWO

Even if the Court were to accept the Government's origin-destination pair markets, which would be premature, the motion in limine should be denied because much of the same evidence that will support a national market also demonstrates that market shares within individual routes "inaccurately predict[] the relevant transaction's probable effect on future competition" and thus that the merger will not substantially lessen competition.  *Baker Hughes*, 908 F.2d at 991.  Defendants intend to do so using evidence of, among other things, frequent entry, divestitures, and other evidence that the Government intends to exclude here.

Evidence of JetBlue's enhanced national competitive effect flowing from the merger is relevant to show that the Government's concentration metrics are not accurate predictors of the transaction's probable effects. The Government simply ignores that the merger will enable JetBlue to mount a national challenge to the Big Four airlines and spread its "JetBlue effect" across an expanded network, encouraging other airlines to offer more competitive offerings (e.g., better service, expanded loyalty and travel benefits, etc.) that will benefit consumers across individual routes.  Moreover, as noted above, Defendants will show at trial that airlines regularly redeploy their assets to enter and exit routes in response to prices and demand.  Hill Rebuttal Rep. ¶ 325. As a bigger JetBlue takes hold throughout the country, other airlines will

inevitably exit and enter routes based on the new competitive dynamics.  That this reallocation process may take some time is no reason to ignore it.  *United States v. Standard Oil Co. (N.J.)*, 253 F. Supp. 196, 227 (D.N.J. 1966) ("[S]hort term evaluation of anticompetitive effect on [the market at issue] is not consistent with the objectives of Section 7.").  Overall, this greater competition across routes will benefit *all* consumers, including by encouraging new entrants on routes around the country.

Indeed, the Government's Horizontal Merger Guidelines recognize that market share should be assessed for firms that are not currently participating in a market when those firms can enter a route in response to a small but significant non-transitory increase in price (a "rapid entrant").  Dept. of Justice & Fed. Trade Comm'n, Horizontal Merger Guidelines § 5.1 (2010) ("HMG"); *see also United States v. Waste Mgmt., Inc.*, 747 F.2d 976, 983 (1984) ("Ease of entry constrains not only WMI, but every firm in the market" despite the fact that "such entry has not happened more frequently.").  But rather than grappling with this reality of rapid entrants in the airline industry, Dr. Gowrisankaran ignores them in his calculation of market shares. Gowrisankaran Dep. Tr., 181:2–6 ("Q. And therefore, [your market concentration measures] don't incorporate entry that may occur in response to the merger, correct? A. They do not account for entry that would – may occur in response to the merger.").

While it is true that there are constraints at a small number of airports that make immediate entry more challenging, those are the airports at which Defendants have divested assets (e.g., slots and gates) to facilitate entry and growth by other ULCCs after the merger. Hill Rebuttal Rep. ¶¶ 230, 233, 244.  In its motion, the Government asks this Court to ignore these divestitures based on the same false premise:  Those divestitures are legally irrelevant unless the buyers are guaranteed to use the assets to serve the exact same routes that Spirit

previously flew and where the Government alleges harm.  Mot. at 9.  In other words, the

Government says the divestitures must be viewed in isolation, with a narrow and static focus

on their impact on individual routes, and without regard to their ability to foster competition

nationwide.

That extreme position, however, is contrary to the Government's course of conduct for

over two decades.  For example, the Government settled a lawsuit in 2013 seeking to block a

merger between American and US Airways because divestitures would "enhance *system-wide*

*competition* in the airline industry resulting in more choices and more competitive airfares for

consumers."[5]  The Government accepted this settlement even though the divestitures did not

directly address more than 700 routes where the Government had claimed that there would be

harm to competition.  *See US Airways Grp., Inc.*, 38 F. Supp. 3d at 81 (finding "unavailing"

objections to the final judgment that "the divestitures are not of significant scope to remedy the

anticompetitive harms from the merger").  Rather, as it did in declining to challenge

Southwest's 2011 acquisition of AirTran, the Government focused on how increased

competition in the U.S. air passenger market as a whole would redound to the benefit of all

customers, noting that "[t]he merged firm will be able to offer new service on routes that

neither serve[d]" at that time.[6]  While the Government now attempts to cast off its course of

---

[5] Press Release no. 13-1202, US Department of Justice Office of Public Affairs, "Justice Department Requires US Airways and American Airlines to Divest Facilities at Seven Key Airports to Enhance System-wide Competition and Settle Merger Challenge: Divestitures at Airports in Boston, Chicago, Dallas, Los Angeles, Miami, New York and Near Washington, D.C. Opens Door for Low Cost Carriers to Compete Resulting in More Choices and More Competitive Airfares for Consumers,", 12 November 2013, https://www.justice.gov/opa/pr/justice-department-requires-us-airways-and-american-airlines-divest-facilities-seven-key.

[6] Press Release no. 11-523, Statement of the Department of Justice Antitrust Division on Its Decision to Close Its Investigation of Southwest's Acquisition of AirTran, Office of Public Affairs, U.S. Dep't of Justice, April 26, 2011.  https://www.justice.gov/opa/pr/statement-

conduct in airline matters as a matter of "prosecutorial discretion," Mot. at 9, it in fact reflects

something entirely different:  that the Government's newfound approach to analyzing this

merger (looking only at individual routes, and ignoring the systemwide competition and

connection among routes) is novel and completely misguided.  *Cf. Waste Mgmt., Inc.*, 743 F.2d

at 983 ("If the Department of Justice routinely considers ease of entry as relevant to

determining the competitive impact of a merger, it may not argue to a court addressing the

same issue that ease of entry is irrelevant.").  And, in any case, a court sitting in equity has

similar discretion to consider the overall public interest.  *Weinberger v. Romero-Barcelo*, 456

U.S. 305, 313 (1982).

Ultimately, through its motion, the Government is attempting to impose a standard for

tracing benefits from a merger that no court has required and that would be impossible to meet

in a dynamic industry like airlines.  In insisting that the Defendants precisely trace every link

of the chain between increased competition from the transaction's efficiencies, entry, and the

specific routes at issue, the Government denies the well-established principle that even "a firm

that never enters a given market can nevertheless exert competitive pressure on that market"

and seeks to require what courts have consistently rejected, "a degree of clairvoyance alien to

section 7" that would "forc[e] a defendant to rebut a probability with a certainty."  *Baker

Hughes*, 908 F.2d at 987, 989, 992.

A recent decision rejecting a Section 7 merger challenge is instructive.  In *Deutsche

Telekom,* the court found that the relevant geographic market was cellular market areas defined

by the FCC.  439 F. Supp. 3d at 204–06.  Nonetheless, in evaluating the transaction's

---

department-justice-antitrust-division-its-decision-close-its-
investigation#:~:text=The%20merged%20firm%20will%20be,cities%20currently%20served%
20by%20AirTran.

efficiencies, it looked at the impact on T-Mobile's marginal costs and increased quality at a national level, *id.* at 206–07, and imposed no requirement of traceability to individual cellular market areas, *id.* at 216 (noting "[a]s a practical matter, the model almost certainly cannot exactly quantify the extent to which each specific aspect of the Proposed Merger would benefit consumers," but "the predictive exercises demanded by Section 7 are not susceptible of a ready and precise answer in most cases.  To expect otherwise in the dynamic and rapidly changing RMWTS Market is to invite almost certain disappointment.") (citing *Philadelphia Nat'l Bank*, 374 U.S. at 362).

Finally, and contrary to the Government's claim, Defendants are not acting as "social engineers who balance harms to a group of customers in one part of the country against purported benefits for customers in another."  Mot. at 2.  Rather, Defendants are simply asking the Court to recognize the reality reflected in the Government's prior airline cases and its own Merger Guidelines—that the impacts of a merger sometimes cannot neatly be compartmentalized, particularly in the airline context.  *See* HMG n.14 ("The Agencies normally assess competition in each relevant market affected by a merger independently and normally will challenge the merger if it is likely to be anticompetitive in any relevant market. In some cases, however, the Agencies in their prosecutorial discretion will consider efficiencies not strictly in the relevant market, but so inextricably linked with it that a partial divestiture or other remedy could not feasibly eliminate the anticompetitive effect in the relevant market without sacrificing the efficiencies in the other market(s).").[7]  Dr. Chipty has

---

[7] Defendants' evidence of benefits across the network also will be relevant to evaluating competitive effects from the transaction at step three of the burden shifting framework if the presumption is rebutted.  *See supra* at 5.  Without the presumption, the Government must introduce additional evidence to prove competitive harm in the relevant market, and the Government relies on its economic expert Dr. Gowrisankaran to support those claims.  But Dr.

similarly agreed that "as an economist, it would be relevant to look at the effects, positive or negative, of a merger outside of the relevant antitrust markets. . . ."  Chipty Dep. Tr. 190:13–191:5.

### III.   THE GOVERNMENT OVERSTATES THE VITALITY AND IMPACT OF *PHILADELPHIA NATIONAL BANK*

Although the Government makes much of the sixty-year old decision in *Philadelphia Nat'l Bank*, it fails to acknowledge the erosion of that era of case law. As *Baker Hughes* explained of that era's cases:  "Although the Supreme Court has not overruled these Section 7 precedents, it has cut them back sharply." 908 F.2d at 990. Noting that "*General Dynamics* began a line of decisions differing markedly in emphasis from the Court's antitrust cases of the 1960s," that court observed that "[w]ithout overruling *Philadelphia Bank,* then, the Supreme Court has at the very least lightened the evidentiary burden on a Section 7 defendant." *Id.* at 990–91.

Courts since have sought to confine *Philadelphia Nat'l Bank* to its facts where that has suited the needs of cases with differing economic realities.  As noted above, *Kottaras v. Whole Foods* is one such example, where applying the Government's single-minded focus on demand substitution to market definition and rejecting of out-of-market benefits would have produced

---

Gowrisankaran concedes that his regression is estimating harm at the national level across routes, rather than calculating with precision the harm on any specific route.  Gowrisankaran Dep. Tr., 280:4–20 ("It shouldn't be used to look at individual observations . . . .").  In addition, the evidence is relevant to rebut the Government's theory of harm that the transaction will enhance coordination.  Defendants' evidence will show that the JetBlue has a greater effect on rival airlines than Spirit, and it is therefore more likely to disrupt any attempted coordination among those rivals.  This aligns with the Government's own view that JetBlue is a "uniquely disruptive" competitor.  Compl. at 2, *United States v. Am. Airlines Grp. Inc.*, No. 1:21-cv-11558 (D. Mass.) (Dec. 2, 2022), ECF No. 1,who for "more than two decades" has "served as the legacy airlines' foil in the northeastern United States." Plaintiffs' Pre Trial Brief at 7, *United States v. Am. Airlines Grp. Inc.*, No. 1:21-cv-11558 (D. Mass.) (Sept. 9, 2022), ECF No. 160.

absent results. 281 F.R.D. at 24–25. The court resolved that tension by defining a market around "the same shopping basket," notwithstanding the lack of demand-side substitution for individual products to avoid an application of *Philadelphia Nat'l Bank* that would have been against the interest of consumers. *Id*. at 25.

The Government's reliance on *Sullivan v. National Football League*, 34 F.3d 1091 (1st Cir. 1994) fares no better. The Government selectively quotes this case, claiming the First Circuit recognized that aggregating benefits across markets is improper in other antitrust contexts such as Section 1 of the Sherman Act. Mot. at 7–8. But the Government fails to acknowledge that *Sullivan* observes that several courts, including the First Circuit, "have found it appropriate in some cases to balance the anticompetitive effects on competition in one market with certain procompetitive benefits in other markets," and ultimately leaves the question of cross-market balancing open. 34 F.3d at 1112. *Sullivan* further held that a jury may take into account benefits to competition that even "indirectly" flow into a market. *Id.* at 1113. Similarly, the Ninth Circuit recently concluded that it is appropriate to consider procompetitive effects outside the relevant market where the efficiencies in the second market would indirectly lead to more demand in the primary market. *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 990 (9th Cir. 2023); *see also id.* at 989 ("[T]he Supreme Court has considered cross-market rationales in Rule of Reason and monopolization cases."). The Supreme Court has also left the cross-market balancing in the Section 1 context question open in *National Collegiate Athletic Ass'n v. Alston*, 141 S. Ct. 2141, 2155 (2021).[8]

---

[8] The Government also cites *United States v. Topco*, 405 U.S. 596, 609–610 (1972), and *Deslandes v. McDonalds USA, LLC*, No. 17 C 4857 , 2023 WL 5496957, at *2 (7th Cir. Aug. 25, 2023) for the proposition that "federal courts of appeals have condemned cross-market balancing." However, *Topco* and *Deslandes* both involved allegedly *per se* violations of

The modern case law applying Section 7 demands an analysis "in the context of the industry as a whole," *United States v. General Dynamics Corp.*, 415 U.S. 486, 498 (1974), considering the "totality-of the-circumstances." *Baker Hughes*, 908 F.2d at 984.  That means taking a holistic approach that addresses each transaction's specific facts.  *Kottaras v. Whole Foods Mkt., Inc.*, 281 F.R.D. 16 (D.D.C. 2012).  Applying those settled principles, this Court should evaluate the airline merger here based on its impact on competition as a whole.  The motion should be rejected.

### CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' Motion in Limine.

---

Section 1 of the Sherman Act and thus did not need to evaluate the competitive effects of the restraints at all. *Topco*, 405 U.S. at 608; *Deslandes*, 2023 WL 5496957, at *2.

Dated: September 20, 2023                    Respectfully submitted,

                                             */s/ Ryan A Shores*
                                             _____
                                             Ryan A. Shores (*Pro Hac Vice*)
                                             David I. Gelfand (*Pro Hac Vice*)
                                             Daniel P. Culley (*Pro Hac Vice*)
                                             Cleary Gottlieb Steen & Hamilton, LLP
                                             2112 Pennsylvania Avenue, NW
                                             Washington, DC 20037
                                             Tel: 202-974-1500
                                             rshores@cgsh.com
                                             dgelfand@cgsh.com
                                             dculley@cgsh.com

                                             Joseph M. Kay (*Pro Hac Vice* forthcoming)
                                             Cleary Gottlieb Steen & Hamilton, LLP
                                             One Liberty Plaza
                                             New York, NY 10006
                                             Tel: 212-225-2000
                                             jkay@cgsh.com

                                             Michael Mitchell (*Pro Hac Vice*)
                                             Brian Hauser (*Pro Hac Vice*)
                                             Shearman & Sterling LLP
                                             401 9th Street, N.W., Suite 800
                                             Washington, DC 20004
                                             Tel: 202-508-8005
                                             Fax: 202-661-7480
                                             michael.mitchell@shearman.com
                                             brian.hauser@shearman.com

                                             Richard F. Schwed (*Pro Hac Vice*)
                                             Jessica K. Delbaum (*Pro Hac Vice*)
                                             Leila Siddiky (*Pro Hac Vice*)
                                             Shearman & Sterling LLP
                                             599 Lexington Avenue
                                             New York, NY 10022-6069
                                             Tel: 212-848-4000
                                             Fax: 212-848-7179
                                             rschwed@shearman.com
                                             jessica.delbaum@shearman.com
                                             leila.siddiky@shearman.com

Rachel Mossman Zieminski (*Pro Hac Vice*)
Shearman & Sterling LLP
2601 Olive Street, 17th Floor
Dallas, TX 75201
Tel: 214-271-5385
rachel.zieminski@shearman.com

Elizabeth M. Wright (MA BBO #569387)
Zachary R. Hafer (MA BBO #569389)
Cooley LLP
500 Boylston Street, 14th Floor
Boston, MA 02116-3736
Tel: 617-937-2300
ewright@cooley.com
zhafer@cooley.com

Ethan Glass (*Pro Hac Vice*)
Deepti Bansal (*Pro Hac Vice*)
Matt K. Nguyen (*Pro Hac Vice*)
Cooley LLP
1299 Pennsylvania Avenue NW, Suite 700
Washington, DC 2004-2400
Tel: 202-842-7800
Fax: 202-842-7899
eglass@cooley.com
dbansal@cooley.com

Beatriz Mejia (*Pro Hac Vice*)
Cooley LLP
3 Embarcadero Center, 20th Floor
San Francisco, CA 94111
Tel: 415-693-2000
Fax: 415-693-2222
bmejia@cooley.com

Joyce Rodriguez-Luna (*Pro Hac Vice*)
Cooley LLP
55 Hudson Yards
New York, NY 10001-2157
Tel: 212 479 6895
Fax: 2124796275
jrodriguez-luna@cooley.com

*Attorneys for Defendant JetBlue Airways
Corporation*

Andrew C. Finch (*Pro Hac Vice*)
Eyitayo St. Matthew-Daniel (*Pro Hac Vice*)
Jay Cohen (*Pro Hac Vice*)
Jared P. Nagley (*Pro Hac Vice*)
Kate Wald (*Pro Hac Vice*)
Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY 10019
Tel: 212-373-3000
Fax: 212-757-3990
afinch@paulweiss.com
tstmatthewdaniel@paulweiss.com
jcohen@paulweiss.com
jnagley@paulweiss.com
kwald@paulweiss.com

Meredith R. Dearborn (*Pro Hac Vice*)
Paul, Weiss, Rifkind, Wharton & Garrison LLP
535 Mission Street, 24th Floor
San Francisco, CA 94105
Tel: 628-432-5100
Fax: 628-232-3101
mdearborn@paulweiss.com

*Attorneys for Defendant*
*Spirit Airlines, Inc.*

## <u>LOCAL RULE 7.1(a)(2) CERTIFICATION</u>

I, Ryan A. Shores, hereby certify that pursuant to Local Rule 7.1(a)(2), counsel for Defendants conferred in good faith with counsel for Plaintiffs before filing this Motion in an attempt to resolve or narrow this issue. The parties have been unable to narrow the issue.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document was filed through the ECF system on September 20, 2023 and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

*/s/ Ryan A. Shores*
Ryan A. Shores
