IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA, *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>JETBLUE AIRWAYS CORPORATION and SPIRIT AIRLINES, INC.,<br><br>*Defendants*. | Civil Action No. 1:23-cv-10511-WGY |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION IN LIMINE
TO ESTOP THE UNITED STATES AND OVERRULE OBJECTIONS**

In law, as in life, "particular facts and circumstances matter," *United States v. Davila*, 569 U.S. 597, 611 (2013). Indeed, when considering the legality of a merger, the foundational inquiry is always: how does competition present itself? That foundational inquiry under Section 7 of the Clayton Act requires a focus on context, facts, and circumstances.

Defendants seek to use and relitigate the facts and circumstances from a different matter recently decided by Judge Sorokin. *See United States v. Am. Airlines Grp. Inc.*, No. 1:21-cv-11558 (D. Mass.) ("the NEA Case"). There are indeed some similarities: both cases involve JetBlue and its plans for partnering with or acquiring another airline and, in both cases, there are material anticompetitive harms caused by JetBlue's plans, including the risk of "coordinated effects," *i.e.*, the risk that competitors may "coordinate their pricing without committing

detectable violations of Section 1 of the Sherman Act, which forbids price fixing." *Hosp. Corp. of Am. v. FTC*, 807 F.2d 1381, 1387 (7th Cir. 1986).

But there are also many meaningful differences between the two cases. Each case focuses on the role different types of airlines play in the industry. The NEA Case centered on how American Airlines ("AA"), a legacy carrier, would diminish the incentives of JetBlue to compete vigorously. By contrast, this case involves an ultra-low-cost carrier ("ULCC"), Spirit, being removed from the airline industry altogether, and its assets being converted to a higher cost model. Two distinct propositions can both be true: (1) consumers benefit when JetBlue is a standalone competitor without an intricate partnership agreement with a legacy airline, as was argued in the NEA Case; and (2) consumers benefit from Spirit's standalone presence in the airline industry as the leading ULCC in the United States. At its core, the purpose of this case is to determine whether a particular transaction—JetBlue's acquisition of Spirit and removal of Spirit's business model from the market—may substantially lessen competition.[1]

Beyond their failed efforts to identify any meaningful inconsistencies, Defendants' Motion ignores three persistent themes across the plaintiffs' theories of coordinated effects in both cases:

---

[1] Defendants seek to divert attention from the facts and circumstances of *this* case and the anticompetitive harm that will result if JetBlue is permitted to eliminate Spirit by instead broadly accusing the United States of being motivated by an alleged "anti-merger zeal." Dkt. 168 at 9. Defendants' statement is a misplaced plea for approval of an acquisition that will especially harm cost conscious flyers. As with the NEA Case, in which JetBlue and AA were found to have violated the antitrust laws, the United States, joined by seven sovereign state attorneys general, brought this lawsuit because the facts of this particular deal demonstrate its potential harm to competition—no more, no less.

- The transaction at issue in each case (the NEA between AA and JetBlue, and JetBlue's acquisition of Spirit) would increase JetBlue's incentives to coordinate—rather than compete—with other airlines.

- There are unique customer segments in the airline industry, and not all airlines compete across all segments in the same ways. In the NEA Case, the inquiry focused on the fact that JetBlue uniquely competed as a maverick for certain customer segments; but the NEA dampened JetBlue's incentives to compete against AA, even outside the NEA markets, in the "spirit of partnership." In this case, the focus is on the unique, disruptive role Spirit plays in the industry, especially in serving cost-conscious customers, and how the elimination of Spirit's unbundled product will result in the loss of both an important competitive constraint and meaningful option to passengers, which would not be replaced by JetBlue's relatively higher cost, higher fare product.

- The JetBlue Effect is real, but the transaction at issue in each case (the NEA and JetBlue's acquisition of Spirit) was or is likely to alter JetBlue's incentives in a way that would lead to greater coordination and dampen that effect. NEA Plaintiffs argued that the NEA would increase JetBlue's incentives to coordinate—rather than compete—with other airlines. *See, e.g.*, Ex. A (NEA Compl.) ¶¶ 49, 50; Ex. B (NEA PFOF) ¶¶ 259–262. Here, Plaintiffs argue that the larger, combined JetBlue/Spirit would have more incentive to coordinate with other airlines than either carrier would on a standalone basis. Am. Compl. (Dkt. 69) ¶ 54.

Because the United States' positions are consistent across both the NEA Case and this one, application of estoppel is unwarranted (if available at all), and Defendants' motion should be denied.

## BACKGROUND

In 2021, the NEA Plaintiffs (i.e., the United States; the District of Columbia; the States of Arizona, California, and Florida; and the Commonwealths of Massachusetts, Pennsylvania, and Virginia) sued to enjoin the Northeast Alliance (the "NEA") between AA and JetBlue. NEA Plaintiffs succeeded. *See United States v. Am. Airlines Grp. Inc.*, No. 1:21-cv-11558-LTS, 2023 WL 3560430, at *2–3 (D. Mass. May 19, 2023) (Sorokin, J.). The court there determined in part that "by aligning its interest with" AA, "JetBlue has sacrificed a degree of its independence and weakened its status as an important 'maverick' competitor in the industry." *Id*. at *34. It concluded that such alignment "amplifie[d] the anticompetitive effects flowing from the NEA's transformation of" AA and JetBlue "from competitors into collaborators," thereby "reduc[ing] JetBlue's independence and undermin[ing] its status as an important 'maverick' competitor." *Id*. at *34, *36.

In March 2023, the Plaintiffs here (i.e., the United States; the Commonwealth of Massachusetts; the District of Columbia; and the States of California, Maryland, New Jersey, New York, and North Carolina) sued to enjoin JetBlue's proposed acquisition of Spirit, the largest ULCC in the country. *See* Dkt. 69. Plaintiffs seek to enjoin the transaction based on myriad theories of harm, including: (1) the elimination of head-to-head competition between JetBlue and Spirit; (2) the heightened risk that remaining airlines would coordinate to raise

prices; and (3) the elimination of Spirit's product offerings as an economical choice for travelers.[2]

Both the NEA Case and the present case challenge proposals to eliminate competition in the passenger airline industry, but the threat the NEA posed to competition is different than that created by JetBlue's acquisition of Spirit. As Judge Sorokin's opinion described, JetBlue and AA's agreement "eliminated the once vigorous competition between two of the four largest domestic carriers in the northeast, replacing it with broad cooperation in pursuit of the shared interests of" the NEA. *Am. Airlines*, 2023 WL 3560430, at *32. In so doing, the court found that JetBlue had sacrificed some of its independence and thus weakened its competitive position in the industry, which amplified the anticompetitive effects of the NEA. *Id.* at *34. Here, rather than sacrificing JetBlue's independence by aligning it with AA, the challenged combination "would eliminate the largest and fastest-growing ultra-low-cost carrier in the United States" and alter JetBlue's incentives to more closely align with legacy carriers: Spirit. Dkt. 69 at 2.

## LEGAL STANDARD

Judicial estoppel "prevents a litigant from pressing a claim that is inconsistent with a position taken by that litigant either in a prior legal proceeding or in an earlier phase of that same legal proceeding." *InterGen N.V. v. Grina*, 344 F.3d 134, 144 (1st Cir. 2003). "Courts are prone to invoke it when a litigant is playing fast and loose with the courts, and not otherwise." *Id.* (citation and internal quotations omitted).

Claims of judicial estoppel against a government enforcer implicate special concerns that advise against the doctrine's application. "If estoppel against the government possesses any

---

[2] Notably, nowhere in Defendants' memorandum do they address how estoppel could apply to the State Plaintiffs who were not parties in the NEA Case.

viability . . ., the phenomenon occurs only in the most extreme circumstances." *Dantran, Inc. v. U.S. Dep't. of Labor*, 171 F.3d 58, 66 (1st Cir. 1999); *accord Nagle v. Acton-Boxborough Regional Sch. Dist.*, 576 F.3d 1, 3 (1st Cir. 2009) ("[G]overnments . . . have been held not subject to estoppel, save exceptional situations that we have called 'hen's-teeth rare.'") (internal citation omitted). At a minimum, it is "well settled that the Government may not be estopped on the same terms as any other litigant." *Heckler v. Cmty. Health Servs. of Crawford Cnty., Inc.*, 467 U.S. 51, 60 (1984). Rather, estoppel against governments is "hen's-teeth rare," *Nagle*, 576 F.3d at 3, because "broad interests of public policy may make it important to allow a change of positions that might seem inappropriate as a matter of merely private interests," especially when "estoppel would compromise a governmental interest in enforcing the law." *New Hampshire v. Maine*, 532 U.S. 742, 755 (2001) (internal citation and quotations omitted).

If it applies at all here, judicial estoppel requires proof of at least two elements: (1) "the estopping position and the estopped position must be directly inconsistent, that is, mutually exclusive," and (2) "the responsible party must have succeeded in persuading a court to accept its prior position." *Alt. Sys. Concepts, Inc. v. Synopsys, Inc.*, 374 F.3d 23, 33 (1st Cir. 2004); *see also id*. at 34 (applying judicial estoppel where positions were "totally inconsistent"). Moreover, because judicial estoppel is an "equitable doctrine" designed primarily to "prevent[] parties from improperly manipulating the machinery of the judicial system," *Guay v. Burack*, 677 F.3d 10, 16 (1st Cir. 2012), "[a] third consideration is whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." *New Hampshire*, 532 U.S. at 751.

**ARGUMENT**

### A. Judicial Estoppel Does Not Apply Against the Government in the Present Circumstances

Applying judicial estoppel would not be appropriate here because Plaintiffs are exercising their civil law enforcement authority. Constraining the exercise of that power through judicial estoppel would create a risk that "the Government is unable to enforce the law" and thus "the interest of the citizenry as a whole in obedience to the rule of law is undermined." *Heckler*, 467 U.S. at 60. This is especially so given the "risk that inconsistency will be found where there is none." 13H Wright & Miller, *Federal Practice and Procedure* § 4477.3 (3d ed. 2023). For these reasons, courts "have left open the possibility of estoppel against the Government only in a rather narrow possible range of circumstances." *Heckler*, 467 U.S. at 68 (Rehnquist, J., concurring). Defendants cite no authority to the contrary. Indeed, they marshal no case—and the United States is aware of none—in which the United States or its state co-plaintiffs were estopped from making purportedly inconsistent arguments in establishing its case in a civil law enforcement context.[3] The Court should not break new ground by being the first.

### B. The Conditions for Judicial Estoppel Are Not Satisfied.

Judicial estoppel does not apply to any of the NEA Case statements identified in Defendants' Motion because all of those statements are consistent with the positions Plaintiffs have taken in this case, and Plaintiffs would derive no "unfair advantage" from taking those positions. The statements at issue fall into three categories: (1) statements regarding the so-called "JetBlue Effect," which is the increased demand and lower fares historically created by JetBlue's entry into a market dominated by legacy airlines, (2) statements about JetBlue's position in the

---

[3] Defendants cite to *Cuyahoga Metropolitan Housing Authority v. United States*, 65 Fed. Cl. 534 (2005) for a collection of cases "finding that judicial estoppel should apply against the Federal Government," but neither *Cuyahoga* nor any of the cases cited for this proposition therein pertain to the United States acting in its law enforcement capacity.

airline industry and its corresponding incentives to coordinate with competitors, and (3) statements by Plaintiffs' economic expert, Dr. Gautam Gowrisankaran, about JetBlue.

### i. Statements Regarding the JetBlue Effect

Plaintiffs' treatment of the JetBlue Effect in this case is consistent with the NEA Plaintiffs' treatment: the JetBlue Effect exists, and it yields consumer benefits; but it is neither inexorable nor static, and agreements that would tend to diminish the JetBlue Effect may harm consumers. The NEA Plaintiffs argued and introduced evidence showing that the JetBlue Effect was threatened because JetBlue and AA—a higher-cost legacy airline—would stop competing in markets comprising 75% of JetBlue's network, compromising JetBlue's maverick status, changing its incentives, and dampening the JetBlue Effect. Plaintiffs in this case acknowledge the JetBlue Effect, but also will present evidence regarding the "Spirit Effect"—Spirit's own unique ability to increase demand and lower fares in markets it enters. Plaintiffs' expert Dr. Gowrisankaran quantified both the JetBlue Effect and the Spirit Effect in calculating the net harm from the proposed acquisition and the replacement of Spirit by JetBlue in markets currently served by Spirit. *See, e.g.*, Ex. C (Gowrisankaran Dep. Tr.) at 230:8-20. Here, the Spirit Effect is not simply threatened, but will be eliminated altogether. *See, e.g.*, Dkt. 69 ¶ 2 ("Where JetBlue and Spirit compete, travelers win—customers enjoy the benefits of both the Spirit and JetBlue Effects, fares go down, and more Americans can afford trips they could not before."). With the elimination of Spirit, not only will JetBlue's closest ULCC competitor be eliminated, but the entire industry will have one less competitor to constrain prices.

Defendants contend that the United States' positions are inconsistent because if the JetBlue Effect is real, then it would be inconsistent to oppose any acquisition by JetBlue since any such acquisition would "spread the disruptive force of the JetBlue Effect." Dkt. 168 at 4–5.

Dr. Gowrisankaran will show, however, that replacing Spirit with JetBlue will result in a net harm for consumers, with cost-conscious passengers who purchase the lowest-priced fares bearing the brunt of the harm. Defendants' reasoning is also flawed because the incentives underlying the JetBlue Effect are not static—they are the product of then-existing competitive conditions at any given time. Defendants' proposal to *change* those conditions through consolidation would endanger these incentives by eliminating competitive pressure on JetBlue—and the entire airline industry—while simultaneously enabling JetBlue to behave even more like a legacy carrier. On this point, the United States has been consistent. In the NEA Case, the Plaintiffs pointed out that JetBlue's cost structure was looking more like that of a legacy carrier, s*ee, e.g.*, Ex. B (NEA PFOF) ¶ 370, and the court there found that "JetBlue's business model and cost structure have evolved over time." *Am. Airlines*, 2023 WL 3560430, at *6. Similarly, here, Dr. Gowrisankaran explained that JetBlue's effect on lowering the fares of legacy carriers has diminished over time, and that JetBlue more closely resembles a legacy carrier today than it did before. Ex. C (Gowrisankaran Dep. Tr.) at 107:14–108:6.

    ii.  **Statements Regarding JetBlue's "Unique Position" in the Airline Industry**

The United States' arguments about JetBlue's market position and incentives to coordinate with competitors has also been consistent: JetBlue has historically constrained legacy carriers' pricing, but JetBlue is also susceptible to coordination with those airlines because the airline industry is concentrated and certain aspects of the passenger airline market make it easier for airlines to coordinate with one another. *See, e.g.*, Ex. B (NEA PFOF) ¶¶ 352–368 (explaining why the airline industry—including JetBlue—is susceptible to coordination).

For example, as the United States and its co-Plaintiffs explained in NEA, an airline can tacitly coordinate pricing decisions with competitors by "highlight[ing] fare changes to other

airlines" through a fare-pricing distribution channel called ATPCO—a practice known as "flashing." *Id.* ¶ 365. The Proposed Findings of Fact in the NEA Case provided examples of JetBlue engaging in this kind of price signaling with legacy airlines. *See, e.g., id.* ¶ 365 (describing an incident where JetBlue pricing analyst was going to "flash" American to encourage American to change a fare). Moreover, a mechanism for enforcing coordinated outcomes (often called "punishment") makes coordination more likely, and because airlines regularly compete with each other across many different routes, they can "punish" each other on one route to try to restore coordinated outcomes (*i.e.*, lower competition) on another route. Once again, NEA Plaintiffs provided examples of JetBlue engaging in this practice with legacy airlines. *See, e.g., id.* ¶ 364 (describing an instance in which JetBlue "intentionally chose" a fare "identical to American's fare" to punish American for competing too intensely on one of JetBlue's routes). Coordination in the airline industry is not just theoretical; it is very real. For example, as another court recently found, domestic airlines "admittedly and openly" engaged in the parallel conduct of capacity discipline for many years "with the effect that diminished capacity resulted in higher industry profits." *In re Domestic Airline Travel Antitrust Litig.*, -- F. Supp. 3d --, 2023 WL 5930973, at *33 (D.D.C. Sept. 12, 2023).

      The United States has carried those same positions forward here. As in the NEA Case, Plaintiffs contend here that JetBlue both: (1) constrains legacy airline pricing, and (2) is susceptible to anticompetitive coordination in ways that would be exacerbated by the proposed acquisition. In the NEA Case, the risk of coordination with legacy airlines was exacerbated by JetBlue forming an alliance with the largest of those airlines (AA), whereas here, the risk of coordination is exacerbated because a larger, combined JetBlue/Spirit would have more incentive to coordinate with other airlines than either carrier would on a standalone basis.

Defendants' arguments for estoppel on this point also fail because they do not account for the differing context of the NEA Case and this one, and they rest on the mistaken premise that a "maverick" is immune from incentives to coordinate. Namely, Defendants contend that, because the United States has taken the position that JetBlue is a disruptive maverick to legacy airlines, it is precluded from contending that JetBlue is susceptible to coordination. Dkt. 168 at 4–5. That argument fails for three reasons. *First*, as discussed above, given that the United States took the position in the NEA Case that JetBlue was susceptible to coordination, there is no inconsistency. *Second*, being a "maverick" is not an immutable characteristic; it is a business strategy designed to earn profits. Just like any other firm, when a "maverick" is presented with incentives to increase profits through coordination, rather than disruption, it will rationally act on those incentives. Acting as a maverick does not insulate a firm from the allure of profitable coordination, as JetBlue's history demonstrates, and so it is perfectly consistent to contend that a firm is both a maverick and susceptible to coordination. *Third*, as Defendants' economic expert acknowledged, it is consistent to argue that JetBlue and Spirit each play their own uniquely disruptive role because it is possible for an industry to have more than one maverick, and different maverick firms can have different effects within the industry. Ex. D (Hill Dep. Tr.) at 25:21–26:4. At bottom, the proposed transaction poses an increased likelihood of coordinated effects because it simultaneously eliminates one unique maverick—Spirit—and diminishes the incentives of JetBlue to act as a maverick.

### iii. Estoppel Does Not Apply to the Testimony of Dr. Gowrisankaran

Estoppel does not apply to the expert testimony of Dr. Gowrisankaran. As a threshold matter, opinions of an expert witness are not attributable to the party that retained that expert for purposes of estoppel. *See, e.g.*, *Kirk v. Raymark Indus., Inc.*, 61 F.3d 147, 164 (3d Cir. 1995)

("Since an expert witness is not subject to the control of the party opponent with respect to consultation and testimony he or she is hired to give, the expert witness cannot be deemed an agent."). Therefore, Dr. Gowrisankaran is free to express his independent opinions, and the doctrine of estoppel cannot be applied to muzzle those opinions. More importantly, estoppel does not apply because Dr. Gowrisankaran's opinions highlighted by Defendants (Dkt. 168 at 5–6) as supposed inconsistencies with NEA Plaintiffs' arguments, are in fact consistent with those arguments. Dr. Gowrisankaran's statements at issue fall into three categories: (1) statements about whether JetBlue is "disruptive;" (2) statements about whether entry from JetBlue disciplines the pricing of legacy airlines; and (3) statements about whether JetBlue differentiates itself from lower-cost airlines by offering higher-quality service.

*First*, as to JetBlue's "disruptive" presence, Dr. Gowrisankaran explained that, in economics, terms like "disruptive" and "maverick" are not fixed and can change as the incentives of firms characterized as such change. Ex. C (Gowrisankaran Dep. Tr.) at 106:21–107:4. As explained above, those statements comport with the United States' position in the NEA Case that JetBlue had historically acted as a maverick because of its then-existing incentives, but that its role in the industry had begun to change, as indicated by, e.g., its willingness to coordinate, rather than compete with AA via the NEA.

*Second*, as to JetBlue's effect on legacy airlines' prices, Dr. Gowrisankaran acknowledges that there is a JetBlue Effect, but he also opined that the existence and magnitude of the effect depends on the route in question, and the effect overall has diminished over time. *See, e.g.*, Ex. C (Gowrisankaran Dep. Tr.) at 105:5-16, 106:21–108:6. Those views are aligned with the NEA Plaintiffs' position in the NEA Case that the JetBlue Effect is real, but also that JetBlue's constraining effect on the airline industry was endangered by changing market

conditions, including its own choices. *See*, *e.g.*, Ex. B (NEA PFOF) ¶¶ 369–371. Defendants contend otherwise by cherry-picking a single statement from Dr. Gowrisankaran's deposition about JetBlue fares being "similar to legacy carriers," but that statement concerned an analysis of a subset of fares in markets where Spirit offers nonstop service. Dr. Gowrisankaran's statement was not—as Defendants imply—a broad statement about JetBlue's fares generally.

*Third*, as to the quality of JetBlue's service, Dr. Gowrisankaran acknowledged that JetBlue differentiates itself from other low-cost carriers by offering features like complementary snacks and more leg room, but he also recognized that, in the field of economics, "there are different dimensions of quality," and that the differentiating features of JetBlue might not appeal to all airline customers equally. *See* Ex. C (Gowrisankaran Dep. Tr.) at 89:9–92:15. This is one area where context is especially important because the concept of "high-quality service" is often in the eye of the beholder and has a different implication here than it did in the NEA Case. In the NEA Case, quality focused on how JetBlue's differentiated offerings, such as its business-class product, Mint, allowed JetBlue to compete with legacy airlines for first-class and corporate customers who low-cost airlines are normally not well-suited to serve. By contrast, in this case, quality focuses on customers choosing between JetBlue and Spirit who, unlike first-class and corporate customers, are influenced primarily by the price of a ticket, rather than non-price offerings. In the eyes of this latter group of customers, the "high-quality service" JetBlue uses to attract business customers might be less attractive (and more expensive) than Spirit's unbundled offering.

### C. Admissibility of NEA Evidence

This case should be tried on the basis of whether the JetBlue/Spirit transaction violates the antitrust laws, not on the basis of re-litigating what was already decided in the NEA Case.

Defendants' proffered evidence from the NEA Case would be nothing more than a sideshow here because, as demonstrated above, the two cases are different in several respects. Defendants' attempt to inject the NEA Case into this one should be rejected because the NEA Case does not help Defendants, and evidence about it would distract from the issues that require determination.

Defendants also ask the Court to admit certain "evidence from the NEA Case." Dkt. 168 at 13.[4] Defendants assert these "prior statements in the NEA Case" may be judicially noticed, "are admissible as party admissions," and that Rule 403 does not bar their admission. Dkt. 168 at 11–13. Plaintiffs oppose these requests.

Plaintiffs objected to the admission of the entirety of voluminous filings NEA Plaintiffs made because much of those filings are not relevant to this case and reflect confidential third-party materials. Defendants failed to confer with Plaintiffs about the specific material they believed were relevant and instead seek to admit these filings in their entirety. As discussed above, the excerpts from these materials cited by Defendants do not reveal any inconsistencies between Plaintiffs' positions in this case, and Plaintiffs do not object to the Court's consideration of the provisions cited by Defendants. However, Plaintiffs do object to the admission of the entirety of these documents as irrelevant, cumulative, and a waste of time under Rule 403.

Plaintiffs do not dispute that "federal courts, in appropriate circumstances, may take notice of proceedings in other courts." *E.I. DuPont de Nemours & Co., Inc. v. Cullen*, 791 F.2d 5, 7 (1st Cir. 1986) (quoting *St. Louis Baptist Temple, Inc. v. FDIC*, 605 F.3d 1169, 1172 (10th Cir. 1979)). A court may not, however, generally take judicial notice of such documents for the

---

[4] Of note, Defendants do not identify which documents from the NEA Case they seek to admit; instead, they refer to "DOJ's prior statements in the NEA Case," "NEA Case filings," and "[s]tatements by the DOJ in the NEA Case." *See* Dkt. 168 at 12–13.

truth of the matter asserted therein. *See, e.g.*, *Barnstable City v. 3M Co.*, No. 17-40002, 2017 WL 6452245, at *5 (D. Mass. Dec. 18, 2017); *Goguen ex rel. Estate of Goguen v. Textron, Inc.*, 234 F.R.D. 13, 19 (D. Mass. 2006). Plaintiffs have no objection to the Court taking judicial notice of the fact that NEA Plaintiffs filed the Proposed Findings of Fact, Complaint, and briefing cited by Defendants in their motion. As noted above, Plaintiffs stand by the statements cited as consistent with the allegations made in this case and do not object to the Court taking judicial notice of the fact they were made, but judicial notice of such filings does not "assume the truth" of their contents. *Barnstable*, 2017 WL 6452245, at *5.

Finally, Defendants' request is premature. In accordance with the Scheduling and Case Management Order ("SCMO") (Dkt. 79), the Parties exchanged initial exhibit lists on August 17, 2023, followed by supplemental exhibit lists on September 8, 2023. Dkt. 79 at 2. During the week of September 4, 2023, the Parties conferred via telephone and agreed that the meet-and-confer process regarding exhibit objections would begin in earnest the week of September 18, 2023. Defendants filed their motion requesting admissibility about documents for which the Parties have not met and conferred, and without the benefit of such process to talk through issues absent judicial intervention. The SCMO requires the Parties submit their final trial exhibits to the Court on October 16, 2023. Accordingly, Defendants' request for admission of certain evidence is not yet ripe for the Court's consideration.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendants' Motion (Dkt. 167).

Dated: September 20, 2023   Respectfully submitted,

/s/ Edward W. Duffy
Edward W. Duffy
Maisie A. Baldwin
Michael D. Battaglia
Garrett Windle
U.S. Department of Justice, Antitrust Division
450 Fifth Street, NW, Suite 8000
Washington, DC 20530
Phone: 202-812-4723
Facsimile: 202-307-5802
E-mail: edward.duffy@usdoj.gov


/s/ William T. Matlack
William T. Matlack (MA Bar No. 552109)
Office of the Attorney General
One Ashburton Place, 18th Floor
Boston, MA 02108
Telephone: (617) 727-2200
Email: William.Matlack@mass.gov


/s/ C. William Margrabe
C. William Margrabe (*pro hac vice*)
Assistant Attorney General
Office of the Attorney General
400 6th Street NW, Suite 10100
Washington, DC  20001
Telephone: (202) 727-6294
Email: will.margrabe@dc.gov


*Attorneys for the United States of America, the Commonwealth of Massachusetts, and the District of Columbia, and on behalf of all Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing document, which was filed with the Court through the CM/ECF system, will be sent electronically to all registered participants as identified on the Notice of Electronic Filing.

/s/ Edward W. Duffy
Edward W. Duffy
U.S. Department of Justice, Antitrust Division
450 Fifth Street, NW, Suite 8000
Washington, DC 20530
Phone: 202-812-4723
Facsimile: 202-307-5802
E-mail: edward.duffy@usdoj.gov