# EXHIBIT J

# Cross-Market Balancing of Competitive Effects: What Is the Law, and What Should It Be?

## Gregory J. Werden*

I. INTRODUCTION ........................................................................................ 119
II. CROSS-MARKET BALANCING IN MERGER CASES .................................... 120
    *A. The Any-Market Rule* .................................................................... 120
    *B.* Philadelphia National Bank .......................................................... 122
III. JURISPRUDENCE ON RULE-OF-REASON BALANCING ACROSS MARKETS ................. 126
IV. CROSS-MARKET BALANCING IN A BURDEN SHIFTING FRAMEWORK ........ 132
    *A. The Plaintiff's Initial Burden* ........................................................ 132
    *B. The Burden of Procompetitive Justification* ................................. 133
    *C. Less-Restrictive Alternatives* ........................................................ 136
    *D. Balancing* ...................................................................................... 138
    *E. An Example* .................................................................................... 139
V. CONCLUSION .......................................................................................... 140

## I. INTRODUCTION

It is has been said that "antitrust cases have always rejected the premise that a procompetitive effect in one market will excuse an anticompetitive effect in another."[1] *Philadelphia National Bank*[2] and *Topco*[3] are cited as authority for this proposition recently dubbed the "market-specificity rule."[4] But the text of the Sherman Act contains nothing suggesting the rule, and the Supreme Court has never directly addressed cross-market balancing under the rule of reason. In this article, I assemble what clues the Court has left and formulate a policy on cross-market balancing in rule-of-reason cases.

I begin, however, with Section 7 of the Clayton Act, which the Supreme Court interpreted in *Philadelphia National Bank*. Section 7 declares a merger unlawful if it

* Senior Economic Counsel, Antitrust Division, U.S. Department of Justice. The views expressed herein are not purported to reflect those of the U.S. Department of Justice. Shana Wallace provided useful discussions.

1. Larry V. Muko, Inc. v. Sw. Pa. Bldg. & Constr. Trades Council, 670 F.2d 421, 439 (3d Cir. 1982) (Sloviter, J., dissenting) (citing United States v. Topco Assocs., Inc., 405 U.S. 596, 609–11 (1972); United States v. Phila. Nat'l Bank, 374 U.S. 321, 370 (1963)).

2. United States v. Phila. Nat'l Bank, 374 U.S. 321 (1963).

3. United States v. Topco Assocs., Inc., 405 U.S. 596 (1972).

4. *See* Daniel A. Crane, *Balancing Effects Across Markets*, 80 ANTITRUST L.J. 397, 397 (2015) (describing the Supreme Court's supposed prohibition on balancing effects across markets as a "market specificity" rule).

*The Journal of Corporation Law* [Vol. 43:1

lessens competition substantially in any relevant market.[5] This "any-market rule" implies a market-specificity rule for merger cases, but I explain that *Philadelphia National Bank* relied on neither rule.

I then review *Topco* and the other Supreme Court Sherman Act decisions that have been cited as authority on cross-market balancing and find them unedifying. In contrast, I find the Court's rule-of-reason jurisprudence irreconcilable with the any-market rule. Finally, I detail how cross-market balancing fits into the burden-shifting process courts employ in rule-of-reason cases. I conclude that the any-market rule applies to the plaintiff's initial burden, but in exceptional cases, cross-market balancing can save a restraint harming competition in a relevant market.

## II. CROSS-MARKET BALANCING IN MERGER CASES

### A. The Any-Market Rule

The any-market rule is the generally accepted plain meaning of the text of Section 7, as the Supreme Court declared in *Brown Shoe*:

> Because § 7 of the Clayton Act prohibits any merger which may substantially lessen competition "in *any* line of commerce" (emphasis supplied), it is necessary to examine the effects of a merger in each such economically significant submarket to determine if there is a reasonable probability that the merger will substantially lessen competition. If such a probability is found to exist, the merger is proscribed.[6]

The legislative history of the 1950 amendment to Section 7 unequivocally states the intention to impose the any-market rule: "It is intended that acquisitions which substantially lessen competition . . . will be unlawful if they have the specified effect in any line of commerce, whether or not that line of commerce is a large part of the business of any of the corporations involved in the acquisition."[7]

The Areeda-Hovenkamp treatise finds the any-market rule in Section 7's text[8] and also supports the rule on administrability grounds. The treatise notes that, when the rule has bite, a merger's "illegality often can be avoided, and the benefits obtained, by partial merger or by disposal of one of the firm's assets in the suspect market to an independent purchaser."[9] But the treatise acknowledges that it can be "impossible or impractical" to fix an anticompetitive merger.[10]

---

5. *See infra* note 6 and accompanying text (quoting *Brown Shoe* and discussing major decisions before that case).

6. Brown Shoe Co. v. United States, 370 U.S. 294, 325 (1962). Pre-*Brown Shoe* merger cases found authority for the any-market rule in an early Clayton Act decision. George Van Camp & Sons Co. v. Am. Can Co., 278 U.S. 245, 253 (1929). *See* Crown Zellerbach Corp v. FTC, 296 F.2d 800, 812 & n.7 (9th Cir. 1961); United States v. Bethlehem Steel Corp., 168 F. Supp. 576, 595 n.38 (S.D.N.Y. 1958).

7. S. REP. NO. 81-1775, at 5 (1950), *reprinted in* 1950 U.S.C.C.A.N. 4293, 4297.

8. *See* 4A PHILLIP E. AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW ¶ 972a, at 57 (4th ed. 2016) ("An acquisition is declared to be unlawful if it has the requisite anticompetitive effects 'in any line of commerce in any section of the country.' The statute thus plainly contemplates that mergers may involve more than one market, yet it bases legality on a separate market-by-market appraisal.").

9. *Id.* at 58–59.

10. *Id.* at 59. The treatise concludes that the any-market rule would have unfortunate consequences if a

The any-market rule is the general policy of the U.S. merger enforcement agencies.[11] Since 1997, however, the Horizontal Merger Guidelines have asserted the inextricably linked exception.[12] As stated by the 2010 Guidelines, the agencies sometimes "consider efficiencies not strictly in the relevant market, but so inextricably linked with it that a partial divestiture or other remedy could not feasibly eliminate the anticompetitive effect in the relevant market without sacrificing the efficiencies in the other market(s)."[13] The Guidelines presented this exception to the general rule as an exercise of prosecutorial discretion because of the rule's statutory basis.[14]

Market delineation under the Guidelines gives the any-market rule greater impact than could have been anticipated by the Congress in 1950 or the Supreme Court in 1962. One reason is that the Guidelines do not place products in the same relevant market on the basis that they are substitutes in supply:

> Market definition focuses solely on demand substitution factors, i.e., on customers' ability and willingness to substitute away from one product to another in response to a price increase or a corresponding non-price change such as a reduction in product quality or service. The responsive actions of suppliers are also important in competitive analysis. They are considered in these Guidelines in the sections addressing the identification of market participants, the measurement of market shares, the analysis of competitive effects, and entry.[15]

Another reason is that the Guidelines delineate price discrimination markets around particular customer groups that could be targeted after a merger.[16]

---

merger with massive competitive benefits would be made unlawful by unfixable anticompetitive effects in a single tiny market. *Id.* ¶ 972c, at 60.

11.   *See* U.S. DEP'T OF JUSTICE & FTC, HORIZONTAL MERGER GUIDELINES § 10 n.14 (2010) [hereinafter HORIZONTAL MERGER GUIDELINES] ("The Agencies normally assess competition in each relevant market affected by a merger independently and normally will challenge the merger if it is likely to be anticompetitive in any relevant market.").

12.   *See* U.S. DEP'T OF JUSTICE & FTC, HORIZONTAL MERGER GUIDELINES § 4 n.36 (1997), http://www.justice.gov/archives/atr/1997-merger-guidelines [hereinafter 1997 HORIZONTAL MERGER GUIDELINES]. The Justice Department had maintained this policy before 1997. *See* Judy Whalley, *After the Herfindahls are Counted; Assessment of Entry and Efficiencies in Merger Enforcement by the Department of Justice*, *in* 1 THE ANTITRUST DIVISION AND FTC SPEAK ON FEDERAL ANTITRUST ENFORCEMENT IN THE 90'S 235, 259 (Practicing Law Inst., 1990) (statement of Deputy Assistant Attorney General) ("[T]here may be situations where the markets in which the efficiencies are achieved are inextricably intertwined with the relevant markets of concern, i.e., they share common production facilities. In such circumstances we would consider the efficiencies to be gained in the intertwined markets in evaluating whether, on balance, consumers would be better or worse off as a result of the merger."); Memorandum in Support of Plaintiff's Motion in Limine Relating to Efficiencies (public redacted version) at 16, United States v. Archer-Daniels-Midland Co., 781 F. Supp. 1400 (S.D. Iowa May 4, 1987) (No. 83-51-D) ("[I]f the efficiencies are achieved in markets that are not inextricably related to the threatened market, then they can be achieved by a less anticompetitive means (i.e., a merger that does not involve the assets in the adversely affected market).").

13.   HORIZONTAL MERGER GUIDELINES, *supra* note 11, § 10 n.14.

14.   The footnote in the 1997 Guidelines containing the inextricably linked exception began: "Section 7 of the Clayton Act prohibits mergers that may substantially lessen competition 'in any line of commerce . . . in any section of the country.'" 1997 HORIZONTAL MERGER GUIDELINES, *supra* note 12, § 4 n.36 (ellipsis in original). That sentence was deleted in the 2010 revision.

15.   HORIZONTAL MERGER GUIDELINES, *supra* note 11, § 4.

16.   *See id.* §§ 4.1.4, 4.2.2 (discussing market definition with target customers). Professor Crane objects to reading Section 7 to state the any-market rule because it "forecloses any balancing within a relevant market that

*The Journal of Corporation Law*                    [Vol. 43:1

The practice of market delineation was quite different in 1962. All of the merging firms' products sharing a common production process often were placed in the same relevant market on the basis that they were good substitutes in supply. All procompetitive benefits from merger-related cost savings affecting that production process, then, arose in the relevant market. With the same facts today, products from a single production process typically are sorted into multiple relevant markets. The locus of alleged competitive harm in a merger challenge can be a small fraction of the products sharing a common production process and a relatively small portion of the merging firms' business.[17] In such cases, cost savings affecting the entire production process are viewed as generating competitive benefits in many distinct markets, with only a small portion in the relevant market.

Perhaps the greatest concern engendered by the any-market rule is that it could lead to result-oriented market delineation that distorts the assessment of competitive effects.[18] If the delineation of the relevant market determines which effects of a merger are considered in determining its legality, a court might delineate the relevant market in a manner designed primarily to avoid constraint from the any-market rule. If a court found claims of procompetitive benefits both convincing and substantial, it could make the claims cognizable by gerrymandering the relevant market. Lacking legal authority to make the inextricably linked exception, a court could abandon sound market delineation principles. The cost of the any-market rule would then be bad market-definition precedent that jeopardizes sound analysis in future cases.

### B. Philadelphia National Bank

Commentators and treatise writers generally read *Philadelphia National Bank* to hold "that it is improper to weigh a merger's procompetitive effects in one market against the merger's anticompetitive effects in another."[19] But the Supreme Court has not endorsed

---

includes submarkets, since submarkets are considered a 'line of commerce' for Section 7 purposes." Crane, *supra* note 4, at 404. But the government is never compelled by the Guidelines or the case law to delineate price discrimination markets, which are the only submarkets now contemplated. *See* HORIZONTAL MERGER GUIDELINES, *supra* note 11, §§ 3, 4.1.4, 4.2.2.

17. *Philadelphia National Bank*, for example, delineated the cluster of commercial banking services to all customers as the sole relevant market. *See infra* notes 22–23 and accompanying text. After the issuance of the 1982 Merger Guidelines, the Justice Department began to delineate narrower banking markets and often alleged anticompetitive effects with respect to a small portion of merging banks' operations. In the last bank merger case litigated to judgment, the courts rejected the relevant market alleged by the government of loans to small businesses. United States v. Cent. State Bank, 621 F. Supp. 1276 (D. Mich. 1985), *aff'd*, 817 F.2d 22 (6th Cir. 1987). The district court did so as a matter of law. *Cent. State Bank*, 621 F. Supp. at 1291–92. The appeals court did so as a matter of fact. *Cent. State Bank*, 817 F.2d at 24.

18. This concern was raised in a 1963 student comment on *Philadelphia National Bank*. *The Supreme Court: 1962 Term*, 77 HARV. L. REV. 62, 163 (1963) ("But should the Court decide in the next case, for example, that the advantages of increased competition in one market clearly outweigh the anticompetitive effects in another, it need only alter its definition of the relevant market to alter the result." (footnote omitted)).

19. Crane, *supra* note 4, at 397. *See, e.g.,* ABA SECTION OF ANTITRUST LAW, MERGERS AND ACQUISITIONS: UNDERSTANDING THE ANTITRUST ISSUES 236 (4th ed. 2015) (*Philadelphia National Bank* "stated that procompetitive effects in one market could not justify anticompetitive effects in another"); HERBERT HOVENKAMP, FEDERAL ANTITRUST POLICY 686 n.92 (5th ed. 2016) (*Philadelphia National Bank* rejected the "defense that a merger that lessened competition in one market should be approved because it increased competition in a different market"). It appears that the first treatise to cite *Philadelphia National Bank* for the market-specificity rule was that by Sullivan. LAWRENCE A. SULLIVAN, HANDBOOK OF THE LAW OF ANTITRUST 625 (1977).

this reading, and the opinion's author, Judge Posner, lamented that he "didn't write very well in those days" and that the opinions were just his "first drafts."[20] It is appropriate, therefore, to take a close look at the paragraph in the opinion read to bar cross-market balancing. Although the opinion cannot have significant implications for Section 7 cases because the any-market rule applies, it is important to determine whether the opinion has any implications for Sherman Act cases under the rule of reason.

When the government was denied an injunction against the merger of Philadelphia National Bank and Girard Trust Corn Exchange Bank,[21] it appealed directly to the Supreme Court, as the law then provided in government antitrust cases. The Court agreed with the government[22] that the sole relevant market in which to evaluate the merger was commercial banking in a four-county area around Philadelphia.[23] The Court found that the competitors in this market were just the "commercial banks with head offices" in the area,[24] and they were assigned market shares on the basis of total assets, deposits, or loans without regard to the locations of the associated customers.[25] The Court found that the merger would produce "a firm controlling an undue percentage share of the relevant market, and result[] in a significant increase in . . . concentration."[26] On that basis, the court found the merger "so inherently likely to lessen competition substantially that it must be enjoined in the absence of evidence clearly showing that the merger is not likely to have such anticompetitive effects."[27]

The banks sought to overcome this presumption primarily on the basis that "the additional resources of the merged bank would permit it to serve more adequately the credit requirements of" the largest Philadelphia businesses.[28] Banks headquartered outside the Philadelphia area, especially New York banks, were serving large Philadelphia customers.[29] The appellee banks argued that their merger would allow them to compete successfully for those customers by making it economical for them to "offer more specialized services" and by increasing their lending limit.[30] Regulations limited outstanding loans to any one customer to 10% of a bank's capital and surplus, and the

---

20. *Philadelphia National Bank at 50: An Interview with Judge Richard Posner*, 80 ANTITRUST L.J. 205, 206 (2015). Judge Posner was asked in 2013 whether the ban on cross-market balancing announced in the opinion produced a "sensible result." He evidently accepted the premise of a ban, and he responded that cross-market balancing "can be done" and is done "with restrictions in distribution." *Id.* at 209–10.

21. United States v. Phila. Nat'l Bank, 201 F. Supp. 348 (E.D. Pa. 1962).

22. *See* Brief for the United States at 28–38, United States v. Phila. Nat'l Bank, 374 U.S. 321 (1963) (No. 62-83) (arguing for the product and geographic market the Supreme Court adopted).

23. *Phila. Nat'l Bank*, 374 U.S. at 356–62. The district court had declined to limit the geographic scope of the relevant market to just the four counties. *See Phila. Nat'l Bank*, 201 F. Supp. at 363–64.

24. *Phila. Nat'l Bank*, 374 U.S. at 330.

25. *See Phila. Nat'l Bank*, 374 U.S. at 331; *Phila. Nat'l Bank*, 201 F. Supp. at 366.

26. *Phila. Nat'l Bank*, 374 U.S. at 363.

27. *Id.* When invoking this market-share-based presumption, the Court noted factors causing it to "shade the percentages," including the fact that some banks doing business in the four-county area did not have their head office there. *Id.* at 364 n.40. The Court also acknowledged that the merging banks had a large volume of outstanding loans to customers outside the four-county area. *Id.* at 359 n.36. These aspects of the case helped inspire the Elzinga-Hogarty test. *See* Kenneth G. Elzinga & Thomas F. Hogarty, *The Problem of Geographic Market Delineation in Antimerger Suits*, 18 ANTITRUST BULL. 45, 56–59, 62–64 (1973).

28. Brief for Appellees at 21, United States v. Phila. Nat'l Bank, 374 U.S. 321 (1963) (No. 62-83).

29. *Id.* at 21–22.

30. *Id.* at 22–23.

*The Journal of Corporation Law*                    [Vol. 43:1

merger would have nearly doubled the highest lending limit of a Philadelphia bank.[31] Critically, the banks' contention was that the merger would promote competition for Philadelphia customers, not that the merger would promote competition for customers anywhere else.[32]

The Court rejected this defense with the following paragraph cited for the market-specificity rule[33]:

> [I]t is suggested that the increased lending limit of the resulting bank will enable it to compete with the large out-of-state banks, particularly the New York banks, for very large loans. We reject this application of the concept of "countervailing power." If anticompetitive effects in one market could be justified by pro-competitive consequences in another, the logical upshot would be that every firm in an industry could, without violating § 7, embark on a series of mergers that would make it in the end as large as the industry leader. For if all the commercial banks in the Philadelphia area merged into one, it would be smaller than the largest bank in New York City. This is not a case, plainly, where two small firms in a market propose to merge in order to be able to compete more successfully with the leading firms in that market. Nor is it a case in which lack of adequate banking facilities is causing hardships to individuals or businesses in the community. The present two largest banks in Philadelphia have lending limits of $8,000,000 each. The only businesses located in the Philadelphia area which find such limits inadequate are large enough readily to obtain bank credit in other cities.[34]

The Court contrasted the claimed positive competitive effects of the merger on "very large loans" made to large businesses with the presumed negative competitive effects of the merger on all other commercial banking services and all other customers. But the Court

---

31.   *Id.* at 5–6, 13 n.15.

32.   *See* Transcript of Oral Argument, United States v. Phila. Nat'l Bank, 374 U.S. 321 (1963) (No. 62-83), *reprinted in* 13, ANTITRUST LAW: MAJOR BRIEFS AND ORAL ARGUMENTS OF THE SUPREME COURT OF THE UNITED STATES, 1955 TERM–1975 TERM 345 (1979) (Philip B. Kurland & Gerhard Casper eds.) [hereinafter Transcript of Oral Argument] ("our argument is confined to the business that originates in the Philadelphia area" (argument of Philip Price, counsel for Girard Trust Corn Exchange Bank)).

33.   The Court also rejected the related defense "that Philadelphia needs a bank larger than it now has in order to bring business to the area and stimulate its economic development":

> [A] merger the effect of which "may be substantially to lessen competition" is not saved because, on some ultimate reckoning of social or economic debits and credits, it may be deemed beneficial. A value choice of such magnitude is beyond the ordinary limits of judicial competence, and in any event has been made for us already, by Congress when it enacted the amended § 7.

*Phila. Nat'l Bank*, 374 U.S. at 371. The Court treated this defense as a claim of welfare gains that did not stem from enhancing competition, and the Court held such gains immaterial because Section 7 is concerned only with competition. Although this holding has been cited by several subsequent merger decisions, none have cited it for the broad proposition, which it clearly supports, that Section 7 does not apply a welfare standard.

34.   *Id.* at 370–71 (citation omitted). The Court's reference to "countervailing power" was followed by a citation to *Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, Inc. Phila. Nat'l Bank*, 374 U.S. at 370 . This case condemned an agreement on maximum resale prices in liquor sales to wholesalers. The respondents defended the agreement on the ground that the wholesalers were unlawfully setting minimum resale prices. The Court held that the "alleged illegal conduct of petitioner . . . could not legalize the unlawful combination." Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, Inc., 340 U.S. 211, 214 (1951). Appellees in *Philadelphia National Bank* asserted no impropriety on the part of New York banks, nor did they assert that the merger was needed to countervail the power of their large customers.

placed everything in one relevant market,[35] so neither the any-market rule, asserted a year earlier in *Brown Shoe*, nor the implied merger-specificity rule mattered.[36] The Court must have used the word "market" to mean "customer group."[37] Although an antitrust decision might be expected to use "market" in its antitrust sense, contemporaneous antitrust decisions by the Court clearly used "market" to mean "customer group."[38] If the Court meant to articulate any rule, it had to be a rule against trading a benefit to one customer group off against harm to another customer group.

A careful parsing of the paragraph's critical third sentence, however, indicates that no general rule was intended. That sentence declared that accepting the banks' argument would mean that "every firm in an industry could, without violating § 7, embark on a series of mergers that would make it in the end as large as the industry leader."[39] The Court explained in the following sentence that the banks' argument applied to every future merger of Philadelphia banks and every future merger of competing banks anywhere but New York,[40] and the Court refused to consider a justification that would be applicable to hundreds of future bank mergers.

The paragraph's third sentence suggested that accepting the banks' justification likely would have been outcome determinative, yet the last sentence of the paragraph evidently found that the claimed procompetitive benefits were inconsequential.[41] The Court surely could have held that the banks' showing was inadequate because they made no effort to prove that adding one bank with a high lending limit would meaningfully enhance competition for very large loans.[42] The Court also could have disposed of the banks' argument by noting that they did not attempt to show that the claimed competitive benefits

---

35. The Court's own recitation of the evidence suggests that it was wrong to delineate a single relevant market. The Court observed at several points that the geographic scope of the competition differed for different-sized customers. *See Phila. Nat'l Bank*, 374 U.S. at 358–61 & nn.35–37. Moreover, different banking services were not reasonably interchangeable.

36. Because the government delineated a single relevant market including all services and customers, the any-market rule had no impact, but the government nevertheless invoked it. *See* Brief for the United States, *supra* note 22, at 33; Reply Brief for the United States at 17 n.12, U.S. v Phila. Nat'l Bank, 374 U.S. 321.

37. The first definition of "market" in a business dictionary that could have been consulted in 1963 is: "People, grouped by geographical, social or other category who may be considered potential purchasers of particular product or service." HAROLD LAZARUS, AMERICAN BUSINESS DICTIONARY 277 (1957).

38. *See* Atl. Ref. Co. v. FTC, 381 U.S. 357, 364 (1965) ("Gasoline service stations are particularly well suited to sell tires, batteries and accessories. They constitute a large and important market for those products."); Sunkist Growers, Inc. v. Winckler & Smith Citrus Prods. Co., 370 U.S. 19, 21 (1962) ("In 1915 several member associations of Sunkist undertook to develop by-products for lemons in order to create a market for produce not salable as fresh fruit.").

39. *Phila. Nat'l Bank*, 374 U.S. at 370. The government had pointed this out to the Court. *See* Brief for the United States, *supra* note 22, at 67–68.

40. *Phila. Nat'l Bank*, 374 U.S. at 370. At the oral argument, Chief Justice Warren confronted the banks' counsel with this proposition. The bank counsel's response was that Philadelphia customers "want loans in the range of $10 to $12 million," but the largest New York banks have lending limits five times that high. Transcript of Oral Argument, *supra* note 32, at 345–46. The Court overlooked this detail in rejecting the argument.

41. *Phila. Nat'l Bank*, 374 U.S. at 370. Many banks outside Philadelphia had significantly higher loan limits than any Philadelphia bank. *See* United States v. Phila. Nat'l Bank, 201 F. Supp. 348, 366 (E.D. Pa. 1962).

42. In support of their justification, the banks pointed to testimony from Philadelphia executives expressing a preference to deal with local banks. Brief for Appellees, *supra* note 28, at 76. Daniel Crane speculates that borrowing from distant banks imposed costs. *See* Crane, *supra* note 4, at 399 n.9. With just one Philadelphia bank having a cost advantage, however, large Philadelphia borrowers would not have experienced more intensified competition. The merged bank would have raised its rates or fees to exploit its advantage over New York banks.

outweighed the harms, while the government had shown that the benefits related to just a tiny fraction of the commerce in relevant market.[43] The Court certainly had no reason to suppose a disastrous impact from instructing the lower courts to trade off opposing competitive effects in future bank merger cases.

A single merger decision by an appellate court has invoked the market-specificity rule and cited *Philadelphia National Bank* as authority for it.[44] It was a 1972 decision affirming an FTC administrative decision ordering divestiture to remedy a cement and concrete merger.[45] The court asserted the market-specificity rule in dictum, but the decision under review indicates that the respondent had sought to justify the merger's anticompetitive effects in three local markets on the basis of procompetitive effects elsewhere.[46] Critically, the court's dictum presented the market-specificity rule as an implication of the any-market rule: "While an acquisition is to be measured functionally within the market structure of the particular market, the anticompetitive effects of an acquisition in one market cannot be justified by procompetitive effects in another market."[47]

The text of Section 7 asserts the any-market rule, which *Philadelphia National Bank* did nothing to explain or expand. The first part of the key paragraph rejected the banks' argument on the basis that it applied too often, and the second part rejected it on the basis that the claimed procompetitive benefits were insufficient. *Philadelphia National Bank* did not create a rule applicable in Sherman Act cases, and no subsequent merger decision by the Court has been cited as authority for the merger-specificity rule. For guidance on cross-market balancing in rule-of-reason cases, we must look elsewhere.

### III. JURISPRUDENCE ON RULE-OF-REASON BALANCING ACROSS MARKETS

The Sherman Act is never read to impose the any-market rule, but the Supreme Court's *Topco*[48] decision sometimes is read to adopt it.[49] The case concerned the territorial

---

43.  *See* Transcript of Oral Argument, *supra* note 32, at 320, 368 (explaining that loans exceeding the current lending limits accounted for only 6% of the total amount loaned).

44.  Daniel Crane contends that two other appellate decisions invoked the rule. Crane, *supra* note 4, at 399 & n.10. *RSR Corp.* cited *Philadelphia National Bank*, but not for the market-specificity rule. RSR Corp. v. FTC, 602 F.2d 1317, 1325 (9th Cir. 1979) (citing *Philadelphia Nat'l Bank*, 374 U.S. 321). Rather, the Ninth Circuit rejected the distinct argument that the merged firm would have been "better able to compete with the industry giant" in the single market found by the FTC and affirmed on appeal. *But see* Saint Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd., 778 F.3d 775, 789 (9th Cir. 2015) (distinguishing *RSR* from decisions recognizing "an efficiencies defense" on the basis that it "involved an argument that the merger would allow the defendant to compete more efficiently *outside* the relevant market"). *Weyerhaeuser Co.* merely observed that FTC had cited *Philadelphia National Bank* for the distinct proposition that "projected procompetitive benefits from construction of a new linerboard mill, with attendant improvement in the area employment rate, would not qualify as defenses." FTC v. Weyerhaeuser Co., 665 F.2d 1072, 1083 (D.C. Cir. 1981). The court declined to rely on the FTC's argument. *See id.*

45.  Miss. River Corp. v. FTC, 454 F.2d 1083 (8th Cir. 1972).

46.  *In re* Miss. River Fuel Corp., 75 F.T.C. 813, 914–15 (1969).

47.  *Miss. River Corp.*, 454 F.2d at 1089 (citations omitted).

48.  United States v. Topco Assocs., Inc., 405 U.S. 596 (1972).

49.  *See, e.g.*, United States v. Am. Express Co., 88 F. Supp. 3d 143, 229 & n.54 (E.D.N.Y. 2015) ("As a general matter, . . . a restraint that causes anticompetitive harm in one market may not be justified by greater competition in a different market." (citing *Topco*)); Law v. NCAA, 902 F. Supp. 1394, 1406 (D. Kan. 1995) ("Procompetitive justifications for price-fixing must apply to the same market in which the restraint is found, not to some other market." (citing *Topco*)); 1 ABA ANTITRUST SECTION, ANTITRUST LAW DEVELOPMENTS 80 n.478

restraints of a cooperative that provided private-label grocery products to small and medium-sized supermarkets.[50] The trial court found the restraints procompetitive,[51] but the Supreme Court condemned them as per se unlawful.[52] Explaining this treatment, Justice Marshall's majority opinion declared that the Sherman Act endowed a "freedom to compete" which "cannot be foreclosed with respect to one sector of the economy because certain private citizens or groups believe that such foreclosure might promote greater competition in a more important sector of the economy."[53]

In declaring the inalienable rights of Topco members, Justice Marshall staked out territory for the per se rule.[54] He initially observed that "[w]hether or not we would decide this case the same way under the rule of reason used by the District Court is irrelevant to the issue before us."[55] He then explained that per se rules are needed because of the limited ability of courts to "examin[e] difficult economic problems" and their "inability to weigh, in any meaningful sense, destruction of competition in one sector of the economy against promotion of competition in another sector."[56] But just one "sector of the economy" was involved in the case; Topco's restraints promoted competition precisely where they restrained it.[57] And a restraint obviously could not be justified by the mere fact that the defendants "believe" that it "might" promote competition.[58]

No court of appeals has read *Topco* to assert the any-market rule or the market-specificity rule, and two circuits explicitly declined such a reading.[59] The most extensive judicial discussion of scope for cross-market balancing under the Sherman Act appeared in the First Circuit's *Sullivan* opinion, which left the law as unclear as the court found it.[60]

---

(8th ed. 2017) ("The Supreme Court also has said that procompetitive effects in one market may not be balanced against anticompetitive effects in another market." (citing *Topco*)).

50.   *Topco*, 405 U.S. at 598–600, 602–03.

51.   United States v. Topco Assocs., Inc., 319 F. Supp. 1031, 1042–43 (N.D. Ill. 1970).

52.   *Topco*, 405 U.S. at 608.

53.   *Id.* at 610.

54.   *See* Milton Handler, *Twenty-Five Years of Antitrust (Twenty-Fifth Annual Antitrust Review)*, 73 COLUM. L. REV. 415, 419–20 (1973) ( "the fact that the arrangement might promote competition in the market as a whole, and that without exclusive territories the economic fruits of a cooperative private brand program might be unattainable, was deemed immaterial").

55.   *Topco*, 405 U.S. at 609.

56.   *Id.* at 609–10. Marshall described the alternative as "leav[ing] courts free to ramble through the wilds of economic theory." *Id.* at 610 n.10.

57.   *See* Handler, *supra* note 54, at 422 ("*Topco* did not deal with different sectors of the economy or with different geographical markets. The case had to do with a single market, to wit, the retail distribution of food products.").

58.   "The defendants' mistaken belief, no matter how sincere, that their collaboration improves competition should be immaterial to the tribunal's decision whether to enjoin it as an unreasonable restraint of trade." 7 PHILLIP E. AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW ¶ 1504a, at 414 (4th ed. 2017).

59.   *See* King Drug Co. of Florence, Inc. v. Smithkline Beecham Corp., 791 F.3d 388, 410 n.34 (3d Cir. 2015) ("It may also be (though we do not decide) that 'procompetitive effects in one market cannot justify anticompetitive effects in a separate market'" (quoting Brief for Nat'l Ass'n Chain Drug Stores Amici Curiae Supporting Appellants, King Drug Co. of Florence, Inc. v. Smithkline Beecham Corp., 791 F.3d 388 (2015) (No. 14-1243) and citing *Topco*); Paladin Assocs., Inc. v. Mont. Power Co., 328 F.3d 1145, 1157 n.11 (9th Cir. 2003) (noting the "Supreme Court's comment" in *Topco* on trading-off effects in different sectors of the economy and commenting that "perhaps that language from *Topco* is not controlling because it is a dictum or incomplete or obsolete").

60.   Sullivan v. NFL, 34 F.3d 1091, 1111–13 (1st Cir. 1994). While declining to decide whether the any-market rule applied, the court explained "that the ultimate question under the rule of reason is whether a

*The Journal of Corporation Law*

A jury had sided with the plaintiff in an NFL team owner's challenge to a league restriction on transfers of ownership interests. One claim of error on appeal related to an instruction limiting the jury's rule-of-reason analysis to the relevant market it found—ownership interests in NFL teams.[61] The NFL had justified the restriction on the basis that it "enhanced the NFL's ability to effectively produce and present a popular entertainment product," and the First Circuit held that the disputed instruction could have lead the jury to think it was precluded from considering the justification, which was cognizable even under the any-market rule, because the value of ownership interests would be enhanced by making the product more popular.[62]

The *Sullivan* decision reviewed many court decisions, including several that "found it appropriate . . . to balance the anticompetitive effects on competition in one market with certain procompetitive benefits in other markets."[63] The decision also commented on the guidance provided by the Supreme Court:

> The issue of defining the proper scope of a rule of reason analysis is a deceptive body of water, containing unforeseen currents and turbulence lying just below the surface of an otherwise calm and peaceful ocean. The waters are muddied by the Supreme Court's decision in *NCAA*—one of the more extensive examples of the Court performing a rule of reason analysis—where the Court considered the value of certain procompetitive effects that existed outside of the relevant market in which the restraint operated.[64]

This characterization of *NCAA*[65] finds clarity in it that is not evident to readers. The case concerned a restraint on the output of college football broadcasts. The restraint affected several distinct markets, which the Court did not delineate.[66] The Court arguably endorsed cross-market balancing by acknowledging that the NCAA's "interest in maintaining a competitive balance among amateur athletic teams is legitimate and important"[67] and by observing that "most of the regulatory controls of the NCAA are justifiable means of fostering competition among amateur athletic teams and therefore procompetitive because they enhance public interest in intercollegiate athletics."[68] But the Court might have believed that competitive balance affected the markets in which competition was restrained. Moreover, the Court gave no weight to competitive balance

---

challenged practice promotes or suppresses competition. Thus, it seems improper to validate a practice that is decidedly in restraint of trade simply because the practice produces some unrelated benefits to competition in another market." The latter sentence is sometimes quoted as support for the any-market rule. *See, e.g.*, *In re* NCAA Student-Athlete Name & Likeness Licensing Litig., 37 F. Supp. 3d 1126, 1151 (N.D. Cal. 2014); Law v. NCAA, 902 F. Supp. 1394, 1406 (D. Kan. 1995). But the court was only rejecting a clearly inferior alternative to cross-market balancing—the rule that any out-of-market procompetitive effects necessarily justify a restraint.

61.    *Sullivan*, 34 F.3d at 1095–97, 1111–13.

62.    *Id.* at 1111–13.

63.    *Id.* at 1112.

64.    *Id.* at 1111.

65.    NCAA v. Bd. of Regents of the Univ. of Okla., 468 U.S. 85 (1984).

66.    The closest the Court came was to assert that "college football constitutes a separate market for which there is no reasonable substitute" and that it "makes no difference whether the market is defined from the standpoint of broadcasters, advertisers, or viewers." *Id.* at 112 n.49. But each of those three customer groups consumed a different product, which traded in a distinct relevant market. Broadcasters purchased rights to air the games live. Advertisers purchased access to the viewers during games. And the viewer got to watch the games.

67.    *Id.* at 117.

68.    *Id.*

because the restraint was "not even arguably tailored to serve such an interest" and NCAA policies not under question protected competitive balance.[69]

To gauge the Supreme Court's receptivity to cross-market balancing in rule-of-reason cases, one must review its decisions more comprehensively. In the classic statement of the rule of reason, the Court's *Chicago Board of Trade* decision declared that: "The true test for legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition."[70] This formulation is compatible with cross-market balancing, but the Court could not have contemplated the issue, as such, because the relevant market concept was introduced much later.[71] After introducing the market concept, after asserting the any-market rule for merger cases, and after deciding *Topco*, the Supreme Court slightly reframed the rule of reason in *Sylvania*: "Under this rule, the factfinder weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition."[72] This statement was incomplete and misleading if the Court intended the any-market rule, but not if the Court intended otherwise.

Critically, the balancing required by the rule of reason is neither quantitative nor precise.[73] In *California Dental Association*, the Supreme Court described a court's task as reaching a "conclusion about the principal tendency of a restriction" on competition.[74] If a restraint suppresses competition in one market and promotes competition in a related market, the *Chicago Board of Trade* and *Sylvania* statements of the rule of reason can be read to hold that legality turns on which effect predominates in a qualitative sense.

The Sherman Act's rule of reason derives from common law on covenants not to compete entered into by employees or sellers of businesses,[75] and the rule of those cases became part of Sherman Act jurisprudence with Judge Taft's 1898 opinion in *Addyston Pipe*.[76] Much later, Justice Stevens explained that the covenants were upheld at common law when the "long-run benefit of enhancing the marketability of the business itself—and thereby providing incentives to develop such an enterprise—outweighed the temporary and limited loss of competition."[77] The ancillary restraints doctrine articulated by Judge Taft lay dormant until revived by Robert Bork,[78] and it is now applied to joint venture restraints on participants' outside activities.[79] Judge Bork's *Rothery* opinion declared that: "To be

---

69. *Id.* at 119.

70. Bd. of Trade of the City of Chi. v. United States, 246 U.S. 231, 238 (1918).

71. *See* Gregory J. Werden, *Antitrust Needs the Relevant Market*, *in* 2012 FORDHAM COMPETITION L. INST. 235, 236–39 (Barry Hawk ed., 2013) [hereinafter Werden, *Antitrust Needs the Relevant Market*].

72. Cont'l T.V., Inc. v. GTE Sylvania Inc., 433 U.S. 36, 49 (1977).

73. *Cf.* 11 HERBERT HOVENKAMP, ANTITRUST LAW ¶ 1912i, at 371 (3d ed. 2011) ("The set of rough judgments we make in antitrust litigation does not even come close to this 'balancing' metaphor.").

74. Cal. Dental Ass'n v. FTC, 526 U.S. 756, 781 (1999).

75. *See* Nat'l Soc'y of Prof'l Eng'rs v. United States, 435 U.S. 679, 688–89 (1978); Standard Oil Co. of N.J. v. United States, 221 U.S. 1, 50–51, 59–60 (1911). *See* ALBERT M. KALES, CONTRACTS AND COMBINATIONS IN RESTRAINT OF TRADE 1–20 (1918) (synthesizing common law decisions).

76. United States v. Addyston Pipe & Steel Co., 85 F. 271 (6th Cir. 1898), *aff'd*, 175 U.S. 211 (1899). Under common law, Taft observed, a restraint of trade was lawful only if it was "merely ancillary to the main purpose of a lawful contract, and necessary to protect the covenantee in the enjoyment of the legitimate fruits of the contract, or to protect him from the dangers of an unjust use of those fruits by the other party." *Id.* at 282.

77. *Prof'l Eng'rs*, 435 U.S. at 689.

78. Robert H. Bork, *Ancillary Restraints and the Sherman Act*, 15 ABA ANTITRUST SEC. PROC. 211 (1959).

79. Texaco Inc. v. Dagher, 547 U.S. 1, 7 (2006) (The ancillary restraints "doctrine governs the validity of

ancillary, and hence exempt from the per se rule, an agreement eliminating competition must be subordinate and collateral to a separate, legitimate transaction. The ancillary restraint is subordinate and collateral in the sense that it serves to make the main transaction more effective in accomplishing its purpose."[80] Later decisions and commentary clarified that a restraint is ancillary only if it is "reasonably necessary" to achieve the venture's procompetitive objectives.[81]

An ancillary restraint is not easily condemned in an assessment isolated from the procompetitive venture to which it is collateral, nor is it necessarily lawful. Rather, a finding of ancillarity fundamentally alters the reasonableness inquiry, requiring an overall assessment of competitive impact from both the venture and its ancillary restraints.[82] That assessment can entail cross-market balancing: suppose two chemical companies partner to produce a new product competing with none of their existing products. And suppose that the joint venture agreement obligates each partner to supply a necessary input produced at a separate facility. A restraint on outside sales of the two inputs might be reasonably necessary to assure the venture's success, yet the competitive benefits from the venture are in a market entirely different from the markets in which competition is restrained. In a challenge to the restraint, a court would have no basis in precedent for eschewing the ancillary restraints doctrine. Its task would be to determine the competitive impact of the venture together with its ancillary restraints using the inquiry suggested by *Chicago Board of Trade* into the "history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, [and] the purpose or end sought to be attained."[83]

The occasional necessity of cross-market balancing is clear in tying cases. Modern decisions recognize that tying can promote competition in the tying product market[84] while it suppresses competition in the tied product market. If the rule of reason is applied,[85] cross-market balancing of the tied and tying markets may be necessary, and a few decisions have

---

restrictions imposed by a legitimate business collaboration, such as a business association or joint venture, on nonventure activities.").

80.    Rothery Storage & Van Co. v. Atlas Van Lines, Inc., 792 F.2d 210, 224 (D.C. Cir. 1986).

81.    *See, e.g.*, Schering-Plough Corp. v. FTC, 402 F.3d 1056, 1072 (11th Cir. 2005) ("Ancillary restraints are generally permitted if they are 'reasonably necessary' toward the contract's objective of utility and efficiency."); ABA ANTITRUST SECTION, MONOGRAPH NO. 23, THE RULE OF REASON 124 (1999) ("Ancillary restraints are judged under the rule of reason and are lawful if *reasonably necessary* to achieve the success of a legitimate joint venture."). On the ancillary restraints doctrine generally, *see* Gregory J. Werden, *The Ancillary Restraints Doctrine after* Dagher, 8 SEDONA CONF. J. 17 (2007) [hereinafter Werden, *Ancillary Restraints Doctrine*].

82.    *See* Major League Baseball Props., Inc. v. Salvino, Inc., 542 F.3d 290, 339 (2d Cir. 2008) (Sotomayor, J., concurring) ("where a restraint *is* reasonably necessary to achieve a joint venture's efficiency-enhancing purposes (i.e., ancillary), it will be analyzed under the rule of reason as part of the joint venture"); Werden, *Ancillary Restraints Doctrine*, *supra* note 81, at 20; Gregory J. Werden, *Antitrust Analysis of Joint Ventures: An Overview*, 66 ANTITRUST L.J. 701, 706, 734 (1998).

83.    Bd. of Trade of the City of Chi. v. United States, 246 U.S. 231, 238 (1918).

84.    *See* Collins Inkjet Corp. v. Eastman Kodak Co., 781 F.3d 264, 271 (6th Cir. 2015); Brantley v. NBC Universal, Inc., 675 F.3d 1192, 1199–200 (9th Cir. 2012); United States v. Microsoft Corp., 253 F.3d 34, 89–96 (D.C. Cir. 2001) (en banc); Grappone, Inc. v. Subaru of New Eng., Inc., 858 F.2d 792, 799 (1st Cir. 1988) ; Mozart Co. v. Mercedes-Benz of N. Am., Inc., 833 F.2d 1342, 1348–51 (9th Cir. 1987).

85.    Courts apply the rule of reason to tying when the elements of a per se tying claim are not alleged or not established. *See, e.g.*, DSM Desotech Inc. v. 3D Sys. Corp., 749 F.3d 1332, 1337 (Fed. Cir. 2014); Reifert v. S. Cent. Wisc. MLS Corp., 450 F.3d 312, 317 n.2 (7th Cir. 2006); Cty. of Tuolumne v. Sonora Cmty. Hosp., 236 F.3d 1148, 1157–58 (9th Cir. 2001); Town Sound & Custom Tops, Inc. v. Chrysler Motors Corp., 959 F.2d 468, 481–85 (3d Cir. 1992) (en banc); Thompson v. Metro. Multi-List, Inc., 934 F.2d 1566, 1574 (11th Cir. 1991).

found that the promotion of competition in the tying product market outweighed the harm to competition in the tied product market.[86]

Moreover, all vertical restraints involve multiple markets and hence raise the possibility of cross-market balancing, and the Supreme Court must have anticipated cross-market balancing when it subjected non-price vertical restraints to the rule of reason. The Court explained that many vertical restraints stimulate "interbrand competition" by restricting "intrabrand competition."[87] And the Court required lower courts to balance these opposing effects of distribution restraints,[88] which arise in what often should be viewed as separate markets. Intrabrand competition is suppressed in the downstream markets in which retailers or distributors compete, whereas interbrand competition is stimulated in upstream markets in which manufacturers compete.[89] Courts reviewing challenges to distribution restraints tend to give controlling weight to procompetitive benefits in upstream markets, even though the alleged anticompetitive effects occur downstream, observing that "interbrand competition is the primary concern of the antitrust laws."[90]

Finally, if a sports league case were ever to get to the point of balancing, that balancing likely would be across markets. In *American Needle*, the Supreme Court held that the NFL teams' collective licensing of intellectual property was subject to Section 1 of the Sherman Act but stressed that the league had "a perfectly sensible justification for making a host of collective decisions."[91] The Court pointed to the teams' shared "interest in making the entire league successful and profitable" and to their "'interest in maintaining a competitive balance.'"[92] These justifications are procompetitive effects in entertainment markets, but sports league restraints typically suppress competition in other markets. The intellectual property licensing restraint in *American Needle* is one example,[93] and the recent *O'Bannon* case concerned player names, images, and likenesses.[94] In addition, the Supreme Court's

---

86.  *See, e.g., Cty. of Tuolumne*, 236 F.3d at 1160; Weiss v. York Hosp., 745 F.2d 786, 821 n.60 (3d Cir. 1984).

87.  Cont'l T.V., Inc. v. GTE Sylvania Inc., 433 U.S. 36, 51–52 (1977).

88.  *See, e.g.*, Valley Liquors, Inc. v. Renfield Imps., Ltd., 822 F.2d 656, 666 (7th Cir. 1987) (explaining that the rule of reason requires a court to "balance the effects the vertical restraint has on intrabrand and interbrand competition."); L.A. Mem'l Coliseum Comm'n v. NFL, 726 F.2d 1381, 1397 (9th Cir. 1984) ("The finder of fact must still balance the gain to interbrand competition against the loss of intrabrand competition."); Hornsby Oil Co. v. Champion Spark Plug Co., 714 F.2d 1384, 1394 (5th Cir. 1983) ("After [*Sylvania*], the courts must balance the competitive repercussions of a vertical restraint on the intrabrand and interbrand components of the relevant market."); Eiberger v. Sony Corp. of Am., 622 F.2d 1068, 1076 (2d Cir. 1980) ("[W]e must weigh any enhancement of interbrand competition against the restrictive effect on intrabrand competition, and determine whether the restraints are, in all the circumstances, reasonable.").

89.  *Cf.* Brown Shoe Co. v. United States, 370 U.S. 294, 320–21 (1962) (The relevant market is the "locus of competition[] within which the anti-competitive effects . . . [are] to be judged.").

90.  Bus. Elecs. Corp. v. Sharp Elecs. Corp., 485 U.S. 717, 726 (1988); *see* Leegin Creative Leather Prods., Inc. v. PSKS, Inc., 551 U.S. 877, 890 (2007) ("The promotion of interbrand competition is important because 'the primary purpose of the antitrust laws is to protect [this type of] competition.'" (quoting State Oil Co v. Khan, 522 U.S. 3, 15 (1997)).

91.  Am. Needle, Inc. v. NFL, 560 U.S. 183, 202 (2010).

92.  *Id.* at 204 (citing NCAA v. Bd. of Regents of the Univ. of Okla., 468 U.S. 85, 117 (1984)).

93.  Licensing intellectual property also was at issue in *Major League Baseball Properties v. Salvino, Inc.*, 542 F.3d 290, 328, 332–34 (2d Cir. 2008), which found competitive balance to be a legitimate justification and held the licensing restraint lawful under the rule of reason.

94.  *E.g.*, Brown v. Pro Football, Inc., 518 U.S. 231 (1996); Flood v. Kuhn, 407 U.S. 258 (1972); Radovich

professional sports decisions all concern player markets,[95] and some recent sports cases involved equipment markets.[96]

## IV. Cross-Market Balancing in a Burden Shifting Framework

In 1986, Phillip Areeda sketched the burden-shifting framework that he believed courts were following when they applied the rule of reason.[97] In this framework, the plaintiff's initial burden is to show a restraint that threatens to harm competition. The defendant then has the burden to show that "a legitimate objective is served" by the restraint, and in response to such a showing, the plaintiff has the opportunity to show that the objective "can be achieved by a substantially less restrictive alternative."[98] If the case gets to the third stage, and the plaintiff fails to make this showing, the court must determine whether "the challenged behavior is, on balance, unreasonable."[99] This framework undoubtedly is followed by the courts today,[100] and the remainder of this article explains how this framework should accommodate claims of out-of-market procompetitive effects.

### A. The Plaintiff's Initial Burden

Every court of appeals applying Professor Areeda's framework describes the plaintiff's initial burden in language implying the any-market rule. Typical is the Ninth Circuit's recent statement in *O'Bannon*: "The plaintiff bears the initial burden of showing that the restraint produces significant anticompetitive effects within a relevant market."[101] Other circuits have stated the plaintiff's initial burden in much the same language,[102] with

---

v. Nat'l Football League, 352 U.S. 445 (1957); Toolson v. New York Yankees, Inc., 346 U.S. 356 (1953); Fed. Baseball Club of Balt. v. Nat'l League of Prof'l Baseball Clubs, 259 U.S. 200 (1922).

95.   O'Bannon v. NCAA, 802 F.3d 1049, 1070 (9th Cir. 2015).

96.   *E.g.*, Marucci Sports, L.L.C. v. NCAA, 751 F.3d 368, 372, 376 (5th Cir. 2014) (citing the need to maintain competitive balance in affirming dismissal of challenge to a rule alleged to suppress competition in the market for non-wood baseball bats); Race Tires Am., Inc. v. Hoosier Racing Tire Corp., 614 F.3d 57, 80–82 (3d Cir. 2010) (alluding to a variety of justifications in affirming summary judgment for defendants on a challenge to a rule alleged to suppress competition in the market for tires for sanctioned dirt track auto racing).

97.   7 Phillip E. Areeda, Antitrust Law ¶ 1502, at 371–72 (1986).

98.   *Id.*

99.   *Id.* at 372.

100.   *See, e.g.*, *O'Bannon*, 802 F.3d at 1070; King Drug Co. of Florence, Inc. v. SmithKline Beecham Corp., 791 F.3d 388, 412 (3d Cir. 2015); *In re* Se. Milk Antitrust Litig., 739 F.3d 262, 271–72 (6th Cir. 2014); Agnew v. NCAA, 683 F.3d 328, 335–36 (7th Cir. 2012); Gregory v. Ft. Bridger Rendezvous Ass'n, 448 F.3d 1195, 1205 (10th Cir. 2006); Schering-Plough Corp. v. FTC, 402 F.3d 1056, 1065 (11th Cir. 2005); Geneva Pharm. Tech. Corp. v. Barr Labs. Inc., 386 F.3d 485, 506–07 (2d Cir. 2004). *See generally* Andrew I. Gavil, *Burden of Proof in U.S. Antitrust Law*, *in* 1 ABA Section of Antitrust Law, Issues in Competition Law And Policy 125, 145–48 (Wayne Dale Collins ed., 2008) (reviewing the cases).

101.   *O'Bannon*, 802 F.3d at 1070.

102.   *See King Drug*, 791 F.3d at 412 ("The plaintiff bears an initial burden under the rule of reason of showing that the alleged combination or agreement produced adverse, anti-competitive effects within the relevant product and geographic markets."); *Milk Antitrust*, 739 F.3d at 272 (setting out the elements of the plaintiff's prima facie case, including "anticompetitive effects" and "that the scheme affected relevant product and geographic markets" (internal quotation marks omitted)); *Agnew*, 683 F.3d at 335 ("Under a Rule of Reason analysis, the plaintiff carries the burden of showing that an agreement or contract has an anticompetitive effect on a given market within a given geographic area."); *Schering-Plough*, 402 F.3d at 1065 ("The plaintiff bears an initial burden of demonstrating that the alleged agreement produced adverse, anti-competitive effects within the

none suggesting a greater burden.

The Areeda-Hovenkamp treatise describes the plaintiff's initial burden as showing "a prima facie anticompetitive restraint."[103] Making out a prima facie case creates a presumption,[104] such that the plaintiff "will prevail unless the defendants introduce evidence sufficient to allow the tribunal to find that the defendants' conduct promoted a legitimate objective."[105] Prior to any suggestion of procompetitive benefits, a showing of harm to competition in any relevant market makes a restraint prima facie anticompetitive. The any-market rule applies when the plaintiff tries to make a prima facie case for the simple reason that the rule of reason addresses a restraint's impact on competition,[106] and competition is understood to occur within a relevant market.[107]

### B. The Burden of Procompetitive Justification

Defendants have the burden of persuasion on any justification for a trade restraint. In *California Dental*, the Justices were split on whether the FTC made out a prima facie case,[108] but they agreed that showing a restraint is "*prima facie* anticompetitive" would "place the burden of procompetitive justification" on the defendants.[109] Antitrust follows the common law, under which "the burden of proving affirmative defenses—indeed,

---

relevant product and geographic markets . . . ."); *Geneva*, 386 F.3d at 506–07 ("Under the rule of reason, the plaintiffs bear an initial burden to demonstrate the defendants' challenged behavior had an *actual* adverse effect on competition as a whole in the relevant market." (internal quotation marks omitted)).

103.   HOVENKAMP, *supra* note 73, ¶ 1914c, at 385.

104.   *See* 9 JOHN HENRY WIGMORE, EVIDENCE § 2494, at 379 (James H. Chadbourn rev. 1981) (defining the presumption from a prima facie case as an entitlement "to a ruling that the opponent should fail if he does nothing more in the way of producing evidence"); *prima facie case*, BLACK'S LAW DICTIONARY (Bryan A. Garner ed., 10th ed. 2014) (defining "prima facie case" as: "The establishment of a legally required rebuttable presumption."). In merger cases, a prima facie case generates a presumption. *See, e.g.*, United States v. Citizens & S. Nat'l Bank, 422 U.S. 86, 120 (1975); United States v. Marine Bancorp., Inc., 418 U.S. 602, 631 (1974); Saint Alphonsus Med. Ctr.-Nampa Inc. v. Saint Luke's Health Sys., Ltd., 778 F.3d 775, 783, 785–88 (9th Cir. 2015); Chi. Bridge & Iron Co. N.V. v. FTC, 534 F.3d 410, 423 (5th Cir. 2008); FTC v. H.J. Heinz Co., 246 F.3d 708, 715–16 (D.C. Cir. 2001). The same is true in employment discrimination cases. *See* Saint Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506–07 (1993); Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 254 n.7 (1981).

105.   AREEDA & HOVENKAMP, *supra* note 58, ¶ 1507c, at 448.

106.   *See, e.g.*, NCAA v. Bd. of Regents of the Univ. of Okla., 468 U.S. 85, 104 (1984) (Under the rule of reason, "the criterion to be used in judging the validity of a restraint on trade is its impact on competition."); Nat'l Soc'y of Prof'l Eng'rs v. United States, 435 U.S. 679, 688 (1978) (The rule of reason "focuses directly on the challenged restraint's impact on competitive conditions."); Gregory J. Werden, *Antitrust's Rule of Reason: Only Competition Matters*, 79 ANTITRUST L.J. 713 (2014).

107.   In defense of the relevant market concept, see Gregory J. Werden, *The Relevant Market Concept in Antitrust Law*, *in* GLOBAL ANTITRUST ECONOMICS: CURRENT ISSUES IN ANTITRUST LAW & ECONOMICS 117 (Douglas H. Ginsburg & Joshua D. Wright, eds. 2016); Gregory J. Werden, *The Relevant Market: Possible and Productive*, ANTITRUST L.J. ONLINE, April 2014; Gregory J. Werden, *Why (Ever) Define Markets? An Answer to Professor Kaplow*, 78 ANTITRUST L.J. 729 (2013); Werden, *Antitrust Needs the Relevant Market*, *supra* note 71. Relevant markets are aggregated as a matter of convenience if a single analysis applies to all. In *Brown Shoe*, for example, the Supreme Court declined to delineate narrower markets when "[f]urther division" did not aid "in analyzing the effects of this merger." Brown Shoe Co. v. United States, 370 U.S. 294, 297–98, 326–27, 336 (1962). The Court pointed to the small impact further division would have on market shares. *Id.* at 327.

108.   *Compare* Cal. Dental Ass'n. v. FTC, 526 U.S. 756, 775 n.12 (1999) (holding that the burden would shift to the defendant only after the court has "properly identified the theoretical basis for the anticompetitive effects and considered whether the effects actually are anticompetitive"), *with id.* at 791 (opining that the challenged restraint was anticompetitive on its face and hence had to be defended) (Breyer, J. dissenting).

109.   *Id.* at 771; *id.* at 788 (Breyer, J., dissenting).

'all . . . circumstances of justification, excuse or alleviation'—rested on the defendant."[110]

Assigning the burden of justification to defendants traditionally was viewed as a matter of fairness: The "ordinary rule, based on considerations of fairness, does not place the burden upon a litigant of establishing facts peculiarly within the knowledge of his adversary."[111] This assignment is now also viewed as efficient.[112] Law-and-economics theories of procedure and evidence posit that the burdens are allocated and calibrated to minimize the sum of the costs of using the legal system and the costs of erroneous resolution of claims.[113] Analysis based on these theories finds that efficiency favors the traditional allocation in which the "burden of persuasion rests on the plaintiff for the main claim but the defendant for affirmative defenses, . . . and the burdens of production are allocated accordingly."[114] A key insight is that the plaintiff cannot perfectly anticipate defenses, so it is inefficient to assign the plaintiff the burden of disproving them.[115]

The Areeda-Hovenkamp treatise explains that the burden of justification for a trade restraint is to show that it has a competitively legitimate objective and serves that objective.[116] In *NCAA*, the Supreme Court held that competitive balance was a legitimate objective for a restraint on the output of college football broadcasting, but the NCAA nevertheless did not meet its burden of justification because the restraint did not serve that objective.[117] The Court observed that the restraint did not "enhance public interest in intercollegiate athletics" and was "not even arguably tailored" to promote competitive balance.[118] The Court also observed that "the NCAA imposes a variety of other restrictions designed to preserve amateurism which are much better tailored to the goal of competitive balance than is the television plan, and which are 'clearly sufficient' to preserve

---

110.   Dixon v. United States, 548 U.S. 1, 8 (2006) (quoting Patterson v. New York, 432 U.S. 197 (1977)). *See* Schaffer v. Weast, 546 U.S. 49, 57 (2005) ("[T]he burden of persuasion as to certain elements of a plaintiff's claim may be shifted to defendants, when such elements can fairly be characterized as affirmative defenses or exemptions.").

111.   *Schaffer*, U.S. at 60 (quoting United States v. N.Y., New Haven & Hartford R.R. Co., 355 U.S. 253, 256 n.5 (1957)). *See* 2 KENNETH S. BROUN ET AL., MCCORMICK ON EVIDENCE § 337, at 650 (7th ed. 2013) ("A doctrine often repeated by the courts is that where the facts with regard to an issue lie peculiarly in the knowledge of a party, that party has the burden of proving the issue."). Research in psychology suggests that: "The freedom of the disputants to control the statement of their claims constitutes the best assurance that they will subsequently believe that justice has been done regardless of the verdict." John Thibaut & Laurens Walker, *A Theory of Procedure*, 66 CAL. L. REV. 541, 551 (1978).

112.   *See* Rice v. Sunrise Express Inc., 217 F.3d 492, 493 (7th Cir. 2000) (Wood, J., dissenting from denial of rehearing en banc) ("When burdens of proof are allocated, it is normally most efficient to place the burdens of production and persuasion on the party with the best access to relevant information.").

113.   *See generally* RICHARD A. POSNER, ECONOMIC ANALYSIS OF LAW §§ 21.1, 22.4 (9th ed. 2014) [hereinafter POSNER, ECONOMIC ANALYSIS OF LAW]; Bruce L. Hay, *Allocating the Burden of Proof*, 72 IND. L.J. 651 (1997); Bruce L. Hay & Kathryn E. Spier, *Burdens of Proof in Civil Litigation: An Economic Perspective*, 26 J. LEGAL STUD. 413 (1997); Thomas R. Lee, *Pleading and Proof: The Economics of Legal Burdens*, 1997 BYU L. REV. 1; Richard A. Posner, *An Economic Approach to the Law of Evidence*, 51 STAN. L. REV. 1477 (1999); Richard A. Posner, *An Economic Approach to Legal Procedure and Judicial Administration*, 2 J. LEGAL STUD. 399 (1973).

114.   POSNER, ECONOMIC ANALYSIS OF LAW, *supra* note 113, at 845.

115.   *See id.*; Posner, *An Economic Approach to the Law of Evidence*, *supra* note 113, at 1503.

116.   *See* AREEDA & HOVENKAMP, *supra* note 58, ¶¶ 1505, 1505a, at 428–33.

117.   NCAA v. Bd. of Regents of the Univ. of Okla., 468 U.S. 85, 117–20 (1984); *see supra* notes 67–69 and accompanying text (explaining the analysis of the Court).

118.   *NCAA*, 468 U.S. at 117, 119.

competitive balance to the extent it is within the NCAA's power to do so."[119]

The any-market rule does not apply when defendants respond to the plaintiff's prima facie case.[120] A restraint can be justified only on the ground that it promotes competition, but nothing in the logic or language of the Supreme Court's Sherman Act jurisprudence requires that the justification focus on the same competitive process as the plaintiff's prima facie case. When out-of-market competitive benefits are invoked to justify a trade restraint, useful guidance on the nature of the defendants' burden is found in cases applying the ancillary restraints doctrine to joint ventures. A joint venture's collateral restraint is ancillary only when it "is reasonably necessary to achieve a joint venture's efficiency-enhancing purposes."[121] Ancillarity, thus, requires an "organic connection between the restraint and the cooperative needs of the enterprise."[122] Adapting this doctrine, defendants can invoke out-of-market competitive benefits to justify a trade restraint only when, without the restraint, the defendants likely would be materially less effective competitors in whatever market they claim to have promoted competition. The issue is not whether the restraint is absolutely necessary to the defendant's competitive vitality,[123] but rather only whether the restraint constitutes a reasonable solution to a real threat to that vitality.[124]

There "is always something of a sliding scale in appraising reasonableness" of trade restraints; "the quality of proof required should vary with the circumstances."[125] What defendants must show to shift the burden back to the plaintiff depends on the restraint being

---

119.  *Id.* at 119.

120.  Unlike in merger cases, prosecutorial discretion cannot be relied upon to make appropriate exceptions because Section 1 cases are predominantly private.

121.  Major League Baseball Props., Inc. v. Salvino, Inc., 542 F.3d 290, 339 (2d Cir. 2008) (Sotomayor, J., concurring) (emphasis omitted). *See In re* Ins. Brokerage Antitrust Litig., 618 F.3d 300, 345 (3d Cir. 2010) ("To say that a restraint is 'ancillary' is to conclude that it is an essential or at least an important part of some arrangement that has potentially redeeming virtues.") (quoting HOVENKAMP, *supra* note 73, § 1904, at 251); Schering-Plough Corp. v. FTC, 402 F.3d 1056, 1072 (11th Cir. 2005) ("Ancillary restraints are generally permitted if they are 'reasonably necessary' toward the contract's objective of utility and efficiency.").

122.  Gen. Leaseways, Inc. v. Nat'l Truck Leasing Ass'n, 744 F.2d 588, 595 (7th Cir. 1984). The required connection is analogous to that for the inextricably linked exception to the any-market rule. *See supra* notes 12–13 and accompanying text.

123.  *See* NFL v. N. Am. Soccer League, 459 U.S. 1074, 1079 (1982) (Rehnquist, C.J., dissenting from denial of cert.) ("The antitrust laws impose a standard of reasonableness, not a standard of absolute necessity."); Fleer Corp. v. Topps Chewing Gum, Inc., 658 F.2d 139, 151 n.18 (3d Cir. 1981) ("In a rule of reason case, the test is not whether the defendant deployed the least restrictive alternative. Rather the issue is whether the restriction actually implemented is fairly necessary in the circumstances of the particular case, or whether the restriction exceeds the outer limits of restraint reasonably necessary to protect the defendant." (internal quotation and alternation marks omitted)); United States v. Realty Multi-List, Inc., 629 F.2d 1351, 1375 & n.49 (5th Cir. 1980) (requiring that the defendants show that their restraints are "reasonably necessary to the accomplishment of the legitimate goals and narrowly tailored to that end" and stating that this requirement is "similar to that first envisioned by Judge Taft in his opinion in [*Addyston Pipe*]").

124.  *See* Werden, *Ancillary Restraints Doctrine*, *supra* note 81, at 24 (Under the ancillary restraints doctrine, "[d]efendants are required to show only that the ability of their legitimate joint venture to function efficiently or effectively was compromised in a significant way that was sensibly addressed by the restraint."). Defendants need not proffer contemporaneous documentation to show that a restraint was imposed with the specific intent to serve the purpose asserted in litigation. Business people cannot be expected to memorialize, or even to articulate, a cogent rationale for every decision. Even though met with skepticism, ex-post rationalizations can withstand scrutiny.

125.  FTC v. Actavis, Inc., 133 S. Ct. 2223, 2237–38 (2013) (quoting Cal. Dental Ass'n v. FTC, 526 U.S. 756, 780 (1999)).

justified and its proven anticompetitive impact.[126] Also relevant is whether the defendants rely on competitive benefits outside the market in which the plaintiff demonstrated harm to the competitive process. Defendants in rule-of-reason cases most often argue that the plaintiff is wrong about the competitive impact of the restraint. When they instead contend the plaintiff is missing the bigger picture of competition extending outside the market on which the plaintiff is focused, they must take on what I dub the "burden of perspective." They must show that the claimed competitive benefit is substantial in relation to any competitive harm conceded (even if it is only conceded *arguendo*). A court may find the claimed benefits are insufficiently weighty to shift the burden back to the plaintiff.[127]

## C. Less-Restrictive Alternatives

If the defendant's showing is deemed sufficient, the case proceeds to the third stage of the burden-shifting process—less-restrictive alternatives.[128] At this stage, the plaintiff has the burden of persuasion[129] in a second "reasonable necessity" inquiry into whether the legitimate objective served by the restraint can be achieved without harming the competitive process, or without the same degree of harm. A restraint is rightly deemed unreasonable if it needlessly harms competition, just as it is unreasonable to use nuclear weapons, or even DDT, to kill mosquitoes posing a threat to public health. When a practical[130] and substantially less restrictive alternative was obvious[131] at the time a restraint was adopted[132] and likely would have been "virtually as effective" in serving the procompetitive purpose of the challenged restraint,[133] the restraint is unreasonable. Any claim of justification is then labeled "pretextual."

126.   *See* HOVENKAMP, *supra* note 73, ¶ 1914a, at 380 ("[T]he more threatening the restraint, the more the defendant must show in order to absolve itself.").

127.   *See In re* Se. Milk Antitrust Litig., 739 F.3d 262, 272 (6th Cir. 2014) (explaining that, if the plaintiff meets its initial burden, "the burden then shifts to the defendant to produce evidence that the restraint in question has procompetitive effects that are sufficient to justify the otherwise anticompetitive injuries" (internal quotation and alteration marks omitted)).

128.   *See, e.g.*, O'Bannon v. NCAA, 802 F.3d 1049, 1070, 1075 (9th Cir. 2015); *In re Se. Milk Antitrust*, 739 F.3d at 271–72; Gregory v. Ft. Bridger Rendezvous Ass'n, 448 F.3d 1195, 1205 (10th Cir. 2006); Schering-Plough Corp. v. FTC, 402 F.3d 1056, 1965 (11th Cir. 2005); Geneva Pharms. Tech. Corp. v. Barr Labs. Inc., 386 F.3d 485, 507 (2d Cir. 2004); United States v. Brown Univ., 5 F.3d 658, 679 (3d Cir. 1993).

129.   *See In re Se. Milk Antitrust*, 739 F.3d at 272 (explaining that, if the defendants meet their burden, "the plaintiff may still prevail by showing that any legitimate objectives can be achieved in a substantially less restrictive manner" (internal quotation marks omitted)); *Gregory*, 448 F.3d at 1205 ("If the defendant is able to demonstrate procompetitive effects, the plaintiff then must prove that the challenged conduct is not reasonably necessary to achieve the legitimate objectives or that those objectives can be achieved in a substantially less restrictive manner."); *Geneva*, 386 F.3d at 506–07 (explaining that, if defendants meet their burden, "the burden shifts back to the plaintiffs to prove that any legitimate competitive benefits offered by defendants could have been achieved through less restrictive means"); *see generally* C. Scott Hemphill, *Less Restrictive Alternatives in Antitrust Law*, 116 COLUM. L. REV. 927, 979–82 (2016) (discussing plaintiff's burden of persuasion).

130.   *See* M&H Tire Co. v. Hoosier Racing Tire Corp., 733 F.2d 973, 987 (1st Cir. 1984) (rejecting "possible less restrictive alternative[s that] are more hypothetical than practical"); Hemphill, *supra* note 129, at 985–86.

131.   *See* HOVENKAMP, *supra* note 73, ¶ 1913b, at 375–76 ("Proffered less restrictive alternatives should either be based on actual experience in analogous situations elsewhere or else be fairly obvious.").

132.   *See* Polk Bros., Inc. v. Forest City Enters., Inc., 776 F.2d 185, 189 (7th Cir. 1985) ("A court must ask whether an agreement promoted enterprise and productivity at the time it was adopted.").

133.   *See O'Bannon*, 802 F.3d at 1074. Scott Hemphill argues that the less-restrictive alternative test offers a "shortcut" to balancing if consideration is limited to "dominant" alternatives, which are "equally (or more) effective" in achieving a procompetitive purpose. *See* Hemphill, *supra* note 129, at 943, 952, 955.

The common law from which the Sherman Act's rule of reason derived made a similar inquiry.[134] Citing a then-recent common law decision, Judge Taft explained in *Addyston Pipe* that a covenant not to compete was "unreasonable" and hence "void on the ground of public policy" when the "restraint is larger than the necessary protection of the party" it protects.[135] Taft distilled the jurisprudence down to a less-restrictive-alternatives test:

> The covenant is inserted only to protect one of the parties from the injury which, in the execution of the contract or enjoyment of its fruits, he may suffer from the unrestrained competition of the other. The main purpose of the contract suggests the measure of protection needed, and furnishes a sufficiently uniform standard by which the validity of such restraints may be judicially determined. In such a case, if the restraint exceeds the necessity presented by the main purpose of the contract, it is void for two reasons: First, because it oppresses the covenantor, without any corresponding benefit to the covenantee; and, second, because it tends to a monopoly.[136]

Before Areeda declared that plaintiffs have the burden of persuasion on less-restrictive alternatives, courts had assigned that burden to defendants,[137] but courts now follow Areeda's approach.[138] Some scholars advocate reversing this burden,[139] but Areeda's assignment makes sense: It is fair and efficient to require that defendants seeking to justify trade restraints show the restraints actually serve legitimate objectives, but it is neither fair nor efficient to demand the further showing that *only* the particular restraints adopted adequately serve those objectives. The plaintiff should be required to propose a specific alternative and explain why it is substantially less restrictive, yet practical and effective.[140] Of course, defendants have a burden of production in rebutting the plaintiff's contentions as to less-restrictive alternatives, as they are in the best position to explain the impracticality or ineffectiveness of any proposed less-restrictive alternative.[141]

The Supreme Court has not explicitly made the inquiry into less-restrictive alternatives a part of rule-of-reason analysis,[142] although such an inquiry was urged in

---

134.   *See* Michael A. Carrier, *The Real Rule of Reason: Bridging the Disconnect*, 1999 BYU L. REV. 1265, 1321–22; Gabriel A. Feldman, *The Misuse of the Less Restrictive Alternative Inquiry in Rule of Reason Analysis*, 58 AM. U. L. REV. 561, 564–66, 570 n.41 (2009).

135.   United States v. Addyston Pipe & Steel Co., 85 F. 271, 282 (6th Cir. 1898) (quoting Nordenfeldt v. Maxim Nordenfeldt Guns & Ammunition Co., [1894] A.C. 535).

136.   *Id.*

137.   *See* Kreuzer v. Am. Acad. of Periodontology, 735 F.2d 1479, 1495 (D.C. Cir. 1984); Wilk v. Am. Med. Ass'n, 719 F.2d 207, 227 (7th Cir. 1983); Graphic Prods. Distribs., Inc v. Itek Corp., 717 F.2d 1560, 1577 & n.31 (11th Cir. 1983); Betaseed, Inc. v. U & I, Inc., 681 F.2d 1203, 1228 n.38 (9th Cir. 1982); N. Am. Soccer League v. NFL, 670 F.2d 1249, 1261 (2d Cir. 1982); Rosebrough Monument Co. v. Mem'l Park Cemetery Ass'n, 666 F.2d 1130, 1145 (8th Cir. 1981).

138.   *See supra* note 100 for supporting cases.

139.   *See* EINER ELHAUGE, UNITED STATES ANTITRUST LAW AND ECONOMICS 141–42 (2d ed. 2011); Carrier, *supra* note 134, at 1342–44 ("A restraint's necessity can best be addresses by the defendant.").

140.   *See* Hemphill, *supra* note 129, at 979–82.

141.   *See id.* at 982 ("Defendants have better access to information about their reasons for adopting a particular practice.").

142.   In a decision upholding vertical restraints under the rule of reason, the Supreme Court did observe that there was nothing in the record indicating that the restraints "exceeded the limits reasonably necessary to meet the competitive problems posed by [the defendant's] more powerful competitors." United States v. Arnold, Schwinn & Co., 388 U.S. 365, 380–81 (1967).

*The Journal of Corporation Law*                            [Vol. 43:1

*White Motor* by Justice Brennan.[143] In that case, the Court declined to condemn certain vertical restraints as per se unlawful.[144] Justice Brennan filed a concurring opinion to explain why such restraints might be justified and to comment on key issues in their assessment. He proposed an inquiry into whether a restraint was "more restrictive than necessary" and an inquiry into "the availability of less restrictive alternatives."[145] He observed that an overly restrictive restraint "invites suspicion" that its "real purpose" was to suppress competition.[146]

### D. Balancing

The vast majority of rule-of-reason cases end with a determination that an assigned burden has not been met or could not be met. To describe their task in the remaining cases, courts use a form of the word "weigh,"[147] but opposing competitive effects are not monetized or reduced to some other common denominator,[148] and, as Judge Bork commented, "Weighing effects in any direct sense will usually be beyond judicial capabilities . . . ."[149]

As indicated above,[150] however, the rule of reason asks only which competitive effect from a restraint predominates. Over the course of a trial presenting opposing competitive effects in different markets, the fact finder is apt to develop a clear view on which predominates. A jury never need explain why it takes a particular view, and a judge can cite any contrast between the opposing effects that the record and common sense support. If the plaintiff makes a compelling case of palpable harm to competition in a substantial relevant market, the court should have no difficulty in explaining that the plaintiff met its ultimate burden of proof. A challenge to the restraint likely would get to the balancing stage only if the plaintiff had made a strong initial showing, which could carry the plaintiff's ultimate burden without any additional showing on justifications or less-restrictive alternatives.

Nevertheless, a sufficiently strong showing by the defendants shifts the burden back to the plaintiff, who bears the burden of proof—the ultimate burden of nonpersuasion of

---

143.   *White Motor Co. v. United States*, 372 U.S. 253, 271–72 (1963) (Brennan, J., concurring).

144.   *Id.* at 255–56, 263–64.

145.   *Id.* at 270–72.

146.   *Id.* at 270 n.9.

147.   *See, e.g.*, California *ex rel.* Harris v. Safeway, Inc., 651 F.3d 1118, 1133 n.10 (9th Cir. 2011) (en banc) (explaining that the "rule of reason weighs legitimate justifications for a restraint against any anticompetitive effects"); E & L Consulting, Ltd. v. Doman Indus. Ltd., 472 F.3d 23, 29 (2d Cir. 2006) ("[A] rule of reason analysis . . . seeks to determine if the alleged restraint is unreasonable because its anticompetitive effects outweigh its procompetitive effects." (internal quotation marks omitted)); Blomkest Fertilizer, Inc. v. Potash Corp. of Sask., 203 F.3d 1028, 1046 (8th Cir. 2000) (en banc) (An agreement "constitute[s] an unreasonable restraint of trade under the rule of reason if the anticompetitive effect of the agreement outweighs its beneficial effects."); Clamp-All Corp. v. Cast Iron Soil Pipe Inst., 851 F.2d 478, 486 (1st Cir. 1988) (Breyer, J.) ("The 'rule of reason' limits the [Sherman] Act's literal words by forbidding only those arrangements the anticompetitive consequences of which outweigh their legitimate business justifications . . . .").

148.   *See* Rebecca Haw Allensworth, *The Commensurability Myth in Antitrust*, 69 VAND. L. REV. 1, 5 (2016) (arguing that "procompetitive and anticompetitive effects, as they are presented in an antitrust suit, are usually incommensurate"); Herbert Hovenkamp, *Antitrust Balancing*, 12 N.Y.U. J.L. & BUS. 369, 370 (2016) ("The factors that are supposedly balanced in Sherman Act cases almost never . . . come in cardinal units . . . .").

149.   *Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 230 n.11 (D.C. Cir. 1986) (Bork, J.).

150.   *See supra* text accompanying notes 73–74.

the fact finder[151]—and hence the burden on balancing.[152] Economics provides sophisticated tools that could be used to trade-off competitive harm in one market and competitive benefits in another, but using those tools has a high cost and doubtful utility, and plaintiffs certainly can prevail without employing them.[153] As explained above, the determination of a restraint's predominant effect on competition need not be quantitative or precise. To persuade the fact finder at the balancing stage, it might suffice for the plaintiff to appeal to the immediacy, severity, and the nature of the harm to the competitive process already demonstrated. The plaintiff's most persuasive arguments at the balancing stage, however, are apt to be attacks on the defendants' justification. Anything discounting procompetitive benefits potentially suffices to meet the plaintiff's ultimate balancing burden.

A material factor in calibrating the plaintiff's balancing burden is the extent to which competitive benefit and harm fall on the same customers. With a high degree of customer coincidence, the views of those affected might shed significant light on net competitive impact, and allowing the restraint would not risk subordinating the interests of one customer group to those of another. In such cases, the plaintiff's balancing burden is greatest. The plaintiff's burden lightens as the degree of coincidence declines. Understandably, the Supreme Court was reluctant to trade-off effects on different customer groups in *Philadelphia National Bank*,[154] and the Court has declared that the Sherman Act "protect[s] all who are made victims of the forbidden practices."[155] If a restraint clearly harms a particular competitive process to the substantial detriment of the customers in a relevant market, and if those customers do not stand to benefit from the restraint's procompetitive effects, close questions as to the predominant effect of the restraint should be resolved in the plaintiff's favor.

### E. An Example

How courts should address claims of out-of-market competitive benefits is usefully explored in the context of the hypothetical chemical manufacturing venture introduced above.[156] The prior discussion of the hypothetical was silent on the restraint's competitive impact, but any antitrust challenge to it would fail at the outset unless the partners competed in one of the relevant input markets prior to the venture or had a significant prospect of

---

151.    *See* WIGMORE, *supra* note 104, § 2489, at 300–01.

152.    *See* ABA ANTITRUST SECTION, *supra* note 49, at 62; ELHAUGE, *supra* note 139, at 142 ("At the final stage the tribunal weighs the anticompetitive and procompetitive evidence to determine which is greater. The plaintiff has the burden of persuasion on whether the net effect is anticompetitive."). *But see* Hertz Corp. v. City of N.Y., 1 F.3d 121, 130 (2d Cir. 1993) ("The traditional rule-of-reason approach requires the defendant to demonstrate that the procompetitive aspects of the agreement outweigh its anticompetitive aspects.").

153.    The use of these tools might be required by commentators advocating a strict welfare standard. *E.g.*, Roger D. Blair & D. Daniel Sokol, *The Rule of Reason and the Goals of Antitrust: An Economic Approach*, 78 ANTITRUST L.J. 471 (2012); Joseph Farrell & Michael L. Katz, *The Economics of Welfare Standards in Antitrust*, COMPETITION POL'Y INT'L, Autumn 2006, at 3; Alan J. Meese, *Reframing the (False?) Choice between Purchaser Welfare and Total Welfare*, 81 FORDHAM L. REV. 2197 (2013); Steven C. Salop, *Question: What Is the Real and Proper Antitrust Welfare Standard? Answer: The True Consumer Welfare Standard*, 22 LOY. CONSUMER L. REV. 336 (2010).

154.    *See supra* notes 34–38 and accompanying text. *See also* Crane, *supra* note 4, at 405 ("antitrust law avoids balancing the interests of different classes of consumers").

155.    Mandeville Island Farms, Inc. v. Am. Crystal Sugar Co., 334 U.S. 219, 236 (1948).

156.    *See supra* text following note 82.

doing so. And if the restraint has only a slight competitive impact, even a weak showing by the partners on legitimate business purpose could secure a judgment in their favor. For example, almost any procompetitive effect from the venture might be sufficient to outweigh the anticompetitive effect from reducing the number of competitors in one input market from six to five.

Things would be radically different if the merging firms had been the only suppliers in the relevant markets for both of the inputs subject to the restraint and if the restraint made each partner a monopolist in one of the markets. With the complete elimination of competition in both input markets an accomplished fact, the restraints would be condemned under the per se rule or the quick look unless the partners demonstrated their reasonable necessity to the success of their venture. Such a demonstration would move the case forward under the rule of reason, but without much more from the partners, the plaintiff's initial showing should convince the fact finder that the venture and its restraints have a net adverse effect on competition, rendering the restraints unreasonable.

When the plaintiff makes a compelling initial showing, such as that just posited, and the defendants offer only out-of-market competitive benefits to offset the anticompetitive effects demonstrated, the defendants' have a substantial burden of perspective. When the hypothetical chemical venture creates two monopolies, meeting this burden requires quantitative and qualitative showings. As to the former, the partners might show, for example, that the relevant input markets are local, while the relevant market for the venture's output is national, so the volume of commerce in the venture's product substantially exceeds the combined commerce in the input markets.[157] As to the latter, they could show, for example, that the venture's product was new to the marketplace and provided great tangible value to customers. Only if the partners made strong showings along such lines would the plaintiff need to present additional evidence or argument.

If the defendants did make strong showings, the plaintiff could advocate a less-restrictive alternative. Depending on the capacity of the partners' production facilities for the inputs and their locations, creating monopolies in the input markets might not have been reasonably necessary. The plaintiff also might produce evidence that the new product was not a massive improvement over preexisting alternatives or that the product would have been introduced by one of the partners or someone else had the venture had not done so. The plaintiff could argue that the complete elimination of competition in two input markets is beyond redemption.[158]

## V. Conclusion

The any-market rule, found in the text of Section 7 of the Clayton Act, bars cross-market balancing in merger cases, but neither the text of Section 1 of the Sherman Act nor Supreme Court jurisprudence bars cross-market balancing in rule-of-reason cases. *Philadelphia National Bank* and *Topco* are said to have done so, but neither involved multiple markets across which the court could have balanced, and neither gave any weight

---

157.  If the inputs were used in a fixed proportion in every other use, the relevant comparison would be between the aggregate commerce in all the other products made from the two inputs and the market-wide commerce in the venture's product.

158.  *Cf.* Polygram Holding, Inc. v. FTC, 416 F.3d 29, 38 (D.C. Cir. 2005) ("[I]f the only way a new product can profitably be introduced is to restrain the legitimate competition of older products, then one must seriously wonder whether consumers are genuinely benefitted by the new product.").

to the claimed procompetitive benefits *within* the relevant market.

Courts mislead when they say that the rule-of-reason requires a weighing of procompetitive effects against anticompetitive effects. When the justification for a trade restraint focuses on the very competitive process the plaintiff contends it harms, the court's decision process actually is quite different. The court chooses between two narratives on how competition works and on how the restraint affects it. But the court might need to engage in a weighing process when opposing effects involve distinct competitive processes, i.e., separate markets.

Cross-market balancing rarely is required because it is a last resort in a multi-stage burden-shifting framework that resolves the vast majority of cases at prior stages. Indeed, most cases do not get past the first stage, when the plaintiff seeks to make a prima facie case, and the any-market rule applies at that stage. Defendants are permitted to justify harm to a particular competitive process on the basis of benefit to another, but they have a significant burden of perspective in doing so. They must show that that claimed competitive benefit is substantial in relation to the competitive harm the plaintiff has shown.

Cross-market balancing should be feasible when required because the rule-of-reason requires only that a court determine which competitive effect predominates in a qualitative sense. When the plaintiff makes a weak initial showing, out-of-market competitive benefits are easily found to predominate. Out-of-market competitive benefits would save a restraint substantially harming a competitive process only if clear and convincing evidence demonstrated that the predominant competitive effect of the restraint was to protect a distinct competitive process in a separate relevant market.