# EXHIBIT M

University of Michigan Law School
University of Michigan Law School Scholarship Repository

Articles                                                                                          Faculty Scholarship

2015

# Balancing Effects Across Markets

Daniel A. Crane
*University of Michigan Law School*, dancrane@umich.edu

Available at: https://repository.law.umich.edu/articles/1773

Follow this and additional works at: https://repository.law.umich.edu/articles

Part of the Antitrust and Trade Regulation Commons, Courts Commons, and the Supreme Court of the United States Commons

## Recommended Citation

Crane, Daniel A. "Balancing Effects Across Markets." *Antitrust L. J.* 80, no. 2 (2015): 391-411.

This Article is brought to you for free and open access by the Faculty Scholarship at University of Michigan Law School Scholarship Repository. It has been accepted for inclusion in Articles by an authorized administrator of University of Michigan Law School Scholarship Repository. For more information, please contact mlaw.repository@umich.edu.

# BALANCING EFFECTS ACROSS MARKETS

Daniel A. Crane*

In *Philadelphia National Bank* (*PNB*),[1] the Supreme Court held that it is improper to weigh a merger's procompetitive effects in one market against the merger's anticompetitive effects in another. The merger in question, which ostensibly reduced retail competition in the Philadelphia area, could not be justified on the grounds that it increased competition against New York banks and hence perhaps enhanced competition in business banking in the mid-Atlantic region. I will refer to the Supreme Court's prohibition on balancing effects across markets as a "market-specificity" rule. Under this rule, efficiencies that may counterbalance anticompetitive aspects must be specific to the market in which the anticompetitive aspects are present.

Although the market-specificity rule is periodically invoked and followed, its justification is hazy. The Court in *PNB* provided one justification—concern about a slippery slope to monopoly—that has limited applicability. Other commentators, particularly the Areeda-Hovenkamp treatise, have provided more elaborate but equivocal defenses of the rule.[2] For their part, the antitrust agencies embrace the rule as a baseline, but then leave open the possibility of waiving it in the exercise of their prosecutorial discretion.

In this essay, I revisit the justifications for the market-specificity rule. While there is some sense to the idea that merger effects should be analyzed on a market-by-market basis—particularly given the complexity and administrative difficulty of comparing effects across markets—the principle is not, and cannot, sensibly be applied as a strict rule. Rather, the principle is best operationalized as a presumption against balancing effects across market lines that can be rebutted based on compelling evidence in particular cases.

---

* Associate Dean, Faculty and Research, and Frederick Paul Furth, Sr. Professor of Law, University of Michigan.
[1] United States v. Phila. Nat'l Bank, 374 U.S. 321 (1963).
[2] 4A Phillip E. Areeda & Herbert Hovenkamp, Antitrust law: An Analysis of Antitrust Principles and Their Application ¶ 972, at 45–49 (3d ed. 2009).

## I. THE MARKET-SPECIFICITY RULE AND ITS APPLICATIONS

### A. THE STAKES IN *PNB*

Philadelphia National Bank and Girard Trust Corn Exchange Bank (Girard) were the second and third largest of the 42 commercial banks operating in the Philadelphia market.[3] PNB, a federal chartered bank, had assets of over a billion dollars while Girard, a Pennsylvania chartered bank, had assets of over $750 million,[4] so the merged banks' combined assets would be somewhat under two billion dollars.

The Comptroller of the Currency supported the merger in part based on the assertion that there would still be plenty of retail banking competition in Philadelphia and in part based on the "beneficial effects of this consolidation upon international and national competition."[5] Defendants pressed this theme at trial, arguing that the merger would raise their capitalization and hence their lending ability for large business loans. They showed that Philadelphia's largest banks were small relative to the size of the market. The two largest banks, PNB and First Pennsylvania, had lending limits of $8 million, and Girard had a lending limit of $6 million.[6] This, in turn, forced some large businesses headquartered in Philadelphia to turn to New York banks for lending. The defendants argued that the merger would allow the bank to increase its lending limits, thus making the merged bank more competitive with banks outside the Philadelphia market, particularly New York banks.[7]

The Supreme Court held that this effort to offset any anticompetitive harms in Philadelphia retail banking with procompetitive effects in large business banking in the mid-Atlantic and Northeast was flatly prohibited. The Court rejected such balancing due to slippery-slope concerns: "If anticompetitive effects in one market could be justified by procompetitive consequences in another, the logical upshot would be that every firm in an industry could, without violating § 7, embark on a series of mergers that would make it in the end as large as the industry leader."[8] In the same paragraph, but turning to a conceptually different point, the Court rejected the merging parties' assertion that the combination would benefit Philadelphia businesses seeking large business loans, finding that the $8 million lending limits of the two largest banks were adequate for most businesses and that "[t]he only businesses located in

---

[3] 374 U.S. at 330.
[4] *Id.* at 331.
[5] *Id.* at 333.
[6] *Id.* at 334 n.10.
[7] *Id.* at 334.
[8] 374 U.S. at 371.

the Philadelphia area which find such limits inadequate are large enough readily to obtain bank credit in other cities."[9]

### B. THE *PNB* MARKET-SPECIFICITY RULE IN THE COURTS

Courts in a handful of cases have invoked the *PNB* market-specificity rule to reject calls for consideration of procompetitive effects outside the relevant market.[10] A straightforward application of the rule appears in *United States v. Ivaco, Inc.*[11] The Justice Department brought an action to enjoin a joint venture between manufacturers of automatic tampers used to maintain railroad tracks. The defendants argued that the joint venture would have the procompetitive effect of allowing them to become exporters to the European market, which was then monopolized by an Austrian company.[12] Not surprisingly given geopolitics, the district court found that *PNB* foreclosed balancing procompetitive effects in Europe against anticompetitive effects in the United States.

Some courts have taken the *PNB* rule to mean that even intra-market balancing is prohibited when anticompetitive effects are concentrated in discrete segments of the market. In *RSR Corp. v. FTC*,[13] the Ninth Circuit relied on *PNB* in rejecting the merging parties' argument that an increase in the overall competitiveness of a national secondary lead market could offset any anticompetitive effects from the merger in a particular region.

The relationship between the anticompetitive and procompetitive effects in the market as a whole is not clear from the opinion. Even though shipping costs meant that most deliveries occurred within a few hundred miles of plants, the court found that the relevant market was the entire United States.[14] On a regional basis, the merging parties only had overlapping plants in the Midwest.[15] Their argument seems to have been that, assuming that the rele-

---

[9] *Id.* The Court cited nothing in support of this last assertion, and it appears to be contradicted by the record. The district court found that a "surprising" number of Philadelphia businesses banked in New York or other large cities, 201 F. Supp. 348, 364 (D.C. Pa. 1962), suggesting that the Philadelphia banks were constrained in their ability to serve large business customers. As to the assertion that large businesses could "readily" obtain credit in other cities, the question is not merely whether credit was available, but at what price. Geographically remote banks may have charged a higher interest rate to Philadelphia businesses than the merged bank would have.

[10] *See, e.g.*, Miss. River Corp. v. FTC, 454 F.2d 1083, 1090 (8th Cir. 1972) (citing *PNB* market-specificity rule in upholding FTC challenge to cement company acquisition); FTC v. Weyerhaeuser Co., 665 F.2d 1072, 1083 (D.C. Cir. 1981) (invoking rule to reject argument that procompetitive effects in one area from construction of new linerboard mill could offset anticompetitive effects in other areas).

[11] 704 F. Supp. 1409 (W.D. Mich. 1989).

[12] *Id.* at 1427.

[13] 602 F.2d 1317, 1326 (9th Cir. 1979).

[14] *Id.* at 1322–24.

[15] *Id.* at 1323.

vant geographic market was the entire United States, any anticompetitive effects in the Midwest region were offset by gains to competition in the market as a whole. The court seems to have had its cake and eaten it too by holding that the market was nationwide but that anticompetitive effects would need to be assessed on a regional basis.

Other courts, however, have stuck to the line suggested by the relevant passage in *PNB*—balancing within a market is permitted, but balancing across market lines is not. In the class-action follow-on litigation to the FTC's challenge to Whole Foods's acquisition of Wild Oats,[16] the *PNB* market-specificity issue arose in the context of class certification. Relying on an economist's expert report, Whole Foods argued that individual issues predominated as to whether particular consumers were injured by the anticompetitive effects of the merger—since the merger had varied effects, both positive and negative, on the prices of the different goods in the shopping baskets of premium and organic grocery purchasers/customers.[17] Plaintiffs countered that Whole Foods's argument violated the *PNB* market-specificity rule, since accepting it would mean balancing price decreases for some goods against price increases for other goods. The district court accepted Whole Foods's argument and denied class certification, observing that "[t]he issue here . . . is not whether to offset harms in one market with benefits in another, but whether to count benefits against harms in the *same* market—indeed in the same shopping basket."[18]

The market-specificity rule has been explicitly invoked in relatively few judicial decisions. There are several possible explanations for this. It may be that few cases present clear instances of efficiencies in one market and anticompetitive effects in another. It also may be that the *PNB* rule is sufficiently clear that merging parties do not find it worth their while to advance balancing arguments that would likely fail. Or, it may be an artifact of the reality that, subsequent to the passage of the Hart-Scott-Rodino Act, relatively few merger cases have been litigated to the point of judicial decision.[19] If that is the case, the rule may still be doing important work behind the scenes in negotiations between the agencies and merging parties.

---

[16] Kottaras v. Whole Foods Mkt., Inc., 281 F.R.D. 16 (D.D.C. 2012); *see also* Larry V. Muko, Inc. v. Sw. Pa. Bldg. & Constr. Trades Council, 670 F.2d 421, 439 (3d Cir. 1982) (Sloviter, J., dissenting) (accusing majority of violating *PNB* market-specificity rule by balancing procompetitive effects in one market against anticompetitive effects in another).

[17] *Kottaras*, 281 F.R.D. at 24–25.

[18] *Id.* at 25.

[19] *See* DANIEL A. CRANE, THE INSTITUTIONAL STRUCTURE OF ANTITRUST ENFORCEMENT 93–94 (2011).

### C. MARKET-SPECIFICITY AND THE MERGER GUIDELINES

The 2010 Horizontal Merger Guidelines continue the practice of previous guidelines of articulating the market-specificity rule as a general matter but then asserting that the agencies may waive the rule in their prosecutorial discretion:

> The Agencies normally assess competition in each relevant market affected by a merger independently and normally will challenge the merger if it is likely to be anticompetitive in any relevant market. In some cases, however, the Agencies in their prosecutorial discretion will consider efficiencies not strictly in the relevant market, but so inextricably linked with it that a partial divestiture or other remedy could not feasibly eliminate the anticompetitive effect in the relevant market without sacrificing the efficiencies in the other market(s). Inextricably linked efficiencies are most likely to make a difference when they are great and the likely anticompetitive effect in the relevant market(s) is small so the merger is likely to benefit customers overall.[20]

How frequently the agencies invoke this prosecutorial discretion in practice is difficult to say. The exercise of discretion to waive the market-specificity rule will likely only show up in a case in which the agencies are not challenging the merger and, hence, there will usually be no formal articulation of the agencies' view regarding the relevant markets. Further, to the extent that delineation of relevant markets has taken a back seat in the 2010 Merger Guidelines (or in the agencies' de facto practices for some time),[21] that is a decreasingly important topic for discussions between the merging parties and the agencies. The market-specificity rule implies bright lines of demarcation around distinct relevant markets in which to consider the balance of pro- and anticompetitive effects, but those lines are increasingly blurred in modern merger practice.

### II. JUSTIFICATIONS FOR THE MARKET-SPECIFICITY RULE

The *PNB* decision spends all of a paragraph articulating the market-specificity rule. The Areeda-Hovenkamp treatise, moreover, admits that "[a]t first blush it could be argued that a merger should be assessed in terms of its net welfare effects in all markets affected and should be absolved where substantial economies in one market out-weigh adverse competitive effects in others."[22] However, the authors generally support the market-specificity rule for "statutory, administrative, and practical reasons" except in "rare excep-

---

[20] U.S. Dep't of Justice & Fed. Trade Comm'n, Horizontal Merger Guidelines ¶ 10, at 30 n.14 (2010) [hereinafter Merger Guidelines], *available at* www.justice.gov/atr/public/guidelines/hmg-2010.html.

[21] *See generally* Howard Shelanski, *Information, Innovation, and Competition Policy for the Internet*, 161 U. PA. L. REV. 1663, 1673 (2013) (explaining agencies' "retreat from formulaic reliance on market definition").

[22] 4A AREEDA & HOVENKAMP, *supra* note 2, ¶ 972a, at 49.

tional case[s]," generally when anticompetitive effects in one market are trivial in proportion to the procompetitive gains in another.[23] The treatise thus articulates a general presumption in favor of the market-specificity rule, but instantly proposes a loophole. This suggests that the justifications for the rule are less than watertight.

### A. Slippery Slope to Monopoly

As noted earlier, *PNB*'s rejection of balancing effects across markets rested on the assertion that such balancing inevitably would lead to mergers creating undue market concentration, since small firms could always justify their mergers as merely ramping up to par with the industry leader. The Court's concern was overstated. The balancing proposed by PNB and Girard would apply only in a case where the merger had simultaneous effects in two markets, procompetitive in one and anticompetitive in the other. In practice, such cases will be relatively rare. Further, one could not justify the merger simply by showing that it produced procompetitive effects in another market. One would have to show that the procompetitive effects in the other market outweighed the anticompetitive effects in the market raising concerns. Recall that the Court in *PNB* asserted that, in any event, the merger would not materially improve the credit options for large Philadelphia businesses, since they could always borrow from banks in New York or elsewhere.[24] In that event, the merger should have been blocked even if balancing across markets were allowed in principle—which undermines the Court's assertion that the slippery slope would be inevitable. Even if the Court were wrong and Philadelphia businesses would see some reduction in their cost of capital by virtue of having available a Philadelphia bank with enhanced lending limits, that efficiency might be considerably smaller than the anticompetitive effects from a loss of competition between PNB and Girard in the Philadelphia market, manifested in higher borrowing costs to individuals and smaller businesses.

The Court's real concern may have been a little different than the one it expressed—that balancing efficiencies against anticompetitive aspects from loss of rivalry as a general matter (and not merely across markets) would inevitably lead to the justification of a rising tide of concentration in the banking industry and elsewhere. *PNB* was decided only a year after *Brown Shoe*, in which the Court held that vertical integration between a shoe manufacturing company and a shoe retailer counted against a vertical merger since "by eliminating wholesalers and by increasing the volume of purchases from the manufacturing division of the enterprise, [the merging parties] can market

---

[23] *Id.* at 49, 50–53.
[24] *Supra* text accompanying note 9.

2015]             BALANCING EFFECTS ACROSS MARKETS                    403

their own brands at prices below those of competing independent retailers."[25] Although the Court retreated from hostility to efficiencies in 1967, holding that they counted neither for nor against mergers,[26] *PNB* reflects a more generalized antipathy to efficiencies arguments than the attitude prevailing today.[27]

Even so, the market-specificity rule goes beyond prohibiting balancing efficiencies in one market against anticompetitive effects in another. It prohibits *all* balancing across markets, including enhancements in market competitiveness. Although antitrust lawyers tend to lump all customer-benefiting merger effects into the "procompetitive" category, they can be separated analytically into two distinct subcategories—(1) efficiencies that benefit customers by lowering the costs of production or distribution or enhancing the quality, functionality, or interoperability of a product; and (2) enhancements in the competitiveness of markets because of the entry or expansion of firms that force rivals to lower their costs or increase their quality or output.[28] The kind of procompetitive effect claimed in *PNB* was of the latter variety. PNB and Girard did not merely claim that Philadelphia businesses would benefit because the combined bank would have increased lending limits. They claimed that the market for large business banking throughout the Mid-Atlantic and Northeastern regions would become more competitive because the merged firm would become a serious rival to New York banks—not just for customers in Philadelphia but for customers in the entire region. Whatever the objections to allowing efficiencies to offset anticompetitive effects in merger analysis, it is harder to see the objection to allowing enhancements in rivalry to count in favor of a merger that is being opposed on the theory that it will diminish rivalry.

### B. STATUTORY LANGUAGE

The Areeda-Hovenkamp treatise defends the market-specificity rule on the ground that Section 7 of the Clayton Act declares unlawful acquisitions that

---

[25] Brown Shoe Co. v. United States, 370 U.S. 294, 344 (1962).
[26] FTC v. Procter & Gamble Co., 386 U.S. 568, 580 (1967) ("Possible economies cannot be used as a defense to illegality. Congress was aware that some mergers which lessen competition may also result in economies but it struck the balance in favor of protecting competition.").
[27] *See generally* Daniel A. Crane, *Rethinking Merger Efficiencies*, 110 MICH. L. REV. 347 (2011).
[28] It was in the latter sense that Justice Brandeis referred to "promot[ing] competition" in his classic enunciation of the rule of reason. Chi. Bd. of Trade v. United States, 246 U.S. 231, 238 (1918) ("The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition."). Brandeis observed that the call rule at issue in *Board of Trade* "increased the number of country dealers engaging in this branch of the business," *id.* at 240, meaning that it made the market more competitive by bringing more participants into the market. Whether or not the call rule actually achieved this result is somewhat doubtful. *See* ROBERT H. BORK, THE ANTITRUST PARADOX: A POLICY AT WAR WITH ITSELF 44–46 (1978).

have anticompetitive effects "in any line of commerce in any section of the country."[29] In the authors' view, "the statute thus plainly contemplates that mergers may involve more than one market, yet it turns legality on a separate market-by-market approach."[30] The treatise finds this parsing of the statutory text further supported by the Celler-Kefauver Act's legislative history.[31]

If the treatise's statutory interpretation argument is correct, then it forecloses *any* balancing across market lines, including in the rare cases where the authors would like to see it happen.[32] It also forecloses any balancing *within* a relevant market that includes submarkets, since submarkets are considered a "line of commerce" for Section 7 purposes.[33] This would mean that a merger would be prohibited if it produced welfare gains to 99 percent of the buyers in a relevant market but also enabled the merged firm to raise prices to 1 percent of buyers in the market with particularly inelastic demand (at least if those buyers constitute a submarket).

For better or worse, however, disciplined textual exegesis has rarely characterized Section 7 jurisprudence. For example, under Supreme Court precedent, it is permissible to alternate between demand side and supply side evidence in defining a relevant market and considering the anticompetitive effects of defendant's conduct,[34] as the Court did in *Grinnell*[35] and *Continental Can*.[36] If the Court in *Continental Can* could consider evidence "cut[ting] across industry lines" in order to make "an adequate determination of the merger's true impact"[37] for the purpose of determining anticompetitive effects, then surely the same could be done for purposes of determining procompetitive effects.

In any event, as stressed in the Merger Guidelines,[38] whether or not the merging parties could prevail in court based on a balancing of effects across

---

[29] 4A AREEDA & HOVENKAMP, *supra* note 2, ¶ 972a, at 46 (citing 15 U.S.C. § 18).

[30] *Id.*

[31] *Id.*

[32] *Id.* ¶ 972c, at 52 (suggesting that mergers should be allowed in cases "where the threatened market is significantly smaller than the benefitted market [and] a tiny efficiency gain in the latter would . . . dwarf a significant loss in the former").

[33] Brown Shoe Co. v. United States, 370 U.S. 294 (1962).

[34] 2B PHILLIP E. AREEDA, HERBERT HOVENKAMP & JOHN L. SOLOW, ANTITRUST LAW: AN ANALYSIS OF ANTITRUST PRINCIPLES AND THEIR APPLICATION ¶ 561, at 360 (3d ed. 2007); *see also In re* Live Concert Antitrust Litig., 247 F.R.D. 98 (C.D. Cal. 2007) (discussing use of supply side factors in defining relevant market).

[35] United States v. Grinnell Corp., 384 U.S. 563, 575–76 (1966) (finding that relevant geographic market was national because, even though fire and burglary services were sold on a local basis, the services were planned and fees were set on a national basis).

[36] United States v. Continental Can Co., 378 U.S. 441, 456–57 (1964) ("Where the area of effective competition cuts across industry lines, so must the relevant line of commerce; otherwise an adequate determination of the merger's true impact cannot be made.").

[37] *Id.*

[38] Merger Guidelines, *supra* note 20.

Case 1:23-cv-10511-WGY   Document 201-13   Filed 09/20/23   Page 11 of 17

market lines, the agencies have prosecutorial discretion to engage in such balancing when deciding whether to bring a case. Since relatively few merger cases ever make it to litigation, the important practical question is whether the agencies can be persuaded to think outside the lines of defined markets in analyzing the likely effects of any given merger. Their guidelines suggest that they can, although they may be reluctant to do so as a general matter.

C. REFUSAL TO TRADE OFF WELFARE AMONG CLASSES OF CONSUMERS

Areeda and Hovenkamp further justify the market-specificity rule on the ground that antitrust law should be reluctant to trade off the welfare of some consumers against those of others: "[T]o balance gains in one market against potential losses in another would necessarily favor one group of consumers over another, a decision not ordinarily involved in the single-market case."[39]

As a general matter, it is true that antitrust law avoids balancing the interests of different classes of consumers,[40] although even procompetitive mergers often create differential effects (some positive and some negative) for different classes of consumers. For example, consider a merger between two clothing companies that induces the merged firm to shift its brands to a more upscale position, thus increasing the competitiveness of the upscale segment of the market but correspondingly decreasing the competitiveness of the downscale segment. Deciding whether the merger is procompetitive overall does not depend on evaluating the effects on particular customers in different portions of the market, even though customers will be differentially affected. Rather, the required analysis focuses on net price effects within the overall market.

But even if it would be unsavory to balance the interests of competing groups of consumers explicitly, it is far from inevitable that deviating from the market-specificity rule would require such balancing. This objection assumes that we have different customers in the different markets affected by the merger—a condition that was likely true in *PNB* itself, where large business customers stood to benefit, but small businesses and individuals stood to lose. In many cases, however, the merger's effects overlap complementary markets in which the customers largely overlap. In such cases, the customers themselves would likely prefer to have the merger's effects evaluated in their totality and not to see the analysis spliced market-by-market.

---

[39] 4A AREEDA & HOVENKAMP, *supra* note 2, ¶ 972a, at 49.

[40] *See* Daniel A. Crane, *Technocracy and Antitrust*, 86 TEX. L. REV. 1159, 1213–14 (2008) (explaining why antitrust law does not generally require balancing the interests of some consumers against the interests of other consumers).

Consider, for example, the FTC's recent enforcement decision in Nielsen/Arbitron.[41] Nielsen's core business is providing syndicated television audience measurement data (the "Nielsen ratings"). Arbitron's core business is providing syndicated radio audience measurement data ("Arbitron certified number one!"). The Commission pointed to no evidence that, absent the merger, Nielsen was likely to enter the radio ratings business or that Arbitron was likely to enter the television ratings business. The Commission, however, obtained a consent decree with respect to a potentially emerging market called "cross-platform measurement," defined as services that "report the overall unduplicated audience size (i.e., reach) and frequency of exposure for programming content and advertisements across multiple media platforms, with corresponding individual audience demographic data."[42] Cross-platform measurement thus relates audience consumption of content on one platform, such as television, radio, or online, to audience consumption of the same content on another platform (i.e., television, radio, or online).

Almost any customer interested in cross-platform measurement would also be a customer for audience measurement in at least two of the platforms that cross-platform measurement connects. Thus, for example, a customer interested in measurements evaluating the relationship between simultaneous advertising campaigns in television and radio measurement would also be a customer for the basic television and radio audience measurement services. Thus, if the merger hypothetically improved the quality of television and radio audience measurement but reduced somewhat competition for measuring across the television and radio spaces, any customers adversely affected in the cross-platform space would also be positively affected in the basic television and radio ratings segments. In determining whether they support or oppose the merger, such customers would naturally consider the net effect on their business—i.e., balance effects across markets.

Several important media customers publicly supported the merger. For example, David Poltrack, the top market researcher for CBS, who has been called the "E.F. Hutton in media research," publicly endorsed the deal in a *Media Post* interview.[43] CBS owns many properties in both radio and television and subscribes to ratings services for both those markets. According to the *Media Post* article, CBS would thus have a natural interest in the develop-

---

[41] Analysis of Agreement Containing Consent Order to Aid Public Comment, Nielsen Holdings N.V., FTC File No. 131-0058 (Sept. 20, 2013), *available at* www.ftc.gov/os/caselist/1310058/index.shtm, Nielsen Holdings N.V., FTC File No. 131-0058 (Sept. 20, 2013). The author represented Nielsen with respect to this transaction. All views expressed about the merger are solely my own and are based on facts available in the public record.

[42] *Id.* at 2.

[43] David Goetzel, *CBS' Poltrack Backs Nielsen-Arbitron Deal*, Media Post Blogs (June 11, 2013), www.mediapost.com/publications/article/ 202223/#axzz2holo5T9G.

ment of cross-platform measurement as well. Even though some industry participants had concerns over the effects of the merger on cross-platform measurement, Poltrack strongly endorsed the deal, focusing on its procompetitive benefits for radio measurement in particular.

Suppose Poltrack's response was representative and that most customers in the industry would see net benefits to their business from the merger, even if it reduced competition for cross-platform measurement. Would it still be sensible to prohibit balancing of effects across market lines if that was the way customers that purchase the relevant services would make their own evaluations? To take an even stronger example, consider a defense industry merger with essentially one customer—the federal government. If the Defense Department concluded that, on net, the merger would be beneficial to its interests even if it diminished competition in some markets, it would support the merger.[44] This is not to say that the customer support for a merger necessarily requires approving the deal,[45] but the fact that a customer considers a deal's net effects should be suggestive in considering how best to protect the interests of customers.

This observation would only serve as a qualification to the market-specificity rule in cases where the effects of a merger are distributed across common customers in the different affected markets. It would not challenge the Supreme Court's use of the market-specificity rule in *PNB* itself.

### D. MAXIMIZING WELFARE EFFECTS

The Areeda-Hovenkamp treatise argues that balancing across markets is usually not required because society can obtain the maximum benefits resulting from procompetitive mergers by requiring divestures or conduct remedies in any market raising anticompetitive concerns—even while allowing the merger to proceed and thus capturing the gains in markets requiring no fix.[46] Thus, suppose the merger would produce a procompetitive effect in Market A worth $5 and an anticompetitive effect in Market B worth –$2, with a net gain to society of $3. Under a balancing approach, the merger should be approved. However, if courts and agencies refused balancing and instead required a fix (either through divestiture or conduct remedy) that brought Market B to a net competitive effect of zero, the net gain to society from the merger would be

---

[44] *See* Tom Campbell, *Bilateral Monopoly in Mergers*, 74 ANTITRUST L.J. 521, 531 (2007) (discussing Defense Department support for LTV's attempted acquisition of Grumman and FTC's opposition).

[45] *See id.*

[46] 4A AREEDA & HOVENKAMP, *supra* note 2, at 50.

$5 rather than $3. Thus, refusing to balance may increase the net gains to society from the merger.[47]

Before turning to the merits of this argument in cases where it might apply, observe that in some cases it simply will not be applicable. Divestiture or conduct remedies are not available to fix competition problems in every merger case. As the Areeda and Hovenkamp treatise recognizes, it is unlikely a fix was available in *PNB* itself.[48]

Even as to cases where such remedies are available, the argument suggests a conception of antitrust law that is not obvious. It implies that merging parties have a duty not merely to avoid reducing net consumer welfare but to optimize it—at least in those cases in which the agencies can identify some reduction in competition in some sector. Even a merger that would advance net consumer welfare could be challenged on the ground that it could advance consumer welfare more.

The question of whether antitrust law requires welfare optimization or simply prohibits welfare reduction is not limited to the context of balancing merger efficiencies across markets. It is analogous to the question of whether rule of reason analysis requires parties justifying a restraint of trade to show that the restraints were the least restrictive alternative available to advance the relevant procompetitive interest. Analytically, such a question would not arise unless it were assumed that the restraint in question generated more social benefit than harm. Otherwise, the restraint should be condemned even if it were the least restrictive means of achieving the relevant efficiency. So in both the merger and rule of reason context, the question is whether a restriction on competition that produces a net benefit to society must minimize any collateral damage to competition or is simply permissible on the theory that antitrust law only prohibits acts that reduce net social welfare.

In the rule of reason context, this question is unsettled. Lower courts often say that the rule of reason requires consideration of less restrictive alternatives in deciding whether a restraint on competition is justified by procompetitive justifications.[49] But dissenting from the denial of certiorari in a case pitting the National Football League against the North American Soccer League, Justice Rehnquist complained that the Second Circuit had improperly read a least

---

[47] The net social gain may be less than the $5 postulated since it may be expensive for the merging parties to fix the competition problem in Market B. The treatise would disregard such private costs, *id.*, presumably on the theory that they do not have a negative effect on consumer welfare.

[48] 4A Areeda & Hovenkamp, *supra* note 2, at 50.

[49] *See, e.g.*, Realcomp II, Ltd. v. FTC, 635 F.3d 815, 825 (6th Cir. 2011); Ark. Carpenters Health & Welfare Fund v. Bayer AG, 604 F.3d 98, 104 (2d Cir. 2010); Gregory v. Ft. Bridger Rendezvous Ass'n, 448 F.3d 1195, 1205 (10th Cir. 2006).

2015]             BALANCING EFFECTS ACROSS MARKETS              409

restrictive alternative analysis—akin to that employed in strict scrutiny contexts in constitutional law—into the rule of reason.[50] Rehnquist argued that "[t]he antitrust laws impose a standard of reasonableness, not a standard of absolute necessity."[51] For their part, the FTC and the Antitrust Division do not demand a showing that the restraint was essential to achieving the efficiencies but merely that the efficiency could not have been achieved by "practical, significantly less restrictive means."[52] By the same token, in the merger efficiencies context, the agencies consider whether alternative solutions could have achieved the efficiencies in a manner less harmful to competition, but then specify that only reasonable and practical alternatives should be considered.[53] Hence, in both their competitor collaboration and merger guidelines, the agencies consider less restrictive alternatives but do not require strict optimization of social welfare.

However closely one might insist that the means fit the ends in the antitrust context, it is hard to see why the market-specificity rule should flatly prohibit inter-market balancing rather than simply require that any reductions in competition be reasonably necessary to achieve relevant efficiencies. In other words, one could say that a merger that produces a large benefit to consumer welfare in Market A and a small diminution in consumer welfare in Market B should not be allowed to proceed unconditionally if a fix (divestiture or conduct commitment) in Market B would alleviate the anticompetitive concern. The underlying rationale would be that the anticompetitive effects in Market B are not reasonably necessary to achieving the procompetitive effects in Market A. Such an approach, however, would not prohibit balancing effects across markets in the event that anticompetitive effects in Market B could not be reasonably fixed without jeopardizing the economics of the merger.

### E. ADMINISTRABILITY

The most convincing justification for a market-specificity rule is that balancing pro- and anticompetitive effects across market boundaries unduly in-

---

[50] Nat'l Football League v. N. Am. Soccer League, 459 U.S. 1074, 1079 (1982) (Rehnquist, J., dissenting).

[51] *Id.*

[52] Fed. Trade Comm'n & U.S. Dep't of Justice, Antitrust Guidelines for Collaborations Among Competitors § 3.36(b) (2000), *available at* www.ftc.gov/os/2000/04/ftcdojguidelines.pdf.

[53] Merger Guidelines, *supra* note 20, § 10 ("The Agencies credit only those efficiencies likely to be accomplished with the proposed merger and unlikely to be accomplished in the absence of either the proposed merger or another means having comparable anticompetitive effects. These are termed merger-specific efficiencies. Only alternatives that are practical in the business situation faced by the merging firms are considered in making this determination. The Agencies do not insist upon a less restrictive alternative that is merely theoretical.").

creases the complexity of antitrust decision making.[54] The increases in complexity may do more than simply impose costs on agencies, courts, and parties. They may also bias decision making in favor of anticompetitive mergers. The concern would be that if decision makers are required to balance all relevant effects before disapproving a merger and cannot confidently say that the effects are (on balance) negative, the tendency may be to approve a supra-optimal set of mergers.

In evaluating this objection, it is important to distinguish between two kinds of balancing prohibited by *PNB*. First, there is the kind under discussion here—balancing procompetitive effects in one market against anticompetitive effects in another. But there is also a second kind of possible balancing—examining the broad socio-economic effects of a merger and weighing them against the direct effects on prices or output. In *PNB*, the banks argued that their merger would stimulate economic development in Philadelphia with broad socio-economic benefits redounding to the entire geographic region.[55] The Court rejected this argument, holding that "a merger the effect of which 'may be substantially to lessen competition' is not saved because, on some ultimate reckoning of social or economic debits and credits, it may be deemed beneficial. A value choice of such magnitude is beyond the ordinary limits of judicial competence . . . ."[56]

The administrative concerns for the second kind of balancing are far more pronounced than for the first. Price increases resulting from a merger and spillover socio-economic effects are incommensurable given the price-theoretic techniques of antitrust analysis. The same is not necessarily true of price effects in two related markets. Indeed, "all" that is needed to compare price effects in two markets is information about total revenues, demand elasticities, and predicted effects of the merger on prices. I put "all" into quotation marks because elasticities are often hard to calculate and merger effects hard to predict. But *if* it can be done in a particular case as to the two markets in question, the comparisons are not difficult to make. The question is just whether the procompetitive price effect exceeds the anticompetitive price effect.

Further, some of the concerns over uncertainty, administrative costs, and systemic bias in favor of allowing mergers can be addressed by placing on the merging parties the burden of proving that the balancing favors allowing the merger. The administrative obstacle to balancing effects across markets would

---

[54] 4A AREEDA & HOVENKAMP, *supra* note 2, at 50 ("[A]dministrative and practical considerations point strongly against taking a balancing approach. In all but clear cases, it would be difficult enough to determine a merger's probable net welfare consequences in a single market; one must rely on general probabilities. The difficulties of balancing effects in different markets are even more severe.").

[55] 374 U.S. at 371.

[56] *Id.*

2015]             BALANCING EFFECTS ACROSS MARKETS                411

be greatest if the government were required to prove as part of its prima facie case that the merger yielded a net diminution in consumer welfare across markets. But it would be less cumbersome if the *PNB* rule were preserved as to the government's prima facie case—the government merely has to show that the merger produces anticompetitive effects in at least one market—but the defendants were allowed a rebuttal opportunity to show that the merger increases welfare across markets.

## III. CONCLUSION

*PNB's* market-specificity rule makes sense as a means of preventing merger analysis from descending into uncontrollable and unresolvable complexity. On the other hand, as both the Merger Guidelines and the Areeda-Hovenkamp treatise suggest, there will be times when mechanical application of the rule would require prohibition of mergers that would significantly increase consumer welfare. The market-specificity rule is best operationalized as a rebuttable presumption—which appears to be largely the way the antitrust agencies have treated it.