IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA, *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>JETBLUE AIRWAYS CORPORATION and SPIRIT AIRLINES, INC.,<br><br>*Defendants*. | Civil Action No. 1:23-cv-10511-WGY |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS'
MOTION IN LIMINE TO EXCLUDE CERTAIN DOCUMENTS**

In the spring of 2022, and well before the spotlight of litigation, Spirit had a view of a proposed merger between itself and JetBlue. It freely shared that view with the world, its shareholders, and regulators. Spirit spent months attempting to convince shareholders to vote against JetBlue's attempt to acquire Spirit in a hostile takeover. In presentations to shareholders that were ultimately filed with the Securities & Exchange Commission ("SEC"), Spirit admitted that a JetBlue acquisition of Spirit would harm competition.

Rather than square Spirit's prior admissions about a JetBlue/Spirit transaction with its crafted litigation narrative, Defendants now seek to exclude "at least 30 documents on Plaintiffs' exhibit list." Although Defendants' motion did not identify these documents, Defendants

1

informed Plaintiffs that they seek to exclude exhibits P0697,[1] P0572,[2] and P0570,[3]—which are three Spirit investor presentations, dated May 5, May 23, and May 25, 2022, respectively—as well as Spirit executive testimony about these and other unidentified exhibits.[4] Dkt. 176 at 1 (hereafter, "Defs. Proxy MIL").

Defendants' motion should be denied. Spirit's executives, who owe the company and its shareholders fiduciary duties, made clear and unequivocal statements about a variety of subjects that are now at issue in this litigation. These investor presentations and testimony from Spirit executives are highly probative contemporaneous evidence that speak directly to issues to be decided by the Court, including, for example: that JetBlue is a "key competitor" of Spirit; that the transaction is likely to result in higher fares and reduced capacity; that the "Spirit Effect" (*i.e.*, the downward effect on prices caused by Spirit's entry into a market) has a larger and longer-lasting impact on fares than the "JetBlue Effect"; and that Spirit had viable and aggressive plans to grow if it were not acquired by JetBlue. These statements are all material to whether JetBlue's acquisition of Spirit violates Section 7 as its effect "may be substantially to lessen

---

[1] Ex. A, Spirit Airlines, Inc., SEC 425 Filing, "Rejected Proposal from JetBlue is Illusory and Not Superior" (May 5, 2022).

[2] Ex. B, Spirit Airlines, Inc., SEC 425 Filing, "Creating America's Most Competitive Ultra-Low Fare Airline" (May 23, 2022).

[3] Ex. C, Spirit Airlines, Inc., SEC 425 Filing, "Spirit + Frontier: Creating America's Most Competitive Ultra-Low Fare Airline" (May 25, 2022).

[4] On its face, Defendants' motion *in limine* states that they seek to exclude "certain documents" but Defendants' motion does not identify the "at least 30 documents on Plaintiffs' exhibit list" they seek to exclude. Defs. Proxy MIL at 3 n.1. Based on Defendants' representations made by email, on September 8, 2023, Plaintiffs' understanding is that there are three exhibits that Defendants seek to exclude (P0697, P0572, and P0570), all of which were publicly filed by Spirit with the SEC. Defendants' motion also seeks to exclude "certain deposition testimony of Messrs. Christie, Morgan, Gardner, Gorelik, and Gable [sic]." Defs. Proxy MIL 3 n.1. Defendants' reference to deposition testimony of "Mr. Morgan" is puzzling; no one named Mr. Morgan was deposed in this case. Nor do Defendants explain how the testimony of Ms. Alla Gorelik, a JetBlue employee, relates to Spirit's purported "Proxy Fight Evidence."

competition, or to tend to create a monopoly." 15 U.S.C. § 18. As such, the documents containing these statements are admissible under Federal Rules of Evidence 402.

Furthermore, each statement Plaintiffs seek to admit is a statement by Spirit, a party-opponent in this case. *See* Fed. R. Evid. 801(d)(2). Those statements include testimony from Spirit's senior executives with personal knowledge—including its Chief Executive Officer and the Chair of its Board of Directors. Those statements also include written materials created by Spirit's senior management, adopted by its Board of Directors, distributed to its shareholders, and ultimately filed with the SEC. The testimony and written materials are all statements of a party-opponent. The limitations of Rule 701 and Rule 704 do not apply to party-opponent statements and therefore do not affect the Court's analysis. *See Life Plans, Inc. v. Sec. Life of Denver Ins. Co*. 2017 WL 106109, at *1 (N.D. Ill. Jan. 11, 2017) ("The statements come in as party admissions, which are an exception to the hearsay rule, regardless of whether in the form of opinions. This is the case even as to what might be considered mixed questions of fact and law that are relevant to the ultimate issue, such as the validity of Plaintiff's case against Defendants.").

Rule 403 also does not bar introduction of statements at issue. It would not be a "waste of time" to admit Spirit's own contemporaneous statements acknowledging that Defendants' proposed acquisition would harm competition. Indeed, such statements are likely most probative of Spirit's assessment of its own competitive role in the airline industry and the impact of the proposed acquisition on the competition its presence engenders. Rule 403 does not provide protection for litigants who would rather not explain away contemporaneous statements in favor of carefully curated, subsequent statements. Plaintiffs, who bear the burden of proof, are entitled to put on evidence that depicts a complete picture of the transaction at issue and Defendants, like

any litigants, will have an opportunity to challenge Plaintiffs' evidence through cross-examination and their own witnesses. Far from a "waste of time," the evidence at issue is central to the issues to be decided by the Court and there is no basis in law or fact for Defendants to attempt to shield this evidence and testimony from the Court.

## BACKGROUND

Defendants' motion seeks to exclude "at least 30 documents on Plaintiffs' exhibit list," including three Spirit investor presentations, dated May 5, May 23, and May 25, 2022, and related testimony. Because Defendants have not identified to Plaintiffs the additional documents they seek to exclude, this brief focuses on exhibits P0697 (Ex. A to Declaration of Edward Duffy), P0572 (Ex. B), and P0570 (Ex. C), and the deposition testimony of Messrs. Christie, Gardner, Bartolotta, and Gabel. These documents were created after Spirit had agreed to merge with another airline, Frontier, but while JetBlue was trying to persuade Spirit's shareholders to reject the Frontier deal in favor of JetBlue's offer to acquire Spirit. During this "proxy fight," Spirit made several public statements that were critical of a potential acquisition of Spirit by JetBlue to persuade its shareholders to reject that deal.

### 1. Spirit's May 5, 2022, Investor Presentation (P0697, Ex. A)

During a May 5, 2022, earnings call, Spirit's management used a presentation titled "Rejected Proposal from JetBlue is Illusory and Not Superior" to explain why Spirit shareholders should reject JetBlue's proposal to acquire Spirit. *See* Ex. A. Spirit also submitted this May 5 presentation to the SEC. The presentation includes several relevant statements about the acquisition challenged in this case, including:

- Statements about the competition at stake between Spirit and JetBlue, their comparative costs and fares, and JetBlue's post-transaction plans to increase fares and reduce capacity. *See, e.g.*, Ex. A at slide 2.

> At its core, the JetBlue proposal represents a <u>high-cost, high-fare airline buying a low-cost, low-fare airline</u> with half the synergies coming from reduced capacity and increased fares

- Statements about how JetBlue's claims with respect to the "JetBlue Effect" overstate JetBlue's competitive significance. *See, e.g., id.*

> JetBlue's claim about the <u>so-called "JetBlue Effect"</u> is based on economic modeling that Spirit believes has significant defects and <u>overstates the impact</u> of JetBlue on legacy carriers

- Statements about how competition from Spirit led to reductions in JetBlue's fares. *See, e.g., id.* at slide 4.



- Statements about how JetBlue is a "key competitor" of Spirit. *See e.g., id.* at slide 2.

> JetBlue's acquisition of Spirit would <u>eliminate a key competitor and a vocal public opponent</u> of JetBlue's anticompetitive NEA deal

Spirit executives also testified about the May 5, 2022, presentation, conceding the following relevant facts:

- Spirit has more seats on comparable aircraft than JetBlue, and Spirit understood at the time that JetBlue intended to convert Spirit aircraft to the JetBlue configuration. Ex. D, Christie Lit. Dep. Tr. 228:15-24; Ex. E, Gardner Lit. Dep. Tr. 173:12-18.

- JetBlue's current plan is ▮▮▮▮▮▮▮▮▮▮. Ex. F, Ursula Hurley Lit. Dep. Tr. 295:16-18 ("▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮."); *id.* 300:17-22 (testifying that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮).

- Reconfiguring Spirit's planes to conform to the JetBlue seat layout would result in increased fares because there would be less supply in the market. *See, e.g.*, Ex. E, Gardner Lit. Dep. Tr. 173:12-18; Ex. D, Christie Lit. Dep. Tr. 269:11-19.

- Half of the purported "synergies" from the JetBlue/Spirit transaction come from higher fares and reduced capacity. Ex. E, Gardner Lit. Dep. Tr. 121:20–123:13; Ex. D, Christie Lit. Dep. Tr. 238:2-11.[5]

- When Spirit flies JetBlue routes, Spirit constrains JetBlue's prices. *See* Ex. G, Bartolotta 30(b)(6) Lit. Dep. Tr. 18:15–19:6; *see also* Ex. E, Gardner Lit. Dep. Tr. 126:13-18.

### 2. Spirit's May 23, 2022, Investor Presentation (P0572, Ex. B)

In a further attempt to convince their shareholders to reject JetBlue's offer, Spirit executives made another investor presentation, "Creating America's Most Competitive Ultra-Low Fare Airline," on May 23, 2022. Spirit likewise submitted this presentation to the SEC, and it includes several additional relevant statements, including:

- Statements about how JetBlue is a "high-fare carrier," (Ex. B at slides 3, 7) that was "trying to buy a low-fare carrier," (*id.* at slide 7), citing the fact that "JetBlue's average prices and passenger yield are higher than those of Spirit in 2019," (*id.*).

---

[5] Spirit made similar admissions in its May 2 and May 19, 2022, press releases, which Defendants cite in the "Background" section of their brief but failed to attach. *See* Ex. H (Spirit's May 2, 2022, press release stating "the conversion of Spirit aircraft to JetBlue configuration will result in significantly diminished capacity on former Spirit routes, also resulting in higher prices for consumers"); *see also* Ex. I (May 19, 2022, press release provided to Spirit Board); Ex. E, Gardner Lit. Dep. Tr. 115:25–116:14 (agreeing that the conversion of Spirit aircraft to JetBlue configuration will result in significantly diminished capacity on former Spirit routes, also resulting in higher prices for consumers); Ex. J (Spirit's May 19, 2022, press release admitting, again, that the proposed acquisition would "eliminate a lower-cost/lower fare airline and remove about half of the ULCC capacity in the United States," and that the "conversion of Spirit aircraft to JetBlue configuration will result in significantly diminished capacity on former Spirit routes, and, as JetBlue has stated, will also result in higher prices for consumers").

- Statements about how a JetBlue acquisition of Spirit has a "very low transaction certainty," and questioning how the transaction could be consummated when "at its core, a JetBlue transaction would substantially raise fares for consumers." *Id.* at slide 10.



- Statements about how the "JetBlue acquisition removes the largest low-fare competitor, affecting millions of consumers across the U.S." *Id.* at slide 3.

- Statements about how JetBlue "continues to spread misinformation" about the proposed acquisition of Spirit and about how "JetBlue is a high fare airline acquiring a low fare airline and vowing to reduce capacity and increase prices to consumers." *Id.* at slide 21.

- That—win or lose—neither outcome in the NEA litigation "changes the **fact** that JetBlue is a high-fare airline trying to buy a low-fare airline **and raise fares**": *Id.* at slide 6 (emphasis added).



Spirit Executives also testified about the May 23, 2022, presentation, conceding facts about Spirit's low-cost business model, how a JetBlue/Spirit transaction would reduce capacity and increase prices, and how a JetBlue/Spirit transaction would harm price-sensitive customers:

- Spirit's CEO testified that JetBlue's 2019 average fare ($182) was more than *three times* that of Spirit's average fare (excluding ancillary prices). *See* Ex. D, Christie Lit. Dep. Tr. 271:11-24.

- Spirit's CEO testified that JetBlue's average "passenger yield" (which is a "corollary to average fare"), was higher than Spirit's. Ex. D, Christie Lit. Dep. Tr. 272:6–273:12 (discussing Ex. B, at slide 7); *see also* Ex. K, Gabel CID Dep. Tr. 164:4-12 (on average, "[t]he data would show" JetBlue is "a higher-fare carrier than Spirit").

- Spirit's CEO testified that, at the time of the proxy battle, he was concerned "with a reduction in seat capacity that fares could float up, because that's what happens in a supply-and-demand market." Ex. D, Christie Lit. Dep. Tr. 276:24–277:10.

- The Chairman of Spirit's Board testified that the millions of customers that would be negatively affected by the removal of Spirit—JetBlue's largest low-fare competitor— includes price-sensitive customers. Ex. E Gardner Lit. Dep. Tr. 169:4-10.

- Spirit executives testified that ultra-low-cost carriers like Spirit give more consumers the ability to fly. Ex. E, Gardner Lit. Dep. Tr. 169:21–170:1; Ex. D, Christie Lit. Dep. Tr. 102:23–103:8 (noting Spirit's target market are customers who are priced out of other fares); *id.* at 227:11-18 (agreeing that "part of Spirit's customer base [is] price-sensitive passengers who otherwise wouldn't be able to fly with higher-price fares").

### 3. Spirit's May 25, 2022, Investor Presentation (P0570, Ex. C)

Again, on May 25, 2022, Spirit provided an "investor presentation" to Institutional Shareholder Services Inc. ("ISS") and Glass Lewis, two proxy advisor firms. Ex. C at 1. In this presentation, which Spirit subsequently filed with the SEC, Spirit made more relevant statements, including:

- Statements that JetBlue's proposed acquisition of Spirit "will necessarily result in reduced capacity and increased fares to travelers." Ex. C at slide 11.



> The JetBlue proposal presents a substantial hurdle to regulatory approval: it would be a high-cost, high-fare airline eliminating the largest low-cost, low-fare airline, which will necessarily result in reduced capacity and increased fares to travelers.

- Statements admitting that Spirit performed "additional analysis" on the JetBlue Effect, which "found that ULCC entry results in significantly lower absolute fares and its impact is maintained over time; the JetBlue effect, by contrast is smaller in absolute terms and diminishes over time." *Id.*[6]



> The claimed "JetBlue effect" is essentially the same as the effect of ULCC entry if one focuses on the percentage change in average market fares. Spirit's additional analysis found that ULCC entry results in significantly lower absolute fares and its impact is maintained over time; the JetBlue effect, by contrast, is smaller in absolute terms and diminishes over time.

- Statements about how JetBlue's assessment of the proposed transaction do not hold up to third-party scrutiny, according to a Wolfe Research paper. *Id.* at slide 23. And Spirit's adoption of the view that, among 39 shared, nonstop markets between Spirit and JetBlue,

---

[6] Mr. Bartolotta also testified, as Spirit's corporate designee, that at the time of this presentation, Spirit agreed with this analysis of the JetBlue effect. Ex. G, Bartolotta 30(b)(6) Lit. Dep. Tr. 16:12–17:5.

Spirit had the lower fare 82% of the time, and Spirit fares were $58 or 32% lower, on average. *Id.*[7]

> - **On Gap in Fares Between JBLU – SAVE and ULCC – SAVE:** Among 39 shared, nonstop markets between SAVE and JBLU, SAVE had the lower fare 82% of the time, and SAVE fares were $58 or 32% lower, on average. In contrast, fares between ULCC and SAVE, as expected, were far tighter. ULCC has the lower fare in 28 of the 68 shared, nonstop markets and ULCC fares were just $4 lower, on average, or less than 5% lower. **This is arguably one of the biggest hurdles that JBLU is facing. It has consistently higher fares than SAVE, and its acquisition of SAVE would eliminate one of the largest ULCCs in the market.**

## LEGAL STANDARD

Evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence" is relevant (Fed. R. Evid. 401), and relevant evidence is generally admissible (Fed. R. Evid. 402). Relevant evidence may include an opposing party's statements, which are admissible against that party as substantive evidence. *See* Fed. R. Evid. 801(d)(2). Several kinds of statements are admissible when offered against a party, including statements made by the party itself, statements the party "manifested that it adopted or believed to be true," and statements "made by the party's agent or employee on a matter within the scope of that relationship and while it existed." *Id.* Therefore, for example, statements made by corporate executives in the scope of their employment are admissible under Rule 801(d)(2). *See, e.g., Bacou Dalloz USA, Inc. v. Cont'l Polymers, Inc.*, 344 F.3d 22, 29 (1st Cir. 2003) (statements by co-chairman and president); *Tuscaloosa v. Harcros Chemicals, Inc.*, 158 F.3d 548, 557–58 (11th Cir. 1998) (statements made by CEO); *Ryder v. Westinghouse Elec. Corp.*, 128 F.3d 128, 134 (3d Cir. 1997) (same). Similarly, statements in a company's SEC filings are routinely held to be statements of that company for the purpose of Rule 801(d)(2). *See Hernandez v. Wells Fargo &*

---

[7] Mr. Bartolotta testified, as Spirit's corporate designee, that Spirit agreed with the Wolfe Research positions on this slide. *See* Ex. G, Bartolotta 30(b)(6) Lit. Dep. Tr. 14:18–15:1, 15:22–16:1.

10

*Co.*, 2019 WL 3017657, at *5 (N.D. Cal. July 10, 2019); *LifeScan Scotland, Ltd. v. Shasta Techs.*, LLC, 2012 WL 2979028, at *6 n.1 (N.D. Cal. July 19, 2012); *In re Hoopai*, 2007 WL 2460762, at *3 (Bankr. D. Haw. Aug. 27, 2007).

Rule 701, which sets forth requirements for admission of lay opinion testimony, does not render otherwise admissible statements of a party-opponent inadmissible because such statements enjoy "freedom . . . from the restrictive influences of the opinion rule and the rule requiring firsthand knowledge[.]" Fed. R. Evid. 801(d)(2), advisory comm. notes (1972); *see, e.g.*, *Brookover v. Mary Hitchcock Mem. Hosp.*, 893 F.2d 411, 415–18 (1st Cir. 1990) (holding opinions of party's employee were admissible, despite lack of personal knowledge regarding facts that informed opinion); *Integrated Commc'ns & Techs., Inc. v. Hewlett-Packard Fin. Servs. Co.*, 478 F. Supp. 3d 126, 136 (D. Mass. 2020) (party-opponent statement was admissible, noting Advisory Comm. Notes); *Koon-to Pau v. Yosemite Park & Curry Co.*, 39 F.3d 1187, 1994 WL 609421 (Table), at *4 (9th Cir. 1994) ("Admissions of a party opponent need not be based upon personal knowledge and are not subject to rule 701"). Therefore, statements of a party opponent are admissible even when they are in the form of opinion, including opinions about an ultimate issue. *See Russell v. United Parcel Serv., Inc.*, 666 F.2d 1188, 1190 (8th Cir. 1981) (lay opinions of party opponent that "went to the very heart of the issue before the jury" were admissible); *Donlin v. Aramark Corp.*, 162 F.R.D. 149, 150 (D. Utah 1995) ("[A]n admission [of a party opponent] in opinion form may be admissible even if it is an opinion of law."); 6 Handbook of Federal Evidence § 801:15 (9th ed.) ("[Party] [a]dmissions in the form of an opinion are competent, even if the opinion is a conclusion of law.").

Relevant evidence can be excluded under Rule 403 "if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue

delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. However, "Rule 403 does not mean that a court may exclude evidence that will cause delay regardless of its probative value." *Sec'y of Lab. v. DeSisto*, 929 F.2d 789, 795 (1st Cir. 1991). "If the evidence is crucial, the judge would abuse his discretion in excluding it." *Id.*; *see also Specht v. Jensen*, 832 F.2d 1516, 1527 (10th Cir. 1987) (defendant's admission that "we screwed up and now we're in trouble" was admissible, not barred by Rule 403).

## ANALYSIS

### I.   Spirit's Presentations and Related Testimony Are Relevant Party Admissions

The three investor presentations and related testimony that Defendants identified are plainly statements of a party opponent, which are admissible under Rule 801(d)(2) when offered against Spirit. *See*, *e.g.*, *Bacou Dalloz*, 344 F.3d at 29 & n.4. The presentations themselves are corporate statements of Spirit itself, statements that Spirit adopted or believed to be true, and/or statements of Spirit employees (up to and including the CEO) made within the scope and during the duration of their employment. *See* Fed. R. Evid. 801(d)(2). Defendants do not contest these points.

The Spirit statements at issue are also highly probative of the core issues in this case, including whether there is a "reasonable probability" that the effect of JetBlue acquiring Spirit may be to substantially lessen competition. *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962) (construing Section 7 of the Clayton Act, 15 U.S.C. § 18); *see also United States v. Aetna*, 240 F. Supp. 3d 1, 18 (D.D.C. 2017) ("[M]ergers with probable anticompetitive effects are prohibited by the Clayton Act. The government need not prove the alleged anticompetitive effects with certainty." (citations omitted) (internal quotation marks omitted)). Indeed, the statements make concessions about many of the issues commonly contested in merger cases, including (1) the relative prices of the merging firms, (2) what the post-merger market would

look like and whether the merger involves the elimination of a low-cost provider, (3) whether, in the pre-merger world, one merging party's low prices are constraining the ability of the other merging party to raise price, (4) whether the merger may reduce capacity in the relevant markets, and (5) whether the merger may increase prices in the relevant markets. *See, e.g., FTC v. H.J. Heinz Co.*, 246 F.3d 708, 719 (D.C. Cir. 2001); *Aetna*, 240 F. Supp. at 18, 42-47.

## II.  Rules 701 and 704 Do Not Bar Admission of Spirit's Statements

As a threshold matter, Rule 701 cannot bar admission of any of the statements at issue because Rule 701 does not apply to statements of a party opponent. *See, e.g.*, Fed. R. Evid. 801(d)(2), advisory committee's notes to 1972 Proposed Rules. This makes sense because admission of an adversary's prior statements is "the result of the adversary system," *id.*, and premised on the principle that "parties bear the lion's share of responsibility for making or breaking their own cases," *Fischer v. Forestwood Co.*, 525 F.3d 972, 985 (10th Cir. 2008) (quoting 4 Mueller & Kirkpatrick, *Federal Evidence* § 8:44 (3d ed.2007)). For these reasons, the concerns that animate Rule 701 do not apply to statements of a party opponent.

The exemption of party admissions from "the opinion rule," Fed. R. Evid. 801(d)(2), advisory committee's notes, extends to opinions about legal issues and ultimate issues in the case. *See, e.g., Russell*, 666 F.2d at 1190; *Donlin*, 162 F.R.D. at 150. Therefore, Spirit statements that opine about the likely economic effects of being acquired by JetBlue, whether the challenged transaction would harm competition, whether the transaction is likely to be approved by antitrust enforcers, or similar issues, are admissible under Rule 801(d)(2), regardless of whether they satisfy the requirements of Rule 701. *See, e.g.*, Ex. I at -05327977 (chairman of Spirit board: "our view is that the proposed combination of JetBlue and Spirit lacks any realistic likelihood of obtaining regulatory approval"); Ex. L at p.7 (Spirit's CEO, calling JetBlue's post-

13

acquisition plans "extremely problematic from a regulatory narrative perspective" because "[y]ou're taking seats out and raising fares, [and] that's not a pro-consumer pro-competitive argument"); Ex. M (Spirit press release: "JetBlue has already stated it would raise fares and reduce capacity, exactly what the antitrust laws were designed to prevent."). Defendants' citations to cases excluding certain lay opinions are inapposite because they do not address opinions of a party-opponent.[8]

Moreover, Rule 701 is independently inapplicable to many of the Spirit statements at issue because they are not "in the form of an opinion." Fed. R. Evid. 701. For example, statements by Spirit acknowledging that JetBlue fares are higher than Spirit fares, identifying JetBlue as a "key competitor," or observing that JetBlue has "vow[ed] to reduce capacity and increase prices to consumers," are statements of fact, not statements of opinion.

### III.  Rule 403 Does Not Bar Admission of Spirit's Statements

Rule 403 is not a basis to exclude any of the documents or testimony described above. Defendants argue that the admission of Spirit's statements would result in "mini-trials" because these statements were made prior to JetBlue's "additional agreements and concessions" reflected in Defendants' July 28, 2022, merger agreement. Defs. Proxy MIL 2-3, 8, 11-12.

---

[8] None of the cases Defendants cite for their Rule 701 argument address opinions in party-opponent statements. *See* Defs. Proxy MIL 9-11; *United States v. Sanabria*, 645 F.3d 505, 516 (1st Cir. 2011) (opinion of non-party witness); *United States v. Meises*, 645 F.3d 5, 16 (1st Cir. 2011) (opinion of investigative agent); *Lacaillade v. Loignon Champ-Carr, Inc.*, 2011 WL 5520942, at *2 (D.N.H. Nov. 14, 2011) (opinion of non-party witness); *Gonzalez-Tomasini v. U.S. Postal Serv.*, 2022 WL 2816714, at *4 (D.P.R. July 19, 2022) (same); *BanxCorp v. Bankrate, Inc.*, 2019 WL 2098842, at *2–3, n.4 (D.N.J. Mar. 21, 2019), (statements of party's founder, but offered by the party itself); *Adams v. New England Scaffolding, Inc.*, 2015 WL 9412518, at *7-9 (D. Mass. Dec. 22, 2015) (expert opinion); *Carrelo v. Advanced Neuromodulation Sys., Inc.*, 777 F. Supp. 2d 315, 320-321 (D.P.R. 2011) (same); *Chow v. Zimny*, 2014 WL 4964408, at *1 (same); *Santiago Garcia v. Costco Wholesale Corp.*, 2020 WL 8575169, at *6–7 (D.P.R. July 23, 2020) (same); *In re Fresh Del Monte Pineapples Antitrust Litig.*, 2009 WL 3241401, at *12–13 (S.D.N.Y. Sept. 30, 2009) (same); *Town of Lexington v. Pharmacia Corp.*, 2015 WL 1321457, at *6 (D. Mass. Mar. 24, 2015) (not applying Rule 801or excluding party testimony).

*First*, the transaction on which Spirit was commenting is substantially the same transaction at issue in this case, and so no additional "context" is required to admit them into evidence. Defendants contend otherwise, suggesting that Spirit changed its position on the deal due to "additional agreements and concessions" by JetBlue, and that therefore Spirit's earlier statements were about an entirely "different deal." Defs. Proxy MIL 3-4, 8. Not so. The "concessions" that Defendants reference, but do not describe, included terms like a higher fee to be paid to Spirit if the JetBlue deal were to fall apart and a purchase price paid entirely in cash rather than being paid partially in stock, but such changes have nothing to do with whether the proposed transaction would harm competition. All the facts that were the basis of Spirit's prior statements about the deal have remained the same: JetBlue is a higher-fare, higher-cost airline seeking to acquire a lower-fare, lower-cost airline; JetBlue intends to retrofit Spirit planes to match JetBlue's seating configuration; and JetBlue's acquisition of Spirit would reduce capacity and increase fares for passengers who fly on Spirit routes.

Moreover, as a public company, Spirit must present what it believes to be truthful statements to investors and potential investors, a fact Spirit's senior leadership has readily acknowledged. *See, e.g.*, Ex. D, Christie Lit. Dep. Tr. 166:21-23; Ex. K, Gabel CID Dep. Tr. 35:20-36:6 (agreeing that Spirit's process for ensuring accurate statements is effective and that when Spirit makes a public statement, that statement is true to the best of Spirit's knowledge). As a way to exclude clearly relevant, probative, and damaging statements, Defendants' Motion suggests statements made to investors as factual from April to July 2022, were, in fact, "evidence or argument concerning opinions that Spirit offered . . . regarding antitrust objections that might be raised by the Department of Justice ("DOJ") if JetBlue acquired Spirit." Defs. Proxy MIL at 1. As described above, however, the statements in these documents and the accompanying

15

testimony go to issues that are at the heart of the present case and were presented to Spirit's investors as factual. Spirit executives are free to explain at trial why their persistent concerns about the JetBlue deal suddenly vanished or were not, in fact, true. Indeed, far from being a "waste of time," understanding why Spirit reversed course on the JetBlue acquisition would provide the Court a complete picture of Spirit's incentives, biases, and credibility.

*Second*, admission of Spirit's 2022 statements explaining why it opposed a JetBlue-Spirit deal is essential, not wasteful. The fact that Defendants claim to need "many hours" to try to explain why Spirit made so many damning admissions is further argument in support of their admission, not exclusion. That is, the fact that tortured explanations and hand-waving may be necessary for the Defendants to justify their made-for-the-courtroom explanation only suggests that perhaps Spirit's initial assessment to its shareholders was the right one. Moreover, Rule 403 "requires a balance of probative value against the negative consequences of using a particular piece of evidence," and when "evidence is crucial, the judge would abuse his discretion in excluding it." *DeSisto*, 929 F.2d at 795-796. As explained above, the Spirit admissions at issue are crucial because they go to the heart of this case: competition in the relevant markets; quantity and price effects of the proposed acquisition; an analysis of the "JetBlue Effect" and the "Spirit Effect"; and the viability of Spirit's standalone growth projections, among others. The cases Defendants marshal in support of their Rule 403 argument are inapposite because none excluded highly relevant evidence like the statements at issue here. *See, e.g.*, *In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*, 2019 WL 4723730, at *2 (D.P.R. July 29, 2019) (excluding evidence "outside of the evidentiary parameters that the Court has . . . set," which limited its probative

value). Further, many of the cases Defendants cite were jury trials, which raise concerns under Rule 403 that do not apply when the Court is the finder of fact.[9]

Finally, all these statements could be properly used at trial to impeach any Spirit witness who testifies contrary to them, as Plaintiffs expect Spirit witnesses to do. *See*, *e.g.*, *United States v. Meserve*, 271 F.3d 314, 320 (1st Cir. 2001) ("a witness's credibility may be impeached by asking him about prior inconsistent statements"). That these statements can be used for impeachment only underscores why they are also admissible as substantive evidence: they are statements of a party opponent. And because these statements can be used for impeachment, it is unavoidable that the stark inconsistency of Spirit's prior statements with its current position will be aired at trial.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendants' motion *in limine* to exclude certain documents.

---

[9] *See BoDeans Cone Co. v. Norse Dairy Sys., LLC*, 678 F. Supp. 2d 883, 895 (N.D. Iowa 2009); *Ostler v. Codman Rsch. Grp.*, 241 F.3d 91, 96 (1st Cir. 2001); *Park W. Radiology v. CareCore Nat. LLC*, 675 F. Supp. 2d 314, 325 (S.D.N.Y. 2009); *Lund v. Henderson*, 807 F.3d 6, 11-12 (1st Cir. 2015).

Dated: September 20, 2023                                Respectfully submitted,

/s/ Edward W. Duffy
Edward W. Duffy
Arianna Markel
Stephanie E. Pearl
John J. DiMarco
U.S. Department of Justice, Antitrust Division
450 Fifth Street, NW, Suite 8000
Washington, DC 20530
Phone: (202) 812-4723
Facsimile: (202) 307-5802
E-mail: edward.duffy@usdoj.gov


/s/ William T. Matlack
William T. Matlack (MA Bar No. 552109)
Office of the Attorney General
One Ashburton Place, 18th Floor
Boston, MA 02108
Telephone: (617) 727-2200
Email: William.Matlack@mass.gov


/s/ C. William Margrabe
C. William Margrabe (*pro hac vice*)
Assistant Attorney General
Office of the Attorney General
400 6th Street NW, Suite 10100
Washington, DC  20001
Telephone: (202) 727-6294
Email: will.margrabe@dc.gov


*Attorneys for the United States of America, the Commonwealth of Massachusetts, and the District of Columbia, and on behalf of all Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing document, which was filed with the Court through the CM/ECF system, will be sent electronically to all registered participants as identified on the Notice of Electronic Filing.

*/s/* Edward W. Duffy
Edward W. Duffy
U.S. Department of Justice, Antitrust Division
450 Fifth Street, NW, Suite 8000
Washington, DC 20530
Phone: (202) 812-4723
Facsimile: (202) 307-5802
E-mail: edward.duffy@usdoj.gov