UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA, *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> JETBLUE AIRWAYS CORPORATION and SPIRIT AIRLINES, INC., <br><br> *Defendants*. | Civil Action No. 1:23-cv-10511-WGY |

**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE CERTAIN OPINIONS OF DR. TASNEEM CHIPTY**

In defense of JetBlue's proposed acquisition of Spirit, Defendants have asserted, based on JetBlue's 2022 evaluation of the acquisition, that it would produce procompetitive benefits for consumers—even though JetBlue claimed to its board and to investors, based on the very same analyses, that the acquisition would earn it hundreds of millions of dollars from price increases and the elimination of service on routes Spirit currently flies. As part of her assignment, Dr. Tasneem Chipty analyzed the collection of analyses that JetBlue performed to evaluate and justify the transaction internally and to the public. Specifically, she assessed whether JetBlue's analyses, which incorporated its plans and projections for the combined firm (collectively referred to as its "deal modeling"),[1] reflect economic efficiencies that would counteract the

---

[1] These analyses include its combined network plans, its estimations of revenue and cost synergies and dis-synergies, and its plans to slow orders of planes compared to Spirit's standalone plans.

obvious anticompetitive harms from the acquisition.[2] Relying on standard and well-accepted methodologies, she concluded that JetBlue's plans do not reflect procompetitive benefits, as Defendants assert, but JetBlue's own assessment of the anticompetitive effects of the acquisition.

Defendants now claim that Dr. Chipty's analysis of JetBlue's deal modeling is unreliable because it relied too much on representations that JetBlue's executives made to its board and to the investing public (and that JetBlue itself continues to rely on in creating its post-transaction combined network plan). Defendants miss the point. Dr. Chipty begins her analysis by summarizing the documents that support her opinion, but she goes on to independently apply qualitative economic analyses to explain why the fare increases and aircraft redeployment the deal modeling predicts, among other things, reflect anticompetitive harms—not procompetitive benefits. In fact, what Defendants are concerned about is that this case is the rare transaction where the acquirer's own projections demonstrate the acquisition will lead to increased costs and higher prices. The real-world result is that Spirit customers will pay hundreds of millions more each year in higher fares.

Dr. Chipty's opinions are based on reliable, qualitative analyses that apply her expertise to the record in this case. She uses well-established economic principles to analyze whether Defendants' claims constitute economic efficiencies that are capable of offsetting expected harm. Dr. Chipty's opinions are likely to help the Court and are not cumulative. Accordingly, they are clearly admissible under Federal Rule of Evidence 702, and Defendants' motion to exclude a subset of those opinions (Dkt. 177) should be denied.

Defendants' motion should also be denied because it is unclear which of Dr. Chipty's opinions they seek to exclude. Defendants ask that the Court limit Dr. Chipty's trial testimony to

---

[2] Dr. Chipty's other analyses, which focus on the potential for entry or expansion and the effects, if any, of Defendants' proposed divestitures, were not part of Defendants' motion in limine (Dkt. 177, 178).

"entry, expansion, and divestitures" and exclude opinions on "competitive harm," citing in cursory fashion nearly 40 paragraphs of analysis in her Initial Report without addressing each separate opinion and methodology. Defs.' Mem. (Dkt. 178) at 1, 6. That is insufficient. *See Rockwood Select Asset Fund XI v. Devine, Millimet & Branch, PA*, No. 14-cv-303-JL, 2016 WL 2637818, at *9 (D.N.H. May 6, 2016) (denying motion in limine regarding "broad categories of documents and information rather than specific instances of conduct or specific pieces of evidence"). This response primarily focuses on the admissibility of Dr. Chipty's opinions concerning JetBlue's customer service premium synergy and network optimization synergy because those are the opinions the Defendants' motion addresses in detail, Defs.' Mem. (Dkt. 178) at 3, 4.

## I.  BACKGROUND

**A.  JetBlue Predicts It Will Increase Prices for Spirit's Customers**

In the spring and summer of 2022, JetBlue employees, including JetBlue's Director of Route Planning, Eric Friedman, conducted "deal modeling" that analyzed how the acquisition would generate increased revenues ("revenue synergies") and decreased costs ("cost synergies") or increased costs ("cost dis-synergies"). *See, e.g.*, Declaration of Edward W. Duffy in Support of Plaintiffs' Opposition to Defendants' Motion to Exclude Certain Opinions of Dr. Tasneem Chipty ("Duffy Decl.") Ex. A, at -7741_0002; Ex. B, at -0597. JetBlue management presented the conclusions of these analyses to JetBlue's board of directors, Duffy Decl. Ex. C, at -5978 (describing revenue and cost synergies and dis-synergies, resulting in $600 to $700 million in net synergies), and the board subsequently approved management's request to proceed with the acquisition. JetBlue also quoted those same synergies numbers in its certified securities filings. Duffy Decl. Ex. D at -2796 (quoting the same $600 to $700 million in annual net synergies). And

it continues to rely on aspects of these revenue synergies to make decisions about which routes to include as part of its post-transaction combined network plan, which Defendants rely on in support of their efficiencies claims. Duffy Decl. Ex. E, at 63:4–64:1, 69:3-23, 71:5-16, 93:2-6.

As part of these synergies calculations, JetBlue predicted that the greatest increase in revenue would come from price increases it would impose on former Spirit customers, which it euphemistically called the "customer service premium" or "customer experience premium." JetBlue predicted these price increases could amount to as much as ▮▮▮▮▮ *each year*. Duffy Decl. Ex. A, at -7741_0002 (quantifying ▮▮▮▮ in revenue synergies for the "customer experience premium"); Duffy Decl. Ex. B, at -0600 (quantifying ▮▮▮▮ in revenue synergies for the "Customer Service Premium").³ Spirit's CEO, Ted Christie, when presented with these "customer service" synergies, was clear about what they are: JetBlue "justif[ies] the synergies in the transaction by raising fares in overlap markets." Duffy Decl. Ex. F, at -0456. Likewise, Dr. Nicholas Hill, Defendants' lead economist, explained it plainly:

"▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮." Duffy Decl. Ex. G, at 127:17–128:4.

Separately, although Defendants cite Dr. Chipty's analysis of it only in passing in their motion in limine, another revenue synergy that JetBlue calculated was its "network

---

³ To create this estimate, Mr. Friedman identified 12 real-world instances in which Spirit exited a route it had previously served. Duffy Decl. Exs. J; K, at 211:21-24. Reviewing these 12 exit events, Mr. Friedman determined that a Spirit exit caused prices to rise ▮▮ on average. Duffy Decl. Ex. L, at -3756. At the same time, he also determined that the market shrank following Spirit's exit. *Id.* Finally, he estimated the share of the market JetBlue would achieve upon entry following Spirit's exit. The result: ▮▮ "RASM premium," i.e., an increase in revenues for JetBlue per available seat mile (or ASMs, an industry measure of capacity) above what Spirit had previously earned. *Id.*
    To calculate the customer service premium, JetBlue then applied this ▮▮ "RASM premium" to all Spirit planes that would remain on the routes where they offered service today. Duffy Decl. Ex. B, at -0600 (explaining that the customer service premium is generated by the "RASM change generated by converting [Spirit's] customer experience to JetBlue's" on aircraft "that remain part of the proposed network strategy"). The result was ▮▮▮▮▮▮▮▮▮▮ in additional revenues to JetBlue on an annual basis. *Id.* Mr. Friedman reported to his boss that customers would be "glad to adjust." *Id.*

optimization" synergy. To calculate that synergy, JetBlue analyzed the profitability of exiting Spirit routes. For routes that JetBlue deemed insufficiently profitable, it projected it would redeploy those planes to new routes where JetBlue thought it might earn higher revenues, Duffy Decl. Ex. B, at -0601 ("")—leaving behind the consumers that are served by Spirit today. JetBlue calculated that this synergy would earn JetBlue ▇▇▇▇ annually. Duffy Decl. Ex. H, at -4562 ▇▇▇▇▇▇ in annual "network optimization" synergies); Ex. I ▇▇▇▇ annually).

**B.     Dr. Chipty's Analysis**

During Plaintiffs' investigation and this litigation, Defendants cited the deal modeling as the basis for claimed efficiencies from the acquisition. Duffy Decl. Ex. M, at -0279 to -0283, -0285 to -0289, -0293 to -0298; Ex. N, at -0354 to -0356.[4] One of Dr. Chipty's assignments in this litigation was to analyze these assertions to understand whether the deal modeling demonstrated economic efficiencies that would eliminate any anticompetitive effects of the acquisition. *See* Duffy Decl. Ex. O ¶ 3 ("Do JetBlue's plans for management of the combined company's assets, as described in internal analyses modeling the value to be captured by the deal, suggest that the merger will produce efficiencies that enhance competition and create consumer benefits that would reverse the merger's potential harm to consumers in the affected markets?").

Applying her training and expertise in antitrust economics, her own analyses, and her review of the record in the case, Dr. Chipty evaluated the economic implications of JetBlue's

---

[4] Conspicuously, although JetBlue reported the revenue synergies calculated in association with synergies categories like "network optimization" and "O&D connectivity," it only described, but did not quantify, the customer service premium in its response to the Division's Second Request. Duffy Decl. Ex. M, at -0296.

deal modeling, including whether Defendants' purported efficiencies meet certain commonly accepted economic criteria.[5] Dr. Chipty began by acknowledging that "[a]s a matter of economic theory," mergers may generate benefits that firms could not achieve on a standalone basis, citing a textbook on industrial organization economics. Duffy Decl. Ex. O ¶ 117 & n.284. But she also noted that only synergies that "also create value *for consumers*—by, for example, lowering prices, raising quality, increasing choice, or expanding output or capacity—can . . . generate 'efficiencies' that could potentially offset the merger's potential harm to consumers in the affected markets." *Id.* ¶ 117. Dr. Chipty then evaluated each synergy in the deal modeling (including the underlying assumptions of each synergy) under that standard, and she also considered whether they were verifiable and merger-specific (citing along the way peer-reviewed materials on efficiencies in merger analysis). *Id.* ¶¶ 129–145. In each case, she concluded that the synergies failed to satisfy one or more of these requirements. *Id.*

In analyzing the customer service premium, for example, she concluded that JetBlue planned to charge customers more in exchange for services they had previously demonstrated that they did not value. *Id.* ¶ 143. Relying on standard economic principles, she concluded that such price increases would be a harm, not a benefit, to consumers. *Id.* § V.F, ¶¶ 143–144 (citing a microeconomics paper on the theory of revealed preference). Because such undesired price increases were a harm, not a benefit, she found that the customer service premium should not be recognized as an economic efficiency. *Id.* Dr. Chipty also found that the network optimization synergy reflected harm in markets where JetBlue would remove or reduce Spirit capacity. *Id.* § V.C, ¶¶ 129–131. As another example, JetBlue projected that it would earn higher revenues from increased "relevance" at airports—looking to achieve the higher prices legacies could

---

[5] Dr. Chipty's reply report also addressed opinions offered by Defendants' experts relating to claimed efficiencies according to the same metrics.

charge at their fortress hubs. Dr. Chipty determined that such a synergy is not cognizable, citing to economic literature on the ambiguous consumer-welfare effects of network relevance. *Id.* § V.E, ¶¶ 138–142. In addition to these analyses, Dr. Chipty also responded to the work of Defendants' industry expert, Mr. Richard Scheff—including by pointing out errors in the design of his model that he subsequently corrected. Duffy Decl. Ex. P, § V.

The table below summarizes the opinions that Dr. Chipty has offered in this case involving her analysis of the deal modeling that are implicated by Defendants' vague challenge to paragraphs 117 to 154 of Dr. Chipty's report. Notably, Defendants' memorandum only addresses Dr. Chipty's opinions on Sections V.C and V.F in any meaningful detail.

| Section[6] | Opinion | Paragraphs |
|---|---|---|
| V | Changes Anticipated by the Merger Are Not Benefits to Consumers Capable of Reversing the Merger's Potential Harm to Consumers | 117–121 |
| V.A | JetBlue and Spirit's Services Are Not Complementary | 122–124 |
| V.B | The Combined Network Post-Merger Would Likely Be Smaller than the Two Standalone Networks | 125–128 |
| V.C | JetBlue's "Network Optimization" Would Harm Many Spirit Consumers | 129–131 |
| V.D | Offering More Connecting Service Through FLL Is Not Merger-Specific and Would Likely Not Benefit Local Traffic on the Affected Routes | 132–137 |
| V.E | "Increased Customer Relevance" Means JetBlue Pricing Will Be More Like the Larger Legacy Carriers | 138–142 |
| V.F | Spirit Customers Would Face Higher Prices and Have Less Choice | 143–144 |
| V.G | Increased Purchases of Loyalty Products Are Unlikely to Offset Harm to Consumers in the Scheduled Air Passenger Service Market | 145 |
| V.H | Increased Utilization Claim Unsupported | 146 |
| V.I | Fleet Rationalization Plans Indicate Lower Future Capacity | 147–150 |
| V.K | Anticipated Changes in Costs Would Not Benefit Consumers | 153–154 |

---

[6] In Section V.J of her report, Dr. Chipty also opines that Defendants' settlement with the Florida Attorney General does not "protect against capacity reductions" relative to the carriers' standalone plans. Duffy Decl. Ex. O § V.J, ¶¶ 151–152. Although the analysis of this proposed settlement appears within the sections of Dr. Chipty's report that Defendants challenge, they offer no reason why her analysis of the settlement should be excluded.

7

## II. ARGUMENT

Defendants' motion to exclude some of Dr. Chipty's opinions regarding JetBlue's revenue synergies and cost synergies and dis-synergies misconstrues the nature of those opinions and ignores the economic expertise that she applied. It also erroneously equates Dr. Chipty's opinions with those of Dr. Gautam Gowrisankaran when, as explained below, their testimony is not cumulative.

### A. Dr. Chipty's Opinions Are Based on Her Expertise and Independent Analysis

Federal Rule of Evidence 702 provides that expert witnesses may offer testimony if their specialized knowledge will help the court determine a fact in issue; their testimony is based on sufficient facts and data; their testimony is the product of reliable principles and methods; and the expert has reliably applied those principles and methods to the facts of the case. Fed. R. Evid. 702. "The ultimate purpose of the *Daubert* inquiry is to determine whether the testimony of the expert would be helpful to the [fact finder] in resolving a fact in issue." *Hochen v. Bobst Grp., Inc.*, 290 F.3d 446, 452 (1st Cir. 2002). An expert's testimony is "helpful" if it would assist the fact finder "to understand or determine a fact in issue." *Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co.*, 161 F.3d 77, 81 (1st Cir. 1998). If a court determines that the testimony is relevant, it must then ascertain whether it is the "product of reliable principles and methods," and that those "principles and methods" have been reliably applied by the expert to the facts of the case. *See McGovern ex rel. McGovern v. Brigham & Women's Hosp.*, 584 F. Supp. 2d 418, 423 (D. Mass. 2008) (Young, J.) (citing Fed. R. Evid. 702).

"So long as an expert's scientific testimony rests upon good grounds, based on what is known, it should be tested by the adversarial process . . . ." *Milward v. Acuity Specialty Prod. Grp., Inc.*, 639 F.3d 11, 15 (1st Cir. 2011) (internal quotation marks and citation omitted).

"Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Id.* (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 596 (1993)).

Contrary to Defendants' argument, Dr. Chipty applied economic theory and principles throughout her assessment of whether Defendants' claimed revenue synergies were also benefits to consumers (and not just JetBlue).[7] *See, e.g.*, *US Airways, Inc. v. Sabre Holdings Corp.*, No. 11 Civ. 2725 (LGS), 2022 WL 1042273, at *1 (S.D.N.Y. Apr. 5, 2022) (rejecting motion to exclude evidence in airline industry case because expert "did not construct an economic model" where expert's opinion was nevertheless "based on reliable economic principles, which he applie[d] reliably to the facts of the case"). Her opinions are replete with discussion of economic principles and, where appropriate, citations to economic literature. *Cf. United States v. Dish Network LLC*, No. 09-3073, 2016 WL 157387, at *9 (C.D. Ill. 2016) ("Reliance on scholarly articles is a reliable method for economists performing the type of qualitative analysis performed by [the expert].").[8]

For example, Dr. Chipty cited economic literature on the theory of revealed choice to support her opinion that JetBlue's assumption that it would be able to earn a higher revenue per available seat mile ("RASM") from former Spirit customers—who already demonstrated their

---

[7] Dr. Chipty also performed her own calculations to help frame the context and relevance of certain synergies. For example, Dr. Chipty examined whether JetBlue's "O&D connectivity synergy" constituted a cognizable efficiency. *See generally* Duffy Decl. Ex. O ¶ V.D. According to JetBlue, this synergy represents the additional revenues that JetBlue would earn from increasing connecting traffic through the Fort Lauderdale airport. *Id.* ¶ 132. Dr. Chipty analyzed the underlying modeling for this synergy and calculated the passenger traffic changes generated by JetBlue's model. *Id.* ¶ 136. She found that increasing connectivity at Fort Lauderdale actually caused an output decrease in nonstop passengers— meaning an anticompetitive harm in some of the nonstop markets touching Fort Lauderdale. *Id.*

[8] As just a few examples, she explicitly discussed economic theory about synergies (¶ 117), complementarity (¶ 122), the effects of increased airline presence at airports (¶¶ 138, 140), and the economics of frequent flyer programs (¶ 142) and loyalty programs (¶ 145), and she reliably applied those theories to the facts here.

preference for Spirit—reflects harm to those former Spirit customers on routes where Spirit and JetBlue overlap. Duffy Decl. Ex. O ¶ 143. Similarly, in analyzing JetBlue's "network optimization" synergy, Dr. Chipty applied economic principles in reaching her conclusion that customers in relevant markets would be harmed in the form of less choice and higher prices caused by a "reduction in market capacity and the loss of the unique competitive effect that Spirit brings to a market." *Id.* ¶ 131. Dr. Chipty's opinions do not merely rely on the "face" of JetBlue's documents, as Defendants argue, but rest on her own economic analysis. That economic expertise will be particularly "helpful" to the Court given the complexity of these business documents, which encompass, among other things, regressions and demand analyses—typical work of economists—amidst dozens of tabs, thousands of rows, and a tangled web of complex formulas. *See, e.g.*, Duffy Decl. Exs. I; Q; J.

Analysis of a defendant's business documents is a reliable and well-accepted role for an economic expert, both as to evaluating efficiencies specifically and for other purposes as well. Such expert opinions are routinely considered by courts evaluating efficiencies claims. *See FTC v. Wilh. Wilhelmsen Holding ASA*, 341 F. Supp. 3d 27, 72–73 (D.D.C. 2018) (considering opinions of FTC's economic expert who "reviewed data and documentation from the merging parties" to evaluate whether defendants' estimated efficiencies were verifiable and merger-specific); *see also Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 484 (7th Cir. 2020) (finding district court exclusion of economic expert was an abuse of discretion because expert "drew conclusions through 'expert assessment'" and while expert "did summarize and repeat some relevant facts, he drew significantly on expertise to 'add something'—context and supporting information—to the record").

Moreover, it was entirely reasonable for Dr. Chipty to rely on Defendants' calculations as a basis for her opinions. Indeed, JetBlue management relied on Mr. Friedman's work—the very work that Defendants say was improper for Dr. Chipty to rely on—in obtaining board approval for the transaction, in quantifying synergies for investors in its certified securities filings, and, to this day, in designing its purported plans for the combined network. Duffy Decl. Ex. C, at -5978 (describing revenue synergies and cost synergies and dis-synergies associated with the acquisition for the JetBlue board); Duffy Decl. Ex. D, at -2796 (quoting the same $600 to $700 million in annual net synergies in a securities filing); Duffy Decl. Ex. E, at 63:4–64:1, 69:3-23, 71:5-16, 93:2-6 (explaining that the same RASM premium used in calculating the customer service premium was used to select routes for the combined network). Mr. Friedman's team prepares the very same types of projections used to calculate the RASM premium every time JetBlue decides to enter a new route. Duffy Decl. Ex. R, at 42:7-25. These facts provide ample basis for Dr. Chipty's reliance. *See In re Blood Reagents Antitrust Litig.*, No. 09–2081, 2015 WL 6123211, at *11 (E.D. Pa. Oct. 19, 2015) (business plan was a reliable basis for expert's testimony because it was "the product of deliberation by experienced businessmen [within defendant] charting their future course") (quoting *Autowest, Inc. v. Peugeot, Inc.*, 434 F.2d 556, 566 (2d Cir. 1970)); *In re Namenda Direct Purchaser Antitrust Litig.*, 331 F. Supp. 3d 152, 180–82 (S.D.N.Y. 2018) (permitting expert to rely on business forecasts where expert analyzed process by which forecasts were reached, defendants had experience relevant to developing forecasts, and that business executives valued the analyses). And, as her report makes clear, Dr. Chipty carefully reviewed the analysis. *See, e.g.*, Duffy Decl. Ex. O ¶ 143 n.355. Tellingly, Defendants nowhere explain how the work which Dr. Chipty considers is unreliable.

The cases Defendants cite in support of exclusion are inapposite. Critical to the court's decision in *ZF Meritor, LLC v. Eaton Corporation*, the case on which Defendants principally rely, was that the expert's unfamiliarity with the underlying work meant that the moving party could not effectively cross-examine the expert. *See* 696 F.3d 254, 293 (3d Cir. 2012). That is not the case here: the underlying work was performed by JetBlue employees, and Defendants have all the information needed to cross-examine Dr. Chipty. *See In re Blood Reagents Antitrust Litig.*, 2015 WL 6123211, at *11 (distinguishing facts from *ZF Meritor* because "[a]s this was [defendant's] business plan, rather than an estimate based on plaintiffs' projections, [defendant] certainly does not lack critical information necessary" for cross-examination). And in contrast to Dr. Chipty's opinions, the expert in *AngioDynamics* was excluded because he offered "no specialized economic analysis that would assist a fact-finder in interpreting the record evidence he relie[d] on," but rather drew "inferences that a fact-finder could glean from merely examining the evidence itself." *AngioDynamics, Inc. v. C.R. Bard, Inc.*, 537 F. Supp. 3d 273, 333 (N.D.N.Y. 2021).[9]

### B.   Dr. Chipty's Opinions Address Different Issues than Those Offered by Dr. Gowrisankaran

Contrary to Defendants' claims, Dr. Chipty and Dr. Gowrisankaran do not offer overlapping opinions, and therefore there is no reason to exclude them as cumulative under Rule 403. As the First Circuit has explained, while a trial court may exclude "needlessly cumulative

---

[9] The other cases Defendants cite are also distinguishable. In *Iconics, Inc. v. Massaro*, the expert offered opinions that were "unsubstantiated and conclusory." 266 F. Supp. 3d 461, 473 (D. Mass. 2017). By contrast, Dr. Chipty's lengthy report, which contains numerous citations to the record and economic literature and calculations she performed specifically for this case, is thoroughly explained. The court in *Maciel v. Thomas J. Hastings Properties* excluded testimony on Rule 403 grounds, not Rule 702. *See* No. 10-12167-JCB, 2012 WL 13047595, at *6 (D. Mass. Nov. 30, 2012). And in *Anderson News LLC v. American Media, Inc.* the expert performed no analysis whatsoever, in contrast to the economic analysis that Dr. Chipty performed. No. 09 Civ. 2227 (PAC), 2015 WL 5003528, at *4 (S.D.N.Y. Aug. 20, 2015).

evidence," Rule 403 "requires a balance of probative value against the negative consequences of using a particular piece of evidence," and "crucial" evidence should not be excluded on the basis of Rule 403. *Sec'y of Labor v. DeSisto*, 929 F.2d 789, 795–96 (1st Cir. 1991). "Evidence is cumulative if repetitive, and if 'the small increment of probability it adds may not warrant the time spent in introducing it.'" *Elwood v. Pina*, 815 F.2d 173, 178 (1st Cir. 1987). Applying this standard, the court in *United States v. Santana-Vasquez* denied a motion to exclude the opinions of one of the government's two experts, finding that—even though the experts arrived at "similar conclusions," the evidence was not "needlessly" cumulative where it pertained not to an "ancillary matter" but to the "underlying issues before th[e] court" and was "probative." 638 F. Supp. 3d 35, 37 (D. Me. 2022).

Here, Dr. Gowrisankaran will testify regarding the likely anticompetitive effects and consumer harm of the acquisition, whereas Dr. Chipty will apply her economic expertise to the evidence of JetBlue's plans for the combined airline—JetBlue's combined network plans, predicted revenue synergies, predicted changes in costs, and fleet rationalization plans—to analyze whether those plans reflect economic efficiencies that are likely to enhance competition (as well as other opinions Defendants do not challenge in their motion). Dr. Gowrisankaran does not opine on JetBlue's own assessment of the acquisition.

Accordingly, Dr. Gowrisankaran's and Dr. Chipty's expert opinions and anticipated testimony are complementary, not cumulative, and do not implicate the concerns articulated by the Court about multiple experts offering duplicative and unnecessary testimony. If the Court were to exclude Dr. Chipty's analysis, no one would testify as to why the purported benefits reflected in JetBlue's deal modeling analysis do not, in fact, show economic benefits, and how

anticompetitive effects are central to Defendants' justification for the deal. Excluding this testimony would not prevent cumulativeness but would unfairly prejudice Plaintiffs.[10]

### III.   CONCLUSION

For the foregoing reasons, Defendants' motion to exclude opinions by Dr. Chipty should be denied.

---

[10] In the unlikely event any expert testimony is cumulative, Defendants may object under Rule 403 at the time that testimony is introduced at trial, or the Court may direct counsel to move on.

Dated: September 20, 2023               Respectfully submitted,

*/s/* Edward W. Duffy                              .
Edward W. Duffy
Daniel Loevinsohn
James L. Moore III
U.S. Department of Justice, Antitrust Division
450 Fifth Street, NW, Suite 8000
Washington, DC 20530
Phone: 202-812-4723
Facsimile: 202-307-5802
E-mail: edward.duffy@usdoj.gov

*/s/* William T. Matlack                           .
William T. Matlack (MA Bar No. 552109)
Office of the Attorney General
One Ashburton Place, 18th Floor
Boston, MA 02108
Telephone: (617) 727-2200
Email: William.Matlack@mass.gov


*/s/* C. William Margrabe                          .
C. William Margrabe (*pro hac vice*)
Assistant Attorney General
Office of the Attorney General
400 6th Street NW, Suite 10100
Washington, DC 20001
Telephone: (202) 727-6294
Email: will.margrabe@dc.gov

*Attorneys for the United States of America, the Commonwealth of Massachusetts, and the District of Columbia, and on behalf of all Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing document, which was filed with the Court through the CM/ECF system, will be sent electronically to all registered participants as identified on the Notice of Electronic Filing.

/s/ Edward W. Duffy
Edward W. Duffy
U.S. Department of Justice, Antitrust Division
450 Fifth Street, NW, Suite 8000
Washington, DC 20530
Phone: (202) 812-4723
Facsimile: (202) 307-5802
E-mail: edward.duffy@usdoj.gov