EXHIBIT A

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA
450 Fifth Street NW, Suite 8000
Washington, DC 20530

STATE OF ARIZONA
2005 North Central Avenue
Phoenix, AZ 85004

STATE OF CALIFORNIA
300 South Spring Street, Suite 1702
Los Angeles, CA 90013

DISTRICT OF COLUMBIA
400 Sixth Street NW, Tenth Floor
Washington, DC 20001

STATE OF FLORIDA
PL-01, The Capitol
Tallahassee, FL 32399

COMMONWEALTH OF MASSACHUSETTS
One Ashburton Place, 18th Floor
Boston, MA 02108

COMMONWEALTH OF PENNSYLVANIA
14th Floor Strawberry Square
Harrisburg, PA 17120

and

COMMONWEALTH OF VIRGINIA
202 North Ninth Street
Richmond, VA 23219

                              *Plaintiffs*,

                    v.

AMERICAN AIRLINES GROUP INC.
One Skyview Drive
Fort Worth, TX 76155

and

JETBLUE AIRWAYS CORPORATION
27-01 Queens Plaza North
Long Island City, NY 11101

                                    *Defendants*.

## **COMPLAINT**

American Airlines Group Inc. ("American"), the largest airline in the world, and JetBlue

Airways Corporation ("JetBlue"), a uniquely disruptive low-cost airline, have entered an

unprecedented and anticompetitive pact. Under their so-called "Northeast Alliance," the two

rivals have quietly agreed to share their revenues and coordinate which routes to fly, when to fly

them, who will fly them, and what size planes to use on flights to and from four major airports:

Boston Logan International Airport ("Boston Logan"), John F. Kennedy International Airport

("JFK"), LaGuardia Airport ("LaGuardia"), and Newark Liberty International Airport ("Newark

Liberty"). By consolidating their businesses in this way, American and JetBlue will effectively

merge their operations on flights to and from the four airports—which collectively account for

two thirds of JetBlue's business. In so doing, the Northeast Alliance will eliminate significant

competition between American and JetBlue that has led to lower fares and higher quality service

for consumers traveling to and from those airports. It will also closely tie JetBlue's fate to that

of American, diminishing JetBlue's incentives to compete with American in markets across the

country. The United States and Plaintiff States bring this action to prevent the hundreds of

millions of dollars in harm to consumers that will occur if these two rivals are permitted to maintain this modern-day version of a nineteenth-century business trust.

## I.     INTRODUCTION

1.     Millions of consumers depend on the airline industry to travel quickly, efficiently, and safely within the United States and around the world.  Since the U.S. airline industry was deregulated in 1978, the public has relied on competition among airlines to promote affordability, innovation, and quality of service.  In recent decades, however, the airline industry in the United States has become increasingly concentrated through mergers, acquisitions, and alliances between competitors.  Today, it is dominated by four large airlines: three "legacy" airlines—American, Delta Air Lines, and United Airlines—and Southwest Airlines.  American is the largest of these airlines.  Together, the four control over 80 percent of domestic air travel.

2.     American's management has long been a "proponent of consolidation in the industry."  As American's current CEO explained in 2012: "With fewer airlines, there are fewer of us trying to get the same number of customers."  "Domestic consolidation" remains one of American's "long term projects."

3.     American has championed consolidation internationally as well.  Because airlines are generally unable to merge formally across national borders, however, American instead has orchestrated *de facto* mergers through a series of "alliances"—intricate joint ventures involving extensive coordination and sharing of revenues.  The other legacy airlines have formed similar alliances.  As a result, the vast majority of traffic between the United States and Europe, for example, is now controlled by three global alliances (oneworld, SkyTeam, and Star Alliance), each headed by one of the three legacy airlines.  As JetBlue's CEO has explained, "it may look as if a dozen or more airlines [are] providing service.  But when you go under the surface, it's

3

really just three big mega-alliances controlling 87% of the traffic. . . . Consumers effectively have very little choice in markets where JVs [joint ventures] have a stranglehold—and they also face higher fares."

4.      JetBlue used to oppose consolidation by the major airlines.  In 2019, just months before American approached JetBlue about a possible partnership, JetBlue explained: "We believe the mega-carriers are large enough—we don't think it's in the interest of consumers or airline workers to allow the giants to get even bigger and more powerful."  That same year, JetBlue warned: "All that power in the hands of a few very deep-pocketed airlines has implications for consumers in the form of reduced options, high fares and often poor service."

5.      In the face of consolidation, JetBlue has provided an important and steadfast source of competition.  As JetBlue has explained, "our brand boxes far above our weight." "Smaller carriers like JetBlue play a critical role in keeping the commercial aviation industry competitive and keeping the immense power of the legacy airlines in check."  JetBlue serves "as an important counterweight to the concentration of power held by our largest competitors; the benefits we bring to the market—lowering fares, stimulating demand, and raising the bar in Customer service—are clear."  JetBlue's own estimate shows that it has saved consumers a total of more than $10 billion since the airline's founding, offering lower fares and better service and forcing competitors to do the same.  Even that estimate was, in JetBlue's words, "conservative."

6.      JetBlue's reputation for lowering fares is so well known in the airline industry that it has earned a name: the "JetBlue Effect."  JetBlue's record in Boston and New York City illustrates why.  Since launching service at Boston Logan in 2004, JetBlue has challenged the major airlines—including American—by offering lower fares and better service.  Consumers voted with their feet.  JetBlue became Boston's leading airline, offering more flights out of

Boston than any other airline. What's more, JetBlue forced American and other airlines that serve Boston to lower their fares as well. This competition has resulted in substantial savings for consumers. In 2019, JetBlue estimated that it had saved consumers flying to and from Boston more than $3 billion since it started serving the airport in 2004. JetBlue has had a similar effect in New York City. In a presentation titled "16 Years of Disrupting the Industry," JetBlue explained that "there's no question we are a disruptor. There's no better example of how we've influenced change than at our home at JFK Airport."

7.    Before entering into the Northeast Alliance, American and JetBlue were poised to compete even more intensively. Having fallen significantly behind JetBlue in Boston, American had vowed to "win BOS back" by adding routes, increasing capacity on existing flights, and obtaining new gates. Likewise, JetBlue had announced more flights to and from Boston. JetBlue was also pursuing opportunities to expand in New York City, and considering expansion at American strongholds like Philadelphia, Miami, and Los Angeles. As a JetBlue network planning executive explained in June 2020, "one of the most common trends in JetBlue's 20 year history is easily stealing share from AA [American] and eventually winning. So that applies to PHL [Philadelphia] and MIA [Miami]."

8.    JetBlue had also announced plans to launch its first transatlantic flight, from New York to London, and publicly touted plans to further expand service to Europe, in what promised to be the most significant challenge to the three global alliances' stranglehold in those markets. "These fares are obscene—they are obscene—and they should not be permitted to exist," JetBlue's CEO said of the legacy airlines' transatlantic service in 2019. "[F]or a low-cost carrier to come in and discipline the market, lower fares, create more availability, I think that's a good thing." Indeed, American executives feared the impact that JetBlue's new transatlantic service

5

would have on fares.  On flights between Boston and London Heathrow, for example, American worried internally about a "50-60% fare drop in BOSLON once B6 [JetBlue] starts non-stop service."

9.      Recognizing the significant and growing threat posed by JetBlue, and not satisfied with the consolidation that has made it the largest airline in the world, American now seeks to co-opt JetBlue through an unprecedented domestic alliance.  Knowing full well that an outright merger would invite a challenge under Section 7 of the Clayton Act, American instead seeks to align JetBlue's economic incentives with its own through a far-reaching partnership based on the same kinds of alliances that American has used to consolidate international air travel.  In so doing, American and JetBlue have violated Section 1 of the Sherman Act by effectively merging their operations in Boston and New York City and eliminating competition that has resulted in substantial benefits for consumers.

10.      The harms threatened by the Northeast Alliance, however, extend well beyond Boston and New York City.  In keeping with their long-held strategy of consolidating the industry, American's senior executives identified "[f]urther domestic consolidation" as a potential value of the Northeast Alliance.  Like previous consolidation efforts, the Northeast Alliance allows American to forgo independent growth that would have benefited consumers.  By effectively absorbing JetBlue's operations in Boston and New York City, American can reduce investments not just in those cities, but also in other parts of its network where it otherwise would maintain or add service.  As a consequence, consumers across the country will have fewer options and pay higher fares.

11.      In addition, by tying JetBlue's success to that of American, the Northeast Alliance will significantly dampen JetBlue's incentive to continue to compete with its much larger partner

in the Northeast and beyond.  Because JetBlue's existing operations focus on the Northeast, two thirds of JetBlue's business will be bound up with American as part of the Northeast Alliance. JetBlue itself recognized the danger posed by this close dependence.  Less than two months before entering the Northeast Alliance, JetBlue warned its Board of Directors that the Northeast Alliance created a risk of JetBlue being "co-opted by Connie [American] manipulation" and noted that potential ways to alleviate this risk might help preserve only some level of JetBlue's independence.

12. If JetBlue complies with American's wishes, the Northeast Alliance gives American ways to reward JetBlue; if American doesn't like what it sees from JetBlue, the Northeast Alliance gives American the tools to punish JetBlue and bring it to heel.  American can, for example, cut off JetBlue's access to American's infrastructure in New York, including scarce take-off-and-landing authorizations or "slots," on which JetBlue will come to rely.  Or American can reward JetBlue with more slots.  During their regular network planning meetings, if JetBlue is behaving, American can agree to exit markets where JetBlue competes.  Or American can terminate the arrangement altogether, leaving JetBlue compromised for having relied upon American.  In these ways and others, JetBlue will be beholden to its larger partner, resulting in a wide-ranging diminution in competition in an industry in which competition is already in critically short supply.

13. American and JetBlue claim that the Northeast Alliance will result in pro-competitive benefits, but consumers have heard these empty promises before, including from American.  Consumers will be better off if American and JetBlue continue to compete for their business.  The United States and Plaintiff States bring this action to prevent the harm to consumers that will occur once the Northeast Alliance is fully implemented and demand for

airline travel has recovered from the impact of the Covid-19 pandemic. For these reasons and those set forth below, the Northeast Alliance violates Section 1 of the Sherman Act, and should be enjoined.

## II. JURISDICTION, INTERSTATE COMMERCE, AND VENUE

14. The United States brings this action pursuant to Section 4 of the Sherman Act, as amended, 15 U.S.C. § 4. The States of Arizona, California, and Florida, the Commonwealths of Massachusetts, Pennsylvania, and Virginia, and the District of Columbia ("Plaintiff States") bring this action under Section 16 of the Clayton Act, 15 U.S.C. § 26, as *parens patriae* on behalf of and to protect their general economies and the health and welfare of their residents. Plaintiffs do so to prevent and restrain American and JetBlue from violating Section 1 of the Sherman Act, 15 U.S.C. § 1. This Court has subject-matter jurisdiction over this action under Section 4 of the Sherman Act, 15 U.S.C. § 4.

15. American and JetBlue are engaged in interstate commerce and in activities substantially affecting interstate commerce. American and JetBlue each annually transport millions of passengers across state lines throughout this country, generating billions of dollars in revenues while doing so.

16. Venue is proper under Section 12 of the Clayton Act, 15 U.S.C. § 22. This Court also has personal jurisdiction over each Defendant. Both Defendants are found and transact business in this judicial district.

## III. DEFENDANTS AND THE NORTHEAST ALLIANCE

### A. Defendants

17. American is the largest airline in the world. In 2019, the last full year before the pandemic, American flew approximately 215 million passengers to more than 365 locations worldwide, taking in roughly $45 billion in revenues. American is a Delaware corporation with

its headquarters in Fort Worth, Texas.

18.     JetBlue is a low-cost airline founded in 1998.  In 2019, JetBlue flew over 42 million passengers to approximately 100 locations worldwide, taking in roughly $8 billion in revenues.  JetBlue has a significantly lower cost structure than the legacy airlines, allowing it to operate profitably even when offering consumers lower fares.  Unlike other low-cost carriers, such as Southwest Airlines, or ultra-low-cost carriers, such as Spirit Airlines and Allegiant Air, JetBlue also offers two classes of service, which helps it compete effectively against the legacy carriers for higher-paying leisure and business customers.  JetBlue is a Delaware corporation with its headquarters in Long Island City, New York.

### B.     The Northeast Alliance

19.     On July 15, 2020, American and JetBlue entered into the Northeast Alliance.  The Northeast Alliance contains many distinct agreements between Defendants.  Most notably, an umbrella agreement, titled the Northeast Alliance Agreement, commits Defendants to pool revenues and coordinate "on all aspects" of network planning at Boston Logan, JFK, LaGuardia, and Newark Liberty, including deciding together which routes to fly, when to fly them, who will fly them, and what size planes to use.  In addition, the Mutual Growth Incentive Agreement commits Defendants to pool and apportion revenues earned on flights to and from the four airports such that each partner earns the same revenues regardless of whether a passenger flies on an American or a JetBlue plane.  An explicit goal of these agreements is to make "each carrier indifferent" about whether a passenger chooses American or JetBlue for a particular flight to or from the four airports.

20.     These kinds of restraints of trade—agreements between competitors to coordinate on output or to share revenues—are often condemned as *per se* illegal because they have the

9

same tendencies to increase prices and reduce output as explicit horizontal agreements on price. While American and JetBlue technically retain the ability to price independently under the Northeast Alliance, in reality, neither airline will have the incentive to undercut the other on price because doing so would simply reduce the revenues each earns under the revenue-sharing arrangement. Moreover, Defendants can raise fares simply by one of them exiting a market where it competed against the other, and then share in their now-ally's increased profits. They can also agree to cut the number of seats they fly in a market and, in so doing, raise fares. In any of these ways, American and JetBlue can increase fares without ever talking to each other about pricing.

21.     At the same time that American and JetBlue agreed to these restraints, they also entered a series of other agreements. Among them is a Codeshare Agreement, through which American and JetBlue have agreed to market each other's flights to and from the four airports, as well as potentially other flights that have yet to be determined. American and JetBlue have also agreed to pool their "slots" at JFK and LaGuardia, which are takeoff and landing authorizations issued by the Federal Aviation Administration.

22.     This combination of agreements resembles—and was specifically modelled after—the alliances American has used to bring *de facto* consolidation to international markets. Through the Northeast Alliance, American and JetBlue will effectively merge their operations in Boston and New York City and reduce choices for consumers. The Northeast Alliance is anticompetitive and unlawful as a whole, and the output coordination and revenue-sharing restraints present particular competitive concerns due to their inherently anticompetitive nature.

## IV.     INDUSTRY BACKGROUND

### A.     Domestic Consolidation in the Airline Industry

23.     Over the past two decades, the U.S. airline industry has experienced dramatic

consolidation through mergers and acquisitions, including those of American/TWA (2001), America West/US Airways (2005), Delta/Northwest (2008), United/Continental (2010), Southwest/AirTran (2011), US Airways/American (2013), and Alaska/Virgin America (2016). As the following JetBlue presentation shows, the four largest airlines now collectively control over 80 percent of domestic air travel.



As JetBlue's CEO has remarked, "this is a startling concentration of power."

24.     American's current CEO, Doug Parker, has cheered these successive waves of industry consolidation. When he was not cheering them, he led them. He served as CEO of America West when it merged with US Airways. Later, he served as CEO of US Airways when it merged with American. Internally, American has referred to Mr. Parker as the "Godfather of consolidation."

25.     Consolidation may have benefited American, but as JetBlue's CEO told the public less than two years before entering into the Northeast Alliance, "it has come at a cost to consumers. Just look at the fares in some of the fortress hubs and in some of the legacy-dominated markets without low-fare competition. Chances are, you'll see fares that are higher

than they should be and in that construct there's very little incentive to provide great service or to innovate."

26.     One way that consolidation has produced this result is by allowing the major airlines to reduce "capacity," the industry's term for the number of seats made available to consumers.  As American's CEO explained to investors in 2006, there is an "inextricable link" between removing seats and raising fares.  Each significant legacy airline merger in recent years has been followed by substantial reductions in service.  In 2005, America West merged with US Airways.  The combined firm reduced capacity, including by cutting flights at two former hubs in Pittsburgh and Las Vegas.  US Airways' own post-merger analysis confirmed that it succeeded in obtaining a "3% - 4% [industry] capacity reduction."  In 2008, Delta merged with Northwest.  Again, the combined firm reduced capacity, including by cutting flights at two former hubs in Cincinnati and Memphis.  In 2010, United merged with Continental.  Yet again, the combined firm reduced capacity, including by shuttering its hub in Cleveland.  The trend continued in 2013, when American merged with US Airways.  Under Mr. Parker's management, the combined company cut flights at its hubs in Philadelphia and Phoenix.

27.     In addition to facilitating these capacity reductions, consolidation has made it easier for American and other legacy carriers to restrict domestic capacity growth.  The legacy airlines euphemistically call this effort "capacity discipline."  To promote it, senior executives of the legacy airlines have used public statements to emphasize the importance of restricting industry growth and to communicate their individual commitments to keep growth in check.  They have also used mergers and acquisitions to make their jobs easier.  Before US Airways merged with American, for example, it stated that if American implemented its aggressive standalone growth plans, other airlines "may react to AMRs [American's] plans with their own

enhanced growth plans destabilizing [the] industry," which would negatively impact industry revenues and threaten industry pricing.  Following the merger and under Mr. Parker's leadership, the combined airline kept its capacity in check, growing at a lower rate than the industry overall.

28.    JetBlue's CEO put it succinctly in 2019: "there's been a lot of consolidation in the U.S., and we really don't have a competitive industry."

### B.    International Consolidation in the Airline Industry

29.    In parallel with their efforts to achieve domestic consolidation, American and the other legacy airlines have sought to consolidate the industry internationally.  They have done so through joint ventures similar to the one American now attempts to impose on consumers in the United States.  In transatlantic markets, for example, American has entered into a joint venture with British Airways, Iberia, Finnair, and Aer Lingus, by which they share revenues and coordinate operations and pricing.  Delta has formed a similar alliance with Air France, KLM, and Virgin Atlantic.  United has done the same with Lufthansa and Air Canada.  As JetBlue's CEO explained in October 2019, the result is that:

> "between the U.S. and Europe, you'd think there's about 12-15 airlines flying, but there really isn't.  You know, there are three large joint ventures.  In these joint ventures, these airlines have a permission slip to collude, set pricing, set scheduling together.  Look, if it happened in any other industry, they'd march you off to the penitentiary, but in aviation it's taken hold . . . And that's why you get such high fares."

30.    American now seeks to bring the strategy home to the United States, by using an alliance to co-opt a uniquely disruptive competitor: JetBlue.

### C.    JetBlue's Role as a Disruptive Competitor

31.    For years, JetBlue has undermined American's efforts to restrain industry capacity growth and raise fares.  The contrast between JetBlue and American's strategies has been stark.  As JetBlue's CEO explained in 2015, the "legacy airlines will boast about capacity

discipline" and "boost profits with higher fares," but JetBlue will do the opposite: "We'll add capacity to keep fares competitive."

32.     The numbers back it up.  Between 2004 and 2019, the last full year before the pandemic, JetBlue expanded its domestic capacity by more than 149 percent, as measured by available seat miles ("ASMs"), a common industry measure of capacity.  By contrast, over that same time period, American's domestic capacity actually declined.  Indeed, accounting for the consolidation achieved through mergers, the three legacy carriers collectively reduced domestic capacity by 4 percent over this period.

33.     JetBlue's capacity growth has been especially remarkable in markets to or from endpoints in the Northeast, where JetBlue has focused its operations.[1]  By 2019, JetBlue had grown into the fourth largest carrier in those markets, with roughly 16 percent of capacity, after American (21 percent), Delta (21 percent), and United (20 percent).  To achieve that status, JetBlue grew its capacity within those markets 154 percent between 2004 to 2019, adding approximately 25 billion ASMs.  By contrast, American and the other legacies collectively shrunk their capacity by 9 percent, or approximately 15 billion ASMs.

34.     JetBlue's capacity growth also has been remarkable in markets within the East Coast.[2]  By 2019, JetBlue had grown into the third largest carrier in those markets, with roughly 16 percent of capacity, after Delta (26 percent) and American (23 percent).  To achieve that

---

[1] For purposes of the calculations in this paragraph, the Northeast includes Connecticut, Maine, Massachusetts, New Hampshire, New Jersey, New York, Pennsylvania, Rhode Island, and Vermont.  *See* U.S. Census Bureau, Census Regions and Divisions of the United States (2010), https://www2.census.gov/geo/pdfs/maps-data/maps/reference/us_regdiv.pdf.

[2] For purposes of the calculations in this paragraph, the East Coast includes Connecticut, Delaware, the District of Columbia, Florida, Georgia, Maine, Maryland, Massachusetts, New Hampshire, New Jersey, New York, North Carolina, Pennsylvania, Rhode Island, South Carolina, Vermont, and Virginia.

status, JetBlue grew its capacity 182 percent in those markets between 2004 and 2019, adding approximately 12 billion ASMs. By contrast, American and the other legacy airlines collectively shrunk their capacity in these markets by 7 percent, or approximately 5 billion ASMs.

35. Just as JetBlue has aggressively introduced capacity, so too has JetBlue challenged the legacy airlines in other ways. As JetBlue has explained, "carriers like JetBlue play a vital role in keeping the commercial aviation industry competitive here and abroad." The "presence of smaller competitive carriers like JetBlue helps push fares down across the board."

36. JetBlue is uniquely disruptive. As JetBlue explained to investors last year, "JetBlue is a unique airline with a differentiated strategy supported by a number of competitive advantages." JetBlue has a significantly lower cost structure than its legacy competitors, allowing it to operate profitably while charging lower fares. As a result, JetBlue has a long and public track record of significantly lowering fares when it enters a market. JetBlue also offers two classes of service through its innovative Mint service. JetBlue touts Mint as "the best premium product in the market," and it helps JetBlue compete effectively against the legacy carriers for higher-paying leisure and business customers in ways other smaller airlines cannot. As JetBlue's CEO has explained, "JetBlue has always been a contrarian airline—a disruptor."

37. Likewise, JetBlue has always been, in its words, "an innovative company." A pioneer in service improvements for economy passengers, JetBlue was the first airline to offer live TV. It was the first to offer free, high-speed Wi-Fi to all passengers, and remains the only airline to do so. In 2014, JetBlue's launch of Mint caused premium fares, in JetBlue's CEO's words, to "halve." JetBlue's next ambition was to disrupt transatlantic markets and challenge American and the other legacy carriers internationally. "The fares have got so obscenely high," JetBlue's CEO said of transatlantic service just weeks before American approached JetBlue

about a partnership. "[W]e're going to improve service, we're going to cut fares dramatically," he told the public. "You should be paying a fraction of that [legacy prices], and that's what we're going to do."

## V.  THE RELEVANT MARKETS AND CONCENTRATION

### A.  Relevant Markets

38.  The relevant product market for assessing the effects of the Northeast Alliance is scheduled air passenger service.  Air travel enables consumers to travel quickly and efficiently between airports, offering passengers significant time savings and convenience over other forms of travel.  For example, a flight between Boston Logan and Ronald Reagan Washington National Airport ("Reagan National" or "DCA") takes approximately an hour and forty-five minutes of flight time, whereas driving between the two locations takes around eight hours and a train trip takes around seven hours.

39.  Due to time savings and convenience afforded by scheduled air passenger service, not enough passengers would substitute other modes of transportation (car, bus, or train) to defeat a small but significant and non-transitory price increase by a hypothetical monopolist of scheduled air passenger service.  Therefore, a hypothetical monopolist over all scheduled air passenger service likely would increase its prices by at least a small but significant and non-transitory amount.

40.  Within the relevant product market, consumer preferences differ.  For example, some passengers prefer premium over economy seats; some passengers prefer nonstop over connecting service because it saves travel time; and some passengers prefer buying tickets at the last minute rather than far in advance.  Through a variety of fare restrictions and rules, airlines can profitably raise fares for some of these passengers without raising fares for others.  Thus, the competitive effects of the Northeast Alliance may vary among passengers depending on their

preferences for particular types of service.

41.     Most passengers book flights with their origins and destinations predetermined. Not enough passengers who wish to travel between one origin and destination pair would switch to flights between a different origin and destination pair to defeat a small but significant and non-transitory price increase by a hypothetical monopolist.  Therefore, a hypothetical monopolist of all scheduled air passenger service in each origin and destination pair likely would increase its prices by at least a small but significant and non-transitory amount.  As a result, scheduled air passenger service between each origin and destination pair where American and JetBlue compete or likely would compete in the future comprise the relevant markets for assessing the effects of the Northeast Alliance under the Sherman Act.

42.     Because passengers seek to depart from airports close to where they live and work, and arrive at airports close to their intended destinations, some passengers within a metropolitan area may strongly prefer service at a particular airport or airports.  Ground transport times can vary significantly for airports within the same metropolitan area.  Recognizing these distinct passenger preferences, airlines may set prices and manage the availability of fares at airports differently, even if those airports serve the same large metropolitan area.  Therefore, an origin or destination is no broader than all the airports in a metropolitan area, but in some areas that contain more than one airport, a specific airport or airports may constitute a distinct origin or destination for the purposes of defining relevant markets.

43.     The four examples described below are particularly relevant for purposes of assessing the effects of the Northeast Alliance.

44.     *Boston Logan*.  Many passengers traveling to and from Boston Logan do not consider Rhode Island T.F. Green International Airport and New Hampshire's Manchester-

Boston Regional Airport to be reasonable alternatives to Boston Logan.  Not enough passengers

who wish to fly to and from Boston Logan would switch to flying to and from T.F. Green or

Manchester-Boston Regional to defeat a small but significant and non-transitory price increase

by a hypothetical monopolist.  Therefore, a hypothetical monopolist of scheduled air passenger

service in an origin and destination pair involving flights to and from Boston Logan likely would

increase its prices by at least a small but significant and non-transitory amount.

45.     *JFK and LaGuardia (for Domestic Travel)*.  For domestic travel, many passengers

traveling to and from JFK or LaGuardia do not view service to Newark Liberty as a reasonable

substitute to JFK or LaGuardia.  As JetBlue has recognized, Newark Liberty has a "distinct"

catchment area "that does not largely overlap with LGA [LaGuardia] or JFK."  Not enough

passengers who wish to fly between JFK or LaGuardia and a domestic origin or destination

would switch to Newark Liberty to defeat a small but significant and non-transitory price

increase by a hypothetical monopolist.  Therefore, a hypothetical monopolist of scheduled air

passenger service in an origin and destination pair involving domestic flights to and from

JFK/LaGuardia likely would increase its prices by at least a small but significant and non-

transitory amount.

46.     *JFK, LaGuardia, and Newark Liberty (for Transatlantic Travel)*.  For

transatlantic travel, for reasons such as longer flight times and the need to go through customs,

more passengers traveling between the New York City metropolitan area and transatlantic

destinations may view JFK, LaGuardia, and Newark Liberty as reasonable substitutes.  Not

enough passengers who wish to fly between JFK, LaGuardia, or Newark Liberty and a

transatlantic origin or destination would switch to another airport to defeat a small but significant

and non-transitory price increase by a hypothetical monopolist.  Therefore, a hypothetical

monopolist of scheduled air passenger service in an origin and destination pair involving transatlantic flights to and from JFK/LaGuardia/Newark Liberty likely would increase its prices by at least a small but significant and non-transitory amount.

47.     *Reagan National*.  Many passengers traveling to and from Reagan National do not consider Baltimore/Washington International Thurgood Marshall Airport ("BWI") or Washington Dulles International Airport ("Dulles") to be reasonable alternatives to Reagan National.  As JetBlue has told the Department of Transportation: "Service from other airports in the greater Baltimore-Washington metropolitan area is not a substitute for service from DCA." Not enough passengers who wish to fly to or from Reagan National would switch to BWI or Dulles to defeat a small but significant and non-transitory fare increase by a hypothetical monopolist.  Therefore, a hypothetical monopolist of scheduled air passenger service between an origin and destination pair involving flights to and from Reagan National likely would increase its prices by at least a small but significant and non-transitory amount.

## B.     Many Relevant Markets Are Highly Concentrated and the Northeast Alliance Will Significantly Increase that Concentration

48.     Where a collaboration between competitors effectively operates like a merger, it is appropriate to evaluate the collaboration using analytical tools from merger analysis.  *See* U.S. Dep't of Justice & Fed. Trade Comm'n, Antitrust Guidelines for Collaborations Among Competitors § 1.3 (Apr. 2000).  One analytical tool often used to evaluate the likely competitive effects of a merger is market concentration.  The more concentrated a market, and the more a merger would increase concentration in a market, the more likely it is that a merger between competitors would result in a meaningful reduction in competition.  Concentration is typically measured by the Herfindahl-Hirschman Index ("HHI").  Markets in which the HHI exceeds 2,500 points are considered highly concentrated.  Increases in the HHI of more than 200 points

are considered to be significant increases in concentration. If a merger would increase the HHI by more than 200, and would result in an HHI above 2,500, the merger is presumed likely to enhance market power and substantially lessen competition. *See* U.S. Dep't of Justice & Fed. Trade Comm'n, Horizontal Merger Guidelines § 5.3 (revised Aug. 19, 2010).

49.      The Northeast Alliance effectively operates like a merger in domestic markets that have either Boston or JFK/LaGuardia as an endpoint. In these markets, American and JetBlue will coordinate capacity and share revenues with one another. Under a merger analysis, the Northeast Alliance would be presumptively anticompetitive in the 11 domestic markets shown in Appendix A, where Defendants both provided competing nonstop service to and from Boston prior to the pandemic. The Northeast Alliance would also be presumptively anticompetitive in the 17 domestic markets shown in Appendix B, where Defendants both provided competing nonstop service to and from JFK/LaGuardia prior to the pandemic.

50.      Concentration measures are also instructive for assessing harms in other markets where the Northeast Alliance likely will significantly diminish Defendants' ability and incentive to compete. In such markets, Defendants will partially coordinate capacity and will share some but not all of their revenues. For example, Appendix C shows 98 domestic markets where, prior to the pandemic, no airline provided nonstop service but JetBlue's connecting service through Boston or JFK/LaGuardia competed against American's connecting service through other hubs. In the markets in Appendix C, Defendants will share revenues and coordinate capacity on JetBlue's service, thereby dampening Defendants' incentives to compete.

51.      Within each of the over one hundred markets in the Appendices, the Northeast Alliance would significantly increase concentration, resulting in a highly concentrated market. In those markets alone in 2019, American and JetBlue served more than 17 million

passengers and collected more than $3.8 billion. Those markets do not even include the many other highly concentrated markets where the Northeast Alliance likely will harm competition, such as legacy-dominated transatlantic markets that JetBlue is poised to disrupt, or markets outside the Northeast Alliance where Defendants will have dampened incentives to compete.

## VI.    THE NORTHEAST ALLIANCE LIKELY WILL HARM COMPETITION

52.    As explained more fully below, the Northeast Alliance likely will cause significant and wide-ranging harms to consumers across the country, including in Plaintiff States. It likely will harm competition in dozens of domestic markets to and from Boston and JFK/LaGuardia. In addition, the Northeast Alliance likely will harm competition in legacy-dominated transatlantic markets to and from Boston and JFK/LaGuardia/Newark Liberty that JetBlue is uniquely poised to disrupt. More broadly, the Northeast Alliance likely will facilitate reductions in capacity, and will significantly curtail JetBlue's independence and dampen its incentives to compete with American to serve consumers across the country.

### A.    The Northeast Alliance Likely Will Harm Competition in Domestic Markets to and from Boston

53.    The Northeast Alliance will eliminate competition between American and JetBlue in markets to and from Boston, leading to reductions in capacity, higher fares, and lower quality of service. Prior to the pandemic, American and JetBlue competed to provide nonstop service in the 11 domestic markets with Boston as an endpoint that are listed in Appendix A. JetBlue's nonstop service also competed against American's connecting service in many other markets to and from Boston.

54.     Competition between American and JetBlue has, for years, resulted in lower fares for consumers traveling to and from Boston.  Since JetBlue launched service at Boston Logan, it has touted in presentations to governmental agencies, lenders, and public audiences that its competition with American and other legacy airlines has reduced fares.  JetBlue has advertised, for example, that the average fare for flights between Boston Logan and LaGuardia fell from $223 to $115 after it entered the market.  As American's Manager of Sales Planning explained in 2019, American's operations in Boston do "not perform well from a profitability perspective . . . largely due to the fare destruction B6 [JetBlue] have wrought."

55.     Before the Northeast Alliance, competition between American and JetBlue was poised to increase.  American planned to significantly increase Boston Logan departures and add new destinations between 2019 to 2024.  In September 2019, American's Senior Vice President for Network Strategy rallied his team: "WE are not done in BOS" and "are going to fight like hell in BOS if I have anything to do with it."  In January 2020, the same executive commanded, "Gird your loins.  Time to swing the bat in Boston."

56.     JetBlue also planned to continue growing in Boston.  JetBlue's growth plans included adding more flights between Boston Logan and American's hubs in JFK/LaGuardia, Reagan National, and Philadelphia International Airport.  As a January 2020 planning document explains: "To defend and increase our leading market share position in BOS, more JetBlue options are added in Boston's key routes to NYC, DCA and PHL [Philadelphia], serving leisure and business customers alike with an (almost) hourly service."

57.     The Northeast Alliance will eliminate the growing competition between American and JetBlue in Boston.  Indeed, for JetBlue, that is a feature of the Northeast Alliance, not a bug.  When JetBlue was developing a joint flight schedule with American in April 2020, it identified

22

as a strategic goal driving higher margins in markets between Boston and American hubs.  Less

than three weeks later, JetBlue circulated a draft joint network schedule showing capacity cuts in

those very markets.  The schedule also proposed that American terminate its service from Boston

to Rochester and Syracuse, markets where American previously competed against JetBlue.

### B. The Northeast Alliance Likely Will Harm Competition in Domestic Markets to and from JFK/LaGuardia

58.     The Northeast Alliance will eliminate competition between American and JetBlue

in markets to and from JFK and LaGuardia, leading to reductions in capacity, higher fares, and

lower quality of service.  Prior to the pandemic, American and JetBlue competed to provide

nonstop service in the 17 domestic markets with JFK or LaGuardia as an endpoint that are listed

in Appendix B.  JetBlue's nonstop service also competed against American's connecting service

in many other domestic markets to and from JFK and LaGuardia.

59.     JetBlue describes itself as "New York's Hometown Airline" and is the only low-

cost carrier with a significant presence at JFK and LaGuardia.  Its unique business model has

enabled it to deliver a "superior product and service compared to its legacy competitors at a

significantly lower cost."  As JetBlue touted in 2019: "Since JetBlue entered the market, overall

JFK passenger traffic has soared from about 30 million annual travelers in 1999 to 62 million

today—that happened because of us and our effect on the market!"  "We've doubled traffic at

one of the world's largest airports in less than two decades—that's what competition brings—

that's what LCCs [low-cost carriers] like JetBlue do!"

60.     JetBlue's introduction of Mint, a premium cabin that competes with other airlines'

business class, further illustrates JetBlue's impact in New York City.  In June 2014, JetBlue

added Mint service on flights between JFK and Los Angeles International Airport, a nonstop

route also served by American and Delta.  Following JetBlue's introduction of Mint on that

route, JetBlue executives observed in internal emails that American and Delta "lowered" their fares "to match B6 [JetBlue] levels." JetBlue calculated that, following JetBlue entry, American and Delta's business class fares on that route fell roughly 49 to 79 percent, depending on the class of fare.

61.     The introduction of Mint has had similar impacts on pricing in other markets where American and JetBlue compete. As JetBlue has explained, the "Mint premium product has been revolutionary in the Transcontinental US. Since Mint was introduced in 2014: Public fares for the premium cabin have decreased, making business class more affordable for all customers." Other carriers, including American, have also "improved their front cabin product to better compete with Mint."

62.     Just as JetBlue has pressured other airlines to reduce fares and improve quality, so too has American constrained JetBlue's pricing. For example, in 2019, American suspended service between JFK and San Diego International Airport, a route on which American competed with JetBlue. Temporarily freed of competition from American, JetBlue "effectively increased fares by $20 to $40," making service between JFK and San Diego "one of the highest fare trans-con markets in the system." In other words, the elimination of American as a competitor on the route allowed JetBlue to raise fares. The elimination of competition between American and JetBlue after the Northeast Alliance will similarly lead to higher prices and worse service for consumers.

### C.     The Northeast Alliance Likely Will Harm Competition in Transatlantic Markets

63.     Prior to the Northeast Alliance, JetBlue had announced plans to launch nonstop transatlantic service, competing against American between JFK and London, and between Boston and London. JetBlue also planned to launch nonstop service to other locations in Europe,

like Paris, where it could "disrupt and capture market share." The Northeast Alliance will significantly diminish JetBlue's incentive to compete aggressively on transatlantic service to and from Boston and New York City—routes dominated by the legacy airlines and their international allies. As a result, consumers will face higher prices and lower quality of service in these markets.

64. As JetBlue has explained, legacy airlines control an "alarmingly high portion of the transatlantic . . . marketplace." The markets between London and Boston and between London and New York City are highly concentrated, dominated by the three legacy carriers and their respective international alliances. As a result, JetBlue has explained, "legacy-dominant" service between the United States and Europe has become "uncompetitive" and "over priced." In addition, the "already dominant" legacy carriers have used alliances and other partnerships with foreign airlines to obtain "even greater scale and control" in these markets.

65. By adding service to London from Boston and JFK, JetBlue planned to "disrupt the transatlantic market through the introduction of its lower airfares and higher-quality service, just as it has done in the transcontinental United States market since introducing its Mint business-class product in 2014." JetBlue has explained that it is "the only . . . credible potential entrant" on these routes.

66. American recognized the threat posed by JetBlue's introduction of transatlantic service. On flights between Boston and London, for example, American predicted that the revenues generated by its alliance with British Airways on that route would fall 10 percent. American's Managing Director of Europe, Middle East, and Asia Sales stated that competition in that market "is going to be a fare fight especially when B6 [JetBlue] looks to get into the fray."

67. Although JetBlue has recently launched service between JFK and London, and

announced plans to launch service between Boston and London beginning in 2022, under the Northeast Alliance, JetBlue will share revenues that American earns on transatlantic service to and from Boston and New York City.  Thus, any effort by JetBlue to undercut American on price would reduce the revenues JetBlue earns under the revenue-sharing arrangement.  As a consequence, JetBlue will have less incentive to compete aggressively with American in those markets, whether by lowering fares or improving service.  JetBlue will also have less incentive to enter new transatlantic markets where it would compete with American.

> **D.** **The Northeast Alliance Likely Will Harm Competition Between American and JetBlue Across Their Networks**

68.     In the following ways, among others, the Northeast Alliance likely will result in a wide-ranging diminution of competition that extends beyond the markets where American and JetBlue provide competing service to and from Boston and New York City.

69.     First, as a January 2020 presentation to American's Board of Directors highlights, a leading value of a JetBlue partnership is to "[f]urther domestic consolidation."  Like past mergers, the Northeast Alliance will help American reduce service and restrict capacity growth, and enhance its efforts to achieve capacity discipline.  In late March 2020, a few weeks into the pandemic, American's President spent "a long time on [the] phone" with Delta's former CEO, and then emailed American's Chief Revenue Officer, reporting "[g]eneral agreement" that "the industry is going to have to shed a tremendous amount of capacity."  The partnership with JetBlue, American's President explained, "will help facilitate" these capacity reductions.

70.     The Northeast Alliance is particularly likely to lead to a reduction in capacity in Philadelphia, where American operates a hub.  Today, Philadelphia plays an important role in American's network, serving as American's "Primary Transatlantic and Northeast connecting hub."  Prior to the Northeast Alliance, American planned to increase its operations in

Philadelphia, including by increasing "north/south flying" along the East Coast, offering "more flights on peak business days," and adding "more flights to leisure markets on Saturday." These investments would have increased competition, driving down prices for consumers. Under the Northeast Alliance, however, American will share the revenues JetBlue earns on flights to and from Boston and New York City. Therefore, American will have less incentive to follow through on its own planned investments in Philadelphia, which it otherwise would have used to connect many of the same origins and destinations. As American executives put it, the partnership with JetBlue "will erode its [Philadelphia's] unique value" for American, causing Philadelphia to be "de prioritized." American internally estimated that the Northeast Alliance would cause American to forgo over $500 million in annual revenues from reduced flying out of Philadelphia on transatlantic routes alone.

71.    Second, the Northeast Alliance aligns the interests of JetBlue with American, thereby limiting JetBlue's ability and incentive to remain an independent and disruptive force. JetBlue will have approximately two thirds of its business tied up with American under the Northeast Alliance. As a result, JetBlue will rationally fear that aggressive actions towards American may cause American to terminate the partnership or otherwise discipline JetBlue for taking actions that displease American in any market.

72.    Indeed, the Northeast Alliance empowers American to do just that: it gives American executives new opportunities to engage regularly with JetBlue executives, and gives them carrots and sticks with which to reward or punish JetBlue depending on the actions JetBlue takes. For example, under the Northeast Alliance, American can selectively prevent JetBlue from being able to market American flights on connecting routes that JetBlue does not serve. Alternatively, if JetBlue takes actions that American favors, American can reward JetBlue by

allowing it to market additional American flights.  American also can withhold slots from

JetBlue at LaGuardia or JFK.  Or, if American likes what it sees from JetBlue, American can

grant JetBlue access to more slots.  In these ways and others, the Northeast Alliance will make

JetBlue beholden to its larger partner.  As a result, JetBlue will be less likely to add capacity,

lower fares, or enter routes where it would compete with American anywhere in its network.

73.     Third, the Northeast Alliance likely will cause American to pull its competitive

punches against JetBlue in order to maintain a good relationship.  Already, this dynamic is

evident in American's interactions with its other "partners."  For instance, American's CEO

explained to his board of directors that American takes certain actions "in the spirit of

'partnership'" with one of its international allies, including not pricing connecting service as

aggressively as it otherwise would on routes where its partner offers nonstop service.

74.     Fourth, the Northeast Alliance will dampen competition in many markets where

no airline provides nonstop service, but where American and JetBlue provide competing

connecting service.  These include the 98 markets listed in Appendix C.  Residents of these

smaller communities already face few choices in how they fly, and the connecting service

offered by JetBlue is often their only alternative to high-priced connecting service provided by

the legacy airlines.  In these markets, American connects passengers through one of its hubs,

such as Philadelphia or Charlotte.  JetBlue competes with American in these markets by

providing connecting service through Boston or JFK.  Under the Northeast Alliance, American

will share the revenues that JetBlue generates in these markets, thereby diminishing Defendants'

incentives to compete against each other.  As a result, consumers in these markets likely will pay

higher fares.

75.     Fifth, the Northeast Alliance makes JetBlue less likely to pursue partnerships with

other, small airlines that share JetBlue's incentive to disrupt the legacy carriers' hold on U.S. domestic markets.  Prior to the Northeast Alliance, JetBlue aspired to obtain, through transactions with other airlines, a national footprint to challenge the legacy carriers.  Provisions in the Northeast Alliance agreements diminish the ability and incentive of JetBlue to pursue these and other disruptive transactions, for example, by imposing financial penalties on JetBlue for engaging in certain agreements with other carriers.

## VII.   ABSENCE OF COUNTERVAILING FACTORS

### A.   New Entry and Expansion Will Not Prevent the Harms to Consumers

76.    New entry, or expansion by existing competitors, is unlikely to be timely or sufficient to prevent or remedy the Northeast Alliance's likely anticompetitive effects.  New entrants into a particular market face significant barriers to success, including difficulty in obtaining access to slots and gate facilities; the effects of corporate discount programs offered by dominant incumbents; loyalty to existing frequent flyer programs; an unknown brand; and the risk of aggressive responses to new entry by the dominant incumbent carrier.  In addition, entry is highly unlikely on routes where the origin or destination airport is another airline's hub, because the new entrant would face substantial challenges attracting sufficient local passengers to support service.

### B.   Any Transaction-Specific Efficiencies Do Not Outweigh the Harms to Consumers

77.    There are no transaction-specific and cognizable efficiencies that outweigh the likely competitive harms of the Northeast Alliance.  Consistent with its role as a disruptive competitor that has increased capacity more than the legacy airlines, JetBlue has generally made more efficient use of its slot holdings in New York City than American, including by flying bigger planes than American.  American now seeks to capitalize on its own inefficiency by

claiming that the Northeast Alliance will enable JetBlue to use its slots instead, resulting in growth benefitting consumers. But there is nothing stopping American from doing this on its own. American could—and in fact planned to—make more effective use of its own slots even without the Northeast Alliance, such as by replacing some of its smaller regional jets with larger planes, allowing it to offer additional seats to customers. Moreover, American could—and in fact planned to—simply sell or lease some of its slots to JetBlue. The Northeast Alliance is not reasonably necessary to accomplish any of Defendants' allegedly procompetitive goals. There are less restrictive alternatives by which Defendants could reasonably achieve any procompetitive benefits. Consumers will be better off if American and JetBlue continue to compete for their business.

### C. The Covid-19 Pandemic Does Not Excuse the Harms to Consumers

78. Defendants seek to justify their unprecedented and anticompetitive alliance by pointing to the temporary decrease in consumer demand for air travel that has resulted from the pandemic. The Northeast Alliance, however, was in the works before the pandemic began to affect the demand for air travel in the United States. In addition, as American and JetBlue themselves have stated publicly, the impact of the pandemic on demand is temporary, and the industry is expected to rebound. Neither airline is failing; they received billions of dollars in subsidies from American taxpayers over the course of the pandemic. There is no reason to accept the significant loss of competition that will accompany the Northeast Alliance. Air travel will recover and, as it does, it is important that American and JetBlue continue to compete for the benefit of consumers.

### D. Defendants' Commitments Are Inadequate to Prevent the Harms to Consumers

79.     On January 10, 2021, Defendants entered into an agreement with the United States Department of Transportation in which they made several commitments regarding the Northeast Alliance. These commitments fail to remedy the harms likely to result from the Northeast Alliance because, among other things, they do not address the competitive harms likely to occur in markets to and from Boston; are far too small in scope to address the harms likely to occur in the many markets to and from New York City; fail to remedy the harms in other markets where Defendants likely will reduce capacity and raise fares; and fail to prevent the diminution in JetBlue's independence and disruptiveness that is likely to result from the Northeast Alliance.

80.     Essentially conceding the anticompetitive nature of the Northeast Alliance, Defendants have recently amended their agreements to carve out from capacity coordination and revenue-sharing six extraordinarily concentrated markets to and from Boston where both Defendants provided competing nonstop service prior to the pandemic. These amendments, however, leave open the prospect that American and JetBlue could add these routes back into the Northeast Alliance under certain conditions. Moreover, even now, these six markets remain within the scope of certain provisions of the Northeast Alliance, including those that allow Defendants to code-share. The amendments to the Northeast Alliance fail to adequately address the anticompetitive effects in these six markets and do nothing to address the many other markets where the Northeast Alliance likely will harm competition.

## VIII. VIOLATION ALLEGED

81.     The United States and Plaintiff States hereby incorporate the allegations of paragraphs 1 through 80 above as if set forth fully herein.

82. The Northeast Alliance is a contract, combination, and conspiracy within the meaning of Section 1 of the Sherman Act, 15 U.S.C. § 1.

83. Under the Northeast Alliance, Defendants will collectively have market power in the sale of scheduled air passenger service in the markets listed in the Appendices, and in other markets where Defendants compete or likely would compete in the future.

84. The Northeast Alliance unreasonably restrains competition in the relevant markets, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

85. Unless enjoined, the Northeast Alliance likely would have the following effects, among others, in the relevant markets:

  (a)  actual and potential competition between American and JetBlue would be eliminated;

  (b)  competition in general among airlines would be reduced;

  (c)  airline fares would be higher than they otherwise would be;

  (d)  capacity would be lower than it otherwise would be; and

  (e)  service would be lessened.

86. The prospective procompetitive benefits, if any, do not outweigh the likely anticompetitive effects of the Northeast Alliance.

## IX.   REQUEST FOR RELIEF

87. Plaintiffs request that:

  (a)  the Northeast Alliance be adjudged to violate Section 1 of the Sherman Act, 15 U.S.C. § 1;

  (b)  Defendants be permanently enjoined from continuing and restrained from further implementing the Northeast Alliance;

  (c)  Plaintiffs be awarded their costs of this action, including attorneys' fees;

and

(d)     Plaintiffs be awarded such other relief as the Court may deem just and

proper.

Dated: September 21, 2021

Respectfully submitted,

**FOR PLAINTIFF UNITED STATES OF AMERICA:**

/s/ Richard A. Powers
RICHARD A. POWERS
Acting Assistant Attorney General
Antitrust Division

/s/ Kathleen S. O'Neill
KATHLEEN S. O'NEILL
Senior Director of Investigations &
Litigation

/s/ Craig W. Conrath
CRAIG W. CONRATH
Director of Civil Litigation

/s/ Robert A. Lepore
ROBERT A. LEPORE
Chief
Transportation, Energy & Agriculture
Section

/s/ Patricia C. Corcoran
PATRICIA C. CORCORAN
Assistant Chief
Transportation, Energy & Agriculture
Section

/s/ Katherine Celeste Speegle
KATHERINE CELESTE SPEEGLE
Assistant Chief
Transportation, Energy & Agriculture
Section

/s/ William H. Jones II
WILLIAM H. JONES II*
DON P. AMLIN
MAISIE A. BALDWIN
GRANT A. BERMANN
JAMES H. CONGDON
MARISA DIEKEN
J. RICHARD DOIDGE (MA Bar No. 600158)
ERIC D. DUNN
JEREMY P. EVANS
MICHELLE LIVINGSTON
SARAH P. MCDONOUGH
VERONICA N. ONYEMA
SCOTT REITER
KATE M. RIGGS (MA Bar No. 670510)
CHINITA M. SINKLER

U.S. Department of Justice
Antitrust Division
450 Fifth Street, NW, Suite 8000
Washington, DC 20530
Tel: (202) 598-8805
Fax: (202) 307-5802
Email: bill.jones2@usdoj.gov

*Attorneys for Plaintiff United States of America*

*Attorney of Record

**FOR PLAINTIFF STATE OF ARIZONA:**

MARK BRNOVICH
Attorney General

*/s/* Dana R. Vogel
DANA R. VOGEL (AZ Bar No. 030748)
ROBERT BERNHEIM (AZ Bar No. 024664)
CHRISTINA GREY (AZ Bar No. 035822)

Arizona Attorney General's Office
2005 North Central Avenue
Phoenix, AZ 85004
Tel: (602) 542-7748
Email: Dana.Vogel@azag.gov

*Attorneys for Plaintiff State of Arizona*

**FOR PLAINTIFF STATE OF CALIFORNIA:**

ROB BONTA
Attorney General

KATHLEEN E. FOOTE
Senior Assistant Attorney General

NATALIE S. MANZO
MICHAEL W. JORGENSON
Supervising Deputy Attorneys General

ROBERT B. McNARY
JAMIE L. MILLER
Deputy Attorneys General

*/s/* Robert B. McNary
ROBERT B. McNARY (CA Bar No. 253745)

California Office of the Attorney General
300 South Spring Street, Suite 1702
Los Angeles, CA 90013
Tel: (213) 269-6283
Email: robert.mcnary@doj.ca.gov

*Attorneys for Plaintiff State of California*

**FOR PLAINTIFF DISTRICT OF COLUMBIA:**

KARL A. RACINE
Attorney General

KATHLEEN KONOPKA (DC Bar No. 495257)
Deputy Attorney General

/s/ Arthur T. Durst
ARTHUR T. DURST (DC Bar No. 888273305)
CATHERINE A. JACKSON (DC Bar No. 1005415)

Office of the Attorney General for the District of Columbia
400 Sixth Street NW, Tenth Floor
Washington, DC 20001
Tel: (202) 442-9853
Email: arthur.durst@dc.gov

*Attorneys for Plaintiff District of Columbia*

**FOR PLAINTIFF STATE OF FLORIDA:**

ASHLEY MOODY
Attorney General

/s/ Lizabeth A. Brady
LIZABETH A. BRADY (FL Bar No. 457991)
RACHEL S. BRACKETT (FL Bar No. 109775)
COLIN G. FRASER (FL Bar No. 104741)

Office of the Attorney General, State of Florida
PL-01, The Capitol
Tallahassee, FL 32399
Tel: (850) 414-3300
Email: Liz.Brady@myfloridalegal.com

*Attorneys for Plaintiff State of Florida*

**FOR PLAINTIFF COMMONWEALTH OF MASSACHUSETTS:**

MAURA HEALEY
Attorney General

*/s/* William T. Matlack
WILLIAM T. MATLACK (MA Bar No. 552109)
DANIEL H. LEFF (MA Bar No. 689302)

Office of the Attorney General
One Ashburton Place, 18th Floor
Boston, MA 02108
Tel: (617) 727-2200
Email: William.Matlack@mass.gov

*Attorneys for Plaintiff Commonwealth of Massachusetts*

**FOR PLAINTIFF COMMONWEALTH OF PENNSYLVANIA:**

JOSH SHAPIRO
Attorney General

JAMES A. DONAHUE, III (PA Bar No. 42624)
Executive Deputy Attorney General
Public Protection Division

*/s/* Tracy W. Wertz
TRACY W. WERTZ (PA Bar No. 69164)
JOSEPH S. BETSKO (PA Bar No. 82620)
JENNIFER A. THOMSON (PA Bar No. 89360)

Pennsylvania Office of Attorney General
Antitrust Section
14th Floor Strawberry Square
Harrisburg, PA 17120
Tel: (717) 787-4530
Email: twertz@attorneygeneral.gov

*Attorneys for Plaintiff Commonwealth of Pennsylvania*

**FOR PLAINTIFF COMMONWEALTH OF VIRGINIA:**

MARK R. HERRING
Attorney General

ERIN B. ASHWELL
Chief Deputy Attorney General

SAMUEL T. TOWELL
Deputy Attorney General
Civil Litigation Division

RICHARD S. SCHWEIKER, JR.
Senior Assistant Attorney General and Chief Consumer Protection Section

*/s/* Sarah Oxenham Allen
SARAH OXENHAM ALLEN (VA Bar No. 33217)
TYLER T. HENRY (VA Bar No. 87621)

Office of the Virginia Attorney General
Antitrust Unit
202 North Ninth Street
Richmond, VA 23219
Tel: (804) 786-6557
Email: SOAllen@oag.state.va.us

*Attorneys for Plaintiff Commonwealth of Virginia*

**APPENDIX A – Shares and HHI Based on Calendar Year 2019 Revenues**

| Market | American Share | JetBlue Share | Combined Share | Resulting HHI | Increase in HHI |
|---|---|---|---|---|---|
| Boston (BOS) to Charlotte (CLT) | 72% | 25% | 96% | 9245 | 3518 |
| Boston (BOS) to Washington DC (DCA)* | 44% | 44% | 88% | 7877 | 3870 |
| Boston (BOS) to Philadelphia (PHL) | 57% | 30% | 87% | 7716 | 3423 |
| Boston (BOS) to Rochester (ROC) | 29% | 57% | 86% | 7548 | 3344 |
| Boston (BOS) to Phoenix (PHX/AZA) | 69% | 16% | 85% | 7319 | 2223 |
| Boston (BOS) to Dallas (DFW/DAL) | 67% | 16% | 84% | 7086 | 2190 |
| Boston (BOS) to Syracuse (SYR) | 25% | 57% | 82% | 6968 | 2887 |
| Boston (BOS) to Miami (MIA/FLL) | 41% | 35% | 76% | 6052 | 2889 |
| Boston (BOS) to Los Angeles (LAX/LGB/BUR/ONT/SNA) | 28% | 34% | 63% | 4404 | 1941 |
| Boston (BOS) to NYC (JFK/LGA) | 29% | 21% | 50% | 5000 | 1207 |
| Boston (BOS) to Chicago (ORD/MDW) | 35% | 13% | 48% | 3661 | 940 |

*\* Delta began nonstop service in this market in September 2019.  Therefore, the shares and the HHI in this market were calculated based on revenue generated in the Fourth Quarter of 2019, the full quarter following Delta's entry into the market.*

## APPENDIX B – Shares and HHI Based on Calendar Year 2019 Revenues

| Market | American Share | JetBlue Share | Combined Share | Resulting HHI | Increase in HHI |
|---|---|---|---|---|---|
| NYC (JFK/LGA) to Nantucket (ACK)* | 6% | 90% | 95% | 9091 | 1034 |
| NYC (JFK/LGA) to Martha's Vineyard (MVY)* | 18% | 73% | 91% | 8327 | 2584 |
| NYC (JFK/LGA) to Phoenix (PHX/AZA) | 52% | 9% | 62% | 4943 | 951 |
| NYC (JFK/LGA) to West Palm Beach (PBI)** | 3% | 57% | 60% | 5177 | 379 |
| NYC (JFK/LGA) to Los Angeles (LAX/LGB/BUR/ONT/SNA) | 27% | 32% | 58% | 4452 | 1686 |
| NYC (JFK/LGA) to Miami (MIA/FLL) | 33% | 23% | 56% | 4609 | 1522 |
| NYC (JFK/LGA) to Orlando (MCO) | 7% | 48% | 55% | 4797 | 672 |
| NYC (JFK/LGA) to Boston (BOS) | 29% | 21% | 50% | 4999 | 1207 |
| NYC (JFK/LGA) to Raleigh-Durham (RDU) | 37% | 11% | 48% | 4980 | 821 |
| NYC (JFK/LGA) to Savannah (SAV) | 5% | 41% | 47% | 5003 | 422 |
| NYC (JFK/LGA) to Las Vegas (LAS) | 14% | 32% | 46% | 4630 | 893 |
| NYC (JFK/LGA) to San Francisco (SFO/OAK/SJC) | 19% | 27% | 46% | 3688 | 1037 |
| NYC (JFK/LGA) to Austin (AUS) | 23% | 21% | 45% | 4304 | 993 |
| NYC (JFK/LGA) to San Diego (SAN) | 12% | 33% | 45% | 4617 | 791 |
| NYC (JFK/LGA) to Charleston (CHS) | 9% | 35% | 44% | 5054 | 615 |
| NYC (JFK/LGA) to Portland, ME (PWM) | 20% | 18% | 37% | 5317 | 695 |
| NYC (JFK/LGA) to Chicago (ORD/MDW) | 33% | 3% | 36% | 2732 | 207 |

*Both American and JetBlue operate nonstop service in these markets on a seasonal basis during the summer.*

*\*\* American operates nonstop service in this market during the winter, while JetBlue operates nonstop service in this market year round.*

**APPENDIX C – Shares and HHI Based on Calendar Year 2019 Revenues**

| Market | American Share | JetBlue Share | Combined Share | Resulting HHI | Increase in HHI |
|---|---|---|---|---|---|
| Martha's Vineyard (MVY) to Charleston (CHS) | 21% | 79% | 100% | 10000 | 3286 |
| Nantucket (ACK) to Sarasota (SRQ) | 29% | 71% | 100% | 10000 | 4119 |
| Nashville (BNA) to Martha's Vineyard (MVY) | 64% | 31% | 96% | 9165 | 4017 |
| Jacksonville (JAX) to Martha's Vineyard (MVY) | 12% | 83% | 95% | 9125 | 2007 |
| New Orleans (MSY) to Martha's Vineyard (MVY) | 65% | 26% | 91% | 8432 | 3432 |
| Martha's Vineyard (MVY) to Pittsburgh (PIT) | 19% | 72% | 91% | 8376 | 2783 |
| Nantucket (ACK) to New Orleans (MSY) | 19% | 70% | 90% | 8096 | 2725 |
| Nantucket (ACK) to Portland, OR (PDX) | 5% | 85% | 90% | 8221 | 881 |
| Nantucket (ACK) to Rochester (ROC) | 10% | 80% | 90% | 8229 | 1642 |
| Nantucket (ACK) to Jacksonville (JAX) | 6% | 84% | 90% | 8085 | 1013 |
| Martha's Vineyard (MVY) to Raleigh-Durham (RDU) | 26% | 63% | 89% | 8036 | 3324 |
| Nantucket (ACK) to Tampa (TPA/PIE) | 11% | 78% | 89% | 7947 | 1680 |
| Orlando (MCO) to Martha's Vineyard (MVY) | 9% | 81% | 89% | 8081 | 1386 |
| Nantucket (ACK) to Charleston (CHS) | 17% | 70% | 87% | 7644 | 2331 |
| Nantucket (ACK) to Orlando (MCO) | 5% | 82% | 87% | 7582 | 808 |
| Martha's Vineyard (MVY) to Tampa (TPA/PIE) | 16% | 68% | 84% | 7260 | 2240 |
| Martha's Vineyard (MVY) to Syracuse (SYR) | 12% | 72% | 84% | 7300 | 1748 |
| Nantucket (ACK) to Fort Myers (RSW) | 5% | 78% | 83% | 7076 | 793 |
| Nantucket (ACK) to Raleigh-Durham (RDU) | 18% | 64% | 83% | 6927 | 2365 |
| Martha's Vineyard (MVY) to Cleveland (CLE/CAK) | 28% | 54% | 82% | 6881 | 3040 |
| Martha's Vineyard (MVY) to Charlotte (CLT) | 63% | 20% | 82% | 6989 | 2468 |
| Nantucket (ACK) to Richmond (RIC) | 13% | 69% | 82% | 6860 | 1806 |
| Martha's Vineyard (MVY) to Richmond (RIC) | 16% | 63% | 79% | 6483 | 1990 |
| Nantucket (ACK) to Miami (MIA/FLL) | 15% | 63% | 78% | 6268 | 1890 |
| Miami (MIA/FLL) to Martha's Vineyard (MVY) | 13% | 64% | 77% | 6179 | 1661 |
| Nantucket (ACK) to Charlotte (CLT) | 50% | 27% | 77% | 6242 | 2698 |
| Nantucket (ACK) to Pittsburgh (PIT) | 10% | 66% | 76% | 6082 | 1345 |
| Nantucket (ACK) to Philadelphia (PHL) | 12% | 63% | 75% | 6246 | 1516 |
| Nantucket (ACK) to Cleveland (CLE/CAK) | 28% | 44% | 72% | 5446 | 2439 |
| Minneapolis-St. Paul (MSP) to Martha's Vineyard (MVY) | 10% | 61% | 71% | 5610 | 1241 |
| Nantucket (ACK) to Atlanta (ATL) | 15% | 55% | 70% | 5311 | 1660 |
| Martha's Vineyard (MVY) to Chicago (ORD/MDW) | 37% | 33% | 70% | 5697 | 2433 |
| Nantucket (ACK) to Nashville (BNA) | 29% | 41% | 70% | 5297 | 2383 |
| Buffalo (BUF) to Palm Springs (PSP) | 63% | 5% | 68% | 5112 | 631 |
| Martha's Vineyard (MVY) to Atlanta (ATL) | 33% | 34% | 67% | 5145 | 2220 |
| Nantucket (ACK) to Phoenix (PHX/AZA) | 43% | 23% | 66% | 4918 | 1961 |
| Martha's Vineyard (MVY) to Dallas (DAL/DFW) | 59% | 5% | 64% | 5108 | 609 |
| San Juan (SJU) to Syracuse (SYR) | 21% | 43% | 64% | 4690 | 1801 |
| Martha's Vineyard (MVY) to Detroit (DTW) | 19% | 43% | 62% | 4773 | 1616 |
| Nantucket (ACK) to Dallas (DAL/DFW) | 54% | 8% | 62% | 5062 | 913 |
| Nantucket (ACK) to Chicago (ORD/MDW) | 28% | 33% | 61% | 4397 | 1841 |
| Burlington (BTV) to San Juan (SJU) | 17% | 44% | 61% | 4518 | 1515 |
| Martha's Vineyard (MVY) to Savannah (SAV) | 9% | 50% | 60% | 5186 | 931 |
| Burlington (BTV) to Fort Myers (RSW) | 40% | 18% | 58% | 4259 | 1431 |
| Burlington (BTV) to West Palm Beach (PBI) | 36% | 22% | 58% | 4289 | 1586 |
| Burlington (BTV) to Jacksonville (JAX) | 45% | 12% | 57% | 4280 | 1111 |
| West Palm Beach (PBI) to Syracuse (SYR) | 50% | 7% | 57% | 4563 | 690 |
| Jacksonville (JAX) to Syracuse (SYR) | 51% | 5% | 56% | 4512 | 553 |
| Albuquerque (ABQ) to Syracuse (SYR) | 50% | 6% | 56% | 4131 | 574 |

**APPENDIX C – Shares and HHI Based on Calendar Year 2019 Revenues**

| Market | American Share | JetBlue Share | Combined Share | Resulting HHI | Increase in HHI |
|---|---|---|---|---|---|
| Burlington (BTV) to Tampa (TPA/PIE) | 43% | 12% | 55% | 4044 | 1043 |
| Burlington (BTV) to Miami (MIA/FLL) | 40% | 15% | 54% | 4062 | 1164 |
| Savannah (SAV) to Syracuse (SYR) | 47% | 6% | 54% | 4377 | 595 |
| Burlington (BTV) to Charleston (CHS) | 40% | 12% | 52% | 3848 | 953 |
| Burlington (BTV) to Raleigh-Durham (RDU) | 40% | 12% | 52% | 3932 | 976 |
| Nantucket (ACK) to Detroit (DTW) | 23% | 29% | 52% | 3517 | 1342 |
| Charleston (CHS) to Syracuse (SYR) | 46% | 5% | 51% | 4226 | 448 |
| Burlington (BTV) to Phoenix (PHX/AZA) | 37% | 13% | 50% | 3721 | 939 |
| Burlington (BTV) to Savannah (SAV) | 35% | 14% | 50% | 3867 | 1024 |
| Buffalo (BUF) to Savannah (SAV) | 41% | 8% | 49% | 4351 | 665 |
| Burlington (BTV) to New Orleans (MSY) | 40% | 9% | 49% | 3736 | 731 |
| Albuquerque (ABQ) to Burlington (BTV) | 21% | 28% | 48% | 3739 | 1140 |
| Burlington (BTV) to Buffalo (BUF) | 26% | 22% | 48% | 3641 | 1126 |
| Reno (RNO) to Rochester (ROC) | 23% | 25% | 48% | 4442 | 1144 |
| Providence (PVD) to San Juan (SJU) | 32% | 15% | 47% | 3741 | 945 |
| Portland, ME (PWM) to Rochester (ROC) | 40% | 6% | 46% | 3094 | 485 |
| San Diego (SAN) to Syracuse (SYR) | 40% | 6% | 46% | 3523 | 488 |
| Syracuse (SYR) to Los Angeles (LAX/LGB/BUR/ONT/SNA) | 33% | 13% | 46% | 3517 | 862 |
| Jacksonville (JAX) to Portland, ME (PWM) | 38% | 6% | 44% | 3260 | 437 |
| Burlington (BTV) to Orlando (MCO) | 24% | 19% | 43% | 2973 | 925 |
| Las Vegas (LAS) to Syracuse (SYR) | 38% | 6% | 43% | 3369 | 425 |
| Albuquerque (ABQ) to Rochester (ROC) | 30% | 11% | 41% | 2900 | 672 |
| Fort Myers (RSW) to Syracuse (SYR) | 35% | 5% | 41% | 3043 | 379 |
| Buffalo (BUF) to Portland, ME (PWM) | 32% | 8% | 40% | 2861 | 508 |
| Burlington (BTV) to San Diego (SAN) | 22% | 17% | 40% | 3559 | 769 |
| Portland, ME (PWM) to San Juan (SJU) | 31% | 9% | 40% | 2807 | 557 |
| Boston (BOS) to Reno (RNO) | 35% | 5% | 40% | 2928 | 375 |
| Buffalo (BUF) to San Juan (SJU) | 12% | 27% | 39% | 3175 | 671 |
| Buffalo (BUF) to West Palm Beach (PBI) | 31% | 7% | 38% | 3243 | 422 |
| Burlington (BTV) to Los Angeles (LAX/LGB/BUR/ONT/SNA) | 19% | 19% | 38% | 3650 | 706 |
| Rochester (ROC) to San Juan (SJU) | 18% | 20% | 38% | 2880 | 713 |
| Rochester (ROC) to Savannah (SAV) | 31% | 6% | 38% | 4031 | 384 |
| West Palm Beach (PBI) to Rochester (ROC) | 29% | 9% | 38% | 3237 | 526 |
| Austin (AUS) to Burlington (BTV) | 26% | 10% | 36% | 3401 | 499 |
| Miami (MIA/FLL) to Rochester (ROC) | 30% | 6% | 36% | 3075 | 352 |
| Portland, ME (PWM) to Los Angeles (LAX/LGB/BUR/ONT/SNA) | 29% | 7% | 36% | 3071 | 410 |
| Raleigh-Durham (RDU) to Rochester (ROC) | 31% | 5% | 36% | 2765 | 321 |
| San Francisco (SFO/OAK/SJC) to Syracuse (SYR) | 25% | 11% | 36% | 3298 | 542 |
| San Juan (SJU) to Albany (ALB) | 19% | 16% | 36% | 3324 | 628 |
| Los Angeles (LAX/LGB/BUR/ONT/SNA) to Rochester (ROC) | 26% | 9% | 35% | 3127 | 475 |
| Burlington (BTV) to Las Vegas (LAS) | 26% | 9% | 34% | 3305 | 442 |
| Jacksonville (JAX) to Rochester (ROC) | 28% | 6% | 34% | 3032 | 325 |
| Portland, ME (PWM) to Reno (RNO) | 14% | 20% | 33% | 4871 | 540 |
| Albuquerque (ABQ) to San Juan (SJU) | 27% | 5% | 32% | 2652 | 279 |
| Burlington (BTV) to Seattle (SEA) | 16% | 17% | 32% | 3426 | 525 |
| Seattle (SEA) to Syracuse (SYR) | 27% | 6% | 32% | 2869 | 305 |
| Syracuse (SYR) to Houston (IAH/HOU) | 26% | 6% | 32% | 3447 | 298 |
| Key West (EYW) to Syracuse (SYR) | 24% | 8% | 31% | 3904 | 371 |
| Martha's Vineyard (MVY) to Phoenix (PHX/AZA) | 5% | 26% | 31% | 5712 | 247 |