# EXHIBIT B

CORRECTED

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA et al.,

*Plaintiffs*,

v.

AMERICAN AIRLINES GROUP INC. and JETBLUE AIRWAYS CORPORATION,

*Defendants*.

Case No. 1:21-cv-11558-LTS

**Motion for leave to file under seal granted on November 18, 2022**

## PLAINTIFFS' PROPOSED FINDINGS OF FACT

256. Mr. Hayes testified that antitrust immunity allows international joint ventures to "coordinate schedules, coordinate prices, share revenue" which, in his words, is "legalized collusion," further noting that such agreements allow airlines to "gain strength and market share that often prevents new competitors from even considering or stepping into market." Tr. Vol. 1, 149:7–150:17 at 149:20-25 (Hayes/JetBlue).

257. Andrew Guenthner, Delta's Director of Alliances, testified that "when you have antitrust immunity" you can have "revenue sharing and/or [a] profit sharing arrangement" but "[i]f you don't have antitrust immunity . . . [y]ou don't coordinate fares, you don't coordinate inventory access." Guenthner (Delta) Dep. 234:16–236:19 at 235:19-23, 236:5-14, June 1, 2022.

███████████████████████████████████████████████
███████████████████████████

258. It is notable that no domestic airline joint venture has received antitrust immunity. Mr. Raja testified that, before the NEA, American had no domestic alliances involving pooled slots and gates and joint decisions on who was going to use them. Tr. Vol. 4, 104:12-16 (Raja/American). American's west coast alliance with Alaska (the "WCIA") does not include coordination on the number of flights for overlap routes, because only international joint ventures with those features can obtain antitrust immunity. Tr. Vol. 4, 104:2–105:15 at 104:2-11 (Raja/American). American understood that domestic alliances had limits, noting internally about a potential JetBlue partnership that became the NEA, "[s]imilar to the AS [Alaska] partnership [WCIA], without ATI there are many things the two partnerships cannot discuss." PX0334 at 36.

    D.    **The Northeast Alliance has adversely affected competition.**

        1.    **Defendants now cooperate instead of competing on overlapping NEA Routes.**

            a.    **As a result of the NEA, Defendants no longer compete with one another at NEA Airports.**

259. The NEA ended the fierce head-to-head competition between American and JetBlue in Boston and New York City. Mr. Hayes admitted that "*outside of the NEA*, we are full blooded competitors", but "*within the NEA* . . . we don't compete with each other directly." Tr.

Vol. 2, 53:7-15 (Hayes/JetBlue) (emphasis added); Tr. Vol. 1, 182:6-10 (Hayes/JetBlue) (emphasis added). Similarly, Mr. Laurence—formerly of JetBlue and now at American—agreed that "it makes more sense [for JetBlue] to cooperate with American, rather than compete for NEA Routes." Laurence (JetBlue) Dep. 146:18-25 (admitted at Tr. Vol. 5, 139:25–140:3).

260. American and JetBlue now coordinate on the NEA Routes that each flies. Tr. Vol. 15, 117:21–118:13 (Znotins/American). This means that American does not view JetBlue as a competitor on NEA Routes both from a network perspective and from a sales perspective. Tr. Vol. 15, 118:14-16, 126:15-21 (Znotins/American); Tr. Vol. 8, 28:13-20 (Swartz/American). As American's Vice President of Network Strategy, Brian Znotins noted, "We're still competitors in all respects *until we choose to implement the [NEA]* . . . ." PX0315 at 3 (emphasis added).

261. Pre-NEA, JetBlue competed with American for corporate customer business on NEA Routes. Roberta Mehoke, JetBlue's Director of Sales, recognized that that if business shifted from JetBlue to American, then JetBlue would lose revenue. Mehoke (JetBlue) Dep. 166:7-19, June 2, 2022 (objection pending). JetBlue therefore competed with American for corporate customer business because "whichever carrier has the better pricing/discount will get the sale." Mehoke (JetBlue) Dep. 186:2-12, June 2, 2022; PX0863 at 1. The NEA changes this competitive dynamic. Ms. Mehoke acknowledged that if business shifts to American in the NEA environment, "in the end the revenue is pooled between [American] and [JetBlue] so that is okay." Mehoke (JetBlue) Dep. 160:18–161:16, June 2, 2022; PX0834 at 1.

262. Other industry participants recognize that the NEA has changed the competitive landscape in the northeast. Delta considers there now to be one fewer competitors in Boston. Somers (Delta) Dep. 158:17-26, July 25, 2022 (objection pending). Andrew Murray, Senior Policy Analyst at the Port Authority of New York and New Jersey ("PANYNJ"), testified that the PANYNJ views American and JetBlue as a single competitor when analyzing competition within the NEA. Murray (PANYNJ) Dep. 230:13–230:20, 230:25–231:12, May 3, 2022; PX0887 at 63. Spirit's Vice President of Network Planning, John Kirby, testified that the NEA will create a

72

virtual duopoly between Delta and the NEA in New York City. Tr. Vol. 3, 128:11-13 (Kirby/Spirit); PX0894 at 3-4.

    **b.**  **The Northeast Alliance has eliminated independent competition between the Defendants to set their own routes and schedules.**

263. American and JetBlue now cooperate with one another on NEA Routes rather than compete to build their own schedules and networks. Before the NEA, Mr. Laurence (then at JetBlue) agreed that JetBlue made independent business decisions to enter new routes without consulting with American; now, if JetBlue planned to enter new routes encompassed by the NEA, it would expect to consult with American first. Tr. Vol. 5, 209:11-16, 211:5-14 (Laurence/American). Mr. Fintzen was unaware of an instance when American's and JetBlue's network representatives were unable to come to a consensus on a proposed schedule post-NEA. Tr. Vol. 8, 119:15–120:20 (Fintzen/JetBlue).

    **c.**  **The Northeast Alliance ensures metal neutrality between American and JetBlue, making the Defendants indifferent about whether customers choose either airline.**

264. The phrase "metal neutrality" refers to when airlines are "agnostic" about the airline on which a given customer flies. Bhargava (American) Dep. 186:15-21, June 3, 2022. The NEA renders American and JetBlue metal neutral, and therefore it "doesn't matter whether" a passenger purchases a ticket on "B6 metal or American metal." Bhargava (American) Dep. 187:13–188:16, June 3, 2022. Metal neutrality also means that American and JetBlue would "rather offer the customer an option between JetBlue and American than have them choose another airline or set of airlines." PX0793 at 1; Tr. Vol. 3, 7:25–9:11 at 9:4-11 (McMenamin/JetBlue); Tr. Vol. 5, 112:2–113:5, 144:5-11 (Laurence/American); PX0450 at 16. As discussed in more detail below, this metal neutrality eliminates any economic incentives for Defendants to win business from one another. *See infra* Section V.E.2.d.

73

Expert). Even Defendants acknowledge that COVID-19 continued to impact revenues in 2021. DX0437 at 1. Second, the NEA was implemented while the U.S. DOJ investigation and subsequently this litigation were ongoing—Defendants have an incentive to avoid changes in price and non-price aspects of competition that could be used as evidence of anticompetitive effects in the investigation and litigation. Tr. Vol. 10, 129:5–130:6 at 130:18-22 (Miller/Pls. Expert); PX0955 (Miller Reply Report) ¶¶ 15, 123. Third, the NEA has only partially been in place for much of the period for which data is available and the rollout of the NEA has been gradual over time. Tr. Vol. 10, 129:5–130:6 at 129:23–130:1 (Miller/Pls. Expert); DX1091 (Israel Report) ¶¶ 201-207.

351. These data issues make it difficult to identify proper control groups that can be used as a point of comparison for Dr. Carlton's difference-in-differences study. Tr. Vol. 17, 81:11–85:23 at 82:3-8 (Miller/Pls. Expert). Specifically, Dr. Carlton's control group and the treated group respond differently to COVID-19, meaning that a comparison across different markets is likely to be confounded with the effects of COVID-19. Tr. Vol. 17, 81:11–85:23 at 83:8-12 (Miller/Pls. Expert); PX0955 (Miller Reply Report) ¶ 18. This is likely because most of the treated routes are business routes, while a smaller portion of the control routes are business routes—and business routes suffered larger declines during COVID-19 than leisure routes. Tr. Vol. 17, 81:11–85:23 at 82:13–83:9 (Miller/Pls. Expert) (discussing demonstrative at 31).

## VI. PLAINTIFFS HAVE MET THEIR BURDEN TO PROVE THE ANTICOMPETITIVE EFFECTS OF THE NORTHEAST ALLIANCE IN MARKETS BEYOND THE OVERLAP MARKETS.

### A. The airline industry is susceptible to coordination.

#### 1. Airline capacity decisions are transparent.

352. Coordinated interaction among airlines can harm consumers even without an express agreement or direct communication among the airlines because it can reduce the intensity of competition. Tr. Vol. 9, 78:24–79:10 (Town/Pls. Expert). This kind of coordination involves conduct by multiple firms that is profitable for each of them only as a result of the accommodating reactions of the others. Tr. Vol. 9, 78:7-23 (Town/Pls. Expert).

100

353. Airlines can easily monitor their rivals' capacity decisions. Tr. Vol. 9, 81:7-16 (Town/Pls. Expert). Airlines publicize their schedules well in advance of flights taking place. PX0066. JetBlue's Pricing Manager, Evan Jarashow, for example, testified that JetBlue will "certainly be aware" of other airlines' schedule changes, including changes in capacity. Tr. Vol. 3, 99:7-25 (Jarashow/JetBlue).

354. Defendants' economic expert, Dr. Lee, testified that airlines have discussed capacity "openly" and that it is "unremarkable," for example, for competitor airlines to discuss capacity in the same room as each other at industry conferences. Tr. Vol. 12, 141:7-17 (Lee/Defs. Expert).

### 2. Airline prices are transparent.

355. Airlines can easily monitor their rivals' pricing. Tr. Vol. 9, 81:7-16 (Town/Pls. Expert); Tr. Vol. 10, 206:21–207:16 (Miller/Pls. Expert).

356. Airlines file their fares through the Airline Tariff Publishing Company ("ATPCO"), an industry standard clearinghouse for airfares. Tr. Vol. 3, 37:23–38:6 (Jarashow/JetBlue). For domestic markets, airlines file fares on ATPCO four times each weekday. Tr. Vol. 3, 38:7-11 (Jarashow/JetBlue).

357. Fares filed in ATPCO can be observed by anyone with an ATPCO subscription. Tr. Vol. 3, 38:12-14 (Jarashow/JetBlue). All domestic airlines have an ATPCO subscription. Tr. Vol. 3, 38:15-25 (Jarashow/JetBlue).

358. Other tools also enable airlines to monitor their competitors' fares. JetBlue uses AirPrice to evaluate changes other airlines make to their publicly filed fares in ATPCO. Tr. Vol. 3, 39:1-9 (Jarashow/JetBlue). JetBlue also uses a web-scraping tool to monitor the fares that competitors are selling on their websites and on third party sites. Tr. Vol. 3, 39:10-22 (Jarashow/JetBlue).

359. JetBlue considers what other airlines are charging, including their filed fares and what fares they are selling, as factors in setting its own prices. Tr. Vol. 3, 89:13–90:12 at 90:2-3

101

(Jarashow/JetBlue); *see infra* Section VI.A.2. American also monitors the prices that its competitors publish on ATPCO. Casey (American) Dep. 61:4–62:23, May 4, 2022.

### 3. Multi-market contacts facilitate coordination.

360. The airline industry has a high degree of "multi-market contacts" that facilitate coordination. Multi-market contacts refer to the fact that airlines compete with one another across many different city-pair markets, which increases the rewards from coordinating with one another and increases the costs of deviating from coordination. Tr. Vol. 9, 81:17-25 (Town/Pls. Expert).

361. One method used by airlines to punish a rival for competing too intensely is a cross-market initiative. A cross-market initiative occurs when one airline responds to a rival's low fare in one market by filing a low fare in a different market. Tr. Vol. 3, 55:22–56:9 (Jarashow/JetBlue); Tr. Vol. 14, 152:8-18 (Israel/Defs. Expert); Casey (American) Dep. 232:1-22, May 4, 2022. Airlines often use cross-market initiatives to punish rivals for cutting prices on certain routes, thereby helping to keep prices high. PX0521 at 1-2.

362. Executives from American, JetBlue, and other airlines admit that all airlines implement cross-market initiatives. Evan Jarashow, Pricing Manager at JetBlue, testified that airlines engage in cross-market initiatives. Tr. Vol. 3, 55:22–56:9 (Jarashow/JetBlue). Allysen Roberts, Senior Manager in Contract Pricing at American Airlines, testified that American and other airlines engage in cross-market initiatives. Roberts (American) Dep. 63:13–64:2, 68:5-11, May 10, 2021; PX0259 at 38. Don Casey, the former Senior Vice President of Revenue at American, explained that competitor pricing actions sometimes cause cross-market initiatives. Casey (American) Dep. 231:23–232:5, May 4, 2022. ████████████████████████████████████████████████████████████████████████████████████████████████████

363. Defendants' economic expert, Dr. Israel, also testified that airlines engage in cross-market initiatives. Tr. Vol. 14, 152:19-22 (Israel/Defs. Expert).

102

364. One example of a cross-market initiative occurred in February 2019. A JetBlue pricing summary reported that for the week ending February 22, 2019, walk-up fares in BOS-LAX "remained low at $139" because American had maintained a low price rather than follow its rivals' fare increases. PX0612 at 10; Tr. Vol. 3, 57:8–58:25 (Jarashow/JetBlue). JetBlue responded to this low $139 fare from American, which targeted JetBlue's focus city of Boston, by filing a $139 tactical fare in five routes to and from American's hubs. PX0612 at 10; Tr. Vol. 3, 59:1–60:9 (Jarashow/JetBlue). JetBlue intentionally chose a fare of $139 for BOS-DCA, BOS-DFW, FLL-PHL, JAX-DCA, and ORD-FLL, identical to American's fare for BOS-LAX. PX0612 at 10; Tr. Vol. 3, 61:4-13 (Jarashow/JetBlue).

365. Airlines also "flash" each other in an effort to highlight fare changes to other airlines in ATPCO. Tr. Vol. 3, 75:9–78:13 (Jarashow/JetBlue). For example, on February 10, 2020, Jeremy Blechman, an inventory manager at JetBlue, reported that American was selling a $44 fare between Boston and Philadelphia outside of JetBlue's timeband, meaning at times of the day when JetBlue wasn't selling the $44 fare. PX0616 at 1; Tr. Vol. 3, 78:24–80:7 (Jarashow/JetBlue). In response, Catterina Yanez, a JetBlue pricing analyst wrote that for the 4 p.m. ATPCO submission she was planning to "try to flash American, and if it doesn't work, then we'll discuss further actions." PX0616 at 1; Tr. Vol. 3, 80:10–81:14 (Jarashow/JetBlue). One reason JetBlue would "flash" American could be to try to encourage American to change its fare. Tr. Vol. 3, 81:12-23 (Jarashow/JetBlue). This "flashing" action was something Ms. Yanez said she would do after having discussed it with JetBlue's pricing manager Evan Jarashow. PX0616 at 1; Tr. Vol. 3, 82:9-16 (Jarashow/JetBlue).

  **4. Other attributes of the airline industry make it susceptible to coordination.**

366. Other characteristics of the airline industry make it susceptible to coordination as well. The airline industry features a large number of small, frequent transactions, each of which reduces the benefits of deviating from a coordinated understanding relative to the potential gains. Tr. Vol. 9, 82:1-9 (Town/Pls. Expert); Tr. Vol. 10, 207:6-8 (Miller/Pls. Expert).

367. There are also a small number of firms, meaning that there are fewer firms to monitor and track, and the gains from coordination are greater because they are divided among fewer participants. Tr. Vol. 9, 82:19–84:2 (Town/Pls. Expert).

368. Defendants' economic expert, Dr. Israel, testified that the airline industry is an oligopoly. Tr. Vol. 14, 95:3-10 (Israel/Defs. Expert). Consistent with an oligopoly, airlines engage in strategic interactions where firms coordinate with one another and consider reactions to one another in making their strategies. Tr. Vol. 14, 95:11-25; 96:18–97:2 (Israel/Defs. Expert).

### B. The Northeast Alliance fosters a spirit of partnership that will encourage American and JetBlue to coordinate to reduce competition outside of the overlap markets.

369. The scope of harm created by the NEA is likely to extend beyond the NEA Airports due to Defendants coordinating their competitive decisions in the "spirit of partnership." Tr. Vol. 10, 200:7-18 (Miller/Pls. Expert). JetBlue recognized that it was at risk of being negatively influenced by American as a result of the NEA. PX0828 at 7 (identifying a risk of the NEA as being that "JetBlue may lose some level of independence and may be co-opted by Connie manipulation"). American's ability to influence JetBlue is exacerbated by the fact that approximately 75 percent of JetBlue's flights in 2019 originated on routes touched by an NEA airport. PX0461 (Miller Report) ¶ 22, Ex.1. JetBlue understood the risk that American would be able to use NEA to the "manipulate" JetBlue. Tr. Vol. 1, 206:5-22 (Hayes/JetBlue). Further, the revenue sharing provision of the NEA means that it makes more sense for JetBlue to cooperate with American, rather than compete. Laurence (JetBlue) Dep. 146:18-25, June 3, 2021 (employed by JetBlue at time of deposition) (admitted at Tr. Vol. 5, 140:1-3).

370. The NEA is also causing JetBlue's cost structure to look more like American's, further aligning their competitive interests. JetBlue's costs have risen since it entered the NEA. Tr. Vol. 10, 84:23–86:2 at 85:20-23 (Clark/JetBlue). Spirit's Vice President of Network Planning, John Kirby, testified that the NEA hastens JetBlue's movement toward being a higher cost carrier. Tr. Vol. 4, 48:25–49:2 (Kirby/Spirit).

104

371. Defendants are already acting in a manner consistent with the spirit of partnership. Tr. Vol. 10, 204:22–205:9 (Miller/Pls. Expert). For example, American agreed to reduce a $200 million transfer payment it was owed by JetBlue down to $27 million. Tr. Vol. 10, 204:22–205:9 (Miller/Pls. Expert); Tr. Vol. 8, 122:4-18, 124:17–125:5 (Fintzen/JetBlue); Bhargava (American) Dep. 212:11–213:20, June 3, 2022; PX0800 at 4. Instead of using the process set out to resolve disagreements under the NEA, Mr. Laurence stated that American and JetBlue treated disagreements less formally, without convening a management committee, "because we sort of – we were urging the teams to be able to work through disagreements." Tr. Vol. 5, 134:13-17, 135:9-15 (Laurence/American); *see also* PX0001a at 7 (Section 4.1.3(iv)). Mr. Hayes testified that he was aware of the $200 million debt but paid it little attention because the number was never seriously contemplated as the payment. Tr. Vol. 2, 82:3-18 (Hayes/JetBlue).

372. Other airlines agree. Mr. Harrison of Alaska testified that alliance partners have the ability to influence their partners' commercial decisions. Tr. Vol. 7, 57:3-10 (Harrison/Alaska). ███████████████████████████████████████████ ███████████████████████████████████████████ ███████████████ Mr. Kirby of Spirit testified that numerous entanglements from the series of NEA agreements will likely cause American and JetBlue to "pull competitive punches" with each other. Tr. Vol. 3, 134:2-8 (Kirby/Spirit). Mr. Kirby explained that the NEA gives American levers to punish or reward JetBlue, such as slot transfers, and that concentration under the NEA could chill competition between American and JetBlue for fear of upsetting each other and related reprisals. Tr. Vol. 3, 135:2-19 (Kirby/Spirit).

373. American has a history of accommodation with its partners. For example, during its partnership with LATAM, American did not compete as aggressively against LATAM as it would have otherwise, including by choosing not to try to win customers away from LATAM by undercutting LATAM's pricing on nonstop markets. Tr. Vol. 6, 65:16-23 (Parker/American); Tr. Vol. 10, 200:19–201:8 (Miller/Pls. Expert); PX0242 at 2 (explaining that American does "a lot of things in the spirit of 'partnership' . . . that help LATAM at the expense of revenue maximization