# EXHIBIT L

S&P Global
Market Intelligence

# Spirit Airlines, Inc. NYSE:SAVE
# Special Call
## Monday, May 23, 2022 9:30 PM GMT

COPYRIGHT © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved
spglobal.com/marketintelligence

# Table of Contents

| | | |
|---|---|---|
| Call Participants | ................................................................................. | 3 |
| Presentation | ................................................................................. | 4 |
| Question and Answer | ................................................................................. | 7 |

COPYRIGHT © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved
**spglobal.com/marketintelligence**

# Call Participants

**EXECUTIVES**

**DeAnne Gabel**
*Senior Director of Investor Relations*

**Edward M. Christie**
*President, CEO & Director*

**ANALYSTS**

**Conor T. Cunningham**
*MKM Partners LLC, Research Division*

**Daniel J. McKenzie**
*Seaport Research Partners*

**David Scott Vernon**
*Sanford C. Bernstein & Co., LLC., Research Division*

**Helane Renee Becker**
*Cowen and Company, LLC, Research Division*

**James M. Kirby**
*JPMorgan Chase & Co, Research Division*

**Michael John Linenberg**
*Deutsche Bank AG, Research Division*

**Savanthi Nipunika Prelis-Syth**
*Raymond James & Associates, Inc., Research Division*

**ATTENDEES**

**Andrew C. Finch**

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.
spglobal.com/marketintelligence

# Presentation

**Operator**

Welcome to Spirit Airlines call to discuss the Board of Directors' decision to reject the tender offer by JetBlue Airways Corporation. [Operator Instructions] I would now like to hand the conference over to your host today, Ms. DeAnne Gabel, Senior Director, Investor Relations.

**DeAnne Gabel**
*Senior Director of Investor Relations*

Thank you, Christian, and thank you, everyone, for joining our call to discuss the Spirit Board's decision to unanimously reject JetBlue's unsolicited tender offer. This call is being recorded and simultaneously webcast. A replay of this call will be archived on our website for 60 days. Presenting on today's Call are Ted Christie, Spirit's Chief Executive Officer; and Andrew Finch, Co-Chair of the Antitrust Practice Group and a partner in the Litigation Department at Paul, Weiss, Rifkind, Wharton & Garrison LLP.

Following our prepared remarks, there will be a question-and-answer session for analysts. In addition to the press release we issued on May 19, we will also be referencing an investor presentation, which is available on our website at ir.spirit.com and has been filed with the SEC.

Before we begin, I'd like to also remind everyone that today's discussion contains forward-looking statements that are based on the company's current expectations and are not a guarantee of future performance. There could be significant risks and uncertainties that could cause actual results to differ materially from those reflected by the forward-looking statements, including the risk factors discussed in our reports and filed with the SEC and the consummation of the merger with Frontier Group Holding pursuant to the merger agreement entered into on February 5, 2022.

We would encourage everyone to read Spirit's definitive proxy statement filed with the SEC on May 11, 2022, and mailed to stockholders as well as Schedule 14D-9 filed with the SEC on May 19, 2022, for more information. The merger is expected to close in the second half of 2022 and is subject to satisfaction of customary closing conditions, including completion of the regulatory review process and approved by Spirit stockholders. We undertake no duty to update any forward-looking statements. And with that, I turn the call over to Ted.

**Edward M. Christie**
*President, CEO & Director*

Thanks, DeAnne, and thanks to all of you for joining us this afternoon to discuss our Board's decision to unanimously reject JetBlue's unsolicited tender offer and reiterate our support for the merger agreement with Frontier Airlines. With me today is Andrew Finch, Co-Chair of the Antitrust Practice Group at leading law firm, Paul, Weiss. Andrew, who previously served as the Principal Deputy Assistant Attorney General and is acting Assistant Attorney General in the DOJ's Antitrust Division has been one of our advisers in evaluating the antitrust risk of a JetBlue Spirit combination. On Thursday, we issued a press release outlining the rationale for the Board's decision. And this afternoon, we filed a presentation with further information.

First, I want to take you through the key facts about JetBlue's inferior offer. Then I'll let Andrew Finch make additional comments on the antitrust risk of JetBlue's proposal, and we'll wrap up with Q&A. As you have heard us say consistently over the last few weeks, at the heart of the Board's decision is the fact that JetBlue's offer is not reasonably capable of being consummated. JetBlue's regulatory case is weak and defies common sense. By their own admission, they expected DOJ to sue to block the JetBlue acquisition. So I have to wonder if JetBlue is purposely downplaying the substantial regulatory risk.

It's inconceivable to us that an acquisition of Spirit by JetBlue gets approved unless they abandon the NEA, the anticompetitive alliance with American Airlines. JetBlue has demonstrated that preserving this alliance with American and not its acquisition of Spirit is its first prize. When we were engaged in discussions with JetBlue, we asked if they would abandon the NEA in order to get regulatory approval for a proposed transaction with Spirit. They refused. If they think approval is so likely, why refuse to do whatever it takes to get the deal done.

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.
spglobal.com/marketintelligence

I'll let Andrew speak to his views in a few minutes. But at the simplest level, a JetBlue transaction is about a high-fare carrier trying to buy a low-fare carrier, reducing capacity and raising fares. Commonsense tells you that is not a favorable story for regulators. In my opinion, JetBlue knows it faces a low probability of approval, which is why it's shifting the risk on Spirit stockholders with inadequate compensation.

So what is JetBlue's motivation in all this? I believe it's a cynical attempt to disrupt our merger with Frontier because the Spirit-Frontier combination poses a competitive threat. Why else would JetBlue wait over 7 weeks after we announced the Frontier deal to submit the acquisition proposal? And why did JetBlue wait to launch the tender offer until just after we mailed our proxy statement for the Frontier merger? I don't think that timing is coincidental.

Think about a world post Spirit-Frontier combination for JetBlue. They will have to compete with the ULCC carrier of a larger size, scale and reach and against one of the lowest cost structures in the world. And the ULCC fares are a fraction of JetBlue's. That is a daunting environment. In fact, in its 2021 10-K risk factors, JetBlue specifically calls out the Spirit/Frontier combination as a factor that may affect JetBlue's competitiveness. That may be an understatement. I think they're scared in the competition. As a result, I think JetBlue believes it's worth the $200 million reverse termination fee to disrupt our pending merger with Frontier.

My message to Spirit stockholders is don't be distracted by JetBlue's tender offer. It is a highly conditional offer, which still requires regulatory approval and contains a list of conditions that are solely for the benefit of JetBlue and cannot reasonably be expected to be met. Including a walk away, the stock market declines more than 10%. And JetBlue's cash offer is highly opportunistic. The supposed premium is based off highly depressed, pandemic-related all-time low stock price levels. I'd remind you that Spirit's stock price was higher than $30 for the entire 5 years before the pandemic. In fact, JetBlue's offer is even below Spirit's high trading price during the depths of COVID.

The offer also excludes Spirit shareholders from participating in the upside from synergies and the industry recovery. Once the airline industry recovers to pre-pandemic levels, that alone is expected to deliver Spirit shareholders value well above JetBlue's offer. This is why we negotiated for 48.5% ongoing ownership through the stock consideration in our Frontier merger. When you combine this with the $500 million of run rate operating synergies from the Frontier merger, Spirit stockholders have even greater potential upside, numbers that by our calculation, dwarf either of JetBlue's offers.

Before I turn it over to Andrew, I also want to touch on the misinformation that JetBlue continues to spread about our Board and our process. The idea that our Board refused to engage on JetBlue's proposal is total fiction. JetBlue's own tender offer document describes the extensive engagement we had with them, including direct contact between our CEOs. To be clear, over a 4-week period, we spent hundreds of hours and hundreds of thousands of dollars assessing the regulatory risk of an acquisition of Spirit by JetBlue, including assessing the validity and merits of JetBlue's own analysis. We share projections with JetBlue's financial advisers and provided them access to documentary due diligence material through a secure virtual data room that offered information substantively consistent with what we shared with Frontier. This included our detailed 5-year plan.

We also participated in a 2-hour due diligence call with JetBlue's management team to discuss financial model projections, fleet financing, labor, our new headquarters and other material contract details. During our engagement with JetBlue's management team and advisers, they thanked us for our openness and transparency. So as you can see, we engaged in good faith. However, we did not meet their requests for highly competitively sensitive information such as forecasts for the economics of every route that we fly or data on our largest and most profitable routes, which would be highly inappropriate to share with a competitor. We didn't provide this information to Frontier either.

The reality is that JetBlue's offer is not superior to our merger agreement with Frontier, but JetBlue is so desperate to disrupt our combination with Frontier that they are willing to spread inaccurate statements and mischaracterizations to the public. I now will turn it over to Andrew for more detail on the regulatory risk.

**Andrew C. Finch**

Thank you, Ted. Given the antitrust issues at the heart of the Spirit Board's decision, I want to briefly reiterate the very substantial regulatory hurdles that a JetBlue/Spirit transaction would face. From my time in the DOJ's Antitrust Division, I can tell you that the facts do not support a favorable decision by regulators. In a JetBlue/Spirit combination, the conversation would be centered around: one, raising ticket prices on Spirit routes to JetBlue levels and reducing capacity on aircraft by reconfiguring them to the JetBlue format with fewer seats.

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

Two, removing approximately 50% of the ULCC capacity in the U.S. as a result of eliminating Spirit as the largest ULCC airline. Three, merging Spirit with what's essentially a combined JetBlue and American Airlines in the Northeast; and four, trying to complete a second major transaction for JetBlue, while it's in the midst of litigation with the DOJ seeking to block the NEA. When taken in combination, all these factors make regulatory approval of the JetBlue transaction, essentially a nonstarter.

As it relates to the NEA, we consider JetBlue's view on potential litigation outcomes to be fundamentally mistaken. In our opinion, if JetBlue wins or settles the NEA litigation, the DOJ will be even more determined to stop an acquisition of Spirit as JetBlue will have just completed a de facto merger in the Northeast with American Airlines, which is the largest airline in the world. On the other hand, if JetBlue loses the NEA litigation, JetBlue would likely appeal in the last ditch effort to save the anticompetitive alliance that it has implied is more important to it than an acquisition of Spirit, and that could take well over a year to resolve.

And even if we set aside the issue of the NEA, one thing that Spirit and JetBlue can agree on is that the DOJ would likely bring a lawsuit to block a JetBlue/Spirit transaction. JetBlue cannot and hasn't denied that this is a likely outcome. That means that the overall review of a JetBlue/Spirit transaction would likely take up to 2 years to be resolved.

Now JetBlue would have you believe that it's offering to divest all of Spirit's assets in New York City and Boston and that, that should be sufficient to address the regulatory issues, but that's simply not true. The DOJ has been clear that it thinks the Northeast Alliance will not only eliminate important competition in these 2 cities, but will also harm air travelers across the country by significantly diminishing JetBlue's incentive to compete with American elsewhere. And JetBlue has not articulated any concrete plan for addressing those concerns.

Moreover, current DOJ leadership has expressed deep skepticism about the effectiveness of divestiture remedies and a preference for seeking to block transactions rather than accept divestiture-based settlements. All this is to say we don't believe that the JetBlue transaction is likely to receive regulatory approval. Spirit's proposed merger with Frontier poses meaningfully less regulatory risk simply due to Frontier not having pending DOJ litigation and the potential to deliver more ULCC fares to more travelers in more markets. That's totally unlike the JetBlue merger, which would eliminate the largest ULCC and result in capacity reductions and fare increases to consumers. With that, I'll turn it back to Ted.

**Edward M. Christie**
*President, CEO & Director*

Thanks, Andrew. Our Board continues to unanimously recommend that Spirit's stockholders vote for the merger proposal with Frontier on June 10. Further, we recommend Spirit stockholders reject the JetBlue tender offer and do not tender any shares of Spirit to the offer. We are excited about the Frontier combination and the opportunities it brings to our guests, our Spirit family and our stockholders. A vote for the Frontier merger is a vote to create America's most competitive ultra-low fare airline and to bring long-term superior value to Spirit stockholders. With that, I'll turn it back to DeAnne.

**DeAnne Gabel**
*Senior Director of Investor Relations*
Thank you, Ted. Christian, we are ready to begin with the question-and-answer session. [Operator Instructions]

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

# Question and Answer

**Operator**

[Operator Instructions] Your first question is from Conor Cunningham from MKM Partners.

**Conor T. Cunningham**
*MKM Partners LLC, Research Division*

There was a fair bit of talk about the math in the deck. So I just wanted to talk a little bit more about that. When you -- did you look into -- if JetBlue was going to be successful in all this, they're going to retrofit your entire fleet. Have you disfigured out how much that may cost them altogether as well? I mean that seems to be something that's been lost in this whole discussion as well outside of what's going on in the press or what not.

**Edward M. Christie**
*President, CEO & Director*

Conor, it's Ted. No, we haven't -- we're not aware of what JetBlue's costs are to reconfigure. I don't anticipate that they are insignificant, however, understanding what their product is on board, but I think that's a matter for JetBlue shareholders. I think what's critical is that the reconfiguration results and the removal of seats from our airplanes, which we estimate could be as much as 20%, which is a significant reduction in capacity.

**Conor T. Cunningham**
*MKM Partners LLC, Research Division*

Right. Right. And then within those discussions that you've had with them, was there ever a discussion about keeping -- like maintaining 2 separate brands? I mean I realize you have a lot of issues with NEA, but assuming that, that was to not be an issue, like that's potentially a path forward. Just curious if you have any thoughts on the 2 separate brand idea in general.

**Edward M. Christie**
*President, CEO & Director*

That was not discussed as an idea. And I think upfront, JetBlue was clear that they intended to do exactly what they've described, which is to migrate our product to the JetBlue product, which we viewed as extremely problematic from a regulatory narrative perspective. You're taking seats out and raising fares, that's not a pro-consumer pro-competitive argument.

And -- but I think I would say running 2 brands is also a very difficult thing to do. We've seen that in the history, the aviation industry is a very difficult thing to do. So look, I mean there's been a lot of narrative around this about why we -- I've heard from them in their presentations, why didn't we reach out to them and talk to them about this. Well, we didn't contact United, American, Delta and Southwest either because they're all higher-fair, higher-cost airlines.

And our objective was to try to find something that could actually deliver value to our stockholders, which we believe we did. And we've had numerous conversations with a number of airlines over the years, both national and international, about ideas and have focused on the Frontier deal as being the best answer.

**Operator**

Your next question is from Helane Becker from Cowen.

**Helane Renee Becker**
*Cowen and Company, LLC, Research Division*

Have you talked to Frontier about adjusting either the cash portion or the equity portion since the stocks are down so much since the February 7 date?

**Edward M. Christie**
*President, CEO & Director*

Helane, it's Ted. So the truth is we negotiated hard with Frontier on the deal that we landed on. At the time of our negotiation, they actually had a superior market cap, and yet we landed in a position to be able to deliver greater than 51% of the economics to our shareholders. And in doing so, preserving all the upside. And in a stock-for-stock deal, we thought that was critical during this time frame when we're at ultra-depressed levels, which is proving to be very smart from our perspective, we think.

And so there was -- right now, where we sit is have there been a superior offer from an alternate party, then no doubt it would have made sense for us to engage to discuss the possibility of additional changes from Frontier. But as we've outlined numerous times over the past few weeks, it stretches the imagination to come up with a way that you could describe JetBlue as superior when their proposal is not able to be consummated.

**Helane Renee Becker**
*Cowen and Company, LLC, Research Division*

That makes sense. That makes perfect sense. And then just a follow-up question. I think you guys said that you have an agreement with your flight attendants, maybe it was Frontier who has the agreement with the flight attendants, but what about other labor groups?

**Edward M. Christie**
*President, CEO & Director*

Yes. I believe Frontier announced that they had reached a transition agreement with the AFA National, which represents both the Frontier and Spirit flight attendants. So I think that, that is in place. And I know that AFA has voiced their support for the Frontier/Spirit transaction.

As it relates to the rest of our labor groups, there's nothing specific to comment on right now other than the fact that it is also true that our pilots are both represented by the same union. So I think there is protocol in place for the way those things would work between Spirit pilots and Frontier pilots.

**Operator**

Your next question is from Savi Syth from Raymond James.

**Savanthi Nipunika Prelis-Syth**
*Raymond James & Associates, Inc., Research Division*

I was kind of curious what kind of response you have got from your shareholder conversations and generally, what the next steps here are leading up to the June 10 vote.

**Edward M. Christie**
*President, CEO & Director*

Well, Savi, I would say that we've been excited by their interest, obviously, and there's quite a bit of effort that we would have intended to put in regardless of JetBlue's entry into this discussion to educate our shareholders on the value of the Frontier transaction to make sure that we're illustrating that well and that the proxy advisory services have the full story, which is partially enhanced by the deck we just released this afternoon.

So I think they've shown significant interest, obviously, in it because this is a very interesting discussion right now. But I think what's important to lay out is that the vote that we will be soliciting from our shareholders on the 10th is a vote for the Frontier merger, which, in all cases, superior to stand-alone Spirit. That vote has nothing to do with a JetBlue proposal. Our Board has already rejected that and it's illusory.

**Savanthi Nipunika Prelis-Syth**
*Raymond James & Associates, Inc., Research Division*

Yes, I get that, absolutely. So Ted, if I might ask, so in the off chance that the vote comes in now for the merger, what would the next steps be?

**Edward M. Christie**
*President, CEO & Director*

Well, we obviously don't think that, that's likely. But in that scenario, then we would revert to stand-alone.

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.
spglobal.com/marketintelligence

**Savanthi Nipunika Prelis-Syth**
*Raymond James & Associates, Inc., Research Division*

Okay. And there's no kind of opportunity -- or I guess it would be on Frontier's kind of court to see if they want to come back again?

**Edward M. Christie**
*President, CEO & Director*

Sure. Then it's -- any discussion could be had between us and them or them and us and any other party. But again, those discussions have been had numerous times over the years, and we arrived that this answer is the best possible answer for our shareholders.

**Operator**

Your next question is from Mike Linenberg from Deutsche Bank.

**Michael John Linenberg**
*Deutsche Bank AG, Research Division*

Ted, I just want to go back to your point where you said you thought a no was unlikely. Is that just based on kind of how you feel about the strength of your proposal? Or is that just based on conversations that you've had with Spirit shareholders over the last week or so? Is that kind of where the running is right now that the majority of in favor?

**Edward M. Christie**
*President, CEO & Director*

No, I'd hesitate to put any speculation as to how individual shareholders intend about. But I do -- extensively on how we view the strength of the proposal facing our shareholders that the Board has unanimously recommended that to our shareholders. And after spending years evaluating numerous opportunities throughout the space and actively rejecting other proposals with Frontier, we arrived at something that we think is superior and deliver significant value. So I think those are the reasons, Mike, that we feel very positive about the story in front of our shareholders.

And again, I remind them and remind you that the comparison point is our status quo, is our stand-alone plan. And as we've outlined since February 7, everything that we do with Frontier is accretive. It's a largely stocked deal that allows our shareholders to participate in the upside, both in the recovery and in the synergies. And so it's very difficult for me to argue that it's anything but better.

**Michael John Linenberg**
*Deutsche Bank AG, Research Division*

Okay. Okay. And then just my second question, Andrew, you sort -- you laid out the regulatory risks for JetBlue/Spirit. What are the potential regulatory risks for Frontier/Spirit? And I guess I'm asking this in light of last year's executive order, where all airline mergers are going to be scrutinized. What are the potential points of contention as you see them?

**Andrew C. Finch**

Thanks, Mike. Look, we think that there will be regulatory scrutiny of a Frontier deal, but we actually think there's a strong case for approval because the transaction will create a disruptive nationwide ULCC competitor for the first time, combining largely complementary routes. And that combined ULCC will be a robust alternative to the Big 4.

And consistent with what you asked about, including the executive order and recent speeches from the Antitrust Division officials, it will actually increase rivalry and enhance the competitive process. The result will be more flights to more destinations with more ULCC fares and that will allow more people to fly who wouldn't otherwise be able to afford to do so. So it's going to be a market structure that's better for society and really have a democratizing influence.

So I think that while they'll look at it carefully, I think that they'll come to the conclusion, I hope that this is going to be a transaction that will enable enhanced competition and enable the combined firm to actually push back against the legacies and their fortress hubs by penetrating at a greater scale and have an improved ability to withstand their aggressive responses from those incumbent carriers.

**Michael John Linenberg**

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

*Deutsche Bank AG, Research Division*

Andrew, just one quick sort of follow-up. The -- I've seen some reports that talk about the overlap of -- I mean I realize on paper. You sort of think, okay, complementary, but when you go sort of city pair or airport pair, there is a decent amount of overlap. Are you prepared to potentially offer up either some form of remedy package if the DOJ request it? And/or is there a reverse breakup fee in the offing because of some of those potential regulatory issues?

**Andrew C. Finch**

Yes. So it's interesting, Mike. A lot of JetBlue's rhetoric about overlaps just isn't relevant and reflects a misconception on JetBlue's part. The one thing, JetBlue ignores that there's substantial competition from the legacies and others on the vast majority of those routes. And in fact, when frequencies are taken into account, i.e., at least sort of like daily flights, the overlaps between the 2 deals are basically identical. And critically, the Frontier/Spirit deal has fewer 2:1 and 3:2 overlaps then the JetBlue deal would.

On top of that, with the Frontier deal, the vast majority of the overlaps involve Orlando and Las Vegas routes, and they don't involve restricted airports. And lastly, it bears emphasis that there are no overlaps on 89% of the Spirit/Frontier -- the broader Spirit/Frontier network when you're looking at daily nonstop service. So look, I think that ultimately, the differences in competitively sensitive overlaps are minor and will have little or no impact on DOJ decision-making.

**Edward M. Christie**
*President, CEO & Director*

Mike, I might just jump into just one other point because it has been one that's been discussed is this idea over. And I think it's missing, I think all the points Andrew made are correct. But I think it's also missing the point that this is really about a higher fare airline buying a lower fare airline. And even if you're willing to accept that there may be greater overlap one way or the other, we have less overlap with Delta today than we do with JetBlue. I don't think we're approaching Delta for an acquisition, right?

So it's sort of a silly way to look at things is that narrow a box. What we're really talking about is high-fare airline, low-fare airline, anticompetitive alliance with American, one of the big 3. And again, it's unusual to me that, that would be perceived as possibly clearable by the DOJ.

**Operator**

Your next question is from Daniel McKenzie from Seaport Global.

**Daniel J. McKenzie**
*Seaport Research Partners*

I can understand the rationale, pardon me, for a national ULCC, the rival is something that Europe currently has. So I get that. But if you permit me just to play devil's advocate for a moment. If the DOJ was going to reject a Frontier/Spirit transaction, is the expectation for that time frame for a decision one way or the other the same, so perhaps sometime this fall? And is there any feedback that you can share that you're getting so far?

**Edward M. Christie**
*President, CEO & Director*

Andrew, you want to provide any insight before I jump in?

**Andrew C. Finch**

Sure. All I'll say is that at this point, it's hard to predict whether or not it will be this fall or sometime next year. But obviously, we're in the process -- as has been reported, we're in the process of engaging with the Department of Justice right now and don't have any particular feedback that I can share at this stage. We're in the early stages of doing that.

**Daniel J. McKenzie**
*Seaport Research Partners*

Okay. And then, I guess, second question here, Slide 29, you've put together some stock price potential outcomes just based on consensus estimates. And I'm wondering if you'd be willing to drill into that somewhat. What insights can you

share about things The Street might be missing about this transaction overlooking from the -- just from where you guys sit, whether it be growth or what have you?

**Edward M. Christie**
*President, CEO & Director*

Sure, Dan. Yes. I think -- and also we referenced it on both Slides 13 and 14 of the presentation. And in those, we actually use Street consensus. So while there -- it is public management view may be higher than the Street rather than debate it in the public, we just decided to use Street consensus.

And at those numbers, even assuming more lower-than-average PEs, we're in all cases, delivering value in excess of the JetBlue offer, reminding everyone that the JetBlue offer, if it were to survive a DOJ lawsuit is 2 years or more down the road. So we're talking about delivery in the window of 2023 and 2024, which is when we expect a more return to normalcy. So that's the way The Street projects the Spirit return to normalcy and the Frontier return to normalcy. We actually believe that we'll be able to return much more quickly and more robustly than that. And we've outlined those reasons to you guys on our earnings call about the power of lower costs and being able to stimulate more travel and the fuel advantage that we enjoy as a result of being younger fleet with more Neos, which clearly is not yet factored in.

But I think that, that's incremental upside to what is already a superior idea at stand-alone versus the JetBlue proposal. Much less when you take into account the combination, which drives incremental utilization, which drives efficiencies and synergies at the op level and delivers $1 billion in consumer savings.

**Operator**

[Operator Instructions] Your next question is from Jamie Baker from JPMorgan.

**James M. Kirby**
*JPMorgan Chase & Co, Research Division*

This is James on for Jamie. Just one for me and just [ pilot orders ]. Just wondering what consideration, if any, you have taken that into both potential transactions here. And what current messaging is to the Spirit pilots?

**Edward M. Christie**
*President, CEO & Director*

Sure. Yes. So we talked about it on our earnings call that while there is an uptick in attrition across the industry as pilots kind of are in demand at the major airlines, we have adjusted to that by increasing the size of our school house, and we're still seeing plenty of applications at Spirit. So right now, not facing any immediate issue.

But I think what the Frontier transaction does is actually enhance the value to Spirit pilots for -- and Frontier pilots for that matter for a number of reasons. One is it will be a much bigger, more stable airline. At that point, it will be in all likelihood the fifth largest airline in the United States. That means that there's more career opportunity and career stability. There's a greater number of bases for pilots and flight attendants to choose to live that.

And we believe that will create a higher quality of life for our pilots, giving them more options and that sort of thing. So there's reasons actually for -- and I believe our pilots feel this way for you to be bullish about the combination because it does create incremental value for them and more opportunity. And I know that's true because I've been out on the line talking to them.

So that's another reason that we think that it's a positive deal for our team because it does create incremental opportunity. What the JetBlue transaction would do for our pilots and flight attendants is right now beyond me because we haven't spent any time with it. But I can tell you that the Frontier deal is very positive.

**Operator**

[Operator Instructions] Your next question is from David Vernon from Bernstein.

**David Scott Vernon**
*Sanford C. Bernstein & Co., LLC., Research Division*

So Ted, if we accept the proposition that the deal is illusory with JetBlue, even if you went down that path and ended up 2 years from now, do you still think Frontier would be there as a possible deal? And if you could talk a little bit about maybe

what you guys have done to try to get JetBlue to gum closer on terms or structure that would maybe kind of mitigate some of that risk of holding out for the higher price?

**Edward M. Christie**
*President, CEO & Director*

Okay. Well, as to the first question, setting aside whether or not it would be wise for any Board to proceed on a transaction that they viewed had very limited probability of execution and subjects the company to substantial risk because they're staring at a bird in the hand today with a transaction with Frontier that creates tremendous value.

So the theory that you're asking us to walk down is we would, in theory, reject that transaction for something that we view today as a [ losery ] and take 2 years of business risk over a time that we think weakens Spirit because we are the acquisition target. And in most cases, as history has proven out, targets in that case, get weaker over that period of time. In fact, I've seen data suggest that they usually trade down 25% or more over that window of time, especially if there is no transaction consummated. And the reward from all of that is $200 million, 2 years down the road. Strikes me as not being an extremely valuable idea to our shareholders.

And to your second point, we did actually proactively engaged with JetBlue early on in the discussions to let them know about the things that we thought they needed to think about and to resolve as it related to the regulatory hurdles. And I think that's outlined in our response, but we asked them to commit that they would abandon the NEA, and they would do anything in their power to get regulatory approval, and that they would need to commit to a much more substantial reverse termination fee than the one they proposed because the risk was so high.

And even with all that, we viewed it a very difficult story to tell, which we've outlined on this call. But nonetheless, we did say those are the things that we think are sort of minimum operating equipment to get us to a discussion and they rejected all of those.

**David Scott Vernon**
*Sanford C. Bernstein & Co., LLC., Research Division*

All right. I appreciate that. I was just trying to think about from the perspective of letting the regulator kind of make the decision as opposed to make a decision that for what the regulator would do. That's the way the question was posed to me, so I appreciate you taking time to answer.

**Edward M. Christie**
*President, CEO & Director*

Sure.

**Operator**

All right. And I'm showing no further questions at this time. This now concludes the call. Thank you.

**DeAnne Gabel**
*Senior Director of Investor Relations*
Thank you, everyone, for joining us.

Copyright © 2022 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

Copyright © 2022 by S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

These materials have been prepared solely for information purposes based upon information generally available to the public and from sources believed to be reliable. No content (including index data, ratings, credit-related analyses and data, research, model, software or other application or output therefrom) or any part thereof (Content) may be modified, reverse engineered, reproduced or distributed in any form by any means, or stored in a database or retrieval system, without the prior written permission of S&P Global Market Intelligence or its affiliates (collectively, S&P Global). The Content shall not be used for any unlawful or unauthorized purposes. S&P Global and any third-party providers, (collectively S&P Global Parties) do not guarantee the accuracy, completeness, timeliness or availability of the Content. S&P Global Parties are not responsible for any errors or omissions, regardless of the cause, for the results obtained from the use of the Content. THE CONTENT IS PROVIDED ON "AS IS" BASIS. S&P GLOBAL PARTIES DISCLAIM ANY AND ALL EXPRESS OR IMPLIED WARRANTIES, INCLUDING, BUT NOT LIMITED TO, ANY WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR USE, FREEDOM FROM BUGS, SOFTWARE ERRORS OR DEFECTS, THAT THE CONTENT'S FUNCTIONING WILL BE UNINTERRUPTED OR THAT THE CONTENT WILL OPERATE WITH ANY SOFTWARE OR HARDWARE CONFIGURATION. In no event shall S&P Global Parties be liable to any party for any direct, indirect, incidental, exemplary, compensatory, punitive, special or consequential damages, costs, expenses, legal fees, or losses (including, without limitation, lost income or lost profits and opportunity costs or losses caused by negligence) in connection with any use of the Content even if advised of the possibility of such damages. S&P Global Market Intelligence's opinions, quotes and credit-related and other analyses are statements of opinion as of the date they are expressed and not statements of fact or recommendations to purchase, hold, or sell any securities or to make any investment decisions, and do not address the suitability of any security. S&P Global Market Intelligence may provide index data. Direct investment in an index is not possible. Exposure to an asset class represented by an index is available through investable instruments based on that index. S&P Global Market Intelligence assumes no obligation to update the Content following publication in any form or format. The Content should not be relied on and is not a substitute for the skill, judgment and experience of the user, its management, employees, advisors and/or clients when making investment and other business decisions. S&P Global Market Intelligence does not act as a fiduciary or an investment advisor except where registered as such. S&P Global keeps certain activities of its divisions separate from each other in order to preserve the independence and objectivity of their respective activities. As a result, certain divisions of S&P Global may have information that is not available to other S&P Global divisions. S&P Global has established policies and procedures to maintain the confidentiality of certain nonpublic information received in connection with each analytical process.

S&P Global may receive compensation for its ratings and certain analyses, normally from issuers or underwriters of securities or from obligors. S&P Global reserves the right to disseminate its opinions and analyses. S&P Global's public ratings and analyses are made available on its Web sites, www.standardandpoors.com (free of charge), and www.ratingsdirect.com and www.globalcreditportal.com (subscription), and may be distributed through other means, including via S&P Global publications and third-party redistributors. Additional information about our ratings fees is available at www.standardandpoors.com/usratingsfees.

© 2022 S&P Global Market Intelligence.