# EXHIBIT B

**HIGHLY CONFIDENTIAL
PURSUANT TO PROTECTIVE ORDER**



Transcript of **Richard Scheff**

Wednesday, September 6, 2023

*United States, et al. v. JetBlue Airways Corporation
and Spirit Airlines, Inc.*

www.TP.One
www.aldersonreporting.com
www.accutrancr.com
800.FOR.DEPO (800.367.3376)
Scheduling@TP.One

Reference Number: 132438

1　　　　　　IN THE UNITED STATES DISTRICT COURT

2　　　　　　　FOR THE DISTRICT OF MASSACHUSETTS

3　- - - - - - - - - - - - - - - - X

4　UNITED STATES OF AMERICA, et　　:

5　al.,　　　　　　　　　　　　　　　　:

6　　　　　Plaintiffs,　　　　　　　:　Case No.

7　　　　　v.　　　　　　　　　　　　:　1:23-cv-10511-WGY

8　JETBLUE AIRWAYS CORPORATION　　 :

9　AND SPIRIT AIRLINES, INC.,　　　X

10　　　　　Defendants.

11　- - - - - - - - - - - - - - - -

12　　　　　　　　VIDEOTAPED DEPOSITION OF

13　　　　　　　　　　RICHARD SCHEFF

14

15　HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

16　　　　　　　　　　Washington, D.C.

17　　　　　　　　　Wednesday, September 6, 2023

18

19

20

21

22

1  Videotaped deposition of RICHARD SCHEFF, a
2  witness herein, called for examination by counsel for
3  the Plaintiff in the above-entitled matter, pursuant
4  to notice, the witness being duly sworn by Desirae S.
5  Jura, a Notary Public in and for the District of
6  Columbia, taken at the offices of Shearman &
7  Sterling, 401 Ninth Street, NW, Washington, D.C., at
8  9:07 a.m., Wednesday, September 6, 2023, and the
9  proceedings being taken down by Stenotype by Desirae
10 S. Jura, RPR, and transcribed under her direction.
11
12
13
14
15
16
17
18
19
20
21
22

Richard Scheff    HIGHLY CONFIDENTIAL    9/6/2023
Case 1:23-cv-10511-WGY Document 214-2 Filed 09/26/23 Page 5 of 18
PURSUANT TO PROTECTIVE ORDER
Page 59

1  and move forward as much as possible, and not use

2  2019.  It depends on the context of the analysis.

3       Q.   Do you have an opinion as to when more

4  recent data, whether it's 2023 or some time in the

5  future, will be, I guess, a more relevant benchmark

6  for analysis than 2019 will be?

7            MR. MITCHELL:  Objection to the form.

8            THE WITNESS:  I think it depends very much

9  on the region.  You really have to look case by case

10 and decide what time period is most relevant.

11 BY MR. DeRITA:

12      Q.   All right.  Let's turn -- and this is the

13 last topic for a while, so we can take a break soon.

14 Let's turn to page 11, paragraph 21.

15      A.   Okay.

16      Q.   I understand that the Spirit total

17 utilization is lower overall in 2023 than its

18 long-term target due to operational constraints,

19 primarily limited total crew availability.  What is

20 your understanding of those constraints?

21      A.   My understanding is that due to pilot

22 attrition, due to hiring issues, that the total



Richard Scheff    HIGHLY CONFIDENTIAL    9/6/2023
Case 1:23-cv-10511-WGY   Document 214-2   Filed 09/26/23   Page 6 of 18
PURSUANT TO PROTECTIVE ORDER    Page 60

1   number of hours that Spirit is able to fly is -- that

2   they can staff, is less than their target. So they

3   deliberately have to choose to fly fewer hours.

4         Q.   This sentence says, primarily limited

5   total crew availability. Are there other operational

6   constraints that have led to total utilization being

7   lower in 2023?

8             MR. MITCHELL: Objection to the form.

9             THE WITNESS: Total utilization, I mean,

10   there are always air traffic control issues in New

11   York. There are things going on. But I don't -- I

12   use primarily, because I think it captures most of

13   the issue, but I don't have a full list. But there

14   are always different operational constraints that

15   affect the schedule.

16   BY MR. DeRITA:

17         Q.   In the next sentence, you write, for this

18   reason, I have used schedule utilization patterns

19   from 2019 to assess the likely implications of future

20   utilization on a merged schedule and fleet. Why is

21   that the case?

22         A.   Well, that's the case because I didn't



1  want to look at a seat production level that was
2  artificially lower than what I would expect in the
3  long term.  So I looked at the patterns from when
4  those pilot constraints were not directly affecting
5  the output.
6      Q.   So would you say that 2023 utilization for
7  Spirit is atypical of what it would be in other time
8  periods?
9           MR. MITCHELL:  Objection to the form.
10          THE WITNESS:  If Spirit is able to
11 increase their pilot staffing, then I would expect
12 that they would have -- the utilization would move
13 more closely to prior periods.
14 BY MR. DeRITA:
15     Q.   And if we can just quickly flip to page 9,
16 figure 2.
17     A.   Yes.
18     Q.   So would you say that 2019 is a more
19 representative year to consider when comparing
20 utilization than 2023 would be due to the operational
21 constraints we just discussed?
22          MR. MITCHELL:  Objection to the form.



1  seat utilization.

2     Q.    So also in her report, Dr. Chipty states,
3  Spirit may generate many more flown seats than
4  JetBlue by running many short haul flights with more
5  idle time.  Do you agree with that statement?

6            MR. MITCHELL:  Objection to the form.

7            THE WITNESS:  No, I don't see any context.
8  I haven't assessed how much idle time they have.
9  Idle time is very specific.  If you're at an
10 airport -- for example, if you have an hour of idle
11 time, you can't add a flight, you can't go anywhere
12 and come back.  So I think there's no context for
13 whether Spirit has time that could be converted into
14 service or not.  So I don't have a view that
15 that's -- that that would happen.

16 BY MR. DeRITA:

17    Q.    So you haven't assessed any combined
18 network plans that would say whether Spirit would be
19 able to fly more or less flights post merger, one way
20 or the other?

21           MR. MITCHELL:  Objection to the form.

22           THE WITNESS:  Well, again, if we go back

1  to the days and the seasons where Spirit has reduced

2  and doesn't fly, for example, a lot of

3  Tuesday-Wednesday service, that is time that can

4  potentially be converted to additional flights,

5  whether flying a three-and-a-half hour flight instead

6  of a four-and-a-half hour flight allows more flights

7  is very context dependent.  And I don't have a view

8  of whether that would occur.

9  BY MR. DeRITA:

10      Q.   We had already talked about this earlier

11  today, but Exhibit 18 of your report, that assesses

12  utilization changes and converts them into a measure

13  of seat departures; is that right?

14           MR. MITCHELL:  Objection to the form.

15           THE WITNESS:  The utilization measure in

16  figure 18 is seat departure.

17  BY MR. DeRITA:

18      Q.   But you also use line utilization at other

19  points in your report, correct?

20           MR. MITCHELL:  Objection to the form.

21           THE WITNESS:  Yes, the report has used

22  line utilization as well as utilization defined by



1　　　Q.　Is there anything that would prevent

2　Spirit from increasing utilization in non-peak months

3　if no merger with JetBlue were to happen?

4　　　　　MR. MITCHELL:  Objection to the form.

5　　　　　THE WITNESS:  You know, Spirit could

6　change their practices and their tactics going

7　forward, given their -- as a ULCC, they're focused on

8　leisure markets heavily, and also on leisure

9　passengers in many markets.  That tactic is

10　consistent, but of course, they could do -- they

11　could change and do something different if they

12　chose.  I don't have insight into that.

13　BY MR. DeRITA:

14　　　Q.　So you didn't evaluate whether Spirit has

15　any plans going forward -- and again, when I say

16　standalone basis, I mean putting aside the potential

17　merger -- Spirit has any plans to increase its

18　utilization in non-peak months?

19　　　　　MR. MITCHELL:  Objection to the form.

20　　　　　THE WITNESS:  I based my analysis on what

21　Spirit has done in 2019, and what they are doing

22　currently and -- but I don't have insight into what



```
 1   profitability of the Spirit fleet?
 2              MR. MITCHELL:  Objection to the form.
 3              THE WITNESS:  You're talking in a post
 4   merger situation?
 5   BY MR. DeRITA:
 6       Q.   Yes.
 7       A.   Well, I mean, I'll give you an example.
 8   Spirit has -- they serve a number of markets that do
 9   -- or routes, city pairs, that have a significant
10   business component.  And it's quite possible that an
11   airline who has that as a bigger piece of their
12   target audience would operate on business days, where
13   an airline who is relying very heavily on leisure
14   travel would not find it profitable to operate on
15   those days.
16       Q.   Have you done any analysis as to which
17   routes Spirit's off-peak utilization might increase
18   post merger?
19       A.   I have looked -- I haven't done analysis
20   on specific profitability, but I have looked at
21   schedule patterns.  So for example, in Austin, which
22   is a fairly large business market with a lot of high
```

1   tech, in 2019, Spirit operated ten flights a day,

2   Wednesday through Monday, and only four on Tuesday

3   and Wednesday.  Flights to Chicago and Los Angeles,

4   Detroit.  I don't remember which ones were cut back.

5            I looked at a number of Atlanta markets,

6   for example, I live there, and there's a lot of

7   markets like Atlanta-Baltimore, Atlanta-Cleveland,

8   whether there's reduction on Tuesday and Wednesday.

9   Those are markets I consider important business

10  markets.  And so on an observational basis, without

11  quantifying, I did look at whether it seemed

12  reasonable that JetBlue would operate a number of

13  those markets.

14       Q.   When you say would operate, are you

15  talking about markets that Spirit operates today, and

16  whether they would operate those markets as a

17  combined airline?

18       A.   Right.  So, for example, let's go to

19  Atlanta-Baltimore, with Spirit operating 12 flights a

20  week.  So only one on Tuesday and Wednesday, and two

21  the other days.  I would think it's very possible

22  that JetBlue would choose to operate 14 a week, and



Richard Scheff    HIGHLY CONFIDENTIAL    9/6/2023
Case 1:23-cv-10511-WGY    Document 214-2    Filed 09/26/23    Page 13 of 18    Page 114
PURSUANT TO PROTECTIVE ORDER

1    operate Tuesday, Wednesday, both flights. So those

2    types of pattern are what would be consistent with

3    how JetBlue operates.

4        Q.    Is it fair to say that Spirit reduces its

5    flying in off-peak months because there's less

6    consumer demands for the routes that Spirit flies in

7    those months?

8            MR. MITCHELL: Objection to the form.

9            THE WITNESS: Well, I mean, I don't have

10    insight into exactly the demand. I think Spirit

11    reduces their capacity in off-peak -- or off-peak

12    days when they view that it would not be profitable

13    to operate. So generally, lower demand does lead to

14    less profit. But that's an analysis that Spirit

15    makes. I don't have their profits by day.

16    BY MR. DeRITA:

17        Q.    So if that's your understanding as to why

18    Spirit changes its flying patterns, why would the

19    Spirit fleet increase utilization, as you suggest in

20    your report, if it's facing lower demand, which as

21    you said, does lead to less profit?

22            MR. MITCHELL: Objection to the form.



1             MR. MITCHELL:  Objection to the form.

2             THE WITNESS:  No, I have not made any

3   assumption that they would reallocate to different

4   routes.

5   BY MR. DeRITA:

6       Q.   Does your analysis account for whether the

7   Spirit fleet is actually capable of being utilized

8   for more hours?

9             MR. MITCHELL:  Objection to the form.

10            THE WITNESS:  I think it's inherent --

11  what you can operate -- if you can operate five days

12  a week, for example, or what you can operate in a

13  peak day, that reflects your capability and capacity

14  to operate.

15            So by doing this seasonal and day of week

16  reductions, I think it's essentially self-evident

17  that there is more capability to add on those days.

18  I don't address whether they can add flying in the

19  peak periods.

20  BY MR. DeRITA:

21      Q.   The question I'm really getting at is, I

22  mean, can the planes just actually be in the air more



1  a plane to fly out on.  So that's the purpose of that

2  variable.

3      Q.    And would that flight that's scheduled

4  later in the day, would that be returning to the home

5  base of that first plane that that crew flew in on?

6          MR. MITCHELL:  Objection to the form.

7          THE WITNESS:  It could go -- I mean, the

8  crew's scheduling -- it doesn't necessarily have to

9  go to the home base, no.  It just means that there's

10 an airplane for them to fly out.  Generating the

11 pairings, and where the airplane goes, is a separate

12 process.

13 BY MR. DeRITA:

14     Q.    Row M, slot.

15     A.    Yes.

16     Q.    What -- or how does that constraint work

17 in FAM?

18     A.    You're able to set a maximum number of

19 arrivals, departures, or operations for a specific

20 time window at an airport.

21     Q.    What does that actually look like in FAM?

22 So would you have the option of entering a slot for



1　each hour, or is it something else?  Like, can you

2　just kind of help me visualize that?

3　　　A.　It's a time window.  So you might say

4　between 0700 and 0800 in DCA, that my maximum number

5　of departures is three.  So you can set -- that's the

6　sort of format that the constraint would take.

7　　　Q.　So if you had, using your example, for

8　between 0700 and 0800, you have three, and the

9　airline has one slot between 0801 and 0900, there's a

10　separate entry for the number of slots in that second

11　time slot?

12　　　　　MR. MITCHELL:  Objection to the form.

13　　　　　THE WITNESS:  You can have -- yes, you

14　could have multiple entries for a single station.

15　BY MR. DeRITA:

16　　　Q.　Okay.  I'm going to hand you something

17　that's being marked as Exhibit 7.

18　　　　　　　(Scheff Exhibit No. 7 was identified

19　　　　　　　for the record.)

20　BY MR. DeRITA:

21　　　Q.　And this one's a little funky.  So just to

22　explain what it is, this is a screenshot taken from

1   the July 2023 schedule.

2   BY MR. DeRITA:

3       Q.   At airports that require slots or

4   authorizations -- you mentioned DCA, so we can just

5   use that as the example.  Does your run of FAM that

6   popped the 15 aircraft consider whether or not the

7   combined airline would have the slots to fly at any

8   adjusted times that FAM suggested?

9       A.   The FAM did not have a constraint for

10  that.  I did happen to look at DCA at the before and

11  after, and by the slot windows.  My investigation --

12  what I saw showed that they had the same number of

13  flights in each hourly window as the before and

14  after.  But I did not force slot constraints as a

15  condition of the FAM run.

16      Q.   Did you do a similar look at slot windows

17  after the FAM run at JFK?

18      A.   I took a brief look.  I spent more time --

19  I looked at LaGuardia.  And I did see some changes.

20  In practice, what would happen is that each schedule

21  is an interactive process, where you make changes,

22  you add flights.  And then you work with the



1  scheduling team, and you see if there are

2  situations -- for example, here the allowable

3  increments were 20 minutes or 40 minutes or 60

4  minutes, the model.  It's a model limitation, but if

5  something, for example, moved outside of a slot, it

6  might be only a five-minute move to fix.  But I

7  did -- I did take a look, and I did see that there

8  were some changes.

9       Q.   Did you look at -- and some people call

10  them slots, some call them operating authorizations,

11  but did you look at the operating authorizations at

12  Newark to see whether or not the FAM model conflicted

13  with what was held by JetBlue and Spirit?

14            MR. MITCHELL:  Objection to the form.

15            THE WITNESS:  I did not look specifically

16  at Newark.  I did very intentionally limit the

17  changes, so that the retimings were quite small for

18  the express purpose of making it much simpler and

19  easier to fix any violations that might occur.

20  BY MR. DeRITA:

21       Q.   Are you aware of the divestitures that

22  have been proposed and now agreed to with third-party

