# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

---

UNITED STATES OF AMERICA, et al.

*Plaintiffs,*

*v.*

JETBLUE AIRWAYS CORPORATION and
SPIRIT AIRLINES, INC.

*Defendants.*

---

Civil Action No. 1:23-cv-10511-WGY

## DEFENDANTS' PRETRIAL BRIEF

## <u>TABLE OF CONTENTS</u>

Page

INTRODUCTION ......................................................................................................1

STATEMENT OF FACTS ........................................................................................5

LEGAL STANDARD...............................................................................................21

ARGUMENT ............................................................................................................24

    I.      THE GOVERNMENT'S ROUTE-LEVEL GEOGRAPHIC MARKETS DO
            NOT CAPTURE THE COMPETITIVE REALITIES OF THIS INDUSTRY
            OR ACCURATELY ILLUMINATE THE LIKELY EFFECTS OF THE
            MERGER ........................................................................................24

    II.     THE GOVERNMENT'S ALLEGED PRESUMPTION OF ILLEGALITY
            FAILS IRRESPECTIVE OF THE MARKET DEFINITION ..............................29

    III.    THE EVIDENCE WILL SHOW THAT THIS MERGER WILL INCREASE
            COMPETITION, NOT REDUCE IT ....................................................37

          A.     A Bigger JetBlue Will Increase Competition ............................37

          B.     The Merger Will Not Cause Adverse Unilateral Effects ..........................40

          C.     The Merger Will Decrease, Not Increase, the Likelihood of Industry
                Coordination ............................................................44

CONCLUSION.........................................................................................................47

## **TABLE OF AUTHORITIES**

**Cases**                                                                 **Page(s)**

*In re AMR Corp.*,
   625 B.R. 215 (S.D.N.Y. B.R. 2021), *aff'd* 2023 WL 2563897 (2d Cir. 2023)............... *passim*

*Ball Mem'l Hosp., Inc. v. Mut. Hosp. Ins., Inc.*,
   784 F.2d 1325 (7th Cir. 1986) ..............................................................................27

*Bio-Rad Lab'ys, Inc. v. 10X Genomics, Inc.*,
   483 F. Supp. 3d 38 (D. Mass. 2020) (Young, J.) ..................................................33

*Blue Cross & Blue Shield United of Wisconsin v. Marshfield Clinic*,
   65 F.3d 1406 (7th Cir. 1995) ................................................................................28

*Brown Shoe Co. v. United States*,
   370 U.S. 294 (1962)..............................................................................25, 28, 29

*Chi. Pro. Sports Ltd. P'ship v. Nat'l Basketball Ass'n*,
   95 F.3d 593 (7th Cir. 1996) ..................................................................................39

*Coastal Fuels of Puerto Rico, Inc. v. Caribbean Petroleum Corp.*,
   79 F.3d 182 (1st Cir. 1996)...................................................................................27

*Fraser v. Major League Soccer, L.L.C.*,
   284 F.3d 47 (1st Cir. 2002)...................................................................................22

*FTC v. Arch Coal, Inc.*,
   329 F. Supp. 2d 109 (D.D.C. 2004) .....................................................................45

*FTC v. H.J. Heinz Co & Milnot Holding Corp.*,
   246 F.3d 708 (D.C. Cir. 2001) .............................................................................35

*FTC v. Occidental Petroleum Corp.*,
   1986 WL 952 (D.D.C. Apr. 29, 1986) ............................................................31, 37

*FTC v. RAG-Stiftung*,
   436 F. Supp. 3d 278 (D.D.C. 2020)......................................................25, 40, 46, 47

*New York v. Deutsche Telekom AG*,
   439 F.Supp.3d 179 (S.D.N.Y. 2020)............................................................... *passim*

*Rebel Oil Co. v. Atl. Richfield Co.*,
   51 F.3d 1421 (9th Cir. 1995) ................................................................................28

*United States v. Am. Airlines Grp. Inc.*,
   2023 WL 3560430 (D. Mass. May 19, 2023) .....................................................5, 45

*United States v. Anthem, Inc.*,
    236 F. Supp. 3d 171 (D.D.C. 2017) ................................................................23, 24, 30

*United States v. Baker Hughes Inc.*,
    908 F.2d 981 (D.C. Cir. 1990) ........................................................................ *passim*

*United States v. Citizens & S. Nat'l Bank*,
    422 U.S. 86 (1975) ....................................................................................................30

*United States v. Country Lake Foods, Inc.*,
    754 F. Supp. 669 .......................................................................................................34

*United States v. General Dynamics Corp.*,
    415 U.S. 486 (1974) ................................................................................... *passim*

*United States v. Grinnell Corp.*,
    384 U.S. 563 (1966) ..............................................................................................3, 27

*United States v. Syufy Enterprises*,
    903 F.2d 659 (9th Cir. 1990) ..............................................................................32, 44

*United States v. U.S. Sugar*,
    2022 WL 4544025 (D. Del. Sept. 28, 2022) ...............................................3, 27, 28

*United States v. U.S. Sugar Corp.*,
    73 F.4th 197 (3d Cir. 2023) ...............................................................................25, 42

*United States v. UnitedHealth Grp.*,
    630 F. Supp. 3d 118 (D.D.C. 2022) .........................................................................22

*United States v. US Airways Grp.*,
    38 F. Supp. 3d 69 (D.D.C. 2014) ..............................................................37, 40, 41

*United States v. Waste Mgmt., Inc.*,
    743 F.2d 976 (2d Cir. 1984) ...............................................................................24, 34

*Virtual Maintenance Inc. v. Prime Computer*,
    957 F.2d 1318 (6th Cir. 1992) ..................................................................................28

**Other Authorities**

David Slotnick, The Points Guy, *JetBlue offers status match to Delta flyers on
    heels of SkyMiles devaluation* (Sept. 26, 2023) ......................................................18

Dep't of Justice, Press Release No. 8-963, *Statement of the Department of
    Justice's Antitrust Division on Its Decision to Close Its Investigation of the
    Merger of Delta Air Lines Inc. and Northwest Airlines Corporation* (Oct. 29,
    2008) ...........................................................................................................................2

Dep't of Justice, Press Release No. 10-974, *Department of Justice Closes Investigation, Transfer of Newark, N.J., Assets Resolves Competition Concerns* (Aug. 27, 2010)................................................................................41

Dep't of Justice, Press Release No. 11-523, *Statement of the Department of Justice Antitrust Division on Its Decision to Close Its Investigation of Southwest's Acquisition of Airtran* (Apr. 26, 2011)............................................2, 41

Fed. R. Evid. 301 ............................................................................................23

DOJ/FTC Horizontal Merger Guidelines.......................................................40

J.D. Power, *North American Airline Passenger Satisfaction Declines: Here's Why That's Good News, Says J.D. Power* (May 11, 2022)............................................15

JetBlue Airways Corp., 2020 Schedule 14A Proxy Statement (Apr. 3, 2020) ............................15

JetBlue, *Press Release: JetBlue Awarded Twelfth Consecutive Customer Satisfaction Honor by J.D. Power* (May 11, 2016) ............................................15

Johnny Diaz, NYT, *Delta to Adjust SkyMiles Program After Customer Outcry* (Sept. 28, 2023)................................................................................................18

KEN HYER ET AL., THE YEAR IN REVIEW: ECONOMICS AT THE ANTITRUST DIVISION 2008-2009 at 7 (2009)............................................................................41

Meena Thiruvengadam, *JetBlue Is the Best U.S. Airline in 2021, According to T+L Readers - Here's Why*, Travel & Leisure (Sept. 8, 2021) ............................................15

## **INTRODUCTION**

JetBlue's acquisition of Spirit will enhance competition by strengthening one of the most disruptive and innovative companies in the history of the airline industry, JetBlue, and expanding its ability to bring lower fares and award-winning service to more consumers in more communities across the United States. JetBlue and Spirit are just the sixth and seventh largest domestic airlines, respectively, and they are a fraction of the size of each of the Big Four (American, Delta, United, and Southwest). Through its acquisition of Spirit, JetBlue will become a fifth national competitor that will still be significantly smaller than the smallest of the Big Four, with less than 10% market share. But armed with a larger footprint and fleet, the new JetBlue will force its larger rivals to compete harder to win the business of the traveling public, injecting substantial systemwide competition into an industry in need of a competitive shake up.

The Government nevertheless claims the merger of these two small airlines is likely to substantially lessen competition under Section 7 of the Clayton Act. The Government's Section 7 challenge is based on a newfound view of JetBlue that departs from its prior positions. Less than a year ago, in this very courthouse, the Government exalted JetBlue's uniquely disruptive role in the airline industry. As the Government explained, JetBlue is an industry "maverick," offering a "unique" blend of low fares and high-quality service that has enabled it to "compete effectively against the legacy airlines in ways other [low cost carriers] and [ultra low cost carriers] could not."[1] The Government celebrated that, because of JetBlue's uniquely disciplining force, consumers have saved *billions of dollars*.[2]

---

[1] Plaintiffs' Proposed Findings of Fact at ¶ 27 *United States v. Am. Airlines Grp. Inc.*, No. 1:21-cv-11558 (D. Mass. Dec. 2, 2022), ECF No. 332 ("NEA Pls. Proposed FoF"); Plaintiffs' Post-Trial Brief at 37, United States v. Am. Airlines Grp. Inc., No. 1:21-cv-11558 (D. Mass.) (Dec. 2, 2022), ECF No. 333 ("NEA Post-Trial Brief") (describing JetBlue as a "maverick" in the airline industry).

[2] NEA Pls. Proposed FoF ¶ 167.

Now, the Government attempts to downplay JetBlue's disruptive force and to thwart a transaction that would allow JetBlue to expand its disruptive effect and generate billions of dollars in additional consumer savings.  In so doing, the Government departs from its long-standing practice of evaluating airline mergers holistically.[3]  In particular, the Government has jettisoned the commonsense view that divestitures of slots and gates in airline mergers (like those contractually agreed to here) are sufficient to resolve competitive concerns where they mitigate increased airport-level concentration from a merger and create more low-cost competition across the dynamic airline ecosystem.[4]  But the Government's new approach is impractical, does not comport with the commercial realities of the airline industry, and would render unlawful almost any conceivable airline merger without regard for the overall competitive impact and benefits it could bring to consumers systemwide.  This approach, and the Government's Section 7 challenge, should be rejected for multiple reasons.

*First,* the Court must consider the commercial realities of the airline industry, and the specific context of this transaction, in choosing the correct *relevant* market in which to evaluate the future competitive effects of this merger.  *United States v. U.S. Sugar*, 2022 WL 4544025 (D. Del. Sept. 28, 2022); *see also United States v. General Dynamics Corp.*, 415 U.S. 486, 498 (1974) ("Congress indicated plainly that a merger had to be functionally viewed, in the context of its particular industry." (citations omitted)).  Here, the commercial realities favor a broad, holistic

---

[3] Response of Plaintiff United States to Public Comments on the Proposed Final Judgment at 30, *United States v. US Airways Grp., Inc.*, No. 1:13-cv-01236 (D.D.C. Mar. 10, 2014), ECF No. 159 ("the United States' primary concerns with this transaction were broad in nature and the proposed remedy reasonably addresses those broad competitive issues even if it does not seek to precisely match harm on a route-by-route basis"); Dep't of Justice, Press Release No. 11-523, *Statement of the Department of Justice Antitrust Division on Its Decision to Close Its Investigation of Southwest's Acquisition of Airtran* (Apr. 26, 2011) [link]; Dep't of Justice, Press Release No. 8-963, *Statement of the Department of Justice's Antitrust Division on Its Decision to Close Its Investigation of the Merger of Delta Air Lines Inc. and Northwest Airlines Corporation* (Oct. 29, 2008) [link].

[4] *Id.* at 8.

assessment of the impact of this merger.  To begin with, people and planes are mobile.  Consumers fly to different destinations at different times for different reasons.  Airlines move planes from airport-to-airport and route-to-route in response to ever-changing shifts in American demand for air travel.  And airlines compete at the national level with respect to network strategies, brand and business model, fare class structure, ancillary fee strategies (e.g., checked bag fees, seat selection fees), loyalty programs, co-branded credit-cards, and aircraft layout and amenities (e.g., more legroom or less).  Contrary to the Government's claim, the fact that airlines compete at the route level does not mean that the competitive implications of this merger are best judged by examining individual routes in isolation.  *United States v. Grinnell Corp.*, 384 U.S. 563, 575 (1966).  That is particularly true in this case, where the Government and Defendants agree the crux of this merger challenge is whether it is good for competition to transform Spirit's planes and assets into JetBlue's uniquely disruptive model systemwide.

*Second*, even if the effects of this merger are examined narrowly and mechanically on a route-by-route basis, as the Government requests, the Section 7 challenge fails.  The Government relies on static, snapshot-in-time market share statistics from a year ago on specific routes—primarily, 51 nonstop routes (out of the thousands of nonstop routes across the country) where JetBlue and Spirit "overlapped."  But these market shares do not account for the fact that entry, exit, and expansion on routes are everyday occurrences in the airline industry.  Nor do they account for the commercial realities of the airline industry (discussed above) or Defendants' divestitures of slots and gates to ultra-low-cost carriers at key airports.  Indeed, due to ordinary course changes in their networks, JetBlue and Spirit no longer overlap on 6 of the 51 routes.  Thus, any "presumption" of future harm based on these static market shares is unreliable.  *United States v. Baker Hughes Inc.*, 908 F.2d 981, 991 (D.C. Cir. 1990) (defendants rebut the presumption by

showing that current market shares "inaccurately predict[] the relevant transaction's probable effect on future competition").

More specifically, as one third party airline executive testified, "airlines are extremely efficient market makers" because "aircraft can be moved with the next schedule change" and therefore capacity "flow[s] to the greatest opportunities."[5]  The most recent court to adjudicate an airline merger challenge agreed.  *See In re AMR Corp.*, 625 B.R. 215, 254-55 (S.D.N.Y. B.R. 2021), *aff'd* 2023 WL 2563897 (2d Cir. 2023) (rejecting Section 7 challenge to an airline merger, finding among other things that static route-level market shares could not accurately capture the dynamic nature of the airline industry or broader network level competition).  Simply put, the law does not require Defendants to prove that competition will be replicated on the same routes Spirit flies today in the same way and to the same degree.  Defendants cannot be required to "rebut a probability with a certainty."  *Baker Hughes*, 908 F.2d at 992.  In the fluid airline industry, that standard is unattainable, and there is no law to support it.

*Third*, the merger will give rise to nationwide procompetitive effects—not anticompetitive "unilateral effects" as the Government claims.  With more planes and a far broader network, JetBlue will spread its uniquely strong competitive effect to more legacy-dominated routes, lowering its rivals' fares and improving the quality of their product along the way.  And unbundled, no-frills service will continue to be available in spades for those consumers who want it.  Indeed, in just the next few years, Spirit's numerous ULCC rivals will add many more aircraft to their fleets.  And they are eager to seize any profit opportunities, including by flying routes Spirit has "proven" to be successful for the ULCC model.

---

[5] Biffle (Frontier) Dep. Tr. 125:3-8.

*Fourth*, there is no basis for the Government's claim that this transaction will increase any anticompetitive coordination among the airlines.  Far from being a coordinator with the dominant airlines, the Government in this Court recently touted JetBlue as these airlines' competitive "foil" and the antidote to the legacy airlines' alleged coordination.[6]  Judge Sorokin agreed.  *United States v. Am. Airlines Grp. Inc.*, 2023 WL 3560430, at *34 n.81 (D. Mass. May 19, 2023) ("The parties all agree, and the Court finds, that JetBlue has played a unique role in the domestic air travel industry and qualifies as a 'maverick' competitor for present purposes.").  It strains credulity to suggest that, if JetBlue grows from a 5% national player into an 8% national player through this merger, it will suddenly reverse course and change its entire business model from disruptor to coordinator.  As the evidence will show, the opposite is true: with a larger, nationwide footprint, JetBlue will disrupt any industry coordination on a much broader scale.

Defendants respectfully request that this Court resist the Government's unduly narrow and cramped approach and evaluate the effects of this merger under the "totality-of-the-circumstances," accounting for the "commercial realities" of the airline industry and the specifics of this proposed merger.  *See New York v. Deutsche Telekom AG*, 439 F. Supp. 3d 179 (S.D.N.Y. 2020).  As the totality of the evidence will show, this merger will not substantially lessen competition in violation of Section 7, but will instead increase it improving consumer welfare overall.  The Government's Section 7 challenge should be rejected.

## STATEMENT OF FACTS

### Background

The "Big Four" airlines—and particularly the "legacy" carriers (United, American, and Delta)—have long dominated the US airline industry.  The legacy airlines are JetBlue's primary

---

[6] NEA Plaintiffs' Pre-Trial Brief, United States v. Am. Airlines Grp. Inc. at 8, No. 1:21-cv-11558 (D. Mass.) (Sept. 9, 2022) ECF No. 160, at 7.

competitors, and they enjoy tremendous scale and scope advantages: they have extensive national and international networks, connections to thousands of destinations, vast fleets of aircraft, enormous stables of pilots, strong frequent-flier and co-branded credit card programs, and outsized access to gates, slots, and other critical assets at key airports. These advantages give them an overwhelming advantage in competing for the business of the traveling public. They are the goliaths of the airline sector. And the evidence at trial will show they wield their significant market power to foreclose competition from smaller airlines wherever possible.[7]

JetBlue, in contrast, is a uniquely disruptive airline that has forced the legacies to compete more aggressively, especially in the Northeast United States. For years, the Government has touted JetBlue's unique low-cost, high-quality offering as the *solution* to the legacies' industry stranglehold, promoting JetBlue growth as a way to *improve* competition systemwide.[8] Indeed, less than a year ago, the Government explained to this Court how JetBlue has "differentiated itself from other low-cost airlines by offering not only low fares, but also high-quality service," and that "[t]here is no obvious replacement for the value proposition that JetBlue provides."[9]

But JetBlue's ability to disrupt the domestic airline market is currently limited by its small size. Though it is an important source of competition on the routes it flies, JetBlue flies to far fewer destinations than the legacies (due to its much smaller network and fleet), which limits its overall competitive impact.[10] Moreover, the airline business today is about much more than flying

---

[7] Complaint at ¶¶ 23–28, *United States v. Am. Airlines Grp. Inc.*, No. 1:21-cv-11558 (D. Mass. Sept. 21, 2021), ECF No. 1 ("NEA Complaint").

[8] *See* Competitive Impact Statement at 5, 9, United States of America v. U.S. Airways Group, Inc., No. 13-cv-01236 (D.D.C. Nov. 12, 2013), ECF No. 148.

[9] NEA Pls. Proposed FoF ¶¶ 24, 320.

[10] *See infra* notes 44–45 and accompanying text; *see also* Am. Compl. at ¶ 3, United States of America v. U.S. Airways Group, Inc., No. 13-cv-01236-CKK (D.D.C. Nov. 12, 2013), ECF No. 73 ("DOJ American/US Airways Complaint") ("Southwest and JetBlue, [despite] offering important competition on the routes they fly, have less extensive domestic and international route networks than the legacy airlines.").

passengers from A to B.  Airlines now operate massive loyalty programs, offer lucrative co-branded credit cards, and sell vacation packages and travel products.  Despite offering a generous loyalty program, JetBlue is less attractive for frequent fliers who are attracted to the much larger legacy networks.[11]  Indeed, Delta's loyalty program alone is valued at billions of dollars—more than JetBlue's value as an entire company.[12]

Spirit and the other ultra-low-cost carriers ("ULCCs") have even less of an impact on the legacies.  ULCCs represent approximately 10% of the domestic airline industry and target travelers seeking the lowest base fares with their "unbundled" product offerings.  The legacies compete with ULCCs primarily for the limited number of customers who choose the legacies' "Basic Economy" offering.[13]  They do not with compete with ULCCs for business travelers, for first-class passengers, for passengers flying to Europe, and for many passengers who simply do not want a ULCC experience—according to the Government, a lower-quality experience.

In contrast, when JetBlue enters a route, the legacies (and other airlines) strongly react because they would otherwise lose significant business.  JetBlue competes against the legacies across its cabin for a broader range of customers, leisure and business, flying within the United States and now to Europe.  Thus, JetBlue's entry on a route benefits virtually every passenger flying the route who now pays lower fares, regardless of which airline they fly.

Organic growth of the sort needed to mount a national challenge to the legacies would take decades.  For example, it has taken JetBlue over twenty years of full-throated competition to eke

---

[11] *See, e.g.*, Ex. PS [JBLU-DOJ-09976407] (June 2021 JetBlue "Evolution to a Travel Company" document) at '438–440 (comparing loyalty programs of JetBlue and the legacies and explaining how meaningful loyalty competition is inhibited by the legacies' size and networks).

[12] Ex. PS [JBLU-DOJ-09976407] (June 2021 JetBlue "Evolution to a Travel Company" document) at '479 (explaining Delta's financial performance as part of a competitor deep dive).

[13] Ex. BEB [AA-23LIT-00000021] (June 2021 American "Basic Economy" slide deck) at '032.

out a five percent market share.  Frontier's CEO estimates that it would take JetBlue at least twenty more years to achieve organically the scale it could obtain through the proposed transaction.[14]  In the meantime, competition up and down the legacies' cabin is in short supply, to the detriment of the tens of millions of consumers who must depend on those airlines for most of their travel needs.

JetBlue's merger with Spirit would turbocharge JetBlue's growth and create a stronger fifth national player in the domestic airline market.  By arming JetBlue with a larger network and fleet, the legacies will be forced to compete with JetBlue's value proposition on more routes.  This means not only lower fares, but network-wide improvements to product and service quality, including with respect to on-board service and legroom, the quality and generosity of frequent-flier programs, in-flight entertainment, and connectivity—all categories in which JetBlue is an industry leader but has had a more limited effect on the legacies due to its smaller network.

## Overview of the Airline Industry

There are at least 13 US airlines that offer commercial air service.  Whether measured by revenue or capacity, JetBlue and Spirit, individually and combined, are a fraction of the size of even the smallest legacy carrier.  Defendants' economic expert, Dr. Nicholas Hill, PhD, illustrated this point in Figure 22 of his opening report (shown below in bar chart format):

---

[14] Biffle (Frontier) Dep. Tr. 161:5-20.



While each of these airlines has its own competitive strategy, they are often grouped into three segments according to their choice of business model:[15]

***Legacy or Network Carriers.***   American, Delta, and United operate "hub-and-spoke" networks that consolidate operations at specific airports or "hubs" from which many "spoke" cities are served.  They offer a premium cabin, at least 30 inches of seat pitch[16] (i.e., the industry average or better), a range of on-board entertainment and connectivity options, exclusive airport lounges, and extensive international service.[17]  They also tend to charge the highest fares in the industry.

---

[15] There are also a number of foreign carriers that can carry passengers from a foreign country to a location in the United States, but because of federal law, cannot carry passengers within the United States.

[16] Seat "pitch," an industry term, is the distance between the same points on two consecutive seats.  More pitch generally means more legroom.

[17] *See* Rebuttal Expert Report of Nicholas Hill, PhD, at ¶ 29 (Aug. 3, 2023) ("Hill Rep't"); Ex. PS [JBLU-DOJ-09976407] (June 2021 JetBlue "Evolution to a Travel Company" document) at '879-80; Ex. BPW [JBLU-DOJ-02427738] (JetBlue 2021 Discrete Choice Analysis deck) at '748, '801.

The legacies' key differentiator, however, is their vast networks, which allow them to take customers from "anywhere to everywhere" in ways other airlines cannot.[18]

**Low-Cost-Carriers or "LCCs".** Southwest, JetBlue, and Alaska typically offer lower fares than the legacies and minimize operating costs by, for example, using fewer varieties of aircraft and carefully controlling costs. In addition, Southwest and JetBlue operate point-to-point networks, which are largely designed to support nonstop service, less complex, and more cost-efficient to operate.

Southwest, the smallest of the "Big Four" (i.e., Southwest and the three legacy carriers) by revenue, is the largest low-cost carrier in the United States and the world. Southwest only offers economy class[19] and focuses primarily on leisure and small business travelers. JetBlue, in contrast, offers multiple classes of services, from basic economy to Mint, its premium offering. While its on-board experience is in many ways superior to the legacies (e.g., more legroom, free high-speed WiFi), JetBlue offers that experience at a lower overall price point than the legacies. Alaska operates a West Coast-focused hub-and-spoke network and offers multiple classes of service.

**Ultra-Low-Cost Carriers or "ULCCs".** Spirit, Frontier, Allegiant, Avelo, Breeze, and Sun Country offer low base fares and an "unbundled" product that requires passengers to pay extra for things like printed tickets, WiFi, in-flight entertainment, in-flight food and drinks, online bookings, and carry-on bags.[20] Low operational costs are the crux of the ULCC model. The result, in the words of the Government, is a "lower quality product" characterized by "having very little legroom

---

[18] *See, e.g.*, Nocella (United) Dep. Tr. 16:10-16 (explaining how hub and spoke model allows United to keep "between 30 and 80 aircraft on the ground at the same time," which enables "efficient[] connections"); *see also In re AMR Corp.*, 625 B.R. 215, 232 (Bankr. S.D.N.Y. 2021) (explaining how the hub-and-spoke model "enables network carriers to provide an 'anywhere to everywhere' service, allowing them to offer routes to smaller cities or regions that would not otherwise be economical to serve and increasing the number of options available for consumers").

[19] *See* Hill Rep't ¶ 36.

[20] *See* Wells (Allegiant) Dep. Tr. 273:17-22.

and less comfortable seats."[21]  The ULCCs generally operate point-to-point networks and maintain nimble network plans that allow for rapid entry and expansion into routes that are either unserved or underserved by other ULCCs.[22]

*Competition Among Airlines.*  Competition in the airline industry takes place on many dimensions and levels.  Airlines compete with respect to the price of a ticket, passenger comfort, nonstop versus connecting flights, convenience of flight schedules, choices for classes of service, number of destinations served, the quality and generosity of frequent-flier and credit card programs, baggage and seating policies, in-flight entertainment, in-flight meal and drink service, and the degree of customer service extended during flight and at the airport.

From a geographic perspective, airlines also compete at different levels of the industry including at the network level, the city or airport level, and the route level.  Many of the strategic decisions that drive competition in the airline industry are made at the network or national level.  For example, all airlines engage in continuous network planning to determine how to deploy their fleets, which destinations they will serve, and how they will serve them (e.g., the number of flights, nonstop vs. connecting service).[23]  They also choose their business model (e.g., LCC, ULCC, or somewhere in between) and make decisions about the quality of on-board service at the network level.  And airlines' decisions regarding the quality and generosity of loyalty programs, ancillary fee policies, fare classes, and aircraft purchasing and design are all determined at the network level.  At the city level, airlines also compete to establish brand recognition and relevance through their

---

[21] NEA Pls. Proposed FoF ¶ 11.

[22] *See, e.g.*, Biffle (Frontier) Dep. Tr. 136:23-138:9.

[23] *See generally* Ex. 146 [JBLU_MERGER_LIT-01583421] (Sept. 2016 JetBlue Quarterly Network Review); Ex. 180 [JBLU-LIT-02827597] (April 2017 JetBlue Quarterly Network Review); Ex. AYT [JBLU-DOJ-01045858] (July 2019 JetBlue Quarterly Network Review).

presence at local airports, which also involves competition for gates, landing slots, and other constrained airport resources.

Competition takes place at the route level, too. For instance, a Boston-based customer who wishes to visit her family in Orlando may review available flight offerings and prices for that specific route when purchasing a ticket. But the attractiveness of the individual airline offerings— for example, the number and time of flights offered on that route, or whether she can sit in a comfortable seat, use her laptop, access in-flight entertainment, or use loyalty points—is the product of network-level competition. Simply put, route-level competition does not occur in a vacuum; it is necessarily affected by national and city-level competition. An examination of competition that fails to account for these broader aspects of competition would thus provide a misleading impression of the competitive dynamics in the airline industry.

Competition in the airline industry is fluid, particularly at the route level. Airplanes are mobile, and carriers are constantly adjusting the routes they fly in response to ever-changing competitive dynamics. Airlines maintain network planning teams that regularly evaluate entry, expansion, and exit opportunities across their networks. And network planners move capacity to new markets and exit markets to capture margin on a constant basis.[24] This fluidity is particularly pronounced in the ULCC segment. ULCCs are generally opportunistic, quickly and frequently entering and exiting routes in response to changes in consumer demand and competitor supply.[25]

---

[24] See, e.g., Biffle (Frontier) Dep. Tr. 125:3-11, 126:11-129:4; Ex. BPR [JBLU_MERGER_LIT-01727660] (April 2023 JetBlue Competitive Schedule Change email, summarizing weekly system-level changes in capacity). Defendants will show that this leads to a "dynamic" industry where "a pattern of entry and exit [on routes is] commonplace." Hill (Vol. I) Dep. Tr. 274:2–5.

[25] See, e.g., Yealy (Avelo) Dep. Tr. 120:14-121:7 ("[W]e pride ourselves on [our] start-up mentality, being flexible, and nimble."); Neeleman (Breeze) Dep. Tr. 187-88 (explaining Breeze's business strategy of maintaining low costs and a "nimble" network).

Because ULCCs usually fly fewer frequencies on a route, they can more easily exit routes to pursue more profitable opportunities.

Allegiant, Frontier, Breeze, Avelo, and Sun Country—all of which provide a similar offering to Spirit—have large order books that, in the aggregate, substantially exceed the number of planes Spirit has on order.[26] These airlines could replace any unmet demand for the type of unbundled product Spirit offers after the merger, and their executives have testified they are ready to do so if this merger is approved.[27]

**The Merging Parties**

*JetBlue.*  JetBlue is the sixth largest US airline, accounting for less than 5% of capacity in the national airline market.  As of 2019, approximately 75% of JetBlue's operations were in the New York/Boston area.[28]  JetBlue launched in 2000 as a low-cost carrier with the mission to disrupt the airline status quo and "bring humanity back to air travel."[29]  Consistent with this mission, JetBlue's approach to air travel rests on a simple principle: consumer value.  That is, JetBlue believes air travelers should not have to choose between a high-quality product, award-winning customer service, and low fares; JetBlue customers get all three.

While JetBlue and the ULCCs garner similar pricing perceptions from customers, JetBlue

---

[26] *See* Ex. 71 [B6NK-TX-00014097] (Frontier 2022 10-K), at 11 (detailing Frontier's plans to acquire 101 additional planes by 2029); Ex. 70 [B6NK-TX-00014000] (Allegiant 2022 10-K), at 8 (Allegiant purchased "50 newly manufactured 737MAX aircraft scheduled to be delivered in 2023 to 2025 with options to purchase an additional 50 737MAX aircraft"); Ex. 184 [JBLU_MERGER_LIT-02737803] (Sun Country 2022 10-K), at 13–15 (detailing Sun Country's recent and future fleet acquisitions); Yealy (Avelo) Dep. Tr. 121:16-122:24 (explaining Avelo fleet projections); Ex. BNC [B6NK-CM-00006884] (Breeze CID Responses) at '889 (listing planned deliveries through 2026).

[27] *See, e.g.*, Yealy (Avelo) Dep. at 32:16-33:12 (explaining Avelo's interest in flying routes that Spirit exited); D. Neeleman (Breeze) Dep. Tr. 158:7-160:15 (explaining Breeze's desire to backfill routes that Spirit exits); Biffle (Frontier) LIT Dep. at 126:11-128:5 (describing Frontier's "flexibility and scale" to backfill Spirit).

[28] Hill Rep't at Figure 2; NEA Pls. Proposed FoF ¶ 369.

[29] Ex. AYX [JBLU-DOJ-02571221] (2022 JetBlue Crewmember Orientation deck), at '226 (deck slide with JetBlue's "founding mission").

"breaks away in value," making it the "customer favorite" for air travel.[30]   JetBlue offers the most

legroom in the industry, with an average of 33 inches of seat pitch in economy class.[31]   JetBlue's

on-board product also ushered in a new era of in-flight comfort.   Every consumer who buys a

JetBlue ticket—regardless what fare class they purchase, where they fly, or how often they fly

JetBlue—gets, at minimum:   free high-speed WiFi; free in-flight entertainment on seatback

screens; free unlimited snacks and drinks in-flight; free advance seat selection; USB ports and

power outlets at their seat; and the ability to accrue and redeem loyalty points for perks throughout

their booking and flight experience.[32]   And JetBlue gives customers all of these benefits while

keeping its fares well below the fares of legacy carriers.[33]   Competitors, third-party research

reports, and dozens of customer-driven awards consistently rank JetBlue at or near the top in terms

of customer experience; ULCCs are often at the bottom.[34]

Through its competitive fares and a consumer-centric model, JetBlue has carved out a

"sweet spot" in the airline industry. It competes with both the larger legacies and the lower-cost

---

[30] *See* [AA-NEA-00071225] at '227 ("JetBlue is the only carrier offering free internet for all customers making it the 'customer favorite'"); Ex. BNH [DAL-00007216] (2022 Delta Competitive Experience Snapshot), at '216 ("[Spirit, JetBlue, and Frontier] garner similar pricing perceptions yet jetBlue breaks away in value").

[31] Ex. BPW [JBLU-DOJ-02427738] (JetBlue 2021 Discrete Choice Analysis deck), at '748, '801; Hill Rep't at Figure 28.

[32] Ex. BPW [JBLU-DOJ-02427738] (JetBlue 2021 Discrete Choice Analysis deck), at '748.  *See generally* Hill Rep't § 6 (comparing JetBlue and Spirit products).  JetBlue provides all customers free advanced seat selection 24 hours prior to takeoff, and free seat selection (at any point prior to the flight) for all fare classes except Blue Basic.

[33] Hill Rep't at Figure 1.  JetBlue's fares are essentially the same as Southwest's but offers customers a significantly higher quality travel experience than Southwest.

[34] *See, e.g.*, Ex. BNH [DAL-00007216] (Q1 2022 Delta Competitive Experience Snapshot), at '216 (explaining that JetBlue has a "commanding lead" in the "helpful crew" and "friendly crew" customer rankings compared to Frontier and Spirit); Ex. AWL [JBLU_MERGER_LIT-00448335] (March 2021 "JetBlue Segmentation" slide deck) at '370–71; JetBlue, *Press Release: JetBlue Awarded Twelfth Consecutive Customer Satisfaction Honor by J.D. Power* (May 11, 2016) [link]; J.D. Power, *North American Airline Passenger Satisfaction Declines: Here's Why That's Good News, Says J.D. Power* (May 11, 2022) [link]; Meena Thiruvengadam, *JetBlue Is the Best U.S. Airline in 2021, According to T+L Readers — Here's Why*, Travel & Leisure (Sept. 8, 2021) [link]; *see also* JetBlue Airways 2020 Schedule 14A Proxy Statement [link] at 11 (Apr. 3, 2020) (listing 2019 recognitions for JetBlue crewmembers' "industry leading customer service").

airlines for all air travelers.[35]  As a result, JetBlue attracts customers across the entire spectrum of the traveling public—from those interested primarily in affordable travel to those interested primarily in comfortable travel that would have otherwise flown with the legacies.  In the words of airline industry veteran and current CEO of Breeze Airways, David Neeleman, "there's *no one* that I know of that *wouldn't fly on JetBlue*."[36]

While JetBlue's sweet spot strategy allows it to compete against all carriers, its biggest competitors by a significant margin are the Big Four and particularly the legacies, as depicted below.  Figure 24 of Dr. Hill's opening report shows the percentage of revenue earned by all carriers who serve JetBlue's nonstop routes:



Figure 24. Share of passengers and passenger revenue on nonstop routes served by JetBlue

Source: DB1B, 2022.

JetBlue does compete with Spirit and the other ULCCs, but to a lesser extent than its larger rivals.  Because of JetBlue's unique blend of low prices and high quality, JetBlue competes for all

---

[35] Ex. AYX [JBLU-DOJ-02571221] (2022 JetBlue Crewmember Orientation deck), at '228 (slide showing the "industry landscape in 2000").

[36] Neeleman (Breeze) Dep. Tr. 136:3-7.

types of leisure travelers and all types of business travelers within its network, whereas ULCCs primarily compete for the set of leisure customers who are looking for a no-frills unbundled offering.

While Spirit and JetBlue do overlap geographically, there are significant differences in their network focus. Approximately 75% of JetBlue's routes touch New York or Boston airports, where Spirit is a small player. JetBlue has increasingly been adding transatlantic flying. Spirit has no similar offering. Given Spirit's near exclusive focus on leisure travel, the competition that does exist between JetBlue and Spirit is primarily in areas like Florida and the Caribbean.

JetBlue's "sweet spot" strategy has made it a uniquely disruptive competitor in the airline industry. In 2013, the Massachusetts Institute of Technology coined the term "JetBlue Effect" in a study showing that in 2012, JetBlue had the largest fare-lowering and traffic-stimulating effect (i.e., more people flew because JetBlue caused prices to come down) of any LCC or ULCC in the industry. The JetBlue Effect is a product of JetBlue's low-cost, high-quality offering that forces competitors to reduce fares, improve service and product quality, and increase capacity to satisfy new demand and remain competitive with JetBlue. As the Government recognized in the litigation concerning the Northeast Alliance ("NEA Case"), JetBlue's impact in Boston has been particularly pronounced, saving consumers billions of dollars. The following is a slide from the Government's opening statement in that case:



The Government likewise recognized that the benefits of the JetBlue Effect are felt by all air travelers, "whether or not they fl[y] on JetBlue."[37] Competition from JetBlue, in the words of the Government, "resulted in higher-quality service offered by legacy airlines," more fare options, and lower ancillary fees.[38] For instance, when JetBlue announced it was eliminating its change fee in June 2020, American commented that it had "no choice" but do to the same.[39] Similarly, JetBlue's introduction of its business-class Mint product caused the legacy airlines to improve their premium cabins throughout their fleet, not just on the routes that overlapped with JetBlue.[40] Just last month, Delta announced changes to its loyalty program that were met with an unfavorable

---

[37] NEA Pls. Proposed FoF ¶ 53.

[38] NEA Pls. Proposed FoF ¶¶ 37–41.

[39] NEA Pls. Proposed FoF ¶ 39 (citing [AA-NEA-00244444] (June 2020 American email) at '444).

[40] NEA Pls. Proposed FoF ¶ 41 ("Competitors have copied elements of JetBlue's Mint product.")

reaction from consumers.  After JetBlue and other airlines started targeting Delta loyalists by offering status matches,[41] Delta announced it would revisit aspects of this policy change.[42]

Still, JetBlue's small market share necessarily limits the scope and efficacy of the JetBlue Effect.  By any measure, JetBlue is dwarfed by the legacies.  For instance, as of year-end 2022, American had 1,461 aircraft in its fleet, while JetBlue had 290.[43]  Likewise, Delta serves nearly four times as many destinations as JetBlue.[44]  The legacies' size also gives them an enormous loyalty advantage over JetBlue and other airlines:  customers are more likely to choose a legacy loyalty program because they can use the rewards to go to more places.  In short, the industry has not yet seen the full competitive potential of JetBlue—potential that would be unlocked by this merger.

*Spirit.*  Spirit transitioned to a ULCC model in 2006, becoming the first domestic airline to charge for carry-on bags in 2009.[45]  Currently Spirit is the seventh largest airline with approximately a 4% market share based on revenue, and only a slightly larger share when measured by capacity.[46]  Spirit offers an "unbundled" product, meaning that a customer who purchases a ticket on Spirit must pay an additional amount for many things that non-ULCC airlines include in the base fare, such as carry-on bags, seat selection, WiFi, water and other beverages, boarding pass printing, and online ticket purchasing.[47]  Spirit also offers an average of 28 inches

---

[41] *See, e.g.*, David Slotnick, The Points Guy, *JetBlue offers status match to Delta flyers on heels of SkyMiles devaluation* (Sept. 26, 2023) [link].

[42] *See, e.g.*, Johnny Diaz, NYT, *Delta to Adjust SkyMiles Program After Customer Outcry* (Sept. 28, 2023) [link].

[43] Ex. 59 [B6NK-TX-00020960] (JetBlue 2022 10-K), at 40 (chart showing JetBlue fleet details); Ex. 47 [B6NK-TX-00005518] (American 2022 10-K), at 69–70 (chart showing American's operating statistics).

[44] Ex. PS [JBLU-DOJ-09976407] (June 2021 JetBlue "Evolution to a Travel Company" document) at '430 (as of 2021, Delta served 1,084 destinations; JetBlue served 284).

[45] *See* Spirit Airlines, Inc., Prospectus (May 25, 2011) [link] at 1.

[46] Hill Rep't at Figure 22.

[47] Hill Rep't at ¶¶ 31, 101

of pitch between seats,[48] below the 30-inch industry average and less legroom than is typically found on LCCs and the legacies.

While Spirit once enjoyed a first-mover advantage in adopting the unbundled ULCC model, it now finds itself in a crowded, commoditized space.  At least five other airlines—Frontier, Allegiant, Avelo, Breeze, and Sun Country—offer an unbundled product comparable to Spirit, and the legacy airlines introduced "basic economy" products designed to compete with ULCC offerings.  Moreover, softening demand for domestic travel, rising costs, and various operational issues have worsened Spirit's already unprofitable operations since the COVID-19 pandemic (it last turned an operating profit in 2019):  Spirit recently estimated its third quarter 2023 operating margin will range between negative 14.5 percent and negative 15.5 percent.[49]  In light of its current financial condition, among other considerations, Spirit recently deferred a large number of aircraft that it formerly had scheduled for delivery between 2024 and 2027.[50]  As a result, Spirit's historical growth—a centerpiece of the Government's case—has slowed.

## The New JetBlue

On July 28, 2022, JetBlue and Spirit executed a merger agreement.  The merger is intended to address JetBlue's biggest competitive disadvantage—its lack of scale to match the legacies' systemwide offering and particularly the offering of its largest competitors, the legacies.  Indeed, it was for this very reason that JetBlue first considered acquiring Spirit in late 2017—to "build a

---

[48] Hill Rep't at Figure 28.

[49] Ex. BTH [JBLU_MERGER_LIT-02742189] (Sept. 2023 Spirit Investor Update) at 1; Ex. 237 [JBLU_MERGER_LIT-02742435] (Q2 2023 Spirit Earnings Release) at 1.

[50] *See, e.g.,* Ex. TZ [B6NK-TX-00001959] (Q2 2023 Spirit Earnings Call Transcript), at 6–7, 15–16; *see also* Ex. BTH [JBLU_MERGER_LIT-02742189] (Sept. 12, 2023 Spirit Investor Update); Ex. 237 [JBLU_MERGER_LIT-02742435] (Q2 2023 Spirit Earnings Release), at 1, 5, 9–10.

stronger platform to compete against the 'Big Four'" and particularly the legacy carriers.[51]  It was this same rationale that motivated JetBlue to consider making an offer for Spirit in 2020, before the COVID-19 pandemic hit.[52]  And it was the same strategic rationale for this transaction.  As JetBlue told its Board of Directors in early 2022, the merger will "unleash a sustainable challenger brand to legacy airlines," "position[] JetBlue as a more relevant LCC player in a Legacy-dominated domestic market," and expand the JetBlue effect "to new heights."[53]  No one seriously contends that JetBlue, Spirit, or any other airline can gain the necessary scale to compete with these dominant players in any foreseeable timeframe without a transaction like this one.

The primary asset that JetBlue is acquiring is Spirit's highly compatible fleet.  Upon closing, JetBlue's expects that its total fleet will comprise of approximately 500 aircraft.[54]  Although JetBlue and Spirit share various fleet and engine commonalities, which will streamline the fleet integration process, their interiors are markedly different.  For example, JetBlue offers the "most legroom in coach"[55] of any US airline on its aircraft and significantly more than Spirit offers.  Because the JetBlue experience—and the corresponding JetBlue Effect—is so crucial to JetBlue's competitive position, JetBlue plans to retrofit the Spirit aircraft over the course of several years, to have the JetBlue layout and amenities by, among other things, removing seats and installing seatback entertainment.   The airlines will remain separate brands until Spirit's planes are

---

[51] Ex. BAV [JBLU-DOJ-10760861] (Oct. 2017 JetBlue Project Henri slide deck), at '863; Ex. BEA [JBLU-DOJ-06254240] (Jan. 2018 JetBlue Project Henri Supplemental Materials).

[52] Ex. BDY [JBLU-DOJ-09982193] (Feb. 2020 JetBlue Project Exchange Board deck), at '194, '206 (showing process of Spirit transaction); Ex. BBB [JBLU-DOJ-11062736] (Dec. 2019 JetBlue Project Exchange Board deck) at '738 (explaining how a merger with Spirit would "create a viable long-term competitor" to the dominant legacy carriers and accelerate JetBlue's organic growth plan).

[53] Ex. BQQ [JBLU-LIT-04400989] (March 2022 JetBlue Board Deck) at '016 (slide showing goal and effects of merger with Spirit).

[54] *See* Ex. AWJ [JBLU_MERGER_LIT-00225844] (2023 JetBlue slide deck analyzing the combined fleet as of February).

[55] *See, e.g.*, JetBlue, *Inflight Experience* (accessed Oct. 10, 2023) [link].

retrofitted, reflecting that JetBlue cannot "deliver [the] JetBlue experience on [aircraft] with Spirit's interior."[56]

The merger will dramatically improve and expand JetBlue's network such that it will be able to provide a national network that is a viable alternative to the legacies.[57]  Following the merger, JetBlue plans to offer over 700 total nonstop routes, including over 250 nonstop routes that neither JetBlue or Spirit flew as of July 2023.[58]  JetBlue's expansion will bring enhanced options for consumers through 10 or more daily departures from nearly 60 cities nationwide.

Beyond specific routes, JetBlue will expand beyond its current six focus cities (New York, Boston, Fort Lauderdale-Hollywood, Los Angeles, Orlando, and San Juan, Puerto Rico) to build nationwide relevance.  Over 20 cities in JetBlue's future network will exceed 30 daily departures.[59] Network improvements of this kind will likely make JetBlue's loyalty program and credit card offering even more attractive for consumers, enhancing JetBlue's ability to challenge the legacies. As a result of this nationwide competition, the traveling public will benefit in the form of lower prices and a better travel experience.

## LEGAL STANDARD

Section 7 of the Clayton Act "prohibits . . . acquisitions whose effect 'may be substantially to lessen competition, or to tend to create a monopoly.'"  *Fraser v. Major League Soccer, L.L.C.*, 284 F.3d 47, 69 (1st Cir. 2002) (quoting 15 U.S.C. § 18).  "To prove a Section 7 violation, 'the government must show . . . that the proposed merger is likely to *substantially* lessen competition,

---

[56] Ex. AXA [JBLU_MERGER_LIT-02015477] (JetBlue 2023 Integration Planning deck), at '569 (slide showing key brand integration principles); O'Brien (JetBlue) Dep. Tr. 202–03.

[57] Ex. DY [JBLU_MERGER_LIT-01649881] (JetBlue 2023 "2027 Combined Network Plan" deck) at '882.

[58] Ex. 25 [JBLU_MERGER_LIT-01649860] (May 2023 JetBlue "Final Combined Network Data" excel) (showing total and incremental frequencies in the Combined Network Plan).

[59] Ex. DY [JBLU_MERGER_LIT-01649881] (2027 Combined Network Plan) at '882.

which encompasses a concept of reasonable probability"; a mere possibility of harm is not sufficient. *United States v. UnitedHealth Grp.*, 630 F. Supp. 3d 118, 129 (D.D.C. 2022) (emphasis in original) (quoting *United States v. AT&T, Inc.*, 916 F.3d 1029, 1032 (D.D. Cir. 2019)).  The "essential question" is whether, at the time of trial, there exists a substantial likelihood of future ham. *United States v. Gen. Dynamics Corp.*, 415 U.S. 486, 505 (1974) (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 323 (1962)).

There is a three-step burden-shifting framework for analyzing the likely competitive effects of a merger in a challenge under Section 7 of the Clayton Act. *See United States v. Baker Hughes Inc.*, 908 F.2d 981, 991–92 (D.C. Cir. 1990).[60]  Significantly, however, there is no "shifting" of the ultimate burden of persuasion in a Section 7 case:  while Defendants bear the burden of rebutting the Government's prima facie showing, "the ultimate burden of persuasion . . . remains with the government at all times." *Baker Hughes*, 908 F.2d at 983; Fed. R. Evid. 301 ("In a civil case, unless a federal statute or these rules provide otherwise, the party against whom a presumption is directed has the burden of producing evidence to rebut the presumption. But this rule does not shift the burden of persuasion, which remains on the party who had it originally.").

At step one, the Government must "show[] that a transaction will lead to undue concentration in the market for a particular product in a particular geographic area," thus establishing "a presumption that the transaction will substantially lessen competition." *Id.* at 982.  If the Government satisfies its initial burden, the "burden of producing evidence to rebut this presumption then shifts to the defendant[s]." *Id.* at 982.

Defendants' production burden at step two is a low bar. *See id.* at 992; *United States v.*

---

[60] Though the First Circuit has not specifically adopted or applied *Baker Hughes*, it is well-established that "[c]ourts generally assess Section 7 cases through [this] three-part burden-shifting framework." *New York v. Deutsche Telekom AG*, 439 F. Supp. 3d 179, 198–99 (S.D.N.Y.) (quoting *Chi. Bridge & Iron Co. N.V. v. FTC*, 534 F.3d 410, 423 (5th Cir. 2008)).

*Anthem, Inc.*, 236 F. Supp. 3d 171, 213 (D.D.C. 2017) ("[The] quantum of evidence [Defendants] must produce to shift the burden back is relatively low . . . . [D]efendants are not required to clearly disprove anticompetitive effect, but rather to make merely 'a showing.'" (quoting United States v. Philadelphia Nat. Bank, 374 U.S. 321, 363 (1963)).  "A defendant can make the required showing by (1) affirmatively showing why a given transaction is unlikely to substantially lessen competition, or (2) by discrediting the data underlying the initial presumption in the government's favor."  *Baker Hughes*, 908 F.2d at 991.  In short, Defendants may rebut the presumption by showing that market shares and concentration are not accurate predictors of future competition. *See id.* at 991.  However, there is no set way in which Defendants are required to rebut the presumption.  *Id.*  Courts have found it to be rebutted based on low entry barriers, academic studies showing results inconsistent with a presumption, and constrained resources of the merging parties relative to their competitors.  *See, e.g.*, *id.* at 984–85, 987–88; *In re AMR*, 625 B.R. at 256, 258; *United States v. Waste Mgmt., Inc.*, 743 F.2d 976, 983 (2d Cir. 1984).

Finally, at step three, "the burden of producing additional evidence of anticompetitive effect shifts to the government, and merges with the ultimate burden of persuasion, which remains with the government at all times."  *Baker Hughes*, 908 F.2d at 983.  In other words, the Government has the burden "on every element of their Section 7 challenge, and a failure of proof in any respect will mean the transaction should not be enjoined."  *Anthem*, 236 F. Supp. 3d at 192 (quoting *FTC v. Arch Coal, Inc.*, 329 F. Supp. 2d 109, 116 (D.D.C. 2004)).

Still, the Court's inquiry under Section 7 is a flexible one.  "The Supreme Court has adopted a totality-of-the-circumstances approach to [Section 7], weighing a variety of factors to determine the effects of particular transactions on competition."  *Baker Hughes*, 908 F.2d at 984.  "Relevant evidence may include unique economic circumstances and nonstatistical evidence that undermines

the predictive value of market share statistics, such as ease of entry into the market, the trend of the market toward or away from concentration, and the continuation of active price competition." *New York v. Deutsche Telekom AG*, 439 F. Supp. 3d 179, 206–07 (S.D.N.Y. 2020).

## ARGUMENT

Although the Government, like JetBlue, has bemoaned legacy dominance and recognized the importance of systemwide competition to improve consumer welfare in the industry, the Government now votes for the status quo with this lawsuit.  In so doing, the Government focuses its challenge on a select number of routes—primarily 51 routes where JetBlue and Spirit both flew nonstop from the third quarter of 2021 through the second quarter of 2022—out of the thousands of routes in the country.  The Government's attempt to ignore the dynamic, network-level competition in defining the relevant market is contrary to the law and alone fatal.  But even if the Government's route-based markets are taken at face value, the Section 7 challenge fails.  The market share statistics on which the Government relies are outdated, do not account for the divestitures contemplated in the merger agreement, do not account for the largely unencumbered entry or expansion of other carriers on these routes, and as a result, do not accurately reflect future competition on these routes.  Nor does the Government grapple with the ample evidence showing that ULCCs are lining up to enter any routes that JetBlue or Spirit exits and that Defendants' divestitures will help ensure promote competition systemwide.

## I.    THE GOVERNMENT'S ROUTE-LEVEL GEOGRAPHIC MARKETS DO NOT CAPTURE THE COMPETITIVE REALITIES OF THIS INDUSTRY OR ACCURATELY ILLUMINATE THE LIKELY EFFECTS OF THE MERGER

To meet its prima facie burden, the Government must identify a relevant product and geographic market and show the transaction will lead to increased concentration levels in the relevant market.  *FTC v. RAG-Stiftung*, 436 F. Supp. 3d 278, 291 (D.D.C. 2020) (citing *Baker Hughes*, 908 F.2d at 982).  The selection of the relevant market definition is a fact-specific inquiry,

*United States v. U.S. Sugar Corp.*, 73 F.4th 197, 203 (3d Cir. 2023), that requires consideration of consumer demand and supply, *see Brown Shoe Co. v. United States*, 370 U.S. 294, 325 n. 42 (1962).

Here, the Government defines the relevant geographic market around unduly narrow origin and destination pairs, comprising a relatively small percentage of routes flown by commercial carriers in the United States. But such a narrow market definition fails to adequately capture the effects of the proposed merger at the national and regional level for at least three reasons:

*First*, the Government's route-level markets ignore abundant evidence of national airline competition. As detailed above, an airline's network design and adjustments, business model and strategy, loyalty and frequent flyer programs, aspects of pricing and fare structure, and airport and city presence are top-down, systemwide decisions. For example, Spirit has assessed its competitors in terms of "network overlaps, as measured by overlapping available seat miles."[61] Further, "price is not the only dimension on which competition occurs." *Deutsche Telekom*, 439 F. Supp. 3d at 235 (explaining that consumers in the mobile phone industry make choices "based on several considerations" other than price and that, accordingly, providers compete on various "dimensions of network quality"). The evidence shows that the quality and breadth of an airline's offering—for example, through loyalty programs, airport presence, and fare class offerings—often drive customers' decisions to purchase any given plane ticket. These are aspects of the flying experience determined through competition at a national or regional level, not the route level.

---

[61] Ex. 39 [B6NK-TX-00000441] (Spirit 2022 10-K) at 9 (discussing competition with other airlines); *see also* Ex. BIA [NK-2R-04164067] (Apr. 2019 Spirit email chain) at '067 (discussing potential options for Spirit to shift capacity in light of reductions by other airlines caused by the Boeing Max grounding, showing that capacity can be quickly shifted throughout an airline's system and routes across the country compete against one another for capacity).

Defendants do not dispute that airlines also compete at the route level.  But that fact alone does not compel the Court to adopt the Government's proposed route-level market definition.  The Government itself has used different market definitions to examine different transactions in the airline industry.  *See* Complaint, *United States v. United Continental Holdings, Inc.*, No. 2:15-cv-07992 (D.N.J. Nov. 10, 2015), ECF. No. 1, at ¶ 32 ("Given that slots can be used to serve any route to or from Newark, it is appropriate to aggregate all routes that either originate or terminate in Newark for the purpose of defining a relevant market in which the transaction will cause anticompetitive harm."); *see also* Am. Compl, *United States v. US Airways Grp., Inc.*, Case No. 1:13-cv-01236 (D.D.C. Sep. 5, 2013), ECF. No. 73, at ¶ 31 (defining a market for slots at an airport).  And the Government's own economic experts acknowledge that competition occurs at different levels of the industry.[62]  The Government's economist, Dr. Gowrisankaran, also acknowledges that multiple geographic markets, including a national market, pass the "hypothetical monopolist test" used to evaluate market definition.[63]

Where multiple geographic markets are potentially in play, the question for the Court is which best illuminates the competitive effects of the merger and thus are the *relevant* geographic market(s) through which this merger should be analyzed.  *United States v. U.S. Sugar Corp.*, 2022 WL 4544025, at *24 (D. Del. Sept. 28, 2022), *aff'd* 73 F.4th 197 (3d Cir. 2023) (explaining that purpose of market definition is not to "figure out which market allows the Government to prevail and then to use that market").  The Court need not choose the narrowest market "where such 'division does not aid [the court] in analyzing the effects of [a] merger.'" *Id.* (quoting *Brown Shoe*

---

[62] *E.g.*, Expert Report of Dr. Tasneem Chipty, PhD, at ¶ 50 (Jul. 31, 2023) ("Chipty Rep't") ("[A]irlines do not make entry decisions on a simple route-by-route basis" but instead, "airlines decide which routes to operate based on sophisticated systemwide network optimization.").

[63] Gowrisankaran Dep. Tr. 9:11–10:3, 15:16–21 ("[A] geographic market, such as the United States as a whole, would pass the hypothetical monopolist test . . .").

*Co., Inc. v. United States*, 370 U.S. 294, 327 (1962)); *see also Coastal Fuels of Puerto Rico, Inc. v. Caribbean Petroleum Corp.*, 79 F.3d 182 (1st Cir. 1996) (rejecting plaintiff's narrow geographic market in favor of defendant's broader one); *Ball Mem'l Hosp., Inc. v. Mut. Hosp. Ins., Inc.*, 784 F.2d 1325, 1336 (7th Cir. 1986) (affirming district court's finding that the relevant "geographic market 'is regional, if not national'" where narrower markets failed to capture full competitive effects). Indeed, even where some aspects of competition are local, the Supreme Court has not hesitated to find a broader geographic market where the record reflected competition at the regional and national level. *See Grinnell*, 384 U.S. at 575 (finding a national market notwithstanding 25-mile catchment area for local facilities where the evidence at trial showed "national planning," agreements "cover[ing] activities in many [s]tates," and a "national schedule of prices, rates, and terms, though the rates may be varied to meet local conditions.").

*Second*, the Government will claim that a national market is not appropriate because it includes routes that are not substitutes for one another, but that argument considers only demand-side substitution—customers choosing to switch from one type of product to another across geographies. The Government fails to consider the commercial reality that airplanes are mobile and the airline industry moves around capacity in response to customer demand and competition from other airlines. Courts recognize that the movement of supply across geographics to satisfy customers—supply-side substitution—is also critical in determining the relevant market. *See Brown Shoe*, 370 U.S. at 325 n. 42 (1962); *Blue Cross & Blue Shield United of Wisconsin v. Marshfield Clinic*, 65 F.3d 1406, 1411-12 (7th Cir. 1995) ("[T]he definition of a market depends on substitutability on the supply side as well as on the demand side."); *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1436 (9th Cir. 1995) ("[D]efining a market on the basis of demand considerations alone is erroneous. . . . A reasonable market definition must also be based on

"supply elasticity. . . .); *Virtual Maintenance Inc. v. Prime Computer*, 957 F.2d 1318 (6th Cir. 1992) ("The relevant product market cannot be determined without considering the cross-elasticity of supply.").  Just last year, the district court in *U.S. Sugar* rejected the Government's proposed regional market because "sugar flows easily across the country from areas of surplus to deficit in response to prices and demand."  *U.S. Sugar*, 2022 WL 4544025 at *24.

The evidence presented at trial will show that airlines move planes across routes in response to changes in consumer demand and competitor supply.  A plane that flies from Chicago to Miami one day may fly from Boston to Detroit the next.  An airline may recognize that one route is more competitive, and therefore less profitable, and shift resources to a route with less competition.  This shifting among routes is a form of supply-side substitution that occurs with ease and frequency in the airline industry, and that must be accounted for in defining the relevant market.  Because airlines can move planes from anywhere in the country to anywhere else in the country, the effects of this merger are best examined at a national level.

*Third*, the specifics of this transaction and both parties' arguments reinforce a national geographic market as an appropriate choice in this case.  Both the Government and Defendants allege that this merger will have significant system-wide effects, they just dispute the nature of those effects.  Defendants argue that the merger will give JetBlue the scale and scope needed to mount a national challenge to the legacy airlines, which will redound to the benefit of millions of consumers across the country.[64]  The Government alleges that by replacing the Spirit business model with the JetBlue business model, customers across Spirit's current and future network will be harmed by the merger.[65]  These broad effects are not accurately captured by the Government's

---

[64] *See, e.g.*, JetBlue's Answer to Am. Compl, ECF No. 87, at ¶¶ 1, 6.

[65] *See, e.g.*, Am. Compl., ECF No. 69, at ¶¶ 30, 57.

artificially narrow route-level market definition. *See Deutsche Telekom AG*, 439 F. Supp. 3d at 232 (holding that courts must evaluate "each merger . . . in the context of its particular industry and unique circumstances").

In summary, the law is clear that the market definition must reflect "commercial realities." *Brown Shoe*, 370 U.S. at 336–37 ("The geographic market selected *must*…correspond to the commercial realities." (emphasis added)). The Government's route-based market definition fails to do so by ignoring important aspects of national and regional competition and, as a result, substantially overstates the competitive effects of this merger.

## II.   THE GOVERNMENT'S ALLEGED PRESUMPTION OF ILLEGALITY FAILS IRRESPECTIVE OF THE MARKET DEFINITION

Market concentration statistics are merely a "convenient starting point" for the competitive analysis. *Baker Hughes,* 908 F.2d at 984, 986, 988, 991-92; *see also Gen. Dynamics*, 415 U.S. at 498 (while "statistics concerning market share and concentration" may be significant, they are "not conclusive indicators of anticompetitive effects"). Modern merger analysis requires a "totality-of-the-circumstances approach" encompassing an "overall assessment of future competitiveness" to determine the probable effects of the proposed merger. *Baker Hughes,* 908 F.2d at 984, 988; *In re AMR*, 625 B.R. at 247 ("[V]arious courts . . . have relied upon a multiplicity of relevant factors in performing a Section 7 violation analysis.").

Only if the Government makes a prima facie showing does the "burden of producing evidence to rebut this presumption then shift[] to the defendant[s]." *Baker Hughes*, 908 F.2d at 982. Even if the Government could make such a showing, Defendants will offer evidence that "market share statistics g[i]ve an inaccurate account of the acquisition's probable effects on competition" in the relevant markets to return the ultimate burden back to the Government. *United States v. Citizens & S. Nat'l Bank*, 422 U.S. 86, 120 (1975); *Anthem*, 236 F. Supp. 3d at 213 ("[T]he

quantum of evidence defendants must produce to shift the burden back is relatively low . . . . [they] are not required to clearly disprove anticompetitive effect, but rather to make merely a showing." (internal quotations and citations omitted)); *see also Baker Hughes*, 908 F.2d at 992 ("Imposing a heavy burden of production on a defendant would be particularly anomalous where . . . it is easy to establish a prima facie case. . . . The Herfindahl–Hirschman Index[66] cannot guarantee litigation victories."). In this respect, evidence of entry and expansion is relevant to both the Government's ability to meet its prima facie burden and Defendants' ability to rebut it. As one court explained: "Whether entry is included as part of the market definition or in the ease of entry evaluation, practically, is of no consequence. In either event, the result is the same. The exercise of market power will be thwarted and collusive behavior will not be possible." *FTC v. Occidental Petroleum Corp.*, 1986 WL 952, at *8 (D.D.C. Apr. 29, 1986) (finding plaintiff failed to meet prima facie burden).

Here, the Government alleges that it is entitled to a presumption of harm on 183 routes, including 51 routes where (as of the time of the Government's snapshot) JetBlue and Spirit offered nonstop service, 117 routes where JetBlue and Spirit offered connect service, and 15 "mixed" routes, where one carrier offered nonstop service and the other carrier offered connecting service.[67] But on the vast majority of these routes—132 out of 183—at least one carrier only offered connect service, and there is no evidence that the merging parties meaningfully compete with one another when one is providing nonstop service and the other is providing connecting service.[68] The Government also ignores that Defendants' connecting flights are often priced using a "sum of

---

[66] The Herfindahl–Hirschman Index or "HHI" is a tool used to measure concentration in antitrust cases and is the basis for the Government's alleged presumption.

[67] Amended Expert Report of Gautam Gowrisankaran, PhD ("Gowrisankaran Rep't") at ¶ 99 (Jul. 7, 2023).

[68] See Hill Rep't ¶¶ 55–57, 248, 256–57.

locals" method that simply adds the price of individual connecting legs together—meaning that JetBlue and Spirit are not actually competing on price on these connecting routes.[69]  Simply put, a merger cannot "substantially lessen" competition if there is no meaningful competition to begin with.  It is therefore not surprising that the Government's own expert who initially calculated these market concentration statistics has chosen to focus on just 51 routes (out of the many hundreds of routes served today by JetBlue and Spirit) where JetBlue and Spirit both offered nonstop service according to his Q3 2021–Q2 2022 snapshot of market shares.[70]

But even on these 51 routes, Defendants will rebut the alleged presumption because the Government's market concentration statistics inaccurately predict the merger's probable effect on competition for several reasons:

*First*, exemplifying the dynamic nature of this industry and the frailty of any inference based on static, route-level market concentration statistics: only one year has passed since the Government's market share snapshot was taken, and JetBlue and Spirit no longer compete on 6 of the 51 (i.e., 12%) of the nonstop "presumption" routes the Government plans to discuss at trial. On each of these routes, one or both carriers has exited due to ordinary course changes in network plans.  These changes, in such a short period of time, illustrate the unreliability of any presumption based on static, route-level market shares.  *See Deutsche Telekom*, 439 F. Supp. 3d at 245 (explaining the pitfalls of using a "simple, static" view of the market to predict anticompetitive effects "in a complex and dynamic industry").

---

[69] Hill Rep't ¶¶ 55–57, 248 256–57, & Figure 82; Ex. AEO [NK-2R-07001679] (April 2022 Spirit slide deck explaining that 97% of passengers on Spirit's top 20 connect routes buy sum of local fares).

[70] Expert Reply Report of Gautam Gowrisankaran, PhD ("Gowrisankaran Reply Rep't), at ¶ 6 (Aug. 25, 2023) (describing the 51 non-stop overlaps as "the central markets in this case").

*Second*, barriers to entry and expansion at the route-level are low and other airlines—particularly ULCCs—are poised and ready to seize any profit opportunities that may arise. *See United States v. Syufy Enterprises*, 903 F.2d 659, 664 (9th Cir. 1990) ("[Absent] significant barriers to entry, . . . rais[ing] prices above the competitive level will lure into the market new competitors able . . . to offer their commercial goods . . . for less."). Entry, exit, and expansion at the route-level are everyday occurrences in the airline industry, as JetBlue's weekly "Competitive Schedule Change" reports illustrate.[71]

This dynamic pattern of entry and exit is critical to the Section 7 analysis. In a recent decision rejecting a challenge to a different airline merger, the court cited the low route-level entry barriers as one (of many) reasons the plaintiffs were not entitled to a presumption of harm:

> While there are substantial capital costs for new entrants into the airline industry generally, *barriers to entry for existing carriers into new routes are relatively low, suggesting that the further expansion of LCCs and ULCCs remains a possibility.*

*In re AMR*, 625 B.R. at 258 (emphasis added).[72]

Of course, an airline seeking to enter a new airport must follow any applicable procedures such as obtaining approval from the relevant airport authority. But airports generally have an incentive to accommodate airlines that want to add flights because more flights result in more revenue for the airports. Moreover, as this Court has explained, in assessing ease of entry, ordinary entry hurdles are not enough; there must be "significant" barriers that "prevent[] another firm from

---

[71] Ex. AVU [JBLU_MERGER_LIT-00011360] (JetBlue weekly change report showing 25 announced changes by JetBlue and other airlines on routes within JetBlue's network during a week in March 2023); Ex. BPR [JBLU_MERGER_LIT-01727660] (JetBlue weekly change report showing more than 100 announced changes by JetBlue and other airlines on routes within JetBlue's network during a week in April 2023); Ex. 231 [JBLU-DOJ-00130028] (JetBlue weekly change report showing 135 changes by JetBlue and other airlines).

[72] The *In re AMR* court also found that route-level market shares, in fact, do not predict future competitive conditions. In *In re AMR*, the court examined various academic studies and expert work showing that prices dropped and traffic increased after airline mergers on nonstop overlap routes that were allegedly presumptively unlawful—which is the opposite of what the presumption would predict. 625 B.R.at 253-55.

entering." *Bio-Rad Lab'ys, Inc. v. 10X Genomics, Inc.*, 483 F. Supp. 3d 38, 66 (D. Mass. 2020) (Young, J.); *see also Sterling Merch., Inc. v. Nestle, S.A.*, 724 F. Supp. 2d 245, 268 (D.P.R. 2010), *aff'd* 656 F.3d 112 (1st Cir. 2011) ("It is established in antitrust law that an entry barrier is a cost that is greater for a new competitor than for established rivals."). Thus, ordinary hurdles that must be overcome to enter a new airport or route are not "barriers" to entry within the context of Section 7. And regardless, Defendants' divestiture commitments will enhance competition in New York, Boston, and Miami/Fort Lauderdale, home to some of the most "constrained" airports in the US.

ULCCs, in particular, have a history of rapid entry and expansion. The ULCC model is particularly well tailored to mobility, as ULCCs typically fly fewer frequencies on routes and are typically less committed to building a brand and customer loyalty. Because ULCCs can nimbly move fleet and crew to enter new routes and airports in the span of weeks or months, they can readily enter the Government's "presumption" routes,[73] such that "any anti-competitive impact of the merger before us would be eliminated more quickly by such competition than by litigation." *Waste Mgmt.*, 743 F.2d at 983; *see also United States v. Country Lake Foods, Inc.*, 754 F. Supp. 669, 673–74 ("In spite of the high concentration . . . the absence of entry barriers makes it unlikely that [defendants] could exercise market power.").

In addition, the merging parties' competitors have outsized orderbooks with well over 500 airplanes scheduled to be delivered in the next 5 years, giving other airlines ample fire power to

---

[73] *See, e.g.*, Yealy (Avelo) Dep. Tr. 120:14-121:7 ("[W]e pride ourselves on [our] start-up mentality, being flexible, and nimble. So I'm quite confident that we could move quickly [to take advantage of new opportunities]. Nothing moves overnight, but we could move quickly."); Neeleman (Breeze) Dep. Tr. 158:15-160:3 ("Q. If JetBlue were to stop flying a route that Spirit was previously flying, would you consider entering that route? A. In a nanosecond. Absolutely. [...] Q. And what about on a route where Spirit and JetBlue are currently both flying? If the Spirit flight went away, would you consider entering that route to compete with JetBlue? A. Yeah. Absolutely."); Wells (Allegiant) Dep. Tr. 193:12-25 (Allegiant's business model is to "announce new routes as quickly as feasible" and "capitalize on each opportunity as soon as possible."); Biffle (Frontier) (Private) Dep. Tr. 17:14-18:22 (estimating it would take Frontier and other ULCCs only "12 to 24 months" to replace all of Spirit's routes).

support new and expanded competition on these routes.  United alone has more planes scheduled for delivery between now and the end of 2024 than Spirit has in its entire fleet.[74]  Similarly, Southwest is scheduled to take delivery of at least 207 aircraft between 2023 and 2025.[75] American and Delta also have sizable orderbooks.  And the other airlines operating a ULCC or similar model (Frontier, Allegiant, Avelo, Breeze, and Sun Country) are collectively slated to add nearly 200 new airplanes to their fleets by the end of 2025, which is well more than JetBlue and Spirit combined.[76]  Even if some of these deliveries are delayed due to supply chain issues, Defendants' rivals will still have plenty of airplanes with which to seize any profit opportunities that may arise from this merger.

In order to rebut the Government's prima facie case, Defendants need only show that entry barriers are low, not that any particular firm will enter any particular route on any particular timeframe.  In this respect, the Government misstates Defendants' burden, asserting that even if other airlines eventually start serving the "presumption" routes, their entry will not be quick enough to abate the harm caused by Spirit's exit.  The Government's argument is founded upon DOJ's own Horizontal Merger Guidelines ("Guidelines"), which are not the law, as courts have made clear.  *See Deutsche Telekom*, 439 F. Supp. 3d at 232 ("[T]he Court . . . disagree[s] that the two-year standard [for entry] once specified by the Merger Guidelines should carry any talismanic force here.").  To the contrary, it is well-established that Defendants do not need to prove entry

---

[74] *Compare* Ex. 185 [JBLU_MERGER_LIT-02738733] (United 10-Q for Period Ending June 30, 2023) at 20 (showing United set to take delivery of 223 aircraft for the rest of 2023 and 2024) *with* Ex. 39 (Spirit 2022 10-K) at 95 (Spirit had 194 aircraft in its fleet at the end of 2022).

[75] Ex. 69 [B6NK-TX-00013756] (Southwest 2022 10-K) at 48.

[76] JetBlue and Spirit are slated to add 65 incremental airplanes total over the same time period. The merging parties' relatively limited future assets is yet another reason why the Government's prima facie case fails.  *See General Dynamics*, 415 U.S. at 508 (rejecting presumption where merging parties' future coal reserves were limited compared to their competitors' reserves).

will be "quick [or] effective" to rebut the Government's *prima facie* case.  *See Baker Hughes*, 908 F.2d at 988 (rejecting the government's proposed "quick and effective" rule for evaluating entry).

Nor must Defendants prove that other airlines *will* replace Spirit one-for-one on the exact routes—with the same frequencies—Spirit chooses to fly today.  *Baker Hughes*, 908 F.2d at 988 ("[A] defendant seeking to rebut a prima facie case certainly need not show that any firm *will* enter the relevant market." (emphasis in original)); *see also FTC v. H.J. Heinz Co & Milnot Holding Corp.*, 246 F.3d 708, 717 n.13 (D.C. Cir. 2001) ("Low barriers to entry *enable* [potential entrants] to deter anticompetitive behavior by firms within the market *simply by [their] ability to enter the market.*" (emphasis added)).  This reflects the parties' respective burdens under Section 7: the Government must demonstrate a probability of future harm.  *See Baker Hughes*, 908 F.2d at 991–92 ("By focusing on the future, section 7 gives a court the uncertain task of assessing probabilities.").  To require Defendants to prove replacement of the merging party one-for-one "would move far toward forcing [Defendants] to rebut a probability with a certainty."  *Id.*  Such a requirement would be particularly inappropriate here given that airlines are constantly reevaluating and adjusting their networks such that JetBlue or Spirit itself may choose to exit some of the presumption routes in the ordinary course.

*Third*, JetBlue has entered into binding contracts to divest to Frontier and Allegiant assets at the handful of airports with arguably higher barriers to entry, which will facilitate entry and expansion by these airlines.  Specifically, JetBlue signed a multi-million dollar contract with Frontier to divest all of Spirit's gates and 22 slot-pairs at LaGuardia Airport ("LGA").  According to Frontier, LGA is "one of the most valuable markets to try to get into," but because of its slot restrictions, Frontier has "no clear path today" to "compete at LGA aside from [] these assets."[77]

---

[77] Biffle (Frontier) Dep. Tr. 167:24-169:24.

This divestiture will make serving routes from the New York market more attractive to Frontier,[78] which would enable Frontier to expand its ULCC fares at LGA.  JetBlue also signed a multi-million dollar contract with Allegiant for 2 gates and facilities at Boston, Logan; 2 gates and 43 takeoff and landing authorizations at EWR; and 5 gates and facilities at Fort Lauderdale.  Allegiant, in the words of its Chief Revenue Officer, will therefore "be poised and ready to seize any [route] opportunities" to and from those airports, including "any currently flown routes by JetBlue and Spirit."[79]

These divestitures will not only unleash entry and expansion by Frontier and Allegiant, but they will also maintain the competitive landscape at these airports, which serve as endpoints for 36 of the Government's 51 nonstop "presumption" routes.[80]  Significantly, the Government's market concentration proof does not account this critical fact, even though the Government itself has repeatedly relied on such divestures to ameliorate the effects of prior airline mergers.[81]

Nor is there any requirement that the divestiture buyers fly the exact same routes that Spirit flies today, as the Government now claims.  To the contrary, as the Government told the Court in promoting the divestiture remedy in American/US Airways, the divestiture of slots, gates and ground facilities "create[s] network opportunities for the purchasing carriers … that will likely use them to fly more people to more places are more competitive fares."[82]  The point is that divestitures

---

[78] Biffle (Frontier) LIT Dep. Tr. 57:2-12, 110:9-23.

[79] Wells (Allegiant) Dep. Tr. 231:23-232:1, 236:9-13.

[80] *See* Hill Rep't at Figure 75.  The parties agree that, if the Government's route-level market definition is accepted, the three New York City-area airports (La Guardia, Newark, and JFK) comprise a single geographic market, as do both Miami-area airports (Miami Dade and Ft. Lauderdale).

[81] *See infra* Section III.

[82] Competitive Impact Statement at 2, *United States v. US Airways Grp.*, Case No. 1:13-cv-01236 (CKK), ECF No. 148 (D.D.C. Nov. 12, 2013); *United States v. US Airways Grp.*, 38 F. Supp. 3d 69, 78 (D.D.C. 2014).

to low-cost carriers result in *systemwide* benefits, which in a fluid industry will redound to the benefits of all consumers.

*Fourth*, even if the Court were to accept the Government's proposed geographic market definition, the same factors that undermine the Government's market definition—i.e., the dynamic nature of the airline industry, the substantial competition that occurs outside of these routes, the substantial benefits that will redound to millions of consumers if this merger is permitted to proceed—significantly undermine the predictive value of the Government's route-level, snapshot-in-time concentration statistics and would therefore rebut any presumption of harm.   *See Occidental Petroleum*, 1986 WL 952, at *8; *see also Gen. Dynamics*, 415 U.S. at 498 (affirming finding that "no substantial lessening of competition occurred" based on "structure, history and probable future" of industry, despite high market concentration figures).

## III.   THE EVIDENCE WILL SHOW THAT THIS MERGER WILL INCREASE COMPETITION, NOT REDUCE IT

Without a presumption of harm, the Government must present other evidence showing the merger is anticompetitive.  They will be unable to do so, particularly when the merger is considered under the "totality of the circumstances." *Baker Hughes*, 908 F.2d at 984.  With that lens, it is apparent this merger will increase airline competition throughout the country, benefitting travelers everywhere.

### A.  A Bigger JetBlue Will Increase Competition

The Government has long recognized that JetBlue is a uniquely disruptive, low-cost airline and has the strongest disciplining effect on the legacy airlines.  As the Government put it well in the NEA Case:

- "JetBlue historically has behaved like a maverick in the airline industry."[83]

---

[83] NEA Pls. Post-Trial Brief at 37.

- "JetBlue's high quality of service allowed it to compete effectively against the legacy airlines in ways other LCCs and ULCCs could not."[84]

- "JetBlue has exerted a particularly unique, disruptive force on the marketplace, termed the 'JetBlue Effect.'"[85]

- "The JetBlue Effect produces lower prices and higher quality service on routes where JetBlue competes."[86]

- "Competition from JetBlue resulted in legacy airlines reducing ancillary fees."[87]

- "In total, competition between JetBlue and the legacy airlines has saved travelers billions of dollars." [88]

Through this merger, JetBlue will vastly improve and expand its network and other aspects of its business—like its loyalty program—ultimately supercharging the JetBlue Effect and providing a national low-cost competitor to the legacies. For example, with this merger, JetBlue will add flights to nearly a hundred new locations that neither JetBlue nor Spirit currently fly across the country. JetBlue will significantly expand its presence in over 15 cities to be similar in size to some of JetBlue's current focus cities. The merger will create an airline with nationwide relevance.[89] It also will give JetBlue a meaningful presence at legacy fortress hubs, so JetBlue can challenge legacy dominance there and offer consumers more choice. Overall, this will multiply the benefits the Government already recognizes JetBlue brings even as a much smaller competitor: lower prices, fewer fees, a better product, and improved customer service.

A bigger JetBlue also will result in more people flying. The model used by one of the Government's own economic experts shows that *millions more people* will travel with the merger than without it. That, too, fatally undermines any notion that the merger is anticompetitive under

---

[84] NEA Pls. Proposed FoF ¶ 27.

[85] NEA Pls. Post-Trial Brief at 37-38.

[86] NEA Pls. Proposed FoF ¶ 12.

[87] NEA Pls. Proposed FoF ¶ 39.

[88] NEA Pls. Proposed FoF ¶ 45.

[89] Ex. DY [JBLU_MERGER_LIT-01649881] (JetBlue 2023 "2027 Combined Network Plan" deck).

standard antitrust principles. *See, e.g., Chi. Pro. Sports Ltd. P'ship v. Nat'l Basketball Ass'n*, 95 F.3d 593, 597 (7th Cir. 1996) ("The core question in antitrust is output. Unless a contract reduces output . . . there is no antitrust problem.").

On the other hand, blocking this merger will preserve the status quo, which no one believes is good for consumers. This Court will hear from executives of JetBlue, Spirit, and other small airlines who will testify to the need for a disruptive, nationwide, low-cost competitor to shake up competition in the airline industry. They will explain the struggles they face as small airlines to compete with the sheer scale and resources of the entrenched legacy airlines. Those advantages include: (1) massive airplane fleets and order books; (2) airline networks that cover the entire United States and, with their international partners, the world; (3) entrenched dominance at strategic airports throughout the country—the legacy "fortress hubs"; (4) loyalty programs that, alone, are worth billions of dollars, and keep travelers within their ecosystem; and (5) the sheer scale and resources to ride out the frequent changes and challenges that have beset the airline industry (e.g., COVID-19 pandemic, increased labor and fuel costs, recent decline in domestic demand in favor of international travel, etc.).

For over a decade, courts and the Government have recognized that the "continued vitality of LCCs," which "place downward pressure on air fares," will ensure "robust competition" and benefit consumers. *See In re AMR*, 625 B.R. at 257; Competitive Impact Statement at 5, *United States v. US Airways Grp.*, No. 1:13-cv-01236 (D.D.C. Nov. 12, 2013), ECF No. 148; *United States v. US Airways Grp.*, 38 F. Supp. 3d 69, 78 (D.D.C. 2014). With this merger, JetBlue will become a sustainable nationwide competitor with the network breadth, loyalty program, and other resources to spread the JetBlue Effect nationwide. As other airlines are forced to lower prices and improve their quality and service in response to a more robust JetBlue, millions of people will save

money and millions more will fly as compared to a world without the merger.  On these facts, the Government cannot show the merger is likely to result in a substantial lessening of competition.

## B.  The Merger Will Not Cause Adverse Unilateral Effects

Unilateral effects are those resulting from "the elimination of competition between two firms that results from their merger."  Guidelines § 6.  Courts have observed that the relevant inquiry for unilateral effects is not whether the defendants compete in some manner or whether prices may increase for "*some* . . . customers," but rather whether the merger "as a whole" will substantially lessen competition.  *FTC v. RAG- Stiftung*, 436 F. Supp. 3d 278, 317 (D.D.C. 2020) (emphasis in original).

By focusing on a subset of routes, and ignoring the network benefits the merger will bring across hundreds or thousands of routes, the Government misses the forest for the trees.  Indeed, DOJ's prior enforcement decisions reflect that, in the airline industry, the Section 7 analysis must look beyond individual routes to systemwide effects.

- In the Delta and Northwest merger, the DOJ predicted the possibility of harm on a number of overlapping routes, but nevertheless approved the transaction, with no divestitures, because the benefits generated by combining the airlines' networks would "easily exceed any potential for harm from the deal."[90]
- DOJ permitted United and Continental to merge after United agreed to divest slots at Newark Airport, even though several overlapping routes did not touch Newark and thus the any route-level harm could not have been "remedied" with those divestitures.[91]
- DOJ approved Southwest/AirTran, which involved numerous overlapping routes, with no divestitures.[92]

---

[90] KEN HYER ET AL., THE YEAR IN REVIEW: ECONOMICS AT THE ANTITRUST DIVISION 2008-2009 at 7 (2009) [link].

[91] Dep't of Justice, Press Release No. 10-974, *Department of Justice Closes Investigation, Transfer of Newark, N.J., Assets Resolves Competition Concerns* (Aug. 27, 2010) [link] ("The transfer of slots and other assets at Newark to Southwest, a low cost carrier that currently has only limited service in the New York metropolitan area and no Newark service, resolves the department's principal competition concerns and will likely significantly benefit consumers on overlap routes as well as on many other routes.").

[92] Dep't of Justice, Press Release No. 11-523, *Statement of the Department of Justice Antitrust Division on Its Decision to Close Its Investigation of Southwest's Acquisition of Airtran* (Apr. 26, 2011) [link] ("The division said

- When American and US Airways merged, DOJ resolved the merger with a divestiture package that was explicitly aimed at improving "system-wide competition," not remedying alleged route-based harm; indeed, as noted above, DOJ argued to the court that approved the settlement that it was not appropriate to consider the impact of the divestitures on simply a route-by-route basis.[93]

These enforcement decisions reflect a fundamental economic reality: the airline industry is not a set of isolated routes that can be compartmentalized and viewed in isolation. Rather, it is an interconnected and dynamic *network* industry where many aspects of competition take place nationally and regionally. Given this economic reality of the airline industry, and modern merger analysis which employs a "totality of the circumstances" approach, *Baker Hughes*, 908 F.2d at 984, the Government's myopic route-based focus fails to capture what is at stake here: namely, the opportunity through this merger to inject substantial competition into an industry that needs more of it. Instead, the proper lens with which to judge the competitive effects of this merger is holistically on a nationwide basis. *US Sugar*, 73 F.4th at 207 ("[W]hen defining a market, courts may draw distinctions as necessary to understand a merger's effects on consumers"). Viewed through this lens, a merger between the sixth and seventh largest carriers will bring substantial systemwide benefits, is not likely to substantially lessen competition under Section 7.

But even looking at this merger on a route-by-route basis, the result is the same: it will not substantially lessen competition. JetBlue's unique blend of low fares and high quality is widely known in the industry to bring the largest competitive impact, forcing other airlines to lower their fares, and improve their product offering, to compete with JetBlue. *See, e.g.*, *Deutsche Telekom*, 439 F. Supp. 3d at 239 (unilateral anticompetitive effects unlikely where "rather than . . . assuming the risk entailed by changing a successful business strategy, the merged company would instead

---

that the presence of low cost carriers like Southwest and AirTran has been shown to lower fares on routes previously served only by incumbent legacy carriers.").

[93] *United States v. US Airways Grp., Inc.*, 38 F. Supp. 3d 69, 73, 79, 82-83 (D.D.C. 2014).

more likely prefer to leverage the capacity benefits provided by the Proposed Merger to continue its successful business strategy on a greater scale").  With a bigger network and fleet, a bigger JetBlue will invoke a broader competitive response from rivals that will benefit flyers across routes.  For example, JetBlue will more broadly cause legacy rivals to rethink and revoke systemwide or regional price increases;[94] reduce their ancillary fees;[95] improve the quality of their airline offering across routes;[96] and improve other aspects of their business, such as their loyalty offerings, in competition with a more robust JetBlue.[97]  The broader JetBlue's network is, the more attractive it is for a consumer on *any route* to choose to be part of JetBlue's frequent flier program, rather than the program of a rival program, because the benefits of that program are more useful. And that means, at any given JetBlue price, rival airlines will have to discount more to win business from JetBlue, making every single JetBlue route more competitive, even for customers that are not a member of a frequent flyer program.  Moreover, if JetBlue enters a new route, that route will become more competitive and so less profitable for other airlines.  One of those airlines may therefore choose to exit that route and, if as the Government claims prices go up on an overlap route between Spirit and JetBlue, the fact that a rival airline now has extra aircraft, ready to be deployed, makes it more likely to enter. Contrary to the Government's suggestion, Defendants have no duty to specifically quantify all of these benefits at a route level or trace them back directly to the routes where the Government claims harm.  *See, e.g.*, *Deutsche Telecom*, 439 F. Supp. 3d at 238 ("It is already difficult to assess the competitive effects of a merger in such a rapidly changing

---

[94] NEA Pls. Proposed FoF ¶ 21

[95] NEA Pls. Proposed FoF ¶ 39.

[96] NEA Pls. Proposed FoF ¶¶ 36–41.

[97] *See supra* note 12 and accompanying text.

industry; asking the Court to [precisely trace harms and benefits] only compounds the necessarily speculative quality of this inquiry.").

In addition, as explained above, there are few meaningful barriers to entry that would prevent other airlines from entering a route if JetBlue were to try to raise fares or lower capacity. Airlines routinely enter and exit routes, add frequencies, swap aircraft types, and retime flights to try to best take advantage of opportunities presented to them.  Consistent with the fluidity of capacity in the airline industry, ULCCs have testified that they are eagerly watching this merger because they view entry or expansion on Spirit's routes as low-risk, "proven" opportunities.[98] Where there are low entry barriers and competitors have a demonstrated ability to move capacity, there is no substantial likelihood of unilateral effects.  *See, e.g.*, *Syufy*, 903 F.2d at 666–67.

Finally, the Government apparently will spend a considerable amount of the Court's time and resources at trial on the dead-end issue of "fleet rationalization"—having designated three fact witnesses and an expert to talk about this—to try to show that JetBlue's financial deal modeling was based on fewer planes than Spirit had in its then-existing 2022 financial plan.  This argument never had any validity because JetBlue's deal modeling is not a business plan, nor JetBlue's future plans to run the merged airline.  But more fundamentally, Spirit itself deferred a large portion of the planes that it had set for delivery because of its current financial condition and other considerations.[99]  JetBlue's deal modeling now assumes many *more aircraft* through 2026 (the last year of the deal modeling) compared to Spirit's current aircraft orders, refuting any idea that JetBlue has modeled *fewer* planes than Spirit would acquire or lease on a standalone basis (and, thus, plans to "rationalize").

---

[98] Biffle (Frontier) Tr. 166:4-12.

[99] *See* Ex. TZ [B6NK-TX-00001959] (Q2 2023 Spirit Earnings Call Transcript), at 7 (Ted Christie discussing operating margins).

In this fast-moving industry, there will be no evidence that JetBlue will be able to control pricing and capacity on a handful of routes. The Government will not be able to show that the transaction will lead to adverse unilateral effects.

### C. The Merger Will Decrease, Not Increase, the Likelihood of Industry Coordination

In a Section 7 case, coordinated effects arise where, because of the merger, "firms will be able to coordinate their behavior, either by overt collusion or implicit understanding, in order to restrict output and achieve profits above competitive levels." *Deutsche Telekom*, 439 F. Supp. 3d at 234 (quoting *FTC v. PPG Indus., Inc.*, 798 F.2d 1500, 1503 (D.C. Cir. 1986)). The Government must prove the relevant market "shows signs of vulnerability to coordinated conduct" *and* present "a credible basis on which to conclude that the merger may enhance that vulnerability." *Id*. (quoting Guidelines § 7.1); *FTC v. Arch Coal, Inc.*, 329 F. Supp. 2d 109, 138 (D.D.C. 2004) (explaining that even where industry "factors and conditions make post-merger coordinated activity . . . *feasible*, whether anticompetitive coordination is *likely* requires closer examination" of various other factors, including "the [relevant] market structure and dynamics" (emphasis added)).

Here, even if the Government can show a vulnerability to coordinated conduct in the airline industry, it cannot show the merger will "enhance" that vulnerability. JetBlue has built its business on being a *disruptor*, not a coordinator, and a bigger JetBlue would expand that disruptive effect. Indeed, just last year, the Government argued that JetBlue *mitigated* the effects of coordination by the legacy airlines by acting as a maverick in the industry.[100] And the Court agreed:

---

[100] NEA Plaintiffs' Pre-Trial Brief, United States v. Am. Airlines Grp. Inc. at 8, No. 1:21-cv-11558 (D. Mass.) (Sep. 9, 2022) ECF No. 160, at 7 (JetBlue's uniquely disruptive offerings "served as the legacy airlines' foil in the northeastern United States" for "more than two decades."); *id.* at 9 ("JetBlue's business model succeeded. While AA and its fellow legacy airlines sought to restrict capacity growth and raise fares, JetBlue introduced new capacity and lowered fares."); NEA Pls. Proposed FoF at 113 (explaining "JetBlue mitigated the effects of capacity discipline" by other airlines by growing its capacity)

The parties all agree, and the Court finds, that JetBlue has played a unique role in the domestic air travel industry and qualifies as a 'maverick' competitor for present purposes.  The Court finds JetBlue occupied such a role regardless of whether it remained an LCC or had migrated to a hybrid form somewhere between a traditional LCC and a GNC.  In either event, it was justifiably viewed by others— and it indisputably viewed itself—as a unique and disruptive force in the domestic air travel market.[101]

The evidence on which the Government will rely to try to prop up its coordination theory— a handful of pricing actions that occurred at the onset of the COVID-19 pandemic and the unsubstantiated opinion of a Spirit employee—is misleading, stale, and belied by the Government's contrary position in the NEA Case.[102]  It also reflects an infinitesimal percentage of pricing actions.  As explained by Michael Hillyard, Pricing Manager for JetBlue's Revenue Management Team, out of the "hundreds of thousands, if not millions, of fares" filed by JetBlue, strategies such as "flashing and cross-market initiatives make up close to zero percent of [JetBlue's] actions."[103]  Indeed, approximately 14 million fare changes are processed every day.[104]  In 2022 alone, over 4.5 *billion* fare changes were processed.[105]  *See, e.g.*, *FTC v. RAG-Stiftung*, 436 F. Supp. 3d 278, 317 (D.D.C. 2020) (rejecting FTC's argument that a "few instances" of apparent coordination supported § 7 injunction where "those decisions also reflected legitimate business considerations").

---

[101] *United States v. Am. Airlines Grp. Inc.*, No. 21-11558, 2023 WL 3560430, at *34 n.81 (D. Mass. May 19, 2023) (citations omitted).  The Court's finding also refutes the Government's suggestion that evolution of JetBlue's business model makes coordination more likely.  *See* Am. Compl. ¶ 45.  As the Court found, regardless of how you characterize JetBlue's model, it is indisputably a disruptor.

[102] *See supra* note 101 and accompanying text; Hill Rep't § 9 (explaining and refuting the Government's purported evidence of coordination).

[103] Hillyard (JetBlue) Dep. Tr. 212:18-23, 225:16-19; *see also id.* at 203:20-21 ("I have never observed JetBlue flashing a fare to signal other airlines."); Johns (JetBlue) Dep. Tr. 70:6-8 ("Our pricing decisions are made on a route-by-route basis and independently using our own internal data."); Weiner (JetBlue) Dep. Tr. 279:23-280:1 ("We take fare actions because we think they're in the best interest of generating a better revenue result for JetBlue.").

[104] *Press Kit*, ATPCO (accessed Oct. 10, 2023) [link] (309 million fares on ATPCO, database, 14 million changes processed daily, 4.5 billion+ fare changes processed in 2022).

[105] *Press Kit*, ATPCO (accessed Oct. 10, 2023) [link].

At bottom, the Government's coordinated effects theory rests on unfounded speculation that an increase in JetBlue's size will transform JetBlue from disruptor to conspirator. Tellingly, the Government's expert testified that even *organic* growth by JetBlue would make it more likely to coordinate.[106] But courts have consistently recognized an increase in size alone is not a basis for finding coordinated effects. *See, e.g., Deutsche Telekom,* 439 F. Supp. 3d at 245 ("Anticompetitive results such as higher prices and lower quality produced by coordinated or unilateral effects of a merger do not just 'happen'; they are not self-executing outcomes spontaneously set in motion upon the creation of a presumed level of market concentration of fewer competitors, or the large market shares amassed by particular participants."); *RAG-Stiftung*, 436 F. Supp. 3d at 317 (explaining that a reduction in the number of competitors is not enough; Section 7 plaintiffs "must have an independent basis to conclude that a merger will increase the likelihood of coordination, apart from whatever evidence it offers to show undue market concentration"). Otherwise, virtually every merger of competitors, which by definition involves an increase in size, would be illegal under the Government's theory. Moreover, the Government itself has sought to promote JetBlue's growth as an antidote to perceived coordination among the legacy airlines.[107] In any event, such a finding would be particularly implausible here, where JetBlue's growth through the transaction is modest—gaining just 4% market share on a revenue basis. Significantly, asymmetries between JetBlue and the legacies—in particular, differences in network size and architecture—will continue to persist and provide ample incentive for JetBlue to continue what it has always done: compete hard to win the business of the traveling public.

---

[106] *See* Gowrisankaran Dep. Tr. 265:18–266:4.

[107] Competitive Impact Statement at 5, United States of America v. U.S. Airways Group, Inc., No. 13-cv-01236-CKK (Nov. 12, 2013), ECF No. 148.

## **CONCLUSION**

For the foregoing reasons, the Government cannot meet its prima facie burden of showing the merger is likely to result in substantial harm.  Even if they could, the lack of barriers to entry and expansion, the national and fluid nature of competition, Defendants' divestiture commitments, and the pro-competitive benefits of the merger require a finding in Defendants' favor.

Dated: October 10, 2023

Respectfully submitted,

*/s/ Ryan A. Shores*
Ryan A. Shores (*Pro Hac Vice*)
David I. Gelfand (*Pro Hac Vice*)
Daniel P. Culley (*Pro Hac Vice*)
Cleary Gottlieb Steen & Hamilton, LLP 2112
Pennsylvania Avenue, NW Washington, DC 20037
Tel: 202-974-1500
rshores@cgsh.com
dgelfand@cgsh.com
dculley@cgsh.com

Michael Mitchell (*Pro Hac Vice*)
Brian Hauser (*Pro Hac Vice*)
Shearman & Sterling LLP
401 9th Street, N.W., Suite 800
Washington, DC 20004
Tel: 202-508-8005
Fax: 202-661-7480
michael.mitchell@shearman.com
brian.hauser@shearman.com

Jessica K. Delbaum (*Pro Hac Vice*)
Leila Siddiky (*Pro Hac Vice*)
Shearman & Sterling LLP
599 Lexington Avenue New York, NY 10022-6069
Tel: 212-848-4000
Fax: 212-848-7179
jessica.delbaum@shearman.com
leila.siddiky@shearman.com

Rachel Mossman Zieminski (*Pro Hac Vice*)
Shearman & Sterling LLP
2601 Olive Street, 17th Floor Dallas, TX 75201

Tel: 214-271-5385
rachel.zieminski@shearman.com

Elizabeth M. Wright (MA BBO #569387)
Zachary R. Hafer (MA BBO #569389) Cooley LLP
500 Boylston Street, 14th Floor Boston, MA 02116-3736
Tel: 617-937-2300
ewright@cooley.com
zhafer@cooley.com

Ethan Glass (*Pro Hac Vice*)
Deepti Bansal (*Pro Hac Vice*)
Matt K. Nguyen (*Pro Hac Vice*)
Cooley LLP
1299 Pennsylvania Avenue NW, Suite 700
Washington, DC 2004-2400
Tel: 202-842-7800
Fax: 202-842-7899
eglass@cooley.com
dbansal@cooley.com

Beatriz Mejia (*Pro Hac Vice*)
Cooley LLP
3 Embarcadero Center, 20th Floor San Francisco, CA 94111
Tel: 415-693-2000
Fax: 415-693-2222
bmejia@cooley.com

Joyce Rodriguez-Luna (*Pro Hac Vice*) Cooley LLP
55 Hudson Yards
New York, NY 10001-2157 Tel: 212 479 6895
Fax: 2124796275
jrodriguez-luna@cooley.com

*Attorneys for Defendant JetBlue Airways Corporation*

Andrew C. Finch (*Pro Hac Vice*)
Eyitayo St. Matthew-Daniel (*Pro Hac Vice*)
Jay Cohen (*Pro Hac Vice*)
Jared P. Nagley (*Pro Hac Vice*)
Kate Wald (*Pro Hac Vice*)
Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas

48

New York, NY 10019
Tel: 212-373-3000
Fax: 212-757-3990
afinch@paulweiss.com
tstmatthewdaniel@paulweiss.com
jcohen@paulweiss.com jnagley@paulweiss.com
kwald@paulweiss.com

Meredith R. Dearborn (*Pro Hac Vice*)
Paul, Weiss, Rifkind, Wharton & Garrison LLP 535
Mission Street, 24th Floor
San Francisco, CA 94105 Tel: 628-432-5100
Fax: 628-232-3101
mdearborn@paulweiss.com

*Attorneys for Defendant Spirit Airlines, Inc.*

## **CERTIFICATE OF SERVICE**

I hereby certify that this document was filed through the ECF system and will be sent

electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).


/s/ Ryan A. Shores
Ryan A. Shores (*Pro Hac Vice*)