## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA et al.,<br><br>                    *Plaintiffs*,<br><br>v.<br><br>JETBLUE AIRWAYS CORPORATION and<br>SPIRIT AIRLINES, INC.,<br><br>                    *Defendants*. | Case  No.  1:23-cv-10511-WGY |

## PLAINTIFFS'  PRETRIAL  BRIEF*

---

*Plaintiffs previously filed this Pretrial Brief with redactions (ECF No. 289), but Defendants have since agreed that the redacted information is not confidential. Other than the removed redactions, this Pretrial Brief is otherwise identical to the prior version.

# TABLE OF CONTENTS

I.    FACTUAL BACKGROUND ....................................................................................3

    A.    Spirit is a unique, disruptive airline whose low cost structure and business model deliver lower prices and more choices to consumers....................................................3

    B.    JetBlue and Spirit recognized that the proposed acquisition is anticompetitive.................5

    C.    Defendants' efforts to stem the myriad harms that flow from eliminating Spirit cannot save this unlawful acquisition. ............................................................................7

II.   LEGAL STANDARDS .........................................................................................7

III.  ARGUMENT ....................................................................................................13

    A.    Origin-and-destination pairs for scheduled air passenger service are the relevant markets for evaluating the proposed acquisition...........................................................14

        1.    Scheduled air passenger service is a relevant product market ...................................15

        2.    Origin-and-destination pairs are relevant geographic markets ...................................15

    B.    The proposed acquisition is presumptively illegal in over 100 markets where JetBlue and Spirit compete head-to-head...........................................................................16

    C.    The proposed acquisition may substantially lessen competition and harm consumers in each relevant market. ......................................................................................17

        1.    The proposed acquisition would eliminate head-to-head competition in hundreds of markets where JetBlue and Spirit compete today or would compete in the future ..............18

        2.    The proposed acquisition would result in lower capacity and higher prices in Spirit markets, as JetBlue's deal-planning documents show ............................................18

        3.    The proposed acquisition would eliminate Spirit, a disruptive and innovative competitor, and reduce consumer choice in hundreds of markets that it serves today or would serve in the future ...................................................................................19

        4.    The proposed acquisition would increase the risk of anticompetitive coordination in all Spirit markets ....................................................................................20

        5.    The proposed acquisition would especially harm cost-conscious consumers...............22

    D.    Other airlines are unlikely to enter soon enough or with sufficient scale to offset the competitive harms in each relevant market .................................................................23

        1.    A shortage of planes and pilots would delay and render insufficient any potential entry. ...........................................................................................................24

        2.    Infrastructure limitations at capacity-constrained airports would impede timely, likely, and sufficient entry....................................................................................24

        3.    The business models of other airlines show that entry into the relevant markets would be unlikely and too little, too late...............................................................25

4.      Even combined, the remaining ULCCs do not have sufficient scale to make timely or sufficient entry.................................................................................................27

E.      Defendants' proposed divestitures are too uncertain and narrow to restore the competitive intensity that would be lost by the elimination of Spirit. ..........................................28

F.      Defendants' purported efficiencies cannot offset the acquisition's harm .........................29

1.      Courts rarely credit efficiencies defenses and scrutinize them closely........................29

2.      JetBlue's assertion that it is a more effective competitor than Spirit ignores the unique, independent benefits that Spirit brings to consumers.....................................30

3.      The Combined Network Plan is neither credible nor merger-specific.........................30

4.      JetBlue's claims about increased utilization are not verifiable ....................................31

IV.  CONCLUSION.................................................................................................................32

# TABLE OF AUTHORITIES

## Cases

*Brown Shoe Co. v. United States*,
    370 U.S. 294 (1962) ................................................................................ ….8, 14

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
    429 U.S. 477 (1977) ......................................................................................9

*California v. American Stores Co.*,
    495 U.S. 271 (1990) ......................................................................................8

*Chicago Bridge & Iron Co. N.V. v. FTC*,
    534 F.3d 410 (5th Cir. 2008) ............................................................... passim

*Coastal Fuels of Puerto Rico, Inc. v. Caribbean Petroleum Corp.*,
    79 F.3d 182 (1st Cir. 1996) .........................................................................14

*Flovac, Inc. v. Airvac, Inc.*,
    817 F.3d 849 (1st Cir. 2016)............................................................. 14, 15, 16

*FTC v. Advocate Health Care Network*,
    841 F.3d 460 (7th Cir. 2016)........................................................................17

*FTC v. Elders Grain, Inc.*,
    868 F.2d 901 (7th Cir. 1989) ............................................................. 9, 11, 20

*FTC v. H.J. Heinz Co.*,
    246 F.3d 708 (D.C. Cir. 2001) ............................................................. passim

*FTC v. Hackensack Meridian Health, Inc.*,
    30 F.4th 160 (3d Cir. 2022)................................................................... passim

*FTC v. PPG Industries, Inc.*,
    798 F.2d 1500 (D.C. Cir. 1986) ............................................................ 11, 13

*FTC v. Staples, Inc.*,
    970 F. Supp. 1066 (D.D.C. 1997) ................................................................19

*FTC v. Staples, Inc.*,
    190 F. Supp. 3d 100 (D.D.C. 2016) .......................................... 10, 12, 23

*FTC v. Tronox Ltd.*,
    332 F. Supp. 3d 187 (D.D.C. 2018)..............................................................27

*FTC v. University Health, Inc.*,
    938 F.2d 1206 (11th Cir. 1991) ............................................................. 10, 20

*FTC v. Wilh. Wilhelmsen Holding ASA*,
    341 F. Supp. 3d 27 (D.D.C. 2018) ...............................................................23

*George R. Whitten, Jr., Inc. v. Paddock Pool Builders, Inc.*,
    508 F.2d 547 (1st Cir. 1974).........................................................................14

*Hospital Corp. of America v. FTC*,
    807 F.2d 1381 (7th Cir. 1986)............................................................... passim

*In re AMR Corp.*,
    625 B.R. 215 (Bankr. S.D.N.Y. 2021)..........................................................15

*In re Domestic Airline Travel Antitrust Litigation*,
    No. 15-1404 (CKK), 2023 WL 5930973 (D.D.C. Sept. 12, 2023) ..............22

*In re Nexium (Esomeprazole) Antitrust Litigation*,
   968 F. Supp. 2d 367 (D. Mass. 2013).................................................................14
*In re Wholesale Grocery Products Antitrust Litigation*,
   752 F.3d 728 (8th Cir. 2014)..........................................................................17
*ProMedica Health System, Inc. v. FTC*,
   749 F.3d 559 (6th Cir. 2014)....................................................................10, 17
*Spirit Airlines, Inc. v. Northwest Airlines, Inc.*,
   431 F.3d 917 (6th Cir. 2005)..........................................................................15
*Saint Alphonsus Medical Center-Nampa Inc. v. St. Luke's Health System, Ltd.*,
   778 F.3d 775 (9th Cir. 2015).....................................................................17, 29
*United States v. Aetna Inc.*,
   240 F. Supp. 3d 1 (D.D.C. 2017) ............................................................. passim
*United States v. Airline Tariff Publishing Co.*,
   836 F. Supp. 9 (D.D.C. 1993)..........................................................................21
*United States v. American Airlines Group Inc.*,
   No. 21-11558 (LTS), 2023 WL 3560430 (D. Mass. May 19, 2023) ...................15, 27
*United States v. Anthem, Inc.*,
   236 F. Supp. 3d 171 ..............................................................................8, 10, 23
*United States v. Anthem, Inc.*,
   855 F.3d 345 (D.C. Cir. 2017) ......................................................................8, 29
*United States v. Bazaarvoice, Inc.*,
   No. 13-00133, 2014 WL 203966 (N.D. Cal. Jan. 8, 2014).............................25, 26
*United States v. Bertelsmann SE & CO. KGaA*,
   646 F. Supp. 3d 1 (D.D.C. 2022) ............................................................. passim
*United States v. E.I. du Pont de Nemours & Co.*,
   366 U.S. 316 (1961).......................................................................................13
*United States v. E.I. du Pont de Nemours & Co.*,
   353 U.S. 586 (1957).........................................................................................9
*United States v. Energy Solutions, Inc.*,
   265 F. Supp. 3d 415 (D. Del. 2017).................................................................23
*United States v. General Dynamics Corp.*,
   415 U.S. 486 (1974)....................................................................................9, 11
*United States v. H&R Block, Inc.*,
   833 F. Supp. 2d 36 (D.D.C. 2011) ........................................................... passim
*United States v. Marine Bancorporation, Inc.*,
   418 U.S. 602 (1974).......................................................................................11
*United States v. Philadelphia National Bank*,
   374 U.S. 321 (1963)............................................................................... passim

**Treatises**

Phillip Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* (5th ed. 2023) .................................................................12

**Statutes**

15 U.S.C. § 18 ...............................................................................................8

**Other Authorities**

United States Department of Justice & Federal Trade Commission, *Draft Horizontal Merger Guidelines* (2023) ................................................................................................................ passim
United States Department of Justice & Federal Trade Commission, *Horizontal Merger Guidelines* (2010) ................................................................................................................ passim

JetBlue's proposed acquisition of Spirit would bring significant harm to the millions of consumers who rely on the lower fares and greater choices that Sprint's presence brings to a route. From the moment JetBlue made its first bid, Spirit recognized this harm, describing the transaction as "a high-cost, high-fare airline buying a low-cost, low-fare airline" that "will have lasting negative impacts on consumers." Consumers are better off with an independent Spirit, not a JetBlue intent on removing seats from planes and charging higher fares—or what JetBlue euphemistically calls "revenue synergies." And that is why Plaintiffs ask this Court to enjoin this anticompetitive acquisition.

* * *

Spirit is a disruptive and innovative airline that has lowered the cost of air travel, both for customers who fly Spirit and those that do not. Spirit introduced à la carte pricing in the United States, or what the industry calls unbundled fares: passengers pay a base fare and can choose what other amenities they want to buy. This model particularly appeals to cost-conscious flyers, giving them the option to take a trip that might otherwise be out of reach. Spirit's aggressively low fares, enabled by its low operating costs, have forced JetBlue and others to follow Spirit's lead by offering their own low-priced, unbundled options. JetBlue has recognized it must lower its fares to respond to Spirit—but it also knows that it can, and does, increase those fares if Spirit leaves a route.

On many routes, particularly those to Florida, the Caribbean, and Latin America, Spirit has earned a substantial, and sometimes leading, market share—often at JetBlue's expense. For this reason, JetBlue views Spirit as a particularly dangerous threat. And this threat is only growing: Spirit has ambitious plans to enter new routes and increase competition, ultimately benefitting the passengers on those routes, whether they choose Spirit or its competitors.

Reflecting this competition, on 183 of the routes where Spirit and JetBlue compete, including 51 nonstop overlap routes, their combined shares are sufficiently high that this acquisition is presumptively illegal. JetBlue's proposed acquisition of Spirit would change all that—and that loss of competition alone is sufficient to block this transaction.

The proposed acquisition would cause other harms, too. Spirit's lower costs and different route structure have made it a thorn in the side of other airlines, which are otherwise happy to settle on higher fares rather than compete. The transaction promises to replace Spirit with a higher-cost airline that offers fewer seats, charges higher fares, and is less likely to upset other airlines' higher prices. As a result, fares would go up; the number of travelers would go down; the remaining passengers would lose the option of a ticket that meets their needs; and the industry would lose a force for innovation. In exchange, passengers would get a bigger JetBlue. But a bigger JetBlue is not necessarily a better JetBlue. With a larger route map, higher cost structure, and increasingly legacy-like strategy, a bigger JetBlue would be more likely than either JetBlue or Spirit is today to follow the price increases by the legacy airlines and Southwest.

The lost competition from Spirit on the routes at issue is unlikely to be replaced because the rest of the industry, including other ultra-low-cost carriers, face numerous constraints on their growth—from planes to pilots to infrastructure limitations to network fit. And Defendants' halfhearted attempts to facilitate entry—through promises to divest takeoff and landing rights or gates at certain airports—are unlikely to replicate the competitive intensity that Spirit provides.

Although all passengers will feel the impact of this acquisition, the harms will fall disproportionately on cost-conscious consumers. These customers depend on competition between JetBlue and Spirit, because without Spirit, they might be priced out of the market altogether. At bottom, this case is not just about increased fares; it is about whether these

customers can travel at all. Ultimately, if this acquisition is approved, JetBlue might earn more revenues, but consumers would pay the price.

## I. FACTUAL BACKGROUND

### A. Spirit is a unique, disruptive airline whose low cost structure and business model deliver lower prices and more choices to consumers.

The proposed acquisition would eliminate Spirit, a unique airline that offers low prices and forces other airlines to compete by lowering their prices as well. Spirit is the largest ultra-low-cost carrier ("ULCC") in the United States and the fastest-growing U.S. carrier over the last ten years. Spirit serves all customers, but in particular, it serves an important segment of the market that is especially reliant on low airfares: customers who travel for leisure—for example, visiting family and friends—as well as certain business customers who seek to minimize costs. Over the years, Spirit has developed a loyal following: about half of Spirit's passengers are repeat customers. Ex. YS at 27.[1] Most importantly, Spirit has created a low-cost offering that enables its customers—many of whom could not otherwise afford to fly—to take a vacation or see a loved one.

Spirit's fares are generally lower than JetBlue's as well as those of the so-called "Big Four"—the three legacy airlines, United, American, and Delta, as well as Southwest. Spirit offers an unbundled, "no frills" fare, in which passengers purchase a base fare with the ability to buy additional options. By its success, Spirit has shown the industry that many passengers value these lower fares over higher-priced ones—even those that include features such as seat selection and carry-on bags. To compete for these cost-conscious passengers, other airlines have had to lower their fares and introduce their own basic economy products. JetBlue, for example, now offers its

---

[1] "Ex." refers to exhibits, with or without objection, on the exhibit list filed at ECF No. 276.

own unbundled fare called "Blue Basic." Through these lower fares enabled by unbundling, JetBlue competes for cost-conscious passengers who may otherwise fly Spirit.

Spirit can offer lower fares because of its uniquely low cost structure compared to the Big Four and JetBlue. Indeed, as one JetBlue executive recognized, "Spirit's key weapon is its very low costs and the very low fares they enable." Ex. GH at 1. Spirit achieves this low cost structure through several strategies: it offers more seats on each plane; it flies planes more hours per day; it uses assets like airport gates and landing/takeoff rights more often; it maintains an airplane fleet that is younger and requires less maintenance; and it frequently innovates to save operational costs (*e.g.*, self-service bag drop). As its CEO explained, Spirit's strategy is to keep its cost structure low and to enter markets with fares low enough to stimulate demand. JetBlue itself has recognized the success of Spirit's strategy. For example, to respond to pressure on its margins caused by Spirit, JetBlue designed a comprehensive strategy to win back share—a strategy that included lower fares and increased capacity in markets where the two compete.

Spirit is unique even when compared to the next-largest ULCCs, Frontier and Allegiant, which, unlike Spirit, avoid competing as directly with the Big Four and JetBlue. For example, Spirit often flies multiple times a day on many of its routes, while Frontier and Allegiant are more likely to fly less than once a day. Spirit also flies more heavily trafficked routes, including those served by the Big Four and JetBlue, while Allegiant tends to focus on small, underserved cities and routes with few or no other airlines providing nonstop service. And compared to other ULCCs, like Frontier, Spirit has a well-established history of staying power in domestic and international markets, including routes occupied by the Big Four. Simply put, these other ULCCs do not provide the same type of competitive discipline to the market as Spirit.

The remaining ULCCs—Sun Country, Avelo, and Breeze (if it can be called a ULCC)—are even more different from Spirit. Unlike Spirit, which has flights throughout the continental United States, Puerto Rico, the Caribbean, and Latin America, Sun Country primarily serves customers traveling to or from its base in Minneapolis. Breeze and Avelo, meanwhile, are less established than Spirit, having only launched service in 2021. Both have much smaller fleets and narrower networks compared to Spirit, JetBlue, and other airlines, and both (like Allegiant) have an explicit network strategy to avoid routes with competition from larger airlines.

### B.     JetBlue and Spirit recognized that the proposed acquisition is anticompetitive.

In February 2022, Spirit agreed to merge with Frontier. But JetBlue had other plans. After Frontier and Spirit announced their intent to merge, JetBlue made three separate offers to purchase Spirit. Spirit's board and leadership told shareholders to reject JetBlue's offers for many of the same reasons that Plaintiffs brought this lawsuit. In particular, Spirit told its shareholders and the public that by eliminating Spirit, JetBlue's takeover offer was likely to reduce seats on flights and increase ticket prices on hundreds of routes where both airlines compete. On May 2, 2022, after reviewing one of JetBlue's offers, Spirit leadership released a press statement highlighting the anticompetitive nature of this transaction:

- "Spirit believes DOJ—and a court—will be very concerned that a higher-cost/higher fare airline would be eliminating a lower-cost/lower fare airline in a combination that would remove about half of the ULCC capacity in the United States."

- "In addition, the conversion of Spirit aircraft to JetBlue configuration will result in significantly diminished capacity on former Spirit routes, also resulting in higher prices for consumers."

Ex. 38 at 3. In a presentation a few days later on May 5, 2022, Spirit reiterated its concerns about the competitive effects of this acquisition:

5

- "At its core, the JetBlue proposal represents a high-cost, high-fare airline buying a low-cost, low-fare airline with half the synergies coming from reduced capacity and increased fares."

- "JetBlue's claim about the so-called 'JetBlue Effect' is based on economic modeling that Spirit believes has significant defects and overstates the impact of JetBlue on legacy carriers."

Ex. VK at 4; *see also* ECF No. 202 at 4–6. On May 16, 2022, JetBlue made a final offer.

Unmoved, Spirit once again emphasized the ways in which a larger JetBlue would increase fares:

- The "JetBlue acquisition removes the largest low-fare competitor, affecting millions of consumers across the U.S."

- Regardless of the outcome of the Northeast Alliance ("NEA") litigation, JetBlue was "still a high-fare airline trying to buy a low-fare airline and raise fares."

- "A JetBlue Acquisition of Spirit will have lasting negative impacts on consumers," including "rais[ing] Spirit's ticket prices" and "remov[ing] ~50% of the ULCC capacity in the U.S."

Ex. TF at 7, 10, 12; *see also* ECF No. 202 at 6–9. Despite the concerns that Spirit's management and its board of directors voiced about the transaction's obvious threat to competition and consumers, JetBlue and Spirit ultimately agreed to combine on July 28, 2022. Spirit's board came to accept that "[Spirit's] shareholders were very much interested in cash," which Frontier's offer lacked. Dep. Tr. of H. McIntyre Gardner (Spirit) (June 27, 2023) at 205:24–206:19.

Spirit's concerns about the anticompetitive effects of this acquisition—fewer seats and higher prices—are confirmed by JetBlue's own plans. To justify the acquisition to its board of directors and the investing public, JetBlue calculated a set of "revenue synergies" that quantified the additional revenues JetBlue expected to earn because of the acquisition. *See* ECF No. 203 at 3–5. JetBlue determined that, upon Spirit's exit, other airlines would raise their prices 30 percent, and JetBlue would be able to take its own share of this price increase, resulting in a "customer service premium" of 24 percent higher revenues per seat for JetBlue compared to Spirit. Ex. NK

at 1.[2] The result: hundreds of millions of dollars each year in additional revenues for JetBlue. JetBlue also calculated that it would be able to increase prices due to its increased "pricing power" at airports where it would be much larger post-acquisition. Ex. BTE at 3. Reflecting its ongoing transition to a more legacy-like business model, JetBlue measured the premium by identifying how much more the Big Four were able to charge consumers at their hub airports.

### C. Defendants' efforts to stem the myriad harms that flow from eliminating Spirit cannot save this unlawful acquisition.

To secure regulatory approval, JetBlue has agreed to divest certain assets—primarily landing/takeoff rights and gates at Boston Logan, Newark Liberty, Fort Lauderdale-Hollywood, and New York-LaGuardia airports—to Frontier and Allegiant. The status of these divestitures remains uncertain, and their ability to replace the competitive intensity that would be lost because of this transaction is in doubt. For example, neither Frontier nor Allegiant has committed to fly the routes that Spirit serves today, and in many instances, they may be unlikely or unable to do so. Using the divestiture assets to fly non-Spirit routes would not help consumers traveling on Spirit routes from those airports, leaving such consumers worse off because of the proposed acquisition. Moreover, the Fort Lauderdale airport authority has indicated that it, not JetBlue, owns the gates, and that it, not JetBlue, will decide who receives them—and that may not be Frontier or Allegiant at all, but one of the Big Four. Similar issues may plague the divestiture assets at the other airports as well.

## II.  LEGAL STANDARDS

***Section 7 outlaws mergers that may harm competition in any relevant market.*** Section 7 of the Clayton Act prohibits acquisitions when their effect "may be substantially to lessen

---

[2] Filed under seal pending Defendants' Motion to Impound and over Plaintiffs' objections. Documents like Exs. HF, SB, and NK demonstrate the competitive harm that would result from JetBlue's proposed acquisition of Spirit. Defendants should not be allowed to hide these critical documents from public view.

competition" in "any line of commerce" in "any section of the country." 15 U.S.C. § 18. Courts generally begin evaluating an acquisition under Section 7 by defining the "area of effective competition," *i.e.*, the market, in which the acquisition may lessen competition. *Brown Shoe Co. v. United States*, 370 U.S. 294, 324 (1962). The "area of effective competition" has two components, each derived from the text of the statute: (1) the product market, *i.e.*, the "line of commerce;" and (2) the geographic market, *i.e.*, the "section of the country." *Id*. As the statutory text states, a reasonable probability of substantial lessening of competition in "any" market is unlawful. 15 U.S.C. § 18; *see also Brown Shoe*, 370 U.S. at 325 (probability of harm in any "economically significant submarket" means that "the merger is proscribed"); *United States v. Anthem, Inc.*, 236 F. Supp. 3d 171, 193 (D.D.C.) ("A court may enjoin a merger based on proof of probable harm to any market alleged."), *aff'd*, 855 F.3d 345, 368 (D.C. Cir. 2017) (harm in a single market "is a sufficient basis for enjoining the merger," even "absent a finding of anticompetitive harm in" all other alleged markets). Accordingly, although Plaintiffs allege hundreds of distinct markets in which competition may be harmed due to the proposed acquisition, *see infra* Section III, reasonably probable harm in any one of those markets violates Section 7 and renders the acquisition unlawful.

**Section 7 requires only a reasonable probability of harm to competition and is designed to stop such harm before it occurs.** Section 7 creates "a relatively expansive definition of antitrust liability," *California v. Am. Stores Co.*, 495 U.S. 271, 284 (1990), and the words "may be" are intentional to show that the statute is concerned with "probabilities, not certainties," *Brown Shoe*, 370 U.S. at 323; *see also FTC v. Hackensack Meridian Health, Inc.*, 30 F.4th 160, 166 (3d Cir. 2022). Plaintiffs need only show by a preponderance of the evidence that the proposed acquisition has "a reasonable probability" of diminishing competition in any relevant

market, *United States v. E.I. du Pont de Nemours Co.*, 353 U.S. 586, 607 (1957); *FTC v. H.J. Heinz Co.*, 246 F.3d 708, 713, 719 (D.C. Cir. 2001), and "create[s] an appreciable danger of such consequences in the future." *Hosp. Corp. of Am. v. FTC*, 807 F.2d 1381, 1389 (7th Cir. 1986) (Posner, J.). "A predictive judgment, necessarily probabilistic and judgmental rather than demonstrable, is called for." *Id.* (citation omitted). Because "the statute requires a prediction," any "doubts are to be resolved against the transaction." *FTC v. Elders Grain, Inc.*, 868 F.2d 901, 906 (7th Cir. 1989) (Posner, J.). Section 7 is also a "prophylactic measure," *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 485 (1977), that Congress designed "to arrest anticompetitive tendencies in their 'incipiency,'" *United States v. Phila. Nat'l Bank*, 374 U.S. 321, 362 (1963); *see also United States v. Gen. Dynamics Corp.*, 415 U.S. 486, 505 n.13 (1974) (Section 7 "was designed to arrest the creation of monopolies 'in their incipiency' ......").

*Plaintiffs may establish a* **prima facie** *case through evidence of undue market concentration as well as other evidence of potential anticompetitive effects.* Plaintiffs may establish their *prima facie* case that the proposed acquisition is illegal in different ways. They may do so by showing that the acquisition results in a firm controlling an undue percentage share of a relevant market and a significant increase in the concentration of firms in that market. *Hackensack*, 30 F.4th at 172–73. Such increases—whether measured by market shares or other measures of concentration—lead to a presumption, based on market structure alone, that the proposed acquisition is anticompetitive and violates Section 7. *See, e.g.*, *Phila. Nat'l Bank*, 374 U.S. at 364 (shares above 30% in a relevant market establish presumption); *Hackensack*, 30 F.4th at 172–73 (increases in market concentration in highly or moderately concentrated markets "demonstrate the merger is presumptively anticompetitive").

Alternatively, or in addition to evidence about the structure of affected markets, Plaintiffs may establish a *prima facie* case through other evidence of potential anticompetitive effects. *Hackensack*, 30 F.4th at 173; *Chi. Bridge & Iron Co. N.V. v. FTC*, 534 F.3d 410, 431–32 (5th Cir. 2008). These threats often include both "unilateral" and "coordinated" effects. *See, e.g.*, *ProMedica Health Sys., Inc. v. FTC*, 749 F.3d 559, 568–69 (6th Cir. 2014). Evidence of these effects may establish a *prima facie* case and may also inform the ultimate question of whether the effect of the acquisition may be substantially to lessen competition. *See, e.g.*, *Chi. Bridge*, 534 F.3d at 433 ("other evidence" beyond market concentration "suffices to establish a *prima facie* case"); *Anthem*, 236 F. Supp. 3d at 215–16 (plaintiff carried ultimate burden of persuasion through evidence of anticompetitive effects); *see also FTC v. Univ. Health, Inc.*, 938 F.2d 1206, 1219 n.25 (11th Cir. 1991) (observing that, "[i]n practice, . . . the government usually introduces all of its evidence at one time," rather than "serv[ing] up its prima facie case" and then later needing to "respond to win the point").

"Unilateral effects" describe the anticompetitive effects resulting from the loss of "direct competition" between the merging parties. *ProMedica*, 749 F.3d at 569. They reflect the risks that after a merger, the combined company will "have the incentive to raise prices or reduce quality" on its own, "independent of competitive responses from other firms," because the merger eliminates the competitive constraints that each imposed on the other. *United States v. H&R Block, Inc.*, 833 F. Supp. 2d 36, 81 (D.D.C. 2011). Mergers "that eliminate head-to-head competition between close competitors often result in a lessening of competition." *FTC v. Staples, Inc.*, 190 F. Supp. 3d 100, 131 (D.D.C. 2016); *see also, e.g.*, *United States v. Bertelsmann SE & Co. KGaA*, 646 F. Supp. 3d 1, 39 (D.D.C. 2022); *United States v. Aetna, Inc.*, 240 F. Supp. 3d 1, 91 (D.D.C. 2017).

"Coordinated effects" refer to how a merger increases the risk of parallel accommodating conduct, tacit coordination, or overt collusion among the merged firm and its remaining competitors. *See Bertelsmann*, 646 F. Supp. 3d at 44–45. Courts ordinarily presume that a risk of greater coordination "attaches to a merger in a highly concentrated market," *H&R Block*, 833 F. Supp. 2d at 77, because "where rivals are few, firms will be able to coordinate their behavior . . . to restrict output and achieve profits above competitive levels." *FTC v. PPG Indus., Inc.*, 798 F.2d 1500, 1503 (D.C. Cir. 1986) (Bork, J.). The risk of coordination is especially high when a market is "already highly concentrated" and "prone" to coordination, *Elders Grain*, 868 F.2d at 906, has a "history of successful cooperation" or "mutual trust and forbearance," *Hosp. Corp. of Am.*, 807 F.2d at 1388, or has "barriers to entry," *Heinz*, 246 F.3d at 724. Acquisitions in such markets are "unlawful in the absence of special circumstances." *Elders Grain*, 868 F.2d at 906.

**Defendants must point to "other pertinent factors" that "mandate a conclusion" that the proposed acquisition does not threaten competition.** Once Plaintiffs establish a *prima facie* case that the proposed acquisition is illegal, the burden is on Defendants to rebut that *prima facie* case through "significant evidence," *United States v. Marine Bancorp., Inc.*, 418 U.S. 602, 631 (1974), that "mandate[s] a conclusion" that it does not threaten "a substantial lessening of competition," *Gen'l Dynamics*, 415 U.S. at 497–98. The "magnitude" of evidence "needed depends on the strength of the likely adverse competitive effects of a merger." *Hackensack*, 30 F.4th at 176–77. Defendants must demonstrate that there are "structural market barriers to collusion" specific to the airline industry, *Heinz*, 246 F.3d at 724–25; *H&R Block*, 833 F. Supp. 2d at 77, or provide other evidence sufficient to conclude that other factors are "significant enough to offset the likely anticompetitive effects of the merger" in the relevant markets, *Hackensack*, 30 F.4th at 177. The stronger Plaintiffs' *prima facie* case, the greater the evidence

that Defendants must offer in response. *See Chi. Bridge*, 534 F.3d at 426 (when plaintiff presents "very compelling" *prima facie* case that "anticipates and addresses [defendants'] rebuttal evidence," defendants' "burden of production on rebuttal is also heightened").

If Defendants fail to rebut the *prima facie* case, then a violation of section 7 is established. *Hackensack*, 30 F.4th at 179. But even if Defendants successfully rebut a *prima facie* case, a court should carefully consider all available evidence—including market structure, head-to-head competition, and evidence of potential coordination—to determine if Plaintiffs have proved by a preponderance that there is a reasonable probability that the merger threatens competition. *See, e.g.*, *Chi. Bridge*, 534 F.3d at 424 (noting how evidence can both establish a *prima facie* case and "serve[] as a redoubt" against rebuttal).

***Any purported benefits that arise outside of the relevant markets cannot justify harm in the relevant markets.*** "[A]nticompetitive effects in one market" cannot "be justified by procompetitive consequences in another." *Phila. Nat'l Bank*, 374 U.S. at 370. The text of Section 7 "plainly contemplates that mergers may involve more than one market, yet it bases legality on a separate market-by-market appraisal." Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 972a (5th ed. 2023); *see also* ECF No. 181 (setting forth additional authorities).

***Divestitures must fully restore competition and eliminate the risk of anticompetitive effects from the acquisition.*** Where Defendants have proposed a divestiture to remedy the potential anticompetitive effects from a proposed acquisition, Defendants must show that the divestiture "will actually occur" and that it "would negate any anticompetitive effects of the merger" and "replace the competitive intensity lost as a result of the merger." *Aetna*, 240 F. Supp. 3d at 60; *see also Staples*, 190 F. Supp. 3d at 137 n.15.

***The appropriate remedy for a Section 7 violation is an injunction prohibiting the acquisition.*** When a transaction would violate Section 7, the presumptive remedy is a "full stop injunction" that prohibits it. *PPG Indus.*, 798 F.2d at 1506; *Phila. Nat'l Bank*, 374 U.S. at 323–24 (unlawful merger "must be enjoined"). "[A]ll doubts as to the remedy are to be resolved in [Plaintiffs'] favor." *United States v. E.I. du Pont de Nemours & Co.*, 366 U.S. 316, 334 (1961).

## III.    ARGUMENT

The proposed acquisition violates Section 7 of the Clayton Act under each of the well-established legal standards described above. Plaintiffs will show that origin-and-destination pairs for scheduled air passenger service are relevant markets that illuminate the transaction's anticompetitive effects (Section III.A). In 183 of those markets where Defendants already offer overlapping service, Plaintiffs can establish their *prima facie* case that the transaction is illegal simply by showing that the transaction results in undue share or undue market concentration (Section III.B). In those 183 markets, as well as the remaining current and future overlap markets, Plaintiffs will also establish their *prima facie* case by showing that the transaction is likely to harm competition through both unilateral and coordinated effects (Sections III.C.1. to III.C.4.). In the current and future Spirit-only routes, Plaintiffs will establish their *prima facie* case by showing the transaction threatens harm by eliminating Spirit's maverick business model (Sections III.C.2. and III.C.3.) and increasing the risk of coordinated effects (Section III.C.4.). The evidence will show that in all of these markets, cost-conscious consumers are most likely to suffer (Section III.C.5.).

In the face of this significant *prima facie* case in each of the relevant markets, Defendants will bear a heavy burden of production. As explained below, the evidence will show that entry and expansion (Section III.D.), divestitures (Section III.E.), and efficiencies (Section III.F.) will

not restore the competition lost as a result of the acquisition in each of the relevant markets.

Accordingly, the only appropriate remedy is a full-stop injunction.

> **A.     Origin-and-destination pairs for scheduled air passenger service are the relevant markets for evaluating the proposed acquisition.**

A product market is defined by "the reasonable interchangeability of use" and "cross-elasticity of demand," *Brown Shoe*, 370 U.S. at 325, the latter of which refers to "the extent to which consumers will change their consumption of one product in response to a price change in another," *Flovac, Inc. v. Airvac, Inc.*, 817 F.3d 849, 854 (1st Cir. 2016); *see also In re Nexium (Esomeprazole) Antitrust Litig.*, 968 F. Supp. 2d 367, 387–88 (D. Mass. 2013) (Young, J.) (even though drugs outside the relevant market could treat the same condition, that was "immaterial" given allegations that those drugs did not have sufficient cross-price elasticity). "[T]he relevant geographic market consists of the 'geographic area in which the defendants face competition and to which consumers can practically turn for alternative sources of the product.'" *Coastal Fuels of P.R., Inc. v. Caribbean Petroleum Corp.*, 79 F.3d 182, 196 (1st Cir. 1996). Questions of market definition must be viewed "from the perspective of consumers," *Flovac*, 817 F.3d at 855, because "[a] market definition which is confined to the seller's perspective is not meaningful," *George R. Whitten, Jr., Inc. v. Paddock Pool Builders, Inc.*, 508 F.2d 547, 551 (1st Cir. 1974).

Applying these principles, the relevant antitrust markets in this case are scheduled air passenger service (the product market) between pairs of origin-and-destination endpoints ("O&D pairs" or "routes") (the geographic markets). These markets specifically include: (1) routes that both JetBlue and Spirit fly today; (2) nonstop routes that Spirit serves today and JetBlue does not; and (3) nonstop routes that Spirit, absent the acquisition, plans to enter.

### 1.    Scheduled air passenger service is a relevant product market.

The Parties agree that scheduled air passenger service constitutes a relevant product market for purposes of analyzing the competitive effects of the acquisition. ECF No. 191 ¶ 12.

### 2.    Origin-and-destination pairs are relevant geographic markets.

O&D pairs are relevant geographic markets for scheduled passenger air service because consumers do not view air travel between one O&D pair as a substitute for travel between a different O&D pair. From "the perspective of consumers," *Flovac*, 817 F.3d at 855, a Bostonian needing to visit Puerto Rico would not view a flight from Boston to Las Vegas as a substitute for a flight from Boston to San Juan. Consistent with these consumer views, airlines set their fares at the O&D pair level, not nationally.

For these reasons and others, several courts, including one in this district, have recognized that O&D pairs (sometimes called "city pairs") are the relevant markets for evaluating antitrust claims in the passenger airline industry. *See, e.g.*, *Spirit Airlines, Inc. v. Nw. Airlines, Inc.*, 431 F.3d 917, 933 (6th Cir. 2005) (accepting Spirit's position that routes are relevant geographic markets: "It is at the route level, after all, that airlines actually compete with one another."); *United States v. Am. Airlines Grp. Inc.*, No. 21-11558 (LTS), 2023 WL 3560430, at *36 (D. Mass. May 19, 2023) (Sorokin, J.) (holding "relevant geographic markets are O&Ds" in challenge to JetBlue's illegal alliance with American Airlines); *In re AMR Corp.*, 625 B.R. 215, 247 (Bankr. S.D.N.Y. 2021) (holding "city-pairs constitute the relevant market" in challenge to airline merger), *aff'd*, *In re AMR Corp.*, No. 22-901, 2023 WL 2563897 (2d Cir. 2023).

Defendants agree that O&D pairs are a proper way to define relevant geographic markets. Their disagreements with the way airports are grouped in certain O&D pairs that Plaintiffs have alleged are immaterial and do not undermine the fact that the acquisition would likely harm

15

competition in more than one hundred relevant markets. Defendants have belatedly tried to

obscure anticompetitive effects in many relevant markets by asserting that there may *also* be a

national market. But market definition in downstream products is measured from the perspective

of consumers, *see Flovac*, 817 F.3d at 855, and the potential presence of some national

dimensions of competition does not suggest customers traveling from Boston to Las Vegas

would view the route from New York to San Juan as a reasonable substitute for their needs. In

any event, the potential for a national market is beside the point; regardless of whether there may

be even more markets to analyze the transaction, Congress prohibited harms in *any* relevant

market, and so Defendants' attempt to point to putative benefits in a national market is legally

irrelevant to the O&D markets harmed by the acquisition. *See* ECF No. 218, at 2–4, 8–9. As

Plaintiffs explain below, the acquisition violates the statute again and again in more than one

hundred O&D pairs across the country, and that is sufficient to enjoin it.

> **B.    The proposed acquisition is presumptively illegal in over 100 markets where JetBlue and Spirit compete head-to-head.**

The proposed acquisition is presumptively illegal in at least 183 markets where JetBlue

and Spirit compete, including 51 nonstop overlaps.[3] In each of those markets, the proposed

acquisition would result in (i) a firm "controlling an undue percentage share" of the market, and

(ii) a "significant increase in the concentration" of that market. *See Phila. Nat'l Bank,* 374 U.S.

at 363. "Market concentration is measured by the Herfindahl-Hirschman Index ('HHI')," which

---

[3] These shares and HHIs are calculated using passenger counts for service offered between the third quarter of 2021 and the second quarter of 2022. Passenger counts are a better measure of market concentration than revenue in this case because "one unit of a low-priced product can substitute for one unit of a higher-priced product." U.S. Dept. of Justice & Fed. Trade Comm'n, *Horizontal Merger Guidelines* § 5.2 (2010) ("2010 Guidelines"); U.S. Dep't of Justice & Fed. Trade Comm'n, *Draft Merger Guidelines* Appendix 4, § B (2023) ("2023 Draft Guidelines"). But even if shares and market concentration statistics were calculated using revenues instead of passenger counts, the acquisition is still presumptively illegal in at least 138 markets.

is the "sum[] [of] the squares of the market shares of each market participant." *Hackensack*, 30

F.4th at 172.[4] If an acquisition would increase the HHI by more than 200 points and result in an

HHI greater than 2,500, then it "is presumed to be likely to enhance market power." *Id.*

> **C.    The proposed acquisition may substantially lessen competition and harm consumers in each relevant market.**

Significant evidence beyond market-share statistics confirms that the proposed

acquisition may substantially lessen competition in routes across the country. These routes

include the 183 O&D pairs where the acquisition is presumed illegal because of Defendants'

combined market shares. It also includes hundreds of other routes, including dozens of routes

where Spirit plans to fly soon. For the routes where the proposed acquisition is presumed illegal,

this additional evidence "bolsters" the *prima facie* case based on market-share statistics, *Heinz*,

246 F.3d at 717; for the remaining routes, this evidence establishes a *prima facie* violation. The

proposed acquisition threatens harm to competition by (1) eliminating head-to-head competition

between Spirit and JetBlue in markets where both airlines currently fly or would compete in the

future; (2) reducing capacity and increasing fares in all current and future Spirit markets;

(3) removing Spirit's uniquely disruptive market presence in all current and future Spirit

markets; (4) increasing the risk of collusion and tacit coordination among remaining airlines in

all current and future Spirit markets; and (5) eliminating a low-cost option for cost-conscious

consumers in all current and future Spirit markets.

---

[4] Numerous courts have relied upon HHI to measure market concentration in antitrust actions. *See, e.g.*, *FTC v. Advocate Health Care Network*, 841 F.3d 460, 466 (7th Cir. 2016) (HHI is "common method for assessing a transaction's competitive effects"); *St. Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys.*, 778 F.3d 775, 786 (9th Cir. 2015) ("commonly used"); *In re Wholesale Grocery Prods. Antitrust Litig.*, 752 F.3d 728, 731 n.1 (8th Cir. 2014) (market concentration "typically measured using [HHI]"); *ProMedica*, 749 F.3d at 570 (affirming presumption of illegality based on HHI); *Heinz*, 246 F.3d at 716 (market concentration "often measured by [HHI]").

Collectively, the effects of the acquisition could cost consumers in excess of two billion dollars *annually* in the form of higher fares in the relevant markets. Indeed, even giving Defendants the benefit of the doubt and crediting efficiencies claims about their plans for operating the combined airline, the transaction would still conservatively cost consumers roughly $1 billion in net harm *every year*.

1.     **The proposed acquisition would eliminate head-to-head competition in hundreds of markets where JetBlue and Spirit compete today or would compete in the future.**

The proposed acquisition would eliminate the head-to-head competition between JetBlue and Spirit that has led to lower fares and more options for passengers in hundreds of markets. JetBlue identifies Spirit as its most important ULCC competitor, and for good reason. When Spirit enters a JetBlue market, JetBlue's prices—and profits—typically decline, because JetBlue must offer fares at or slightly above Spirit's. And when JetBlue lowers its base fares to compete with Spirit, it often also lowers prices on its other (higher) fares. Because of this, when Spirit exits a market, JetBlue can both eliminate its lowest fare offerings in that market and increase its other fares. Competition from Spirit on routes into and out of Fort Lauderdale, including routes between Fort Lauderdale and the Northeast and between Fort Lauderdale and the Caribbean and Latin America, has been especially effective at disciplining JetBlue. Recognizing Spirit's growth on these routes, JetBlue CEO Robin Hayes lamented that Spirit "now controls the ball" in Fort Lauderdale. Ex. HH at 1. If the acquisition proceeds, JetBlue would no longer need to respond to Spirit on the routes where they compete, which would result in all of JetBlue's fares increasing.

2.     **The proposed acquisition would result in lower capacity and higher prices in Spirit markets, as JetBlue's deal-planning documents show.**

Eliminating Spirit would also reduce capacity in the relevant markets, putting even more upward pressure on prices. JetBlue plans to remove approximately 10 to 15 percent of seats from

Spirit aircraft by converting them to the JetBlue layout. JetBlue's internal documents show that it understands these changes will mean not only fewer seats for consumers to fly on, but also higher prices for the seats that remain. In estimating the higher revenues it would achieve on the routes where it maintains the former Spirit aircraft, JetBlue's internal deal model shows that prices would increase 30 percent, and some passengers would stop flying in those markets altogether post-acquisition. Ex. HF. Tellingly, JetBlue did not model that its service would either lower these 30 percent higher fares or bring travelers back to the market; instead, it simply assumed it would take its own share of the pie, resulting in 24 percent higher revenues per seat than Spirit standalone would have obtained. Ex. SB; Ex. NK.

> **3.** **The proposed acquisition would eliminate Spirit, a disruptive and innovative competitor, and reduce consumer choice in hundreds of markets that it serves today or would serve in the future.**

This acquisition would eliminate Spirit's influence as a maverick that competes vigorously against other airlines and pressures them to lower prices or unbundle fares. When a company "play[s] a special role in [the] market that constrains prices," it is a "maverick." *H&R Block*, 833 F. Supp. 2d at 80; *see also FTC v. Staples*, 970 F. Supp. 1066, 1082–83 (D.D.C. 1997) (evaluating "elimination of a particularly aggressive competitor"); 2010 Guidelines § 2.1.5 (considering "whether a merger may lessen competition by eliminating a 'maverick' firm"); 2023 Draft Guidelines § II.3.A. Spirit's unique business strategy and its industry-leading cost structure deliver benefits for consumers, such as lower airfares, that higher-cost, higher-fare airlines, including JetBlue, cannot replicate. Spirit's innovations have ranged from unbundling fares (*i.e.*, offering no-frills service at a lower cost) to adding new technologies at airports that are aimed at decreasing costs and improving the customer experience. By creating a combined airline with a cost structure that is higher than Spirit's is today, the transaction would remove Spirit's

innovative competition from the marketplace and harm consumers. *Cf. Hackensack*, 30 F.4th at 172 (recognizing that anticompetitive effects can include reduced product innovation).

       **4.**       **The proposed acquisition would increase the risk of anticompetitive coordination in all Spirit markets.**

As described above, the proposed acquisition will increase concentration in hundreds of relevant markets, which gives rise to the "ordinary presumption of collusion" that "attaches to a merger in a highly concentrated market." *H&R Block*, 833 F. Supp. 2d at 77. The acquisition will also increase the risk of anticompetitive coordination in all markets where Spirit flies or plans to fly because: (1) market conditions are already conducive to "reaching terms of coordination and detecting and punishing deviations from those terms," *id.*; (2) the industry has a documented "history of successful cooperation," *Hosp. Corp. of Am.*, 807 F.2d at 1388; (3) the transaction would eliminate Spirit's low prices, which disrupt the ability of other airlines to coordinate on price; and (4) the acquisition would alter JetBlue's size, network, and cost-structure, making it more likely to coordinate. In light of these factors, the acquisition is "unlawful in the absence of special circumstances." *Elders Grain*, 868 F.2d at 906.

The airline industry is vulnerable to coordination because numerous markets are highly concentrated, and other features of the industry—transparent pricing, small and frequent transactions, frequent updates to pricing, competition across many markets, and few firms to monitor and track—make it easy for airlines to coordinate and punish firms that deviate from coordinated (*i.e.*, anticompetitive) outcomes. *See, e.g.*, *id.*, 868 F.2d at 906; *Univ. Health*, 938 F.2d at 1218 n.24; 2010 Guidelines § 7.2; 2023 Draft Guidelines § II.3; *see also* Plaintiffs' Proposed Findings of Fact ¶¶ 352–68, *United States v. Am. Airlines Grp., Inc.*, No. 21-11558 (LTS) (D. Mass. Dec. 2, 2022), ECF No. 332 ("NEA PFOF") (explaining why airline industry is susceptible to coordination).

Coordination among airlines is facilitated by the Airline Tariff Publishing Company ("ATPCO"), an industry-standard clearinghouse for airfares that all airlines use. Airlines file many of their fares in ATPCO, making them visible to other airlines. In addition to the terms and conditions of sale (*e.g.*, the days of the week to which the fare applies and the time period a fare is available for purchase), airlines also include notations in these ATPCO filings that allow them to communicate with each other about why they are filing fares (*e.g.*, to respond to or punish a rival). Such "routine[] exchange" of strategic and "intimate information" among rivals "facilitates collusion" and is a therefore a reason "to worry even more" about the merger. *See Hosp. Corp. of Am.*, 807 F.2d at 1389.

Unsurprisingly, the features that make the airline industry vulnerable to coordination have resulted in a long history of coordination by airlines, and that "history of successful cooperation" is another reason that the acquisition presents a risk of reducing competition. *See id.* at 1388; *see also Bertelsmann*, 646 F. Supp. 3d at 45; 2010 Guidelines § 7.2; 2023 Draft Guidelines § II.3.A. This history of coordination dates back at least 30 years, when the United States first secured a consent decree to try to stop airlines from using ATPCO to "reach price-fixing agreements or unnecessarily to facilitate fare coordination." *See United States v. Airline Tariff Publ'g Co.*, 836 F. Supp. 9, 12 (D.D.C. 1993).

The last of the ATPCO consent decrees expired in 2011. Since then, JetBlue and other airlines have continued much of the same coordination the decrees were designed to prevent. *See, e.g.*, NEA PFOF ¶¶ 364–65 (summarizing evidence of JetBlue engaging in coordination during 2019 and 2020). For example, JetBlue and others conduct "cross-market initiatives," or CMIs, which are tactics by which an airline uses temporary, unusually low fares in one market to discourage another airline from offering lower fares in a different market. This conduct,

facilitated by ATPCO, allows airlines to punish each other for deviating from the coordinated outcome. Other courts have acknowledged the industry's susceptibility to coordination as well. For example, one court found in denying summary judgment that domestic airlines "admittedly and openly" engaged in the parallel conduct of capacity discipline for many years "with the effect that diminished capacity resulted in higher industry profits." *In re Domestic Airline Travel Antitrust Litig.*, No. 15-1404 (CKK), 2023 WL 5930973, at *33 (D.D.C. Sept. 12, 2023).

Spirit, on the other hand, does not "follow[] the herd," Ex. AAZ at 10, and has demonstrated a willingness and ability to go its own way, which helps to disrupt coordinated actions by other airlines, including JetBlue. For example, Spirit distributes many fares outside of ATPCO and consistently offers fares that are lower than rivals, insulating it from punishment by other airlines. It also does not as predictably respond to ATPCO filings like other airlines do. The acquisition would remove Spirit's disruptive presence, making anticompetitive coordination between the remaining airlines more likely. *See, e.g.*, *H&R Block*, 833 F. Supp. 2d at 80–81; 2010 Guidelines § 7.1; 2023 Draft Guidelines § II.3.A.

Finally, the acquisition would also make coordination more likely by creating a larger JetBlue with a network and cost structure that more closely resembles that of the legacy carriers. After the acquisition, a bigger JetBlue will be more susceptible to retaliatory actions by the Big Four and less able and willing to be a disruptive presence than either JetBlue or Spirit is today.

**5.    The proposed acquisition would especially harm cost-conscious consumers.**

The proposed acquisition would especially harm the consumers who are least able to withstand it. Spirit prides itself on offering low, unbundled fares to cost-conscious travelers who, absent Spirit, would travel less or not at all. Many customers prefer Spirit's unbundled product, even when a more-bundled fare is available, and the acquisition would deprive millions of

consumers of that unbundled option. Spirit's presence also spurs other airlines to lower their fares, which disproportionately benefits cost-conscious travelers. Spirit's entry on a route typically causes the prices of the least-expensive tickets in a market (*i.e.*, the bottom 10 percent of fares) to fall by more than 30 percent on average. The acquisition would curtail these benefits because the combined airline is unlikely to replicate this same downward effect on fares.

### D.   Other airlines are unlikely to enter soon enough or with sufficient scale to offset the competitive harms in each relevant market.

Defendants have the burden to show that possible, future entry by other airlines in the relevant O&D markets would "counteract the competitive effects of concern." *Aetna*, 240 F. Supp. 3d at 52. To rebut a *prima facie* case, entry must satisfy three independent conditions: (1) **timely**, *i.e.*, "rapid enough to deter or render insignificant the anticompetitive effects of the merger" within two to three years; (2) **likely**, *i.e.*, "profitable and feasible, accounting for all the attendant costs and difficulties;" and (3) **sufficient**, *i.e.*, able to "'affect pricing' and 'scale to compete on the same playing field as the merged firm.'" *United States v. Energy Sols., Inc.*, 265 F. Supp. 3d 415, 443 (D. Del. 2017); *Staples*, 190 F. Supp. 3d at 133.

Any assessment of possible entry hinges on economic realities, including whether the relevant markets are insulated from competition by barriers to entry. Thus, in order for a potential entrant "to act as a competitive constraint on incumbent firms, entry—at least for that firm— must be easy." *Chi. Bridge*, 534 F.3d at 428; *see also FTC v. Wilh. Wilhelmsen Holding ASA*, 341 F. Supp. 3d 27, 68 (D.D.C. 2018) (rejecting entry argument because it was "at odds with inferences drawn from the state of the current market and with documentary and testimonial evidence from customers and suppliers"); *Anthem*, 236 F. Supp. 3d at 222 (rejecting entry arguments supported by "anecdotal" evidence "not necessarily tied to the relevant geography").

23

Here, entry would not be timely, likely, or sufficient because: (1) industry-wide shortages of airplanes, engines, and pilots would constrain ULCC entry for at least several years; (2) limits on airport infrastructure would continue to hinder other airlines' ability to enter new routes for the foreseeable future; (3) entry on the specific routes at issue is unlikely because it would not fit with other airlines' business models; and (4) entry by other ULCCs would not be sufficient because, even combined, they would not have the size and scale to replace Spirit.

### 1. A shortage of planes and pilots would delay and render insufficient any potential entry.

An enduring shortage of both airplanes and pilots would delay any potential entry in the relevant markets and would make any entry too incremental to deter or counteract the harmful effects of the proposed acquisition. Current orders for airplanes have been repeatedly delayed, and delivery of airplanes in response to new orders is years away. Also, the early retirements of many pilots during the COVID-19 pandemic have left the U.S. airline industry with a shortage of pilots, an imbalance that is expected to continue for years to come. These shortages will continue to affect all ULCCs who might otherwise try to enter the relevant markets post-acquisition, including Frontier and Allegiant. Accordingly, it would take many years for ULCCs, individually or collectively, to replace the Spirit capacity lost due to the acquisition.

### 2. Infrastructure limitations at capacity-constrained airports would impede timely, likely, and sufficient entry.

Limited availability of gates and significant regulatory controls, among other limitations, often make it difficult to enter a particular route. Airports serving many of the relevant markets are gate-constrained, which means that demand for gates far outstrips supply—making it difficult to add a route where gates are not already available. This issue affects several airports that serve

relevant O&D pairs, including Atlanta (Hartsfield-Jackson), Boston (Logan), Chicago (O'Hare), Fort Lauderdale-Hollywood, Los Angeles, Newark (Liberty), and New York (LaGuardia).

At some especially high-demand airports, regulations also limit the number of takeoffs and landings, referred to variously as "slots" or "runway authorizations." Similar restrictions affect many international airports, such as Cancun, that serve relevant O&D pairs. And, in addition to its limited availability of gates, Fort Lauderdale-Hollywood airport has a limited number of customs facilities, which constrains available times for international flights. These infrastructure limitations, both individually and collectively, render entry unlikely and demonstrate that any entry into many of the relevant markets would be very limited.

3. **The business models of other airlines show that entry into the relevant markets would be unlikely and too little, too late.**

Entry or expansion by other airlines also is unlikely to occur or to be timely or sufficient to counteract the harmful effects of the proposed acquisition because (1) entering the nonstop overlaps where the acquisition may harm competition would be contrary to other airlines' business strategies, and (2) the business models of other airlines would render entry insufficient to counteract such effects. *See United States v. Bazaarvoice*, No. 13-00133, 2014 WL 203966, at *71 (N.D. Cal. Jan. 8, 2014) ("[C]ompanies do not simply enter any market they can—they will only do so if it is within their strategy to do so and they have the requisite ability to do so.").

*Allegiant.* Allegiant's network strategy is to avoid competition, unlike Spirit, which seeks out such competition. Indeed, Allegiant believed that its aversion to competition would make it an attractive divestiture buyer to JetBlue. Ex. AE at 6. Allegiant also tends to connect small- and medium-sized markets to leisure destinations and offers less than daily service, making Allegiant unlikely to enter the large markets that are part of many relevant O&D pairs harmed by the acquisition. Allegiant is particularly unlikely to enter international O&D pairs and O&D pairs

with an endpoint in Puerto Rico because it does not currently offer international service or service to Puerto Rico and has no plans to do so beyond a limited codeshare in Mexico.

*Frontier.* Any entry by Frontier is unlikely to be sufficient because it tends to fly less often than Spirit, and it has a track record of quickly exiting markets, unlike Spirit. Entry by Frontier would also be unlikely for several long-distance Spirit routes to and from LaGuardia because of regulatory restrictions. And any Frontier entry would either be (1) insufficient because Frontier is numerous years away from matching Spirit's current scale, let alone the scale Spirit would have achieved absent the acquisition, or (2) untimely because of how long it would take Frontier to "compete on the same playing field" as the merged JetBlue, *id.*; *cf. Bertelsmann*, 646 F. Supp. 3d at 53 ("[I]t is a strain to characterize Disney's five-year aspirational plan as evidence of 'timely' market entry.").

*Other ULCCs.* Other ULCCs (Sun Country, Avelo, and perhaps Breeze) are even less likely to enter relevant markets or to do so quickly or sufficiently. Sun Country's network strategy is narrowly focused on routes to and from Minneapolis on which Spirit and JetBlue do not compete. Avelo and Breeze are both many years away from approaching Spirit's scale and, like Allegiant, have historically focused their entry on routes with limited competition.

*The Big Four.* The Big Four are unlikely to enter affected routes in a way that would "counteract the competitive effects of concern," *Aetna*, 240 F. Supp. 3d at 52, because they have higher cost structures than Spirit and do not offer the same fully unbundled fare product that cost-conscious consumers value. *Cf. Bertelsmann*, 646 F. Supp. 3d at 53 (rejecting argument that expansion of existing "Big Five" would be sufficient due to lack of evidence that others in Big Five "could or would compete more aggressively with the merged company").

26

### 4. Even combined, the remaining ULCCs do not have sufficient scale to make timely or sufficient entry.

Entry by ULCCs is also unlikely to be timely or sufficient without repositioning that would create new harm to competition, and therefore would not "ameliorate the feared anticompetitive effects of [the] merger." *Aetna*, 240 F. Supp. 3d at 52.

Spirit accounts for nearly half of all ULCC capacity in the United States today. If the proposed acquisition proceeds, that capacity would no longer serve customers who currently rely on ULCCs to fly, and Spirit's remaining, smaller ULCC competitors would need to grow at historically unprecedented rates to deter or counteract the harmful effects of extinguishing that ULCC capacity. In the short term, ULCCs would need to reallocate planes they currently have in other markets or scale back their plans in those markets in service of the routes Spirit operates today. Not only is such repositioning unlikely for other reasons just discussed, *supra* Sections III.D.1–D.3, it would require moving resources that currently serve other routes, rather than growing to serve both the old routes and the new routes. *Cf. FTC v. Tronox Ltd.*, 332 F. Supp. 3d 187, 214–15 (D.D.C. 2018) (rejecting entry arguments because proposed entrants would need to expand rapidly and would prioritize existing growth markets before entering harmed markets). And at bottom, shifting capacity around would be a zero-sum shell game that risks harm to competition and consumers in "any" market. *See supra* Section II. That is not credible entry under the law and cannot save an otherwise anticompetitive merger. *Cf. Am. Airlines*, 2023 WL 3560430, at *41–42 (rejecting purported benefits of JetBlue's illegal alliance because new service arose from eliminating service elsewhere in the carriers' networks and therefore did not reflect growth).

27

### E.      Defendants' proposed divestitures are too uncertain and narrow to restore the competitive intensity that would be lost by the elimination of Spirit.

Defendants' proposal to divest to Allegiant and Frontier certain rights to gates, slots, and runway timings at four airports would not remedy the harms of the acquisition because: (1) it is highly uncertain whether the divestitures will occur at all; (2) the divestiture buyers are unlikely to use the divested assets to compete in the relevant markets; (3) even if the divestitures occur and the assets are deployed in the relevant markets, the divested assets are unlikely to restore the "competitive intensity" lost due to the acquisition, *Aetna*, 240 F. Supp. 3d at 60; and (4) the divestitures do not address at all numerous routes where competition would need to be replaced.

*First*, the divestitures have not been approved by all relevant authorities and thus may not occur at all. That is fatal to Defendants' proposal because "defendants cannot produce evidence showing that the divestiture would create an effective competitor unless they first produce evidence that the divestiture is likely to occur." *Id.* at 60. For example, the airport authorities in Boston and Fort Lauderdale, not Defendants, decide whether gate rights can be transferred to the divestiture buyers. The Boston-Logan authority has stated Allegiant does not meet its gate-usage requirements. Dep. Tr. of Daniel Gallagher (MassPort) (June 28, 2023) at 31:8-23. And the Fort Lauderdale authority has gone as far as to state that the assets cannot be assigned by JetBlue and could be transferred to a non-ULCC carrier, such as a legacy airline. Dep. Tr. of Mark Gale (BCAD) (June 14, 2023) at 72:4–73:6. Similarly, the FAA and the New York airport authority have authority to approve transfers of necessary regulatory authorizations.

*Second*, if the divestitures occur, it is unlikely that Allegiant and Frontier will use the divested assets to compete in all of the relevant markets. Both airlines admit they do not have firm plans to serve the Spirit markets and do not believe they are under any obligation to do so.

28

Moreover, many network-fit factors suggest they may be unable to serve the overlap markets or may choose to use the divested assets outside the relevant markets. *See supra* Section III.D.3.

*Third*, even if Frontier and Allegiant were to introduce service on some of the previous Spirit routes, they are unlikely to restore the "competitive intensity" lost as a result of the acquisition. Both of these carriers tend to offer service at lower frequencies than Spirit, and Frontier is more likely to exit a market than Spirit.

*Fourth*, in the unlikely event that the divestitures occur, and the buyers use the assets to compete in some of the relevant markets, the assets are too narrow to "replace fully the competition lost by the merger," *Aetna*, 240 F. Supp. 3d at 72, because the divested assets would not cover all the markets where the acquisition would harm competition. Nor do the divested assets include a key asset necessary to fly these routes: additional planes.

## F.  Defendants' purported efficiencies cannot offset the acquisition's harm.

The "efficiencies" proposed by Defendants are also insufficient to rebut the compelling evidence that the acquisition would harm competition.

### 1.  Courts rarely credit efficiencies defenses and scrutinize them closely.

The Supreme Court has never approved an efficiencies defense. *St. Alphonsus*, 778 F.3d at 788–89. Courts have repeatedly expressed skepticism about the availability of such a defense and have often rejected it on the facts of each particular case. *See, e.g.*, *Anthem*, 855 F.3d at 353–55 (noting "it is not at all clear that [efficiencies] offer a viable legal defense to illegality under Section 7" but stating it could "assume the availability of an efficiencies defense" because the parties had failed to establish it).

To the extent courts do consider efficiencies claims, they are "rigorously" scrutinized. *Heinz*, 246 F.3d at 721. Efficiencies must be "verifiable" and "merger-specific," and they cannot

arise from the anticompetitive effects of the transaction. *H&R Block*, 833 F. Supp. 2d at 89. If efficiencies are credited at all, they must also be passed on to customers in the relevant market. *See* ECF No. 174, 181. In the face of significant evidence of anticompetitive effects here, Defendants must establish "extraordinary" efficiencies. *Heinz*, 246 F.3d at 720.

> **2.      JetBlue's assertion that it is a more effective competitor than Spirit ignores the unique, independent benefits that Spirit brings to consumers.**

Defendants offer little to justify the acquisition. Their primary defense is that JetBlue is (purportedly) a better competitor than Spirit. But even if JetBlue were the better competitor, which is not at all clear, it would not justify eliminating competition between JetBlue and Spirit. Even in markets where JetBlue is present, Spirit exerts an *additional* constraint on its competitors, including on JetBlue. For that reason, even customers that choose to fly JetBlue benefit from Spirit's low prices. The acquisition would eliminate that effect.

Further, this supposedly better "JetBlue experience" means higher prices for Spirit consumers, regardless of whether they value the features JetBlue imposes on them. The evidence will show that Spirit brings down the average fares in a market more than JetBlue—through a combination of Spirit's own low fares and its fare-lowering effect on its competitors—undermining Defendants' claim the JetBlue offers a better value to customers.

> **3.      The Combined Network Plan is neither credible nor merger-specific.**

The Combined Network Plan, which Defendants will point to in support of their claims that the acquisition would create growth, is not credible for several reasons. First, it was created in early 2023 under the supervision of lawyers and specifically for the purposes of defending this case. *See, e.g.*, *Aetna*, 240 F. Supp. 3d at 80 (Courts discount "a firm's behavior undertaken with the aim of persuading a court or the government regarding the legality of a merger," as such behavior "may not be predictive of how that firm will behave once the court or the government

are no longer engaged."). Second, the Combined Network Plan, without any apparent justification and contrary to common business sense, assumes that JetBlue will maintain service on Spirit routes, without regard to profitability considerations. This change, which squarely contradicts JetBlue's pre-merger deal-planning documents, was obviously intended solely to evade regulatory scrutiny and is not reliable.

Even accepting the Combined Network Plan despite its credibility issues, Defendants must show that the Combined Network Plan reflects growth that is "merger-specific." If JetBlue and Spirit could have achieved that same growth anyway, the growth cannot logically be attributed to the acquisition. But comparing any of JetBlue's plans for the combined network with JetBlue's and Spirit's standalone growth plans reveals that the Combined Network Plan unlocks little to nothing beyond what the carriers would have done anyway—while also depriving customers of the benefits of JetBlue's and Spirit's head-to-head competition.

### 4. JetBlue's claims about increased utilization are not verifiable.

JetBlue has openly admitted since it first announced the acquisition that it intended to strip seats from Spirit's aircraft to match the less-dense JetBlue configuration. In addition, JetBlue's plans for the combined airline reveal a preference to slow the acquisition of aircraft, under the euphemism of "fleet rationalization." Fewer seats, though, means lower capacity, and basic economics teaches that a capacity reduction is accompanied by a price increase. As Spirit's CEO bluntly summarized, this plan is an antitrust "no-no." Ex. SO at 3.

Defendants have now hired an expert to tell the Court that JetBlue will increase its aircraft utilization post-acquisition. But even that expert's *own calculations* show the acquisition would reduce capacity—even before accounting for JetBlue's plans to rationalize its fleet. No expert will offer verifiable evidence that the acquisition increases capacity. But more to the point,

JetBlue did not prepare any analysis suggesting it would increase utilization post-transaction, and certainly no analysis that such utilization would offset either the capacity decrease from removing seats on JetBlue planes or the decrease in fleet size due to fleet rationalization.

## IV.     CONCLUSION

As both JetBlue and Spirit have admitted—at one time or another, when not under the microscope of litigation—the inevitable result of this acquisition would be higher fares and fewer options for consumers. Spirit itself recognized that a transaction like this one is "exactly what the antitrust laws were designed to prevent." The United States and the Plaintiff States agree. This transaction is illegal, and at the close of evidence, Plaintiffs will ask that the Court ensure the benefits of competition for American travelers by enjoining it.

Dated: October 30, 2023

_____/s/ Edward W. Duffy_____
EDWARD W. DUFFY
JAMES L. MOORE III
ARIANNA MARKEL
JOHN R. THORNBURGH II

U.S. Department of Justice
Antitrust Division
450 Fifth Street, NW, Suite 8000
Washington, DC 20530
Phone: (202) 812-4723
E-mail: edward.duffy@usdoj.gov

*Attorneys for Plaintiff United States of America*

_____/s/ Olga Kogan_____
ELINOR R. HOFFMANN
  Chief, Antitrust Bureau
CHRISTOPHER D'ANGELO
  Chief Deputy Attorney General
  Economic Justice Division
OLGA KOGAN
  Assistant Attorney General
MORGAN J. FEDER
  Assistant Attorney General

New York State Office of the Attorney General
28 Liberty Street, 20th Floor
New York, NY 10005
Phone: (212) 416-8262
E-mail: olga.kogan@ag.ny.gov

*Attorneys for Plaintiff State of New York*

_____/s/ William T. Matlack_____
WILLIAM T. MATLACK (MA Bar No. 552109)
DANIEL H. LEFF (MA Bar No. 689302)

Office of the Attorney General
One Ashburton Place, 18th Floor
Boston, MA 02108
Phone: (617) 727-2200
E-mail: william.matlack@mass.gov

*Attorneys for Plaintiff Commonwealth of Massachusetts and Local Counsel for the State of California, the District of Columbia, the State of Maryland, the State of New Jersey, the State of New York, and the State of North Carolina*

_____/s/ C. William Margrabe_____
C. WILLIAM MARGRABE
  Assistant Attorney General
ESTEFANIA Y. TORREZ PAEZ (MA Bar No. 705952)
  Assistant Attorney General

Office of the Attorney General
400 6th Street NW, Suite 10100
Washington, DC 20001
Phone: (202) 727-6294
E-mail: will.margrabe@dc.gov

*Attorneys for Plaintiff District of Columbia*

_____/s/ Jamie L. Miller_____
JAMIE L. MILLER

California Department of Justice
Office of the Attorney General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102
Phone: (415) 510-3565
E-mail: jamie.miller@doj.ca.gov

*Attorney for Plaintiff State of California*


_____/s/ Bryan S. Sanchez_____
BRYAN S. SANCHEZ
   Deputy Attorney General
ANA ATTA-ALLA
   Deputy Attorney General

State of New Jersey
Office of the Attorney General
Division of Law
124 Halsey Street – 5th Floor
Newark, New Jersey 07102
Phone: (973) 648-3070
E-mail: bryan.sanchez@law.njoag.gov

*Attorneys for the Plaintiff State of New Jersey*


_____/s/ Schonette J. Walker_____
SCHONETTE J. WALKER
   Assistant Attorney General
   Chief, Antitrust Division
GARY HONICK
   Assistant Attorney General
   Deputy Chief, Antitrust Division
BYRON WARREN
   Assistant Attorney General

Maryland Office of the Attorney General
200 St. Paul Place, 19th Floor
Baltimore, MD 21202
Phone: (410) 576-6470
E-mail: swalker@oag.state.md.us

*Attorneys for Plaintiff State of Maryland*


_____/s/ Jessica V. Sutton_____
JESSICA V. SUTTON
   Special Deputy Attorney General

North Carolina Department of Justice
Post Office Box 629
Raleigh, North Carolina 27602
Phone: (919) 716-6000
E-mail: jsutton2@ncdoj.gov

*Attorney for Plaintiff State of North Carolina*