# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA et. al,        Case No. 1:23-cv-10511-WGY

      *Plaintiffs*,

v.

JETBLUE AIRWAYS CORPORATION, and
SPIRIT AIRLINES, INC.,

      *Defendants.*

_____/

---

### *AMICUS CURIAE* BRIEF OF TRANSPORT WORKERS UNION, LOCAL 570, AFL-CIO, IN SUPPORT OF PLAINTIFFS' POSITION

---

KATHLEEN M. PHILLIPS, ESQ.
Florida Bar No. 28773
HOLLY E. OLIVA-VAN HORSTEN, ESQ.
Florida Bar No. 57791
Phillips, Richard & Rind, P.A.
9360 S.W. 72 Street, Suite 283
Miami, Florida 33173
(305) 412-8322

# TABLE OF AUTHORITIES

**Cases**

*California v. Safeway, Inc.*,
   651 F.3d 1118 (9th Cir. 2011)................................................................................6

*Mandeville Island Farms, Inc. v. Am. Crystal Sugar Co.*,
   334 U.S. 219 (1948) ..............................................................................................6

*NCAA v. Alston*,
   141 S.Ct. 2141 (2021) ...........................................................................................6

*Todd v. Exxon Corp.*,
   275 F.3d 191 (2d Cir. 2001)...................................................................................18

*United States of America v Bertelsmann SE and Co.*,
   646 F. Supp. 3d 1 (D.D.C. 2022) ....................................................................5, 13

*Vogel v. Am. Soc'y of Appraisers*,
   744 F.2d 598 (7th Cir. 1984)..................................................................................18

*Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co.*,
   549 U.S. 312 (2007) ...............................................................................................18

**Statutes**

Clayton Act, 15 U.S.C. § 18.......................................................................................5, 23

**Other Authorities**

David Arnold, Mergers and Acquisitions, Local Labor Market Concentration, and Worker
   Outcomes, Working Paper (2021)..........................................................................9

Draft Merger Guidelines, U.S. DOJ and the FTC at 25-27 (2023) ...........................11, 20

Elena Prager & Matt Schmitt, Consolidation and Wages: Evidence from Hospitals,
   111 Am. Econ. Rev. 397-427 (2018) .....................................................................9

Eric Posner, Why the FTC Should Focus on Labor Monopsony, ProMarket (Nov. 5, 2018) ............8

Gregor Schubert, Anna Stansbury & Bledi Taska, Working Paper Series: Employer Concentration
   and Outside Options, Washington Center for Equitable Growth, (March 2022)...........................7

José Azar, Ioana Marinescu, and Marshall I. Steinbaum, Labor Market Concentration ....................8

Joseph Farrell & Carl Shapiro, Antitrust Evaluation of Horizontal Mergers: An Economic
   Alternative to Market Definition, The B.E. Journal of Theoretical Economics (2010)................16

Joseph Simons, Chairman, FTC, Keynote Address at American University (March 8, 2019)..........10

Lina M. Khan, Chair, FTC, "Remarks of Chair Lina M. Khan at the Joint Workshop of the Federal Trade Commission and the Department of Justice Making Competition Work: Promoting Competition in Labor Markets" (December 26, 2021) ................................................................11

Merger Guidelines, U.S. DOJ and the FTC (2010)....................................................................11, 17

Myongjin Kim, Qi Ge, & Donggeun Kim, Mergers and labor market outcomes in the US airline industry, 39 Contemporary Econ. Policy. 849-866 (2021) .............................................................8

Naidu, Posner, and Weyl (2018) ...............................................................................................18

OJ/FTC Horizontal Merger Guidelines, Guidelines § 12 ...............................................................17

Suresh Naidu, Eric Posner, & E. Glen Weyl, Antitrust Remedies for Labor Market Power, 132 Harv. L. Rev. 537 (2018) ..........................................................................................6, 18

Working Paper 24147, National Bureau of Economic Research (Revised February 2019) ...............8

## **TABLE OF CONTENTS**

I.  STATEMENT OF INTEREST AND INTRODUCTION ...................................................4

II.  ARGUMENT ...........................................................................................................5

   A.  The Impact of the Proposed Acquisition on Spirit Gate Agents and The Aviation Employees of Both Carriers Must Be Taken Into Account  . ..........................................…..5

     1.  The Economic Research Literature Indicates that Mergers between Close Competitors are Often Harmful to Workers. ....................................................................................6

     2.  Federal Antitrust Agencies Have Also Increasingly Recognized the Harm to Workers in Mergers. This Important and Requisite Analysis Underscores why This Merger Lessens Competition. ...................................................................................................10

     3.  Courts Have Followed Suit and Recognized That Labor Considerations in Antitrust Analysis. ...................................................................................................................13

   B.  Like Customers, Spirit's Gate Agents (and Other Workers), Will be Roadkill—Additional Collateral damage if the Merger is Allowed to Proceed and the Market Becomes Even More Highly Concentrated. ................................................................................................16

     1.  The Fundamental Economic Principles of Merger Analysis Apply Directly to Competition for Workers ...............................................................................................16

     2.  The Merger Will Illegally Reduce Competition and Harm Gate Agents at FLL.........19

     3.  Even the Proposed Divestiture—which Will Also Directly Harm Spirit Gate Agents—Will Not Cure the Antitrust Violations of the Merger. ......................................................21

IV.  CONCLUSION .......................................................................................................23

CERTIFICATE OF SERVICE...........................................................................................24

I.     STATEMENT OF INTEREST AND INTRODUCTION

The TRANSPORT WORKERS UNION OF AMERICA, LOCAL 570, AFL-CIO ("TWU Local 570") is a transportation union chartered in 1989 that proudly represents airline workers at Fort Lauderdale-Hollywood International Airport ("FLL"), Miami International Airport ("MIA"), John F. Kennedy International Airport ("JFK"), LaGuardia Airport ("LGA") and Raleigh-Durham International Airport ("RDU")[1], including hundreds of Guest Service Agents ("Spirit Gate Agents") employed by Spirit Airlines, Inc. ("Spirit") at FLL. These Gate Agents are responsible for assisting passengers and keeping air travel on schedule and safe. They are the frontline workers who greet and check-in passengers, assisting with boarding passes and reschedules as customers move through the airport. As part of the multilayered airline security and safety process at the airport, their importance cannot be understated. These aviation voices are amongst the very few employees with whom Spirit passengers actually interact as they travel.

The Spirit Gate Agents' careers are also on the chopping block if the proposed acquisition of Spirit by JetBlue Airways Corporation ("JetBlue") is approved. Their livelihoods, quality of work life, and competition within the airline industry are on the line. They have a paramount interest in the ultimate outcome of this case, and in the preservation of competition within the industry to which they have dedicated themselves.

TWU Local 570's interest in this case cannot be understated. This case will have critical and potentially severe impacts on workers and their families within what will be a more concentrated airline industry if the merger is allowed to proceed.  The employees are among the most vulnerable,

---

[1] Along with the Spirit Gate Agents, TWU Local 570 represents Fleet Service Clerks, Aircraft Maintenance Technicians, Ground Equipment Mechanics, and Inventory Control Clerks who work in these airports throughout the country.

and just like airline consumers, they stand to lose from this merger.[2] With this interest in mind, TWU Local 570 files this brief to underscore the labor market that cannot be forgotten in this Court's analysis of the anti-competitive effects of the merger.

For its members and their families, TWU Local 570 has a profound interest in the outcome in this case. As the legally recognized bargaining agent of the Spirit Gate Agents represented by TWU Local 570—the employees who could stand to lose the most if the proposed merger proceeds—TWU Local 570 supports the Plaintiffs' position to block the proposed merger between Spirit and JetBlue.

## II.    ARGUMENT

### A.    The Impact of the Proposed Acquisition on Spirit Gate Agents and The Aviation Employees of Both Carriers Must Be Taken Into Account.

According to the Proposed Final Pretrial Order: "The ultimate issue in this case is whether the Proposed Transaction may substantially lessen competition, in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18." ECF No. 191 at 13, ¶ 42. Further, this Court will be deciding "[w]hether, considering the totality of circumstances and the specific context of the airline industry, the merger of JetBlue and Spirit is likely to substantially lessen competition." ECF No. 191 at 11. To make these determinations, the totality of circumstances must include the impact on the workers who will be impacted by the proposed merger—like the Spirit Gate Agents filing this *amicus* brief who have so much to lose from the reduction in competition.

---

[2] There are some labor groups that may argue in support of the proposed merger for the workers they represent because of benefits secured for their members during successful talks with the involved carriers. However, support for the merger arising out of important side dealings are not relevant to this Court's instant antitrust analysis. *See United States of America v Bertelsmann SE and Co.,* 646 F. Supp. 3d 1, 79 (D.D.C. 2022) ("The Court is required to assess the anticompetitive effects of the merger under the applicable statute and case law, which do not contemplate consideration of the preferences of the merging parties' employees and stakeholders, or their distaste for other potential buyers of the assets in question. The focus of the Court's inquiry is harm to competition in the relevant market.") As will be discussed below, and as advanced in this brief, what *is* relevant to the antitrust analysis is concentration in labor and supply markets.

Antitrust laws reach conduct aimed at not only consumers, but also suppliers. This includes workers, who are suppliers of labor. As the Supreme Court has noted, in the context of the Sherman Act, "[t]he statute does not confine its protection to consumers, or to purchasers, or to competitors, or to sellers. . . The Act is comprehensive in its terms and coverage, protecting all who are made victims of the forbidden practices by whomever they may be perpetrated." *Mandeville Island Farms, Inc. v. Am. Crystal Sugar Co.*, 334 U.S. 219, 235–36 (1948); *see also NCAA v. Alston*, 141 S.Ct. 2141 (2021) (applying the Sherman Act to protect workers from an employer-side agreement to limit compensation); *California v. Safeway, Inc.*, 651 F.3d 1118, 1132 (9th Cir. 2011). Nonetheless, "although product market concentration and labor market concentration are both covered by antitrust law, product market concentration has historically received a significant amount of attention from researchers and government officials, while labor market concentration has received hardly any attention at all." Suresh Naidu, Eric Posner, & E. Glen Weyl, Antitrust Remedies for Labor Market Power, 132 Harv. L. Rev. 537, 539–540 (2018).

While consumers have rightfully been a longtime focus of antitrust protections, they are not the only consideration. Economists, courts and administrative agencies are increasingly recognizing that workers are equally worthy of antitrust protection. Analysis and labor considerations under the antitrust law and the economic theories and evidence in support thereof should be instructive to this Court. To that end, this brief has been submitted.

## I. The Economic Research Literature Indicates that Mergers between Close Competitors are Often Harmful to Workers.

In recent years, economists have seriously studied the relationship between competition and labor outcomes, primarily wages. *See* Suresh Naidu, Eric Posner, & E. Glen Weyl, Antitrust Remedies for Labor Market Power, 132 Harv. L. Rev. 537, 539–540 (2018). For example, the entire April 2022

issue of the well-known Journal of Human Resources was devoted to the topic of "Monopsony in the Labor Market."[3]

A key insight highlighted by this research is that  many workers may have a large number of jobs that they *could* get, but many of these jobs are not relevant in the sense that they are greatly inferior to the jobs that these workers already have or to other jobs that they could realistically get. Hence, they do not affect the competitive environment faced by the worker. For example, the fact that a highly skilled worker in a particular occupation can likely get a job in a fast food restaurant is not relevant to the competitive environment faced by those workers, because they are unlikely to take such a job even if conditions in the market for their occupation were to deteriorate substantially.

In other words, this research indicates that many workers face less competition for their labor as had previously been believed, because many available jobs are not competitively relevant. In the past, this point was not widely appreciated. Analysts mistook widespread availability of *some* jobs for robust competition among firms offering *relevant* jobs—which is one reason why labor market power has previously not received much antitrust attention. This is changing as antitrust economists conduct more research on the effect of competition on workers.

A more recent study finds similar results. Gregor Schubert, Anna Stansbury & Bledi Taska, Working Paper Series: Employer Concentration and Outside Options, Washington Center for Equitable Growth, (March 2022), https://equitablegrowth.org/working-papers/employer-concentration-and-outside-options/.  Specifically, it finds that moving from the median to 95th percentile of employer concentration reduces wages by 2.6% on average. Perhaps more importantly, moving from the median to the 95th percentile of concentration reduces wages by 7.3% for workers in the lowest quartile of outward occupational mobility (i.e., the lowest tendency to leave that

---

[3] https://muse.jhu.edu/issue/47580

occupation for another). These studies collectively provide strong evidence that high market concentration tends to cause lower wages.

As Eric Posner, a Distinguished Professor of Law from the University of Chicago, wrote: "Recent studies have shown that many labor markets are concentrated, and that wages, as one would predict, are lower in concentrated labor markets than in competitive labor markets. Moreover, concentration is far more serious in labor markets than in product markets; wage suppression is much more significant than price inflation." Eric Posner, Why the FTC Should Focus on Labor Monopsony, ProMarket (Nov. 5, 2018), https://www.promarket.org/2018/11/05/ftc-should-focus-labor-monopsony/ (citing José Azar, Ioana Marinescu, and Marshall I. Steinbaum, Labor Market Concentration), Working Paper 24147, National Bureau of Economic Research (Revised February 2019), https://www.nber.org/system/files/working_papers/w24147/w24147.pdf)[4].

In addition to this empirical research on the general relationship between labor market concentration and wages, there is also a growing body of empirical research specifically about how *mergers* affect workers. Papers in this literature employ a well-established method called "difference-in-differences" analysis to rigorously study the effect of mergers on wages. The most directly relevant of these is a recent paper specifically about airline mergers. These papers are the most relevant empirical evidence for evaluating the merger of Spirit and JetBlue.

The most directly relevant of these is a recent paper about airline mergers. Myongjin Kim, Qi Ge, & Donggeun Kim, Mergers and labor market outcomes in the US airline industry, 39 Contemporary Econ. Policy. 849-866 (2021). The airline industry has been characterized by a significant number of mergers, which provides a strong basis for such a study.[5] The paper finds an

---

[4] This paper has since been published in the Journal of Human Resources in April 2022. https://jhr.uwpress.org/content/57/S/S167.

[5] https://www.airlines.org/dataset/u-s-airline-mergers-and-acquisitions/

approximately 5% reduction in the merging airlines' salaries and fringe benefits in the three (3) to five (5) years following the merger announcements, with a smaller reduction within the first two years. This effect is larger among large-scale mergers involving major airlines and low cost carriers— like Spirit and JetBlue.

Another important paper finds that mergers (across industries) that have positive predicted impacts in local labor market concentration result in a 2.1% decline in workers' earnings, with larger declines in already concentrated markets . David Arnold, Mergers and Acquisitions, Local Labor Market Concentration, and Worker Outcomes, Working Paper (2021).This analysis is directly relevant to the proposed merger at bar.

A third important paper is about the effect of hospital mergers on workers.  Elena Prager & Matt Schmitt, Consolidation and Wages: Evidence from Hospitals, 111 Am. Econ. Rev. 397-427 (2018). The research was published in the American Economic Review, widely regarded as the flagship journal of the discipline of economics. That research finds that  for the top quartile of concentration-increasing mergers (i.e., the 25% of mergers that increase concentration the most), wages four years after the merger  are 4.0 percent lower for skilled non-health professionals and 6.8 percent lower for nursing and pharmacy workers than they would have been absent the merger. The paper finds no effect for unskilled hospital workers. This bears out the labor market discussion above (e.g., hospital nurses who can only perform that occupation in a small number of relatively nearby hospitals, but not custodians or cafeteria staff who can likely find similar jobs elsewhere). Mergers have significant effects for workers for whom the merger eliminated one major possible employer out of a small number of suitable ones. This labor market effect is the possible reality for workers which would happen if Spirit and JetBlue were allowed to merge. Spirit Gate Agents' (and other airline workers') jobs are specific to airports and that industry, and they can only perform their specific job at relatively nearby airports.

Taken together, this economic literature suggests that workers are harmed by mergers that substantially reduce competition. This is the setting of the proposed Spirit and JetBlue merger. Beyond the empiricism of the studies are the real life effects of lower wages and benefits, and worsening quality of work life on the labor market of these airlines' workers. These corporate entities have not adequately studied or addressed this dynamic.

## II. Federal Antitrust Agencies Have Also Increasingly Recognized the Harm to Workers in Mergers. This Important and Requisite Analysis Underscores why This Merger Lessens Competition.

The federal antitrust agencies—the Federal Trade Commission ("FTC)" and the United States Department of Justice ("DOJ")—have increasingly focused on competition in labor markets as a part of their merger review. The former Chair of the FTC, Joseph Simons, recognized that "both agencies [the FTC and the DOJ] are now devoting more attention to competition in labor markets and to how certain conduct, including mergers, may impact competition in those markets." Joseph Simons, Chairman, FTC, Keynote Address at American University (March 8, 2019), https://www.ftc.gov/system/files/documents/public_statements/1515179/simons_-_jon_baker_speech_3-8-19.pdf.

Lisa Khan, the current chair of the FTC, echoed the increased focus on labor, stating:

**At the FTC, our congressional mandate is to root out unfair methods of competition and unfair or deceptive practices in the economy, a mission that protects all Americans, including workers**. To recalibrate our work to protect workers, the agency is building on its existing efforts in several ways.

First, we are redoubling our commitment to investigating potentially unlawful transactions or anticompetitive conduct that harm workers. **In particular, we must scrutinize mergers that may substantially lessen competition in labor markets, recognizing that the Clayton Act's purview applies to product and labor markets alike.** Recent scholarship and research—including by many of our panelists— has expanded our understanding of the scope of monopsony power in labor markets and the magnitude of its effects, insights that we are keen to incorporate into our work.

Lina M. Khan, Chair, FTC, "Remarks of Chair Lina M. Khan at the Joint Workshop of the Federal Trade Commission and the Department of Justice Making Competition Work: Promoting Competition in Labor Markets" (December 26, 2021), https://www.ftc.gov/system/files/documents/public_statements/1598791/remarks_of_chair_lina_m_khan_at_the_joint_labor_workshop_final_139pm.pdf (emphasis added).

Though labor market effects or mergers had not received much attention from enforcers in the past, and though the recent research described above provides a strong basis for paying more attention, this principle is well established. It is discussed in the current DOJ/FTC Horizontal Merger Guidelines (Guidelines), specifically in Guidelines § 12 ("Mergers of Competing Buyers"), which says that "[m]ergers of competing buyers can enhance market power on the buying side of the market, just as mergers of competing sellers can enhance market power on the selling side of the market," and that therefore "essentially the same framework" should be applied to monopsony cases as monopoly cases. Merger Guidelines, U.S. DOJ and the FTC (2010); https://www.justice.gov/atr/horizontal-merger-guidelines-08192010#12.

The principle is emphasized even further in the July 2023 Draft Merger Guidelines released by the DOJ and FTC, which explicitly and directly addressed the potential for harm to labor markets within the antitrust merger analysis. Draft Merger Guidelines, U.S. DOJ and the FTC at 25-27 (2023); https://www.justice.gov/d9/2023-07/2023-draft-merger-guidelines_0.pdf (emphasis added) ("Draft Merger Guidelines"). In the Fact Sheet released by the DOJ and the FTC with the Draft Merger Guidelines, the agencies noted that "[s]ince 1982, the merger guidelines have devoted increasing attention to mergers that reduce competition among buyers, including employers as buyers of labor services. The Draft Merger Guidelines build on this principle and explain that the agencies will evaluate the impact of a merger on labor as a stand-alone basis to challenge a transaction." Fact Sheet

–   2023   Draft   Merger   Guidelines   for   Public   Comment   at   1   (2023),

https://www.ftc.gov/system/files/ftc_gov/pdf/Merger-Guidelines-Fact-Sheet-07-17-2023.pdf.

According to Section 11 of the Draft Merger Guidelines:

<u>When a Merger Involves Competing Buyers, the Agencies Examine Whether It May Substantially Lessen Competition for Workers or Other Sellers.</u>

A merger between competing buyers may harm sellers just as a merger between competing sellers may harm buyers. **The same—or analogous—tools used to assess the effects of a merger of sellers can be used to analyze the effects of a merger of buyers, including employers as buyers of labor.** A merger of competing buyers can substantially lessen competition by eliminating the competition between the merging buyers or by increasing coordination among the remaining buyers. It can likewise lead to undue concentration among buyers, accelerate a trend towards undue concentration, or entrench or extend the position of a dominant buyer. Competition among buyers can have a variety of beneficial effects analogous to competition among sellers. For example, buyers may compete by expanding supply networks, through transparent and predictable contracting, procurement, and payment practices, or by investing in technology that reduces frictions for suppliers. In contrast, a reduction in competition among buyers can lead to artificially suppressed input prices or purchase volume, which in turn reduces incentives for suppliers to invest in capacity or innovation. The level of concentration at which competition concerns arise may be lower in buyer markets than in seller markets, given the unique features of certain buyer markets.

**Labor markets are important buyer markets. The same general concerns as in other markets apply to labor markets where employers are the buyers of labor and workers are the sellers. The Agencies will consider whether workers face a risk that the merger may substantially lessen competition for their labor. Where a merger between employers may substantially lessen competition for workers, that reduction in labor market competition may lower wages or slow wage growth, worsen benefits or working conditions, or result in other degradations of workplace quality. When assessing the degree to which the merging firms compete for labor, any one or more of these effects may demonstrate that substantial competition exists between the merging firms.**

Labor markets frequently have characteristics that can exacerbate the competitive effects of a merger between competing employers. For example, labor markets often exhibit high switching costs and search frictions due to the process of finding, applying, interviewing for, and acclimating to, a new job. Switching costs can also arise from investments specific to a type of job or a particular geographic location. Moreover, the individual needs of workers may limit the geographical and work scope of the jobs that are competitive substitutes.

In addition, finding a job requires the worker and the employer to agree to the match. Even within a given salary and skill range, employers often have specific

demands for the experience, skills, availability, and other attributes they desire in their employees. At the same time, workers may seek not only a paycheck but also work that they value in a workplace that matches their own preferences, as different workers may value the same aspects of a job differently. This matching process often narrows the range of rivals competing for any given employee.

In light of their characteristics, labor markets are often relatively narrow.

The features of labor markets may in some cases put firms in dominant positions. To assess this dominance in labor markets (see Guideline 7), the Agencies often examine the merging firms' power to cut or freeze wages, exercise increased leverage in negotiations with workers, or generally degrade benefits and working conditions without prompting workers to quit.

If the merger may substantially lessen competition or tend to create a monopoly in upstream markets, that loss of competition is not offset by purported benefits in a separate downstream product market. Because the Clayton Act prohibits mergers that may substantially lessen competition or tend to create a monopoly in any line of commerce and in any section of the country, a merger's harm to competition among buyers is not saved by benefits to competition among sellers. **That is, a merger can substantially lessen competition in one or more buyer markets, seller markets, or both, and the Clayton Act protects competition in any one of them.**

Just as they do when analyzing competition in the markets for products and services, the Agencies will analyze labor market competition on a case-by-case basis.

Draft Merger Guidelines, at 25-27. These guidelines underscore the growing focus on the impact of a merger on workers. The Spirit employees have not seen any adequate attention to these markets by the carrier here as they rush to close this deal.

## III.   Courts Have Followed Suit and Recognized That Labor Considerations in Antitrust Analysis.

Courts have also recently reinforced that antitrust laws protect competition for the acquisition of goods and services from workers. In a landmark case most directly on point, just last year, the District Court of Appeal for the District of Columbia upheld the Department of Justice's suit to block Penguin-Random House's proposed acquisition of Simon & Schuster. *United States of America v Bertelsmann SE and Co.,*  646 F. Supp. 3d 1, 80 (D.D.C. 2022)  ("Penguin-Random House"),. The Court found that the proposed merger among direct competitors unlawfully restrained competition in

violation of Section 7 of the Clayton Act in the context of the book publishing industry—a highly concentrated industry like the airline industry at issue in the case before this Court. The court found that there were five publishing houses that controlled the bulk of the market for anticipated top selling books, referred to as the "Big Five," and that a merger between two of the five would inevitably reduce competition for the right to publish anticipated top selling books to the detriment of their authors and sellers. *Id.* at 3, 80.  Specifically, the court found that "the amount [of an advance] paid [to an author] is "inexorably determined by competition," and that such competition would be harmed by the merger of two direct competitors where authors would receive lower advances of anticipated-top selling books and less favorable contract terms. *Id.* at 11, 51-54. In short, the impact on the authors (the workers in that case) were a pivotal focus of the court's analysis.

The principles and analysis articulated in that decision dealing with a different industry, but one with similar concentration to the airline industry,[6] are relevant to this dispute and can be summarized as follows:

- When reviewing whether a merger unlawfully restrains competition in violation of the Clayton Act the initial task is to analyze market concentration. The government must demonstrate that such a merger would produce a "firm controlling an undue percentage share of the relevant market and would result in a significant increase in the concentration of firms in the market." *Id.* at 43. Competition is always higher when there are a greater number of sellers, none of which have a significant share of the market…*Id.*

- The substantial market share of the combined entity created by the proposed merger leads to a strong presumption of anti-competitiveness. *Id.* at 45. A trend toward concentration in the industry, whatever it's causes, is "a highly relevant factor in deciding how substantial the anti-competitive effect of a merger may be." *Id.*

---

[6]Like the "Big Five" in the publishing industry, the airline industry currently has a big four (Delta, United, American, Southwest) along with several smaller niche carriers (JetBlue, Spirit, Frontier, Alaska, Hawaiian, Sun Country) which provide some level of competition to the mega-carriers. . The proposed merger of JetBlue and Spirit will convert the big four into a big five, thereby further consolidating the industry. As discussed further below, an anti-competitive concern with the proposed merger is that there are specific routes and specific airports where the head-to-head competition between the two airlines is much stronger. For example at FLL the combined share of flights is 46%.

- Stability of the market shares of the primary participants over time is an important factor. Specifically, in the *Penguin-Random House* case the fact that the aggregate market share of the big-five publishers remained flat reinforces the presumption of anticompetitive effects based on market concentration. *Id.*

- A merger can enhance market power just by eliminating competition between the merging parties, even if the merger otherwise has no effect on the behavior of other firms in the marketplace. Further, unilateral effects can be especially acute in a "highly concentrated market." *Id.* at 48.

- In seeking to block a merger the government can also highlight a likelihood of "coordinated effects" which occurs when market participants mutually decrease competition in the relevant marketplace leading to higher prices for customer. *Id.* at 57.

- If the government is successful in demonstrating that a merger will cause increased concentration in an already concentrated market, the burden then shifts to the defendants to provide evidence of "structural market barriers to collusion" specific to the industry that would defeat the "ordinary presumption of collusion. *Id.* at 58.

- In reviewing whether there was undue market concentration in the publishing industry, the court also observed that "new entrants to the market would presumably give authors alternative outlets to publish their books, thereby preventing the merged entity from lowering advances." The court further noted that "the existence and significance of barriers to entry are frequently…crucial considerations in a rebuttal analysis." *Id.* at 70 (citation omitted).

- The court emphasized that "the best proof that would-be new competitors face formidable barriers to entry is the stability of market shares in the industry. The court specifically noted that no publisher had entered the marketplace and become a competitor against the Big Five publishers in the last thirty years. *Id.* at 72.

- The court is only required to assess the anticompetitive effects of the merger under the applicable statute and case law which doesn't take into consideration the preferences of the merging parties' employees. *Id.* at 79.

As the *Penguin-Random House* case reinforced, mergers between dominant companies can reduce wages and harm workers by eliminating employer competition for workers. While that case involved authors, the ruling made clear that antitrust law is not limited to its impact on consumers. Instead, echoing the same principles as the FTC and the DOJ, the court recognized that the Clayton Act protects workers from lessened competition in the labor market, including cases with increased market concentration (like the proposed merger before this Court).

15

Like the economists, the federal antitrust agencies, and the *Penguin-Random House* court, this Court should consider the anticompetitive effects on workers, including the Spirit Gate Agents, in the totality of the circumstances for this industry-changing potential merger. The analysis will reveal the serious market risks faced by these aviation workers.

### B. Like Customers, Spirit's Gate Agents (and Other Workers), Will be Roadkill— Additional Collateral damage if the Merger is Allowed to Proceed and the Market Becomes Even More Highly Concentrated.

#### 1. The Fundamental Economic Principles of Merger Analysis Apply Directly to Competition for Workers

The most fundamental economic principle of merger analysis is that mergers eliminate the competitive constraint that each of the merging firms had previously imposed upon the other. Joseph Farrell & Carl Shapiro, Antitrust Evaluation of Horizontal Mergers: An Economic Alternative to Market Definition, The B.E. Journal of Theoretical Economics (2010), https://faculty.haas.berkeley.edu/shapiro/alternative.pdf. (recognizing "merging firms no longer compete with each other to attract customers: this generically encourages higher prices."). This is equally true of competition for customers and competition for workers. Moreover, the underlying mechanism is the same, as described presently.

Before the merger, the terms that each firm offers to its customers, or to its workers, are influenced by the existence of the other as an independent competitor: the desire of each firm to win customers/workers away from the other (or to avoid losing them to the other) causes each firm to offer better terms than they would absent that competition. In contrast, the merged firm owns *both* of the previously-independent firms (which can be thought of as "divisions" of the merged firm). For the merging firm, "losing" customers/workers from one of its divisions to the other is much less costly than losing them entirely, as would have been the case pre-merger. For this reason, the merged firm has less incentive to offer favorable terms to its customers/workers than the individual firms did prior to the merger. *See id.*

The magnitude of the effect from this lost competition is greater when that competition was more consequential to begin with: the stronger the competition between the merging firms, and the weaker the competition with non-merging firms, the greater the harmful effect, and vice-versa. The strength of competition between two firms is driven by the extent to which customers/workers regard the products/jobs of the merged firms as close substitutes for each other. Firms offering similar products are close competitors for customers, and firms offering similar jobs are close competitors for workers.[7]

This conclusion that the fundamental economic principles underlying merger analysis are the same for effects on workers as for the effects on customers is well-established and uncontroversial textbook economics. It is discussed in the DOJ/FTC Horizontal Merger Guidelines,[8] specifically in Guidelines § 12 ("Mergers of Competing Buyers"), which says "[m]ergers of competing buyers can enhance market power on the buying side of the market, just as mergers of competing sellers can enhance market power on the selling side of the market," and that therefore "essentially the same framework" should be applied to monopsony cases as monopoly cases. Merger Guidelines, U.S. DOJ and the FTC (2010); https://www.justice.gov/atr/horizontal-merger-guidelines-08192010#12.

The reason for this is straightforward. A merger is harmful to customers when customers regard the merging firms' products as close substitutes and when there are not too many other close substitute products. Similarly, a merger is harmful to workers when workers regard the merging firms' jobs as close substitutes and when there are not too many other close substitute jobs.[9]

---

[7] This doesn't mean that the harmful effect of any particular merger must be the same for customers and for workers. Two firms could have closely-competing products but not closely-competing jobs, or vice-versa. The point is that the fundamental mechanism is the same.

[8] https://www.justice.gov/atr/horizontal-merger-guidelines-08192010#12.

[9] There is one important reason why mergers may harm workers that does not apply to customers. A customer can generally choose from among all available products; sellers will sell to any willing buyer. In contrast, a worker cannot generally choose from all available jobs; the firm may not be hiring (or may only be hiring with some probability at some time in the future, rather than immediately

As discussed above, despite this close conceptual similarity, the great majority of DOJ/FTC merger enforcement deals with harm to customers, not to workers. Suresh Naidu, Eric Posner, & E. Glen Weyl, Antitrust Remedies for Labor Market Power, 132 Harv. L. Rev. 537, 539–540 (2018). One reason for this is that there was a widespread sense that there are often many more potential employers for a worker than there are sellers of a particular product. That is, it seemed that outside of extreme examples such as a one-employer "company town," most workers have many possible firms for which to work, making a merger between any two of them unlikely to lead to substantial harm. But as discussed above, recent evidence has shown this to be largely incorrect. Even if a worker has many jobs that they *could* take, there may be only a few jobs that are competitively *relevant*. Once this is understood, the idea that there can be harm from a merger between firms offering two of only a small number of relevant jobs.

In addition to the principles described above, mergers can also be harmful if they facilitate collusion[10]. To sustain collusion, all of the colluding firms must successfully coordinate their actions, which is generally easier when there are fewer firms. This concern is exacerbated by a long history of collusion in the airline industry. Even when protected by a union, workers get better terms when there is more competition for their labor.

---

and with certainty), or may not wish to make an offer to that worker. See Naidu, Posner, and Weyl (2018), *supra*.

[10] *See also Todd v. Exxon Corp.*, 275 F.3d 191, 201 (2d Cir. 2001) (Sotomayor, J.) (recognizing that "a horizontal conspiracy among buyers to stifle competition"—there, a conspiracy among oil companies to suppress the compensation of their employees—"is as unlawful as one among sellers"); *Vogel v. Am. Soc'y of Appraisers*, 744 F.2d 598, 601 (7th Cir. 1984) ("Just as a sellers' cartel enables the charging of monopoly prices, a buyers' cartel enables the charging of monopsony prices; and monopoly and monopsony are symmetrical distortions of competition from an economic standpoint."), *quoted in Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co.*, 549 U.S. 312, 321 (2007).

### 2.  The Merger Will Illegally Reduce Competition and Harm Gate Agents at FLL

As to the JetBlue-Spirit merger on Passenger Service Agents at FLL (among other airports), the question is whether jobs at those two airlines are close enough competitors for some category of workers, and jobs at other airlines are distant enough competitors for those workers, for the merger to cause substantial harm.

It is clear that this merger would substantially increase concentration at FLL. Every Gate Agent loses one major possible employer. The magnitude of the harm depends on the extent to which other jobs, including similar jobs at other airports, or different jobs altogether, are close substitutes for those jobs at FLL.[11] It is implausible that most Gate Agents regard those alternatives as *very* close substitutes for their current jobs at FLL. This suggests that the merger will likely cause some decrease in competition, which will harm workers—and possibly a much bigger harmful effect than that may be forced upon the aviation workers.

This point can be demonstrated quantitatively. In June 2023, Spirit's passenger share was 26.52% and JetBlue's was 19.48%,[12] for a combined share of 46.00%.[13] The pre-merger Herfindahl–

---

[11] It is obvious that there are many jobs that may be readily available that are not close substitutes for FLL Passenger Service Agent jobs. For example many of these workers could likely get jobs in fast food restaurants, but those jobs are likely considered to be so much worse that no such worker would accept them even if the wages at their current job were to decrease substantially. Such jobs are simply not relevant to the competitive environment in which FLL Spirit Gate Agents operate. The question therefore is whether there are other jobs that FLL Gate Agents regard as close substitutes, and therefore may be relevant to the competitive environment. It is unlikely that these substitutes are so readily available as to make a large reduction in competition for Gate Agents jobs irrelevant.

[12] https://www.transtats.bts.gov/airports.asp?20=E

[13] For the DOJ analysis of the effects on customers, the key issue is competition over *routes*. In contrast, for airport-based workers the key issue is competition within *airports*.

Hirschman Index (HHI) is 1599, and the post-merger HHI is 2632,[14] for a change of 1033.[15] The *Guidelines* establish that a market with a post-merger HHI greater than 2500 is a "Highly Concentrated Market." The Guidelines also establish that "Mergers resulting in highly concentrated markets that involve an increase in the HHI of more than 200 points will be presumed to be likely to enhance market power." The new Draft Merger Guidelines tighten these thresholds to a post-merger HHI of 1800 and a change of 100. Draft Merger Guidelines, U.S. DOJ and the FTC at 6.  This market exceeds that 2500 threshold,[16] and it vastly exceeds the 200 point increase (1033 vs. 200). Moreover, recent economic research has established that the change in HHI is much more predictive of economic harm than is the level. Volker Nocke & Michael D. Whiston, Concentration Thresholds for Horizontal Mergers, American Economic Review (Jun. 2022), https://www.aeaweb.org/articles?id=10.1257/aer.20201038.

Under this definition the merger is strongly presumed to be harmful, which means that the market would have to be much broader in order for the merger not to harm Gate Agents at FLL. That is unlikely.[17] In short, competition will decrease as a result of the merger, and workers like the Spirit

---

[14] The HHI calculation conservatively assumes that the "Other" airlines comprising 15.82% of passengers are all very small, so that the sum of their squared shares is zero. A more realistic assumption would increase the post-merger HHI (but would not have any effect on the change in HHI).

[15] As explained in the *Guidelines*, "The HHI is calculated by summing the squares of the individual firms' market shares, and thus gives proportionately greater weight to the larger market shares." The pre-merger HHI is based on the JetBlue and Spirit shares separately, and the post-merger HHI is based on the combined firm's share; the fact that the shares are squared is what causes the HHI to increase.

[16] These calculations are based on the assumption that "Gate Agents at FLL" is a relevant market as defined by the Guidelines.

[17] It is important to emphasize that the relatively modest *national* shares of JetBlue and Spirit are not relevant to this inquiry. The question is whether the merging firms are close substitutes for each other for particular categories of workers in particular locations where those two firms represent a substantial fraction of total employment.

Gate Agents will likely be harmed. With decreased competition—and power saturated by the merger of two direct competitors—it is the workers who will suffer.

As discussed above, concentration in labor markets generally, and competition-reducing mergers in particular, decrease wages. They also likely increase the ability for collusion. There will undoubtedly be job loss for Gate Agents at FLL, including the Spirit Gate Agents specifically. There are the obvious effects of job loss, the harm from which could be exacerbated by the high cost of living in South Florida. In sum, with less competition in the market, workers will have less opportunity to move to another job, which will likely result in a reduction in pay with limited prospect of recoupment.

As the FTC and DOJ Draft Merger Guidelines recognize: "Where a merger between employers may substantially lessen competition for workers, that reduction in labor market competition may lower wages or slow wage growth, worsen benefits or working conditions, or result in other degradations of workplace quality." Draft Merger Guidelines, U.S. DOJ and the FTC at 26. This is in line with the economic analysis: the less competition there is, the less favorable are the terms that will be offered to employees. Here, where the proposed merger of Spirit and JetBlue would only increase the concentration of an already concentrated market, the Gate Agents and other workers face all of these harms. With the combination of JetBlue and Spirit, things will only get worse for the workers who lose competition in the labor market.

**3. Even the Proposed Divestiture—which Will Also Directly Harm Spirit Gate Agents—Will Not Cure the Antitrust Violations of the Merger.**

JetBlue has purported to address these concerns by means of divestiture agreements. Specifically:

> JetBlue and Frontier have executed a divestiture agreement, pursuant to which Frontier agreed to purchase Spirit holdings at LaGuardia Airport if the proposed transaction is consummated, subject to necessary approvals and other conditions of the divestiture agreement. . . .

21

> JetBlue and Allegiant have executed a divestiture agreement, pursuant to which Allegiant agreed to purchase Spirit holdings at Boston Logan International Airport and Newark International Airport (with the exception of one gate), and five JetBlue gates and related ground facilities at the Fort Lauderdale-Hollywood International Airport if the proposed transaction is consummated, subject to the conditions of that agreement, including receipt of necessary approvals and other conditions of the divestiture agreement."

ECF No. 191 at 7.

However, these proposed divestitures are not sufficient to resolve the competitive concerns. These proposed transactions cannot remedy anti-competitiveness and seem only to be political and cosmetic gestures. One difficulty that arises in many divestiture scenarios is whether the divestiture buyer is capable of operating the assets in a way that fully replaces the pre-merger competition.[18] In the case of FLL, there is a more fundamental problem. Under the proposed divestiture, JetBlue would divest five gates at FLL. But under the merger it would acquire *all* of Spirit's gates, which includes ten preferential gates and three shared gates. That is, even assuming that the divestiture buyer was suitable, the divestiture would include less than half of the gates, and an unknown share of other relevant assets.

For the Spirit Gate Agents in particular—those who work at the gates to be divested—this only makes matters worse. It increases the likelihood of job loss, in a market where there is one less employer (and thus less opportunity to find a relevant comparable job). These workers are looking down the barrel of another airline merger—lost jobs, reduced wages, worsened working conditions,

---

[18] That is questionable here where JetBlue's own announcement includes that it would have to work with the Broward count Aviation Department to "facilitate Allegiant's ULCC growth at FLL using these gates." https://news.jetblue.com/latest-news/press-release-details/2023/JetBlue-and-Allegiant-Announce-Divestiture-Agreement-in-Connection-with-JetBlues-Combination-with-Spirit/default.aspx

and challenges to their families' futures. Cheerleading, marketing, and slogans are no substitute to rigorous empirical analysis and will not remedy an anti-competitive merger and acquisition.

## IV.   CONCLUSION

TWU Local 570  urges this Court to block the merger of Spirit and JetBlue, which will harm workers like the Spirit Gate Agents and substantially lessen competition, in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.

Dated: October 5, 2023                                 Respectfully submitted,


                                                        */s/ Kathleen M. Phillips*
                                                        KATHLEEN M. PHILLIPS, ESQ.
                                                        Florida Bar No. 28773
                                                        HOLLY E. OLIVA-VAN HORSTEN, ESQ.
                                                        Florida Bar No. 57791
                                                        Phillips, Richard & Rind, P.A.
                                                        9360 S.W. 72 Street, Suite 283
                                                        Miami, Florida 33173
                                                        (305) 412-8322
                                                        Email: kphillips@phillipsrichard.com
                                                               holly@phillipsrichard.com

                                                        */s/ Peter J. Perroni*
                                                        Peter J. Perroni, Esquire
                                                        (BBO No. 634716)
                                                        Nolan/Perroni, PC
                                                        73 Princeton Street
                                                        North Chelmsford, MA 01863
                                                        Telephone: 978-454-3800
                                                        Email: peter@nolanperroni.com

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to counsel of record for all parties as identified on the Notice of Electronic Filing.

Dated: October 5, 2023                    BY: ___/s/ Peter J. Perroni_____
                                              Peter J. Perroni, Esquire