# Exhibit B

S. Hrg. 113–318

# AIRLINE INDUSTRY CONSOLIDATION

# HEARING

BEFORE THE

SUBCOMMITTEE ON AVIATION OPERATIONS, SAFETY, AND SECURITY

OF THE

# COMMITTEE ON COMMERCE, SCIENCE, AND TRANSPORTATION UNITED STATES SENATE

ONE HUNDRED THIRTEENTH CONGRESS

FIRST SESSION

———

JUNE 19, 2013

———

Printed for the use of the Committee on Commerce, Science, and Transportation



U.S. GOVERNMENT PRINTING OFFICE

88–515 PDF         WASHINGTON : 2014

For sale by the Superintendent of Documents, U.S. Government Printing Office
Internet: bookstore.gpo.gov   Phone: toll free (866) 512–1800; DC area (202) 512–1800
Fax: (202) 512–2104   Mail: Stop IDCC, Washington, DC 20402–0001

29

more attractive than the network American, standing alone, could produce. The combined network will be comparable in size to the networks of United and Delta, which have both used bankruptcies and mergers of their own to leapfrog American.

American and US Airways are under no illusions that mergers are easy or seamless. Both companies are keenly focused on using the lessons from prior mergers to maximize value and minimize disruptions. This merger is good news for everyone except our competitors. The new American will lift the competitive bar in an already highly competitive U.S. airline industry, and this merger will position the company to accomplish great things for its employees, customers and shareholders.

Thank you again for the opportunity to testify today.

Senator CANTWELL. Thank you very much.
Mr. Leocha?

### STATEMENT OF CHARLES A. LEOCHA, DIRECTOR, CONSUMER TRAVEL ALLIANCE

Mr. LEOCHA. Chairwoman Cantwell, Ranking Member Ayotte, and other members of the Subcommittee, my name is Charlie Leocha. I am the Director of the Consumer Travel Alliance. We, the passengers, thank you for a place at this hearing.

About 3 years ago I sat here before the full Commerce Committee to discuss the merger of United and Continental. I reread that transcript and noticed the same rationale for merger then as now, almost word for word. But this time, there are enormous differences.

During the previous mergers, the airline industry was under severe financial stress. Today the airline industry is thriving. The two airlines sitting before you are in their best positions in years, even without any merger. Both can fly on their own wings. Their CEOs have both confirmed that.

We, the passengers, need your careful examination of this merger from a consumer's point of view. Number one, competition will be clobbered. A study done by the Consumer Travel Alliance showed that we, the passengers, in 38 out of 50 states will lose significant airline competition. The recent GAO report released today is even more dramatic. On 1,665 connecting markets, effective competition will be reduced.

Two, prices will go up. In past mergers, we the people have faced price increases three times more than the norm where airlines have any semblance of market control. Now with fees, airlines have already acted. Only last month, the big four airlines raised the change in fees from $150 to a whopping $200, even when these two airlines sitting before you were faced with antitrust hearings, and one of them was raking in record profits. We, the passengers, have no power to even vote with our wallets when the legacy carriers raise their fees in concert like that. These are the kinds of avaricious fees that require competition, not more power for the airlines.

Three, airports will suffer. Overlapping routes mean airports are in danger. Airports like Boston, Bradley, Seattle, San Francisco, Fresno, Minneapolis, San Antonio, Orlando, and others are all in danger of right sizing. That is airline speak for layoffs and service cuts. Every Senator here will see her or his state lose competitive airline service, and many airports in their states will face layoffs as the airlines consolidate. Some hub airports will be downsized. If I was from Arizona, North Carolina, Pennsylvania, or Florida, I would never vote to approve this merger.

Number four, there are no significant benefits for consumers. Most airline mergers claim big financial synergies or big benefits for we, the passengers. This merger does neither.

Five, passengers will suffer. With every merger, massive computer glitches delay thousands and thousands of airline passengers. This merger will be the same if history is to bear. And on planes, American Airlines has already announced that they are moving their seats closer together. That is what we can expect.

Combining American Airlines and US Airways brings together two of the worst airlines for customer service according to the American Customer Satisfaction study. Bad plus bad equals worse, not better.

Finally, on labor issues, they will bog down the merger. Any promises about labor peace are pie in the sky, and bad labor relations translates to bad customer service. This merger will see coming labor unrest. After eight years, as we sit at this hearing, US Air pilots are still not integrated, and their flight attendants were only united a couple of months ago. For them to promise anything different today cannot be believed.

And within American Airlines, TWA flight attendants have been battling to reclaim their shamefully stolen seniority. Mr. Parker and the American Airlines flight attendant unions should sort out this date of hire disgrace.

In conclusion, there are no benefits overall. Consumers will dramatically lose competition. Air fares will go up, airport service may be reduced, consumers will suffer during the merger integration, and there is no magic union peace. How many times does Congress, the government, and the airlines have to do the same thing over and over, again expecting different outcomes? It is time to stop this merger madness and do what is best for consumers and the free market. We, the passengers, are depending on you, our representatives.

I am ready for any questions.

[The prepared statement of Mr. Leocha follows:]

PREPARED STATEMENT OF CHARLES A. LEOCHA, DIRECTOR,
CONSUMER TRAVEL ALLIANCE

The Consumer Travel Alliance objects to this proposed merger of American Airlines with US Airways for the following reasons—

- There is no need for this merger.
- There are no overall benefits to consumers from this merger.
- The aviation system will dramatically lose competition and see fares and fees rise.
- Airline service may be reduced.
- Consumers will suffer during the merger process.
- Labor issues will continue to be a factor affecting customer service.

Members of this subcommittee need to ask whether this merger will benefit their constituents. The simple answer is: no.

When this merger is examined, no matter how you dress it up, competition will be reduced, consumers will ultimately have fewer choices, they will have to bear the burden of merging operations and labor unions, and will enjoy no net gains in destinations.

**Antitrust is designed to protect consumers**

Let's start with the basics. Antitrust protections are designed to protect consumers from the effects of oligopolies and monopolies. These laws were passed in

order to ensure competition in the marketplace. The leaders from US Airways and American Airlines are asking you to ignore their prima facie assault on competition. They're hoping you overlook the results of two previous mergers, which created enormous problems for consumers.

When this merger was proposed, statements from both US Airways and American Airlines would have you believe that there was virtually no competition, the routes were "complementary," and that the only semblance of competition was on 12 overlapping non-stop routes. Later in the testimony, we will point to studies that show dramatic route overlap—as much as 40 percent of the current American Airlines connecting routes and 30 percent of US Airways routes compete head-to-head with each other. Consumers will lose that competition.

**There are no net benefits for consumers**

Overall, consumers will see no new routes or improved service that couldn't be achieved without a merger. In addition, frequent flier programs will be upended and businesses near current airline hubs may face cutbacks in airline service. Whatever "benefits" claimed by better US Airways/American Airlines connectivity and frequent flier choice will come at the expense of the current US Airways/United airline alliance service and frequent flier programs. What this merger purports to give with one hand, it takes from consumers with the other.

*1. No compelling economic reason for this merger*

This merger is unique in the airline industry among recent mergers. In the past, one of the major airlines being merged has always been in financial distress. Delta merged with cash-strapped Northwest. Continental merged with struggling United. American West merged with bankrupt US Airways. Plus, the airline industry was losing money hand-over-fist.

In this case, neither airline is in danger of collapse—US Airways just reported a record profit and American Airlines, having just made aviation's largest aircraft order, will emerge from bankruptcy with billions of dollars in the bank with its labor costs slashed through the bankruptcy process. Its CEO, Tom Horton, has repeatedly claimed that American Airlines would be able to stand alone after emerging from Chapter 11.

It is only because of the intensely poor labor relations, where American Airlines' unions united in their mantra ("Anything but the current management would be an improvement") that Mr. Parker, CEO of US Airways, managed to turn the American Airlines board of directors in favor of the merger. Otherwise, American Airlines was predicting that bondholders and most stakeholders other than stockholders would be made almost whole.

Remember, these bonds and the commercial paper are held by seasoned investment professionals. American Airlines' woes were well-publicized. There is no reason for this committee, whose purpose is to protect consumers against the loss of competition, to be concerned with financial stakeholders. That is the job of the bankruptcy court, not the U.S. Senate or the Department of Justice.

With past mergers, the aviation system was at a tipping point. Today, that is not true. The antitrust laws and review need to be used to benefit consumers, not to make creditors whole. That is a basic difference between antitrust and bankruptcy issues.

**Consumer score: No consumer benefit**

*2. No discernible consumer benefits from this merger*

This merger brings no new routes, no new competition, no savings that can be passed on to consumers. Even if there were significant savings created by synergies in this merger, they would be overwhelmed by the negative consequences of higher airfares and reduced competition.

Past testimony from Mr. Parker and Mr. Horton alludes to new destinations and better connections between American Airlines destinations and US Airways destinations. However, their testimony and statements conveniently exclude the current connections that are offered between United destinations and US Airways destinations by virtue of their airline alliance arrangements. When Mr. Parker claims new connections between US Airways and American Airlines destinations, there is no evidence to suggest that there will be any improvement in route connections over those already provided by these carriers' current alliance arrangements.

When looking at the international routes, airline alliances and destinations, the changes for current US Airways customers are bleak. They will be exiting the Star Alliance that has 1,329 destinations served by 28 member airlines and will be affiliating with the Oneworld Alliance that serves 850 destinations by 13 member

32

airlines.[1] This will be a dramatic cut of 479 destinations that are today available to current US Airways passengers.

When this committee looks at whether customers will enjoy additional destinations or not, take into account the dismantling of Star Alliance frequent flier and code-share partnerships that will harm millions of passenger because of reduced destinations.

American Airline passengers may see some benefits of additional destinations; however, overall, 46 million members[2] of the Star Alliance will see a reduction in their available destinations and frequent flier mileage options.

**Consumer score: Consumers receive no net benefit and possibly lose destinations**

*3. Lost route competition across airlines will harm consumers*

The total number of national, domestic carriers will be reduced from five to four—a 20 percent reduction. Consumers will be faced with less choice, less service, fewer non-stop flights and higher airfares.

A study commissioned by the CTA found that competition will be clobbered in 38 out of 50 states by this merger. The CTA study[3] showed that 761 routes between domestic airports overlap between these two airlines. Forty percent of American Airlines' routes face daily competition from US Airways and 30 percent of US Airways' routes face competition from American Airlines. A recently completed GAO study echoes these findings and shows the loss of competition and dramatic number of overlapping routes.



38 of 50 states will lose competition on one-stop overlapping routes plus Puerto Rico and Washington, DC (grey states)

Though the new American Airlines message is that there are only 12 non-stop overlapping routes, the real competition between hub-and-spoke airlines comes via connecting routes. Hub-and-spoke systems live and die through connecting routes.

For example, take a passenger deciding between airlines flying from Seattle, Washington, to Austin, Texas. Currently, American Airlines and US Airways compete vigorously on this route—US Airways connects via Phoenix, Arizona, and American Airlines connects via Dallas, Texas.

---

[1] *http://en.wikipedia.org/wiki/Airline_alliances*
[2] *Ibid.*
[3] See Appendix B

33

Another example might be passengers flying between Hartford, Conn., and Phoenix, Arizona. They would fly via Dallas on American Airlines and connect in Philadelphia if flying on US Airways.

Even where one airline may have non-stop service and the other features connecting service, many passengers choose to fly on a connecting flight because the prices are normally lower in most markets.

Furthermore, consumers will lose from the perspective of price competition. The system of "signaling" airfare increases only requires one airline belonging to the "Big 5" (American, Continental, Delta, Southwest and US Airways) to decline to participate in an airfare increase. When all the majors do not agree, tested airfare increases are rolled back. Several years ago, there were seven airlines in this fare-setting universe. If the American Airlines/US Airways merger is approved, we will only have four domestic airlines participating and, effectively, only three international airline alliances (protected by antitrust immunity and operation joint ventures). Airline passengers will, on balance, lose 20 percent of their competition dynamic with this merger.

According to the *Wall Street Journal*,[4] "When two competitors combine to dominate prime routes, those markets tend to bear the brunt of higher prices." The effect on airfares has been brutal.

> Consider United Airlines and Continental Airlines, which used to compete for customers flying between Chicago and Houston, for example. After the two airlines merged in 2010, the combined company, which took the United name, now carries 79 percent of the traffic traveling between Houston's Bush Intercontinental Airport and Chicago's O'Hare Airport, not counting connecting passengers. United's average fare on that route soared 57 percent in the three months ended September 2012 compared with the same period three years earlier, according to Department of Transportation data compiled by *PlaneStats.com*. By comparison, United's total average domestic price per mile over the same three-year period went up only 16 percent.
>
> . . .
>
> Travel will change significantly for consumers on a few routes served by both American and US Airways. Between Miami and Philadelphia, for example, US Airways carries 54 percent of travelers, according to DOT data for the third quarter of last year. American has 44 percent, and a combined American-US Airways will have 98 percent unless other airlines decide to do battle against the behemoth.

In testimony before the Senate Judiciary Committee's Subcommittee on Antitrust, Competition Policy and Consumer Rights, Diana Moss, VP, American Antitrust Institute, said that post-mergers, "Fare increases are above average at the origin airport on 70 percent of routes affected by Delta-Northwest and on over 90 percent of routes affected by United-Continental."

Airlines are already effectively colluding with one another when it comes to capacity controls. US Airways executives have publicly stated that when airline industry capacity is restrained, it allows the industry to pass on the added costs of increased fuel prices. There are many ways to compete. Capacity control and price are two of them. This merger will make it easier to raise prices on consumers via either route.

Now that airlines have created a bifurcated pricing model that combines airfares with ancillary fees, they can squeeze consumers with airfare increases or with arbitrary fee increases. A perfect case in point is the recent ratcheting up of the change fees on domestic airline tickets from $150 to $200. Even when preparing to face congressional and DOJ scrutiny, legacy carriers followed each other with this 33 percent increase. Consumers have no viable way to counter this heavy-handed airline fee increase, since every legacy airline increased these fees in concert. This raw pricing power over ancillary fees will only become worse with consolidation.

---

[4] *Wall Street Journal,* April 10, 2013 *http://online.wsj.com/article/SB10001424127887324010704578414813368268482.html*

34

**Consumer core: Negative—competition will be reduced and airlines will find it easier to raise prices**

*4. Popular, mid-sized, non-hub airports like St. Louis, Fresno, Seattle and Las Vegas that are at the end of "spokes" in US Airways and American Airlines hub and spoke systems are in danger of losing service as the airlines "right-size."*



Airports that will suffer the greatest loss of competition from one-stop connecting routes
Airports that have the best chance of losing service due to "right-sizing"

The Consumer Travel Alliance (CTA) study shows many non-hub airports where American Airlines and US Airways vigorously compete, such as Austin, Bradley, Pittsburgh, Raleigh Durham, Kansas City, San Diego and Las Vegas. That competition will disappear. Flights to those cities will be cut back should they be considered "unprofitable redundancies."

Las Vegas and St. Louis have already taken hits from other mergers. They certainly do not need compounded damages. Other vibrant airports will face difficulties as one support company is laid off for another as the new American consolidates its support services. In each of these airports, the ancillary airport service industry will take a significant hit and result in unemployment and regional displacements. Remember, the airlines are not the only part of the economy that may or may not suffer layoffs; there are strong ripple effects.

When no longer forced to compete for leisure and business travelers attending conventions and sales meetings, both airlines will be able to eliminate individual "spoke" flights to these airport in order to gain efficiencies. This will result in less service to these outlying airports.

**Consumer score: Negative—Consumers will have less choice**

*5. Consumers will lose one of the most competitive national legacy carriers*

US Airways has prided itself on low labor costs that have allowed it to compete successfully with larger rivals even while its service was via hubs that did not have high numbers of originating traffic. That labor advantage will evaporate when the merger is complete and prices will be forced to rise.

**Consumer Score: Negative consumers get less choice and less competition**

*6. Consumer harm in addition to increased airfares are the norm with recent mergers*

Post-merger system integration problems plagued the Delta/Northwest and the Continental/United mergers. While the airline management rakes in merger bonuses, consumers are the ones who bear the brunt of post-merger integration service problems. With prior mergers, these issues have created major problems for passengers. DOJ should analyze the performance of previous mergers, their post-merger problems and the erosion of consumer choice and competition.

The problems with integration of United Airlines and Continental has resulted in what Jim Compton, COO of United Continental Holdings, called a "dis-synergy."[5]

> United executives reiterated Thursday that not only did the merger bring higher cost and lower revenue in 2012, but also labor costs will rise in 2013 as a result of new contracts that resulted at least partially from the merger.
>
> On the United call on Thursday, CEO Jeff Smisek called 2012 "the toughest year of our merger integration" and said, "We are absolutely not satisfied with the financial results we produced last year."
>
> In its summer schedule, United sought for the first time to fully merge operations of the two airlines. Operational performance plummeted, reaching a low in July when the carrier's 64 percent on-time arrivals rate was the worst in the industry. Problems included the introduction of new fleet types in various stations, unaccompanied by the introduction of appropriate jet bridges; a series of computer glitches; and a reduction of the number of spare aircraft in the fleet. One result of the latter miscalculation: in the second week of July, 300 passengers were stranded in Shanghai for three days.

The Delta/Northwest merger also resulted in a similar "dis-synergy."[6]

> Delta, for instance, had the worst on-time record among major carriers in 2010. Delta shares, which traded near $11 when the merger was announced in April 2008, spent almost all of 2009 trading in the single-digits and fell as low as $3.51 in March 2009. Analysts kept saying, "They need more time."

Should this merger be approved, the exact same events will probably occur.

While the pain in past mergers may have been necessary to save the airline industry from devastating financial losses, there is no such condition now. In the case of this merger, there is no compelling national reason to merge—no airline is in danger of failing—but, there is a compelling case, according to both the CTA and GAO studies, to be made that competition will be lost.

**Consumer score: Negative—Coming reservation hassles are the norm. Every merger has had to deal with these problems. This merger will be no different. Airline consumers will suffer**

*7. Some hub cities may suffer as a result of mergers*

Past mergers have seen once-vibrant hubs disappear. St. Louis airport is a ghost town compared to when it was a hub for TWA. After American acquired TWA's assets in 2001, the merged airline's daily departures out of TWA's former hub in St. Louis plunged from nearly 500 down to just 36.

Reno, Nevada, was abandoned by American Airlines. Cincinnati has shut down several of its terminals because of cutbacks from Delta. Cleveland was forced to negotiate a separate agreement with Continental/United to keep its hub operating temporarily. And, only a few weeks ago Delta abandoned Memphis as a hub after vowing to maintain their post-merger-with-Northwest service.[7]

With this merger, Charlotte may lose much of its international service—Latin American service may shift to Miami and European service to JFK and Philadelphia.

On the other hand, Mr. Parker, the incoming CEO, is committed to cost savings that have, in part, resulted in Charlotte, NC, being the lowest-cost major airport in the Nation.[8] With Miami Airport rating as one of the more expensive airports in the country and one of the airports with the worst customs and border protection service, Charlotte may end up the winner. There are no promises either way.

Phoenix as a hub may disappear as Los Angeles and Dallas would absorb much of its traffic. It will still be an important airport for US Airways, but its service levels may dip below those of its main local competitor, Southwest Airlines, in the not-too-distant future.

This shift away from once-important hubs harms both small and large communities and citizen-funded airports, adds to unemployment woes and drains government funding. These are all possibilities of this merger with no compelling counter argument for the public good.

---

[5] CNBC Stock Blog, The Street, Friday, 25 Jan 2013
[6] *Ibid.*
[7] Fox News *http://www.foxnews.com/travel/2013/06/05/delta-air-lines-dropping-memphis-as-hub-airport-this-fall-will-cut-230-jobs/*
[8] *CharlotteObserver.com http://www.charlotteobserver.com/2013/04/05/3962857/study-costs-primary-driver-behind.html*

**Consumer score: Negative—This is what mergers are all about, squeezing synergies from the operating systems. In this case no public good is proffered to mitigate possible economic damages**

*8. The airline industry will enter the too-big-to-fail world*

With the airline industry consolidated to four domestic airlines and three international airlines, the specter of massive airlines that affect too much of our Nation's economy will come into focus.

This is a two-edged sword. The too-big-to-fail reality will also provide the unions negotiating with these big airlines more power with their ability to disrupt the national economy.

**Consumer score: Negative—Both big airlines and big unions can hold the economy hostage. With this development, all taxpayers will have to pay for a possible government bailout**

*9. A multiplication of labor issues and higher labor costs*

For more than half-a-decade, US Airways has operated with its labor force of pilots and flight attendants divided into the America West group and the US Airways side. Over the past few years, American Airlines has faced some of the most contentious labor strife of any airline. Putting these three competitive groups of workers together—former America West, former US Airways and American Airlines—will be a challenge to say the least.

Mr. Parker has already announced that new contracts with a unified workforce would increase the US Airways' costs and erode much of the airline's current cost advantage that has allowed the carrier to grow and profit. These additional costs can only be paid for with an increase in airfares and/or fees.

Though US Airways and American Airlines have announced that the merger has the support of their unions, that support is only skin deep and union peace only has been declared until the merger is consummated. (The inter-union ceasefire is fraying.)

- *Pilots:* The CTA has heard from USAPA pilots who have not agreed to the current Memorandum of Understanding signed by American Airlines pilots. Disagreements between pilots' unions are baked into the merger cake. As these hearings are being held, Mr. Parker has not been able to bring the pilots' union from American West under a common contract with pilots from the old US Airways. That American West/US Airways merger took place back in 2005, about 8 years ago. For Mr. Parker to declare union peace and agreement with the merger is only a partial truth as far as pilots are concerned.
- *Flight Attendants:* Only in the last few months have flight attendants from America West and US Airways agreed how to merge their seniority lists. The two, once-separate groups are only now getting comfortable (or uncomfortable) with the new contract. During a visit to Phoenix for US Airways Media Day, I had the opportunity to speak with many former America West flight attendants who are not happy with the new contract and doubtful about the merger. According to sources, there will be a battle between the much larger overall Association of Flight Attendants (AFA—representing US Airways) and the Association of Professional Flight Attendants (APFA—representing American Airlines).
  Ex-TWA flight attendants who were "stapled to the bottom of the American Airlines flight attendant seniority list" are fighting for their proper positions in the new American Airlines. Their original TWA dates of hire are still preserved by American Airlines. The computer can combine the names in 7 seconds.[9]
- *Machinists:* his union is in the midst of an open battle for representation between the Teamster Union and the Transport Workers Union.[10]

Bottom line: Union peace is far from certain. When there are poor management/union relations or union vs. union disruptions, consumers suffer. This latest survey of the American Customer Satisfaction ranked US Airways and American Airlines dead last among major airlines.[11] Notably, both of these airlines have the most union unrest among major airlines.

---

[9] See Appendix C
[10] Tompson Reuters May 5, 2013 *http://newsandinsight.thomsonreuters.com/Legal/News/2013/05_-_May/Teamsters_union_seeks_to_displace_union_at_American_Airlines/*
[11] American Customer Satisfaction Index™ *http://www.theacsi.org/?option=com_content&view=article&id=147&catid=14&Itemid=212&i=Airlines*

37

**Consumer score: Negative—Reducing the number of remaining carriers can only further aggravate the consequences to be felt by the public. Higher labor costs translate to more expensive airfares. Poor labor relations result in low customer service rankings**

**Conclusions**
- There is no need for this merger.
- There are no net benefits to consumers from this merger.
- The aviation system will dramatically lose competition.
- Airline service may be reduced at both hub and non-hub airports.
- Consumers will suffer during the merger process.
- Labor issues will continue to be a factor affecting customer service.

It is the role of Congress and DOJ to protect the American public from loss of competition. In the past that loss was mitigated by financial benefits to the airline systems and, thus, the economy and the public. This merger comes with no such apocalyptic backdrop and with no clear benefits to consumers.

The only clear and present result will be a loss of competition among the major airlines. That will not be good for the American public, American business and the American economic system.

**Consumer Travel Alliance**

The Consumer Travel Alliance (CTA) is a nonprofit, nonpartisan organization that works to provide consumers an articulate and reasoned voice in decisions that affect travel consumers across all of travel's spectrum. CTA's staff gathers facts, analyzes issues, and disseminates that information to the public, the travel industry, regulators and policy makers.

APPENDIX A

**Possible Competition and Free-Market Remedies**

With some substantive aviation policy changes such as these, consumers may receive something positive out of this transaction.
- Slot divestiture at DCA and LGA
- Airline ancillary fee transparency
- Cabotage, with Essential Air Service carve-outs
- Customer service improvements

*1. Divestiture of slots at slot-controlled airports.* Most of these divested slots should go to low-cost carriers and new entrants. Gates and counter space should be made available to airlines that choose to compete with the entrenched carriers at these slot-controlled airports. This will provide some semblance of new competition, especially at Washington, DC.

While US Airways and American Airlines argue that competition in the nation's capital region is strong with three airports—Dulles, Baltimore-Washington and Reagan-National—the new American Airlines will control 67 percent of the slots at DCA.

Representatives of the new American Airlines have been lobbying furiously on The Hill, warning many members that small communities may lose service to Ronald Reagan Washington National Airport (DCA) if slot controls are changed. However, that small-airport service can just as well feed into one of the other Washington-region airports. New rail connections and the bus/metro connections (as well as the coming extension of the DC Metro to Dulles) make reaching Baltimore Washington Marshall Airport (BWI) and Dulles International Airport (IAD) easier than ever.



Plus, their use of those slots shows a preponderance of smaller regional jets used in order to maintain their slot supremacy. A study prepared by Southwest Airlines notes that US Airways' aircraft size at DCA is smaller than any airline at any other U.S. hub.

Take-off and landing slots are a national resource that should be used efficiently. CTA has been arguing for better use of these slots since the deliberations over the slot swap between Delta and US Airways. A redistribution of these slots, resulting in a reduction of merged carrier's domination of DCA (to less than 50 percent of the operations), would serve the greater consumer good and instill competition into the DCA airport market.

Redistributing some of the smaller airport markets to either BWI or IAD will not be a major inconvenience to passengers and will allow more citizens to travel in and out of DCA.

At New York LaGuardia airport, this merger will result in 77 percent control of that airport by new American Airlines and Delta. No low-cost carriers will have more than five percent of the slots. An example of changes that come into effect when efficient low-costs carriers are allowed to compete with legacy carriers at airports formerly closed to them because of slot controls can be easily seen at Newark. When Southwest acquired divested slots at Newark Liberty Airport, Southwest airfares were reduced by 13 percent and passenger loads out of the airport increased by 36 percent, while other Newark fares rose 10 percent.

2. *Airlines must disclose all ancillary fees through all channels where they choose to sell airline tickets.* If competition is wrung out of the airline system through this merger, Congress can put competition back into the system by mandating that airlines disclose ancillary fees to travel agents so that passengers can easily comparison shop across airlines. Consumers should also be allowed to purchase any ancillary services and pay any ancillary fees at the time of booking either through airlines or travel agents.

It is about time that a family traveling can note that they are a four-member family that will be carrying on four bags, checking two bags and want to sit together in one row. Technology has already been demonstrated to the Advisory Committee for Aviation Consumer Protections last year that shows that the airfares plus ancillary fees can be compared easily. The only barrier to this kind of pricing transparency is the airlines' refusal to disclose their ancillary fee data in a dynamic way that can be used by travel agents.

The market system only thrives when prices are transparent and comparable across airlines. This is the only way that effective full price competition can flourish. Price competition becomes more important as the number of competing airlines is reduced.

Without full and dynamic extra fee disclosure, consumers have no hope of comparing all-in prices across airlines—prices that include airfare plus baggage and seat reservation fees. If all ancillary fees are fully disclosed in a dynamic fashion, software from third parties will eventually allow comparison of the full cost of travel

39

across airlines. Such a change would allow passengers to bundle their own airfare and compare prices before they purchase airfares.

Plus, passengers should be able to purchase airfares and any extra fees at any place that the airlines choose to sell airline tickets. This stops the present airline practice that forces passengers who buy airline tickets from travel agents to later purchase extra services directly from the airlines.

*3. Congress should review the ban on allowing foreign carriers to serve domestic routes.* As the domestic line-up of carriers shrinks and as domestic carriers abandon smaller airports, foreign carriers could offer service to smaller airports as a way to guarantee essential air services.

When a consolidated airline industry does not provide competition, new competition may need to be injected into the model. Plus, foreign competition can be used to create service to essential air service (EAS) airports in return for access to more lucrative routes. More than likely, U.S.-based regional airlines will serve the EAS airports, which will add revenues for the domestic airline industry.

This could be a win-win-win-win proposition. Such a system would allow small regional airports to benefit; taxpayers would save some EAS subsidies; regional airlines will most likely provide the service and will benefit; and competition will be put back into our domestic market that will help the traveling public.

*4. Customer service improvements*

- *Implement minimum seat width and legroom standards.* Even dogs are protected by humane minimum-space rules. It is time that airlines declare some sort of minimum pitch and width for airline seats.
- *Add customer commitments to the airline contract of carriage.* Passengers today have no contract with airlines that control how they are treated as customers. Airline-created customer service obligations dealing with airfares, flight delays, cancellations, lost baggage, bumping, etc., should be legally enforceable. Airlines already enjoy Federal preemption. Consumers should be provided an enforceable contract of carriage.
- *Adopt a "plain English" and standard contract of carriage.* Consumers have a right to have contract terms clearly stated and understandable.
- *Provide passengers clear customer service contact phone numbers.* Passengers deserve the ability to call, in real time, a customer-service number or reach an airline representative using their electronic device should they be faced with problems during their travels. This need for real-time customer service becomes more important when airline itineraries cross domestic and international airlines due to code-share and airline-alliance arrangements. This phone number should be staffed with personnel who can solve problems and assist consumers with issues while traveling with airlines and their partners.
- *Clearly and conspicuously display consumer service rules at all airline gates and baggage claim areas.* Airlines should be required to inform passengers of their rights and the airline customer service commitments prominently at airport check-in areas, boarding gates and baggage carousels.

The E.U. has created posters that can be seen displayed at airports across the union. These humorous posters have a basic message: "You have rights." They have been produced for the past five years and their display is voluntary. Here in the USA, airports have been reluctant to display such public information posters for fear of upsetting the airlines. There should be some kind of mandated display of customer service information other than forcing consumers to request a Contract of Carriage should they want to learn their rights.

Appendix B

**Consumer Travel Alliance Analysis of Competitive Market Overlap, American Airlines and US Airways**

**Methodology and Findings**
- Bureau of Transportation Statistics' Airline Origin and Destination Survey (DB1B) "Market" and "Coupon" data were imported using SAS and loaded to a SQL database without modification
- Records for carriers 'US' and 'AA' were selected into a working dataset (the "analysis" dataset) based on the following operational definitions:
- ○ Only records meeting the following criteria were included:
- § BulkFare = 0
- § No unreported or surface carriers in OpCarrierGroup
- § Maximum of two stops (equivalent to three point-to-point segments)

- Where Carrier defined as 'US':
  § Where no change in carrier occurs for the route (OPCarrierChange = 0):
  - Operating Carrier = 'US' or (Ticketing Carrier = 'US' and Operating Carrier in ('YX', 'ZW', 'YV', 'OO', 'EV', 'RP', '16', '17'))
  § Where two or more operating carriers were involved (OPCarrierChange = 1):
  - Ticketing Carrier = 'US'
  - All coupons in the itinerary had Operating Carrier in ('US', 'YX', 'ZW', 'YV', 'OO', 'EV', 'RP', '16', '17')
  ○ Where Carrier defined as 'AA':
  § Where no change in carrier occurs for the route (OPCarrierChange = 0):
  - Operating Carrier = 'US' or (Ticketing Carrier = 'US' and Operating Carrier in ('MQ', 'RP', 'OW'))
  § Where two or more operating carriers were involved (OPCarrierChange = 1):
  - Ticketing Carrier = 'AA'
  - All coupons in the itinerary had Operating Carrier in ('AA', 'MQ', 'RP', 'OW')
  - Passenger Counts were summed by carrier, origin, destination, and non-stop indicator
  ○ Only records where Passenger Count > = 15 (approximating 150 PAX, or 1 regional jet per month)
  ○ Where passenger count exceeded the cutoff in one direction but not in the other (primarily due to Passenger Counts only slightly above 15) then the remaining direction was removed from analysis
  - Total market share by TKCarrier-origin-destination was calculated from the base dataset
  ○ Market share limited to itineraries with a maximum of two stops
  ○ Market share calculation limited to market-carriers having Passenger Count >= 15
  - Total market share by OPCarrier-origin-destination was calculated from the base dataset
  ○ Market share limited to itineraries with a maximum of two stops
  ○ Market share calculation limited to market-carriers having Passenger Count >= 15
  - The Analysis dataset was then limited to contain only markets where either U.S. or AA has 5 percent or greater ticketing or operating market share, based on total passenger counts (non-stop plus connecting.)
  ○ A number of cases exist where one carrier serves a market primarily with non-stop flights, while the other carrier serves a market primarily with connecting flights, but also offers a limited number of direct flights. Based on the above definitions, these are classified as overlapping, non-stop markets, which number greater than the 12 markets where scheduled, direct flights overlap.
  ○ Additional cases exist where BTS market data may not delineate between non-stop and direct flights. For example, U.S. offers a direct flight from BWI to DFW that stops, but does not deplane, in PIT. These may appear as non-stop flights in the BTS dataset, and are also classified as overlapping, non-stop markets based on the above definitions.
  - The cleansed "Analysis" dataset was then used to produce a cross-tab of overlapping and non-overlapping markets by non-stop/connecting indicator, displayed in Table 1.

41

Table 1.—Non-stop and connecting market overlap for U.S. and AA

| Market Overlap | Non-stop Markets | Connecting Markets | Total Markets |
|---|---|---|---|
| 1) AA-only | 322 | 1,943 | 2,265 |
| 2) US-only | 350 | 2,560 | 2,910 |
| 3) Competitive | 49* | 761 | 810 |
| * Competitive, non-stop markets include those where competition is predominantly direct versus connecting, but where BTS data report both carriers offering non-negligible direct service. | | | |

APPENDIX C

**The TWA Flight Attendant Conundrum**

TWA flight attendants should be provided seniority status that corresponds with the same standard agreed upon by the two representing unions at American Airlines and US Airways. That "fair and equitable" standard should reflect each flight attendant's actual date of hire seniority.

Current Federal law (McCaskill-Bond) requires that the two unions try to resolve the integration of their seniority lists. Whatever standard is agreed upon should apply across the board to every member of the bargaining unit to avoid compounding previous problems and inviting litigation that will delay the merger.

There are about 950 TWA flight attendants remaining who have never received any seniority integration into the system seniority list and who will be further permanently damaged unless a single standard is required. This can easily be accomplished because the company offered a buyout that 2,250 flight attendants accepted and there is no harm in slotting in the remaining 950 with their earned date of hire, not their acquisition date of the last merger in 2001. Congress should require this as a remedy under the spirit of McCaskill-Bond because the former TWA flight attendants cannot arbitrate against their own union.

The President of the Association of Professional Flight Attendants publicly admitted in an interview with the Fort Worth Star Telegram Editorial Board that the APFA 'screwed up big time' and made a 'mistake' in stapling the former TWA flight attendants to the bottom of the list in 2001. Now is the time to correct this admitted injustice.[12]

Senator CANTWELL. Thank you, Mr. Leocha.

I am going to start with you, Ms. Kurland, on this issue of slots. Do you know if—how DOT arrived at their conclusion about the previous US Air-Delta merger that they could own 55 percent—I think it is 55.6 percent—of the slots they raked in after their swap with Delta? And did under that—answer that question first. Sorry.

Ms. KURLAND. Yes, under the slot swap transaction that was proposed to us by Delta and US Airways, we took a careful look at what the outcomes would be both at LaGuardia and at DCA. And in doing an analysis we came up with the conclusion that it would be appropriate for US Airways and Delta to divest of a certain amount of slots. We put them up for auction, and they were obtained by Jet Blue at the time.

So at the time, we made the conclusion or we made the judgment that 55.6 percent—I believe that was the number—that it should not go higher at that time.

Senator CANTWELL. And did the Department of Justice at that time consider Dulles or Baltimore as substitutes for consumers, or was that separate?

Ms. KURLAND. We took a look at all three markets, and there is not perfect substitutability between all three markets. Different

---

[12] APFA website *http://www.apfa.org/content/view/2301/929/*