1                  UNITED STATES DISTRICT COURT

2                 DISTRICT OF MASSACHUSETTS (Boston)

3                              No. 1:23-cv-10511-WGY
                               Vol 1, Pages 1 - 64
4

5

6    UNITED STATES OF AMERICA, et al,
             Plaintiffs
7

8    vs.

9

10   JETBLUE AIRWAYS CORPORATION, et al,
             Defendants
11

12                        * * * * * * * * *

13

14                    For Bench Trial Before:
                      Judge William G. Young
15

16

17                 United States District Court
                   District of Massachusetts (Boston)
18                 One Courthouse Way
                   Boston, Massachusetts 02210
19                 Tuesday, October 31, 2023

20                        * * * * * * * *

21

22            REPORTER: RICHARD H. ROMANOW, RPR
                   Official Court Reporter
23              United States District Court
         One Courthouse Way, Room 5510, Boston, MA 02210
24                   rhrbulldog@aol.com

25

```
 1                 A P P E A R A N C E S

 2

 3   EDWARD WILLIAM DUFFY, ESQ.
     ARIANNA MARKEL, ESQ.
 4   AARON TEITELBAUM, ESQ.
         DOJ-Atr
 5       450 Fifth Street NW, Suite 8000
         Washington, DC 20530
 6       (202) 812-4723
         Email: Edward.duffy@usdoj.gov
 7   and
      WILLIAM T. MATLACK, ESQ.
 8       Attorney General's Office
         One Ashburton Place, 18th Floor
 9       Boston, MA 02108
         (617) 727-2200
10       Email: William.matlack@mass.gov
         For Plaintiffs United States of America and
11       The Commonwealth of Massachusetts

12

13    RYAN SHORES, ESQ.
         Cleary Gottlieb Steen & Hamilton LLP
14       2112 Pennsylvania Avenue, NW
         Washington, DC 20037
15       (202) 974-1876
         Email: Rshores@cgsh.com
16   and
      ELIZABETH M. WRIGHT, ESQ.
17       Cooley LLP
         500 Boylston Street
18       Boston, MA 02116-3736
         (617) 937-2349
19       Email: Ewright@cooley.com
     and
20    RACHEL MOSSMAN ZIEMINSKI, ESQ.
      MICHAEL MITCHELL, ESQ.
21       Shearman & Sterling LLP
         2601 Olive Street, 17th Floor
22       Dallas, TX 75201
         Email: Rachel.zieminski@shearman.com
23       For Defendant JetBlue Airways Corporation

24

25       (Continued.)
```

1      (Continued.)

2

3   JAY COHEN, ESQ.
    ANDREW C. FINCH, ESQ.
4      Paul, Weiss, Rifkind, Wharton & Garrison
       1285 Avenue of the Americas
5      New York, NY 10019-6064
       (212) 373-3000
6      Email: Jaycohen@paulweiss.com
       For Defendant Spirit Airlines, Inc.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    I N D E X

2

3    OPENING STATEMENT BY MS. MARKEL................    6

4    OPENING STATEMENT BY MR. MATLACK..............   28

5    OPENING STATEMENT BY MR. SHORES...............   33

6    OPENING STATEMENT BY MR. COHEN................   54

7

8

9                    E X H I B I T S

10                    (None marked.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1              P R O C E E D I N G S
2         (Begins, 9:00 a.m.)
3         THE CLERK:  Civil Matter 23-10511, the United
4    States of America, et al versus JetBlue, et al.
5         THE COURT:  Good morning.
6         MS. MARKEL:  Good morning, your Honor.
7         THE COURT:  Ms. Markel, you may proceed.
8         MR. DUFFY:  And, your Honor, before we get
9    started, just three quick preliminary things.  We have
10   provided the list of counsel who would be --
11        THE COURT:  I appreciate it.  I see it.
12        MR. DUFFY:  And then the parties did agree to the
13   preadmission of certain other exhibits and I can provide
14   that to the Court Reporter and to Ms. Gaudet in a
15   moment.
16        And then also the parties agreed last night,
17   recognizing each side has certain objections and in some
18   cases in-limine to material in opening, we agreed not to
19   object to any of those materials during the opening, but
20   recognize that either side is waiving their ability to
21   object by not raising the objection during the opening.
22        THE COURT:  That's acceptable.
23        Ms. Markel.
24        MS. MARKEL:  Good morning, your Honor.  My name is
25   Ariana Markel and I, along with my colleague, represent
```

1    the United States.

2

3    OPENING STATEMENT BY MS. MARKEL:

4         Air travel today forges connection and opportunity

5    in nearly every corner of the American economy.  The

6    ability to fly connects people to their families.  It

7    helps small businesses grow.  It allows Americans to

8    come together in times of crisis or celebration.  And

9    that's why air travel is an essential part of our lives.

10   And why we're here today.

11        The defendants had inked a nearly $4 billion deal,

12   a deal they negotiated as competitors, but that would

13   lead them as a single firm.  At its core this case is

14   about JetBlue eliminating Spirit, its fastest-growing,

15   low-cost, low-fair competitor in the United States.  If

16   that were to happen, JetBlue's own analysis of the deal

17   shows that it would reduce the number of seats, reduce

18   choice, and raise fares for millions of Americans.  In

19   short, JetBlue is counting on the fact that eliminating

20   Spirit and the competition Spirit provides will allow

21   JetBlue to increase fares.  That is real harm to real

22   people.

23        With Spirit out of the way, JetBlue intends to use

24   Spirit's claim to make what they call a "bigger

25   turbocharged JetBlue," but bigger isn't always better.

1    The evidence will show that this bigger JetBlue might be

2    better for JetBlue's bottom line, but it isn't better

3    for consumers or better for competition.

4         Now what would this bigger JetBlue actually look

5    like?  Well defendants' own documents will show that a

6    bigger JetBlue means fewer planes, fewer seats, and

7    higher fares.  JetBlue itself projects that fares will

8    increase by 30 percent after Spirit exits.  30 percent.

9    JetBlue based this estimate on how airlines have

10   responded to Spirit's exiting routes in the past.  And

11   JetBlue presented the results of this analysis that

12   increased fares would increase revenue to the board as

13   justification for the deal.

14        A bigger JetBlue also means that consumers lose

15   the choices that Spirit's business model has empowered

16   them with.  They won't have the option to choose

17   Spirit's low fares.  They'll also can't choose Spirit's

18   innovative a la carte pricing structure, which gives

19   customers the freedom to decide what features they want

20   to pay for on a flight, and just as important, what

21   features they don't.

22        And, sorry, your Honor, may we publish our slides

23   for the Court?  It doesn't appear that they're on.  (On

24   screen.)  There we go.

25        MR. DUFFY:  And if we may also, there's a binder

1     that, um, if we can approach, for the Court as well.

2          THE COURT:  If you're dealing with me, a binder is

3     always preferable to slides.

4          MS. MARKEL:  And a bigger JetBlue would also leave

5     some Spirit passengers truly stranded.  The Court will

6     see evidence that JetBlue was intending for a bigger

7     JetBlue to stop serving some routes that Spirit flies

8     today.  And even for the routes that remain, higher

9     fares will mean that some people won't be able to afford

10    to fly at all.

11        The loss of Spirit's low fares would be

12    devastating for many people.  A difference of $20 or $50

13    for a plane ticket matters to all of us, but it is

14    critical for some of us.  For a family of four, a $50

15    increase per person each way would cost that family an

16    extra $400 to fly round trip.  These costs have real

17    impact, whether it is fewer trips to visit family and

18    friends or fewer small businesses able to send their

19    employees out on the road.

20        As a Spirit Senior Executive testified to

21    Congress, Spirit may not be for everyone, but Spirit

22    offers a low-priced reliable service to those who may

23    have no other option.  And with the strong discipline

24    that Spirit endured from the prices charged by other

25    airlines, which is known as the "Spirit effect," Spirit

1    helps drive savings for all travelers, whether they fly

2    Spirit or not.  This case is also remarkable in that the

3    Court will see exactly what JetBlue and Spirit thought

4    about this deal as it was being negotiated.

5         Just last year Spirit told its shareholders, the

6    SEC, and the American public, that a JetBlue/Spirit

7    combination would be bad for consumers and bad for

8    competition.  Was this just bravado from Spirit?  No.

9    Spirit's views were directly linked to JetBlue's own

10   plans for what a bigger JetBlue would look like.

11   Spirit's assessment back then, before it had an

12   incentive to sell this deal to this Court, was clear-

13   eyed, and it was right.

14        Over the next few weeks the Court will see and

15   hear a lot of evidence which on balance will point in

16   one direction.  As the evidence will show, the loss of

17   Spirit would result in roughly a billion dollars of net

18   harm year after year from millions of passengers who fly

19   on over 100 routes throughout the country.  That is why

20   the United States and the Attorneys General of

21   Massachusetts, D.C., California, Maryland, New Jersey,

22   New York, and North Carolina, brought this case.  We did

23   this because, as Spirit itself has said, this deal is

24   exactly what the antitrust laws were designed to

25   prevent.

1          Our complaint alleges that the proposed

2     acquisition violates Section 7 of the Clayton Act and

3     therefore should be enjoined.  Mindful that the Court

4     has our pretrial brief, I want to make three quick

5     points on Section 7 that are important to how the

6     evidence will be presented.

7          First, Section 7 is unique among other civil

8     causes of action because the statute, by its design, is

9     meant to be forward-looking.  Congress said "maybe," not

10    "will be."  This statutory design reflects the reality

11    that mergers and their associated harms necessarily

12    require peering into the future.  So if a merger poses a

13    reasonable probability of danger to competition, and

14    that can be just a threat to competition, it is in fact

15    illegal.

16         Second, Congress said in any line of commerce, in

17    any section of the country, that means in any relevant

18    market.  In other words, we only need to show that this

19    deal poses a threat to competition in any one relevant

20    market, not in every relevant market.

21         And third, the Supreme Court has held that mergers

22    that result in a significant concentration in any market

23    are presumed to be illegal.  The evidence will show that

24    there are dozens of those presumption markets here.

25         THE COURT:  Well what kind of presumption is it?

1     Because in the law we're using the word "presumption" to

2     convey two different things.

3          A traditional presumption, unless there's contrary

4     evidence, gets you from Point A to Point B, but a

5     traditional presumption, once there's contrary evidence,

6     disappears, it's the theorian bubble-bursting type of

7     presumption.  But, for instance, in patent law when they

8     talk about a "presumption," a patent is presumed to be

9     valid, the way the law is developed is entirely

10    different, it shifts the burden of proof to the other

11    side.

12          Which is it here?

13          MS. MARKEL:  Here, your Honor, a presumption is --

14    the presumption here means that it is enough for the

15    United States and the plaintiffs to meet its prima facie

16    case.

17          THE COURT:  Thank you.  Thank you.

18          MS. MARKEL:  The evidence will show that there are

19    dozens of those presumption markets here for which over

20    30 million passengers pay more than $6 billion to fly

21    each year.

22          But the evidence won't end there, your Honor.  The

23    evidence that this deal may harm competition goes well

24    beyond just market shares, that's because this deal

25    would extinguish meaningful head-to-head competition

1   between Spirit and JetBlue.  And with Spirit out of the

2   way, JetBlue has already told us that it will be able to

3   reduce capacity and increase fares.

4       Consumers will also be deprived of Spirit's

5   innovation, including Spirit's a la carte pricing model,

6   and there will be greater risk that airlines coordinate

7   on prices.  And that's why the dangers of the

8   defendants' proposed deal are in the heartland of what

9   the antitrust laws are designed to prevent.  So with

10  that let's start with some analytical framing, what are

11  the relevant markets here?

12      A "relevant market" means an area of effective

13  competition which includes both a product market and a

14  geographic market.  Market definition is a common sense

15  inquiry that asks how a Court should understand the

16  potential effects of a proposed deal from the

17  perspective of consumers.  Here the evidence will show

18  that the relevant markets are scheduled air passenger

19  service for origin and destination fares, in other words

20  air service on a specific route connecting two

21  metropolitan areas.  Let's take an example.  Boston to

22  San Juan is a relevant market and Boston to Las Vegas is

23  a separate relevant market.

24      Let's say a college student in Boston wants to

25  travel to San Juan to visit her parents.  A flight to

1    Las Vegas is not a substitute for that new Bostonian who

2    wants to visit her mom in San Juan.  This is also

3    consistent with how JetBlue and Spirit themselves make

4    pricing decisions.  As the evidence will show, they

5    price based on route-level of competition.

6         The relevant markets here fall within three

7    categories.  One, routes that both Spirit and JetBlue

8    fly or what the Court might hear witnesses refer to as

9    "overlap routes."  Two, nonstop routes that Spirit flies

10   today but JetBlue doesn't.  And three, new nonstop

11   routes that Spirit plans to fly soon.

12        Now defendants have already tried to muddy the

13   waters by suggesting about the relevant market the Court

14   should consider is a national market, but their position

15   is full of inconsistencies.

16        First, defendants' position is inconsistent with

17   their own prior statements.  They have admitted in other

18   cases, including in the ***Northeast Alliance*** trial just

19   last year, that origin and destination pairs are

20   relevant markets.  Second, defendants' theory is

21   inconsistent with their own experts who did not propose

22   a national market in his reports.  And third,

23   defendants' theory just does not square with common

24   sense, it does not square with how consumers make

25   purchasing decisions.

1        For instance, when your Honor sits by designation

2    in the District of Puerto Rico, a flight to anywhere

3    other than San Juan, no matter how much fancier that

4    experience is, isn't going to cut it.

5        Now I'm going to turn to what is at the core of

6    this case, that this deal would eliminate Spirit.  That

7    means the fierce head-to-head competition between Spirit

8    and JetBlue on over 100 routes would cease to exist.  On

9    these overlap routes, especially those to Florida, the

10   Caribbean, and Latin America, Spirit's value proposition

11   resonates with passengers.  Spirit has been growing and

12   JetBlue itself recognizes that Spirit's entry and growth

13   in those markets is a major threat to its business.

14   That's because when Spirit is in a market, JetBlue must

15   compete with what a JetBlue executive has described as

16   Spirit's "key weapon," Spirit's very low cost and the

17   very low fares that they enable.

18       As the Court will hear at trial, Spirit's costs

19   are lower than JetBlue, and that is a major reason why

20   Spirit's very low fares are on average lower than

21   JetBlue's, even when including ancillary fees.  So how

22   does Spirit keep its costs lower than JetBlue's?  There

23   are a few ways.

24       Spirit has higher utilization, which just means

25   more flights flying for longer hours.  Spirit also

1    accommodates more passengers per flight than JetBlue.

2    And you'll hear how JetBlue is further reducing the

3    number of passengers who can fly on its planes by

4    expanding it's luxury-mint cabin.

5          Another way that Spirit keeps its costs low is by

6    offering passengers its innovative unbundled fares.  A

7    Spirit passenger can choose to purchase or can choose

8    not to purchase WIFI, snacks, or extra leg room, but all

9    JetBlue passengers pay for those perks and more.

10         All the add-ons that JetBlue requires its

11   passengers to purchase with their ticket comes at a

12   cost, but at whose expense?  Passengers of a bigger

13   JetBlue may get more, but they won't get more for less,

14   they will get more for more.  So where would that lead

15   travelers who can't or don't want to pay more?

16         Nevertheless you'll hear JetBlue tout the "JetBlue

17   effect," which is that after JetBlue enters a market,

18   fares in that market decrease.  Now the "JetBlue effect"

19   is good for competition, but so too is the "Spirit

20   effect."  As the evidence will show, when Spirit enters

21   a market, even one where the JetBlue effect is at play,

22   fares in that market decrease by an average of about 20

23   percent.  And the inverse is true too.  When Spirit

24   exits a market, fares, including JetBlue's, increase.

25         The evidence will also show that this Spirit

1     effect is greater than the JetBlue effect.  That is why

2     Spirit told its investors just last year that it is

3     Spirit that continues to be a check on other airline

4     fares, including JetBlue's.  So what's better than

5     either the JetBlue effect or the Spirit effect?  Having

6     both in a market.

7          The Court should reject defendants' framing

8     otherwise.  The defendants want the Court to decide that

9     JetBlue is better than Spirit, but we think that it is

10    consumers who should decide that for themselves.  And as

11    you'll hear from plaintiffs' expert, each effect

12    actually complements the other.  Even defendants' expert

13    will agree with that.

14          Despite this JetBlue will suggest that having a

15    bigger JetBlue would somehow unlock the full potential

16    of the JetBlue effect and would allow it to better

17    compete against the legacies.  That may be effective

18    management consulting speak, but it's at odds with

19    common sense and what the evidence will show.

20          In a world without Spirit, Spirit's downward

21    pressure on airfare would completely disappear, that

22    means a bigger JetBlue with its higher costs would have

23    the rational economic incentive to raise fares.

24          THE COURT:  From your preparations for this trial,

25    is in your view -- is Spirit a viable economic model?  I

 1     mean can they go on doing this?

 2          MS. MARKEL:  Yes, your Honor, the evidence will

 3     show that Spirit has a viable economic model and that,

 4     um, Spirit's Chairman, just a few months ago, as of his

 5     deposition, stated that -- stated that he believed

 6     Spirit would continue to be profitable for the next five

 7     years and continues to hope -- hopes to continue

 8     competing.

 9          And JetBlue's own documents will show, first, that

10     JetBlue is planning to reduce capacity, and second, that

11     JetBlue is expecting that fares will increase.

12     JetBlue's own internal deal model will show that JetBlue

13     plans to remove 10 to 15 percent of seats from Spirit

14     aircraft by changing it to JetBlue's configuration.

15          For example, a Spirit A321 plane fits 228

16     passengers.  A JetBlue only fits up to 200 passengers on

17     that exact same plane.  And for JetBlue planes with the

18     fancy-mint seating, those flights can only seat 160

19     people, which is merely 70 passengers or 30 percent less

20     than Spirit.  Those are some of the people who would be

21     stranded.

22          And what does JetBlue's deal model say will happen

23     to fares after so many seats are removed?  Exactly what

24     you would expect, a 30 percent increase in average fares

25     on former Spirit routes charged by all remaining

1    airlines including JetBlue.  And for JetBlue fares are a

2    feature, not a bug of this deal.  Making more money from

3    increased fares factored into JetBlue's decision to

4    pursue the deal.  And what does JetBlue's model say

5    about passengers and markets that benefited from

6    Spirit's low fares?  That more than 12 percent of them

7    will no longer fly those routes.

8         And that's not all.  Not only does JetBlue plan to

9    have fewer seats on each plane, but you'll also hear

10   evidence that JetBlue intends to have fewer planes than

11   JetBlue and Spirit would have had as independent

12   competitors.  And you'll hear evidence that JetBlue has

13   already acted on that intention.

14        For example, you'll hear how in November of 2202,

15   after the merger agreement was signed but before this

16   Court will have ruled, Spirit asked JetBlue for its

17   consent to acquire additional planes.  But JetBlue said

18   no.  In other words, a bigger JetBlue would likely be a

19   smaller competitor than a standalone Spirit and a

20   standalone JetBlue.

21        Now I'd like to briefly turn to what we call the

22   coordinated effects from this deal, which is that this

23   deal also threatens competition because it increases the

24   risk that other airlines, including JetBlue, will

25   coordinate to achieve and maintain higher fares in the

1   relevant market.  As the evidence will show, this is an

2   industry that is already susceptible to price

3   coordination, that's because this industry is highly

4   consolidated, four airlines account for nearly 80

5   percent of scheduled air passenger service in the United

6   States.  JetBlue's acquisition of Spirit would just

7   continue that trend.

8         It's also because most airline fares are visible

9   to every other airline.  That transparency makes it

10  possible for airlines to see who's acting in the best

11  interests of the airlines as a group, meaning higher

12  prices for consumers.  It also means that the group can

13  quickly detect and punish a competitor who is offering

14  low fares.

15        Before as the evidence will show, Spirit does not

16  play that game, Spirit is a disrupter, and the evidence

17  will show that Spirit's pricing philosophy is that it is

18  under no obligation to follow the herd.  Spirit is

19  harder to punish because not all of its fares are

20  visible to other airlines.  And Spirit does not

21  concentrate routes out of a small number of hub

22  airports.

23        Spirit can also price for what is best for its

24  markets due to its low cost structure.  By contrast, a

25  bigger JetBlue would have more to gain by following the

1    herd and more to lose if another airline introduces low

2    fares in its key market.

3        So it's not just JetBlue though that has

4    recognized that this deal would result in fewer seats,

5    higher fares, and less choice, Spirit has too, which is

6    why Spirit opposed this deal just last year.  In a press

7    release to the world, Spirit recognized that converting

8    Spirit aircraft to JetBlue's configuration will result

9    in significantly-diminished capacity on former Spirit

10   routes, which would result in higher prices for

11   consumers.

12       Spirit also recognized that half the synergies

13   that JetBlue was contemplating were from reduced

14   capacity and increased fares.  And what are those

15   so-called "synergies"?  It is JetBlue's way of

16   describing the additional money it believes it will make

17   from the deal.

18       Spirit saw this deal for what it is.  Spirit

19   recognized that the reduced capacity and increased fares

20   resulting from this deal would harm millions of

21   passengers.  And as you'll hear in testimony, Spirit's

22   CEO publicly stated last year that taking seats out and

23   raising fares is not a proconsumer, procompetitive

24   argument.

25       So if Spirit's board and management opposed this

1  deal, why does Spirit ultimately agree to merge with

2  JetBlue a few months later in July of 2022?  Well

3  JetBlue went directly to Spirit's shareholders and

4  offered them more cash.  But what is good financially

5  for Spirit's shareholders is not necessarily good for

6  competition or for the American public.  Of course there

7  will also be a different story about defendants'

8  executives, who have strong financial and professional

9  interests to defend this deal, will deliver in this

10  courtroom.  But JetBlue and Spirit's contemporaneous

11  documents already tell the Court what it needs to know.

12      Now defendants may attempt a few different ways to

13  justify their illegal merger, but none would eliminate

14  the danger that this deal poses to competition.

15  Defendants may first try to argue that other low-cost

16  carriers, like Frontier, Allegiant, or Avelo, will be

17  able to enter former Spirit routes and make up for that

18  lost Spirit competition.  But the evidence will show

19  that it is unlikely that other ULCCs would even want to

20  replace Spirit, and even if they did want to, they

21  couldn't.

22      For some ULCCs, replacing the lost competition on

23  former Spirit routes would go against their own business

24  strategies.  Spirit is not afraid to compete against

25  legacies, but that's not true for many other ULCCs.  For

1    instance, you'll hear from another ULCC that one of the

2    pillars of its business strategy is flying routes that

3    have little competition.  And Spirit, unlike other --

4         THE COURT:  That's Allegiant, right?

5         MS. MARKEL:  That is, your Honor, yes.

6         And Spirit, unlike many other ULCCs, provide

7    international service to Latin America, the Caribbean,

8    and South America.  Defendants have no answer for how

9    the harm to these international markets will be offset.

10   They have no answer for those passengers in Fort

11   Lauderdale who will be stranded.

12        You will also hear from executives at some of

13   these other ULCCs that they face significant growth

14   constraints, such as aircraft delivery delays, engine

15   issues, and pilot shortages, and you'll hear from one of

16   plaintiff's experts that these other ULCCs do not have

17   sufficient scale to replace Spirit even if they wanted

18   today.

19        Spirit accounts for almost half --

20        THE COURT:  Just what does that mean, they don't

21   have sufficient scale?  If Spirit's gone, I would

22   imagine there's a vacuum.

23        THE COURT:  Well Spirit accounts for about half of

24   the ULCC capacity, so that means the remaining ULCCs

25   would collectively have to double in size to replace

1   Spirit, which is must faster growth than they had been

2   able to achieve or expecting to achieve.  So the ULCC

3   story isn't going to work.  What will defendants try

4   next?

5        Well they may try to patch over the many problems

6   with their entry story by trying to show that their

7   proposed divestitures to Frontier and Allegiant would

8   allow those ULCCs to step into Spirit's shoes.  To

9   provide air passenger service at an airport, an airline

10  must secure the rights to use gates, and at some

11  extremely busy airports, the rights to take off and land

12  as well.  Those take-off and landing rights are called

13  "slots" in the industry.

14       Defendants hope to divest some of their gates and

15  some of their slots to Allegiant in Boston, New York,

16  and Fort Lauderdale, they also hope to divest some

17  assets to Frontier at La Guardia Airport in New York

18  City.  The defendants are not even proposing to sell all

19  of their gates or slots at those airports and they are

20  not going to able to show that these partial

21  divestitures will fix the competition problems from this

22  deal.

23       As an initial matter these partial divestitures

24  are far from certain.  The evidence will show that these

25  divestitures need to be approved by several different

1      government agencies.  And it's not certain whether the

2      divestitures will go to other ULCCs or other airlines.

3           Also some of the assets that JetBlue is trying to

4      divest are not even JetBlue's to give.  Defendants won't

5      be able to resolve these uncertainties, but even if they

6      could, these partial divestitures will still be plagued

7      by other fatal flaws.  What will Allegiant and Frontier

8      actually do with their engagement slots?  Will they fly

9      the routes that Spirit flies today?  They don't have to.

10     And there is no reason to believe that they will.

11          Let's take Fort Lauderdale as an example.  What

12     you're looking at here, your Honor, is a map of the

13     United States with Spirit's nonstop routes from Fort

14     Lauderdale depicted in yellow.  As you can see, Spirit

15     flies to dozens of destinations from Fort Lauderdale.

16          Now JetBlue has proclaimed that Allegiant will be

17     the divestiture buyer of some assets in Fort Lauderdale,

18     but the evidence will show that airport authorities, not

19     JetBlue, decide who gets these assets.  And even so,

20     Allegiant does not fly international routes.

21          So now on this same chart you'll see Allegiant's

22     nonstop routes from Fort Lauderdale depicted in blue.

23     As you'll hear at trial, Allegiant purposely shies away

24     from competition, they seek out routes to smaller cities

25     and smaller airports like Des Moines and Northwest

1   Arkansas.  There is no reason to think Allegiant will

2   step into Spirit's shoes and start challenging the

3   legacy airlines on routes to Boston or other major

4   cities.

5         Nor will the divestitures magically give Allegiant

6   scale.  They don't provide Allegiant with planes,

7   engines, pilots, or any of other things that it needs to

8   organically grow.  Does this look like a buyer that can

9   replicate Spirit?  So the prospect of entry will be

10   belied by the facts and the divestitures are definitely

11   not a cure.

12         What else will defendants try to argue?  Will the

13   third try be the charm?  Well defendants will likely

14   double-down on size.  They may try to put on evidence

15   that bigger is indeed better.  But the evidence will

16   show that JetBlue is not actually planning to be bigger

17   than a standalone Spirit and a standalone JetBlue would

18   be.  And a bigger JetBlue would not be better for

19   consumers or better for competition, it would result in

20   fewer seats, higher fares, and fewer choices.

21         The bottom line is if a bigger JetBlue were a

22   better competitor, if entry were realistic, if their

23   partial divestitures were likely to work, why then is

24   JetBlue still today modeling a 30 percent increase in

25   fares once Spirit is gone?  And why then is JetBlue

1    still today assuming that more than 12 percent of

2    passengers will no longer fly those routes?

3         In just a few minutes defendants are also going to

4    stand up and try to make hay about Spirit's recent

5    financial performance.  It's hardly surprising that the

6    last 3 to 4 years have presented unprecedented

7    challenges to Spirit and others, including JetBlue.  Two

8    things that the evidence will show are, one, these are

9    not challenges that are unique to Spirit, a global

10   pandemic, supply chain issues, pilot shortages, and

11   engine issues, have plagued the entire industry.  And,

12   two, despite these challenges, Spirit has not abandoned

13   its business model, if anything Spirit has leaned in.

14   You'll hear evidence from Spirit's Chairman that Spirit

15   has a healthy standalone plan and expects to be

16   profitable.  And most importantly, that Spirit expects

17   to continue competing over the next five years.

18        And finally, our expert's models and analyses will

19   support and confirm what the Court will see in the

20   documents.  At a minimum the net harm from eliminating

21   Spirit as a competitor would be roughly a billion

22   dollars annually across over 100 relevant markets, and

23   it may be much more than that.  That billion dollars of

24   harm takes into account two of the ways that consumers

25   are harmed, it takes into account the loss of Spirit's

1    own low fares and it also takes into account the loss of

2    the Spirit effect on other airline fares including

3    JetBlue.

4         And who will feel this harm the most?  Well, one,

5    cost-conscious passengers, many of whom will have no

6    other choice but to fly less often or to not fly at all.

7    And, two, passengers who fly on the 50-or-so nonstop

8    overlap routes where JetBlue and Spirit's combined

9    market share is so high that the deal is presumptively

10   illegal.

11        While 50 routes may not be a big deal to the

12   defendant, those 50 routes are a big deal to the over 30

13   million passengers who pay more than $6 billion to fly

14   those routes each year.  And plaintiff's expert will

15   confirm that the harm to that subset of passengers is

16   significant, conservatively estimating it at roughly

17   $500 million per year.  That's half a billion dollars

18   every year for consumers on those 50-or-so routes.

19        This deal would cause harm felt by real people and

20   real wallets and in their very real choices about how to

21   allocate limited financial resources.  All of this is

22   why this threat to competition is illegal under the

23   Clayton Act.

24        The evidence at trial will demonstrate that

25   eliminating Spirit may help JetBlue and it may help the

1    legacy airlines, but it would harm consumers in real and

2    material ways.  That harm, less capacity, higher fares,

3    fewer choices, and less access to air travel, lies at

4    the heart of what our antitrust laws require the United

5    States and our state partners to vindicate.  And that is

6    why at the conclusion of the evidence we will ask the

7    Court to find that the defendants' proposed acquisition

8    violates Section 7 of the Clayton Act and should be

9    enjoined.

10          And now Will Matlack will speak briefly for the

11   state plaintiffs.  Thank you, your Honor.

12          THE COURT:  Thank you.

13          Mr. Matlack.

14

15   OPENING STATEMENT BY MR. MATLACK:

16          Good morning, your Honor.  I'm William Matlack for

17   the Commonwealth of Massachusetts, I'm Chief of the

18   Antitrust Division at the Massachusetts Office of the

19   Attorney General.  I'm also speaking today on behalf of

20   the rest of the government's plaintiffs, in the east,

21   the states of New York, New Jersey, Maryland, North

22   Carolina, and the District of Columbia, and on the West

23   Coast, the State of California.

24          I'd like to tell you why we are here together with

25   our Department of Justice colleagues.  We're here and

1    our Attorneys General filed this case with the United

2    States because the evidence you will hear includes harm

3    that directly impacts the people of our respective

4    states and districts and particularly harms the most

5    financially vulnerable of the people we are here to

6    represent.  I will highlight some of that evidence most

7    relevant to the 7 state and district plaintiffs which

8    together make up more than 92 million people.

9            Speaking for Massachusetts, the evidence will show

10   that JetBlue's proposed acquisition of Spirit eliminates

11   head-to-head competition between JetBlue and Spirit on 7

12   nonstop routes that fly in and out of Boston, Logan

13   Airport.  As Ms. Markel just told you, the evidence will

14   show that this is presumptively anticompetitive under

15   the merger guidelines because of the high-market share

16   the merger would create on those routes.  The evidence

17   will also show that the loss of competition caused by

18   this acquisition would increase prices resulting in harm

19   to Massachusetts residents and others flying those

20   routes totaling more than $80 million per year.  We who

21   live here know how critical affordable air travel from

22   Logan Airport is for the people of Massachusetts and

23   their families.  It's even more critical for the less

24   advantaged among our Massachusetts residents.

25           If this opposition goes forward, Spirit, with its

1    very low prices, will simply disappear from the market.

2    This means not only will Spirit stop forcing JetBlue and

3    the other airlines to lower prices to compete, but the

4    loss of Spirit's very-low-cost air travel will mean that

5    some Massachusetts consumers will not be able to fly at

6    all.  That anticompetitive harm falls on those least

7    able to bare it.

8         For example, the loss of competition on the route

9    between Boston and Orlando, Florida would increase

10   JetBlue's market share to 57 percent and increase cost

11   to consumers flying that route by over $20 million a

12   year.  Similarly, post-acquisition on the Boston to San

13   Juan Puerto Rico route, JetBlue's market share jumps to

14   88 percent and our Massachusetts consumers and others

15   would pay an extra $8 million a year to fly that route,

16   or some wouldn't pay because they can't afford the

17   higher fare.

18        But these harms obviously don't just impact

19   Massachusetts.  My co-plaintiffs from the other six

20   states and districts are here because this acquisition

21   would harm their people too.  For example, you will hear

22   that the loss of competition on the route between the

23   Greater New York and New Jersey airports and Orlando

24   Florida will cost consumers flying that route $55

25   million a year, and that the defendants would hold 46

1   percent of that market.  The flight from the New York

2   area airports to Miami Florida would go up in price even

3   more.  You will hear that the increased prices will lead

4   to more than $90 million per year in consumer harms for

5   flights on this route if JetBlue takes out Spirit as a

6   competitor.

7        The Washington D.C. area to San Juan Puerto Rico

8   route is similar.  JetBlue and Spirit together hold 50

9   percent of that market.  If they stop competing and

10  undercutting each other on price, consumers from

11  Washington D.C., Maryland, and others will pay more than

12  $6 million a year in higher prices.  In total, for

13  direct routes flying in or out of the Greater Washington

14  D.C. area that are presumed to be anticompetitive,

15  consumers will pay more than $30 million a year in

16  higher costs.

17       You will hear the same kind of harm impacts

18  California.  Consumers flying on the Los Angeles to

19  Miami route will pay $31 million per year in higher

20  costs on that route alone.  In total, on direct routes

21  in and out of Los Angeles, the loss of competition

22  caused by the deal will increase costs to travelers on

23  those routes by more than $70 million a year.

24       Finally, North Carolina would be harmed by the

25  loss of competition between the defendants.  The

1    consumers flying in or out of Raleigh Durham Airport, on

2    nonstop routes they will pay more than $9 million per

3    year if this merger goes forward.

4          Your Honor, the evidence will show that JetBlue's

5    proposed acquisition of Spirit will increase prices and

6    cost the people of our states and the District of

7    Columbia hundreds of millions of dollars per year.

8          THE COURT:  5 more minutes, Mr. Matlack.

9          MR. MATLACK:  I don't need 5.

10         THE COURT:  Fine.

11         MR. MATLACK:  It will also show that the merger

12   will dramatically reduce competition by taking Spirit

13   out of the picture as an aggressive competitor that

14   holds JetBlue's and the other airlines' feet to the fire

15   to provide lower prices.  This harm impacts specific

16   routes touching much of the country, but it particularly

17   impacts the people of each of our respective states or

18   districts.  And that impact is most acute for the people

19   we are here to represent who are least able to afford

20   it.

21         And that's why we're here, your Honor, to work

22   with our Department of Justice colleagues to present

23   this evidence to you, and that is why we will also ask

24   this Court to enjoin this transaction at the end of the

25   evidence.

1        Thank you.

2        THE COURT:  Thank you.

3        And now for JetBlue, Mr. Shores?

4        MR. SHORES:  Good morning, your Honor.  May I

5    approach with copies of our opening?

6        THE COURT:  You may.

7        (Hands.)

8        MR. SHORES:  Good morning, your Honor, Ryan

9    Shores, and I'm proud to represent JetBlue in this case

10   and may it please the Court.

11

12   OPENING STATEMENT BY MR. SHORES:

13       Your Honor, the government in this case has lost

14   the forest or the trees.  Although you would not know it

15   from the government's opening, this is a merger of just

16   the 6th and 7th largest U.S. airlines, which together

17   account for less than 8 percent of airline revenue in

18   this country.  This is the first time the government has

19   ever challenged in court on antitrust grounds a merger

20   of two airlines this small.  And the government's choice

21   to put a stake in the ground on this merger, after

22   blessing all the mergers leading to the dominant Big 4

23   airlines, is particularly misguided.

24       As the government itself touted in this very

25   courthouse just one year ago, JetBlue has been a

1    uniquely disruptive counterweight to the industry's
2    dominant airlines, and as a result of that it has saved
3    consumers billions of dollars.  With this merger JetBlue
4    will finally become a disrupter nationwide and the
5    consumer benefits will multiply.  Your Honor, let me
6    start with some fundamental industry facts that are not
7    reasonably in dispute.
8         First, there's no dispute that the airline
9    industry is controlled by four airlines, the three
10   legacy airlines, American, Delta, United, as well as
11   Southwest.  These are the airlines that you heard so
12   little about in the government's opening.
13        As you can see from this chart, your Honor, these
14   airlines account for 80 percent of the airline revenue
15   in this country, and without any irony the government's
16   counsel just noted that the small airlines are
17   struggling in a post-covid world while these airlines
18   are thriving.  As I mentioned before, the merging
19   parties here, JetBlue and Spirit, account for less than
20   8 percent of revenue.
21        Second, there's no dispute that this industry's
22   status quo, that the stark division between the airlines
23   haves and have nots is bad for competition and it's bad
24   for consumers.  As the government again said in this
25   courthouse in the **Northeast Alliance** case last year, the

1    legacy airlines in particular have immense power and

2    they use that power to thwart competition from smaller

3    airlines and charge the highest prices to consumers.

4        As the evidence will show, the immense power of

5    these legacy airlines starts with their massive fleets.

6    And let me just give some perspective on this, your

7    Honor.  JetBlue has 294 planes in its fleet.  In 2022,

8    each of the three legacies had over 1250 individually

9    and over 4,000 collectively.  With those fleets the

10   legacies have established airline networks that blanket

11   this country, and with their massive airline partners,

12   the entire world.

13       These legacy airlines, not Spirit, are by far

14   JetBlue's largest competitors.  The government's opening

15   contains a slide with a document that says "Spirit is

16   our main competitor" and it says "66 overlap routes."

17   But what the government did not tell you is that Spirit

18   accounts for a small fraction of the overall competition

19   on the routes that JetBlue flies.

20       This next chart, your Honor, shows the percentage

21   of revenue accounted for by JetBlue and its competitors

22   on the routes that JetBlue flies.  This is from 2022.

23       (On screen.)

24       As you can see, your Honor, Delta, American, and

25   United account for most of the revenue on the routes

1   flown by JetBlue.  Southwest is fourth.  Spirit accounts

2   for less than 4 percent of the revenue on JetBlue

3   routes.  Even Alaskan, an airline that predominantly

4   operates out of the West Coast, has a larger share of

5   revenues on JetBlue routes than Spirit does.

6       Now that puts in context, your Honor, the curated

7   set of documents the government will feature in this

8   case about competition between JetBlue and Spirit pulled

9   from about the 3.5 million that we produced to the

10  government in this case.  When the government offers

11  these documents, it's important to keep in mind what it

12  is not showing, the many many thousands of documents

13  related to over 90 percent of JetBlue's competition.

14      Now at least until this case, your Honor, there

15  was something else the parties agreed on, and that's

16  that one airline is a uniquely disciplining force and

17  counterweight for the legacy airlines and their higher

18  prices, that airline is JetBlue.

19      Less than 12 months ago in this same court some of

20  these same lawyers from the government told Judge

21  Sorokin that he should adopt as fact that JetBlue is a

22  unique low-cost airline, that JetBlue has differentiated

23  itself from other low-cost airlines by offering not only

24  low fares but also high-quality service, that JetBlue's

25  high quality of service allowed it to compete

1    effectively against the legacy airlines in ways that

2    other LCCs, like Southwest, and ULCCs, like Spirit,

3    cannot.  I could go on, your Honor, with all the

4    admissions made by the government.  But as is clear from

5    the position the government took in this courthouse a

6    year ago, JetBlue is a unique disrupter, more than

7    Spirit, more than any other low-cost airline, and the

8    result of that is the government has admitted this

9    billions of dollars of savings for consumers.

10           THE COURT:  Is that a defense here?

11           MR. SHORES:  It absolutely is a defense here, your

12   Honor.  One of the benefits that we will show from this

13   merger is that JetBlue spreads to new routes throughout

14   this country.  And I'll show you JetBlue's network in

15   just a second.  It's very limited.  But as it spreads to

16   new routes throughout the country, the very billions of

17   dollars that they've admitted JetBlue has saved

18   customers will move to those new geographies as well.

19   So it's absolutely a defense here, your Honor.

20           Now what is the high quality of JetBlue's service

21   that the government celebrated in the NEA case?  As

22   everyone who flies knows, airlines have crammed

23   customers into ever-shrinking spaces on airplanes, but

24   JetBlue has bucked this trend with the most leg room

25   across seat classes of any airline, economy and premium.

1          As this slide shows, in the core of its cabin,

2     JetBlue has an average 32-inch pitch, which is the most

3     of any airplane.  Spirit has an average of 28 inches, 4

4     inches less than JetBlue and the lowest in the industry.

5          In addition, JetBlue offers free WIFI, free brand

6     name snacks and drinks, free seat-back entertainment,

7     and an outlet to charge your phone.  Some of JetBlue's

8     legacy rivals offer some of these features, in fact

9     they've often mimicked JetBlue, but none offer anything

10    close to the entire customer service experience offered

11    by JetBlue.

12          And what about Spirit, your Honor?  On Spirit you

13    get none of these features, even the water is not free.

14          Now despite recently promoting JetBlue's higher

15    quality and greater leg room in this court last year,

16    the government now tries to recast those very same

17    quality features as part of its consumer harm story.

18    For example, you just heard several times about

19    JetBlue's plans to retrofit Spirit's planes to remove

20    seats in order to provide more leg room to consumers

21    under the JetBlue consumer friendly model, and that is

22    exactly what we intend to do, your Honor, adopt and

23    expand our consumer friendly model.

24          But JetBlue's unique quality is not harm, it's a

25    key reason why JetBlue is able to disrupt its larger

1    competitors in bringing credible consumer benefits.  In

2    fact JetBlue's competitive impact is so pronounced that

3    it's earned its own name called the "JetBlue effect."

4    As the Court will learn during this trial, the "JetBlue

5    effect" is a term coined by MIT researchers and it

6    reflects the undisputed economic reality that when

7    JetBlue enters new routes prices drop dramatically and

8    more people fly as a result.

9         And importantly, your Honor, you do not have to be

10    a JetBlue customer to benefit from the JetBlue effect,

11    the power of the JetBlue effect is it forces other

12    airlines, particularly the legacy airlines, to respond,

13    lower their prices, improve their quality, in order to

14    avoid losing customers to a lower-priced higher-quality

15    JetBlue.

16         Your Honor, although I wish I could take credit

17    for it, this was the government's own opening slide in

18    the *Northeast Alliance* case delivered just last year.

19    As the Court will hear in this case, Boston is a JetBlue

20    focus state.  As JetBlue has entered routes from Boston

21    to cities ranging from Cleveland, to Detroit, to D.C,

22    fares have dropped dramatically, in some cases by around

23    half.  As a result, in Boston alone, as the government

24    celebrated last year, JetBlue has saved customers over

25    $3 billion just through 2019.  Many more people have

1    also flown, taken advantage of those lower prices.

2         Now the government just touted its new favorite,

3    "Spirit effect."  We don't deny, your Honor, that Spirit

4    has some effects on prices, all competition does, but

5    JetBlue's competitive impact on the dominant legacy

6    airlines is, to use the government's word, "unique,"

7    because it -- JetBlue simply competes against the

8    legacies for a broader set of customers than Spirit

9    does.

10        You may recall the quote from the Spirit

11   executives that the government had on the very first

12   slide of its opening presentation.  He said "At Spirit

13   we recognize our product may not be for everyone."  He's

14   right, your Honor.

15        For example, Spirit is not for leisure customers

16   demanding a certain level of quality and it's not for

17   many types of business travelers.  So as common sense

18   suggests and the economic evidence will show in this

19   case, prices overall will fall more in response to

20   competition from JetBlue than Spirit and more passengers

21   will fly.  Those are consumer benefits that this Court

22   absolutely can and should take into account in judging

23   the competitive impact of this merger.

24        That brings me to the backdrop of this

25   transaction, your Honor, and the reason we're here

1    today.  Since JetBlue was founded 20 years ago, it's

2    scratched and clawed its way to about a 5 percent market

3    share overall, but JetBlue has never been able to

4    materially grow outside its East Coast presence and

5    there's simply no way, your Honor, for JetBlue to

6    acquire on its own the planes and other assets needed to

7    become a nationwide challenger to the dominant legacy

8    carriers.

9        So as you will hear from JetBlue's CEO, Robin

10   Hayes, Jet Blue began considering an acquisition of

11   Spirit 6 years ago.  In January 2020, he was authorized

12   by the JetBlue board to approach Spirit about merging,

13   January 2020, and we all know what happened after that,

14   covid hit and derailed his plans and JetBlue's plan.

15       In March of 2022, after news of Frontier

16   potentially merging with Spirit became public, JetBlue

17   again asked its board for permission to pursue a merger

18   with Spirit.  Your Honor, this is the decl., the board

19   decl., from March of 2022, and like every prior

20   consideration of Spirit over the last 6 years, the

21   rationale was the same, the goal is to unleash a

22   sustainable challenger to the legacy airlines and to do

23   so throughout this country.  And through this

24   transaction, as the bottom part indicates, JetBlue will

25   finally be able to spread its disruptive force

1    nationwide and bring the JetBlue effect to new heights.

2          Right now, as I mentioned, your Honor, JetBlue's

3    domestic route network, as the Court can see from this

4    slide, has a gaping hole in the middle and western parts

5    of this country, placing it at a significant strategic

6    disadvantage to its largest rivals like Delta.  With

7    this transaction JetBlue will finally be able to

8    establish a new focus city in the Midwest and expand its

9    presence outward filling out its national network.  It

10   will finally have enough planes to go into the legacy

11   hubs, called "fortress hubs" in the industry, and

12   meaningfully compete with them.  Overall JetBlue plans

13   to offer over 700 nonstop routes including over 250

14   nonstop routes that neither JetBlue nor Spirit fly

15   today.  As a result, millions more consumers across

16   these routes will benefit from the very JetBlue effect

17   that the government celebrated in this courthouse one

18   year ago.

19         I would now like to turn more specifically to the

20   reasons why the government's arguments are mistaken

21   under Section 7 of the Clayton Act, but before doing

22   that, your Honor, let me dispel two notions raised by

23   the government's counsel right out of the gate.

24         First, the government just repeatedly bemoaned

25   that JetBlue has a higher average price than Spirit, but

1    there is nothing wrong much less anticompetitive about

2    JetBlue charging a price that is commensurate with its

3    value.  As the government has admitted, it's exactly

4    JetBlue's superior quality and value that allows it to

5    disrupt and discipline the prices charged by the

6    carriers carrying most people in this country, the

7    high-priced legacy carriers.  And for those customers

8    who want the bare bones ULCC experience, as I will

9    discuss in just a second, that option will be there for

10   those about 10 percent of customers traveling on ULCCs

11   in this country.

12        Second, the government referred to and alleged the

13   "JetBlue post-deal plan," I think that's what they

14   called it, your Honor, to raise prices by 30 percent

15   after the merger.  There is no such plan.  What the

16   government is talking about is some internal work done

17   by JetBlue to estimate how much more consumers value the

18   JetBlue experience than the Spirit experience, and they

19   do, for revenue synergy purposes.  As the employee who

20   prepared this work will testify --

21        THE COURT:  Excuse me.  What does "revenue

22   synergy" mean?

23        MR. SHORES:  What that means, your Honor, is that

24   after this merger JetBlue expects, because it offers a

25   better product and generates more revenue than Spirit

1    does, for example on its travel products, on its loyalty

2    program because more people want to fly JetBlue, it

3    expects to earn more revenue than Spirit would on its

4    own.  And again it goes back to the quality, your Honor.

5    JetBlue's offering a better product and so we'll

6    naturally anticipate attracting more customers and

7    earning more revenue.

8        And the employee who prepared this will testify,

9    he'll explain to you, your Honor, for purposes of the

10   work he was doing, he wasn't attempting to model post-

11   merger competitive conditions like an economist would,

12   in fact he did not even try to model factors like things

13   the government's own expert agrees would impact consumer

14   pricing and demand, the full impact of the JetBlue

15   effect or entry by ULCCs.

16       So let me turn to the real issue here, your Honor,

17   whether this merger will substantially lessen

18   competition under Section 7 of the Clayton Act?  And I

19   appreciate that your Honor has had a ton of paper about

20   what Section 7 means, but let me briefly just describe

21   some key principles.

22       Number 1, Section 7 requires a totality-of-

23   the-circumstances evaluation of a future merger's

24   competitive -- of a merger's future competitive impact,

25   that's the most fundamental command under Section 7.

1    But at every step of the three-part burden-shifting

2    framework, the government will ask this Court to put

3    blinders on as to the critical facts and evidence that

4    will be established at trial.  So let me go to that

5    framework, your Honor.

6        As a threshold step, the government must show this

7    merger will lead to "undue concentration in a relevant

8    market," and that would establish the presumption that

9    was discussed earlier.  The government will do this

10   primarily with some basic calculations related to market

11   share concentration that's used in merger cases as

12   basically a screen.  But as Baker Hughes, the leading

13   case for this burden-shifting framework says, it's just

14   a starting point, your Honor, a convenient starting

15   point for the broader competitive effects analysis.

16       At Step 2, we the defendants may rebut that prima

17   facie case through a variety of factors which we intend

18   to do here.  For example, we will show, unlike the

19   static view the government intends to present of the

20   airline industry, that it is in fact very dynamic.  So

21   static market shares don't predict the future effects of

22   this transaction.  We will show that barriers to entry

23   are low and that the transaction has enormous consumer

24   benefits, including again spreading the JetBlue effect

25   that the government itself has celebrated.  The burden

1   on us at this stage is low, your Honor.

2        Finally, at the last stage the burden shifts back

3   to the government to prove the merger is

4   anticompetitive.

5        So let me go to Step 1.  The government wants this

6   Court to ignore the national market and the national

7   implications of this merger and it is very easy to see

8   why, your Honor.  As this chart shows, after this merger

9   JetBlue would go from about a 5 percent player to just

10  over a 7 percent player in this country, and it still

11  would be less than half the size of the smallest Big 4

12  airline.

13       Now to distract from this reality the government's

14  counsel just threw -- threw out three categories of

15  supposed route-level markets where the government claims

16  harm.  But in one category JetBlue does not even compete

17  with Spirit, in another neither Spirit nor JetBlue

18  compete.  These are hypothetical markets that Spirit

19  might enter into in the future.  But there can be no

20  substantial lessening of competition under Section 7

21  when there is no competition at all on these routes by

22  the merging parties.

23       The third category of routes, your Honor, are

24  routes where JetBlue and Spirit actually do compete,

25  they're sometimes referred to as "overlap routes."  But

1    of the 183 that the government has focused on, most of

2    those are connecting routes, and as the evidence will

3    show, your Honor, the merging parties don't even

4    separately price connecting routes, they only do so on

5    their nonstop routes.  So there is not material

6    competition between the parties on these routes either.

7         That leaves what the government's economist has

8    called the "51 central markets in this case."  And you

9    heard the government's counsel talk about these

10    so-called "central markets."  These are 51 routes where

11    based on a snapshot of data taken about a year ago, your

12    Honor, both JetBlue and Spirit compete and they meet

13    that threshold structural test that I referred to for

14    concentration.  Now let me just put these 51 central

15    routes in perspective, your Honor.

16         Using the same data, the same time period, and the

17    same method of identifying routes as the government's

18    expert did, there are 6,614 nonstop routes flown by

19    domestic airlines between cities in this country.  So

20    the government's 51 central routes?  Less than 1 percent

21    of nonstop routes in this country.  And even just

22    looking at JetBlue and Spirit, the 6th and 7th largest

23    airlines in this country, these airlines together fly

24    about 630 nonstop routes.  So the government's 51 routes

25    are less than 10 percent of those.

1    And the government is not just asking this Court

2  to ignore the national picture and look at a small

3  fraction of routes, it's telling the Court that it must

4  look at these routes individually, and if there's harm

5  in any one of them, the Court must enjoin this merger

6  full stop, even if the evidence shows benefits to

7  millions of customers flying hundreds of routes

8  throughout this country.

9    Your Honor, the government's approach to markets

10  here is not consistent with common sense or how the

11  airline industry works.  For example, much of the

12  competition in the airline industry occurs at the

13  national level.  For example, as the evidence will show,

14  airlines determine nationally, not on a route-by-route

15  basis, their brand and business model, their network

16  strategies, how they're going to have their airplanes be

17  laid out and the amenities, the fare class structure,

18  structures of their loyalty programs, ancillary fees,

19  certain ancillary fees, cobranded credit card

20  agreements, and their partnerships and alliances.  The

21  government is asking you to ignore all that evidence.

22    Secondly, as I'll discuss more fully in a few

23  moments, the airline industry is mobile, your Honor,

24  with airplanes constantly being redeployed to new routes

25  in response to ever-shifting changes in demand.  The

1    government is asking you to just focus on the demand

2    side, our two route substitutes from a consumer

3    perspective, but it ignores that the supply in the

4    industry airplanes literally can move to meet that

5    demand.  In antitrust law that's called "supply side

6    substitution."  And for over 50 years courts have

7    considered this mobility critical in defining markets

8    that cut across many different geographies.

9         Third, your Honor, the government's proposed

10   route-by-route approach would not allow this Court to

11   review the merger in its totality, the totality of the

12   circumstances.  Take the government's own example of a

13   traveler who flies multiple routes.  Miss Smith may fly

14   from Boston to Las Vegas, then to New Orleans, then to

15   Orlando, and then to San Juan.  Under the government's

16   view this Court must look at these routes individually

17   and block this merger if there is a penny of harm in any

18   of them even if Miss Smith saved hundreds of dollars on

19   each of the other routes.  This mechanical approach

20   would make Miss Smith economically worse off, which is

21   not what the antitrust laws are intended to do.  And

22   Miss Smith is just one example of millions of travelers

23   who fly multiple routes a year and will be impacted by

24   this merger across routes.

25        In the end your Honor's going to be presented with

different antitrust markets here and it's up to the
Court to pick the geographic market that would allow it
to determine the competitive effects of the merger in
its totality, that is what in the law is called the
"relevant antitrust market," in a world where planes are
mobile, people are mobile, and the most fundamental
airline decisions are made at the national level.  The
right lens is a national one, your Honor, and at a
national level this merger presents no conceivable
concern.

      But even if the government establishes route-level
markets and is able to meet its presumption, defendants
will rebut that presumption.  Let me start with the
dynamic nature of this industry.

      Every day, as I said, airlines are redeploying
their airplanes across routes and adjusting their
frequencies, that means reducing or increasing how much
they fly to match an evolving competitive landscape.  I
just want to give the Court some flavor of this.

      What this chart shows is the number of new nonstop
routes flown by U.S. carriers in 2023, compared to 2022,
where at least one endpoint of the route was in the
United States, and what this shows is a domestic
airlines entered 406 new routes over this time period.
At the same time the domestic airlines also exited 436

1    routes over this time period.

2         It's notable, your Honor, that the ULCC business

3    model is particularly fluid.  For example, ULCCs rely

4    less on customer loyalty or brand awareness to generate

5    their demand, so they can come in and out of markets and

6    scam the limited demand for their product.  Of the 406

7    new route entries I just discussed, over half, 205 were

8    by airlines with a ULCC or similar model, and most of

9    those entries were by ULCCs other than Spirit.  At the

10   same time at least one ULCC also exited 194 routes,

11   again demonstrating the dynamic nature of the ULCC model

12   and this industry.

13        Now, your Honor, you're going to hear from the

14   executives of other ULCCs in this case including the CEO

15   of Frontier, Barry Biffle, and as he said in his

16   deposition, these ULCCs have the ability to fluidly

17   shift among routes, define the most profitable

18   opportunities.  And for ULCCs like Frontier --

19        THE COURT:  Just so you know, 15 minutes more for

20   the defendants' openings.  Have that in mind.

21        Go ahead.

22        MR. SHORES:  15 more minutes?

23        THE COURT:  15 more minutes for the defendants'

24   total.

25        Go ahead.

1           MR. SHORES:  Okay.

2           Your Honor, as he's going to testify, it's a very

3       mobile industry in which the airlines are able to shift,

4       and they will shift to go and find a Spirit opportunity

5       -- the opportunities vacated by Spirit here.

6           Your Honor, as the evidence will show,

7       particularly under this timeframe, these other ULCCs are

8       poised to grow, continue evolving their business models

9       to fill any competitive void left by Spirit.  This chart

10      shows your Honor that the total aircraft fleet of the

11      other ULCCs are expected to be twice that of Spirit in

12      just two years.  And why is this important?  Because the

13      timeframe for entry under the antitrust laws, according

14      to the government itself, is two or three years.  So the

15      question is not what's going to happen tomorrow or next

16      month or even next year, the question is one of two to

17      three years down the road.  And in that timeframe, your

18      Honor, other ULCC options will be there for consumers.

19          Now your Honor did hear some mention of the

20      divestitures and I want to mention those briefly.

21      You're going to hear evidence about a significant

22      divestiture package that JetBlue offered and that

23      Frontier and Allegiant have agreed to take in this case,

24      your Honor.  And if we could go -- thank you.  And that

25      includes divestitures in Boston, in La Guardia, in

1    Newark, and in Fort Lauderdale.  And importantly, your

2    Honor, it's not a question of whether these divestiture

3    buyers are going to fill up one specific route, as the

4    government itself has said in a prior merger challenge,

5    the point of these divestitures is to facilitate their

6    growth and entry and their ability to grow and fill up

7    demand on a system-wide basis.

8         So where does that leave us with the government's

9    51 central markets in this case, your Honor?  Well just

10   showing how mobile this industry is, approximately 20

11   percent of these 51 routes are not irrelevant because

12   either JetBlue or Spirit has exited or will suspend

13   service in the ordinary course of their business.

14   Moreover, many of them have recently seen entry by the

15   other ULCCs and 36 of them will be impacted by the

16   divestitures defendants have offered here.  All this

17   means, your Honor, is that the government's

18   point-in-time market shares on these individual routes

19   are telling the Court very little about what's going to

20   happen to competition two to three years down the road.

21        Particularly without this presumption, your Honor,

22   at Step 3 the government will be able to show this

23   merger is anticompetitive.  The government's main retort

24   is this so-called "coordinated effects theory."  But

25   again in this court last year the government argued and

1     the judge agreed that JetBlue is a maverick in this

2     industry and that has special meaning in the antitrust

3     laws.  And what it means, according to the government's

4     own antitrust merger guideline, is that JetBlue is a

5     disrupter of coordination.  And with 3 percent more

6     market share, JetBlue is not going to suddenly become a

7     legacy co-conspirator, it is going to disrupt even more.

8          So let me conclude, your Honor, and I want to

9     return to where I started.  No matter how much the

10    government wants to ignore it, the fundamental point

11    here is that JetBlue and Spirit are the 6th and 7th

12    largest airlines in an industry controlled by four

13    dominant players.  JetBlue needs scale to compete with

14    its dominant rivals and through this merger it will gain

15    that scale and be able to provide numerous consumer

16    benefits.

17         Thank you, your Honor.  And I'll turn it over to

18    Mr. Cohen.

19         MR. COHEN:  Your Honor, let me get right into it

20    because we're on the clock --

21         THE COURT:  We are, and thank you, Mr. Cohen.

22

23    OPENING STATEMENT BY MR. COHEN:

24         So I want to focus on three Spirit-specific claims

25    advanced by the government, each is critical to the

1   government's case, but each collapses under the weight

2   of the evidence.

3       First, historical growth.  Mr. Shores just touched

4   on this.  The government has argued that Spirit, through

5   its unique business model has grown and grown, but the

6   reality is that Spirit is a small airline that's dwarfed

7   by the Big 4 and has many competitors that have emulated

8   Spirit's model.

9       Second, and your Honor asked about this future --

10  is it sustainable?  That's a key question in a Section 7

11  case.  And the government says that but for this deal

12  Spirit will continue to grow as fast or faster than it

13  did in the past and remain an independent airline, and

14  they cite Spirit's plans, which we'll talk about.  The

15  reality, the reality is that Spirit's financial

16  performance will not permit the growth that Spirit

17  planned for, and that Spirit has been pursuing a merger

18  to get larger for many years to help with those

19  financial realities.

20      And lastly and third, your Honor.  The government

21  went to great lengths this morning to try to persuade

22  you that Spirit recognized, admitted they say from the

23  outset, that a merger with JetBlue would violate the

24  antitrust laws.  The reality is that the government has

25  cherry-picked a few sound bites that should be excluded,

1    for the reasons set out in our motion in limine before

2    your Honor.  What the admissible evidence will show is

3    that Spirit negotiated a transaction with JetBlue for

4    many months seeking and ultimately obtaining regulatory

5    concessions that Spirit believed would allow a deal to

6    close.

7         So let me turn in a little bit more detail to

8    Spirit's place in the competitive landscape, and let's

9    go right to the next slide, because I want to get to the

10   future as quickly as I can.

11        (On Screen.)

12        Here's a chart from the government's complaint and

13   this is designed to show your Honor that Spirit, over

14   the past period, which is not the most important period,

15   but over the past Spirit has been the fastest growing

16   airline in the country.  But what the government omits,

17   and is shown on the right hand of this slide, is that

18   Spirit still only has a 5 percent market share of seats

19   in the United States, and as Mr. Shores showed, its

20   share of revenue is even smaller.

21        The so-called "slow growth airlines" in this

22   chart, United, Delta, American, and Southwest, which are

23   referred to as the "Big 4," they have 75 percent of the

24   seats and over 80 percent of the revenues in the airline

25   industry.

1       Spirit's growth has not put a dent in the

2   overwhelming market share and in other advantages that

3   these airlines enjoy, and even if Spirit were able to

4   continue to grow on a standalone basis, and more on that

5   in a minute, there is no plan, no projection, no 5-year

6   plan, no financial plan, no plan to enter routes, no

7   network plan, that will allow Spirit to get big enough

8   on its own to compete more effectively for market share

9   with the Big 4.

10       Now the government also claims that Spirit's grown

11   because of its unique business model.  That's just based

12   on an outdated view of competition in the airline

13   industry.  Spirit did pioneer, pioneer the ULCC model,

14   this unbundled model that Ms. Markel referred to in the

15   United States, but today and going forward Spirit has

16   robust ULCC competitors, including Frontier, which flies

17   on many of Spirit's routes.  Allegiant, Sun Country, and

18   Avelo, these are all low-cost airlines that offer

19   unbundled fares and experiences for passengers and fares

20   for passengers that mimic those on Spirit.  And although

21   the government argued this morning that these ULCCs face

22   challenges, the evidence will show that they are growing

23   rapidly, they collectively have more planes on order

24   than Spirit and they are poised for even greater growth

25   going forward including but not limited to current

1    Spirit routes that will be vacated by Spirit upon the

2    JetBlue merger.

3          Now Spirit has another set of competitors for

4    these unbundled fares, your Honor, and that's these

5    legacy airlines.  Spirit's success has led not only to

6    foster ULCCs to enter the market, but it has spurred

7    every large airline, Delta, American, and United, three

8    of the largest airlines, as well as JetBlue and Alaskan,

9    to offer unbundled fares.  What your Honor will hear is

10   that this is called "basic economy," and in basic

11   economy you get an unbundled ticket similar to the

12   Spirit ticket and you make the kind of choices that the

13   government talked about today as supposedly unique to

14   Spirit.  It was unique to Spirit in 2014, your Honor,

15   there are nine competitors today that offer the same

16   thing.

17         So let's go to the going-forward picture because,

18   as the government correctly stated in its opening, what

19   this trial is about is looking out into the future.  And

20   here the picture that the government is trying to paint

21   with respect to Spirit on a going-forward basis is even

22   more cropped.  The government did not really have a lot

23   to say about that feature this morning, but here's what

24   they said in their amended complaint.  "Spirit planned

25   to grow and compete even more widely and effectively in

1    the future as an independent company."

2         Your Honor, it is true that Spirit has and had

3    ambitious plans for growth, but a plan is just a plan.

4    A forecast is just a forecast.  And a plan for growth

5    does not guarantee growth.  And in touting the growth of

6    Spirit and saying somehow that this was just a blip,

7    here's what they didn't show you.

8         Spirit lost money -- it's been consistently

9    profitable, your Honor, before 2019.  It lost money in

10   2020, that was admittedly a covid year.  It lost more in

11   2021 than in 2020.  It planned to make money in 2022,

12   but it lost even more money in 2022 than in 2021.  And

13   it budgeted to return to profitability this year.  That

14   was the plan.  And that was even the plan when the

15   Chairman of Spirit was deposed.  The reality -- not the

16   plan, the reality is that Spirit will be losing money

17   for the fourth year in a row.

18        So let me turn, in the few minutes I have left, to

19   a couple of other points.  First, let me turn to the

20   issue of whether Spirit will continue to grow as an

21   independent airline, was that the plan all along?  Stay

22   independent.  That's the but-for that the government is

23   offering.  Slide 9, please.  Here the reality.  The next

24   slide, please.

25        Since 2016, Spirit has been pursuing a merger.  It

1    had multiple merger discussions with Frontier.  It had

2    discussions with Allegiant.  It thought about having

3    discussions with JetBlue, but did not.  And that is

4    because Spirit and its advisors recognized that you need

5    to get bigger in this industry to compete effectively

6    with the Big 4, and it understood and understands that

7    that will not likely be achieved by standalone growth.

8    In fact, Spirit is not achieving that growth.

9         So let me turn lastly to the government's

10   argument, which they spent a lot of time on this

11   morning, that Spirit admitted in 2022 that any merger

12   with JetBlue would be anticompetitive.  Now unless the

13   Court grants our in-limine motion, and I think the

14   number of times the government talked about Spirit's

15   proxy-fight materials this morning demonstrates why we

16   brought it and why it should be granted.  They'll be

17   extensive testimony about these statements.  And

18   notwithstanding the snippets the government showed in

19   court this morning, the weight of the evidence will show

20   that Spirit never conceded that a transaction with

21   JetBlue would violate the antitrust laws.

22        Now the evidence on this point will prove the old

23   adage that "actions speak louder than words," and what

24   those actions show is that Spirit's board of directors

25   instructed Spirit's management over and over again to

1    negotiate with JetBlue to see if a transaction could be

2    reached on terms that would be likely to pass antitrust

3    scrutiny.

4         Here's an excerpt from the April 7th board meeting

5    of Spirit, this is a month before the decls. that were

6    shown to your Honor this morning, and what it shows is

7    that the Spirit board on April 7th made a determination

8    that a deal with JetBlue could be better than a Frontier

9    deal, that's a secure proposal, and they directed Spirit

10   management to negotiate deal terms with JetBlue.  When

11   the Spirit board gave that instruction, your Honor, it

12   knew that JetBlue was not a ULCC, it knew that JetBlue

13   had higher average fares than Spirit, it knew that

14   JetBlue was a party to and in litigation with the

15   government over the NEA, and it knew that a transaction

16   with JetBlue could face more regulatory scrutiny than a

17   Frontier transaction.  If it had actually been Spirit's

18   view that the antitrust deals -- antitrust laws made a

19   deal with JetBlue impossible to close, it would have

20   made no sense for the Spirit boards even to commence

21   negotiations with JetBlue.

22        But negotiate they did, your Honor, and in this

23   slide, which is derived from a Spirit SEC filing, the

24   merger proxy, which is in evidence, what it shows is

25   that despite the snippets that were shown to you by the

1    government, Spirit and JetBlue spoke over and negotiated

2    over 5 months to see if they could reach a common ground

3    on a transaction.  But the weight of the evidence will

4    show that Spirit never said, never believed that a

5    JetBlue deal was impossible to close because of

6    antitrust concerns, to the contrary Spirit's focus was

7    on persuading JetBlue to agree to make sufficient

8    concessions to antitrust regulators to find a way to a

9    deal.

10        Now the evidence will show that in the end JetBlue

11   did in fact give broad assurances to Spirit that would

12   be necessary -- that it would if necessary engage in

13   significant divestitures in order to gain regulatory

14   approval even on top of the agreed and significant

15   divestitures that Mr. Shores mentioned in Boston, La

16   Guardia, New York, and Fort Lauderdale, that have

17   subsequently been pledged to Spirit's principal ULCC

18   competitors, Frontier and Allegiant.

19        THE COURT:  Best to sum up.

20        MR. COHEN:  And let me just say in closing, your

21   Honor, the notion that Spirit would recommend it to

22   shareholders that a deal should be done out of self-

23   interest will never be proven by the government.  The

24   deal was recommended by the Spirit board because it was

25   good for Spirit, it was good for JetBlue, and it was

1    good for competition.

2          THE COURT:  Thank you.

3          We'll take a recess now until 11:00 and then I

4    plan to run until 1:00.  So we'll stand in recess now

5    for 25 minutes until 11:00.  We'll recess.

6          THE CLERK:  All rise.

7          (Recess, 10:35 a.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          C E R T I F I C A T E

2

3

4          I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER,

5     do hereby certify that the foregoing record is a true

6     and accurate transcription of my stenographic notes

7     before Judge William G. Young, on Tuesday, October 31,

8     2023, to the best of my skill and ability.

9

10

11     /s/ Richard H. Romanow 10-31-23
       _____
12     RICHARD H. ROMANOW   Date

13

14

15

16

17

18

19

20

21

22

23

24

25