```
                    UNITED STATES DISTRICT COURT
                  DISTRICT OF MASSACHUSETTS (Boston)

                                    No. 1:23-cv-10511-WGY
                                    Vol. 2, Pages 65-156


UNITED STATES OF AMERICA, et al
          Plaintiffs

vs.


JETBLUE AIRWAYS CORPORATION,
et al,
          Defendants



                         ********


                    For Bench Trial Before:
                    Judge William G. Young




                       United States District Court
                       District of Massachusetts (Boston)
                       One Courthouse Way
                       Boston, Massachusetts 02110
                       Tuesday, October 31, 2023



                         ********



            REPORTER:  CHERYL B. PALANCHIAN, RMR, CRR
                     Official Court Reporter
                  United States District Court
                One Courthouse Way, Boston, MA 02110
```

A P P E A R A N C E S


EDWARD WILLIAM DUFFY, ESQ.
ARIANNA MARKEL, ESQ.
AARON TEITELBAUM, ESQ.
        DOJ-Atr
        450 Fifth Street NW, Suite 8000
        Washington, DC 20530
        (202)812-4723
        Email:  Edward.duffy@usdoj.gov
        For Plaintiff United States of America
- and -
WILLIAM T. MATLACK, ESQ.
        Attorney General's Office
        One Ashburton Place, 18th Floor
        Boston, MA 02108
        (617)727-2200
        Email:  William.matlack@mass.gov
        For Plaintiffs United States of America and The
        Commonwealth of Massachusetts



RYAN SHORES, ESQ.
        Cleary Gottlieb Steen & Hamilton LLP
        2112 Pennsylvania Avenue, NW
        Washington, DC 20037
        (202)974-1876
        Email:  Rshores@cgsh.com
- and -
ELIZABETH M. WRIGHT, ESQ.
        Cooley LLP
        500 Boylston Street
        Boston, MA 02116-3736
        (617)937-2349
        Email:  Ewright@cooley.com
- and -
RACHEL MOSSMAN ZIEMINSKI, ESQ.
MICHAEL MITCHELL, ESQ.
        Shearman & Sterling LLP
        2601 Olive Street, 17th Floor
        Dallas, TX 75201
        (214)271-5777
        Email:  Rachel.zieminski@shearman.com
        For Defendant JetBlue Airways Corporation


(Continued.)

(Continued.)


JAY COHEN, ESQ.
ANDREW C. FINCH, ESQ.
        Paul, Weiss, Rifkind, Wharton & Garrison
        1285 Avenue of the Americas
        New York, NY 10019-6064
        (212)373-3000
        Email:  Jaycohen@paulweiss.com
        For Defendant Spirt Airlines, Inc.

```
                    I N D E X

WITNESS:            DIRECT    CROSS    REDIRECT    RECROSS

EDWARD CHRISTIE

  By Mr. Teitelbaum 69
```

| EXHIBITS | PAGE |
|---|---|
| 348 . . . . . . . . . . . . .97 |
| 38  . . . . . . . . . . . . 122 |
| 349 . . . . . . . . . . . . 130 |
| 105 . . . . . . . . . . . . 136 |
| 350 . . . . . . . . . . . . 137 |
| 351 . . . . . . . . . . . . 141 |
| BUI . . . . . . . . . . . . 151 |

```
 1                THE CLERK:  Court is back in session.  You may be
 2      seated.
 3                THE COURT:  Now, something before we commence with
 4      this witness.  I understand that this witness is the chief
 5      officer, executive officer of Spirit.  There is a motion to
 6      exclude certain -- and it was late disclosed -- changes of
 7      route, but the motion is denied.  This situation is dynamic.
 8      It's denied with these provisos, that if the government
 9      thinks it's necessary to recall this witness during the
10      course of the trial, I will allow it.
11                All right.
12                MR. TEITELBAUM:  Good morning.  Your Honor, Aaron
13      Teitelbaum for the United States.
14                THE CLERK:  Can you please stand and raise your
15      right hand?
16                         EDWARD CHRISTIE, sworn
17                THE COURT:  Go ahead.
18                MR. TEITELBAUM:  Thank you.
19                         DIRECT EXAMINATION
20      BY MR. TEITELBAUM:
21      Q.   Good morning, Mr. Christie.
22      A.   Good morning.
23      Q.   How are you doing today?
24      A.   Fine, thank you.
25      Q.   You currently serve as the chief executive officer and
```

1   president of Spirit Airlines; is that right?

2   A.   Yes.

3   Q.   And you've held those positions since 2019?

4   A.   Correct.

5   Q.   I just want to briefly talk about your duties and

6   responsibilities as chief executive officer and president.

7   Fair to say that you generally oversee all the business

8   operations of Spirit Airlines?

9   A.   Yes.

10  Q.   And you also sit on the board of directors; right?

11  A.   I am, yes.

12  Q.   Do you also report to the board of directors in

13  addition to serving on it?

14  A.   I do, yes.

15  Q.   Before you were the chief executive officer of Spirit,

16  you served as its chief financial officer; is that right?

17  A.   Correct.

18  Q.   Have you also worked at other airlines?

19  A.   I have.

20  Q.   Could you just briefly outline for the Court where

21  you've worked?

22  A.   I joined the aviation industry in late 2002 at Frontier

23  Airlines.  I worked there for about eight years and finished

24  as the chief financial officer there.  And then after a

25  brief hiatus out of the industry, I joined Pinnacle

1    Airlines, which is a regional provider for the larger

2    network airlines.  I was there for about a year until I

3    joined Spirit in 2012.

4    Q.   All right.  I'm going to have some questions for you

5    about Spirit's business model and how it operates as an

6    airline.

7              MR. TEITELBAUM:  But before I do that, actually,

8    your Honor, with the Court's permission could we approach

9    the witness and the bench with exhibit binders?

10             THE COURT:  Yes, of course.  And that may be done

11   throughout.

12             MR. TEITELBAUM:  Understood.

13             THE COURT:  I've had cases where we had a bunch of

14   binders and I'm fine with it.  I can recall the binders were

15   both for myself and for my law clerks, and I'm fine with

16   that.  But when you start giving the law clerks the binders

17   before you give them to me, I'm not fine with that.

18             (Handing.)

19   Q.   I'm sorry for that brief interruption, Mr. Christie.

20        There's no need for you to refer to those binders yet,

21   but they do have some documents that we're likely to discuss

22   during your examination, so I'll ask you if there's a time

23   that it makes sense to refer to them.

24        But before we get to Spirit's business model, I'd just

25   like to talk briefly about why we're here today.  Under the

1   terms of the proposed transaction that's at issue in this

2   case, JetBlue is going to acquire Spirit Airlines; right?

3   A.   Correct.

4   Q.   And the combined carrier is going to operate as a

5   larger JetBlue?

6   A.   That's my understanding, yes.

7   Q.   And before the merger agreement with JetBlue was

8   approved by shareholders, there had previously been a merger

9   agreement with Frontier; is that fair?

10  A.   Yes.

11  Q.   And that was in the very early part of 2022?

12  A.   February of 2022, yes.

13  Q.   But ultimately Spirit's shareholders chose and approved

14  a combination with JetBlue; correct?

15  A.   Correct.

16  Q.   All right.  We'll come back to that a little bit more

17  later.

18       Let's turn to talk about Spirit's business model and

19  how it operates for a bit.  Spirit is the largest ultra

20  low-cost carrier in the United States; is that fair?

21  A.   We believe so, yes.

22  Q.   And that's at least in terms of capacity and fleet?

23  A.   I think in both measures, yes.

24  Q.   Now, we've already heard the term ultra low-cost

25  carrier, or ULLC, used throughout opening statements, for

1    instance, but when there's a reference to cost in that

2    acronym, that's a reference to unit operating costs; is that

3    correct?

4    A.   That's correct, yes.

5    Q.   And fair to say that we have a typical measure of unit

6    operating costs in the airline industry?

7    A.   We do.

8    Q.   Is that cost per available seat mile?

9    A.   That's correct.

10   Q.   Usually referenced as CASM?

11   A.   Yes.

12   Q.   Could you just briefly explain to the Court what CASM

13   is in layman's terms?

14   A.   I think you have to start with what the unit of measure

15   is, which is an available seat mile.  So that's one seat

16   traveling one mile is the way the industry refers to its

17   capacity.  And then cost per available seat mile is

18   basically your total operating expenses divided by the total

19   capacity of the industry reducing that to a unit measure.

20   Q.   And it's a way of taking into account a carrier's

21   operating cost versus how much it actually flies; is that

22   fair?

23   A.   It's -- yeah.  And I guess the simplest way to describe

24   it is you're unitizing your cost structure to make it easier

25   to understand your business.

1    Q.   So we've now talked about the term ULLC or ultra

2    low-cost carrier.   There are other categories of airlines

3    operating in the United States; would you agree with that?

4    A.   Yeah, I think that's fair to say.

5    Q.   So, for instance, are you familiar with the term

6    "network carrier"?

7    A.   Yes.

8    Q.   Some people also would say "legacy carrier" instead of

9    "network"; is that right?

10   A.   That's correct.

11   Q.   Could you please identify to the Court the legacy

12   carriers that are operating in the United States?

13   A.   Those are commonly referred to as Delta, American and

14   United.

15   Q.   There's also a label called "low-cost carriers"; right?

16   A.   Yes.

17   Q.   And that's LCC, as opposed to ULCC?

18   A.   Yes.

19   Q.   Would you put JetBlue and Southwest into those

20   categories?

21   A.   I would.

22   Q.   And what about Alaska?

23   A.   I would also put them in that category, yes.

24   Q.   Are you also familiar with the term "hybrid carrier"?

25   A.   I've seen it referenced that way, yes.

```
 1    Q.   And fair to say that a hybrid carrier is an airline
 2    that has some attributes of a legacy and some attributes of
 3    a low-cost carrier?
 4    A.   I'm guessing at this point because I don't define them
 5    that way.
 6              THE COURT:  You can't guess.  So -- it's more than
 7    semantic.  So if it comes into your mind you're guessing, I
 8    can't rely on it.  But you are perfectly allowed to
 9    estimate, you're perfectly allowed to say my best opinion
10    is, given your background.  But "guess" is a red flag for
11    me.
12              THE WITNESS:  Fair enough.
13    A.   I don't refer to carriers as hybrids, but my best
14    estimate would be that there are some that are referred to
15    that way, yes.
16    Q.   And is it your understanding that there are some in the
17    industry who refer to JetBlue as a hybrid?
18    A.   I have seen that, yes.
19    Q.   So now let's talk about the other ultra low-cost
20    carriers operating in the United States besides Spirit.
21    Fair to say we have Frontier?
22    A.   Yes.
23    Q.   Sun Country?
24    A.   Yes.
25    Q.   Allegiant?
```

1   A.   Yes.

2   Q.   And what about Avelo, would you put them in the same

3   category?

4   A.   I would, yes.

5   Q.   They're a fairly recently established airline; right?

6   A.   Yes, relatively recent.  Yes.

7   Q.   What about Breeze Airlines?

8   A.   I don't know that I would necessarily categorize them

9   as a ultra low-cost carrier.  They have some elements of

10  that business model but they also do introduce some

11  differences that are not traditionally ultra low cost.

12  Q.   They have some more premium aspects to them, in other

13  words?

14  A.   They do, yes.

15  Q.   Let's talk now about some of the awards that Spirit has

16  won as an airline.  Fair to say that in 2023 Spirit was the

17  value airline of the year, according to ATW?

18  A.   ATW, yes.

19  Q.   And Spirit has also won the APEX, or Airline Passenger

20  Experience Association four-star low-cost carrier award; is

21  that right?

22  A.   We did.

23  Q.   Both in 2022 and 2023?

24  A.   That's correct.

25  Q.   And that's actually an award that's based on passenger

```
 1    feedback?

 2    A.    That's right, yes.

 3    Q.    And in 2021, Fortune stated -- or awarded Spirit,

 4    world's most admired companies, among those companies; is

 5    that right?

 6    A.    We were on the list, yes.

 7    Q.    And I believe you've mentioned in other statements, and

 8    so have your colleagues, some fly-quiet awards that Spirit

 9    has won?

10    A.    We have won a few of those as well, yes.

11    Q.    And that's just for having low noise levels at certain

12    airports?

13    A.    Correct, yes.

14    Q.    So Sea-Tac and Los Angeles Airport would be two of

15    those?

16    A.    I think those were the two that come to the top of

17    mind, yes.

18    Q.    So now let's talk a little bit more about Spirit's

19    business model as a ULLC.  And fair to say that when you're

20    talking about Spirit's business model, you also sometimes

21    give investor presentations about how Spirit operates; is

22    that right?

23    A.    We do, yes.

24    Q.    And Spirit makes its best efforts to be accurate in the

25    investor presentations?
```

 1    A.    We do.

 2    Q.    All right.  I'd ask that --

 3          MR. TEITELBAUM:  And before I do this, your Honor,

 4    I just want to be careful, since this is the maiden voyage

 5    with a witness for this trial.  The parties have agreed to

 6    the -- to not object to certain exhibits being admitted in

 7    evidence.  So the exhibit that I'm about to ask that

 8    Mr. Christie see is one such exhibit, but I just wanted to

 9    inquire if it would be appropriate for us still to offer

10    that exhibit in evidence?

11          THE COURT:  Well, have we agreed upon exhibits

12    that will be admitted in evidence?  And I take it there are

13    some, and others that are objected to.  And the protocol

14    that I've always followed is to give numbers to those that

15    are agreed to and letters to the base twenty-six to those to

16    which there is no agreement.

17          We are going to follow the time limits here, so it

18    would behoove you all to sit down and have a list of all the

19    exhibits agreed to.  I don't care who they come from.

20    There's not a government 1 and a defense 1, they're just --

21    just give them numbers.  And when we get to letters, it's A

22    to Z, then AA, AB, not AA, BB.  I once tried a case, we got

23    up to 7Q.  It's very difficult to the court reporter.  Now,

24    that's my protocol.

25          So have we followed that?

```
 1              MR. TEITELBAUM:  We have, absolutely, your Honor.

 2              THE COURT:  Okay.  I thought so.

 3              MR. TEITELBAUM:  Mr. Cohen and I have had, and

 4    there have been some conversations between the parties as

 5    recently as last night about some additional exhibits that

 6    are unobjected to and have been assigned numbers.

 7              THE COURT:  And, therefore, you need do nothing.

 8    You need not offer them.  If they have numbers then I am

 9    accepting them as part of the record, and it will be my duty

10    to be conversant with them in making my findings of fact.

11              MR. COHEN:  Your Honor, may I be heard briefly?

12              THE COURT:  Yes.

13              MR. COHEN:  There are two numbered exhibits that

14    we have advised the government, at least one of which I know

15    they're going to use with Mr. Christie, that we

16    inadvertently did not object to.  There are 1400 exhibits

17    that the government gave us.

18              THE COURT:  I have no problem.

19              MR. COHEN:  So they have refused --

20              THE COURT:  I accept your representation.

21              MR. COHEN:  I'm going to object to those.  There

22    are only two.

23              THE COURT:  I appreciate it.  And thank you,

24    Mr. Cohen.

25              MR. TEITELBAUM:  Your Honor, the withdrawal of
```

```
 1    those exhibits would be over the government's objection.
 2              THE COURT:  Well, I'm going to allow them to
 3    withdraw and then we'll sort it out.  But inadvertence is
 4    understood.  It's a complex case.
 5              MR. TEITELBAUM:  Understood, your Honor.
 6              THE COURT:  Go ahead.
 7              MR. TEITELBAUM:  So if we could show the witness
 8    Exhibit 347.
 9              (On screen.)
10    Q.   And, Mr. Christie, it's up to you if you'd like to take
11    a look in the binder or not.  It's also going to be pulled
12    up on the screen.  I can tell you that this is an investor
13    presentation that you and Mr. Haralson gave that has some
14    cover e-mail correspondence.
15              THE COURT:  Just a moment.
16              MR. TEITELBAUM:  Absolutely, your Honor.
17              THE COURT:  Excuse me.  In a very real sense, I
18    work for Ms. Gaudet, who has properly advised me that under
19    your agreements certain exhibits are not to be thrown up on
20    the public screen.  That's fine.  But you must advise me as
21    to that so we're all clear as to how we're going forward.
22              So you're showing him Exhibit --
23              MR. TEITELBAUM:  347, your Honor.
24              THE COURT:  Thank you.
25    Q.   And, Mr. Christie, it's up to you if you'd like to look
```

1    in the binder.

2            MR. TEITELBAUM:  But, specifically, could we

3    please show the witness pages 14 and 16 of that exhibit

4    which, for the record, are the Bates ending in 944 and 946.

5            (On screen.)

6    Q.   And, Mr. Christie, take whatever time you need, but if

7    you'd also like to look on the screen there, you can see two

8    pages from that deck?

9    A.   I see it on the screen.

10   Q.   Okay.

11   A.   And I'm now finally to the page.

12   Q.   Understood.  Do those look like two pages from an

13   investor presentation from November of 2022?

14   A.   It does look like it, yes.

15   Q.   It looks like you gave that presentation with Mr. Scott

16   Haralson, the chief financial officer of Spirit?

17   A.   Yes.

18   Q.   I'm going to have a few additional questions for you

19   about this exhibit.

20           MR. TEITELBAUM:  So let's start with, if we could

21   please turn to the pages, the page ending in 959, Bates

22   number.  And at this time there are no confidentiality

23   concerns with this page, so I would ask that it be published

24   to the gallery as well.

25           THE COURT:  Well, the default is the other way.

1    Let's not waste time with things -- understand, this Court

2    has a very strong concern with trying this public trial

3    publicly.  I've said that in the pretrial conference and I

4    insist on it.  But I will honor your agreements as to

5    confidentiality by not throwing them up on the screen.

6              Go ahead.

7              MR. TEITELBAUM:  Understood, your Honor, it's

8    certainly the government's preference as well for as much --

9              THE COURT:  Well, you needn't -- when you've

10   just -- when you're with me, you need not gild the lily.

11             MR. TEITELBAUM:  Understood.

12             THE COURT:  Go ahead.

13   Q.   Mr. Christie, this slide reflects here, as of

14   November 2022, what we were talking about before, that

15   Spirit's the largest ultra low-cost carrier in the Americas;

16   is that right?

17   A.   Yes.

18   Q.   And this also reflects the comparative fleet sizes of

19   the different carriers; right?

20   A.   Yes.

21   Q.   And so we see that as of November of 2022, Spirit was

22   at about 184 aircraft compared to 115, 116 for Frontier and

23   Allegiant?

24   A.   Correct.

25   Q.   And since November of 2022, Spirit's actually taken

1    delivery of more aircraft; is that right?

2    A.   We have, yes.

3         MR. TEITELBAUM:  All right.  If we could go,

4    please, now to the slide ending in Bates number 960, which

5    is just the next slide.

6    Q.   So we were talking about unit operating costs

7    previously.  Fair to say that this is a graph reflecting a

8    comparison of CASM, or the unit operating costs for a

9    variety of airlines operating in the United States?

10   A.   It represents CASM, excluding fuel, for the trailing

11   twelve months of the third quarter of '22.  Correct.

12   Q.   And that's one version of CASM that airlines sometimes

13   look at to exclude the volatility of fuel prices?

14   A.   That's right.

15   Q.   And on this graph here, Spirit, Allegiant and Frontier

16   are towards the bottom on the left?

17   A.   Correct.

18   Q.   And those are the carriers with the lowest unit

19   operating costs on this graph; right?

20   A.   Yes.

21   Q.   And then JetBlue is roughly in the middle with about

22   11.1 cents of CASM ex-fuel?

23   A.   Yes.

24   Q.   And the legacy carriers, United, Delta and American,

25   are up at the top right, or on the right-hand side with the

1   highest cost; is that fair?

2   A.   Yes.

3   Q.   And, in fact, based on the data from this November 2022

4   presentation, JetBlue's unit operating costs excluding fuel

5   are closer to the legacy airlines than they are to Spirit's;

6   right?

7   A.   It appears so, yes.

8   Q.   Let's go to the next slide which, for the record, is

9   the Bates ending in 961.

10          THE COURT:   Where does this data come from?   Is

11   this generally known throughout the industry?

12          THE WITNESS:   Well, most of these airlines, in

13   fact, I think at this point all of them are public airlines,

14   so they report information in their SEC filings.   And then

15   all the airlines consume that data and use it to --

16          THE COURT:   So from the SEC filings, this

17   information and, therefore, this graph can be generated?

18          THE WITNESS:   Yes, that's correct.   And there are

19   additional sources of public data that we consume as well.

20   We make a significant number of reports to the Department of

21   Transportation, and often that data is used to help inform

22   investors and make comparisons.

23          THE COURT:   Understood.   Thank you.

24          THE WITNESS:   Uhm-hmm.

25   Q.   So turning to the slide ending in 961 now,

 1    Mr. Christie, there's -- that's an "Explanation of how

 2    Spirit keeps costs down"; right?  That's the title of the

 3    slide?

 4    A.   That's the title, yes.

 5    Q.   So I want to ask you a few questions about most but not

 6    all of these bullet points here.  So at the top left,

 7    "High-seat density and asset utilization," would you mind

 8    briefly explaining to the Court how those things contribute

 9    to low operating costs?

10    A.   Okay.  The most expensive asset that an airline has is

11    its airplane, and the crews and labor to support that

12    aircraft.  And so seat density is really a moniker for how

13    many seats are on the aircraft.  If you put more seats on

14    the airplane, you spread the expenses associated with that

15    airplane and that crew over more seats, which gives you a

16    lower unit cost advantage.

17        And the second way that you can drive cost efficiency

18    with that expensive asset and those crews is to increase the

19    number of hours that airplane is in revenue service every

20    day, which is commonly referred to here as "asset

21    utilization."  So the combination of relative density, or

22    number of seats on the airplane, plus how many hours you

23    operate does contribute to unit cost, to lowering your unit

24    cost.

25    Q.   Thank you.  And then if we could move on to

point-to-point itineraries.  Could you briefly explain to
the Court how that contributes to keeping unit costs down?
A.   I'll try to keep it brief again, but the idea here is
the network construct of each individual airline varies.
Point-to-point itineraries mean an airport is leaving any
individual city and going to its next.  And it's turning the
airplane, removing passengers from that aircraft, and
putting new passengers on, and that aircraft is moving as
quickly as possible to its next destination, which keeps the
relative period of time on the ground lower.

      In a more network construction, or a network airline
will build hub-and-spoke airlines, which the airplanes all
generally concentrate into a single large city.  All those
airplanes arrive, passengers get off those airplanes and
connect to other aircraft on the ground, and then those
airplanes depart again.  And that can cause you to have more
aircraft time on the ground waiting for people to connect
and transmit to other airlines, which is why that is
generally referred to as a higher cost approach.
Q.   And so, for instance, the legacy airlines that we
discussed before typically operate a hub-and-spoke network;
is that accurate?
A.   They do.  And to be fair, Spirit does have some
elements of hub structure in its network today that -- in
certain cities.  But largely we operate a point-to-point

1    type network.

2    Q.   And the somewhat hub nature that you referred to for

3    Spirit's network, there's some hub activity in Fort

4    Lauderdale; is that fair?

5    A.   We do have some -- we do structure our network in and

6    out of Fort Lauderdale with a hub-type structure, and we

7    have some limited hub-type structure also in Orlando and

8    Houston.

9    Q.   But otherwise largely a point-to-point network for

10   Spirit?

11   A.   Correct.

12   Q.   Then, briefly, if we could move to, "Very low overhead

13   costs," if you could please explain to the Court what those

14   are referring to for Spirit's business model?

15   A.   Well, "overhead" in this case, we're referring to those

16   fixed expenses that any business has to deliver its product

17   to its consumers.  That would be members of the general and

18   administrative team, your headquarter's facilities, other

19   physical plant, those types of things.  And Spirit strives

20   to remain as efficient as possible and keep its overhead

21   costs very low.

22           THE COURT:  What about your ground personnel that

23   are not engaged in aircraft maintenance?  I take it the

24   aircraft maintenance is dealt with in this high-seat

25   density.  But what about your gate agents and people who

1   direct, take care of complaints and things like that?  How

2   do you address that?

3           THE WITNESS:  Well, it's an interesting concept

4   because there are elements of both your maintenance, your

5   crew, and your gate service personnel that are fixed in

6   nature.  So, you know, there are times when they are not

7   efficient.  They are sitting waiting for airplanes.  They

8   are -- there's physical expense that doesn't get utilized in

9   your maintenance crew as well.  So having high-seat density

10  and asset utilization assists in driving unit costs

11  throughout the business, but there are elements of fixed

12  expense across the board in some of those places you

13  mentioned.

14          THE COURT:  Very well.  Go ahead.

15          MR. TEITELBAUM:  Thank you, your Honor.

16  Q.   And Spirit has actually been effective at using a small

17  number of gates to generate a significant amount of traffic

18  at some of these airports; is that fair?

19  A.   Yes.  We, again, back to the asset-utilization concept,

20  one of the assets that you look to utilize to keep your

21  costs low is the physical plant or the gate itself.  And so

22  we strive to turn more airplanes per day on a gate than an

23  average airline.

24  Q.   And some other overhead costs that other airlines might

25  incur would include premium lounges at certain airports; is

1    that fair?

2    A.    Yeah.   We view that as an additional overhead expense,

3    yes.

4    Q.    And Spirit does not maintain lounges for premium

5    passengers at any airports; is that correct?

6    A.    We do not, no.

7    Q.    And similarly, having to cater or maintain a first

8    class cabin, that could be another overhead cost; is that

9    right?

10    A.    There is overhead associated with that and a first

11    incremental variable expense as well.

12    Q.    So let's move on and talk about unbundled fares for a

13    bit.   Could you please briefly explain to the Court how

14    unbundled fares contributes to keeping costs down?

15    A.    Well, our structure, our product structure is that we

16    offer an a la carte product, which means our guests can pick

17    and choose elements of their transportation that are

18    important to them.   That is a component of the product

19    offering we have, but we also believe that it does drive

20    some behavior with our guests that can contribute to

21    low-cost behavior.   For example, we do have separate charges

22    for bags, be they carry-on bags or assigned bags -- or,

23    excuse me, checked bags.   For that reason, our guests, on

24    average, carry fewer bags than on other airlines.   Which

25    means we have less infrastructure to manage the bags, we

1    have less weight on board the airplane when it's flying

2    because we have fewer bags.  That's one way that it can

3    contribute.

4    Q.   And the a la carte structure also gives customers

5    choice about which of those offerings they value as opposed

6    to which ones they don't want to pay for; is that fair?

7    A.   We believe so, yes.

8    Q.   Spirit introduced the unbundled fair concept to the

9    United States; is that right?

10   A.   We like to think so, yes.

11            MR. TEITELBAUM:  If we could go forward in this

12   same slide deck to the Bates number ending in 963, please.

13   A.   Did you say 3?

14   Q.   Yes, ending in 963.  And we'll have it on the screen

15   for you too, if you prefer that.

16        So this is a schematic of the different ancillary

17   product offerings that Spirit has on board its planes; is

18   that right?

19   A.   Yes.

20   Q.   And on the right-hand side we see the different things

21   that a passenger could choose to pay for?

22   A.   These are some of them, yes.

23   Q.   And by the same token, a passenger could choose to not

24   pay for any of these things; right?

25   A.   That's correct.

1    Q.    And, in fact, some Spirit passengers do, in fact, just

2    choose the base fare on Spirit; right?

3    A.    Yes.

4    Q.    Now, I'd like to just talk about some other airlines

5    and their partially unbundled or unbundled offerings as well

6    as some legacy carriers.  So let's talk about basic economy

7    on a legacy carrier like Delta, for instance.  To your

8    knowledge, basic economy passenger on Delta is still going

9    to receive snacks and drinks to some degree on that service;

10   right?

11   A.    I think so, but I'm not a hundred percent certain.

12   Q.    And when that service is included in the base price of

13   a ticket, that means that it's baked into the price that the

14   passenger has to pay; right?

15   A.    Yeah.  It's all part of that, that price.  I guess it's

16   bundled into that price.

17   Q.    And similarly, when JetBlue offers Wi-Fi to all of its

18   passengers as part of the ticket price, passengers pay for

19   that in their ticket price no matter what; right?

20   A.    Well, yes.  I mean, to be clear, they don't have an

21   option not to have Wi-Fi.  In JetBlue's case it's offered

22   complimentary across the cabin, although fares themselves

23   can be competitive, but yes.

24   Q.    In other words, a JetBlue passenger doesn't have an

25   option to pay $8 less and not get Wi-Fi?

```
 1   A.    That's my understanding, yes.

 2            MR. TEITELBAUM:  If we could go back to slide 18

 3   in this presentation.

 4   Q.    There's a bullet on the slide we were looking at,

 5   Mr. Christie, about operating a uniform A320 family fleet.

 6   Could you please briefly explain to the Court how that

 7   contributes to keeping costs down?

 8   A.    In Spirit's case we operate, it says here, we operate

 9   in all Airbus A320 family fleet.  We operate all the

10   variants of the Airbus A320 family, which include the

11   smallest which is the A319, the midsize which is the 320,

12   and the largest airplane which is the 321.

13        The benefit to operating a uniform fleet from a cost

14   perspective is twofold.  One is that it is the same exact

15   training and cockpit for your flight crews, both for your

16   inflight crews and your pilots.  And secondarily, they are

17   maintained roughly the same.  They have a similar amount of

18   spare parts that are in common and allow you to keep your

19   costs lower because you operate that uniform fleet.

20   Q.    And similarly, could you explain to the Court how the

21   flying young, fuel-efficient aircraft, in the bottom right

22   there, contributes to keeping costs down?

23   A.    So in this case we're referring principally to the

24   variable operating expense of the aircraft.  And I'll

25   clarify that in a second.  But when you fly newer aircraft,
```

1    they tend to be more fuel-efficient than older aircraft,

2    which is good for variable operating expenses.  Also younger

3    aircraft tend to be more reliable, meaning they spend less

4    time in maintenance, which means they're up and operating

5    more frequently.  The offset to that, of course, is newer

6    aircraft are more expensive to buy.  So you have a higher

7    fixed cost.

8              MR. TEITELBAUM:  If we could take a look at the

9    Bates number ending in 964.  That's page 21 of this slide

10   deck.

11   Q.   This is a diagram reflecting various features of

12   Spirit's young uniform Airbus fleet; is that right,

13   Mr. Christie?

14   A.   Yes.

15   Q.   And the graph in the lower right-hand corner reflects

16   the average fleet age of the different airlines operating in

17   the United States?  We can blow that up for you.

18   A.   Yes.

19   Q.   And as of November 2022, from this slide deck, this

20   reflects that Spirit had the second youngest fleet of the

21   airlines listed here; is that right?

22   A.   Correct.

23             MR. TEITELBAUM:  All right.  Now, if we could

24   please go to slide 19, which is the Bates number ending in

25   962.

1    Q.   All right.  So this slide is entitled, "Focused on the
2    VFR and leisure customer."  Can you please tell the Court
3    what "VFR" stands for in the airline industry?
4    A.   That's an acronym for "visiting friends and relatives."
5    Q.   And leisure customers, pretty much what it sounds like,
6    people not traveling for business?
7    A.   Correct.
8    Q.   Fair to say that Spirit's product is not in any way
9    restricted to just people flying for visiting friends and
10   relatives and leisure; you accept business travelers as
11   well?
12   A.   We do accept business travelers, yes.
13   Q.   And really Spirit's product is for anyone who's looking
14   for what Spirit's value proposition is; right?
15   A.   That's correct.  We offer a product intended to attract
16   a number of people based on the fare we charge and the
17   routes we serve and the products we offer.
18   Q.   And when this slide reflects, in the top left bubble,
19   "Ultra low fares (and total prices including all
20   ancillaries)," "ancillaries" is a reference to the
21   additional add-on products that a customer can buy?
22   A.   That's correct.
23   Q.   And so "including all ancillaries" is a reflection that
24   Spirit is still offering a low fare even taking into account
25   the extras that someone might buy; right?

1    A.    That's correct.  Of course, this is taken on average

2    across our entire system.  But, yes, when compared to other

3    averages at other airlines, this is correct.

4    Q.    All right.  And then in the top right, there's a

5    reference to, "To and from top destinations and major

6    airports."  Would you agree that Spirit maintains a strong

7    position among ULLCs in large metropolitan areas?

8    A.    We have worked to establish that, yes.

9    Q.    And Spirit manages to operate successfully out of

10   primary airports in cities; is that fair?

11   A.    In most of them, yes.

12   Q.    And a primary airport would be something like LaGuardia

13   or Newark in the New York City metropolitan area; right?

14   A.    Yeah.  I would refer -- yes.  I would refer to them

15   that way.

16   Q.    And that would be contrasted with Islip Airport, for

17   instance, in Long Island?

18   A.    In that good example, correct.

19   Q.    You've actually observed, in your time at Spirit, that

20   other ultra low-cost carriers have not had as much success

21   maintaining a presence in those primary airports; is that

22   right?

23   A.    I have.  I have thought of -- I can think of a few

24   examples where we've seen some ultra low-cost carriers enter

25   markets like those and leave, yes.

 1   Q.   For instance, Frontier, you've observed, has had

 2   difficulty maintaining a presence at the primary New York

 3   metropolitan area airports; right?

 4   A.   Well, in this case we may be referring to Newark

 5   Airport.  I think their presence in LaGuardia has been

 6   consistent as long as I can think of.  So they've been

 7   maintaining that presence there.  But you may be referring

 8   to Newark Airport.

 9   Q.   And, in fact, in recently, you observed that Frontier

10   had to retreat back to Islip Airport instead of maintaining

11   that presence in Newark; right?

12   A.   I don't remember exactly when it was, but I know

13   Frontier did cut their service from Newark Airport.

14         MR. TEITELBAUM:  So I'd ask the witness be shown

15   what's been marked for identification as Exhibit ZW.

16   Q.   And, Mr. Christie, that will also be in your binder

17   marked as ZW, if you'd like to look at it.

18         MR. TEITELBAUM:  And if we could please bring this

19   up on the screen for the witness but, of course, not publish

20   it.

21   Q.   And it's up to you, Mr. Christie, but we do have the

22   exhibit for you up on the screen if you'd like to look at

23   that.

24   A.   I'm becoming more farsighted, so I'm trying to decide

25   which one to --

```
 1                THE COURT:  Do I have it?

 2                MR. TEITELBAUM:  Yes, your Honor.  And I'll just

 3     confirm that it's not labeled accurately here.  Just one

 4     second.  If I could have just one moment, your Honor, this

 5     may be an exhibit about which there was recent discussion to

 6     assign it a number.

 7                MR. COHEN:  Your Honor, if I could be helpful, I

 8     have no objection to the admission of this exhibit.

 9                THE COURT:  Very well.  ZW, wherever it is, will

10     have the next number, which is what?

11                MR. TEITELBAUM:  That will be Exhibit 348, your

12     Honor.

13                THE COURT:  ZW is 348 in evidence.  And if anyone

14     could give it to me, I'd appreciate it.

15                (Exhibit 348 received in evidence.)

16                MR. TEITELBAUM:  I will just ask my colleagues if

17     they can retrieve a copy of Exhibit ZW, now 348, for the

18     Court.

19                THE COURT:  Yes, but you can go ahead.

20                MR. TEITELBAUM:  Thank you, your Honor.

21                If we could please magnify the top half of this

22     exhibit.

23                Is it all right for us to approach the bench to

24     provide the exhibit?

25                THE COURT:  Of course.
```

```
 1              MR. TEITELBAUM:  Thank you, your Honor.
 2              (Handing.)
 3              MR. TEITELBAUM:  And actually, before we magnify
 4    that portion of the text, let's just magnify the from, to,
 5    and the subject.
 6    Q.   So the top e-mail here, Mr. Christie, is from Mr. Mac
 7    Gardner to yourself; is that right?
 8    A.   Yes.
 9    Q.   And Mr. Gardner is a, also, the chairman of Spirit's
10    board of directors?
11    A.   He is the chairman, yes.
12    Q.   The subject line is, "Re:  Frontier is launching
13    eighteen new routes to Florida and beyond with a special
14    focus on rival Spirit's home airport of Fort Lauderdale.
15    See the full list."  Right?
16    A.   Yes.
17    Q.   And then if we can take that magnification away, and
18    there's an e-mail from you dated November 30th, 2021, at
19    7:50 p.m.  And if you could please read this portion of the
20    e-mail that you wrote, sir?
21    A.   "Well, the message that we're receiving (if they're
22    trying to send one) is that they can't make big city East
23    Coast strongholds like Newark and Miami work for them, so
24    instead they are retreating back to Islip, Stewart and Fort
25    Lauderdale.  Their FLL announcement, by the way, largely
```

```
 1    does not overlap with us (with the exception of Atlanta and
 2    Philly), so not sure that is an aggressive message either."
 3    Q.   So this would be an example of you having observed
 4    Frontier retreating from a primary airport and going back to
 5    a secondary or tertiary airport; is that fair?
 6    A.   Yes.
 7              MR. TEITELBAUM:  All right.  We can take that
 8    exhibit down.
 9    Q.   So we've talked a little bit about Spirit's value
10    proposition.  And you've also testified about this before
11    the House Infrastructure Committee; is that right?
12    A.   I believe so, yes.
13    Q.   In 2019.  Does that sound right?
14    A.   That sounds right.
15    Q.   And the overarching purpose of that testimony was
16    the -- it related to a passenger facility charge at
17    airports; right?
18    A.   Correct.
19    Q.   And that testimony was truthful and under oath?
20    A.   Yes.
21    Q.   And this is Exhibit 121, if we could please play that
22    in open court.
23              (Video playing.)
24    Q.   So understanding that the size of Spirit has changed
25    substantially since 2019; is that fair?
```

1   A.    We are larger than we were, yes.

2   Q.    But regarding some other aspects of your testimony, you

3   mentioned during your testimony that Spirit's fares are on

4   average 30 percent lower than other airlines in the United

5   States; do you recall that portion?

6   A.    Yes.

7   Q.    And that's an example of Spirit's competitive advantage

8   versus other airlines in the United States; is that right?

9   A.    I think that shows our product offering, that our

10  average fares are, again, on average lower.

11  Q.    And, once again, your reference there to including all

12  ancillary charges reflects that the total fare is actually

13  lower by 30 percent on average; right?

14  A.    Yes.

15  Q.    It's not a situation where once you account for a

16  checked bag or an advanced seat assignment that suddenly

17  that advantage goes away?

18  A.    That's correct.  Again, dealing with averages, because

19  it can move consistently across the spectrum.

20  Q.    And you referenced during your testimony also Spirit's

21  focus on a customer base that's price-sensitive who pay for

22  their own tickets.  Fair to say that's still true today?

23  A.    We believe so.

24  Q.    And the reference to paying for their own tickets, that

25  it is a contrast with business travelers who are often

1   traveling at their employer's expense; right?

2   A.   That tends to be the distinction, yes.

3   Q.   And similarly, a price-sensitive passenger may not have

4   the extra cash on hand to pay for a premium economy ticket

5   on another airline?

6           MR. SHORES:  Objection, your Honor.

7           THE COURT:  Yes, sustained to the question.  I

8   didn't understand it, for one thing.

9           MR. TEITELBAUM:  Understood, your Honor.  I'll

10  move on.

11          THE COURT:  All right.

12          MR. TEITELBAUM:  Now, if we could please skip

13  forward in the video a little bit that we've been playing

14  and start playing at 154, for the record.

15          (Video playing.)

16  Q.   Just a couple questions about that portion of your

17  testimony.  For a tiny bit of background, the passenger

18  facility charge is a fee that gets added to tickets, airline

19  tickets?

20  A.   Yes.

21  Q.   And it's charged by airports, essentially?

22  A.   Yes.

23  Q.   And so you were referencing even a $64 increase in the

24  total cost of a vacation would have a meaningful impact on

25  some Spirit passengers; is that right?

```
 1    A.    It could have an impact on their decisions, yes.

 2    Q.    And you reference if travel prices rise, they will

 3    travel less.  That's just a recognition that an increase in

 4    price can contribute to people just not taking trips; right?

 5    A.    It may, yes.

 6              MR. TEITELBAUM:  All right.  We can take that

 7    exhibit down.  Thank you.

 8    A.    Startlingly older now.

 9    Q.    All right.  So now I'd like to talk to you a little bit

10    about the practical impact of Spirit's business model and

11    its low cost structure.  Ultimately, you'd agree with me

12    that Spirit's responsibility as a for-profit corporation is

13    to turn a profit; is that fair?

14    A.    It's one of them, yes.

15    Q.    And in broad strokes, profit occurs when revenue

16    exceeds costs; right?

17    A.    Yes.

18    Q.    And so lower operating costs gives Spirit the

19    flexibility to operate profitably at lower fare levels;

20    right?

21    A.    That is our belief, yes.

22    Q.    And are you familiar with something called the "Spirit

23    Effect"?

24    A.    Yes.

25    Q.    Could you please briefly explain to the Court what the
```

1    Spirit Effect is?

2    A.   We describe the Spirit Effect insofar as it's basic

3    economics.  We're in a supply-demand environment, which

4    means that there is demand for product, and there is a

5    corresponding supply of that product, and the clearing price

6    of that product shows you where those two curves intersect.

7    And the Spirit Effect basically says if you can lower fares,

8    you're stimulating additional demand into the marketplace.

9    So more people travel more frequently with lower fares.

10   Q.   So, in other words, there's a component of the Spirit

11   Effect that is driving fares down on a route; is that right?

12   A.   To be clear, it's trying to come into a market with

13   lower fares than existed prior to our existence.  However,

14   we are actively managing the revenue on our aircraft so that

15   we can charge the highest amount we can to achieve our

16   target margins, yes.

17   Q.   Understood.  And yet at the same time, Spirit's value

18   proposition is to charge low fares and attract business that

19   way; right?

20   A.   That is our entry point.  We come into a market with

21   lower fares in an attempt to stimulate more activity, yes.

22   Q.   You reference the demand stimulation.  That's bringing

23   more travelers on to a route total; right?

24   A.   That is our goal.  It's either more travelers or more

25   frequent travelers.

1    Q.   That's just -- that's not just attracting customers to

2    fly Spirit; right?

3    A.   Can you --

4    Q.   Sure.  It's attracting customers to fly Spirit, but

5    also increasing the total size of the passenger activity on

6    a particular route; right?

7    A.   That is -- we believe that's the way it works, is the

8    stimulation increases the size of the total buy.

9              MR. TEITELBAUM:  All right.  I'd ask that the

10   witness be shown Exhibit 298, but I'm not asking for it to

11   be published at this moment just to get to the right page

12   before we do that.

13   Q.   So if you want to look at the first page that's on your

14   screen there, Mr. Christie, that's some e-mail

15   correspondence about some board of director slides from

16   2021; right?

17   A.   Yes.

18   Q.   And if we could go -- and fair to say that as the CEO

19   you're involved in presentations to the board of directors?

20   A.   I am.

21   Q.   And you review them for accuracy?

22   A.   I do.

23             MR. TEITELBAUM:  If we could please go to page 26

24   of the exhibit altogether, and then publish that.

25             MR. COHEN:  Bates number, please?

```
 1              MR. TEITELBAUM:  It does not have a Bates number
 2    because it is the color version of that exhibit.
 3              MR. COHEN:  Thank you.
 4              MR. TEITELBAUM:  And if we could please publish
 5    that.
 6              THE CLERK:  You want it published?
 7              MR. TEITELBAUM:  Yes, please.
 8              (On screen.)
 9    Q.   All right.  Mr. Christie, what you see here is a
10    diagram of the Spirit Effect in action, essentially; right?
11    A.   Yes.
12    Q.   And is there -- there's someone at Spirit in your chain
13    of command that reports to you who's responsible for
14    calculating and monitoring the Spirit Effect; is that right?
15    A.   I don't think we have a regular monitor of the Spirit
16    Effect, but I know that in the planning department they
17    have, at times, prepared presentation slides like this for
18    us, yes.
19    Q.   And it's the individuals that report to John Kirby who
20    are responsible for that; right?
21              THE COURT:  I'm lost.  You're on exhibit number?
22              MR. TEITELBAUM:  We are on Exhibit Number 298,
23    your Honor.
24              THE COURT:  And the page number?
25              MR. TEITELBAUM:  It is very nearly the last page.
```

1    The color version was produced to us without Bates numbers,

2    but I could point you to it from the back --

3              THE COURT:  I have it.  I have it.

4              MR. TEITELBAUM:  Thank you.

5              THE COURT:  Proceed.

6    Q.   And I just want to talk to you very briefly about the

7    three examples that are on this chart.  So on the far left

8    we've got a discussion of the Newark to Fort Lauderdale

9    route; is that right?

10   A.   Yes.

11             MR. TEITELBAUM:  And if we could please magnify

12   that portion of the exhibit.

13   Q.   All right.  And what this is reflecting here, we're

14   talking about a comparison of the twelve months before

15   Spirit entered this route and the twelve months after; is

16   that right?

17   A.   I believe that's what the footnote says, although

18   it's -- yes.

19   Q.   Okay.  And so what this graph is showing is that

20   comparing those two time periods, Spirit's entry was

21   connected with an 88 percent increase in overall passenger

22   traffic?

23   A.   Yes.

24   Q.   And a 33 percent reduction in fares; is that right?

25   A.   In the average fare, which includes our fare.

```
 1    Q.    Understood.
 2            MR. TEITELBAUM:  And then if we could move to the
 3    middle exhibit and magnify that.  And, I'm sorry, if we
 4    could include the name of the route there.
 5    Q.    So this is Newark to Myrtle Beach, South Carolina.
 6    Just a quick question separate from the data that's here.
 7    In your position as the CEO, and within Spirit Airlines, a
 8    route is sometimes referred to as a market; is that right?
 9    A.    It can, yes.
10    Q.    And so a market is a synonymous term for an origin and
11    destination pair?
12    A.    We have referred to it that way, yes.
13    Q.    So here we're looking at the Newark to Myrtle Beach
14    route, once again comparing before Spirit entered to after
15    Spirit entered; right?
16    A.    Yes.
17    Q.    And here what's reflected is a 398 percent increase in
18    overall passenger traffic; right?
19    A.    Yes.
20    Q.    And a 60 percent average decrease in fares; right?
21    A.    Yes, including our fare.  Yes.
22            MR. TEITELBAUM:  And then if we could move to the
23    far right portion of the diagram.
24    Q.    And so here, looking at the average of all Spirit
25    markets systemwide, this reflects a 30 percent overall
```

1   increase in passenger demand upon Spirit entry; right?

2   A.   I think for the same time period measured, I'm

3   guessing, yes.

4           THE COURT:  Well, you're guessing.  That's what

5   you're --

6           THE WITNESS:  Again, I assume it is for the same

7   time period.

8   Q.   And to avoid any assumptions or guessing, do you want

9   to take a quick look at the footnote again just to confirm

10  the sourcing of that data?

11  A.   If you don't mind.

12          MR. TEITELBAUM:  If we could take that

13  magnification down, please, and just bring that footnote up.

14  Q.   And that reflects the full twelve months before and

15  after Spirit enters a market; right?

16  A.   Good clarity.  Yes.

17  Q.   Okay.  All right.  And so a 22 percent, on average,

18  reduction in fares, including Spirit's?

19  A.   Correct.

20          MR. TEITELBAUM:  All right.  We can take that

21  exhibit down.

22  Q.   So we've discussed a lot about dollars and cents in

23  Spirit's business model.  But we've also talked a little bit

24  about how Spirit produces satisfied customers too; right?

25  It's not just about dollars and cents?

1    A.    I think you mentioned some of the awards we won,

2    perhaps, yes.

3    Q.    And Spirit also attracts repeat customers on its

4    routes?

5    A.    We believe so, yes.

6    Q.    It's not as if Spirit's entire customer base is people

7    flying Spirit for the first time and then never again?

8    A.    No.

9    Q.    So I'd like to talk briefly about repeat customers and

10   some of Spirit's internal data.

11             MR. TEITELBAUM:  If we could, please, show the

12   witness the first page of Exhibit 304.

13             (On screen.)

14   Q.    And this is a slide presentation that's entitled,

15   "Profiling by trip type," on the very first page of that

16   slide deck; is that right, Mr. Christie?

17   A.    I see that, yes.

18   Q.    And fair to say that one of the things that Spirit does

19   in the operation of its business is to monitor customer

20   satisfaction?

21   A.    Yes.

22   Q.    And keep track of how the brand is being perceived?

23   A.    We do survey our guests, yes.

24             MR. TEITELBAUM:  And so if we could please go to

25   page 27 of the exhibit and also publish this to the gallery.

```
 1              (On screen.)
 2   Q.   We've got it on the screen for you, or if you'd like to
 3   go there on hard copy, this would be the little number 11 in
 4   the lower right on the hard copy.
 5   A.   I'll find you on the screen here.
 6   Q.   Okay.  So what this graph -- first of all, the slide is
 7   labeled, "Business guests repeat more frequently than
 8   leisure guests."  Right?
 9   A.   That's what the slide says, yes.
10   Q.   So there's some data here that's keeping track of the
11   different purposes of travel for some different customers
12   and different trip types for Spirit; right?
13              MR. COHEN:  Objection, your Honor.  Foundation.
14              THE COURT:  No, we'll see what the witness
15   answers.  The witness is capable of answering this question,
16   I assume.
17              Can you answer it?
18              THE WITNESS:  Can you reask the question?
19              THE COURT:  Yes.
20   Q.   This slide is showing some data about the trip types
21   for Spirit's repeat customers; right?
22   A.   I'm reading it.  I don't recall this presentation.
23   Q.   Understood.  But you can see from that --
24   A.   Yes.
25              MR. TEITELBAUM:  And if we could just briefly
```

1    magnify the data sources at the bottom of this slide deck.

2    Q.   This reflects that this slide deck comes from

3    post-flight survey and revenue data from June 5th, 2019 to

4    December 31st, 2019; right?

5    A.   I see that, yes.

6              MR. TEITELBAUM:  Okay.  We can take that

7    magnification down.

8    Q.   What this reflects is that for the time period in this

9    slide, 30.7 percent of business travelers were actually

10   repeat customers within the past six months; right?

11   A.   I believe that's the indication of the slide, yes.

12   Q.   Do you have any reason to doubt that this slide deck is

13   accurate?

14   A.   None that I can think of, no.

15             MR. TEITELBAUM:  And then if we could look at and

16   actually magnify the leisure column.

17   Q.   This reflects that 21 percent, 21.7 percent of leisure

18   customers during that time period were repeats within the

19   past six months; right?

20   A.   Yes.

21   Q.   And then there's also an additional 10.3 percent that

22   were within the past twelve months?

23   A.   Yes.

24             MR. TEITELBAUM:  Okay.  We can take that exhibit

25   down.  Thank you.

1   Q.   I have some general questions for you, Mr. Christie,

2   about the strategy and planning documents that Spirit uses

3   when it operates its business.  Are you familiar with

4   something called a five-year network plan?

5   A.   Yes.

6   Q.   And fair to say that that's something that the network

7   planning team prepares on an annual basis?

8   A.   They do prepare one usually.  It's not consistently --

9   usually for at least one review with our board annually, and

10  then we're constantly iterating that plan throughout the

11  course of the year.

12  Q.   And, once again, that's John Kirby, the vice president

13  of network planning who is responsible for that?

14  A.   Yes.

15  Q.   And that network plan, it lays out high-level

16  objectives for Spirit's route network in the coming years;

17  is that a fair description?

18  A.   I think it's fair to say it's a plan.  So it's our best

19  estimate of what we're looking at for the future five years,

20  yes.

21  Q.   And understanding that it's necessarily predictive,

22  it's intended to be realistic; right?

23  A.   It's based on the information we have as of that

24  moment, yes.

25  Q.   And then you're also familiar with something called a

1    five-year financial plan?

2    A.    I am.

3    Q.    And that's something else that Spirit creates on an

4    annual basis?

5    A.    Again, similarly, we do have a -- usually have an

6    update to that for our board annually, but it is a fluid

7    document that moves throughout the year.

8    Q.    And this is essentially an economic forecast reflecting

9    Spirit's prospects over the coming five years; is that

10   right?

11   A.    That's right.

12   Q.    And, ultimately, it's Scott Haralson, the chief

13   financial officer, who's responsible for preparing the

14   five-year financial plan?

15   A.    Scott and the financial planning and analysis team,

16   that's correct.

17   Q.    And I just have a few questions about what the inputs

18   are for the five-year financial plan.  The airline's

19   capacity is one of those inputs; is that fair?

20   A.    Yes.

21   Q.    And the cost structure of the airline as anticipated in

22   the coming years?

23   A.    As known and as anticipated, correct.

24   Q.    And anticipated fares and yields in the markets that

25   Spirit serves?

```
 1    A.    Again, we make an estimate, but yes.

 2    Q.    And, once again, understanding that it's predictive in

 3    nature, it's nonetheless something that you put together

 4    based on current market realities; is that fair?

 5    A.    Yes.

 6    Q.    And you use it to help drive business decisions going

 7    forward?

 8    A.    That's correct.

 9    Q.    Spirit has grown substantially in the past five years;

10    is that fair?

11    A.    We believe so, yes.

12    Q.    And, in fact, it's grown faster than legacy carriers?

13    A.    I think if you look at percentages that would be true,

14    yes.

15    Q.    And the same could be said for other ultra low-cost

16    carriers?

17    A.    Not sure about the more recent past, but it's going to

18    be close either way, yes.

19    Q.    And same with low-cost carriers; right?

20    A.    I believe so.

21          THE COURT:  Well, the same, low-cost -- ultra

22    low-cost carriers are growing faster than low-cost carriers,

23    or low-cost carriers are growing faster than legacy?  I

24    didn't get the comparison.

25          THE WITNESS:  I don't have all the data right at
```

1    my -- but my -- but my experience would tell me that the

2    ultra low-cost segment is growing, on percentage terms,

3    faster than the low-cost segment.  And the low-cost segment

4    is growing, on percentage terms, faster than the legacy

5    segment.

6    Q.    And specifically with respect to Spirit, Spirit is

7    growing faster on a percentage basis than low-cost carriers?

8    A.    I believe so, yes.

9    Q.    And Spirit has grown faster than other ultra low-cost

10   carriers on a percentage basis over the past five years?

11   A.    We have been among the fastest growing.  I'm hesitating

12   because more recently we're not.  So I don't know how much

13   that influences the number.

14   Q.    Well, let's just talk briefly.  As of June 2023, June

15   of this year, Spirit was planning on a compound annual

16   growth rate of 13 to 17 percent; is that right?

17   A.    For our forward five-year plan?

18   Q.    Yes.

19   A.    It's possible that that was the number provided, yes.

20   Q.    And as of 2021, that 13 to 17 percent compound annual

21   growth rate also seemed realistic to Spirit, right, going

22   forward?

23   A.    I believe so.  Although the numbers are a bit jumbled

24   during the course of the pandemic because there was

25   significant reduction in size over the course of the year

1  2020 and 2021, and that does influence the percentages,

2  but...

3  Q.   And would you agree that it still, as of June 2023, it

4  was Spirit's objective to achieve a 13 to 17 percent

5  compound annual growth rate going forward?

6  A.   That was our plan for the five-year network plan.  Of

7  course, that has changed significantly over the past four or

8  five months.

9  Q.   All right.  And we can talk about that in a little bit.

10 But you would agree with me that as of June 2023 that was

11 the plan?

12 A.   I think that was our target growth rate.

13 Q.   And fair to say that Spirit plans to increase the size

14 of its route network over the next five years?

15 A.   Yes.

16 Q.   And Spirit plans to continue adding international

17 service in the coming years as well; right?

18 A.   We think so, yes.

19 Q.   All right.  So now let's circle back to the proposed

20 transaction that's on the table here.

21        MR. TEITELBAUM:  And if you could just give me one

22 moment, your Honor.

23        THE COURT:  Of course.

24        (Whereupon counsel conferred.)

25 Q.   So stepping back to February of 2022, Mr. Christie,

1    fair to say that the plan as of that time was that Frontier

2    Airlines was going to acquire Spirit Airlines; right?

3    A.    Yes.

4    Q.    And there was actually -- there was a signed merger

5    agreement to that effect that was in place as of the earlier

6    part of February 2022?

7    A.    That's correct.

8    Q.    And the transaction with Frontier, that was primarily a

9    stock transaction as opposed to cash; right?

10   A.    Largely a, what they referred to as an equity swap

11   transaction.  Correct.

12   Q.    So most of what Spirit's shareholders were going to get

13   in that transaction was going to be Frontier stock as

14   opposed to cash?

15   A.    Most of it.  That's correct.

16   Q.    But there was some -- still some cash involved; right?

17   A.    Also correct.

18   Q.    And you supported the transaction with Frontier as of

19   February of 2022; is that right?

20   A.    I did.

21   Q.    And the rest of Spirit's board of directors also

22   supported it?

23   A.    We did.

24   Q.    And it was about a month and a half after that merger

25   agreement with Frontier was signed that you first got an

1  offer from JetBlue to acquire Spirit; is that right?

2  A.   Yes.

3  Q.   It was in March of 2022?

4  A.   Very late March, yes.

5  Q.   And it was an offer, cash, of $33 a share; is that

6  right?

7  A.   Yes.

8  Q.   And at that time Spirit engaged Barclays and Morgan

9  Stanley as financial advisers to evaluate this proposal;

10 right?

11 A.   They were already engaged as our financial advisors,

12 but I believe we did meet with them to discuss that

13 proposal.

14 Q.   You directed them to invest time in analyzing this

15 proposal; is that fair?

16 A.   Yes.

17 Q.   And Spirit Airlines itself also invested time in

18 analyzing whether or not the transaction with JetBlue would

19 be reasonably consummated; is that fair?

20 A.   That is the threshold that was specifically referenced

21 in our merger agreement with Frontier.  So we did invest

22 some time understanding the regulatory review process and

23 JetBlue's strategy for that, yes.

24 Q.   And while Spirit was evaluating this offer from

25 JetBlue, JetBlue actually sent Spirit a revised offer at the

```
1    end of April 2022; right?
2    A.   Yes.  So we received our initial offer in March of
3    2022.  March, end of March, the board met and determined
4    that it was reasonably likely that it could lead to a
5    superior proposal.  We began our discussions with JetBlue,
6    and I believe they modified that proposal at the end of the
7    month.
8    Q.   And you use the term "superior proposal."  That's
9    because that was some triggering terminology for whether or
10   not Spirit could abandon the Frontier deal in favor of
11   something else; right?
12   A.   That's correct.
13   Q.   And the revised offer from JetBlue that came in at the
14   end of April of 2022, that included a reverse breakup fee of
15   $200 million; does that sound right?
16   A.   I believe so, yes.
17   Q.   The reverse breakup fee was essentially an amount of
18   money that JetBlue would pay to Spirit or its shareholders
19   if the merger ultimately did not go through; is that fair?
20   A.   Yes.
21            THE COURT:  I -- would pay if what merger didn't
22   go through, the Frontier merger?
23            THE WITNESS:  No.  As a condition of the JetBlue,
24   of their proposal, JetBlue's proposal to purchase Spirit,
25   they offered a reverse termination fee, that if we accepted
```

1    their proposal, and that that transaction was never

2    consummated because of regulatory review, then they would

3    pay the reverse termination fee.

4             THE COURT:  And nevertheless, you get -- Spirit

5    would get $220 million?

6             THE WITNESS:  That was the proposal at that time,

7    yes.

8    Q.   So, for instance, just to make this a bit clearer, if,

9    based on the proposal at that time that we're discussing

10   right now, if that merger were then enjoined or blocked,

11   then while there would be no merger with JetBlue, Spirit

12   shareholders would at least be walking away with a

13   $200 million payment from JetBlue essentially as a

14   consolation prize; right?

15   A.   Yes.

16   Q.   And so the Spirit board also rejected this revised

17   offer; right?

18   A.   We did.

19   Q.   And starting in early May of 2022 there were actually a

20   series of public statements that Spirit's management made

21   with respect to its views of JetBlue's offer; is that fair?

22   A.   I'm sure that's true, yes.

23   Q.   And, for instance, on May 2nd of 2022, Spirit issued a

24   press release that attached a letter from you and

25   Mr. Gardner, the chairman of the board of Spirit, addressed

1    to Robin Hayes, the CEO of JetBlue; is that right?

2    A.    That sounds right.

3          MR. TEITELBAUM:  And I would just ask that the

4    witness be shown what was previously numbered as Exhibit 38

5    that the defendants have withdrawn.

6          (On screen.)

7    Q.    And, Mr. Christie, you also have that in your binder

8    there, but feel free to take a look at it either on the

9    screen or it should be in the exhibit binder labeled with a

10   38.

11   A.    38?

12   Q.    Yes.

13   A.    Oh, it's in the front.  Thank you.

14   Q.    Do you recognize that document as the press release

15   that Spirit issued on May 2nd of 2022?

16   A.    Yes.

17   Q.    And do you see that in the subsequent pages it attached

18   a letter that has your S-slash signature?

19   A.    Yes.

20   Q.    And that appears to be a fair and accurate copy of that

21   press release with its associated letter; right?

22   A.    I'm sure it is.

23         MR. TEITELBAUM:  At this time, your Honor,

24   plaintiffs would offer exhibit previously numbered 38 into

25   evidence.

```
 1                    MR. COHEN:  Objection, your Honor.

 2                    THE COURT:  Ground?

 3                    MR. COHEN:  This is the first of the documents

 4    that are on the subject matter --

 5                    THE COURT:  I understand.  And I'm taking it that

 6    they have to lay a foundation for this.  So he thinks he has

 7    and he offers it.  Why shouldn't it be admitted?

 8                    MR. COHEN:  Because it's being offered to discuss

 9    the opinions of Spirit with respect to regulatory matters,

10    which we have --

11                    THE COURT:  So it does.  And so what's the matter

12    with that?

13                    MR. COHEN:  It violates 701 and 704.

14                    THE COURT:  Oh, I think not.  Overruled.  It may

15    be admitted, Exhibit 38 in evidence.  Your rights are saved.

16    It's in evidence.

17                    (Exhibit 38 received in evidence.)

18                    MR. TEITELBAUM:  Thank you, your Honor.  If we

19    could please publish the second page of the letter.  This is

20    the Bates number ending in 119.  And if we could please

21    magnify the paragraph that begins with the word "moreover."

22                    (On screen.)

23    Q.  And so, Mr. Christie, this is a letter from you and the

24    chairman of the board of Spirit to the CEO of JetBlue;

25    right?
```

```
 1    A.    Correct.
 2    Q.    And it lays out your concerns as of that time about a
 3    combination of JetBlue and Spirit; right?
 4    A.    I think that's the right way to say it as of this date,
 5    yes.
 6    Q.    And so I have a couple of questions for you about this
 7    paragraph.  I'm going to not ask you to read the whole
 8    thing, for the sake of time, but first of all, you see in
 9    the second line there the reference to a
10    "higher-cost/higher-fare airline would be eliminating a
11    lower-cost/lower-fare airline"?
12    A.    I see that.
13    Q.    So one of the concerns that Spirit had about a
14    combination with JetBlue is that both the Department of
15    Justice and a court would be concerned that JetBlue -- let
16    me break this question up a little bit.
17          The reference to a higher-cost/higher-fare airline in
18    this sentence, that's to JetBlue; right?
19    A.    Relative to Spirit, yes.
20    Q.    Because it has a higher operating cost structure?
21    A.    Than Spirit, correct.
22    Q.    And it has a higher average fare; correct?
23    A.    Average fare, that's correct.
24    Q.    And so one of the things that Spirit's management was
25    concerned about is that JetBlue's acquisition of Spirit
```

 1  would eliminate that lower-cost/lower-fare airline, meaning
 2  Spirit; right?
 3  A.   We were concerned that this would be raised by
 4  regulators and so wanted to point it out.
 5  Q.   And then the next part of that sentence, "in a
 6  combination that would remove about half of the ULLC
 7  capacity in the United States," that's just a reference to
 8  the percentage of Spirit's position in the market as a large
 9  ULCC?
10  A.   That's right.  I think we're referencing we were about
11  half of the ULCC carriers in the market.  Of course our
12  capacity wouldn't be removed, but the brand itself would be
13  changed.
14  Q.   In connection with the changing of the brand, that
15  capacity would no longer be operating as an ultra low-cost
16  carrier; right?
17  A.   That was, again, one of the concerns that we had.
18  Q.   Instead it was going to be operating as part of
19  JetBlue's business model?
20  A.   That was our understanding, yes.
21  Q.   And then the sentence starting with, "Finally."
22  "Finally, we are skeptical about your claims regarding the
23  so-called JetBlue Effect."  So Spirit's management here was
24  stating its skepticism about the potency of the JetBlue
25  Effect here; is that right?

```
 1   A.   Based on the summary output that we received.  We

 2   really didn't have enough information, so we were skeptical,

 3   yes.

 4   Q.   And the final sentence of that paragraph references,

 5   "After receiving the summary output," as you said, "of your

 6   economic model from your advisers, Spirit's economic

 7   consultants identified reasons to doubt that such an effect

 8   would significantly exceed any similar ULCC effect."  Right?

 9   A.   Based on that time and at that review that was our

10   concern, yes.

11   Q.   And that reference to Spirit's economic consultants

12   reflects that Spirit asked Morgan Stanley and Barclays to

13   analyze the information that was being received from

14   JetBlue; right?

15   A.   Among others.  We counseled with all of our advisers at

16   the time, and with the information that was provided, which

17   admittedly was incomplete, we were skeptical about it, yes.

18   Q.   And the reference to the ULCC effect here, that's

19   another way of referring to the Spirit Effect; right?

20   A.   I believe so, yes.

21   Q.   And so there's a comparison being drawn here about

22   whether or not the JetBlue Effect would significantly exceed

23   any similar Spirit Effect in this sentence; right?

24   A.   Again, our concern was that, and based on the

25   information we had, that that was -- that was not true.  But
```

1  that has changed over time.

2  Q.  All right.  Well, we can talk about that in a little

3  bit.

4       Now, in the middle of May 2022 --

5            MR. TEITELBAUM:  And we can take that exhibit

6  down.  Thank you.

7  Q.  In the middle of May 2022, JetBlue actually went

8  directly to Spirit's shareholders with an offer to buy

9  outstanding Spirit shares; is that right?

10 A.  They did, yes.

11 Q.  And that's sometimes referred to as a tender offer?

12 A.  Correct.

13 Q.  At the time that that occurred in the middle of May of

14 2022, Spirit's board continued to oppose a transaction with

15 JetBlue; right?

16 A.  We did.  The tender offer was actually modestly worse

17 than the prior offer, so we remained in objection based on

18 the proposal they made at that time.

19 Q.  And, in fact, JetBlue came and offered $30 a share

20 instead of $33 a share; right?

21 A.  Correct.  I believe it had some vehicle in it that you

22 could perhaps go back to thirty-three.  I don't recall

23 specifically but, yes, it was on the surface worse than the

24 prior proposal.

25 Q.  And Spirit's management continued to communicate with

```
 1    the public and its shareholders about its views of this

 2    potential JetBlue transaction during May of 2022; is that

 3    fair?

 4    A.   Yes, and specifically talking about our transaction

 5    with Frontier at the time.

 6    Q.   As a basis for comparison, in other words?

 7    A.   And we were actively soliciting votes from our

 8    shareholders to approve the Frontier transaction, yes.

 9    Q.   And so on May 19th of 2022, Spirit's management issued

10    yet another press release urging its shareholders to reject

11    JetBlue's offer; is that right?

12    A.   It could be.

13         MR. TEITELBAUM:  So I would just ask that the

14    witness be shown what was previously numbered as

15    Exhibit 105, but defendants have withdrawn.

16         (On screen.)

17    Q.   And do you see that there, Mr. Christie, that it's --

18    that there's a date there of May 19th of 2022?

19    A.   I see that, yes.

20         MR. COHEN:  That's not in the book.

21         MR. TEITELBAUM:  I think it's in the binder.

22         THE COURT:  I don't have 105, apparently.

23         MR. COHEN:  Neither do I.

24         MR. TEITELBAUM:  We will find that for everyone

25    right now.
```

```
 1              (Pause in proceedings.)
 2              MR. TEITELBAUM:  And for the moment, to avoid
 3    spending the Court's time, we can circle back to the exhibit
 4    formerly known as Exhibit 105 and cover some other subject
 5    matter.  And we'll make sure we get that to the Court and
 6    defense as well.
 7    Q.   Mr. Christie, aside from press releases, Spirit's
 8    management was also communicating with its shareholders
 9    directly about its views about a transaction with JetBlue;
10    right.
11    A.   Specifically, our views on our transaction with
12    Frontier, but also communicating the comparison with the
13    JetBlue tender offer, yes.
14    Q.   And Spirit management, including yourself, gave a
15    series of presentations to Spirit shareholders and also
16    proxy advisers during May of 2022; is that right?
17    A.   We did, yes.
18    Q.   And, for instance, on May 5th of 2022, you participated
19    in a presentation in connection with an earnings call; does
20    that sound right?
21    A.   That does sound correct.  Our quarterly earnings call
22    was around that time, yes.
23    Q.   You and other Spirit senior executives make your best
24    efforts to be truthful and accurate in your presentations to
25    Spirit's shareholders?
```

```
 1   A.    We do.

 2   Q.    And these presentations were also filed with the SEC;

 3   is that right?

 4   A.    I believe so, yes.

 5              MR. TEITELBAUM:  And so I'd ask that the witness

 6   be shown what's marked for identification as Exhibit VK.

 7              (On screen.)

 8   A.    Did you say "Victor"?

 9              THE COURT:  Yes.

10   Q.    Victor, kilo.

11         And, Mr. Christie, this is a May 5th, 2022 presentation

12   made in connection with Spirit's quarterly earnings call; is

13   that right?

14   A.    Yes.

15   Q.    And you presented these slides during that call; is

16   that right?

17   A.    As I recall, I think we provided the slides as backup

18   to the discussion in the presentation.  I don't know that we

19   actually went page by page through the presentation.

20   Q.    But they accompanied your oral presentation to Spirit's

21   shareholders?

22   A.    They were intended to be backup to that presentation,

23   yes.

24   Q.    And this is a fair and accurate copy of that

25   presentation?
```

1   A.   It appears to be, yes.

2          MR. TEITELBAUM:  At this time, your Honor,

3   plaintiffs offer Exhibit VK into evidence as Exhibit 349.

4          MR. COHEN:  Your honor, this is another exhibit

5   that's the subject of our motion in limine with respect

6   to --

7          THE COURT:  But isn't this an admission?  Doesn't

8   this state the position of Spirit, at least at that point in

9   time?  And that's relevant.  That would be my analysis.

10  What's the matter?

11         MR. COHEN:  I don't dispute that it's an

12  admission, your Honor.  But if it's admission, it's still

13  excludable under 701 and 704.

14         THE COURT:  I think not.  Overruled.

15         It may be admitted.  VK, then, will be Exhibit --

16         MR. TEITELBAUM:  349, at least by plaintiff's

17  numbering, your Honor.

18         THE COURT:  Very well.  Exhibit VK is 349 in

19  evidence.

20         (Exhibit 349 received in evidence.)

21         MR. TEITELBAUM:  And if we could please go to

22  slide 2 of this presentation.

23         (On screen.)

24  Q.   And this slide is entitled, "JetBlue's illusory offer

25  is not superior."  Is that right, Mr. Christie?

1   A.   Yes.

2            MR. TEITELBAUM:  And looking at the second bubble

3   from the top that starts "At its core," if we could please

4   magnify that.

5   Q.   Would you please read what is written there in that

6   second bubble?

7   A.   "As its core, the JetBlue proposal represents a

8   high-cost, high-fare airline buying a low-cost, low-fare

9   airline with half the synergies coming from reduced capacity

10  and increased fares."

11           MR. TEITELBAUM:  We can remove that magnification.

12  Q.   And that reference to "synergies," that's a term that's

13  used for the purported benefits of a merger; right?

14  A.   It has been used that way, yes.

15  Q.   And so it was the view of Spirit's management at the

16  time of this presentation that half of the purported

17  benefits of this merger with JetBlue were going to come from

18  reduced capacity and increased fares; right?

19  A.   We had a concern.  We did not do any analysis on

20  synergies, but we did see a presentation from JetBlue that

21  may have implied that.  So that was a concern we were

22  raising, that this would, again, be something that could be

23  raised in the regulatory review process.

24  Q.   Well, let's talk about that for a bit.  So, first of

25  all, it was based on your concern from information that

```
 1   JetBlue had given you about their plans; right?

 2   A.   I think it was a presentation that JetBlue gave

 3   broadly.  I don't think they gave it to us.  I think it was

 4   in support of their initial proposal.  My memory on that is

 5   not perfect.

 6   Q.   But nonetheless the sourcing was JetBlue?

 7   A.   Correct.

 8   Q.   And you mentioned in the second part of your answer

 9   that this had to do with concern about how regulators would

10   view this transaction; right?

11   A.   Exactly.

12   Q.   And so I just want to talk about what's literally

13   written on this slide for a moment.  The title, "JetBlue's

14   illusory offer is not superior," makes no reference to

15   regulators; correct?

16   A.   That title does not, no.

17   Q.   The bubble that you just read, "At its core, the

18   JetBlue proposal represents a high-cost, high-fare airline

19   buying a low-cost, low-fare airline with half the synergies

20   coming from reduced capacity and increased fares," makes no

21   reference to regulators or the Department of Justice or a

22   court; correct?

23           THE COURT:  The document speaks for itself.

24           MR. TEITELBAUM:  Understood, your Honor.  I can

25   move on to something else.
```

```
 1              THE COURT:  Please.
 2              MR. TEITELBAUM:  Let's move on to slide 5 in this
 3    presentation, please.
 4              (On screen.)
 5    Q.   So here we see two different graphs comparing Frontier,
 6    Spirit and JetBlue's passenger yield and average fare; is
 7    that right?
 8    A.   Yes.
 9    Q.   And underneath those comparisons there's a blue bubble
10    that states, "JetBlue has stated it will reduce capacity and
11    raise fares on Spirit routes."  Right?
12    A.   Yes.
13    Q.   And this slide is entitled, "At its core, the JetBlue
14    proposal," et cetera, essentially the same bubble that I
15    asked you to read previously; right?
16    A.   Yes.
17    Q.   And, once again, no reference to regulators?
18    A.   On this slide, no.
19    Q.   Okay.
20              MR. TEITELBAUM:  Then if we could please move on
21    to slide 6.
22              (On screen.)
23    Q.   We have three different routes or markets depicted
24    here; right?
25    A.   Yes.
```

```
 1    Q.    And the title of this slide is, "Spirit continues to be
 2    a check on JetBlue's fares"?
 3    A.    Yes.
 4    Q.    And then the slide explains, "This is a comparison of
 5    JetBlue's fares on select routes pre and post Spirit's
 6    entry."  Right?
 7    A.    Yes.
 8    Q.    Let's take a look at the middle origin and destination
 9    pair, Boston to San Juan.  So what this is reflecting is in
10    connection with Spirit's entry onto the Boston to San Juan
11    route, the average JetBlue fare dropped from $231 to $208;
12    is that right?
13    A.    I see that, yes.
14          MR. TEITELBAUM:  All right.  We can take that
15    exhibit down.  Thank you.  And, your Honor, with the Court's
16    indulgence, I can pass out copies of Exhibit 105 now that --
17          THE COURT:  Go right ahead.
18          (Handing.)
19          MR. TEITELBAUM:  May I approach the bench and the
20    witness?
21          THE COURT:  Please.  I started out as a state
22    court judge, and I always thought that when you passed the
23    bar you were entitled to practice your profession inside the
24    railing there.  So I know some judges require you to ask to
25    move around, but for all the lawyers, you don't have to ask
```

```
 1    to move around.  Give things to the witness, the Court, and

 2    the like.  No one's going to get out of line.  They're not.

 3           Go ahead.

 4           MR. TEITELBAUM:  Thank you, your Honor.

 5    Q.   So, Mr. Christie, if we can just back up briefly to the

 6    exhibit formerly known as Exhibit 105, and do you see here

 7    that this is a press release from Spirit Airlines that's

 8    dated May 19th of 2022?

 9           (On screen.)

10    A.   Yes.

11    Q.   And the title of that slide is, "Spirit Airlines' board

12    of directors urges stockholders to reject JetBlue tender

13    offer."  Right?

14    A.   Yes.

15    Q.   Does this appear to be a fair and accurate copy of that

16    press release?

17    A.    I have no reason to suspect it's not, no.

18           MR. TEITELBAUM:  At this time, your Honor,

19    plaintiffs would offer Exhibit 105 in evidence, now to be

20    restored to its prior number.

21           THE COURT:  Same objection, Mr. Cohen?

22           MR. COHEN:  Yes, your Honor.  And I assume the

23    same response, it's admitted?

24           THE COURT:  You're correct.  Your rights are

25    saved.  Overruled.  Exhibit 105 in evidence.
```

```
 1              (Exhibit 105 received in evidence.)
 2   Q.   And I'll be brief with this exhibit.  Mr. Christie, if
 3   we could please just very briefly go to the second page.
 4   And do you see the heading that's underlined and bolded?
 5   And, for the record, this is the Bates ending 882.  "The
 6   Spirit board conducted a comprehensive review of the offer
 7   and recommends Spirit stockholders reject the offer for the
 8   following reasons."  That's just a reflection of the
 9   resources that Spirit's board invested in analyzing
10   JetBlue's tender offer; is that right?
11   A.   That's right.
12              MR. TEITELBAUM:  All right.  We can take that
13   exhibit down.
14   Q.   All right.  And then later in May of 2022,
15   Mr. Christie, there was also a special call with Spirit's
16   shareholders, right, on May 23rd of 2022?
17   A.   I do recall that, yes.
18   Q.   And, once again, there was a slide presentation
19   connected to that call?
20   A.   Yes.
21   Q.   And you made a presentation in connection with that
22   call on behalf of Spirit?
23   A.   I did.
24   Q.   And, once again, that presentation was filed with the
25   SEC by Spirit Airlines; right?
```

```
 1   A.   I believe so, yes.

 2           MR. TEITELBAUM:  I'd ask that the witness be shown

 3   Exhibit TF.  Tom, Frank.

 4           (On screen.)

 5   Q.   Mr. Christie, does that appear to be the slide deck

 6   that we've been discussing that was filed with the SEC?

 7   A.   It does, yes.

 8   Q.   And you participated in this presentation?

 9   A.   I did.

10   Q.   And Spirit and its management makes its best efforts to

11   communicate truthfully, accurately and completely with its

12   shareholders; right?

13   A.   We do.

14   Q.   And similarly, with materials filed with the SEC,

15   Spirit's management makes those same best efforts; right?

16   A.   Yes.

17           MR. COHEN:  Same, your Honor.  And I understand.

18           THE COURT:  Overruled.  TF, then, will be

19   Exhibit 350?

20           MR. TEITELBAUM:  Correct, your Honor.

21           THE COURT:  TF, 350.

22           (Exhibit 350 received in evidence.)

23           MR. TEITELBAUM:  Very briefly here, if we could

24   please publish the exhibit?  It looks like it's already

25   published, and go to page 3.
```

1    Q.   And this slide is entitled here, "Is JetBlue

2    purposefully downplaying the substantial regulatory risk?"

3    Right?

4    A.   Yes.

5    Q.   And this is a reference to the regulatory risk that

6    this proposed transaction would not, in fact, be able to be

7    consummated; right?

8    A.   Our view of that risk, yes.

9    Q.   So there's a column on the left labeled "JetBlue's

10   claim."  Do you see that there?

11   A.   I do.

12   Q.   And the claim underneath that is, "A combined

13   Spirit/Frontier and JetBlue/Frontier will be approximately

14   the same size."  Do you see that?

15   A.   I do.

16   Q.   One of Spirit's two responses there under the column

17   "Reality" is, "Not about size, but about type of carrier.

18   JetBlue is a high-fare carrier."  Do you see that?

19   A.   I do, yes.

20   Q.   This reflected the views of Spirit's management as of

21   the time of this presentation; right?

22   A.   As of the time referencing JetBlue as a higher --

23   relevant to -- relative to us, yes.  And -- sorry.

24   Q.   If we could please go on to page 8.  And once again

25   here this slide is entitled, "Shareholders should think

1    about the conversation with regulators."  Is that right?

2    A.   I see that, yes.

3    Q.   And on the left-hand side there's a statement, "A

4    JetBlue acquisition of Spirit will have lasting negative

5    impacts on consumers"?

6    A.   I see that.

7    Q.   And two of those impacts are, "Raises Spirit's ticket

8    prices," at the top?

9    A.   Yes.

10   Q.   And then the next one is, "Removes approximately

11   50 percent of the ULCC capacity in the United States."  Is

12   that fair?

13   A.   I see that.  And these were obviously our concerns

14   about the regulatory conversation, as you can see.

15   Q.   And then if we could please go to page 27.

16   A.   Did you say 27?

17            THE COURT:  He did.

18   Q.   Yes.  And during the course of this exchange, Spirit

19   actually -- I'll wait until you're there, Mr. Christie.

20   A.   I'm getting there.

21   Q.   Take your time.

22        And during the course of this process that played out

23   in May of 2022, Spirit's management actually referred to

24   JetBlue's statements about the transaction as propaganda; is

25   that right?

 1    A.   We were concerned as to whether or not their offer

 2    was -- was sincere or not.  We did have those concerns at

 3    that time.

 4    Q.   And that term "propaganda" was used also in connection

 5    with this SEC file presentation?

 6    A.   I'm on the wrong slide.  But, yes, I see it there.

 7              MR. TEITELBAUM:  We can take that exhibit down.

 8    Q.   And then you also participated, during the course of

 9    May of 2022, in some presentations to some proxy advisers

10    about this transaction; is that right?

11    A.   I believe that's right, yeah.

12    Q.   And two of those were ISS and Glass Lewis; is that

13    right?

14    A.   That sounds right.

15    Q.   And proxy advisers are firms that advise shareholders

16    on how they should vote on certain matters related to the

17    shares that they own; is that fair?

18    A.   I think that's a good summary, yes.

19    Q.   And if --

20              MR. TEITELBAUM:  I'd just ask that the witness be

21    shown what's been marked for identification as TD.  Tom,

22    David.

23              (On screen.)

24    Q.   All right.  And once again, Mr. Christie, does this

25    appear to be a fair and accurate copy of the slide deck that

1    accompanied that presentation to the proxy advisers?

2    A.   I don't recall this specific presentation, but I have

3    no reason to doubt it's not complete.

4    Q.   Okay.  And you have no reason to doubt its

5    authenticity?

6    A.   I'm sorry?

7    Q.   You have no reason to doubt it's an accurate copy?

8    A.   Correct.

9               MR. TEITELBAUM:  At this time plaintiffs offer

10   Exhibit TD in evidence.

11              MR. COHEN:  Same objection.

12              THE COURT:  Same objection, same ruling.  And TD

13   will be Exhibit 351 in evidence.

14              (Exhibit 351 received in evidence.)

15              MR. TEITELBAUM:  And we can take that exhibit down

16   for now.

17   Q.   But I do have some questions about this presentation

18   more generally, Mr. Christie.  One of the things that

19   Spirit's management addressed with the proxy advisers during

20   this presentation was whether or not other ULCCs, other

21   ultra low-cost carriers, would be able to backfill the lost

22   Spirit capacity.  Do you recall that?

23   A.   I don't specifically, no.

24   Q.   All right.  So would it refresh your recollection to

25   look at the report prepared by the proxy advisers about that

 1   presentation?

 2   A.   It may, yes.

 3   Q.   Okay.  Why don't you take a moment to look at what's

 4   marked for identification as AGJ, towards the back of your

 5   binder.  I would like to also pull that up on the screen but

 6   not publish it.

 7              (On screen.)

 8   Q.   And you're welcome to take a look at the presentation

 9   itself, Mr. Christie.  I can also direct you to the page on

10   the screen here.  For the record, I'd be directing you to

11   the 15th page of the exhibit.  It's the Bates ending 519,

12   and it's the second sentence of the last full paragraph.

13              MR. TEITELBAUM:  We can blow that up.

14              THE COURT:  Second sentence of the last full

15   paragraph?

16              MR. TEITELBAUM:  Correct, your Honor.

17              MR. COHEN:  Your Honor, I'm going to object.

18              THE COURT:  Well, the exhibit is not in evidence.

19   This is not an admission.  He hasn't asked him to read from

20   it, and no harm is done by my looking at it.  So that's

21   where we stand.

22              MR. COHEN:  Understood.

23              THE COURT:  He's using it to see if it refreshes

24   his recollection.

25              And, in essence, when he says that, he's saying to

```
 1   you, take a look at this part in particular, and does that

 2   jog your memory about anything that your company had to say

 3   in this presentation about backfilling the slots?

 4              THE WITNESS:  It doesn't.  I don't remember the

 5   meeting that well, to be honest.

 6              THE COURT:  All right.

 7   Q.   And do you recall, leaving aside this document, which

 8   we can take down off the screen now, do you recall a

 9   conversation during that presentation about backfilling more

10   generally?

11   A.   I don't.

12   Q.   And you don't recall Spirit making statements that

13   other ULCCs would be unable to backfill the lost capacity?

14   A.   I don't remember that part of this meeting, no.

15   Q.   Okay.  So let's move on.  Ultimately, JetBlue made a

16   revised tender offer to Spirit's shareholders to acquire

17   Spirit; is that right?

18   A.   Moving forward from the midpart of May, I believe there

19   was another revision to the tender offer, yes.

20   Q.   And the per-share price went up to $33.50, potentially

21   going as high as $34.15; right?

22   A.   Yes.  So that was at least a couple iterations forward

23   of the original tender offer, as I recall, but yes.

24   Q.   And there was also a larger reverse breakup fee of

25   about $470 million?
```

1   A.   By the time we got to July I think that's where it was,

2   yes.

3   Q.   And there was also a list of divestitures that JetBlue

4   was proposing as part of the proposed transaction; does that

5   sound right?

6   A.   Over the course of that period of time I think those

7   were included, along with changes to the overall commitment

8   and covenant that JetBlue was willing to extend for

9   regulatory approval.

10   Q.   And the divestitures included Spirit's assets in Newark

11   and LaGuardia?

12   A.   I believe it included those two.  If I'm not mistaken

13   it includes Boston, Logan Airport, as well as some of our

14   gates in Fort Lauderdale Airport.

15   Q.   And those are the same divestitures that were

16   contemplated as we sit here today; right?

17   A.   As far as I know.  Although the covenant that they

18   committed to allows them to do considerably more pursuant to

19   that covenant.

20   Q.   But as far as what's been talked about in concrete

21   terms, that's what we're talking about right now; right?

22          MR. COHEN:  Objection, your Honor.  602.

23          THE COURT:  Sustained on that ground.

24   Q.   Mr. Christie, as the chief executive officer of Spirit

25   Airlines, are you familiar with the substance of the

1    divestiture proposals that are currently under consideration
2    with respect to the merger with JetBlue?
3    A.   I am aware of those divestitures that you mentioned,
4    yes.
5    Q.   And, to your knowledge, the divestitures that were
6    under consideration in May of 2022 are the same as they are
7    today; right?
8    A.   Well, I know that they did make some changes when they
9    got specific about Fort Lauderdale.  I don't remember
10   exactly when this was.  But, yes, I think largely we're
11   talking about Boston, New York, Newark and Fort Lauderdale.
12   Q.   Ultimately, Spirit's shareholders went against the
13   recommendation of the Spirit board and Spirit's management
14   and voted against a Frontier merger in the middle part of
15   2022; is that right?
16   A.   The votes were coming in not in favor of the Frontier
17   merger, that's correct.
18   Q.   And the vote actually never reached a final tally;
19   right?
20   A.   That's right.
21   Q.   And subsequently a proposed merger agreement with
22   JetBlue was approved by shareholders later in 2022; is that
23   right?
24   A.   I believe it was in September, but yes.
25   Q.   And we discussed before that you were recommending in

1    favor of the Frontier transaction and against the JetBlue

2    transaction during the time that that voting was going on;

3    right?

4    A.    No.   Well, are you referring to the voting on the

5    JetBlue merger?

6    Q.    I'm referring to the voting on the Frontier merger.

7    A.    Up until the Frontier pulled their, you know, their

8    proposal, we were supporting the Frontier transaction,

9    that's correct.

10   Q.    But ultimately you are, as the chief executive officer,

11   accountable to your shareholders at Spirit Airlines; right?

12   A.    Yes.

13   Q.    And you're responsible for carrying out their will;

14   right?

15   A.    Well, I'm responsible for the best interests of our

16   team, the consuming public, and all our constituents,

17   including our shareholders, and we are delegated the

18   authority to execute to our strategic plan in the best

19   interest of all those things, yes.

20   Q.    But having seen the direction that the voting was

21   trending on the Frontier merger, it became clear to you that

22   the shareholders favored a combination with JetBlue over

23   Frontier; right?

24   A.    Well, we knew for sure they didn't want the Frontier

25   transaction.   And so I think we took it upon ourselves at

```
 1    that point to evaluate with JetBlue and continue

 2    negotiations with JetBlue, the JetBlue transaction, versus

 3    our standalone prospects.

 4    Q.   Now, if this transaction with JetBlue goes forward, you

 5    personally don't have an expectation of employment at the

 6    combined carrier; is that right?

 7    A.   I -- I don't know.  That's correct.

 8    Q.   But as far as you know, Robin Hayes will be the chief

 9    executive officer of the combined carrier; right?

10          MR. COHEN:  Objection.  Relevance, your Honor.

11          THE COURT:  No, it may go to his motive.  On the

12    other hand, I don't know how he would know that.  So I'm

13    going to sustain it.

14          MR. TEITELBAUM:  I can lay some additional

15    foundation if that would be appropriate, your Honor.

16          THE COURT:  I just make rulings.

17          MR. TEITELBAUM:  Understood, your Honor.

18    Q.   Mr. Christie, have you had any communications with

19    JetBlue's management in terms of what their plans are for

20    who will lead the combined carrier?

21    A.   I'm not aware of anything specifically to me, but I am

22    aware that Robin Hayes has been designated as the CEO of the

23    company.

24    Q.   And as you sit here today, do you recall the

25    compensation that you will receive if you are terminated
```

1    following the consummation of the merger?

2            MR. COHEN:  Objection, your Honor.  403.

3            THE COURT:  No, again, it goes to motive.

4    Overruled.

5    A.   As a result of the completion of the merger or if I'm

6    terminated?

7    Q.   As a result -- following the completion of the merger.

8    A.   There is a retention agreement in place between

9    myselves and the company -- myself and the company, along

10   with other members of our management team, that would

11   trigger in the event the merger was consummated.

12   Q.   And, in fact, drawing a comparison between the amount

13   of money that you'll receive if you're terminated after the

14   consummation of the merger, compared to continuing as the

15   CEO of Spirit Airlines if the merger is blocked -- I'm going

16   to ask that question in a less confusing way.

17           THE COURT:  No, I understand the question.

18           MR. TEITELBAUM:  Understood, your Honor.

19           THE COURT:  I think you understood?

20           THE WITNESS:  I think he's asking me to compare.

21           THE COURT:  How will you come out -- what's the

22   difference between the merger's blocked and you continue as

23   the chief executive officer, and the merger goes through and

24   you get whatever you get under this retention agreement?

25           THE WITNESS:  Well, the retention agreement is

1   some multiple of my salary and bonus.  So it's approximately

2   a year's worth of salary and bonus, I guess.  And then -- of

3   which some of which has already been paid as a progress

4   payment.  And then I believe counsel also asked in the event

5   that I'm terminated as a result of merger?

6           THE COURT:  Well, we'll let him ask.

7   Q.   That was my question but I'm going to break my question

8   up into two smaller parts.

9   A.   Okay.

10  Q.   First of all, with respect to the retention agreement,

11  in terms of the incremental additional amount that you will

12  receive, that is over a million dollars; is that fair?

13  A.   You know, we get a portion regardless if the

14  transaction does or does not close.  And half of that has

15  already been paid.  Half will be paid if the deal does not

16  close, and then the other 50 percent would be the amount

17  you're referring to.  So it's probably about that number.

18  Q.   So fair to say it's at least a million dollars

19  additional if the deal does close?

20  A.   I'm guessing that's right.  I suspect that's right.

21  Q.   Is it your understanding that that is a correct

22  estimate?

23  A.   Probably so, yeah.  I haven't looked at the numbers

24  closely, to be honest.

25  Q.   Okay.  And then stepping aside from the retention

1    bonus, there's also severance that's in place that's

2    separate from that?

3    A.   I have a employment agreement with the company that

4    would direct what would happen in the event there is, for

5    example, in this case, a change of control and, in fact, I

6    am either severed for a variety of reasons or with good

7    reason.  Yes.

8    Q.   And, in fact, if you are severed in connection with a

9    change in control, the amount that comes to you is

10   approximately $12 million; is that right?

11   A.   I don't believe that's the number.  I think the way

12   that our provisions work is I receive a payment of a

13   multiple of my salary and my bonus, and then for amounts

14   that were previously granted to me as part of my

15   compensation over the past unvested period, those amounts

16   may be accelerated.  When I'm talking about "amounts," I'm

17   talking about stock in the company.

18       So the core amount, I believe, is that we would receive

19   a termination payment that's equal to a multiple, and I

20   believe it's two times my salary and my bonus.

21   Q.   All right.  And then I'd ask that the --

22          THE COURT:  Rather than these details, let me ask

23   you, and I do this with respect.

24          THE WITNESS:  Thank you.

25          THE COURT:  I'm going to ask you a coarse

```
 1   question.  Are you better off financially if this goes
 2   forward or it does not?
 3        THE WITNESS:  Well, if it goes forward and I don't
 4   have a job, then I would consider that to be not as good a
 5   position to be in.
 6        THE COURT:  Thank you.
 7        MR. TEITELBAUM:  And I'd just ask that the witness
 8   be shown a document that we can mark for identification now,
 9   and I will provide copies to opposing counsel and the Court
10   as well.  If I could just ask my colleagues what the next
11   letter exhibit will be.
12        (Handing.)
13        MR. TEITELBAUM:  And I'd ask that this be marked,
14   with the Court's permission, for identification as exhibit
15   BVI.  I'm sorry.  BUI.
16        THE COURT:  It may be marked, BUI.
17        (Exhibit BUI marked for identification.)
18   Q.   And, Mr. Christie, this appears to be a -- this is an
19   SEC filing by Spirit Airlines, right, from the cover?
20   A.   Yes.
21   Q.   And it's dated -- it's the 2023 proxy statement,
22   according to the second page; right?
23   A.   Correct.
24   Q.   And if you could, please, turn to page 51, according to
25   the numbering on the actual exhibit in the lower right-hand
```

1  corner.  And just let me know when you're there.

2  A.   I see it.

3  Q.   There's a -- the top section of that chart reflects

4  different termination scenarios for Edward M. Christie, III?

5  A.   Yes.

6  Q.   And one of those is a -- you see where it says a

7  "qualifying termination," and then there's an amount of

8  money there on the right-hand side?

9  A.   I see that, yes.

10  Q.   And so -- and you would agree with me that Spirit is

11  accurate in its SEC filings?

12  A.   Yes.

13  Q.   And what that reflects there is a $12.4 million payment

14  in connection with a qualifying termination; right?

15  A.   Well, as I said earlier, the columns, working left to

16  right, the severance amount is the amount that would be paid

17  as a multiple of my bonus and salary.  I see the second

18  column is the value of unvested equity.  So those are

19  previous grants that have been included in my prior

20  compensation.  So they're not technically incremental, but

21  they would be accelerated as a result of the change in

22  control and qualifying termination.  And then we did discuss

23  the merger retention payments, which in some cases already

24  have been paid partially.

25  Q.   So if we compare -- first of all, qualifying

1    termination includes termination in connection with a change

2    in control; right?

3    A.   There are -- our program requires two triggers.  So

4    there has to be both a change in control and another reason,

5    either termination for a good reason or without cause.

6    Q.   And you would agree with me that the difference between

7    the total amount for termination without cause and the

8    difference -- and the amount for qualifying termination is

9    approximately $8 million; is that right?

10   A.   Are you -- I'm sorry.  Are you looking termination

11   without cause as 4.6 and qualifying termination, 12.4?

12   Q.   Yes.

13   A.   The primary driver of the difference there being that

14   my unvested equity would remain and it would just be

15   accrued.

16   Q.   And if you were to remain employed at Spirit Airlines

17   as the chief executive officer without consummating the

18   transaction with JetBlue, there's no additional payments

19   coming your way, is that right, aside from your normal

20   compensation?

21   A.   The normal compensation, of course the portion of the

22   retention, and this unvested equity would continue to vest.

23             MR. TEITELBAUM:  No further questions for this

24   witness at this time, your Honor.

25             THE COURT:  And it's 1:00.  We'll suspend at this

1    time.  Do you wish to -- well, I can ask you now, Mr. Cohen.

2    Do you wish to examine this witness now or reserve?

3         MR. COHEN:  No, reserve, your Honor.  One

4    question.  Our trial order, we noticed, provided that we

5    would not be able to speak to the witness until the witness

6    is excused.  I have to say, we had believed we were

7    operating under the customary rule that -- maybe not your

8    Honor's customary rule, that --

9         THE COURT:  No, that's quite right.  You have no

10   objection to his speaking to the witness?  He examines the

11   witness.  You can examine about what they spoke about.

12        MR. TEITELBAUM:  Respectfully, we nonetheless do

13   object, primarily for the reason that this was an agreed

14   upon protocol between the parties, and we stand by that

15   agreement if the Court would permit us to do so.

16        THE COURT:  Well, no, I'm going to revise it.  I'm

17   going to allow them to talk with the witness, and everything

18   that's said between attorneys and this witness now until

19   he's excused is fair game.

20        MR. TEITELBAUM:  Understood, your Honor.

21        THE COURT:  All right.  We'll recess until --

22   well, you may step down.

23        MR. DUFFY:  We have additional deposition

24   designations.  Can we provide those to Ms. Gaudet?

25        THE COURT:  They're not in the book I have?

```
 1              MR. DUFFY:  They're additional designations from

 2      the parties, your Honor.

 3              THE COURT:  Very well.  That's helpful.

 4      Especially now that I've heard the witness on direct.

 5              So now my question, you're going to reserve so

 6      he'll be excused tomorrow.

 7              MR. COHEN:  I'm sorry.  I didn't understand.  I

 8      thought we would actually, unless your Honor prefers, that

 9      we would just move right to our examination.

10              THE COURT:  Oh, no, that's fine.  Technically,

11      they've called an adverse witness so there's rules governing

12      that, and you are going to examine him now tomorrow subject

13      to those rules?

14              MR. COHEN:  Yes, your Honor.

15              THE COURT:  I understand.  And you may step down.

16              (Whereupon the witness stepped down.)

17              THE COURT:  Total elapsed time, the twenty days,

18      ten days for each side, the government has used up two hours

19      and forty-five minutes.  The defense has used up

20      fifty minutes.

21              We'll stand in recess until 9:00 a.m. tomorrow

22      morning.  Thank you.  We'll recess.

23              THE CLERK:  All rise.

24              (Proceedings adjourned.)

25
```

C E R T I F I C A T E


        I, Cheryl B. Palanchian, Court Reporter

for the United States District Court for the

District of Massachusetts, do hereby certify that

the foregoing pages are a true and accurate

transcription of my shorthand notes taken in the

aforementioned matter to the best of my skill and

ability.



        /s/ Cheryl B. Palanchian 10/31/23
              CHERYL B. PALANCHIAN

           Registered Merit Reporter
           Certified Realtime Reporter