```
 1              UNITED STATES DISTRICT COURT

 2             DISTRICT OF MASSACHUSETTS (Boston)

 3                         No. 1:23-cv-10511-WGY
                           Vol 1, Pages 1 - 90
 4

 5

 6   UNITED STATES OF AMERICA, et al,
              Plaintiffs
 7

 8   vs.

 9

10   JETBLUE AIRWAYS CORPORATION, et al,
              Defendants
11

12                       * * * * * * * * *

13

14                   For Bench Trial Before:
                     Judge William G. Young
15

16

17                   United States District Court
                     District of Massachusetts (Boston)
18                   One Courthouse Way
                     Boston, Massachusetts 02210
19                   Wednesday, November 1, 2023

20                       * * * * * * * *

21

22           REPORTER: RICHARD H. ROMANOW, RPR
                   Official Court Reporter
23               United States District Court
          One Courthouse Way, Room 5510, Boston, MA 02210
24                   rhrbulldog@aol.com

25
```

```
 1                    A P P E A R A N C E S

 2

 3   EDWARD WILLIAM DUFFY, ESQ.
     ARIANNA MARKEL, ESQ.
 4   AARON TEITELBAUM, ESQ.
         DOJ-Atr
 5       450 Fifth Street NW, Suite 8000
         Washington, DC 20530
 6       (202) 812-4723
         Email: Edward.duffy@usdoj.gov
 7   and
      WILLIAM T. MATLACK, ESQ.
 8       Attorney General's Office
         One Ashburton Place, 18th Floor
 9       Boston, MA 02108
         (617) 727-2200
10       Email: William.matlack@mass.gov
         For Plaintiffs United States of America and
11       The Commonwealth of Massachusetts

12

13    RYAN SHORES, ESQ.
         Cleary Gottlieb Steen & Hamilton LLP
14       2112 Pennsylvania Avenue, NW
         Washington, DC 20037
15       (202) 974-1876
         Email: Rshores@cgsh.com
16   and
      ELIZABETH M. WRIGHT, ESQ.
17       Cooley LLP
         500 Boylston Street
18       Boston, MA 02116-3736
         (617) 937-2349
19       Email: Ewright@cooley.com
     and
20    RACHEL MOSSMAN ZIEMINSKI, ESQ.
      MICHAEL MITCHELL, ESQ.
21       Shearman & Sterling LLP
         2601 Olive Street, 17th Floor
22       Dallas, TX 75201
         Email: Rachel.zieminski@shearman.com
23       For Defendant JetBlue Airways Corporation

24

25       (Continued.)
```

1    (Continued.)

2

3  JAY COHEN, ESQ.
   ANDREW C. FINCH, ESQ.
4     Paul, Weiss, Rifkind, Wharton & Garrison
      1285 Avenue of the Americas
5     New York, NY 10019-6064
      (212) 373-3000
6     Email: Jaycohen@paulweiss.com
      For Defendant Spirit Airlines, Inc.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                        I N D E X

2

3   WITNESS                 DIRECT  CROSS  REDIRECT  RECROSS

4

5   EDWARD CHRISTIE  (Continued.)

6      By Mr. Teitelbaum:

7      By Mr. Cohen:                    6

8

9                      E X H I B I T S

10                        (None marked.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          P R O C E E D I N G S

2          (Begins, 9:00 a.m.)

3          THE COURT:  Good morning.  I do acknowledge the

4     receipt of the defense's list of the order of the

5     reading of depositions, and thank you, that's helpful.

6     Here it is.

7          Also I've received word, since the defense

8     requested, of the administrative office.  I've talked to

9     the, I guess, Chief of the Division there, and I have

10    the power, um, the authority, to allow the motion that

11    the defense has made, the parties have made with respect

12    to Court Connect and communication with your law

13    offices.

14         I do allow that motion with the following

15    modification.  If the connections go to the law offices

16    where lawyers for parties in this case work and reside,

17    I mean where they're going to do their work, it's not

18    just for all the law offices of your various law firms.

19    Likewise this is for lawyers, not those who will be

20    called as witnesses, experts or others.  Not that they

21    can't go to that office.  But those are the limitations.

22         And now if you'd remind the witness.

23         THE CLERK:  I'd like to remind you, sir, that you

24    are still under oath.

25         Do you understand?

```
 1          THE WITNESS:  Yes.
 2          THE COURT:  And --
 3          Yes, Mr. Cohen?
 4          MR. COHEN:  Yes, good morning, your Honor.  We're
 5   going to bring some binders up.  I apologize for the
 6   heft, um, that they weigh.
 7          THE COURT:  No apology is necessary.
 8          MR. COHEN:  Thank you, your Honor.
 9
10   CROSS-EXAMINATION BY MR. COHEN:
11   Q.  Mr. Christie, I put two binders in front of you.
12   From time to time I'll ask you to look at those.  And I
13   may show you a few documents that the government showed
14   you yesterday as well.
15   A.  Okay.
16   Q.  Now you were asked a number of questions yesterday
17   about Spirit's ULCC model.  Has Spirit always been a
18   ULCC, an "Ultra-Low-Cost Carrier"?
19   A.  No, we have not.
20   Q.  And can you tell the Court briefly how Spirit became
21   a ULCC?
22   A.  Spirit was founded in the '80s and ran a traditional
23   two-class airline with a business class product and a
24   coach product and a traditional bundled service
25   offering, and then in the mid 2000s was purchased by a
```

1    private equity firm who invested the time to start to

2    change the model over to the model that we have today.

3    Q.    Did Spirit invent the ULCC model?

4    A.    We did not.  At that time that the investment team

5    and the management team was working to change the model

6    in the mid 2000s, they were looking at examples of other

7    airlines internationally that had, um, successful

8    business models, um, and looked to Europe and looked to

9    Asia at a few airlines that had this idea of a more

10   unbundled service, and decided to apply that here in the

11   United States.

12   Q.   Are there other ULCCs in the United States?

13   A.   There are, yes.

14   Q.   And what are they?

15   A.   I think they're most commonly referred to would be

16   Frontier Airlines, Sun Country Airlines, Allegiant

17   Airways, and a recent startup called Avelo as well.

18   Q.   Okay.  And you were asked some questions about this

19   yesterday, but just to bring us back, can you tell us

20   what you mean when you refer to an "unbundled fare

21   structure"?

22   A.   Sure.  So a traditional airline product, at least

23   when I was growing up, meant that you bought a ticket

24   and it included a seat assignment and various bags, both

25   check and carry-on bags, maybe food on board the

1    aircraft, maybe in-flight entertainment, all of that was

2    included in your ticket price.  And what we do or other

3    unbundled products do is they give the consumer a chance

4    to adjust the ticket and then add those things that are

5    most important to them on an a-la-carte basis.

6    Q.   Okay.  And the other ULCCs that you mentioned, do

7    they offer unbundled fare structures as well?

8    A.   They do, yes.

9    Q.   And how do those ULCCs, Frontier, Allegiant, Sun

10   Country, and Avelo, compare in size to Spirit?

11   A.   Well we are the largest of the group, but when you

12   look at Frontier and Allegiant, the two next-largest

13   airlines and combine both aircraft size, they're larger

14   than Spirit combined.

15   Q.   When you say "Spirit combined," what do you mean by

16   that?

17   A.   They are, combined, larger than Spirit.

18   Q.   Okay.  And does Spirit compete with those ULCCs that

19   you just mentioned?

20   A.   We do.  We have competitive routes with all of them,

21   in fact with Frontier I believe we overlap on about 50

22   percent of our capacity.

23   Q.   And that 50 percent -- when you say you overlap on

24   50 percent of your capacity with Frontier, can you

25   explain for us just a little bit more about what you

1  mean?

2  A.  Well the common measure of capacity in the airline

3  business is an available seat mile, um, that's one seat

4  traveling one mile, and so if you have 200 seats on an

5  airplane traveling 1,000 miles, it's 200,000 available

6  seat miles.  That's the easiest way that we compare

7  capacity.  And so when you look at all of our available

8  seat miles, Frontier overlaps on about half of those

9  today.

10  Q.  Okay.  And has the overlap between Spirit and

11  Frontier been changed over the past few years?

12  A.  It has.  Frontier has been a rapid-growing airline

13  over the last 5 or 6 years, and I think it may have

14  almost doubled over that period of time.

15  Q.  And, Mr. Christie, even though you have those two

16  giant binders, I need to hand you a piece of paper with

17  it.  It's Exhibit 348, which is a document that

18  Mr. Teitelbaum examined you about yesterday.

19       MR. COHEN:  Your Honor, may I approach?

20       THE COURT:  Of course.

21       (Hands.)

22  Q.  Mr. Christie, do you recognize Exhibit 348?

23  A.  Yes.

24  Q.  And this is an e-mail that you were shown by

25  Mr. Teitelbaum about Frontier and he asked you about

1   whether Frontier was retreating -- the sentence about

2   "Frontier retreating to Islip, Stewart, or Fort

3   Lauderdale airports."  Do you see that, sir?

4   A.  I do, yes.

5   Q.  Is Fort Lauderdale a secondary airport?

6   A.  Well some people classify it as a "secondary

7   airport" to, um, Miami and South Florida.  Obviously

8   it's one of our largest airports, so we consider it

9   primary to us.

10   Q.  Okay.  And has Frontier retreated from all the

11   primary airports it services across the country?

12       MR. TEITELBAUM:  Objection as to timeframe.

13   Q.  At the timeframe that you -- as of November 30th --

14       MR. COHEN:  I'm sorry, your Honor, I didn't let

15   you rule.  I'm sorry.

16       THE COURT:  I -- when you spoke I thought you had

17   withdrawn the question and chosen to rephrase it.

18       MR. COHEN:  I'll rephrase it.

19       THE COURT:  You may.

20   Q.  As of the time of this e-mail, November 30th, 2021,

21   had Frontier withdrawn from all of the primary airports

22   with services in the country?

23   A.  No.

24   Q.  Had it retreated from most of the primary airports?

25   A.  No.

1   Q.   Is Frontier today expanding into primary airports?

2   A.   They are, yes.

3   Q.   Do you know of any?

4   A.   They continue to grow in places like Orlando, which

5   is the primary -- Orlando International is the primary

6   airport in Orlando.  Las Vegas, um, Harry Reid Las Vegas

7   Airport, they continue to grow.  Denver International is

8   their single, um, was their founding place and they're

9   getting larger there as well.  They have presence in

10  Miami along with Fort Lauderdale.  They've shown

11  interest in expanding in Dallas Fort Worth Airport and

12  have continued to grow there as well.  So some of those

13  are examples.

14       MR. COHEN:  Can you put that aside please.

15  Q.   Now, do any airlines other than Spirit and the ULCCs

16  that you mentioned offer passenger fares on their

17  unbundled departures?

18  A.   Yes, I believe most airlines with -- I think the

19  only exception of Southwest Airlines, has a product that

20  has been commonly referred to as "basic economy" that

21  mirrors the product that we offer.

22  Q.   Okay.  Would up open Tab 19 in your book, it's the

23  second volume, um, and it is Exhibit 39 in evidence.

24  It's a 10K for Spirit for the calendar year of 2022.

25  Let me know when you have that in front of you?

1    A.  I do.

2    Q.  Okay.  And if you would turn please with me to the

3    Bates-number page 461, which is Page 21 of the document,

4    Page Number 461.

5    A.  (Turns.)  Okay, I have that.

6    Q.  And you see that this is in a section called -- on a

7    page before "Risks Related to Our Industry," "We operate

8    in an extremely competitive industry."  Do you see that,

9    sir?

10   A.  I do.

11   Q.  And in the paragraph on the -- three paragraphs from

12   the bottom of Page 21, Bates 461, there's a sentence

13   that says, "In 2015, Delta Airlines began to market and

14   sell a, quote, 'basic economy,' end quote, product,

15   which was designed in part to provide its customers with

16   a low-base fare similar to Spirit.  In 2017, American

17   Airlines and United Airlines announced their own basic

18   economy product.  And beginning in late 2019, other

19   airlines like Alaska Airlines and JetBlue have followed

20   suit."

21        Do you see that, sir?

22   A.  Yes.

23   Q.  And why does Spirit include that information in its

24   risk section of its 10K?

25   A.  Well we identified this product as a competitive

1  product to ours and so we're alerting our shareholders

2  to the risk that this product, um, can be an incursion

3  upon our market.

4  Q.  And how do the prices compare between these airlines

5  basic economy products and Spirit's unbundled fares on

6  average?

7        MR. TEITELBAUM:  Objection, foundation.

8        THE COURT:  Overruled.

9  A.  Well fares in the airline industry are quite

10  dynamic, um, they change all the time, but I think on

11  average the basic economy product is intended to compete

12  directly with a traditional ULCC-type product, so

13  they're very similar.

14  Q.  And what impact if any has the introduction of basic

15  economy had on Spirit from a competitive standpoint?

16  A.  Well I would describe it as a quite a competitive

17  product.  I think it's, um, the larger airlines that

18  have deployed it have used it effectively to compete

19  with us to offer a product to other customers that we

20  identify as an available market and I think it validates

21  that that market exists.  And they're actively pursuing

22  that market.

23  Q.  And do you know whether these airlines are expanding

24  or contracting their basic economy products today?

25  A.  Well it's been changing over the course since its

1    introduction, they've refined its application and its

2    distribution.  It's widely available across their entire

3    networks.  And I've, for example, recently, you know,

4    listened to United talk about how they're selling, you

5    know, 12 percent of their seats basic economy, and that

6    compares with about 9 percent in recent memory.  So it

7    appears to be working for them and growing for them as

8    an available product.

9    Q.  Now -- you can put that aside, Mr. Christie.

10        Do you recall being asked by Mr. Teitelbaum

11   whether Spirit's passengers are cost-conscious

12   travelers?

13   A.  I do.

14   Q.  And do you recall that he asked you if some of your

15   passengers buy only a ticket and no ancillary products?

16   A.  Yes.

17   Q.  And just to clarify, what are the ancillary products

18   that are in that question?

19   A.  Well all the ancillary products are those products

20   we offer beyond the sale of the ticket.  So that would

21   include your baggage options, your seat options, um,

22   your on-Spirit WIFI is available, any food that we have

23   on board the airplane.  Those are the types of ancillary

24   products.

25   Q.  What percentage of your customers choose to add one

1  or more ancillary products?

2  A.  It's about two-thirds.

3       THE COURT:  Two-thirds buy something more than the

4  basic?

5       THE WITNESS:  Correct.

6  Q.  And how much of Spirit's revenue, let's say in 2022,

7  the last full year, for an example, is earned from the

8  sale of ancillary products as opposed to basic ticket

9  fares?

10  A.  Um, it's approaching about an even split these days,

11  so about 50 percent of our revenues comes from the

12  ticket and 50 percent come from ancillary products.

13  Q.  Okay.  And do you remember being asked by

14  Mr. Teitelbaum some questions about repeat rates and

15  customers on Spirit --

16  A.  Yes.

17  Q.  Okay.  Do your customers choose Spirit for any

18  reason other than price?

19       MR. TEITELBAUM:  Objection as to foundation.

20       THE COURT:  Yeah, I mean he can't testify as to

21  what the customers thought.  Well he can give us his

22  evaluation of what he thinks.

23  Q.  Well let me ask you this.

24       From time to time does Spirit conduct research on

25  customer preferences and the like?

```
1    A.   We have, yes.

2    Q.   And do you review that research in the regular

3    course of your work?

4    A.   I have seen it, yes.

5    Q.   So why then do these passengers, based on that

6    research, pick Spirit in addition to price?

7              MR. TEITELBAUM:  Objection, hearsay.

8              THE COURT:  Research is what would speak to the

9    issue.  And if that's before me, fine.  I'm going to

10   sustain it.

11   Q.   What is your understanding of why customers choose

12   to fly on Spirit other than price?

13             MR. TEITELBAUM:  The same objection.

14             THE COURT:  The same ruling.

15             (Laughter.)

16   Q.   Given that your customers choose largely on price,

17   what steps if any does Spirit take to ensure that it has

18   the lowest fares on a given route?

19   A.   Well as I said earlier, fares in the industry are

20   quite dynamic, um, and they are also public.  Everyone

21   has availability to see what other airlines are

22   charging.  And so we're routinely evaluating our

23   position in the market versus our competitors to assure

24   that we are appropriately balanced between supply and

25   demand, and what I mean by that is our fares move as we
```

1    evaluate the demand of the marketplace and as we are

2    filling the aircraft.  So there are times when our fares

3    are the lowest available in the market and there are

4    some times when our fares are not the lowest available

5    in the market, depending on how those factors move.

6    Q.  Now I want to shift topics, Mr. Christie.  Do you

7    remember being asked by Mr. Teitelbaum about the growth

8    of Spirit over the course of your tenure with the

9    company?

10   A.  Yes.

11   Q.  And how many planes did Spirit have when you became

12   the CFO in 2012?

13   A.  We had about 35 aircraft.

14   Q.  And how many today?

15   A.  We're just over 200 today.

16   Q.  Okay.  And let me -- we're going to put up on the

17   screen a document we've marked as Christie Demonstrative

18   1, and let me just give you a paper copy.

19       MR. COHEN:  It's in the -- in the pocket of your

20   binder, your Honor.

21       THE COURT:  Thank you.

22       (Hands.)

23   A.  There it is.  (Looks.)

24   Q.  Now this is an excerpt from Paragraph 22 of the

25   government's complaint and I'm focused on the chart down

1   at the bottom.  Do you see that, sir?

2   A.  Yes.

3   Q.  And the source says, "Airlines for America."  What

4   is that?

5   A.  Airlines for America is the trade organization that

6   represents, um, a number of airlines in their

7   interactions largely with the government.

8   Q.  Okay.  And the heading of this chart says "Spirit

9   Airlines was 6 times larger in 2022 than in 2010."

10       Is that accurate as far as you know?

11   A.  It seems right.

12   Q.  And at the end of this period, 2022, where Spirit

13   had this growth, where did Spirit rank among U.S.

14   airlines in terms of available seat models?

15   A.  We are the 7th largest airline in terms of available

16   seat miles.

17   Q.  Okay.  And which ones are larger than you are?

18   A.  Well looking at this chart you can start at the far

19   left, so United, Delta, American, Southwest, Alaska, and

20   JetBlue were all larger than us.

21   Q.  I see.  And now I'm going to ask you to turn to Tab

22   20 in that second book, which Is Exhibit 293 in

23   evidence.  And it's a board -- materials relating to a

24   board meeting on May 10th, 2024.  Let me know when

25   you're there.

```
 1    A.  I am.
 2    Q.  Okay.  And if you could turn to the page, um, it's a
 3    fair way back, the Bates number is MK Merger Lit
 4    0003774250-1.
 5    A.  (Turns.)
 6    Q.  It's also on the screen, if that's easier for you.
 7    A.  (Looks.)  I have it.
 8    Q.  Okay.  And now just as a general matter, do you
 9    participate in the board meetings of Spirit?
10    A.  I do.
11    Q.  And do you review the materials that are presented
12    to the board in advance of those board meetings?
13    A.  Yes, I do.
14    Q.  Okay.  And now looking at this chart, the slide that
15    says "Still despite rapid growth, we are only
16    approximately 5 percent of domestic market."
17         Why was this slide presented to the board in May
18    of 2023?
19    A.  Well we wanted to give our board perspective that
20    despite our growth over, you know, the last decade or
21    so, we're still relatively insignificant in the
22    industry, um, and haven't yet achieved any relevance.
23    So we want to illustrate to them that our growth has
24    been productive, but we're still very very small.
25    Q.  And what limitations, if any, are there in measuring
```

1    relative size of airlines based solely on seat miles?

2    A.  Well capacity is one measure, it's commonly used to

3    evaluate the size of airlines, but I think the other

4    that's also used would be the size of the revenue base

5    of those airlines.

6    Q.  Okay.  And do you know what percentage --

7         THE COURT:  What is meant by the term "revenue

8    base"?

9         THE WITNESS:  The total revenues of the industry

10   and then each individual airline as to how they compare

11   to that total.

12   Q.  Has Spirit's revenues increased over the same

13   period, 2018 to 2023, that are in this chart in the May

14   2023-24 decl.?

15   A.  They have, yes.

16   Q.  Okay, let me show you what's marked at the beginning

17   of your screen, um, Christie Demonstrative 2.

18        MR. COHEN:  Your Honor, if it's not in the pocket,

19   I'll bring it up to you.

20        THE COURT:  It's not with my cursory review.

21        (Hands.)

22        THE COURT:  That's fine.  Thank you.

23   Q.  Now, um, can you tell us what's depicted in Christie

24   Demonstrative 2?

25   A.  This is Spirit's total operating revenue for the

1   fiscal years ending 2018 through 2022.

2   Q.   Okay.   And what accounts for the dip in revenue in

3   Fiscal Year 2020?

4   A.   That was the beginning of the covid pandemic, which

5   would have a very destructive impact on transportation

6   and the U.S. aviation industry, so our revenues fell

7   dramatically as did other airlines.

8   Q.   And if we look at 2022, Fiscal Year 2022, it says

9   "Revenues at 5.1 Billion."

10        How did that rank in Spirit's history among its

11  revenues?

12  A.   I believe that's the highest revenues we've produced

13  in our history.

14  Q.   And do you track the revenue of competitive

15  airlines?

16  A.   I do, yes, I look at how our competitors perform on

17  a regular basis.

18  Q.   Do you know what percentage Spirit's $5.1 billion in

19  2022 comprise of all airline revenues in the United

20  States?

21  A.   I think we were about 3 percent or just under 3

22  percent of the total revenue in the industry.

23  Q.   Okay.   And do you know how this $5.1 billion

24  compares to the revenues of 2022 of the Big 4 airlines

25  combined, American, Delta, United, and Southwest?

1          MR. TEITELBAUM:  Objection as to foundation.

2          THE COURT:  No, he may testify.

3     A.  The large four airlines are the biggest part of the

4     industry, they're about 80-plus percent of the total

5     revenue in the industry.  If I'm not mistaken, in '22

6     they had between $165 and $170 billion in revenue.

7     Q.  Now what do you attribute --

8          MR. COHEN:  Can we put Demonstrative 1 back up,

9     please.

10    Q.  What do you attribute this growth to with seat miles

11    during this period in Demonstrative 1?

12    A.  Well we took delivery of a number of airplanes over

13    that period of time and that provided us with, um, the

14    capacity growth that's referenced here.

15    Q.  Okay.  And in what ways has Spirit extended its

16    network over this period?

17    A.  We've also geographically expanded our network.

18    When I joined Spirit in 2012, we were largely focused on

19    the Eastern seaboard and in and out of Florida and some

20    Latin American presence, but we're now -- we do have

21    more capacity in the Midwest and the Western part of the

22    U.S., and that's where our expansion has been.

23    Q.  And when people in the airline industry like you

24    refer to a "network," what do you refer to?

25    A.  Well we're referring to the actual construction of

1    the in-and-outs of the airplane.  So, um, this is a

2    network business, which means that because the assets

3    are mobile, they are in constant rotation throughout the

4    network, and that means that our individual routes are

5    in flux at any given point.  We may or may not keep

6    certain flying if it's not productive.  We may add new

7    flying if we're seeing new opportunities.  And what the

8    network does is it gives you power to offer more

9    services to people through connections, um, and it gives

10   you, um, a larger array of possible opportunities for

11   people to travel.

12   Q.  Does Spirit enter new routes on a regular basis?

13   A.  We do, yes.

14   Q.  Does Spirit exit routes on a regular basis?

15   A.  We do, yes.

16   Q.  What's the principal determinant of entry rights of

17   a given route?

18   A.  Well the primary determinant is profitability.  So

19   we're in constant review of our network and where we see

20   routes that are underperforming, um, from a

21   profitability standpoint, we start to make adjustments

22   to those routes in the form of the level of capacity we

23   are serving in the market.  It could be we use a smaller

24   airplane.  It could be we change the time of day that

25   we're flying.  It could be we offer only on certain days

1   of the week.  And if those types of things are not

2   improving the market performance, then we will pull the

3   route and deploy that aircraft somewhere else.

4        THE COURT:  Does the government regulate that in

5   any respect?  I've read about concerns for serving rural

6   America.  I just wonder if it's regulated in any way?

7        THE WITNESS:  No, largely the U.S. has an

8   open-skies-type approach to -- so with the noted

9   exception of some airports that are what are called --

10  referred to as "slot restricted," which means that the

11  number of takeoffs and landings are restricted at that

12  airport and only held by slotholders.  There's three of

13  those airports in the United States, that's New York's

14  La Guardia, New York's JFK, and Reagan National in

15  Washington, D.C.  But basically every other airport is

16  open for service as long as you can find a gate and the

17  people in the airplanes.

18        THE COURT:  Chicago's O'Hare?

19        THE WITNESS:  Is again, um -- there's a smaller

20  level of restriction at a certain number of airports

21  where you have to seek prior approval of your takeoff

22  and landing with the FAA, those are called Level 2

23  airports.  Chicago O'Hare is one of those.  However we

24  operate there and we've always been approved.  So it's

25  largely open skies.

1   Q.   I want to go back to the Big 4 airlines, um,

2   Mr. Christie.  And could you tell us what difficulties,

3   if any, Spirit encounters when competing against those

4   Big 4 airlines?

5   A.   Well it's very challenging, um, in the market to

6   compete with these large dominant airlines.  The Big 4,

7   as we said earlier, control 75 percent of the capacity,

8   80 percent of the revenue in the market, and they offer

9   a broad array of products to consumers that give them

10  access to a number of people that Spirit could never

11  serve, and they use that and their various forms of

12  diversified revenue to compete effectively against the

13  smaller airlines.  And I think that's been no more

14  evident than what's been happening since the emergence

15  of the pandemic.

16  Q.   And what was that last part that you just added

17  about since the emergence of the pandemic?

18  A.   Well as we've witnessed as we've come out of the

19  pandemic, the larger airlines have returned to

20  profitability and the smaller low-cost airlines have

21  not, and I think that is a product of the successes that

22  we've talked about earlier with their transformation to

23  basic economy, the various forms of diversified revenue

24  that they offered, both geographically -- and what I

25  mean by that is they have large international networks

1   where they offer services that Spirit can't.  They have

2   alliances with other airlines that give them worldwide

3   reach that Spirit won't be able to serve.  And they have

4   very lucrative, um, credit card affinity programs and

5   loyalty programs, and all of those things give them

6   significant revenue diversity.  And so that when any one

7   particular piece of their geography or their revenue

8   base is suffering, they're able to offset those losses

9   with other forms.  And Spirit has not been able to do

10  that as well.

11  Q.   And can you tell us a little more about what you

12  mean by a "loyalty program" or a "credit card program"

13  of the Big 4 airlines?

14  A.   Well the loyalty program and the credit card -- they

15  can be divided into two primary components.  First, is

16  the loyalty program itself, and those are largely driven

17  by the accumulation of either points or miles based on

18  how much you fly with the individual airline, and those

19  points can be accumulated and then used for services and

20  goods on those airlines.  It could be for additional

21  tickets.  They offer other products as well for their

22  loyalty members.  And you accrue status in those loyalty

23  programs based upon how much you fly and they give you

24  certain perks and complimentary services as you attain

25  that status, like access to lounges and complimentary

1   upgrades on their products and that sort of thing.  So

2   that's one component, which is the points-based loyalty

3   system.

4        The second is the affinity credit card that

5   attaches to that loyalty program, and those are credit

6   cards that are branded with the airline on them and

7   issued by a bank, and those banks actually buy those

8   points from the airline and give those points to their

9   credit card holders as they spend.  So the airline is

10  earning revenue in the sale of those points to the bank.

11  And it further increases the hold on those customers as

12  to their loyalty.  They continue to spend more on those

13  credit cards to achieve more loyalty status.  And it's a

14  very virtuous cycle in that regard.

15  Q.  And how do those loyalty and credit card programs

16  affect your ability to compete with those large

17  airlines?

18  A.  Well Spirit has a loyalty program and a credit card

19  program as well that we use and we do have members of

20  our points-based loyalty program who also have our

21  credit card, um, and our credit card program today

22  accounts for somewhere between 1 to 2 percent of our

23  revenue.  But in comparison to the larger network

24  airlines who have developed very successful credit card

25  programs and loyalty programs, we're seeing their

1    percentage of revenues somewhere in the 12 to 14 percent

2    of their revenue.  So you can see it gives them a much

3    more stable revenue base compared to us.

4    Q.  And what incentives do those loyalty programs

5    provide for passengers when they're selecting airlines?

6         MR. TEITELBAUM:  Objection as to the foundation.

7         THE COURT:  How do you know that?  He asked you so

8    I assume he thinks you know the answer.  How do you know

9    it?

10        THE WITNESS:  I've been in the industry for 21

11   years and seen how these programs have worked and

12   listened to consumers talk about how they worked and

13   watched how other airlines talk about how they work.

14        THE COURT:  We'll get his views.  Overruled.  He

15   may answer.

16        How do they work?

17        THE WITNESS:  Well they are very effective.  They

18   are "loyalty programs" and they're called that on

19   purpose.  They drive, um, significant attachment to

20   individual brands.  If you're a resident of Dallas Fort

21   Worth, for example, and you know that American flies

22   90-plus percent of the capacity in and out of Dallas

23   airport, you're probably going to be a member of their

24   loyalty program, you're probably going to hold their

25   credit card, and that would influence your buying

1  decision when you're looking to purchase a ticket

2  because you recognize the value of that and the affinity

3  associated with it.

4  Q.  Now you called these airlines "network airlines."

5  What impact does their network have on the choices that

6  passengers make on which airline to fly?

7  A.  Well given their breathe and their size, the network

8  itself drives significant value for consumers and for

9  the airline itself.  So yesterday I referred to the

10  difference between a point-to-point structure and a

11  hub-and-spoke structure.  But network airlines largely

12  deploy hub-and-spoke type structures, and they use that

13  to offer connecting service to a broad array of

14  passengers throughout their network.  And that gives

15  them, um, again diversified revenue opportunities

16  throughout their network and allows them to effectively

17  compete against point-to-point airlines.

18       For example, if I use the Dallas example again,

19  Spirit serves Dallas to Fort Lauderdale, and I believe

20  we offer that twice a day, um, and we're largely serving

21  people who either live in Fort Lauderdale or live in

22  Dallas, um, travelling back and forth on leisure or

23  visiting friends and relatives or on business.  What

24  American offers is service between Dallas and Fort

25  Lauderdale and it's some number considerably larger than

```
 1    twice a day, but I don't know where their network sits
 2    today, but it's somewhere north of 5.  And they offer
 3    obviously the same for people who live in both Fort
 4    Lauderdale and Dallas.  But they also have significant
 5    connecting opportunities in their main hub in Dallas
 6    where if you live in Fresno or you live in Billings or
 7    you live in San Diego, you can get to Fort Lauderdale
 8    over Dallas, and those additional travelers give them
 9    the opportunity to more effectively compete on just the
10    local service between Dallas and Fort Lauderdale.
11    Q.  I want to turn now, Mr. Christie to Spirit's
12    profitability.
13         Has Spirit been profitable over the course of your
14    tenure with the company?
15    A.  We were profitable every year through the end of
16    Fiscal Year 2019.
17    Q.  And what's happened since 2019?
18    A.  Well as we witnessed on the revenue slide earlier at
19    the beginning of the Fiscal Year 2020, the pandemic took
20    hold, which had a very damaging impact on Spirit, and we
21    began losing money that year.  2021, I believe we
22    commonly referred to as a covid-impacted year as well,
23    Spirit was in a net loss position.  And then beginning
24    in 2022, we started to anticipate the recovery out of
25    covid, however we posted a rather significant loss for
```

1   2022 as well for some of the reasons I described

2   earlier.  And then as we head into this year, we're in a

3   net loss position year to date as well and anticipate a

4   full year of a net loss for 2023 also.

5   Q.  Okay, let me see if I can break a little bit of that

6   down.  Let me show you what's we've marked as Christie

7   Demonstrative 3.  (Hands.)

8        Tell us what was depicted -- you don't have to

9   show us, but tell us what's depicted in Christie

10  Demonstrative 3?

11  A.  This is Spirit's net income as reported for Fiscal

12  Years 2018 through Fiscal 2022.

13  Q.  Okay.  And at a high level, and we'll go through

14  some of it in more detail, but can you tell us what are

15  the principal factors that have led to these losses of

16  -- I'm just adding it up, it seems to be that of $1.3

17  billion over the 2020 through 2022 period?

18  A.  As I mentioned, I believe it started in 2020 with

19  the covid pandemic, which had a significant impact, and

20  I believe that carried over into 2021.  But as we look

21  forward into '22 and '23, there have been other impacts

22  that have impacted -- that have negative impacts on

23  Spirit and I think that can be summarized in a few

24  things.

25        First, we've seen significant cost inflation

1   across the business, labor rates in the industry are up

2   significantly and that drove a tremendous change in our

3   overall cost structure.  We've seen elevated expenses at

4   our airports, um, where the airport expenses have driven

5   considerable change in the cost structure.  In all of

6   the services that we buy, the third-party services from

7   maintenance repair and overhall services to catering

8   services, to fueling services, all of those have seen

9   cost inflation as well.  And then we've seen a change in

10  the fuel price since the depths of the pandemic, which

11  has gone up dramatically.  I believe in the period of

12  the pandemic, fuel was as low as $6 a barrel and now

13  it's about $80 a barrel.  So we've seen dramatic change

14  in fuel price over that.  That has had a significant

15  impact on our earnings capability.

16      When you look at the other side of the ledger,

17  which is the revenue side of the ledger, um, we're

18  experiencing some of what I described could be the risk

19  associated with being a nondiversified airline from a

20  revenue-based perspective.

21      So the domestic industry was seeing some recovery

22  in 2022, but in 2023 we have seen that change

23  dramatically.  And much of the demand in the U.S.

24  domestic industry has shifted towards more premium

25  traffic and international traffic, which Spirit does not

1    necessarily have, and that has exposed us from an

2    earnings perspective.  It's evidence further of the

3    dominance of the larger airlines and their ability to

4    use that size to flex their revenue sources and change

5    the competitive dynamics.

6        THE COURT:  Why do you think that the demand has

7    shifted more to premium travel?

8        THE WITNESS:  Well I think, um, that it can be,

9    um, for a couple of reasons.  One is that the impacts of

10   the economic inflationary changes that we've seen in the

11   economy over the last year have begun to pinch the

12   lower-end consumer more and they're making different

13   buying decisions as a result, and so that is changing

14   some of the dynamic with certain elements of the demand

15   base, so they're not buying as much of the product as

16   they were before because their own household expenses

17   are higher.

18       And the second is --

19       THE COURT:  Let me say that back to you and see if

20   I understand it.

21       You're saying the impact of increased inflation

22   generally --

23       THE WITNESS:  That's correct.

24       THE COURT:  -- pinches those least able to pay and

25   therefore what demand there is is greater among the

1  premium, for the premium services because the people who

2  are willing to pay are willing to pay for the premium

3  services.

4      Do I understand that?

5      THE WITNESS:  I think that is almost an exact

6  summary.  Inflation is pinching everyone, but I think

7  there is a scale at which it pinches people.

8      THE COURT:  And that's the point you're making?

9      THE WITNESS:  Exactly.

10     THE COURT:  All right.  I do understand that.  And

11 you hadn't finished, so go ahead.

12     THE WITNESS:  That's okay.

13 A.  And then secondarily the, um, the dynamics of the

14 industry have changed.  The, um, the larger airlines are

15 more effectively competing for that type of traffic

16 using their basic economy products and their low-fare

17 products and they have grown over this window of time,

18 which gives those travelers that are available more

19 choice, um, to make their buying decisions.  And again

20 the larger airlines are using the power of their

21 networks and their diversified revenues to effectively

22 compete against the smaller low-fare airlines that is --

23 that is driving some of this change as well.

24 Q.  Okay, let me ask you if we can look at Tab 18, which

25 is Exhibit 241 in your book.

1    A.   (Looks.)

2    Q.   Do you see that, sir?  That's a board presentation

3    from December 9, 2022 board of directors meetings with

4    Spirit Airlines.

5         Do you see that, sir?

6    A.   I do.

7    Q.   And again would it be fair to say that you

8    participated in the preparation of this presentation?

9    A.   I did.

10   Q.   Is there a particular subject that is typically

11   covered at the December annual board meeting?

12   A.   Yes, we usually cover our next year's financial

13   plan, so in this case we would be covering the 2023

14   financial plan with the board.

15   Q.   Okay.  And let me ask you to turn to the page with

16   the Bates Number 168897-1, it's right in the middle, and

17   it says "Full Year 2023 NonGAAP, P & L."  Let me know

18   when you're there?

19   A.   I see it.

20        MR. COHEN:  Your Honor, I'll wait for you to get

21   to that page.  I apologize for our numbering system.

22        THE COURT:  Okay, I have it.

23   Q.   Okay.  So what is this Full Year 2023 NonGAAP P & L

24   slide?

25   A.   This is a summary presentation of the company's, um,

1   income statement for Full Year 2023, and we say

2   "NonGAAP" meaning we're excluding what are referred to

3   in the public markets as "special items," so they're

4   nonrecurring items, and the first numerical column is

5   our projection for the plan for 2023 when compared to

6   our Full Year 2022 actual and forecast and our Full Year

7   2019 actual performance.

8   Q.  Now, the 2022 forecast in December of 2022, does

9   that earn a profit or a loss?

10  A.  We were, um - we were forecasting a loss here of --

11  a net loss of $190 million.

12  Q.  Okay.  And if we had gone back a year and looked at

13  September 2021 -- December 2021 budget, had Spirit

14  budgeted for a loss for 2022?

15  A.  No, I believe we were projecting a profit for 2022

16  at that time.

17  Q.  Okay.  And what in December of 2022 was Spirit

18  projecting for Fiscal Year of 2023?

19  A.  We were projecting a net income of $242 million.

20  Q.  And what was the reason why Spirit, in December of

21  2022, believed that 2023 would be the first profitable

22  year since 2019?

23  A.  Well as part of the plan we were optimistic that a

24  few things would start to move in our direction where we

25  would begin to see normalized demand patterns in the

1    domestic marketplace in the Latin international markets

2    where we serve.  We were expecting to see a return to

3    more normalized aircraft fleet utilization, which is how

4    many hours per day does each airline -- each airplane

5    fly in revenue service, which as I discussed yesterday,

6    drives some level of our efficiency.  And -- and we were

7    hoping that those things would give us some cost

8    advantage and that we would be able to produce a profit

9    as a result, albeit a modest profit with the net margin

10   being 3.9 percent.  But nonetheless, um, we were hoping

11   at least a return to profitability.

12   Q.  And would you turn to about 30 pages forward in this

13   same presentation to Page 168931-1, it's titled "Risks

14   and Opportunities in 2023 Plan."

15         THE COURT:  16893 --

16         MR. COHEN:  168931, your Honor.

17         THE COURT:  31.

18         (Turns.)

19         MR. COHEN:  "Risks and Opportunities."

20         (Turns.)

21   A.  I see that.

22   Q.  Okay.  Are you familiar with this slide?

23   A.  I am, yes.

24   Q.  What's the purpose of providing the board, in

25   connection with the budget, with an outlook on risks and

1    opportunities in the plan?

2    A.  Well given that the plan is based on certain

3    assumptions, we outline for the board the risks of those

4    assumptions, meaning things that may move against us and

5    produce negative impacts on the forward plan and those

6    opportunities that could result in positive changes to

7    the forward plan.

8    Q.  Okay, let's start with the risks.

9         Did any of the risks identified in December of

10   2022 for the board come about?

11   A.  I'm sorry, Mr. Cohen, did they --

12   Q.  I'm sorry.  Did any of these risks that you

13   identified in December of 2022 get realized in 2023?

14   A.  Um, looks like most of these risks ended up being --

15   becoming reality.

16   Q.  Okay.  Can you speak to the ones that in fact

17   happened over the course of 2023 that were identified to

18   the board as "risks" in December of 2022?

19   A.  Well the first risk I mentioned earlier, which was

20   we were concerned that while we were seeing at the time

21   a rebound in major demand, we were worried that it

22   could, um, we could see a slowdown as a result of

23   historic inflation and we believed that we have

24   witnessed some change in leisure demand, at least

25   domestically, as a result of historic inflation.  So

1    that's materialized unfortunately.

2         The second is, um, shifts in the U.S. labor market

3    presenting challenges related to staffing the airline.

4    We have seen that continue to be a pressure.  We have

5    made adjustments as a result of that, um, specifically

6    with regard to our pilots and our flight attendants,

7    which we reference here in just a second, that have made

8    some improvements.  But we also had challenges staffing

9    other components of the airline at the airports and with

10   our third-party service providers.

11   Q.  Mr. Christie, could I just stop you for one second

12   just so we understand something.  It says "as well as

13   inflationary C-A-S-M."  Is that "CASM," "CASM X

14   pressures"?

15   A.  Yes.

16   Q.  Could you explain to the Court what "CASM X" means?

17   A.  "CASM" is the acronym for "Cost per Available Seat

18   Mile."  Once again, the available seat mile is the unit

19   of measuring in the airline business, and what we said

20   here is that CASM is cost divided by available seat

21   miles.  In this case it's excluding the X, which means X

22   fuel.  So those are those costs that we control the most

23   and focus on the most.  And we were again worried here

24   that the labor market could present challenges to

25   staffing, and in addition to that, if we address it, it

1    will cause inflationary expenses.  That part of it

2    absolutely materialized, which I'll, I guess, just get

3    to in just a second with regard to contractual changes

4    to our pilot and flight attendant wages.  So that has

5    been a pressure, as I mentioned earlier on CASM.

6         The fuel assumption at the time was $2.87.  We saw

7    fuel in the course of 2023 reach as high as $3.40 a

8    gallon, so that obviously did move against us as well.

9    Q.   The math is hard since you're not filling up at the

10   pump, right?  How much gas fuel does Spirit use in a

11   year?

12   A.   I think our projections for 2023 were to burn about

13   600 million gallons.  So the change in fuel price from

14   2.87 to 3.40, um, could be as much as an impact of $300

15   million on our P & L statement.

16   Q.   Okay, would you go to the next one, please, "Engine

17   Maintenance Events."

18   A.   So the next discussion here had to do with engine

19   maintenance events and the pressure to get our engine

20   and our aircraft to return to service.  We've

21   experienced a significant issue with regard to the

22   engine that powers our newest aircraft in our fleet that

23   is referred to as the "NEO fleet," and that stands for

24   "New Engine Option" on the Airbus A320 family.  We are

25   partners with Pratt & Whitney, they are the power plant

1    provider of that, and they have, um, over the course of

2    the introduction of that engine from 2016 through today,

3    experienced issues with reliability which have forced us

4    to put aircraft on the ground with no engines on them

5    because they've been unable to support us with spares,

6    unable to get engines out of the repair shop on time.

7    We were optimistic that we were going to see improvement

8    in that over the course of 2023, but we identified that

9    it may be a risk that that would not improve.

10   Unfortunately it didn't just not improve, it got

11   dramatically worse where Pratt & Whitney has identified

12   significant new issues with that engine variant.  At the

13   beginning of the year here in 2023, we had three

14   aircraft on the ground with no engines.  Today we have

15   approximately 12 aircraft on the ground with no engines.

16   And we expect by the end of 2024, that number could grow

17   north of 40 aircraft on the ground with no engines.  So

18   it's gotten worse.

19   Q.  And what is the financial impact on Spirit of having

20   a plane grounded because the engines are not available

21   to utilize the airplane?

22   A.  Well it's difficult to explain exactly how damaging

23   it is because it's, um, having the airplane on the

24   ground means you're missing the entire contribution of

25   that aircraft to your profitability.  You've lost the

1    ability to cover your fixed expenses that you've already

2    incurred with the business.  You're unable to offset

3    other cost inflations.  But the simplest way to think

4    about it is you've now got an asset that you've paid a

5    lot of money for and it's sitting on the ground idle and

6    you're continuing to pay for it.  And an aircraft costs

7    Spirit about $6 million a year roughly in rent.  So by

8    the end of next year, to the extent that the projections

9    are correct and we have 40 aircraft on the ground,

10   that's $240 million of foregone rent expense on an asset

11   that's sitting idle and not producing anything.

12        THE COURT:  "Foregone rent expense"?  Do you rent

13   them?

14        THE WITNESS:  We rent some.  About half of our

15   aircraft we rent and the other half we have purchased

16   with some form of debt.

17        THE COURT:  Sure.

18        THE WITNESS:  So it's an estimate of the fixed

19   expense of the airplane.

20        THE COURT:  From whom do you rent?

21        THE WITNESS:  Well there are a number of, um,

22   large sophisticated aircraft leasing companies

23   internationally, um, there are five or six that dominate

24   the space.  And we rent from all of them as well as a

25   few others.

1          THE COURT:  Thank you.

2    Q.  And do you have, as you're sitting here today, a

3    time line for when these engine issues are going to be

4    resolved?

5    A.  Unfortunately I do not.  The guidance we're

6    receiving from Pratt & Whitney is that they don't have

7    an exact time line for when it will improve.  In fact

8    we're expecting it to continue to get worse into 2025.

9    Q.  All right.  Does the Pratt & Whitney engine problem

10   affect your competitors as well?

11   A.  There are other, um, U.S.-based airlines that

12   operate this engine variant, but Spirit is the largest,

13   um, adopter of this engine in the United States, both in

14   total count and as a percent of the fleet, we're the

15   second largest in the world.  So it's having an outsized

16   impact on Spirit.

17          THE COURT:  And in part that's because you fly all

18   the variants of this, um, a 320 airbus, right?

19          THE WITNESS:  Yes, it's the engine itself on that

20   airplane.

21          THE COURT:  I understand.  But your fleet, what

22   I've gotten from the testimony, you try to have a modern

23   fleet which has fuel efficiencies --

24          THE WITNESS:  Correct.

25          THE COURT:  -- and you're pretty much drawn to

1    this airbus in its various iterations, is that accurate?

2         THE WITNESS:  Yes, said quickly, we're are in on

3    the airbus A320 family and all in on the Pratt variance

4    and that has exposed us again to a lack of diversity.

5    Q.  Let me just ask you to look at the last two bullets

6    and let's cover those, if we can, "Pilot Attrition" and

7    "Wages."

8    A.  Well we were experiencing in 2022 a significant

9    increase in attrition related to our pilot group, um,

10   where there has been high demand for pilots in the

11   industry and we were beginning to lose pilots to other

12   airlines, larger network airlines who were hiring again

13   as a result of the growth coming out of the pandemic,

14   and so we did assume here that we would see a reduction

15   in pilot attrition.  Thankfully that has begun to

16   materialize throughout the course of 2023.  However it

17   happened with the last bullet, which was identified as a

18   risk, which is a contractual change to both our pilot

19   and flight attendant agreements.

20        We signed new agreements with our pilot group --

21   we signed with our pilot group in January of 2023 and

22   with our flight attendants I believe in April of 2023.

23   Both of those contracts were not included in the plan

24   and they were identified as cost risks.  The combined

25   impact of those two contracts at an annualized basis is

1    about $225-plus million.

2    Q.   Okay.  "Opportunities."  Could you tick through

3    those for us and tell us which if any of those

4    opportunities have arisen in 2023?

5    A.   Again unfortunately most of these did not

6    materialize, so going the other way we didn't get the

7    benefit of some of these opportunities.

8    Q.   Did any of them materialize in 2023?

9    A.   Well we were optimistic that supply constraint in

10   the industry would contribute to fare improvement.  The

11   airlines have continued to grow, so we haven't seen

12   anything there yet.  We were hopeful that there would be

13   a return to a more normalized business traffic

14   environment which would help, um, that demand would help

15   support higher yields and offset the cost inflation that

16   the business has seen.  Business traffic has been

17   stagnant and not returned.

18        The easing of international travel restrictions

19   has taken place, um, beginning in late '22 and into

20   2023.  Here we were optimistic that it could drive

21   additional demand into the Latin American network that

22   we serve.  Unfortunately what we witnessed in the summer

23   is that most of the restriction benefit increased

24   traffic to places where Spirit does not fly, the

25   Transatlantic being the primary beneficiary of the

1    easing of international travel restrictions, so another

2    benefit to the larger network airlines.  Transpacific

3    has seen some return to normalcy as well.  So we didn't

4    get to benefit from that as much as we would have hoped.

5         This next bullet point talks about our ability to

6    get back to a more normalized efficiency.  We refer to

7    that in "pilot speak" as "pay to block," meaning how

8    efficient pilots are.  As of yet we have not returned to

9    a more normal efficiency level largely because of some

10   of the fleet issues we've had, but also because of some

11   of the restrictions throughout our network in air

12   traffic control, um, restricting our ability to fly in

13   certain places.

14        And then this last one we did sign a new pilot

15   contract, which did improve some hiring and attrition

16   for us, so that one actually did help us out this year.

17   Q.  Okay, you can put that slide down, please.

18        What impact have these 2022, 2023 results, if any,

19   had on the size of Spirit's fleet?

20   A.  Well we started seeing, um, in late 2022, that we

21   were not seeing a return to normalcy for our, um, our

22   profitability, and we were optimistic that that would

23   reverse in 2023, but as we headed into the year and into

24   the late spring and early summer, it became very

25   apparent that that was not going to be the case.  So

1    Spirit started to make moves and we started with -- we

2    reached out to our aircraft manufacturer, which is

3    Airbus, and made a modification to our delivery stream

4    to remove airplanes or defer airplanes out of 2023 and

5    2024 because we were cautious and fearful that we would

6    not be able to justify that growth with profitability.

7        We also were in the midst of evaluating a

8    retirement schedule for our A319 fleet, which is the

9    smallest aircraft in our fleet, and we decided to press

10   ahead with that and move it as accelerated as we could,

11   so we started to take aircrafts out of the current

12   periods and push them down the line or take them out of

13   service because the demand hasn't been there and our

14   profitability hasn't been there.

15   Q.   Now tell us about 2023, about the first three

16   quarters, how has Spirit performed financially?

17   A.   Well year to date we're in a net loss position.

18   Through the end of the September quarter, we released

19   our financial results for the September quarter a week

20   or two ago and gave our investors guidance on how we

21   intend to perform in the fourth quarter, which

22   unfortunately is again at a loss.  So we're staring at

23   another full-year loss for 2023 as well.

24   Q.   Well can you estimate the size of the loss based on

25   the guidance you gave for --

1    A.   It's going to be comparable to prior years,

2    somewhere in that range that we saw in that prior slide.

3    Q.   Mr. Christie, do you know when Spirit will return to

4    profitability?

5         MR. TEITELBAUM:   Objection, calls for speculation.

6         THE COURT:   Well it does.   But as you say, the

7    government -- and this is all forward-looking, so I

8    won't let him speculate, but I will let him estimate.

9    A.   I don't have an estimate as to when we intend to

10   return to profitability.   The challenges we face now

11   we're doing our best to tackle, but they are

12   significant, and, um, we're going to have to make

13   adjustments to the business as a result.   As I said

14   earlier, we're already evaluating our growth strategy in

15   the moves we've made and I think that will be a

16   continual evaluation, simply put.   If the business isn't

17   making money, you can't justify deploying additional

18   capital for growth, so we're going to have to evaluate

19   that going forward.

20        We're going to have to take a hard look at our

21   cost structure and whether or not we can make any

22   changes to that to influence profitability.   And we'll

23   have to review the revenue side of the business as well

24   and take a look at our product and where we're flying

25   and make continual changes.

1   Q.   Now you were asked by Mr. Teitelbaum yesterday about

2   your discussions with JetBlue and Frontier in 2022.   Do

3   you recall that?

4   A.   Yes.

5   Q.   Just to remind us, the discussions that culminated

6   in the signing of the merger agreement with Frontier,

7   when did those discussions begin?

8   A.   They began in July of 2021.

9   Q.   And what were the reasons why Spirit agreed to a

10   merger with Frontier in the beginning of 2022?

11   A.   Well there were a number, but the primary reason was

12   we were looking -- the combined airlines were looking to

13   achieve a scale and a relevance in the business that

14   would make us a more effective competitor with the

15   dominant four airlines in the industry, and we both

16   agreed that combining in that respect would give us some

17   of those advantages of size, scale, relevance in the

18   places where we fly.   And what I mean by "relevance" is

19   people choosing to buy based on whether or not you offer

20   the necessary services.   The bigger you get the more

21   services you offer, the more relevant you are in their

22   decisions.   And so we were looking -- both of us were

23   looking to achieve that as a result of the merger.

24   Q.   And just to clarify, when you say the bigger you get

25   the more services you offer, what do you mean by the

1  more services you offer?

2  A.  Well in that case I'm largely referring to the

3  network, so the bigger the airline, the more

4  opportunities for guests of Spirit to choose to fly with

5  Spirit because we offer, um, more destinations.  And

6  that relevance then attaches to their royalty, which

7  makes them more interested in being a buyer of your

8  product.  And so that was an important part of the

9  thesis around creating a merger with Frontier.

10  Q.  And had Spirit had merger discussions with Frontier

11  before 2021?

12  A.  We had, yes.

13  Q.  Okay.  And let me ask you to look at Tab 10 in your

14  book, which is Exhibit 297 in evidence.  And it is a

15  proxy statement filed by Spirit Airlines and Frontier.

16      Do you see that, sir?

17  A.  Yes, I do.

18  Q.  Okay.  And I'm going to ask you to turn -- hopefully

19  there are extra page numbers on it, to Page 61 of this

20  proxy statement, and that says "Background of the

21  Merger."  Let me know when you're there?

22  A.  (Turns.)

23  Q.  And the Bates numbers are 2741933.

24  A.  I got there eventually.  I'm here now.

25  Q.  Okay.  And in the last paragraph on this page the

1    proxy statement says, "Between November 16 and August

2    2018, Spirit and Frontier periodically explored the

3    possibility of a business combination involving the two

4    companies."

5         Do you see that, sir?

6    A.  Yes.

7    Q.  Okay.  And did you participate in those discussions

8    with Frontier between 2016 and 2018?

9    A.  I did.

10   Q.  Okay.  Was Spirit profitable at the time it was

11   conducting those earlier discussion with Frontier?

12   A.  We were, yes.

13   Q.  Why then did you contemplate a merger?

14   A.  Again we viewed -- the primary issue here is we

15   recognized the dominance of the larger airlines in the

16   space.  We were concerned that, um, our independent

17   growth would not be significant enough to be able to

18   become a relevant player, a relevant fifth challenger in

19   the U.S. base, and so we began exploring this idea in

20   2016 as a way to kind of combine and create that more

21   viable fifth competitor.

22   Q.  Okay.  And why didn't those discussions result in an

23   agreement in the earlier period?

24   A.  Well they broke down largely over economics.

25   Q.  What do you mean by that?

1    A.   Price between the two businesses.

2    Q.   And in the period prior to the merger agreement that

3    was signed by Frontier in 2022, did Spirit analyze

4    combinations with other airlines in addition to

5    Frontier?

6    A.   We did, yes.

7    Q.   Which ones?

8    A.   Over the course of this period we looked at,

9    obviously, Frontier Airlines.  We evaluated, um,

10   investments in and combinations with Latin American

11   Airlines, one being Viva Colombia.  We looked at and

12   explored the opportunity at Sun Country Airways who was

13   looking for a buyer.  We -- we looked at Allegiant

14   Airlines.  And we also evaluated JetBlue Airways.

15   Q.   Okay.  And when did Spirit evaluate a potential

16   transaction with JetBlue?

17   A.   We had some preparatory work, um, that we did in

18   2018.

19   Q.   And what preparatory work was that?

20   A.   Well we hired a third-party aviation consultant to

21   do some analysis for us on what a combination of -- what

22   a combination would look like between ourselves and

23   Spirit -- excuse me, and Frontier and Allegiant and

24   JetBlue.

25   Q.   And what was the name of that consultant?

A.   That's Campbell Hill Aviation Group.

Q.   And what did Spirit in 2018, when you were doing this work, see as the benefits of a potential JetBlue transaction?

A.   Well the primary benefit is identical to what we evaluated in our eventual merger agreement with Frontier, which was we believed that the combination with JetBlue would create a national fifth challenger to the large four airlines, creating an opportunity for us to achieve some relevance and scale and be a more effective competitor against those four airlines.

Q.   And did you in fact have discussions with JetBlue at that time?

A.   We did not.

Q.   Why not?

A.   We were busy with Frontier over the course of these periods of time and focused on that primary transaction, so we did not, um, have any discussions with JetBlue.

Q.   Let me ask you to turn to Tab 1 in your book, which is a document entitled "Spirit Opportunities Analysis Summary," prepared by Campbell Hill Aviation Group, March of 2018, and it's Exhibit BHZ.

     Do you see that, sir?

A.   I do, yes.

Q.   Who made the decision to retain Campbell Hill for

1    this analysis?

2    A.  I was the one who reached out Campbell Hill and

3    hired them to do this work.

4    Q.  And why did you do that?

5    A.  I was preparing myself for, um, a strategic

6    discussion with the board of directors and I wanted to

7    have thoughts from a third-party on these potential

8    opportunities available to me.

9    Q.  And what role if any did you play in Campbell Hill's

10   work?

11   A.  Um, we worked together on iterating this particular

12   presentation to, um, refine the work, to understand the

13   scope of the work, um, and how the presentation actually

14   looked.

15   Q.  And from time to time has Spirit retained Campbell

16   Hill for other analyses?

17   A.  We have, yes.

18   Q.  Do you know how many times approximately?

19   A.  I don't, but it's been quite a few, probably north

20   of 10.

21   Q.  Okay.  And what reliance in your work at Spirit did

22   you place on this Campbell Hill analysis?

23   A.  Well I used their opinions to help guide me in my

24   discussions with the board on various opportunities we

25   were looking at strategically.

1          MR. COHEN:  Your Honor, I'm offering BHZ not for

2    the truth, but for the fact that this presentation was

3    created at Mr. Christie's direction.

4          THE COURT:  Why is that relevant?

5          MR. COHEN:  It demonstrates and supports his view

6    that they were examining, um, a potential acquisition

7    with JetBlue.

8          THE COURT:  That hasn't been challenged.

9          Well do you object?

10         MR. TEITELBAUM:  Yes, your Honor, we do.

11         THE COURT:  I'm guilty of overspeaking.

12         MR. COHEN:  It was coming regardless, I can assure

13   you.

14         (Laughter.)

15         THE COURT:  Well I'm going to sustain it, but

16   without prejudice to it being offered later if there's

17   some challenge to the issue of whether who was, in good

18   faith, exploring these things.  It's sustained.

19         MR. COHEN:  May I be heard briefly, your Honor?

20         THE COURT:  Yes.

21         MR. COHEN:  I will say that there's a almost a

22   recent fabrication attack being made by the government

23   during the opening, um, what the government said was --

24         THE COURT:  If there was, I didn't hear it.

25         MR. COHEN:  Okay, then I'm going to move on.

```
1          THE COURT:  All right.  And the government will
2     take note that I didn't hear any such charge.
3     Q.  Now did there come a time when you mentioned that
4     Spirit considered, um, a potential combination with
5     Allegiant Airlines, did you say that, sir?
6     A.  We did as well, yes.
7     Q.  Okay.  And when was that?
8     A.  In 2019, um, I actually had an initial conversation
9     with the Chairman and CEO of Allegiant, Maury Gallagher,
10    about a possible combination between Allegiant and
11    Spirit.  That led to further discussions between the
12    management teams of Allegiant and Spirit, an exchange of
13    information.  And I believe eventually we received a
14    preliminary proposal from Allegiant in late 2019.
15    Q.  And what happened with respect to that preliminary
16    proposal?
17    A.  We ended up not pursuing that proposal largely
18    because of the structure that Allegiant was proposing
19    and the economics behind that structure.
20    Q.  And prior -- between the time of this Allegiant
21    discussion and the merger discussions in late 2021, did
22    you discuss from time to time with Frontier a merger?
23    A.    We did.  Um, I believe there was an exchange with
24    the Chairman of Frontier sometime toward the end of 2019
25    as well.
```

1    Q.   And what happened to those discussions?

2    A.   They again did not go anywhere largely because of

3    the structure of the transaction and the price at that

4    time.  And then we immediately went into the early part

5    of 2020, um, the airline business was hit with the covid

6    pandemic and all discussions really stopped, in thinking

7    that everything turned internally about how we were

8    dealing with the challenges in the business.

9    Q.   Okay, let's turn to the JetBlue offer.  I think you

10   testified yesterday that the first offer from JetBlue

11   came in March of 2022, is that right, the end of March?

12   A.   That's correct.

13   Q.   Okay.  Would you look at Tab 4 in your book, please,

14   which is Exhibit 210 in evidence.  And can you tell us,

15   um, what this document is?

16   A.   This is an e-mail that, um, I received from Robin

17   Hayes, the CEO of JetBlue, on March 29th, with an

18   attachment, um, that reflected their initial proposal

19   for the acquisition of Spirit.

20   Q.   Okay.  And if you look down at the bottom of the

21   first page of Mr. Hayes's letter, it says "Enhance the

22   scale, positioning the combined JetBlue/Spirit for long-

23   term viability as a strong competitor to the Big 4

24   carriers translating into lower fares for customers."

25        Do you see that, sir?

1    A.   I do.

2    Q.   Did you agree, when you received that letter, that

3    that was one of the strategic rationales for a potential

4    deal with JetBlue?

5    A.   I did, it was consistent with our feelings about our

6    -- looking at Frontier and Allegiant and at JetBlue in

7    the past, so it resonated with me as a consistent

8    feeling.

9    Q.   And after receiving, um, JetBlue's initial offer,

10   what if anything did Spirit need to evaluate?

11   A.   Well we convened as an advisory group, we got our

12   advisors together and management together to look at the

13   terms and conditions of this proposal in preparation for

14   advising our board on next steps, um, with JetBlue.

15   Q.   And let me ask you to turn to Tab 5 in your book,

16   which is Exhibit 211 in evidence, and it's the minutes

17   of the meeting of the Spirit board dated April 7, 2022.

18        Do you see that, sir?

19   A.   Yes, I do.

20   Q.   Okay.  And remind us, when did this meeting take

21   place in relationship to the JetBlue offer?

22   A.   Well we received that initial offer on March 29th,

23   so it was a little over a week later after we received

24   that.

25   Q.   And remind us, do you participate in board meetings?

1    A.   I do, yes.

2    Q.   In both capacities as the CEO and as the Director?

3    A.   That's correct.

4    Q.   Okay.  And if we look at the second page of the

5    minutes, there's a resolution down towards the bottom

6    that says "Resolved, that the board finds and determines

7    the JetBlue proposal dated March 29th, 2022 could

8    reasonably be likely to lead to a superior proposal as

9    such term is defined in the Frontier merger agreement."

10        Can you tell us what that means?

11   A.   So the board had an initial evaluation to do when we

12   received a potential competitive proposal while we were

13   under a merger agreement with Frontier, the merger

14   agreement with Frontier actually guided us as to how we

15   would behave if we received a competitive proposal, and

16   that initial evaluation was a high-level determination

17   to see whether or not it was reasonably likely that that

18   proposal could lead to a, capitalized term, SUPERIOR

19   PROPOSAL in the merger agreement compared with Frontier.

20   And if they determined that to be the case, that gave

21   management and its advisory teams the opportunity to

22   engage with that party and, um, understand and negotiate

23   terms going forward.  So our board resolved that this

24   day, which gave us the authority to engage with JetBlue.

25   Q.   And just below there's a paragraph that says "The

1    board then directed management to undertake further

2    evaluation of the JetBlue offer including entry into an

3    appropriate nondisclosure agreement with JetBlue,

4    negotiation of deal terms, granting JetBlue access to

5    due diligence, and review of regulatory and other legal

6    aspects."

7         Do you see that, sir?

8    A.  Yes.

9    Q.  And did you do that?

10   A.  We did.  We took the board's direction, we, um,

11   reached out to JetBlue and entered into the appropriate

12   agreement with them, began exchanging information, and

13   then giving them access to diligence.  But more

14   importantly, primarily discussing with them, at the

15   board's direction here, a review of their regulatory

16   strategy.

17        As, um, we were instructed by the board and

18   pursuant to the merger agreement with Frontier, we had

19   to evaluate any competitive proposal really on two

20   distinct characteristics.  The first was, um, is it

21   reasonably likely to be consummated?  And the second is

22   is it an economically-superior proposal?  And the board

23   had us focus first on whether or not it was reasonably

24   likely to be consummated and exploring JetBlue's

25   regulatory strategy for approval, so that they could

1    make that evaluation.

2    Q.   Now when the board instructed management to pursue

3    discussions with JetBlue on April 7th, what was your

4    understanding of whether JetBlue charged fares that were

5    on average higher or lower than Spirit?

6    A.   We were aware that JetBlue had on average higher

7    fares than Spirit.

8    Q.   And when the board instructed management to pursue

9    those discussions, what did you understand JetBlue would

10   do with the Spirit airplanes if the transaction would

11   result?

12   A.    Well it was never explicitly provided to us, but

13   it was our understanding that they intended to move the

14   Spirit product to the JetBlue product, the brand, and

15   the on-board product, which would change the

16   configuration of the aircraft.

17   Q.   And when you referred to the regulatory issues that

18   you were interested in at the beginning of April of

19   2022, what were those?

20   A.   Well our primary concern was that at the time

21   JetBlue was involved in an alliance with American

22   Airlines, referred to as the "Northeast Alliance," and

23   we and our board had concerns, um, because that alliance

24   was being challenged by the Department of Justice, and

25   that, at the very least, that could impede or cloud the

1   regulatory process for a potential merger between, um,

2   Spirit and JetBlue.  So the primary thrust of our

3   discussions with JetBlue was around that and their

4   strategy as to how they intended to approach the

5   regulators and overcome any of those concerns.

6   Q.  Okay, would you turn please to Tab 6 in your book,

7   Exhibit 295, which are the minutes of the board meeting

8   of Spirit held on April 21st, 2022.  Tell me when you're

9   there?

10  A.  Okay.

11  Q.  The last board meeting was on April 7th.  What

12  transpired between Spirit and JetBlue between the 7th of

13  April and the 21st of April?

14  A.  Well there were discussions between advisory firms,

15  there was an exchange of information, there was some,

16  um, diligence that was pursued, all of which were

17  intended to inform us principally about, um, the

18  concerns we had with regard to regulatory approval.

19  Q.  And if you turn to the second page of the minutes of

20  the April 21st meeting, the next-to-last paragraph says,

21  "Mr. Christie suggested that the company revert to

22  JetBlue without turning down a proposal, but setting

23  forth some guiding principles, namely flexibility in

24  regulatory remedies, retention, and significant

25  shareholder protection provisions, i.e. reverse

```
 1   termination fee."
 2         Do you see that, sir?
 3   A.  Yes, I do.
 4   Q.  Did you, subsequent to this meeting, convey those
 5   guiding principles to JetBlue?
 6   A.  We did.  We outlined for JetBlue, um, a path that we
 7   felt would help us resolve any concerns that we had with
 8   regard to the regulatory review process, um, and
 9   instructed them to give us feedback on that in an
10   alternate proposal, um, in the hopes that they would be
11   able to see our -- agree with us, and then we could
12   pursue perhaps further discussions.
13   Q.  When you say "We gave guidance," who had the
14   conversation with JetBlue?
15   A.  I did.
16   Q.  With whom?
17   A.  I had a phone conversation with Robin Hayes, the CEO
18   of JetBlue.
19   Q.  Can you tell us when that conversation took place?
20   A.  It took place after this board meeting.  I don't
21   remember the exact date.  But within a couple of days of
22   that.
23   Q.  Okay.  And what did you convey to Mr. Hayes on the
24   subject that you just discussed?
25         MR. TEITELBAUM:  Objection, hearsay.
```

1          THE COURT:  Well what do you say to that?

2          MR. COHEN:  I'm saying that the declarant is here

3    to be cross-examined about them, your Honor, so it's

4    reliable and --

5          THE COURT:  And what?

6          MR. COHEN:  (Silence.)

7          THE COURT:  I mean it's hearsay.

8          MR. COHEN:  And I'm offering it for the fact of

9    what was said and not for the truth necessarily of what

10   he said.

11         (Pause.)

12         THE COURT:  Well the way the testimony has

13   developed -- what this Court has heard is that Spirit

14   was defensive of JetBlue's merger attempts and now we

15   see the evidence, which you averted to in your opening,

16   that he was under instructions to, um, proceed and he is

17   now proceeding.  So I accept that.

18         MR. COHEN:  I'll rephrase the question, your

19   Honor.

20         THE COURT:  Okay.

21   Q.  What were the principles that were conveyed to

22   Mr. Hayes?

23         MR. TEITELBAUM:  Same objection.

24         THE COURT:  No, as to that, here it's a verbal

25   act, they're negotiating.  And so he's got instructions

1   from his board.  He's, I would imagine, carrying out

2   those instructions.  So he may answer.

3   A.   Um, we or I, um, conveyed to Mr. Hayes, um, the

4   regulatory path that we had in mind, um, which -- which

5   was focused around a few primary components.  The first

6   was we were asking JetBlue to commit to a covenant that

7   they would do anything in their power to achieve

8   regulatory approval in the form of divestitures and

9   other manners, and we refer to that as a "Come hell or

10  high water" clause, which means you would do anything,

11  come hell or high water, um, to achieve regulatory

12  approval up to and including the abandonment of the

13  Northeast Alliance with American.  We also asked of

14  JetBlue that they consider a reverse termination fee

15  that would be put in place as both a conviction, um,

16  offering their conviction in the process, and as

17  offsetting the risks to our shareholders in what we --

18  what we may see as a protracted regulatory review

19  process, and we had discussions about retention for the

20  Spirit management team during what we thought would be a

21  longer review process as well.

22       THE COURT:  And you slipped into discussions about

23  retention.  Was that one of the things that you were

24  instructed to raise with them?

25       THE WITNESS:  Yes, your Honor.

1          THE COURT:  Yes.  All right, you've answered.

2          THE WITNESS:  Yes.

3          THE COURT:  But they've objected, the government,

4     and I honor that, so we're getting what your

5     instructions were that you were trying to carry out.

6          Anything else?

7          THE WITNESS:  And I'm referring back to the

8     minutes of the board meeting.  It was the regulatory

9     remedies, which was the covenant that we discussed, the

10    retention of our team members, and the shareholder

11    protections in the form of a reverse termination fee,

12    that's what we outlined or I outlined for JetBlue.

13         THE COURT:  Thank you.

14    Q.  Did there come a time after that discussion with

15    Mr. Hayes when JetBlue came back to you with a revised

16    offer?

17    A.  We did, we received a revised proposal at the end of

18    April, I think it was the 29th.

19    Q.  And would you look please at Tab 7 in your book,

20    which is Exhibit 124.

21    A.  (Looks.)

22    Q.  Do you recognize this document?

23    A.  Yes, this is an e-mail that I received from Robin

24    Hayes, the CEO of JetBlue, with an attachment, which was

25    the revised offer letter dated April 29th.

1    Q.  And if you look at Page 3 of this letter, there's a

2    bullet up at the top that says "Regulatory Covenants,"

3    do you see that, sir?

4    A.  Yes, I do.

5    Q.  And it says "We are willing to commit to use our

6    reasonable best efforts to obtain regulatory approval

7    with an express obligation to litigate and to divest

8    assets of JetBlue and Spirit up to a material adverse

9    effect on Spirit with a limited carve-out to this

10   divestiture obligation for actions that would represent

11   a, quote unquote, 'burdensome condition' under JetBlue's

12   Northeast Alliance."

13        Do you see that?

14   A.  I do.

15   Q.  And was that regulatory commitment satisfactory to

16   Spirit at that time?

17   A.  Um, no, as of the time of this proposal, while it

18   was, um, a notable move in the right direction by

19   committing to, um, use their efforts to offer

20   divestitures, um, it still fell short of the standard

21   that we had discussed with them.  And so while it was a

22   move in the right direction, it disappointed on what we

23   had asked them to do.

24   Q.  And what was Spirit's principal regulatory concern

25   that you thought that this proposal did not address?

1   A.   Well as I mentioned earlier, the primary, um,

2   concern had to do with JetBlue's involvement in the

3   Northeast Alliance with American.  The fact that there

4   was an already ongoing litigation between the Justice

5   Department and JetBlue and American on that and how that

6   might confuse and distract to our potential transaction

7   with JetBlue.  So once again we had asked them to a

8   covenant that would -- that would, you know come hell or

9   high water, they would do everything, they fell short of

10  that standard here.

11  Q.   Mr. Christie, you said it would be a "potential

12  distraction to your transaction with JetBlue."  Did you

13  mean with Frontier?

14  A.   Well what I meant was, in a potential transaction

15  between JetBlue and Spirit, we were concerned that the

16  existence of the Northeast Alliance and the litigation

17  would draw out the regulatory process and be a

18  distraction to that process.

19  Q.   Okay, I apologize.  I misunderstood.

20       Let me ask you to turn to Tab 8, which is Exhibit

21  38 in evidence, it's a document that Mr. Teitelbaum

22  showed you yesterday.

23       And can you remind us what Exhibit 38 is?

24  A.   This is a press release that Spirit issued on May

25  2nd, um, reiterating our support for the merger with

1    Frontier and attaching to it, or in the text of it, a

2    letter we gave to Robin Hayes, um, rejecting their

3    proposal.

4    Q.   And if you would turn to the letter, and I'm

5    interested in the second page of the letter, so it's --

6    the Bates number is 119 there at the bottom, and it's

7    the last full paragraph on the page, the second

8    sentence.

9         "To reduce that risk and achieve a more

10   appropriate balance of risk between our companies, in

11   our April 25th response, Spirit proposed a strong

12   covenant requiring JetBlue to take any action required

13   to obtain regulatory clearance which specifically

14   included abandoning the NEA at closing."

15        Do you see that, sir?

16   A.   Yes, I do.

17   Q.   What is that a reference to?

18   A.   That referred back to the, um, you know the path

19   that we had instructed JetBlue to follow and the

20   covenant that we had expressed that they provide to us.

21   The board, um, was interested in, um, in further

22   discussions with JetBlue, but we did have this concern.

23   And so we were offering them, um, a path to represent

24   all of those concerns.  So -- and what we mentioned here

25   is that we -- that they fell short of that standard.

```
 1   Q.  Let me ask you to turn to the next, um, tab in this
 2   book, this is Exhibit 349, a decl., a presentation that
 3   Mr. Teitelbaum showed you yesterday.  It's behind Tab 9,
 4   Exhibit 349, entitled "Rejected Proposal from JetBlue is
 5   Illusory and Not Superior."
 6        Do you see that, sir?
 7   A.  Yes, I do.
 8   Q.  Okay.  Would you turn please to Page 2 of that
 9   exhibit and that ends on page, um, the Bates numbers are
10   873.
11   A.  (Turns.)
12   Q.  And the first box -- and I'm not sure what to call
13   this, but the first box under the title "JetBlue's
14   Illusory Offer," it says "JetBlue's offer is not
15   superior as Spirit believes it is unlikely to be
16   approved by regulators who are already suing JetBlue
17   over the anticompetitive Northeast Alliance."
18        Do you see that, sir?
19   A.  I do.
20   Q.  Okay.  And remind us, who was this presentation,
21   this exhibit released to?
22   A.  This presentation would have been, um, released to
23   our shareholders and investors.
24   Q.  And why did you say or make reference to the
25   Northeast Alliance in this letter?
```

1    A.  Well as I said earlier, it was our primary concern,

2    um, it's the first thing that we discussed on this slide

3    because it's the, um, principal issue we viewed, which

4    was, um, the fact that there was a, um, an alliance

5    between JetBlue and American and they were involved in

6    that litigation, um, and we wanted our shareholders to

7    understand why we hadn't rejected JetBlue's proposal on

8    the 29th.

9    Q.  And turning to the next tab, Tab 12, which is

10   Exhibit 350, another document that Mr. Teitelbaum

11   reviewed with you yesterday, and it's entitled, on the

12   second page, "Creating America's Most Competitive Ultra-

13   Low Fare Airline."

14        Do you remember this document, sir?

15   A.  Yes.

16   Q.  Okay.  And if you would turn to Slide 8.

17   A.  (Turns.)

18   Q.  Which is, it ends in Bates Number 217.  There is a

19   slide that's entitled, "Shareholders should think about

20   the conversation with regulators."

21        Do you see that, sir?

22   A.  I do.

23   Q.  And why was this slide included in your presentation

24   to your shareholders?

25   A.  Well this was our primary concern, um, was that the

1    -- the regulators would interpret certain things with

2    regard to a transaction between Spirit and JetBlue that

3    could lead to a longer review process and a longer

4    regulatory process, and so all of the themes in our

5    presentation about the regulatory process were intended

6    to reflect that we wanted our shareholders to be aware

7    of that risk, um, and think about the potential

8    transaction with JetBlue accordingly.

9         In fact, as of the time of this presentation,

10   JetBlue had already, um, engaged into a nonsolicited

11   tender offer with our shareholders where they were

12   marketing directly to our shareholders for the purchase

13   of the stock, and so we were advising our shareholders

14   about this risk and why we had rejected their last

15   proposal, which was, um, the April 29th proposal, and

16   that why they should continue to view the tender offer

17   as not superior, and that the tender offer actually did

18   move in the wrong direction, they reduced the purchase

19   price from the April 9th proposal.

20        So we were trying to educate our shareholders on

21   the risk of the regulatory review process and educate

22   them as to why as of yet, as of the date of this

23   proposal, we had not supported a JetBlue transaction.

24   Q.  If you would turn to the next tab, sir, Exhibit 351,

25   and I think this is the last of these presentations that

1   Mr. Teitelbaum showed you.  It's entitled -- well behind

2   Tab 13.

3   A.  I see that.

4   Q.  And if you would turn to Slide 11.  And it's on --

5   and so the Bates number is --

6   A.  Yes.

7   Q.  Do you see that, sir?

8   A.  Yes.

9   Q.  And if you'd look to the next-to-last paragraph on

10  that page it says, "To alleviate concerns about the

11  substantial antitrust risk presented by the JetBlue

12  transaction, Spirit reasonably proposed that JetBlue

13  agree to take any action required to obtain regulatory

14  clearance including abandoning the NEA at closing and

15  pay a substantial reverse termination fee intended to

16  partially compensate Spirit if the transaction failed to

17  win antitrust clearance."

18       Do you see that, sir?

19  A.  I do.

20  Q.  And why was that paragraph included in the

21  presentation of May 25th?

22  A.  Well again we were, um, advising our shareholders

23  that, um, while we had concerns, there was a path by

24  which we could see engaging in a transaction with

25  JetBlue and we outlined to JetBlue that path, um, to

1    satisfy our concerns with regard to the regulatory
2    review process.  And as of the date of this presentation
3    they had not satisfied us.  And so that was one of the
4    reasons we were advising our shareholders to not accept
5    the tender offer from JetBlue.
6    Q.  At this point in time were you still advocating for
7    the Frontier transaction?
8    A.  We were, yes.
9    Q.  Why was that?
10   A.  Well pursuant to the prior discussions, we still
11   viewed the -- the, um, terms and conditions of the
12   merger agreement with Frontier, as it related to the
13   JetBlue transaction, had not been met, and we reviewed
14   the Frontier proposal or transaction, as of this time,
15   as superior.  So we were advocating on behalf of that
16   transaction.
17   Q.  Would you turn please to Tab 14 in your book.  It's
18   Exhibit 127 in evidence.  And it's an e-mail and an
19   attached letter, the subject matter is "New offer for
20   Spirit Airlines."
21        Do you see that, sir?
22   A.  Yes, I do.
23   Q.  And what is Exhibit 127?
24   A.  Well this is an e-mail, um, a forwarded e-mail that
25   I received from Robin Hayes on June 6th with an

1    attachment for a new offer, um, a new proposal for the

2    purchase of Spirit by JetBlue.

3    Q.  And if you look at the second page of Mr. Hayes's

4    letter in the third bullet up at the top, it says "More

5    regulatory protections through our divestiture

6    commitments and a $350 million reverse breakup fee, 100

7    million greater than the amount being offered by

8    Frontier."

9         Do you see that, sir?

10   A.  Can you point me to the --

11   Q.  Oh, of course.  It's the second bullet-- the third

12   bullet --

13   A.  I see it now.

14   Q.  Yes, Mr. Christie.  "More regulatory protections."

15   Do you see that, sir?

16   A.  Yes, I do.

17   Q.  And what was Spirit's reaction when it received this

18   revised offer from JetBlue?

19   A.  Well we acknowledged they had made regulatory and

20   divestiture commitments over the course of the prior

21   discussions with, um, with divestiture commitments of

22   certain assets where Spirit flies in New York, in New

23   Jersey, in Boston, and in Florida, um, and they also did

24   increase the size of their reverse termination fee by

25   $100 million here.  But, um, they still had not made the

1   necessary changes to the regulatory covenant that would

2   give us sufficient comfort that, in addition to those

3   committed divestitures, they were willing to do more to

4   achieve regulatory approval.

5   Q.  Did Spirit engage with JetBlue after receiving this

6   offer?

7   A.  We did, yes.

8   Q.  Okay, let me ask you to look at Tab 17 in the second

9   book, Exhibit 226.  And it's the Spirit/JetBlue -- the

10  Spirit rather proxy statement dated September 12, 2022.

11       Do you see that, sir?

12  A.  Yes.

13  Q.  Okay.  And can you just tell us briefly what this

14  document is?

15  A.  This was the proxy filed by Spirit Airlines

16  soliciting votes in favor of the signed merger agreement

17  between Spirit and JetBlue.

18  Q.  And if you look please at Page 37 of this document,

19  of this proxy statement, it has the Bates numbers at the

20  end, 40793.  Let me know when you're there?

21  A.  I see it.

22  Q.  It says "On June 8th, 2022, at the direction of

23  Spirit, representatives of Barclays and Morgan Stanley

24  spoke by telephone with representatives of Goldman Sachs

25  and requested a revised offer from JetBlue by June 20,

1    2022, outlining the following key items that Spirit

2    would expect be included in a potential transaction with

3    JetBlue, Roman Numeral I, an improved economic offer

4    representing the best price that JetBlue is prepared to

5    pay, Roman Numeral II, regulatory covenants including a

6    robust divestiture package that would provide sufficient

7    assurance as to the ability to obtain antitrust

8    approval."

9         Do you see that, sir?

10   A.  Yes, I do.

11   Q.  Now it says that -- at the beginning of that

12   paragraph, it says that "Barclays and Morgan Stanley

13   were directed by Spirit."  Who gave that direction?

14   A.  I did.

15   Q.  And why did you give the direction to your bankers

16   to solicit a new proposal from JetBlue?

17   A.  While we were disappointed with the revised proposal

18   they provided on June 6th, the board was still engaged

19   in evaluating JetBlue as a viable competitive proposal,

20   um, with Frontier, and decided that we would go through

21   a best-and-final type process with the parties where we

22   would request of them their best and final offer by June

23   20th for the board to evaluate a final JetBlue proposal

24   and a final proposal from Frontier.

25   Q.  And did JetBlue in fact provide a new proposal on or

1    before June 20th?

2    A.   They did.

3    Q.   Okay.  And let's look at Tab 15, which is the last

4    tab in the first book, and I want you to skip all the

5    way to three pages from the end of this exhibit to the

6    letter that begins on the page that has the final four

7    Bates numbers 1518.

8         THE COURT:  The number of the exhibit?

9         MR. COHEN:  The number of the exhibit, your Honor,

10   is Exhibit 218.

11        THE COURT:  Thank you.

12   A.   (Looks.)

13   Q.   Do you see that, sir?

14   A.   Yes.

15   Q.   Okay.  What is Exhibit 218?

16   A.   This was JetBlue's response, a letter issued to our

17   board on June 20th, um, responding to our request for

18   their proposal on this date.

19   Q.   Okay.  And would you turn please to the second page

20   at the top.  Mr. Hayes writes, "Stronger regulatory

21   commitment which includes," and then there's a bullet,

22   "An express obligation to litigate and to divest assets

23   of JetBlue and Spirit up to a material adverse effect on

24   the combined JetBlue/Spirit with a limited carve-out to

25   this divestiture obligation for actions that would be

1    reasonably likely to materially and adversely affect the

2    anticipated benefits under JetBlue's Northeast Alliance.

3    This commitment significantly enhances our prior

4    proposal and meaningfully exceeds the divestiture

5    commitment from Frontier."

6         Now when you received this new offer with this new

7    regulatory commitment, what was the view of Spirit?

8    A.  Well we viewed this as a very very significant move

9    towards what we were requesting of JetBlue to resolve

10   our concerns regarding the regulatory review process.

11   As you recall, when we initially advised JetBlue of our

12   proposed covenant, we referred to it as a "come hell or

13   high water" covenant, that they would do anything in

14   their power up to and including the abandonment of the

15   NEA, the Northeast Alliance, to divest enough assets to

16   achieve regulatory review process, regulatory review.

17   Over the course of our back and forth with JetBlue, we

18   became, um, we softened that proposal some.  Our

19   discussion with them on the 8th of June said we were

20   looking for a strong covenant that would resolve the

21   same idea, and they responded in this way, which was a

22   notable change from where they were before.  And it's

23   highlighted in bold here, a "material adverse effect on

24   the combined JetBlue and Spirit."  Their private

25   covenant was that they would agree to litigate and

1    divest assets of JetBlue and Spirit up to a material and

2    adverse effect on Spirit.

3         So what they've done here is that by combining the

4    businesses, they've increased the total size of the

5    amount of divestitures that they would be willing to

6    commit, nearly more than doubling that commitment,

7    because JetBlue is larger than Spirit.  So the

8    combination of JetBlue makes it a much more significant

9    offer.  And they did have the addition of a limited

10   carve-out to this divestiture, as it says for "Actions

11   that would be reasonably likely to materially and

12   adversely affect the anticipated benefits under the

13   Northeast Alliance," we didn't really have a good

14   understanding at the time of what that meant.

15   Q.  And did Spirit accept that offer of June 28th?

16   A.  We did not, we rejected this offer.

17   Q.  And what was the specific concern -- let's focus on

18   the regulatory commitment.  What was the specific

19   concern, if any, with respect to the regulatory

20   commitment, if that played a part in that rejection?

21   A.  Well again I mentioned it earlier, there is this

22   carve-out for something that could reasonably likely

23   materially and adversely affect the anticipated benefits

24   under the Northeast Alliance, we had no visibility and

25   JetBlue was, due to confidentiality, reasons unwilling

1  to share with us, what the anticipated benefits were

2  under the Northeast Reliance and we could not arrive at

3  a reliable estimate at this time.  And so for that

4  reason we were unable to pursue or move forward with

5  JetBlue at this time.

6  Q.  Did discussions with JetBlue continue with respect

7  to regulatory matters?

8  A.  They did, yes.

9  Q.  And --

10      THE COURT:  Mr. Cohen, excuse me.  Are you about

11  done or shall we take the morning recess?

12      MR. COHEN:  Whenever your Honor would like.  I

13  think I have less than 10 minutes.

14      THE COURT:  Less than 10 minutes?  Well go ahead.

15      MR. COHEN:  I must say I never met somebody who

16  would keep such a sharp cloak, but I'll get moving.

17      (Laughter.)

18  Q.  So did there come a time when you had conversations

19  with JetBlue about that regulatory commitment?

20  A.  We did, yes.

21  Q.  And what did you learn in those discussions?

22      MR. TEITELBAUM:  Objection, hearsay.

23      THE COURT:  No, these are the -- these people are

24  in negotiation, these are the verbal acts.  If it's --

25  well it is broader than that.  But you may frame it,

1    "Did they make another proposal or another offer?"

2         MR. COHEN:  Well let me ask the question this way.

3    Q.  With respect to the regulatory covenant that was

4    contained in that June 20th -- July 20th -- no, June

5    20th, did there come a time when Spirit agreed to accept

6    that proposal?

7    A.  We did, yes.

8    Q.  Why?

9    A.  We, um, over time and beginning in the early parts

10   of July, um, started to get some information on what the

11   -- the size of this carve-out would mean with regard to

12   the anticipated benefits under JetBlue's Northeast

13   Alliance, and over the course of that understanding we

14   became aware that the anticipated benefits were very

15   large and that meant that it gave JetBlue significant

16   latitude to, um, to offer very significant divestitures

17   with regard to this transaction.  And that gave us

18   comfort over the period of that time that we -- that we

19   did in fact have a significant covenant that JetBlue was

20   willing to make, and that gave us comfort that we had

21   satisfied our concerns with regard to the regulatory

22   matters.

23   Q.  And would you turn to Tab 16 of your book, Exhibit

24   296 in evidence, it's the minutes of the board of

25   directors that Spirit did July 27th, 2022.

1           What happened at that board meeting?

2    A.   This was a meeting of the board to review the merger

3    agreement between JetBlue and Spirit where the board,

4    um, resolved to accept that proposal.

5    Q.   And, um, did you, as a member of the board and the

6    CEO, support that decision with the board?

7    A.   I did, yes.

8    Q.   And on the date that the merger proposal was

9    accepted or was to be recommended to the shareholders,

10   did you have any lingering concerns about regulatory

11   approval for the transaction?

12   A.   Well we knew that the review process was probably

13   going to be a longer process and for that reason we had

14   worked very carefully over that period of time to

15   achieve the commitments that we got from JetBlue, which

16   included the covenant that I mentioned earlier.  We were

17   able to increase or negotiate for an increase in the

18   size of the, um, of the reverse termination fee all the

19   way up to $470 million, which based on our advisor's

20   review for the size of this transaction was a near

21   record, and that reassured us that JetBlue had the

22   commitment, that they were putting their money where

23   their mouth was, and they were willing to pursue the

24   transaction with all due vigor.

25           We also were successful in getting, over the

```
 1    course of July, the types of things that we needed to
 2    protect our business, like the retention packages for
 3    our management team during a longer review process, and,
 4    um, the ability to continue to execute as a standalone
 5    business and in negotiations with JetBlue in a merger
 6    agreement.  So we did have concerns.  But we knew that
 7    we had the tools available to us now and that JetBlue
 8    had the commitment to pursue it and get it done.
 9    Q.  And can you tell us whether you viewed the specific
10    divestitures that JetBlue agreed to with respect to La
11    Guardia and Newark and Boston and Fort Lauderdale as
12    significant?
13    A.  They --
14         MR. TEITELBAUM:  Objection, vague, 701.
15         THE COURT:  He can answer.  Overruled.
16    A.  We did view them as significant.
17         THE COURT:  Don't say "we," did you?
18         THE WITNESS:  Spirit Airlines and I did as well.
19         THE COURT:  All right.
20    A.  The proposed divestitures, those that had been
21    publicly stated to date, include positions at --
22    Spirit's positions at New York's La Guardia Airport,
23    which as I mentioned earlier is a slot-controlled
24    airport, and that means you cannot get access to that
25    airport today without the slot, and JetBlue has agreed
```

```
 1    to divest Spirit's 11 positions, 11 takeoffs and 11
 2    landings, at La Guardia Airport, which has significant
 3    value both monetarily and in the fact that it is the
 4    single largest metropolitan area in the United States
 5    and the most attractive airport.  They've also agreed to
 6    divest Spirit's gate positions at La Guardia Airport, we
 7    have six gate positions at La Guardia, and that would
 8    give the recipient of those slots the ability to
 9    continue to grow.
10          To the extent they could gain access to those
11    slots, that has tremendous value.  And it's my
12    understanding that those slots and gates at La Guardia
13    have been pledged to Frontier Airlines, the next largest
14    ULCC, and they intend to operate those, which is a very
15    valuable asset.
16          They've also agreed to divest our positions at
17    Newark's Liberty Airport, which is again very difficult
18    to gain access to.  In fact we had to sue the U.S.
19    government and the Department of Transportation to gain
20    access to certain timing slots that were surrendered by
21    Southwest Airlines, and we were successful after a long
22    litigation to gain access to that.  So we worked over --
23          THE COURT:  Excuse me.  Where is Liberty Airport?
24          THE WITNESS:  That's Newark.
25    A.  And we were successful in building our position in
```

```
 1    Newark over time, so that has tremendous value.  Along
 2    with gates at Boston Logan Airport, which again is a
 3    very difficult airport to get gates at.  And five gates
 4    in Fort Lauderdale Airport, which again is technically
 5    not a gate-restricted airport today, but it's extremely
 6    difficult to get five positions.  And those have, to my
 7    understanding, have all been pledged to Allegiant
 8    Airways, another large ULCC, and that will immediately
 9    establish them as a relevant player on the eastern
10    seaboard.  So these are valuable assets that they've
11    agreed to pledge.
12         In addition to what is a significant covenant that
13    they will continue to pursue additional divestitures and
14    remedies up to a material adverse change on both Spirit
15    and JetBlue.  We viewed that as a very valuable total
16    package.
17    Q.  And why did you view the last part as having value?
18    A.  Well it has, um, a very significant -- the material
19    adverse change on both Spirit and Jetblue is a big
20    number and that would mean that the divestitures they
21    were willing to pledge would have to be -- that they
22    were willing to do it up to a very large value total.
23    Which is what -- combined with those stated divestitures
24    they already have, is a pretty valuable package.
25    Q.  Did Spirit have a standalone plan going forward on
```

1    the date that the board recommended this merger

2    agreement?

3    A.    We did have a plan.  We've always had a plan.  And

4    plans are always in flux and they change based on inputs

5    we're receiving from the market.

6    Q.   Why did you believe that a merger with JetBlue is

7    superior to going, on a standalone basis, going forward

8    for Spirit, if you did?

9    A.   Well this gets back to the primary thesis of the

10   discussions that we've engaged in over the years with

11   various parties.  What we're really trying to do is

12   establish a fifth viable competitor in what is a very

13   dominated space by the Big 4 airlines, and in order to

14   do that you have to gain scale, and while the

15   independent airlines have grown over that period of

16   time, we're still relatively insignificant and small.

17   So it has been our view over that period of time, that

18   in order to effectively compete against the Big 4

19   airlines, we must find someone that together we can

20   create a fifth challenger that can have the scale and

21   have the relevance in the market to attract travelers,

22   and in doing so benefit travelers that today are

23   traveling on the larger four airlines in the United

24   States.

25        THE COURT:  Well let me ask a question.

1          MR. COHEN:  Oh, of course.

2          THE COURT:  And you're saying that's been Spirit's

3     idea from the beginning?

4          THE WITNESS:  Well since the beginning of our

5     investigations into various mergers, which dates back to

6     initial conversations back into 2016, so for the better

7     part of 7 years, we've been exploring different

8     combinations with different airlines in an effort to

9     achieve that scale and be a viable fifth competitor,

10    yes.

11    Q.  Now Mr. Teitelbaum showed you a SEC document

12    yesterday with your severance arrangements in the event

13    that this transaction is completed.

14         Do you recall that?

15    A.  Yes.

16    Q.  What impact has that severance agreement had on your

17    support of this transaction?

18    A.  None.

19         MR. COHEN:  Nothing further, your Honor.

20         THE COURT:  Very well.

21         You have very brief redirect?

22         MR. TEITELBAUM:  Um, not so brief, your Honor.

23         THE COURT:  All right, we'll take the morning

24    recess until 25 minutes after 11:00.  We'll stand in

25    recess.

1          THE CLERK:  All rise.

2          (Recess, 10:55 a.m.)

```
 1              C E R T I F I C A T E

 2

 3

 4         I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER,

 5    do hereby certify that the foregoing record is a true

 6    and accurate transcription of my stenographic notes

 7    before Judge William G. Young, on Wednesday, November 1,

 8    2023, to the best of my skill and ability.

 9

10

11    /s/ Richard H. Romanow 11-01-23
      _____
12    RICHARD H. ROMANOW    Date

13

14

15

16

17

18

19

20

21

22

23

24

25
```