```
                    UNITED STATES DISTRICT COURT
                   DISTRICT OF MASSACHUSETTS (Boston)

                                      No. 1:23-cv-10511-WGY
                                      Vol. 2, Pages 91-163


UNITED STATES OF AMERICA, et al
            Plaintiffs

vs.


JETBLUE AIRWAYS CORPORATION,
et al,
            Defendants




                          ********


                    For Bench Trial Before:
                    Judge William G. Young




                       United States District Court
                       District of Massachusetts (Boston)
                       One Courthouse Way
                       Boston, Massachusetts 02110
                       Wednesday, November 1, 2023




                          ********




            REPORTER:  CHERYL B. PALANCHIAN, RMR, CRR
                    Official Court Reporter
                  United States District Court
                 One Courthouse Way, Boston, MA 02110
```

A P P E A R A N C E S

EDWARD WILLIAM DUFFY, ESQ.
ARIANNA MARKEL, ESQ.
AARON TEITELBAUM, ESQ.
        DOJ-Atr
        450 Fifth Street NW, Suite 8000
        Washington, DC 20530
        (202)812-4723
        Email:  Edward.duffy@usdoj.gov
        For Plaintiff United States of America
- and -
WILLIAM T. MATLACK, ESQ.
        Attorney General's Office
        One Ashburton Place, 18th Floor
        Boston, MA 02108
        (617)727-2200
        Email:  William.matlack@mass.gov
        For Plaintiffs United States of America and The
        Commonwealth of Massachusetts


RYAN SHORES, ESQ.
        Cleary Gottlieb Steen & Hamilton LLP
        2112 Pennsylvania Avenue, NW
        Washington, DC 20037
        (202)974-1876
        Email:  Rshores@cgsh.com
- and -
ELIZABETH M. WRIGHT, ESQ.
        Cooley LLP
        500 Boylston Street
        Boston, MA 02116-3736
        (617)937-2349
        Email:  Ewright@cooley.com
- and -
RACHEL MOSSMAN ZIEMINSKI, ESQ.
MICHAEL MITCHELL, ESQ.
        Shearman & Sterling LLP
        2601 Olive Street, 17th Floor
        Dallas, TX 75201
        (214)271-5777
        Email:  Rachel.zieminski@shearman.com
        For Defendant JetBlue Airways Corporation


(Continued.)

(Continued.)


JAY COHEN, ESQ.
ANDREW C. FINCH, ESQ.
        Paul, Weiss, Rifkind, Wharton & Garrison
        1285 Avenue of the Americas
        New York, NY 10019-6064
        (212)373-3000
        Email:  Jaycohen@paulweiss.com
        For Defendant Spirt Airlines, Inc.

```
                        I N D E X

WITNESS:              DIRECT    CROSS    REDIRECT    RECROSS

EDWARD CHRISTIE, Continued

  By Mr. Teitelbaum                        95

  By Mr. Cohen                                        125


DAVID C. CLARK

  By Mr. Thornburgh 127
```

```
   EXHIBITS                       PAGE

      643 . . . . . . . . . . . . . 102

      644 . . . . . . . . . . . . . 134

      646 . . . . . . . . . . . . . 139

      647 . . . . . . . . . . . . . 143

      648 . . . . . . . . . . . . . 146
```

```
 1                THE CLERK:  Court is back in session.  You may be
 2     seated.
 3                THE COURT:  Mr. Teitelbaum, you may continue.
 4                MR. TEITELBAUM:  Thank you, your Honor.
 5                     EDWARD CHRISTIE, (Resumed)
 6                     REDIRECT EXAMINATION
 7     BY MR. TEITELBAUM:
 8     Q.   And good morning, again, Mr. Christie.
 9     A.   Good morning.
10                MR. TEITELBAUM:  If we could please display
11     Christie demonstrative 3 that we saw earlier today.
12                (On screen.)
13                THE COURT:  Well, I have it.  The witness has it.
14                MR. TEITELBAUM:  I'll proceed on that.
15                THE WITNESS:  I have it.
16     Q.   Thank you, Mr. Christie.  So my first question, 2019,
17     as you testified, that was the last year that Spirit turned
18     a profit, up to now; is that right?
19     A.   Yes.
20     Q.   And 2020, the COVID-19 pandemic started basically
21     February/March of 2020?
22     A.   That's correct.
23     Q.   And I believe you testified on cross, at least to some
24     degree, that was extremely disruptive to all airlines;
25     right?
```

1   A.    Yes.

2   Q.    Virtually inconceivable that an airline would be

3   profitable in 2020 given what happened; right?

4   A.    I believe so, yeah.

5   Q.    2021, pandemic was still very much with us; right?

6   A.    We believe so, yes.

7   Q.    And in the early part of 2022, February 7th, I think,

8   of 2022, is the date that Spirit signed a merger agreement

9   with Frontier; right?

10  A.    Correct.

11  Q.    And, in fact, it's often the case that for Spirit's own

12  financial reporting and forecasting, 2019 is considered to

13  be the benchmark normal year that's used; right?

14  A.    We had been using that during the pandemic.  The

15  convention, most airlines were referring back to the

16  prepandemic year.  And that started to change this year.

17  Q.    And that's because really 2019 is the last year that we

18  could consider to be normal airline operations in the

19  present day; right?

20  A.    At least through the pandemic era it was the last year,

21  correct.

22  Q.    And, in fact, we don't need to pull this exhibit up,

23  but when we were talking about the non-GAAP forecasts from

24  the board presentation that you made at the end of 2022,

25  that's Exhibit 241, and just for the record, that was the

1    Bates number page ending in 8897-1, do you remember that

2    schematic that we were looking at?  You don't have to refer

3    to it now.

4    A.   I think so, yes.

5    Q.   And of the comparisons that were being done for

6    Spirit's own forecasting were against 2019; right?

7    A.   For the 2023 plan period?

8    Q.   Yes.

9    A.   Yeah, I think we showed both 2022 and 2019.

10   Q.   So 2019 was one -- was a benchmarking year that Spirit

11   was using; right?

12   A.   It was the last pre-COVID year, yes.

13   Q.   All right.  And then just being subject to a merger

14   agreement in and of itself is disruptive to Spirit's

15   business; right?

16   A.   Well, it can be.  And that was one of the concerns we

17   had in having a longer process was the distraction, and that

18   sort of thing.

19   Q.   And for all of 2022, Spirit's been subject to those

20   disruptions; right?

21   A.   Well, beginning in February of 2022, yes, and then.

22   Q.   And all the way, all of 2023 up to today; right?

23   A.   We have been in a merger agreement, yes.

24   Q.   And there's, essentially, a -- there's a strategic

25   malaise that exists, right, when a company is subject to a

1    possible merger that hasn't been consummated?

2    A.   Well, I think there could be.  And we were concerned

3    about that in our discussions with both Frontier and

4    JetBlue, and attempted to resolve some of the worry that we

5    may have about a subjected malaise by giving ourselves

6    appropriate interim operating covenants to be able to

7    execute to the business on a standalone basis, as if we

8    weren't in a merger.

9    Q.   But that risk, the strategic malaise from being subject

10   to a merger agreement, is significantly material, in

11   Spirit's view, that it is listed as a separate risk factor

12   in Spirit's SEC filings; right?

13   A.   It is a risk, absolutely.

14   Q.   And also you, yourself, during the merger negotiations

15   where the Frontier deal was still on the table but JetBlue

16   was making bids in the earlier part of 2022, you actually

17   referred -- and we can take the demonstrative down -- you

18   referred to withering, "Meanwhile we wither, waiting for

19   potential merger approval."  Do you recall that?

20   A.   I do, yes.

21   Q.   And that's a fair summary or encapsulation of the

22   strategic malaise that can set in from having to wait so

23   long for a possible merger to be consummated?

24   A.   I think that was the risk, yes.

25   Q.   Let's move on and talk a little bit about Spirit's

1    recent earnings data in some more detail.  So, first of all,

2    one of the things that Spirit touts, including in its SEC

3    filings, is that it has a resilient business model; right?

4    A.    That is definitely one of the hallmarks of us in the

5    past, yes.

6    Q.    And including for the 2022 10-K filing, which is

7    Exhibit 68, Spirit still touts its resilient business model;

8    right?

9    A.    Absolutely thought we had a resilient business model

10   that could endure different macroeconomic changes, and we

11   had seen that in the past, yes.

12   Q.    And the 2022 10-K is actually a document that's filed

13   in the first couple months of 2023; right?

14   A.    It is.

15   Q.    And I think you testified on cross that one of the

16   factors that's affecting the demand environment for Spirit,

17   in your view, is that inflation is a constricting demand for

18   price-sensitive customers.  Do you recall that testimony?

19   A.    I do.

20   Q.    And, in fact, Spirit itself offers a significant value

21   proposition for price-sensitive customers; right?

22   A.    We do.  Low fares across the industry offer that value,

23   and we're worried that those fare levels are not profitable

24   today.

25   Q.    And at a time when people in lower income brackets are

1    being pinched by higher costs, a transaction that's being

2    contemplated would actually remove half of the ULCC capacity

3    in the United States; right?

4    A.   Well, it would change our brand from Spirit to JetBlue,

5    yes.

6    Q.   And JetBlue offers a more premium product offering;

7    right?

8    A.   I think they offer a broader array of products,

9    including low fares and a more premium product offering,

10   than Spirit, yes.

11   Q.   A more premium product offering for which they charge

12   more money?

13   A.   For those products, yes.

14   Q.   And we were talking a little bit about the

15   Frontier/Spirit merger, both on your direct examination and

16   cross.  That merger would not have removed any ULCC capacity

17   from the marketplace; right?

18   A.   It would have been a combination of two ULCCs.

19   Correct.

20   Q.   All right.  So now I want to talk a little bit about

21   Spirit's quarterly earnings statements.  Fair to say that

22   you're involved in reporting the earnings of Spirit to

23   shareholders?

24   A.   I am.

25   Q.   And you understand that you and other Spirit executives

```
 1    are under a legal obligation to be truthful and transparent
 2    in reporting those earnings?
 3    A.   Yes.
 4              MR. TEITELBAUM:  I'd ask that the witness be
 5    shown --
 6    Q.   And this should be in the smaller binder in front of
 7    you, Mr. Christie.  It's marked for identification as
 8    Exhibit TH.
 9    A.   I'm sorry?
10    Q.   It would be Tom, Harry, TH.  If it's not, we will get
11    you a copy.
12              THE COURT:  Oh, I have it.
13    A.   I've got it too.
14    Q.   So you, along with other senior executives, are
15    involved in conference calls to announce your earnings;
16    right?
17    A.   I am, yes.
18    Q.   And these are transcribed?
19    A.   They are.
20    Q.   And do you see that this is an S&P Global Market
21    Intelligence report that contains a transcription of
22    Spirit's first quarter 2023 earnings call?
23    A.   I do.
24    Q.   And any reason to doubt that this is a fair and
25    accurate transcription of that call?
```

```
 1   A.   I don't have reason to doubt it, no.

 2              MR. TEITELBAUM:  At this time plaintiffs offer

 3   Exhibit TH in evidence.

 4              THE COURT:  Any objection?

 5              MR. COHEN:  Your Honor, there is embedded hearsay

 6   in here.  I assume that the government is interested in the

 7   statements made by Spirit.  Those are admissions.  So I

 8   certainly have no objection to the portions --

 9              THE COURT:  No objection to the statements by

10   Spirit.  How about the rest of it?  Can we receive it on

11   that -- in that way?

12              MR. TEITELBAUM:  Yes, your Honor.

13              THE COURT:  Very well.  This is TH, will be

14   Exhibit 35 -- maybe the clerk --

15              MR. TEITELBAUM:  I believe it's now 634.  Oh, I'm

16   sorry, your Honor.  It's 643.

17              THE COURT:  Exhibit 643 in evidence, as limited.

18              (Exhibit 643 received in evidence.)

19   Q.   And, Mr. Christie, if you could please turn to

20   page 4 of that document, which is also the Bates number

21   ending in 1499.

22              (On screen.)

23   A.   Okay.

24   Q.   You see there's a portion there on the bottom half of

25   the page which transcribes your remarks, or at least part of
```

1    your remarks during this call?

2    A.    Yes.

3    Q.    And, now, if you look at the second paragraph of your

4    remarks, I'm not going to ask you to read from this

5    document, but for efficiency sake maybe we can do some basic

6    paraphrasing.  One of the things that you mention there is

7    that adjusted operating margin came in better than expected

8    at negative 6.8 percent; right?

9    A.    Correct.

10   Q.    And that was actually helped by lower fuel and strong

11   total RASM performance?

12   A.    Yes.

13   Q.    And "RASM" is a term for "revenue per available seat

14   mile"?

15   A.    That's right.

16   Q.    And in the ensuing paragraphs, one of the things that

17   you're pointing out is several operational issues that

18   Spirit encountered in the first quarter of 2023; right?

19   A.    I see that, yes.

20   Q.    So, and there's no need to refer to the document for

21   these questions, but fair to say in the first quarter of

22   2023 there were air traffic control congestion issues that

23   were affecting Spirit's operations?

24   A.    Yes, and continue to.  Yes.

25   Q.    They continue to to this day; right?

1   A.   Yes.

2   Q.   That's an -- something that has nothing to do with

3   Spirit's operations, right, that's an air traffic control

4   problem?

5   A.   Correct.

6   Q.   And other airlines are affected by that as well?

7   A.   I've heard them reference it, yes.

8   Q.   And you also reference engine issues that we've heard a

9   little bit about; right?

10   A.   I must have mentioned that.  I'm sure we did.

11   Q.   And engine issues were an issue for you in the first

12   quarter of 2023 as well as subsequent quarters; right?

13   A.   Correct.

14   Q.   And if we go to page 6 of this same document, which is

15   the Bates number ending in 1501, you see the second

16   paragraph of your remarks there, and what you say there at

17   the end is, the second to last sentence of that paragraph

18   is, "And although it may take as much as another year to get

19   to normalized profitability, double-digit op margins are in

20   sight, which will provide a base from which we can continue

21   to refine and improve."  Right?

22   A.   That's correct.

23   Q.   Is that right?

24   A.   Yes.

25   Q.   So that's an acknowledgment that 2023 had the potential

1    to be a bumpy year?

2    A.    At the very least, yes.  At this time, based on what we

3    knew, it was at least going to be bumpy.

4    Q.    Okay.  And, in fact, you praised your team's ability to

5    manage the volatility and the ability to make tactical

6    adjustments to what the circumstances were throwing at you;

7    right?

8    A.    I'm sure I did, yes.

9    Q.    And, in fact, that's because the airline industry is a

10   dynamic and volatile industry; right?

11   A.    It is.

12   Q.    And so one quarter or one year you could be facing

13   engine issues; right?

14   A.    I think it's fair to say we've -- we face a number of

15   different inputs into the business that can influence

16   profitability, yes.

17   Q.    And, in fact, to some degree in the airline industry

18   it's always something, right, that's impacting operations in

19   one way or the other?

20   A.    Well, it can be viewed that way.  You know, over the

21   course of my tenure at Spirit we've had a -- an excellent

22   run with consistent profitability from the time I entered

23   the building in 2012 through 2018, and were able to navigate

24   any and all challenges, we did, and maintain that

25   profitability.  With the advent of the pandemic, which is

```
 1   obviously one of those things that was an unusual thing,
 2   that changed.  And now the market has changed as well right
 3   now and we're -- we haven't been able to get ourselves back
 4   to profitability yet.
 5   Q.   But nonetheless, you'd agree with me that there are
 6   periods where circumstances just make operating an airline
 7   very difficult?
 8   A.   They can, yes.
 9   Q.   Okay.  Let's talk about the second quarter of 2023 now.
10        MR. TEITELBAUM:  And we can take that exhibit
11   down.
12   Q.   In a moment, I'm going to be asking you some questions
13   about Exhibit 341 in your binder, but I'll give you a
14   heads-up when it's time to turn there.
15   A.   Okay.
16   Q.   Fair to say in the second quarter of 2023 the pilot
17   attrition issues that you discussed on cross-examination,
18   those actually began to ease up a little bit; right?
19   A.   Correct.
20   Q.   And actually by the end of the second quarter of 2023,
21   the pilot hiring situation was satisfactory, in your view,
22   for Spirit's operations?
23   A.   Well, I hadn't satisfied all of our concerns yet but we
24   were definitely seeing progress in the right direction.
25   Q.   Getting at least close, in other words, to where you
```

 1   wanted to be with pilots?

 2   A.   We were sill experiencing elevated levels of attrition

 3   when compared to the company's attrition levels prior to the

 4   pandemic, still multiples of what it was, but we'd been

 5   successful at reducing that attrition level and attracting

 6   pilots to offset that attrition.

 7   Q.   And, in fact, by the end of the second quarter of 2023

 8   it was not so much pilots that were the constraint on

 9   Spirit's operations, it was planes with engines?

10   A.   That's when it began to shift, that's correct, away

11   from pilots being the constraint and more to being a

12   fleet-related constraint.

13            MR. TEITELBAUM:  And, in fact, now if we could

14   take a look at Exhibit 341.  Actually let's first turn to

15   page 6, which is Bates number ending in 1964.

16            (On screen.)

17   Q.   And you see there those are the --

18            THE COURT:  If it's out of their books I need the

19   tab.

20            MR. TEITELBAUM:  I'm sorry, your Honor.  It should

21   be -- the tab also should be labeled as Exhibit 341.

22            THE COURT:  Is it in your most recent book?

23            MR. TEITELBAUM:  It is, the second-to-last

24   exhibit.

25            THE COURT:  Oh, thank you.  Thank you.

```
 1              MR. TEITELBAUM:  No problem.

 2   Q.   So if we look at the fifth paragraph down of Scott

 3   Haralson's remarks, it's a paragraph that begins, "With

 4   pilot attrition no longer being a drag on our utilization by

 5   the fourth quarter, we can now isolate the AOG issues."

 6   "AOG" stands for "aircraft on ground"; right?

 7   A.   Yes.

 8   Q.   And one of the reasons you would have an aircraft on

 9   ground is the engines are out of commission from the Pratt &

10   Whitney issues; right?

11   A.   That's what we were referring to here, yes.

12   Q.   And what Mr. Haralson says there, and you would agree

13   that Mr. Haralson also makes accurate statements to

14   shareholders in connection with earnings calls?

15   A.   Yes.

16   Q.   What he says is that, "The core airline that is

17   excluding aircraft on ground should be back to full

18   utilization by Q4 and is expected to be closer to run rate

19   margin CASM ex production."  In other words, he's just

20   saying that Spirit should be closer to its normal operations

21   by the fourth quarter; is that right?

22   A.   That was our hope at this time, yes.

23   Q.   Finally, with respect to the engine issues, we don't

24   need to read from this document, but Spirit actually expects

25   to be made whole by Pratt & Whitney for the engine issues
```

```
 1   that you've been having with the new engines; right?
 2   A.    Pratt & Whitney has made public comments to that
 3   effect, and we haven't seen anything yet beyond that
 4   commitment.  But they did make public comments using the
 5   words "make whole."
 6   Q.    In fact, what Mr. Haralson said was that, "The drag on
 7   margin caused by the AOG aircraft should be viewed as
 8   neutralized due to RTX's make-whole commitment."  Right?
 9   A.    That's right.
10   Q.    That's another way of saying the losses incurred by
11   having all these aircraft on the ground, those are
12   eventually going to be compensated for; right?
13   A.    Well, we were hopeful they would be.
14   Q.    But at the moment, those are a significant -- those
15   engine issues are a significant drag on Spirit's margins;
16   right?
17   A.    They are a drag on the margin, yes.
18            MR. TEITELBAUM:  All right.  And then if we could
19   go to page 7.
20   Q.    We'll go back to your remarks now.  And starting with
21   the second paragraph there, one of the things that you say
22   in the second paragraph, starting with the second
23   sentence --
24            MR. TEITELBAUM:  And, once again, I'll just ask
25   for some light paraphrasing, if defense counsel will indulge
```

 1   me.

 2   Q.   What you're saying here is that, in hindsight, Spirit's

 3   aggressive growth that it undertook over roughly the past

 4   five years caused some growing pains, basically; right?

 5   A.   I think what I specifically say here is that slower

 6   growth would have been more ideal during and coming out of

 7   pandemic.  So probably for closer to the past three years we

 8   did pursue -- we did continue to take delivery of aircraft

 9   during the pandemic, even though there was a drop-off in

10   demand, and it looks like we probably outgrew the

11   opportunity right now.  That's the implication.

12   Q.   And back during the pandemic, especially the early

13   part, you and your colleagues made a strategic judgment to

14   try and keep growing during that period; right?

15   A.   Correct.

16   Q.   And in this instance what you're saying is that, with

17   the benefit of hindsight, maybe slower growth might have

18   been better?

19   A.   Correct.

20   Q.   And, in fact, maybe slower growth might have had less

21   of a negative impact on your margins?

22   A.   That was -- that was one conclusion you could draw from

23   that, yes.

24   Q.   But your pace of growth going forward is something that

25   Spirit has control over; right?

1    A.    Correct.

2    Q.    And, in fact, you've already taken steps to try to

3    moderate the pace of Spirit's growth going into the future?

4    A.    We have.

5    Q.    So, now, if we could please look at the very last small

6    paragraph of your remarks right above, and now back to

7    Vivian.  It starts with, "Frustrations aside."  In that

8    first sentence, what you told your shareholders at the end

9    of the second quarter of 2023 was, "Frustrations aside, our

10   team is doing a great job adjusting as necessary, and I

11   strongly believe our expected 3Q performance is an anomaly."

12   Do you see that?

13   A.    I do.

14   Q.    In other words, you knew, even at the end of the second

15   quarter of 2023 that the third quarter was not going to look

16   fantastic from an earnings perspective; right?

17   A.    We did.

18   Q.    And, in fact, when you identified it as an anomaly,

19   that was as distinguished from a systemic problem; right?

20   A.    Well, that was our hope.  The reason we were so

21   emphatic here is that the third quarter in the airline

22   business is the strongest quarter in the airline business.

23   It's the peak summer travel period.  We were forecasting a

24   significant loss when some -- most of our industry peers

25   were projecting profitability.  And so we attributed some,

1    if not most of that to leisure demand shifting from the

2    domestic marketplace to the international marketplace, which

3    was our hope for the anomaly, that it would trend back to

4    normal.  And that was our hope at this time, and that has

5    not yet materialized yet in the fourth quarter.

6    Q.   But that's what you told your shareholders at the end

7    of the second quarter, with all of the obligations to be

8    truthful attached to it; right?

9    A.   Again, that was what we knew at that time.

10   Q.   All right.  Let's talk now about some of Spirit's other

11   SEC filings.  We don't need to go there yet, I just have

12   some general questions.

13        So you spoke with Mr. Cohen for a bit about the risk

14   factors that were identified in Spirit's 2022 10-K.  Do you

15   recall that testimony?

16   A.   Yes.

17   Q.   And the 10-K is the one that's filed every calendar

18   year?

19   A.   Correct.

20   Q.   And then there are also 10-Qs which are filed quarterly

21   throughout the year?

22   A.   Yes.

23   Q.   And one of the things that a company has to do in a

24   10-Q is inform its shareholders whether there are any new

25   risk factors that have accrued since the 10-K was filed;

```
 1    right?
 2              MR. COHEN:  I'm going to object, your Honor, as
 3    the exhibit calls for a legal conclusion.
 4              THE COURT:  Well, I'm not sure I followed the
 5    question.  Let him ask the question again.  Your question
 6    again?
 7              MR. TEITELBAUM:  Of course, your Honor.
 8    Q.   There's a section of the 10-Q filing that has the
 9    heading "Risk Factors"; right?
10    A.   It can, if we have changes to risk factors.
11    Q.   So why don't we actually take a look at Exhibit 73 in
12    that same -- I believe it's that same binder that you have
13    in front of you.  Should be.  And it's the numbered page 43
14    based on the documents numbering; it's page 56 of the
15    overall exhibit.
16              (On screen.)
17    Q.   And just let me know when you're there.
18    A.   I am, page 43.
19    Q.   Okay.  And that's the Bates number ending in 552?
20    A.   Correct.
21    Q.   And there's a section there called, "Risk Factors";
22    right?
23    A.   I recognize that.
24    Q.   What the additional risk factor that Spirit identified,
25    in the second quarter, related to suppliers for aircraft and
```

 1  engines; right?

 2  A.   I see that.  I believe that risk factor exists prior.

 3  We probably had changes to it though.

 4  Q.   But otherwise what it says there at the very top under

 5  "Risk Factors" is that, "There have been no material changes

 6  to the risk factors disclosed in item 1A 'Risk Factors'

 7  contained in our annual report on Form 10-K for the year

 8  ended December 31, 2022."  So, in other words, the only new

 9  risk factor, we have it here on the page or at least

10  updated?

11  A.   Or the update to it, correct.

12  Q.   And this is really just the aircraft and engine supply

13  issues that we've been hearing about on cross-examination;

14  right?  For instance, the Pratt & Whitney geared turbofan

15  problems; right?

16  A.   Yes.

17  Q.   These are the NEO engine issues we've been hearing

18  about?

19  A.   I believe so, yes.

20  Q.   And also Airbus delivery delays, more generally, of the

21  aircraft itself; right?

22  A.   Correct.

23  Q.   And then other than that, in this section, right,

24  there's no other risk factors that have been added to the

25  2022 10-K?

1    A.    None that I see.

2    Q.    Okay.  So why don't we go now to the third quarter

3    10-Q, which is Exhibit 633, also in that same binder.  And,

4    once again, it's going to be approximately that same page.

5    It's going to be page 43 of the document, once again.  It's

6    very likely to be close to page 56 of the overall exhibit.

7    A.    I have it, page --

8    Q.    It looks like you're there, and it looks like the Court

9    may be there as well so I'll ask the question while we catch

10   up on the screen here.

11          THE COURT:  Go ahead.

12   Q.    What that says here in 43 is that there have been no

13   additional risk factors that need to be added for this

14   quarter; right?

15   A.    Correct.

16   Q.    So, in other words, what's been said in the 2022 10-K,

17   plus what you said in the second quarter of this year,

18   that's everything; right?

19   A.    It appears so, yes.

20   Q.    So you provided some testimony on cross-examination

21   about, you know, the going-forward concerns that you have

22   about Spirit's business model; right?

23   A.    Yes.

24   Q.    And you agree that you're under a legal obligation to

25   disclose to your shareholders any additional material risks

1    to your business in your SEC filings; right?

2    A.    We disclose those risks in our 10-K and update them as

3    necessary in the Q, yes.

4    Q.    And so despite your testimony on cross-examination

5    about disappointing earnings, there's no updates here;

6    right?

7    A.    Those risks are covered in our risk factors in the

8    10-K.

9    Q.    But there isn't an update or a supplement that says we

10   are concerned we can't be a ULCC anymore, for instance?

11   A.    Well, those risks are identified in our 10-K as part of

12   the business being dynamic and making changes, yes.

13   Q.    You agreed with me when we were talking about that, you

14   know, the engine and aircraft issues were a problem in 2022;

15   right?

16   A.    Well, they're different now, which is why we felt it

17   necessary to update the risk factor.

18   Q.    And if something gets worse materially you would update

19   that as well; right?

20   A.    In this particular instance --

21               MR. COHEN:  I'm going to object, your Honor.

22               THE COURT:  Wait a minute.  I understand the line

23   of questioning.  Let me try this question.

24               I'm assuming that you think you're fully complying

25   with the law in what you set forth.  He asked one question

```
 1    that stuck in my mind.  But at no time have you said
 2    directly, or even by inference, in your SEC filings, annual
 3    or quarterly, that, his words, we can't be an ultra low-cost
 4    carrier anymore?  You've never said that?
 5              THE WITNESS:  I don't recall using those words,
 6    no.
 7              THE COURT:  Well, not those words, and I tried to
 8    frame it by natural inference.  Did you ever say, in your
 9    capacity, in these filings, that that was in the offing?
10              THE WITNESS:  I think we --
11              THE COURT:  No, no.  Forgive me.  I'm accustomed
12    to trying jury cases and also asking questions.  And,
13    naturally, the witness wants to answer my question, and so I
14    have this grand gesture to look at the jury while you're
15    answering.  There is no jury here, it's my obligation.  So
16    we can talk.
17              THE WITNESS:  Okay.  We identified, have
18    identified in the past, numerous risks to our business which
19    include risks to our model.  That can be competitive risks,
20    that could be pricing-related risks, that could be
21    demand-related risks.  And I think that those are the type
22    of risks we're talking about that we're experiencing today.
23    So those are all part of our risk factors as disclosed.
24              THE COURT:  Risks that you've dealt with in the
25    past?
```

```
 1            THE WITNESS:  Have had some success in dealing

 2   with in the past.  And what we're seeing now is we're -- as

 3   of thus far we've been unsuccessful at resolving those

 4   risks, but they're definitely there.

 5            THE COURT:  Go ahead, Mr. Teitelbaum.

 6   Q.   But, in other words, even in your Q3, third quarter

 7   earnings results, you didn't tell your shareholders, We're

 8   going to start operating as a network carrier; right?

 9   A.   I believe that what we, you know, told our shareholders

10   in our most recent earnings release was that we were

11   projecting a loss for the fourth quarter, and that in

12   prudent business management we had to take assessment of all

13   aspects of our business, including our growth rate and our

14   cost structure and our revenue model as well, and evaluate

15   any changes that needed to be made.

16   Q.   And just for the sake of clarification, that was an

17   earnings press release; right?

18   A.   Correct.

19   Q.   There was no earnings call this quarter?

20   A.   We did not have an earnings call.

21   Q.   Typically Spirit does conduct a quarterly earnings

22   call?

23   A.   We do.  We're concerned about conflicts with this

24   proceeding, given that we'll have people involved, so we

25   were unsuccessful at being able to schedule one.
```

1    Q.   Because, typically, one of the things that happens at

2    the earnings call is an extensive question-and-answer

3    session?

4    A.   Correct.

5    Q.   Right.  Let's move on to another subject.

6         You were talking with Mr. Cohen about the merger

7    negotiations both with Frontier and JetBlue during the first

8    half of 2022, as we also talked about yesterday?

9    A.   Yes.

10   Q.   And one of the things that you mentioned on

11   cross-examination was that, in essence, the Northeast

12   Alliance was a substantial concern that Spirit had when

13   evaluating whether a merger with JetBlue could be

14   consummated; right?

15   A.   Correct.

16   Q.   Because the presence of the Northeast Alliance could

17   potentially elevate the scrutiny that you would get from

18   regulators?

19   A.   I think the presence of the Alliance and, more

20   importantly, the fact that that Alliance was being

21   challenged in court, had us concerned that it would lengthen

22   the review process of our potential transaction.

23   Q.   And, in fact, that was not the only concern though that

24   Spirit had about that transaction; right?

25   A.   Well, we had a number of concerns about other

1    narratives that would be brought up in the regulatory review

2    process that could be advanced as possible concerns with our

3    deal as well, and we wanted our shareholders to be aware of

4    those concerns as we went through this potential process.

5    Q.   And, in fact, as we discussed yesterday, it wasn't just

6    regulators, right?  Spirit asserted as fact that at its core

7    the transaction would be a higher-cost, higher-fare airline,

8    buying a lower-cost, lower-fare airline?

9    A.   Well, it is a fact that JetBlue has a, on average,

10   higher fair and higher cost structure than Spirit, and we

11   were concerned that that fact would be raised as a concern

12   by regulators.

13            MR. TEITELBAUM:  And just for the sake of

14   efficiency here, I'm going to hand out an extra copy of

15   Exhibit 105 so that we don't have to go back into any

16   binders.

17            (Handing.)

18   A.   Thank you.

19   Q.   And, Mr. Christie, this is a press release that we were

20   talking about a little bit yesterday which has a letter from

21   you and Mr. Gardner attached?

22   A.   I see that.

23   Q.   And if you could just go to the second page, the last

24   full bullet point which starts, "Even putting aside the

25   NEA."

1   A.   I see that, yes.

2   Q.   What that paragraph says is that even apart from the

3   concerns about the NEA, Spirit believed that DOJ and a court

4   would be concerned about this transaction; right?

5   A.   We did have that concern, yes.

6   Q.   Because of the higher-cost, higher-fare airline buying

7   a lower-cost, lower-fare airline; right?

8   A.   We were worried that that narrative could be advanced

9   and could raise some concern in the process, yes.

10   Q.   And the heading for these bullets is, "The JetBlue

11   transaction faces very substantial regulatory hurdles,

12   especially while the NEA is in effect."  Right?

13   A.   I see that.

14   Q.   It doesn't say "only" while the NEA is?

15   A.   It does not.

16   Q.   All right.  Let's move on to a couple of different

17   subjects.

18          MR. TEITELBAUM:  And, your Honor, I am getting

19   close to the end of my examination here.

20   Q.   First of all, you testified on cross-examination about

21   some of the additional supplements that JetBlue made to its

22   offer to acquire Spirit in the, essentially, middle part of

23   2022.  Do you remember that testimony?

24   A.   Yes.  I think we had some back-and-forth about it, yes.

25   Q.   You spoke both with Mr. Cohen and with me about the

```
 1   timeline as the different versions of the offer evolved?
 2   A.   Yes.
 3   Q.   And you and the rest of the board actually resisted a
 4   JetBlue acquisition pretty much the entire time that the
 5   Frontier transaction was still a possibility; right?
 6   A.   We were rejecting the various proposals as they were
 7   coming in as not satisfactory to our requests.  And so what
 8   we were, in that back and forth with JetBlue, continuing to
 9   bargain and they were continuing to counter-propose.  But,
10   yes, up until we accepted the final proposal we had rejected
11   the proposals up until that date.
12   Q.   And, in fact, the -- you and the board supported the
13   Frontier transaction up until the moment that you saw the
14   voting by the shareholders was going completely the other
15   way; right?
16   A.   That's correct.
17   Q.   And, essentially, that your shareholders forced your
18   hand in that regard to get out of the Frontier merger
19   agreement; right?
20   A.   They were telling us that the Frontier transaction was
21   not going to be approved.  And eventually Frontier did
22   abandon that transaction, which left us evaluating our
23   standalone plan versus any other plan, which obviously we
24   had something on the table from JetBlue.
25   Q.   And you and the rest of the board have a fiduciary duty
```

1  to your shareholders?

2  A.   We do.

3  Q.   And, ultimately, it's your responsibility to carry out

4  their instructions; right?

5  A.   Well, they appoint the board and management to execute

6  to the business, to make appropriate strategic decisions.

7  Anything that rises to the need of a shareholder vote,

8  obviously, would go to the shareholders.  But we are

9  appointed, with our business judgment, to make decisions on

10 what we think the best answer is, and that's how we execute.

11 Q.   But over time, in connection with the voting that

12 occurred on the Frontier transaction, the shareholders at

13 Spirit chose the more cash-rich offer from JetBlue; right?

14           MR. COHEN:  Objection to the --

15           THE COURT:  Well, the facts are what they are.

16 So, I mean, at least at the time things took place here, the

17 evidence, as I hear it, which doesn't seem to be disputed,

18 is that the shareholder vote was tending to reject the

19 Frontier merger.  But I'll ask the witness.

20           That's correct, isn't it?

21           THE WITNESS:  The votes never reached finality.

22           THE COURT:  That's why I said tending to reject

23 the Frontier merger.

24           THE WITNESS:  Correct.  So they were leaning

25 towards rejecting the Frontier merger, and we were left to

 1   evaluate the next step, which could be stand alone, or

 2   engage in a merger with JetBlue at that time, or anything

 3   else.

 4            THE COURT:  I think that's been his testimony.

 5   Anything else?

 6            MR. TEITELBAUM:  Yes, your Honor.  Just briefly.

 7   Q.   You mentioned, Mr. Christie, another thing -- two

 8   things that were taken care of in the middle part of 2022 to

 9   eventually reach a merger agreement with JetBlue, that there

10   were appropriate changes to the retention packages for

11   executives, I believe you testified about that on

12   cross-examination; right?

13   A.   That was one of the concerns that we had and looked to

14   address, that we wanted to make sure that the management

15   team was retained and incentivized to remain through the

16   course of the review process and eventual closing with

17   JetBlue.

18   Q.   There needed to be appropriate financial incentives to

19   keep the management team on board during the period where

20   the transaction was pending?

21   A.   That was the board's view, is one of the tools they

22   wanted to use was a retention package, yes.

23   Q.   And, additionally, the size of the reverse breakup fee

24   ultimately went up to $470 million; right?

25   A.   We were successful at negotiating that higher as well,

```
 1    yes.

 2    Q.    That was to ensure that the shareholders would get, and

 3    Spirit would get some money even if the transaction did not

 4    go through; right?

 5    A.    That is one avenue of the reverse termination fee.  As

 6    you correctly stated, the vast majority of that reverse

 7    termination fee goes directly to the Spirit shareholders.

 8    But we also were, in the course of bargaining with JetBlue,

 9    looking for them to show their conviction to our process,

10    which they eventually did.

11               MR. TEITELBAUM:  Can I have just one moment, your

12    Honor?

13               THE COURT:  You may.

14               (Whereupon counsel conferred.)

15               MR. TEITELBAUM:  No further questions.

16               THE COURT:  Nothing further, Mr. Cohen?

17               MR. COHEN:  Your Honor, just one or two questions.

18               THE COURT:  You may.

19                          RECROSS-EXAMINATION

20    BY MR. COHEN:

21    Q.    Mr. Christie, Mr. Teitelbaum mentioned the concept of

22    strategic malaise.  Do you recall that?

23    A.    I do, yes.

24    Q.    What is your view of what part strategic malaise played

25    in Spirit's losses in 2022?
```

```
 1    A.   It played no part in the losses that we've sustained to

 2    date.  The losses that we're sustaining today are a product

 3    of the environment, and we've seen a fall in our revenue

 4    production as a result of less demand in the markets where

 5    we operate.  And that's been the principal cause of the

 6    change in the economics in the business, in addition to the

 7    cost inflation that I explained earlier.  But I wouldn't

 8    ascribe any of it to a strategic malaise.

 9              MR. COHEN:  And that's it, your Honor.  Nothing

10    further.

11              THE COURT:  Thank you.  Nothing further?

12              MR. TEITELBAUM:  No, your Honor.

13              THE COURT:  You may step down.  Thank you very

14    much.

15              (Whereupon the witness stepped down.)

16              THE COURT:  Call your next witness.

17              MR. TEITELBAUM:  Yes, your Honor.  With the

18    Court's indulgence, we have a little bit of a stage change

19    to make but --

20              THE COURT:  That's fine.

21              MR. TEITELBAUM:  -- the plaintiffs do call David

22    Clark, as an adverse witness, from JetBlue.

23              THE COURT:  He may be called.

24              MR. TEITELBAUM:  And John Thornburgh will be

25    taking this witness for the plaintiffs.
```

```
 1              THE COURT:  That's fine.  I know we're not
 2   committed to broadcast these proceedings, or Zoom them, but
 3   it would be very instructive to the public to have a view of
 4   this courtroom at this time.
 5              (Pause in proceedings.)
 6              THE COURT:  All right.  Let's swear the witness.
 7              THE CLERK:  Can you please stand and raise your
 8   right hand?
 9                   DAVID C. CLARK, sworn
10                   DIRECT EXAMINATION
11   BY MR. THORNBURGH:
12   Q.   Good morning, Mr. Clark.  It's good to see you again.
13   There's some binders in front of you.  We'll refer to them
14   throughout your examination, but I'll let you know when you
15   need to open them.
16   A.   Thank you.
17   Q.   Sure.  Mr. Clark, you have an undergraduate degree?
18              THE COURT:  Well, let's -- I'm accustomed to
19   getting his full name first.
20              MR. THORNBURGH:  Sure.
21   Q.   Mr. Clark, can you state your full name, for the
22   record?
23   A.   David Christopher Clark.
24              THE COURT:  Go ahead.
25              MR. THORNBURGH:  Thank you, your Honor.
```

```
 1   Q.   Mr. Clark, you have an undergraduate degree from the
 2   University of Virginia; correct?
 3   A.   Correct.
 4   Q.   You received an MBA from Harvard; correct?
 5   A.   Correct.
 6   Q.   Since 2009, you've had -- you've held a variety of
 7   positions at JetBlue, both in the network planning and the
 8   sales and revenue management organizations; correct?
 9   A.   Yes.
10   Q.   Your current title is head of revenue and planning;
11   correct?
12   A.   Yes.
13   Q.   And you've been in this role since January of 2021?
14   A.   January of 2022.
15   Q.   Okay.  Thank you.  Mr. Clark, in your current role you
16   have responsibility for four main areas of JetBlue's
17   business; correct?
18   A.   Correct.
19   Q.   One of those is sales and revenue management?
20   A.   Yes.
21   Q.   The other is network planning; correct?
22   A.   Correct.
23   Q.   A third one is operations planning; correct?
24   A.   Yes.
25   Q.   And a fourth is airline partnerships; right?
```

```
 1    A.    Correct.

 2    Q.    You report to Joanna Geraghty, who is JetBlue's

 3    president and chief operating officer; correct?

 4    A.    Correct.

 5    Q.    And you are a member of JetBlue's senior leadership

 6    team; correct?

 7    A.    Correct.

 8    Q.    You regularly join JetBlue earnings calls; correct?

 9    A.    Yes.

10    Q.    You had one yesterday; correct?

11    A.    Correct.

12    Q.    And you regularly attend JetBlue board meetings;

13    correct?

14    A.    Correct.

15    Q.    And sometimes you present at those board meetings;

16    correct?

17    A.    Yes.

18    Q.    Mr. Clark, I want to talk a little bit about the types

19    of customers that JetBlue serves.  During your time at

20    JetBlue, the airline has attempted to distinguish, at a high

21    level, between customers traveling for leisure versus those

22    traveling for business; is that fair?

23    A.    That's fair.

24    Q.    That's a common thing in the industry for airlines to

25    do, fair?
```

1   A.   It's one way to think about customer groups, yes.

2   Q.   JetBlue today estimates that it serves, approximately

3   85 percent of its customers are leisure customers; correct?

4           THE COURT:  Are what customers?  Leisure

5   customers?

6           MR. THORNBURGH:  Leisure customers, your Honor.

7   A.   Yes, that's our approximate current customer mix.

8   Q.   And those customers traveling for leisure would include

9   passengers traveling to visit friends and relatives;

10  correct?

11  A.   Yes, that's part of it.

12  Q.   Those customers are often known as VFR customers;

13  correct?

14  A.   Correct.

15  Q.   JetBlue then estimates that the other 15 percent of its

16  customers are traveling for business; right?

17  A.   Correct.

18  Q.   The main way JetBlue tries to distinguish between

19  customers traveling for leisure versus those traveling for

20  business is based on the itinerary they book; is that fair?

21  A.   That's one of the ways we do it for data analysis

22  purposes.

23  Q.   Mr. Clark, generally speaking, leisure passengers tend

24  to be more price-sensitive than business passengers;

25  correct?

```
 1    A.   Leisure passengers is a very broad scale with lots of

 2    different needs and willingness to pay, so I wouldn't

 3    generalize.

 4    Q.   You wouldn't generalize that leisure passengers tend to

 5    be more price-sensitive than business passengers, at a high

 6    level?

 7              MR. SHORES:  Objection, your Honor.  Foundation.

 8              THE COURT:  No, overruled.  I think he's capable

 9    of answering.

10              If you have an opinion, you may give it.

11    A.   While there's all sorts of leisure passengers, many of

12    which book premium leisure products, it's probably true, on

13    average, the average leisure customer is a bit more

14    price-sensitive than the average business customer.  But

15    it's a very broad scope.

16    Q.   Okay.  Thank you.  Mr. Clark, leisure customers can

17    prefer to travel at different times of day than business

18    travelers; correct?

19    A.   I think every customer, based on that itinerary, has a

20    preferred time of day.

21    Q.   Let me ask the question a slightly different way.

22    JetBlue may set a different flight schedule for a particular

23    route depending on whether that route has a higher

24    percentage of leisure customers versus business customers;

25    is that fair?
```

```
 1    A.    Yes, customer mix is an input in the flight scheduling.
 2    Q.    Mr. Clark, JetBlue competes with Spirit; right?
 3    A.    We do.
 4    Q.    And JetBlue has competed against Spirit for several
 5    years; right?
 6    A.    Yes.  We compete against all the major U.S. airlines.
 7    Q.    You previously informed colleagues that Spirit's key
 8    weapon is its very low cost and the very low fares they
 9    enable; right?
10    A.    I don't specifically recall saying that, but it's
11    possible.
12    Q.    Does that sound like something you have said, sir?
13    A.    In the past, yes.  There's been cost convergence in the
14    industry more recently.
15    Q.    You've also indicated to colleagues previously that
16    customers most interested in the absolute lowest fare may
17    find Spirit's offer compelling; correct?
18    A.    Again, I don't recall saying that, but they may.  I can
19    see that some would find that compelling, yes.
20    Q.    Do you have any reason, sitting here today, to disagree
21    with that notion?
22    A.    Can you repeat it, please?
23    Q.    Sure.  Customers most interested in the absolute lowest
24    fare may find Spirit's offer compelling?
25    A.    No reason to dispute that.
```

```
 1   Q.   Okay.  Mr. Clark, let me take you back to a year or so
 2   prior to the pandemic, late 2018 and then into 2019.  You
 3   would agree with me that you recall during this period that
 4   Spirit was growing rapidly; right?
 5   A.   Yes.  It was a pretty memorable, unusual period.
 6   Q.   And, specifically, Spirit was growing rapidly in
 7   markets that JetBlue served; correct, sir?
 8   A.   At that time, that's my recollection.
 9   Q.   And so because Spirit was growing rapidly in markets
10   that JetBlue served, competition between the two airlines
11   was increasing during that time; right?
12   A.   Broadly, yes.
13   Q.   Let's take a quick look at a document from this period
14   that describes this increasing competition.  If you could
15   please turn in your tab to the binder marked HU, Mr. Clark.
16           MR. THORNBURGH:  If the witness could be shown HU
17   on the screen, please.
18           (On screen.)
19   A.   Okay.
20   Q.   Mr. Clark, this is an e-mail conversation principally
21   between you and Mr. Erwin Coffy from October 2019; is that
22   right?
23   A.   That's correct.
24   Q.   Okay.  At this time, Mr. Coffy was a manager on the
25   JetBlue revenue management team; right?
```

```
 1    A.    Correct.
 2    Q.    And you were the vice president of sales and revenue
 3    management at this time; right?
 4    A.    Correct.
 5    Q.    So Mr. Coffy reported to you; right?
 6    A.    There was a leader in between us but, yes, he was part
 7    of my team.
 8              MR. THORNBURGH:  Your Honor, plaintiffs ask that
 9    HU be admitted in evidence as Exhibit 644.
10              THE COURT:  No objection?
11              MR. SHORES:  No objection, your Honor.
12              THE COURT:  HU admitted, 644 in evidence.
13              (Exhibit 644 received in evidence.)
14              MR. THORNBURGH:  Thank you, your Honor.
15    Q.    Mr. Clark, let's start with the e-mail from Mr. Erwin
16    Coffy that starts at the bottom of page 1 and goes to
17    page 2.  Do you see that?
18    A.    I do.
19    Q.    Now, in the first paragraph of Mr. Coffy's e-mail that
20    appears on the second page, you understood him to be
21    expressing some concern about low fares in three markets,
22    New York-Santo Domingo, New York-Santiago, and New York-San
23    Juan; correct?
24    A.    Correct.  He's raising a red flag to draw our attention
25    to a concern.
```

```
 1   Q.   The three-letter acronyms in the exhibit refer to codes
 2   for specific airports or cities; correct, Mr. Clark?
 3   A.   Correct.
 4   Q.   And when Mr. Coffy wrote "NYC" here, you understood him
 5   to be referring to the New York City metro area airports;
 6   correct?
 7   A.   That's correct.
 8   Q.   And when JetBlue refers to the New York City metro area
 9   airports, that most often includes JFK, LaGuardia and
10   Newark; right?
11   A.   Correct.
12   Q.   In the next paragraph, on page 2 still, you understood
13   Mr. Coffy to indicate that after Spirit had entered the New
14   York-Santo Domingo market, United became more aggressive in
15   lowering fares from Newark to Santo Domingo; correct?
16   A.   Correct.
17   Q.   And, again, just for the benefit of the Court, "NK" in
18   this sentence refers to Spirit; right?
19   A.   Yes.
20   Q.   And "UA" refers to United?
21   A.   Correct.
22   Q.   Now, you understood Mr. Coffy to also indicate that
23   after Spirit entered this market, United responded by filing
24   what are called walk-up fares at $29; correct?
25   A.   Yes.  And this is a 1600-mile route, so a $29 walk-up
```

1    fare is extraordinarily low.

2    Q.   And the Court's heard some testimony already about

3    walk-up fares.  Walk-up fares, Mr. Clark, refer to fares

4    that have no advance purchase retirement; right?

5    A.   Correct.

6    Q.   So, in other words, a customer could theoretically walk

7    up and purchase the fare the same day that the flight

8    departs; right?

9    A.   Correct.

10   Q.   Now, Mr. Clark, you also understood Mr. Coffy to be

11   indicating that Delta had expanded its own low walk-up fares

12   for flights from JFK to Santo Domingo after Spirit entered;

13   right?

14   A.   Yes.  This extraordinarily low fare spread to the JFK

15   airport.

16   Q.   And Mr. Coffy goes on to inform you that JetBlue had

17   been trying to remove its own low fares on that same

18   JFK-Santo Domingo route but had so far been unsuccessful;

19   right?

20   A.   That's what he indicates in the e-mail, yes.

21   Q.   And Mr. Coffy, and that's what you understood him to be

22   indicating; correct, Mr. Clark?

23   A.   Correct.  These are very temporary -- this is an

24   unreasonably low fare, so it's very temporary that it would

25   be in the market.

```
 1   Q.   Okay.  Mr. Clark, Mr. Coffy notes in his last sentence

 2   that walk-up fares in this market are usually around $160 to

 3   $180; right?

 4   A.   Correct.

 5   Q.   So these walk-up fares were now more than $100 lower

 6   after Spirit had entered; correct?

 7   A.   For this very short period of time, correct.

 8   Q.   Okay.  Well, let's go to the front page of the e-mail

 9   string, if we could, and you e-mail your -- you e-mail

10   Joanna Geraghty and others at JetBlue on October 29th, 2019.

11   Do you see that?

12   A.   I do.

13   Q.   And in your e-mail you refer to the extreme fare

14   pressures that JetBlue is now facing in key markets from

15   both ultra low-cost carriers, like Spirit, and legacy

16   airlines; correct?

17   A.   Correct.  At that time we were experiencing it.

18   Q.   So, Mr. Clark, in other words, Spirit's low fares had

19   caused other competitors to lower their fares as well;

20   right?

21   A.   For a temporary amount of time, correct.

22   Q.   And now JetBlue is facing pressure to lower its fares

23   from Spirit and these legacy airlines as well; correct?

24   A.   During this time period.

25   Q.   You go on, Mr. Clark, to indicate that ultra low-cost
```

1    carriers had grown 30 percent in JetBlue markets over the

2    last three quarters preceding your e-mail; right?

3    A.    Yes.

4    Q.    And, Mr. Clark, that was primarily growth from Spirit;

5    right?

6    A.    I don't recall the breakdown.

7    Q.    Okay.  You can put that document aside for now,

8    Mr. Clark.

9         During this time in 2019, Spirit growth was especially

10   pronounced in JetBlue markets touching Florida; is that

11   fair?

12   A.    We compete with them most often in Florida and in the

13   Latin America region, so that sounds reasonable.

14   Q.    Okay.  Let's take a look at a document that describes

15   the competition JetBlue was facing from Spirit in Florida

16   during this time.  Can you please turn to the tab in your

17   binder marked GG, please?

18   A.    I'm there.

19              (On screen.)

20   Q.    This is an e-mail string between you and your boss at

21   the time, Scott Laurence; correct?

22   A.    Yes, that's correct.

23   Q.    And Mr. Laurence was JetBlue's head of revenue and

24   planning at the time; correct?

25   A.    Yes.

1    Q.   The subject of this e-mail is, "November pricing

2    massive pressure test results." Right?

3    A.   I see that, yes.

4             MR. THORNBURGH:  Your Honor, plaintiffs ask that

5    GG be moved in evidence as Exhibit 646.

6             THE COURT:  No objection?

7             MR. SHORES:  No objection, your Honor.

8             THE COURT:  GG is admitted, Exhibit 646.

9             (Exhibit 646 received in evidence.)

10            MR. THORNBURGH:  Thank you, your Honor.

11   Q.   So, Mr. Clark, let's go to the second page of

12   Exhibit 646, and the e-mail that you wrote.  You indicate in

13   this e-mail that you had recently spent time with your

14   revenue management team going through JetBlue's performance

15   in its Florida region; right?

16   A.   Yes, for departures during November of 2019.

17   Q.   And you indicate that the good news is that the revenue

18   management team was doing a good job, and that JetBlue was

19   already very competitively priced; right?

20   A.   Yes, I see that.

21   Q.   And then you get to the bad news; right?

22   A.   The next paragraph is -- starts with the words "Bad

23   News," correct.

24   Q.   And you indicate in that paragraph with the heading

25   "Bad News" that there are many examples of markets where

1  JetBlue's fares and load factor were down year-over-year;

2  right?

3  A.   Correct.

4  Q.   Mr. Clark, load factor in this context refers to the

5  number of seats that JetBlue was filling on its planes;

6  right?

7  A.   That's broadly it.  It's the percent of seat miles that

8  are sold to revenue customers, but it's roughly the number

9  of seats that are sold.

10  Q.   Thank you.  You go on to attribute this really bad news

11  to a few different factors; correct?

12  A.   Yes.  I see four factors there.

13  Q.   One of the factors that you mention is competition with

14  ultra low-cost carriers; right?

15  A.   That's the fourth of the four mentioned.  Correct.

16  Q.   And then you go on to indicate that it appears that

17  ultra low-cost carriers are affecting JetBlue more than

18  other airlines; right?

19  A.   I'm sorry.  Can you repeat the question, please?

20  Q.   Sure.  You go on to indicate that it appears ultra

21  low-cost carriers are affecting JetBlue more so than other

22  airlines; right?

23  A.   At this time.  That's what the e-mail indicates.

24  Q.   The "OA" in this sentence refers to "other airlines,"

25  correct, Mr. Clark?

1    A.   Correct.

2    Q.   Thank you.  Now, let's go up to Mr. Laurence's e-mail

3    on October 21st, 2019, at 7:14 a.m.

4         MR. THORNBURGH:  Ms. O'Brien, if we could actually

5    go to the e-mail in the middle of page 1, please.

6    Q.   Now, Mr. Laurence is hypothesizing in this e-mail that

7    Spirit was working on a new strategy that JetBlue had not

8    figured out yet; right?

9    A.   His e-mail says that, that he's hypothesizing that.

10   Q.   That's what you understood Mr. Laurence to be referring

11   to; correct, Mr. Clark?

12   A.   My interpretation, that he's hypothesizing they're

13   working on a new strategy.

14   Q.   Okay.  Let's go to the e-mail you wrote back to

15   Mr. Laurence.  You describe two concerns that you had at

16   this time; right, Mr. Clark?

17   A.   Correct.

18   Q.   The first concern is that Spirit is getting better at

19   targeting customers visiting friends and relatives in

20   price-sensitive markets; right?

21   A.   Yes, at that time.

22   Q.   And then your second concern was that both United and

23   Delta were now also more aggressively matching Spirit's low

24   fares; correct?

25   A.   Correct.  That was happening at that time as well.

```
 1    Q.   And so when United and Delta matched Spirit's low

 2    fares, that put -- that made it even more difficult for

 3    JetBlue to command a premium price; right?

 4    A.   Yes, that's what the e-mail says.

 5    Q.   Commanding a premium price means charging a higher

 6    fare; right, Mr. Clark?

 7    A.   Correct, to -- given the value of the product that

 8    we're delivering.

 9    Q.   You can put that document aside, Mr. Clark.

10         Around this same time in 2019, Mr. Clark, you learned

11    as part of a competitor profit and loss analysis that Spirit

12    was actually making more money than JetBlue in Fort

13    Lauderdale; correct?

14    A.   At that time.

15    Q.   Ultimately, in late 2019, JetBlue initiated a Spirit

16    competitive strategy in order to better compete with Spirit;

17    correct, Mr. Clark?

18    A.   I don't recall specifically what you're referring to.

19    We were constantly trying to compete as effectively against

20    all competitors.

21    Q.   Okay.  Well, let me ask you to turn to the tab marked

22    FV in your binder, please.

23              THE COURT:  FB?

24              MR. THORNBURGH:  V, as in Victor, your Honor.

25              THE COURT:  Thank you.
```

```
 1              (On screen.)
 2    A.    I'm there.
 3    Q.    So, Mr. Clark, this is an e-mail string with you and
 4    other JetBlue colleagues from late October of 2019; correct?
 5    A.    That's correct.
 6    Q.    Okay.  And the title -- the subject of this e-mail is,
 7    "Spirit competitive strategy"; correct?
 8    A.    I see that, yes.
 9              MR. THORNBURGH:  Your Honor, plaintiffs ask that
10    FV, as in Victor, be admitted in evidence as Exhibit 647.
11              THE COURT:  No Objection?
12              MR. SHORES:  No objection, your Honor.
13              THE COURT:  FV is admitted, Exhibit 647.
14              (Exhibit 647 received in evidence.)
15    Q.    Mr. Clark --
16              MR. THORNBURGH:  Can we go to the second page,
17    please?  Apologies, let's go back to the first page.
18    Q.    So, Mr. Clark, in the bottom e-mail from Mr. Laurence,
19    he suggests kicking off a joint planning-revenue management
20    exercise to develop an integrated strategy to better compete
21    with Spirit; right?
22    A.    I see that.
23    Q.    Okay.  And then in the e-mail that you wrote on
24    October -- on November 26th, you indicate that you fully
25    agree with Mr. Laurence's plan; correct?
```

1    A.   Let me review it first, please.

2    Q.   Sure.

3              (Witness reviewed document.)

4    A.   I appear to be responding to Andrea Lusso when I say,

5    "Fully agree."  So I wouldn't take that to indicate I fully

6    agree with everything Mr. Laurence says.

7    Q.   Mr. Lusso, in the e-mail preceding yours, indicates

8    that he had talked to you and you're both absolutely

9    supportive of the plan for -- for a plan to better compete

10   with Spirit; correct?

11   A.   We're supportive of developing a plan, yes.  I just

12   don't want to indicate that I'm supportive of everything

13   Mr. Laurence said in this e-mail below.

14   Q.   You were supportive of that plan to better compete with

15   Spirit; correct, Mr. Clark?

16   A.   We did these from time to time.  This was a relatively

17   short-lived one.  So, yes, at that time I agreed it was wise

18   to create a plan to better compete with Spirit, just as we

19   had done with other airlines that we compete against.

20   Q.   Mr. Clark, you've been at JetBlue 14 years; correct,

21   sir?

22   A.   Correct.

23   Q.   And during that time there are two instances you can

24   recall when JetBlue undertook a specific strategy to better

25   compete against a specific airline; right?

1    A.    Two stick out the most, yes.

2    Q.    One of those was the Spirit competitive strategy that

3    we are discussing right now; correct, sir?

4    A.    Correct, given recency.

5    Q.    You can put that document aside, Mr. Clark.

6          Mr. Clark, in late 2019 and early 2020, the Spirit

7    competitive strategy morphed into what became known

8    internally at JetBlue as the ULCC strategy review; is that

9    right?

10   A.    I recall something to that effect, yes.  We broadened

11   it.

12   Q.    Okay.  Well, let's take a look at a document addressing

13   JetBlue's ULCC strategy review.  If you could please turn in

14   your binder to the tab marked GP, please.

15   A.    I'm there.

16              (On screen.)

17   Q.    So, Mr. Clark, this is an e-mail that you received in

18   January 2020 concerning JetBlue's ULCC strategy review;

19   right?

20   A.    Correct.  It looks like this was a work-in-process

21   draft that he's sharing.

22   Q.    And at this time you were JetBlue's vice president of

23   sales and revenue management; correct, Mr. Clark?

24   A.    Correct.

25   Q.    Okay.

```
 1                MR. THORNBURGH:  Your Honor, plaintiffs request

 2      that Exhibit GP be moved in evidence as Exhibit 648.

 3                THE COURT:  No objection?

 4                MR. SHORES:  No objection.

 5                THE COURT:  GP is admitted, Exhibit 648 in

 6      evidence.

 7                (Exhibit 648 received in evidence.)

 8                MR. THORNBURGH:  Your Honor, I think this is the

 9      first time we've done this.  This document has been redacted

10      at the request of defense counsel.  That is the redacted

11      version that we are going to have displayed on the screen

12      for the Court.

13                THE COURT:  And that's what we're going to rely

14      on, is it?

15                MR. THORNBURGH:  Correct, your Honor.

16                THE COURT:  All right.

17      Q.   Mr. Clark, let me direct you now to the third slide of

18      the attachment for Exhibit 648.  The first bullet on this

19      slide, Mr. Clark, indicates that Spirit is JetBlue's main

20      ULCC competitor; is that right?

21      A.   Yes.  At that time, of the ultra low-cost carriers,

22      they were our largest competitor.

23      Q.   Okay.  And it also indicates that JetBlue and Spirit

24      competed head-to-head on six routes at this time; right?

25      A.   At that time, yes.  That number is constantly changing.
```

1    Q.   And it also indicates that, if you take into account

2    other airports in the same metro area of an endpoint on one

3    of those routes, there was actually ninety-nine route

4    overlaps between Spirit and JetBlue; correct?

5    A.   Correct.  So if you broaden it to the metro areas the

6    number increases.

7    Q.   So, for example, Mr. Clark, JetBlue serves a route from

8    JFK to Austin, and Spirit serves a Newark to Austin route.

9    That would count in this slide as a metro area overlap;

10   correct?

11   A.   That's correct.

12   Q.   And again, Mr. Clark, this is an accurate depiction of

13   competition between JetBlue and Spirit at this time; right?

14   A.   Yes, at this time, close to four years ago.  That's

15   correct.

16           MR. THORNBURGH:  Let's go ahead and turn to

17   slide 4 of this exhibit, please.

18   Q.   So focusing your attention, Mr. Clark, on the graphic

19   on the left-hand side of the screen, this graphic is

20   depicting the number of overlap routes between JetBlue and

21   Spirit; is that right?

22   A.   That's correct.

23   Q.   And, Mr. Clark, as this graphic shows, the number of

24   overlap routes where JetBlue and Spirit compete head-to-head

25   grew significantly between 2010 and 2019; right?

```
 1    A.    Yes, during that time period.

 2    Q.    And if you look to the right, there's a chart that is

 3    depicting JetBlue overlap with ultra low-cost carriers by

 4    region; do you see that?

 5    A.    I do.

 6    Q.    And this chart indicates that most of the overlap

 7    between JetBlue and ultra low-cost carriers was in JetBlue's

 8    Florida and Latin regions; right?

 9    A.    Correct.  We only compete with them in some places in

10    our network.  A lot of places we don't compete.

11    Q.    Well, let's look at the bottom graphic.  That's a chart

12    depicting JetBlue's overlap with Spirit by focus city;

13    right?

14    A.    Correct.

15    Q.    JetBlue has six focus cities; correct?

16    A.    Correct.

17    Q.    And over 90 percent of JetBlue's flights touch one of

18    its six focus cities; correct, sir?

19    A.    Yes.

20    Q.    And as this chart depicts, the overlap between JetBlue

21    and ultra low-cost carriers was most significant in Fort

22    Lauderdale, Orlando, and Boston; correct?

23    A.    But for context, I think Spirit has about a 3 or

24    4 percent share in Boston.  So, yes, but they're still a

25    pretty small player.
```

1   Q.   This is where -- these are the focus cities where

2   JetBlue's overlap is most with ultra low-cost carriers;

3   correct?

4   A.   Yes.  Just noting it was still a small overlap in some

5   of those.

6          MR. THORNBURGH:  Let's go to slide 5 of this

7   exhibit, please.

8   Q.   Mr. Clark, the chart in the top left corner is

9   depicting how Spirit, on average, offers more daily flights

10  than Frontier in the markets it serves; right?

11  A.   At this time, that's correct.

12  Q.   Okay.  Do you have any reason to believe that's

13  changed, Mr. Clark?

14  A.   I don't, but I haven't been checking it.

15  Q.   The chart at the bottom left corner of this slide

16  indicates that Frontier had exited a larger percentage of

17  markets than both Spirit and JetBlue; correct?

18  A.   For this year-long time period, 2018 and 2019, that's

19  the case, yes.

20          MR. THORNBURGH:  Let's go to slide 8 of this

21  exhibit, please.

22  Q.   Now, Mr. Clark, there's a lot of numbers on this slide

23  so I'm going to try to walk through it slowly for the

24  benefit of everyone in the courtroom.  Let's start on the

25  left-hand side, if we could.  The first column is a list of

1    markets where JetBlue operated at this time; correct?

2    A.   Correct.

3    Q.   And then to focus your attention on the opposite side

4    of this slide for a moment, because Spirit is mentioned in

5    each of the "Pricing Strategy" rows, that indicates that

6    Spirit was operating in each of those markets when this

7    slide was created; right?

8    A.   Yes.  Any row they're mentioned in is likely because

9    they're operating in it during this time period.

10   Q.   And as you can tell on this slide, correct, Mr. Clark,

11   Spirit, or NK, as it's referred to here, was operating in

12   each of these markets; right?

13   A.   Yes.  I see that in each row they're listed.

14   Q.   Okay.  Now, let me take you back to the left side of

15   the slide and there's a column heading "Margins."  Do you

16   see that?

17   A.   I do.

18   Q.   Now, Mr. Clark, the specific margin figures are

19   redacted for the Court.  I'm going to ask you a few general

20   questions.  I'd ask that you not say any specific figures

21   out loud, at your counsel's request.  Okay?

22   A.   Thank you.

23   Q.   Looking at those margin columns as a whole, out of the

24   fourteen markets listed on the slide, in all but one of

25   those markets JetBlue's profit margin decreased in the

1  twelve months after Spirit's entry as compared to the twelve

2  months prior to Spirit's entry; correct?

3  A.   Correct.  And that's not unusual with any competitor

4  entering.

5  Q.   The title of the slide is, "Impact of ULCC Upon Entry";

6  correct, Mr. Clark?

7  A.   Yes, that's the slide title.

8  Q.   And Spirit's impact on JetBlue's margins, as depicted

9  on this slide, is consistent with the documents or exhibits

10  we discussed just a few minutes ago demonstrating that

11  Spirit was hurting JetBlue's bottom line; right?

12  A.   Which one specifically are you referring to?

13  Q.   Exhibit 645 and 646.  We looked at an exhibit,

14  Mr. Clark, describing how Spirit's entry into the Santo

15  Domingo-JFK market had impacted Spirit's financial results.

16  Do you recall that?

17  A.   I recall that for -- at that time there was temporarily

18  very low fares in the market.  Yes, I recall seeing that.

19  Q.   So you would agree with me then the margin information

20  depicted on this slide is consistent with that exhibit that

21  we discussed previously; correct?

22  A.   Most of these markets -- only one of them mentions New

23  York-Santo Domingo.  So this is a different market set.

24  Q.   But in all these markets, except for one, as you

25  previously indicated, JetBlue's margin decreased after

1    Spirit entered; right?

2    A.   For this set of markets at this time period, that's

3    correct.

4    Q.   Okay.  Let me draw your attention now to the column

5    titled "Fare."  Do you see that?

6    A.   I do.

7    Q.   And "Fare," Mr. Clark, here refers to the fares JetBlue

8    offers to the public for sale; correct?

9    A.   That's correct.

10   Q.   The column titled "After versus Before" depicts

11   JetBlue's average fares and how they changed in these

12   markets after Spirit entered; right?

13   A.   Correct.  It's the fare after their entry, I believe;

14   the twelve months after versus the fare the twelve months

15   before.

16   Q.   Thank you.  So focusing your attention for a moment on

17   the Boston-Orlando market, JetBlue's fares decreased

18   8 percent on average after Spirit entered the market; right?

19   A.   At this time, that's correct.

20   Q.   And then the next column over indicates that JetBlue's

21   fares remained 8 percent lower as of the date this

22   presentation was created; correct?

23   A.   Yes.  It doesn't indicate when they entered, so I'm not

24   sure if that's the same time period or sometime later.

25   Q.   And then if I focus your attention, for a moment, on

1    the Boston to Las Vegas market at the top of the slide,

2    JetBlue's fares dropped 5 percent after Spirit entered;

3    right?

4    A.    Correct.

5    Q.    And then fares, JetBlue's fares were actually

6    12 percent lower on this route, as of the date this

7    presentation was made, as compared to the period prior to

8    Spirit's entry; right?

9    A.    Correct.

10   Q.    And then, Mr. Clark, looking at the two fare columns as

11   a whole, they indicate that JetBlue's average fares in all

12   but one market decreased after Spirit started competing in

13   each of those markets; correct?

14   A.    Yes.  Very common when new capacity comes into any

15   market.

16   Q.    So, Mr. Clark, a few minutes ago you referred to the

17   Newark-Santo Domingo market we talked about previously.

18   It's depicted on this slide at the second row from the

19   bottom where it says EWRSDQ; correct?

20   A.    Correct.

21   Q.    Now, as shown here, JetBlue's analysis was that after

22   Spirit entered this market, JetBlue's fares dropped

23   19 percent; right?

24   A.    That's correct.

25   Q.    Now, if you look at the pricing strategy column for

1   this market, it indicates that JetBlue was, quote,

2   monitoring Spirit's fares on this route; right?

3   A.   It appears to be monitoring.  It says LTVL2/2.  I

4   believe that's monitoring a temporary fare with the last

5   travel date of February 2nd.  But, yes, this is, I think,

6   the only row where we're not ignoring their pricing.

7   Q.   Okay.  So we'll get to the descriptions about "Ignore

8   Spirit" in just a moment.  But for now, focusing just on

9   this market, even though JetBlue's pricing strategy was to

10   monitor Spirit's fares on that route, as this slide depicts,

11   Spirit's entry actually led JetBlue to have lower fares;

12   right?

13   A.   At least for that initial time period, yes.

14   Q.   Uhm-hmm.  Okay.  Now, as you just referred to, in the

15   last column on this slide under "Pricing Strategy" there's

16   several places where it indicates, with an entry of "Ignore

17   NK," referring to Spirit; right?

18   A.   Correct.

19   Q.   But, again, looking at the fare values in the slide as

20   a whole, even in the markets where JetBlue's pricing

21   strategy at this time was to, quote, ignore Spirit,

22   JetBlue's average fares actually went down after Spirit

23   entered as compared to the period prior to Spirit's entry;

24   right?

25         MR. SHORES:  I'm going to object, your Honor.  The

1    document refers to ULCC.

2           THE COURT:  I'm going to sustain that.  Sustained.

3           MR. THORNBURGH:  Can we go back to slide 7,

4    please?  I'm sorry.  The previous slide, Ms. O'Brien.

5    Q.  Mr. Clark, let me, while we're waiting to catch up here

6    on the previous slide on the presentation in front of you,

7    there's a chart as well there; correct?

8           THE COURT:  The chart with the same caption,

9    "Impact of ULCC Upon Entry"?

10          MR. THORNBURGH:  Correct, your Honor.

11   A.  Yes, on slide number 7.

12   Q.  Correct.  Slide 7.

13   A.  I see that in my personal binder, yes.

14   Q.  Okay.  Now, while we're waiting here, the third column

15   indicates when a ULCC had entered; correct?

16   A.  Correct.

17   Q.  And then if you go over to the far right, last column,

18   there's a column where F9 is listed; right?

19   A.  Yes, that's correct.

20   Q.  Okay.  And as it indicates there, F9 was, quote, new in

21   three of those markets; right?

22   A.  That's what it indicates, yes.

23   Q.  And then the column that's marked, "ULCC Years of

24   Service" indicates that ULCCs had been in all of these

25   markets for more than a year; right?

```
 1   A.    Correct.

 2   Q.    Based on the fact that a ULCC had been in all of these

 3   markets for over a year, and Frontier was new in only three

 4   of them, we can conclude that the entry we're talking about

 5   here is a Spirit entry; correct, Mr. Clark?

 6              MR. SHORES:  Objection, vague.

 7              THE COURT:  Well, I couldn't conclude that, though

 8   you did it very carefully from that chart.  Who's B --

 9   whatever it is, BO, B6?  Who are they?

10              THE WITNESS:  B6 is JetBlue's airline code.

11              THE COURT:  Oh, all right.  Okay.  So you could

12   conclude that from this chart, couldn't you?

13              THE WITNESS:  It doesn't say what "new" means, so

14   I'm not sure of the timing of the Frontier entry based on

15   this chart.

16              THE COURT:  Understood.  All right.  It's a

17   reasonable inference.  You may go on.

18              MR. THORNBURGH:  Thank you, your Honor.

19              Let's go back to slide 8, if we could, for a

20   moment.

21   Q.    So, Mr. Clark, after having looked at that prior slide,

22   I'm going to ask you a similar question slightly

23   differently.  As this slide demonstrates, even in the

24   markets where JetBlue's pricing strategy was to ignore

25   Spirit, JetBlue's average fares went down after ULCC entry
```

1  in those markets; right?

2  A.   And that's very much in line with anytime supply goes

3  up -- excuse me, supply goes down -- excuse me, supply goes

4  up, price tends to come down.

5  Q.   So you agree then that even though JetBlue's pricing

6  strategy was to ignore Spirit in some of these markets,

7  JetBlue's fares went down after ULCC entry; right?

8  A.   After any airline entry, so yes, including ULCCs.

9  Q.   Mr. Clark, after this slide was created in December of

10 2020, JetBlue did, in fact, make a concerted effort to

11 better match Spirit's fares in multiple markets; correct?

12 A.   Just on the time period, the e-mail's dated January 6,

13 2020.  I believe you said December 2020.

14 Q.   Sure.  I'll rephrase the question, Mr. Clark.

15      After this slide presentation was created in January of

16 2020, JetBlue did make a concerted effort to better match

17 Spirit's fares in multiple markets; right?

18 A.   We ran a test to see the impact of different pricing

19 strategies against Spirit during this period in 2020.

20          MR. THORNBURGH:  Can we go to slide 13, please?

21 Q.   Mr. Clark, you just referred to some of the testing

22 that JetBlue did with regards to its pricing after this

23 presentation was created; right?

24 A.   Yes.  This is at the time, so perhaps not final, but I

25 believe it refers to the same test I was referring to.

 1   Q.   And as indicated in the last column there, one of the
 2   strategies that JetBlue was contemplating was to, quote,
 3   utilize lower fares; right?
 4   A.   That looks like one of the items being tested, yes.
 5          MR. THORNBURGH:  We can put that document away.
 6   Q.   Mr. Clark, I want to switch gears for a moment and give
 7   the Court a little bit more background about JetBlue's fare
 8   options as they exist today.  Mr. Clark, when a customer
 9   purchases a ticket to fly on JetBlue, they choose between
10   different fare options; correct?
11   A.   That's correct.
12   Q.   And each of JetBlue's fare options has different
13   features or amenities associated with it; right?
14   A.   Correct.
15          MR. THORNBURGH:  Okay.  I'd like to briefly, your
16   Honor, take a quick look at JetBlue's fare options as they
17   exist today.  We have a demonstrative that we would like to
18   put up, which is Clark Demonstrative A, for purposes of
19   discussing these fare options.
20          THE COURT:  You may.
21          (On screen.)
22   Q.   So, Mr. Clark, this is a screenshot from JetBlue's
23   website.  This is depicting the five fare options that
24   JetBlue has today; right?
25   A.   Correct.

```
1              THE COURT:  We don't have this in paper?

2              MR. THORNBURGH:  Your Honor, we can provide a copy

3    to you in paper.  I believe it's in the back of your binder,

4    actually.  My apologies for not identifying it before.  It

5    should be the last tab titled, "Clark Demonstrative A."

6              THE COURT:  I see it.  Thank you.

7    Q.   So, Mr. Clark, the screenshot on the screen in front of

8    you depicts the five fare options that JetBlue has today; is

9    that right?

10   A.   Correct.

11   Q.   And with the exception of Mint, the rest of these fare

12   options are associated with seats in JetBlue's economy or

13   core cabin; correct?

14   A.   That's correct.

15   Q.   Starting on the left-hand side of the screenshot is

16   Blue Basic; right?

17   A.   Yes.

18   Q.   Blue Basic, Mr. Clark, is JetBlue's most unbundled fare

19   option; right?

20   A.   Correct.

21   Q.   Blue Basic is similar to the basic economy fare options

22   offered by other airlines; right?

23   A.   On most attributes.  JetBlue also has additional

24   attributes, like free Wi-Fi included with the fare.

25   Q.   JetBlue considers Blue Basic to compete closely with
```

1    Spirit's unbundled fare; right?

2    A.   It competes with a very broad number of competitors.

3    It competes with ULCC on bundled fares, it competes -- it

4    was actually designed to compete with the legacy carriers'

5    basic economy fares.

6    Q.   You just mentioned, Mr. Clark, that it was designed to

7    compete against legacy airlines' basic economy fares.  Was

8    it also designed to compete against the unbundled fare

9    Spirit offered, Mr. Clark?

10   A.   Yes, ULCCs as well.

11   Q.   Mr. Clark, customers who purchase a Blue Basic fare

12   option today are able to bring a personal item with them on

13   board the plane; right?

14   A.   Correct.

15   Q.   But except on flights to or from Europe, a customer who

16   purchases Blue Basic cannot bring a carry-on bag on board

17   the plane; right?

18   A.   That's correct.

19   Q.   In fact, a consumer who purchases a Blue Basic fare is

20   not allowed to bring a carry-on bag with them even if they

21   are willing to pay for it; right?

22   A.   Correct.  For a customer who purchases the Blue Basic

23   fare, if they want to bring a carry-on bag they would need

24   to purchase an Even More Space seat, which would come with

25   carry-on bag rights.  But they cannot just purchase a

1    carry-on bag a la carte.

2    Q.   Right.  So if I showed up at a gate with a Blue Basic

3    fare option and I had a bag, I would not be allowed to bring

4    it on board the plane even if I was willing to pay for it;

5    right?

6    A.   You could purchase a Blue Basic -- excuse me.  You

7    could purchase an Even More Space seat at the gate and then

8    board with the carry-on bag.

9    Q.   But I couldn't just pay for the bag by itself; correct,

10   sir?

11   A.   That's correct.

12   Q.   Today, Mr. Clark, more than 30 percent of JetBlue's

13   passengers purchase a Blue Basic fare; correct?

14   A.   That's roughly correct, yes.

15   Q.   Okay.  And then the other fare options depicted on this

16   screenshot, Blue, Blue Plus and Blue Extra, all are more

17   bundled fare options that JetBlue offers as compared to Blue

18   Basic; is that right?

19   A.   Correct.  They come with additional features.

20   Q.   And they cost more as well; correct?

21   A.   Correct.

22   Q.   For example, a customer who purchases a Blue fare, as

23   depicted on the chart in front of you, they're allowed to

24   bring both a carry-on bag and personal item with them on

25   board the plane; right?

1   A.    Correct.

2   Q.    But still no checked bag is included in that fare

3   option; correct, Mr. Clark?

4   A.    Only for flights to Europe it's included.  But for most

5   flights it is not included.

6   Q.    Thank you, Mr. Clark.

7         MR. THORNBURGH:  We can pull down that

8   demonstrative.

9         Your Honor, I'm happy to keep going.  I know you

10   like to end right at 1:00.

11         THE COURT:  I do, and we will stop at this time,

12   and I thank you.  And you may step down, sir.

13         THE WITNESS:  Thank you.

14         (Whereupon the witness stepped down.)

15         THE COURT:  We will resume promptly at 9:00 a.m.

16   tomorrow morning.  At the end of the second day of this

17   trial, out of the ten days that each party has, the

18   government, the plaintiff, has used up one day,

19   forty-five minutes.  The defense has used up two hours and

20   forty-five minutes.

21         We'll stand in recess until 9:00 a.m. tomorrow

22   morning.  We'll recess.

23         THE CLERK:  All rise.

24         (Proceedings adjourned.)

25

C E R T I F I C A T E


        I, Cheryl B. Palanchian, Court Reporter

for the United States District Court for the

District of Massachusetts, do hereby certify that

the foregoing pages are a true and accurate

transcription of my shorthand notes taken in the

aforementioned matter to the best of my skill and

ability.




        /s/ Cheryl B. Palanchian 11/1/2023
             CHERYL B. PALANCHIAN

         Registered Merit Reporter
         Certified Realtime Reporter