```
 1                UNITED STATES DISTRICT COURT

 2               DISTRICT OF MASSACHUSETTS (Boston)

 3                           No. 1:23-cv-10511-WGY
                             Vol 1, Pages 1 - 87
 4

 5

 6  UNITED STATES OF AMERICA, et al,
              Plaintiffs
 7

 8  vs.

 9

10  JETBLUE AIRWAYS CORPORATION, et al,
              Defendants
11

12                      * * * * * * * * *

13

14              For Bench Trial Before:
                Judge William G. Young
15

16

17              United States District Court
                District of Massachusetts (Boston)
18              One Courthouse Way
                Boston, Massachusetts 02210
19              Thursday, November 2, 2023

20                      * * * * * * * *

21

22          REPORTER: RICHARD H. ROMANOW, RPR
                Official Court Reporter
23            United States District Court
        One Courthouse Way, Room 5510, Boston, MA 02210
24                  rhrbulldog@aol.com

25
```

```
 1                    A P P E A R A N C E S

 2

 3    EDWARD WILLIAM DUFFY, ESQ.
      ARIANNA MARKEL, ESQ.
 4    AARON TEITELBAUM, ESQ.
         DOJ-Atr
 5       450 Fifth Street NW, Suite 8000
         Washington, DC 20530
 6       (202) 812-4723
         Email: Edward.duffy@usdoj.gov
 7   and
      WILLIAM T. MATLACK, ESQ.
 8       Attorney General's Office
         One Ashburton Place, 18th Floor
 9       Boston, MA 02108
         (617) 727-2200
10       Email: William.matlack@mass.gov
         For Plaintiffs United States of America and
11       The Commonwealth of Massachusetts

12

13    RYAN SHORES, ESQ.
         Cleary Gottlieb Steen & Hamilton LLP
14       2112 Pennsylvania Avenue, NW
         Washington, DC 20037
15       (202) 974-1876
         Email: Rshores@cgsh.com
16   and
      ELIZABETH M. WRIGHT, ESQ.
17       Cooley LLP
         500 Boylston Street
18       Boston, MA 02116-3736
         (617) 937-2349
19       Email: Ewright@cooley.com
     and
20    RACHEL MOSSMAN ZIEMINSKI, ESQ.
      MICHAEL MITCHELL, ESQ.
21       Shearman & Sterling LLP
         2601 Olive Street, 17th Floor
22       Dallas, TX 75201
         Email: Rachel.zieminski@shearman.com
23       For Defendant JetBlue Airways Corporation

24

25       (Continued.)
```

```
 1      (Continued.)

 2

 3   JAY COHEN, ESQ.
     ANDREW C. FINCH, ESQ.
 4       Paul, Weiss, Rifkind, Wharton & Garrison
         1285 Avenue of the Americas
 5       New York, NY 10019-6064
         (212) 373-3000
 6       Email: Jaycohen@paulweiss.com
         For Defendant Spirit Airlines, Inc.
 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    I N D E X

 2

 3    WITNESS                DIRECT  CROSS  REDIRECT  RECROSS

 4

 5    DAVID CLARK  (Continued.)

 6       By Mr. Thornburgh:     8

 7       By Mr. Shores:

 8

 9                    E X H I B I T S

10
```

```
11           EXHIBIT 650............................ 13

12           EXHIBIT 651............................ 23

13           EXHIBIT 652............................ 29

14           EXHIBIT 653............................ 35

15           EXHIBIT 654............................ 37

16           EXHIBIT 655............................ 64

17           EXHIBIT 656............................ 72

18           EXHIBIT 657............................ 80

19           EXHIBIT 658............................ 83
```

```
20

21

22

23

24

25
```

```
 1            P R O C E E D I N G S
 2            (Begins, 9:00 a.m.)
 3            THE CLERK:  Civil Action 23-10511, the United
 4    States of America, et al vs. JetBlue Airways
 5    Corporation, et al.  The Court is in session.
 6            Mr. Clark, do you understand that you're still
 7    under oath?
 8            THE WITNESS:  Yes, I do.
 9            THE COURT:  And --
10            MR. SHORES:  Your Honor, may I raise one thing
11    before we start the testimony?
12            THE COURT:  Yes.
13            MR. SHORES:  Okay.
14            There are two pieces of physical evidence in this
15    case that will discussed by witnesses that are coming up
16    very soon.  I'll lay the foundation for them.  It's
17    Number 623 and 624 on the exhibit list.  It's two rows
18    of JetBlue seats and --
19            THE COURT:  Right.  Ms. Gaudet has told me
20    something about that.
21            And you want me to take a view of them?
22            MR. SHORES:  We would welcome that if you're
23    interested, your Honor.
24            THE COURT:  Well I like views.
25            (Laughter.)
```

```
 1          THE COURT:  I once took a view of a swamp and fell
 2     in the water.
 3          (Laughter.)
 4          MR. SHORES:  I'll try to make sure this is the
 5     same --
 6          THE COURT:  But here's how -- I'm told they're
 7     nearby.
 8          MR. SHORES:  They are, your Honor.
 9          THE COURT:  I don't think we ought to take time
10     9:00 till 1:00.  We'll scheduled a time.  I don't want
11     to do it tomorrow, but we'll schedule a time and I won't
12     count it against the trial time.  I take a view with the
13     Court Reporter and we look at whatever is to be looked
14     at.
15          Is that satisfactory?
16          MR. SHORES:  Yes, your Honor.  And shall we
17     coordinate with Ms. Gaudet about that.
18          THE COURT:  Exactly.
19          MR. DUFFY:  And we have no objection to the
20     process, your Honor.  We would request that any time be
21     allocated against the defendants' allotment.
22          THE COURT:  No, I think I'm going to do it in the
23     afternoon and that's fine.
24          MR. DUFFY:  All right, that's fine.
25          THE COURT:  Well I'm counting this time.  And now
```

1    that we're on a side issue, let me say something I was

2    going to say during the break.

3         I have to say I'm more than satisfied with how you

4    people are presenting the case.  I think I'm

5    understanding the facts and the way I can go through

6    these notebooks is fine.  But I have made a mistake in

7    my protocol for depositions.

8         I've been through one deposition.  I've carefully

9    -- the one you wanted me to start on, sort of

10   corroborated things I've already heard, I've carefully

11   reviewed the objections, overruled them all.

12        It cannot work this way.  There is a public

13   interest in expedition here.  So I'm changing the

14   protocol.  But it will have no effect on you, save as

15   you are trying to persuade the Court.

16        I've decided now that all deposition excerpts that

17   you've given me are admitted in evidence.  Those to

18   which objections have been raised are provisionally

19   admitted in evidence.  That means you may rely upon them

20   in argument and you may use them in your requested

21   findings.

22        I imagine, to the extent you use them in your

23   requested findings, they'll be citations to them.  Those

24   I will all look at because I'll be considering whether

25   the requested finding actually persuades me.  If, when I

1    look at them, and I assure you I will, you've cited
2    something to which an objection is made, I will rule on
3    the objection and, as I said, I'll endorse it right on
4    the transcript so the record is clear.
5         When I come to write my opinion, um, I don't say
6    I'm going to say, because it's going to be obvious, on
7    what I have relied, but the rest of it is open to you,
8    should there be any appeal, to say "He just couldn't
9    have found that," or whatever.  That's how we're going
10   to proceed.
11        Now let's get going.  And, Mr. Thornburgh, you may
12   continue.
13        MR. THORNBURGH:  Thank you, your Honor.
14
15   DIRECT EXAMINATION BY MR. THORNBURGH:  (Continued.)
16   Q.   Mr. Clark, welcome back.
17        Did you discuss the substance of your testimony
18   that you provided yesterday with anyone since you left
19   the stand?
20   A.   I have not.
21   Q.   And have you discussed the substance of the
22   testimony you offer today with anyone since leaving the
23   stand yesterday?
24   A.   No, I have not.
25   Q.   Okay.  Thank you, Mr. Clark.

1          MR. THORNBURGH:  If we could, please, um, repull

2     up Clark Demonstrative A, please.

3          (On screen.)

4     Q.    Mr. Clark, when we finished yesterday we were

5     discussing the fare options that JetBlue offers today,

6     do you recall that?

7     A.    I do.

8     Q.    JetBlue makes Blue Basic available in nearly all

9     the markets it serves today, correct?

10    A.    Correct.  And in fact we now do make it available

11    in all markets we serve.

12    Q.    That was a relatively recent change, there used to

13    be some small categories of markets that -- where

14    JetBlue did not offer Blue Basic?

15    A.    That's correct, it's a recent change.

16    Q.    So, Mr. Clark, when a customer goes to JetBlue's

17    website and puts in their proposed itinerary, the

18    default lowest fare shown to them would be a fare

19    associated with the Blue Basic fare option, is that

20    fair?

21    A.    That's correct.

22    Q.    And customers who want to purchase a more bundled

23    fare option, such as the Blue Fare option, for example,

24    they have to pay an additional amount of money to buy up

25    from Blue Basic to Blue, is that accurate?

A.      Yes.

Q.      JetBlue sets the buy-up amount on a
market-by-market basis, is that fair?

A.      Correct.

Q.      And one of the two main objectives that JetBlue
has in setting the specific buy-up amount, between Blue
Basic and Blue, is to maximize the amount of revenue
that JetBlue earns, correct?

A.      That's one of the two, yes.

Q.      And so in order to do that, Mr. Clark, JetBlue
would want to set the buy-up amount at the highest level
it can while still ensuring enough customers would buy
up to the Blue bundled fare, right?

A.      There's generally an optimal buy-up amount that
yields the most revenue.

Q.      If JetBlue creates too large of a gap, let's say
between Blue Basic and Blue, there is a list of people
who would have been willing to buy up to that more
bundled fare option who will instead stick with Blue
Basic, correct?

A.      Correct.

Q.      And, Mr. Clark, when JetBlue raises fares in a
particular market, it would typically raise those fares
across all of its fare options such that you ensure
there remain gaps between each of the different fare

1    options, is that fair?

2    A.    That's most often the case, yeah.

3    Q.    So in other words JetBlue wouldn't typically just

4    raise the price of Blue Basic fares, for example,

5    because that would eliminate the gap between Blue Basic

6    and Blue, right?

7    A.    Not typically, although there's exceptions at

8    times.  But not typically.

9    Q.    Okay, thank you, Mr. Clark.

10         Now, Mr. Clark, prior to late 2019, JetBlue did

11   not offer a Blue Basic, correct?

12   A.    Correct, we introduced Blue Basic in November of

13   2019.

14   Q.    The least-bundled fare option that JetBlue offered

15   prior to 2019 was its Blue Fare, right?

16   A.    Correct.

17   Q.    Okay.  JetBlue ultimately did introduce Blue Basic

18   to better compete against the unbundled fare options

19   offered by other airlines, right?

20   A.    Correct.

21   Q.    This included Spirit's unbundled fare, correct?

22   A.    That was one of them, but that was not what

23   triggered us to launch the Blue Basic.

24   Q.    Would you agree -- apologies.

25         Would you agree with me that the industry trend

```
 1   towards unbundling was initially set in motion by
 2   Spirit?
 3   A.    Um, in the United States perhaps.  Not globally.
 4   Q.    Part of the reason JetBlue introduced Blue Basic
 5   was to better capture price-sensitive customers, right,
 6   Mr. Clark?
 7   A.    That was one of the objectives.
 8   Q.    Okay.  So let's take a quick look at some evidence
 9   that describes JetBlue's rationale for introducing Blue
10   Basic.
11        MR. THORNBURGH:  If you would please turn in your
12   binder to the tab marked LR.
13        THE COURT:  Marked?  Say it again?
14        MR. THORNBURGH:  LR, your Honor.
15        THE COURT:  Thank you.
16   A.    (Turns.)  I'm at LR.
17   Q.    Okay.  So, Mr. Clark, this is an e-mail that you
18   sent in January of 2018 to Christina Lind at JetBlue,
19   correct?
20   A.    Um, yes.
21   Q.    And at the time you were the Vice-President of
22   Sales and Revenue Management, right?
23   A.    Correct.
24   Q.    And you indicate in your e-mail here that you
25   presented the attached presentation, right?
```

1   A.    Yes, that's correct.

2   Q.    Okay.

3         MR. THORNBURGH:  Your Honor, plaintiffs ask that

4   LR be moved in evidence as Exhibit 650.

5         THE COURT:  No objection?

6         MR. SHORES:  No objection, your Honor.

7         THE COURT:  It is admitted, LR is admitted as 650.

8         (Exhibit 650, marked.)

9   Q.    Mr. Clark --

10        MR. THORNBURGH:  If we can publish the document to

11  the gallery.

12  Q.    Mr. Clark, the "exec crew" that you reference here

13  in your e-mail, that is what is today known inside

14  JetBlue as the Senior Leadership Team, correct?

15  A.    Correct.

16  Q.    And that would include the CEO, Mr. Robin Hayes,

17  correct?

18  A.    Yes, he was part of the exec crew at that time.

19  Q.    Okay.  If I can direct your attention now to the

20  attachment in the second slide, which has a Bates number

21  ending in 659.  The title of the slide is "Project

22  Segmentation Discussion."

23        Do you see that, Mr. Clark?

24        MR. SHORES:  You mean "Products"?

25  Q.    Excuse me, "Product Segmentation Discussion."

1        MR. THORNBURGH:  Thank you.

2  A.    Correct, "Product Segmentation Discussion."

3  Q.    You're listed as one of the presenters on this

4  slide, correct, Mr. Clark?

5  A.    Correct.

6  Q.    "The meeting was intended to provide the JetBlue

7  executive crew with an update on competitors' product

8  segmentation efforts," right?

9  A.    Correct.

10  Q.    And that refers to the Basic Economy fare options

11  that legacy airlines have been introducing at this time,

12  correct?

13  A.    Correct.

14  Q.    And part of the discussion was going to be about

15  how JetBlue was going to respond to these developments,

16  right?

17  A.    Correct.

18  Q.    You understood at this time that the legacy's

19  Basic Economy offering was allowing those airlines to

20  compete aggressively against ultra-low-cost carriers

21  like Spirit, right?

22  A.    That was the understanding at the time, that's

23  what's listed here, yes.

24  Q.    Okay.

25        MR. THORNBURGH:  Let's turn to the fifth side of

1    this exhibit please, that page has a Bates number ending

2    in 662.

3          (On screen.)

4    Q.    So, Mr. Clark, this slide depicts the impact that

5    Basic Economy has had at this time on how JetBlue

6    competes in both ULCC markets and nonULCC markets,

7    correct?

8    A.    Correct.

9    Q.    And to be clear, at this time JetBlue had not yet

10   introduced its Blue Basic product offering, right?

11   A.    Correct.

12   Q.    A ULCC market, as depicted on this side,

13   Mr. Clark, refers to a market where JetBlue competes

14   against an ultra-low-cost carrier or ULCC, right?

15   A.    Correct.

16   Q.    And the only ULCC being depicted on this side is

17   Spirit, correct?

18   A.    That's the one we use for this example, yes.

19   Q.    Frontier does not appear on this side, correct,

20   Mr. Clark?

21   A.    Not on this slide, no.

22   Q.    Okay, let's focus on the top half of this side, if

23   we could for the moment.

24          The first bullet on the top left indicates that

25   JetBlue was previously able to charge higher fares than

1  Spirit, right?

2  A.    Um, yes, it uses the words "command the price

3  premium," but it means we're getting more revenue per

4  seat than they were.

5  Q.    And "NK" that you just alluded to is referencing

6  Spirit there, correct?

7  A.    Correct.

8  Q.    And that is consistent with what is depicted on

9  the left side of the top graphic there, correct?

10  A.    Correct.

11  Q.    The JetBlue logo is above the Spirit logo, right?

12  A.    Yes.

13  Q.    And then the right side of that graphic indicates

14  that JetBlue was now, at this time, having to match the

15  standard fares offered by Spirit, correct?

16  A.    I think it's an oversimplification, um, I do not

17  believe we were matching their fares one-to-one at this

18  time.  But it's illustrative.

19  Q.    That's what's indicated on this slide, correct,

20  Mr. Clark?

21  A.    It is showing that at a high illustrative level,

22  that we're needing to price near the Basic Economy

23  levels of American, United, and Delta, and that's also

24  at a high illustrative level, you know roughly the

25  ballpark of Spirit there.

1   Q.    That JetBlue's having to price at the Basic

2   Economy levels of those airlines you mentioned, but also

3   at the level that Spirit was offering, correct,

4   Mr. Clark?

5   A.    My point is I think if you break it down by

6   dollars and make it less illustrative and high level,

7   you would see Spirit's still below, um, the other levels

8   on average.

9   Q.    I understand, Mr. Clark.  I have a relatively more

10  simple question here.  Which is as depicted on this

11  line, JetBlue is having to match the fare offering of

12  Spirit Airlines, correct?

13       THE COURT:  Well the slide speaks for itself.

14  He's given some nuance there.  So I think we can move

15  on.  I see how things have been laid out on the slide.

16       Go ahead.

17  Q.    Mr. Clark, the bottom graphic here is depicting

18  how competition has similarly changed in markets without

19  an ultra-low-cost carrier, right?

20  A.    Correct.

21  Q.    In a market without an ultra-low-cost carrier

22  would be a route that is not served by an ultra-low-cost

23  carrier, right?

24  A.    Correct.

25  Q.    As the text at the bottom right corner of the side

1  indicates, "After other airlines had introduced their

2  Basic Economy fares, JetBlue was no longer able to price

3  above them or Spirit's unbundled fare," right?

4  A.    Um --

5          MR. SHORES:  Objection, mischaracterizes the

6  document.

7          THE COURT:  It misstates the document by including

8  Spirit, but maybe that's the question he wants to ask.

9          Is it?

10         MR. THORNBURGH:  Yes, your Honor.

11         THE COURT:  All right, if you understand it, you

12 may answer.

13 A.    Can you repeat the question, please?

14 Q.    Sure.  At this time, Mr. Clark, JetBlue was no

15 longer able to drive a pricing premium as compared to

16 both the legacy's Basic Economy offerings and also

17 Spirit's unbundled fare, right?

18 A.    Um, I don't believe that's correct.  If you look

19 at historical data, we're still driving a price premium

20 versus Spirit's unbundled fare.  Perhaps it was smaller

21 than it had been, but it was still sizable.

22         THE COURT:  And that's on routes that Spirit

23 didn't fly?

24         THE WITNESS:  I was referring to Spirit as to both

25 -- that both JetBlue and the ULCCs, um, serve nonstop.

1    We were still, um -- we were still commanding a revenue

2    premium per seat versus them.

3         THE COURT:  But in this presentation he's asking,

4    and the way I'm following it is, the slide we're talking

5    about talks about nonULCC markets, and I assume that

6    means markets where these ultra-low-cost carriers don't

7    fly.

8         THE WITNESS:  So at this time, which was the

9    beginning of 2018, during this period, we were having

10   difficulty generating a price premium versus the

11   legacy's Basic Economy fares.  It was a new concept at

12   the time.  That has changed drastically over time.  But

13   that's how it was at this time nearly 6 years ago.

14        THE COURT:  And this slide makes the point that

15   JetBlue had to price similar to the legacy's Basic

16   Economy fares?

17        THE WITNESS:  Correct, at this time we did.  Yes.

18        THE COURT:  All right.

19   Q.   Mr. Clark, in your testimony just a minute ago in

20   response to the Judge's question, you said that you

21   believe that the situation has changed drastically since

22   this time.  Is that your -- is my understanding correct?

23   A.   Correct.

24   Q.   And when did it change drastically such that

25   JetBlue was able to again, um, give a price premium over

1    Spirit?

2    A.    Um, I believe the data shows that we've always had

3    a price premium versus Spirit, that's continued

4    throughout.  At this time it had temporarily narrowed.

5    But that throughout we've always been able to drive,

6    given our superior on-board product, a price premium

7    versus Spirit.

8    Q.    Okay, so at this time you agree that the premium

9    that JetBlue has been able to capture versus Spirit had

10   narrowed, correct?

11   A.    Potentially.  It was six years and I don't recall

12   exactly, it's not on this chart, but potentially, yes.

13   Q.    And, um, when did -- in your best recollection,

14   when did that temporary narrowing, when did that cease

15   to exist such that JetBlue was able to now command a

16   larger price premium over Spirit again?

17   A.    I don't recall specifically.  We need to look at

18   the data.

19   Q.    Okay, fair enough.

20        MR. THORNBURGH:  If we could now go to Slide 8 of

21   this document, please.  It has a Bates number ending in

22   665.

23        (On screen.)

24   Q.    Mr. Clark, this slide is describing three

25   strategies that JetBlue was considering at this time in

1    response to the introduction of more unbundled fares in

2    the industry, correct?

3    A.    It's outlining three paths forward.  (Looks.)  It

4    doesn't give all the context you just did, but it

5    certainly outlines three paths forward from this

6    discussion.

7    Q.    The first strategy that JetBlue was considering

8    was to "create a fare option tailored to price-sensitive

9    customers," correct?

10   A.    It says "in order to compete against the other

11   airlines' Basic Economy offerings," that, yes, it

12   targeted the legacies is how I interpreted it.

13   Q.    JetBlue ultimately did pursue this strategy of

14   "creating a new basic fare offering tailored to

15   price-sensitive customers," correct, Mr. Clark?

16   A.    We did.

17   Q.    That strategy led to the introduction of what

18   today is known as "Blue Basic," correct?

19   A.    That's correct.

20        MR. THORNBURGH:  Okay, you can put that document

21   aside, Mr. Clark.

22   Q.    Mr. Clark, you would agree with me, right, that

23   the industry evolution that led to the introduction of

24   unbundled fares has been beneficial for customers,

25   correct?

```
 1   A.    I do think customer choice is a good thing, yes.
 2   Q.    And as you just said, it's given consumers more
 3   choice to purchase the product amenities that they
 4   value, right?
 5   A.    That's correct.
 6   Q.    And it has made it possible for additional
 7   consumers to fly who otherwise could not afford to do so
 8   previously, right?
 9   A.    Yes, that's one of the benefits of more choices,
10   more customers find a choice that they're comfortable
11   with or find attractive.
12   Q.    Okay.  If I could please ask you to turn in your
13   tab to the -- in your binder, excuse me, to a tab marked
14   NB, please.
15   A.    Okay.  (Turns.)  I'm there.
16         THE COURT:  "MB," is it?
17         MR. THORNBURGH:  "N" as in "Nancy," your Honor.
18         THE COURT:  Oh, "N."
19         MR. THORNBURGH:  And it's "B" as in "boy."
20         THE COURT:  I'm sorry.
21         MR. THORNBURGH:  No, that's okay.
22         THE COURT:  All right.
23         Go ahead.
24   Q.    So, Mr. Clark, this is an e-mail conversation you
25   had with JetBlue colleagues Marty St. George and Rob
```

1    Land in February of 2018, correct?

2    A.    Um, that's correct, they're both copied on this

3    e-mail.

4    Q.    Mr. St. George was JetBlue's Chief Commercial

5    Officer at the time, correct?

6    A.    Correct.

7    Q.    And Mr. Land was and is, still remaining today, a

8    lawyer on JetBlue's Government Affairs Team, correct?

9    A.    Correct.

10   Q.    Okay.

11         MR. THORNBURGH:  Your Honor, plaintiffs request

12   that NB be admitted in evidence as Exhibit 651.

13         THE COURT:  No objection to that?

14         MR. SHORES:  No objection, your Honor.

15         THE COURT:  NB is admitted Exhibit 651 in

16   evidence.

17         (Exhibit 651, marked.)

18   Q.    So Mr. Clark, focusing your attention for the

19   moment on Page 2 of the document.  Mr. Land e-mailed you

20   on February 10th, 2018, correct?

21   A.    Yes.

22   Q.    And in the e-mail Mr. Land appears to be

23   expressing some concerns about the materials he has

24   reviewed in reference to project Epcot, correct?

25   A.    That's correct.

1  Q.   Project Epcot is another name for Fare Options 2.0

2  which led to the introduction of Blue Basic, correct?

3  A.   It was the name earlier before we had fully

4  decided on a path.  So at this time we're still

5  considering lots of options.  It eventually led to

6  Options 2.0, but that decision was not made for another

7  5 or 6 months.

8  Q.   Okay.  So Mr. Land's concerns here was related to

9  how the various scenarios JetBlue was contemplating at

10  the time regarding project Epcot might affect customers,

11  right?

12  A.   I think that accurate, yes.

13  Q.   Okay.  So let's now -- I want to go back to the

14  e-mail that you wrote in response to Mr. Land at the top

15  of Page 2.

16       You indicate in your e-mail that you actually

17  think that these developments are good for customers,

18  right?

19  A.   Correct, that's what I state.

20  Q.   And let's go back to the first page of this e-mail

21  string.

22       You provided a more fulsome response back to

23  Mr. Land's a couple of days later, correct?

24  A.   Yes, on the 11th, the next day.

25  Q.   The first thing that you note in your e-mail is

```
 1    that "The larger industry contacts is that the airline
 2    industry appears to be evolving from its traditional
 3    all-inclusive model in which many couldn't afford to fly
 4    and those who did had to pay for things they didn't
 5    value, to a customer choice model where customers have a
 6    lot more ability to select the attributes they value
 7    such as they would in a hotel or restaurant."
 8         Mr. Clark, you still agree with that sentiment
 9    today, correct?
10    A.    I think it's -- which part of the sentiment?
11    There's a couple pieces.  Just to be accurate, which
12    part?
13    Q.    The entire sentiment expressed in the e-mail that
14    you wrote on February 11th, 2018, the sentence that I
15    just read, Mr. Clark.
16    A.    Yes, I agree still.
17    Q.    Okay.  You go on in your e-mail to note, "I
18    believe this is good for consumers overall as it lowers
19    the price of entry for air travel and allows travelers
20    to customize their experience to their personal
21    preferences."
22         Do you still agree with that sentiment, Mr. Clark?
23    A.    I do.
24    Q.    Now in the next paragraph, in the first sentence,
25    you note that "While some customers will lament this
```

1   development, the reality is that the product amenities

2   that used to be included in a bundled fare are still

3   available for consumers to purchase," correct?

4   A.    Correct.

5   Q.    And then in the third paragraph you indicate that

6   "Unbundling is better for consumers than potential

7   alternatives," correct?

8   A.    (Pause.)  Sorry, I'm just -- could you repeat the

9   question, please.  I'm reviewing what I wrote at the

10  time.

11  Q.    Sure.

12        In the third paragraph you indicate that

13  "Unbundling is better for consumers than potential

14  alternatives," right?

15  A.    Um, yes, compared to alternatives like fewer

16  flight choices, higher ticket prices, and less access to

17  air travel, correct.

18  Q.    And let me just, for the record, because you left

19  off a phrase there at the end of your sentence, let me

20  just read it for the record.

21        And your view, as you indicated in your e-mail

22  here, is that "other alternatives could lead to fewer

23  flight choices, higher ticket prices, and less access to

24  air travel for price-sensitive customers," that's what

25  you wrote, correct, Mr. Clark?

1    A.    That's correct.

2    Q.    You previously described your e-mail here as

3    "beautifully written," right?

4    A.    Um, I don't recall that, but I certainly may have.

5          (Laughter.)

6    Q.    I'm happy to point you to your prior testimony,

7    Mr. Clark, and you can check to confirm that.

8    A.    Um, I don't doubt, um, that I would have said that

9    previously.

10   Q.    Okay.  Thank you.  You can put that document aside

11   now.

12         Mr. Clark, JetBlue eventually did start offering

13   Blue Basic in late 2019, correct?

14   A.    Yes, that's correct.

15   Q.    And when JetBlue first introduced Blue Basic in

16   2019, the fare option included both a carry-on bag and a

17   personal item that customers could bring on board with

18   them, correct?

19   A.    That's correct.

20   Q.    And then as we discussed previously yesterday,

21   today Blue Basic no longer includes that carry-on bag

22   allowance, correct?

23   A.    Correct, it was done for multiple reasons,

24   including some operation issues.

25   Q.    Okay.  So we discussed yesterday, Mr. Clark, that

1    JetBlue initiated some price testing in 2020 as part of

2    what was then known as the "Spirit Competitive

3    Strategy," right?

4    A.    Correct.

5    Q.    And after conducting this testing in late 2020, as

6    you just alluded to, JetBlue made a change to its Blue

7    Basic offering, right?

8    A.    The two were unrelated.  We ran a test in 2020, we

9    made a change afterwards, but it wasn't because of the

10   results of the test.

11   Q.    So in your view the testing that JetBlue did was

12   completely unrelated to a change that occurred with

13   regards to JetBlue unbundling the carry-on bag from Blue

14   Basic, is that correct?

15   A.    That's my recollection, that they were largely

16   separate.

17   Q.    Okay.  Well let's take a look at a document that

18   describes JetBlue's decision to remove the carry-on bag

19   from Blue Basic.

20        If you would please turn in your binder to the tab

21   marked LO, please.

22        (On screen.)

23   A.    (Turns.)  I'm there.

24   Q.    Mr. Clark, this is an e-mail that you sent on

25   November 6th, 2020, correct?

1    A.    Correct.

2    Q.    And in the e-mail you are transmitting materials

3    in reference to an upcoming JetBlue Senior Leadership

4    Team meeting regarding "Customer Offering Evolution,"

5    correct?

6    A.    Correct.

7    Q.    And, Mr. Clark, you would have been one of the

8    presenters for this meeting, correct?

9    A.    Um, likely, but I don't recall specifically.  But

10   likely.

11   Q.    Okay.

12         MR. THORNBURGH:  Your Honor, plaintiffs request

13   that Exhibit LO be admitted in evidence as Exhibit 652.

14         THE COURT:  Objection?

15         MR. SHORES:  No objection.

16         THE COURT:  It's admitted in evidence LO 652, in

17   evidence.

18         (Exhibit 652, marked.)

19   Q.    Mr. Clark, let's go to Page 2 --

20         MR. THORNBURGH:  Can we please publish the

21   document for the Court now.

22   Q.    If you would please -- let me go to Page 12 of the

23   document, there's a slide there with the Bates number

24   ending in 862 with the heading "Strategic Need to

25   Consider Carry-on Baggage Changes."

```
 1          Mr. Clark, this slide is describing why JetBlue
 2    felt it was necessary to change its carry-on baggage
 3    policies for Blue Basic, correct?
 4    A.    Um, just give me a moment to review it, please.
 5    Q.    Sure.
 6    A.    (Looks.)  I've reviewed it.  Could you please
 7    repeat the question.
 8    Q.    Sure.
 9          So, Mr. Clark, this slide is describing why
10    JetBlue felt it necessary to change its carry-on baggage
11    policy for Blue Basic, correct?
12    A.    Correct, it's listing four reasons.
13    Q.    Okay.  And so, Mr. Clark, we talked yesterday
14    about how Spirit had grown rapidly in JetBlue markets in
15    2019, right?
16    A.    Yes.
17    Q.    And as indicated on the slide, Spirit grew 87
18    percent in JetBlue markets in the three years leading up
19    to 2019, correct?
20    A.    That's what the slide indicates, yes.
21    Q.    And as of November 2020 when the slide was
22    created, JetBlue continued to believe that Spirit had
23    the strongest competitive offering for price-sensitive
24    customers, correct?
25    A.    No, that's not how I interpreted that bullet.
```

1    Q.    How would you interpret that bullet, Mr. Clark?

2    A.    That Spirit is growing more slowly against OAs,

3    the other airlines who have the strongest competitive

4    offering.  "With strongest competitive offering" is

5    talking about the OAs.

6    Q.    Okay.  Mr. Clark, JetBlue had found that when

7    Spirit enters a market where JetBlue is operating,

8    JetBlue's fares and revenue, quote, "decrease by more

9    than 10 percent," right?

10   A.    Yes, at this time that's what it says.

11   Q.    The reference to "summer 2020 tests" here, refers

12   to the ULCC testing that we just discussed a few minutes

13   ago, right?

14   A.    Um, yes, I believe it refers to the pricing test

15   that was done in that first month of covid in a very

16   unique customer demand environment.

17   Q.    So, Mr. Clark, this slide seems to link the price

18   testing that JetBlue had done to JetBlue's ultimate

19   decision to change the carry-on baggage policy

20   associated with Blue Basic, correct?

21   A.    The slide appears to link, um -- it's a bit

22   surprising to me because I don't recall there being a

23   strong link.  I'm not sure if there's other documents

24   supporting this or just one bullet.

25   Q.    As the slide indicates, the testing that JetBlue

1  did revealed that "JetBlue faced revenue challenges when

2  it priced significantly above Spirit," correct?

3  A.    I think the context is really important here.

4  This is the depths of covid, industry demand is probably

5  at 25, 30 percent of historical levels, there's lots of

6  empty seats, way more seats than customers.  So it was a

7  very unique and challenging time for pricing.

8  Q.    I understand that, Mr. Clark, and I'm sure your

9  counsel will be happy to ask you questions and allow you

10  to provide the context, but for right now my question is

11  actually just a little bit simpler.

12      Which is that the testing that JetBlue did at this

13  time, um, demonstrated that JetBlue faced revenue

14  challenges when it priced significantly above Spirit,

15  correct?

16      MR. SHORES:  Objection, asked and answered.

17      THE COURT:  Overruled.  You may have it.

18  A.    It indicates that during this time period,

19  December of 2020, there's challenges pricing

20  significantly above ULCCs.

21  Q.    And in fact, Mr. Clark, JetBlue found, through its

22  revenue testing, that matching Spirit's fares also

23  produced the best revenue results for JetBlue, correct?

24  A.    I don't recall that as a major conclusion.  We

25  have not operated that way in the three-plus years

 1    since.

 2         MR. THORNBURGH:  Can we quickly go to Page 41 of

 3    this exhibit please.  It has a Bates number ending in

 4    891.

 5    A.    (Looks.)  Yeah, I'm on that page.

 6    Q.    Great.  Just waiting for that slide, it takes a

 7    couple of seconds.

 8         (On screen.)

 9    Q.    Okay.  So, Mr. Clark, directing your attention

10    here to the first subsection of the slide, it indicates

11    that "Matching the bottom end of ULCC fare structure

12    provides the most options for maximizing revenue per

13    flight," right?

14    A.    I see that, yes.

15    Q.    And so that seems to be consistent with the notion

16    that JetBlue found through its testing that matching

17    Spirit's fares also produced the best revenue results

18    for JetBlue?

19    A.    I don't see that indicated.  It refers to the most

20    options.

21         MR. THORNBURGH:  Can we go to the next slide,

22    please.

23         THE COURT:  The next page?

24         MR. THORNBURGH:  The next page.

25         (On screen.)

1          THE COURT:  My folder doesn't have a next page.

2          MR. SHORES:  I don't have a next page.

3          THE COURT:  Nor do I.

4          MR. THORNBURGH:  Sure.  Sorry.

5          Can we go to Slide 37, please.

6          THE COURT:  And that has a Bates number?

7          MR. THORNBURGH:  Ending in 888, your Honor.

8          THE COURT:  Thank you.

9          (On screen.)

10    Q.    Okay.  So, Mr. Clark, this slide is describing the

11    results of the ULCC price testing that JetBlue

12    performed, correct?

13    A.    Um, correct.

14    Q.    And if you look at the result section, it reads

15    "In general we saw positive booking trends in groups

16    where we were closely aligned to ULCCs, match and

17    premium," right?

18    A.    I see that, yes.

19    Q.    And then in the next bullet it reads "Match

20    slightly outperformed other test groups until August,"

21    correct?

22    A.    Correct.  Again it says "summer of 2020," so a

23    very unique time.

24    Q.    But "match" here, Mr. Clark, would refer to

25    JetBlue matching the fares offered by other ultra-low-

1    cost carriers including Spirit, correct?

2    A.    Correct, and this says "Match slightly

3    outperformed other test groups until August."

4    Q.    Okay, you can put that document aside, Mr. Clark.

5          And now I want to direct your attention to the tab

6    in your binder marked GH, please.

7    A.    (Turns.)

8    Q.    Mr. Clark, this is another e-mail conversation

9    that you were a part of from October of 2019, correct?

10   A.    Correct.

11   Q.    And, um, you write an e-mail that appears at the

12   top of this exhibit, correct?

13   A.    Correct, the e-mail at the top is written by me.

14   Q.    Okay.

15         MR. THORNBURGH:  Your Honor, plaintiffs ask that

16   GH be moved in evidence as Exhibit 653.

17         THE COURT:  No objection?

18         MR. SHORES:  No objection, your Honor.

19         THE COURT:  GH is admitted, Exhibit 653.

20         (Exhibit 653, marked.)

21   Q.    Mr. Clark, I just want to point out --

22         MR. THORNBURGH:  If we could publish this for the

23   gallery, please.

24   Q.    Yesterday, Mr. Clark, I asked you some questions

25   about "Spirit's key weapon."  Do you recall that?

```
 1    A.    Um, frankly I don't recall that from yesterday,

 2    but it's certainly possible.

 3    Q.    Okay.  So just directing your attention now to the

 4    second paragraph of your e-mail.

 5          You indicate here that "Spirit's key weapon is its

 6    very low costs and the very low fares they enable.

 7    Customers most interested in the absolute lowest fare

 8    may find their offer compelling."

 9          That's what you wrote, correct, Mr. Clark?

10    A.    Yes, that's what I wrote at the time, four years

11    ago.

12    Q.    Okay, you can put that document aside.

13          I'd now like to ask that you turn to the tab in

14    your binder marked DH, please.

15    A.    (Turns.)

16    Q.    Mr. Clark, this is a very short e-mail that you

17    wrote to yourself in December of 2022.  Correct?

18    A.    Yes, it appears that way.

19    Q.    So this was less than a year ago, correct?

20    A.    Correct.

21          MR. THORNBURGH:  Your Honor, plaintiffs ask that

22    Exhibit DH be moved into evidence as Exhibit 654.

23          THE COURT:  Any objection?

24          MR. SHORES:  No objection.

25          THE COURT:  DH is admitted, Exhibit 654.
```

1          (Exhibit 654, marked.)

2     Q.     So it appears here, Mr. Clark, that you are --

3          MR. THORNBURGH:  And can we publish this for the

4     gallery please.

5     Q.     Mr. Clark, it appears that you are responding to a

6     recent Spirit earnings report here, correct?

7     A.     That's my assumption as well, yes.

8     Q.     Now "TRASM" here refers to "Total Revenue per

9     Available Seat Miles," right?

10    A.     Correct.

11    Q.     And "ASM" here refer to "Available Seat Miles,"

12    right?

13    A.     Correct.

14    Q.     And this would be notable because typically if you

15    increase capacity, or ASMs, it makes it more difficult

16    for unit revenue to grow as well, correct?

17         MR. SHORES:  Objection, vague.

18         THE COURT:  Oh, no, I understand it, and I assume

19    he does.

20    A.     During typical times that is true.  This is during

21    -- it's part of the height of the covid recovery, so

22    demand was accelerating pretty quickly.

23    Q.     Mr. Clark, just to get in for reference, this is

24    less than a year ago in December of 2022, correct?

25    A.     Correct.

Q.    And just for the record, when is your -- when you
spoke about the "height," in your mind when did the
covid recovery end?
A.    The -- so there was multiple phases to it, but
there was a pent-up demand phase that ran through the
second half of 2022 through the first half of 2023.  So
domestically the recovery, I would say, was complete,
and that pent-up demand ran through by the mid of 2023.
Q.    So less than a few months ago, is that your
testimony?
A.    Um, yes, domestically.
Q.    Okay.  So here, as you indicate in your e-mail to
yourself, "Spirit managed to grow both its capacity and
unit revenue," correct?
A.    Correct.
Q.    And you thought this was a good revenue report,
right?
A.    It's an impressive result, yes.
Q.    It was notable enough for you to write yourself a
note about it, right?
A.    Correct.
Q.    Okay.  Mr. Clark, let's --
      MR. THORNBURGH:  Go ahead and take that document
down.
Q.    Let's switch gears for a moment.  I want to talk a

1    little bit about how JetBlue creates its fares and makes

2    them available for purchase.

3          Mr. Clark, to start, JetBlue sets its fares on a

4    market-by-market basis, correct?

5    A.    I would say a route-by-route basis just to be a

6    bit more precise.  But, yes, a "route" is one way to

7    define a market, so.

8    Q.    Thank you.  And when JetBlue sets fares in a

9    particular market, the airline takes into account the

10   competitive conditions on that route, right?

11   A.    That's one of many inputs, yes.

12   Q.    And the competitive conditions would include the

13   fares offered by other airlines operating on that route,

14   correct?

15   A.    It can.  It does not always.  But it can.

16   Q.    Mr. Clark, JetBlue most commonly files its fares

17   that it creates through what is called the "Airline

18   Tariff Publishing Company," or "ATPCO," correct?

19   A.    That's correct.

20   Q.    ATPCO serves as a sort of clearing house for

21   airfares for many different airlines, right?

22   A.    Yes.

23   Q.    Once JetBlue files its fares through ATPCO, those

24   fares typically become very easily visible to every

25   other airline in the industry, correct?

1    A.    Most of them are public fares that are visible.

2    There's also the minority that are private fares that

3    aren't visible.

4    Q.    Similarly JetBlue is able to see the fares offered

5    by other airlines that file the fares in ATPCO, correct?

6    A.    Yes, this is one method of seeing other airline

7    fares.

8    Q.    JetBlue monitors ATPCO to see the fares filed by

9    other airlines, correct?

10   A.    It's one of the data sources we monitor, yes.

11   Q.    In fact, Mr. Clark, ATPCO is the primary way that

12   JetBlue monitors the fares offered by its competitors,

13   correct?

14   A.    It is, yes, it's the primary most common way that

15   we monitor, but not the only.

16   Q.    Mr. Clark, similarly you understand that other

17   airlines monitor ATPCO as well, correct?

18   A.    That's my broad understanding.  I haven't worked

19   in another carrier.  But that's my broad understanding.

20   Q.    When JetBlue files fares in ATPCO, they include

21   terms and conditions in addition to just the price of a

22   fare, correct?

23   A.    They can, yes.

24   Q.    An example of a term or condition would be a

25   requirement of how far in advance of a flight a fare is

1    able to be purchased, correct?

2    A.    That's correct.

3    Q.    So, for example, the Court's heard testimony

4    already about "0 AP fares" or "walk-up fares."  You're

5    familiar with those fares, correct?

6    A.    Yes, I am.

7    Q.    A "0 AP fare" means that there is no advanced

8    purchase requirement associated with purchasing that

9    fare, right?

10   A.    Correct.

11   Q.    Sometimes though there are advanced purchase

12   requirements associated with purchasing a fare, right?

13   A.    Yes.

14   Q.    It could be a 7-day AP, for example, right?

15   A.    Yes, for example.

16   Q.    Another example of a term or condition of sale

17   would be a last ticket date restriction, which

18   identifies the last date a fare can be sold, correct?

19   A.    That's correct.

20   Q.    The terms and conditions of JetBlue's fares that

21   are filed in ATPCO are visible to all the airlines that

22   use ATPCO, correct?

23   A.    For the fares that are filed publicly, yes.

24   Q.    And again, just to make sure the record is clear,

25   the terms and conditions of other airlines's fares that

1   are filed in ATPCO are also visible to JetBlue as well,

2   correct?

3   A.    If they have filed it publicly, then, yes.

4   Q.    As part of JetBlue's monitoring of ATPCO,

5   Mr. Clark, JetBlue will regularly create reports to

6   track, for example, fare changes by other airlines, is

7   that fair?

8   A.    Yes.

9   Q.    Okay, let's take a quick look at one of these

10  reports that JetBlue uses to monitor other airlines'

11  fare changes.  Would you please turn to the tab in your

12  binder marked 388, please.

13        And we can go ahead and publish this for the

14  gallery, it's an exhibit that's already in evidence.

15        (On screen.)

16  A.    (Turns.)

17  Q.    Mr. Clark, this is an e-mail exchange you were

18  involved in from March 2021 with other colleagues in

19  JetBlue's Revenue Management Organization, correct?

20  A.    Yes, that's correct.

21  Q.    At this time you are the Vice-President of Sales

22  and Revenue Management at JetBlue, right?

23  A.    Correct.

24  Q.    Okay.  Now I want to direct your attention, if we

25  could, to almost the very end of the exhibit.  It's on

1     the page with the Bates number ending in 568.

2     A.     (Turns.)

3     Q.     Towards the top of this page is a table with the

4     heading "$10 Increase Initiated by B6." Do you see

5     that?

6     A.     I do.

7     Q.     And as we discussed in court yesterday, B6 here

8     refers to JetBlue, correct, Mr. Clark?

9     A.     Yes, that's correct.

10     Q.     So this heading is indicating that JetBlue had

11     initiated a $10 price increase in multiple markets,

12     right?

13     A.     Um, yes, that's correct, in March of 2021.

14     Q.     So even though JetBlue sets fares on a

15     market-by-market basis, sometimes JetBlue will try to

16     increase prices across multiple markets at the same

17     time, right?

18     A.     If we're seeing a broad change in demand such as

19     the beginning of covid recovery, then, yes, you can do a

20     broad fare action.

21     Q.     And to be clear, Mr. Clark, this is not a

22     system-wide price increase that JetBlue is initiating

23     here, right?

24     A.     Um, it's under the heading -- at the top of this

25     page it says "INT/PR," which stands for

1   "International/Puerto Rico."  Reading this now my

2   interpretation is that we increase fares in many,

3   potentially all markets in international Puerto Rico.

4   There's no mention of domestic on this page.

5   Q.    Right.  So there are other markets where JetBlue

6   operates where it didn't increase prices, correct?

7   A.    That's certainly possible.  I can't tell from this

8   page.  But this does not cover our entire system.

9   Q.    Well the chart on the screen in front of you

10  indicates that JetBlue initiated this increase in 138

11  markets, right?

12  A.    Correct, but that could be the entirety of our

13  international Puerto Rico region, it's certainly not the

14  entirety of our whole system.  That's correct.

15  Q.    Thank you.  So this chart, Mr. Clark, shows, for

16  example, that United matched JetBlue's $10 price

17  increase in 15 markets, right?

18  A.    Correct.

19  Q.    And this chart is also indicating that Spirit

20  matched JetBlue's price increase in no markets, right?

21       THE COURT:  It would be helpful -- he can read

22  this, but I'm having trouble.  Where -- just point out

23  to me, sir, if you can describe it.

24       Where does it increase -- where does it tell you

25  that, um, United increased it in --

1          THE WITNESS:  In 15.

2          THE COURT:  -- in 15 markets?

3          THE WITNESS:  So there's a column about two-thirds

4    of the way over labeled "UA."

5          THE COURT:  Yes.

6          THE WITNESS:  Which stands for "United Airlines,"

7    that's the airline code.

8          THE COURT:  Oh, I see it.  And that's the -- the

9    chart's there?

10          THE WITNESS:  Correct, and the table.

11          THE COURT:  Yes.  Thank you.

12          THE WITNESS:  And the top row is the number of

13   overall markets.  So it appears they served 19 of the

14   routes where we increased the fare, and that they have

15   increased their fare in 15 of them for a 79 percent

16   ratio.

17          THE COURT:  Okay.

18   Q.    Now this table depicts "NK" as Spirit, correct,

19   Mr. Clark?

20   A.    Correct.

21   Q.    And it lists no overlap markets for Spirit and no

22   markets where there was a price increase, right?

23   A.    Um, it does, but I believe that's more of a data

24   issue than -- there actually are no overlap routes.

25   Q.    What's your understanding, Mr. Clark, of that data

1    issue?

2    A.    Um, in its -- it was mentioned a bit at the e-mail

3    at the beginning of this.  But in more recent years, um,

4    Spirit has not been making most of their fares public in

5    the -- in the ATPCO public tariff, so we've been meaning

6    to use other data sources to monitor Spirit fares.

7    Q.    Okay, let's actually go to --

8    A.    And likewise with Frontier as well, they're listed

9    with 0s on this chart.  And potentially other ULCCs as

10   well.

11   Q.    Okay, let's go actually to Page 3.  Yeah, let's go

12   to Page 3 of the exhibit, please.

13   A.    (Looks.)

14   Q.    This -- there's a table at the top of page with

15   text indicating a $10 fare increase initiated by

16   American Airlines.  Do you see that?

17   A.    I do.

18        THE COURT:  What's the Bates's code?

19        MR. THORNBURGH:  Your Honor, it's the page with

20   the Bates number ending in 553.

21        THE COURT:  Thank you.

22   Q.    Sorry, Mr. Clark, I apologize, I don't know if I

23   heard an answer to my question, so I'll just ask it

24   again to make sure we're on the same page.

25        So there's a table at the top of this page that

1    has text indicating a $10 fare increase initiated by

2    American Airlines, right?

3    A.    Correct.

4    Q.    Okay.  But as we discussed previously, it appears

5    this chart is actually tracking a JetBlue-initiated

6    price increase, correct?

7    A.    I -- I vaguely recall.  I believe during one of my

8    depositions we determined that the chart was mislabeled.

9    I don't remember that with clarity if it's this chart or

10   another one.

11   Q.    So -- well just to direct your attention to the

12   chart, right, it depicts JetBlue as matching a price

13   increase in 323 of its 323 markets, right?

14   A.    Yes.  Thank you.  Given the numbers in the chart,

15   it does appear that this was likely initiated by

16   JetBlue, and that there's a typo saying it was initiated

17   by American.

18   Q.    Okay.  And if we go to the right side of that

19   chart, Mr. Clark, the last column heading is F9, do you

20   see that?

21   A.    I do.

22   Q.    That is referring to Frontier Airlines, correct,

23   sir?

24   A.    Correct.

25   Q.    So it appears, in this report, that Frontier's

1    fare responses to JetBlue's price increase did show up

2    in JetBlue's reporting and monitoring of ATPCO, correct?

3    A.    Correct, at this time in March of 2021, it appears

4    that it does, yes.

5    Q.    Okay.  And "NK" here refers to Spirit, right?

6    A.    Correct.

7    Q.    And on this monitoring of the reporting it's

8    consistent with the last chart we looked at, Spirit's

9    fares are not showing up, correct?

10   A.    Correct, it's showing 0 overlap markets.  But I do

11   believe we competed on some routes.  So I think that's

12   the data, a lack-of-data issue.

13   Q.    Okay.

14        MR. THORNBURGH:  If we can go now back to the

15   front page of the exhibit, please.

16        (On screen.)

17   Q.    And focusing our attention on the e-mail that you

18   wrote first, Mr. Clark, on March 4th, 2021.

19        The first thing you wrote in your e-mail to other

20   colleagues at JetBlue is that you're seeing a very high

21   level of matching in domestic fare level and

22   international, correct?

23   A.    Correct, that's my first observation.

24   Q.    "Matching" here refers to other airlines matching

25   the fares that JetBlue was offering, correct?

```
 1    A.    That's correct.
 2    Q.    Okay.  And then, as we've been discussing, you
 3    actually asked your colleagues, in the third bullet down
 4    here, about why Spirit was listed as having 0 overlap
 5    markets, correct?
 6    A.    Correct.
 7    Q.    And as we've discussed today, it's because
 8    Spirit's lowest fares do not show up in JetBlue's
 9    monitoring of ATPCO, correct?
10    A.    Yes, the e-mail above this provides a little bit
11    more.  But it says their lowest fares are not public.
12    So they're mostly irrelevant in this chart.
13    Q.    Okay.  And for the record that's an e-mail that
14    your colleague, Mr. Weiner, sent to you, correct?
15    A.    Correct, in response to my question.  Yes.
16    Q.    Mr. Weiner works -- at this time worked for you in
17    the Revenue Management Organization, correct?
18    A.    Correct.
19          MR. THORNBURGH:  You can put that document aside,
20    Mr. Clark.
21    Q.    Mr. Clark, JetBlue sells the majority of its fares
22    through its website, JetBlue.com, correct?
23    A.    Correct.
24    Q.    But JetBlue has other channels through which it
25    sells tickets as well, right?
```

1   A.    Yes.

2   Q.    One of those other channels, it is referred to as

3  "Global Distribution Systems," correct?

4   A.    Yes, that's more of the piping to get to the

5  travel you see on the other side.  But we use GS

6  providers to then sell, so you can see a travel agent.

7   Q.    Global Distribution Systems are sort of

8  distributors for JetBlue to sell tickets to travel

9  agents, correct?

10   A.    They're sort of the "data plumbing" between the

11  airline and the travel agency.

12   Q.    JetBlue has contractual agreements with these

13  Global Distribution Systems or GDS providers, right?

14   A.    That's correct.

15   Q.    Those contractual agreements give those companies

16  access to the same fares that JetBlue sells through its

17  website, right?

18   A.    Yes.

19   Q.    And JetBlue only has a very limited ability to

20  sell cheaper fares through its website than it does

21  through GDSs or Global Distribution Systems providers,

22  correct?

23   A.    Correct, we can do it in some places, but it's

24  fairly limited at this time.

25   Q.    Okay.

1     MR. THORNBURGH:  I want to take a look at another

2  document now, if we could, and this is Exhibit 408, it's

3  already in evidence.

4     You can go ahead and please publish it for the

5  Court.

6     (On screen.)

7  A.    (Looks.)

8     MR. THORNBURGH:  Your Honor, this exhibit is a

9  series of text messages between Mr. Clark and a

10  colleague, they were produced to us, each text message,

11  separately on a different page.  For ease of the Court's

12  review of this exhibit, we created a demonstrative with

13  all the text messages on the same page.  And we request

14  now to publish that demonstrative for the Court's

15  benefit.

16     THE COURT:  Is this B?

17     THE CLERK:  Yes, B.

18     THE COURT:  All right, I have 408.  And the

19  demonstrative?

20     MR. THORNBURGH:  I believe the demonstrative, your

21  Honor, appears at the beginning of the tab marked 408.

22     (Pause.)

23     THE COURT:  There's no objection to that, that may

24  be done.

25     Go ahead.

Q.    Mr. Clark, this is a series of text messages that
you had with your colleague, Mr. Weiner, in March of
2020, right?

A.    Correct.

Q.    That's the same colleague that we saw on the prior
exhibit that you had an exchange with, right?

A.    Yes.

Q.    Mr. Weiner again at this time worked in Revenue
Management, right?

A.    Correct.

Q.    These text messages appeared to concern pricing
actions that you were contemplating taking at the time,
correct?

A.    Correct, this is as covid is greatly impacting
customer demand.  So demand was changing rapidly.

Q.    In the first message you suggest that JetBlue
should "lower its fares to even more aggressively match
the fares offered by ultra-low-cost carriers in some
markets," right?

A.    Yes, given the unique environment I'm proposing a
change from our normal strategy and to aggressively
match ULCC fares.

Q.    And Mr. Weiner responds to you a little bit later
that day, right?

A.    Yes, 30 minutes later.

1    Q.    Mr. Weiner referred to "JetBlue getting very
2    aggressive," which you understood him to mean that
3    JetBlue was lowering its fares to better match the fares
4    offered by Spirit and Frontier, correct?
5    A.    Correct, which is appropriate given the great
6    demand reduction happening at this time.
7    Q.    And when Mr. Weiner wrote that "Execution is
8    challenging due to private nature," you understood him
9    to be referring to the fact that because Spirit's fares
10   don't show up in ATPCO, it's harder for JetBlue to
11   monitor them, right?
12   A.    Correct, you have to use different data sources to
13   monitor them.
14   Q.    You'd agree with me that that makes it more
15   difficult for JetBlue to track Spirit's fares, right?
16   A.    Um, yes, more difficult, you have to use a
17   secondary source, not a primary.
18   Q.    I want to go down now to the message that you sent
19   at 2:20 that day.  Do you see that message, Mr. Clark?
20   A.    I do.
21   Q.    In that message you are instructing Mr. Weiner to
22   "only match American Airlines' moves in markets where
23   American had already taken fare-lowering actions,"
24   right?
25   A.    Um, that's correct.

1   Q.    And, I'm sorry, I think I -- I think I jumbled

2   that question so let me ask it a little more clearly.

3   You're instructing him to only match American Airlines'

4   fares in markets where American Airlines had already

5   taken a fare-lowering action, right?

6   A.    Um, the e-mail specifically mentions inventory,

7   um, which would mean not changing the fare, but changing

8   the amount of seats available at each fare.  So it's a

9   different method of selling lower fares without actually

10  lowering the fare themselves.

11  Q.    Okay, thank you for making that clear.  So you are

12  suggesting a change in inventory which has the effect of

13  making lower fares available to consumers, correct?

14  A.    Correct, it makes previously-existing lower fares

15  even more available, um, more seats available in those

16  lower-fare inventory buckets.

17  Q.    Okay, thank you.

18        Mr. Clark, when you referenced "game theory" in

19  your message here, you were pointing out to Mr. Weiner

20  that JetBlue had to consider how American was going to

21  interpret any action that JetBlue took, correct?

22  A.    Correct, we always want to think about how

23  competitors will respond to our actions or what sort of

24  next steps in the chain of events could be.

25  Q.    Right.  You were concerned that if JetBlue took

1   fare-lowering action in additional markets, American

2   would interpret that as JetBlue spreading lower fares to

3   other markets, right?

4   A.    Um, yes, or I'm theorizing it could be interpreted

5   as spreading, yes.

6   Q.    And you wanted to avoid American having that

7   interpretation, correct, Mr. Clark?

8   A.    They had a history at this time of being pretty

9   aggressive, so we wanted to think through it more

10  thoughtfully in that regard.

11  Q.    And when you say they had a history of being

12  pretty aggressive at this time, what you mean is they

13  had a history of lowering fares, right?

14  A.    They had a history of sometimes further lowering

15  fares.  So you reduce fares to one level and then they

16  reduce it much further or much wider, something like

17  that.  There have been some incidents in the time period

18  leading up to this.

19  Q.    And that's what you were trying to avoid happening

20  here, right?

21  A.    I'm mostly saying just keep in mind, you know,

22  think through what might happen and just think through

23  their past, um, you know, occurrences as we consider our

24  plan.

25  Q.    And when you referred to, in your prior answer,

1    that you were trying to avoid wider fare action, you

2    meant that American would take action in additional

3    JetBlue markets, correct?

4    A.    Well it doesn't say that specifically.  I think

5    I'm just reminding the team to sort of think through

6    additional steps and potential responses.

7    Q.    All right, I want to switch gears, Mr. Clark, and

8    talk a little bit now about the responsibility that you

9    have for JetBlue's network planning and strategy,

10   correct?

11   A.    Correct.

12   Q.    Mr. Clark, in the ordinary course of business

13   JetBlue creates 5-year-forward-looking network plans,

14   right?

15   A.    Um, we do.  They're high level.  And I think in

16   the last couple of years it's more like 3 years, given

17   the greater uncertainty around covid.  But, yes, in

18   general we have many times created 5-year look-forward

19   network plans.

20   Q.    And when you say they're "high level," Mr. Clark,

21   you're referring to the fact that JetBlue -- those

22   future-forward-looking network forecasts, typically have

23   plans at the focus city or JetBlue region level,

24   correct?

25   A.    Correct, that's where most of the focus would be,

1    at the city level.  Any future routes would be sort of

2    placeholders at best.

3    Q.    Okay.  JetBlue's future network forecast filling

4    out 5 years do not include a route-by-route forecast

5    going out that far into the future, correct?

6    A.    Correct.

7    Q.    And in the ordinary course JetBlue also does what

8    are called "Quarterly Network Reviews" or "QNRs,"

9    correct?

10   A.    Correct.

11   Q.    That involves giving JetBlue's senior leadership

12   an update on JetBlue's network typically four times a

13   year, correct?

14   A.    Yes.

15   Q.    And these Quarterly Network Reviews, one of the

16   things that might be covered are new routes that JetBlue

17   is considering adding to its network, correct?

18   A.    Correct.

19   Q.    And when JetBlue is contemplating adding new

20   routes to its network, it will consider a variety of

21   metrics to determine the most viable candidates for that

22   expansion, correct?

23   A.    Correct.

24   Q.    One of those metrics is profitability, right?

25   A.    Yes.

1    Q.    JetBlue does not make a habit of starting service

2    on new routes that it knows will be unprofitable, right?

3          MR. SHORES:  Objection, your Honor.

4          THE COURT:  Well I'm going to sustain that.  The

5    answer seems obvious.

6    A.    The --

7          THE COURT:  I'm sorry.  Contrary to what has been

8    happening, I sustained that.  You don't have to answer.

9          (Laughter.)

10   A.    Um, most often --

11         THE COURT:  You want to answer it even though you

12   don't have to?

13         (Laughter.)

14         THE WITNESS:  The question was incorrect, so I was

15   going to clarify.

16         THE COURT:  Well I think we'll let them ask the

17   question.

18         (Laughter.)

19         THE WITNESS:  Okay.

20   Q.    Another metric JetBlue will consider is

21   "operational feasibility," correct, Mr. Clark?

22   A.    Yes.

23   Q.    That means considering whether JetBlue can

24   reliably serve the route given JetBlue's current fleet

25   and existing network, correct?

1   A.    Correct.

2   Q.    As best you can recall, JetBlue has never started

3   offering nonstop service on a new route in which it was

4   not previously operating at either airport on the ends

5   of that route, correct?

6   A.    Um, correct, I cannot recall any new route that we

7   did not already operate at one of the two airports.

8   Q.    That would be unusual then, right, Mr. Clark?

9   A.    For JetBlue, yes.

10   Q.    One reason it would be unusual for JetBlue is

11   because when JetBlue starts offering service on a new

12   route, typically there's a ramp-up period associated

13   with offering that new service, correct?

14   A.    Correct, a ramp-up in customer awareness of our

15   superior product and on-board experience.

16   Q.    Another metric that JetBlue considers when adding

17   new routes is "strategic importance to JetBlue," right?

18   A.    Yes.

19   Q.    And that would involve, for example, considering

20   to what extent the new routes would help improve

21   JetBlue's relevance to its customers, right?

22   A.    Correct.

23   Q.    Now, Mr. Clark, we discussed yesterday that

24   JetBlue focuses its network on 6 focus cities, correct?

25   A.    Yes.

1   Q.    And 90-plus percent of JetBlue's network touches
2   one of those 6 focus cities, correct?
3   A.    Correct.
4   Q.    JetBlue offers flights from those focus cities to
5   other airports that are, for example, hubs for airlines
6   such as American, United, or Delta, correct?
7   A.    Correct.
8   Q.    As just one example, JetBlue serves Chicago O'Hare
9   today from both Boston and JFK, right?
10  A.    Correct.
11  Q.    O'Hare is a hub for American and United, right?
12  A.    Yes.
13  Q.    Now O'Hare is typically a below-average airport
14  for JetBlue in terms of financial performance, right?
15  A.    Um, yes, I think that's generally accurate.
16  Q.    JetBlue has had difficulty growing to more than 5
17  flights a day at O'Hare, right?
18  A.    Correct.
19  Q.    Similarly JetBlue serves George Bush
20  Intercontinental Airport in Houston, right?
21  A.    We do, yes.
22  Q.    That airport is a hub for United, right?
23  A.    Correct.
24  Q.    JetBlue faces some of the same challenges at
25  Intercontinental Airport as it does at Chicago O'Hare,

1    correct?

2    A.    Yes, although we have not aspired to grow these

3    airports larger than they are either.  It's not that

4    we've tried and failed.  We haven't tried much.

5    Q.    Going back to just O'Hare for a second, Mr. Clark.

6          JetBlue previously offered service from Chicago

7    O'Hare to Fort Lauderdale Airport, correct?

8    A.    Yes, that's correct.

9    Q.    And JetBlue cut that service in the last few

10   years, correct?

11   A.    We no longer serve them, that's correct.

12   Q.    Going back to George Bush Intercontinental Airport

13   then.

14         It's fair to say that JetBlue's profit margin at

15   that airport is likely negative today, right?

16         THE COURT:  Would you ask that again?  Forgive me.

17         MR. THORNBURGH:  Of course, your Honor.

18   Q.    So just going back to our discussion about George

19   Bush Intercontinental Airport in Houston, my question to

20   Mr. Clark was whether he would agree that JetBlue's

21   profit margin at that airport is likely negative today?

22   A.    Likely, but not certainly.

23   Q.    One of the primary reasons JetBlue's faced some

24   difficulties at both O'Hare and Houston Intercontinental

25   is because both airlines are hubs for other airlines,

1   right?

2   A.    Um, yes, that's one of the reasons.

3   Q.    Now, Mr. Clark, at both of those airports, O'Hare

4   and Houston Intercontinental, JetBlue is today primarily

5   serving the business customers, flying from those

6   airports to Boston, right?

7   A.    Um, no, I don't agree.

8   Q.    You don't agree with that?

9   A.    I don't agree that our primary customer from -- on

10   the Houston-to-Boston flight is a business customer who

11   lives in Houston.

12        THE COURT:  You added "who lives in Houston."

13        THE WITNESS:  That's how I interpreted the

14   question.

15        THE COURT:  Yeah, but if we take that out of it,

16   you still don't agree?

17        THE WITNESS:  The Boston to Houston route will

18   have a heavier mix of business customers than a normal

19   15 percent mix.  Um, yes, I do agree with that.

20   Q.    Okay.  And that is in contrast to Spirit,

21   Mr. Clark, which you understand to be almost entirely

22   serving the leisure customers at those airports,

23   correct?

24   A.    Correct, I think their leisure mix is higher than

25   ours at those airports.

1   Q.    Okay, let's go to a slightly different topic now,

2   Mr. Clark.

3          Prior to JetBlue's pursuit of Spirit in early

4   2022, JetBlue considered alternative growth scenarios as

5   a standalone airline, correct?

6   A.    That's correct.

7   Q.    And in fact you presented on those alternative

8   growth options to the Senior Leadership Team at JetBlue

9   shortly after taking on your current role as JetBlue's

10  Head of Revenue and Planning, correct, sir?

11  A.    Correct.

12  Q.    Okay.  And again, just to be clear, those

13  alternative growth scenarios contemplated JetBlue

14  growing as a standalone airline, correct?

15  A.    Correct.

16  Q.    Let's take a look at some of those growth

17  scenarios that you presented on.  If you could please

18  turn to the tab in your binder marked NX, please.

19  A.    (Turns.)  I'm there.

20  Q.    Mr. Clark, this is an e-mail that you received on

21  January 31st, 2022, right?

22  A.    Correct.

23  Q.    Attached to the e-mail is a presentation that you

24  gave on growth scenarios that we've been discussing,

25  right?

1    A.    Um, yes, it references the network presentation

2    slides which include growth scenarios.

3    Q.    And at this time, Mr. Clark, in 2022, Frontier and

4    Spirit had not yet announced their merger agreement,

5    correct?

6    A.    Um, I don't believe -- I believe that is correct.

7    I'm not 100 percent sure, but I believe that's correct.

8         MR. THORNBURGH:  Your Honor, plaintiffs request

9    that NX be moved in evidence as Exhibit 655.

10         THE COURT:  No objection?

11         MR. SHORES:  No objection.

12         THE COURT:  NX is admitted, Exhibit 655.

13         (Exhibit 655, marked.)

14         MR. THORNBURGH:  Your Honor, this exhibit has been

15    redacted at the request of counsel for defendants.  But

16    just to somewhat anticipate your question yesterday, we

17    do think that the material underlying those redactions

18    is relevant to your Honor's decision, but we've redacted

19    it at the request of defense counsel at this time.

20         THE COURT:  Well how am I going to get that

21    material if you think it's so important?

22         MR. THORNBURGH:  The material is in your binder in

23    front of you, your Honor, so you'll be able to see the

24    pages without the redactions.  And we're happy to

25    explain to the Court in briefing if the Court --

1          THE COURT:  No, no, so long as I have it now.

2          MR. THORNBURGH:  Yes.

3          THE COURT:  All right, that's fine.

4          MR. THORNBURGH:  Thank you, your Honor.

5          Could we publish this document and exhibit for the

6    gallery?

7          THE COURT:  Well --

8          MR. THORNBURGH:  The redacted version of the

9    document, your Honor, I'll just put it on the screen.

10         THE COURT:  You may.

11         MR. THORNBURGH:  Okay.  Thank you.

12         (On screen.)

13   Q.    Okay.  Mr. Clark, I want to direct your attention

14   to Page 14 of this exhibit.  It has a Bates number

15   ending in 976.

16   A.    (Turns.)  Yes.

17   Q.    Mr. Clark, you are listed as a presenter for two

18   of these network presentations here, right?

19   A.    That's correct.

20   Q.    And that's consistent with your recollection that

21   you presented on these topics?

22   A.    Yes.

23         MR. THORNBURGH:  Could we go to Page 30 of the

24   exhibit now, please.

25         And, your Honor, that page has a Bates number, um,

 1   ending in 992, I believe.

 2          THE COURT:  Thank you.

 3          MR. THORNBURGH:  I apologize.  I'd like to go back

 4   for a moment, your Honor.  I apologize.

 5          Can we please stop on the page ending in 982,

 6   please.

 7          (On screen.)

 8          MR. THORNBURGH:  The page ending in 982 has a

 9   heading reading "The decade of consolidation has led to

10   the decade of expansion."

11          THE COURT:  I have it.

12          MR. THORNBURGH:  You have it.  Great.

13          (On screen.)

14   Q.    So, Mr. Clark, this slide is indicating that

15   Spirit at this time was set to become larger than

16   JetBlue beginning in 2025, right?

17   A.    Correct, and that's a concern, because scale's

18   important in this industry.

19   Q.    And the question asked at the bottom of the slide

20   is "Should JetBlue increase its current growth

21   trajectory?"  Right?

22   A.    Correct, that's the question at the bottom.

23   Q.    Okay.

24          MR. THORNBURGH:  Now we can go to Page 30, your

25   Honor, and I apologize for the detour.

1          THE COURT:  All right.  Which is 992?

2          MR. THORNBURGH:  Yes, your Honor.

3          (On screen.)

4    Q.    Mr. Clark, this slide is summarizing the four

5    growth scenarios that JetBlue was contemplating at this

6    time, right?

7    A.    Correct.

8    Q.    The first growth scenario listed on this page is

9    JetBlue's 5-year plan that was in existence at that

10   time, right?

11   A.    Correct.

12   Q.    The second growth scenario here lists -- that

13   contemplates "10 additional mint aircrafts" that JetBlue

14   would have acquired as part of that growth plan, right?

15   A.    Yes.

16   Q.    And, um, then there's a third growth plan listed

17   there that is titled "Industry plus 4.2 points."  Do you

18   see that?

19   A.    I do.

20   Q.    Do you have an understanding of what that refers

21   to?

22   A.    It's a scenario where our growth rates would be

23   4.2 faster -- 4.2 points faster than the industry growth

24   rate, which is the growth rate we had had for most of

25   the decade leading up to covid.

1   Q.    Thank you.  The last growth plan listed there, um,

2   do you have an understanding of what that growth plan

3   refers to?

4   A.    I believe it's the growth needed to remain larger

5   than Spirit plus Frontier's, um, combined size.

6   Q.    But again as we discussed earlier, at this time

7   Spirit and Frontier had not yet announced the merger

8   agreement, right?

9   A.    I believe that's correct.

10  Q.    Now the following information I would ask about is

11  redacted, Mr. Clark, so I'm not going to ask you for

12  specific figure information, but I just want to give a

13  kind of big -- give a big picture idea of what's going

14  on here for the record.

15        Each of the growth plans, going from the top of

16  the chart, starting a 5-year plan, to the bottom, would

17  require additional -- would require JetBlue to obtain

18  additional aircraft, is that right?

19  A.    So the first year of the 5-year plan was with our

20  existing fleet plan, and then the three scenarios below

21  that would require additional aircraft beyond our fleet

22  plan at that time.

23  Q.    Okay.  Now, Mr. Clark, after you presented these

24  growth plans, there was some discussion among the

25  JetBlue Senior Leadership Team about the two more

1    aggressive growth plans, the ones listed at the bottom

2    of this chart, being "infeasible," correct?

3    A.    So from a strategic perspective we like them

4    because scale is very important in this industry, but

5    from an aircraft availability perspective they were

6    largely judged infeasible given the shortages of

7    aircraft available from the manufacturers.

8    Q.    Well, Mr. Clark, it wasn't just that there was a

9    question about the availability of aircraft, you would

10   agree with me that part of the reason those were deemed

11   infeasible is because of the capital expenditures that

12   would be required to obtain those additional aircraft,

13   right?

14   A.    Um, I believe that was a consideration as well.

15   It's not my area of expertise.  But, yes, I do recall

16   the conversation.  There's a lot of Cap X associated.

17   Q.    Those more aggressive growth plans would require

18   JetBlue to spend a lot of cash, right?

19   A.    Correct, on plans that may or may not even be

20   available given the long lead times from the

21   manufacturers.

22   Q.    And at this point in early 2022, your recollection

23   was that JetBlue had been hemorrhaging money for 2

24   years, correct?

25   A.    It was during covid, it was a very difficult time.

1   Q.    But you would agree with me that JetBlue had been

2   hemorrhaging money for 2 years, right?

3   A.    We've been -- we've reported financial losses for

4   the 2 years leading up to this, yes.

5   Q.    And JetBlue went on to lose money for the full

6   year of 2022, correct, sir?

7   A.    Correct.

8   Q.    Now, Mr. Clark, the three more aggressive growth

9   plans listed on this chart would have involved JetBlue

10  growing as an independent airline, right?

11  A.    Correct, these were scenarios for independent

12  growth.

13  Q.    And then a few months later in March of 2022,

14  JetBlue made an initial offer to acquire Spirit, right?

15  A.    Um, yes, I don't recall the exact timeline, but

16  that aligns with my general recollection.

17  Q.    And JetBlue ultimately had to spend $3.8 billion

18  in cash to acquire Spirit, right?

19  A.    I believe that was the agreed-upon price, yes.

20  Q.    But unlike these growth plans that we've been

21  discussing, the acquisition of Spirit would eliminate

22  Spirit as an independent competitor, right?

23  A.    Sure.

24        MR. THORNBURGH:  Put that document aside.

25  Q.    Mr. Clark, one of the responsibilities you had in

1    connection with JetBlue's bid for Spirit was to oversee

2    the estimate of "revenue synergies," right?

3    A.    Correct, I provided a high-level, um, review of

4    those.

5    Q.    The actual revenue synergies calculations was led

6    by Eric Friedman, right?

7    A.    Correct.

8    Q.    Mr. Friedman reported to you, correct, sir?

9    A.    Correct.  And I should note that Mr. Friedman led

10   the revenue synergies that were related to the network.

11   Or the overall synergies was led by the strategy team,

12   including some other revenue synergies not related to

13   the network.

14   Q.    Thank you for that clarification.

15        So there were certain categories of revenue

16   synergies that you had ownership of and there were other

17   categories of revenue synergies that were outside of

18   your purview, is that fair?

19   A.    That's correct.

20   Q.    Okay.  And I think as the Court has heard

21   previously, these revenue synergies represented

22   additional money or revenue that JetBlue expected to

23   earn as a result of its acquisition of Spirit as

24   compared to the revenue that the two airlines could earn

25   themselves today as independent companies, right?

1    A.    Correct.

2    Q.    Mr. Clark, in June of 2022, you presented to the

3    JetBlue board of directors the estimates of revenue

4    synergies that you were responsible for, correct?

5    A.    Correct.

6    Q.    Let's take a look at a few of these synergies in

7    more detail.

8         If you could please turn to the tab in your binder

9    marked NE, please.

10   A.    (Turns.)

11   Q.    Mr. Clark, this document described the categories

12   of revenue synergies that you had responsibility for

13   overseeing, correct?

14   A.    Yes, that's correct.

15   Q.    Okay.  And this document contains notes on those

16   revenue synergies, right?

17   A.    Um, yes.

18         MR. THORNBURGH:  Your Honor, plaintiffs ask that

19   NE be moved in evidence as 656.

20         THE COURT:  No objection?

21         MR. SHORES:  No objection.

22         THE COURT:  NE is admitted, 656.

23         (Exhibit 656, marked.)

24   Q.    Mr. Clark --

25         MR. THORNBURGH:  Let's please publish it to the

1   gallery.

2   Q.    Mr. Clark, this exhibit contains notes of four

3   categories of revenue synergies that you have

4   responsibility for, right?

5   A.    Yes.

6   Q.    Okay, let's start on the bottom half of the first

7   page.  There's a synergy there entitled "Network

8   Optimization," right?

9   A.    Yes.

10   Q.    The idea behind this synergy category was that

11   JetBlue would be able to earn additional revenue by

12   redeploying Spirit aircraft from underperforming routes

13   to other routes where presumably they would make more

14   money for the combined airline, right?

15   A.    Yes, but every airline does that on their own on a

16   continuous basis, so it's the value to me from having

17   the larger network to redeploy into.

18   Q.    Okay, I appreciate that answer.  I want to, and

19   just for a moment, I'm stepping back from this document.

20         One of the other responsibilities that you had,

21   Mr. Clark, in connection with an acquisition of Spirit,

22   was overseeing the creation of a network plan for the

23   combined airline, right?

24   A.    Correct.

25   Q.    That is referred to, by many people, as the

1    "Combined Network Plan," right?

2    A.    Yes.

3    Q.    Now, Mr. Clark, that Combined Network Plan has

4    routes and frequencies for every year going out to 2027,

5    right?

6    A.    Correct.

7    Q.    The Combined Network Plan was created earlier this

8    year in 2023, right?

9    A.    Correct, early this year.  Yes.

10   Q.    So it was at least 6 or more months after these

11   revenue synergies that you presented to the JetBlue

12   board of directors, right?

13   A.    Correct.

14   Q.    Now, Mr. Clark, the Combined Network Plan assumes

15   that after the acquisition is complete, JetBlue will

16   continue flying all of the routes that each of JetBlue

17   and Spirit fly today, right?

18   A.    Um, correct, that's a base assumption.

19   Q.    So another way of saying this is that the Combined

20   Network Plan assumes no redeployment of JetBlue or

21   Spirit aircraft, right?

22   A.    No, it, um -- airlines, as I've said, are

23   continuously redeploying aircraft.  Spirit, you know

24   over the past months, has been canceling and redeploying

25   aircraft.  So we decided not to try to guess ahead of

1   time which routes they might cancel or pull their

2   frequency on and which routes we might.  So as a

3   simplifying assumption and since it's going to impact

4   the results of the analysis, we just kept all the routes

5   in rather than guessing which ones they or we might pull

6   for a higher performance in the future.

7   Q.    Right, so it assumes no redeployment, correct,

8   under the plan?

9        MR. SHORES:  Objection, it mischaracterizes his

10  testimony.

11       THE COURT:  Actually it does.  I didn't hear him

12  say that.

13  Q.    I'm just trying to understand.  The Combined

14  Network Plan -- let me ask it in a slightly different

15  way, assumes that JetBlue and Spirit will continue

16  operating all the routes the two airlines operate today,

17  right?

18       MR. SHORES:  Objection, asked and answered.

19       THE COURT:  It is, and he properly stated that.

20  That's his assumption.  But what planes fly on those

21  routes, the frequency, and I'm interpolating here, but

22  that's the inference, that they can effectively disperse

23  their combined fleet over the network that the two fly

24  today.

25       Have I got that right?

1        THE WITNESS:  Yes.

2   Q.    Mr. Clark, this network optimization synergy,

3   focusing on the page in front of you, what's

4   contemplated by that synergy is redeploying aircraft

5   from some Spirit routes to other routes, is that right?

6        MR. SHORES:  Objection, asked and answered.

7        THE COURT:  Oh, no, that's a different question.

8   Overruled.  And you may answer it.

9   A.    The network optimization synergy looks at -- so as

10  I mentioned, all airlines continuously remove

11  frequencies, remove routes, and redeploy them in other

12  places they think will be more productive.  This synergy

13  gives additional revenue for the fact that not only can

14  it be deployed onto just Spirit's network, but they can

15  now be deployed onto the JetBlue and Spirit combined

16  network, which is twice as large, and that should lead

17  to bigger benefits because you have more areas of

18  opportunity to redeploy those aircraft to.

19  Q.    Consistent with your testimony just now,

20  Mr. Clark, you would expect that after the transaction

21  closes, if it were to close, JetBlue would, as a

22  combined airline, redeploy some planes from

23  underperforming routes to better-performing routes,

24  correct?

25  A.    We do that on a continuous basis as to Spirit.

1    So, yes.

2    Q.    Let's go back to the document and I want to direct

3    your attention to the top of the first page if we could.

4    There's a bullet there that reads "Customer Service

5    Premium."

6          Do you see that?

7    A.    I do.

8    Q.    That's another one of the revenue categories that

9    you had ownership of, right?

10   A.    Correct.

11   Q.    Now this synergy refers to additional revenue that

12   JetBlue estimated it could obtain by converting Spirit

13   aircraft to JetBlue aircraft, right?

14   A.    Correct, from their configuration and their

15   customer offering to our on-board configuration and our

16   customer offering.

17   Q.    And one of the differences between the Spirit

18   customer offering and the JetBlue customer offering is

19   that Spirit planes have more seats on their planes today

20   than JetBlue planes, right?

21   A.    Yes, they're very tightly packed without a lot of

22   leg room.

23   Q.    And so in order to convert from the Spirit

24   customer experience to the JetBlue customer experience

25   approximately 20 seats would come off of every Spirit

1    aircraft, right?

2    A.    The number varies.  That sounds a little high.

3    But we have more leg room for each seat, which leads to

4    fewer seats on board.

5    Q.    And so the idea here, Mr. Clark, is that, as

6    indicated on the slide -- on the page in front of you,

7    is that JetBlue assumed customers would see the value of

8    the better, quote, "JetBlue product" and would be glad

9    to adjust by 24 percent, right?

10   A.    Yes, that's how the slide references it, that the

11   customers will see the value and the superior product

12   and we will generate more revenue per seat due to that.

13   Q.    And the "glad to adjust" language here refers to

14   JetBlue's belief that customers would be willing to pay

15   24 percent more to fly on JetBlue than they do on Spirit

16   today, correct?

17   A.    We know many customers would happily do this.  We

18   constantly have customers asking us to fly on Spirit

19   routes so they have more options than just Spirit to fly

20   on.

21        (Pause.)

22        MR. THORNBURGH:  Put that document aside,

23   Mr. Clark.

24   Q.    You said in your answers a few minutes ago that

25   you know customers will be willing to pay more for

1    JetBlue than for Spirit, is that an accurate

2    characterization of your testimony?

3    A.    We have many customers who request that we start

4    flying its routes saying they would much rather have a

5    JetBlue offering at a JetBlue price.  They want more

6    options than Spirit.  We get those requests regularly.

7    Q.    To be clear though, Mr. Clark, JetBlue has not

8    undertaken any sort of quantitative analysis to better

9    understand how many customers would be willing to pay

10   more for the JetBlue products as compared to the Spirit

11   products, is that fair?

12   A.    I believe that's correct.

13   Q.    Okay.  I just want to look fairly quickly here at

14   a few prior statements you've made regarding how much

15   customers value the JetBlue product compared to the

16   Spirit product.

17        If you could please turn in your binder to the tab

18   marked LQ, please.

19   A.    (Turns.)

20   Q.    Mr. Clark, this is an e-mail you wrote in August

21   2020 to other colleagues in connection with an upcoming

22   JetBlue Senior Leadership Meeting, right?

23   A.    Um, yes, that's correct.

24   Q.    Okay.

25        MR. THORNBURGH:  Your Honor, plaintiffs request

1    that LQ be admitted in evidence as Exhibit 657.

2         THE COURT:  No objection to LQ?

3         MR. SHORES:  No objection, your Honor.

4         THE COURT:  LQ is admitted, Exhibit 657.

5         (Exhibit 657, marked.)

6    Q.    Mr. Clark, the subject of this e-mail that you

7    wrote is "Customer Product and Pricing Innovation."  I

8    should say it's partially the subject, correct?

9    A.    That's correct.

10   Q.    Okay, let's take a look at the e-mail that you

11   wrote.

12         In your e-mail here you're sharing some thoughts

13   about JetBlue's competitive strategy going forward,

14   right?

15   A.    Um, I'm sharing thoughts at this time and during

16   the height of covid, yes.

17   Q.    You offer, in the third paragraph here, a "major

18   hypothesis," right?

19   A.    Correct, I interpret that to be my main

20   hypothesis, yes.

21   Q.    And as you indicate here, JetBlue had an extremely

22   difficult time charging price-sensitive customers more

23   for the JetBlue product as compared to either the Spirit

24   or United Basic Economy product, right?

25   A.    At that time that's how I felt.

1   Q.    So as a result of that, this forced JetBlue to do

2   things like match Spirit pricing, correct?

3   A.    At that time we needed to, yes.

4   Q.    And because JetBlue couldn't reliably price above

5   Spirit, you suggest in the next paragraph that JetBlue

6   should "strip down Blue Basic to make it as close as

7   possible to the Spirit unbundled fare and the United

8   Basic Economy," right?

9   A.    That's what I say there.  I think I've been proven

10  wrong over the past 3 years on this, however.

11  Q.    Mr. Clark, at this time do you have a sense of how

12  many of JetBlue's customers were purchasing Blue Basic?

13  A.    Yes, at this time it was, um, roughly two-thirds

14  of our customers, um, and that number has come way down,

15  now only roughly a third as customer awareness of the

16  different choices has become more prevalent.

17  Q.    Still more than 30 percent, I think was your

18  testimony yesterday, correct, sir?

19  A.    Roughly a third, yes.

20  Q.    The bottom of this first page you suggest that

21  "JetBlue consider removing unlimited free WIFI from its

22  Blue Basic product," right?

23  A.    I'm sort of speculating in this e-mail.  We had

24  discussions and I fully agree that that wasn't the right

25  course.  But at this time I'm stating that as an option

1    to debate and consider.

2    Q.    If JetBlue had done that, it would have -- it

3    would have stripped down Blue Basic even more, correct?

4    A.    Um, correct, and undermined one of the main sort

5    of brand promises of JetBlue.

6    Q.    Let me direct you now to Page 2 of this e-mail

7    that you wrote.

8          You reference, in the paragraph below the bulleted

9    material, the threat that JetBlue was facing from

10   Spirit, right?

11   A.    (Reads.)  Again this is how I'm feeling at the

12   time, at the height of covid three years ago.

13   Q.    And at this time your proposed solution was "to

14   match Spirit very aggressively on price," right?

15   A.    At the time that's how I was feeling.

16   Q.    Okay.

17         MR. THORNBURGH:  Would you put that document

18   aside, Mr. Clark.  There's just one more thing I wanted

19   to do with you at this time.

20         If you would please turn in your binder to the tab

21   marked GB, please.

22   A.    (Turns.)

23   Q.    Mr. Clark, this is an e-mail that you wrote on

24   January 3rd, 2022, right?

25   A.    Correct.

1    Q.    And this is just a few months before JetBlue

2    started pursuing an acquisition of Spirit, correct?

3    A.    It was the same year, yes.

4    Q.    The e-mail was in reference to a strategy review

5    that JetBlue was undertaking at the time, right?

6    A.    Um, that's the subject of this e-mail exchange,

7    yes.

8    Q.    Okay.

9         MR. THORNBURGH:  Your Honor, plaintiffs ask that

10   GB be moved in evidence as Exhibit 658.

11        MR. SHORES:  No objection.

12        THE COURT:  GB is admitted, Exhibit 658.

13        (Exhibit 658, marked.)

14        MR. THORNBURGH:  Thank you, your Honor.

15   Q.    Mr. Clark, in the first paragraph of your e-mail

16   you are expressing concern that "only a minority of

17   customers may actually be willing to pay even just a bit

18   more for JetBlue's product offering," correct?

19   A.    That was my fear at the time.  I think the data

20   has proven that since.

21   Q.    And you're referring in your e-mail here to both

22   JetBlue customers and customers as a whole, right?

23   A.    Correct.

24   Q.    And then in the second paragraph, you identify

25   some characteristic of customers who may not be willing

1    to pay just a bit more for JetBlue's product offering,
2    right?
3    A.    Correct.
4    Q.    And one of the characteristics that you identify
5    is customers who purchase a Basic Economy or a Blue
6    Basic product, right?
7    A.    I do, and I note that at that time about half the
8    purchasing of Basic Economy, we discussed that that
9    number was reduced quite a bit over the past year and a
10   half or two years.
11   Q.    So, Mr. Clark, as we looked at it a few minutes
12   ago, as a result of this acquisition, Spirit customers
13   would have to pay more -- Spirit customers who fly on
14   Spirit today would have to pay more to fly on JetBlue
15   after the acquisition is complete, right?
16        MR. SHORES:  Objection, mischaracterizes the
17   testimony.
18        THE COURT:  He may be allowed to ask the question.
19   We'll see what the witness says.
20   A.    Not necessarily.
21   Q.    You would agree with me that some customers would
22   likely have to pay more to fly on JetBlue after the
23   acquisition is complete as compared to flying on Spirit
24   today, right, Mr. Clark?
25   A.    Some customers, in exchange for a superior

1    product, may end up paying more, yes.

2    Q.    But some of those customers may not be willing to

3    pay even a bit more, as demonstrated in your e-mail in

4    front of you, correct, Mr. Clark?

5         MR. SHORES:  Objection, your Honor.

6         THE COURT:  Overruled.

7    A.    Um, there's lots of ULCCs in this market.  We've

8    made divestitures.  So if there's a market for a ULCC

9    product, I'm confident that one will be there to serve

10   those customers.

11   Q.    What about markets where there isn't another

12   ultra-low-cost carrier, Mr. Clark?

13   A.    There's very low barriers to entry.  And where

14   there are any of these, we've made divestitures to

15   eliminate them.

16   Q.    And if another ultra-low-cost carrier doesn't

17   enter that market?

18   A.    Then there must not be much demand for an ultra-

19   low-cost product in that market.

20        MR. THORNBURGH:  I have no further questions for

21   Mr. Clark at this time, your Honor.

22        THE COURT:  In view of the hour, it's close to the

23   recess, do you want to inquire of this witness now or

24   reserve?

25        MR. SHORES:  I'm happy to start now or we can take

1   a break, your Honor.

2          THE COURT:  Not my question.

3          Yes, the break is in my mind, and if you're going

4   to ask questions, we'll take a break.  I was being more

5   procedurally concerned.

6          Do you want to inquire -- he's called as an

7   adverse witness, that invokes certain rules.  Do you

8   want to inquire as part of their case in chief or

9   reserve, because you have the right to call him as part

10  of your case?

11         What about that question?

12         MR. SHORES:  I would like to inquire of him now,

13  your Honor.  I misinterpreted your question.  I'm sorry,

14  your Honor.

15         THE COURT:  No, "now" can be at 10 minutes after

16  11:00.

17         MR. SHORES:  That's all right.

18         (Laughter.)

19         THE COURT:  We'll take a recess until then.  We'll

20  recess.

21         (Recess, 10:40 a.m.)

22

23

24

25

```
 1              C E R T I F I C A T E

 2

 3

 4         I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER,

 5    do hereby certify that the foregoing record is a true

 6    and accurate transcription of my stenographic notes

 7    before Judge William G. Young, on Thursday, November 2,

 8    2023, to the best of my skill and ability.

 9

10

11    /s/ Richard H. Romanow 11-02-23
      _____
12    RICHARD H. ROMANOW   Date

13

14

15

16

17

18

19

20

21

22

23

24

25
```