```
                 UNITED STATES DISTRICT COURT
                DISTRICT OF MASSACHUSETTS (Boston)

                                   No. 1:23-cv-10511-WGY
                                   Vol. 2, Pages 88-176


UNITED STATES OF AMERICA, et al
            Plaintiffs

vs.


JETBLUE AIRWAYS CORPORATION,
et al,
            Defendants



                      ********


                  For Bench Trial Before:
                  Judge William G. Young




                     United States District Court
                     District of Massachusetts (Boston)
                     One Courthouse Way
                     Boston, Massachusetts 02110
                     Thursday, November 2, 2023



                      ********



         REPORTER:  CHERYL B. PALANCHIAN, RMR, CRR
                  Official Court Reporter
                United States District Court
              One Courthouse Way, Boston, MA 02110
```

```
                    A P P E A R A N C E S


EDWARD WILLIAM DUFFY, ESQ.
ARIANNA MARKEL, ESQ.
AARON TEITELBAUM, ESQ.
        DOJ-Atr
        450 Fifth Street NW, Suite 8000
        Washington, DC 20530
        (202)812-4723
        Email:  Edward.duffy@usdoj.gov
        For Plaintiff United States of America
- and -
WILLIAM T. MATLACK, ESQ.
        Attorney General's Office
        One Ashburton Place, 18th Floor
        Boston, MA 02108
        (617)727-2200
        Email:  William.matlack@mass.gov
        For Plaintiffs United States of America and The
        Commonwealth of Massachusetts



RYAN SHORES, ESQ.
        Cleary Gottlieb Steen & Hamilton LLP
        2112 Pennsylvania Avenue, NW
        Washington, DC 20037
        (202)974-1876
        Email:  Rshores@cgsh.com
- and -
ELIZABETH M. WRIGHT, ESQ.
        Cooley LLP
        500 Boylston Street
        Boston, MA 02116-3736
        (617)937-2349
        Email:  Ewright@cooley.com
- and -
RACHEL MOSSMAN ZIEMINSKI, ESQ.
MICHAEL MITCHELL, ESQ.
        Shearman & Sterling LLP
        2601 Olive Street, 17th Floor
        Dallas, TX 75201
        (214)271-5777
        Email:  Rachel.zieminski@shearman.com
        For Defendant JetBlue Airways Corporation


(Continued.)
```

(Continued.)


JAY COHEN, ESQ.
ANDREW C. FINCH, ESQ.
        Paul, Weiss, Rifkind, Wharton & Garrison
        1285 Avenue of the Americas
        New York, NY 10019-6064
        (212)373-3000
        Email:  Jaycohen@paulweiss.com
        For Defendant Spirt Airlines, Inc.

I N D E X

WITNESS:                DIRECT    CROSS    REDIRECT    RECROSS

DAVID C. CLARK, CONTINUED

  By Mr. Shores                    92

  By Mr. Thornburgh                           164

EXHIBITS                                    PAGE

   659 . . . . . . . . . . . . . .97

   660 . . . . . . . . . . . . . 102

   661 . . . . . . . . . . . . . 105

   662 . . . . . . . . . . . . . 105

   663 . . . . . . . . . . . . . 108

   664 . . . . . . . . . . . . . 110

   665 . . . . . . . . . . . . . 112

   666 . . . . . . . . . . . . . 113

   667 . . . . . . . . . . . . . 142

   668 . . . . . . . . . . . . . 153

```
 1            THE COURT:  Please be seated.  Court is in
 2  session.  Mr. Shores, you may proceed.
 3            MR. SHORES:  Thank you, your Honor.
 4                  DAVID C. CLARK, (Resumed)
 5                    CROSS-EXAMINATION
 6  BY MR. SHORES:
 7  Q.   Good morning, Mr. Clark.
 8  A.   Good morning.
 9  Q.   Mr. Clark, I wanted to ask you a couple more questions
10  about your background.  Could you please tell us when you
11  started working at JetBlue?
12  A.   I started as a crew member in 2009, but had worked as a
13  consultant in 2008.
14  Q.   And, Mr. Clark, you just used the word "crew member."
15  Can you explain to us what that means?
16  A.   Sure.  That's JetBlue's term for employee.  We're all
17  crew members at JetBlue.
18  Q.   And since 2009 can you provide some brief description
19  of the roles you've played at JetBlue?
20  A.   Sure.  I've had -- I started on the network planning
21  team.  I was first the director of route planning, then the
22  director of schedule planning, then vice president of
23  network planning, then vice president of sales and revenue
24  management.  Now my current role is head of revenue and
25  planning.
```

1    Q.    Okay.  And can you remind us, Mr. Clark, what are your

2    responsibilities as head of revenue and planning?

3    A.    There's four main responsibilities:  Network planning,

4    sales and revenue management, airline partnerships, and

5    then, lastly, we call it enterprise planning but it's an

6    operations planning function.

7    Q.    Thank you, Mr. Clark.  I want to start with your

8    responsibilities related to network planning?  And at a high

9    level, Mr. Clark, what is a network plan?

10   A.    The network plan is where we're going to fly the

11   airplanes.  So from, you know, what are our big focus cities

12   where we're going to concentrate most of our resources, down

13   to the individual routes, and then even beyond that, down to

14   how many times a day you fly and what time of day.

15   Q.    And as part of your network planning responsibilities

16   do you analyze who your competitors are within JetBlue's

17   network?

18   A.    Yes, absolutely.  It's a big component of the network

19   plan and strategy.

20   Q.    And do you use any data sources to do that analysis,

21   Mr. Clark?

22   A.    We do.  There's a few data sources we use.

23   Q.    And can you explain what those are?

24   A.    Sure.  So one of them is the publicly available

25   schedules that each airline publishes.  So you can see what

1  routes they fly, how many flights a day.  Another big one is

2  from the Department of Transportation, the DB1B database

3  which shows, for U.S. carriers, the amount of revenue and

4  number of customers they have on each origin and destination

5  pair.

6  Q.  Okay.  And are you personally familiar with the

7  schedule data?

8  A.  Yes, I am.

9  Q.  Does your team use the schedule data, your network

10  planning team?

11  A.  Yes, regularly.

12  Q.  Are you personally familiar with the DB1B data?

13  A.  Yes, I am.

14  Q.  And does your team use this data in its ordinary

15  course?

16  A.  Yes, they do.

17  Q.  Okay.  Mr. Clark, I'd like you to turn, in your binder,

18  to what should be the first tab.  It says 1006, A through H.

19  A.  I'm there.

20  Q.  I'm going to ask you to look at what has been

21  identified as Clark 1006 Summary A.  Do you see that?

22          (On screen.)

23  A.  I do.

24  Q.  And at a very high level, Mr. Clark, can you just

25  describe to us what this represents?

1   A.   This shows the market share, measured in a few

2   different ways, of the domestic U.S. airlines on the city

3   pairs that JetBlue flies.  So for our network, for the city

4   pairs that we cover, who else is flying them and what share

5   do each of us have.

6   Q.   And, again, when it says, "All of JetBlue network," can

7   you just explain what that means?

8   A.   Sure.  So the time period of this analysis is

9   the second quarter of 2022 to the first quarter of 2023,

10   which shows the most recent time available for some of these

11   data points.  And it looks like at every city pair JetBlue

12   flew during that time.

13        So a city pair is, for example, New York to Orlando.

14   We may fly LaGuardia airport to Orlando, but it would

15   include the entire New York city pair, all three main

16   airports.  It does that for each of our routes.  It looks at

17   the city pair and who else serves them.  And this is the

18   overall landscape of market share.

19   Q.   And did you oversee the preparation of this document,

20   Mr. Clark?

21   A.   I did.  I directed the team to create it and also

22   reviewed it myself.

23   Q.   And when you say you reviewed it yourself, what are you

24   referring to?

25   A.   I looked at not only the chart that came back, but the

 1    spreadsheet data that populates the chart and was the output

 2    of analysis, and included the queries that were run to get

 3    the data.

 4    Q.    Okay.  And, Mr. Clark, can you just briefly describe

 5    how the revenue shares were calculated on this chart?

 6    A.    Sure.  So for each city pair during this time period,

 7    using the DB1B database, it can show the revenue share.  And

 8    in this case, this data source is the Department of

 9    Transportation, uses the ticket fare.  So it includes the

10    base fair, but not all the ancillaries.  It doesn't include

11    if they paid more for a seat or checked a bag.  But the

12    revenue data on this is the ticket data, the ticket revenue.

13    Q.    Okay.  In the ordinary course of your business,

14    Mr. Clark, do you use the data that you just described?

15    A.    Yes, we do.

16    Q.    Okay.  And can you explain to us how the seat shares

17    are calculated?

18    A.    Sure.  The seat share looks at nonstop flights between

19    the city pairs and uses that.  So it's from the schedule --

20    the publicly available schedule data notes the number of

21    seats that each of these airlines produced during this time

22    period in these city pairs that JetBlue also serves.

23    Q.    And what about the passenger shares, Mr. Clark?

24    A.    Passenger share is also from the DB1B database, and it

25    counts the number of customers in these city pairs that was

```
 1   carried by JetBlue or these various domestic competitors.
 2   Q.   Okay.  And, Mr. Clark, does this Clark 1006 Summary A
 3   accurately reflect the revenue passenger and seat shares for
 4   the time frame you just mentioned?
 5   A.   To my belief it does, yes.
 6            MR. SHORES:  Your Honor, I'd like to move into
 7   admission Clark 1006 Summary A as Exhibit -- let me see.
 8   I'm sorry, your Honor.  Exhibit 659.
 9            THE COURT:  No objection?
10            MR. THORNBURGH:  No objection, your Honor.
11            THE COURT:  It is admitted.  A for identification
12   is admitted as 659.
13            (Exhibit 659 received in evidence.)
14   Q.   Let's start, Mr. Clark, with the revenues on this
15   chart.  And as head of revenue and planning at JetBlue, do
16   you regularly review the revenues of your competitors?
17   A.   We do.  As mentioned, understanding the competitive set
18   and the choices our customers have for other providers is an
19   important part of the network plan.
20   Q.   Okay.  And where on this chart are the revenues of your
21   competitors represented?
22   A.   It's the first column for each airline in the fully
23   dark color.
24   Q.   Okay.  So, for example, for JetBlue, what is the
25   revenue share on this chart?
```

```
 1   A.   So it's 24 percent, meaning that for all the city pairs
 2   that we served during this time, our market share in those
 3   city pairs against the U.S. competitor set was 24 percent.
 4   Q.   Okay.  And, Mr. Clark, overall what does this summary
 5   tell you about your competitors on a revenue basis within
 6   JetBlue's network?
 7   A.   Sure.  It shows that we primarily compete against the
 8   legacy competitors.  We know the top four airlines in the
 9   United States control about 84 percent of the market share.
10   And that's largely true for us as well.  Our number one
11   competitor is Delta, who has 22 percent in our markets, only
12   2 points less than us, followed by United at 20 percent,
13   American at 18 percent, and then Southwest at 7 percent.
14   Q.   And how do you view Spirit as a competitor looking at
15   revenues?
16   A.   They're certainly a competitor.  They're our
17   sixth largest competitor, so they're behind the big four and
18   Alaska in terms of competition for revenue.
19   Q.   And remind me, Mr. Clark, the revenue shares here, do
20   they include or exclude ancillary fees?
21   A.   They exclude ancillaries.  This is just the base
22   ticket.
23   Q.   Okay.  And would your opinion change as to the role of
24   Spirit as a competitor on a revenue basis if the ancillaries
25   were included?
```

1    A.   It would not change meaningfully.  You can see they're

2    quite close to Alaska.  They have a higher seat share and

3    passenger share.  It's possible Spirit would be slightly

4    ahead of Alaska instead of behind them if you included total

5    revenue.  But it's still the same, they're about a 4 or

6    5 percent player in our markets.

7    Q.   Let's look at passenger shares.  What do the passenger

8    shares tell you about your competitors within JetBlue's

9    network?

10   A.   So the same main conclusion as with revenue, that the

11   big four airlines are our main competitors.  We see Delta at

12   19, United at 16, American at 15 and Southwest at 12.

13   Q.   And what is your understanding about why Spirit's

14   passenger share is more than its revenue share?

15   A.   Spirit's -- so two reasons.  The main reason is that

16   their offering is very unbundled:  Less leg room, no snacks,

17   no drinks, no TV, no Wi-Fi.  So they don't charge, they

18   cannot charge.  You know, the willingness to pay for that

19   product is less than it is for the other airlines.  That's

20   the main reason.  The secondary reason, as we noted, is this

21   only includes ticket revenue.  They do have a bit higher mix

22   of their total revenue coming from the ancillary.  But it's

23   predominantly the first reason of the offering is very

24   unbundled.

25             THE COURT:  I don't understand your answer.  If I

understand this chart, their revenue, as compared to their

passenger share, the inference that I draw is that their

extremely low base pricing attracts a larger group of

customers.  Where, if you look, starting with JetBlue and

then go down through the legacy, we get to Southwest.  Their

base price attracts a larger group of customers, and that's

the only other one that does.  Is that a fair inference?

THE WITNESS:  It is.  There's a couple things

driving that.  One is the airline's average stage length,

how far the airplane flies.  If their average stage length

is farther then the average ticket price is likely to be

higher.  So, for example, Southwest and Spirit both have

relatively short stage lengths compared to JetBlue.

And then, secondly, Spirit also has a very high

percentage of its revenue came from ancillary fees.  Roughly

half of it.  Which is quite different from the -- all the

carriers to the left of it.  So their total revenue, as a

proportion of what's shown on the share, on this slide,

which is ticket revenue, is also higher.

THE COURT:  Yes.  I follow that, but when you were

asked the question a couple questions ago if you added the

ancillary fees would it change, you were asked generally,

and I heard you say it wouldn't change very much.  But now

you're saying, at least with Spirit, it does change?

THE WITNESS:  It would.

```
 1            THE COURT:  You think it does, right?

 2            THE WITNESS:  My initial answer was it wouldn't

 3    change them from being a relatively small competitor in our

 4    network.  They might go from 4 percent to, say, 6 percent,

 5    but they'd still be sort of mid-single digit revenue share

 6    and still be well behind the market share of the big four

 7    airlines that we primarily compete with.

 8            THE COURT:  Thank you.  Mr. Shores?

 9    Q.   Let's look at seat shares, Mr. Clark.  Who are your

10    primary competitors on a seat-share basis?

11    A.   It remains the big four airlines in the United States.

12    Delta, United, American and Southwest all have seat shares

13    12 percent or higher in our markets.  The next closest is

14    7 percent.

15    Q.   All right.  Mr. Clark, let's go, if we could, to what

16    has been marked as Clark 1006 Summary B.  It should be the

17    next document at the first half of your binder.

18            (On screen.)

19    A.   I'm there.

20    Q.   Okay.  And at a high level, Mr. Clark, what's the

21    difference between this chart and the one we just previously

22    looked at?

23    A.   This is the same data as the previous chart, but

24    whereas the last one showed the market share including

25    JetBlue, so the market share of all the U.S. domestic
```

 1   carriers, this shows the market share not including JetBlue.

 2   So it's the market share of our competitive set.

 3   Q.   And, Mr. Clark, was this summary prepared in the same

 4   way you described previously for the first summary we looked

 5   at?

 6   A.   Correct, same way and uses the exact same data.

 7           MR. SHORES:  Okay.  Your Honor, I'd like to move

 8   into evidence what would be Exhibit Number 660, which is

 9   identified as Clark 1006 Summary B.

10           THE COURT:  No objection?

11           MR. THORNBURGH:  No objection, your Honor.

12           THE COURT:  B is admitted in evidence as 660.

13           (Exhibit 660 received in evidence.)

14   Q.   All right.  Mr. Clark, I believe you referred to these

15   as competitor shares.  Is that what they're referred to?

16   A.   Correct.

17   Q.   And on a revenue basis, what are your competitor shares

18   with respect to -- I'm sorry, let me reframe.

19       On a revenue basis, what do your competitor shares tell

20   you about your competition within the JetBlue network?

21   A.   So this makes it even more clear that we're competing

22   against the very large airlines.  If we look at the three,

23   Delta, United, American, their revenue share sums up to

24   78 percent.  So 78 percent of our competition comes from

25   just those three carriers.  When you add in the fourth of

1   the big four, Southwest, it increases it to 88 percent.  So

2   just under 90 percent of our competition is from the big

3   four carriers in the United States.

4   Q.   Okay.  And what does it tell you, these competitor

5   shares, about Spirit as a competitor?

6   A.   They remain a competitor of ours, but as we see, you

7   know, they're roughly a 5 percent player, you know, as high

8   as 10 percent on passenger share.  And that's, frankly, the

9   amount of mind share that we spend with them.  We think

10  about Spirit.  We compete against them.  There was obviously

11  a flurry of e-mails and activities a few years ago.  But, in

12  general, we're spending 90 percent of our time thinking

13  about the big four and competing against the big four.

14  Q.   Okay.  Mr. Clark, let's turn to the next document in

15  your tab, tab 1.  It's Clark 1006 Summary C.  Do you see

16  that?

17          (On screen.)

18  A.   I do.

19  Q.   And at a high level what does this summary represent?

20  A.   So this is similar information and is pulled from the

21  same sources, but rather than looking at our entire network,

22  this is looking at just one city we serve.  So this is

23  looking at New York City, specifically the three main

24  airports there, which are Newark, JFK, and LaGuardia.  And

25  it's looking, for New York City, all the places that

1    customers travel to, whether or not JetBlue serves it.   So

2    it's a look at the market share of us and our competitors

3    from New York City for global airline travel.

4    Q.   And just to take a step back, Mr. Clark, is New York

5    one of your focus cities?

6    A.   Yes, New York is our largest focus city.

7    Q.   Okay.  And what is this summary telling you with

8    respect to your competitors in your largest focus city, New

9    York?

10   A.   Two things.  One, you can see that in New York we're

11   the fourth largest airline with 17 percent revenue share.

12   We're competing against the big three who have revenue share

13   of 76 percent.  So in our -- excuse me -- in our largest

14   focus city we're almost entirely competing against the big

15   three.  After that, the next carriers are all quite small,

16   low single digits.

17   Q.   And what do you view Spirit -- how do you view Spirit

18   as a competitor in the New York area?

19   A.   They're a quite small one.  They're not at our largest

20   airport, which is JFK, where we have the bulk of our New

21   York operation.  We do compete with them at LaGuardia and

22   Newark, where they have slots, which we have pledged to

23   divest as part of this transaction.

24           MR. SHORES:  Your Honor, I'd like to move into

25   admission as Exhibit 661, Clark 1006 Summary C.

```
 1            THE COURT:  No objection?

 2            MR. THORNBURGH:  No objection, your Honor.

 3            THE COURT:  C is admitted, Exhibit 661.

 4            (Exhibit 661 received in evidence.)

 5   Q.   Okay.  Mr. Clark, let's go to the next summary in your

 6   binder, and this is Clark 1006 Summary D, and can you

 7   explain what this summary represents?

 8            (On screen.)

 9   A.   Sure.  This is the same data as the previous chart, or

10   same methodology, same approach, but it's for Boston, which

11   is our second largest focus city.

12            MR. SHORES:  And, your Honor, I'd like to move

13   into admission as Exhibit 662, Clark 1006 Summary D.

14            THE COURT:  No objection?

15            MR. THORNBURGH:  No objection, your Honor.

16            THE COURT:  It's admitted, 662.

17            (Exhibit 662 received in evidence.)

18   Q.   Mr. Clark, what does this summary tell you about your

19   competitors in Boston?

20   A.   In Boston, which is our second largest focus city, we

21   compete against the big three legacy carriers primarily.

22   You can see Delta is roughly the same size as us, then

23   American, then United.  And then after that all the other

24   competitors are low single digits.

25   Q.   Okay.  And how do you view Spirit as a competitor in
```

1    Boston?

2    A.   They're our sixth largest competitor in Boston.  You

3    know, we serve a few of the same routes.  We looked

4    yesterday and we saw there was some route overlap between

5    us.  But, as you can see, as a low single digit player

6    they're not a significant competitor to us in Boston.

7    Q.   Okay.  And you mentioned divestitures a couple times

8    during our conversation.  Do you know if there are any

9    divestitures in Boston?

10   A.   Correct.  Yes, there are.  We have committed to

11   divesting Spirit's gates in Boston just to be extra sure

12   there's room for any additional airlines, ULCCs, any ULCCs

13   that would like to grow in Boston.

14   Q.   I should have asked you this before, Mr. Clark, when

15   you mentioned divestitures related to New York.  Do you know

16   who those divestitures have been committed to?

17   A.    I do.  One of them has gone to Frontier Airways, and I

18   believe the other to Allegiant.

19        THE COURT:  I don't understand.  When you say

20   "committed to," what do you mean?

21        THE WITNESS:  We have agreements, signed

22   agreements that, contingent upon us closing the deal, the

23   transaction in purchasing Spirit, that we will sell all of

24   Spirit's assets at Newark, LaGuardia, Boston, and then

25   there's also divestiture in Fort Lauderdale, to another ULCC

```
 1   to ensure that the amount of ULCC competition at the airport
 2   does not decrease.
 3           THE COURT:  Signed agreements are signed
 4   agreements with these other ULCCs?
 5           THE WITNESS:  Correct.  There's executed documents
 6   with another ULCC for each of those assets.
 7           THE COURT:  Thank you.
 8   Q.   All right.  And, Mr. Clark, in Boston also there's an
 9   executed divestiture agreement for Spirit's assets; is that
10   right?
11   A.   For their gates, correct.  There's no slots in Boston,
12   so gates.  If there were to be a constraint to entry, it
13   would be gates, and that's why we've done that.
14   Q.   Okay.
15           MR. SHORES:  Your Honor, I would like to move into
16   admission as Exhibit 662, Clark 1006 Summary D.
17           THE COURT:  It's in.
18           MR. SHORES:  Oh, it's in.  I apologize.
19           THE COURT:  662.
20   Q.   Okay.  Mr. Clark, can we move to the next summary,
21   which is Summary E in your binder?
22           (On screen.)
23   A.   Yes.
24   Q.   And at a high level, can you just tell us what Clark
25   1006 Summary E is?
```

1    A.   So this is the same type of data that we've looked at

2    for New York and Boston.  We're now looking at it for South

3    Florida, whereas Fort Lauderdale is our third largest city.

4    And this looks at the two main airports in South Florida,

5    which are Fort Lauderdale and Miami.

6    Q.   And, Mr. Clark, why would you look at both Fort

7    Lauderdale and Miami?

8    A.   Just like in New York City, there's multiple viable

9    airports that are nearby each other in South Florida.

10   Customers can choose between the two and will travel out of

11   multiple airports, depending on convenience, flight

12   schedule, things like that.

13   Q.   Okay.  And was this summary prepared in the same way as

14   you described previously, Mr. Clark?

15   A.   Yes, the same way as the New York and Boston data

16   summaries.

17         MR. SHORES:  Okay.  I'd like to move into

18   admission as Exhibit 663, Clark 1006 Summary E.

19         THE COURT:  No objection?

20         MR. THORNBURGH:  No objection, your Honor.

21         THE COURT:  E is in evidence, 663.

22         (Exhibit 663 received in evidence.)

23   Q.   All right.  Mr. Clark, what does this document tell you

24   about your competitors in the South Florida region?

25   A.   It makes clear that American Airlines is by far the

 1   largest airline in South Florida.  They have about

 2   45 percent of the revenue share and seat share in the

 3   market.

 4   Q.   Okay.  And what does this document tell you about your

 5   other competitors in South Florida?

 6   A.   So, after American there's about five other airlines

 7   that are roughly the same size.  You see Delta, JetBlue,

 8   United, Spirit and Southwest.  So we're all roughly a third

 9   to a quarter of the size of American in South Florida.

10   Q.   And, Mr. Clark, are you aware of divestitures in Fort

11   Lauderdale as a result of this transaction?

12   A.   Yes.  We have an agreement to divest five gates at Fort

13   Lauderdale to ensure there's ample room for ULCC

14   competition.

15   Q.   Okay.  Let's go to Clark 1006 Summary F.

16        (On screen.)

17   Q.   Can you describe to us at a high level what this is,

18   Mr. Clark?

19   A.   Sure.  This is the same data that we've been looking at

20   for the first three cities.  This is for Orlando, and

21   specifically the MCO airport in Orlando, the Orlando

22   International Airport, which are our fourth largest focus

23   city.

24   Q.   Okay.  Was this summary prepared in the same way you

25   previously described, Mr. Clark?

```
 1   A.   Yes, it was.
 2          MR. SHORES:  I would like to move into admission
 3   as Exhibit 664, Clark 1006 Summary F.
 4          THE COURT:  No objection?
 5          MR. THORNBURGH:  No objection, your Honor.
 6          THE COURT:  F is admitted, Exhibit 664.
 7          (Exhibit 664 received in evidence.)
 8   Q.   Mr. Clark, what does this document tell you about your
 9   competitors in Orlando?
10   A.   Orlando's a very fragmented market.  We can see no
11   airline has more than 21 percent share, and there's seven
12   airlines that are sort of at or above 10 percent share,
13   roughly.  Which is a high amount.  So it's a very
14   competitive, very fragmented market.
15   Q.   And how do you view your ULCC competitors in Orlando,
16   Mr. Clark?
17   A.   Orlando is sort of your prototypical ULCC market.  So
18   there's a lot of ULCC competition here.  We see not only
19   Spirit, but Frontier has 14 percent of the seat share.
20   There's a couple smaller ULCCs listed here, Sun Country
21   Airlines, Avelo.  Then there's also, to round out the
22   complete metro market, there's a secondary airport in
23   Orlando, called Sanford, which Allegiant serves.  And if
24   that was included, they'd have about a 5 percent to
25   6 percent share of the entire Orlando area.
```

1    Q.   And are you familiar with the Orlando airport,

2    Mr. Clark?

3    A.   The MCO, very well, yes.

4    Q.   Okay.  And are there any constraints that would prevent

5    airlines from flying at the Orlando airport?

6    A.   No, there's not.  And, in fact, about a year ago they

7    opened a brand-new terminal C, so there's lots of additional

8    gate space since that's opened.  And they have an additional

9    phase of more gates under construction right now.

10   Q.   And does JetBlue anticipate further ULCC growth in

11   Orlando?

12   A.   We do.  This is a market where they've been growing

13   very rapidly.  We can see Frontier's growth here.  They have

14   a pilot base there.  They may have additional bases as well.

15   So this is a market that has always been attractive to

16   ULCCs, given the customer type.

17   Q.   Okay.  Mr. Clark, let's go to the next summary, Clark

18   1006 Summary G.

19            (On screen.)

20   A.   I'm there.

21   Q.   Okay.  And at a high level what is this, Mr. Clark?

22   A.   So this is the same type of data for LAX, Los Angeles

23   International Airport, which LA and San Juan are roughly

24   tied as our fifth and sixth largest focus cities.  So this

25   one is for Los Angeles, specifically, showing the exact same

1    share data that we've had for the previous cities.

2    Q.    Okay.

3          MR. SHORES:  And, your Honor, I'd like to move

4    into admission as Exhibit 665, Clark 1006 Summary G.

5          THE COURT:  No objection?

6          MR. THORNBURGH:  No objection, your Honor.

7          THE COURT:  G is admitted, 665 in evidence.

8          (Exhibit 665 received in evidence.)

9    Q.    Mr. Clark, just as a background matter, is LAX your

10   only focus city in the west?

11   A.    Correct.  It's our only focus city that's not in the

12   East, not on the east coast.

13   Q.    So by that, you mean, do you have any focus cities in

14   the Midwest?

15   A.    No, we do not.

16   Q.    And what does this summary tell you with respect to

17   your competitors at LAX?

18   A.    It's very similar to what we've seen throughout the

19   country and our network.  The three largest, Delta,

20   American, United, with about three-quarters of the share

21   between the three of them.  Then there's us.  And then you

22   see Southwest, Alaska and Spirit also have a fairly sizable

23   presence.  So this is another fragmented market.

24   Q.    All right.  Mr. Clark, let's go to Clark 1006 Summary

25   H.  Can you describe to us what this represents?

```
 1                (On screen.)
 2    A.   So this is the same type of information, but for San
 3    Juan, which is our other small focus city, using the same
 4    type of data and same approach.
 5                MR. SHORES:  Okay.  Your Honor, I'd like to move
 6    into evidence Exhibit 666, Clark 1006 Summary H.
 7                THE COURT:  No objection?
 8                MR. THORNBURGH:  No objection, your Honor.
 9                THE COURT:  H is admitted as 666.
10                (Exhibit 666 received in evidence.)
11    Q.   And, Mr. Clark, what does this tell you with respect to
12    your competitors in San Juan?
13    A.   So it shows that we're the largest carrier in San Juan.
14    American is second largest.  This is also a highly
15    competitive and fragmented market.  We can see there's six
16    competitors that roughly have a 10 percent share, if you
17    look at American all the way down through Frontier.  This is
18    also another market with a fairly large ULCC presence.  We
19    see both Spirit and Frontier midteens in terms of passenger
20    share.
21    Q.   And are you familiar with the San Juan airport,
22    Mr. Clark?
23    A.   Yes, I am.
24    Q.   And are you aware of any constraints that would prevent
25    an airline from growing in San Juan?
```

```
 1   A.   No, I'm not.

 2   Q.   Okay.  And, Mr. Clark, does JetBlue have any

 3   expectation about the future of ULCC competition in San

 4   Juan?

 5   A.   It's been growing rapidly.  We expect it will continue

 6   to grow.

 7   Q.   Okay.  Mr. Clark, I would just like you to back up for

 8   a second.  So we've just talked about all of JetBlue's focus

 9   cities; is that correct?

10   A.   Correct.  All six of our focus cities, yes.

11   Q.   And what do these summaries tell you, generally, about

12   where you compete with Spirit?

13   A.   We do not compete with them in our two largest focus

14   cities.  As we saw in New York and Boston, where about

15   three-quarters of our capacity is located, they were a low

16   single-digit player, maybe 3 percent.  They have a larger

17   share at our other focus cities but were, in none of them,

18   our largest competitor or our primary competitor.

19   Q.   And, Mr. Clark, do you remember this morning discussing

20   with counsel growth of ULCCs and, I'm sorry, Spirit in Fort

21   Lauderdale?

22   A.   I do.

23   Q.   And I want to talk to you a little bit more about that.

24        MR. SHORES:  If we could, could we put up

25   Exhibit 415?  I'm sorry, which I believe has already been
```

```
 1   admitted in evidence.

 2              THE COURT:  415.

 3              (On screen.)

 4   Q.   Do you recognize this document, Mr. Clark?

 5   A.   I do.

 6   Q.   And what is it?

 7   A.   This is one of our quarterly network reviews.  We

 8   mentioned these earlier today, that we present quarterly to

 9   JetBlue's senior leadership team.  This one is from

10   the fourth quarter of 2019.

11   Q.   Okay.  If we could turn to slide 35 in this document,

12   Mr. Clark.

13   A.   I'm there.

14              MR. SHORES:  And there were some redactions to

15   this document but, your Honor, I'm not going to ask about

16   anything that is covered by redactions.

17   Q.   Mr. Clark, this says at the top, "MIA/FLL Overview."

18   Do you see that?

19   A.   I do, yes.

20   Q.   And why are you doing an MIA/FLL overview?  What does

21   that mean?

22   A.   So these refer to the two main airports in South

23   Florida, Miami and Fort Lauderdale.  And we're looking at

24   them together as part of the South Florida area.

25   Q.   Okay.  And you're specifically -- what airline are you
```

1    looking at in this summary?

2    A.   We're looking at, it's American Airlines.  So it's a

3    competitive assessment of American in South Florida.

4    Q.   Okay.  I want to go down to the part of the document

5    that says, "Number of Markets."  Do you see that?

6    A.   I do.

7    Q.   And what does a "market" here mean?

8    A.   It likely means a route.  So the number of airports we

9    serve nonstop from either, in the column for American, the

10   number they serve nonstop from Miami, and for us it's the

11   number we serve nonstop from Fort Lauderdale.

12   Q.   Okay.  And let's look at the total most of markets.  Do

13   you see that?

14   A.   I do.

15   Q.   And can you tell us what this column is representing,

16   the "total number of markets" column?

17   A.   So it represents that at this time American, from

18   Miami, served 139 routes nonstop, and that JetBlue in Fort

19   Lauderdale served 63 routes nonstop.

20   Q.   Okay.  That's less than half, right, Mr. Clark?

21   A.   Correct.  They were well more than twice our size in

22   all metrics.

23   Q.   Okay.  I want to look at a number of overlap markets.

24   Do you see that?

25   A.   I do.

1    Q.   What does that mean?

2    A.   So that's referring to routes that both of us serve.

3    So that American has service on from Miami, and we have

4    nonstop service on from Fort Lauderdale.

5    Q.   And what are the number of overlap markets here?

6    A.   Fifty-four.  So that means of the 63 markets we serve

7    out of Fort Lauderdale, American serves 54 of them out of

8    Miami.

9    Q.   And I want to come back to the number of overlap

10   markets, the 54, in just a moment.  But before we do that,

11   it says at the bottom, "Stats," and then there's, "Avg."

12   A-V-G "Daily Deps."  What does that mean, Mr. Clark?

13   A.   So that's shorthand for average daily departures, which

14   is the number of flights taking off each day for these

15   airlines at these airports.

16   Q.   Okay.  And what are the relative average daily

17   departures of American in Miami and JetBlue in Fort

18   Lauderdale?

19   A.   So at this time American had 328 departures per day, on

20   average, from Miami International Airport, and JetBlue had

21   100 per day from Fort Lauderdale.

22   Q.   Okay.  And below that it says, "Seat Share."  Do you

23   see that?

24   A.   I do.

25   Q.   And what does seat share represent?

A.   So that would be the percent for each airport, what
percent of seats do the airline produce.  So interpreting
this now, I believe it means that 69 percent of all seats in
and out of Miami were flown by American.  So they had
69 percent share of the capacity in that market.  Whereas,
in -- of that airport specifically.  Whereas, in Fort
Lauderdale, we had a 24 percent share of the seats to and
from Fort Lauderdale airport.

Q.   And is Miami a hub for American?

A.   Yes.

Q.   And the 69 percent seat share, does JetBlue have a
comparable share to 69 percent at any of its focus cities?

A.   No.  As we looked through our six focus cities earlier,
I believe the highest we had was in the twenties.  I don't
think we even hit 30 percent, not to mention hitting
69 percent.

Q.   And, Mr. Clark, I told you I'd come back to the number
of overlap markets which, again, what are the overlap
markets in Miami for American Airlines?

A.   So it was 54 routes that they served nonstop from Miami
and we served nonstop from Fort Lauderdale.

Q.   Okay.  And, Mr. Clark, you were asked some questions
about Spirit's overlaps with JetBlue across its entire
network.  Do you remember that?

A.   I do.  Yesterday we discussed that.

 1          MR. SHORES:  All right.  And let's put up, if we

 2    could, Exhibit 648, I believe it's GP, already admitted into

 3    evidence.

 4          (On screen.)

 5    Q.   Do you recall counsel for the government asked you

 6    about this document earlier, Mr. Clark?

 7    A.   I do, yes.

 8    Q.   And let's go to page 3 of this document.  And do you

 9    recall that you were asked about the line, "Spirit is our

10    main ULCC competitor (66 overlap routes)"?

11    A.   I do.

12    Q.   Okay.  And so how does the number of overlaps with

13    Spirit across your entire network compare to the number of

14    overlaps you have with just American Airlines in Miami?

15    A.   So it's only a little bit higher.  We, in our entire

16    network, we have 66 overlap routes with Spirit.  In just

17    South Florida we have 54 overlap routes with American.  So

18    it shows the amount of competition we had with American in

19    South Florida is only a little bit smaller than the amount

20    of competition we had with Spirit in our entire network.

21    Q.   Do you compete with American in other places?

22    A.   Absolutely.  They're large in New York, we saw them

23    large in Boston, we saw them large in LA.  We compete with

24    them pretty vigorously throughout our network.

25    Q.   Okay.  Mr. Clark, while we're here, if you look up at

1   the top chart, it says, "ULCC."  Do you see that?

2   A.    I do.

3   Q.    Okay.  And there's a percentage of direct routes.  Do

4   you see that?

5   A.    Yes.

6   Q.    Okay.  And that's 27 percent?

7   A.    Correct.

8   Q.    Okay.  So how many -- what percentage of routes do you

9   not compete against any ULCC, according to this analysis?

10  A.    So at this time the remaining routes, which would have

11  been 73 percent of our routes, had no ULCC competition.

12  Q.    Okay.  If you look at it on a metro basis, what

13  percentage of routes did you not compete against any ULCC

14  during this time?

15  A.    So when looking at the city pair versus city pair metro

16  basis, 58 percent of our routes had no ULCC competition.

17          MR. SHORES:  Okay.  And if we could, let's go to

18  slide 4 of this document.

19  Q.    And do you recall that counsel asked you about the

20  right-hand side of this slide, Mr. Clark?

21  A.    I do, yes.

22  Q.    Okay.  And you discussed growth in the Florida region;

23  do you recall that?

24  A.    Yes.

25  Q.    And the Latin region; do you recall that?

A.    Yes.

Q.    What about the other regions?  Was there growth

reflected on this chart in the other regions where you

compete --

A.    No.  As you can see --

Q.    Go ahead.

A.    As you can see from the other four lines, there's very

little overlap in our other four geographic regions and it's

not growing.  It's basically flat at a very low level.

Q.    And what about on a focus-city basis?

A.    On a focus-city basis we do see the growth in Fort

Lauderdale and Orlando.  Boston's the third one, the third

highest.  But, as we recall, Spirit only had about a

3 percent share in Boston.

Q.    All right.  Mr. Clark, I want to move on to a different

topic, which is the network planning process at JetBlue.

Why do you prepare a network plan, Mr. Clark, can you just

remind us of that?

A.    We prepare a network plan for several reasons.  One,

it's important for our team and the company to know, from a,

you know, strategy, and from a financial perspective where

we plan to grow.  But it's also very important to have the

entire company aligned behind that.  We need to ensure we

have the resources, whether that's gates, ground equipment.

We need crew members.  We might need bases for pilots or

```
 1    flight attendants or our maintenance technicians.  So it's
 2    important that we plan ahead so that all parts of JetBlue
 3    can ensure they have the resources needed to execute the
 4    plan.
 5    Q.   How does the number of planes that you have in your
 6    fleet affect your network strategy?
 7    A.   It's -- it's the starting point.  It's extremely
 8    important.  When you're building a plan, the first thing you
 9    need to know is the amount of resources you have.  And our
10    primary resource that always constrains our network planning
11    is the number of airplanes.
12    Q.   Mr. Clark, we just talked about six focus cities.  Do
13    you recall that?
14    A.   I do.
15    Q.   Does JetBlue have ambitions to have more focus cities?
16    A.   We do.  We've been talking for about a decade about
17    what the seventh focus city will be, but haven't had enough
18    aircraft to achieve our objective in our six focus cities
19    and to start a seventh one.
20    Q.   And would you like to have more than seven focus
21    cities, Mr. Clark?
22    A.   Of course.  We're very concentrated in the East and in
23    the Northeast right now and we'd like to have a national
24    presence.
25    Q.   Why do you want a national presence, Mr. Clark?
```

A.   Scales are important in this business for a few

reasons.  On the revenue side, the larger you are, the more

relevant you are to customers.  Right?  Customers, whether

that's an individual person or a corporation, they want to

work with an airline that can get them to most of the places

they want to go.  So if we can't bring customers to the

Midwest or the West, we're just not as relevant to them and

they're going to be less likely to choose us.

       Plus customers move around.  Right?  They move cities.

Or maybe it's a corporation that has locations throughout

the country.  Our ability to serve other parts of the

country would make us much more valuable to them.  So having

a just regional presence in the East is -- makes it

difficult for really high-value corporations or individuals

to choose us.

Q.   Mr. Clark, I want to return to the network planning

process, and we were just looking at a quarterly network

review.

A.   Correct.

Q.   Can you describe what happens, generally, during your

quarterly network reviews?

A.   Sure.  It's a discussion with senior leadership where

we're generally updating them on recent performance as well

as sharing our plans of what's coming.  And at times we're

often debating and sort of co-developing or co-refining

 1   larger strategic questions and decisions.

 2   Q.   And do you consider as part of that quarterly process

 3   the possibility of entering new markets?

 4   A.   Yes.  We often discuss new markets that we're

 5   considering entering into.

 6   Q.   Okay.  And you had a discussion with counsel about that

 7   earlier this morning.  Do you recall that?

 8   A.   I do.

 9   Q.   Okay.  And why don't we look at an example of that.

10   Let's go to slide 7 of what is Exhibit 415, which is the

11   Q4 -- yeah, the 2019 fourth quarter quarterly network

12   review.

13             (On screen.)

14   A.   I'm there.

15   Q.   And what does this slide reflect, Mr. Clark?

16             THE COURT:  I need you to tell me the slide again.

17             MR. SHORES:  Sure, your Honor.  I apologize about

18   that.  It's number 7.

19             THE COURT:  Thank you.

20             MR. SHORES:  And Bates number is 4839.

21             THE COURT:  I have it.

22   Q.   And, Mr. Clark, there's new markets listed here.  Can

23   you just describe what those are?

24   A.   Sure.  This is a high-level performance update to our

25   senior leadership on how our newest markets are performing,

```
1   so the newest routes that we've launched over the past three
2   years.
3   Q.   Approximately how many new markets do you enter each
4   year?
5   A.   Roughly ten to fifteen.  Some years it's more, some
6   years slightly less, but that's generally been the ballpark
7   for us.
8   Q.   Okay.  And let's go to slide 10, if we could,
9   Mr. Clark.  And this refers to closures and redeploys.  What
10  are those?
11  A.   So "closure" usually refers to closing a route, meaning
12  that you're going to stop flying that route.  Then you
13  redeploy that aircraft time to another either new route or
14  added frequency to an existing route.  It's part of that
15  continuous optimization that JetBlue and all airlines do to
16  ensure our aircraft are deployed as productively as
17  possible.
18  Q.   Mr. Clark, let's go to the next slide, slide 11.
19          THE COURT:  Give me the page number, please.
20          MR. SHORES:  Sure.  It is 3 -- it ends in 34 --
21  I'm sorry.  34843, your Honor.
22          THE COURT:  Thank you.  Very well.
23  Q.   And, Mr. Clark, the title of this is, "Additional
24  Closures and Redeploys are Planned for 2020."  Do you see
25  that?
```

1    A.    I do.

2    Q.    And this is an ordinary part of your quarterly network

3    process?

4    A.    It is.  Not every quarter will have this, but it's

5    pretty typical, you know, at least a couple of times a year,

6    that we'll be reviewing markets that are underperforming and

7    talking about how to redeploy those aircraft into

8    better-performing areas.

9    Q.    Okay.  And can you just generally describe the closures

10   and redeploys that we are seeing on this particular slide,

11   Mr. Clark?

12   A.    Sure.  So what we have here is, on the left side, about

13   eleven routes that are listed for closures, meaning that

14   we're going to stop flying them.  And then you can see, it

15   says "AC freed."  That stands for aircraft freed, so how

16   many aircraft or percent of an aircraft will it free up that

17   we can redeploy elsewhere.  So these eleven markets sum up

18   to about 4.2 aircraft that we free up.

19        And then on the right side it shows the markets that

20   we're planning to redeploy them to, some of which are new

21   markets, new stations.  Those are noted in green.  Some of

22   which are just additional frequencies to existing markets.

23   Those are the blue ones.  You can see that "the number of AC

24   used," so the number of aircraft consumed by these additions

25   also equals 4.2 aircraft.

1   Q.   Okay.  You mentioned the word "new station."  What is a

2   new station?

3   A.   A station is another word for airport.  So a new

4   station would be an airport that we don't previously serve

5   that we are going to start serving.  In this case it's GUA,

6   which is the airport code for Guatemala City.

7   Q.   Thank you, Mr. Clark.  I'd like to move on to another

8   document, Mr. Clark, which is in evidence as Exhibit 231.

9         (On screen.)

10   A.   I'm there.

11   Q.   Mr. Clark, what is this e-mail entitled, "Competitive

12   Schedule Changes - March 8th, 2022"?

13   A.   So this is our weekly competitive schedule changes

14   report that is sent out each Tuesday based on the changes to

15   their selling schedules that the U.S. airlines have made

16   that are relevant to JetBlue's network.

17   Q.   Okay.  And who receives these reports?

18   A.   It goes to a distribution list.  So it would go to

19   JetBlue senior leadership, as well as most of our revenue

20   team, the network planning team, the sales and revenue

21   management team.

22   Q.   And what's the purpose of these reports?

23   A.   It's to inform company leaders and specific teams of

24   the changes being made by other airlines so that we can be

25   aware of them, as it will sometimes have impact on our

```
 1    services.
 2    Q.    And where is the information derived from that's
 3    reflected in this competitive schedule change?
 4    A.    So this comes from the -- this comes from the publicly
 5    available schedule data.  We have a web tool we use that
 6    is -- does a compare each week and shows you differences
 7    between this week's data and last week's data.
 8    Q.    And let's go to the e-mail, Mr. Clark.  It says, "This
 9    week within the JetBlue network."  Do you see that?
10    A.    I do.
11    Q.    And what does "within the JetBlue network" mean there?
12    A.    "Within the JetBlue network" would indicate markets
13    that we fly.  That's what we mean by in our network, we
14    serve it as well.
15    Q.    Okay.  And I want to look at some of the examples that
16    are listed after that, just to give the Court a flavor of
17    some of the terminology.  The first one says, "Spirit
18    Airlines entered 1X daily EWR-LAX."  Do you see that?
19    A.    I do.
20    Q.    And what does that mean?
21    A.    That's saying that during this week Spirit started
22    selling flights, it scheduled flights, the Newark to Los
23    Angeles market, LAX airport, serving at one time per day
24    with the flights starting May 5th.
25    Q.    Okay.  And let's go to the Alaska Airlines example
```

 1   here.  It says, "Alaska Airlines - Adjusted BOS Tcon
 2   capacity."  What is adjusted BOS Tcon capacity?
 3   A.   They've made some changes to their -- B-O-S stands for
 4   Boston.  "Tcon" refers to transcontinental flights, so
 5   flights to the west coast of the US.  So they made changes
 6   in the past week on their flights between Boston and the
 7   west coast.
 8   Q.   There's also some mentions of exits of markets here,
 9   Mr. Clark.  Do you see that?
10   A.   I do.
11   Q.   What's an exit from a market?
12   A.   An exit is when you completely stop selling that route
13   entirely.  So it mentions Frontier exited four times weekly
14   LaGuardia to Miami.  So they removed all future flights on
15   that route from their selling schedule, effective some date
16   in the future.
17   Q.   Okay.  Let's go down further in the e-mail.  It says,
18   "Outside of the JetBlue network."  Do you see that?
19   A.   I do.
20   Q.   What does, "Outside of the JetBlue network" mean?
21   A.   So this is where we summarize markets that we don't
22   serve, but either the market or the airline is of interest
23   to us because of competition.
24   Q.   And can you be more specific, Mr. Clark?  Why are you
25   tracking changes outside of the JetBlue network?

```
 1   A.   There's a couple reasons.  In some cases it's the
 2   competitor.  Here, for example, we see Breeze Airways enters
 3   thirty-five additional markets.  There's also, later at the
 4   bottom it mentions, "Avelo Airlines adding three new
 5   markets."  These are two of the rapidly growing ultra
 6   low-cost carriers, and we're obviously keeping an eye on
 7   them to understand the markets they're serving and, you
 8   know, from that trying to imply what their strategy may be.
 9   So that's one reason, is focus on the airline.
10        Secondly, can be focus on the broader market.  So, for
11   example, we mention Hartford here.  We mention Providence.
12   We fly from those airports.  Sometimes it's even an airport
13   near an airport we fly to.  There's references at the bottom
14   to New Haven Airport, who we don't serve, but New Haven
15   competes against Bradley, which is Hartford's airport.  So
16   there's competition for customers in Connecticut, in
17   general.  So we're keeping an eye on these adjacent markets
18   as well.
19   Q.   Okay.  Let's just pause on the Avelo example you just
20   mentioned.  At the end of the sentence it says, "Finally,
21   Avelo Airlines added 3 to 5X weekly markets in HVN."  What's
22   HVN?
23   A.   The airport code for New Haven, Connecticut.
24   Q.   JetBlue is not a competitor in New Haven?
25   A.   Well, we don't serve the New Haven airport but we serve
```

 1  Hartford.  Just like in South Florida, there's customers who

 2  may choose between those two airports.  So for the larger

 3  Connecticut marketplace it's certainly a competitive

 4  service.

 5  Q.   Mr. Clark, let's go down to the bottom, towards the

 6  bottom of this e-mail.  I think there is a list I wanted to

 7  ask you about.  It's Bates number 30029.

 8  A.   Yes.

 9  Q.   And it says, "In-network changes."

10  A.   Yes, I see that.

11  Q.   And are these all of the changes listed here that

12  occurred in your network in this particular week?

13  A.   Correct.  So the paragraph we saw above was a summary

14  of the most noteworthy ones.  But the next couple pages here

15  list, for each bullet, all of the changes made in JetBlue

16  markets over the past week.

17  Q.   Okay.  And I'm not going to ask you to count all these

18  in-network changes, Mr. Clark, but can you just generally

19  summarize about how many changes you're seeing this week?

20  A.   Sure.  It looks to be roughly fifty, sixty, seventy.

21  It's, you know, a page and a half.  And we see, you know,

22  many airlines covered, many different types of changes,

23  additions, suspensions, entries, exits.  It's a fairly

24  typical week.

25  Q.   Okay.  And let's look at the bottom, there's --

```
 1              THE COURT:  And just excuse me.  Excuse me.
 2   Excuse me.
 3              MR. SHORES:  I'm sorry.
 4              THE COURT:  My ignorance here.  I see various
 5   cancellations.  These are not the cancellations for weather
 6   or other problems, these are changes in the services that
 7   the airlines offer?
 8              THE WITNESS:  That is correct.  This is only the
 9   published schedule.  It doesn't reflect the operational
10   outcomes.  And when we see "canceled," we're referring to a
11   frequency reduction.  If they're leaving the route entirely,
12   we use the term "exit."
13              THE COURT:  Thank you.  Go ahead, Mr. Shores.
14   Forgive me.
15              MR. SHORES:  Yeah, I apologize for that, your
16   Honor.
17   Q.   There's an F9 listed under, "In-network changes."  Do
18   you see that?
19   A.   I do.
20   Q.   And what is F9?
21   A.   F9 is Frontier Airlines' airline code.
22   Q.   So does this reflect that Frontier entered a route this
23   week?
24   A.   Correct.  So this week Frontier began serving, or began
25   selling flights to serve Miami to Kingston, Jamaica.
```

1    Q.    And it also exited somewhere else?

2    A.    It also this week exited three routes, yes.

3    Q.    And then what is added?  What does "Frontier added"

4    mean?

5    A.    We use the word "added" to denote an increase in

6    frequency.  So for the first bullet there, they added a

7    sixth and seventh weekly flight between Albany and Orlando.

8    And on the last bullet they added a sixth weekly flight

9    between Stewart Airport in Newburgh, New York to Orlando.

10   Q.    All right.  And if we go up to the next page there's

11   NK.  Do you see that?

12   A.    I see it in my binder.  Yes, now I see it on the screen

13   as well.

14   Q.    Okay.  And what is NK?

15   A.    NK is Spirit Airlines' airline code.

16   Q.    Can you describe, generally, the action of Spirit

17   Airlines during this week?

18   A.    Sure.  So this week it looks like they entered one

19   market between Newark and LAX.  They temporarily suspended

20   service in two markets during the month of May.  They added

21   frequency in about maybe eight to ten different routes.  And

22   then they reduced frequency at another different eight to

23   ten routes, all that week.

24   Q.    Okay.  And let's go up to the top of the next page, if

25   we could.  This is Bates number ending in 130031.  And do

1    you see the JetBlue changes there?

2    A.    I do.

3    Q.    And can you describe what the JetBlue changes were this

4    week?

5    A.    So for this week we made four changes, which is a

6    relatively light week.  We added frequency in two markets,

7    Boston to Orlando and JFK to Orlando, and we reduced

8    frequency in two markets, JFK to Puerto Plata and JFK to

9    Santiago.

10   Q.    Then there's a list of out-of-network changes.  Do you

11   see that?

12   A.    I do.

13   Q.    We talked about some of those previously, Mr. Clark?

14   A.    Right.  So either airlines we're keeping close tabs on

15   because of their growth, or markets that are adjacent to

16   markets we serve.

17   Q.    All right.  Thank you, Mr. Clark.  You can put that

18   aside.

19        Mr. Clark, I'd like to move on and talk to you about

20   pricing.  And do you recall the government's counsel asking

21   you about pricing strategy with respect to ULCCs?

22   A.    I do.

23   Q.    Okay.  And I want to show you a document that counsel

24   showed you, and it is Exhibit 648.  And, again, it's the

25   January 2020 ULCC Strategy Review.

```
 1                    (On screen.)
 2     A.    I'm there.
 3     Q.    Okay.  I'd like to turn to slide 6 of this
 4     presentation.  And at the bottom there is, "Revenue
 5     Management Strategy."  Do you see that?
 6     A.    I do.
 7     Q.    And can you read for us the second bullet in this
 8     revenue management strategy?
 9     A.    Sure.  It says, "We do not let NK" -- which is
10     Spirit -- "or F9" -- which is Frontier -- "drive pricing
11     structures but will match one-off fares as needed."
12     Q.    And, Mr. Clark, do you recall that you were shown some
13     documents where JetBlue was reacting to Spirit prior to the
14     date of this document, earlier in your testimony?
15     A.    I do.  I recall it was extremely low fares between New
16     York City and the Dominican Republic and San Juan.
17     Q.    And are these examples of the one-off matching that's
18     referenced here on this slide?
19     A.    That is a good example.  Those were extraordinarily
20     low, clearly temporary fares that would denote a change from
21     our normal policy and for us to match them on a one-off
22     basis.
23     Q.    If you look at the last bullet, it says, "Select RM
24     processes do exclude ULCC pricing for decision-making.  This
25     is true for both inventory and pricing."  Do you see that?
```

```
 1    A.    I do.

 2    Q.    What does that mean?

 3    A.    This refers to a few things, but the way we think about

 4    and price ULCCs is different than our competitors.  For

 5    example, we saw that slide where on nearly every route said

 6    "Ignore NK."  We most often ignore Spirit's pricing.

 7    Whereas, for the legacy carriers that we compete against

 8    much more heavily, we're often very attuned to their pricing

 9    and we will not let them, as sort of a team strategy, will

10    not let them price below us.

11    Q.    So if there's a "Match Delta," what does that mean in

12    your world, Mr. Clark?

13    A.    So "Match Delta" refers to if they lower fare, our

14    default reaction is to lower our fare also to match their

15    fare.  It's shorthand.  We actually don't match their

16    increases, but on a decrease we have a default strategy to

17    always match their decrease.

18    Q.    What if a legacy airline does increase their price;

19    what do you do then, Mr. Clark?

20    A.    Then we'll look at it on an independent basis.  We'll

21    look at the market again to see if we think maybe demand and

22    supply would warrant a fare increase, or if there's been

23    some changes in the market maybe we hadn't detected before.

24    And then most often we don't change our price, but sometimes

25    we will see that there's a reason to increase and we will, a
```

1    minority of times, increase our price.

2    Q.   And counsel showed you an example of JetBlue increasing

3    its price.  Does sometimes JetBlue increase its price?

4    A.   It does.  Sometimes we see a change in the

5    demand-supply dynamic that warrants a pricing increase.  I

6    think the example we looked at was during the COVID recovery

7    as customers were coming back to air travel.

8    Q.   Why would JetBlue be increasing its prices during the

9    COVID recovery, Mr. Clark?

10   A.   Two reasons.  One is, if price gets out of balance you

11   risk selling out too early.  Right?  And you might come a

12   few weeks before departure and there's no seats left.  That

13   does a disservice to customers who want to fly but don't

14   know that close in.

15        Secondly, we mentioned JetBlue had financial losses

16   during COVID.  Obviously, if we could generate more revenue

17   to help reduce those losses that's good for the financial

18   health of the company.

19   Q.   How, generally, would you describe the pricing

20   environment during COVID, Mr. Clark?

21   A.   Can you repeat the question, please?

22   Q.   Sure.  How, generally, would you describe the pricing

23   environment during the COVID period?

24   A.   It was very dynamic.  The market was very fluid.  You

25   might recall we had waves of COVID coming and going.  So

```
 1    with demand changing more rapidly than usual, it led to
 2    pricing to change more rapidly than usual, and lead to
 3    unique circumstances I'd never seen before in my fourteen
 4    years.  Load factors well below normal levels lead to
 5    different behavior by customers and airlines.
 6    Q.   Okay.  Mr. Clark, do you recall you were asked about
 7    some ULCC testing earlier in your testimony?
 8    A.   I do.
 9    Q.   Okay.
10         MR. SHORES:  If we could pull up Exhibit LO,
11    please.
12         (On screen.)
13    Q.   This will be in the binder the government gave you,
14    Mr. Clark.
15    A.   Oh, thank you.
16    Q.   Sure.  If we go to slide 37 of this document,
17    Mr. Clark.
18         THE COURT:  The Bates number?
19         MR. SHORES:  5888, your Honor.
20         THE COURT:  Thank you.
21    A.   I'm there.
22    Q.   Okay.  And do you recall counsel asking you about the
23    results of this ULCC test, summer of 2020?
24    A.   I do.
25    Q.   Okay.  And there's a disclaimer at the bottom.  Do you
```

1    see that, Mr. Clark?

2    A.    Yes.   The bottom section, the header of that section is

3    "Disclaimer."

4    Q.    Okay.   I want to give you an opportunity to explain

5    what this disclaimer is, Mr. Clark?

6    A.    Just give me a moment to reflect -- or refresh my

7    memory.

8              (Witness reviewed document.)

9              MR. SHORES:   It's -- I'm sorry.   I should have

10   said LO is Exhibit 652.

11   A.    So this is noting that this is occurring during a very,

12   I'd say, fluid environment.   We're in the COVID recovery.

13   It mentions constant changes to the fare and quarantine

14   environments.   You may recall back in COVID certain states

15   and countries had quarantines which imposed travel

16   restrictions on people.   And when those quarantine laws

17   changed, it could have a very large and quick change in

18   airline demand.

19        It mentions changes to the fare, changes to capacity,

20   outlier markets skewing results due to small sample size.

21   So it's noting -- we don't normally include a disclaimer on

22   this test, but it's noting this test was done during a very

23   unusual and dynamic time.

24   Q.    Okay.   Put that aside, Mr. Clark.   I'd now like to go

25   to what has been admitted into evidence as GE, and this will

```
 1   be in the binder that we provided you, Mr. Clark.

 2              MR. THORNBURGH:  Just an objection, your Honor.  I

 3   don't think this is in evidence.

 4              MR. SHORES:  Oh, I apologize.  You're right.  Your

 5   Honor, I do understand there's no objection to this being

 6   admitted in evidence.

 7              Am I right about that, Mr. Thornburgh?

 8              MR. THORNBURGH:  That's incorrect, your Honor.  We

 9   have outstanding hearsay objections on this exhibit.

10              THE COURT:  Well, there's been no foundation laid

11   so we'll see where we go.  But I must sustain it at the

12   present moment.

13              MR. SHORES:  Yes, your Honor.

14   Q.   Mr. Clark --

15              THE COURT:  Did you say GE?

16              MR. SHORES:  Yes, your Honor.

17              THE COURT:  My records show GE has been admitted

18   as 648, but I'll --

19              MR. SHORES:  And I also --

20              THE COURT:  Oh, that's GP.  Wait a minute.  Wait a

21   minute.  I am mistaken.  GP is 648.  And I stand corrected.

22   Well, they've objected so I'll sustain it.

23              MR. SHORES:  Okay.  All right.

24   Q.   Do you recognize this document, Mr. Clark?

25   A.   I do.
```

1    Q.   Okay.  And what is this document?

2    A.   This is from that summer of 2020, and it is a results

3    document, or potentially an update document -- I haven't

4    completely reviewed it yet -- but from the pricing test that

5    we did during that summer where we looked at different

6    pricing approaches versus the ULCC carriers.

7    Q.   Okay.  And, Mr. Clark, do you perform pricing tests in

8    the ordinary course of your business?

9    A.   We do, against all types of carriers.

10   Q.   And how are those pricing tests kept within your

11   ordinary course of business?

12   A.   What do you mean by "kept"?

13   Q.   Are they within your electronic management system?

14   A.   Most of them are relatively small scale, and the team

15   will have test markets and control markets and then document

16   the results either via presentation or e-mail or things like

17   that.

18   Q.   And are you personally familiar with these tests, price

19   tests that we're referring to?

20   A.   I do recall I was the vice president of the team at the

21   time, so I was certainly aware and part of the discussions.

22   Q.   Okay.  If we could look at the cover page.  It says,

23   "Competitive and Elasticity Test."  Do you see that,

24   Mr. Clark?

25   A.   I do.

```
1    Q.   And are you personally familiar with the competitive

2    and elasticity test from the summer of 2020?

3    A.   I believe it's referring to the pricing tests which,

4    yes, I'm familiar with.

5    Q.   Okay.

6              MR. SHORES:  Your Honor, we would like to move

7    Exhibit GE into evidence.

8              MR. THORNBURGH:  Your Honor, the government

9    objects to this document as hearsay.

10             THE COURT:  Well, it is hearsay but he's laying a

11   foundation that it's a business record.

12             MR. THORNBURGH:  Well, your Honor, as I believe

13   Mr. Clark previously testified, this was not a regularly

14   occurring price testing that JetBlue undertook.

15             THE COURT:  No, but if they do price testing and

16   they maintain these records as part of their business, isn't

17   that enough?

18             MR. THORNBURGH:  Your Honor, we will withdraw our

19   objection at this time.

20             THE COURT:  It's withdrawn.  Okay.  GE is

21   admitted, Exhibit 667.

22             (Exhibit 667 received in evidence.)

23             (On screen.)

24             MR. SHORES:  All right.  Your Honor, I would like

25   to go to page 2 of this document, and the Bates number is
```

 1    very small on what I'm looking at, but it ends on 9071.

 2              THE COURT:  Yes, I have it.

 3    Q.   And, Mr. Clark, the first bullet mentions some tests

 4    that JetBlue was running at the time.  Can you just describe

 5    the tests that JetBlue was running at this time?

 6    A.   Sure.  The summary here lists three types of tests that

 7    we were running during the summer of 2020, as COVID was

 8    greatly impacting demand, a constantly changing environment.

 9    The first one was pricing at a premium.  So higher than

10    carriers who don't block middle seats.

11         So at this time, as I recall, JetBlue was not selling

12    the middle seat because customers were worried about COVID

13    and we thought that may improve demand.  And we, frankly,

14    had lots of empty seats anyway, so there wasn't a big cost

15    of blocking the middle ones.

16              MR. SHORES:  And -- I'm sorry, your Honor.

17    Q.   Mr. Clark, it says, "Pricing a premium versus

18    carriers."  Did this just concern the ULCCs or other

19    carriers as well?

20    A.   I believe, based on this, that it was all, against more

21    than just the ULCCs, that it was against airlines not

22    blocking the middle seats.

23    Q.   Okay.  And the second one refers to ULCCs, and that's

24    the test we discussed earlier; is that right, Mr. Clark?

25    A.   Correct, to identify an optimal fare-matching strategy

1    versus ultra low-cost carriers.

2    Q.    The last one is, "Fare-Driven Elasticity Tests."  Do

3    you see that?

4    A.    I do.

5    Q.    Is it normal for JetBlue to conduct pricing tests?

6    A.    It is.  It's something we do throughout the regular

7    course when we're not sure if a change in tactic or a new

8    tactic would drive more revenue.  We'll test it in certain

9    parts of the network to see results, and if it's successful

10   then we will spread it.  If it's not successful, we've

11   learned.

12   Q.    Okay.  And let's turn to slide 6, Mr. Clark.  The Bates

13   number ends 9075.  And is this, again, a general summary of

14   the ULCC test?

15   A.    Yes.

16   Q.    And does it have the same disclaimer that you referred

17   to before, Mr. Clark?

18   A.    It does.  It has a disclaimer noting COVID changes,

19   capacity changes, fare environment changes.  So it's very

20   similar.  A bit longer than the first disclaimer we saw.

21   Q.    And what was the result of these ULCC tests on your

22   ultimate strategy with respect to pricing and Spirit?

23   A.    Ultimately, it led to no change in tests.  As before,

24   we largely ignored ULCC fares.

25               THE COURT:  I heard you say ultimately it led to

1  no change in tests?

2       THE WITNESS:  The results of the tests led to us

3  having no change in our strategy for pricing.  Before the

4  test we largely ignored ULCC pricing.  To this day we

5  continue to largely ignore ULCC pricing and only match on a

6  one-off basis, as needed.

7  Q.   You can put that aside, Mr. Clark.

8       Mr. Clark, do you recall you were asked about whether

9  you're able to monitor Spirit prices on ATPCO?

10  A.   I do.

11  Q.   And are there ways other than ATPCO for you to monitor

12  Spirit's prices?

13  A.   Yes, there are.

14  Q.   And do you systematically use those other ways to

15  monitor Spirit's prices?

16  A.   Yes.  We pay for a web scraping service that, you know,

17  frequently scrapes.  It looks at the fare that other

18  airlines are charging on their website and then records

19  that.  And we have that data available.

20  Q.   Okay.  And how often does your pricing team consult

21  that data?

22  A.   Regularly, is my understanding.  I'm not as into the

23  day-to-day with that, but I think it's a regular updated

24  source we use.

25  Q.   Thank you, Mr. Clark.

```
 1        Mr. Clark, I want to talk to you a little bit about
 2   partnerships, which I believe you mentioned you have a
 3   partnership; is that right?
 4   A.   That's correct.
 5   Q.   Can you just describe for the Court what an airline
 6   partnership is?
 7   A.   So airlines will partner together for multiple reasons,
 8   but to help generally serve customers together that they
 9   can't serve on their own.  So one example might be, imagine
10   a customer wants to fly from Tampa, Florida to, say, Warsaw,
11   Poland.  Our planes can't fly far enough to go to Poland,
12   but we have partners there -- or we have a partner there.
13   But Tampa is too small a market to make a nonstop flight
14   feasible.  The Polish carrier cannot fly within the United
15   States domestically.  What we do is partner together.  We
16   can bring that customer from Tampa to New York.  Our partner
17   can bring them from New York to Poland.  And we have now
18   served the customer and given them an option that they
19   wouldn't have otherwise.  So it's a way to serve customers
20   and generate more revenue via these partnerships.
21   Q.   Do you compete with other airlines to establish
22   partnerships?
23   A.   Absolutely.  It's very competitive.
24   Q.   And who do you compete with, what other airlines, to
25   establish partnerships?
```

1    A.    We're -- we're competing generally against the three

2    largest carriers in the U.S.   So Delta, United and American

3    have very large, actually have alliances, which are even

4    beyond partnerships.   And there's very much benefit to scale

5    in partnerships.

6    Q.    What is the benefit of scale in partnerships?

7    A.    So there's a fixed cost in setting up a partnership.

8    You need to build the relationship, negotiate the agreement,

9    go through all the IT work to put the execution of the

10   agreement in place.   All that takes time and money.   So it's

11   not worthwhile to do that for a small carrier or small

12   partner who can only get you maybe a handful of routes and a

13   small number of customers.   You want to do it with as big a

14   carrier as you can who can provide you more customers and

15   more geographic coverage.

16   Q.    Are partnerships significant in the airline business?

17   A.    They are.   They've become a big part of the global

18   strategy.   So the largest airlines, it's a very big part of

19   their strategy.   For us it's a significant part as well.

20   Q.    You mentioned the large airlines, it's part of their

21   strategy.   Can you give us an example of that, Mr. Clark?

22   A.    Sure.   So all three of the three largest airlines in

23   the United States -- Delta, United and American -- are part

24   of alliances.   They've each been a founding member of one.

25        So Delta, for example, is the main U.S. member of the

```
 1   SkyTeam Alliance, and they have partners all over the world
 2   in different geographies that they use to connect customers
 3   to sell each other's flights, to have loading partnerships
 4   where you can earn and burn your frequent flier points on
 5   the various airlines in your alliance.  It's a very big part
 6   of their global strategy.
 7   Q.   How does that impact your competition with these
 8   airlines?
 9   A.   We're essentially competing against not only the U.S.
10   carriers but the alliance partners as well.  For example, we
11   started flying from Boston to Amsterdam this year.  We're
12   competing against Delta Airlines on that route.  We're also
13   competing against KLM, one of their SkyTeam partners.  As
14   you can imagine, in the point of sale in the Netherlands
15   JetBlue is not known.  We only have two flights.  We've only
16   been there a few months.  KLM is a national carrier, they
17   have a very large share of the market.  So to have them as a
18   partner in this market is a very big advantage for Delta.
19   Q.   How does your network size impact your ability to
20   compete for partnerships?
21   A.   It makes it more difficult.  We regularly have partners
22   or potential partners say that they don't want to work with
23   us, or that they'd rather work with a larger partner who can
24   give them a bigger benefit than we can, given our limited
25   network size.
```

1    Q.   All right.  Mr. Clark, I'd like to move on and talk to

2    you about Boston, focus city Boston.

3              MR. SHORES:  And we have a demonstrative that

4    we're going to use for this purpose, your Honor, and it's

5    demonstrative B.  And it's the second tab of the binder

6    we've provided.

7              THE COURT:  Thank you.

8    Q.   Mr. Clark, when did JetBlue first begin service in

9    Boston?

10   A.   We started service back in 2004.

11   Q.   And when did you first become involved with JetBlue's

12   Boston strategy?

13   A.   So I mentioned in 2008 I was working as a consultant.

14   The project I was working on with JetBlue was a refresh of

15   their revenue strategy, which included many things including

16   the network.  And one of the major recommendations of that

17   strategy was to grow in Boston to become the largest carrier

18   there, and to make it -- to try to be the airline of choice

19   in Boston.

20   Q.   And what was your strategy for becoming the airline of

21   choice in Boston?

22   A.   Well, it was being served primarily by the legacy

23   customers who were largely connecting customers through

24   their big hubs to other destinations.  So one of our

25   strategies was to offer the most nonstop destinations, so

```
1   that if someone lived in Boston and they went to a lot of
2   places, we would be the airline who could give them the most
3   places nonstop.
4   Q.   Is offering a nonstop service a differentiator for
5   JetBlue from the other airlines?
6   A.   Certainly.  If a customer choice is a nonstop or
7   connecting fare, they will generally prefer the nonstop
8   alternative.
9   Q.   And are you familiar with the term "point-to-point,"
10  Mr. Clark?
11  A.   Yes.
12  Q.   And what does that mean?
13  A.   Point-to-point means flying nonstop versus flying sort
14  of hub-and-spoke, or connecting.  So JetBlue's -- we're
15  primarily a point-to-point carrier.  Only about 10 to
16  15 percent of our customers connect, and 80 to 90 percent of
17  them fly point-to-point or nonstop from their beginning
18  point to their end point.
19  Q.   What about the legacy airlines, which methodologies to
20  do they use, Mr. Clark?
21  A.   They use the hub-and-spoke model.  It varies based on
22  their -- throughout their system, but in some of their large
23  hubs, well more than half, often two-thirds or maybe even
24  three-quarters of their customers could be on a connecting
25  itinerary through that hub.
```

Q.   All right.  Mr. Clark, I want to ask you about some of
the routes listed on this demonstrative B, but just before
we do that, what was JetBlue's strategy for entering new
routes from Boston?

A.   Sure.  We were looking for markets that had high fares
or sort of poor service, like on regional jets, or both.
And there was a lot of them.  It was a pretty fertile
ground.  So we would come in with a better product with a
lower fare, really stimulate traffic and really please
customers.  And this is, obviously, a great illustration of
the JetBlue Effect that was, you know, during this time
found to be the largest impact in the industry when JetBlue
entered the markets.

Q.   Mr. Clark, I'd like to show you what is Exhibit BRT in
your binder.

            (On screen.)

Q.   And do you recognize this document, Mr. Clark?

A.   I do.  I believe it's materials from the trial against
the Northeast Alliance.

Q.   Okay.  And, Mr. Clark, do you recognize this as slides
from the opening statement of the government from the
Northeast Alliance case?

A.   Yes, I believe that's correct.

Q.   Okay.  And I want to go to slide 5 of this document.
In the top it says, "When JetBlue competes, travelers save

 1   billions."  Do you see that, Mr. Clark?

 2   A.    I do.  I'll note the judge isn't quite there yet.

 3   Q.    Thanks for the tip.

 4   A.    Yes, I see that.  "When JetBlue competes, travelers

 5   save billions," which is the title of the slide by the

 6   Justice Department.

 7   Q.    And do you agree with that?

 8   A.    Absolutely.

 9   Q.    And the markets that are listed below, are those the

10   markets that are also reflected on the demonstrative I just

11   showed you, Mr. Clark?

12   A.    Yes.  They're the same markets, although there's many

13   others that could be up here.  But these are the five the

14   Department of Justice used for their materials in that

15   trial.

16   Q.    Okay.  And can you just describe what this is showing

17   in terms of fare difference after entry into these markets?

18   A.    Sure.  So in these five markets, which JetBlue entered

19   in Boston during this time period of growth, you can see

20   that the fare in the market after we entered dropped between

21   25 percent and 53 percent versus what the fare was before we

22   entered.  So really great savings brought on by JetBlue.

23   Q.    Okay.  And then there is a -- part of the left it says,

24   "JetBlue has saved customers flying to and from Boston about

25   $3 billion over the last -- the past fifteen years."  Do you

1   see that?

2   A.   I do.

3   Q.   And do you know what that's a reference to, Mr. Clark?

4   A.   I do.  For our 15th anniversary in Boston, in 2019,

5   given we had entered so many markets and lowered so many

6   fares, we decided to sum it up so as part of our 15th

7   anniversary celebration we could publicly share how much we

8   had saved customers in Boston alone during our first fifteen

9   years.  So we did the analysis and it came out to about

10  $3.3 billion.  So to be conservative we rounded down.  And

11  we, internally, in an internal JetBlue note, celebrating

12  with our crew members that we saved Boston customers

13  $3 billion over the past fifteen years.

14          MR. SHORES:  Okay.  Your Honor, I'd like to move

15  into admission slide 5 from the Justice Department's

16  presentation from the NEA opening into evidence, please,

17  your Honor.

18          THE COURT:  No objection?

19          MR. THORNBURGH:  The government has no objection

20  to this specific slide being introduced into --

21          THE COURT:  That's all he offered.  So it is the

22  document which is with the last Bates number 1758 from this

23  Exhibit BRT, in evidence as Exhibit 668.

24          (Exhibit 668 received in evidence.)

25  Q.   All right.  If we could go back to our demonstrative.

1    All right.  Mr. Clark, I want to ask you about transcon

2    routes.  What does "transcon" mean?

3    A.    Transcon is our shorthand for transcontinental which,

4    again, are routes or flights that go between the east coast

5    and the west coast.

6    Q.    Okay.  And on transcon routes, does JetBlue offer the

7    Blue Basic offering?

8    A.    We do now, yes.

9    Q.    Okay.  And do you offer all of your fare options on

10   transcon routes?

11   A.    We offer the four main ones.  We offer Blue Basic,

12   Blue, Blue Extra and Mint.

13   Q.    And does JetBlue offer a Mint service from Boston

14   transcon?

15   A.    We do, to most of the major west coast destinations.

16   Q.    Okay.  And when did you start offering Mint from

17   Boston?

18   A.    So we launched Mint from Boston in 2016, which is two

19   years after we'd first introduced it in our network in New

20   York.  And at the time we entered it in Boston, no other

21   carrier had lie-flat seats or a comparable experience flying

22   between Boston and the west coast.

23   Q.    What was the reaction of your competitors to JetBlue

24   offering this service?

25   A.    Customers loved it, so the competitors reacted pretty

1  swiftly.  In the near term, they took planes from

2  international markets that did have lie-flat seating that

3  had been designed to fly internationally, and they moved

4  those planes to Boston, started flying Boston to the west

5  coast with an international style lie-flat first class.  And

6  then over time they've since developed domestic aircraft

7  configurations that include lie-flat seating.  So it's

8  really changed the available options to the customer in

9  Boston to be far superior to what it was before 2016.

10 Q.    Okay.  Mr. Clark, there's also a mention of "Boston

11 200" under here.  Do you see that?

12 A.    I do.

13 Q.    What's Boston 200?

14 A.    Boston 200 was one of our network growth plans that we

15 do to help coalesce the company and help our planning.  So

16 we initially had a Boston 100 strategy, which was to get us

17 to 100 flights a day in Boston.  We achieved that.  We set a

18 Boston 150 strategy.  We achieved that.  And in 2016 we

19 announced our Boston 200 plan, which was to grow Boston to

20 200 flights per day.

21 Q.    Has JetBlue achieved its Boston 200 strategy?

22 A.    We have not.  It's been severely delayed due to COVID

23 and other items.

24 Q.    Okay.  And does JetBlue have an ambition to fulfill the

25 Boston 200 strategy still?

```
 1    A.    We would like to, but we're balancing aircraft
 2    availability against not only this need, but other needs
 3    throughout our network.
 4    Q.    And can you describe some of those other needs?
 5    A.    Sure.  So we have a Fort Lauderdale 140 plan that was
 6    announced before COVID.  We have an Orlando 100 plan.  All
 7    that requires aircraft.  And there simply hasn't been enough
 8    aircraft to do all these quickly, given delivery delays from
 9    the aircraft manufacturers, as well as the engine issues
10    that all the new generation engines are having.  We have six
11    aircraft on the ground with no engines because of engine
12    issues.  So there's been severe aircraft availability
13    constraints.
14    Q.    And, Mr. Clark, if JetBlue were able to purchase
15    Spirit, would you be able to achieve your Boston 200
16    initiative?
17    A.    Absolutely.  It would help us achieve our focus city
18    targets that we already have out there with many planes left
19    over for other network priorities.
20    Q.    And, Mr. Clark, let's go to the 2019 listing here.  It
21    says, "Project Revere."  Can you explain to us what Project
22    Revere is?
23    A.    So Project Revere was a competitive strategy to respond
24    to Delta's very aggressive growth in Boston.  They started
25    growing rapidly in 2016.  We had a series of, I'd say, ad
```

1    hoc or technical responses and plans for the first couple

2    years, and then in 2019 we solidified it and sort of branded

3    it into Project Revere, given it was so long-standing.

4    Q.    Okay.  And, Mr. Clark, I would like to show you a

5    document that is Exhibit 368 in your binder.  And it's been

6    admitted into evidence.

7              (On screen.)

8    A.    I'm there.

9    Q.    And can you describe what this document is, Mr. Clark?

10   A.    So this was the materials for a Project Revere somewhat

11   kickoff meeting.  We had been working on competing against

12   Delta in Boston for a couple of years, but this was the

13   first time we formally brought everyone together under the

14   Project Revere banner.  It was in January 2019.

15   Q.    And why did you do that?  Why did you bring everybody

16   together under that banner?

17   A.    It was our most significant competitive threat at that

18   time, had been for a couple years, and remains to this day.

19   Our biggest focus of competition is against Delta,

20   specifically, throughout our network, and in Boston

21   particularly.

22   Q.    Okay.  And had Delta grown in Boston at this time?

23   A.    They've been growing rapidly since about 2016.

24   Q.    Okay.  Let's look at slide 6, which has the Bates

25   number ending in 9365.

```
 1   A.    Yes.
 2   Q.    And what does this slide reflect as to Delta's growth
 3   in Boston?
 4   A.    It shows that they're growing very rapidly in Boston,
 5   about 88 percent between 2015 and 2019, which is much faster
 6   than we were growing at the time.
 7   Q.    And did you want to grow at this time, Mr. Clark?
 8   A.    Absolutely.  But with our available fleet plan, this --
 9   in other focus cities, this was the most we could -- most
10   resources we could bring to Boston during this time period.
11   Q.    Okay.  And let's look over to the right.  There's two
12   bar graphs.  Do you see that?
13   A.    I do.
14   Q.    Okay.  And can you explain what the one that says DL
15   shows?
16   A.    Sure.  So it shows three components of Delta's growth.
17   One being their mainline aircraft, which are airplanes that
18   they own and operate themselves.  One being Delta regional
19   partners, which are the smaller regional aircraft which
20   would be branded Delta but generally another independent
21   airline would own and operate those planes.  And then it
22   says Delta JV, which are the joint venture partners such as
23   KLM, Air France, Air Mexico, things like that.
24   Q.    Okay.  And does JetBlue have any regional -- a regional
25   fleet, Mr. Clark?
```

```
 1    A.    We do not.
 2    Q.    Okay.  So is that -- that's not available for your
 3    growth efforts in Boston?
 4    A.    Correct.  That's typically only the legacy carriers
 5    have regional fleets, and Alaska has a small one also.
 6    Q.    Okay.  And what about a JV partner that would help you
 7    grow in Boston; do you have that, Mr. Clark?
 8    A.    No, we don't have any joint venture partnerships.
 9    Q.    All right.  Mr. Clark, you can put that aside.
10            MR. SHORES:  We can bring back up the
11    demonstrative.
12            (On screen.)
13    Q.    All right.  Mr. Clark, I want to go to the bottom here.
14    You see a reference in 2022 to BOS-LON?
15    A.    I do.
16    Q.    And did JetBlue at some point begin service to London?
17    A.    Yes.  We launched service to London in the third
18    quarter.  We launched service from Boston to London in
19    the third quarter of 2022.
20    Q.    Okay.  And did you launch service to London from a
21    different airport prior to that, Mr. Clark?
22    A.    Correct.  We started flying between New York and London
23    about a year earlier.
24    Q.    And why did JetBlue start flying to London?
25    A.    A couple reasons.  One, it was more or less the largest
```

 1    market from Boston that we didn't serve nonstop.  So in our

 2    quest to be relevant to customers, to be able to take them

 3    where they wanted to go, London was, I believe, at the top

 4    of the list.  And then, secondly, it was a classic JetBlue

 5    market where we -- fares were very high.  We thought we

 6    could come in new with a lower fare and a better product and

 7    stimulate demand and please customers.

 8    Q.    Okay.  Mr. Clark, I want to show you a document that is

 9    in evidence as number 614.

10           (On screen.)

11    A.    Yes, I'm there.

12    Q.    And what is this document, Mr. Clark?

13    A.    This is a London pricing review that was originally

14    created in March of 2022, before we went out for sale with

15    London flights.  And then it was updated in May of 2022,

16    after we went out for sale with London flights.

17    Q.    Okay.  And I want to go to slide 2, which is Bates

18    number ending in 9602.

19    A.    Yes, I'm there.

20    Q.    Okay.  And does this slide reflect your pricing

21    strategy for London?

22    A.    It does.

23    Q.    Okay.  And let's go down below "JetBlue Transatlantic

24    Public Pricing," and there's a line that starts, "Create a

25    new."  Can you explain what that means?

1    A.    It says, "Create a new and simplified tariff that

2    challenges conventional legacy pricing models."  So a tariff

3    is sort of a pricing structure.  So it's to create a new and

4    simpler set of fares that challenges the historical model.

5    Q.    And let's go down further, there's a Mint launch

6    strategy.  Do you see that?

7    A.    I do.

8    Q.    And below that it says, "Powerful disruption"?

9    A.    Correct.

10   Q.    And what was your strategy, launch strategy for Mint?

11   A.    For Mint, we knew we could come in with a lower fare

12   and a better product and really improve the market.  And so

13   we came in with fares that were -- especially the lowest

14   fares were during peak periods.  We were able to reduce

15   fares by about 50 percent.  And then those close-in fares,

16   we referred to them as walk-up fares earlier, those close-in

17   fares we were also able to reduce by about 50 percent.  So

18   those really high fares that the legacies used to charge for

19   customers who maybe didn't have any other options because it

20   was close in, we were able to lower those by about half.

21   Q.    Okay.  And then below it says, "Industry Impact -

22   Business Class."  Do you see that?

23   A.    I do.

24   Q.    What is this box representing?

25   A.    So, in summary of all the different changes we made to

1  the Mint fares, we were able to reduce the industry, reduce

2  the business class fares by about 30 percent versus what

3  they had been before our entry.

4  Q.   All right.  Let's go over to, "Core - Launch Strategy."

5  What is "Core"?

6  A.   So Core is our, our word for coach or economy.

7  Q.   Okay.  And can you describe what the launch strategy

8  was with respect to Core?

9  A.   Sure.  It was to have competitive fares, because there

10 were already some low fares in the market, better terms,

11 like terms and conditions, advance purchase, things like

12 that, as well as our far superior product in our Core

13 section in the transatlantic planes.

14 Q.   What was the industry impact on the economy class?

15 A.   It was large as well.  We did things like eliminated

16 some of the minimum stay requirements, reduced advance

17 purchase requirements.  And as you see at the bottom there,

18 in aggregate it led to the industry price dropping about

19 15 percent versus before we started the service.

20 Q.   All right.  Mr. Clark, you can put that aside.

21      Mr. Clark, you were asked some questions this morning

22 about customer segmentation.  Do you recall that?

23 A.   Yes, I do.

24 Q.   Okay.  And is customer segmentation a strategy that the

25 legacy airlines utilize?

```
 1  A.   Yes.  They have offerings from basic economy all the
 2  way through first class.
 3  Q.   Can you describe what those offerings are?
 4  A.   For the legacy carriers?
 5  Q.   Yes.
 6  A.   Generally, they'll have a basic economy, a main cabin
 7  fare, some sort of premium economy or comfort plus, and then
 8  at least one business class cabin, sometimes a business
 9  class cabin and first class cabin.  So it's generally four
10  or five different options on an airplane.
11  Q.   Does JetBlue compete against the legacy airlines across
12  those different offerings?
13  A.   We do.  We have our Blue Basic fare, we have our Blue
14  fare, which is very similar to a main cabin.  We have Even
15  More Space, which we sell as an add-on, which is similar to
16  that premium economy experience.  Then on our long-haul
17  flights we have Mint, which is a lie-flat experience that's
18  as good as any other premium cabin in the world.
19  Q.   Does Spirit compete against the legacy airlines across
20  all those different offerings that you just mentioned?
21  A.   No, they do not at all.
22  Q.   Okay.  And, Mr. Clark, you were asked about the concept
23  of consumer choice earlier.  Do you recall that?
24  A.   I do.
25  Q.   And do you support consumer choice, Mr. Clark?
```

1    A.   Absolutely.

2    Q.   Do you think legacy airline customers should have a

3    choice, consumer choice when they fly?

4    A.   Absolutely.  Oftentimes they don't have the choice of

5    JetBlue.  But, yes, the legacy customers should have choice

6    as well.

7           MR. SHORES:  No further questions.  I'll pass the

8    witness.

9           THE COURT:  Anything else, Mr. Thornburgh?

10          MR. THORNBURGH:  Yes, your Honor.  I have a few

11   minutes of questions, if that's okay.

12          THE COURT:  You go right ahead.

13                  REDIRECT EXAMINATION

14   BY MR. THORNBURGH:

15   Q.   Mr. Clark, to start, you've had several answers today

16   where you've talked about the impact of COVID on JetBlue's

17   business.  When JetBlue is looking at a baseline to compare

18   activity with, given COVID, is it fair to say it looks back

19   to 2019?

20   A.   We often refer to that as a clean baseline, yes.

21   Q.   Okay.  If you could, I'd like to go back to Exhibit 415

22   which, I believe, is in the binder that your counsel

23   provided to you.  And I'd like to direct you first to slide

24   ending in 870, if I could, please.

25          (On screen.)

```
 1   A.    The one titled, "Spirit P&L Analysis"?
 2   Q.    That's correct.  So, Mr. Clark, this is another section
 3   of the same PowerPoint slide that your counsel asked you
 4   questions about a few minutes ago with regards to American
 5   Airlines and American's performance in Miami; correct?
 6   A.    Yes.  It's from a quarterly network review in
 7   the fourth quarter 2019.
 8            MR. THORNBURGH:  Okay.  If we could, could we go
 9   to -- we'll go -- well, let's go to the slide -- there we
10   go.  Then if we could go three slides later, please, to the
11   slide ending in 873.
12            (On screen.)
13            MR. SHORES:  Your Honor, I'm going to object.
14   This is beyond the scope of my questions.  I didn't ask any
15   questions about Spirit performance.
16            THE COURT:  It is beyond the scope.  Sustained.
17   Q.    Mr. Clark, let me, before we move on from this
18   document, let me point you to a different spot in the
19   document.
20            MR. THORNBURGH:  If we could go to slide 25,
21   please.
22            THE COURT:  Which has the Bates number?
23            MR. THORNBURGH:  Bates number ending in 857, your
24   Honor.
25            THE COURT:  857.  Thank you.
```

```
 1              (On screen.)
 2   Q.    The title of the slide is, "Competitors are structuring
 3   FLL south service around more tightly timed and densified
 4   banks."  Do you see that?
 5   A.    I do.
 6   Q.    Now, Mr. Clark, defense counsel asked you some
 7   questions about the divestitures that JetBlue has offered at
 8   Fort Lauderdale Airport.  Do you recall that?
 9   A.    Yes.
10   Q.    And JetBlue has offered some divestitures of gates,
11   JetBlue gates, to Allegiant; is that correct?
12   A.    Yes.
13   Q.    Okay.  What's your understanding with respect to this
14   slide and the reference to international gates that is being
15   referred to here?
16   A.    I'm sorry.  Can you repeat the question?  I'm not quite
17   sure.
18   Q.    Sure.  I'm just asking what's your understanding of
19   what's being referred to here with regards to limitations in
20   terms of international gates at Fort Lauderdale?
21              MR. SHORES:  Your Honor, I'm going to have to
22   object again.  I don't know what this has to do with what I
23   asked in my questions.
24              THE COURT:  I think it's close enough.
25   A.    It appears to be charting, by time of the day, when
```

 1    international departures out of Fort Lauderdale occur for

 2    us, Spirit and Southwest.

 3    Q.   Let me ask, I was asking about the text at the bottom

 4    of the slide, actually, Mr. Clark.  So let me ask a slightly

 5    different question, which is:  To the best of your

 6    knowledge, are there limitations that JetBlue faces at Fort

 7    Lauderdale Airport with regards to international gates,

 8    specifically?

 9              THE COURT:  I'll allow that.  Yes.

10    A.   There's some limitations.  I believe we work with the

11    airport to schedule our international arrivals to ensure

12    there's gate availability.  I would call it sort of limited

13    or, you know, modest limitations.

14    Q.   Okay.  Thank you.

15    A.   I'll also note it says, "Relief in sight."  So I can't

16    recall, there may or may not have been more international

17    gates made available since this document was created.

18    Q.   Okay.  Thank you, Mr. Clark.

19         If I could direct your attention back now to slide 35

20    of this document, which ends in a Bates number of 867.  This

21    is a slide that defense counsel asked you a few questions

22    about.

23    A.   Yes, I'm there.

24    Q.   On this slide, defense counsel asked you a few

25    questions about, I believe, number of overlap routes here,

1    which refers to routes where JetBlue and American overlap;

2    right?

3    A.   Correct.

4    Q.   And these, these routes here that are overlap routes

5    out of Miami would be metro overlaps, given that Miami

6    serves Miami out of Miami International, and JetBlue

7    services both Miami International and Fort Lauderdale

8    Airport; is that correct?

9    A.   My interpretation that, yes, this is metro area

10   overlaps.

11            MR. THORNBURGH:  Okay.  And if we could leave this

12   slide up on the screen and just put it to the left for just

13   a moment.  And then I want to ask counsel about -- go back

14   to, on the right-hand side of the screen, if we could, put

15   document Exhibit 648, which is in evidence, and the slide

16   from that document that is slide 3, which ends in a Bates

17   number of 712.

18            (On screen.)

19   A.   Can you repeat the document number, please?

20   Q.   Sure.  It's in your -- defense counsel's binder at 648.

21   A.   Thank you.

22   Q.   And so, Mr. Clark, defense counsel asked you some

23   questions about comparing this overlap number to the overlap

24   number in the slide on the right side.  And he asked you, he

25   compared that number to the 66 overlap routes in the bullet.

 1   Do you recall that?

 2   A.   I do.

 3   Q.   But since this slide on the left between American and

 4   JetBlue is talking about metro or citywide overlaps, the

 5   relevant comparison would actually be the number at the

 6   top-left corner of the chart which shows Spirit having 66 --

 7   or, excuse me, 66 direct metro area overlaps -- or excuse

 8   me, sorry, apologies -- 99 metro overlaps with JetBlue;

 9   right?

10   A.   I do think you're correct here, yes.

11   Q.   Okay.  I'd like to now ask you a few questions --

12   sorry.  While we're here, let me just ask you one question.

13   This document, if you go --

14        MR. THORNBURGH:  Can we go to the first page of

15   this document?  This is Exhibit 648.

16        (On screen.)

17   Q.   Mr. Clark, this ULCC strategy review, or ULCC test,

18   this was planned by JetBlue or initiated by JetBlue prior to

19   the onset of COVID; correct?

20   A.   I believe we were planning it before COVID.  I don't

21   recall whether or not we started the test before COVID or

22   not.  It was a very dynamic time.  I don't think we started

23   beforehand, but I can't recall specifically.

24   Q.   It was contemplated in this e-mail as starting prior to

25   COVID; correct, sir?

1    A.   The strategy review, yes.  I don't recall specifically

2    on the pricing test.

3         MR. THORNBURGH:  Okay.  Just a few more questions,

4    your Honor.

5    Q.   If we can go to the first demonstrative -- excuse me --

6    1006 summary exhibit that defense counsel asked you about

7    earlier today.  I think it's the first tab in the binder

8    from defense counsel.

9         THE COURT:  Well, I admitted that as a summary

10   under 1006.

11        MR. THORNBURGH:  Correct, your Honor.  My

12   apologies, I don't have the number in front of me.

13        THE COURT:  Well, we have the document.  What do

14   you want to look at?

15   Q.   Okay.  Mr. Clark, do you have a ballpark idea on how

16   many routes that JetBlue -- nonstop routes that JetBlue

17   serves today, on how many routes it competes against all of

18   the carriers listed here, Delta, United, American,

19   Southwest, Alaska, Spirit and Frontier?

20        THE COURT:  I don't understand the question.

21   You're asking how many routes JetBlue competes against one

22   or more of these others, or competes against all of them

23   together?

24        MR. THORNBURGH:  Apologies, your Honor.  I'm

25   asking the latter, on how many routes competing against all

1    of them.

2              THE COURT:  That's what you said.

3    A.   I don't know that number offhand, no.

4    Q.   Would you say it's common in JetBlue's network for all

5    of these airlines to be serving a nonstop route that JetBlue

6    serves as well?

7    A.   No, it wouldn't be common.

8              MR. THORNBURGH:  Can we go to the demonstrative

9    that is labeled E, which is 663 in evidence?

10             (On screen.)

11             MR. THORNBURGH:  Apologies, H.  If we can go

12   there, please.  666 in evidence.

13             (On screen.)

14   A.   Yes.

15   Q.   So as you discussed with defense counsel earlier, this

16   is looking at different metrics of share at the San Juan

17   airport; is that correct?

18   A.   Correct.

19   Q.   And, Mr. Clark, you answered some questions earlier

20   this morning in response to questions from defense counsel

21   about divestitures.  JetBlue is not offering any

22   divestitures at San Juan airport; correct, sir?

23   A.   That's correct.

24   Q.   So as a result of this transaction, the combined

25   JetBlue and Spirit airline would have over 30 percent share

 1  across any of these metrics; right?

 2  A.   It depends on what happens.  I believe other carriers

 3  are free to enter and grow.  So I can't really predict what

 4  the future share will be.

 5  Q.   Understood.  I can't ask you to predict anything.

 6  Understanding, looking at this slide, as the shares are

 7  depicted here, the combined airline would have more than

 8  30 percent?

 9          MR. SHORES:  Objection.  Asked and answered.

10          THE COURT:  Overruled.  He may press it.

11  A.   Correct.  If you add together the Spirit share and

12  JetBlue share from this time period it would be over

13  30 percent.

14  Q.   Okay.  Thank you.

15      Mr. Clark, defense counsel asked you a question about

16  other methods that JetBlue utilizes to track the fares of

17  its competitors, separate and apart from ATPCO.  Do you

18  recall that?

19  A.   I do.

20  Q.   Would you agree with me that if a competitor's fares

21  don't appear in ATPCO it can take JetBlue days, sometimes

22  weeks to identify those fares?

23  A.   I don't work as closely with the data so I don't know

24  for sure.  That strikes me, though, as not correct.  But I'm

25  not the expert on it.

1   Q.   Mr. Clark, can I direct you?  There's a binder up there

2   that contains your testimony from your deposition with the

3   government a few months ago.  It's labeled, "CID Individual

4   Deposition."  Now, if I can direct you, please, to page 26

5   of that document.  And, apologies, it's the page starting at

6   the end of 26 and going into 27.

7   A.   I think I'm there.

8   Q.   So just, Mr. Clark, if you wouldn't mind, go ahead and

9   read the question that starts -- to yourself -- the question

10   that starts on line 17 of page 26 and then goes into 27, and

11   let me know if that refreshes your recollection as to

12   whether it can take JetBlue days, sometimes weeks to find

13   fares that don't show up in ATPCO?

14   A.   I don't believe I have the right page.  That's not --

15   what was the tab again?

16   Q.   "CID Individual Dep" is the name of the tab, sir.

17   A.   I have one that says, "LIT Individual Dep."  Is that

18   the same?

19   Q.   Should be another -- should be in the front of your

20   binder probably.

21          MR. SHORES:  I think it's the first tab,

22   Mr. Clark.

23   A.   Ah, thank you.  All right.  Page 26.  What was the line

24   number again, please?

25   Q.   Sure.  It starts on line 17 of page 26, Mr. Clark.

```
 1              (Witness reviewed document.)
 2    A.   Yes, I see what you're referring to.
 3    Q.   So, Mr. Clark, does that refresh your recollection as
 4    to whether it can take JetBlue days, sometimes weeks to find
 5    fares that are not filed in ATPCO?
 6    A.   It doesn't.  I'm referring to other airlines there.  We
 7    have a systematic process of scraping airlines to look for
 8    private fares, but not all of our competitors do, at least
 9    have not always in the past.  So there's been times in the
10    past where we knew we could get a pricing advantage for a
11    number of days or perhaps weeks against a specific
12    competitor.  But this was referring to their processes, not
13    ours.
14    Q.   So you're familiar with the processes of other airlines
15    even though you've only worked for JetBlue, Mr. Clark?
16    A.   Well, we know that when we file a fare privately we can
17    watch to see how long it takes another carrier to respond.
18    In some cases, certain carriers will not respond for a
19    period of days or weeks.
20              THE COURT:  It's 1:00.  I'm not pressing you.  Are
21    we going to let him go or are we going to resume on Friday?
22              MR. THORNBURGH:  I have no further questions, your
23    Honor.
24              THE COURT:  And are you going to let him go?
25              MR. SHORES:  I am certainly going to let him go,
```

```
1   your Honor.
2           THE COURT:  You are.  You may step down.
3           (Whereupon the witness stepped down.)
4           THE COURT:  And we'll resume, since we're not
5   going anywhere, we'll resume tomorrow, 9:00 a.m.  We'll
6   recess.
7           I should announce that as of now -- let's see.  I
8   have it here.  The government has used up, of its ten days,
9   one day, two hours, thirty-five minutes.  Defense has used
10  up one day, fifty-five minutes.
11          We'll recess.
12
13          (Proceedings adjourned.)
14
15
16
17                      ******
18
19
20
21
22
23
24
25
```

C E R T I F I C A T E


        I, Cheryl B. Palanchian, Court Reporter

for the United States District Court for the

District of Massachusetts, do hereby certify that

the foregoing pages are a true and accurate

transcription of my shorthand notes taken in the

aforementioned matter to the best of my skill and

ability.




        /s/ Cheryl B. Palanchian 11/2/2023
              CHERYL B. PALANCHIAN

            Registered Merit Reporter
            Certified Realtime Reporter