```
                    UNITED STATES DISTRICT COURT
                  DISTRICT OF MASSACHUSETTS (Boston)

                                    No. 1:23-cv-10511-WGY
                                    Vol. 2, Pages 79-173


UNITED STATES OF AMERICA, et al
            Plaintiffs

vs.


JETBLUE AIRWAYS CORPORATION,
et al,
            Defendants




                        ********


                For Bench Trial Before:
                Judge William G. Young




                   United States District Court
                   District of Massachusetts (Boston)
                   One Courthouse Way
                   Boston, Massachusetts 02110
                   Friday, November 3, 2023




                        ********




            REPORTER:  CHERYL B. PALANCHIAN, RMR, CRR
                    Official Court Reporter
                  United States District Court
                One Courthouse Way, Boston, MA 02110
```

A P P E A R A N C E S


EDWARD WILLIAM DUFFY, ESQ.
ARIANNA MARKEL, ESQ.
AARON TEITELBAUM, ESQ.
        DOJ-Atr
        450 Fifth Street NW, Suite 8000
        Washington, DC 20530
        (202)812-4723
        Email:  Edward.duffy@usdoj.gov
        For Plaintiff United States of America
- and -
WILLIAM T. MATLACK, ESQ.
        Attorney General's Office
        One Ashburton Place, 18th Floor
        Boston, MA 02108
        (617)727-2200
        Email:  William.matlack@mass.gov
        For Plaintiffs United States of America and The
        Commonwealth of Massachusetts



RYAN SHORES, ESQ.
        Cleary Gottlieb Steen & Hamilton LLP
        2112 Pennsylvania Avenue, NW
        Washington, DC 20037
        (202)974-1876
        Email:  Rshores@cgsh.com
- and -
ELIZABETH M. WRIGHT, ESQ.
        Cooley LLP
        500 Boylston Street
        Boston, MA 02116-3736
        (617)937-2349
        Email:  Ewright@cooley.com
- and -
RACHEL MOSSMAN ZIEMINSKI, ESQ.
MICHAEL MITCHELL, ESQ.
        Shearman & Sterling LLP
        2601 Olive Street, 17th Floor
        Dallas, TX 75201
        (214)271-5777
        Email:  Rachel.zieminski@shearman.com
        For Defendant JetBlue Airways Corporation


(Continued.)

(Continued.)


JAY COHEN, ESQ.
ANDREW C. FINCH, ESQ.
        Paul, Weiss, Rifkind, Wharton & Garrison
        1285 Avenue of the Americas
        New York, NY 10019-6064
        (212)373-3000
        Email:  Jaycohen@paulweiss.com
        For Defendant Spirt Airlines, Inc.

```
                        I N D E X

WITNESS:              DIRECT    CROSS    REDIRECT    RECROSS

MATTHEW KLEIN, Continued

  By Ms. Dearborn               84

  By Ms. Riblet                            133


ROBIN HAYES

  By Mr. Duffy       146
```

<u>EXHIBITS</u>                                    <u>PAGE</u>

    672 . . . . . . . . . . . . . 136

    673 . . . . . . . . . . . . . 150

    674 . . . . . . . . . . . . . 155

    675 . . . . . . . . . . . . . 164

    676 . . . . . . . . . . . . . 167

```
 1                THE CLERK:  Court is back in session.  You may be
 2     seated.
 3                THE COURT:  Ms. Dearborn?
 4                MR. DUFFY:  Your Honor, if I may interject for
 5     quick procedural points.  I spoke with Mr. Gelfand,
 6     defendant's counsel, JetBlue's counsel, about the order
 7     yesterday, about the experts potentially being able to watch
 8     the streaming if they are present with counsel in counsel's
 9     office.  We wanted to confirm that that understanding was
10     correct?
11                THE COURT:  That understanding is correct.  The
12     restriction was only where the feed would go.  It's going to
13     go to attorneys' offices.
14                MR. DUFFY:  Yes.
15                THE COURT:  And I don't expect young associates to
16     be gathering to -- in that office to learn from your
17     skillful presentations.  I expect people who have an
18     appearance in this case be watching, but experts can
19     likewise watch.  All right.
20                MR. DUFFY:  Thank you, your Honor.
21                MS. DEARBORN:  Thank you, your Honor.  We've
22     presented the witness with a Book of exhibits, and we're
23     handing that up to your Honor as well.
24                THE COURT:  Yes, thank you.
25
```

1                    MATTHEW KLEIN, (Resumed)

2                     CROSS-EXAMINATION

3    BY MS. DEARBORN:

4    Q.   Good morning, Mr. Klein.

5    A.   Good morning.

6    Q.   Would you please remind the Court of when you joined

7    Spirit?

8    A.   In 2016.

9    Q.   And would you please briefly describe the roles that

10   you held at Spirit since that time?

11   A.   Sure.  I've been the chief commercial officer, I

12   started off as a senior vice president, and I was promoted

13   to executive vice president a few years ago.

14   Q.   And you mentioned a few of the airlines that you have

15   worked at before you joined Spirit, but would you please

16   briefly summarize your professional background before 2016?

17   A.   Sure.  I worked for -- graduated from the University of

18   Maryland in 1995, and with my undergraduate degree in

19   Finance, and I worked for U.S. Air for four years in Crystal

20   City, Virginia, and then worked for -- and while I was

21   there, I was in the domestic pricing department.  And then I

22   worked for AirTran Airways out of Orlando headquarters, and

23   there I was responsible for pricing, as well as revenue

24   management, and distribution planning, and some forecasting,

25   and a variety of other roles.  And then in addition to that,

 1    I worked in the travel agency world for a few years as well.

 2    Q.   Great.  How many years in total have you worked in the

 3    travel industry?

 4    A.   Twenty-eight.

 5    Q.   Now, when you described the roles that you have -- that

 6    you play at Spirit when you were questioned by the

 7    government, you mentioned that one of the areas you oversee

 8    is network planning; is that right?

 9    A.   Yes, that's correct.

10    Q.   What is network planning in the airline industry?

11    A.   Sure.  So network planning, we have airplanes and these

12    airplanes have to fly around.  They're expensive airplanes.

13    And we have to figure out where exactly we're going to fly

14    those airplanes.  So network planning is about what cities

15    we fly to, and also involves what routes or city pairs, or

16    like we mentioned earlier, O&Ds that we may fly to in

17    between those cities.  Those are the routes we fly.  We also

18    determine how many times per day that we would fly those

19    routes.  So that's, generally, how I think about network

20    planning.

21    Q.   Now, if you're deciding which routes to fly, why do you

22    call it network planning and not route planning?

23    A.   Right.  So while we sell individual routes, the

24    strategy that we have is the network.  The network is

25    ultimately what we are selling overall to customers.  So

think of the strategy as being the network, and then the
routes that we have may be the tactics to achieve the
overarching goal.  What we're really selling to customers is
the overall network.  And that's why we call it network
planning.

Q.  Can you please explain what you mean when you say what
we are selling to customers is really the network?

A.  Yeah, sure.  So individual transactions matter, you
know, but at the end of the day the customer is buying the
network.  We're trying to establish long-term relationships
with customers and, ultimately, you do that through your
network.

Q.  Now, in the airline business what is the overarching
strategy for network planning?

A.  Really what you're trying to do is seek out profits.
You're looking to see where can you move your aircraft.  We
have a limited number of aircraft.  You have a fleet, and
there's a fleet plan, and you try to figure out where's the
best way that we can be profitable, but at the same time
recognize that it's the network that we're trying to
optimize for profitability, not any individual route, per
se.

Q.  Are there any types of routes that Spirit typically
flies?

A.  Yeah, sure.  So we have -- then we have a strategy

1   inside our own overall network strategy, and that strategy,

2   really, we kind of talk about it as three pillars.  It's how

3   we think about where the routes -- the tactics, the routes

4   that we would put into place.  That would be to and from big

5   cities, generally.  That's where people live and where they

6   want to go.  We also want to fly to large leisure

7   destinations, which are great destinations for leisure

8   customers.  And then we also want to maintain a balance of

9   Latin America and Caribbean flying as well.  So we think of

10  that as our three pillars at Spirit.

11  Q.   And you mentioned large leisure destinations.  What are

12  some examples of large leisure destinations?

13  A.   Certainly.  So Orlando would be an example.  Las Vegas

14  would be another example.

15  Q.   So I'd like to talk about some of the decisions that go

16  into network planning at Spirit.  Are you ultimately

17  responsible for deciding what new routes Spirit should fly?

18  A.   Yes.  That group reports to me, yes.

19  Q.   And I believe you mentioned it before, but what role,

20  if any, does profitability have in deciding whether Spirit

21  should start service on a new route?

22  A.   That is the absolute number 1 priority, and that would

23  hold the highest regard as to whether we think we should

24  start a route.

25  Q.   How does Spirit forecast the likely profitability of a

1    route?

2    A.   Yeah, sure.  So we have a lot of data that the

3    government provides.  It's a ton of lag, but we do get data

4    from the government.  And that shows how many people are

5    already flying in certain routes.  It also is reported on

6    what the average fares are that people pay in certain

7    routes.  So we can take all of that data, and then we

8    also -- then we can forecast what we think we'd be able to

9    do in terms of growing routes, and what might happen to

10   fares when we go in there.  Ultimately, all that has to roll

11   up into profitability.

12        There's another way that we also forecast.  Sometimes

13   it's a new route that doesn't have any data.  So then we're

14   going to be looking for other routes that might look similar

15   or we think may be similar.  And that's what goes into the

16   forecasts, and we ultimately see if the forecasts are

17   accurate.

18   Q.   Thank you, Mr. Klein.  What impact, if any, does the

19   likely demand on a route have on Spirit's profitability

20   analysis?

21   A.   Yeah, sure.  So that, what we think the demand will be

22   is ultimately the top input towards whether we think we can

23   ultimately be profitable.

24   Q.   Now, are low prices the only thing that impacts

25   potentially demand on a route?

1   A.    No.

2   Q.    What else, other than price, might impact the demand

3   that you might see on a new route for Spirit?

4   A.    Yeah, sure.  So what we would also be thinking about is

5   what's going on from a competition perspective that's

6   already in that route.  We would also be thinking about

7   whether it's part of a strategy we have in certain cities to

8   be able to have more relevance in a route.  Those are the

9   kinds of things that can go into how we think about ultimate

10  success.

11  Q.    You mentioned relevance.  What is relevance in the

12  airline industry?

13  A.    Sure.  So relevance, I think the best way to think

14  about that is if you want to associate yourself with a

15  brand, you need -- you want to be thinking about whether

16  that brand is relevant to you.  So it might depend on where

17  you live, or where you want to fly, or how you ultimately

18  want to travel.  Ultimately that relevance will matter.  It

19  can have an influence on how you think about whether or not

20  you want to fly on that airline, or any airline, or really

21  on any brand anywhere.

22  Q.    How do airlines build relevance?

23  A.    Sure.  So relevance can be built through size.  Scale

24  can be important for relevance.  And then also just how we

25  interact with individual guests or the guests in the

```
 1   community, or their friends or family or other influencers
 2   that they may be influenced by.
 3   Q.   How often does Spirit make changes to its network, as a
 4   general matter?
 5   A.   We make changes to the network every month, at a
 6   minimum.  At a minimum every month.
 7   Q.   And how --
 8            THE COURT:  And that's -- excuse me.
 9            MS. DEARBORN:  Oh, I'm sorry.
10            THE COURT:  So each time you change a route,
11   that's a change to the network?
12            THE WITNESS:  Correct.
13   Q.   How many new routes did Spirit enter in 2022,
14   approximately?
15   A.   Sure.  So between 40 and 50.  Depends on how you want
16   to measure it.
17   Q.   How about in the first half of 2023, how many new
18   routes did Spirit enter in that time frame?
19   A.   Again, around 40.
20   Q.   Okay.  And once you have made a decision to enter a new
21   route, how quickly can Spirit execute on that decision?  How
22   fast can you start service?
23   A.   How fast can we start service?  As quickly as five
24   weeks really is how quickly we can start service in a new
25   route.
```

1   Q.   Is there any difference to the speed with which Spirit

2   can enter a new route depending on whether Spirit is already

3   present at one or both of the endpoint airports on that

4   route?

5   A.   That is definitely the most important variable in how

6   fast we can enter.

7   Q.   If Spirit is not present at an airport, how would that

8   change the length of time that it takes Spirit to enter a

9   new route?

10  A.   Sure.  So instead of, say, five weeks if we're already

11  in both of those cities, it might push that out to about

12  three months or so.

13  Q.   Now, does the network planning team review information

14  about other airlines' entry and exit in the ordinary course?

15  A.   Oh, absolutely.

16  Q.   And do you pay attention to other airlines'

17  announcements regarding their entry and exit on to new

18  routes?

19  A.   We do.

20  Q.   Based on what you have observed, is Spirit faster or

21  slower than other airlines in adding routes to its network?

22  A.   I would say that we are generally about the same speed

23  as what others can do.

24  Q.   All right.  Now, you mentioned that you evaluate routes

25  for profitability for Spirit.  Now, if a route is not

 1   profitable for Spirit, what actions might Spirit take in
 2   response to that?
 3   A.   Yeah, sure.  So we are monitoring that all the time.
 4   We're always looking at what's profitable, or struggling is
 5   the way we like to talk about it.  And then we will employ a
 6   variety of tactics.  We will try to do some promotion.  We
 7   will look to partner with airports to see if we can do some
 8   advertising and promotional activity, things of that nature.
 9   We will make our best efforts to try to get those struggling
10   routes up to profitability.
11   Q.   And if those efforts are not successful, what actions
12   might Spirit take?
13   A.   Well, ultimately we will have to exit the route if it's
14   not successful.
15   Q.   Okay.  Now, I've handed you a new binder.  It's a
16   slightly smaller binder than the one the government gave
17   you.  I'd like you to turn in that binder to Trial
18   Exhibit 339, which is in evidence.
19            (On screen.)
20   Q.   As with many of these documents, Mr. Klein, I'll
21   represent that there are two copies of the same document
22   behind that tab, one in black and white, which is first, and
23   then another in color at the back of the document where the
24   Bates numbers have a dash 1 after them.
25   A.   I see that.

1   Q.   Mr. Klein, do you recognize this document?

2   A.   I do.

3   Q.   What is it?

4   A.   This is a board of directors deck that we would have

5   presented to the board.

6   Q.   Okay.  What was the date of this board of directors

7   meeting?

8   A.   October 9th, 2018.

9   Q.   And looking at the agenda on the first page, were you

10  present at this board of directors meeting?

11  A.   Yes.

12  Q.   And did you present some slides to the board of

13  directors?

14  A.   I did.

15  Q.   Okay.  Now, please turn, in the color version, to the

16  slide whose Bates numbers end in 587-1.  Let me know when

17  you've reached it.

18  A.   Yes, I'm there.

19  Q.   Thank you.  Now, this section of slides is called,

20  "Network update."  Who presented these slides to the board

21  of directors?

22  A.   That would have been me.

23  Q.   Okay.  Now, please turn to the next slide, 588-1.  This

24  slide is titled, "We have an initial 2019 plan - continuing

25  to refine plan."  So what plan is this slide referring?

1    A.    This would have been the network plan.

2    Q.    Why did you tell the board that you were continuing to

3    refine Spirit's network plan?

4    A.    Sure.  So this would have been in October.  We would

5    have been a few months out from the start of 2019, so we

6    were basically letting them know that this is what we think

7    right now, and we'll continue to update all the way through

8    the launch of 2019.

9         I think it's probably important to also add that we're

10   always refining plans.  They're really never set in stone.

11   They're plans, and then we immediately adjust as necessary.

12   Q.    All right.  The first bullet states, "Competitive

13   environment rapidly changing."  Do you see that?

14   A.    I do.

15   Q.    What impact, if any, does the competitive environment

16   have on Spirit's network plan?

17   A.    It is a very large impact.

18   Q.    Can you please describe that?

19   A.    Yeah, sure.  So if we're thinking about different

20   opportunities that exist, we will -- we will be thinking

21   about who else is already flying in those opportunities.  We

22   may be thinking about are other airlines possibly also

23   thinking about opportunities.  And depending on what we're

24   seeing in the marketplace, it can inform us as to whether or

25   not we need to adjust off of what we think we want to be

1    doing in the near future.

2    Q.   Okay.  The second bullet reads, "We are closely

3    monitoring markets launched in 2018 and taking actions on

4    those that should not continue into 2019."  Do you see that?

5    A.   I do.

6    Q.   Is this a typical time frame in which Spirit will

7    evaluate the performance of a route?

8    A.   We -- yes.  I must add that we are always reviewing the

9    performance of routes.  So this would have been a moment in

10   time, but we're always monitoring routes.

11   Q.   Now, if you could please turn three pages further to

12   591-1.

13   A.   Uhm-hmm.

14   Q.   This slide is titled, "We are addressing

15   underperforming markets," and there's a bullet under the

16   yellow line that says, "Discontinued 27 routes" or it

17   begins, "Discontinued 27 routes."  Would you please explain

18   that first bullet to the Court?

19   A.   Absolutely.  So there's some acronyms in here.

20   Discontinue 27 routes in LTM, that stands for last 12

21   months, August 2018.  So think of that as routes that we had

22   discontinued from September of '17 through August of '18.

23   And that's to enhance, P&L would be profitability and loss

24   performance.  So our profitability, ultimately.

25   Q.   How many routes does this slide indicate that Spirit

1    exited in the last 12 months ending in August 2018?

2    A.    Twenty-seven.

3    Q.    And you can see there's a bracket there, it says,

4    "Discontinued routes were 4.5 percent of total network

5    capacity measured in ASMs."  Do you see that?

6    A.    I do.

7    Q.    Was this an unusually high or low number of routes for

8    Spirit to exit in a year?

9    A.    I think at that time we were continuing to get bigger.

10   So as you continue to get bigger, you're going to also have

11   a little bit more exits because not everything works.  I

12   would say that I -- I would love to have this environment

13   back where I'm only thinking about 27 routes being

14   discontinued.

15   Q.    Thank you.  Now, there's a box on this slide after the

16   list of routes that Spirit exited in 2018 that says,

17   "Discontinued markets had an FAC margin of negative

18   24 percent," and then it continues.  Do you see that?

19   A.    I do.

20   Q.    Can you explain this little box to the Court?

21   A.    Absolutely.  So the discontinued markets is referencing

22   the 27 routes above it.  And FAC margin is fully allocated

23   cost margin, which is the best way to determine

24   profitability.  So those routes combined, unfortunately, had

25   a negative margin of minus 24 percent, and that's on an

1    average stage.  Stage is how far the aircraft flies.  So

2    those 27 routes combined flew, on average, 1,475 miles.  And

3    that was significantly above the rest of the system.

4    Basically 45-ish percent above what the average stage would

5    have been, which is a lot of aircraft losing 24 percent

6    margin.  So that's the need to discontinuation.

7    Q.   Okay.  Now, I'd like you to turn to the next slide in

8    this presentation, slide that ends in Bates number 592-1.

9    A.   Uhm-hmm.

10   Q.   This slide is titled, "2019 plan has diverse growth in

11   line with our strategy."  Did Spirit have a plan to grow its

12   network in 2019?

13   A.   Yes.

14   Q.   Can you please explain why Spirit will both be entering

15   and exiting routes in the same year?

16   A.   Oh, sure.  Absolutely.  So if we're losing money and we

17   don't -- as we talked about just a minute ago, if we're

18   losing money and we don't see a way to get those routes to

19   profitability then we will exit.  We have a, sort of

20   mentioned it earlier, I think, as well, we have a limited

21   number of aircraft.  So we have to figure out where's the

22   best places we can fly those aircraft to be as profitable as

23   we can.  That's why we discontinue routes at the same time

24   as we would grow.  And we will be looking for new

25   opportunities to invest in and put those aircraft there.

1    Q.   Thank you, Mr. Klein.  You can set that document aside.

2         Now, as a general matter, how long does Spirit strive

3    to stay on a new route after it enters?

4    A.   Our goal would be to be there forever.  We don't enter

5    to then exit.

6    Q.   Can you please explain to the Court why, if it's your

7    intention to stay permanently Spirit nonetheless exits

8    routes?

9    A.   So, again, if we have a limited fleet, it's there.  We

10   know how many aircraft we have.  We know how many hours per

11   day that we can fly.  And if we're not going to be

12   profitable with some of those assets, then we must move them

13   elsewhere.

14   Q.   Now, after Spirit determines that a route is not

15   profitable, how soon thereafter will it make changes to that

16   route?

17   A.   As soon as we determine that -- and sometimes it can

18   take a little while, sometimes it can be fast.  As soon as

19   we determine it's time to move those assets, we can move

20   them.  Again, as quickly as five weeks certainly.  We can

21   make the decision immediately, and the aircraft can be

22   flying somewhere else very fast.

23   Q.   Moving forward in time -- we were looking at a document

24   from 2018.  So focusing on today, approximately how many

25   routes does Spirit fly today?

1    A.    Depending on the time frame it's going to be different.

2    But I'd say between 300, 350.  Again, depending on the

3    season, et cetera.

4    Q.    How many routes did Spirit exit in 2022, approximately?

5    A.    We exited just over 70 routes in 2022.

6    Q.    And you mentioned that the number might change

7    depending on how you look at it.  Does that number take in

8    to account seasonal changes?

9    A.    No, it does not.  That is exits with no intention at

10   the time to come back.

11   Q.    And can you please explain to the Court what a seasonal

12   change would be to Spirit's network?

13   A.    Sure.  Seasonal change would be, I think the best way

14   to describe that is think about certain cities or O&Ds, city

15   pairs, for that matter, that have profitability because

16   passengers generally will want to go between, say, for

17   example, from Boston, you may want to go down to Fort Myers,

18   or something like that, for the winter.  So a lot of travel

19   back and forth at certain times of the year.  So certain

20   cities have seasonality.

21        And conversely, say, Myrtle Beach would be an example

22   in the summer, where people want to go to Myrtle Beach more

23   often in the summer.  So that's seasonal.  So we're going to

24   move the aircraft in and out based on where we think the

25   profitability will be.

1    Q.    Does that number you mentioned, the number of routes
2    Spirit exited in 2022, does that take into account any
3    temporary suspensions?
4    A.    No.
5    Q.    How does the number of routes that Spirit exited in
6    2022 compare to the number of routes that Spirit entered in
7    2022?
8    A.    So we exited just over 70.  We entered between 40 and
9    50.  So a lot more exits than enters in 2022.
10   Q.    And expressed as a percentage of Spirit's network,
11   approximately what percentage of Spirit's total network did
12   Spirit exit in 2022?
13   A.    Oh, wow.  So 70 out of 300, so you're looking at 25-ish
14   percent, something like this.
15   Q.    And how about in the early part of 2023; how many
16   routes did Spirit permanently exit in the first six months
17   or so of 2023?
18   A.    Also around 40.
19   Q.    And how does that number compare to previous years,
20   Mr. Klein?
21   A.    So, unfortunately, it would look like we're on pace to
22   be very similar to last year.
23   Q.    And, Mr. Klein, in your 28 years of experience in the
24   industry, is Spirit unusual in how often it changes its
25   network?

1    A.    Oh, no.  Not at all.  We're -- every airline is

2    changing their network all the time.

3    Q.    Okay.  Now, Mr. Klein, you mentioned earlier your team

4    monitors changes to the networks that other airlines are

5    flying.  What materials do you or your team review regarding

6    those changes?

7    A.    Sure.  So at a minimum, every week we have a meeting

8    together with my team, and we call it -- we review what's

9    called the change tape.  And we have lots of reports and

10   meetings over that.  Again, at a minimum weekly.

11   Q.    Why is it called the change tape?

12   A.    It's called the change tape because a long time ago,

13   when this information was sent to airlines, it was literally

14   on tape.  And over time, as technology evolved, it's now

15   electronic distribution.  But the phraseology just has

16   stuck, so to speak, and continues to be called the change

17   tape.

18   Q.    How often does the change tape change?

19   A.    We get a summary of it once a week, but it can change

20   more often than that.  But we get a summary once a week.

21   Q.    Okay.  And what types of changes will Spirit make in

22   reaction to the changes that other airlines are making to

23   their networks?

24   A.    Well, depending on the changes that we see and

25   evaluate, we can then determine whether or not we think we

```
1    should be doing something.  If we see something that tells
2    us there's an opportunity that has opened up, then we may go
3    and take advantage of that opportunity.  And we're also
4    evaluating what we see to determine if we think another
5    airline, the way they're moving around, are they starting to
6    think about other routes that Spirit already serves.  That's
7    an important piece of evaluation as well.
8    Q.   Please describe that.  What -- to what extent does
9    Spirit consider the potential entry by airlines that are not
10   currently flying on a route in making decisions about
11   network planning?
12   A.   Can you ask the question again, please?
13   Q.   Sure.  To what extent does Spirit consider the
14   potential entry by airlines that are not currently flying on
15   a route in making decisions about network planning?
16   A.   It's very important for us.
17   Q.   Can you please explain why?
18   A.   Yeah, sure.  So if we are -- if we're profitable -- so,
19   again, taking a step back, the data, it becomes public.  So
20   the government releases this data, on a lag, but it does
21   become public.  So we know how we're performing and we also
22   know what the capacity of certain routes may be.  So if we
23   see that -- if we know that airlines are going to start to
24   see our data, and we start to see changes being made through
25   the weekly review of network changes, then we may think
```

1    about should we be adding more service into a route that we

2    already serve perhaps?

3         Really, at the end of the day, we're trying to maximize

4    profitability.  So are other airlines -- I would assume, so

5    are other airlines.  So they're going to look for these

6    opportunities.  I'd rather compete with myself rather than

7    somebody else.  That's the way I always think about it, if I

8    can.  At the end of the day, you know, we don't have a

9    monopoly on good ideas.  I say this all the time.  Other

10   airlines can see that opportunity and come in.  They do.  So

11   sometimes it's good for us to get, you know, out in front of

12   this.

13        Another phrase I like to use at times is nature abhors

14   a vacuum.  If there's a vacuum there, if something can get

15   sucked into it, it will.  And it doesn't take a long time

16   for another airline to figure that out and go in if they

17   want to.

18   Q.   Now, if Spirit takes up capacity on a route, what

19   effect will that have on prices on a route, as a general

20   matter?

21   A.   Well, I would actually say if any airline puts capacity

22   into a route then there's more supply.  If there's more

23   supply then, by definition, in the laws of supply and

24   demand, if there's not outsized demand then fares will end

25   up coming down.  Even if there is outsized demand fares will

1    come down with more capacity, if any airlines has capacity,

2    not just Spirit.

3    Q.    In your experience are the tactics you described unique

4    to Spirit?

5    A.    Not from my experience, no.

6    Q.    I'd like to shift gears a bit now.  One of the other

7    areas of responsibility that you mentioned was pricing and

8    revenue management.  So let's break that down.  What do your

9    pricing responsibilities entail?

10   A.    My responsibilities or pricing in general?

11   Q.    Thank you for the clarification.  Let's go pricing in

12   general.

13   A.    Sure.  So we have -- I'll try to keep it brief.  We

14   have two sides to the pricing side.  We have technical

15   pricing review, which is monitoring what we see other

16   airlines doing, not unlike the network planning change tape.

17   We get change tapes, so to speak, from published pricing

18   that we see other airlines doing, ATPCO.  And then we also

19   have a side of the pricing department that is also reviewing

20   what are other airlines actually selling on their websites,

21   and we review that as well.  And these reviews are happening

22   all day.

23   Q.    And what is revenue management?  What does that mean?

24   A.    Sure.  So revenue management, the way that we use that

25   term is really thinking about it as inventory management,

```
 1    sometimes called yield management.  And what that means is
 2    on the pricing side, think of it, thinking about the pricing
 3    for one second, you have, like, this menu of fares, so to
 4    speak, and those fares all have different fare rules
 5    associated with them but, ultimately, the fares are
 6    available for sale.  And then the revenue management side
 7    then decides how many seats do they want to sell at each
 8    price point within any given flight actually.
 9         So, ultimately, the definition of revenue management,
10    the way that I think about it, it's selling the right
11    products at the right price to the right person -- and this
12    is important -- at the right time.  That ultimately matters
13    as well.  So it's kind of a revenue management theory that's
14    been around.
15    Q.   And can you please explain why different passengers on
16    a flight might pay different prices for a ticket?
17    A.   Sure.  So largely that's going to be a function of how
18    far in advance a customer wants to buy their ticket.  So
19    depending on if you're further in advance, you generally can
20    get a lower fare.  That's not always true, but generally
21    true.  And another -- another reason why there may be
22    different prices on the aircraft is the demand patterns may
23    change.  So if -- the team is responsible for forecasting,
24    doing their best to determine how many seats do I think I
25    can sell at each price point.  Like any other forecast, it's
```

1    frequently directionally correct, but maybe not perfectly

2    correct.  And then they can adjust up or down to capture as

3    much revenue as they possibly can.

4    Q.   Broadly speaking, what is Spirit's strategy for pricing

5    and revenue management?

6    A.   Well, I mean, broadly we are going to set prices and

7    control the inventory to maximize revenue on the aircraft.

8    Always trying to maximize revenue on the aircraft.

9    Q.   Okay.  Now, please turn to Trial Exhibit 330, which is

10   a document that the government asked you about.  It's

11   actually in both binders.

12   A.   Okay.

13        (On screen.)

14   Q.   And, again, Mr. Klein, the color version of this

15   document is reproduced at, you know, essentially halfway

16   through the document.

17   A.   Would you like me to look at the color?

18   Q.   Please, the color version.  Thank you.  And as

19   Ms. Riblet noted, unfortunately we do not have Bates numbers

20   on the color version of the document, so I'll be referring

21   to the slide number in the bottom right-hand corner of the

22   page.

23        So I'd like to ask you about a few slides in this deck

24   that the government did not show you.  Let's start with

25   slide 8.  Now, Mr. Klein, please look at the second bullet

1   that says, "Prices are mostly driven by."  Can you please

2   describe what factors influence the pricing that Spirit

3   charges?

4   A.   Sure.  So it lists out demand factors, competition and

5   capacity.

6   Q.   And what impact, if any, does competition have on the

7   prices that Spirit charges?

8   A.   Again, a very large impact.

9   Q.   So the last bullet on slide 8 says, "Cost is considered

10  as a constraint, but not a primary determinant of price."

11  What role, if any, does Spirit's costs play in setting fares

12  on a given route?

13  A.   So we don't price at all and control revenue at all

14  based on costs.  Our job is to maximize revenue on the

15  aircraft.  So we don't think of cost.  While it's there, and

16  it matters in the long run, it has nothing to do with what

17  we're doing in the short or medium term trying to get as

18  much revenue on board as possible.

19  Q.   Thank you.  Now, let's turn to a slide that the

20  government asked you about as well.

21         THE COURT:  Well, before we leave these two pages,

22  take a look at slide 9.

23         THE WITNESS:  Uhm-hmm.

24         THE COURT:  And the second bullet point there

25  which says, "Should segment the market as much as is

    1    practical."  When you use the term, or Spirit uses the term

    2    "market" there, what do you mean?

    3            THE WITNESS:  We're talking about city pairs, like

    4    the U.S. O&Ds earlier, that's what we're talking about when

    5    we define market.  It's really sort of a city pair.

    6            THE COURT:  And "segment the market" means what?

    7            THE WITNESS:  So the best way to maximize revenue

    8    is to try to understand what customers -- it's -- customer

    9    segmentation, so some customers are willing to pay more and

   10    some are willing to pay less.  To the extent we can segment

   11    those customers and figure out how much people are willing

   12    to pay, then if we can figure out how to offer them the

   13    product at the right time at the right price, that's how we

   14    can maximize revenue and get higher fares.

   15            THE COURT:  So in a particular market you're

   16    trying as best you can to understand the customer mix and

   17    appeal to that mix.  Is that right?

   18            THE WITNESS:  Absolutely.  That's correct.

   19            THE COURT:  All right.  Forgive me, Ms. Dearborn.

   20    Go ahead.

   21            MS. DEARBORN:  Thank you, your Honor.

   22    Q.   Let's turn to slide 10 in this presentation, please,

   23    which is a slide that Ms. Riblet asked you about.

   24    Mr. Klein, Ms. Riblet asked you about the bullet under NK

   25    that starts, "No obligation to follow the herd."  Do you see

1   that?

2   A.   I do.

3   Q.   Is the phrase "follow the herd" a term that you use at

4   Spirit?

5   A.   It is not.

6   Q.   Does Spirit have a policy to not follow the herd when

7   it comes to pricing?

8   A.   No.  We don't have -- we don't have a policy like that

9   at all.  What we do is do what we think is best for Spirit

10  at that time.  So depending on -- and this phrase "follow

11  the herd" is always -- I heard about it when I had my

12  deposition, and today.  So this phrase is just an

13  interesting phrase.  You know, when other airlines make

14  pricing changes, we determine, for us, what we think is the

15  best thing for us to do.  Sometimes that might be do what

16  other airlines do, for sure.  Sometimes it's don't do what

17  other airlines do.  Sometimes it's do a little bit of what

18  other airlines do.  Sometimes it's do a lot of what other

19  airlines do.  It really just depends on what we think is the

20  best thing for Spirit to do to maximize revenue.

21  Q.   Do you have an understanding as to -- well, let me

22  start over.  This, the full bullet reads, "No obligation to

23  follow the herd when it comes to large industry

24  initiatives."  Do you see that?

25  A.   I do.

1   Q.   Do you have an understanding of what the phrase "large

2   industry initiatives" means in this sentence?

3   A.   Yeah.  I think what it means here is there's multiple

4   ways to think of large industry initiatives.  Generally,

5   it's going to be defined, I guess the simplest way to think

6   about it is fare increases or fare reductions.  And that's

7   sort of the best way to think about large initiatives.

8   Q.   Do you have any example of a large industry initiative

9   that might be illustrative?

10  A.   Yeah, sure.  So there are times when other airlines

11  will try to take, say, a system fare increase.  They might

12  try to raise fares -- I'm making this up -- by about

13  $3 across the board.  We will then determine whether we want

14  to do that as well.  And frequently we will choose to do

15  that, and frequently we will choose not to do that.

16       Another example might be large sale fare activity,

17  which we're seeing today actually.  And then we have to

18  decide do we want to reduce our fares to match those sale

19  initiatives.  Sometimes we have to reduce to match,

20  sometimes we already have fares there.  It just kind of

21  depends on what's going on.  A lot of times when it comes to

22  reducing fares, we then take into account whether or not we,

23  again, think it's the best thing for us to do.  If it is,

24  we'll do it.

25  Q.   Okay.  Now, please turn a few pages forward to

 1  slide 22.  This title -- this slide is titled, "Selecting a

 2  price - competitive monitoring."  Do you see that?

 3  A.   Yes.

 4  Q.   And I believe you touched on it before, but the first

 5  bullet says, "Must be aware of what our competition is

 6  doing."  Do you see that?

 7  A.   I do.

 8  Q.   And does Spirit monitor what its competition is doing?

 9  A.   We do.

10  Q.   The next bullet says, "Determine best form of

11  response."  Is this essentially what you were saying earlier

12  about how Spirit will respond to activity from other

13  airlines in the marketplace?

14  A.   Actually, yes, it's exactly what I was saying.  Sorry

15  about that.  Yes, it's right there.

16  Q.   Okay.  Thank you.  Now --

17          MS. DEARBORN:  You can go ahead and take that

18  slide down.  Thank you, Mr. McLeod.

19  Q.   The government mentioned a name to you during your

20  examination, a gentleman named Leo Lage.  Do you recall

21  that?

22  A.   Yes.

23  Q.   Who's Mr. Lage?

24  A.   He is on the technical pricing team in the pricing

25  department.

```
 1    Q.    How long have you known Mr. Lage?

 2    A.    I've known Mr. Lage for quite some time.  A long time.

 3    He's worked for me now at a couple of different airlines.

 4    Q.    Now, does Mr. Lage report directly to you?

 5    A.    He does not.

 6    Q.    To whom does he report?

 7    A.    Currently he's reporting to a senior director in --

 8    actually, he reports to a director.  We did some

 9    organizational changes, sorry.  He reports to a director in

10    that group, that's who his direct sort of manager would be.

11    Q.    Who does that director report to?

12    A.    To a senior director in the group.

13    Q.    Who does that senior director report to?

14    A.    To a vice president in the group.

15    Q.    And who does the vice president report to?

16    A.    To the chief marketing officer.

17    Q.    And who does the chief marketing officer report to?

18    A.    To me.

19    Q.    Okay.

20          MS. DEARBORN:  Sorry, your Honor.

21    Q.    Does Mr. Lage make strategic decisions about Spirit's

22    fares?

23    A.    Mr. Lage reports on what he sees.

24    Q.    Okay.  Does he make any day-to-day decisions about what

25    prices to offer for Spirit's products?
```

A.   He might have some suggestions or recommendations based
on his own experience, but ultimately he's not going to be
responsible for making those decisions.  I shouldn't -- I
don't know if that's true 100 percent of the time, but
certainly the majority of the time, especially on big
decisions that would be going up, for sure.
Q.   Now, if he does not have any responsibility for setting
prices, what is Mr. Lage's role?
A.   Mr. Lage, generally, is going to be reviewing fare
activity and then reporting on that activity and giving me
his opinion on what he sees and what he thinks he's seeing
out there.
Q.   Now, the government mentioned something called a
pricing activity report.  Do you remember that?
A.   Yes.
Q.   What's a pricing activity report?
A.   So we had mentioned a little bit earlier about
reviewing the fares that are at ATPCO.  So Mr. Lage was
responsible for reviewing those changes as they come
through.  His team is as well.  He has a small team but he's
really in charge of the bulk of that and he's reviewing what
is happening out there.  And that's what he puts into the
pricing change report.  And then in addition to that, he'll
also give his opinion as to what he -- why and what he
thinks he's seeing out there.

1    Q.   How many pricing activity reports has Mr. Lage sent you

2    over the course of your experience working with him?

3    A.   Well, he sends me at least one a day, and that's if

4    things were slow.  If things were busy we'll get multiple

5    per day.  Over the course of all those years it's probably

6    been -- it's definitely in the thousands.  I don't have an

7    exact number.

8    Q.   Okay.  And do you review those pricing activity reports

9    from Mr. Lage?

10   A.   I do.

11   Q.   Why?  Why do you review those reports?

12   A.   Well, I like to have a general sense as to what's

13   happening in the pricing world.  I have a lot of experience

14   in it, so I can also lend an opinion as to what I think I'm

15   seeing based on Mr. Lage's reports and his opinion as well.

16   And, generally, I feel like the pricing department at an

17   airline and how the airline's pricing departments act and

18   think can be also ultimately reflective of overall strategy

19   that airlines are thinking about as well.  The more

20   organized, in my opinion, the pricing kept is, and how they

21   act, that should be -- it's a reflection of the airline

22   overall that we're looking at.

23   Q.   Do you look at those pricing activity reports in order

24   to determine what fares Spirit should offer?

25   A.   No.

 1    Q.    Okay.   Now, the government asked you a number of

 2    questions about how Spirit's fares compare on average to

 3    those of other airlines.   Do you recall those questions?

 4    A.    Uhm-hmm.

 5    Q.    When you are making decisions in your role supervising

 6    pricing and revenue management at Spirit, is it useful for

 7    you to consider Spirit's average fares?

 8    A.    When we think about individual -- when we think about

 9    fares overall, we're offering fares to customers?

10    Q.    Yes.

11    A.    Is that what you mean?

12          No, the averages are not relevant when we think about

13    individual offerings.

14    Q.    Why not?   Why is it not useful to you to consider how

15    Spirit's fares compare on average to those of other

16    airlines?

17    A.    Well, I think the easiest way to think about it is we

18    don't sell averages to customers, we sell individual -- we

19    compete on individual transactions.   So it doesn't matter

20    what the average is.   And on top of that, the average is the

21    average.   If we're talking about the averages of overall --

22    in the city pair itself overall, then you're also talking

23    about all the different products and all the different

24    offerings that airlines make.   And if airlines have more

25    expensive products that Spirit doesn't compete with, like,

1  at all, then by definition the average fare of other

2  airlines should be a lot higher.

3      To me, competing on averages is, it's nice to talk

4  about, and we get compared on things like that, and we

5  sometimes talk about it as well, but in the midst of trying

6  to be profitable and maximize revenue, we think about what

7  that individual's shopping transaction is at that time.

8  Q.   You know, you mentioned different products and

9  offerings that other airlines offer that might affect the

10 average fare on a route.  Can you give some examples to the

11 Court of what you meant when you referenced that?

12 A.   Sure.  So I think the easiest way to think about it is

13 as a first class product.  If another airline has first

14 class, that is an offering or product that Spirit does not

15 offer.

16 Q.   Now, shifting gears a bit, the government played you a

17 video of your testimony before a House subcommittee.  Do you

18 recall that?

19 A.   Yes.

20 Q.   Now, what was the date of that hearing?

21 A.   March -- it was early March 2020.  I think it was

22 March 3rd, 2020.

23 Q.   And where was it relative to the COVID-19 pandemic?

24 A.   Right.  So COVID-19 was starting to spread across the

25 U.S.

1  Q.   Now, you mentioned in one of your answers that you're

2  not so sure today whether price-conscious customers are

3  underserved?

4  A.   Correct.

5  Q.   How, if at all, have the options available to

6  price-conscious customers changed since the COVID-19

7  pandemic?

8  A.   Well, a lot has changed.  There's a couple ways to

9  think about that.  Leisure customers, especially going to

10 leisure destinations, there's a lot more capacity flying

11 around and destinations today than there used to be.  That

12 kind of changed throughout COVID and it still is there today

13 as well.  So leisure customers going to leisure destinations

14 certainly have a lot more options than they had before.  And

15 then even if it's not your traditional leisure destination,

16 there's been a lot less corporate traffic since the

17 pandemic.  Hopefully we're out of it for good, but since the

18 pandemic has ended, hopefully, there's been a move towards

19 larger aircraft for other airlines.  And that, in

20 conjunction with a lot less corporate traffic happening, is

21 opening up a lot more seats that previously would have

22 either not been there at all or would have been filled with

23 corporate traffic.

24      So there's a lot more seats.  When there's a lot more

25 seats, especially, say, airlines that have basic economy

1    products have a lot more seats to sell, and they're reducing

2    fares with basic economy in order to offer lower fares to

3    customers that wouldn't have been there when I gave my

4    testimony to Congress.

5    Q.   Thank you, Mr. Klein.  I'd like to shift gears again.

6         Have you ever heard the term "the Spirit Effect"?

7    A.   Yes.

8    Q.   When you use the term the Spirit Effect, what do you

9    mean?

10   A.   Largely what that means is Spirit will enter a market,

11   more capacity gets added to the market, so the market will

12   grow with more capacity.  And then the average fare will

13   tend to go down because there's more capacity in the

14   marketplace.

15   Q.   Now, have there been occasions when Spirit has not been

16   able to stimulate demand on a route?

17   A.   Yes.

18   Q.   Do you have any examples?

19   A.   Yes, I do.  So we -- there's extreme examples as well,

20   where sometimes we go into routes, we enter a route -- in

21   the last 12 to 18 months Miami to Port-au-Prince is top of

22   mind because it was a really poor performer.  Literally,

23   unfortunately, we had single-digit passengers at times

24   flying on these aircraft.  So a 182-seat aircraft flying

25   around with eight people on it is really, really bad.  So

1    things like that can happen.  No matter what we did to the

2    price, people don't want to fly.

3         We have other examples of that as well.  We had an

4    example in Burbank, California, where we entered Burbank

5    initially and we had a similar issue.  We added too much

6    capacity.  We had to pull a lot of capacity out of there in

7    order to make sure that we could rightsize in a city like

8    Burbank to a destination even like Las Vegas, for that

9    matter.

10   Q.   Have there been occasions when Spirit has been able to

11   stimulate demand on a route but that has not translated into

12   a profit for Spirit?

13   A.   Yeah, sure.

14   Q.   When that happens what actions will Spirit take?

15   A.   Well, we will take -- bless you -- we will -- well,

16   first we'll try to rehab the market, like we were talking

17   about earlier, and struggle markets we'll try to get the

18   fares up.  We'll do everything we can to try to increase

19   fares to try to maximize revenue on the aircraft.  If we

20   can't do that, and if lower fares are too low and we're not

21   profitable, then we will ultimately have to exit.

22   Q.   Has Spirit ever attempted to measure the Spirit Effect?

23   A.   Yeah.  Spirit Effect has been measured in the past.

24   Q.   What is the most recent set of data that Spirit has

25   analyzed to assess the Spirit Effect?

```
 1   A.    The analyses that I have seen has been from 2019.
 2   Q.    And why have you not measured the Spirit Effect since
 3   then?
 4   A.    So it's difficult.  So in order to measure an effect
 5   like that you need to have a base, a good base period and
 6   then a test period or a post-entry period, so to speak.  And
 7   during COVID lots of things got very strange very quickly.
 8   And, therefore, it was hard to really assess what is a good
 9   base period.  So we'll probably soon, maybe in a year or so,
10   be able to start to do those kinds of analyses again.  You
11   can do the analysis now, I just wouldn't put a lot of merit
12   into an analysis done today.
13   Q.    Now, I'd like to return to a concept that you mentioned
14   earlier, which is the increase in leisure capacity in a
15   market.  So to aid us, can you please turn to Trial
16   Exhibit 334 in your binder, which is in evidence.
17              (On screen.)
18   A.    I'm there.
19   Q.    Do you recognize this document, Mr. Klein?
20   A.    I do.
21   Q.    What is it?
22   A.    This would have been the board of directors
23   presentation deck from March 10th, 2021.
24   Q.    And were you present for this board meeting?
25   A.    Yes.
```

1   Q.   And, as usual, the color document is behind the

2   black-and-white document.  So I'd like you -- I'd like to

3   direct your attention to the page ending in 856-1 in the

4   color version.  This is, again, a section titled, "Network

5   update."  Who presented these slides to the board,

6   Mr. Klein?

7   A.   That would have been me.

8   Q.   Okay.  Now, please turn two slides forward to the slide

9   ending 858-1.  This slide has the header, "Nearly every

10  carrier shifted network towards leisure."  Do you see that?

11  A.   Yes.

12  Q.   What is this graph depicting?  Can you please explain

13  it to the Court?

14  A.   Yes.  So the gray bars would have been the time frame

15  of March 2019, and the yellow bars would have been two years

16  later, March of 2021.  So just to set that first.  And then

17  what we're trying to demonstrate here is how much capacity.

18  So there's ASM.  ASM is an available seat mile.  That, think

19  of that as how far each seat on an airplane flies.  So it's

20  an available seat mile.  And we think of that as -- you can

21  think of that as capacity.  That's what we sell.

22       So, and what the mix means is how much of the network

23  is, in this case, touching Florida, Las Vegas, Phoenix and

24  Hawaii.  So it's comparing March 2019 to March 2021 using

25  those destinations, so to speak, as the measure -- what we

1   are measuring.

2   Q.   Why did you choose those four destinations to highlight

3   for the board?

4   A.   Sure.  So during COVID a lot of people, depending on

5   where you lived, were kind of stuck inside for a long time.

6   And when people wanted to travel, they wanted to travel to

7   outdoor destinations where they could be outside and not be

8   stuck inside.

9        So as is the case always, airlines, and this

10  demonstrates it, airlines were looking to put their capacity

11  where they saw opportunity to try to be as profitable as

12  possible.  So that's why the capacity -- that's why we're

13  trying to measure this and demonstrate to the board that a

14  lot of capacity had moved in the two years into these kinds

15  of destinations.

16  Q.   Now, the little box in this graph says, "Combined

17  legacy mix increase on 2019 ASMs is the equivalent of adding

18  another Spirit and Frontier-size airline."  Do you see that?

19  A.   I do.

20  Q.   Can you please explain to the Court what that is

21  conveying?

22  A.   Sure.  So we're looking here at American, Delta and

23  United, and the percentage change of the capacity there into

24  those -- into what we were -- into these destinations was so

25  large, even though the percentages don't look like they

1     changed a lot, these airlines are so large that moving that

2     amount of capacity for those three airlines added up to

3     putting, basically, two airlines into the entire industry by

4     themselves.  So that's what we're trying to show here, and

5     make sure the board was aware of how much influence and

6     capacity American, Delta and United have and how they can

7     affect the industry very quickly.

8     Q.   And how quickly did the changes in this graph arise?

9     A.   They can happen very quickly.  They did happen very

10    quickly, and they can happen -- even today they can happen

11    very quickly.  But back then it was happening rapidly.

12    Q.   What impact, if any, does the shift in other airlines'

13    networks towards leisure have on Spirit?

14    A.   Well, sure.  So the law of supply and demand takes over

15    very, very quickly.  That capacity shift has an immediate

16    impact on our ability to generate the revenue that we would

17    want based on the demand that we could capture.  So that has

18    an immediate impact on fares and also then ultimately on

19    profitability.

20    Q.   Please turn to the next slide in this presentation,

21    which ends in Bates number 859-1.  This slide is titled,

22    "Hybrid/ULCCs have launched 40 plus new cities."  Do you see

23    that?

24    A.   Yes.

25    Q.   Can you please explain what this slide is depicting?

1    A.   Sure.  Just as a follow-up to the slide before, in

2    terms of how much capacity was being added to those four

3    specific destinations we were talking about earlier, this is

4    another demonstration of how much had been added in,

5    basically, one year.  Because the pandemic started in

6    March 2020.  Lot of things, a lot of capacity went away very

7    fast as -- as -- that's what happened.  And then this is

8    merely one year later.  These are all of the new cities that

9    were added by at least the five airlines listed on the left

10   there.  And we were just trying to show how fast and how

11   much had been added across the country.

12   Q.   Thank you, Mr. Klein.  Now, compared to March of 2021,

13   how much leisure capacity is in the market today?

14   A.   Oh, I don't have an exact percentage, but it's

15   definitely more than what we saw in March 2021.

16   Q.   And are those shifting demand patterns affecting

17   Spirit?

18   A.   Well, I'm sorry.  Can you rephrase?

19   Q.   Sure.  How, if at all, has the shift in capacity mix

20   towards leisure affected Spirit in the present day?

21   A.   Right.  So at -- I think it's a little bit of -- it's a

22   little bit of the same kind of answer, which is as that

23   capacity shifts, it has an impact on our ability to generate

24   the fares that we need in order to be profitable.  So

25   that's -- you know, unfortunately that's what has happened

```
 1   is the capacity comes in, the fares have to be able to

 2   adjust, and if there's too much capacity in any given market

 3   or any given city and the fares come down, and if that

 4   impacts profitability, that goes back to your questions you

 5   had earlier about market exits.  Unfortunately, if we can't

 6   be profitable we end up having to exit city pairs.

 7            THE COURT:  If you look at the next slide.

 8            THE WITNESS:  Uhm-hmm.

 9            THE COURT:  The one that says, "Carriers facing

10   new landscape."

11            THE WITNESS:  Uhm-hmm.

12            THE COURT:  And the last bullet point there starts

13   with the phrase, "High execution risk."  I read "execution"

14   as ability to accomplish.

15            THE WITNESS:  Uhm-hmm.

16            THE COURT:  What do you mean there?

17            THE WITNESS:  That's exactly what we mean.  That's

18   exactly correct.

19            THE COURT:  Why is it?

20            THE WITNESS:  Oh, right.  So new cities and -- so

21   if -- when airlines add new cities, then you have to --

22   that's always something new so you have forecasts.  Right?

23   But the forecasts might not always be accurate, as it turns

24   out.  And as the competitive dynamics change, airlines have

25   to assess what's happening and then also change along with
```

1    it.  The industry capacity is a bit of a ecosystem.  As new

2    cities get launched, as new routes get launched, the

3    ability, especially if it's something that that airline

4    hasn't always done a lot of in the past, it may be new, it

5    may be new to the marketing department, new to the revenue

6    management department, they have to adjust very quickly and

7    they might not have a lot of experience with it.

8          So the execution risk talks to all of this

9    happened so fast and so rapidly that it's sort of upsetting

10   the applecart in a way.  Which isn't a bad thing, by the

11   way.  That could be a good thing.  But it just means a lot

12   of execution risk is there, and there will be -- I would

13   have voiced over this, by the way, to tell the board that

14   there's going to be a shakeout.  Things will shake out over

15   time from all of that change as well.  That would have been

16   my expectation.  I should say probably.  I didn't know for

17   sure at that time but that would have been my expectation.

18   Q.   Thank you.  Now I'd like to shift gears.  Now,

19   Mr. Klein, are you familiar with the models of seats that

20   are installed on Spirit's aircraft?

21   A.   I am.

22   Q.   What sorts of seats are on Spirit's aircraft today?

23   A.   The brand names or --

24   Q.   Yes, please.

25   A.   Yeah, sure.  So we have largely today have four models,

1    basically.  One of them is called -- it's an older seat

2    called the Brice seat.  There's the next oldest model is

3    called the Acro 3 seat.  Then we have the Acro 6 seat.  And

4    then just recently we have added another.  The new seat for

5    the cabin now is called the HAECO.  It might be easier to

6    call it the Vector Light seat.

7    Q.   How are those models distributed across Spirit's fleet,

8    as a general matter?

9    A.   Sure.  So we're actually in the midst of removing those

10   oldest seats that I talked about, but I can give you what we

11   have today versus what we'll have after that's all done.

12        So today the, those older seats, the Brice seat is on

13   12 aircraft today.  And I'm happy to say that they're going

14   away soon.  And so that's -- that has 12 aircraft.  The

15   Vector Light seat, which is the newest seat, is still pretty

16   small.  That's on, like, 19 aircraft today.  The

17   Acro 6 aircraft is on 84 aircraft today.  And the Acro 3, I

18   believe, is on, like, 89 aircraft today.

19   Q.   And you mentioned that Spirit is in the process of

20   retrofitting or changing that distribution; right?

21   A.   We are.

22   Q.   And after that retrofit what will the distribution of

23   the seat models be on Spirit's aircraft?

24   A.   Right.  So the Brice seat, which has 12 aircraft today,

25   that's going to zero.  Nothing against that manufacturer,

```
 1    just I'm happy to see those older seats go away.  The Vector

 2    Light, which is the newest seat, that stays exactly the

 3    same.  The retrofit isn't involving that new seat, so that

 4    stays at 19.

 5              THE COURT:  What's the name of the new seat again?

 6              THE WITNESS:  The Vector Light.

 7    A.   And the -- so the retrofits are going to go into the

 8    Acro 6.  So the Acro 6 will go from the 84 I said before, is

 9    going to go to 98.  And then the Acro 3 loses 2 so it goes,

10    I think, from 89 to 87.

11    Q.   Thank you, Mr. Klein.  And what model -- focusing on

12    the Acro 6 seats, what model of aircraft are those seats

13    installed on?

14    A.   The Acro 6 today is on our A320.  It's one of the -- on

15    the A320, I guess, is the best way to say it.

16    Q.   When will Spirit's retrofit be completed?

17    A.   They're scheduled to be completed within the next few

18    months.  Things can change, but that's our expectation.

19    Q.   Okay.  I'd like to show you a few photographs.  Can we

20    please pull up trial Exhibit 627 in your binder?  This is in

21    evidence.

22              (On screen.)

23    Q.   So, Mr. Klein, I'm showing you a set of eight

24    photographs.  I'd like you to focus on four of those eight

25    photographs.  Unfortunately, the pages are not numbered but
```

1    it's the even pages that I'd like you to focus on, the

2    second, fourth, sixth and eighth pages.  Let me know when

3    you --

4              MS. DEARBORN:  And, Mr. McLeod, can we pull up all

5    those photographs, 2, 4, 6 and 8?

6    Q.   What object is shown in these photos?

7    A.   Yeah, those are the Acro 6.

8    Q.   Where are the seats in this photo -- in these

9    photographs located?

10   A.   Across the street at the -- there's a WeWork facility

11   right across the street.

12   Q.   Have you had an opportunity to interact with the seats

13   in the WeWork?

14   A.   I have.

15   Q.   Are the seats in the WeWork an accurate model of

16   Acro 6 seats that Spirit chose for use on its aircraft?

17   A.   Yes.

18   Q.   And does this photograph fairly represent the set of

19   seats in the WeWork?

20   A.   Oh, yes.

21   Q.   Now, looking at the side view, which is the photograph

22   in the bottom right-hand corner, the armrest looks different

23   between those two seats.  Can you please explain that?

24   A.   Yes.  So what we provided here was a view -- it's a

25   little confusing.  I will try to explain this briefly.  We

 1   have a product called the big front seat that's usually in

 2   rows 1 and 2.  This would be a depiction of rows 3 and 4, or

 3   really row 3 and then kind of almost any other row.  That's

 4   how it's set up here.  And the seat there is, the tray table

 5   is in the armrest because there isn't an ability to put a

 6   tray table because of the row in front of it is a

 7   2-by-2 seating.  This is the first row of three.  Therefore,

 8   we can't have the tray table attached to the seat in front

 9   of it so it's in the armrest.

10   Q.   Thank you.  And can you please describe to the Court

11   where the seats in the WeWork came from?

12   A.   Yeah.  They were in our headquarters facility in

13   Miramar, Florida.

14   Q.   And before they were in your headquarters, did they

15   come from the manufacturer, from a plane, or something else?

16   A.   From the manufacturer.

17   Q.   And what are the standard ways in which Spirit measures

18   the seats on its aircraft?

19   A.   The seat itself?

20   Q.   The seat itself and the distance between the seats.

21   A.   Sure.  So the distance between the seats, there's an

22   industry standard term that's used called pitch.  Oh, sorry.

23   And the pitch is when you measure from one spot on the seat

24   to the exact same spot on the seat behind it or in front of

25   it, however you want to measure.  And that distance would be

1    called the pitch.  And that, think of that as how much space

2    there is between the seats.  That's one measurement.  And

3    then another measurement then simply is the dimensions of

4    the seat itself.

5    Q.   Did you bring a slide with you today to help show the

6    Court those measurements?

7    A.   Yes.

8    Q.   And please turn in the front pocket of your binder

9    where there's a demonstrative that we've marked as Klein

10   Demonstrative 1.  Using this demonstrative, Mr. Klein, can

11   you please tell the Court what Spirit's standard

12   measurements are for the Acro 6 seats?

13   A.   Absolutely.  So if we start, I guess maybe start on the

14   right side because I was just describing pitch.  So there

15   you can demonstrate the 28 inches of pitch.  That would be

16   between the standard seat, the standard seating

17   configuration.  And you can see there where it's measuring

18   from the exact same spot on the seat to the exact same spot

19   on the seat, again, either in front or behind, wherever you

20   want to start.  That's 28 inches, is our generally standard

21   pitch.  Then it also is demonstrating that the seat is

22   44 inches in height, and you measure that from the seat

23   track that the seat is attached to up to the top of the

24   seat.

25        And then moving over to the left side of the

```
 1   demonstrative, that's just demonstrating the width of the
 2   seats themselves on the Acro 6.  And you can notice that the
 3   middle seat is 1 inch wider than the aisle and window seats.
 4   Q.   And just for the record, what are the widths of the
 5   seats?
 6   A.   Certainly.  So the aisle and window seats would be
 7   17 inches, and the middle seat is 18 inches.
 8   Q.   And are those measurements consistent with your
 9   understanding of a typical layout of planes equipped with
10   Acro 6 seats?
11   A.   It is.
12   Q.   Okay.  One final topic for you, Mr. Klein.  I'd like to
13   talk a little bit about JetBlue.  As chief commercial
14   officer, to what extent, if at all, do you assess the degree
15   to which other airlines' networks overlap with Spirit's?
16   A.   We do assess that.
17   Q.   Why do you assess that?
18   A.   Well, it gives us, largely, besides wanting to know the
19   metric, it gives us an idea as to how much of our network
20   overlaps with other airlines.
21   Q.   What is the metric you find most useful in assessing
22   overlap with other airlines?
23   A.   I find ASM, as we mentioned ASMs earlier, the capacity
24   that we offer, I find that generally to be, for me, the best
25   metric.
```

1    Q.   And what are the top three airlines that Spirit's
2    network overlap with by ASMs?
3    A.   Sure.  So American, Southwest and Frontier.
4    Q.   Where does JetBlue rank in the list of Spirit's main
5    competitors in terms of the degree of network overlap by
6    ASMs?
7    A.   Sure.  So out of the main competitors that we overlap
8    with the most, JetBlue is the lowest of overlap.
9    Q.   Is the degree of that overlap higher or lower than it
10   was in 2019?
11   A.   It's, I'd say, directionally about the same, although
12   it is lower, but not -- I would say -- to answer directly,
13   it's lower.
14        MS. DEARBORN:  Thank you, Mr. Klein.  I have no
15   further questions.  Pass the witness.
16        THE COURT:  Any redirect for this witness?
17        MS. RIBLET:  Just briefly, your Honor.  And if I
18   may have a moment to confer with my cocounsel to make sure
19   I'm as efficient as possible.
20        THE COURT:  Of course.
21        (Whereupon counsel conferred.)
22                    REDIRECT EXAMINATION
23   BY MS. RIBLET:
24   Q.   Mr. Klein, your counsel just discussed Spirit seats
25   with you; correct?

```
 1    A.    They did.

 2    Q.    Mr. Klein, are Spirit's bulkhead row seats less wide to

 3    accommodate those in-armrest tray tables?

 4    A.    Oh, we would have to measure that to be specific.  On

 5    that one specific row I'm not certain.

 6    Q.    So they could be less wide to accommodate that?

 7    A.    We would have to -- and we can measure that to get the

 8    answer for you.

 9              THE COURT:  And a bulkhead seat is one that faces

10    the bulkhead?  In other words, it's row 1?

11              THE WITNESS:  In -- I believe your question is in

12    regard to that row 3, behind.  That's what we were

13    referencing in the demonstrative.

14    Q.    The row that is available for the Court to review in

15    the WeWork, one of those rows is a bulkhead row; right?

16    A.    It's actually row 3 which is behind the big front seat.

17    In front of you there would be -- there would be a seat in

18    front of you.

19              THE COURT:  That's the big front seat?

20              THE WITNESS:  The big front seat would be the ones

21    directly in front of that first row on the demonstrative.

22    Sorry, it's a little --

23              THE COURT:  No, I'm following.

24              THE WITNESS:  Okay.  Got it.

25              THE COURT:  And I take it you charge for that?
```

```
 1            THE WITNESS:  For the big front seat we do,
 2   absolutely.  As much as we can, by the way.
 3   Q.   Mr. Klein, you also mentioned that Spirit is in the
 4   process of rolling out some new Vector Light seats; right?
 5   A.   That is correct.
 6   Q.   Let's take a look at a document that's been marked for
 7   identification as BUH.  My cocounsel will hand it up to you.
 8   A.   Sure.  Absolutely.
 9            (Handing.)
10            (On screen.)
11   Q.   Mr. Klein, looking at the first page of this exhibit
12   you see an e-mail and attachments addressed to you; correct?
13   A.   Yes.
14   Q.   The attached slide deck, beginning at Bates number 470,
15   which we flagged for you --
16   A.   Uhm-hmm.
17   Q.   -- relates to these new Vector Light seats we've been
18   discussing; right?
19   A.   Yes.
20   Q.   Does this appear to be a fair and accurate presentation
21   relating to those new seats?
22   A.   It would look like it, uhm-hmm.
23            MS. RIBLET:  Your Honor, at this time plaintiffs
24   move to admit the document previously identified as BUH as
25   Exhibit 672.
```

1          THE COURT:  No objection?

2          MS. DEARBORN:  No objection, your Honor.

3          THE COURT:  BUH is admitted, 672.

4          (Exhibit 672 received in evidence.)

5     Q.   Mr. Klein, turning to the page of this presentation

6     with the Bates number ending 475, do you see the first

7     bullet that reads, "Curved seatback design continues to

8     unlock space at the knee level"?

9     A.   I see that.

10    Q.   Am I correct in understanding that Spirit has curved

11    seats to accommodate folks' knees?

12    A.   Yes, that's correct.

13    Q.   And do you see the third bullet that reads, "Pitch

14    focuses on flatback seats and omits this extra space"?

15    A.   I do.

16    Q.   So Spirit feels that the standard measurement of pitch

17    doesn't accurately capture its seat space; right?

18    A.   We believe that usable legroom is a good measure, and

19    pitch doesn't capture usable legroom.

20    Q.   And, Mr. Klein, these Vector Light seats are part of

21    Spirit's continued investment in cabin comfort that we

22    discussed earlier; right?

23    A.   It is.

24    Q.   Spirit aims to maximize both seat comfort and the

25    number of seats on its aircraft; right?

1   A.   We do aim to do that, to the best of our ability.

2   Sorry.

3   Q.   If Spirit's seats were larger or more spaced out fewer

4   could fit on the aircraft; right?

5   A.   If they were more spaced out, fewer would fit on the

6   aircraft.

7   Q.   And there are people who choose not to pay for larger,

8   more expensive seats than Spirit's; right?

9   A.   I'm sorry.  Can you say that again?  I'm sorry.

10   Q.   There are people who choose not to pay for larger, more

11   expensive seats than Spirit's standard seats; right?

12   A.   Can you -- what do you mean by expensive?

13           THE COURT:  Well, I think she's asking, part of

14   your customer mix or your hoped-for -- I'll make it simpler.

15   Some people won't fly Spirit because they think you're

16   crowded and don't have much space, is that --

17           THE WITNESS:  Sure.  Some people would want more

18   legroom.  Sure.  Absolutely.

19           THE COURT:  Now your question?

20   Q.   But there are people who choose not to pay for a

21   larger, more legroom, more expensive seat than Spirit's

22   standard seat; right?

23           THE COURT:  I don't understand the question.  Some

24   people, in order to get the Spirit price, they're fine with

25   sitting in the seats I'm going to see?  Is that your

 1   question to him?

 2           MS. RIBLET:  Precisely, your Honor.

 3           THE COURT:  Now I understand.

 4           Do you understand that question?  You're filling

 5   your planes, people are willing to get your prices in order

 6   to sit in those seats?

 7           THE WITNESS:  We're not filling it as much as we

 8   used to but, yes, I think that people who buy our product

 9   are sitting in those seats.

10   Q.   Mr. Klein, I'd like to turn back to a document your

11   counsel showed you.  This is Exhibit 334.

12           (On screen.)

13   Q.   And I'd like to turn specifically to slide 859-1.

14   A.   I apologize for asking.  You're talking about the

15   smaller binder?

16   Q.   Yes.

17   A.   Okay.  And which page again?

18           THE COURT:  859.

19   A.   859.

20   Q.   Dash 1.  It's in the color version of the presentation.

21   A.   Okay.

22   Q.   We're showing you the black and white, but this works

23   well too.  The title of this slide is, "Hybrid/ULCCs have

24   launched 40 plus new cities."  Right, Mr. Klein?

25   A.   Yes.

 1    Q.   And you are identifying in this slide JetBlue and

 2    Alaska as hybrid carriers; right?

 3    A.   That's what this -- they would need to find JetBlue,

 4    Alaska and Southwest, I guess.  Again, this term hybrid, I

 5    know it's in this deck.  I generally use the term LCC,

 6    low-cost carrier, but it would be referencing JetBlue,

 7    Southwest and Alaska.

 8    Q.   This slide was presented to Spirit's board of

 9    directors; correct?

10    A.   It was.

11    Q.   You spoke with your counsel about the pricing at Spirit

12    Airlines' presentation that we looked at earlier; right?

13    A.   Yes.

14    Q.   I'd like to look at another version of that

15    presentation, and this is going to be in your government

16    binder now --

17    A.   Okay.

18    Q.   -- as Exhibit 327.  Have you reached 327, Mr. Klein?

19    A.   Yes, I'm there.

20    Q.   This is a cover e-mail and attachment from Eric LaVerne

21    to Camila Sierra Torres.  Do you see that?

22             (On screen.)

23    A.   I do.

24    Q.   Mr. LaVerne was the manager of pricing and revenue

25    management at Spirit at the time of this e-mail; correct?

```
 1              MS. DEARBORN:  Objection, your Honor.  Beyond the
 2    scope.
 3              THE COURT:  That would be my instinct.  Why is it
 4    not beyond the scope?  This is redirect.
 5              MS. RIBLET:  We're questioning Mr. Klein about the
 6    same pricing document that his counsel showed him during
 7    their --
 8              THE COURT:  It doesn't -- well, are we?  It
 9    doesn't seem like we are.
10              MS. RIBLET:  It's a different version of the same
11    document.  I have some questions to elicit that, your Honor.
12              THE COURT:  Let's lay that foundation.
13    Q.   Mr. Klein, looking at the attachment to this
14    presentation, this is also -- go ahead, the next page.
15    A.   Oh, sorry.  Yes.
16    Q.   This is also titled, "Pricing at Spirit Airlines"?
17    A.   Yes.  That would have been older, I guess.  From 2020,
18    I suppose.
19    Q.   And turning to the page ending in 628, we see a slide
20    titled, "Spirit's Business Model."  Right?
21    A.   Yes.
22    Q.   Like the one we looked at earlier; correct?
23    A.   I don't have the other one in front of me so I don't --
24    can I open the other one and look at it to compare?
25    Q.   Certainly.
```

```
 1    A.    And what deck was that and which binder?

 2    Q.    That's Exhibit 330.

 3    A.    Yes, I see it.  I'm just going to turn to the color

 4    part of it.

 5    Q.    Sure.

 6    A.    Okay.  I'm there.

 7    Q.    So if you look at these two slides that are both

 8    titled, "Spirit's Business Model"?

 9    A.    They are.

10    Q.    And they're consistent; correct?

11    A.    Do you want me to read both slides to --

12          THE COURT:  Well, the documents speak for

13    themselves and they're both in evidence.

14    Q.    All right.  Thank you, Mr. Klein.  We can turn to the

15    cover e-mail again now of 327.

16    A.    Okay.

17    Q.    So this is a cover e-mail and attachments from Eric

18    LaVerne to Camila Sierra Torres.  I think you said you saw

19    that?

20    A.    Yes.

21    Q.    And Mr. LaVerne, as you said, was the manager of price

22    and revenue management at Spirit at the time of this e-mail;

23    right?

24    A.    He would have been one of them.

25    Q.    Ms. Torres was a new Spirit pricing analyst at the
```

```
 1   time?
 2           THE COURT:  Well, wait a minute.  She objects this
 3   is beyond the scope.  The whole idea of the rule of beyond
 4   the scope is an enforcing mechanism to bring an examination
 5   at some reasonable time to an end.  And I said lay a
 6   foundation for the -- your objection that this is just a
 7   variation of what she raised in her cross.  Unless we're
 8   going to go right there, I'm going to sustain the objection.
 9   Right there.  Where's the variation?
10   Q.   Mr. Klein, the cover e-mail of this exhibit, 327, shows
11   that this deck was used for training; correct?
12           MS. DEARBORN:  Objection.  Beyond the scope.
13           THE COURT:  Sustained.  All right.  Move on.
14   Q.   Mr. Klein, you testified on cross-examination about
15   network planning; correct?
16   A.   Yes.
17   Q.   And John Kirby is the vice president of network
18   planning at Spirit; right?
19   A.   He is.
20   Q.   Mr. Kirby reports to you?
21   A.   He does.
22   Q.   Mr. Kirby has direct oversight of the network planning
23   section at Spirit; correct?
24   A.   Yep.  He runs it day to day.
25   Q.   Mr. Klein, you testified on cross that Spirit competes
```

1    on individual offerings or transactions; right?

2    A.   When we sell to customers, when we price and revenue

3    manage it, yes.

4    Q.   You were referring to individual routes; correct?

5    A.   I'm talking -- well, individual transactions is -- I'm

6    actually talking about when a customer shops, they're

7    shopping an individual transaction, not necessarily the

8    route.  Of course the route matters, for sure, but I'm

9    talking about when they're shopping for exactly what they

10   want to fly at that time, including the dates, things like

11   that.

12            MS. RIBLET:  Could I have another moment, your

13   Honor?

14            THE COURT:  Of course.

15            (Whereupon counsel conferred.)

16   Q.   Mr. Klein, you testified earlier that you're not

17   filling planes as much as you would like; correct?

18   A.   We're not filling them as much as we used to.

19   Q.   But Spirit's load factor is still over 80 percent;

20   correct?

21   A.   In -- in what measure -- in what time period,

22   measurement?  What are you referring to?

23   Q.   You told shareholders in August of this year that

24   Spirit's load factor was still over 80 percent; correct?

25   A.   That was correct for the time period that was measured,

which would have been the second quarter of this year, which

would have been April, May and June of 2023.

          THE COURT:  What is it today or what is it in

the third quarter?

          THE WITNESS:  I don't have that number exactly

memorized, sir, but, your Honor, but right now we're in an

off-peak period.  Some days of the week we're running in the

60 percent range right now.  It's an off-peak time though.

          THE COURT:  So you'd expect it to be down

somewhat?

          THE WITNESS:  We expect it to be down right now

and then it will bounce back.  Weekends and peak periods are

a little bit stronger.  And then Thanksgiving, Christmas and

New Year's are coming so it will be stronger over there.

But then we hit January when it gets a little off again.

Q.   Mr. Klein, in 2019 Spirit's average load factor was

84.7 percent; correct?

A.   I don't have that number memorized.  I'm sorry.

Q.   Does that sound right?

A.   I really don't have that number memorized.

Q.   Fair enough.  Mr. Klein, we spoke about the fact that

other domestic airlines followed Spirit's lead in

introducing basic economy; correct?

A.   Can you repeat the question, please?

Q.   We spoke about the fact that other domestic airlines

1  followed Spirit's lead in introducing a basic economy

2  product; correct?

3          MS. DEARBORN:  Objection.  Beyond the scope.

4          THE COURT:  Sustained on that ground.

5  Q.   Mr. Klein, you testified on cross-examination that

6  other airlines' basic economy products have created

7  challenges for Spirit recently; correct?

8  A.   Other airlines' basic economy product has created

9  challenges.

10  Q.   But other airlines have been offering basic economy

11  since before the pandemic; correct?

12  A.   They were.

13  Q.   Delta introduced basic economy in 2015; right?

14  A.   It might even have been a little bit before that,

15  actually, but then it got expanded as the years went by.

16  Q.   American and United introduced basic economy in 2017?

17  A.   Around that time frame, I believe.

18  Q.   And Spirit was profitable from 2015 to 2019; correct?

19  A.   We were.

20          MS. RIBLET:  All right, your Honor.  No further

21  questions.  Thank you, Mr. Klein.

22          THE COURT:  Nothing further, Ms. Dearborn?

23          MS. DEARBORN:  Nothing further.

24          THE COURT:  You may step down.  Thank you.

25          (Whereupon the witness stepped down.)

```
 1                THE COURT:  Call your next witness.

 2                MR. DUFFY:  Your Honor, the plaintiffs would call

 3   Robin Hayes at this time.

 4                THE COURT:  He may be called.

 5                (Pause in proceedings.)

 6                THE COURT:  Let's swear the witness.

 7                        ROBIN HAYES, sworn

 8                THE COURT:  You may be seated.

 9                MR. DUFFY:  All right.  If you give us just a

10   moment, your Honor, we'll provide some binders to the Court

11   and the witness.

12                THE COURT:  That's fine.

13                MR. DUFFY:  May I proceed, your Honor?

14                THE COURT:  You may.

15                        DIRECT EXAMINATION

16   BY MR. DUFFY:

17   Q.   Mr. Hayes, can you please state and spell your name,

18   for the record?

19   A.   Yes.  It's Robin Hayes, R-O-B-I-N, H-A-Y-E-S.

20   Q.   Mr. Hayes, you are the chief executive officer of

21   JetBlue; correct?

22   A.   Yes, I am.

23   Q.   And you have been the CEO of JetBlue since 2015; right?

24   A.   From February 2015, correct.

25   Q.   And you have been with JetBlue since 2008; right, sir?
```

```
 1   A.    Yes.
 2   Q.    And previously you were an executive with British
 3   Airways; right?
 4   A.    Yes.
 5   Q.    JetBlue was founded in 1998; right, Mr. Hayes?
 6   A.    Yes.
 7   Q.    And today it is one of the two largest airlines by
 8   total passengers carried on flights to and from Boston;
 9   right?
10   A.    Yes.
11   Q.    The other would be Delta Airlines; right?
12   A.    Yes.
13   Q.    And JetBlue is also one of the two largest airlines by
14   passengers carried at Fort Lauderdale Airport; right?
15   A.    Yes.
16   Q.    And the other of those two largest airlines at Fort
17   Lauderdale would be Spirit; correct?
18   A.    Yes.
19   Q.    All right.  And JetBlue and Spirit both serve routes
20   from Fort Lauderdale to destinations in the Caribbean;
21   right, Mr. Hayes?
22   A.    We do.
23   Q.    As well as between Fort Lauderdale and Latin America;
24   right?
25   A.    Yes.
```

```
 1    Q.   And JetBlue and Spirit also fly between Fort Lauderdale
 2    and the New York metropolitan area; right?
 3    A.   Yes.
 4    Q.   And as well between Fort Lauderdale and Boston; right?
 5    A.   I believe they do, yes.
 6    Q.   And Fort Lauderdale is an attractive airport for
 7    low-cost carriers and ultra low-cost carriers because it is
 8    cheaper to operate than Miami International Airport; right?
 9    A.   Yes.
10    Q.   It is true Spirit competes head-to-head with JetBlue on
11    a number of routes that both airlines fly; correct?
12    A.   We compete on some routes with Spirit, yes.
13    Q.   If you turn, please, to the first document in your
14    binder -- not the first, but the first we'll be looking at.
15    Tab HH should be among the exhibits in your binder.
16               (On screen.)
17    A.   I'm still trying to raise this chair.
18    Q.   Take a moment to --
19    A.   I'm just raising the chair.  It was a bit low.
20    Q.   All right.  Let me know when you're there to tab HH,
21    please.
22    A.   HH.
23    Q.   I think it's the smaller binder, actually.
24    A.   Oh, I'm sorry.
25    Q.   Yes.
```

```
 1  A.   There's also a piece of paper here.  I don't know if

 2  that's --

 3           THE COURT:  You can give that to me.

 4           THE WITNESS:  Thank you.

 5           (Handing.)

 6  Q.   All right.  Let me know when you've gotten to that

 7  document, sir.

 8  A.   HH.  Yes, I have it.  Thank you.

 9  Q.   Okay.  So this is an e-mail that you sent to Ms. Joanna

10  Geraghty and Mr. Scott Laurence on November 26th of 2019;

11  correct?

12  A.   Just give me a brief moment to read it.

13  Q.   Sure.  Let me know when you're ready.

14           (Witness reviewed document.)

15  A.   Yes.  Thank you.

16  Q.   So you sent this e-mail on November 26, 2019; right?

17  A.   Yes.

18  Q.   Okay.  And Ms. Geraghty is the chief operations officer

19  of JetBlue; right?

20  A.   President and chief operating officer.

21  Q.   And at this time Mr. Laurence was the head of revenue

22  and planning at JetBlue; correct?

23  A.   Yes, he was.

24  Q.   And today he's actually an executive at American

25  Airlines; right?
```

```
 1   A.    Yes.
 2              MR. DUFFY:  Okay.  Your Honor, plaintiffs ask that
 3   HH be admitted in evidence as Exhibit 673.
 4              THE COURT:  No objection?
 5              MR. SHORES:  No objection.
 6   Q.    And in this e-mail, Mr. Hayes --
 7              MR. DUFFY:  If we may publish it to gallery.
 8   There's no confidentiality issues.
 9              (On screen.)
10   Q.    In this e-mail you discuss competition between JetBlue
11   and Spirit at Fort Lauderdale Airport; correct?
12   A.    Would you mind expanding on the screen a little bit?
13   Is that possible?
14   Q.    Yes.
15              MR. DUFFY:  If we can zoom in on the first few
16   sentences, please.
17   A.    Thank you.
18              THE COURT:  HH is 672, in evidence.
19              MR. DUFFY:  I believe it's 674, your Honor.
20              THE COURT:  674.
21              MR. DUFFY:  673.  I apologize.
22              (Exhibit 673 received in evidence.)
23   A.    Thank you for giving me a chance to review it.  This
24   was in relation to Spirit in Fort Lauderdale.
25   Q.    And specifically you say, "NK now controls the ball in
```

```
1    FLL."  Right?

2    A.    Yes, that's what the document says.

3    Q.    Breaking down those acronyms, that means Spirit now

4    controls the ball in Fort Lauderdale; right?

5    A.    Yes.

6    Q.    And by that you meant that Spirit was earning better

7    margins than JetBlue on its flights to and from Fort

8    Lauderdale; right?

9    A.    Yes, I think -- you know, I was surprised how well they

10   were doing.  I hadn't spent that much time or attention on

11   Spirit.  And I think I, yeah, I was surprised.  And this

12   really was my challenging my team for us to do a better job

13   there.

14   Q.    Spirit's strong performance required JetBlue to

15   respond; correct?

16   A.    Well, it was more about making sure our own performance

17   was where it needed to be.

18   Q.    Okay.  And then looking further in this e-mail, you

19   ask, "I think we also have to ask ourselves if we have the

20   right cost structure to compete if this is the new normal."

21   Do you see that, sir?

22   A.    Yes.

23   Q.    And JetBlue has a higher cost structure than Spirit;

24   right?

25   A.    We have a higher unit cost structure than Spirit.
```

```
 1   Q.   And you recognize JetBlue is proud of its product;
 2   right, sir?
 3   A.   Oh, yes.  For sure.
 4   Q.   But you would agree that that product does come at a
 5   higher cost; right?
 6   A.   Yes, it costs more to provide the product.
 7   Q.   Sure.  And JetBlue could compete against the legacy
 8   airlines in part because it has a lower cost structure than
 9   the legacies; right?
10   A.   In part, yes.
11   Q.   Whereas, it has been challenging for JetBlue to compete
12   against ULCCs because of ULCCs' lower cost structure; right?
13   A.   No, I wouldn't say it was challenging.  I mean, this
14   was 2019 and we had been competing with ultra low-cost
15   carriers for a long time.  This just related to a moment in
16   time where I was concerned we did not have the right plan
17   for Fort Lauderdale.
18   Q.   Okay.  If we look at the next sentence, you say, "Our
19   model was built to compete against legacies, but we found it
20   worked against ULCCs, but Fort Lauderdale says otherwise."
21   Right?
22   A.   Yes.
23   Q.   So the data at that point in time in this particular
24   instance was causing you to question whether JetBlue could
25   effectively compete against ULLCs; right?
```

1    A.    As I said, we had been competing against ULCCs for many

2    years, but I was concerned in this quarter of 2019 about how

3    we were doing and I was challenging my team to do better.

4    Q.    And indeed, this, the fourth quarter of 2019, was the

5    last full quarter preceding the COVID pandemic; correct?

6    A.    Yes, it was.

7    Q.    And you would agree that in every quarter since

8    the fourth quarter of 2019, JetBlue has either been engulfed

9    in the COVID pandemic or under a merger agreement; correct?

10   A.    Well, we were recovering from the COVID pandemic, yes,

11   and then entered into a merger agreement about a year ago.

12   Q.    Right.  And even during the first quarter of 2022

13   JetBlue was still very much recovering from the COVID

14   pandemic; right?

15   A.    The whole industry was recovering.

16   Q.    Right.  You close this e-mail, Mr. Hayes, by saying you

17   had no idea how well they were doing; right?

18   A.    Uhm-hmm.

19   Q.    "They" is a reference to Spirit Airlines; correct?

20   A.    Yes, sir.

21   Q.    You were indicating that despite Spirit's low fares on

22   flights from Fort Lauderdale, Spirit's profits were higher

23   than you had expected; correct?

24   A.    Well, yes.  I mean, we didn't know exactly what their

25   profits were because we were modeling from our own

1    assessment.  But, yes, I wanted to -- I felt there was an

2    opportunity for us to do better.  As I said, I hadn't really

3    spent much time focused on Spirit in my previous four, five

4    years in the job.  And so, yeah, we needed to get a better

5    plan.

6    Q.   Spirit's performance prompted you to believe that

7    JetBlue could do better; correct?

8    A.   In that -- in that period of 2019, yes.

9    Q.   All right.  You can put that document aside, Mr. Hayes.

10   I want to continue talking about Fort Lauderdale, but talk

11   about a particular flight that you took, Mr. Hayes.  It is

12   true that you personally have flown Spirit Airlines; right?

13   A.   Yes, it is.

14   Q.   You took a flight from Newark to Fort Lauderdale in

15   2021; correct?

16   A.   I did.

17   Q.   And if you turn to tab LG in your binder.  Let me know

18   when you're there.  You can take a moment to read the

19   e-mail.  Let me know when you're ready, Mr. Hayes.

20   A.   Thank you.

21              (Witness reviewed document.)

22   A.   Yes.  Thank you.

23   Q.   So this is an e-mail that you sent on April 7th of

24   2021; correct?

25   A.   Yes.

```
 1    Q.   And, again, this is to Ms. Geraghty and others; right?
 2    A.   Yes.
 3              MR. DUFFY:  Your Honor, plaintiffs ask that LG be
 4    admitted in evidence as Exhibit 674.
 5              THE COURT:  No objection?
 6              MR. SHORES:  No objection, your Honor.
 7              THE COURT:  LG is admitted, Exhibit 674.
 8              (Exhibit 674 received in evidence.)
 9    Q.   So, Mr. Hayes --
10              MR. DUFFY:  And we would ask that this be
11    published as well.
12              (On screen.)
13    Q.   Mr. Hayes, this e-mail is a report of a flight you took
14    on Spirit from Newark to Fort Lauderdale; correct?
15    A.   Yes.
16    Q.   This is a route where both JetBlue and Spirit fly
17    nonstop today; correct?
18    A.   It is, yes.
19    Q.   And you reported to your leadership team that you were
20    impressed by certain aspects of the flight; right,
21    Mr. Hayes?
22    A.   Yes.  Whenever I fly on another airline I'll complete
23    one of these reports.
24    Q.   For example, you reported Spirit had efficient boarding
25    for this flight; right?
```

```
 1   A.    Yes.

 2   Q.    And that the aircraft was spotless; right, Mr. Hayes?

 3   A.    Yes.  I mean, again, we were just post-COVID so a lot

 4   of focus on, you know, physical distancing and cleanliness.

 5   Really that was what prompted the e-mail.

 6   Q.    You also reported that the crew was nice; right?

 7   A.    The crew were great.

 8   Q.    And the flight was full; right?

 9   A.    If I wrote it there it probably was, yes.

10   Q.    Okay.  You also recognized, going to the service

11   section, the first bullet, you note that, "Spirit fans will

12   know it" -- service -- "is limited."  Right?

13   A.    Yes.

14   Q.    So you were recognizing that Spirit had repeat

15   passengers familiar with Spirit's more limited offering;

16   correct?

17   A.    Well, I -- I don't know how many were repeat on that

18   airplane but, yes, I think when you buy Spirit, you know, a

19   lot of customers know what they're getting and what they're

20   not.

21   Q.    Right.  And those passengers, those repeat passengers

22   know Spirit well and choose to continue flying it; right?

23               MR. SHORES:  Objection.  Foundation.

24               THE COURT:  Well, sustained.  He can't testify to

25   what is in their minds.
```

```
 1              MR. DUFFY:  Very well.  Withdrawn, your Honor.
 2    Q.   On this flight, Mr. Hayes, you personally were pleased
 3    with the level of service that Spirit provided; correct?
 4    A.   I was -- they gave me a big front seat and I was very
 5    happy.
 6    Q.   Right.  We'll talk about the big front seat in just a
 7    moment, I assure you, Mr. Hayes.  You said the flight was
 8    just fine; correct?
 9    A.   Yes, the flight was good.
10    Q.   Right.  And as you mentioned, on this flight you had
11    Spirit's big front seat; correct?
12    A.   I did.
13    Q.   And if you turn to Exhibit 347 in your binder, which is
14    already in evidence, 347, if you turn to the Bates label
15    ending in page 964, and this will be -- there's a color
16    version of a PowerPoint presentation.
17    A.   Just give me a minute.
18    Q.   Sure.
19    A.   I'm just finding my way around the documents here.
20    Okay.  I -- 347, you said?
21    Q.   964 is the number in the bottom right-hand corner.
22    A.   964.
23    Q.   Right.  There should be a black-and-white and a color
24    version.  I would recommend the color version, Mr. Hayes.
25    A.   Oh, really?  Okay.
```

1          MR. DUFFY:  And, yes, we can publish this to the

2  gallery.

3          (On screen.)

4  A.   Most choice, yes.  I've got it.  Thank you.

5  Q.   The photograph on the left is a photograph of the big

6  front seat; correct, Mr. Hayes?

7          MR. SHORES:  Your Honor, I'm going to make an

8  objection.  This is a Spirit document.  No foundation has

9  been made as to Mr. Hayes' knowledge of this document.

10         MR. DUFFY:  I'm just asking if this accurately

11  reflects the seats that Mr. Hayes flew on for this

12  particular flight.

13         THE COURT:  Since there's a photograph there he

14  may answer it.

15         Does that look like the seat that you flew on?

16         THE WITNESS:  It could well be the seat I flew on,

17  yes, your Honor.  They had two or three different versions

18  so I couldn't say for 100 percent certainty, but it was that

19  or similar.

20  Q.   Sure.  And this big front seat is similar to what you

21  find on a legacy airline's domestic first class in terms of

22  physical seat itself; right?

23  A.   It could be, yeah.  Yeah.  I can't remember the

24  legroom, if that would be the same, but --

25  Q.   All right.  So this particular seat is -- has -- it's

```
 1    wider than either a standard JetBlue seat or standard Spirit
 2    seat; right?
 3    A.   Yes.
 4    Q.   And it has more legroom than a standard JetBlue seat or
 5    a standard Spirit seat; correct?
 6    A.   I'm not sure about the legroom because I can't recall
 7    what the legroom was, but it has more width than a JetBlue
 8    seat.
 9    Q.   Okay.  So it was sufficiently comfortable for your
10    flight, Mr. Hayes?
11    A.   They gave me the courtesy of a free ticket.  I was
12    happy with what I got.  Very happy.
13    Q.   How tall are you, Mr. Hayes?
14    A.   Well, I am 6'2" and a tiny bit.
15    Q.   So this seat was comfortable for you at 6'2",
16    Mr. Hayes?
17    A.   Yes.
18    Q.   And as a Spirit passenger you would have the option to
19    decide whether or not to purchase a big front seat; correct?
20    A.   Yes.
21    Q.   And so Spirit gives passengers the power to decide for
22    themselves whether or not to buy a seat that is actually
23    wider than a JetBlue seat; correct?
24    A.   Well, there aren't many of them so I'm not sure
25    everyone gets what they want, but there's the option there
```

```
 1   for the first-takers.
 2   Q.   Right.  And you also had the option to buy Wi-Fi on
 3   this flight; right, Mr. Hayes?
 4   A.   I don't know.
 5   Q.   Okay.  You could pay for a carry-on or a checked bag if
 6   you wanted; right?
 7   A.   Not on a free ticket, no.
 8   Q.   Okay.  But you are aware of Spirit's product offering
 9   to typical customers; correct?
10   A.   Yes.
11   Q.   And those passengers can decide whether to buy checked
12   bags, carry-on bags, Wi-Fi, snacks and drinks; right,
13   Mr. Hayes?
14   A.   Yes.
15   Q.   Whereas, every JetBlue ticket includes Wi-Fi, snacks,
16   drinks and TV in every single fare; correct?
17   A.   Nonalcoholic drinks.
18   Q.   Right.  And you would agree that some cost-conscious
19   passengers might not want to pay extra to get those
20   features; correct, Mr. Hayes?
21           MR. SHORES:  Objection.  Foundation.
22           THE COURT:  Sustained.
23   Q.   In the course of your business, Mr. Hayes, you have to
24   understand what customers are willing to pay for; correct?
25           MR. SHORES:  Same objection, your Honor.  We're
```

1    asking for customer testimony.

2            THE COURT:  No, but this man's the CEO.  There are

3    people in his organization who analyze this.  Are we now

4    going to test his knowledge of these things?

5            MR. DUFFY:  Well, I'm just asking, your Honor, if

6    he's able to testify whether certain passengers, in his

7    understanding, based on the data he has seen, might not want

8    to pay extra for these features.

9            THE COURT:  Well, I mean, you've got 20 days, but

10   I'm telling you overall I didn't think that was disputed.

11           MR. DUFFY:  Okay.  I can move on, your Honor.

12           THE COURT:  All right.

13   Q.   As compared to Spirit, you would agree that JetBlue is

14   more successful in attracting business travelers; correct,

15   Mr. Hayes?

16   A.   I haven't seen the Spirit data on that, but my

17   experience would tell me that's probably the case.

18   Q.   Okay.  And you would also agree that JetBlue has been

19   relatively successful in attracting leisure travelers

20   willing to pay for a premium product; correct?

21   A.   Well, I think the unique thing about JetBlue is that we

22   attract a very broad range of customers, including the

23   couple of examples that you mentioned.

24   Q.   Okay.  And you also have been successful in Boston in

25   attracting corporate clients; correct, Mr. Hayes?

```
1    A.    Yes, to some degree.

2    Q.    All right.  And a corporate customer is a business that

3    has a particular contract with JetBlue; correct?

4    A.    Well, there are corporate customers that have contracts

5    with JetBlue, and there are other corporate customers that

6    we don't have contracts with but will fly us.

7    Q.    Right.  And you have some business travelers who won't

8    have a corporate contract who nevertheless choose to fly

9    JetBlue?

10   A.    The vast majority, especially small and medium-sized

11   businesses who don't have access to low fares on legacy

12   airlines, they will choose us.

13   Q.    JetBlue has been successful in attracting business

14   travelers in Boston in part because it offers multiple

15   flights a day to certain destinations; right?

16   A.    To certain destinations, yes.

17   Q.    Having multiple flights a day is something that

18   business travelers are more likely to value than leisure

19   travelers?

20   A.    Yes.  I would say that is evolving, post-COVID, as

21   we've seen a reduction of the day trip type business.  But

22   you see that, actually, on LaGuardia-Boston, LaGuardia-DCA,

23   where frequencies have come down a lot.  Having said that, I

24   recognize that there are certain markets where frequencies

25   may still be higher than other markets.
```

1   Q.   You would agree that JetBlue has adopted a relatively

2   high-frequency schedule from Boston to certain destinations

3   to attract business travelers; right?

4   A.   Yes, I would say in a few markets that's true.  But

5   it's still relatively rare for us.

6   Q.   Okay.  If we can -- if you can turn to NT in your

7   binder, Mr. Hayes?

8   A.   Have you finished with this one?

9   Q.   Yes.  You can put that to the side.

10  A.   Thank you.  I like to keep good order here or I get

11  confused.

12  Q.   All right.  Let me know when you're there, Mr. Hayes.

13  A.   Do you mind if I don't put this back and just lay it?

14  Q.   Whatever you like is fine.  We won't be returning to

15  it.

16  A.   What is the number of the one --

17  Q.   NT is what this one will be.

18  A.   NT.

19          (On screen.)

20  A.   Okay.  Thank you.

21  Q.   Okay.  This is an e-mail from you to Ms. Geraghty dated

22  October 15, 2019; correct?

23  A.   Give me a second.  Yes, thank you.  Yes, it is.

24          MR. DUFFY:  And plaintiffs ask that NT be admitted

25  in evidence as Exhibit 675.

```
 1              THE COURT:  No objection?

 2              MR. SHORES:  No objection, your Honor.

 3              THE COURT:  NT is admitted, Exhibit 675.

 4              (Exhibit 675 received in evidence.)

 5    Q.   All right.  And Ms. Geraghty here forwarded an e-mail

 6    she had sent to others at JetBlue; correct?

 7    A.   Well, she sent it to Scott and probably Mike.  So two

 8    people, yeah.

 9    Q.   And eventually you responded to Ms. Geraghty's e-mail;

10    correct?

11    A.   Well, yes, seventy-five minutes later.  I think that's

12    pretty quick.

13    Q.   Looking at the second paragraph of your response you

14    say that, "One more last-minute customer paying a higher

15    fare can mean the difference in outperforming."  Correct?

16    A.   Yes.

17    Q.   You would agree that passengers who buy tickets at the

18    last minute are usually paying a higher fare than someone

19    who purchased the ticket weeks in advance; correct?

20    A.   Yes, I would agree with that.

21    Q.   Would you agree that travelers who purchase last minute

22    are more likely to be business travelers?

23    A.   Yes, I would.

24    Q.   And getting more business travelers will improve the

25    revenue mix of the plane; right, Mr. Hayes?
```

 1    A.    For sure.

 2    Q.    And business travelers are willing to pay, generally, a

 3    higher fare for a refundable ticket or a ticket sooner to

 4    the time of purchase; correct?

 5    A.    Yes.  I would say, on the first one, now change fees

 6    have pretty much disappeared across the industry.  That's

 7    less of an issue.  But they will tend to buy later, that is

 8    true.

 9    Q.    All right.  And in this e-mail, Mr. Hayes, you

10    emphasize the need to focus on the inelastic parts of the

11    demand curve; correct?

12    A.    Yes.

13    Q.    And the inelastic part of the demand curve are

14    customers who are less sensitive to price; correct?

15    A.    Yes.  I mean, that's why -- a lot of businesses the

16    need to travel is there and they will buy the ticket.

17    Q.    In addition to certain schedule changes, JetBlue

18    entered the Northeast Alliance with American Airlines in

19    part to try to be attractive to business travelers; right?

20          MR. SHORES:  Objection, your Honor.  We're not

21    here on that issue.

22          THE COURT:  No.  No, I'm going to allow that.  You

23    may answer.

24          THE WITNESS:  Thank you, your Honor.

25    Q.    Would you like me to reask the question?

1   A.   Yes.

2   Q.   JetBlue entered the Northeast Alliance with American

3   Airlines in part because it thought the Northeast Alliance

4   would help it attract more business travelers; right?

5   A.   In part, yes.

6   Q.   And it's correct that JetBlue has since decided to walk

7   away from the NEA after the Court's decision in that case;

8   correct?

9   A.   Yes.

10   Q.   Okay.  Let's talk a little bit about how different

11   airlines compete with each other, Mr. Hayes.  You can put

12   that document to the side, either back in the binder or to

13   the side.  And if you would turn now to tab HT.  Let me know

14   when you're ready.

15   A.   Okay.  Thank you.  Yep.

16   Q.   All right.  This is an e-mail from January 29 of 2020;

17   correct, Mr. Hayes?

18   A.   January 9 -- January 29, 2020, yes.

19   Q.   And this is an e-mail to Ms. Geraghty that is part of

20   your annual self-assessment; correct?

21   A.   Would you give me a second just to review it?

22   Q.   Yes.  Let me know when you're ready.

23   A.   Thank you.

24         (Witness reviewed document.)

25   A.   Yes.  Thank you.  It is, yes.

```
 1   Q.    Okay.

 2              MR. DUFFY:  Your Honor, we would move HT in

 3   evidence as Exhibit 676.

 4              THE COURT:  No objection?

 5              MR. SHORES:  No objection, your Honor.

 6              THE COURT:  HT is in evidence, Exhibit 676.

 7              (Exhibit 676 received in evidence.)

 8   Q.   So looking on page 1, the very bottom of page 1 and

 9   going on to page 2, that is a summary of your own revenue

10   self-evaluation; correct?

11   A.    Yes, it was.

12   Q.    All right.  And then in the first paragraph at the

13   bottom of the first page, and going on to the second page,

14   you note JetBlue was doing well with corporate business and

15   transcontinental flights in Mint; correct?

16   A.    Yes.

17   Q.    All right.  And then going down in this same paragraph,

18   you also say that, "JetBlue saw significant comprehensive

19   growth from Spirit in the region, challenging some of our

20   traditional strength in the visiting friends and relatives

21   market."  Right?

22   A.    Yes.  I would draw your attention though to the next

23   sentence which says, "The real issue was more how the legacy

24   airlines were reacting to those fares, rather than the acts

25   of the ULCCs themselves."
```

```
 1   Q.   Right.  So, in fact, the legacies were lowering their
 2   fares to put pressure on the smaller ULCC entrants; correct?
 3   A.   Put pressure on all smaller airlines.
 4   Q.   Right.  And so the legacy airlines were responding to
 5   Spirit's entry by lowering their own fares; correct?
 6   A.   Yes, beyond, you know, in what I felt was sort of a
 7   very predatory way, as I put later in the note.  I mean,
 8   these are below cost, clearly, for these legacy airlines.
 9   Q.   So Spirit, even though small, was causing the big
10   legacy airlines to lower their fares drastically in response
11   to Spirit's entry; right?
12   A.   Yeah.  I mean, look, yes in this case, but we've seen
13   that from JetBlue in the past.  I've seen it when Frontier
14   has been growing Denver.  We did see these things pre-COVID
15   from time to time.
16   Q.   And this particular issue of the legacies lowering
17   their fares in response to Spirit was causing revenue
18   challenges for JetBlue; correct?
19   A.   It was causing revenue challenges for, I would imagine,
20   all the smaller airlines.
21   Q.   Right.  And that is one of the things you were
22   discussing in your self-evaluation here; correct?
23   A.   Yes.
24   Q.   Okay.  Additionally, JetBlue responded in part to
25   Spirit by introducing an unbundled Blue Basic fare; correct?
```

```
 1   A.    So when was this?  Yeah.  So you're referring to what
 2   we called fare options 2.1, which was the next iteration of
 3   fare options.  Actually, just so we're clear, the unbundling
 4   of the fare structure actually started in 2008 with American
 5   Airlines.
 6   Q.    Right, but --
 7   A.    But in terms of this issue here, I would say what we
 8   were doing was much more in response to the actions the
 9   legacy airlines had taken in responding to the ultra
10   low-cost carriers because those were the biggest competitors
11   we had at the time.
12   Q.    Sure.  The legacy airlines themselves introduced basic
13   economy in response to competition from the ULCCs; correct?
14   A.    Yes, in part.
15   Q.    And then JetBlue, itself, decided to offer its own
16   unbundled product, Blue Basic; correct?
17   A.    Yes.  We had an unbundled product for many years but we
18   evolved it in the next iteration in early 2021.
19   Q.    So the early 2021 iteration you referred to, Blue
20   Basic -- I'm sorry, fare options 2.1, further unbundled by
21   starting to charge for a carry-on bag; right?
22   A.    We changed the benefit.  It is true that we did start
23   charging for a carry-on bag in Blue Basic, but we also
24   allowed customers to change bookings in Blue Basic.  Up to
25   that point, if you bought a Blue Basic fare and you didn't
```

```
 1   travel you would lose your money.  And we changed that.  So
 2   we really just changed benefits through the categories.
 3   Q.   Okay.  So JetBlue had to adjust its own offering to
 4   better compete with both the ULCCs and the legacy basic
 5   economy; correct?
 6   A.   Yeah.  I mean, we needed to make sure we're competitive
 7   with how the market is evolving at the time.
 8           MR. DUFFY:  Your Honor, I see it's 12:57.  I have
 9   a few questions that's a small line.
10           THE COURT:  I'll stop or go to 1:00.  It's up to
11   you.
12   Q.   I'll ask a couple of questions to you right now,
13   Mr. Hayes.  It's a small topic but I'd like to address it
14   now.
15       Mr. Hayes, it is true that it is not possible, to your
16   understanding, to purchase an aircraft from Airbus directly
17   until 2029; correct?
18   A.   Yes.  I would say that is largely, almost largely true.
19   Q.   Okay.  So unless an airline already has a firm order in
20   place with Airbus, that airline is not possible to get an
21   additional aircraft from Airbus directly until 2029?
22   A.   It would be very challenging to do that.
23   Q.   And you would agree that there is another way to get
24   aircraft, by leasing them from a lessor; correct?
25   A.   Yes.
```

1    Q.   And you would agree that an airline is not able to

2    enter into a lease, a new lease for a new aircraft until at

3    least 2027; correct?

4    A.   I -- I don't have direct knowledge of that.  I haven't

5    talked to any of the lessors recently.

6    Q.   Okay.  You have -- you, personally, have knowledge as

7    to JetBlue's fleet plans; correct?

8    A.   Yes.

9    Q.   All right.  And you have an expectation as to when

10   JetBlue would be able to get an additional aircraft through

11   a lease; right, Mr. Hayes?

12   A.   Yeah, we don't tend to -- we don't tend to do operating

13   leases.

14   Q.   Right.  JetBlue prefers to --

15             THE COURT:  Now it is 1:00.  How about one more

16   question or we'll stop.

17   Q.   Okay.  I will ask you, JetBlue prefers to purchase

18   aircraft instead of lease them; correct?

19   A.   That's been historically true, yes.

20             THE COURT:  All right.

21   Q.   If an airline wanted to lease an Airbus --

22             THE COURT:  One more question.  It was just asked.

23             THE WITNESS:  Friday afternoon benevolency.

24             MR. DUFFY:  We will pick up then on Monday.

25             THE COURT:  We shall.  All right.  You may step

```
 1  down, sir.

 2          I'm going to recess.  The total elapsed time is

 3  plaintiffs, two days, one hour, five minutes.  Defense, one

 4  day, two hours, twenty-five minutes.

 5          Just so we're clear -- you may step down.

 6          (Whereupon the witness stepped down.)

 7          THE COURT:  Next week is a four-day week in view

 8  of the armistice -- my wife always reminds me, it's the

 9  Veteran's Day weekend, on Friday.  I will tell you that on

10  Tuesday morning I have my physical early in the morning, and

11  I will surely be here by 10:00.  We'll take a shorter recess

12  so as not to lose more time.  It will be helpful if we are

13  all ready to go by quarter of 10:00, but you'll understand

14  that I will surely be here by 10:00.

15          Have a good weekend.  We'll stand in recess.

16          THE CLERK:  All rise.

17

18          (Proceedings adjourned.)

19

20

21

22                        ******

23

24

25
```

C E R T I F I C A T E


        I, Cheryl B. Palanchian, Court Reporter
for the United States District Court for the
District of Massachusetts, do hereby certify that
the foregoing pages are a true and accurate
transcription of my shorthand notes taken in the
aforementioned matter to the best of my skill and
ability.


              /s/ Cheryl B. Palanchian 11/3/2023
                CHERYL B. PALANCHIAN

            Registered Merit Reporter
            Certified Realtime Reporter