```
                    UNITED STATES DISTRICT COURT
                  DISTRICT OF MASSACHUSETTS (Boston)

                                       No. 1:23-cv-10511-WGY
                                       Vol. 2, Pages 95-169


UNITED STATES OF AMERICA, et al
            Plaintiffs

vs.


JETBLUE AIRWAYS CORPORATION,
et al,
            Defendants




                         ********


                   For Bench Trial Before:
                   Judge William G. Young




                      United States District Court
                      District of Massachusetts (Boston)
                      One Courthouse Way
                      Boston, Massachusetts 02110
                      Monday, November 6, 2023




                         ********



         REPORTER:  CHERYL B. PALANCHIAN, RMR, CRR
                   Official Court Reporter
                 United States District Court
               One Courthouse Way, Boston, MA 02110
```

```
                    A P P E A R A N C E S


EDWARD WILLIAM DUFFY, ESQ.
ARIANNA MARKEL, ESQ.
AARON TEITELBAUM, ESQ.
        DOJ-Atr
        450 Fifth Street NW, Suite 8000
        Washington, DC 20530
        (202)812-4723
        Email:  Edward.duffy@usdoj.gov
        For Plaintiff United States of America
- and -
WILLIAM T. MATLACK, ESQ.
        Attorney General's Office
        One Ashburton Place, 18th Floor
        Boston, MA 02108
        (617)727-2200
        Email:  William.matlack@mass.gov
        For Plaintiffs United States of America and The
        Commonwealth of Massachusetts



RYAN SHORES, ESQ.
        Cleary Gottlieb Steen & Hamilton LLP
        2112 Pennsylvania Avenue, NW
        Washington, DC 20037
        (202)974-1876
        Email:  Rshores@cgsh.com
- and -
ELIZABETH M. WRIGHT, ESQ.
        Cooley LLP
        500 Boylston Street
        Boston, MA 02116-3736
        (617)937-2349
        Email:  Ewright@cooley.com
- and -
RACHEL MOSSMAN ZIEMINSKI, ESQ.
MICHAEL MITCHELL, ESQ.
        Shearman & Sterling LLP
        2601 Olive Street, 17th Floor
        Dallas, TX 75201
        (214)271-5777
        Email:  Rachel.zieminski@shearman.com
        For Defendant JetBlue Airways Corporation


(Continued.)
```

(Continued.)


JAY COHEN, ESQ.
ANDREW C. FINCH, ESQ.
        Paul, Weiss, Rifkind, Wharton & Garrison
        1285 Avenue of the Americas
        New York, NY 10019-6064
        (212)373-3000
        Email:  Jaycohen@paulweiss.com
        For Defendant Spirt Airlines, Inc.

```
                         I N D E X

WITNESS:              DIRECT    CROSS    REDIRECT    RECROSS

ROBIN HAYES, Continued

  By Mr. Shores                   99

  By Mr. Duffy                                127


HARTWELL MCINTYRE GARDNER

  By Ms. Markel       143


  EXHIBITS                              PAGE

    678 . . . . . . . . . . . . . 165
```

1              THE CLERK:  Court is back in session.  You may be

2      seated.

3              THE COURT:  Mr. Shores, you may continue.

4              MR. SHORES:  Thank you, your Honor.

5                    ROBIN HAYES, (Resumed)

6                    CROSS-EXAMINATION, (Cont'd.)

7      BY MR. SHORES:

8      Q.   Mr. Hayes, before we had a break we were talking about

9      Exhibit 617.  Do you have that in front of you?

10     A.   Yes.

11             (On screen.)

12     Q.   And this exhibit is entitled, "Board of Directors

13     Meeting, Project Exchange," and it's dated December 1st,

14     2019.  Do you see that?

15     A.   I do.

16     Q.   And what is Project Exchange?

17     A.   Project -- so we referred to earlier Project Henri,

18     which is 2017, look at potential acquisition targets.

19     Project Exchange was the 2019 look at Spirit.

20     Q.   And why did JetBlue consider purchasing Spirit again in

21     2019?

22     A.   Well, the issues hadn't changed, the growing dominance

23     of the legacy airlines, their growing profitability, and it

24     was an issue that I felt was fundamental to JetBlue.  And so

25     it was something that, as a board, we needed to continue to

 1  discuss.

 2  Q.   Okay.  And earlier, Mr. Hayes, you testified during

 3  Henri, you considered two airlines?

 4  A.   Yes.

 5  Q.   Why did you focus on Spirit at this time in 2019?

 6  A.   Well, I would say we did a lot of the sorting out in

 7  2017 to sort of identify Spirit as the preferred partner.

 8  Really, you know, common fleet type.  We flew the same

 9  airplanes.  We had the same engines.  We discussed earlier

10  how we keep our costs low.  One of the ways we keep our

11  costs low is that sort of fleet commonality.

12  Q.   Let's just pause there for a second, Mr. Hayes.  Can

13  you explain what a commonality of fleet is, and how that

14  impacts your cost?

15  A.   Yes, of course.  So for every different type of

16  airplane you have, you have to have different pilots trained

17  to fly it.  You have to have different -- you have to buy

18  different maintenance parts.  You have to enter into

19  different maintenance agreements.  You have to enter into

20  different engine agreements.  There's a complexity that

21  comes with having three different types of pilots.

22       So, for example, right now in Boston where we're

23  undergoing a fleet transition from our 190 platform to our

24  Airbus 220, we actually have Boston 190 pilots, Boston A220

25  pilots, Boston A320, 321 pilots.  So, you know, we don't

 1   want to add to that.  We want to reduce the number of fleet
 2   types we have.
 3   Q.   Did Spirit present the opportunity to have fleet
 4   commonality and the cost savings you just discussed?
 5   A.   Yes.  I mean, one of the things that we identified in
 6   2017 that was still true in 2019 was they were buying the
 7   same Airbus platform we were, the 320, 321neo.  They were
 8   buying the same Pratt & Whitney geared turbofan engine.
 9   That really was, you know, real important in trying to
10   maintain that cost benefit.
11   Q.   Okay.  Let's look at slide -- I'm sorry -- yeah, slide
12   with the Bates number ending in 738.
13   A.   I have it.
14   Q.   And the title of this slide is, "Strategic Rationale:
15   Unleash a sustainable challenger brand to the legacy
16   airlines."  And was this the strategic reason you were
17   considering purchasing Spirit at this time in 2019,
18   Mr. Hayes?
19   A.   Yes.
20   Q.   Okay.  And then there's three boxes listed below.  Do
21   you see those boxes?
22   A.   I do.
23   Q.   And the first one is, "Network Relevance."  What does
24   that mean?
25   A.   So we saw a number of benefits in this transaction from

```
 1    a network perspective.  You know, we talked earlier about
 2    what a huge advantage the legacy airlines have in terms of
 3    network size.  And this gave us the ability to be a much
 4    more national competitor.  So, first of all, it would allow
 5    us to grow in some of our existing focus cities.  LAX is a
 6    good example where we called it a focus city.  We're 30 to
 7    40 flights a day.  Spirit is the same.  We could make it a
 8    60 to 80-flight-a-day business.  That was the first element.
 9         Secondly, to become bigger in other airline hubs.  So
10    we talked earlier about the dominance of the legacy
11    airlines, the ability to go to add flights to Chicago,
12    Atlanta, some of these OA hubs where we believe we would
13    have the most impact on bringing down fares because we could
14    offer, you know, viable choices of flying, say, to the top
15    ten or fifteen markets from those destinations.
16         And then, finally, adding new focus cities and flying
17    to new places where they're not necessarily well-served
18    today.  So I would say from a network point of view it was
19    those three things.
20    Q.   And from a focus city, new focus city perspective, what
21    would establishing new focus cities do for JetBlue's
22    network?
23    A.   Well, it would give us a more national presence.  It
24    would give us more loyalty customers in that market because
25    now they have a reason to join our loyalty program and to
```

1    get the credit card.  And it would allow us to, you know,

2    compete for corporate contracts and other things more

3    successfully.

4    Q.   What would the implication be for consumers if you're

5    able to expand your network nationally?

6    A.   Well, you know, it really goes back to the JetBlue

7    Effect.  I mean, I know going to an OA hub with 20, 30, 40

8    flights a day isn't going to meet the same need as a legacy

9    who may be flying six, seven, 800 flights a day.  I mean,

10   let's take Atlanta, Delta six, seven, 800 flights a day, us

11   going to 30 or so, I understand, is not going to ever

12   compete with what they do.  But I know people flying in

13   those 30 markets are going to be paying lower fares as a

14   result of us being more prominent there because of the

15   JetBlue Effect.

16   Q.   Let's go to the next box.  It says, "Growth Engine."

17   Do you see that, Mr. Hayes?

18   A.   Yes.

19   Q.   And what is "Growth Engine" intended to represent here?

20   A.   We talked earlier about how we were so small compared

21   to the legacy airlines, a quarter of the size if you look at

22   those aircraft numbers we saw earlier.  And they all got

23   there through mergers.  As I testified earlier, you would

24   never get there through organic growth.  So what this did

25   was allow us to grow more inorganically and become bigger

 1    more quickly than we would otherwise be able to do.

 2         In addition, as I testified earlier, the industry is

 3    experiencing acute aircraft shortages in terms of the both

 4    main manufacturers.  And so this is going to also give us

 5    more aircraft more quickly than we'd be able to get from the

 6    manufacturers.

 7    Q.   Okay.  The last box is, "JetBlue Effect."  Do you see

 8    that, Mr. Hayes?

 9    A.   Yes.

10    Q.   And what was the rationale behind that?

11    A.   Again, as I testified earlier, this is kind of what we

12    do.  We take our product and service, which is better, and

13    we fly it to new places and we bring down the fares in those

14    markets where customers historically have been flying on one

15    of the legacy airlines.

16    Q.   Okay.  Mr. Hayes, this Strategic Rationale slide,

17    anywhere on this does it suggest that one of the rationale's

18    for this merger was to eliminate Spirit as a competitor?

19    A.   No.

20    Q.   Okay.  And in your discussions in 2019 around Project

21    Exchange, was one of the reasons you were buying or

22    considering buying Spirit to eliminate Spirit as a

23    competitor?

24              MR. DUFFY:  Objection.  Leading.

25              THE COURT:  Well, it's an adverse witness.  I

```
 1    think he's entitled to lead, where you called the witness to
 2    the stand.  The problem is that he must, therefore, confine
 3    his examination solely to topics that you raised on your
 4    examination.  This is within those topics.  Overruled, he
 5    may answer.
 6            MR. SHORES:  Thank you, your Honor.
 7    A.   I'm sorry.  Would you mind repeating the question,
 8    counselor?
 9            THE COURT:  Were you trying to eliminate Spirit in
10    those discussions?
11            THE WITNESS:  Oh, no.  No, no.
12    Q.   Mr. Hayes, what happened in 2019 after you considered
13    this acquisition of Spirit?
14    A.   Well, the -- this was the December board meeting in
15    2019.  We had a February board meeting, which was normal
16    course, on February 2020.  And as a result of the
17    discussions we'd had really over a number of years about
18    Spirit, I was authorized by the board to reach out to Ted
19    Christie, who was then and still is the president and CEO of
20    Spirit, and see if Spirit had any interest in a merger.
21    Q.   And did you do that?
22    A.   I did not.
23    Q.   Why not?
24    A.   Unfortunately, that happened about a week or two before
25    the COVID pandemic took hold and we became distracted with
```

```
 1   that.
 2   Q.    Okay.  All right, Mr. Hayes, I want to turn to
 3   Exhibit 669 in your binder.
 4              (On screen.)
 5   A.    I have it.
 6   Q.    And this is entitled, "Board of Directors, Project
 7   Exchange meeting, March 21st of 2022."  Do you see that?
 8   A.    I do.
 9   Q.    And what does this concern, Mr. Hayes?
10   A.    Well, this -- so, you know, we just looked at end of
11   2019, 2020.  We then spent the next two years in COVID.  And
12   this relates to a board meeting we had in March to decide if
13   we should make another bid for Spirit.
14   Q.    Why were you considering this in March of 2022?
15   A.    Well, what happened was, you know, for all the reasons
16   from when we looked at it before I still had an interest in
17   pursuing this transaction.  However, we'd been very focused
18   on COVID, and that was clearly the priority, to make sure
19   that we could navigate through that.  So we hadn't really
20   revisited it.
21        And then prior to this, Frontier and Spirit announced
22   that they were entering into a merger agreement, and that
23   meant that we had to decide -- we had a finite time period
24   at that point to decide if we wanted to make a bid for
25   Spirit or not.
```

```
 1   Q.   Okay.  Let's look at slide ending in 147.  And that's

 2   entitled, "Strategic Rationale."  Do you see that,

 3   Mr. Hayes?

 4   A.   Yes.

 5   Q.   And then let's turn to the next slide which is 148.

 6   Mr. Hayes, can you just describe what the strategic

 7   rationale was in March of 2022 related to Project Exchange,

 8   this iteration?

 9   A.   Yes.  I mean, this slide really is a -- a near copy, if

10   not a copy, of the slide that you saw from the 2019 board

11   deck in that we wanted to create a more national challenger,

12   you know, a low-fare, high-quality challenger to the legacy

13   airlines.

14   Q.   And at any time in March of 2022 did you have a

15   discussion with the board of directors of JetBlue about the

16   rationale of this transaction being to eliminate Spirit as a

17   competitor?

18   A.   No.  I mean, the industry was at a very different time

19   in 2022, and I think it wasn't certain still at that point,

20   you know, we would all step out of it.  So absolutely not.

21   This was about securing and anchoring JetBlue's future.

22   Q.   All right.  And, Mr. Hayes, what would the impact be on

23   JetBlue's network if it is able to consummate this

24   transaction?

25   A.   Yes, I really would repeat what I said earlier.  It
```

1    will allow us to be at our focus cities.  It will allow us

2    to build presence and create new focus cities that we don't

3    have today.  It would allow us to fly more into other

4    airline hubs and bring more low-fare service, and also fly

5    to some underserved markets, markets that haven't been

6    served so well in the past.

7    Q.   Okay.  All right.  Mr. Hayes, I want to transition

8    topics to talk about divestitures.  Are you personally

9    familiar with the concept of divestitures in the airline

10   industry?

11   A.   I am.

12   Q.   And, I'm sorry, Mr. Hayes.  You can put that document

13   aside.

14   A.   Okay.  Thank you.

15   Q.   In general, what is your understanding of the purpose

16   of divestitures?

17   A.   Divestitures are when you take slots or some form of

18   asset that you have and you say, you know, we're going to

19   stop flying it and we're going to make it available to

20   somebody else to fly instead.  And they have historically

21   been used in our industry in relation to some of the mergers

22   that have gone on in the past.

23   Q.   Okay.  And have you personally been involved in any

24   divestitures in your experience in the airline industry?

25   A.   I actually have been involved, yes.

1    Q.    Okay.  Can you describe that experience to us?

2    A.    Well, the most recent one was the -- when American

3    Airlines and U.S. Airways was -- that merger was approved.

4    A number of slots and assets were made available at

5    different airports as a condition of that transaction.  You

6    know --

7    Q.    And let's pause there for a second.  I want to make

8    sure we have the terminology correct.

9    A.    Yes.

10   Q.    Can you describe for us what a slot is?

11   A.    Yes.  A slot is the permission to land and take off at

12   an airport at specific times.

13   Q.    And do all airports have slots?

14   A.    There are -- every airport has a slot.  However, most

15   airports aren't slot-constrained.  In other words, you can

16   get a slot anytime you want.  However, there are a small

17   number of airports that are slot-constrained, when you can't

18   get a slot unless it's available.

19   Q.    Okay.  And so returning to your experience with the

20   divestitures from the U.S. Air-American matter, what

21   divestitures did JetBlue receive as a result of that matter?

22   A.    We were able to pick up slot pairs.  When I use the

23   term slot pairs, I mean an arrival and a departure slot.  So

24   two slots is in one slot pair.  We were able to pick up a

25   number of slot pairs at DCA airport that allowed us to

1    expand our service in Washington, D.C.

2    Q.   And what was the effect for JetBlue of being able to

3    obtain these divestitures with respect to its service at --

4    in Washington, D.C.?

5    A.   Well, it allowed us -- we had a very small presence in

6    Washington, D.C.  In fact, we hadn't been in there for most

7    of our history.  But we managed -- we had done a slot swap

8    in the past with American Airlines so we built some presence

9    but it was still very small.  This gave us the ability to

10   take Washington, D.C. up to about 30 flights a day.  We were

11   able to add markets like Boston, DCA and some other places

12   we haven't flown out of D.C. before.

13   Q.   Were you required, as a condition of obtaining those

14   divestitures to fly specific routes from Washington, D.C.?

15   A.   No.  We would never have accepted the slots on that

16   basis.

17   Q.   Why not?

18   A.   Because it's a very dynamic industry.  Profitability on

19   different routes comes and goes, and you'd want the ability

20   to fly those to where you think you can have the most

21   consumer benefit.

22   Q.   And has JetBlue had any other experience with

23   divestitures?

24   A.   Yes.  We also benefited before that.  Delta and U.S.

25   Airways had done a very significant slot swap between

```
 1    LaGuardia and DCA where U.S. Airways took a larger number of
 2    Delta slots at DCA, and Delta took their slots at LaGuardia.
 3    As a result of that approval, some slots were made available
 4    to JetBlue and we were able to add service to LaGuardia.
 5    Q.   What was the effect of that for JetBlue's business at
 6    LaGuardia?
 7    A.   Well, it allowed us to fly to markets that we hadn't
 8    been able to fly before.  And, you know, one of the things,
 9    and we talked about it earlier, was adding flights to Boston
10    and LaGuardia.  So it allowed those things to become
11    possible.
12    Q.   Okay.  And were you required, as part of those
13    divestitures, to fly any specific routes from LaGuardia?
14    A.   No.
15    Q.   Okay.
16         THE COURT:  Well, I get the sense from the tenor
17    of your testimony that that would be an extraordinary
18    requirement.  Have you ever heard of that requirement?
19         THE WITNESS:  It has happened occasionally.  So,
20    your Honor, there was an agreement in relation to London
21    Heathrow when, I think it was British Airways merged, and
22    they were -- so it wasn't a merger, it was a joint venture
23    they created with American Airlines.  I'm sorry.  As a
24    result of that, there was some -- there were concerns around
25    certain routes, and slots were made available on the basis
```

```
 1    that you flew that route.  But it's very rare and I've not
 2    heard of it in the U.S. domestic market at all.
 3              THE COURT:  Go ahead, Mr. Shores.
 4              MR. SHORES:  Thank you, your Honor.
 5    Q.   Mr. Hayes, did JetBlue agree with Spirit to make
 6    certain divestitures as part of the transaction we're here
 7    today about?
 8    A.   We did.  We did -- yes, we did.  Yes.
 9    Q.   And why did you feel like those divestitures were
10    necessary?
11    A.   Well, I'd always been a huge proponent of divestitures.
12    You know, first of all, JetBlue had benefited from it.
13    Secondly, I had sort of been quite prominent on the issue of
14    these legacy airlines forming -- I mean, we talk a lot about
15    the power of the legacy airlines today.  You then multiply
16    that with their immunized international joint ventures.  So
17    you fly between Europe and the U.S. where you're flying
18    British Airways, American, you're flying the same airline.
19    They set prices and schedules together.  The same Delta, Air
20    France, Virgin, the same Lufthansa, United.  It has this,
21    you know, huge turbo effect because they can fly all of
22    those people in the domestic market.
23         So JetBlue had been for years saying, Look, we think
24    these things are fundamentally problematic, but we're not
25    necessarily opposed to them providing remedies are provided,
```

```
 1   like divestitures.
 2        So, first of all, we were very familiar with
 3   divestitures.  Secondly, we recognized that this transaction
 4   was going to get a lot of scrutiny from the regulators and
 5   we wanted to show that we were proactive and, you know,
 6   willing to engage on that topic.  And, thirdly, it was
 7   something the Spirit management team and board had raised as
 8   a concern for them, too, in getting this transaction
 9   approved.  We wanted to be mindful and respond to that.
10   Q.   Okay.  Mr. Hayes, let's look at Exhibit 218, which has
11   been admitted into evidence.
12             (On screen.)
13   Q.   This is a very long document, and I'm going to ask you
14   about a letter starting at Bates 1518.
15   A.   1518.  Yes, I have it.  Thank you, counselor.
16   Q.   Mr. Hayes, do you recognize this as a letter that
17   JetBlue sent to the Spirit board of directors?
18   A.   I do.
19   Q.   Okay.  And was this one of the offers that JetBlue made
20   to Spirit during the course of the negotiations?
21   A.   Yes.
22   Q.   Let's look at the next page, if we could.  It's ending
23   in Bates number 1519.  And I want to look at the top.  It
24   says, "Stronger regulatory commitment."  Do you see that?
25   A.   I do.
```

1    Q.   And there's two sub-bullets under that.  Do you see

2    that?

3    A.   I do.

4    Q.   And did these bullet points represent the regulatory

5    commitment that JetBlue ultimately made to Spirit as part of

6    its transaction?

7    A.   It does, yes.

8    Q.   And we'll start at the one at the bottom, Mr. Hayes,

9    and it says, "A proactive offer to the Department of Justice

10   of a remedy package."  Do you see that?

11   A.   Yes.

12   Q.   And what does that mean by "proactive offer to the

13   Department of Justice"?

14   A.   Well, we would -- you know, historically when these

15   divestitures have happened they've come on the back end as a

16   result of a discussion with the regulator, not necessarily

17   as part of an initial offer.  The word "proactive" means

18   that we would go into the Department of Justice with that,

19   you know, proposal already on the -- already there to be

20   discussed.

21   Q.   All right.  And there's a listing of assets, New York,

22   Boston and Fort Lauderdale.  Do you see that, Mr. Hayes?

23   A.   Yes.

24   Q.   And we're going to come back to that in just a moment,

25   but let me go first to the top, first bullet point.  And it

```
 1    says, "An express obligation to litigate and to divest
 2    assets of JetBlue and Spirit up to a material adverse effect
 3    on the combined JetBlue-Spirit."  Do you see that?
 4    A.    I do.
 5    Q.    And what does that mean?
 6    A.    Well, what that means is whilst we had, you know, put a
 7    specific offer in place, which you referred to in that
 8    second paragraph, we also wanted to recognize that as a
 9    result of conversations with the Department of Justice that
10    additional divestiture requirements may be needed to get
11    this transaction approved.  And so we wanted to demonstrate
12    to Spirit that we were open to that and would agree to that
13    to actually a very high bar.  I mean, I'm not a legal
14    expert, but the lawyers amongst our team advised me that
15    this was a very significant commitment on our part to make
16    this level of commitment.
17    Q.    Okay.  And, Mr. Hayes, after "material adverse effect
18    on the combined JetBlue and Spirit," there's a following
19    carve-out.  It says, "With a limited carve-out to this
20    divestiture obligation," and it's related to the Northeast
21    Alliance.  Do you see that?
22    A.    I do.
23    Q.    Has JetBlue withdrawn from the Northeast Alliance?
24    A.    We have.
25    Q.    All right.  And, Mr. Hayes, what did you predict or
```

```
 1    understand would happen after you contractually agreed with
 2    Spirit to these regulatory commitments or these divestiture
 3    commitments?
 4    A.   I would have expected sort of a discussion or
 5    engagement with the Department of Justice on what they
 6    wanted to do with this package, were there other things that
 7    they wanted to see and have some kind of a back-and-forth on
 8    it.
 9    Q.   Okay.  And did any additional divestitures occur as a
10    result of any discussions with the Department of Justice?
11    A.   No.
12    Q.   Why not?
13              MR. DUFFY:  Your Honor, object.  408, settlement
14    communications.
15              MR. SHORES:  Your Honor, they put at issue why we
16    haven't agreed to do additional divestitures here.  I think
17    it's appropriate for the witness to provide this context for
18    that.
19              THE COURT:  No, I'm going to sustain it on the
20    ground of the objection.  But I am curious, and I'll ask the
21    witness.  I don't want anyone to take anything from this
22    question.  You should not.  But I'm going to ask the
23    witness, and perhaps we'll get some further briefing.
24              Have you ever heard -- and you're chief executive,
25    I'm telling you looking at you, don't take anything from
```

1    this.  Have you ever heard of a judicial decision that said

2    this doesn't pass muster, but if you did the following

3    perhaps it would pass muster?

4              THE WITNESS:  So I'm only really familiar in our

5    industry, and I --

6              THE COURT:  I guess that's the industry I'm asking

7    you about.

8              THE WITNESS:  Yeah.  Well, in our industry that

9    hasn't really happened.  Either the Department of Justice

10   has approved it without any remedies, or they have -- they

11   did sue to block the American-U.S. Airways merger, but then

12   there was a discussion and it was settled with remedies.

13   And there's also been other ones where joint ventures were

14   approved with remedies and the parties made a decision -- a

15   good one is Delta, WestJet.  When they tried to not merge

16   but do a possible joint venture, there were slot

17   divestitures required at LaGuardia as part of that.  And the

18   parties said no and they didn't execute the agreement.

19             So in our industry I've never seen it.  We've

20   always -- it's always got there through the regulator.

21             THE COURT:  Thank you.  The government's objection

22   is sustained.  Move on.  Go ahead.

23   Q.   All right.  Mr. Hayes, I want to talk to you about the

24   divestitures in Boston, New York and Fort Lauderdale.  Okay?

25   How did JetBlue go about selecting buyers of those

1    divestiture assets?

2    A.   Well, you know, we, if you look back at the history in

3    this country of divestitures, the divestitures have normally

4    gone to what I call new entrants in airports or, you know,

5    airlines either with no presence or very small presence.

6    Those tend to be the low-cost carriers and ultra low-cost

7    carriers, because we haven't been around for decades to sit

8    on these legacy offerings.

9         With that sort of institutional knowledge in mind, we

10   felt that we should start by looking at the ultra low-cost

11   carriers.  We felt that that was directly addressing some of

12   the concerns that may be raised about this transaction and

13   that we would be proactively addressing those.  So we just

14   offered these divestitures to the ultra low-cost carriers.

15              MR. SHORES:  Okay.  And if we could, Mr. McLeod,

16   could we bring up Hayes Demonstrative F?

17   Q.   And, Mr. Hayes, did these -- did Hayes Demonstrative F

18   reflect what you talked about earlier as the proactive

19   divestitures?

20   A.   Yes, sir.

21   Q.   And you've entered into binding agreements to divest

22   these assets reflected on Hayes Demonstrative F?

23   A.   Yes.

24   Q.   Okay.  And let's start with Frontier.  Do you see that,

25   the second one down on this demonstrative?

1    A.    I do.

2    Q.    And what have you agreed to divest to Frontier?

3    A.    We have agreed to divest to Frontier.  So LaGuardia

4    airport is a slot-constraint airport.  And so we have agreed

5    to divest the 22 slots that Spirit currently operates today,

6    and also the six gates at LaGuardia that Spirit has to serve

7    those flights.

8              MR. SHORES:  Okay.  And if we could, let's bring

9    up Exhibit 360 which has been admitted into evidence.

10             (On screen.)

11   Q.    And do you recognize this document, Mr. Hayes?

12   A.    I do.

13   Q.    All right.  Is this the divestiture agreement that you

14   entered into with Frontier Airlines?

15   A.    Yes.

16   Q.    All right.  And let's turn to the page ending 763.

17   A.    Yes, I have it.

18   Q.    Okay.  And, Mr. Hayes, I know you're not a lawyer, but

19   there is a number of definitions:  Transferred assets,

20   transferred gates, transferred ground facilities,

21   transferred slots.  Are these the assets that you just

22   discussed that are being contractually agreed to be divested

23   to Frontier as reflected in Hayes Demonstrative F?

24   A.    Yes, they are.

25   Q.    And, Mr. Hayes, from your perspective at JetBlue, what

```
 1    is the significance of these divestitures?
 2    A.    I mean, it's a very significant divestiture package.
 3    It really means that in New York, which is probably the most
 4    slot-congested markets in the United States, that the ultra
 5    low-cost carrier percentage of that market would be the same
 6    after this transaction as it was before it.  And it would
 7    also allow Frontier to begin service to markets that they
 8    have never been able to fly out of New York.
 9    Q.    Okay.  Mr. Hayes, let's go back, if we could, to
10    Demonstrative F, and then there's three different
11    divestiture packages mentioned with respect to Allegiant.
12    Do you see that?
13    A.    Yes.
14    Q.    Can you describe those for the Court?
15    A.    Yes.  So in the case of Newark, which is an airport
16    just across the river in New Jersey, it isn't a slotted
17    airport in the same way as LaGuardia is slotted, but it is a
18    busy, congested airport.  So you still have to get approval
19    to operate airplanes in and out of the airport to make sure
20    the airport can manage the traffic at the time.
21         And so in this case we have agreed to divest what's
22    called runway authorizations, which kind of conveys the same
23    benefit as a slot in terms of bringing the airplane in and
24    out.  And also, again, the gates needed in the airport to
25    support those flights.
```

1          In Boston and Fort Lauderdale, where these airports are

2      not, you know, constrained, from a slot perspective, they

3      don't require runway authorizations, then we have agreed to

4      divest two gates at Boston, which matches Spirit's size of

5      operation in Boston, and five gates in Fort Lauderdale.

6      Q.    Okay.  And let's start with Newark.  Can you describe

7      for us the significance of the divestitures in Newark?

8      A.    Yeah.  I mean, it's a very significant divestiture

9      package because whilst 43 runway authorizations is obviously

10     around 22 flights, there are times of day where runway

11     authorizations are easier to get because it's not a peak

12     period.  So this would allow Allegiant to, you know, really

13     replace all of Spirit's flying at Newark.

14     Q.    What about Boston?

15     A.    Same thing.  Again, these are providing the gates and

16     the facilities for Allegiant to fly out of Boston.

17     Q.    And what about Fort Lauderdale, what's the significance

18     of these divestitures at Fort Lauderdale?

19     A.    Well, again, you know, it provides access to Allegiant

20     in a fairly meaningful way.  I mean, five gates can allow a

21     forty -- 30 to 45-flight-a-day departure operation, and to

22     really create a meaningful presence in Fort Lauderdale.

23          MR. SHORES:  Okay.  And if we could, let's take a

24     look at, the number here, Exhibit 246.

25          (On screen.)

1    Q.   And do you recognize this, Mr. Hayes, as the

2    divestiture agreement with Allegiant?

3    A.   I do.

4    Q.   Okay.  And let's look at pages 890 and 891.  And,

5    again, I'm not going to ask you to go through each of these,

6    but there's a listing of transferred assets at the various

7    airports you just mentioned.  Does this reflect the assets

8    that you've agreed to divest to Allegiant?

9    A.   Yes.

10   Q.   All right.  Mr. Hayes, do you understand that to

11   transfer gates at a particular airport there needs to be

12   approval by the local airport authority?

13   A.   Yes.  It's -- yes.

14   Q.   And -- I'm sorry.

15   A.   I'm sorry.  Yes.

16   Q.   And with respect to the transfer of slots, are there

17   any approval requirements?

18   A.   Yes.

19   Q.   And in JetBlue's prior experience with divestitures,

20   have you encountered any difficulties with approvals by

21   airport authorities or the approvals related to the slots?

22   A.   No.  I would tell you, in all my experience, getting

23   the other airline to divest them is the hard part.  I've

24   always found airports and local authorities, you know, very

25   supportive in, you know, making sure that you can then

1  operate them.  And indeed they have a requirement to get
2  airlines the service.
3  Q.   And, Mr. Hayes, what would happen if a local airport
4  authority said you cannot, as part of your agreements,
5  transfer the gates at one of these airports?
6  A.   Well, we are committed to giving the gates up.  It is
7  possible that -- so most airlines, you know, a lot of
8  airports have competition plans.  If that airport had a
9  different vision of how to divest these gates, then of
10  course we would cooperate with that.  What we wanted to do
11  was do the hard bit, which was find committed partners to
12  take these divestitures.
13  Q.   But either way JetBlue will no longer have these assets
14  as a result of this transaction; is that correct?
15  A.   We have a commitment in our merger agreement to divest
16  these assets, so we would not have them post-merger
17  agreement.
18  Q.   All right.  I want to change topics, Mr. Hayes.  You
19  were involved in the Northeast Alliance case that was
20  litigated in this court, weren't you, Mr. Hayes?
21  A.   I was.
22  Q.   Okay.  What was your involvement in that case?
23  A.   I was deposed twice, I testified, and then I read the
24  Court's decision.
25  Q.   And the Court ruled against JetBlue; right, Mr. Hayes?

1    A.    The court ruled against the NEA, yes.

2    Q.    After that ruling you've withdrawn from the NEA?

3    A.    We have.  We've unwound it and been in the process of

4    giving the slots back to American.

5    Q.    And are you aware, Mr. Hayes, about the Department of

6    Justice making statements about JetBlue's product quality

7    during the course of the Northeast Alliance matter?

8    A.    Yes.  As I understood it from the trial, the concern

9    the Department of Justice had, that JetBlue would change who

10   we were as a result of the NEA.

11   Q.    Okay.

12          MR. SHORES:  Could we pull up Hayes Demonstrative

13   G, please?

14          (On screen.)

15   Q.    Mr. Hayes, I want to show you some of the statements by

16   the Department of Justice and ask if you agree with them.

17   The first one is, "JetBlue is unique among low-cost

18   carriers."  Do you agree with that?

19   A.    I do.

20   Q.    Why?

21   A.    Because we are uniquely committed to the combination of

22   low fares and great service.

23   Q.    All right.  Let's look at the second one.  "JetBlue

24   differentiated itself from other low-cost airlines by

25   offering not only low fares, but also high-quality service."

1    Do you see that?

2    A.   Yes.

3    Q.   Do you agree with that?

4    A.   I do.  That's our competitive strategy.

5    Q.   All right.  Mr. Hayes, the next one is, "JetBlue's high

6    quality of service allowed it to compete effectively against

7    the legacy airlines in ways other LCCs and ULCCs could not."

8    Do you see that?

9    A.   Yes.

10   Q.   Do you agree with that?

11   A.   Yes.  And this really was in relation to the JetBlue

12   Effect, and the unique ability we have to force legacy

13   airlines to lower fares when we fly because we appeal to

14   that broad spectrum of customers.

15   Q.   All right.  The next one is, "For more than two

16   decades, JetBlue served as the legacy airlines' foil in the

17   northeastern United."  Do you agree with that, Mr. Hayes?

18   A.   I do.

19   Q.   All right.  And the last one is, "In total, competition

20   between JetBlue and the legacy airlines has saved travelers

21   billions of dollars."  Do you agree with that?

22   A.   Yes.

23   Q.   All right.  Mr. Hayes, I want to show you one more

24   thing.

25           MR. SHORES:  Let's go, if we could, to Hayes

```
 1  Demonstrative H.
 2          (On screen.)
 3  Q.   And, Mr. Hayes, I think you said you had an opportunity
 4  to review the judge's decision in the NEA case?
 5  A.   I did.
 6  Q.   And this Hayes Demonstrative H reflects a portion of
 7  that opinion; is that right?
 8  A.   Yes, it does.
 9          THE COURT:  I've read the opinion.
10          MR. SHORES:  Okay.
11  Q.   And, Mr. Hayes, I just want to ask you about the term
12  "maverick" here.  Mr. Hayes, does JetBlue view itself as a
13  maverick?
14  A.   We do.  As I testified earlier, we believe we are
15  uniquely disruptive.
16  Q.   And after, if this transaction were approved, would
17  anything about JetBlue's maverick status change?
18  A.   No.  I believe, you know, we've demonstrated this
19  consistently over 23 years.  We've kept fares low, we've
20  improved the quality of service of flying in the United
21  States, and it's how we compete.  We could never become a
22  legacy airline.  We are a fraction of the size.  And the
23  reality is JetBlue and Spirit together is a small part of
24  the market.  Most people are always going to be flying on
25  the legacy airlines, and this is how we get those customers
```

```
 1    a better deal as well.
 2              MR. SHORES:  All right.  No further questions,
 3    your Honor.  I'll pass the witness.
 4              THE COURT:  Mr. Duffy, anything further?
 5              MR. DUFFY:  Yes, your Honor, and it will be
 6    relatively brief.
 7              THE COURT:  Okay.
 8                   REDIRECT EXAMINATION
 9    BY MR. DUFFY:
10    Q.  Mr. Hayes, you were talking just a moment ago on
11    cross-examination regarding the divestitures at issue in
12    this transaction.  Do you recall that?
13    A.  Yes, sir.
14    Q.  And just so the record is clear, JetBlue is not giving
15    those assets away to Allegiant and Frontier, it would be
16    selling those assets; correct?
17    A.  Yes.
18    Q.  Okay.  And there are no aspects of the divestitures
19    that would allow Allegiant or Frontier to obtain access to
20    pilots or aircraft; right?
21    A.  That is correct.
22    Q.  They are limited to airport-level assets?
23    A.  Yeah.  I mean, they have their own order book for
24    aircraft.
25    Q.  Right.  And I believe you testified there is no
```

```
 1   guarantee that Allegiant or Frontier will fly any particular
 2   route using the divestiture assets; right?
 3   A.   That is correct.
 4   Q.   And it is true that with respect to Allegiant,
 5   Allegiant does not provide international service at all
 6   currently; correct?
 7   A.   They don't currently but that could change.
 8   Q.   And nor does Allegiant provide any connecting service;
 9   right?
10   A.   I'm not -- I don't know.  I'm not familiar with their
11   connectors.
12   Q.   So you would agree that absent a significant change to
13   Allegiant's business, Allegiant is not capable of replacing
14   Spirit as a competitor on international routes; right?
15            MR. SHORES:  Objection.  Foundation.
16            THE COURT:  No, I think he may have that.
17            Can you answer that?  Do you know enough to answer
18   that?
19            THE WITNESS:  I don't know what their plans are to
20   fly international.  Southwest didn't fly international until
21   several years ago.  They're now flying international.
22   Allegiant, you know, they operate Hawaii so they know how to
23   operate long flights over water.  I just don't have access
24   to their business plan.
25   Q.   Okay.  And also with respect to the divestitures, it is
```

```
 1    true that the relevant airport authorities have not yet

 2    approved the divestitures at issue; correct?

 3    A.    That is correct.  That won't happen until we know we

 4    can close this transaction and put those into effect.

 5    Q.    Okay.  And I want to ask you a little bit about your

 6    understanding of the slot divestitures and the American

 7    Airlines-U.S. Airways merger which you are familiar about;

 8    right?

 9    A.    Yes.

10    Q.    So you have personal familiarity with that?

11    A.    Yes.

12    Q.    And you were involved in the bidding process; right?

13    A.    Yes.

14    Q.    You also were knowledgeable about the competitive

15    concerns the Justice Department raised with respect to the

16    American-U.S. Air transaction; right?

17    A.    Initially, yes, which -- the result.

18    Q.    It was your understanding that the slot divestitures at

19    issue in American-U.S. Air were designed to combat

20    coordinated interactions that the Justice Department alleged

21    would increase following the transaction; right?

22    A.    I'm not familiar with those, that terminology.

23    Q.    Okay.  And here you're offering divestitures to deal

24    with the overlaps between JetBlue and Spirit; correct?

25    A.    Yes.
```

```
 1   Q.   All right.  I want to ask you a little bit about the
 2   concept of relevance, Mr. Hayes.  You recall discussing that
 3   on cross-examination?
 4   A.   I do.
 5   Q.   All right.  So you talked about relevance on both a
 6   national and an airport level; right, Mr. Hayes?
 7   A.   Yes.
 8   Q.   So would you agree that relevance matters for people
 9   who wish to fly on a regular basis?
10   A.   Yes.
11   Q.   Right.  Relevance enables people to have more flights
12   to a particular destination available at more convenient
13   times, for instance; right?
14   A.   I think -- I mean, I think relevance benefits everyone
15   that wants to fly from a certain destination.  Right?  If
16   you live in a city, it is better you have direct service
17   from that city than having to connect via a one-stop via
18   somewhere else.
19   Q.   Sure.  But for a particular airline to have relevance,
20   it's your understanding that many passengers will value the
21   ability to fly on one airline to a number of different
22   destinations; right?
23   A.   Yes.
24   Q.   And those particular people don't necessarily choose
25   the cheapest option, right, because they value that
```

```
 1   relevance?
 2              MR. SHORES:  Objection, your Honor.
 3              THE COURT:  Well, no.  His experience, if he can
 4   answer that question I'll let him answer it.
 5   A.   I, you know, I think -- I don't know because I think
 6   that it applies to everybody.  If -- before you could even
 7   get to the price of a ticket, you've got to figure out does
 8   the airline actually fly from that market.
 9   Q.   Right.  Well, all passengers need to fly -- all
10   passengers wishing to fly from point A to point B would need
11   to have that as an option to choose; right?
12   A.   Yes.
13   Q.   Okay.  But you would agree certain passengers will pick
14   the lowest fare to get from point A to point B irrespective
15   of whether that airline serves many other destinations;
16   correct?
17   A.   For some people that could be true, yes.
18   Q.   But other people value that relevance; right?
19   A.   Yes, and I also think people who want low fares also
20   value relevance.
21   Q.   The people who value relevance are the frequent
22   travelers who are able to afford to travel multiple times a
23   year; right?
24   A.   I don't agree just with that characterization.  That is
25   one group that benefits but there are many others that
```

1    benefit too.

2    Q.   All right.  You would agree that having relevance at a

3    particular airport enables an airline to command a premium

4    price on flights to and from that airport; right?

5    A.   Well, I think it depends on scale.  So if I'm in

6    Charlotte, and American has 85 percent of the departures in

7    Charlotte, yes, I see higher fares as a result of that.  In

8    JetBlue's case, you know, I think the most relevance we have

9    or would have is around the 30 percent mark.  That is a long

10   way from the sort of legacy hub.  So your pricing power at

11   30 percent is significantly less, but you can serve business

12   travelers to a greater degree and that does help your

13   average fare go up.

14   Q.   So you agree having a larger presence at an airport

15   enables the airline with that larger presence to increase

16   its pricing power; right?

17   A.   It allows you to capture more business travelers, and

18   so that does help bring your average fares up.

19   Q.   Right.  And, in fact, establishing relevance at certain

20   airports is one of the synergies that JetBlue has identified

21   as resulting from this transaction; correct?

22   A.   Yes.  It's one way that we can better compete with the

23   legacy airlines.

24   Q.   Okay.  And I would caution you not to reveal the name

25   of the airport, but it is true that JetBlue's combined

```
 1   network plan, of which it's claiming is confidential, that
 2   includes a new focus city; correct?
 3   A.   Yes.
 4   Q.   And that particular new focus city is not a hub of any
 5   legacy airline; correct?
 6   A.   That's currently true, yes.
 7   Q.   And so to the extent that JetBlue is able to establish
 8   pricing power at that airline, it will not be displacing a
 9   legacy competitor; right?
10   A.   Well, not today, no.
11   Q.   Okay.  You have identified the relevance of legacy
12   airlines as one of their advantages; right?
13   A.   Yes.
14   Q.   And you have testified that the large scale of legacies
15   enables them to make life difficult for the smaller
16   airlines; right?
17   A.   Yes.
18   Q.   Right?  Spirit and JetBlue alike have been targets of
19   the legacies' attempt to make life difficult; right?
20   A.   I can't speak for Spirit but I can speak for JetBlue,
21   yes.
22   Q.   With respect to Spirit, you are aware that Spirit has
23   grown faster than any other airline in the last ten years;
24   correct?
25   A.   That was the case pre-COVID, yes.
```

```
 1   Q.   Right.  So it has grown despite those attempts by the
 2   legacy to fight off the smaller competitors?
 3   A.   Off a very small base.
 4   Q.   So Spirit, like JetBlue, has grown organically over the
 5   last several years; correct?
 6   A.   Yes.
 7   Q.   All right.  And counsel asked you about JetBlue's
 8   inorganic growth plan, so other possible mergers and
 9   combinations it's looked at; correct?
10   A.   Yes.
11   Q.   Now, I'd ask you to review Exhibit 617, which is in
12   your binder, the same binder that JetBlue's counsel
13   provided.
14   A.   Oh, the same one?
15            (On screen.)
16   Q.   Okay.  And so let me know when you're there, Mr. Hayes.
17   A.   617.
18   Q.   Yes, 617.
19   A.   Okay, yep.  Thank you.
20   Q.   Okay.  And so there are actually three decks here, and
21   if you will go to the slide ending in Bates label 778.  I'm
22   sorry.  First 771, which is just the cover of this
23   particular deck.  771.
24   A.   Yes.
25   Q.   Okay.  So this is a presentation given to the board of
```

 1   directors of JetBlue on September 19th, 2019; right?

 2   A.   Yes, sir.

 3   Q.   And if you go to the Bates label ending in page 78, let

 4   me know when you're there.

 5   A.   Yes.

 6   Q.   Okay.  And, again, this is from a presentation made to

 7   the JetBlue board of directors; right?

 8   A.   Yes.

 9   Q.   The second bullet says, "Do we have a desire to pursue

10   Spirit further?"  Do you see that?

11   A.   Yes.

12   Q.   And the third bullet indicates, "Are we aligned Spirit

13   is the next natural step in our longer-term goal to pursue

14   Alaska?"  Did I read that correctly?

15   A.   Yes.

16   Q.   That's a reference to Alaska Airlines; right?

17   A.   Yes.

18   Q.   So Spirit is simply the first step in this process;

19   right, Mr. Hayes?

20   A.   The context of that statement is it was an aspiration

21   of our chairman at the time, our previous chairman at the

22   time had.  I would tell you we've had no conversations in

23   the last few years about this being the next step to acquire

24   Alaska.  We have focused on this transaction.  And my

25   personal opinion is if this transaction is approved, it

```
 1   would not be possible to do anything else.
 2   Q.   Okay.  And at this point in time you did identify the
 3   acquisition of Spirit as the natural next step in the
 4   longer-term goal to pursue Alaska; right?
 5   A.   It's really framed as a question in terms of, you know,
 6   getting people's thoughts.  It's not a statement of our
 7   intent.
 8   Q.   And a combination of a post-acquisition JetBlue and
 9   Alaska would be comparable in size to the legacy airlines;
10   right?
11   A.   A combination of Spirit, JetBlue and Alaska?
12   Q.   Yes.
13   A.   No, it would still be smaller than the legacy airlines,
14   but it would be getting towards it.  But, as I say, that
15   isn't something I can think can get done.
16   Q.   You agree a combination of those airlines would be
17   getting toward the large size of the legacies; right?
18           MR. SHORES:  Objection.  Asked and answered.
19           THE COURT:  I think I'm going to sustain it.
20           MR. DUFFY:  Okay.  Understood.
21   Q.   Mr. Hayes, you were asked a number of questions about
22   the dominance of the legacy airlines; correct?
23   A.   Yes.
24   Q.   All right.  And it is true that as part of the
25   Northeast Alliance JetBlue entered a partnership with the
```

 1    largest of the three legacy airlines; right?

 2    A.    Yes.

 3    Q.    So you actually signed the merger agreement at issue in

 4    this case while the Northeast Alliance with American

 5    Airlines was still in effect; correct?

 6    A.    Yes.

 7    Q.    You terminated the Northeast Alliance only after the

 8    Court issued an opinion in the case; right?

 9    A.    Yes.

10    Q.    And so this is the second time that you have been in

11    this courthouse touting the benefits of inorganic growth for

12    JetBlue; right?

13    A.    It is.

14    Q.    And over -- since its founding, JetBlue has grown

15    organically and delivered benefits for customers based on

16    that organic growth; right?

17    A.    Yes.

18    Q.    And you, in the course of talking with news outlets

19    when you were pitching the JetBlue bid to Spirit

20    shareholders, you indicated that if this deal is enjoined,

21    JetBlue would get back to growing organically; right?

22    A.    Well, we have been growing organically.  I think my

23    concern is if you look at how the industry has evolved since

24    COVID, and there's no escaping these numbers, that the

25    highest-margin airlines are all the large legacy airlines.

1    In fact, one analyst, Jamie Baker, from JP Morgan, describes

2    the rest of us as the LMAs, the low-margin airlines.  My

3    view is that profitability is core to growth because you

4    have to fund that growth.  And I think the path of organic

5    growth is just more challenging than it has been in the

6    past.

7    Q.    Just one moment, Mr. Hayes.

8          (Whereupon counsel conferred.)

9    Q.    And yet in the fourth quarter, Mr. Hayes, of this year,

10   you have chosen to limit your capacity growth; correct?

11   A.    Well, we had to reduce flights at the government's

12   request by 10 percent because of the New York slot waiver,

13   which was something that we supported because there is no

14   way we can handle the traffic in the northeast.  As the FAA

15   have disclosed, they are at 54 percent of the air traffic

16   controllers they need in New York.  And, secondly, we've

17   suffered from aircraft delivery delays, as other airlines

18   have, which impacted our capacity.

19         (Pause in proceedings.)

20   Q.    So, again, Mr. Hayes, I just want to ask you about your

21   decision to reduce growth in the fourth quarter.  You told

22   investors that you reduced growth in order to drive revenue

23   improvement; right?

24         MR. SHORES:  Objection, your Honor.  I'm going to

25   object on scope.  This is also cumulative.  He's given

1   testimony on this.

2           THE COURT:  If I need argument, I'll ask for it.

3   But I'm going to sustain it.  The evidence is what it is.

4           MR. DUFFY:  A moment to confer?

5           THE COURT:  Of course.

6           (Whereupon counsel conferred.)

7   Q.   Just one last point.  You were asked about Exhibit 612,

8   which is in the binder that Mr. Shores provided to you.

9   A.   612?

10  Q.   612.  And let me know when you're there, Mr. Hayes.

11  A.   Yeah, I have it.  Thank you.

12  Q.   All right.  And if you turn to slide 9, which is the

13  Bates label ending in 231.

14          (On screen.)

15  A.   231.

16  Q.   And this is the JFK-to-Pittsburgh slide.  Let me know

17  when you've got it.

18  A.   Yes.

19  Q.   So in Mr. Shores' examination you were asked about the

20  effect of JetBlue leaving this particular route; right?

21  A.   Yes.

22  Q.   And you agree that a loss of competition on a route can

23  lead to much higher fares; right?

24  A.   It can.

25  Q.   Right.  And you saw that in this particular instance;

```
 1  right, Mr. Hayes?
 2  A.   Well, I think the challenge in this instance was just
 3  it was being served by two legacy airlines, and JetBlue came
 4  out and fares went up.
 5  Q.   And you agree that JetBlue cannot maintain service on a
 6  route that is persistently not profitable; right?
 7  A.   Yes, that's correct.
 8  Q.   Right.  And a route will not be profitable if the costs
 9  exceed the revenue; right, Mr. Hayes?
10  A.   Yes.
11  Q.   All right.
12          MR. DUFFY:  A moment to confer?
13          (Whereupon counsel conferred.)
14  Q.   And just one final question, Mr. Hayes.  It is true
15  that in the most recent quarter JetBlue sustained a
16  quarterly loss of over $150 million; correct?
17  A.   Yes.
18  Q.   Okay.  You expect JetBlue's profitability to improve,
19  Mr. Hayes?
20  A.   Well, yes.  But we haven't guided anything into the
21  future so I can't talk about what that is.  But I will tell
22  you a lot of the smaller airlines have not made any money
23  since COVID, and I think that just talks of the challenges
24  and the way the industry has evolved since COVID in favor of
25  the legacy airlines.
```

```
 1   Q.   Okay.  And the volatility of the industry is such that

 2   some types of airlines are more profitable in certain time

 3   periods than others; right, Mr. Hayes?

 4            MR. SHORES:  Objection, scope.

 5            THE COURT:  Sustained.

 6            MR. DUFFY:  No further questions, your Honor.

 7            THE COURT:  Anything further?

 8            MR. SHORES:  No further questions, your Honor.

 9            THE COURT:  Actually, I do.  And I'm trying to

10   think how to frame this but I really would like your

11   response to this analysis.

12            The question is:  What good are these divestitures

13   in a period where it's impossible to get planes until some

14   time in the future?  And I would base that on this analysis,

15   and I want you to tell me what's wrong with it.  You make

16   these disclosures and -- divestitures, and you supported

17   them, to smaller airlines who are the ultra low-cost

18   carriers.  They have more limited fleets.  I can understand

19   such a carrier paying good money for their increased access

20   to more desirable cities, but with a limited fleet they'll

21   have to take airlines from someplace they fly now to fly out

22   of these more attractive gates, thus impacting the consumers

23   that fly ultra low-cost carriers.  I had understood, and I

24   understand that the effect on competition is one of the

25   concerns of the statute it's my duty to interpret, so if
```

1    that's going to happen, I'll ask the question, how good are

2    the divestitures?

3              THE WITNESS:  Your Honor, it's a good question.  I

4    mean, the divestitures present a generational opportunity to

5    get into some of these airports, particularly LaGuardia and

6    Newark.  I know at JetBlue, I mean, we're based in New York,

7    we've been around 23 years, we have maybe 15 or 16 flights a

8    day at LaGuardia.  It's extremely hard to get into.  So

9    these really are the treasure.

10             The airlines that we have divested to, both

11   Allegiant and Frontier, have significant order books of

12   airplanes coming.  Even though they're delayed, they have a

13   lot of airplanes coming.  And it's my view they would plan

14   to take those airplanes and assign them to those markets,

15   because otherwise they never are going to get in and bring

16   consumer benefits to markets that they wouldn't otherwise be

17   able to get in.

18             The other point I would just like to make to your

19   Honor is that the moving from the Spirit configuration to

20   the JetBlue configuration is going to take a number of

21   years.  And so there will still be, you know, a lot of seats

22   in the market.  It's going to give some of these other ultra

23   low-cost carriers time to ramp up and fly some of these

24   markets as well.  But, yeah, they have order books to come

25   in that they can fly.  These divestitures are meaningful,

```
 1    they will, and it's the only way you can get into these
 2    congested airports, as JetBlue can tell you.
 3              THE COURT:  Thank you.  Any questions based on my
 4    question?
 5              MR. DUFFY:  No.  Thank you, your Honor.
 6              THE COURT:  Mr. Shores?
 7              MR. SHORES:  No, your Honor.
 8              THE COURT:  Thank you.  Please step down.
 9              (Whereupon the witness stepped down.)
10              THE COURT:  Call your next witness.
11              MR. DUFFY:  Yes.  Ms. Markel will be taking the
12    next witness.  The plaintiffs will be calling Mr. Gardner.
13              THE COURT:  He may be called.
14                 HARTWELL MCINTYRE GARDNER, sworn
15              THE WITNESS:  Good afternoon.
16              THE COURT:  Good afternoon.
17              Ms. Markel, when you're ready.
18              MS. MARKEL:  Arianna Markel on behalf of the
19    United States.
20                       DIRECT EXAMINATION
21    BY MS. MARKEL:
22    Q.   Good morning, Mr. Gardner.  Would you please state your
23    full name for the record?
24    A.   Yes, good morning.  Hartwell McIntyre Gardner.
25              THE COURT:  Yeah, the mic will move.  Pull it a
```

```
 1    little closer to you.  You be comfortable.
 2              THE WITNESS:  Thanks.
 3    Q.   And will you please spell your name, for the record?
 4    A.   H-A-R-T-W-E-L-L, M-C-I-N-T-Y-R-E, G-A-R-D-N-E-R.
 5    Q.   And you should have a binder on the stand.  I may refer
 6    to documents in the binder, but I'll let you know when.
 7    A.   Very good.
 8    Q.   Mr. Gardner, when is your -- what is your current
 9    position at Spirit?
10    A.   I'm the chairman of the board of directors.
11    Q.   And when did you join Spirit's board?
12    A.   2010.
13    Q.   And when did you become chairman?
14    A.   The summer of 2013.
15    Q.   And you are an independent director; right?
16    A.   I am.
17    Q.   And what does it mean to be an independent director?
18    A.   Other than my directorship at the company, I have no
19    affiliation or conflict.  I'm not a member of management.
20    Q.   And as a board director, you have a fiduciary duty to
21    Spirit's shareholders; right?
22    A.   I do.
23    Q.   And so as chairman of the board and as a director, you
24    use your best efforts to act in the best interests of
25    Spirit's shareholders; right?
```

```
 1   A.    Yes, I do.
 2   Q.    And when doing that, you are responsive to the
 3   preferences of Spirit's shareholders as well; right?
 4   A.    Pardon?  The preferences?
 5   Q.    When you are doing that, you are responsive the
 6   preferences of Spirit shareholders?
 7   A.    Mmm, how -- what do you mean by preferences?
 8   Q.    Well, do you consider what Spirit shareholders want?
 9   A.    As a fiduciary, we act in the way that we believe is in
10   their best interest.  But it would be hard to say that I
11   know what all the preferences of all of our shareholders
12   are.
13   Q.    Okay.  So Mr. Christie is also a director on Spirit's
14   board; right?
15   A.    He is.
16   Q.    But he's what's known as an interested director; is
17   that right?
18   A.    Yes, he is.
19   Q.    And that's because he's also part of Spirit's
20   management?
21   A.    Yes.  He's the one nonindependent director.
22   Q.    And Mr. Christie reports to the board; right?
23   A.    He does.
24   Q.    And prior to joining Spirit's board you worked at
25   Merrill Lynch; right?
```

```
 1   A.    Yes, I did.
 2   Q.    And during your time at Merrill Lynch you were the head
 3   of the Private Wealth in Americas group?
 4   A.    That and the global bank group, yes.
 5   Q.    And you had experience with M & A while at Merrill
 6   Lynch; right?
 7   A.    I did.
 8   Q.    And you've also had experience with M & A while working
 9   in management roles at other companies; right?
10   A.    I have.
11   Q.    And M & A is mergers and acquisitions; right?
12   A.    Yes, that's how I understand it to be.
13   Q.    So it's fair to say that you are experienced with
14   respect to M & A transactions; right?
15   A.    I think generally, yes.
16   Q.    And you are also on Spirit's -- on the Spirit board
17   deal committee that evaluated a potential deal with JetBlue;
18   right?
19   A.    I was.
20   Q.    And Mr. Christie was not on the deal committee; right?
21   A.    No.
22   Q.    And you don't have any expectation of having a position
23   in a combined JetBlue; is that right?
24   A.    Correct.
25   Q.    And you don't have a retention agreement; right?
```

A.    I don't.

Q.    Okay.  So now that we're done with those preliminaries,
I'd like to start with just a few questions on Spirit's
place in the industry.  You would agree that Spirit's key
competitors are JetBlue, Frontier and the big four; right?

A.    Frontier, JetBlue, the big -- those would be the
primary ones.

Q.    Okay.  And you would agree that Spirit is a check on
JetBlue's fares; right?

A.    I guess I would -- we think we're a check on everyone's
fares.

Q.    So you would also agree that Spirit's entry in a market
puts pressure on legacy carriers to lower their fares as
well; right?

A.    It puts -- the entry of any new carrier into a market
puts pressure on whoever is in that market, on whether they
raise their fares or lower their fares.

Q.    That would include legacy carriers?

        MR. COHEN:  I'm sorry, your Honor, the witness
wasn't finished with his answer.

        THE COURT:  He may finish his answer.

A.    Pressure.  New supply into a marketplace, I guess,
would be pressure to anyone.  What they choose to do with
that, whether they lower fares or not is -- if pressure
implies downward pressure then that may or may not happen.

1   But, generally, a new entrant to a market causes competitors
2   to respond.
3   Q.   And those competitors would include legacy carriers;
4   right?
5   A.   It would.
6   Q.   Okay.  And you would agree that the legacies have taken
7   steps to limit Spirit's expansion opportunities in their hub
8   airports; right?
9   A.   In all the places they compete they -- with the
10   creation of basic economy, pretty much everyplace they go,
11   whether it's a hub or not, they're -- it's definitely had an
12   impact on our business.
13   Q.   But for Spirit the potential benefit of expansion in
14   those airports with legacies outweighs the risk of a
15   competitive response from them; right?
16   A.   Yeah, could you repeat that?
17   Q.   For Spirit the potential benefit of expansion in legacy
18   hubs outweighs the risk of a competitive response from them;
19   right?
20   A.   It depends on the hub.
21   Q.   What about Chicago, Houston and Dallas?
22   A.   I couldn't speak to the specific hub.  I just know that
23   they don't all behave the same.
24   Q.   Okay.  I would like to direct your attention to your
25   deposition transcript, page 81, starting with line 14 going

1    to 23.

2    A.   Is that -- the first 39, is that -- where's the --

3    where's my transcript?

4    Q.   I'm sorry.  It should be -- the transcript should be

5    the last document in your binder.

6    A.   And what page?

7    Q.   Page 81, beginning on line 14 through line -- through

8    page 82, line 1.  And so were you asked these questions and

9    did you give these answers?

10       "QUESTION:  And would you agree that building gates in

11   places like ORG and IAH or DFW comes with risk?

12       "ANSWER:  I'm not sure I agree with that.

13       "QUESTION:  Why aren't you sure that if you agree with

14   that?

15       "ANSWER:  I don't think it's a disproportionate amount

16   of risk that Chicago, Houston and Dallas, and those are all

17   big cities with lots of potential passengers.  It requires a

18   financial commitment, but I would say that the potential

19   benefit outweighs the risk."

20          Was that your testimony?

21          MR. SHORES:  Objection, your Honor.  It's improper

22   impeachment.  There's nothing inconsistent about his prior

23   testimony.

24          THE COURT:  Well, I don't know that it is, but in

25   the exercise of discretion I'll let it stand.

```
 1   A.    That's my testimony, yes.

 2   Q.    Okay.  So Spirit conducts analyses on customer

 3   satisfaction; right?

 4   A.    We do.

 5   Q.    In your view, Spirit's customers are generally

 6   satisfied with Spirit; right?

 7   A.    Yes.

 8   Q.    Okay.  So let's turn to the topic of Spirit's financial

 9   health.  You were deposed in this case on June 27th, 2023;

10   right?

11   A.    I believe that was the date.

12   Q.    As of June 27th, it was your view that Spirit had a

13   healthy standalone plan; right?

14   A.    Yes.

15   Q.    And as of that date it was your expectation that Spirit

16   would be profitable over the next five years; right?

17   A.    We had a -- I expected us to be profitable that year,

18   which would have been a building block for the subsequent

19   years.  So, yeah, I would have expected us to be profitable

20   in the subsequent years had 2023 turned out the way we

21   thought.

22   Q.    And so as of June 2023 it was also your expectation

23   that Spirit would grow its fleet size over the next five

24   years; right?

25   A.    Yes.  We have planes on order.  They're coming.
```

```
1   Q.   As of then, it was also your expectation that Spirit
2   would increase the number of its routes over the next five
3   years; right?
4   A.   Yes.
5   Q.   As of then, it was your expectation that Spirit would
6   grow its international routes over the next five years;
7   right?
8   A.   Yes.
9   Q.   As of then, it was your expectation that Spirit would
10  improve its flight utilization over the next five years;
11  right?
12  A.   Yes.
13  Q.   As of then, it was your expectation that Spirit will
14  continue competing over the next five years; right?
15  A.   Yes.
16  Q.   As of the time of your deposition, it was your view
17  that Spirit was not a troubled company; right?
18  A.   Correct.
19  Q.   And as of the date of your deposition, you were also
20  aware that Spirit was unlikely to outperform quarter over
21  quarter in the near term; right?
22  A.   Outperform --
23  Q.   Outperform quarter over quarter?
24  A.   Outperform what?
25  Q.   Outperform itself.
```

```
 1   A.    Oh.

 2             MR. SHORES:  Objection, your Honor.  Vague.

 3             THE COURT:  No, she's made it clear now.

 4   A.    Outperform our -- so there's a budget.  Can I sort of

 5   explain the --

 6             THE COURT:  You can if she will permit it.

 7   Q.    Yes.

 8   A.    So each year we, at the end of the -- typically in

 9   December of the year prior to the upcoming year, we --

10   management puts together a budget.  And that budget is for

11   the next year.  It's fairly detailed, goes through all of

12   the revenue and expense categories, expected trends,

13   assumptions for fuel, labor, utilization, number of

14   aircraft.  And that's where I'd say there's a heavy amount

15   of detail.

16        Once that budget is complete there's a five-year

17   forecast developed.  And that five-year forecast is, in

18   effect, it's a roll-forward of the next year's budget going

19   out another four years.  And the reason that we do that is

20   because we have contractual commitments for planes that we

21   know are coming and we need to figure out where those planes

22   that we have a firm commitment to take, where they're going

23   to fly.

24        So once we know the number of planes that are going to

25   get delivered, which, as simple as it sounds, the last few
```

```
 1    years the schedule from Airbus has moved around quite a bit.
 2    So we take the information we have at that time.  The other
 3    big component is debt maturity.  So we'd schedule out in the
 4    next five years what are the big commitments that we have to
 5    make.
 6         And so the five-year plan is really a sort of a
 7    roll-forward in less detail than the one-year plan, but it
 8    takes into account significant events that we know are going
 9    to be coming.  It's a lot like somebody with a child in high
10    school who knows college is coming in four years.  So
11    there's a certain amount of planning that you have to do.
12         At the time that we created the five-year plan, the one
13    that we were talking about in my deposition in June, I had
14    certainly expected that we would be profitable in 2023.
15    That didn't end up being what happened.  And actually it
16    wasn't too far after my deposition in 2023 that -- that the
17    business outlook for our business changed pretty
18    dramatically, which I can talk about, if you like.  But I --
19    all of what you said is what I believed at the time, for
20    sure.
21    Q.   Okay.  So can you turn to what is in your binder as
22    Exhibit 350?  And can you turn to slide 21, ending in Bates
23    number 234?
24              (On screen.)
25              MS. MARKEL:  And this is already in evidence.
```

```
 1              THE COURT:  The exhibit number again?

 2              MS. MARKEL:  Slide 21.

 3              THE COURT:  No, the exhibit number.

 4              MS. MARKEL:  I'm sorry.  Exhibit Number 350,

 5   ending in 234.

 6              THE COURT:  Thank you.

 7   Q.   And so if you can turn --

 8   A.   Is that the title, "JetBlue continues to spread

 9   misinformation"?

10   Q.   That is correct.  It is titled, "JetBlue continues to

11   spread misinformation."  So I'd like to just direct your

12   attention to the very last bullet point here which states,

13   "Spirit's ultra-low cost structure and fuel-efficient fleet

14   make us a relative winner in a higher fuel environment; we

15   believe that the Street will catch up to our long-term

16   targets as we continue to outperform quarter over quarter."

17   Do you see that?

18   A.   I do.

19   Q.   So what do you understand Spirit "continuing to

20   outperform quarter over quarter" to mean there?

21              MR. COHEN:  Objection.  Foundation, your Honor.

22              THE COURT:  If he knows.

23   A.   I didn't write this, so let me take a minute to read it

24   and think about it and tell you if I -- this -- okay, let's

25   see.
```

```
 1              (Witness reviewed document.)
 2    A.   It's interesting.  For the first eight years that I was
 3    on the board I would have -- in the times that this had
 4    happened this was true.  In this, actually, latest period
 5    when fuel spiked in the summer, that, at this moment in
 6    time, this being -- we haven't been a relative winner in the
 7    high-fuel environment this summer, for sure.  So it was
 8    certainly our thought.  I'd like to say it was something
 9    we'd like to believe.  I would like it to be true.  At the
10    moment, it doesn't appear to be.
11    Q.   And as of the date of your deposition you recognized
12    that a higher-fuel environment did not result in Spirit
13    outperforming quarter over quarter; right?
14    A.   I don't know exactly when, whether I, at that moment in
15    time or not, around June 27th -- it's certainly become more
16    clear to me as the summer panned out that that's not what
17    we -- we weren't a beneficiary of a high-fuel environment.
18    Q.   Would seeing your deposition transcript refresh your
19    recollection?
20    A.   It might.
21    Q.   Okay.  Why don't you turn to page 183 in your
22    deposition transcript, starting with line 15.
23              (Witness reviewed document.)
24    A.   I think what I said on line 18, 19, 20, 21, I guess I
25    said the same thing then that I did today.
```

1   Q.   Okay.  Thank you, Mr. Gardner.

2        And as of the date of your deposition, you were also

3   aware that the demand environment had softened for Spirit in

4   fiscal year 2023; right?

5   A.   Not to the degree that had happened.  We were, at the

6   end of the first quarter, I think we were forecasting an

7   operating margin of 4 1/2 to 6, something like there, in and

8   around 5.  The second quarter ended up -- and at that time

9   also we were expecting the third quarter, which is July,

10  August and September, to be better than the second quarter

11  and to be profitable through the full year.

12       It turns out the second quarter came in at, instead of

13  5, it came in at, like, 1.5 percent operating margin.  So

14  off some, but not nearly as much as what happened later

15  when -- I think we issued a new guide in August.  It said,

16  so that if our initial expectation at the end of the first

17  quarter was at least 5, in August we guided to minus 5.  I

18  think early August.  And then again in September we came out

19  and guided to ten points lower than that, minus 14, 15.  So

20  we had a, literally, in that six-month period, about a

21  20-point swing in op margin expectations from kind of April

22  to September.  I think that release was September 12th,

23  something like that.

24  Q.   Thank you, Mr. Gardner.  Just to be clear, is that a

25  yes to my question?

```
 1    A.   I'm going -- I'm sorry.  I'm going to have to ask you
 2    to repeat it.
 3    Q.   So as of the date of your deposition, you were aware
 4    that the demand environment had softened for Spirit in
 5    fiscal year 2023; right?
 6    A.   Softened from the budget, but not -- if softened means
 7    anything less than budget, then yes it had softened.
 8    Q.   Okay.  As of the date of your deposition you were aware
 9    that Spirit was considering changes to its fleet plan;
10    right?
11    A.   Yes.
12    Q.   And as of the date of your deposition Spirit was
13    considering reducing the number of aircraft that it would
14    acquire in 2024 and 2025; right?
15    A.   The total number of aircraft didn't change.  We were --
16    some of the deliveries got moved back.  That was a
17    combination of both Airbus' ability to deliver and our
18    desire to take fewer in that near-term period of time.  But,
19    yes, in those two years there would be fewer airplanes.
20         THE COURT:  Just -- I've asked witnesses this
21    question.  I just don't understand how these contracts work.
22    But as you've just explained, you had some contractual
23    flexibility, and apparently Airbus did too, but some
24    contractual flexibility to delay taking aircraft which
25    you've had ordered, is that right?
```

```
1              THE WITNESS:  I don't know if, technically, that
2    part was in the contract, but for the last several years, I
3    don't know if you've heard anything about this geared
4    turbofan engine at this point?
5              THE COURT:  I'm learning.
6              THE WITNESS:  Okay.  So a contract like that is a
7    little bit like a marriage.  There's a constant state of
8    negotiation.  Sometimes you're a winner, sometimes you're
9    not.  So as soon as -- and Airbus was having issues.  So it
10   started in COVID when everything got shut down.  And getting
11   restarted, spooling back up, when they tried, just in time,
12   getting parts delivered and stuff, their ability to deliver
13   aircraft on the schedule that we had signed in -- I think it
14   was, that contract, was '19.  We had another contract, I
15   think we were still maybe at the tail end of one we signed
16   in '15.  When -- if we were supposed to take an aircraft in
17   June and they say, Hey, we don't have it.  Okay.  When will
18   you have it?
19             So that was going on.  And then we got to a place
20   where, well, they haven't, you know, they haven't been
21   meeting their part but now we actually could use some
22   relief.  And these guys are booked out, I think now the
23   latest -- I don't think they have any planes available to
24   buy until, like, 2030.  So you've got this to'ing and
25   fro'ing; we need something, they need something.
```

1          In the middle of all of this we've got these

2     geared turbofan engines that are -- they're making them for

3     Airbus to deliver on new aircraft, but because of the issue

4     with the engines we need spares.  They can only make so many

5     engines.  So, geez, do I want to deliver the engine I have

6     that just came off the line to Airbus or do I want to give

7     it to Spirit who's got a plane on the ground because -- and

8     they can't fly with one.  Right?

9          So what started out as airlines on the ground of

10    maybe one or two is now, I want to say we have eight or

11    nine.  And that number is just growing.

12         THE COURT:  The only part of your answer I didn't

13    understand, and I thank you, is "they can't fly with one,"

14    which I infer these planes require two engines?

15         THE WITNESS:  They do.

16         THE COURT:  Thank you.

17         THE WITNESS:  One on each wing.

18    Q.   Thank you, Mr. Gardner.

19         So it was still your expectation, at the time of your

20    deposition, despite the higher fuel environment, softened

21    demand, and changes to Spirit's fleet plan, that Spirit

22    would be profitable over the next five years; right?

23    A.   Yes.

24    Q.   Okay.  And then since the date of your deposition

25    Spirit has released its 2023 third quarter results; right?

```
 1   A.    Yes.
 2   Q.    And isn't it true that Spirit's load factor for
 3   the third quarter of 2023 was over 80 percent?
 4   A.    If that's what the release says, then the answer's yes.
 5   I have to look.
 6   Q.    Why don't we -- we can take a look.  You can turn to
 7   Exhibit 633 in your binder.
 8              (On screen.)
 9   Q.    And I'll direct your attention to page 24, ending in
10   the Bates number 559.
11   A.    Hang on.  The only word I heard, the last thing I heard
12   was 663.
13   Q.    633.
14   A.    Oh, I didn't even hear that right.
15   Q.    I may have misspoke, but it's Exhibit 633 in your
16   binder.
17   A.    Got you.  What's the number?
18   Q.    Page 24, ending in the Bates number, on the bottom,
19   559.  This shows Spirit's load factor for the third quarter
20   of 2023 to be 81.4 percent; right?
21   A.    81.4.
22   Q.    Okay.  And this also shows that the load factor,
23   Spirit's load factor for third quarter 2022 was
24   83.3 percent; right?
25   A.    Yes.
```

1    Q.   And if we look at the -- right above that, "available

2    seat miles," this shows that Spirit had increased its -- or

3    had a greater number of available seat miles in Q3 of this

4    year than last year; right?

5    A.   Yes.

6    Q.   13.5 percent higher; right?

7    A.   13.5 percent.  Correct.

8    Q.   Great.  And if we actually turn to the next page,

9    page 25.  So it should end in 560.  There should be a

10   comparison of the nine months ending in the third quarter.

11   A.   I see that.

12   Q.   And if you take a look at load factor there, that shows

13   that the load factor for 2023 for the nine months prior to

14   the end of the quarter was 81.7 percent; right?

15   A.   It does.

16   Q.   And for 2022 that number was 82.2 percent; right?

17   A.   Yes.

18   Q.   Okay.  Great.  So -- and since the date of your

19   deposition, Pratt & Whitney notified Spirit that its engines

20   in Spirit's fleet are subject for inspection and possible

21   replacement; right?

22   A.   Since my deposition?

23   Q.   Yes.

24   A.   Additional engines, for sure.  There were already

25   engines before that that were going to be scheduled in July.

1    I'm trying to place this in and around my deposition.

2    Q.   Well --

3    A.   The -- the answer we got kept getting worse.  And I

4    want to say -- so that the -- originally the scope of the

5    number of engines that were having an issue was confined to

6    a certain number of years, as we learned later.  And I think

7    it was after my deposition.

8    Q.   Okay.  Well --

9    A.   The number got a lot bigger.

10   Q.   Well, let's take a look, actually, at Exhibit 633, the

11   same one you're looking at.  You can turn to page 26, ending

12   in Bates number 561.  And this, if you look at the last

13   paragraph there, Pratt & Whitney, it states that on

14   July 25th, 2023, Pratt & Whitney's parent company announced

15   that it determined a rare condition in powder metal use and

16   manufacture, certain engine parts will require accelerated

17   inspection of a certain fleet which powers the A320neo

18   aircraft; right?

19   A.   Yes.

20   Q.   And that was after your deposition; right?

21   A.   Yes.

22   Q.   So these Pratt & Whitney engine issues will result in

23   Spirit grounding some of its fleet in Q3; right?

24   A.   Yeah, it has already.  Yes.

25   Q.   And it will result in Spirit grounding some of its

1   fleet in 2024 as well; right?

2   A.   Yes.

3   Q.   And a majority of the required engine removals will

4   occur in 2023 and early 2024; right?

5   A.   That may be what it says.  I couldn't speak to the

6   exact timing of -- my understanding as a board member is

7   that the number will grow over the course of 2024, and by

8   the end of 2024 we could have as many as 40 AOGs.

9   Q.   Well, while you have it open, why don't you turn to the

10  next page in the 3Q, page 27, ending in 562.

11  A.   Okay.

12  Q.   And take a look at the first paragraph, the

13  second-to-last sentence, which states, "A majority of the

14  incremental engine removals will occur in 2023 and early

15  2024."  That's accurate; right?

16  A.   That was accurate as of July 25th.  I'm -- well, that

17  was related to the July 25th or August 4th announcement?

18  They kept having more announcements and it felt to me like

19  the scope was growing.  So in August -- on August 4th of

20  2023, or September -- let me see.

21  Q.   Well, this is from Spirit's --

22  A.   Our 10-Q, yeah.  But I was trying to see whether it was

23  what they said.  Yeah, I'm sure this is correct as of the

24  date of the 10-Q.

25  Q.   And the date of the 10-Q is October 25th, 2023; right?

1    A.    Okay.  Yes.

2    Q.    Okay.  Just a few days ago.

3          It is your expectation that these engine challenges

4    will result in a dramatic decrease in Spirit's near-term

5    growth projections; right?

6    A.    It's the company's expectation if that's what it says

7    in the Q.

8    Q.    Okay.  And you still expect that capacity for 2024 will

9    remain the same or increase by mid single digits; right?

10   A.    I can't tell you specifically.  I'm reading this as

11   you're reading it.  So I'm not in the weeds on the specific,

12   you know, exact details of the timing and the -- other

13   people could certainly answer that question more readily

14   than I.

15   Q.    Well, I can pass up a document.

16         MS. MARKEL:  Can I have the -- my colleague will

17   pass up a document that is marked BUO, which is the press

18   release that -- a Spirit press release that accompanied the

19   Q3.

20         (Handing.)

21         THE WITNESS:  Thanks.

22   Q.    Do you recognize this document?

23   A.    Yes.

24   Q.    And what is it?

25   A.    It's our earnings release for the third quarter of

```
1   2023.

2   Q.   And if you take a look at the first paragraph --

3        MR. COHEN:  Your Honor, is counsel going to offer

4   the document before she questions the witness?  I have no

5   objection.

6        THE COURT:  No objection to admitting this

7   document?

8        MS. MARKEL:  No objection to admitting the

9   document.  I'll move to admit this document.

10        THE COURT:  And it is admitted.  It will be

11   Exhibit 678?

12        THE CLERK:  Yes.

13        THE COURT:  678 in evidence.

14        (Exhibit 678 received in evidence.)

15        THE COURT:  I have a question about it.  Just

16   reading it, sir, if you know.  Reading it down here, it

17   says, "We have already taken the first steps by modifying

18   the cadence of our aircraft."  What does the word "cadence"

19   in that sentence mean?

20        THE WITNESS:  The timing of deliveries.  So the

21   rate.

22        THE COURT:  All right.

23   Q.   So, Mr. Gardner, if you could take a look at page 2

24   under, "Neo engine update."  That first paragraph, the last

25   sentence states, "For the full year 2024, Spirit estimates
```

```
 1   capacity will range between about flat to up mid single
 2   digits compared to the full year 2023."  Do you see that?
 3   A.   No.  I'm -- but I'm slow.  I'm getting there.
 4   Q.   Take your time.
 5   A.   I'm there.
 6   Q.   Okay.
 7   A.   For the full year?
 8   Q.   "For the full year 2024" --
 9   A.   2024.
10   Q.   Yes.  "Spirit estimates capacity will range between
11   about flat to up mid single digits compared to the full year
12   2023."  Do you see that?
13   A.   I do.
14   Q.   And that is an accurate statement; right?
15   A.   That's what they estimate.
16   Q.   Okay.  As chairman of Spirit's board, management
17   updates you on public financial metrics for other airlines
18   as well; right?
19   A.   From time to time.
20   Q.   And single digit -- and that would include capacity
21   growth measured by available seat miles for other airlines;
22   right?
23   A.   Yes, from time to time.
24   Q.   And single-digit capacity growth is sill consistent
25   with or better than the growth rate of legacy airlines;
```

```
 1   right?
 2              MR. COHEN:  Objection.  Foundation, your Honor.
 3              THE COURT:  Overruled.  If he knows.
 4   A.   It -- us growing 20 percent and American growing
 5   3 percent is them adding more capacity than us.  Does that
 6   make sense?  Do you understand what -- they're so much
 7   larger that percentages don't actually -- don't tell the
 8   story.
 9              THE COURT:  That's his answer.
10              We'll stop here as it's 1:00, whatever the clock
11   says.  And you may step down, sir.
12              We're going to resume here tomorrow.  And as I've
13   told you, we'll resume at 10:00, take a shorter break.  I
14   would appreciate it if we could be ready to go at quarter to
15   10:00 and I will get here just as fast as I can from the
16   doctor's.
17              This afternoon we will take the view.  We'll meet
18   at the front door to the courthouse shortly before 2:00.  I
19   don't think we need the battalions of leading skill in order
20   to take a view, and I mean no disrespect to anyone.
21              We're not counting the time for taking the view.
22   The total elapsed time out of the ten days of each side, the
23   government has used up two days, two hours,
24   fifty-five minutes.  The defense has used up two days,
25   thirty-five minutes.
```

1          We'll stand in recess in this case for those going on

2     the view until 2:00 p.m.  We'll recess.

3               THE CLERK:  All rise.

4

5               (Luncheon recess.)

6

7

8

9                         *****

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E


        I, Cheryl B. Palanchian, Court Reporter
for the United States District Court for the
District of Massachusetts, do hereby certify that
the foregoing pages are a true and accurate
transcription of my shorthand notes taken in the
aforementioned matter to the best of my skill and
ability.



        /s/ Cheryl B. Palanchian 11/6/2023
               CHERYL B. PALANCHIAN

           Registered Merit Reporter
           Certified Realtime Reporter