```
 1                   UNITED STATES DISTRICT COURT

 2                  DISTRICT OF MASSACHUSETTS (Boston)

 3                                No. 1:23-cv-10511-WGY
                                  Vol 1, Pages 1 - 77
 4

 5

 6   UNITED STATES OF AMERICA, et al,
                Plaintiffs
 7

 8   vs.

 9

10   JETBLUE AIRWAYS CORPORATION, et al,
                Defendants
11

12                          * * * * * * * *

13

14                    For Bench Trial Before:
                      Judge William G. Young
15

16

17                    United States District Court
                      District of Massachusetts (Boston)
18                    One Courthouse Way
                      Boston, Massachusetts 02210
19                    Tuesday, November 7, 2023

20                          * * * * * * * *

21

22            REPORTER: RICHARD H. ROMANOW, RPR
                      Official Court Reporter
23                    United States District Court
              One Courthouse Way, Room 5510, Boston, MA 02210
                          rhrbulldog@aol.com
24

25
```

```
 1                    A P P E A R A N C E S

 2

 3    EDWARD WILLIAM DUFFY, ESQ.
      ARIANNA MARKEL, ESQ.
 4    AARON TEITELBAUM, ESQ.
         DOJ-Atr
 5       450 Fifth Street NW, Suite 8000
         Washington, DC 20530
 6       (202) 812-4723
         Email: Edward.duffy@usdoj.gov
 7   and
      WILLIAM T. MATLACK, ESQ.
 8       Attorney General's Office
         One Ashburton Place, 18th Floor
 9       Boston, MA 02108
         (617) 727-2200
10       Email: William.matlack@mass.gov
         For Plaintiffs United States of America and
11       The Commonwealth of Massachusetts

12

13    RYAN SHORES, ESQ.
         Cleary Gottlieb Steen & Hamilton LLP
14       2112 Pennsylvania Avenue, NW
         Washington, DC 20037
15       (202) 974-1876
         Email: Rshores@cgsh.com
16   and
      ELIZABETH M. WRIGHT, ESQ.
17       Cooley LLP
         500 Boylston Street
18       Boston, MA 02116-3736
         (617) 937-2349
19       Email: Ewright@cooley.com
     and
20    RACHEL MOSSMAN ZIEMINSKI, ESQ.
      MICHAEL MITCHELL, ESQ.
21       Shearman & Sterling LLP
         2601 Olive Street, 17th Floor
22       Dallas, TX 75201
         Email: Rachel.zieminski@shearman.com
23       For Defendant JetBlue Airways Corporation

24

25       (Continued.)
```

```
1        (Continued.)

2

3    JAY COHEN, ESQ.
     ANDREW C. FINCH, ESQ.
4        Paul, Weiss, Rifkind, Wharton & Garrison
         1285 Avenue of the Americas
5        New York, NY 10019-6064
         (212) 373-3000
6        Email: Jaycohen@paulweiss.com
         For Defendant Spirit Airlines, Inc.
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    I N D E X

 2

 3   WITNESS              DIRECT  CROSS  REDIRECT  RECROSS

 4

 5   McINTYRE GARDNER  (Continued.)

 6      By Ms. Markel:        5                71

 7      By Mr. Cohen:              34

 8

 9

10                    E X H I B I T S

11

12         EXHIBIT 679 ..........................  9

13         EXHIBIT 680 .......................... 13

14         EXHIBIT 681 .......................... 23

15         EXHIBIT 682 .......................... 25

16         EXHIBIT 683 .......................... 27

17         EXHIBIT 684 .......................... 29

18         EXHIBIT 685.......................... 32

19

20

21

22

23

24

25
```

```
 1          P R O C E E D I N G S
 2          (Begins, 9:00 a.m.)
 3          THE COURT:  If you would remind the witness.
 4          THE CLERK:  Mr. Gardner, you recall you are under
 5    oath?
 6          THE WITNESS:  I do.
 7          THE COURT:  You may continue.
 8          MS. MARKEL:  Thank you, your Honor.
 9
10    DIRECT EXAMINATION BY MS. MARKEL:  (Continued.)
11    Q.    Good morning, Mr. Gardner.
12    A.    Good morning.
13    Q.    Since you left the stand yesterday, have you
14    spoken with anyone about the substance of your testimony
15    either from yesterday or for today?
16    A.    No.
17    Q.    So this morning I'd like to start with Spirit's
18    negotiations with Frontier and Allegiant back in 2019.
19          Back in 2019, Spirit was considering combining
20    with another ULCC, right?
21    A.    Yes.
22    Q.    And to that end, Spirit had discussions with
23    Frontier and Allegiant back in a 2019, right?
24    A.    I believe that's correct, yes.
25    Q.    And those were the only two airlines that Spirit
```

1    engaged in discussions with at the time, right?

2    A.    Yes.

3    Q.    And Spirit's board ultimately decided against

4    moving forward with either Frontier or Allegiant back

5    then?

6    A.    In 2019, yes.

7    Q.    And Spirit's board made the decision to focus on

8    its standalone plan rather than pursue any strategic

9    combination at that time, right?

10   A.    Yes.

11   Q.    Okay.  So now let's talk about Allegiant very

12   briefly.

13        So at this time please direct your attention to

14   the document marked BJC in your binder.

15   A.    (Turns.)  Okay.

16   Q.    Do you recognize this to be an agenda -- if you

17   look at the first page, an agenda of materials prepared

18   for a board meeting on August 24th, 2021?

19   A.    Yes.

20   Q.    And if you look at the agenda, it looks like you

21   opened that meeting, right?

22   A.    I did.

23        MS. MARKEL:  Your Honor, at this time I move for

24   the admission of BJC in evidence.

25        THE COURT:  Any objection?

```
1          MR. COHEN:  Your Honor, I think the document has
2     hearsay within hearsay under 805.  I don't know if the
3     witness is going to be directed to that.  But beginning
4     at --
5          THE COURT:  Well she's offering -- she's offering
6     a document.  Now I'm assuming its authenticity, it's an
7     admission by Spirit, and your concern is material in
8     there that you say is, um, hearsay within hearsay.
9          Is that right?
10         MR. COHEN:  Yes, your Honor.  And just to be
11    clear, I'm not objecting to the document also as a
12    business record of -- but it's hearsay within hearsay.
13         THE COURT:  All right.  Well then if she's -- if
14    you have no objection to the document, then I'll admit
15    the document, which means that anything in here is --
16    has probative weight if, um -- if I find it persuasive
17    of something relevant.
18         Is that all right with you?
19         MR. COHEN:  No, your Honor, I --
20         (Laughs.)
21         THE COURT:  No.  Well then the default is on you
22    to point out what I ought not look at.
23         MR. COHEN:  Yes.
24         I would say the beginning at Bates page that ends
25    in 947, it's, I suspect, where we're going on the slides
```

 1    that follow.  All of the material around Allegiant is

 2    compiled from data that would not be native to Spirit.

 3    It has to be --

 4         THE COURT:  I follow that.  All right.  Now I

 5    understand the objection.

 6         What -- um, do you want that data?

 7         MS. MARKEL:  Yes, your Honor.

 8         THE COURT:  And how can you get it in under the

 9    rules?

10         MS. MARKEL:  Um, if you look at the page ending in

11    944, it appears that this competitive analysis was

12    prepared by Spirit.  It's in a Spirit presentation.

13    These are Spirit admissions.  Spirit put this together.

14         THE COURT:  I understand that, but -- wait a

15    minute.  Here's his point.

16         His point is that the data that had to come from

17    somewhere, it came from Allegiant, and I'm not

18    Allegiant.  We don't know where the data came from.

19         Now this may be what Spirit thought about

20    Allegiant, but it does not prove anything about

21    Allegiant.

22         Now are you okay with my taking it with that

23    limitation?

24         MS. MARKEL:  Yes, your Honor.

25         THE COURT:  And you have no problem with that?

1          MR. COHEN:  No, your Honor.

2          THE COURT:  All right.  Then BJC is admitted in

3     evidence, it will be Exhibit -- and I need the Clerk's

4     help here -- 679, as limited.  And you may proceed.

5          MS. MARKEL:  Okay.

6          (Exhibit 679, marked.)

7     Q.    So, Mr. Gardner, if you turn to page -- the page

8     ending in 944, and it also has the Page 15 on the

9     bottom, and it's called, "Competitive Analysis."

10         Do you see that?

11    A.    Not yet.  I'm getting there.  (Turns.)  I do.

12    Q.    Okay.  So this section is a Competitive Analysis

13    that Spirit put together on Allegiant, right?

14    A.    Um, yeah, I assume so.

15    Q.    Okay.  So turn to Page 950 in your binder.

16    A.    (Turns.)

17    Q.    And that slide should be titled "Allegiant has

18    remained much smaller than Spirit."

19         Do you see that?

20    A.    I do.

21    Q.    And do you see at the right-hand side of the chart

22    that Spirit was, in Spirit's estimation, "158 percent

23    larger than Allegiant as of 2019 in terms of ASMs,"

24    right?

25    A.    That's what this says, yeah.

1    Q.    And this also shows that in Spirit's estimation,

2    Spirit was growing much more quickly than Allegiant,

3    right, if you look at the left-hand side?

4    A.    Um, yes, that's what it says.

5    Q.    Okay.  So now let's turn to Page 955.

6    A.    (Turns.)

7    Q.    And so this is titled "Model focuses on network

8    breadth, peak frequency."

9          Do you see that?

10   A.    I do.

11   Q.    Okay.  So take a look at the second bullet point

12   that states, "Over 500 nonstop markets this summer, only

13   15 -- about 15 percent have a competitor."

14         Do you see that?

15   A.    I do.

16   Q.    And so that was Spirit's assessment of Allegiant,

17   right?

18   A.    Um, of their network market here, I think so.  I

19   can't read the footnote that is referenced in that

20   point.  But it's to, um -- maybe I can read it on the

21   screen, but "markets on a head-to-head airport basis

22   approximately."  And what does that say, "one-third on a

23   metro basis"?  I'm just trying to make sure I understand

24   the -- I think what you say is correct.

25   Q.    Okay.  And so if you look at the fourth bullet

```
1    point now, that states "Only 6 percent of markets
2    operate daily or greater."  So that was Spirit's
3    assessment of Allegiant, right?
4    A.    Um, of the markets that operate daily or greater,
5    yeah.
6    Q.    Okay.  So now take a look at the page ending in
7    981.
8    A.    (Turns.)
9    Q.    And let me know when you're there, please.
10   A.    (Turns.)  Got you.
11   Q.    Okay.  So this sign is called "Key Financial
12   Theme," and please direct your attention to, I guess,
13   the third bullet under "Allegiant Key Plan," which
14   states "Small city, low-volume market, limited runway
15   for growth, but at potentially higher unit revenue
16   level."
17         Do you see that?
18   A.    I do.
19   Q.    So it was Spirit's assessment that Allegiant had a
20   limited runway for growth, right?
21   A.    Um, yes.  Under that model, yes.
22   Q.    Okay.  Now turn to the next side ending in 982.
23   A.    (Turns.)  Yup.
24   Q.    This was "Spirit Management's Strategic Comparison
25   of Allegiant and Spirit," right?
```

1    A.    Yes.

2    Q.    Okay, take a look at "Network" under "Allegiant"

3    and under "Spirit."

4          "Whereas Spirit had breadth and depth in this

5    network, it was Spirit's assessment that Allegiant had

6    breadth but no depth," right?

7    A.    Yes, that was its model.

8    Q.    Okay.  Now take a look at "Schedule" underneath

9    that.  "Spirit had" -- "It was Spirit's assessment that

10   Spirit had daily frequencies, unlike Allegiant," right?

11   A.    Yes.

12   Q.    Now take a look at "Aircraft Utilization."  "It

13   was Spirit's assessment that where Spirit had high

14   utilization, Allegiant had low," right?

15   A.    That's what it says, yeah.

16         MS. MARKEL:  Okay, you can put that exhibit aside.

17   Q.    And I'm going to, um, pass -- my colleague will

18   pass up a document that has been marked as BUW.

19         (Hands to witness.)

20   Q.    And do you recognize this document?

21   A.    (Looks.)  I do.

22   Q.    This is Spirit's investor update as of October

23   26th, 2023, right?

24   A.    Yes.

25   Q.    Okay.

1          MS. MARKEL:  At this time I will move this

2     document in evidence.

3          MR. COHEN:  No objection, your Honor.

4          THE COURT:  May be received, Exhibit 678 --

5          MS. MARKEL:  680.

6          THE COURT:  680.  Thank you.

7          (Exhibit 680, marked.)

8   Q.    And so if you direct your attention to the last

9     two, um, rows here.  This shows -- the second-to-last

10    row shows that, um, there was a 14 percent expected

11    increase in ASM for the fourth -- sorry, let me say that

12    again.

13          So the second-to-last row shows that Spirit's

14    expected ASM increase for the fourth quarter 2023, year

15    over year, is 14 percent, right?

16  A.    That's what it says.

17  Q.    And then if you look at the row below that, it

18    shows it to be 7 percent for the -- for the first

19    quarter of 2024, right?

20  A.    Yes, that's what it says.

21  Q.    Okay.

22          MS. MARKEL:  You can put that aside.

23  Q.    So now I'd like to discuss the more recent

24    Frontier, Spirit negotiations.

25          Spirit picks up discussions with Frontier in late

1    2021, right?

2    A.    Um, summer, I think.

3    Q.    The summer of 2021?

4    A.    Yeah.  Uh-huh.

5    Q.    Okay.  And on February 5th, 2022, Spirit and

6    Frontier signed a merger agreement, right?

7    A.    We did.

8    Q.    And you wrote it in favor of a Spirit, Frontier

9    transaction, right?

10   A.    I did.

11   Q.    Now let's fast-forward to the end of March 2022.

12         On March 29th of 2022, JetBlue made a proposal to

13   acquire Spirit, right?

14   A.    I believe that was the date, yes.

15   Q.    And Spirit's board met to discuss JetBlue's

16   proposal, right?

17   A.    We did.

18   Q.    And ultimately Spirit's board determined that the

19   JetBlue proposal was not a superior proposal, right?

20   A.    Um, correct.

21   Q.    And one of Spirit's concerns with JetBlue's

22   proposal at the time was the ability to run Spirit as an

23   independent enterprise during the pending approval

24   process, right?

25   A.    That was one of them.

1   Q.    Okay.  Now let's fast-forward to May of 2022.

2         In May of 2022, JetBlue made a hostile takeover

3   bid for Spirit, right?

4   A.    Yes.

5   Q.    Okay.  And sitting -- and you are aware that

6   JetBlue has stated that it intends to convert Spirit's

7   fleet to JetBlue's fleet, right?

8   A.    That's what they say publicly, yes.

9   Q.    Okay.  And so sitting here today, you would agree

10  that the conversion of Spirit's aircraft to JetBlue's

11  configuration would result in higher prices for Spirit

12  consumers, right?

13  A.    Um, ultimately.  Their average fares are higher

14  than ours.

15  Q.    Thank you.

16        So now let's turn to Exhibit 105 in your binder.

17  A.    (Turns.)  105?  Oh, here it is.

18  Q.    Yes.

19  A.    Got you.

20  Q.    And this is Spirit's press release from May 19th,

21  2022, right?

22  A.    It is.

23  Q.    And this press release was issued after JetBlue's

24  tender offer, right?

25  A.    Um, yes.

1    Q.    Okay.  So take a look at the bottom of the first

2    page continuing onto the second page, and you should see

3    that you're quoted in this press release.  Do you see

4    that?

5    A.    I do.

6    Q.    Now let's look at your quote on the top of the

7    second page.  You're quoted as saying, "Based on our own

8    research and the advice of antitrust and economic

9    experts, our view is that the proposed combination of

10   JetBlue and Spirit lacks any realistic likelihood of

11   obtaining regulatory approval while our company faces a

12   long and bleak limbo period as we await resolution."

13         Do you see that?

14   A.    Yes.

15   Q.    Your statement there accurately reflects the

16   board's determination as of May 19th, 2022, right?

17   A.    That was our feeling at the time based on that

18   offer, yes.

19   Q.    And to make that determination, the board relied

20   on Spirit's own research, right?

21   A.    Spirit's own research?  Um, yes, it was the

22   conclusion of the board.

23   Q.    And if you look at the beginning of your quote you

24   wrote -- or you said, "Based on our own research and

25   advice of antitrust and economic experts."

1    A.    Yeah.

2    Q.    Okay.  And so the board also relied on advice from

3    Spirit's antitrust and economic experts, is that right?

4    A.    Um, yes.

5    Q.    Okay, so now let's look at your quote, the next

6    part of your quote.  You write, "In that scenario, a

7    $1.83 cent per share reverse rate of pay will not come

8    close to adequately compensating Spirit's stockholders

9    for the significant business disruption Spirit will face

10   during what JetBlue acknowledges will be a protracted

11   regulatory process."

12         You see that, right?

13   A.    I do.

14   Q.    And so you were concerned that a regulatory

15   challenge could result in a significant business

16   disruption risk for Spirit, right?

17   A.    Um, yes.

18   Q.    Okay.  So --

19         MS. MARKEL:  You can put that exhibit aside.

20   Q.    And let's turn to the document marked 350 in your

21   binder.

22   A.    (Turns.)

23   Q.    And this is a May 23rd, 2022 presentation that is

24   already in evidence.  So I will direct your attention to

25   Slide 3 on the page ending in 212, which is titled "Is

1    JetBlue purposely downplaying the substantial regulatory

2    risk?"  Let me know when you're there.

3    A.    (Pause.)  I'm there.

4    Q.    Okay.  If you look at the second bullet point on

5    this page, it states, "JetBlue's acquisition removes the

6    largest low-fare competitor affecting millions of

7    consumers across the U.S."

8          Do you see that?

9    A.    I do.

10   Q.    And those millions of consumer are Spirit's

11   consumers, right?

12   A.    Um, yes.

13   Q.    Okay.  So it's Spirit's position at the time that

14   this deal would harm millions of Spirit consumers,

15   right?

16   A.    Um, that was a concern.

17   Q.    Okay.  So now please turn to Slide 6 at Page 215.

18   A.    (Turns.)

19   Q.    This slide is titled, "Spirit's shareholders lose

20   in all NEA litigation scenarios."

21         Do you see this?  Let me know when you're there.

22   A.    I'm there.

23   Q.    Okay, great.

24         So this flow chart considers how JetBlue's win or

25   loss in the NEA trial would affect a JetBlue, Spirit

```
1    deal, right?
2    A.     Yes, at the time.
3    Q.     And this flow chart shows that regardless of what
4    happened with the NEA, "a JetBlue, Spirit deal would
5    still be a high-fare airline trying to buy a low-fare
6    airline and raise fares," right?
7    A.     That's what this says, yes.
8    Q.     Okay.  And this also shows that regardless of what
9    happened with the NEA, Spirit did not believe that this
10   deal could be consummated at this time, right?
11   A.     We were concerned about that, yes.
12   Q.     All right.  So now if you could turn to Slide 10,
13   which is called -- it's on the Bates number ending in
14   219.
15   A.     (Turns.)
16   Q.     And this slide is called "Let's use common sense."
17   Let me know when you're there?
18   A.     Yes.
19   Q.     Okay.  So on this chart let's focus on the row
20   that is labeled "A JetBlue transaction."  And now let's
21   look at what it says under the "Common sense."
22          Next to "Value Disruption" it states, "RTF of
23   $1.83 per share does not come anywhere close to
24   protecting Spirit's shareholders from the business
25   disruption of a botched M & A transaction.  Average
```

1    market underperformance of 25 percent experienced by

2    target-to-sale mergers."

3          Do you see that?

4    A.    I do.

5    Q.    So it's fair to say that Spirit was concerned

6    about its business underperforming if JetBlue's tender

7    offer was successful, right?

8    A.    We were concerned about, um, a transaction, um,

9    that might not have closed.

10   Q.    Okay.  So now if you could turn to Slide 15,

11   which, um, is on the page ending with Bates 226, and

12   it's titled "We believe JetBlue's real motivation is to

13   break up the Spirit, Frontier merger."

14         Do you see that?

15   A.    I'm there.

16   Q.    Great.  Around this time it crossed your mind that

17   JetBlue's hostile bid could be an attempt to tank the

18   Spirit, Frontier deal, right?

19   A.    We were skeptical at that time.

20   Q.    Okay.

21   A.    There were a number of conditions in that tender

22   offer that, um, that led us to be, um, um, concerned

23   about the sincerity of their effort.  The one that pops

24   to mind most readily is the tender offer had -- if the

25   market moved up or down 10 percent, then they didn't

1  have to proceed.  And, um -- and ironically within, I

2  think, a week or 10 days of that tender offer being

3  issued, the market actually did move far enough that

4  they wouldn't have had an obligation to continue.

5  Q.    Okay, thank you.  Now if you could turn to, um,

6  the next slide, Slide 16, ending in 227.

7  A.    (Turns.)

8  Q.    You were aware that JetBlue had included a risk

9  factor in its 10K stating that "a combined Spirit

10 Frontier is expected to be a larger competitor to

11 JetBlue, which may affect JetBlue's competitiveness,"

12 right?

13 A.    Um, I became aware when I saw this, yes.

14 Q.    Okay.  And now please take a look at Slide 20,

15 which is ending in Bates number 233.

16 A.    (Turns.)

17 Q.    And 234.  Those two slides are called "JetBlue

18 continues to spread misinformation."  Do you see that?

19 A.    Yes.

20 Q.    And so at the time it was your view that JetBlue

21 was spreading misinformation, right?

22 A.    Um, it felt like it.  And there were elements of

23 it that, um, presumed things that they couldn't possibly

24 have known.  And, um -- I don't think this part was in

25 it, but there was some -- it was hostile.  It got kind

1    of personal.

2         So, um, there were other things in here that were

3    definitely misinformation, because it was about me.  So,

4    yes.

5    Q.    Well thank you, Mr. Gardner.

6         MS. MARKEL:  So you can put that exhibit aside.

7    And at this point I would like my colleague to pass up

8    what has been marred as SX.

9         (Passes to witness.)

10   Q.    So in connection with the May 23rd, 2022

11   presentation that we were just looking at, Spirit held a

12   special call for its investors, right?

13   A.    That's what this says.

14   Q.    Okay.  You don't have any reason to doubt that

15   this is a fair and accurate copy of the transcript for

16   that investor call, right?

17   A.    I don't have a reason to know.

18        MS. MARKEL:  Okay, at this time I move to admit

19   this into evidence.

20        MR. COHEN:  Your Honor, I don't object with

21   respect to the other earnings releases other than

22   insofar as this document contains information that are

23   statements of analysts in the questions and answers.  If

24   it's being offered only for the statements by Spirit

25   management, I have no objection.  Otherwise it is

1    hearsay.

2         MS. MARKEL:  We are fine with that limitation,

3    your Honor.

4         MR. COHEN:  And I'm also going to lodge a

5    continuing now -- not continuing, but an objection for

6    foundation.  I mean we're just reading documents, your

7    Honor.

8         THE COURT:  I'm watching.  I know what they're

9    doing.

10        MR. COHEN:  I've been trying to give counsel some

11   leeway, but if it doesn't say it, it's not particularly

12   probative, so.

13        THE COURT:  That's what you can argue.

14        I have no objection to the admission, so it's

15   admitted as Exhibit 681 in evidence and as limited.

16        You may proceed.

17        MS. MARKEL:  All right.

18        (Exhibit 681, marked.)

19   Q.   You can actually put that aside, Mr. Gardner.

20        And so let's fast-forward in time to the end of

21   June 2022.

22        In the end of June of 2022, Spirit amended its

23   merger agreement with Frontier, right?

24   A.   At the end of '22?  Oh, with Frontier?  Yes.

25   Sorry.  I thought you said JetBlue.

1    Q.    Okay.  And so if you can, um -- after Spirit

2    amended its merger agreement with Frontier -- after it

3    amended its merger agreement with Frontier, JetBlue made

4    a new offer, right?

5    A.    I don't know which one -- there were 2 or 3 of

6    those back and forth over the course of June.  And if

7    you give me a date, I can tell you which --

8    Q.    Well why don't you turn to Exhibit 94 in your

9    binder.

10   A.    (Turns.)  I'm there.

11   Q.    Okay.  And this is a press release that Spirit put

12   out after amending its merger agreement with Frontier,

13   right?

14   A.    Yes.

15   Q.    Okay.  So then after this, after this -- after

16   June 24, 2022, JetBlue made a new offer, right?

17   A.    Um, I believe that's right.

18   Q.    Okay.  Please take a look at the document that has

19   been marked for identification as BJR in your binder.

20   A.    (Turns.)  I'm there.

21   Q.    Okay.  You recognize these to be Spirit board

22   minutes from June 28th, 2022, right?

23   A.    I do.

24        MS. MARKEL:  Your Honor, I move to admit the

25   document identified as BJR in evidence.

```
1          MR. COHEN:  No objection, your Honor.

2          THE COURT:  Received as Exhibit 681 in evidence.

3          THE CLERK:  682.

4          THE COURT:  682.  I'm sorry.

5          (Exhibit 682, marked.)

6   Q.    So if you take a look at the second-to-last

7   paragraph on the page ending in 335, um, it states, "The

8   board generally agreed that the new JetBlue proposal was

9   not a material improvement from the June 20th proposal."

10         Do you see that?

11  A.    I do.

12  Q.    So the board did not recommend accepting JetBlue's

13  June 27th, 2022 offer, right?

14  A.    At that time, yes.

15  Q.    Okay.

16         MS. MARKEL:  You put that exhibit aside.

17  Q.    So at this point please turn to the exhibit that

18  has been preadmitted and marked as Exhibit 93 in your

19  binder.

20  A.    (Turns.)  Got you.

21  Q.    Okay, thank you.  This is a June 28th, 2022 press

22  release by Spirit, right?

23  A.    That's what it says.

24  Q.    And it's titled "Spirit Airlines reaffirms

25  commitment to merger with Frontier," right?
```

```
 1   A.    Yes.
 2   Q.    And this was issued after JetBlue provided a
 3   revised proposal at the end of June, right?
 4   A.    Um, I believe so.
 5   Q.    Okay.
 6   A.    What's the date on this?  I can't see it.  Oh,
 7   June 28th.  Okay.
 8   Q.    June 28th, 2022?
 9   A.    Yeah.
10   Q.    Okay.  So turn to the second page of this ending
11   in 999.
12   A.    (Turns.)
13   Q.    And please direct your attention to the third
14   bullet point in the middle of the page which states
15   "JetBlue has already stated it would raise fares and
16   would reduce capacity, exactly what the antitrust laws
17   were designed to prevent."
18   A.    Where are you?
19   Q.    The third bullet point in the middle of the page.
20   A.    Okay, I'm with you.
21   Q.    Okay.
22         So as of June 28th, 2022, it was still your
23   position that a JetBlue, Spirit deal would raise fares
24   and reduce capacity, right?
25   A.    Um, yes, that was, um, the concern we had.
```

```
 1    Q.     And that was based in part on JetBlue's own
 2    statements, right?
 3    A.     Yes.
 4    Q.     Okay, thank you.
 5           MS. MARKEL:  You can put that exhibit aside.
 6    Q.     Now please turn to the document marked ABY in your
 7    binder.
 8    A.     (Turns.)  I'm there.
 9    Q.     This is an e-mail that you received from
10    Mr. Christie on June 29th, 2022, right?
11    A.     Yes.
12    Q.     And this is from the day after Spirit published
13    the press release that we were just looking at, right?
14    A.     Correct.
15    Q.     Okay.
16           MS. MARKEL:  At this time I move to admit what has
17    been marked as ABY.
18           MR. COHEN:  No objection, your Honor.
19           THE COURT:  ABY is admitted, Exhibit 683.
20           (Exhibit 683, marked.)
21    Q.     In this e-mail Mr. Christie wrote to you that "The
22    vote is moving quickly against us."  Do you see that?
23    A.     I do.
24           MR. COHEN:  Objection, your Honor.
25           THE COURT:  Well he wrote what he wrote.
```

1          And I can't read.

2     Q.    Well, Mr. Gardner, at the time of this e-mail you

3     believed that Spirit's shareholders were unlikely to

4     vote in favor of a Spirit, Frontier transaction, right?

5     A.    Yes.

6     Q.    Okay.

7          MS. MARKEL:  And you can put that exhibit aside.

8     Q.    And now please turn to Exhibit 223 in your binder.

9     A.    (Turns.)

10    Q.    And so I could direct your attention to the last

11    paragraph on this first page, "As of July 12th, 2022,

12    Spirit's board was still unanimously in favor of a

13    Spirit, Frontier transaction."  Right?

14    A.    Yes.

15    Q.    Okay.

16         MS. MARKEL:  You can put that exhibit aside.

17    Q.    On July 27th, 2022, Spirit and Frontier ended

18    their merger agreement, right?

19    A.    I think that's right.

20    Q.    And on July 28th, JetBlue and Spirit entered into

21    a merger agreement, right?

22    A.    July 28th, yes.

23    Q.    Okay, let's turn to the document marked AGE in

24    your binder.

25    A.    (Turns.)  Got you.

1    Q.    Mr. Gardner, looking at AGE, this is an e-mail

2    exchange between you and a friend of yours from July

3    28th, 2022 after the merger agreement was announced,

4    right?

5    A.    Yes.

6    Q.    Okay.

7          MS. MARKEL:  And at this time I move to admit, um,

8    the document marked AGE in evidence.

9          MR. COHEN:  Hearsay, your Honor.

10          (Pause.)

11          THE COURT:  What do you say to that?

12          MS. MARKEL:  I am only using the statements from

13    the nonparty for the effect on the listener, but

14    Mr. Gardner responds, and I'm moving that for the truth

15    of the matter.

16          THE COURT:  He responds and says what, so I can

17    see it?

18          MS. MARKEL:  He responds at the very top and he

19    says "Immediate conclusion, unfortunately regulatory

20    approval is the big wild card."

21          THE COURT:  I'll admit so much of AGE as says

22    that.  It's admitted in part.  And it will be Exhibit

23    684.

24          (Exhibit 684, marked.)

25          MS. MARKEL:  And, your Honor, actually I

1    apologize, there's one other line from Mr. Gardner

2    further down on the page where he writes "Sort of..."

3            THE COURT:  I'll stand on my ruling.

4            MS. MARKEL:  Okay.

5    Q.    So, Mr. Gardner, at this time on July 28th, 2022,

6    you were still of the belief that regulatory approval of

7    a JetBlue Spirit deal was a big wild card, right?

8    A.    Well this is an e-mail -- I guess it was an e-mail

9    to a friend of mine.  Most people, I can't even tell you

10   how many people, think that when you sign a merger

11   agreement, that that's it, like you're done.  And, um,

12   so my friends were calling to congratulate me when, at

13   the moment I thought, "Okay, this is a good first step,

14   but there's obviously the next part to go."  So

15   that's -- most people are relatively uninitiated about

16   this stuff.

17           So that's why I said, um, she's like

18   "Congratulations."  I think the reason she sent it is

19   because JetBlue sent out a blast e-mail to their

20   frequent-flier customers announcing this, and so she's

21   like "Oh, awesome, great," and I'm like "Sort of."

22   (Laughs.)  "We started down the road."  That's what I

23   meant by that.

24   Q.    Thank you.

25           MS. MARKEL:  You can put that exhibit aside.

1  Q.   Now let's fast-forward a few months to October

2  2022.  So let's turn to the document marked AFR in your

3  binder.

4  A.   "A" and "F" as in "Frank"?

5  Q.   "A," "F," as in "Frank," "R."

6  A.   Got you.

7  Q.   And you may also look at the front, at the first

8  page behind that tab, which is a demonstrative labeled

9  Gardner Demonstrative A, which shows the text-message

10  exchange that followed.

11       Mr. Gardner, looking at AFR, this is a text

12  exchange between you and Mr. Christie from October 13th,

13  2022, right?

14  A.   It is.

15  Q.   And Gardner Demonstrative A is a fair and accurate

16  representation of that text-message exchange between you

17  and Mr. Christie on that date, right?

18  A.   Yes.

19       MS. MARKEL:  At this time I move to admit AFR and

20  request to publish Gardner Demonstrative A.

21       MR. COHEN:  No objection with the understanding

22  that the demonstrative is not being offered as evidence.

23       THE COURT:  The demonstrative is not evidence.

24  But when I look at my AFR, all I -- wait a minute.  Oh,

25  I understand.

```
 1          AFR is admitted as Exhibit 685, Demonstrative A
 2    may be published.
 3          (Exhibit 685, marked.)
 4    Q.    So, Mr. Gardner, on the morning of October 13th,
 5    2022, you wrote to Mr. Christie, "For this call I'm
 6    going to stick to the shareholders.  We're pretty clear
 7    in their desire for this transaction rather than the
 8    other one."
 9          Do you see that?
10    A.    Yes.
11    Q.    And you wrote this a few days before Spirit's
12    shareholders voted to approve JetBlue's merger, right?
13    A.    Um, I can't remember when the meeting was, but --
14    um, I can't -- that's the date that I wrote it.  I can't
15    say what it was before or after.
16    Q.    That's okay.  But later that evening you wrote to
17    Mr. Christie "You know I was just thinking..., do you
18    think JetBlue would pay us something to get out of the
19    deal."
20          Do you see that?
21    A.    I do.
22    Q.    And you wrote that months after the merger
23    agreement with JetBlue was signed, right?
24    A.    I did.
25          MS. MARKEL:  Thank you.
```

1          I will pass the witness.

2          THE COURT:  Any questions or do you want to

3     reserve?

4          MR. COHEN:  I'm not going to reserve, your Honor,

5     I just need a moment to get organized and I will --

6          THE COURT:  That's all right.

7          (Pause.)

8          THE COURT:  While they're shuffling around, I'll

9     ask this question.

10         The last e-mail exchange with Mr. Christie, you

11    say that you don't -- well first you ask, um, "Do you

12    think that, um, JetBlue will pay us to get out of the

13    deal?"  Right?

14         THE WITNESS:  Yeah.

15         THE COURT:  And, um, then he, Mr. Christie,

16    responds, he doesn't think so, "Nor do I think we want

17    that."

18         Why did you think he was advising that Spirit

19    wouldn't want that?

20         THE WITNESS:  Well there's context to this e-mail.

21    I think -- and my memory of this was in the middle of

22    the NEA trial.

23         THE COURT:  I see.

24         THE WITNESS:  And my memory is, um, it wasn't --

25    it wasn't a joke, it was a little bit tongue and cheek,

1    obviously we signed a merger agreement, but my memory

2    was somewhere in there that, um, in the NEA trial, um, I

3    can't remember whether it was going well or poorly at

4    the time or what we thought, but it was probably a

5    thought that, um -- Mr. Christie and I have -- I mean as

6    the Chair and the CEO, we communicate, and there has to

7    be hundreds of text messages, so --

8        THE COURT:  You just thought that might have the

9    wrong flavor in the midst of that trial?

10       THE WITNESS:  Yeah.

11       THE COURT:  All right.

12       And, Mr. Cohen, are you ready?

13       MR. COHEN:  Yes, we're just going to bring the

14   binders up to the witness.

15       THE COURT:  That's fine.

16       THE WITNESS:  Am I going to need this one?

17       MR. COHEN:  Keep that one handy though.

18

19   CROSS-EXAMINATION BY MR. COHEN:

20   Q.    While you're waiting for the binders, so we don't

21   waste any time, you were asked some questions by

22   Ms. Markel about the fear of disruption of a JetBlue

23   merger during the period between signing and closing.

24   Do you recall that?

25   A.    I do.

```
 1    Q.    From your perspective as the Chair of the board,
 2    has the JetBlue merger disrupted the operations of
 3    Spirit?
 4    A.    No.
 5    Q.    We're going to talk a little bit about some of the
 6    financial results that Ms. Markel reviewed with you from
 7    2023.
 8          In your view, is any part of the financial
 9    performance of Spirit since 2022 attributable to the
10    pendency of the merger?
11    A.    Not at all.
12    Q.    Okay, let's, um -- I just want to talk a little
13    bit more about the Spirit board.
14          You were asked some questions yesterday about your
15    NEA experience.  Do you remember that?
16    A.    I do.
17    Q.    And I want to talk about -- you're one of 8
18    members of the board?
19    A.    I am.
20    Q.    And Mr. Christie is another?
21    A.    He is.
22    Q.    Okay.  And so let's put up, if we can, Gardner
23    Demonstrative 1, which has been previously shared with
24    the government, and can you tell us what's most likely
25    in Gardner Demonstrative 1?
```

```
1    A.     Yeah, this is a brief summary of the members of
2    the board of directors.  Um, yeah, that's a little
3    picture of me.
4    Q.     Okay.
5    A.     I'm in the upper left.  I've been the Chair
6    since --
7           Do you want me to go through it?
8    Q.     I just want to ask you one question.
9    A.     Okay.
10   Q.     Did any of these members have prior experience
11   with mergers and acquisitions other than you?
12   A.     Um, yes.
13   Q.     And who is that?
14   A.     Let me see.  Working my way down.  Mark Dunkerley.
15   Bob Johnson.  Barkley Jones.  Christine Richards for
16   sure, probably the most of anyone.  And Dawn Zire.  And
17   I don't know about Merna.  But the others in their
18   regular jobs.
19   Q.     Okay.  And why don't you tell us a little bit --
20   rather than just reading the title, tell us a little bit
21   about what each of these members of the board contribute
22   to the collective experience and judgment of the Spirit
23   board?
24   A.     Okay.  So when we assemble the board we look for
25   people who have relevant experience in areas that we
```

1    think are going to, um, add particular value to the
2    deliberations and decisions that the board makes related
3    to the company.  So -- and Ted obviously is our CEO.
4    He's the only, um, um, interested director, the rest are
5    independent.
6        Mark Dunkerley has, um, at least two decades,
7    probably more like three, um, decades directly in the
8    commercial aviation business.  His last job was the CEO
9    of Hawaiian Airlines.  And he currently is the board
10   member on a few airlines.  And he's also on the board of
11   Airbus.
12       Bob Johnson, um, it's also an old picture, was
13   the -- his last full-time gig was as the CEO of
14   Honeywell Aerospace.  He's currently the Chairman of the
15   Board of a company called Spirit Aerosystems, which is
16   no relation to Spirit, but it's one of the largest
17   airframe manufacturers in the country.  They make the
18   fuselages for Boeing and for Airbus.
19       And Barkley Jones has been in and around the real
20   estate M & A and finance businesses his whole career.
21   He's actually the longest-tenured director, he's been on
22   the board since I believe 2006.
23       Christine Richards came on the board I think four
24   years ago.  She's the, um, head -- retired as the
25   General Counsel, um, of FedEx, and was there for, um,

1    more than 20 years.  And probably has more M & A

2    experience than everyone else on the board combined.

3           Merna Soto was the Chief Information and Security

4    Officer for Comcast cable company for a number of years.

5           And then Dawn Zire was the former CEO and Director

6    of NutriSystem.  And her -- so that the last two, um,

7    since we're in the consumer-facing business, Dawn had a

8    ton of experience in marketing and consumer behavior.

9    And cyber security's been a major focus of every

10   business, but in particular ours since, um, since the

11   world went to their phones, and Merna's got a deep

12   background in cyber security.

13   Q.    And did each of these Spirit board members

14   participate in the evaluation of the Frontier and

15   JetBlue transactions?

16   A.    Um, yes, all of them participated and all of them

17   voted, and all votes around all transactions.  Whether

18   we're voting for something or against something, all

19   votes were unanimous.

20   Q.    How many meetings do you think the board of Spirit

21   had in 2022 to discuss these transactions?

22   A.    Something just shy of 30 maybe.

23   Q.    And you were asked some questions at the outset of

24   your examination yesterday about whether you viewed it

25   your responsibility as the Chair of the board or as a

1   director to follow the preferences of shareholders.  Do

2   you remember that?

3   A.    I do remember that.

4   Q.    Okay.  Is that how you understand what your role

5   is supposed to be as a director of a public company?

6   A.    Up, no, not at all.

7   Q.    Okay, what is your understanding?

8   A.    So, um, I guess simply put, I view, um, the role

9   of the board in a fiduciary matter, I sort of compare --

10  I was thinking about it last night because I couldn't

11  understand what "preferences" was, um, and it's the

12  difference between being a babysitter and being a

13  parent.

14        There's things that kids want, the babysitter is

15  inclined to give it to them because they want it, but a

16  parent knows better, and the parent is acting in the

17  child's best interest.  So our view -- my view as being

18  a director is I represent all the shareholders, but I'm

19  supposed to do what I think is right in my judgment for

20  all shareholders.  I happen to be one as well.

21        And I think -- I don't think that, um -- we

22  regularly, um, I don't know if it's annual, but

23  regularly we, you know, have our own onboarding process,

24  and periodically we bring in counsel to advise us what

25  the role of a -- you know what a member of the board is

1    doing and what their duties are as directors.  So I
2    don't think that's lost on anyone.
3          THE COURT:  So your view is much like a
4    legislator, at least in theory?
5          THE WITNESS:  Um, I -- yeah, I guess so.
6          THE COURT:  Go ahead, Mr. Cohen.
7    Q.    Mr. Gardner, I want to pivot to another topic you
8    were asked about yesterday and a little bit today, which
9    is Spirit's financial position.
10         Has Spirit been profitable over the course of your
11   time as a member and then as the Chairman of the Spirit
12   board?
13   A.    Um, my memory, I think from 2010 until 2019, I
14   think we -- I think we were profitable every year.
15   There were certainly quarters where we weren't, but I
16   think every year we had a profit.
17   Q.    Go ahead.  I'm sorry.
18   A.    Since 20 -- since covid, the beginning of covid,
19   in whatever, February or March of 2020, um -- in 2020,
20   '21, and '22, our cumulative losses are approaching a
21   billion and a half dollars, in and around 4 to $500
22   million losses per year.  So -- and I don't know what
23   the aggregate adds up to.  I don't know.  We still have
24   a positive net worth, but the last three years -- and
25   this will be 4, because we are going to have a loss this

1    year, and that number is probably in the same kind of

2    range, 4 to 500 million.  So since covid we will have

3    lost about, um, at the end of this year, just shy of $2

4    billion.

5    Q.    So does Spirit sustain its business model losing

6    $500 million a year?

7    A.    Um, if we continue losing $500 million a year?

8    Absolutely not.

9    Q.    I want to turn to what the board anticipated for

10   2023, and I believe you testified yesterday that the

11   board set the budget at the December meeting of 2022.

12   Do you remember that?

13   A.    Yeah.

14   Q.    And does the board review budgets annually, in

15   December?

16   A.    We do.

17   Q.    And what did the 2023 budget that was approved

18   last December forecast with respect to profitability?

19   A.    I believe the budget said we'd make a couple-

20   hundred million dollars for 2023.

21   Q.    And what was the reason why Spirit believed, in

22   the December of 2022, that 2023 would be the first

23   profitable year since before covid?

24   A.    Um, so in -- our business is seasonal.  So in the

25   first quarter and -- and we're a calendar year, fiscal

```
1   year, so, um, the first quarter is the winter, January
2   through March, we, um, typically lose money that
3   quarter, it's the slowest time of year.
4        The second quarter is usually profitable.  But the
5   third quarter, I refer to it as that's our "Christmas in
6   retail," the third quarter is the quarter when we make
7   the bulk of our money.  And then we typically turn a
8   profit in the fourth quarter as well.
9        Since covid, so all of 2020 was shot for all the
10  covid reasons everyone knows about.  2021 started off,
11  um, in early April, um, people started to fly again and
12  things looked really good and then Omnicron -- I don't
13  know how many versions that was, but Omnicron hit, and
14  all the hope that -- I think most of the airlines had
15  it, for everything returning to normal, um, was thrown
16  out the window.  So 2021 turned into people stopped
17  flying again.
18       What 2022 was, even though we had a loss, was that
19  the booking patterns and travel patterns started to look
20  like they had before.  And our fourth quarter of, um,
21  2022, um, started to -- both the booking trends and, um,
22  and ticket prices started to look like it was returning
23  to the more normal pattern.
24       And so we -- and, um, looking into January, the
25  first quarter, had started to look, um, people buying
```

1    tickets in advance and at rates that looked like it was
2    more normal than it had in the last few years.
3    Q.    And let's look at the actual performance in the
4    first quarter.
5          Would you look at behind Tab 11 in your book is
6    Exhibit 77 in evidence, which is an 8K, and then a
7    Spirit Earnings Release for the first quarter.
8          THE COURT:  What tab do you want him to look at?
9          MR. COHEN: Tab 11, your Honor.  77.
10         THE COURT:  Thank you.
11   Q.    And specifically, Mr. Gardner, I'm going to direct
12   your attention to the fourth page of the exhibit that
13   has the Bates numbers 4629.  Let me know when you're
14   there.
15   A.    (Turns.)  I'm there.
16   Q.    And what this shows is that, um, Spirit had a loss
17   in the first quarter of 2023, correct?
18   A.    Yes.
19   Q.    And I should have done this before, but this
20   document, this Earnings Release, if you go back to the
21   first page, this is as of April 26th, 2023.  Do you see
22   that?
23   A.    Yes, I do.
24   Q.    Okay.  And was that unexpected, the first quarter
25   loss?

1    A.    No.

2    Q.    And the first -- underneath some of the numbers on

3    the first page, it says "For the first quarter of 2023,

4    our adjusted operating margin came in better than

5    expected, helped by lower fuel and a strong revenue per

6    available seat mile TRASM performance.  Looking ahead to

7    the second quarter, demand continues to be strong and

8    industry capacity remains constrained, both of which are

9    beneficial for unit rep."

10        Do you see that, sir?

11   A.    I do.

12   Q.    And did Spirit have any reason, at the end of the

13   first quarter or in April of 2023, to believe that it

14   would not meet its goal of having a profitable 2023?

15   A.    No.

16   Q.    And if you would turn to Page 4630, the next page,

17   I'm interested in the paragraph, I'm going to direct

18   your attention to the paragraph about "Fleet" that says

19   "For the second quarter of 2023."  Do you see that, sir?

20   A.    I do.

21   Q.    And it says "For the second quarter of 2023, we

22   estimate our operating margin will range between 4.5 and

23   6.5 percent."  And then if we go down a few lines to the

24   next-to-last sentence in this paragraph it says "We

25   expect to be profitable for the remainder of the year

1    with margins improving each quarter."

2         Do you see that, sir?

3    A.    I do.

4    Q.    Was this Earnings Release the last Earnings

5    Release the company had issued at the time of your

6    deposition?

7    A.    Um --

8    Q.    Which was the end of June.

9    A.    Well, yeah, the second quarter wasn't over --

10   Earning Releases for sure.  I don't know if we had any

11   other releases.  But, yes.

12   Q.    And if we also look on this -- at page --

13        MR. COHEN:  I'm sorry.  You can put this document

14   aside.

15   Q.    Let me ask you to turn to the next tab, Tab 12.

16   And this is the Q2 Earnings Release dated August 3.  Do

17   you see that?

18   A.    I do.

19   Q.    So does that refresh your recollection now that,

20   at the time of your deposition, the only earnings that

21   had been released was for Q1?

22   A.    Yes.

23   Q.    Okay.  And this is Exhibit 76.  And I'm going to

24   ask you again to turn to the third page, which is Bates

25   14611.

A.    (Turns.)

Q.    Do you see the reported net income loss of $2.3 million?

A.    Yes.

Q.    And how did that compare to the forecast that the Spirit board had issued prior to Q2?

A.    The prior forecast -- well the Q1 forecast said 4 1/2 to 6, and we came in at, um, 3.4.  And I'm focused on the operating margin.

Q.    Okay, why are you focused on the operating margin?

A.    Well, um, we lost 2.3 million versus, um, on an adjusted basis we had a profit of 32.3.

Q.    Okay.  And if you'd turn to the next page, 14612, the paragraph that begins "Despite achieving record revenue."

      Do you see that, sir?

A.    I do.

Q.    "Despite achieving record revenue, quarterly revenue in the second quarter of 2023, productivity had wins primarily related to pilot constraints, and NEO engine availability issues resulted in a disappointing operating margin.  With these issues, as well as an acute reduction in the domestic and Latin American demand outcome, we estimate our third quarter operating margin will range between 5.5 percent and negative 7.5

1    percent."

2          Do you see that, sir?

3    A.    The first says "negative," "negative 5.5 and

4    negative 7.5."

5    Q.    I thank you, "negative 5.5 and negative 7.5."

6    A.    Correct.

7    Q.    And what had been the prior forecast?

8    A.    Um, well it didn't say specifically, but it said

9    the margins were going to improve from 4 1/2 to 6, so.

10   Q.    Positive 4 1/2 to --

11   A.    From positive 4 1/2 to 6.  So we lost 10 points in

12   that process.

13   Q.    And not to go over ground we've already gone over,

14   but is the "NEO engine availability" the issue that you

15   discussed yesterday in your testimony?

16   A.    Yes, it is.

17   Q.    And is that issue going to be solved in 2023?

18   A.    Um, no.

19   Q.    Is it going to be solved, the engine issue, in

20   2024?

21   A.    Um, I don't think anyone is planning on that.  Not

22   that I've heard.  So I think the answer is no.  In fact

23   we're planning on having more planes on the ground than

24   we do now.

25   Q.    And actually you testified yesterday about

```
1    something called "AOG."  Is that "Aircraft On Ground"?

2    A.    "Aircraft On Ground."

3    Q.    And do you recall how many aircraft on the ground

4    you're expecting at the end of 2024?

5    A.    I think it's around 40.

6    Q.    What percentage of Spirit's fleet is that?

7    A.    Um, 20 percent.  It's like having a hotel that you

8    -- with rooms to rent that you can't open.

9    Q.    And is the engine issue going to be resolved in

10   2025?

11   A.    Um, I don't think so.  Not -- based on what I know

12   now, I think the answer is probably not.

13   Q.    Can you state with any degree of certainty when

14   this Pratt & Whitney engine issue will stop affecting

15   Spirit Airlines?

16   A.    Um, no.

17   Q.    Now in that sentence also, the next one of the

18   sentences I read, it talks about "an acute reduction in

19   the domestic and Latin American demand outcome."

20         Do you see that, sir?

21   A.    Yes.

22   Q.    Okay.  And what does that refer to?

23   A.    So, um, sometime in -- so the way this summer --

24   and I just keep using the word "normal," there was a

25   pattern of business that -- that I was used to as a
```

1    board member for a decade and then covid hit, and for

2    the first, um -- for the first number of years after

3    covid, a convention for analysts and whatever on the

4    street, when they're looking at airline results, was

5    they compare it to 2019, which was the last year that

6    was, um, uninterrupted by, you know, these changes.

7         But the way that the summer looked, July and

8    August typically were very strong, and the reason for

9    that is we are predominantly a leisure carrier, so

10   you've got people going on vacation, and it's the

11   busiest time of year for travelers to vacation.  And

12   what happened on those is that sometime in July,

13   bookings for all that -- normally bookings stay strong

14   through Labor Day, and for some reason in 2023, um, that

15   pattern broke in August, which would normally look

16   strong, um, kind of fell out of bed.  And "bookings," as

17   it says here, the word "acute," um, was, um, certainly

18   unexpected, and didn't follow any trends that we had

19   ever seen that were, um, normal.

20   Q.    You were asked a question or two by Ms. Markel

21   about the "load factors" of Spirit, do you recall that?

22   A.    Yup.

23   Q.    And how do you reconcile the fact that she showed

24   you that the load factor was in the 80-plus-percent

25   range with the statement in this Earnings Release that

1    there's been an "acute reduction in demand"?

2    A.    Well, um, not that I don't care about "load

3    factor," but "load factor" isn't actually -- we could

4    fill the plane at a dollar, um, it -- the issue for

5    health and profitability is at what price are you

6    selling seats?

7         So an acute reduction in -- and what this means is

8    that an acute reduction, that the fares necessary to,

9    um, have profit in that period is what you are paying

10   attention to.  In those same charts there was a number

11   in those things that was called "yield," which is

12   basically what's the margin you're making on the 80

13   percent or the 81 percent load factor that you have?

14   And in those things the yield, in each of those

15   quarters, the yield was going down, which means we were

16   putting the same number of passengers on the plane, they

17   were just paying less money for their seat.

18   Q.    And is that sustainable for Spirit?

19   A.    That set of conditions?  No.

20   Q.    Would you look at Tab 13 in your binder, Exhibit

21   337 in evidence.  Do you see that, sir?

22   A.    337?  Yup.

23   Q.    It's an Investor Update as of September 12th,

24   2023.  Can you tell us what this is?

25   A.    It's yet, um, another revision to, um, what we

1    expected to have happening in the third quarter.

2    Q.    And what was that revision?

3    A.    Um, another 10 points down.  So, you know, we

4    started with an expectation at the end of April of 5

5    positive, August 3rd it was 5 negative, September 12 was

6    15 negative.  So over the span of that 4-month period,

7    um, our margin expectation declined 24 points.

8    Q.    And do you have an understanding as to why, um,

9    this guidance was required and why Spirit is doing -- as

10   it was stated in September, that it is expected to do

11   even worse than what it had announced in August?

12   A.     Um, this is very unusual, um, in that the entire

13   time I've been on the board, I think this is the first

14   time we did it.  And we, um -- guidance is given to, um,

15   to the street to -- you want to tell them what you think

16   is going to happen and a lot of times you're not really

17   sure, right, because there's business ahead of you.  But

18   once you know what something is going to be, and it's

19   going to be materially different, we felt an obligation

20   to convey that to the street.

21   Q.    And let's look at the actual results for Q3.  And

22   that's -- I want to look at the Earnings Release that's

23   behind Tab 15, which was marked by the government

24   yesterday as Exhibit 678 in evidence.  Let me know when

25   you're there.  It should be Tab --

1    A.     I'm there.

2    Q.     Tab 15 in your book.

3    A.     Yes.  Okay.

4    Q.     And this shows me -- and this was dated October

5    26th, 2023.

6           Do you recall discussing this document with

7    Ms. Markel?

8    A.     I do.

9    Q.     And let's just start with the bottom line.  What

10   was the net income loss for the quarter?

11   A.     157.6 million.

12   Q.     Okay.  And what was the margin, the operating

13   margin?

14   A.     Minus 15 percent.

15   Q.     Now putting covid, 2020 to one side.  In the time

16   you have been on the board at Spirit, has Spirit ever

17   had a third quarter with a 15 percent negative operating

18   margin?

19   A.     No.

20   Q.     What's the -- and look below the numbers, it says

21   "Softer demand for our product and discounted fares in

22   our markets led to a disappointing outcome for the third

23   quarter of 2023."

24          Do you see that, sir?

25   A.     (Looks.)

1   Q.    The first quote under the --

2   A.    I do.

3   Q.    And has that been discussed with the board?

4   A.    It has.

5   Q.    And then it goes on to say, two sentences later,

6   "And unfortunately we have not seen the anticipated

7   return to normal demand and pricing environment for the

8   peak holiday periods."

9        And has that changed since the end of October?

10  A.    I don't believe so.

11  Q.    And then it says, "Given these continued trends,

12  we," meaning Spirit, "are evaluating our growth profile

13  and our competitive position."

14       What does that mean?

15  A.    Um, that means that, um, that we can't just keep

16  doing what we're doing and expect, um, the outcome to be

17  dramatically different.  If this environment stays the

18  way it is, um, I guess the expression I'd use is "hope

19  is not a strategy."  So, um, we're going to do what we

20  need to do to figure out, um, how to address this.

21  Q.    And if you'd turn to the next page of Exhibit 678,

22  Page 2, if you look at the second paragraph on there, it

23  says "On a per-passenger-flight-segment basis, compared

24  to the same period of 2022, total revenue per passenger

25  flight segment for the third quarter of 2023 decreased

1   13.5 percent to $116.43."

2      What's the significance of the "revenue per

3   passenger" number to your business -- to Spirit's

4   business?

5   A.   Um, well that's what you're getting for, um, per

6   seat on the plane, and against the, um -- well you've

7   obviously got all the costs against that.  So, um, in a

8   healthy business you've got your, um, revenue per seat

9   going up, and ideally it's above the cost of delivering

10   that, you know, seat cost.  So a 13 1/2 percent decrease

11   is meaningful.

12   Q.   And how about, in the following sentence, the

13   decrease in fare revenue of 27.8 percent.  What is "fare

14   revenue"?

15   A.   So we -- in our unbundled product we sell the

16   ticket and then we sell what are called "ancillaries."

17   So if you've got a bag, you pay extra for the bag, and

18   it depends whether the bag goes in the belly of the

19   plane or if you want to carry it on with you.  You'd

20   also pay for, um, WIFI, you'd pay for seat assignment,

21   you'd pay for, um, getting on early, um, you know all of

22   the sort of a la carte things that you might want are

23   what are considered "ancillaries."  And that's, um,

24   generally speaking that's been, you know, 50 percent or

25   more of our total revenue per passenger.

1    Q.    And you were asked some questions about, um, by

2    Ms. Markel, about answers you gave in your deposition on

3    June 27th.

4          Do you recall that?

5    A.    Yes.

6    Q.    And she asked you in June about whether Spirit had

7    a plan to be profitable, to grow increased revenue, a

8    healthy standalone plan as a travel company.  Do you

9    recall those questions and answers?

10   A.    I do.

11   Q.    And are those truthful answers that you gave in

12   June?

13   A.    Yeah, of course.

14   Q.    And do you today believe that Spirit has an

15   achievable standalone plan for profitability and growth?

16   A.    Um, not if we just keep doing what we're doing.

17   Q.    All right.  Has management given the board the

18   solution to the problems that have arisen over the

19   course of 2023?

20   A.    Um, they have not given us the solution, no.  But

21   we are, um -- as I would say there's a lot of wood to

22   chop and they're busy chopping.  But as of now, no.

23   Q.    And in your view, as the Chair of Spirit's board,

24   what impact did the pendency of a merger with JetBlue

25   have on these results?

A.      Nothing.

Q.      Did management take its eye off the ball of running a standalone airline?

A.      No.

Q.      And what protections, if any, did the board put in place in the merger agreement with JetBlue to ensure that management would stay focused on running standalone Spirit?

A.      Um, well there were -- there were two primary ones, um, and, um, the specific one was what we call "interim operating covenants."  So we wanted to be sure because we knew it would take a while, we wanted to be sure that, um, Spirit could run as an independent airline without having to, um, worry about its, um -- the easiest example is we compete against JetBlue just like we would have competed with them before, for fares and for customers.  And so we've been running the airline as if it was going to remain independent.

        The other piece that was important, um, was frequently in a merger when a deal gets signed, you run the risk of losing -- because of an acquisition, you run the risk of losing senior people.  We negotiated a retention package, not just for our senior executives, but it actually went fairly deep into the organization, certainly all of the critical people, and that's got to

```
 1    be probably at least 100, maybe more, and to make sure
 2    that they had every incentive to stick, um, with the
 3    management team through the pendency of the conclusion.
 4    And I'm happy to say, um, and I think it's probably as
 5    much related to Ted's leadership as anything else, that
 6    we have not lost any senior executives since the
 7    announcement of this merger in July of '22.  So those
 8    were the, you know, the two primary things.
 9    Q.    What restrictions if any do those interim
10    operating covenants -- and I know you're not a lawyer,
11    but to your understanding, what restrictions if any do
12    those interim operating covenants put on the ability of
13    Spirit to run a standalone airline?
14    A.    Um, we had baskets for borrowing, we had --
15    nothing that would have gotten in the way, we couldn't
16    like issue equity, um, and add to the share count, um,
17    except in I think some very limited circumstance.  But
18    for the most part we structured it so it would be
19    business as usual.
20    Q.    And are you aware of any requests of JetBlue under
21    those covenants that were turned down by JetBlue?
22    A.    No.
23    Q.    Now I want to turn, um, next to the JetBlue
24    negotiations that Ms. Markel covered with you today.
25    And let me ask you to turn to Tab 2 in your binder, and
```

1    this is Exhibit Number 295 in evidence, the April 21st,

2    2022 board minutes, and I'm going to ask you to turn to

3    the second page that ends in 3374.

4            Do you see that?

5    A.    No, I started turning my book and you're way ahead

6    of me.  What Tab are we on?

7    Q.    Tab 2.

8    A.    Okay.

9    Q.    It's two pages.  And if you look at the -- do you

10   see it?

11   A.    I'm there.

12   Q.    Okay.  It's the first page of the minutes of the

13   board meeting?

14   A.    Yes.

15   Q.    And was this a few weeks after the first JetBlue

16   offer?

17   A.    It was.

18   Q.    And turn to the second page, 374, the next-to-last

19   paragraph.

20   A.    Yeah.

21   Q.    "Mr. Christie suggested that the company revert to

22   JetBlue without turning down the proposal, but setting

23   forth some guiding principles, namely flexibility and

24   regulatory remedies, retention and significant

25   shareholder protection provisions, i.e. reverse

1    termination fee."  Let me just stop you there.

2        Why didn't the board, as soon as this JetBlue

3    offer came in, turn the offer down?

4    A.    Um, because, um, we knew, um, what -- we had a

5    deal in hand but we knew that JetBlue was a, um, a very

6    capable company with the means to make an offer that

7    we'd find acceptable.  In fact over the course of, I

8    don't know, at least since 2018, we do strategic reviews

9    of where do we fit in the landscape?  And most of those

10   reviews, the three primary airlines that have been on

11   those charts as viable candidates that would have

12   strategic value for us to potentially combine with was

13   Frontier, JetBlue, and Allegiant.

14       So, um, we knew the fact that they made an offer,

15   one, it was an opening letter, so who knows what the

16   answer would have -- you know where they would go, how

17   serious they were.  But when you have an offer and

18   you're a board member and a fiduciary and you have a

19   strategic, um, competitor who makes an offer, you have

20   an obligation to run it to ground to see whether or not

21   it's something that -- and the conditions actually, our

22   Frontier agreement, the merger agreement, um, had a

23   provision that allowed us to, um, negotiate with another

24   party under certain conditions, because that was our

25   obligation as a board.  And those two conditions were

1    that the offer was superior from a financial point of

2    view and reasonably likely to be able to be consummated.

3         So we thought that their first offer, um, met

4    neither of those tests, but again it was their opening

5    letter.  So that, um -- this paragraph is -- the items

6    you mentioned, "regulatory remedies," "retention," those

7    were the items that would be of concern to us about

8    getting to an answer.

9    Q.   And did the board believe, on April 21st, 2022,

10   that JetBlue could ultimately enter into an agreement

11   with Spirit that would be reasonably likely of being

12   consummated?

13   A.   We thought it was possible, but not that offer.

14   Q.   And when you decided to negotiate with JetBlue,

15   were you aware that JetBlue's fares on average were

16   higher than Spirit's fares?

17   A.   Yes.

18   Q.   Why then did you continue to negotiate?

19   A.   Um, because, um, that wasn't the, um, that wasn't

20   the test for whether or not this was a transaction that

21   would make sense.  We've always, um, looked at and

22   thought that scale and size was important.  Most of the

23   reason -- when we would do these strategic reviews --

24   and the last one in the course of this case, the first

25   one that sort of shows up is 2018, but I'm pretty sure

1    we were doing it before that.

2         My view is I'd rather know what's going on in the

3    landscape with our competitors because I'm a bigger fan

4    of making things happen than having them happen to me.

5    So we regularly would review, um, not just what should

6    we do, but what would it be like if, um, if JetBlue

7    merged with Frontier, what situation would we be in?

8         So, um, so we, um, we regularly, um, looked at

9    those things.  And the marketplace is big.  And over --

10   I think from 2014 was probably our peak margin year, and

11   that was also -- I think it was Delta, was the first

12   competitor to introduce Basic Economy.  And Basic

13   Economy in the majors is basically our product offered

14   at, on top of, or slightly more than our fare, but it

15   unbundles the product.

16        So competition, um, was available at a --

17   JetBlue's average fare was higher, but if you wanted

18   to get -- I can't remember what the -- they've got a,

19   what do you call it, a bare-bones, um, product that

20   costs the same as ours probably, it's just that their

21   average, right, when somebody buys a little more extra

22   leg room, um, their average is higher because their

23   consumers want more.  But certainly on -- I've gotten on

24   Delta, United, and American, I've gotten fares from

25   places that we go that are the same prices as ours.  Now

1   I'm sitting in the middle seat and I've got my backpack

2   under the seat in front of me, but the fare was the

3   same.

4   Q.    Look at the last sentence of Exhibit 295.

5   A.    Yeah.

6   Q.    It says, "Mr. Gardner suggested the board

7   reconvene soon to discuss a straw man response to

8   JetBlue to be prepared by management and advisors."

9         Do you see that, sir?

10  A.    I do.

11  Q.    And do you recall making that statement at the

12  board meeting?

13  A.    I do.

14  Q.    What did you mean by a "straw man proposal"?

15  A.    So the "straw man," for each of those items, what

16  would each of those things look like?  How big a

17  retention package would we think we needed?  What kind

18  of reverse termination fee do we think that we would

19  need?  What set of regulatory remedies do we think we

20  would need in order to be -- to think that there was a

21  reasonable likelihood -- a reasonable likelihood that we

22  could enter into a transaction that would be approvable?

23  Q.    And did Spirit in fact convey those principles to

24  JetBlue with respect to regulatory remedies, retention,

25  and shareholder protection, that it thought was required

1    to consummate a transaction?

2    A.    We did.

3    Q.    And did there come a time when JetBlue responded?

4    A.    Um, to that initial request?  Yes.

5    Q.    And did the first response by JetBlue satisfy you?

6    A.    No.

7    Q.    And what did you do in response to that?

8    A.    Um, we told -- we -- I think they sent a letter

9    and we rejected it and reaffirmed our transaction with

10   Frontier, and, um -- I mean we had the road map in front

11   of them from the very beginning, we said "This is what

12   we need."  If I'm remembering right, we told them we

13   needed an RTF, a Reverse Termination Fee of about 12 1/2

14   percent of the transaction amount, um, and they offered

15   200.  Miraculously at the end of the transaction that we

16   signed with them, the RTF was right about 12 1/2 percent

17   of the transaction with them.

18   Q.    Now Ms. Markel showed you various documents from

19   May, press releases, board decks, do you recall that?

20   A.    I do.

21   Q.    By the way, did you prepare that board deck that

22   you were shown from May 23rd?

23   A.    Pardon me?

24   Q.    Did you prepare the May 23rd board deck you were

25   shown by Ms. Markel?

A.      No.

Q.      When did you get that board deck?

A.      Um, I think it was about, looks like 8:30 in the morning of the -- the morning of the meeting itself.

Q.      Okay.  And did there come a time after those public statements by Spirit in May, um, saying -- expressing concerns about JetBlue, that you resumed negotiations with JetBlue over a potential transaction?

A.      Yeah, um, my memory is that -- is the -- from the time they sent the letter, um, we stayed in a pretty steady state of negotiation because we had a serious buyer.  I think when the hostile got launched and it got, um, a little nasty, um, we -- I think we shut down the data room, it was a couple of weeks maybe -- and maybe from the middle of May until the time they went hostile until Memorial Day, something like that.

        But, um, you know, it's a -- there's a process.  We knew there was a process and we knew that "Just say no" was not, um, viable.  And so our goal as a board was to see, based on the principles that we knew we needed in order to get comfortable, to continue to focus on getting to that set of principles that we had given them at the front end.

Q.      And did those principles include regulatory commitments beyond what JetBlue initially offered?

1    A.    Oh, yes, they did.

2    Q.    Now would you look please at Tab 9 in your book,

3    9, it's Exhibit 226.

4    A.    (Looks.)

5    Q.    It's a big document, I'm only going to show you

6    one or two small pieces of it, and it's the schedule of

7    14A in connection with the shareholder vote on the

8    JetBlue transaction.

9    A.    Yes.

10    Q.    Now is that called a "merger proxy"?

11    A.    It is.

12    Q.    And could you turn please to Page 33, which has

13    the Bates number 0789 at the bottom.

14    A.    (Turns.)

15    Q.    Do you see that, sir?

16    A.    33?

17    Q.    33, that section that says "Background of the

18    merger."

19    A.    Yup.

20    Q.    And then if you just page through 33, 34, 35, and

21    all the way through to Page 43 -- through Page 43, can

22    you tell us what's set forth in those 10 pages of the

23    merger proxy?

24    A.    You know how I spent my summer vacation.  Yeah, so

25    there was a constant, um, stream of service -- this is a

1    lot of meetings, behind the meetings, um, conversations

2    between professionals of both sides.  But in effect it's

3    the amount of "engagement," for lack of a better term,

4    between the two sides, in getting to, um, a place where

5    we could unanimously support this merger.

6    Q.    And did there come a time when the Spirit board

7    became comfortable with the regulatory commitment from

8    JetBlue?

9    A.    Yes.

10   Q.    Why was that?

11   A.    Because -- so that the initial commitment, um, was

12   sort of read to us like it was originally at their

13   discretion, so "We'll do this if we can."  We had

14   concerns about the NEA, um, and -- which was the

15   Northeast Alliance, um, and we had concerns about it in

16   large part because we didn't understand the magnitude

17   and the scope of it because we hadn't ever seen the

18   agreement, and they were unwilling to share it with us,

19   I'm sure for their own good reasons.  So it was hard for

20   us to understand, um, just how far they were prepared to

21   go.

22         Their initial offer said they would put it

23   together, a divestiture remedy package up to the size

24   of -- until it had a material adverse effect on Spirit

25   as a whole.  Over the course of these 15 pages, that got

1    expanded to being -- having a material adverse effect on

2    both Spirit and JetBlue, the combined enterprise, which

3    was at least double the size.  So that got even larger.

4         And then over the course of I would say from the

5    end of June, maybe late June through to -- through to

6    most of July, we, um, came to have an understanding -- a

7    better understanding of the size of what that NEA carve-

8    out was, how big that was, and we concluded that the

9    skin in the game that JetBlue had was significant, was

10   substantial enough for us to believe that they were

11   going to do whatever it is they needed to do to get to a

12   closing on this transaction, whatever sort of remedies

13   that they would need to offer up to the government and

14   to the regulators in order to make that happen.  Which

15   is how, um, as I understand it -- and I'm not a lawyer,

16   but as I understand the bulk of the mergers that have

17   happened over the last 20 years have been solved with,

18   um, with those type of divestiture remedies.

19        So we felt that, um, that the package that was

20   together was, um, it insulated us from the risk of a

21   no-deal.

22   Q.    And when did the board approve the JetBlue merger?

23   A.    The 28th of July.

24   Q.    And was it a unanimous decision?

25   A.    It was.

1    Q.    When you voted for that merger, or to recommend
2    that merger to the shareholders, an affirmative
3    recommendation, did you believe that there was a
4    reasonable path to regulatory approval?
5    A.    Oh, for sure.
6    Q.    Would you have voted for the merger if there was
7    no reasonable path for regulatory approval?
8    A.    Never.
9    Q.    Can I ask you to stay on this exhibit, um, the
10   merger proxy, 226, and just ask you to turn to Page 47,
11   which has the dates 40803.
12   A.    I'm there.
13   Q.    Do you see the section in the middle that says
14   "Reasons for the merger, recommendation of the Spirit
15   board of directors"?
16   A.    I do.
17   Q.    And why is this section included in the merger
18   proxy?
19   A.    It's to give shareholders who are about to vote on
20   whether or not to approve this, a window into what the
21   reasoning of the board was for thinking that the -- that
22   this was something that they should support.
23   Q.    And the first bullet says that "The Spirit board
24   of directors believed that entry into the merger
25   agreement with JetBlue was the best available strategic

1    alternative for Spirit given the termination of the

2    previously-proposed merger agreement between Spirit and

3    Frontier following the failure of the Spirit

4    stockholders to approve that agreement."

5         Do you see that, sir?

6    A.    Yes.

7    Q.    And did the Spirit board believe, in June of --

8    in July of 2022, that a combination with JetBlue was

9    preferable to a standalone Spirit?

10   A.    Absolutely.

11   Q.    Why?

12   A.    The reason we sort of -- we're always interested

13   in, um, doing something strategic that was, what they

14   call "inorganic," right?  We had our own organic plan,

15   we had planes on order.  But the network benefits of

16   being a larger airline in this industry are -- are

17   significant.

18        So, um, first you've got four competitors, each of

19   whom control roughly 20 percent of the domestic air

20   traffic, so the rest of us are fighting over the last

21   fifth.  We had gotten ourselves to, um, 4 percent, 5

22   percent, but there's only so much, you know, you can do.

23   And one of the biggest, um, to me strategic benefits,

24   um, is I think about our network map and where we fly,

25   and then you take someone like JetBlue or Frontier,

1    right, and where they fly, and JetBlue flies places that

2    we don't fly and we fly places they don't.  So when you

3    put those two networks together, all of a sudden you

4    have two city pairs that, um, a route that you can fly

5    that neither of you could have flown before.

6         And, um, and one of the important components, and

7    it's become more important over time, I think one of the

8    reasons that Basic Economy was, um, has been such a, um,

9    challenge, is that while we have a loyalty program,

10   these other airlines have, um, a much larger loyalty

11   program, they've got people walking around with their

12   credit cards.

13        And so the importance that -- the more important

14   you can be to your customer, i.e. being able to take

15   them rather than just from New York to Florida, if you

16   can take them anywhere they want to go, then they're

17   going to be more dependent and more likely to use you.

18        So we've always thought as a strategic rationale,

19   that was the reason that we wanted to get bigger than we

20   could get on our own, and this transaction we met all of

21   those objectives.

22   Q.   Okay, and if you look at the third bullet, "The

23   expectation that the merger will create a more

24   competitive and financially successful airline than

25   Spirit would be able to create on a standalone basis,

1    including because the combined company would constitute

2    the fifth largest airline in the United States."

3            Did you believe that at the time you voted for the

4    merger?

5    A.    Yeah, for sure.

6    Q.    How about today?

7    A.    I believe that.

8    Q.    How strongly?

9    A.    Yeah, maybe more so given what I've seen happen to

10   our results.

11           I can't remember who it was, it was a guy who was

12   the CEO of United, who basically said that him and Delta

13   were making 90 percent of the money that's being made in

14   the airline business today.  I'm certainly not.  We're

15   certainly not making any.

16           So I think bigger is a requirement of the -- of

17   the ones who remain.

18   Q.    Thank you, Mr. Gardner, I have no further

19   questions.

20           THE COURT:  Any redirect?

21           MS. MARKEL:  Yes, your Honor, briefly.

22

23   REDIRECT EXAMINATION BY MS. MARKEL:

24   Q.    Mr. Gardner, I have a couple of questions about

25   the Judge's question to you on Demonstrative A, which is

 1   behind Exhibit ADX.

 2   A.    Uh-huh.

 3   Q.    In our binder.  So now the one --

 4   A.    No, hang on.

 5        MR. COHEN:  Your Honor, I think it is beyond the

 6   scope.

 7        THE COURT:  It's my question, she didn't have a

 8   chance to --

 9        MR. COHEN:  Oh, I'm sorry, your Honor, I didn't

10   recall you asking it at the very end of her examination.

11        THE COURT:  I did.

12        MR. COHEN:  My apologies.

13   A.    So what am I looking for?

14   Q.    It will be behind Tab ADX.  It is in evidence.

15   But in your binder it's ADX.  And it's Demonstrative A.

16   A.    Yeah.  (Looks.)  I think I passed it.

17   Q.    Oh, sorry, I apologize, it's AFR.

18   A.    Okay, AFR.  Okay.  Yeah.

19   Q.    Okay.

20        So if you take a look at Demonstrative Gardner A,

21   do you recall the Judge asking you about the context for

22   your text, "You know I was just thinking, do you think

23   B6 would pay us something to get out of the deal?"

24   A.    Yeah.

25   Q.    And I think you testified that you believe that

1   this is related to the NEA trial, is that right?

2   A.    Well that's my memory at the time.  And I know you

3   asked me about this in my deposition and I honestly

4   can't remember.

5   Q.    Well let's take a look at your deposition

6   transcript.

7   A.    Okay.

8   Q.    Page 225.

9   A.    Here we go.

10  Q.    It's at the very end of your binder.

11  A.    Okay.  (Looks.)  Yes.

12  Q.    And so at your deposition, if you refer to Page

13  225, Lines 13 to 16, were you asked these questions and

14  did you give these answers.

15        Question, "You wrote that in the midst of the NEA

16  trial, right?"  Answer, "I did, but I don't think it was

17  related to the NEA trial."

18  A.    Yeah.

19  Q.    Okay.

20  A.    I did tell them I thought it was tongue-and-cheek,

21  which is what I sort of intended.  But, yeah.

22  Q.    Thank you.

23        MS. MARKEL:  I move for --

24        THE COURT:  You thought it was "tongue and cheek"?

25        THE WITNESS:  This says -- my answer in my

```
 1    deposition was I was kidding.  "Tongue and cheek,"
 2    meaning I wasn't serious.
 3          MR. COHEN:  Your Honor, for completeness may we
 4    read in Lines 10 to 12 at Page 325, for completeness and
 5    context?
 6          THE COURT:  I will take judicial notice of Lines
 7    10 through 25.
 8          All right.
 9          MS. MARKEL:  Thank you.
10          THE COURT:  Ms. Markel, anything else?
11          MS. MARKEL:  Yes, your Honor, just briefly.
12    Q.    So if you now turn to Defendants' binder --
13    defense counsel's binder, so the other binder.
14    A.    (Turns.)
15    Q.    And if you turn to Tab 15 in that binder, Exhibit
16    678, which your counsel asked you about.
17    A.    Hang on.  (Turns.)  Yeah.
18    Q.    Okay.  And if you turn to -- and do you recall
19    your counsel asking you a few questions about Spirit's
20    profitability, um, expected profitability, right?
21    A.    Yeah.
22    Q.    Okay.  So turn to Page 2.  In the middle of the
23    page there's a quote from Mr. Scott Harrelson who is
24    Spirit's Chief Financial Officer.
25          Do you see that?
```

1    A.    I do.

2    Q.    And if you look at the last line in that

3    paragraph, Mr. Harrelson said, is quoted as saying, "Our

4    team is resilient and nimble and we are committed to

5    returning Spirit to sustained profitability."

6          Do you see that?

7    A.    I do.

8    Q.    You would agree with that too, right?

9    A.    That they're resilient and nimble and committed?

10   Yes.

11   Q.    Okay, thank you.

12         And Spirit hasn't disclosed any bankruptcy or

13   going-concern risk in its latest filings, right?

14   A.    No.

15   Q.    Okay.

16         And your counsel also asked you a few questions

17   about your role on Spirit's board.  Do you remember

18   that?

19   A.    I do.

20   Q.    And I think you mentioned, in response to one of

21   his questions, that you were also a Spirit shareholder,

22   right?

23   A.    I am.

24   Q.    And about how many shares do you own?

25   A.    Um, 38,000, 40,000, something like that.  Around

```
 1    there.  Maybe a little less.
 2    Q.    And if this deal goes through, you would get
 3    $33.50 per share, right?
 4    A.    Um, that would be the total.
 5    Q.    And that's a significant premium compared to
 6    Spirit's current share price, right?
 7    A.    It is.
 8          MR. COHEN:  I'm going to object, your Honor.
 9          THE COURT:  It's not timely.  We're going to let
10    that stand.  I assume she's done with it.
11          MS. MARKEL:  I am done.  Thank you.  And no
12    further questions.
13          MR. COHEN:  Nothing further, your Honor.
14          THE COURT:  Very well.
15          Now we will take the morning recess until 12:00.
16    We'll stand in recess until 12:00.
17          (Recess, 11:45 a.m.)
18
19
20
21
22
23
24
25
```

```
 1              C E R T I F I C A T E

 2

 3

 4          I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER,

 5     do hereby certify that the foregoing record is a true

 6     and accurate transcription of my stenographic notes

 7     before Judge William G. Young, on Tuesday, November 7,

 8     2023, to the best of my skill and ability.

 9

10

11     /s/ Richard H. Romanow 11-07-23
       _____
12     RICHARD H. ROMANOW   Date

13

14

15

16

17

18

19

20

21

22

23

24

25
```