UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS (Boston)

No. 1:23-cv-10511-WGY
Vol. 2, Pages 78-134

UNITED STATES OF AMERICA, et al
          Plaintiffs

vs.

JETBLUE AIRWAYS CORPORATION,
et al,
          Defendants

********

For Bench Trial Before:
Judge William G. Young

United States District Court
District of Massachusetts (Boston)
One Courthouse Way
Boston, Massachusetts 02110
Tuesday, November 7, 2023

********

REPORTER:  CHERYL B. PALANCHIAN, RMR, CRR
Official Court Reporter
United States District Court
One Courthouse Way, Boston, MA 02110

```
                    A P P E A R A N C E S


EDWARD WILLIAM DUFFY, ESQ.
ARIANNA MARKEL, ESQ.
AARON TEITELBAUM, ESQ.
        DOJ-Atr
        450 Fifth Street NW, Suite 8000
        Washington, DC 20530
        (202)812-4723
        Email:  Edward.duffy@usdoj.gov
        For Plaintiff United States of America
- and -
WILLIAM T. MATLACK, ESQ.
        Attorney General's Office
        One Ashburton Place, 18th Floor
        Boston, MA 02108
        (617)727-2200
        Email:  William.matlack@mass.gov
        For Plaintiffs United States of America and The
        Commonwealth of Massachusetts



RYAN SHORES, ESQ.
        Cleary Gottlieb Steen & Hamilton LLP
        2112 Pennsylvania Avenue, NW
        Washington, DC 20037
        (202)974-1876
        Email:  Rshores@cgsh.com
- and -
ELIZABETH M. WRIGHT, ESQ.
        Cooley LLP
        500 Boylston Street
        Boston, MA 02116-3736
        (617)937-2349
        Email:  Ewright@cooley.com
- and -
RACHEL MOSSMAN ZIEMINSKI, ESQ.
MICHAEL MITCHELL, ESQ.
        Shearman & Sterling LLP
        2601 Olive Street, 17th Floor
        Dallas, TX 75201
        (214)271-5777
        Email:  Rachel.zieminski@shearman.com
        For Defendant JetBlue Airways Corporation


(Continued.)
```

(Continued.)


JAY COHEN, ESQ.
ANDREW C. FINCH, ESQ.
        Paul, Weiss, Rifkind, Wharton & Garrison
        1285 Avenue of the Americas
        New York, NY 10019-6064
        (212)373-3000
        Email:  Jaycohen@paulweiss.com
        For Defendant Spirt Airlines, Inc.

I N D E X

WITNESS:              DIRECT    CROSS    REDIRECT    RECROSS

JOHN P. KIRBY

  By Ms. Pearl        82


   EXHIBITS                                    PAGE


    686 . . . . . . . . . . . . . 101

 1          THE COURT:  Court is in session, please be seated.

 2  If you could stand, sir, to be sworn.

 3                    JOHN P. KIRBY, sworn

 4          MS. PEARL:  Good afternoon, your Honor.  My name

 5  is Stephanie Pearl on behalf of the United States.  May I

 6  proceed?

 7          THE COURT:  You may.

 8          MS. PEARL:  We obviously call John Kirby as an

 9  adverse-party witness at this time.

10                    DIRECT EXAMINATION

11  BY MS. PEARL:

12  Q.   Good morning, Mr. Kirby.  Could you please state and

13  spell your name, for the record?

14  A.   Sure.  Good morning as well.  My name is John Patrick

15  Kirby, J-O-H-N, P-A-T-R-I-C-K, K-I-R-B-Y.

16  Q.   You just received two binders.  Okay, great.  So you

17  can keep those to the side for now, and we might refer to

18  them during your testimony today.  I'll let you know.

19          Mr. Kirby, you're the vice president of network

20  planning at Spirit Airlines; is that right?

21  A.   It is.

22  Q.   And you've been employed at Spirit since April of 2018?

23  A.   Since November 1st of 2018.

24  Q.   Thank you.  And you've had the same title of vice

25  president network planning since you joined the company;

```
 1   correct?
 2   A.   I have.
 3   Q.   You report up to Matt Klein, who's Spirit's chief
 4   commercial officer; is that correct?
 5   A.   Yes.
 6   Q.   And as the vice president of network planning, you're
 7   the head of the network planning group at Spirit; is that
 8   fair?
 9   A.   That is correct.
10   Q.   The network planning group oversees long-term strategic
11   network planning at Spirit; right?
12   A.   That is one of our responsibilities, yes.
13   Q.   Now, taking a step back, for the Court, could you
14   explain what a network is?
15   A.   Sure.  The way I like to think about it is, it is a
16   combination or aggregation of the cities we serve and the
17   geographies we serve.  So it's dots on the map, North
18   America, as well as Latin and the Caribbean is really the
19   main of our network.
20   Q.   So the airline's network that you just described is
21   made up of these origin and destination pairs to cities; is
22   that right?
23   A.   It's made up of cities and then origination and
24   destination pairs, yes.
25   Q.   You often refer to origin and destination pairs as a
```

1   route ("rout"); is that correct?

2   A.   As a route ("root"), yes.

3   Q.   Or "route."  I don't know where I got "route."

4   A.   Tomato ("toe-may-toe"), tomato ("toe-ma-toe").

5   Q.   And you also had referred to route as a market; is that

6   right?

7   A.   Yes.  I use those terms synonymously.

8   Q.   And an airline's network also includes frequency of

9   service on a given route or market; right?

10  A.   It does.

11  Q.   So the network planning group is responsible for

12  planning out Spirit's network over a period of time; is that

13  right?

14  A.   Yes.  It's -- part of our domain is long-term planning

15  as well as ultimately what gets published and sold.

16  Q.   And as part of this process, your team puts together a

17  five-year network plan; is that right?

18  A.   They do.

19  Q.   And you sometimes present this five-year network plan

20  to Spirit's board of directors; correct?

21  A.   I have.

22  Q.   And I think you just sort of touched on this a little

23  bit, but the network planning group also oversees capacity

24  planning; right?

25  A.   Yeah, that's part of the planning process.

```
1   Q.   As well as schedule planning?
2   A.   That is correct.
3   Q.   And then the actual distribution of this flight
4   schedule to the public; correct?
5   A.   Correct.
6   Q.   As part of your job, you and your team review other
7   airlines' performances on routes; correct?
8   A.   We study what's going on in the industry.  And in the
9   past we have looked at the financial performance of other
10  carriers.
11  Q.   And some of these reviews of financial performances of
12  other carriers are on routes that overlap with those of
13  Spirit; right?
14  A.   Yeah, some of them do overlap.
15  Q.   Your team is not responsible, however, for actually
16  setting the prices on any given route; is that right?
17  A.   It is not.
18  Q.   Part of your responsibilities or those of your team
19  also involve demand forecasting; is that right?
20  A.   Correct.
21  Q.   And is that just essentially analyzing passenger demand
22  for a given route?
23  A.   Well, it's looking at the regularly available DOT data
24  and then looking at the amount of passengers in the
25  marketplace, the average fare.  Then we have a rudimentary
```

1   forecast model that looks at the differential fare versus

2   what we likely would charge at that stage, and then

3   basically extrapolates how much stimulation would occur.

4   Q.   And you also keep tabs on the public growth plans or

5   the exits of other airlines that you compete against; right?

6   A.   We do.  We have a weekly tape that compares adds and

7   exits of other carriers.

8   Q.   Now, Mr. Kirby, you've been involved in the airline

9   business for about 40 years; is that right?

10   A.   Yeah, a little over 40 years.

11   Q.   And where did you first start your career?

12   A.   I started with a company called People Express in

13   September of 1983 when I was still in university.

14   Q.   And that People Express, that's a low-cost airline; is

15   that right?

16   A.   It was a low-cost airline that came out of the

17   deregulated environment.

18   Q.   And then People Express, that became a part of

19   Continental Airlines?

20   A.   My memory is it became part of Texas Air Group, that

21   eventually melded it.  Because they had Eastern continental

22   and Texas Air, and they melded it together, ultimately, to

23   Continental.

24   Q.   And then Continental is part of United; right?

25   A.   That's correct.

1    Q.   And you've worked at additional airlines, obviously,

2    since 1983.  For example, Northwest Airlines, you spent a

3    period of three years there; is that fair?

4    A.   That is correct.  From 1989 to 1992.

5    Q.   And Northwest is now part of Delta?

6    A.   That is correct.

7    Q.   And then you spent about seven years at USAir which

8    then became US Airways; correct?

9    A.   Yes.  When I started it was USAir and then it became US

10   Airways and now it's part of American.

11   Q.   And you ran the capacity planning and future schedules

12   group there; is that right?

13   A.   I did.

14   Q.   And US Airways is now part of American; correct?

15   A.   That is correct.

16   Q.   And then you spent eleven years at AirTran; right?

17   A.   Yes.

18   Q.   And what was your position at AirTran?

19   A.   AirTran initially I was director of network planning,

20   and then somewhere along the way I was promoted to senior

21   director of strategy and network.  So it was a director, and

22   then a senior director role.

23   Q.   And was your work there similar to what you do at

24   Spirit today?

25   A.   It was.  It was long-term planning, capacity planning,

1    schedule, distribution and slots.

2    Q.   And AirTran became a part of North -- or of Southwest;

3    correct?

4    A.   That is correct.  In May of 2011, Southwest acquired

5    AirTran.

6    Q.   Was it after the acquisition that you joined Southwest

7    then or was it right beforehand?

8    A.   It was afterwards.

9    Q.   And so you spent about four years at Southwest; is that

10   right?

11   A.   That is correct.

12   Q.   And then after Southwest you spent, is it four years at

13   Alaska?

14   A.   Yes, four years at Alaska.

15   Q.   And what was your role at Alaska?

16   A.   At Alaska I was vice president of capacity planning,

17   alliances and commercial fleet planning.

18   Q.   And while you were at Alaska, did they purchase Virgin

19   American?

20   A.   They did.

21   Q.   And now you're at Spirit?

22   A.   Yes.

23   Q.   All right.  So the Court has heard testimony about

24   Spirit's ultra low-cost business model, and the importance

25   of high utilization to this model.  You would agree,

1   Mr. Kirby, that Spirit achieves its ultra low cost primarily

2   through high utilization of assets; is that right?

3   A.   Well, that's certainly a large component of how we

4   achieve our industry-leading costs.

5   Q.   And Spirit tends to operate at higher utilization rates

6   than its legacy competitors; correct?

7   A.   In general, that's correct.

8   Q.   And Spirit also tends to operate at higher utilization

9   rates than its LCC competitors; right?

10   A.   For the most part, yes.

11   Q.   One way that Spirit strives to operate at lower cost is

12   by operating its aircraft for more hours each day; is that

13   fair?

14   A.   Yeah.   Again, high utilization of assets, including

15   aircraft.

16   Q.   And operating for more hours each day, that just

17   spreads Spirit's costs out of all its aircraft that are

18   operating; is that right?

19   A.   Yeah.   It spreads the cost out of -- you're getting

20   more value, more ASMs out of a single aircraft.

21   Q.   One of the ways in which Spirit tries to increase the

22   daily use of its aircraft is by operating a point-to-point

23   network; correct?

24   A.   Yeah, our network is predominantly point-to-point.   We

25   only schedule for connectivity in Fort Lauderdale.

1    Q.   This point-to-point network enables Spirit to be more

2    efficient with respect to its aircraft than airlines who

3    might operate a hub network; is that right?

4    A.   Well, I think it is beneficial in terms of driving high

5    utilization of both aircraft and assets.

6    Q.   Is that just because Spirit's planes don't have to wait

7    for that connecting flight that's coming in?

8    A.   Yeah, I think that's part of it.  You know, generally,

9    if you think about a hub-and-spoke system, you have a lot of

10   assets necessary, a lot of gates, a lot of ticket counter

11   positions, for a very short period while many planes are

12   coming in, and then often you have to wait for connectivity.

13   Q.   With respect to Spirit's aircraft utilization, Spirit

14   aims to maximize the use of its aircraft but within

15   operating limits; right?

16   A.   Yeah, without a doubt.

17   Q.   And operating limits are things just like operating

18   aircraft at a reasonable on-time performance; right?

19   A.   Yeah.  We strive to do that.  In fact, coming out of

20   the pandemic we've reduced our utilization rates in order to

21   give our operators the best chance of being successful.

22   Q.   So right now Spirit's target is to get to 13.5 hours of

23   average use per aircraft; is that correct?

24   A.   Well, that was -- when we discussed this in May that

25   was the target.  At this time we've been able to get it a

1   little bit higher.  We're about 13.7 now.

2   Q.   And Spirit will continue to try to maximize its

3   aircraft use absent this merger; right?

4   A.   Yeah, again, with the caveat you mentioned, within

5   operational constraints.

6   Q.   Spirit also strives to achieve this higher utilization

7   by operating higher-density aircraft; right?

8   A.   Yes.  Our aircraft are generally more dense than many

9   of our competitors.

10   Q.   And Spirit also strives to achieve higher utilization

11   by operating more turns per gate; is that your

12   understanding?

13   A.   Yeah.  We try to, again, maximize all assets.  And that

14   includes also striving to operate eight flights a gate, when

15   we can, at the airports we serve.

16   Q.   So, Mr. Kirby, the Court has heard that Spirit's lower

17   operating costs enable or allow Spirit the flexibility to

18   operate profitably at lower fares.  Do you agree with that?

19   A.   Yeah.  I would say historically that's been the case,

20   although we've been challenged coming out of pandemic.  Our

21   costs have gone up somewhat and we haven't been able to

22   achieve that utilization.  So right now I'd say that's not

23   happening right now but, obviously, that would be our

24   aspiration.

25   Q.   But historically Spirit's lower operating costs allow

1   it to offer these lower fares; right?

2   A.   Yeah.  I think lower costs allow you to offer lower

3   fares.

4   Q.   And you would agree that Spirit generally offers some

5   of the lowest fares in the markets or the routes, or

6   "routes," that it serves; correct?

7   A.   Yeah.  I would say, on average, we certainly intend to

8   offer the lowest fares.

9   Q.   In fact, part of Spirit's network strategy is to enter

10  high-fare markets with lower fares than are offered in those

11  markets before Spirit entered; correct?

12  A.   Yeah, that's what we look for.  We look for markets --

13  we generally look for markets that are large that, again, we

14  can stimulate demand.  And then we look for the higher fares

15  where we believe we can offer lower fares and greatly

16  stimulate the marketplace.

17  Q.   And you would agree that Spirit typically offers --

18  enters routes with fares that are about half the average

19  fair pre-Spirit entry; correct?

20  A.   I don't think we have a specific target but, generally,

21  I would say, on average, I believe I said earlier it was

22  about 30 to 50 percent reduction in fares.

23  Q.   So the Court has heard about the Spirit Effect.  That's

24  something that your network planning team has actually

25  calculated in the past; right?

1   A.   Yeah, we put together some representations, primarily

2   when we were trying to vie for the Newark peak capacity

3   Southwest had vacated.

4   Q.   To actually calculate the Spirit Effect your team uses

5   data from the DOT; is that right?

6   A.   That is correct.

7   Q.   And the Spirit Effect that you've analyzed is just the

8   effect that Spirit's low fares actually have on the market

9   it's entering; is that fair?

10  A.   Yeah.  It looks at the differential before and after

11  Spirit's entry on both passenger levels, we commonly refer

12  to it as passengers daily each way, or PDEWs, as well as the

13  variation of fare.

14  Q.   PDEW, okay.  Your team has found, on average, that

15  after Spirit enters a route more people fly on that route;

16  is that right?

17  A.   Well, again, I think as a generalization, but I think

18  when we represented that in some of the slides, that was

19  what was indicated.

20  Q.   But, on average, it is correct that when Spirit enters

21  a route more people fly on that route; correct?

22  A.   Yeah.  I would say that, you know, I'd be surprised

23  that wasn't the case.  But, again, to be fair, I haven't

24  looked at every single route over the course of the time I

25  was there, or here, at Spirit.

1    Q.   And your team has also found that after Spirit enters a

2    route, the average fares on that route go down; correct?

3    A.   Yeah.  I think some of it's just math because we tend

4    to go in with lower fares.  So, of course, once we enter it

5    with lower fares then the average fair is going to drop.

6    You know, really the open question is whether competitors

7    will match our price or not.

8    Q.   And so you just mentioned Spirit's lower fares

9    contribute to this average lower fare.  But, in addition,

10   the lower average fare often reflects that other airlines

11   will reduce their fares after Spirit enters; right?

12   A.   Yeah.  We've seen that other carriers will reduce their

13   fares.

14   Q.   In fact, it's frequently the case that other carriers

15   will drop their fares when Spirit enters; right?

16   A.   Again, I'm not a pricing person, so I don't study that

17   as part of my business every day, but I'd say in general

18   where I've looked at it that seems to be the case.

19   Q.   These other carriers that drop their fares, those would

20   include legacy carries; right?

21   A.   All carriers.

22   Q.   So including ULCCs?

23   A.   Yes.

24   Q.   Now, when other airlines decrease their fares, this can

25   encourage more people to fly; right?

1   A.   Yeah.  In general, if there's more capacity at lower

2   fare levels, it generally stimulates demand even greater

3   than we can do on our own.

4   Q.   You would agree that customers benefit from the Spirit

5   Effect whether they fly Spirit or not; right?

6   A.   I would agree that lower fares is something that helps

7   people travel, and also whether they fly on Spirit or not.

8   Q.   And you'd also agree that the lower fares resulting

9   from the Spirit Effect are particularly beneficial to

10  price-sensitive customers; right?

11  A.   Well, I think everybody likes low fares.

12  Q.   But price-sensitive customers are able to consider

13  travel they wouldn't otherwise because of the lower fares

14  that result from the Spirit Effect; correct?

15  A.   I mean, I --

16          MR. FINCH:  Objection, your Honor.

17          THE COURT:  Sustained.  I'm not so sure -- he's

18  the network fellow.  He says he doesn't have that much to do

19  with pricing.  So you're asking for his conclusions here.

20  You may try to lay a foundation, and that's a reasonable

21  inference, but I don't know as he can testify to it.  I mean

22  no disrespect.

23          MS. PEARL:  Your Honor, the question was really

24  stemming since his team does calculate the Spirit Effect.

25  So my question stemmed from whether he has observed that

```
 1    price-sensitive customers had benefited from the Spirit
 2    Effect.
 3            THE COURT:  Well, did their calculations involve
 4    differentiating as among customers.  Look, I've seen
 5    evidence that says when Spirit enters a market, previous
 6    fare, on average, is thus and so, and then it becomes this,
 7    and the like.  I think on this foundation I'm going to
 8    sustain the objection.
 9            MS. PEARL:  I understand, and I will move on.
10            THE COURT:  Go ahead.
11            MS. PEARL:  Thank you.
12    Q.   Well, so we just discussed that other carriers will
13    often reduce their fares when Spirit enters a route.  That
14    includes JetBlue; correct?
15    A.   Again, I've observed that other carriers will reduce
16    their fare, but not being the pricing person, I can't tell
17    you specifically who did what.  It's not something that I
18    track in my role.
19    Q.   Your team has observed that JetBlue lowered its fares
20    upon Spirit's entry into the Boston-San Juan route though;
21    correct?
22            MR. FINCH:  Objection, your Honor.  Really
23    foundation.
24            THE COURT:  No, she may have it.  We'll see if she
25    has -- if he has observed that.
```

```
 1              What's your answer?
 2              THE WITNESS:  My answer is that we did some work
 3     on a few routes, and that was one of them that we did see a
 4     reduction of the average fare.  Although, I believe, if
 5     memory serves me, I could be wrong, that it was during the
 6     pandemic, which might cloud some of the impact.
 7     Q.   So Spirit entered the route of Boston-San Juan in late
 8     2019; is that right?
 9     A.   Generally, that's my recollection.
10     Q.   And it's your understanding that prior to Spirit's
11     entry, JetBlue was the only airline flying nonstop from
12     Boston to San Juan; correct?
13     A.   Correct.
14     Q.   Spirit still flies the Boston to San Juan route; right?
15     A.   We do.
16     Q.   And JetBlue still flies, to your understanding, the San
17     Juan to Boston or Boston to San Juan route; correct?
18     A.   Correct.
19     Q.   And this route, Boston to San Juan, has been a strong
20     market for Spirit in terms of revenue; right?
21     A.   It has done well.
22     Q.   And as we just discussed, your team analyzed the effect
23     that Spirit's entry into Boston-San Juan had on JetBlue's
24     fares specifically; correct?
25     A.   Yeah.  No, I remember the analysis, I just don't recall
```

1    exactly when it was done.

2    Q.   And your team found that after Spirit entered,

3    JetBlue's fares dropped; correct?

4    A.   My recollection is that was the case.

5    Q.   So JetBlue, when Spirit entered, was the only carrier

6    on that route; correct?

7    A.   Yes, the only one operating.

8    Q.   So fair to say the average fare for all travelers

9    flying direct from Boston to San Juan was lower post Spirit

10   entry?

11   A.   I'd have to look at the numbers again because I've got

12   to look at our average fare versus what it was before, and

13   whether it was just the fact that our fare was lower that

14   dragged it down or not.  Again, I'm not trying to be

15   difficult as much as I, you know, I don't recall the exact

16   numbers of that analysis.

17   Q.   And would it refresh your recollection to look at this

18   analysis?

19   A.   It would.

20   Q.   All right.

21             MS. PEARL:  Could we please pass out Exhibit AIS?

22             (Handing.)

23   Q.   And if you'll take a look at the page with the Bates

24   ending in 549.  Once you've had a chance to review that I

25   can ask my question again.

```
 1              (Witness reviewed document.)
 2   A.   Okay.
 3   Q.   All right.  You could just set that to the side and I
 4   can ask my question again.
 5   A.   Yep.
 6   Q.   So having taken a look at that, your team found that
 7   after Spirit entered, JetBlue's fares dropped; right?
 8   A.   Well, it appears to be the case, yes.
 9   Q.   And as you stated earlier, JetBlue was the only airline
10   on that route before Spirit entered; correct?
11   A.   Yes.
12   Q.   So fair to say that the average fare for all travelers
13   flying direct from Boston to San Juan was lower after Spirit
14   entered?
15   A.   It appears to be the case, yes.
16   Q.   Mr. Kirby, are you familiar with Mark Raker?  I believe
17   he was previously the head of air service at Massport.
18   A.   I am.
19   Q.   And you've communicated or you communicated in the past
20   with Mr. Raker about Spirit's service in Boston; correct?
21   A.   Yeah.  I would regularly meet with the leadership at
22   Massport.
23   Q.   All right.  I'd like to take a look at an e-mail
24   exchange between you and Mr. Raker.  It should be Exhibit
25   AAC in the thinner binder, at the back.
```

```
 1              (On screen.)
 2   A.    Okay.  Even better.
 3   Q.    Is it not in the binder?
 4   A.    It is, but it's on the screen so I'd rather watch it on
 5   the screen.
 6   Q.    There you go.  That's just as well.
 7         This is an October 3rd, 2019 e-mail from yourself to
 8   Mr. Raker with the subject, "Re: new service."  Correct?
 9   A.    Yes.
10   Q.    You wrote the e-mail at the top of this correspondence?
11   A.    I did.
12              MS. PEARL:  Your Honor, plaintiffs offer in
13   evidence Exhibit 686.
14              THE COURT:  No objection?
15              MR. FINCH:  Objection, your Honor.  It's hearsay
16   except for the portions that Mr. Kirby wrote.
17              THE COURT:  And so you're okay with limiting it to
18   the portions he wrote?
19              MR. FINCH:  Yes, I am.
20              THE COURT:  Well, actually, that was directed to
21   the government.
22              MS. PEARL:  Yes, your Honor.
23              THE COURT:  But I'm happy to know you are.  And
24   Ms. Pearl?
25              MS. PEARL:  Yes.  Thank you, your Honor.
```

```
 1              THE COURT:  So AAC is admitted in evidence.
 2              MS. PEARL:  Oh, I was just -- okay.  Great.
 3              THE COURT:  Exhibit?
 4              MS. PEARL:  Exhibit 686.
 5              THE COURT:  686, limited.
 6              (Exhibit 686 received in evidence.)
 7   Q.   All right.  So in your e-mail, SJU, that's -- I'm going
 8   to butcher this -- the Luis Munoz Marin International
 9   Airport in San Juan; correct?
10   A.   Correct.
11   Q.   And BOS is the Boston Logan International Airport?
12   A.   Correct.
13   Q.   And you wrote this e-mail when Spirit was about to
14   introduce daily service to and from Boston and San Juan;
15   right?
16   A.   Yes.
17   Q.   When you received this e-mail from Mr. Raker, did you
18   dispute his comment that Spirit brings good competition to
19   Boston?
20   A.   No.  I believe we bring competition to the cities we
21   serve.
22   Q.   Okay.  You can put that document aside.
23        So Spirit continues to enter markets to and from
24   Boston; right?
25   A.   Yes.  We've been able to get a third gate in Boston
```

1    which allowed us to grow.

2    Q.   And some of the routes in which Spirit has entered

3    include overlap routes with JetBlue; correct?

4    A.   Yes.  JetBlue has a very large presence in Boston, so

5    they do serve a lot of markets.

6    Q.   And Spirit actually entered some of these new routes

7    this past summer; correct?

8    A.   We did.

9    Q.   Do you recall which route Spirit entered?

10   A.   We went into Boston-LA, Boston-Phoenix,

11   Boston-Charlotte, Boston-Dallas.  I think that's the list.

12   We did load Boston-Houston, but because of some of the

13   challenges earlier this summer with pilot attrition, and

14   then later with engines, we had to push that until next

15   year.

16   Q.   And the routes you listed, I think was Boston-LAX,

17   Boston-Charlotte, Boston-Dallas Fort Worth; correct?

18   A.   And Phoenix, I think, was the other one I put in there.

19   Q.   And which of those routes -- on which of those routes

20   does JetBlue also compete?

21   A.   I believe they're in all four.

22   Q.   And the average fares on the routes that Spirit entered

23   are fairly high during the peak summer window; correct?

24   A.   Historically they have been.

25   Q.   And there's high demand on those routes too; right?

1  A.   Yeah, they're all fairly large markets.

2  Q.   And in entering those markets, Spirit believed it could

3  enter with lower fares than those offered by the incumbent

4  carriers; correct?

5  A.   Again, that is how our model works, is that we look for

6  higher-fare markets that we can stimulate.  So, yes, that's

7  correct.

8  Q.   So one of those incoming carriers was also JetBlue;

9  right?

10 A.   Yes, it was.

11 Q.   Now, you mentioned that Spirit recently gained a third

12 gate at Boston?

13 A.   Yeah.  We took that third gate in August of this year.

14 Q.   And has Spirit entered any additional routes to and

15 from Boston since this summer?

16 A.   I don't believe we've added anything this year.  But we

17 have -- we have advanced new markets to both Charleston and

18 Norfolk, and also to Houston, that I mentioned, for next

19 spring.

20 Q.   So we talked about this in the very beginning of your

21 testimony today, but your team sometimes performs, or has

22 performed in the past, competitive reviews of other

23 airlines; right?

24 A.   We look at the available public data, particularly the

25 DOT data, and we make some estimates on where we think

1    carriers are profitable, yes.

2    Q.   And so the reviews that you and your team do sometimes

3    involve analyses of Spirit's performance in overlap markets

4    compared to JetBlue; right?

5    A.   In the past we've compared our results to overlap

6    market carriers, yes.

7    Q.   All right.  I want to turn to another document in your

8    binder.  It's Exhibit 311.  It's still in the skinnier

9    binder.

10   A.   Okay.  Yeah.  I just didn't know if -- okay.  I'm good.

11             (On screen.)

12   Q.   All right.  So, as you can see, this is a July 15th,

13   2020 e-mail from yourself to Spirit's CEO, Ted Christie, as

14   well as Spirit's CCO, Matt Klein.  The subject is, "Forward

15   B6 and NK markets."  Correct?

16   A.   Yes.

17   Q.   And B6 and NK, that's JetBlue and Spirit; right?

18   A.   That is correct.

19   Q.   And you're just forwarding an e-mail with some

20   commentary from Mr. Haag with attachments.  Do you see that?

21   A.   I do.

22   Q.   And Mr. Haag, Mr. Haag had put attachments -- sorry.

23   The attachments from Mr. Haag include a Spirit-JetBlue

24   overlap market analysis for the fourth quarter of 2019;

25   correct?

```
 1   A.   I see that.
 2   Q.   And it's also further in the document, but that is in
 3   the attachments.  You can probably see that.  So I wanted to
 4   just look at Mr. Haag's e-mail first before turning to
 5   yours.
 6   A.   Okay.
 7   Q.   So he's concluding that Spirit was outperforming
 8   JetBlue in overlap markets for the fourth quarter of 2019;
 9   correct?
10   A.   Yeah.  I would say that it indicates that in the
11   markets that we compete with JetBlue that our performance is
12   pretty strong.
13   Q.   And then taking a look at your e-mail on the top, the
14   first sentence says, "As we look to future growth, it's
15   obvious that we'll see more overlap with B6," or JetBlue;
16   correct?
17   A.   I do see that.
18   Q.   So at the time, am I correct that JetBlue had publicly
19   announced plans to double its flights out of Newark?
20   A.   Yeah, I think I recall that they were saying they were
21   going to go to about 70 to 75 flights.  I think that's close
22   to doubling.
23   Q.   JetBlue had also publicly announced plans to add many
24   flights out of Los Angeles as LAX airport; correct?
25   A.   Yeah, a similar number.  They migrated their Long Beach
```

1    service to LAX and announced that they were going to grow

2    substantially.

3    Q.   And then, in addition, JetBlue had publicly announced

4    it would add routes to and from Philadelphia; correct?

5    A.   Yeah, they started service in Philadelphia.

6    Q.   At this time Spirit was also planning to grow at

7    Philadelphia, Newark and Los Angeles; right?

8    A.   We had already been growing in Philadelphia and, yeah,

9    aspirationally we wanted to get larger both in Newark and

10   Los Angeles.

11   Q.   And so in your e-mail you're noting that given both

12   carriers were growing at these three airports, there likely

13   would be route overlap between JetBlue and Spirit in the

14   future; correct?

15   A.   Yeah.  Based on what I'm surmising at this point in

16   time, back in 2019, that was my conclusion, that it's likely

17   if this comes to fruition.

18   Q.   So with respect to Newark, and based on your view of

19   publicly available statements and data, you understood that

20   JetBlue did not meet these 2020 public growth plans;

21   correct?

22             THE COURT:  Did not meet these 2020 --

23             MS. PEARL:  Public growth plans.

24   A.   They did not reach the goals that they had set out in

25   their announcement.

```
 1   Q.   Similarly, with respect to LAX, JetBlue did not meet
 2   these public growth plans; right?
 3   A.   They did not.
 4   Q.   And with respect to Philadelphia, JetBlue exited the
 5   announced routes very quickly that it had planned to enter;
 6   correct?
 7   A.   They did.
 8   Q.   So JetBlue did not fulfill its promises to these
 9   airports that it stated it would; correct?
10   A.   Well, I can't -- I can't tell you what they promised
11   the airport, I can only say that they didn't meet what they
12   said publicly that they were going to do.
13   Q.   You would agree that JetBlue has tended to be a little
14   bit more bombastic in terms of its announcements regarding
15   growth than Spirit; right?
16   A.   I'm sure I've said that in the past.
17   Q.   In fact, you believe Spirit is more realistic about its
18   growth projections at airports than JetBlue; correct?
19   A.   Yeah, I think that really is my approach.  I've always
20   felt like it's better to under-- you know, underpromise and
21   overdeliver.  But I think it's more the way I've run my
22   departments.
23   Q.   You've also witnessed JetBlue make what you believe to
24   be unrealistic plans at Orlando; correct?
25   A.   Trying to remember now.  I probably have said something
```

 1    like that.

 2    Q.   But you do believe that Spirit has been more realistic

 3    about its growth plans at Orlando; right?

 4    A.   I think up to recently, yes, we have.

 5    Q.   In fact, Mr. Kirby, you described to your colleagues

 6    that JetBlue's MO, or modus operandi, is to promise big and

 7    not deliver; right?

 8    A.   I know I've said that in the past, yes.

 9    Q.   And that contrasts with what you said about Spirit,

10    which is that it has a history of doing what it says; right?

11    A.   Yeah.  I think that was something that's been

12    established even before I joined the company.

13    Q.   All right.  So I want to discuss now a demonstrative

14    that your counsel has actually prepared for your

15    cross-examination.  It should be in the -- what do you call

16    this -- the folder part of your binder, on the little, like,

17    the side slip.

18    A.   I was -- okay.

19    Q.   It will go on the screen, too.

20    A.   This one?

21    Q.   Yes, exactly.

22              (On screen.)

23    A.   Oh, perfect.  This one's so much better.

24    Q.   Yeah, it is a little bit brighter that way, isn't it?

25    A.   Yeah.

```
 1    Q.    So do you recognize this graph here?
 2    A.    Well, I only recognize it from the recent few days when
 3    we reviewed it.
 4    Q.    And I definitely don't want you to get into
 5    conversations with your counsel, but what is your
 6    understanding of what this graph depicts?
 7    A.    Let's see.  So I think it's the -- I would say it's the
 8    overlap markets that Spirit and JetBlue share where they
 9    have a certain high market share.
10    Q.    And when you're talking about share, it's with respect
11    to passenger share; right?
12    A.    Let me just make sure.  Yeah, it looks like the
13    header -- again, this is something I really haven't studied
14    too hard, but I believe it's passenger share.
15    Q.    And so based on your review of this graph, you'd agree
16    that the markets are ranked by the highest combined
17    percentage of passenger share; right?
18    A.    That appears to be the case, yes.
19    Q.    So just because a market is at the top, it doesn't mean
20    that that's the market with the most number of passengers
21    that fly that route; correct?
22    A.    Correct.
23    Q.    And there's a source, which I realize is kind of
24    blocked off now, but it's on the right-hand side.  Do you
25    see that?
```

```
 1    A.    I do.

 2    Q.    DB -- DB1B OAG?

 3    A.    Yes.

 4    Q.    Is that a source that you sometimes work with?

 5    A.    Yeah.  That's one of the DOT databases that are readily

 6    available.  DB1B, DB1A, 441, T100 are some of the others.

 7    Q.    I only know DB1B OAG.  That was very impressive.

 8    A.    Okay.

 9    Q.    So Spirit and JetBlue have exited or suspended service

10    at some of the markets that are listed here; right?

11    A.    Well, right at the top, yeah.  Top three.  So, yes.

12    Q.    And Spirit -- oh, I'm sorry.

13    A.    Oh, no, my bad.

14    Q.    So the top three, those are ones that Spirit decides to

15    suspend service on within the last month or so; is that

16    correct?

17    A.    Correct.

18    Q.    But Spirit continues to compete on many of the overlap

19    routes or markets that are listed here; right?

20    A.    We do.

21    Q.    Including many of the largest markets with respect to

22    passengers flown; right?

23    A.    Yeah, some of the larger ones.

24    Q.    And Spirit has been competing in many of these markets

25    since before you joined the airline; right?
```

```
 1   A.    Yes.
 2   Q.    All right.  I want to talk about a few of them, so if
 3   we could blow the chart back up again.
 4         All right.  So going down the list, we've talked about
 5   Boston-San Juan.  Boston-Orlando is a popular market in
 6   terms of the total number of passengers flown; right?
 7   A.    Yes.
 8   Q.    And is it right that Spirit's been offering service on
 9   that route since before you joined the company?
10   A.    Yeah.  At the time I joined the company, we were
11   already serving that market.
12   Q.    And does 2016 sound like a fair ballpark?
13   A.    Again, I'm not a hundred percent sure but I'd say
14   that's reasonable.
15   Q.    All right.  New York City to San Juan, that's another
16   popular market in terms of the total passengers flown;
17   correct?
18   A.    Yes.
19   Q.    Spirit has been offering service on that route since
20   2019; right?
21   A.    Well, we -- LaGuardia route we did offer Saturday-only
22   service for a short period but we've exited that.  But we
23   have been in the New York market, and I have no reason to
24   not trust your date.
25   Q.    I said 2019 since you've been at the company since
```

```
 1  then.  But if there's a different date?
 2  A.   My recollection is I think we started it a little
 3  later, but we've been in that market for a few years now.
 4  Q.   So the next one I want to look at is Orlando to San
 5  Juan.  That also serves a large number of passengers; right?
 6  A.   Yeah.  It's a very big market.
 7  Q.   And, to your knowledge, has Spirit been on that route
 8  for 20 years?
 9  A.   Again, I don't know how long it was but, again, it was
10  a market that we served prior to my joining the company.
11  Q.   And Miami-San Juan, that's another market here.  That's
12  also big in terms of the number of passengers that are
13  actually flying that route; correct?
14  A.   Well, it's -- yes.  It's not as big as Orlando, but it
15  is a large market.  And I know we're using Miami and Fort
16  Lauderdale interchangeably.  So Fort Lauderdale was a market
17  that we've been in a longer time and were in when I joined
18  the company.  Miami is more recent.
19  Q.   All right.  So just a few more we'll go through because
20  I don't want to try your patience.  But Boston-Miami is
21  another popular market in terms of total passengers flown;
22  right?
23  A.   Yes.
24  Q.   And do you know how long Spirit has been offering
25  service on that route?
```

1   A.   So, again, using the split, Boston-Fort Lauderdale

2   predated, so we've been in it before I joined the company.

3   So that's been a while.  And Fort Lauderdale is one of our

4   largest, most established cities, so my guess is we probably

5   have been in that market a long time.  Miami, though, is

6   more recently when we entered Miami.

7   Q.   And then New York City to Orlando, that's an even

8   larger route than the ones we've talked about in terms of

9   total passengers; is that right?

10  A.   It's large.  Orlando-San Juan may be larger, but it's

11  up there.

12  Q.   And then the last one I wanted to take a look at is the

13  Miami to New York City market.  That is one of the largest,

14  if not the largest, markets here in terms of passengers

15  flown; correct?

16  A.   Yeah.  It's one of the larger ones, particularly the

17  Fort Lauderdale market.

18  Q.   And Spirit's been offering service in that market since

19  2002; does that sound correct to you?

20  A.   Yeah, I have no reason to doubt that.  Fort Lauderdale

21  has been Spirit's largest city for a very long time.

22  Q.   And so the routes that we went through, does Spirit

23  have any identified plans to leave any of those routes?

24  A.   To leave any of those.  No, not -- we're not planning

25  to leave any of those.

```
 1   Q.   All right.  You could put that aside.  But I did want
 2   to just state for the record, I think I called it
 3   "demonstrative."  This is Kirby Demonstrative A?  It's
 4   yours, but should we do it in order?
 5            THE COURT:  If you're asking me, so long as it's
 6   identified separate from any other demonstrative, and by
 7   mentioning the name of the witness.  I don't care whether
 8   it's a letter or a number.
 9            MS. PEARL:  We'll keep this as Kirby Demonstrative
10   2, for ease of all of this.
11            THE COURT:  Fine.
12   Q.   All right.  Now, we discussed a bit earlier that
13   Spirit's recently added some Boston routes that overlap with
14   JetBlue; correct?
15   A.   We discussed some that we entered last -- this past
16   summer, and then we mentioned a few for next spring.
17   Q.   In addition to these routes, Spirit has added routes
18   from Charleston to Miami; right?
19   A.   Charleston to Fort Lauderdale, yes.
20   Q.   Okay.  Thank you.  And Charleston to Newark?
21   A.   Yes, Charleston to Newark.
22   Q.   As well as Hartford to San Juan?
23   A.   Yes, we're in that market.
24   Q.   Newark to Oakland?
25   A.   We're in Newark to Oakland, yes.
```

1    Q.    As well as LAX to Orlando for seasonal; correct?

2    A.    Yeah, that was a seasonal add.

3    Q.    And JetBlue operates on all -- in all of those markets

4    that I just listed; correct?

5    A.    I guess if you're saying metro they do.

6    Q.    All right.

7    A.    For example, they don't serve Newark to Oakland.  They

8    serve -- I think they serve JFK to San Francisco.  And they

9    may be in Newark to San Francisco, but not Newark to

10   Oakland, just for clarification.

11   Q.    I appreciate the clarification.  All right.  So, again,

12   something we talked about at the very beginning, but

13   Spirit's network planning group is responsible for creating

14   Spirit's five-year network plan; right?

15   A.    It is one of the responsibilities, yes.

16   Q.    And you aim to put together a five-year network plan

17   that's generally realistic with respect to overall growth;

18   correct?

19   A.    Yeah, at a point -- we -- at a point in time we try to

20   put together a plan with the inputs that we have regarding

21   fleet and blocks, block time, how much pilot time we have

22   available.  We put together something that I'd say is

23   aspirational but realistic.

24   Q.    Spirit uses its five-year network plan in its

25   fleet-planning process; right?

1    A.   Not in their fleet-planning process.  The fleet is an

2    input to the five-year plan.

3    Q.   Oh, okay.  Spirit uses its five-year plan for financial

4    planning; is that fair?

5    A.   Not the five-year plan.  It's actually the next stage.

6    So we go from the five-year plan that generally starts in

7    January, we usually finish it sometime in April.  We usually

8    will present it to the board in the May session.  Then we

9    move, in June/July, into the budget-planning process.  And

10   the budget schedule that we build, which is for the

11   remainder of the current year and the subsequent year, is

12   really what's used for financial projections and also for

13   the budgetary purposes for the carrier.

14   Q.   So as part of this five-year network-planning process,

15   talking about the five-year plan -- and I appreciate your

16   clarification there -- your team is recommending new airport

17   opportunities; correct?

18   A.   Yeah.  We're looking for what are the best

19   opportunities.  It could be new cities as well as new

20   routes.

21   Q.   And you described Spirit as methodical in its approach

22   to entering new cities; right?

23   A.   Yeah.  We tend to feel like we want to get the analysis

24   right and then, you know, we usually feel like confident

25   that we can be successful.

Q.   Spirit invests in the cities that it enters; right,
Mr. Kirby?

A.   Again, we look at it as an investment.  Generally,
aircraft are forty, $45 million investments, so that's a big
investment.  Again, we try to make markets work.

Q.   And when Spirit decides to enter a new city, its
assumption is it will be in that city in perpetuity;
correct?

A.   That is our assumption, yes.

Q.   Mr. Kirby, in your role, we mentioned this a bit
earlier, you observe other airlines' route and city entry
and exit; correct?

A.   I do.

Q.   And the frequency at which they fly routes to and from
different cities; right?

A.   I do.

Q.   And you believe other ULCCs are not as methodical as
Spirit in determining which cities to enter; right?

A.   I'm not sure if I -- again, I'm not sure if I said it
that way.  I think that I had observed that historically
some carriers went in and out of markets more frequently
than we did.

Q.   And these other carriers that you mentioned, who are
they?

A.   I think the two that we discussed in the prior

```
 1    testimony was Allegiant, which I believe I said, you know,
 2    more recently they've been pretty stable in their service
 3    offering.  And Frontier.  I think Frontier, if you look
 4    back, had a history of getting in and out of markets fairly
 5    quickly.  But when we talked about this in May, I indicated
 6    that I saw a shift in their strategy and they were a lot
 7    stickier.  And since then I've observed that they are even
 8    more sticky.  So they seem to be -- I'd say in many ways
 9    they look a lot like our strategy today.
10    Q.   But historically, and I'm going to use your phrase
11    "stickier," Spirit has tended to be stickier in terms of
12    staying power at airports than both Frontier and Allegiant;
13    correct?
14    A.   I'd say if you look in the past that was the case.
15    Q.   So when choosing airports to enter, often your team
16    looks to enter the more-well established and busier airports
17    in an area; right?
18    A.   We generally are in the primary airports.  That's not
19    always the case but we usually are.  It's because we want to
20    be in the biggest markets.
21    Q.   And you mentioned primary airports.  So the routes that
22    are to and from, or routes to and from these primary
23    airports are often served by other carriers, including
24    legacy carriers; right?
25    A.   Yeah.  It's rare we're in a market where there isn't
```

     1    competition.

     2    Q.    The legacy carriers might actually be operating hubs at

     3    these airports; right?

     4    A.    In many cases, yes.

     5    Q.    There are also smaller, less busy airports that are

     6    called secondary or tertiary airports; correct?

     7    A.    Yes.

     8    Q.    And you've observed that Allegiant predominantly

     9    operates routes to and from smaller secondary and tertiary

    10    airports; right?

    11    A.    Again, I think historically that's been the case,

    12    although they're in New York now, they're in Los Angeles,

    13    they're in Boston.  So they seem to be evolving into maybe

    14    at least some primary airports.

    15    Q.    But the routes that Spirit -- or, sorry, that Allegiant

    16    operates from these airports often have no other

    17    competition, right, or no other competitors?

    18    A.    Yeah.  Generally, they're looking for unserved markets.

    19    Q.    Have you or your team calculated the number of routes

    20    in which Allegiant faces no competition?

    21    A.    Not recently, but I think historically the number has

    22    been in the 80 percent range.

    23    Q.    You also mentioned that Frontier has historically

    24    exited some markets.  Recently, you've observed Frontier

    25    exited some high-cost primary airports; right?

1    A.   Well, I guess "recently" is, you know, kind of

2    variable.  But, yes, we saw them get out of Newark and Los

3    Angeles, I think it was a few years ago now.

4    Q.   You'd agree that it is a big investment to enter a

5    city; right?

6    A.   Well, certainly there's an investment in time.  There's

7    a certain amount of investment in infrastructure, and so on.

8    So, yeah.  Again, our financial people tell me that it's

9    about a $600,000 investment to go into a domestic city, and

10   probably about a quarter of a million for an international

11   city.

12   Q.   And so it makes sense then that it would be easier for

13   an airline to begin serving a route when they already have a

14   presence at one or both of the endpoints of that route;

15   correct?

16   A.   Yeah.  Certainly, you know, I refer to that as dot

17   connecting.  But, yeah, if you're already in both cities

18   it's a little easier, assuming that you have the

19   infrastructure, to add service.

20   Q.   So we talked about Spirit, what it looks for when it's

21   entering an airport.  When Spirit decides to enter a route,

22   it also plans to be in that route in perpetuity; correct?

23   A.   Yes.

24   Q.   And your team puts a lot of thought into whether to

25   enter a route; correct?

```
 1    A.   We do a lot of analysis and we look for markets that

 2    resemble markets that we've had success.

 3    Q.   Historically, the thorough planning that your team does

 4    has resulted in fewer market exits for Spirit compared to

 5    other ULCCs; right?

 6    A.   Definitely historically, maybe not so much of late.

 7    Q.   All right.  I want to take a look at one of the

 8    five-year plans that, I believe, your team put together.  So

 9    this is Exhibit 285 in your binder.

10              (On screen.)

11    Q.   And this is a May 14th, 2019 board of directors agenda,

12    and there's an attached presentation to it.  And if you see

13    here, I think it's the fifth topic, you and Mr. Klein were

14    to lead the topic of Spirit Airlines five-year network plan.

15    Do you see that?

16    A.   I do.

17    Q.   And this is the network plan that you and your team put

18    together?

19    A.   Yes.  It looks like it was the first one we did.

20    Q.   So if you turn to page 29, or the Bates ending in 060

21    of Exhibit 285.  And this is tabbed, if you need it, in your

22    binder.

23    A.   I just want to say thank you to whoever is doing this

24    on the screen.  It's awesome.

25    Q.   They're very fast.
```

```
1        So this is the start of the five-year network plan that
2   you and your team put together; correct?
3   A.   Yes.
4             THE COURT:  It would not be amiss for me to say I
5   share that, and the performance generally.  All right.
6             MS. PEARL:  They're quite amazing.
7             THE COURT:  But now I've forgotten where we're
8   supposed to be.
9             MS. PEARL:  060.
10            THE COURT:  Say again?
11            MS. PEARL:  060.
12            THE COURT:  Thank you.
13            MS. PEARL:  And there's also page 29 at the bottom
14   center.
15   Q.   So, Mr. Kirby, to your knowledge, 2019 was the first
16   year Spirit prepared a five-year network plan; right?
17   A.   That is correct.
18   Q.   And that's because you introduced the first five-year
19   network plan to Spirit; right?
20   A.   I did.
21   Q.   All right.  Let's turn to the slide ending in 062 of
22   Exhibit 285.  It's titled, "Executive Summary."  So the
23   second main bullet on this page, "We want to go where people
24   are or take them to popular destinations," below that is a
25   list of Spirit's three target growth areas; is that right?
```

```
 1    A.    Yes.
 2    Q.    And are those Spirit's target -- primary target growth
 3    areas today?
 4    A.    Yeah.  I would say that really is a good summary.  We
 5    want to go either where people originate, we want to offer
 6    to destinations they want to go, and then often big cities
 7    are destinations as well as originations.  And, obviously,
 8    continue to develop our international portfolio.
 9    Q.    So the first sub-bullet, "Major metropolitan areas,"
10    based on your experience, routes to and from these major
11    metropolitan cities are often dominated by legacy carriers;
12    right?
13    A.    I'd say in general, yes.
14    Q.    And we talked about hubs earlier, but is it because
15    they often operate hubs at these major -- at airports
16    serving these major metropolitan areas?
17    A.    I would say that that's a generalization, but I'd say
18    that certainly there's quite a few large metro areas that do
19    have hub.  But, for example, we're in Boston right now.
20    There isn't a Boston hub carrier, but there's carriers that
21    have significant service out of Boston.
22    Q.    Spirit is generally not deterred from entering a route
23    based on the presence of legacy carriers; right?
24    A.    Again, we recognize we really compete with everyone.
25    And, yes, we typically look at the market characteristics
```

```
 1    more than, necessarily, the number of competitors or the

 2    type of competitors.

 3    Q.   And Spirit has taken significant pains to grow in many

 4    airports that are serving these major metropolitan areas;

 5    right?

 6    A.   Well, we've tried to, again, secure the ability to grow

 7    in these cities.

 8    Q.   And as a result of Spirit's growth in these cities,

 9    you've described Spirit as having a more noteworthy position

10    relative to some of the other ULCCs; correct?

11    A.   We're larger and, yeah, we've been able to establish a

12    stronger, I'd say, or larger what I call service portfolio

13    in some of the larger cities in the United States.

14    Q.   And Spirit historically has been more likely than other

15    ULCCs to enter and compete with legacies in markets that are

16    serving these major metropolitan areas; right?

17    A.   I'd say in general that's fair.  I mean, there are

18    exceptions, but in general that's fair.

19    Q.   And you'd agree that the breadth of Spirit's service in

20    many of these major metropolitan areas would be difficult

21    for another ULCC to replicate; right?

22    A.   Well, again, I think that's kind of a broad statement,

23    but I think that, you know, you almost really have to take

24    it market by market.  But I think, in general, at big cities

25    infrastructure can be constrained.
```

1    Q.    So I just want to make sure the question was answered.

2    It was:  You'd agree that the breadth of Spirit's network

3    service in these large metropolitan areas would be difficult

4    for another ULCC to replicate?  And what is your answer to

5    that question?

6    A.    The answer is it would be difficult to replicate

7    without, I think, some help.

8    Q.    All right.  So since 2019 Spirit -- Spirit has grown in

9    many major metropolitan areas like New York, Los Angeles,

10    Dallas, Houston, Chicago and Baltimore; right?

11    A.    I would say that most of those are correct.  There's a

12    few -- we're actually a little smaller in Baltimore than we

13    were prepandemic.  I think Chicago is about the same.  But

14    we are bigger in Los Angeles, New York and Dallas.

15    Q.    I can -- sorry.

16    A.    Dallas on a year-round basis.

17    Q.    So the second sub-bullet here is sort of a twofer,

18    "Large leisure markets both domestic and international."  So

19    focusing on domestic for a moment, would you agree that

20    these are large domestic vacation destinations like Orlando

21    and Myrtle Beach?

22    A.    Yes, places like Myrtle Beach, Las Vegas, Nashville,

23    Austin.  There's a number of destinations.

24    Q.    And other destinations that Spirit serves include Fort

25    Lauderdale, I think you mentioned New Orleans.  Fort Myers,

1   would that also be considered leisure?

2   A.   Yeah, it certainly would.

3   Q.   Since 2019 Spirit has added routes to and from these

4   and other domestic leisure destinations; correct?

5   A.   From the ones you mentioned?

6   Q.   Yes.

7   A.   Because where I began, smaller in New Orleans, last

8   year we were much -- significantly smaller in Fort Myers.

9   Some of them were actually down a little bit.  There's

10  reasons for that.  One of the challenges we're facing is the

11  understaffing of the Jacksonville center, and that's forced

12  us to reduce capacity, particularly last year.  It was to

13  Tampa, Fort Myers and Miami.

14  Q.   And the Jacksonville center, that's an air traffic

15  control center; is that right?

16  A.   It is.

17  Q.   And that's outside of Spirit's ability to control,

18  what's going on at the air traffic control center in

19  Jacksonville; right?

20  A.   It is, but it's within our ability to control or

21  minimize the impact to our operations.  So we artificially

22  constrained ourselves in a number of geographies to not

23  overwhelm our operations.

24  Q.   So one of the international -- or, sorry, the domestic

25  leisure markets that Spirit's added since 2019 is also

1    Orange County; right?

2    A.   I would say that's secondary, but it is the gateway to

3    Disneyland.

4    Q.   Which is a magical place.  So we all appreciate

5    Disneyland.

6    A.   I heard that.

7    Q.   So the second part of this is international.  So those

8    are just vacation destinations that are in Latin America,

9    the Caribbean and northern South America; right?

10   A.   Yes.

11   Q.   And, recently, Spirit actually announced plans to start

12   flying routes to and from Tulum, Mexico; correct?

13   A.   We have.

14   Q.   The third bullet here is with respect to international

15   VFR markets; right?

16   A.   Yes.

17   Q.   And what is VFR?

18   A.   It stands for "visiting friends and relatives."  So if

19   you think about, sort of, the universe of vacations, people

20   can go to destinations like Disneyland, or Las Vegas, but

21   then they might -- the vacation might be going to see mom or

22   their sister or brother or attending a wedding as well.  So

23   that's what we think of as VFR.  That can be both

24   international, in ethnic places like Central America, and

25   South America, Colombia, as well as the United States.

1    Q.   And so Spirit's focus on South America, the Caribbean,

2    Latin America, that's because Spirit's home in South Florida

3    is actually home to a large number of expats that are from

4    those areas; is that right?

5    A.   Yeah, it's one of the larger expat populations,

6    particularly from Latin America.

7    Q.   Since 2019, Spirit has entered these international VFR

8    markets including -- again, I'll butcher this --

9    Baranquilla, Colombia?

10   A.   Baranquilla.

11   Q.   Tegucigalpa?

12   A.   Tegucigalpa, yes.

13   Q.   Any others?

14   A.   Well, we did enter Bucaramanga.  That's one of the

15   markets we're going to suspend.

16   Q.   You're suspending that due to the current engine

17   issues; right?

18   A.   Yeah.  We're having to take a hard look at

19   underperformance in our network and, again, free up aircraft

20   unfortunately put on the ground with no engines.  So a lot

21   of the markets that we typically try to hang in year-round

22   are going to become seasonal, and we're having to make some

23   tough decisions.

24   Q.   The Bucara --

25   A.   Bucaramanga.

```
 1   Q.   The Bucaramanga flight, that carries a smaller number
 2   of passengers compared to some other routes that Spirit
 3   operates on; right?
 4   A.   I mean, the loads are pretty good, it's just that the
 5   yields aren't there in the offpeak season.
 6   Q.   Going now to the third main bullet, "The network
 7   strategy has four pillars"?
 8   A.   Yes.
 9   Q.   The first one is, "Continue investment in core cities."
10   Spirit's core cities including Fort Lauderdale, Orlando and
11   Las Vegas; is that correct?
12   A.   Those are our three biggest core cities, yes.
13   Q.   And as a result of Spirit's growth since 2019, your
14   network planning team anticipates that Los Angeles, New York
15   City, and Houston will also be part of Spirit's foundational
16   cities by 2025; correct?
17   A.   Well, at the time of that document we did.  A number of
18   things have changed.
19   Q.   And Spirit still considers that those three will be
20   part of its foundation?
21   A.   I don't think Houston is going to be able to grow like
22   we thought.  At the time, we thought that there was an
23   opportunity to get more capacity there, but there's been a
24   change in the plan and they're moving towards a new terminal
25   which will take years to develop.
```

1    Q.    But Los Angeles and New York City continue to be part

2    of Spirit's plan; right?

3    A.    Yeah, we certainly -- we've maximized the capacity that

4    we currently have at both facilities, and then we're going

5    to try to work to see if we can get more capacity there.

6    Q.    All right.  So the second bullet, sub-bullet, pardon

7    me, is, "Expand in strategic markets."  Do you see that?

8    A.    I do.

9    Q.    And strategic markets are endpoints that Spirit has

10   identified in which it wants to grow; correct?

11   A.    Yes.

12   Q.    So some of the strategic markets that you and your team

13   have been looking at are western U.S. cities, or routes

14   touching western U.S. cities; correct?

15   A.    It includes both east and west coast, and central even.

16   Q.    So all of the cities?

17   A.    There's a number of cities that we consider to be

18   strategic and they encompass the lower 48.

19   Q.    Spirit's interest in western U.S. cities, though, is

20   part of Spirit's current strategy to become a more national

21   carrier; right?

22   A.    Yeah.  When I joined the company, I observed that most

23   of our capacity was in the eastern half of the country, and

24   I felt to be a more national carrier that we needed to

25   continue to develop out west.

```
 1    Q.   So we talked about Orange County, Disneyland, but in
 2    addition, the last five or so, three, four years, Spirit has
 3    added routes to Burbank; correct?
 4    A.   Yes.
 5    Q.   Sacramento?
 6    A.   Yes.
 7    Q.   Boise?
 8    A.   Yes.
 9    Q.   Albuquerque, New Mexico?
10    A.   Yes.
11    Q.   Reno, Nevada?
12    A.   Yes.
13    Q.   As well as Salt Lake City; correct?
14    A.   Yes.
15    Q.   Spirit continues to serve routes to and from the cities
16    that I just mentioned; correct?
17    A.   We do.
18    Q.   The third sub-bullet here is, "Opportunistically grow
19    in constrained cities."  Do you see that?
20    A.   Yes.
21    Q.   These constrained cities are cities in which it's
22    challenging to get the necessary real estate to operate; is
23    that fair?
24    A.   That's fair.
25    Q.   So it might be gates that are hard to get; correct?
```

```
1    A.    Gates, ticket counters.  It could be a lot of things.

2    Q.    And these constraints make growth, as well as entry at

3    airports, difficult; right?

4    A.    Yeah.  You would have to work and be patient to get

5    more capacity.

6    Q.    This is particularly an issue in some of the larger

7    cities in which Spirit operates or wishes to grow in;

8    correct?

9    A.    I'd say, generally, the larger cities in the country

10   have some level of constraint.

11   Q.    So despite the constraints at some of these cities,

12   Spirit has opportunistically grown in these constrained

13   cities since 2019; right?

14   A.    Well, I'd say in a blanket statement, yes.  In many

15   cases we've been able to grow at historically constrained

16   cities.

17   Q.    So one example --

18         THE COURT:  Give me some examples of historically

19   constrained cities.

20         THE WITNESS:  Yeah.  I guess, your Honor, probably

21   the one that jumped in my head right away is Los Angeles.

22   Prepandemic we had three preferential gates.  We tend to

23   want preferential gates because you can control those.  And

24   we strive to utilize them highly.  We usually try to get

25   about eight flights a gate.
```

```
 1              So during the pandemic we -- we had, prepandemic,
 2    engaged with Los Angeles about an opportunity, if it arose,
 3    to get more capacity.  And during the pandemic they saw a
 4    drop-off in traffic and we were able to secure two
 5    additional gates which allowed us to go from about 25
 6    flights to 40 flights a day.
 7              THE COURT:  You used an adjective before the word
 8    "gate."  What are those type of gates?
 9              THE WITNESS:  Yeah.  Preferential gate is --
10              THE COURT:  Preferential.
11              THE WITNESS:  -- a gate that you lease from the
12    airport.  Generally, you have control of that gate unless
13    you greatly underutilize that gate.  And that's how Spirit
14    really likes to grow, is by securing preferential gates and
15    being able to control our utilization.  I almost used the
16    math.  It's number of gates times eight is the number of
17    flights we can operate.
18              THE COURT:  Thank you.  Ms. Pearl, I've used up
19    your time.
20              MS. PEARL:  No, that's okay.  I think this is
21    actually a proper stopping point.
22              THE COURT:  Very well.  We will stop.  We'll start
23    tomorrow promptly at 9:00.  We'll stand in recess.
24              THE CLERK:  All rise.
25              (Proceedings adjourned.)
```

C E R T I F I C A T E


        I, Cheryl B. Palanchian, Court Reporter

for the United States District Court for the

District of Massachusetts, do hereby certify that

the foregoing pages are a true and accurate

transcription of my shorthand notes taken in the

aforementioned matter to the best of my skill and

ability.




                /s/ Cheryl B. Palanchian 11/7/2023
                  CHERYL B. PALANCHIAN

                 Registered Merit Reporter
                 Certified Realtime Reporter