1              UNITED STATES DISTRICT COURT

2            DISTRICT OF MASSACHUSETTS (Boston)

3                          No. 1:23-cv-10511-WGY
                           Vol 1, Pages 1 - 90
4

5

6   UNITED STATES OF AMERICA, et al,
            Plaintiffs
7

8   vs.

9

10  JETBLUE AIRWAYS CORPORATION, et al,
            Defendants
11

12                      * * * * * * * * *

13

14              For Bench Trial Before:
               Judge William G. Young
15

16

17             United States District Court
               District of Massachusetts (Boston)
               One Courthouse Way
18             Boston, Massachusetts 02210
               Wednesday, November 8, 2023
19

20                      * * * * * * * *

21

           REPORTER: RICHARD H. ROMANOW, RPR
22              Official Court Reporter
               United States District Court
23     One Courthouse Way, Room 5510, Boston, MA 02210
                   rhrbulldog@aol.com
24

25

```
1                    A P P E A R A N C E S

2

3    EDWARD WILLIAM DUFFY, ESQ.
     ARIANNA MARKEL, ESQ.
4    AARON TEITELBAUM, ESQ.
         DOJ-Atr
5        450 Fifth Street NW, Suite 8000
         Washington, DC 20530
6        (202) 812-4723
         Email: Edward.duffy@usdoj.gov
7    and
      WILLIAM T. MATLACK, ESQ.
8        Attorney General's Office
         One Ashburton Place, 18th Floor
9        Boston, MA 02108
         (617) 727-2200
10       Email: William.matlack@mass.gov
         For Plaintiffs United States of America and
11       The Commonwealth of Massachusetts

12

13    RYAN SHORES, ESQ.
         Cleary Gottlieb Steen & Hamilton LLP
14       2112 Pennsylvania Avenue, NW
         Washington, DC 20037
15       (202) 974-1876
         Email: Rshores@cgsh.com
16   and
      ELIZABETH M. WRIGHT, ESQ.
17       Cooley LLP
         500 Boylston Street
18       Boston, MA 02116-3736
         (617) 937-2349
19       Email: Ewright@cooley.com
     and
20    RACHEL MOSSMAN ZIEMINSKI, ESQ.
      MICHAEL MITCHELL, ESQ.
21       Shearman & Sterling LLP
         2601 Olive Street, 17th Floor
22       Dallas, TX 75201
         Email: Rachel.zieminski@shearman.com
23       For Defendant JetBlue Airways Corporation

24

25       (Continued.)
```

```
 1       (Continued.)

 2

 3    JAY COHEN, ESQ.
      ANDREW C. FINCH, ESQ.
 4       Paul, Weiss, Rifkind, Wharton & Garrison
         1285 Avenue of the Americas
 5       New York, NY 10019-6064
         (212) 373-3000
 6       Email: Jaycohen@paulweiss.com
         For Defendant Spirit Airlines, Inc.
 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                        I N D E X

2

3    WITNESS                 DIRECT  CROSS  REDIRECT  RECROSS

4

5    JOHN KIRBY  (Continued.)

6       By Ms. Pearl:           5

7       By Mr. Finch:                  46

8

9

10                      E X H I B I T S

11                        (None marked.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1          P R O C E E D I N G S
 2          (Begins, 9:00 a.m.)
 3          THE COURT:  Good morning, I believe I neglected to
 4     state the time used before we broke yesterday.  At the
 5     end of yesterday's session, recognizing that we started
 6     late, the government has used up 3 days, 1 hour, 15
 7     minutes.  The defense has used up 2 days, 1 hour, 45
 8     minutes.
 9          And if you'd remind the witness.
10          THE CLERK:  I'd like to remind you, sir, that you
11     are still under oath.
12          Do you understand?
13          THE WITNESS:  Yes.
14          THE COURT:  And, Ms. Pearl, you may continue.
15
16     DIRECT EXAMINATION BY MS. PEARL:  (Continued.)
17     Q.  Good morning, Mr. Kirby.
18     A.  Good morning.
19     Q.  So when we left off yesterday we were talking about
20     Exhibit 285 in your binder, and we'll bring it back up.
21     And at this time I would like for all of us to turn to
22     the page ending in 72 -- 072.  And just as a reminder,
23     this is a May 2019 5-year network plan.
24     A.  (Turns.)
25     Q.  All right.  So this is, as of May 2019, the new
```

1    markets by year, based by date and other priorities,

2    that your team had a potential plan to enter by 2023,

3    correct?

4    A.   Correct.

5    Q.   So we discussed, I guess yesterday at this point,

6    that the 5-year network plan that you put together at

7    the time was realistic, right?

8    A.   At the point in time that we put it together we

9    believe it's -- I usually say aspirational but

10   realistic.

11   Q.   And Spirit might make adjustments to the specifics

12   of the plan though, right?

13   A.   Oh, absolutely.

14   Q.   So, for example, at this time Spirit planned to

15   enter Nashville in 2020 and they actually entered

16   Nashville in 2019, correct?

17   A.   That is correct.

18   Q.   And then Tegucigalpa, Spirit actually entered that

19   airport in 2021, is that right?

20   A.   Yes, at the end of 2021.

21   Q.   All right.  So -- I'm going to ask you to do some

22   counting.  But if we look at the airport Spirit planned

23   to start off its service from 2019 to 2023, Spirit

24   entered 19 of the 29 listed here, although it might have

25   been in a different year, is that correct?

A.   Um, give me one second.

Q.   Yes.  I'm sorry.

A.   (Pause.)  That is correct.

Q.   Spirit also entered some alternative cities that are not listed on this page, correct?

A.   We did.

Q.   All right.

MS. PEARL:  So at this time, your Honor, I'm going to use, or try to use the ELMO device to, I guess, broadcast Page 072 from Exhibit 285, um, with the Court's permission?

THE COURT:  You may.

MS. PEARL:  We'll see how this goes.

(Pause.)

(On screen.)

Q.   So, Mr. Kirby, my attempt at this is going to be to work with you to sort of highlight the airport that Spirit didn't enter and to identify that Spirit -- that Spirit did enter and then identify the additional airports that Spirit entered.  So you'll have to bear with my handwriting as well as my highlighting skills.

And again, understanding that Spirit may not have entered the airport in the year indicated, in 2019 there's a number of airports here.  By the end of this year, it's correct that Spirit entered Austin, right?

```
 1    A.   That's correct.

 2    Q.   Spirit entered Burbank?

 3    A.   Correct.

 4    Q.   Spirit entered Charlotte?

 5    A.   We did.

 6    Q.   Spirit entered Raleigh-Durham?

 7    A.   Correct.

 8    Q.   Spirit entered Indianapolis?

 9    A.   Yes.

10    Q.   Spirit entered Sacramento?

11    A.   Yes.

12    Q.   Spirit entered Barranquilla?

13    A.   Correct.

14    Q.   Spirit entered Bucaramanga?

15    A.   Um, yes.

16    Q.   Spirit did not enter Liberia, correct?

17    A.   Correct.

18    Q.   All right.  The same exercise for 2020,

19    understanding that you list it for 2020, but Spirit

20    might have entered at a different point throughout this

21    5-year period.

22         Spirit has entered Nashville?

23    A.   Yes.

24    Q.   Spirit recently entered San Jose?

25    A.   Correct, in 2023.
```

```
1    Q.  Spirit entered Milwaukee?
2    A.  Yes.
3    Q.  And Spirit entered Reno, correct?
4    A.  Yes.
5    Q.  All right, here comes the handwriting problem.
6        So in addition to those I just listed, Spirit also
7    entered the John Wayne Airport in 2020, correct?
8    A.  Yeah, November of 2020.
9        THE COURT:  Now that's in Orange County?
10       THE WITNESS:  Orange County.  Also in -- the John
11   Wayne -- I believe the airport has three names, Santa
12   Anna, John Wayne, and Orange County.
13       THE COURT:  All right.  Thank you.
14   Q.  All right.  And moving now to 2021.  Spirit started
15   to fly, you know during this 5 year time period, from
16   Memphis?
17   A.  Yes.
18   Q.  San Antonio?
19   A.  Yes.
20   Q.  St. Louis?
21   A.  Yes.
22   Q.  Ponce?
23   A.  Yes.
24   Q.  As well as Puerto Vallarta?
25   A.  Correct.
```

1   Q.  In addition, not listed here, Spirit entered Miami,

2   correct?

3   A.  We did.

4   Q.  Spirit also entered Louisville?

5   A.  Yes.

6   Q.  I'm very sorry for my handwriting.

7       Spirit entered Pensacola?

8   A.  Correct.

9   Q.  And Spirit also entered Manchester New Hampshire?

10  A.  Yes.

11      MS. PEARL:  And I'll pull this down so it can be

12  seen.

13  Q.  All right, moving on to 2022.

14      Since 2019, Spirit has entered Salt Lake City?

15  A.  Yes.

16  Q.  And Spirit entered Tegucigalpa, correct?

17  A.  Correct, the alternate Tegucigalpa.

18  Q.  And is that a new airport that Tegucigalpa had?

19  A.  It was an existing military field that they built a

20  new terminal for and converted to a commercial airfield.

21  Q.  Also, in 2022, um, Spirit entered Monterey, Mexico?

22  A.  Yes.

23  Q.  Spirit entered -- and this is a hard one to spell,

24  Albuquerque?

25  A.  Albuquerque.  If you want to just say "ABQ," that's

 1   their 3-letter code.

 2   Q.  I'm going to try to spell it.

 3   A.  Okay.

 4   Q.  But I appreciate it.  (Writes.)  I was not a

 5   spelling bee participant at all.

 6        And Spirit entered Boise?

 7   A.  Correct.

 8   Q.  And Spirit entered Rochester, correct?

 9   A.  Yeah, Rochester, New York.

10   Q.  Okay.  All right.

11        Then in 2023, Spirit didn't enter any of the

12   cities listed here, correct?

13   A.  It did not.

14   Q.  But Spirit did enter Charleston, South Carolina?

15   A.  That's correct.

16   Q.  As well as Norfolk, Virginia?

17   A.  That's correct.

18   Q.  And you already mentioned that Spirit entered in

19   this year San Jose, so I'll just keep it where it is.

20   A.  Yes.

21   Q.  All right.  So at this time -- so looking at all the

22   airports including the green highlighted, the green

23   written, am I correct that from 2019 to present, Spirit

24   entered roughly the same number if not more cities than

25   it anticipated?

1    A.  Let's see.  (Counts.)  Yes.  11 versus, looks like

2    10, 10 or 9.

3    Q.  So 10 or 9?

4    A.  Yeah, 11 versus 9.

5    Q.  So Spirit enters 30 cities over the course of 2019

6    to 2023, correct?

7    A.  Yes.

8        MS. PEARL:  Your Honor, plaintiffs offer in

9    evidence what will be 690.

10       THE COURT:  And what is that, this handwritten

11   document?

12       MS. PEARL:  Yes, my beautiful work here.

13       THE COURT:  No objection?

14       MR. FINCH:  No objection, your Honor, but it's not

15   evidence, it's just in the nature of a demonstrative

16   graph, but it's not evidence.

17       THE COURT:  I think that's right.  It's a

18   demonstrative, isn't it?

19       MS. PEARL:  Okay.

20       THE COURT:  It illustrates his testimony.  And as

21   a demonstrative, I will receive it.

22       So it -- given the nomenclature which follows,

23   this would be Kirby --

24       MS. PEARL:  1.

25       THE COURT:  1.  All right.

1        MR. FINCH:  Why don't we make it "Kirby 3," if we

2   may, your Honor, because I've got a "Kirby 1."

3        THE CLERK:  There's a 1 and a 2.

4        THE COURT:  All right, "Kirby 3."

5        MS. PEARL:  Okay.

6        I'm just going to put the ELMO away so that people

7   don't see my hands anymore.

8        (Turns ELMO off.)

9   Q.  Okay.  All right.  So you can actually put away, I

10  guess you don't have it open, that 5-year plan, and

11  we'll actually take a look now at the most recent 5-year

12  plan.  It should be Exhibit 293.

13  A.  Is it still in the smaller binder?

14  Q.  It is in the smaller binder, that's right.

15  A.  Just in case.  (Looks.)  Which exhibit is it?

16  Q.  It's Exhibit 293.

17  A.  (Turns.)  Okay, 293.

18  Q.  And, Mr. Kirby, I will note that some pages in this

19  deck have been redacted on confidentiality grounds by

20  the request of your counsel, so, um, you have the

21  unredacted version in your binder, the redacted version

22  will be shown on the screen.  I will let you know, when

23  we are discussing a case that has a redaction, so you

24  can be sure to take a look before testifying.

25  A.  Thank you.

1   Q.  So this is the May 10th, 2023 board of directors

2   agenda, and do you see that there's an attached

3   presentation?

4   A.  Yes.

5   Q.  And you were to lead the topic of the 5-year network

6   plan, is that correct?

7   A.  That is correct.

8   Q.  So if you turn to the page with Bates ending in 247

9   of Exhibit 293, that should be the start of the 5-year

10  network plan.

11  A.  (Turns.)  Yes.

12  Q.  And again, this is the 5-year network plan that your

13  team puts together, right?

14  A.  Correct.

15  Q.  This is the 5-year network plan -- this is the most

16  recent 5-year network plan that was actually presented

17  to you and approved by Spirit's board, is that fair?

18  A.  I wouldn't say the board approved it, it's more of

19  an inform to the board.  And I oversee the development.

20  But I did work with my team on this.  But, yes, it was

21  presented to the board.

22  Q.  And so this is the network plan for Spirit for this

23  year absent a merger with JetBlue, correct?

24  A.  Yes.

25  Q.  All right.  And let's turn to the page in your

```
 1   binder to 250.

 2   A.  (Turns.)

 3   Q.  And I want to take a look at the numbers below the

 4   chart, it says "2018 to 2023 ASM CAGR."  Do you see

 5   that?

 6   A.  Yes, Compounded Annual Growth Rate.

 7   Q.  And is the Compound Annual Growth Rate something

 8   that your team tracks?

 9   A.  It's not something we normally track, this is really

10   more for an inform for the board.

11   Q.  But it is something that you put into your 5-year

12   plan, correct?

13   A.  It's for illustrative purposes, yes.

14   Q.  So among the carriers listed on this page, Spirit

15   had the highest CAGR based on available seat miles from

16   the period 2018 to 2023, is that correct?

17   A.  Yeah, just slightly above Frontier, yes.

18   Q.  And that was at 8.2 percent?

19   A.  That is correct.

20   Q.  By contrast, JetBlue's CAGR was 1.4 percent, right?

21   A.  That's what it indicates, yes.

22   Q.  And all legacy carriers had growth rates of under 1

23   percent, correct?

24   A.  Correct.

25   Q.  American's was even a negative number, right?
```

1    A.  Yes, it was.

2    Q.  All right, you can put that page away.  And we're

3    going to turn now to the Bates ending in 255 of Exhibit

4    293.

5    A.  (Turns.)

6    Q.  Titled "Infrastructure Limits are Growth in Many of

7    our Key Cities."  Are you there?

8    A.  Yes.

9    Q.  Great.  So most of the cities on this page have

10   constraints, right?

11   A.  Well again some level of constraints, yes.

12   Q.  So, for example, at DFW, which is Dallas Fort Worth,

13   is it true that there are currently no gates available

14   to lease?

15   A.  Yeah, there's no preferential gates available to

16   lease.

17   Q.  At DPW, Detroit, is it also fair that there are no

18   preferential gates available to lease?

19   A.  That's correct.

20   Q.  At IAH, which is the George Bush Intercontinental

21   Airport in Houston, is it also correct that there are no

22   gates available for lease?

23   A.  No preferential gates to lease, yes.

24   Q.  And not on this list but Austin, is it -- that's

25   also constrained with respect to available gates, right?

1   A.   I'm sorry, say that again?

2   Q.   Austin.

3   A.   Oh, Austin, Texas.

4   Q.   But it is constrained?

5   A.   Well it was at the time that we talked about it.

6   There's been some recent development that indicates that

7   may have changed.

8   Q.   And Spirit has had successfully flown in Austin,

9   right?

10  A.   We have.

11  Q.   So I think we talked about it yesterday, but Spirit

12  has successfully flown at some capacity-concerned

13  airports, right?

14  A.   We have.

15  Q.   And you believe the capacity constraints that exist

16  at these airports limit other airlines' ability to grow

17  at these airports, correct?

18  A.   Well I mean I believe what I said was that it could

19  limit growth of other carriers, but there are paths to

20  growth.

21  Q.   And it could limit other ULCCs' ability to grow at

22  these airports, right?

23  A.   Well it could limit any carrier's ability to grow,

24  but, yes.

25  Q.   All right.  So next we'll turn to the page that does

1   have redactions, um, and this is going to be Page 258 of

2   this exhibit.

3          MS. PEARL:  And, your Honor, we do request that

4   you consider the underlying language of these

5   redactions.

6   A.  (Turns.)

7   Q.  So again, yes, okay, you're looking at the screen.

8   Great.

9          So, Mr. Kirby, by upgrading Spirit's aircraft,

10  from the smaller A319 airplanes to the larger A221 Neos,

11  markets with endpoints in this location that's noted

12  here might be an option for Spirit in the future,

13  correct?

14  A.  It certainly might be an option in the far future,

15  yes.

16  Q.  And this is a possibility for Spirit as a standalone

17  competitor, correct?

18  A.  Yeah, at some point in the future, yes.

19  Q.  All right, we're going to turn to the next page,

20  which also, I think, might be fully redacted.

21         MS. PEARL:  Again, your Honor, we do request that

22  you consider the underlying language of these

23  redactions.

24  A.  This is 259?

25  Q.  That's right, yes.

1          All right.  So yesterday we discussed that part of
2    Spirit's, um, sort of strategy is to seek new
3    opportunities in international areas, right?
4    A.   Yes.
5    Q.   And this that's on the screen is such an
6    opportunity, correct?
7    A.   It's one we've looked at.
8    Q.   This would allow Spirit to serve even more
9    international communities?
10   A.   It would if we were able to move forward with it.
11   Q.   And it would allow Spirit to serve international
12   communities that are farther away from the domestic
13   United States, right?
14   A.   It would.
15   Q.   To you knowledge have any other U.S.-based ULCCs
16   established such a position in this region?
17   A.   No one has ever done this.
18   Q.   And again this is a possibility for Spirit as a
19   standalone competitor, correct?
20   A.   Well we've gone through the analysis and have ruled
21   it out at this time.
22   Q.   All right, let's turn to Page 263 in Exhibit 293.
23   Again there are redactions on this page.
24        MS. PEARL:  And, your Honor, we do request that
25   you consider the underlying language of these

1  redactions.

2       THE COURT:  Let's go back to Bates Number 259.

3  You said you "ruled it out."  Sensitive to the

4  redactions, I'll ask this question.

5       Is that because of the current financial

6  situation?

7       THE WITNESS:  No, we ruled it out prior to that

8  because, um, it's my opinion that it's, um, it's -- the

9  upside versus the downside, it's too much risk and there

10  are better opportunities.

11       THE COURT:  Thank you.

12  Q.  All right.  So we're going from the fully-redacted

13  page to a partially-redacted page, and that is 263.

14  A.  (Turns.)

15  Q.  So this is a similar airport entry plan that we saw

16  for the prior 5-year plan that we looked at, right?

17  A.  Correct.

18  Q.  And this provides an outline of the 30 airports

19  Spirit plans to start providing service to in the next 5

20  years, correct?

21  A.  Well I would say it again, at the point in time that

22  this document was completed, this was again our

23  aspiration, but realistic plan.

24  Q.  And you believe -- and I think you just said at the

25  time the goals laid out in this plan are realistic,

1    right?

2    A.  We believe them to be, yes.

3    Q.  All right, you can put this document away.

4         All right.  So we've just been discussing that

5    part of Spirit's network strategy includes growing its

6    international destinations, right?

7    A.  Yes.  Actually could I clarify something?

8    Q.  Yes.

9         THE COURT:  Always.

10   A.  On the last one, um, I believe they were realistic

11   at the time that we developed the deck, again because of

12   the -- we talked about the engine difficulties.  I think

13   right now it's mostly -- it's unrealistic.

14   Q.  Okay.  And so that was in May that you put together

15   the deck?

16   A.  Yeah, in May we believed those to be realistic.  But

17   again, knowing what we now know, I think it really isn't

18   realistic.  It isn't realistic.

19   Q.  All right, so let's put that away.  So going on to,

20   um, international strategy.

21        So many of the airports that are international

22   have prescribed landing and takeoff times, right?

23   A.  Yeah, typically they either have slots or something

24   that looks like a slot.

25   Q.  And it can be difficult to obtain these landing and

1    takeoff times at international airports, right?

2    A.  Again, depending on the airport, but some are more

3    constrained than others.

4    Q.  So, for example, Spirit has operated out of Bogota,

5    Colombia's El Dorado International Airport for a number

6    of years, right?

7    A.  Yes, we've operated in Bogota for quite a long time.

8    Q.  But obtaining the necessary slots to operate during

9    peak hours at Bogota has been challenging recently,

10   correct?

11   A.  I'd say it's been challenging, there's been a number

12   of concerns.  There was actually some controversy there.

13   There was corruption.  A lot of the members of the DJAC,

14   which is the equivalent of the FAA, were put in jail.

15   So we went through a lot of turbulence there.  But, yes,

16   in general peak times are difficult to get.

17   Q.  Obtaining slots in Cancun can also be difficult in

18   certain seasons, right?

19   A.  Yeah, certain seasons and certain days of the week.

20   Typically the weekends.  And again times you consider to

21   be peak, seasons like peak winter and peak summer.

22   Q.  Obtaining slots at the Aruba International Airport

23   can also be difficult on certain days?

24   A.  Yeah, so on Saturday and sometimes on Sunday it can

25   be difficult.  The rest of the week is certainly easier.

1  Q.  Obtaining special operating authorization privileges

2  at the Ramon Villeda International Airport in Honduras

3  can also be difficult, correct?

4  A.  Yeah, we've had similar issues with Bogota on our

5  grandfather slots because the capacity of the airport is

6  pretty limited.  But, yes.

7  Q.  Despite these difficulties though, Spirit has

8  established routes with endpoints in all of the airports

9  we just went through, correct?

10 A.  We have.

11 Q.  And Spirit has also established routes with

12 endpoints in many other international airports, right?

13 A.  We've continued to grow with international service.

14 Q.  And you'd agree that Spirit has generally been

15 successful in international routes, correct?

16 A.  Again in general, yes, most of our routes have been

17 -- we've been able to maintain, and until recently, um,

18 we've been operating most year-round.

19 Q.  All right, let's turn in your binder now to the

20 exhibit that's 310.

21 A.  (Turns.)

22 Q.  This is a December 3rd, 2021 e-mail from yourself to

23 Blake Haag and Nick Bartolotta titled "RE: API Deck."

24 Do you see that?

25 A.  Yes.

1    Q.   What is the "API"?

2    A.   "Airport Council International," it's a trade group

3    made of airports, mostly North American airports.

4    Q.   And you often present to the ACI, correct?

5    A.   I have a number of times over the last 25 years or

6    so.

7    Q.   And in this e-mail you're working with Mr. Haag and

8    Mr. Bartolotta to analyze the number of international

9    available seat miles Spirit and other airlines had at

10   the time, correct?

11   A.   Correct.

12   Q.   So I want to look at your e-mail, which is at the

13   top.

14         You write, "This is pretty cool.  Among the

15   ULCCs/LCC crowd we are the largest international carrier

16   by ASM," right?

17   A.   That's correct.

18   Q.   And the table below your statement supports that

19   statement, correct?

20   A.   It does.

21   Q.   So zooming in on this for a moment, it shows that

22   Spirit, as of year-end, 2021, was the only listed

23   carrier here with over 2 billion in international

24   available seat miles, right?

25   A.   For the -- I see Southwest.  Oh, you're saying for

1   the -- oh, yes, that's correct.

2   Q.  The year-end.  Sorry.

3   A.  Correct.

4   Q.  And Spirit's ASMs in year-end 2021 were more than

5   double what they started out at in year-end 2017,

6   correct?

7   A.  Yes.

8   Q.  So looking at the airline code in the left-hand

9   side, "AS," that stands for Alaska Airlines, right?

10  A.  Yes.

11  Q.  And compared to Spirit, Alaska Airlines

12  international ASMs actually went down over this period,

13  right?

14  A.  Correct.

15  Q.  And Spirit had over 1 billion more ASMs as of

16  year-end 2021 than Alaska, correct?

17  A.  That's correct.

18  Q.  Going again down the list, "F9" is Frontier?

19  A.  That is correct.

20  Q.  And Spirit had over 1.5 billion more ASMs as of

21  year-end 2021 than Frontier, right?

22  A.  In this time window, which was in the middle of the

23  pandemic, but, yes.

24  Q.  But despite the pandemic, Spirit's international

25  ASMs went up over that time period, correct?

```
1    A.   We did.  Frontier also went up as well.  But, yes.

2    Q.   The table then lists G4 as Allegiant?

3    A.   Correct.

4    Q.   And they only had ASMs in year-end December of 2019,

5    right?

6    A.   That's what it appears to be, yes.

7    Q.   And why is that Allegiant only had international

8    ASMs in year-end 2019?

9    A.   I'm not 100 percent sure to be honest with you.  I

10   know that -- I've heard anecdotally that they had

11   technical problems in starting international service,

12   but I think given the number of ASMs, it's probably some

13   limited service and then they decided not to bring it

14   back after the pandemic.

15   Q.   To your knowledge does Allegiant fly any

16   international routes today?

17   A.    To my knowledge they do not, although they have a

18   relationship with Aviva, a Mexican-based carrier, and I

19   think they're planning to expand to international in

20   that regard.

21   Q.   SY at Sun Country?

22   A.   SY Sun Country, correct.

23   Q.   And their ASMs also went down over this period,

24   correct?

25   A.   They did.
```

1   Q.  And even at their highest in December of 2018, they

2   were never as high as that of Spirit, correct?

3   A.  Correct.

4   Q.  And the last one, WN, that's Southwest?

5   A.  That is Southwest, yes.

6   Q.  And Southwest, international ASMs also shrank from

7   year-end December 2017 to year-end December 2021, right?

8   A.  Correct.

9   Q.  And as we discussed, Spirit continues to seek out

10  additional international destinations today, right?

11  A.  Yes, we've continued to look for opportunities.

12  Q.  All right, you can put that document aside.

13       So at the very beginning of yesterday, um, you

14  mentioned that your team is also involved in schedule

15  planning, is that right?

16  A.  Yeah, we take that capacity plan that our planning

17  group puts together and then the schedule turns into an

18  operable schedule.

19  Q.  And that operable schedule is then distributed to

20  the public?

21  A.  It is.  So you think about the online travel

22  agencies, the global distributions channels, as well as

23  Spirit.com.

24  Q.  And with respect to this schedule distribution, am I

25  correct that Spirit starts selling tickets for flights

1    about 6 months before their departure?

2    A.  I would say that we like to start -- in a perfect

3    world we like to start selling new markets or new

4    cities, um, 6 months, 4 to 6 months out, but we try to

5    maintain at least a sellable schedule 6-plus months out.

6    So I would say between 6 and 8 months is what we shoot

7    for.

8    Q.  And is that for just new routes or is that for all

9    routes?

10   A.  That's for all routes.

11   Q.  Okay.  You just mentioned this, but just to put it

12   clear on the record, your team is involved in capacity

13   planning?

14   A.  Yes.

15   Q.  And capacity planning sets out which routes that

16   Spirit will fly and how often, is that a fair

17   assessment?

18   A.  Yeah, they pick the routes and then they pick the

19   frequencies for those routes, um, and then the schedule

20   group will turn it into marketable times.

21   Q.  And there's a monthly capacity planning process, is

22   that right?

23   A.  Yes.

24   Q.  And in addition, historically your team has put

25   together a 5-year capacity plan?

1    A.   Again, yeah, we usually put together a 5-year, um --

2    what would be the 5-year plan in January and the, like I

3    said, it generally is completed in April or May.  And

4    then the schedule group, if they have the bandwidth,

5    will build some schedules off it.  They have to share

6    with the operators so they can start thinking about what

7    we're looking at.

8    Q.   And so the 5-year capacity plan, it sets out which

9    routes Spirit plans to fly over the next 5 years of that

10   plan?

11   A.   Yes, that's what the 5-year does.

12   Q.   And it specifies how often each route would be

13   flown?

14   A.   It does have frequency as well.

15   Q.   And your team puts a lot of rigor into creating

16   these 5-year capacity plans, right?

17   A.   I would say there's less rigor in the 5-year plan.

18   I mean if you think about it in sort of the level of

19   rigor, the 5-year plan is really again, we know it's

20   going to change.  So it's more about a representation or

21   a proxy of what we think we might do and where we want

22   to grow.

23        And then the budget schedule is something that has

24   more rigor, which is at the end of the year and the

25   subsequent year, because we know that the entire

1    operating groups and the commercial groups are planning

2    their budget to that.

3        But the real rigor comes in the monthly capacity

4    plan when we're really looking at what's going on in the

5    industry at that moment, competition, economies, you

6    know our wherewithal when it comes to both pilots,

7    aircraft, and available block hours.

8    Q.  So when you are putting it together, it's Spirit's

9    best forecast as to how it grows networks over the next

10   5 years, right?

11   A.  At that point in time, yes.

12   Q.  And your team provides these 5-year capacity plans

13   to other departments at Spirit, right?

14   A.  We share it.  We're careful, um, who gets to see

15   that, because obviously it is confidentially worked in

16   the company, but we'd be sharing with some of the groups

17   including the stations and our financial group.

18   Q.  And then finance might consider the 5-year capacity

19   plan when building out its forecast models, right?

20   A.  They'll use it against their fleet plan.  Again, the

21   fleet plan's an input, so they'll use it for estimated,

22   um, I'll say ASM-generation departures and so on.

23   Q.  And before you left Spirit, Mr. Haag worked closely

24   with you to put together a 5-year capacity plan through

25   2027, right?

A.   Yes.

Q.   So, Mr. Kirby, as the Head of Network Planning at

Spirit, are you familiar with these 5-year capacity

plans?

A.   Yes.

Q.   All right.  I'd like to turn in your binder to

Exhibit 245.  And this is a pdf version of an EXCEL

spreadsheet.  And there's a cover sheet on it -- there's

actually two, one says "Meta Data" and the next is the

actual cover sheet that came when we printed the

document.

          THE COURT:  The exhibit is 245?

          MS. PEARL:  That's right.

A.   (Turns.)  Okay.

Q.   So the file name that's on this cover sheet right

here, it says "2022 to 2027, FYT Capacity 2022 0323 with

Data Dictionary."  Do you see that?

A.   I do.

Q.   And I'm sorry again, we note, at the request of your

counsel, that some language -- not here, but actually in

the EXCEL, has been redacted.

          So, Mr. Kirby, fair to say this is Spirit's 5-year

capacity plan for 2022 to 2027?

A.   Well again it's similar to earlier, it's at the

point in time when we were creating the revised 5-year

1    plan for 2022, um, again we do create a capacity plan

2    with it.  So that's what that is.

3    Q.  All right.  So let's go on -- it's the fifth page of

4    Exhibit 245.  I hopefully have tabbed it in your binder

5    for both of you.

6    A.  Yup.  (Looks.)  Okay.

7    Q.  The bottom of it says, um, "432 Markets."

8    A.  I'm there.

9    Q.  Okay, great.

10        So Row 1 of the table includes a header "Daily

11   Departures YE Annualized."  Do you see that?

12   A.  Yes.

13   Q.  And "YE" stands for "year-end," is that right?

14   A.  "Year-end," yes.

15   Q.  And "Daily Departures" just means the number of

16   daily flights?

17   A.  Yeah, it represents the number of daily flights

18   assumed for this period.

19   Q.  And then for 2023, which is Column E, these numbers

20   describe the number of flights Spirit intended to fly by

21   the end of 2023, correct?

22   A.  As again at that point in time in this document,

23   yes.

24   Q.  Okay.  You can put that document away.

25        So I want to turn to discuss Spirit's March 2022

1    application to the Department of Transportation to

2    operate 16 so-called "peak-hour runway timings" at

3    Newark.  I guess just to start, um, the Court has heard

4    about "slots," but can you explain the difference

5    between a "slot" and a "peak-hour runway timing"?

6    A.   Yeah, I admit it can be confusing.

7         So slotted airports, um, each carrier operate at a

8    -- Washington Reagan or La Guardia JFK, has to have a

9    specific slot, either to arrive or depart.  That's

10   called a Level 3 airport.  A Level 2 airport is referred

11   to as schedule coordination or coordinated, and so you

12   submit your schedules to the FAA and they look at the

13   schedules and they try to determine whether there's

14   going to be some operating challenges at that airport

15   given the schedules, and often they'll suggest, um, some

16   adjustments.

17        They try to be, you know, cognizant of historic

18   service, so in other words if you've been operating the

19   same service for many many years, they tend to try to

20   grandfather you if they can.  So new services would be

21   asked to get bumped before.  But in general what it is

22   is it's coordinated.

23        Newark is a little different and that's why I

24   wanted to give you the two differences that Newark is.

25   So Newark used to be a Level 3 airport, it used to be

1    slot controlled, and then it moved to a 2 level.  And

2    the FAA treats Newark a little differently than it does

3    the other Level 2 airports in that it has identified a

4    maximum number of operations allowable in any hour at

5    Newark, and the number is 79.

6         So during certain times of the day, carriers would

7    like to exceed that 79 departures, and the FAA, they

8    technically can't say no, but basically they frown on it

9    and generally the carriers place nice.  So between 07:00

10   and 8:59 and then 14:00 and 21:59, those are considered

11   to be the peak periods that in essence are almost like

12   slots.

13   Q.  So when it was --

14        THE COURT:  And just to follow up to fill it out,

15   and then those peak times will happen.  If they can

16   handle 79 routinely, what happens on the peak time?

17        THE WITNESS:  No, they -- the FAA won't approve

18   any operations above 79.

19        THE COURT:  I see.  But there's a little cheat

20   factor on other hours?

21        THE WITNESS:  No, the other hours, if they were to

22   get 79, then the FAA would frown on that as well.  So

23   the entire day is capped at 79.  But between the period

24   of 09:00, 13:59, there's less than 79 operations, so the

25   FAA doesn't restrict those, um, today.

```
1              THE COURT:  I see.
2              But at the peak hours, given historic usage, it
3       gets up to 79 and that's it?
4              THE WITNESS:  That's it.
5              THE COURT:  Thank you.
6       Q.  So at this time then in March of 2022, Spirit was
7       applying for 16 of these peak-hour runway timings that
8       had been relinquished by Southwest when it exited Newark
9       in 2019, correct?
10      A.  That is correct.
11      Q.  And Spirit applied to take over all of the 16
12      available timings, right?
13      A.  We were desirous of all 16.
14      Q.  Accessing these additional peak hour timings could
15      allow Spirit to fully use its gates at 8 departures per
16      gate per day, right?
17      A.  That is our target, yes.
18      Q.  And being able to fly 8 departures per day out of
19      Newark is particularly important because Newark is an
20      expensive airport to operate at, correct?
21      A.  Yes, it's important at Newark to fully utilize the
22      gate so you can spread the cost around.
23      Q.  Newark is today and was in March of 2022 a United
24      hub, right?
25      A.  Yes, it is.
```

```
 1    Q.  But despite this, Spirit has been successful in many
 2    markets touching Newark, right?
 3    A.  We have.  It's worked for us, yes.
 4    Q.  Including markets in which United competes, correct?
 5    A.  Including a lot of markets with United.
 6    Q.  And Spirit believes Southwest timings should be
 7    reallocated to a carrier that would provide competition
 8    to United, right?
 9    A.  We believe that because the initial allocation to
10    Southwest was specifically, um, divested to ensure
11    competition with United's Fortress Hub.
12    Q.  And one more clarification.  The EWR timings, are
13    those transferable by airlines?
14    A.  Um, no.  So I'm getting ahead, but ultimately we
15    were successful.
16    Q.  Okay.
17    A.  But the order that granted us those slots says that
18    they're not transferable.
19    Q.  And, I'm sorry, I said "EWR," but that's New York
20    International.
21    A.  Yeah, I'm familiar with that.
22    Q.  (Laughs.)  Okay.
23          So Spirit, in applying to all 16 timings, believes
24    that it would be best qualified to bring competition to
25    United, right?
```

A.   Certainly, yes.

Q.   In addition to Spirit, JetBlue and Alaska applied
for at least some of the relinquished timings at Newark,
right?

A.   They did.  I believe Allegiant did as well.

Q.   No other ULCC actually applied for the 16 Newark
timings though, right?

A.   Not the full 16, no.

Q.   In fact the only other airlines to apply for all 16
timings was JetBlue, correct?

A.   To my knowledge correct.

Q.   And the DOT selected Spirit over JetBlue, as you
just mentioned, to receive all 16 of these timings,
correct?

A.   They did.  I think part of it though was that
JetBlue was still in the NEA at that time, which gave
them a very large position in the New York area, I think
gave us an advantage.

Q.   But Spirit did address and meet all of the criteria
set out by the DOT, right?

A.   We did.

Q.   And, Mr. Kirby, you're familiar with the substance
of Spirit's application?

A.   I am.

Q.   All right.  Let's turn to Exhibit 319 in your

1  binder.

2  A.  (Turns.)

3  Q.  So this is a March 11th, 2022 e-mail from Joanne

4  Young to the Department of Transportation and you are

5  CCed.  Do you see that?

6  A.  (Looks.)  Yes.

7  Q.  Sorry, the CC is --

8  A.  Yes, we're at the bottom.

9  Q.  Oh, okay.

10      So, um, am I correct that as of March 11th, 2022,

11  Spirit was not in an acquisition agreement with JetBlue?

12  A.  Now you're testing my memory.  Um, I don't -- no, we

13  were not, I believe we were working with Frontier at the

14  time.

15  Q.  The e-mail here attaches Spirit's proposal to obtain

16  the 16 Newark runway timings, right?

17  A.  Yes.

18  Q.  And you believe the content of this application was

19  accurate, right?

20  A.  I do.

21  Q.  All right, let's turn to the Bates ending in 734,

22  Exhibit 319.

23  A.  (Turns.)

24  Q.  So under the title "Spirit is the Top Choice for

25  Receiving the 16 EWR Runway Timings," there are a number

1    of bullets that support this statement, correct?

2    A.  Yes.

3    Q.  They are not numbered, but counting, the 6th bullet

4    explains that "Spirit successfully competes with legacy

5    carriers at several major hubs," right?

6    A.  Yeah, so the ones that are listed.  Yes.

7    Q.  And Spirit was noting this because Newark is a

8    United hub, right?

9    A.  Yes.

10   Q.  All right.  If we could turn to the Bates ending in

11   738 of Exhibit 319.

12          THE COURT:  I missed it.  Say it again?

13          MS. PEARL:  738.

14          THE COURT:  Thank you.

15          MS. PEARL:  It's also Page 7 in the upper right.

16   Q.  So at the top it says "Spirit is the lowest fare

17   U.S. airline serving EWR today."  Do you see that?

18   A.  I do.

19   Q.  And looking actually at the second chart on this

20   page, that shows the average seats for departure, right?

21   A.  It does.

22   Q.  And it shows JetBlue, or B6, as having fewer average

23   seats for departure than Spirit or NK, correct?

24   A.  You said Spirit or NK?

25   Q.  Yeah.

1    A.   Oh, okay, I'm sorry.  Yes.  Yes, JetBlue had less

2    seats per departure than Spirit.  Yes.

3    Q.   In fact Spirit has the most seats for departure than

4    any of the airlines listed here, right?

5    A.   That is shown on this at the point in time, yes.

6    Q.   All right, let's turn to the following page of

7    Exhibit 319, it's Page 8, ending in 739.

8         And the first paragraph here further explains that

9    "Though the seat differences per flight may seem

10   relative small, Spirit generates many more seats to

11   compete with other airlines, which are offered to

12   consumers at low fares.  For example, the 41 seats-per-

13   departure difference between NK and B6 would translate

14   to over 30,000 more seats per year on just one more

15   daily flight."

16        Did I read that correctly?

17   A.   You did.

18   Q.   Spirit continues to have a higher average number of

19   seats per departure than JetBlue, right?

20   A.   I haven't done that analysis, um, recently, but I

21   think it's likely.

22   Q.   All right, let's turn to the Bates ending in 741 --

23        THE COURT:  Well that follows because you have

24   more seats on the plane?

25        THE WITNESS:  It does.

1          THE COURT:  All right.

2          THE WITNESS:  But I haven't looked at specifically

3    Newark, whether JetBlue -- because JetBlue does have a

4    larger-gauge aircraft, but they also have some smaller

5    gauges as well.  Any other mix of aircraft type, it's

6    possible that it could be different or maybe closer.

7          THE COURT:  Thank you.

8          Ms. Pearl, I'm sorry.

9          MS. PEARL:  No, it's fine.

10   Q.  So I'm going to turn now to Bates ending in 741 as

11   Exhibit 319.

12          And just for the record, this was accurate last

13   year in March of '22, what we're just talking about with

14   respect to the more seats per departure, right?

15   A.  Well at the time this document was put together, I'm

16   sure this data is accurate.  Yes.

17   Q.  Okay.  So we have a lovely yellow map here, but I'm

18   actually going to look at the header right below that.

19   It says "More than any other potential applicant, Spirit

20   offers the most competitive and reliable schedules."

21          Do you see that?

22   A.  Yes.

23   Q.  And then there's a paragraph below saying that "80

24   percent of Spirit's routes operate one-time daily or

25   more," correct?

1    A.   That's correct.

2    Q.   Today Spirit still operates around 80 percent of its

3    flights once a day or more, correct?

4    A.   Actually it's higher.  I was actually looking at it

5    for another thing I was interested in.  And, for example

6    in our October schedule, it's almost 100 percent.  And

7    then we've seen some of our competitors change as well.

8    Frontier is nearly 80 percent now.  So it's been a

9    little bit of an adjustment.

10   Q.   So I guess you sort of, um, preempted my next

11   question because the following sentence, um, explains

12   that Frontier and Allegiant offer one-time daily service

13   or more on only 25 percent and 11 percent of their

14   routes.

15        Do you see that?

16   A.   Yeah, I'd say at this point in time.  I would say

17   though that that is different today.

18   Q.   And is it -- it's not as high, Frontier's is not

19   as high as Spirit's, correct?

20   A.   Frontier's is about as high as Spirit was, in this

21   period, and then Spirit has actually gotten larger.  And

22   Allegiant is a little higher, they're almost 20 now.

23   Q.   Okay.  So Spirit is informing, or was informing the

24   Department of Transportation at this time, that Frontier

25   and Allegiant don't typically have schedules that are

1    competitive in large markets as those Spirit offers,

2    correct?

3    A.   They don't fly as often daily as we do, yes.

4    Q.   And just looking at the header there it says "More

5    than any other potential applicant, Spirit offers the

6    most competitive and reliable schedules," right?

7    A.   Yeah, again this is an advocacy piece, but, yes, I

8    would say that's accurate.

9    Q.   All right, let's turn to Page 15 -- or sorry, Bates

10   ending 726 of Exhibit 319.

11   A.   (Turns.)

12   Q.   And halfway through the page there's another header.

13   It says "Spirit has a well-established history of

14   staying power against dominant incumbent carriers at

15   Newark and in many other domestic and international

16   markets," right?

17   A.   Yes.

18   Q.   And do you agree with this header?

19   A.   I do.

20   Q.   What is a "dominant incumbent carrier"?

21   A.   Um, we have talked about that before, but Newark at

22   United would be considered a dominant carrier.  And DFW

23   American would be considered a dominant carrier.  And

24   just to round it out, Atlanta Delta would be considered

25   a dominant carrier.

1    Q.   All right.  Going now down to the Bates ending in

2    752 of Exhibit 319, Page 21, it's a few pages forward.

3    A.   (Turns.)

4    Q.   Okay.  There's a header underneath the colorful

5    draft that says "Spirit has one of the best track

6    records among both legacy and low-fare carriers for

7    serving markets over the long term."  Is that right?

8    A.   Yes.

9    Q.   And these markets include what we're just talking

10   about, markets against these dominant incumbent

11   carriers, right?

12   A.   Yes, that's what it says.

13   Q.   And it just means that Spirit typically exits

14   markets less frequently than other carriers?

15   A.   Historically that is accurate.

16   Q.   All right.  Turning to the next page, so it ends in

17   753.

18   A.   (Turns.)

19   Q.   And there's a chart there of routes cut by airlines

20   July 2019 versus July 2018.

21        So we talked about some of these airlines

22   yesterday, both Frontier and Allegiant, but I want to

23   actually look at the paragraph -- there's two paragraphs

24   below that chart and in the second paragraph, the second

25   sentence reads "Other carriers like Avelo and Breeze,

1   both of which are less than a year old, have small

2   fleets.  More importantly, they do not have a proven

3   track record for competing against legacy carriers as

4   their business models are designed to avoid head-to-head

5   competition with legacy airlines," right?

6   A.   That's what it says.  And again it's about a year

7   and a half ago, so they are a little more mature and

8   they're a little bigger now too.

9   Q.   But you do believe it's still the case that Breeze

10   and Avelo don't have proven track records for competing

11   against legacy carriers, right?

12   A.   I think that's fair.

13   Q.   And you believe it's still accurate that the

14   business models of Breeze and Avelo are designed to

15   avoid head-to-head competition, is that fair?

16   A.   Yeah, I think that's relatively correct stuff.

17   Q.   All right.  So with this proposal, Spirit hoped to

18   show the Department of Transportation that it could

19   trust Spirit to stay in Newark, right?

20   A.   Yes.

21   Q.   And it could trust Spirit to compete on routes

22   against United, correct?

23   A.   Yes.

24   Q.   And it also hoped to show the Department of

25   Transportation that Spirit historically had a better

1    track record of staying and competing against incumbent
2    carriers than other applicants, right?
3    A.  Yeah, we felt we were the right choice.  Again this
4    was a -- we were trying to win basically a, you know, a
5    contest, right, so we're trying to put our best foot
6    forward.  But I believe everything here is accurate.
7    Q.  And again Spirit did win all 16 of these timings,
8    right?
9    A.  Yes, we did.
10   Q.  All right.
11       MS. PEARL:  No further questions, your Honor.
12   Pass the witness.
13       THE COURT:  Okay.  Thank you.
14       THE COURT:  Mr. Finch?
15       MR. FINCH:  Your Honor, if I may just put the
16   podium up here?
17       THE COURT:  Of course.
18
19   CROSS-EXAMINATION BY MR. FINCH:
20   Q.  Good morning, Mr. Kirby.
21   A.  Good morning, Mr. Finch.
22   Q.  I'd like to start with a few follow-up questions
23   from yesterday about your background.
24   A.  Sure.
25   Q.  Yesterday, um, Ms. Pearl asked you about your work

1    at AirTran, and she asked you whether AirTran was

2    acquired by Southwest Airlines.  Do you recall that?

3    A.  I do.

4    Q.  And you testified that you ran the AirTran

5    scheduling group before the merger with Southwest?

6    A.  Oh, I ran both the planning and the scheduling group

7    at AirTran.

8    Q.  And at that time was AirTran in the nature of a

9    low-cost and ultra-low cost carrier?

10   A.  Um, I would say that our cost structure would be

11   that of an ultra-low cost carrier, but the nomenclature

12   didn't exist at that time.

13   Q.  And at that time was Southwest in the nature of a

14   low-cost carrier.

15   A.  I'd say they were probably closer to a low-cost

16   carrier at that time as well.

17   Q.  And was that merger between Southwest and AirTran

18   consummated?

19   A.  It was.

20   Q.  After the merger, you continued to run AirTran's

21   scheduling group for a period of time?

22   A.  I did as well as set up their international group.

23   Q.  And based on that experience, do you recall whether

24   the Department of Justice challenged the AirTran

25   Southwest merger?

1   A.  I recall --

2        MS. PEARL:  Objection, your Honor, leading.

3   Outside the scope.

4        THE COURT:  Well we talked about this leading.

5   You called him as an adverse witness.  In this session

6   of the court, they are allowed to lead, but they may

7   talk only about those things that you covered in your

8   direct.  They may recall the witness if they want to go

9   further.  It is outside the scope.  Sustained.

10       MR. FINCH:  Your Honor, may I ask a question?  Our

11  understanding with prior witnesses is that we would

12  incorporate our direct, some of our direct during the --

13       THE COURT:  She's objected.  I mean I just follow

14  the rules.  If there's no objection, I've been taught to

15  keep by mouth shut, unless there's exceptions to that,

16  which deals with competency and prior, um, sexual acts

17  and things like that.  Other than that, I keep my mouth

18  shut.

19       She's not going along with your understanding.

20  She's objected.  Sustained.

21       MR. FINCH:  Okay.

22       If I may, your Honor?

23       THE COURT:  You may.

24  Q.  I just wanted to follow up on that.  One more point.

25       The proposed joint pretrial order says that a

1    party conducting a cross-examination will be permitted

2    to go beyond the scope of the direct for witnesses on

3    that party's final witness list, and Mr. Kirby is on our

4    final witness list.

5            THE COURT:  Oh, I agreed to that.  All right.

6            What do you say to that?

7            MS. PEARL:  I don't believe Mr. Kirby is on their

8    final witness list, and that they just can't lead with

9    the questions or things that are --

10           THE COURT:  No, no, it's determined by the final

11   pretrial order, which I've signed.  I stand by what I've

12   agreed to, because you apparently are all agreed.

13           MS. PEARL:  Yes, your Honor, I think the issue is

14   we don't believe Mr. Kirby is on their final witness

15   list.

16           THE COURT:  You don't have the paper in front of

17   you?

18           You people are masters of the paper.  (Laughs.)  I

19   should simply say "Show me the document," and it

20   appears.

21           MR. FINCH:  If I may, your Honor?

22           THE COURT:  Yes.

23           MR. FINCH:  Defendants reserved the right on our

24   witness list to call on direct any of the witnesses that

25   the government put on their final witness list.  So we

1   made it very clear that we had intended to call

2   Mr. Kirby potentially as a direct witness after the --

3            THE COURT:  Fine, well that goes along with my

4   ruling.  You may call him.  But her objection is

5   sustained because the agreement doesn't go that far.

6   He's not on your list.

7            MR. FINCH:  Understood, your Honor.  Thank you.

8            THE COURT:  But of course he may be recalled.

9            MR. FINCH:  Okay.

10  Q.  Moving on.

11           Mr. Kirby, Ms. Pearl did ask you a number of

12  questions just this morning about Newark and these

13  Southwest slots.

14           Do you remember that?

15  A.  She did.

16  Q.  Yeah, I'm sorry "landing authorizations" to be

17  precise.

18           Do you, um -- do you know where Southwest got

19  those landing authorizations?

20  A.  Yeah, they were given to Southwest by -- well

21  obviously the divestiture required to allow the

22  Continental, United merger.

23  Q.  Thank you.

24           Mr. Kirby, I'd like to ask a few questions about

25  network planning following up on Ms. Pearl's questions

1    yesterday.

2        What goals do you try to achieve when planning

3    Spirit's network?

4    A.  Yeah, I have a phrase I like to use, that "We try to

5    maximize profitability while maintaining long-term

6    sustainability."

7    Q.  And to what extent do you approach developing

8    network strategy from the perspective of a network as a

9    whole?

10   A.  Yeah, one of the things I use a lot, I talk about

11   relevance and portfolio.  So I think about it as if you

12   serve a market with only one destination, you're not

13   really relevant to that population.  But the more

14   nonstop destinations, the more important nonstop

15   destinations you serve from that city, the more

16   relevant, the more likely a consumer will consider

17   flying your airline.  And then you raise it up to the

18   network level and then it's really about what kind of

19   mark, what cities you serve across, what geographies.

20       You know I mentioned yesterday about

21   aspirationally becoming a national airline.  So the

22   more, um, I'd say important dots in a map that we serve

23   in the U.S. and in Latin America, we're better able to

24   compete with other airlines, other national airlines.

25   Q.  And to what extent, if any, Mr. Kirby, is achieving

1    relevance on a national level an important part of

2    Spirit's network strategy?

3    A.  It's a very important part, because I believe as we

4    grow, um, we need to offer, not only in the city, but

5    also nationwide in the geographies which compete, the

6    destinations people want to go.

7    Q.  And to what extent does Spirit view its overall

8    network as competing with other airlines' networks?

9    A.  Very much so.  You know we already look at it as

10   everything we do ultimately is an aggregation and it's

11   our product that we compete with other carriers with.

12   Q.  And you testified yesterday that the network is made

13   up of cities and origins and destination pairs.  But is

14   there anything more to the network than cities and

15   origin and destination pairs?

16   A.  More to the network?  Um, again it's -- again I look

17   at it as kind of that portfolio approach where I'm

18   thinking about how they all connect together and, you

19   know, we serve it as a product.  We offer it as a

20   product rather.

21   Q.  I'd like to focus now on following up on some

22   questions you got about the network planning process at

23   Spirit.

24        How often does the network planning team consider

25   making changes to Spirit's network?

1    A.   I would say constantly.

2    Q.   And at a basic level what kinds of changes does the

3    network planning team consider making?

4    A.   At a basic level, you know we're studying what's

5    happening in the industry, it's changing all the time.

6    You know some events we anticipate and some events we're

7    surprised by.  You know even last week I was surprised

8    by some events.  But typically we make frequency

9    adjustments, we may add frequency, we may add day of

10   week frequency.  And then conversely we may pull

11   frequency down, we may exit routes, we may add routes.

12   So a lot of adjustments.

13   Q.   So how often, Mr. Kirby, does Spirit actually make

14   changes to its network?

15   A.   Well I like to think of it as we're -- it's very

16   much a fluid process through the whole capacity planning

17   process each month.  So I'll be sending information to

18   my team that's putting it together, suggesting things or

19   asking to look at certain things.  And then ultimately

20   it culminates in a review that I do with them and then

21   we hand that off.  So generally it's represented

22   monthly, although in any given week we could load new

23   changes to any month.

24   Q.   And in your experience, Mr. Kirby, how often is it

25   the case that Spirit's capacity plan for one month is

1  exactly the same as the capacity plan for the prior

2  month?

3  A.  Wow.  I'm trying to think if there's -- I mean I'd

4  say almost never.  Maybe, um, because again there's a

5  lot of inputs, there might have been a period where, you

6  know, certain periods maybe have similar demand, so we

7  had June and July, and if there's no changes to the

8  fleet plan you might -- I think maybe one summer we had

9  the same June and July schedule.  But generally that

10  never happens.

11  Q.  I'd like to focus on Spirit's decision-making when

12  it's considering specifically to enter new routes for a

13  moment.

14       To what extent, if any, does Spirit consider

15  whether an airline that's not already serving on a route

16  may decide to enter that route and start serving that

17  route?

18  A.  We do think about that.

19  Q.  Can you provide an example of when Spirit has

20  considered potential entry by another airline when

21  making its own decision about whether to enter a route?

22  A.  Yeah, I mean there's two that pop in my head.  One,

23  I remember meeting with some people from Hartford

24  Connecticut and they were strongly pitching a nonstop

25  service to Nashville which had no nonstop service at

1    that time, and it was intriguing, it fit, you know, our

2    type of model.  But I was sure that Southwest would go

3    in if we went in, so I decided not to do that.  Because

4    I thought it was viable for one carrier, but not two.

5    Q.  And what happened with the --

6    A.  Southwest did go into that market.

7    Q.  Any other example to --

8    A.  Oh, yeah, the other one, because it's more recent,

9    was, um, both United and American don't serve Oakland,

10   um, and I'm not sure why American doesn't serve Oakland,

11   but my presumption is that, um, because United has a

12   such large operation in San Francisco, they don't serve

13   Oakland airport as well.  And we worked with Oakland

14   Airport and at one point there were 19 flights in the

15   New York area to Oakland and today there are none, or

16   there were none.  And so they offered us a fairly

17   attractive incentive program to go into that market.

18   But in the back of my head I was thinking "I wonder if

19   this is enough to get United in the market?"  But we did

20   go forward anyway and at this point United has not

21   entered.

22   Q.  And is it fair to say, Mr. Kirby, that when you're

23   thinking about entering a route that's connected in some

24   ways to Newark, um, you always think about whether

25   United might enter that route as well?

1   A.  Yeah, certainly.  You know I mentioned some Fortress

2   Hubs, but I'm saying for the Fortress Hub carriers, it's

3   always a consideration, especially United.

4   Q.  Mr. Kirby, I'd like to ask you now about a different

5   decision in which is the decision to exit a particular

6   route that Spirit is already flying.  What factors does

7   Spirit take into account in deciding to exit a route?

8   A.  Yeah, it's at a long process.  You know we talked

9   earlier.  We typically like to have a stability in our

10  schedule and, um, when we make the decision to go into a

11  new city or a new route, we try to make it work.  We try

12  to be patient.  Sometimes we may have to adjust the

13  cities we serve.  We may pull the frequencies down, go

14  to a day a week, to try to kind of nurture the city

15  along.  And it's only when we've exhausted all our

16  options that we make the exit.  I'd say historically we

17  have not exited many cities.

18  Q.  And how if at all has the frequency of Spirit

19  exiting a route changed more recently?

20  A.  Yeah, um, we're in very unique times.  We went

21  through a challenging, I would say, first half of the

22  year with pilot attrition, really quite the spikes.  So

23  we're in this situation where we had aircraft and we

24  didn't have pilots.  We're also facing I'd say -- you

25  know we haven't been profitable for a number of quarters

1    now and I think that's obviously something we need to

2    get back to.

3          And then I would say frustratingly, once we got

4    enough pilots, and we started putting more and more

5    planes on the ground, we found out about this powdered

6    metal issue sometime at least I think in early to mid

7    July is my recollection, because I remember my team had

8    to go through a lot of hoops of pulling aircraft.  We

9    had to pull 7 aircraft out of the September schedule the

10   day before it went final to react to the situation.

11   Q.  And just so the record is clear, that powdered metal

12   issue, is that referring to something you mentioned

13   yesterday involving a Pratt & Whitney engine?

14   A.  It is.  It's, um -- we've gone through challenges

15   with Pratt & Whitney and quite frankly in the first half

16   of the year we generally had about 5 or 6 aircraft on

17   the ground in any given month because of the backup in

18   the maintenance and overhaul realm.  It typically would

19   take about 120 days to do the maintenance and now it's

20   taking about 300 days, because it's taking longer to end

21   up, and then the maintenance is taking longer because of

22   the backup.  So that was an ongoing issue.  But it was

23   manageable.

24         But this new issue is a lack of either records of

25   the inspection or the inspection wasn't done.  And so

1    what they need to do is they need to remove these
2    engines, take them apart, inspect the disk, I guess for
3    cracks they have to take X-rays, and then they have to
4    put it all back together.
5         And so we're now up to 11 aircraft on the ground
6    in December of this year and we're going to 20 on the
7    ground on January 10th of next year.  And the projection
8    right now is it's going to be at least 45 by the end of
9    the year and 72 at the apex in 2025.  So on one hand you
10   could say maybe it could change, but everything that's
11   happened seems like it's getting worse and worse.
12   Q.  I'd like to ask you now about the decision to
13   completely exit the city, which you testified about
14   earlier.
15        First of all, for the sake of clarity, can you
16   explain how exiting a city differs from exiting a
17   particular route?
18   A.  Yes.  Again if you exit a city, you're removing all
19   service from that city, and I used the nomenclature
20   earlier, taking a dot off your map.  Whereas if we're
21   exiting a route, presumably that you would still have
22   some service level from that city, or airport.
23   Q.  And you testified yesterday that Spirit had aims to
24   stay in perpetuity in a city after it enters?
25   A.  Yes, um, you know that's something that I feel very

1  strongly, that if you're going to a market or a city

2  with the idea that you might exit, I think that's a

3  fool's errand.  So of course you've done your homework

4  on the front end and you believe it will be successful

5  or you wouldn't invest a, you know a $45 million

6  aircraft or multiple $45 million aircrafts in a venture.

7  Q.  So to what extent, if any, Mr. Kirby, has Spirit

8  recently found it necessary to exit cities more

9  frequently?

10 A.  Yeah, again it's because of this GTF issue, um, it's

11 making us take a much harder look at all of our

12 services, including markets that have been

13 underperforming that we've been trying to coax as well

14 as markets that maybe historically hadn't been as strong

15 in certain seasons, but because of continuity we tried

16 to maintain year-round service, and now we're going to

17 have to look at season service.

18       THE COURT:  Forgive my inability to keep up with

19 the acronyms.  The "GTF" issue is?

20       THE WITNESS:  Sorry, your Honor, it's the powdered

21 metal GTF --

22       THE COURT:  Understood.

23       Go ahead.

24 Q.  Mr. Kirby, I'd like to ask you now about 5-year

25 plans, somewhat generally.

```
 1        I believe you mentioned that your team prepares a

 2   5-year plan more or less annually?

 3   A.  Yes, we do it annually.

 4   Q.  Why do you need to prepare it annually if it's a

 5   5-year plan?

 6   A.  Because this is a very dynamic industry that's

 7   constantly changing.  Quite frankly, even by the time we

 8   get to the budget plan, which is only a month or two

 9   later, it's already stale.

10   Q.  Mr. Kirby --

11        MR. FINCH:  Your Honor, you both have received

12   binders of exhibits on behalf of defendants, and I'd

13   like you to turn to Tab 1 of that binder, which should

14   be Exhibit 285.

15   A.  (Turns.)

16   Q.  And this is actually an exhibit that Ms. Pearl asked

17   you about earlier today and yesterday.

18   A.  I see it.

19   Q.  Okay.  And I believe you testified that this is the

20   board of director's meeting that it includes the 2019

21   network plan.  Is that correct?

22   A.  That's correct.

23   Q.  And, um, if you turn to the page ending with the

24   Bates number 6062.

25   A.  (Turns.)  Okay.
```

1    Q.   It's the Executive Summary that Ms. Pearl asked you

2    about yesterday.

3    A.   Okay, yup, we're there.

4    Q.   And I'm not going to keep you there very long.  But

5    I just wanted to ask you to look at that and then turn

6    to the prior page, which Ms. Pearl did not ask you about

7    yesterday.

8    A.   Okay.

9    Q.   It says at the top "Value of the 5-Year Plan"?

10   A.   Yes, sir.

11   Q.   And what was the purpose of including this slide in

12   the 5-year plan?

13   A.   Yeah, um, as we talked about yesterday, prior to my

14   joining Spirit Airlines, Spirit Airlines didn't have a

15   5-year plan, it was not part of the processes.  And so

16   this is a brand new, um, I would say analysis that, um,

17   they hadn't seen before.  So I wanted to make sure that

18   not only our Senior Executive team, but also our board

19   of directors understood what it is and what it isn't.

20   Q.   And I'd like to direct your attention to the second

21   subbullet point on that slide, which says, quote,

22   "Establishes a growth plan based on current industry

23   dynamic/opportunities."

24        Do you see that?

25   A.   I do.

1   Q.   Why did you feel it was important to point that out

2   to the board?

3   A.   Because again it's that point in time reference that

4   I've used a few times.   It's what -- based on what we

5   see right now looking out into the future what we might

6   look like.   But we also know that industry dynamics

7   change all the time, competition, economies, pandemics,

8   there's always something that derails a plan.   But what

9   I like about a 5-year plan is then we see, you know, a

10  digression from the plan, you have more visibility to

11  the impact of that digression.

12  Q.   And the third subbullet point there says, quote,

13  "Provides a tool to assess downline impact of plan

14  deviation for improved decision-making."   Do you see

15  that?

16  A.   I do.

17  Q.   And what was the purpose of telling that to the

18  board?

19  A.   Yeah, I guess I already answered that question.   But

20  again the point really is that, um, often when you're

21  doing things month to month you can get lost in the

22  minutia of it all.   And what I liked about the 5-year

23  plan is it puts out a road map, a vision, a strategy for

24  where the company might go.   And I use the word

25  "aspirational" a lot as well.   But I also think it gives

1    you, you know, better visibility to, when you deviate

2    from that plan, you can really understand the downline

3    impact of that deviation, and that's a consideration as

4    you move forward.

5    Q.  Mr. Kirby, I'd like you to turn, if you would, to

6    the slide that ends with the Bates number 6074, and

7    that's on the deck, it's Slide Number 43.

8    A.  (Turns.)  Okay.

9    Q.  I believe you can confirm for me that this is the

10   last slide of that presentation to the board?

11   A.  It is.

12   Q.  And, um, what was the point of including this slide

13   at the end of your presentation?

14   A.  Just to summarize what I wanted to be the take-away

15   from the board.  So why are we doing this?  Why it's

16   meaningful?  So again it's designed for a strategy of

17   vision.  I'll first take the CEO through this.

18        So in this case Ted would say, "Yes, this makes

19   sense to me, this makes sense in how we would grow."

20   And then again, as I mentioned earlier, just sort of it

21   gives people an opportunity to see what we might look

22   like 5 years from now.  It's helpful for the operators

23   to at least see where we might be looking to grow or

24   work very closely with our corporate real estate people.

25        It also gives finance a little bit more, I would

```
 1    say, tangibility to their multi year financial plan.

 2    And, you know, the Bullet Point 4 I think is a really

 3    good one, which is we know market conditions are going

 4    to change, so we want to be flexible.  We want to create

 5    this and its ability to be flexible.

 6    Q.   Okay, I recognize you're jumping around a little

 7    bit, but if you could now turn to the slide ending with

 8    the Bates numbers 6072, the Slide Number 41 in this

 9    deck, and this is a slide that Ms. Pearl asked you about

10    earlier this morning.  Let me know when you're there.

11    A.   I'm there.

12    Q.   Okay.  Ms. Pearl went through, um, made a list and

13    created a demonstrative identifying the markets that

14    Spirit had entered on this slide, and some additional

15    markets it actually entered in addition to what's on

16    this slide.  But let me ask you.

17         Can you identify the cities on this slide that

18    Spirit has not entered?

19    A.   Yes, I can.

20         THE COURT:  As I understand the demonstrative,

21    it's all the ones that he did not list when she was

22    asking the questions.

23         Is that right?

24         THE WITNESS:  That is correct, your Honor.

25         THE COURT:  Yeah.  All right.
```

1          MR. FINCH:  Okay, I'm happy for us to take it

2     down.

3          THE COURT:  I mean that's what I got, and my notes

4     reflect that.

5          All right.

6          MR. FINCH:  That's perfect.

7     Q.  Another question with regard to this or the time

8     period.

9          Mr. Kirby, between 2019 and 2023 this year, did

10    Spirit exit any cities that were not listed on this

11    table?

12    A.  Yes.

13    Q.  Can you think of an example of a city that was

14    exited before covid?

15    A.  We did exit Ashville, North Carolina before covid.

16    Q.  Why did Spirit exit Ashville?

17    A.  Um, we had entered prior to my joining the company,

18    but the -- the performance -- and again similar to what

19    I said before, we tried different markets, we tried

20    different frequencies, we just couldn't get any

21    traction.  And so financially it was unpalatable and we

22    decided to exit the market.

23    Q.  Thank you, Mr. Kirby, you can put that exhibit

24    aside.

25          While we're on the subject of 5-year plans, I'd

1    like you to turn to Exhibit 307, please.  It should be

2    Tab 2 in your binder.

3    A.   (Turns.)

4    Q.   And this is 307 in evidence.  Let me know when

5    you're there, Mr. Kirby?

6    A.   I'm there.

7    Q.   Okay.  So, um, let's start from the beginning, that

8    there's a cover e-mail correct, um -- dated July 7th?

9    A.   Yes.

10   Q.   And can you tell me what that cover e-mail indicates

11   to you about Exhibit 307?

12   A.   Yes, that was Mr. Haag letting me know that he had

13   made the final adjustments that I had recommended and

14   offered to set a time to take Matt Klein, who's our

15   Chief Commercial Officer, and Ted Christie, our CEO,

16   through the deck.

17   Q.   And this deck is the 2021 update to the 5-year plan?

18   A.   Yeah, and so it really is the 2021 5-year plan.

19   Q.   And did you oversee preparation of the 2021 update

20   to the 5-year plan?

21   A.   I did.

22   Q.   And as far as you know this is the final version?

23   A.   I believe it is.

24   Q.   Would you please turn to the second page, which ends

25   with the Bates number 2045.

1    A.   (Turns.)

2    Q.   It should be a map, unless I'm mistaken.  Well maybe

3    it's the third page.  Well maybe it's -- it should be --

4    you know what?  I'm mistaken.  It's near the end.  It's

5    Slide 59, ending with 205.  My apologies.

6    A.   Okay.  (Turns.)

7    Q.   It's a map.

8    A.   (Turns.)

9    Q.   Are you there?

10   A.   I am.

11   Q.   Okay.  So, Mr. Kirby, this says at the top, "Was

12   targeting at least 23 new cities to add to the network."

13   Is that correct?

14   A.   That's correct.

15        MR. FINCH:  And then just for the Court, the map

16   itself has been redacted so it's not being shown to the

17   gallery.  You should have a copy in front of you.

18        Your Honor, since this map was fairly illegible,

19   we've actually created a demonstrative that recreates

20   this map, and that is what Kirby Demonstrative 1 is.  So

21   if you want to look, you can see that Kirby

22   Demonstrative 1 --

23        THE COURT:  Thank you.  Do I have it?

24        MR. FINCH:  You should have it in the pocket of

25   your binder, your Honor.

1          THE COURT:  Thank you.  I do.  Yes.  And it is

2    more legible.

3    Q.  Mr. Kirby, can you please tell the Court what this

4    slide was intended to show?  And please don't identify

5    any particular cities that are on the map.

6    A.  Yeah, I would view this as a representation of, um,

7    that table slide that we also provide usually in those

8    5-year plan decks of the cities, the new cities that

9    we're contemplating entering during that 5-year window.

10   Q.  And, Mr. Kirby, can you tell the Court of the 23

11   cities identified on Kirby Demonstrative 1, how many of

12   those 23 has Spirit actually entered since 2021?

13   A.  Yeah, let me take a look.  (Looks.)  10.

14   Q.  Thank you.  So if 23 cities are listed, it's fair to

15   say that if you actually entered 10, then 13 cities in

16   total were not entered, is that correct?

17   A.  That's correct.

18   Q.  Thank you.

19          Of the 13 cities that Spirit has not entered, can

20   you tell me, Mr. Kirby, to what extent Spirit has plans

21   to enter any of them by 2025?

22   A.  Yeah, I would say right now, um, because of the GTF

23   issue, um, it's unlikely that we'll add many new cities

24   in the next two years.

25   Q.  And you've mentioned the GTF issue.  What has been

1    the overall impact of the GTF problem on Spirit's

2    network so far?

3    A.   Yeah, again it's forcing us to uninvest, um, let's

4    say prioritize even more, pull down portfolios in some

5    cases.  You know there's a lot of risk associated with

6    reducing what we've built up.  We're giving competitors

7    opportunities to, you know, come in in a backdoor

8    capacity, it might make it more difficult for us to

9    reenter in the future.  We may risk some real estate as

10   well.  So again it's very unfortunate.

11   Q.   You can set that aside, Mr. Kirby.

12       And I'd like you to turn to Exhibit 331 in your

13   binder, which is, um, in evidence, and I'd like to ask

14   you what is that when you get there?

15   A.   Um, yeah, we saw this earlier.  This is the most

16   current version of the 5-year plan that we did in May of

17   this year.

18   Q.   To what extent, Mr. Kirby, were you aware of the

19   magnitude of the Pratt & Whitney GTF engine issue when

20   you presented this 5-year plan to the board?

21   A.   Um, I was totally unaware of the powdered metal GTF

22   issue.  I was aware of the teething issues.  And my

23   recollection is, in the 4-year plan for 2023, it more or

24   less stabilized again between 4 and 6 aircraft a month.

25   Q.   Okay, Mr. Kirby, I'd like you to turn, if you would,

1    to the slide that ends with the Bates Number 2235.  The

2    deck itself doesn't have slide numbers on it.  So that's

3    the one to look for in the lower right-hand corner.

4    Please let me know when you're there.

5    A.  Okay, I'm there.

6        MR. FINCH:  And, your Honor, this slide also has

7    been redacted for confidentiality reasons.  But, um,

8    you've got the unredacted version.

9    Q.  Mr. Kirby, can you tell me what this slide shows?

10   A.  Yeah, again it's a similar table that we've seen in

11   previous 5-year decks, but it shows the anticipated new

12   cities by year that we would plan to enter as

13   contemplated when we created this presentation.

14   Q.  And without identifying any of the cities or

15   airports, can you tell us how many new domestic cities

16   are listed under the column under the Year 2024?

17   A.  Um, there's 5 domestic cities.

18   Q.  And is Spirit still planning to enter any of those 5

19   domestic cities in 2024?

20   A.  No, at this time we're not planning to enter any of

21   them.

22   Q.  Turning to the column under the Year 2025, can you

23   tell me how many cities are listed there?

24   A.  5 as well.

25   Q.  And to what extent, if any, does Spirit anticipate

1    that it will enter any of those cities in the year

2    indicated?

3    A.   Again with what I know about the GTF issue right

4    now, I think opening new cities is going to be towards

5    the bottom of our opportunity set.  New cities

6    inherently have a lot of risk associated with them.  It

7    certainly doesn't preclude us from considering new

8    cities, but I would say the bar is much higher than it

9    was in the past.

10   Q.  I'd like to direct your attention to the page ending

11   with the Bates Number 2238 in this exhibit.

12   A.  Okay.  (Turns.)

13   Q.  And I'm just going to ask you questions about the

14   small table in the middle.  Are you there?

15   A.  I am.

16   Q.  And can you tell me what that small table in the

17   middle is supposed to show?

18   A.  It's showing the delta between the year ending 2027,

19   departure and number of cities served, versus the year

20   ending in the second quarter of 2023.

21   Q.  Under the 2027 column, what does the slide indicate

22   as to the number of anticipated departures for Spirit by

23   2027?

24   A.  1386.

25   Q.  And as you sit here today as Spirit's Vice-President

1    of Network Planning, what's your best judgment as to

2    whether Spirit will average 1386 daily departures by

3    2027?

4    A.   I think it's incredibly unlikely.

5    Q.   And under the 2027 column, what does this slide

6    indicate as to the number of cities that are anticipated

7    to be served by Spirit by 2027?

8    A.   115.

9    Q.   And again as Spirit's Vice-President of Network

10   Planning, what is your best judgment as to whether

11   Spirit will serve 115 cities by 2027?

12   A.   Again highly unlikely because even the 2023 number

13   now is lower than it -- it's lower now than it was in

14   the second quarter of 2023.

15   Q.   And, Mr. Kirby, I believed you testified yesterday

16   that you have almost 40 years of experience in network

17   planning, is that correct?

18   A.    Actually a little over -- oh, network planning?

19   I'm sorry.  I apologize.  A little over 34.

20   Q.   34.  Thank you.

21        And, Mr. Kirby, what extent, if any, have you ever

22   experienced a situation like this during your career?

23   A.   I've never seen anything of this magnitude.  I've

24   certainly seen grounded fleets and different issues.

25   There were hydraulics in DC 10s or MV 80s, you know.

1   But I've never seen this many aircraft project to be on

2   the ground for this long a time period.

3   Q.  Mr. Kirby, yesterday you were asked some questions

4   about cities that, um, Spirit has recently exited, and

5   I'd like to follow up on that.  Starting with asking you

6   to just identify, if you could, cities that Spirit has

7   exited or suspended service to in 2023?

8   A.  Yeah, I guess going in sequential order, um, we

9   talked about Charleston, West Virginia, which we exited

10  in early May of this year.  And then subsequently it was

11  Monterey, Mexico, which I think we ended the service in

12  September.  Puerto Vallarta -- so I should clarify too,

13  both of those were exits.

14        Puerto Vallarta and Cabo, and in early November,

15  so right around now, um, they are service suspensions,

16  so we hope at some point in the future to be able to

17  return to those markets.  Agua Dia and Ponce, Puerto

18  Rico, also service suspensions, exits start in early

19  December of this year.  And again those are markets that

20  we hope to return to at some point in the future.

21        And then finally, um, just recently we announced

22  -- or didn't announce, but we're going to exit Denver,

23  Colorado, and we're going to suspend service to

24  Bucaramanga, and that occurs with the January schedule

25  change.

1   Q.  Is it possible to say, um, with regard to all of

2   those exits and suspensions, what was the driving factor

3   behind that decision-making?

4   A.  Again it was lack of either profitability overall,

5   particularly in the case of exits, or it was, um, lack

6   of profitability in certain seasons of the year for the

7   suspensions.

8        MR. FINCH:  Your Honor, yesterday Ms. Pearl showed

9   you Kirby Demonstrative 2 and there's another version of

10  that in your binder, it should be in the left-hand-side

11  pocket.  Actually we've got two copies this time, one of

12  them is printed on 11 by 17 paper, so it's a little bit

13  more legible.

14  Q.  Do you have one, Mr. Kirby?

15  A.  It doesn't look like I have it, but I should be okay

16  with the screen.

17       MR. FINCH:  Did you find it, your Honor?

18       THE COURT:  I did.

19       MR. FINCH:  Okay.

20       As Ms. Pearl indicated yesterday, Kirby

21  Demonstrative 2 is a reproduction of the exhibit from

22  the expert report of Dr. Gowrisankaran, who is one of

23  the government's expert witnesses in this case, and I

24  will represent to the Court that the expert report is

25  dated July 7th of 2023.  And the table, as discussed

 1    yesterday, identifies a certain set of nonstop overlap

 2    routes that Spirit and JetBlue either currently served

 3    or have served.

 4         I'll also note that Gowrisankaran grouped airports

 5    in certain metropolitan areas together.  So Miami

 6    includes Fort Lauderdale and Miami and New York City

 7    includes La Guardia and JFK and Newark.

 8    Q.  Mr. Kirby, could you please identify any routes on

 9    Kirby Demonstrative Number 2 that Spirit stops flying on

10    or before July 7th, 2023?

11    A.  Let me take a look here.  Um, okay.  Fort Meyers,

12    Hartford, was one that we had suspended that we haven't

13    gone back to.  Boston, New Orleans.  So in San Juan --

14    near San Juan, we had exited, we had already exited La

15    Guardia, San Juan, but we still do serve New York.

16    (Looks.)  Oh, Hartford to Tampa as well.  (Looks.)  And

17    then we're out of both La Guardia and Newark to Tampa.

18    We currently don't serve New Orleans to La Guardia or

19    New York.  And finally Austin, Cancun.  And let me just

20    make sure.  (Pause.)  Yeah, the rest were in place

21    before -- or after rather.

22    Q.  When Spirit decided to enter or suspend those

23    routes, was that decision in any way related to this

24    litigation?

25    A.  None whatsoever.

1    Q.  And I believe, Mr. Kirby, you mentioned yesterday

2    that Spirit had entered -- I'm sorry, had exited certain

3    routes after July 7th of 2023 that are on this chart.

4    Can you identify those, any routes that were exited

5    after?

6    A.  Yes, the first three are the ones that I think jump

7    out.  So Orlando, Ponce, and Agua Dia to both Fort

8    Lauderdale and Orlando.

9    Q.  And, Mr. Kirby, was the decision to exit those three

10   cities or suspend service to them in any way related to

11   this litigation?

12   A.  None whatsoever.

13   Q.  I'd like to change topics now, Mr. Kirby, and ask

14   you about the extent to which your job involves working

15   with airports to obtain infrastructure.

16        You were asked some questions about infrastructure

17   at airports?

18   A.  Yes, it does.

19   Q.  And you referred to infrastructure, but just as sort

20   of to get it out there, when you talk about

21   "infrastructure," what do you mean?

22   A.  I talk about like what I mean is all the things at

23   an airport that you need from a facilities standpoint to

24   operate service.  So I think the obvious ones are gates

25   and ticket counters.  But it would include things like

1    operation rooms, break rooms, baggage rooms, and so on.

2    Q.  And to what extent were you involved in obtaining

3    infrastructure in any of your prior jobs in the airline

4    industry?

5    A.  Yeah, it's something that I've done quite a bit.

6    Probably started back in my U.S. Airways days.  So

7    that's almost 30 years ago.  And it's been one of my

8    focuses at AirTran, Southwest, as well as Alaska, and

9    now Spirit.

10   Q.  We've already talked about slots and landing rights

11   at Level 2 and level 3 airports, now I'd like to ask you

12   about gates.  And yesterday you testified about

13   preferential gates.  What other gates might exist at

14   airports?

15   A.   There's really three gates, three types of gates

16   when people think about it.  There's exclusive rights

17   gates, which really are going away, they were more

18   prevalent in the early days of aviation when airports

19   were trying to coax carriers to serve the market and

20   airports weren't as full as they are today.  So there's

21   very few exclusive right agreements still in the

22   industry to my knowledge.  You know Atlanta at Delta is

23   an example.  But most airports, because they've enjoyed

24   growth in service and so on, go with the preferential

25   model.

1           And with the preferential model, it is part of

2      the -- to release the gate, you have to be a signatory

3      carrier as well, and that allows you really to control

4      that gate to the extent that you fill that gate up with

5      service all day long.

6           THE COURT:  You have to be a "signatory carrier as

7      well," what does that mean?

8           THE WITNESS:  Well, your Honor, you sign also a

9      lease with the airport to operate, and really what it is

10     is a protection for the airport.  In the old days it

11     used to be 30 or 40-year leases weren't uncommon, today

12     it's generally 5 years, unless there's a big capital

13     expenditure in a new terminal or runway or so on.  But

14     it forces the carriers to lock in so they guarantee that

15     they will pay the rates and charges in the preferential

16     gate lease for the gate.  And there's a "nonsig," and

17     what that means is you can come in, get a higher rate,

18     but you can leave whenever you want, you have no

19     liability.

20     Q.  And so "common-use gates"?

21     A.  So again the "pref gate," and the pref gate is

22     really what Spirit likes to, how we focus our growth.

23     "Common-use gate," generally they're available at

24     virtually every airport in the country in some manner,

25     shape, or form.  And again that's usually used either to

```
 1   accommodate a new entrant or a carrier who maybe is
 2   growing above their pref capacity, but isn't quite
 3   qualified for an additional pref gate.  It also can be
 4   used during an interrupted flight, you know if there's
 5   bad weather or so on, it can used to park an aircraft
 6   that maybe is stuck on the ground or needs maintenance.
 7   Q.  Has Spirit ever entered any airports where
 8   preferential gates weren't available?
 9   A.  We have.
10   Q.  And has Spirit entered airports using common-use
11   gates?
12   A.  We have.
13   Q.  Why would Spirit enter an airport using a common-use
14   gate?
15   A.  Again it's not ideal, I would say that's certainly
16   not our MO, but you want to get into -- if there's a
17   particular airport that you want to serve -- I guess
18   there's actually two recent examples I can touch on.
19   I'm going to use one of them to start with.
20        But Salt Lake City was an airport we were very
21   desirous of going to, we've seen great growth in Salt
22   Lake City, but there were no preferential gates
23   available.  And there was actually quite a bit of
24   construction going on in the airport at the time, so
25   eventually there were going to be preferential gates
```

```
 1    available after a number of years.
 2          And so we went in, um, with a -- on a common-use
 3    gate and built our service up, and the good news is, I
 4    think it was either last month or this month, um, we
 5    were finally awarded our first preferential gate.  So
 6    it's a good story.  We were in there about a year and a
 7    half.
 8    Q.  And you mentioned --
 9    A.  Oh, yeah, the other one is San Antonio.  This one
10    was a little different in that actually there were
11    preferential gates available, but you had to have a
12    certain service level, and so we didn't want to come in
13    with a service level as large as it was required, so we
14    went in with a smaller number, used a common-use gate,
15    and again the good news is we've been able to build up
16    our service level and now we've been able to acquire a
17    preferential gate.
18    Q.  So how would you describe how you go about getting
19    access to gates at airports?
20    A.  Yeah, my process is I -- one, I work very closely
21    with our corporate real estate people, I make sure they
22    know where we're looking to grow and where we think
23    there's opportunities, so they let me know.  But I
24    generally will meet with airports, um, you know
25    frequently through the year.
```

```
 1        Certainly the airports that I'm most desirous of
 2   growing capacity, I often will go out and visit that
 3   airport once or twice a year.  I historically come to
 4   Massport once or twice a year just to give him an
 5   update.  Port Authority, New York, New Jersey, Los
 6   Angeles, just examples of ones that I meet with fairly
 7   regularly.
 8   Q.  And did you use this strategy when you were working
 9   at other airlines?
10   A.  I did.  I did.  Again I find that if you're upfront
11   with the airports and they know what you want to do, um,
12   again they think about you and maybe something happens.
13   Q.  To what extent, if any, have you observed other
14   airlines using a similar strategy to obtain
15   infrastructure at airports where it might otherwise be
16   limited?
17   A.  Well I have, um, again I was just thinking here
18   because I was saying Logan, but both Sun Country and
19   Allegiant came into Boston, they're taking vast
20   advantage of common-use gates at Logan.  Frontier, um,
21   started growing, they had a pref gate, but they started
22   growing into a common-use gate, and the airport turned
23   it into a pref gate because of their growth.  So it can
24   be done.  You know again it takes patience sometimes and
25   also, I think, communication.
```

1   Q.   In your experience do airports sometimes provide

2   incentives to airlines in order to encourage airlines to

3   start providing service at an airport?

4   A.   They do.

5   Q.   And can you describe those kinds of incentives?

6   A.   Yeah, um, and so I would say there's two types of

7   common incentives.  It could be one or the other or it

8   could be both.  But typically there's cost incentives.

9   So typically either, um, landing fee waivers or rental

10   waivers.  And then there's also usually some kind of

11   marketing supports.  So if you're coming in, they're

12   aware of your service, they may give you some marketing

13   dollars.  And that's -- you know you often see that as a

14   new entrant.  So a new entrant will come in and they'll

15   get some kind of cost or marketing or both incentives.

16         And then the second thing I see is most airports

17   are always desirous of more service and they generally

18   keep a list of nonstop destinations that they would like

19   to see from their airport.  And so they may have a list

20   of unserved markets that would qualify for incentives or

21   underserved markets, the markets that are served but

22   maybe they feel the level of service isn't sufficient

23   for the demand.

24   Q.   Mr. Kirby, is it possible for you to sort of

25   describe the approximate size of these types of

1    financial incentives that you've seen?

2    A.  Yeah, they're definitely in the hundreds of

3    thousands of dollars for both the cost offsets.  The

4    marketing I've seen anywhere from $25,000 to $500,000.

5    Again depending on the facility, the landing fee could

6    be in the hundreds of thousands of dollars in a cost

7    abatement.

8    Q.  In your experience will an airport sometimes offer a

9    financial incentive to an airline that's already

10   operating in that airport, an incentive to expand or

11   encourage that airline to enter new routes from that

12   airport?

13   A.  Yes, as I mentioned earlier, if you're already

14   there, um, but they would like you to add service to

15   their unserved or underserved markets, then even an

16   incumbent could be entitled to an incentive package.

17   Actually a great example is the one I mentioned earlier,

18   which is we've been in Oakland for many years, um, but

19   we've got an incentive package for that Newark to

20   Oakland route.

21   Q.  I'd like to direct your attention again to Tab

22   Number 3 in your binder, which is Exhibit 331 in

23   evidence.  And if you would please turn to the slide

24   with the Bates number ending in 2227.  This is, um, this

25   says "Infrastructure limits our growth in many of our

1   key cities."

2   A.  Yes, I see it.

3   Q.  So let's start at the top.  What did you mean to

4   convey when you said "Infrastructure limits our growth

5   in many of our key cities"?

6   A.  Yeah, again you see "our" twice, it really is for

7   Spirit.  How Spirit thinks about growth.  I talked about

8   how we prefer to get preferential gates because then it

9   allows us to control our growth, versus a common-use

10  gate, it's somewhat arbitrary.

11  Q.  So why were you focused specifically on Spirit's

12  needs when putting this deck together?

13  A.  Well this is Spirit's 5-year plan presented to

14  Spirit's board, so it would focus on Spirit.

15  Q.  To what extent do the constraints here apply to

16  other airlines?

17  A.  Well again I'd say everything is different, but

18  certainly, you know, I could use an example.  Let's use

19  just Atlanta because it's top.  We have two pref gates

20  on D concourse.  We've been able to grow through the

21  pandemic using the E concourse, which is the

22  international gates.  And more recently, and actually

23  more recently than this deck, um, Atlanta Airport was

24  able to get United Airlines and American Airlines to

25  give back for a -- for I think it's a 2-year window, two

1    gates each on the E concourse.

2         So there actually is a tremendous opportunity to

3    procure and grow on the T concourse in Atlanta.  In fact

4    T gates are the most desirable because they're the

5    closest to the terminal.  But for Spirit that would be

6    hard to use because it's about a mile and a half from

7    our existing operation.

8         So that would be, you know, an example where

9    suddenly, you know, and a dynamic industry is always

10   changing, but something unanticipated, these four gates

11   become available, but we can't take advantage of them

12   because of the logistics of our service today.

13   Q.  Have recent events changed, um, the characterization

14   on this table of the infrastructure situation in Fort

15   Lauderdale?

16   A.  It has, and this is actually very new and again

17   something unanticipated.  But Southwest, um, really has

18   announced that they're going to drop Fort Lauderdale

19   down to only 35 flights and they're removing all of

20   their international service.  And so they enjoy 10

21   preferential gates and then they also use 3 of the 5

22   international swing gates on T1.  So I would say this is

23   a real opportunity for someone to come in and grow at

24   Fort Lauderdale.

25   Q.  And what about Denver?

1    A.   In Denver?  Well again this is unfortunate, but we

2    had two preferential gates in Denver, and with our exit,

3    that presents an opportunity for someone else to come in

4    and grow at Denver.

5    Q.   To what extent are common-use gates available at the

6    airports listed on this table?

7    A.   With the exception -- and in fact I'm not -- the

8    only reason I -- I'll give the caveat.  But with the

9    exception of possibly La Guardia, common-use capacity is

10   available at every one of these airports.

11   Q.   And since you joined Spirit in late 2018, has Spirit

12   had success in obtaining infrastructure at any of the

13   airports identified on this table?

14   A.   We have.

15   Q.   Can you identify some of them?

16   A.   Um, well again I mentioned that we did grow in

17   Atlanta, taking advantage of the pandemic in the

18   international.  At Boston, and I mentioned it yesterday,

19   we were able to add a third gate and that was because it

20   had been, um, planned that Southwest would take those

21   two gates, but they did not grow and we were able to

22   secure that gate.

23        Charlotte?  Originally when we went into

24   Charlotte, we were told that we were getting the last

25   preferential gate available, but the airport was so

1    happy with our service growth that they moved some other

2    carriers around and offered us a second pref gate.  And

3    then subsequently they've offered us a third pref gate

4    with the opening of their new concourse in the fall of

5    next year.

6        Denver?  Dallas?  We did take advantage of some of

7    the company's capacity in Dallas over on the D

8    concourse.

9        Newark?  We -- with the opening of the new -- the

10   full opening of the new A terminal, we were able to

11   secure a fourth gate and be able to increase our service

12   level from 24 to 32 flights.

13       Fort Lauderdale?  I'd say we're evaluating, you

14   know, again the impact of the new situation with

15   Southwest.

16       Houston?  We did take advantage of some of the

17   common-use capacity on the D concourse.

18       We have been known to get additional capacity at

19   both Las Vegas and LX.

20       La Guardia?  Even though that's red, we've been

21   able to take advantage of a very unique situation.  We

22   operate out of the historic Marine Air Terminal, which

23   has 6 gates, and originally we were only planning to

24   move from under, um -- Delta was leasing a single gate

25   for us on Concourse C, we're offering 11 flights on a

1    single gate, which at La Guardia is kind of a fool's

2    errand.  So when I joined the company, I investigated

3    and talked to the Port Authority about possibly getting

4    two gates on the Marine Air Terminal.  And we were

5    successful in getting that, which allowed us to add an

6    additional frequency on off-peak times.  But then

7    subsequently JetBlue left the terminal to go with the --

8    work over with American Airlines at the brand new D

9    concourse, and we were offered the lease for the whole

10   concourse.

11       So what that's allowed us to do is not only add

12   more off-peak flying outside of the slotted period, but

13   it also has allowed us to entertain capacity on a

14   seasonal basis from some of our competitors.  So, for

15   example, even though we hold only 11 slot pairs in La

16   Guardia as Spirit, we're operating now 21 flights a day

17   because we're covering capacity for both American and/or

18   Canada.

19       Orlando?  Again those are green, so I'd say we've

20   been able to grow there.

21       O'Hare, we have a path to a fifth gate at some

22   point in the next year and a half.

23       And then San Juan, um, was tight, but we were able

24   to work with the airport authority there to get

25   additional capacity.

1    Q.   And you noted that a couple of these are green and

2    it looks like Miami is green and NCO is also green at

3    Orlando?

4    A.   They are.

5    Q.   Yeah, can you explain, as to each of those, why

6    they're identified as green on this chart?

7            THE COURT:   Mr. Finch, about how much longer have

8    you?

9            MR. FINCH:   Your Honor, I believe I have about 15

10   to 20 minutes.

11           THE COURT:   Do you care to take the morning

12   recess?

13           MR. FINCH:   I'll do whatever you prefer, your

14   Honor.

15           THE COURT:   I think we'll take the morning recess.

16           We'll take the morning recess until 20 minutes

17   after 11:00.  We'll stand in recess.

18           (Recess, 10:50 a.m.)

19

20

21

22

23

24

25

```
 1              C E R T I F I C A T E

 2

 3

 4          I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER,

 5     do hereby certify that the foregoing record is a true

 6     and accurate transcription of my stenographic notes

 7     before Judge William G. Young, on Tuesday, November 7,

 8     2023, to the best of my skill and ability.

 9

10

11     /s/ Richard H. Romanow 11-07-23
       _____
12     RICHARD H. ROMANOW    Date

13

14

15

16

17

18

19

20

21

22

23

24

25
```