```
              UNITED STATES DISTRICT COURT
            DISTRICT OF MASSACHUSETTS (Boston)

                                No. 1:23-cv-10511-WGY
                                Vol. 2, Pages 91-168


UNITED STATES OF AMERICA, et al
          Plaintiffs

vs.


JETBLUE AIRWAYS CORPORATION,
et al,
          Defendants



                    ********


              For Bench Trial Before:
              Judge William G. Young




                 United States District Court
                 District of Massachusetts (Boston)
                 One Courthouse Way
                 Boston, Massachusetts 02110
                 Wednesday, November 8, 2023



                    ********



         REPORTER:  CHERYL B. PALANCHIAN, RMR, CRR
                Official Court Reporter
              United States District Court
            One Courthouse Way, Boston, MA 02110
```

A P P E A R A N C E S


EDWARD WILLIAM DUFFY, ESQ.
ARIANNA MARKEL, ESQ.
AARON TEITELBAUM, ESQ.
        DOJ-Atr
        450 Fifth Street NW, Suite 8000
        Washington, DC 20530
        (202)812-4723
        Email:  Edward.duffy@usdoj.gov
        For Plaintiff United States of America
- and -
WILLIAM T. MATLACK, ESQ.
        Attorney General's Office
        One Ashburton Place, 18th Floor
        Boston, MA 02108
        (617)727-2200
        Email:  William.matlack@mass.gov
        For Plaintiffs United States of America and The
        Commonwealth of Massachusetts



RYAN SHORES, ESQ.
        Cleary Gottlieb Steen & Hamilton LLP
        2112 Pennsylvania Avenue, NW
        Washington, DC 20037
        (202)974-1876
        Email:  Rshores@cgsh.com
- and -
ELIZABETH M. WRIGHT, ESQ.
        Cooley LLP
        500 Boylston Street
        Boston, MA 02116-3736
        (617)937-2349
        Email:  Ewright@cooley.com
- and -
RACHEL MOSSMAN ZIEMINSKI, ESQ.
MICHAEL MITCHELL, ESQ.
        Shearman & Sterling LLP
        2601 Olive Street, 17th Floor
        Dallas, TX 75201
        (214)271-5777
        Email:  Rachel.zieminski@shearman.com
        For Defendant JetBlue Airways Corporation


(Continued.)

(Continued.)


JAY COHEN, ESQ.
ANDREW C. FINCH, ESQ.
        Paul, Weiss, Rifkind, Wharton & Garrison
        1285 Avenue of the Americas
        New York, NY 10019-6064
        (212)373-3000
        Email:  Jaycohen@paulweiss.com
        For Defendant Spirt Airlines, Inc.

```
                        I N D E X

WITNESS:              DIRECT    CROSS    REDIRECT   RECROSS

JOHN KIRBY, Continued

  By Mr. Finch                    95

  By Ms. Pearl                                107


MICHAEL HILLYARD

  By Mr. Briggs       109                    164

  By Ms. Siddiky               155


   EXHIBITS                            PAGE

     690 . . . . . . . . . . . . . 114

     691 . . . . . . . . . . . . . 117
```

 1              THE CLERK:  Court is back in session.  You may be

 2      seated.

 3              THE COURT:  Mr. Finch, please continue.

 4              MR. FINCH:  Thank you, your Honor.

 5                      JOHN KIRBY, (Resumed)

 6                      CROSS-EXAMINATION, (Cont'd.)

 7      BY MR. FINCH:

 8      Q.   Mr. Kirby, before we took our morning break I had asked

 9      you about, in particular, about Orlando and Miami with

10      regard to this exhibit that's in front of you, slide 2227.

11      And I guess I'd just ask you to start there, maybe taking

12      them one at a time?

13      A.   Sure.

14              THE COURT:  Orient me as to the question.  You're

15      taking one at a time to explain what?

16              MR. FINCH:  The question, your Honor, I noted that

17      both Orlando, which is airport code MCO, and Miami, MIA, are

18      green on this chart, and I'd asked Mr. Kirby to explain the

19      infrastructure situation and availability.

20              THE COURT:  In those two airports?

21              MR. FINCH:  Yes.

22              THE COURT:  Thank you.  Go ahead.

23      A.   In the case of Orlando, there's a new, they call it

24      terminal C, but the south terminal.  So they added

25      substantial capacity to the airfield and they have multiple

1   versions to grow that.  So that's going to add a lot of

2   capacity, but also move carriers from the other four

3   concourses down there.  So there's room to grow in our

4   current terminal, which is with air site 1, at least three

5   more gates available as of today, and then also air site

6   4 has quite a bit of capacity as, again, some of those

7   carriers move down to the south terminal.

8        And in the case of Miami, the airport's working on a

9   project with concourse F.  So the TSA throughput was being

10  widened.  Once that is widened, there's 13 gates on

11  concourse F.  Right now Frontier is only using two of them.

12  So, in essence, you'd have 11 gates' worth of growth

13  potential once the TSA throughput is finalized.

14  Q.   When you refer to TSA throughput, could you explain

15  briefly what that means?

16  A.   Sure.  Again, F is a little bit of an older terminal,

17  predates 9/11.  So the amount of physical space for the TSA

18  to basically set up limits the number of lanes that can go

19  through.  So this widening will allow more lanes which will

20  allow more passengers per hour to go into the terminal.

21  Q.   Last question, I believe, about this table.  Mr. Kirby,

22  can you identify whether you're aware of any other airlines

23  that have had any success in attaining infrastructure at the

24  airports identified on this chart, examples?

25  A.   Again, I did mention that Frontier has been able to

```
 1    take advantage of common use capacity to grow substantially
 2    in Atlanta.  I did mention Sun Country and Allegiant taking
 3    advantage of common use capacity to grow in Boston.  Dallas,
 4    I mentioned that Frontier has been able to grow and acquire
 5    an additional preferential gate.  Let's see.  Oh, and
 6    Frontier actually has been able to grow substantially in
 7    Philadelphia.  The airport has been aggressive in taking
 8    gates away from carriers that aren't meeting the required
 9    number of departures.  And that's a place they've been able
10    to grow.  As well as San Juan and Tampa Frontier has been
11    able to grow quite a bit.
12    Q.   Thank you.  Yesterday, Mr. Kirby, Ms. Pearl asked you
13    some questions about utilization.  Do you remember that?
14    A.   I do.
15    Q.   Are there different metrics for calculating
16    utilization?
17    A.   There are.  Typically two are used.  There's a schedule
18    utilization, and then there's fleet utilization.
19    Q.   Okay.  And is schedule utilization sometimes also
20    referred to line utilization?
21    A.   It can be used as -- in that regard, yes.
22    Q.   And when you testified about utilization yesterday,
23    were you referring to line utilization, or schedule
24    utilization?
25    A.   I was.  The number I shared, the 13.7, was line
```

1    utilization, or schedule.

2    Q.    And then to come back around to some testimony earlier

3    today, I think there may have been a lack of clarity and

4    it's my fault.  But the -- can you describe how common it is

5    for Spirit to exit a route?

6    A.    I think it's fairly common to exit a route.  You know,

7    it's kind of the normal course of business.  So, again,

8    we'll prune unprofitable flying, route flying, but we do try

9    to hang in there, particularly in the city.

10   Q.    So that's the difference between city exits and route

11   exits?

12   A.    Yeah.  I'd say the bar is much higher on a city exit

13   than it would be on a route exit.

14   Q.    Do you anticipate that Spirit will be making future

15   city exits as a result of the situation with the engines

16   and -- you've identified?

17   A.    Yeah.  We are contemplating some additional city exits,

18   unfortunately, because of the expectation of aircraft on the

19   ground.

20   Q.    There was some testimony about, yesterday, about -- and

21   today, about Aguadilla and Ponce?

22   A.    Yes.

23   Q.    Could you tell us whether there's been any entry in

24   Aguadilla and Ponce?

25   A.    Well, entry this year or --

1    Q.    Yes, this year.

2    A.    -- or more recently?

3    Q.    Either one.

4    A.    Okay.  Well, Frontier started service in Ponce in March

5    of this year.  They had already served Aguadilla, but then

6    they went into the Orlando market this year as well.  So at

7    least that's my recollection, is it was sometime early this

8    year.  They do not serve the Fort Lauderdale market.  But

9    what I observed since we loaded our suspensions, Frontier

10   has backfilled the Orlando Aguadilla route with a second

11   daily trip, and they've backfilled our Orlando Ponce

12   capacity with additional weekly frequencies.

13   Q.    Yesterday Ms. Pearl asked you some questions about the

14   Spirit Effect.  To what extent, if any, did the calculations

15   that you testified about regarding the Spirit Effect

16   differentiate among different customers based on how

17   price-sensitive the customers might be?

18   A.    There was no, I'd say, breakout of type of customers.

19   It was just a straight line simulation.

20   Q.    You testified shortly before the break about Spirit's

21   assets at LaGuardia, in particular the Marine Air Terminal

22   and the gates.  I wanted to follow up on that a little bit.

23   I believe you said at one point that Spirit -- that the slot

24   restrictions don't apply 24 hours a day; isn't that correct?

25   A.    That is correct.  They only apply from 0600 to 2159.

1    Q.   And so to what extent is an airline free to operate

2    during those times when slots aren't required?

3    A.   They have the ability to operate before 0600 and 2200

4    and later.

5    Q.   And do the slot restrictions at LaGuardia apply on

6    weekend days?

7    A.   They do not apply on Saturdays, and before noon on

8    Sundays.  I was going to say also the perimeter rule doesn't

9    apply on Saturday.

10   Q.   What's the perimeter rule?

11   A.   The perimeter rule limits the amount of a stage that a

12   carrier can fly from LaGuardia.  It was actually set up

13   many, many years ago to protect the development of JFK.

14   Q.   So the stage meaning the distance?

15   A.   The distance, amount of miles.  It's a 1500-mile

16   limitation.  I'm sorry, 1250.  1250, sorry.

17   Q.   To what extent, if at all, has Spirit operated out of

18   LaGuardia at times when there are no slot restrictions?

19   A.   Well, since our move to the Marine Air Terminal we've

20   been able to operate one to two more frequencies in the

21   unslotted times.

22   Q.   I think you mentioned that there's six gates at the

23   Marine Air Terminal?

24   A.   There are.

25   Q.   How many of those is Spirit using currently?

```
 1   A.   Spirit is using five of the six.  Frontier uses the
 2   additional gate.
 3   Q.   And turning, for a second, back to the
 4   slot-restrictions point, to what extent has Spirit operated
 5   out of LaGuardia at times when there are no slot
 6   restrictions?
 7   A.   Well, again, one to two frequencies -- oh, well, I'm
 8   sorry.  Yeah, on the Saturdays.  We have taken advantage of
 9   the unslotted times on Saturday to fly some transcon
10   capacity.  So it is something that we've taken advantage of,
11   and I think there could be opportunity to do more in the
12   future.
13   Q.   So based on your experience, Mr. Kirby, how valuable
14   are Spirit's assets at LaGuardia?
15   A.   Extremely valuable.  The slotted airports, you know,
16   artificially constrain capacity and competition.  So
17   they're -- you know, they're highly valued.
18   Q.   And are there particular benefits from the lease at the
19   Marine Air Terminal that flow from its location in the
20   greater airport complex?
21   A.   There are.  Well, first, I'd say that the Marine Air
22   Terminal is less expensive than the other terminals.  So,
23   again, it allows us to keep our costs down.  Also, it's
24   closer to the runway so the taxi in and taxi out is shorter,
25   so you burn less fuel.  So it's, again, a cost savings.
```

```
 1        Plus, I would also say while this is somewhat
 2   anecdotal, the Marine Air Terminal, I believe, is the
 3   easiest in and out for the consumer.  It's easier to get
 4   Ubers, taxis, and so on.  It's one of the reasons why, when
 5   I was at Alaska, I chose to put Alaska in the Marine Air
 6   Terminal instead of the main terminal.
 7   Q.   Turning to Newark, I'd like to ask you about how many
 8   flights a day Spirit can operate out of Newark?
 9   A.   Working with our operators we've agreed to a limit of
10   eight departures per gate.  So with our fourth -- four
11   gates, we can operate 32 flights a day.
12   Q.   And how many departures is that per gate?
13   A.   Eight departures per gate.
14   Q.   How valuable are each of these gates at Newark to
15   Spirit?
16   A.   For us they're extremely valuable.  We've had great
17   success at Newark.  And particularly now that we can fully
18   utilize the gates with the Newark capacity that Southwest
19   gave back to the FAA.
20   Q.   Could you describe Spirit's operations at Boston-Logan?
21   A.   Yes.  We historically had operated two gates, and now
22   we have a third gate as of August which has allowed us to
23   grow and add new destinations.
24   Q.   Are those preferential gates?
25   A.   They are.
```

1    Q.   How many flights does Spirit operate out of those gates

2    at Logan?

3    A.   Right now typically we're between 15 and 20.  Our

4    utilization rate is a little lower than the eight I aspire

5    to.  We're generally five to seven flights per day -- I'm

6    sorry, five to seven departures per gate per day.

7    Q.   And are any preferential gates available at Logan?

8    A.   There's still one preferential gate available.

9    Q.   And to what extent are common-use gates available?

10   A.   They're readily available on the international

11   concourse.

12   Q.   And turning back to Spirit's assets at Logan, how

13   valuable is each of those gates that Spirit has at Logan?

14   A.   Again, I consider them very important.  It's one of the

15   reasons why I pursued additional capacity at Logan.

16   Q.   Turning to Fort Lauderdale, can you describe Spirit's

17   assets at Fort Lauderdale?

18   A.   Yes.  We have ten preferential gates.  And then, as we

19   talked about, we do have an international portfolio in Fort

20   Lauderdale, so we typically use as much as four of the

21   international gates at various times during the day.

22   Q.   Approximately how many daily flights does Spirit

23   operate out of each gate at Fort Lauderdale?

24   A.   Again, it's at least eight.  I think we might even be a

25   little bit above.  We're currently at about 100-plus

1    departures.  But I would say at least eight.

2    Q.    How valuable is each of those gates to Spirit?

3    A.    For Spirit, incredibly valuable.  It's our largest

4    operation and a place we would like to, you know, grow.

5    Q.    To what extent, if any, are foreign airlines an option

6    for travelers wishing to fly out of South Florida to Latin

7    America or the Caribbean?

8            MS. PEARL:  Objection.  Foundation.

9            THE COURT:  Well, do you think you know?

10           THE WITNESS:  I do.

11           THE COURT:  And how, in the course of your

12   discharging your duties, have you come to know this?

13           THE WITNESS:  It's part of -- I study other

14   airlines, service out of various gateways, particularly the

15   ones that we serve.  So I'm familiar with, at least, the

16   carriers that are in the South Florida market to the

17   Caribbean and Latin America.

18           THE COURT:  Overruled.  And put your question

19   again, Mr. Finch.

20   Q.    To what extent, if any, Mr. Kirby, are foreign airlines

21   an option for travelers wishing to fly out of South Florida

22   to Latin America or the Caribbean?

23   A.    There are options available, both out of Fort

24   Lauderdale, Copa, Azul, as well as Miami has services with

25   LATAM, Air Mexico, also Copa, Avianca.  So there's a number

1    of international opportunities as well.

2    Q.   Mr. Kirby, are you aware of certain divestitures

3    JetBlue has agreed to make if this transaction is approved?

4    A.   I am on a cursory level.

5    Q.   What is your understanding of --

6    A.   My understanding is they're divesting our assets at

7    Logan, Newark, Liberty, LaGuardia, and five gates at Fort

8    Lauderdale.

9    Q.   Mr. Kirby, are you familiar with the term "backfill"?

10   A.   I am.

11   Q.   And what do you understand that term to mean?

12   A.   It means when a carrier may exit or reduce capacity,

13   another carrier goes in and replaces that capacity.

14   Q.   In your experience, to what extent does Spirit consider

15   backfilling when another airline exits a route?

16   A.   We look at it all the time.  In fact, just recently we

17   talked about this, is the Boston-Norfolk market, we saw a

18   carrier exit and that was one of the reasons why it advanced

19   us entering the Boston-Norfolk market.

20   Q.   And to what extent in your job have you had the

21   opportunity to observe other airlines backfilling?

22   A.   I see it frequently.

23   Q.   Can you provide the Court with examples of backfilling

24   by other airlines that you've observed?

25   A.   Yeah.  I'd say the obvious one is the one I mentioned

earlier, which is that Frontier has backfilled our capacity
in both Orlando to Aguadilla and Orlando to Ponce a week
after we showed we were removing the services for the month
of December.  And the one I always think about was when I
was at AirTran we were acquired by Southwest in May of 2011.
They eventually closed about 15 of AirTran's smaller
operating cities, and Allegiant came in and backfilled a
bunch of -- quite a bit of capacity.  They entered at least
four new markets I can think of.  They entered Asheville,
which they didn't serve before, they entered Harrisburg,
Pennsylvania, they went into Newport News, Virginia, and
Bloomington, Illinois and replaced our service there.
     They also were in these markets, but then they grew in
places like Allentown, Knoxville, Tennessee.  I'm trying to
think what the other ones were.  But Lexington, Kentucky,
and Moline, Illinois were places they served.  But they
backfilled the destinations we served at least in the metro
area.
          (Whereupon counsel conferred.)
Q.   Just to clarify, Mr. Kirby, when you said "we," you
meant AirTran?
A.   Oh, I -- yes.  I guess we, AirTran or Southwest.
Southwest or AirTran exited those cities and Allegiant
either entered markets and backfilled or grew their service
level at exited AirTran markets and backfilled the capacity,

 1  yes.

 2          MR. FINCH:  I pass the witness, your Honor.

 3          THE COURT:  Any redirect?

 4          MS. PEARL:  Your Honor, if I could just have a

 5  moment to confer with counsel?

 6          THE COURT:  Of course.

 7          (Whereupon counsel conferred.)

 8          MS. PEARL:  Sorry, your Honor.

 9          THE COURT:  No apologies are necessary.

10          MS. PEARL:  Well, it took a little long.

11          THE COURT:  Nothing further?

12          MS. PEARL:  Yes, very brief redirect.  Thank you,

13  your Honor.

14          THE COURT:  Go ahead.

15                    REDIRECT EXAMINATION

16  BY MS. PEARL:

17  Q.   So, Mr. Kirby, you just discussed backfill with your

18  counsel.  I just want to ask a few questions about that, if

19  you don't mind.

20  A.   Sure.

21  Q.   So the ability to backfill depends on specific route

22  characteristics; correct?

23          THE COURT:  Specific route --

24          MS. PEARL:  "Root," "route."

25  A.   Could you embellish a little bit?

```
 1          THE COURT:  The ability to backfill depends upon

 2   specific route characteristics.  That's what she suggested.

 3   Do you understand that question?

 4          THE WITNESS:  I don't know what route

 5   characteristics are.

 6   Q.   Just my question is basically it's a "route" or

 7   route-by-route analysis of whether backfill is possible for

 8   that particular route; is that fair?

 9   A.   Again, you certainly would look at whether it fit your

10   strategy, whether you felt that you would be offering

11   something that would make the route viable for you versus

12   the carrier that exits the capacity.  So, yes, you would

13   look at various factors.

14   Q.   In addition, I think you just mentioned about it

15   fitting in, sort of, with your overall strategy.  You have

16   to see if aircraft is available to actually fulfill the

17   needs of that route; correct?

18   A.   I mean, you certainly would have to have an aircraft,

19   or you may believe that that opportunity is greater than

20   maybe something you're doing today.  But, yeah, either/or

21   you need an aircraft.

22   Q.   Is the availability of pilots something else you have

23   to consider when whether or not to backfill?

24   A.   Again, I would say earlier in the year -- if you're

25   talking specifically Spirit, I'd say earlier in the year
```

```
 1   that was a challenge.  It isn't right now.  But certainly if
 2   a carrier was limited in their pilot capacity that would be
 3   something they'd have to think about.
 4           MS. PEARL:  All right.  Thank you, Mr. Kirby.
 5   Thank you, your Honor, no further questions.
 6           THE COURT:  Nothing further?
 7           MR. FINCH:  Nothing further.  Thank you.
 8           THE COURT:  You may step down.
 9           THE WITNESS:  Thank you, your Honor.
10           (Whereupon the witness stepped down.)
11           THE COURT:  Call your next witness.
12           MR. DUFFY:  Mr. John Briggs will be taking the
13   next witness, who is Mr. Hillyard.
14           THE COURT:  Fine.  Mr. Hillyard may be called.
15           (Pause in proceedings.)
16           THE CLERK:  Please remain standing and raise your
17   right hand.
18               MICHAEL HILLYARD, sworn
19           THE COURT:  Mr. Briggs?
20           MR. BRIGGS:  May I proceed, your Honor?
21           THE COURT:  You may.
22               DIRECT EXAMINATION
23   BY MR. BRIGGS:
24   Q.  Good morning, sir.
25   A.  Good morning.
```

```
 1    Q.   Would you please state and spell your name, for the
 2    record?
 3    A.   Michael Hillyard, M-I-C-H-A-E-L, H-I-L-L-Y-A-R-D.
 4    Q.   Mr. Hillyard, you have in front of you a binder
 5    containing some exhibits and your prior testimony.  I'll let
 6    you know when to turn to the binder.
 7    A.   Thank you.
 8    Q.   You are employed by JetBlue; correct?
 9    A.   Yes.
10    Q.   What is your position with JetBlue?
11    A.   My position at JetBlue is in the revenue management
12    department.  I am a manager on the pricing team,
13    specifically, the domestic side of things.
14    Q.   And as the manager on the pricing team on the domestic
15    side, you're responsible for domestic markets within the
16    United States, including Puerto Rico?
17    A.   Correct.
18    Q.   Mr. Hillyard, you joined JetBlue as a pricing analyst
19    in 2016; right?
20    A.   Correct.
21    Q.   And you were promoted to senior pricing analyst in
22    2019?
23    A.   I believe that's correct, yes.
24    Q.   In 2022 you were promoted again to pricing manager?
25    A.   Yes.
```

1   Q.   And you have a team of several pricing analysts who

2   report to you?

3   A.   Yes, currently six.

4   Q.   I believe you testified you're responsible for domestic

5   markets.   There are about 180 such routes; correct?

6   A.   That's right.

7   Q.   And, Mr. Hillyard, I've now used the terms "markets"

8   and "routes."   The JetBlue team uses those terms

9   interchangeably; right?

10   A.   That's fair, yep.   Yes.

11   Q.   I have a few questions about the organization of

12   JetBlue's revenue management department.   JetBlue's pricing

13   team, on which you're manager, is responsible for setting

14   the menu of fares that JetBlue offers in each market you

15   serve; right?

16   A.   Yes, among other things.

17   Q.   And those fares are organized in two fare classes which

18   generally have different price points; right?

19   A.   Correct.

20   Q.   There's another team within the revenue management

21   department called inventory management; right?

22   A.   Correct.

23   Q.   The inventory management team is responsible for

24   deciding how many seats to make available on each flight in

25   each fare class; right?

1    A.    Correct.

2    Q.    Fair to say that the decisions made by both the pricing

3    and inventory management teams affect the prices at which

4    JetBlue offers tickets on each flight?

5    A.    That's correct.  We work together.

6    Q.    And the overall goal of those two teams within the

7    revenue management department is to maximize JetBlue's

8    revenue; right?

9    A.    That's the main goal, yes.

10   Q.    Now, focusing on the pricing team specifically, a large

11   part of the job of pricing analyst is to review public fare

12   data in markets JetBlue serves; right?

13   A.    Yes, that's the -- a large part of the role.

14   Q.    The pricing team does that by monitoring fares that

15   other airlines file on ATPCO?

16   A.    Yes.  We review public information submitted through

17   ATPCO.

18   Q.    In domestic markets ATPCO distributes fares four times

19   per day; right?

20   A.    During the week, yes.

21   Q.    And one time per day on the weekend?

22   A.    Correct.

23   Q.    And during the week, those times are 10:00 a.m.,

24   1:00 p.m., 4:00 p.m. and 8:00 p.m.; right?

25   A.    Correct.

```
 1   Q.   Those times are referred to as the ATPCO submissions?

 2   A.   That's how we refer to them, yes.

 3   Q.   Your pricing team reviews the information from ATPCO

 4   after each of those four daily submissions; right?

 5   A.   Exactly.

 6   Q.   Fair to say that the pricing team pays very close

 7   attention to fares filed by other airlines?

 8   A.   Yes.  We review what other airlines file throughout the

 9   day.

10   Q.   When the pricing team observes another airline change

11   fares in one of the markets you serve, the team considers

12   whether to match that fare change; right?

13   A.   Exactly.  We review what other airlines file and decide

14   if there's -- if it's strategically necessary to match what

15   fare has entered the market.

16   Q.   Mr. Hillyard, in March 2023 JetBlue's pricing team

17   undertook a review comparing fares on routes between New

18   York City and Florida with the fares of ultra low-cost

19   carriers in those markets; right?

20   A.   Yes, we did.

21   Q.   And around that time, JetBlue lowered its fare

22   structure in New York-to-Florida markets to be more

23   competitive with ultra low-cost carriers; right?

24   A.   We adjusted our strategy to get closer on price to the

25   competition in the market, yes.
```

 1   Q.   Let's take a look at what happened.  Mr. Hillyard, in

 2   your binder, would you please turn to the tab marked Exhibit

 3   CR?  And that's behind the numbered tabs.

 4            (On screen.)

 5   Q.   Mr. Hillyard, tab CR is an e-mail and attachment that

 6   Miguel Velez sent to you and others on March 15th, 2023; is

 7   that right?

 8   A.   Yes.  I was on this e-mail.

 9   Q.   And Mr. Velez is a JetBlue pricing analyst who reports

10   to you; right?

11   A.   Yes.  He's an associate analyst who reports to me.

12            MR. BRIGGS:  Your Honor, plaintiffs offer CR into

13   evidence as Exhibit 690.

14            THE COURT:  No objection?

15            MS. SIDDIKY:  No objection.

16            THE COURT:  CR is admitted, Exhibit 690.

17            (Exhibit 690 received in evidence.)

18   Q.   Mr. Hillyard, in Exhibit 690 Mr. Velez was transmitting

19   a comparison of JetBlue's fares to Spirit and Frontier fares

20   on routes between New York and Florida; right?

21   A.   I'm sorry.  Could you repeat that?

22   Q.   In the exhibit in front of you, sir, Mr. Velez was

23   transmitting a comparison of JetBlue fares to Spirit and

24   Frontier fares on routes between New York and Florida;

25   right?

1   A.   Yes.  He was comparing what JetBlue had filed to

2   Frontier and Spirit in these markets he selected.

3   Q.   Let's take a look at one of the routes at issue.  Would

4   you please turn to the page with the Bates number ending

5   FLLLGA?

6   A.   Yes.

7   Q.   And this page compares JetBlue's fares and Spirit's

8   fares from Fort Lauderdale to LaGuardia; right?

9   A.   Yes.

10  Q.   Now, focusing your attention on the table at the top

11  left of the page with the columns B6 and NK, do you see

12  that?

13  A.   Yes.

14  Q.   And that refers to JetBlue and Spirit; right?

15  A.   Correct.

16  Q.   The rows refer to walk-up fares, or zero AP fares, and

17  fares with 7 and 14-day advance purchase minimums; right?

18  A.   Yes, that's what he prepared.

19  Q.   And this table shows Spirit's fare was lower than

20  JetBlue's fare at each of those different advance purchase

21  minimums; right?

22  A.   That's what he discovered using their fare filing in

23  ATPCO and the surcharge they would apply on top of their

24  fare, yes.

25  Q.   Now, Mr. Hillyard, if you would please look at the

 1   colored cells at the top right of the page.  Focusing on the
 2   red cell which reads, "F9 did not fly direct," that means
 3   Frontier did not offer nonstop service between Fort
 4   Lauderdale and LaGuardia; right?
 5   A.   That's my understanding as well.
 6   Q.   And looking at the Blue cell, "B6 matched with other
 7   carriers for all APs," that means JetBlue fares were matched
 8   to all other airlines on the Fort Lauderdale to LaGuardia
 9   route except for Spirit; right?
10   A.   At that time that seems to be the strategy, yes.
11   Q.   And shortly after the analysis contained in this
12   exhibit JetBlue changed its fares in the New York-to-Florida
13   markets to get more competitive on price with ULCCs; right?
14   A.   Yes.  It looks like prior to the analysis we were
15   competitive with the other carriers, and after the analysis
16   we became competitive with the ULCCs in this market.
17   Q.   Let's take a look at that change for Fort Lauderdale to
18   New York specifically.  Would you please turn in your binder
19   to the tab marked as Exhibit CQ?
20          (On screen.)
21   Q.   Mr. Hillyard, CQ is an e-mail that Mr. Velez sent to
22   you and others on March 23rd, 2023, eight days after the
23   prior exhibit; right?
24   A.   Yes.
25          MR. BRIGGS:  Your Honor, plaintiffs offer CQ into

1    evidence as Exhibit 691.

2             THE COURT:  No objection?

3             MS. SIDDIKY:  No objection.

4             THE COURT:  CQ is admitted, Exhibit 691.

5             (Exhibit 691 received in evidence.)

6    Q.   Now, Mr. Hillyard, in this exhibit Mr. Velez was

7    reporting to you and others on changes in JetBlue fares

8    between New York and Florida; right?

9    A.   Yes.  He was including me in the group to explain his

10   changes.

11   Q.   And there are some references in his e-mail to FCR.

12   That's a term for fare class realignment; right?

13   A.   Yes.  Fundamentally, an FCR would refer to when we make

14   a sort of market-level change to fares in the market.

15   Q.   And specifically it would be a wholesale change for a

16   given market; right?

17   A.   Yes.  We, to use the word we used earlier, we sort of

18   adjust the menu on offer in that market.

19   Q.   Mr. Velez explains he's providing a comparison to ULCC

20   fares with the new fare change realignment; right?

21   A.   I'm sorry.  Could you ask that again while I read?

22   Q.   Sure.  Mr. Velez is explaining that he's providing a

23   comparison to ULCC prices with the new fare change

24   realignment; right?

25   A.   Yes.  He says he's including an analysis on B6 price

1    points versus the ULCCs.

2    Q.   Would you please turn to the last page of the exhibit

3    with the Bates number ending "ULCC difference analysis," and

4    I'll ask you to focus on the leftmost portion to begin.  Do

5    you see the label NYCFLL?

6    A.   Yes.

7    Q.   And that means New York to Fort Lauderdale; right?

8    A.   Yes.  He's encompassing the various New York City

9    markets to Fort Lauderdale.

10   Q.   And focusing on the row that reads, "B6 before FCR,"

11   that shows the least expensive fares JetBlue offered between

12   New York and Fort Lauderdale before the fare change

13   realignment at 21, 14, 7 and 3 days advance purchase, and

14   walk-up fares; right?

15   A.   Yes, before FCR.  Yes.

16   Q.   And there are also rows referring to ULCC.  As we saw

17   in the prior exhibit, the ULCC that served LaGuardia to Fort

18   Lauderdale nonstop was Spirit; right?

19   A.   Correct.

20   Q.   And there's a percentage difference row that shows the

21   percentage difference in fare between JetBlue and Spirit at

22   each advanced purchase level; right?

23   A.   Yes.

24   Q.   Mr. Hillyard, column F shows JetBlue reduced its lowest

25   walk-up fare from $264, which was 115 percent more expensive

1    than Spirit, to $174, which was only 41 percent more
2    expensive than Spirit; right?
3    A.   Yes, the filed fare amount, those are the numbers he
4    calculated, yes.
5    Q.   And column D shows JetBlue reduced its lowest 7-day
6    advance purchase fare from $194, which was 208 percent more
7    expensive than Spirit, to $79, which was only 25 percent
8    more than Spirit; right?
9         MS. SIDDIKY:  Objection.  The document has ULCC,
10   and the footnote indicates it's Frontier at Spirit.
11        THE COURT:  But I thought he had asked the
12   question Frontier, in fact, does not fly this route.
13        MS. SIDDIKY:  I think the document is capturing
14   fares for both of them.  At least the footnote indicates
15   they're comparing the fare to Frontier and Spirit.
16        THE COURT:  What do you say to that, Mr. Briggs?
17        MR. BRIGGS:  I'll ask the question when it comes
18   to ULCCs in general in the market.
19        THE COURT:  Why don't you ask the question now and
20   we'll see where we are.
21   Q.   Okay.  Mr. Hillyard, are you familiar with other ULCs
22   in the New York-to-Fort Lauderdale market?
23   A.   To be totally honest, I don't have a perfect knowledge
24   of any airline in every market, so I'm not certain the
25   current list of airlines that serve this market.

```
 1              THE COURT:  Well, we've got the document.  At the
 2    time this document was prepared, what did you think -- what
 3    airlines did you think were reflected in the horizontal bar
 4    marked "ULCC"?
 5              THE WITNESS:  Bearing in mind the prior document
 6    we reviewed, my memory is that Spirit was more commonly
 7    overlapping than Frontier.  So that would be my
 8    understanding, is many of these are comping against Spirit
 9    as they were more prevalent than Frontier.
10              THE COURT:  Thank you.  You may proceed,
11    Mr. Briggs.
12    Q.   I'll ask the question slightly differently,
13    Mr. Hillyard.  This is showing at the 7-day advance purchase
14    level that JetBlue's fare before the fare change request was
15    $194, which was 208 percent more than any ULCC in the
16    market, and JetBlue's fare after the fare change request at
17    7 days was $79, which was 25 percent more than any ULCC in
18    the market; right?
19    A.   Yes.  We brought it down, yes.
20    Q.   And it was your testimony that Spirit had more
21    prevalent service between New York and Fort Lauderdale than
22    Frontier; correct?
23    A.   From the documents we've reviewed, yes, that is the
24    case.
25    Q.   And looking at the prior document that showed that from
```

1   LaGuardia to Fort Lauderdale the only ULCC was Spirit;

2   correct?

3   A.   I'd have to -- can I refresh -- can I read it?

4   Q.   You're welcome to go back to the prior exhibit.

5   A.   And that was CR?

6   Q.   That's correct.

7           MR. BRIGGS:  We can publish this.  I apologize for

8   not asking.

9   A.   Fort Lauderdale to LaGuardia was JetBlue and Spirit,

10  yes.

11  Q.   Now, Mr. Hillyard, looking at the rest of the page in

12  CQ labeled, "ULCC difference analysis," that shows that

13  JetBlue's fare class realignment also involved reducing

14  fares in at least two other New York-to-Florida markets;

15  right?

16  A.   Yes.

17  Q.   And as a result, JetBlue became more competitive on

18  price with ULCCs in all of those markets; right?

19  A.   Yes.  Before the change it looks like we didn't match

20  to ULCCs.  After the change it looks like we got closer to

21  matching with the ULCCs.

22  Q.   You can set the exhibit aside.

23       Mr. Hillyard, you would agree that JetBlue tries to be

24  competitive on price with other airlines; right?

25  A.   Yes.

1    Q.   And JetBlue's strategy includes matching other

2    airlines' prices when that's what it takes to be

3    competitive; right?

4    A.   Yes.  We want to -- part of our strategy is to make

5    sure we have the lowest fare in the market at any given

6    time.

7    Q.   JetBlue's particular pricing strategy is determined on

8    a market-by-market basis; right?

9    A.   Yes.  We empower analysts to make the decision they

10   think will best serve the market they're -- they're owning.

11   Q.   The markets where JetBlue and Spirit overlap, JetBlue

12   sometimes files fares that match Spirit's fares; right?

13   A.   JetBlue matches, again, matches whatever carriers we

14   feel makes us most competitive in the market, and that does

15   involve matching Spirit as well.

16   Q.   And sometimes JetBlue matches Spirit with a slight

17   premium; correct?

18   A.   That happens, yes.

19   Q.   And sometimes Spirit matches -- excuse me -- JetBlue

20   matches Spirit's fare dollar for dollar; right?

21   A.   We would make that decision on a market-by-market

22   basis.  But if we choose to get more competitive with

23   Spirit, either of those situations can be true.

24   Q.   Mr. Hillyard, let's look at another example of JetBlue

25   considering competition with Spirit.  If you would look at

 1   the tab in your binder labeled Exhibit 371.

 2             MR. BRIGGS:  Exhibit 371 is in evidence and may be

 3   published.

 4             (On screen.)

 5   Q.   Mr. Hillyard, Exhibit 371 is a chat conversation you

 6   had with Daniel McNulty regarding fares; right?

 7   A.   Yes.

 8   Q.   And Mr. McNulty was a senior inventory analyst; right?

 9   A.   At that time I believe that's the case, yes.

10   Q.   At the time of this conversation you were a senior

11   pricing analyst; right?

12   A.   Yes.

13   Q.   And you shared responsibility with Mr. McNulty for some

14   markets?

15   A.   Yes, we shared a few markets during this time.

16   Q.   I'd like to direct you to the second page of

17   Exhibit 371, and this has a Bates number ending 276.

18   A.   Okay.

19   Q.   And specifically looking about a third of the way down

20   the page, starting with your message at 2:02 p.m.  Do you

21   see that?

22   A.   Yes.

23   Q.   So you wrote, "Hey, Dan, I think WN increased in PR $5

24   FLPR."  "WN" means Southwest Airlines; right?

25   A.   Yes.

1    Q.   And you were informing Mr. McNulty that Southwest had

2    raised fares in its Puerto Rico-to-Florida markets by $5;

3    right?

4    A.   Yes.

5    Q.   Now, you testified earlier JetBlue considers whether to

6    match fare changes that other airlines make; right?

7    A.   Yes, we always consider it.

8    Q.   And in this exhibit you and Mr. McNulty were discussing

9    whether to match Southwest's $5 fare increase; right?

10   A.   Yes.

11   Q.   Now, looking at Mr. McNulty's 2:03 p.m. response, he

12   referred to three particular Florida airports by their

13   airport codes, and those are Fort Lauderdale, Tampa and

14   Orlando; right?

15   A.   Correct.

16   Q.   Mr. McNulty was indicating that he wanted to match

17   Southwest's $5 increase from Fort Lauderdale to Puerto Rico,

18   but not match Southwest's increase from Tampa to Puerto Rico

19   and Orlando to Puerto Rico; right?

20   A.   Yes.

21   Q.   And then, Mr. Hillyard, looking at your 2:05 p.m.

22   message, you wrote a question back, "So just Fort

23   Lauderdale?"  Right?

24   A.   Yes.

25   Q.   Confirming that Mr. McNulty only wanted to increase

1  fares in Fort Lauderdale; right?

2  A.   Correct.

3  Q.   And Mr. McNulty responded to you, "Can't get too far

4  away from Spirit in the other ones."  Right?

5  A.   Yes.

6  Q.   In other words, Mr. McNulty indicated that he did not

7  want to increase the fare gap between JetBlue and Spirit

8  fares in Tampa to Puerto Rico or Orlando to Puerto Rico;

9  right?

10  A.   Yes.  It looks like he was more conscious of their

11  pricing in those other Florida markets than in Fort

12  Lauderdale.

13  Q.   And by "their," you mean Spirit; is that right?

14  A.   Yes.  That's the airline he's indicating.

15  Q.   And so this conversation is reflecting a consideration

16  of Spirit competition in terms of JetBlue's pricing decision

17  between Tampa to Puerto Rico and Orlando to Puerto Rico;

18  right?

19  A.   Yes.  It looks like he's bearing in mind what one of

20  our competitors, in this case Spirit, is pricing on their

21  routes in those markets.

22  Q.   You can set that exhibit aside.

23       Mr. Hillyard, you testified earlier that JetBlue

24  monitors fares that other airlines file publicly on ATPCO

25  four times every day; right?

```
 1   A.    Domestically, yes.
 2   Q.    And I have some questions about JetBlue's monitoring of
 3   those other airline fares.  Let's start with the legacy
 4   airlines, American, Delta and United.  It's quite clear to
 5   your pricing team at JetBlue what those airlines' fares are;
 6   right?
 7   A.    Yes.  They file them publicly and their base fares are,
 8   you know, quite simple to observe, yes.
 9   Q.    Now, compared to those carriers and also compared to
10   Southwest, it takes you more research to understand Spirit's
11   fares; right?
12   A.    The way Spirit files their fares in ATPCO is certainly
13   different than how the legacies file their fares in ATPCO.
14   Q.    And that means it requires more work for the team at
15   JetBlue to ascertain Spirit's pricing; right?
16   A.    Yes.  It takes a couple more steps to observe Spirit's
17   pricing.
18   Q.    In your experience, the prices Spirit offers on its
19   website tend to be lower than Spirit's fares distributed on
20   ATPCO; right?
21   A.    I wouldn't -- no, I wouldn't say that's correct.  No.
22   Q.    You've encountered situations where Spirit offers
23   website prices that are lower than ATPCO distributed fares
24   from Spirit; right?
25   A.    ATPCO would be before tax.  So almost certainly the
```

1   fares would always be cheaper on ATPCO than the website, the

2   Spirit website.

3   Q.   And you've performed a review or reviews of Spirit's

4   web pricing with its ATPCO fares; right?

5   A.   Yes.  We've reviewed how Spirit prices on their website

6   versus other public channels, which are more directly

7   connectible to what's filed in ATPCO.

8   Q.   You found that it's challenging to connect the fares on

9   ATPCO with the Spirit website fares; right?

10  A.   It's -- I wouldn't use the word challenging, but

11  there's certainly -- my guess is that they use --

12          THE COURT:  Once you say "guess" that's a red flag

13  for me.

14          THE WITNESS:  Okay.

15          THE COURT:  Because I'm not permitted to guess.

16          THE WITNESS:  Okay.

17          THE COURT:  And this is just semantic, but I

18  assume you have an estimate?  You're reaching up, you're not

19  just throwing a figure against the wall?

20          THE WITNESS:  Sure.

21          THE COURT:  So if you can testify honestly to an

22  estimate, I will receive it as evidence and see what I can

23  do with it.  Go ahead.

24          THE WITNESS:  Okay.  To put it slightly

25  differently --

```
 1              THE COURT:  Okay.
 2              THE WITNESS:  -- my expectation is there -- in
 3   pricing we have public and private.  So I can't see private.
 4   So I'd have to have an expectation of how Spirit does
 5   something without truly knowing.
 6              THE COURT:  Uhm-hmm.
 7              THE WITNESS:  My expectation is there's some
 8   special sauce that their website uses to adjust fares behind
 9   the curtain, so to speak, that I just can't see nor
10   understand or know about.  That would be my guess of how --
11   estimate of how it works.
12              THE COURT:  Okay.
13              THE WITNESS:  Publicly I can connect the dots
14   exactly how those fares calculate.
15              THE COURT:  And in doing your work you develop a
16   feel for a competitor's secret sauce, I take it?
17              THE WITNESS:  It's a hard question.
18              THE COURT:  Well, the follow-up question was the
19   one that I really wanted to ask, and it would have been
20   this:  You haven't undertaken some sort of -- with any
21   competitor, some sort of project enigma to decode their
22   secret sauce?
23              THE WITNESS:  No.  I mean, we would -- we
24   wouldn't -- to be honest, that would be too much work to
25   undertake.
```

```
 1              THE COURT:  Not surprising.  And so as you do your
 2    work for JetBlue, you rely on the ATPCO publicly announced
 3    fares and bring to bear, you and your team, your experience
 4    and sensitivity to how competitive airlines do the same work
 5    in their own bailiwicks?
 6              THE WITNESS:  Yes.  So we certainly can review
 7    what Spirit files publicly, but we can also review their
 8    website to see -- you know, they sell fares to customers, so
 9    that's public as well.  We can kind of triangulate and get a
10    sense of what they're selling and pricing and theorize how
11    it all ties together.
12              THE COURT:  And that's sufficient for you to do
13    your work?
14              THE WITNESS:  We think so, yes.
15              THE COURT:  Forgive me, Mr. Briggs.  Go ahead.
16              MR. BRIGGS:  Thank you, your Honor.
17    Q.   I'd like to understand your testimony about Spirit's
18    website pricing, Mr. Hillyard.  Is it your testimony, or is
19    it not, that the prices Spirit offers through its web fares
20    are often lower than the publicly distributed Spirit fares
21    through ATPCO?
22    A.   From what we've observed is that fares tend to be the
23    same -- you know, a one-to-one example, the same fare would
24    be cheaper on Spirit's website than on other public
25    websites.
```

1    Q.   And you've also found that it tends to be cheaper on

2    Spirit's website than the information available to JetBlue

3    through ATPCO; right?

4    A.   Again, I wouldn't agree with that, no.

5    Q.   Mr. Hillyard, I'd like to refer you to the tab in your

6    binder which contains your deposition, and to page 41 of

7    your deposition.  It should be very near the end of the

8    binder.

9    A.   I'm sorry.  Say that again?

10   Q.   It should be near the end of the binder on page 41.

11   And you were deposed in this action in June of this year;

12   correct, sir?

13   A.   Yes.

14   Q.   Do you see on page 41, line 7 through 18 I asked you:

15        "QUESTION:  Have you found that Spirit's web fares are

16   often lower than the publicly distributed fares of Spirit?"

17   A.   Yes.

18   Q.   And I then asked:

19        "QUESTION:  Is that fairly -- "

20        I'm sorry.  I skipped your answer.  On line 11 you

21   responded:

22        "ANSWER:  I've seen cases of that happening."

23        I then asked:

24        "QUESTION:  Is that fairly common in your experience?"

25   And you answered:

```
 1          "ANSWER:  I haven't done an in-depth comparison, but in

 2     brief reviews I've found that to tend to be the case."

 3     A.   Yes.

 4               MS. SIDDIKY:  Objection, your Honor.

 5               THE COURT:  Any grounds?

 6               MS. SIDDIKY:  Yeah, this is not -- this is

 7     improper impeachment.  I think the question that counsel was

 8     asking previously was about ATPCO, and the testimony here is

 9     more general.  And so I think there's a little inconsistency

10     in the question and there's no impeachment here.

11               THE COURT:  Oh, I'm not necessarily saying there's

12     impeachment but I'm accepting the testimony in evidence.

13               All right.  Go ahead, Mr. Briggs.

14     Q.   And were those the questions that I asked and the

15     answers that you gave, sir?

16     A.   These are the questions you asked in June, and these

17     are the answers I gave in June, yes.

18     Q.   Was it accurate testimony when you gave it?

19     A.   Yes.

20               MR. BRIGGS:  Your Honor, I'd offer that testimony

21     as a prior inconsistent statement and for its truth.

22               THE COURT:  No.

23               MS. SIDDIKY:  Objection, your Honor.

24               THE COURT:  Sustained.  I'm just accepting it.

25               MR. BRIGGS:  I'll move on.
```

1   Q.   Mr. Hillyard, would you please turn in your binder

2   to -- I'm sorry.  I have a few warm-up questions first.

3        Mr. Hillyard, turning to a different topic related to

4   the information in ATPCO filings, when JetBlue and other

5   airlines file fares on ATPCO, those fares are identified

6   with a string of letters and numbers called a "fare basis

7   code"; right?

8   A.   That's correct, when they file publicly.  Yes.

9   Q.   And those fare basis codes are visible to other

10  airlines; right?

11  A.   Yes, it's all public.

12  Q.   The different characters in a fare basis code

13  correspond to different attributes of the fare; right?

14  A.   Yes.  The different numbers and letters would indicate

15  the different term and condition of the fare, to put it

16  simply.

17  Q.   And at JetBlue you maintain an internal reference

18  called a fare basis code decoder; right?

19  A.   Yes.  We do maintain that as a reference guide of our,

20  the meaning of our own fare basis code, yes.

21  Q.   Would you please turn in your binder to Exhibit 365,

22  which is in evidence.

23       I'd like to let you and the Court know we agreed to

24  some redactions that JetBlue's counsel requested.  The

25  version in your binder does not contain the redactions, but

1   the version that will be publicly displayed to the Court or

2   to the gallery will be redacted.

3   A.   Thank you.

4           MR. BRIGGS:  With that, we can publish the

5   exhibit, please.

6           (On screen.)

7   Q.   Mr. Hillyard, do you recognize Exhibit 365 as JetBlue's

8   fare basis code decoder?

9   A.   Yes.  It looks like you have a few examples prepared,

10   but yes.

11   Q.   Would you please turn to the first substantive page of

12   Exhibit 365 which is labeled, "Domestic/western HEM B6 FBC

13   decoder public"?

14   A.   Yes.

15   Q.   That's the fare basis code decoder for United States

16   domestic public fares; right?

17   A.   Yes, among other things.  But yes.

18   Q.   Now, directing your attention to the box, the large box

19   at the top of the page, reading from left to right that

20   defines the meaning of each character of JetBlue's fare

21   basis code; right?

22   A.   Yes, each character is defined.

23   Q.   So, for example, looking at column D, that reflects

24   that the third character of JetBlue's fare basis code

25   corresponds to an advance purchase requirement for a fare;

1    right?

2    A.   Exactly.

3    Q.   Now, let's look at column F, which corresponds to the

4    fifth character.  Do you see that column is labeled,

5    "structure/match"?

6    A.   Yes.

7    Q.   The fifth character distinguishes between a fare that

8    was initiated based on JetBlue's strategy and a fare that

9    JetBlue filed to match another airline's fare; right?

10   A.   Exactly.

11   Q.   Now, the letters in character five are redacted, I'll

12   caution you not to say them out loud, but without saying

13   them out loud, am I right that if the fifth character of the

14   fare basis code is the letter that is next to

15   "B6 initiated," that means JetBlue filed that particular

16   fare based on its own strategy?

17   A.   I'm sorry.  Can you say that one more time?

18   Q.   Am I right that if the fifth character of the fare

19   basis code is the letter next to "B6 initiated," that means

20   that JetBlue filed that particular fare based on its own

21   strategy?

22   A.   Yes.  The "B6 initiated" character would suggest that

23   was our, you know, our analysis, our pursuit of pursuing our

24   own strategy in that case, yes.

25   Q.   If the fifth character is the letter next to "0A

match," that means JetBlue filed the fare as a match to

another airline's fare; right?

A.   Yes.  The B character would indicate we -- excuse me --

would indicate we matched the fare that another airline

filed, and did so on price, including terms and conditions,

as close as we could.

Q.   So based on that testimony, Mr. Hillyard, the

indication of whether a fare was B6 or JetBlue-initiated, or

an OA match, does not affect any of the terms and conditions

of the fare; right?

A.   The characters used here would not fundamentally

trigger any particular terms and conditions to apply to a

customer, no.  They would be meaningless to a customer.

Q.   Each airline organizes its fare basis code differently;

right?

A.   Correct.

Q.   At JetBlue the pricing analysts have reviewed the fare

basis codes of all of your competitors; right?

A.   Uhm --

          THE COURT:  If these things are coded, and we're

actually concerned about them being confidential to the

airline, why are they included by ATPCO in its public

disclosures?  Or I've lost something.  In other words, it's

not just the fare of B6 and the information of whether it's

seven days out, there's a code.  And now here's a whole

1  exhibit that tells me, anyway, how to decode it.  Why do

2  those figures go into the publicly disclosed fares?

3           THE WITNESS:  So not everything -- you're exactly

4  right, all of this goes into ATPCO.  Many of these things

5  mean something in ATPCO.  So Mr. Briggs identified the

6  advanced purchase requirements.  So that's something that

7  would be triggered --

8           THE COURT:  Right.

9           THE WITNESS:  -- in ATPCO.  But not everything is

10  triggered in ATPCO.

11           THE COURT:  And you can add in some of your own

12  codes?

13           THE WITNESS:  It's not quite as simple.  But, yes,

14  airlines, you know, strategically build out what, you know,

15  they think is most important to prebuild out, I guess you

16  could say.  But certainly in the case of JetBlue, again, not

17  every character triggers something.  So we do use some to

18  sort of broadly, just for our own awareness, sort of like

19  administratively.  But that still has to be part of the

20  chain, it just doesn't have a public meaning, per se.

21           THE COURT:  Like the famous signal to Admiral

22  Halsey, which included filler, the words, "The world waits,"

23  which, of course, infuriated him because he had missed, sent

24  his carriers off to the wrong direction.  But that's neither

25  here nor there.  But I'm drawing that analog.  That analog

```
 1    makes some sense, doesn't it?

 2           THE WITNESS:  Well, we certainly use the

 3    characters as certain indicators for our own purposes of,

 4    you know, who filed that fare first.  Again, they have no

 5    public meaning.  So, you know, that would -- I have no

 6    understanding of any other airlines' setup on nonpublic

 7    things, and nor would I expect them to have an understanding

 8    on JetBlue.

 9           THE COURT:  And the reason for doing that is since

10    you're going to -- you, JetBlue, that you're familiar with,

11    you and your team are going to be scanning this daily,

12    constantly, you build in some of your codes simply because

13    this is a convenient way to tab them to the data which

14    really interests you?

15           THE WITNESS:  So any one of our analysts would be

16    responsible, particularly on the JetBlue side, to sort of

17    manage, maintain, understand, frankly, thousands of fares.

18           THE COURT:  Right.

19           THE WITNESS:  And let's say we had a market where

20    we had our strategy but another airline filed something

21    different.  You know, it would be meaningful for, frankly,

22    for that person's -- the JetBlue analyst, but maybe they're

23    on vacation so someone's covering for them.  Maybe we're

24    doing a high-level analysis and we want to know where, you

25    know, we're selling JetBlue fares versus more match fares.
```

1    It does have administrative sort of value.

2              THE COURT:  Thank you.  I don't want to go down a

3    rabbit hole.  Go ahead.

4    Q.    So following up on that, Mr. Hillyard, you said it was

5    administratively convenient to have "B6 initiated" or "OA

6    match" included in the fare basis code; right?

7    A.    It is, yes, administratively convenient.

8    Q.    But, as I believe you indicated in response to the

9    Court's questions, that information is also publicly filed

10   with ATPCO as part of the fare code; right?

11   A.    Well, the only thing public about, I guess, character

12   5 in this case is just that it simply is.  There's no other

13   public meaning portrayed there or, frankly, public meaning

14   discernible from that.

15   Q.    If a pricing analyst at another airline were to learn

16   the meaning of the fifth character of a JetBlue fare basis

17   code, that analyst would be able to know and review in your

18   fare basis codes whether a given fare was based on JetBlue's

19   own strategy or a match to another airline; right?

20   A.    They could arrive to that conclusion, but I'm not sure

21   the benefit they would reap.

22   Q.    Now, within JetBlue, pricing analysts on the pricing

23   team have reviewed the fare basis codes of all of JetBlue's

24   competitors; right?

25   A.    I wouldn't agree with that blanket statement.  We are

1    aware of some characters, again, by reviewing the public

2    ATPCO rule filings, which is, again, publicly discernible.

3    But we don't -- the value of that is to be better at the

4    market intelligence and to be better understanding of what

5    fares our competitors are filing.  But we don't sort of

6    exhaustively do that or maintain such things.

7    Q.   And that helps you and your team to understand other

8    airlines' secret sauce; right?

9    A.   No.  Again, this is all public.  So something like an

10   advance-purchase character would be valuable to understand,

11   which again is fairly simple to review in the public ATPCO

12   submissions.  You know, making sure we get the

13   advance-purchase requirements correct when we match another

14   airlines' fares is quite significant.

15   Q.   JetBlue would be able to track whether given fares were

16   based on its own strategy or an OA match without including

17   that information in the public fare code; right?

18   A.   Could you ask that one more time, please?

19   Q.   JetBlue would be able to track whether given fares were

20   based on its own strategy or matches to other airlines by --

21   without including that information in the public fare codes;

22   right?

23   A.   I suppose we could determine a method, but this seems

24   like the most time-efficient and simple for us to maintain.

25   Q.   Mr. Hillyard, you can set that exhibit aside.

```
 1          Turning to a different topic relating to how airlines
 2    interact with each other when it comes to fare filings, in
 3    your experience on JetBlue's pricing team, you'd observed
 4    ATPCO fare filings that are intended to send a message to
 5    other airlines; right?
 6    A.   I've never knowingly observed an intended message
 7    between airlines, no.
 8    Q.   You've observed filings that can be interpreted by
 9    other airlines; right?
10    A.   Well, every filing that we observe is public, so I'm
11    not sure I quite follow the line of questioning.
12    Q.   Let me ask a more specific question.  You're familiar
13    with the term "flashing" when it comes to fares; right?
14    A.   Yes.
15    Q.   And you learned about flashing from someone else in
16    JetBlue's revenue management department?
17    A.   We -- not exactly.  We take legal training, which is
18    when, you know, the concept of flashing was first brought up
19    and introduced.
20              THE COURT:  What's flashing?
21              THE WITNESS:  Flashing would describe the act, I
22    guess, of filing and unfiling a fare, perhaps in, you know,
23    rapid succession with, I suppose, the overall intent of
24    communicating something between carriers.
25    Q.   Mr. Hillyard, would you please turn to the tab in your
```

 1    binder labeled Exhibit 370, which is in evidence.  And,

 2    Mr. Hillyard, this is another chat conversation that you had

 3    with your colleague, Daniel McNulty, this time in

 4    January 2020; right?

 5    A.   Yes.

 6              MR. BRIGGS:  And Exhibit 370, which is in

 7    evidence, can be published, please.

 8              (On screen.)

 9    Q.   Let's focus on the page with the Bates number ending

10    884, please, and I have a few questions about messages at

11    the top of the page.  Looking at your first message on the

12    page, at 10:46 a.m., "AA matched the $5 in SAN."  You were

13    reporting that American Airlines had matched a $5 fare

14    increase in a market touching San Diego; correct?

15    A.   Yes, I did.

16    Q.   And Mr. McNulty, his response "The question, all

17    buckets," was inquiring whether American increased all of

18    its fares by $5 for that particular route; right?

19    A.   Let me just double-check the context.  Yes, I believe

20    he was referring to my comment at 10:46.

21    Q.   And you responded with an explanation that American had

22    generally matched, but not matched at the 3-day minimum

23    advance purchase level; right?

24    A.   Yes.

25    Q.   And you added that that might have been an oversight by

1    American; right?

2    A.    I do speculate that at the very end, yes.

3    Q.    In other words, American had not matched at the 3-day

4    level; right?

5    A.    Just overall they did not match at the 3-day level,

6    yes.

7    Q.    Mr. McNulty responded to you, "Oh, maybe we try to

8    flash that."  Do you see that?

9    A.    I do see that.

10   Q.    He was referring to flashing a fare amount; right?

11   A.    That would be my interpretation of his question as

12   well.

13   Q.    You interpret his question to you as a suggestion that

14   JetBlue should make an ATPCO filing to call attention to

15   American that they had made an oversight when it comes to

16   fares; right?

17   A.    That's how I interpreted his comments, yes.

18   Q.    And you didn't respond that it was inappropriate to

19   communicate with American about raising prices, did you?

20   A.    I didn't -- did not respond in that manner, but I also

21   didn't respond to his concept there.

22   Q.    The reason for suggesting a flash to American would be

23   to encourage American to raise its fare by $5 at the 3-day

24   minimum purchase level; right?

25              MS. SIDDIKY:  Objection.  Foundation.

```
 1              THE COURT:  Oh, no.  Overruled.  Overruled.
 2              You may answer.
 3    A.    Could you repeat the question one more time?
 4    Q.    Sure.  The reason to suggest flashing American in this
 5    context would be to encourage American to raise its fare by
 6    $5 at the 3-day advance purchase level; right?
 7    A.    I wouldn't use the word "encourage," but as defined,
 8    flashing tends to be to draw attention to something.  So if
 9    I speculated on his intent, that's what he would mean.
10    Q.    Well, can you think of any other reason why Mr. McNulty
11    would suggest flashing American about the 3-day advance
12    purchase oversight other than that American should raise
13    fares by $5?
14    A.    No.  I'd agree that's the most likely intent.
15    Q.    You can set the exhibit aside.
16          Would you please turn in your binder to the tab marked
17    Exhibit 389, which is in evidence and can be published.
18              (On screen.)
19    Q.    Mr. Hillyard, Exhibit 389 is an e-mail you sent to
20    members of the revenue management team in February 2020;
21    right?
22    A.    Yes.  I was added onto the latter portion of this
23    chain, but my response is the most recent one.
24    Q.    And you were a senior pricing analyst at the time?
25    A.    That's true, yes.
```

```
 1    Q.    And the e-mail chain concerns the Boston-to-Baltimore
 2    market; right?
 3    A.    Yes, that's -- I believe that to be correct.
 4    Q.    I'll start by asking you about the e-mail that begins
 5    at the end of the page numbered 004 and continues on to 005
 6    which, I believe, is the last page of the exhibit.  This is
 7    an e-mail from Mr. Rosen, who was an inventory management
 8    analyst at JetBlue; right?
 9    A.    I'm sorry.  Could you redirect me where?
10    Q.    This is the e-mail that starts at the very end of 004
11    and mostly is on 005.
12    A.    Oh, yes.  Got it, yes.  Yes, this is written by Jonah
13    Rosen.
14    Q.    And Mr. Rosen was an inventory management analyst?
15    A.    Yes, at this time he was on the inventory team.
16    Q.    And Catterina Yanez was a pricing analyst; right?
17    A.    Yes.
18    Q.    In this e-mail Mr. Rosen observed that Southwest had a
19    cheaper fare than JetBlue between Baltimore and Boston with
20    a 14-day minimum advance purchase; right?
21    A.    Yes.  He's saying Southwest has a cheaper fare at the
22    14 AP than JetBlue did at that point in time, correct.
23    Q.    So at that AP, Southwest's fare was $47 and JetBlue was
24    $56?
25    A.    Yes.
```

1  Q.   And Mr. Rosen suggested that JetBlue should match

2  Southwest's $47 fare; right?

3  A.   Yes.  I'm sorry, let me just read.  Yep.  He says,

4  "Might it be possible to match."  So he wants Catterina to

5  match that $47 fare.

6  Q.   Now, let's look at Ms. Yanez's response which is on the

7  middle of page 004.  Reading her e-mail, she begins by

8  explaining that the -- that JetBlue had filed that fare in

9  the Boston-to-Baltimore market as a match to Spirit; right?

10 A.   Let me just reread it.

11       (Witness reviewed document.)

12 A.   Yes, it looks like we filed the Spirit match.

13 Q.   And looking at her next sentence, she wrote that, "We

14 filed it with FTVL 22 April '20, and LTVL 8 September '20."

15 That conveys when JetBlue filed this Spirit match fare.  The

16 fare was only valid for travel between April 22nd and

17 September 8th; right?

18 A.   Exactly.  Yep.

19 Q.   And first travel and last travel date restrictions are

20 included in footnotes to ATPCO fare filings; right?

21 A.   Yes, footnotes are fundamentally date ranges.  And,

22 again, those are publicly visible.

23 Q.   Now, Ms. Yanez then explained that Southwest had filed

24 it without travel date restrictions.  Do you understand her

25 to mean that Southwest had a lower fare than JetBlue --

1    excuse me, let me start over.

2        Do you understand that to mean that Southwest had

3    matched the JetBlue fare that, in turn, matched Spirit's

4    fares, but Southwest did not include travel date

5    restrictions?

6    A.    Yes.  It looks like Southwest didn't have dates on

7    their fare.

8    Q.    And as a result of that, Southwest had a lower fare

9    than JetBlue for travel on this market for dates outside of

10   that limited window?

11   A.    Yes, that would be the case.  They had a cheaper filed

12   fare for dates outside of the ones defined in that sentence.

13   Q.    Ms. Yanez went on to write, "I did an add/cancel on

14   Friday to try to flash the travel dates."  You understand

15   that to mean that she added and canceled the matching fare

16   on ATPCO to draw Southwest's attention to the travel dates;

17   right?

18   A.    That's how I read that as well.

19   Q.    And she describes that as flashing; right?

20   A.    Yes, that's her description.

21   Q.    The reason to call Southwest's attention to this fare

22   would be to encourage Southwest to add a travel date

23   restriction to its $47 fare; right?

24   A.    I wouldn't quite say encourage, but it's -- seems to be

25   to indicate to them that they did not use the travel range

1   as well.

2   Q.   And understanding that they didn't use the travel date

3   restrictions, you understand the reference to flashing and

4   add/canceling to mean calling that lack of matching by

5   Southwest to Southwest's attention; right?

6   A.   Yes, the flashing part.

7   Q.   And the reason to do that would be to encourage

8   Southwest to match JetBlue's travel window; right?

9   A.   Correct, yes.

10   Q.   And Ms. Yanez, in her next sentence, states that, "I

11   think we should give them until the 1:00 p.m. subs."  That's

12   a reference to the 1:00 p.m. ATPCO submission; right?

13   A.   Yes.

14   Q.   And you understand her to be explaining that JetBlue

15   would like to see if Southwest took action at 1:00 p.m. in

16   response to JetBlue flashing this fare; correct?

17   A.   From her note we're seeing what their -- seeing if they

18   have any submissions for the 1:00 p.m. in this market to

19   discuss next steps.

20   Q.   And she's explained -- I'm sorry.  Let's go to the

21   first page of the e-mail, please.  You see in her 6:15 p.m.

22   e-mail, this was after the 1:00 p.m. ATPCO submission;

23   right?

24   A.   The 6:15 e-mail would be, yeah, after the -- sorry.

25   Just catching up.  Yes, it would be later that day.

1    Q.   And she explained that she canceled JetBlue's fare that

2    matched Spirit's fare; right?

3    A.   Yes, she canceled the fare per that e-mail, it seems.

4    Q.   And she would then monitor Southwest's reaction to

5    JetBlue canceling that fare; right?

6    A.   Yes.  With Southwest as a main competitor in that

7    market she, of course, would be monitoring what they do in

8    that market.

9    Q.   And she added Evan Jarashow and Jeremy Blechman to the

10   e-mail; right?

11   A.   Yes, they were added.

12   Q.   Looking further up on the page, Mr. Blechman added you

13   to the chain to cover for Ms. Yanez while she was out of the

14   office; right?

15   A.   It looks like I was covering for the next day.

16   Q.   And you were asked to watch the ATPCO submissions just

17   in case we needed to rematch the Spirit fare; correct?

18   A.   Yes.  Just in case we were continuing to be undercut.

19   It looks like I was asked to, again, make sure we were

20   competitive on price at that point.

21   Q.   So that, again, was monitoring Southwest's activity on

22   ATPCO; right?

23   A.   Yep, which is part and parcel with managing that market

24   or covering the person who owns that market.

25   Q.   Would you please turn, in your binder, to the tab

1    marked Exhibit 392, which is in evidence.

2              MR. BRIGGS:  And we can publish 392.

3    Q.   Mr. Hillyard, Exhibit 392 is a chat you had with Evan

4    Jarashow and Ann Masline about fare filings; right?

5              (On screen.)

6    A.   Yes.

7    Q.   And at the time, Mr. Jarashow was JetBlue's pricing

8    manager for all markets worldwide; right?

9    A.   All markets worldwide, yes.

10   Q.   And he was your boss at the time; right?

11   A.   Yes.

12   Q.   The conversation begins with Mr. Jarashow asking if any

13   other airlines had matched JetBlue's changes to a footnote

14   in fare filings; right?

15   A.   Yes.

16   Q.   And as we discussed, footnotes are included for the

17   purpose of adding date ranges to fares; correct?

18   A.   Footnotes probably means dates, yes.

19   Q.   And those footnotes are visible to other airlines on

20   ATPCO?

21   A.   They're public as well, yes.

22   Q.   Now, you went on to write, "It occurs to me after the

23   fact, but simply changing the FN dates versus an add/cancel

24   is a more easily missed fare action, though when we do the

25   bigger add/cancel tomorrow it may be matched."  Do you see

 1    that?

 2    A.    Yes.

 3    Q.    In this message you were describing two types of

 4    filings JetBlue could make on ATPCO, the first to change a

 5    footnote definition and a second to cancel a fare and add a

 6    new one; right?

 7    A.    Correct.

 8    Q.    And if JetBlue wants to change the last travel date for

 9    a fare, it can either change the corresponding footnote or

10    it can cancel the old fare and file a new one; right?

11    A.    Well, the only way to change the dates on the fare

12    would be to adjust the footnote.

13    Q.    But if JetBlue wants to make changes, including a date

14    change, it can do so by filing a new fare; right?

15    A.    Right.

16    Q.    And you were explaining in this message that other

17    airlines are more likely to overlook changes that JetBlue

18    makes to footnotes than if JetBlue were to add and cancel

19    fares; right?

20    A.    I'm sorry.  One more time?

21    Q.    In your message to Mr. Jarashow, you were explaining

22    that other airlines would be more likely to overlook

23    footnote changes than adding and canceling fares; right?

24            MS. SIDDIKY:  Objection.

25            THE COURT:  No, overruled.  We'll see what his

```
 1   answer it.
 2   A.    Yes.  Given my experience and sort of understanding of
 3   how JetBlue operated, my understanding was that simply
 4   changing footnote dates can be a sort of easier action to
 5   miss.
 6   Q.    You can set the exhibit aside.
 7         Mr. Hillyard, you're familiar with a term called
 8   "cross-market initiatives"; right?
 9   A.    Yes.
10   Q.    The cross-market initiative occurs when an airline
11   takes a fare that was filed in one market and brings that
12   fare to another market with the purpose of calling another
13   airline's attention to that fare; right?
14   A.    Right.
15   Q.    Let's talk about your experience with cross-market
16   initiatives.  When you were a pricing analyst at JetBlue,
17   there was a time when you were responsible for pricing in
18   markets that JetBlue served between the U.S. and Latin
19   America; right?
20   A.    Correct.
21   Q.    In one of those markets a colleague asked you to do a
22   cross-market initiative; right?
23   A.    They didn't put it in those terms, but it is what I
24   came to learn as such, yes.
25   Q.    They asked you to take a fare action and you later
```

```
1    realized that what the action you had taken was a

2    cross-market initiative; right?

3    A.   That's right.

4    Q.   And this initiative related to a market that JetBlue

5    served on a nonstop basis to Latin America; right?

6    A.   Yes, I believe so.

7    Q.   Okay if we call that the nonstop market?

8    A.   Sure.

9    Q.   And JetBlue had a competitor in that nonstop market;

10   right?

11   A.   Yes.

12   Q.   And that competing airline filed a fare in JetBlue's

13   nonstop market that undercut JetBlue's fare; right?

14   A.   That was my memory, yes.

15   Q.   And as a response, you filed a lower fare in multiple

16   other markets that JetBlue -- where JetBlue competed with

17   that other airline on a connecting basis; right?

18   A.   That's my memory, yes.

19   Q.   The fares that were filed in those connecting markets

20   were at the exact same price as the fare that the other

21   airline had filed in the nonstop market; right?

22   A.   I don't remember the exact particulars but, yes, it was

23   in a separate, more connecting market than the nonstop we

24   flew.

25   Q.   And it was -- excuse me.  Let me ask the question again
```

1    to make sure I understand your testimony.

2        The fare amount that JetBlue filed in the connecting

3    markets where it also competed with this other airline was

4    the same fare amount as in the nonstop market; right?

5    A.    Given how long ago it was, I don't remember the exact

6    dollar amounts.

7    Q.    Would it refresh your recollection to look at your

8    deposition from this June?

9    A.    Possibly.

10   Q.    Would you please look at page 207 of your deposition?

11   And specifically on page 207 look at lines 10 through 18 of

12   the transcript.

13   A.    I'm sorry.  One more time the lines?

14   Q.    10 through 18.

15   A.    Okay.

16            (Witness reviewed document.)

17   Q.    Does that refresh your recollection about whether the

18   fare amount that was filed in the connecting markets was the

19   same fare amount as the other airline had filed in the

20   nonstop market?

21   A.    Yeah.  At this time it seems as though I said to the

22   best of my memory it was using the same fare amount.

23   Q.    And you understand the cross-market initiative to be

24   the fare that you filed in the connecting markets; right?

25   A.    Yes.

```
 1   Q.   And that was a response to the undercutting fare that
 2   the other airline filed in JetBlue's nonstop market?
 3   A.   That's my understanding, yes.
 4   Q.   And that cross-market initiative was designed to send a
 5   message to the other airline; right?
 6   A.   It was designed to just draw attention to the fare,
 7   fares filed.
 8   Q.   And you wanted to send a message to the other airline
 9   that it should not undercut JetBlue in the nonstop market;
10   right?
11   A.   I wouldn't quite say I wanted to send that message.  I
12   was very junior on the team at the point, but that would be
13   the broad thrust of the initiative, yes.
14           MR. BRIGGS:  Pass the witness.
15           THE COURT:  Well, let me ask a question before you
16   do.  So we're talking about it as a message, but a
17   cross-market initiative is, in essence, a warning.  Is that
18   a fair characterization?
19           THE WITNESS:  I would not necessarily clarify
20   it -- classify it as a warning, no.
21           THE COURT:  All right.  Ms. Siddiky?
22           MS. SIDDIKY:  One moment, your Honor.
23           (Pause in proceedings.)
24
25
```

CROSS-EXAMINATION

BY MS. SIDDIKY:

Q.   Mr. Hillyard, earlier you testified there are six
analysts on your team.  Does your team set the fares and
file them as well?

A.   Yes.  We -- those six analysts would be responsible for
a particular scope of markets, and their job would be to set
the fares in a given market and monitor activity to see if
additional fares need to be filed.

Q.   And are fares filed every day at JetBlue?

A.   Yes, we file fares every day throughout the day at
JetBlue.

Q.   And on average how many fares does JetBlue file per day
in ATPCO?

A.   It can range from the hundreds to well into the
thousands or hundred thousands.  But roughly averaging it
out, a thousand or so.

Q.   And on average how many fares does JetBlue file per
year in ATPCO?

A.   Throughout the course of a year it would be a few
million, you know, 5 to 10 million probably.

Q.   And what's your best estimate as to how many fares you
filed in ATPCO during your tenure at JetBlue?

A.   It would be -- it would be in the half million to a
million range myself.

```
 1    Q.   And at any given time, approximately, how many
 2    published fares does JetBlue have in ATPCO?
 3    A.   At any given time JetBlue would have about two or
 4    3 million fares in ATPCO.
 5    Q.   And at any given time how many published fares do all
 6    airlines have in ATPCO?
 7    A.   All airlines, speaking of the world, would be hundreds
 8    of millions, if not billions.
 9    Q.   And during your seven-year tenure at JetBlue have you
10    ever flashed a fare?
11    A.   I never have, no.
12    Q.   Okay.  You were asked a couple questions in some
13    e-mails about flashing, and you explained to the judge what
14    it means.  Is fare flashing permitted at JetBlue?
15    A.   No.
16    Q.   And you were shown a Teams message between you and your
17    colleague where you mentioned a footnote date possibly being
18    a more easily missed fare action than an add/cancel?
19    A.   Uhm-hmm.
20    Q.   Were you suggesting to your colleague that they should
21    flash?
22    A.   No, I wasn't.
23    Q.   Plaintiffs asked you some questions about adding and
24    then canceling fares.  Do you and/or analysts on your team
25    use add and cancel to flash fares?
```

```
 1   A.   We don't, no.

 2   Q.   What is add and then the cancel of a fare in ATPCO used

 3   for?

 4   A.   Yeah, so it's just describing, frankly, as it sounds.

 5   We would do -- we would, assuming we're sort of changing a

 6   bulk amount of things, we would do so perhaps outside of

 7   ATPCO and import it in, which would be adding a lot of

 8   fares.  So for, like, when we refresh our connecting fares,

 9   there's hundreds of thousands of those.  When we fulfill for

10   our partners, there's hundreds of thousands of those.  So we

11   would add the new fares and then cancel the stale, old

12   fares.

13   Q.   Why not just change each fare manually?

14   A.   We change the fares manually when it's sort of a very,

15   very, very small scope.  But, you know, if I asked an

16   analyst on the team to tweak, you know, tens or hundreds of

17   thousands of fares at once, that would take far too long and

18   be far too prone to error.

19   Q.   And the two e-mails you were shown were from 2020.  Are

20   you aware of any flashing occurring at JetBlue in 2021?

21   A.   I am not aware of any.

22   Q.   Are you aware of any flashing occurring at JetBlue in

23   2022?

24   A.   I am not aware of any.

25   Q.   Are you aware of any flashing that's occurred this year
```

1    at JetBlue?

2    A.    I'm not aware.

3    Q.    You were also asked about cross-market initiatives, and

4    the term referred to as "CMI," and you explained what that

5    is.  Do you -- did you understand at the time that when you

6    entered that fare that it was a CMI?

7    A.    I did not, no.

8    Q.    And what year was that in?

9    A.    I believe it was my first year, so that would be 2016.

10   Q.    Are CMIs permitted at JetBlue?

11   A.    CMIs are not.

12   Q.    And is that fare filing that you were referencing from

13   2016 the only time you have entered into what you later

14   learned to be a CMI?

15   A.    That's correct.

16   Q.    Do you instruct your analysts not to engage in CMIs at

17   JetBlue?

18   A.    We do not instruct our analysts to engage in CMIs.

19   Q.    Thank you.  You were also asked some questions about

20   Spirit and your tracking of Spirit's fares.  In the ordinary

21   course, on a daily basis, what does your team do to review

22   ATPCO filings?

23   A.    For the ordinary course of business we review -- as

24   mentioned ATPCO publishes data a few times throughout the

25   day, so we monitor the submissions that other airlines

1    publicly file at those intervals throughout the day.

2    Q.    If you can turn to your binder and please look at what

3    is Exhibit 179, which is in evidence.

4            MS. SIDDIKY:  And it can be published.

5            (On screen.)

6    Q.    What's the subject of this e-mail?

7    A.    Excuse me.  This is an ATPCO load report from

8    November 2021, the 11th, and it's summarizing the 8:00 p.m.

9    submission and the 10:00 a.m. submission.

10   Q.    And how does your team use the ATPCO load report?

11   A.    So this gets published following the ATPCO submission

12   times, and we use this report internally to communicate

13   within, frankly, the revenue management department

14   high-level changes or, you know, changes or sales that other

15   airlines file throughout the day so everyone's aware of fare

16   actions throughout the system.

17   Q.    And who sent this ATPCO load report on that day?

18   A.    This one it looks like it was me.

19   Q.    And if you can look at the bullets of -- below the

20   underlined term "Domestic."  What information are you

21   summarizing in these bullets for your team?

22   A.    This is a summary of a -- it looks like United

23   initiated a broad fare increase earlier in the week, and I

24   am providing an update on the most recent actions taken by

25   the various competitors in the markets.

1    Q.   And in the first bullet what's being described as the

2    fare action that is being flagged for the team?

3    A.   It looks like United initiated a fare increase at their

4    three and zero AP level earlier in the week.

5    Q.   And the second bullet, what is being summarized?

6    A.   What's being summarized is Alaska, Delta, United

7    rescinded the increase in what I refer to as select markets.

8    So not everything, but markets they chose to rescind in.

9    Q.   So am I understanding correctly that Alaska, Delta and

10   United had first matched that or matched the fare increase

11   of United?

12   A.   Yes.  So it looks like Alaska and Delta did match the

13   increase of United.

14   Q.   And then in the last bullet what is being summarized

15   about JetBlue's fare actions?

16   A.   The summary detail here for JetBlue is that at no point

17   did JetBlue match this fare increase.

18   Q.   And is this an example of you monitoring the ATPCO

19   filings of other airlines?

20   A.   Yes.  We monitor what other airlines file throughout

21   the day.

22   Q.   And why are you circulating this information amongst

23   the team?

24   A.   At a high level it's valuable just for general

25   awareness of market trends.  But as you can kind of see in

1   the more micro level of detail, it can be valuable for

2   various analysts who may not be on the pricing team to

3   understand the competitive posture with regards to pricing

4   versus their competitors in particular markets.

5   Q.   And in this example another carrier had raised its

6   fares but JetBlue did not match that fare.  How frequently

7   does JetBlue not match a fare increase instituted by other

8   airlines?

9   A.   Most of the time JetBlue wouldn't be matching a fare

10   increase.  I would say it's in the 20 percent or so time.

11   Q.   Okay.  And if you look at the chart that's in there,

12   the colored chart, on the right-hand side there's a column

13   labeled "NK."  Is that Spirit?

14   A.   Yes.

15   Q.   And how many overlap markets are listed for Spirit?

16   A.   In this table there's zero overlap markets listed for

17   Spirit.

18   Q.   Does that mean that Spirit and JetBlue aren't flying

19   the same routes?

20   A.   No, it just means that we, at that time, didn't have a

21   blanket strategy to match Spirit in any case.

22   Q.   And so you weren't tracking Spirit's prices through

23   this ATPCO load report; is that right?

24   A.   No, we weren't.  No.

25   Q.   But is your team able to track what Spirit's charging

1    for its fares?

2    A.   We certainly do have ways to track what Spirit has

3    filed and what they are, in fact, charging publicly to

4    customers.

5    Q.   And plaintiffs showed you examples, I think it was

6    Exhibit 370 and 371, and those were instances where you were

7    reviewing Spirit's fares as compared to JetBlue from earlier

8    this year.  And you can turn back to it, if you like.

9    A.   I might need a sec.  You said 370, 371?

10   Q.   I think it's 371.

11              (On screen.)

12   A.   Yes.  Yes, exactly.

13   Q.   Is this the type of e-mail you would typically see

14   when -- sorry, it is 370.

15   A.   370?

16   Q.   It's -- sorry.  It's 691, Exhibit CQ.  It should be in

17   your binder.  Apologies.

18   A.   Yes.

19   Q.   This is the e-mail from Miguel Velez about the fare

20   class realignment from New York City to Florida?

21   A.   Exactly, yep.

22   Q.   Yep.  Is this the type of kind of analysis that you

23   typically do for, when you're comparing your fares to the

24   big four?

25   A.   When we compare the fares to the big four it's a little

1    more plain to just observe in the public ATPCO filings.

2    Q.    Yeah.  And would you typically, if you saw that your

3    fares were higher than either Delta, United, Southwest or

4    American, would you typically go through this analysis

5    before deciding whether to match them?

6    A.    No.  We typically would match more broadly to those

7    types of competitors.

8    Q.    So why is this analysis happening in this instance for

9    Spirit?

10   A.    In this case it looks like a bit of a transition from

11   not matching the ULCC competition to choosing to get closer

12   to them on price in these markets.

13   Q.    And why do you typically not match Spirit's fares?

14   A.    We typically don't mainly because the product

15   differentiation.  We feel that our product is better than

16   Spirit's, so worth the, you know, difference in fare value.

17             MS. SIDDIKY:  Give me one moment, counsel.

18             (Whereupon counsel conferred.)

19             MS. SIDDIKY:  I have no further questions.

20             THE COURT:  Nothing further, Mr. Briggs?

21             MR. BRIGGS:  Just a very brief redirect, your

22   Honor.

23             THE COURT:  Go ahead.

24

25

```
 1                    REDIRECT EXAMINATION
 2   BY MR. BRIGGS:
 3   Q.   Counsel for JetBlue asked you, Mr. Hillyard, about
 4   JetBlue's strategy with respect to matching or not matching
 5   Spirit; right?
 6   A.   Yes.
 7   Q.   Spirit does continually review how to best compete with
 8   other airlines in the market it serves; right?  I'm sorry.
 9   That was a -- I misspoke.  Thank you.
10        JetBlue continuously reviews how to best compete with
11   other airlines; right?
12   A.   Yes, we -- part of the task is to constantly review how
13   we compete with those we share markets with.
14   Q.   And occasionally the conclusion is that it's
15   appropriate to match a Spirit fare; right?
16   A.   On a market-by-market basis there are cases where we do
17   match Spirit.
18   Q.   Mr. Hillyard, your counsel showed you an Exhibit 179 in
19   her binder in which JetBlue did not match another airline
20   fare increase.  Do you remember that?
21   A.   I do remember that and I have it in front of me.
22   Q.   From time to time, sir, JetBlue does match fare
23   increases by other airlines; right?
24   A.   From time to time JetBlue does match fare increases by
25   other airlines, yes.
```

```
 1  Q.   And from time to time JetBlue initiates fare increases

 2  that other airlines then follow; right?

 3  A.   From time to time JetBlue does initiate fare increases,

 4  yes.

 5  Q.   And if JetBlue initiates a fare increase and other

 6  airlines do not follow it, JetBlue is likely to rescind that

 7  fare increase; right?

 8  A.   That's correct.  We wouldn't want to choose to be

 9  uncompetitive on price given that would contradict our

10  general pricing strategy.

11  Q.   Mr. Hillyard, you testified about the vast volume of

12  fares that JetBlue files; correct?

13  A.   Yes.

14  Q.   Have you reviewed all of the fares that JetBlue files?

15  A.   I -- I'm incapable of doing such a thing.

16  Q.   Do you know how many of them involve flashing another

17  airline?

18  A.   My assumption would be none, given it's against our

19  policy and practices to do so.

20  Q.   Other than the policy and practices, do you have any

21  basis to know that there was no fare flashing?

22  A.   I work with high-integrity individuals who I would not

23  believe to ever do such a thing.

24  Q.   And we looked at, I think, two communications today

25  where colleagues of yours referenced flashing fares; right?
```

```
1    A.    We did.

2    Q.    That was contrary to JetBlue's policy; right?

3    A.    Yes.

4    Q.    Do you have any basis to believe that on other

5    occasions JetBlue didn't flash fares?

6    A.    Again, I, trusting the team I work with, my belief

7    would be we probably reviewed the only two examples in the

8    last recent memory.

9              MR. BRIGGS:  A moment, your Honor.

10             (Whereupon counsel conferred.)

11             THE COURT:  It's about 1:00.  Are we going to let

12   this fellow go?

13             MR. BRIGGS:  Your Honor, I'll take that as a cue.

14   We have no further questions for the witness.

15             THE COURT:  Ms. Siddiky, nothing further?

16             MS. SIDDIKY:  No.

17             THE COURT:  You may step down.  Thank you.

18             Total elapsed time out of the ten days available

19   to each party, the government has used up three days, three

20   hours, fifteen minutes.  The defense has used up two days,

21   three hours, fifteen minutes.

22             We'll resume promptly at 9:00a.m. tomorrow

23   morning.  And you can look forward to when we conclude for

24   the week, in light of the holiday, at this time tomorrow

25   I'll be asking the government about how much longer in terms
```

1    of days they expect to take to put in their case.  But think

2    about that and I'll be asking tomorrow.  Thank you.

3            We'll recess until 9:00 a.m. tomorrow morning.

4    We'll recess.

5            THE CLERK:  All rise.

6

7            (Proceedings adjourned.)

8

9

10

11

12

13

14

15                        * * * * * *

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E

       I, Cheryl B. Palanchian, Court Reporter for the United States District Court for the District of Massachusetts, do hereby certify that the foregoing pages are a true and accurate transcription of my shorthand notes taken in the aforementioned matter to the best of my skill and ability.

       /s/ Cheryl B. Palanchian 11/8/2023

          CHERYL B. PALANCHIAN
        Registered Merit Reporter
       Certified Realtime Reporter