```
            UNITED STATES DISTRICT COURT
          DISTRICT OF MASSACHUSETTS (Boston)

                               No. 1:23-cv-10511-WGY
                               Vol. 2, Pages 107-159


UNITED STATES OF AMERICA, et al
          Plaintiffs

vs.


JETBLUE AIRWAYS CORPORATION,
et al,
          Defendants



                    ********


              For Bench Trial Before:
              Judge William G. Young




                 United States District Court
                 District of Massachusetts (Boston)
                 One Courthouse Way
                 Boston, Massachusetts 02110
                 Tuesday, November 14, 2023



                    ********



      REPORTER:  CHERYL B. PALANCHIAN, RMR, CRR
              Official Court Reporter
             United States District Court
           One Courthouse Way, Boston, MA 02110
```

                    A P P E A R A N C E S


EDWARD WILLIAM DUFFY, ESQ.
ARIANNA MARKEL, ESQ.
AARON TEITELBAUM, ESQ.
        DOJ-Atr
        450 Fifth Street NW, Suite 8000
        Washington, DC 20530
        (202)812-4723
        Email:  Edward.duffy@usdoj.gov
        For Plaintiff United States of America
- and -
WILLIAM T. MATLACK, ESQ.
        Attorney General's Office
        One Ashburton Place, 18th Floor
        Boston, MA 02108
        (617)727-2200
        Email:  William.matlack@mass.gov
        For Plaintiffs United States of America and The
        Commonwealth of Massachusetts



RYAN SHORES, ESQ.
        Cleary Gottlieb Steen & Hamilton LLP
        2112 Pennsylvania Avenue, NW
        Washington, DC 20037
        (202)974-1876
        Email:  Rshores@cgsh.com
- and -
ELIZABETH M. WRIGHT, ESQ.
        Cooley LLP
        500 Boylston Street
        Boston, MA 02116-3736
        (617)937-2349
        Email:  Ewright@cooley.com
- and -
RACHEL MOSSMAN ZIEMINSKI, ESQ.
MICHAEL MITCHELL, ESQ.
        Shearman & Sterling LLP
        2601 Olive Street, 17th Floor
        Dallas, TX 75201
        (214)271-5777
        Email:  Rachel.zieminski@shearman.com
        For Defendant JetBlue Airways Corporation


(Continued.)

(Continued.)


JAY COHEN, ESQ.
ANDREW C. FINCH, ESQ.
        Paul, Weiss, Rifkind, Wharton & Garrison
        1285 Avenue of the Americas
        New York, NY 10019-6064
        (212)373-3000
        Email:  Jaycohen@paulweiss.com
        For Defendant Spirt Airlines, Inc.

I N D E X

| WITNESS: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|

BARRY BIFFLE, Continued

  By Mr. DiMarco                                111


DREW WELLS

  By Mr. DeRita        121

  By Ms. Bansal                151


  <u>EXHIBITS</u>                        <u>PAGE</u>

    706 . . . . . . . . . . . . . 154

```
 1    (Proceedings, 11:25 a.m.)
 2             THE COURT:  Court is in session, please be seated.
 3    Mr. Hohler told me that you inquired about the -- be seated,
 4    please -- the stenciling on the wall.  That, as large
 5    aspects of this courtroom, is a nod to historic courtrooms
 6    in Massachusetts because stenciling is seen in many of the
 7    courtrooms in Massachusetts.  And it's cheap.  That's why,
 8    in public buildings, back then, and I guess now, they use
 9    stenciling.  The stenciling here is a computer-generated
10    overlay of the arc of the fiberglass wall, which is the
11    signature architectural aspect of the building, laying that
12    arc, one over the other.  And then on the courtroom floors,
13    the color code is different.  I think on the third floor
14    it's green, here it's blue with red shields, and the like.
15             I delight in talking about the courtroom.  But now
16    redirect.
17             MR. DiMARCO:  Thank you, your Honor.
18                     BARRY BIFFLE, (Resumed)
19                     REDIRECT EXAMINATION
20    BY MR. DiMARCO:
21    Q.   Mr. Biffle, when you were talking to defense counsel
22    you spoke at length about your growth plans.  Frontier has
23    its own growth plans; correct?
24    A.   Yes.
25    Q.   And Frontier purchased over 200 aircraft in 2017 and
```

1   2021 believing there were opportunities to deploy those

2   planes on your routes; correct?

3   A.   Yes.

4   Q.   And to increase frequency on existing routes; correct?

5   A.   Yes.

6   Q.   Frontier decided to purchase those planes before

7   JetBlue and Spirit entered into the merger agreement;

8   correct?

9   A.   Yes.

10   Q.   In fact, after deciding to enter into the Airbus

11   contract in 2021, Frontier tried to merge with Spirit;

12   correct?

13   A.   Yes.

14   Q.   Frontier wanted even more planes with the Spirit

15   transaction; correct?

16   A.   Yes.  I would think we believed that we needed more at

17   the time, yes.

18   Q.   And Frontier planned to use all of those planes as a

19   result of that transaction using the ULCC business model;

20   correct?

21           MS. BANSAL:  Objection.  Beyond the scope.

22           THE COURT:  No, I think it's not.  Overruled.

23   A.   I'm sorry, what was the question?

24           THE COURT:  You were going to use those planes in

25   the ULCC business model?

```
 1              THE WITNESS:  That is our business model, yes.
 2   Q.   And that would have been over 500 planes, given Spirit
 3   and Frontier's fleet and order book; correct?
 4   A.   Yes.
 5   Q.   The Court asked you some questions about whether you
 6   would need to reallocate planes from other routes to use the
 7   LaGuardia assets.  Do you recall that?
 8   A.   Yes.
 9   Q.   And you testified that Frontier could serve the
10   LaGuardia routes using newly delivered planes; right?
11   A.   Yes.
12   Q.   Frontier would use those planes on other routes if it
13   didn't have LaGuardia assets; correct?
14   A.   Yes.
15   Q.   And Frontier doesn't currently have enough planes on
16   order to replace Spirit on all routes Spirit serves today;
17   correct?
18   A.   That's correct.
19   Q.   So Frontier would need to redeploy planes from existing
20   routes to chase most of the opportunities that would be
21   there if Spirit no longer operated; correct?
22              MS. BANSAL:  Objection.
23              THE COURT:  No, overruled.
24   A.   Well, it depends upon the moment in time.  Right?  So
25   when you say the opportunities, right now, Spirit's latest
```

```
 1    numbers is they -- they -- like, a negative 15.  So I don't
 2    know how many of them are opportunities.  It would be
 3    obviously a subset of their current size.  Right?  Because
 4    if they can't be served profitably then they're not really
 5    an opportunity.
 6    Q.   And you testified that Spirit and Frontier already
 7    compete on a third of Frontier's routes; correct?
 8    A.   Yes.
 9              MS. BANSAL:  Objection, your Honor.  Leading on
10    redirect.
11              THE COURT:  He is, and it's improper.  Don't lead
12    him.  Go ahead.
13    Q.   To what extent, if at all, would you need to compete
14    with Spirit on the third of those overlap routes if the
15    merger went through?
16    A.   I'm sorry --
17              MS. BANSAL:  Objection.
18              THE COURT:  Overruled.
19    A.   I'm sorry.  What do you mean by the question?
20              THE COURT:  Actually, I don't understand it
21    because if the merger goes through there's not going to be
22    any Spirit.
23              MR. DiMARCO:  Correct.  Yes, correct.
24              THE COURT:  Go ahead.
25    Q.   To the extent you compete today, you would no longer
```

1  have to compete with Spirit; correct?

2  A.   If they're not there, it would be whatever's left of

3  JetBlue.  If they pulled out, well then they wouldn't be

4  there.  I assume that they're going to convert it to

5  JetBlue, and we'll be competing with JetBlue.  Yeah, that

6  third would be completely different than the other

7  two-thirds because we're already there.  Right?  I mean,

8  it's not like there's nothing to replace.

9  Q.   Ms. Bansal showed you both a demonstrative and referred

10  you to your SEC filings with regard to your order book.  Do

11  you recall that testimony?

12  A.   Yes.

13  Q.   Okay.

14          MR. DiMARCO:  Could we pull up what was

15  Exhibit 702?

16  A.   I'm sorry, you said 702?

17  Q.   Yes.  It's with the Bates ending 21650.

18          (On screen.)

19  Q.   And I think your discussion was this was the orders

20  that you had planned to deliver -- this section at -- on the

21  page 21650 discussing your order book, this page does not

22  include the net lease returns; correct?

23  A.   That's correct.

24  Q.   To what extent, if at all, does this page include all

25  of the deliveries that you're aware of, in the future, of

```
 1   the aircraft?

 2              MS. BANSAL:  Objection.

 3              THE COURT:  Overruled.

 4   A.   These include the ones that we have contracted for.  I

 5   mean, there's -- we're in constant negotiations and

 6   discussions with others, so we could obviously add to this.

 7   Q.   Okay.

 8   A.   But these are the ones that we have contracted for.

 9   Q.   And to what extent does this represent your

10   understanding as to when those aircraft will actually be

11   delivered?

12   A.   As of the end of September, this is what we had

13   contracted and in some cases received delay notices for.  So

14   this is, as we understand it, Airbus' best intention to

15   deliver on these periods.

16   Q.   And Ms. Bansal directed you to a sub-bullet in this

17   section, which says, "While the schedule presented reflects

18   contract delivery dates as of September 30th, 2023, the

19   company has recently experienced delays in deliveries of

20   aircraft which may persist in future periods."  Correct?

21   A.   That's right.

22   Q.   So they may be delivered -- so it's possible -- is it

23   possible that there could be future delivery delays relative

24   to the schedule?

25              THE COURT:  Sustained.  You are leading.
```

```
 1                 MR. DiMARCO:  I apologize, sir.

 2                 THE COURT:  Every question is leading.  You're not

 3      to lead on redirect.  Is there anything else?

 4                 MR. DiMARCO:  A moment to confer.

 5                 (Whereupon counsel conferred.)

 6      Q.   Mr. Biffle, you were shown Biffle Demonstrative 3.  On

 7      this demonstrative how many retirements does Frontier expect

 8      in the next couple of years?

 9      A.   Which one's Demonstrative 3?  Is it --

10      Q.   It's the one with the airplanes on it.

11      A.   This is the one with all the airplanes across the page?

12      Q.   Yep.

13      A.   Okay.  I don't know the exact number.

14      Q.   Do you have an estimate as to what they are?

15      A.   I feel like we're getting hung up on exact orders of

16      aircraft.  And this is -- I'm not trying to be difficult,

17      but this isn't exactly how the world works.  Right?  So this

18      is what we've contracted from Airbus.  This can go up or

19      down.  We have huge amounts of flexibility up or down.  We

20      can go get more aircraft.  We can lease more aircraft, not

21      even a direct buy from them.  We could get rid of planes.

22                 So these are guideposts.  What we normally said, I

23      think the best way to think about our growth is that we have

24      said we will grow in the 15 to 20 percent range for years to

25      come based on what we know.  If something changes, so in the
```

```
 1   marketplace if something changes, so a carrier fails,

 2   there's a merger that takes place, then we may go find and

 3   acquire a big growth, step-function growth in airplanes.  So

 4   I worry we're getting a little too worried about exactly the

 5   number of planes.  This can change dramatically based on

 6   what the opportunity set is.

 7           THE COURT:  Well, the reason that they're doing

 8   this, and I appreciate your answer, is because I'm going to

 9   have to make a prediction of what will happen whatever I

10   ultimately order.  And I guess that's why I was pressing.

11   If this goes through -- and I'll just ask and let you

12   answer.  If this goes through, how well are you going to be

13   able to serve your existing routes?

14           THE WITNESS:  I don't think we would ignore our

15   existing routes.  I mean, we're not going to take things

16   that we've invested in dramatically and just turn them off

17   to chase something that Spirit flew.  Right?  Would we look

18   to acquire more aircraft above our normal growth in order to

19   exploit a near-term opportunity?  Absolutely.  I mean, we

20   would ramp up.

21           We've looked at, like, for example, like, I could

22   train like three times as many pilots as those I'm currently

23   training.  Like, we've looked at what it would take to

24   actually fill a hole or a void if it existed.  We don't mind

25   investing in that capacity because I'm going to need it
```

```
 1    anyway once I get to a particular size.  But we wouldn't
 2    ignore our existing customers.  I mean, that would be...
 3              THE COURT:  And another -- and you tell me if I've
 4    heard you right.  I get the sense from your testimony that
 5    if this merger were to go through it makes good business
 6    sense, from Frontier's point of view, to serve the gates
 7    that are divested, which you purchased really, and you think
 8    you would be up and running within a year of that time, is
 9    that about right?
10              THE WITNESS:  Are you talking about the LaGuardia
11    ones?
12              THE COURT:  I guess I am talking about the
13    LaGuardia.
14              THE WITNESS:  Yeah, the LaGuardia ones, we
15    actually would be required, the agreement was that we would
16    do it within six months of closing.
17              THE COURT:  All right.
18              THE WITNESS:  So we would have about eight, I'm
19    guessing, if this trial --
20              THE COURT:  Well, guessing, you can't guess.  You
21    can estimate.
22              THE WITNESS:  We believe that that is an adequate
23    amount of time, six months is an adequate amount of time,
24    and that's why we put it in the agreement.
25              THE COURT:  And the other assets that you would
```

```
1    get through this?
2             THE WITNESS:  We haven't contracted for anything
3    else beyond LaGuardia.  We would be looking.  Obviously, we
4    would watch what JetBlue does with the assets, like everyone
5    will be.  We will all be watching every Sunday to see what
6    Saturday night's change tape gave us.  And I think we would
7    start to make maneuvers to fill those voids.  And we would,
8    so would everybody else in the marketplace.
9             THE COURT:  Thank you.  Mr. DiMarco, go ahead.
10            MR. DiMARCO:  No further questions, your Honor.
11            THE COURT:  Nothing further, Ms. Bansal?
12            MS. BANSAL:  Nothing further.
13            THE COURT:  Thank you.  You may step down.
14            (Whereupon the witness stepped down.)
15            THE COURT:  Call your next witness.
16            MR. DeRITA:  All right.  We'll be calling
17   Mr. Wells.
18            THE COURT:  He may be called.
19            (Pause in proceedings.)
20                       DREW WELLS, sworn
21            THE COURT:  Actually, I didn't hear your answer,
22   sir.  The court reporter --
23            THE WITNESS:  I do.
24            THE COURT:  Thank you.  Please be seated.  Now,
25   pull that microphone.  You be comfortable, but pull the
```

 1   microphone close to your mouth so it picks you up.

 2             MR. DeRITA:  Good morning, your Honor.  I'm Mike

 3   DeRita with the United States.

 4             THE COURT:  Yes, Mr. DeRita.  Go ahead.

 5                         DIRECT EXAMINATION

 6   BY MR. DeRITA:

 7   Q.   Mr. Wells, can you state and spell your name, for the

 8   record?

 9   A.   Sure.  Drew Wells, D-R-E-W, W-E-L-L-S.

10   Q.   Where are you currently employed?

11   A.   Allegiant Air.

12   Q.   What's your position there?

13   A.   Senior vice president and chief revenue officer.

14   Q.   And how long have you been in this position?

15   A.   Oh, almost a year.

16   Q.   What are your responsibilities at Allegiant?

17   A.   Generally, anything revenue-related, network planning,

18   kind of a lot of the commercial functions excluding

19   marketing.

20   Q.   Can you give some more color as to what that means with

21   respect to network planning?

22   A.   The network planning team decides where we fly, how

23   often we fly, the schedule, locations of our crew and

24   aircraft bases.

25   Q.   And with respect to revenue management, can you give us

```
 1  some more detail on that?
 2  A.   Sure.  Pricing all air tickets, as well as our
 3  ancillary and third-party products that we offer.
 4  Q.   As part of your role at Allegiant, are you familiar
 5  with the operations of other airlines?
 6  A.   Somewhat, yes.
 7  Q.   And how are you familiar with those operations?
 8  A.   Sorry.  Can you --
 9  Q.   What types of things do you read or follow that allow
10  you to stay familiar with operations of other airlines?
11  A.   Generally aware of, you know, industry media and public
12  schedule data that allows me to keep up on network
13  decisions, schedules, capacity, things of that nature.
14  Q.   How long have you been at Allegiant in total?
15  A.   About twelve and a half years.
16  Q.   What other positions have you held at Allegiant?
17  A.   Started in financial planning and analysis, worked in
18  the fleet planning group, then spent the last decade,
19  really, with the revenue team.
20  Q.   Now, I'll have more questions for you about this later,
21  but I'd like to just briefly discuss divestitures.  But as a
22  general matter, has Allegiant agreed to purchase Spirit and
23  JetBlue assets that will be divested in relation to the
24  JetBlue-Spirit merger?
25  A.   Yes.
```

1    Q.    At which airports?

2    A.    Fort Lauderdale, Boston Logan and Newark.

3    Q.    Were you involved in Allegiant's discussions with

4    JetBlue to purchase those assets?

5    A.    Yes.

6    Q.    And what was your role with respect to those

7    negotiations?

8    A.    I was generally the primary point of contact with

9    Allegiant.

10   Q.    Okay.  I'd like to turn and discuss Allegiant's

11   business model and its position in the industry.  Starting

12   there, how would you describe Allegiant?

13   A.    Allegiant is an ultra low-cost carrier.  We pride

14   ourselves on keeping fixed costs low that enable us to

15   deploy capacity in a way that matches with the level of

16   demand we foresee in the marketplace.

17   Q.    How does Allegiant keep fixed costs low?

18   A.    Generally, through our aircraft acquisition tactics.

19   Q.    Can you explain what you mean by that?

20   A.    Sure.  Historically, Allegiant has operated a used

21   aircraft fleet that's been, you know, a low-cost point to us

22   to put into service.  As we moved forward, we do have a new

23   order of Boeing MAXs that we're very proud of the economics

24   behind that deal as well.

25   Q.    How would you describe Allegiant's airport costs?

1   A.   Typically lower through airport selection, but not

2   always.

3   Q.   What do you mean by that?

4   A.   If we go to LAX, we may not have any different cost

5   structure than another airline such as JetBlue or Spirit.

6   If we're in Grand Island, Nebraska, obviously we have a fair

7   bit of a different setup.

8   Q.   Does Allegiant seek to serve lower-cost airports?

9   A.   Where it makes sense, yes.

10   Q.   And what airports typically are lower-cost?

11   A.   Secondary or less well-served airports.

12   Q.   How would you describe Allegiant's seating density?

13   A.   Not quite at max capacity, as our ideal state, but

14   close to it.

15   Q.   Is there any relationship between Allegiant seating

16   density and its costs?

17   A.   On a unitized basis, but actually more expensive on a

18   trip cost.

19   Q.   How would you compare Allegiant's cost structure to

20   Spirit's?

21            MR. BANSAL:  Objection.  Foundation.

22            THE COURT:  Do you think you're able to answer

23   that question?

24            THE WITNESS:  Generally so, yes.

25            THE COURT:  And I'll accept his answer

1  understanding that it's general.  How would you compare it?

2          THE WITNESS:  Allegiant's cost structure on the

3  unitized basis is slightly higher than Spirit's because we

4  fly less often, generally.

5  Q.   When you say less often, on what basis are you

6  referring to?

7  A.   The number of hours per aircraft per day, what we'd

8  call utilization.

9  Q.   How would you quantify the difference in utilization

10  that you're describing?

11  A.   Sure.  Spirit will tend to fly roughly 12 hours per

12  aircraft per day at a high level, Allegiant is closer to six

13  or seven hours per day.

14  Q.   How would you compare Allegiant's cost structure to

15  JetBlue's?

16  A.   Allegiant would be lower than JetBlue's.

17  Q.   How would you compare Allegiant's cost structure to

18  other ULCCs, setting aside Spirit?

19          MS. BANSAL:  Objection.  Foundation.

20          THE COURT:  If he thinks he can answer it we'll

21  receive his answer.

22  A.   The answer would be similar to Spirit's in that we fly

23  a little bit less and, therefore, our unitized costs are

24  slightly higher.

25  Q.   Okay.  I'd like to turn to discuss Allegiant's network

1    strategy.  At a high level how would you describe
2    Allegiant's network strategy?
3    A.    Allegiant is attempting to serve underserved or
4    unserved routes where folks don't have an option or are
5    priced out of the ability to travel.
6    Q.    What do you mean by underserved or unserved routes?
7    A.    Unserved is kind of how it seems.  There's no current
8    options between points A and B.  Underserved would mean
9    there is service but it's generally higher priced and
10   pricing out some element of the demand that exists.
11   Q.    How would you describe Allegiant's destinations in
12   terms of city size?
13   A.    Pretty broad array from more sun destinations, like
14   Orlando and Las Vegas, to some of the largest metropolitan
15   areas like Newark, Boston and others.
16   Q.    Is there a city size that's more prevalent within
17   Allegiant's network, typically?
18   A.    Given that we started with a smaller size strategy,
19   that's a bit more prevalent today.  But the evolution of the
20   network has been such that we have all been more midsized
21   cities through the midpart of the last decade, and then to
22   some of the largest cities kind of within the last five to
23   six years.
24   Q.    I'd like to turn your attention to a document that is
25   in the binder in front of you.  It's Exhibit 10.  It's

```
 1   already in evidence.
 2            (On screen.)
 3   Q.   And just let me know when you're open to that page.
 4   We'll stay right on the first page here.  What is this
 5   document?
 6   A.   It appears to be an e-mail from me to our chief
 7   marketing officer and our former -- well, she was over
 8   flight ops and moved into more of a customer experience type
 9   of role.
10   Q.   Okay.  I'd like to direct your attention to the
11   paragraph that has a number 1 in front of it.
12            MS. BANSAL:  Objection.  Sorry to interrupt you.
13   Objection.  He hasn't laid a business foundation.
14            THE COURT:  It's in evidence, Exhibit 10.
15            MS. BANSAL:  It is in evidence but I believe he's
16   using it in an improper way.
17            THE COURT:  I don't.
18   Q.   Do you need me to redirect you?
19   A.   Something about bullet point 1.
20   Q.   Yeah.  So if we can go to bullet point 1, here you
21   write with focus on the "pillar/built to be different"
22   pieces.  What are you referring to by "pillar/built to be
23   different pieces"?
24   A.   The "built to be different" has been a staple of our
25   management presentations and external communication really
```

1    since the inception of the company.

2    Q.   How, if at all, does Allegiant consider the "built to

3    be different pieces" in its strategy?

4    A.   The way I consider it, and probably why I use pillars

5    here is this is how we think about, you know, the core of

6    our service.  So underserved markets is as we described

7    before.  Leisure customers, our frequency does not lend

8    itself well to business customers, and so on.  If there's a

9    specific point I'm happy to talk to it.

10   Q.   Yeah, so let's go through some of them.  First let's

11   talk about the leisure customer.  You sort of already

12   discussed it, but can you explain by what is meant by

13   leisure customer being included in this set of pillars?

14   A.   This is generally a customer going on vacation or

15   visiting friends and relatives.  Because our frequency is

16   often less than daily, it doesn't work well for a more

17   schedule-centric traveler, which a business customer usually

18   is.

19   Q.   To what extent does Allegiant focus its business on

20   serving those types of leisure customers?

21   A.   Historically, a hundred percent of our efforts go

22   toward that.

23   Q.   And you mentioned the frequency with which Allegiant

24   serves being less than daily.  How would you describe the

25   number of times a week that Allegiant typically provides

 1   service?

 2   A.   Typically, we try to match the capacity with the level

 3   of demand that exists.  For some parts of the year that can

 4   be daily or more, and in many parts and more than 50 percent

 5   of the time it tends to be two times a week.

 6   Q.   How often does Allegiant provide daily service on a

 7   route?

 8   A.   Over the last 12 months, 58 routes have had daily or

 9   more service.

10   Q.   And how many routes has Allegiant served total?

11   A.   Approximately 550.

12   Q.   So I'm a lawyer, don't really love math, but that's

13   about 10 percent?

14   A.   Ballpark, that works.

15   Q.   If we move down the list here, I believe you already

16   described underserved markets, but there's an entry here

17   with "little competition."  What is that a reference to?

18   A.   That's really a reference to unserved or underserved

19   markets.  There is a lot of demand that exists, especially

20   in the leisure space, that we don't believe is being

21   satisfied broadly by the industry.  That's led to a lot of

22   opportunities for us where there may or may not be existing

23   industry competition or service.

24   Q.   How does Allegiant use this pillar of "little

25   competition" in its network planning capacity?

1   A.   We use it to understand what the dynamics of the

2   marketplace are.  We couldn't make a call on what's

3   underserved without knowing the number of seats, the number

4   of passengers or the yields being produced by routes.  This

5   is all generally available public information but it is not

6   a binary yes or no there is or is not competition, therefore

7   we should or should not serve.

8   Q.   To what extent, if at all, does Allegiant seek out

9   routes with little competition?

10  A.   We seek out routes that we believe have opportunity for

11  us.  And whether or not they have competition, like I said,

12  it's not a binary decision or an end state there, but rather

13  an influence on whether or not we believe there is demand to

14  be stimulated on that market.

15  Q.   How many of Allegiant's routes is Allegiant the only

16  airline that provides service?

17  A.   Using the definition that we do, which would include a

18  single proxy airport but not double proxy airports, and no

19  regional jet service, we have -- out of the 550 routes, 124

20  have competition, the balance would not.

21  Q.   So, again, trying to do the math here, that would mean

22  about 75 percent of the routes that Allegiant serves do not

23  have competition?

24  A.   Correct.

25  Q.   And how does that 75 percent or so compare to the level

```
 1    of competition on routes that Allegiant has identified in
 2    its forward-looking network strategy?
 3    A.   As of today, we think the forward-looking is
 4    approximately the same.
 5    Q.   Let's move down the list to the "low frequency/variable
 6    capacity."  We've talked about capacity and frequency a
 7    little bit, but how would you explain this entry in the
 8    table here?
 9    A.   Very much how I did before.  We aim to match the level
10    of capacity we deploy with the amount of demand we foresee
11    in the market.  That's going to be different in a July than,
12    say, a September.
13    Q.   Why would it be different in July versus September?
14    A.   I'm guessing if we polled the room, many more people
15    take vacation --
16              THE COURT:  I always jump in when you use the word
17    "guess."  You can estimate, but you can't guess.
18    A.   I'm sorry.  I estimate if we polled the room, more
19    folks here would take vacation in July than in September.
20    As we focus on the leisure customer, that's the demand we
21    focus on.
22    Q.   Does Allegiant vary its capacity based on route?
23    A.   Based on the level of demand we forecast for any given
24    route, yes.
25    Q.   And does Allegiant vary its frequency based on the day
```

1    of the week?

2    A.    Certainly.  Again, as the leisure customer's demand

3    profile is very weekend heavy, typically, and less so on a

4    Tuesday or Wednesday, for example.

5    Q.    Okay.  I'd like to turn to some specific questions

6    about Allegiant's network and how it uses its fleet.  Where

7    do Allegiant's planes typically park overnight?

8    A.    We have 24 crew and aircraft bases around the system

9    and all of our aircraft and crew should rest overnight

10   there.

11   Q.    Are you familiar with the term "out and back"?

12   A.    Yes.

13   Q.    What does that mean to you?

14   A.    For us, in our network, that would mean a crew and

15   aircraft departing a base, going out to one of our

16   outstations, and then returning immediately to the domicile

17   in which it started.

18   Q.    Does Allegiant operate an out-and-back network?

19   A.    Predominantly, yes.

20   Q.    When you say "predominantly," how frequent would it be

21   that the service is out and back?

22   A.    More than probably 90 percent of the time out and back.

23   Q.    Are you familiar with the term "fortress hub"?

24   A.    Yes.

25   Q.    What are they?

```
 1    A.    To me, fortress hub means, predominantly for a legacy

 2    carrier, a place where many of their spoke routes will

 3    terminate to create connection opportunities to their

 4    thicker routes at an airport that they heavily dominate in

 5    terms of level of service.

 6    Q.    Does Allegiant serve other airlines' fortress hubs?

 7    A.    Yes.

 8    Q.    Which ones?

 9    A.    Newark, for example, would be a fortress for United.

10    We serve adjacent to other fortress hubs.  For example, we

11    serve Midway in Chicago adjacent to the O'Hare fortress hub

12    for, again, United.  We're here in Boston.  We serve both

13    Dulles and Baltimore in the DC area.  Houston.

14    Q.    Does Allegiant serve -- provide service to Atlanta?

15    A.    Atlanta will be one of the few, along with Dallas, of

16    the kind of fortress metros that we do not serve.  I believe

17    we serve all of the others.

18    Q.    But on an airport-to-airport basis, which fortress hubs

19    does Allegiant serve?

20    A.    On a specific airport basis?

21    Q.    Yes.

22    A.    Dulles, Newark, Boston.  If we're including Southwest

23    in this, Houston Hobby and Midway, Minneapolis, Denver,

24    Portland, if you count that for Alaska, LAX.

25    Q.    Does Allegiant serve Atlanta Airport on an
```

```
 1   airport-to-airport basis?
 2   A.   We do not serve Atlanta or the region.
 3   Q.   Does Allegiant serve O'Hare Chicago on an
 4   airport-to-airport basis?
 5   A.   O'Hare, no.
 6   Q.   Dallas-Fort Worth on an airport-to-airport basis?
 7   A.   Not Dallas nor the region.
 8   Q.   Does Spirit serve other airlines' fortress hubs?
 9           MS. BANSAL:  Objection, foundation.
10           THE COURT:  No, I think he's demonstrated a level
11   of knowledge.  I can accept that testimony.  It all will go
12   to the weight.
13   A.   Yes, they do.
14   Q.   Which fortress hubs does Spirit serve that Allegiant
15   does not?
16   A.   I certainly don't know that I'll have a full list for
17   you.  I presume, based on the line of questioning, they
18   serve Atlanta and they serve Dallas-Fort Worth.
19   Q.   Good guess.  Does Allegiant currently provide
20   international service?
21   A.   We have an application out to do so.  It is in the
22   government's hands.  If you could please talk with your
23   colleagues and get that through.  We would have been serving
24   in January of this year.  Appreciate it.
25   Q.   And can you just explain more about what that
```

1    application is for?

2    A.    Sure.   It was an antitrust immunity and joint venture

3    with Viva Aerobus in Mexico.   The intention was that we

4    would be able to collaborate and serve transborder between

5    the U.S. and Mexico together, yeah, fully cooperatively.

6    Q.    Whose metal would that service be provided on?

7    A.    It would be a mix.   It would be metal neutral, with the

8    estimate that it would be close to 50/50.

9          THE COURT:   The metal neutral, which means equal

10   number of planes?

11         THE WITNESS:   Meaning for the consumer it would be

12   indifferent.   It could be Allegiant one day, it could be

13   Viva Aerobus the next day.   There was no prescribed, from

14   the city, it must be X airline.

15   Q.    Does Allegiant provide any international service on an

16   independent basis?

17   A.    Not today, no.

18   Q.    And has Allegiant attempted to do so in the past?

19   A.    Twice, yes.

20   Q.    Why does Allegiant not provide that service?

21   A.    The first time we had put application in with the

22   Mexican government it became very cumbersome from a

23   development, IT-development perspective, and we decided that

24   it was not in our best interests to continue going down that

25   path.   The second time a global pandemic struck and we

```
 1   stopped progress.

 2   Q.   Does Allegiant currently provide service to Puerto

 3   Rico?

 4   A.   No, not currently.

 5   Q.   Has Allegiant provided service to Puerto Rico in the

 6   past?

 7   A.   Yes.

 8   Q.   Why did Allegiant stop providing Puerto Rican service?

 9   A.   Puerto Rico was well served and the results weren't

10   great for us at that time so we ceased service.

11   Q.   What do you mean by "well served"?

12   A.   There's a high number of fairly low-fare seats that

13   entered that marketplace to a place that we no longer felt

14   it was underserved and producing results we had hoped for.

15   Q.   Does Allegiant currently sell tickets for connecting

16   service?

17   A.   No.

18   Q.   Okay.  I want to change the topic here and talk about

19   the way that you compete with other airlines.  How would you

20   describe the current competition, if any, between JetBlue

21   and Allegiant?

22   A.   Only on a handful of routes.

23   Q.   Did you have a specific number?

24   A.   I believe it's -- I believe it's less than ten.

25   Q.   How would you compare Allegiant's business model to
```

1    Spirit's?

2    A.   Similar from a ultra low-cost carrier perspective but

3    different thoughts on how we deploy capacity.

4    Q.   Can you expand a little bit more on that, about the

5    difference on deployment capacity?

6    A.   Sure.  We believe that, being Allegiant, we should

7    deploy capacity when demand exists.  And I believe Spirit

8    believes they should deploy capacity in a way that minimizes

9    unit cost regardless of the demand environment.

10   Q.   I guess can you put that into more practical terms as

11   to how that would play out in the deployment of the

12   capacity?

13            MS. BANSAL:  Objection.

14            THE COURT:  I didn't understand that question.  I

15   understood his answer to the previous question.

16   Q.   All right.  Can you give --

17            THE COURT:  They serve demand, Spirit uses other

18   calculations.

19   Q.   Can you give an example of where that might be the

20   case?

21   A.   I would look at the number of times that Allegiant

22   serves a two- or three-time-a-week market because that's

23   where we believe the level of demand exists, relative to

24   Spirit not flying very many of those and likely flying empty

25   airplanes on some days a week.

```
 1   Q.   How would you compare Allegiant's fleet size to
 2   Spirit's?
 3   A.   I don't know Spirit's fleet number, off the top of my
 4   head.  Allegiant has approximately 125 aircraft.
 5   Q.   And how would you compare the number of destinations
 6   that Spirit serves to the number that Allegiant serves?
 7   A.   Allegiant serves more destinations than Spirit does.
 8   We should be third overall in the industry for that.
 9   Q.   How would you compare the number of times --
10        THE COURT:  Third -- excuse me.  Third among ultra
11   low-cost carriers?
12        THE WITNESS:  No.  Into the pandemic we actually
13   served more domestic cities than any other airline,
14   including legacies.  American and Delta, as they've gone to
15   main-line service on the bigger aircraft to some of the
16   smaller cities, have passed us.  But it's third among all in
17   the U.S. industry.
18        THE COURT:  Thank you.
19   Q.   When you say "served," do you mean year-round or is
20   that a seasonal basis?
21   A.   It could be either.
22   Q.   How would you compare the number of times per week that
23   Allegiant serves its routes versus Spirit?
24   A.   I don't have Spirit's, off the top of my head.  I
25   believe the vast majority are served at least daily.
```

```
 1  Whereas, as we discussed, more of ours are served less than
 2  daily.
 3  Q.   I'd like to return to a topic I previewed earlier, the
 4  divestitures.  First, let's discuss at a high level how
 5  these assets would actually be transferred to Allegiant.
 6  And just to start, I want to talk about gates and ground
 7  facilities, not authorizations or anything like that.
 8       What approvals, if any, are required to transfer the
 9  assets at Boston, Fort Lauderdale and Newark to Allegiant?
10  A.   We would need the airport or airport authority to
11  approve that, as well as the merger to go through.
12  Q.   Has Allegiant obtained those consents from the airport
13  authorities for the transfers that we were just discussing?
14  A.   Not at present, no.
15  Q.   Has Allegiant been involved in discussions with the
16  airport authorities to obtain those consents?
17  A.   Somewhat, yes.
18  Q.   Okay.  And I want to switch and talk about the
19  operating authorizations at Newark.  So when I say
20  "operating authorizations," are you aware of what I'm
21  referring to?
22  A.   I presume runway authorizations, landing and departure
23  pairs.
24  Q.   And Allegiant is purchasing operating authorizations at
25  Newark; is that right?
```

```
 1   A.   Correct.
 2   Q.   Okay.  Is any authorization required to transfer the
 3   operating authorizations from Spirit to Allegiant at Newark?
 4   A.   My understanding is the FAA would have to get involved
 5   with that.
 6   Q.   Has that consent been obtained from the FAA yet?
 7   A.   No.
 8   Q.   How, if at all, did the need to obtain consent from the
 9   airport authorities and the FAA impact the price Allegiant
10   offered for the divestiture assets?
11   A.   Sorry.  Was that for the FAA or in general?
12   Q.   In general.
13   A.   It impacted it meaningfully.  We reduced the price
14   roughly in half.
15   Q.   When you say -- did you say decreased the price roughly
16   in half?  I wasn't quite clear.
17   A.   Correct.  Yeah, the price came down by about
18   50 percent.
19   Q.   Okay.  And I'd like to walk through the three
20   divestiture airports and we'll start with Boston.  What
21   assets has Allegiant agreed to purchase in Boston?
22   A.   Two gates, along with support to run those gates.
23   Q.   Does the divestiture agreement include any planes?
24   A.   No.
25   Q.   Does it include any pilots?
```

```
 1    A.    No.

 2    Q.    Does it include any other flight crew or employees?

 3    A.    No.

 4    Q.    Putting aside the divestiture, has Allegiant attempted

 5    to obtain preferential gates at Boston in the past?

 6    A.    Yes.

 7    Q.    And what happened in those attempts?

 8    A.    We did not get them.

 9    Q.    Do you have any understanding as to why?

10    A.    I do not.

11    Q.    Let's talk about Boston's -- Allegiant's current

12    service in Boston.  In your binder you have a demonstrative

13    labeled Wells Demonstrative A, and it's also going to appear

14    on the screen in front of you.  And just let me know when

15    you're there.

16              (On screen.)

17    A.    Okay.

18    Q.    So this is a screenshot of Allegiant's route map, and

19    it's been filtered to Boston.  It came directly from your

20    website.  You can see the URL there at the top.

21          Does this look like an accurate list of Allegiant's

22    Boston routes to you, Mr. Wells?

23    A.    Yes.

24    Q.    And it's a little bit hard to kind of make out with all

25    the colors and lines here so I just want to walk through
```

1    this.  When we get to the others we'll assume it's all the

2    same.

3         So the lines here on this map, they would indicate the

4    routes from Boston Logan to the destinations that are being

5    served; is that right?

6    A.    Correct.

7    Q.    And the green dots are the other endpoints of the

8    Boston service; is that right?

9    A.    Correct.

10   Q.    And on the right-hand side here there's actually a list

11   of the destinations spelled out by name; is that right?

12   A.    Yes.

13   Q.    Okay.  How would you describe the destinations that

14   Allegiant currently serves to and from Boston?

15   A.    Cities that have demand to Boston.  They range from

16   more mid-continent, perhaps origination cities that use

17   Boston as a destination, as well as some sun destinations in

18   the south that would originate a bit more from Boston.

19   Q.    How would you characterize the traffic and passengers

20   on these routes?

21   A.    Sorry.  In what manner?

22   Q.    For what reason are the travelers typically traveling

23   on these routes?

24              MS. BANSAL:  Objection.

25              THE COURT:  Overruled.

```
1    A.    Leisure, generally.

2    Q.    And as far as the size of the cities that Boston serves

3    from -- that Allegiant serves from Boston, how would you

4    characterize those?

5    A.    Mostly midsized cities or sun destinations.

6    Q.    Why does Allegiant serve leisure customers in midsized

7    destinations from Boston?

8    A.    Because they aren't being served properly by the rest

9    of the industry.

10   Q.    And what do you mean by that?

11   A.    There's not enough seats to satisfy the level of demand

12   that we believe exists, especially at the price point we're

13   willing to offer.

14   Q.    Does Allegiant currently compete with JetBlue on any of

15   its Boston routes?

16   A.    I believe they announced Asheville, and certainly to

17   Sarasota.

18   Q.    Is there any difference between Allegiant's strategy

19   for its Boston routes and your understanding of the service

20   that JetBlue provides at Boston?

21   A.    Sorry.  Can you repeat?

22   Q.    Yeah.  Is there a difference between the way we've been

23   talking about Allegiant's strategy for Boston and the

24   service that JetBlue provides at Boston, the cities and the

25   types of passengers?
```

A.   I can certainly speak to Allegiant.  You know, like I
said, we're attempting to serve a leisure customer either
out of or into Boston that's not currently being served in a
way that we feel the demand dictates.  But I would also like
to point out that we're fairly pigeonholed in Boston using
international gates from midmorning until early afternoon.
Our capability to grow beyond this is severely hindered by
that inability to gain a preferential gate.

Q.   Okay.  Let's talk about Allegiant's plans for the
Boston divestiture assets.  Does the divestiture agreement
obligate Allegiant to serve the routes that Spirit currently
serves in Boston?

A.   Does the divestiture agreement dictate that?

Q.   Yes, sir.

A.   No.

Q.   Has Allegiant developed plans for which routes it will
serve using the Boston assets?

A.   It's a fluid environment.  We can certainly make calls
based on what we know historically on the day that it
exists, but I'm not in the business of speculating what may
happen when the merger closes and what demand may look like.

Q.   Sure.  I'm not asking you to speculate.  I guess let me
put a finer point on it.  Are there any concrete plans, like
having a list of routes that -- and frequencies that
Allegiant would serve in Boston should it acquire the

1   divestiture assets?

2   A.   No.  I'm not going to try to speculate what may happen

3   with capacity and yields far to the future when this merger

4   may or may not occur.  So it wouldn't be practical for me to

5   say what the network will look like then.

6   Q.   So no such list exists today?

7   A.   Correct.

8   Q.   Okay.  Let's shift and talk about Newark.  What assets

9   has Allegiant agreed to purchase in Newark?

10  A.   Similarly, the two gates as well as the runway

11  authorizations.

12  Q.   Does Allegiant plan to use all of the Newark operating

13  authorizations it's acquired?

14  A.   We'll certainly attempt to.  I'll admit some are more

15  challenging for us to use than others.

16  Q.   Why would that be the case that they would be more

17  challenging?

18  A.   We don't currently base any crew or aircraft in Newark,

19  so hitting the earliest time frames are a challenge.

20  Q.   Okay.  I'm going to introduce Wells Demonstrative C

21  and, yes, I'm going out of order here.  But it will look

22  very similar to the route map that we discussed earlier but

23  this one has been filtered to Newark.  And it's also from

24  Allegiant's website.

25            (On screen.)

Q.   Does this look like an accurate list of Allegiant's

Newark routes to you, Mr. Wells?

A.   Yes.

Q.   And we had just explained and discussed that Allegiant

serves smaller leisure destinations from Boston.  Does

Allegiant serve those same types of customers to and from

Newark?

A.   Yeah.  Generally, midsized cities and sun destinations.

Q.   Does Allegiant currently compete with JetBlue on any of

its Newark routes?

A.   I don't believe so.

Q.   Has Allegiant developed plans for which routes it will

serve using the Newark assets?

A.   I can't speculate what will happen with capacity and

yields into the future.

Q.   Okay.  We can pull that one down.  And I'd like to move

to the last of the three divestiture airports, Fort

Lauderdale.  What assets has Allegiant agreed to purchase in

Fort Lauderdale?

A.   Five gates.

Q.   So putting aside the divestiture, has Allegiant

attempted to acquire gates at Fort Lauderdale?

A.   We have.

Q.   And has Allegiant acquired -- has Allegiant faced any

difficulties in obtaining preferential gates at Fort

```
 1   Lauderdale?
 2   A.   Fort Lauderdale requires that you fit an extra gate
 3   worth of service onto your existing footprint in order to
 4   qualify for an incremental gate.  So it's a bit slower in
 5   nature to accomplish that.
 6   Q.   So has Allegiant been able to do that?
 7   A.   Yes.
 8            THE COURT:  How many gates do you have at Fort
 9   Lauderdale?
10            THE WITNESS:  Three gates currently.
11   Q.   Has Allegiant faced any gate constraints at Fort
12   Lauderdale?
13   A.   Certainly.
14   Q.   How so?
15   A.   We would like to have more gates than they are
16   currently offering us.
17   Q.   Okay.  And I'd like to talk about Allegiant's current
18   service at Fort Lauderdale.  I'm going to introduce Wells
19   Demonstrative B.  And, again, this is another screenshot
20   from the Allegiant website, and this one actually appears on
21   two pages.  So if we can actually get those side by side.
22            (On screen.)
23   Q.   The map itself is exactly the same and this would be
24   the right-hand side with the list.  And does this look like
25   an accurate list of Allegiant's Fort Lauderdale routes to
```

1   you, Mr. Wells?

2   A.   Yes.

3   Q.   And does Allegiant serve the same types of passengers

4   that we described at Boston and Newark out of Fort

5   Lauderdale?

6   A.   Obviously, Fort Lauderdale being a bit more sun

7   destination, it's not quite the same as Boston or Fort

8   Lauderdale.  But, generally, a leisure customer a bit more

9   inbound than you would see, but otherwise yes.

10  Q.   And as far as city size, how would you describe the

11  city size that Allegiant serves to and from Fort Lauderdale?

12  A.   Predominantly midsized with some small and an

13  occasional large city.

14  Q.   Does Allegiant currently compete with JetBlue on any of

15  its Fort Lauderdale routes?

16  A.   I believe so but I don't know for sure, off the top of

17  my head.

18  Q.   Recognizing that you don't know, is there a number of

19  routes that you think might be competition between JetBlue

20  and Fort Lauderdale there?

21          MS. BANSAL:  Objection.  He said he doesn't know.

22          THE COURT:  Sustained.

23  Q.   Has Allegiant developed plans for which routes it will

24  serve using the Fort Lauderdale assets?

25  A.   Along the same lines.  I can't speculate what may

1    happen with capacity and yields into the future so it would

2    be hard to do.

3    Q.   Okay.  And, finally, I just want to take a step back

4    and discuss Allegiant's future plans more generally, not

5    just the three divestiture assets.  Are there any concrete

6    plans for Allegiant's network strategy of serving small

7    leisure -- end leisure markets to change if Allegiant

8    acquires the divestiture assets?

9    A.   Our focus is on serving unserved and underserved routes

10   which, over time, has evolved to mean more than just small

11   and midsized cities.  So I would expect everything is fair

12   game, including international.

13   Q.   Are there any concrete plans for those things to

14   change?

15   A.   No.  It's a fluid industry.

16   Q.   And earlier you mentioned that 75 percent of

17   Allegiant's routes have no competition.  Did Allegiant

18   believe the fact that it doesn't offer -- that it doesn't

19   often compete with other carriers would make it an

20   attractive divestiture buyer?

21              MS. BANSAL:  Objection.

22              THE COURT:  Sustained.  You're leading the

23   witness.

24   Q.   Are there any concrete plans for Allegiant to change

25   the frequency with which it faces competition if Allegiant

```
 1    acquires the divestiture assets?
 2    A.   Our plan remains to match capacity with demand.  Such
 3    that minimum-use requirements exist, we have every bit of
 4    faith that we will meet those.
 5    Q.   I'm not sure that I was actually clear on the question.
 6    So going back on the number that we were talking about,
 7    75 percent of Allegiant's routes don't face competition, are
 8    there any concrete plans for Allegiant to change how often
 9    it faces competition if Allegiant acquires the divestiture
10    assets?
11    A.   Our plan is to serve un- and underserved routes where
12    we think it makes sense that there's a demand profile not
13    properly being served.  So whether it has competition or not
14    is kind of indifferent.  It's about what exists on that
15    market.
16              THE COURT:  You said it would be challenging to
17    serve Newark where you were going to get some gates.  How
18    challenging will it be to serve Fort Lauderdale?
19              THE WITNESS:  Well, maybe for a point of
20    clarification, challenging to hit the earliest time slots of
21    the runway authorization, not challenging in general.
22              THE COURT:  I'll take your refinement and I
23    appreciate it.
24              THE WITNESS:  Fort Lauderdale, we've had no issue
25    and continue to grow gates.  I have every bit of confidence
```

 1   that we can serve five additional gates with an ever

 2   expanding network.  And after counselor speaks with his

 3   colleagues, our international service transborder as well.

 4          MR. DeRITA:  We're the DOJ, we're not the DOD or

 5   the FAA.

 6          I have no further questions at this time.  I'll

 7   pass the witness.

 8          THE COURT:  Ms. Bansal, any questions for this

 9   witness?

10          MS. BANSAL:  I do, your Honor.

11          THE COURT:  You may.

12                       CROSS-EXAMINATION

13   BY MS. BANSAL:

14   Q.   Good morning, Mr. Wells.

15   A.   Good afternoon.

16   Q.   Good afternoon.  Are we there yet?

17        Allegiant is a ULCC that has been quickly growing over

18   time; correct?

19   A.   Correct.

20   Q.   And part of Allegiant's business model is to constantly

21   monitor opportunities for growth; correct?

22   A.   Correct.

23   Q.   And in doing so, you often look at routes in which

24   other airlines have dropped capacity; correct?

25   A.   Correct.

```
 1    Q.   And that would include routes in which Spirit has
 2    dropped capacity; correct?
 3    A.   Yes.
 4    Q.   In looking for opportunities you will also look for
 5    routes where fares increased; is that fair?
 6    A.   Uhm-hmm.  Yes.
 7    Q.   Now, as you just discussed with the Department of
 8    Justice, Allegiant is a divestiture buyer in this merger;
 9    right?
10    A.   Correct.
11    Q.   You've signed agreements to acquire assets in three
12    airports; correct?
13    A.   Correct.
14    Q.   And do you agree, sir, that those assets will increase
15    your ability to compete out of Boston, Newark and Fort
16    Lauderdale?
17    A.   Certainly.
18    Q.   And it will increase your flexibility to grow out of
19    those airports; correct?
20    A.   Correct.
21    Q.   If you could turn, Mr. Wells, to Exhibit BUY.  This
22    would be in the binder.  I think you're in the right binder.
23              (On screen.)
24    Q.   Just let me know when you have it up.
25    A.   Yep, we're good.
```

1    Q.   Now, this is Allegiant's management presentation from

2    the second quarter of 2023; correct?

3    A.   Yes.

4    Q.   And you're familiar with this presentation?

5    A.   Generally so, yes.

6    Q.   You're part of Allegiant's management?

7    A.   Correct.

8             MS. BANSAL:  I'd like to introduce BUY into

9    evidence.

10            MR. DeRITA:  Objection.  Hearsay.

11            THE COURT:  It is.

12            MS. BANSAL:  It's a business record, your Honor.

13            THE COURT:  You haven't laid a foundation for it,

14   but I assume that it is.  So it's a business record.  Is it

15   relevant?

16            MS. BANSAL:  I believe so, yes.

17            THE COURT:  Well, how so?

18            MS. BANSAL:  This shows the -- this shows

19   Allegiant's growth plans over the next few years, it shows

20   its network map, it shows its performance in the industry,

21   and that it's a quickly growing ULCC.

22            THE COURT:  You don't challenge that it's really a

23   business record of Allegiant's, do you?

24            MR. DeRITA:  Well, I'm not sure exactly how

25   counsel plans to use it and for what statements within this

```
1    document, but it's still hearsay.
2              THE COURT:  Well, we'll see.  And if you have a
3    valid objection I'll hear you.  BUY is admitted and the next
4    number will be 7-0 what?
5              COUNSEL:  Six.
6              THE COURT:  Six, in evidence.
7              (Exhibit 706 received in evidence.)
8    Q.   If you could turn, Mr. Wells, to the Bates ending in
9    3230.  Now, Mr. Wells, this is a map of Allegiant's route
10   network as of June 2023.  Does that look accurate to you?
11   A.   Yes.
12   Q.   And I believe you testified to this earlier, but if you
13   could remind the Court, how many routes does Allegiant serve
14   today?
15   A.   It's approximately 550 today, down from the 572 here in
16   the document.
17   Q.   How many passengers does Allegiant serve?
18   A.   Seventeen to 18 million annually.
19   Q.   And I think you testified to this too, but just as a
20   reminder to the Court, how many airports does Allegiant
21   serve?
22   A.   There's approximately between 120, 125.
23   Q.   And I think you testified earlier, that is the third
24   highest of all domestic airlines; is that correct?
25   A.   Domestically, yes.
```

```
 1   Q.   How does Allegiant's airport presence compare with
 2   Spirit's?
 3   A.   I don't know the Spirit number, off the top of my head,
 4   but I know that Allegiant's is larger.
 5   Q.   Would approximately double sound right to you?
 6   A.   I could believe it.
 7   Q.   And you testified earlier that you have 24 bases;
 8   correct?
 9   A.   Correct.
10   Q.   And included in these bases are ground crew, hangar
11   space.  Anything else?
12   A.   Everything required to run, essentially, an isolated
13   airline out of that base.  All maintenance, all crews,
14   everything should be self-contained there, yes.
15   Q.   So you have 24 of those across the country; right?
16   A.   Correct, yes.
17   Q.   And how many aircraft does Allegiant currently have?
18   A.   Approximately 125.
19   Q.   Now, if you look at this map and you look at the orange
20   dots, what do those orange dots represent?
21   A.   Those represent what we deem are leisure destinations.
22   Q.   Are those the major areas of travel for Allegiant?
23   A.   Generally, traffic would be inbound to the orange dots
24   out of the blue dots, but not exclusively, obviously.
25   Q.   And do you see roughly ten dots just in Florida alone?
```

```
 1   A.    That sounds right.
 2   Q.    And that's all the way from -- it's a little too soon
 3   to -- all the way from Destin to Key West?
 4   A.    Correct.
 5             THE COURT:  Bellingham, Washington, is a leisure
 6   destination?
 7             THE WITNESS:  We get a fair amount of transborder
 8   traffic coming down from Vancouver to service that.
 9   Bellingham is actually one of our oldest cities and is a
10   plane and aircraft base.  At one time it was about
11   12 percent of our total service.
12             THE COURT:  Thank you.
13   Q.    And so of your 24 bases, you have six in Florida alone?
14   A.    That sounds right, yes.
15   Q.    And why does Allegiant have so much presence in
16   Florida?
17   A.    We serve a leisure customer and Florida, obviously, is
18   a very strong leisure-oriented state.
19   Q.    So it's a natural extension of your leisure destination
20   VFR services -- service offerings?
21   A.    Certainly, yeah.
22   Q.    There's also orange dots in a number of larger cities.
23   Do you see that?
24   A.    Yes.
25   Q.    Boston, Los Angeles, San Francisco, Las Vegas, New
```

```
 1   York, D.C., Baltimore, New Orleans; correct?
 2   A.   Yes.
 3          THE COURT:  I don't mean to prolong this.  See if
 4   you can't do the same as you did for Bellingham with Tulsa.
 5   Tulsa, Oklahoma.
 6          THE WITNESS:  Not nearly as large as Bellingham
 7   simply because Vancouver is such a large catchment area of
 8   passengers.  So Tulsa, probably never more than 2 percent of
 9   overall capacity.
10   Q.   When you were speaking with the Department of Justice
11   you talked about an evolution in Allegiant's business model.
12   Can you give us a little bit more detail about that
13   evolution?
14   A.   Sure.  We started as an airline very much focused on
15   the smallest cities that were generally unserved going to
16   Vegas and Orlando, the biggest destinations.  In the midpart
17   of last decade, meaning roughly 2013, we started into
18   midsized cities like Austin, Texas.  Cincinnati, Ohio
19   followed shortly after that, and a few other midsized
20   cities.  2016 was kind of the rival into some of the bigger
21   northeast cities with our Newark announcement, and then that
22   was followed really through 2021 with additions into Boston
23   into Houston, Chicago, cities that Allegiant typically
24   hadn't been in but represented a big opportunity of kind of
25   an underserved demand profile.
```

```
 1            THE COURT:  Ms. Bansal, I'm going to have you stop

 2  now because we have to go out to Boston University.

 3            The present elapsed time stands the government,

 4  five days, twenty-five minutes.  The defense, three days,

 5  two hours, twenty minutes.  We'll stand in recess now until

 6  9:00 a.m. tomorrow morning.  We'll start promptly then.

 7  We'll recess.

 8            THE CLERK:  All rise.

 9

10            (Proceedings adjourned.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
                    C E R T I F I C A T E



         I, Cheryl B. Palanchian, Court Reporter

for the United States District Court for the

District of Massachusetts, do hereby certify that

the foregoing pages are a true and accurate

transcription of my shorthand notes taken in the

aforementioned matter to the best of my skill and

ability.




                _/s/ Cheryl B. Palanchian_ 11/14/2023
                     CHERYL B. PALANCHIAN

                   Registered Merit Reporter
                   Certified Realtime Reporter
```