THE UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS (Boston)

No. 1:23-cv-10511-WGY
Vol 1, Pages 1 - 93

UNITED STATES OF AMERICA, et al,
          Plaintiffs

vs.

JETBLUE AIRWAYS CORPORATION, et al,
          Defendants

* * * * * * * * *

For Bench Trial Before:
Judge William G. Young

United States District Court
District of Massachusetts (Boston)
One Courthouse Way
Boston, Massachusetts 02210
Wednesday, November 15, 2023

* * * * * * * *

REPORTER: RICHARD H. ROMANOW, RPR
Official Court Reporter
United States District Court
One Courthouse Way, Room 5510, Boston, MA 02210
rhrbulldog@aol.com

```
 1                    A P P E A R A N C E S

 2

 3    EDWARD WILLIAM DUFFY, ESQ.
      ARIANNA MARKEL, ESQ.
 4    AARON TEITELBAUM, ESQ.
         DOJ-Atr
 5       450 Fifth Street NW, Suite 8000
         Washington, DC 20530
 6       (202) 812-4723
         Email: Edward.duffy@usdoj.gov
 7    and
       WILLIAM T. MATLACK, ESQ.
 8       Attorney General's Office
         One Ashburton Place, 18th Floor
 9       Boston, MA 02108
         (617) 727-2200
10       Email: William.matlack@mass.gov
         For Plaintiffs United States of America and
11       The Commonwealth of Massachusetts

12

13    RYAN SHORES, ESQ.
         Cleary Gottlieb Steen & Hamilton LLP
14       2112 Pennsylvania Avenue, NW
         Washington, DC 20037
15       (202) 974-1876
         Email: Rshores@cgsh.com
16    and
       ELIZABETH M. WRIGHT, ESQ.
17       Cooley LLP
         500 Boylston Street
18       Boston, MA 02116-3736
         (617) 937-2349
19       Email: Ewright@cooley.com
      and
20    RACHEL MOSSMAN ZIEMINSKI, ESQ.
      MICHAEL MITCHELL, ESQ.
21       Shearman & Sterling LLP
         2601 Olive Street, 17th Floor
22       Dallas, TX 75201
         Email: Rachel.zieminski@shearman.com
23       For Defendant JetBlue Airways Corporation

24

25       (Continued.)
```

1     (Continued.)

2

3   JAY COHEN, ESQ.
    ANDREW C. FINCH, ESQ.
4       Paul, Weiss, Rifkind, Wharton & Garrison
        1285 Avenue of the Americas
5       New York, NY 10019-6064
        (212) 373-3000
6       Email: Jaycohen@paulweiss.com
        For Defendant Spirit Airlines, Inc.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                        I N D E X

2

3    WITNESS                DIRECT  CROSS  REDIRECT  RECROSS

4

5    DREW WELLS (Continued.)

6       By Mr. DeRita:                        32

7       By Ms. Bansal:               5                  41

8

9    MARK GALE

10      By Mr. Amlin:        42               82

11      By Ms. Wright:              68

12

13   EVAN JARASHOW

14      By Mr. Briggs:       84

15      By Ms. Zieminski:

16

17                      E X H I B I T S

18

19         EXHIBIT 782 ........................  52

20         EXHIBIT 783 ........................  55

21         EXHIBIT 784 ........................  64

22         EXHIBIT 785 ........................  87

23         EXHIBIT 786 ........................  92

24

25
```

```
 1          P R O C E E D I N G S
 2          (Begins, 9:00 a.m.)
 3          THE COURT:  Good morning, we're ready to go.
 4          Please remind the witness.
 5          THE CLERK:  I'd like to remind you, sir, that you
 6     are still under oath.
 7          Do you understand?
 8          THE WITNESS:  Yes.
 9          THE COURT:  And, Ms. Bansal, you may continue.
10          MS. BANSAL:  Thank you, your Honor.
11          THE COURT:  Not continue.  You may proceed.
12          (Laughter.)
13          MS. BANSAL:  Thank you.
14
15     CROSS-EXAMINATION BY MS. BANSAL:  (Continued.)
16     Q.  Good morning, Mr. Wells.
17     A.  Good morning.
18     Q.  We're going to go -- we're going to start by
19     bringing Exhibit 706, which was admitted into evidence
20     yesterday, back on the screen, and I think that will be
21     Tab BUY in your binder.
22          MS. BANSAL:  Your Honor, this is the --
23          THE COURT:  Yeah, "BUY"?
24          MS. BANSAL:  Yes.  And it's the page ending in
25     3230.
```

 1    Q.  So, Mr. Wells, please orient ourselves and the

 2    Court.

 3         Yesterday you were explaining the evolution of

 4    Allegiant's business model, correct?

 5    A.  Correct.

 6    Q.  And you were explaining how in the past 5 to 7 years

 7    Allegiant has entered a number of larger cities over

 8    time, correct?

 9    A.  Correct.

10    Q.  Now in addition to entering larger cities, are there

11    other aspects of Allegiant's evolution?

12    A.  With respect to network or more broadly?

13    Q.  Correct, network, um, utilization, frequency.

14    A.  Sure.  So with respect to the network, um, there's

15    been a lot more, I guess, connections between

16    nontraditional Allegiant cities, for example an Austin

17    to a Cincinnati, which doesn't necessarily have a core,

18    um, some destination attached to it, but it's more of a

19    Visiting Friends and Relatives-style connection.

20         As we think about the fleet, we move from

21    exclusively or nearly exclusively a used operator to

22    ordering a brand new Boeing Max fleet, which we'll start

23    to deliver the early part of next year, but will serve

24    as a backbone for our growth moving forward.  But it's a

25    bit of a departure from kind of how we thought about the

1    company 20 years ago.

2        Beyond that, um, you know we're building a resort

3    in Southwest Florida, which is a little bit of a

4    departure for an airline as well.

5    Q.  And in addition to those things that you just

6    mentioned, has Allegiant also evolved over time into

7    entering larger cities and geographic regions?

8    A.  Certainly as a part of those kind of last 5 to 7

9    years, as you mentioned, is a big part of it.

10   Q.  And that would include, um, bigger airports and

11   geographic regions, correct?

12   A.  Correct.

13   Q.  And Allegiant sometimes refers to its evolution as

14   "Allegiant 2.0," is that right?

15   A.  Correct.

16   Q.  So yesterday the Department of Justice asked you

17   about Allegiant's business strategy with respect to

18   frequencies, um, and you testified that Allegiant

19   strives to match capacity with demand, is that fair?

20   A.  Yes.

21   Q.  And so as a part of that Allegiant sometimes offers

22   less than daily service on its routes, fair?

23   A.  Correct.

24   Q.  Can you explain to the Court what benefits there are

25   from flying less than daily on your network?

A.   Um, to us I mean primarily it's not flying empty
aircraft around, which on the one hand would lose us
money, is not ideal, but it's certainly better from an
environmental perspective, right?  Flying an empty
aircraft around does nobody any good.

Q.   And does it also result in cost savings for the
airline?

A.   Certainly, yeah.

Q.   And are you able to pass those cost savings on to
your passengers?

A.   We believe so, yes.

Q.   You testified yesterday that Allegiant flies
approximately 10 percent of its network on a daily
basis, right, around 58 routes?

A.   Correct.

Q.   And that's because Allegiant has identified on those
routes that there is sufficient demand, right?

A.   Yes.

Q.   Now if Allegiant already flies a route and
identifies that there is an uptick in demand, Allegiant
can increase its capacity, correct?  I'm sorry, increase
its frequency, correct?

A.   Correct.

Q.   Now you mentioned sometimes providing service
through smaller airports in a city.  You sometimes refer

1    to those as "proxy airports"?

2    A.   Yes.

3    Q.   And do you believe those proxy airports compete with

4    the larger airports in the region?

5    A.   Yes, absolutely.

6    Q.   So what are some benefits from flying out of proxy

7    airports?

8    A.   From our perspective there generally is cost savings

9    associated with the proxy airport.   From a customer

10   perspective we believe it's a much more seemless

11   experience, it's quicker from the parking lot to the

12   gate, quicker through the TSA lines, and all around just

13   a better and faster experience for the customer.

14   Q.   And so with respect to the cost savings, again are

15   you able to pass those on to your passengers?

16   A.   Certainly.

17   Q.   And I believe you're saying that there's some

18   passengers that in fact prefer the proxy airport, is

19   that right?

20   A.   That's my strong belief, yes.

21   Q.   Because there's less congestion, less traffic, in

22   and out?

23   A.   Right.

24   Q.   Now you said that these proxy airports sometimes

25   compete with the larger airports in the region.   So let

1    me name a couple of proxy airports and you can tell me

2    whether it competes with the larger airport in the

3    region.

4    A.  Okay.

5    Q.  Baltimore Washington International.

6    A.  Yes.

7    Q.  That competes with Dulles and, um, DCA, correct?

8    A.  Correct.

9    Q.  Midway in Chicago.  That competes with O'Hare,

10   correct?

11   A.  Correct.

12   Q.  And I believed you testified yesterday that Midway

13   is actually the hub for Southwest, do I have that right?

14   A.  They have a very strong presence there, yes.

15   Q.  And Midway is actually located closer to Downtown

16   Chicago than O'Hare, is that right?

17   A.  It's much more convenient, yeah.

18   Q.  So that goes back to the seemless experience you

19   were telling us about?

20   A.  Correct.

21   Q.  What about Saint Pete's Clearwater International?

22   A.  It's Tampa International, yes.

23   Q.  So that is an airport that competes with Tampa?

24   A.  Yes.

25   Q.  And what about Sarasota Airport?

```
 1    A.   That's not so much a proxy, I view that as
 2    competitive in and of its own right.
 3    Q.   Okay.  So with Saint Pete, that competes with Tampa?
 4    A.   Uh-huh.
 5    Q.   And how far is Saint Pete's from the Tampa Airport?
 6    A.   It's really just across the bridge, it's not very
 7    far.  20 minutes maybe.
 8    Q.   10 miles perhaps?
 9    A.   Yeah.
10    Q.   So it's very close?
11    A.   Yes.
12    Q.   Now what about Sanford Airport, does that compete
13    with MCO?
14    A.   Yes.
15    Q.   And you currently fly out of Sanford?
16    A.   Correct.
17    Q.   And have you just recently announced that you will
18    expand at MCO?
19    A.   Not officially or formally announced, but it is on
20    the website, um, to ensure it was working when we did
21    intend to announce it.
22         THE COURT:  I should know this, but "MCO" is?
23         MS. BANSAL:  Orlando.
24         THE COURT:  Thank you.
25    Q.   So now you will compete out of both airports in
```

1    Orlando?

2    A.   Correct.

3    Q.   And what about AZA in Phoenix, does that compete

4    with Sky Harbor?

5    A.   Yes.

6    Q.   And what about Punta Gorda, does that compete with

7    Fort Meyers?

8    A.   Yes.

9    Q.   So you testified yesterday that Allegiant competes

10   with other airlines on about 25 percent of its routes,

11   correct?

12   A.   Correct.

13   Q.   And I believe you said that's somewhere around 124

14   routes?

15   A.   Yes.

16   Q.   And so because Allegiant flies so many routes

17   overall, over 500, 25 percent is actually over 100

18   routes?

19   A.   Correct.

20   Q.   So you're competing on over 100 routes --

21   A.   Yes.

22   Q.   And you don't choose your routes based on whether

23   there's a competitor on it or not, do you?

24   A.   Correct.

25   Q.   How do you -- how does that factor play into your

1    decision to enter, if at all?

2    A.   Um, only so far as what the prevailing fares and

3    capacity levels are that we believe we can stimulate,

4    um, incremental demand at our price point.  For example,

5    when we launched Austin Texas to Las Vegas, Southwest

6    was very prevalent on the market, however in the 12

7    months before serving the 12 months after, Southwest

8    carried the same number of passengers and every one that

9    flew on Allegiant was clearly stimulated into that

10   market.

11   Q.   And so you choose the route that would be the most

12   profitable for you?

13   A.   That's certainly the hope as we forecast it out,

14   yes.

15   Q.   Whether there's a competitor on them or not?

16   A.   Correct.

17   Q.   Now of those 100 routes, 100-plus routes I should

18   say, how many does Allegiant compete with a Big 4

19   airline?

20   A.   Um, a Big 4 is not particularly -- well I should

21   take that back.  Southwest is meaningful and close to 20

22   percent, um, of the overall picture.  So almost all of

23   the competitive routes have Southwest.  The other three

24   legacies are a bit less so.

25   Q.   So including Southwest, is it fair to say that above

1    95 percent of your routes have either Southwest, United,

2    Delta, or American on them?

3    A.   Above 90 for sure, but 95, I could believe.

4    Q.   Now I'm going to -- I'd like to get your reaction to

5    this statement.  And this is not my statement.

6         "Allegiant is afraid to compete against the

7    legacies."  Is that true, Mr. Wells?

8         MR. DeRITA:  Objection.

9         THE COURT:  I don't understand that.  It's not

10   connected to anything.

11        MS. BANSAL:  I can provide more context, your

12   Honor.

13        THE COURT:  I mean I've never heard someone say,

14   "I'd like your comment on this statement, but it's not

15   my statement."  It's an intriguing --

16        (Laughter.)

17        MS. BANSAL:  Let me provide more context, your

18   Honor.

19        THE COURT:  So in light of the objection,

20   sustained.

21        Go ahead.

22   Q.   So in the Department of Justice's trial -- in the

23   trial transcript of its opening statement, DOJ

24   represented, "For instance, you will hear from another

25   ULCC that one of the pillars of its business strategy is

1    flying routes that have little competition."  And then

2    the Department of Justice clarified that they were

3    speaking about Allegiant.

4         Does that provide enough context for you,

5    Mr. Wells, to get your reaction?

6         THE COURT:  Now I have the context, I might have

7    suspected it, but what they say in their opening is not

8    evidence.  What you folks have said in the opening is

9    not evidence.  I don't -- his reaction to it --

10        You're afraid to compete with legacies?

11        THE WITNESS:  Not afraid, no, sir.

12        THE COURT:  Well that takes care of it.  I mean

13   that's his testimony.

14        MS. BANSAL:  Thank you, your Honor.

15        THE COURT:  It's one of those "What did you expect

16   him to say? questions.

17        (Laughter.)

18        THE COURT:  Go ahead.

19   Q.  All right.  All these competitive routes, go back to

20   the 124 routes, how many routes does it compete with

21   other ULCCs?

22   A.  Um, Frontier and Spirit both come in second and

23   third, so they would, you know, be somewhere around 15

24   to 20 percent of routes.

25   Q.  Of the 124?

1    A.  Of the total picture.  That would include routes

2    where perhaps Southwest and a legacy are on as well as a

3    ULCC.  There's more than one competitor on several

4    routes.

5    Q.  I see.  So there might be a number of routes in

6    which you have a Big 4 and a ULCC?

7    A.  Correct.

8    Q.  But if you were looking at just routes total with a

9    ULCC, would that number be higher?

10   A.  That would be in that 15 to 20 percent of total

11   routes.

12   Q.  So is it fair to say that Allegiant does not

13   preclude servicing routes with other competitors?

14   A.  Correct.

15   Q.  Is it fair to say that Allegiant does not shy away

16   from competition?

17   A.  Correct.

18   Q.  Is it fair to say that Allegiant will consider

19   entering large markets after the merger should those

20   opportunities arise?

21   A.  Absolutely.

22   Q.  In fact you testified yesterday that you'll consider

23   all opportunities that may arise after the merger

24   regardless of city size, correct?

25   A.  Correct.

1    Q.   That's true today?

2    A.   Yes.

3    Q.   And it will be true after the merger, right?

4    A.   Yes.

5    Q.   (Pause.)  Now if the merger goes through and there

6    are certain routes on which Spirit exits, would

7    Allegiant consider those to be opportunities?

8    A.   Yes.

9    Q.   And if the merger should go through and the

10   Department is correct that fares will go up, would

11   Allegiant consider those routes potential opportunities?

12   A.   We would certainly consider them, yes.

13   Q.   And in the past has Allegiant taken advantage of

14   opportunities arising from other mergers?

15   A.   Yes.

16   Q.   Can you tell us an example of that?

17   A.   When Southwest and AirTran merged, excuse me, um,

18   there was meaningful capacity, it was pulled out of --

19   more midsized cities on the East Coast that AirTran

20   serviced and Southwest did not that we backfilled a

21   meaningful amount of capacity in.

22   Q.   And do you have an estimate of "meaningful

23   capacity"?

24   A.   Um, it's, you know, kind of hard to say at this

25   point, it's been a while.

1   Q.  But a substantial number of routes?

2   A.  Correct.

3   Q.  Now when opportunities arise, is it important for

4   Allegiant to move quickly?

5   A.  Yes.

6   Q.  Why is that?

7   A.  Um, we do believe that there is a first-mover

8   advantage when opportunities arise, and there are other

9   ULCCs that have the same publicly-available information

10  that we do that may or may not view the opportunity like

11  we do.

12  Q.  And so when opportunity arises, if Allegiant is

13  interested in that opportunity, it has to move fast?

14  A.  We believe so, yes.

15  Q.  And if you do decide to enter a route, how quickly

16  can you do so?

17  A.  We believe that we can get everything together to

18  make an announcement within, um, 2 to 4 weeks generally,

19  depending on whether or not we exist in that city

20  already.  And then of course we want a, you know, 2 to 4

21  months, depending on how long the flight is, for a

22  booking curve to develop for the first flight.

23  Q.  All right, Mr. Wells, let's talk about Allegiant's

24  fleet.

25        So you testified yesterday that Allegiant has

1    approximately 127 planes in its gates currently?

2    A.   Correct.

3    Q.   And I believe you said your current fleet

4    utilization is somewhere around 7 hours per day?

5    A.   Yes.

6    Q.   Is Allegiant in the process of trying to increase

7    its utilization?

8    A.   Absolutely.

9    Q.   And can you tell us what you would like to increase

10   it to?

11   A.   In 2019, um, we accomplished something closer to 8

12   hours per day per aircraft, I think that's probably the

13   right level for us depending on the fuel environment,

14   the demand environment, and some other fluid variables.

15        THE COURT:  I hear you say you'd like to increase

16   to 8 hours and you're working toward that, but at 8

17   hours you think that's correct for your fleet.  You

18   haven't got a sense you want to increase it further?

19        THE WITNESS:  Some of that would depend on the

20   prevalent fuel environment.  For example, in 2019 it was

21   about $2.15.  If we were to see something at $1.15, I

22   would expect that number to go higher.  I just don't

23   know if that's a reasonable estimate at this time.

24   Q.   And would that utilization increase with your new

25   fleet coming in?

1  A.  Certainly.  The Boeing Max has 20 percent less fuel

2  burn, which produces a better economic outcome for us to

3  fly more.

4  Q.  And so how much higher would you anticipate it to be

5  with the new planes?

6  A.  Um, we believe we should fly those probably 10 to 20

7  percent more than we would the Airbus.

8  Q.  In 2022, did Allegiant enter an agreement with

9  Boeing to take delivery of additional aircraft?

10        MR. DeRITA:  Objection, this is outside the scope,

11  so I believe that counsel should not be allowed to --

12        MS. BANSAL:  I disagree, your Honor.

13        THE COURT:  Why?

14        MS. BANSAL:  Because their entire direct was about

15  trying to establish that Allegiant is not a credible

16  competitor and all of these questions go to discrediting

17  that.

18        THE COURT:  I think you can -- as to this subject

19  you take it on direct, you can do that.

20        MS. BANSAL:  All right.  So may I proceed, your

21  Honor?

22        THE COURT:  Of course you may proceed.

23        THE WITNESS:  I apologize.  Can you repeat it?

24  Q.  Do you have additional aircraft coming in?

25  A.  Yes.

1    Q.   And can you describe the details of that order?

2    A.   At a high level at least.   There are 50 firm Boeing

3    Max aircrafts split between the Dash 8200 variant and

4    the Dash 700.   Along with that there are 80 options for

5    future purchases of Boeing Max aircraft.

6    Q.   And so if I understand you correctly, you have a

7    commitment to purchase 50 planes?

8    A.   Correct.

9    Q.   And you will be -- you have an option to receive an

10   additional 80 planes?

11   A.   Correct.

12   Q.   And how do those additional 80 planes impact your

13   ability to grow, if at all?

14   A.   They would have a meaningful impact to growth.

15   We'll certainly have some retirements of older aircraft,

16   but this order was almost entirely dedicated to the

17   growth of the airline.

18   Q.   And how will it increase your flexibility, if at

19   all?

20   A.   We believe with the lower fuel burn and a similar

21   fixed-cost profile, um, we'll be able to fly more often

22   in lower-demand environments, while still maintaining

23   the ability to park the aircraft if we need to continue

24   to match capacity with demand in say September.

25   Q.   Okay.   How many seats are there on these new Boeing

1    737s?

2    A.   We'll take, um, the Dash 8200s at 190 seats, and the

3    Dash 700s at I believe it's 163.

4    Q.   And when will you start taking delivery of these new

5    planes?

6    A.   The first one is estimated at either the end of

7    January or the beginning of February.

8    Q.   And at what pace do you anticipate receiving these

9    planes?

10   A.   The expectation is two per month, um, after that,

11   until we've completed the 50 firm.

12   Q.   And is that 2 per month every month for the next

13   year, do I have that correct?

14   A.   Um, yes, correct.

15   Q.   And is that also correct for the following year?

16   A.   Correct.

17   Q.   (Pause.)   All right.   Let's pull up Wells

18   Demonstrative 1.

19        Okay.   How many aircraft do you have in your fleet

20   currently?

21   A.   127 is in the document.

22   Q.   And how many do you believe you'll receive next

23   year?

24   A.   Next year would be approximately 27, but 25 Boeing

25   and 2 Airbus are to come on line.

1   Q.  And in 2025, how many?

2   A.  That should be the balance of the last 25.

3   Q.  And then you have the option, right?  How many are

4   in your option?

5   A.  The 80.

6   Q.  And then I believe you said they'll be some that you

7   plan to retire?

8   A.  Correct.

9   Q.  Roughly how many do you think you'll retire over

10   this period of time?

11   A.  We've talked about retiring our 27 oldest aircraft

12   over the next three to four years.

13   Q.  Okay, so this Demonstrative shows 21, but you

14   believe it's closer to 27?

15   A.  Yeah.

16   Q.  Okay.  And so in total -- and I'm asking you to do a

17   little bit of math on the fly here.

18        In total, taking into account the retirements and

19   taking into account the options, how many planes could

20   you have by the end of 2019?  And an estimate is fine.

21        MR. DeRITA:  Objection.  Calls for speculation.

22        THE COURT:  Oh, I think not.  He can estimate

23   this.

24   A.  Yeah, hold it, please.  (Laughter.)  (Pause.)  It

25   looks like 230, if I use my 27 number on the

 1   retirements.

 2        THE COURT:  But would that be -- you're looking at

 3   that document here, and somebody made that up for this

 4   trial.  Do you think the numbers here are roughly

 5   accurate?

 6        THE WITNESS:  Yes, sir.

 7        THE COURT:  Okay.  And so your estimate is what?

 8        THE WITNESS:  The 230.

 9        THE COURT:  The 230.  All right.

10   Q.  All right, Mr. Wells, a new topic.

11        MS. BANSAL:  You can bring the demo down.

12   Q.  Yesterday you talked about a joint venture between

13   Allegiant and Aviva Aerobus, correct?

14   A.  Correct.

15   Q.  And I believe you said that if that application had

16   been approved, you would be serving Mexico today,

17   correct?

18   A.  Correct.

19   Q.  And if that application were to be approved today,

20   how quickly could you be serving Mexico?

21   A.  We believe we can be selling within probably 30 days

22   with about a 3-month window to begin operations.

23   Q.  Now in addition to Mexico, are, um -- are the

24   Caribbean and Latin America natural extensions of your

25   offerings?

```
1   A.  Very much so, yeah.
2   Q.  And so those would be natural next steps for your
3   international expansion?
4   A.  Correct.
5   Q.  And do you have any constraints into expanding
6   there?
7   A.  Um, nothing that anyone else wouldn't have, just
8   some IT development and some regulatory approvals that
9   would be needed.  But that's it.
10  Q.  So you believe you could overcome those obstacles?
11  A.  Certainly.
12  Q.  And would you consider returning to Puerto Rico if
13  it were profitable for the airline?
14  A.  Yes.
15  Q.  All right, let's talk about your divestitures.
16      MS. BANSAL:  We can pull up Wells Demonstrative 2.
17  Q.  So this demonstrative reflects the assets that
18  JetBlue will divest to Allegiant if the merger goes
19  through, correct?
20  A.  Correct.
21  Q.  Okay.  Can you explain to the Court why you
22  purchased these assets?
23  A.  Sure.  I'll kind of take it in two pieces.  For
24  Boston to Newark, it represents an opportunity to expand
25  a presence, that in both airports we've been constrained
```

1    to the international gates in a relatively tight time

2    window, generally midmorning to early afternoon, and

3    have had an inability to get a preferential gate.  In

4    Fort Lauderdale we have a long track record of success

5    and look forward to growing a bit more rapidly than

6    we've been able to otherwise.

7    Q.  And I believe you just said that Allegiant already

8    operates at all three of these airports?

9    A.  That's correct.

10   Q.  And so you're familiar with the airports?

11   A.  Correct.

12   Q.  You've done your diligence into the airports and the

13   regions around them?

14   A.  Yes.

15   Q.  And so I believe you just testified, you've had

16   about as much success as you can with what you have

17   today?

18   A.  In terms of our ability to grow, um, it's extremely

19   constrained, yes.

20   Q.  And so these preferential gates that you will

21   receive will unlock your growth in these three regions,

22   do you agree?

23   A.  Absolutely.

24   Q.  Now do you remember the maps that the Department

25   showed you yesterday?

1    A.   The route maps from the region website?

2    Q.   Correct.

3    A.   Yes.

4    Q.   Would you like me to pull them back up or do you

5    remember them?

6    A.   It depends on what level of detail you'd like, I

7    suppose.   (Laughter.)

8    Q.   Okay, let's try it without and then you can tell me

9    whether it would be helpful for me to pull them up.

10   A.   Okay.

11   Q.   So those maps show where Allegiant currently flies,

12   is that fair?

13   A.   Correct.   Yes.

14   Q.   It does not show where Allegiant could fly, correct?

15   A.   Correct, yes.

16   Q.   And it does not show where Allegiant could fly if it

17   had the divestiture assets, correct?

18   A.   Correct.

19   Q.   So with those assets in hand, you would expect those

20   maps to look completely different, is that fair?

21   A.   Absolutely.

22   Q.   Yesterday you testified that there might be some

23   certain runway authorization spots at Newark in the

24   early-morning hours that may be a little bit more, um --

25   that might take more effort to use, is that fair?

A.  Yes.

Q.  Are there steps that Allegiant could take to make
those authorizations easier to use?

A.  Yes.

Q.  What are some of those steps?

A.  Um, at the most extreme end, we could base crew and
aircraft in Newark and be able to start the day at that
time.  Alternatively we could rest our aircraft
overnight out of base, which is a fairly natural, I
think, next step for the airline regardless.

Q.  And would Allegiant consider, um, doing the
out-of-base options?

A.  Yes.

Q.  And that would ease the, um, any difficulty with
those early-morning slots?

A.  Yes.

Q.  Is there any doubt in your mind that with these
assets Allegiant will become a stronger competitor out
of these three cities?

A.  No doubt.

Q.  And are you confident that when the assets transfer,
you will be poised and ready seize available
opportunities?

A.  Absolutely.

Q.  And that will allow Allegiant to offer low-cost

1    fares to consumers in Newark, South Florida, and Boston,

2    correct?

3    A.  Correct.

4    Q.  All right, our final topic, Mr. Wells.

5         Approximately how much revenue did Allegiant

6    generate last year?

7    A.  Somewhere in the 2 1/2 billion range.

8    Q.  And how does that measure up to Allegiant's

9    expectations?

10   A.  Well last year was wild.  Um, it was reasonably in

11   line of we're thinking of 20, 22, um -- I guess it all

12   depends on what timeframe you're asking for my

13   expectations.

14   Q.  Well let me ask a more simple question.

15        You made $2.3 billion last year, correct?

16   A.  That sounds fair.

17   Q.  And the year before that, which was a covid year,

18   you made $1.7 billion, right?

19   A.  Yes.

20   Q.  So you increased your revenue by $600 million?

21   A.  Yup.

22   Q.  Now if we could just look at Exhibit 706 again, um,

23   the slide ending in 3229.

24        MS. BANSAL:  Slide 706.

25        (On screen.)

1    A.   (Looks.)

2    Q.   Have you seen this graph before?

3    A.   Um, yes.

4    Q.   So does this graph show that Allegiant has had

5    positive pretax margins every year since 2005 with the

6    exception of 2020?

7    A.   Yes.

8    Q.   And that percentage of margin is higher than the

9    rest of the industry?

10    A.   Correct.

11        MR. DeRITA:   I'm just going to object again on the

12    leading point that --

13        THE COURT:   Well she is, I mean, as I've said

14    before, I was taught to keep my mouth shut unless

15    there's an objection.   Yes, she's gone right on leading.

16    Now she has led again.   The objection is sustained.

17        Don't lead.

18        MS. BANSAL:   Understood, your Honor.

19        THE COURT:   I trust you are.

20    Q.   What were your third quarter of 2023 financial

21    results in revenue?

22    A.   Boy, this is only a couple of weeks ago, so you'd

23    think I would remember off the top of my head.

24        We were -- we gained about 1 percent of revenue on

25    each year-to-year basis.   I'm sure you may have the

```
 1    number in front of you.  I'm coming up blank.
 2    Q.  I can bring up -- yes, let me bring up the numbers.
 3         MS. BANSAL:  Exhibit 703.
 4         (On screen.)
 5    A.  (Looks.)
 6    Q.  This is the Bates page ending in 3325, and it is the
 7    first sentence going into the second sentence.  Where
 8    you're speaking.  At the bottom of the page under --
 9    A.  Oh, the $565 million in total revenue?
10    Q.  Yes.  So that was your '23 revenue?
11    A.  Yeah.
12    Q.  And you see there that you're saying that you're
13    extremely pleased with the record, correct?
14    A.  Correct.
15    Q.  Mr. Wells, are you confident in Allegiant's
16    continued ability to grow?
17    A.  Absolutely, yes.
18    Q.  And are you confident that you will continue to grow
19    with the divestiture assets in hand?
20    A.  Absolutely.
21    Q.  Thank you.
22         MS. BANSAL:  Pass the witness.
23         THE COURT:  Mr. DeRita, anything further for this
24    witness?
25         MR. DeRITA:  Yes, your Honor.
```

1          THE COURT:  You may.

2

3    REDIRECT EXAMINATION BY MR. DeRITA:

4    Q.  So I'd like to start by talking about -- I mean I'm

5    not going to bring up the exhibit, but we're talking

6    about the evolution of Allegiant's network, you were

7    talking about that with defense counsel.

8          One of the slides there, it says at the top of the

9    page, "A Very Large Niche."  Can you explain what that

10   means for Allegiant's network?

11   A.  I'm sorry, may I see the exhibit to know what's

12   being displayed?

13   Q.  Sure.  If we go to Exhibit 706, and it's actually I

14   think it's BUY in your binder.  And that would be the

15   Bates-labeled page ending in 30.

16   A.  (Looks.)  Okay, the route map.  Yes.

17   Q.  Yeah, that's right.  So at the very top there "A

18   Very Large Niche."  What's meant by that statement?

19   A.  In general I think it comes back to the network

20   strategy of targeting unserved and underserved

21   opportunities, um, which I think kind of definitionally

22   describes a "niche," right, something that others are

23   overlooking that we are eager to serve.

24   Q.  And when you say "others," what others are you

25   referring to?

A.   The industry probably.

Q.   You talked about an evolution in the network in

entering larger cities.  When entering larger cities, is

Allegiant connecting those larger cities to other larger

cities?

A.   Historically, um, not so much.

Q.   And there is a discussion of something called

"Allegiant 2.0."

     As part of "Allegiant 2.0," has Allegiant

identified routes for potential expansion?

A.   Um, certainly.  Yeah, we've talked about 1400

incremental domestic routes that we believe are valid.

Q.   And of those 1400, what percentage of those routes

do not face competition?

A.   It's approximately the same as our network today,

about 75 percent.

Q.   And going back historically, let's say over the last

5 years, how is the -- if at all, the percentage of

competition that Allegiant faces on its routes changed?

A.   Our percentage has grown meaningfully since the

beginning of the company.  We started with Fresno

California to Las Vegas, Nevada, which was

noncompetitive.  And so we've gone from about 0 percent

at the beginning to 25 percent where we are today.

Q.   So I'm asking it the other way.

1          In the last 5 years -- well Allegiant was founded

2    in what year?

3    A.   2000, give or take.

4    Q.   Yes, so in the last 5 years, how if at all has the

5    percentage of routes that Allegiant competes on do not

6    face competition change, using the 75 percent as a

7    baseline?

8    A.   It's been roughly flat over that timeframe.

9    Q.   And I just want to make sure that I properly

10   understood some of the testimony you gave when you were

11   being questioned by defense counsel.

12          So there was a number that you had given, about 90

13   percent of routes face a Big 4 competitor.  But I just

14   want to be clear.  That 90 percent applies only to the

15   25 percent of routes that have competition, correct?

16   A.   Correct, the 124.

17   Q.   (Pause.)  I'd like to talk a little bit about the

18   planned fleet that was discussed.

19          I can bring up the Demonstrative if you wish, but

20   it had said on that Demonstrative with the fleet, um,

21   that the 2024 planned fleet number was, um, to add 25

22   incremental planes.  Does that sound right?

23   A.   There will be 2 Airbus that go into service as well

24   as what we expect to be 25 going Maxes, yes.

25   Q.   Okay.  So -- what's the current fleet now?

1    A.   That approximately 127 in the document.

2    Q.   Okay.  So what's the expectation for total fleet by

3    the end of 2024?

4    A.   I believe we'll be in the mid 140s taking into

5    account some of those retirements.

6    Q.   Okay.  So 127 plus 25 is not mid 140s, correct?

7    A.   Correct, because there will be some retirements,

8    yes.

9    Q.   And when you said the 140, is there a finer number

10   that you can give?

11   A.   Not off the top of my head.  I can call it 145 for

12   the sake of a midpoint.

13   Q.   When did Allegiant decide to enter the contract with

14   Boeing?

15   A.   Um, I believe it was formally announced in January

16   of '22, December of '21.  But obviously the decision

17   would have been made ahead of that.

18   Q.   When was that decision made, preannouncement?

19   A.   Oh, I don't recall exactly.  It's somewhere not

20   terribly far before that.

21   Q.   Okay.  So that decision was made before the JetBlue,

22   Spirit transaction was announced, correct?

23        MS. BANSAL:  Objection, leading.

24        THE COURT:  Sustained on that ground.

25   Q.   Was that decision made before the announcement of

1    the Spirit, JetBlue merger?

2    A.  I believe so, yes.

3    Q.  (Pause.)  And you have discussed retirements.  Can

4    you explain when the retirements are expected to take

5    place?

6    A.  They'll generally align with upcoming heavy

7    maintenance events on these aircrafts.  So it will be

8    somewhere in the 3-year horizon as the aircraft is on a

9    36-month maintenance cycle.

10   Q.  Now going back to the plans for the new aircraft.

11        Did Allegiant have plans to use those planes

12   regardless or irrespective of the JetBlue, Spirit

13   merger?

14   A.  Sorry, can you maybe rephrase?

15   Q.  Yeah, what plans did the -- at the time the order

16   was made or the decision was made, um, what plans did

17   Allegiant have to use that fleet that was coming to

18   order?

19   A.  Um, I mean we intended to use them as the work

20   horses of our network.  I apologize.  Maybe I'm not

21   following you exactly.

22   Q.  Sure.  So at the time the decision was made, how if

23   at all did the prospect of a JetBlue merger factor into

24   the potential use of those planes?

25   A.  Those are completely distinct features.

1  Q.  Okay, there was some talk about, um, switching

2  topics, potential expansion internationally and two of

3  the places that were brought up were Latin America and

4  the Caribbean, and you had mentioned that there were two

5  things that come up, IT and regulatory, um, points.

6  Can you give some more color on what those are?

7  A.  Perhaps at a high level.  Any country -- as I

8  understand it, any country that you choose to enter with

9  new service has applications that are required likely on

10  both ends, both the U.S. and whatever the foreign entity

11  is.  And then every country -- and perhaps that's an

12  overstatement, most countries have different taxes and

13  information that must be remitted, and would have some

14  element of the specific development required.  I don't

15  believe that's an Allegiant-specific thing, just in the

16  industry.

17  Q.  And I believe you used the term "constraints" when

18  describing those things.  Has Allegiant found a way to

19  get over or past those constraints?

20  A.   I'm not sure that I remember using "constraints"

21  for this specifically.  However we, um, as a company,

22  have brought on a third-party vendor, Navataire, to

23  replace a lot of our back-end systems and with that

24  comes a lot of international development that we have

25  been unsuccessful in developing on our first two

1    occasions.

2    Q.   Does Allegiant have any concrete plans to expand to

3    Latin America or to the Caribbean?

4    A.   It would be on our longer-term road map.  But first

5    things first, getting across the finish line with our

6    joint venture, the ATI, and getting our feet wet in

7    international-scheduled service before, um, moving past

8    that to other countries.

9    Q.   Okay, I'd like to shift topics and talk about the

10   divestiture assets.

11        I believe you were discussing with defendants

12   about how you think that the divestiture assets will

13   increase your ability to compete in those airports, is

14   that fair?

15   A.   Yes.

16   Q.   Okay, I'd like to ask you some more questions about

17   that.

18        I'm going to pull up a document that has been

19   marked as Exhibit AE.

20        THE COURT:  Marked as what?

21        MR. DeRITA:  AE.  It's going to be passed up.

22        (Passes up.)

23   Q.   So this document has red boxes on it because your

24   counsel has requested that certain portions of it be

25   redacted.  So the portions of your document that have

1    red outlining around them, if I ask about them, just

2    please be aware that you're not supposed to actually

3    read them or say them out loud.  And they won't be

4    published as well.

5    A.   (Looks.)

6    Q.   Okay.  After you've taken a second to look through

7    it, I will ask you about it.

8    A.   Sure.

9         MS. BANSAL:  I'm going to object, your Honor, this

10   is beyond the scope.

11        THE COURT:  It looks like it's beyond the scope.

12   What do you say?

13        MR. DeRITA:  Well, your Honor, Ms. Bansal had been

14   asking the witness about plans using the divestiture

15   assets.  This document speaks to the competition between

16   Allegiant and potential competition between Allegiant at

17   three divestiture airports.  In fact as I just mentioned

18   when I first started talking about this topic, one of

19   the things that the witness has testified to is that it

20   will increase the ability to compete in those airports.

21   And I believe this document says otherwise.

22        MS. BANSAL:  Your Honor, if I may?

23        THE COURT:  You may.

24        MS. BANSAL:  This document goes well beyond what

25   we discussed during my examination --

1    THE COURT:  Yeah, I think it does.  Sustained.

2  Beyond the scope.

3    (Pause.)

4    THE COURT:  Anything else for this witness?

5    MR. DeRITA:  Yes.  Yes, your Honor.

6    THE COURT:  Go ahead.

7  Q.  So we had discussed earlier, um, on your direct

8  examination, about the ways that Allegiant determines

9  how it will, um, choose its routes, and we had discussed

10  the amount of -- we had discussed a variety of factors.

11    Would those factors change as a result of

12  acquiring these divestiture assets?

13    MS. BANSAL:  Objection.

14    THE COURT:  Grounds?

15    MS. BANSAL:  Your Honor, I don't understand the

16  question.

17    THE COURT:  Well, I do.

18    Overruled.  You may answer.

19  A.  Our plans on how we choose, um, routes would not

20  change as a result of gaining the divestiture assets,

21  no.

22    (Pause.)

23    MR. DeRITA:  That's all I have, your Honor.

24    THE COURT:  Nothing further for this witness,

25  Ms. Bansal?

1          MS. BANSAL:  Your Honor, just one question.

2

3     RECROSS-EXAMINATION BY MS. BANSAL:

4     Q.  Mr. Wells, how if at all will the merger impact your

5     decision whether to exercise your option for the

6     additional 80 planes?

7          MR. DeRITA:  Objection, speculation.

8          THE COURT:  Well on that ground, overruled.

9          You may answer.

10    A.  It certainly provides more runway for growth in

11    three airports where we're currently constrained.  I

12    strongly believe in our network runway, um, in all

13    situations, but having more open opportunities is

14    obviously a good thing for us.

15    Q.  So it's a factor that you --

16         THE COURT:  I thought you said one question?

17         (Laughter.)

18         MS. BANSAL:  Apologies.

19         THE COURT:  Go ahead.

20    Q.  So it is a factor that you may consider, correct?

21         MR. DeRITA:  Objection, leading.

22         THE COURT:  It is leading.

23    Q.  Mr. Wells, is that a factor that you will

24    consider?

25    A.  The number of opportunities we have that, um, have

```
 1    freed up constraints is certainly something we would
 2    consider.
 3    Q.  Okay, thank you, Mr. Wells.
 4         THE COURT:  Nothing further for this witness,
 5    Mr. DeRita?
 6         MR. DeRITA:  Nothing further, your Honor.
 7         THE COURT:  You may step down.  Thank you.
 8         Call your next witness.
 9         MR. DUFFY:  Yes, your Honor, we'll be calling
10    Mr. Gale and we'll just get him from outside.
11         THE COURT:  He may be called.
12         (Pause.)
13         (MARK GALE, sworn.)
14         THE COURT:  Mr. Amlin, you may proceed.
15         MR. AMLIN:  Your Honor, Don Amlin for the United
16    States.  Plaintiffs call Mark Gale of the Broward County
17    Aviation Department.
18         THE COURT:  He's been sworn.
19
20         ********
21         MARK GALE
22         ********
23
24    DIRECT EXAMINATION BY MR. AMLIN:
25    Q.  Would you please state your name for the record and
```

1    spell it.

2    A.  Sure.  My first name is Mark, M-A-R-K, middle

3    initial E, last name is Gale, G-A-L-E.

4    Q.  Mr. Gale, there are binders in front of you which I

5    may refer you to at the appropriate time.  But I'd like

6    to begin by asking you some background questions about

7    your employer, position, and history in the industry.

8          For whom do you currently work?

9    A.  I work for Broward County government, Broward

10    County, Florida.

11    Q.  And where is Broward County located?

12    A.  In Southern Florida.

13    Q.  And what agency within Broward County do you work

14    for?

15    A.  The Broward County Aviation Department.

16    Q.  And how long have you worked there?

17    A.  Um, approximately 7-and-three-quarters years, again

18    in March of 2016.

19    Q.  Is it okay for me to refer to the Broward County

20    Aviation Department as "DCAD" during this examination?

21    A.  It is.

22    Q.  And before working for DCAD, where did you work?

23    A.  The City of Philadelphia, the Philadelphia National

24    Airport.

25    Q.  And how long did you work there?

1    A.   Um, nearly 30 years.

2    Q.   What was your last position at the Philadelphia

3    International Airport before --

4    A.   I was CEO.  I was the CEO or the Chief Executive

5    Officer.

6    Q.   And what's your current position at DCAD?

7    A.   Chief Executive Officer and Director of Aviation.

8    Q.   And what are your responsibilities as CEO and

9    Director of Aviation?

10    A.   I'm essentially responsible for all matters that

11    relate to our two airports, um, both the Fort Lauderdale

12    Hollywood International Airport, and as well as our

13    general aviation reliever, North Perry Airport.

14        THE COURT:  The second is what, "general

15    aviation"?

16        THE WITNESS:  General Aviation Reliever Airport.

17    We only handle general aviation aircraft traffic.  It

18    helps move some of those smaller private airplanes away

19    from the large international airport.

20    Q.   Is it okay for me to refer to Fort Lauderdale and

21    Hollywood International Airport as "the airport" or just

22    "Fort Lauderdale" during this examination?

23    A.   It is.

24    Q.   Thank you.

25        Approximately how many passengers does the Airport

1   serve each year?

2   A.  Um, in 2023, this year, we anticipate approximately

3   35 million.

4   Q.  In your role as CEO and Director of Aviation at the

5   Airport, are you familiar generally with the operations

6   of the various commercial airlines who fly from the

7   Airport?

8   A.  I am.

9   Q.  And are you also familiar with the gate leasing and

10  assignment contracts and policies of the Airport?

11  A.  Generally I am, yes.

12  Q.  Are you responsible for selecting which airlines

13  acquire the right to operate at available gates at the

14  Airport?

15  A.  I interact with my team on the leasing of gates to

16  airlines based upon availability.

17  Q.  And does your team make the ultimate selection as to

18  who is awarded a leasing right?

19  A.  We do.

20  Q.  So if gates become available at the Airport upon the

21  closing of JetBlue's acquisition of Spirit, will you

22  personally be involved in selecting who gets the gates?

23  A.  I would be involved in the gate process, yes.

24  Q.  Would you be the primary decision-maker?

25  A.  Um, possibly.  I think there would be, um, potential

1    questions that would need to be answered relative to

2    compliance with let's say our Airport Competition Plan

3    that we have on file with the FAA.

4    Q.  I'm going to focus my examination today exclusively

5    on the purported divestitures at the Fort Lauderdale

6    Airport and your role in the process.

7         Now at Fort Lauderdale, with regard to gates, do

8    airlines own any gates at Fort Lauderdale?

9    A.  They do not.

10   Q.  Who owns the gates?

11   A.  The gates are owned by Broward County, the owner and

12   operator of the Airport.

13   Q.  So the airlines don't own the gates.  Do the

14   airlines lease the gates from DCAD?

15   A.  They do.

16   Q.  To what extent can an airline sell or transfer its

17   lease right to operate from a particular gate at the

18   Airport to another airline?

19   A.  Under our terminal building leases, the airlines do

20   not have the right to assign or sublet or any other way

21   obligate a gate that is currently underneath their

22   preferential use control, at least not without the

23   express written consent by the County.

24   Q.  Now you mentioned the terminal building lease

25   agreement, I think.  Is that a contract with the various

1   airlines between those airlines and DCAD?

2   A.  Yeah, we refer to it as the "Terminal Building Lease

3   Agreement" or a "TBLA."

4   Q.  And do those various TBLAs memorialize the

5   prohibition on airlines selling or leasing gates?

6   A.  It does.

7   Q.  Okay, let's turn to that then and let's pull up

8   Exhibit AIE.

9   A.  (Looks.)

10  Q.  Mr. Gale, if you go about halfway through this stack

11  to the page ending in Bates number Dash 4323, there's a

12  document titled "Signatory Terminal Building Lease

13  Agreement Between Broward County and JetBlue Airways

14  Corp." with an original stamp on it.

15       Do you recognize this document, sir?

16  A.  I don't know if I've ever seen this original

17  document, but that appears to be, um, the cover page for

18  the agreement between JetBlue and Broward County, yes.

19  Q.  And when you say the "agreement," do you mean the

20  TBLA?

21  A.  The TBLA, correct.

22  Q.  And did JetBlue and DCAD each sign this agreement?

23  A.  There is an executed copy between the two parties,

24  yes.

25  Q.  Would you turn to Pages 40 and 41, and those would

1    correspond to Bates number Dash 4364 to Dash 4365.

2         MS. WRIGHT:  Your Honor, we object to the use of

3    this exhibit with this witness.

4         MR. AMLIN:  Your Honor, I'm continuing to lay my

5    foundation, I have a few more questions, and then I can

6    address Ms. Wright's objection at that time.  If that's

7    all right with you?

8         THE COURT:  Well I don't know what her objection

9    is?

10        MS. WRIGHT:  Foundation.  This is not a document

11   that was produced by the County, it's a document that

12   was produced by JetBlue, and it's an internal JetBlue

13   document.

14        MR. AMLIN:  And, your Honor, I intend to use only

15   the part of this document which was used during his

16   deposition and as produced by JetBlue, this is a

17   fully-executed contract between the Broward County

18   Aviation Department and JetBlue, and Mr. Gale, as I will

19   show, is aware of the contents and there is sufficient

20   foundation.

21        THE COURT:  Well that's sufficient to allow you to

22   go ahead and ask some more foundation questions.

23        MR. AMLIN:  Thank you, your Honor.

24        And if we could turn on the screen, if it's

25   possible to put on Bates ending in 4364.

1          THE COURT:  Yes.

2          (On screen.)

3     Q.  Is this the page that has -- these two pages have

4     the signatures of DCAD and JetBlue for this contract, is

5     that correct?

6     A.  They appear to be the pages from the TBLA.  I

7     recognize some of the names in the signatures.

8     Q.  And I guess this is the original from 2011, so you

9     weren't there, but there have been amendments to this

10    contract and this version has it.

11         MR. AMLIN:  So if we turn to the page ending in

12    Bates number 4396, and I'll wait for that to come on the

13    screen as well, 4396 now.

14         (On screen.)

15    Q.  So this appear to be the "Ninth Amendment Edition to

16    the Signatory Terminal Building Lease Agreement."  Is

17    that right, Mr. Gale?  Look at the top.

18    A.  Yes, it appears to be the Ninth Amendment.

19    Q.  If we turn to the page ending in Bates Number 4398,

20    just a few pages down.  (On screen.)

21         Did you personally sign this amendment, which is

22    part of this exhibit, um, as the amendment, the Ninth

23    Amendment to the TBLA?

24    A.  That is my signature, yes.

25    Q.  If we go to the next page ending in 4399.

A.   (Turns.)

Q.   Do you recall this being JetBlue's signature to the Ninth Amendment to the TBLA?

A.   It appears to be the signature.  I recognize the name of the Vice-President above.

Q.   And in signing this amendment, did you review the original contract along with the amendments?

A.   I generally review all of the documents when I'm signing an amendment that needs to be approved.

Q.   Thank you.

        MR. AMLIN:  Your Honor, plaintiffs offer AIE into evidence as Exhibit 72.

        MS. WRIGHT:  Objection.

        THE COURT:  Well this is more than the agreement, AIE?

        MR. AMLIN:  It has an additional agreement, but I'm only going to talk about the --

        THE COURT:  No, but you offered the whole thing and you laid the foundation for the agreement and its amendments.

        Now are you offering the agreement and its amendments?

        MR. AMLIN:  I'm offering the agreement and its amendment and not any of the other material.

        THE COURT:  And so where does that -- so we're

1   clear for the record, where does that begin?

2          MR. AMLIN:  That begins with -- yeah, the first

3   page that I mentioned earlier --

4          THE COURT:  No, my question is different.

5          MR. AMLIN:  -- that begins with the page ending in

6   Bates number 4323 and extends through the remainder of

7   the document ending in 4418.

8          THE COURT:  Is 4323 the beginning of the

9   agreement, the first page of the agreement?

10         MR. AMLIN:  Yes, your Honor, that's the one that

11  we brought up originally that has the original stamp and

12  has the signatory terminal --

13         THE COURT:  Thank you.

14         There's no objection to that?

15         MS. WRIGHT:  So the proposal then, that AIE would

16  be amended to begin at --

17         THE COURT:  Not amended, I'm admitting those

18  Bates-numbered of -- beginning at that Bates number.

19         MS. WRIGHT:  Beginning at that.

20         THE COURT:  Yes.  No objection to that?

21         MS. WRIGHT:  No objection to AIE being admitted

22  beginning at Bates page ending in 4323.

23         THE COURT:  So ordered.

24         And it will be exhibit?

25         MR. AMLIN:  782, your Honor.

1              THE COURT:  782?

2              MR. AMLIN:  Yes, sir.

3              THE COURT:  Exhibit 782 in evidence.

4              (Exhibit 782, marked.)

5     Q.  Mr. Gale, let's turn to the page of the document

6     with the Bates number ending in 4348.  So I think, for

7     you and the Court, this should have a red tab at the

8     top, which is in your binder as well, or you could read

9     it from the screen, by the way.

10    A.  (Looks.)

11    Q.  Focusing on Article 10 titled "Assignment,

12    Subletting, and Ground Handling," is this a standard

13    clause in DCAD's agreements with airlines who operate at

14    the Airport?

15    A.  It is a standard clause for an agreement that

16    anybody who executes the terminal building lease

17    agreement, the TBLA.

18            MR. AMLIN:  Let's expand Section 10.1 on the

19    screen, please.

20            (On screen.)

21    Q.  So Section 10.1 of the agreement prohibits JetBlue

22    or Spirit from subletting gates to another airline

23    without prior written consent?

24            MS. WRIGHT:  Objection.

25            THE COURT:  Well it says what it says.  His

1    statement is supererogatory.  I can read.

2         (Pause.)

3    Q.  In Section 10.1 of that prohibition, it uses the

4    term "Leased Premises."  Is it your understanding that

5    "leased premises" includes gates at the Airport?

6         MS. WRIGHT:  Objection.

7         MR. AMLIN:  Your Honor, he is familiar with the

8    contract and --

9         THE COURT:  Yes, he is, and do you --

10        What's the objection?

11        MS. WRIGHT:  Leading.

12        THE COURT:  Well at this level I'll allow it.

13        Does it include gates?

14        THE WITNESS:  It does, your Honor.

15        MR. AMLIN:  Thank you.

16   Q.  And do you recall sending this particular language

17   to JetBlue recently?

18   A.  Um, can you define "recently"?

19   Q.  Within the past couple of years.

20   A.  Um, yes, we sent a representative of JetBlue a

21   reminder of this particular clause within our TBLA.

22        MR. AMLIN:  Let's pull up Exhibit EK.

23   A.  (Looks.)

24   Q.  If you'd turn to that in your binder or look on the

25   screen.

1    A.   (Turns.)

2    Q.   Let's focus on your e-mail at the bottom of this

3    page and with the Bates number ending in Dash 803.

4         Who is Mr. Costello?

5    A.   Mr. Costello is one of the corporate real estate

6    representatives who I would deal with on a regular basis

7    with JetBlue, who I believe is no longer with the

8    company right now.

9    Q.   So he's a former JetBlue employee?

10   A.   A former JetBlue employee as I understand it, yes.

11   Q.   When was this e-mail sent?

12   A.   January 27th of this year, 2023.

13   Q.   Was that after JetBlue announced its agreement to

14   purchase Spirit?

15   A.   I believe it was.

16   Q.   And what are the three attachments you reference in

17   your e-mail?

18   A.   Um, the TBLA, which we've just discussed,

19   particularly Article 10.  The FAA's letter recommending

20   the development of a policy when announcing gate

21   availability.  We recently had submitted as a

22   requirement, um, an Airport Competition Plan to the FAA

23   because we had triggered, um, a requirement based upon

24   two airlines exceeding 50 percent of market share.  And,

25   um, we were letting them know that that was something

1   the FAA pointed out to us.  That while it wasn't

2   included in our original submission, that they

3   recommended that we put that in any subsequent version

4   of our Airport Competition Plan.  And the last was our

5   response to the FAA, um, recommending that we were going

6   to develop that said policy.

7         MR. AMLIN:  Your Honor, plaintiffs offer Exhibit

8   EK into evidence as Exhibit Number 73.

9         THE COURT:  Any objection?

10        MS. WRIGHT:  No objection, your Honor.

11        THE COURT:  EK is admitted, 783 in evidence.

12        (Exhibit 783, marked.)

13  Q.  Now what is the reason you're sending this e-mail

14  and the attachments to Mr. Costello?

15  A.  Well there were discussions that Mr. Costello and I

16  had relative to what JetBlue's ability was at that time

17  to enter into -- or potentially enter into an agreement

18  with another airline whereby they would either assign or

19  sublet those gates to the airline potentially without

20  our expressed written approval.

21  Q.  And which other airline was at issue, do you recall?

22  A.  At that time there was no specific airline, as I

23  recall, it was later identified through some

24  announcements of, um, the possibility of entering into

25  an agreement with Allegiant Airlines.

1      MR. AMLIN:  Let's turn to the top of Page 3 of

2  this document, which has a Bates number ending in Dash

3  805.  This is the first attachment.

4      (On screen.)

5  Q.  What is this attachment that you sent to

6  Mr. Costello?

7  A.  That is the page-referencing Article 10 of the TBLA,

8  the one that we discussed just a few minutes ago.

9  Q.  And did you send the entire TBLA or just this page?

10  A.  I don't recall.  I think I may have only sent that

11  particular page, um, because that was most pertinent to

12  the conversation that was ongoing at that time.

13  Q.  And at least with regard to Article 10, this is the

14  same language that we had discussed previously, correct?

15  A.  It appears to be, yes.

16  Q.  And at the time of this e-mail, and also currently,

17  is this Section 10.1 provision prohibiting the transfer

18  of gates without the County's prior written consent in

19  effect?

20  A.  Yes.

21  Q.  Has Broward County given written consent to JetBlue

22  -- your Honor, strike that.

23      Has Broward County given consent to JetBlue or

24  Spirit to transfer its gates to another airline?

25  A.  Not at this time, that I'm aware of.

1      MR. AMLIN:   Let's turn back to Page 4 of this

2   exhibit with the Bates number ending in Dash 806.

3   A.   (Turns.)

4   Q.   Mr. Gale, what is this document?

5   A.   This is a letter we received from the FAA on the

6   review of the competition plan that we had submitted for

7   their review and approval identifying that we were now,

8   quote, a "covered airport" because of the triggering

9   event that I mentioned earlier.  And that was our first

10  submission of a competition plan to the FAA.

11  Q.   At the bottom of the first page continuing on to the

12  second page of this letter, there's a paragraph that

13  appears to be highlighted.

14      Do you recall whether you highlighted this

15  paragraph on sending the documents to Mr. Gale?

16  A.   You mean to Mr. Costello?

17  Q.   To Mr. Costello, yes.

18  A.   Yes, I believe I did highlight that to bring his

19  attention to it, which was again the -- I think the

20  second attachment and the second reference in the e-mail

21  that I had sent in April.

22  Q.   And with regard to this highlighted language,

23  specifically the mention of "developing a formal policy

24  for announcing gate availability, reporting aircraft

25  available and potential new entrants and existing

1    tenants," what do you understand this to mean?

2    A.  It was the FAA's recommendation that the Airport,

3    upon coming into receipt of any additional gates, um,

4    including gates that might be recaptured from an airline

5    that was no longer utilizing them on a preferential use

6    basis, that we announce the availability of those gates

7    in an accessible place, most likely our website, um, so

8    that other potential airlines that might have an

9    interest in serving our airport would be aware of those

10   gates.

11       MR. AMLIN:  Now let's turn to the last two pages

12   of this document with Bates numbers ending in 0810

13   through 0811.

14   A.  (Turns.)

15   Q.  Mr. Gale, what is this letter?

16   A.  This was a response, um, to some increase that the

17   FAA had placed to us, in this case Mr. Craven with the

18   FAA, stating that the review of their -- of our

19   competition plan had been completed.  They made a few

20   inquiries, in one case to a description of, um, our new

21   Terminal 5 now under construction.  Also wanting to

22   understand how the gates would be allocated.  And there

23   were some questions about how Terminal 5 came to be a

24   development that we wanted to undertake.  We had

25   discussed the fact that we had put that in front of our

1   airline community to vote on and all the airlines voted

2   on it in the affirmative for us to move forward with

3   that project.  I think we also had identified that the

4   gates in the terminal facility would be capable of

5   handling pretty much any airline that we would put into

6   that concourse when it's completed.

7   Q.  And again in the last paragraph of the second page

8   there's some yellow highlighting.  Did you highlight

9   that paragraph when sending this document to

10  Mr. Costello?

11  A.  I believe I did.

12  Q.  Why did you highlight it?

13  A.  Again to bring the attention that the FAA had made a

14  recommendation to us and that we had formally responded

15  to the FAA that we would be adopting that

16  recommendation, and looking to formalize that procedure,

17  and we would probably include it within our next

18  scheduled submission.  Which unless there was another

19  triggering event, we would be required to provide an

20  update to that competition plan 18 months after the

21  approval of the first submission.

22  Q.  So to be clear, this is you, on behalf of DCAD,

23  accepting the FAA's recommendation to advertise the

24  availability of gates to all interested parties?

25          MS. WRIGHT:  Objection, leading.

1          THE COURT:  Sustained on that ground.

2     Q.  To what extent is this highlighted language

3     indicative of DCAD accepting the FAA's proposal

4     regarding advertising the availability of the gates?

5          MS. WRIGHT:  Same objection.

6          THE COURT:  And the same ruling.

7          MR. AMLIN:  I'll move on, your Honor.

8     Q.  You had mentioned earlier that part of it was you

9     accepting the FAA's recommendation.

10          Is that currently the policy in effect right now,

11     sitting here today, on November 15th, 2023?

12     A.  It is a policy that we are following and we include

13     the announcement of any gates on our website.  It has

14     not been submitted to the FAA as a formal change to our

15     Airport Competition Plan at this time.

16     Q.  And you've made -- and have you made JetBlue aware

17     of that policy?

18     A.  I believe they're aware of it.  I personally haven't

19     called them and said "This is the policy, we've

20     referenced this in these e-mails," that it was our

21     intent to follow the FAA's recommendation on this

22     particular matter.  We have again reiterated to JetBlue,

23     um, on other discussions and occasions, that we believe

24     they need our express written consent before entering

25     into any type of arrangement with another airline for

1    the gates that are currently being used by them on a

2    preferential use basis.

3    Q.   And to what extent would DCAD provide express

4    written consent without opening up the availability of

5    the gates to other interested airlines?

6    A.   I'm not sure that I understand the question.

7    Q.   To what extent would DCAD provide express written

8    consent for JetBlue to transfer gates without first

9    advertising the availability of the gates to other

10   interested airlines?

11        MS. WRIGHT:  Objection, leading.

12        THE COURT:  No, overruled.

13   A.   I'm not sure that we would.  We would have to take a

14   look at what the specific request was for how many

15   gates.  We haven't had any, um, immediate request from

16   airlines that they want a gate or additional gates, and

17   -- well we haven't had any new airlines that said "We

18   want to come in right now, we want a gate."  We're

19   always in discussions with airlines about the potential

20   new service to our airport, but nobody in the U.S. said

21   "We want a gate right now."  We have not denied access

22   to anybody at this particular point in time.  But based

23   upon the recommendation to the FAA and our response to

24   them, it would have been -- it would be our position

25   that the gate availability would need to be announced

1    and then we would move through the process.

2    Q.  To what extent are the gates that we're talking

3    about available currently right now?

4         THE COURT:  I didn't catch the question?  It's my

5    fault.  Ask it again.

6    Q.  The gates that we're talking about that are the

7    subject of the potential divestitures, to what extent

8    are they currently available?

9         MS. WRIGHT:  Objection.

10         THE COURT:  Overruled.

11   A.  I'm not sure which gates are actually being

12   referenced.  We have seen and heard the potential of an

13   arrangement that might make gates available to Allegiant

14   Airlines, potentially up to 5 gates.  JetBlue currently

15   has preferential use lease arrangements on a number of

16   different gates, 14 to be exact, at FLL.  Some of those

17   gates are for domestic use only, some are for

18   international as well as domestic use.  We would want to

19   understand what it is that -- specifically which gates

20   JetBlue would be looking to divest.  And I do not have

21   that information.

22   Q.  And is JetBlue currently using all 14 of the gates

23   to which it is currently allocated?

24   A.  They are.

25         MR. AMLIN:  Let's bring up Exhibit ATO.

```
 1          (On screen.)
 2   Q.   This is a press release from JetBlue dated September
 3   11th, 2023, titled "JetBlue and Allegiant announced
 4   divestiture agreement in connection with JetBlue's
 5   combination with Spirit."  This press release is also
 6   available currently on JetBlue's website.
 7          Mr. Gale, have you seen this press release before?
 8   A.   It's just coming up now.
 9   Q.   It's also in your binder as well.
10          MR. AMLIN:  If we could flip it on the screen to
11   the second page.
12          (On screen.)
13          MS. WRIGHT:  Your Honor, we object to these
14   documents per se.
15          MR. AMLIN:  Your Honor, it's a party admission,
16   it's a press release from JetBlue.
17          THE COURT:  It appears that it is.
18          MS. WRIGHT:  Mr. Gale is not a party witness.
19          THE COURT:  He's not a party witness.  It's your
20   document.  Overruled.
21   Q.   Mr. Gale, do you have any reason to believe this
22   isn't an authentic printout of the press release that
23   currently appears on JetBlue's website?
24          MS. WRIGHT:  Objection.
25          MR. AMLIN:  Your Honor, I'm asking if he has
```

1    reason to believe it's not authentic.

2         THE COURT:  Well let's not horse around.

3         Do you -- Ms. Wright, do you deny the authenticity

4    of this document?

5         MS. WRIGHT:  We do not, your Honor.

6         THE COURT:  All right, so it's an admission.  It's

7    admitted.  Let's get to the substance.

8         And we'll have number?

9         MR. AMLIN:  784, your Honor.

10        THE COURT:  All right, 784 in evidence.

11        (Exhibit 784, marked.)

12   Q.  Now let's go to the very last sentence of the last

13   paragraph of this page, which is Page 2 of the exhibit

14   ending in Dash 875.  And this reads, quote:  "JetBlue

15   has agreed to relinquish up to 5 gates at Fort

16   Lauderdale to the Broward County Aviation Department.

17   We'll work closely with the Department to facilitate

18   Allegiant's ULCC growth at Fort Lauderdale using these

19   gates."  End quote.

20        This uses the term "relinquish."  What is your

21   understanding of what "relinquish" means in this

22   context?

23        MS. WRIGHT:  Objection.

24        THE COURT:  No, he can give us his understanding.

25   A.  In my opinion the term "relinquish" would indicate

1    that while JetBlue is making effective use of 14 gates,

2    14 preferential-use gates, that the return of up to 5 of

3    these preferential gates would be coming back to the

4    County, um, for potential utilization by one or more

5    other airlines.

6    Q.   Now to what extent have you or anyone else at DCAD

7    informed JetBlue, Spirit, or Allegiant, that you will

8    work with JetBlue to, quote, "facilitate Allegiant's

9    ULCC growth at the Airport using these gates"?

10        MS. WRIGHT:  Objection.

11        MR. AMLIN:  By the press release though --

12        THE COURT:  Now just a moment.  If I need

13   argument, I'll ask for it.  She's objecting that you're

14   leading.  She didn't state it, but you're obviously

15   leading.

16        Have you read this press release?

17        THE WITNESS:  I have, your Honor.

18        THE COURT:  Have you talked about these matters at

19   all with JetBlue as of today?

20        THE WITNESS:  I have had conversations with

21   JetBlue to again, um, reiterate what we believe the

22   position is relative to gates that become available.  In

23   fact they are the property of the County.  And that

24   while under the terms of the TBLA or the building lease,

25   they are fully within their rights to submit a request

1   to me for our review for the assignment or consent.  I

2   believe they understand that.  But to date we do not

3   have a request for them to assign.

4        THE COURT:  And that's how they stand today?

5        THE WITNESS:  That's correct.

6        THE COURT:  All right.

7   Q.  To what extent could some or all of these gates be

8   awarded to American, Delta, or United?

9        MS. WRIGHT:  Objection.

10       THE COURT:  Why is that germane?

11       MR. AMLIN:  Why is this germane, your Honor?  The

12  parties have come here representing that it's a done

13  deal that these gates are --

14       THE COURT:  No, no, it's pretty clear that it's

15  not, and they don't represent it as a done deal here.

16  One imagines there are regulatory issues.  And you're

17  absolutely right to bring them to the attention of the

18  Court.  But speculation is -- I'm going to sustain it.

19       MR. AMLIN:  Your Honor, can I be heard on one more

20  point on this?

21       THE COURT:  You may.

22       MR. AMLIN:  Mr. Gale has testified that he's a

23  part of this process and also this press release that,

24  um, says that JetBlue is going to work closely to

25  facilitate the ULCC role.  And I'm asking Mr. Gale, in

1   his role in deciding who may get these gates, whether it

2   may go to a non --

3        THE COURT:  Well you didn't ask that, did you?

4   Q.  Mr. Gates, in your role in overseeing the

5   availability of awarding the available gates to

6   interested parties, to what extent could these gates be

7   awarded to a legacy carrier such as American, Delta, or

8   United?

9        MS. WRIGHT:  The same objection.

10       THE COURT:  No, it's not leading.  And I'm going

11   to allow it.

12   A.  It's been our position that the gates would revert

13   back to the County for an announcement of availability

14   and that, um, our view I believe at the County has been

15   that any airline, including new entrants and/or

16   incumbents, whether they be, quote, "legacy," unquote

17   airlines, would be permissible to submit interest on

18   those gates.  I think that, um, the position that

19   JetBlue in our conversations is that -- in order to

20   continue to promote, um, competition, particularly

21   amongst low-fare carriers, that it would make more sense

22   if those gates went to low-fare carriers, um, low-cost

23   carriers like Allegiant.

24   Q.  And in making your decision, to what extent is it

25   relevant that JetBlue has entered into an agreement with

1   Allegiant concerning these gates?

2   A.  Um, again the County's position is that JetBlue is

3   not in a position to assign, um, or in any other way

4   sublet the utilization of those gates or any leased

5   premise at our airport without our expressed written

6   consent, and that has not been awarded by the County at

7   this point in time.

8   Q.  Thank you, Mr. Gale.

9       MR. AMLIN:  I pass the witness.

10      THE COURT:  All right.

11

12  CROSS-EXAMINATION BY MS. WRIGHT:

13  Q.  Good morning, Mr. Gale.

14  A.  Good morning.

15  Q.  Mr. Gale, airports are major economic engines for

16  communities, correct?

17  A.  I believe that to be correct, yes.

18  Q.  And that's true for Fort Lauderdale Airport in South

19  Florida, correct?

20  A.  Absolutely correct.

21  Q.  Is it right that Fort Lauderdale Airport's annual

22  economic impact is billions of dollars?

23      MR. AMLIN:  Objection, your Honor, this is beyond

24  the scope.  Mr. Gale is not on defendants' witness list

25  and he's --

```
 1          THE COURT:  Please.  Please.  Please.  If I want
 2    argument, I'll ask for it.
 3          Since you object that it's beyond the scope, and
 4    so please don't lead the witness.  He's objecting on
 5    that basis.  But you may inquire.
 6          MS. WRIGHT:  Thank you, your Honor.  And just for
 7    clarity, Mr. Gale is not a defense witness, so this
 8    isn't cross-examination.
 9          THE COURT:  I understand it is.  But, um, as I
10    understand the rule, they called the witness, you get to
11    cross-examine -- under the federal rules you get to
12    cross-examine him as to everything that they've covered.
13    When you go beyond the scope, as has happened frequently
14    in this case, on objection you're supposed to take him
15    on direct.  I think that's how the rule works.
16          MS. WRIGHT:  Understood.  Thank you, your Honor.
17          THE COURT:  Yeah.
18    Q.  And, Mr. Gale, Fort Lauderdale Airport strives to be
19    South Florida's airport of choice, correct?
20    A.  That's correct.
21    Q.  And does Fort Lauderdale Airport strive to provide
22    global connectivity at a low cost and with an
23    exceptional guest experience?
24          MR. AMLIN:  Objection, your Honor.
25          THE COURT:  Yes, you are leading the witness.
```

1    Don't lead the witness.

2    Q.  Mr. Gale, you mentioned earlier, in response to

3    questioning by the government, the construction of

4    Terminal 5, correct?

5    A.  Correct.

6    Q.  And did Fort Lauderdale Airport recently break

7    ground on the construction of Terminal 5?

8    A.  We did.

9    Q.  And when Terminal 5 is open, how many gates will

10   Fort Lauderdale Airport have available?

11   A.  There are 5 gates in Terminal 5.  If the question is

12   how many gates will the total airport have at that point

13   in time?  It will be 71.

14   Q.  And with 71 gates, how many million passengers can

15   Fort Lauderdale Airport serve?

16   A.  Our projections are that we would be able to serve

17   approximately 21 to 22 million imployments annually.  So

18   if you double that for imployments and deployments,

19   roughly 44 million approximately.

20   Q.  Mr. Gale, earlier you mentioned the competition

21   plan, so let's look at the Exhibit 14 in your binder

22   that we handed up to you, and that's a copy of the

23   competition plan.  And there's a yellow tab, a Post-It

24   note, that starts the color version of that exhibit.  I

25   guess it's easier to view it in color.

A.   (Looks.)

Q.   Mr. Gale, does Fort Lauderdale Airport monitor gate usage daily?

A.   We monitor the gate utilization through resource management tools, my team does, in our airport operations database, and those analyses are taken into consideration when it comes time to review the utilization of the gate on an annualized basis to see whether an airline retains its preferential use rights on that gate.

Q.   And does the airport work closely with carriers to accommodate their flights?

A.   We do.  Very closely.

Q.   And does your team work hard to accommodate new entrants at the airport?

A.   We do.  I think my team does an excellent job in that regard.

Q.   So let's look in Exhibit 14 at the page Bates-ending 4595.  We're looking for Section 1-5.

A.   (Looks.)

Q.   Let me know when you're there, Mr. Gale.

A.   1-5.  Uh-huh.

Q.   Okay.  When the County submitted this competition plan to the FAA in May 2022, there had been no access complaints at Fort Lauderdale Airport within the prior

1    12 months, correct?

2    A.   That is correct.

3    Q.   And the County told the FAA that Fort Lauderdale had

4    been able to accommodate all carriers that had requested

5    access in the prior 12 months, is that right?

6    A.   Yes, that's correct.

7    Q.   And in fact in the entire time that you've been at

8    Fort Lauderdale Airport since March 2016, you're not

9    aware of any new entrant who has been denied access to

10   the airport, correct?

11   A.   I am not aware of --

12        MR. AMLIN:   Objection, your Honor.

13        THE COURT:   Ground?

14        MR. AMLIN:   Scope and also the --

15        THE COURT:   Oh, no, you went into that.  So, um --

16        MR. AMLIN:   Yes, your Honor.

17        THE COURT:   Their regulatory stance here and

18   interaction both with the FAA and airlines, as a

19   regulatory matter, I think is within the scope.  Just

20   for -- she may have the question in that form.  But

21   please state it again.

22        MS. WRIGHT:   Thank you.

23   Q.   In the entire time, Mr. Gale, that you've been at

24   Fort Lauderdale Airport, this is March 2016, you're not

25   aware of any new entrant who has been denied access to

1    the airport, is that right?

2    A.   I am not.

3    Q.   And more recently, Mr. Gale, Fort Lauderdale Airport

4    has been able to accommodate Avelo, a new ULCC, correct?

5    A.   Correct.

6    Q.   And Fort Lauderdale Airport has been able to

7    accommodate Flair, a ULCC operating out of Canada?

8    A.   Correct.

9    Q.   And just this year Fort Lauderdale Airport has been

10   able to accommodate three new international carriers, El

11   Al from Israel, Porter Airlines from Canada, and Bermuda

12   Air from Bermuda, is that correct?

13   A.   That is correct.

14   Q.   Mr. Gale, has Fort Lauderdale also been able to

15   accommodate its existing carriers who want to start new

16   routes?

17   A.   Existing carriers, um, is the question in terms of

18   expansion?

19   Q.   Yes, let me ask it again.

20        So has Fort Lauderdale been able to accommodate

21   its existing or incumbent carriers who are looking to

22   expand some new routes from Fort Lauderdale?

23   A.   We have been challenged to accommodate growth of

24   certain carriers, that is primarily one of the reasons

25   for the development of Terminal 5, largely requested,

1    um, by JetBlue and Spirit years ago, but supported, as I

2    said, by other airlines, through their vote on our

3    capital projects.  And we've recently completed a, um,

4    master plan forecast for the airport which identifies

5    significant development improvements throughout the

6    airport over the course of the next 20 years to

7    accommodate future growth.

8    Q.  So, for example, Allegiant is an existing carrier at

9    Fort Lauderdale Airport, correct?

10   A.  That is correct.

11   Q.  And Allegiant will be starting two routes from Fort

12   Lauderdale this month, one to Nashville and one to Cedar

13   Rapids, is that right?

14   A.  I believe that is correct, yes.

15   Q.  And Allegiant currently has how many preferential

16   gates at Fort Lauderdale Airport?

17   A.  I believe Allegiant has two right now.

18   Q.  (Pause.)  All right.  Mr. Gale, I believe you

19   testified earlier that the FAA has approved your

20   competition plan, correct?

21   A.  That is correct.

22   Q.  So let's look in Exhibit 14 in the competition plan

23   at the page with the Bates number ending in 4593.

24   A.  (Looks.)

25   Q.  And if you look at the introduction in that first

1   paragraph, Mr. Gale, do you continue to believe what you

2   told the FAA here, that "Fort Lauderdale plays an

3   integral role in having to meet South Florida's regional

4   demand for air travel service"?

5   A.   I do.

6   Q.   And looking further down in this paragraph.  Do you

7   continue to believe that "Fort Lauderdale is a key

8   member of the nation's airport system providing

9   efficient operations, low fares, and high levels of

10  safety, security, and service for its passengers,

11  communities, and stakeholders"?

12  A.   I do.

13  Q.   All right, let's turn now to Section 4 of the

14  competition plan, in Bates 4599.  (On screen.)

15  A.   (Turns.)

16  Q.   Mr. Gale, is it still accurate that Broward County

17  wants to ensure the equitable treatment of all carriers?

18  A.   Absolutely, yes.

19  Q.   And is it still accurate that the County uses a

20  schedule submission policy to ensure that the County

21  manages the demand for air service responsibly?

22  A.   It is accurate, yes.

23  Q.   And a carrier that's operating at Fort Lauderdale

24  Airport must follow the schedule submission policy so

25  "no one carrier has a competitive advantage over another

1    and all have equal access to airport facilities," isn't

2    that right?

3    A.   That is our stated position, yes.

4    Q.   And earlier you mentioned relinquishing gates.

5         Does the County also have a policy to recapture

6    gates that are being underutilized?

7    A.   We have a provision to recapture preferential-use

8    gates if they're not needed -- if the airlines is not

9    meeting the stated demand or the utilization of that

10   particular gate, yes.

11   Q.   And that's a form of a use-it-or-lose-it policy?

12   A.   Yes, it is.

13   Q.   And that's in the lease agreement that we looked at

14   earlier, correct, with your signatory carriers that the

15   County can recapture gates that are not being fully

16   utilized?

17   A.   To the extent that the formula is not met, yes.

18   Q.   And so that's another way that the County can ensure

19   that the gates are being fully utilized and that the

20   airport can meet the consumer demand for air service in

21   South Florida, correct?

22   A.   Yes.

23   Q.   Mr. Gale, has Southwest recently announced moving

24   some of its flights from Fort Lauderdale to Orlando?

25   A.   Yes.

```
 1        MR. AMLIN:  Objection, your Honor.
 2        THE COURT:  Well again you say this is beyond the
 3   scope?
 4        MR. AMLIN:  It's leading again, your Honor.
 5        THE COURT:  No, I think this is going to deal with
 6   regulatory matters, so I'm going to let her have it.
 7   Overruled.
 8        Have they?
 9        THE WITNESS:  Yes, they have, your Honor.
10   Q.  And how many preferential gates does Southwest
11   currently have at Fort Lauderdale Airport?
12   A.  I believe they currently have 10 preferential-use
13   gates.
14   Q.  And of those 10, are some of those international-
15   capable gates?
16   A.  They are.
17   Q.  Do you know how many are international-capable?
18   A.  I think two, um, those are international, if I'm
19   correct in my memory.
20   Q.  And will the County need to recapture gates if
21   Southwest is not meeting the formula for the use of the
22   preferential gates?
23   A.  We will go through the established process that we
24   use for all airlines.  The way that we typically work,
25   the recapture process isn't necessarily on a specific
```

1    gate-by-gate, it's on the aggregate number of total

2    gates.  So in this case here, if Southwest has 10

3    preferential-use gates and after we run the formula at

4    the year end and they only qualify for 9, we would look

5    to recapture one of those gates, and, um, because of

6    their shifting of their international traffic, we would

7    look to, more likely than not, recapture one of the

8    international-capable gates.

9    Q.  All right.  Mr. Gale, moving to the potential

10   divestiture here.

11        Do I understand you correctly that the County

12   intends to run a process and consider any interested

13   carrier before you would decide how to allocate

14   JetBlue's gates?

15   A.  I believe that would be our stance, yes.

16   Q.  And in deciding how to allocate JetBlue's gates, the

17   County is going to follow the competition plan, correct?

18   A.  The County is going to take a look at the

19   competition plan and then in some cases we might need to

20   consult with the FAA, if there's an ambiguity regarding

21   any of the policies, to make sure that we don't

22   inadvertently step afoul of the competition plan and we

23   wind up in a bad spot with the FAA.

24   Q.  I'm sorry, "wind up with"?

25   A.  In a bad spot with the FAA, having, let's say,

1    violated, inadvertently violated some portion of the
2    competition plan.  We always want to make sure we're on
3    the right side of that.
4    Q.  And in deciding how to allocate any JetBlue gates,
5    you're going to make the best business decision you can
6    while following the competition plan, correct?
7    A.  That's correct.
8    Q.  And in making this decision on how to allocate
9    JetBlue's gates, the County will manage the demand for
10   air service responsibly?
11   A.  That is correct.
12   Q.  And in deciding how to best allocate these gates,
13   the County will be trying to meet South Florida's
14   regional demand for air travel service, correct?
15   A.  That is correct.
16   Q.  Mr. Gale, in making this decision on allocating
17   JetBlue gates, the County will be a proxy for the
18   consumer demand in the region, correct?
19   A.  Can you be a little bit more clear regarding a
20   proxy?
21   Q.  Sure, let me try it a different way.
22        In deciding how to allocate gates, the County will
23   be a proxy for its passengers, communities, and
24   stakeholders, correct?
25   A.  I believe that's correct.

1    Q.  And in making this decision, the County will be
2    making the best decision it can to ensure competition at
3    Fort Lauderdale Airport, correct?
4    A.  I believe that is correct.
5    Q.  So after you conduct your process pursuant to the
6    competition plan, the County may decide to assign some
7    gates to Allegiant, correct?
8    A.  I believe that is a possibility, yes.
9    Q.  However the process plays out, JetBlue will be
10   relinquishing these gates and will not have those,
11   correct?
12   A.  If JetBlue approaches the County and says that they
13   wish to relinquish a set number of gates, whether it's
14   1, 2, 3, 5, or however many it is, part of what we need
15   to look at to make sure that whomever would potentially
16   access those gates or would be leased those gates, that
17   we have the corresponding other facilities that are
18   necessary in order to run a successful operation,
19   whether that be ticket counters or other types of backup
20   office space, um, baggage service office space.  I think
21   the conversation with JetBlue needs to be a
22   comprehensive conversation regarding resources that are
23   necessary in order to make sure that whoever would step
24   in would have success.
25   Q.  All right.

1          MS. WRIGHT:  Just a moment to confer, your Honor.

2          (Pause.)

3     Q.  And, Mr. Gale, just to be sure that I understand

4     your answer.

5          If JetBlue informs you that it will be

6     relinquishing these gates, JetBlue will no longer have

7     those preferential gates, am I correct?

8     A.  If JetBlue comes to me and says they wish to

9     relinquish the gates, um, with no other provisions, then

10    it comes back immediately to the County and we would

11    follow our established process to announce the

12    availability of those gates.  If JetBlue wants to

13    request the assignment or consent of those gates to

14    another airline, I think we would have to take a look at

15    that, follow the competition plan as best we can, and

16    there are other parameters that need to be taken into

17    place at times when we're looking as to whether the gate

18    is international or domestic, whether it's handling a

19    wide-body aircraft versus an air-body aircraft, because

20    of the facility limitations.  We need to take a look at

21    all of that in context.

22    Q.  Okay.  But if JetBlue told you it is relinquishing

23    these 5 gates, the County would decide how to allocate

24    those gates, correct?

25    A.  The County would go through its allocation process,

1     the announcement of availability, and its allocation

2     process, yes.

3              MS. WRIGHT:  I'll pass the witness.

4              MR. AMLIN:  Your Honor, may I have one moment to

5     confer with my colleagues?

6              THE COURT:  You may.

7              (Pause.)

8              MR. AMLIN:  Your Honor, two very quick questions.

9

10    REDIRECT EXAMINATION BY MR. AMLIN:

11    Q.  Mr. Gale, you mentioned the construction of Terminal

12    5 and new gates to be available there.  Have you decided

13    which carriers will receive gates at the new Terminal 5?

14    A.  The initial discussions when we went through the

15    process of reviewing the project with all of the

16    signatory airlines at the airport, um, and because

17    JetBlue and Spirit, um, were the ones that were seeking

18    expansion when others were not, we did come up with a

19    potential split of the gates whereby we'd move some

20    airline operations around.  The net gain to Spirit

21    Airlines under that arrangement would have been 3, taken

22    from 10 preferential or 13 preferential, um, and 2 to

23    JetBlue -- at that time they had 15 preferential, so

24    they would have gone from 15 to 17.  That was, um,

25    discussed with the carrier group years ago when Terminal

```
1    5 was originally being conceived and designed.
2    Obviously the outcome of this may warrant that we take
3    another look at how the allocation of those gates would
4    be done going forward.
5    Q.  Thank you, Mr. Gale.
6         MR. AMLIN:  No further questions, your Honor.
7         THE COURT:  Nothing further?
8         MS. WRIGHT:  No, your Honor.
9         THE COURT:  You may step down.  Thank you.
10        I'm going to stick specifically to 10:45, because
11   I have a school group coming in, so go ahead and call
12   your next witness.
13        MR. BRIGGS:  Sure.  It will be Mr. Jarashow, your
14   Honor.
15        THE COURT:  Mr. Jarashow may be called.
16        (EVAN JARASHOW, sworn.)
17        (Pause.)
18        MR. BRIGGS:  Your Honor, John Briggs for the
19   United States.
20        THE COURT:  Yes, Mr. Briggs, you may proceed.
21
22        * * * * * * * * * * * * *
23        EVAN JARASHOW
24        * * * * * * * * * * * * *
25
```

```
1    DIRECT EXAMINATION BY MR. BRIGGS:

2    Q.  Good morning, Mr. Jarashow.

3    A.  Good morning.

4    Q.  Would you please state and spell your name for the

5    record.

6    A.  Of course.  Excuse me.  It's Evan Jarashow, E-V-A-N,

7    Jarashow, J-A-R-A-S-H-O-W.

8    Q.  And, Mr. Jarashow, we passed out binders with

9    exhibits in your prior testimony.  I'll let you know

10   when it's time to turn to those.

11   A.  Okay.

12   Q.  You're employed by JetBlue, right, sir?

13   A.  That's correct.

14   Q.  And what is your position with JetBlue?

15   A.  Manager of the International Pricing Team.

16   Q.  Let's go back to the start of your career in the

17   airline industry.

18        You worked in Revenue Management for U.S. Airways

19   from 2006 to 2011, right?

20   A.  That's correct.

21   Q.  You joined JetBlue in 2011?

22   A.  Correct.

23   Q.  And in 2015 you began working as a manager in

24   JetBlue's Revenue Management department, right?

25   A.  That's right.
```

1   Q.   In 2018 you became the manager of JetBlue's Pricing

2   Team, right?

3   A.   That's correct.

4   Q.   And at that time you managed pricing for all of

5   JetBlue's markets, both domestic and international,

6   right?

7   A.   Yes, that's right.

8   Q.   One of your pricing analysts was Michael Hilliyard

9   who is currently the Domestic Pricing Manager?

10  A.   That's correct.

11  Q.   And since 2021, you focused on international

12  markets, right?

13  A.   Yes, that's right.

14  Q.   Mr. Jarashow, I'd like to begin by asking about a

15  practice called "fare flashing."

16       Are you familiar with the use of the term "flash"

17  to describe one airline's effort to highlight a fare

18  change to another airline?

19  A.   I've come to understand it to mean that through the

20  course of my participation in this case and in the NEA

21  case.

22  Q.   In this case and in the Northeast Alliance case?

23  A.   Correct.

24  Q.   And you testified at the Northeast Alliance trial,

25  right, sir?

1    A.   I did.

2    Q.   Mr. Jarashow, "flashing" can involve an airline

3    canceling and refiling its fares on the same ATPCO

4    submission, right?

5         MS. ZIEMINSKI:   Objection, your Honor, leading.

6         THE COURT:   Sustained on that ground.

7         What do you understand "flashing" to be?

8         THE WITNESS:   Your Honor, I've come to understand

9    it to mean, um, changing a fare and retracting it.

10        THE COURT:   Why would one do that?

11        THE WITNESS:   There could be a variety of reasons.

12   But again I've come to understand that it could be an

13   intent to signal.

14        THE COURT:   To another airline?

15        THE WITNESS:   Correct.

16        THE COURT:   Go ahead, Mr. Briggs.

17        MR. BRIGGS:   Your Honor, before I proceed, I would

18   just like to state that Mr. Jarashow is being held as an

19   adverse party witness.   I'm happy to establish that

20   first --

21        THE COURT:   I was mistaken.   You're correct.

22   Proceed.

23        MR. BRIGGS:   Thank you, your Honor.

24   Q.   Mr. Jarashow, now let's look at a few documents

25   about "fare flashing."

1          Would you please turn in your binder to the tab

2     marked as Exhibit JT.

3     A.   The large binder or the small one?

4     Q.   I'm sorry, it's the small binder.

5     A.   Thank you.  "JT," you said, correct?

6     Q.   That's right.

7     A.   (Looks.)

8     Q.   Mr. Jarashow, Exhibit JT is an e-mail chain among

9     you and others in JetBlue's Revenue Management

10    department, right?

11    A.   Yes, that looks right.

12    Q.   And the e-mail chain, it concerns fares in the

13    Boston-Philadelphia market, right?

14    A.   That's what I see in the subject line, yes.

15         MR. BRIGGS:  Your Honor, plaintiffs offer Exhibit

16    JT into evidence as Exhibit 785.

17         THE COURT:  No objection?

18         MS. ZIEMINSKI:  No objection, your Honor.

19         THE COURT:  It is admitted, JT, 785.

20         (Exhibit 785, marked.)

21    Q.   Mr. Jarashow, looking at the other participants in

22    the e-mail chain.

23         Catarina Yanez is an analyst in the JetBlue

24    Pricing Team, right?

25    A.   Correct.

1    Q.   Jeremy Blackman is a manager in the Inventory

2    Management Team, right?

3    A.   Yes, that's right.

4    Q.   And at the time of this e-mail, Andrew Parker was

5    the Director of Revenue Management, right?

6    A.   Yes, I believe he was.

7    Q.   Now looking at Mr. Blackman's e-mail at the bottom

8    of the first page, he states, "Is there an update on

9    where we stand with TOD and OA matches."  And to explain

10   that for the Court, "TOD" means "Time Of Day," right?

11   A.   Yes, I believe that's right.

12   Q.   So when a fare is filed by an airline on ATPCO, it

13   can include Time Of Day restrictions meaning those fares

14   are only valid for travel at certain times of day,

15   right?

16   A.   Yes, that would be right.

17   Q.   And "OA matches" refers to matching fares by other

18   airlines?

19   A.   Yes, it would.

20   Q.   Now looking at the next sentence of Mr. Blackman's

21   e-mail, he wrote "I see Americans selling the $44 all

22   and outside of our timebands."

23        And, Mr. Jarashow, that means American had a $44

24   fare in the Boston-to-Philadephia market that did not

25   match the Time-Of-Day restrictions of JetBlue's fare,

1    right?

2    A.   Yes, I believe that's right.

3    Q.   In other words, at Times Of Day outside of JetBlue's

4    timeband, American's fare was $44 and JetBlue's was

5    higher, right?

6    A.   That seems about right.

7    Q.   And let's look at Ms. Yanez's response at the top of

8    the first page.

9         She wrote that she had discussed this issue with

10   "Evan," and that's you, right, Mr. Jarashow?

11   A.   Yes.

12   Q.   And she continued that, um, "for the 4:00 p.m.

13   subs," that's a reference to the 4:00 p.m. ATPCO

14   submission, right?

15   A.   Yes, that's right.

16   Q.   She wrote, "I'll do an ADB slash CXL to try to flash

17   American, and if it doesn't work, then we'll discuss

18   further actions."

19        "ADD/CXL" stands for "Add/Cancel," right?

20   A.   Yes, I believe it's a shorthand for that.

21   Q.   And Ms. Yanez was saying, in this e-mail, that she

22   would cancel JetBlue's fare and refile it on the same

23   4:00 p.m. ATPCO submission, right?

24   A.   That's what I believe she's saying, yes.

25   Q.   And she described this as trying to "flash

1    American"?

2    A.  Um, that's what she said, yes.

3    Q.  By "flashing American," using an Add/Cancel, you

4    understand Ms. Yanez was trying to draw American's

5    attention to this particular fare, right?

6         MS. ZIEMINSKI:  Objection, foundation.

7         THE COURT:  No, overruled.

8    A.  I don't recall thinking of it, at the time, as

9    drawing attention to a fare or signaling, but I see that

10   that's what she said.

11   Q.  And, um, Ms. Yanez reported to you at the time of

12   this e-mail, right?

13   A.  Um, yes, she would have.

14   Q.  And she stated in the e-mail that she discussed this

15   action with you, right?

16   A.  That's what she said, yes.

17   Q.  You communicated frequently with Ms. Yanez about her

18   actions, right?

19   A.  Occasionally.  I wouldn't say "frequently."  But

20   occasionally, yes.

21   Q.  Do you have any reason to believe that she was

22   suggesting something other than drawing American's

23   attention to this particular fare?

24   A.  Um, well again I don't recall thinking of it as

25   "drawing attention to a fare at the time."  But looking

1    back on it now, that's the way I interpret it.

2    Q.   A reason to flash American would be to encourage

3    American to change its fare so it would be within

4    JetBlue's timeband, right?

5    A.   Again I don't recall thinking this is really drawing

6    attention or trying to encourage a carrier to do

7    anything specific.  Looking back on it now, that's the

8    way I interpret it.

9    Q.   And if American were to make such a change,

10   American's price would increase outside of JetBlue's

11   timeband, right?

12   A.   It seems like that would have been the outcome.

13   Q.   You can set the exhibit aside.

14        MR. BRIGGS:  Your Honor, I'm happy to stop here or

15   move on.

16        THE COURT:  No, I'm trying not to waste time, so

17   why don't you move on a little while and I'll see if I

18   need to break.

19        MR. BRIGGS:  Of course.

20   Q.   Mr. Jarashow, would you please turn to the tab

21   marked as Exhibit FB in this same binder?

22   A.   "FB," you said?

23   Q.   "FB" as in "bravo."

24   A.   Thank you.  (Turns.)

25   Q.   Mr. Jarashow, is Exhibit FB a chat between you and

1   your colleague, Ann Masline, regarding fare filings?

2   A.  It looks like it is, yes.

3   Q.  Ms. Masline is and was a Pricing Analyst for

4   JetBlue, right?

5   A.  Correct.

6        MR. BRIGGS:  Your Honor, the plaintiffs offer

7   Exhibit FB into evidence as Exhibit 786.

8        THE COURT:  "FE," right?

9        MR. BRIGGS:  "FB," as in "bravo."

10        THE COURT:  All right.

11        No objection?

12        MS. ZIEMINSKI:  No, your Honor.

13        THE COURT:  "FB" is admitted, Exhibit 786.

14        (Exhibit 786, marked.)

15   Q.  I'm looking at the first three messages in the chat,

16   Mr. Jarashow.

17        Ms. Masline was asking about where other airlines

18   --

19        THE COURT:  Forgive me, Mr. Briggs, but I think

20   our guests have arrived.  So we'll take the morning

21   recess now till 20 minutes after 11:00.  We may all

22   stand in recess.

23        THE CLERK:  All rise.

24        (Recess, 10:50 a.m.)

25

```
 1              C E R T I F I C A T E

 2

 3

 4         I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER,

 5    do hereby certify that the foregoing record is a true

 6    and accurate transcription of my stenographic notes

 7    before Judge William G. Young, on Wednesday, November

 8    15, 2023, to the best of my skill and ability.

 9

10

11    /s/ Richard H. Romanow 11-15-23
      _____
12    RICHARD H. ROMANOW    Date

13

14

15

16

17

18

19

20

21

22

23

24

25
```