```
            UNITED STATES DISTRICT COURT
          DISTRICT OF MASSACHUSETTS (Boston)

                              No. 1:23-cv-10511-WGY
                              Vol. 2, Pages 94-168


UNITED STATES OF AMERICA, et al
          Plaintiffs

vs.


JETBLUE AIRWAYS CORPORATION,
et al,
          Defendants



                    ********


              For Bench Trial Before:
              Judge William G. Young




                 United States District Court
                 District of Massachusetts (Boston)
                 One Courthouse Way
                 Boston, Massachusetts 02110
                 Wednesday, November 15, 2023



                    ********



      REPORTER:  CHERYL B. PALANCHIAN, RMR, CRR
             Official Court Reporter
            United States District Court
          One Courthouse Way, Boston, MA 02110
```

A P P E A R A N C E S


EDWARD WILLIAM DUFFY, ESQ.
ARIANNA MARKEL, ESQ.
AARON TEITELBAUM, ESQ.
        DOJ-Atr
        450 Fifth Street NW, Suite 8000
        Washington, DC 20530
        (202)812-4723
        Email:  Edward.duffy@usdoj.gov
        For Plaintiff United States of America
- and -
WILLIAM T. MATLACK, ESQ.
        Attorney General's Office
        One Ashburton Place, 18th Floor
        Boston, MA 02108
        (617)727-2200
        Email:  William.matlack@mass.gov
        For Plaintiffs United States of America and The
        Commonwealth of Massachusetts



RYAN SHORES, ESQ.
        Cleary Gottlieb Steen & Hamilton LLP
        2112 Pennsylvania Avenue, NW
        Washington, DC 20037
        (202)974-1876
        Email:  Rshores@cgsh.com
- and -
ELIZABETH M. WRIGHT, ESQ.
        Cooley LLP
        500 Boylston Street
        Boston, MA 02116-3736
        (617)937-2349
        Email:  Ewright@cooley.com
- and -
RACHEL MOSSMAN ZIEMINSKI, ESQ.
MICHAEL MITCHELL, ESQ.
        Shearman & Sterling LLP
        2601 Olive Street, 17th Floor
        Dallas, TX 75201
        (214)271-5777
        Email:  Rachel.zieminski@shearman.com
        For Defendant JetBlue Airways Corporation


(Continued.)

(Continued.)


JAY COHEN, ESQ.
ANDREW C. FINCH, ESQ.
        Paul, Weiss, Rifkind, Wharton & Garrison
        1285 Avenue of the Americas
        New York, NY 10019-6064
        (212)373-3000
        Email:  Jaycohen@paulweiss.com
        For Defendant Spirt Airlines, Inc.

I N D E X

| WITNESS: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|

EVAN JARASHOW, Continued

| By Mr. Briggs | 98 | | 141 | |
|---|---|---|---|---|
| By Ms. Zieminski | | 135 | | |


LEONARDO LAGE

| By Mr. Doidge | 147 | | | |
|---|---|---|---|---|

<u>EXHIBITS</u>                    <u>PAGE</u>

787 . . . . . . . . . . . . . 104

788 . . . . . . . . . . . . . 107

789 . . . . . . . . . . . . . 109

790 . . . . . . . . . . . . . 113

791 . . . . . . . . . . . . . 124

792 . . . . . . . . . . . . . 130

793 . . . . . . . . . . . . . 159

```
1    (Proceedings, 11:20 a.m.)
2              THE COURT:  Court is in session, please be seated.
3    Mr. Briggs, you may continue.
4              MR. BRIGGS:  Thank you.
5                      EVAN JARASHOW, (Resumed)
6                  DIRECT EXAMINATION, (Cont'd.)
7    BY MR. BRIGGS:
8    Q.   Mr. Jarashow, before the break we were looking at
9    Exhibit 786, which is FB in your binder.  Are you there?
10             (On screen.)
11   A.   Yes.
12   Q.   Now, Mr. Jarashow, looking at the messages in this
13   exhibit, in the first three messages, Ms. Masline was asking
14   about where other airlines did not shorten the last-travel
15   date of a footnote; right?
16   A.   Correct.
17   Q.   And for the Court's context, a fare with a last-travel
18   date is only valid for travel through that particular date;
19   right?
20   A.   Yes, that's right.
21   Q.   That type of date restriction is included in footnotes
22   transmitted in ATPCO filings?
23   A.   Correct.
24   Q.   So a footnoted fare could be used to offer a low fare
25   that's only valid for a limited travel window; right?
```

1    A.   Correct.  A fare with a footnote that has a travel

2    period defined is only valid for travel during that time

3    period.

4    Q.   And shortening the last-travel date for a low fare can

5    have the effect of raising prices after the new shorter

6    last-travel date; right?

7    A.   Well, it could.  Whatever fare sells in its place after

8    the last travel is no longer applicable.

9    Q.   The low fare would no longer be valid after that

10   last-travel date; right?

11   A.   Correct.

12   Q.   And looking at your 10:38 a.m. response to Ms. Masline,

13   you were reporting that American had not shortened its

14   last-travel date; right?

15   A.   Correct.

16   Q.   In other words, American was selling a particular fare

17   for a longer travel period than JetBlue was selling its

18   equivalent fare; right?

19   A.   I believe that's about right.

20   Q.   And later at 10:45 a.m. Ms. Masline reported that

21   JetBlue had changed the last-travel date on one of its fares

22   and JetBlue's change was not 100 percent matched by

23   American; right?

24   A.   That's the way I read what's on the page, yes.

25   Q.   So just to sort of summarize that, Mr. Jarashow, if

1    American had not shortened its last-travel date, that means

2    they had a fare that was available for a longer period of

3    time than a comparable fare from JetBlue; right?

4    A.   That's right.

5    Q.   That could mean American was selling a lower fare than

6    JetBlue on certain dates after that last-travel date?

7    A.   I think that's about right.

8    Q.   Now, at 10:40 a.m. Ms. Masline wrote, "But an

9    add/cancel couldn't hurt."  Do you see that?

10   A.   I do.

11   Q.   And as we discussed earlier, adding and canceling a

12   fare can be used to flash a fare to highlight it to another

13   airline; right?

14   A.   It could.  An add/cancel is a reference to a technical

15   process in ATPCO where you're changing an attribute of a

16   fare.  It happens for a variety of reasons.  Earlier, yes,

17   we did discuss that could be a flash.

18   Q.   And in this context you would agree that the reason to

19   do an add/cancel was to encourage American to be aligned

20   with JetBlue's last-travel date; right?

21   A.   Well, I don't recall saying that we encouraged them.  I

22   think it was a matter of changing the travel period

23   associated with the date -- associated with the fare, excuse

24   me.

25   Q.   And would you agree that doing an add/cancel would

 1    highlight the discrepancy in fare dates for American?

 2              MS. ZIEMINSKI:  Objection.

 3              THE COURT:  No, overruled.

 4    A.   Well, a carrier would see, I assume, a change come

 5    through on the travel period.  Again, I don't recall

 6    thinking of anything as highlighting or encouraging any type

 7    of response.

 8    Q.   And if American observed, in response to the

 9    add/cancel, the discrepancy in travel dates, that could lead

10    American to shorten its last-travel date to match JetBlue;

11    right?

12    A.   Well, they would -- I believe they would change -- they

13    would see a change come through and make a decision for

14    themselves.

15    Q.   And returning to your response to the judge's question

16    earlier, you agree that this exhibit shows an example of

17    flashing action by JetBlue that could send a signal to

18    American?

19    A.   No, I do not.  I believe we were saying we did not take

20    that action.  We were saying the difference in travel dates

21    was fine.

22    Q.   And the action being discussed would potentially have

23    highlighted that fare change to American; right?

24    A.   I don't know that it would or wouldn't have.  I think

25    we were talking about, as I'm reading this, just changing

1    the travel period associated with our fare.

2    Q.    Okay.  Mr. Jarashow, let's take a step back from this

3    particular example.  While you've been at JetBlue, you've

4    observed other airlines making filings on ATPCO that you

5    have interpreted as an effort to signal another airline;

6    right?

7    A.    I believe I've testified in the past that I may have

8    seen it, but I don't recall a specific instance of it.

9    Q.    So your testimony is clear, sir, you recall generally

10   seeing ATPCO fare filings that you interpreted as an effort

11   by one airline to send a signal to another airline; right?

12   A.    I believe that's probably happened.  Again, I don't

13   recall a specific instance of it though.

14   Q.    Let's turn to a slightly different topic.  You're

15   familiar with the concept of a cross-market initiative;

16   right?

17   A.    Yes.

18   Q.    And you observe that cross-market initiatives occur in

19   the airline industry; right?

20   A.    I believe that they have happened.

21   Q.    There's a shorthand acronym, CMI, that's sometimes used

22   to mean cross-market initiative; right?

23   A.    I believe that's been used in the past.

24   Q.    Would you please turn in your binder to a tab marked

25   BVG?  It should be the last tab in your small binder.

```
 1              (On screen.)
 2    Q.   Mr. Jarashow, looking at the e-mail at the middle of
 3    the first page, that's an e-mail from JetBlue's executive
 4    vice president, Marty St. George, to you and others at
 5    JetBlue; right?
 6    A.   Yes, that looks right.
 7    Q.   And Mr. St. George was responding to market summaries
 8    that you circulated on behalf of the revenue management
 9    team; right?
10    A.   I see that in the subject line.  I don't have the
11    attachment here, but I see that, what he has made reference
12    to.
13              MR. BRIGGS:  Your Honor, plaintiffs offer BVG into
14    evidence as Exhibit 787.
15              THE COURT:  No objection?
16              MS. ZIEMINSKI:  We don't have an objection to the
17    portion of the exhibit that counsel has been referencing.
18    The top portion does not have a "from" line and so we just
19    want to note that, for the record.
20              THE COURT:  No objection to limit it like that?
21              MR. BRIGGS:  No objection to limiting it to the
22    e-mail from Mr. St. George as well as the second page of the
23    exhibit.
24              THE COURT:  All right.  I think we have agreement.
25    As limited, BVG is admitted, Exhibit 786 in evidence.
```

```
 1              MR. BRIGGS:  787, your Honor.

 2              THE COURT:  787, I'm sorry.

 3              (Exhibit 787 received in evidence.)

 4              MR. BRIGGS:  And 787 can be published.

 5              (On screen.)

 6    Q.   Now, Mr. Jarashow, I'd like to focus on point 7 in

 7    Mr. St. George's list of points.  Mr. St. George was

 8    reacting to fare reductions JetBlue had filed in DCA/FLA

 9    meaning routes between Washington's Reagan airport and

10    Florida; right?

11    A.   I believe he had a question about it, is the way I read

12    this.

13    Q.   And just to be clear, DCA/FLA, you interpret that to be

14    routes between Reagan National and Florida; right?

15    A.   The Florida, yeah.  That's right.

16    Q.   Okay.  And he makes a reference to "our fare

17    reduction," suggesting JetBlue had reduced fares on those

18    markets; right?

19    A.   I see that's consistent with the way I interpret the

20    question I see there.

21    Q.   And looking at Mr. St. George's question, the

22    second sentence, he asks, "Are they doing any CMIs?"  You

23    understood that to be a question about whether American did

24    a cross-market initiative in response to JetBlue lowering

25    fares between Washington, D.C. and Florida; right?
```

1    A.   I don't recall thinking about it or giving it any

2    attention at the time, so I'm not sure how I understood it

3    then.  As I'm reading it now, I believe he's making a

4    reference to a CMI and just asking if that was happening.

5            THE COURT:  What do you understand a CMI to be?

6            THE WITNESS:  I understand it to be a reference --

7    a shorthand reference or abbreviation for cross-market

8    initiative.

9            THE COURT:  And what is that, as you understand

10   it?

11           THE WITNESS:  A cross-market initiative would be a

12   competitive pricing scenario where a carrier takes a fare

13   from one market and extended it -- a fare gets extended by a

14   different carrier into another market.

15   Q.   And following up on that answer, Mr. Jarashow, if a

16   fare is extended into a different market as part of a

17   cross-market initiative, that could lead the airline that

18   filed the fare originally to reconsider it in the first

19   market; right?

20   A.   I don't know how another carrier would interpret -- how

21   they would interpret any change that comes through, make a

22   decision for themselves.

23   Q.   I'm not asking about other carriers' reactions in that

24   question, Mr. Jarashow, I'm asking about JetBlue's reaction

25   if a cross-market initiative were filed against JetBlue and

1   a fare that JetBlue had filed was expanded by another

2   carrier into other markets.  Are you with me?

3   A.   I believe so.

4   Q.   And that action, when JetBlue observed it, would pose a

5   risk to JetBlue's revenue; right?

6   A.   Well, any fare filed in a market would have revenue

7   implications.

8   Q.   And that action, that cross-market initiative, could

9   lead JetBlue to reconsider its fare in the first market;

10  right?

11  A.   Well, any fare that's filed we would take a look at and

12  make a decision independently about what makes sense for us.

13  Q.   So returning to Mr. St. George's question, he was

14  asking whether JetBlue's action to reduce fares between D.C.

15  and Florida led American to file a cross-market initiative

16  against JetBlue; correct?

17  A.   That's the way I interpret his question now, yeah.

18  Q.   Okay.  You can set the exhibit aside.

19       Mr. Jarashow, staying on the topic of cross-market

20  initiatives, I'd like to walk you through a series of events

21  concerning JetBlue and American fares.  Would you please

22  turn in your binder to the tab marked Exhibit EV.

23  A.   Again, still in the small binder?

24  Q.   Still in the small binder.

25  A.   Thank you.

```
 1              (On screen.)
 2   Q.   Mr. Jarashow, Exhibit EV is an e-mail chain involving
 3   you and others at JetBlue concerning fare activity; right?
 4   A.   That's correct.
 5              MR. BRIGGS:  Your Honor, plaintiffs offer EV into
 6   evidence as Exhibit 788.
 7              THE COURT:  No objection to EV?
 8              MS. ZIEMINSKI:  No objection.
 9              THE COURT:  EV is admitted, Exhibit 788.
10              (Exhibit 788 received in evidence.)
11   Q.   Looking at the participants in the e-mail thread, sir,
12   I believe we saw Andrew Parker in an earlier exhibit.  He
13   was JetBlue's revenue management director at this time;
14   right?
15   A.   Yes, he was.
16   Q.   And we also saw Marty St. George before.  At this time
17   he was executive vice president and chief commercial officer
18   of JetBlue; right?
19   A.   I believe that was still his title at the time, and
20   that's what I see on the page.
21   Q.   And the last participant, other than yourself, is Dave
22   Clark.  The Court is familiar with Mr. Clark from his
23   testimony at this trial.  He was vice president of sales and
24   revenue management at the time of this e-mail; right?
25   A.   I believe that's right.
```

1    Q.    Now, the subject line is, "Re: TCON Tactical Activity

2    Recap."   "TCON" refers to transcontinental routes between

3    the east and west coasts, such as Boston to Los Angeles;

4    right?

5    A.    Yes, it would.

6    Q.    And the word "tactical" is used.  A tactical fare is a

7    temporary fare that's only valid for a limited or specific

8    date range; right?

9    A.    Limited selling period or travel period, yes.

10   Q.    In your e-mail at the bottom of the first page of this

11   exhibit you gave a summary of tactical walk-up fares that

12   had been filed on transcontinental routes; right?

13   A.    That looks right to me, yes.

14   Q.    And looking at the first paragraph of your e-mail,

15   which is near the bottom of the first page, one of the

16   developments that you highlighted in this e-mail was a low

17   American Airlines fare in the Boston-to-Los Angeles market;

18   right?

19   A.    I believe that's right, yes.

20   Q.    Now, let's look at Mr. St. George's response in the

21   middle of the page.  He asked about where the team was

22   seeing cross-market initiative activity; right?

23   A.    That was his question, yes.

24   Q.    Then Mr. Parker responded later that evening on

25   February 21st and he suggested having an in-person or a

1    phone conversation about the cross-market initiatives;

2    right?

3    A.   He said we could talk about it over the phone.

4    Q.   You can set the exhibit aside.

5         Would you turn in your binder to Exhibit FC, please.

6    And, Mr. Jarashow, Exhibit FC is an e-mail you sent

7    attaching summaries of weekly competitive pricing activity;

8    right?

9              (On screen.)

10   A.   That looks right.

11   Q.   And around this time these weekly pricing summaries

12   were regularly prepared for and sent to Mr. Parker and

13   Mr. Clark; right?

14   A.   I believe they were recipients, yes.

15             MR. BRIGGS:  Your Honor, plaintiffs offer FC into

16   evidence as Exhibit 789.

17             THE COURT:  No objection?

18             MS. ZIEMINSKI:  No objection.

19             THE COURT:  FC is admitted, 789 in evidence.

20             (Exhibit 789 received in evidence.)

21             MR. BRIGGS:  And it can be published.

22             (On screen.)

23   Q.   Would you please turn, Mr. Jarashow, to the page of the

24   exhibit with the Bates number ending 997.  And the heading

25   is, "Week ending February 22nd, 2019."

```
 1  A.   997, you said?

 2  Q.   997.

 3  A.   Thank you.  All right.

 4  Q.   And the week ending February 22nd, 2019, is the same

 5  week as the e-mail we just looked at involving

 6  Mr. St. George and yourself and Mr. Parker; right?

 7  A.   I don't recall the exact date in front of me, but I

 8  will accept that it's probably around the same time.

 9  Q.   You're welcome to look if you like.  It was in EV in

10  your binder.

11  A.   All right.  In the interest of time I'll accept it.

12  Q.   Now, back on Exhibit FC, which is now in as

13  Exhibit 789, I'd like to focus you on the fourth bullet

14  point on the page that begins, "TCON markets remain active

15  throughout the week."  And, again, TCON markets are

16  transcontinental markets; right?

17  A.   That's right.

18  Q.   Looking at the second sub-bullet underneath that which

19  reads, "By the 2000 subs on Friday, OAP fares in Boston-Los

20  Angeles remained low at $139.  AA did not follow OA neither

21  to increase nor to cancel."  The "2000 subs" is a reference

22  to the ATPCO submission at 8:00 p.m. on that Friday; right?

23  A.   Yes, that's right.

24  Q.   And this bullet point conveys that during that week in

25  February of 2019 American had maintained a low fare of $139
```

1    in the Boston-to-Los Angeles market; right?

2    A.    That looks correct.

3    Q.    Boston and Los Angeles are both important cities for

4    JetBlue; right?

5    A.    They are.  They're both focus cities for us.

6    Q.    Now, let's look at the very next bullet on the page,

7    beginning, "On Friday at the 1000 subs."  That's a reference

8    to the 10:00 a.m. ATPCO submission; right?

9    A.    You're referring to the next bullet, I heard you say,

10   right?

11   Q.    It begins, "On Friday at the 1000 subs B6 filed."

12   A.    Yes, thank you.

13   Q.    This bullet conveys that JetBlue filed $139 walk-up

14   fares in five markets at 10:00 a.m. on that Friday; right?

15   A.    That looks right.

16   Q.    The amount of that fare in those five markets was $139,

17   which was the same amount as American's fare from Boston to

18   Los Angeles; right?

19   A.    That looks right.

20   Q.    Would you please identify for the Court the markets

21   where JetBlue filed this $139 walk-up fare?

22   A.    Sure.  I see Boston to DCA; Boston Logan to Reagan,

23   Washington Reagan; Boston to Dallas-Fort Worth; Fort

24   Lauderdale to Philadelphia; Jacksonville to Washington; and

25   Chicago to Fort Lauderdale.

```
 1    Q.   And none of those five markets is a transcontinental
 2    market, is it?
 3    A.   No, I don't believe they are.
 4    Q.   And fair to say that each of those markets is very
 5    different from the others?
 6    A.   There are some similarities between them.  They're
 7    different routes.  They're all routes that we serve.
 8    Q.   It's a mix of different geographies; right?
 9    A.   Yes, that's right.
10    Q.   And a mix of typical customer profiles from business to
11    leisure; right?
12              MS. ZIEMINSKI:  Objection.
13              THE COURT:  Do you know the answer from your work?
14              THE WITNESS:  I'd be guessing.
15              THE COURT:  You may not guess.
16              MR. BRIGGS:  I'll move on.
17    Q.   All five of these markets have involved hub markets,
18    hub airports for American; right?
19    A.   It looks like there's an airport on one end or the
20    other that they might describe as a hub or an area of large
21    operation.  These are also routes that we serve.
22    Q.   And those airports that are American hubs or large
23    operations are DCA, being Washington Reagan, Dallas-Fort
24    Worth, Philadelphia, and Chicago O'Hare; right?
25    A.   Yes.
```

1    Q.   Now, in other words, taking a step back, Mr. Jarashow,

2    after American maintained a low walk-up fare between

3    JetBlue's focus cities Boston to Los Angeles, JetBlue filed

4    a fare of the same amount in five markets touching American

5    hubs; right?

6    A.   Again, routes that we serve.  That looks about right

7    though.

8    Q.   You'd agree that that's a way of describing a

9    cross-market initiative; right?

10   A.   I think that's a reasonable statement in this case.

11   Q.   Let's turn to the next exhibit, please.  Would you turn

12   in your binder to Exhibit FD?  Mr. Jarashow, Exhibit FD is

13   an e-mail that you were involved, a few weeks later than the

14   last exhibit, also relating to fare filings; right?

15   A.   Looks like from March of 2019.

16        MR. BRIGGS:  Your Honor, plaintiffs offer FD into

17   evidence as Exhibit 790.

18        THE COURT:  No objection?

19        MS. ZIEMINSKI:  No objection.

20        THE COURT:  FD is admitted Exhibit 790.

21        (Exhibit 790 received in evidence.)

22        MR. BRIGGS:  Now, your Honor, we've prepared a

23   demonstrative which is Jarashow Demonstrative A.  It's in

24   the next tab in the binder after FD.  And it organizes the

25   messages in the exhibit in a way that we think will be

 1   helpful to streamline the examination.  We request

 2   permission to publish that demonstrative.

 3            THE COURT:  You may use it.

 4            MR. BRIGGS:  Thank you.

 5   Q.   Now, Mr. Jarashow, I'll ask you primarily about the

 6   demonstrative, but at any time if you'd like to go back to

 7   look at the original exhibit you're welcome to do so.

 8   A.   Thank you.

 9            (On screen.)

10   Q.   Now, I'd like to start by focusing on the first box of

11   the demonstrative which is excerpts from an e-mail from

12   Ms. Masline on March 13th, 2019.  Do you see that?

13   A.   I do.

14   Q.   And looking at the table on the left, Ms. Masline was

15   making a report about the lowest walk-up fares in certain

16   transcontinental markets; right?

17   A.   Yes, that's right.

18   Q.   So the table shows that American Airlines, as of

19   March 13th, in the Boston-to-Los Angeles market, had a $139

20   fare; correct?

21   A.   Again, you're looking in the top left box?

22   Q.   That's right, sir.

23   A.   Yes, I see $139 on several carriers.  It looks like all

24   these carriers have $139.

25   Q.   All of the carriers were matched, including American

1   and also including JetBlue; right?

2   A.   And Alaska, Delta, United, yes.

3   Q.   Okay.  And you'd describe $139 as a relatively low fare

4   for transcontinental service between Boston and Los Angeles;

5   right?

6   A.   By historical standards I believe that would be right.

7   Q.   Now, let's look at the table in Ms. Masline's e-mail

8   which is on the right-hand side of box 1.  This reports the

9   lowest walk-up fare in six other markets; right?

10  A.   Correct.

11  Q.   And the first five of the markets in the table are the

12  same five markets we were discussing earlier involving

13  American hubs where JetBlue had filed a $139 fare in the

14  prior exhibit; right?

15  A.   They look the same, yes.

16  Q.   Okay.  And there's one additional market in this table,

17  Philadelphia/Phoenix; right?

18  A.   I see that, yes.

19  Q.   And those are both American hub airports; right?

20  A.   I believe they are.

21  Q.   And the table showed that in several of those markets

22  JetBlue still had a $139 walk-up fare and it was slightly

23  different in a couple of the markets; right?

24  A.   Yes, that looks right.

25  Q.   Now, let's move ahead a few days, Mr. Jarashow.  Will

```
 1    you please look at box 2 of the demonstrative which is an
 2    excerpt from an e-mail that you sent on March 18th.  And,
 3    again, this is a similar table showing the lowest walk-up
 4    fares filed in the same four transcontinental markets as of
 5    March 18th at 11:30 a.m.; right?
 6    A.    That's what I see on the page.
 7    Q.    And you would agree that JetBlue received the
 8    information here about other airline fares by the 10:00 a.m.
 9    ATPCO submission that day?
10    A.    That looks about right to me.
11    Q.    Okay.  Now, this table shows that by that time,
12    10:00 a.m. on the morning of March 18th, American had raised
13    its walk-up fare from Boston to Los Angeles to $279; right?
14    A.    I see that, yes.
15    Q.    Now, let's look at the box number 3 of the
16    demonstrative, and this excerpt is an e-mail from Andrew
17    Parker on March 18th at 11:31 a.m.  This e-mail goes back to
18    the six markets involving American Airlines hubs; right?
19    A.    The markets look the same as the one we saw earlier.
20    Q.    It conveys that the same fares were present in those
21    same six markets as on March 13th; right?
22    A.    Just examining it quickly that looks right.
23    Q.    Okay.  Now, turning to Mr. Irwin's message on
24    March 18th, which is in box 5 of the demonstrative, he
25    reported that JetBlue's fares in those six markets would be
```

1    canceled at 1:00 p.m.; right?

2    A.    I'm sorry.  Which box are you referring to, 4 or 5?

3    Q.    Box 5, which is underneath the American hub markets.

4    A.    Thank you.  I was looking at the wrong box.  He

5    indicated that they have been canceled, which they'll

6    distribute at 1:00 p.m.

7    Q.    Okay.  By the time Mr. Irwin sent that message, JetBlue

8    was aware from its information on the 10:00 a.m. ATPCO

9    submission that American had raised its fare in Boston to

10   Los Angeles and other transcontinental markets; right?

11   A.    That looks about right.

12   Q.    And when you said a moment ago, we were talking about

13   the message about canceled for 1:00 p.m., that means that

14   the fares would be canceled on the 1:00 p.m. ATPCO

15   submission that date; correct?

16   A.    That's when those fares would be distributed, correct.

17   Q.    In other words, after JetBlue had observed American

18   raise its walk-up fare between JetBlue's focus cities Boston

19   to Los Angeles, JetBlue raised its walk-up fares in the

20   American hub markets; right?

21   A.    Well, I don't know if the fare was raised, all I know

22   is that these fares appear to have been canceled.

23   Q.    Let's focus on box 4 of the demonstrative.  Box

24   4 excerpts Mr. Irwin's message to you and others at 12:15 on

25   the same day; right?

1    A.    That's what I see on the page.

2    Q.    And Mr. Irwin wrote that he had spoken with you and

3    Mr. Parker, and JetBlue had determined to raise its own fare

4    in the transcontinental markets, including from -- including

5    in Boston to Los Angeles to $279; right?

6    A.    That's the way I read it.

7    Q.    Okay.  And that $279 fare corresponds to American's

8    newer Boston-to-Los Angeles fare reflected in box 2; right?

9    A.    That's -- that looks right.

10   Q.    Now, let's review the circumstances we've been

11   discussing, Mr. Jarashow.  You would agree that American had

12   filed a low fare in the Boston-Los Angeles market and

13   several other transcontinental markets; right?

14   A.    Yes, that's right.

15   Q.    And JetBlue responded with low fares in several markets

16   touching American hubs; right?

17   A.    That's right, in addition to routes that we served that

18   $139 was present.

19   Q.    And on March 18th American raised its fare in the

20   transcontinental markets, including Boston to Los Angeles;

21   right?

22   A.    That looks accurate.

23   Q.    And after JetBlue saw that, JetBlue removed its low

24   fare in the American hub markets; right?

25   A.    That looks right.

```
 1   Q.   That activity -- one other question also on March 18th
 2   as part of the recap.  JetBlue also raised its fare in
 3   Boston to Los Angeles matching American's higher fare;
 4   right?
 5   A.   Where do you see that?
 6   Q.   This would have been box 4 again where it says that
 7   JetBlue had canceled fares below $279 in Boston-Los Angeles.
 8   You'd agree that that matched American's $279 fare in box
 9   2 in Boston to Los Angeles; right?
10   A.   That looks about right.
11   Q.   Okay.  Now, the activity that we've been reviewing is
12   consistent with a cross-market initiative; right?
13   A.   As I said before, I believe that's right.
14   Q.   You can set the exhibit and the demonstrative aside,
15   sir.
16        Changing subjects, Mr. Jarashow, the Court has heard
17   quite a bit of testimony during this trial about how
18   airlines file fares and observe each other's fares.  I have
19   just a few questions on that topic.  Part of your job on the
20   pricing team at JetBlue is to try to understand what other
21   airlines are doing when they file fares; right?
22   A.   That's generally right.  We observe changes and
23   activity in the marketplace and try to make sense of it.
24   Q.   And the primary tool JetBlue uses to evaluate changes
25   in other airlines' fares in the marketplace is air price,
```

```
1    which is used to analyze ATPCO filings; right?
2    A.   Yes.  We have some other tools as well.
3    Q.   Okay.  And among those other tools, the team also looks
4    at fares available on other airlines' websites; right?
5    A.   Correct.
6    Q.   Let's compare the amount of information available to
7    JetBlue using those tools.  The Court has heard, and you
8    gave some of this testimony about the daily ATPCO
9    submissions four times a day in domestic markets.  Those
10   fares are associated with fare basis codes; right?
11   A.   Correct.
12   Q.   And the same or similar fare basis codes can be filed
13   in different markets; right?
14   A.   Yes.
15   Q.   You can use the ATPCO data and air price to determine
16   if an airline has filed the same fare basis code in multiple
17   markets on the same ATPCO submission; right?
18   A.   Yes, that's right.
19   Q.   Now, airlines can file fares on ATPCO in batches;
20   correct?
21   A.   Yeah.  I would describe the hourly or the four-time
22   daily and hourly transmissions as batches, yes.
23   Q.   The transmissions also have particular batch numbers
24   associated with them; right?
25   A.   Distribution groups, yeah, that's right.
```

```
 1    Q.    And an airline can file multiple batches or

 2    distribution groups on the same ATPCO submission; right?

 3    A.    Yes.

 4    Q.    So an airline can group a set of fares that have a

 5    particular strategic purchase into a distinct batch; right?

 6    A.    I suppose we could.

 7    Q.    For example, an airline could file fares for a

 8    cross-market initiative in multiple markets together in a

 9    distinct batch; right?

10    A.    I suppose that's right.

11    Q.    And at JetBlue you can use the ATPCO data and air price

12    to see the exact batch, staying on that question, that

13    another airline filed a cross-market initiative in; right?

14    A.    I suppose you could query the data that way.

15    Q.    Mr. Jarashow, an airline can also file the same

16    footnote on ATPCO for fares in multiple markets; right?

17    A.    Yes.

18    Q.    And with the ATPCO data and air price, you can identify

19    all of the fares in all the markets where the airline has

20    filed the same footnote; right?

21    A.    Yes.

22    Q.    And you can use that data about footnote filings to

23    assess the strategic purpose of another airline's fare

24    filing; right?

25    A.    You have to make an inference.  And, again, we try to
```

1   make sense of what we see happening, but ultimately it's our

2   interpretation.

3   Q.   Okay.  And you make those sorts of interpretations just

4   about every day in the pricing team; right?

5   A.   We do our best, yeah.

6   Q.   Would it be fair to say, Mr. Jarashow, that simply

7   searching other airlines' websites to see what fares they're

8   offering on the web doesn't allow you to probe airlines'

9   fares in the same way as you can with ATPCO data and air

10  price; right?

11  A.   Well, they are -- those two tools are put together to

12  form a holistic view, but they're looking at different

13  things to help, again, form a holistic impression.

14  Q.   And the level of information that you can access and

15  process using ATPCO is richer in the ways we were

16  discussing; right?

17  A.   You can see underlying rules and attributes.  I would

18  also point out, though, that the data we get from our -- by

19  looking at airline websites is richer in a different way

20  because it tells you what's actually selling.

21  Q.   Okay.  Turning to my last topic, this will involve a

22  bit of a change of gears too.  It relates mostly to what the

23  Court has heard described as the ULCC test.

24  A.   All right.

25  Q.   And, Mr. Jarashow, are you familiar with an exercise

1    JetBlue conducted called the ULCC test?

2    A.    Yes.

3    Q.    And that was an effort to evaluate JetBlue's strategy

4    relative to ultra low-cost carriers including Spirit?

5    A.    Yeah, that's generally correct.  We were evaluating a

6    series of options or pricing relative to ULCCs at the time.

7    That's how I remember it.

8    Q.    You worked on the pricing aspects of the ULCC test;

9    right?

10   A.    I helped to set up the initial framework and

11   methodology for evaluating the pricing position.

12   Q.    And that framework involved matching Spirit fares in

13   markets where JetBlue and Spirit competed; right?

14   A.    In some instances I believe it did.

15   Q.    As part of the ULCC test, JetBlue evaluated risks to

16   JetBlue if matching Spirit's fares; right?

17   A.    I believe that was one of the considerations, yes.

18   Q.    Let's take a look at some documents about that.  Would

19   you turn in your binder, still on the small binder, sir, to

20   the tab marked Exhibit JD?

21          (On screen.)

22   Q.    Mr. Jarashow, Exhibit JD is an e-mail you received with

23   materials about the ULCC test in February 2020; right?

24   A.    February 28th, 2020.

25   Q.    And you contributed to portions of the attached

```
 1   materials; right?
 2   A.   I may have contributed portions of it.
 3          MR. BRIGGS:  Your Honor, plaintiffs offer JD into
 4   evidence as Exhibit 791.
 5          THE COURT:  No objection?
 6          MS. ZIEMINSKI:  No objection.
 7          THE COURT:  It's JT, correct?
 8          MR. BRIGGS:  "D" as in Davis.
 9          THE COURT:  JD, excuse me.  JD is admitted,
10   Exhibit 791.
11          (Exhibit 791 received in evidence.)
12   Q.   Now, Mr. Jarashow, would you please turn to the page
13   with the Bates number ending 148, which is in the slide
14   deck.
15          (On screen.)
16   Q.   This is a slide titled, "Anticipating OA Response,
17   Yield Risks."  Do you see that?
18   A.   I do.
19   Q.   And the slide generally describes risks JetBlue
20   anticipated about the ULCC test; right?
21   A.   I think it was describing potential risks.
22   Q.   Understood.
23          MR. BRIGGS:  And if I didn't say so, this exhibit
24   can be published.
25   Q.   Now, looking at the first bullet underneath "Risks"
```

1   that begins, "An OA response is to be expected," OA response
2   means the response of other airlines; right?
3   A.   That's the way I interpret it, yes.
4   Q.   And JetBlue interpreted that when you lowered fares to
5   match Spirit's fares in particular markets, other airlines
6   in those markets would match those lower fares; right?
7   A.   I believe we were discussing it as a potential outcome.
8   As new fares are introduced into routes, I don't know what's
9   going to happen after you file them.
10   Q.   Looking at the next bullet point beginning, "Some of
11   these fares," it reads, "Some of these fares will touch OA
12   hubs, example, Atlanta, Philadelphia, Boston, while others
13   will compete with OA connecting markets, both of which they
14   have shown propensity to defend."  "OA hubs" means the hub
15   airports of legacy carriers; right?
16   A.   That's the way I read it.
17   Q.   And "OA connecting markets" would be markets that
18   legacy carriers serve through their hubs?
19   A.   It could be.  I just read it as not nonstop routes.
20   Q.   Now, the phrase "propensity to defend" at the end of
21   the bullet reflects that the legacy airlines have a practice
22   of taking actions to defend their markets; right?
23   A.   I'm not sure how to interpret that.  I think this is a
24   question that just sort of says once fares are introduced
25   you don't know what's going to happen next.  I don't know

1    what's to interpret or defend.

2    Q.   This is about OAs having a propensity to defend,

3    meaning in the past; right?

4    A.   That's what I -- how I read it.

5    Q.   And so however you read it, this has to refer to legacy

6    airlines taking actions, having a propensity to take actions

7    to defend their markets; right?

8              MS. ZIEMINSKI:   Objection.   Asked and answered.

9              THE COURT:   Well, it is, and I receive the

10   evidence, and its plain meaning is that legacies take steps

11   to defend their prices in those markets.   So I'll sustain

12   it.   I've got that point.

13             MR. BRIGGS:   I'll move on, your Honor.

14   Q.   Mr. Jarashow, you would agree that JetBlue anticipated

15   that when it matched Spirit's fares in some markets legacy

16   airlines might respond by filing lower fares in additional

17   markets; right?

18   A.   I don't remember anticipating that that would happen.

19   I remember discussing it as a potential risk.

20   Q.   And that risk is the risk described in the bullet point

21   that begins, "Expansion of these fares to additional

22   markets."   Right?

23   A.   That's the way I understand it.

24   Q.   Okay.   And expansion of Spirit-matching fares to

25   additional markets posed a risk to JetBlue's revenue; right?

1    A.    I believe it could have.

2    Q.    And if a fare spread to additional markets, that could

3    cause JetBlue to reconsider its fare in the original markets

4    where it was filed; right?

5    A.    I don't know that we would reconsider it in the

6    original routes.  We were, again, evaluating a test that we

7    were looking to understand.  I think we just highlighted it

8    as a potential risk that the fare could move into different

9    routes elsewhere.

10   Q.    And if that risk emerged, there's a potential that it

11   would lead JetBlue to reconsider the ULCC test strategy of

12   matching Spirit fares; right?

13   A.    That seems very hypothetical.  I don't know that we

14   would have reconsidered it.  Again, we were evaluating a

15   test, and I think we wanted to understand what would happen.

16   Q.    Okay.  Would you turn, please, in the larger binder to

17   the tab market CID?  I think it's CID Individual.  It should

18   be the fourth tab in that binder.

19   A.    CID Individual?

20   Q.    That's right.

21   A.    Thank you.

22   Q.    And do you recognize that as the transcript of the

23   deposition that you gave during the investigation of this

24   transaction?

25   A.    From February of this year, that looks right.

 1   Q.   Okay.  Would you turn to page 294?  And before I ask

 2   you about what's on the page, you recall being asked about

 3   this slide at your deposition in February of this year;

 4   right?

 5   A.   There were a lot of questions.  I do see it on the page

 6   though.

 7   Q.   Okay.  And you see from lines 8 through 12 you were

 8   asked:  "If a fare spreads to additional markets, would that

 9   cause JetBlue to reconsider its fare in the original market

10   where it was filed?"

11        And you answered:  "Possibly."

12   A.   That's what I see there.

13   Q.   And was that testimony accurate when you gave it?

14   A.   I believe it was.

15        MS. ZIEMINSKI:  Your Honor, I object.  That's not

16   a proper impeachment.

17        THE COURT:  It may stand.

18   Q.   Mr. Jarashow -- and you can set the transcript aside.

19        We spoke earlier about cross-market initiatives.

20   Cross-market initiatives can involve fares being expanded to

21   other markets as a competitive response; right?

22   A.   It could.

23   Q.   And so what's -- the slide we've been looking at, Bates

24   number ending 138, reflects, in part, that JetBlue was

25   concerned about other airlines filing cross-market

```
 1   initiatives against it in response to the ULCC test; right?
 2   A.   Again, we were -- how I read this is we were concerned,
 3   wanted to highlight the risk that fares could be spread into
 4   additional markets.
 5   Q.   You can set the exhibit aside.
 6        Let's speak for a couple of minutes about Spirit's
 7   response to JetBlue's matching fares.  Would you turn in
 8   your binder, please, to the tab marked Exhibit OQ?
 9            THE COURT:  Now, which binder are we in?
10            MR. BRIGGS:  I'm sorry, sir, your Honor, it's the
11   small binder.
12            (On screen.)
13   Q.   Mr. Jarashow, Exhibit OQ is an e-mail that Lucas
14   Osolkowski sent to you and others at JetBlue on March 3rd,
15   2020; right?
16   A.   That's correct.
17   Q.   And Mr. Osolkowski at the time was an inventory analyst
18   at JetBlue; right?
19   A.   That's right.
20   Q.   That's within the revenue management department?
21   A.   Correct.
22            MR. BRIGGS:  Your Honor, plaintiffs offer OQ into
23   evidence as Exhibit 792.
24            THE COURT:  No objection?
25            MS. ZIEMINSKI:  No objection.
```

```
 1              THE COURT:  OQ is admitted, Exhibit 792.
 2              (Exhibit 792 received in evidence.)
 3              MR. BRIGGS:  And there are, on a few pages,
 4    redactions to which we haven't objected but I won't go
 5    anywhere near those pages.
 6              So OQ may be published.
 7              (On screen.)
 8    Q.   Mr. Jarashow, let's look at the e-mail that
 9    Mr. Osolkowski sent on the first page of the exhibit.  I'd
10    like to start with the paragraph beginning, "Hypothesis."
11    Do you see that he stated an observation that Spirit's
12    strategy was to always have a lower price point than both
13    legacy and low-cost carriers?
14    A.   Yes, I see that's what he stated.
15    Q.   And in the following paragraph, beginning, "As part of
16    the initial ULCC test on January 24th," now, that reflects
17    that JetBlue had begun the ULCC test by January 24th, 2020;
18    right?
19    A.   That looks right.  That's the way I read it.
20    Q.   And January 24th, 2020, was before the COVID pandemic;
21    right?
22    A.   Well, I believe it was at that point beginning to be a
23    concern, certainly something we were aware of at the time.
24    Q.   It was certainly before the major panic began with the
25    COVID pandemic; right?
```

```
 1    A.    Again, there was increasing concern about it.

 2    Q.    Understood.  Now, in this paragraph Mr. Osolkowski is

 3    reporting that JetBlue had matched Spirit's lowest fares in

 4    two markets; right?

 5    A.    I'm sorry.  Which e-mail are you referring to?

 6    Q.    I'm on the paragraph underneath "Hypothesis" from

 7    Mr. Osolkowski.

 8    A.    Thank you.

 9    Q.    Still on the, "As part of the initial ULCC test."

10    A.    Thank you.

11    Q.    So he was reporting JetBlue matched Spirit's lowest

12    fares in two particular markets; right?

13    A.    Correct.

14    Q.    And he also reported that Spirit had responded to

15    JetBlue's matching fares in those markets by lowering its

16    own fares even lower in that market; right?

17    A.    That's what he stated.

18    Q.    Okay.  And you have no reason to doubt that that's

19    accurate, do you?

20    A.    I have no reason not to believe it.

21    Q.    I'd like to stay on this same exhibit, Mr. Jarashow,

22    but turning to an earlier period of time and turning to the

23    attachment to the e-mail which begins on page ending 445.

24    This is the slide deck attachment.

25            THE COURT:  Say again the -- where are we?
```

```
 1              MR. BRIGGS:  Page 445, your Honor.
 2   Q.   And this is a set of materials titled, "Strategy
 3   Outline for Spirit-Impacted Florida-Latin Markets."  Do you
 4   see that?
 5   A.   I do.
 6   Q.   And Mr. Osolkowski had prepared these materials in
 7   May 2019; right?
 8   A.   That's the date that I see there.
 9   Q.   And that was before the ULCC test; right?
10   A.   Thinking about the timeline, that sounds right.
11   Q.   As the title reflected, JetBlue has been impacted by
12   Spirit in routes between Florida and Latin America by 2019;
13   right?
14   A.   That seems about right.
15   Q.   And JetBlue was considering what strategies to take in
16   response to that impact?
17   A.   I think that's right.
18   Q.   Okay.  Would you turn to the page ending 447 of this
19   exhibit, slide 3?  The title is "Background."
20   A.   Thank you.
21   Q.   And, Mr. Jarashow, the background slide includes
22   several charts depicting the growth of Spirit as a
23   competitor in JetBlue's Florida-Latin America routes in the
24   years leading up to 2019; right?
25   A.   That looks right.
```

1    Q.    Okay.  You can set the exhibit aside.

2         Mr. Jarashow, returning briefly to the subject of the

3    ULCC test, would you please turn in your binder to the tab

4    marked as Exhibit 395.  It should be the first tab in the

5    small binder.

6              MR. BRIGGS:  And, your Honor, Exhibit 395 is in

7    evidence and can be published.

8              (On screen.)

9    Q.    Mr. Jarashow, Exhibit 395 is an e-mail with the

10   presentation about the ULCC test from March 2020; right?

11   A.    March 25th, 2020, that's what I see.

12   Q.    And you contributed to portions of the attached

13   presentation; right?

14   A.    I may have.  I don't recall preparing it, but there may

15   have been items to which I contributed.

16   Q.    Let's turn to the page of the presentation with the

17   Bates number ending 633, and the title is, "Anticipated

18   Risks:  A retrospective."

19              (On screen.)

20   Q.    I'd like to focus on the fourth line on the page which

21   begins, "Legacy carriers have generally matched the fares

22   filed by B6."  That was a reference to markets where JetBlue

23   had matched Spirit's fares and JetBlue also competed in

24   those markets with a legacy airline; right?

25   A.    Could you repeat the question?  I just want to make

1  sure I heard it.  I apologize.

2  Q.   Sure.  Let me rephrase it slightly to make it a little

3  easier.  The markets being discussed in this bullet point

4  would involve markets where JetBlue competes against both

5  Spirit and legacy carriers; right?

6  A.   That seems like a reasonable inference.

7  Q.   And what this bullet point was referring to is that in

8  those markets where JetBlue competes with both Spirit and a

9  legacy carrier, the legacy carrier generally filed a fare

10  that matched JetBlue's fare that, in turn, matched Spirit's

11  fare; right?

12  A.   That looks right.  In the next bullet though I see also

13  that they've applied a premium in certain cases.

14  Q.   Now, later on the page do you see the bullet that

15  reads, "Spirit has dropped fares even lower since we began

16  matching"?

17  A.   I see that bullet.

18  Q.   And that reflects that after JetBlue had matched

19  Spirit's fares in overlapping markets, Spirit then filed

20  even lower fares in those same markets; right?

21  A.   This seems consistent with the timeline.

22  Q.   And that's consistent with what we saw in

23  Mr. Osolkowski's e-mail as well; right?

24  A.   It's consistent with the statement that he made.

25  Q.   Okay.  You can set that exhibit aside, sir.

```
 1              MR. BRIGGS:  I'll pass the witness.
 2              THE COURT:  Ms. Zieminski, you may proceed.
 3              MS. ZIEMINSKI:  Thank you, your Honor.  One
 4    moment.
 5                        CROSS-EXAMINATION
 6    BY MS. ZIEMINSKI:
 7    Q.   Mr. Jarashow, how long have you been working in
 8    JetBlue's pricing department?
 9    A.   I've been in the pricing group for about five years.
10    Q.   Would you explain to the Court why you file fares on
11    ATPCO?
12    A.   Sure.  ATPCO is sort of the clearinghouse for getting
13    our fares and rules, rule data sort of set up and
14    distributed out into the world to places where customers can
15    buy our tickets.
16    Q.   Could you explain some of the places that the ATP data
17    goes out in the world?
18    A.   Sure.  It might be, like, travel agencies, you know,
19    traditional travel agency that you might stop into to buy a
20    ticket, an online travel agency, and the reservation system
21    that drives our own website.
22    Q.   And so the fare information that you put into ATPCO is
23    then distributed from ATPCO to all the places that you just
24    mentioned so that customers can book tickets; is that right?
25    A.   Yeah, that's about right.
```

1    Q.   You were asked some questions today about flashing

2    other airlines.  Do you remember those?

3    A.   Yes.

4    Q.   In your five years of experience in the JetBlue pricing

5    team, how many routes on a daily basis is the JetBlue

6    pricing team responsible for pricing?

7    A.   Well, we have about 200 or so nonstop routes, and all

8    the connections in between them.  Quite a few.

9    Q.   At any given time how many fares does JetBlue have

10   filed on ATPCO?

11   A.   It would be well over a million.  I'd say probably

12   between 1- and 3 million.

13   Q.   And how often can those fares change?

14   A.   International fares can change hourly and, as we said

15   earlier, domestic fares can change up to four times a day.

16   Q.   In practice, how many times are your -- is your team

17   changing fares per day?

18   A.   Well, some days are busier than others.  Some days can

19   be relatively quiet where only a few hundred fares may

20   change.  Other days might be very busy with tens of

21   thousands.  On average, I'd say thousands.

22   Q.   And over the five years that you've been on the pricing

23   team, how many fare changes has JetBlue filed or changed?

24   A.   Tens of millions, I'd say.

25   Q.   Mr. Briggs showed you Exhibit 785.  Do you remember

1    that exhibit?

2    A.    Yes, I do.

3    Q.    It was an e-mail where Ms. Yanez made reference to

4    flashing?

5    A.    Yes.

6    Q.    Do you remember when that e-mail was dated?

7    A.    It would have been in February of 2020.

8    Q.    Other than that isolated instance of flashing, do you

9    recall any other discussions of flashing during your time at

10   JetBlue?

11   A.    No, I do not.

12   Q.    Mr. Briggs also asked you some questions about the

13   purpose of an add/cancel.  Do you remember those?

14   A.    Yes.

15   Q.    Could you explain what an add/cancel is?

16   A.    Sure.  Add/cancel is a shorthand reference for the

17   technical process that happens several times a day for a

18   variety of reasons where a fare has to be canceled, an

19   attribute of it is changed, and then it's refiled.

20   Q.    Could you give a specific example of why you might need

21   to file an add/cancel to change a fare?

22   A.    Sure.  If you wanted to change the travel dates on a

23   fare.

24   Q.    Does add/cancel necessarily mean that you're signaling

25   another airline?

1   A.   No.

2   Q.   Is signaling another airline permitted at JetBlue?

3   A.   No.

4   Q.   Have you ever trained anyone on how to flash another

5   airline?

6   A.   No.

7   Q.   Have you ever been trained on how to flash another

8   airline?

9   A.   No.

10   Q.   Do you follow the instructions not to flash other

11   airlines?

12   A.   We do.

13   Q.   Also I want to turn to cross-market initiatives which

14   you heard some questions about.  Similarly, are cross-market

15   initiatives part of JetBlue's practices?

16   A.   No, that's not part of our practices.

17   Q.   Other than the activity that you spoke to Mr. Briggs

18   about in early 2019, do you recall any other instances of

19   JetBlue pricing analysts engaging in any cross-market

20   initiatives?

21   A.   No, I do not.

22   Q.   Do you recall any instances of engaging in cross-market

23   initiatives in 2020?

24   A.   No, I do not.

25   Q.   What about in 2021?

```
 1   A.    No, I do not.

 2   Q.    How about last year, in 2022?

 3   A.    No.

 4   Q.    Has it happened this year in 2023?

 5   A.    No.

 6   Q.    Have you ever been trained on how to initiate a

 7   cross-market initiative?

 8   A.    No.

 9   Q.    Have you ever trained anyone else on how to do that?

10   A.    No.

11   Q.    Let's turn to the ULCC test.  Mr. Briggs asked you some

12   questions about that test.  Do you remember those?

13   A.    Yes.

14   Q.    What was your involvement with the ULCC test?

15   A.    Well, as I mentioned earlier, I was involved with

16   helping to set up the initial framework and methodology for

17   evaluating a series of our prices relative to some ultra

18   low-cost -- some ULCCs on a handful of routes.

19   Q.    When did you start setting that up?

20   A.    The discussions began late 2019.

21   Q.    And when did the test begin?

22   A.    Early 2020, I believe in January.

23   Q.    And how long did the test go on?

24   A.    Approximately six months.  So I believe it ended

25   somewhere in the middle of that summer, 2020.
```

1    Q.    Okay.  And Mr. Briggs made mention of the COVID-19

2    pandemic.  Was that also happening at the same time as this

3    test was just getting off the ground?

4    A.    Yes, it was.

5    Q.    Exhibit 791 was dated February 28, 2020.  That was the

6    PowerPoint that discussed anticipated risks; right?

7    A.    I believe that's right.

8    Q.    And Exhibit 793 was dated March 25th, 2020, about a

9    month later; right?

10   A.    I believe that's right.

11   Q.    And it took into account some of the analysis that the

12   group did in that intervening month; right?

13   A.    I believe that's right.

14   Q.    How reliable was the data that came in during the month

15   between January 28th, 2020 and March 25th, 2020?

16   A.    Well, the COVID pandemic introduced a lot of

17   confounding factors, a lot of external factors.  I would say

18   it made it unreliable, iffy.

19   Q.    What about the test overall?  Were you able to, later

20   in the year 2020, draw any reliable conclusions from the

21   data that you got earlier that year?

22   A.    Not really, no.

23   Q.    What changes did JetBlue make to its pricing strategy

24   as a result of the ULCC test?

25   A.    None really.

```
 1   Q.   Is the ULCC test still in place today?

 2   A.   No.

 3             MS. ZIEMINSKI:  Pass the witness, your Honor.

 4             THE COURT:  Anything further, Mr. Briggs?

 5             MR. BRIGGS:  A few questions.  It won't take very

 6   long, your Honor.

 7                     REDIRECT EXAMINATION

 8   BY MR. BRIGGS:

 9   Q.   Mr. Jarashow, counsel asked a number of questions about

10   the number of fares that JetBlue files in ATPCO; right?

11   A.   Correct.

12   Q.   And we looked at Exhibit 785, which is an example of

13   JetBlue engaging in fare flashing using ATPCO; right?

14   A.   785.  Could you remind me?

15   Q.   Sure.  That is JT.

16   A.   Okay.

17   Q.   And we don't need to go over it again, I'm just asking

18   if that, to your recollection, was an example of fare

19   flashing using ATPCO?

20   A.   Correct.  That's not the way I interpreted it at the

21   time, but yes.

22   Q.   And we looked at another example on Exhibit 786, which

23   is FB, of yourself and Ms. Masline discussing an add/cancel

24   that would highlight a fare change to American; right?

25   A.   I believe the discussion was around an add/cancel
```

1    around travel dates.

2    Q.   It concerns aligning the travel dates with American;

3    right?

4    A.   I believe it was, again, just about the travel period

5    associated with the fare.  I think there was some

6    differences between what the travel dates were.

7    Q.   And you don't know how often JetBlue has engaged in

8    fare flashing; right?

9    A.   I'm not aware of any instances beyond what we've

10   discussed.

11   Q.   And you're not aware of how often other airlines have

12   engaged in fare flashing; right?

13   A.   No.

14   Q.   And we spoke about a cross-market initiative on direct

15   and your counsel asked you a couple of follow-up questions

16   about that.  Just to be clear, Mr. Jarashow, you testified

17   earlier that your understanding is that cross-market

18   initiatives do occur in the airline industry; right?

19   A.   I believe that they have happened.

20   Q.   And we looked at JetBlue examples of that from 2019;

21   right?

22   A.   I believe there was an example of it from 2019.

23   Q.   Okay.  Mr. Jarashow, counsel asked you about JetBlue's

24   practices in the last two or three years, if I remember

25   correctly.  And taking a step back, this is actually the

1    sixth time that you've testified in a matter involving the

2    DOJ in the last two and a half years, either at depositions

3    or trial; right?

4    A.   That number sounds right, six.

5    Q.   And those depositions and testimony have involved the

6    Northeast Alliance and now this proposed merger; right?

7    A.   Correct.

8    Q.   The first of that deposition was -- the first of your

9    depositions was in March 2021; right?

10        MS. ZIEMINSKI:  Objection, your Honor.  This is

11   outside the scope of my cross-examination.

12        THE COURT:  It is.  Sustained.

13   Q.   Based on your experience, Mr. Jarashow, you've been

14   aware for the last few years, at least, that your

15   communications can be produced in antitrust litigation;

16   right?

17   A.   Yes.

18        MS. ZIEMINSKI:  Objection.  Same objection.

19        THE COURT:  Overruled.

20   Q.   And you've seen, Mr. Jarashow, through your depositions

21   and testimony, that JetBlue's internal communications can be

22   used as evidence in trial; right?

23   A.   Yes.

24   Q.   And that experience has made you cautious about what

25   you put in writing; right?

1    A.   I don't know that -- cautious but careful, and

2    certainly conscious of what I put in writing, but also what

3    we discuss.

4    Q.   Are you careful not to use the phrase "cross-market

5    initiatives" in writing?

6              MS. ZIEMINSKI:  Objection.  Outside the scope.

7              THE COURT:  No, it isn't.  You may ask the

8    question.

9    Q.   Are you cautious not to use the phrase "cross-market

10   initiatives" in writing?

11   A.   Well, or in discussions.

12   Q.   Are you cautious not to use the phrase "flashing" in

13   writing?

14   A.   Well, it's not something that we discuss or write

15   about.  We don't do them.  It's not our practice.

16   Q.   Your counsel asked you a few questions about the ULCC

17   test, and you testified that some of the data available to

18   JetBlue during the ULCC test was perhaps less than totally

19   reliable; right?

20   A.   Yes.

21   Q.   The data that we looked at in a couple of the exhibits

22   on direct concerning Spirit's responses to JetBlue's fares,

23   there's no indication that those data were unreliable;

24   right?

25   A.   I believe you're referring to the fares that they had

 1   filed and were selling at the time.  I think those are

 2   straightforward.

 3   Q.   They're accurate?

 4   A.   They represent, I believe, what he -- what

 5   Mr. Osolkowski was seeing at the time.

 6   Q.   And there was no suggestion in Mr. Osolkowski's e-mail

 7   or the March 20 deck that there was any inability to

 8   interpret what JetBlue was seeing in the marketplace at that

 9   time; right?

10   A.   Are you referring to the fares that we were selling?

11   Q.   Yes.

12   A.   I believe that would be accurate.

13   Q.   Mr. Jarashow, is it your testimony that JetBlue stopped

14   implementing specific strategies relative to Spirit after

15   the ULCC test in 2020?

16   A.   I believe the test ended right around that time.

17   Q.   But the question, Mr. Jarashow, was whether at the end

18   of the test JetBlue stopped implementing specific strategies

19   to respond to Spirit?

20   A.   I believe there was some --

21          MS. ZIEMINSKI:  Objection.  That mischaracterizes

22   the question.

23          THE COURT:  We'll see what his answer is.  I

24   understand what his testimony is.

25          And you may answer.

1   A.   The test expired in the middle of 2020.  I believe

2   there was some flavor of some form of benchmarking, but not

3   really active, loosely referencing ULCC fares for some

4   period of time after that.

5          THE COURT:  What do you mean when you answer?

6          THE WITNESS:  As I recall, we had some form of

7   benchmark, or matching Spirit fares, but with premiums, or

8   perhaps not all times a day, not all days a week, or

9   seasonally.  But some rough form of it for a period of time.

10         THE COURT:  After the end of the ULCC test?

11         THE WITNESS:  Correct.

12         THE COURT:  Thank you.

13  Q.   And JetBlue never made a specific decision to stop

14  benchmarking Spirit's fares, did it?

15  A.   Well, as a general matter of practice we don't

16  benchmark versus Spirit's fares.  At some points in time in

17  certain situations we've used them as a reference point.

18  Q.   And that goes on to this day; right, sir?

19  A.   Not really, no.

20  Q.   At times JetBlue will file lower tactical fares that

21  are approaching Spirit's fares; right?

22  A.   We may from time to time in certain situations.  Again,

23  as a matter of practice we don't benchmark for Spirit.

24         MR. BRIGGS:  That's all I have, your Honor.

25         THE COURT:  Nothing further?

```
 1                    MS. ZIEMINSKI:  No, your Honor.

 2                    THE COURT:  You may step down.  Thank you.

 3                    (Whereupon the witness stepped down.)

 4                    THE COURT:  And you may call your next witness.

 5                    MR. DUFFY:  Yes, your Honor.  We'll be calling

 6      Mr. Lage from Spirit.

 7                    THE COURT:  He may be called.

 8                         LEONARDO LAGE, sworn

 9                    THE COURT:  Mr. Doidge?

10                    MR. DOIDGE:  Good morning, your Honor.

11                         DIRECT EXAMINATION

12      BY MR. DOIDGE:

13      Q.   Good morning, Mr. Lage.

14      A.   Good morning, counsel.

15                    MR. DOIDGE:  Just to remind you, your Honor,

16      Mr. Lage is an adverse-party witness.

17      Q.   Mr. Lage, we have provided you with a binder and we'll

18      likely to be referring to it during your examination and

19      I'll let you know.  You don't need to look at it right now.

20      We'll let you know when you need to turn to it.

21           Could you please state and spell your name, for the

22      record?

23      A.   My name is Leonardo Lage, L-E-O-N-A-R-D-O, last name

24      Lage, L-A-G-E.

25      Q.   Mr. Lage, you are a senior pricing manager for Spirit;
```

1    right?

2    A.    That's correct.

3    Q.    You've held that position since joining Spirit in 2017;

4    correct?

5    A.    Yes.

6    Q.    In your position as senior pricing manager your main

7    responsibility is to evaluate pricing activity by Spirit's

8    competitors; right?

9    A.    I monitor the activity.  I'm not sure that I evaluate

10   the activity, but I report on activities of other airlines.

11   Q.    Well, Mr. Lage, your monitoring involves looking at

12   pricing activity related to fares and footnote changes that

13   could have an impact in origin and destination markets that

14   Spirit serves; right?

15   A.    That would be correct.

16   Q.    And one of the things that you're attempting to do is

17   to get a better understanding of what competitors are doing;

18   right?

19   A.    That's correct.  Monitor filings and fares, rules and

20   footnotes so I can get trends and information on our

21   competitors.

22   Q.    And part of doing that job involves trying to interpret

23   and understand what other airlines' fare actions are; right?

24   A.    To an extent, yes.  That's correct.

25   Q.    So, Mr. Lage, you began your career at Northwest

1  Airlines in the 1980s; right?

2  A.   I began my career with Northwest Airlines in 1978.

3  Q.   And fair to say, Mr. Lage, that you have worked for

4  many years in airline pricing?

5  A.   A good part of those years.  I would say not many, but

6  I've had experience about nine, twelve years of experience

7  in pricing.

8  Q.   Mr. Lage, you worked in pricing at Northwest Airlines;

9  right?

10  A.   Yes, I did.

11  Q.   And you worked at AirTran Airlines on pricing; right?

12  A.   Correct.

13  Q.   And you worked on pricing at Southwest Airlines; right?

14  A.   Correct.

15  Q.   And you've worked at Spirit Airlines for roughly six

16  years now in the pricing department; right?

17  A.   Correct.

18  Q.   And while you were at -- well, let me step back.  You

19  actually worked for Spirit's chief commercial officer for a

20  number of years even before you came to Spirit; correct?

21  A.   If you're referring to Matt Klein?

22  Q.   Mr. Klein, yes.

23  A.   Yes.  I worked with Matt Klein at AirTran Airways.

24  Q.   In fact, with Mr. Klein was the head of the pricing and

25  revenue management department at AirTran when you were the

 1    pricing manager at AirTran; right?

 2    A.   That would be correct.

 3    Q.   In that position you reported directly to Mr. Klein;

 4    correct?

 5    A.   Yes, I did.

 6    Q.   And you participated in meetings with senior executives

 7    that Mr. Klein reported to; right?

 8    A.   At times I did participate in some meetings.

 9    Q.   And then in 2017 you again joined Mr. Klein just a few

10    months after he had joined Spirit; correct?

11    A.   Yes.  I joined in 2017.  I'm not quite clear exactly

12    what date Matt Klein joined Spirit Airlines.

13    Q.   You recall that he was at Spirit when you joined;

14    right?

15    A.   That would be correct.

16    Q.   Does it sound about right that Mr. Klein joined Spirit

17    in roughly August of 2016?

18         MR. NAGLEY:  Objection, your Honor.  The witness

19    has just said he doesn't know.

20         THE COURT:  Well, he's trying to refresh his

21    recollection.

22    A.   I really have no recollection exactly what month and

23    date he started working for Spirit Airlines.  I can't a

24    hundred percent be sure about that, answering that question.

25         THE COURT:  That's his testimony.

```
 1              MR. DOIDGE:  I'll move on.
 2   Q.   Mr. Lage, based on your many years of experience, it's
 3   fair to say you're very familiar with how airline pricing
 4   works; right?
 5   A.   I'm familiar with airline pricing, yes, of course.
 6   Q.   So, Mr. Lage, I want to focus on what you do to monitor
 7   and understand other airlines' fare actions.  Now, you have
 8   pricing analysts that report directly to you; right?
 9   A.   I currently have one pricing analyst that reports to
10   me.
11   Q.   And prior to that time you had two at various points in
12   time; right?
13   A.   That's correct.
14   Q.   And when you were at AirTran, how many analysts did you
15   have reporting to you?
16   A.   I had two, at times three.
17   Q.   Mr. Lage, the Court has already heard about ATPCO and
18   its weekly -- and its multiple transmissions each day.  Fair
19   to say that one of the responsibilities of the analysts that
20   report to you are to review the fare changes filed by those
21   other airlines at every one of those ATPCO transmissions?
22   A.   That's correct.  We try to review every single ATPCO
23   transmission that's reported.
24   Q.   And those analysts also review any changes to footnotes
25   that are transmitted through ATPCO by the other airlines;
```

1    right?

2    A.   That's one of their responsibilities, yes.

3    Q.   And after each ATPCO transmission they provide you with

4    a summary of what they've observed; right?

5    A.   That's correct.

6    Q.   And over the course of the day you may also have

7    conversations with them regarding what they've observed;

8    right?

9    A.   We constantly have conversations during the course of

10   business about airline pricing and our responsibilities.

11   That's correct.

12   Q.   And you also may communicate with them via chat or

13   text; right?

14   A.   We do at times, yes.

15   Q.   And, Mr. Lage, at the end of each day you prepare a

16   report called the pricing activity report; right?

17   A.   Yes.

18   Q.   And that report provides a summary of the observation

19   of other airline fare activity that's been observed over the

20   course of the day; right?

21   A.   That's correct.  So the report summarizes what I

22   consider high-level activity within our network that might

23   impact our specific markets, and that information may relate

24   to various fares, rules and footnote changes.

25   Q.   And you provide that report to the entire pricing and

1   revenue management team at Spirit; right?

2   A.   The -- I don't know about the entire.  I include the

3   revenue management team and pricing team, as well as other

4   members of the organization.

5   Q.   You also provide the report to the chief commercial

6   officer, Mr. Klein; right?

7   A.   Yes, I do.

8   Q.   And you're providing that information about the fare

9   activity of other airlines to help Spirit make decisions

10  about the prices it should set in its markets; right?

11  A.   I'm basically providing tactical information for them

12  to be able to make whatever decisions regarding our network,

13  regarding pricing in our network, yes.

14  Q.   And, Mr. Lage, it's fair to say that Mr. Klein will, at

15  times, have questions for you about the airline -- the fare

16  activity of other airlines that you've observed; right?

17  A.   Yes.  At times I get questions or feedback from any

18  member of the distribution group where I send that report

19  to.

20  Q.   And fair to say you often directly engage with

21  Mr. Klein in responding to his questions; right?

22  A.   I wouldn't characterize it as often.  There are times

23  when Mr. Klein will ask me a question or ask me to clarify

24  something in my report, yes.

25  Q.   Well, and in addition to the pricing activity report,

1    Mr. Lage, you also send information through other means to

2    Mr. Klein about other airline fare activity; right?

3    A.   Right.  So we use various means of communications:

4    e-mail, reports, or just conversations at times.  It's the

5    normal course of business.

6    Q.   And also sometimes you'll have a chat or text message

7    with Mr. Klein; right?

8    A.   Yes, at times.

9    Q.   Now, I think you mentioned this, Mr. Lage, but I just

10   want to make it clear, you're not responsible for setting

11   Spirit's fares; right?

12   A.   No, I'm not.  I have no authority to do that.

13   Q.   Your responsibility is to monitor that other airline

14   fare activity; right?

15   A.   That's correct.

16   Q.   But in performing your monitoring and evaluation

17   activity, you do make recommendations about how Spirit

18   may -- should respond to particular actions by other

19   airlines; right?

20   A.   I do make recommendations at times just to help them

21   out in making better decisions.

22   Q.   Just to get a sense of the scope of markets that you're

23   looking at, Mr. Lage, it's fair to say that in your role

24   your primary focus is on the routes that Spirit serves

25   nonstop; right?

1  A.   Not necessarily the primary focus.  I mean, most of the

2  time it's consumed on nonstop markets, but there's also

3  focus on connect markets as well.

4  Q.   Mr. Lage, when you're talking about -- fair to say that

5  you sometimes use the word -- the term "Spirit's network" to

6  describe the nonstop markets that Spirit serves?

7  A.   Well, Spirit network has nonstop and connect markets.

8  So, as I said, we monitor both.  Time permitting, we look at

9  the entire network, whether it's nonstop or connect.

10 Q.   Mr. Lage, in trying to understand a fare filed by

11 another airline in one route you may examine fares filed by

12 the same airline in other routes; right?

13 A.   I don't specifically look at a fare that's filed by one

14 airline and try to see if that same fare is filed somewhere

15 else in our network.  That's not something that we spend

16 time on.  So I'm not sure that --

17 Q.   Mr. Lage, let me --

18 A.   I'm not clear as to the question.

19 Q.   Let me try to break it down a little bit.

20 A.   Okay.

21 Q.   There are occasions where you'll see another airline

22 filing a fare in a market that Spirit serves nonstop; right?

23 A.   I see that every day.

24 Q.   Sometimes you'll identify that fare as potentially a

25 cross-market initiative; right?

1    A.   At times I will if, in my observation, it appears to be

2    a cross-market initiative, yes.

3    Q.   And at times -- and to help further evaluate whether or

4    not that's a cross-market initiative you'll look at what

5    that airline has done in other markets; right?

6    A.   Correct.  I look to see what the scope of the

7    cross-market initiative is to see if it has an impact on

8    more than the specific market that I'm looking at, and try

9    to understand why that cross-market initiative is being

10   filed.

11   Q.   And so fair to say, Mr. Lage, that looking at those

12   other markets can help you understand what your competitor

13   is thinking; right?

14   A.   That's basically what I do on a daily basis, understand

15   trends in the industry.

16   Q.   And understanding what another airline is thinking

17   helps Spirit make better decisions; right?

18   A.   Understanding how that competitor's filing their fares

19   and setting the rules for those fares helps me understand a

20   lot about how each competitor is competing in our network.

21   Q.   Mr. Lage, when you're examining the fare filings in

22   ATPCO, there is information that helps you in interpreting

23   the strategic purpose of the other airlines' fare filing;

24   right?

25   A.   That is correct.  The -- not just the fare level but

1    the rules and the footnotes of the fare.

2    Q.   And some other things that you can look for are whether

3    or not -- is looking at the markets where the other airline

4    has filed a similar fare at the same -- in the same

5    transmission; right?

6    A.   I don't quite get that question.

7    Q.   I'll step back.  One of the things that you look for

8    when -- one of the things that you look for when you're

9    looking at ATPCO is you're able to see what the airline has

10   done in other markets; right?

11   A.   At any given time I can look at what the airline is

12   doing in any specific market, that's correct.

13   Q.   And you're also able to see the precise fare basis code

14   that the airline is using; right?

15   A.   Yes.  Part of the data that we receive from ATPCO for

16   filed fares, it shows that information.

17   Q.   And you're also -- can look to see the footnote

18   designator that the airline used; right?

19   A.   That's part of the review process as well, yes.

20   Q.   And, again, I think as we've already discussed, one of

21   the things you look for is trying to identify whether or not

22   the fare filed is a cross-market initiative; right?

23   A.   There's a lot of things that I look for when I look at

24   the fare that's filed.  It could be a sale, it could be a

25   core-structure fare, it could be a sub-structure fare.

```
 1   There's various uses of filed fares in a market, specific
 2   market for each of our competitors.
 3   Q.   I appreciate that, Mr. Lage, but one of the things it
 4   might be is a cross-market initiative; right?
 5   A.   It's possible that it could be, yes.
 6   Q.   So let's turn to an example of an e-mail that you sent
 7   regarding a cross-market initiative that you've observed,
 8   and I'd ask you to look at tab ZB in that binder.
 9            (On screen.)
10   A.   What is the tab again?
11   Q.   It's Z, zed, beta.
12            THE COURT:  Well, I don't seem to have it.  Wait
13   one minute.  Wait a minute.  The fault is mine, I am sure.
14   Let me look here.
15            MR. DOIDGE:  You should have one binder for
16   Mr. Lage.  Everything will be in the same one.
17            THE COURT:  I do have it.  Proceed.  I apologize.
18            MR. DOIDGE:  Thank you, your Honor.
19   Q.   Mr. Lage, ZB is an e-mail that you prepared on
20   February 9th, 2019; is that right?
21   A.   Yes.
22   Q.   And this is an e-mail that you sent to Spirit's vice
23   president of pricing and revenue management, Mr. Monaghan;
24   right?
25   A.   Yes.
```

```
 1   Q.   And you're providing Mr. Monaghan with information

 2   about other airline fare activity that you've observed;

 3   right?

 4   A.   That's correct.

 5        MR. DOIDGE:  Your Honor, plaintiff moves that ZB

 6   be admitted in evidence as Exhibit 793.

 7        THE COURT:  No objection?

 8        MR. NAGLEY:  No objection.

 9        THE COURT:  No objection.  ZB is admitted,

10   Exhibit 793.

11        (Exhibit 793 received in evidence.)

12   Q.   So, Mr. Lage, let me direct you to the second paragraph

13   of your e-mail, and in that paragraph you were describing a

14   fare action by Southwest Airlines; correct?

15   A.   Just give me a second to read the paragraph, please.

16   Q.   Sure, that's fine.

17        (Witness reviewed document.)

18   A.   Okay.  This does appear to be describing a cross-market

19   initiative by Southwest.

20   Q.   And to help us all, the code WN, that's a reference to

21   Southwest; right?

22   A.   That would be correct, yes.

23   Q.   And you noted you've used the term "CMI" here, and

24   that's a reference to a cross-market initiative; right?

25   A.   It was my observation at the time that this appeared to
```

1   be a cross-market initiative, yes.

2   Q.   And here you're identifying that the cross-market

3   initiative that Southwest had filed is directed at Delta

4   Airlines; right?

5   A.   That's correct.  Based on the observations and the

6   analysis I did, that was my conclusion at the time.

7   Q.   And in the e-mail you were explaining that after

8   Southwest filed the cross-market initiative, Delta canceled

9   approximately 5,000 fares that were in markets that were

10  within Southwest's network; right?

11  A.   Yes.

12  Q.   And so fair to say, Mr. Lage, that by canceling its

13  fares, Delta was no longer offering those lower fares to

14  consumers; right?

15  A.   I have no way of verifying that those fares were the

16  lowest in the market.  They were filed fares, but I'm not

17  sure by canceling it would have automatically increased

18  fares.

19  Q.   But you don't have any reason to think that it didn't;

20  right?

21  A.   Any reason that it did not?

22  Q.   That it did not result in an increase in fares?

23  A.   I have no way of verifying either way.

24  Q.   Mr. Lage, we've seen in Exhibit 793 an example of a

25  cross-market initiative.  Fair to say that cross -- well,

 1    let me step back.

 2        Mr. Lage, you recognize that a purpose of a

 3    cross-market initiative can be to try to get another airline

 4    to remove a low fare in a different market; right?

 5    A.   Counsel, I recognize a cross-market initiative as a

 6    competitive response by airlines within networks, within the

 7    domestic U.S. network.

 8    Q.   Well, Mr. Lage, you have described cross-market

 9    initiative actions as trying to get another airline to

10    cancel fares; correct?

11    A.   I have seen cross-market initiatives where fares are

12    filed and there's fare changes that happen in each of the

13    carriers' network that were involved in the cross-market

14    initiative.  And so I view them as just competitive activity

15    between those carriers to try and get an advantage over the

16    other carrier.

17    Q.   Let me ask my question again, Mr. Lage.  You have

18    described cross-market initiative actions as trying to get

19    another airline to cancel fares; right?

20    A.   I have described that the airline has canceled fares

21    after the cross-market initiative was filed.  Whether that's

22    the intent of the carrier, that's -- again, I -- the

23    cross-market initiative could have started way before I

24    noticed it within our network.  So all I have, all I'm going

25    by is the data that I look at at that point in time and make

```
 1   my best observation and analysis on what's happening in our
 2   network.
 3   Q.   Mr. Lage, let me ask you to turn to what's marked in
 4   your binder as Exhibit 688.
 5           MR. DOIDGE:  This is already in evidence so it can
 6   be published.
 7           (On screen.)
 8   Q.   Are you there, Mr. Lage?
 9   A.   Yes, I am.
10   Q.   Mr. Lage, this is an e-mail that you sent to
11   Mr. Monaghan and Mr. Finelli on November 25th, 2019; right?
12   A.   Correct.
13   Q.   And you're reporting on fare actions taken by American;
14   correct?
15   A.   Just give me a moment to read this paragraph, please.
16           (Witness reviewed document.)
17   A.   Okay.
18   Q.   So there you're observing a fare action taken by
19   American?  That's one of the things you're observing; right?
20   A.   Correct.
21   Q.   And there you observe that Delta and United had filed
22   walk-up fares at lower levels than the American fare; right?
23   A.   Right.  So at that time it appeared that those carriers
24   had lower filed walk-up fares.  That's correct.
25   Q.   And you also observed that American had filed a
```

```
 1   cross-market initiative in response to the Delta and United
 2   actions; right?
 3   A.   So I noticed that American had filed fares in these --
 4   in Delta and United markets to try to compensate for the
 5   possible -- to try to be more competitive in their markets,
 6   since they were higher than Delta and United in their own
 7   markets, yes.
 8   Q.   Well, Mr. Lage, let me ask you to focus on the second
 9   line in your e-mail.  There you explain that American has
10   tried unsuccessfully with the CMI to have Delta and United
11   cancel fares; right?
12   A.   Right.  That was my observation.  I mean, American is
13   canceling their fares.  So American is deciding, for
14   whatever reason that I'm not aware of, that they didn't want
15   to sell -- they didn't want to file fares that would be
16   available at these levels.
17   Q.   Mr. Lage, the question I'm asking you is very simple.
18   There you've described the American effort as unsuccessful,
19   and it was unsuccessful because Delta and United had failed
20   to cancel fares; right?
21   A.   Right.  I mean, they were -- they try to put -- they
22   try to file competitive fares in Delta and United markets to
23   try to compensate for their loss in market share or revenue,
24   possibly, in their own markets.
25   Q.   You can put that exhibit aside.
```

```
 1    A.    Excuse me?

 2    Q.    You can put that one aside.

 3    A.    Okay.

 4    Q.    Let me just ask, Mr. Lage, cross-market initiatives are

 5    not something new in the airline industry; right?

 6    A.    No.  They've been in the industry since I've started

 7    pricing in early '81, 1981.

 8    Q.    You've observed them throughout your career?

 9    A.    I have -- I observe them, they happen occasionally,

10    yes.  Once a month maybe I come across these cross-market

11    initiatives.

12    Q.    So, Mr. Lage, let me now turn to a different, slightly

13    different topic and let's see how you use information in

14    ATPCO regarding fare basis codes to assess the strategic

15    purpose of another airline's fare action.  So let me ask you

16    to turn to Exhibit 332.

17              (On screen.)

18    A.    What's the number again?

19    Q.    332.  It should be -- it should be --

20    A.    Okay.

21    Q.    -- the third tab in your binder.

22    A.    Yep, I'm there.

23    Q.    Mr. Lage, this is an Excel document that you created

24    with the title, "OA Structure Review."  Right?

25    A.    Yes.  This is my own personal document.
```

1   Q.   It's something that you regularly prepare; right?

2   A.   It's a document that I don't regularly prepare.  It's

3   only on a time-permitted basis I update some of the

4   information in this document.  It's very dynamic, so -- but

5   it doesn't allow me to update it on a daily basis, or weekly

6   basis for that matter.

7   Q.   You update it as frequently as you can?

8   A.   As much as I can and whenever I can.

9   Q.   And you use this tool to help you analyze industry

10  pricing activity; right?

11  A.   I use it to -- so I use it to give me a -- an

12  indication of what data I'm seeing from ATPCO when it comes

13  in the report.  The report comes in, on average over a

14  million fares filed for each report that ATPCO sends.

15  That's four times a day.  And what this document does for me

16  is being able to identify specific fare action that I have

17  observed might be related to a specific carrier or some

18  other type of fares.

19  Q.   So notwithstanding that there are a huge volume of

20  fares, in some cases, being -- going through ATPCO, there

21  are tools that you have available to help you process that

22  information more efficiently?

23  A.   We have multiple tools that we use to analyze the ATPCO

24  data.  This is just a personal tool that I use to further

25  make my analysis more efficient.

```
 1    Q.   And one of the things that you do with this tool is to
 2    analyze other airlines' fare basis codes; right?
 3    A.   That's one of the main uses of this, yes.
 4    Q.   So let's look at an example.
 5              MR. DOIDGE:  And I'm prepared we're running close
 6    to time, your Honor.
 7              THE COURT:  If you want to stop now, it's
 8    convenient.  It's up to you.  Or another couple minutes.
 9              MR. DOIDGE:  I can do a couple of questions, your
10    Honor.
11              THE COURT:  Go ahead.
12    Q.   Mr. Lage, we prepared a demonstrative.  You can see it
13    in your binder immediately after that tab called Lage
14    Demonstrative D.
15              (On screen.)
16    Q.   This reflects information taken from -- from
17    Exhibit 332 reflecting what you've identified with respect
18    to United Airlines' fare basis codes.  Does that look right
19    to you?
20    A.   That's accurate, yes.
21    Q.   And this is your decoder of the United Airlines fare
22    basis codes; right?
23    A.   I wouldn't classify it as my decoder.  This is
24    information that's publicly available in ATPCO, and I just
25    put it in a format that's easier for me to view.  Other than
```

 1   any remarks that I might make on the side of this, but this

 2   is basically carving out ATPCO public information.

 3          THE COURT:  Thank you.  I think with that

 4   explanation it's a good place to stop.  We'll stop taking

 5   testimony at this time.  You may step down, sir.

 6          (Whereupon the witness stepped down.)

 7          THE COURT:  Total elapsed time, the government has

 8   used up five days, two hours, thirty minutes.  The defense

 9   has used up four days, twenty minutes.

10          We'll stand in recess until 9:00 a.m. tomorrow

11   morning.  We'll recess.

12          THE CLERK:  All rise.

13

14          (Proceedings adjourned.)

15

16

17

18                        * * * * * *

19

20

21

22

23

24

25

C E R T I F I C A T E

I, Cheryl B. Palanchian, Court Reporter for the United States District Court for the District of Massachusetts, do hereby certify that the foregoing pages are a true and accurate transcription of my shorthand notes taken in the aforementioned matter to the best of my skill and ability.

/s/ Cheryl B. Palanchian 11/15/2023
CHERYL B. PALANCHIAN

Registered Merit Reporter
Certified Realtime Reporter