1                    THE UNITED STATES DISTRICT COURT

2                      DISTRICT OF MASSACHUSETTS (Boston)

3                                  No. 1:23-cv-10511-WGY
                                   Vol 1, Pages 1 - 83
4

5

6   UNITED STATES OF AMERICA, et al,
               Plaintiffs
7

8   vs.

9

10  JETBLUE AIRWAYS CORPORATION, et al,
               Defendants
11

12                          * * * * * * * *

13

14                      For Bench Trial Before:
                        Judge William G. Young
15

16

17                      United States District Court
                        District of Massachusetts (Boston)
                        One Courthouse Way
18                      Boston, Massachusetts 02210
                        Thursday, November 16, 2023
19

20                          * * * * * * * *

21

22              REPORTER: RICHARD H. ROMANOW, RPR
                        Official Court Reporter
                        United States District Court
23          One Courthouse Way, Room 5510, Boston, MA 02210
                        rhrbulldog@aol.com
24

25

```
 1               A P P E A R A N C E S

 2

 3   EDWARD WILLIAM DUFFY, ESQ.
     ARIANNA MARKEL, ESQ.
 4   AARON TEITELBAUM, ESQ.
        DOJ-Atr
 5      450 Fifth Street NW, Suite 8000
        Washington, DC 20530
 6      (202) 812-4723
        Email: Edward.duffy@usdoj.gov
 7   and
      WILLIAM T. MATLACK, ESQ.
 8      Attorney General's Office
        One Ashburton Place, 18th Floor
 9      Boston, MA 02108
        (617) 727-2200
10      Email: William.matlack@mass.gov
        For Plaintiffs United States of America and
11      The Commonwealth of Massachusetts

12

13    RYAN SHORES, ESQ.
        Cleary Gottlieb Steen & Hamilton LLP
14      2112 Pennsylvania Avenue, NW
        Washington, DC 20037
15      (202) 974-1876
        Email: Rshores@cgsh.com
16   and
      ELIZABETH M. WRIGHT, ESQ.
17      Cooley LLP
        500 Boylston Street
18      Boston, MA 02116-3736
        (617) 937-2349
19      Email: Ewright@cooley.com
     and
20    RACHEL MOSSMAN ZIEMINSKI, ESQ.
      MICHAEL MITCHELL, ESQ.
21      Shearman & Sterling LLP
        2601 Olive Street, 17th Floor
22      Dallas, TX 75201
        Email: Rachel.zieminski@shearman.com
23      For Defendant JetBlue Airways Corporation

24

25      (Continued.)
```

1     (Continued.)

2

3   JAY COHEN, ESQ.
    ANDREW C. FINCH, ESQ.
4       Paul, Weiss, Rifkind, Wharton & Garrison
        1285 Avenue of the Americas
5       New York, NY 10019-6064
        (212) 373-3000
6       Email: Jaycohen@paulweiss.com
        For Defendant Spirit Airlines, Inc.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                           I N D E X

2

3     WITNESS                  DIRECT   CROSS   REDIRECT   RECROSS

4

5     LEONARDO LAGE (Continued.)

6        By Mr. Doidge:          5                49

7        By Mr. Nagley:                   28

8

9     CLAIRE ROESCHKE

10       By Ms. Baldwin:         53

11       By Mr. Hauser:

12

13

14                          E X H I B I T S

15

16          EXHIBIT 794 .......................... 15

17          EXHIBIT 795 .......................... 21

18          EXHIBIT 796 .......................... 25

19          EXHIBIT 797 .......................... 63

20

21

22

23

24

25

```
 1          P R O C E E D I N G S
 2          (Begins, 9:00 a.m.)
 3          THE COURT:  Good morning.  If you'd remind the
 4     witness.
 5          THE CLERK:  I'd like to remind you, sir, that you
 6     are still under oath.
 7          Do you understand?
 8          THE WITNESS:  Yes, I do.
 9          THE COURT:  You may continue.
10          MR. DOIDGE:  Thank you, your Honor.
11
12     DIRECT EXAMINATION BY MR. DOIDGE:  (Continued.)
13     Q.  Mr. Lage, when we broke yesterday -- and good
14     morning, we were examining Lage Demonstrative D.  If you
15     could turn back to that.  Lage Demonstrative D is taken
16     from Exhibit 332 in evidence.
17     A.  (Looks.)  Okay.
18     Q.  And so, Mr. Lage, each of these columns relates to
19     a -- each of the columns that you see in the
20     demonstrative, relates to a position in the United
21     Airlines 8-character alphanumeric fare basis code,
22     correct?
23     A.  Yes, they do.
24     Q.  And you created this based on your observation of
25     how United was using its fare basis codes at this point
```

1    in time, correct?

2    A.   The document was created from, um, ATPCO data which

3    are then used to, um, try to, um, decipher what each

4    character in the fare basis code could possibly mean as

5    I observed the data.

6    Q.   And so just to be clear.  If we just take, for

7    example, the third row, that is -- well let's use the

8    4th row -- the 4th column.

9         The 4th column is identified as "AP," right?

10   A.   That's correct, that would be the "Advanced

11   Purchase" restriction of the fare.

12   Q.   Thank you.  And what you see in the United fare

13   basis codes, in that 4th character, is that they may be

14   using a 2, a 4, a 1, a 7, a 3, etc., right?

15   A.    Correct.  So at that time, based on the ATPCO

16   data, that's what it was telling me.

17   Q.   And what you were to decipher is that 2, in that

18   position of the United fare basis code, is equivalent to

19   or demarcates a 21-day Advanced Purchase fare for

20   United, right?

21   A.   That's correct.  So when I looked at United

22   Airlines' fares, we look at that specific fare rule

23   governing that fare, it appeared that at the time a 2 in

24   the 4th position would require a customer, 21 days in

25   advance, to obtain that fare.

1  Q.  And you're going through this exercise to gain a

2  better understanding of what the United fares may be

3  related to, right, that's part of this process for you?

4  A.  That's one of the, um, things that I try to do, yes.

5  Q.  Now directing your attention to Column F, the 6th

6  column, you've labeled this as "Match," right?

7  A.  That's a term used very loosely.  Again this is my

8  cheat sheet, so basically meaning by "Match," what I'm

9  trying to say here is that's possibly being filed in

10  order to be competitive for this specific carrier.

11  Q.  To put it slightly differently, there you're

12  observing that at this point in time United was using

13  this character in its fare basis codes to track sort of

14  specific competitor issues, right?

15  A.  Right, they appeared to be using that character

16  whenever they were addressing a competitive issue in

17  their market with Frontier Airlines.

18  Q.  So United is using a unique tab to identify that the

19  fares related to a specific competitive purpose, right?

20  A.  Correct.  The fare was filed, um -- it appeared from

21  my observations, based on fare levels and rule

22  restrictions, that the fare filed with this character

23  was a competitive filing, um, for Frontier in their

24  markets.

25  Q.  Okay.  And that's -- and when you say "for

1    Frontier," you mean that if you were to see a C in that

2    position of the United fare basis code, that tells you

3    it's fare-related to Frontier, right?

4    A.   Based on my observations, um, yes.

5    Q.   All right.  So let me ask you to turn to another

6    document you created called "Lage Demonstrative C."  It

7    should be right next to the other one.  Well adjacent to

8    it in your binder.

9    A.   (Turns.)

10   Q.   Mr. Lage, this is your -- this is also from Exhibit

11   332 and this is your deciphering of the American

12   Airlines fare basis code, right?

13   A.   That's correct.

14   Q.   And similarly here -- here we see that if we look at

15   the 4th position of the American Airlines fare basis

16   codes, you've identified that as "Carrier Match," right?

17   A.   Again that is being used not necessarily to match a

18   fare level or a fare rule, basically as a tool to be

19   competitive with another -- with a specific carrier in

20   their market.

21   Q.   All right.  And so, for example, when you see "J" in

22   this 4th position of the American Airlines fare basis

23   code, it indicates to you that it's a fare action

24   American is taking that relates to something JetBlue has

25   done, right?

1    A.   That's correct.  Based on my observations at the

2    time, most fares that have this character, um, it

3    appeared to me they were related to a competitive filing

4    with JetBlue.

5    Q.   All right.  And so, Mr. Lage, it's your

6    understanding that, for example, this character "J,"

7    that doesn't relate to any specific term or condition of

8    sale associated with the fare, right?

9    A.   It does not tell me anything about selling, um,

10   availability, or anything else, it just basically gives

11   me a clue as to what I may be looking at as far as an

12   initiative by American Airlines.

13   Q.   But this is just a cosmetic component of a fare

14   basis code as American has constructed it, right?

15   A.   It's not only cosmetic, it could be administrative

16   as well.  These characters, um -- working for legacy

17   carriers myself, will help us process fares in a faster

18   manner when we're doing our market maintenance.

19   Q.   And in terms of transmitting information that would

20   be relevant to a consumer, again it's not related to any

21   term or condition of sale, right?

22   A.   It would not be as far as fare restrictions, it

23   wouldn't have anything to do with fare restrictions for

24   a consumer, no.

25   Q.   Mr. Lage, it's fair to say that seeing these types

1  of codes can help you understand the strategic purpose

2  of a fare action, right?

3  A.  That's one of the things that I would use that code

4  for, yes.

5  Q.  And so just to take an example.  If you were to see

6  JetBlue file a fare increase in one transmission and

7  then observe American filing a fare increase in the next

8  transmission with J in the 4th position, that would

9  provide you with an indication that United -- that the

10  American increase may be related to the JetBlue

11  increase, right?

12  A.  So based on my observations about what I would

13  expect to see, that if I analyzed that data further and

14  compared fare levels, compared fare rules, it would more

15  than likely be associated with a JetBlue competitive

16  initiative, yes.

17  Q.  And for another example, Mr. Lage, if you were to

18  see say J in the fare basis code of American, that you

19  believed was a cross-market initiative, seeing that J

20  would help you evaluate whether or not the American

21  cross-market initiative is related to a fare action by

22  JetBlue, right?

23       MR. NAGLEY:  Objection, your Honor.  Foundation.

24       THE COURT:  No, overruled.  He's exploring the

25  issue.

1    A.   Could you repeat the question again please?

2    Q.   Sure.  Well let me shift to a United example.

3         Let's suppose, as we were seeing before, that you

4    saw "H" in the 6th position of the United fare basis

5    code, and you had reason to think that this fare may be

6    a cross-market initiative by United.  Seeing that "H" in

7    the 6th position of the United fare basis code can help

8    you evaluate whether or not that is a fare -- is a

9    cross-market initiative that's directed at JetBlue,

10   right?

11   A.   So in my analysis, in my observation, if I were to

12   decide that -- it is a cross-market initiative, as you

13   mentioned, that would give me an indication to -- where

14   to look further to try to understand what the action is

15   about.  But I would have to assume that my observation

16   that this is a cross-market initiative would be

17   accurate.

18   Q.   Fair enough, Mr. Lage.  But this would provide you

19   with another clue to start looking at fares that might

20   be related to JetBlue markets that United had filed,

21   right?

22   A.   Exactly.  This cheat sheet gives me kind of like a

23   step of, um -- more efficiency than me analyzing the

24   hundreds of fares that I need to -- the thousands of

25   fares that I need to look at on a daily basis.

1    Q.  Mr. Lage, you can put that demonstrative aside.  And

2    let me ask you about another element in your -- in

3    Exhibit 332, in this tool you created.

4         Mr. Lage, um -- so I want to talk a little bit

5    about footnotes.

6         And just to step back for a moment.  Fares may

7    have footnote designators associated with them, right?

8    A.  That's correct.

9    Q.  A footnote designator is a 1 or 2 character

10   alphanumeric code, right?

11   A.  That's correct.

12   Q.  And the same footnote designator could be used for

13   multiple fare basis codes and across multiple markets,

14   right?

15   A.  Could you repeat that again?

16   Q.  Sure.

17        The same footnote designator could be used for

18   multiple fare basis codes and it can also be used to

19   cross multiple markets, right?

20   A.  That's correct.  And for multiple filings as well.

21   Q.  And so the footnote designator can help you link a

22   single fare action across multiple markets, right?

23   A.  It associates a lot of fares into one group that I

24   can then analyze much easier, yes.

25   Q.  So let me ask you to turn to another demonstrative

```
1    that we've prepared, and this is, um --
2         (Pause.)
3         MR. DOIDGE:  Excuse me, your Honor.
4         (Pause.)
5    Q.  Lage Demonstrative E.  Thank you.
6    A.  (Looks.)
7         MR. DOIDGE:  Your Honor, Lage Demonstrative E is
8    taken from the first tab of Exhibit 332.
9    A.  (Looks.)
10   Q.  And, Mr. Lage, this reflects -- this reflects your
11   effort to track footnote designators that other carriers
12   are using, right?
13   A.  That's one of the uses of this document that I
14   prepare for myself, yes.
15   Q.  And you're examining these footnotes to better
16   understand the fare actions of other airlines, right?
17   A.  Among other things, that's one of the possibilities,
18   yes.
19   Q.  And here you are tracking the footnotes of American,
20   Delta, Southwest, United, and JetBlue, correct?
21   A.  (Looks.)  That's correct.
22   Q.  And among other things, one of the things you would
23   try to do in this exercise is to identify whether or not
24   a footnote is associated with the cross-market
25   initiative, right?
```

1    A.   Cross-market initiatives, substructure fares, core

2    structures, it depends on the use of the footnote,

3    that's what I try to remark just to get myself a, um --

4    again this is a cheat sheet that I use on a daily basis

5    for analysis.

6    Q.   And cross-market initiatives, whether or not a

7    footnote is associated with a cross-market initiative is

8    one of the things that you're trying to identify here,

9    right?

10   A.   Yes, if it's at the time that I do the review, that

11   footnote happens -- in my observation happens to be what

12   I think is a cross-market initiative, I would remark it

13   in my document, yes.

14   Q.   You can put that -- you can put that exhibit aside.

15        So let me ask you just to -- let's talk about one

16   more example of a cross-market initiative that you

17   observed.  And so I would ask you to turn to Tab AEF in

18   your binder.

19   A.   (Turns.)  Okay.

20   Q.   AEF is an e-mail that you sent on September 16th,

21   2021, right?

22   A.   Yes, that's correct.

23   Q.   And in your e-mail you're informing the team about

24   cross-market initiatives that have been filed by Delta

25   and United that affect some Spirit nonstop markets,

```
 1    right?
 2    A.  If I can take a minute to read it just to confirm
 3    that, please?
 4    Q.  Go ahead.
 5    A.  (Reads.)  Okay.
 6    Q.  And do you recall the question?
 7    A.  No, if you could repeat that please.
 8    Q.  In your e-mail you were informing your team about
 9    cross-market initiatives that had been filed by Delta
10    and United that affect some Spirit nonstop markets,
11    right?
12    A.  Yes.
13         MR. DOIDGE:  Your Honor, plaintiffs moves that
14    Exhibit AEF be admitted in evidence as Exhibit 794.
15         THE COURT:  No objection?
16         MR. NAGLEY:  No objection, your Honor.
17         THE COURT:  AEF is admitted, Exhibit 794.
18         (Exhibit 794, marked.)
19    Q.  Mr. Lage, let me ask you to turn to the second
20    paragraph in your e-mail.
21    A.  (Turns.)
22    Q.  And there -- excuse me, in the second sentence in
23    the e-mail at 9:28 a.m.
24    A.  (Turns.)
25    Q.  And there you explain that the cross-market
```

1    initiatives filed by Delta and United may be at levels

2    close to or below Spirit fare levels in the market,

3    correct?

4    A.   That's correct.  But to be a little bit more

5    specific, I was -- file fare levels.

6    Q.   Fare enough, Mr. Lage.

7         Now if you turn to the next sentence you write

8    that -- you write, quote, "To make sure these levels are

9    not used as guidance as they will eventually be

10   cancelled in ways to normal market levels by these

11   carriers," right?

12   A.   That's correct.

13   Q.   Your expectation at the time was that the fares

14   would be withdrawn, right?

15   A.   My expectation is when it is proven that it is a

16   cross-market initiative, these fares tend to have a

17   short life span and they could last for hours, a day,

18   and sometimes over a week.

19   Q.   Mr. Lage, let me also ask you.  If you look down at

20   the next sentence, you're identifying the footnote that

21   United has used for its cross-market initiatives, but no

22   K, right?

23   A.   Based on my observations at the time, that that

24   would be accurate, yes.

25   Q.   And if we look below, you've listed a set of markets

1   where United has filed what you thought was a cross-

2   market initiative, right?

3   A.  Those are the markets that, according to my

4   analysis, and based on the footnote and the filing

5   advice from ATPCO, I was able to carve out from the data

6   that I received from the ATPCO database.

7   Q.  And each of those markets involve a Delta hub,

8   right?

9   A.  (Turns.)  Yes, it appears to be a Delta hub.

10  Q.  All right.  You can put that document aside.

11      Let me just ask more broadly about what you

12  observed regarding airlines' uses of cross-market

13  initiatives.

14      Now you've observed that each of the three legacy

15  airlines and Southwest, you've observed them using

16  cross-market initiatives, right?

17  A.  I would say the legacies and Southwest Airlines are

18  the ones that, um -- and every time I come across a

19  cross-market initiative filing, it's either legacies or

20  Southwest Airlines.

21  Q.  It's not every time, right, Mr. Lage, because you've

22  also observed JetBlue filing cross-market initiatives,

23  right?

24  A.  I did observe JetBlue at one time, um, since I've

25  been at Spirit, file a -- what I would consider a cross-

1  market initiative, but, um, after further analyzing the

2  data I realized that, um, it didn't pan out as I

3  expected it to pan out for a cross-market initiative

4  fare because it eventually became part of that fare

5  structure for JetBlue in the market.

6  Q.  And, Mr. Lage, let me ask you to turn to your

7  deposition transcript in your binder.

8  A.  Okay.

9  Q.  And look at Volume 1.  I ask you to turn to Page

10 179.

11 A.  (Turns.)

12 Q.  Actually, sir, if you'd go to the top of Page 180,

13 Mr. Lage.

14 A.  I'm on Page 179.

15 Q.  You can turn to the top of Page 180, and look at

16 Line 1.

17 A.  Okay.

18 Q.  And there's the question.

19     "So let me ask, Mr. Lage, have you also observed

20 JetBlue filing cross-market initiatives?"  Answer, "I

21 would say that I have, yes."

22 A.  That's correct.

23 Q.  Is that the question and answer?  Is that the answer

24 that you gave in your deposition?

25 A.  Yes.

1    Q.   And was that answer truthful?

2    A.   Yes.

3    Q.   Mr. Lage, Spirit doesn't file cross-market

4    initiatives, right?

5    A.   As I mentioned before, at one time I did observe a

6    filing by --

7    Q.   I'm not asking about JetBlue.  Well let me step

8    back.

9    A.   Okay.

10   Q.   Switching topics.

11        Spirit doesn't file cross-market initiatives,

12   right?

13   A.   Not that I have observed.  But I do not -- I don't

14   -- I'm not involved in the filing of fares, I'm involved

15   more in the observation of other airlines' filings.  So

16   to my understanding we do not file -- we're not involved

17   in cross-market initiative filings in general, but I'm

18   not involved in the process of filing fares and what

19   their reasoning behind the filings are.

20   Q.   All right.  And you don't typically observe other

21   airlines filing cross-market initiatives that you

22   believe are directed towards Spirit, right?

23   A.   I don't believe that I have specifically observed

24   that.

25   Q.   You do see them being filed in markets that Spirit

1    serves nonstop though, right?

2    A.  I have seen that, yes.

3    Q.  And one clue to help you decipher that it's not

4    directed -- that cross-market initiative isn't directed

5    at Spirit, is by looking at other markets where you see

6    that cross-market initiative occurring, right?

7    A.  That's correct.  Time permitting I try to understand

8    if the filing is a cross-market initiative and what

9    markets are involved in our network.

10   Q.  But, for example, if you see United fares, we just

11   saw in a Spirit nonstop market, but also see that same

12   fare basis code filed in Delta nonstop markets, that

13   gives you -- that indicates to you that the cross-market

14   initiative is likely directed at Delta, right?

15   A.  I would have to -- like I said, it depends on how

16   much time I spend on analyzing that filing, um, but --

17   and what those fare levels are.  So without the data in

18   front of me -- but I need to look at the data to

19   understand if the markets involved are because of

20   competitive issues with a specific carrier, whether it's

21   Spirit or any other carrier.

22   Q.  I appreciate that, Mr. Lage.  But that's a clue you

23   look for, right?

24   A.  That's correct.

25   Q.  And another clue that you look for is if you see the

```
 1    same exact fare level, the dollar amount filed in other
 2    markets, right?
 3    A.  That would be one observation I look for as well,
 4    yes.
 5    Q.  All right.  Mr. Lage, let me ask you to, um, turn --
 6    on a slightly different topic, if you could turn to Tab
 7    AEC in your binder.
 8    A.  (Turns.)  That's "E" as in "echo"?
 9    Q.  Yes, "Alpha" "Echo" "Charlie."
10    A.  (Turns.)
11    Q.  Are you there?
12    A.  Yes, I am.
13    Q.  This is a chat that you had with Rafael Weiner on
14    July 15th, 2021, right?
15    A.  That's correct.
16    Q.  And at the time Mr. Weiner was a pricing analyst
17    that reported to you, right?
18    A.  Yes, he was.
19         MR. DOIDGE:  Your Honor, plaintiff moves that AEC
20    be admitted in evidence as Exhibit 795.
21         THE COURT:  No objection?
22         MR. NAGLEY:  No objection.
23         THE COURT:  AEC is admitted, Exhibit 795.
24         (Exhibit 795, marked.)
25    Q.  Mr. Lage, let me direct your attention to the chat
```

1   that you placed at 7:17 p.m.

2   A.  Okay.

3   Q.  And there you note that JetBlue is trying to

4   possibly get American to place the last ticket date on

5   its fare, right?

6   A.  Yes, that's what I wrote.

7   Q.  And, Mr. Lage, you'd agree that the use by another

8   airline of a last ticket date could be a way for an

9   airline to suggest a fare action to another airline,

10   correct?

11   A.  Could you repeat that question again?

12   Q.  Sure.

13       The use by another airline of a last ticket date

14   could be a way for an airline to suggest a fare action

15   to another airline, right?

16       MR. NAGLEY:  Objection, your Honor.

17       THE COURT:  Would you ask that question again?

18       MR. DOIDGE:  Yes, your Honor.

19   Q.  Mr. Lage, you'd agree that the use of a last ticket

20   date by an airline could be a way to suggest a fare

21   action to another airline?

22       THE COURT:  No, overruled, he may have that

23   question, if the witness can answer.

24   A.  I have no way of knowing the intentions of another

25   airline when they put a last ticket on a fare.  They

1  could possibly be using that fare level for a sales

2  promotion or some other initiative.  That may not be a

3  cross-market initiative or anything else.  I have no way

4  of knowing that.

5  Q.  Mr. Lage, let me ask you to turn again to your

6  deposition transcript at Page 197.

7  A.  (Turns.)

8  Q.  If you could turn to the bottom of the page at Line

9  20.

10  A.  Okay.

11  Q.  The question is, "When assessing whether or not

12  another carrier is possibly trying to suggest a fare

13  action to another carrier, what sorts of things do you

14  look for?"  Answer, "Well that would be one specific

15  example there.  Last ticket date could be placed.  The

16  fare could be filed in more than one market.  So if

17  that's -- let's say JetBlue in this case, taking their

18  example, they could put that fare in Newark as well,

19  being that they may consider New York and Newark as

20  sister cities.  They may say 'Okay, if we're going to

21  put it in New York, we need to put it in Newark as

22  well.'  So there's a lot of different things that you

23  can look at to see what the true intent might be.  At

24  the end of the day, it's just my opinion and my analysis

25  of what I'm seeing."

1      Is that the question you asked and the answer you

2  gave?

3  A.  Correct.

4  Q.  All right, you can put that document aside,

5  Mr. Lage.

6      So, Mr. Lage, one of the fare activities that you

7  observe at times is something called "fare increase

8  initiatives," right?

9  A.  Yes.

10  Q.  And by a "fare increase initiative," you have in

11  mind that an airline has increased the fare level of a

12  single fare and group of fares in an origin and

13  destination market, right?

14  A.  Correct.

15  Q.  And one of the things you're monitoring is how the

16  other airlines respond to that fare increase initiative,

17  right?

18  A.  Yes.

19  Q.  Let me ask you to please turn to Tab AEI in your

20  binder.

21  A.  (Turns.)  Okay.

22  Q.  Mr. Lage, AEI is a chat between you and Mr. Weiner

23  and Mr. Jensen on January 22nd, 2021, right?

24  A.  That's correct.

25  Q.  The chat is discussing fare actions by other

1    airlines from New York airports to destinations in

2    Florida, right?

3    A.  If I can take a minute to read it?

4    Q.  Okay.

5    A.  (Reads.)  Okay.

6    Q.  Mr. Lage, again the question.  The chat is

7    discussing the fare actions by other airlines in routes

8    from New York airports to destinations in Florida,

9    right?

10   A.  New York and Newark, New Jersey as well.

11   Q.  All right.

12       MR. DOIDGE:  Your Honor, the plaintiff moves that

13   Exhibit AEI be admitted in evidence as Exhibit 796.

14       THE COURT:  No objection?

15       MR. NAGLEY:  No objection.

16       THE COURT:  AEI is admitted, Exhibit 796.

17       (Exhibit 796, marked.)

18   Q.  In the chat in Mr. Weiner's message at 10:21 p.m.,

19   he notes that "American hadn't followed United in

20   canceling fares," right?

21   A.  Yes.

22   Q.  And you reply that "It will take more than one

23   Domino to fall for some success," right?

24   A.  Yes.

25   Q.  And if we look below that, Mr. Weiner responds, that

1    it could be that -- "It could be that they," referring

2    to American here, right?

3    A.  I have no way of -- what the intention that day?

4    It's not very specific to me.  So I don't know by

5    "they," he means one, two airlines, three airlines, it's

6    not clear to me what he's trying to convey in this

7    message.

8    Q.  Mr. Lage, Mr. Weiner wrote, and I'll just read it,

9    "It could be that they are remaining because of us.  The

10   legacies may see us as the lowest common denominator.  I

11   know WN saw it that way."  Correct, that's what

12   Mr. Weiner wrote?

13   A.  That's what he wrote, yes.

14   Q.  And he asked for first Spirit, right, that much you

15   understand?

16   A.  (Reads.)  Yes, I would assume "us" being Spirit

17   Airlines.

18   Q.  Mr. Lage, let's look at what happened a week later.

19   Please turn to Exhibit 449 in your binder.

20   A.  (Turns.)

21        MR. DOIDGE:  And this is already in evidence.

22   Q.  Mr. Lage, this is your Price and Activity Report

23   from January 20th, 2021, correct?

24   A.  That's correct.

25   Q.  And if you could turn your attention towards the

1    bottom of the first page, you have a section under the

2    heading "Increases," right?

3    A.   Yes.

4    Q.   And there you were describing a fare increase action

5    that you observed JetBlue taking, right?

6    A.   That's correct.

7    Q.   And this action also involves New York -- routes

8    from New York airports to destinations in Florida,

9    right, including Newark?

10   A.   That's correct.

11   Q.   And those are Florida cities -- these routes are

12   routes that Spirit serves nonstop, right, from one or

13   more of the New York airports?

14   A.   Some of them are nonstop, yes.

15   Q.   And focusing on the last sentence you write on the

16   page, there you write, "As with JetBlue's previous

17   increase initiative filed last week, this will encounter

18   pushback from American, United, and Delta, as these

19   carriers are reluctant to increase their own ULCC

20   structures," right?

21   A.   Right.  So the legacy carriers have specific ULCC

22   structures, so most often they'll want to remain

23   competitive with each other with these structures.  So

24   that's basically what I'm trying to communicate in that

25   sentence.

```
1    Q.   And Spirit again operates in those markets, right?

2    A.   In some of those, yes.

3    Q.   And in this case again, as you observed in the

4    prior -- in the chat just a week earlier, Spirit is the

5    "lowest common denominator," right?

6    A.   The "lowest common denominator" meaning for other

7    airlines filing their fares?

8    Q.   It's your statement, Mr. Lage, that's what you

9    wrote, right?

10   A.   Well I wouldn't necessarily say that legacy

11   carriers, their only focus on filing low fares would be

12   based on Spirit Airlines's, um, fare levels.

13   Q.   Mr. Lage, I'm focused on this particular -- this was

14   your observation at this point, correct?

15   A.   Yes.

16        MR. DOIDGE:  I pass the witness.

17        (Pause.)

18        MR. NAGLEY:  Just a moment, your Honor?

19        THE COURT:  Of course.

20        (Pause.)

21

22   CROSS-EXAMINATION BY MR. NAGLEY:

23   Q.   Good morning, Mr. Lage.

24   A.   Good morning, counsel.

25   Q.   Could you tell the Court when you started working in
```

1    the airline industry?

2    A.   I started working in the airline industry in 1978.

3    Q.   Could you briefly tell the Court how you got

4    interested in the airline industry?

5    A.   So, um, my interest in aviation in general, um,

6    became apparent once I immigrated to the United States

7    and took my first flight, and from that moment, from

8    that point on, it was just a passion that, um --- that

9    still exists actually.

10   Q.   And what was your first job in the industry?

11   A.   Um, I started as a reservation sales agent for

12   Northwest Airlines in 1978.

13   Q.   And we've heard a lot about your experience in

14   pricing, but what sort of jobs have you done in the

15   airline industry over your time?

16   A.   How much time do we have?  (Laughter.)  So I've

17   done, as I mentioned, a reservation sales agent.  I've

18   worked at the airport as well, um, the ticket counter,

19   um, boarding passengers, working, um, outside loading

20   and offloading the aircraft, deicing the aircraft.  I've

21   worked in the cargo operations for airlines as well.  I

22   have been a station trainer and I've done pricing for

23   the airlines.  Pretty much everything you can think of

24   except flying the aircraft, which I still have time to

25   do if I --  (Laughter.)  If I can do it.

Q.  I believe you can, Mr. Lage.

     When did you start working at Spirit?

A.  I started working at Spirit Airlines in 2017.

Q.  And can you remind the Court, what's your current title?

A.  Currently I'm the pricing -- the Senior Pricing Manager for the Pricing Technical Team.

Q.  And who do you currently report to at Spirit?

A.  I currently report to Eric Monahan, who's the Vice-President of Pricing and Revenue Management.

Q.  And at a high level, and it would be helpful, if you would explain what the function is of Pricing and Revenue Management at an airline?

A.     So in most of the airlines that I've worked, there are two specific groups.  One group handles the filing of fares structure for a specific market, and the -- what the other group is responsible for is deciding, out of those fare levels that are filed in a specific market, the structure, what fare levels to make available for the customer to purchase.

Q.  So if you could expand a little bit, because I think it would be helpful, what's the difference between a "filed fare" and a "selling fare"?

A.     So the best way I can describe that is, um, if you, as a consumer, are walking into a store to purchase

1  a specific product, the file fare would be equivalent to

2  you walking into the store and there's 10 shelves of the

3  same product, each shelf price, let's say it's $10 every

4  shelf, from 10 to 100, that is the file fare.  You may

5  walk in and find that only the bottom three shelves do

6  not have the product, meaning that that store wants to

7  charge you $40 for their product.  You may come back 2

8  hours later and that $10 shelf may be stocked and you'll

9  be able to buy it for $10.  So that's as basic as -- I

10  just wanted to explain the complexity of filing a fare

11  as opposed to making a fare available for purchase by a

12  consumer.

13  Q.  And how do your responsibilities on the Pricing

14  Technical Team relate to what you just described about

15  the difference between filing and selling fares?

16  A.  My responsibilities are basically to gather tactical

17  information on what other competitors are doing in my

18  network and relate that information to the revenue and

19  pricing analysts so they can better decide what fares to

20  file and what fares to make available to purchase at the

21  time.

22  Q.  All right, changing subjects a little bit, Mr. Lage.

23      The government asked you, today and yesterday a

24  little bit, about Pricing Activity Reports.  Do you

25  remember that conversation?

1    A.   Yes.

2    Q.   Um, can you just remind us again what a Pricing

3    Activity Report is?

4    A.   So the Pricing Activity Report is a report that I

5    compose every weeknight, and sometimes on weekends, and

6    it basically includes high-level summarization of fare

7    initiatives, um, by other airlines in our network.  Some

8    of those initiatives could be related to sales increases

9    and other pertinent information that we should know in

10   order to make better decisions.

11   Q.   And what information do you review in preparing

12   these reports?

13   A.   The information is basically taken from the ATPCO

14   data that we receive on a daily basis four times a day

15   and once on the weekends.

16   Q.   As you mentioned earlier, again "filed fares" versus

17   "selling fares."

18        What type of fares do you report on in your

19   Pricing Activity Reports?

20   A.   What type of fares?

21   Q.   What type of fares.

22   A.   Um, the type of fares that I report on is basically

23   the filed fares for other carriers.

24   Q.   And when did you first start preparing Pricing

25   Activity Reports?

1    A.   I started preparing those shortly after I started

2    working with Spirit Airlines in 2017.

3    Q.   And how often do you write these reports?

4    A.   Um, I write them every weeknight and at times on the

5    weekends as well.

6    Q.   So what is your best estimate of how many Pricing

7    Activity Reports you've prepared during your time at

8    Spirit?

9    A.   Um, based on my time with Spirit and quick math, I

10   would say over 1500 fares -- sorry, over 1500 reports

11   have been sent out.

12   Q.   And the government's shown you under 5 today?

13   A.   I didn't count, but it sounds pretty accurate.

14   Q.   Now let me ask you about another report that you

15   prepare.

16        Can you tell the Court what a 037 AP report is?

17        MR. DOIDGE:  Your Honor, objection, it's outside

18   the scope.

19        THE COURT:  It is, but, um --

20        MR. DOIDGE:  And he's not on their witness list.

21        THE COURT:  Well let's see.  You called him as an

22   adverse witness and therefore -- all right.  We've

23   talked about this.

24        What do you say to that?

25        MR. NAGLEY:  I say that we -- in our agreement we

1   said anyone they put on the report we could call.  And
2   I'm not leading the witness and --
3          THE COURT:  No, you're not.  No, you're not.  The
4   question is whether it's now or later?  The man's here.
5   But you don't get to put your case in in the middle of
6   their case, save by agreement, and they don't agree.  So
7   it's beyond know the scope and, um, he's an adverse
8   witness, so my instinct is to sustain the objection
9   without -- we're going to hear from him later then, he's
10  just going to come back.
11         But that's what you prefer?
12         MR. DOIDGE:  Yes, your Honor.
13         THE COURT:  Very well.
14         MR. COHEN:  Your Honor, may I be heard?
15         THE COURT:  Yes.
16         MR. COHEN:  We have an agreement with the
17  government that we can --
18         THE COURT:  The agreement has to be in writing.
19         MR. COHEN:  It is in writing.
20         THE COURT:  Well fine.  And now I have to have it
21  before me and then I'll interpret it.
22         MR. COHEN:  The case management order provides
23  that any witness --
24         THE COURT:  Well someone's got to give it to me
25  now.

1        MR. COHEN:  Yes, your Honor.

2        (Pause.)

3        MR. DOIDGE:  We'll withdraw, your Honor.

4        THE COURT:  Withdrawn.  All right.  The government

5    withdraws the objection.  Fine.

6        Go ahead.

7        MR. NAGLEY:  Yes, sir.  Thank you, your Honor.

8    Q.  Mr. Lage, I'll try the question again, I know a bit

9    of time has passed.

10        Can you explain to the Court what one of the

11    reports you prepare, which is a 037 AP report, what is

12    that?

13    A.  So a 037 report, or you may see it named as a

14    "Closed-End Report," has to do with fare categories that

15    have 0 events they purchase, 3-day events they purchase,

16    and 7-day events they purchase.  We highly focus on

17    those fares, and so every morning, every weekday in the

18    morning I would send out a report that would give us a

19    high-level view of the filed fares that other

20    competitors were filing -- the lowest filed fares that

21    other competitors were filing in our market, in our

22    nonstop markets.

23    Q.  And why did you prepare these reports?

24    A.  The reason for me preparing that report is to give

25    the analysts in the Revenue and Pricing Team that set --

1     that file the fares and set what fares need to be sold,

2     at what level, um, a better understanding and guidance

3     as to, um, help them out and make those decisions on a

4     daily basis.

5     Q.  And what do the 037 AP reports show about the lowest

6     available fare for purchase on any given day?

7     A.  The report has -- shows nothing about availability

8     or available fares in the market.

9     Q.  What does this report show about the number of seats

10    available at the lowest-filed fare?

11    A.  No availability information for a specific market in

12    that report at all.

13    Q.  And what does this report show about any

14    restrictions that are put on the lowest-filed fare?

15    A.  It's very simple, it shows no restrictions, um,

16    regarding the fare rules or days-of-the-week travel.

17    None of that.

18    Q.  And how often are Spirit's lowest-filed fares the

19    same as Spirit's available fares?

20    A.  I have -- the question again?

21    Q.  How often are Spirit's lowest-filed fares the same

22    as Spirit's available fares?

23         MR. DOIDGE:  Objection, foundation, your Honor.

24         THE COURT:  No, if he knows the answer, he can

25    answer.

1   A.   I have no way of determining that.

2        THE COURT:   Well that's your answer.   Thank you.

3   Q.   And why can't you answer that question?

4   A.   I just don't have the tools or the news to know

5   exactly when that happens -- or when it happens.

6   Q.   And why would you not have the tools to know what

7   the lowest available -- the lowest selling fare was?

8        MR. DOIDGE:   Objection, your Honor.

9        THE COURT:   No, overruled.

10  A.   Why wouldn't I have the tools?

11  Q.   Um-hum.

12  A.   Because in my job I don't -- that's not a tool that

13  I work with.   In my job I'm just analyzing filed fare

14  levels, I'm not looking at what is actually selling in a

15  market.

16  Q.   And when did you start preparing the 037 AP reports?

17  A.   That report was also created shortly after I started

18  working for Spirit in 2017 and it was sent out every

19  weekday, um, until earlier this year when I dropped it

20  off, my responsibilities.

21  Q.   Why did you stop preparing this report earlier this

22  year?

23  A.   Um, it became apparent that we had obtained better

24  tools known as "scraping tools" where the revenue and,

25  um, pricing analyst had a better idea what actually was

1    selling in a market based on any given day or a week,

2    um, for specific fare levels as well.  So my report

3    became kind of redundant and not really as helpful as I

4    thought it would be.

5    Q.  And would these scraping tools allow Spirit's

6    pricing and revenue analysts to see fares that were

7    selling in both the public and private --

8    A.  It would allow them to see anything, public or

9    private as well.  Anything that was in the other

10   airlines' website for the customer to purchase would be

11   seen on that scraping tool, yes.

12   Q.  And what is your best estimate of how many 037 AP

13   reports you've prepared during your time at Spirit?

14   A.  Math again.  Okay.  So I say with my time at Spirit,

15   I would say over 1200 reports were sent.

16   Q.  Okay, turning now to a subject the government's

17   asked you a lot about today and yesterday, cross-market

18   initiatives.  So I want to cover some ground again.

19        In your 6-plus years at Spirit, what airlines have

20   you observed engaging in what you believe to be

21   cross-market initiatives?

22   A.  They would be the legacy carriers and Southwest

23   Airlines.

24   Q.  And what firsthand knowledge, if any, do you have

25   about why the legacies and Southwest engage in fare

1  actions that you perceive to be cross-market

2  initiatives?

3  A.  No firsthand knowledge, it's basically based on my

4  observations and experience.

5  Q.  Have you ever attempted to contact any other airline

6  to confirm that their fare action was a cross-market

7  initiative?

8  A.  That's a "No."

9  Q.  Have you ever changed your mind about whether a fare

10  action was a cross-market initiative?

11  A.  Many times.

12  Q.  And why would you change your mind?

13  A.  Again because in the original filing the first

14  impression, um, is that it appears to be a cross-market

15  initiative and at times I've analyzed deeper into the

16  initiative filed by that airline, and eventually, um,

17  they -- they're buying those fares remain as part of a

18  specific structure or substructure in the market.

19  Q.  And what information do you review, um, for your

20  observations that other airlines' fare actions might be

21  cross-market initiatives?

22  A.  The information is basically, um, taken from the

23  data I received from ATPCO.

24  Q.  And to what extent do you include your observations

25  about cross-market initiatives in any reports you

1    prepare?

2    A.   So whenever I observe these initiatives, um, they

3    become part of my Pricing Activity Report, which I sent

4    out, um, every weeknight, at times on weekends as

5    mentioned, and they're also included in the 037 or

6    Closed-End report, which used to be sent, until

7    recently, every morning on weekdays.  And at times I

8    would, via e-mail, alert the specific market analysts,

9    the pricing revenue management analysts, about the

10   filing.

11   Q.   So how long can the fare actions that you perceive

12   to be cross-market initiatives last?

13   A.   It could be anywhere from hours within the same day,

14   um, it could last for a few days, sometimes over a week.

15   Q.   And how if at all can a single cross-market

16   initiative change over time?

17   A.   So there's multiple ways that initiative can be

18   changed and the two most common ways would be either for

19   the market scope to change, become smaller or larger, or

20   it could be based on fare-level exchanging, either

21   higher or lower, depending on the filing.

22   Q.   Now since in your observations cross-market

23   initiatives could last for several days or more than a

24   week, how many times could the same cross-market

25   initiative appear in your reports?

1   A.  So if we're looking at the Pricing Activity Report

2   that's sent out every night, that cross-market

3   initiative would be included in the first data that

4   initiative is filed, that I observe to be filed, would

5   be on that report.  If there were any changes after

6   that, after a few days I would report it again.  And

7   then eventually, until the market initiative was

8   cancelled out of our network, then I would report it in

9   that report as well.

10        In the 037 or Closed-End report, um, that was sent

11   out until earlier this year, that cross-market

12   initiative fare level would be there from the first day

13   it's filed.  It would stay throughout that report every

14   day, it will come up, that fare level will come up every

15   day in that report, um, until there was any changes in

16   the fare level, and eventually until the fare was

17   canceled.

18   Q.  So in the well-over 1500 Pricing Activity Reports

19   you have prepared, how often have you noted the

20   existence of what you believe to be a distinct cross-

21   market initiative?

22   A.  Very rarely.  I would say I've come across maybe

23   once a month.

24   Q.  And let's get to a subject that the Department of

25   Justice asked you about specifically.

1          In your 6-plus years at Spirit, how often have you

2    seen JetBlue engaging in what you believe to be a cross-

3    market initiative?

4    A.   Again, so I observed JetBlue file what I appear to

5    consider a cross-market initiative at the time, but it

6    turned out it was not a cross-market initiative based on

7    the results of how that fare behaved through the days.

8    Q.   And how did you determine that the JetBlue fare was

9    not a cross-market initiative?

10   A.   The way I determined that is because eventually that

11   fare became part of the JetBlue structure as a

12   competitive fare to other airlines in that market.

13   Q.   Okay.  Other than that one time when you observed

14   what you thought was a cross-market initiative by

15   JetBlue, how many other times have you observed JetBlue

16   engage in what you believe to be a cross-market

17   initiative?

18   A.   I have not observed any other filings as such for

19   JetBlue.

20   Q.   Thank you, Mr. Lage.

21          MR. NAGLEY:  Just a moment, your Honor.

22          (Pause.)

23   Q.   Mr. Lage, can I turn your attention please to what

24   the government's marked as Lage Demonstrative E.

25   A.   (Looks.)

Q.  And, Mr. Lage, you testified earlier that
Demonstrative E provides an overview of footnotes that
you believe were associated with some of Spirit's
competitors, is that correct?

A.  Yes.

Q.  And just to be clear about its provenance, you
testified that this demonstrative is based on a document
you create called "OA Structural Review," is that
correct?

A.  That would be accurate, yes.

Q.  And who do you distribute OA Structural Review to?

A.  This is my report that is distributed, this is a
personal report that I use as a, um, cheat sheet or
reference to help me analyze data much quicker.

Q.  And, Mr. Lage, could you tell the Court how you use
the "Remarks" column in the document?

A.  The "Remarks" column is basically giving me an
indication of, um, what to look for.  If I receive data
-- and we receive data from ATPCO on a daily basis, on
average 4 million fares have to be reviewed, and if I
see a large filing for a specific airline that has a
specific footnote associated with it, I can quickly go
to this cheat sheet in reference and it will give me an
indication of what to look for in my analysis and it
saves me time throughout the day.

1    Q.   So let's walk through this just a little bit.

2         If I could direct your attention to Rows 2 through

3    12, what do these rows show?

4    A.   So Rows 2 through 12 are showing the American

5    Airlines, um, footnotes that were filed in ATPCO and

6    were being used, in my observations, um, to file

7    initiatives of competitors with other airlines in the

8    American Airlines network.

9    Q.   And looking at the Remarks column, can you identify

10   rows that record your observations of footnotes that

11   American used for competition with JetBlue?

12   A.   Yes, I can.  So Row Number 9, at the time that I

13   made this review, American was using Footnote B3 to file

14   competitive fares to compete with JetBlue in their

15   network.

16   Q.   So you observed American using one footnote for

17   competition with JetBlue, correct?

18   A.   That would be accurate, yes.

19   Q.   Next I'd like to direct your attention to Rows 13

20   through 41, please.

21   A.   (Turns.)

22   Q.   Would you tell the Court what these rows show?

23   A.   So these rows are showing me the footnotes that

24   United had filed in ATPCO that were associated with, um,

25   fares that United was filing to what I observed to be

1    competitor fares versus other airlines in the United

2    Airlines network.

3    Q.  And can you identify rows that record your

4    observations of footnotes that you might have used for

5    competition with JetBlue?

6    A.  So the first one, um, if you go to Row, um, 29, in

7    my observation United was using Footnote BE to match,

8    um, specific competitive fares with JetBlue in their

9    network.  (Looks.)  Rows 34, United was using H2 at the

10   time to match and file fares competitive to JetBlue in

11   the network as well.  Row 35, United was using Footnote

12   JK to match JetBlue's fares in the network.  Going down

13   the line.  38, United was using footnote NE to match

14   JetBlue.  39, United was using Footnote NR to match

15   JetBlue substructure.  And Row 40, United was also using

16   Z5 to match JetBlue.

17          And just to be clear, when I say "match," again

18   it's not an exact match, but it's a filing that is

19   competitive with some sort of fare that JetBlue had in

20   their structure in the market.

21   Q.  And then I know the font is smaller, so maybe it's

22   better on your screen, Mr. Lage, but I would also ask

23   you to look at, um, if you could tell me what Row 31

24   indicates to you?

25   A.  31?

Q.   Yes.

A.   Yeah, that's another footnote that United was using to match JetBlue.

Q.   And so United used 7 footnotes for competition with JetBlue according to your observations, correct?

A.   Yes.

Q.   Let's now look at Rows 42 to 59.

A.   (Turns.)

Q.   What do these rows show?

A.   Okay.  So this would be Southwest Airlines, um, footnotes that were filed in ATPCO at this time to file fares associated with other carriers in the Southwest network.

Q.   And can you identify rows that record your observations of footnotes that Southwest used for competition with JetBlue?

A.   So Row 43, um, Southwest at the time was using footnote 1B to match, um, filed competitive fares with JetBlue.  And if you go down to Row 59, Southwest was using Footnote H2 to file competitive fares with JetBlue, in their network.

Q.   So Southwest used two footnotes for competition with JetBlue, correct?

A.   That would be correct.

Q.   And then finally, I'd like to direct your attention

1  to Rows 60 to 83 of Demonstrative E?

2       THE COURT:  How many times did you perceive that

3  Southwest was using those footnotes?

4       THE WITNESS:  At the time that I was reviewing the

5  data, it was just a one-time capture.

6       THE COURT:  I understand that.

7       THE WITNESS:  Yes.

8       So, um, as far as how many times?  It all depends

9  how -- so if we look at the travel dates for each

10  footnote, um, on Row 59, those fares went on till

11  February 15th.  So up to that point, if Southwest filed

12  fares with this footnote, I would know right away that

13  they were associated with JetBlue.

14       THE COURT:  All right.  Thank you.

15       Mr. Nagley, go ahead.

16  Q.  And finally I'd like to direct your attention to

17  Rows 60 to 83, Mr. Lage.

18       Could you tell the Court what these rows show?

19  A.  Yes.  So these are the Delta Airlines footnotes

20  filed in ATPCO to file competitive fares versus other

21  airlines in their network.

22  Q.  And the last time for this exercise, Mr. Lage.  Can

23  you identify rows that record your observations of

24  footnotes that Delta used to file competitive fares with

25  JetBlue?

1    A.   So Row 61, um, I'm showing Delta using Footnote 1P

2    at the time to file competitive fares versus JetBlue.

3    Row 66, I'm seeing Delta using Footnote 4J to file

4    competitive fares versus JetBlue.   Row 69, Delta was

5    using Footnote AJ to file competitive fares versus

6    JetBlue in the network.   Row 75, um, Footnote B4 used

7    for the same purpose, matching JetBlue and possibly

8    American Airlines in the network.   Rows 76, Footnote B7

9    was being used by Delta at the time to file competitive

10   fares with JetBlue.   And finally, 77, um, Delta was

11   using Footnote B9 to match what appear to be either

12   Alaska and possibly JetBlue as well.

13   Q.   And so Delta used 6 footnotes for competition with

14   JetBlue, according to your observations, correct?

15   A.   That would be correct.

16   Q.   So, Mr. Lage, you've identified 16 footnotes that

17   you observed American, Delta, United, and Southwest, use

18   for competition with JetBlue, does my math sound right?

19   A.   It sounds good, yes.

20   Q.   And how many of these footnotes, for any of those

21   four carriers, relate specifically to competition with

22   Spirit?

23   A.   Um, none in this document that I can see.

24        MR. NAGLEY:   Thank you, your Honor.   I pass the

25   witness.

1          THE COURT:  Anything further for this witness?

2          MR. DOIDGE:  Just very briefly, your Honor.

3          THE COURT:  Okay.

4

5    REDIRECT EXAMINATION BY MR. DOIDGE:

6    Q.  Mr. Lage, let me ask you to turn to Exhibit 699 in

7    your binder.

8    A.  (Turns.)  Okay.

9    Q.  Mr. Lage, this is an example of one of the 037

10   reports that Mr. Nagley was referring, um, discussing

11   with you, right?

12   A.  037 and the Closed-End are basically the same, yes.

13   Q.  And if we could turn to the spreadsheet.

14   A.  (Turns.)

15   Q.  It's a PDF, I think.  If you could just take a look

16   at Row 9 for an example.  All right?

17   A.  (Turns.)

18   Q.  Row 9 is what you were recording with respect to

19   the, um, the Atlanta, Philadelphia market, right?

20   A.  Yes, this is showing the filed fare levels for these

21   carriers in our market, yes.

22   Q.  And in this particular market Spirit had the lowest

23   fare of $56, right?

24   A.  The lowest-filed fare, yes.

25   Q.  And that's well below the lowest-filed fare for both

1    American and Delta of $183, right?

2    A.  It's lower, yes.

3    Q.  And you'd understand American and Delta to be

4    offering nonstop service in that market because those

5    involve hubs for those two airlines, right?

6    A.  It would be safe to assume that they were offering

7    nonstop service, yes.

8    Q.  And you understand that United would only be

9    offering connection service, right?

10   A.  That's correct.

11   Q.  And even though it is only offering connection

12   service, United is matched exactly with its filed fare

13   of $183 with American and Delta, right?

14   A.    United, like any other airline, filed a

15   competitive fare in the market, yes.

16   Q.  And Southwest with respect to -- and we're focusing

17   on the OAP fares there, Southwest has also matched

18   exactly the $183, right?

19   A.  It appears Southwest has filed competitive fares as

20   well, yes.

21   Q.  And JetBlue's lowest-filed fare is $298, right?

22   A.  The lowest-filed fare for JetBlue in this market is

23   $298, that's correct.

24   Q.  And just to clarify something, Mr. Lage.  It's not

25   possible for the airline, with respect to a 0AP fare,

1    for within that window, within that booking window, it's

2    not possible for an airline to actually be selling a

3    fare at a lower level than the filed fare that you're

4    observing here, right?

5    A.   Can you repeat the question again?

6    Q.   Sure.   Let's assume I'm looking to purchase a ticket

7    one day in advance of my travel.

8    A.   Okay.

9    Q.   So I need to buy a walk-up fare, right?

10   A.   Um-hum.

11   Q.   Are you with me?

12   A.   Yes.

13   Q.   It's not possible -- so let's take the JetBlue fare

14   of $293 -- $298.   It's not possible for JetBlue to offer

15   a lower fare to sell -- to be selling a lower fare on

16   that date than the $298 that you've identified as a

17   filed fare, right?

18   A.   That's correct.   $298 just tells me that's the

19   lowest-filed fare in the market, it's not necessarily --

20   it's not necessarily telling me what JetBlue is actually

21   selling that walk-up or day-of-departure fare level.   It

22   could be even greater than 298.

23        THE COURT:   You've answered my question.

24   Q.   Stepping back, Mr. Lage.   We see here American,

25   Delta, United, and Southwest are all lined up at $183 in

1    that market.  And fair to say, Mr. Lage, that in your

2    experience it's not uncommon to see those four carriers

3    lined up with respect to their fare levels, right?

4    A.  Again it's very common to see filed fare levels that

5    are lined up because every airline wants to have

6    something competitive in the event that they need to

7    make that fare available.

8    Q.  And again, Mr. Lage, if I am a consumer trying to

9    purchase a ticket one day in advance of my travel, I

10   can't buy a ticket for less than $183 on any of those

11   four airlines, right?

12   A.  Based on the data at this time when I make the

13   report, the lowest you could possibly find available for

14   any of these four carriers would be $183, that's

15   correct.

16   Q.  Okay, thank you.

17        MR. DOIDGE:  No further questions.

18        THE COURT:  Nothing further for this witness?

19        MR. NAGLEY:  No, your Honor, thank you very much.

20        THE COURT:  All right, you may step down.  Thank

21   you.

22        Call your next witness.

23        MR. DUFFY:  Thank you, your Honor.  We'll be

24   calling Claire Roeschke of JetBlue.

25        THE COURT:  She may be called.

```
1              (Noise in courtroom.)
2              THE COURT:  Quiet in here.  The Court is in
3      session.  You can have all these binder people walk
4      around, but this isn't a recess.
5              (CLAIRE ROESCHKE, sworn.)
6              MS. BALDWIN:  Good morning, your Honor.
7              THE COURT:  Good morning.  You may proceed.
8              MS. BALDWIN:  Maisie Baldwin for the United
9      States.
10             THE COURT:  Yes, Ms. Baldwin.
11
12             ***************
13             CLAIRE ROESCHKE
14             ***************
15
16     DIRECT EXAMINATION BY MS. BALDWIN:
17     Q.  Good morning, Ms. Roeschke.  Would you please state
18     and spell your full name for the record.
19     A.  Sure.  Claire Roeschke.  C-L-A-I-R-E.  Last name
20     Roeschke, R-O-E-S-C-H-K-E.
21     Q.  Thank you.  And, Ms. Roeschke, are you currently
22     employed by JetBlue Airways?
23     A.  Yes.
24     Q.  You've worked for JetBlue since 2019?
25     A.  That's correct.
```

1   Q.  And when you started at JetBlue, you were a Senior
2   Analyst in the Strategy and Business Development
3   department, right?
4   A.  Yes.
5   Q.  And then in 2021, in June, you were promoted to be a
6   manager in the Strategies Business Development group?
7   A.  That's correct.
8   Q.  And then in January of 2023, you became a manager in
9   JetBlue's Integration Management Office, right?
10  A.  Yes.
11  Q.  And that's your current title at JetBlue?
12  A.  Yes, a manager of the Integration Management Office,
13  also known as the "IMO."
14  Q.  You anticipated my next question.
15       Ms. Roeschke, JetBlue's Integration Management
16  Office was created to plan the incorporation of Spirit's
17  assets into the JetBlue brand if this deal closes, is
18  that fair?
19  A.  Yes, that's a general description of the two groups
20  coming together to plan for the eventual potential close
21  in the transaction.
22  Q.  And in your role in the IMO, Mrs. Roeschke, you
23  worked closely with Goldman Sachs?
24  A.  Correct.
25  Q.  Goldman Sachs served as a financing partner for this

1   transaction?

2   A.   They served as an advisor for us as well as a

3   financing partner.

4   Q.   And in your role as a liaison between JetBlue and

5   Goldman Sachs -- let me start again.

6         In their role as an advisor to JetBlue, Goldman

7   Sachs reviewed JetBlue's projections about the

8   transaction to determine whether JetBlue was paying a

9   fair price to acquire Spirit, right?

10  A.   Yeah, that was one of the assistants who assisted us

11  during the transaction.

12  Q.   Goldman Sachs issued a document to confirm that the

13  terms of the opposition were fair to JetBlue, right?

14  A.   Yes.

15  Q.   And they rendered that in the summer of 2022?

16  A.   Yeah, that's the right time.

17  Q.   And that's called a Fairness Opinion, right,

18  Ms. Roeschke?

19  A.   That is, I believe, what it's described as, yeah.

20  Q.   And before they rendered their Fairness Opinion, you

21  worked closely with Goldman Sachs to provide them

22  information about JetBlue and Spirit, right?

23  A.   Correct.

24  Q.   And you understood that the purpose of that was to

25  feed their Fairness Opinion?

1   A.   Yes, and, um, provide them context as to, um, yeah,

2   the value that was part of the deal.   But they were

3   acting as an advisor as well as a financing partner, so

4   they kind of intermingled.

5   Q.   And you understood that Fairness Opinion ultimately

6   went to JetBlue's board of directors, right?

7   A.   Yes.

8   Q.   And that helped inform JetBlue's board of directors

9   about whether to approve the current terms of the deal?

10  A.   That's correct.

11  Q.   Some of the work that you did included preparing

12  projections for a combined JetBlue-Spirit fleet, right?

13  A.   Yes.

14  Q.   And you worked on these fleet projections with

15  colleagues of yours at JetBlue, right?

16  A.   That's correct.

17  Q.   And that included Ms. Elle Garella?

18  A.   Yes.

19  Q.   And what was Ms. Garella's title at that time?

20  A.   She was also a manager in the Strategy and Business

21  Development group.

22  Q.   So you were in sort of parallel roles?

23  A.   Correct, we were peers.

24  Q.   In addition to creating fleet projections, you also

25  provided Goldman Sachs with financial models, is that

1    right?

2    A.  That's true.

3    Q.  And those financial models were called the "Spirit

4    Standalone Model" and the "JetBlue Standalone Model,"

5    right?

6    A.  That's correct.

7    Q.  And you were the person at JetBlue who was primarily

8    responsible for this so-called "Spirit Standalone

9    Model," right?

10   A.  Yes.

11   Q.  And to create the Spirit Standalone Model, before

12   you sent it to Goldman Sachs, you started with Spirit's

13   ordinary-course 5-year financial plan, right?

14   A.  A plan that we had developed internally at JetBlue,

15   yes.

16   Q.  But the starting point for that development was

17   Spirit's Standalone 5-year financial plan, right?

18   A.  Yeah, so it was a plan that we had for Spirit.  But

19   the Strategy and Business Development team had

20   developed, um, forecasts and projections for what Spirit

21   might do.

22   Q.  I think you're jumping ahead a few steps,

23   Ms. Roeschke.

24        The very starting point of that model that you're

25   describing now was Spirit's internal ordinary-course

1    5-year financial plan, right?

2    A.  Yes, I mean it wasn't their internal plan, it was

3    our plan that our team had modeled.  Sorry, I'm --

4    Q.  That's okay.  Spirit sent JetBlue its

5    ordinary-course 5-year financial plan sometime in the

6    spring of 2022, is that right?

7    A.  Yes.

8    Q.  And they did that via what's called a "data room"?

9    A.  Yes.

10   Q.  And would you briefly explain what a "data room" is?

11   A.  It was an online way to exchange documents in a

12   secure way.  It was set up for us to exchange documents

13   as part of a due diligence process for the transaction.

14   Q.  So when you're referring to this Spirit Standalone

15   Model, that's a bit of a misnomer because it reflects

16   changes that JetBlue made to Spirit's internal

17   production for itself, right?

18   A.  It's our view on what Spirit might do.

19   Q.  And in the process of your due diligence, you also

20   reviewed Spirit's order book, right?

21   A.  Correct.

22   Q.  Spirit's order book contains something called "firm

23   orders"?

24   A.  Yes.

25   Q.  And would you explain what "firm orders" are,

1   Ms. Roeschke?

2   A.  Sure.  "Firm orders" are aircraft that have

3   contracts associated with them.  So they could be

4   contracts with Airbus, um, another manufacturer, or a

5   lessor.

6   Q.  Okay.  Spirit's order book also contains something

7   called "Options," right?

8   A.  Yes.

9   Q.  And those are options for aircraft that a purchaser

10  has the option to buy or not, right?

11  A.  Right, the right to acquire an aircraft at a later

12  date.

13  Q.  Specifically a deadline by which a buyer needs to

14  execute an option, right?

15  A.  Yes.

16  Q.  And the terms of Spirit's then-existing options were

17  disclosed to JetBlue during that diligence process in

18  the spring and summer of 2022?

19  A.  That's correct.

20  Q.  In addition to the Spirit Standalone Model that

21  JetBlue created, you were also responsible for reviewing

22  and sending JetBlue's Standalone Model to Goldman Sachs,

23  right?

24  A.  Yes.  I reviewed it, but I didn't create it.

25  Q.  It contained similar information to the Spirit

1    Standalone Model?

2    A.  Yes.

3    Q.  So Goldman Sachs received the Spirit Standalone

4    Model and the JetBlue Standalone Model and then

5    projected what a combined JetBlue/Spirit would look

6    like?

7    A.  Yes, but they are, um -- they did include synergies

8    on top of that.  So there were synergy models that were

9    sent to them as well.  They would be incremental on top

10   of what the two standalone companies would do on their

11   own.

12   Q.  So once you layered the synergies and dissynergies,

13   we have what's called a "Pro Forma Model"?

14   A.  That's correct.

15   Q.  And this Spirit Standalone Model that JetBlue

16   created and the Spirit 5-year financial plan have

17   different assumptions for the number of aircraft that

18   would be in Spirit's fleet in the future, right?

19   A.  That's correct.

20   Q.  The Spirit Standalone Model has a lower fleet count

21   than what Spirit's standalone 5-year financial

22   projection shows, right, Ms. Roeschke?

23   A.  Yes, our internal view of what Spirit would do

24   included the firm commitments which were lower than what

25   they had included in their financial plan, which

1    included extra aircraft that did not have firm

2    commitments.

3    Q.  To say it differently, Spirit's own internal 5-year

4    financial plan had additional aircraft that JetBlue did

5    not account for in the deal model, right?

6    A.  They had additional aircraft, correct, that we did

7    not account for, because when looking at the valuation

8    of this deal, we felt that firm commitments were the

9    best way and most conservative way to model.

10   Q.  And so at the time the Spirit so-called "Spirit

11   Standalone Model" that was being developed at JetBlue,

12   you analyzed how the Spirit 5-year financial plan

13   compared the number of aircraft that JetBlue would want

14   to obtain post-transaction, is that what I'm hearing you

15   say?

16   A.  It's what we would obtain.  When we were thinking

17   about what we're acquiring, um, it's assets, it's

18   liabilities, it's obligations.  So to us it's something

19   that we would inherit as part of this transaction and

20   inevitably pay for.  And so that's what we, um -- that's

21   why we contemplated it that way, versus using extra

22   aircraft that would not be an obligation to JetBlue upon

23   signing -- or closing rather.

24   Q.  I want to talk a bit about the analysis you

25   conducted in May of 2022 regarding the number of

1    aircraft in Spirit's 5-year financial plan and the

2    number of aircraft JetBlue wanted to obtain post-merger.

3    So if you would, um, there's a small binder in front of

4    you.  If you would turn to the Tab labeled KR.

5    A.   (Turns.)

6    Q.   Sorry, it's not "CR" for you, that would have been

7    too convenient.

8    A.   (Laughs.)

9    Q.   Ms. Roeschke, this is an e-mail that you sent to

10   Ms. Ursula Hurley, Mr. Derek Klinka, Ms. Russo, and

11   Mr. Eric Friedman?

12   A.   Yes.

13   Q.   And at the time of this e-mail all four of those

14   individuals were colleagues of yours at JetBlue?

15   A.   That's correct.

16   Q.   You sent this e-mail to them on May 2nd, 2022?

17   A.   Yes.

18   Q.   The subject line reads "Fleet Rationalization"?

19   A.   Yes.

20   Q.   And you also attached an EXCEL file named "Project

21   Exchange Fleet Rationalization," right?

22   A.   That's correct.

23   Q.   And you did in fact send this e-mail, Ms. Roeschke?

24   A.   Sorry?

25   Q.   You did in fact send this e-mail?

```
 1    A.  I did, yes.
 2         MS. BALDWIN:  Your Honor, at this time plaintiffs
 3    move to admit Exhibit KR in evidence as 797.
 4         THE COURT:  Objection?
 5         MR. HAUSER:  No objection.
 6         THE COURT:  KR is admitted, Exhibit 797.
 7         (Exhibit 797, marked.)
 8         MS. BALDWIN:  And at the request of defense
 9    counsel, this document contains a number of redactions,
10    so we will publish the redacted versions on all of them.
11    Q.  And, Ms. Roeschke, you'll see there's a discrepancy
12    in what you see in your binder and what's on the screen.
13    Again at the request of your counsel, please take care
14    not to divulge any of the specific numbers that are
15    blacked out.
16         Does that make sense?
17    A.  Yes.
18    Q.  I want to return to the subject line of your e-mail.
19    You called this e-mail "Fleet Rationalization."  Do you
20    see that?
21    A.  Yes.
22    Q.  What did you mean here by "Fleet Rationalization"?
23    A.  So "rationalization" is a pretty loose term, it can
24    be used, um, to describe a number of things, but
25    generally it means optimizing an order book, um, for the
```

 1   number or the type of aircraft.  So really what I meant

 2   here is making a choice between, um, a few different

 3   opportunities we had of fleet counts that were available

 4   to us.  So rationalizing between the two.

 5        THE COURT:  This is just a parenthetical comment

 6   for case administration.

 7        The way -- up till this document, but this may be

 8   my fault, the way you've handled redactions, um, I find

 9   fully acceptable and sensible, and I get an unredacted

10   copy but the unredacted copy has a red box around those

11   matters which the parties, or at least the defendants'

12   parties consider confidential, and so far, one, that's

13   an excellent way to proceed, and, two, I don't see

14   anything that would cause me trouble in preserving

15   defendants' confidentiality when I come to explain, as I

16   must explain, the decision in this case.

17        In this document you refer to it as -- the

18   redactions as "numbers blacked out," but I can't tell

19   what's redacted.  And I interrupt because I would

20   prefer, and in fact I think I will give notice to the

21   parties, if when I come to discharge my function under

22   Rule 52, I don't, up till now, and I'm not saying for

23   this witness, it's just a procedural matter.  So far it

24   looks to me I can stay away from anything they want to

25   redact, which appears to be future activity and the

1     like, all of which makes sense to me.  I don't know what

2     to do with this document if I'm going to use it in the

3     findings of fact.

4          Do you understand my concern?

5          MS. BALDWIN:  I do, your Honor.

6          THE COURT:  So maybe you could tinker with it so

7     that I know -- so that I have an unredacted document and

8     I know what you've agreed the parties may redact.

9          Forgive the interruption, but I've been so pleased

10    with the procedure up to this document, that I hope it

11    may continue.

12         You go right ahead.

13         MS. BALDWIN:  Thank you, your Honor, that's very

14    helpful guidance.

15    Q.  So, Ms. Roeschke, a moment ago you mentioned that

16    "fleet rationalization" is sort of a reference to

17    optimizing a combined fleet between JetBlue and Spirit,

18    right?

19    A.  That's the way that I'm using "rationalization,"

20    yes.

21    Q.  And by "optimizing," you mean optimizing for

22    JetBlue, right?

23    A.  Optimizing an order book for a number or type, not

24    for JetBlue, but in a general sense.

25    Q.  Well in this particular exercise you were

1    rationalizing or optimizing the combined-firm fleet for

2    the benefit of the combined firm, right?

3    A.   Yes, that's what we're modeling.

4    Q.   Okay.  And in this document, um, Exhibit 797,

5    represents some of the modeling that you did based on

6    Spirit's 5-year financial plan, right?

7    A.   Yes.

8    Q.   This was the start of the deal-modeling process we

9    talked about a moment ago?

10   A.   This was not necessarily the start of a

11   deal-modeling process, this was, um, well within it.

12   Q.   It was --

13   A.   Sorry, it was within the period which we were

14   evaluating the deal.

15   Q.   Okay, so this is a step in the deal-modeling

16   process, a midway step?

17   A.   Not a midway step, but I'm simply saying that

18   between June, when we finalized the deal, and April,

19   when we received additional documents, this is in the

20   middle of that.

21   Q.   Okay.  This leaves out some of the fleet assumptions

22   that were told to Goldman Sachs, right?

23   A.   This would include, um, firm orders that were

24   included in the deal model, they're sprinkled throughout

25   this.

1    Q.  Goldman Sachs ultimately received the deal model,

2    right?

3    A.  Yes.

4    Q.  With these numbers included?

5    A.  The numbers that were included did not contemplate

6    any deferrals, they were simply the firm orders that

7    were in the fleet plan.

8    Q.  You sent this along to your colleague, Ms. Garella,

9    right?

10   A.  At some point I do, I believe.

11   Q.  Okay.  I want to focus on the text that appears

12   above the table.

13        Here in this exercise you were looking at the

14   number of aircraft that combined JetBlue and Spirit

15   would need to increase capacity exactly 5 percent

16   between 2024 and 2025, right?

17   A.  That's what this hypothetical model shows, yes.

18   Q.  You were also looking at the exact number of

19   aircraft a combined JetBlue and Spirit would need to

20   increase capacity exactly 5 percent for 2025 and 2026,

21   right?

22   A.  That was the idea of the tool was to help us

23   understand what that would mean.

24   Q.  Who asked you to conduct this exercise,

25   Ms. Roeschke?

```
 1    A.  I don't recall exactly who.  I believe it came out
 2    of one of my due diligence calls.  But I don't remember
 3    who instructed me to do so.
 4    Q.  Who else at JetBlue attended due diligence calls
 5    that were arranged?
 6    A.  It was the Strategy and Business Development team
 7    that was working on the deal as well as senior leaders
 8    that would have oversight to this transaction.
 9    Q.  That would include Ms. Hurley?
10    A.  Yes.
11    Q.  And she's the CFO of JetBlue?
12    A.  Yes.
13    Q.  And she was at the time?
14    A.  Yes.
15    Q.  So you don't recall who instructed you to do this,
16    do you recall why you were targeting the 5 percent
17    growth number?
18    A.  No, we were simply running hypothetical analyses
19    like we did between April and June to better inform our
20    model and pressure test assumptions.  It's a pretty
21    typical thing that our group would run, just ad hoc
22    analyses, to better arm, um, our analysis.
23    Q.  And when you say April to June, you're referring to
24    2022, right?
25    A.  Yes.
```

1    Q.   Thank you for that clarification.

2         So based on this analysis -- again still focused

3    on the text above the tables here, you determined that

4    Spirit's internal 5-year financial plan assumed a plug

5    for aircraft that were not yet represented in Spirit's

6    order book for the year 2025, right?

7    A.   Correct, it included noncommitted aircraft.

8    Q.   So a plug for aircraft here means that Spirit's

9    5-year financial plan assumed Spirit would get some

10   additional aircraft that were not yet in those firm

11   orders?

12   A.   Yes, it assumed additional aircraft.

13   Q.   Okay.  So then I want to look --

14        MS. BALDWIN:  If we could zoom the table at the

15   bottom of Exhibit 797.  (On screen.)

16   Q.   And you'll see there's a sort of a subtable labeled

17   "NK Net ADDS"?

18   A.   Yes.

19   Q.   And there's a line that reads "Plugged aircraft for

20   growth not in order book."  Do you see that?

21   A.   Yes.

22   Q.   And this shows your model identified there were 21

23   plugged aircraft that were in Spirit's 5-year financial

24   plan that were not in Spirit's then-existing firm order

25   book, right?

1    A.   Correct.

2         MS. BALDWIN:  You can take that down and focus on

3    just the top table and the two lines below it.  (On

4    screen.)

5    Q.   Do you see there are sort of two large columns

6    labeled "2025 v. 2024" and "2026 v. 2025"?

7    A.   Yes.

8    Q.   And under each of those two primary columns there's

9    three sort of subcolumns?

10   A.   Yes.

11   Q.   Those are labeled "Aircraft Capacity" and "ASM

12   Growth Percentage," do you see that?

13   A.   Yes.

14   Q.   The numbers in the Aircraft Column represent the

15   number of additional planes in each company's fleet for

16   the specified year, right?

17   A.   Yes.

18   Q.   And the Capacity Column here represents the

19   additional number of available seat miles?

20   A.   Yes.

21   Q.   And these numbers are in the billions, right?

22   A.   That's correct.

23   Q.   The terminal 3 zeroes have been cut off?

24   A.   Right.

25   Q.   And the ASM Percentage Growth column is the

1  percentage of ASMs added each year compared to the prior

2  year, right?

3  A.  Yes.

4  Q.  I want to walk through just what the rows mean

5  briefly.

6       The first row of numbers represents JetBlue on a

7  standalone basis, right?

8  A.  Yes.

9  Q.  The second row is representing Spirit according to

10  Spirit's 5-year financial plan if it were configured at

11  JetBlue's layout, right?

12  A.  Yes.

13  Q.  In that change of having them configured to

14  JetBlue's layout is important to note because Spirit's

15  aircraft typically have more seats on them than

16  JetBlue's, right?

17  A.  Correct, they have the most leg room, which would

18  mean more seats.

19  Q.  The third row here is titled "Combined Incremental

20  Prerationalization"?

21  A.  Yes.

22  Q.  That's the growth that would be achieved by a

23  combined JetBlue plus Spirit if JetBlue were to follow

24  Spirit's internal standalone plans and JetBlue's

25  standalone plans for finding aircraft, right?

1   A.  Correct, if Spirit couldn't contract those

2   additional aircraft.

3   Q.  And again the Spirit numbers here are actually

4   already somewhat reduced from Spirit's standalone plans

5   because of this assumption that the Spirit planes would

6   be at the JetBlue layout, right?

7   A.  Correct, it would be the JetBlue layout and product

8   and experience.

9   Q.  And then the 4th row here is titled "Desired

10  Combined Growth Rate Incremental," do you see that?

11  A.  Yes.

12  Q.  And like we discussed in this exercise, you

13  identified 5 percent as the desired combined growth rate

14  for this merger for this exercise, right?

15  A.  That was what this exercise was trying to toggle to,

16  but it's not what our standalone combined plan would

17  look like from a growth rate perspective.  It's just the

18  desired rate for this exercise.

19  Q.  The next line down says "Combined Fleet Post-

20  Rationalization," do you see that?

21  A.  Yes.

22  Q.  And this row represents what the combined fleet

23  would look like if post-merger JetBlue were able to

24  pursue this desired capacity growth rate of 5 percent,

25  right?

1    A.   Sure, that's what this hypothetical exercise tells

2    us the fleet plan would be.

3    Q.   And you call that "post-rationalization," right?

4    A.   Post-rationalization in the sense of this exercise,

5    not in the rationalization that actually occurred, um,

6    when choosing between the financial plan and the fleet

7    plan.

8    Q.   I want to look now at the values of some of these

9    tables.  We're just going to walk through the 2025

10   versus the 2024 side.  I want to start by looking at the

11   number of aircraft.

12        So this first row is showing that if JetBlue went

13   on to acquire Spirit, JetBlue assumed it would add 9

14   additional aircraft between 2024 and 2025, right?

15   A.   Yes.

16   Q.   That's the total number of assets, not a net number?

17   A.   Sorry, I'm mistaken, that is a net number.  If you

18   look at the, um, the table below, it shows the 9s and

19   the net and will take on 30 -- I can't see the rest of

20   it there?

21        MS. BALDWIN:  If you'd zoom down briefly.

22        (Zooms in.)

23   A.   Yes.

24   Q.   Okay, this is a net number?

25   A.   A net number.  I apologize.

1          MS. BALDWIN:  Okay, we can zoom back now.  Thank

2   you.

3   Q.  The second row here shows that if JetBlue weren't to

4   acquire Spirit, Spirit's internal 5-year financial plan

5   showed it would grow by 36 incremental aircraft between

6   2024 and 2026, right?

7   A.  That's also a net number, I believe.

8   Q.  So an additional 36 planes would be flying for

9   Spirit, right, if this acquisition doesn't go through?

10  A.  If they were able to contract the incremental

11  aircraft.

12  Q.  And so together that's a total of 45 incremental

13  aircraft between 2024 and 2025, assuming no

14  rationalization, right?

15  A.  Yes, if they were able to contract the additional.

16  Q.  But in JetBlue's desired post-transaction world,

17  there would only be 28 incremental aircraft, right?

18          MR. HAUSER:  Objection.

19          THE COURT:  Grounds?

20          MR. HAUSER:  Mischaracterizes the testimony.

21          THE COURT:  I'm not clear that it does.

22  Overruled.

23          You may answer if you understand the question.

24          THE WITNESS:  Thank you.

25  A.  It doesn't exactly, or at all, um, show what we

1    desire to do post -- post-acquisition, and one of the

2    growth rates that we show, and any of our standalone

3    models show getting to 5 percent, was just a

4    hypothetical analysis that was performed that is pretty

5    standard for our team to run in order to pressure test

6    all of the assumptions that we had going into our model.

7    Q.   This was a hypothetical model that you sent along to

8    Goldman Sachs?

9    A.   This model was not sent to Goldman Sachs.  But the

10   Pro Forma model was, which included the confirmed

11   combined fleet plan as well as the JetBlue fleet plan.

12   Q.   And you created this model, Ms. Roeschke?

13   A.   This model here.

14   Q.   And you called that 28 number the "Desired Combined

15   Growth Rate," right, you wrote that label?

16   A.   I didn't write that label, but as I stated earlier,

17   the desired combined growth rate was for this exercise,

18   not necessarily for the end state for the company, it

19   was for this specific toggled exercise, which in the

20   text here we note that this 5 percent that you see is

21   something that could be toggled.  So it's something that

22   I was sending across to our team to help pressure test

23   up/down what this meant for what would be included in

24   the model.  And that's what that tool was able -- was

25   supposed to enable.

1          And at the end of the day, none of these numbers

2     ended up in the final deal model.  The only numbers that

3     ended up in the deal model were Spirit's fleet plan as

4     firm and committed, plus a couple of incremental

5     aircraft actually in 2025, on top of what they had

6     planned for firm orders.

7          THE COURT:  So help me out as to why you were

8     doing this?  You say "pressure test it up and down."  I

9     don't know what that means.

10          THE WITNESS:  Sure.

11          So this 5 percent number that you see here, so in

12     an EXCEL model you can change that around, um, to

13     different numbers, as I'm sure you know.  And what it

14     would spit out is --

15          THE COURT:  Don't be so sure but --

16          (Laughter.)

17          THE COURT:  That's why I'm asking.

18          THE WITNESS:  Sure.

19          And what it would spit out would say "To get to

20     this number you would take on more aircraft or you would

21     take fewer aircraft."  And so it was simply a way to

22     give our senior leaders a way to understand adding this

23     many aircraft means this gets you this much growth.  And

24     potentially, um, if Spirit cannot contract as many

25     aircraft as they were planning, um, this is what the

1  growth rate would be.

2          THE COURT:  Thank you.

3  Q.  Ms. Roeschke, you don't recall who asked you to

4  target the 5 percent number?

5  A.  No, not specifically.

6  Q.  And you don't recall why 5 percent was chosen?

7  A.  No.

8  Q.  So this model is showing that if JetBlue wanted to

9  achieve what you called the "desired combined growth

10  rate" for this exercise, JetBlue wouldn't need all of

11  the aircraft in Spirit's 5-year financial plan, right?

12  A.  In this hypothetical exercise, correct, you wouldn't

13  need the 36 aircraft.

14  Q.  You wouldn't need the plugged aircraft that Spirit

15  assumed, in its own internal standalone plan, that it

16  would take delivery of, right?

17          MR. HAUSER:  Objection.

18          THE COURT:  Would you ask the question again?

19  Q.  This model shows that JetBlue would not need to take

20  delivery of all of the plugged aircraft in Spirit's

21  standalone 5-year financial plan?

22          THE COURT:  Overruled.

23  Q.  That's what this model shows?

24  A.  That's what this model is intending to get at.  It

25  doesn't mean that we wouldn't, at some point, take this

1    additional aircraft.  But this was only a hypothetical

2    exercise that was trying to get to whatever number was

3    in that 5 percent, whether it was 8 percent, 2 percent,

4    10 percent.

5    Q.  Okay, let's look at the incremental capacity numbers

6    next, Ms. Roeschke.

7          The first row is showing that again if JetBlue

8    doesn't acquire Spirit, JetBlue would add an additional

9    6.1 billion ASMs between 2024 and 2025?

10   A.  That's correct.

11   Q.  That represents a 7.2 percent ASM growth rate for

12   JetBlue on a standalone basis?

13   A.  Yes.

14   Q.  The second row is showing that if JetBlue doesn't

15   acquire Spirit, but again Spirit's planes were

16   configured to JetBlue's layout, Spirit would add an

17   additional 9.9 billion ASMs between 2024 and 2025,

18   right?

19   A.  Yes.

20   Q.  And that represents a 14.5 ASM growth rate for

21   Spirit on a standalone basis, right?

22   A.  Yes.

23   Q.  The third row is showing that absent any fleet

24   rationalizations, the combined JetBlue and Spirit would

25   add roughly 16 billion additional ASMs in 2025 versus

1  2024, right?

2  A.  Yes, if Spirit can contract the additional 21

3  aircraft that they had plugged.

4  Q.  That's an ASM growth rate of 10.5 percent, right?

5  A.  Yes.

6  Q.  But in this modeled JetBlue-desired post-deal world,

7  there would only be about 7.6 billion additional ASMs

8  between 2024 and 2025, right?

9  A.  That's not what our model shows, this is what this

10  hypothetical exercise shows.

11  Q.  This hypothetical exercise is showing that -- let me

12  start again.

13      This hypothetical exercise, this targeted 5

14  percent growth, shows there would only be about 7.6

15  billion additional ASM if you target at the 5 percent

16  growth rate, right?

17  A.  If that's what we targeted.  But again that's not

18  what we targeted in 2025 and, um, that's -- if we're

19  actually thinking about what is possible to, um, to

20  deliver from Spirit or defer, if you will, so going up

21  and down.  So delivering additional or deferring

22  additional, um, in 2025, JetBlue would have almost no

23  control over what is actually coming in.  So the

24  analysis for 2025 is something that is likely already

25  set in stone by the time we would close this deal.

1    Q.  This deal model that you conducted did not -- sorry,

2    not this one, but the deal model that you conducted did

3    not assume the entire plug, right?

4    A.  It assumed a portion of the plug in 2025.  We

5    assumed on top of the committed fleet plan, because

6    between signing and closing we assumed -- so they had an

7    option deadline coming up, so that's -- sorry, I don't

8    have the red boxes on this document.  I can't see what

9    is redacted.

10        Okay.  So the five options.  We did assume that

11    they would exercise those on their own before we had

12    closed the deal, and so that was included in our 2025

13    fleet plan to them.  And we also assumed that they would

14    contract an additional 10 aircraft, um, between signing

15    and closing, and as if they were a standalone company,

16    because Spirit still has to assume that that could be an

17    outcome.  And so we assume that, um, they would contract

18    an additional 10 deliveries in 2025 for a total of 15 on

19    top of their committed fleet plan, because we wanted to

20    -- at the end of the day our exercise was to value the

21    combined company and we wanted to better understand what

22    we would be inheriting at the end of the day.  And

23    that's why we included an additional 15 aircraft that

24    they would have, on their own, contracted between

25    signing and closing.

1          So that's why I say a portion of the plug, um, we

2     would have contemplated as well.  So not just the fleet

3     plan, but fleet plan-plus.

4     Q.   The number of plugged aircraft that you identified

5     in this exercise is 2021 -- I'm sorry, is 21 for the

6     year of 2025, right?

7     A.   Yes.

8     Q.   And in the text above the table you write that

9     "JetBlue may not need to defer any aircraft at all,"

10    right?

11    A.   That's correct.

12    Q.   Because in order to optimize for the combined

13    entity, you didn't want these additional plugged

14    aircraft, right?

15    A.   That's not true, it's something we're continuing to

16    explore over time, because we had not set out a business

17    plan for this company yet.  What we were doing here is

18    valuing the combined transaction and business plan and

19    it takes a lot more than a limited set of people with a

20    limited set of information modeling this out.

21    Q.   Do you know whatever happened to those 21 plugged

22    aircraft?

23    A.   No, I'm not aware.

24    Q.   All right.

25          MS. BALDWIN:  We'll pass the witness.

1          THE COURT:  Actually it's a good time -- if you

2     want to inquire, it's a good time to take the recess

3     because I have a meeting at 10:45.

4          Do you want to inquire?

5          Well we'll take the recess now and we'll go to

6     11:15.  We'll stand in recess.

7          THE CLERK:  All rise.

8          (Recess, 10:42 a.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        C E R T I F I C A T E

2

3

4        I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER,

5   do hereby certify that the foregoing record is a true

6   and accurate transcription of my stenographic notes

7   before Judge William G. Young, on Thursday, November 16,

8   2023, to the best of my skill and ability.

9

10

11  /s/ Richard H. Romanow 11-16-23
    _____
12  RICHARD H. ROMANOW   Date

13

14

15

16

17

18

19

20

21

22

23

24

25