UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS (Boston)

No. 1:23-cv-10511-WGY
Vol. 2, Pages 84-164

UNITED STATES OF AMERICA, et al
            Plaintiffs

vs.

JETBLUE AIRWAYS CORPORATION,
et al,
            Defendants

********

For Bench Trial Before:
Judge William G. Young

United States District Court
District of Massachusetts (Boston)
One Courthouse Way
Boston, Massachusetts 02110
Thursday, November 16, 2023

********

REPORTER:  CHERYL B. PALANCHIAN, RMR, CRR
Official Court Reporter
United States District Court
One Courthouse Way, Boston, MA 02110

```
                        A P P E A R A N C E S


EDWARD WILLIAM DUFFY, ESQ.
ARIANNA MARKEL, ESQ.
AARON TEITELBAUM, ESQ.
        DOJ-Atr
        450 Fifth Street NW, Suite 8000
        Washington, DC 20530
        (202)812-4723
        Email:  Edward.duffy@usdoj.gov
        For Plaintiff United States of America
- and -
WILLIAM T. MATLACK, ESQ.
        Attorney General's Office
        One Ashburton Place, 18th Floor
        Boston, MA 02108
        (617)727-2200
        Email:  William.matlack@mass.gov
        For Plaintiffs United States of America and The
        Commonwealth of Massachusetts



RYAN SHORES, ESQ.
        Cleary Gottlieb Steen & Hamilton LLP
        2112 Pennsylvania Avenue, NW
        Washington, DC 20037
        (202)974-1876
        Email:  Rshores@cgsh.com
- and -
ELIZABETH M. WRIGHT, ESQ.
        Cooley LLP
        500 Boylston Street
        Boston, MA 02116-3736
        (617)937-2349
        Email:  Ewright@cooley.com
- and -
RACHEL MOSSMAN ZIEMINSKI, ESQ.
MICHAEL MITCHELL, ESQ.
        Shearman & Sterling LLP
        2601 Olive Street, 17th Floor
        Dallas, TX 75201
        (214)271-5777
        Email:  Rachel.zieminski@shearman.com
        For Defendant JetBlue Airways Corporation


(Continued.)
```

(Continued.)


JAY COHEN, ESQ.
ANDREW C. FINCH, ESQ.
        Paul, Weiss, Rifkind, Wharton & Garrison
        1285 Avenue of the Americas
        New York, NY 10019-6064
        (212)373-3000
        Email:  Jaycohen@paulweiss.com
        For Defendant Spirt Airlines, Inc.

I N D E X

WITNESS:              DIRECT    CROSS    REDIRECT    RECROSS

URSULA L. HURLEY

  By Ms. Markel       89

  By Mr. Shores                  136


  EXHIBITS                                PAGE

    798 . . . . . . . . . . . . . 105

    799 . . . . . . . . . . . . . 111

```
 1   (Proceedings, 11:16 a.m.)
 2           THE CLERK:  Court is back in session.  You may be
 3   seated.
 4           THE COURT:  Counsel, you may proceed.
 5           MR. HAUSER:  Your Honor, on the break I reviewed
 6   my outline and have no questions.  Thank you.
 7           THE COURT:  You don't?
 8           MR. HAUSER:  No.
 9           THE COURT:  That's fine.  You may step down.
10           (Whereupon the witness stepped down.)
11           MR. DUFFY:  Yes, your Honor, the government will
12   be calling Ms. Hurley from JetBlue as an adverse witness.
13           THE COURT:  And you may.
14           MR. DUFFY:  Your Honor, before we begin
15   Ms. Hurley's examination, there are some confidentiality
16   issues related to some exhibits that will be presented to
17   this witness, I believe.  This is one issue where the
18   parties have not agreed on a confidentiality matter.
19           THE COURT:  Thank you for the heads-up.  Shall we
20   address it when it arises?
21           MR. DUFFY:  Whatever the Court prefers, of course.
22           THE COURT:  Yeah, why don't we do that.  I'll be
23   in a better position to address it.
24           THE CLERK:  Will you please remain standing and
25   raise your right hand?
```

```
 1                    URSULA L. HURLEY, sworn

 2              THE CLERK:  You can be seated.

 3              THE WITNESS:  Thank you.

 4              THE COURT:  And, Ms. Markel, you may continue, or

 5    proceed.

 6              MS. MARKEL:  Thank you, your Honor.  Arianna

 7    Markel for the United States.

 8                    DIRECT EXAMINATION

 9    BY MS. MARKEL:

10    Q.   Good morning, Ms. Hurley.  Would you please state and

11    spell your full name, for the record?

12    A.   My name is Ursula Lauren Hurley, U-R-S-U-L-A,

13    L-A-U-R-E-N, H-U-R-L-E-Y.

14    Q.   There should be a binder of exhibits and your

15    deposition testimony on the stand.  I will let you know at

16    the time when I am going to use an exhibit.

17    A.   Thank you.

18    Q.   Ms. Hurley, where do you currently work?

19    A.   I work at JetBlue Airways.

20    Q.   And you've been employed by JetBlue since graduating

21    from college in 2004; right?

22    A.   Correct.

23    Q.   And what is your current position at JetBlue?

24    A.   I'm currently the chief financial officer.

25    Q.   And when did you become JetBlue's CFO?
```

```
 1    A.    Just over two years ago.

 2    Q.    And as CFO you oversee a few departments; right?

 3    A.    Correct.

 4    Q.    You oversee financial planning and analysis; is that

 5    right?

 6    A.    Correct.

 7    Q.    And that is the group that's responsible for developing

 8    JetBlue's five-year financial plans; right?

 9    A.    As well as many other things, but yes.

10    Q.    And a five-year financial plan is the five-year

11    financial outlook for the company; right?

12    A.    Yes.

13    Q.    And as CFO, you also oversee fleet planning; is that

14    right?

15    A.    Correct.

16    Q.    And fleet planning includes managing JetBlue's

17    contracts and relationships with aircraft manufacturers like

18    Airbus; right?

19    A.    Correct.

20    Q.    And the fleet planning team also works closely with

21    JetBlue's network team; right?

22    A.    Yes.

23    Q.    And together the fleet planning team and the network

24    team ensure that JetBlue's fleet plan aligns with JetBlue's

25    growth strategy; is that right?
```

```
 1    A.    Correct.
 2    Q.    And as CFO you're also part of JetBlue's senior
 3    leadership team; right?
 4    A.    Correct.
 5    Q.    And you report to Mr. Robin Hayes?
 6    A.    Yes.
 7    Q.    And as CFO you often attend board meetings as well;
 8    right?
 9    A.    Correct.
10    Q.    And so you routinely provide information to the board
11    regarding JetBlue's financial plans?
12    A.    Yes.
13    Q.    And you've also assessed the potential financial impact
14    of this deal on JetBlue; right?
15    A.    Correct.
16    Q.    And you assessed the economic environment and its
17    implications for JetBlue; right?
18    A.    Which are ever-evolving, yes.
19    Q.    So let's turn to the deal at hand.  In February of
20    2022, you learned that Spirit and Frontier had entered into
21    a merger agreement; right?
22    A.    Correct.
23    Q.    And in the days following that announcement, you
24    discussed the Spirit-Frontier transaction with Mr. Hayes;
25    right?
```

1    A.    Correct.

2    Q.    And you and Mr. Hayes discussed what the

3    Frontier-Spirit transaction could mean for JetBlue; right?

4    A.    Yes.  I mean, Mr. Hayes wasn't the only one we had

5    conversations about.  This was an industry deal that was

6    going to have impact across many airlines, not only JetBlue.

7    Q.    And a Frontier-Spirit combination could impact

8    JetBlue's position in the industry; right?

9    A.    Any merger in the airline industry could impact

10   JetBlue, so yes.

11   Q.    And so a decision was made to -- by JetBlue to revisit

12   its 2019 analysis of a potential JetBlue-Spirit deal; right?

13   A.    Correct.

14   Q.    And so that work included putting together a model of

15   the combined company; right?

16   A.    Correct.

17   Q.    And that model included a fleet plan for the combined

18   company; right?

19   A.    Correct.

20   Q.    Okay.  So now turning to late March of 2022, JetBlue

21   made an offer to acquire Spirit; right?

22   A.    Yes.

23   Q.    So let's briefly discuss some of the diligence that

24   JetBlue did after it submitted its proposal to Spirit.  In

25   the spring of 2022, Spirit opened a data room to share

```
1   information with JetBlue; right?

2   A.   Correct.

3   Q.   And JetBlue received a copy of Spirit's fleet plan;

4   right?

5   A.   Correct, as well as many other documents.

6   Q.   And that fleet plan included Spirit's order book;

7   right?

8   A.   Correct.

9   Q.   And an order book is basically a schedule for an

10  airline's contractual aircraft deliveries; right?

11  A.   Correct.

12  Q.   And so Spirit's order book includes firm aircraft

13  deliveries from Airbus; right?

14  A.   It can, yes.

15  Q.   And firm aircraft deliveries means that Spirit and

16  Airbus had contracted for those deliveries already; right?

17  A.   Correct.

18  Q.   Okay.  And so as part of this acquisition, JetBlue

19  would take over Spirit's contractual order book with Airbus;

20  right?

21  A.   Yes.

22  Q.   And Spirit's fleet plan also included what are called

23  committed aircraft leases; right?

24  A.   Correct.

25  Q.   And so, in other words, those are aircraft that Spirit
```

```
 1   had contracted to lease from aircraft lessors; right?
 2   A.   Correct.
 3   Q.   And so as part of this acquisition, JetBlue would take
 4   over Spirit's committed aircraft leases as well; right?
 5   A.   Correct.
 6   Q.   And Spirit's fleet plan also includes aircraft options
 7   with Airbus; right?
 8   A.   Correct.
 9   Q.   And what are aircraft options?
10   A.   It's exactly that.  At a point in time you can
11   determine if you want to convert that aircraft to a firm
12   commitment.
13   Q.   And so as part of this acquisition, JetBlue would take
14   over Spirit's contractual options with Airbus; right?
15   A.   It's exactly an option, so we don't -- we're not
16   technically committed to take that as a firm aircraft until
17   we notify Airbus.  So, yes, we would assume Spirit's
18   contract with Airbus, which includes firm aircraft as well
19   as the ability to, and access to those options.
20   Q.   And what does -- I think you alluded to this, but what
21   does it mean to convert an option?
22   A.   You notify -- usually there's a defined time period
23   where you need to notify Airbus to convert an option to a
24   firm commitment that you will definitively take from Airbus.
25   Q.   And there's typically a notification period for
```

```
 1  aircraft options; right?
 2  A.   Correct.
 3  Q.   And what is the notification period?
 4  A.   It's a defined number of months whereby which you need
 5  to notify them that you want to move that option to a firm
 6  aircraft.
 7  Q.   So, for example, like about how long is JetBlue's
 8  notification period with Airbus?
 9  A.   So our notification with Airbus is 24 months.
10  Q.   Okay.  So let's, for example, consider a JetBlue option
11  for January of 2026.  When does JetBlue need to notify
12  Airbus that it wants to convert that option to a firm
13  delivery for January of 2026?
14  A.   So 24 months prior, so that would be January of 2024.
15  I also want to note that different airlines might have
16  different notification periods.  As I mentioned, ours is 24
17  months but airlines might have different notification
18  periods.
19  Q.   And so over the course of this deal you've come to
20  learn Spirit's notification period with Airbus as well;
21  right?
22         MR. COHEN:  Your Honor, I think we're now heading
23  into something confidential, so if I may be heard.
24         THE COURT:  You may be.
25         MR. COHEN:  We, at the direction of Airbus, have
```

 1    treated the Spirit notification period, as well as the

 2    number of options, as being a confidential number.  And --

 3           THE COURT:  All right.  I certainly accept that

 4    you have.

 5           Why is this relevant?

 6           MS. MARKEL:  This is relevant, your Honor, because

 7    the number of -- the -- excuse me -- the notification period

 8    shows the lead time that airlines need to actually acquire

 9    the options, and it also will come into play because of

10    testimony that I expect that you'll hear regarding JetBlue's

11    denial of Spirit's request to exercise options and when that

12    denial happened.

13           THE COURT:  Well, the denial I certainly think you

14    can inquire about, but the actual number or distance out I

15    don't -- I'm not clear I need that.  So go ahead, excluding

16    that, but at least for now I don't want to cramp your

17    interrogation save for the actual number.  Can you do that?

18           MS. MARKEL:  I can do that, your Honor, but the

19    number might come into play later on and I will flag it for

20    you then.

21           THE COURT:  That would be helpful.  Go ahead.

22           MS. MARKEL:  Thank you.

23    Q.  So without disclosing the, at this point in time, the

24    notification period, is it true that over the course of this

25    deal that you've come to learn Spirit's notification period

1  with Airbus?

2  A.    Yes.

3  Q.    Okay.  So in addition to receiving Spirit's fleet plan,

4  Spirit also provided JetBlue with its five-year financial

5  plan in the spring of 2022; right?

6  A.    Correct.

7  Q.    And Spirit's five-year financial plan projected that

8  Spirit would acquire more aircraft than what was in its

9  fleet plan; right?

10  A.    Correct.

11  Q.    And throughout the spring of 2022 you attended some

12  diligence sessions with Spirit; right?

13  A.    Yes.

14  Q.    And during some of those diligence sessions you

15  discussed Spirit's aircraft delivery schedule; right?

16  A.    Correct.

17  Q.    And you discussed Spirit's five-year financial plan

18  during some of those diligence sessions as well; right?

19  A.    At a high level, yes.

20  Q.    And in some of those diligence sessions you also

21  discussed whether Spirit was contemplating any incremental

22  leases beyond what was in Spirit's order book; right?

23  A.    Yes.  Aircraft delivery schedules were one of the

24  topics that we discussed during diligence.

25  Q.    So now I'd like to turn to the topic of fleet

1    rationalization.  You're familiar with that term; right?

2    A.   That term is used in different ways as we talk about

3    aircraft delivery schedules and how we're managing those.

4    So it can be interpreted in different ways based on the

5    context that you provide.  So, yes, I'm very familiar with

6    the term.

7    Q.   And fleet rationalization could include, as one of

8    those ways, reducing the number of aircraft when combining

9    two fleets of two separate entities; right?

10   A.   That is one way, yes.

11   Q.   Okay.  And this is not the first time that JetBlue has

12   considered a JetBlue-Spirit combination; right?

13   A.   Correct.

14   Q.   It also considered acquiring Spirit back in 2019 and

15   2020; right?

16   A.   Yes.

17   Q.   And at that time JetBlue was contemplating reducing the

18   number of aircraft for a combined company; right?

19   A.   That was one scenario, that that was presented prior

20   to, you know, seriously discussing and contemplating a

21   potential approach to Spirit.

22            THE COURT:  I just want to be sure I understand.

23   In the 2019 proposal, as far as you analyzed it, it would

24   reduce the number of aircraft in the combined entity below

25   what the inventory of aircraft in both separate entities and

1    what was on order would otherwise be.  Have I said that

2    right?

3              THE WITNESS:  Correct.

4              THE COURT:  And it did contemplate that?

5              THE WITNESS:  Correct, at that point in time.

6              THE COURT:  At that point.

7              THE WITNESS:  Uhm-hmm.

8              THE COURT:  But JetBlue, if it was going to be the

9    surviving company in the 2019 merger, it nevertheless would

10   have a bigger fleet?

11             THE WITNESS:  Of course.  Of course.

12             THE COURT:  All right.

13   Q.   So let's discuss some of the ways that reducing the

14   number of aircraft for a combined company could benefit

15   JetBlue.  Reducing the number of aircraft for a combined

16   company is one lever that JetBlue could use to reduce its

17   debt; right?

18   A.   Correct.  But there are also many other levers that can

19   be utilized in order to reduce debt.  Right?  Like driving

20   increased revenue, reducing costs, deciding if we finance

21   aircraft or not finance aircraft.  So there are many ways in

22   which you can manage your debt level outside of any

23   rationalization.

24   Q.   And reducing the number of aircraft is one way of doing

25   that; right?

1    A.   It is.  But I also want to remind everyone, we have

2    contractual obligations to Airbus.  These are contracts that

3    we are committed to take these deliveries.  So there's no

4    contractual right for us to exit or defer or just not take

5    delivery of aircraft.

6    Q.   But you are not required to exercise any options;

7    right?

8    A.   Correct.  That's -- an option is an option.  Right?  So

9    you have the ability to determine whether you want to turn

10   that into a firm aircraft or not.

11   Q.   So deciding not to exercise options is one lever that

12   JetBlue could use to reduce its debt; right?

13   A.   So an option is just an option, as we discussed.  So

14   those are outside of the base case that we're assuming when

15   we combine JetBlue and Spirit.  So between the two

16   companies, we have options -- we have between 60 and 70

17   options between the two companies.  And so at that point in

18   time, given market dynamics, we will make the appropriate

19   decision whether we want to convert those to more firm

20   aircraft to further boost our growth trajectory.

21            THE COURT:  Because we've got a contemplated 2019

22   merger and we have the present agreed merger that's being

23   tested here, which one are you talking about in answer to

24   the question?

25            THE WITNESS:  Yeah, the current one.

```
 1              THE COURT:  Thank you.

 2              THE WITNESS:  The current one.

 3              THE COURT:  Thank you.

 4   Q.  And just to be clear, JetBlue's deal model assumed the

 5   exercise of some options; right?

 6              THE COURT:  And, again, I want to be clear what

 7   we're talking about, the merger that's before the Court or

 8   this earlier testing of the waters?

 9              MS. MARKEL:  Thank you, your Honor.  I'm talking

10   about the merger before the Court.

11              THE COURT:  Thank you.  We'll assume you are

12   unless you tell me otherwise.

13              MS. MARKEL:  Thank you, your Honor.

14              THE COURT:  And I'll try to be quiet.  Go ahead.

15   Q.  So the deal model to the current iteration of this deal

16   assumes the exercise of some options; right?

17   A.   No, it did not.  They are options and, again, there's

18   notification periods that we have.  And I manage our fleet

19   portfolio with flexibility, through the lens of flexibility.

20   So we will make the decision at the appropriate point in

21   time, which we're required to do contractually, to change

22   those options to firm aircraft depending on the market

23   dynamics at that point in time.

24   Q.   Okay.  And returning back to what reducing the number

25   of aircraft could do for JetBlue, reducing the number of
```

1    aircraft for the combined company is also one lever that

2    JetBlue could use to increase its free cash flow; right?

3    A.   So, I just want to be explicitly clear.  So in our deal

4    model we do not assume that we decrease the number of

5    aircraft.  So we --

6    Q.   Ms. Hurley, I was not asking about the deal model and

7    any of the assumptions.  My question is just very general:

8    Reducing the number of aircraft for the combined company is

9    one lever that JetBlue could use to increase free cash flow?

10   A.   That is one lever that can be utilized to manage free

11   cash flow.

12   Q.   Okay.  Thank you.  And reducing the number of aircraft

13   for the combined company is also one lever that JetBlue

14   could use to slow its growth; right?

15   A.   Yes.

16   Q.   Okay.  So now let's turn to Spirit's November 2022

17   request under the merger agreement to acquire additional

18   aircraft for 2025 and 2026.  You are aware that JetBlue --

19   that the JetBlue-Spirit merger agreement has what are called

20   interim operating covenants; right?

21   A.   Correct.

22   Q.   And those are sometimes referred to as IOCs?

23   A.   Correct.

24   Q.   Okay.  And under the IOCs of this deal, there are

25   certain items for which Spirit must seek JetBlue's consent

1    prior to the deal closing; right?

2    A.    Correct.

3    Q.    And under the IOCs Spirit must seek JetBlue's consent

4    prior to leasing any additional aircraft; right?

5    A.    Above and beyond what we had originally agreed upon

6    prior to executing the merger agreement, yes.

7    Q.    Thank you.  And under the IOCs Spirit must also seek

8    JetBlue's consent prior to exercising any additional

9    aircraft options that have not yet been exercised; right?

10   A.    Yes.

11   Q.    And JetBlue and Spirit negotiated these IOCs; right?

12   A.    Correct.

13   Q.    And during those negotiations, Spirit requested the

14   flexibility to convert its options at any point in time;

15   right?

16   A.    They did.

17   Q.    And JetBlue did not agree to Spirit's request; right?

18   A.    So just to put this in context, we were negotiating

19   with Spirit on a full-fledged merger agreement back in July

20   of 2022.  And as part of that merger agreement were these

21   IOCs.  And so we were negotiating back and forth, not only

22   about aircraft but liquidity levels, about debt levels.  And

23   you can imagine, aircraft is the largest purchase that an

24   airline makes.  As so what we did back in July is agree upon

25   a fleet plan that Spirit had contractual commitments to

1    deliver to.  And then if they wanted to do anything above
2    and beyond that agreed-upon fleet plan, we wanted to be able
3    to have a discussion and to be able to consent to that in
4    light of an aircraft is an expensive asset.  So, yes, that
5    is what transpired and that's what we've been operating
6    under as the IOCs.
7    Q.   So, ultimately, just referring back to my question,
8    JetBlue did not agree to Spirit's request, right, for
9    flexibility to convert its options at any point in time?
10              MR. SHORES:  Objection, asked and answered.
11              THE COURT:  No, overruled.  You may have it.
12   A.   We did not agree at that point in time.
13   Q.   Okay.  And you would agree that the interim operating
14   covenants were important to JetBlue in negotiating this
15   deal; right?
16   A.   Of course.  I mean, these are typical covenants that
17   exist in, from what I understand, many merger and
18   acquisition transactions.  So, obviously, aircraft in this
19   specific instance was very important.
20   Q.   And it's important because they help ensure that
21   Spirit's business is not materially changed between the
22   signing of the merger agreement and closing; right?
23   A.   Correct.
24   Q.   And it was important to Spirit -- or, sorry, it was
25   important to JetBlue that Spirit could not unilaterally

1    decide to convert any of its aircraft options; right?

2    A.   Correct.

3    Q.   So let's turn to the document marked QT in your binder.

4         MS. MARKEL:  And I think this may have some

5    agreed-upon redactions, but this can be published.

6         (On screen.)

7    Q.   Ms. Hurley, you received this e-mail that was sent on

8    November 3rd, 2022; right?

9    A.   Correct.

10   Q.   The sender is Leticia Lamarque?

11   A.   Yes.

12   Q.   She is one of Spirit's in-house counsel; right?

13   A.   Correct.

14   Q.   And the subject of this e-mail exchange is, "Spirit/JB

15   merger agreement section 5.1, IOC request for consent."

16   Right?

17   A.   Yes.

18        MS. MARKEL:  At this time I move to admit the

19   document marked as QT in evidence.

20        MR. SHORES:  No objection, your Honor.

21        THE COURT:  QT may be admitted and it is

22   Exhibit 794.

23        THE CLERK:  798, Judge.

24        THE COURT:  798 we're up to.  798.

25        (Exhibit 798 received in evidence.)

1    Q.    And so Ms. Lamarque's e-mail includes several requests

2    for JetBlue's consent under the interim operating covenants;

3    right?

4    A.    Correct.

5    Q.    I'm going to just focus on two of those requests.

6    Let's focus on the paragraph next to the number 2.  One of

7    Spirit's requests is for consent to acquire up to 21

8    additional aircraft for delivery in 2025; is that right?

9    A.    Correct.

10   Q.    And Spirit is proposing to acquire those 21 aircraft

11   through direct leases; right?

12   A.    Correct.

13   Q.    And another request by Spirit is to acquire up to 6

14   additional aircraft for delivery in 2026; right?

15   A.    Yes.

16   Q.    And Spirit was proposing to acquire those 6 aircraft

17   through either direct leases or exercising existing options;

18   is that right?

19   A.    Correct.

20   Q.    Okay.  So I'll come back to these two requests a bit so

21   I'll call them the incremental aircraft request.  Is that

22   okay?

23   A.    Sure.

24   Q.    Okay.  Thank you.  So underneath the incremental

25   aircraft request, Ms. Lamarque writes, "The above would

1    permit Spirit to meet the following five-year plan for

2    aircraft deliveries."  Do you see that?

3    A.    Yes.

4    Q.    And below that Ms. Lamarque includes a chart showing

5    five-year plan aircraft deliveries.  And the aircraft

6    deliveries in this chart include three different categories

7    of aircraft deliveries; right?

8    A.    Yes.

9    Q.    So the first category in this chart is deliveries from

10   Spirit's order book.  Do you see that?

11   A.    Yes.

12   Q.    And then the second category is committed direct

13   leases; right?

14   A.    Yes.

15   Q.    And then the third category is incremental aircraft.

16   Do you see that?

17   A.    I do.

18   Q.    The incremental aircraft here was not reflected in

19   Spirit's order book; right?

20   A.    Correct.

21   Q.    But it was reflected in Spirit's five-year financial

22   plan; right?

23   A.    Correct.

24   Q.    Okay.  You can put that exhibit aside.

25         Ms. Hurley, you discussed Spirit's incremental aircraft

1    request with some of your colleagues at JetBlue; right?

2    A.   Correct.

3    Q.   It was your view that JetBlue should not consent to

4    Spirit's request for incremental aircraft; right?

5    A.   I did not think it was the appropriate time to commit

6    to incremental aircraft.

7    Q.   And you discussed Spirit's incremental aircraft request

8    with Mr. Hayes; right?

9    A.   He was one of the individuals.

10   Q.   Did Mr. Hayes agree with your view?

11   A.   It was my recommendation.

12   Q.   And did Mr. Hayes agree with your recommendation?

13   A.   I believe so.

14   Q.   And you also discussed the incremental aircraft request

15   with JetBlue's general counsel, Brandon Nelson; right?

16   A.   Yes.

17   Q.   And Mr. Nelson told you that he discussed Spirit's

18   request with Spirit; right?

19   A.   So what happened, from what I understand, with this

20   specific request, is that the working teams discussed the

21   request and we relayed that we didn't think it was

22   appropriate at this point in time.  We believe we had time

23   in the future in order to make aircraft -- incremental

24   aircraft decisions in the years 2025 and 2026.  So the

25   working teams discussed this and relayed our initial

1    thoughts on this request to the Spirit team.

2    Q.   So I will come back to that.  But I want to first

3    return to my actual question, which was Mr. Nelson told you

4    that he discussed Spirit's request with Spirit; right?

5            MR. SHORES:  Objection, asked and answered, your

6    Honor.

7            THE COURT:  Yeah, I have notes on this.

8    Sustained.

9            MS. MARKEL:  Okay.

10           THE COURT:  It was discussed.  That's the sense I

11   get from her testimony.

12           THE WITNESS:  Yes.

13           THE COURT:  And she confirms it.

14   Q.   Ms. Hurley, you reference the working team section;

15   right?

16   A.   Correct.

17   Q.   Who is the working team?

18   A.   Some of the other folks on this e-mail, so Dora, Derek.

19   And I believe that they relayed some initial feedback to the

20   appropriate folks at Spirit equivalent to their level.

21   Q.   Is Mr. Nelson on the working team?

22   A.   No.

23   Q.   Well, do you know what Mr. Nelson conveyed to Spirit

24   with respect to the incremental aircraft request?

25           MR. SHORES:  Objection.  I believe this has also

1    been asked and answered, your Honor.

2              THE COURT:  No, I don't know, but --

3              THE WITNESS:  Listen, I don't believe that --

4              THE COURT:  Wait, wait, wait.

5              THE WITNESS:  Go ahead.

6              THE COURT:  Thank you.

7              THE WITNESS:  Sorry.

8              THE COURT:  I play a small role, but I really have

9    to play my role.

10             THE WITNESS:  Yes, understood.

11             THE COURT:  I'm going to sustain that.  She

12   doesn't really know what they talked about.  She can tell us

13   what she understands happened.  So why don't you frame it in

14   that way.

15             MS. MARKEL:  Okay.

16   Q.   Ms. Hurley, you discussed this request with Derek

17   Klinka; right?

18   A.   Yes.

19   Q.   And what was Mr. Klinka's role at JetBlue at this time?

20   A.   So he was working on a lot of the modeling that

21   supports the deal and the financial analysis.

22   Q.   Okay.  And so let's turn to the document marked QN in

23   your binder.

24             MS. MARKEL:  And this is a document for which I

25   think there are outstanding privilege -- sorry, outstanding

1    confidentiality disputes, but I'm happy to, at this time,

2    just show defendants' proposed redacted version.

3              (On screen.)

4    Q.   Okay.  So this is a continuation of the e-mail chain

5    that we were looking at earlier; right?

6    A.   Correct.

7    Q.   And you received this topmost e-mail sent from

8    Mr. Klinka; right?

9    A.   Correct.

10             MS. MARKEL:  At this time, I move to admit the

11   document marked as QN in evidence.

12             MR. SHORES:  No objection, your Honor.

13             THE COURT:  QN is admitted, Exhibit 799 in

14   evidence.

15             (Exhibit 799 received in evidence.)

16   Q.   Let's take a look at Mr. Klinka's November 6th e-mail

17   from 4:33 p.m. which starts at the page ending in 988 and

18   continues on to 989.

19   A.   Okay.

20   Q.   And so in this e-mail Mr. Klinka provided you with two

21   charts, one titled, "Financials" and one titled "Fleet."  Do

22   you see that?

23   A.   Yes.

24   Q.   I'm going to focus on the second chart titled, "Fleet."

25   The first row in the fleet chart provides the, "Total fleet

1   count in Spirit's five-year plan to meet growth plan."  Do

2   you see that?

3   A.   I do.

4   Q.   And the second row in the fleet chart provides, "Total

5   committed/firm fleet count at deal signing."  Do you see

6   that?

7   A.   Yes.

8   Q.   So this second row reflects the number of Spirit's

9   fleet that JetBlue used in its deal model; right?

10  A.   Correct.

11  Q.   And this fleet chart shows that JetBlue assumed fewer

12  Spirit aircraft deliveries in its deal model than what

13  Spirit assumed in its five-year financial plan; right?

14  A.   Correct.

15  Q.   So Spirit's five-year financial plan contemplated an

16  additional 21 aircraft deliveries for 2025; right?

17  A.   Correct.

18  Q.   And as we've been discussing, one of Spirit's

19  incremental aircraft requests was to acquire 21 additional

20  aircraft for 2025; right?

21  A.   Correct.

22  Q.   Okay.  Now, take a look at the second paragraph of

23  Mr. Klinka's e-mail which is right above the charts he had

24  included.  So Mr. Klinka writes to you, "The second section

25  (fleet) covers the aircraft ask.  They are trying to fill in

1    the gaps in their 2025-26 fleet plan through direct leases

2    and option exercises.  This is not surprising, given their

3    five-year financial plan growth required more aircraft than

4    what their committed/firm fleet plan contemplated."

5         There Mr. Klinka is describing the fleet chart that we

6    were just looking at; right?

7    A.   Correct.

8    Q.   And Mr. Klinka then continues, "However, as we

9    mentioned on our earlier note, we do not believe the

10   combined entity will need this many aircraft and thus, and

11   so if given the choice, we would prefer not to take them."

12        So that was what Mr. Klinka wrote to you; right?

13   A.   Correct, those are Derek's words.

14   Q.   And you agreed with Mr. Klinka's assessment?

15   A.   In the e-mail from November 7th at 10:09, I

16   specifically say that at this point I did not think it was

17   appropriate to add incremental aircraft above and beyond the

18   fleet count that we used at deal signing.

19   Q.   Great.  Let's look at your response at 10:09 a.m.  And

20   that's the third paragraph -- and, specifically, let's look

21   at the third paragraph of your response.  So you wrote, "In

22   regards to aircraft, we spent a significant amount of time

23   negotiating this specific ask."  That's a reference to

24   Spirit's request for flexibility to convert options at any

25   time during negotiations of the merger agreement; right?

A.   Back in July we spent a significant amount of time
aligning on the committed order book.  So we had worked
through that in July, and here we are in November now
revisiting this.

Q.   And so you then continue, "We made this clear when we
closed the IOCs four months ago."  So JetBlue had made it
clear to Spirit that it did not want Spirit to acquire any
new aircraft before closing; right?

A.   We had -- again, we had agreed upon an aircraft
delivery plan that Spirit had commitments to deliver on back
in July.  So we had agreed to that.  That happened during
the IOCs, and that's what I'm highlighting here, is we
already discussed this and here we are, you know, a few
months later whereby Spirit is now asking for incremental
aircraft that I didn't think it was necessary to proceed
with at this point in time, given market dynamics, as well
as I believed we had time to work through the 2025 and 2026
delivery schedule.

Q.   So I guess despite JetBlue making this clear to Spirit,
Spirit still came back to JetBlue in November 2022 and asked
for consent to acquire additional aircraft; right?

A.   Correct.

Q.   You then continue, "At this point I have little to no
interest in increasing the size of our combined order
books."  Do you see that?

1    A.    I do.

2    Q.    So at this point in time, you had little to no interest

3    in increasing the number of aircraft for the combined

4    company; right?

5    A.    Correct.  At that point in time, which was close to two

6    and a half years prior to the time frame in which these

7    aircraft would be scheduled to deliver.  And, quite frankly,

8    we all understand how volatile the environment is that we

9    live in.  So at this specific moment in time, I did not

10   think these aircraft were necessary.

11   Q.    Okay.  And then you continued in your e-mail response,

12   "I want to ensure we reiterate this point.  There are

13   options they can explore to provide us flexibility, one of

14   them being decreasing their Airbus notification period."  Do

15   you see that?

16   A.    I do.

17   Q.    So you were suggesting that Spirit could instead try to

18   negotiate a shorter notification period with Airbus for

19   exercising its options; right?

20   A.    Just to be clear, the way that I manage our fleet

21   portfolio is flexibility.  We live in a dynamic environment

22   and so I don't want to have to make decisions prior to when

23   is necessary.  And so what I was saying, I was highlighting

24   that there's probably other levers that Spirit could explore

25   to give us more flexibility, one of them being an Airbus

1    notification period.  It was just a suggestion and I was

2    highlighting that I value flexibility and how can we help

3    them work through that.

4    Q.   And a shorter notification period would mean that

5    Spirit would not have to decide whether to exercise its

6    options prior to the deal closing; right?

7    A.   Yeah.  Well, a notification period is defined and

8    attached to the Airbus contract.  So depending on -- I mean,

9    the deal is not associated with that.  Right?  Like, it's an

10   Airbus contract with a notification period in it.

11           THE COURT:  But you're pointing out that in the --

12   at least in your experience, and I guess it's true with

13   JetBlue -- in your contracts with Airbus, the notification

14   period is set out?

15           THE WITNESS:  It is.

16           THE COURT:  And you're assuming, or maybe you

17   know, that in Spirit's contracts you're assuming that their

18   notification period is set out as a contractual requirement?

19           THE WITNESS:  From what I understand, yes, and

20   different airlines can have different notification periods.

21           THE COURT:  And you so testified.  Yes.  Go ahead.

22   Q.   And if -- without revealing the number, because this

23   is --

24           THE COURT:  Well, let's not horse around.  And

25   maybe I can ask counsel.  In your agreement with Airbus,

```
 1   when you say you agreed to treat it confidential, does that
 2   mean that I can't know it?
 3            MR. COHEN:  No, your Honor, you can know it.  It
 4   can't be publicly --
 5            THE COURT:  Well, then, it seems to me, and now I
 6   understand the relevance, that it can be conveyed to me.
 7   It's not disputed.  It need not be mentioned in open court,
 8   either by this witness or by counsel, but I will have the
 9   information.  And if that becomes crucial in my opinion,
10   then I'm going to have to wrestle with that issue.  So we'll
11   deal with it that way.
12            MS. MARKEL:  Thank you, your Honor.
13   Q.   And, Ms. Hurley, if you could just turn to the first
14   page of Exhibit 799, point number 3(b)(i), without -- oh,
15   it's QN.  It's that same document that we're looking at.
16   That accurately reflects the notification period for
17   Spirit's options; right?
18   A.   Sorry.  Could you clarify what you're referencing?
19   Q.   Sure.  It's the first page of this document that --
20   A.   Exhibit QN?
21   Q.   QN, correct.  And this is an e-mail actually from
22   Mr. Klinka to you?
23            THE COURT:  The data is in the -- if you look at
24   the first page in the subparagraph "I" there, what we're
25   skirting around is set forth there, and I will treat it as
```

```
 1    confidential unless I have further conference with the
 2    parties.  But we see that there.  You see it?
 3              THE WITNESS:  I do.
 4              THE COURT:  All right.  Go from there.
 5    Q.  And you understand that number to be Spirit's
 6    notification period with Airbus; right?
 7    A.  Correct.
 8    Q.  Okay, thank you.  And so at the time of this request,
 9    of the incremental aircraft request, JetBlue and Spirit were
10    supposed to be operating as independent airlines; right?
11    A.  Correct.
12              THE COURT:  Well, you say "supposed to be."  You
13    were, weren't you?
14              THE WITNESS:  We are.
15              THE COURT:  Yeah.
16    Q.  To be clear, has JetBlue provided consent to Spirit for
17    the incremental aircraft request?
18    A.  No, we did not.
19    Q.  And JetBlue communicated to Spirit that it was denying
20    the incremental aircraft request; right?
21    A.  There was no formal response back to Spirit.
22    Q.  Well, earlier you referenced the working team making a
23    communication to Spirit; right?
24    A.  At the working-team level, yes.  A formal response
25    would be from someone like our general counsel.  And there
```

1   was no formal response from our general counsel or myself

2   back to Spirit on this ask.  And we never heard about it

3   since.

4   Q.   Formal or informal, did JetBlue tell Spirit it was

5   denying the incremental aircraft request?

6   A.   At the working-team level, which is informal, the teams

7   communicated that we would most likely deny this request

8   because we didn't believe it was appropriate at this point

9   in time to be sourcing aircraft two and a half years out.

10  Q.   And did Mr. Klinka tell you in advance of his

11  communication with Spirit that he would be communicating to

12  Spirit that JetBlue was going to deny the request?

13  A.   The working teams work fluidly.  I don't recall there

14  being a specific point in time where Derek told me that he

15  was going to do that.  But from what I understand, and from

16  what I recall, that that did occur.  But, again, there was

17  no formal response back to Spirit.  And, again, Spirit never

18  brought it up again.

19  Q.   Mr. Klinka and Ms. Habachy have the authority to

20  consent to an IOC request; right?

21  A.   They do.

22  Q.   And after Mr. Klinka told you that he had communicated

23  JetBlue's -- had made that communication to JetBlue, you did

24  not take any steps to undo what he did; right?

25  A.   No.

1   Q.   So let's turn to Exhibit 425 in your binder.  And let's

2   actually just turn to JetBlue's disclosure schedule in

3   this -- well, actually, sorry.  Let me take a step back.

4        If you take a look at the first page of this e-mail

5   from Ms. Habachy, you're copied on it; right?

6   A.   Correct.

7   Q.   And if you look at the list of the attachments here, it

8   shows the first attachment is the merger agreement; right?

9   A.   Correct.

10  Q.   And the second attachment is called, "Exchange - Parent

11  Disclosure Schedule (Final Version.)" Right?

12  A.   Yes.

13  Q.   And that's a reference to JetBlue's disclosure schedule

14  to this deal; right?

15  A.   Correct.

16  Q.   Okay.  So why don't we just turn to section 5.1 of the

17  merger agreement, which is called, "Conduct of Business by

18  the Company Pending the Closing," and it begins at the page

19  ending in 7670.  And this is article 5 of the merger

20  agreement, and below that is a paragraph called 5.1.

21  Section 5.1 governs the IOC consent process that we've been

22  discussing; right?

23  A.   Correct.

24  Q.   And section 5.1 is pretty long, but I want to direct

25  your attention to the last paragraph which is on page 7676.

1   And so take a look at the first sentence of that last

2   paragraph beginning with, "Notwithstanding."  This

3   defines -- this has a defined term of "parent consent

4   persons." Right?

5   A.   Correct.

6   Q.   So the merger agreement specifies there are only

7   certain individuals at JetBlue who can provide consent for

8   an IOC request; right?

9   A.   Correct.

10  Q.   And those individuals are listed in section 5.1 of

11  JetBlue's disclosure schedule; right?

12  A.   Yes.

13  Q.   All right.  So now let's take a look at JetBlue's

14  disclosure schedule which begins at the page ending in the

15  Bates number 7745.  And once you're there, I'd like to

16  actually go to page 7749, which has section 5.1.  And this

17  version has been redacted at the request of defense counsel.

18  These are the parent consent persons that we were just

19  discussing; right?

20  A.   Correct.

21  Q.   You're listed there?

22  A.   I am.

23  Q.   And so is Mr. Nelson?

24  A.   Yes.

25  Q.   And Mr. Klinka is listed here too; right?

```
 1   A.   Correct.

 2   Q.   And so is Ms. Habachy?

 3   A.   Yes.

 4   Q.   And you describe Ms. Habachy and Mr. Klinka as being on

 5   the working-team level; right?

 6   A.   Correct.

 7   Q.   And so it's your understanding that Mr. Klinka and

 8   Ms. Habachy can consent on behalf of JetBlue to an IOC

 9   request; right?

10   A.   For this contract, yes.  But in reality what we do is

11   Brandon and I work with the working team to arrive at an

12   assessment of any IOC requests, and we collaboratively come

13   up with a plan as to how we're going to respond to Spirit.

14   So that's how it actually plays out.

15   Q.   And Mr. Klinka and Ms. Habachy are the ones who told

16   Spirit that JetBlue did not support adding incremental

17   aircraft into its fleet as of November 2022; right?

18           MR. SHORES:  Objection, mischaracterizes

19   testimony.

20           MS. MARKEL:  I can rephrase, your Honor.

21           THE COURT:  I'll take that as a willingness to do

22   so.  Go ahead.

23   Q.   Did Mr. Klinka and Ms. Habachy tell Spirit that JetBlue

24   did not support adding incremental aircraft into its fleet

25   plan as of November 2022?
```

```
 1  A.   So I believe they went back and communicated that we
 2  would most likely deny the IOC request to add aircraft.
 3            THE COURT:  And as I get your testimony, at that
 4  point the back-and-forth about that issue petered out?
 5            THE WITNESS:  Correct.
 6  Q.   Okay.  You can put this exhibit aside.
 7       I want to return to the topic of Spirit's options to
 8  acquire aircraft from Airbus.  And I'd like to first focus
 9  on July 2022.  That's when the merger agreement was
10  executed; right?
11  A.   Correct.
12  Q.   And as of July 2022, you were aware that Spirit had, I
13  would say, some number of Airbus options for aircraft to be
14  delivered in the first quarter of 2026; right?
15            MR. COHEN:  Your Honor, just to clarify, this is
16  the only second number that is subject to the
17  confidentiality issue.
18            THE COURT:  All right.  So now this is another
19  number.  And it is -- say again what you were asking about
20  before he spoke?
21            MS. MARKEL:  Of course.  I understand this is not
22  the only number that is subject to confidentiality issues.
23            THE COURT:  Well, all right.  But for this, what
24  is it?
25            MS. MARKEL:  Yes.  This is the number of Airbus
```

```
 1    options that Spirit had for aircraft to be delivered in the
 2    first quarter of 2026.
 3                THE COURT:  Understood.
 4                MS. MARKEL:  Okay.
 5    Q.   And so, Ms. Hurley, as of July 2022, you were aware
 6    that Spirit had a number of Airbus options for aircraft to
 7    be delivered in the first quarter of 2026; right?
 8    A.   Just -- can you clarify what type of aircraft you're
 9    talking about?
10    Q.   Well --
11                THE COURT:  Well, let's start from the general.  I
12    mean --
13                THE WITNESS:  I mean, I'm not sure if she's
14    talking about options or if you're talking about firm
15    aircraft.
16                THE COURT:  No, she's talking about -- the
17    question, anyway, was options.
18                THE WITNESS:  Okay.
19                THE COURT:  Options from Airbus.
20                THE WITNESS:  Yes.
21                THE COURT:  And you understood how many they had?
22                THE WITNESS:  I did.
23                THE COURT:  Go ahead, Ms. Markel.
24    Q.   And you also knew what Spirit's notification period was
25    for those options --
```

```
1                THE COURT:  Well, we've been over that.  She does.
2                MS. MARKEL:  Okay.
3     Q.   It was your understanding then that Spirit had to make
4     a decision whether to exercise those options by --
5                THE COURT:  A certain date.
6     Q.   -- a certain date; right?
7     A.   Correct.
8                THE COURT:  That's what the contract says.
9                MR. SHORES:  Your Honor, we're going over -- I'm
10    sorry.
11               THE COURT:  Yeah, we have been all over this.
12    Except now, now we -- the number of aircraft is confidential
13    and I'll respect that to the extent I can.
14               MS. MARKEL:  Okay.
15    Q.   So was it your view -- we previously discussed the 21
16    aircraft for 2025.  I'm now talking about 2026.  It was your
17    view that Spirit should not convert any of its options -- or
18    let me -- yeah.  Let me start over.  Did JetBlue communicate
19    to Spirit its view that Spirit should not convert any of its
20    options in advance of the notification date?
21               MR. SHORES:  Objection, asked and answered.
22               THE COURT:  No, overruled.  Overruled.  That's a
23    little different.
24    A.   So as part of the request that Spirit had in November
25    of 2022, there was the 21 aircraft in 2025, which were going
```

1    to be leases, and then the 2026 aircraft that they were

2    requesting, those could have been converting options to

3    firm.  At that point in time, from a contractual

4    perspective, we had time.  We didn't have to do that in

5    November of 2022.  So that is why specifically I said at

6    this point in time we don't have to do that.

7         I -- I, you know, I mentioned earlier, I manage our

8    fleet plan through the lens of flexibility.  And a lot can

9    change very, very quickly in our industry.  So specific to

10   those options in 2026, we had time to make that decision and

11   so we did not need to make that decision in November of

12   2022.

13   Q.   Okay.  And understanding that we're not saying the

14   notification date for those 2026 Q1 options, the

15   notification date has since passed; right?

16   A.   Well, to be totally frank, much of this discussion,

17   from my perspective, is moot.  What has happened since we

18   signed the merger agreement, and since November of 2022,

19   when Spirit was asking us for additional aircraft, Spirit on

20   their own has actually deferred aircraft.

21   Q.   Ms. Hurley, I will come back to that, but my question

22   was very simple:  Has the notification date for those

23   options passed?

24             MR. SHORES:  Objection, asked and answered.

25             THE COURT:  Sustained.  Sustained.

1              MS. MARKEL:  Okay.

2    Q.   So Spirit did not come back to JetBlue with another

3    request to convert options at the time of the notification

4    date; right?

5    A.   The next time that Spirit came back to JetBlue with an

6    aircraft request was, quite frankly, the deferral.  And as

7    part of the deferral that they did in August of 2023, they

8    shifted their options to the right.  So, again, we have more

9    time to make that decision because now the options have

10   moved further to the right.

11             THE COURT:  When you say "moved further to the

12   right," that means to the deferral state?

13             THE WITNESS:  Correct.

14             THE COURT:  All right.

15   Q.   So, Ms. Hurley, Spirit came to JetBlue with a request

16   for JetBlue's consent to amend its Airbus contract; right?

17   A.   Correct.

18   Q.   And at that point in time JetBlue consented to that

19   request; right?

20   A.   Correct.

21   Q.   And that was exactly the outcome that JetBlue had

22   wanted; right?

23   A.   At the end of the day, we want to make sure we're

24   purchasing a viable entity when this transaction financially

25   closes.  So if Spirit believed that they needed to defer

```
 1   aircraft in order to set themselves up financially, and from
 2   a viability perspective, logically, JetBlue was going to
 3   approve the request.
 4   Q.   And you had told Spirit that you had no interest in
 5   more aircraft back in July of 2022; right?
 6   A.   Correct.
 7   Q.   And you told your team to reiterate that position to
 8   Spirit in November 2022; right?
 9            MR. SHORES:  Objection, asked and answered.
10            THE COURT:  Yeah, sustained.  On that ground.  And
11   now that this is moot I'm not at all clear as to the
12   relevance of this.  I'm dealing with -- and I think it's
13   appropriate to say this -- I'm dealing with this not as a
14   historic event, but as the situation exists today and may
15   exist in the future.  That's enough to say.  Go ahead,
16   Ms. Markel.
17   Q.   Ms. Hurley, does Spirit have any options to acquire
18   aircraft from -- from Airbus for 2026 at this point in time?
19            MR. SHORES:  Your Honor, I'm going to object as
20   asked and answered.  We're going back over the same --
21            THE COURT:  No, if they do at this time.  She may
22   answer.
23   A.   Yes, Spirit has a firm order book with Airbus where
24   they'll be taking aircraft in the 2026 time frame.
25   Q.   I'm sorry.  What was that?
```

1    A.    Yes.   The answer is yes.

2            THE COURT:   They have a firm order book whereby

3    they will be taking aircraft in 2026.

4    Q.    My question was whether Spirit has any options to

5    acquire aircraft from Airbus for 2026?

6    A.    I believe that the options begin in 2027, if I'm not

7    mistaken.   Again, that was the deferral that just occurred.

8    So not only did Spirit defer firm aircraft, but they

9    deferred their option aircraft as well.

10   Q.    Ms. Hurley, if this deal goes through, JetBlue is

11   expecting that it will close by July 2024; right?

12   A.    That is our hope, yes.

13   Q.    And Spirit does not have -- well, my question is what

14   is the earliest -- this is hard to kind of dance around, but

15   what is the earliest notification date for Spirit as of this

16   time?

17           THE COURT:   Well, you can figure that.   She says

18   that they have options in -- to -- for aircraft in 2027.

19   You can count that back.

20           MS. MARKEL:   Okay.

21   Q.    So if this deal were to close, Ms. Hurley, by

22   July 2024, JetBlue would control all the options; right?

23   A.    Correct.

24   Q.    And JetBlue could decline to exercise all of Spirit's

25   options at that time; right?

1    A.   Just to be clear, an option is utilized throughout the

2    industry.  So JetBlue and Spirit aren't the only ones that

3    have aircraft options.  And they are just that.  So it

4    allows an airline to assess the economic backdrop and the

5    supply-and-demand dynamics at a point in time.  And we will

6    make the appropriate decision whether we want to add

7    incremental growth by converting that option to firm.

8    Q.   Okay.  And let's briefly discuss what was going on when

9    Spirit came to JetBlue for consent to amend its contract

10   with Airbus more recently.  By that point in time, you had

11   already been deposed in this case; right?

12   A.   Correct.

13   Q.   And you were questioned about the November 2022 IOC

14   request; right?

15   A.   Correct.

16   Q.   And you were aware that other witnesses were deposed on

17   that same issue; right?

18   A.   I'll take your word for it.

19   Q.   Okay.

20        MR. SHORES:  Your Honor, I'm going to object to

21   the relevance of this.  I mean, we've already established --

22        THE COURT:  Wait -- well, that objection is not

23   timely, but I am wondering why it's relevant.  Go ahead.

24        MS. MARKEL:  I can move on to the next topic.

25        THE COURT:  All right.

```
 1   Q.   I'd like to briefly discuss JetBlue's and Spirit's
 2   recent financials.  As the CFO of JetBlue, and in light of
 3   this deal, do you review Spirit's recent financial
 4   statements?
 5   A.   What's publicly available, yes.
 6   Q.   Okay.  Are you aware that Spirit had a net loss for
 7   this most recent quarter?
 8   A.   I am aware.
 9   Q.   And JetBlue also failed to make a profit for the most
10   recent quarter; right?
11   A.   Correct.
12   Q.   JetBlue actually had a net loss of over $150 million
13   for the third quarter of this year; right?
14   A.   Correct.
15   Q.   Are you aware that Spirit had a net loss the first
16   quarter of 2023?
17   A.   Yes.
18   Q.   And JetBlue did not make a profit in the first quarter
19   of 2023 either; right?
20   A.   Correct.
21   Q.   You had a net loss of about $192 million; right?
22   A.   Correct.
23   Q.   Are you aware that Spirit had a net loss for 2022?
24   A.   Yes.
25   Q.   JetBlue did not make a profit in 2022 either; right?
```

```
 1    A.    Correct.

 2    Q.    Net loss of about $362 million?

 3    A.    Yes.

 4    Q.    Are you aware that Spirit had a net loss for 2021?

 5    A.    Yes.

 6    Q.    JetBlue did not make a profit in 2021; right?

 7    A.    Correct.

 8    Q.    Had a net loss of about $182 million; right?

 9    A.    Yes.

10    Q.    JetBlue typically targets a mid to high single-digit

11    growth rate; right?

12    A.    Historically, yes.

13    Q.    And you're aware that Spirit has historically targeted

14    a mid-teens growth rate; right?

15    A.    Correct.

16    Q.    So Spirit's growth rate has historically been higher

17    than JetBlue's; right?

18    A.    Yes.

19    Q.    And JetBlue is expecting its capacity to decrease for

20    the first quarter of 2024 year-over-year; right?

21    A.    Correct.

22    Q.    And JetBlue is expecting that it will have much lower

23    growth profile for this upcoming year; right?

24    A.    Yes, given industry constraints.

25    Q.    And those industry constraints include the
```

```
1   Pratt & Whitney engine issues and aircraft delivery delays;
2   right?
3   A.   Correct.
4   Q.   And JetBlue is dealing with its own aircraft delivery
5   delays, right, from Airbus?
6   A.   Correct.
7   Q.   And you're aware that Spirit is too?
8   A.   Yes.
9   Q.   And both JetBlue and Spirit fly A321s; right?
10  A.   Correct.
11  Q.   And so both JetBlue and Spirit are affected by the
12  Pratt & Whitney GTF engine issues; right?
13  A.   Correct.
14  Q.   You're aware that some of Spirit's A321s will have to
15  be grounded this year due to Pratt & Whitney's GTF issues;
16  right?
17  A.   Correct.
18  Q.   And some of JetBlue's A321s will also have to be
19  grounded this year due to Pratt & Whitney GTF issues; right?
20  A.   Yes.
21  Q.   And that number of grounded aircraft will increase for
22  JetBlue next year; right?
23  A.   Correct.
24  Q.   And JetBlue is in discussion with Pratt & Whitney to
25  compensate JetBlue for the impact of the GTF engine issues;
```

1   right?

2   A.   Correct.

3   Q.   Are you aware that Spirit also expects to receive

4   compensation from Pratt & Whitney for the GTF engine issues?

5   A.   Pratt & Whitney has publicly said that they're going to

6   do right by their customers, so I could assume that Spirit

7   is having discussions as well.

8   Q.   So JetBlue still wants this deal to go through; right?

9   A.   Yes.

10  Q.   Even despite Spirit's Pratt & Whitney engine troubles;

11  right?

12          MR. SHORES:  Objection, asked and answered.

13  A.   Correct.

14          THE COURT:  Well, she answered it.

15  Q.   Well, JetBlue would be taking over those Spirit planes

16  with engine issues; right?

17  A.   Correct.

18  Q.   And how much debt does JetBlue have to take on to

19  finance this deal?

20  A.   So we're planning to raise approximately $3.5 billion

21  in debt to support the purchase of Spirit.

22  Q.   The merger agreement has a section on conditions to

23  closing; right?

24  A.   Correct.

25  Q.   One closing condition is that Spirit's business will

```
 1    not have had a material adverse effect; right?
 2    A.    Correct.
 3    Q.    As CFO, it's your business understanding that if
 4    Spirit's business has suffered a material adverse effect
 5    then JetBlue doesn't have to close the deal; right?
 6              MR. SHORES:  Objection, your Honor.  Relevance?
 7              THE COURT:  Why is that relevant?
 8              MS. MARKEL:  The defendants have put at issue
 9    Spirit's financial performances and --
10              THE COURT:  But you're trying to stop the deal.
11    If they don't want the deal, you could settle it.  That's
12    not for me to speak to.  I sustain the objection.
13    Q.    Well, despite Spirit's Pratt & Whitney engine issues,
14    has JetBlue notified Spirit that it believes there has been
15    a material adverse effect on Spirit's business?
16              MR. SHORES:  Objection, same --
17              THE COURT:  Has JetBlue notified Spirit.  I'll let
18    you have that.
19              MS. MARKEL:  Thank you.
20              THE COURT:  You're about through, I take it?
21              MS. MARKEL:  This is it.
22              MR. SHORES:  Your Honor --
23              THE COURT:  All right, this is it.  You may answer
24    that question.
25    A.    No, we have not.
```

```
 1              THE COURT:  Thank you.  Mr. Shores, do you wish to
 2  inquire?
 3              MR. SHORES:  I would like to inquire, your Honor.
 4  May I have a moment just to get organized?
 5              THE COURT:  Of course.
 6              MR. SHORES:  Thank you very much.
 7              May I proceed, your Honor?
 8              THE COURT:  You may.
 9                        CROSS-EXAMINATION
10  BY MR. SHORES:
11  Q.   Good afternoon, Ms. Hurley.
12  A.   Good afternoon.
13  Q.   Ms. Hurley, how long have you worked at JetBlue?
14  A.   Just over 19 years.
15  Q.   And has that been your entire career?
16  A.   My entire career, yes.
17  Q.   And you are currently the chief financial officer of
18  JetBlue; is that right?
19  A.   I am.
20  Q.   And what positions did you have before becoming chief
21  financial officer?
22  A.   I've moved around the finance organization a handful of
23  times: accounting, financial planning analysis, fleet,
24  treasury, procurement.
25  Q.   And you mentioned fleet.  How long have you been
```

1    involved in fleet issues for JetBlue?

2    A.   I've been leading the fleet team for probably over ten

3    years.

4    Q.   Ten years?

5    A.   Ten years.

6    Q.   Thank you.  Ms. Hurley, what role did you play in the

7    events leading up to the consummation of the JetBlue-Spirit

8    merger agreement in July of 2022?

9    A.   Yeah.  So I was a big supporter of the transaction and,

10   obviously, oversaw the financial analysis that occurred to

11   help justify the deal.  I also was a public face in engaging

12   with investors as well.

13   Q.   And as chief financial officer of JetBlue, were you in

14   favor of pursuing this deal?

15   A.   I was in favor.  I believe this is a transformational

16   opportunity for JetBlue to become a national competitor.

17   Q.   And, Ms. Hurley, I want to talk a little bit about the

18   managing of JetBlue's fleet.  So, in general, what

19   principles do you apply in the management of JetBlue's

20   fleet?

21   A.   So my team works hand in hand with the network team.

22   So we define, you know, the network opportunities that

23   exist, and we ensure that the fleet plan actually aligns and

24   can deliver on that network strategy.  We look through the

25   lens of flexibility as well.  You know, we live in an

1    ever-dynamic industry and sector and things can change on a

2    dime.  And so building in any flexibility to our fleet

3    planning is very beneficial.

4    Q.   Okay.  And are you familiar with the term "fleet

5    commonality"?

6    A.   I am.

7    Q.   And what does that mean?

8    A.   Yeah.  So fleet commonality is operating one fleet

9    type.  So today we fly the Airbus fleet as well as the E190.

10   We're retiring the E190, so we will have fleet commonality

11   once we retire the E190.

12   Q.   And "engine commonality," you're familiar with that

13   term?

14   A.   Correct.

15   Q.   And what is that?

16   A.   Yeah, operating the same type of engines.  I mean, when

17   you operate common engines or aircraft, there are

18   efficiencies that can be gained, whether it's procuring

19   parts, whether it's training.  And so there's a benefit, a

20   financial benefit and efficiency to engine and aircraft

21   commonality.

22   Q.   And did aircraft and engine commonality play any role

23   in your decision to pursue the Spirit transaction?

24   A.   It did.  It was very, very attractive that Spirit flies

25   in an all-Airbus fleet as well as operates the same

1    Pratt & Whitney engine type.

2    Q.   And what would be the outcome of this commonality for

3    you from a cost perspective?

4    A.   Yeah.  Again, efficiencies from a training, from a

5    safety perspective, from a procurement perspective.  These

6    are all cost efficiencies or benefits by having a single

7    fleet type.

8    Q.   Ms. Hurley, how many planes are in JetBlue's fleet

9    today?

10   A.   So as of today we have 296.

11   Q.   Okay.  And how does that fleet size compare to, say,

12   ten years ago?

13   A.   Yeah.  So ten years ago we probably had about 195

14   aircraft.

15   Q.   So you've roughly grown, if I'm doing the math

16   correctly, about ten planes per year.  Does that sound

17   right?

18   A.   Correct.

19   Q.   And without a transaction would JetBlue be able to

20   continue to grow its fleet?

21   A.   Yes, but not at scale.

22   Q.   And what do you mean by not at scale?

23   A.   Yeah, not in large quantities because there are

24   constraints in the industry in terms of getting your hands

25   on aircraft.  This is a transformational; overnight we have

1   access to 200 more aircraft.

2   Q.   And by the end of 2027, if there's no transaction,

3   approximately how many planes would you estimate would be in

4   JetBlue's fleet?

5   A.   No transaction, we'll probably have about 335

6   airplanes.

7   Q.   So roughly 40 more airplanes; is that about right?

8   A.   Yes.

9   Q.   And does that account for any delivery delay that may

10  occur in the industry?

11  A.   Correct.

12  Q.   Okay.  So you would anticipate receiving that number

13  including accounting for any delivery delay?

14  A.   Correct.

15  Q.   And what about retirements?  Does JetBlue have to

16  retire fleet?

17  A.   We do.

18  Q.   And why does JetBlue retire aircraft?

19  A.   Yeah, we retire aircraft because they get to an age

20  where it's more expensive to invest in them and operate

21  them.  And also there is next-generation technology in terms

22  of aircraft and engines that can provide a company cost

23  efficiencies, fuel savings.  And so those are two of the

24  main reasons that we retire aircraft.

25  Q.   And, Ms. Hurley, if this transaction was allowed to

1  close next year, how many planes would be in JetBlue's

2  fleet?

3  A.    Yeah.  So overnight we go to 500 aircraft.

4  Q.    Okay.  And if this transaction, again, was allowed to

5  proceed, how many planes would be in JetBlue's aircraft --

6  I'm sorry, JetBlue's fleet by the end of 2027?

7  A.    We'll have just over 600 aircraft.

8  Q.    Okay.  And you mentioned that there are options built

9  in to the transaction that you'd also receive; is that

10  right?

11  A.    Correct.

12  Q.    Do you have approximately how many options would

13  JetBlue obtain as a part of this transaction?  And I mean

14  collectively between JetBlue and Spirit?

15  A.    Sure.  It's between 60 and 70 aircraft.

16  Q.    And you were asked some questions about exercising

17  options.  Have you made any decisions about exercising those

18  options today?

19  A.    We have not because we still have time to make that

20  decision.

21  Q.    And why is that important, Ms. Hurley?

22  A.    Well, I think that's really important because, as I

23  mentioned earlier, I value fleet flexibility.  And we will

24  wait until the contractual time frame that we have to make

25  that decision and assess the market opportunities at that

1    point in time.

2    Q.   And, to your knowledge, sitting here today, has JetBlue

3    ever not exercised an option?

4    A.   I don't recall not exercising options.

5    Q.   Other than planes, what other assets is JetBlue

6    acquiring as part of this transaction?

7    A.   Yeah.  We're looking forward to also acquiring Spirit's

8    team members.  Specifically, their pilots will be very

9    beneficial to continue to operate their 200 aircraft that we

10   will take on overnight.  Also, the infrastructure across the

11   country, and having more gates and slots at airports that

12   JetBlue isn't at today or that we don't have scale at today.

13   Q.   All right.  And, Ms. Hurley, after this transaction, do

14   you have an understanding of what JetBlue's fleet size will

15   be compared to your big four competitors, if you understand

16   what I mean by that term?

17   A.   We do.  So just to put it in reference, of the top four

18   largest carriers, the smallest one has just over 800

19   aircraft.

20              THE COURT:  And that would be Southwest?

21              THE WITNESS:  That would be Southwest.

22   A.   And then the others in that category have over a

23   thousand aircraft.

24   Q.   And do you have an understanding of whether those other

25   in the big four, are they growing as well?

A.   They are growing.  So many of them have actually placed

recent orders.  So Southwest actually came out in October

and placed a 100-aircraft order.  United is taking 800

airplanes over the next nine years.  Delta, last July,

actually placed an order for 100 aircraft.  So they are all

going to continue to grow.

Q.   And from a CFO perspective, Ms. Hurley, how is

JetBlue's growth achieved from this merger going to impact

the business for JetBlue?

A.   Yeah.  It gives us scalability.  Right?  It allows us

to be a national competitor against these four carriers, and

it closes the gap overnight in terms of size.  We're still

going to be small.  Right?  But it allows us a platform

where we can better compete over time.

Q.   And you mentioned volatility in the industry several

times.  How does growth for JetBlue impact that volatile

environment that you've discussed?

A.   Yeah, the larger you are, the better you can navigate

through impacts to the business and volatility.  Right?  The

more opportunity you have in size and scale, you can weather

shocks to the system better than we can today because we are

of a smaller scale.

Q.   And is the airline industry one that's experienced

shocks?

A.   Yes.  Very much so.  You think of 9/11, you think of

```
 1   COVID.  Just the overarching oil environment.  Those are
 2   the -- those are some of the volatility aspects that we have
 3   to deal with.
 4        I'll use New York as a good example.  50 percent of
 5   JetBlue's network today is exposed to New York, and we
 6   severely were impacted by the weather and air traffic
 7   control constraints this summer, which was one of the big
 8   reasons we didn't actually make money in the third quarter.
 9   And so diversifying our network and our geography can better
10   set JetBlue up to compete and weather any shocks to the
11   system.
12   Q.   Okay.  And I'm going to come back to the third quarter,
13   which the government's counsel also raised.  What about from
14   a consumer perspective?  How do you view JetBlue's growth
15   impacting consumers?
16   A.   Yeah, I mean, we want to bring more JetBlue to more
17   consumers across the country.  I mean, we pride ourselves on
18   offering an enhanced customer service and product at a
19   competitive fare.  And we've shown very effectively that we
20   can do that against the legacies.
21   Q.   Ms. Hurley, I want to turn to those third quarter
22   results that the government's counsel asked you about.  So
23   did JetBlue make money in the third quarter of 2023?
24   A.   We did not.
25   Q.   And did you study the performance of other carriers in
```

1    the industry?

2    A.   We did.

3    Q.   Okay.  And was JetBlue alone in not making money?

4    A.   No.

5    Q.   Did anybody make money?

6    A.   There were others that made money.  Most of the

7    legacies made money.  I mean, you look at United and Delta

8    and they produced a pretax profit of over $1.5 billion in

9    the third quarter.

10   Q.   1.5 billion?

11   A.   Yes.

12   Q.   Okay.  And do you have an understanding of how these

13   legacy carriers were able to make $1.5 billion while JetBlue

14   lost money in the third quarter of 2023?

15           MS. MARKEL:  Objection, foundation.

16           THE COURT:  Well, I think she's sufficiently

17   qualified to give us her view.

18           I understand American is not doing all that well.

19   So you class them as one of those legacy carriers.  But your

20   testimony is United and Delta made this $1.5 billion,

21   American not so much.  Is that right?

22           THE WITNESS:  That's right.  They didn't do as

23   well as United and Delta in the third quarter.  Southwest

24   did make money in the third quarter.

25           THE COURT:  And now, Mr. Shores, put your question

1    again.

2            MR. SHORES:  Will do, your Honor.

3    Q.   Do you have an understanding of how United and Delta

4    were able to make over $1.5 billion in income while JetBlue

5    lost money?

6    A.   Yeah.  The legacies, in general, have diversified

7    networks and they're very good at attracting very different

8    types of customers based on their product offering.  They,

9    because of the breadth of their networks, they can

10   capitalize on certain regions in terms of customer and

11   demand outperforming, versus others.  And they also have

12   really, really strong loyalty programs which generate a

13   meaningful amount of cash for those airlines.

14          So at a high level they have scale, they have size,

15   they have customer diversification, and then they have these

16   ancillary-type programs that deliver for them.

17   Q.   And what about from a cost perspective?  What is -- do

18   you have an understanding from a cost perspective how

19   they've been able to achieve these results consistent with

20   the cost basis that they have?

21   A.   Yeah.  Listen, just because of the size and scale that

22   they have, their cost structures, they are good.  They have

23   negotiating power with business partners.  Right?  And they

24   can spread their costs, just given their size and scale, on

25   a unit-cost basis.  So they have the ability to scale better

1    than some of us smaller airlines.

2    Q.   And how do these Q3 results impact your view of this

3    transaction with Spirit?

4    A.   Yeah.  I viewed the Spirit transaction as a way for us

5    to better compete against these four carriers.  I think it

6    highlights exactly the benefits that we need.  We need size,

7    we need scale, we need diversification of geographies, we

8    need to be able to grow, continue to grow a very efficient

9    cost base so that we can maintain that benefit against the

10   legacies.  So this transaction is even more prevalent and

11   prominent and really, really important to JetBlue.

12   Q.   You mentioned loyalty programs.  Can you give us a

13   sense, Ms. Hurley, how those programs have impacted

14   competition in 2023?

15   A.   Yeah.  Airline loyalty programs generate a lot of -- a

16   meaningful amount of cash for airlines.  And loyalty-program

17   growth is really driven by customer relevance, right, and

18   the credit card programs that we, us airlines, have.  And

19   you can only become more relevant to customers the more you

20   fly and the more diversification you have to drive customers

21   into these programs.  So it's a huge cash generation for

22   airlines.

23   Q.   And for the loyalty programs, is there cash generated

24   from credit cards that are associated with those?

25   A.   Correct.  The credit card programs are the most

```
 1    meaningful part of loyalty programs.
 2    Q.   And do you track the amount of money that your
 3    competitors make from these programs?
 4    A.   We do.
 5              THE COURT:  How?  How do you do that?
 6              THE WITNESS:  Many of us are very public about how
 7    well our loyalty programs are actually performing.
 8              THE COURT:  So you look at their announced --
 9              THE WITNESS:  Correct.  Correct.
10              THE COURT:  Excuse me, Mr. Shores.
11              MR. SHORES:  Of course, your Honor.
12    Q.   And, Ms. Hurley, do you have an understanding of
13    Delta's revenues from their loyalty program?
14    A.   So Delta just, in their earnings release a few weeks
15    ago, said that they're on track to deliver $7 billion this
16    year through their loyalty program.
17    Q.   And how does that compare to JetBlue?
18    A.   So that compares to JetBlue, we are on track to
19    generate close to a billion dollars this year.
20    Q.   And revenues from loyalty programs, are they used to
21    cross-subsidize the business of flying?
22    A.   They are.  They're such cash generators that we
23    continue -- we would continue to invest in the customer
24    experience.  I'll give you a good example.  Legacies, they
25    actually have a lot of lounges throughout their networks,
```

```
 1    right, that are for loyalty-type customers.  Someone like
 2    JetBlue, we do not yet have a lounge because our loyalty
 3    program hasn't gotten to the size and scale that we think it
 4    can, especially through the light of this transaction.
 5    Q.   And, Ms. Hurley, could you just describe JetBlue's
 6    loyalty program for the Court?
 7    A.   Sure.  So our loyalty program, we reward people even to
 8    spend very little.  I know that sounds funny, but our
 9    tiering system is all about the dollars that people spend in
10    the JetBlue ecosystem, whether it's on a flight, whether
11    it's buying their groceries on our credit card, or whether
12    it's buying hotels and rental cars through JetBlue.
13         So we create these tiers, and you can accumulate what
14    are called tiles.  And you can then use those tiles to
15    actually purchase perks.  So whether it's getting a free
16    beer or wine on your flight, or whether it's boarding early,
17    or whether it's getting upgraded to our business-class
18    product.  So we value customers spending any dollar with
19    JetBlue and we reward them for that.
20    Q.   And how would you compare JetBlue's program to, say,
21    the legacy program?
22    A.   Yeah.  We reward people more quickly, and we want them
23    to continue to spend within the JetBlue ecosystem.
24    Q.   And do you aim to take customers from legacy carriers'
25    loyalty programs?
```

1    A.    Of course.

2    Q.    And does that happen?

3    A.    It does happen.  We actually, recently there was one of

4    the legacy airlines who made changes to their loyalty

5    program that was not well-received by their current

6    loyalists.  And so we actually took the opportunity to see

7    if we could convert some of those legacy airline loyalists

8    over to JetBlue, and we were actually pretty successful in

9    doing so.  And, again, that's because we reward people more

10   quickly.

11   Q.    And what was the reaction of the legacy airline in that

12   instance, Ms. Hurley?

13   A.    They actually rolled back some of the changes that they

14   had actually made to their loyalty program.

15             THE COURT:  Who are we talking about?

16             THE WITNESS:  Delta.

17             THE COURT:  Thank you.

18   Q.    Ms. Hurley, would JetBlue be able to expand its loyalty

19   program if this transaction were approved?

20   A.    Yeah.  Again, I mentioned earlier, loyalty is all about

21   relevance and how do you become more relevant to more

22   customers.  And so us gaining access to more aircraft so

23   that we can fly to more cities and serve more customers is

24   naturally an opportunity for us to continue to grow our

25   loyalty program.

1    Q.   What do you think the impact on consumers would be if

2    you're able to do that, Ms. Hurley?

3    A.   Exceptionally positive.  I mean, we've shown

4    historically, right, through the JetBlue Effect that we

5    bring consumer benefit across the board when we enter

6    markets and go head-to-head against these legacy airlines.

7    Q.   Thank you, Ms. Hurley.  I'm going to change topics.

8    You were asked by the government's counsel about debt that

9    JetBlue is taking on in order to finance this transaction.

10   Do you recall that testimony?

11   A.   I do.

12   Q.   Okay.  Just as a background matter, can you describe

13   your philosophy to managing JetBlue from a financial

14   perspective?

15   A.   Sure.  So we have historically managed our debt level

16   and our liquidity level very conservatively.  So heading

17   into COVID we had the second strongest balance sheet in the

18   industry.  And so that allowed us to navigate through COVID

19   successfully.  And, quite frankly, the strength of our

20   balance sheet is what is putting us in a position here today

21   to be purchasing Spirit.

22   Q.   Okay.  And I'd like to take a look at a document.  It's

23   the document that's in evidence as 649.  And it's in your

24   binder, Ms. Hurley.  Let's see what tab it is.  I apologize.

25   It's the third tab in your binder.

```
 1              (On screen.)
 2   Q.    Do you recognize this document, Ms. Hurley?
 3   A.    I do.
 4   Q.    And what is this document?
 5   A.    This is the presentation that we made on October 31st
 6   as part of our earnings release.
 7   Q.    Okay.  And could you turn with me to slide 11, which
 8   has the Bates number ending in 1606?
 9   A.    Yes.
10   Q.    And on the right-hand side there's a bullet that says,
11   "Balance sheet remains among the strongest in the industry."
12   Do you see that, Ms. Hurley?
13   A.    Yes.
14   Q.    What does that mean?
15   A.    That means that we have a healthy mix of cash and debt
16   and assets that don't have any financing on them.
17   Q.    And if you look to the left, there's a chart and it
18   says, "Adjusted Debt to Capital."  Do you see that,
19   Ms. Hurley?
20   A.    Yes.
21   Q.    And what does "Adjusted Debt to Capital" mean?
22   A.    It's essentially the amount of debt that you put on
23   your books to support, quite frankly, buying airplanes.
24   Right?  So 50 percent, roughly, of our asset base has
25   financing on it.
```

1    Q.    How does your debt-to-cap ratio, as reflected in this
2    chart, compare to the industry as a whole?
3    A.    We are third in line.
4    Q.    And after -- third in line, Ms. Hurley?
5    A.    Just to be clear, it's good to be on the left side of
6    this chart.  So we actually were at 56 percent, and Alaska
7    and Southwest are to the left of us.
8    Q.    And you'll have to take on additional debt as part of
9    this transaction, is that right, Ms. Hurley?  That was your
10   testimony?
11   A.    We will.
12   Q.    And what will that do to your debt-to-cap ratio?
13   A.    Yeah, that will move us up towards the legacy level in
14   terms of percentage of debt to cap.
15   Q.    And did you support taking on additional debt as part
16   of this transaction?
17   A.    I did.
18   Q.    And why is that?
19   A.    Because this is a generational opportunity to transform
20   JetBlue, and JetBlue's future.  So I'm a big believer that
21   the short-term risk of increasing the amount of debt on your
22   balance sheet is going to be worth it in the long run.
23   Q.    And was there a risk of not acting on this transaction,
24   Ms. Hurley?
25   A.    Yes.  I mean, these merger and acquisition

1   opportunities don't come around very often.  And this is an

2   opportunity for us to significantly grow overnight and

3   become a larger competitor.  So there was actually probably

4   more risk in not progressing with this acquisition.

5   Q.   And does the board of directors have a committee that

6   oversees finance issues, Ms. Hurley?

7   A.   We do.

8   Q.   And can you just describe that committee to us?

9   A.   So a subset of the board is called our finance

10  committee, and we have five members of the board that sit on

11  that committee.

12  Q.   And do those members have mergers and acquisitions

13  experience?

14  A.   They do.

15  Q.   And do they have finance experience?

16  A.   They do.

17  Q.   And did they support taking on this additional debt as

18  part of this transaction?

19  A.   Yes.

20  Q.   And, Ms. Hurley, does JetBlue have a plan to decrease

21  that debt over time?

22  A.   Of course, yes.  I mean, this is a moment in time where

23  we're going to increase our debt, and when we bring these

24  two companies together, the profitability or the money that

25  the combined company makes is going to generate cash and

```
 1   that will allow us, over a period of time, to start paying
 2   down this debt.
 3   Q.   And does part of the strategy for paying down that debt
 4   concern management of costs?
 5   A.   That is one of the levers, yes.
 6   Q.   Okay.  And JetBlue, apart from this transaction, can
 7   you describe its cost-management strategy?
 8   A.   Yeah.  So the JetBlue business model was essentially
 9   built around having a lower cost structure than the
10   legacies.  That allows us to go into markets and effectively
11   compete and keep more money in our pockets.  So we have a
12   history of putting in place what we call structural cost
13   programs, which identify initiatives throughout the
14   organization to gain scale and efficiency to take costs out
15   of the business.
16   Q.   And can you provide us an example of one of those cost
17   programs?
18   A.   Sure.  We're actually in one right now.  So we've
19   committed to the market that we would take out $150- to
20   $200 million in run rate savings by the end of next year.
21   To date here in 2023 we will have achieved $70 million of
22   that.
23   Q.   And is that the first time JetBlue's done a cost,
24   structural cost program?
25   A.   No.  We have a history of doing these.  We actually had
```

1   a $300 million structural cost program that was set to wrap

2   up at the end of 2020.  We were on track to exceed that, and

3   then obviously COVID hit the industry.

4   Q.   Okay.  And do you expect to save costs as a result of

5   combining with Spirit in the long run?

6   A.   Of course.  I mean, we're going to have a larger cost

7   base, and there's definitely efficiencies that can be gained

8   by bringing these two companies together.

9   Q.   Okay.  And how much in cost savings have you identified

10  to date, if you recall, through the transaction?

11  A.   So thus far at a high level we've identified

12  $325 million.

13  Q.   And do you expect to achieve more cost savings than

14  that in the long run?

15  A.   I do.  This was a very high-level analysis with a

16  limited amount of information at this time.  And once we

17  actually purchase Spirit, we'll be able to go through the

18  nth level of detail in terms of how and where they spend

19  their money and identify opportunities.

20  Q.   Okay.  And are you familiar with the term "cost

21  dyssynergies"?

22  A.   Yes.

23  Q.   And what are those?

24  A.   Well, naturally, we're buying an ultra low-cost

25  carrier.  So the largest dyssynergy that we have is bringing

1    Spirit labor rates up to JetBlue labor rates.  So that is a

2    dyssynergy that we will see in this specific transaction.

3    Q.    Okay.  And has that dyssynergy changed over time?

4    A.    It has.

5    Q.    And how has it changed?

6    A.    It -- what has happened in the industry is that pay

7    rates have started to converge, specifically with our pilot

8    groups.  And so because our pilot rates are now closer to

9    Spirit's than they were when we entered the transaction last

10   July, that dyssynergy number has come down.

11   Q.    Thank you, Ms. Hurley.  And from a cost perspective,

12   you maintain a cost gap relative to the legacy airlines; is

13   that right?

14   A.    We do.

15   Q.    And are you confident after this transaction you'll be

16   able to maintain that cost gap relative to the legacy

17   airlines?

18   A.    I do.  I do believe that we can do that.  I actually

19   spoke to that on an earnings call last year.  There are

20   efficiencies that can be gained bringing these two companies

21   together and, again, the JetBlue business model is built

22   around having a lower cost structure than the legacies so

23   that we can enter these markets and be competitive from a

24   fare perspective.

25   Q.    All right.  Ms. Hurley, I want to change topics and

1   talk about interim operating covenants.  And just at a

2   high-level background, can you explain, what is an interim

3   operating covenant?

4   A.   And interim operating covenant is essentially a

5   parameter -- predefined parameters whereby which we expected

6   Spirit to operate in as we -- between the time frame of

7   merger-agreement execution and financial close.

8   Q.   Okay.  And what is the purpose of an interim operating

9   covenant?

10  A.   Yeah.  At the end of the day we're spending

11  $3.8 billion to purchase Spirit, and we want to ensure that

12  when we actually financially close, the entity that we're

13  purchasing is still what we thought when we executed the

14  merger agreement.

15  Q.   Okay.  So if we could go back to Exhibit 425, which I

16  believe the government showed you.  And if we could go to

17  the Bates number ending in 7670.

18              (On screen.)

19              THE COURT:  425?

20              THE WITNESS:  It's in the last binder.

21              MR. SHORES:  It's in the government's binder, your

22  Honor.

23              THE COURT:  All right.  Fine.  Thank you.

24              MR. SHORES:  Sure.

25  A.   Can you repeat the Bates again, please?

1    Q.   Sure.   The Bates number ends in 7670.

2         Now, Ms. Hurley, under 5.1, I want to look at the

3    language starting midway down that says, "The company will

4    conduct its operations in the ordinary course of business

5    and use commercially reasonable efforts to preserve

6    substantially intact its business organization."  And then

7    there's some other pieces behind that.  What is your

8    understanding of the purpose of this provision in the

9    interim operating covenants?

10        MS. MARKEL:  Objection, calls for a legal

11   conclusion.

12        THE COURT:  Well, he's just asked for her

13   understanding.  She may give her understanding.

14   A.   My understanding is that, again, we just wanted to make

15   sure that Spirit continued to operate through the lens that

16   they historically had so that we end up with an entity that

17   we expect at financial close.

18   Q.   Okay.  And let's take a look at the next page, if we

19   could, Ms. Hurley, which is the Bates number ending in 7671.

20   And, Ms. Hurley, I want to focus on the language that says,

21   "The company will not, between the date of this agreement

22   and the effective time, directly or indirectly, do or agree

23   to do or permit any other member of the company group to do

24   any of the following without the prior written consent of

25   the parent."  Do you see that language?

A.    Yes.

Q.    And then there are some provisions following that as well.  What is your understanding of this provision?

A.    Yeah, if Spirit wanted to do any of these items they would have to come to JetBlue for consent.

Q.    And why was that important to set out certain items that Spirit would need to come to JetBlue's consent for between the time of signing the agreement and closing?

A.    Yeah.  These items, if you look at them, they're material changes.  They could be material changes to the way that Spirit was operating.  And, again, we wanted to ensure that the entity that we purchased, or executed the merger agreement in July of '22, was the same entity when we hit financial close.

Q.    Right.  So in this language Spirit, as the company, would have to come to the parent, JetBlue, for consent related to these matters; right?

A.    Correct.

Q.    Okay.  And let's just take a look at a couple of them so we can put this in context.  So on 7671, little A says, "Amend the company charter or company bylaws."  Do you see that?

A.    Correct.

Q.    Why would Spirit need to come to JetBlue if they wanted to take this action, Ms. Hurley?

```
 1   A.   I mean, clearly, if they wanted to amend their bylaws
 2   or charter to head in a different direction we would want to
 3   be able to consent or deny that.  That could materially
 4   impact the deal.
 5   Q.   And let's look at another one.  Let's look at section H
 6   on 7672.  It says, "Enter into any new line of business."
 7   Why would Spirit need to come to JetBlue for that type of
 8   action?
 9   A.   Yeah.  At the end of the day, what we're purchasing is
10   an airline.  If Spirit decides to enter another line of
11   business we would obviously want to be able to consent or
12   deny.
13   Q.   Okay.  And then let's look at paragraph section W, if
14   we could.  That's on the Bates ending in 7675.  And this
15   refers to, "Acquire lease or exercise any option to acquire
16   or lease any aircraft."  Do you see that, Ms. Hurley?
17   A.   Correct.
18   Q.   And why did JetBlue negotiate for a consent right
19   related to the acquisition or leasing of additional
20   aircraft?
21   A.   It's an expensive asset that costs tens of millions of
22   dollars.  And so if they were going to go out and acquire
23   aircraft, we wanted to be able to consent or deny.
24        THE COURT:  This is a good place to stop because I
25   need to -- and you may step down, ma'am.
```

```
 1              (Whereupon the witness stepped down.)

 2              THE COURT:  I need to do a little management here.

 3     And it's this.  You've seen me just a moment ago, when we

 4     went back to the government's binder, fumble with the

 5     binders.  So really this is a request or a direction.  We've

 6     got battalions of binder people here.  So now what I want by

 7     Monday, I want a binder or binders giving me all the

 8     exhibits from number 1 through whatever we're up to today,

 9     and we can add to it as we go along.  I want no more than

10     two copies of that.  And I intend to sit here with the

11     exhibits on the bench.  And it's not necessary to put

12     numbered exhibits in the binders that you've already given

13     me because I want to be working with a single binder that

14     I'm going to be working with, and the law clerk as well,

15     soon.  So I want such a binder by Monday.  And it will be

16     helpful if an exhibit has been marked for identification, if

17     the identification letters are described as well.  But

18     that's all.  In other words, if 645 was BUY, I just want

19     Exhibit 645/BUY.

20              And I thank you in advance.  The way you've

21     presented this, and I've said it before, is very helpful to

22     the Court and I'm appreciative of it.

23              The second thing, Mr. Duffy, are you going to rest

24     next week?

25              MR. DUFFY:  Yes, I think so, your Honor.  The only
```

```
 1   caveat, we don't know exactly how long the crosses are going

 2   to take, but I believe so.

 3            THE COURT:  I understand.  And that makes sense.

 4            All right.  At present, total elapsed time out of

 5   the ten days available to each side, government has used up

 6   six days, one hour, thirty minutes.  The defense has used up

 7   four days, one hour, twenty minutes.

 8            We'll recess until 9:00 a.m. tomorrow morning.

 9   We'll stand in recess.

10            THE CLERK:  All rise.

11

12            (Proceedings adjourned.)

13

14

15

16

17

18                         * * * * * *

19

20

21

22

23

24

25
```

C E R T I F I C A T E


        I, Cheryl B. Palanchian, Court Reporter

for the United States District Court for the

District of Massachusetts, do hereby certify that

the foregoing pages are a true and accurate

transcription of my shorthand notes taken in the

aforementioned matter to the best of my skill and

ability.




            /s/ Cheryl B. Palanchian 11/16/2023
                 CHERYL B. PALANCHIAN

              Registered Merit Reporter
              Certified Realtime Reporter