```
 1              THE UNITED STATES DISTRICT COURT

 2                DISTRICT OF MASSACHUSETTS (Boston)

 3                              No. 1:23-cv-10511-WGY
                               Vol 1, Pages 1 - 81
 4

 5

 6   UNITED STATES OF AMERICA, et al,
               Plaintiffs
 7

 8   vs.

 9

10   JETBLUE AIRWAYS CORPORATION, et al,
               Defendants
11

12                        * * * * * * * * *

13

14                    For Bench Trial Before:
                      Judge William G. Young
15

16

17                    United States District Court
                      District of Massachusetts (Boston)
18                    One Courthouse Way
                      Boston, Massachusetts 02210
19                    Friday, November 17, 2023

20                        * * * * * * * *

21

22             REPORTER: RICHARD H. ROMANOW, RPR
                      Official Court Reporter
23                    United States District Court
             One Courthouse Way, Room 5510, Boston, MA 02210
24                         rhrbulldog@aol.com

25
```

```
 1                    A P P E A R A N C E S

 2

 3   EDWARD WILLIAM DUFFY, ESQ.
     ARIANNA MARKEL, ESQ.
 4   AARON TEITELBAUM, ESQ.
         DOJ-Atr
 5       450 Fifth Street NW, Suite 8000
         Washington, DC 20530
 6       (202) 812-4723
         Email: Edward.duffy@usdoj.gov
 7   and
      WILLIAM T. MATLACK, ESQ.
 8       Attorney General's Office
         One Ashburton Place, 18th Floor
 9       Boston, MA 02108
         (617) 727-2200
10       Email: William.matlack@mass.gov
         For Plaintiffs United States of America and
11       The Commonwealth of Massachusetts

12

13   RYAN SHORES, ESQ.
         Cleary Gottlieb Steen & Hamilton LLP
14       2112 Pennsylvania Avenue, NW
         Washington, DC 20037
15       (202) 974-1876
         Email: Rshores@cgsh.com
16   and
      ELIZABETH M. WRIGHT, ESQ.
17       Cooley LLP
         500 Boylston Street
18       Boston, MA 02116-3736
         (617) 937-2349
19       Email: Ewright@cooley.com
     and
20    RACHEL MOSSMAN ZIEMINSKI, ESQ.
      MICHAEL MITCHELL, ESQ.
21       Shearman & Sterling LLP
         2601 Olive Street, 17th Floor
22       Dallas, TX 75201
         Email: Rachel.zieminski@shearman.com
23       For Defendant JetBlue Airways Corporation

24

25       (Continued.)
```

1        (Continued.)

2

3     JAY COHEN, ESQ.
      ANDREW C. FINCH, ESQ.
4         Paul, Weiss, Rifkind, Wharton & Garrison
          1285 Avenue of the Americas
5         New York, NY 10019-6064
          (212) 373-3000
6         Email: Jaycohen@paulweiss.com
          For Defendant Spirit Airlines, Inc.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                        I N D E X

 2

 3   WITNESS                  DIRECT  CROSS  REDIRECT  RECROSS

 4

 5   URSULA HURLEY (Continued.)

 6      By Ms. Markel:                        15

 7      By Mr. Shores:               5

 8

 9   DEREK KLINKA

10      By Ms. Baldwin:       25

11      By Ms. Siddiky:               39

12

13   DR. GAUTAM GOWRISANKARAN

14      By Mr. Battaglia:     40

15      By Mr. Culley:

16

17                     E X H I B I T S

18

19         EXHIBIT 800 ........................  11

20         EXHIBIT 801 ........................  38

21

22

23

24

25
```

```
 1          P R O C E E D I N G S
 2          (Begins, 9:00 a.m.)
 3          THE COURT:  Good morning, I'll address these
 4     questions about the binder here in writing.  We're all
 5     ready to go.
 6          And if you would remind the witness.
 7          THE CLERK:  I'd like to remind you that you're
 8     still under oath.
 9          Do you understand?
10          THE WITNESS:  Yes.
11          MR. SHORES:  May I proceed, your Honor?
12          THE COURT:  Yes, Mr. Shores, you may.
13
14     CROSS-EXAMINATION BY MR. SHORES:  (Continued.)
15     Q.  Good morning, Ms. Hurley.
16     A.  Good morning.
17     Q.  Ms. Hurley, if we could go back to Exhibit 425 in
18     the binder that was given to you by the government.
19     A.  (Turns.)
20     Q.  And specifically I want to turn to Bates ending in
21     7625.
22     A.  (Turns.)
23     Q.  I'm sorry.  I apologize.  It's 7676.
24     A.  (Turns.)
25     Q.  Are you there, Ms. Hurley?
```

1    A.   I am.

2    Q.   Okay.  And the government asked you a couple of

3    process questions about IOC requests, and I'm going to

4    follow up on a piece of the language they didn't ask you

5    about.  So let's start at the top where it says

6    "Notwithstanding anything to the contrary" in Section

7    8.3.

8         Do you see that language?

9    A.   Yes.

10   Q.   Okay.  It says "The company shall send, by e-mail

11   indicating that such e-mail is high priority, any

12   request for consent to take an action for which the

13   consent of parent is required under Section 5.1."  Do

14   you see that?

15   A.   Yes.

16   Q.   And we discussed yesterday that the "company" is

17   Spirit?

18   A.   Correct.

19   Q.   And the "parent" is JetBlue?

20   A.   Yes.

21   Q.   So an IOC request requires Spirit to send JetBlue an

22   e-mail in writing making an IOC request, is that right?

23   A.   Correct.

24   Q.   Okay.  Now let's go to the bottom of the e-mail

25   there's a line that starts "Parents shall provide."  Do

1    you see that?

2    A.  Yes.

3    Q.  And it says, "Parents shall provide a response to an

4    IOC request," and then there's a parenthesis, "(by

5    replying to the initial e-mail sending such IOC

6    request), no later than 72 hours following receipt of

7    such IOC request by the parent consent person."  And

8    then there's a parenthesis that says "(the response

9    deadline)."

10        Do you see that, Ms. Hurley?

11   A.  I do.

12   Q.  Okay.  So do you understand this to require that

13   JetBlue provide a response, either affirming or denying,

14   in writing within 72 hours of receiving the request?

15   A.  Yes.

16   Q.  Okay.  And let's look at the next sentence.  It says

17   "In the event that no parent consent person shall have

18   responded to an IOC request prior to the applicable

19   response deadline," and that's 72 hours, right,

20   Ms. Hurley?

21   A.  Correct.

22   Q.  "Parents shall be deemed to have consented solely to

23   the actions specified in such IOC request."  Do you see

24   that?

25   A.  Yes.

1    Q.  So if JetBlue does not respond in writing, affirming

2    or denying within 72 hours, the request is being

3    consented to.

4         Is that your understanding?

5    A.  Correct.

6    Q.  Ms. Hurley, did anyone from JetBlue send a response

7    in writing, within 72 hours, affirming or denying the

8    request from November that we discussed yesterday?

9    A.  No.

10   Q.  Would you, as CFO of JetBlue, been aware if somebody

11   sent an e-mail in response within 72 hours affirming or

12   denying such a request?

13   A.  Yes.

14   Q.  All right.  You can put that aside, Ms. Hurley.

15        I'd like to change the topics, Ms. Hurley, and

16   unfortunately we have to change binders here too.  Put

17   that aside.  If you could go to the binder we provided.

18        MS. MARKEL:  I don't believe the --

19        The same binder as yesterday?

20        MR. SHORES:  Right.

21        MS. MARKEL:  Okay.

22   Q.  Do you have your binder, Ms. Hurley?

23   A.  I do.

24   Q.  Okay.  And if we could go to the document that is

25   AIG, it's the fourth tab in your binder.

1    A.   (Turns.)

2    Q.   All right.  Ms. Hurley, do you recognize this

3    document?

4    A.   Yes.

5    Q.   And what is this document?

6    A.   This is a board presentation that was put together

7    and presented in June.

8    Q.   And was that June of this year?

9    A.   Correct.

10   Q.   Okay.  And was this document created in the ordinary

11   course of JetBlue's business?

12   A.   Yes.

13   Q.   And was it created at or near the time of this board

14   meeting?

15   A.   Yes.

16   Q.   And is this document maintained as part of JetBlue's

17   ordinary recordkeeping process?

18   A.   It is.

19   Q.   And is this an accurate, um, reflection of the board

20   presentation from June of this year?

21   A.   Yes.

22        MR. SHORES:  Your Honor, I'd like to move into

23   evidence, as Exhibit 799 -- no, I'm sorry, 800.  I have

24   my numbers wrong.  What is AIG.

25        THE COURT:  No objection?

1        MS. MARKEL:  We object, your Honor, on hearsay and

2   also embedded hearsay.

3        THE COURT:  Well he admits it's hearsay, he's laid

4   a foundation that it's a business record.  You don't

5   challenge that it's a business record.

6        As to embedded hearsay, why don't we go question

7   by question and see where we are.

8        Is that satisfactory?

9        MS. MARKEL:  Well, your Honor, if I may be heard

10   on the business record?

11        THE COURT:  Go ahead.

12        MS. MARKEL:  The proponent must show that the

13   record was a regular practice of that activity.

14        THE COURT:  Yes.

15        MS. MARKEL:  But that includes slides on the

16   transaction and it's from June of 2023, just a couple of

17   months prior to this litigation.

18        THE COURT:  But a business record -- what is

19   thought to make it reliable is the regularity of the

20   record taken.  Now this is a presentation to the board

21   of directors, one imagines they keep these, one imagines

22   they keep all of them.  Looking at this, there's some

23   redactions for attorney-client privilege, that makes

24   sense in the context of this case.  It seems like a

25   business record to me.

1          MS. MARKEL:  Your Honor, there is a competitive --

2     there is an assessment of the transaction which I don't

3     believe there's been a foundation that putting together,

4     um, that type of assessment of the transaction or the

5     Integration Committee as sort of a regularly-conducted

6     activity.

7          THE COURT:  Oh, in other words there's the

8     substance of the business that they are dealing with?

9          MS. MARKEL:  Exactly.

10          THE COURT:  I'm not troubled by it.  It goes to

11     the weight, not the admissibility.

12          All right.  AIG, Exhibit 800 in evidence.

13          (Exhibit 800, marked.)

14     Q.  All right.  Ms. Hurley, on the first page of this

15     board presentation there's an item that says "Spirit

16     Integration Planning," do you see that?

17     A.  Yes, I do.

18     Q.  Okay.  And at a high level, what is "Spirit

19     Integration Planning"?

20     A.  Preparing to bring both Spirit and JetBlue together.

21     Q.  Okay, fair enough.

22          So Let's turn to Slide 35 with the Bates number

23     ending in, um, 0320.

24     A.  (Turns.)

25     Q.  Ms. Hurley, this slide is entitled "Major Milestones

 1    Leading to Full Integration."  Can you just provide us,

 2    at a general level, what was being conveyed in terms of

 3    milestones to full integration here?

 4    A.  So this is specifically one work stream within the

 5    integration planning process whereby which we're

 6    highlighting what needs to take place in what order

 7    prior to us starting to make the Spirit aircraft into

 8    JetBlue aircraft.

 9    Q.  Okay.  And let's start on the left-hand side.  Do

10    you see there's a dotted line that below it it says "Day

11    1"?

12    A.  I do.

13    Q.  And is that intended to be the first day after the

14    transaction would close?

15    A.  Correct.

16    Q.  Okay.  And what would happen immediately after the

17    transaction closes with respect to the Spirit aircraft?

18    A.  Nothing.  On Day 1.

19    Q.  Okay.  And let's look -- there's a star at the top

20    and it says "Single AOC Achieved."  Do you see that?

21    A.  Yes.

22    Q.  What does that indicate?

23    A.  This is a Single Aircraft Operating Certificate.

24    Q.  And what is a Single Aircraft Operating Certificate?

25    A.  Essentially it's a certificate that allows us to

1    operate as one airline.

2    Q.  Okay.

3         MR. SHORES:  And there's some redacted

4    information, but I'm not going to go into that, your

5    Honor.

6    Q.  Just below "Single AOC Achieved" and to the right

7    there's two stars and it says "Fleet Retrofit Begins."

8    Do you see that?

9    A.  I do.

10   Q.  And what does "Fleet Retrofit Begins" mean?

11   A.  That means it's the beginning of the retrofit

12   program whereby which a Spirit aircraft will be turned

13   into a JetBlue aircraft.

14   Q.  Okay.  So before the retrofit begins, just so we're

15   clear, the Spirit aircraft will be flown in their

16   current configuration, is that right?

17   A.  Correct.

18   Q.  Okay.  And this process will begin for retrofitting

19   in the timeframe you just discussed, right, Ms. Hurley?

20   A.  Correct.

21   Q.  Okay.  And what will happen after the retrofit

22   process begins?

23   A.  It will take a multitude of years for us to convert

24   all of the Spirit aircraft into JetBlue aircraft.  So we

25   have highlighted that that could take anywhere between 4

1   and 5 years.

2   Q.  So before the retrofit process begins, is it fair to

3   say that there will be no removal of seats for purposes

4   of the retrofitting process on the Spirit aircraft?

5   A.  Correct.  Just to be clear, we need to achieve the

6   Single Operating Certificate and that usually will take

7   12 to 18 months.  So in that timeframe Spirit aircraft

8   will still be flying around in Spirit configuration.

9   Q.  Okay.

10        THE COURT:  This is a simple-minded question.  But

11   how would they be painted?

12        THE WITNESS:  They will still be yellow.

13        THE COURT:  And how will one know that they're not

14   flying JetBlue?

15        THE WITNESS:  We're really, on Day 1, going to be

16   operating as two separate entities.  So from a customer

17   perspective, really nothing is going to change on Day 1.

18   We need the regulatory approval, which is the Single

19   Operating Certificate, before we can start to combine as

20   one entity.

21        THE COURT:  And having interrupted, forgive me,

22   Mr. Shores, when I see things in a trial situation, they

23   have Bates stamps on them and the like.  If you look at

24   this document -- I'm not talking about anything that the

25   parties have designated as confidential, but on the

1    document, on the bottom in orange it says

2    "Confidential," et cetera.

3         Do I understand that that line was there at the

4    time the presentation was made to the board of

5    directors?

6         THE WITNESS:  Correct.

7         THE COURT:  Thank you.

8         Mr. Shores, go ahead.

9         MR. SHORES:  I'll pass the witness, your Honor.

10        THE COURT:  All right.

11        Ms. Markel, anything else for this witness?

12        MS. MARKEL:  Yes, your Honor.  One moment to

13   confer?

14        THE COURT:  Of course.

15        (Pause.)

16

17   REDIRECT EXAMINATION BY MS. MARKEL:

18   Q.  Good morning, Ms. Hurley.

19        Yesterday your counsel asked you a few questions

20   about JetBlue's management of its debt and balance

21   sheet.  Do you recall that?

22   A.  Yes.

23   Q.  And you testified that JetBlue has historically

24   managed its debt level and liquidity level very

25   conservatively, right?

1    A.   Correct.

2    Q.   And now I'd like to turn to a slide from Exhibit

3    649, which is in defendants' binder, which our counsel

4    showed you yesterday.   Would you please turn to Slide 11

5    on the page ending in 606.

6    A.   (Turns.)

7         THE COURT:   Slide 11 on the page ending in?

8         MS. MARKEL:   606.

9         THE COURT:   Thank you.

10        MS. MARKEL:   On Exhibit 649.   And this is called

11   "Focus on Managing Liquidity and Earnings."

12   Q.   And, Ms. Hurley, this chart shows JetBlue's

13   debt-to-cap ratio is 56 percent, right?

14   A.   Correct.

15   Q.   And this reflects JetBlue's debt-to-cap ratio

16   without the merger, right?

17   A.   Correct.

18   Q.   And JetBlue also has a debt-to-cap target, right?

19   A.   Correct.

20   Q.   And historically JetBlue has targeted a much lower

21   debt-to-cap ratio than 56 percent, right?

22   A.   Prior to covid, yes.

23   Q.   JetBlue previously targeted a debt-to-cap ratio

24   between 30 and 40 percent?

25   A.   Prior to covid, yes.

1  Q.  And in 2009, prior to covid, JetBlue's debt-to-cap

2  ratio was 34 percent, right?

3  A.  Correct.

4  Q.  And you testified that with the merger JetBlue's

5  debt-to-cap ratio would be even higher than the 56

6  percent, um, and closer to that of some of the legacies

7  on here.

8      In addition to the over $3 billion of debt that

9  JetBlue will need to take on to fund this deal, JetBlue

10  will also be taking on Spirit's debt, right?

11  A.  Correct.

12  Q.  And you're aware that Spirit has nearly $4 billion

13  in debt, right?

14  A.  Yes.

15  Q.  And what is JetBlue's projecting its debt-to-cap

16  ratio for 2027 with the transaction?

17  A.  Sorry, can you repeat the question?

18  Q.  What is JetBlue's projected debt-to-cap ratio for

19  2027 with the transaction?

20  A.  So based on our high-level modeling that we've done

21  to date, when the transaction closes, at financial

22  close, we will be on the higher end of this chart.  So

23  we will most likely be between United and American

24  Airlines.

25  Q.  Okay.  So between 83 percent and 111 percent?

A.   Correct.

Q.   Okay.  You can put that aside.

     Yesterday your counsel also asked you a few questions about fixed cost savings and cost dissynergy if JetBlue acquires Spirit.

     Do you recall that?

A.   Yes.

Q.   And I think you testified about one cost dissynergy, which was labor.

     JetBlue's also expecting to incur other recurring cost dissynergies if this deal goes through, right?

A.   There are some other cost dissynergies, yes.

Q.   There are over $300 million and other costs dissynergies, right?

A.   We've identified at least $325 million in cost synergies, yes.

Q.   I'm asking about cost dissynergies.

A.   So, yes, there are dissynergies as well, the majority of which are labor, which we discussed yesterday.

Q.   How much is the one rate for those other cost dissynergies?

A.   Yeah, that number has continued to evolve since we closed the transaction.  We talked about yesterday that labor rates have started to converge.  So the initial

1   number was between 600 and 700 million, but that has

2   decreased since we closed the transaction.

3   Q.  Can you quantify the other cost dissynergies other

4   than labor?

5   A.  Yeah, the other most prominent component is bringing

6   up the Spirit flying experience to the JetBlue

7   experience, right?  So the customer proposition.  So

8   when you think of we offer live TV and free WIFI and

9   free snacks and drinks, that's the other most meaningful

10  dissynergy.

11  Q.  And even taking into account JetBlue's projected

12  fixed cost savings that you testified to yesterday,

13  JetBlue is still anticipating that there will be net

14  cost dissynergies, right?

15  A.  Yeah, correct.  I mean naturally we're buying a

16  ultra-low cost carrier.  So as I mentioned yesterday,

17  naturally there's going to be dissynergies in this

18  specific merger because of that, and the majority of

19  those are associated with labor as well as, as I

20  mentioned, improving the overarching customer experience

21  on board the aircraft.

22  Q.  And those costs that you mentioned, $600 to $800

23  million, those are per year, right?

24  A.  No these are run-rate.

25  Q.  Well what is "run-rate"?

1   A.  You achieve it over a period of time.  So we've said

2   that we're going to achieve $600 to 700 million in

3   synergies, so that includes revenue, that includes

4   costs, and we said that we're going to deliver that

5   between 4 and 5 years, and then that will be built into

6   the base financial model going forward.

7   Q.  But the recurring costs will be in the hundreds of

8   millions of dollars annually, right?

9       MR. SHORES:  Objection, asked and answered.

10      THE COURT:  No, overruled.  She may have it.

11  A.  Clearly on Day 1, or after financial close, I should

12  say, Spirit labor rates are going to step up to JetBlue

13  labor rates at some point in time, and so that naturally

14  will be in the cost base on a go-forward basis.

15  Q.  Thank you.

16      So I want to now turn to Exhibit 425, which your

17  counsel asked you about, it's the merger agreement, it's

18  in the larger binder.

19  A.  (Turns.)

20  Q.  And if you turn to Page 7676, or the page ending in

21  7676, that last paragraph that your counsel was just

22  asking you about this morning.

23  A.  (Turns.)

24  Q.  And so if you turn to the last sentence which your

25  counsel asked you about, um, "In the event that no

 1    parent consent person shall have responded to an IOC
 2    request prior to their applicable response deadline,
 3    parent shall be just deemed to have consented solely to
 4    the action specified in such IOC requests."
 5         Do you see that?
 6    A.  I do.
 7    Q.  And that doesn't say "affirmed" -- that doesn't say
 8    consent affirmed or denied, right?
 9    A.  Well it says "It shall be deemed to have consented."
10    Q.  Well a parent consent person, um, just needs to have
11    responded, right, if you take a look at the
12    third-to-last sentence there?
13    A.  But it says if we haven't responded, the default is
14    that it's consented to.
15    Q.  Yesterday you testified that JetBlue has not
16    consented, right?
17    A.  Correct.  So taking a step back.  This was one of
18    the earlier IOC requests that we received from Spirit,
19    and to be totally frank, as we were assessing the
20    specific incremental aircraft that you highlighted
21    yesterday, we were not aware -- I was not aware that we
22    had a 72-hour constraint.
23         And so ultimately, um, we internally agreed that
24    we were not going to consent.  We actually did not
25    formally send any amount to Spirit.  So per the

1    contract, um, that means that technically we had

2    consented to that request.

3    Q.  Well the response may not indicate approval or

4    denial, right?

5          MR. SHORES:  Objection, asked and answered.

6          THE COURT:  I don't understand.

7    Q.  But JetBlue did respond to Spirit's request, right?

8          THE COURT:  Well we really have been over this.

9    So I'm going to treat that as objected to and sustain

10   it.

11         MS. MARKEL:  Okay.  Moving on.

12   Q.  Can we turn to -- what was marked as AIG in defense

13   counsel's binder, which is Exhibit 800.

14   A.  (Turns.)

15   Q.  And please direct your attention to Slide 35, which

16   is in the page ending in 320, which your counsel was

17   asking a few questions about.

18   A.  (Turns.)

19   Q.  And so if you look at the top right corner where

20   defense counsel has redacted some information that shows

21   a year, right, or a couple years.

22         Without revealing the number, it shows years,

23   right?

24         MR. SHORES:  Just to be clear, I think she's

25   asking a "yes" or "no" answer -- a question, without

1    revealing the specific numbers, Ms. Hurley.

2    A.   Okay.   Yes.

3    Q.   Okay.   And so is that when JetBlue intends for, um,

4    this retrofit to be done?

5    A.   No.

6    Q.   Okay.   What is the cost of the retrofit?

7    A.   We had provided a public estimate of about $800

8    million.

9    Q.   Add as part of that retrofit, JetBlue will be

10   eliminating over 10 percent of seats on Spirit aircraft,

11   right?

12   A.   So the purpose of this slide is to highlight that

13   immediately after the transaction closes we will not be

14   taking seats out of the market.   We first need to get a

15   Single Aircraft Operating Certificate, which will take

16   between 12 and 18 months, and then after that we can

17   begin the retrofit and we've publicly said that the

18   retrofit will take anywhere between 4 or 5 years to

19   complete.   So during that timeframe, there will still be

20   Spirit aircraft flying around the network.

21        THE COURT:   That wasn't her question.   Her

22   question was, when you're done, 10 percent of the seats

23   will be gone, isn't that right?

24        THE WITNESS:   When we're complete.

25        THE COURT:   And that is right, when you're

1    complete?

2          THE WITNESS:  When we're complete.

3          THE COURT:  Go ahead.

4    Q.  And JetBlue will start taking seats out of Spirit's

5    aircraft once it received the approval that it needs,

6    right?

7    A.  Correct.

8    Q.  And starting at Day 1, JetBlue controls all the

9    prices for those Spirit aircraft, right?

10   A.  We will have control over the entire Spirit entity

11   on Day 1.  So pricing is one component.

12   Q.  And starting at Day 1 of this chart, JetBlue and

13   Spirit will no longer be competing against each other,

14   right?

15   A.  After financial closes, correct.

16         MS. MARKEL:  No further questions.

17         THE COURT:  Nothing further, Mr. Shores?

18         MR. SHORES:  Nothing further, your Honor.

19         THE COURT:  Thank you.  You may step down.

20         You may call your next witness.

21         MR. DUFFY:  Yes, your Honor.  Plaintiffs will be

22   calling Derek Klinka of JetBlue, a recalled witness.

23         THE COURT:  He may be called.

24         (DEREK KLINKA, sworn.)

25

```
1          * * * * * * * * * * * *

2          DEREK KLINKA

3          * * * * * * * * * * * *

4

5     DIRECT EXAMINATION BY MS. BALDWIN:

6          MS. BALDWIN:  Good morning, your Honor, Maisie

7     Baldwin again for the United States.

8          THE COURT:  Ms. Baldwin, you may continue.

9     Q.  Good morning, Mr. Klinka.

10    A.  Good morning, Maisie.

11    Q.  Would you please state and spell your full name for

12    the record.

13    A.  Sure.  My name is Derek Klinka, D-E-R-E-K

14    K-L-I-N-K-A.

15    Q.  Mr. Klinka, are you currently employed by JetBlue

16    Airways?

17    A.  I am.

18    Q.  You've worked for JetBlue since 2017?

19    A.  I have.

20    Q.  And when you started at JetBlue, you worked within

21    JetBlue's Corporate Development Group, right?

22    A.  We call it "Strategy and Business Development," but

23    it's been used as that term as well like in other areas.

24    Q.  In April of 2021, you became a Director in that

25    group?
```

1    A.   I believe so, yes.

2    Q.   And then in October of 2022, you became the Value

3    Capture Lead for JetBlue's Integration Management

4    Office?

5    A.   Yes.

6    Q.   And that is your current title?

7    A.   That is my current title, yes.

8    Q.   And the Integration Management Office is planning on

9    how to incorporate Spirit's assets into the JetBlue

10   brand if this deal were to close?

11   A.   That's one of the responsibilities of the office,

12   yes.

13   Q.   And in your role you're also responsible for

14   ensuring that JetBlue captures all of the financial

15   value associated with this acquisition, right?

16   A.   Yes.  And one of the -- like one of many

17   responsibilities there, but, yes.

18   Q.   It's why they call you the "Value Capture Lead"?

19   A.   Yes.

20   Q.   Between March and July of 2022, JetBlue extended a

21   few different offers to buy Spirit, right?

22   A.   Can you repeat the question please?

23   Q.   Between March and July of 2022, JetBlue extended a

24   number of offers to purchase Spirit, right?

25   A.   Um, yes.

1   Q.   And throughout that time period, you conducted

2   diligence related to the potential acquisition, right,

3   Mr. Klinka?

4   A.   Um, yes, I did.

5   Q.   For example, you reviewed Spirit's 5-year financial

6   plan?

7   A.   I did.

8   Q.   That was their ordinary course standalone projection

9   for their future --

10   A.   That was their internal forecast of their -- their

11   financial output, yeah.

12   Q.   You also reviewed Spirit's order book during that

13   time?

14   A.   I was given access to their orders via a fleet plan,

15   um, at one point in time probably, yes.

16   Q.   And Spirit's order book contained a provision that

17   Spirit had to exercise its option some number of months

18   in advance, right?

19   A.   I was never given visibility into that at that time.

20   But traditionally that is like an assumption that is

21   made with like manufacturers, yes, there's like a

22   "notice period," if you will.

23   Q.   You subsequently did learn of Spirit's notice

24   period, right, Mr. Klinka?

25   A.   Yes, I did.

1    Q.   Would you please turn in your binder to Exhibit EM,

2    that's "Echo" "Mike."

3    A.   (Turns.)

4    Q.   Mr. Klinka, this is an e-mail thread from July of

5    2022.

6    A.   (Reads.)  Yes.

7    Q.   The subject line is "Fleet Option Aircraft," right?

8    A.   Correct.

9    Q.   You were a participant in this e-mail thread?

10   A.   I was for this, um, yeah, after not being on the

11   initial e-mails back and forth.  But, yes, eventually I

12   was sent this e-mail.

13        MS. BALDWIN:  Your Honor, at this time plaintiffs

14   move Exhibit EM in evidence as 801.

15        THE COURT:  No objection to EM?

16        MS. SIDDIKY:  Your Honor, there's no objection to

17   the document itself, but there is an objection to this

18   line of questioning, which seeks to elicit testimony

19   that's not relevant and it's cumulative of what was

20   discussed yesterday with Ms. Hurley.

21        THE COURT:  I am struggling to figure out the

22   relevance here.  Why don't you tell me what it is.

23        MS. BALDWIN:  Sure, your Honor.

24        We believe this evidence directly relates to what

25   the post-merger world will look like.  JetBlue's prior

1   conduct, vis-vis Spirit, is probative of its future

2   conduct.  This evidence will also illustrate a motive or

3   intent on the part of JetBlue to restrain growth post-

4   transaction if the merger closes.  We'll be brief.

5          MS. SIDDIKY:  Your Honor, if I may?

6          THE COURT:  No, wait a minute.  I'll tell you when

7   you may.

8          That's pretty conclusory.  I'll tell you what I've

9   heard, that they've got some options to slow things down

10  based upon economic situations.  If you're suggesting

11  that their plan is to talk up all the great advantages

12  of their acquiring this fleet of aircraft, whereas in

13  fact, um, what they plan, really planned to do is to,

14  um, have a much more modest use of the assets of Spirit,

15  I guess I have to ask.  Is that what you're saying?  I

16  mean I'll stop talking, but try to get my problem here.

17         If all we're going to do is reserve, wisely, the

18  option, as Ms. Hurley kept saying, "I believe in

19  flexibility," um, that in fact they do believe in

20  flexibility and these are the documents that illustrate

21  that, I don't see what difference that makes?  One would

22  think that a proper, um, corporation would do that.  It

23  may make some difference, because I do have to consider

24  what may happen in the future.  I'm only groping.  But

25  you tell me.

1      MS. BALDWIN:  So, um, your Honor, I think that

2  this is relevant because the benchmark world is what

3  JetBlue and Spirit would look like as standalone

4  competitors, and this is evidence directly relating to

5  how JetBlue will control what Spirit has in flexibility

6  right now, what they will do with that flexibility, what

7  they will do with those options.

8      Obviously a JetBlue witness can't speak to what

9  Spirit would have done, but he can speak to what JetBlue

10 will do.  And again it will be brief.  I will

11 reemphasize that this will be brief.

12      THE COURT:  I'll hear you.

13      MS. SIDDIKY:  Yes, your Honor, the document that

14 is going to be the subject of his testimony relates to

15 an option schedule that has now been superseded.  So the

16 testimony that will be elicited is as to facts that no

17 longer exist, the circumstances have changed.  And so I

18 do think the relevance and the cumulativeness is the big

19 issue here.

20      THE COURT:  Yes, I agree.

21      MS. BALDWIN:  Your Honor, if I may?

22      THE COURT:  Yes.

23      MS. BALDWIN:  It was superceded during the course

24 of this litigation.

25      THE COURT:  Fine.

1          MS. BALDWIN:  I think that seeing what was

2    happening prior to being in shadow of litigation is

3    relevant and highly probative.  The defendants will have

4    the opportunity to call witnesses, elicit testimony,

5    about what they'll do post-deal, we've heard a lot of

6    promises, and we just want the opportunity to put on

7    evidence of what defendants' executives have said

8    outside this courtroom about what they may do if this

9    deal closes.  It's all we're asking for.

10         THE COURT:  Sustained.  It will remain EM for

11   identification.  Move on.

12         MS. BALDWIN:  All right.

13   Q.  Mr. Klinka, JetBlue and Spirit entered a merger

14   agreement in July of 2022, is that right?

15   A.  That is correct.

16   Q.  And the merger agreement included a number of

17   "Interim Operating Covenants" or IOCs?

18   A.  I'm sorry, I missed the question?

19   Q.  The merger agreement included a number of Interim

20   Operating Covenants or IOCs, right?

21   A.  Yes.

22   Q.  Let's take a look at one of Spirit's IOC requests

23   for additional aircraft.

24         If you would please turn in your binder to the Tab

25   marked Exhibit 799.

 1    A.   (Turns.)

 2         MS. SIDDIKY:  Your Honor, objection.

 3         THE COURT:  What's the ground of this objection?

 4         MS. SIDDIKY:  This again seeks to retread, um, the

 5    topic and the testimony that has already been elicited.

 6    This is a document that relates to the IOC request, um,

 7    that also relates to the options that are now superseded

 8    by the current order book.

 9         THE COURT:  Well I'm not clear of that.  The

10    document's in evidence.  She may inquire about it.

11    Q.   Mr. Klinka, to orient ourselves, this is an e-mail

12    thread from November of 2022?

13    A.   Correct.

14    Q.   You're a participant in this e-mail thread?

15    A.   I am.

16    Q.   This e-mail thread is regarding Spirit's IOC request

17    for additional aircraft among others?

18    A.   Um, yes, it's an internal e-mail thread, um, that we

19    are utilizing to kind of provide context around the

20    request that came through from Spirit prior to this

21    discussion.

22    Q.   All right, let's look at the second page of Exhibit

23    799, which has a Bates number ending in 988.

24         Towards the bottom of the page there's an e-mail

25    you sent at 4:33 p.m. that then spills onto the third

 1    page?

 2    A.  (Looks.)  Um, yes, there is.

 3    Q.  And in the second paragraph of your e-mail,

 4    Mr. Klinka, you wrote that "Spirit's IOC request was not

 5    surprising given Spirit's 5-year financial plan."  Do

 6    you see that?

 7    A.  I do, yes.

 8    Q.  This is a reference to the gap between Spirit's

 9    standalone 5-year financial plan and what you saw in

10    that order book, right?

11    A.  Um, part of it is, yes.

12    Q.  Your e-mail spills onto the next page and I want to

13    direct your attention to that continuation.

14         You write "We do not believe the combined entities

15    will need this many aircraft."  Do you see that?

16    A.  I do.

17    Q.  You then go on to write, "Given the choice, JetBlue

18    would prefer not to take that," right?

19    A.  No.

20    Q.  That's what you write?

21    A.  No, I wrote "We would prefer not to take that."

22    Q.  Okay, and "we" here is a reference to JetBlue?

23    A.  No, this is work that Claire and I have done, which

24    I think I've referenced in the first paragraph.  So I'm

25    giving my perspective -- mine and Claire's perspective

1    here, that's the "we."

2    Q.   And "Claire" is a reference to Ms. Roeschke?

3    A.   Oh, yes.  Sorry.

4    Q.   You and Ms. Roeschke were leading the Integration

5    Management Office at JetBlue at the time?

6    A.   Um, no, we're members of the team, but we don't lead

7    it.

8    Q.   And in your work in evaluating this transaction, you

9    did not want to take these additional aircraft that

10   Spirit requested?

11   A.   I think I was giving my opinion at this time.

12   Q.   Your preference?

13   A.   (Pause.)   Um, yeah, that's the word I used.

14   Q.   All right.  Let's go to your e-mail on the first

15   page of Exhibit 799, there's a Bates number ending in

16   2987.

17        This is the e-mail that you sent to Ms. Hurley

18   CCing other folks at JetBlue?

19   A.   Yes.

20   Q.   And there's a number in the body of your e-mail in

21   bold headers?

22   A.   Yes.

23   Q.   Item Number 3 is titled "Incremental Aircraft

24   Request," right?

25   A.   It is.

1   Q.  And you write that "Spirit's IOC request was

2   consistent with Spirit's standalone growth model where

3   the requested aircraft would be a plug to enable Spirit

4   to achieve a 15 percent annual growth rate," right?

5   A.  Um, yeah.

6   Q.  And again this is a reference to the fact that

7   Spirit's 5-year financial plan contemplated Spirit would

8   grow on a standalone basis at 15 percent, right?

9   A.  It's a reference to, um, the difference between what

10  their fleet plan implies, or their firm order book, and

11  what they had modeled in the financial model that they

12  provided us, which was incremental aircraft.  The term

13  "plug" in this instance is a financial tool that's used

14  by kind of financial modelers, it's meant to say like

15  there's no real line of sight into that aircraft coming,

16  it's not firm, there's no contractual obligation.

17  Q.  Well Spirit did ask for those aircraft in November

18  of 2022?

19       MS. SIDDIKY:  Objection.

20       THE COURT:  Well it really isn't in question.  It

21  appears to be undisputed.  So assume that that's so.

22  Q.  But Spirit did have a plan to fill that plug for

23  growth, right?

24       THE COURT:  Well he can't testify as to the inner

25  workings of Spirit's operations.

1          But you understood that they had asked to have the
2     right to, um, take steps to obtain those aircraft?
3          THE WITNESS:  I do.  Yeah, that's how I read the
4     IOC requests.
5          THE COURT:  Yeah.
6          Go ahead, Ms. Baldwin.
7          MS. BALDWIN:  Thank you, your Honor.
8     Q.  Under Subbullet C here, you wrote that you
9     recommended dissenting from this request?
10          MS. SIDDIKY:  Your Honor, objection.
11          THE COURT:  Well the document speaks for itself.
12          MS. BALDWIN:  I'm just trying to orient the
13     witness.  I don't need to.
14          THE COURT:  All right.  He can read what it says.
15     That's what he said.
16          MS. SIDDIKY:  Your Honor, if I may be heard?
17          THE COURT:  You may.
18          MS. SIDDIKY:  The date on this document is
19     November 7th.  As we've seen in other documents, the
20     date of the IOC request was Thursday, November 3rd.  As
21     we understand from the language of the contract, there's
22     a 72-hour deadline to respond in writing.
23          THE COURT:  No, um, overruled.  He may answer.  Or
24     she may ask.
25          MS. BALDWIN:  Thank you, your Honor.

1    Q.   Mr. Klinka, your recommendation of dissent was

2    consistent with JetBlue's stance in the negotiation of

3    the IOCs, right?

4    A.   No, it's consistent with my stance.

5    Q.   You were one of the folks that JetBlue had

6    negotiated the IOCs with Spirit, right?

7    A.   No.

8    Q.   What is your reference that's consistent with your

9    stance, in the negotiation of IOCs, that you recommend

10   dissenting?

11   A.   It's a reference to my understanding of the stance

12   of those who negotiated it.

13   Q.   Okay.  And it was your understanding that dissenting

14   from this incremental request would be consistent with

15   those negotiations?

16   A.   I think -- I think the -- like the point of our

17   stance was just to maintain as much flexibility as

18   possible to the combined entity.  So I don't think

19   there's a stance for or against aircraft here, I think

20   it's just a stance of flexibility.

21   Q.   You can put that document aside, Mr. Klinka.

22        If you will now just turn in your binder to

23   Exhibit EN, "echo" "November".

24   A.   (Turns.)

25   Q.   This is an e-mail that you sent to Ms. Hurley and

1   Ms. Hibachi on November 17th, 2022?

2   A.  Yes.

3   Q.  You did in fact send this e-mail?

4   A.  I did send this e-mail, yes.

5       MS. BALDWIN:  Your Honor, at this time plaintiffs

6   move Exhibit EN in evidence as 802.

7       MS. SIDDIKY:  No objection to the document.

8       THE COURT:  But I didn't admit 801.

9       MS. BALDWIN:  Oh, I apologize.  It's 801.

10       THE COURT:  You assumed you got that in evidence.

11  It's not.  (Laughter.)

12       All right.  Exhibit 801 in evidence.

13       (Exhibit 801, marked.)

14   Q.  Mr. Klinka, reviewing this document.

15       By November 17th of 2022, JetBlue had communicated

16  to Spirit that JetBlue was denying Spirit's IOC request

17  for incremental aircraft, right?

18   A.  I'm assuming that at this time.

19   Q.  You made that assumption in writing to your CFO?

20   A.  I did, yes.

21       MS. BALDWIN:  The United States passes the

22  witness.

23       THE COURT:  Any questions for this witness?

24       MS. SIDDIKY:  Just a few, your Honor.

25       THE COURT:  You may.

1

2    CROSS-EXAMINATION BY MS. SIDDIKY:

3    Q.  Staying on Exhibit 801, Mr. Klinka.

4         At the time you wrote this e-mail, were you aware

5    of any written response to the IOC request from Spirit?

6    A.  I was not.

7    Q.  Were you aware of any informal response?  You said

8    you had made an assumption.  Were you aware of any

9    formal response?

10   A.  I was not.

11        MS. SIDDIKY:  One moment to confer?

12        (Pause.)

13        MS. SIDDIKY:  Nothing further, your Honor.

14        THE COURT:  All right.  You may step down.

15        Call your next witness.

16        MS. BALDWIN:  I'm sorry, briefly, your Honor, may

17   we have a moment to confer?

18        THE COURT:  Oh, I assumed.

19        You may.

20        (Pause.)

21        MS. BALDWIN:  No further questions, your Honor.  I

22   told you we'd be brief.

23        THE COURT:  You may step down.

24        (Witness steps down.)

25        MR. DUFFY:  Plaintiffs will be calling

1    Dr. Gowrisankaran.

2          THE COURT:  He may be called.

3          (DR. GAUTAM GOWRISANKARAN, sworn.)

4          THE COURT:  Mr. Battaglia.

5          MR. BATTAGLIA:  Oh, yes, your Honor.

6          THE COURT:  You may proceed.

7

8          * * * * * * * * * * * * * * * * * * * * * * * *

9          DR. GAUTAM GOWRISANKARAN

10         * * * * * * * * * * * * * * * * * * * * * * * *

11

12   DIRECT EXAMINATION BY MR. BATTAGLIA:

13   Q.  Good morning, Dr. Gowrisankaran.

14   A.  Good morning.

15   Q.  Can you please state and spell your name for the

16   record.

17   A.  I'm Gautam Gowrisankaran.  First name G-A-U-T-A-M.

18   Last name G-O-W-R-I-S-K-A-R-A-N.

19   Q.  Thank you, Doctor.

20         Would you please describe your educational

21   background.

22   A.  I earned my Bachelor of Arts in Economics from

23   Swarthmore College in 1991, and I earned my PhD in

24   Economics from Columbia University in New York -- excuse

25   me, from Yale University in 1995.

1    Q.   Thank you, Doctor.

2         Can you please describe your recent work

3    experience?

4    A.   Yes, I'm a Professor of Economics at Columbia

5    University.

6    Q.   And, Dr. Gowrisankaran, what do you teach at

7    Columbia?

8    A.   I teach Industrial Organization and I teach it both

9    to undergraduates and to PhD students.

10   Q.   And what other courses have you taught, Doctor?

11   A.   I've taught a lot of courses over my career as a

12   professor, but most pertinent to this case I've taught

13   Econometrics, which is the study of statistics as

14   applied to economics.  And I've also taught Competitive

15   Strategy to MBA students.  And Competitive Strategy

16   analyzes how firms make decisions, for instance in

17   product positioning or in pricing.

18   Q.   Doctor, have you published in peer-reviewed journals

19   in the field of economics?

20   A.   Um, yes, I have throughout my career as a professor.

21   Q.   And what topics did you write about?

22   A.   My primary field of research is Industrial

23   Organization and I've written on a whole bunch of topics

24   related to that.  So including merger analysis, dynamics

25   of competition, um, consumer demand.

1   Q.   Doctor, have you previously testified in federal

2   court as an economic expert in a merger antitrust case?

3   A.   Um, yes, I have, I've testified twice before this on

4   merger cases.

5   Q.   Has any court excluded you from testifying as an

6   expert?

7   A.   No, no court has excluded my opinions.

8   Q.   And have you previously worked on matters related to

9   the airlines industry?

10  A.   Yes, I have.

11       MR. BATTAGLIA:   Your Honor, I would like to offer

12  Dr. Gowrisankaran as an expert in the field of

13  economics --

14       THE COURT:   I don't practice that way.

15       MR. BATTAGLIA:   All right.

16       THE COURT:   You go ahead and -- lots of courts do.

17  I understand how you proffer him, I just don't take a

18  position except on specific questions.  So now go ahead

19  and ask him your questions.

20       MR. BATTAGLIA:   Thank you, your Honor.

21  Q.   Dr. Gowrisankaran, have you prepared a slide

22  presentation to assist with your testimony?

23  A.   Yes, I have.

24       MR. BATTAGLIA:   Your Honor, we ask at this time to

25  show the slide presentation.

1          THE COURT:  You may.

2          MR. BATTAGLIA:  It should be the first tab in your

3     binder.

4          THE COURT:  Thank you.

5     Q.  Dr. Gowrisankaran, what was your assignment in this

6     case?

7     A.  Um, my assignment in this case was to examine the

8     competitive effects of the proposed merger between

9     JetBlue Airways and Spirit Airlines.

10    Q.  And who retained you?

11    A.  I was retained in this case by the United States

12    Department of Justice.

13    Q.  Doctor, how many expert reports did you submit in

14    this case?

15    A.  I submitted two main expert reports.  So I submitted

16    an initial report in July and then I submitted a reply

17    report that I replied to the report of the defendants'

18    expert, Dr. Nicholas Hill.  I also amended my initial

19    report with -- to correct some small errors, um, the day

20    after it was filed.  And I also filed supplemental

21    exhibits, and those exhibits were in response to

22    supplemental exhibits that Dr. Hill filed.

23    Q.  Thank you, Doctor.  The next slide please.

24          And, Doctor, is this an outline of what you'll be

25    discussing today?

A.   Um, yes, it is.

Q.   Okay, let's turn to the summary of your opinion.

And, Dr. Gowrisankaran, what is the overall opinion -- what is your overall opinion of the likely competitive effects of the proposed merger?

A.   My overall opinion is that this proposed merger is likely to lessen competition substantially in many relevant markets that are defined, and these relevant markets are for scheduled air passenger service between origin and destination endpoint pairs.

Q.   And, Doctor, what are the key aspects of your opinion?

A.   There are three key aspects of my opinion.  The first is that if this merger were to go forward, there would be a loss of competition that would stem from the loss of Spirit Airlines as an independent airline.

The second main opinion is that this merger, if it were to go forward, would have a disproportionate impact on cost-conscious travelers who form the target market for Spirit Airlines.

And my third main opinion is that looking at the defendants' claimed conversion efficiency, that the, um, the JetBlue Effect is bigger than the Spirit Effect, and so consumers on net would benefit from this merger. Even accounting for that, I find that this merger would

1  account -- would result in net harm to consumers.

2  Q.   The next slide, please.

3       And, Doctor, what leads you to conclude that the

4  merger would likely reduce competition and harm

5  consumers?

6  A.   There are four bases behind this part of my opinion

7  that there would be an adverse competitive effect if

8  this merger were to go forward.

9       The first is that the merger would substantially

10 increase concentration in many markets -- many relevant

11 markets I've defined that are already highly

12 concentrated.

13      The second is that Spirit Airlines and JetBlue

14 compete head to head and this head-to-head competition

15 lowers prices and benefits consumers, and this

16 head-to-head competition would be lost if the merger

17 were to go forward.

18      The third is that Spirit doesn't just compete with

19 JetBlue, but it competes with other airlines more

20 broadly and this benefits consumers too by lowering

21 rivals' prices and putting a downward pressure on prices

22 in the market more generally, in the relevant markets

23 where Spirit competes, and this competition would also

24 be lost if the merger were to go forward.

25      And finally, what I find is that this merger, if

1    it were to go forward, would increase the risk of
2    coordination in the relevant markets that I've
3    identified.
4    Q.   Next slide please.
5         And, Doctor, how would the elimination of Spirit
6    affect cost-conscious consumers?
7    A.   Well Spirit focuses on offering low prices and
8    because of this it's the customers who care about low
9    prices, who put a priority on price, that form the
10   target market for Spirit.
11        So think of a small business owner in Orlando who
12   needs to meet a supplier in Richmond, Virginia and is
13   paying their way to go there.  Or think of the college
14   student in Cleveland who wants to go back to visit her
15   family for Thanksgiving in Los Angeles.  Or the family
16   who live in South Florida who, um, immigrated to the
17   U.S. from South America and, um, want to go back to
18   visit their extended family in Colombia and want to fly
19   to Bogota for the holidays.  Those are the core
20   customers of Spirit Airlines.
21        And "Spirit Airlines allows those customers to fly
22   who couldn't afford to in the past," and that's a quote
23   from my report that's from a Spirit document that I
24   sent.  And Spirit Airlines is going to
25   disproportionately -- Spirit Airplanes

1    disproportionately helps these consumers by lowering

2    prices for these cost-conscious consumers, and if this

3    merger were to go forward, they would be the ones who

4    would most be affected by the loss of the low fares that

5    Spirit Airlines brings.

6    Q.  And, Doctor, did you conduct any analysis of how

7    Spirit affects cost-conscious consumers?

8    A.  Yes, I did, and I plan to testify on that later.  So

9    what I find is that not only does Spirit lower prices

10   overall, but it lowers prices the most at the low end of

11   the price distribution, exactly for these customers that

12   are the most price-sensitive and thereby paying less for

13   airline tickets than other customers.

14   Q.  Next slide please.

15        And, Doctor, did you estimate the harm from the

16   loss of Spirit?

17   A.  Yes, I did.

18   Q.  And what is that estimate?

19   A.  What I found is that if we were to remove Spirit

20   Airlines from the relevant markets, then this would

21   result in over $4 billion in harm annually, and the

22   exact number varies based on the specification I

23   estimate.  But I didn't stop there because the point of

24   this merger is that the parties have indicated that they

25   plan to remove Spirit from the relevant market, but

1    they've also indicated that they want to take those

2    Spirit planes and use them as JetBlue planes.

3         And so what I did is I took the parties'

4    efficiency claims seriously and said what if they use

5    the Spirit planes as JetBlue planes in all the relevant

6    markets and use all the planes in those markets?  And I

7    then investigated what would be the net harm to

8    consumers if I take these, the parties's efficiency

9    claims, seriously and assume that they're going to use

10   all the planes that are currently Spirit planes in these

11   same relevant markets?

12   Q.  And, Doctor, what were your net harm estimates?

13   A.  My net harm estimates, um, what I found is that

14   conservatively there would be over $900 million annually

15   in net harm to American consumers.  And of that greater

16   than $900 million figure, the bulk of it, over $700

17   million, would occur in the nonstop routes where Spirit

18   and JetBlue currently compete and where their

19   head-to-head competition lowers prices and where that

20   competition would be lost as a result of the merger.

21   Q.  Now, Doctor, the Court's heard a lot about the 51

22   presumption markets.  Are those markets included in your

23   estimate on net harm?

24   A.  They are included in there.  So the nonstop overlap

25   markets include those 51 markets and that's the bulk of

1   the harm, of the net harm that I'm finding, and they

2   also include some other markets, something like 20 or 30

3   other markets.

4   Q.  May I have the next slide please.

5        Doctor, have you had an opportunity to review the

6   report from the defendants' economic expert, Dr. Hill?

7   A.  Yes, I did.

8   Q.  I understand that you and Dr. Hill disagree on the

9   likely harm resulting from this merger.  What are the

10  reasons for that disagreement?

11  A.  Well there's really two central reasons that

12  underlie my disagreement with Dr. Hill, and I would say

13  that Dr. Hill makes two key omissions in his analysis

14  and in his modeling of net harm.

15       So, first of all, Dr. Hill, when he's looking to

16  say "How much does Spirit Airlines lower prices?" he

17  doesn't count Spirit's own low prices in his measure.

18  So what Dr. Hill does instead is he looks at the prices

19  of Spirit's rivals and he says inaccurately that we can

20  just understand Spirit's effect by saying "How much did

21  Spirit Airlines lower rivals' prices?"  But this ignores

22  Spirit passengers, it ignores the low fares that Spirit

23  passengers are paying.  And that, in some sense, is the

24  most important part of Spirit.  Sure Spirit lowers

25  competitors' prices, but it also offers low prices to

1   its customers, and those low prices are what Spirit's

2   customers benefit and what they would no longer have if

3   the merger were to go forward.

4        The second error -- omission that Dr. Hill makes

5   is he does not include nonstop overlap markets in his

6   analysis and he chooses not to apply his model to these

7   nonstop overlap markets, and he simply assumes in many

8   cases that, with no economic justification, that there

9   would be no harm.  And to me the biggest part of this

10  merger is exactly these nonstop overlap markets.  This

11  is where JetBlue and Spirit currently compete head to

12  head.  And that's where the loss of competition is most

13  important, if this merger were to go forward.

14  Q.  Doctor, have you considered how the results of

15  Dr. Hill's model change when it accounts for these two

16  points?

17  A.  Yes, I have.

18  Q.  And what did you find?

19  A.  What I found is that if I simply adjust Dr. Hill's

20  model to include Spirit prices, instead of just focusing

21  on rival prices, and include the nonstop overlap markets

22  where JetBlue and Spirit compete head on, then

23  Dr. Hill's conclusions largely agree with the

24  conclusions of my model.  In particular, both models

25  would find that there's substantial consumer harm from

1   the merger, and would also find, they would both also

2   find that converting JetBlue planes to Spirit -- excuse

3   me, converting Spirit planes to JetBlue, would fail to

4   remediate this harm.

5   Q.   Thank you, Doctor.   The next slide please.   I'd like

6   to take a quick look at defendants' operations.

7        Doctor, what features of Spirit's operations are

8   relevant to your analysis?

9   A.   Well as an economist, and we've certainly seen a lot

10  of testimony about Spirit's operations, but as an

11  economist, I just want to highlight a few things about

12  Spirit's operations for the Court.

13       The first is that Spirit Airlines has been a very

14  successful airline over the past several years, and one

15  way of noting that is that it's had the highest growth

16  rate of any of the major U.S. airlines.   And so between

17  2010 and 2023, it's grown almost 6-fold.

18       The other thing that I would like to highlight and

19  it factors into my analysis, is that Spirit Airlines is

20  valued by consumers.   So how do I know this?   Because as

21  an economist what I do is I think -- I look at revealed

22  preferences, what are consumers actually doing?   And

23  what I see is that Spirit Airlines has a lot of repeat

24  business.   So about half of Spirit's customers

25  previously flew Spirit and a whole bunch flew them in

1    the past 6 months.

2    Q.   Thank you.  The next slide please.

3         Doctor, how do Spirit's prices compare to those of

4    other airlines?

5    A.   Quite simply put, Spirit offers low prices, and

6    this, um, graph shows their low prices and it shows them

7    in two ways.

8         The first way -- and the yellow bar of course is

9    Spirit's prices, and I put for comparison are the prices

10   of the Big 4 airlines, and also, um, I put JetBlue's

11   prices and Allegiant's and Frontier's on this.  And not

12   only are the base prices of Spirit lower than most

13   airlines -- and that's what's indicated on the left

14   graphs where it says "DB 1B" price, but also I went in

15   and I calculated the full price of Spirit if you include

16   all of the ancillary fees, if you include the prices

17   that people are paying when they fly Spirit, including

18   potentially prices that they paid for overhead bin space

19   or for priority boarding.  And when you include all

20   those prices, you still see that Spirit has among the

21   lowest prices in the industry.  And that's the bar graph

22   on the right.

23   Q.   And, Doctor, did you conduct the analyses being

24   shown here?

25   A.   Yes, I did, and these analyses are in my initial

1    expert report.

2    Q.  Thank you, Doctor.  The next slide please.

3         Dr. Gowrisankaran, do you have a view about what

4    type of customer is attracted to Spirit's low prices?

5    A.  Yes, I do.

6    Q.  And what is that view?

7    A.  So the typical Spirit customer, as Spirit said, and

8    that quote is from a Spirit document, is a

9    "cost-conscious leisure traveler," in their own words.

10    I'm going to use the words "cost-conscious" throughout

11    my report.  Sometimes you see "leisure" is used.  But

12    what I really mean is that these are travelers who are

13    price-sensitive.  And they might be small business

14    owners, and that's why I prefer "cost-conscious."  I've

15    seen both types of words used in the record.  But the

16    bottom line is that Spirit customers make travel

17    decisions primarily based on price, that's what they

18    care about more than anything else.  And for this reason

19    they frequently decline these ancillary services, things

20    like seat selection, for instance, or carry-on bags.

21    Q.  And, Doctor, how do you know that their travel

22    decisions are based primarily on price?

23    A.  Well there's a lot of bases behind that, including

24    Spirit documents, but also based on work that I did,

25    empirical work.  And so I showed one of these on the

1    right side of this slide.  And this is a -- this is a

2    figure that's in my expert report and based on an

3    analysis I did.  And what I did is I said, "How often

4    does Spirit passengers decline to buy these add-ons,

5    like checked bags or carry-on bags?"  And the leftmost

6    bar shows that almost one-third of Spirit passengers

7    forego every ancillary service, 30.5 percent to be

8    exact.  And if you start looking at specific ancillary

9    services, like checked bags or seat selection or

10   carry-on bags, a half or more of Spirit's passengers are

11   simply not buying these services.

12   Q.  Thank you, Doctor.  The next slide please.

13        Now, Doctor, you just mentioned that Spirit's

14   customers tend to be cost-conscious.  What have you

15   observed about how those customers value amenities?

16   A.  Well what I've observed is that not only do those

17   customers end up not buying a lot of those amenities,

18   but they don't place a lot of value on them on average.

19   And so this exhibit here is something I took from a

20   Spirit ordinary-course document, and what Spirit found

21   is that only 5 to 13 percent of their passengers are

22   buying WIFI.  And they surveyed their passengers and

23   they said, "What's the reason not to buy WIFI?"  And the

24   top reason that Spirit passengers gave was "No need or

25   desire to buy it."

```
1            Spirit offers a bunch of seats that have extra leg
2    room and also have extra leg room and extra width,
3    that's the big front seats.  The prices for those seats,
4    they're not that more than buying a standard economy
5    seat.  So in the case of extra leg room exit row seats,
6    they're $6 to $15 more, or even the big front seats,
7    which are a lot wider and also have a lot more leg room,
8    those are only $34 to $43 more.  But despite that, on
9    more than half of the Spirit flights, they don't even
10   sell out on these seats.  And all this tells me, again
11   with revealed preferences, is that Spirit passengers,
12   they don't value these amenities a lot.  A lot of people
13   who fly on Spirit, um, are just not that interested in
14   buying these amenities.
15   Q.  The next slide please.  Let's turn to JetBlue.
16        Doctor, what have you observed about JetBlue's
17   product offering?
18   A.  Well JetBlue offers, um, a wide range of product
19   offerings, and so they, with their wide range, have
20   products that focus on leisure or cost-conscious
21   passengers and ones that focus on business passengers.
22   There are five different fare options.  The one that's
23   most similar to Spirit is called "Blue Basic."  And
24   JetBlue offers a bundled business model, and what that
25   means is that many of the amenities that are there on
```

1    Spirit that you would pay for separately and you'd only

2    pay for it on Spirit if you wanted it, on JetBlue it's

3    bundled with the base ticket price.  And so those are

4    things like in-flight entertainment or WIFI, for

5    instance.

6         Now Blue Basic is most similar to Spirit in that

7    it restricts a whole bunch of attributes, just like

8    Spirit does.

9    Q.  And what attributes are restricted to Blue Basic?

10   A.  So they restrict what seating you can get.  You

11   cannot bring a carry-on bag unless you bought it in

12   advance, you can't bring it in at the last minute, for

13   instance.  You can't reschedule -- they limit the

14   flexibility of rescheduling and they limit seat

15   assignments.

16   Q.  Thank you, Doctor.

17        MR. BATTAGLIA:  Your Honor, at this time I'd like

18   to move the following exhibits in evidence.  From

19   Dr. Gowrisankaran's initial report, Exhibits 32 and 42.

20        THE COURT:  And how am I going to find them?

21        MR. BATTAGLIA:  Well again, your Honor, these are

22   exhibits that Dr. Gowrisankaran has referenced, they're

23   in the slide deck.  We plan to submit them as --

24        THE COURT:  Well what are they?  I mean where are

25   they?

1          MR. BATTAGLIA:  Oh, in the slides.

2          THE COURT:  You want to admit certain of these

3    slides that we just looked at?

4          MR. BATTAGLIA:  Yes.

5          THE COURT:  Which ones?

6          MR. CULLEY:  Your Honor, if I may?

7          THE COURT:  Please.

8          MR. CULLEY:  It seems to be more efficient if we

9    did this at the end of the presentation so that we can

10   talk about all the slides.

11         THE COURT:  That makes sense to me.

12         But so you're armed for this, I'm not accustomed

13   to admitting expert reports as evidence.

14         MR. BATTAGLIA:  We're not seeking to admit the

15   whole report, just exhibits from his report, 1006

16   exhibits, analysis that he conducted, summaries of

17   analyses he conducted.

18         THE COURT:  So you think you can get some of these

19   slides in under 1006?

20         MR. BATTAGLIA:  Not the slides, but the charts

21   from the slides.

22         THE COURT:  I haven't seen the charts from the

23   slides.

24         MR. BATTAGLIA:  For example, your Honor, this is

25   one of the exhibits.

```
 1            THE COURT:  What would be?  I need to look at with
 2      my eyes.
 3            MR. BATTAGLIA:  Slide 10, your Honor.  My
 4      apologies.
 5            THE COURT:  Slide 10 is what?
 6            MR. BATTAGLIA:  It's a summary of Spirit prices.
 7            THE COURT:  Where will I find it?
 8            MR. BATTAGLIA:  In your deck, your Honor.  In the
 9      binder, Slide 10 is in the first deck.
10            THE COURT:  All right.
11            (Looks.)
12            THE WITNESS:  Your Honor, I think it's the other
13      direction.
14            THE COURT:  The other direction.  All right.  I
15      appreciate that.  Why don't you show me where it is?
16            THE WITNESS:  Sure.
17            (Shows.)
18            THE WITNESS:  So starting -- this is the number.
19      Yes.
20            (Shows.)
21            MR. BATTAGLIA:  Your Honor, I'm not seeking to
22      admit the whole slide, just the --
23            THE WITNESS:  So keep on.
24            THE COURT:  All right.
25            (Looks.)
```

1          THE WITNESS:  Right there.

2          THE COURT:  All right.

3          Well it may be more efficient to look at this at

4     the end.

5          Are you okay with that?

6          MR. BATTAGLIA:  Yes, your Honor.

7          THE COURT:  All right, then we'll pass this for

8     the moment.  And you just go right ahead.

9          MR. BATTAGLIA:   Thank you.

10    Q.  Slide 14, please.

11         So, Dr. Gowrisankaran, I would like to turn next

12    to the definition of "relevant markets."  The next

13    slide.

14         Doctor, when analyzing a merger, why do you define

15    "relevant market"?

16    A.  Well the goal of a market definition analysis is to

17    identify, um, boundaries of products and geography where

18    it's possible to exercise market power, and what I mean

19    by "exercise market power" is to identify these

20    boundaries for where there's a potential for competitive

21    concerns for a merger to occur.  So where, for instance,

22    prices might go up as a result of the merger.

23    Q.  And, Doctor, how do you define a "relevant market"?

24    A.  Well the big picture of defining a "relevant market"

25    as a economist, it's summarized, first of all, in the

horizontal merger guidelines, and I put an image of them
on the right, and those are guidelines that the U.S.
Department of Justice and the Federal Trade Commission
put out.

So the idea in the horizontal merger guidelines,
and as an economist, of how I define "markets," or how
we as economists define "markets," is that how do firms,
um, how do firms exercise market power?  Well the way
that they can raise prices is if customers don't have a
lot of substitutes.  So that's what governs firms'
ability to raise prices is a lack of substitution from
customers.  So that's really the focus of what I do in
market definition.

And the way that I do that, or the way that we do
that as economists, one way we typically do that is we
would propose a market, and then the first thing we
would do is to apply what's called a "Hypothetical
Monopolist Test."  And what the Hypothetical Monopolist
Test asks, is it says is this set of products that are
in this putative market too narrow to constitute a
market?  So if the set of products is really narrow,
then a Hypothetical Monopolist that controlled all those
products, um, would not be able to raise prices by some
Level, and that's the Hypothetical Monopolist Test.
They wouldn't be able to raise prices, because if it's

1   too narrow, there's a bunch of substitutes to these
2   products, close substitutes, that wouldn't be in the
3   market.
4        So what you want, in an antitrust market
5   definition, is a set of products and geographies that
6   are broad enough that if the Hypothetical Monopolist
7   controlled them, then it could profitably raise prices 5
8   percent over the competitive level.
9   Q.   And, Doctor, how do you choose among different
10  markets the path of the Hypothetical Monopolist?
11  A.   Well so the Hypothetical Monopolist Test is meant to
12  rule out markets that are too narrow, but not to rule
13  out markets that are too broad.  And so that under the
14  merger guidelines, the way that we choose among markets
15  that pass the Hypothetical Monopolist Test is that we
16  want to look at markets that "illuminate the evaluation
17  of competitive effects," and that's again quoting from
18  them, um, from the horizontal merger guidelines.
19       So just as an example of that, let's say we were
20  looking for a market of coffee shops around the
21  courthouse in Boston, then there's a, you know, we might
22  first take some market of potential coffee shops within
23  a few blocks of the courthouse and see if, um, if a
24  Hypothetical Monopolist controlled all those coffee
25  shops, could they raise prices some level, like 5

1   percent above the competitive level?  And that would

2   pass the Hypothetical Monopolist Test.

3        But now let's say that we wanted to look at the

4   market for coffee shops near the courthouse and we added

5   in coffee shops that were say in New York near my

6   office.  Then that's not going to illuminate competitive

7   effects.  Because if you raise prices for coffee shops

8   here in Boston, nobody's going to go to New York to get

9   their coffee.

10        So that is what is meant by "illuminate the

11   competitive effects," it has to be ones that are

12   relevant for choices of consumers, and ones that are

13   that far away, they simply wouldn't be relevant.

14   Q.  Thank you, Doctor.  The next slide please.

15        So, Dr. Gowrisankaran, what did you define as the

16   "relevant markets" here?

17   A.  So what do we define as "relevant markets"?  First

18   of all, in "product markets" are scheduled air passenger

19   service.  And so what I mean there is it excludes, for

20   instance, um, taking the bus or taking the train or

21   driving.  And in terms of geographic markets, what we

22   find are origin destination endpoint pairs.  And so

23   those are cities and the airports that serve a given

24   city and two endpoints.

25        So one example of a market, um, might be Miami to

1    Bogota, um, and the Miami market, I'm going to use --

2    I'm going to generally use the markets as defined by the

3    Department of Transportation.  So when I say "Miami," I

4    mean both Miami International and Fort Lauderdale, um

5    Hollywood International Airport that's a few miles to

6    the North.

7    Q.  And, Doctor, did you have any endpoints that

8    deviated from the Department of Transportation

9    groupings?

10   A.  Yeah, I did in two instances.

11   Q.  And why did those deviate?

12   A.  So here in Boston I excluded both Manchester

13   Regional Airport in New Hampshire and also TF Green

14   Airport in Providence, and they do not have a big

15   capacity and they're sufficiently far from the city

16   center that I -- I determined that it was -- I could

17   just think of Logan, Boston Logan as a market for

18   Boston.  And I did something similar in New York where

19   there were three airports that were small and far from

20   the city center that I excluded.

21   Q.  Now, Doctor, how is this definition of a "relevant

22   market" consistent with how consumers travel?

23   A.  This definition, um, is fundamentally what would

24   make sense for consumer travel.  So if you're in, um,

25   Boston say and you want to go to Disney Land, you're

1    thinking of, um -- or Disney World, I guess, you're

2    thinking of flights to Orlando.  And so that's typically

3    how consumers make decisions, is they think they live

4    somewhere, they want to go somewhere, and they choose

5    flights to get there.

6    Q.   And, Doctor, what evidence and analyses did you rely

7    on to determine which markets are relevant here?

8    A.   Well as I do as an economist generally is I looked

9    at documents, ordinary-course documents and documents

10   I've seen in testimony, first from depositions and then

11   later in trial, and then I looked to see what industry

12   participants are saying about markets, and then I

13   substantiated that with quantitative analyses that

14   verified that the putative markets I have thought about

15   that are listed here really do constitute relevant

16   antitrust markets and are appropriate to look at this

17   matter.

18   Q.   Now, Doctor, we've heard testimony that airlines

19   compete nationally with respect to certain aspects of

20   their business.  Did you consider a national market

21   here?

22   A.   Well a national market, um, it simply wouldn't make

23   sense.  When you think about airlines and how they price

24   tickets, they're pricing them on the route level.  And

25   so if you want to look at what, um -- who they compete

1  with on a route level and how they set prices for

2  individual tickets, you want to look at markets that are

3  defined by origin and destination pairs, and then you

4  want to think about, you know, airlines, they offer many

5  routes, and so I'll think about these as each being

6  individual markets, but then competing in a whole bunch

7  of markets together.

8  Q.   The next slide, please.

9       And, Doctor, what kind of ordinary course evidence

10  did you see that supports your market definition?

11  A.   Well I saw a bunch of evidence on how airlines think

12  about pricing for tickets, and when you look at the

13  evidence, what they're thinking about is, um, pricing

14  for tickets on individual routes.

15       So this is an example, this is an ordinary course

16  document that I'm showing on this slide, and this

17  document is, um, it's from JetBlue, and they're talking

18  about, um, pricing, and they're talking about pricing on

19  the BOS SJU, which means, on the left, that means that

20  they're pricing from Boston to San Juan International in

21  Puerto Rico, and that's how they look at pricing

22  decisions.  So as a pricing team, they're looking at it

23  there, and here they're talking about competing with

24  Spirit Airlines for pricing on this route.

25  Q.   Thank you, Doctor.  The next slide please.

 1          Now, Dr. Gowrisankaran, what empirical analyses

 2     did you conduct to support your market definition?

 3     A.  So the first analysis that I did was I did a

 4     Hypothetical Monopolist Test.  So then the point of the

 5     Hypothetical Monopolist Test is to say if a Hypothetical

 6     Monopolist controlled all of the flights between, um,

 7     these, um -- all the flights are controlled by this

 8     market entirely, so that all the flights between Boston

 9     and San Juan, for instance, could they raise prices

10     profitably by some level, typically 5 percent over the

11     competitive level?  And the way I did this test was I

12     looked at ordinary course documents on margins in the

13     airline industry and then I looked at, um, what the

14     elasticity of demand is, um, or has been estimated in a

15     variety of, um, in papers in the economics literature.

16     And so if elasticity demand is low, then what that means

17     is that, um, customers don't have that many substitutes.

18     And so what I wanted to check is whether the elasticity

19     demand was sufficiently low that these markets would be

20     broad enough to pass the Hypothetical Monopolist Test?

21     And I considered markets of just airports, airport

22     pairs, and I found that that was sufficiently broad.  So

23     it passed my critical elasticity analysis.

24          The second thing that I did, and this is really

25     evidence I'm presenting mostly later in my competitive

effects section, is I went in and looked at what happens

when you see an entry in these markets.  So if you see

an entry by, for instance, Spirit or JetBlue, the prices

go down.  And when I found that prices go down, to me

that also informs me that these are relevant antitrust

markets, because they really illuminate competition in

these markets.

The third thing I did was I wanted to look at

whether scheduled air passenger travel was broad in that

product market or whether it would be necessary to

include substitutes like, for instance, um, taking the

bus or Amtrak, for instance, and those substitutes are

most likely relevant in shorter markets.  And so I

looked at the five shortest markets I could find where I

saw entry by an LCC, a low-cost carrier, or a ULCC.

So one of those markets, for instance, is Boston to

Syracuse.  And when I looked at each of those markets, I

found that they would pass the Hypothetical Monopolist

Test, it wasn't necessary to consider substitution at

other -- substitution to other modes of travel besides

air travel.

The final thing I did was looking specifically at

Boston and New York and I looked at the relative

capacity at these outlying airports, like Manchester

Regional Airport, as I mentioned, and I confirmed that

1  it was sufficiently small, that if I just looked at the

2  main airport at Logan, then that was sufficient.

3  Q.  The next slide please.

4      Doctor, how does your definition of "relevant

5  markets" compare to other analyses of "relevant markets"

6  in the airline industry?

7  A.  It's very similar to other market definitions in

8  what's been used in the industry.  So, um, for instance

9  similar markets are used in other airline cases.  So I

10  looked at the **Northeast Alliance** case that was heard in

11  this courthouse last year and they used similar market

12  definitions.

13      I also looked at the academic literature in detail

14  and what I found is that when people in economics or

15  transportation studies are analyzing how to think about

16  competition, they modeled competition on a route level.

17  So that's very consistent with my using a route level, a

18  city or endpoint pairs, as my market definition.

19      And finally I looked at what Dr. Hill, um, thought

20  about "market definition" and he, by and large, doesn't

21  contest my markets.  He offers a couple of narrow

22  objections that are largely immaterial.  So in one case

23  he says, um, that there's an airport that's North of

24  Orlando called Sanford International, and he thinks that

25  should be in the Orlando market even though the DOT

1    doesn't put it in there.  And in another case there are

2    two smaller airports in Puerto Rico, Ponce and Agua Dia,

3    and he said that some flights from those airports, ones

4    that are one-stop, should be in the same market as for

5    San Juan International.  And those are really small

6    objections to my market definition.

7    Q.  Thank you, Doctor.  The next slide please.

8        Dr. Gowrisankaran, what origin and destination

9    markets did you conclude are relevant to evaluating the

10   effects of this transaction?

11   A.  I identified three types of markets.  So one type is

12   overlap markets, and these are markets where Spirit and

13   JetBlue both provide service, it's where they compete

14   head-on.  And I'm going to split those three overlap

15   markets, those types of markets into -- I'm going to

16   split that overlap market into three subtypes, nonstop

17   overlaps where both Spirit and JetBlue compete with

18   nonstop service, and mixed overlaps, and connect

19   overlaps.  Those are markets where one of the airlines

20   might provide nonstop service, but the other or both of

21   them provide connect service.

22       Besides overlap markets, I'm also looking at

23   nonoverlap markets, and these are markets where Spirit

24   provides nonstop service, but there's no JetBlue

25   service.  And reason I'm considering these as relevant

1    markets, where there's a potential for harm, is that the

2    parties have made clear that what they want to do with

3    this merger is to remove Spirit Airlines and replace it

4    with JetBlue Airlines.  And so that means that because

5    they're removing Spirit Airlines, there's the potential

6    for harm and for net harm in markets where Spirit is

7    currently there, but JetBlue isn't, and because

8    customers, if this merger were to go forward, would no

9    longer have the option of Spirit Airlines in those

10   markets.

11       And the final set of markets that I look at are

12   future Spirit nonstop markets, those are ones where

13   Spirit plans to offer nonstop service, but doesn't

14   currently offer the service.

15   Q.  Thank you.  The next slide please.

16       Doctor, now I'd like to discuss how you used your

17   definition of "relevant markets" to assess market shares

18   and market concentration.  The next slide please.

19       And, Doctor, how do market shares help you analyze

20   a proposed transaction?

21   A.  Well market shares are standard measures that we use

22   as economists, and the reason that we use market shares

23   is that there's a fundamental link between having a high

24   market share and having market power.  So the highest

25   market share would be a monopoly, a 100 percent share,

1    and we understand as economists that monopolies have a

2    lot of market power, and that that link is true more

3    generally, that the higher the market shares, the more

4    likely there is to be the potential for market power.

5    And the implications of market power include, most

6    directly, higher prices, but that can lead to reduced

7    output, and it can also lead to less product variety,

8    for instance.

9    Q.   And, Doctor, how did you measure market shares?

10   A.   Well what I did to measure market shares is I used

11   passenger counts.  So what I mean by that is that if I'm

12   looking at a route, say Boston to San Juan, I looked at

13   -- and I want to see what's JetBlue's market share?  I

14   looked at what's the number of passengers that are

15   flying on JetBlue and I divided that by the total number

16   of passengers that are flying on, um, that are flying on

17   any airline from Boston to San Juan.

18   Q.   And what data did you use, Doctor?

19   A.   So I used two data sources to construct my market

20   shares.  So I used the DB 1B data, that's federal data

21   from the Department of Transportation, that provides

22   ticket data, a 1-in-10 sample of tickets that airlines

23   submit to the DOJ.  I also used the OAG data, that's the

24   official airline guide, and the OAG data are, um, a data

25   that, um, from an industry trade group effectively.

1    Q.   And, Doctor, what time period did you use?

2    A.   So I used a 1-year time period from the year before

3    the merger announcement, so it's a most recent year that

4    ends before the merger announcement.  So I ended with

5    the second quarter of 2022.

6    Q.   The next slide please.

7         Now, Doctor, what did your analysis of defendants'

8    market shares on the nonstop overlap markets tell you?

9    A.   So I did an analysis on this and this is, um -- this

10   demonstrative is from my report, it's based on an

11   analysis I did, and I know I've seen it this court, in

12   this court before, because I think this was used in one

13   of the previous witnesses's testimony.  I think it was

14   flipped vertically then.

15        But what this analysis shows is that, um, these

16   parties have high market shares in a whole bunch of

17   routes.  And so what I listed here are the 51 routes

18   that meet what's called the "structural presumption" for

19   there being likely competitive effects from this merger.

20   And on each of those 51 routes, the parties, um,

21   together have a whole bunch of the market.

22        So just focusing on one of them, Boston to San

23   Juan, and that's the one that's fourth from the left,

24   and so I indicated it with an arrow, JetBlue's market

25   share there is 60 percent and Spirit's market share is

1    28 percent.  So together they control about 88 percent

2    of the flights of the passengers that are going from

3    Boston to San Juan.

4    Q.  All right.  Thank you, Doctor.  The next slide,

5    Slide 2, please.

6         And, Dr. Gowrisankaran, what did you do after

7    calculating market shares?

8    A.  So the next step in my analysis was I used the

9    market shares to understand, um, market concentration.

10   And so I used a measure of market concentration that as

11   economists we use all the time, and it's called the

12   "HHI," which stands for "Herfindahl Hirschmann Index."

13   And the HHI is a measure of market concentration.  So

14   the higher the HHI, the more concentrated the market is.

15   Q.  And, Doctor, are there certain levels of

16   concentration that typically are thought to raise

17   concerns about harming the competition?

18   A.  Yes, there are.  And so these are also in the

19   horizontal merger guidelines, the same guidelines that I

20   discussed earlier.  And so the horizontal guidelines,

21   they lay out three buckets for mergers that warrant

22   further scrutiny.

23        So if the post-merger HHI is over 2500 and the

24   change in HHI from the merger is over 200, then these

25   are called "highly-concentrated markets," and these are

1   markets that are presumed to be likely to enhance market

2   power, or for short they're often called just

3   "presumption markets."  And these presumption markets

4   are the 51 markets that I showed earlier.

5        But the horizontal merger guidelines also lay out

6   two other buckets and those buckets are ones where the

7   post-merger Herfindahl is also over 2500, but the change

8   is a little bit less, often the change from the merger

9   is between 100 and 200, although the post-merger

10  Herfindahl is a little less, it's between 1500 and 2500.

11  And in the words of the guidelines, in these markets --

12  these are also concentrated markets that potentially

13  raise significant competitive concern and often warrant

14  scrutiny.

15  Q.  Slide 25, please.

16       Doctor, what were the results of your analysis in

17  market shares and market concentration?

18  A.  Well I present the results graphically and this is

19  an exhibit based on an analysis I did that's in my

20  report, and what I showed here is, um, I highlighted

21  here all of the routes where, um, they meet the

22  presumption for anticompetitive harm, and I indicated

23  the size of each route by the size of the circle.  So

24  the bigger the circle, the more passengers that are

25  flying on that route.

1          So just to illustrate what are the biggest routes

2     where there's, um, a presumption of anticompetitive

3     harm?  Those are New York City to Miami and New York

4     City to Orlando, two very big routes.

5          Now what I did here is I color-coded these and so

6     I put all the nonstop overlaps in red and I put the

7     other overlaps, the connect ones in blue and green.  And

8     the nonstop overlaps are there's 51 of these markets,

9     the same 51 that were on my bar graphs earlier, and this

10    is where the bulk of the harm in this transaction is,

11    where the bulk of the concern is.  And the way that we

12    can see that is that if we look at those 51, those are

13    the biggest circles.  So New York to Orlando and New

14    York to Miami are the very biggest, but if you just look

15    at that at this graph, most of it is red.

16    Q.   Now, Doctor, I see this one dot at the top right-

17    hand corner of this chart.  Could you please explain

18    what's being shown there?

19    A.   Right, that's the same market that I talked about

20    earlier, which is Boston to San Juan, and that market is

21    so concentrated that it wouldn't have fit on the graph,

22    or if I made it fit, then the other ones, you couldn't

23    see them very well.  And so what I did is I indicated

24    it, I put it at the top right, and then tracing my way

25    down from that, what I indicated is that it's at 6,000

1    plus for the Herfindahl.  And tracing that dot to the

2    left, what I showed is that -- that the change in

3    Herfindahl is 3,000 plus.  And that just indicates that

4    it's higher than the levels in which I cut off the

5    graph.

6    Q.  Thank you, Doctor.

7         MR. BATTAGLIA:  Ms. Afari, can you please pull up

8    Appendix C from Dr. Gowrisankaran's report.

9         And, your Honor, this should be the second tab in

10   your binder.

11        (On screen.)

12   Q.  The second -- Dr. Gowrisankaran, the second tab in

13   your binder.

14   A.  Oh, I'm sorry, yes.

15   Q.  It's the Appendix C.

16   A.  Yeah.  I can just look at it on the screen.  That's

17   fine.

18   Q.  And, Doctor, is this an appendix from your initial

19   report?

20   A.  Yes, it is.

21   Q.  And at a high level can you describe what it is

22   showing?

23   A.  Yes.  So what I did in this appendix is I

24   highlighted all of the markets that meet either the

25   structural presumption for harm or that are in these

1    other two buckets for being concentrated, and for each

2    of those markets what I did was I reported a number of

3    figures about those markets.

4           And so going from left to right, on the leftmost I

5    indicated the first endpoint city.  Then I indicated the

6    second endpoint city.  Then the number of passengers in

7    the market.  Then the share of -- oops.  Okay.  Then the

8    share of Spirit Airlines.  Then the share of JetBlue.

9    The combined share.  The, um, the Herfindahl index

10   post-merger.  The change in the Herfindahl index from

11   pre to post merger.  And then a check mark for whether

12   these are in the set of presumptive anticompetitive

13   markets.  And I'll note that all of these numbers are

14   calculated using passenger shares.

15   Q.  And, Doctor, what categories of relevant markets are

16   included in this appendix?

17   A.  They include three buckets, the three buckets I

18   talked about earlier, the presumptive ones and the two

19   other ones where they're concentrated also and warrant

20   significant competitive concerns.

21   Q.  And, Doctor, just to be clear, there are markets --

22   there are nonstop markets that don't meet the

23   presumption that are included?

24   A.  Yeah, absolutely.  So even on the screen, the first

25   one you see is Miami to Philadelphia, that's where it's,

1    um -- I think that's a nonstop -- yes, these are all

2    nonstop overlaps, I should say.  And that's one that

3    doesn't meet the presumption, and so it's the first one

4    without a check mark.

5    Q.  Thank you.

6         MR. BATTAGLIA:  Ms. Afari, can you please pull up

7    Appendix E.

8         (On screen.)

9         MR. BATTAGLIA:  And, your Honor, this is the tab

10   labeled Appendix E.

11        THE COURT:  I have it.

12        MR. BATTAGLIA:  Okay, thank you.

13   Q.  Now, Dr. Gowrisankaran, is this an appendix from

14   your initial report?

15   A.  Yes, it is.

16   Q.  And can you please describe what it is showing?

17   A.  This is showing the analogous information to

18   Appendix C.  But rather than calculating market shares

19   based on passenger counts, what I did was I calculated

20   market shares based on revenues.  So in other words, I

21   looked at Spirit's market shares, the total amount that

22   people paid for Spirit flights on a route divided by the

23   total amount paid on any airline.  And I calculated

24   revenues here using the DB 1B data, the Department of

25   Transportation data.  And apart from this change on how

1    I calculated shares and the change in markets that's

2    going to be there because of the difference in shares,

3    it provides the same information as Appendix C, the same

4    fields.

5    Q.  Thank you, Doctor.

6         MR. BATTAGLIA:  Ms. Afari, if you could please

7    pull up Appendix F.  And it's the next tab in the

8    binder.

9    Q.    And, Doctor, is this an appendix from your initial

10   report?

11   A.  Yes, it is.

12   Q.  And what is being shown in this appendix?

13        THE COURT:  Mr. Battaglia, I'm going to interrupt

14   you, though I know you're right in the middle of a

15   document, and I apologize, but again because I have

16   students that I'm going to talk to during the break and

17   towards the end of the break and I'll parade them

18   through the courtroom and out.

19        But I interrupt now because we've deferred the

20   evidentiary issue.  What I want you to do is, during the

21   break, is to pull together all of the exhibits that you

22   want to get in through his testimony.  I assume the

23   basis is 1006, that's the only thing I've heard.  But in

24   any event, bring them all together and give me a packet

25   of them so I can be looking at them and considering them

1  as you go along, and that will tighten up our discussion

2  and save time once you offer them.

3          All right.  We'll stand in recess until 11:15.

4  We'll recess.

5          THE CLERK:  All rise.

6          (Recess, 10:45 a.m.)

1            C E R T I F I C A T E

2

3

4        I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER,

5    do hereby certify that the foregoing record is a true

6    and accurate transcription of my stenographic notes

7    before Judge William G. Young, on Friday, November 17,

8    2023, to the best of my skill and ability.

9

10

11    /s/ Richard H. Romanow 11-17-23
      _____
12    RICHARD H. ROMANOW    Date

13

14

15

16

17

18

19

20

21

22

23

24

25