1                 THE UNITED STATES DISTRICT COURT

2                  DISTRICT OF MASSACHUSETTS (Boston)

3                             No. 1:23-cv-10511-WGY
                              Vol 1, Pages 1 - 82
4

5

6    UNITED STATES OF AMERICA, et al,
               Plaintiffs
7

8    vs.

9

10   JETBLUE AIRWAYS CORPORATION, et al,
               Defendants
11

12                          * * * * * * * * *

13

14                     For Bench Trial Before:
                       Judge William G. Young
15

16

17                     United States District Court
                       District of Massachusetts (Boston)
18                     One Courthouse Way
                       Boston, Massachusetts 02210
19                     Monday, November 20, 2023

20                          * * * * * * * *

21

22             REPORTER: RICHARD H. ROMANOW, RPR
                      Official Court Reporter
23                    United States District Court
           One Courthouse Way, Room 5510, Boston, MA 02210
24                        rhrbulldog@aol.com

25

```
 1                    A P P E A R A N C E S

 2

 3    EDWARD WILLIAM DUFFY, ESQ.
      ARIANNA MARKEL, ESQ.
 4    AARON TEITELBAUM, ESQ.
          DOJ-Atr
 5        450 Fifth Street NW, Suite 8000
          Washington, DC 20530
 6        (202) 812-4723
          Email: Edward.duffy@usdoj.gov
 7    and
       WILLIAM T. MATLACK, ESQ.
 8        Attorney General's Office
          One Ashburton Place, 18th Floor
 9        Boston, MA 02108
          (617) 727-2200
10        Email: William.matlack@mass.gov
          For Plaintiffs United States of America and
11        The Commonwealth of Massachusetts

12

13     RYAN SHORES, ESQ.
          Cleary Gottlieb Steen & Hamilton LLP
14        2112 Pennsylvania Avenue, NW
          Washington, DC 20037
15        (202) 974-1876
          Email: Rshores@cgsh.com
16    and
       ELIZABETH M. WRIGHT, ESQ.
17        Cooley LLP
          500 Boylston Street
18        Boston, MA 02116-3736
          (617) 937-2349
19        Email: Ewright@cooley.com
      and
20     RACHEL MOSSMAN ZIEMINSKI, ESQ.
       MICHAEL MITCHELL, ESQ.
21        Shearman & Sterling LLP
          2601 Olive Street, 17th Floor
22        Dallas, TX 75201
          Email: Rachel.zieminski@shearman.com
23        For Defendant JetBlue Airways Corporation

24

25        (Continued.)
```

1      (Continued.)

2

3    JAY COHEN, ESQ.
     ANDREW C. FINCH, ESQ.
4        Paul, Weiss, Rifkind, Wharton & Garrison
         1285 Avenue of the Americas
5        New York, NY 10019-6064
         (212) 373-3000
6        Email: Jaycohen@paulweiss.com
         For Defendant Spirit Airlines, Inc.
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                           I N D E X

2

3    WITNESS                    DIRECT  CROSS  REDIRECT  RECROSS

4

5    DR. GAUTAM GOWRISANKARAN (Continued.)

6       By Mr. Battaglia:        6

7       By Mr. Culley:                   51

8

9                          E X H I B I T S

10

11          EXHIBIT 802 ......................... 66

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1          P R O C E E D I N G S
 2          (Begins, 9:00 a.m.)
 3          THE COURT:  Good morning.  I apologize for how hot
 4     it is here.  And we're all ready to go.
 5          And if you'd remind the witness.
 6          THE CLERK:  I'd like to remind you, sir, that you
 7     are still under oath.
 8          Do you understand?
 9          THE WITNESS:  Yes, I do.
10          MR. DUFFY:  Your Honor, just two very quick
11     things.  I guess three.
12          The binders that you requested for all the
13     exhibits admitted are over here and --
14          THE COURT:  And Ms. Gaudet has spoken to me about
15     them.  We'll take custody of them.  And thank you.
16          MR. DUFFY:  And if we may approach, we just have
17     the binder of the 1006 exhibits.
18          And then if the Court would like, we do have a
19     larger version of these slides.  I know some of the data
20     slides are a bit small, so.
21          THE COURT:  No, this is fine, the larger versions.
22     You've seen I've brought out my magnifying glass now.
23          (Laughter.)
24          THE COURT:  I guess I'm a little confused here and
25     I speak to save time.
```

1          When an evidentiary issue was raised because of an

2     objection, I thought it would save time if we put the

3     issue to the end of this witness's testimony, and I

4     asked for all those exhibits that you wanted to get in

5     evidence through this witness.  And I've -- actually you

6     gave me a lot of folders, but we've trimmed them down to

7     this packet of documents which I hold in my hand.  And

8     while I haven't heard argument entirely, I had thought

9     that the reason for admitting these was under 1006.

10    That's the point on which I came on the bench.  I don't

11    know what this is?

12         MR. DUFFY:  It's just a binder of the same

13    materials, your Honor.

14         THE COURT:  It's the same thing over again?

15         MR. DUFFY:  With a few, um -- basically the

16    folders that you had on Friday are what has already been

17    testified to.  The binder includes all of those plus

18    those that Dr. Gowrisankaran will be testifying about

19    today.

20         THE COURT:  I understand.  And thank you.

21         All right, you may continue.

22

23    DIRECT EXAMINATION BY MR. BATTAGLIA.  (Continued.)

24         MR. BATTAGLIA:  Ms. Afari, would you please pull

25    up Slide 84.

```
 1          (On screen.)
 2   Q.   Good morning, Dr. Gowrisankaran.  Welcome back.
 3   A.   Good morning.
 4   Q.   Doctor, when we left off Friday you had just
 5   finished explaining the results of your Net Harm Model.
 6   At a high-level can you please remind the Court of what
 7   you mean by "net harm"?
 8   A.   Yes.  So what I mean by "net harm" is the harm that
 9   would accrue to consumers annually net of the gains from
10   taking the parties' efficiency, conversion efficiency
11   claim seriously, which is that they're going to -- in
12   the words of the parties, they're going to take the
13   Spirit claims and turn them into JetBlue claims.  And so
14   the "net harm" that I'm calculating is the gross harm
15   from removing Spirit, but then adding back in the
16   benefit of the JetBlue Effect.
17   Q.   And on Friday you testified that your Net Harm Model
18   gets credit to JetBlue being a stronger competitor as a
19   result of the proposed transaction.  Can you explain
20   what you meant by that?
21   A.   Yes, what I mean by that is that, um, what I did in
22   my net harm model is, um, in routes for instance where
23   Spirit and JetBlue both compete currently in what are
24   nonstop overlap routes, what I did is I allowed for
25   Spirit's capacity to become JetBlue's capacity.  So in
```

1    those routes, um, what I specified is that Spirit is

2    a -- excuse me, JetBlue would be bigger, and they'd be

3    bigger by exactly the amount that Spirit currently

4    operates, and that extra size, that extra relative

5    capacity in my model would allow the JetBlue Effect in

6    those markets to be bigger than it currently is.

7    Q.  So taking into account the additional capacity

8    JetBlue would have as a result of the transaction, does

9    your Net Harm Model find most consumers flying in

10   relevant markets will be better or worse off as a result

11   of the merger?

12        THE COURT:  I don't understand the question.

13   Maybe I --

14        MR. BATTAGLIA:  I'll rephrase, your Honor.

15        THE COURT:  All right, thank you.

16   Q.  So, Doctor, taking into account the additional

17   capacity JetBlue would have as a result of the

18   transaction, what does your Net Harm Model find with

19   respect to the effects of the transaction?

20   A.  It finds that the transaction would result in

21   conservatively $900 million in net harm annually.  And

22   recall that I testified that I estimated my Net Harm

23   Model in two ways.  One was the weighted-regression

24   model and that's the version that's more favorable to

25   defendants, that's where I get the $900 million number

1      from, and the other is the unweighted-regression model

2      which I think is more accurate, and that's where I get a

3      larger number, I think it's $2 billion in that harm to

4      consumers.

5           THE COURT:  Tell me again -- and I'm slow, what is

6      the "net harm"?

7           THE WITNESS:  Absolutely.

8           The "net harm," your Honor, is the extra prices

9      that consumers would pay as a result of this merger

10     assuming that JetBlue took all the Spirit planes and

11     operated them as JetBlue planes in the same markets.

12          THE COURT:  Yes, I've been following that.

13          THE WITNESS:  Uh-huh.

14          THE COURT:  But as I've listened to the testimony

15     here, there's -- and I'm going to let your lawyer ask

16     you the questions in order.  But they -- they, JetBlue,

17     has proffered various gates and, um, they're going to

18     dispense with various things on the theory that --

19     ultra-low-cost carriers are going to come in there, meet

20     that need, and in fact -- and you may disagree with

21     this, but in fact given JetBlue's competitive model,

22     vis-vis the legacy airlines, will be better off were

23     this to go forward.

24          You haven't gotten to dealing with those

25     contentions yet, is that right?

1       THE WITNESS:  Your Honor, I'm not here to testify

2    about divestitures, the next witness, Dr. Chipty will

3    testify about divestitures.

4       THE COURT:  Understood.  All right, that answers

5    my question.

6       Go ahead.

7       MR. BATTAGLIA:  Thank you, your Honor.

8    Q.  And, Doctor, going back to your network model.  To

9    the extent JetBlue does not continue flying all of the

10   JetBlue and Spirit planes in the same markets they fly

11   today, how would that affect your conclusion with

12   respect to the net harm?

13   A.  Well it would make the net harm bigger.  And so what

14   I did is I took the most favorable interpretation of the

15   -- to the defendants, which is to say that they're going

16   to operate all of the planes that Spirit operates in

17   these same markets, and I think as I testified on

18   Friday, that's not likely to be consistent with their

19   incentives.  And so if they act in the ways that are

20   suggested by their incentives, which are to move some of

21   those planes out of the markets and not use them as

22   intensely as Spirit uses them, then the net harm would

23   be larger than the $900 million that I outlined.

24   Q.  Thank you, Doctor.

25       MR. BATTAGLIA:  Slide 85, please.

1          (On screen.)

2    Q.   So, Doctor, you just finished explaining why this

3    merger is likely to result in substantial harm to

4    consumers.  Now I'd like to turn to some of the

5    disagreements between you and defendants' expert,

6    Dr. Hill, about how to assess the competitive effects of

7    this.

8          MR. BATTAGLIA:  Slide 86, please.

9    Q.   And, Dr. Gowrisankaran, how does your analysis of

10   this merger differ from Dr. Hill's approach?

11   A.   Well Dr. Hill makes two key omissions throughout his

12   analysis and these are the same two omissions I

13   testified to at the beginning of my testimony on Friday,

14   which is that Dr. Hill ignores Spirit customers -- the

15   first of them is that Dr. Hill ignores Spirit customers

16   and the low prices they pay.  So he focuses only on

17   rival prices.

18        So when he's looking to calculate his Net Harm

19   Model, his net harm, which is of course, um, prices,

20   based on prices, as I testified to the Court, he's only

21   looking at rivals' prices and he's not looking at

22   Spirit's own low prices.  And he justifies that first

23   omission with inaccurate facts and an economic model

24   that I believe is inappropriate.

25        The second omission that Dr. Hill makes is that he

1    ignores nonstop overlap markets, these are markets where

2    Spirit and JetBlue compete head to head and where that

3    head-to-head competition would go away as a result of

4    this merger, if it were to go forward.  And that's the

5    heart of this matter is these nonstop overlap markets.

6    So that's where head-to-head competition occurs in this

7    merger is where they compete over -- is where they

8    compete nonstop in the same markets.  And so I think

9    it's not appropriate to just ignore that, that's the

10   biggest part of this merger.

11   Q.  And, Doctor, are there any other ways in which you

12   and Dr. Hill disagree?

13   A.  Yes, he makes, um, many other additional errors, and

14   he has a number of critiques of my analysis, but they're

15   largely immaterial to our findings, to the difference in

16   our findings.

17        What explains the differences in the findings

18   between me and Dr. Hill is these two effects and really

19   it's those two effects together that explain why I find

20   that this merger will likely result in net harm to

21   consumers and Dr. Hill finds that they would likely not

22   find or result in a net benefit to consumers.

23        MR. BATTAGLIA:  Slide 87, please.

24   Q.  Doctor, I'd like to take a closer look at those two

25   key admissions that you identified.

1          Doctor, what do you mean that Dr. Hill ignores
2     Spirit customers?
3     A.  So what I mean is that my Net Harm Model is based
4     on, um, understanding what the prices that consumers pay
5     in those markets and how those are impacted by -- by the
6     relative capacity of entry, and when Dr. Hill calculates
7     prices, he simply ignores Spirit customers.  And so I
8     illustrate that with the same demonstrative from
9     Dr. Hill's report that I talk about earlier --
10          And, your Honor, this is the Hartford-to-Miami
11     example.
12          And what I'm looking at to say what's the impact
13     of Spirit's entry on prices is all the prices in that
14     market?  And so those are the four airlines that fly in
15     that market after Spirit's entry.  And Spirit's prices
16     are much lower and that's going to mean -- and this is
17     pretty typical, and that's going to mean that the
18     overall average prices are lower.
19          What Dr. Hill is going to look at, when he
20     calculates net harm, is he's simply going to erase the
21     yellow line effectively and he's going to say "Let me
22     look at the prices of Spirit's rivals.  So he's going to
23     look at what he marked as the dotted line in that
24     figure, which is just the average of Spirit's rivals,
25     and not account for the fact that Spirit's prices

1    themselves are lower, and that's the biggest benefit of

2    Spirit's competition is the prices that Spirit customers

3    themselves pay.  Now Spirit has effects on other

4    airlines, but the biggest benefits is their own

5    customers.

6    Q.   And, Doctor, what is your understanding of why

7    Dr. Hill ignores Spirit's customers and prices?

8    A.   Well Dr. Hill gives two rationales behind why he

9    ignores Spirit's customers.  The first is that he views

10   JetBlue as delivering more value to customers than

11   Spirit in general, and also with the Blue Basic product,

12   which as I testified is the one that competes most

13   heavily with Spirit.  And he also gives a rationale, the

14   second rationale, that JetBlue, um, when it enters a

15   market that Spirit is operating on, affects Spirit's

16   prices more than Spirit affects JetBlue's prices, and he

17   thinks that this suggests that Spirit has lower value.

18   Q.   I want your thoughts on these rationales?

19   A.   Both rationales are invalid and they're invalid as a

20   matter of economics of whether these imply that Spirit

21   customers are better off paying more to fly JetBlue, and

22   also invalid as a matter of fact, that just the two

23   facts there are not true.

24        MR. BATTAGLIA:  Slide 88, please.

25   Q.   Doctor, what do you think of Dr. Hill's first

1   rationale for ignoring Spirit's customers and prices?

2   A.  Well his first rationale, and I put in two quotes

3   from Dr. Hill's report there, so he has this viewpoint

4   that JetBlue and Blue Basic specifically deliver more

5   value to customers than Spirit.  But what Dr. Hill

6   ignores in his -- as is evidenced by his quotes there,

7   is that he assumes that all customers are the same.  And

8   what that really ignores fundamentally is that, um,

9   customers vary, individuals vary in their preferences.

10   Some people would rather fly Spirit and some people

11   would rather fly Blue Basic.

12        It's not -- as an economist, it's not up to me or

13   Dr. Hill to say which product is better just looking at

14   it, it's up to customers, and customers, um, they say

15   which product is better by what's called "revealed

16   preferences," by what they choose, and Dr. Hill just

17   ignores that, that individuals in many cases choose

18   Spirit Blue Basic, for instance.

19        MR. BATTAGLIA:  Slide 89, please.

20   Q.  Doctor, what do you think about Dr. Hill's claim

21   that JetBlue is higher quality than Spirit?

22   A.  Well I think that Dr. Hill bases his claim on really

23   conflating the concept of quality with the concept of

24   bundling.  And so I illustrate this with a figure from

25   Dr. Hill's report.  And what the figure shows is, um,

1    what Dr. Hill views as JetBlue being higher quality for

2    a bunch of amenities, but the difference between Spirit

3    and JetBlue -- so Spirit offers most of these amenities,

4    it's just -- the difference is that it just doesn't

5    force customers to buy all of them.

6         So if you buy a Spirit ticket, then the customers

7    who want those amenities by and large can buy them, like

8    extra leg room seats or WIFI service, Spirit just

9    doesn't force customers who don't want them to buy them

10   as a cost of buying a Spirit ticket.  And recall that I

11   testified on Friday that from Spirit's own documents,

12   most of its customers don't want things like WIFI, they

13   said they just had no need for that.

14   Q.  And, Doctor, have you done any analyses to account

15   for bundling?

16   A.  Yes, I did.

17   Q.  And which analyses are those?

18   A.  Well I did an analysis where I did my same Net Harm

19   Model, but instead of using the DB 1B data, that's the

20   Federal data, I used the date produced by the parties --

21   not just by the parties, but by major airlines in the

22   U.S., and what I did with those data is I added in all

23   the ancillary fees that airlines reported.  And so I

24   calculated a full price measure that includes the basic

25   ticket price plus the reported ancillary fees.  So if

1    people fly Spirit and they're paying for overhead bin

2    space, then that's in my Spirit price.  And similarly

3    for JetBlue, whatever amenities people are picking on

4    JetBlue is in there.

5         And what I found is that even with my produced

6    ticket data, the net harm numbers, they're very similar

7    to my base numbers, and not only are they similar,

8    they're slightly higher.  So my base net harm numbers

9    are 900 million annually to American consumers and with

10   the produced ticket data they're about a billion

11   dollars.

12        And the other analysis I did is I looked at my net

13   harm models from this analysis that I just discussed and

14   I said "How much value would Spirit passengers need to

15   place -- in these nonstop overlaps, how much value would

16   they need to place on the JetBlue product to offset the

17   net harm of about a billion dollars?"  And when I did

18   this it turns out that the calculation says that each

19   Spirit passenger would have to place an average of $115

20   each way on these JetBlue amenities to account for the

21   billion dollars in net harm, and that number is simply

22   too large to be credible.  And so Spirit charges a lot

23   less for a whole bunch of its amenities together than

24   $115, and many people decline all of those amenities,

25   and the majority of people decline to buy specific ones.

1       So there's, um -- it's just not credible that

2  people would be willing to spend $115 extra each way for

3  these amenities that are bundled on Blue Basic, but not

4  on Spirit.

5  Q.  So, Doctor, what did these analyses tell you about

6  Dr. Hill's rationale for ignoring Spirit's customers?

7  A.  They tell me that this rationale is just not

8  accurate, that he's, um -- it's not appropriate to throw

9  out Spirit passengers and the low prices they pay just

10  because Dr. Hill views JetBlue or Blue Basic as a

11  superior product to Spirit.

12  Q.  Thank you.

13       MR. BATTAGLIA:  Slide 90, please.

14  Q.  And, Dr. Gowrisankaran, have you done any analysis

15  of passengers choosing between Blue Basic and Spirit?

16  A.  Um, yes, I did.

17  Q.  And what analysis was that?

18  A.  Well I wanted to not just -- when I looked at

19  Dr. Hill's report, I wanted to understand, to drill down

20  on this and say is Dr. Hill really right that if you do

21  a full apples-to-apples comparison, um, people prefer

22  Blue Basic to Spirit?  And so what I did was I went to

23  the ticket data, the produced ticket data, and I said

24  let me try to identify instances when Spirit was more

25  extensive than Blue Basic?  And so those are instances

1    when the reason to pick Blue Basic over Spirit does

2    not -- or to pick Spirit over Blue Basic does not come

3    down to being cheaper, Spirit's more expensive, and I

4    wanted to see is it always true that people pick Blue

5    Basic when you factor aside price?

6         And so I did that by looking at the data and

7    identifying those instances when Spirit is more

8    expensive than Blue Basic, and there aren't that many,

9    but there's still about 475,000 passenger choices, and I

10   picked of course the same origin and destination, but I

11   also looked at customers who are buying tickets for the

12   same day of travel and on the same day of purchase.  And

13   by doing that what I did is it's -- it's as close to an

14   apples-to-apples comparison as you can get.

15   Q.  And what did you find, Doctor?

16   A.  What I found is that the blue and the yellow bars,

17   they're almost the same height, and what that tells me

18   is that even when you factor aside price -- so in these

19   -- for these passengers Spirit was actually more

20   expensive than Blue Basic.  So factoring aside price,

21   almost half of passengers are willing to pick Spirit

22   over Blue Basic.  So 225,000 are picking Spirit and

23   250,000 are picking Blue Basic.  Very similar numbers.

24   Q.  And, Doctor, what does this analysis tell you about

25   Dr. Hill's assumption that Spirit customers will be

1    unaffected switching to Blue Basic?

2    A.  Well it tells me that a substantial number of Spirit

3    customers would be affected, that Dr. Hill is not right

4    to make that assessment.  So if people are picking

5    Spirit and they're picking it even when it's more

6    expensive, in those rare times when it's more expensive,

7    then those people, and it's a substantial fraction of

8    people, they prefer Spirit to Blue Basic.  And those

9    people, if Spirit were not in the market, would be

10   affected.

11        MR. BATTAGLIA:  Slide 91, please.

12   Q.  Doctor, how would this merger affect these customers

13   you've been talking about who prefer Spirit?

14   A.  Well those customers would be harmed by the loss of

15   the Spirit product.  And so I've just testified how as a

16   economist we think that there's a harm when people pick

17   a product and that product is no longer available, and

18   that's because what people do, choices and the decisions

19   they make, that's central to how we analyze competition

20   as economists.

21        And the horizontal merger guidelines, they really

22   agree with this idea, they really echo it, and I put a

23   quote from them here.  And what it said is that if the

24   merged firm would withdraw a product that a significant

25   number of customers strongly prefer, then that can

1  constitute a harm to consumers over and above any

2  effects on the price or quality of any given product.

3        MR. BATTAGLIA:   Slide 92, please.

4  Q.  And, Doctor, what do you think about the second

5  rationale offered by Dr. Hill for ignoring Spirit's

6  customers and prices?

7  A.  Well the rationale is Dr. Hill looks at the impact

8  of Spirit's entry on JetBlue and JetBlue's entry on

9  Spirit and compares them, and I thought that that

10  rationale, it didn't make a lot of sense to me from the

11  point of view of economics, and it's also wrong on the

12  facts.

13        And so focusing on the first point about whether

14  it makes sense as a matter of economics.  If you want to

15  understand whether Spirit or JetBlue are a more

16  important competitor, what we should really do is

17  regress entry of Spirit or of JetBlue on market prices,

18  not on each other.  So regressing them on each other, it

19  doesn't really tell us anything that's informative about

20  which is a better competitor.  And Dr. Hill, um, I

21  didn't find a justification that I found convincing in

22  his report about this.

23        But even if Dr. Hill were right that this somehow

24  tells us that Spirit is a weaker competitor to JetBlue,

25  Dr. Hill is wrong on the facts, um, and that's because

1    he doesn't do an appropriate apples-to-apples comparison

2    here.

3    Q.  Doctor, did you conduct any analysis of defendants

4    pricing effects on each other?

5    A.  Yes, I did.

6    Q.  And what analysis was that?

7    A.  So this is what I'm showing on the right side of

8    this demonstrative, and what I did is I wanted to

9    understand what's the impact of Spirit on JetBlue prices

10   and of JetBlue on Spirit prices?  And what I did to make

11   it apples-to-apples is I divided by the number of planes

12   at which Spirit enters or on which JetBlue enters.  And

13   you recall that I testified on Friday that this is

14   important because when Spirit enters it typically enters

15   with fewer flights per day, so 1.7 flights per day for

16   Spirit versus 2.7 on average for JetBlue.

17           And so when I look at the impact of Spirit entry

18   on JetBlue prices -- that's the yellow bars, your Honor,

19   and I look at the impact of JetBlue entry on Spirit

20   prices, and I divide by how many flights a day Spirit

21   enters, the Blue and the yellow bars are pretty similar

22   to each other.  In fact if we look at my unrated

23   specification, the one I think is more accurate, then

24   Spirit entry has a bigger impact on JetBlue prices.

25   Minus 8.2 percent is how much it lowers JetBlue's

1    prices.  While JetBlue entry has a slightly smaller

2    effect of minus 7.7 percent on Spirit prices.

3    Q.  Thank you.

4        MR. BATTAGLIA:  Slide 93, please.

5    Q.  Doctor, given that Dr. Hill ignores Spirit's

6    customers and prices, how then is he perceived to

7    analyze the likely effects of the merger?

8    A.  Well what Dr. Hill does is he first, um, as you

9    asked, just eliminates Spirit prices and Spirit

10   customers and the low prices they pay, and he defines

11   this thing that he calls a "composition effect."  And

12   these are not words that I would use to describe this,

13   but this is Dr. Hill's own words.  But just to explain

14   what he did, so he said the "composition effect" is

15   Spirit's prices and he said "We can ignore them because

16   they're not reliable" for the two rationales he gave

17   earlier.  And then what he said is he wanted to focus on

18   what he called the "competition effect."  And he defines

19   the "composition effect" as the effect of Spirit's entry

20   or entry in general on rivals' average prices.

21        So again turning back to the Hartford-to-Miami

22   example, he's saying the composition effect is when

23   Spirit enters what happens to the other airlines, how

24   much do those airlines go down?  But that's also not

25   appropriate because what that hides is that the mix of

1 customers on those other airlines changes after Spirit

2 enters.

3       So let's think about Spirit entering on the

4 Hartford-to-Miami route.  So Spirit's going to attract

5 cost-conscious travelers on average.  What's going to

6 happen to other airlines like say Delta on that route?

7 Well Delta is going to get more of the business

8 travelers.  So because they're cost-conscious travelers

9 and many of them are going to Spirit, Delta's mix of

10 passengers afterwards is going to focus on the business

11 travelers, and because of that -- and business travelers

12 typically pay more than cost-conscious travelers, they

13 get more amenities for their fares, they might buy

14 walk-up fares, for instance, they're more likely to do

15 that, and so the average fare after and before Spirit

16 entry is not an appropriate mix because it's going to

17 reflect a different composition itself, it's going to

18 reflect more business passengers and fewer of the cost-

19 conscious travelers.

20       And Delta could see -- it might be that every

21 single group of customer on Delta is paying less, but

22 because there are more business travelers and fewer

23 cost-conscious travelers, those Delta fares might be

24 unchanged as a result of that.  And so the bottom line

25 is that Dr. Hill's focus on looking at rivals' prices,

1  that's also not accurate.

2  Q.  Now, Doctor, can you please remind us what prices

3  you use in your analysis of competitive effects?

4  A.  What I used were market average prices.  So I took

5  all the passengers that are flying on that route, I took

6  the total amount they paid, and I divided by the number

7  of passengers.  And it doesn't matter which airline

8  they're flying on because Spirit competes with airlines

9  and Spirit itself is an important competitor to look at.

10      MR. BATTAGLIA:  Slide 94, please.

11  Q.  And, Dr. Gowrisankaran, you just explained that you

12  used market average prices to analyze the pricing

13  effects of entry by Spirit and JetBlue.  How do

14  defendants analyze their own entry on this?

15  A.  Well in looking at defendants' ordinary course

16  evidence and how they testified in trial, they do the

17  same thing.  And so I was here for Mr. Hayes, the CEO --

18  the CO of JetBlue's testimony, and what Mr. Hayes talked

19  about, when he's talking about the JetBlue Effect, he

20  put up a demonstrative about the JetBlue Effect, um,

21  Boston to La Guardia, and what's in there is all prices,

22  it's not just the rivals to JetBlue.  When he looks at

23  the JetBlue Effect, he's looking at market average

24  prices, just like I'm doing.

25      And on the right is an ordinary course document

1   from Spirit, and what Spirit looks at when they look at

2   how much they affect competition, when they want to

3   analyze the Spirit effect, they also look at market

4   average prices, they look at all fares, they don't just

5   look at their rivals' fares.  And I read the testimony

6   of the CEO of Spirit, Mr. Christie, and when he was

7   talking about the Spirit effect, he also talked about

8   Spirit's effect on all market fares, not just on rivals'

9   fares.

10  Q.   Thank you, Doctor.

11       MR. BATTAGLIA:  And Slide 95, please.

12  Q.   Now going back to Dr. Hill's analysis.

13       Did you analyze how the inclusion of Spirit's

14  customers and prices affect Dr. Hill's conclusions?

15  A.   Yes, I did.

16  Q.   And what did you find, Doctor?

17  A.   What I found is that, um, this analysis -- so

18  Dr. Hill's eliminating Spirit passengers is really

19  crucial to his findings.  And so I showed a

20  demonstrative on this from work I did in my rebuttal

21  reports based on analyses I did, and the first two bars,

22  the bars at the left that are in blue that say 193 and

23  1473, those are the net harm that I'm finding with my

24  two different specifications of weighted and unweighted,

25  and those include Spirit passengers, and these are only

1    -- these are in Spirit-only nonstop markets, this is not

2    yet considering the nonstop overlaps.

3          Now when I look at Dr. Hill's numbers, his report

4    -- and that's the right-most bar, your Honor, found that

5    there would be $614 million in benefits to consumers in

6    these Spirit-only nonstop markets.  But I took

7    Dr. Hill's, um, model and I adjusted it to just include

8    Spirit passengers and I did it two different ways, one

9    way that Dr. Hill did in his report, and another way

10   that they reported in the supplement to his report.  And

11   whichever way you do it -- and those are the two green

12   bars, your Honor, the third and the fourth, what I find

13   is that even Dr. Hill's model, if you just include

14   Spirit's passengers and prices they pay, he finds that

15   there's net harm to consumers in these Spirit-only

16   nonstop markets.

17         MR. BATTAGLIA:  Slide 96, please.

18   Q.  Now, Doctor, when discussing Dr. Hill's key

19   omissions, you said that he also ignores nonstop overlap

20   markets.  Can you please explain how exactly Dr. Hill

21   ignores these markets?

22   A.  Well Dr. Hill's reasoning here for excluding them to

23   me seems somewhat circular.  So he designed a model that

24   he said is not reliable for analyzing nonstop overlaps,

25   and then he chooses in his, um, in his rebuttal report,

1    in his report to focus his analysis on markets where

2    JetBlue doesn't compete.  And when I look at this

3    transaction, I see that the most important part of this

4    transaction is exactly the markets where Spirit and

5    JetBlue compete, that's where there's currently a

6    head-to-head competition between these two airlines and

7    that's where that competition would be lost as a result

8    of this merger.

9          MR. BATTAGLIA:  Slide 97, please.

10   Q.    So Dr. Hill claims that his model is not reliable

11   for analyzing nonstop overlaps.

12         Doctor, were you able to use Dr. Hill's model to

13   analyze harm in nonstop overlap markets?

14   A.    Yes, I was.

15   Q.    And what did you find?

16   A.    Again I present five bars and the two left bars are

17   my harm numbers from nonstop overlap markets, and I

18   present them two ways, the weighted and the unweighted

19   harm, and that's where the bulk of the harm is.  So $751

20   million for my more conservative weighted regression

21   numbers.

22         And so I took Dr. Hill's model and I just applied

23   it to nonstop overlaps and what I find is that -- and I

24   did it in two ways, but it doesn't matter which way you

25   do it.  Those are the two orange bars of 730 million and

1    743 million.  So whichever way you do it -- Dr. Hill's

2    own model applied to nonstop overlap markets and finds a

3    similar amount of harm to my base model, to my model

4    with more conservative numbers of 751 million.

5        And the reason I did it two ways is the first of

6    the orange bars, the third bar, that's where -- that's

7    the bar Dr. Hill used in his -- in his report, and he

8    said that that was a specification that was not

9    appropriate to use in nonstop overlaps because of the

10   very technical or econometric point, and so I adjusted

11   the specification to address his point and that's the

12   fourth bar I use, and that's called -- that's called

13   "continuous line segments," your Honor.  And it doesn't

14   matter whether you adjust it or not, you get very

15   similar results.

16       And even if Dr. Hill, if we look at those nonstop

17   overlaps, and even if we exclude Spirit prices and

18   customers, you still get a big harm number, and that

19   harm number, that $327 million, that's the number in the

20   right-most bar.

21       MR. BATTAGLIA:  Slide 98, please.

22   Q.  Now, Doctor, given the assistance of horizontal

23   merger between competitors, how does Dr. Hill justify

24   ignoring the likely harm in nonstop overlap markets?

25   A.  Well Dr. Hill justifies this in three different

1    ways.  And so let me talk about all three ways.

2         So, first of all, I estimate harm in 73 nonstop

3    overlap markets.  So, um, Dr. Hill assumes no harm in 58

4    of these markets.  So he puts these 58 markets into one

5    of three buckets.

6         The first bucket is that they do not meet the

7    presumption of being -- of being highly concentrated and

8    therefore being presumed to enhance market power, the

9    merger being presumed to enhance market power.  And to

10   the second is that they do not meet the presumption with

11   passenger, um -- they meet the presumption with

12   passenger shares, by not with revenue shares.

13   And the third is that they touch an airport with a

14   divestiture.  And let me talk about each of those three

15   reasons.

16        So the first reason, um, just because a market

17   doesn't meet the presumption doesn't mean that there's

18   no likely harm in that market.  And in fact the

19   guidelines lay out three levels of potentially

20   concentrated markets and almost all the markets that

21   don't meet the presumption of harm are in those next two

22   buckets of having likely competitive harm.

23        And the second is, as I already testified to, that

24   passenger shares here are more appropriate than revenue

25   shares.

1           And the third point is something that Dr. Chipty

2      will be testifying to, which is that divestitures --

3           THE COURT:  Well then let him testify to it.

4           THE WITNESS:  Absolutely, yes.  All right.

5           THE COURT:  Go ahead and ask another question.

6      Q.  Yes, so, Doctor, um, you just discussed 58 -- how

7      Dr. Hill treats 58 of your 73 nonstop overlap markets.

8      How does he treat the remaining 15 nonstop overlap

9      markets?

10     A.  For those markets, and Dr. Hill labels them "holdout

11     routes," he offers no alternative estimate of harm to

12     what I'm finding.

13     Q.  And, Doctor, what's being shown here on the right-

14     hand side?

15     A.  What I showed is, first of all, my three harm -- my

16     three net harm numbers, and that's the same 751 million

17     as the red bar on the left, and then the two other ways

18     I calculated them are the two other red bars.  And what

19     I show on the right is how Dr. Hill gets to only 143

20     million in, um, in net harm in what he calls "holdout

21     routes," and that's a number Dr. Hill reports in the

22     supplement to his report.  And so he drops those three

23     other buckets, and those are the ones where there's

24     divestitures, ones where there's, um -- they're not in

25     presumption markets, or ones that are in presumption

1    markets but where -- but only with passenger shares and

2    not revenue shares.

3         And so the difference between me and Dr. Hill in

4    our findings in nonstop overlaps fundamentally boils

5    down to him dropping 58 of these 73 nonstop overlap

6    markets.

7         MR. BATTAGLIA:  Slide 99, please.

8    Q.  So, Doctor, you just discussed two key omissions

9    made by Dr. Hill.  In what other ways do you and

10   Dr. Hill disagree?

11   A.  Well Dr. Hill, um, made a number of other critiques

12   about my econometric modeling.

13   Q.  Okay, let's take a closer look at those critiques.

14        MR. BATTAGLIA:  Slide 100, please.

15   Q.  Now earlier you mentioned that Dr. Hill's criticisms

16   didn't affect your conclusion.  Can you explain why?

17   A.  Yeah, so what I report here, the red bar on this, is

18   these are -- this is the same number I've testified to

19   earlier, 751 million, and so what I did in this analysis

20   here is I said let me look at each of Dr. Hill's

21   critiques that make any sense to look at and let me see

22   what happens to the net harm if I take my model and I

23   adjust it to account for Dr. Hill's critiques.  And so

24   for five of his critiques, the net harm was actually

25   bigger if I implement Dr. Hill's critiques.  And those

1     are the five bars that lie to the left of that $751

2     million number.

3          And for three of his critiques, or four of his

4     critiques, I should say, the numbers are smaller, but

5     they're not -- but there's still significant harm in

6     nonstop overlaps.  And, your Honor, what I highlighted

7     in the red square, the red rectangle to the right, is

8     when I addressed all of Dr. Hill's critiques together --

9     and he had two different sets of critiques and that's

10    why they're two different numbers, and even if I address

11    all of them together, then that harm is very similar to

12    the net harm that I give, 623 million instead of 751

13    million.  And I'll point out that the right-most bar,

14    the 370 million, that's a critique I think is not

15    appropriate to do.  But even if you accounted for it,

16    Dr. Hill would still find substantial harm in nonstop

17    overlap markets.

18    Q.  And, Doctor, which of your regressions illustrates

19    this analysis?

20    A.  This is all with my weighted regression model and

21    then adjusting it for Dr. Hill's critiques.

22         MR. BATTAGLIA:  Slide 101, please.

23    Q.  Now, Doctor, how does this chart differ from the one

24    on the previous slide?

25    A.  Well what this does it it's the same set of

1   critiques but it's for Spirit-only nonstop markets,

2   while the previous slide was about nonstop overlap

3   markets.

4   Q.   And what did your analysis for these markets find?

5   A.   What I found is that my own analysis of the net harm

6   in Spirit-only markets was again right in the middle

7   between Dr. Hill's critiques.  In other words, if I take

8   five of Dr. Hill's critiques and apply them to my model,

9   then the net harm goes up.  If I take all of the

10  critiques together, those are again the red rectangle

11  that I circle.

12      And my overall point here is that, depending on

13  the specification, the numbers could vary a little bit

14  based on what I found, but in no way are -- does this

15  make this transaction beneficial to American consumers.

16  If we just look at the number here and we take any one

17  of Dr. Hill's critiques and we add it up with the net

18  harm from the nonstop overlap markets, this merger is

19  still going to be very costly to consumers.  And in many

20  cases, depending on the critique, it's going to be more

21  costly than what I found.

22  Q.   Thank you, Doctor.

23      MR. BATTAGLIA:   Slide 102.

24  Q.   Dr. Gowrisankaran, were any of Dr. Hill's critiques

25  not reflected in the two charts we just discussed?

1    A.   Yes, there was one econometric critique that I did
2    not put in there.
3    Q.   And which one was that?
4    A.   Dr. Hill's critiques, um, my use of what's called an
5    "intercept term," and I think it was, um, fundamentally
6    wrong, his critique was wrong.
7    Q.   And could you please explain the use of an
8    "intercept term"?
9    A.   Yeah, so in a regression analysis, the point of the
10   regression analysis -- and this is the analysis I did
11   with all the dots that marked net harm, and then the
12   line that I fit through it.
13        So in any analysis the point of the regression
14   line is to fit the two relationship and the data as
15   closely as possible, and so I illustrate that on the
16   left with just a hypothetical and the blue dots there
17   are meant to be the points that you're trying to fit.
18   And what a regression line does is it's a statistical
19   package that then says "Let me try to find a line that
20   goes really closely through those dots."  And so in this
21   case, as I've drawn those blue dots in the hypothetical,
22   that line would not go through the origin or the point
23   marked 0.
24        So what an intercept term does is it allows for
25   those lines to not go through the origin, not go through

1    that 0 point.  If I were to admit the intercept term in

2    my regression, then what would happen is I would be

3    forcing the line to go through 0, and the example of

4    that would be the dotted red line in the hypothetical,

5    and that's a biased estimate.  What I mean by that is

6    it's not going to fit the data very well and so it's not

7    going to be reliable.  Unlike the blue line, that red

8    line is not going to be reliable in predicting the

9    impact of any relationship.  And that's why as an

10   econometrician, we always use intercepts in our

11   regressions.

12   Q.  So, Doctor, how is the inclusion of an intercept

13   term relevant to your net harm level?

14   A.  So what I showed on the right is, um, those are the

15   same, um, those are the same effects of JetBlue and

16   Spirit that I estimated, the same curved lines that I

17   used in my net harm model, and what they show is the

18   real data or showing that that JetBlue line is pretty

19   similar to 0 to going through the origin, it goes

20   through that point marked 0 percent or pretty close to

21   it, but the Spirit line doesn't.  And what that means is

22   that not including an intercept term, as Dr. Hill does,

23   would allow that Spirit line, would make it biased.  It

24   would no longer reflect the real impact of the real

25   Spirit Effect, it would reflect a biased version of

1    that.

2          MR. BATTAGLIA:   Slide 103, please.

3    Q.  Now, Doctor, is there anything in Dr. Hill's report

4    that uses your net harm model for something other than

5    harm?

6    A.  Um, yes, there is.

7    Q.  And what is that?

8    A.  Well Dr. Hill took my net harm model and he swapped

9    out prices for quantities and he used it to try to

10   predict how much quantities, number of passengers that

11   is, would change if you replace Spirit with JetBlue.

12   Q.  And, Doctor, what do you make of that exercise?

13   A.  Well I didn't think it made a lot of sense.  And so,

14   first of all, Dr. Hill didn't really offer an

15   explanation for what he was doing.  So this analysis was

16   only mentioned in a footnote in his report and the

17   actual analysis he did was in an appendix, so he didn't

18   really give an explanation for it.  But also, if I

19   wanted to predict the output effects of replacing Spirit

20   with JetBlue, this wouldn't be the model I would pick,

21   and I wasn't sure why Dr. Hill picked this model given

22   that there was no explanation for what he was trying to

23   do or why this was the right model.

24   Q.  And what did Dr. Hill find using your model in this

25   way?

A.   What Dr. Hill found was that in percent terms there
was very little change in passengers from replacing
Spirit with JetBlue.  And so I showed this, um, by,
first of all, this demonstrative, and what the
demonstrative shows is the right-most column, the
right-most bar is the total number of passengers in
these markets, and on the left are the change in
passengers that Dr. Hill reports in his figures.
As a percent term, he's finding less than a 1 percent
change in passengers doing it one way, that's the
left-most bar, or less than a 2 percent change in
passengers doing it the other way.

        MR. BATTAGLIA:   Slide 104, please.

Q.   Now, Doctor, why do you think that Dr. Hill's use of
your model to predict output is inappropriate?

A.   Well what Dr. Hill is doing is he's saying, um, if I
change, um, capacity what happens to market output?  So
just in very simple terms what he's saying is if I
change the number of planes on that route, so if I
change -- JetBlue enters with some planes or Spirit
enters with some planes, how does that affect the number
of passengers flying?  Well the number of passengers is
fundamentally linked to the number of planes.

        And so what you want to do -- when you look at how
the number of planes and the number of passengers

1    change, the two should really move in tandem.  So if you
2    add a plane, you're going to add about the same number
3    of passengers.
4    Q.  And, Doctor, just to be clear, what do you mean by
5    "capacity"?
6    A.  What I mean by "capacity" there is the number of
7    planes by which Spirit and JetBlue enter.  So in my net
8    harm model, what I'm using is this relative capacity
9    measure, and what I'm doing when I calculate the net
10   harm is I'm saying Spirit and JetBlue have the same
11   number, the same relative capacity or the same number of
12   planes.
13   Q.  And, Doctor, how does your net harm model treat
14   capacity?
15   A.  My net harm model treats it as the same.  So I don't
16   adjust capacity in my net harm model when I -- and
17   that's conservative.  I said the defendants are going to
18   have the same Spirit capacity as JetBlue capacity if the
19   merger were to go forward.
20   Q.  And, Doctor, outside of the context of your net harm
21   model, did you do any analysis of each airline's impact
22   on market output?
23   A.  Um, yes, I did.
24   Q.  And what was that analysis?
25   A.  Well what I did was I wanted to understand, um,

1    whether, um, Dr. Hill's analysis, why he was getting

2    such a small effect?  And so what I did to understand

3    his small effect was I did, um -- I looked at, um, a

4    regression of JetBlue and Spirit entry on the change in

5    total passengers, and then what I did is I divided by

6    the number of flights.  And recall again that with

7    Spirit they have fewer flights, 1.7 instead of 2.7.

8    Q.  And, sorry, Doctor, what did you find?

9    A.  Well that's what's on the demonstrative on this

10   slide.  And what I found is that plane for plane Spirit

11   and JetBlue had very similar effects on total market

12   passengers.  And that's not surprising because if Spirit

13   enters with one plane or JetBlue enters with one plane,

14   the total market passengers is likely to be very

15   similar.  And so when Spirit enters with one plane, or

16   plane for plane, they have a 20.3 percent increase in

17   numbers of passengers in the market, and when JetBlue

18   enters, they have a 21.2 percent increase.

19   Q.  And what does this analysis tell you about

20   Dr. Hill's output calculation using your net harm model?

21   A.  Well Dr. Hill's output calculation is essentially

22   the difference between that blue bar and the yellow bar.

23   So if you take that blue bar and you subtract the yellow

24   bar, you're going to get a percent number that's very

25   close to 0.  And that's exactly what Dr. Hill finds.

1          And so what my analysis verified is that by

2     construction Dr. Hill's output regression is essentially

3     going to give a very small percent number.  And it's

4     really noise, there's not much that I would take away

5     from it besides the fact that it should be pretty close

6     to 0 in percent terms.

7     Q.  And so, Doctor, is the output result of Dr. Hill

8     using your net harm model consistent with the parties'

9     incentive proposed merger?

10    A.  No, it's not.

11    Q.  Why not?

12    A.  Because what I did in calculating prices is I

13    assumed that the parties, um, would have the same

14    capacity on those routes that they do now.  But the

15    parties have an incentive to reduce capacity, as I

16    testified to on Friday, and if they reduce capacity,

17    then it's likely that quantity would also go down on

18    those routes.

19         MR. BATTAGLIA:  Slide 105, please.

20    Q.  Doctor, now I'd like to discuss how you and Dr. Hill

21    differ with respect to coordinated effects.

22         MR. BATTAGLIA:  Slide 106.

23    Q.  Doctor, how do you and Dr. Hill disagree on

24    coordinated effects?

25    A.   Well we had three -- I would say, big picture,

1    that Dr. Hill doesn't really engage with my analysis of

2    coordinated effects.  So this slide just summarizes what

3    I found in my analysis and what Dr. Hill said about it.

4    Q.   Would you please explain this briefly?

5    A.   Yes.  So the first thing I found is that the

6    industry is susceptible to coordination and has a

7    history of coordination, and Dr. Hill does not analyze

8    the susceptibility of the industry to coordination.  He

9    also asserts that there's not perfect coordination

10   occurring today, that airlines don't perfectly harmonize

11   their prices, but that's not relevant.  I never thought

12   or testified that the airlines perfectly coordinate,

13   just that they engage in some coordination and that they

14   have a history of coordination.

15        The second thing I found is that Spirit's

16   competitive significance -- and the whole Spirit

17   business model, the way that they price, the fact that

18   their prices are less transparent than other airlines,

19   their cost structure, their route network, that makes it

20   effective at disciplining coordination, as I testified

21   on Friday.  And Dr. Hill, um, he ignores the effect of

22   losing Spirit, he doesn't engage with that.

23        And the third thing I testified to is that this

24   merger will weaken JetBlue's incentives to disrupt

25   coordination, it's going to make JetBlue look more like

1    a legacy and it's going to increase the symmetry in the

2    relevant markets where one airline can punish another on

3    its hub, and they're going to look more similar.

4         Dr. Hill emphasized instead that JetBlue has been

5    acting like a maverick before the transaction.  So he

6    ignores the fact that this effect is about what JetBlue

7    is going to do after the merger, how do JetBlue's

8    incentives change as a result of this merger were it to

9    go forward.

10   Q.  Now, Doctor, does the fact that JetBlue has been

11   characterized as a "maverick" change your conclusions

12   with respect to coordinated effect?

13   A.  No, it does not.

14   Q.  Why not?

15        MR. CULLEY:  Objection, your Honor, we covered

16   this yesterday.

17        MR. BATTAGLIA:  This is a slightly different

18   question, this actually does appear in

19   Dr. Gowrisankaran's reply report, your Honor.

20        THE COURT:  Where?

21        MR. BATTAGLIA:  On Pages 113 and 114, Paragraphs

22   207 and 208.

23        THE COURT:  What do you say to that?

24        MR. CULLEY:  (Looks.)  What paragraphs did you

25   say?

```
1              MR. BATTAGLIA:  Paragraphs 207 and 208.
2              (Pause.)
3              THE COURT:  He may testify consistent to those
4     paragraphs.
5              Proceed.
6     A.  Yeah, so what I'm arguing -- I'm not arguing that
7     JetBlue is not a maverick, what I'm arguing instead is
8     that JetBlue's incentives will change as a result of the
9     merger and it will have less of an incentive to act like
10    a maverick than it did before, less of an incentive to
11    be disruptive.
12    Q.  Thank you, Doctor.
13             MR. BATTAGLIA:  Slide 107.
14    Q.  Now let's switch topics and talk about national
15    competition.
16             MR. BATTAGLIA:  Slide 108.
17    Q.  Now, Doctor, we've heard testimony suggesting that
18    airlines make competitive decisions on a national level,
19    but is the national market consistent with how consumers
20    purchase airline tickets?
21    A.  No, it's not.
22    Q.  And why is that?
23    A.  When people want to buy plane tickets, they have a
24    flight in mind, they live at someplace and they have a
25    destination in mind.  And so as I explained on Friday
```

1   morning, if you live in Boston and you want to go to

2   Disney World with your family, then you're buying a

3   ticket to Orlando.  And the fact that some other

4   airlines have service between Los Angeles and Spokane,

5   it's just not a good substitute for a flight between

6   Boston and Orlando.  That's common sense.  When people

7   buy tickets, they don't buy them based on the overall

8   network structure, they buy them with an origin and

9   destination.

10  Q.  And, Doctor, is the national market consistent with

11  how airlines price tickets for the routes on which they

12  operate?

13  A.  It's really not.

14  Q.  Why not?

15  A.  Well airlines respond to this competition and so

16  when they're looking at pricing, they're thinking of

17  competitors on those routes.  What I found is that when

18  a new competitor comes in, be it Spirit or JetBlue,

19  airlines lower their prices on routes.  That's how

20  competition, that's how tickets are sold, it's based on

21  routes.  And that's how airlines do their pricing.

22  Q.  Doctor, is it appropriate to use national passenger

23  shares?

24  A.  It's not, it would be not be appropriate to look at

25  this transaction with national passenger shares.

Q.  Why not?

A.  Well it's just going to understate the significance
of JetBlue and Spirit on the routes where they compete.
So neither JetBlue nor Spirit operate in Spokane
Washington, but that's not relevant to the fact that --
that if you look at South Florida, like Orlando and
Miami and routes that are served from there, JetBlue and
Spirit have big market shares on those routes, and the
fact that they don't operate in some parts of the
country or don't have a big presence in other parts,
it's not really relevant to this.

        And so just as one example that I testified to
earlier, um, Boston to Orlando.  Spirit shares 15
percent.  JetBlue shares 42 percent.  These are
highly-concentrated markets.

        MR. BATTAGLIA:  Slide 109, please.

Q.  Doctor, we're almost done.

        MR. BATTAGLIA:  Slide 110.

Q.  But before we finish, can you please provide a
summary of your findings and the likely competitive
effects in a merger?

A.  Yes.  So what I find, first of all, is that Spirit
and JetBlue compete head to head, and Dr. Hill agrees
with this assessment, and this competition will be lost
if this merger were to go forward, and that's the

1    biggest part of the reason for why this is a bad deal

2    for American consumer.

3         Spirit and JetBlue -- the second thing I found is

4    that Spirit and JetBlue have large shares, large market

5    shares, and the merger is presumptively anticompetitive

6    in many relevant markets that I've defined, and those

7    critiques of their shares are robust to various -- those

8    findings of large shares, excuse me, are robust to

9    various critiques by Dr. Hill.

10        And the third thing I found is that there's

11   substantial consumer net harm from this merger.  So

12   conservatively I find $900 million annually in net harm

13   to American consumers, and that $900 million figure

14   takes as given the defendants' conversion efficiency

15   claim.

16        A particularly large portion of the net harm is in

17   nonstop overlap markets and cost-conscious customers who

18   form the target market of Spirit are especially going to

19   be harmed by the elimination of Spirit.  And these

20   estimates are robust to Dr. Hill's econometric critiques

21   and even to using his own model when applied to nonstop

22   overlaps and applied to Spirit passengers included in

23   the mix of prices.

24        MR. BATTAGLIA:  Slide 111, please.

25   Q.  So, Doctor, what do these likely competitive effects

1   mean for consumers?

2   A.   What I showed here is the dollar values of what the

3   net harm to consumers would be if this merger were to go

4   forward, and the three columns on the left, the three

5   red bars, those are the net harm calculated three

6   different ways in nonstop overlap markets that I've

7   already testified to earlier.

8        The numbers on the right, those are the net harm

9   in Spirit-only nonstop markets.  And again I showed the

10  three different ways that I characterized this, with the

11  weighted data, the unweighted data that I think is more

12  robust, and with the ticket data that includes all the

13  ancillary fees that people pay on Spirit and other

14  airlines.

15       MR. BATTAGLIA:  Slide 112, please.

16  Q.  And what's being shown here, Doctor?

17  A.   These are the two bars from Dr. Hill's model that I

18  testified to earlier.  And what these show is that

19  Dr. Hill's model, if I just include nonstop overlap

20  markets and I include Spirit passengers and the low

21  prices they pay, it fundamentally agrees with my

22  conclusions.  And so those numbers from Dr. Hill's model

23  adjusted in those two ways are $743 million in nonstop

24  overlap markets and $282 million in harm in Spirit-only

25  nonstop markets.  Any way you cut it, this merger is

1    likely to harm American consumers.

2    Q.   (Pause.)   And, Doctor, one last question.

3         The Court asked you a question earlier about

4    airlines entering new markets.  In what ways does your

5    net harm model account for entry by other airlines?

6    A.   So my net harm model, it allows for the fact that

7    other airlines will enter.  So when I calculated the --

8    all of the entry of Spirit and the entry of JetBlue, um,

9    in my analysis I kept the data after they entered

10   regardless of what other airlines did.  And so my model

11   fully accounts for the fact that Spirit and JetBlue,

12   when they enter, that maybe more airlines enter or maybe

13   some airlines exit, but whatever happens, those events

14   are in my data.  I'm keeping the prices.  I'm treating

15   the shock that's a natural experiment as Spirit or

16   JetBlue is entering in markets.  And in doing that I'm

17   fully accounting for the fact that other airlines may

18   adjust their capacity or may enter or exit in response

19   to Spirit or JetBlue entering.

20   Q.   Thank you, Dr. Gowrisankaran.

21        MR. BATTAGLIA:  I have no further questions on

22   direct, your Honor.

23        THE COURT:  And you want to examine him?

24        MR. CULLEY:  Yes, your Honor.

25        THE COURT:  Let me just take a moment before you

1    start.

2          I've gone over what's been proffered, at least as

3    of Friday, as exhibits and I've divided them into two

4    categories, and I'll pass them back to you, A and B.

5          Having looked at A, it looks to me like the

6    documents in Subcategory (a) meet the criteria of Rule

7    1006 and I'd be prepared to accept them as actual

8    exhibits from which I could draw inferences so long as I

9    don't base anything on the titles of the exhibits which

10   are somewhat argumentative.

11         Now, B, um, I would be prepared to accept as

12   demonstrative aids.  Demonstrative aids are not

13   evidence, but as the witness himself has referred so

14   often to these documents, they are "demonstrative aids,"

15   they help me understand the witness's testimony.  But

16   their probative value rests on the witness's testimony,

17   not on the compilation of underlying raw data.  So I'm

18   certainly, when I come to reflect on this case, going to

19   be looking at all of the demonstrative evidence in order

20   to understand his testimony and decide the extent to

21   which I credit it.

22         I'll also be looking at those documents that I

23   think meet 1006 and I can draw inferences directly from

24   those documents as well as using them to understand his

25   testimony.

1          Now if you agree with this, because I don't really

2     see the enormous difference, I'm going to be looking at

3     these documents, um, if you agree with this we can give,

4     for the purity of the record, my Subcategory (a), we can

5     give them exhibit numbers, and rather than renumber

6     these as demonstratives, it seems to me that the ones in

7     Subcategory (b) can have their exhibit numbers for

8     identification, they are parts of the expert report, and

9     I can use them as demonstrative aids.

10         Argument now doesn't make sense, but I'll pass

11    these back so you can glance at them and you can see the

12    line that I've drawn.

13         And if you're ready to cross-examine, go right

14    ahead.

15         MR. BATTAGLIA:  I'm sorry, your Honor.  In

16    addition to the ones that you've reviewed, we do have a

17    set of 1006s from today's testimony.

18         THE COURT:  Yeah, I'm sure you do.  Take a look at

19    those and you'll get a pretty good idea of how I'd react

20    to them.  Let's let him cross-examine.

21         MR. BATTAGLIA:  Thank you, your Honor.

22         THE COURT:  And I thank you.

23

24    CROSS-EXAMINATION BY MR. CULLEY:

25    Q.  Good morning, Doctor.

```
1   A.   Good morning.
2   Q.   I'd like to start by looking back at your slide that
3   categorized the different relevant markets here.  And
4   I'd like to start with the last bullet, um, that titled
5   "Future Spirit Nonstop Markets."
6        THE COURT:  Are we looking at his slides now?
7        MR. CULLEY:  That's right, your Honor.
8        THE COURT:  And they have numbers.  So can you
9   tell me the number?
10       MR. CULLEY:  Slide 20, your Honor.
11       THE COURT:  Thank you.
12  A.   (Looks.)
13  Q.   And the routes that are in this category, Doctor,
14  those are routes where you're asserting, based on
15  Spirit's last 5-year plan, that Spirit will offer
16  nonstop service by 2027, correct?
17  A.   Yes.
18  Q.   And you did not update your analysis of those routes
19  to reflect any changes in Spirit's plans since 2020 --
20  since 2022, correct?
21  A.   Yes, that's right, but I don't calculate net harm
22  for those numbers because I know that the plans might
23  change.
24  Q.   And you didn't testify to any individual analysis of
25  the likelihood that Spirit will enter any of those
```

1    routes, correct?

2    A.  Um, that's not quite -- no, that's not quite correct

3    because I did -- I did include some data since my

4    initial report that showed Spirit had entered some of

5    these routes in the current year.

6    Q.  And that it hadn't entered others, correct?

7    A.  That's correct, yes.

8    Q.  And you didn't testify to any analysis of the

9    intensity of Spirit, what the intensity of Spirit's

10   entry in those routes could be, correct?

11   A.  Yes, I think you mean by "intensity" like the number

12   of flights per day, and I did not, that is correct.

13   Q.  And you didn't testify to any analysis of what other

14   carriers are present on those routes, right?

15   A.  Could you repeat the question?

16   Q.  And you did not testify to any analysis of what

17   other carriers would be present on these future nonstop

18   market routes, correct?

19   A.  That's correct, yes.

20   Q.  And you did not testify to any analysis of whether

21   other ULCCs would be well-positioned to enter any of

22   these future nonstop markets, correct?

23   A.  Um, that's right, yes.

24   Q.  And for those routes where JetBlue had service, you

25   did not testify to any analysis of JetBlue's share for

1    the routes that could be future Spirit nonstop markets,

2    correct?

3    A.  I think that's not correct, no, um, for the reasons

4    I said.  I did say which of the routes where Spirit had

5    entered since, um -- since my initial data were

6    presumptive markets.  And so the presumption has a

7    implication.  I calculate that with market shares,

8    including JetBlue's market shares.

9    Q.  But you did not calculate market shares for future

10   Spirit nonstop markets?

11   A.  Correct, yes.  But just to be clear, I did for the

12   2022 to 2023 -- like 2-3-2022 up to 2-3-2023.

13   Q.  And these go out to 2027, correct?

14   A.  That's right, yes.

15   Q.  You didn't calculate market shares out to 2027,

16   right?

17   A.  Yes, that's right, it wouldn't be possible.

18   Q.  All right.  Okay, let's go up to the next item on

19   your list, the nonoverlap routes.

20        And you agree that Spirit and JetBlue do not

21   compete on these routes, correct?

22   A.  Um, yes, I agree that they don't compete on those

23   routes.

24   Q.  And so there'll be no loss of head-to-head

25   competition between Spirit and JetBlue on these routes

1    as a result of the merger, correct?

2    A.   Right, yes, as I testified, the merger will have an

3    impact on those routes, but there's no loss of

4    competition stemming from the reduced competition on

5    those routes.

6    Q.   And the category above that chapter is "Overlaps."

7    And just going here, continuing in reverse order, the

8    bottom one on that list is "Connect Overlap," is that

9    right?

10   A.   That's right.

11   Q.   And those are routes where both Spirit and JetBlue

12   have only connecting service?

13   A.   That's right, yes.

14   Q.   And for that category the only analysis that you

15   testified to in your direct examination was to calculate

16   market shares, right, for those specific set of routes?

17   A.   Um, no, that's not quite right because I also gave

18   Herfindahls and changes in Herfindahl for those routes.

19   So if you recall, um, there was a figure I gave with a

20   bunch of circles and most of them were red, but some of

21   them were blue and green, and those were connect overlap

22   routes.  I don't remember whether it was blue or green,

23   but one of those.

24   Q.   And thank you, Doctor.  Those Herfindahls,

25   Herfindahl Index, HHI numbers that you just mentioned,

1    those were calculations based on the market shares,

2    correct?

3    A.  Yes, that's right.

4    Q.  And to calculate the HHI based on the market shares,

5    that's just -- you just apply the mathematical formula,

6    correct?

7    A.  Right, to all the airlines in that industry.

8    Absolutely.

9    Q.  And again when you assert that some of those routes

10   qualify for the presumption, you are just comparing that

11   HHI number with 2500 and whether it went up by more than

12   200, correct?

13   A.  Yes.

14   Q.  And you didn't calculate harm for those routes, the

15   connect routes, right?

16   A.  I did not calculate harm or net harm for those

17   routes, yes.

18   Q.  And let's go up to the next category, the "Mixed

19   Overlaps."

20   A.  (Turns.)

21   Q.  So I'm going to divide these into two.  So these are

22   mixed -- these are routes where one of the parties had

23   nonstop service but the other party had connecting

24   service, correct?

25   A.  Yes, that's right.

1  Q.  And so for the routes where Spirit is the party that

2  has the connecting service, the only analysis that you

3  testified to on your direct examination was the

4  calculation of market shares and HHIs, correct?

5  A.  Yes, that's the only numbers I gave.

6  Q.  And again, just as we discussed before, that's just

7  applying a mathematical formula to the market shares,

8  correct?

9  A.  Yes, that's right.

10  Q.  And you didn't apply a harm calculation to those

11  routes that Spirit has connecting service on, correct?

12  A.  That's right, I did not.

13  Q.  And then for the mixed routes where JetBlue is the

14  party with a connecting flight, you did calculate harm

15  for those routes, correct?

16  A.  Yes, I calculated harm and net harm for those

17  routes.

18  Q.  And for all but four of those routes JetBlue shared

19  below 1 percent, is that right?

20  A.  I don't remember exactly, but I can turn to my

21  appendix, I list the JetBlue shares on those routes.

22  Q.  It wouldn't surprise you that all but four of those

23  routes JetBlue shares below 1 percent, correct?

24  A.  Correct.

25  Q.  And you'd agree that on those routes where, um,

```
 1    those mixed overlap routes that don't meet the
 2    presumption, what your net harm calculation is measuring
 3    is not primarily a loss of head-to-head competition
 4    between JetBlue and Spirit, correct?
 5    A.   No, I wouldn't quite agree with that, um, because
 6    there's a bunch of routes that don't meet the
 7    presumption, but that might still be moderately
 8    concentrated or highly concentrated, but have a smaller
 9    threshold of increases in concentration, and as an
10    economist and under the merger guidelines, these routes
11    are considered to have likely competitive effects.
12    Q.   Doctor, you, um -- those mixed routes that do not
13    meet the presumption, those were included in a category
14    that Dr. Hill called "Econometric Complaint Routes,"
15    correct?
16    A.   Yes, that sounds right to me.  But I don't remember,
17    he had a lot of categories, so.
18    Q.   Let's go ahead and take a look at Pages 158 to 159
19    of your reply report.
20         MR. CULLEY:  Could you put that on the screen?
21    A.   I think I have it in my original binder.
22    Q.   Oh, that's right.
23    A.   (Looks.)
24    Q.   And let's look at Paragraph 292.
25    A.   (Looks.)
```

1    Q.   Which crosses over from 158 to 159.

2    A.   (Looks.)   Right.

3    Q.   And you wrote there, sir, that "Meanwhile these

4    econometric complaint routes are overlaps where Spirit

5    offers nonstop service but which do not meet the

6    presumption.   Harm in these markets occur because of

7    JetBlue's decision to eliminate Spirit, not primarily

8    because of the loss of head-to-head competition between

9    Spirit and JetBlue in these markets."

10        That's what you wrote right there, sir?

11   A.   Yes, that's right.

12   Q.   All right.   Now as you just mentioned a moment ago,

13   you did not testify about divestitures, correct?

14   A.   That's correct.

15   Q.   And, um, let's talk about your individual analysis

16   though.

17        So your concentration analysis that reports HHIs

18   and market shares throughout, that did not consider the

19   impact of divestitures, correct?

20   A.   Yes, that's correct.

21   Q.   And you've "gumby" analysis, that did not consider

22   the impact of divestitures, correct?

23   A.   Yes.

24   Q.   And your econometric analyses, that did not make any

25   adjustments for divestitures, correct?

1   A.   That's right.

2   Q.   So let's go to your final category then, which are

3   the nonstop overlap routes, and I'm going to focus on

4   the presumption routes.  But let's first talk about the

5   role that market shares played in your assessment.

6         You'd agree that as an economist you wouldn't do

7   an analysis of a merger that only considers market

8   shares, right?

9   A.   Yeah, I would agree with that.  It's a first step to

10  looking at competitive -- you know to looking at harm,

11  concentration, Herfindahls, and then I would like to do

12  competitive effects.

13  Q.   And you would agree that you wouldn't want to look

14  at market shares on particular markets in isolation,

15  correct?

16  A.   I'm not sure what you mean by that.  It depends, I

17  guess.

18  Q.   Well in determining whether market shares would

19  accurately predict the transaction's probable effect on

20  future competition, you wouldn't want to look at market

21  shares on a particular market in isolation, correct?

22  A.   Um, yes, that sounds right.

23  Q.   And your concentration analysis does not account for

24  entry by other airlines that may occur in response to

25  the merger, correct?

A.   Well that's not exactly -- no, I wouldn't say that's

correct because -- so concentration and shares are about

a point in time, but when there's a presumption of

anticompetitive harm, that implicitly is saying that

they're going to take that presumption -- that those

markets are anticompetitive or likely anticompetitive

even though everybody, economists and the agencies and

the guidelines, recognize that there may be some entry

in the future.  So I wouldn't say it's fair to say that

like those concentration measures don't account for the

possibility of entry.

Q.   Okay, let's take a look at your deposition, Doctor,

Page 180, Line 10, through Page 181, Line 8, and that's

in that binder that we just handed up.

A.   Yeah.  (Looks.)

Q.   And there, Doctor, I started by asking you about

your concentration analysis, correct?

A.   Uh-huh.

Q.   And then down near the end, um, we were talking

about the concentration analysis and I asked you, "And

therefore they don't incorporate entry that may occur in

response to the merger, correct?"  And you answered,

"They do not account for entry that would-may occur in

response to the merger."

          Is that right?

```
 1        MR. BATTAGLIA:  Your Honor, I object to this
 2   impeachment, Mr. Culley's question was vague at the time
 3   of entry.
 4        THE COURT:  Overruled.
 5   A.  So that's what it says, but the previous line is --
 6   Q.  Thank you, Doctor.
 7        MR. BATTAGLIA:  Objection, your Honor, I would
 8   like, for completeness, the rest of his answer read.
 9        THE COURT:  The entire answer may be read.
10        MR. BATTAGLIA:  Thank you, your Honor.
11   A.  That's correct.  But the previous line what I said
12   is "While the concentration measure is, by its
13   definition, a measure at a point in time."  And that's
14   exactly what I testified to now, it measures at a point
15   in time.
16   Q.  Doctor, you're going beyond reading the rest of the
17   answer.
18        MR. BATTAGLIA:  Objection.
19        THE COURT:  That is his testimony, as you well
20   know.
21        Go ahead.
22        MR. CULLEY:  Thank you, your Honor.
23   Q.  And considering the prospect of entry in response to
24   a merger is part of the full assessment of the
25   competitive effects of a merger, correct?
```

1   A.   Sir, would you repeat that please?

2   Q.   Considering the prospects of entry in response to a

3   merger is part of the full assessment of the competitive

4   effects of a merger, correct?

5   A.   Yes, it generally is.

6   Q.   Okay, let's talk about your specific sets of shares.

7        You talked about two sets of shares in your direct

8   examination, one set for the 12 months that ended in

9   June 2022, and one that ended in the 12 months ending in

10  June 2023, is that right?

11  A.   Yes.

12  Q.   Let's bring up your Slide 27 in the presentation

13  that you used in your direct examination.

14  A.   (Looks.)

15  Q.   And this first line here says, "Most appropriate to

16  measure shares using 2021 Q3 to 2022 Q2 data."  And

17  right below it it says, "Shares measured after merger

18  announcement may reflect changed incentives resulting

19  from agreement to merge."  Do you see that?

20  A.   Um, yes, I do.

21  Q.   You do not identify any evidence, Doctor, for any

22  particular route that Spirit has exited that absent the

23  pendency of the merger it would have continued to fly

24  that route, correct?

25  A.   That's right.

1    Q.  And you did not identify any evidence that for any

2    particular route JetBlue has exited, that absent the

3    pendency of the merger, it would have continued to fly,

4    correct?

5    A.  Yes, that's right.

6    Q.  You used the Department of Transportation's DB 1B

7    data to calculate these shares in June 30th, 2022,

8    correct?

9    A.  Yes, that's right.  I also used the OAG data.

10   Q.  And the shares you calculated in your report were

11   annual shares, right?

12   A.  Yes, that's right.

13   Q.  For 12 months?

14   A.  Yeah.

15   Q.  Now when you look at a 12-month window, it's

16   possible that another carrier could enter a route midway

17   through your window, correct?

18   A.  Sure.

19   Q.  And before that, um -- and before that entry, their

20   share would be 0, correct?

21   A.  Yes, that's right.

22   Q.  And so if you do shares for the full year, they may

23   understate that carrier's go-forward service, is that

24   fair?

25   A.  Um, sure.

1   Q.  And you didn't do anything to adjust your shares for

2   a particular route if a carrier entered the route

3   partway through the year, is that right?

4   A.  No, I did not.  I don't think it would be possible.

5   Q.  Okay.  And let's take a look at some examples where

6   this occurred.

7         MR. CULLEY:  I would ask that we put up

8   Gowrisankaran's 1006 Summary 1.

9   Q.  And this 1006 summary, Doctor --

10         MR. CULLEY:  It should be in a folder there in

11   your binder, your Honor, that we handed up.

12         THE COURT:  A folder?

13         MR. CULLEY:  Yes.

14         THE WITNESS:  Should I look at it in the binder?

15         MR. CULLEY:  It should also be in your folder

16   there.  In the folder in the front.

17         THE WITNESS:  Oh, I see.

18         THE COURT:  Right there, yes.

19         THE WITNESS:  (Looks.)

20   Q.  Okay, this 1006 summary, Doctor, splits out your

21   annual shares into quarters.  And then we've added the

22   following four quarters as well using the same

23   methodology that you used for your later set of shares.

24         MR. CULLEY:  And, your Honor, I would move to

25   admit Gowrisankaran 1006 Summary 1 as Exhibit 802.

```
 1            THE COURT:  All right, let me just be sure I have
 2    it.  It's this with your additions here, is that right?
 3            MR. CULLEY:  No, that's Demonstrative A, your
 4    Honor, the other folder contains the 1006.
 5            THE COURT:  It's the other folder?
 6            MR. CULLEY:  Correct.  Sorry for the confusion.
 7            THE COURT:  Oh, no.  (Looks.)  Yes, I have it.
 8    All right.
 9            Any objection?
10            MR. BATTAGLIA:  No objection, your Honor.
11            THE COURT:  All right.  It may be received as
12    Exhibit 801 in evidence.
13            (Pause.)
14            MR. CULLEY:  802, your Honor.
15            THE COURT:  Thank you.
16            (Exhibit 802, marked.)
17    Q.  Okay, so let's take a look at some of these
18    examples, Doctor.
19            So the first example, um, is the San Juan, Puerto
20    Rico, to Tampa, Florida route.  And there in your
21    Appendix D of your report, you reported Frontier's share
22    as 1 percent.  Is that right?
23    A.  It sounds right.  I can check if you'd like.
24    Q.  And as you can see here, Doctor, Frontier entered
25    partway through Q2 of 2022?
```

```
 1    A.   Um, okay.
 2    Q.   And are you aware that Frontier entered this route
 3    on June 23rd, 2022?
 4    A.   It sounds about right to me.
 5    Q.   And that's the last week of your window, right?
 6    A.   Yes, that's right.
 7    Q.   And in that quarter, just in one week, it obtained a
 8    4 percent share.  And then in the four quarters
 9    following, its share was above 20 percent in each of
10    those quarters, isn't that right?
11    A.   That's what this data shows.  I haven't evaluated
12    it.
13    Q.   And then on Aguadilla, Puerto Rico, to Orlando,
14    Florida route, you in your Appendix D reported Frontier
15    having a share of 7 percent, correct?
16    A.   Yeah, I mean again would you like me to check the
17    report?
18    Q.   Does that sound right to you?
19    A.   Sure, yeah.
20    Q.   And again at some point during Q1, 2022 Frontier had
21    entered that route, correct?  It's on the share data.
22    A.   I mean it looks that way, but it's hard to know, it
23    could be seasonal service also.
24    Q.   And then in the four quarters following, again
25    Frontier had a share that exceeded 25 percent in every
```

1    quarter?

2    A.  (Looks.)  Yeah, that's right.  I think they

3    highlighted the wrong thing, but, yeah, in the four

4    quarters starting in 2023, it's 25 percent or more.

5    Q.  And then on the Cartegena, Colombia to Miami route,

6    you reported Avianca as having a 12 percent share, does

7    that sound about right?

8    A.  Um, sure.

9    Q.  And while they were present on the route, their

10   share was in the single digits for the first three

11   quarters?

12   A.  Yes, that's what this is showing.

13   Q.  And then their share increased considerably in the

14   fourth quarter to 28 percent?

15   A.  Yes, and it seemed to go down after that.

16   Q.  And they continued to have double-digit shares

17   throughout the four quarters following the window,

18   correct?

19   A.  Yes, that's right.

20   Q.  And then on the Miami, Florida to Lima, Peru route,

21   you reported Sky Peru as having a 1 percent share,

22   correct?

23   A.  Yeah, again I'll take your word for it.  It sounds

24   right.  But I don't know for sure.  I don't want to

25   testify to, um --

1    Q.  And Sky Peru, they're an ultra low-cost carrier,

2    correct?

3    A.  Um, yes, they are.

4    Q.  And for the first three quarters they had a 0

5    percent share?

6    A.  That's right, according to this.

7    Q.  And they entered during the fourth quarter of 2022?

8    A.  It looks that way from this, yes.

9    Q.  And then they had double-digit shares for the

10   following four quarters, correct?

11   A.  Yes, that's what this shows.

12   Q.  Let's go to, um, the changes that occurred in the

13   year after the period you used to calculate your shares.

14        MR. CULLEY:  Can we put up Gowrisankaran

15   Demonstrative A, please.

16        And that's the one you had in your first folder,

17   your Honor.  Sorry for so many folders.

18        THE COURT:  (Looks.)

19   Q.  So this is on your slides in your direct, Doctor,

20   but in a different orientation, is that right?

21   A.  That's right.

22   Q.  And you heard Mr. Kirby testify about Spirit's exits

23   on your presumption routes, is that correct?

24   A.  Yes, I was here for Mr. Kirby's testimony.

25        MR. CULLEY:  Okay, so let's add those to the

1      demonstratives.
2           And, your Honor, if you're working with the paper
3      version, that's just the next page.
4           THE COURT:  Thank you.
5      Q.  And you heard Mr. Friedman testify to JetBlue's
6      exits on your presumption routes, correct?
7      A.  Yes, but there's one thing about this that looks a
8      little bit inaccurate, if I may?
9      Q.  Your counsel is free to ask you questions.
10     A.  Okay.
11     Q.  You heard Mr. Friedman testify about JetBlue's exits
12     from your presumption routes, correct?
13     A.  I wasn't here for Mr. Friedman's testimony.  Oh,
14     yeah, I was not here for Mr. Friedman's testimony, but I
15     read it, the transcript.
16     Q.  You read it?
17     A.  Yes.
18     Q.  And let's add those exits to the demonstrative
19     please.
20          Again that will be on the next page for the paper
21     copy.
22     Q.  And you heard or read Mr. Friedman's testimony about
23     entry on the Miami, Port-au-Prince, Haiti and the Miami,
24     Lima routes by other carriers, correct?
25     A.  Yes, that sounds right.

1   Q.  And you also read Mr. Friedman's testimony about

2   JetBlue's competitive change summaries, correct?

3   A.  Yes, and I looked at some of those competitive

4   change summaries.

5        MR. CULLEY:  Let's go ahead and add those to the

6   demonstrative.

7        It should be on the next page in the paper copy.

8   Q.  And you also heard -- sorry?

9   A.  Where should I be looking for this?  You said it was

10  another --

11  Q.  Gowrisankaran Demonstrative A, which is in the other

12  folder.

13  A.  Fine.

14  Q.  And we would be now on the third page of that paper

15  copy.

16  A.  Right.  (Looks.)

17  Q.  Do you have that in front of you, sir?

18  A.  There we go.  (Looks.)  Yes.

19  Q.  And you also heard testimony about the proposed

20  divestitures in this case, correct?

21  A.  Um, from whom?

22  Q.  Mr. Hayes and others.

23  A.  Yes, I heard Mr. Hayes's testimony.

24       MR. CULLEY:  And let's add any route with at least

25  one point at a divestiture report to the demonstrative

1    as well, and this will be on the last page.

2         (On screen.)

3    Q.  And there are only four routes which remain unmarked

4    on the demonstrative by a Spirit exit, a JetBlue exit,

5    and through your expansion by other carriers or being

6    touched by a divestiture report, is that right, Doctor?

7    A.  There are only four that are unmarked.  I don't know

8    that I would say a Spirit exit.  But, yes, there are

9    four that are unmarked.

10   Q.  Okay, let's turn to your new analysis of presumption

11   routes from the 12 months that ended on June 30th of

12   this year.  So that's on Slide 28 of your presentation.

13   A.  (Looks.)

14        MR. CULLEY:  Could we put that up on the screen,

15   please.

16        (On screen.)

17   Q.  You show here, Doctor, that there are 9 routes where

18   the shares indicated a presumption in the year that

19   ended June 30th, 2022, but no longer indicate a

20   presumption in the year that ended June 30th, 2023, is

21   that correct?

22   A.  Yes, that's right.

23   Q.  And then there are 7 routes where the opposite

24   occurred, there wasn't a presumption in the older data,

25   but there is a presumption in the new data, correct?

1    A.  Yes, that's right.

2    Q.  And the point you made in your direct examination

3    was that there were a similar number of routes that had

4    the presumption, is that a correct characterization?

5    A.  Yes, that is.

6    Q.  But the actual set of routes from one period to

7    another, that changed, right?

8    A.  Yes, it changed, especially on the smaller routes.

9    Q.  And a little less than 20 percent of the routes

10   changed from one year to another, 17.6 to be exact?

11   A.  Yes, again those are smaller routes

12   disproportionately, so it's not 17 percent of

13   passengers.

14        THE COURT:  Which slide are you looking at?

15        MR. CULLEY:  I'm looking at Slide 28 of

16   Dr. Gowrisankaran's presentation, your Honor.

17        THE COURT:  Fine.

18   Q.  And you did not go back, Doctor, and do a similar

19   analysis for the four quarters that ended in, um, June

20   2020, um, and compare that to the four quarters that

21   ended in June 2021, for example, correct?

22   A.  No, I did not.

23   Q.  And you didn't do that for any prior period

24   actually, correct?

25   A.  That's right.

1    Q.  And so you can't say how this set of presumption

2    routes would have changed from one year to another in

3    any of those prior periods, correct?

4    A.  That's right.

5    Q.  And you also can't rule out that the list of

6    presumption routes here will change again in the next

7    year, correct?

8    A.  That's right, in fact I know it will change because

9    there's been some exits and some entries.

10   Q.  Okay.  All right, now let's talk about some of the

11   issues with this slide as well and first let's talk

12   about routes that are being exited.

13        MR. CULLEY:  Let's bring up your Slide 29.

14        (On screen.)

15   Q.  And the top table, that identifies nonstop overlap

16   routes that Spirit or JetBlue will exit, um, between the

17   end of the second quarter of this year and, um, the

18   second quarter of 2024, correct?

19   A.  That's right.

20   Q.  But it omits exits that occurred before Q3 2023,

21   correct?

22   A.  Yes.  I think I testified wrongly to your last

23   question, your previous question.

24   Q.  Okay, please clarify.

25   A.  So exits, um, they have to not be there in, starting

1   in July of this year, and they had to have been there in

2   the 12 months preceding July of this year.

3   Q.   Thank you for that clarification, Doctor.

4        MR. CULLEY:   So let's put up Gowrisankaran

5   Demonstrative B, which is going to add the exits that,

6   um, Mr. Kirby testified to that occurred during the

7   course of, um, the year that ended in June 30th, 2023.

8   Q.   So those were Boston to New Orleans, Austin to

9   Cancun, and New York to Tampa, does that sound right,

10  Doctor?

11  A.   I don't remember the specific ones, but that sounds

12  right.

13  Q.   Okay.   And then Mr. Friedman also testified that

14  JetBlue had exited Cleveland to Miami, Cartegena to

15  Miami, Philadelphia to San Juan, Austin to Cancun, and

16  Miami to San Juan, correct?

17  A.   A number of those basically, yes.

18  Q.   So now that we've filled out that list, let's go to

19  Gowrisankaran Demonstrative C, which just we'll mark up

20  your Slide 28.

21  A.   (Looks.)

22       MR. CULLEY:   And I'll just give your Honor a

23  moment to get to C.

24       (Pause.)

25       MR. CULLEY:   Let's go ahead and show those Spirit

```
 1    exits, which would be on the second page of the
 2    demonstrative.
 3            (On screen.)
 4    Q.   Now the first one listed here, Dr. Gowrisankaran, is
 5    Aguadilla to Miami, Florida, and you put a check mark in
 6    the second column here, correct, that route?
 7    A.   That's right.
 8    Q.   And by that check mark you were indicating that you
 9    still believe there's a presumption on that route?
10    A.   All right, using the 2023 Q3 to 2023 Q2 data, there
11    is a presumption on it.
12    Q.   And you would agree though that because Spirit has
13    exited the route, there's no longer a presumption on
14    that route, correct?
15    A.   Well, yes, I agree that there's no longer a
16    presumption today, but that's not what I -- not what I
17    heard.  What I heard Mr. Kirby testify to is that Spirit
18    suspended service on that route, but that they planned
19    to go back to it.
20    Q.   He said they "hoped" to go back, isn't that right,
21    Doctor?
22    A.   Yeah, it sounds right.
23    Q.   Okay.  And the second one is Aguadilla to Orlando,
24    Florida, and similarly there's no longer a presumption
25    on that route going forward, correct?
```

1    A.   Yes, the same answer to the previous route.

2    Q.   And the same with, um -- and let's add the -- sorry.

3    And the same with Fort Meyers to Hartford?

4    A.   Yeah, basically the same answer.  I don't remember

5    what he said about going back to that route.

6    Q.   And the same for Orlando, Florida to Ponce?

7    A.   Um, sure, yes.

8        MR. CULLEY:  And then let's go ahead and add the

9    JetBlue exits to that route.

10        (On screen.)

11   Q.   And the same answer for Aruba to Miami?

12   A.   What's the question again?  Just to be precise.

13   Q.   The question is that you agree that there's not a

14   presumption going forward on Aruba to Miami due to

15   JetBlue's exit on that route?

16   A.   I mean, yes, basically there's no presumption.  If

17   they did exit since the -- in the last year then, if you

18   used today's data, there would not be -- there may not

19   be a presumption or there wouldn't be one.

20   Q.   Thank you, Doctor.

21        And then again you recall we discussed

22   Mr. Friedman's testimony on the competitive change

23   summaries and on a couple additional entries that

24   occurred after those summaries.

25        MR. CULLEY:  Let's go ahead and mark those in the

 1    demonstrative as well.
 2            (On screen.)
 3    Q.   And we restricted these to entries or expansions
 4    that occurred during the calendar year 2023, so halfway
 5    through your period.  And you would agree that entries
 6    that occurred halfway through your new period are not
 7    fully reflected in the shares for your full-year period,
 8    correct?
 9    A.   Sure, but the document was mostly about expansions,
10    not entries.
11    Q.   They're not fully reflected in your 12-month,
12    correct?
13    A.   Ask that again, I'm sorry?
14    Q.   The expansions that you just mentioned and also the
15    entries, if they occurred during the year 2023, they're
16    not fully reflected in the 12 months of data, correct?
17    A.   Sure, yes.  Uh-huh.
18    Q.   And then of course we also discussed divestitures
19    earlier.
20            MR. CULLEY:  And let's add airports that are
21    marked by a divestiture to the demonstrative.
22            (On screen.)
23    Q.   And again we're left with only 5 routes that are
24    untouched by a Spirit exit, a JetBlue exit, the entry
25    expansion of other carriers, or routes of a divestiture

 1   endpoint, correct?

 2   A.  Um, according to this graph, yes.  Uh-huh.

 3   Q.  And a number of these I notice involve Orlando,

 4   Florida.  Do you notice that as well, Doctor?

 5   A.  (Silence.)

 6   Q.  All but one?  Two?  All but one?

 7   A.  Oh, sure, you mean the ones that you didn't color?

 8   Q.  Right.

 9   A.  Yes.

10   Q.  And we heard some testimony about the Orlando

11   International Airport from Mr. Wells earlier.  He

12   testified that Allegiant had recently entered into

13   Orlando National Airport, correct?

14   A.  That sounds right, yes.

15   Q.  And you also -- one of these is Cancun to Orlando.

16   You also heard Mr. Wells' testimony that Allegiant is

17   waiting on the Department of Transportation to approve

18   its joint venture with Viva Airlines, correct?

19   A.  I don't remember that, but, yeah, it sounds right.

20   But I'm not sure.

21   Q.  It sounds right to you?

22   A.  Sure.

23   Q.  And after approval of that application, Mr. Wells

24   testified that Allegiant could begin operating a service

25   between Mexico and the United States within 3 months,

1  right?

2  A.  Again I don't remember, but I don't see any reason

3  to think that it's --

4  Q.  Would you like to take a look?

5  A.  If you'd like.

6       MR. CULLEY:  Can we bring up the trial transcript

7  for November 15th.  And Tab P, Pages 2412 through 2514.

8       (On screen.)

9       THE COURT:  Tab what?

10      MR. CULLEY:  Tab P in the binder, your Honor.

11      THE COURT:  P.  All right.

12      MR. CULLEY:  And we're looking at Page 24.

13      (On screen.)

14  Q.  And does this refresh your memory about Mr. Wells'

15  testimony, Doctor?

16  A.  Yes, it does.

17  Q.  And he testified that Allegiant could begin

18  operating between Mexico and the United States within 3

19  months, correct?

20  A.  Yes, he testified that if this, um, joint venture

21  were approved, that would happen.

22      THE COURT:  Mr. Culley, I know you're just getting

23  rolling, but sometime I'm going to need to take a

24  recess.  Is this a good time?

25      MR. CULLEY:  I think this would be a great time to

1    take a morning recess.

2         THE COURT:  We'll take the morning recess at this

3    time until 11:15.  We'll stand in recess.

4         (Recess, 10:45 a.m.)

```
1              C E R T I F I C A T E

2

3

4         I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER,

5    do hereby certify that the foregoing record is a true

6    and accurate transcription of my stenographic notes

7    before Judge William G. Young, on Monday, November 20,

8    2023, to the best of my skill and ability.

9

10

11   /s/ Richard H. Romanow 11-20-23
     _____
12   RICHARD H. ROMANOW    Date

13

14

15

16

17

18

19

20

21

22

23

24

25
```