```
                    UNITED STATES DISTRICT COURT
                  DISTRICT OF MASSACHUSETTS (Boston)

                                      No. 1:23-cv-10511-WGY
                                      Vol. 2, Pages 83-162


UNITED STATES OF AMERICA, et al
            Plaintiffs

vs.


JETBLUE AIRWAYS CORPORATION,
et al,
            Defendants




                        ********


                    For Bench Trial Before:
                    Judge William G. Young




                      United States District Court
                      District of Massachusetts (Boston)
                      One Courthouse Way
                      Boston, Massachusetts 02110
                      Monday, November 20, 2023




                        ********




            REPORTER:  CHERYL B. PALANCHIAN, RMR, CRR
                      Official Court Reporter
                    United States District Court
                  One Courthouse Way, Boston, MA 02110
```

```
                    A P P E A R A N C E S


EDWARD WILLIAM DUFFY, ESQ.
ARIANNA MARKEL, ESQ.
AARON TEITELBAUM, ESQ.
        DOJ-Atr
        450 Fifth Street NW, Suite 8000
        Washington, DC 20530
        (202)812-4723
        Email:  Edward.duffy@usdoj.gov
        For Plaintiff United States of America
- and -
WILLIAM T. MATLACK, ESQ.
        Attorney General's Office
        One Ashburton Place, 18th Floor
        Boston, MA 02108
        (617)727-2200
        Email:  William.matlack@mass.gov
        For Plaintiffs United States of America and The
        Commonwealth of Massachusetts



RYAN SHORES, ESQ.
        Cleary Gottlieb Steen & Hamilton LLP
        2112 Pennsylvania Avenue, NW
        Washington, DC 20037
        (202)974-1876
        Email:  Rshores@cgsh.com
- and -
ELIZABETH M. WRIGHT, ESQ.
        Cooley LLP
        500 Boylston Street
        Boston, MA 02116-3736
        (617)937-2349
        Email:  Ewright@cooley.com
- and -
RACHEL MOSSMAN ZIEMINSKI, ESQ.
MICHAEL MITCHELL, ESQ.
        Shearman & Sterling LLP
        2601 Olive Street, 17th Floor
        Dallas, TX 75201
        (214)271-5777
        Email:  Rachel.zieminski@shearman.com
        For Defendant JetBlue Airways Corporation


(Continued.)
```

(Continued.)

JAY COHEN, ESQ.
ANDREW C. FINCH, ESQ.
        Paul, Weiss, Rifkind, Wharton & Garrison
        1285 Avenue of the Americas
        New York, NY 10019-6064
        (212)373-3000
        Email:  Jaycohen@paulweiss.com
        For Defendant Spirt Airlines, Inc.

```
                          I N D E X

WITNESS:              DIRECT    CROSS    REDIRECT    RECROSS

GAUTAM GOWRISANKARAN, Continued

  By Mr. Culley                   87

  By Mr. Battaglia                           147


    EXHIBITS                          PAGE


    845 . . . . . . . . . . . . . .90

    846 . . . . . . . . . . . . . 112

    847 . . . . . . . . . . . . . 113

    848 . . . . . . . . . . . . . 133
```

```
 1   (Proceedings, 11:17 a.m.)

 2           THE CLERK:  Court is back in session.  You may be

 3   seated.

 4           MR. DUFFY:  Your Honor, if I may, before

 5   Mr. Culley begins, I passed to Ms. Gaudet a list of all the

 6   exhibits by number and letter.  We had conferred with

 7   defendants before, our understanding was they would not

 8   object to any of the 1006s that we tendered that were

 9   discussed by Dr. Gowrisankaran through his examination.  So

10   we apologize for not making that clear sooner.

11           THE COURT:  Oh, so my division is of no moment.

12           MR. DUFFY:  So we've already agreed that they

13   would be --

14           THE COURT:  Is that right, Mr. Culley?

15           MR. CULLEY:  That is right.  And we totally defer

16   to the Court.

17           THE COURT:  That's fine.

18           MR. DUFFY:  Thank you, your Honor.

19                GAUTAM GOWRISANKARAN, (Resumed)

20                 CROSS-EXAMINATION, (Cont'd.)

21   BY MR. CULLEY:

22   Q.   Welcome back, Doctor.  So just to summarize, before the

23   break we were talking about your newest market shares and

24   how they did not account for exits of either party?

25           MR. CULLEY:  I'm sorry.  Could we put that back
```

1    up, demonstrative C, the final page, please?

2            (On screen.)

3    Q.   And how a number of these rows are impacted by the exit

4    of Spirit, the exit of JetBlue, entry or expansion by other

5    carriers, and routes with the divestiture endpoint; correct?

6    A.   Yes, we were discussing that.

7            MR. CULLEY:  We can take that down.

8    Q.   Let's talk about entry a little bit more generally.

9    Your econometric analysis of net harm is actually based on

10   entry events; correct?

11   A.   Yes.

12   Q.   And those occurred over about two years, 2017, 2018,

13   and the first quarter of 2019?

14   A.   Yes, exactly.

15   Q.   And to identify those entry events, you relied on T100

16   data from the Department of Transportation; correct?

17   A.   Yes, that's right.

18   Q.   Okay.

19           MR. CULLEY:  Let's show now Gowrisankaran

20   1006 Summary 2.

21           (On screen.)

22   Q.   And this tallies, by carrier, all of the entries in the

23   T100 data during your time period, 2017, 2018, and the first

24   quarter of 2019, defined as four or more consecutive

25   quarters with at least weekly round-trip nonstop service by

```
 1    a carrier, on average, following four or more consecutive

 2    quarters with less than weekly round-trip nonstop service.

 3              THE COURT:  Mr. Culley, I rather like this big

 4    list of slides, but now I have things in exhibits.  I'm just

 5    not with you.  Direct me to where I should be looking.

 6              MR. CULLEY:  We're looking in the 1006 summary

 7    folder.

 8              THE COURT:  Yes, fine.

 9              MR. CULLEY:  And this is Gowrisankaran

10    1006 Summary Number 2.  I could also hand up another copy if

11    that would be easier.

12              THE COURT:  No, that's all right.  I should be

13    able to follow, and I believe I can.  Well, why don't you

14    hand up a copy so I'm --

15              MR. CULLEY:  Of course.

16              (Handing.)

17              THE COURT:  Thank you very much.

18              MR. CULLEY:  Of course, your Honor.  And

19    defendants would move to admit Gowrisankaran

20    1006 Demonstrative 2 as Exhibit 803.

21              MR. BATTAGLIA:  Your Honor, I think 845 will be

22    the new number.

23              MR. CULLEY:  Oh, sorry.  Yes, because we just

24    moved --

25              THE COURT:  Right.  And there's no objection?
```

```
 1              MR. BATTAGLIA:  No objection, your Honor.
 2              THE COURT:  Thank you.  It's evidence, 845.  Thank
 3  you.
 4              (Exhibit 845 received in evidence.)
 5  Q.   And, Doctor, as reflected on this summary, there were
 6  597 entry events during the period that you measured;
 7  correct?
 8  A.   Yes, that's right.
 9  Q.   And that's more than twice as many as the 264 routes on
10  which you calculated net harm; correct?
11  A.   Yes, that's right.
12              MR. CULLEY:  We could take that down.
13  Q.   Let's talk about your GUPPI analysis.  That was on your
14  presentation slide 33.
15              MR. CULLEY:  Can you put that up on the screen?
16              (On screen.)
17  Q.   Your GUPPI analysis, Doctor, is based on diversion
18  proportional to market shares; is that right?
19  A.   Yes, that's right, within airlines, not for the
20  outside, just to be technically complete.
21  Q.   And the market shares you used to calculate those
22  diversions were the market shares for the year ending
23  June 30th 2022; correct?
24  A.   Yes, that's right.
25  Q.   And if the market shares changed, then your GUPPI
```

 1   calculations would change as well; right?

 2   A.   Yes, that's right.

 3        MR. CULLEY:  Let's go ahead and put up

 4   Gowrisankaran Demonstrative H.

 5        (On screen.)

 6        MR. CULLEY:  And if it would be easier, your

 7   Honor, I could also hand up another copy of that too.

 8        THE COURT:  No, I'm with you now.

 9   A.   I'm sorry.  Where can I find it?

10   Q.   It's in the folder marked "Demonstratives."

11   A.   Okay.

12   Q.   I could also hand up a copy to you, Doctor, if you

13   like?

14        THE COURT:  I believe this is it.

15   A.   Maybe just a copy.

16   Q.   Of course.  Absolutely.

17   A.   I see I.  Oh, no, that's A.

18   Q.   Here you go.  You don't need to look for it.

19        (Handing.)

20   A.   Thanks so much.

21   Q.   Of course.

22        So this demonstrative overlays the same information

23   that we showed earlier for your market-share analysis on top

24   of the routes for which you calculated the GUPPIs which were

25   based on those market shares.  So let's go ahead and add to

```
 1    this demonstrative all of the factors that impacted the
 2    market shares that we had before.  So the Spirit exits,
 3    partial exits, exits by JetBlue, entry or expansion by other
 4    carriers, and routes with a divestiture endpoint.  Okay.
 5         And just as we saw earlier with your first set of
 6    shares, only four routes are unmarked by one of these
 7    factors; correct, Doctor?
 8    A.   Yes.  It's the same set of routes, of course.
 9    Q.   And as we discussed before, your GUPPI analysis does
10    not account for divestitures; correct?
11    A.   Yes, that's correct.
12    Q.   Nor does it account for entry in response to the
13    merger; correct?
14    A.   Well, it does -- as I said earlier, it's a point in
15    time.  It looks at what the diversions are.  But implicitly
16    when you do a GUPPI it's about the likelihood of raising --
17    it's about how competitors are likely to respond -- or,
18    excuse me, it's about how the firms that are merging are
19    likely to respond, and unilateral incentives.
20    Q.   And not about the incentives of firms that are not
21    presently in the market; right?
22    A.   That's fair, yeah.
23         MR. CULLEY:  Okay.  We can take that down.
24    Q.   So those are the market shares that you calculated in
25    your markets.  Let's back up and discuss your geographic
```

1    market definition itself.

2         So your analysis of the proposed relevant markets in

3    this case was guided by the hypothetical monopolist test;

4    correct?

5    A.   In part, yes, as I -- it's also -- that was to rule out

6    markets that are too narrow.

7    Q.   And you agree that a nationwide geographic market for

8    scheduled air passenger service would pass the hypothetical

9    monopolist test?

10   A.   Yes.  The test is meant to rule out markets that are

11   too narrow.

12   Q.   And you agree it is technically possible to analyze the

13   effect of the JetBlue-Spirit transaction in a nationwide

14   market for scheduled air passenger service; right?

15   A.   Yes.

16   Q.   And you're not opining that we must always choose the

17   narrowest market that passes the hypothetical monopolist

18   test as the relevant antitrust market; right?

19   A.   That's right.

20   Q.   And choosing narrower or broader markets is akin to

21   zooming in or zooming out on the competition at issue;

22   right?

23   A.   Yeah, in general it is.  You want to choose a market

24   that's relevant for the options, that illuminates

25   competition.

1   Q.   And the goal in selecting among candidate markets is to

2   make the market definition the one that helps focus the

3   exercise; right?

4   A.   Yes, that illuminates the effects of competition, I

5   think, is what the guidelines say.

6   Q.   Now, one of the points that you argued against

7   nationwide geographic market definition is that it would

8   include routes that are not substitutable from the consumer

9   perspective; right?

10  A.   That's right.

11  Q.   But you aggregate travel between two endpoints in

12  either direction; correct?

13  A.   That's right.

14  Q.   For example, you aggregate together a point from

15  Hartford to Miami with a flight from Miami to Hartford;

16  correct?

17  A.   Absolutely.

18  Q.   And, of course, a customer who's trying to travel from

19  Hartford to Miami couldn't get on a flight from Miami to

20  Hartford; right?

21  A.   That's right.  But the competitors are the same.

22  Q.   And that's a sensible thing to do, as you just

23  mentioned, because in a situation where a firm's capacity

24  can be used in multiple relevant markets, the horizontal

25  merger guidelines allow you to aggregate those markets

```
 1   together; correct?
 2   A.   That's not why I did it.  It's because the competitors
 3   from Miami to Hartford are the same from -- as the
 4   competitors from Hartford to Miami.
 5   Q.   Okay.  Well, let's take a look at your report, Doctor.
 6   A.   Uhm-hmm.
 7   Q.   Page 36 --
 8   A.   Which report?
 9   Q.   Your initial report.  Paragraph 74.
10        (On screen.)
11   Q.   And that's in the binder the government gave you,
12   just --
13   A.   Yeah.
14   Q.   And paragraph 74 discusses this --
15   A.   I'm so sorry.  I just need to get the binder out.
16   Q.   Take your time, please.
17   A.   No, that's not it.  Oh, there it is.  Yes.
18   Q.   The last sentence of that paragraph -- first of all,
19   the paragraph -- scratch that.
20        That paragraph is discussing the very issue we just
21   talked about, Doctor, right?  Aggregating travel in both
22   directions?
23   A.   Yeah, let me get there.  Is this page 36, is that what
24   you said?
25   Q.   I believe so.  Yeah, it's page 36.
```

1   A.   Yes, that's right.

2   Q.   In the last sentence there it says, "The merger

3   guidelines allow that in such situations where each firm's

4   capacity can be used in multiple relevant markets that the

5   description of said markets may be aggregated for the sake

6   of convenience."  Right?

7   A.   Right.

8   Q.   That's what you wrote?

9   A.   Yes.

10  Q.   And that concept is called supply-side substitution;

11  correct?

12  A.   I think that might be a word for it.  I'm not sure if

13  it's in the guidelines or not.

14  Q.   Okay.  Well, let's take a look.  So you cite in

15  footnote 131 here, the merger guidelines, footnote 8.

16  Right?  You cited footnote 8, Doctor?

17  A.   Yes, that's right.

18  Q.   Let's go take a look at footnote 8 of the merger

19  guidelines.  Those are in tab A of the binder that we gave

20  you.  And on page 16 --

21  A.   Uhm-hmm.

22  Q.   -- section 5.1, footnote 8, it discusses supply-side

23  substitution; correct?

24  A.   Yes, that's right.  May I see where that's referring to

25  in the guidelines?

```
 1              (Witness reviewed document.)
 2    A.   Yeah, that's in the section on rapid entrance.
 3    Q.   That's right.  Thank you.
 4              MR. CULLEY:  And we can take that down.
 5    Q.   Let's talk about how you applied the hypothetical
 6    monopolist test specifically to your city pair markets.
 7    A.   Uhm-hmm.
 8    Q.   You'd agree, Doctor, that passing the hypothetical
 9    monopolist test is a necessary condition in defining market;
10    correct?
11    A.   Yes, I would.
12    Q.   A market that fails the hypothetical monopolist test is
13    too narrow?
14    A.   That's right.
15    Q.   To apply the hypothetical monopolist test to your
16    proposed geographic market of origin-destination city pairs,
17    you used something called a "Simple Critical Elasticity
18    Framework."  Correct?
19    A.   Yes, that's right.
20    Q.   To level the set, when we talk about elasticity, we're
21    talking about demand elasticity?
22    A.   Right.  That's right.
23    Q.   And demand elasticity measures how much a quantity
24    changes in response to a price change; is that right?
25    A.   Yeah, it's basically right.  It's the percent change in
```

1    quantity to the percent change in price, so the more elastic

2    the more substitutes consumers have.

3    Q.   To, for example, an elasticity of 2, that would mean

4    that a price increase of 1 percent means a quantity decrease

5    of 2 percent; fair?

6    A.   Yes, that's right.

7    Q.   And sometimes economists put a negative number in front

8    of that and sometimes they don't?

9    A.   Yes.  I do both when I teach.

10   Q.   And here the critical elasticity calculate, that is the

11   elasticity at which a 5 percent price increase for a

12   hypothetical monopolist would become unprofitable; correct?

13   A.   Yes, that's right.

14   Q.   And then the idea is you would compare the actual

15   demand elasticity against your critical demand elasticity?

16   A.   That's right.

17   Q.   Okay.  The critical elasticity you calculate here is

18   1.82; correct?

19   A.   I think I used a couple of different -- oh, sorry, the

20   critical elasticity, yes, that's right.

21        MR. CULLEY:  And, your Honor, I realize we're

22   getting a bit technical, so to make it easier to follow the

23   numbers we've created Gowrisankaran Demonstrative D.

24        THE COURT:  Thank you.

25        (On screen.)

```
 1              THE COURT:  I have it.
 2   Q.   And just to help the Court understand how this works,
 3   Doctor, if the actual elasticity for a candidate market
 4   were, say, 1.6, that would be below your critical value and
 5   the candidate market would pass the hypothetical monopolist
 6   test; correct?
 7   A.   Yes, that's right.
 8   Q.   And, by contrast, if the actual elasticity were, say,
 9   1.9, that would be above your critical elasticity and it
10   would fail the hypothetical monopolist test because it's too
11   narrow; right?
12   A.   Yes, that's right.
13   Q.   Okay.  So that's the critical elasticity.  Let's talk
14   about the estimates of actual elasticity that you have.
15        You did not calculate your own estimates of actual
16   elasticities; correct?
17   A.   Correct.  I used numbers from the literature.
18   Q.   In fact, you used two academic papers to get those
19   estimates; correct?
20   A.   Yes, Berry and Jia, and Lee, et al.
21   Q.   And both of those papers estimate an elasticity that is
22   an aggregate across many different routes; correct?
23   A.   That's right.  That's how estimation works.  There's
24   only identification at a bigger level.
25   Q.   None of those were for a particular origin and
```

1    destination pair; correct?

2    A.    That's right.  The estimates aggregate across routes.

3    Q.    And you agree that there's going to be some variation

4    in demand elasticity across routes; right?

5    A.    Sure.

6    Q.    And that means some of the routes are going to have an

7    elasticity that is higher than the aggregate estimate;

8    correct?

9    A.    Sure.

10   Q.    For example, routes that have fewer business travelers

11   will tend to have more elastic demand; correct?

12   A.    Yeah, that's -- that's possible, right.  Yeah.

13   Q.    That means their elasticity would be higher?

14   A.    Yes, that's right.

15   Q.    And the number of the airports that have been discussed

16   at this trial have a high share of leisure travelers;

17   correct?

18   A.    I wouldn't assess that necessarily.

19   Q.    For example, Orlando?

20   A.    Orlando, sure, yeah.  Uhm-hmm.  Not necessarily, like,

21   New York or Miami or other ones.

22   Q.    Fair enough, Doctor.  And your report does not contain

23   any analysis of whether the sample of routes used in these

24   two papers are representative of the routes that JetBlue and

25   Spirit fly; correct?

1    A.    No, they didn't report all their route sample.

2    Q.    To make it more concrete, let's talk about some of the

3    specific markets that could be impacted.  Do you recall

4    Mr. Friedman's testimony that Orlando International Airport

5    and Orlando Sanford Airport are perfectly substitutable?

6    A.    I think so, yes.

7    Q.    And you did not include Orlando International Airport

8    and Orlando Sanford Airport in the same geographic market?

9    A.    I didn't.  In my reply report I did investigate

10   robustness about Orlando Sanford and showed that it's very

11   small.

12   Q.    And those are not the shares that you presented to the

13   Court; correct?

14   A.    They're not.  But, again, I showed robustness too

15   including Orlando Sanford.

16   Q.    And do you recall Mr. Clark's testimony that Hartford's

17   and New Haven's airports compete with each other?

18   A.    Yes, I do.

19   Q.    And Mr. Yealy's testimony that Avelo considers New

20   Haven and Hartford to be very close to each other?

21   A.    Sure.  Yes, I do.

22   Q.    And you did not include New Haven and Hartford in the

23   same geographic market, did you?

24   A.    I didn't.

25   Q.    And do you recall Mr. Wells' testimony that Punta Gorda

1    Airport and Fort Myers Airport compete with each other?

2    A.   I don't remember specifically but it sounds right.

3    Q.   Let's go ahead and take a look if you want.  It's in

4    the trial transcript, November 15th, Volume 1, page 12,

5    lines 6 through 8.

6               MR. CULLEY:  You can put that up on the screen.

7               (On screen.)

8    Q.   Does this refresh your memory about Mr. Wells'

9    testimony?

10   A.   Yes, it does.

11   Q.   And do you recall Mr. Yealy's testimony that

12   Philadelphia, Pennsylvania and Wilmington, Delaware are

13   relatively close to each other?

14   A.   Yes, I think so.

15   Q.   And that Mr. Yealy looked at service from Philadelphia

16   to San Juan when considering whether Avelo should begin

17   service from Wilmington to San Juan?

18   A.   Yes, I think I remember that.

19   Q.   And you did not include Philadelphia and Wilmington in

20   the same market; right?

21   A.   No, I didn't.

22   Q.   So that's the issue of using an aggregate as opposed to

23   individual estimate.  Let's talk about the actual estimate

24   itself.  You cite an article by Berry and Jia that you

25   discussed earlier for one of your estimates; correct?

1   A.   That's right.

2   Q.   And you consider this article to be a reliable

3   authority; right?

4   A.   Yes.  It's a well-published article.

5   Q.   In fact, you referred to it as one of the seminal

6   articles in economics; right?

7   A.   Yes, it is, for the method -- and Berry, they're very

8   well-established economists, too.

9   Q.   And your report used the value 1.67 that Berry and Jia

10  estimate in the aggregate for individual airport pairs;

11  correct?

12  A.   Yes, that's their main estimate.  And I used that even

13  though it's for airport pairs and not city pairs, because

14  demand at the airport-pair level will be more elastic than

15  demand at the city-pair level.

16  Q.   Okay.  Let's go ahead and put that on the

17  demonstrative.

18          (On screen.)

19  Q.   As you just mentioned, your candidate markets are not

20  individual airport pairs; correct?

21  A.   Right.  They include city pairs when the Department of

22  Transportation defined them to be in the same city, like

23  Fort Lauderdale and Miami, for instance.

24  Q.   And that's not what was estimated there, airport pairs;

25  correct?

A.   Yes.  Berry and Jia's main specification estimated
airport pairs, and then they had a robustness that estimated
city pairs that gave different results, and it's not what --
their main specification.

Q.   Okay.  Let's go ahead and cross that out then.  And as
you mentioned, they did give an estimate for city pairs
which are your geographic market; correct?

A.   Yes, but that's not their main specification.

Q.   And that estimate was 2.01; right, Doctor?

A.   Right, yes.

Q.   And that is above your 1.82 critical elasticity;
correct?

A.   Yes, it is.

Q.   And if we use that estimate, it would fail the
hypothetical monopolist test; correct?

A.   Sure, if you used just that estimate.

Q.   Okay.

          MR. CULLEY:  You can take that -- actually, you
can leave --

Q.   Let's also discuss the time frame of your elasticity
estimates.  The most recent data for both of the academic
papers you relied on is from 2006; correct?

A.   That's right.

Q.   That's more than 15 years ago?

A.   Right.

1   Q.   And the Berry and Jia paper that you relied on, that

2   didn't just look at estimates from 2006, it also looked at

3   estimates from 1999; correct?

4   A.   Yes, that's right.

5   Q.   And it found that demand elasticity for both airport

6   pairs and city pairs had been increasing over time; correct?

7   A.   Yes.

8   Q.   And, in particular, they found that it had been 1.55 in

9   1999 for airport pairs, and 1.68 in 1999 for city pairs;

10  correct?

11  A.   Yes, that's right.

12  Q.   So it had gone up for both of those?

13  A.   Yes.

14  Q.   And your report does not include any analysis of

15  whether the elasticity estimates you rely on increased any

16  further since 2006; correct?

17  A.   No, nor have they decreased, as might be likely too.

18  Q.   You don't know what happened to them, correct, one way

19  or the other?

20  A.   Yeah, so the -- as an economist, and this is what I

21  teach my students about elasticity, is we tend to use

22  elasticities because they don't change that much over time.

23  They're very comparable.  That's the point of using

24  elasticities.  So I don't know exactly what happened to

25  them, but they're probably fairly similar now.

1    Q.   And you didn't do any analysis to establish that;

2    correct?

3    A.   That's not exactly fair, no.  I mean, I looked at the

4    competitors now.  I looked at -- I also looked at what

5    courts have ruled on markets more recently.  And they, in

6    this very courthouse, in the Northeast Alliance, they found

7    that city pairs or, I think, something even slightly

8    smaller, were relevant markets.  So I did a bunch of

9    analyses to verify that this was accurate.

10   Q.   Let's look at some other elasticity estimates.  You

11   heard testimony from Mr. Friedman that he estimated

12   elasticities for individual routes in the process of

13   creating JetBlue's combined network plan; right?

14   A.   I think I did but I don't remember exactly what I

15   heard.

16   Q.   Let's take a look at it.

17            MR. CULLEY:  Let's bring up Exhibit 153.  And if

18   you flip over to tab "Source File Final," Mr. McLeod.  Here

19   we go.

20            (On screen.)

21   Q.   And you can see the underlying source data there,

22   Doctor?

23   A.   Yes, I can.  Is there something you have on this in --

24   Q.   No, but we created a demonstrative to pull out the

25   relevant items for you.  It's Gowrisankaran Demonstrative E.

1    A.   E, as in Edward?

2    Q.   Correct.

3         And each of these estimates is greater than 1.82;

4    correct?

5    A.   It is, but I don't know how he got them.  And,

6    actually, you know, when I looked at the record in depth,

7    like Mr. Clark testified about the ULCC test --

8    Q.   So, Doctor, I just asked you, these are greater than

9    1.82?

10   A.   They are.  I just don't know how reliable they are,

11   though.

12   Q.   Let's go back to that, please.  So, I'm sorry, let me

13   just understand that a little bit better.  You don't

14   understand how reliable these estimates are?  That's what

15   you said?

16   A.   Yes, that's right.

17   Q.   Okay.  And you're saying you would need to examine this

18   underlying document further in order to assess the

19   reliability?

20   A.   No, I'd need to understand the variation in the data

21   that created it.  So what you want to do to create a

22   elasticity is you want to move prices around and see how

23   consumers respond.  And the closest I saw to that is, like,

24   the ULCC test, but they didn't vary them exogenously so they

25   didn't create what we call natural experiments.  So I don't

```
 1   know that JetBlue has very reliable information on

 2   elasticities.

 3   Q.   Okay.  And you'd want to investigate that before you

 4   relied on it?

 5   A.   Yeah.  I mean, in general, I would rather rely, for an

 6   elasticity estimate, on -- that's the thing that's very much

 7   in the wheelhouse of economists rather than firms.  And I

 8   want to rely on studies that are peer-reviewed or that, you

 9   know, where I can say that this is variation that makes

10   sense to use.

11   Q.   Fair enough, Doctor.

12            MR. CULLEY:  Okay.  Let's take that down.

13   Q.   Let's switch gears and talk about coordinated effects.

14   And let's bring up slide 53 from your direct testimony

15   presentation.

16            (On screen.)

17   Q.   At the bottom here you cite the 1994 ATPCO Consent

18   Decree as evidence of past coordination; correct?

19   A.   That's right.

20   Q.   That case was filed six years before JetBlue was

21   founded; isn't that right?

22   A.   That's right.

23   Q.   And the settlement you mentioned here with American

24   Airlines, that did not mention JetBlue at all; correct?

25   A.   It did not, no.
```

```
 1              MR. CULLEY:  You could take that down.
 2   Q.   Let's talk about some of the points that you made about
 3   Spirit.  On slide 9 of your direct testimony you identified
 4   Spirit as having the most growth of major U.S. airlines
 5   measured by available seat miles; correct?
 6   A.   Yes, over the 13-year period.  Over quite a long
 7   horizon.
 8   Q.   And in this graph on the bottom that you just
 9   referenced you took that from a presentation from Airlines
10   for America; correct?
11   A.   Yes, that's right.
12   Q.   And before you showed that to the Court you examined
13   that presentation; right?
14   A.   Yes.  But I took it from -- it wasn't analysis I did to
15   create this.
16   Q.   And you determined it was reliable before you showed it
17   to the Court; right?
18   A.   Yes.
19   Q.   Okay.  Let's go ahead and put the underlying document,
20   which is Exhibit BYH, up on screen.
21              (On screen.)
22   Q.   And that's tab 1 at the very end of the binder that we
23   gave you.  This is the document; right, Doctor?
24   A.   It looks right.
25   Q.   And the graph that you relied on, that's on slide 23?
```

1   A.   I don't remember.

2   Q.   Can you see it there?

3   A.   Oh, slide 23.  Yes, it is.

4   Q.   Let's go three slides back to slide 20.  Now, slide 20

5   of this presentation on which you relied states, "The number

6   of competitors per domestic trip rose from 3.33 to 3.47."

7   Do you see that?

8   A.   Yes, I do.

9   Q.   From the period 2000 to 2022?

10  A.   Yes, I do.  Uhm-hmm.

11  Q.   And then right below that it says, "Made possible by,

12  one, lack of entry barriers allowing rapid nationwide

13  expansion of lower-cost carriers; and two, mergers of

14  complementary networks enabling large network carriers to

15  offer competitive connecting service on more city pairs and

16  new nonstop service into markets they previously did not

17  serve."  I read that correctly; right, sir?

18  A.   Yes.

19          MR. CULLEY:  We would move to enter BYH into

20  evidence as 846, your Honor.

21          THE COURT:  BYH?

22          MR. BATTAGLIA:  Your Honor, objection.  This is

23  untimely.

24          MR. CULLEY:  Your Honor --

25          THE COURT:  I don't understand the objection.

```
 1   What do you mean untimely?

 2             MR. BATTAGLIA:  This was not provided to us.

 3             MR. CULLEY:  We did provide it to them over the

 4   weekend after we saw the document in Dr. Gowrisankaran's

 5   slides.

 6             THE COURT:  You've seen that document for some

 7   time.

 8             MR. CULLEY:  His slides, sir?  We only received

 9   his slides on Thursday.

10             THE COURT:  Oh, really?

11             MR. BATTAGLIA:  No, the slides were provided three

12   days before he took the stand.

13             THE COURT:  That's Thursday.

14             MR. BATTAGLIA:  Tuesday.

15             THE COURT:  Well, you're asking that this be

16   admitted in evidence?

17             MR. CULLEY:  Yes, your Honor, under Rule 703 as

18   a -- as the doctor relied on it.

19             THE COURT:  You did rely on it?

20             THE WITNESS:  I relied not on this, but I just

21   reproduced one of the figures, yes.

22             THE COURT:  And which figure is it?

23             MR. CULLEY:  He relied on slide 23 --

24             THE COURT:  No, no, I'm asking him.

25             MR. CULLEY:  I'm sorry.
```

```
 1              THE WITNESS:  Yes, it is this figure that I
 2    relied.  I put that in my original report which was filed in
 3    July.
 4              THE COURT:  This one which says, "Change
 5    percentage to systemwide scheduled ASMs"?
 6              THE WITNESS:  No -- sorry.  May I see?  It's the
 7    one that says -- it says, yeah, "Change percent in
 8    systemwide scheduled ASMs."  That's right.
 9              THE COURT:  I'll admit that.
10              MR. BATTAGLIA:  We'll allow the slide to be
11    admitted.
12              MR. CULLEY:  We're asking for the whole document
13    to be admitted.
14              MR. BATTAGLIA:  We object as to the whole
15    document.
16              THE COURT:  No, I'll allow the slide to be
17    admitted and it will be, what, Exhibit 846.
18              (Exhibit 846 received in evidence.)
19              MR. CULLEY:  Okay.
20    Q.  Let's go back to your presentation, Doctor.  And we
21    were on slide 9 of your presentation.  Let's keep that up,
22    and we will put up Gowrisankaran 1006 Summary 6 next to it.
23              (On screen.)
24    Q.  That's in your folder with the 1006 summaries, Doctor.
25    A.  I got it.
```

```
 1              MR. CULLEY:  Have you been able to locate it, your

 2   Honor?

 3              THE COURT:  I have.  Thank you.

 4   Q.   So you looked, as you mentioned, Doctor, over the

 5   13-year period from 2010 to 2023, at the growth in available

 6   seat miles; correct?

 7   A.   That's right.

 8   Q.   And that's 13 years?

 9   A.   That's right.

10   Q.   And the figures in your graph are cumulative figures

11   over the entire period, they're not annual numbers?

12   A.   Correct.

13   Q.   Okay.  So in 1006 Summary 6 we took the same underlying

14   public schedule data and we restricted it to 2021 to 2023.

15              MR. CULLEY:  And, your Honor, we would move to

16   admit Gowrisankaran 1006 Summary 6 as 847.

17              THE COURT:  No objection?

18              MR. BATTAGLIA:  No objection, your Honor.

19              THE COURT:  It may be admitted, 847.

20              (Exhibit 847 received in evidence.)

21   Q.   And, Doctor, your slides reported that Spirit had the

22   most growth of all the airlines, but if we look over here

23   from 2021 to 2023 in this more restricted period, Spirit

24   actually has the seventh highest growth of all airlines;

25   correct?
```

```
 1    A.   That's not quite right for two reasons.  The first is I
 2    restricted it to the most growth of any major airline.  And
 3    the second is two of the airlines that you put there, Avelo
 4    and Breeze, simply didn't exist at the start of this sample.
 5    And so that's not even defined what their growth rate is.
 6    Q.   So if you look at the footnote, Doctor, we looked at
 7    them against the base year of 2022 to account just for the
 8    issue that you mentioned.
 9    A.   Right.  But according to your question, you said they
10    had the seventh highest growth rate from 2021 to '23.  And
11    two of those airlines weren't even there in 2021.
12    Q.   So over the period that you're talking about, the two
13    airlines that did not even exist entered the market; is that
14    right?
15    A.   They did.  They're pretty small still.
16    Q.   And if we also look at ULCCs, Frontier had larger
17    growth over this period, 2021 to 2023, than Spirit did;
18    correct?
19    A.   Yes, it did.
20    Q.   As did Delta, Hawaiian and United?
21    A.   Yes.  During this recovery from COVID period, those all
22    had higher growth rates.
23              MR. CULLEY:  We can take that down.
24    Q.   On slide 10 of your presentation you presented an
25    analysis of Spirit's fares versus other airline fares in the
```

1    nonstop overlap markets; correct?

2    A.    Yes, that's right.

3    Q.    These fares are averages; right?

4    A.    Yes.  These are average stage length adjusted prices.

5    Q.    And you didn't restrict the fares in these averages to

6    fares most comparable to Spirit's offering, basic economy

7    and Blue Basic?  You did not do that; correct?

8    A.    No, I did not, but I did include amenities on the right

9    column to account for that.

10   Q.    Thank you, Doctor.  So the JetBlue line here on the

11   left, for example, that says 186, that would include tickets

12   for Mint, JetBlue's business-class product; correct?

13   A.    I don't think that's right because I don't think

14   JetBlue offers Mint on any routes it competes overlap with

15   Spirit.  So I don't think there would be any Mint fares in

16   there.

17   Q.    Fair enough.  It would include Blue Extra there --

18   A.    Yes, it would.  Sorry to interrupt.  Yeah, it would.

19   Q.    And on the graph on your right there's a little

20   asterisk next to F9.  Do you see that?

21   A.    Yes, I do.

22   Q.    And that's Frontier?

23   A.    That's right.

24   Q.    And the explanation for that is that all the lines on

25   your right side exclude taxes except for Frontier; correct?

```
 1   A.    Yes.  My team wasn't able to exclude taxes for Frontier
 2   because of how they produce the data.
 3   Q.    And not excluding taxes would make the Frontier number
 4   larger than it really is; correct?
 5   A.    Right, relative -- it would make it not an
 6   apples-to-apples comparison, which is why I put a star
 7   there.
 8   Q.    To circle back to the same issue on your graph on the
 9   left, for example, for United Airlines that would include
10   first class tickets on those routes for United; correct?
11   A.    Sure, yeah.
12   Q.    As it would for AA?
13   A.    Yes.
14   Q.    And for Delta?
15   A.    Yes.
16   Q.    Let's go to slide 55 of the presentation that you gave
17   on direct.
18           (On screen.)
19   Q.    You state at the top here that, "Spirit fares are less
20   transparent to other airlines, whereas JetBlue must make
21   nearly all fares available through ATPCO."  That's what you
22   wrote, sir?
23   A.    Yes, that's right.
24   Q.    And you heard Mr. Klein's testimony that it is not any
25   harder or more complicated to scrape fares from Spirit's
```

1   website than it is to get them from ATPCO; did you not?

2   A.   Mr. Clark, you said, right?

3   Q.   Mr. Klein.

4   A.   Oh, Mr. Klein.  Yes, I did hear -- I thought -- okay,

5   yeah, I heard the testimony of that.  Right.

6            MR. CULLEY:  You can take that down.

7   Q.   One of the reasons you gave to support your

8   coordinated-effects opinion in your direct testimony was

9   that JetBlue will become more like a legacy as a result of

10  the merger because it will be bigger on many of the routes

11  that it operates and more like a hub-and-spoke carrier;

12  correct?

13  A.   Yes, that's right.

14  Q.   But your opinion is also that if JetBlue grows

15  organically, meaning without the merger, and has more

16  connecting routes and more breadth nationally, that JetBlue

17  will be more likely to engage in coordination over time;

18  correct?

19  A.   Sure, that's definitely possible.  It depends how it

20  grows.

21  Q.   And is it your opinion that JetBlue will no longer be a

22  maverick after the merger?

23  A.   That's not how I think about it as an economist.  How I

24  think about it as an economist is however much JetBlue is a

25  disruptive force now, they'll have incentives to be less of

1    a disruptive force after the merger if it were to go

2    forward.

3    Q.   And did you hear Mr. Hayes' testimony that after the

4    merger nothing about JetBlue's maverick status would change?

5    A.   Yes, I did.

6    Q.   And did you also hear him say that JetBlue could never

7    become a legacy airline because the reality is that JetBlue

8    and Spirit together is a small part of the market?

9    A.   Yes, I heard him say that.

10   Q.   And is your opinion that one reason for JetBlue

11   becoming more like a legacy is that it will have more

12   connecting traffic?

13   A.   I said it will have more incentives to act like a

14   legacy carrier.  But, yes, one reason I said is that it

15   would have more potential for connecting traffic.

16   Q.   And did you hear Mr. Friedman's testimony that JetBlue

17   will go from only 85 percent nonstop to 80 percent nonstop

18   service as a result of the transaction?

19   A.   I wasn't here for Mr. Friedman's testimony, but I read

20   the transcript, so...

21   Q.   Did you read that part of the testimony?

22   A.   I think so, yes.

23   Q.   And did you also hear him say that that 80 percent

24   nonstop is similar to Spirit's share of nonstop traffic

25   today?

```
 1    A.   Yes, I did.  I didn't hear him say that, I'm sorry.  I
 2    wasn't here.
 3    Q.   You read him say that?
 4    A.   Yes.
 5    Q.   One of the things you cited in your direct testimony to
 6    support your coordination theory was the existence of
 7    airline cross-market initiatives; correct?
 8    A.   Yes, that's right.
 9    Q.   But you did not do any systematic study of the
10    frequency of cross-market initiatives; right?
11    A.   No.  It's not really necessary to understand.  Just the
12    fact --
13    Q.   I'm sorry, Doctor.  I just asked whether you did or
14    not?
15    A.   Oh, no, I didn't.  Yeah.
16    Q.   And you did not do any -- you also referred to
17    flashing; correct?
18    A.   I did, and other types of signaling, yes.
19    Q.   And you did not do any systematic study of the
20    frequency of flashing; right?
21    A.   No, I didn't.
22    Q.   And you heard Mr. Lage testify that he recalls only one
23    instance where he observed JetBlue file what he thought
24    might be a cross-market initiative; right?
25    A.   Yes, that's right.
```

 1   Q.   And you also heard him testify that it turned out that

 2   fare action was not actually a cross-market initiative;

 3   right?

 4   A.   Yeah, I think he said something like that.

 5   Q.   And for any of the alleged cross-market initiatives

 6   that were discussed at trial, you didn't go back and check

 7   whether they were actually cross-market initiatives; right?

 8   A.   No.  It wasn't necessary.

 9   Q.   And you heard Mr. Hillyard testify that JetBlue alone

10   files 5- to 10 million fares on a yearly basis; right?

11   A.   Yes, I did.

12   Q.   Another reason you note in support of your coordination

13   opinion is that JetBlue prices similar to the legacies;

14   correct?  I might have mangled that.  Let me enunciate a

15   little bit more.

16        Another reason you note, in support of your

17   coordination opinion, is that JetBlue prices similarly to

18   the legacies; correct?

19   A.   I might have said something like that, but I don't want

20   to -- you know, like, there's two parts to this.  It doesn't

21   offer an unbundled model, like Spirit, so it -- so its

22   pricing, the way it prices is more similar to legacies with

23   a bundled model.  I might have said -- I certainly said in

24   other parts of my report that it's more often similar in

25   pricing to legacies than Spirit is.

 1   Q.   Let's go ahead and take a look at slide 56 of your

 2   presentation.

 3           (On screen.)

 4   Q.   And this is what I was referring to; right, Doctor?

 5   A.   Right.  This is where I said that it's --

 6   Q.   You don't need to repeat your testimony.

 7   A.   No, that's fine.

 8   Q.   And this graphic was based on the Spirit 037 AP

 9   reports; correct?

10   A.   That's right.

11   Q.   And you heard Mr. Lage testify earlier that he's the

12   person who prepares the Spirit 037 AP reports; correct?

13   A.   Yes.  I think he no longer does, actually.

14   Q.   And you heard him testify that these reports reflected

15   only the lowest filed fare on each route; correct?

16   A.   Absolutely.

17   Q.   And not the fares that were actually sold on these

18   routes?

19   A.   Not necessarily what was sold, the lowest filed fares.

20   Q.   Or even if they were available; correct?

21   A.   Right.

22   Q.   Because the 037 AP reports do not report nor could they

23   report how many seats were actually available for purchase

24   at each of these fare levels; correct?

25   A.   Correct.

1    Q.   Because that data is not public; right?

2    A.   Those data are not public -- I mean, well, ATPCO isn't

3    public either, but they're not available on ATPCO.   Prices

4    are available.

5    Q.   And not the inventory available at the price?   That's

6    not available on ATPCO; correct?

7    A.   Correct.

8    Q.   And you also heard Mr. Lage testify that the reports do

9    not control for restrictions that may be placed on the fares

10   that limit their availability to particular customers;

11   correct?

12   A.   That's right.

13   Q.   And as you mentioned before, Mr. Lage actually stopped

14   using these reports; correct?

15   A.   Yes.   He said he stopped reporting them.

16   Q.   And you had access to the DB1B from the Department of

17   Transportation for tickets actually sold; correct?

18   A.   That's right.

19   Q.   And you could have showed an analysis by type of fare

20   using that data, but that is not what you chose to show to

21   the Court; correct?

22   A.   No, that's not right.   So I did show analyses that

23   Spirit's fares are lower and that JetBlue's fares are very

24   similar to the legacy carriers.   I can point that to you.

25   It's a slide in my testimony.

1   Q.   You did not show a breakdown by different type of fare

2   bucket?

3   A.   Well, the problem is, is that it's hard to interpret

4   those fare buckets.  So I don't know if it's an

5   apples-to-apples comparison.  These are more interpretable

6   because they show what fares are filed with walk-up fares.

7   So I wouldn't know from DB1B if those are walk-up fares or

8   what other types of fares.  But if you look at that it's

9   very consistent here.  The JetBlue fares are very similar to

10   legacies and Spirit fares are a lot lower.  So I already did

11   show that in some sense.

12   Q.   You're not familiar with the exact methodology that

13   Mr. Lage used to identify the prices or the routes within

14   the 037 AP reports; correct?

15   A.   I identified the routes because these are nonstop

16   overlap markets.  And so he did it by across routes and

17   reported it in a spreadsheet.  And I took those spreadsheets

18   and I calculated it by route, or my team did, I should say.

19   So I am aware of that.

20       I'm not specifically aware of about what he did, but my

21   understanding is he just went -- you know, he did this like

22   roughly every other day for 2022, is when I'm taking the

23   data.  And my understanding is he just went to ATPCO and

24   looked at the lowest available fare without any

25   restrictions, that's the walk-up fare, or the 3-day, or the

 1    7-day, and then looked at that for the big four and JetBlue,

 2    and he looked at Spirit's own internal systems to find their

 3    lowest available fare.

 4    Q.    You don't know the exact methodology he used; correct,

 5    Doctor?

 6    A.    I mean, I don't know the specifics but that's pretty

 7    close to the exact methodology.

 8    Q.    Okay.  Let's take a look at your deposition, page 87

 9    line 5 through page 88 line 9.

10    A.    The deposition is here in --

11    Q.    That's right.  It's in the binder, the first tab in the

12    binder we gave you.

13    A.    Now, what were the page numbers again?

14    Q.    It was page 87 line 5 through page 88 line 9.

15            (On screen.)

16    Q.    Just to orient you, you and I at that point were

17    discussing the bottom part of your graph all the way on the

18    left about the 20.5 percent.  So I had asked you, "It is not

19    what Spirit -- about what Spirit observes.  But is it your

20    conclusion that 25 percent of the time, JetBlue -- only 25

21    percent of the time is JetBlue pricing below the big four on

22    zero-day advance purchase tickets.  Is that your conclusion,

23    sir?"

24          You answered, "So that's not my -- that's not my

25    conclusion that JetBlue is pricing below the legacies

1    20.5 percent of the time because this is a particular sample

2    that Mr. Lage at Spirit took.  It's my conclusion that

3    Spirit observes that JetBlue is similar to legacy airlines.

4    And I would see that based on their ticket sales at

5    zero-advance purchase, 3-day advance purchase or 7-day

6    advance purchase that they are, in fact, similar to legacy

7    sales.  I don't know the exact methodology that Mr. Lage

8    used to identify the prices or routes.  And this is about a

9    very particular time period.  So I'm not assessing overall

10   whether JetBlue fares are lower than legacy fares

11   20.5 percent of the time or lower than the big four fares."

12        Correct?

13   A.   Yes.

14             MR. CULLEY:  Okay.  You can take that down.

15   Q.   Let's go back to slide 56.

16             (On screen.)

17   Q.   Now, in your legend here you group the big four; is

18   that right?

19   A.   That's right.

20   Q.   And the big four in your graph include Southwest;

21   correct?

22   A.   That's right.

23   Q.   And Southwest is a low-cost carrier; right?

24   A.   Yes, it is.

25   Q.   And in your report you did not provide -- you did not

1    prepare an alternative version of this analysis that broke

2    out Southwest; correct?

3    A.    I did not, no.

4              MR. CULLEY:   Okay.   We can take that down.

5    Q.    Let's talk about your opinions on cost-conscious

6    customers.   You do agree that legacy airlines compete for

7    cost-conscious travelers by offering tickets in basic

8    economy that are designed to compete with the offerings of

9    LCCs and ULCCs; correct?

10   A.    Yes, I do.

11   Q.    You don't define a separate market for cost-conscious

12   consumers; correct?

13   A.    That's correct.

14   Q.    You agree there's no firm objective boundary between

15   cost-conscious consumers and other consumers; correct?

16   A.    That's right.   I'm not here to offer an opinion that

17   there's a firm boundary, rather it's a continuum.

18   Q.    In fact, the same customer could be cost-conscious for

19   some flights but not for others; correct?

20   A.    Sure.   I think I gave an example of somebody who's

21   traveling for vacation might be more cost-conscious than if

22   she's traveling for a business trip paid by her employer.

23   Q.    And a customer could be cost-conscious for some flights

24   in their personal life but not cost-conscious for other

25   flights in their personal life, as well, not just their

1  business travel; correct?

2  A.   Sure.  If they're going to a funeral for a parent or

3  something they're not going to be cost-conscious.

4  Q.   And you didn't calculate market shares among airlines

5  for cost-conscious consumers; right?

6  A.   No.  I didn't define of them as markets, to start with.

7  Q.   And you agree that cost-conscious travelers have more

8  price elastic demand than passengers as a whole; right?

9  A.   Yes, I would.

10 Q.   And you would agree that cost-conscious travelers may

11 be willing to travel further to an airport than business

12 travelers for scheduled air passenger service; correct?

13 A.   Yes, that's right.

14 Q.   In applying the hypothetical monopolist test, you

15 didn't separately analyze the demand elasticity of

16 cost-conscious travelers; right?

17 A.   I didn't.  I didn't even define a market that way.

18 Q.   Let's talk about your estimates of harm.  I think you

19 started to explain this around slide 63 of your

20 presentation.

21          MR. CULLEY:  If we could bring it up on screen.

22          (On screen.)

23 Q.   And on this slide you were explaining to the Court how

24 your -- how you estimated the effect of Spirit's entry on

25 prices; is that right?

A.   Yes, that's right.  I don't think this was -- this was
my first slide in net harm, so I think I have some earlier
slides where I estimated the impact of Spirit's entry on
market prices before this.  I don't think it's the first
one.

Q.   But this slide is illustrating the estimation that you
did; correct?

A.   That's right.

Q.   The shape of your price change prediction here, that's
called a parabola; right?

A.   Yes, that's right.

Q.   And, at first, if we go down the yellow line -- well,
let me first ask, the bottom, your X-axis here, that's
relative capacity; correct?

A.   Could you repeat the question, please?

Q.   The bottom of the graph here, the X-axis, that's
relative capacity; correct?

A.   Yes.

Q.   And that means roughly how much capacity Spirit entered
with compared to how much capacity was already in a market;
correct?

A.   Roughly, yeah.  It's number of passengers in the
market.

Q.   And as Spirit adds more capacity, you testified, we see
a larger impact on the price charged in that market;

1    correct?

2    A.   Yes, for almost all of the sample.

3    Q.   But around 0.03 here your estimation stops going down;

4    correct?

5    A.   Yes, that's right.

6    Q.   And it starts going up?

7    A.   Yes.  I would say the regression line starts going up.

8    Q.   Fair enough.  And so entry with 0.015 relative capacity

9    and entry with, say, 0.04, they basically have the same

10   impact on prices?

11   A.   Yes.  There's almost no entry with 0.04.

12   Q.   Even though entry at 0.04 is more capacity than

13   at 0.015?

14   A.   Yeah.  Not only is that out of sample, but it kind of

15   makes sense that it would start going up after a while.

16   Because if you enter with a huge amount of capacity, there's

17   only one route there, you're basically the only airline

18   serving that route.  And so you're not disciplining prices

19   because you might be a monopoly on that route.  So that's

20   only one route, of course, that that happens for.

21   Q.   And -- okay.  Let's continue with that line of thought.

22   So around, say, 0.058 your regression line actually predicts

23   that prices would go up if you entered by flooding the

24   market with capacity; right?

25   A.   Yeah.  I mean, that's -- I mean, it would predict that

1   but it's not something I would want to use, as an economist.

2   So as I testified to, as an economist what we want to do is

3   use regressions, use predictions in sample.  And so how

4   lines predict out of sample, that's not really probative of

5   anything.

6   Q.   So the way that you handled this prediction was you

7   just didn't use any part of the line after a particular

8   capacity?

9   A.   Yes, basically.  But just to be accurate what I did is

10  I think I dropped two entry events that were bigger than my

11  biggest -- two events where Spirit was there and they were

12  essentially the only airline that was bigger than my biggest

13  entry event.

14  Q.   So you had data that was out that far and you just

15  excluded it; correct?

16  A.   No, that's not exactly right.  So I didn't exclude any

17  data from the regression.  Where I excluded data from was

18  from the prediction.  So remember that what I said is

19  there's two steps to my -- to my net-harm calculation.

20  First, I estimate this parabola or this line, as you --

21  parabola, as you called it accurately.  And then what I did

22  is I used it to predict the yellow arrows that say for every

23  route where Spirit is there, how much would be the price

24  impact if Spirit were removed, and then the blue arrows.

25       So what I did was that, to be conservative, I did not

1    include Spirit markets where they're present, they're

2    outside of the sample of entry.  Because entry is where I

3    have identification in the data.  I apologize if that's

4    long, but ask me if --

5    Q.   Thank you for the clarification.

6    A.   Okay.

7              MR. CULLEY:  We can take that down.

8    Q.   So your net-harm analysis calculates harm on routes

9    where Spirit but not JetBlue is operating today; right?

10   A.   In part it does, yes.

11   Q.   And as we discussed earlier, on those routes where only

12   Spirit is present but not JetBlue, the companies don't

13   compete; correct?

14   A.   That's right.

15   Q.   But you still calculate harm on the merger from these

16   routes because your opinion is that harm from the merger --

17   sorry, let me -- the places where there is harm from the

18   merger are decoupled from the places where the merger

19   creates any competitive incentives; correct?

20   A.   Yes.  And just to be clear, I estimate both harm and

21   net harm there.

22   Q.   Okay.  But just to clarify, Doctor, you're estimating

23   harm on these nonoverlap routes?

24   A.   Yes, that's right.

25   Q.   Because they're -- the places where harm is felt are

1    decoupled from the places where incentives are created; is

2    that right?

3    A.   Yes.  I think I already answered that.

4    Q.   Okay.  Let's take a look at some examples of your

5    net-harm results.  So I wanted to take a look at one of the

6    examples that you gave, slide 74 on your presentation.

7              (On screen.)

8    Q.   So here you were looking at the Las Vegas-to-San

9    Francisco route; correct?

10   A.   That's right.

11   Q.   And the box here says, "Market Facts."  Is that right?

12   A.   Yes, it does.

13   Q.   Okay.  And then in a few slides from here you predict a

14   net 9 percent increase in price on this route; right?

15   A.   Yes, I did.

16   Q.   So let's talk about some of the other market facts

17   about this route.  How many nonstop carriers are there on

18   this route?

19   A.   There's a lot.  JetBlue's not nonstop, but I think

20   Delta, United, American, and Frontier maybe, Southwest.  I

21   think there are five others, at least, I remember.

22   Q.   And how many ULCCs are on this route?

23   A.   I think Frontier and Allegiant may both be on it, but I

24   can't remember for sure.

25   Q.   And is Spirit the largest ULCC on this route?

```
 1   A.   I'm not sure.

 2   Q.   Okay.  Let's take a look at Gowrisankaran 1006 Summary

 3   3.  That should be in that folder of 1006 summaries that you

 4   have there, Doctor.

 5             (On screen.)

 6             MR. CULLEY:  Were you able to find that one, your

 7   Honor?

 8             THE COURT:  I do.

 9   Q.   Okay.  And I think you mentioned there were five rivals

10   on that route.  We have six listed here.  But of course

11   American is quite small so --

12   A.   Yeah.  I think I listed Delta, maybe, and it's not

13   there too.

14   Q.   So this displays your net-harm estimates for San

15   Francisco to Las Vegas and also for Chicago to Phoenix, and

16   it does that using the information you provided in your

17   appendices with the shares of each airline offering nonstop

18   route based on the same data and time frame used to

19   calculate the shares for your concentration analysis.

20             MR. CULLEY:  And at this point, your Honor, we

21   would move to admit 1006 Summary 3 as Exhibit 848.

22             THE COURT:  No objection?

23             MR. BATTAGLIA:  No objection, your Honor.

24             THE COURT:  3 is admitted, Exhibit 848.

25             (Exhibit 848 received in evidence.)
```

1   Q.   Doctor, so, again, your unweighted price prediction for

2   this route was that prices would go up by 9.4 percent;

3   correct?

4   A.   That's correct.

5   Q.   And so is it still your view that after this merger

6   prices will go up by 9.4 percent on this route with six

7   other competitors where Spirit has only a 7.3.8 percent

8   share, JetBlue has only a 0.04 percent share, and Spirit is

9   not even the largest ULCC?

10  A.   So, basically, yes.  But let me just put two caveats to

11  that, which is JetBlue's share is not even counted here

12  because it's not a nonstop overlap.  Then also, you know,

13  what I think -- the way you want to think of an economic

14  model is if you're looking at it nationally, you have pretty

15  good degrees of significance.  That's what confidence

16  intervals are for, for instance.  But if you're looking at

17  it in any one route you're going to be less sure about what

18  the harm is.  But remember that what I did is I looked

19  overall at cross routes and looked at the average.

20       So the points that you saw, like the yellow dots, they

21  don't track the yellow line exactly.  Right?  Some points

22  are a little bit above the line and some are a little bit

23  below the line.  And that's natural in economics, that every

24  line, the impact might vary.  So I wouldn't assess the same

25  degree of certainty for one particular route as I would

1    overall to harm.  Because the point of regression is it

2    averages across those routes and comes up with an average

3    number that where we have a lot more certainty than on any

4    individual route or market.

5    Q.   Thanks for that clarification, Doctor.

6         Just to pick up on one thing that you said, you

7    mentioned JetBlue's connecting service here.  So you would

8    agree that for both of these routes what you're measuring

9    with your regression is not the loss of head-to-head

10   competition, but simply the effect from substituting Spirit

11   planes for JetBlue planes; correct?

12   A.   In these two routes, because they are not nonstop

13   overlaps, that's accurate, yes.

14   Q.   Now, as we discussed earlier, the parties have exited

15   or will exit some of the nonstop presumption routes;

16   correct?

17   A.   Yes, that's right.

18   Q.   But you are still including the presumption routes that

19   the parties have exited since the first half of 2022 in your

20   econometric calculation of harm; right?

21   A.   Yes.  I took one point in time.  I took the most recent

22   point in time that's unaffected by incentives of the merger,

23   and so I also document that there will be some entry.  But

24   we can't look at shares going forward or look at prices

25   going forward since we don't know what shares would be for

 1   2024.

 2   Q.   Let's take a look at Gowrisankaran Demonstrative F and

 3   let me know once you've located that, Doctor.

 4           (On screen.)

 5   A.   Yes, I have it.

 6   Q.   So what we've listed on Gowrisankaran Demonstrative F

 7   are your estimates of harm from your appendices on each of

 8   the routes, presumption routes that have been exited or

 9   partially exited by at least one party.  In that first row

10   there Spirit exited from LaGuardia but not from Newark.  Do

11   you see that?

12   A.   I see that, yes.

13   Q.   And the total harm -- well, let me back up.

14           The unweighted specification, you testified earlier

15   that's your preferred specification; correct?

16   A.   That's right.

17   Q.   So the total for these routes under your unweighted

18   specification is $70,941,397 of harm; correct?

19   A.   Yes.  That's less than 10 percent of the total net harm

20   I find.

21   Q.   Are you still opining that there will be $70.9 million

22   of harm on these routes after the merger?

23   A.   No.  I mean, the New York-to-San Juan route I'm happy

24   to opine that there will be harm there because they only had

25   weekly service to LaGuardia.  But those others, they're not

1      going to be necessarily net harm in exactly those routes,

2      but there are going to be new routes where they've entered

3      and where there's going to be net harm.

4      Q.   But you can't give an estimate for any of these

5      particular routes; correct?

6      A.   Besides New York to San Juan, the biggest on this, I

7      couldn't give an estimate, no.

8      Q.   But you still included this number in your total that

9      you presented to the Court; right?

10     A.   Yes, I did.

11            MR. CULLEY:   We could take that down.

12     Q.   Separate from your analysis of the Spirit Effect, one

13     of the papers you cited in your report by Brad Shrago,

14     titled, "The Spirit Effect ultra low-cost carriers and fare

15     dispersion in the U.S. airline industry," that also

16     estimated the Spirit Effect; correct?

17     A.   Yes, that's right.

18     Q.   And you agree that Dr. Shrago's work is reliable?

19     A.   Yeah, generally.   Yeah.

20     Q.   And his article is in tab J of your binder, if you want

21     to refer to it.   And on page 4 in table 1 of his article --

22            MR. CULLEY:   If we could put that up on screen.

23            THE COURT:   Let me go back, if I could.   And

24     excuse me, Mr. Culley.

25            Take a look to your demonstrative F.   And did I

```
1   understand you correctly that you can't give a, with any
2   precision, an estimate, a reliable estimate of the harm when
3   you isolate a particular route?  Did I understand that
4   correctly?
5           THE WITNESS:  I wouldn't say with no precision,
6   your Honor, but I'd say it's a lot less precision than
7   overall.
8           THE COURT:  Thank you.  And you go ahead,
9   Mr. Culley.
10          MR. CULLEY:  Of course.
11  Q.   So we were just discussing Mr. Shrago's article on the
12  Spirit Effect.  We're putting up page 4 in table 1.  Just to
13  orient ourselves here about his definitions -- take your
14  time to get there, Doctor.
15  A.   It's F, is that right?  Tab F?
16  Q.   Tab J.
17  A.   J.
18  Q.   Just let me know when you're there.
19  A.   Okay, I'm there.  It's page 4, you said?
20  Q.   Correct.
21  A.   Yeah, I'm there.  Uhm-hmm.
22  Q.   And so Dr. Shrago, he defines low-cost carriers to
23  include JetBlue; correct?
24  A.   Yes, that's right.
25  Q.   And he defines ultra low-cost carriers to include
```

```
 1   Spirit; correct?
 2   A.   Right.
 3   Q.   Now, on page 20, Dr. Shrago presents his estimations of
 4   the effects of different carriers' presence on the fares of
 5   legacy carriers in different fare percentiles in his
 6   figure 3; correct?
 7   A.   Yes, that's right.
 8   Q.   And the way we should read the bottom here of each
 9   graph, the X-axis, is the deciles of fare.  So the lowest
10   fare classes would be on the left, and the most expensive
11   fare classes would be on the right; correct?
12   A.   Right.  They're just like the regressions I did where I
13   looked at fares for cost-conscious travelers.  I only put
14   10 and 90 in the demonstrative, but same idea.
15   Q.   Okay.  And figure 3 presents six separate charts;
16   correct?
17   A.   Right.
18   Q.   So to help us compare them to each other we've created
19   a demonstrative, Gowrisankaran Demonstrative G.
20              (On screen.)
21   Q.   So that's in the little folder that we gave you, if you
22   want to look at that as well.  Do you need another copy,
23   Doctor?
24   A.   Give me one second.  I think I can probably get it.
25   Yeah, I got it.  Thank you.
```

```
 1   Q.   Okay.  So on the front we've just showed the graph that
 2   we were just looking at, and if you turn to the next page
 3   we've overlayed Dr. Shrago's estimate of going from zero to
 4   one low-cost carrier with his estimate of Spirit being
 5   present on the route.  Do you see that?
 6   A.   Yes, I do.
 7   Q.   Okay.  And what we see here is that starting at the
 8   tenth percentile, his estimate of the impact of a low-cost
 9   carrier on legacy carrier fares, that's above the point
10   estimate for Spirit for all the rest of the fare classes;
11   correct?
12   A.   That's right.
13   Q.   And these gray bands around the point estimates, those
14   are called "confidence intervals"; right?
15   A.   Yes, that's right.
16   Q.   And 95 percent confidence intervals, to be precise?
17   A.   Right.
18   Q.   And if the 95 percent confidence intervals for these
19   overlap, it would be a rough first cut of saying that they
20   are not statistically distinguishable from one another;
21   correct?
22   A.   Yes, that's right.
23   Q.   And, now, you did not look at the Frontier Effect;
24   right?  That's not something you estimated?
25   A.   I didn't directly estimate the Frontier Effect, no, I
```

1    didn't.  So, I mean, Frontier's in my sample because it's

2    going to be, you know -- Spirit and Frontier compete on some

3    routes, so...

4    Q.   But Dr. Shrago did estimate the Frontier Effect; right?

5    We can take a look at the next page where we've overlaid his

6    estimate of Frontier with his estimate of Spirit.

7    A.   Yes.

8    Q.   And at every point the confidence intervals for Spirit

9    and Frontier, those are touching; correct?

10   A.   Yes.

11   Q.   And you did not estimate the Allegiant Effect; correct,

12   Doctor?

13   A.   No, just like for Frontier.

14   Q.   But Dr. Shrago did estimate the Allegiant Effect;

15   right?

16   A.   Yes, he did.

17   Q.   And let's take a look at the next page.  And, again, at

18   every point the confidence intervals for his estimate of the

19   Allegiant Effect and his estimate of the Spirit Effect,

20   those overlap; correct?

21   A.   Yes, that's right.

22   Q.   Doctor, a little bit earlier you testified that your

23   net-harm model accounts for entry; is that right?  Sorry,

24   we're switching topics, just to orient.

25              THE COURT:  Let's stick with this for a moment.

```
 1              MR. CULLEY:  Of course.

 2              THE COURT:  I just want to be -- I want to see if

 3     I understand this.

 4              Take a look at the last page of their

 5     demonstrative, and what I get from that is that because

 6     there is this Spirit-Allegiant overlap, it may be accurate

 7     to say that the fares will drop, but we can't tell which or

 8     what -- we can't tell which airline or both airlines.  Is

 9     that right?

10              THE WITNESS:  So, your Honor, what I would -- how

11     I would interpret this is that when either Allegiant or

12     Spirit -- and I haven't done this analysis, of course, this

13     is Dr. Shrago.  But when either Spirit or Allegiant enter on

14     routes, fares drop.  Now, your Honor, Allegiant enters on --

15     I haven't done an entry analysis, but I know from my work on

16     the airline industry that Allegiant enters on fundamentally

17     different routes than Spirit.  So they tend to enter very

18     small airports.  Like, from very small ones to very small.

19     So I don't view this as an apples-to-apples comparison at

20     all.

21              THE COURT:  I see.  But is my understanding of the

22     chart correct?

23              THE WITNESS:  If you could repeat it, your Honor,

24     so --

25              THE COURT:  My understanding of the chart is, the
```

```
1    last page of this demonstrative G shows a Spirit Effect and
2    an Allegiant Effect, and they are roughly comparable within
3    the confidence intervals.  And from that, though you don't
4    think this is an apples-to-apples comparison, and I
5    appreciate that, but just trying to understand this chart, I
6    think I could infer that the fares will drop, but we can't
7    tell due to which airline's entrance or both airlines.  Is
8    that right?
9              THE WITNESS:  Your Honor, I would phrase the last
10   statement just slightly differently.  What I would say is
11   putting aside the apples-to-oranges comparison, I would say
12   when Spirit or Allegiant are present on a market, fares
13   would drop by a similar amount, regardless of whether it's
14   Spirit or Allegiant.
15             THE COURT:  Thank you.  Mr. Culley, you go ahead.
16             MR. CULLEY:  Okay.  So we can take that down now.
17   Q.   And moving to a different topic, you testified earlier
18   that your net-harm model accounts for entry; correct?
19   A.   Yes.  Just to be clear, I think what you mean is does
20   it account for entry or exit of rivals to Spirit after
21   Spirit enters.  And in that way it does account for them.
22   For any repositioning that might occur after Spirit enters,
23   it's in there.
24   Q.   And the way that it does that is because you look at
25   the effect of Spirit's entry and you say that that is --
```

1    that price drop is comparable to a price increase that would

2    occur if Spirit were to exit; correct?  That's how your harm

3    model works?

4    A.   I think there's two -- I don't quite understand your

5    question.  I apologize for this.  But you asked me earlier

6    about rivals, does it account for rivals' entry, I thought.

7    And what you're asking me now is about Spirit and what

8    Spirit does.  So it has nothing to do with the previous

9    question?

10   Q.   I'm just trying to break it down.  So in your model

11   Spirit enters routes; correct?

12   A.   Yes.  So let me be clear.  In my estimation I use

13   Spirit entry to understand the impact of Spirit, of having

14   Spirit presence on prices.

15   Q.   And you say that if Spirit exits a route, the price

16   drop that occurred when it entered will be similar to the

17   price increase when it exits.  That's what you're saying?

18   A.   That's right.  That's like the yellow arrow I testified

19   to, that we go back to the baseline level, the vertical

20   yellow arrow.

21   Q.   And you are saying because you did not control for

22   rivals' entry on a route or exit on a route after Spirit

23   enters, you're saying that a rival exiting, in your data,

24   after Spirit enters, is comparable to a rival entering after

25   Spirit exits?

1  A.   No, that's not quite right.  But let me just explain it

2  as I would think about it as an economist.  So the natural

3  experiment here is Spirit entering routes.  The

4  identification assumption is that if Spirit were to exit,

5  it's going to look similar.  And I did not control -- you're

6  right that I did not control for what happened to rivals

7  after.  Because if rivals repositioned in response to Spirit

8  entry, they might enter more, they might exit, then that's

9  all going to be baked into it.  So the variation that's a

10  natural experiment is Spirit itself entering.

11      So if the merger were to go forward I'm going to flip

12  that variation and look at Spirit exiting, and the

13  assumption is that what the rivals are going to do is

14  roughly the reverse of what the rivals did when Spirit

15  entered.

16  Q.   You would agree, Doctor, that exits are not necessarily

17  motivated by the same factors as entries; correct?

18  A.   They're not, but in this particular case I'm looking at

19  exits caused by the merger, and that means all Spirit routes

20  are going to exit.  And that's quite similar to the

21  identification that I used here, the natural experiment of

22  Spirit entry being driven by Spirit's big growth plans over

23  the last 13 years.

24  Q.   When carriers exited, in your data sample, after Spirit

25  entered, you did not go back and analyze those individual

```
 1   entries to determine their exit was caused by Spirit's
 2   entry; correct?
 3   A.   There was -- I apologize.   There were too many entries
 4   and exits flipped in that.   Could you ask that again,
 5   please?
 6   Q.   So we're talking about cases where, in your data,
 7   Spirit entered and then another carrier subsequently exited.
 8   Do you follow?
 9   A.   Yes.
10   Q.   In each of those cases you did not go back and, for
11   each of those individually, verify that the carrier exited
12   in response to Spirit's entry; correct?
13   A.   No, I didn't.   And nor did it have to be.   The point
14   is, is that my exogenous variation, my natural experiment is
15   Spirit entry.   And I want to look at what happens in
16   response to that or what happens after that that's not in
17   response to that.   But I don't need to control for it.   It
18   might be for other factors that are completely random.
19            MR. CULLEY:   And just to clear up the record a
20   bit, if we could put Gowrisankaran Demonstrative -- I'm
21   sorry.   If we could put tab J back up, the Shrago -- or,
22   sorry, Gowrisankaran Demonstrative G back up.   Thank you.
23   And if we could go to the page that overlaid Frontier and
24   Spirit.
25            (On screen.)
```

1   Q.   I believe, Doctor, you gave a little bit of testimony

2   about the lines and confidence intervals overlapping for

3   Spirit and Allegiant, and that meant that the effect of

4   Spirit being present or Frontier being present were

5   comparable; correct?

6   A.   If you -- again, I said that I didn't think it was an

7   apples-to-apples comparison.  They're not looking at the

8   same routes.  But if you were, then if two lines like this

9   are similar, then the point is, is that the effects are

10  comparable, and that's what I testified to the Court.

11  Q.   The same would be true for Spirit and Frontier, because

12  those confidence intervals are overlapping, Dr. Shrago's

13  estimate of the impact of Spirit being present on a route or

14  Frontier being present on a route, those are comparable;

15  correct?

16  A.   Yeah.  I think your last question asked me Frontier

17  also, but it's all right.  So...

18          MR. CULLEY:  I pass the witness, your Honor.

19          THE COURT:  Mr. Battaglia, anything further?

20          MR. TEITELBAUM:  One moment, your Honor.

21                    REDIRECT EXAMINATION

22  BY MR. BATTAGLIA:

23  Q.   Hello, Doctor.

24          Dr. Gowrisankaran, the Court asked you if you could

25  give a precise estimate on a single route, and you said that

1    the estimate across all routes would be more precise.  Why

2    is that the case?

3    A.   Well, when you look at a -- at all routes, I'm going to

4    take an average of a bunch of estimates for each route.  So

5    if we look at any route there may be particular factors that

6    would affect the harm in that route or the net harm.  And

7    the point of econometrics of statistics is that when you

8    look at an average, all of those estimates will average out.

9    And so you get much more precision if you look at a hundred

10   routes than if you look at one route.  Because any

11   particular factor that might affect harm or net harm in one

12   route, that factor is going to be counterbalanced by a

13   different route.  When you look at all 100 together you get

14   a lot more certainty about what's going to happen than

15   looking at one route in isolation.

16   Q.   So why does the estimation of harm across all the

17   overlap and Spirit-only routes provide the most accurate

18   estimate of effects?

19   A.   Well, what it does is it uses the most routes possible.

20   And that's the basic premise of statistics, that if you want

21   the most accurate effects, what you want to do is take the

22   most points that are there.  You don't want to take just one

23   route and extrapolate from it, you want to look at all the

24   routes that are there.  And then you get as close to

25   possible as getting the complete answer because you've taken

```
 1   the average across a whole bunch of different markets, each
 2   with slightly different conditions.
 3   Q.   Doctor, do you recall defendants' counsel asking you
 4   about a national market?
 5   A.   Yes, I do.
 6   Q.   Would a national market help you understand the likely
 7   competitive effects of this merger?
 8   A.   I --
 9            MR. COHEN:  Objection.  Leading, your Honor.
10            THE COURT:  Sustained.  Don't lead the witness.
11            MR. BATTAGLIA:  I apologize, your Honor.
12   Q.   How would a -- Doctor, how would a national market help
13   you understand the likely competitive effects of this
14   merger?
15            MR. CULLEY:  Your Honor, the question was already
16   covered in his direct examination.
17            THE COURT:  No, I think not.  He may have it.
18   A.   It really wouldn't help me understand them at all.
19   Q.   And why not, Doctor?
20   A.   Because that's not how tickets are sold.  So if we look
21   at how passengers buy tickets, it's on particular routes for
22   particular endpoint pairs.  If you want to look at where
23   prices are set, it's on routes.  That's how firms set
24   prices.  That's how customers buy tickets.  They don't buy
25   tickets for some national travel, they buy a ticket from one
```

 1   origin to one destination.

 2   Q.   Doctor, do you recall defendants' counsel asking you

 3   about the Shrago paper?

 4   A.   Yes, I do.

 5   Q.   If we could pull up demonstrative G, please.

 6        MR. CULLEY:  Mr. McLeod, would you put that up for

 7   them?

 8        (On screen.)

 9   Q.   Now, Doctor, why is this relevant?

10   A.   To my analysis, that is?

11   Q.   Yeah.

12   A.   I don't think it's relevant to my analysis.

13   Q.   And why not, Doctor?

14   A.   Well, what this is asking is how Frontier and Spirit

15   and other airlines are going to lower legacy prices.  The

16   point that Dr. Shrago makes is that these airlines lower

17   prices of legacy carriers.  That's not what -- that doesn't

18   add anything to what I'm finding, which is if you remove

19   Spirit from the market prices would go up.  Now, it's

20   consistent with it, but it doesn't take away from it in any

21   way.

22   Q.   Doctor, do you know whether Mr. Shrago controls for

23   capacity in his analysis?

24   A.   I don't --

25        MR. CULLEY:  Objection, your Honor.  This is not

1    in his report.

2            THE COURT:  Is it?

3            MR. BATTAGLIA:  It's responsive to their

4    questioning on cross.

5            THE COURT:  It is, but my rule is clear.

6    Sustained.

7            Anything further for this witness?

8            MR. BATTAGLIA:  Sorry, yes, more questions, your

9    Honor.  I apologize.

10           THE COURT:  Of course.

11   Q.   Doctor, did you control for capacity in your analysis?

12   A.   Yes, I did.  And by controlling for capacity, I found

13   that when Spirit has bigger capacity it lowers prices more.

14   Q.   Now, Doctor, defendants asked you some questions about

15   your net-harm estimates.  Do you recall that?

16   A.   Yes, I do.

17   Q.   And I believe you mentioned a national amount of harm.

18   Can you clarify what you meant by that?

19   A.   What I meant is that across the relevant markets that

20   I've identified there would be over $900 million in harm in

21   my most conservative model.  When I said national harm, what

22   I really meant is the aggregation across the relevant

23   markets that I've identified that would be the total.

24   Q.   And, Doctor, earlier defendants' counsel asked you

25   about your use of critical elasticity to apply the

1  hypothetical monopolist test to a broader set of markets.

2  Do you remember that?

3  A.   Yes, I do.

4  Q.   And was the hypothetical monopolist test the only basis

5  for your concluding the origin and destination pairs are the

6  relevant markets to assess this acquisition?

7  A.   It certainly was not.

8  Q.   So what other analyses did you conduct?

9  A.   I had a slide on these where I listed three sets of

10  other analyses I did.  So what I looked at was I looked at

11  competitive effects to understand whether, in fact, prices

12  went down when there's entry on those markets.  And that

13  spoke to there being -- this being markets -- these being

14  relevant antitrust markets.  I also looked at -- at the

15  shortest routes and looked at whether other modes of

16  transportation needed to be in the market.  And I found that

17  they didn't need to be in the market.  And I think there was

18  a fourth reason.  I don't remember what it is.  I can turn

19  to my report, if you like.

20  Q.   No, that's okay, Doctor.

21       Defendants' counsel asked you about aggregating markets

22  based on supply-side substitution.  Do you recall that?

23  A.   Yes, I do.

24  Q.   And you were asked about a footnote in the horizontal

25  merger guidelines?

```
 1   A.   Yes, I do remember that.

 2   Q.   And so it was footnote 8, page 16, if I can refer you

 3   to tab A of defendants' binder.

 4   A.   Uhm-hmm.

 5   Q.   Footnote 8 on page 16.

 6   A.   What page is that again?

 7   Q.   That would be page 16.

 8   A.   Sixteen.

 9   Q.   And in response to defense counsel's questions you

10   mentioned -- this is in the rapid entrance section?

11   A.   Yes.

12   Q.   Doctor, how do you understand rapid entry?

13          MR. CULLEY:  Objection, your Honor.  This, again,

14   is not in his report.

15          MR. BATTAGLIA:  Again, it's in response to the

16   line of questioning of defense counsel.

17          THE COURT:  It may be but you've exchanged these

18   reports.  I have rules for a reason.  I'm delighted to have

19   these guidelines.  I'll be reading.  Go ahead.  Sustained.

20          Anything else?  It's in his report.

21          MR. BATTAGLIA:  Yes.  Yes, your Honor.

22          THE COURT:  Go ahead.

23          MR. BATTAGLIA:  Could you please pull up

24   defendants' 1006 Summary 1?

25          THE COURT:  Now in evidence as --
```

```
 1              MR. BATTAGLIA:  As 802, I believe.
 2              THE COURT:  Yes.
 3    Q.   And, Doctor, defense counsel asked you about a few
 4    select nonstop presumption routes for the market share
 5    change for a particular airline on these routes.  Do you
 6    remember that?
 7    A.   Yes, I do.
 8    Q.   And, Doctor, and you have your slides?  I'd like to
 9    refer you to slide 28 from your --
10    A.   Yes, I -- 28.  I'm sorry.  There's a lot in this
11    binder.  Okay.  I'm there.
12    Q.   So on your slide 28 do you see the San Juan-Tampa
13    market?
14    A.   Yes, I do.
15    Q.   And did that market remain a presumption market from Q2
16    2022 to Q2 2023?
17    A.   Yes, it did.
18              THE COURT:  What number is it, sir?
19              THE WITNESS:  It is 41, your Honor.
20              THE COURT:  Thank you.
21    Q.   So, Doctor, is it surprising to you that this market
22    remained a presumption market despite entry by another
23    airline?
24              MR. CULLEY:  Objection.  Leading again, your
25    Honor.
```

```
 1              THE COURT:  Sustained.

 2              What do you make of that?

 3              THE WITNESS:  I think, your Honor, that it's not

 4   surprising to me.  Spirit and JetBlue have big market shares

 5   on this.  And Frontier, when it enters, it typically has

 6   lower frequency than Spirit or JetBlue.

 7   Q.   And, Doctor, earlier defendants' counsel showed you

 8   some of your own exhibits for the 51 presumption nonstop

 9   overlap markets with several different colors.  I think

10   yellow for Spirit exits, blue for JetBlue exits, maybe

11   magenta for entry or expansion by other carriers.  Do you

12   remember that?

13   A.   Yes, I do.

14              MR. BATTAGLIA:  Could you please bring up

15   Gowrisankaran Demonstrative A?

16              (On screen.)

17              MR. BATTAGLIA:  If you could please scroll through

18   showing the different colors.  Thank you.

19              (On screen.)

20   Q.   Now, Doctor, with respect to recent or planned exits by

21   Spirit or JetBlue, did you look at how those exits compared

22   to recent or planned entries by Spirit or JetBlue?

23   A.   Yes, I did.

24   Q.   And what did you find?

25   A.   I found that they're pretty similar.  So I looked at
```

```
 1   the last year for which we have share data, and we went from
 2   51 presumptive markets to 49.  I also testified that when we
 3   look at the current year, for which we don't know how many
 4   presumptive markets there were, there was something like, I
 5   don't remember the number, but I have a slide on it, like
 6   14 planned exits that would eliminate overlaps and, like,
 7   nine entries that would create overlaps.  I don't remember
 8   the exact numbers but I testified to that on Friday, of
 9   course.
10           MR. CULLEY:  Your Honor, it appears we're just
11   repeating direct testimony yet again.
12           THE COURT:  Maybe to you, and you can object to
13   it.  So this stands.  I rule on objections.
14   Q.  Doctor, what do you make of the markets that were
15   highlighted in what I'll call magenta, the entry expansion
16   by other carriers?
17   A.  Well --
18           MR. CULLEY:  Objection, your Honor.  Vague, and
19   also, again, cumulative.
20           THE COURT:  It bears a striking resemblance to my
21   question.  If he understands it he may answer.  Of course
22   before he was cued by the leading question, which I
23   sustained.  So it's easy for me to say what do you make of
24   it.  Now he's trying it, we'll see what he says.
25           THE WITNESS:  Thank you, your Honor.
```

 1                 THE COURT:  Can you answer the question?

 2                 THE WITNESS:  Yes, I can.

 3                 THE COURT:  What do you make of it?

 4                 THE WITNESS:  Well, I find those entry or

 5     expansion events really not informative for a bunch of

 6     reasons.  So, first of all, I looked at the demonstrative

 7     from Mr. Friedman and what it showed often is examples like

 8     added one flight a day seasonally.

 9                 MR. CULLEY:  Objection, your Honor, again.  This

10     testimony is not in his report.

11                 THE COURT:  Oh, no -- well, I'm going to let him

12     answer.

13                 THE WITNESS:  Okay.  Thank you, your Honor.

14                 Yes, I saw this last night actually.  And it

15     showed examples like seasonal one time, one flight a week

16     addition.  These are not mostly -- and there are also a

17     bunch of exits, which defense counsel did not ask me about.

18     And so all together these were not entry events that would

19     make me substantially rethink what's happening in these

20     markets.  These were mostly about repositioning.  And there

21     was only one side of this being shown in the magenta lines,

22     the entry side.  There were other events where I saw

23     examples of exit or of reductions in service by other

24     carriers.

25                 So it really didn't affect my overall conclusions

```
 1   that the bulk of these are nonstop presumption routes.
 2              THE COURT:  That's about it, isn't it,
 3   Mr. Battaglia?
 4              MR. BATTAGLIA:  One last -- a few questions.
 5              THE COURT:  Go right ahead.
 6   Q.   And, Doctor, here the orange routes concern a
 7   divestiture endpoint.  Was evaluating divestitures part of
 8   your assignment in this case?
 9   A.   No, it was Dr. Chipty's assignment and I won't say
10   anything more about that.
11   Q.   Was evaluating the likelihood of ULCC entry in the
12   relevant markets part of your assignment in this case?
13   A.   No, it was not.  Again, it was Dr. Chipty's assignment.
14   Q.   And under the horizontal merger guidelines, at what
15   step in the process of evaluating competitive effects does
16   one evaluate the likelihood of entry?
17              MR. CULLEY:  Objection, your Honor.  Again, this
18   is not in the report.
19              THE COURT:  Sustained.
20              MR. BATTAGLIA:  Nothing further, your Honor.
21              MR. CULLEY:  No questions from me, your Honor.
22              THE COURT:  All right.  You may step down, and
23   thank you.
24              (Whereupon the witness stepped down.)
25              THE COURT:  Rather than have you call your last
```

 1   witness we'll stop now.  And let me -- I've been informed,

 2   and correct me if my information is wrong, here's how things

 3   look.  We're going to call Dr. Chipty.  We expect to get

 4   done with him tomorrow.  If that's short of 1:00 we'll stop,

 5   and that's fine.  I'll charge the time to the defense, but

 6   they have plenty of time.

 7           I understand that the defense then will begin to

 8   put on its case on Monday, the 27th.  We'll sit the 27th,

 9   28th, 29th and 30th.  And you expect to be done by then, is

10   that right?

11           MR. SHORES:  That's correct, your Honor.

12           THE COURT:  Thank you.  And thank you for that

13   information.

14           Now, I don't intend to sit on Friday the 1st or

15   Monday the 4th.  Assuming that your -- assuming that these

16   estimates are correct, we'll have closing arguments on

17   Tuesday, the 5th of December, and we'll take the morning for

18   that.  I'm not -- that's not an invitation to take the

19   morning, I will set aside the morning.

20           I follow the old state practice.  The party

21   bearing the burden of proof gets to go last.  The government

22   will go last, the defense will go first.

23           Let me ask a question.  I'm sure it's dealt with

24   in the pretrial order but now that we're coming up to it,

25   when am I going to see your proposed findings and rulings?

```
 1              MR. DUFFY:  Your Honor, that's a very good
 2    question.  The CMO had those deadlines initially set for, I
 3    think it was eight days after the anticipated closing date
 4    but obviously that has shifted.  So our preference would be
 5    to have it be roughly that same amount of time after
 6    closings.
 7              THE COURT:  And that's what you're figuring on
 8    too, Mr. Shores?
 9              MR. SHORES:  Yeah, eight days is fine, your Honor,
10    as earlier reflected.
11              THE COURT:  Right.
12              MR. DUFFY:  I just had a clarification question,
13    your Honor.  It's correct that Court will sit on that
14    Wednesday of next week?  Is that correct?  Because I think
15    the prior schedule did not have us --
16              THE COURT:  Oh, it is correct.  I was mistaken.  I
17    cannot sit on Wednesday, the 27th of December.  But the time
18    limits still work, right?
19              THE CLERK:  The 29th.
20              THE COURT:  The 29th of November.  I'm sorry.
21              MR. SHORES:  We would still expect to close our
22    case on that Thursday, your Honor.
23              THE COURT:  I appreciate that.  And thank you,
24    because I have to be absent that day.  All right.
25              MR. SHORES:  Could I ask one more clarification
```

```
 1   question?

 2             THE COURT:  Sure.

 3             MR. SHORES:  In terms of time for closing

 4   arguments, we would request one hour, if that's sufficient,

 5   per side?

 6             MR. DUFFY:  That's fine with us, your Honor.

 7             THE COURT:  An hour per side.

 8             MR. SHORES:  Thank you, your Honor.

 9             MR. DUFFY:  Just one minor thing.  We had one

10   error on the list of exhibits admitted through

11   Dr. Gowrisankaran.  So I'll pass this to Ms. Gaudet, if I

12   can.

13             THE COURT:  I appreciate it.

14             At present then we stand government seven days,

15   two hours, thirty-five minutes.  Defense four days, two

16   hours, fifteen minutes.

17             We'll stand in recess until 9:00 a.m. tomorrow

18   morning.  We'll stand in recess.  And I do thank counsel.

19             THE CLERK:  All rise.

20

21             (Proceedings adjourned.)

22

23

24                      * * * * * *

25
```

C E R T I F I C A T E


        I, Cheryl B. Palanchian, Court Reporter
for the United States District Court for the
District of Massachusetts, do hereby certify that
the foregoing pages are a true and accurate
transcription of my shorthand notes taken in the
aforementioned matter to the best of my skill and
ability.




        /s/ Cheryl B. Palanchian 11/20/2023
          CHERYL B. PALANCHIAN

        Registered Merit Reporter
        Certified Realtime Reporter