```
 1              THE UNITED STATES DISTRICT COURT

 2                DISTRICT OF MASSACHUSETTS (Boston)

 3                            No. 1:23-cv-10511-WGY
                             Vol 1, Pages 1 - 78
 4

 5

 6   UNITED STATES OF AMERICA, et al,
               Plaintiffs
 7

 8   vs.

 9

10   JETBLUE AIRWAYS CORPORATION, et al,
               Defendants
11

12                      * * * * * * * * *

13

14                   For Bench Trial Before:
                     Judge William G. Young
15

16
                     United States District Court
17                   District of Massachusetts (Boston)
                     One Courthouse Way
18                   Boston, Massachusetts 02210
                     Tuesday, November 21, 2023
19

20                      * * * * * * * *

21
                 REPORTER: RICHARD H. ROMANOW, RPR
22                    Official Court Reporter
                    United States District Court
23       One Courthouse Way, Room 5510, Boston, MA 02210
                      rhrbulldog@aol.com
24

25
```

```
 1                    A P P E A R A N C E S

 2

 3    EDWARD WILLIAM DUFFY, ESQ.
      ARIANNA MARKEL, ESQ.
 4    AARON TEITELBAUM, ESQ.
         DOJ-Atr
 5       450 Fifth Street NW, Suite 8000
         Washington, DC 20530
 6       (202) 812-4723
         Email: Edward.duffy@usdoj.gov
 7    and
       WILLIAM T. MATLACK, ESQ.
 8       Attorney General's Office
         One Ashburton Place, 18th Floor
 9       Boston, MA 02108
         (617) 727-2200
10       Email: William.matlack@mass.gov
         For Plaintiffs United States of America and
11       The Commonwealth of Massachusetts

12

13    RYAN SHORES, ESQ.
         Cleary Gottlieb Steen & Hamilton LLP
14       2112 Pennsylvania Avenue, NW
         Washington, DC 20037
15       (202) 974-1876
         Email: Rshores@cgsh.com
16    and
       ELIZABETH M. WRIGHT, ESQ.
17       Cooley LLP
         500 Boylston Street
18       Boston, MA 02116-3736
         (617) 937-2349
19       Email: Ewright@cooley.com
      and
20    RACHEL MOSSMAN ZIEMINSKI, ESQ.
      MICHAEL MITCHELL, ESQ.
21       Shearman & Sterling LLP
         2601 Olive Street, 17th Floor
22       Dallas, TX 75201
         Email: Rachel.zieminski@shearman.com
23       For Defendant JetBlue Airways Corporation

24

25       (Continued.)
```

1      (Continued.)

2

3    JAY COHEN, ESQ.
     ANDREW C. FINCH, ESQ.
4        Paul, Weiss, Rifkind, Wharton & Garrison
         1285 Avenue of the Americas
5        New York, NY 10019-6064
         (212) 373-3000
6        Email: Jaycohen@paulweiss.com
         For Defendant Spirit Airlines, Inc.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    I N D E X

 2

 3   WITNESS                  DIRECT  CROSS  REDIRECT  RECROSS

 4

 5   DR. TASNEEM CHIPTY

 6      By Mr. Moore:            7

 7      By Ms. Bansal:

 8

 9                    E X H I B I T S

10                     (None marked.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1              P R O C E E D I N G S
2         (Begins, 9:00 a.m.)
3         THE COURT:  Good morning.  Please swear the
4    government's final witness.
5         (DR. TASNEEM CHIPTY, sworn.)
6         MS. BANSAL:  Your Honor, before Dr. Chipty begins,
7    I'd like to raise an outstanding issue with respect to
8    her testimony.  We first raised this at the pretrial
9    conference and it's an open issue from our motion in
10   limine.  And I believe your ruling was that Dr. Chipty
11   cannot testify with any testimony that would be
12   duplicative of what your Honor heard yesterday and on
13   Friday from Dr. Gowrisankaran.
14        But we think there's an additional issue, which is
15   that we remain very concerned, based on the materials
16   that we received from the government, that Dr. Chipty
17   will be spending a lot of her time today talking about
18   ordinary-course JetBlue documents that your Honor has
19   already heard hours and hours of testimony on from a
20   number of fact witnesses, and it's our view that
21   Dr. Chipty is just reading these documents and taking
22   them at face value.  And so we don't believe that's
23   proper economic testimony under 702.
24        THE COURT:  I'll properly resolve that on a
25   question-by-question basis.
```

1        MS. BANSAL:  Well if your Honor would like, I can

2   tell you the precise topic on which this issue raises.

3   Dr. Chipty talked about --

4        THE COURT:  Why don't we hear the precise topic

5   and I will hear you.

6        My problem is that listening to argument about

7   testimony, I always feel at sea, because you people are

8   superb advocates.  Once I've heard the -- not heard the

9   testimony, but heard the questions, that's where you

10  raise your challenge.  Then in the setting of the trial,

11  I'm more comfortable.  So let's proceed that way.

12       MS. BANSAL:  Okay, thank you, your Honor.

13       THE COURT:  all right.

14       MR. MOORE:  And, your Honor, one other matter

15  before I begin. Plaintiffs will seek to admit a number

16  of Rule 1006 summary exhibits through Dr. Chipty.  As

17  with our -- with Dr. Gowisankaran's exhibits, we've

18  conferred with defendants, we think most of them will be

19  unobjected to.  There might be some objection to --

20       THE COURT:  I'm going to leave it to you people,

21  because I sorted through all the others.  Believe me,

22  I'm always in favor of agreement, only to find out that

23  you agreed.  Now I'm not going to do anything.  When you

24  offer something, we'll hear what the other side says.

25  But you may use them, of course, during the course of

```
 1    their testimony.
 2          MR. MOORE:  Yes, your Honor.  And we'll move them
 3    in at the end of the testimony, if that's satisfactory?
 4          THE COURT:  Fine.
 5
 6          * * * * * * * * * * * * * * * * * *
 7          DR. TASNEEM CHIPTY
 8          * * * * * * * * * * * * * * * * * *
 9
10    DIRECT EXAMINATION BY MR. MOORE:
11    Q.  Good morning, Dr. Chipty.  Could you please state
12    and spell your full name for the record.
13    A.  Yes, good morning, Mr. Moore.  My name is Tasneem
14    Chipty, that's T-A-S-N-E-E-M, C-H-I-P-T-Y.
15    Q.  What is your educational background, Dr. Chipty?
16    A.  So I have an undergraduate degree in math and
17    economics from Wellesley College and I have a PhD in
18    economics from MIT.
19    Q.  And what are your fields of research?
20    A.  So I specialize in the fields of competition
21    economics and econometrics, which is the application of
22    statistical methods to economic questions.  My research
23    focuses on questions surrounding how markets function.
24    So that includes the choices consumers make and the
25    strategic interaction among firms.
```

1   Q.   Would you please provide an overview of your work

2   experience.

3   A.   Sure.  I've been a professional economist for 30

4   years.  Early in my career I was a full-time academic.

5   Later I began consulting with companies in government

6   involved in disputes surrounding competition issues.

7   I've been a partner at some of the large competition

8   consultancies.  For a while I ran my own firm.  Most

9   recently I was the Global Head of the Economics practice

10  at a large management consulting firm.

11       THE COURT:  Who employs someone at -- what clients

12  does a firm of competition economists have?

13       THE WITNESS:  So the clients can range from

14  government agencies, not just the United States but

15  foreign governments, but always involving some issue of

16  economics.  So it's traditionally an antitrust

17  authority, if it's a government agency, but it could be

18  other types of agencies like trade departments, the

19  departments of trade and so forth.  And then private

20  companies who are either involved in economic disputes

21  with respect to other companies or involved in

22  investigations with the government, like this one.

23       THE COURT:  Okay.

24  Q.   Dr. Chipty, I think you were walking through your

25  work history.  Anything else you'd like to say?

A.   Yes.  Yes.  So as I was saying, most recently I was
the Global Head of the Economics practice at a large
management consulting firm and now I'm an independent
consultant.

Q.   Have you published in peer-reviewed journals?

A.   Yes, I have several.

Q.   Have you previously testified as an expert
economist?

A.   Yes, I have, several times over the past 15 years or
so.

Q.   Could you give us a couple of examples of those
cases?

A.   Sure, I'll give you a couple of recent examples.
So, for example, I testified in *FTC vs. Qualcomm*, for
Qualcomm.  And I testified in a regulatory proceeding in
Canada before the Canadian equivalent of the U.S.'s FCC,
and that was on behalf of the Canadian Competition
Bureau.  So those are some examples.

Q.   Other than this case, have you previously been
retained by the government in order to evaluate a
transaction?

A.   Yes, several times, including by the Department of
Justice, but also by the Canadian Competition Bureau as
well as the Massachusetts Health Policy Commission.

Q.   Have you previously been retained by the merging

1   parties to evaluate a transaction?

2   A.   Yes, several times.

3   Q.   About how many times?

4   A.   About 10 times or so.

5   Q.   Without getting into the specifics of the opinions

6   themselves, what types of issues have you offered

7   opinions on in those prior matters?

8   A.   So I've studied all aspects of competition merger

9   reviews including questions about entry and

10  efficiencies.  So, for example, I've studied whether

11  entry is capable of offsetting harm caused by a merger,

12  and I've also evaluated the question of whether the

13  merger is capable of generating efficiencies that would

14  benefit consumers.

15  Q.   Have you had prior engagements related to the

16  airline industry?

17  A.   Yes, I have.

18  Q.   Has any court ever excluded you from testifying?

19  A.   No, not ever.

20  Q.   Let's turn to the next slide.

21       MR. MOORE:   And, your Honor, there should be a

22  physical copy of the slides for you as well as with

23  Dr. Gowrisankaran.

24  Q.   So on Slide 2, Dr. Chipty, could you give us an

25  overview of what your assignment was in this case?

1   A.   Sure, I was asked to study entries and efficiencies.

2   The specific questions that were posed to me are shown

3   on this slide.

4        So I was asked first "Is airline entry on the

5   affected routes, both in general and in light of the

6   proposed divestitures, likely to offset harm identified

7   by Dr. Gowrisankaran?"  And I was also asked to evaluate

8   "Whether JetBlue's plans for the management of the

9   combined company's assets suggest that the merger will

10  produce efficiencies that might enhance competition and

11  create benefits for consumers that could reverse the

12  merger's potential harm to those consumers in the

13  affected market?"

14  Q.   Did you independently study the competitive harms

15  that were caused by the merger or may be caused by the

16  merger?

17  A.   No, I did not.  As I just said, I was asked to study

18  entry and efficiencies and the extent to which they are

19  capable of offsetting the harm identified by

20  Dr. Gowrisankaran.

21  Q.   And what is your understanding of that competitive

22  harm?

23  A.   So my understanding is that he concluded there would

24  be harm to consumers, especially cost-conscious

25  consumers, on routes that JetBlue and Spirit serve today

1    as well as on nonstop overlap routes that Spirit

2    might -- that Spirit serves today and might serve in the

3    future.

4          MS. BANSAL:  Objection, your Honor, that's

5    duplicative of what Dr. Gowrisankaran testified to

6    yesterday.

7          THE COURT:  We'll let it stand.  Yes, it is, she

8    was asked what she thought he testified about.  She told

9    me.

10         MR. MOORE:  Thank you, your Honor.

11   Q.  Dr. Chipty, let's move on to the next side.

12         How did you go about completing your assignment in

13   this case?

14   A.  Well I reviewed a large body of material that

15   related to my assignment.  So, for example, I studied

16   the academic literature related to entry and

17   efficiencies.  I evaluated a variety of public data.  I

18   also looked at information in the record.  In addition,

19   I considered the opinions of the defendants' experts.

20   And I used this information to develop qualitative and

21   statistical analyses of entry.

22         I also assessed the ability of the proposed

23   divestitures to facilitate entry.  And then I evaluated

24   whether the claimed deficiencies and the other changes

25   anticipated in JetBlue's deal modeling could offset the

1    expected harm to competition.

2    Q.  Let's go to the next line.

3         So after considering that evidence and following

4    the methods that you just described, Dr. Chipty, what

5    conclusions did you reach in this case?

6    A.  Well at a high level I concluded that entry and

7    efficiencies are unlikely to offset the potential harm

8    to consumers caused by the substantial lessening of

9    competition in each of the affected markets.

10   Specifically I concluded that ULCC entry and expansion

11   would not be timely, likely, and sufficient to offset

12   the loss of competition on each of those affected

13   routes.  That despite the proposed divestitures,

14   Allegiant and Frontier are unlikely to enter many of the

15   overlap routes involved in Boston, Miami, and New York,

16   let alone on a timely basis at a sufficient scale.  And

17   then finally I concluded that the defendants -- and that

18   the claimed -- the defendants's claimed benefits are not

19   cognizable economic efficiencies capable of offsetting

20   the potential harm.

21   Q.  I'm going to start with your opinions regarding

22   entry expansion and the proposed divestitures.  So let's

23   go to the next slide now.

24        And, Dr. Chipty, to give us a framework for our

25   discussion, could you please explain what economic

1    standards you apply when evaluating entry in a merger

2    case?

3    A.   Sure.   The economic standard in some ways is simple.

4    Entry has to be capable of fixing the competitive

5    problem created by the merger.   Attributes of successful

6    entry are it has to be timely, it has to be likely, and

7    it has to be sufficient.   That's also what the merger

8    guidelines say.   And I've selected an excerpt from the

9    guidelines here on this slide.

10   Q.   You just described the requirements for effective

11   entry.   What's the standard you apply when assessing the

12   effectiveness of expansion?

13   A.   Well entry by a new firm or expansion by an existing

14   firm both amount to new capacity available to compete.

15   So the same standard applies.

16   Q.   I want to walk through each of the attributes of

17   successful entry that you just mentioned.

18        What do you understand it to mean for entry to be

19   "likely"?

20   A.   I'm sorry, what was that?

21   Q.   I'm sorry.   What do you understand -- I'll start in

22   the order on the slide.

23        What do you understand it to mean for entry to be

24   "timely"?

25   A.   Well there's no bright line.   The timeliness of

1    entry depends on how quickly the competitive harm is

2    expected to occur.  Say, for example, you have a

3    situation where firms can't raise prices quickly because

4    customers are protected by long-term contracts.  Well

5    the relevant time period over which entry would have to

6    occur in that situation would be relatively longer than

7    in a situation where firms can change prices quickly or

8    reduce output quickly.  Now in this case airlines can

9    change prices relatively quickly, so entry would have to

10   occur quickly.

11   Q.  Moving on to the next criteria.

12        And what do you understand it to mean for entry to

13   be "likely"?

14   A.  Well it's about the probability of entry.  If entry

15   is possible but not probable, consumers will likely be

16   harmed.

17   Q.  And what's the difference between "possible" and

18   "probable" as you're describing it?

19   A.  Well as a matter of economics, entry might be

20   possible but not probable if firms don't have either the

21   incentives or the capabilities.

22   Q.  And just moving on now to the last criterion on this

23   slide, what does it mean for entry to these --

24   A.  Well it's a recognition that not all entry is the

25   same.  If entry is not from the right products, in the

1  right locations, at the right scale, many consumers

2  could still be harmed even if there is some entry.

3  Q.  All right.  Let's move on to the next slide.

4       THE COURT:  Mr. Moore, um, I mean no disrespect to

5  the witness, but so far she's been asked to do what I'm

6  supposed to do, and, um, I suppose it's helpful to have

7  an outline of what I'm supposed to do, but under 702

8  she's got to give me something that as factfinder one

9  would expect that I wouldn't know myself as an average

10 factfinder.  And I understand she's going to do that

11 with her economic expertise.  Let's get to it.

12      MR. MOORE:  Yes, your Honor.

13 Q.  Let's move on to the next slide.

14      So, Dr. Chipty, you mentioned that you had to

15 evaluate the right product in order to determine what

16 entry would be sufficient.  What order of the right

17 products did you determine in this case?

18 A.  Well the right products have to be like the

19 products, um, whose prices might increase or whose

20 availability might decrease as a result of the merger.

21 Q.  What did you determine that the right products are

22 in this case?

23 A.  Well the right products need to involve no-frill

24 unbundled service because Dr. Gowrisankaran has

25 concluded that the harm to competition in this case

 1    stems from the elimination of the Spirit product.  That

 2    means the best way to offset harm to competition is with

 3    the entry and expansion of other ULCCs that focus on

 4    no-frills unbundled service like Spirit.

 5            MS. BANSAL:  Objection, your Honor, she's speaking

 6    about --

 7            THE COURT:  Well you can't listen to her

 8    testimony, technically this is a motion to strike.  Now

 9    the only new thing that helps me out of what she just

10    said -- and again I mean no disrespect to her, is she's

11    telling me what airlines she looks at.  That's helpful.

12    That may stand.  Treating it as a motion to strike, the

13    rest of it is stricken.

14            Let's get to her expertise, Mr. Moore.

15    Q.  Dr. Chipty, which ULCCs did you consider in your

16    analysis?

17            THE COURT:  She's just told us.

18            Haven't you?

19            THE WITNESS:  Your Honor, I haven't told you which

20    specific ones.

21            THE COURT:  Oh, forgive me.  And he asked the

22    question and I'm interested to hear the answer.

23            THE WITNESS:  Sure.

24    A.  So I considered the ones listed on this slide, so

25    Frontier, Allegiant, Sun Country, Avelo, and Breeze.

1    Although I observed that Breeze is a relatively recent
2    entrant that may not be a ULCC.  Mr. Christie of Spirit
3    testified to this, he explained that Breeze offers
4    flight chairs at a premium cabin, which are
5    uncharacteristic of a ULCC.
6    Q.  Let's go to the next slide now.
7         Dr. Chipty, you also mentioned that sufficient
8    entry needs to be in the right locations.  What are the
9    right locations for entry in this case?
10   A.    Well those would be the Spirit locations.
11   Imagine, for example, you have families that rely on a
12   ULCC to travel from say Dallas to Fort Lauderdale.
13   Those families would not be any better off after the
14   merger if, for example, Allegiant were to increase its
15   service from Boston to Indianapolis.  Only entry in the
16   markets where the harmed occurred would have the
17   potential to offset harm to consumers in those markets.
18   Q.  Okay, let's go to the next slide.
19        Dr. Chipty, could you give the Court a sense of
20   where Spirit flies today?
21   A.    Sure.  Here's an overview of the routes that Spirit
22   served as of June 2022.  At that time there were 351
23   routes primarily on the East Coast of the United States.
24   These include routes connecting the mainland to Puerto
25   Rico and also international routes connecting the United

 1    States to Latin America, to South America, and also to

 2    the Caribbean.

 3    Q.   Let's go to the next slide.

 4         Dr. Chipty, you also mentioned that sufficient

 5    entry needs to be at the right scale.  What did you

 6    determine is the right scale of entry in this case?

 7    A.   Well entry would have to be large enough to make

 8    consumers whole from the loss of Spirit's competitive

 9    effect.  Now it could be entry at a scale that's larger

10    or smaller than Spirit's actual capacity.  What's

11    important is that the additional capacity be sufficient

12    to offset the loss of competition.

13         MS. BANSAL:  Objection, your Honor,

14    Dr. Gowrisankaran talked about Spirit's scale at length

15    yesterday.

16         THE COURT:  I'll treat it as a motion to strike.

17    I'll allow that to stand.

18         MR. MOORE:  Your Honor, may I be heard on that.

19         THE COURT:  I'll allow that to stand.  You just

20    won that.

21         MR. MOORE:  Sorry, I misunderstood, your Honor.

22         (Laughter.)

23         THE COURT:  I don't mean to be obscure, but let's

24    cut right to the chase here.

25         One of the interesting things that I'm now

1    hearing, I -- first of all, and I suppose we're going to

2    confront this entire argument, I've got to master the

3    legal framework here.

4         So we have this proposed merger and it takes

5    Spirit off the board, and that obviously has some effect

6    and one could easily imagine, and there's plenty of

7    evidence here, it has an anticompetitive effect, but

8    JetBlue, the defendant, they say "But look at the

9    competition that we're now giving you."  And that

10   competition, I take it the law is it sufficiently

11   outweighs the loss of competition.  So I ought allow the

12   merger to go forward.  I recognize this is a simplistic

13   analysis, but I have to start somewhere.

14        Now she's saying, "Well the only competition that

15   counts here is the competition that is removed by the

16   Spirit departure."  Is that the law?  I take it you

17   think it is?

18        MR. MOORE:  Your Honor, the antitrust laws ensure

19   that we restore competition to the extent that it's

20   diminished as a result of the merger.  The specific

21   competition that's being diminished here is the harm of

22   course to all consumers in the market.  As you've heard,

23   there's testimony about how Spirit benefits not only

24   cost-conscious but other consumers.  But there's

25   particularly harm as Dr. Gowrisankaran testified as to

1    cost-conscious consumers.

2         THE COURT:  I understand.

3         The government's position here is that any

4    increased competition from the divestitures that don't

5    meet this criteria is legally immaterial.

6         MR. MOORE:  So the divestitures, our position is

7    that they do not actually ensure the entry that would be

8    necessary in order to restore competition.  Dr. Chipty

9    will actually testify to that.

10        THE COURT:  Isn't that another way of saying the

11   other divestitures, if there are other divestitures, are

12   legally immaterial?

13        MR. MOORE:  Our position is not that the

14   divestitures are always legally immaterial --

15        THE COURT:   Here.  I only have to decide this

16   case.

17        MR. MOORE:  Just in this case they are not

18   sufficient in order to restore the competition that

19   would be lost as a result.

20        THE COURT:  And without argument, Ms. Bansal, you

21   disagree with that?

22        MS. BANSAL:  I do, your Honor.

23        THE COURT:  All right.

24        I'm not surprised.

25        (Laughter.)

1          THE COURT:  All right, so that's an issue.

2          And you go right ahead, Mr. Moore.

3          MR. MOORE:  Thank you, your Honor.

4   Q.  So, Dr. Chipty, we were talking about scale.  Let's

5   move on to the next slide, which is Slide 10.

6          Could you give us a sense of the size of

7   Spirit's --

8   A.  Sure, this Slide here describes the size of Spirit

9   in two ways, I measure it using available seat miles.

10         So the first bar shows you that, um -- that as of

11  2022, Spirit accounted for 46 percent of all domestic

12  ULCC capacity on a nationwide basis.  And on Spirit

13  routes, Spirit accounted for 71 percent of all domestic

14  ULCC capacity.

15         Now the difference between the higher shares on

16  the Spirit routes is accounted for by the fact that

17  substantial portions of the other ULCCs' networks don't

18  overlap with Spirit.

19  Q.  Let's go to the next slide.

20         Dr. Chipty, how did you go about determining

21  whether entry meets the standards you've outlined?

22  A.  So I studied the factors that are described on this

23  slide.  So first I studied the relationship between the

24  scale of the entry needed to offset the loss of Spirit's

25  capacity and historical growth.  I looked at the

1    availability of planes and pilots necessary for rivals

2    to enter and expand.  I considered infrastructure

3    limitations at airports involving the Spirit routes.  I

4    also looked at the ability of the proposed divestitures

5    to ensure entry.

6         Then I looked at a variety of network fit

7    considerations, and by that I mean whether the, um,

8    whether the other ULCCs would enter the Spirit routes,

9    would find those routes attractive given their existing

10   broader network strategies.

11   Q.  I want to talk about each of those factors that you

12   considered in assessing entry, Dr. Chipty.  Let's go to

13   the next slide and start with the first one, which is

14   the scale of entry that will be necessary.

15        Why was this factor relevant to your assessment of

16   entry?

17   A.  Well as I said the scale of entry matters.  So if --

18   if entry occurs but at a relatively small scale, that

19   entry would not be capable of offsetting the loss of

20   competition due to Spirit's lost capacity.  So I studied

21   by how much the other ULCCs would have to grow to offset

22   the loss of Spirit and how that growth compares to their

23   historical growth.

24   Q.  Let's go to the next slide.

25        Earlier you mentioned that Spirit was half of all

1    ULCCs' capacity.  How does that compare to each of the

2    other ULCCs individually in terms of size?

3    A.  So I show you that comparison on this slide here.

4         THE COURT:  You object?

5         MS. BANSAL:  A motion to strike, your Honor, this

6    is duplicative of what we heard yesterday.

7         (Pause.)

8         THE COURT:  Well I do have evidence of the growth

9    rates of all these three.

10         MR. MOORE:  Your Honor, may I be heard on that?

11         THE COURT:  Yes.

12         MR. MOORE:  Dr. Chipty has studied the level of

13    entry that would be necessary in order to offset the

14    loss of Spirit's capacity.  Dr. Gowrisankaran has not

15    looked at entry at all.  This forms the foundation of

16    the extent of entry calculations that Dr. Chipty has

17    performed in this case.

18         THE COURT:  Overruled.  She may testify.

19    Q.  Dr. Chipty, could you explain to us how does Spirit

20    compare to each of the other ULCCs individually in terms

21    of size?

22    A.  Sure.  As I started to say, this chart here

23    describes that using available seat miles.  If you look

24    at the horizontal axis, that shows you the timeframe.

25    So this time period runs from 2002 to 2022, and the

1    vertical axis shows you the available seat miles in

2    billions.

3          Looking at the lines on the chart, the faded gray

4    line is JetBlue.  I want to focus on the ULCCs.  The

5    yellow line is Spirit.  The lines below the yellow line

6    are each for Frontier, Allegiant, Sun Country, Avelo,

7    and Breeze.  Now the Breeze and Avelo lines sit on top

8    of each other and the line only begins in 2021.

9          Beginning in 2013, each of the other ULCCs are

10   smaller than Spirit, and Spirit's had the fastest growth

11   rate among the ULCCs.  Now there are many ways to

12   describe growth and sometimes I describe total growth

13   over some defined time period.  Now here I've described

14   the annual growth rates for each of Spirit, Frontier,

15   and Allegiant, from 2013 to 2022, and you can see that

16   Spirit's growth rate over this period, it's annual

17   growth rate was 15.4 percent a year.  The others are

18   smaller.

19   Q.   What is the total impact of these differences in

20   the annual growth rates if you added them up together?

21   A.   Well added together these differences in the annual

22   growth rates amount to large cumulative differences.  So

23   by 2022, the other carriers were significantly smaller

24   than Spirit.  Frontier was 35 percent smaller.

25   Allegiant was 64 percent smaller.  And Sun Country was

1    89 percent smaller.  Breeze and Avelo were each of

2    negligible scale.

3         THE COURT:  And these percentages are the growth

4    rate, was that percentage smaller?

5         THE WITNESS:  No, your Honor.  The growth rates

6    are described in the table and what I'm describing with

7    the 35, 64, and 89, is that at the end of the day how

8    much smaller were each of these three compared to

9    Spirit.

10        THE COURT:  Isn't that what I just said?  But all

11   right, I do understand.

12        Go ahead.

13   Q.  Dr. Chipty, what is the importance of these

14   differences in relative size between Spirit and other

15   ULCCs to the amount of growth that would be necessary to

16   replace Spirit?

17   A.  Well given how large Spirit is relative to these

18   other ULCCs, it calls Spirit into the analysis that the

19   growth that will be required to replace Spirit will also

20   be large.

21   Q.  Let's go to the next slide.

22        Could you give us a sense of how quickly the other

23   ULCCs would need to grow in order to replace Spirit?

24   A.  Yes, my analysis indicates that the other ULCCs

25   would have to grow at historically unprecedented rates

1    to replace Spirit.  The specific growth rates, some of

2    which I will describe, depend on a variety of factors,

3    including which ULCCs?  So, for example, are we looking

4    specifically at an individual ULCC like Frontier or is

5    it the combination of the ULCCs?  I'll consider whether

6    the ULCCs would have grown but for the merger, whether

7    the ULCCs would need to replace all of Spirit's capacity

8    or just some of it to restore competition, and over what

9    set of routes.

10   Q.  Focusing for a moment on the second consideration on

11   this slide, why do you consider whether the ULCCs would

12   have grown but for the merger?

13   A.  Well the merger will affect competition in the

14   future, so the right way to think about the impact of

15   the merger is what the future would look like with and

16   without the merger.

17           Without the merger, Spirit and the other ULCCs

18   might have grown organically, that's the relevant

19   baseline for comparison.  So in thinking about how much

20   the other ULCCs would have to grow to replace Spirit,

21   the answer will be they will have to grow by enough to

22   grow as they would have and to grow by enough to restore

23   Spirit's future capacity.  That level of growth

24   necessarily requires the other ULCCs to grow faster than

25   their premerger growth plans.

1    Q.   Let's go to the next slide.

2         Could you please walk us through some of your

3    calculations describing the growth that would be

4    necessary in order to replace Spirit?

5    A.   Sure.  This is the first set of calculations I'll

6    walk through.

7         So the left panel describes the assumptions that

8    go into these calculations.  As I said, there are a

9    number of factors that would affect the specific growth

10   rates one could calculate.  So here I consider all other

11   ULCCs on a combined basis, so Frontier, Allegiant, Sun

12   Country, Breeze, and Avelo.  I assume that none of the

13   other ULCCs would have grown but for the merger.  I

14   assume that the ULCCs would need to restore all of

15   Spirit's capacity to restore competition, that's an

16   assumption that I will change later.  And then I looked

17   at two sets of routes, all routes on a nationwide basis

18   and all Spirit routes.

19   Q.   What's the difference between looking at nationwide

20   versus looking only at the Spirit routes?

21   A.   So the nationwide calculation simply asks by how

22   much would the other ULCC have to grow in the aggregate?

23   It's agnostic about where that capacity would have to be

24   used.  By contrast, the Spirit recalculation focuses

25   specifically on growth that would be required to replace

1    Spirit's capacity on the Spirit routes.  That

2    calculation assumes that the other ULCCs would continue

3    to serve their former routes.

4    Q.  And how should we think about the relationship

5    between these two numbers?

6    A.  Well so the -- the two numbers in essence bookend

7    the growth that would be required.

8    Q.  So what did you find applying the assumptions you

9    described on the left-hand side of the slide?

10   A.  Well so let me walk you through the three bars.  So

11   the red bar is a calculation of historical growth, it

12   shows you that over the 5-year period from 2017 to 2022,

13   the other ULCCs grew by 51 percent.  The two Blue bars

14   are forward-looking.  The first blue bar shows you that

15   the other ULCCs would have to grow by 85 percent to

16   replace Spirit's 2022 capacity.  And given their

17   historical 5-year growth rate, it would take them over 5

18   years to do that.

19        The second bar shows you that the other ULCCs

20   would have to grow by nearly 250 percent to replace

21   Spirit's 2022 capacity on these Spirit routes.  And

22   again given the 5-year historical growth rates, it would

23   take over 15 years for them to do that.

24   Q.  Let's go to the next slide.

25        Dr. Chipty, could you explain why the Spirit

1    routes bar that we were just looking at on the previous

2    slide is so much higher than the nationwide bar is?

3    A.   Sure.   It has to do with what I said earlier, that

4    significant portions of the other ULCCs networks don't

5    overlap with Spirit.   And the best way to explain that

6    is to unpack the two growth rate calculations that I

7    just walked you through, the 85 percent and the 250

8    percent growth.   So these two charts decompose the

9    calculation.

10          The first bar in each -- in each chart describes

11   the size of the other ULCCs.   So on a nationwide basis,

12   the other ULCCs had 59.1 billion ASMs.   On the Spirit

13   routes, they only had 20.3 billion ASMs.   So that's the

14   source of the difference.

15          Now the middle bar shows you Spirit's capacity.

16   In both cases the thought experiment is by how much

17   would the other ULCCs have to grow to replace Spirit's

18   capacity?   So you can see under the Spirit route

19   calculation, in order for the ULCCs to replace Spirit's

20   capacity, they'd have to grow from a smaller base.   That

21   explains the higher percentage.

22   Q.   In the calculations you've been discussing so far,

23   Dr. Chipty, you said that you assumed that there would

24   be no growth but for the merger.   What's the impact of

25   that assumption?

1    A.  Well that means that these growth rates understate

2    the growth that would be necessary.  If the other ULCCs

3    and Spirit both have independent growth plans, then in

4    the world without the merger a larger Spirit would have

5    competed against a larger set of ULCCs.  So that means

6    to restore competition the other ULCCs would have to

7    grow as they would have and grow by enough to replace a

8    larger Spirit.

9    Q.  Let's go to the next slide.

10        Dr. Chipty, could you provide an example of how

11   accounting for that standalone growth would impact your

12   analysis in practice?

13   A.  Sure.  I presented a calculation here which is going

14   back to the nationwide calculation, the first of the two

15   numbers I just presented.  And for this analysis it

16   maintains the same assumptions as before, except now I

17   assume that Spirit would have grown organically.  So

18   under its 2022 network plan, Spirit had planned to grow

19   its ASMs at 16 percent a year between 2022 and 2026, and

20   that's consistent with its historical growth rate.

21        So I build this level of growth into Spirit's

22   capacity and I ask, "But how much would the other ULCCs

23   have to grow to replace Spirit's 2022 capacity and its

24   planned growth?"  And the answer is shown in the third

25   bar on this -- on this slide.

1      So the first two bars just repeat what I showed

2  you.  The red bar is the historical growth rate.  The 85

3  percent is the growth assuming -- the growth rate for

4  the other ULCCs assuming no but-for growth otherwise, no

5  organic growth.  And then the last bar shows you that

6  the other ULCCs would have to grow 171 percent to

7  replace a larger Spirit in the future.  And it would

8  take them over 10 years to do that given their 5-year

9  historical growth rate.

10 Q.  Dr. Chipty, have you heard the testimony in this

11 case that Spirit has had recent financial difficulties?

12 A.  Yes, I have.

13 Q.  How does that testimony affect your opinion on how

14 realistic the Spirit standalone numbers that are

15 factored in here are?

16 A.  Well the numbers could change if the growth organic

17 plans change, but my conclusion is unlikely to change.

18 That's because the middle bar on this slide assumes that

19 Spirit doesn't grow at all.  The middle bar assumes that

20 Spirit maintains its 2022 capacity, which is unlikely

21 given the decade of historical growth, but nonetheless

22 that's what the middle bar assumes, and even under that

23 conservative assumption I find that it would take the

24 other ULCCs over 5 years to replace Spirit's capacity.

25 Q.  Have you seen any evidence that Spirit is still

1    growing today despite the use of the --

2    A.  Yes, there's been testimony in this case that

3    despite its recent financial difficulties, Spirit has

4    still experienced growth.  For example, Mr. Gardner

5    testified that Spirit -- that year-over-year growth for

6    Spirit this quarter will be on the order of 14 percent

7    and next quarter it would be about 7 percent.

8        MS. BANSAL:  Objection, your Honor.  To the extent

9    that she is testifying about Spirit's change in

10   circumstances, that is not in her report.

11       MR. MOORE:  Your Honor, may I be heard on that?

12       THE COURT:  Well she's reciting saying she relied

13   upon Gardner's testimony and then she recites it.

14   You're moving to strike her recital of it.  That motion

15   is allowed.

16       MS. BANSAL:  I am, your Honor.

17       THE COURT:  All right.

18       MR. MOORE:  And, your Honor, just a clarification

19   on the ruling.  The remaining portion of the answer,

20   that her opinion doesn't change, that stays in the

21   record?

22       THE COURT:  That stays in the record.

23       MR. MOORE:  Thank you, your Honor.

24       THE COURT:  The rule is that an expert is entitled

25   to rely upon hearsay so long as that hearsay is reliable

1    in the area of that expert's expertise.  That does not

2    make the hearsay admissible.  She's testifying to the

3    hearsay on which she relied.  I strike it.  But her

4    opinion stands.

5    Q.  Dr. Chipty, we've been focusing nationwide so far

6    and I now want to focus on the divestiture metro areas

7    for a moment.  For that discussion let's go to the next

8    slide in your slide deck.

9         Could you explain how much the divestiture buyers,

10   Frontier and Allegiant, would need to grow to replace

11   Spirit in those divestiture metropolitan areas?

12   A.  Well this next slide begins to understand that.  So,

13   for example, the first bar looks at Boston where

14   Allegiant would be the divestiture buyer.  So in these

15   calculations I should say I look at the rate at which in

16   each of the divestiture areas the divestiture buyers

17   would have to grow to replace half of Spirit's capacity

18   on routes involving those areas.

19        So in Boston I find that Allegiant would have to

20   grow by about 410 percent to replace half of Spirit's

21   2022 capacity on Spirit's Boston routes.

22        The next bar is for Miami where Allegiant would

23   also be the divestiture buyer.  Here Allegiant would

24   have to grow by over 750 percent to replace half of

25   Spirit's 2022 capacity on its Miami routes.

1         And the last bar is for New York where both

2    Allegiant and Frontier would be divestiture buyers.  So

3    this calculation, um, considers Allegiant and Frontier

4    on a combined basis.  So on a combined basis the two

5    would have to grow by about 460 percent to replace half

6    of Spirit's 2022 capacity.

7    Q.  How likely are these growth rates, Dr. Chipty, based

8    on the evidence you reviewed?

9    A.  Well based on the historical growth rates, growth at

10   these levels would be unprecedented for both Allegiant

11   and Frontier.

12   Q.  Given the factors you discussed so far, what is your

13   opinion with respect to the sufficiency of scale of the

14   ULCC entries?

15   A.  Well given the substantial difference in the

16   relative sizes, the other ULCCs would have to grow at

17   rates that they had never grown at before and that makes

18   their ability to replace Spirit unlikely over the --

19   over the coming 5 years or more.  So in general my

20   opinion is that the prospect of entry at these rates

21   is -- the prospect of entry at sufficient scale, um, on

22   a timely basis is unlikely.

23   Q.  Dr. Chipty, did you hear the testimony from

24   Frontier's CEO, Mr. Barry Biffle during this trial?

25   A.  I did.

1   Q.   Did you hear Mr. Biffle's testimony that he believes

2   Frontier and other ULCCs would pursue opportunities on

3   the former Spirit routes?

4   A.   I did.

5   Q.   How does that testimony impact your opinion in this

6   case?

7   A.   Well I think his testimony is consistent with mine.

8   The question isn't whether, um, whether ULCCs would find

9   it attractive to enter certain routes, the question is

10   whether there would be -- the question isn't whether

11   there would be targeted entry, but whether there would

12   be complete entry at a scale sufficient to replace the

13   largest ULCC in the marketplace.

14       I didn't understand Mr. Biffle's testimony to

15   suggest that Frontier's entry would be complete.  I also

16   didn't hear his testimony to rule out the possibility of

17   exit on certain routes that Frontier serves today or

18   exit on routes that Frontier might serve in the future

19   based on its organic growth plans.

20       MS. BANSAL:  Objection, your Honor, motion to

21   strike her mischaracterization of Mr. Biffle's

22   testimony, which is not in her report.

23       THE COURT:  No, that may stand, that's what she

24   thinks of his testimony.  It's not evidence that that's

25   what he testified to, I have the transcript of that.

1          MS. BANSAL:  Thank you, your Honor.

2     Q.    Dr. Chipty, I want to turn to the next factor that

3     you studied in analyzing entry, which is planes and

4     pilots.  For this discussion let's go to our next slide.

5          Could you explain why this factor of planes and

6     pilots was relevant to your assessment of entry?

7     A.   Well airlines need planes and pilots to enter new

8     routes to expand their service on existing routes.

9     Q.   I want to start with planes.

10         What did you determine about the sufficiency of

11    the existing ULCC order book in order to replace Spirit

12    capacity?

13    A.   Well I understand that all of the ULCCs have order

14    books that predate the JetBlue-Spirit merger that were

15    put into place to pursue their independent growth plans.

16    For example, Mr. Biffle testified that Frontier has, um,

17    planes that were ordered in 2017 that it might -- that

18    may be delivered shortly.  Those types of additions --

19    additional planes are not sufficient to offset Spirit's

20    capacity in the future.

21    Q.   Why do you say that?

22    A.   Well because as I said the economic standard is what

23    the future would look like with and without the merger,

24    because the merger is going to affect competition in

25    that future.

1  Q.  Let's go to the next slide.

2       Based on the record that you've reviewed in this

3  case, what is the likelihood that other ULCCs could

4  acquire the aircrafts necessary to replace Spirit?

5  A.  Well I understand there's a serious plane shortage.

6       MS. BANSAL:  Objection, your Honor, foundation.

7       THE COURT:  Yeah, sustained on that foundation.

8  Q.  Dr. Chipty, what evidence have you reviewed

9  regarding the availability of an aircraft in this case?

10  A.  Well I've reviewed certainly the testimony in this

11  trial, but I've also reviewed a variety of ordinary

12  course documents that are cited in my report.

13       MS. BANSAL:  Your Honor, objection, that is just

14  reading documents, that's not economic testimony --

15       THE COURT:  Please, you know, if I need argument,

16  I'll ask for it.

17       MS. BANSAL:  Okay.

18       THE COURT:  I'll hear you and Mr. Moore on this.

19       Now she's an expert on when the planes are going

20  to be delivered?  I have some problems with that.  We

21  have some testimony about that from which I can draw

22  inferences.  But I don't know that -- and from that

23  testimony it would warrant me to conclude that they're

24  going to have trouble getting the planes to fill those

25  routes.  Any more specificity on this foundation I'm

1  skeptical of.

2       MR. MOORE:  Yes, your Honor.  Dr. Chipty was

3  simply providing the foundation for her opinion, I can

4  move directly to her opinion.

5       THE COURT:  Go ahead.

6  Q.  Dr. Chipty, how does the evidence about the

7  availability of aircraft and the aircraft shortages

8  impact your assessment of entry in this case?

9  A.  Well they're an important consideration.  Difficulty

10 of accessing necessary inputs like this make the

11 prospect of entry even more challenging.

12 Q.  So we just talked about planes.  I want to talk for

13 a moment about pilots.

14       What did you learn about the availability of

15 pilots and specifically how does that impact your

16 opinion in this case?

17       MS. BANSAL:  Objection, your Honor.

18       THE COURT:  Sustained, as to what she learned,

19 that's the hearsay.

20 Q.  Dr. Chipty, how does the availability of pilots that

21 you studied impact your opinions in this case?

22 A.  Well the same answer as with airplanes, pilots are a

23 necessary input into providing more service.  And so to

24 the extent there are serious pilot shortages, those too

25 would create barriers to entry that would make the

1    prospect of the necessary entry unlikely.

2    Q.   Let's go to the next slide.

3         Dr. Chipty, I want to turn to the next factor you

4    studied in analyzing entry, which is infrastructure

5    limitations.  And we can actually go one slide further,

6    so Slide 22 now.

7         What infrastructure limitations have you

8    identified in the airline industry?

9    A.   Well these are limitations involving things like

10   gates and slots and runway timings and international

11   landing timings at several airports throughout the

12   country.  Now the academic literature confirms that

13   limited access to infrastructure like this has been

14   shown to deter airline entry and increase fares.  And I

15   cited an article here from the Review of Economics and

16   Statistics that explains that barriers to entry in the

17   airline industry can limit competition and this article

18   specifically points to these types of infrastructure

19   limitations.  I've also listed on this slide a handful

20   of other articles that speak to the same subject that

21   are also cited in my reports.

22   Q.   Did you determine that there were infrastructure

23   limitations at the airports that involve the Spirit

24   routes?

25         MS. BANSAL:  Objection, leading.

1        THE COURT:  Sustained, you may ask her what she

2    did.

3    Q.   What did you do to study infrastructure limitations

4    in this case, Dr. Chipty?

5    A.   Well I reviewed the testimony in this case and I

6    also reviewed the ordinary course evidence and, um, that

7    evidence suggests that there are infrastructure

8    limitations at multiple airports around the country

9    including, um, at many Spirit gateways that involve both

10   the divestiture and the nondivestiture airports.

11       THE COURT:  What did you mean when you said

12   "ordinary course evidence," what is that?

13       THE WITNESS:  So I'll give you an example.  I

14   recall a document from JetBlue where they studied the

15   difficulty of accessing facilities at various airports

16   throughout the country.

17       THE COURT:  So by "ordinary course evidence," you

18   mean you reviewed the testimony and you reviewed the

19   exhibits that I have admitted as business records in the

20   ordinary course, is that what you're saying?

21       THE WITNESS:  Um, almost.  It's just that I can't

22   be certain that the documents that I reviewed in

23   production, say for example deposition exhibits, I'm not

24   sure if they are records that have been admitted for

25   your consideration.

1          THE COURT:  But you looked at those things?

2          THE WITNESS:  Yes, I did.

3          MS. BANSAL:  Motion to strike, your Honor.

4          THE COURT:  Yeah, I was leading the witness.

5     You're right.

6          (Laughter.)

7          THE COURT:  You're absolutely right.

8          It may stand generally.  That's --

9          Go ahead, Mr. Moore.

10         MR. MOORE:  Thank you, your Honor.

11    Q.  Dr. Chipty, why was this factor, infrastructure

12    limitations, relevant to your assessment of entry?

13    A.  Well infrastructure limitations, um, like this are

14    often described as "barriers to entry," and "barriers to

15    entry" as a general, um, as a general matter make the

16    prospect of entry even more unlikely.

17    Q.  Let's turn to the next factor you considered, which

18    is the ability of the divestitures to ensure entry, and

19    I want to move one slide forward for that, so now Slide

20    23.

21         What did you conclude about this factor?

22    A.  Well my analysis of the proposed divestiture

23    suggests that they are not likely to ensure entry for

24    various reasons.

25    Q.  I want to walk through those reasons.  So let's move

1    to the next slide, Slide 24.

2         What's the first reason you identified for why the

3    divestitures would not ensure entry?

4    A.  Well the first reason has to do with the perimeter

5    rule that limits the usefulness of the divestitures at

6    La Guardia where Frontier would be the divestiture

7    buyer.

8    Q.  What is the "perimeter rule"?

9    A.  Well I understand that it's a rule that prevents an

10   airline from flying flights longer than 1500 miles

11   except on Saturdays and to Denver.

12   Q.  Why was the perimeter rule relevant to your analysis

13   of the effectiveness of the divestitures?

14   A.  Well there are five New York nonstop overlap routes

15   that would be affected by the perimeter rule.  Two of

16   those five are presumptive nonstop overlap routes.  And

17   by that I mean routes that Dr. Gowrisankaran has

18   identified that meet the structural presumption.

19        MS. BANSAL:  Objection, your Honor, the witness is

20   not an expert in the perimeter rule.

21        THE COURT:  Well is there any doubt that that's

22   what the perimeter rule says?

23        MS. BANSAL:  Your Honor, she has no expertise

24   in --

25        THE COURT:  No, no, is there any doubt?  Maybe

1   it's something I can take judicial notice of.

2       Is that disputed?

3       MS. BANSAL:  We don't dispute the perimeter rule.

4       THE COURT:  All right, then that's not hearsay,

5   and I'll take judicial notice of it.  Her testimony can

6   stand.

7   Q.  Dr. Chipty, you were explaining why the perimeter

8   rule is relevant to your analysis of divestitures.

9   Could you continue.

10  A.  Yes.  So as I said there are five routes that Spirit

11  currently serves out of New York, these routes account

12  for about 12 percent of all Spirit flights out of New

13  York and about 20 percent of all Spirit capacity on

14  routes involving the New York metropolitan area.

15  Frontier would not be able to use their divested assets

16  at La Guardia to replace Spirit on these routes.

17  Q.  If these divestitures --

18      THE COURT:  I'm not clear why?  If they flew

19  Spirit routes, if Spirit flies them, Spirit is subject

20  to the perimeter rule?

21      THE WITNESS:  That's a great point and I

22  investigated that.

23      So as it happens, Spirit flies these routes

24  primarily out of Newark, that's not subject to the

25  perimeter rule.  And, um -- but Frontier doesn't have a

1    presence at Newark.

2          THE COURT:  Thank you.

3    Q.  Dr. Chipty, let's turn to the second reason you

4    identified that the divestitures would not ensure entry

5    and that I believe is on the next slide, so Slide 25.

6          Could you explain this reason?

7    A.  Yes, the next reason is that Allegiant doesn't offer

8    international service or service to Puerto Rico.  17 of

9    the 36 presumptive nonstop overlap routes that involve a

10   divestiture airport are international routes or Puerto

11   Rico routes involving Boston and Miami where Allegiant

12   would be the divestiture buyer.  This slide shows you

13   what those routes are, your Honor.  And what this means

14   is that Allegiant is unlikely to use the divestiture

15   assets to serve these routes.

16   Q.  And, Dr. Chipty, I apologize if I missed it.  How

17   many routes did you identify would be impacted by this

18   limitation?

19   A.  It would be 17 of the 36 presumptive nonstop overlap

20   routes that involve Boston and Miami.

21         MS. BANSAL:  Objection, your Honor, this is just

22   legal argument, it's not based on economic analysis.

23         THE COURT:  Well it will have such weight as it's

24   due, but the testimony may stand.

25   Q.  Dr. Chipty, if Allegiant decided to offer

1    international service out of Fort Lauderdale, did you

2    determine that the divestiture assets would allow them

3    to do so?

4    A.  Well the evidence I've reviewed suggested that even

5    if it wanted to, um, 4 of the 5 gates to be divested, at

6    Fort Lauderdale they don't have the necessary

7    facilities, like for example customs and border patrol

8    that are necessary to offer international service.

9          THE COURT:  Well they don't have them today?

10          THE WITNESS:  True, they don't have them today.

11          THE COURT:  But they could apply for them.

12          THE WITNESS:  Potentially but -- your Honor will

13    have to determine the sufficiency of that, the record is

14    unclear whether that would be possible.

15          THE COURT:  I will.  Go ahead.

16    Q.  Dr. Chipty, if the divestiture assets wouldn't allow

17    Allegiant to serve the international routes out of Fort

18    Lauderdale, how does Spirit serve them today?

19    A.  Well, um, Spirit serves these routes using other

20    gates out of Fort Lauderdale and JetBlue is not

21    divesting those gates.

22    Q.  And what is the relevance of the particular gates --

23          THE COURT:  I'm sorry?

24    Q.  What is the relevance of the divestiture of specific

25    gates to your analysis of the effectiveness of the

 1  divestitures?

 2  A.  Well again it just goes to my, um, conclusion that

 3  the divestitures, at least of these assets, would not

 4  allow Allegiant to serve these -- would not result in

 5  the replacement of competition on these routes through

 6  the divestiture.

 7  Q.  Let's turn to the next slide, which is Slide 26.

 8  It's the last reason you identified the divestitures

 9  would not ensure entry.

10       Could you explain what we're looking at here?

11  A.  Yes, my last reason has to do with the coverage of

12  the divestitures and I find that the divestitures don't

13  cover either endpoint of many routes.  So this analysis

14  describes the coverage of the divestitures and their

15  ability to ease operational constraints, say access to

16  things like gates and slots on Spirit's network

17  system-wide.

18       So I look at two measures, the number of routes

19  and the amount of capacity covered by the divestitures

20  and I describe this -- so different combinations of

21  Spirit routes.  So the last row looks at all Spirit

22  routes, then the rows above it look at subsets of Spirit

23  routes.  So the presumptive nonstop overlaps, the

24  nonpresumptive nonstop overlaps, and the nonoverlaps.

25       Looking at the bottom row, the row that I would

1    read this table at is that 73.5 percent of all Spirit

2    routes are not covered -- the divestitures don't cover

3    either endpoint of 73.5 percent of the Spirit routes and

4    they don't cover about 60 percent of Spirit ASMs.

5         But looking specifically at the nonpresumptive --

6    I'm sorry, the first row, the presumptive nonstop

7    overlaps, I find that the divestitures don't cover about

8    30 percent of the routes or about 20 percent of the ASMs

9    on these routes.

10   Q.  Let's go to the next slide.

11        Before we leave the topic of divestitures,

12   Dr. Chipty, have you looked at divestiture from past

13   airline mergers?

14   A.  I have in response to Dr. Hill.

15   Q.  Which ones did you look at?

16   A.  Well I looked at the American U.S. Airways

17   transaction because that's the one he looked at.

18   Q.  What did you learn about the relevance of the

19   divestitures from that merger to this one?

20   A.  Well as a general principle, divestiture remedies

21   are crafted to address the competition concerns that are

22   specific to a transaction.  In order for a prior merger

23   to shed light on the sufficiency of the divestitures in

24   a current merger, the two transactions have to be

25   similarly situated.

1          So I considered the extent to which the antitrust
2     concerns in the American and U.S. Airways transaction
3     were similar.  And as a general matter, the American and
4     U.S. Airways transaction was different, it involved the
5     merger of two legacy airlines that each operated hub and
6     spoke networks out of different hubs.  The difference
7     between those carriers and JetBlue and Spirit gives rise
8     to a different set of competitive concerns, which led me
9     to conclude that the comparison was not apt.
10    Q.  Can you explain what we're looking at in this table?
11    A.  Yes, this table describes one aspect in which the
12    American-U.S. Airways and the JetBlue-Spirit
13    transactions are different.  This table characterizes
14    the extent -- whether and the extent to which the
15    nonstop overlap routes between JetBlue and Spirit and
16    American U.S. Airways are comparable.

17         So just to focus in on one aspect of this table,
18    let's look at the middle panel.  That describes the
19    percent of nonstop overlaps and the percent of ASMs, so
20    capacity on the nonstop overlap routes, from the
21    perspective of the surviving airline.  So for American-
22    U.S. Airways, that's American, and for JetBlue-Spirit,
23    that's JetBlue.  And what I find for American-U.S.
24    airways is that less than 5 percent of their networks
25    involved nonstop overlap routes and less than 5 percent

1    of their networks were overlapping even on a capacity

2    basis.  By contrast, JetBlue-Spirit, 30 to 40 percent of

3    their nonstop overlaps were, um, less than 30 -- excuse

4    me, between 30 to 40 percent of their nonstop routes are

5    overlapping.  That's the better way to say it.

6    Q.  And given those differences you just discussed,

7    Dr. Chipty, what did you conclude about the

8    applicability of the divestitures in the American-U.S.

9    Airways case to the present case?

10   A.  I concluded that it would be difficult to learn

11   anything from the comparison and I find it not

12   informative.

13   Q.  Let's go to the next slide, which is Slide 28.  And

14   I want to talk about the last factor you considered when

15   assessing entry, which is network fit.

16         So just to get us started, can you explain what

17   you mean when you say "network fit"?

18   A.  Well as I said earlier, "network fit" refers to

19   whether each of the other ULCCs would find it reasonable

20   or attractive, whether it would make sense for them to

21   enter Spirit routes given their existing networks.

22   Q.  What factors did you find impact whether an airline

23   enters a new route?

24   A.  So based on the evidence I reviewed, I understand

25   that there are two types of considerations, strategic

1   and operational.  The strategic refers to some basic

2   economic questions like will there be demand on the

3   routes?  Does the route fit the airline's business

4   model?  For example, earlier I explained that Allegiant

5   doesn't fly international routes.

6        The operational considerations have to do with the

7   cost of entering a route.  The cost of entering a route

8   may be lower when the airline already has flight

9   maintenance and flight crews located in a city.  So the

10  testimony suggests that the cost of entering a new route

11  is lower when the airline already has presence at each

12  endpoint of the new route and the cost may be even lower

13  when the airline has substantial presence at each

14  endpoint of a route.

15  Q.  Apart from the testimony in this case, have you

16  considered other evidence that, um, presence at both

17  endpoints is an important consideration for an entry?

18  A.  Yes, there's a body of economic literature that

19  studies the relationship between airline entry and

20  network fit with respect to endpoint presence and that

21  literature finds that there's a positive correlation

22  between airline entry and -- and significant dual

23  endpoint presence.

24  Q.  Let's go to the next slide, Slide 29.

25        Dr. Chipty, did you perform any independent

1   analysis to corroborate the evidence and academic
2   literature you have seen?
3   A.   Yes, I conducted my own analysis of airline schedule
4   data.  So I studied data over a 5 1/2 year period, from
5   Q1 2017 to Q2 2022, and I studied entry decisions by
6   Spirit, Frontier, Allegiant, and Sun Country.
7   So I started my analysis by identifying the routes that
8   the carrier was not operating in a given quarter and I
9   characterized the carrier's presence at each of those
10   route endpoints, and then I looked ahead in time and I
11   determined whether that each of the carriers entered the
12   routes that they were not operating four quarters later.
13   And so using this type of information I studied the
14   correlation between endpoint presence and entry.
15   Q.   Let's go to the next slide.
16       Dr. Chipty, could you provide an example that
17   illustrates the methodology that you were just
18   describing?
19   A.   Sure.  Here's an example from the data.  So in the
20   data you see that there are three metro areas, you see
21   I'm highlighting Albuquerque, Austin, and Columbus, and
22   as it happens, in Q1 2017 Allegiant flew out of each of
23   those three metropolitan areas.  Allegiant flew 3
24   destinations out of Albuquerque, 8 destinations out of
25   Boston, and 6 destinations out of Columbus.

1        If you go to the next slide please, 31.  You see

2   that Allegiant was not flying the Austin, Columbus route

3   or the Albuquerque, Columbus route.  So these are

4   candidates for potential entry.  And you can also look

5   at these data and identify that Allegiant was already

6   serving five or more routes out of both Austin and

7   Columbus, but Allegiant was serving less than 5 routes

8   out of Albuquerque.

9        Now if you go one slide forward to Slide 32.  You

10  see that if you fast-forward four quarters, we can study

11  what Allegiant actually did with respect to these

12  routes.  So what I see in the data in Q1 2018 is that

13  Allegiant entered the Austin, Columbus route where it

14  had presence at a certain threshold out of both

15  endpoints, but Allegiant did not enter the Albuquerque

16  Columbus route where it had less presence at one of the

17  endpoints.

18       And so like this I aggregated candidate entry

19  events and information about endpoint presence across

20  each of the carriers over 5 years and that gave me the

21  basis to conduct a more systematic analysis of the

22  relationship between entry and endpoint presence.

23  Q.  Let's go to the next slide.

24       Dr. Chipty, what did you find about the impact of

25  endpoint presence applying this methodology?

A.   Well this table here describes some of my results.
Each of the columns in this table describe a set of
routes based on the route characteristics of endpoint
presence, and what I find generally is that the rate of
entry is much higher on routes where the carrier has
presence at both endpoints, and that rate of entry is
even higher on routes where the carrier has substantial
presence at each of the endpoints.
Q.   What if that's not true?
A.   And when that's not true, it's less likely that the
carrier would enter that route.
Q.   Would you walk us through how we could see those
results in this table?
A.   Sure.  So what I did is I took all of those
candidate entry routes that I identified and I divided
them into samples based on endpoint presence.  So if you
consider, for example, the first column, that includes
all of the candidate entry routes where the carrier had
at least -- was already serving at least 5 or more
routes from each endpoint.  So this column, for example,
would include the Austin-Columbus route in my example.

     The next column includes routes where the carrier
is present at both endpoints, but not at the same high
level at both endpoints.  So this sample would include,
for example, the Albuquerque-Columbus route in my

1    example.

2        Now going from left to right, the samples go from

3    substantial dual endpoint presence all the way to no

4    presence at either endpoint.  And if you look at the

5    bottom now, which symbolizes the rate of entry within

6    that type of sample, you see that the rate of entry was

7    much higher in the first column, and as we go from left

8    to right the rate of entry steadily declines.  Overall

9    in the sample the rate of entry is 4 percent, so these

10   numbers should be understood in that context, but

11   nonetheless the rate of entry with significant dual

12   endpoint presence is higher than any other sample of

13   routes.

14   Q.  Dr. Chipty, you mentioned that, um, to determine

15   significant presence you had to use a cutoff of 5 or

16   more routes.  Why did you choose that cutoff?

17   A.  Well I chose that cutoff because empirically, as you

18   can see in this table, there's a sharp dropoff for less

19   than 5.  But I could have used other cutoffs.

20   Reasonable alternatives would have produced the same

21   result in that preserving the qualitative result that,

22   um, being present at both endpoints and being

23   substantially present at more endpoints is highly

24   correlated with a higher rate of entry.

25   Q.  Let's go to the next slide, which is Slide 34.

1      How did you use these results to study the

2 prospect of entry in this case?

3 A.  Well I used these results to then assess whether

4 there were ULCCs and how many ULCCs were well-positioned

5 to enter the routes that they were currently not serving

6 as of Q2 2023.

7 Q.  (Pause.)  How many ULCCs meet the criteria you used,

8 the significant dual endpoint presence?

9 A.  Well remember I identified 5 ULCCs that I was

10 studying.  And so at most there could be 5 ULCCs present

11 on a -- as a potential entrant on a presumptive nonstop

12 overlap route.  And so that's why this table has -- has

13 rows running from 0 to 5.

14      So, for example, the way to read the table, let's

15 look at the first row.  It says that there was 0 or no

16 potential ULCC entrants on 32 of the 51 presumptive

17 nonstop overlap routes, that's 63 percent of the routes

18 had no potential ULCC entrants that met this dual

19 endpoint presence criteria.

20 Q.  And could you just explain how to read the rest of

21 the table as well?

22 A.  Sure.  The next row describes the number of routes

23 where there was one potential ULCC entrant, and there

24 were 15 routes like that accounting for 29 percent of

25 the presumptive nonstop overlap routes, and then there

1    were 4 routes that had 2 or more potential ULCC entrants

2    present.  And if you look at the last row, there were no

3    routes with 5 ULCC potential entrants.

4    Q.  Where you did find that there were potential

5    entrants, who were those potential entrants?

6    A.  Well the most frequent potential entrant was

7    Allegiant and it was a potential entrant on about 20

8    percent of these routes.

9    Q.  Let's go to the next slide, Slide 35.

10        So far we've only been talking about endpoint

11   presence on the presumptive nonstop overlap routes.

12   What does your analysis look like if you expand it to

13   consider all Spirit routes?

14   A.  So this table here expands the analysis I just

15   showed you to all Spirit routes to investigate that

16   question.  So it's set up the same way.  And the way you

17   read this, if I just look at the first row, there were

18   no potential ULCC entrants on 153 of the Spirit routes,

19   and that accounted for 50 percent of all Spirit routes.

20   And again Allegiant was the most frequent potential ULCC

21   entrant and it was present on about 20 percent of the

22   routes.

23   Q.  Let's go to the next slide, Slide 36.

24        So far we've been focused on entry and potential

25   entrants.  Dr. Chipty, have you studied how many of the

1    ULCCs are already present and offering service on the

2    Spirit routes?

3    A.  Yes, this next slide shows you that information.  So

4    I described the presence of Frontier, Allegiant, Sun

5    Country, Breeze, and Avelo individually and I looked at

6    it -- I looked at their presence in two ways, on the

7    presumptive nonstop routes, so that's the top panel, and

8    on all Spirit routes, that's the bottom panel.  And as

9    you can see, the carrier that's most often present on

10   the Spirit routes is Frontier, it's present on the

11   Spirit routes about 40 percent of the time by both

12   metrics.  The next most frequent is Allegiant, it's

13   present between 2 to 4 percent of the time.  I'm sorry,

14   between 2 to 8 percent of the time.  8 percent overall.

15   And by and large they are larger than each of the other

16   ULCC entrants.

17   Q.  I want to shift gears now, Dr. Chipty, and talk

18   about each of the ULCCs individually and in more detail

19   and focusing in particular on the divestiture buyers.

20   So let's turn to the next slide and start with Frontier.

21   This is Slide 37.

22       What did you conclude about the likelihood of

23   entry by Frontier on the Spirit routes?

24   A.  Well I concluded that entry and expansion by

25   Frontier would not be timely, likely, and sufficient,

 1   and that's based on my analysis of various aspects of
 2   their network.
 3           So, for example, I find that Frontier flies at a
 4   lower frequency relative to Spirit.  I find that
 5   Frontier is twice as likely to exit a route it had
 6   previously entered.  And it would also take Frontier a
 7   long time to replace Spirit's capacity.
 8           MS. BANSAL:  Objection, your Honor, foundation.
 9   She's only speaking to facts --
10           THE COURT:  You're moving to strike it and I'll
11   take it under advisement.
12           MS. BANSAL:  Yes, motion to strike, your Honor.
13           THE COURT:  I'll take it under advisement.  We'll
14   see if she can support it.
15           MR. MOORE:  Your Honor, we're going to cover the
16   foundation now.
17           THE COURT:  Well we'll see.
18   Q.  Let's turn to next slide and start with the first of
19   the points you mentioned, Dr. Chipty.
20           What did your analysis show about how frequently
21   Frontier flies compared to Spirit?
22   A.  So I started in New York where Frontier is the
23   divestiture buyer and I studied the, um, I studied the
24   frequency with which Spirit and Frontier each fly on
25   routes involving New York.

1          So here I look at the 1-year period from Q3 2021

2    to Q2 2022.  Now the way to read this chart is that each

3    bar represents a destination served out of New York.  If

4    you look at the horizontal axis, you'll see the name of

5    the destination served.  The vertical access describes

6    the frequency, so here the measure I use is total

7    flights over the course of the year.  The yellow color

8    is for Spirit, the green is for Frontier.  Where a bar

9    has both colors, that means that both Spirit and

10   Frontier serves those destinations.  If you look at the

11   numbers, you'll see that Spirit flies 2 to 3 times as

12   often as Frontier on routes involving New York.

13   Q.  Let's go to the next slide.

14          What did your analysis show when you expanded

15   outside of New York to system-wide?

16   A.  Yes, this next chart shows you that.  Um, here I

17   looked at a slightly different measure, the measure is

18   flights per route, and I looked at all routes to Spirit

19   and Frontier destinations everywhere.  The table looks

20   at -- considers different combinations of routes.  The

21   last row are all Spirit and Frontier routes, but this

22   row I've highlighted are the Spirit-Frontier overlap

23   routes involving Boston, Miami, and New York.  And if

24   you work out these numbers, what you find is that

25   Frontier flies less than one-third as many flights per

1    route as Spirit does.  And these differences were
2    statistically significant.
3    Q.  Well why do you highlight the Frontier and Spirit
4    overlaps on this slide?
5    A.  Well as I explained earlier, Frontier overlaps
6    Spirit on about 40 percent of its routes, so this is a
7    significant set of routes, and I wanted to investigate
8    even on routes where Frontier and Spirit already
9    compete, how comparable are they?  And so I wanted to
10   understand that and that's why I highlight this row.
11   Q.  Let's turn to Frontier's rate of exits.  Why did
12   study the rate of exits?
13   A.  Well JetBlue and Spirit have staying power on the
14   routes that they serve.  So for entry to be sufficient,
15   the replacement also has to have a similar kind of
16   staying power.  So if Frontier, for example, exits
17   routes at a faster rate than Spirit, it may not have a
18   sufficient capability to replace lost competition from
19   Spirit.
20        THE COURT:  Why?
21        THE WITNESS:  I'm sorry, your Honor?
22        THE COURT:  Why?  You said it may not have.  I
23   guess I don't -- the fact that they exit is not -- it's
24   probably not a profitable route for them, but how does
25   that bear on capacity?

1          THE WITNESS:  How does that bear on what?

2          THE COURT:  Capacity.

3          THE WITNESS:  Capacity.

4          THE COURT:  Isn't that what you were talking

5     about?

6          THE WITNESS:  No, not necessarily.  I am talking

7     about replacing the lost competition from Spirit, and I

8     know I've been talking so far about capacity, but

9     shortly I will be talking about how to practically move

10    from the concept of capacity to the concept of replacing

11    the competitiveness of Spirit.

12         THE COURT:  But my question is, what bearing does

13    the frequency of exit from the route play here?

14         THE WITNESS:  It goes to the ability of Frontier

15    to have the same kind of competitive impact on the

16    incumbents on the route to understand that this is a

17    serious player who will stay and provide consumers with

18    an alternative if we -- and so it would -- the -- how

19    can I say this?  The -- the durability of Frontier on a

20    route can affect the competitors' response to that type

21    of entry, and that can have consequences for consumers.

22         THE COURT:  What type of consequences?

23         THE WITNESS:  Um, so if an airline -- if an

24    incumbent faces the threat of entry by a firm that's

25    likely to be a fly-by firm, and that's bad use of term

1  here but --

2        THE COURT:  I'm following.

3        THE WITNESS:  But, you know, a fleeting entrant,

4  then the incumbent need not really lower price, expand

5  capacity, in response to make sure they retain their

6  customers.  So the more durable is the entrant, the more

7  likely there'll be, as a matter of economics, as a

8  matter of strategy for the incumbents, the more likely

9  it will be that that entrant will spur the kind of

10  competitive response that will ultimately be good for

11  consumers.

12        THE COURT:  Thank you.

13        Go ahead, Mr. Moore.

14        MR. MOORE:  Thank you, your Honor.

15  Q.  Let's move on to the next slide, which is Slide 40.

16        Can you explain what we're looking at in this

17  slide, Dr. Chipty?

18  A.  Yes, um, this is one of three analyses I performed

19  to investigate, um, this concept of staying power that I

20  described.  So I was interested in understanding how

21  likely and historically, um, do Spirit and JetBlue stay

22  on the routes that they enter?  And so this particular

23  chart looks at the 7 non -- presumptive nonstop overlap

24  routes involving Boston, and what it describes is that

25  for each of JetBlue and Spirit, the initial year of

1    entry, the years in service, and the years not in

2    service, it's this third column, the years not in

3    service that I look at to assess what I've been calling

4    "staying power" or "stickiness."

5         Looking at JetBlue, you can see here in Boston,

6    um, JetBlue has been serving each of these routes

7    anywhere from 15 to 19 years on an uninterrupted basis

8    from the time it has entered.  Spirit has less of a

9    history in Boston.  Spirit entered these routes later.

10   But from the time it entered, it has been serving these

11   routes anywhere from 4 years to 15 years, again on an

12   uninterrupted basis with one exception.

13   Q.  I'm going to focus on Note 2 on this slide for a

14   moment, Dr. Chipty.

15        What does this footnote show us?

16   A.  Well, um, it's an analysis I did to check the

17   robustness of my analysis.  This is described in my

18   report as well.  What I did here is I extended this

19   analysis to 2023 because my primary analysis is for

20   2022, and what this dagger symbol shows you is that I

21   have marked the routes where Spirit or JetBlue exited in

22   2023.  And in this case what I find is that even

23   extending the analysis one additional year, which is the

24   additional year I had available to me when I did my

25   report, I found that it didn't change the basic

1    conclusions or the inference I drew from this table.

2    Q.  Let's go to the next slide.

3         What does your analysis show for Miami, Fort

4    Lauderdale?

5    A.  Well this table is set up in the same way.  There

6    were 25 presumptive nonstop overlap routes involving

7    Miami.  And you see a very similar pattern.  But in some

8    ways Miami is perhaps more informative than Boston

9    because Spirit has a gateway in Miami, Spirit is

10   headquartered in Miami, that means that Spirit had

11   entered the Miami route long before it entered the

12   Boston route.  And so that gives us a longer window to

13   study the extent to which Spirit stays once it enters.

14        And you can see, looking at the Spirit panel in

15   Miami, that from the time it entered, anywhere from 15

16   to 21 years, Spirit has served each of these Miami

17   routes on an uninterrupted basis, at least as of 2022.

18   The JetBlue panel shows a very similar pattern.  JetBlue

19   has served these routes on an uninterrupted basis for a

20   very long time as well.

21   Q.  And let's go to the next slide, Slide 42.

22        Could you explain what we see in New York?

23   A.  Sure.  These are the six presumptive nonstop overlap

24   routes involving New York.  And again you see a very

25   similar pattern.  JetBlue has been serving these routes

1    for at least 21 years.  Spirit has been serving these

2    routes from 4 to 21 years.  Again, um, relatively

3    uninterrupted.

4    Q.  Let's go to the next slide, Slide 43.

5         Dr. Chipty, what do these results suggest to you

6    about JetBlue and Spirit service on the presumptive

7    nonstop overlap routes?

8    A.  Well they suggest to me that JetBlue's service or

9    entry on these routes as well as Spirit's entries on

10   these routes is neither fleeting nor temporary, making

11   their overlap fairly durable.  What the data shows is

12   consistent with the testimony that I reviewed in this

13   case and here is some testimony from Spirit's Mr. Kirby.

14   My results are consistent with that.

15   Q.  Let's go to the next slide, Slide 44.

16        What did you learn about Frontier's rate of exit

17   from market compared to Spirit's?

18   A.  So I studied that systematically from 2014 to 2019.

19   This table traces the entries over that time period by

20   each of Spirit and Frontier.  For each of the routes

21   they entered, I studied the -- whether and when they

22   exited.  And just looking at the total rows, if you look

23   at the Spirit panel, um, Spirit exited at a rate of 18

24   percent of all routes that entered over this time

25   period.  By contrast, Frontier exited at a rate of 40

1    percent.  So that's a 2-to-1 ratio.

2    Q.  I want to turn now to the last reason you gave for

3    why you think Frontier is unlikely to replace Spirit.

4    So let's go to the next slide.

5         What opinions have you reached about the time it

6    would take for Frontier to replace Spirit?

7    A.  Well my analysis suggests it would take a long time

8    for Frontier to replace Spirit's capacity.

9    Q.  What analysis did you do to reach that conclusion?

10   A.  Well I performed a series of illustrative

11   calculations investigating the growth that would be

12   required by Frontier to offset harm on all routes

13   nationwide and on routes involving Boston, New York, and

14   Miami, and that's what -- and those are the growth rates

15   shown in the lower panel of this table.

16   Q.  Before we go to the lower panel, would you walk us

17   through the first two rows we're seeing here?

18   A.  Sure.  The first two rows describe the current

19   capacity for each of Frontier and Spirit on the

20   different sets of routes, so all routes, routes

21   involving Boston, Miami, and New York.  The first row is

22   Frontier and the second row is Spirit.  And the thought

23   experiment is by how much would Frontier have to grow on

24   any of these routes or sets of routes maintaining their

25   current capacity there and growing by enough to replace

1    Spirit?

2    Q.   Moving on to the bottom panel, I see there's a

3    reference to "adjustment factor."

4         Can you explain what that term is?

5    A.   Sure, that's a practical way to move between

6    capacity and competitiveness.  So, for example, an

7    adjustment factor of 100 percent assumes that Frontier

8    would have to replace all of Spirit's capacity to

9    restore the loss of competition from Spirit.  An

10   adjustment factor below 100 percent allows for the

11   possibility that 1-for-1 replacement may not be

12   necessary.  An adjustment factor greater than 100

13   percent considers the possibility that the entrants

14   might need to enter at a larger scale in order to

15   restore the competitive effect.

16   Q.   Why do you need these adjustment factors,

17   Dr. Chipty?

18   A.   Well there may be reasons to think that an

19   adjustment is necessary.  So, for example, an

20   adjustment -- it may not -- so, for example, Frontier

21   may not need to replace all of Spirit's capacity if, for

22   example, a larger JetBlue in the future itself provides

23   some of the replacement competition.  A larger --

24   Frontier may need to enter with more than Spirit's

25   capacity if, for example, in the future, um, Frontier is

1   not as credible a threat as Spirit was.

2   Q.  Could you give us an example of how you would apply

3   these adjustment factors in practice?

4   A.  Sure.  Let's, um, look at the Boston column and

5   let's start with the yellow highlighted cells.

6       So, for example, if Frontier needed to replace

7   Spirit 1-for-1 to restore Spirit's effect in Boston on

8   routes -- on Spirit routes out of Boston, Frontier would

9   have to grow by 419 percent to do that.  Depending on

10  the adjustment factor you consider, that growth rate

11  could range between 105 percent all the way to 523

12  percent.

13  Q.  What do those rates look like if you expand to

14  nationwide?

15  A.  Well on a nationwide basis, um, that's actually what

16  the first column shows you and we could start with the

17  highlighted cells in that column.

18      What I've highlighted here is the possibility that

19  Frontier needs to replace just half of Spirit's

20  capacity, accounting for other factors that might make

21  up the difference, in order to restore competition.  And

22  so here what you see is that Frontier would need to grow

23  at 77 percent to restore that level of competition.

24  Q.  Earlier today you talked about, um, the idea of

25  factoring in independent growth plans.  What would be

1    the impact if you did that here?

2    A.  Well these numbers understate growth because they

3    don't factor those in.  Remember I said that if the

4    other ULCCs -- if Spirit and the other ULCCs had organic

5    plans to grow, then the other ULCCs in this case,

6    Frontier, would have to grow as it would have and by

7    enough to replace a larger Spirit.

8    Q.  How attainable are these growth rates for Frontier

9    based on the evidence you reviewed?

10   A.  Well Frontier's historical growth rate --

11        MS. BANSAL:  Objection, foundation.

12        THE COURT:  She's testified to that.  And she may

13   testify.  Overruled.

14   A.  Frontier's historical growth rate was 13 percent per

15   year between 2013 and 2022, and at that rate it would

16   take Frontier over 5 years to grow by 77 percent.  Now

17   Frontier projected a growth rate of 20 percent per year

18   from 2022 to 2026 in its -- in its network growth plan.

19   So if Frontier were to expand as it had planned,

20   Frontier would have to grow by more than 77 percent to

21   both grow as planned and replace Spirit's capacity.

22   Q.  Let's move on to the next slide now and discuss

23   Allegiant.  So this is Slide 46.

24        What did you conclude about the likelihood of

25   entry by Allegiant onto the Spirit routes?

1    A.  Well my analysis shows that Allegiant also has a

2    network that's not compatible with Spirit's even though

3    they both fly from Boston, Miami, and New York.  My

4    analysis shows that Allegiant serves significantly

5    smaller destinations, it flies at a significantly lower

6    frequency, and as I've already explained, it doesn't fly

7    international routes or routes to and from Puerto Rico.

8            MS. BANSAL:  Objection, your Honor.  This is

9    duplicative of Dr. Gowrisankaran's testimony yesterday.

10           THE COURT:  No, it may stand.

11   Q.  Dr. Chipty, I think you've gotten about halfway

12   through the slide.  Could you just provide us your

13   overview of the Allegiant opinion?

14   A.  Yes, um, another aspect of the difference in their

15   networks is that Allegiant tends to avoid competition,

16   which is consistent with the testimony of Mr. Wells,

17   who, um, affirmed that Allegiant doesn't face

18   competition on about 75 percent of its routes.  And my

19   growth analysis indicates that it would take Allegiant a

20   long time to replace Spirit's capacity.

21   Q.  Let's go to the next slide, Slide 47.  I want to

22   discuss that first difference between Spirit and

23   Allegiant that you mentioned, which is the size of

24   destinations served.  Let's start here in Boston.

25           What does your analysis show?

A.  Well my analysis shows that Allegiant serves smaller

destinations compared to Spirit on routes involving

Boston.  The left side of this slide shows you that.

This chart focuses on the populations of the

destinations served by both Allegiant and Spirit out of

the Boston metro area.  So each bar on this chart, um,

represents a destination served.  You could see what the

destinations are by the labels on the horizontal axis.

The vertical axis describes the population in millions.

The yellow is for Spirit.  The orange is for Allegiant.

The destinations are ordered from increasing to

decreasing size of population served.

     The first thing to note is that there are no

overlap destinations served out of Boston.  And also the

destinations served by Allegiant are generally smaller.

In fact they're statistically significantly smaller than

the destinations served by Spirit out of Boston.

Q.  What about the second difference between Spirit and

Allegiant you mentioned, which is frequently of service.

How does that compare in Boston?

A.  Well that's shown by the companion chart on the

right of this slide.  It's set up the same way, only now

the vertical axis shows you the total flights over the

year.  And if you look at the numbers, you see that, um,

Spirit flies on average 11 flights per week per route on

1    the routes it serves out of Boston, while Allegiant

2    serves three flights per week per route.  So Allegiant

3    flies less frequently out of Boston compared to Spirit.

4    Q.  Let's go to the next slide, Slide 48.

5         How do Spirit and Allegiant compare in the other

6    divestiture metro areas of Miami, Fort Lauderdale, and

7    New York?

8    A.  So this analysis is set up the same way, um, as the

9    one I just walked you through.  The left chart shows you

10   population differences and the right chart shows you

11   frequency-of-flying differences.

12        And if we go to the next slide, I show you the

13   same information for New York.  So this is Slide 49.

14   And here the same thing.  Across all three metro areas

15   what you see is that Allegiant and Frontier often don't

16   fly, in fact they rarely fly the same destinations.

17   Allegiant flies -- Allegiant serves smaller destinations

18   in terms of population size.  And Allegiant flies

19   significantly less frequently than Spirit.

20   Q.  What do these results look like if you expand

21   outside of the divestiture metro area?

22   A.  So I've looked at that analysis as well and I find

23   the same pattern holds.

24   Q.  Let's move one slide forward now to Slide 50.  I

25   want to talk about the last reason you identified for

```
 1    differences between Allegiant and Spirit, which is the
 2    rate at which Allegiant would each grow.  How fast did
 3    you calculate that would be?
 4    A.  Well again I undertook a series of illustrative
 5    calculations under varying assumptions of adjustment
 6    factors and my analysis shows that Allegiant would have
 7    to grow at historically unprecedented rates to replace
 8    Spirit on any of the sets of routes that I considered.
 9    Q.  Let's look at Boston.  Could you walk us through
10    what we're seeing in Boston?
11    A.  Sure.  So the Boston column, this table is set up
12    the same way as the Frontier table, so we could read it
13    the same way.
14         If Spirit were to replace -- I'm sorry.  If
15    Allegiant needed to replace Spirit's competitive effect
16    in Boston, and assume it needed to replace it with full
17    1-for-1 capacity replacement, Allegiant would have to
18    grow at a rate of 823 percent to do that.
19         The column -- the first column shows you the same
20    calculation network-wide.  Um, nationwide.  Nationwide,
21    um, Allegiant would have to grow by 139 percent to
22    replace half of Spirit's capacity nationwide.  And as I
23    said, given historical growth rates, Allegiant grew at a
24    rate of 10 percent per year between 2013 and 2022, and
25    at that rate it would take Allegiant about 9 years to
```

```
 1    meet that nationwide target of a 50 percent replacement.
 2    Q.  The title of your table says you assume no
 3    standalone growth for either firm.  What's the impact of
 4    that assumption?
 5    A.  Well as I've said, that if the -- if the other ULCCs
 6    and Spirit would have growth organically, these growth
 7    rates understate the growth that would be necessary in
 8    the future with the merger to restore competition.
 9    Q.  Dr. Chipty, Dr. Hill has suggested, or will suggest
10    in this case, that Southwest might be able to replace
11    the loss of Spirit capacity.  What is your response to
12    that opinion?
13    A.  Well I didn't consider Southwest because Southwest
14    doesn't offer no-frills unbundled service like the other
15    ULCCs.  Southwest -- all Southwest tickets include
16    things like free baggage checks and free snacks and free
17    food, of course, and I think through the higher service
18    it comes with a higher price.  And so it's not like a
19    ULCC product in that way.
20         Also the defendants point to Southwest and
21    describe Southwest as one of the Big 4 and they suggest
22    that a benefit of the transaction is to allow JetBlue to
23    compete more effectively than Southwest.  So in that
24    light I didn't see why it would be reasonable to look to
25    Southwest as a potential replacement for Spirit's
```

 1    competitive effects.

 2    Q.   So we've now talked about several different factors

 3    impacting entry.  Given everything that we've discussed

 4    so far, how do these factors together inform your

 5    opinions on entry in this case?

 6    A.   Well my analysis suggests that there are many

 7    impediments to entry -- and by the way I've looked at

 8    the issue of entry from multiple perspectives, and this

 9    analysis suggests there are many impediments to entry,

10    some of which affect all of the routes, and there are

11    multiple routes with many impediments.  These

12    impediments suggest that it is unlikely for the other

13    ULCCs to replace Spirit with entry or expansion at

14    sufficient scale.

15         MR. MOORE:  Your Honor, I'm about to turn to a

16    different topic.

17         THE COURT:  Oh, you are, and it's about the time

18    to break.  How much more do you have?

19         MR. MOORE:  Well, your Honor, we --

20         THE COURT:  Keep in mind that you said, all

21    parties, that we'd be done with this witness today.

22         MR. MOORE:  Yes, your Honor.  We're dealing --

23    there's been some back and forth, so it's going a little

24    bit longer than anticipated.  But we are about

25    two-thirds of the way through.  Possibly a little

```
1    longer.

2           THE COURT:  Two-thirds?

3           MR. MOORE:  Two-thirds or more through the exam

4    now.

5           THE COURT:  One devotedly hopes so.  I mean no

6    disrespect.

7           We'll recess for one half hour until 11:15.  We'll

8    recess.

9           THE CLERK:  All rise.

10          (Recess, 10:45 a.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1              C E R T I F I C A T E

2

3

4          I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER,

5     do hereby certify that the foregoing record is a true

6     and accurate transcription of my stenographic notes

7     before Judge William G. Young, on Tuesday, November 21,

8     2023, to the best of my skill and ability.

9

10

11    /s/ Richard H. Romanow 11-21-23
      _____
12    RICHARD H. ROMANOW    Date

13

14

15

16

17

18

19

20

21

22

23

24

25
```