```
                    UNITED STATES DISTRICT COURT
                  DISTRICT OF MASSACHUSETTS (Boston)

                                        No. 1:23-cv-10511-WGY
                                        Vol. 2, Pages 79-153


UNITED STATES OF AMERICA, et al
             Plaintiffs

vs.


JETBLUE AIRWAYS CORPORATION,
et al,
             Defendants



                        ********


                    For Bench Trial Before:
                    Judge William G. Young




                    United States District Court
                    District of Massachusetts (Boston)
                    One Courthouse Way
                    Boston, Massachusetts 02110
                    Tuesday, November 21, 2023



                        ********



        REPORTER:  CHERYL B. PALANCHIAN, RMR, CRR
                 Official Court Reporter
              United States District Court
            One Courthouse Way, Boston, MA 02110
```

A P P E A R A N C E S


EDWARD WILLIAM DUFFY, ESQ.
ARIANNA MARKEL, ESQ.
AARON TEITELBAUM, ESQ.
        DOJ-Atr
        450 Fifth Street NW, Suite 8000
        Washington, DC 20530
        (202)812-4723
        Email:  Edward.duffy@usdoj.gov
        For Plaintiff United States of America
- and -
WILLIAM T. MATLACK, ESQ.
        Attorney General's Office
        One Ashburton Place, 18th Floor
        Boston, MA 02108
        (617)727-2200
        Email:  William.matlack@mass.gov
        For Plaintiffs United States of America and The
        Commonwealth of Massachusetts



RYAN SHORES, ESQ.
        Cleary Gottlieb Steen & Hamilton LLP
        2112 Pennsylvania Avenue, NW
        Washington, DC 20037
        (202)974-1876
        Email:  Rshores@cgsh.com
- and -
ELIZABETH M. WRIGHT, ESQ.
        Cooley LLP
        500 Boylston Street
        Boston, MA 02116-3736
        (617)937-2349
        Email:  Ewright@cooley.com
- and -
RACHEL MOSSMAN ZIEMINSKI, ESQ.
MICHAEL MITCHELL, ESQ.
        Shearman & Sterling LLP
        2601 Olive Street, 17th Floor
        Dallas, TX 75201
        (214)271-5777
        Email:  Rachel.zieminski@shearman.com
        For Defendant JetBlue Airways Corporation


(Continued.)

(Continued.)


JAY COHEN, ESQ.
ANDREW C. FINCH, ESQ.
        Paul, Weiss, Rifkind, Wharton & Garrison
        1285 Avenue of the Americas
        New York, NY 10019-6064
        (212)373-3000
        Email:  Jaycohen@paulweiss.com
        For Defendant Spirt Airlines, Inc.

I N D E X

WITNESS:            DIRECT    CROSS    REDIRECT    RECROSS

TASNEEM CHIPTY, Continued

  By Mr. Moore    83                      148

  By Ms. Bansal              112

(No exhibits)

```
 1  (Proceedings, 11:16 a.m.)
 2          THE CLERK:  Court is back in session.  You may be
 3  seated.
 4          THE COURT:  Mr. Moore, you may continue.
 5          MR. MOORE:  Thank you, your Honor.  We've done
 6  some streamlining on break so we may be skipping across some
 7  of the slides.  I'll let you know when we skip ahead.
 8          THE COURT:  Thank you.
 9                  TASNEEM CHIPTY, (Resumed)
10                  DIRECT EXAMINATION, (Cont'd.)
11  BY MR. MOORE:
12  Q.  Dr. Chipty, I'd like to turn to the second area of your
13  opinion which is whether JetBlue's plans for management of a
14  combined firm suggests that the transaction would produce
15  efficiencies.  So let's go to slide 51, which is where we
16  are now.
17          (On screen.)
18  Q.  To get us started, could you please explain what are
19  merger efficiencies?
20  A.  Sure.
21          MS. BANSAL:  Objection, your Honor.  This is just
22  a legal conclusion.
23          THE COURT:  No, overruled.  It's a mixed question
24  of fact and law.  She may testify to it.
25  A.  So merger efficiencies are improvements created by a
```

1   merger that ultimately benefit consumers.  Mergers that

2   bring together complementary assets are -- have a better

3   chance of creating such improvements.

4       Imagine, for example, you have a firm that's really

5   good at production and another firm that's really good at

6   distribution.  The combination of those assets may allow the

7   merged firm to produce higher quality lower-cost products

8   that might not otherwise be possible.

9   Q.   How do you think about efficiencies in the context of

10  this case?

11  A.   Well, take, for example, Mr. Friedman's testimony that

12  the merger might let JetBlue increase its scale.  From --

13  for an economist, the question isn't what can JetBlue do

14  with or without the merger, the question is would consumers

15  be better off being served by two standalone firms.  If the

16  answer to that is yes, they'd be better off with two

17  standalone firms, then there would be no efficiency, even if

18  the merged firm is able to increase its scale.

19          MR. MOORE:  Let's go to the next slide, which is

20  slide 52.

21          (On screen.)

22  Q.   What economic standard do you apply when evaluating

23  efficiencies, Dr. Chipty?

24  A.   Well, the economic standard with efficiencies is

25  similar to the standard with entry; the merger has to be

```
 1    capable of offsetting harm caused by the merger.  And there,
 2    you know, that's also what the Horizontal Merger Guidelines
 3    say, and I've selected an excerpt from that on this slide
 4    here.
 5    Q.   And we'll talk about each of those attributes
 6    throughout your testimony today, Dr. Chipty, but one
 7    question for you is what role do benefits to the merging
 8    parties play in your evaluation of efficiencies?
 9    A.   Well, merger efficiencies aren't about benefits to the
10    firm or generating revenues for the firm.  Now, that's not
11    to say firms can't benefit from a merger, but some of those
12    benefits have to be passed on to consumers in the form of
13    lower prices, higher quality, more choice, greater output,
14    something like this.
15              MR. MOORE:  Let's go to the next slide, which is
16    slide 53.
17              (On screen.)
18    Q.   What are the claimed efficiencies that you evaluated in
19    this case?
20    A.   Well, in the course of the merger investigation and
21    this litigation the defendants have claimed several
22    categories of efficiencies and I've summarized them here on
23    this slide.
24              MS. BANSAL:  Objection, your Honor.  The testimony
25    that --
```

 1              THE COURT:  Wait, wait.  Again, you've objected.

 2          And now where do you get these figures that are in

 3     the right-hand column here?

 4              THE WITNESS:  So those come from JetBlue's deal

 5     modeling.  These are the --

 6              THE COURT:  All right.  All right.  This is no

 7     calculation of yours, this is their deal modeling?

 8              THE WITNESS:  That's correct.

 9              THE COURT:  All right.

10          MR. MOORE:  And, your Honor, if I may --

11              THE COURT:  Well, there's -- I'm going to let you

12     inquire about these because this is data that she's entitled

13     to question or rely on.  But let's get to the subject

14     matter.

15          MR. MOORE:  Yes, your Honor.

16     Q.  Dr. Chipty, you were describing what we were looking at

17     on this slide.  Did you complete your answer?

18              THE COURT:  Well, try my instruction.  Let's get

19     to the specific aspects of it.

20          MR. MOORE:  Yes, your Honor.

21          We can actually forward ahead to slide 57.

22          (On screen.)

23     Q.  I want to walk through each of the claimed efficiencies

24     that you evaluated, Dr. Chipty.  Let me know when you're

25     there.

1   A.    Yes, I'm there.

2            MS. BANSAL:  Which slide?

3            MR. MOORE:  57.

4   Q.    So let's start with the first claimed efficiency you

5   considered, which is customer relevance.  Can you explain

6   what this efficiency is?

7   A.    Yes.  So this is one of the -- the first of the claimed

8   efficiencies that I had listed in the table.  So to evaluate

9   whether this is a merger efficiency, I just would like to

10  set the stage and explain what I understand it to be.

11       JetBlue expects here to earn a premium from increasing

12  its presence at airports that both Spirit and JetBlue

13  currently serve.  And this premium is based on the legacies'

14  ability to charge higher fares at airports where they have

15  higher shares.  So that means that after the merger JetBlue

16  expects to earn premiums like the legacies at airports where

17  it obtains similar shares.

18            THE COURT:  But you've made the point that merger

19  efficiencies, in terms of what's significant to me, must

20  benefit the consumer.  And this is illustrating what may

21  benefit JetBlue.  Is that right?

22            THE WITNESS:  I think that's where I ultimately

23  come out.  But I didn't presume that.  What -- my purpose

24  was to probe this efficiency to determine whether in there

25  lies some benefit to consumers.  And so --

```
 1              THE COURT:  We'll let -- that's an answer.  We'll
 2    let Mr. Moore ask his questions.
 3              MS. BANSAL:  Your Honor, may I -- I do object to
 4    the extent that she's done no additional economic analysis
 5    of this work.  This is just a rereading of JetBlue's
 6    ordinary-course documents.
 7              THE COURT:  Well, so far it appears to be.
 8              Go ahead, Mr. Moore.
 9              MR. MOORE:  Yes, your Honor.
10    Q.   So, Dr. Chipty, what is the significance to your
11    analysis of the way that JetBlue estimated this premium?
12    A.   Well, if you go to slide 59, what I find is that at the
13    heart of this claimed efficiency is JetBlue's plan to price
14    more like the legacy carriers.  Now, there is a
15    well-established academic literature that explains that
16    higher legacy-like pricing reflects the legacies' greater
17    pricing power, which is generally not good for consumers.
18    And I've selected two of the articles that I've cited in my
19    report that makes this point.
20    Q.   Did you identify any potential benefits associated with
21    increased relevance?
22    A.   Yes.  The same academic literature explains that
23    greater airport presence can allow an airline to offer
24    denser schedules.  So this may be a benefit to some
25    consumers, especially some price-insensitive travelers like
```

business travelers.  In fact, JetBlue's synergy explanation
appears to be that the revenues it expects to earn will
likely derive from serving a greater share of business
travelers.  This type of benefit, though, the flexibility
offered by a denser flight schedule, is unlikely to benefit
many consumers, including the cost-conscious consumers.

MS. BANSAL:  Your Honor, motion to strike.

THE COURT:  Yeah, I'm -- respectfully, Mr. Moore,
I'm going to strike it because her answer, which I credit, I
will say, is an aspect of the synergies that benefit
JetBlue.  That's not material to me.  It's -- and when I
asked her, she said, well, I'm going to bore down and see
how consumers benefit.  Let's see how they do or do not.

I'm just thinking, given her repeated objections,
which are not on this point, but I'm sustaining them because
I think it's immaterial how JetBlue will be better off.  How
are consumers going to be better off?  I truly think that's
the inquiry that I'm required to make.

MR. MOORE:  Yes, your Honor.  If I may?

THE COURT:  Yes.

MR. MOORE:  These are the claimed efficiencies
that were presented to the Department of Justice, both
during this investigation, during this litigation, and we're
simply responding -- evaluating them to in order to, in
fact, assess whether they are consumer benefits, which is

```
 1   ultimately a criteria for efficiencies.
 2           THE COURT:  Well, all right.  So you agree with
 3   me.  And I, you will understand that I perceive, on the 14th
 4   day of trial, that the benefits to JetBlue don't weigh in
 5   the balance here.  You represent the consumer.  JetBlue,
 6   quite properly, represents its shareholders.  Now, if there
 7   are benefits to the consumer from this, I query what's our
 8   definition of consumer, that's why I'm sustaining the
 9   objection.
10           MR. MOORE:  Yes, your Honor.
11           THE COURT:  And allowing that motion to strike.
12           MS. BANSAL:  Thank you, your Honor.
13           MR. MOORE:  And, your Honor, just a moment,
14   please.
15           (Whereupon counsel conferred.)
16           THE COURT:  I mean, as always, I'm guilty of
17   overspeaking.  Truth is, I love the demonstrative.  As a
18   demonstrative, you can be sure I will look at these
19   particular sources upon which she relies.  But I hope I'll
20   look at them from the view of the material, the factual
21   issues that the Court has to resolve.
22           Go right ahead, Mr. Moore.
23           MR. MOORE:  Thank you, your Honor.
24   Q.   Let's move on to slide 60, Dr. Chipty.
25           (On screen.)
```

1   Q.   So this is increased sales of JetBlue travel and

2   loyalty products.  What did you conclude about this

3   efficiency?

4   A.   Well, this is the second claimed efficiency the

5   defendants have offered that might benefit consumers, and

6   here again I drew on the academic literature.  What the

7   academic literature tends to find is that loyalty programs,

8   in general, and in the airline industry in particular, raise

9   what we call customer-switching costs.  It means people,

10   consumers, become loyal, and that these products help

11   airlines raise fares.

12       To the extent there are benefits to consumers from

13   loyalty and travel products, which, by the way, include

14   things like selling more vacation packages and car rentals,

15   these would be products outside of the relevant markets

16   identified by Dr. Gowrisankaran.

17           MR. MOORE:  Let's go to the next slide, slide 61.

18           (On screen.)

19   Q.   Can you explain what the next claimed efficiency you

20   evaluated is?

21   A.   Yes.  This third one has to do with JetBlue's plans to

22   sell more connecting traffic through Fort Lauderdale.

23           MS. BANSAL:  Same objection, your Honor.  This is

24   all based on ordinary-course documents.  There's no

25   additional analysis.

 1          MR. MOORE:  Your Honor, if I may, on that point?

 2          THE COURT:  Yes, go ahead.

 3          MR. MOORE:  As Dr. Chipty was, I think, about to

 4   testify, she actually did perform additional analyses that

 5   are not reflected in the ordinary-course documents that show

 6   a reduction --

 7          THE COURT:  I'll let that stand and you may

 8   inquire about it.

 9   Q.   Dr. Chipty, what did you conclude about this claimed

10   efficiency?

11   A.   Well, first of all, I did look at the under -- the data

12   underlying JetBlue's deal modeling on this front, and I

13   found that the -- the plan to sell more connecting traffic

14   would result in a 6.3 percent reduction in passengers

15   traveling to and from Fort Lauderdale.  That would be what

16   sometimes is called the local traffic.  And that this local

17   traffic would be displaced by increasing the more profitable

18   connecting traffic.

19          THE COURT:  How did you figure that out?

20          THE WITNESS:  That -- I'm sorry.  Which part of

21   that?

22          THE COURT:  The 6.3 reduction?

23          THE WITNESS:  So the underlying data in the

24   JetBlue files goes route by route in different combinations

25   of itineraries.  I identified the direct or local tickets

```
 1   from the connecting tickets from various parts of the
 2   country through Fort Lauderdale, and then I did the
 3   tabulations.
 4            THE COURT:  And that's because -- I seem to be
 5   fixed on capacity, but that's because there's only so many
 6   flights you can fly and gates that you have, and you opine
 7   that the merged firm would displace, they would operate at
 8   capacity, or they're going to try to --
 9            THE WITNESS:  That's right.
10            THE COURT:  -- to make their profits.  But it
11   would displace a portion, 6.3 percent, of the local traffic,
12   you just said it, for more profitable connecting fights?
13            THE WITNESS:  That's exactly right.
14            THE COURT:  Understood.
15   Q.   And, Dr. Chipty, what was your ultimate conclusion
16   about this efficiency?
17   A.   Well, in addition to this reduction in, if you will,
18   output for local traffic or local customers, I also
19   evaluated the extent to which this change might be
20   merger-specific.  And by that, I mean whether the
21   efficiency, the claimed efficiency, meaning increasing
22   connecting traffic through Fort Lauderdale, might have been
23   achieved without the merger.
24            And on this front I observed that both JetBlue and
25   Spirit offer significant connecting traffic already through
```

1    Fort Lauderdale.  Both -- and my review of their standalone

2    network plans show both have plans to grow at Fort

3    Lauderdale, as well as at various airports around the

4    country, which indicate that the two airlines could, on a

5    standalone basis, should they choose, have the possibility

6    of increasing connecting traffic through Fort Lauderdale.

7    And they have not shown why they would need the merger to do

8    that, in any case.

9              MR. MOORE:  Let's go to the next slide, slide 62.

10             (On screen.)

11   Q.   Could you explain what this claimed efficiency you

12   evaluated is?

13   A.   Yeah.  So this claimed efficiency is related to

14   JetBlue's plan to grow the combined firm's daily departures

15   at various airports.

16   Q.   What did you conclude about this claimed efficiency?

17             MS. BANSAL:  Objection, your Honor.  Same

18   objection.

19             THE COURT:  No, overruled.  We'll hear her

20   testimony.

21   A.   Well, based on my analysis of the standalone plans and

22   the combined network plans for the future, I find that

23   JetBlue and Spirit already have plans to grow in many of the

24   regions that JetBlue identifies for post-merger growth.

25             MR. MOORE:  Let's go to the next slide, which is

1    slide 63.

2              (On screen.)

3    Q.   How did you determine whether these plans were

4    merger-specific?

5    A.   Well, so I compared the standalone plans for the future

6    that each of JetBlue and Spirit have for growth at various

7    airports around the country to JetBlue's plans for the

8    combined network.

9    Q.   What plans did you consider?

10   A.   Well, I considered two future plans that JetBlue has

11   put forward in this case.  The first is the original

12   Combined Network Plan, and the other, the New Combined

13   Network Plan, or at least that's how I refer to them.  And I

14   use that language because the original Combined Network Plan

15   was created earlier and it contains plans for 2025.  The New

16   Combined Network Plan is -- was created later, after the

17   merger agreement was signed, and it contains plans for

18   growth for the year 2027.

19   Q.   Why did you compare the standalone plans to these two

20   combined plans?

21   A.   Well, that's because it allows me to assess merger

22   specificity.  If the two airlines, on a standalone basis,

23   could have achieved the same type of growth -- and by

24   "growth," the metric I'm using here is to evaluate daily

25   departures because that's how they think about it in their

1    network plans.  So if the two firms on a standalone basis

2    could have achieved similar levels of daily departures in

3    future without the merger, then I would describe this

4    claimed efficiency as not being merger-specific.

5    Q.   What did you conclude when comparing the standalone

6    plans to the plans for the combined firm?

7    A.   Well, the results that I describe in this table are as

8    follows.  First of all, I chose three airports -- Fort

9    Lauderdale, Orlando and Las Vegas -- that account for a

10   substantial portion of both JetBlue and Spirit's current

11   networks.  And I also looked at a fourth airport that could

12   be important to their networks in the future.  The results

13   generally showed no systematic difference between the

14   standalone plans and the combined network plans.

15        Take, for example, Fort Lauderdale.  In Fort

16   Lauderdale, the standalone plan -- which, by the way, is for

17   2025 for JetBlue and 2027 for Spirit, so there's a little

18   bit of a year mismatch.  Those were the data the parties put

19   forward.  But for Fort Lauderdale, the standalone plan of

20   210 daily departures is in the range of the two combined

21   network plans.

22        For Orlando and Las Vegas it goes in the other

23   direction.  The Combined Network Plan actually shows a

24   slight decrease relative to the standalone plans.

25        At the fourth airport --

```
 1              THE COURT:  Remind me again where that is?

 2              THE WITNESS:  I could, but it's redacted so I

 3    can't.

 4              THE COURT:  Oh.  Thank you.  And I'll respect

 5    that.  All right.  At the fourth airport?  Go ahead.

 6    A.   So at that fourth airport the comparison goes in the

 7    other direction, but only with respect to the New Combined

 8    Network Plan.  And based on the timing of the -- of

 9    circumstances, I think the reversal in the fourth row could

10    be an artifact of exactly that, the timing.  And by that I

11    mean the standalone plans and the original Combined Network

12    Plan predate the opening of a new terminal at that fourth

13    airport that could account for the upward revision in the

14    New Combined Network Plan.

15              MR. MOORE:  Let's go to the next slide, slide 64.

16              (On screen.)

17    Q.   Dr. Chipty, the Court will hear testimony from Dr. Hill

18    later in this case that JetBlue's growth is a benefit of the

19    merger.  Based on your review of Dr. Hill's opinions, how

20    does his analysis compare to yours?

21    A.   Well, so Dr. Hill uses a different measure.  I was

22    looking at daily departures.  He's looking at nonstop

23    domestic routes.  And he reaches the opposite conclusion.

24    He describes the merger as allowing JetBlue to fly more

25    nonstop domestic routes than it did in 2023.  And he -- I
```

 1   guess I should continue and explain that he does that by

 2   comparing this number, 542, which is shown on this slide,

 3   which is the expected nonstop domestic routes that JetBlue

 4   and Spirit will fly on a combined basis in 2027, to the

 5   number of nonstop domestic routes JetBlue flies in 2023, so

 6   the 199.

 7        The problem with that is Dr. Hill's comparison ignores

 8   Spirit both today and in the future.  So, in other words,

 9   he's comparing the routes served by a single firm today to

10   two firms on a combined basis in the future.  What he should

11   have done is compared what I've highlighted here by the

12   green cells, which is look at the combination of the

13   standalone firms in the future with and without the merger.

14   That comparison would have been a more apples-to-apples

15   comparison capable of identifying a merger effect.  That's

16   the kind of comparison I just showed you looking at daily

17   departures.

18   Q.   Let's turn to the next slide and the next claimed

19   efficiency which is network optimization.  What was your

20   assessment of this efficiency?

21        (On screen.)

22   A.   Well, here JetBlue plans to eliminate about 15 percent

23   of Spirit routes where JetBlue does not currently operate,

24   but that --

25   Q.   And what was your -- sorry, Dr. Chipty.

 1     What was your assessment of that efficiency?

 2  A.   Well, that type of change would presumably make some

 3  consumers on the other routes, where the Spirit planes would

 4  be redeployed, better off, but that change would leave

 5  consumers on the former Spirit routes with fewer options.

 6  So that efficiency cannot offset the harm to consumers on

 7  the exit routes.

 8         MR. MOORE:  Let's move on to the next slide and

 9  the next claimed efficiency.  So this is slide 66.

10         (On screen.)

11         THE COURT:  Excuse me.  But the harm you're

12  talking about is the ability to fly an ultra low-cost

13  carrier on a particular route, isn't that so?

14         THE WITNESS:  It's both the ability to fly as well

15  as the price consequences of having that type of ultra

16  low-cost carrier on the route.

17         THE COURT:  Though by taking the Spirit planes and

18  flying them on what seems to be the most efficacious route,

19  routes, that JetBlue Effect is going to spread to those

20  routes and benefit consumers on those routes.  Isn't that

21  so?

22         THE WITNESS:  So, yes and no.  It is certainly

23  true that JetBlue would then fly either more on some of the

24  routes it currently serves or enter some new routes that it

25  might not be currently serving with those Spirit planes, but

```
1   it wouldn't be with an ultra low-cost carrier, first of all.
2   And, secondly, it would -- and but those entries would not
3   offset the lack of choice and the loss of competition on the
4   former Spirit routes.
5              THE COURT:  All right.
6   Q.   Dr. Chipty, let's go to slide 66.  I want to move on to
7   the next claimed efficiency you evaluated.  What is this
8   efficiency?
9   A.   So this is what JetBlue calls the customer service
10  efficiency.  This is JetBlue's plans to convert the Spirit
11  planes to the JetBlue layout and eliminate the Spirit
12  product.
13  Q.   The Court has heard some testimony that consumers will
14  be better off, and this is going to the discussion you were
15  just having, because the JetBlue product is a higher quality
16  than the Spirit product.  What's your response to that?
17  A.   Well, based on my review of JetBlue's deal modeling, as
18  well as the expert opinion of Mr. Scheff, one of defendants'
19  experts, I find that that change would result in a reduction
20  in Spirit fleet capacity by about 11 percent.  It would
21  allow JetBlue to earn a revenue premium relative to the
22  Spirit product, and it is associated with a contraction in
23  demand by about 12.6 percent based on JetBlue's own
24  estimates on the affected routes.  That would mean the
25  routes that JetBlue would continue to serve with the Spirit
```

```
 1    planes.
 2    Q.   What does this tell you about this claimed efficiency?
 3    A.   Well, if a claimed efficiency arises for or is
 4    associated with things like higher prices, reduced capacity
 5    or output, well, those things are emblematic of increases in
 6    market power and they generally are not considered to be
 7    efficiencies that are capable of offsetting harm.
 8    Q.   Let's turn to the --
 9              MS. BANSAL:  Your Honor, motion to strike to the
10    extent all of that testimony was just relied on the
11    documents themselves.
12              THE COURT:  And also it's a legal conclusion.  And
13    I will strike it.
14              Go ahead, Mr. Moore.
15    Q.   Let's turn to the last claimed efficiency, which is
16    increased utilization of assets.  Have you seen evidence in
17    the record that utilization would increase as a result of
18    the transaction, Dr. Chipty?
19    A.   Well, no.  JetBlue's deal modeling doesn't contemplate
20    an increase in utilization.  I haven't seen it.  And that's
21    consistent with the testimony of Mr. Friedman.
22              MS. BANSAL:  Your Honor, motion to strike.
23              MR. MOORE:  Your Honor, if I may on that point,
24    counsel has now objected several times to striking
25    references to trial testimony.  The parties actually have an
```

```
 1    explicit agreement not to object on that basis.
 2              MS. BANSAL:  Just to clarify, my motion to strike
 3    is on her testimony on relying on the documents themselves.
 4              THE COURT:  If you have an agreement, it seems
 5    that she is relying on the trial testimony.  I'll allow that
 6    to stand.  I don't know what it adds, because I heard the
 7    trial testimony and can draw that inference.  All right.
 8    Q.  Let's go to slide 67, Dr. Chipty.
 9              (On screen.)
10    Q.  So the Court will hear testimony from defendants'
11    expert, Mr. Scheff, later in this case, about utilization.
12    Have you reviewed Mr. Scheff's opinions?
13    A.  Yes, I have.
14    Q.  What is your assessment of Mr. Scheff's opinion that
15    the transaction would increase utilization and thereby
16    increase output?
17              MS. BANSAL:  Your Honor, we object to Dr. Chipty's
18    testimony on fleet utilization and fleet optimization.
19    She's responding to defendants' industry expert but she has
20    no expertise in that area herself.  She's an economist.  And
21    we believe that this is improper testimony.
22              THE COURT:  Well, we may have to see what her
23    basis is but at the moment we're going to let him inquire.
24              MS. BANSAL:  Would you like me to voir dire her,
25    your Honor?
```

 1          THE COURT:  If you'd like to.  And you'll get your

 2    chance, but not at this point.  We'll let Mr. Moore lay a

 3    foundation.  And I'll ask a general question.

 4          Look at the slide on page -- on slide 67.  Now,

 5    how did -- what did you do to come up with these figures

 6    here, this chart?  What did you do?

 7          THE WITNESS:  So, your Honor, this is not my

 8    chart.  This is Mr. Scheff's chart.

 9          THE COURT:  All right.

10          THE WITNESS:  He constructed it and I evaluated

11    the bases for his numbers.  And it's on that evaluation that

12    I have -- have formed an opinion as to whether his analysis

13    actually shows that claimed increases in utilization would

14    offset harm to consumers or, in other words, are capable of

15    showing output expansion.

16          THE COURT:  Right.  And what familiarity do you

17    have with this area?

18          THE WITNESS:  So I am not an industry expert.

19    That's -- that's certainly true.  But I do have extensive

20    experience working with data analyses and data analytics.

21    And a lot of what has happened here is a mechanical exercise

22    which is devoid of some of the fundamental economic issues

23    that -- for example, there are opinions here about

24    increasing utilization, and I questioned whether there would

25    be demand to do so, whether it would be profitable to do so.

 1    And, ultimately, I look at the net result even with the

 2    numbers on their face and I ask does this -- taking the

 3    numbers on their face, is the computation of the net change

 4    in annual seat departures evidence of an improvement that's

 5    capable of benefiting consumers.

 6              THE COURT:  Have you done, in your work in the

 7    past, analysis of charts like this?

 8              THE WITNESS:  Waterfall charts like this, yes, I

 9    have, sir.

10              THE COURT:  Confining yourself to the areas with

11    which you are familiar, you may answer Mr. Moore's

12    questions.

13              Go ahead, Mr. Moore.

14    Q.  Could you walk us through the chart that we're looking

15    at on this slide, Dr. Chipty?

16    A.  Sure.  So the first panel looks at Mr. Scheff's

17    calculation of the changes in seat departures due to

18    aircraft reconfiguration.  And this, again, relates to

19    JetBlue's plans to change the layout of the Spirit planes.

20    And you can see his calculation that this change will result

21    in a significant reduction in annual seat departures.  So

22    that's the single biggest change on this chart.

23         The second panel is where Mr. Scheff evaluates whether

24    increasing -- whether JetBlue's plan to increase the

25    utilization of Spirit planes on days of the week and on --

1   in months of the year where there's relatively low demand,

2   whether that plan could offset some of the reductions in the

3   first panel.

4        And so here I observed that, first of all, JetBlue

5   doesn't seem to have any plans to increase utilization and

6   that's why I began with Mr. Friedman's testimony.  But more

7   than that, as I look at Mr. Scheff's analysis I find this to

8   be a mechanical analysis that has not evaluated the

9   plausibility of increasing Spirit's utilization during

10  periods where there is low demand.  So Mr. Scheff doesn't

11  explain where the demand would come from.  He doesn't

12  explain whether these changes would be profitable for the

13  firm.  But nonetheless that's what this middle panel shows.

14       And then the third panel is what Mr. Scheff calls

15  "Fleet Optimization."  And under this calculation Mr. Scheff

16  asserts that JetBlue -- if JetBlue were to manage the

17  combined fleet, it would be able to change the schedules in

18  a way to free up 15 planes that it could use elsewhere to

19  the benefit of consumers.  And I have evaluated his analysis

20  of fleet optimization and have some problems with that.

21       But my point to start is that even taking his numbers

22  on their face, Mr. Scheff is not able to show an output

23  expansion which would be necessary to conclude that these

24  increases or claimed increases in utilization are

25  efficiencies capable of offsetting harm.

1    Q.   Let's skip a couple slides ahead to slide 70,

2    Dr. Chipty.

3              (On screen.)

4    Q.   You mentioned that you had certain issues with your

5    assessment of Mr. Scheff's analysis of the fleet

6    optimization.  Could you explain what those problems are?

7    A.   Well, so the easiest way to explain is to describe what

8    Mr. Scheff did.  He compared JetBlue and Spirit's actual

9    schedules of their standalone fleets to a modeled schedule

10   of the combined firm.  The problem is that the modeled

11   output, the modeled schedule differs from the actual

12   schedule in many ways apart from a merger effect.

13   Q.   How is that so?

14   A.   Well, as Mr. Scheff explained in his deposition, the

15   model output is usually the beginning of the construction of

16   an actual schedule.  And he explained that the model doesn't

17   reflect demand factors.  He agreed that the model doesn't

18   reflect profitability considerations.  And so -- and that he

19   didn't take the steps to bridge the gap between a modeled

20   schedule and an actual schedule.

21             MR. MOORE:  Could we flip forward a slide.

22   Another slide forward, please.

23             THE COURT:  End up where?

24             MR. MOORE:  We are now at slide 72.

25             THE COURT:  Thank you.

 1               (On screen.)
 2  Q.   Dr. Chipty, could you explain what we're looking at in
 3  this slide?
 4  A.   Yes.  So this slide summarizes the point of my saying
 5  that the modeled schedule differs from the actual schedule
 6  in many practical ways.  And so the point is that the
 7  differences between the actual and modeled schedules, which
 8  Mr. Scheff recognizes, could be due to the ways in which the
 9  model differs from reality, not differences attributable to
10  the merger itself.
11               MR. MOORE:  Let's go to the next slide, slide 73.
12               (On screen.)
13  Q.   How would you go about identifying a merger effect,
14  Dr. Chipty?
15  A.   Well, as a matter of research design, if one is
16  interested in measuring the effect of a change one needs to
17  isolate one change at a time.  Those types of controlled
18  comparisons are more capable of identifying a causal
19  relationship.
20  Q.   Did you investigate what impact this would have on
21  Mr. Scheff's analysis?
22  A.   Yes, I did.  So what I did to probe the extent to which
23  an actual schedule could differ from a standalone schedule,
24  I repeated Mr. Scheff's analysis on the separate fleets for
25  each of JetBlue and Spirit.

1    So, in essence, I compared what's on this slide in

2    terms of the first and second cells.  So by repeating his

3    exercise on the separate fleets I was able to compare the

4    actual schedules on the separate fleets to the modeled

5    schedules on the separate fleets as a validation exercise.

6    And I found that even on the separate fleets, the actual

7    schedule differed from the modeled schedule.  That tells me

8    that the effects that Mr. Scheff measures between the actual

9    schedules on the standalone fleets and the modeled schedule

10   of the combined fleet are -- the differences are due, at

11   least in part, to the -- to the methodology that he used in

12   constructing his comparison, not to an actual merger effect.

13          MR. MOORE:  Let's go to the next slide, slide 74.

14          (On screen.)

15   Q.   What's your assessment of the overall effect that

16   Mr. Scheff estimates?

17   A.   Well, as I said, even taking the numbers of this

18   waterfall chart on their face, Mr. Scheff is not able to

19   show an increase in output.  And even then, if one were to

20   consider the effect of fleet rationalization on output, the

21   effect would be even bigger.

22   Q.   What do you mean by "fleet rationalization"?

23   A.   Well, by fleet rationalization I'm referring to

24   JetBlue's plans to taper the growth of the combined firm to

25   5 percent.  The documents that I reviewed refer to this

```
 1   tapering as fleet rationalization.  JetBlue planned to
 2   accomplish this by acquiring fewer aircraft relative to
 3   Spirit's standalone financial plan.
 4            MR. MOORE:  Let's go to the next slide, slide 75.
 5            MS. BANSAL:  Your Honor?
 6            THE COURT:  Yes?
 7            MS. BANSAL:  We move to strike her testimony on
 8   this slide.  She has no experience in this.  I believe she's
 9   testifying outside the scope of her expertise.
10            THE COURT:  There's some merit to that, but I
11   won't strike it.  It goes to the weight.
12            MS. BANSAL:  Thank you, your Honor.
13            THE COURT:  Go ahead, Mr. Moore.
14            MR. MOORE:  Thank you, your Honor.
15            (On screen.)
16   Q.   Dr. Chipty, could you explain what we're looking at on
17   this slide?
18   A.   Yes, on this slide I describe what the import is of
19   accounting for fleet rationalization, so reflecting
20   JetBlue's and Spirit's differential incentives on the
21   management of the Spirit fleet.  If Mr. Scheff had evaluated
22   the additional impact of this change on overall output, as
23   he measures it, he would have found a significantly bigger
24   reduction in overall net output as he measures it.
25            MR. MOORE:  Let's go to the next slide, slide 76.
```

```
 1            (On screen.)
 2    Q.   Have you reached any other conclusions about
 3    Mr. Scheff's opinions?
 4    A.   Well, Mr. Scheff offers three additional claims about
 5    increased utilization, and I reviewed each of those claims
 6    and observed that he doesn't provide any quantification of
 7    these.  And so there is no basis to conclude that these
 8    claims would ultimately benefit consumers.
 9            MR. MOORE:  Let's move on to the next slide,
10    slide 77.
11            (On screen.)
12    Q.   Dr. Chipty, could you summarize your opinions regarding
13    the claimed efficiencies by defendants?
14    A.   Yes.  So I considered each of the seven claimed
15    efficiencies within the rubric of the Horizontal Merger
16    Guidelines, which explain that for efficiency to be credited
17    and capable of offsetting harm caused by a merger, it has to
18    satisfy three standards:  Is it merger specific?  Is it
19    verifiable?  And does it arise from anticompetitive
20    reductions in output or service?
21        As you can see, this slide summarizes my assessment of
22    each of these by each criteria.  First of all, none of the
23    efficiencies or -- none of the claimed benefits to consumers
24    have been quantified by the defendants or their experts.  So
25    I concluded none of them were verifiable.  Four of the seven
```

```
1    appear to be merger-specific.  Where they are
2    merger-specific, they're also associated with increases in
3    price, decreases in quantity or capacity, all of which are
4    emblematic of increases in market power.
5         And so I concluded overall that none of these are
6    capable of offsetting harm caused by -- harm caused by the
7    merger to consumers in the affected routes.
8    Q.   Thank you, Dr. Chipty.
9         MR. MOORE:  Your Honor, I have no further
10   questions for Dr. Chipty.  However, we would like to move in
11   a few 1006 exhibits.  We have a list for the Court.
12        THE COURT:  And are they by agreement?
13        MR. MOORE:  Most are but not all of them.
14        THE COURT:  Well, the ones that are, are admitted,
15   and they'll have the numbers that you give them.  And give
16   that to the clerk.  The ones that are objected to, pass up
17   to me.
18        And, Ms. Bansal, you may inquire.  I take it you
19   wish to inquire?
20        MS. BANSAL:  Sorry, your Honor.  Would you like to
21   hear my objections to the exhibits or --
22        THE COURT:  No.  I'm always delighted to hear you,
23   but now I want to hear your cross-examination of the
24   witness.
25        MS. BANSAL:  Thank you, your Honor.  We will
```

```
 1   proceed expeditiously.
 2           THE COURT:  And while we're doing that, can
 3   someone -- you've identified them.  Can someone give me
 4   copies of these documents to which objection is made?
 5           MR. MOORE:  Yes, your Honor.  I believe your
 6   binder should have all of these exhibits behind the
 7   demonstrative slides.
 8           THE COURT:  All right.
 9           MR. MOORE:  And they're all identified by the
10   exhibit letters.
11           THE COURT:  Thank you.
12           MR. MOORE:  And on the paper we just gave you, the
13   unobjected to ones are above the gray line and the --
14           THE COURT:  And they will have the numbers that
15   you set forth there.
16           And, Ms. Bansal, you may inquire.
17           MS. BANSAL:  Thank you, your Honor.
18                         CROSS-EXAMINATION
19   BY MS. BANSAL:
20   Q.   Good afternoon, Dr. Chipty.
21   A.   Good afternoon.
22   Q.   Now, earlier you testified that none of your prior
23   opinions have been excluded in court; is that correct?
24   A.   That's correct.
25   Q.   But a federal judge has found your opinions to be
```

```
 1    unreliable; is that correct?
 2    A.    I'm not sure what you're referring to.
 3    Q.    So were you a testifying expert for Qualcomm in the FTC
 4    versus Qualcomm case?
 5    A.    Yes, I was.  I mentioned that at the start.
 6    Q.    And in that case you were representing Qualcomm;
 7    correct?
 8    A.    Yes, I was.
 9    Q.    And that was in the northern district of California;
10    correct?
11    A.    That's correct.
12    Q.    And after that bench trial, Judge Koh found that your
13    opinions were not reliable; correct?
14    A.    It is true that Judge Koh found against Qualcomm in
15    those cases, but then the appellate court reversed on all of
16    the substantive issues.
17    Q.    The Ninth Circuit did not reverse on their finding that
18    your opinion was unreliable; correct?
19    A.    So I'm --
20          MR. MOORE:  Objection, your Honor.
21    A.    -- I'm not a lawyer --
22          THE COURT:  Well, wait a minute.  I can take --
23    the question is exactly what the judge said in her opinion.
24    I'll take a look at it.  Someone give me the citation to it.
25          MS. BANSAL:  Your Honor, it's 411 F. Supp. 3d 658
```

 1   Northern District of California 2019.

 2           THE COURT:  Thank you very much.  I'll take a look

 3   at it.  Let's move on.

 4   Q.   Now, Dr. Chipty, you agreed that one consideration for

 5   an airline when they're contemplating entry is how well that

 6   new route will fit in the airline's network; correct?

 7   A.   Yes, I agree with that.

 8   Q.   And you agree that one reason that an airline may enter

 9   a route is because it fits the network's strategy, the

10   airline's network strategy; fair?

11   A.   Yes, I think that's right.

12   Q.   And indeed it's your view that airlines decide which

13   routes to operate based on sophisticated systemwide network

14   optimization; correct?

15   A.   That's my understanding.

16   Q.   And it's your opinion that airlines do not make entry

17   decisions on a simple route-by-route basis; fair?

18   A.   That's correct.  The evidence I reviewed suggest there

19   are layers of consideration.  There's the route level,

20   there's the endpoint level, and then there's the overall

21   network strategy.

22   Q.   But fair that you do not believe airlines make entry

23   decisions on a simple route-by-route basis?

24   A.   No, not simple, but route-by-route consideration is

25   certainly there.

1    Q.   All right.  So why don't we take a look at your report

2    at paragraph 50.

3    A.   Give me one second.  I'll try to find it.

4    Q.   I believe that's in the binder -- do you have your

5    report, Dr. Chipty?

6    A.   I think I might.  Give me a second.

7    Q.   Okay.  Thank you.

8            (On screen.)

9    A.   The opening report?

10   Q.   Yes, your opening report at paragraph 50.

11   A.   I'm there.

12           MS. BANSAL:  And, your Honor, that's page 41.

13           THE COURT:  Thank you.

14   Q.   And do you see after the semicolon in that

15   second-to-last sentence you say, "For this reason, airlines

16   do not make entry decisions on a simple route-by-route

17   basis.  Rather, airlines decide which routes to operate

18   based on sophisticated systemwide network optimization"?

19   A.   Right.  I think that's consistent with what I just said

20   to you.

21   Q.   And so --

22           MS. BANSAL:  We can take that down.

23   Q.   So as a result, one of the things that you evaluated in

24   your report was whether there was a prospect for ULCCs to

25   replace Spirit capacity on a nationwide basis; correct?

1    A.   I did the nationwide calculation.  I also did

2    calculations on different route -- combinations of routes.

3    And I explained the two bookend each other in the sense that

4    the nationwide was a very conservative calculation for my

5    purposes.

6    Q.   And so you looked at the nationwide fit and then you

7    used that to determine whether some subcategories of routes

8    may also be impacted; correct?

9    A.   I'm sorry.  Could you repeat that?

10   Q.   Yes, sure.  So I believe what you're testifying is that

11   you studied entry on a nationwide level and then used your

12   conclusions from that to look at whether there was entry on

13   a subset of routes; is that fair?

14   A.   No, I wouldn't characterize it that way.  I -- you're

15   connecting the two.  And what I testified to earlier was

16   that I did the nationwide, and that was agnostic of where

17   the entry would occur.  And then I did the route level, and

18   not just route level but combinations of route levels.  And

19   those calculations were different because they assumed that

20   the carrier, whether Allegiant, Frontier or whoever else,

21   would continue to serve their other routes.

22        So they're related but they're not built off of each

23   other.

24   Q.   Okay.  Thank you for that clarification.  Maybe I can

25   just ask the question slightly differently.

1        You did not look at entry for each individual route in

2   which Dr. Gowrisankaran has alleged harm; is that fair?

3   A.   That's correct.

4   Q.   Okay.  Thank you.

5        And Dr. Gowrisankaran, he defines the relevant markets

6   in this case at the city-pair route level; right?

7   A.   That's my understanding.

8   Q.   And were you here for his testimony yesterday?

9   A.   I -- well, I -- for part of it I was here yesterday,

10  the other part I listened to on video.

11  Q.   Okay.  And you heard him testify that even his

12  route-level harm analysis wasn't as precise at the route

13  level?  You heard that; correct?

14  A.   I'm sorry.  Please repeat that?

15  Q.   You heard Dr. Gowrisankaran testify that his harm

16  analysis wasn't as precise at the route level; correct?

17  A.   That may have been what he said, but I -- I can't

18  recall exactly what he said.

19  Q.   Would you like to look at his testimony?

20  A.   We could.  I can't speak to his opinion, so, but I'm

21  happy to look at it.

22  Q.   And that's fair --

23            MR. MOORE:  Objection, your Honor.

24            THE COURT:  Well, this is cross-examination.  I'm

25  going to give her some latitude.

1    Q.   That's fair, Dr. Chipty.  I'm not asking you to opine

2    on his opinions, I'm just asking if you heard the testimony?

3    A.   I did hear his testimony.  I don't recall his exact

4    words.  So if you're representing that he said that --

5             THE COURT:  Well, in substance, that's what I

6    heard so go ahead from there.

7             MS. BANSAL:  All right.  Thank you, your Honor.

8    Q.   And --

9             THE COURT:  He said other things as well, but he

10   did say that.  Go ahead.

11   Q.   And I believe you testified earlier with DOJ counsel

12   that assessing entry at the route level also requires some

13   caution, right, because airlines don't make entry decisions

14   on a simple route-by-route basis; correct?

15   A.   I would agree with that statement, yes.

16   Q.   And I believe one of the risks that you mention in your

17   report is that if we credit an airline's entry on a harmed

18   route, then we may risk exit from another nonharmed route;

19   fair?

20   A.   I don't think that's fair.  I don't think that's right.

21   I don't -- my understanding of Dr. Gowrisankaran's opinion

22   is that there would be harm on all Spirit routes.  So I

23   think --

24   Q.   I'm sorry.  I'll clarify the question.  So my question

25   is not about what Dr. Gowrisankaran said.  So I'm now saying

1    what your opinion is.  And I'm asking if one of your

2    concerns about crediting entry at the route level is that if

3    we credit entry at the route level of a harmed route, then

4    we may risk exit on a nonharmed route?

5    A.    Not quite.  I would describe it as if you are going to

6    look route-by-route at the prospect of an entry, then you

7    also need to bear in mind the consequences of that on other

8    routes.

9         Part of the advantage of doing some of the route -- the

10   combination of route-level analyses I did is that I

11   calculated the net entry that would be necessary assuming,

12   for example, on routes involving Boston, that the entrant

13   ULCC would continue to serve their former routes.  So that

14   handles the concern about harm to consumers on one route

15   cannot offset -- excuse me -- benefits to consumers on some

16   routes cannot offset harms to consumers on other routes.

17   Q.    Okay.  So why don't we look at your testimony and just

18   make sure we're clear on this point.

19        MS. BANSAL:  So if we could pull up the deposition

20   testimony from 184 line 16 --

21   A.    Is that in my binder somewhere?

22   Q.    It is in your binder.

23        (On screen.)

24        MS. BANSAL:  And, your Honor, I believe it's in

25   your binder as well, but if it's not we can pass it up.

```
 1              THE COURT:  No, no, I have it.
 2   Q.   And so here --
 3   A.   I'm sorry, Ms. Bansal.  I don't have the deposition
 4   binder.
 5   Q.   We'll pass it up.
 6              (Handing.)
 7   A.   Thank you.  And what page is this?
 8   Q.   This is page 184.  And the question starts at line 16.
 9   So here you see that you were asked -- I'm sorry.  Are you
10   with me?
11   A.   Yes, I got there.  Thank you.  Thank you for waiting.
12   Q.   All right.  So you were asked:
13        "QUESTION:  You did not analyze on a route-by-route
14   basis the collective threat that other airlines had to enter
15   each relevant antitrust market if there was competitive harm
16   from the merger; correct?"
17        And your answer is:
18        "ANSWER:  Well, as I've explained that on a
19   route-by-route basis you will risk studying the prospect of
20   entry that comes at the expense of exit somewhere else."
21        Do you see that?
22   A.   Yes, I see that.
23   Q.   And so that's -- and you agree with that testimony?
24   A.   Yes.  Yes, I do.
25              MR. MOORE:  Your Honor, we object to the extent
```

1    the entire answer has not been read into the record.

2              THE COURT:  The entire answer may be read.

3              Read your whole answer to me.

4              THE WITNESS:  Oh, to you, out loud?  Okay.

5              THE COURT:  Out loud.

6              THE WITNESS:  "Well, as I've explained that on a

7    route-by-route basis you will risk studying the prospect of

8    entry that comes at the expense of exit somewhere else.  So

9    one way to study entry is to see if there's prospect to

10   replace capacity network-wide, which would then get

11   deployed.  And then later -- and then layer on, which is

12   what I did, a consideration of specific network fit to see

13   if there are likely to be entry possibilities on specific

14   routes."

15   Q.   Thank you.  And so we'll just go back to my original

16   question, which is:  One of the risks that you had

17   identified is that you will, if you credit the entry on one

18   route, a harmed route, that may come at the expense of a

19   nonharmed route; correct?

20   A.   Yes, I agree with that.  I'm just not sure I like -- I

21   wouldn't agree with your use of harmed and nonharmed routes.

22   But except for that, yes, I have no problem with the general

23   characterization.

24   Q.   And so, Dr. Chipty, you would agree with me -- you

25   would agree with me that your analysis takes into account

1    harms outside of the relevant market; is that fair?

2    A.   Well, all of -- this is why I was trying to explain.

3    All of these are relevant markets.  And my point is, for the

4    trier of fact, how does one do that balancing.  Economists

5    don't have a way of balancing benefits to one group that

6    come at the expense of harms to another group.

7    Q.   So is the answer to my question no?  Would you like me

8    to repeat the question?

9    A.   Yes, please do.

10   Q.   Your analysis takes into account alleged harms outside

11   of the relevant market; correct?

12   A.   My analysis, correct, recognizes that you cannot offset

13   benefits to one group -- you cannot offset harms to one

14   group with benefits to another group.

15   Q.   All right.  Dr. Chipty, if we can look at Exhibit 7 of

16   your reply report?

17   A.   Let me just get to it.

18   Q.   So I just want to make sure that I understood your

19   answer to my last question.  Your analysis takes into

20   account alleged harms outside of the relevant market?

21            MR. MOORE:  Objection.  Asked and answered.

22   Q.   It's a "yes" or "no" question, Dr. Chipty.

23            MR. MOORE:  Same objection.

24            THE COURT:  No, overruled.  If she understands it,

25   she may answer.

```
 1    A.   I think I'd give you the same answer.  I'm not taking

 2    account of harms, I'm explaining that the benefits to one

 3    group of consumers on one set of routes can't offset the

 4    harms to other groups of consumers on another set of routes.

 5    Q.   Including if those routes were outside of the relevant

 6    market; correct?

 7    A.   So that's the part I don't understand.

 8    Q.   All right.  Dr. Chipty, why don't we just go back and

 9    look at your deposition testimony.

10    A.   Okay.

11              MS. BANSAL:  Pull up 186 line 20.

12          (On screen.)

13    A.   Okay.  I'm there.

14    Q.   The question is:

15          "QUESTION:  So you're saying that impacts from the

16    merger on routes that are not relevant antitrust markets are

17    relevant to the merger analysis?"

18          Do you see that?

19    A.   Yes, I see the question.

20    Q.   And then you see where you say:

21          "THE WITNESS:  I think in that case you would have a

22    series of potentially out-of-market harms."

23          Correct?

24    A.   Yes, I see that.  I don't recall the full context of

25    it, but the way the question is phrased that's the answer I
```

1    gave.

2              MR. MOORE:  And, your Honor, again objection to

3    reading only a portion of the answer.

4              THE COURT:  In this case I don't see the necessity

5    of reading the entire answer.  Go ahead.

6              MS. BANSAL:  I'm sorry.  If we could just keep

7    that up.  Could we zoom back in?

8              (Whereupon counsel conferred.)

9    Q.   Okay.  If you see at line 7 --

10   A.   On what page?

11   Q.   I believe this is 187 line 7.  "But there would be harm

12   in those markets because the merger made it more attractive

13   for the other airlines to leave the routes that they were

14   serving, in your hypothetical, to chase those profit

15   opportunities created by the merger."

16   A.   Yes, I see those words.

17   Q.   Okay.  So would you agree that your analysis takes into

18   account harms outside of the relevant market?

19   A.   So I think --

20   Q.   Dr. Chipty --

21   A.   All of those markets are relevant markets, according to

22   Dr. Gowrisankaran.  And this is a hypothetical, Ms. Bansal.

23   But, yes, I agree that to the extent that a merger creates

24   harm in some relevant markets, benefits in other relevant

25   markets, at least as an economist, can't just be added up so

1    neatly.

2    Q.   And in this answer you talked about out-of-market

3    harms; correct?

4    A.   Yes.  It's in response to a hypothetical.

5    Q.   Okay.  All right.  I'll move on.

6         Let's move to Exhibit 7 in your reply report.

7              (On screen.)

8    A.   Give me one second.

9    Q.   And we have this on the screen.  This is what's in your

10   report, but you'll see that we've added numbers to the

11   left-hand side to make it easier for -- easier to navigate.

12        Now, this is a list of the 51 nonstop presumption

13   routes identified in Dr. Gowrisankaran's report; correct?

14   A.   Yes, that's right.  They look to be.  Can you just tell

15   me what page of my report this is?

16   Q.   Sure.  It's page 34 of your reply report.

17   A.   Okay.  Thank you.

18   Q.   Okay.  And you see that there's four columns here at

19   the top?

20   A.   I do.

21   Q.   And the first one is the route.  The second one says,

22   "Potential ULCC Entrant at One Endpoint," the second one

23   says "Potential ULCC Entrant at Both Endpoints," and the

24   third one says, "ULCC Currently Present."  Do you see that?

25   A.   Yes, I do.

1    Q.   So let me ask you some questions about this.  So for

2    the second and third columns, when you're saying there is a

3    potential entrant, you're defining presence as an airline

4    that flies at least five daily routes out of the endpoint;

5    correct?

6    A.   Yes, based on the analysis I presented to the Court

7    earlier.

8    Q.   And this last column, "ULCC Currently Present," that

9    means that airlines in that column already serve the route;

10   right?

11   A.   That's correct.

12   Q.   Now, do you remember in your deck on slide 9 you said,

13   "The best way to offset harm to competition is with entry

14   and expansion of other ULCCs that focus on no frills,

15   unbundled service like Spirit"?

16   A.   That's correct.

17   Q.   And you're aware that the three legacy carriers,

18   United, American, Delta, they offer an unbundled fare

19   product?

20   A.   Yes, I'm aware of that.

21   Q.   And did you -- you heard the testimony of Spirit's CEO,

22   Mr. Christie, that the legacies' basic economy products

23   compete directly with Spirit's ULCC offering?  Do you

24   remember that?

25   A.   I don't remember his exact testimony, but there may

1   have been something close to those words, yes.

2   Q.   But directionally you agree with the sentiment?

3   A.   Yes, directionally I think he said something like that.

4   Q.   And you heard him testify that Spirit identifies basic

5   economy in their 10-K as a competitive product to Spirit?

6   Did you hear that?

7   A.   I'm sorry.  Could you say that again?

8   Q.   Sure.  You heard Mr. Christie testify that Spirit puts

9   basic economy in their 10-K as a competitive product?

10  A.   I'm not sure.  I don't recall.  You'd have to show me

11  that testimony.

12  Q.   All right.  Let's bring up Christie deposition

13  transcript page 12 -- I'm sorry, trial testimony, page 12.

14  This is line 23.  And the -- your answer goes on to the next

15  page.  So it says:

16       "QUESTION:  Why does Spirit include that information in

17  its risk section of its 10-K?"

18       And he says:

19       "ANSWER:  Well, we identified this product as a

20  competitive product to ours and so we're alerting our

21  shareholders to the risk that this product, um, can be an

22  excursion upon our market."

23       Do you see that?

24  A.   Yes, I do.  Thank you.

25  Q.   And you heard the testimony of Frontier's CEO,

 1   Mr. Biffle, testify that the legacies compete with Frontier

 2   through their basic economy product; correct?

 3   A.   Yes, I think he said that.

 4   Q.   And so that would be at least two CEOs of two ULCCs

 5   testifying that their airlines compete with basic economy;

 6   right?

 7   A.   Yes.  But I believe Mr. Christie also explained that --

 8   Q.   With all due respect, Dr. Chipty, I'm sorry.  Just if

 9   you could please just answer the question.  I know you're

10   trying to be helpful, I do, but we just -- we're all trying

11   to get to Thanksgiving.

12              MR. MOORE:  Objection, your Honor.

13              THE COURT:  Well, no, her -- the testimony she's

14   given is -- may stand but we'll stop it at that point and

15   let Ms. Bansal inquire.

16              MS. BANSAL:  All right.  So we'll go back to

17   Exhibit 7.

18              (On screen.)

19   A.   Okay.

20   Q.   Now, you don't see United, American or Delta or their

21   basic economy services reflected here; correct?

22   A.   That's correct.

23   Q.   And you haven't studied the impact of entry by

24   American, Delta or United's basic economy offerings anywhere

25   in your report; correct?

A.   No, I disagree with that.  It's one of the possible

reasons for downward adjusting when considering growth

rates.  As I explained, there are reasons to consider that.

And if you consider the amount of basic economy service

offered by the legacies, and also by JetBlue, the totality

of that doesn't amount to more than 25 percent in the market

today.  And so you could consider that in the context of the

adjustment factors, if your Honor uses that rubric that I

set up.

Q.   So, Dr. Chipty, you believe that you have studied the

impact of those three carriers' basic economy services in

your report?  That is your testimony?

A.   My testimony is that it -- my framework allows for the

possibility that replacement by the ULCCs need not be one

for one.  And you've described one of the factors that might

lead to a downward adjustment.

Q.   And would you -- you didn't study the competitive

significance of those legacy carriers and their basic

economy fares; correct?

A.   No.  I think that's Dr. Gowrisankaran's provenance.  I

studied the question of entry and he studied the importance

on competitive effects.

Q.   And you also don't see any international ULCCs in this

Reply Exhibit 7; correct?

A.   That's correct.  These are the domestic ULCCs.  But my

1    report did consider the foreign airlines and their presence

2    on these routes, and I found them to be all domestic --

3    excuse me, all foreign airlines account for very low share

4    of these 51 routes.  And that would mean the foreign ULCCs

5    account for an even smaller share.  All total, including

6    non-ULCCs, your Honor, I estimated to have about a

7    3 percent --

8    Q.   Dr. Chipty?

9            THE COURT:  No.  This is going to go faster if --

10   listen to her questions.  And she's framing them so,

11   theoretically, they can be answered yes or no, which she's

12   entitled to do on cross-examination.  If a complete and

13   honest answer is yes or no, answer yes or no.  If you can't

14   answer yes or no, say, That can't be answered yes or no.

15   Then it's up to her to decide whether she wants you to

16   explain.  Always you can say, I don't know, or, I don't

17   remember.  And that's the rule.  And you're going on and

18   giving your explanation in light of her question.  Mr. Moore

19   will have a further chance, perhaps.  Go ahead.

20   Q.   All right.  So you don't see any international ULCCs

21   listed here; correct?

22   A.   No, for the reason I just explained.

23   Q.   All right.  So I'm going to direct you to row 9.

24           MS. BANSAL:  And, in fact, if we could zoom in so

25   that she can see the full exhibit on the screen.

1    Q.   All right.  So there's 51 presumption routes listed

2    here.  And do you see that row 9 is the only row in which

3    there's no ULCC in one of the three columns to the right?

4    A.   Yes, I see that.

5    Q.   And you heard Spirit's VP of network planning,

6    Mr. Kirby, testify that Spirit has exited the Boston-to-New

7    Orleans route; correct?

8    A.   That's correct.

9    Q.   So this row would come off the chart, yes?

10   A.   I think so, yes.

11   Q.   And you heard Dr. Gowrisankaran yesterday testify that

12   there's a number of other routes that have come off this

13   list; right?

14   A.   Yes, he did.

15   Q.   And I won't go through all of the changes, but you're

16   also aware that there's been some ULCC entries on some of

17   these routes; correct?

18   A.   Yes, that's correct.

19   Q.   And you're aware that today, Dr. Chipty, Avelo has a

20   base in Orlando at the MCO airport; correct?

21   A.   I -- I can't recall for certain, but it's possible.

22   Q.   Does that sound right to you?

23   A.   It could be.  But I -- I'd rather not testify

24   affirmatively.

25   Q.   Do you have any reason to dispute that?

```
1              THE COURT:  Well, I think her answer is
2   satisfactory.  Move on.
3              MS. BANSAL:  Okay.
4   Q.   And you're aware that Avelo flies more than five routes
5   out of MCO today?
6   A.   I, sitting here, I don't know one way or the other.
7   Q.   Okay.  You reviewed Trevor Yealy's testimony in
8   preparation for writing your report; correct?
9   A.   I did.
10  Q.   Okay.
11             MS. BANSAL:  So let's pull up Mr. Yealy's
12  testimony.  And this is page 55 of Yealy's deposition
13  testimony.
14  Q.   Let me ask you this while we're waiting for that.  If
15  it is correct that Avelo flies more than five routes out of
16  Orlando's MCO, you would expect to add that to your first
17  column in your chart; correct?
18  A.   Yes, if they would show up in the data today.  The
19  analysis is always done at a point in time.  And so this is
20  the distinction between a point in time and prior points in
21  time or historical trends.  So it's certainly possible that
22  today it would be changed one way or another, but I have no
23  reason to see it change systematically.
24  Q.   So my question is if Avelo flies more than five routes
25  out of MCO, and you did this chart today, you would expect
```

 1   to see them in that first column; correct?

 2   A.   If what you're representing is correct then, yes, they

 3   would have shown up in that first column.  But that first

 4   column is Dr. Hill's column.  I have -- and my analysis and

 5   opinion have pointed to the middle column.

 6   Q.   Well, you included that first column in this report;

 7   correct?  In this exhibit, correct?

 8   A.   Yes, as a response to Dr. Hill's figure 100.

 9   Q.   Okay.  Thank you.  So can you -- I will represent to

10   you that there are 11 entries here on this Reply

11   Exhibit 7 that have Orlando on one or both -- I'm sorry, on

12   the origin or destination.  So if Avelo flies five times out

13   of MCO, you would expect to see them in that row eleven

14   times; correct?

15   A.   Yes.  And that's the column Dr. Hill prefers, but my

16   analysis --

17   Q.   Dr. Chipty, please.  That is not the question that I've

18   asked you.  So if you could just limit your responses to my

19   question we'll all get out of here a lot sooner.

20           MS. BANSAL:  All right.  We can take that down.

21   Q.   Dr. Chipty, I think you spoke earlier with the DOJ

22   counsel about your regression, correct, that you ran

23   studying the relationship between presence at one or both

24   endpoints and entry; correct?

25   A.   So I didn't actually discuss the regression, I

1   discussed the descriptive analysis.

2   Q.   So you discussed sort of the data that went into the

3   regression; fair?

4   A.   That's correct.

5   Q.   And you showed us that chart on, I believe it was

6   slide 33, with the rate of entry?

7   A.   Yes, yes.  I assume that's 33.

8   Q.   And you agree with me that one of the notable results

9   of your regression is that ULCCs are more likely to enter a

10  route when they have presence at one or both endpoints;

11  correct?

12  A.   I think there's a hierarchy: both is better than one,

13  one is better than none.

14  Q.   Okay.  But the notable results from your regression is

15  that ULCCs are more likely to enter a route when they

16  already have a presence at one or both endpoints?  That's

17  what's in your report; correct?

18  A.   Yes, and the follow-on is --

19  Q.   I have not asked you about a follow-on, Dr. Chipty.

20       And what that means is that an airline's presence at

21  one or both endpoints is highly correlated with the decision

22  to enter a route; correct?

23  A.   Statistically correlated, in an economic sense, both is

24  better.

25  Q.   And you agree that all of the results, so one endpoint,

```
 1    two endpoints, all of those had a statistical significance
 2    at a 1 percent threshold; correct?
 3    A.   Yes.  They were precisely estimated.  But the economic
 4    effects of both are stronger.
 5    Q.   And 1 percent is a high level of statistical
 6    significance; correct?  Higher than 5 percent or 10 percent?
 7    A.   Yes.
 8             MS. BANSAL:  Now, if we can just pull back up
 9    Reply Exhibit 7.
10             (On screen.)
11    Q.   What your regression tells us, with statistical
12    significance, is that every airline in this second column is
13    more likely to enter this route than if it had zero
14    presence, yes?
15    A.   Yes.
16    Q.   Now, this regression does not assess entry over time?
17    There's no time variant involved?
18    A.   There are no time-varying controls, if that's what
19    you're asking.
20    Q.   That is.  Thank you.
21         And this regression, it excluded airlines that were
22    already present on the route; right?  Because you
23    definitionally can't enter a route you're already on; fair?
24    A.   That's correct.  That's correct.
25    Q.   And so while we see it here in Reply Exhibit 7, those
```

1    incumbents weren't actually put into the regression;

2    correct?

3    A.   That's correct.  This was an entry analysis, not an

4    expansion analysis.

5    Q.   Great.  That was my next question.  So we can't use the

6    regression to really understand anything about expansion;

7    correct?

8    A.   I would agree with that.

9    Q.   And your regression, it used data from ordinary-course

10   entry; correct?

11   A.   I'm not sure how you're using the term.

12   Q.   What I mean by that is you studied entry over a period

13   of time, but it wasn't as if you studied entry after some

14   event or some change in competitive dynamics?

15   A.   I would agree with that.

16   Q.   All right.  So if you'll just go back to the chart that

17   was on slide 33 of your presentation from earlier.

18            (On screen.)

19   A.   Okay.

20   Q.   Now, this shows route entry decisions by Spirit,

21   Frontier, Allegiant and Sun Country, correct, over a

22   5 1/2-year period of time?

23   A.   That's correct.

24   Q.   And the source of this data, this is the data that went

25   into your regression that we just discussed; right?

1    A.    Well, this is a descriptive table of the underlying

2    data that went into the regression.

3    Q.    Okay.  Thank you.  So this table also excludes the

4    incumbents; correct?

5    A.    That's correct.

6    Q.    And you noted that this table does not include Breeze

7    and Avelo because they entered towards the end of your study

8    period; fair?

9    A.    That's correct.  They entered beginning in Q1 2021, so

10   there wasn't a bunch of time to observe them.

11   Q.    And if you had included Breeze and Avelo, starting when

12   they entered in Q1 2021, for the last year and a half of

13   your analysis every route that one of those two airlines

14   entered would be a new entry event; correct?

15   A.    Not necessarily, because this traces entry

16   quarter-by-quarter.  And even coming in in late -- mid to

17   late 2021 there would have been additional quarters.  So not

18   all entry -- not all -- no, I take that back.  Sorry.  Sure.

19   I'll agree with that.

20   Q.    Okay.  So these Breeze and Avelo entry events are not

21   included here for the reason you explained?

22   A.    Yes.  But I have looked at that sensitivity, and

23   including Breeze and Avelo doesn't change the general

24   pattern of these results.

25   Q.    Okay.  But my question is those entry events are not

1   included in this table?

2   A.   No, not in this table.

3   Q.   And so what this chart shows us, Dr. Chipty, is that

4   over a 5 1/2-year period of time there were a total of 4,701

5   entry events; correct?

6   A.   That's correct.

7   Q.   So that means over 5 1/2 years one of these four ULCCs

8   entered a route 4,701 times; correct?

9   A.   Yes, 4 percent of the total.

10  Q.   And if we added Breeze and Avelo that number would be

11  even higher; correct?

12  A.   That's correct.

13  Q.   Okay.

14        MS. BANSAL:   We can take that down.

15        (Whereupon counsel conferred.)

16  Q.   Now, you spoke earlier with your counsel about Spirit's

17  scale, and you included Spirit's route map in your report.

18  And that's slide 8 of your deck; right?

19  A.   Yes.  Yes, it is.

20        (On screen.)

21  Q.   And you also included in your report the route maps of

22  each domestic ULCC; correct?

23  A.   I did.

24  Q.   So that would be the maps of Frontier, Sun Country,

25  Avelo, Allegiant and Breeze; correct?

```
 1   A.   I'm sorry.  Did you say in my deck or in the report?

 2   Q.   I'm sorry.  In your report.

 3   A.   Yes, in the report, not in the deck.  Yes.

 4             MS. BANSAL:  All right.  If we could look at what

 5   is Chipty Demonstrative C.  And for your Honor we've

 6   actually --

 7             THE COURT:  I have it.

 8             MS. BANSAL:  -- given large copies as well.

 9             THE COURT:  I appreciate it.

10             (On screen.)

11   Q.   All right.  So page 1 of this demonstrative, this is

12   Spirit's map.  Now, if we could turn to page 2, this is

13   Avelo's map from your report compared to Spirit's map.  You

14   see that?

15   A.   Yes, I do.

16   Q.   And your report doesn't identify how many routes Avelo

17   flew during this period, but would it surprise you to know

18   that was roughly 35 routes?

19   A.   No, that would sound about right.

20   Q.   All right.  And page 3, which is Breeze's map compared

21   to Spirit, and would it surprise you to know that Breeze

22   flew 82 routes during this period of time?

23   A.   I don't know the number but it sounds about right.

24   Q.   And page 4, this is the Sun Country map compared to

25   Spirit.  Would it surprise you to know that Sun Country flew
```

1    107 routes during this period?

2    A.   I don't have a reason to agree or disagree.  Could be.

3    Q.   All right.  Page 5, this is Allegiant's map compared to

4    Spirit.  And based on your backup data, would it surprise

5    you that Allegiant served 631 routes during this period?

6    A.   It's possible it could and, as I explained, different

7    kinds of routes.

8    Q.   And then page 6, this is Frontier's map compared to

9    Spirit.  And based on your backup data would it surprise you

10   to know that Frontier served 437 routes during this period

11   of time?

12   A.   No, it wouldn't.  And, again, different nature.

13   Q.   I'm sorry?

14   A.   I said and, again, a different nature of their flying

15   on those routes.

16   Q.   Okay.  Mr. Moore can ask you about that.

17        Now, I'm not going to put you on the spot and make you

18   do math, but that is a total of roughly 1,292 routes.  Does

19   that sound directionally correct?

20   A.   It's possible it's right.

21   Q.   And during this period Spirit had 351 routes?

22   A.   That's correct.

23   Q.   Now, is there a map in your report where you look at

24   all of the ULCCs' networks collectively?

25   A.   You mean layered onto each other?

```
 1    Q.   Yes.

 2    A.   No.

 3    Q.   All right.  So let's turn to Chipty Demonstrative B.

 4    Now, here on the left, using the same data from your report,

 5    we've recreated Spirit's route map.  And on the right we

 6    have put the five ULCCs with their route maps and

 7    superimposed them on top of each other.  Now, you would

 8    agree with me, as an economic matter, that harm can be

 9    offset through the entry of multiple participants; fair?

10    A.   Yes, and I've shown you some of those calculations.

11    Q.   And it's certainly not your position that one ULCC

12    would need to come in and offset the harm itself?

13    A.   That's correct.  And I considered that, if you recall,

14    in my direct testimony.

15    Q.   And you would agree with me, just looking at this map

16    on the right, that the ULCCs collectively have route

17    coverage at a network level all over the country; is that

18    correct?

19    A.   Well, I'm not sure how to process "all over the

20    country."  I find this map pretty uninformative.  There are

21    definitely lines everywhere but --

22    Q.   Thank you, Dr. Chipty.

23         So this map shows the 1,292 routes that we just talked

24    about, and you would agree with me that each of the ULCCs

25    here have -- are present at endpoints all over the country;
```

1    correct?  You see coverage all over the country?

2    A.   No.  I can't tell much from this.  My analysis shows

3    that, for example, Allegiant, which shows up all over this

4    map, doesn't serve the same routes as Spirit.  So I think

5    you have to go under these lines to really understand.

6    Q.   Okay.  Thank you, Dr. Chipty, for that clarification.

7         MS. BANSAL:  We can take that down.

8    Q.   Now, Dr. Chipty, in your analysis of whether entry will

9    be likely timely or sufficient, you analyzed certain ULCCs'

10   standalone growth plans; correct?

11   A.   Yes.  I think mostly Spirit and Frontier, for whom I

12   had the best information.

13   Q.   Okay.  And the growth plans that you looked at, none of

14   them took the merger into account; fair?

15   A.   I think the ones I described didn't.  They predate the

16   merger.

17   Q.   And you would agree with me that a firm's growth plans

18   may change if they learn about a merger?

19   A.   Yes.

20   Q.   And that's because they might change their anticipated

21   plans if they perceive new opportunities; correct?

22   A.   Correct.  Correct.

23   Q.   Correct?  Okay.  Thank you.

24        And you would agree with me that Dr. Gowrisankaran has

25   predicted that after the merger there will be an incentive

1    for JetBlue to raise its fares; correct?

2    A.   Yes, that's right.

3    Q.   And you would agree with me that all else equal, higher

4    fares in a relevant antitrust market would incentivize

5    entry; correct?

6    A.   All else equal, I think that's right.

7    Q.   So that would make the merger more attractive than it

8    was before?

9    A.   Yes, all else equal, assuming lots of other things

10   lining up.

11   Q.   And your analysis, it looks at entry, ordinary-course

12   entry from the past; correct?

13   A.   And expansion.  But yes, entry and expansion.

14   Q.   So it doesn't take into account that there may be a

15   higher incentive for ULCCs to enter after the merger;

16   correct?

17   A.   It doesn't take into account the greater incentives

18   from this merger, but it doesn't preclude the possibility of

19   other incentives over the many years that I studied.

20   Q.   Okay.  Thank you.

21        All right.  So one of the things you studied was the

22   ability of the proposed divestitures to ensure entry;

23   correct?

24   A.   That's correct.

25   Q.   And your conclusion was that the divestiture assets

```
 1    can't ensure entry on the specific routes that Spirit flies
 2    out of the divestiture airports today; fair?
 3    A.    That was part of my opinion, yes.
 4    Q.    And you would agree with me that the divestiture asset
 5    buyers have an incentive to use the assets; right?  They
 6    paid for them?
 7    A.    Yes, I should hope so.
 8    Q.    And you heard testimony from Frontier's Mr. Biffle and
 9    Allegiant's Mr. Wells that they do, in fact, plan to use the
10    assets; correct?
11    A.    That's correct.
12    Q.    And you heard them say that they would -- the assets
13    would allow them to compete more vigorously out of those
14    regions than they do today; correct?
15    A.    That's correct.  And what I assessed is whether they'd
16    use those assets to enter the Spirit routes at sufficient
17    scale.
18    Q.    Correct.  And so you didn't evaluate any benefit to
19    competition that would result as a -- from them using those
20    assets on non-Spirit routes; correct?
21    A.    That's correct, for the reasons I gave, that benefits
22    to one group can't offset harms to another.
23    Q.    Okay.  Thank you, Dr. Chipty.  Let's move on to the
24    next topic.
25          So, Dr. Chipty, you've never worked as an employee for
```

1    an airline; correct?

2    A.    Correct.

3    Q.    And you've never been involved in the operation of an

4    airline; correct?

5    A.    That's correct.

6    Q.    And you've never been involved in preparing an airline

7    network plan; correct?

8    A.    That's correct.

9    Q.    And you've never been involved in network planning

10   strategy as an employee of an airline; correct?

11   A.    No, never.  Correct.

12   Q.    And you're, in fact, not claiming to be an expert in

13   network planning; right?

14   A.    That's correct.

15   Q.    And you've never been involved in airline decisions

16   about utilization or optimization; correct?

17   A.    That's correct.

18   Q.    And you've never conducted a fleet-assignment analysis

19   for any airline; correct?

20   A.    That's correct.

21   Q.    And, Dr. Chipty, you understand that Mr. Scheff ran a

22   fleet-assignment model in this case; right?

23   A.    Yes, I do.

24   Q.    And prior to this case you had never used a

25   fleet-assignment model before; correct?

```
 1    A.   That's correct.

 2              MS. BANSAL:  Your Honor, we ask that all of

 3    Dr. Chipty's testimony on Mr. Scheff's report and analysis

 4    be excluded.

 5              THE COURT:  Denied.  Goes to the weight, not the

 6    admissibility.  I'll allow it to stay in evidence.

 7              (Whereupon counsel conferred.)

 8    Q.   And I believe you talked with Mr. Moore earlier that

 9    you agreed with the premise that the ULCCs that come in and

10    enter, they don't need to replace Spirit on a one-for-one

11    basis; right?

12    A.   That's right.  I said it's possible that it could be

13    more or less, and there are reasons to think about it both

14    ways.

15    Q.   Okay.  And that was the adjustment factors that you

16    talked about; right?

17    A.   That's correct.

18    Q.   And you included Exhibits 22 and 33 in your report

19    because, I believe as you testified, there are reasons why a

20    one-for-one replacement wouldn't be necessary; correct?

21    A.   That's correct.

22    Q.   Okay.

23              MS. BANSAL:  If we could look at Exhibit 22.

24              (On screen.)

25              THE COURT:  In the case, or with respect to her,
```

1    or what?

2            MS. BANSAL:  I'm sorry, your Honor.

3    Q.   Exhibit 22 from your report.

4        Now, on the left you see the various adjustment

5    factors?  I'm sorry.  I'll let you get there first.

6    A.   Yes, I'm sorry.  I find it helpful.

7            MR. MOORE:  And, your Honor, it might be easier if

8    you're trying to look on paper, it's BXN in the Chipty

9    binder from the government.

10           THE COURT:  Thank you.

11   A.   Yes, I'm there.

12   Q.   Okay.  So now this analysis is only looking at what

13   Frontier would have to grow alone to replace anywhere

14   between 25 percent and 125 percent of Spirit; right?

15   A.   That's correct.

16   Q.   And you didn't do a similar adjustment factor analysis

17   looking at all the ULCCs collectively, did you?

18   A.   No, I did not.

19           MS. BANSAL:  All right.  Your Honor, we pass the

20   witness.  Thanks so much, Dr. Chipty.

21           THE COURT:  Anything further, Mr. Moore?

22           MR. MOORE:  Just a couple questions, your Honor.

23           THE COURT:  All right.

24

25

```
 1                     REDIRECT EXAMINATION

 2   BY MR. MOORE:

 3   Q.    Dr. Chipty, Ms. Bansal asked you some questions about

 4   harm caused in other markets.  Do you recall that?

 5   A.    Yes, I do.

 6   Q.    In which routes did you analyze entry in this case?

 7   A.    Well, I did it in different ways.  For example, my --

 8   the analysis we looked at looking at the rates of entry

 9   would have looked at all entry all over the United States.

10   And then I used that analysis to then look at the prospects

11   of new entry on the 51 presumptive routes, and then all

12   Spirit routes as well.

13   Q.    Why -- what is the relevance of the potential exits in

14   other markets to your analysis of entry in this case?

15   A.    I'm sorry.  The potential exits in other markets?

16   Q.    Correct.

17   A.    Well, the JetBlue deal modeling does model exits of

18   Spirit routes and considers the price consequence of those

19   when that happens.  And one of the things that I've

20   explained is that if entry -- if JetBlue anticipated entry,

21   especially entry at a large scale, that large-scale entry

22   would have offset the price increases that JetBlue

23   identifies as a result of the exits elsewhere.  And so I

24   take the fact that JetBlue didn't consider entry in its deal

25   modeling as informative of JetBlue's expectations of entry
```

1   in the future.

2   Q.   You mentioned in your discussion with Ms. Bansal that

3   your analysis accounted for some ways for legacy basic

4   economy.   Could you explain how that is?

5   A.   Yes.   So I understand and recognize that the legacies

6   offer some portion of their seats as basic economy, as well

7   as does JetBlue.   And then, taken together, the -- so just

8   rough order of magnitude, those basic-economy products

9   account for about 25 percent of, if you will, no-frills

10  unbundled service.   And so that means that, again, to the

11  extent that that's an option for consumers, and thinking

12  about the replacement growth that would be necessary to

13  offset the loss of Spirit, you could adjust down on the

14  order of 25 percent to get a handle on what level of growth

15  would be necessary.

16  Q.   You talked with Ms. Bansal about what is your Reply

17  Exhibit 7, the expansion of Dr. Hill's analysis.   It's the

18  exhibit you looked at with her that had the three columns.

19  Do you recall that?

20  A.   Yes, I do.

21  Q.   What was the relevance of that first column to your

22  analysis?

23  A.   Well, that was a column that Dr. Hill includes in his

24  figure 100 where he considers -- he expanded my analysis to

25  show how many additional potential entrants there would be

if you considered only one endpoint presence.  But as I
showed you in my own analysis, that when you -- what's more
important for increased rate of entry is dual-endpoint
presence.  In fact, significant dual-endpoint presence is
more important than some dual-endpoint presence, but some
dual-endpoint presence is even more important than
single-endpoint presence.

     So, in my view, that extra column is not as informative
on the potential for entry as the middle column.

Q.   You also talked with Ms. Bansal about your regression
analysis, and I think you used the term "statistical
significance" and "economic significance."  What did you
mean by that?

A.   Well, the stars that she was pointing to, or
identifying -- that's an odd way to say it -- are really
indicators of the precision of the estimates.  So I was
trying to distinguish between statistical precision and
economic interpretation.  So something could be
statistically significant but not economically significant.

     And so, essentially, what I was explaining is that all
of those estimates in my regression were precisely
estimated, but the order of magnitude, when you interpret
the estimated coefficients, means that, for example, entry
in -- on routes with significant dual-endpoint presence is
economically much bigger.  The rates of entry there are much

1   more significant economically than rates of entry at -- on

2   routes where there is single-endpoint presence.

3   Q.   Thank you, Dr. Chipty.

4           MR. MOORE:  Your Honor, I have no further

5   questions for Dr. Chipty.  I just wanted to --

6           THE COURT:  Well, then let's see if --

7           MS. BANSAL:  No further questions, your Honor.

8           THE COURT:  Nothing further?  Very well.

9           And you may step down.  And thank you.

10          (Whereupon the witness stepped down.)

11          THE COURT:  Go ahead, Mr. Moore.

12          MR. MOORE:  Just one matter with relation to the

13  1006 exhibits.

14          THE COURT:  I'm prepared to rule on it.  The

15  disputed exhibits are all excluded.  I will look at all --

16  that means they will retain their identifying letters.  I

17  will look at all of them as demonstrative aids, because I

18  consider them helpful to understand the witness' testimony.

19  With the exception of BYA, this comparison between the

20  situation in the American-USAir merger and the present case.

21  That's excluded as irrelevant.  I'm not basing anything on

22  that.

23          That leaves us, the motion filed as to AW, AX and

24  AY, certain deposition exhibits, are those objected to?

25          MR. COHEN:  Yes, your Honor, and we submitted a

```
 1   response to the motion.
 2            THE COURT:  I'm sorry.  I haven't looked at it and
 3   I must.  So recognizing that I have yet to rule on that, and
 4   they may be admitted, the government rests?
 5            MR. DUFFY:  Yes, your Honor, subject only to that
 6   motion, the government rests.
 7            I would, with the Court's permission, my
 8   understanding is defendants have objected to those exhibits
 9   on the basis of Campbell Hill not being an agent.  We would
10   like to provide the Court with a letter relating to a
11   privilege dispute in which Spirit very much took the
12   position that Campbell Hill had a long-standing
13   relationship, provided a variety of tasks for Spirit.
14            THE COURT:  I'll receive the letter before ruling.
15            MR. DUFFY:  Thank you.
16            THE COURT:  All right.  Total elapsed time, and
17   now it makes a difference here or it may make a difference,
18   at least to the government.  The government's used up eight
19   days, one hour, forty minutes.  The defense has used up four
20   days, three hours, ten minutes.
21            And we will start with the government's case on
22   Monday, the 27th of November.  Happy Thanksgiving to
23   everyone.  Please enjoy the recess.  We'll stand in recess.
24            THE CLERK:  All rise.
25            (Proceedings adjourned.)
```

C E R T I F I C A T E


        I, Cheryl B. Palanchian, Court Reporter

for the United States District Court for the

District of Massachusetts, do hereby certify that

the foregoing pages are a true and accurate

transcription of my shorthand notes taken in the

aforementioned matter to the best of my skill and

ability.




        /s/ Cheryl B. Palanchian 11/21/2023
              CHERYL B. PALANCHIAN

           Registered Merit Reporter
           Certified Realtime Reporter