```
 1              THE UNITED STATES DISTRICT COURT

 2               DISTRICT OF MASSACHUSETTS (Boston)

 3                         No. 1:23-cv-10511-WGY
                           Vol 1, Pages 1 - 94
 4

 5

 6  UNITED STATES OF AMERICA, et al,
            Plaintiffs
 7

 8  vs.

 9

10  JETBLUE AIRWAYS CORPORATION, et al,
            Defendants
11

12
                        * * * * * * * * *
13

14                  For Bench Trial Before:
                    Judge William G. Young
15

16
                    United States District Court
17                  District of Massachusetts (Boston)
                    One Courthouse Way
18                  Boston, Massachusetts 02210
                    Monday, November 27, 2023
19

20                      * * * * * * * *

21
                REPORTER: RICHARD H. ROMANOW, RPR
22                  Official Court Reporter
                  United States District Court
23      One Courthouse Way, Room 5510, Boston, MA 02210
                    rhrbulldog@aol.com
24

25
```

```
 1                    A P P E A R A N C E S

 2

 3   EDWARD WILLIAM DUFFY, ESQ.
     ARIANNA MARKEL, ESQ.
 4   AARON TEITELBAUM, ESQ.
         DOJ-Atr
 5       450 Fifth Street NW, Suite 8000
         Washington, DC 20530
 6       (202) 812-4723
         Email: Edward.duffy@usdoj.gov
 7   and
      WILLIAM T. MATLACK, ESQ.
 8       Attorney General's Office
         One Ashburton Place, 18th Floor
 9       Boston, MA 02108
         (617) 727-2200
10       Email: William.matlack@mass.gov
         For Plaintiffs United States of America and
11       The Commonwealth of Massachusetts

12

13    RYAN SHORES, ESQ.
         Cleary Gottlieb Steen & Hamilton LLP
14       2112 Pennsylvania Avenue, NW
         Washington, DC 20037
15       (202) 974-1876
         Email: Rshores@cgsh.com
16   and
      ELIZABETH M. WRIGHT, ESQ.
17       Cooley LLP
         500 Boylston Street
18       Boston, MA 02116-3736
         (617) 937-2349
19       Email: Ewright@cooley.com
     and
20    RACHEL MOSSMAN ZIEMINSKI, ESQ.
      MICHAEL MITCHELL, ESQ.
21       Shearman & Sterling LLP
         2601 Olive Street, 17th Floor
22       Dallas, TX 75201
         Email: Rachel.zieminski@shearman.com
23       For Defendant JetBlue Airways Corporation

24

25       (Continued.)
```

1        (Continued.)

2

3   JAY COHEN, ESQ.
    ANDREW C. FINCH, ESQ.
4        Paul, Weiss, Rifkind, Wharton & Garrison
         1285 Avenue of the Americas
5        New York, NY 10019-6064
         (212) 373-3000
6        Email: Jaycohen@paulweiss.com
         For Defendant Spirit Airlines, Inc.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                              I N D E X

2

3    WITNESS                    DIRECT   CROSS   REDIRECT   RECROSS

4

5    DR. NICHOLAS HILL

6       By Mr. Gelfand:          5

7       By Mr. Thornburgh:

8

9                          E X H I B I T S

10                        (None marked.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1          P R O C E E D I N G S
 2          (Begins, 9:10 a.m.)
 3          THE COURT:  Good morning.  And I hope you all had
 4     a good Thanksgiving.  We have a witness on the stand.
 5     And let's swear the witness.
 6          (DR. NICHOLAS HILL, Sworn.)
 7          MR. GELFAND:  Good morning, your Honor, my name is
 8     David Gelfand on behalf of JetBlue.
 9          THE COURT:  Mr. Gelfand, you may proceed.
10          MR. GELFAND:  Thank you.
11
12          * * * * * * * * * * * * * * * *
13          DR. NICHOLAS HILL
14          * * * * * * * * * * * * * * * *
15
16     DIRECT EXAMINATION BY MR. GELFAND:
17          MR. GELFAND:  Your Honor, I believe we placed
18     three things before you in connection with the testimony
19     today.  One is a set of demonstratives and exhibits that
20     are compiled into a slide deck that Dr. Hill will use
21     during his testimony.  One is just a set of the exhibits
22     with the marked-for-identification letter indicators.
23     And one is a notebook with his reports and his
24     supplemental exhibits.
25          THE COURT:  Thank you.
```

1   Q.    Would you please state your name and spell it for
2   the record.
3   A.    Yes, it's Nicholas Hill, N-I-C-H-O-L-A-S, H-I-L-L.
4   Q.    And what is your academic training?
5   A.    I have a PhD in economics from Johns Hopkins
6   University.
7   Q.    What year did you get the PhD?
8   A.    2006.
9   Q.    And what work have you done since obtaining your
10  PhD?
11  A.    So immediately after my PhD I worked as a Staff
12  Economist at the Department of Justice in their
13  Antitrust Division and at the FTC in their Bureau of
14  Competition.  I was then a Supervisory Economist at the
15  Department of Justice.  And then after that, in 2017, I
16  left to join Bates White Economic Consulting.
17  Q.    Did you receive any awards while you were working
18  for the Justice Department?
19  A.    I did.  I received an Attorney General's award for
20  distinguished service for my work on the Aetna-Humana
21  merger and I received an Assistant Attorney General for
22  Antitrust's award for my work on the Newark Slots
23  Litigation.
24  Q.    What was the Newark Slots Litigation?
25  A.    So United and Delta reached a deal for United to

1  purchase some of Delta's slots at Newark Airport and the

2  Department of Justice challenged the transaction in

3  court.

4  Q.    How did you come to work on the Newark Slots

5  Litigation?

6  A.    One of my responsibilities while I was a

7  supervisor economist was to oversee the economic work

8  done by the Antitrust Division on airlines.

9  Q.    And what was your role exactly in the litigation?

10  A.    So I was supervising the team of economists

11  working internally at the Department of Justice and I

12  was supervising the expert economist who had been

13  retained on behalf of the Division.

14  Q.    You said you worked at Bates White after your

15  government service, is that correct?

16  A.    That's correct.

17  Q.    And what year did you do that?

18  A.    2017.

19  Q.    Could you please describe generally for the Court

20  the kind of consulting work that Bates White does?

21  A.    Sure.  So we're an economics consulting group with

22  a number of different practices.  The largest practice

23  we have is the Antitrust Group and that looks at mergers

24  and other types of antitrust issues.

25  Q.    Do you specialize in any particular type of

1   economic analysis?

2   A.    I do, I specialize in the analysis of -- well in

3   antitrust generally, but specifically with respect to

4   mergers.

5   Q.    Over the course of your time working for the

6   government and with Bates White, can you estimate how

7   many mergers you have analyzed?

8   A.    At this point I've worked on hundreds of mergers.

9   Q.    Have you ever published on the subject of merger

10  analysis?

11  A.    I have, I've published both in the trade press and

12  also in academic economic journals.

13  Q.    Have you been recognized by any court as an

14  economics expert in litigation?

15  A.    Yes, I've been recognized by 6 courts, um, but one

16  of them was the Administrative Court of the FTC, so an

17  internal court.

18  Q.    And other than the Administrative Court of the

19  FTC, the others were federal court?

20  A.    That's correct.

21  Q.    And who did you testify on behalf of in those

22  various matters?

23  A.    So in three of those matters I testified on behalf

24  of either the DOJ or the FTC, And in two of them I

25  testified on behalf of the parties.

```
1    Q.    When were you most recently recognized as an
2    expert in litigation?
3    A.    Last fall I testified on behalf of the Antitrust
4    Division in the Penguin, Random House, Simon & Schuster
5    matter.
6    Q.    And when you say the "Antitrust Division," you
7    mean the DOJ?
8    A.    Correct.
9    Q.    And in each of those cases that you've described,
10   did the Court recognize you as an expert in any
11   particular field?
12   A.    Yes, in economics of mergers.
13   Q.    Have you submitted any report -- any expert
14   reports in this matter?
15   A.    Yes, I submitted two.  I submitted a rebuttal
16   report in reply to the plaintiffs' expert's initial
17   reports, and then I submitted some supplemental exhibits
18   in response to those expert's reply reports.
19   Q.    Now the Court has a copy of your rebuttal report
20   before it.  Is your Curriculum Vitae, attached as
21   Appendix A to that report, immediately following your
22   signature on Page 174?
23   A.    Yes, I believe so.
24   Q.    Dr. Hill, what was your assignment in this case
25   with respect to JetBlue's proposed acquisition of
```

1    Spirit?

2    A.    So, it had two parts.  The first was to evaluate

3    the likely effect of the transaction on competition, and

4    the second was to reply -- was to respond to any reports

5    submitted by the plaintiffs' experts.

6    Q.    Have you prepared a slide presentation to assist

7    with your testimony?

8    A.    I have.

9    Q.    And do you have that with you today?

10    A.    I do.

11        MR. GELFAND:  Your Honor, as I mentioned, Dr. Hill

12    intends to use this slide presentation.  May we proceed

13    in that manner?

14        THE COURT:  You may.

15        MR. GELFAND:  Thank you.

16    Q.    All right.  Could you please summarize for the

17    Court the key conclusions of your analysis in this case?

18    A.    Yes.  So, your Honor, I have five key conclusions

19    here.

20        The first is that entry and reposition -- and

21    repositioning are common in the airline industry.  The

22    second is that JetBlue is a more effective competitor

23    than Spirit.  The third is that Professor

24    Gowrisankaran's estimates of harm are not reliable.  The

25    fourth is that on balance the transaction is likely to

 1    benefit consumers.  And the fifth is that the
 2    transaction is likely to reduce the risk of
 3    coordination.
 4    Q.    All right.  I'd like to start the remainder of
 5    your testimony by discussing competition in the domestic
 6    airline industry.
 7          Could you tell the Court what competition looks
 8    like at the national level?
 9    A.    Sure.  If we could please advance the second
10    slide.
11          So this slide, your Honor, is looking at, for
12    2022, revenue-based shares for domestic carriers, and
13    there's a couple of interesting points on this slide.
14          So the first is we can see what the four largest
15    carriers by a significant margin are American, Delta,
16    Southwest, and then United.  So the three legacy
17    carriers and then Southwest.  After them is Alaska.  And
18    then following them we have JetBlue and Spirit, who are
19    the 6th and 7th largest.  And then we have all others,
20    Frontier and Hawaiian.
21          And so what we see at the national level is
22    there's a significant number of competitors.  The Big 4
23    are indeed the Big 4.  And JetBlue and Spirit are a
24    relatively small part of the total industry.
25    Q.    Have you analyzed with whom JetBlue competes most

1    closely at an aggregate legal?

2    A.    Yes, so if we could please advance to Slide Number

3    3.

4         So this slide, your Honor, is looking at, for

5    2022, the previous slide was looking at all domestic

6    routes, and here we're just focused on JetBlue's nonstop

7    routes.  So we're trying to understand with whom JetBlue

8    competes closely.

9         And here we can see that JetBlue is larger than it

10   is nationally, because these are the routes on which

11   it's competing, but then most of the picture looks

12   substantially the same.  We see Delta, United, and

13   American, the three legacy carriers who are JetBlue's

14   largest competitors, followed by Southwest.  Then we

15   have Alaska.  And then Spirit is the 6th largest

16   competitor for JetBlue.

17   Q.    And JetBlue's share on this pie chart is larger

18   than it was on the national chart, is that because these

19   are only JetBlue's routes that are being shown here?

20   A.    Yes, this is JetBlue's nonstop routes.

21   Q.    And then the shares for the other carriers on this

22   pie chart represent their shares in the aggregate across

23   all of JetBlue's routes, do I understand that correctly?

24   A.    That's correct.

25   Q.    Okay.

```
 1          THE COURT:  Well there's a nuance and I think I
 2    understand it.
 3          You've got the revenue shares on JetBlue's nonstop
 4    routes, that takes JetBlue to 22 percent.  The others
 5    are on those routes and other routes with which they
 6    compete with JetBlue, is that right?
 7          THE WITNESS:  Yes, sir.  For the other carriers
 8    it's just their share on JetBlue's nonstop routes.
 9          THE COURT:  Okay, that corrects it.
10          So the 22 percent is JetBlue's share on nonstop
11    routes.  Taking United's 19 percent, that's United's,
12    um, revenue shares on nonstop routes of JetBlue?
13          THE WITNESS:  That's correct, your Honor.
14          THE COURT:  All right.
15          Go ahead.
16    Q.    And what if any relevance does national
17    competition in the two charts that you just displayed
18    for the Court add to your analysis of this route?
19    A.    So I think it's useful here to see that in the
20    national picture there are a large number of other
21    competitors who are more a focus of JetBlue's
22    competitive intensity, and to the extent that the
23    transaction allows JetBlue to compete more effectively,
24    it can compete more effectively with those carriers.
25    And it also gives us a broader sense of what the
```

1  industry looks like and who is available to compete on

2  specific routes.

3  Q.   Okay, let's talk about entry and repositioning,

4  which you mentioned in your summary of opinions.

5       Could you tell the Court what you mean by "entry"

6  and "repositioning" in the context of this case?

7  A.   Sure.  So, your Honor, in this discussion when I

8  say "entry" and "repositioning," I'll be speaking with

9  respect to routes.  So "entry" will be a carrier

10  beginning to serve a route it was not previously present

11  on, and "repositioning" will be a carrier changing the

12  frequency with which it serves a route.

13  Q.   And what is the role of entry and repositioning in

14  an economic analysis of a merger?

15  A.   So it's typically one of the things one considers

16  when thinking will there be an adverse competitive

17  effect?  Were there to be an effect, entry repositioning

18  can mitigate or eliminate that effect because new firms

19  may come in to compete and replace any firm that is

20  left.

21  Q.   Did you reach any conclusions about how common

22  entry and repositioning are in this industry?

23  A.   Both entry and repositioning are common in the

24  airline industry.

25  Q.   And what is your basis for finding that?

1    A.    So if we could please advance to Slide Number 4.

2          So here, your Honor, we're looking for 2023 at

3    nonstop routes entered by the domestic carriers, and you

4    can see that for each of these carriers they've entered

5    a significant number of routes in 2023.  And in

6    aggregate the total number of routes entered here is

7    going to be somewhere between 300 or 400 routes.

8    Q.    And have you done any other -- have you done any

9    other analysis about this issue?

10   A.    Yes.  If we could please advance to Slide Number

11   5.

12         So this slide, your Honor, is taking a slightly

13   different look, and here we're thinking more about both

14   entry and exit.  And so in particular what this is

15   saying is, for each carrier, as a percentage of its

16   total routes in 2022, how many entries and exits did it

17   have in 2023?  That is in some sense how much did its

18   network change?

19         So if we focus in the middle on JetBlue here, and

20   we just imagine that JetBlue was serving 100 routes in

21   2022, then what this 19 percent here means is that

22   JetBlue, in combination, entered and exited 19 routes.

23   So roughly a 5th of its network turned over in one way

24   or another in 2023, looking back at 2022.

25         So it's giving us a sense of how much turnover

1   there is on routes for each carrier, and we can see that

2   each carrier has a significant turnover in its route

3   structure from year to year.

4   Q.    Have you seen any other evidence about the

5   frequency of entry and exit during the course of this

6   trial?

7   A.    Yes.  And if we could please advance to Slide

8   Number 6.

9         So this slide is taken from Professor

10  Gowrisankaran's presentation and it's looking for --

11  Professor Gowrisankaran, your Honor, had 51 nonstop

12  overlap routes that he analyzed.  And in this figure

13  he's saying, in the first column, that none of those

14  routes -- if he updates the data by one year, were no

15  longer presumptive overlaps, they were presumptive

16  overlaps in the previous year, but in this year they're

17  not.  And then in the second column he has 7 routes that

18  were not presumptive overlap routes in the previous

19  year, but they are if you take data from 2022 Q3 to 2023

20  Q2.

21        And so what we're seeing here, if you just focus

22  for the moment on the line, is that roughly 20 percent

23  of the nonstop presumption routes changed so that they

24  were no longer presumption routes due to entry or exit

25  and 7 new ones appeared.  So what it's showing is the

1   dynamism in the industry, the extent to which routes

2   evolve and carriers move their aircraft around to serve

3   new routes.

4   Q.    Now have you systematically examined the

5   probability of entry on routes in the ordinary course of

6   business from the evidence in the record in this case?

7   A.    Yes.  If we could please advance to Slide Number

8   7.

9        So this slide, your Honor, is taking Dr. Chipty's

10  entry model.  Dr. Chipty used a model to predict whether

11  entry was more likely if a carrier was present at both

12  endpoints of a route, one endpoint of a route, or

13  neither endpoint of a route.  And so what I did was I

14  took that model and I used it to predict the probability

15  of entry on a route by a ULCC within one year.  And then

16  each of these bars, your Honor, is looking at a

17  different set of routes.

18       So, for example, if we start on the far left, the

19  JetBlue nonstop routes -- this is all of JetBlue's

20  nonstop routes, and for those routes the model predicts

21  a 34 percent probability of entry by a ULCC within a

22  year.  And you can see the other figures have similar

23  numbers.

24       So what this is showing is that using Dr. Chipty's

25  model and looking at one year, we see significant

1   probabilities of entry by ULCCs on these routes.  And if

2   you expand it to two years or three years, these

3   probabilities will increase significantly.

4   Q.   And just to look at the bar on the far right side,

5   could you tell the Court what that bar is that says 40

6   percent on it?

7   A.   Sure.  So these are the 51 routes that Professor

8   Gowrisankaran identified and I was discussing on the

9   previous slide, and it's shown here that within one year

10  40 percent of them would expect to see entry by a ULCC

11  in the ordinary course of business.

12  Q.   And then you said something about what would

13  happen if you looked at a longer period of time?

14  A.   Sure.  So as you increase the time period, your

15  Honor, these probabilities also increased along with

16  them.

17  Q.   How many entry events was Dr. Chipty's analysis

18  based on?

19  A.   So she testified that this model was based on

20  4,700-plus entry events.

21  Q.   And that was over a number of years?

22  A.   That was from 2017 to 2022, so it was over 6

23  years.

24  Q.   Was there evidence in the trial record, relevant

25  to your analysis, about how carriers decide whether to

1    enter a route?

2    A.    Yes.  So if we could please advance to Slide

3    Number 8.

4         These are just a selection of quotes of testimony

5    from Spirit, Frontier, and Allegiant.  And not

6    surprising for profit-maximizing firms, they look --

7    when they're deciding which routes to enter, which

8    routes are likely to be most profitable.

9    Q.    And why is that significant?

10   A.    Well so in this case here we're discussing -- when

11   we're thinking about entry in the context of a merger,

12   Professor Gowrisankaran predicts adverse competitive

13   effects on a number of routes, and if that happens, the

14   profitability of that route is going to increase, and

15   that's going to make those routes more attractive to

16   entrants.

17   Q.    Did you do any analysis of profitability?

18   A.    I did.  So if we could please advance to Slide

19   Number 9.

20   Q.    And let me just caution you, Dr. Hill, that there

21   are confidential numbers on this document that are in

22   squares on your version.  Please don't say those out

23   loud.  The Court has those numbers before it.  So you

24   can refer to them by position on the graph, but just

25   don't reveal the actual numbers.

1   A.     Yes, happily I can't see them on my copy here, so

2   it's perfect.

3   Q.     Oh, okay.

4   A.     Yeah, so, your Honor, here I'm breaking down what

5   is the profitability today of JetBlue and Spirit's

6   routes and what would it look like tomorrow?  So to do

7   that, on the left-hand side, at the bottom, the far

8   left, is the actual average JetBlue profit margin in

9   2019.  So I took the last year precovid and you can see

10   that number.

11        And then the bar next to it is, if Professor

12   Gowrisankaran's predicted fare increases were to occur,

13   how much more profitable would that route be?  And you

14   can see there's a substantial increase in profitability.

15        And then on the right-hand side, I do the same

16   thing but for Spirit.  And again you can see the

17   substantial increase in the predicted margin.

18        And so the point here is just we saw a lot of

19   entry in the ordinary course, but here we're saying that

20   if these price increases were to occur as predicted,

21   there would be even more entry because those routes

22   would become more profitable than average and attract

23   new entrants.

24   Q.     So putting together the 40 percent from

25   Dr. Chipty's model, the profit margins that we see here,

1   and looking at a time period of one or more years, could
2   you give the Court an overview of what you, um, what you
3   conclude from that evidence?
4   A.    Yeah, so the 40 percent, your Honor, is just in
5   the ordinary course, so it's telling us that entry and
6   repositioning are common.  And then it shows us that in
7   most routes there aren't significant entry barriers.
8   And then this figure here is saying, "Look if there were
9   to be a price increase, it would attract even more entry
10  because the profitability of those routes would increase
11  above their current level."
12  Q.    And is there evidence in the trial record relevant
13  to your analysis about whether ultra-low-cost carriers
14  would in fact enter routes if fares were to increase
15  post-merger?
16  A.    Yeah, and if we can please advance to Slide Number
17  10.
18         So this slide here, your Honor, is testimony from
19  Frontier and from Allegiant, and Mr. Biffle from
20  Frontier says the airline market is extremely efficient.
21  So he's talking about the extent to which carriers are
22  ready and able to enter new routes.  And then on the
23  right-hand side we have similar testimony from Mr. Wells
24  who also talks about a past merger between Southwest and
25  AirTran where the merged firm stopped serving some

1   routes and Allegiant was able to successfully backfill

2   those routes to start competing in place of AirTran.

3   Q.    Now if a low-cost carrier or an ultra-low-cost

4   carrier wanted to enter a route, are you aware of

5   evidence in the trial record relevant to your economic

6   analysis of where the airplanes would come from to do

7   so?

8   A.    Sure.  So if we could please move on to Slide

9   Number 11, please.

10          On the right-hand side here, your Honor, we have

11   the growth in planned aircraft fleet net of retirements

12   for selected -- for the ULCCs and the LCCs from 2022 to

13   2025.  So here we're taking the order book and

14   subtracting off planned retirements.  And you can see

15   there would be a significant growth in capacity for each

16   of these firms.

17          And then the quotes on the left-hand side, the one

18   on the top is Mr. Biffle saying that "Look, if we felt

19   that there are opportunities, we can scale up or down

20   the number of new aircraft we're acquiring."  So one

21   source of planes to enter these routes are new planes,

22   whether they're purchased or leased.

23          And then the other possibility which Mr. Biffle

24   alludes to in the second quote is "We're serving a lot

25   of routes and in some of those routes we're not making a

1    profit and we're not necessarily having a competitive

2    impact, and we can repurpose those planes to use on more

3    profitable opportunities."

4            And, your Honor --

5            THE COURT:  Excuse me, just so I can follow.

6            THE WITNESS:  Yes.

7            THE COURT:  On the right, the data that supports

8    the bars there, that's from the actual order books of

9    the several airlines?

10           THE WITNESS:  Yes.

11           So here, your Honor, we combined information from

12   the 10Ks and from CID responses from the airlines.  One

13   was to get the number of aircraft that were on order,

14   and the other was to get the planned retirements.

15           THE COURT:  Thank you.

16           THE WITNESS:  And that's how we calculated those

17   numbers.

18           THE COURT:  Thank you.

19           Go ahead.

20           MR. GELFAND:  Thank you, your Honor.

21   Q.    You mentioned Mr. Biffle's testimony, but more

22   broadly the possibility of expanding the number of

23   airplanes being acquired.  Can you tell the Court if

24   you've seen evidence in the trial record about the role

25   that options play for airlines that have to acquire

1    aircraft?

2    A.    Yes.  So that I think speaks to the box on the

3    upper left there which is just Mr. Biffle saying "If you

4    believe that there are opportunities, you can scale up

5    to compete -- have more aircraft than you otherwise

6    would have planned."

7    Q.    Based on what you've testified to, Dr. Hill, what

8    are your conclusions about entry and repositioning?

9    A.    Sure.  So entry and repositioning are common.  It

10   shows us on most routes that entry and repositioning are

11   even.  If there were to be post-merger adverse

12   competitive effects and fares would arise, that would

13   likely attract additional entrants.  And then three is

14   the ultra-low-cost carriers and low-cost carriers for

15   well-positioned entry routes.

16   Q.    Okay, let's change gears and discuss JetBlue.

17         Have you analyzed JetBlue as a competitor?

18   A.    I have.

19   Q.    And how would you characterize JetBlue as a

20   competitor?

21   A.    So I'd say JetBlue is a disruptive competitor and

22   has a combination of quality features and lower fares

23   that allow it to compete with all other types of

24   carriers ranging from the legacy carriers down to the

25   ultra-low-cost carriers.

1   Q.    And you mentioned "features," and the Court has

2   heard a lot of evidence about this.  Could you very

3   briefly describe what you mean by "features"?

4   A.    Sure.  So if we could please advance to Slide

5   Number 12.

6         This is just a list of some of the features that

7   are offered by JetBlue, so, for example, extra leg room

8   or free WIFI service in flight.  This is just a list of

9   them.

10        One point I do want to make in conjunction with

11  this is Professor Gowrisankaran testified that

12  essentially what's going on here is bundling.  So with

13  JetBlue, you buy a ticket, you get all of these

14  features.  Spirit you don't, but you have the option to

15  purchase them if you'd like to.  So this is really a

16  question of bundling.

17        But I think it's little misleading just in the

18  sense that some of these features aren't actually

19  available on a Spirit flight.  So, for example, seat

20  back screens, you can't purchase those on Spirit.

21  Similarly on Spirit there are four big front seats and

22  then there's an exit row that has extra leg room.  But

23  outside of that limited number of tickets, you're just

24  going to get the standard Spirit leg room.

25        So there's some element of bundling here with

1    putting together features, but there's also an extent to

2    which some of these features just aren't available on

3    Spirit.

4    Q.    Dr. Hill, have you looked at whether JetBlue

5    competes with low-cost and ultra-low-cost carriers?

6    A.    I have.

7    Q.    And why did you believe that -- well tell me

8    whether they compete with low-cost and ultra-low-cost

9    carriers?

10   A.    Sure.  Yeah, they compete with carriers that range

11   from the legacy carriers down to the ultra-low-cost

12   carriers, and the way in which they are able to compete

13   with the low-cost carriers and the ultra-low-cost

14   carriers is they tend to offer lower fares in the

15   general business and they also have a Blue Basic fare

16   class that takes away some of the features that are

17   otherwise available on JetBlue.

18         So, for example, if you have a Blue Basic ticket,

19   you're not allowed to have a carry-on, it's just not

20   allowed.  And the Blue Basic offers more of an

21   unbundled-type fare that can compete effectively with

22   the ultra-low-cost carriers.

23   Q.    All right.  I believe it was Professor

24   Gowrisankaran referred several times to "cost-conscious

25   customers."

1      Have you analyzed whether Blue Basic and Spirit

2   customers have differences or similarities when it comes

3   to cost-consciousness?

4   A.    Yeah, so if we could please advance to Slide 13.

5        So, your Honor, the data here, both the DB 1B data

6   you get from the government and ticket data that was

7   presented by the carriers, doesn't itself have

8   information on passenger income, so to analyze this

9   question what I did was I took information about those

10  passengers' zip codes and I went to those zip codes and

11  said "What's the median income in those zip codes?"  And

12  then I averaged them all together to get a picture of,

13  for the zip codes that JetBlue's Basic passengers are

14  coming from, what's the average income?  And that's the

15  bar on the left.  And then for Spirit, that's the bar on

16  the right.  And you can see that the two numbers are

17  fairly similar to one another.

18       So using this analysis, it suggests that they have

19  similar demographics.

20  Q.    Now does JetBlue make Blue Basic fares available

21  only when there is an ultra-low-cost carrier on a

22  particular route?

23  A.    No.  So if we could please advance to Slide 14.

24       So this slide here, your Honor, is looking at the

25  share of JetBlue passengers who purchased Blue Basic

1      tickets.  On the left we have routes on which JetBlue is

2      competing with Spirit.  In the middle it's routes where

3      there's at least one ultra-low-cost carrier present.

4      And on the right we have routes where there's no ultra-

5      low-cost carrier present.

6          And you can see that the percentage of JetBlue

7      passengers who purchased Blue Basic is very similar

8      across these different types of routes.  Blue Basic is

9      just part of the offering that JetBlue makes.

10     Q.    I just want to ask you one question here.  You

11     showed several graphs and several numbers that have been

12     calculated.  Is that based on work that you've done and

13     that you hold yourself responsible for?

14     A.    Yes.

15     Q.    All right.  And so what do you -- what do you

16     conclude from this graph?

17     A.    Yes, so the conclusion here is that Blue Basic is

18     just part of JetBlue's competitive package at this

19     point, it does not seem to be driven by whether or not

20     it's on a particular route competing with an ultra-low-

21     cost carrier or whether it's competing with Spirit.

22     Q.    Now have you analyzed the relative appeal of

23     Spirit versus JetBlue to consumers on average?

24     A.    Yes.  If we could please advance to Slide 15.

25          So here, your Honor, we're looking at routes on

1    which JetBlue and Spirit compete head to head, which of

2    the two attracts more passengers?  So on the left-hand

3    side we have nonstop overlaps.  And you can see that

4    JetBlue is capturing a larger share on those nonstop

5    overlaps than is Spirit.  And then on the right-hand

6    side we have nonstop routes where the presumption has

7    been asserted.  So this is those 51 nonstop overlap

8    routes.

9         And in each case what we see is that when the two

10   carriers go head to head, JetBlue attracts more

11   passengers.  So that doesn't mean that there aren't some

12   passengers that prefer Spirit, but on average JetBlue is

13   attracting more passengers.  And Professor Gowrisankaran

14   also looked at this issue and he found that JetBlue is

15   the largest carrier on the routes it serves more than 60

16   percent of the time and for Spirit the equivalent number

17   is 10 percent of the time.

18        So this ties back to what I was saying, that

19   JetBlue is appealing to a broad demographic and Spirit

20   is appealing to a more niche group.

21   Q.   And what conclusions do you draw from that?

22   A.   On average JetBlue is delivering more value to

23   passengers.

24   Q.   Have you performed any quantitative analysis of

25   JetBlue's competitive impact relative to Spirit's?

1    A.    I have.

2    Q.    And what have you done?

3    A.    So I've looked at the impact of JetBlue's entry on

4    rival fares and the total number of passengers on the

5    route.

6    Q.    You mentioned the impact of JetBlue's entry on

7    rival carrier fares and total passengers.  Why did you

8    focus on rival carrier fares?  And, first of all,

9    explain what you mean by that phrase?

10   A.    Sure.  "Rival carrier fares," your Honor, are the

11   fares being charged on a route by other carriers at the

12   time JetBlue entered.  So this is an attractive measure

13   for two reasons.

14         First, it's a nice way to summarize JetBlue's

15   competitive impact.  There are carriers on the route,

16   JetBlue entered, how did those carriers respond?  Did

17   they lower their fares?  Did they not change their

18   fares?

19         Second, it's a nice way to think about the impact

20   of that entry on customers traveling on those carriers.

21   So I'm traveling on Delta, JetBlue enters, fares drop by

22   $50.  I get the same Delta ticket I used to get, but

23   it's $50 cheaper.  So it's a very direct measure of the

24   benefit to those passengers.  And that's important in

25   this industry where we see differentiation, different

1   carriers are offering different levels of quality.

2   Q.    Now it has been suggested in this case that you

3   should use all fares for this study.  Why not do that?

4   A.    So the problem with -- if you use all fares,

5   because of this level of differentiation, you can get

6   turned around and reach conclusions about competition

7   that are inaccurate.

8        So an example of that is, um, let's imagine a

9   route that Spirit is serving.  So today Spirit is

10  competing and Delta enters the route.  So Delta puts

11  some competitive pressure on Spirit, Spirit lowers its

12  fares, but the average fare on the route actually goes

13  up because Delta has a higher quality, a higher fare

14  package.

15       And so if we looked at all fares we'd say that the

16  average fare on the route went up, so this must be --

17  consumers must be worse off, but in fact the Spirit

18  customers see a little lowering in their fare and

19  customers who like to fly on Delta now have the option

20  of flying on Delta.  And so if we look at all fares, we

21  can get ourselves confused about the actual impact of

22  competition.

23  Q.    And --

24       THE COURT:  Say again what the relevant measure

25  is?

1          THE WITNESS:  So there's two.  So I'm going to use
2    -- for the most part I'm going to use rival fares, to
3    use that to measure the impact of entry by JetBlue and
4    Spirit.  But when I get to adding up potential harms and
5    benefits, to capture this effect on Delta customers, I'm
6    going to use Professor Gowrisankaran's own estimates of
7    the effect of the transaction on those passengers.
8          THE COURT:  Thank you.
9    Q.    And, um, what you've just explained to the Court,
10   what does that tell you about an analysis that looks at
11   all carrier fares?
12   A.    Yeah, so what can go wrong with all carrier fares
13   is if you have carriers of different qualities, you're
14   going to -- then often a measurer is going to overvalue
15   carriers with low fares and not give credit to carriers
16   who offer a higher-quality product.
17          So, for example, if we think about the example I
18   gave where there's a Spirit route and Delta enters, a
19   customer who switches from Spirit to Delta may end up
20   paying a higher fare, and if we just looked at that,
21   we'd say that customer is worse off.  In fact they're
22   likely better off, they now have an option to travel on
23   Delta and they switched.  But we can't use fares to
24   measure that benefit because there's also a change in
25   quality when they picked Delta.

Q.    And when you looked at rival fares, does that
suffer from the same problem?

A.    No, so rival fares should give us a measure of the
impact -- of the competitive impact.  So in this case
Spirit's fares went down a little bit because it
responded to the entry by Delta.

       But as you asked already, your Honor, when we get
to totaling up harms and -- potential harms and
potential benefits, we'll take separate account of the
impact on those passengers who switched.

Q.    And I had a question about that.

       Professor Gowrisankaran testified that the way
you're doing this ignores the impact of this transaction
on Spirit customers.  How do you respond to that?

A.    Yeah, so when we get to the time we're looking at
potential harms and potential benefits, I'm absolutely
going to take account of the effect on Spirit
passengers.

       THE COURT:  How?

       THE WITNESS:  So I'm going to use Professor
Gowrisankaran's measure and I'm going to do that to be
conservative, that measure is going to tend to overstate
potential harm.  So if you imagine, for example, we have
a route where today Spirit and JetBlue are competing and
after the transaction it all becomes JetBlue, and some

1    Spirit passenger switches from their Spirit fare to a

2    JetBlue fare, so let's say it goes up by $20.  They're

3    getting a higher quality, but it's $20 more.

4         Professor Gowrisankaran's methodology is going to

5    say the harm to that passenger is $20.  That's a

6    conservative measure in my view because in fact that

7    customer is also getting a higher-quality product.  So

8    the harm is somewhere between 0 and 20 and I can't

9    easily say where, so to be conservative I'll just agree

10   with Professor Gowrisankaran and say "Let's take the

11   $20."

12   Q.    And on that point, Dr. Hill, did Dr. Gowrisankaran

13   attempt to take account of that quality difference?

14   A.    He does not.  He does not adjust for that.

15   Q.    So he only looks at the price difference?

16   A.    That's correct.

17   Q.    Now turning back to the question of JetBlue's

18   effect on rival fares, what did you find when you

19   studied that question?

20   A.    So if we could please advance to Slide 16.

21        This is a example, your Honor, that I think sort

22   of sets the stage for what I did.  And just to situate

23   us on this graph, if we look at the horizontal axis

24   here, these are quarters, so they range from the first

25   quarter of 2013 to the fourth quarter of 2014.  And then

1   the vertical axis here is going to be average fares, and

2   each line depicts the average fares for a particular

3   carrier.

4         So in light blue we have United.  In, um, maroon,

5   we have Delta.  And then in between those two we have a

6   dotted line, which is the average rival fare.  So this

7   is just showing us on average what's happening to rival

8   carrier fares.  And then in dark blue we have JetBlue's

9   fares.  And right in the middle is a vertical line

10   that's labeled "JetBlue entry."  So this is the quarter

11   that JetBlue entered in.  And the graph is showing us

12   though that rival carriers had higher fares, JetBlue

13   entered, and those fares came down.

14         One thing I should just note, your Honor here, is

15   that each of these dots is a data point, it's the

16   average fare in that quarter.  The lines connecting them

17   are just for convenience to show us the connection,

18   they're not themselves data.  So for each carrier we

19   have 8 dots of information, one for each quarter.  And

20   then in the lower left-hand corner we have an inset

21   graph, which is summarizing the average change in rival

22   fares.

23         So before JetBlue entered on this route between

24   New York and Savannah, the average fare was $303 for

25   rival carriers.  After JetBlue entered, on average Delta

1    and United were charging $215, a decrease of about 30

2    percent.

3            THE COURT:  I have to say, I don't see that in

4    these, um, the graph lines, it looks to me like the

5    average fare was on the way down before JetBlue entered,

6    and then remain more or less, just taking the average,

7    more or less constant with JetBlue undercutting the fare

8    by what's indicated here.

9            Am I reading this graph wrong?

10           THE WITNESS:  Yes, your Honor.

11           So the thing here is to remember that those

12   connecting lines are not -- sorry, I touched the screen,

13   those are not actual data points.

14           THE COURT:  No, I understand that.

15           THE WITNESS:  Yeah, so the first quarter -- the

16   last quarter before JetBlue entered is 2013 Q4 and you

17   can see the average rival fare at that point was about

18   $300.  Then JetBlue entered in the first quarter of

19   2014.  In the first quarter in which it's present, the

20   average rival fare is about $210.

21           THE COURT:  So your point is that between 2013 Q4

22   and 2014 Q1, that's the so-called "JetBlue Effect"?

23           THE WITNESS:  That's correct, your Honor, exactly.

24           THE COURT:  All right.  Thank you.

25   Q.    And just on that last point, Dr. Hill.  Before

1   JetBlue entered, were those fares coming down?

2   A.    No, if you follow the dotted average rival fare

3   line or you just look at the gray dots, you can see that

4   it moves around a little bit, but it was somewhere in

5   the vicinity of $300.

6   Q.    Okay.  Did you do any systematic analysis beyond

7   examples of the impact of JetBlue's entry on rival

8   fares?

9   A.    Yes.  If we could please advance to Slide 17.

10          This slide, your Honor, is taking that example and

11   applying it systematically.  So I identify all the

12   JetBlue entry events between 2011 and 2018 and I ask

13   what was the average effect of those entries?

14   So the horizontal line that's labeled "JetBlue Average,"

15   this is telling us that on average when JetBlue entered

16   rival carriers dropped their fares by 13 percent.

17          And then the blue bars here, your Honor, are

18   breaking down JetBlue's effect based on how aggressively

19   it enters a route.  And so I'm going to measure its

20   aggressiveness using something called "entry intensity."

21   So what that's going to be is essentially the ratio of

22   JetBlue's planes that it enters with to the number of

23   planes that are already on the route and the planes with

24   which JetBlue entered.  So I think an example might make

25   it most clear.

1          So suppose we have a route on which there are 6

2     planes flying a day and JetBlue enters with 2 planes.

3     So the entry intensity level would be 2, that's JetBlue

4     entry, over 8, which are the 6 existing planes and

5     JetBlue's 2 planes.  So it's sort of a measure of how

6     much of capacity on the route after JetBlue entered did

7     JetBlue account for.

8          So the first bar is less than 25 percent, so

9     that's JetBlue entered, but even after entry it was less

10    than 25 percent of the capacity.  The middle bar is

11    JetBlue is between 25 percent and 50 percent of the

12    capacity on the route.  And then the last bar is JetBlue

13    is more than 50 percent.  And you can think about those

14    as the intensity with which it enters the route.

15         And what we see on the left-hand side is when it

16    enters with the lowest intensity, it has about a 9

17    percent impact on average fares.  If it enters with

18    minor intensity, it has a 19 percent impact.  And if it

19    enters with more than 50 percent of the capacity, it has

20    a 24 percent impact.

21    Q.    And what is the average?

22    A.    And then the JetBlue average effect is the

23    horizontal line that says "JetBlue averaged a 13 percent

24    decrease."

25    Q.    And when you did this study, what time period did

1    you use?

2    A.    So, your Honor, I took all data between 2010 and

3    2019.  If you look on the previous chart, I look at four

4    quarters before and four quarters after.  So if I take

5    everything in that time period, my last entry is at the

6    end of 2018 because I need four quarters to see what

7    happened as a result of that entry.

8    Q.    And why did you go all the way back to 2010?

9    A.    So the more entry events I have, the more

10   confidence I have that I can actually identifying a true

11   effect and not just noising the data.

12   Q.    Why did you not use more recent data than 2018?

13   A.    So the 2020 covid pandemic means that after that

14   period we don't really have a time period where we have

15   a year before and a year after any significant number of

16   entries.

17   Q.    In addition to looking at JetBlue, did you compare

18   JetBlue's impact using this methodology to Spirit's

19   impact?

20   A.    I did.

21   Q.    And what did you find?

22   A.    So if we advance to Slide Number 18.

23         This slide, your Honor, for JetBlue here it's the

24   same as the previous slide, this is the impacts by entry

25   intensity.  And then the yellow bars here are

1    summarizing Spirit's entry.

2         So you can see for each of the entry-intensity

3    bins, JetBlue has a larger impact than does Spirit.

4    Q.    Does Professor Gowrisankaran agree with your

5    evaluation of these relative impacts?

6    A.    He does not.

7    Q.    And how did his evaluation differ from yours?

8    A.    He concluded that in general Spirit has a larger

9    impact than does JetBlue.

10   Q.    Have you examined his methodology and reached any

11   conclusions about it?

12   A.    I have.  I don't think that his methodology is

13   reliable.

14   Q.    And why is that?

15   A.    So if we could please advance to Slide 19.

16   These are some of the reasons I think his methodology is

17   not reliable.

18        So the first one is a simple one, he has

19   significantly less entry events that he uses to estimate

20   the relationship, and I think my additional data gives

21   my model more power.

22        Second, he predicts -- his model has some unusual

23   features so it predicts that more aggressive entry can

24   lead to higher fares.

25        Third, his model is sensitive to small changes in

1     its assumptions.

2          Fourth, as I discussed earlier, his model is going

3     to focus on all fares.  So it gives credit for lower

4     fares, but not for higher quality.

5          And then fifth, in his model, he's going to ignore

6     the possibility that if JetBlue is present on a route,

7     then Spirit's entry may have a different impact than

8     when JetBlue is not present on that route.

9     Q.   Okay, let's take those one at a time.

10          In what way does Professor Gowrisankaran's model

11    rely upon significantly less data than yours?

12    A.   So if we could please advance to Slide 20.

13          So here, your Honor, we're summarizing the data

14    that I use in my model and Professor Gowrisankaran uses

15    in his model.  On the left we summarize JetBlue, where I

16    have 55 entry events, and Professor Gowrisankaran has

17    18.  And then for Spirit, I have 125 entry events and he

18    has 62.

19          And so when Professor Gowrisankaran testified, he

20    said he has -- the bulk of his data is 2017 and 2018.

21    He has a few entry events from the first quarter of

22    2019, but he's really relying upon two years of data.

23    My study is essentially relying on 8 years of data.  So

24    it gives me significantly more entry events.

25    Q.   And why is that preferable?

A.     The more entry events you have, the more you can
be confident that you're identifying a real effect.

Q.     Okay, you said that Professor Gowrisankaran's
model predicts that more aggressive entry can lead to
higher fares.  What did you mean by that?

A.     Yeah, so if we could please advance to Slide 21.

These are figures summarizing Professor
Gowrisankaran's model.  And if you recall, your Honor,
he testified that it has a shape like a parabola, it
goes down and then it goes back up.  And if we focus on
the left-hand side, this is summarizing JetBlue.  The
lines here are showing Professor Gowrisankaran's
unweighted model in the solid line and his weighted
model in the dotted lines.  That's his relationship
between relative capacity, which is on the horizontal
axis, and the change in fares on the route.  And so this
is similar to what I'm doing.  He's asking as the
intensity of entry increases, so as the relative
capacity goes up, what happens to fares?

And if we zoom in on the JetBlue figure and we
look at the dotted line, you can see that if you go from
an entry intensity of 0 to 0.03, his unrated model goes
down to 75 percent.  So that's saying if you enter with
an intensity of 0.03, fares on the route are going to
come down by 75 percent.

1        But then the -- the relationship turns and

2    actually entering more aggressively leads to higher

3    fares.  And if we go all the way over to 0.06, we can

4    see the weighted line is now above 0.  So that's saying

5    if you enter twice as aggressively as 0.03, fares on the

6    route actually go up.

7        So this is not a plausible relationship, that

8    flooding the route with capacity is going to lead to

9    higher fares on average.  And on the right-hand side we

10   can see the same chart for Spirit.  So Professor

11   Gowrisankaran's model finds this relationship for both

12   Spirit and JetBlue.

13   Q.    You said it was implausible in your view.  Why do

14   you believe it's implausible?

15   A.    Well if a carrier enters a route and adds a large

16   amount of capacity, it's going to have to have people

17   flying on those planes, and the only way you're going to

18   do that is by lowering fares.  But the model here is

19   predicting that actually fares would go up on average,

20   that you can fly a huge amount of additional planes,

21   raise prices, and still be able to compete effectively.

22   Q.    Can you provide an example, beyond the one you

23   just gave, of the implications of this model's shape for

24   a specific route?

25   A.    Yeah, so this backward bending, this going down

1    and then going back up in a parabola, means that routes

2    in which today's Spirit has a high relative capacity can

3    have strange predictions.

4         So, for example, one of the overlap routes is

5    between Philadelphia and Aguadilla, and if you applied

6    this model to that route, it predicts trillions of

7    dollars of harm, because it's a high-relative capacity

8    route and it gets into this part where the curves are

9    starting to do very very strange things.

10   Q.   Now obviously Professor Gowrisankaran's now

11   predicting trillions of dollars of harm.  What does he

12   say about the point that you just made?

13   A.   Sure.  So his argument is "Look, I'm going to

14   estimate this relationship and I'm only going to use the

15   part of the curves for which I have an entry-intensity

16   event of relative capacity, so I'm going to cut it off

17   beyond that, and Aguadilla-Philadelphia is beyond that.

18   So he just doesn't apply his model to that sample.  But

19   these lines that he's plotting here are the -- his model

20   is predicting each one of those points equally, and I

21   don't think -- I think what it's showing is that the

22   model is making strange predictions because it has a

23   strange shape that doesn't really fit industry reality.

24   Q.   Do you have a view that the validity of his point

25   is to just look at a range that is within a certain

1    number of the data points on this curve?

2    A.    Yeah, I don't think it's reasonable.  And I think

3    that the Aguadilla-to-Philadelphia example is showing us

4    that something is going wrong in the underlying model.

5    Q.  All right.  Going back to your critique.

6         So Professor Gowrisankaran, um, you said is

7    "sensitive to small changes."  What did you mean by

8    that?

9    A.    So if we could please advance to Slide 22.  This

10   is another of Professor Gowrisankaran's slides, or an

11   excerpt from it.

12        And here he's getting at a point, he's really

13   zoomed in on very small changes in relative capacity.

14   And in his model this is the -- the yellow line here,

15   your Honor, is Spirit and the blue line here is JetBlue.

16   And if we look at the Spirit line here, it's saying that

17   for a relative capacity of 0, there's a 10 percent

18   decrease in fares.

19        So, for example, if you take a very busy route,

20   like Miami to New York, Professor Gowrisankaran's model

21   is saying that on that route, with many competitors,

22   lots of capacity, if Spirit entered with one flight a

23   week, say a flight on Thursday, all fares would go down

24   by 10 percent on that route.  And this is not plausible,

25   that that small level of entry intensity is going to

1    have that impact.

2         So I just made one change to his model and that

3    change was I said "If you have 0 relative capacity, the

4    price change is going to be 0."  No other constraints.

5    After that the curves can do anything they like, they

6    can drop quickly, they can drop slowly.  And if you make

7    that small change, it makes a big difference in the

8    predictions of the model.

9    Q.    And when you said "They can do anything they

10   like," you mean using Professor Gowrisankaran's

11   methodology?

12   A.    Yeah, the methodology is not constrained.  I'm

13   just saying if you have 0 relative capacity, you have 0

14   price change.

15   Q.    And that's the assumption you changed?

16   A.    That's the assumption that I changed, yes.

17   Q.    I just want to make one point.  This slide says

18   "Results of My Net Harm Model."  This is displaying a

19   slide that Professor Gowisankaran displayed, correct?

20   A.    Yes, this is his slide.

21   Q.    So the "my" there is not referring to you,

22   correct?

23   A.    That's correct, it's referring to his model.

24   Q.    And what happened when you made that change to,

25   um, to that inner set, that 0 equals 0 point?

1    A.    So if we advance please to Slide 23.  This is a

2    figure summarizing the effect.

3          And, your Honor, here the purple bars are

4    summarizing Professor Gowrisankaran's initial results.

5    So you can see his weighted model says $944 million in

6    harm and his unweighted says on the order of $2.6 in

7    harm.  And then the blue bars are what happens if I make

8    this small change to his model.

9          None of his weighted model predicts that the

10   transaction will generate $161 million in benefit for

11   consumers.  And on the unrated model it still predicts

12   harm on the order of $637 million.  But the amount of

13   harm has dropped by $2 billion.  So a small tweak to the

14   model is resulting in making very different predictions.

15   Q.    Are you giving the Court a view that the rest of

16   his model is valid so that these numbers in blue are

17   correct?

18   A.    No, the point I'm just trying to make here is that

19   small changes in the model result in very big changes in

20   predictions.  The model is unstable.

21   Q.    And what is the implication that that small change

22   equals a large change in results points?

23   A.    Yeah, I think it's one of the reasons why I think

24   the model is not reliable.

25   Q.    All right.

1          Now you said that, um, Professor Gowrisankaran did

2     not consider whether JetBlue's presence on a route

3     affects the impact of Spirit's entry on the route.  What

4     did you mean by that?

5     A.    Yeah, so if we could please advance one more

6     slide.

7          So, your Honor, you can imagine that both JetBlue

8     and Spirit, when they enter, have an impact on the fares

9     of existing carriers.  And so if JetBlue enters and then

10    Spirit enters, Spirit's additional entry -- you can only

11    get so much blood out of a stone, so it may not be as

12    impactful if Spirit entered when JetBlue was not

13    present.  And so to test this, I estimated what happens

14    if Spirit enters when JetBlue is present and when

15    JetBlue is not present?

16         So the left-hand side here is Professor

17    Gowrisankaran's unrated model.  When JetBlue is not

18    present and Spirit enters, also rival fares drop by 10

19    percent on average.  When JetBlue is present, rival

20    fares drop on average by 6 percent.  So as we might

21    expect, JetBlue's presence means that Spirit has a

22    smaller marginal effect.

23         The right-hand side is Professor Gowrisankaran's

24    weighted model.  Here when JetBlue is not present

25    Spirit's entry lowers rivals' fares by 6 percent, and

1    when JetBlue is already present, they go down by 1

2    percent.  And so what we can see is if JetBlue is

3    present, it mitigates the impact of losing Spirit as a

4    competitor or of Spirit entering as a competitor.

5    Q.    Dr. Hill, you've mentioned several times

6    "weighted" versus "unweighted" and you've provided

7    slides and information about your critiques.  Do those

8    matter -- does it matter whether you use weighted or

9    unweighted for the ultimate points you're making?

10   A.    No, I think my points apply to both the unweighted

11   and the weighted model.

12   Q.    Okay.  Sir, you've mentioned a number of

13   critiques.  Did you look at the cumulative effects of

14   your critiques on Professor Gowrisankaran's analysis?

15   A.    I did.  So if we could please advance to Slide 25.

16         This slide here is looking at the left of

17   Professor Gowrisankaran's unweighted model and at the

18   right at his weighted model.  And what we can see is

19   that the unweighted model, after I make my adjustments,

20   is predicting 274 billion -- million, sorry, in

21   benefits, and the weighted is predicting 708 million in

22   benefits.

23   Q.    Now does that mean that the transactions before

24   the Court is beneficial, um, as a net matter?

25   A.    So this, your Honor, is just taking into account

1    of rival fares, that was one of my critiques.  So later

2    on I'll separately take account of what would happen to

3    Spirit passengers if Spirit were to disappear.

4    Q.    And you talked about various critiques.  Did they

5    all result in adjustments going in the same direction

6    when you did the revised run of the model?

7    A.    No, so Professor Gowrisankaran noted in his

8    testimony that some of my critiques tend to increase

9    harm and some of them tend to decrease harm.  And I

10   don't find that surprising.  I didn't make those changes

11   to affect harm, I made them because I thought they were

12   the right way to estimate the model.

13   Q.    And could you give a final summary for the Court

14   of what you did to adjust the model to get these green

15   results that we have here?

16   A.    Yes.  So what I did was I adjusted for this fact

17   that Spirit's impact may vary depending on whether or

18   not JetBlue is present.  I adjusted for the presence of

19   other carriers.  I used the data from 2011 to, um, 2018.

20   I used, um, as I said, one year before and one year

21   after.  So I used a consistent window to look at each of

22   the events.

23        I dropped a small number of entry events where

24   Professor Gowrisankaran had one carrier enter and it

25   exited before one year.  I don't think those ones are

1    the best basis.  And then I used my entry-intensity

2    model rather than his relative capacity model.

3    Q.    I think you said something about before and after

4    windows that you used.  Could you just contrast that

5    with what Professor Gowrisankaran did?

6    A.    Sure.  In my methodology, your Honor, I compare --

7    to try to understand the impact of entry, I say "What

8    did fares look like on average for the year before and

9    what did they look like in the year after?"  Professor

10   Gowrisankaran uses different entry windows.  So for one

11   entry event he may compare one year before to two years

12   after.  Another he may compare two years before to one

13   year after.  So I thought it was sensible to pick a

14   particular window one year before compared to one year

15   after to estimate the effect.

16   Q.    Okay.  We've discussed the impact of JetBlue and

17   Spirit entry on fares.  Did you analyze the effect of

18   each of those carriers' entry on the number of

19   passengers on particular routes?

20   A.    I did.

21   Q.    And why did you want to examine changes in

22   passenger volume?

23   A.    So passenger volume can be taken as a sort of a

24   bellwether of whether consumers are better off on

25   average.  If you see an entry or some other change and

1    the number of passengers increases, it's indicating that

2    passengers like that change and they're more willing to

3    travel on that route than they were before.

4    Q.    And what did you do to analyze the impact of

5    JetBlue's entry on numbers of passengers?

6    A.    So if we could please advance to Slide 26.

7          So, your Honor, this is similar to the previous

8    slide we had.  Again the horizontal axis here is

9    particular quarters and then the vertical axis is going

10   to be the total number of passengers per quarter.  And

11   again the lines will show the passenger volume.

12         So if we look at this -- this is that same route

13   between New York City and Savannah, we can see that

14   JetBlue enters in the first quarter of 2014, and we see

15   over time Delta's volume increases significantly.  And

16   the inset graph tells us that before JetBlue's entry,

17   the average volume was 83,000 per quarter.  After it's

18   138,000.  So an increase of roughly 70 percent.

19   Q.    And what conclusion did you draw from this

20   example?

21   A.    Yeah, so this is again going back to this

22   question.  The passengers here are showing us that

23   JetBlue entering and forcing rival carriers to lower

24   their fares benefitted passengers and more of them are

25   flying after the transaction than did before.

1    Q.    Did you do any systematic analysis of the impact

2    of entry on the number of passengers flying a route?

3    A.    I did.  So if we could please advance to Slide 27.

4          So in this figure here, your Honor, Professor

5    Gowisankaran, in his initial report, estimated that when

6    Spirit enters, there's a 32 percent increase in

7    passenger volume.  So Spirit enters and demand is

8    stimulated.

9          So in my rebuttal report, I did the same thing for

10   JetBlue.  And we can see that JetBlue, when it enters,

11   on average passenger volume increases by 56 percent.  So

12   we can see that JetBlue, using this measure, is having a

13   larger impact on passengers than is Spirit.

14   Q.    Did you perform any other analysis of the impact

15   of entry on passenger volumes?

16   A.    I did.  So if we could please advance one more

17   slide to 28.

18         Here, your Honor, I took Professor Gowrisankaran's

19   relative capacity model and instead of using it to

20   estimate a change in fares, I used it to estimate a

21   change in passenger volume.  And so the right-hand side

22   here, which is indicated with an intercept, that

23   prediction is from Professor Gowrisankaran's model and

24   it predicts an increase of 1.7 million in total number

25   of passengers as a result of the transaction.  The left-

1   hand side, which says 1.2 million, this is Professor

2   Gowrisankaran's model with the small change I made to it

3   to, um, make sure that when there's 0 relative capacity,

4   there's 0 effect.

5   Q.    All right.  So the phrases at the bottom, "Without

6   Intercept" and "With Intercept," just remind the Court

7   what those refer to?

8   A.    Sure.  The right-hand side here is "With

9   Intercept" and is Professor Gowrisankaran's model.  The

10  left-hand side is the model with the small tweak I

11  described earlier.

12  Q.    And what is the implication of this finding?

13  A.    So Professor Gowrisankaran's model is predicting

14  that passenger volume will likely increase as a result

15  of the transactions.

16  Q.    Does Professor Gowrisankaran agree with this

17  analysis of yours?

18  A.    Professor Gowrisankaran objects to this, and his

19  argument is he's holding the number of the amount of

20  capacity fixed, so any change in the number of

21  passengers is just noise.  But of course with the data

22  also picking up what we saw in the previous slide.  When

23  JetBlue enters, how do rival carriers respond and how do

24  passengers respond to those change in rival carrier

25  fares?

1    Q.    Do you agree with his critique?

2    A.    I don't.  I think this is a real prediction that

3    the model is making that they'll be an increase in the

4    number of passengers.

5    Q.    Do you have another slide to demonstrate this

6    point?

7    A.    Sure.  If we could please advance to Slide 29.

8          This is Professor Gowrisankaran in his testimony

9    introduced this figure saying "If I control plane for

10   plane, then it's true that JetBlue's entry increases the

11   number of passengers relative to Spirit, the effect is

12   relatively small."  So the 1.7 million we saw in the

13   previous slide is not a large number, it's on the order

14   of 1 percent, but it is a significant increase.  And

15   here we're seeing Professor Gowrisankaran's analysis.

16   But when you do it plane for plane, JetBlue still has a

17   larger impact than Spirit.

18   Q.    And this is actually a slide that Professor

19   Gowrisankaran presented to the Court in this trial,

20   correct?

21   A.    That's correct, this is taken from his slide,

22   Number 104.

23   Q.    All right, stepping back.

24         Dr. Hill, what do you conclude based on your

25   analysis of the impact of JetBlue's entry on prices and

1    passenger volume combined?

2    A.    So when JetBlue enters a route, it leads to lower

3    fares and more passengers, and that's true both in

4    absolute terms and also relative to Spirit.

5    Q.    And what implications does that have for your

6    analysis of the possible competitive effects of the

7    merger that's before the Court?

8    A.    So this is the basis for my second conclusion that

9    JetBlue is a more effective competitor than Spirit is.

10   And so routes on which, for example, Spirit is competing

11   today and JetBlue is not, when we replace Spirit with

12   JetBlue, it's likely to increase benefits to consumers.

13   Q.    Okay, thank you.  Let's now turn to Professor

14   Gowrisankaran's analysis of the impact of the

15   transaction on competition.

16        How do you understand his analysis of the effects

17   of the transaction on airline routes?

18   A.    Sure.  So if we could please turn to Slide 30.

19        This is just a summary, your Honor, of Professor

20   Gowrisankaran's prediction.  He predicts adverse

21   competitive effects on 562 routes.  And on the left-hand

22   side here we have -- and I'll talk about each of these

23   in more detail individually, but he has three routes on

24   which the plaintiffs are not asserting a presumption,

25   but he believes there's ultimately going to be harm

1    based on his model.  And then on the ride-hand side

2    there are three routes where the plaintiffs assert the

3    presumption and he believes there's likely to be harm to

4    consumers.

5    Q.    Just at a high level, do you agree in general with

6    Professor Gowrisankaran that these 562 routes are likely

7    to see adverse competitive effects?

8    A.    I don't.  I don't think that prediction is

9    reliable.

10   Q.    And why don't you agree?

11   A.    Well, sir, we've already talked about two high-

12   level reasonings.  One is the, um, the frequency that

13   entry and repositioning occur in this industry, and then

14   the other is that the -- as we just saw, JetBlue is a

15   more effective competitor than Spirit.  And then for

16   each of the -- those are sort of broad reasons that

17   apply across the routes.  And then each specific route

18   category, there's additional reasons why I don't think

19   the predictions are reliable.

20   Q.    Okay, let's go through these categories, one at a

21   time, hopefully not spending too much time on any one.

22   What is a "Spirit-only route," the one on the far left?

23   A.    Sure.  So a "Spirit-only route" is a route on

24   which today Spirit is competing and JetBlue is not.

25   There may be other carriers, but the key on the route,

1    but the key feature is that Spirit is present and

2    JetBlue is not.

3    Q.    And how many such routes are there?

4    A.    So if we could please turn to Slide 31.  There

5    are -- we're just here, your Honor, narrowing in on a

6    particular category.

7          There's 115 such routes.

8    Q.    And I think this is obvious from the picture.  But

9    did Professor Gowrisankaran assert that a structural

10   presumption applies to these routes?

11   A.    He did not.

12   Q.    There's no current competition between JetBlue and

13   Spirit on these routes, correct?

14   A.    That is correct.

15         MR. THORNBURGH:  Objection.

16         THE COURT:  No, sustained.

17         You're leading the witness.

18         MR. GELFAND:  Understood, your Honor.

19   Q.    Do you have an example of a Spirit-only route?

20   A.    Yes.  So if we could please turn to Slide 32.

21         So this, your Honor, is looking at the Spirit-only

22   route between Atlanta and Chicago, and each of the

23   ribbons connecting Chicago and Atlanta is showing a

24   particular carrier.  So the dark marine, for example, is

25   Delta.  And then the thickness of each of the ribbons

1      shows the relative market share or the relative route

2      share of that carrier.  So Delta has 43 percent.

3      Southwest has 24 percent.  American has 13.  United has

4      11.  Spirit has 7 percent.  And Frontier has 2 percent.

5      And these are nonstop carriers because we're connecting

6      directly between Chicago and Atlanta.

7              And you can see, your Honor, that Spirit is

8      present with 7 percent share and JetBlue is not present.

9      And then in the upper right-hand corner, Professor

10     Gowrisankaran estimates that they'll be $18 million per

11     year in harm on this route.

12     Q.    Why does Professor Gowrisankaran's model predict

13     harm on this route?

14     A.    So his prediction here again goes back to his

15     prediction that Spirit is a more effective competitor

16     than JetBlue.  So his prediction is if you replace

17     Spirit with JetBlue, you're going to see an increase and

18     you're going to see harm.

19     Q.    And what did your analysis show?

20     A.    My analysis shows the opposite.  That if we

21     replace Spirit with JetBlue, you're going to see an

22     increase in competition, it's going to lower the fares

23     charged by rival carriers, and that's going to benefit

24     consumers.

25     Q.    Professor Gowrisankaran asserts that you ignored

1    all of these Spirit customers on these Spirit-only

2    routes.  How do you respond to that?

3    A.    No, I don't agree with that.  So I think what I'm

4    doing here is saying the rival carriers, when JetBlue

5    enters, are going to decrease fares by more and it's

6    going to stimulate passengers on them by more.  What's

7    more is there are going to be consumers who want to fly

8    JetBlue who previously could not and now have that

9    option available to them.  There may be some Spirit

10   customers who really value Spirit services.  For them

11   they have the option of purchasing Blue Basic tickets.

12   Or if they're a large-enough group, then entering and

13   repositioning, a new ULCC can come in and serve that

14   profit opportunity.

15        THE COURT:  Go back a phrase or two.

16        You said that there no doubt are people who would

17   rather fly JetBlue but previously they didn't have that

18   opportunity.  But this chart shows that they do.

19        Did I mishear you?

20        THE WITNESS:  So JetBlue is not presently --

21   present on the routes, your Honor.  The blue here is

22   United.

23        THE COURT:  I stand corrected.  I understand.

24   Thank you.

25   Q.    Okay.  Now you said, um, that those who want an

1    ultra-low-cost carrier, they can could, um -- that it's

2    possible others would enter.  But on this route, are

3    there any ultra-low-cost carriers other than Spirit

4    already serving the route?

5    A.    Yes, Frontier today is present on the route.

6    Q.    Is this the only Spirit-only route where that's

7    the case?

8    A.    No, I don't have a summary of all of them, but

9    there are certainly other Spirit-only routes where

10   ultra-low-cost carriers are present today.

11   Q.    Okay, let's move to the next category,

12   "Econometric Routes," I think you called it.  What is an

13   "econometric route"?

14   A.    So these are routes where, um, the plaintiffs

15   don't allege that there's a structural presumption, but

16   Professor Gowrisankaran's model predicts that there

17   nevertheless be a significant reduction in competition.

18   Q.    And how many econometric routes are there in this

19   case?

20   A.    So if you would please turn to Slide 33, you'll

21   see that there's 96.

22   Q.    Does Professor Gowrisankaran assert that a

23   structural assumption applies to these routes?

24   A.    He did not.

25   Q.    Do you have an example of one of these econometric

1    routes?

2    A.    Sure.  If we could please turn to Slide 34.

3          Here, your Honor, we have a similar figure to the

4    one we saw before, but this time we're looking at

5    service between San Francisco and Las Vegas.  And you

6    can see that a large number of carriers serve this on a

7    nonstop basis, including Southwest, Frontier, Spirit,

8    Allegiant, Alaska.  And then two carriers serve it on a

9    connect basis via Los Angeles.  So Delta has 0.2 percent

10   market share connecting via Los Angeles and JetBlue has

11   a 0.04 market share.  So JetBlue is technically present

12   on the route, but it has a very small share.  And you

13   can see in the lower right-hand corner, Professor

14   Gowrisankaran's model estimates $25 million per year in

15   harm on this route.

16   Q.    And on this route is, um, Spirit competing with

17   any other ultra-low-cost carriers already?

18   A.    Yeah, so Frontier and Allegiant are both ultra-

19   low-cost carriers and Southwest is a low-cost carrier.

20   Q.    And in your opinion, what is the implication of

21   JetBlue replacing Spirit on this route?

22   A.    So this particular route is similar to one of the

23   Spirit-only routes, today JetBlue is not presently

24   competing.  When they enter the route to replace Spirit,

25   they will put pressure on rival carriers to lower their

1   fares and that will benefit passengers.

2   Q.    Then why does Professor Gowrisankaran's model

3   predict $25 million per year of harm on this route?

4   A.    So his model predicts that Spirit is the more

5   effective competitor and so he comes up with a

6   prediction of significant harm here, because in his

7   model replacing Spirit with JetBlue is a negative.

8   Q.    And do you agree with that?

9   A.    I don't.

10  Q.    Okay, let's move on to "Spirit Entry Routes," your

11  third category.  What is a "Spirit-entry route"?

12  A.    This is a route that Spirit planned to enter

13  according to its 2027 network plan by 2027.  But it does

14  not serve today.

15  Q.    Please -- I'm sorry I interrupted you.

16  A.    That it plans to serve by 2027, but does not serve

17  today.

18  Q.    And how many Spirit entry routes are there in

19  Professor Gowrisankaran's analysis?

20  A.    Yeah, I see, we're on Slide 35.  There are 168.

21  Q.    Did Professor Gowrisankaran assert that a

22  structural presumption applies to these 168 Spirit-entry

23  routes?

24  A.    He does not.

25  Q.    Can you provide the Court with an example of one

1  of these for illustration?

2  A.    Sure.  If we could please move to Slide 36.

3        This is the route between Providence and Orlando.

4  So you can see today it's served on a nonstop basis by

5  Southwest, JetBlue, and Frontier, and then on a connect

6  basis by American, Delta, and United.

7  Q.    And looking at these, um, these -- this particular

8  example.  Is there any assurance that Spirit would enter

9  this or any of the other routes in Professor

10 Gowrisankaran's analysis?

11 A.    No, and indeed if you look on the left-hand side

12 you'll see some testimony from Mr. Kirby saying that

13 because of the airline -- the engine issues and other

14 factors, Spirit is unlikely to be able to enter

15 everything it had planned to by 2027.

16 Q.    And even if it enters, is there any assurance that

17 Spirit would be successful as a competitor on those

18 routes?

19       MR. THORNBURGH:  Objection, your Honor.

20       THE COURT:  Grounds?

21       MR. THORNBURGH:  Leading, your Honor.

22       THE COURT:  Well technically that is, but in my

23 discretion I'll let him have it.

24       Is there in your opinion?

25       THE WITNESS:  No, because we don't have a

1    prediction of what would happen if Spirit were to enter

2    this route.

3    Q.    And did Professor Gowrisankaran estimate the

4    competitive impact of Spirit's entry on any of these

5    Spirit-entry routes?

6    A.    He did not.

7    Q.    Is JetBlue even present on these routes today?

8    A.    So it's present on this route and it's present on

9    23 of the 168, but on the other 145, it's not present

10   today.

11   Q.    And what are your conclusions, based on your

12   economic analysis, about Spirit-entry routes?

13   A.    So those 145 other routes are routes on which

14   JetBlue can enter tomorrow and could enter in Spirit's

15   stead and potentially have a more significant impact

16   than Spirit does.  So I think on balance it's unlikely

17   that there's going to be a substantial reduction of

18   competition on these Spirit-entry routes.

19   Q.    All right, let's talk about the next category,

20   which you called "Connect Routes."  What are "connect

21   routes"?

22   A.    "Connect routes" are routes on which both carriers

23   today are serving the route on a connect basis, not

24   nonstop.

25   Q.    And how many of these connect routes are there in

1   Professor Gowrisankaran's analysis?

2   A.    So there are about 117.  And if we could please

3   turn to Slide 37, we'll see that.

4   Q.    Did Professor Gowrisankaran do any analysis, um,

5   other than calculating market shares and concentration

6   on these routes?

7   A.    No, he did not.

8   Q.    Did his model predict any harm on any of these

9   routes?

10  A.    No, he didn't make predictions for these routes.

11  Q.    And how often do JetBlue and Spirit fly connect

12  service generally?

13  A.    So if we could please advance to Slide 38 we'll

14  see a summary of that issue.

15        So here, your Honor, we're looking at selected

16  carriers and the percentage of their domestic ticketed

17  passengers that had at least one connection in 2022.  So

18  you can think of this as each of these carriers'

19  percentage of connect passengers.  And if we look first

20  at the left-hand side, we'll see American, Delta, and

21  United, are grouped together with between 29 percent and

22  40 percent.  So these carriers are carrying a

23  significant amount of connecting traffic.  And if we

24  then look at the right-hand side, we'll see JetBlue has

25  only 6 percent connect passengers, Frontier has 8

1   percent, and then Spirit is 9 percent.

2        So both Spirit and JetBlue are heavily focused on

3   serving nonstop routes point to point.  And the legacy

4   carriers on the left have much more of the hub-and-spoke

5   model.

6   Q.    As part of your analysis in this case, did you

7   examine how JetBlue and Spirit set fares on these

8   connect routes?

9   A.    I did.

10   Q.    And what did you determine?

11   A.    So they do it in two ways, and the first is known

12   as "Sum of Locals," and the other is "Through Fares."

13   And if we could please advance to Slide 39, we'll see an

14   example of this.

15        So on the left-hand side here, your Honor, we have

16   a hypothetical route, which I just created to illustrate

17   the concept, and it's a connect route between Boston and

18   San Juan that goes via Miami.  And if you're doing Sum

19   of Locals' pricing, the price on that route will be the

20   sum of the two nonstop legs, which here you can think of

21   as being the locals.

22        So Boston to Miami costs $100.  If you fly it

23   direct, Miami to San Juan cost $100.  So to get the

24   fare, including the Sum of Locals, you just add them

25   together and it's $200.  That fare is not reflecting

1    competition on the connect route, it's reflecting the

2    competition on the underlying routes.  So if the fare

3    between Boston and Miami changed, the Sum of Locals

4    fares would change by the same amount.  So that's Sum of

5    Locals pricing.

6         And then a "Through Fare" is if the airline says

7    "We want to explicitly set the price between Boston and

8    San Juan.  We can set it at $180.  We can set it at

9    $220.  But it would be something other than the Sum of

10   Locals."  It could be in response to their cost to serve

11   the route.  It could be in response to competition on

12   the route.  Whatever their reason, it's not merely

13   taking the Sum of Locals.

14   Q.    Did you look at how often -- and these numbers are

15   on the public version, Dr. Hill, but did you take a look

16   at how often JetBlue and Spirit used the Sum of Locals

17   method?

18   A.    Yes.  So on the right-hand side here we have, for

19   Spirit, the percentage of its passengers who pay a Sum

20   of Locals fare, and on the left of the figure we have

21   JetBlue's percentage.  And you can see that they're both

22   significant.

23        Not surprisingly, given that these two carriers

24   don't focus on connect service, they're often pricing

25   their connect service just as the Sum of the Locals,

1   what's the cost to fly each of the two nonstop local

2   legs?

3   Q.    And what is the implication of that for an

4   economic analysis of connect routes?

5   A.    Oh, I apologize.  For routes that have a high

6   percentage of Sum of Locals, the fare is not primarily

7   being driven by competition between connect carriers or

8   nonstop carriers, it's instead being driven by

9   underlying routes that aren't connected or are not the

10  same as the connect route.

11  Q.    And do you have an example of one of these connect

12  routes to present to the Court?

13  A.    Sure.  If we could please advance to Slide 40.

14        So this is looking at a connect route between

15  Milwaukee and Santiago in the Dominican Republic.  And,

16  your Honor, before diving into the details, I should say

17  that this route, in the time period Professor

18  Gowrisankaran studied, had 410 passengers total across

19  all airlines.  So that's roughly 1 passenger a day.  So

20  calling this a "route" in some sense is maybe giving it

21  more credit than it deserves, just because this is not a

22  focused run of these carriers.  There's very limited

23  volume on this.

24        But setting that aside, we can see that different

25  carriers are serving this on a connect basis in

```
 1    different ways.  American, United, Spirit, JetBlue, and
 2    Delta are all present, serving it connect.  And you can
 3    see that Delta in fact -- the other carriers are all
 4    doing one stop, but Delta is actually doing two stops to
 5    get to Santiago.  And on this route, Spirit, 95 percent
 6    of its passengers are traveling Sum of Locals, and for
 7    JetBlue, 100 percent of passengers are traveling Sum of
 8    Locals.
 9         So the pricing here has really not being driven by
10    competition between JetBlue and Spirit on this route or
11    even between JetBlue and Spirit on the other carriers,
12    it's instead for these carriers been driven by the
13    underlying nonstop demand on the routes that make up the
14    connect route.
15    Q.   And have you looked at this issue more generally
16    than just particular examples?
17    A.   Yes.  If we could please turn to Slide 41.
18         This, your Honor, is a summary of the Sum of
19    Locals issue.  So if you look at the horizontal axis,
20    this is going to show us the percent of JetBlue
21    passengers paying a Sum of Locals fare, and the vertical
22    axis will show us a percentage of Spirit passengers
23    paying a Sum of Local fare.  And then each dot is going
24    to be one of Professor Gowrisankaran's 117 routes.  And
25    what you can see is that for every one of the routes,
```

1  one of the carriers or the other has 50 percent Sum of

2  Locals or more.

3       And indeed if we look at the upper right-hand

4  corner, this box that's shaded the most dark gray, this

5  is where both carriers have 50 percent or more, if their

6  passengers are Sum of Locals.  So what the figure is

7  showing us is that by and large the fares on these

8  routes are not likely to be the result of competition

9  between JetBlue and Spirit.

10      And then I've indicated, your Honor, with red any

11 route that has fewer than 5,000 annual passengers.  So

12 these are routes that have very low volume.  And we've

13 heard some testimony in this case about the A320.  If

14 you were to fly an A320 once a week, you could carry

15 about 200 passengers.  So if you did that, you'd get

16 more than 10,000 passengers a year.  These routes have

17 half of that amount for all carriers on the route.  So

18 the red dots are indicating routes that really have a

19 low total volume of passengers that are not likely to be

20 a competitive focus.

21 Q.   And what do you conclude from this figure,

22 Dr. Hill?

23 A.   Because of this Sum of Locals issue, I don't think

24 that there's likely -- and also the small size of some

25 of these routes, I don't think there's likely to be a

1    substantial lessening of competition on these routes.

2    Q.    Okay, let's go to your next category, "Mixed

3    Routes."  What are "Mixed Routes"?

4    A.    So a "mixed route" is a route on which one of the

5    two carriers serves the route nonstop and the other

6    carrier offers only connect service.

7    Q.    How many mixed routes are there in Professor

8    Gowrisankaran's analysis?

9    A.    So there are 15.  And if we could please advance

10   to Slide 42, we'll see that number.

11   Q.    And do you believe that there is likely to be a

12   substantial reduction in competition on these routes?

13   A.    I do not.

14   Q.    Why not?

15   A.    So there's a number of reasons.  A first one is

16   it's often the case that a connect carrier of the two

17   tends to have a very low market share, and it tends to

18   be the case that the connect carrier has a significant

19   percentage of Sum of Locals.  And then for some of these

20   routes, the connect fare is actually significantly above

21   the nonstop fare, which is a sign that there isn't close

22   competition between the connect fare and the nonstop

23   fare.

24   Q.    Do you have an example of one of these mixed

25   routes for the Court?

```
 1    A.     Yeah, if we could please advance to Slide 43.

 2           This is the mixed route between Boston and Montego

 3    Bay in Jamaica, and here you can see that there are

 4    three nonstop carriers, JetBlue, American, and Delta.

 5    And then we have United, Southwest, Spirit, and

 6    Frontier, are also competing on the route.  And you can

 7    see that Spirit's market share on this route is 3

 8    percent and its Sum of Locals, and I won't give the

 9    exact number, but is a high number on this route.

10    Q.     Did Professor Gowrisankaran estimate harm on this

11    route that we have before us?

12    A.     On this one he did not, no.

13    Q.     And then what is the implication of JetBlue

14    replacing Spirit on this route?

15    A.     So on this route, um, Spirit only has a relatively

16    small market share here, so I think replacing Spirit

17    with JetBlue here is not likely to have a large impact

18    on competition.

19    Q.     And have you looked at mixed routes in a more

20    systematic way?

21    A.     Yeah, if we could please advance one more slide to

22    Slide 44.

23           Here, your Honor, again we're looking at this

24    connect -- sorry, your Honor.  On the horizontal axis

25    here we have the connect-only carrier share of
```

1     passengers.  So the carrier that is connect-only, what
2     is its share on the route?  And then on the vertical
3     axis we have the connect-only carrier, what percent of
4     its passengers are paying a Sum of Locals fare?  And the
5     yellow dots are Spirit routes and the blue dots are
6     JetBlue routes.

7          And what we can see from the Spirit routes is
8     Spirit, typically when it's the connect-only carrier,
9     has a low share on the route and a large proportion of
10    its customers are paying a Sum of Locals fare.
11    And then on the JetBlue ones, we again see a low market
12    share.  Here the Sum of Locals percentage is lower.  But
13    on these routes, JetBlue, the connect carrier, is
14    charging a significantly higher fare than the nonstop
15    carrier, which is a sign there's unlikely to be
16    substantial competition today between the connect
17    carrier and the nonstop carrier.
18    Q.    Why is there unlikely to be substantial
19    competition today?
20    A.    Right.  So on some of these the connect fare is
21    more than $100 above the nonstop fare and nonstop fares
22    are more attractive than connect fares in general
23    because you don't have to connect, it takes less time,
24    there's less risk of losing your luggage or missing a
25    connection.  So if we see a situation where the connect

1    fare is significantly higher, it doesn't seem likely

2    that that's a major competitive constraint on the

3    nonstop route and it doesn't seem likely that that

4    connect route was set with respect to the nonstop

5    carriers' fares.

6    Q.    Okay, let's talk about the last category, um,

7    "Nonstop Overlap Routes," that's the 6th category on the

8    graph that you showed earlier.

9          What is a "Nonstop Overlap Route"?

10   A.    Yeah, so a "nonstop overlap route" is one on which

11   both carriers today are offering nonstop service.

12   Q.    How many nonstop routes are there in the United

13   States?

14   A.    There's more than 6,000.

15   Q.    And how many routes, nonstop routes do JetBlue and

16   Spirit combined fly today in the United States?

17   A.    Um, more than 600.

18   Q.    And how many nonstop overlap routes are there in

19   Professor Gowrisankaran's analysis?

20   A.    So if we could advance one more slide, please, to

21   45, we'll see that there's 51 such routes.

22   Q.    What is your evaluation of Professor

23   Gowrisankaran's assessment of the likelihood of adverse

24   competitive effects on these routes?

25   A.    I don't think it's reliable.

1    Q.    And what is the basis for that opinion, Dr. Hill?

2    A.    I don't think he adequately takes account of entry

3    or the effect of the divestitures.

4    Q.    Let's take those one at a time.

5          Are you aware of evidence from the trial record

6    that is relevant to your economic analysis about entry

7    and exit on these 51 nonstop overlap routes?

8    A.    Yeah, so as we discussed earlier, we saw

9    significant evidence about the frequency of entry in the

10   airline industry, but then in terms of the evidence in

11   the trial, we also discussed Professor Gowrisankaran's

12   exhibit with respect to the 51 routes where we saw that

13   9 of them have had entry or exit and are no longer

14   presumption routes, 7 new presumption routes are being

15   created, so showing that there's a lot of entry and

16   exit.  And I believe Mr. Friedman also testified that on

17   these 51 routes, there's been a significant number of

18   entries and changes in service since the time of

19   Professor Gowrisankaran's report.

20   Q.    So the, um, the slide that you referred to that we

21   saw earlier, your Honor, that was Slide 6, if your Honor

22   would want to refer back to it.

23         Just tell the Court one more time what that slide

24   from Professor Gowrisankaran showed?

25   A.    So that was -- Professor Gowrisankaran was looking

1    at, of the 51 nonstop routes in his initial report, how

2    many of them today are no longer presumptively, um,

3    illegal and how many new routes are being created that

4    could be presumptively illegal?  And so he saw roughly

5    20 percent of the 51 were no longer in the presumption

6    category and 7 new presumption routes are being created.

7    Q.    So that related to this category of 51 that we're

8    now talking about?

9    A.    That's correct.

10   Q.    Okay.  And in your opinion, did Professor

11   Gowrisankaran account for post-merger entry and

12   repositioning when he did his modeling?

13   A.    I don't think so, not in an adequate way.

14   Q.    Did you hear Professor Gowrisankaran testify in

15   this trial that he believes his model does incorporate

16   the probability of entry?

17   A.    Yes, and his argument was, your Honor, he looked

18   at entry events, as did I, and he argued that in his

19   entry study there were some exits.  And so those exits

20   were capturing sort of the inverse of entry.  So he

21   would have argued it was sort of built into the model.

22   That he's looking at entry and there were some exits, so

23   he's capturing that by looking at these events over a

24   1-year period.  You can consider that as controlling for

25   entry when you turn it around and think about exits.

1    Q.    What is your evaluation of that argument by

2    Professor Gowrisankaran?

3    A.    I don't think it's entirely reliable.  So in this

4    case we're asking a separate question, we're not

5    thinking so much about ordinary course entry, we're

6    asking more particularly were there to be an

7    anticompetitive effect, would you see increased entry

8    and repositioning?  And that is not something that was

9    captured in his study.

10   Q.    And what is the consequence of not capturing that?

11   A.    He's not, in my view, properly controlling for

12   entry and repositioning.

13   Q.    Are you talking about future entry?

14   A.    Correct.

15   Q.    Okay.  You also mentioned that Professor

16   Gowrisankaran's analysis disregards the divestitures in

17   this case.  Um, extremely briefly, the Court's heard

18   about it, but could you remind the Court about the

19   divestitures that are being made here?

20   A.    Sure, the parties have committed to divest assets

21   at four airports.

22   Q.    And how do you analyze divestitures as an

23   economist when you are evaluating a merger?

24   A.    Usually you want to build them into the

25   competitive effects analysis.  So is there likely to be

 1   a reduction in competition?  If so, would the

 2   divestitures help to offset that or mitigate it

 3   entirely?

 4   Q.    And in your experience, Dr. Hill, can it be

 5   instructive to perform a retrospective analysis of prior

 6   mergers in the same industry?

 7   A.    It can be, yes, you can look back and see what's

 8   happened in the past when there was a merger or there

 9   was a merger with a divestiture.

10   Q.    And how is that instructive?

11   A.    So it helps you see, in this industry, what is

12   likely to be the consequence of a particular

13   divestiture, have past divestitures been successful or

14   unsuccessful.

15   Q.    Is it necessary that it be perfectly analogous,

16   the prior example?

17   A.    Um, not necessarily, the more analogous it is, the

18   more weight you can give it.

19   Q.    Are you aware of any prior airline mergers that

20   had divestitures?

21         MR. THORNBURGH:  Objection, your Honor, relevance.

22         THE COURT:  Well he's tried to lay the foundation

23   for why it's relevant, and I think I'm going to hear the

24   evidence.  Overruled.

25   A.    Yes, I am aware.

1    Q.    And what are you aware of in that regard?

2    A.    So in 2013, the United States and American

3    Airlines and U.S. Airways settled that proposed merger,

4    and to settle it, American Airlines divested assets at 7

5    airports.  So they divested 104 slots at Reagan

6    National, they divested 34 slots at La Guardia, and they

7    divested 2 gates each at five other airports.

8    Q.    And when you say "slots," you're talking about

9    takeoff and landing slots?

10   A.    That's correct.

11   Q.    Have you done any analysis of what happened as a

12   result of those divestitures?

13   A.    Yes, if we could please advance to Slide 46.

14          So here, your Honor, again on the horizontal axis

15   here we have quarters ranging from the fourth quarter of

16   2011 to the fourth quarter of 2015, and the vertical

17   line in the middle here is indicating the date of the

18   divestitures.  And then I'm looking at the -- the

19   vertical axis is a number of passengers.  And the top

20   line here, the dashed section, this is the combined

21   volume of American and U.S. Airways prior to the

22   divestitures, and then the solid line is their volume

23   after the divestitures.

24          And so you can see, despite divesting 104 slots at

25   Reagan National, the merged firm was able to continue

1    serving its passengers or possibly even serve a few

2    more.

3           And then at the bottom, the other three lines are

4    looking at the divestiture buyers, Southwest, JetBlue,

5    and Virgin.  And you can see that each of those carriers

6    used the slots to significantly increase the number of

7    passengers it was serving.

8           THE COURT:  Yeah, it's time for the break, you're

9    moving along splendidly here, um, and that's not a

10   comment on substance, but on time.

11          (Laughter.)

12          THE COURT:  How much more time do you think you

13   have on direct?

14          MR. GELFAND:  I think I can finish this

15   examination in no more than 15 minutes, your Honor.

16          THE COURT:  Fine.  Go ahead.

17          MR. GELFAND:  Thank you.

18   Q.    What do you draw from this graph, Dr. Hill?

19   A.    Right, so these divestitures at Reagan National

20   led to a significant increase in competition.  We saw

21   more passengers served by the divestiture buyers.  And

22   the existing carrier was able to continue to serve its

23   customers.

24   Q.    So this is Reagan National.  Did you also look at

25   La Guardia?

1   A.    I did, and the pattern at La Guardia is

2   substantially the same.

3   Q.    And why are these findings relevant to your

4   current opinions?

5   A.    So given the divestitures proposed in this case, I

6   think this is useful to look back and then ask, in the

7   past have slot and gate divestitures had a significant

8   effect?  And it's showing us that they seem to be able

9   to maintain or increase competition.

10  Q.    And just for the Court's benefit, did the

11  divestitures that the DOJ agreed to in American

12  Airlines's, U.S. Air, include any aircraft, were any

13  aircraft divested?

14  A.    They were not.

15  Q.    And did the DOJ require the divestiture buyers to

16  replicate any of the routes for which the slots were

17  previously used?

18      MR. THORNBURGH:  Objection, your Honor, this is

19  outside the scope of Dr. Hill's report.

20      THE COURT:  It would seem so.

21      Move on.

22      MR. GELFAND:  I will move on, your Honor.  Thank

23  you.

24  Q.    Returning to the proposed merger between JetBlue

25  and Spirit.  And I may have a slide.  Let's do it

 1    quickly, the Court's seen it a number of times.

 2          What's being divested here?

 3    A.    If we move to Slide 47, please.

 4          Your Honor, this is just a summary of the

 5    proposed, um, or the committed-to divestitures in this

 6    matter.

 7    Q.    And who are the two buyers?

 8    A.    Allegiant and Frontier.

 9    Q.    Is there evidence in the trial record relevant to

10    your economic assessment of how Allegiant and Frontier

11    will likely use these assets that are going to be

12    divested?

13    A.    Yes, if we could please advance to Slide 48.

14          These are quotes from both Frontier and Allegiant

15    stating that they intend to use the assets to compete

16    aggressively at both airports.

17    Q.    And how do you evaluate these divestitures here?

18    A.    So I think the divestitures are likely to maintain

19    or increase competition at the airports at which they

20    were being made.

21    Q.    Did you look at how many of the 51 nonstop overlap

22    routes in that last category have one or both endpoints

23    in a city where there will be a divestiture?

24    A.    Yes, so if we could please advance to Slide 49.

25          This, your Honor, is summarizing that visually.

1    Each one of these bars represents a route, and a run of

2    the 51 routes, and the height of the bars represents the

3    total volume of traffic on that route.  And then the

4    routes that are grayed out are routes that involve a

5    divestiture airport.  And the routes that are not grayed

6    out, we have just a simple summary of the route shares,

7    where yellow is Spirit, blue is JetBlue, and green is

8    other competitors.  And some of these routes, if we go

9    to the far right to Miami to New York City, some of

10   these routes there's divestitures at both ends.  So for

11   this example Allegiant is acquiring assets in both Miami

12   and New York City.

13   Q.    What are the implications of those divestitures at

14   one or both ends?

15   A.    I think they're likely to maintain competition at

16   those airports.

17   Q.    Is it necessary to require Allegiant and Frontier

18   to serve those exact routes going forward?

19   A.    No, I don't think it's -- Allegiant and Frontier

20   both testified that they don't have a finalized plan

21   about what they're going to do.  It's uncertain what

22   they're going to do.  But I think they're going to use

23   them to compete aggressively.

24   Q.    Why shouldn't the Court be concerned about that,

25   if they are not committed to serving the same exact

1   routes?

2   A.    So we've already seen significant evidence of

3   route networks evolving over time and Spirit itself, if

4   it continued to serve these routes, might have adjusted

5   the routes it served.  So I think if there is a

6   profitable opportunity here, Allegiant and Frontier will

7   investigate it.  And they may also serve other routes.

8   There may be routes that today could benefit from

9   competition, that they can bring new competition too.

10  Q.    Okay.  Other than the divestiture routes or the

11  routes with divestitures, um, how many routes are left

12  after that?

13  A.    There are 15 such routes.

14  Q.    And have you analyzed those 15 routes?

15  A.    Yes.  So if we could please advance to Slide 50.

16        So this slide, your Honor, is summarizing those 15

17  routes.  So the first column is the name of the route.

18  The second column is Spirit's average daily departures

19  today on that route, or at the time of the report.  And

20  then the last two columns, the third column shows us

21  ULCCs -- ultra-low-cost carriers or low-cost carriers

22  who are present on the route today.  And the fourth

23  column shows us ultra-low-cost carriers or low-cost

24  carriers who have a substantial presence at one or both

25  endpoints and are particularly well-positioned to enter.

Q.    And what the implications of this graphic that
you've shown the Court?

A.    So it's showing us that the ultra-low-cost
carriers and low-cost carriers are in a position to
expand, to reposition, or to enter these routes.

Q.    Now I know you've indicated what your second
column has, but can you just tell the Court how many
total departures there are per day by Spirit for the
combination of these 15 routes?

A.    There's 30.

Q.    Are all 15 of these routes still nonstop overlap
routes?

A.    No, 4 of them are not any longer.  San Juan to
Philadelphia is no longer a nonstop overlap.  And then
the last three routes, Hartford to Tampa, Hartford to
Fort Meyers, and Cancun to Austin, those are no longer
overlaps.

Q.    So that leaves 11?

A.    Correct.

Q.    Other than the low-cost carriers and the ultra-
low-cost carriers listed here, are you aware of any
evidence in the trial record that other carriers have
entered any of these routes or could enter any of these
routes?

A.    So I believe Mr. Yealy testified that, um, Avelo

1    is now present at Orlando, so it's present at one end of
2    those routes.  It's also entered San Juan or will
3    shortly.  And then I should just note that Allegiant
4    generally is not present at the main Orlando Airport,
5    but they are present at Orlando, Sanford, and they
6    compete there.
7    Q.    Okay.  And do you have a view about legacy
8    carriers, whether they could enter or serve these
9    routes?
10   A.    Sure.  Legacy carriers could also compete on these
11   routes.
12   Q.    And based on everything you've told the Court,
13   Dr. Hill, um, can you go through what your findings are
14   about this -- about this merger.  Let's begin with what
15   you found about the effects of JetBlue entry versus
16   Spirit entry on rival fares?
17   A.    Sure.  So if we could please go to Slide 51.  And
18   this, your Honor, is just a recapitulation of what we
19   saw earlier.  This is showing that JetBlue tends to have
20   a larger impact than Spirit on rival carrier fares.
21   Q.    And what conclusions do you draw from that?
22   A.    Today we have a route on which Spirit is present
23   and JetBlue will replace it, so then there's likely to
24   be increased pressure on rival carriers and that will
25   benefit consumers.

1   Q.    Did you analyze how many passengers might be

2   impacted?

3   A.    Yes.  So if we could please turn to Slide 52.

4         On the left-hand side here, your Honor, we have

5   what I call the "increased competition routes."  These

6   are routes on which Spirit is present today, but JetBlue

7   is either not present or has less than 1 percent market

8   share, or route share.  And you can see that there are

9   93 million passengers per year on routes of this type.

10  On the right-hand side we have the 15 holdout routes,

11  which are the routes we were just discussing, and on

12  those routes there's 5 million passengers per year.

13  Q.    And do you believe that those 5 million passengers

14  on the holdout routes are actually going to be harmed?

15  A.    So the 5 million may also benefit from entry

16  repositioning, which may mitigate any harm.  But here

17  I'm including them all.

18  Q.    Okay.  Do you think Professor Gowrisankaran's

19  analysis of those 5 million passengers is correct?

20  A.    No, I think his model will tend to overstate any

21  potential adverse competitive effect, and he didn't, in

22  my view, take appropriate -- take appropriate account of

23  entry and repositioning.

24  Q.    Now moving from the number of passengers to total

25  dollars, have you analyzed the benefits that may arise

1    from this merger to consumers?

2    A.    Yes.  So if we could please turn to Slide 53.

3          So this slide is broken into two parts.  On the

4    left-hand side, this is the estimated benefit using my

5    model on increased competition routes and it's on the

6    order of 614 million.  And then on the right-hand side,

7    your Honor, as I said earlier, when we got to weighing

8    the harms and the benefits, I use Professor

9    Gowrisankaran's own estimate.

10         So here for the 15 holdout routes, I used

11   Professor Gowrisankaran's estimate of harm of $108

12   million, even though this is to be conservative.  But I

13   think that is an overestimate and it doesn't account for

14   entry and repositioning.

15   Q.    You think his methodology for arriving at that 108

16   is reliable?

17   A.    I do not think that methodology is reliable.

18   Q.    And why not?

19   A.    Um, so I walked through the reasons why I didn't

20   think it was reliable earlier, and also it doesn't take

21   account of entry and repositioning.

22   Q.    Did Professor Gowrisankaran propose an alternative

23   in response to your entry-intensity model?

24   A.    Yes, he criticized the entry-intensity model and

25   he proposed instead a splayed model that he called a

1     "Continuous Line Segment Model," and if we move to Slide

2     54, we'll see a summary of the estimated benefit on the

3     increased competition routes.

4          On the left-hand side, we have my original model,

5     and on the right-hand side we have the estimate from

6     Professor Gowrisankaran's alternative model.  And you'll

7     that his model actually ends up increasing -- predicting

8     slightly increased benefits relative to mine.

9     Q.    All right, Dr. Hill, I want to move on to the

10    topic of coordination for 5 minutes.

11         Are you familiar with that concept?

12    A.    I am.

13    Q.    In the context of coordinated effects, are you

14    familiar with the concept of a "maverick firm"?

15    A.    Yes.

16    Q.    What is a "maverick"?

17    A.    A "maverick" is a firm that tends not to go along

18    with existing agreements to compete less aggressively

19    with one another, it instead puts aggressive pressure on

20    other competitors.

21    Q.    Are you aware of a carrier that has behaved as a

22    maverick in the airline industry?

23    A.    Yes, JetBlue has behaved as a maverick.

24    Q.    Why do you conclude that JetBlue is a maverick?

25    A.    So as we saw earlier, your Honor, when JetBlue

1    enters a route, rival carriers lower their fares, more
2    passengers fly, and consumers benefit.
3    Q.    Did you hear Professor Gowrisankaran discuss
4    coordination in the context of this transactions?
5    A.    I did.
6    Q.    Did you hear him testify that he expect the
7    transaction will change JetBlue's nature and make it
8    more likely to coordinate?
9    A.    I did.
10   Q.    What reasons did he give for that?
11   A.    So he gave three.  His first one is he said that
12   it will make JetBlue more of a network carrier, so a
13   hub-and-spoke carrier.  Second, he says that over time
14   JetBlue has priced more and more like a legacy.  And
15   then finally, he said that JetBlue's increased size will
16   make it more vulnerable to retaliation.
17   Q.    And do you agree that the transaction will likely
18   make JetBlue more of a hub-and-spoke network competitor
19   and hence increase the risk of coordination?
20   A.    I don't think that's a fair way to describe it.
21   Today JetBlue flies less connect passengers than does
22   Spirit and there's nothing to suggest that after the
23   transaction its shares to connect passengers will be any
24   larger than Spirit's is today.
25   Q.    Do you agree that JetBlue's pricing has been more

1    like a legacy carrier?

2    A.    I do not.

3    Q.    Why not?

4    A.    The evidence I've seen suggests that JetBlue has

5    continued to compete with the legacy carriers in the

6    same way as it has in the past.

7    Q.    And do you agree that JetBlue's bigger share will

8    make it more susceptible to coordination?

9    A.    I do not.

10   Q.    Why not?

11   A.    So I think in fact the larger size will make

12   JetBlue, if anything, more able to resist attempted

13   intimidation by other carriers.

14   Q.    And what is your overall conclusion with respect

15   to coordination in this transaction?

16   A.    I think the transaction is likely to reduce the

17   risk of coordination because it's going to expand the

18   influence of JetBlue, which is the single most effective

19   carrier disrupting competition.

20        MR. GELFAND:  Your Honor, I'm at the conclusion of

21   my prepared questions.  What I would suggest is we take

22   the break, give me an opportunity to consult with my

23   colleagues, and I'll come back and either ask a couple

24   more questions or --

25        THE COURT:  Why don't you consult with your

```
 1    colleagues and then we'll be through with it.
 2         MR. GELFAND:  Okay, that's great.  I'll consult
 3    right now.
 4         (Pause.)
 5         THE COURT:  You'll understand I meant no
 6    disrespect.
 7         (Laughter.)
 8         MR. GELFAND:  I actually appreciate it being done
 9    now.
10         THE COURT:  All right.
11    Q.   A final question.  Professor Hill, could you
12    summarize your opinions about the transaction to the
13    Court?
14    A.   I think the transaction's likely to increase
15    competition and benefit consumers.
16         MR. GELFAND:  Thank you, your Honor, I have no
17    further questions.
18         THE COURT:  Very well, at 1 minute to 11:00.
19    We'll stand in recess for one half hour to 11:30.  We'll
20    recess.
21         THE CLERK:  All rise.
22         (Recess, 11:00 a.m.)
23
24
25
```

1                    C E R T I F I C A T E

2

3

4          I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER,

5     do hereby certify that the foregoing record is a true

6     and accurate transcription of my stenographic notes

7     before Judge William G. Young, on Monday, November 27,

8     2023, to the best of my skill and ability.

9

10

11    /s/ Richard H. Romanow 11-27-23
      _____
12    RICHARD H. ROMANOW    Date

13

14

15

16

17

18

19

20

21

22

23

24

25