UNITED STATES DISTRICT COURT
                   DISTRICT OF MASSACHUSETTS (Boston)

                                      No. 1:23-cv-10511-WGY
                                      Vol. 2, Pages 95-172


UNITED STATES OF AMERICA, et al
            Plaintiffs

vs.


JETBLUE AIRWAYS CORPORATION,
et al,
            Defendants



                         ********


                    For Bench Trial Before:
                    Judge William G. Young




                       United States District Court
                       District of Massachusetts (Boston)
                       One Courthouse Way
                       Boston, Massachusetts 02110
                       Monday, November 27, 2023



                         ********



          REPORTER:  CHERYL B. PALANCHIAN, RMR, CRR
                    Official Court Reporter
                 United States District Court
               One Courthouse Way, Boston, MA 02110

A P P E A R A N C E S


EDWARD WILLIAM DUFFY, ESQ.
ARIANNA MARKEL, ESQ.
AARON TEITELBAUM, ESQ.
        DOJ-Atr
        450 Fifth Street NW, Suite 8000
        Washington, DC 20530
        (202)812-4723
        Email:  Edward.duffy@usdoj.gov
        For Plaintiff United States of America
- and -
WILLIAM T. MATLACK, ESQ.
        Attorney General's Office
        One Ashburton Place, 18th Floor
        Boston, MA 02108
        (617)727-2200
        Email:  William.matlack@mass.gov
        For Plaintiffs United States of America and The
        Commonwealth of Massachusetts



RYAN SHORES, ESQ.
        Cleary Gottlieb Steen & Hamilton LLP
        2112 Pennsylvania Avenue, NW
        Washington, DC 20037
        (202)974-1876
        Email:  Rshores@cgsh.com
- and -
ELIZABETH M. WRIGHT, ESQ.
        Cooley LLP
        500 Boylston Street
        Boston, MA 02116-3736
        (617)937-2349
        Email:  Ewright@cooley.com
- and -
RACHEL MOSSMAN ZIEMINSKI, ESQ.
MICHAEL MITCHELL, ESQ.
        Shearman & Sterling LLP
        2601 Olive Street, 17th Floor
        Dallas, TX 75201
        (214)271-5777
        Email:  Rachel.zieminski@shearman.com
        For Defendant JetBlue Airways Corporation


(Continued.)

(Continued.)


JAY COHEN, ESQ.
ANDREW C. FINCH, ESQ.
        Paul, Weiss, Rifkind, Wharton & Garrison
        1285 Avenue of the Americas
        New York, NY 10019-6064
        (212)373-3000
        Email:  Jaycohen@paulweiss.com
        For Defendant Spirt Airlines, Inc.

```
                    I N D E X

WITNESS:            DIRECT    CROSS   REDIRECT   RECROSS

NICHOLAS HILL, Continued

  By Mr. Thornburgh            99
```

EXHIBITS                        PAGE

    881 . . . . . . . . . . . . 103

    882 . . . . . . . . . . . . 157

```
 1    (Proceedings, 11:31 a.m.)

 2              THE CLERK:  Court is back in session.  You may be

 3    seated.

 4              THE COURT:  Counsel, you may continue.

 5              MR. THORNBURGH:  Thank you, your Honor.

 6              THE COURT:  You may commence.

 7              MR. THORNBURGH:  Thank you.

 8                   NICHOLAS HILL, (Resumed)

 9                     CROSS-EXAMINATION

10    BY MR. THORNBURGH:

11    Q.   Good morning, Dr. Hill.

12    A.   Hello, Mr. Thornburgh.

13    Q.   Good to see you again.

14    A.   Likewise.

15    Q.   I hope your Thanksgiving was as relaxing as mine.

16    A.   It was.  Thank you.

17    Q.   Dr. Hill, in your direct testimony just now you shared

18    the results that you found when you applied your entry

19    intensity model to your purported increased competition

20    routes; correct?

21    A.   Correct.

22    Q.   And the results that you shared were purporting to look

23    at fares in a market and how they were affected when either

24    JetBlue or Spirit entered; correct?

25    A.   Looking at the effects on a route, yes.
```

1    Q.   But in that analysis and the results of that analysis

2    that you shared, you weren't including all fares in your

3    results; correct, sir?

4    A.   That's correct.

5    Q.   And so by only looking at rival fares you left out the

6    fares offered by the airline that is entering a particular

7    route or market; correct?

8    A.   So correct on the left-hand side, yes.

9    Q.   And you would agree, Dr. Hill, that Spirit typically

10   enters markets or routes with fares that are lower than the

11   prevailing marketwide average fares; correct?

12   A.   I think that's fair.

13   Q.   And so when you were evaluating Spirit entry and only

14   looking at rivals' fares, that means that you are leaving

15   out the low fares that Spirit offers when it enters a

16   market; fair?

17   A.   So Spirit's fares are not included, or JetBlue's, for

18   that matter.  Yes.

19   Q.   Indeed, Dr. Hill, you've acknowledged that using your

20   model to assess rivals' fares in the overlap markets where

21   JetBlue and Spirit compete today would only provide a lower

22   bound of harm that would occur as a result of this

23   transaction; right?

24   A.   So I think it's important to balance both the benefits

25   and the harms, as I did on my slide.  Yes.

1    Q.   But just to make sure the record is clear, Dr. Hill, if

2    you were to only look at rivals' fares in the overlap

3    markets for JetBlue and Spirit today, it's your

4    understanding that that would only provide a lower bound of

5    harm that could occur as a result of this transaction;

6    correct?

7    A.   Yeah.  You'd be missing the potential effect that would

8    happen to Spirit passengers.  Correct.

9    Q.   Dr. Hill, you actually did use your entry intensity

10   model to assess the impact that JetBlue and Spirit each have

11   on all fares in a market; right?

12   A.   That's correct.

13   Q.   And examining each airline's impact on marketwide

14   average fares is consistent with the testimony the Court has

15   heard from Spirit's CEO about how Spirit measures the Spirit

16   Effect; right?

17   A.   I don't recall but I'll take -- yeah, that sounds

18   right.  Okay.

19   Q.   You have no reason to disagree with me on that?

20   A.   Yeah, no, I don't.  I don't.

21   Q.   And you also understand that JetBlue measures its

22   impact in a market by looking at how marketwide average

23   fares change when it enters a market; correct?

24   A.   That's my general understanding, yes.

25   Q.   Okay.

```
 1              MR. THORNBURGH:  So let's go ahead and look at
 2   figure 69 from Dr. Hill's report, if we could.
 3              (On screen.)
 4   Q.   Dr. Hill, I believe this figure is either in your
 5   binder or will be passed out to you now.  It will be Hill
 6   1006 Summary 3.
 7   A.   Which of these folders should I look at?
 8   Q.   I think the smaller one.
 9   A.   Exhibits and Demonstratives?
10   Q.   Just one moment.
11   A.   Oh, sorry.  I could probably find it in my report if
12   you want me to just go there.
13              THE COURT:  Dr. Hill figure 69, right?
14              MR. THORNBURGH:  Yes.
15              THE COURT:  I have it.
16              THE WITNESS:  I have it.
17   Q.   Great.  It appears we're the only ones who don't have
18   it.  Do you have it, Dr. Hill?
19   A.   I do.  I have it in my report.  So, I see, yes.
20   Q.   So, Dr. Hill, this is a figure that was in the report
21   that you submitted as part of your evaluation of competitive
22   effects for this case; right?
23   A.   It was submitted in my report, correct, in the context
24   of explaining, you know, I don't think all fares is
25   appropriate, but I also ran it that way for full disclosure.
```

 1              MR. THORNBURGH:  Your Honor, plaintiffs request

 2    that Hill 1006 Summary 3, which is figure 69 from Dr. Hill's

 3    report, be admitted in evidence as Exhibit 881, I believe.

 4              THE COURT:  No objection?

 5              MR. GELFAND:  No objection.

 6              THE COURT:  The document, it will be admitted,

 7    Exhibit 881.

 8              MR. THORNBURGH:  Thank you, your Honor.

 9              (Exhibit 881 received in evidence.)

10    Q.   We've created a demonstrative that contains both figure

11    69, Dr. Hill, as well as an additional analysis which will

12    now be passed out to you as well.  I'll wait until you have

13    the demonstrative here.

14              (Handing.)

15              (On screen.)

16    Q.   So let's start, Dr. Hill, if we could, with the figure

17    on the left.  So this is the figure 69 from your report.  So

18    this shows the results of your entry intensity model when

19    you apply this model to all fares in a market based on

20    whether JetBlue or Spirit enters; right?

21    A.   Correct.

22    Q.   So, in other words, unlike your focus on rival fares

23    that you testified to this morning, figure 69 includes the

24    entrants' low fares as well; right?

25    A.   Correct.

1  Q.   And so figure 69 shows that when JetBlue or Spirit

2  enters a new market with relatively low intensity,

3  below 0.25 on this figure, Spirit is about twice as

4  effective as JetBlue at lowering marketwide average fares;

5  correct?

6  A.   That's true for market average wide because it has

7  lower fares.  Yes.

8  Q.   And then focusing on the right bin above 0.5, Spirit is

9  also more effective than JetBlue in that bin at lowering

10 marketwide average fares as well; correct?

11 A.   Did you say the second bin here?

12 Q.   I'm sorry, Dr. Hill, the final bin where it says

13 above 0.5 in figure 69.

14 A.   Correct.

15 Q.   And in the middle bin, which is titled between 0.25

16 and .5, JetBlue and Spirit are about even; correct?

17 A.   That's fair.

18 Q.   Now, the figure on the right is something that we put

19 together, Dr. Hill.  It shows the breakdown of market

20 quarters for which you calculate a net benefit in your

21 purported increased competition routes.  Dr. Hill, do you

22 have any reason to dispute the results shown on the

23 demonstrative in front of you?

24         MR. GELFAND:  Your Honor, we object to this part

25 of the exhibit because this analysis was not previously

1    disclosed to us.

2              THE COURT:  Well, I'm going to allow him to

3    examine it, but that question, I'm going to sustain the

4    objection to that particular question.  You may proceed.

5              MR. THORNBURGH:  Let me try a different question

6    if I could, your Honor.

7    Q.   Dr. Hill, your entry intensity model and the results

8    shown in figure 69, you apply those in your benefits

9    calculation to market quarters.  Is that accurate?

10   A.   Can you say more of what you mean about market

11   quarters?  I mean, it takes the four quarters before and the

12   four quarters after an entry event to estimate the effect of

13   the entrant.

14   Q.   Sure.  And when you, Dr. Hill, apply your entry

15   intensity model to your purported increased competition

16   routes to calculate a total net benefit, you are applying

17   this entry intensity model to individual markets; correct?

18   A.   I apply it on a route-by-route basis, yes.

19   Q.   It includes multiple quarters of a year, for example,

20   four quarters, to figure out the total benefits that are

21   associated with a particular market; correct?

22   A.   I don't recall the details of whether I did an annual

23   prediction or took four quarters and moved them up.  But

24   regardless, yeah, it's applied on an annual basis.

25   Q.   Okay.  Well, let me ask you this question:  If we were

1    to take the entry intensity model results shown in figure 69

2    and we applied these -- applied your entry intensity model

3    to all fares in your purported increased competition routes,

4    we would find that there would be a benefit not a -- excuse

5    me, we would find there would be a harm, not a benefit to

6    consumers in those markets; correct?

7    A.   Yeah, I believe that would be true.

8    Q.   Dr. Hill, you didn't apply your entry intensity model

9    to markets where both JetBlue and Spirit provide nonstop

10   service today; correct?

11   A.   That's correct.

12   Q.   You acknowledge that you designed your model to focus

13   on the purported increased competition routes where Spirit

14   provides nonstop service today but JetBlue is not present in

15   a meaningful way; right?

16   A.   I don't think that's quite fair.  I mean, the model was

17   set up to try to estimate the effect of Spirit and JetBlue

18   on rivals' fares.

19   Q.   Well, let's go ahead and take a look at your

20   deposition, if we could, sir.  If I could ask you to turn in

21   your binder to your deposition, page 234.

22        MR. THORNBURGH:  If we could put 234, Ms. O'Brien,

23   and 235 on the screen, please.

24        (On screen.)

25   Q.   So, Dr. Hill, let me know when you're there.

```
 1   A.    234?  I'm there.
 2   Q.    Yes, sir.  So, Dr. Hill, I asked you on line --
 3   A.    Hold on.  I apologize.  This is a different page than I
 4   have.  Oh, 234 or 235?
 5   Q.    234, starting there.  I asked you on line 15:
 6         "QUESTION:  Dr. Hill, would you agree your entry
 7   intensity model measures the net harm associated with this
 8   transaction?"
 9         Your answer:
10         "ANSWER:  No, it's not really set up for that."
11         My question was:
12         "QUESTION:  Okay.  What's it set up to do, in your
13   opinion?"
14         And your answer was:
15         "ANSWER:  It's really set up to look at the -- what I
16   call the, I think, increased competition or the Spirit-only
17   plus routes, routes where essentially today Spirit is
18   operating" -- it says "put" -- "JetBlue is not present in a
19   meaningful way and JetBlue will replace Spirit.  You could
20   also use it in the other direction if the transaction was
21   going in the other direction, but for this transaction
22   that's where I see its value."
23         Those are the questions I asked and those are the
24   answers you gave; correct, Dr. Hill?
25   A.    That's correct.
```

Q.   So put another way, Dr. Hill, you designed a model that
you acknowledge cannot be reliably used to assess harm in
nonstop markets where both JetBlue and Spirit compete today;
correct?
A.   Yeah, I disagree with you.  The way you're using
"design" there is the source of my discomfort here.  I mean,
the model was set up to ask the question what's the effect
on rivals' fares.  And it's not able to answer the question
of what's the effect on the entering carrier, or in this
case exiting carrier, but it was designed to answer a
question it can answer.  And then for those other folks it's
hard to -- neither Professor Gowrisankaran nor I have an
answer to how do we account for the effect of them.

      Because this is the example, your Honor, I was talking
about earlier.  If Spirit exits and a customer switches to
JetBlue and they pay $20 more for their fare, we don't know,
given that they're getting a higher quality product, whether
they lose between zero or $20 in benefit.  So you're
absolutely right it can't be applied to estimate the total
effect, and that's why I used Professor Gowrisankaran's
estimates when I get to weighing harms and benefits.
Q.   So just to make sure the record is clear, Dr. Hill, you
agree your entry intensity model that you designed cannot be
used reliably in the nonstop overlap markets where JetBlue
and Spirit compete today; correct?

1    A.   To look at focal carriers -- focal carriers' fares,

2    yes.

3    Q.   Dr. Hill, usually when you look at a transaction, when

4    you're asked to evaluate a potential transaction, you look

5    at head-to-head competition; correct?

6    A.   That's fair.

7    Q.   In fact, you have never before, as best you can recall,

8    built a model for evaluating competitive effects for a

9    horizontal merger such as this one that could not be applied

10   to markets where the two merging parties compete; right?

11   A.   That's fair.

12   Q.   Dr. Hill, on direct examination you testified that you

13   believe JetBlue is a more effective competitor than Spirit;

14   right?

15   A.   Correct.

16   Q.   However, you would agree that JetBlue and Spirit can

17   both be effective competitors in a market; right?

18   A.   Yeah.  I think my results show that they both are

19   effective competitors.

20   Q.   And you would agree, Dr. Hill, that consumers can

21   benefit from both JetBlue and Spirit; right?

22   A.   They can.

23   Q.   And would you agree that some passengers prefer

24   Spirit's low unbundled fare to the higher fares offered by

25   JetBlue?

1    A.    I think that's fair.

2    Q.    Dr. Hill, it's your opinion that JetBlue offers more

3    value to its consumers than Spirit; right?

4    A.    I would say on average JetBlue offers more value than

5    Spirit.

6    Q.    And that's your basis for concluding that passengers

7    traveling on Spirit today will be at least equally well off

8    in the future flying on JetBlue instead?

9    A.    I would say it slightly different.   On the Spirit-only

10   routes I would say that on average passengers will be at

11   least as well off.

12   Q.    That's true, what you just said, even though you

13   acknowledge those customers flying Spirit today would have

14   to pay on average higher fares by flying on JetBlue in the

15   future; correct?

16   A.    Yeah, there are some customers who may benefit because

17   they get JetBlue when they didn't have it.   And as you're

18   saying, there may be some customers who really wanted Spirit

19   and either aren't able to get it or have to pay more for it.

20   Q.    Dr. Hill, if we can go ahead and put up slide 12 from

21   your direct presentation from a few minutes ago.   On this

22   slide -- I'll wait for it to get up on the screen here.

23              (On screen.)

24   Q.    This is a slide, Dr. Hill, where you discuss some of

25   the features of the JetBlue product; right?

1  A.   Correct.

2  Q.   This is based off of a chart that you included in your

3  report; right?

4  A.   That is correct.

5  Q.   But the chart in your report also included Spirit;

6  correct?

7  A.   Correct.

8  Q.   Okay.

9        MR. THORNBURGH:  I have another demonstrative for

10  this next line of questioning.  If we could please hand out

11  Hill Demonstrative B, and we'll hand out copies to counsel

12  and to the witness as well.

13        (Handing.)

14        THE WITNESS:  Thank you.

15  Q.   So, Dr. Hill, on the right side of this slide is the

16  figure 27 from your report.  Do you recognize it, sir?

17  A.   I do.

18  Q.   And so focusing just on the figure that's on the right,

19  for the moment, Spirit does actually offer many of the

20  products or services that are listed here where you put a

21  red X; correct?

22  A.   It does, but it doesn't offer them if they're free, for

23  example.  So that's -- this -- the one on the left doesn't

24  have, for example, free -- oh, it does.  Yeah.  Yep.

25  Q.   Okay.  And so as you testified earlier to this morning,

```
 1    Spirit offers seats on its flights with additional legroom,
 2    like exit-row seats and big front seats; right?
 3    A.    That's fair.
 4    Q.    And you were here to hear the testimony of
 5    Dr. Gowrisankaran that those seats go unsold on more than
 6    half of Spirit flights despite a relatively low incremental
 7    cost for consumers to purchase them; correct?
 8    A.    I don't recall that, but I have no reason to doubt it.
 9    Q.    Okay.  Dr. Hill, you did not undertake any empirical
10    analysis yourself to understand how much consumers value
11    additional legroom; is that fair?
12    A.    That's true.
13    Q.    And the Court also heard testimony from
14    Dr. Gowrisankaran about the low percentage of Spirit
15    passengers that purchase Wi-Fi today.  You did not
16    empirically study how much consumers value Wi-Fi; correct?
17    A.    I didn't study it, no.
18              THE COURT:  And more to the point, you don't know
19    of a way to quantify how much they value that?
20              THE WITNESS:  That's fair.  Your Honor, at an
21    aggregate level I can see that I see customers choosing
22    JetBlue more than Spirit when both are available, but I
23    can't go into this chart and say legroom is worth this much.
24    And, furthermore, I haven't studied it.  My guess would be
25    that different --
```

```
 1              THE COURT:  Well, guesses alert me right away.

 2              THE WITNESS:  Apologies.  My inference would be

 3    that different consumers would have different preferences.

 4    I have not studied that.

 5              THE COURT:  Mr. Thornburgh, go right ahead.

 6              MR. THORNBURGH:  Thank you, your Honor.  Before I

 7    continue, can I ask that the demonstrative be published to

 8    the gallery, please?

 9              THE COURT:  It may be.

10              MR. THORNBURGH:  Thank you.

11    Q.   Dr. Hill, I want to ask you about your response to the

12    judge's question just now.  You understand that

13    Dr. Gowrisankaran, as part of his net harm analysis, did a

14    sensitivity where he used the produced ticket data from all

15    of the domestic carriers that included ancillary purchases

16    of various services; correct?

17    A.   Correct.

18    Q.   And so he included, in the price that consumers pay,

19    the consumers, if they bought priority boarding, or carry-on

20    bags and all of those different types of services; right?

21    A.   He included the things that can be bought, yes.

22    Q.   And he produced a net harm model using those -- the

23    features that consumers bought; correct?

24    A.   I think it's the same model as he used on the DB1B

25    data, but yes.
```

1    Q.   Now, Dr. Hill, you did not run a sensitivity of your

2    own entry intensity model accounting for these purchases of

3    ancillary services or products that consumers -- that

4    consumers may value; correct?

5    A.   Right, correct.

6    Q.   Okay.  So just stepping back for a moment, Dr. Hill,

7    you did not undertake any empirical analysis to understand

8    how much consumers value any of the individual features that

9    are listed in figure 27 from your report; correct, sir?

10   A.   That's correct.

11   Q.   And you would agree, Dr. Hill, that some of the

12   services listed here, some consumers may have no value for

13   that particular service or product; correct?

14   A.   That's certainly possible, yes.

15   Q.   So, for example, you don't know what -- to what degree

16   a single parent traveling with children on Spirit today

17   might prefer to, say, pack snacks from home rather than pay

18   a higher fare to fly on JetBlue; right?

19   A.   I did not analyze that issue.

20   Q.   You similarly don't know whether such a person would

21   place any value on a better JetBlue loyalty program;

22   correct?

23   A.   Correct.

24   Q.   You don't know whether someone who chooses to fly

25   Spirit today and declines to purchase any ancillary services

 1   would place any value on JetBlue's, say, seat-back

 2   entertainment; correct?

 3   A.   That's correct.

 4   Q.   And you don't know whether someone who chooses to fly

 5   on Spirit today would find JetBlue's increased relevance as

 6   a result of this merger worth paying a higher fare; correct?

 7   A.   Yeah, I don't think I analyzed increased relevance.

 8   Q.   And you don't know whether someone flying Spirit today

 9   to visit family in Bogota, Colombia would place any value on

10   a better JetBlue credit card partnership; right?

11   A.   I definitely didn't get down to that detail, no.

12   Q.   Now, Dr. Hill, there may be airline product attributes

13   that are not found on your figure 27 or on your slide from

14   this morning that consumers may value; right?

15   A.   That's possible, yes.

16   Q.   I think you probably would agree with me, Dr. Hill,

17   that most airline passengers value getting to their

18   destination on time; correct?

19   A.   Yeah, in general.

20   Q.   You didn't study, though, how JetBlue and Spirit

21   compare in terms of on-time performance; correct?

22   A.   I did not.

23   Q.   You also didn't study how JetBlue and Spirit compare in

24   terms of canceled flights; correct?

25   A.   Correct.

```
 1            THE COURT:  Well, let me just ask counsel a
 2   question.  The government's rested here, and I've got a
 3   mountain of information, but is there information in the
 4   record as to that as of now?
 5            MR. THORNBURGH:  I believe there may be
 6   ordinary-course documents, your Honor, in the record that
 7   speak to this.  I was just about to ask the witness a
 8   question based on a publicly available Department of
 9   Transportation document.  You know, we'd certainly be
10   welcome to put additional evidence into the record on this
11   issue.
12            THE COURT:  I'm not asking for it, I just wondered
13   what the basis of your questions were.  All right.  You
14   proceed.
15   Q.   So, Dr. Hill, would it surprise you to learn that
16   Spirit actually performed better than JetBlue on both
17   on-time performance and cancellation metrics in data
18   recently reported by the Department of Transportation?
19            MR. GELFAND:  Your Honor, I have a different
20   objection.  It's beyond the scope of my examination.
21            THE COURT:  It is and, therefore, this is not a
22   proper way to frame the question, but that doesn't preclude
23   you from getting the information.  Go ahead.  The objection
24   is sustained.
25   Q.   Dr. Hill, let me ask you this question:  If you learned
```

```
 1    that Spirit had better performance metrics with regards to
 2    on-time performance and cancellation, would that affect your
 3    opinion as to whether JetBlue is a -- provides more value to
 4    its customers?
 5    A.   I'd definitely have to analyze them.  I mean, they fly
 6    different route networks.  I'd have to understand what's
 7    really being included in that information.  I --
 8    Q.   But it's not -- oh, I'm sorry.
 9    A.   Sorry, just I haven't studied that.
10    Q.   Thank you.
11              MR. THORNBURGH:  We can now go to slide 15 of
12    Dr. Hill's direct testimony, please.
13    A.   Mr. Thornburgh, something just fell out of your pocket.
14    Q.   Oh, some lint.  Thanks for the tip.
15    A.   Slide 15, did you say?
16    Q.   Yes, sir.
17              (On screen.)
18    Q.   Okay.  So, Dr. Hill, this is the slide that you
19    testified to this morning as your basis for concluding that
20    JetBlue provides more value than Spirit to customers; right?
21    A.   It's one of the bases, yes.
22    Q.   Okay.  So, and what this is purporting to show is the
23    share of passengers that fly JetBlue versus Spirit on
24    nonstop overlap routes; correct?
25    A.   On the left-hand side, yes.
```

1    Q.   And then on the right-hand side is a more narrow set of

2    nonstop overlaps where the -- that meet the presumption

3    under merger guidelines; correct?

4    A.   Correct.

5    Q.   So let's break this down a little bit.  So, first,

6    Dr. Hill, you would agree that an airlines' share in a

7    particular market will depend in part on how much capacity

8    or planes an airline chooses to put on that particular

9    route; right?

10   A.   It can, but their capacity will also depend upon their

11   appeal.

12   Q.   So -- fair enough.  But in other words, Dr. Hill, it's

13   not just the competitive conditions in a particular route or

14   market that affect how much capacity an airline chooses to

15   deploy; correct?

16   A.   There may be other factors that affect their total

17   capacity decision, yeah.

18   Q.   And you don't account for those other factors in

19   figure 36 here; correct?

20   A.   Correct.

21   Q.   Second, Dr. Hill, you were here for the testimony of

22   Mr. Clark from JetBlue; right?

23   A.   I was here for some, and some I watched remotely, yes.

24   Q.   Mr. Clark testified that on some routes today,

25   particularly routes between Boston and other airlines' hubs,

JetBlue serves a higher proportion of business customers

whereas Spirit is more focused on leisure customers.  Do you

recall that testimony?

A.   Yes.

Q.   So, Dr. Hill, if JetBlue and Spirit are serving

different types of customers on a particular route, what can

you really conclude about how much consumers value a

particular airline if they're not considering both options?

A.   Well, so I'm not sure that they're not considering both

options.  So this is looking on average across all of these

routes.  And Professor Gowrisankaran looked at something

similar when he looked at the percentage of routes on which

each carrier was the largest.  So I think this is

informative, and combined with the information about

quantity effects, I think it's a reasonable basis for saying

that JetBlue is appealing to more customers than is Spirit.

Q.   Dr. Hill, you acknowledge that on 14 of the 51 nonstop

presumption markets that go into the calculation here on the

right, it's actually Spirit that has a larger share than

JetBlue; correct?

A.   I don't recall the exact number but it's something like

that, yes.

Q.   So then would you agree that on those 14 routes Spirit

is providing more value than JetBlue to customers?

A.   You could make that.  I think it would be an aggressive

 1    inference.  And my preference is to look across all of the

 2    routes, and that's why I presented this as average across

 3    all of those routes.

 4    Q.   Dr. Hill, at a minimum, doesn't the fact that Spirit

 5    has a higher market share than JetBlue on those 14 routes

 6    mean that you need to investigate further to understand

 7    whether Spirit customers are getting more value on those

 8    routes before concluding that on average all customers would

 9    be better off as a result of this merger?

10    A.   Yeah, I mean, I don't really agree.  Because we're

11    looking on average, we're saying across the average of all

12    these routes what's true.  There may be a route where Spirit

13    is more preferred than JetBlue.  I'm not ruling that out.

14    I'm just asking an average question.  Take an average route

15    on which they go head to head, who's more likely to have the

16    higher market share.

17    Q.   Let's take a look at figure 22 from your report, if we

18    could.  It's on page 34 of your report, Dr. Hill.

19    A.   Sure.

20    Q.   Are you there, Dr. Hill?

21    A.   I am, sir.

22              (On screen.)

23    Q.   You recognize this figure 22 as a figure that you

24    included in your original report; correct?

25    A.   I do.

 1   Q.   Okay.  And on the left is passenger-based shares for

 2   domestic-ticketed passengers; right?

 3   A.   That's correct.

 4   Q.   And in that chart it's actually Spirit that has a

 5   higher share than JetBlue; correct?

 6   A.   Yes, correct, on the passenger-based side.  That's

 7   right.

 8   Q.   And so doesn't this show that it's actually Spirit

 9   that's providing more value to customers than JetBlue?

10   A.   I don't think so.  I mean, I think a better way to get

11   at this issue is to look at routes on which they both

12   compete head to head, which do passengers choose more often.

13   Q.   Dr. Hill, let's go back to slide 15 of your direct

14   testimony, if we could.

15            (On screen.)

16   Q.   Dr. Hill, you agree that about 30 percent of JetBlue's

17   passengers on routes where Spirit is present today purchase

18   Blue Basic tickets; correct?

19   A.   I think that number was redacted on my slide so I'm not

20   going to commit to an exact number.  But something in the

21   vicinity, yes.

22   Q.   Okay.  Fair enough.  Well, we prepared a demonstrative.

23            MR. THORNBURGH:  If we can pass this Hill

24   Demonstrative C out quickly here.

25            (Handing.)

```
 1   Q.   So, Dr. Hill, we took the amount of passengers that fly
 2   Blue Basic in routes that overlap with Spirit and we just
 3   did some math to calculate what the share of -- what
 4   JetBlue's share would be in those markets if you just looked
 5   at the Blue Basic share.  Do you see that on the screen in
 6   front of you?
 7              MR. GELFAND:  Your Honor, I'm going to make a
 8   similar objection to before.  This is the first time we've
 9   seen this analysis, so I object to using calculations that
10   we can't pressure-test.
11              MR. THORNBURGH:  Your Honor, I'm not trying to get
12   the underlying data into the record, I was just about to ask
13   Dr. Hill if he has a reason to disagree with the figures
14   shown on the screen.
15              THE COURT:  He's just seen it.  I've just seen it.
16   So I have a problem with that question.  But let me see what
17   your assumptions are.
18              You're assuming that on overlap routes you've
19   taken the number of passengers on JetBlue that have
20   purchased Blue Basic, and then you've taken the number of
21   Spirit passengers on that route and compared the two?
22              MR. THORNBURGH:  That's correct, sir.  That's just
23   math to come up with the market-share calculations on the
24   screen in front of you.
25              THE COURT:  So the only thing that is math here is
```

```
 1    the vertical axis to the left to figure out -- and the
 2    captions on each one -- to figure out the market share.
 3              MR. THORNBURGH:  For JetBlue, correct.  The Spirit
 4    shares are unchanged from Dr. Hill's figure from this
 5    morning.
 6              THE COURT:  All right.  On those assumptions, ask
 7    some questions.
 8              MR. THORNBURGH:  Thank you, your Honor.
 9    Q.   So, Dr. Hill, we see that if you only look at Blue
10    Basic passengers, the share of customers buying Blue Basic
11    is about 6 percent --
12              THE COURT:  No, no.  I guess I didn't make myself
13    clear in light of the objection.
14              MR. THORNBURGH:  Sure.
15              THE COURT:  I now understand the assumptions.  I
16    understand the different bars.  Ask him questions.  I --
17    there's no basis in the record to say that the market -- in
18    the record -- to say that the market share is 6 percent,
19    though that might be a warranted inference and it may be
20    helpful that I have it.  But as we sit here today, he's not
21    going to testify to it.
22              MR. THORNBURGH:  Fair enough, your Honor.
23              THE COURT:  But maybe you can get some information
24    from him that's helpful.  Go ahead.
25    Q.   Just for the moment, Dr. Hill, assuming these numbers
```

 1    are true, I'm not asking you to agree with them or not, but

 2    assuming they're true, using your market-share logic that

 3    you testified to on direct this morning, we can infer from

 4    that that Spirit is offering a higher value unbundled

 5    product than JetBlue; correct?

 6    A.    Than JetBlue?  But JetBlue -- I mean, you took out a

 7    large part of JetBlue's share here.

 8    Q.    We took out the part of JetBlue's share that's not

 9    offering an unbundled product.  So just comparing the two

10    unbundled products using your market-share logic from this

11    morning, Dr. Hill, this would seem to suggest that Spirit is

12    offering a more valuable unbundled product than the JetBlue

13    unbundled product; correct?

14    A.    Yeah, I'm not totally sure what you've done here but I

15    don't think it's necessarily an apt comparison.  Because if

16    the part of the JetBlue plane that's not Blue Basic fares

17    sells out, then there may not be Blue Basic fare

18    availability.  So I see where you're going but I'm just

19    not -- I'm not sure that you can draw that inference here.

20    Q.    Well, I'll represent to you, sir, that on the vast

21    majority of JetBlue flights, JetBlue does not limit the

22    number of Blue Basic tickets that it sells.  So if you

23    assume that, does that change your answer?

24    A.    I'm not arguing that it limits them, just if other

25    tickets have sold, then you can only sell a limited amount

```
 1    of Blue Basic tickets.  So if there's heavy demand for the
 2    non-Blue Basic tickets, it puts a limit on how many Blue
 3    Basic fares you can sell.
 4            THE COURT:  Well, let's try this.  If I even
 5    understand what this shows.  Could I, from this, could I
 6    draw the inference that more people prefer flying in the
 7    rather spartan Spirit seats than prefer flying in the more
 8    comfortable JetBlue seats on Blue Basic fares?
 9            THE WITNESS:  I think what you could say here is
10    that more people do fly Spirit than fly Blue Basic.  The
11    difficulty with the inference here is that these Blue Basic
12    fares are also competing with ordinary Blue -- JetBlue
13    fares.  So if a JetBlue fare goes on sale for a particular
14    route at a particular time, and many customers buy the other
15    fares, the non-Blue Basic, it puts an upward cap on how many
16    Blue Basic fares can be sold.
17            THE COURT:  Well, you've made that point.  I see.
18    All right.
19            THE WITNESS:  Yeah.  Sorry, your Honor.
20            THE COURT:  And, Mr. Thornburgh, go ahead.
21    Q.  Dr. Hill --
22            MR. THORNBURGH:  If you can go back to slide 15
23    for just a moment in Dr. Hill's presentation.
24            (On screen.)
25    Q.  To calculate the figures that we're about to see on
```

1    slide 15, you used Dr. Gowrisankaran's definitions of

2    nonstop presumption overlap markets; right?

3    A.    That's correct, I believe.

4    Q.    You didn't calculate these shares using alternative

5    markets that you put forward, for example; correct,

6    Dr. Hill?

7    A.    That's correct.

8    Q.    You didn't offer any alternative relevant markets in

9    your report; correct, sir?

10   A.    That's correct.

11   Q.    And with the exception of a few critiques that you

12   offer on how Dr. Gowrisankaran defined the Orlando and

13   Puerto Rico markets in certain circumstances, you did not

14   offer in your report any other specific critiques of

15   relevant markets that Dr. Gowrisankaran defined; correct?

16   A.    Correct.

17   Q.    Dr. Hill, you would agree with me that today customers

18   in the markets where both JetBlue and Spirit compete get to

19   choose between the products offered by both airlines; right?

20   A.    In overlaps, yes.

21   Q.    And this includes the ability to choose between the

22   different amenities that each airline offers; correct?

23   A.    Yeah.  Subject to the discussion we previously had

24   about whether an amenity is offered or not, yes.

25   Q.    And, Dr. Hill, you acknowledge that the loss of this

1  product choice or product variety, as it's sometimes called,

2  is an independent harm aside from any increase in fares that

3  consumers might face as a result of this transaction;

4  correct?

5  A.   It could be.  I didn't -- I don't think I've said that

6  it is.

7  Q.   Right.  I don't -- my question wasn't asking whether it

8  is, my question is just you acknowledge that the loss of

9  product variety is an independent source of harm under the

10  merger guidelines; correct?

11  A.   It can be, in the merger guidelines, yes.

12  Q.   And it could be applicable -- it could be the type of

13  harm that some consumers would face as a result of this

14  transaction; right?

15  A.   It could be, yes.

16  Q.   Let's go to slide 13 of your direct, if we could,

17  Dr. Hill.

18  A.   Do you mind bringing it up on the screen, actually,

19  it's easier -- thank you.

20           (On screen.)

21  Q.   The average annual incomes you report here are based on

22  ZIP codes where passengers live; right?

23  A.   That's correct.

24  Q.   And so to come up with the figures that are depicted

25  here, you used the mean or average income in each ZIP code;

1   correct?

2   A.   Correct.

3   Q.   So even if a particular ZIP code had a widespread of

4   annual income, say less than $50,000 to over $200,000, your

5   analysis is based only on the mean annual income in that

6   specific ZIP code; right?

7   A.   That's correct.

8   Q.   Your analysis doesn't foreclose the possibility that

9   passengers flying on Spirit, for example, all might have a

10  household income that is below the mean annual income in a

11  particular ZIP code; correct?

12  A.   It does not.  But in my report I also looked at this

13  for JetBlue passengers more generally, and they have a

14  higher average income than Blue Basic.  So there's also, in

15  the report, you can see that the Blue Basic JetBlue

16  passengers seem to be buying -- seem to be from a different

17  set of ZIP codes than all JetBlue passengers.

18  Q.   Dr. Hill, in your report you didn't cite any

19  ordinary-course materials produced by either JetBlue or

20  Spirit to support your finding here; correct?

21  A.   I don't believe so.

22  Q.   Let's switch gears.  Dr. Hill, you did not offer an

23  opinion in your report that the divestiture buyers should be

24  assigned shares on any particular route; correct?

25  A.   Correct.

1    Q.    You didn't describe the divestiture buyers as rapid

2    entrants at any place in your report; correct?

3    A.    That's correct.

4    Q.    You are not offering an opinion that Allegiant or

5    Frontier will fly on any particular route or set of routes

6    as a result of purchasing the divestiture assets; correct?

7    A.    That's fair.

8    Q.    So you cannot rule out the possibility that neither

9    Allegiant nor Frontier will enter any of the nonstop

10   presumption routes that touch a divestiture airport;

11   correct?

12   A.    Yeah, I mean, I think they both testified they're still

13   figuring out exactly which routes they plan to compete on.

14   Q.    You have not pointed to any evidence, Dr. Hill, that

15   Allegiant plans to operate on the same routes that Spirit

16   serves today out of Boston or Fort Lauderdale; correct?

17   A.    That's fair.

18   Q.    And you have not pointed to any evidence that Frontier

19   plans to operate in the same markets that Spirit serves

20   today out of LaGuardia or the New York City metro area;

21   correct?

22   A.    That's fair.

23   Q.    Let's go to slide 7 of your direct, please.

24          (On screen.)

25   Q.    So, Dr. Hill, here you used Dr. Chipty's endpoint

1    presence model to purportedly predict the likelihood of ULCC

2    entry on these categories of markets; correct?

3    A.   So this is for ULCC entry in the ordinary course within

4    one year, yes.

5    Q.   You understand Dr. Chipty's model was designed to

6    understand the relationship between endpoint presence and

7    entry as it had occurred in the past by ULCCs; correct?

8    A.   That's what she said, yes, but it can predict the

9    probability of entry based on endpoint presence.  The only

10   way it can do that is if it can also predict the probability

11   of entry.

12   Q.   You are aware that Dr. Chipty specifically warned

13   against using her endpoint presence model to try to predict

14   future entry; right?

15   A.   Yes.

16   Q.   Your use of Dr. Chipty's model does not account for

17   changes to an airline's network strategy that has recently

18   taken place, such as Frontier's decision to fly more of its

19   routes back to home bases each day; correct?

20   A.   I mean, it's looking over time at the 4,700 entry

21   events Dr. Chipty purports to use, so whatever changes

22   happened in network strategies in that time period are

23   captured.

24   Q.   But it wouldn't capture the Frontier change in strategy

25   that was just announced a few months ago; correct, sir?

```
 1    A.    No.  It's looking at past experience to predict the
 2    future.
 3    Q.    And your use of Dr. Chipty's model does also not
 4    account for limitations on the availability of planes and
 5    pilots that we've heard testimony about in this courtroom;
 6    correct?
 7    A.    Correct.
 8    Q.    So putting aside those issues, what this chart shows is
 9    that there is, at best, a 40 percent likelihood that a ULCC
10    enters any particular route in one year; right?
11    A.    So this is the ordinary-course probability absent some
12    kind of anticompetitive price increase.  This is just
13    ordinary course, 40 percent of those routes would expect to
14    see entry by a ULCC within one year.
15    Q.    Let me ask you about that, Dr. Hill.  You would
16    acknowledge that airlines have probably tried to increase
17    prices on some of the routes that were included in this
18    analysis previously; right?
19    A.    They probably increased and decreased prices, yes.  I
20    mean, there's a natural fluctuation.
21    Q.    Dr. Hill, these figures give no indication of whether
22    entry by a ULCC would be sufficient to fully replace the
23    competition that Spirit brings to markets where it operates
24    today; correct?
25    A.    Yeah.  This is just looking at ordinary-course entry.
```

1   It's not making a further representation that they'll either

2   do more than replace or do less than replace.

3   Q.   Earlier this morning you presented on a slide that

4   looked at the frequency with which Spirit operates on 15 of

5   Dr. Gowrisankaran's nonstop overlap presumption markets.  Do

6   you recall that?

7   A.   Are you talking about the slide with the 15 nonstop

8   overlap routes?

9   Q.   Yes.

10  A.   Yeah.

11  Q.   Besides that analysis where you looked at Spirit's

12  current presence or frequency on those routes, you did not

13  undertake any other analysis to understand what level of

14  entry by another carrier would be necessary to fully replace

15  Spirit; correct?

16  A.   I don't think that's quite true just because of my

17  answer.  I think in my supplemental exhibits I looked at all

18  51 of those routes, and we just talked about 15 this

19  morning.  But other than that I didn't otherwise analyze it.

20  Q.   Let's go to slide 10 of your direct, please.

21          (On screen.)

22  Q.   So, Dr. Hill, here you quoted some testimony from other

23  ULCC carriers about expanding into Spirit routes; correct?

24  A.   That's correct.

25  Q.   None of the testimony here indicates where the planes

 1    would be coming from to replace Spirit; right?

 2    A.   Correct.

 3    Q.   You haven't done any sort of quantitative analysis

 4    yourself to determine the ability of ultra low-cost carriers

 5    to fulfill their standalone network plans while also

 6    replacing the competition lost from this transaction;

 7    correct?

 8    A.   I disagree a little.  I mean, I did do quantitative

 9    analysis of the total expected change in total number of

10    planes.  So I think that qualifies, unless -- yeah.

11    Q.   Sorry.  Can you clarify what analysis you're referring

12    to?

13    A.   Yeah.  So if we -- maybe it's back on slide 7.

14         MR. THORNBURGH:  Can we go to slide 7, please?

15    A.   Maybe I have the wrong one.  Let me see.  Oh, sorry.

16         MR. THORNBURGH:  Let's go to slide 11.  I think

17    this is the one Dr. Hill may be referring to.

18    A.   Yeah, slide 11.

19    Q.   Okay.  So, Dr. Hill, the -- I'll wait for it to come up

20    on the screen here.

21         (On screen.)

22    Q.   The chart on the right, this was figures that were

23    taken in part from these airlines' publicly available

24    10-K's; correct?

25    A.   That's correct.

1    Q.   And some of these publicly available 10-K's predate the

2    announcement of this transaction; right?

3    A.   That's possible.

4    Q.   Right.  So these fleet plans were plans that these

5    airlines had in place prior to the announcement of this

6    transaction; correct?

7    A.   I don't think that's generally true, but it's possible

8    for some of them.

9    Q.   Regardless, the number of planes that these airlines

10   choose to get, that doesn't tell you whether these airlines

11   would have an ability to both fulfill their standalone

12   growth plans while also replacing the competition that would

13   be lost as a result of this transaction; correct?

14   A.   I mean, I think it's a reasonable way to look at the

15   issue and, you know, the testimony from Mr. Biffle in the

16   upper left-hand corner here is saying we can ramp up or down

17   based on conditions.

18   Q.   Dr. Hill, you were here for the testimony of Mr. Hayes

19   where he talked about the inability of JetBlue to get

20   additional Airbus aircraft before 2030; correct?

21   A.   I think it's you can't place an order for new

22   deliveries before 2030, yes.

23   Q.   You didn't independently study Frontier's ability to

24   get additional planes; correct?

25   A.   No.  I heard Mr. Biffle's testimony but I did not study

```
 1    it.
 2    Q.    Dr. Hill, throughout your report you indicate that this
 3    transaction will enable JetBlue to better compete against
 4    the big four.  Do you recall that?
 5    A.    I do.
 6    Q.    Okay.  I want to hand up a demonstrative now.  This
 7    just contains a screenshot of a paragraph from your summary
 8    of opinions in your report, as well as a figure from your
 9    presentation this morning.
10           THE COURT:  Before we go on, let me interject with
11    this question.
12           Assume now that when I come to finding facts I
13    adopt your approach and draw inferences as to possible
14    benefits and burdens from this merger.  Inevitably it's --
15    and I'll state this, I'll state this now, it seems to me
16    that as -- if this goes forward it's going to take some time
17    to shake out, an expression, but you'd agree with that?
18    Things don't just instantly happen.  A slot opens up and the
19    contracted ULCC jumps in and planes begin to fly painted in
20    that logo.  So some time passes.  How have you calculated
21    for that time?  Or is your approach the picture that I ought
22    be adopting after things have shaken out?  Does my question
23    make sense?
24           THE WITNESS:  It does, your Honor.
25           THE COURT:  And what about that?
```

```
 1            THE WITNESS:  Yeah, so generally in antitrust
 2    analysis we think about there's a short-term adjustment
 3    period and a longer term equilibrium.  So what I'm looking
 4    at here is the longer term equilibrium.  You're absolutely
 5    right, your Honor.  I believe Mr. Biffle and Mr. Wells both
 6    said it will take us some time to get the slots and then to
 7    be able to use them.  I think it was within six months.  But
 8    there is a lag period.  And what I'm thinking of here is
 9    sort of the long-term equilibrium.
10            THE COURT:  Thank you.
11            THE WITNESS:  You're welcome, your Honor.
12            THE COURT:  I interrupted, Mr. Thornburgh.  You go
13    right ahead.
14            MR. THORNBURGH:  Always welcome to interrupt me,
15    your Honor.
16    Q.   So, Dr. Hill, on the demonstrative in front of you,
17    Hill Demonstrative G, on the right-hand side is a paragraph
18    from your report.  Do you recognize that?
19    A.   I do.
20    Q.   And in that paragraph you talk about how this
21    transaction will better enable JetBlue to compete against
22    the big four, which includes Southwest; right?
23    A.   Correct.
24    Q.   And then on the left, which is a exhibit or a slide
25    from your presentation this morning; right?
```

```
 1    A.    That's correct.
 2    Q.    And there you are indicating on what routes Southwest
 3    is either present or has a substantial presence at one of
 4    the endpoints; right?
 5    A.    Correct.
 6    Q.    You would agree, Dr. Hill, that Southwest has, on
 7    average, higher fares than Spirit; right?
 8    A.    That's fair.
 9    Q.    Southwest does not offer an unbundled product like
10    Spirit; right, Dr. Hill?
11    A.    I'm not sure I'd put it in those terms, but it's fair
12    to say that Southwest you don't have the -- well -- sure, we
13    can go ahead with that.
14    Q.    You'd also agree that other ULCCs are more likely than
15    Southwest to have a similar effect as Spirit on lowering
16    fares in a market; right?
17    A.    That other ULCCs?
18    Q.    Correct.
19    A.    Yes, I believe that's fair.
20    Q.    So, Dr. Hill, on one hand you were arguing that this
21    transaction will enable JetBlue to better compete against
22    Southwest, while on the other you're also arguing that
23    Southwest is well-positioned to remedy potential harm that
24    is associated with this transaction; correct?
25    A.    Correct.
```

```
 1              MR. THORNBURGH:  If we can go to slide 46, please.
 2              (On screen.)
 3  Q.   So, Dr. Hill, this is the slide that you spoke to this
 4  morning about the American-US Airways merger.  Do you recall
 5  that?
 6  A.   I do.
 7  Q.   Dr. Hill, you don't have an opinion of as to how these
 8  divestitures impacted competition on individual origin and
 9  destination markets touching Reagan National Airport;
10  correct?
11              THE COURT:  I didn't catch the whole -- you don't
12  have an opinion on how these divestitures affected, did you
13  say -- pick up there.  Origin?
14              MR. THORNBURGH:  Competition on origin and
15  destination markets that touched Reagan Airport, which is
16  what's depicted on the screen, your Honor.
17              THE COURT:  Thank you.
18              MR. THORNBURGH:  Of course.
19  A.   So just a mild modification.  So, first, in general
20  you're right.  The figure is just looking at what happened
21  in aggregate at Reagan National.  And then I separately, in
22  my report, also looked at what happened to
23  existing/preexisting routes at Reagan National.  And what I
24  found is on those routes, routes that were already being
25  served, those continue to be served at about the same
```

1    volumes.

2         So putting the two figures together, what happened was

3    the, especially the divestiture buyers, entered a bunch of

4    new routes, but I haven't individually analyzed which routes

5    they competed on while maintaining service on their existing

6    routes.

7    Q.   You didn't look at how these divestitures impacted the

8    prices or fares on any particular market; correct, Dr. Hill?

9    A.   On any particular route, that's correct.

10   Q.   I want to switch focuses now and talk more about how

11   you evaluated potential harm in overlap markets.

12         MR. THORNBURGH:  And if we could start, please, by

13   going to slide 30 of Dr. Hill's presentation this morning.

14         (On screen.)

15   Q.   So, Dr. Hill, I just want to start by making sure

16   something is clear.  You would agree that there are more

17   than 51 markets where JetBlue and Spirit compete as

18   nonstop -- nonstop markets where JetBlue and Spirit compete

19   today; right?

20   A.   Correct.

21   Q.   So there's the 51 nonstop presumption markets, as you

22   indicated here; correct?

23   A.   Correct.

24   Q.   But there are additional nonstop overlap markets where

25   JetBlue and Spirit compete that just don't have the HHIs

1    that meet the threshold under the merger guidelines;

2    correct?

3    A.    Correct.

4    Q.    Okay.  Those would be included in your econometric

5    category that is depicted on the screen; correct?

6    A.    That's fair.

7    Q.    So, Dr. Hill, you would agree with me that when you

8    typically evaluate the competitive effects of a merger with

9    two head-to-head competitors, you use a framework that is

10   consistent with the horizontal merger guidelines; correct?

11   A.    Typically true, yeah.

12   Q.    Okay.  And, Dr. Hill, as we already discussed this

13   morning, you did not apply your entry intensity model to the

14   overlap markets where JetBlue and Spirit compete; right?

15   A.    Correct.

16   Q.    Instead, Dr. Hill, you looked at the overlap markets

17   where Dr. Gowrisankaran alleged harm and you identified

18   purported disqualifying deficiencies with many of these

19   markets; right?

20   A.    Yeah, that's correct.

21   Q.    And if you found that a route had just one of these

22   disqualifying deficiencies, you determined that there would

23   be no harm on that route; correct?

24   A.    Well, I started by taking deficiencies that I thought

25   were sufficient to disqualify routes.  But, yes, within that

 1    framework, correct.

 2    Q.   So once you applied your disqualifying deficiencies to

 3    the overlap markets where JetBlue and Spirit compete today,

 4    that's how you got the 15 holdout routes, as you call them;

 5    correct, Dr. Hill?

 6    A.   Correct.

 7    Q.   So I want to talk about some of these disqualifying

 8    deficiencies for a moment.  So we have another demonstrative

 9    I'd like now to guide our discussion.  And this is a

10    demonstrative that was shared with your counsel previously.

11             (Handing.)

12             MR. THORNBURGH:  We can go ahead and put it up on

13    the screen.

14             (On screen.)

15    Q.   So I'd like to start, Dr. Hill, with the Lima-Miami

16    market.  You identified two purported disqualifying

17    deficiencies with that market; correct?

18    A.   Correct.

19    Q.   One of the two disqualifying deficiencies was that it

20    didn't have HHIs or market shares that meet the presumption

21    threshold when you use revenue shares; correct?

22    A.   That's correct.

23    Q.   But you understand that the market did meet the

24    presumption when you use passenger shares; right?

25    A.   Correct.

1   Q.   You also understand that using revenue shares for this

2   market, it still was a highly concentrated market under the

3   merger guidelines; correct?

4   A.   That's correct.

5   Q.   And so under the merger guidelines for a highly

6   concentrated market, that raises significant competitive

7   concerns and often warrants further scrutiny; correct?

8   A.   I can't remember the exact wording from the guidelines

9   on that.  But, in general, they say that moderately

10  concentrated routes can raise concerns and merit further

11  scrutiny.

12  Q.   If it's a highly concentrated market but it doesn't

13  have a change in concentration that rises to above 200 HHIs

14  it can raise significant competitive concerns; correct?

15  A.   It can.

16  Q.   And you have indicated previously, Dr. Hill, that when

17  you usually evaluate competition in such a highly

18  concentrated market you would look at qualitative evidence,

19  the concentration numbers, and you would also perform a

20  competition analysis; is that fair?

21  A.   Could you direct me to that, please?  I may have said

22  that.  I just don't recall.

23  Q.   Sure.  If you want to look at page 54 of your

24  deposition, sir.

25  A.   Sure.

```
 1                 (On screen.)

 2    A.    I'm there.

 3    Q.    So it's, if you look at lines 19, starting on page 54,

 4    and then you read over to page 55, Dr. Hill.  Does that

 5    refresh your memory as to the type of analysis that you

 6    usually conduct in such a market?

 7                 (Witness reviewed document.)

 8    A.    Yes.

 9    Q.    So you would agree with me then in such a market you

10    typically would look at qualitative evidence, the

11    concentration numbers, and you would also perform a

12    competition analysis; right?

13    A.    Sure.

14    Q.    But in this case, or in the case of the Lima-to-Miami

15    market --

16                 MR. THORNBURGH:  If we can go back to that slide,

17    please.

18                 (On screen.)

19    Q.    -- you did not perform such an analysis here; correct?

20    A.    I disagree because this market is affected by the

21    divestitures.

22    Q.    Okay.  Fair enough.  And we will get to the

23    divestitures.

24          So besides identifying that this market touched a

25    divestiture airport, you did not do any other analysis to
```

better understand competition on the Lima-to-Miami market;
correct, sir?

A.   I wouldn't say narrowly, but in general I looked at the
fact that entry and repositioning are common in the
industry.  In fact, I think Sky Peru has now entered this
route and it no longer meets either of the thresholds.

Q.   Again, Dr. Hill, when you evaluated this market for
purposes of offering your opinions in your report, besides
noting that it touches -- that this market touched a
divestiture airport, you did not do any other further
analysis to understand how -- what competition was going on
there; correct?

          MR. GELFAND:  Objection.  Asked and answered.

          THE COURT:  I think it is.  I understand his
answer to this question to be yes.  So that's where I am.
You go ahead, Mr. Thornburgh.  Sustained.  He did not.

Q.   Dr. Hill, there were 12 econometric routes that, as you
categorized them, which had HHIs that the guidelines
indicated warrant further scrutiny, but you disqualified
them if they had shares that did not meet the presumption;
right?

A.   Are you saying solely disqualified them on that
grounds?

Q.   That wasn't my question.  My question was you supplied
a disqualifying deficiency to them if they had shares that

1   did not meet the presumption under the merger guidelines?

2   A.   Yes, but all of them also were divestiture airports.

3   Q.   Okay.  So let's talk about that second deficiency that

4   you identified with regards to this market which, as you

5   just indicated, related to the divestitures at the Fort

6   Lauderdale Airport; correct?

7   A.   Correct.

8   Q.   And if a route touched an airport where there were

9   divestitures you labeled it as a disqualifying deficiency;

10   correct?

11   A.   Correct.

12   Q.   It didn't matter where the other endpoint on that route

13   was, so long as there was an endpoint in a market that

14   touched a divestiture airport that -- then you gave it a

15   disqualifying deficiency; correct?

16   A.   Correct.

17   Q.   So, Dr. Hill, first, you've heard the testimony of

18   Mr. Gale from the Broward County Airport Authority; correct?

19   A.   I did.

20   Q.   You heard Mr. Gale testify that JetBlue does not have

21   the right to divest its gates at Fort Lauderdale Airport;

22   correct?

23   A.   Correct.

24   Q.   But you didn't factor that into your analysis of the

25   divestitures for the opinions you offered in your report;

1    correct?

2    A.   I -- I didn't consider Mr. Gale's particular testimony

3    on that but, again, the way I thought about the divestitures

4    is they maintain competition at the level of the airport

5    and --

6    Q.   You -- I'm sorry.  I didn't mean to cut you off.

7    A.   I apologize.  No, you go ahead, please.

8    Q.   When I took your deposition earlier this year, sir, you

9    were not aware of Mr. Gale's testimony on this topic; right?

10   A.   That's correct.

11   Q.   So putting that aside, you heard the testimony of

12   Allegiant's Mr. Wells in court; correct?

13   A.   Correct.

14   Q.   And he indicated that Allegiant has no existing plans

15   to offer international service except to or from Mexico as

16   part of its joint venture; correct?

17   A.   I don't think that's quite fair.  I -- well, it depends

18   what you mean by existing plans.  What he said was they

19   don't currently have authorization.  They have a plan for

20   their -- or at least I recall the plan for their joint

21   venture with Viva Aerobus, and then their plan after that to

22   enter the Caribbean and Latin America.

23   Q.   Do you recall Mr. Wells offering any definitive plans

24   that Allegiant had to enter any markets, international

25   markets, other than in Mexico, sir?

1    A.    Yeah.  He said they don't have definitive plans.

2    Q.    So since Lima is not in Mexico, fair to say that the

3    divestitures aren't likely to facilitate entry in this

4    particular market anytime soon; correct?

5    A.    This particular route, yes.  Well, I apologize.  I

6    shouldn't say yes.  What do you mean by "anytime soon"?

7    Q.    As you understand it, sir.

8    A.    I mean, in the short run I think that's fair, but in

9    the longer run I can't opine on that.

10   Q.    So, Dr. Hill, even though you say that you think it's

11   right to analyze the divestitures at the airport level, you

12   use the airport-level divestitures to conclude that there

13   wouldn't be harm in specific markets like the Lima-to-Miami

14   market; correct, sir?

15   A.    I would put it slightly differently.  The way I think

16   about it is it's going to preserve competition at the

17   airport.  There may be a route that Allegiant decides not to

18   serve, but if it does it's going to use those assets to

19   compete on another route which will benefit.  And I am,

20   you're correct, assuming that those switches in network will

21   essentially cancel each other out.

22   Q.    If you could please turn to slide 19 from your direct,

23   please.

24          (On screen.)

25   Q.    Dr. Hill, this is a slide from this morning where you

```
 1   offer testimony about some of your critiques of

 2   Dr. Gowrisankaran's harm model; correct?

 3   A.   That's correct.

 4   Q.   Okay.

 5           MR. THORNBURGH:  And we have another

 6   demonstrative, this will be Hill Demonstrative H, and this

 7   contains this slide and then just a figure from

 8   Dr. Gowrisankaran's report next to each other.  If we could

 9   put that up on the slide and then provide it to the Court,

10   please.

11           (Handing.)

12           (On screen.)

13   Q.   Dr. Hill, you recognize the figure on the right, I

14   presume, from your review of Dr. Gowrisankaran's reply

15   report; is that fair?

16   A.   It's familiar, yes.

17   Q.   Okay.  So I want to just go through the critiques that

18   you offered here fairly quickly.  Your first critique was

19   that Dr. Gowrisankaran's model relied on less data than your

20   model; correct?

21   A.   That's fair.

22   Q.   You understand that Dr. Gowrisankaran ran a sensitivity

23   of his model to address that particular critique; right?

24   A.   Just making that change?  Yes.

25   Q.   And that change is indicated by the bar that's labeled,
```

```
 1    "Using Dr. Hill's 2011 to 2019 data."  Do you see that?

 2    A.   I do.

 3    Q.   And he found $835 million in weighted harm; correct?

 4         MR. GELFAND:  Your Honor, I object to this line of

 5    questions.  The government is taking an exhibit out of the

 6    report that wasn't presented to the Court.  Dr. Hill's

 7    testimony is about the evidence in court.

 8         THE COURT:  It is.  But I think this is

 9    appropriate.  He may proceed.

10         MR. THORNBURGH:  Thank you, your Honor.

11    Q.   Dr. Hill, the reason you have more entry events than

12    Dr. Gowrisankaran, as you testified this morning, is that

13    you used older entry events than Dr. Gowrisankaran did;

14    correct?

15    A.   I used more years, yes.

16    Q.   You used entry events for both JetBlue and Spirit going

17    back to 2012, whereas Dr. Gowrisankaran limited his entry

18    events from 2017 to 2019; right?

19    A.   So I believe I went back to 2011, that was my earliest,

20    and Professor Gowrisankaran only uses the first quarter of

21    2019.  But other than that, agree.

22    Q.   Fair enough.  Thank you, sir.

23         In 2012, Dr. Hill, US Airways had not purchased

24    American Airlines yet; right?

25    A.   That's correct.
```

```
 1   Q.   In 2012 Frontier had not transitioned to a ULCC
 2   carrier; correct?
 3   A.   That's fair.
 4            MR. THORNBURGH:  Let's look at Dr. Gowrisankaran's
 5   Reply Exhibit 17, if we could, on page 71 of his reply
 6   report.
 7   Q.   This will be put on the screen in front of you.  Do you
 8   recognize this figure, Dr. Hill?
 9            (On screen.)
10   A.   Yes.
11   Q.   Okay.  And this figure from Dr. Gowrisankaran's report
12   is comparing the JetBlue and Spirit Effects between two time
13   periods; correct?
14            MR. GELFAND:  Your Honor, I have the same
15   objection.
16   A.   Correct.  I'm sorry.
17            MR. GELFAND:  They're using his report --
18            THE COURT:  Well, more fundamentally, he's lost me
19   now.  Where are you?  What are you looking at?
20            MR. THORNBURGH:  There should be, in your binder,
21   there's a tab marked, "Dr. Gowrisankaran's Reply Report."
22            THE COURT:  I see it.
23            MR. THORNBURGH:  I'm on page 71 of that report,
24   your Honor.
25            THE COURT:  Thank you.
```

```
 1              MR. GELFAND:  Your Honor, may I be heard on the

 2    objection when your Honor is ready?

 3              THE COURT:  Yes.  What page?

 4              MR. THORNBURGH:  71, your Honor.

 5              THE COURT:  Now, your question and then I'll hear

 6    counsel.  What's your question?

 7              MR. THORNBURGH:  My question to Dr. Hill was you

 8    recognize this figure as showing the JetBlue and Spirit

 9    Effects for two different time periods.

10              THE COURT:  In your expert's reply report?

11              MR. THORNBURGH:  Correct.  So my first question

12    was whether Dr. Hill was familiar with it, or recognized it,

13    I think was my wording, and I think he said yes.

14              THE COURT:  I'll allow a few questions.

15    Overruled.  A few questions.

16              MR. THORNBURGH:  Just a few, your Honor.

17    Q.   So, Dr. Hill, sorry, just to repeat my question.  So

18    you would agree this is purporting to show, at least, the

19    impact of Spirit and JetBlue that they have on two different

20    time periods; correct?

21    A.   Correct.

22    Q.   And as depicted on the chart in front of you, JetBlue

23    had a larger effect in the period from 2012 to 2016;

24    correct?

25    A.   Correct.
```

1    Q.   The Spirit Effect is largely unchanged, though, as

2    depicted here; correct?

3    A.   That's correct.

4    Q.   Okay.

5         MR. THORNBURGH:  Those are all my questions on

6    that exhibit.  If you can go back to the demonstrative that

7    was previously on the screen.

8         (On screen.)

9    Q.   So, Dr. Hill, your second critique was that

10   Dr. Gowrisankaran's model predicts that more aggressive

11   entry leads to higher fares; right?

12   A.   Correct.

13   Q.   And by that, you mean that as a result of the shape of

14   the curve that Dr. Gowrisankaran utilized, his regression

15   indicates increasing fares once you get to a capacity above

16   a certain point; right?

17   A.   That's correct.

18   Q.   I think, as you testified this morning, you understand

19   that he did not apply his harm model to those capacities in

20   a range that would actually predict those fare increases;

21   right?

22   A.   I disagree a little.  So if you look back at the

23   figure, he did apply it to the area where the capacity for a

24   while decreases -- increases the effect.  So I add more

25   planes, fares come down.  And then it turns and adding more

     1    planes leads to higher fares relative to what would have

     2    happened with fewer planes.  But it doesn't cross over the

     3    actually overall positive until later.  So with that

     4    clarification, I'll agree.

     5    Q.    Okay.  Thank you, Dr. Hill.

     6          And if we look at the figure on the right here, you

     7    understand that Dr. Gowrisankaran ran a sensitivity to

     8    address this particular critique by using a linear model.

     9    Do you see that?

    10    A.    I do.

    11    Q.    Okay.  And when he ran that, the model addressing that

    12    particular critique, he actually found more harm than he

    13    reported in his initial report; correct?

    14    A.    That's what he reports, yes.

    15    Q.    Your fifth critique, Dr. Hill, was that

    16    Dr. Gowrisankaran's model assumed that Spirit's impact is

    17    unaffected by JetBlue; correct?

    18    A.    Correct.

    19    Q.    In other words, your critique was that his model does

    20    not control for the Spirit Effect in markets where JetBlue

    21    was already a competitor; is that right?

    22    A.    Yeah, how -- yeah, that's fair.

    23    Q.    Okay.  And, again, you understand that

    24    Dr. Gowrisankaran ran a sensitivity to address this

    25    particular concern; right?

 1   A.   Yes.  In isolation he did.

 2   Q.   And it says, if you look at the chart on the right,

 3   there's a bar that says, "Allowing Spirit Effect to Differ

 4   in JetBlue markets."  Do you see that?

 5   A.   Yes, I do.

 6   Q.   And when Dr. Gowrisankaran addressed that particular

 7   sensitivity he found $926 million in annual harm; right?

 8          MR. GELFAND:  Same objection, your Honor.  This is

 9   an improper attempt to read into the record --

10          THE COURT:  If I need argument I will call for it.

11   I'm going to sustain that objection.  Go ahead.  I mean, we

12   all understand that the reports are not evidence.

13          MR. THORNBURGH:  Of course, your Honor.

14   Q.   I want to talk about the third critique here, Dr. Hill,

15   which you said that Dr. Gowrisankaran's model is sensitive

16   to small and reasonable changes in its assumptions.  Do you

17   see that?

18   A.   I do.

19   Q.   And this morning when you testified about that

20   particular critique you focused on what is called an

21   "intercept term" and whether it's included in

22   Dr. Gowrisankaran's model; correct?

23   A.   It's the intercept of the marginal effect, not the

24   intercept, per se.  There's still an intercept term in the

25   model I used for Professor Gowrisankaran.

1    Q.   Dr. Hill, you didn't cite any academic literature in

2    your report to support your opinion about what to do with

3    Dr. Gowrisankaran's intercept term; correct?

4    A.   That's true.  This is a common way to approach the

5    marginal effect.

6    Q.   Dr. Hill, the last critique I don't think that we've

7    talked about yet is number four where you said that

8    Dr. Gowrisankaran's model gives credit for lower fares but

9    not for higher quality; right?

10   A.   Correct.

11   Q.   Your entry intensity model does not include a

12   correction or an adjustment for quality; correct?

13   A.   That's correct.

14   Q.   I'm going to switch topics.

15            MR. THORNBURGH:  If we could go to slide 6 of

16   Dr. Hill's direct presentation, please.

17            (On screen.)

18   Q.   So, Dr. Hill, you testified this morning on this slide

19   that Dr. Gowrisankaran's nonstop presumption markets have

20   changed materially.  Do you recall that?

21   A.   Yes.

22   Q.   Besides looking at this analysis from

23   Dr. Gowrisankaran, did you do any of your own analysis to

24   understand how consistent Dr. Gowrisankaran's nonstop

25   presumption markets have been over time?

```
 1    A.    I have not.
 2    Q.    Well, let's look at some data that would speak to that.
 3    On -- I believe it will either be passed out to you or it's
 4    already in your binder, is Hill 1006 Amended Summary 2.
 5    A.    Which binder should I look in?  Or if it comes up on
 6    the screen, that's fine.
 7              (On screen.)
 8    A.    Oh, that's okay.
 9    Q.    It's admittedly small font.
10    A.    That's fine.  I have my glasses.
11    Q.    Okay.
12              MR. THORNBURGH:  Your Honor, I believe there's a
13    large printout of this particular 1006 Summary.
14              THE COURT:  One devoutly hopes so.
15              MR. THORNBURGH:  Do you have it there, your Honor?
16              THE COURT:  Not yet.  Yes.
17              MR. THORNBURGH:  Okay.
18    Q.    So, Dr. Hill, you recognize this demonstrative of -- as
19    containing Dr. Gowrisankaran's nonstop presumption markets;
20    correct?
21    A.    It does contain the original 51, and then it has some
22    additional ones, I think, at the bottom.
23    Q.    Okay.  And so what we've done here is we've added
24    markets for which there is -- that have met the presumption
25    in any of the three-year time window starting in 2021
```

 1    through the current period.  Oh, excuse me.  Through 2020.

 2    I apologize.

 3    A.    So the first column goes back to the COVID period?

 4    Q.    Q3 of 2020.

 5    A.    Okay.

 6    Q.    And you recognize that as containing market shares for

 7    a three-year window starting in 2020; right, Dr. Hill?

 8    A.    Yeah.  It goes from -- you mean the Q3 2020 to Q2 2021?

 9    Q.    Correct.  And then there's two additional time periods

10    on the chart; correct, sir?

11    A.    Yep, I see that.

12    Q.    And you recognize the fields here as containing data

13    aggregated from data sources including DB1B, OAG, and DiiO

14    that you utilized to some degree in your report; correct,

15    sir?

16    A.    I would assume so, yes.  That seems fair.

17              MR. THORNBURGH:  Your Honor, plaintiffs ask that

18    Hill 1006 Amended Summary 2 be introduced as Exhibit 882, I

19    believe.

20              THE COURT:  Any objection?

21              MR. GELFAND:  No objection.

22              THE COURT:  It may be admitted, Exhibit 882 in

23    evidence.

24              (Exhibit 882 received in evidence.)

25    Q.    Dr. Hill, we've taken this 1006 summary and we've added

1  another page with highlighting that is a demonstrative.

2  Sorry for multiple terms here.  But we'll put that up on the

3  screen in front of you, and I think some of my colleagues

4  will pass it out to you as well.

5  A.    Sure.

6         MR. THORNBURGH:  Your Honor, you have this already

7  in your materials.

8         (Handing.)

9         THE WITNESS:  Thank you.

10  Q.    So, Dr. Hill, we've taken this, the 1006 summary, and

11  added some highlighting.  The highlighting indicates, as the

12  key shows at the bottom, markets where -- that have met the

13  presumption for all of the last three years.  Do you see

14  that?

15  A.    I do.

16  Q.    And as you can see, there are 35 markets listed there;

17  correct?

18  A.    Correct.

19  Q.    Dr. Hill, is it surprising to see that 35 of

20  Dr. Gowrisankaran's nonstop presumption markets had market

21  shares that exceeded the presumption the last three years in

22  a row?

23  A.    Well, I would note that I wouldn't put a ton of weight

24  on the COVID ones, but I'm not surprised for the other two

25  time periods.

```
 1   Q.   And I'll represent to you that those 35 markets
 2   represent 80 percent of the passengers that were in the
 3   nonstop presumption markets that Dr. Gowrisankaran defined
 4   in his initial report.  Is that surprising to you?
 5             MR. GELFAND:  Objection, your Honor.  A lawyer
 6   representing --
 7             THE COURT:  The objection is sustained.
 8             MR. GELFAND:  Thank you.
 9             THE COURT:  "Surprising."
10             MR. THORNBURGH:  We can take that down.
11   Q.   Dr. Hill --
12             MR. THORNBURGH:  Let's go to slide 28 of
13   Dr. Hill's direct, please.
14             (On screen.)
15   Q.   Dr. Hill, on this slide you reported the output effect
16   that you found when you changed the price variable in
17   Dr. Gowrisankaran's model to passengers; correct?
18   A.   That's correct.
19   Q.   And you found it useful to do this type of analysis;
20   correct?
21   A.   Correct.
22   Q.   You did not, though, present any output results from
23   your own entry intensity model; correct?
24   A.   Correct.
25   Q.   Did you undertake the same analysis to see what your
```

1   model predicts about how total output would change in your

2   increased competition routes?

3   A.   I did not.

4   Q.   Okay.  So, Dr. Hill, you thought it would be useful to

5   understand where Dr. Gowrisankaran's model predicts an

6   increase in passengers, but you did not think it was useful

7   to see whether your own model predicts an increase in

8   passengers; is that right?

9   A.   Yeah.

10  Q.   Would it be a meaningful critique of your model,

11  Dr. Hill, if it found an output or passenger decrease of 1

12  to 2 percent in your increased competition routes?

13  A.   I'd have to look at it and see what the analysis was.

14  I just haven't done it.

15  Q.   Dr. Hill, you calculated purported benefits to

16  consumers associated with converting Spirit planes to

17  JetBlue planes on your increased competition routes;

18  correct?

19  A.   That's correct.

20  Q.   Those are the benefits that you found using your entry

21  intensity model to analyze each carrier's impact on rival

22  fares; right?

23  A.   Correct.

24  Q.   But beyond that calculation you did not qualify any

25  additional benefits to consumers that would occur as a

```
 1   result of this transaction; right?
 2   A.   That's fair.
 3   Q.   You also did not qualify to what extent, if any, a
 4   combined JetBlue would be bigger than JetBlue and Spirit as
 5   standalone competitors; correct?
 6   A.   Correct.
 7            THE COURT:  I need that question repeated.  I'm
 8   sorry.
 9            MR. THORNBURGH:  Of course, your Honor.
10   Q.   Dr. Hill, you also did not quantify to what extent, if
11   any, a combined JetBlue airline would be bigger than JetBlue
12   and Spirit as standalone separate airlines; correct?
13            THE COURT:  And he said correct?
14            THE WITNESS:  Correct, your Honor.
15            THE COURT:  Thank you.
16   Q.   Dr. Hill, you did not present in your report a
17   route-by-route analysis of the purported benefits from the
18   conversion of Spirit aircraft to JetBlue aircraft; correct?
19   A.   That's correct.
20   Q.   You presented an estimate, rather, at the aggregate
21   level for converting Spirit planes to JetBlue planes on your
22   increased competition routes; right?
23   A.   That's correct.
24   Q.   You did not present any estimate of benefits for the
25   nonstop overlap routes where JetBlue and Spirit compete
```

1   today; correct?

2   A.   Correct.

3   Q.   Dr. Hill, your estimate of benefits in your increased

4   competition routes assumes that JetBlue flies the Spirit

5   planes in the same routes where Spirit flies today; correct?

6   A.   That's correct.

7   Q.   You heard testimony from Mr. Friedman, though, that in

8   JetBlue's 2022 deal modeling they assumed that there would

9   be a redeployment of approximately one-sixth of Spirit's

10  network as it exists today; right?

11  A.   That's true.  I will say Professor Gowrisankaran did

12  the same thing, he just assumed that, you know, we'll just

13  take the current plans and work on that.  And I followed him

14  in that assumption.

15  Q.   Mr. Friedman testified about an example of a market

16  which was confidential so he identified it on row 122 of the

17  deal modeling spreadsheet where JetBlue's modeling

18  contemplated the combined airline removing service from that

19  route.  Do you recall that testimony, sir?

20  A.   No, but I'll take your word for it.

21  Q.   Because it was part -- because this route is a route

22  where Spirit flies today, it's part of your increased

23  competition routes and is a market for which you calculated

24  benefits.  Okay?

25  A.   Okay.

```
 1   Q.   Do you know how much benefit, Dr. Hill, you ascribed to
 2   the market that Mr. Friedman acknowledged JetBlue modeled
 3   removing service from?
 4   A.   I do not.
 5   Q.   Would it surprise you to learn that it was more than
 6   $4 million annually in benefit?
 7   A.   I haven't analyzed it.  I mean, Professor Gowrisankaran
 8   and I looked at the current network and we analyzed that.  I
 9   just don't know the answer to your question.
10   Q.   Fair enough.  You'd agree, though, that if JetBlue
11   doesn't keep the Spirit planes in the market where the
12   Spirit planes are operating today there would not be a
13   benefit in that market; correct?
14   A.   There may not be in that route, but if they're set onto
15   another route they can have a similar equivalent effect on
16   that route or less.  But in average I would expect it to be
17   similar.
18   Q.   Dr. Hill, you made no effort to independently assess
19   whether JetBlue was likely to keep flying the Spirit
20   aircraft in the markets where Spirit aircraft fly today;
21   right?
22   A.   That's fair.
23   Q.   Dr. Hill, nowhere in your report do you offer an
24   opinion that there is a national market for scheduled air
25   passenger service; correct, sir?
```

```
 1    A.    Correct.
 2    Q.    Nor will I find an opinion in your report that airlines
 3    offer a product to individual consumers that involves a,
 4    say, national product for air travel; right?
 5    A.    Well, that's fair.
 6    Q.    Your report doesn't contain an opinion that there is
 7    significant consumer substitution between different
 8    origin-and-destination pair markets; correct, sir?
 9    A.    So when you're -- are we talking about a particular
10    route like Miami to Washington, D.C. and Fort Lauderdale to
11    Washington, D.C.?  What exactly do you have in mind?
12    Q.    Sure.  As an example, you did not study, Dr. Hill,
13    whether there's customer substitution between, say, a route
14    from Miami to Lima and a route from Los Angeles to Spokane,
15    Washington; correct, sir?
16    A.    That's fair.
17    Q.    Dr. Hill, in prior cases you have testified that the
18    question of market definition rests on customer
19    substitution; correct, sir?
20    A.    Yes, with the exception of supply side.  If there's
21    substantial swinging of capacity across markets then you may
22    have a supply-side reason as well.  But in general it's
23    based on customer substitution.
24    Q.    Okay.  I want to switch gears again, talk a little bit,
25    perhaps a little more than five minutes, but talk a little
```

```
 1   bit about coordinated effects.
 2   A.   Sure.
 3   Q.   Dr. Hill, you would agree with me that the guidelines
 4   set three conditions for a merger to potentially increase
 5   the risk of coordination:  The first, increased
 6   concentration in a moderately or highly concentrated market;
 7   the second, a market or markets that are vulnerable to
 8   coordinated conduct; and third, a credible basis for
 9   concluding that the merger may enhance that vulnerability;
10   right?
11            MR. GELFAND:  Objection, your Honor.  I'm going to
12   object.  May I explain?
13            THE COURT:  You're going to object what?
14            MR. GELFAND:  I didn't want to just go on without
15   getting permission to explain the basis of my objection.
16            THE COURT:  I'll hear you.
17            MR. GELFAND:  There's been a lot of talk in this
18   trial about the merger guidelines.  This is a policy
19   document produced by the Justice Department, the prosecutor
20   in this case.  I object on relevance grounds.  He's
21   cross-examining with a government policy document created
22   for the purpose of assisting the government in bringing
23   cases.  That's not part of his analysis, it's beyond the
24   scope, and it's an improper use of a government policy
25   document.
```

```
 1              THE COURT:  No, I don't think it's an improper use
 2    of it.  He may use it.  I will give it such weight as is its
 3    due.
 4              And so put your question.
 5              MR. THORNBURGH:  So my first question was whether
 6    Dr. Hill agreed that the merger guidelines set three
 7    conditions.
 8              THE COURT:  Well, they say what they say.  So a
 9    question would be:  Do you think those are proper guidelines
10    for analyzing the antitrust laws?
11              THE WITNESS:  Yeah, I've used them in the past.
12    Well, the guidelines, parts of the guidelines, certainly.
13              THE COURT:  Understood.  Go ahead.
14              MR. THORNBURGH:  Thank you, your Honor.
15    Q.   Dr. Hill, do you think the airline industry is
16    susceptible to coordination today?
17    A.   I haven't taken an opinion on that.
18    Q.   You would agree with me though that there had been
19    periods in the airline industry when -- prior periods in the
20    airline industry when tacit coordination has occurred;
21    correct?
22    A.   Could you say which periods you have in mind?
23              THE COURT:  Well, apparently there was a lawsuit
24    on this and now there's a consent decree.  And I am
25    sensitive to the sporadic evidence of such coordination.
```

1    I'm really not clear what to make of it.  I'm not sure you
2    can get it from this witness who's here pursuant to rule
3    702.  But I don't foreclose it.  Go ahead.
4    A.   So the --
5            THE COURT:  Well, go ahead.  There's no question.
6    He'll ask.
7            THE WITNESS:  Oh.
8    Q.   Dr. Hill, you've indicated previously that there have
9    been periods in the past in the airline industry when tacit
10   coordination has occurred; correct?
11   A.   If you just say coordination, I'm -- yes.
12   Q.   Dr. Hill, you mentioned in your direct testimony that
13   you've testified a number of times on behalf of both the
14   government and private parties in merger litigation; right?
15   A.   That's true.
16   Q.   In four of the five cases in which you testified you
17   actually did analyze whether the industry at issue in those
18   litigations was susceptible to coordination; correct?
19           MR. GELFAND:  Objection.  Relevance.
20           THE COURT:  Yeah, why is that relevant here?  He
21   hasn't offered an opinion here.
22           MR. THORNBURGH:  Your Honor, I'm trying to probe
23   the fact as to why he hasn't offered an opinion here where
24   he has in almost all of the other merger cases in which he
25   testified.

```
 1              THE COURT:  Why don't you ask him that?
 2              THE WITNESS:  Sure.  So the reason is, here my
 3    analysis of coordinated effects is we have a maverick firm
 4    in this industry.  It's going to grow larger and it's going
 5    to be able to compete on more routes and disrupt any
 6    coordination should it occur.  So I really haven't focused
 7    on whether or not there are the other two conditions.
 8              THE COURT:  So part, as I get your answer, you're
 9    accepting that, based on your analysis, that JetBlue is,
10    quote, a maverick firm?
11              THE WITNESS:  That's correct, your Honor.
12              THE COURT:  All right.  Go ahead.
13    Q.   Dr. Hill, you agree that an industry can have more than
14    one maverick; correct?
15    A.   That could be true, yes.
16    Q.   You agree that Spirit is a disruptive force today;
17    correct?
18    A.   Correct.
19    Q.   You also agree that Spirit lowers the risk of
20    coordination in the markets where it competes today;
21    correct?
22    A.   I think that's fair.
23    Q.   You would also agree that a firm's incentives help
24    determine how it competes; correct?
25    A.   That's fair.
```

1  Q.   It's possible for a merger to change a firm's

2  incentives; right?

3  A.   Correct.

4  Q.   So it's possible that this transaction could change

5  JetBlue's incentives such that it is no longer as disruptive

6  as it is today; correct, Dr. Hill?

7  A.   It's possible, but I don't think it's likely.

8  Q.   Dr. Hill, you didn't do any quantitative analysis in

9  your report to determine the likelihood that JetBlue's

10  incentives would remain the same after this transaction is

11  completed; correct?

12  A.   That's correct.

13  Q.   You've -- you were here for the testimony of Mr. Hayes

14  when he described JetBlue's need to make JetBlue's loyalty

15  program stronger; right?

16  A.   I heard it.  I don't recall it carefully.

17  Q.   You also heard Mr. Hayes describe how the transaction

18  would enable JetBlue to more successfully compete for

19  corporate contracts; right?

20  A.   I believe so.

21  Q.   And you also heard the testimony of Mr. Eric Friedman

22  from JetBlue who testified that the transaction would enable

23  JetBlue to open up thousands or hundreds of routes that

24  JetBlue could serve on a connecting basis; right?

25  A.   Correct.

```
 1   Q.   Dr. Hill, United, Southwest, American and Delta, they
 2   all focus a lot on loyalty, competing for corporate
 3   contracts, and operating lots of connecting itineraries,
 4   wouldn't you agree, sir?
 5   A.   I think that's fair.
 6   Q.   So if this merger does occur and JetBlue places an
 7   increased focus on those three factors, isn't it conceivable
 8   that JetBlue's incentives to act as a maverick could change?
 9   A.   I already agreed.  It's possible it could change.  I
10   just don't think it's likely, given the evidence.
11            (Whereupon counsel conferred.)
12            MR. THORNBURGH:  No further questions at this
13   time, your Honor.
14            THE COURT:  Now, it's time to stop and we're going
15   to stop, but let me ask, and I'll give you, obviously, the
16   time for redirect.  Are we done then with evidence?  I'm
17   turning to the defense.
18            MR. SHORES:  No, your Honor.  We will have a
19   third-party witness tomorrow, followed by one additional
20   expert, and then possibly one more third-party.
21            THE COURT:  So we'll go as you expected, through
22   tomorrow.
23            MR. SHORES:  We will go through tomorrow.
24            THE COURT:  And probably into Friday?
25            MR. SHORES:  Not Friday, but into Thursday.  I
```

1  believe we previously talked about not having court on

2  Friday.

3          THE COURT:  I appreciate your correcting me.  So

4  the schedule that we have discussed is the schedule, and I

5  thank you.

6          All right.  We'll recess.  You may step down, sir.

7          (Whereupon the witness stepped down.)

8          THE COURT:  We'll start promptly at 9:00 a.m.

9  tomorrow morning.  The total elapsed time is plaintiff,

10  eight days, three hours, ten minutes.  Defense, five days,

11  one hour, forty minutes.

12          We'll stand in recess until 9:00 a.m. tomorrow

13  morning.  We'll recess.

14          THE CLERK:  All rise.

15

16          (Proceedings adjourned.)

17

18

19

20                       * * * * * *

21

22

23

24

25

C E R T I F I C A T E


        I, Cheryl B. Palanchian, Court Reporter

for the United States District Court for the

District of Massachusetts, do hereby certify that

the foregoing pages are a true and accurate

transcription of my shorthand notes taken in the

aforementioned matter to the best of my skill and

ability.




        /s/ Cheryl B. Palanchian 11/27/2023
               CHERYL B. PALANCHIAN

            Registered Merit Reporter
            Certified Realtime Reporter