UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS (Boston)

No. 1:23-cv-10511-WGY
Vol. 2, Pages 77-151

UNITED STATES OF AMERICA, et al
          Plaintiffs

vs.

JETBLUE AIRWAYS CORPORATION,
et al,
          Defendants

* * * * * * * *

For Bench Trial Before:
Judge William G. Young

United States District Court
District of Massachusetts (Boston)
One Courthouse Way
Boston, Massachusetts 02110
Tuesday, November 28, 2023

* * * * * * * *

REPORTER:  CHERYL B. PALANCHIAN, RMR, CRR
Official Court Reporter
United States District Court
One Courthouse Way, Boston, MA 02110

```
              A P P E A R A N C E S


EDWARD WILLIAM DUFFY, ESQ.
ARIANNA MARKEL, ESQ.
AARON TEITELBAUM, ESQ.
        DOJ-Atr
        450 Fifth Street NW, Suite 8000
        Washington, DC 20530
        (202)812-4723
        Email:  Edward.duffy@usdoj.gov
        For Plaintiff United States of America
- and -
WILLIAM T. MATLACK, ESQ.
        Attorney General's Office
        One Ashburton Place, 18th Floor
        Boston, MA 02108
        (617)727-2200
        Email:  William.matlack@mass.gov
        For Plaintiffs United States of America and The
        Commonwealth of Massachusetts



RYAN SHORES, ESQ.
        Cleary Gottlieb Steen & Hamilton LLP
        2112 Pennsylvania Avenue, NW
        Washington, DC 20037
        (202)974-1876
        Email:  Rshores@cgsh.com
- and -
ELIZABETH M. WRIGHT, ESQ.
        Cooley LLP
        500 Boylston Street
        Boston, MA 02116-3736
        (617)937-2349
        Email:  Ewright@cooley.com
- and -
RACHEL MOSSMAN ZIEMINSKI, ESQ.
MICHAEL MITCHELL, ESQ.
        Shearman & Sterling LLP
        2601 Olive Street, 17th Floor
        Dallas, TX 75201
        (214)271-5777
        Email:  Rachel.zieminski@shearman.com
        For Defendant JetBlue Airways Corporation


(Continued.)
```

(Continued.)

JAY COHEN, ESQ.
ANDREW C. FINCH, ESQ.
        Paul, Weiss, Rifkind, Wharton & Garrison
        1285 Avenue of the Americas
        New York, NY 10019-6064
        (212)373-3000
        Email:  Jaycohen@paulweiss.com
        For Defendant Spirt Airlines, Inc.

```
                          I N D E X
WITNESS:              DIRECT    CROSS   REDIRECT   RECROSS

RICHARD SCHEFF, Continued

  By Mr. Mitchell 81

  By Mr. DeRita                   105
```

```
    EXHIBITS                          PAGE

     900 . . . . . . . . . . . . . . 149

     901 . . . . . . . . . . . . . . 149

     902 . . . . . . . . . . . . . . 149

     903 . . . . . . . . . . . . . . 149

     904 . . . . . . . . . . . . . . 149

     905 . . . . . . . . . . . . . . 149

     906 . . . . . . . . . . . . . . 149

     907 . . . . . . . . . . . . . . 149

     908 . . . . . . . . . . . . . . 149

     909 . . . . . . . . . . . . . . 149

     910   . . . . . . . . . . . . . 149
```

```
 1   (Proceedings, 11:13 a.m.)
 2           THE CLERK:  Court is back in session.  You may be
 3   seated.
 4           THE COURT:  Mr. Mitchell, you may continue.
 5           MR. MITCHELL:  Thank you, your Honor.
 6                   RICHARD SCHEFF, (Resumed)
 7               DIRECT EXAMINATION, (Cont'd.)
 8   BY MR. MITCHELL:
 9   Q.   Mr. Scheff, we were talking before the break about the
10   seasonality and day/week analyses you performed.  What's the
11   next analysis that you conducted in connection with your
12   assignment in this matter?
13   A.   I looked to see whether by pooling the complementary
14   fleets of the two airlines and networks that the schedules
15   could be flown with fewer aircraft.
16   Q.   So let's take a look at that analysis.
17   A.   Okay.  If we turn to the next slide.
18   Q.   What model did you use to perform your fleet-pooling
19   analysis?
20   A.   I used the APG FAM, fleet assignment model.
21   Q.   Is that the fleet assignment model we discussed
22   earlier, the one you helped develop?
23   A.   Yes, that's correct.
24   Q.   Explain to the Court why it's referred to as the APG
25   fleet assignment model?
```

1    A.    Yes.   So in 2002, when I joined APG, I brought the

2    model with me.   They had a -- already had a network planning

3    model called APG Net.   So we licensed the FAM model, we

4    called it APG FAM.   So it's the same model, it just picked

5    up the APG name.

6    Q.    At a high level, what is the FAM model?

7    A.    The FAM model is a model designed to take a specific

8    schedule in a fleet and assign that fleet to the schedule in

9    the most profitable and efficient way that you can.

10   Q.    Okay.   And again at a high level, how did you use the

11   APG FAM model on this assignment?

12   A.    I used the APG FAM model to look at the standalone

13   schedules and how many planes it would take and how they

14   could be operated, and then I pooled the complementary

15   fleets and ran them through the FAM model to see what

16   efficiencies could be achieved that way.

17   Q.    So let's break that down a little bit so we can

18   understand it.   Let's start with the existing standalone

19   airlines.   What did you do with those fleets and schedules

20   with respect to the FAM model?

21   A.    So I took the published schedules from July of 2023 for

22   each of the airlines, as well as the available aircraft for

23   flying that -- provided, and ran those schedules through the

24   model to see if they could be flown with fewer aircraft.   I

25   did that for both the Spirit standalone network and the

1    JetBlue standalone network.

2    Q.   Okay.  And did the model indicate that those networks

3    could be flown with fewer aircraft?

4    A.   No.  Both of those networks required all the aircraft

5    that they had listed as being available.

6    Q.   Okay.  And then what did you do with respect to the

7    model in terms of what could happen at the post-merger

8    airline?

9    A.   So what I did is I combined the complementary fleets,

10   so the A320 fleets for the two airlines and, separately, the

11   A321 fleets for the two airlines.  And by combining the

12   schedules, as well as the fleets, ran that through the model

13   to see if -- along with some modest retiming, to see if

14   there were opportunities to fly the schedules with fewer

15   airplanes.

16   Q.   Okay.  And this time when you ran the model over the

17   combined schedule, the pooled fleets and the retimings you

18   just mentioned, did the FAM model in essence identify that

19   the combined schedule could be flown with fewer aircraft?

20   A.   Yes, it did.

21   Q.   Okay.  So we'll talk about that in a minute but I just

22   want to ask you some questions about a few things you said.

23            THE COURT:  Well, just make sure I understand.

24   You're saying that the combined fleet could fly the present

25   schedule, which, as I understand it, means the networks that

```
 1    JetBlue is now flying and the network that Spirit is now

 2    flying with the planes available and, in fact, it could be

 3    flown to all those cities with less planes; is that right?

 4              THE WITNESS:  After pooling?

 5              THE COURT:  Yes.

 6              THE WITNESS:  Yes, that's correct.

 7              THE COURT:  All right.

 8              MR. MITCHELL:  Thank you, your Honor.

 9    Q.   Just, first of all, so we understand, what do you mean

10    when you say "pooled"?

11    A.   By pooling, essentially I took the similar fleets, so

12    the A320s that JetBlue had and the A320s that Spirit had,

13    and as opposed to treating them as separate fleets I

14    combined them into a single A320 fleet, and did the same

15    thing with all the flights that were flown by those two

16    airlines on that fleet.

17    Q.   Okay.  How does pooling two fleets, two aircraft types,

18    provide opportunities to fly a schedule with fewer aircraft?

19    A.   I think the easiest way --

20              MR. DeRITA:  Objection.

21              THE COURT:  Grounds?

22              MR. DeRITA:  Leading.

23              THE COURT:  No, that one isn't.  How does it.

24    How.  No, no, that isn't leading.  You may answer.

25    A.   Okay.  I think the easiest way to explain, so flying a
```

1    schedule with fewer aircraft, what I refer to as popping an
2    airplane.  So the goal there is to have an airplane on the
3    ground for all 24 hours.  So if you have an airplane at a
4    station on the ground for 24 hours, essentially you've
5    pulled that from the schedule and you can use that to do
6    whatever you want.
7          So typically you would start with a freebie, ten hours
8    overnight.  So the planes overnight, you have that.  But
9    rarely, if ever, would the airline have an airplane on the
10   ground during the day for a whole day.  So but what you
11   might have, say at a busy station like Fort Lauderdale, you
12   might have a 320 that Spirit operates that's on the ground
13   for three hours, and you might have a 320 that JetBlue
14   operates that's on the ground for three hours.  And if
15   those, if you can put those together and create a 6-hour
16   block of time, that's quite useful.  The 3-hour block of
17   time is really of virtually no value to a network planner
18   because you can't fly someplace and come back.  You can't do
19   anything with it.  But six hours, you could add a round trip
20   and come back.
21         So that's valuable but it doesn't give you a whole
22   airplane.  But by combining, having more airplanes and more
23   flights, if you can piece together those blocks of time to
24   cover that day, the day in addition to the overnight, you've
25   created an airplane.  So that's the power of pooling and the

```
 1   ability to pop an airplane.  It's putting together blocks of
 2   time to put an airplane on the ground.
 3   Q.   And that exercise you just described of identifying and
 4   aggregating those blocks, in essence, is that what the FAM
 5   model does?
 6   A.   Yes, that's one of the purposes that it can do,
 7   certainly.
 8   Q.   In your prior answer you used the term "popping" an
 9   airplane.  Is that a euphemism or what does that mean?
10   A.   Basically, that means to pull an airplane from the
11   schedule.  So you fly the exact same frequencies with the
12   same seats, the same city pairs, but you use one fewer
13   airplane.  So that airplane can now be used for another
14   purpose.
15   Q.   Okay.  With respect to other things you talked about
16   when you ran the FAM model over the combined schedule with
17   the pooled fleets is that you allowed for retiming of the
18   schedules.  What did you mean by that?
19   A.   Yes.  I allowed for moderate retiming so the departure
20   time of a flight could move by up to one hour in increments
21   either twenty minutes, forty minutes or sixty minutes.  I
22   did put heavy emphasis on preferring either no retiming or
23   at most 20 minutes.  But each flight was allowed to move up
24   to an hour.
25   Q.   Okay.  In about 20 or so minutes the government
```

```
 1    attorney here is going to suggest that you should have also
 2    done that retiming on the standalone July 2023 base
 3    schedules.  Why didn't you do that?
 4    A.    I don't agree with that.  My intent was to compare what
 5    could happen in the case of the merged and combined airline.
 6    Now, certainly in that case they would optimize the
 7    schedules together and make, you know, substantial changes
 8    that would be retiming and other factors.  The standalone
 9    schedules are exactly what the airlines chose to fly, what
10    the available fleet, with all their, you know, many weeks
11    and months of analysis.  So the -- I thought the appropriate
12    baseline of what the standalone airlines would do was what
13    they did do with their data, their information, their staff.
14    So that's why I used that as the base.
15    Q.    Now, Mr. Scheff, slide 11 here says that you think your
16    use of the FAM model was conservative.  Why does it say
17    that?
18          MR. DeRITA:  Objection, your Honor.  He doesn't
19    make any opinion in his report as to the conservative nature
20    of the FAM model at all.
21          THE COURT:  Is it explained in the report?
22          MR. MITCHELL:  All of the bullets here, your
23    Honor, are explained within the report.
24          THE COURT:  Well, where is it specifically about
25    the conservative use of the --
```

```
 1              MR. MITCHELL:  Sure.  So let's look at, for
 2   example, if we look at paragraph 47 --
 3              THE COURT:  Well, you're going to have to give me
 4   a chance.
 5              MR. MITCHELL:  I'm sorry, your Honor.  In your
 6   binder you have a tab behind the slides that is Mr. Scheff's
 7   report.
 8              THE COURT:  Thank you.
 9              MR. MITCHELL:  And paragraph 47 appears on
10   page 22, your Honor.
11              THE COURT:  Thank you.
12              MR. MITCHELL:  And so if you look at that
13   paragraph that gives some of the context.
14              THE COURT:  Just a moment.
15              (Pause in proceedings.)
16              THE COURT:  He may testify in accordance with
17   what's set forth in paragraph 47 through 51, but that
18   doesn't say anything about why that's conservative.
19              MR. MITCHELL:  Okay.
20              THE COURT:  So I'll sustain the objection.
21              MR. MITCHELL:  Thank you, your Honor.
22   Q.   Mr. Scheff, what are the limitations you placed on your
23   FAM analysis for purposes of this assignment?
24   A.   I only used the A320 and A321 fleets of the two
25   airlines.  So I did not incorporate the A319 or the A220.
```

1    So it was a portion of the two airlines' networks.

2        I also did not allow for regauging.  So if we were to

3    allow a 320 to become a 321, in addition to potentially

4    having more capacity where there's higher demand, but you

5    would have a bigger pool.  You would have more opportunities

6    to create those blocks that would allow you to potentially

7    schedule even more efficiently.

8        And also the emphasis on limiting the retiming changes.

9    So in the merged airline there would be, I think, much

10   more -- they would pool all of their fleets.  They would

11   look at, particularly markets where they -- both airlines

12   fly, do substantial retiming if they could improve their

13   schedules.  So there would be a much more comprehensive

14   evaluation of how they would use that.  It would be a single

15   optimized network.  But by really limiting the timing, the

16   retiming much more so than the airline would do by not

17   including substantial portions of the fleet, the 319 and the

18   220, and now allowing an airplane to have more or fewer

19   seats than it already did, I think those were all

20   limitations that, you know, that I placed on the model.

21   Q.   Okay.  So a moment ago you testified that when you ran

22   the combined pooled fleets through the model it identified

23   that you could fly the combined schedules with fewer

24   aircraft.  So let's take a look at the output of the model

25   with respect to that issue.

1    A.    Okay.  So, yes, if we can turn to slide 12.

2            (On screen.)

3    Q.    Okay.  And just explain to the Court what's reflected

4    in figure 11 here?

5    A.    Figure 11 shows the output results from running the FAM

6    model on the standalone fleets as well as the combined and

7    pooled fleets.

8    Q.    All right.  And then explain to the Court what the, in

9    figure 11, the difference between the left side of the

10   figure and the right side of the figure?

11   A.    The left side of the figure represents the standalone

12   airlines and shows how each, the count of each fleet and

13   their statistics.  And the right side shows the FAM results

14   after the pooling and optimization.

15   Q.    Okay.  And what are the three highlighted rows there?

16   A.    Those three rows show the cases where the solution,

17   after pooling and optimization, used fewer aircraft.  So,

18   for example, the A320-200 there were 113 originally but the

19   optimized solution only used 103.  So those three rows show

20   the reduction in airplanes, the 15 airplanes that the

21   optimized solution could pull.

22   Q.    Okay.  And just at the bottom there's two numbers

23   highlighted in the total row.  Explain to the Court what

24   those numbers are?

25   A.    All right.  So on the left, the 430, that's the total

1    number of active airplanes flying that were required for the

2    standalone fleets and schedules.  The 415 is the number that

3    could fly after the pooling and the optimization.  So you'll

4    note in both cases the total flights are the same, 12,493.

5    So every flight is flown, there is no change in seats,

6    there's a modest retiming, but essentially those 15

7    airplanes are freed up and they can be used for other

8    purposes.  So that's the, basically, what the 415 and 430

9    represent.

10   Q.   Okay.  And then did you do something to convert the 15

11   aircraft the FAM model identified here into additional seats

12   available for departure?

13   A.   Yes.  If we could turn to slide 13.

14        (On screen.)

15   Q.   And what is figure 12 here showing on slide 13?

16   A.   So what I assumed was that if they had additional -- if

17   JetBlue were to have additional 320s and A321s available in

18   a post-merger situation, that they would use them and

19   produce seats comparable to how they used those aircraft in

20   2023.

21        So, for example, A320 flying JetBlue in 2023 produced

22   665 seats per day.  So if they flew it in the same way, then

23   I calculated how many seats would be added per year with

24   those 15 additional aircraft.

25   Q.   Okay.  And the number -- what is the number that's

1    highlighted here?

2    A.    Yes, that's the total annual seat departures that would

3    be produced with those 15 airplanes flying at the pattern

4    that JetBlue flew those fleets in 2023.

5    Q.    Okay.   Now, were these additional seats that you

6    calculated with respect to your fleet optimization analysis,

7    were those seats included in the waterfall chart we looked

8    at earlier?

9    A.    Yes, they were.   You can turn to the next slide.

10              (On screen.)

11   Q.    Could you please confirm to the Court that the numbers

12   reflected on figure 18 here under the Fleet Optimization

13   column, are those the same numbers that you calculated on

14   the prior slide?

15   A.    Yes, they are.

16   Q.    Thank you, Mr. Scheff.   Let's turn to the next slide.

17              (On screen.)

18   Q.    Mr. Scheff, in addition to the categories of

19   utilization improvements we've already discussed, are there

20   other categories of potentially increased utilization the

21   combined entity could achieve through the merger?

22   A.    Yes, I believe that there are.

23   Q.    And what are those?

24   A.    I believe that the combined entity would be able to

25   more effectively and comprehensively use the Spirit A321 CEO

1    fleet.  I believe that the combined entity would be

2    motivated and would certainly likely increase the amount of

3    red-eye flying compared to what the separate airlines would

4    do.  And I believe that there is potential for the combined

5    airline to reduce the number of spares.  So I think each of

6    those three categories would certainly likely contribute to

7    additional seat utilization.

8    Q.    Okay.  What did you find with respect to the combined

9    entity's use of Spirit's A321 CEO?

10   A.    So if we could turn to the next slide.

11          (On screen.)

12   A.    The A321 CEO that Spirit flies, it's a densely

13   configured airplane, has 228 seats.  And as a result, it's a

14   heavier airplane.  Mostly related to if you have 228

15   passengers.  Whereas, the JetBlue CEO has, A321, has 200

16   seats.  So Spirit has limited how far that they would fly

17   that airplane.  They've -- don't fly it on transcontinental

18   routes, for example, for performance reasons.

19          JetBlue, on the other hand, does fly their A321 CEO on

20   very long and transcontinental routes.  So that

21   reconfiguration of the Spirit CEOs would open up a set of

22   new markets where you could fly that larger airplane

23   matching seasonal demand patterns that Spirit is not

24   currently able to do because the range is restricted due to

25   the configuration.

1  Q.   All right.  The second bullet on this slide, it makes

2  reference to performance limitations.  You alluded to some

3  of this a moment ago.  But what do you mean when you say

4  performance limitations there?

5  A.   Essentially, it's what type of flight can the airplane

6  reliably operate.  So if Spirit were to determine that on

7  any day where there's a full plane or adverse winds or

8  something else that they wouldn't operate that.  So if they

9  feel they can't reliably operate a flight on a consistent

10  basis, they wouldn't do so because it's very bad from a

11  customer service standpoint.  So they would limit the length

12  of their flights on each airplane to flights that they are

13  very confident that they can do close to 100 percent of the

14  time.

15  Q.   Okay.  And in July 2023 how did Spirit's use of its

16  A321 CEO compare to the way JetBlue used its A321 fleet?

17        MR. DeRITA:  Objection, your Honor.  There's no

18  opinion on comparison of July 2023 data with respect to this

19  point in Mr. Scheff's report.

20        THE COURT:  Where is it?

21        MR. MITCHELL:  Your Honor, it's in paragraph 59,

22  which is on page 26 of the report.  And then also -- I'll

23  let you get there and let me know when you're there.

24        (Pause in proceedings.)

25        MR. MITCHELL:  And if you're there, your Honor,

 1  can I direct you to two figures where this is specifically

 2  set forth?

 3             THE COURT:  Yes.

 4             MR. MITCHELL:  If you can also take a look at

 5  figure 13A, which is Spirit's average schedule stage length

 6  by fleet, and 13C, which is JetBlue's average schedule

 7  stage --

 8             THE COURT:  He may so testify.

 9             MR. DeRITA:  Your Honor, if I may be heard.  These

10  charts here are for 2019 data, clearly says so in the title,

11  but the slide and what he was asked about was July 2023.

12             THE COURT:  You can testify in accordance with the

13  report.

14             MR. MITCHELL:  Sorry, your Honor, I have to direct

15  you to another figure for 2023 if you'll indulge me.

16             THE COURT:  I will.

17             MR. MITCHELL:  Page 8 of the report, figure 1

18  we -- sorry, page 7 of the report has figure 1, which we

19  looked at earlier, which has July 2023 information in it for

20  JetBlue.  And then figure 2 of the report on page 9 has

21  July 2023 information with respect to Spirit.

22             MR. DeRITA:  And if I may -- this only has average

23  numbers, it doesn't have the longest stage length flown by

24  Spirit in this chart.

25             THE COURT:  It doesn't have the longest stage

 1   length.  That's the 2019 data.  The point is made.  What's

 2   in the report I will accept for 2019, but the slide should

 3   be changed to 2019.  All right.  Go ahead.

 4          MR. MITCHELL:  Thank you, your Honor.  And we'll

 5   just -- we'll move on.

 6   Q.  Mr. Scheff, one of the other analyses you mentioned

 7   related to the potential for the combined airline to reduce

 8   the number of spares.  What did you conclude related to

 9   spare aircraft?

10   A.   Yes.  If we could turn to page 17.

11          (On screen.)

12   A.   So I concluded that there would be a potential for the

13   combined airline to reduce the total number of spares.  A

14   spare aircraft is an airplane that is held in reserve so

15   they can fly in the case of a maintenance or other issue

16   that causes one of the active planes to not be able to fly.

17   So it reduces the probability that an airline might have to

18   either cancel or delay flights.

19          So my conclusion is that by combining the larger

20   fleets, and also because they have airports where they have

21   significant overlap, that there would be potential to reduce

22   the number of spares of the combined entity compared to what

23   the separate entities would maintain.

24   Q.   Now, did you quantify the effect of that potential

25   utilization improvement in terms of additional seat

1    departures?

2    A.   I didn't quantify.  The number of spares that an

3    airline maintains can be somewhat fluid depending on

4    operational performance.  So what I looked at is what

5    circumstances would allow them to reduce the spares.

6        So I think there are two types of situations that the

7    combined airline could take advantage of.  So one would be

8    at a large airport, let's say Fort Lauderdale, both

9    airplanes may have enough service, enough flights that they

10   require a spare.  So you would have two spares.  When you

11   combine and you have like fleets, it is a potential that

12   Fort Lauderdale would only require one spare.

13       The other issue is airlines typically have a number of

14   spares relative to the size of the fleet.  So a typical

15   number might be one spare for every 30 airplanes.  So by

16   pooling and creating a larger combined fleet of the same

17   equipment type, that could also open that opportunity.

18       So, for example, say one of the airlines had a fleet of

19   20 airplanes.  Well, even with the 1-to-30 ratio they would

20   need a spare with 20 airplanes.  So that would be a spare.

21   If the other airline had a fleet of 40 airplanes, the same

22   type, they would need two spares because you need one for

23   your 30 but you need the second one when you go over.  So

24   that's three spares.  Now, it is 60 airplanes.  So if you

25   combined them and have the 1-for-30, ratio that would be

```
 1   two.
 2        So I think those two circumstances would potentially
 3   result, but because it's really difficult to put an exact
 4   number, I didn't think it was appropriate to quantify.  But
 5   I think it's certainly a potential that it could happen.
 6   Q.   And --
 7            MR. DeRITA:  Objection.  Motion to strike the
 8   testimony by the witness.  The two categories that he just
 9   testified to, the first one is very clearly not in his
10   report.  The second is not in his report either.
11            MR. MITCHELL:  Your Honor, page 31 and,
12   unfortunately, I've got to give you three paragraphs this
13   time.  So it's paragraphs 70 to 72.
14            THE COURT:  I don't mind that.  31, 70 to 72.
15            MR. MITCHELL:  Yes.
16            THE COURT:  The motion to strike is denied.  It
17   may stand.
18   Q.   Mr. Scheff --
19            MR. MITCHELL:  Thank you, your Honor.
20   Q.   Mr. Scheff, the other category of additional
21   utilization improvements related to red-eye flying; is that
22   correct?
23   A.   Yes, that's correct.
24   Q.   What is red-eye flying?
25   A.   Red-eye flying is typically late-night flying, often
```

```
 1   long flights east to west.  But essentially the idea is that
 2   if you can take, for the most part, aircraft that would
 3   spend the night on the ground, and instead of sitting on the
 4   ground, fly them to create additional service.
 5   Q.   And why do you think the combined airline can make more
 6   seats available for departure by increasing red-eye flying?
 7   A.   Yes.  So if we turn to slide 18.
 8          (On screen.)
 9   A.   So it is true both airlines currently do make extensive
10   use of red-eye flying.  The larger your network is, and the
11   more aircraft you have, it certainly opens up a bigger
12   opportunity for red-eye flying.
13          But there are several additional factors.  The
14   JetBlue's Combined Network Plan, the 2027 plan that they
15   provided me with a time schedule, has extensive additional
16   red-eye flying, much more so than is operated by the
17   airlines today.
18          They also have factors that would lead you to want to
19   fly red-eyes.  For example, they have planned significant
20   growth in some western cities where they intend to add a lot
21   of capacity and make them focus cities.  So those, that
22   growth, particularly on west coast cities that can be paired
23   with east coast cities, gives you more and more
24   opportunities to fly a red-eye successfully.
25          THE COURT:  Sitting here in Boston and living in
```

1    this area, I've always thought of a red-eye as taking me

2    from the west coast back to the east coast.  But you're

3    talking about a potential market or maybe an actual market

4    from a mid-continent, a 2-, 3-hour flight to the west coast,

5    there's a market for that?

6         THE WITNESS:  From the mid-continent hub I would

7    not consider that they're adding red-eyes.  But what their

8    mid-continent hub is doing in the schedule they provided is

9    flying a lot of airplanes that would leave late at night

10   from a mid-continent hub and arrive in the west coast to

11   spend the night.

12        So basically the setup for adding red-eye flying

13   is if you have an overnight airplane in the west coast city,

14   your Honor.  So, to me, that's the contribution.  You would

15   not fly red-eye from the midwest to the east coast.  But if

16   you have more and more airplanes in a city -- so Los

17   Angeles --

18        THE COURT:  You'd overnight them on the west

19   coast?

20        THE WITNESS:  Yes.  Their schedule has indicated a

21   number of flights that fly late in the evening from the

22   mid-continent hub and arrive in the west coast, and those

23   planes are scheduled the next morning to fly out.  Now,

24   whether -- those are planes that could be used to add

25   red-eye service without buying new airplanes.

```
 1              THE COURT:  Those are planes that could be used
 2   for red-eye service the next night?
 3              THE WITNESS:  Well, the same night.  If a flight
 4   goes from a midwestern city, let's say it leaves at
 5   8:00 p.m.
 6              THE COURT:  So that's one time zone.
 7              THE WITNESS:  Or two, depending on --
 8              THE COURT:  All right.
 9              THE WITNESS:  So maybe it's a four-hour flight,
10   and so two time zones, and it lands at 10:00 p.m. on a west
11   coast city.  That plane could turn around --
12              THE COURT:  Be available for a red-eye to fly to
13   Boston.
14              THE WITNESS:  To fly to Boston leaving at
15   11:00 p.m.
16              THE COURT:  Understood.  Thank you.
17              MR. MITCHELL:  Thank you, your Honor.  And let's
18   move to the next slide.
19              (On screen.)
20   Q.  Earlier we discussed the waterfall chart you put
21   together with some of your illustrative quantifications.  So
22   let's take another look at that.
23   A.  Okay.
24   Q.  So we've seen this chart a few times this morning but
25   we have not discussed the column all the way to the right.
```

So explain to the Court why the number in the column all the
way to the right is negative?

A.   Okay.  Yeah, that number, the .38 million, is the sum
of each of these individual bars in the waterfall.  So I'd
point out a couple of things.  Although that number is
negative, as I've indicated I believe there would be
substantial opportunity through fleet optimization, with
regauging and other methods to increase there, and certainly
additional red-eye flying, better use of the A321 CEO fleet.

     I would also point out that number is, essentially, I
would call it a wash.  It's pretty close to zero.  If you
were to look at 2023, the two combined airlines in the 320
and 321 fleets scheduled approximately 86 million seats.  So
this number is really less than one-half of 1 percent.  So I
would view this as basically break-even or indistinguishable
from zero from that standpoint, but it does not account for
the other potential seat increases that I have, you know,
described.

Q.   Okay.  So but just to be clear, does the fact that the
number there is negative, does that mean that your opinion
is that the combined firm will decrease the number of seats
in the market post-merger?

          MR. DeRITA:  Objection.  Leading.

          THE COURT:  It is leading.  You may ask him what
it means.

1    Q.   What is your opinion with respect to whether the

2    combined firm will increase or decrease number of seats

3    available in the market post-merger?

4    A.   I'm very confident that the combined firm could

5    increase the number of seats.  As I said, I think they would

6    do a much more extensive clean-sheet optimization, so the

7    fleet optimization category would go up, and I think the

8    red-eye flying and the better use of the 321s and the

9    spares.  I'm very confident that with all those factors that

10   this number would be very significantly positive.

11   Q.   Okay.  Before we move on from this slide I want to talk

12   to you, were you in the courtroom last week when Dr. Chipty

13   testified?

14   A.   Yes, I was.

15   Q.   And do you recall that during her trial testimony she

16   put up your slide and she had two green bars that she added

17   to your slide?

18   A.   I recall that.

19   Q.   And those green bars reflected a reduction of

20   approximately 3 1/2 million additional seats she says are

21   attributable to fleet rationalization?

22        MR. DeRITA:  Objection, your Honor.  This is

23   outside the scope of the opinions in this report.

24        MR. MITCHELL:  Your Honor, it's certainly outside

25   the scope of the report.  It's in response to trial

```
 1    testimony that Mr. Scheff should have an opportunity to
 2    respond to.
 3              THE COURT:  No, I'm confining people to the
 4    report.
 5              MR. MITCHELL:  Thank you.
 6              THE COURT:  Is that it for this witness?
 7              MR. MITCHELL:  One more question, your Honor.
 8    Q.   So, Mr. Scheff, a moment ago you mentioned two
 9    categories of potential utilization increases that you
10    didn't quantify in this waterfall chart, but notwithstanding
11    that you didn't quantify them, are you able to provide the
12    Court with a sense of the magnitude of how those categories
13    could result in additional seat departures?
14              MR. DeRITA:  Objection.  Calls for speculation.
15              THE COURT:  Oh, I don't think so.  Overruled, if
16    you're able to.
17              THE WITNESS:  Sure, I can do that.  If we could
18    turn to slide 21, please.
19              (On screen.)
20    A.   So starting with red-eye flying, so to the extent that
21    the combined merged entity with their increased focus on
22    west -- some west coast cities with their mid-continent hub
23    and their larger network and fleet would be able to add
24    red-eye flying, a single daily red-eye round trip on an A320
25    aircraft would produce 118,000 seats over the course of a
```

 1    year.  And a single round trip would produce, on an A321,

 2    146,000 seats.  So with the very substantial number of

 3    planned additional red-eyes, even if a small percentage of

 4    those, ten additional red-eyes would produce well over a

 5    million additional seats.  Similarly, a single spare, so if

 6    you could just produce one -- reduce the operational spares

 7    by one, a 320, that would generate 232,000 additional seats.

 8         So a very small number of these categories, only a few

 9    red-eyes or only one spare, could add up to a very

10    significant increase in seat production for the combined

11    entity.

12              MR. MITCHELL:  Thank you, Mr. Scheff.  Your Honor,

13    I pass the witness.

14              THE COURT:  Mr. DeRita?

15              MR. DeRITA:  Thank you, your Honor.

16                        CROSS-EXAMINATION

17    BY MR. DeRITA:

18    Q.   Good morning, or I guess almost afternoon, Mr. Scheff.

19    A.   Good morning.

20    Q.   I'd like to start with some questions about your

21    assignment in this matter.  You weren't retained by JetBlue

22    to make recommendations about how to improve utilization

23    after the merger; correct?

24    A.   That is correct.

25    Q.   In reaching your opinions in this case you reviewed

1   less than ten JetBlue and Spirit documents; right?

2   A.   I think that's correct.

3   Q.   And those documents were identified to you by counsel,

4   that is you did not request them; correct?

5   A.   Well, some of the documents I requested, the combined

6   network plan and the schedule -- time schedules.  So there

7   were some documents that I requested in there.

8   Q.   You didn't request any additional documents beyond the

9   less than ten documents that you reviewed; correct?

10  A.   I did not.

11  Q.   I'd like to talk a little bit about your prior airline

12  work.  You've only been asked to evaluate a merger one time

13  in the past; right?

14  A.   Well, that's not correct.  I mean, I was -- helped

15  evaluate a merger as a Delta employee when there was a

16  merger there.  And I have looked at other potential merger

17  situations.  Not necessarily in the context of pooling and

18  fleet optimization, but we have, as a consulting basis, we

19  have been involved in some merger analysis over the years.

20  Q.   Yeah, so I want to focus on the pooling and

21  optimization part of that.  So you've only done an analysis

22  of pooling and optimization of two airlines one time in the

23  past; right?

24  A.   With respect to it changing the fleet and what would

25  happen, I can only recall one -- one project where that

```
 1   specific analysis was done, yes.
 2   Q.   And you did that work on behalf of an investor;
 3   correct?
 4   A.   That's correct.
 5   Q.   That work was not done on behalf of either of the
 6   airlines being evaluated; right?
 7   A.   It was not done on behalf of the airline, that's right.
 8   One of the airlines did provide information because they
 9   would have been the acquiring party, and so there was some
10   information from them.  But the work was done for the
11   investor.
12   Q.   And in that work you did not analyze the ability of an
13   airline to make gauge changes when combining two separate
14   schedules; right?
15   A.   Well, in that work we actually did because we were
16   asked to provide a more comprehensive analysis of the
17   potential synergies and benefits.  So the investor was
18   wanting to know all.  So we looked at potential cost
19   savings, we did look at gauge changes, and we looked at
20   ability to fly with fewer airplanes.  So it was a more
21   comprehensive financial analysis.  It wasn't limited to
22   simply looking at seats.
23   Q.   So it was a different type of analysis than the
24   analysis you are undertaking here for this matter?
25   A.   The analysis undertaken here, I would say, would be a
```

```
 1   subset of the complete analysis that we did in that project.
 2   Q.   Okay.  I'd now like to discuss slide 20 of your
 3   demonstratives which summarizes your calculations.
 4              (On screen.)
 5   Q.   This slide depicts the net reduction in seat departure
 6   changes that would occur as a result of the merger after
 7   accounting for all the utilization changes that you
 8   quantified; right?
 9   A.   The specific areas that were quantified, summing those
10   up from this bar, it is a small negative number.  That's
11   correct.
12   Q.   So we're going to highlight the total column on the
13   screen.  So this panel provides a summation of all the seat
14   departure changes that you calculated; right?
15   A.   The specific seat departure changes that were directly
16   calculated are summed, and that's what that shows, yes, not
17   the -- what I would assume to be or what I view to be the
18   full potential benefit.
19   Q.   And you calculated that to be a reduction
20   of .38 million seats; right?
21   A.   Yes, that's correct.
22   Q.   Now, I want to walk through this slide left to right.
23   So we'll start with aircraft reconfiguration, the blue
24   panel, and it's been highlighted just to make sure we're on
25   the same page.
```

1      You're aware that JetBlue has publicly stated that it

2    plans to reconfigure Spirit's aircraft to remove seats;

3    right?

4    A.   Yes, I am aware of that.

5    Q.   And this panel calculates the impact of those changes;

6    right?

7    A.   Yes, it does.

8    Q.   And you calculated that reconfiguration will result in

9    a decrease of 6.1 million seats for departure; right?

10   A.   Yes, I think that's right, if I do the math.  Yes.

11   Q.   And this 6.1 million reduction in seats is certain to

12   occur once JetBlue implements those plans; right?

13   A.   I wouldn't say it's certain to occur because it's not

14   certain they would fly the aircraft exactly as they were

15   flown by Spirit.  But certainly there would be a reduction,

16   and this number is my best estimate of what the reduction

17   would be.  I don't -- I don't think anything is certain in

18   the airline industry.

19   Q.   So you started off by calculating the negative impact

20   of reconfiguration in this chart; right?

21   A.   Yes.

22   Q.   And then as we walk from left to right, your analysis

23   was an attempt to identify sources of potential utilization

24   changes that would counteract that reduction; right?

25   A.   I would say it was an attempt to quantify what I

1    believe would happen, what the combined firm would be able

2    to do.  So I would rephrase it that way.

3    Q.   And you would agree with me that the reconfiguration

4    change is certain to happen if JetBlue follows through on

5    what it says it plans to do; right?

6    A.   I would be extremely surprised if they did not

7    reconfigure the aircraft to be consistent with their own.

8    So I think it's virtually certain.  I would agree with that.

9    Q.   Okay.  Let's move on to the next panel, the red panel,

10   Schedule Changes.  And that's going to be highlighted as

11   well.  Now, this panel portrays the results of your analysis

12   that utilization will increase by reducing seasonal and

13   day/week variation of Spirit's schedule; right?

14   A.   Yes, that's correct.

15   Q.   And of the two changes that you calculated, this is the

16   second or the smaller of the two; right?

17   A.   Relative to the fleet optimization?

18   Q.   Correct.

19   A.   Yes, the impact is smaller here.

20   Q.   And that's about 2.16 million seats; right?

21   A.   Yes, that's correct.

22   Q.   So about 40 percent of the increases that you were able

23   to calculate; right?

24   A.   That looks about right, doing mental math, yes.

25   Q.   And that number was different in your initial report;

 1   correct?

 2   A.   Yes, that's correct.

 3   Q.   So in your initial report that number was about

 4   2.6 million seats; right?

 5   A.   I don't recall the exact number, but I'll take your

 6   word for it.

 7   Q.   And you made that amendment after Dr. Chipty identified

 8   the double-counting error in your report; right?

 9   A.   Yes, that's correct.

10   Q.   Now, you don't cite in your report any actual

11   post-merger plans by JetBlue to increase Spirit's off-peak

12   and Tuesday/Wednesday flying; correct?

13   A.   My report does not cite any specific JetBlue statements

14   on that.  That's correct.

15   Q.   Okay.  So I want to switch gears and talk about

16   utilization data and how you incorporated that into your

17   analysis.

18        You would agree that your opinion on schedule changes

19   assumes that JetBlue would increase Spirit's utilization by

20   matching JetBlue's scheduling pattern; right?

21   A.   I would assume, yes, there would be fewer reductions on

22   off-peak and off-days and months and that that would result

23   in an increase in Spirit seat utilization.  I do believe

24   that.

25   Q.   So to put it, I guess, in more plain terms, so JetBlue

1    flies more frequently than Spirit on Tuesday and Wednesday

2    and in off-peak seasons; right?

3    A.   As a percentage of their peak capability.  So not

4    necessarily in absolute terms, but relative to how they fly

5    on their peaks, which was the standard that I used.

6    Q.   Right.  And by increasing Spirit's flying to match

7    JetBlue's pattern, you have claimed that Spirit's

8    utilization will increase; right?

9    A.   I guess I don't view it as Spirit utilization or

10   JetBlue, I view it as combined JetBlue.  But I believe those

11   aircraft would be used to produce more seats on certain days

12   of the week and months of the year, so...

13   Q.   So you would agree that the -- using the former Spirit

14   planes to match JetBlue patterns would increase utilization

15   is the opinion you gave; right?

16   A.   I think across the 320 and 321 fleets that, yes, they

17   would be able to increase the seat production of those

18   aircraft after the merger and the different efficiencies

19   that they could implement.

20   Q.   And in reaching your opinion related to the schedule

21   change analysis, you used July 2019 scheduling patterns;

22   correct?

23   A.   Well, I mean, the seasonality I used calendar year 2019

24   as well as the day of the week, so...

25   Q.   Sorry.  Let me ask it differently.

1     You based your analysis under the assumption -- or

2  using July 2019 as a peak month; right?

3  A.   Well, the analysis from 2019 looked at -- I believe

4  August may have been the peak for seasonality, and of course

5  the day of the week was Friday.  So I'm not -- it may have

6  been July.  I thought it was August.  But they're very

7  close.

8  Q.   Okay.  So if we were to go to slide 6 of your

9  demonstratives.

10  A.   Okay.

11  Q.   You should have a copy in front of you?

12  A.   Yeah.  I thought it was going to pop up on the screen.

13  Okay.

14  Q.   The dotted line at the top of this chart, that reflects

15  July 2019 data; right?

16        (On screen.)

17  A.   Well, it was either July or August, whichever was the

18  peak.  But they're essentially equivalent, so yes.

19  Q.   Sure.  So you used July or August, I guess it doesn't

20  really matter which, but the month you used you used because

21  it's the best representative of a peak month of utilization;

22  right?

23  A.   Yes.  For each airline I looked at what was their peak

24  utilization month in 2019.

25  Q.   And you used 2019 because, since COVID, 2019 has been

1   most commonly used as a benchmark in the airline industry;

2   correct?

3   A.   Well, more to the point I thought it was the most

4   appropriate year.  It is certainly the most commonly used,

5   but in my view it was the most appropriate, the last full

6   year where, as much as possible, I could identify any

7   changes as a result of seasonality and not other factors

8   that might affect the scheduling pattern.

9   Q.   You would agree that for their total fleets Spirit's

10  line utilization in July 2019 was higher than JetBlue's;

11  right?

12  A.   I believe looking at the chart that I had with the

13  total line utilization in 2019, yes, it showed across all of

14  the fleets, you know, including ones that I would not have

15  included in my analysis.  Across the entire network the

16  utilization was higher for Spirit, yes.

17  Q.   And despite the fact that Spirit's total line

18  utilization was higher than JetBlue's in July 2019, your

19  analysis assumes that the merger will allow JetBlue to

20  increase Spirit's utilization; correct?

21  A.   My analysis does assume that.  And I would point out

22  the -- yes, as I mentioned, the Embraer 190, which flies on

23  very short stage lengths, it's not value comparable to

24  anything that Spirit flies.  But also the Mint and neo

25  aircraft, which have very high utilization, are also not

```
 1    comparable.  So I excluded those aircraft.  And if we look
 2    at the -- actually, no.  If we exclude the LR, then the
 3    JetBlue utilization was actually higher in July 2019.
 4    Q.   So the E190s, I believe you testified on direct that
 5    those serve a different mission than the rest of JetBlue's
 6    fleet; right?
 7    A.   The general mission profile.  I mean, they have
 8    similar -- when I fly to Atlanta, it's a 50/50 chance of an
 9    E190 or 220.  They're not totally isolated but, in general,
10    they would be on lighter-demand flights.  And they do have a
11    limited range, so they would tend to fly shorter stage
12    lengths.
13    Q.   And the reason why you excluded them from the analysis
14    of utilization, at least the way you calculated it, was
15    because those E190s have a shorter stage length than the
16    rest of the JetBlue fleet; right?
17    A.   An airplane that flies a shorter stage length will have
18    more flights but will have much more time on the ground
19    because it might fly an hour, hour and a half.  Because time
20    on the ground is not part of utilization.  So it typically
21    would fly more departures but lower utilization.  And
22    because -- so I felt it was not appropriate to include that.
23    And I didn't include any assumptions on changes in seat
24    production from the E190, which is also being retired going
25    forward.
```

1    Q.   You would agree, as a general matter, that a shorter

2    stage length would result in less utilization; right?

3    A.   More often than not shorter stage lengths do correspond

4    with lower utilization.  There could be exceptions, but that

5    would be a general pattern that would hold in most cases,

6    yes.

7    Q.   Okay.  And if we can go to slide 4 from your

8    demonstratives.

9              (On screen.)

10   Q.   You would agree that JetBlue's total line utilization

11   in 2019 for the total fleet was one thousand two hundred --

12   I'm sorry, I meant stage length, was 1,232 miles; correct?

13   A.   Yes, that's what I calculated.

14   Q.   And Spirit's average stage length in July 2019 is

15   998 miles; right?

16   A.   Yes, that's correct.

17   Q.   So despite the fact that stage length being lower, as

18   you just agreed, tends to result in lower utilization,

19   Spirit with its lower utilization -- or lower stage length

20   still had a higher utilization; correct?

21   A.   Across all the fleets.  My analysis did not include all

22   the fleets, so -- so that's -- while the statement is

23   correct, I'm not sure it's meaningful with respect to how

24   the airline would operate in a merged entity going forward.

25   Q.   Okay.  I'd like to go back to slide 6 of your

1    demonstratives.

2    A.   Okay.

3             (On screen.)

4    Q.   And I'd like to talk about the December bar chart here

5    on the right.

6    A.   Okay.

7    Q.   So you would agree that the 18 percent number shows a

8    significant drop in utilization for Spirit compared to the

9    other months?

10   A.   Yes, I would agree with that.

11   Q.   You didn't do anything to investigate why that number

12   is significantly higher than the other months on this chart,

13   did you?

14   A.   I did.  I looked -- Spirit took a number of additional

15   aircraft in December.  So because their flying days --

16   because their fleet grew, but they didn't add a lot of

17   flights so they had lower utilization.  Also my experience

18   is although many people consider December to be a very peak

19   month, they're thinking of the Christmas holiday, but it's

20   not necessarily the case.  The first two weeks of December

21   are -- typically there's very little leisure travel.  People

22   take vacations for Thanksgiving, they're going to travel on

23   Christmas, so they don't have that.  And then the last

24   couple of weeks there's almost no business travel.

25             So looking at historical patterns, so I did look into

1    some potential explanations for that, but yes.

2    Q.   So you just mentioned new fleet or new aircraft being

3    added to Spirit's fleet.  You would agree that those new

4    aircraft were put into utilization at a lower rate than the

5    rest of Spirit's existing aircraft at the time; right?

6    A.   Well, the overall fleet, whether those specific

7    airplanes, how they were flown, I don't know.  But, yes, the

8    overall capacity did not grow -- so it grew less than it

9    would have if you added those six airplanes at the rate that

10   they flew them in most of the other months.

11   Q.   So you would agree that adding the new aircraft flying

12   at a lower frequency than a typical Spirit aircraft would

13   drag down the total number of seat production in that month

14   compared to other months; right?

15   A.   Yes, I would agree with that.

16   Q.   So is it fair to say that December is not a

17   representative -- December of 2019 is not likely a

18   representative month or representative of other Decembers?

19   A.   I did not investigate other Decembers to see what

20   Spirit's seasonality was.  Basically, I looked at 2019, what

21   did they do.  I think, potentially, in any month you could

22   look at what happened, what were the circumstances.  So I --

23   I used what Spirit did with their fleet and what they did

24   with their schedule and I used that.  So that's -- that's

25   what's included in my analysis.

1  Q.   You didn't adjust your calculation in any way for the

2  introduction of these new Spirit aircraft that were not

3  being fully used, did you?

4  A.   Well, for each month Spirit provided me exactly how

5  many airplanes they had for scheduling, not just December

6  but every month.  So I used the number available that they

7  provided exactly as they provided it.

8  Q.   You didn't do any investigation into how that fleet

9  information was put together, did you?

10  A.   Well, I asked Spirit for their active fleet, their

11  flying aircraft by month for both 2019 and then for 2023.

12  And they provided it to me.

13  Q.   But after putting this chart together and seeing a very

14  large number compared to all the other months, you didn't do

15  any further investigation into the underlying fleet data; is

16  that right?

17          MR. MITCHELL:  Objection, your Honor.  Asked and

18  answered.

19          THE COURT:  Overruled.

20  A.   I did not contact Spirit to ask them if they had

21  provided incorrect data, that's correct.

22  Q.   Okay.  I'd now like to discuss to what extent you

23  considered profitability in the 2.2 million -- approximately

24  2.2 million seat increase that you predicted via schedule

25  changes.  You would agree that airlines will not fly a

1  frequency if it's not profitable to do so; right?

2  A.   I think if the airline projects that operating

3  frequency would lose money, they will choose not to operate

4  it.

5  Q.   But when undertaking this schedule change analysis, you

6  did not analyze whether it would be profitable for JetBlue

7  to increase Spirit planes off-peak and Tuesday/Wednesday

8  flying; right?

9  A.   Could you ask the question again, please?

10 Q.   Yes.  So you did not analyze whether it would be

11 profitable to increase flying of Spirit's planes on off-peak

12 and Tuesday/Wednesday times; right?

13 A.   I view that Spirit's off-peak and Tuesday/Wednesday

14 flying that they have done historically represents what they

15 believe is a profitable use of their assets and that they

16 would continue to fly similarly to where they have.  So

17 that's -- that was the basis, that I believe they would fly

18 that.  So it's looking at their network as a whole, would

19 they use those airplanes in this similar manner.  And I have

20 every reason to believe that they would.

21 Q.   So you would agree that Spirit reduces capacity in

22 off-peak days when they view it would not be profitable to

23 operate; right?

24 A.   I think that's correct.

25 Q.   And you would also agree that not every Spirit route

```
 1    would have sufficient demand to add off-peak and
 2    Tuesday/Wednesday flying; right?
 3    A.    Yes.  I think that's correct for Spirit, yes.
 4    Q.    And you didn't do any analysis to determine which
 5    Spirit routes, if any, could be profitably served with
 6    greater frequency in off-peak times and on
 7    Tuesday/Wednesday; right?
 8    A.    I did not assume that the additional JetBlue capacity
 9    would be, you know, specifically one-for-one replacement on
10    Spirit routes.  So I did not do a future forecast of
11    profitability for JetBlue on specific days or in specific
12    markets.  That's correct.
13    Q.    Now, you mentioned during your testimony that JetBlue
14    tends to fly more business routes than Spirit; right?
15    A.    I believe that's correct, yes.
16    Q.    And you also testified that you believe that's one of
17    the reasons why JetBlue has a, I believe you used the word
18    flatter schedule than Spirit does; right?
19    A.    Yes, that's right.
20    Q.    So wouldn't you agree that in order for Spirit to take
21    advantage of that scheduling pattern, JetBlue post-merger
22    would have to redeploy Spirit's aircraft to more
23    business-focused routes?
24    A.    I don't agree that would be exclusive.  Even in markets
25    where they both serve, they could have different scheduling
```

```
 1    and seasonality patterns based on the customer segment that
 2    they're trying to attract.  So I think some of that capacity
 3    might go in other markets.
 4         But I was looking at the Spirit schedules when I came
 5    up for my deposition in September, and I noted that in the
 6    Atlantic-Cleveland market, for example, Spirit flew twice a
 7    day every day except Tuesday and Wednesday.  And on Tuesday
 8    and Wednesday they did not have a morning flight.  That's a
 9    market I would consider made up, September,
10    Atlantic-Cleveland, largely business travel.  And I believe
11    an airline who is focusing on the business customer, if I
12    were to fly to Cleveland for business I probably would want
13    to leave in the morning, and there's a very good chance I
14    might want to leave on Tuesday or Wednesday.
15         So that's the sort of market where I think in the same
16    market JetBlue may feel there's demand.  But some of that
17    may be other markets as well.  They may fly a plane that
18    Spirit would not operate on Tuesday to a leisure market,
19    JetBlue might fly in a business market.  So there would be,
20    I think, a series of schedule changes that the merged entity
21    would do to improve their schedule pattern and
22    profitability.
23    Q.   So when you say schedule changes, do you mean
24    redeployment of Spirit's fleet to different routes?
25    A.   It could be different routes, could be changing the
```

gauge.  There would be a pooled fleet.  It would be a single

network, not two separate networks.  So I would certainly

view that JetBlue would look at all of the airplanes on all

of the routes and fly them in the way they felt was most

effective.

Q.  So you would expect that JetBlue would redeploy

Spirit's fleet if it's profitable to do so?

                MR. MITCHELL:  Objection, your Honor.  Asked and

answered.

                THE COURT:  Oh, overruled.

A.  Well, any airline that I've ever worked with, they are

often redeploying aircraft from routes that lose money to

routes that make money.  So I would say on an ongoing basis,

whether they're merged or standalone, both Spirit and

JetBlue would continue to evaluate profitability, potential

opportunity for changes, and would continue to do that going

forward.

                THE COURT:  Well, what I hear you say, we're not

talking standalone here.  If the merger goes through, he

posits, and he asks you, JetBlue is going to fly the Spirit

planes on the routes that it chooses to maximize its

profitability.  That's what's going to happen, isn't it?

                THE WITNESS:  Yes, your Honor, I believe that's

what they would do.

                THE COURT:  Yeah.

1    Q.    Okay.  I'd like to move on to a new topic.  And if we

2    can go back to slide 20 of your demonstratives, we're going

3    to continue walking through that panel by panel.

4              (On screen.)

5    Q.    So next up would be fleet optimization.

6    A.    Okay.

7    Q.    Fleet optimization is the larger of the two increases

8    that you quantified; right?

9    A.    Yes, that's correct.

10   Q.    And that's about 3.6 million seats?

11   A.    Yes, that's right.

12   Q.    And it's about just under 60 percent of the increase

13   that you calculated; right?

14   A.    I think that's right, yes.

15   Q.    Now, you did not cite in your report any post-merger

16   plans by JetBlue for additional up-gauging and down-gauging

17   of the combined fleet; right?

18   A.    Well, every airline evaluates up-gauges and down-gauges

19   on an ongoing basis, on a yearly basis.  That's what they

20   do.

21   Q.    But you didn't see any JetBlue documents that showed

22   plans to up-gauge and down-gauge the combined fleet;

23   correct?

24   A.    That's correct.  That's one reason I didn't allow for

25   any up-gauges or down-gauges, because there's significant

```
 1    other information you would need to evaluate the efficiency
 2    of those.  And so I didn't -- I didn't even allow that.  So
 3    there's no assumption of any up-gauge or down-gauge.
 4    Q.   And when you say significant other information would be
 5    needed, you did not have access to that information;
 6    correct?
 7    A.   I mean, I don't believe the information would even
 8    exist.  So, for example, the question would be if I have a
 9    320 and now I put a 321, how many additional passengers and
10    revenue would I generate.  So if you're Spirit, you know,
11    the question is now I have a 320 and a 321 that are -- with
12    a JetBlue configuration, with a JetBlue product, so there
13    was no way that they would be able to quantify that.  And
14    similarly with JetBlue, they wouldn't have the detail of the
15    demands and the patterns for Spirit.
16         So that data wouldn't exist.  So that's really a strong
17    reason why I didn't even go down to consider regauging.
18    There's simply not data that would allow the quantification
19    to be done properly.  And I didn't want to kind of do a
20    halfway assumption.  That's what I do in many projects, and
21    it's a very important piece, is that quantification of the
22    regauge, and simply not -- there would be no data to do it
23    right.  So I did not.
24    Q.   So I want to talk more specifically about the FAM model
25    itself.  So that's the computer program you used for your
```

1   analysis of fleet optimization; right?

2   A.   Yes, that's correct.

3   Q.   And to your knowledge JetBlue has not used FAM in the

4   ordinary course of its business; right?

5   A.   I have no knowledge that they have used it.

6   Q.   And to your knowledge Spirit has not used FAM in the

7   ordinary course of its business; right?

8   A.   I have no knowledge of Spirit using FAM.

9   Q.   Are you aware that APG, the company that owns FAM, is

10  no longer selling licenses for the product?

11  A.   Yes, I'm aware.  Now, in context, APG was acquired by

12  Accenture, and Accenture very recently did stop licensing

13  both the network planning and the fleet assignment model.

14  So I'm aware of that, yes.

15  Q.   I want to discuss how you used FAM to determine the

16  number of planes that could be popped.

17  A.   Okay.

18  Q.   So the way you calculated this was by comparing the

19  number of planes needed to fly the standalone JetBlue and

20  Spirit schedules against the number of planes needed to fly

21  the combined future schedule; right?

22  A.   Yes, that's right.

23  Q.   I'd like to bring up slide 12 of your demonstratives.

24       (On screen.)

25  Q.   So this slide 12 reflects that analysis; right?

```
 1    A.    Yes, it does.

 2    Q.    And you used FAM to do that; right?

 3    A.    Yes, I did.

 4    Q.    And you decided to use different settings in FAM to

 5    analyze the standalone schedules and the combined schedule;

 6    right?

 7    A.    Yes.  Because the standalone schedules had already been

 8    optimized by the airlines --

 9    Q.    Mr. Scheff, I just ask that you answer the question

10    asked.  If there's more color you'd like to add, counsel can

11    ask about that on their redirect.

12    A.    Okay.  Yes, the settings were different.

13    Q.    Okay.  So let's start by discussing the standalone

14    schedules and the way you used FAM to evaluate those.  When

15    you ran the standalone schedules through FAM, you did not

16    allow the retiming of flights; right?

17    A.    That's correct.

18    Q.    And retiming means flights can be moved within the

19    schedule; right?

20    A.    Yes.  If the airline had chosen to retime them they

21    would be at a different time.  So you could do that.

22    Q.    So when you ran FAM on the standalone schedules you did

23    not allow flights to be moved at all; right?

24    A.    That's correct.

25    Q.    And when you used FAM to evaluate the standalone
```

1   schedules you found that no planes could be popped, as you

2   use the term, on a standalone basis; right?

3   A.   That's correct.

4   Q.   Now, let's discuss what you did with the combined

5   schedule.  You ran JetBlue and Spirit's combined fleet

6   schedule, fleet and schedule through FAM; right?

7   A.   I did.

8   Q.   And when you ran the combined schedule through FAM, you

9   decided to allow for the retiming of flights; right?

10  A.   With the awareness that there would certainly be

11  extensive retiming after the merger, I did allow modest

12  retiming which would capture only a portion of what they

13  would do.  But for that reason I did allow retiming.

14  Q.   And the way you implemented that was to allow flights

15  to be moved in 20-minute increments up to 60 minutes total;

16  right?

17  A.   That's correct.

18  Q.   So you used different retiming settings in FAM for the

19  standalone schedules than you did for the combined schedule;

20  right?

21  A.   That's correct.

22  Q.   So I want to talk about how you determined how many

23  planes would be popped due to the merger.  So after you ran

24  the FAM module, you compared the FAM output for the

25  standalone schedules to the output for the combined

1    schedule; right?

2    A.   Yes, I did.

3    Q.   And the difference between the number of planes

4    required for the standalone schedule and the combined

5    schedule is what you testified will be popped due to the

6    merger; right?

7    A.   The difference between the solution shown here and the

8    standalone schedule is the number of airplanes.

9    Q.   You would agree that it's important to ensure that any

10   popped planes were the result of pooling rather than

11   existing slack in the networks; right?

12   A.   No, not necessarily.  The existing networks, I believe,

13   were flown as the airlines chose to fly them.  So, to me,

14   that was the appropriate baseline.  And so that's what I

15   used.

16   Q.   Okay.  I'd like to direct you to page 42 of your

17   report, which you have in front of you, and it's

18   paragraph 42.  Page 19, paragraph 42.  And in your report it

19   states, "The first step I took was to analyze whether

20   JetBlue and Spirit could fly their July 2023 schedules with

21   fewer planes on a standalone basis because I wanted to

22   ensure that any popped planes were the result of pooling

23   rather than existing slack in the network."  That's in your

24   report; right?

25   A.   That is.  And I would note that the July 2023 schedule

1    includes both the market pair as well as the departure and

2    arrival times.  The schedule is comprehensive of that

3    information.

4    Q.   Okay.  So I'm focusing on the part about ensuring

5    popped planes were the result of pooling rather than

6    existing slack in the networks.  By "pooling" you mean

7    combining the JetBlue and Spirit fleets; right?

8    A.   Yes, pooling the like fleets for JetBlue and Spirit.

9    Q.   And the reference to existing slack means whether

10   there's an opportunity to reassign and pop planes on a

11   standalone basis; right?

12   A.   Using the July 2023 schedule as operated and published

13   by the airlines, yes.

14   Q.   So that is, you wanted to determine whether planes

15   could be popped without a merger and combining the fleets

16   before you went any further in your analysis; right?

17   A.   Really it was without the merger I was wanting to

18   determine how many airplanes were required to fly the

19   schedule that the airlines chose to fly.  That was my

20   baseline.

21   Q.   Okay.  And I believe earlier in your testimony you had

22   mentioned the term "apples-to-apples."  You said an

23   apples-to-apples comparison is important.  You said that;

24   right?

25   A.   Referring to which measure was used to assess

1    utilization.  So seat departures, in that context, yes.

2    Q.   You would agree that when performing an analysis, that

3    having an apples-to-apples comparison is important; right?

4    A.   I think having -- doing the right analysis in the

5    context of the question is important.  So I wouldn't make a

6    general statement.  I think each analysis is -- is -- you

7    need to look at the -- what you're trying to assess and

8    decide the best comparison.

9    Q.   So, Mr. Scheff, that was a "yes" or "no" question.

10   A.   Okay.

11   Q.   Would you agree that doing an apples-to-apples

12   comparison is important when undertaking analysis?

13   A.   I think without the context of the analysis, I don't

14   think I can necessarily answer or even define what

15   apples-to-apples is.

16   Q.   And in this context when you're reviewing the potential

17   to pop planes from a combined fleet, you would agree that

18   apples-to-apples -- doing an apples-to-apples comparison is

19   important; right?

20   A.   I don't -- I don't necessarily agree with that.  In one

21   case you have schedules that have been optimized already,

22   and in another case you have what could potentially be done

23   with optimization.  So they're really two separate cases.

24   So, again, I'm not sure I can define what apples-to-apples

25   is.

```
 1    Q.    Okay.  We can move on.

 2    A.    Okay.

 3    Q.    So the reason you ran FAM on the standalone schedule is

 4    that in order to determine the planes that can be popped due

 5    to the merger, you would need to subtract planes popped on a

 6    standalone basis from the number of planes that can be

 7    popped in the combined schedule; right?

 8    A.    Yes.  I wanted to compare the number of planes required

 9    to fly the standalone schedule with the number of planes

10    that would be required to fly after pooling and

11    optimization.

12    Q.    And you would agree that you did not allow FAM to

13    retime the standalone schedules; correct?

14    A.    I did not think it was appropriate to retime the

15    standalone schedules, that's correct.

16    Q.    Sure.  Again, I just -- please answer the question.

17    A.    I did not.

18    Q.    So you don't know whether FAM would have popped any

19    planes on a standalone basis if retiming had been allowed;

20    right?

21    A.    At the time I did this.  I have seen a subsequent

22    report from Dr. Chipty that indicates that may be possible.

23    But I did not investigate that at the time.

24    Q.    And I'd like to move on and talk about how airlines

25    would typically use the output from FAM.  So airlines that
```

```
 1  use FAM would not implement the schedule exactly as FAM

 2  outputs it; right?

 3  A.   In general, when you use FAM to do an airline schedule,

 4  or whether you use FAM or not, an airline schedule is

 5  constantly tweaked and tuned and it's finished on the day

 6  that it's due to be published.

 7       So a FAM model output would generally go through a

 8  review, and it would go through some iterations to improve

 9  or to change things, and it would be a multiple-run case.

10  So I've never seen a case where any schedule did not have

11  continuous evolution over time.

12  Q.   And your analysis did not do this iterative process in

13  the continuous evolution for the combined schedules; right?

14  A.   The combined schedules had already gone through that

15  process in the way that each airline saw was most fit, which

16  is why I used the schedules as they were published.

17  Q.   So I'm talking about the schedule after you combined it

18  and ran it through FAM.

19  A.   Oh, after I combined it.  So, I did not go through an

20  iterative process to try to improve the solution, that's

21  correct.

22  Q.   And in the iterative process an airline would typically

23  consider the impact of schedule changes on profitability;

24  right?

25  A.   Yes, absolutely.
```

```
 1    Q.   And you didn't consider profitability on the schedule
 2    changes generated by FAM; right?
 3    A.   I did not measure profitability.  What I tried to do
 4    was limit the changes.  For example, there's no gauge change
 5    so there should be no revenue change.  And by keeping the
 6    timing very close, the intent was to --
 7    Q.   Mr. Scheff, is that a no?  Again, you'll have a chance
 8    to answer and add more color on redirect.
 9    A.   I did not -- I did not forecast profitability in my
10    analysis.
11    Q.   The JetBlue and Spirit schedules have already gone
12    through the iterative process, right, on the standalone
13    basis, that is?
14    A.   Yes, absolutely.
15    Q.   So you compared finalized standalone schedules to a
16    combined one that has not gone through the iterative
17    process; right?
18    A.   That's correct.
19    Q.   I want to talk about some other things that might be
20    considered in network planning and whether FAM is able to do
21    that.
22         The FAM model doesn't consider whether retimed flights
23    are at times that are desirable to passengers; right?
24    A.   The FAM model does not directly calculate that,
25    correct.
```

1    Q.    You're familiar with the concept of connecting banks;

2    right?

3    A.    Certainly.

4    Q.    And connecting banks are times that hubs, focus cities,

5    core cities, whatever the airline may call them, where

6    several flights take off within minutes of each other;

7    right?

8    A.    Normally there's a series of arriving flights and then

9    later a series of departing flights designed to allow for

10   connections.

11   Q.    And the FAM model doesn't consider whether retiming

12   would move flights outside of bank hours; right?

13   A.    The FAM model does not directly consider that.

14   Q.    So the retiming that we just talked about, the way you

15   implemented that in FAM was by using a setting that could be

16   turned on or off; right?

17   A.    Which particular setting or --

18   Q.    Retiming?

19   A.    Retiming can be turned on or off, can be allowed or

20   not, yes.

21   Q.    Okay.  So I'd like to show you what's been marked as

22   Scheff Demonstrative A.  This was created using backup from

23   your report.  At the top you'll see the file name and the

24   tab that it came from.  So the file name is, "B6 NK FAM

25   Output Log," and the tab is, "Log combined/base."

```
1    A.    Okay.  I see it.
2    Q.    Now, this has been filtered to show just the constraint
3    settings and just make it more printable and easy to use.
4    Does this appear to be an excerpt of the setting selections
5    from the results of your FAM run on the combined schedules?
6    A.    Yes, it does.  I can't tell exactly which one it's
7    from, but this is certainly a log from a FAM run that was --
8    that I conducted.
9    Q.    Sure.  And it's more for illustrative purposes than it
10   is for specifics, so we can just talk through it like that.
11   So the items in rows 376 through 395 are FAM settings that
12   represent things that can impact scheduling; right?
13   A.    Yes, I would say so.
14   Q.    And those are called constraints; right?
15   A.    Yes, those are constraints.
16   Q.    Where there's a zero after the colon for these
17   constraints, that means you did not instruct FAM to consider
18   that constraint; right?
19   A.    This run did not use any constraint.  Where there's a
20   zero, no constraints were built, yes.
21   Q.    And some of these constraints that are set to zero you
22   have used in your prior work for other airlines; right?
23   A.    Yes.  Each constraint is used in the proper context
24   depending on the situation.  So I have used all of them.
25   Q.    So I want to specifically talk about row 388, which is
```

```
 1    "Slot," and that represents takeoff and landing slots that
 2    are needed at some airports; right?
 3    A.   Yes, that's correct.
 4    Q.   And the zero in row 388 means that you did not instruct
 5    FAM to consider slot constraints; right?
 6    A.   Yes, that's correct.
 7    Q.   Spirit serves airports such as LaGuardia that require
 8    slots for takeoff and landing; right?
 9    A.   Yes, that's right.
10    Q.   But you did not instruct FAM to consider JetBlue and
11    Spirit slot holdings; right?
12    A.   Yes, that's right.
13    Q.   Okay.  We're going to move on and we'll start by
14    discussing slide 16 of your demonstratives and talk through
15    the additional categories of utilization that you have
16    testified about.
17    A.   Okay.
18    Q.   It might be easier to look on paper.  I think the
19    version we have on screen looks a little --
20    A.   Okay.
21    Q.   You testified on direct that JetBlue could increase
22    utilization by increasing the stage length of Spirit's
23    A321s; right?
24    A.   Yes, I did.
25    Q.   And you didn't cite in your report any post-merger
```

1    plans by JetBlue to increase the stage length of Spirit's
2    A321s; right?
3    A.    That -- correct.  The post-merger schedule that JetBlue
4    provided was unfleeted.  Everything was on a 320.
5    Q.    And you did not calculate any change to the number of
6    seats for departure that would result from the A321 stage
7    length increases you've suggested; right?
8    A.    I did not directly quantify that, that's correct.
9    Q.    And you would agree that, in general, a longer stage
10   length reduces seat departures; right?
11   A.    It depends on the context.  If the longer flight is a
12   red-eye, and you're using the same airplane, it could
13   increase it.  But as a general rule, longer flights have
14   fewer takeoffs and that -- in that case they can contribute
15   to lower seat departures.  But it's really the context of
16   the flights that would determine exactly how that plays out.
17   Q.    Next I want to talk about the ability to reduce spares.
18   You discussed it on slide 17 of your demonstratives.
19   A.    Yes.
20   Q.    So you testified that it is possible or it's a
21   potential that JetBlue might be able to reduce the number of
22   spares it keeps; right?
23   A.    Yes, I did.
24   Q.    You didn't cite in your report any plans by JetBlue to
25   reduce spares after the merger; right?

```
 1   A.    Because I'm not aware of any specific plans, I did not

 2   cite that.

 3   Q.    And you weren't able to quantify how many fewer spares

 4   would be needed if the JetBlue and Spirit fleets were to

 5   combine; right?

 6   A.    That's correct.

 7   Q.    You didn't calculate any change to the number of seats

 8   for departure that would result from having fewer spares;

 9   right?

10   A.    I mean, I calculated, in my testimony today, if you did

11   have an additional spare, what it would generate.  But I did

12   not quantify how many additional seats I thought they would

13   produce or how many spares.

14   Q.    You don't know the method that Spirit or JetBlue use to

15   determine the number of spares that they maintain; right?

16   A.    I'm not -- I'm not sure of the exact methodology.  I

17   know the numbers change depending on conditions.  So it's a

18   fluid number for both airlines.

19   Q.    Okay.  Let's turn to slide 18 of your demonstratives.

20   And on direct you said that JetBlue can increase red-eye

21   flying together in the way that JetBlue and Spirit could not

22   individually; right?

23           (On screen.)

24   A.    Yes, I did.

25   Q.    You didn't calculate any change to the number of seats
```

1    for departure that would result from additional red-eye

2    flying; right?

3    A.    That's correct.

4    Q.    So you identified routes as candidates for additional

5    red-eye flying if they appeared in the 2027 Combined Network

6    Plan, but do not appear in JetBlue and Spirit's July 2023

7    schedules; right?

8    A.    That was part of the rationale behind believing that

9    they would use much more extensive use of red-eyes.  So

10   that, yes, I did look at that.

11   Q.    So I want to discuss figure 16, which is on page 31 of

12   your second amended report.  And that's in the tab labeled,

13   "Scheff Expert Report."  We're not going to put it on the

14   screen because I've seen confidentiality redactions from

15   defense counsel on similar maps.  So we can talk around it.

16   It's not really going to be an issue.  I just want to make

17   sure that you have it in front of you.

18   A.    Okay.  Can you cite the location again?

19   Q.    Yeah.  That's page 31, figure 16.

20         MR. MITCHELL:  Your Honor, I just have an

21   objection.  The witness didn't actually testify to this

22   figure.  It's not in evidence.  It wasn't discussed, so --

23         THE COURT:  Well, he may inquire about it

24   certainly.

25         MR. MITCHELL:  Thank you, your Honor.

```
 1              THE COURT:  And I appreciate his sensitivity, but

 2    he may inquire about it and we'll see if we get some helpful

 3    evidence.

 4              MR. DeRITA:  Thank you, your Honor.

 5    Q.   This is a map of the routes that you identified for new

 6    red-eye flying; right?

 7    A.   From examining the combined 2027 schedule and comparing

 8    it with the current red-eye flying, this is a route map

 9    showing those, yes.

10    Q.   So these are the routes that account for some of the

11    opinions that you made related to red-eye flying on

12    slide 18; correct?

13              MR. MITCHELL:  Objection, your Honor.  Again, he

14    didn't testify to it and so --

15              THE COURT:  He didn't, but he may be asked that

16    question.

17    A.   Seeing these routes in the schedule did contribute to

18    my opinion that the combined entity would fly more red-eyes.

19    Q.   So, for example, on slide 18 you identified six

20    additional daily red-eye round trips, and where they're from

21    has been blacked out.  But those appear in the map in

22    figure 16; right?

23              (On screen.)

24    A.   Yes, they do.

25    Q.   Okay.  I'd like to keep your binder open to this page
```

       but I'm going to show you a couple of demonstratives.  And
       we'll start with demonstrative B, which is a screenshot of a
       booking search on the JetBlue website for Los Angeles to
       Buffalo, departing November 18th, 2023.  It's also in your
       binder, but it's on the screen in front of you as well.

              MR. MITCHELL:  Your Honor, can I ask a question?
       The witness testified that that map we just talked about was
       a comparison against the July 2023, the current schedule.
       I'd ask counsel to represent when this screenshot was taken?

              MR. DeRITA:  Yesterday.

              MR. MITCHELL:  Thank you.

              THE COURT:  Thank you.

Q.     Do you have any reason to doubt that this is an
       accurate screenshot from the JetBlue website?

A.     No, I have no reason to doubt that.

Q.     And Los Angeles to Buffalo is a route that you've
       identified as a new red-eye route in figure 16 of your
       report; correct?

A.     Yes.  I believe that was one of the routes that is in
       the combined network that was not in July '23.  I think
       that's correct.

Q.     And demonstrative B shows that JetBlue currently
       operates a red-eye flight at 10:00 p.m. that arrives 5:36
       the next day; right?

A.     Yes, I see that.

1    Q.   You would agree that because JetBlue flies this route

2    today it would not be new red-eye flying created from the

3    merger; right?

4    A.   Yes, I would agree that that particular flight would

5    not be merger-related, sure.

6    Q.   Okay.  And I'd now like to show you demonstrative C,

7    which is a screenshot of a booking search on the Spirit

8    website for Las Vegas to Tampa departing February 14th,

9    2024, and this screenshot was also created in the last day

10   or two.  Do you have any reason to doubt that this is an

11   accurate screenshot from the Spirit website?

12   A.   No, I have no reason to doubt it.

13   Q.   And Las Vegas to Tampa is a route that you identified

14   as a new red-eye route in figure 16 of your report; right?

15   A.   I believe that's correct.

16   Q.   And demonstrative C shows that Spirit's selling tickets

17   for a 9:47 p.m. departure that arrives 5:04 the next day;

18   right?

19   A.   Yes, I see that.

20   Q.   So you would also agree that this is not new red-eye

21   flying that would be created from the merger; right?

22   A.   Yes, I would say this additional red-eye would not be

23   merger-related.

24   Q.   Now, you had mentioned that with respect to slide 18

25   and to your analysis for more red-eye flying, that you had

1    compared the 2027 Combined Network Plan to the 2023

2    schedules; right?

3    A.    July 2023 schedule, yes.

4    Q.    Are you aware that JetBlue has a 2025 standalone

5    network plan that outlines the service it plans to provide

6    in 2025?

7    A.    I did not analyze the JetBlue 2025 standalone plan.  So

8    I don't doubt its existence, but I'm not familiar with the

9    contents.

10   Q.    Okay.  You would agree that if a route appears in the

11   2025 standalone plan for JetBlue that they likely would plan

12   to fly that route even without the merger; right?

13   A.    Yes, I would agree with that.

14   Q.    Okay.

15             MR. DeRITA:  If we can go back to slide 18.

16             (On screen.)

17   Q.    The third bullet here or, sorry, the second bullet here

18   reads, "Additional red-eye flying is made possible by a

19   larger network and more aircraft."  You would agree that

20   having more aircraft enables the additional red-eye flights;

21   right?

22   A.    Yes, I would agree with that.

23   Q.    And you would agree that JetBlue's fleet on a

24   standalone basis is projected to be larger in 2027 than it

25   is today; right?

```
 1    A.    Yes, I think that's correct.

 2    Q.    Okay.  So I'd like to go back to slide 20 of your

 3    demonstratives one last time.

 4              (On screen.)

 5    Q.    You chose seat departures as the metric for this

 6    analysis; right?

 7    A.    Yes, that's right.

 8    Q.    But you would agree that airlines attempt to maximize

 9    profits from network planning; right?

10    A.    Absolutely.

11    Q.    That is, they're more likely to be focused on

12    maximizing profits than seat departures; right?

13    A.    Yes.  The objective is generally almost always profits.

14    Q.    This slide does not consider -- actually, we'll move on

15    from that.  Sorry.

16          So this slide also does not include any calculations

17    related to changing how Spirit flies its A321s; right?

18    A.    That's correct.

19    Q.    And it doesn't include any calculations related to

20    reduced spares?

21    A.    That's correct.

22    Q.    And it does not include any calculations related to

23    additional red-eye flying; right?

24    A.    That's correct.

25    Q.    And going back to the blue Aircraft Reconfiguration
```

1   panel, you would agree that of the three categories of

2   changes that you calculated on this chart, reconfiguration

3   is the only one that JetBlue has concrete plans to make;

4   right?

5   A.   They're the only ones I've seen them announce their

6   plans.  So certainly something that's going to happen in the

7   future, if the merger occurs or not, they wouldn't have

8   announced how they would enact that.  But, yes, that's the

9   only one I have seen a confirmation of a specific plan.

10  Q.   And you calculated that that reconfiguration would

11  result in the decrease of nearly 6.2 million seats; right?

12  A.   Yes, that's right.

13  Q.   And, finally, let's discuss the Total column.

14  A.   Okay.

15  Q.   In your initial report you have presented a positive

16  total number; right?

17  A.   Yes.  It was a small positive number in the initial

18  report, that's correct.

19  Q.   And you -- and initially you managed to come up with

20  enough seat departure increases to offset the 6.2 million

21  decrease that would result from reconfiguration; right?

22  A.   I wouldn't phrase it as I managed to come up with a

23  number.  I did the analysis and that's what the number came

24  up to be.  Because of the double-counting error it was

25  slightly inflated.  I would say both numbers were

 1    essentially close to zero, so there was no big-picture

 2    change.  But I just -- I think it's a mischaracterization to

 3    say that I came up with a number.  I did the analysis and

 4    that's the number.

 5    Q.   And after you made a change to the Schedule Changes

 6    panel in response to the error identified by Dr. Chipty,

 7    your calculation of the net impact on seats changed from a

 8    positive to a negative number; right?

 9    A.   Within the categories quantified in this waterfall,

10    that's correct.

11    Q.   And the schedule changes and the fleet optimization

12    increases that you estimated, those are not based on any

13    plans from JetBlue that you have seen; right?

14    A.   No.  They would --

15                 THE COURT:  In all honesty, I think you've asked

16    that.  My impression of his testimony is they are not.

17                 THE WITNESS:  Yeah.

18    Q.   And just one last question here.

19    A.   Okay.

20    Q.   So I believe on direct you had testified that the

21    380,000 negative change was a wash; is that right?

22    A.   Pretty close.  When you're looking at 86 million total

23    seats, yes, I think so.

24    Q.   Now, on your direct you also testified about slide 21.

25                 MR. DeRITA:  If we can go to slide 21.

```
 1           (On screen.)
 2    Q.   In the last bullet here you were talking about the
 3    number 291,000 annual seats.  You said that that's very
 4    significant; right?
 5    A.   Well, that's for a single airplane.  I think that would
 6    be significant.
 7    Q.   And you would agree that a reduction of 6.2 million
 8    seats, that's more significant than 291,000 seats; right?
 9    A.    It's certainly a larger number, yes.
10    Q.   Okay.
11           MR. DeRITA:  No further questions, your Honor.
12           MR. MITCHELL:  Your Honor, I don't have any
13    questions for redirect.  Just a housekeeping item.
14           THE COURT:  That's fine.  And he may step down.
15    And go ahead.
16           (Whereupon the witness stepped down.)
17           MR. MITCHELL:  Earlier today we provided
18    Ms. Gaudet with a list of the agreed-to exhibits and you
19    have those two folders in your binder there.
20           THE COURT:  I do.  And we will, upon agreement,
21    accept them as evidence.  That takes us up to -- maybe
22    they're already accounted for?
23           MR. MITCHELL:  They're already accounted for, and
24    one of the folders are the exhibits we proffered with
25    Mr. Scheff.  Those are Exhibits 900 through 909.  There's
```

```
 1   one exhibit in there that we proffered through Dr. Chipty,

 2   and that one has been stamped Exhibit 910.  And the

 3   plaintiffs don't object to that.

 4           THE COURT:  Thank you.  And I thank you for your

 5   agreement.

 6           MR. MITCHELL:  Thank you, your Honor.

 7           (Exhibits 900 - 910 received in evidence.)

 8           THE COURT:  Is that the defense case?

 9           MR. SHORES:  Your Honor, the defense only has one

10   more witness, it's a third-party witness, who will be

11   available on Thursday.

12           THE COURT:  And that's fine.  We'll charge you the

13   fifteen minutes.

14           MR. SHORES:  No problem, your Honor.  And I do

15   want to advise the Court we would not anticipate going the

16   full time on Thursday.

17           THE COURT:  But consistent with our discussion and

18   to afford your time to prepare for final argument, we

19   planned for final argument on the 5th, and I propose to hold

20   it then unless you're pressing to get --

21           MR. DUFFY:  We're happy to proceed on the 5th,

22   your Honor.  What time on the 5th?

23           THE COURT:  9:00.

24           MR. DUFFY:  9:00.  Perfect.

25           MR. SHORES:  Look forward for it.  Thank you, your
```

1    Honor.

2            THE COURT:  Very well.  So we will recess at this

3    time.  Let me just do my calculation for just a moment.

4            The government has used up nine days, one hour,

5    five minutes.  And the defense has used up six days and

6    forty minutes.

7            We'll stand in recess until 9:00 a.m. tomorrow

8    morning.  We'll recess.

9            THE CLERK:  All rise.

10

11           (Proceedings adjourned.)

12

13

14

15

16                        ******

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E


          I, Cheryl B. Palanchian, Court Reporter

for the United States District Court for the

District of Massachusetts, do hereby certify that

the foregoing pages are a true and accurate

transcription of my shorthand notes taken in the

aforementioned matter to the best of my skill and

ability.




          /s/ Cheryl B. Palanchian 11/28/2023
               CHERYL B. PALANCHIAN

             Registered Merit Reporter
             Certified Realtime Reporter