1              THE UNITED STATES DISTRICT COURT

2                DISTRICT OF MASSACHUSETTS (Boston)

3                              No. 1:23-cv-10511-WGY

4

5

6    UNITED STATES OF AMERICA, et al,
                Plaintiffs

7

8    vs.

9

10   JETBLUE AIRWAYS CORPORATION, et al,
                Defendants

11

12                        * * * * * * * * *

13

14                    For Bench Trial Before:
                      Judge William G. Young

15

16                      Closing Arguments

17

18                    United States District Court
                      District of Massachusetts (Boston)
                      One Courthouse Way

19                    Boston, Massachusetts 02210
                      Tuesday, December 5, 2023

20

21                        * * * * * * * *

22

23            REPORTER: RICHARD H. ROMANOW, RPR
                      Official Court Reporter
                      United States District Court

24       One Courthouse Way, Room 5510, Boston, MA 02210
                      rhrbulldog@aol.com

25

```
 1                    A P P E A R A N C E S

 2

 3   EDWARD WILLIAM DUFFY, ESQ.
     ARIANNA MARKEL, ESQ.
 4   AARON TEITELBAUM, ESQ.
         DOJ-Atr
 5       450 Fifth Street NW, Suite 8000
         Washington, DC 20530
 6       (202) 812-4723
         Email: Edward.duffy@usdoj.gov
 7   and
      WILLIAM T. MATLACK, ESQ.
 8       Attorney General's Office
         One Ashburton Place, 18th Floor
 9       Boston, MA 02108
         (617) 727-2200
10       Email: William.matlack@mass.gov
         For Plaintiffs United States of America and
11       The Commonwealth of Massachusetts

12

13    RYAN SHORES, ESQ.
         Cleary Gottlieb Steen & Hamilton LLP
14       2112 Pennsylvania Avenue, NW
         Washington, DC 20037
15       (202) 974-1876
         Email: Rshores@cgsh.com
16   and
      ELIZABETH M. WRIGHT, ESQ.
17       Cooley LLP
         500 Boylston Street
18       Boston, MA 02116-3736
         (617) 937-2349
19       Email: Ewright@cooley.com
     and
20    RACHEL MOSSMAN ZIEMINSKI, ESQ.
      MICHAEL MITCHELL, ESQ.
21       Shearman & Sterling LLP
         2601 Olive Street, 17th Floor
22       Dallas, TX 75201
         Email: Rachel.zieminski@shearman.com
23       For Defendant JetBlue Airways Corporation

24

25       (Continued.)
```

```
 1      (Continued.)

 2

 3   JAY COHEN, ESQ.
     ANDREW C. FINCH, ESQ.
 4      Paul, Weiss, Rifkind, Wharton & Garrison
        1285 Avenue of the Americas
 5      New York, NY 10019-6064
        (212) 373-3000
 6      Email: Jaycohen@paulweiss.com
        For Defendant Spirit Airlines, Inc.
 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                          I N D E X

2

3   CLOSING ARGUMENT BY MR. SHORES................   7

4   CLOSING ARGUMENT BY MR. COHEN.................  38

5   CLOSING ARGUMENT BY MR. DUFFY.................  46

6

7

8

9                      E X H I B I T S

10

11       EXHIBIT 912...........................   5

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1           P R O C E E D I N G S

2           (Begins, 9:00 a.m.)

3           THE CLERK:  Now hearing Civil Matter 23-10511, the

4    United States of America versus JetBlue, et al.

5           THE COURT:  And good morning to everyone.

6           I understand there's some issues about exhibits.

7    As Ms. Gaudet explained to me, there are certain

8    exhibits as to which there is no dispute and they may be

9    admitted.  I agree they may be admitted.  They will have

10   the next numbers.

11          Which will take us up to what?

12          MR. SHORES:  912, I believe, your Honor.

13          THE COURT:  All right.  So those exhibits are

14   admitted.

15          MR. SHORES:  Thank you, your Honor.

16          (Exhibit 912, marked.)

17          THE COURT:  I mean maybe this has been resolved,

18   but she said there were three that were at issue before

19   the defense rested?

20          MR. DUFFY:  Before actually the plaintiffs rested,

21   we have submitted a motion to admit three exhibits that

22   were related to Campbell Hill, which is a consulting

23   firm that Spirit had retained.  My understanding of

24   defendants' objection to those exhibits is challenging

25   our contention that Campbell Hill was an agent of

1    Spirit's.  So that motion was pending before the Court
2    at the time we rested.
3           THE COURT:  I understand.  And I have reviewed
4    those.
5           On balance I'm going to deny the admission.  They
6    may have the exhibit numbers -- the exhibit letters that
7    they had heretofore.
8           MR. DUFFY:  Understood, your Honor.
9           THE COURT:  All right.  Now here's how we're going
10   to proceed.  An hour for closings.  The defense will go
11   first.  I'll take a 10-minute break.  And I'll hear the
12   government.  Mr. Shores is going to argue.
13          And I should say something, and I say this
14   primarily for the gallery more than for counsel, but
15   counsel will understand this.
16          I'm prepared for your argument and I'm looking
17   forward to it, but I will have questions.  Everyone
18   should understand that those questions do not in any way
19   indicate the inclination of the Court as to any matter
20   under which -- as to which I'm taking things under
21   advisement.  What they may indicate is issues I'm
22   thinking about.  Nothing more.  I think it's appropriate
23   to say that.
24          All right.  And Mr. shores and Mr. Cohen are going
25   to argue and you'll divide up the time as you see fit.

1       MR. SHORES:  Yes, your Honor.

2

3    CLOSING ARGUMENT BY MR. SHORES:

4       May it please the Court.  After four weeks of

5    trial there were 900 exhibits and testimony from 22

6    witnesses, but one fact remains undisputed, the domestic

7    airline industry is dominated by the Big 4 carriers who

8    together account for 80 percent of the market.  And

9    looking into the future, as Section 7 of the Clayton Act

10   requires, there is no prospect of that changing.  As

11   both the CEOs of JetBlue and Spirit testified, the

12   competitive landscape fundamentally shifted years ago in

13   favor of the dominant carriers, particularly the

14   high-priced high-profit legacy carriers.  That is why

15   starting 6 years ago JetBlue began considering a merger

16   with Spirit with one main goal, to create a viable,

17   disruptive, big national challenger to the industry's

18   dominant airlines.  That mandate is even more urgent

19   today.

20       As the evidence showed, the legacies in particular

21   have used their massive scale and broad networks to gain

22   a large part, through mergers blessed by the government,

23   to cement their dominance in a post-covid world.  For

24   example, United and Delta together made billions of

25   dollars in profits in the third quarter of this year

1    alone, while the smaller airlines like JetBlue and

2    Spirit have faced severe financial headwinds post-covid

3    and lost money every year.  Now this is not just a

4    problem for the pocketbooks of these small airlines, it

5    is fundamentally a problem for competition and for

6    consumers.  As a matter of basic economics and as both

7    JetBlue and Spirit CEOs explain, future growth for the

8    smaller disruptive airlines is not possible without

9    profit.  Meanwhile the legacy airlines will continue to

10   pull away.

11        Just as an example, United has 800 new planes on

12   order, that is 300 planes more than the anticipated

13   fleets of JetBlue and Spirit combined.

14        THE COURT:  Well excuse me.  Help me out as to

15   this.

16        I understand that the Clayton Act is designed to

17   benefit competition, and at bottom to benefit consumers.

18   So, um, who is going to benefit if this merger goes

19   forward?  It's not a question of, um, JetBlue's standing

20   with respect to the so-called "legacies," it's whether

21   consumers are going to benefit and more particularly, as

22   I expect the government to argue, what consumers.

23        Help me out with that.

24        MR. SHORES:  Sure, your Honor, and that's the

25   fundamental point here.

1          As the government itself recognized in the NEA

2     case, JetBlue is uniquely able to discipline on price

3     and on quality the legacy airlines who carry the most

4     passengers in this country.  And that makes sense, your

5     Honor, JetBlue competes across the entire cabin against

6     the legacy airlines, from Basic Economy all the way to

7     first class.  So when JetBlue enters routes, what the

8     evidence shows is that prices come down for consumers,

9     most consumers in this country.

10          Now at the same time we do recognize there are

11    people who have chosen a ULCC-type option.  And as the

12    Clayton Act recognizes, if you have entry, the ability

13    to enter the market in a mobile industry, those

14    consumers will be protected.  And as I'm going to talk

15    about today, one of the key features of this case that

16    we've heard about was the fact that Frontier, Allegiant,

17    Breeze, Avelo, they're growing, and they're able to

18    quickly move their assets from one market to another,

19    and what that means under the antitrust laws is low

20    barriers to entry will allow them to serve that side of

21    the market.

22          THE COURT:  Well when should I look at the status

23    of competition?  That's an inapt question.  I'll try it

24    better.

25          MR. SHORES:  If -- sorry.

1          THE COURT:  If the merger goes forward there's

2     going to be some disruption, that's inevitable and

3     expected.  When should I expect to see the benefit that

4     you describe?  And is that the time at which my

5     forward-looking analysis ought grab hold?

6          MR. SHORES:  Again if we could turn to Slide 12,

7     Mr. McCloud.

8          It is the fundamental question here, your Honor,

9     what is the relevant timeframe that the Court must

10    conduct the competitive effects analysis?  And one of

11    the fundamental principles of Section 7 is that the

12    Court has to look out into the future -- not tomorrow,

13    not next month, not even next year, but years into the

14    future after the market has arrived at it's post-merger

15    competitive equilibrium.  The government itself has

16    identified the relevant timeframe for entry to be 2 to 3

17    years and some courts look out even further.  But even

18    focusing on just the government's timeframe, your Honor,

19    and assuming the closing of this transaction in 2024,

20    that means looking all the way out until 2027.

21          I'd also point out, your Honor, that the cases

22    hold that even if there's some short-term

23    anticompetitive effect from a merger, that doesn't bar

24    the merger if in the long run the merger is good for

25    competition, and that makes sense, your Honor, because

1    every merger causes some temporary dislocation to

2    competition.  And if that were enough to do the merger,

3    then Section 7 would practically doom almost every

4    merger.  So the fundamental point is that the Court has

5    to look out into the future again beyond the short term

6    to the long term and ask whether this merger is going to

7    be good for competition in the long run?

8         THE COURT:  But that's -- to me that's one of the

9    key issues here.

10        If the niche that Spirit occupies and the routes

11   that Spirit presently flies, if that's going to be gone,

12   and it is under this merger -- you say well everyone can

13   come in over time or Frontier and Allegiant can come in,

14   what is my benchmark for balancing the loss to the

15   Spirit consumers against the benefit downstream to

16   consumers -- perhaps a more affluent or business class

17   that all airlines compete for, how do I balance that

18   here?

19        MR. SHORES:  Well, your Honor, I would point to

20   the language of Section 7 which gives a balancing test

21   and what the language of Section 7 says is that a merger

22   has to substantially lessen competition, not just lessen

23   competition, but substantially lessen competition.  And

24   what that means is that the Court has to look out into

25   the future and say "What is going to be the competitive

1   effect of this merger?"  And there may be some loss of

2   competition, you know Congress chose not to set the bar

3   at just loss of competition or even possible loss of

4   competition, there has to be a substantial lessening of

5   competition.  And what Congress was trying to achieve

6   through the Clayton Act is to say "We don't want mergers

7   that in the long run are bad for competition."

8        And I think this is important to point out that

9   witnesses, the ULCC witnesses like Mr. Biffle, a witness

10  from Allegiant, a witness from the other ULCCs, they

11  testified that they have the ability to both serve the

12  profitable existing routes as well as acquire new

13  planes, get leases, exercise options -- Allegiant alone

14  has 80 options, and redeploy existing aircraft from

15  unprofitable routes, like they do every day, in order to

16  serve the routes that will be vacated by Spirit.

17       I'll also point out, your Honor, those were

18  witnesses called by the government and they made clear

19  that they want to grow.  I think one important thing

20  about Section 7 cases, particularly in a dynamic

21  industry, is you can't take a snapshot of what the world

22  looks like today, the airline business evolves.

23       Take Avelo and Breeze, for example, your Honor.

24  Those were two airlines that entered during the height

25  of the pandemic, which is the worst demand environment

1     that the airline industry has ever seen, and they're now

2     in dozens of cities and many routes.  Allegiant already

3     has a new plan called Allegiant 2.0.  Yes, historically

4     they serve secondary or proxy airports, that's true, but

5     some of those airports even compete with the primary

6     airports, take Sanford that's competitive with Orlando.

7     But they also said, in a post-merger world particularly,

8     is that the government contends that profits are going

9     to go up, prices are going to go up, and the business

10    models will evolve to meet that, that's what the history

11    of the airline industry shows.

12          So back to your question, your Honor.  I think

13    it's a balancing, but it's also looking at the

14    perspective of what's going to happen in this industry

15    and thinking about what has happened in this industry in

16    the past and what it tells us about competition in the

17    future.

18          Your Honor, if we could go to Slide 8.

19          (On screen.)

20          In the left-hand corner, your Honor, this was the

21    testimony of Mr. Biffle, and what he said was "Airlines

22    have portable assets."  It's not like the hotel

23    business, this is not a merger of a widget factory, this

24    is a merger of a mobile asset.  And what that means is,

25    for purposes of your analysis in this case, the asset

1    can move.  And when Spirit exits these routes in the

2    long run, there's going to be profitable entry here by

3    other ULCCs.

4         Now if I could, your Honor, I would like to turn

5    to the *Baker Hughes* framework.

6         And if we could, Mr. McCloud, let go to -- um,

7    sorry.  19.  I'm sorry, 15.  No, 17.  You got me

8    confused here.

9         (On screen.)

10        And I think it's important to put the analysis in

11   the context of what the law requires, your Honor.

12        There's a very well-settled framework for

13   analyzing the competitive effects here and that's the

14   *Baker Hughes* framework, and what it provides is, in Step

15   1, there has to be undue concentration in a relevant

16   market.

17        THE COURT:  But on that point, isn't it clear that

18   it is the routes that JetBlue competes with Spirit?

19   Your own expert emphasized the routes.  I recognize that

20   there is competition at a national network level.  But

21   isn't it appropriate to consider the routes that we've

22   been talking about during the course of the trial?

23        MR. SHORES:  I do think it's appropriate to

24   consider the routes, your Honor.  I think there are two

25   separate questions though.

1          One question is that at Step 1 of the analysis,

2     what is the relevant market for antitrust purposes?  And

3     that question involves whether you should look at

4     competition on a national level for purposes of the

5     relevant antitrust market, and what I mean by that is

6     you get to choose, after hearing all the evidence,

7     what's the best way to think about the market dynamics

8     here.  It doesn't mean --

9          THE COURT:  I recognize that, and so let me push

10    back a little bit.

11         It seems to me, or I'm thinking, that I really

12    have to look at these routes where there's head-to-head

13    competition, and I have these exhibits and I can see

14    who's got them, and also I have to, um, take into

15    account the national competition as well.  I have to do

16    both at the same time.

17         So this business about deciding strictly what's

18    the relevant market, um, I have some problems with that,

19    because if I look just at the routes, the competition

20    that you're talking about, um, I don't know how to value

21    that.  On the other hand, if I look just at the national

22    market, then it seems to me I'm not giving due weight to

23    the competition in which Frontier is a -- really is a

24    dominant player.

25         MR. SHORES:  Yes, your Honor.  The government has

1    not alleged --

2         THE COURT:  Yes, but does that make sense, I

3    guess?

4         MR. SHORES:  It does, your Honor.

5         The question in an antitrust case is what is the

6    starting point for the analysis?  And really the

7    starting point is this idea of a market.  And sometimes

8    we can get caught up with the labels, but the

9    fundamental question is what is the best way to think

10   about the competition here?  And our submission is that

11   you have to think about competition in a market where

12   planes are mobile and people are mobile, as beyond just

13   an individual route level.

14        So you can consider competition at the route

15   level, but when you choose the right market to conduct

16   the antitrust framework, that framework should be around

17   national competition and this type of dynamic industry.

18   And we'll address this in our brief, your Honor.

19        But there are many cases, including the **United**

20   **Sugar** case that was recently tried, a merger case, where

21   courts recognize that when you have mobility of supply

22   across different local areas, the courts do not choose

23   those local areas themselves as the relevant market.

24   Why?  Because the business itself is mobile.  And also,

25   in this particular industry, people are mobile.

1        Take, for example, somebody who flies on one of

2   the routes that the government claims is going to be

3   harmed.  In this world that person is also going to fly

4   on another route where we claim there's going to be

5   benefits.  So for the Court to just look at one

6   individual route, as the government contends, and say

7   "You can find a substantial lessening of competition on

8   one of those," we submit is the wrong way to think about

9   it, you have to look at it holistically across the

10  entire nation.  And once you've --

11       THE COURT:  Your conclusion that people are going

12  to fly on other routes, some people just fly one route,

13  because of where they are or where their family is, or

14  some businesses fly one route or two routes.  Where can

15  I draw the conclusion that people, consumers, are as

16  mobile as the airline industry itself?

17       MR. SHORES:  Well I do think there is a record on

18  that and we can brief that, your Honor, but I'd make a

19  different point too.

20       If we could turn to Slide 21 of the slide deck.

21       (On screen.)

22       And on the left here what we have is we have Judge

23  Easterbrook's opinion in the ***Ball Memorial Hospital***

24  case, and that case was about insurance in Indiana.  And

25  what the Court held there, what Judge Easterbrook held

1    there, was when you have the ability of other insurance

2    suppliers to come into Indiana, in a case about

3    insurance in Indiana, those suppliers can protect even

4    people who are not mobile in a particular geographic

5    area.

6         So in that case what Judge Easterbrook was saying

7    is even if you have a consumer set that is not mobile,

8    you have to take into account, in defining the relevant

9    market, which the Court concluded was national or even

10   regional, that those -- that those other suppliers can

11   come in, in his words, "The Blue's rivals whose mobility

12   is not restricted, the suppliers, to protect consumers,

13   whose mobility is restricted."

14        So, your Honor, the fundamental point is you can't

15   think about these things in isolation, the demand side

16   and the supply side are inextricably intertwined.  And

17   again it goes back to the fundamental point here that

18   the nature of this industry is mobile.  So when you

19   think about the market, you have to think about those

20   things together.

21        And I mentioned the *U.S. Sugar* case, there's also

22   a *Dredging* case, and there's many others where courts

23   have looked at the market definition question and said

24   "I can't just take a snapshot of what individual markets

25   look like with existing competitors when the supply

1   itself is mobile because that would paint an inaccurate
2   picture of competition going forward."

3        So that's why, you know you can look at it from a
4   market definition perspective, but I also think it's
5   important, your Honor, that you can look at it from the
6   perspective of even if they have alleged and proven
7   individual routes, in the **Baker Hughes** framework the way
8   the steps work is, in Step 1 they can rely on
9   statistics, but at Step 2, one of the well-known ways,
10  one of the well-settled ways to rebut a presumption at
11  Step 2 is to show ease of entry and mobility.

12       THE COURT:  I recognize that.  And you mentioned
13  "presumption" here.

14       Simply tell me how this presumption works?  I mean
15  there's the traditional presumption, for instance in
16  discrimination cases.  The law uses the word
17  "presumption" in so many different ways.  There's the
18  theorian presumption where you put on rebuttal evidence
19  and the bubble is the presumption bursts and it
20  disappears, that's Justice Scalia describing, um,
21  discrimination cases.  But the presumption, for
22  instance, of patentability in the patent law is entirely
23  different, it shifts the whole burden of proof to the
24  other side and indeed proof by a fair preponderance of
25  -- by clear and convincing evidence.

1          And then when I read Justice Breyer speaking about

2     the antitrust laws, he's just talking about balancing

3     the procompetitive effect against the anticompetitive

4     effect.  When he was Chief Judge here in this circuit,

5     he came up with something he called "presumptions of the

6     middle ground," which were similar to Massachusetts

7     prima facie evidence.  Well there's my lecture on

8     presumptions.

9          What's this one?

10          MR. SHORES:  Yes, your Honor.

11          The way that the **Baker Hughes** burden-shifting

12     framework is intended to work, and does work, is that it

13     starts with the government showing that there's this

14     undue concentration we've talked about before, and how

15     is that done here?

16          Well the plaintiff's expert, Dr. Gowrisankaran, he

17     looked at the routes where JetBlue and Spirit compete,

18     which he referred to before, and he said, "How many of

19     those routes?"  And then he looked at the then-existing

20     competitors on those routes and he asked "How many of

21     those meet a screen that is in the DOJ's guidelines for

22     a presumption of harm?"  A so-called "structural

23     presumption."  That's kind of a screen, it's a starting

24     point.  And the cases make clear, like the **Baker Hughes**

25     case, and this is on Slide 17, that's just a starting

 1     point.  So it gets the government -- the way to think

 2     about it is it gets the government out of the gate.

 3         And then the burden shifts to us, at Step 2, to

 4     say the defendants, those market share statistics,

 5     static-market share statistics -- and remember, he

 6     calculated them 18 months ago in a dynamic industry,

 7     those are not indicative or predictive of future

 8     competition.

 9         THE COURT:  In other words it shifts to you the

10     burden of going forward in the traditional sense and you

11     may well have borne it here.  But that's been the

12     subject that we've been wrestling with.  Let's assume

13     for our discussion that you have borne it, then, Step 3,

14     the government bears the burden of proof by proving by a

15     fair preponderance of evidence the substantial

16     impairment of competition.

17         Have I got that right?

18         MR. SHORES:  That is right, your Honor.  And I

19     would just add a couple of things.  One is at Step 2, we

20     can rely on a number of different factors to rebut that

21     presumption.  I mean *Baker Hughes* and other cases say

22     the burden is low.  And so what we have relied on is not

23     just the dynamic nature of the market, which shows these

24     static-market shares are really not indicative of future

25     competition, but also other factors, ease of entry, you

1    know the divestitures, which we haven't talked much

2    about, the benefits to competition from this merger.

3    All of those things, as **Baker Hughes** says, go into a big

4    bucket.  And what they show is that together these

5    market shares are not telling you a lot about the future

6    of competition.

7        And then you're right, in Step 3 what happens is,

8    without the benefit of any presumption, the government

9    has to show with facts a substantial lessening of

10   competition is likely -- is likely -- not just possible,

11   it's probable, it's likely in the future.

12       And so what the -- at Step 3 what they've relied

13   on in this particular case, and I'm happy to address it,

14   are the so-called "coordinated effects" theories as well

15   as the economic evidence of their plaintiffs' expert,

16   Dr. Gowrisankaran.

17       THE COURT:  Well if I have some problem, I'll ask

18   them about this coordinated offense.  We find that

19   clearly in the guidelines, but one would imagine that's

20   where the guidelines to government attorneys ought be.

21   Well enough said.  You have attempted to deal with that

22   and I have that evidence in mind.

23       Go ahead.

24       MR. SHORES:  Yes, your Honor.  Let me, um, let me

25   turn there real quick though, if I may, just to address

1    one issue, which is what the government is trying to do

2    with this coordinated effects theory?  It's to

3    resuscitate a so-called "ATP code theory" that was part

4    of a Sherman Act price-fixing case from over three

5    decades ago.

6        Now JetBlue wasn't even in existence during the

7    time this was going on, and the last of the ATP code

8    consent decrees, which again JetBlue had nothing to do

9    with, expired in 2011.  Now to our knowledge, since all

10   of this occurred, there's been no investigation of

11   ATPCO, which the government clearly could do under the

12   Sherman Act, instead the government is using a Clayton

13   Act merger challenge of two small airlines to kind of

14   resuscitate this theory.

15       And I think what's important about this is,

16   particularly at Step 3, we talked about the burden at

17   Step 3, they have to come forward with facts at this

18   point to support this theory -- not just guidelines, you

19   know statements or theories, they have to come forward

20   with facts to support it.  And we produced millions of

21   documents in this case and among all those millions of

22   documents all they came up with was a handful of alleged

23   flashing and cross-market initiatives -- your Honor will

24   remember those from trial, we talked about those, in a

25   4-year period from 2016 to 2020.  And our pricing

1   witnesses got on the stand and they credibly testified

2   that those acts are not part of JetBlue policy and they

3   haven't happened in years.

4           And as Mr. Hayes said, JetBlue is a maverick, and

5   that was recognized by the Court here last year, it's in

6   JetBlue's DNA, it's part of its 20-year history, and

7   that's not going to change going forward.  The far more

8   reasonable inference on this whole coordinated effects

9   idea is that JetBlue is going to continue to be a

10  disrupter of coordination going forward.  So that's one

11  of their theories, your Honor.

12          And the second relies on their economic expert,

13  Dr. Gowrisankaran.  And you may recall that he

14  testified, and there was a promise in opening, that he

15  was going to show a billion dollars of net harm.

16          And if we could turn to those slides Mr. McCloud.

17          And I think this is important, your Honor, that

18  we're talking about route-level harm.  But

19  Dr. Gowrisankaran did not conduct a route-level analysis

20  that reliably provides the Court harm, information about

21  harm at the route level.  He testified that he is less

22  sure about what the harm is going to be at the national

23  level -- at the route level as opposed to the national

24  level.  And that's critical.  If you do look at this on

25  the route level, they've identified 51 routes that they

1    claim are at the heart of this case and they do not have

2    economic evidence to support that there's harm on those

3    routes.

4         I would also point out, your Honor, let's talk

5    about the divestitures.  Dr. Gowrisankaran did not

6    consider the divestitures in this case.  You may recall

7    that you asked Dr. Gowrisankaran, "Did you consider

8    divestitures?"  And he punted that question to

9    Dr. Chipty, who gives them no weight.  So although

10   Dr. Gowrisankaran did not say it, what is happening with

11   his model is that he is accounting for harm or counting

12   harm in routes where the divestitures are going to

13   eliminate any possibility of harm.

14        THE COURT:  Let me pose this question, and in my

15   own review of the cases I have seen cases, um, sparse,

16   but I have seen cases where a Court has decided that the

17   divestitures were close, but not sufficient, and then

18   has proceeded to go forward to say "But this would pass

19   muster if there were this divestiture or that

20   divestiture."  What's your position about that, assuming

21   the Court were to go down that read?

22        MR. SHORES:  Well it's a good question, your

23   Honor, because one of the things that I think is

24   remarkable about this merger challenge is there are

25   6,000 nonstop routes in this country, 6,000, and the

1     government has centered its merger challenge to these

2     two small airlines on 51 of them, which is just 1

3     percent.  And we agreed to very significant divestitures

4     in this case.  You've heard testimony from Spirit, from

5     Frontier, from JetBlue, from Allegiant about how --

6          THE COURT:  My question is, um, accepting all

7     that, saying, "Oh, these apply, but we need a little

8     more," is that within the Court's province?  Should the

9     Court analyze that?  Should I hold for -- if I think I

10    need to hold further hearings on remedy, should I go do

11    that?

12         MR. SHORES:  You absolutely can, your Honor, I

13    mean that's in the case law --

14         THE COURT:  I can, but the question is should I?

15         (Laughter.)

16         MR. SHORES:  Well our position is that as opposed

17    to a full-stop injunction against a merger of these two

18    small airlines, the Court should hold a remedy if it

19    determines there are any harms from this merger.  Which

20    we of course deny, I must add.

21         THE COURT:  I understand that.

22         MR. SHORES:  And if I could, your Honor, you know

23    let me cite a case.  I'll just read the language from

24    the **Ford Motor Company** case, 405 U.S. 562, this was from

25    1972, "The relief in an antitrust case must be effective

1   to address the violations and to restore competition.

2   The District Court is clothed with large discretion to

3   fit the decree to the special needs of the individual

4   case."  And I would also point the Court to the ***FTC vs.***

5   ***Pepsico*** case, that's 477 F. 2d 24, and that's a Second

6   Circuit case from 1973, where the Court made clear and

7   in fact ordered divestitures that were less than what

8   was sought by the government.

9        So if the Court has specific concerns about this

10  merger -- and again our position is that the merger

11  completely passes muster, but accepting your question,

12  your Honor --

13       THE COURT:  And that's really one of the reasons I

14  spoke, we're dealing with possibilities.

15       MR. SHORES:  Uh-huh.

16       THE COURT:  Let me give you another one which you

17  won't like, or the government won't like.

18       MR. SHORES:  Oh-oh.

19       THE COURT:  They want a permanent injunction here

20  in what, it seems quite clear to this Court, is a

21  dynamic industry facing unique opportunities and

22  challenges in this post-covid environment.  And that's

23  not saying very much, but it's dynamic.

24       All right.  If I were to fashion an injunction,

25  that's what you don't like, what sort of, um,

1    limitations or, um, steps for further consideration or

2    review should I build into it assuming that the economic

3    picture is not as the Court posits it?

4        MR. SHORES:  Well I think in terms of limitations,

5    if you look at the antitrust remedy cases, what they say

6    is that any remedy should be narrowly-tailored to the

7    concern at issue.  So it's difficult for me to speak --

8    you know to hypotheticals.  But I think the underlying

9    principle here is that the Court would have to tailor

10   any remedy to a specific harm, if found, in this

11   particular case.  And that should be narrow.

12       I mean, you know, the whole premise of this merger

13   is that we want to go out and compete broadly across the

14   country, we're a limited airline right now, we want to

15   go out and compete broadly across the country in order

16   to discipline the legacy carriers and bring down prices.

17   If the Court has a concern about any particular issue,

18   it could expose those to the parties, we could have an

19   evidentiary hearing, we could brief the issue.  There's

20   a lot of different procedural ways to address that.

21   But, yes, the Court would have the ability to narrowly

22   tailor a remedy to the particular concern that is at

23   issue.

24       (Pause.)

25       Now, your Honor, I would like to return, if I

1     could, to the issue of these other ULCCs that we've

2     talked about a little bit before, um, and the government

3     has said that these other ULCCs will not be able to,

4     quote, "replace Spirit."  And one thing that I think is

5     important, your Honor, is a "replace-Spirit" standard is

6     not the law here.

7          The Court asked instead whether there is a remedy,

8     and here this is what we've done, a divestiture remedy,

9     that would promote competition system-wide after the

10    merger, "system-wide after the merger."  And those

11    aren't my words, that's the government's words from the

12    *American U.S. Airways* case.  And if you look at Slide

13    35, JetBlue in fact was a beneficiary of those

14    divestitures.  And the reason the government promoted

15    those is because they provided JetBlue the ability, the

16    incentive to increase and invest in our business and

17    position JetBlue to be a more meaningful competitor

18    system-wide.  So the government's idea that a remedy

19    here has to replace competition on a route-by-route

20    level is simply not the law.

21         In fact, your Honor, I would point you to a recent

22    decision by Judge Nichols in the *United Health* case in

23    the District of Columbia.  And in that case the

24    government said the divestiture has to "completely

25    replace the competition lost as a result of the merger."

1    And what Judge Nichols said there is that that violates

2    the language of Section 7.  And instead, what we're

3    looking to do here is to stimulate competition

4    long-term, not ask a question of whether, you know, it's

5    going to completely replace competition, because that's

6    a burden that practically defendants could never meet.

7        And so what do we see out there in the competitive

8    landscape today?  Well we have Frontier, who's grown

9    rapidly in the last several years.  You heard

10   Mr. Biffle, he said they want to grow at 15 to 20

11   percent.  He said that they do have the ability to go

12   out and get additional planes.  Collectively the ULCCs

13   have 156 planes that they are going to receive just

14   through 2025.  He talked about the leases.  He talked

15   about the options.  And he talked about the ability to

16   redeploy from other routes.

17       Now the government has really painted this point-

18   in-time view, a snapshot in time of these other ULCCs,

19   and I just want to address that quickly.  Because if you

20   look at the other ULCCs, it's important to look in the

21   future to their replacement opportunity, because that

22   goes directly to your core question here.  And

23   particularly look at the divestitures at Fort

24   Lauderdale, at Boston, in New York, those are going to

25   turbocharge the ULCCs, Allegiant and Frontier, going

1    forward, say nothing of the other ULCCs.

2         Now the other thing the government has said is

3    that we don't yet have regulatory approval for those

4    divestitures.  Well that's not surprising, your Honor.

5    I mean typically in these cases it would take some time

6    in order to get approval from the FAA or the local

7    airport authority.  And in fact in the American U.S. Air

8    merger, the government supported the divestitures even

9    before there had been any approval by the local airport

10   authorities or the FAA.

11        And as Mr. Gale testified, regardless if we have

12   to contractually, and we do, give these assets back to

13   the airport authorities, the airport authorities are

14   going to use these assets, they're going to give them to

15   the companies, the airlines that best will promote the

16   community and competition.  So again in the long run

17   this is going to benefit competition, these

18   divestitures.  And they are -- you know, we would say,

19   even more significant, when you take the relative size

20   of this deal, than other airline mergers, big airline

21   mergers where the government itself has supported these

22   divestitures, your Honor.

23        Now if I could, your Honor, I would like to talk a

24   little bit about Dr. Chipty because the government

25   relied on her analysis to say that there won't be any

1    entry.  And Dr. Chipty did an analysis that focused on

2    the ordinary course.

3         And if we could go to Slide 46, your Honor.

4         So what was the government's answer to all of the

5    testimony on documentary evidence about entry?  Well

6    let's turn to Dr. Chipty.  And Dr. Chipty did not even

7    ask the right question, your Honor, she focused only on

8    the question of whether there would be entry in the

9    ordinary course?  Ignoring that airlines will have even

10   greater incentives in the future if the merger closes

11   and if there is an increase in prices.  Although her

12   companion expert, Dr. Gowrisankaran, claims that prices

13   and profits will rise after the merger, she didn't

14   account for that at all.

15        And I'd also point out, your Honor, if we could go

16   to the next slide.

17        THE COURT:  Well prices are going to rise after

18   the merger, aren't they?

19        MR. SHORES:  Well I think it depends, your Honor.

20   I mean when JetBlue goes into a route, they discipline

21   the prices of the largest carriers typically on these

22   routes.

23        THE COURT:  Well it was an inapt question.

24        The things as they stand today, there appears to

25   be a spectrum of prices from the premium price down to

1   at least the Spirit model which -- whose object seems to

2   be to undercut everybody else's prices.  If this merger

3   goes through, there will remain a spectrum of prices and

4   competition among the airlines that will go down to

5   Basic Economy and, um -- but it seems that the Spirit

6   model will be lost?

7        MR. SHORES:  Well the model itself will not be

8   lost, your Honor, Spirit itself is going to become part

9   of JetBlue.  But far from being lost as a model, you

10  have other ULCCs who are in the market and they're

11  growing.  And you mentioned Basic Economy too, your

12  Honor.  Basic Economy is growing.  And as we heard

13  Mr. Nocella say, United, on their Basic Economy product,

14  attempts to match Spirit on price.  And that's a

15  significant piece of this, your Honor.

16       The government has talked a lot in this case about

17  cost-conscious customers.  We've heard a lot of talk

18  about that in this case.  But it's very important, the

19  government did not define a market around just cost-

20  conscious customers, much less ones that just fly ULCCs.

21  And what the evidence shows is that the customers choose

22  between Basic Economy, ULCCs, and even JetBlue's own

23  Blue Basic product.  So far from the model going away,

24  that model is going to be there in the long run, your

25  Honor.

1    In fact we've seen a transition in this industry

2  where Spirit was one of the earlier adopters of the ULCC

3  model, but after that time the model is adopted by the

4  legacies, other ULCCs recognized an opportunity and they

5  grew into that model, and now if you look out into the

6  government's timeframe for entry, 2 to 3 years, which

7  is, you know, timely entry according to the government,

8  in 2027 we're going to have at least 8 airlines offering

9  some type of unbundled model.

10    So the model itself is here to stay.  Spirit will

11  not be part of that particular model going forward, it

12  will be part of JetBlue, and we will take the assets and

13  we will retrofit them and we'll use them.  But the model

14  itself will be there.

15    And one other point about timing that I think is

16  important to just keep in mind.  As you remember, that

17  JetBlue is going to take time, has to take time to

18  retrofit these planes.

19    Now you heard the testimony from Ms. Hurley,

20  JetBlue's CFO, and as a practical matter JetBlue has to

21  do things like get a single operating certificate, and

22  it's going to take at least 12 to 18 months -- and this

23  is on Slide 13, your Honor, it's going to take at least

24  12 to 18 months to retrofit these planes, which means in

25  the meantime the Spirit aircraft are still going to be

1    flying in the Spirit configuration.  12 to 18 months the

2    retrofit process will begin and in 4 to 5 years the

3    retrofit process will be complete.  But overall the

4    Spirit yellow planes are going to continue to be in the

5    market for some period.  And that's important because if

6    you look out several years, what that means is they will

7    continue to be there, but also it gives time for these

8    other ULCCs to grow and fill the void.

9         If we can flip the slide, Mr. McCloud, that's what

10   we see in the next slide here, is the unbundled low-fare

11   offering, something that may have been unique many years

12   ago has now been effectively commoditized.  And although

13   there are somewhat differences between the different

14   airlines and in what exactly they do when they unbundle,

15   there's no question that they're all going after the

16   same basic customer here.

17        And again the government could have had its

18   experts do an analysis, do the work and say "Hey, there

19   are some of these customers, there is a market -- to use

20   the antitrust word, there is a market of people who just

21   fly the ULCCs," but they didn't do that.  In fact their

22   theory of the case was completely opposite, they asked

23   witness after witness "Did it, Spirit, in fact spur the

24   unbundled model?"  And the answer is "Yes, they did."

25   They were part of that.  So where we are today and where

 1    we are going to be in the future, which again is the

 2    most important question, is Spirit planes are going to

 3    continue to fly and others are going to continue to grow

 4    this unbundled offering over time.

 5         THE COURT:  You have 15 minutes left.  I don't

 6    know how you split it with Mr. Cohen, but there's 15

 7    minutes left in the hour, so.

 8         MR. COHEN:  I'll give you another 3 minutes,

 9    Mr. Shores.

10         (Laughter.)

11         MR. SHORES:  Mr. Cohen, I thank you.

12         THE COURT:  No, it's entirely up to you.  I just

13    want to remind you.  That's all.

14         Go right ahead.

15         MR. SHORES:  Sure, your Honor.  I would like to

16    address one more issue and then make some closing

17    remarks.

18         Which is the government has relied very heavily,

19    and I'm sure you're going to hear it in a moment, on

20    some deal modeling, particularly synergy's modeling from

21    before the merger agreement was signed, but as Eric

22    Friedman from JetBlue explained, this model was an

23    attempt to just value the company, it wasn't a business

24    plan going forward.

25         Mr. Friedman made clear he didn't even attempt to

1    account for important things, like the JetBlue Effect,

2    you know, or entry of other airlines going forward, in

3    this pricing study.  And even the plaintiffs' own

4    experts, like Dr. Gowrisankaran, recognized that those

5    are part of any pricing analysis.

6         In effect, your Honor, like the focus on the

7    Spirit flight decks I'm sure you're going to hear about

8    or the deal modeling, those are shortcuts, and the focus

9    here should be on what the evidence will be going

10   forward about future pricing.  Those prices that are

11   built into that modeling and the modeling simply is not

12   evidence of what the future will be and what the Court

13   should rely on.

14        So let me just say in closing, your Honor, that

15   I'd like to return to where I did in my opening.  The

16   simple fact and economic reality is that scale matters

17   in this business, and particularly, your Honor, where we

18   sit today, it's very difficult for the small airlines to

19   compete.  In fact you may have seen this weekend we had

20   two other small airlines, Hawaiian and Alaska announced

21   that they too are merging.  And the reality for the

22   small airlines in this business is that they need the

23   ability, they need the scale, they need the network

24   breathe to be able to compete with the larger airlines.

25        And Section 7 has a very specific mandate, it

 1    prohibits mergers where and only where the government

 2    proves with record evidence there would likely be a

 3    substantial lessening of competition in the future.  And

 4    far from a substantial lessening of competition, the

 5    record here demonstrates that JetBlue has been a 20-year

 6    maverick in this industry, and this merger will provide

 7    the scale to become a viable, disruptive, big national

 8    challenger to the industry's dominant airlines for years

 9    to come.

10         Thank you, your Honor.  I'm going to yield to

11    Mr. Cohen.

12         THE COURT:  Mr. Cohen.

13         MR. COHEN:  Good morning, your Honor.

14

15    CLOSING ARGUMENT BY MR. COHEN:

16         I'm going to start where the Court started with

17    Mr. Shores in talking about the burden and the framework

18    because much of what I want to say focuses on this

19    3-part framework, and really the second part, that

20    assuming the government has come forward with enough

21    evidence to have a presumption, how is that presumption

22    erased and how low is the burden?  And there are really

23    two principle parts.

24         One, I want to take from Mr. Shores's deck Slide

25    9, and this is the question, your Honor, that you raised

1    of dynamism, and we can start with the government's own

2    evidence, which is Dr. Chipty, who showed that there

3    are, over in this 5-year period -- and this is Slide 9

4    of the JetBlue deck, 4700 entries just by the ULCCs.

5         Now the significance of that, your Honor -- and if

6    we just look at Slide 10, which is Dr. Hill's companion

7    piece.  The significance of that is that are the

8    government's statistics about market share reliable?

9    How do you have a reliable market share analysis in an

10   industry that is this dynamic?  And that is how the

11   government's case, with respect to proving

12   concentration, falls apart in the second step of the

13   *Baker Hughes* burden.

14        The other problem that they have is

15   Spirit-specific, and I'll turn to my deck now --

16        And if we go to the next slide please.

17        And, you know, the principal issue here with

18   respect to Spirit is the government's been focused on

19   the past.  Their evidence is backward-facing when

20   Section 7 and general dynamics is all forward-looking.

21   They want you to look at projections and performance and

22   a Spirit model, which, yes, it did invent, but which has

23   been widely copied, but those facts and circumstance in

24   that model have been superseded by the economic and

25   competitive realities that Spirit is facing today.

1        So the question is not was Spirit really

2    successful in 2015 or '16 or '17 when it had very little

3    ULCC competition, Basic Economy was in its infancy, and

4    it had essentially created this model in the United

5    States, the question -- and there's no dispute between

6    us and the government, is what will the competitive

7    realities look like over the next 2 to 3-year period?

8    And what the government promised in its opening and it

9    failed to deliver on is it promised that Spirit's

10   historic growth was the best barometer of how it will

11   compete on a going-forward basis.

12       But what the evidence shows, your Honor, is that

13   Spirit -- the past is not prologue.  At least if what

14   the past is supposed to be a proxy for is a rapidly

15   growing and profitable airline, because unfortunately,

16   because of the competitive involvement, that is not

17   Spirit today.

18       And, you know, the government's view of Spirit is

19   really -- and the historical view is really best

20   exemplified by their continual repetition of a single

21   statistic.  We saw it in the complaint.  We heard from

22   Dr. Gowrisankaran.  And what they say over and over

23   again is that Spirit has grown so rapidly over the last

24   13 years, and this is the growing and dynamic airline

25   that JetBlue was trying to take out of the market.

1        You know it's true, you Honor, beginning in 2010

2    when Spirit had a few dozen planes, they did grow

3    rapidly from a small airline to a still small airline

4    with 4 percent of revenue but with 200 planes, but it is

5    not sufficient for Spirit to prosper in this competitive

6    environment going forward.  And Spirit has recognized

7    this since 2016.  Your Honor may remember some version

8    of this slide from the opening and Mr. Christie's

9    testimony, Spirit has been seeking a merger since 2016

10   for the same reason it ultimately decided to merge with

11   JetBlue, which is that it needs scale and size to

12   compete with the Big 4 airlines, particularly given the

13   change in business model of the Big 4 airlines.

14       And if we go to the next slide, please.

15       What the government ignores is there's just been

16   an explosion in ULCC competition.  And Spirit has been

17   listing this as a risk factor in its securities filings.

18   And this is the 2022 10K, "Our growth and success of our

19   ULCC business model could stimulate competition in our

20   markets through our competitors' development of their own

21   ULCC strategies."  And it goes on to say in the same

22   paragraph, "If these competitors adopt and successfully

23   execute a ULCC business model, we could be materially

24   and adversely affected."  That is precisely what's

25   happened.

1          Mr. Nocella from United testified about the

2     "growing nature that 12 percent of this vast fleet of

3     United planes that it devoted to ULCC competition by way

4     of Basic Economy."  There's a huge order book at

5     Frontier "Which is flying on top of," Mr. Christie

6     testified, "Spirit's routes almost 50 percent of the

7     time."  We have a growing Avelo.  We have new entrants

8     in this space.  We will see from the documents that

9     American and Delta similarly have vast Basic Economy and

10    growing Basic Economy competitors to Spirit.  And that

11    has left us in a completely different place.

12          And where it has left us, if we look at Slide 6,

13    please, is that the net margin of Spirit peaked in 2017,

14    the year, probably not coincidentally that United and

15    American interjoined Delta with an introduction of Basic

16    Economy, JetBlue and Alaska followed, and the profit

17    margins required by Spirit to fuel the future growth,

18    which the government says Spirit will undergo, peaked

19    then and declined, and they declined even before covid.

20    And as the Court will recall from the testimony of

21    Mr. Christie, Spirit lost more than $1.3 billion in the

22    period 2019 through 2022, and it's on pace to lose

23    another $475 million.  Pretty soon it's real money,

24    almost $2 billion.

25          Now at trial the government -- and I think we'll

1    hear it today, they've tried to freeze the facts and in

2    their opening they said "You'll hear evidence from

3    Spirit's Chairman that Spirit has a healthy standalone

4    plan it expects to be profitable."  Well the government

5    again didn't meet its promise.  What Mr. Gardner and the

6    other Spirit executive said is that Spirit did have a

7    plan to be profitable, of course it did --

8            THE COURT:  5 more minutes, Mr. Cohen.  Go right

9    ahead.

10           MR. COHEN:  Yes.

11           -- but rapidly changes in Spirit's business over

12   the course of 2023 have left it without a certain path

13   to profitability.

14           If we go to the next slide, you'll recall

15   Mr. Christie was examined in some length about this

16   budget document in 2022, and as he said, "Virtually

17   every risk to Spirit's business that was identified at

18   the end of 2022 for this year have come to fruition."

19           And the two issues that have been particularly

20   significant for Spirit is, one -- if we go to the next

21   slide, the Pratt & Whitney engines, which is uniquely a

22   Spirit issue, your Honor.  Mr. Christie testified that

23   it is the largest customer for the Pratt engines in the

24   United States.  And 45 of -- over 20 percent of Spirit's

25   fleet will be on the ground next year.  72 airplanes by

1    2025.  And there's no easy fix, your Honor, these

2    repairs are time-consuming.  And the impact on Spirit's

3    operations and finances will be substantial.

4         Second, and this got a little less air time at the

5    trial but it is in the record, is what Spirit described

6    as an "acute reduction in demand."  And this is why the

7    Spirit model, the historical model, is not today's

8    model.

9         Now the government, in its examination of various

10   witnesses, it mistakenly pointed to load factor, what

11   percentage of the plane is filled, and they said, "Oh,

12   Spirit, you have a robust load factor, your planes are

13   still full, all must be good."  But what that misses is

14   that Spirit can only fill planes at prices that today

15   cannot generate a profit.  And this quote in the bottom

16   right of Slide 11, from the third quarter Q of Spirit,

17   is that "Fares have come down 27 percent year-on-year."

18        Now you cannot continue to grow an airline losing

19   money.  The effects of 4 years of massive losses have

20   rippled through the Spirit business.  Spirit has

21   unilaterally cut its plan to grow its fleet.  It worked

22   out a deal with Airbus to defer delivery of aircraft.

23   And while it did adopt a new 5-year plan only 6 months

24   ago -- only 6 months ago, you know as Mr. Kirby

25   testified, the plan is no longer realistic.  It's not

1    going to happen.  And as Mr. Kirby and Mr. Klein

2    testified, "Spirit is cycling in and out of routes.

3    It's dropping unprofitable routes.  It's searching for

4    profitable ones.  The plan was just a plan.  It's not

5    being executed on."

6        Now the evidence also shows that Spirit is really

7    in unchartered waters and the importance of this is

8    should you rely on historical Spirit statistics?  But

9    what Mr. Christie testified -- neither Mr. Christie nor

10   Mr. Gardner was willing to speculate at the trial as to

11   whether Spirit is likely to return to profitability, but

12   Mr. Christie did make one thing crystal clear, that an

13   airline that is unprofitable cannot continue to grow.

14   As a result, as he testified, "Everything is on the

15   table."  Mr. Gardner's take was even starker, "Spirit's

16   business model is not sustainable if the losses of the

17   past 4 years continue."  And this is not a trivial

18   issue, your Honor.  And I know time is very short, but

19   it goes to the heart of the government's case because it

20   undermines all of the market statistics that the

21   government relies upon and its experts rely upon.

22       And if I can end on this last slide.  If we look

23   at Dr. Gowrisankaran and Dr. Chipty, what we see is they

24   assumed that Spirit would grow 16 percent a year, they

25   assumed Spirit would enter 100 routes between 2022 and

1  2027, they assumed that Spirit was loathe to abandon the

2  routes that it currently flies, none of that, your

3  Honor, is true.  None of these statistics work.  And

4  which is why that even apart from entry, which in and of

5  itself defeats the government's case in this dynamic

6  industry, the statistics about market share which the

7  government relies upon to show that this merger is

8  anticompetitive simply do not hold up on a going-forward

9  basis.

10         THE COURT:  Thank you.

11         We'll take a 10-minute recess and return for the

12  government's closing.  We'll recess.

13         THE CLERK:  All rise.

14         (Recess, 10:05 a.m.)

15         (Resumed, 10:20 a.m.)

16         THE COURT:  Mr. Duffy.

17         MR. DUFFY:  All right, thank you, your Honor.  May

18  I proceed?

19         THE COURT:  You may.

20

21  CLOSING ARGUMENT BY MR. DUFFY:

22         Your Honor, Congress passed the Clayton Act to put

23  a stop to mergers exactly like this one.  The

24  prohibition in the Clayton Act is simple but compelling,

25  any merger that may have the effect of substantially

1    lessening competition is unlawful.  This means that any

2    merger with a reasonable probability of harming

3    competition in any single market, as this one does

4    across hundreds, should be enjoined.

5         THE COURT:  What's your authority for reasonable

6    probability here?

7         MR. DUFFY:  Your Honor, if we go to slide -- let

8    me see.  Slide 3, your Honor.

9         THE COURT:  Yes, got it.

10        MR. DUFFY:  The actual language used here is

11   "appreciable danger."  So this is a case from Judge

12   Posner, **_Hospital Corporate America v. FTC_**.  "All that is

13   necessary is that the merger create an appreciable

14   danger of such consequences, in the future, of harm."

15   And this stems directly from the text of Section 7 of

16   the Clayton Act, your Honor, that it speaks of a

17   transaction that may have the effect of substantially

18   lessening competition.

19        And here JetBlue and Spirit are asking this Court

20   to bless a deal whose harm would be felt by more than

21   145 million passengers each year who fly on hundreds of

22   routes.  This deal may serve defendants' bottom lines,

23   but it comes at an unacceptable cost to those travelers

24   for whom a destination matters far more than the

25   journey.  Those travelers benefit from Spirit's low

1    fares, it's innovative business model, and the choices

2    it empowers them to make.

3         THE COURT:  But we're not going to get anywhere if

4    you win, I enjoin this merger, and Spirit goes belly up.

5    No, um, immediate prospect of that.  But don't I have to

6    look out into the future?  Aren't they right about that?

7    We're making predictions.

8         MR. DUFFY:  They're certainly right, your Honor,

9    that it is appropriate to look out into the future, but

10   the simple fact of the matter is that if we go to Slide

11   17, we've heard testimony from Mr. Christie, from others

12   about Spirit's recent financial problems, but we should

13   look to what Spirit has been telling its investors just

14   in the last few months.

15        In the second quarter earnings call held just in

16   August, Mr. Christie, anticipating the problems that

17   Spirit would have in the third quarter, said to his

18   investors, "I strongly believe our expected Quarter 3

19   performance is an anomaly."  In every SEC filing, Spirit

20   has continued to tout its ability to return to

21   profitability.  Mr. Biffle, when he testified, said that

22   he expects that Frontier will return to profitability.

23        So the testimony from witnesses who are not party

24   witnesses and what those witnesses have been telling

25   their own investors is clear, there is nothing wrong

1    with the ULCC business model.  Spirit is still
2    projecting to grow 14 percent this quarter, 7 percent
3    next quarter.  So there is no evidence to support this
4    notion.
5        And I will note, your Honor, that there is legal
6    authority as to what defendants would have to show in
7    order to make this argument.  It's referred to as a
8    "weakened competitor defense."  And the Sixth Circuit
9    has described it, if we turn to the next slide, as "The
10   Hail Mary pass of presumptively doomed mergers."  And it
11   is simply the case, your Honor, that there is no
12   evidence that Spirit is in any danger of folding up any
13   time soon, at most its growth is going to slow to some
14   degree.  But it is still looking to grow at a faster
15   rate than JetBlue would plan to grow independently or as
16   a combined company should it acquire Spirit.
17       THE COURT:  Suppose -- just to follow out that
18   line, though there's many other issues and I want to
19   hear you develop them.  You are asking for a permanent
20   injunction here.  Don't you think I ought build in some
21   future review or, um, way to, um, see if whatever
22   determinations I make here, even were you to be
23   successful, can be rethought if, um, my assumptions are
24   incorrect?
25       MR. DUFFY:  Well I think, your Honor, that that

1    type of injunction obviously requires a finding of

2    liability in the first instance, and I simply think this

3    deal, as it exists now under the market conditions that

4    are likely to persist for the next several years, if not

5    indefinitely, are such that this merger could not be

6    anticompetitive at any time in the foreseeable future.

7            THE COURT:  Could not be procompetitive.

8            MR. DUFFY:  Could not be procompetitive, would be

9    anticompetitive, yes.

10           THE COURT:  Right.  Right.

11           But that doesn't answer my question about what

12   sort of trip wires should I -- I mean this is a softball

13   question, this question jumps to the end and presumes

14   the government prevails here.  I'm having trouble with a

15   permanent injunction candidly.

16           MR. DUFFY:  Sure.  Why I think just mechanically,

17   your Honor, the terms of the agreement in front of the

18   Court are such that the deal would need to close in July

19   of next year.  So under the terms of that proposal --

20           THE COURT:  So this deal falls apart, I appreciate

21   that.  I mean obviously if you will obey the Court's

22   order.  But then what?  Maybe a permanent injunction is

23   too restrictive, that's what I'm suggesting.  And I'm

24   asking you to grapple with the idea that I come to think

25   that even were you to win, which is just also another

1    assumption.  But we jump to the end there.  What sort of

2    limitations should I put on it?

3         MR. DUFFY:  Well I think, your Honor, that the

4    injunction would be limited to the deal that is

5    presently in front of the Court.  So I don't know that

6    at some point --

7         THE COURT:  So another deal is another case?

8         MR. DUFFY:  Another deal would be another case,

9    right, your Honor, I think that's definitely fair to

10   say.

11        THE COURT:  Thank you.  Go right ahead.

12        MR. DUFFY:  Sure.

13        So returning to the evidence of harm, um, the

14   evidence is concrete, your Honor.  So Mr. Shores has

15   spoken in terms of possibilities of what could happen in

16   terms of entry by other carriers, the effects of

17   divestitures, efficiencies that JetBlue has put forward,

18   but the Court should keep in mind that the harm that has

19   been demonstrated by the evidence is concrete, it is

20   real, it's certain to happen.  This transaction would

21   result in the elimination of half the ultra-low-cost

22   carrier capacity in the country, over 6 million fewer

23   seats in flights each year, 30 percent higher fares

24   market-wide.  Those are concrete certainties.  And in

25   response, the defendants have offered speculation,

1    inconsistencies, and misdirection.

2         JetBlue has both claimed that without this merger

3    it can't grow fast enough to take on the Big 4, and yet

4    at the same time Frontier and Allegiant would have no

5    issue growing fast enough to replace Spirit.  JetBlue

6    claims that both entry and the threat of entry are

7    enough to stop price hikes, and that this deal, um,

8    would facilitate 30 percent price increases.  So

9    JetBlue's own deal-modeling, which we'll discuss, is

10   premised on the belief and evidence that other ULCC

11   entrants would not be able to enter the affected routes

12   to offset those price increases.  JetBlue's attempts to

13   minimize the anticompetitive consequence of this deal

14   are belied by the facts and the law.

15        THE COURT:  Now since you've raised the deal-

16   modeling, how do you respond to the argument that's

17   thought to debunk that, that the deal-modeling was,

18   quote, "different" or for more modest purpose?

19        MR. DUFFY:  Sure.  So I think the important thing

20   to remember, your Honor --

21        If we can go first to Slide 49 here.

22        The important thing to consider is that the

23   deal-modeling was presented -- 49.

24        The deal-modeling was presented to JetBlue's board

25   of directors, it was presented to Goldman Sachs, which

1    issued a fairness opinion, to give comfort to JetBlue's

2    shareholders that the price being paid at a significant

3    premium over Spirit's share value was fair from the

4    standpoint of JetBlue.  And so what Mr. Friedman did is

5    he looked at actual events in which Spirit exited routes

6    and the impact on fairness.  And what he found was a

7    30-percent fare increase that persisted over at least a

8    12-month period.  So that fare increase was not

9    sufficient to facilitate the entry of other ULCC

10   carriers that could lower the fares.

11        And why was that important?  That 30 percent fare

12   increase that Mr. Friedman analyzed was the basis for

13   JetBlue's estimation of certain revenue synergies the

14   transaction would create.  So the synergy is the

15   additional amount of revenue that JetBlue would earn

16   were it premised on this 30 percent fare increase.  And

17   that revenue-synergies modeling was presented to

18   JetBlue's board of directors.  The number baked in for

19   the Customer Service Premium, which JetBlue projects

20   remaining at $400 million a year, well into the future,

21   and is strong evidence that JetBlue themselves do not

22   believe ULCC entry will happen at a sufficient scale to

23   offset this harm.

24        So that is the evidence that shows that JetBlue

25   themselves bet $3.8 billion in the purchase price that

1    they paid, plus the debt they're taking on, that that

2    entry by ULCCs would not happen and they would have this

3    fare increase that would persist indefinitely into the

4    future.

5         And, your Honor, if I may turn to the legal

6    standards.

7         If we go to Slide 2.

8         There is an important clarification I think to be

9    made in the way the burdens and the analysis that the

10   Court must conduct has been framed.  As the Court has

11   recognized, Section 7 is forward-looking and it's

12   looking at the list of anticompetitive effects.  I

13   mentioned the Judge Posner case.  Another case that I

14   would mention for the reasonable probability standard is

15   *Brown Shoe*, a U.S. Supreme Court case.

16        And I want to turn to the burden-shifting

17   framework which has been discussed.

18        If we go to the two slides forward, please.

19        And I just want to explain what our prima facie

20   case is, how this structural presumption works.  Given

21   the amount and the extent of harm, this case has been

22   presented differently than some cases like *Baker Hughes,*

23   for instance*.*  In *Baker Hughes*, the government relied

24   only on a structural presumption of increased shares in

25   particular markets.  That structural presumption is part

```
 1    of our case.  There are 51 nonstop markets where the
 2    shares aren't that high but the structural presumption
 3    applies.  But there is also direct evidence, so things
 4    like the fare increases that have been projected by
 5    ordinary-course documents, the loss of a particular
 6    choice that many customers do rely upon, the evidence of
 7    coordination, a wide-body of direct evidence that
 8    strengthens the prima facie case, and that is in
 9    addition to the structural presumption.
10         The next step is defendants' rebuttal.  Now where
11    the structural presumption applies, the defendants have
12    a particular burden, they must come forward with
13    significant evidence that mandates the conclusion that
14    the merger does not threaten a substantial lessening of
15    competition.
16         THE COURT:  And the language that mandates the
17    conclusion comes from?
18         MR. DUFFY:  That is from, I believe, um -- I'll
19    have it for you in a moment, your Honor.
20         THE COURT:  All right.
21         And then the ultimate question --
22         MR. DUFFY:  Sure.  So the ultimate question -- and
23    this is where the burden is particularly important, the
24    standard is particularly important.  The government does
25    have the burden of persuasion, but it is not a
```

1    preponderance of the evidence standard.  Because of the

2    reasonable probability language the Supreme Court used

3    in **Brown Shoe,** the "appreciable danger" language Judge

4    Posner discussed in his opinion, and the text of Section

5    7 itself, because the government is showing an

6    appreciable danger or a reasonable probability, it is

7    not what a preponderance-of-the-evidence standard would

8    be in other cases.

9        THE COURT:  Well wait a minute.  This really is

10   important.  It's -- I'm familiar with fair preponderance

11   of the evidence, proof beyond a reasonable doubt, clear

12   and convincing evidence.  Let me say it back to you

13   having looked at the language of the statute.

14       If we get to Step 3 -- and now correct me here

15   because I think I'm saying back to you something

16   different than you just said.  I do believe it is the

17   government's burden to convince the Court by a fair

18   preponderance of the credible evidence that there is a

19   reasonable probability that the merger -- and you have

20   dropped out the word "substantially," which Mr. Shores

21   was, um, emphasizing, but let that by for the moment.

22   But do you see -- do you see it isn't a difference?  I

23   fully accept -- and I'll have to reflect on

24   "substantial" here, but the language in the statute.

25   But I'm telling you, it's your burden to convince the

1    Court as factfinder that by a fair preponderance of the

2    evidence -- and again that's one of the reasons I'm

3    hesitant about a permanent injunction, but maybe you've

4    answered that because that just destroys this merger not

5    any merger.  Do you see where I'm coming from here?

6         MR. DUFFY:  Yes, I understand the Court's

7    articulation and I think that is an entirely fair way to

8    look at it, that the government has the burden to prove

9    by a preponderance a reasonable --

10        THE COURT:  But the standard is as you perhaps --

11   as you recite it?

12        MR. DUFFY:  Yes.

13        Now I will point out there are some caveats to

14   that and that the defendants do have production burdens

15   once the presumption has been met structurally to come

16   forward with certain evidence, which is particularly

17   important for some issues that we can discuss.

18        THE COURT:  I fully agree.

19        MR. DUFFY:  Right.  Okay.  I think we're on the

20   same page, your Honor.

21        If we go to Slide 8, if we can.  Um, and sorry,

22   Slide 7 first.

23        Briefly on the issue of relevant markets.  I think

24   the Court has correctly cut to the core of this issue.

25   And I did want to mention the **_Florvac_** case from the

1   First Circuit, which notes that it's the consumers'

2   options and the consumers' choices on which the relevant

3   market analysis obtains.  So quite obviously a passenger

4   is not going to view a flight from Boston to Las Vegas

5   as a substitute for a flight from Boston to San Juan and

6   what have you.  We think the evidence on this issue is

7   quite clear.  JetBlue just last year in the *Northeast*

8   *Alliance* case agreed origin and destination pairs are

9   the relevant markets.

10         I do want to respond though to the Court's concern

11   that defining the markets around origin and destination

12   pairs in no way limits the evidence that the Court can

13   consider.  The Court can obviously consider all of the

14   relevant evidence that has come in.  The issue is are

15   consumers in these particular markets harmed?  So this

16   market definition framework, it guides the Court's

17   analysis as opposed to limiting the evidence.

18         THE COURT:  I've -- you've answered the question I

19   had.  And so you agree that it's appropriate for me to

20   consider the national procompetitive and anticompetitive

21   effects as I am persuaded by the evidence?

22         MR. DUFFY:  To the extent that they would affect

23   those markets, absolutely, your Honor.  So all the

24   evidence of coordinated effects, which we'll get to, is

25   a good example of something that cuts very much across

1   markets.

2          And if we go now to the types of markets that we

3   have defined, there are three general categories.

4          If we look to Slide 8.

5          I just want to go through specifically the markets

6   we're talking about.  There are 262 routes where JetBlue

7   and Spirit currently fly, where they compete

8   head-to-head, where there would be a loss of

9   head-to-head competition.  There's an additional 115

10  routes that Spirit flies nonstop today where JetBlue is

11  not completing directly head-to-head against Spirit.

12  And there are additional routes that Spirit plans to

13  enter.

14         If we go to the next slide, just to briefly go

15  through the types of evidence of harm that we see, in

16  all these routes we see harm that will manifest in the

17  loss of the Spirit effects or the significant decline on

18  fares market-wide that would result from the elimination

19  of Spirit, or the loss of the Spirit product itself on

20  which cost-conscious customers depend, the loss of

21  innovation that Spirit has brought to the marketplace,

22  and in the overlap routes we have the additional harm of

23  a loss of head-to-head competition, which results in

24  significant harm that can be estimated which

25  Dr. Gowrisankaran has.  And I would just note that --

1          THE COURT:  Now wait a minute.  I mean no

2     disrespect to Spirit here, who was a leader in the

3     ultra-low market, but I'm not clear about innovation.

4     Mr. Cohen argued, and with some effect I think, that the

5     model has now reached fruition, others can compete using

6     this model.  What innovation are we talking about?

7          MR. DUFFY:  Sure.

8          THE COURT:  Go ahead.

9          MR. DUFFY:  Let me give you an example of that,

10    your Honor.

11         So you focused correctly on Spirit is trying to

12    cut costs right now in any way it can.  Many of the

13    innovations that Spirit has developed have been in

14    response to that pressure to cut costs and they have in

15    fact benefitted the customer experience.  So the self-

16    service bag drop is a good example of that where Spirit

17    was able to save on labor costs, it allowed customers to

18    drop off their bag using biometric information and other

19    things, and they have found that customers appreciate

20    that, shorter lines, it's easier to get through the

21    airport more quickly.  And the nature of innovation is

22    such that we don't know what the next innovation will

23    be, but there's no basis to conclude that the current

24    environment of difficulty returning to profitability is

25    going to hinder the innovation that Spirit continues to

 1   bring.

 2         If we go to the next slide please.

 3         I want to briefly just touch on how much of the

 4   harm is occurring in the nonstop overlap markets.  We

 5   heard talk of 6,000 routes per year that are at issue

 6   across the country in terms of airlines.  The nonstop

 7   overlaps, there's only 73 of them, but they are big

 8   heavily-trafficked routes, routes like Miami to New

 9   York, Boston to Orlando, where many millions of

10   passengers fly each year.  So 55 million passengers are

11   flying on these routes, $9 billion in revenue are spent

12   on these routes.  So although they're a relatively small

13   numeric amount of the total routes in the country, in

14   terms of dollars and passengers, they're quite large.

15         Go to the next slide please.

16         We've heard a lot about the issue of fluidity,

17   questions about whether the market shares statistics

18   presented gave a reliable prediction of the head-to-head

19   competition between JetBlue and Spirit.  And we heard

20   testimony from Mr. Kirby talking about the stickiness of

21   Spirit on particular routes, that they have been on

22   these routes for a very long time, especially the bigger

23   routes like those that I was just mentioning that they

24   served before Mr. Kirby joined the company.

25         If we go to Slide 13 please.

1          One of the things we heard from Mr. Clark was the

2     extent to which this overlap between JetBlue and Spirit

3     has grown over the years.  So, yes, there have been a

4     few routes that have dropped out since the merger

5     agreement was signed, but the trend that we see from the

6     data and the ordinary-course documents and the testimony

7     is that JetBlue and Spirit have been increasing the

8     extent to which they are competing head-to-head on these

9     particular routes.

10          And if we go to Slide 14.

11          There are 51, um, routes that meet the statutory

12     presumption where the market shares are so high after

13     the transaction that it is presumed illegal in those

14     markets.  Now of those there are 35 routes that have met

15     the presumption consistently over the last 3 years.  So

16     what the data is showing is sustained competition,

17     sustained high-market shares, between JetBlue and Spirit

18     on these many routes.  And again, these are the big

19     heavily-trafficked routes that millions and millions of

20     passengers travel on every year.

21          And if we go to the next slide please.

22          You heard some testimony from Mr. Friedman, an

23     exhibit was used, Exhibit 697, talking about various

24     exits and entries supposedly that had happened over a

25     1-year period, and what we found through the examination

1    of Mr. Friedman was that the vast majority of those

2    instances were very minor schedule and frequency

3    adjustments, instances like an airline that only flies a

4    a route during the summer and not during the winter.

5    And so what we saw was a substantial exaggeration of the

6    extent to which new carriers are truly entering these

7    routes.  And instead what we have seen is sustained

8    competition and presence by JetBlue and Spirit on the

9    presumption routes and very high market shares that have

10   been consistent over the last several years.

11        The other thing I would point out, your Honor, is

12   that defendants have pointed to divestitures as a simple

13   fix and a basis to cross out, um, many of these 51

14   routes solely because the divestiture buyer will be

15   flying from that airport to some destination, and we'll

16   get into that later.  But there's been no showing

17   whatsoever that any of those entries would happen on any

18   of those routes.  And in fact, concrete evidence that it

19   is highly unlikely to happen in many cases as with

20   respect to Allegiant.

21        If we go to Slide 20 please.

22        THE COURT:  Just a moment.

23        MR. DUFFY:  Yes.

24        THE COURT:  Why is it highly unlikely that

25   Allegiant will not compete effectively on those routes?

1      MR. DUFFY:  So there's two principal reasons I
2  would give, your Honor.  The first is that across all
3  routes the testimony from Mr. Wells was quite clear, and
4  Mr. Wells from Allegiant, that Allegiant does not have
5  any airlines competing with it on 75 percent of its
6  routes and that that has been quite consistent over the
7  last 5 years, and there's no expectation to change.  So
8  if Allegiant requires gates in Boston, it's not likely
9  to fly Boston to Orlando where there's several other
10  carriers flying, it's going to look at a flight from
11  Boston to perhaps Astro, North Carolina, or someplace
12  that it's going to be less heavily trafficked.  So they
13  won't restore the same competitive intensity and they
14  won't fly the same routes that Spirit does today.
15      THE COURT:  Is it not true that in order to
16  preserve competition, it is not required that all the
17  routes be flown at the same frequency as Spirit's
18  network?  That's so, isn't it?
19      MR. DUFFY:  Well I would say it's certainly not
20  necessarily the case that the routes would need to be
21  flown at the same frequency, what has to happen is that
22  the competitive intensity has to be restored and it does
23  have to be restored in all the markets that are
24  affected.  The Supreme Court has said most clearly.
25  **Philadelphia National Bank**, the Court again, just

1    following the text of Section 7, held very clearly that

2    harm in any single market is not just efficient, but a

3    deal must be enjoined.

4        THE COURT:  And any single market here that is a

5    nonstop between Point A and Point B, that is

6    presumptively illegal and has remained so?

7        MR. DUFFY:  Right, presumptively illegal and

8    remain so.  So, your Honor, this is not a situation in

9    which there is only one or two routes that the

10   presumption is met and there's no answer.  Indeed if

11   there was only 1 or 2, I would expect there may have

12   been a better divestiture proposal that could have

13   restored the harm.

14       I think the issue here is that because we're

15   dealing with so many markets, there is no divestiture

16   fix that could do that.  But the legal principle is as

17   your Honor articulated, that harm in any single market

18   is sufficient and necessary to enjoin the transaction.

19       And if we can talk just a bit more about the harms

20   at issue.  Slide 20, please.

21       We talked about the Spirit effect and one point

22   that I do think is important and bears mentioning, and I

23   mentioned 135 million passengers flying the routes that

24   Spirit flies each year.  Now not all of those passengers

25   fly Spirit, um, a relatively small percentage do, but

1    they fly other airlines and Spirit anchors the fares in

2    that marketplace.  So all those passengers benefit from

3    the Spirit Effect whether they're flying on Spirit or

4    not.

5         So the harm that this transaction will create is

6    much -- is in excess and disproportionate to Spirit's

7    small size, and that's a reason why fixating on the

8    relatively small share of passengers that Spirit has on

9    a national level is not the right way to think about

10   this transaction.  The right way to think about it is

11   how is Spirit's presence in markets today affecting

12   those markets?  And the answer is clear, demand is

13   stimulated, fares go down, when Spirit is in these

14   markets.

15        The second thing I would just point out, um, is

16   it's important to note that the average fares will

17   increase as a result of this transaction --

18        But if we go to Slide 21 please.

19        The Court should consider -- we haven't defined a

20   market around only cost-conscious or price-sensitive

21   travelers, the markets we're looking at are all

22   passengers that travel in particular origin and

23   destination pairs.  But we do think it is important that

24   the Court consider, and there's a legal basis to

25   consider, the loss of a particular choice that is

1   available for customers in those markets, and that

2   choice is the unbundled very low-price option that

3   Spirit provides.

4        The testimony was crystal clear on this point.

5   Spirit doesn't intend to be for everybody, it is there

6   for the cost-conscious travelers that otherwise could

7   not afford to travel at all or want to use the money

8   they saved for other things, whether that be, um, an

9   extra night accommodation on their trip, an activity

10  when they're out, or something completely unrelated to

11  their travel.

12       THE COURT:  But the same question I put to

13  Mr. Shores.

14       Suppose the Court were to find that if the merger

15  went through, nationwide now there would be more

16  competition and more fares would be lowered at some

17  percentage.  At what point does that benefit outweigh

18  the burden that you are now describing?  At no point?

19       MR. DUFFY:  Well, your Honor, we would say that

20  you cannot aggregate the harms and benefits across

21  different markets.  So comparing a fare increase on the

22  Boston to San Juan passenger with a fare decrease on Los

23  Angeles to San Francisco would not be an appropriate

24  balancing for the Court to consider.  The Court can look

25  at the average fares and see if they're going to go up

 1   or down.  We think the evidence here is quite clear that

 2   they would go up.  But I think the question the Court is

 3   fixated on is the harms cannot be balanced across

 4   markets.

 5          THE COURT:  I am not fixated on it.

 6          (Laughter.)

 7          THE COURT:  But something I think it --

 8          MR. DUFFY:  Focused upon, your Honor.

 9          THE COURT:  Right.

10          MR. DUFFY:  All right.

11          THE COURT:  And so that's why I, um, Mr. Shores

12   was arguing so strenuously for a national market.

13          MR. DUFFY:  And I think the answer to that is that

14   defendants have no hope of winning this case if the

15   markets are defined around particular origin and

16   destination pairs.  I still think, looking at the harms

17   across markets, that there is harm demonstrated in each

18   one of them.

19          I would point out that defendants mention

20   incorrectly that Dr. Gowrisankaran didn't quantify harms

21   in particular markets, he did.  Those Exhibits 842 and

22   843 are in evidence.  And they show on a market-by-

23   market basis what the amount of estimated harm would be.

24          He's testified correctly the harm is more

25   accurately measured at the national level only because

1    you have more data to look at.  So you're going to have

2    a more precise number because of that set of data.  But

3    he does present reliable well-substantiated estimates of

4    the harm in each of the hundreds of markets that are at

5    issue here.

6         But this loss of a particular product is something

7    independent and apart of the average fare that the Court

8    absolutely can consider in, um, analyzing whether this

9    transaction will result in harm.

10        The third harm I would mention, if you go to the

11   next slide, is the loss of seats.  This is something

12   that is quite unusual in transactions, your Honor.

13        Here we have explicit evidence that the

14   transaction is going to reduce the capacity in the

15   market.  We have concrete evidence based on JetBlue's

16   publicly-stated plans that there will be 6.1 million

17   fewer seats or more every year from taking Spirit seats

18   out of the aircraft.

19        Now JetBlue tendered an expert witness,

20   Mr. Scheff, to the Court, he went through an analysis

21   that attempted to offset that 6 million seats and he

22   couldn't do it, and there are numerous issues with that

23   analysis that the Court heard, using a

24   nonapples-to-apples comparison, not taking profitability

25   into account, there were numerous issues.  But this is

1    also getting to a central narrative feature of the case,

2    that the harms in this transaction are very concrete,

3    they're undisputed, and they are put against speculation

4    of things that might happen, things that don't have

5    support in ordinary-course business documents and are

6    instead based in unreliable speculation.

7         If we go to the next slide please.

8         I mention the innovation with respect to Spirit.

9    The other thing to point out is Spirit has grown very

10   quickly, an 8 percent growth rate between 2018 and 2023,

11   much of that during the heart of the pandemic, much

12   faster than every other airline at issue.  Frontier, the

13   other ULCC, is growing fast as well.  Showing that the

14   ULCC business model is robust.

15        THE COURT:  But they rebut that by saying those

16   days are gone.

17        MR. DUFFY:  Well right below that, like a lot of

18   this, we see what they are doing in the next couple

19   quarters.  They're still growing 14 percent this

20   quarter.  7 percent next quarter.  And this is the

21   change in available seat miles.  This is accounting for

22   the fact that they're going to have a significant amount

23   of their fleet grounded because of this NEO engine

24   issue.  So even with that, they are still growing year

25   over year.

1          And the NEO engine issue, Spirit has told its

2     investors it expects to be made whole.  At some point in

3     time there's going to be an influx of cash, how much we

4     don't know, the terms of it we don't know, but there

5     will be an ongoing commercial negotiation between

6     Raytheon, Pratt & Whitney, and Spirit with respect to

7     this issue.

8          I'd like to turn to coordinated effects, if we

9     can.

10          If we can go to Slide 26.

11          The Court indicated an interest in this issue when

12     Mr. Shores was speaking.

13          THE COURT:  I did.

14          MR. DUFFY:  Yes, and I am curious if there's any

15     questions.

16          THE COURT:  Yes.  Here's my problem.

17          I understand the role of horizontal merger

18     guidelines here and I understand very wise reasons the

19     government and the defense has played off that model.

20     It makes perfect sense for an enforcement guideline

21     model to include these coordinated effects.  Candidly

22     that makes less sense to the Court, which I think

23     appropriately doesn't presume wrongdoing.

24          Do you see my problem here?

25          MR. DUFFY:  Yes.  Yes.

1        THE COURT:  There's some evidence, there is, and

2   one would be warranted, this Court believes it is

3   warranted, in assuming that there is something more, um,

4   to this coordinated business than was demonstrated by

5   the relatively few instances you've come up with because

6   oligarchs operate that way.  And I mean no disrespect to

7   anyone, but the term fits here.

8        You've taken an enforcement manual, which given

9   the broad language of the statute, makes perfect sense

10  for everyone to play off, and you've used one aspect of

11  the enforcement model and said, "Well this is a reason

12  to stop them from becoming bigger."  Well I'm skeptical.

13  Go ahead, if that's worth addressing.

14       MR. DUFFY:  I think it is, your Honor.

15       And if we go to Slide 26.

16       I would just quickly point out that it's not just

17  the guidelines that are identifying the risk of

18  coordination as grounds to block a transaction, um, **FTC**

19  **v. Hines** is a case that has some similarities to this

20  one in which the ability to compete against a larger

21  competitor was put forward as one of the rationales for

22  the deal, um, involved the merger of the second and

23  third largest company, and their argument was that it

24  would enable them to better compete against the largest.

25  The Court recognized that the tacit coordination is an

1    issue and it is a central object of merger policy to

2    obstruct the creation or reinforcement by merger of such

3    oligopolistic market structures in which tacit

4    coordination can occur.

5        I think the important thing, your Honor, is that

6    coordination does not require ill intent or wrongdoing,

7    market structures can facilitate it whether companies

8    want to participate in it or not.  It is a difficult

9    situation to address in the context of Section 1, in the

10   context of post-merger enforcement actions, because an

11   agreement under Section 1 is required for enforcement

12   and that does make it more difficult.  So the structure

13   of markets is absolutely very important to enabling,

14   facilitating this degree of coordination, and the law

15   does permit the Court to take this into account and to

16   enjoin a transaction on this basis.

17       The Court is well-familiar with the ATPCO flashing

18   and the cross-market initiatives, and I need not address

19   that, I think, but --

20       THE COURT:  All right, you're making the point

21   that it's within the Court's power to take it into

22   account and indeed it's something that perhaps should be

23   taken into account.  I -- I'll tell you I remain

24   skeptical under these circumstances.

25       Go ahead.

1          MR. DUFFY:  Okay.

2          And I would, your Honor, like to turn to the issue

3     of entry, just if I can, because I do think it's quite

4     important for the Court to consider.

5          If we can just quickly go to Slide 36.

6          And we're talking thus far primarily about the

7     government's prima facie case and just this one point I

8     would like to point out that pertains to the legal

9     standards.  But if the government's prima facie case is

10    strong in addressing the respondent's rebuttal evidence,

11    as obviously ours did, the prima facie case is very

12    compelling and strengthened.  And under those conditions

13    the defendants' burden of production on rebuttal is also

14    heightened.

15         If we can go now to the next slide.

16         Before discussing entry, I do think it's important

17    to talk about what the testimony was from the party

18    witnesses.  The testimony came in loud and clear,

19    aircraft are in short supply.  Mr. Hayes testified that

20    direct orders from Airbus are not available until 2029

21    at the earliest.  He also testified, with respect to

22    leasing, that maybe you could get an aircraft in 2027.

23    So the leasing market is tight as well.  Pilots are not

24    as much an issue in the current time period, but they

25    were earlier.  And as airlines are trying to grow, being

1    able to grow pilots, aircraft, presence at airports, are

2    all things that are quite difficult to do.

3         Ms. Hurley testified that in discussing the

4    competitive rationale of this deal, the difficulty in

5    being able to grow quickly and organically by going out

6    and purchasing aircraft and hiring pilots, so JetBlue's

7    stated reason for needing this transaction to grow is

8    directly at odds with its argument that Frontier,

9    Allegiant, and others, can grow at astronomical rates

10   that have never been seen before in the industry.

11        If we go to the next slide, the legal standard.  I

12   want to talk through the legal requirements of what

13   defendants must show on this issue.

14        And again, defendants bear the burden of

15   production to show timely, likely, and sufficient

16   evidence.  They must come forward with the evidence that

17   would allow the Court to conclude that the competitive

18   intensity of Spirit would be replaced in a timely,

19   likely, and sufficient manner.  And I want to talk about

20   what each of these three requirements mean.

21        Timely.  The 2-to-3-year time period was used.

22   And the courts have thrown out a specific number as to

23   what the legal requirement is, 2 to 3 years has been

24   cited in a number of opinions.  I would say that --

25             THE COURT:  And you agree?

1          MR. DUFFY:  I agree there are a number of cases

2    that have said that --

3          THE COURT:  No, that you agree that that's the

4    time period that I ought be looking at here?

5          MR. DUFFY:  I would say that that -- to understand

6    whether competition will be restored, we do need to look

7    at what is going to happen when this deal closes?  And

8    immediately when this deal closes, Spirit ceases to

9    exist as an independent competitor, the pricing pressure

10   that it brings to bear in head-to-head markets will be

11   gone.

12         So I think the evidence has shown clearly that

13   entry is not going to happen within the 2 to 3-year

14   window, but if we're looking at is entry going to offset

15   the harm?  It really is less than 2 years, based on the

16   fare increases that would happen in the immediate, um,

17   aftermath of this transaction.

18         The second element is likely.  Now likelihood in

19   the context of entry, it's not framed in terms of a

20   numerical probability or something like that, it's what

21   does the evidence have to show?  And the evidence has to

22   show that entry is reasonably probable based off of the

23   profitability considerations that would have been

24   involved as well as the operational feasibility.  So

25   defendants would need to come forward with specific

1   evidence about particular routes that these entrants

2   would look at, how they would overcome barriers that are

3   particular on these routes that pose these types of

4   operational barriers, whether they would be sufficiently

5   profitable to attract assets away from other markets.

6       The other issue is sufficiency.  Is the entry

7   sufficient to constrain the harm from the merger?  So

8   the entry, it might not need to be 1 to 1 in terms of

9   seat for seat, but it has to be at a scale that is large

10  enough to offset the fare increase that would otherwise

11  occur.

12      And I'd like to go forward and address the

13  different entrants that defendants have suggested as

14  possibilities.

15      If we go to the next slide.

16      I want to briefly talk about Basic Economy, which

17  was suggested as one of the possible options to replace

18  Spirit, and the Basic Economy end with Southwest, it is,

19  um, you know in some sense telling that JetBlue is

20  claiming that this transaction will help it better

21  compete against the Big 4, it is simultaneously holding

22  up legacy Basic Economy and Southwest as a check on the

23  fare increases that would otherwise occur.  But as

24  Mr. Nocella testified, Basic Economy exists in a market

25  at a price that is a business decision.  The pricing of

1    Basic Economy is going to depend heavily on whether

2    there is a ULCC in the market.  Without Spirit or

3    another ULCC to anchor that Basic Economy price, it will

4    float up and be more or less the same level as Regular

5    Economy with perhaps a very slight reduction.

6            Southwest is the next entrant.

7            If we go to Slide 40.

8            Mr. Biffle testified clearly, Southwest is a

9    mid crossed airline, the data supports that.  Dr. Hill

10   acknowledged that, um, and this inconsistency was

11   apparent in defendants' arguments, that Southwest is one

12   of the Big 4, yet simultaneously held up as a likely

13   candidate for entry.

14           And I want to talk next about Frontier.  And

15   Frontier, I think the Court is correct to ask a number

16   of questions about Frontier, about Mr. Biffle's

17   testimony in particular.  Now he gave very colorful

18   testimony about scavengers on the carrier and so forth,

19   painting a somewhat vivid picture, but the fact is that

20   ULCCs, as a flock and individually, are too small to

21   make up for that loss of Spirit especially considering

22   Spirit is half of all the ULCC capacity today.

23           So Frontier is the largest of the remaining ULCCs.

24   But Spirit is still 50 percent bigger than Frontier.

25   Frontier probably could enter some of the more than 200

1    affected routes, but the relevant question isn't whether

2    Frontier might ultimately decide to enter some of those

3    routes that are found to be profitable, defendants have

4    to show that entry by Frontier will be likely, timely,

5    and sufficient to restore the competition that will be

6    lost across all the routes that Spirit currently flies

7    and would plan to fly in the future.

8         Now let's talk about specific numbers instead of

9    the colorful language of Mr. Biffle.  If we go to Slide

10   42, this is the language that Mr. Biffle used.

11        He acknowledged he didn't have the planes or the

12   pilots to replace Spirit.  When asked how long it would

13   take to replace Spirit?  7 or 8 years was the answer

14   that he gave based on concrete plans of Frontier's

15   growth.  And then he talked a little further and he

16   ventured a guess, not a plan, not an estimate, nothing

17   based on reality, but a guess that he could do it inside

18   of 5 years.  Not that he would, but that perhaps it

19   would be possible.  And that type of speculation is

20   exactly the type of evidence that is insufficient for

21   defendants to meet even their burden of production that

22   the entry is going to be timely.

23        And timeliness isn't the only issue here.

24        Go to the next slide.

25        Frontier and Spirit are different, they are ULCCs,

1    they have many similar aspects of their business model,

2    but they do not operate with the same business traction.

3    Mr. Biffle testified very clearly about how the presence

4    of a Big 4 airline on the route affects its plans.  He

5    testified that there is an impact that they don't try to

6    overexpose themselves by being too big on a route, they

7    try to conduct asymmetric warfare to make sure that

8    their capacity is not largest.  So Frontier does lie on

9    some of the routes that Spirit flies that are nonstop

10   overlap routes, but Mr. Biffle has said his strategy

11   would not be to expand to such a level and replace

12   Spirit such that it would be overexposed to retaliation

13   from the legacies.

14        If we go to Slide 44.

15        The other thing is relating to, um -- relating to

16   Frontier's business strategy and its stickiness on

17   routes, so it's ability to stay with a sustained

18   presence at an airport and in a particular market.  And

19   the evidence came in that Frontier has exited entire

20   airports, like Newark and LAX, those are good examples

21   of big legacy hub airports.  Spirit flies many routes in

22   both of those cities today, touching on big airlines'

23   hubs, bringing those fares to their heavily-trafficked

24   routes.  And Frontier simply does not do that to the

25   same extent that Spirit does.

1          If we go to Slide 45.

2          And the other thing to just consider is that

3     Mr. Biffle testified he wouldn't go on a quest to

4     replace every Spirit route, some routes he would look

5     at.  The only route that came out that was specifically

6     mentioned at all in the testimony of Mr. Biffle was

7     Atlanta City to Myrtle Beach.  Defendants could have

8     come forward with evidence about concrete plans or at

9     least robust analyses of what was likely to happen and

10    how Frontier could replace the competitive intensity of

11    Spirit, but they didn't do it, they didn't produce it to

12    the Court.

13         And we can briefly talk about Allegiant as well,

14    your Honor.  Now I think the case with Allegiant is

15    simpler.  Allegiant was quite clear, Mr. Wells's

16    testimony, that Allegiant looks to fly on routes that

17    have little competition.  The evidence came in that 75

18    percent of their routes, um, do not have a competitor

19    flying.

20         Now Allegiant plays an important role in the

21    industry, we're not here to criticize or belittle

22    Allegiant's role, but it's different, they are serving

23    unserved, underserved small cities providing them with

24    destination and connect -- with nonstop service on

25    routes where connections would otherwise be the only

1   option.  They have found that that strategy works for

2   them.  They are not the type of airline that is going to

3   come in and fly these heavily-trafficked routes that

4   Spirit frequents.

5       They also have an entirely different business

6   model, only flying routes a few days a week, they only

7   fly their planes a few hours a day.  It's just a

8   different type of airline than Spirit does.  And there's

9   no plans for any of that to change.

10      And if we quickly go through the remaining

11  airlines.  There's been a little bit of testimony about

12  Sun Country, Avelo, and Breeze.  Just very briefly.

13      Breeze is not even a ULCC at all.  There's been no

14  testimony about what routes they might look to enter.

15  They have a similar business strategy of flying unserved

16  routes.

17      Avelo is much the same, only has 16 planes today,

18  is growing at a rate of a few planes a year.  It's just

19  nowhere near the size to factor significantly in the

20  ability to replace Spirit.

21      Sun Country is a somewhat unusual ULCC.  We

22  haven't heard much about them.  They are essentially a

23  Minneapolis-based carrier and nearly the entirety of

24  their route touches on Minneapolis, which really isn't

25  any of the nonstop routes at issue in this case.

1      So we know for certain that Spirit, in its

2   benefits to competition, would go away if this

3   acquisition went through, but defendants have not come

4   forward with anything remotely concrete or specific to

5   show what would happen.  And what the Court would need

6   to believe, with entry to restore the competition would

7   be possible, is, you know, simply staggering.  The Court

8   would have to believe that ULCCs would grow faster than

9   they ever have before and then some, that they would

10  take on legacy airlines in a way they never have before,

11  that they would fly in ways and in places fundamentally

12  at odds with their established business strategies, and

13  there simply isn't a rebuttal sufficient to overcome the

14  clear overwhelming harms from the deal.

15      I want to briefly just talk about what Dr. Hill

16  did or didn't do.  He didn't offer any specific economic

17  evidence to show that timely, likely, and sufficient

18  entry would occur in the relevant markets.  There were

19  no plans that were pointed to.  And that speculation is

20  standing in stark contrast to the clear evidence of

21  concrete harm in that.

22      And again, we've talked about the deal-modeling.

23      And if we go to Slide 45.

24      But again, Mr. Friedman's analysis, that was the

25  basis for JetBlue's expected ability to increase fares,

1    evaluated actual exit events of Spirit, found that fares

2    on those routes went up by 30 percent, and that entry

3    didn't occur to offset those fare increases within a

4    year.

5         JetBlue's revenue projections count on that

6    similar absence of price-constraining entry after this

7    deal closes.  So there's optimism and then there are

8    hopes and dreams divorced from reality, and that is

9    ultimately what defendants' entry story is showing.

10        If we can briefly chat about divestitures and go

11   to Slide 50.

12        Now the divestitures at issue here are

13   airport-specific issues, um, assets at Boston, New York,

14   and Fort Lauderdale, both La Guardia and New York.

15        THE COURT:  Well let me ask you the question that

16   I asked Mr. Shores.

17        MR. DUFFY:  Sure.

18        THE COURT:  Suppose when everything -- as I work

19   through this, I think that what I have before me is

20   insufficient and warrants, um, some restraint on the

21   Court's order, but with some more divestitures it might

22   work.  Could I go down that route?

23        MR. DUFFY:  Well again, your Honor, I think

24   that -- I would point to *United States v. Aetna* is the

25   case that I would cite on this.  It is the case that the

1   divestitures do have to fully restore what the

2   competition has lost.  I think that's an important point

3   to keep in mind.  And obviously the divestitures would

4   only be available as a remedy upon a finding of

5   liability.

6       I would say this.  That the Court asked this

7   question of defendants and I don't know I heard an

8   answer as to what other divestitures might be on the

9   table, what other assets could make this deal workable.

10  And I do think looking at the nature of the harm, it is

11  difficult for me to envision substantively what type of

12  remedies could offset this.

13      I mean we're talking about a significant reduction

14  in capacity, a loss of a large ULCC competitor that is

15  different --

16      THE COURT:  5 more minutes.  But you go right

17  ahead.

18      MR. DUFFY:  So again, the extent of the harm that

19  we've discussed seems to be such that there does not

20  seem to be a remedy other than a full-stop injunction

21  that would restore our competition.  Procedurally, of

22  course, if the Court found that there was liability here

23  and the Court wanted to discuss a remedy, that would

24  obviously be at the Court's discretion.  But I would

25  just point to you, the harms are concrete, they're real,

1   and they're multifaceted.  They affect a number of

2   different things.  And there would be very practical

3   limitations in what divestitures could even

4   hypothetically be put forward.  I'm talking about

5   constraints at international airports.  Who knows what

6   the Airbus terms and conditions are in terms of aircraft

7   being available?  Pilot union issues.  There are lots of

8   things that would make it extraordinarily difficult to

9   fashion a remedy that could restore the competition that

10  is lost.  And that is why a full-stop injunction is, in

11  the government's view, the only thing that can be done

12  to prevent -- to prevent the harm that is otherwise near

13  certainly to occur.

14        Yeah, so if I may?  The Court should see

15  defendants' arguments for what they are, unsuccessful

16  efforts to overcome a mountain of evidence that this

17  merger violates Section 7 in hundreds of markets.

18  Defendants know the bad facts here.  They know that

19  JetBlue planned significant fare hikes and substantial

20  capacity reductions.  And they know that their arguments

21  about entry and divestitures are based on speculation.

22  Defendants know all of this.  So they try to minimize

23  those harms.  They've denigrated a number of routes

24  impacted, thrown up their hands in the face of

25  conditions that affect the entire airline industry, and

1    most tellingly they've invited the Court to look past

2    the harms caused to passengers who can't pay for

3    JetBlue's richer experience.

4         What defendants leave unspoken is why?  But

5    perhaps they view that harm to those least able to bear

6    it as just the cost of doing business.  But the Court

7    should reject their invitation because that's not the

8    law in America.

9         The Clayton Act protects competition even at the

10   expense of businesses that prefer to merge rather than

11   compete.  In doing so, the Clayton Act occupies a unique

12   place in our law where risks and probabilities are

13   dispositive and doubts are to be resolved against a

14   proposed deal, and that makes sense because once this

15   deal is consummated, Spirit is eliminated, and that is

16   cold comfort to those who will bear the very real harms

17   that are apparent today to say "We were too optimistic

18   in how we thought about entry."  The defendants, not the

19   American people, should bear the risk of being wrong.

20        The evidence points to one inescapable conclusion

21   here, this transaction is a bad deal for consumers, it

22   risks substantially lessening competition and so it

23   violates Section 7 of the Clayton Act.  We therefore

24   respectfully request the Court enjoin it.

25        THE COURT:  Thank you.

1          Now a few housekeeping matters and I do have

2     something to say.

3          First, we're agreed on 8 days for the filing of

4     requested findings and rulings.  That would take us to

5     the, um, 13th of December.  And I'll be looking for them

6     then.  I will accept further briefing at any time, I'm

7     always happy to get whatever help I can.  But the matter

8     today I'm taking under advisement and I will commence to

9     work on it.

10         One last thing, and this does need to be said.  I

11    want sincerely to express my thanks to the attorneys in

12    this case, the attorneys for the government and private

13    parties in this case.  You have all -- this has been a

14    real trial.  Any one of you who has worked on this trial

15    in any capacity ought to be proud of it.

16         It doesn't say anything about what I'm able to do

17    in my core capacity, but I will discharge my judicial

18    function.  But it really needs to be said that this case

19    is an exemplar of how a case should be handled.

20         Thanks to all of you zealous advocates for your

21    respective positions, we've gotten this case to trial in

22    little over a year.  There's been no wasteful really

23    unproductive motion practice.  All of the examinations

24    and the arguments have been to the point and have been

25    designed to help the Court, rather than to obfuscate

1    anything or hide the ball or somehow not truly focus on

2    those matters which ought compel the Court's attention,

3    and frankly I appreciate it.

4         And as one small part, this case in my practice

5    will stand as an example of how to handle confidential

6    material.  This restricting of confidential material to

7    what is actually confidential and notifying the Court of

8    that in a matter that preserves what should be preserved

9    but necessarily allows for a fully public trial is a

10   model that I will follow in the future.  And it's fair

11   to say, at least as things look to me now, I see no

12   reason at all to wonder whether I need to reveal

13   anything that's confidential.  And I will say further,

14   if I thought I did, I would notify the parties and we

15   would hold a hearing on that.  But I don't see any need

16   for that.

17        So I'm going to recess, but I do so with my

18   sincere thanks to the lawyering that's gone on here.

19   This case is an example of how a case ought be tried.

20   Thank you all.

21        We'll take the matter under advisement and we'll

22   stand in recess.

23             THE CLERK:  All rise.

24             (Ends, 11:20 a.m.)

25

1          C E R T I F I C A T E

2

3

4          I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER,

5     do hereby certify that the foregoing record is a true

6     and accurate transcription of my stenographic notes

7     before Judge William G. Young, on Tuesday, December 5,

8     2023, to the best of my skill and ability.

9

10

11    /s/ Richard H. Romanow 12-5-23
      _____
12    RICHARD H. ROMANOW    Date

13

14

15

16

17

18

19

20

21

22

23

24

25