# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA, *et al.*, | ) ) ) |
| *Plaintiffs*, | ) ) |
| v. | ) )    Civil Action No. 1:23-cv-10511-WGY |
| JETBLUE AIRWAYS CORPORATION and SPIRIT AIRLINES, INC., | ) ) ) |
| *Defendants*. | ) ) ) |

## DEFENDANTS' PROPOSED FINDINGS OF FACT

**<u>TABLE OF CONTENTS</u>**

I.    TRANSACTION BACKGROUND ................................................................1

      A.    Since 2015, JetBlue Has Considered A Merger To Better Compete With The Big Four ...............................................................................5

      B.    JetBlue Agreed To Purchase Spirit In July 2022 ...................................7

      C.    JetBlue Agreed To Divest Valuable Airport Assets To Address Regulatory Concerns ...............................................................................10

II.   AIRLINE INUDSTRY BACKGROUND ..............................................13

      A.    Air Travel And How It Is Delivered To Consumers...............................13

            1.    Air Travel Preferences Vary By The Individual.......................13

            2.    As Consumer Demand Evolves, So Does Air Travel ...............16

      B.    Airline Business Models ........................................................................19

            1.    Legacy Carriers ........................................................................19

            2.    Low-Cost Carriers ("LCCs") ..................................................26

            3.    Ultra-Low-Cost Carriers ("ULCCs").......................................39

      C.    The Airline Industry Is Inherently Dynamic.........................................57

            1.    Airlines' Business Models Evolve............................................57

            2.    Networks Constantly Evolve; Route-Level Market Shares Change Frequently ...............................................................................59

III.  DEFINING THE RELEVANT MARKET ...........................................65

      A.    The Relevant Product Market Includes All Air Travelers .....................65

      B.    The Relevant Geographic Market Is The United States ........................66

            1.    Market Definition Is Intended To Illuminate The Competitive Effects Of The Merger ........................................................................66

            2.    Dr. Gowrisankaran's Route-Level Market Definition Is Unreliable .........67

            3.    A Nationwide Market Most Illuminates The Competitive Effects Of This Merger ...............................................................................70

IV. THE GOVERNMENT'S 562 ROUTES ALLEGEDLY SUFFERING HARM ARE UNLIKELY TO SEE A SUBSTANTIAL LESSENING OF COMPETITION AS A RESULT OF THE MERGER ...................................................................................81

A. JetBlue And Spirit Do Not Compete On The 115 "Spirit-Only" Routes .............82

B. JetBlue And Spirit Do Not Compete On The 168 "Spirit-Entry" Routes, And Spirit's Entry On These Routes Is Highly Speculative.........................................83

C. There Is Unlikely To Be A Substantial Lessening Of Competition On The 96 "Econometric" Routes, As JetBlue Is A Stronger Competitor Than Spirit ..........84

D. There Is Unlikely To Be A Substantial Lessening Of Competition On The 117 "Connect" Routes Because JetBlue And Spirit Do Not Meaningfully Compete On Those Routes .....................................................................................85

E. There Is Unlikely To Be A Substantial Lessening Of Competition On The 15 "Mixed" Routes As JetBlue And Spirit Do Not Meaningfully Compete On Those Routes......................................................................................................87

F. There Is Unlikely To Be A Substantial Lessening Of Competition On The 51 Nonstop "Presumption" Overlap Routes ................................................................89

G. The Government's New Allegations Regarding "Consistent" Nonstop Overlap Routes Also Demonstrate the Dynamic Nature of Route-Level Markets .....................................................................................................................99

V. THE GOVERNMENT'S MARKET SHARES ARE NOT RELIABLE PREDICTORS OF GOING-FORWARD COMPETITIVENESS ..................................103

A. Spirit's Past Does Not Reflect Its Ability To Compete In The Future ...............103

1. Spirit Has Not Turned A Profit Since 2019 ..............................................103

2. Spirit Is Changing Its Route Plans, Exiting Cities And Deviating From Its Five-Year Plan...........................................................................109

3. Spirit Is Slowing The Growth Of Its Fleet, Which Will Result In Slower ASM Growth In The Future ........................................................110

4. Spirit Is Reconsidering Its Business Model ............................................112

5. None Of Spirit's Changes Are Impacted By The Pendency Of This Merger Or Ongoing Litigation...............................................................113

B. Barriers To Entry Are Low ................................................................................116

1. Orlando (MCO, SFB)..............................................................................119

2.     San Juan, Puerto Rico (SJU) ...................................................121

3.     Miami/Ft. Lauderdale (MIA, FLL)........................................122

4.     New York City (LGA, EWR, JFK) .........................................126

5.     Boston (BOS)..........................................................................128

C.    Divestitures Are Common And Effective Methods Of Facilitating Entry .........129

D.    Any Price Increases Will Further Incentivize And Enable Entry ......................131

E.    Many Airlines Are Well Positioned And Highly Motived To Enter Routes That Spirit Was Previously Flying........................................................................133

1.     Allegiant................................................................................135

2.     Frontier..................................................................................138

3.     Avelo .....................................................................................141

4.     Other ULCCs ........................................................................142

5.     Basic Economy .....................................................................143

VI.    THE TRANSACTION WILL INCREASE COMPETITION AND BENEFIT CONSUMERS .....................................................................................................146

A.    JetBlue Will Bring Competitive Fight To The Legacies, Benefitting Customers With Lower Prices And Improved Quality.......................................146

1.     A Larger JetBlue Will Result in Substantial Competitive Benefits for Consumers.............................................................148

2.     The Combined Firm Will Have The Scale Needed To Compete With The Legacies ..............................................................154

3.     The Combined Firm Will Have The Relevance Needed To Compete With The Legacies .....................................................156

4.     The Combined Fleet Will Enable Growth That Would Take Decades To Achieve Organically ..........................................159

B.    Post-Pandemic Industry Conditions Reinforce The Need For A Disruptive Competitor To The Big Four .............................................................160

VII.   THE GOVERNMENT HAS NOT PROVEN A SUBSTANTIAL LESSENING OF COMPETITION BY UNILATERAL EFFECTS ...........................................162

A.  JetBlue And Spirit Are Not Particularly Close Competitors .............................162

    1.  JetBlue's Main Competitors Are Delta, United, And American .............162

    2.  JetBlue Monitors All Competitor Fares And Sets Fares To Remain
        Competitive..........................................................................................163

    3.  Spirit's Main Competitors Are Southwest, Frontier, And American ......164

    4.  Other Airlines Offer The Same Unbundled Product As Spirit ...............164

    5.  JetBlue And Spirit Compete In Different Geographic Areas .................166

B.  Dr. Gowrisankaran's GUPPI Analysis Is Not Reliable For The Same Reasons
    His Market Shares Are Not Reliable ....................................................................168

C.  Dr. Gowrisankaran's Net Harm Model Is Not Reliable ......................................169

    1.  Dr. Gowrisankaran's Net Harm Estimates Are Not Based On
        Sufficient Data ......................................................................................170

    2.  Dr. Gowrisankaran's Model Is Based On Unreliable Methods Because
        It Predicts Price Increases As JetBlue Or Spirit Enter With Greater
        Intensity.................................................................................................170

    3.  Dr. Gowrisankaran's Model Is Based On Unreliable Methods Because
        It Is Sensitive To Small, Reasonable Changes In Assumptions .............173

    4.  Dr. Gowrisankaran's Model Is Based On Unreliable Methods Because
        It Does Not Give Credit To JetBlue's Higher Quality............................173

    5.  Dr. Gowrisankaran's Model Is Not Reliably Applied To The Facts Or
        Data Because It Assumes That Spirit's Impact Is Unaffected By
        JetBlue's Presence On A Route ..............................................................174

    6.  Dr. Gowrisankaran's Net Harm Results Are Unreliable Because They
        Are Inconsistent With The Other Evidence In The Case........................174

    7.  Dr. Gowrisankaran Net Harm Model Is Not Reliable In Light Of The
        Likelihood Of Entry By Other Carriers Post-Merger ............................176

D.  Dr. Hill's Model Of Competitive Effectiveness Is Reliable And Predicts That
    The Merger Will Benefit Consumers....................................................................178

E.  Entry Is Robust And Will Discipline Any Attempted Anticompetitive Price
    Increases...............................................................................................................180

F.  The Academic Literature Supports JetBlue Being A More Effective
    Competitor Than Spirit ........................................................................................182

iv

G.     The Government's Reliance On The "Proxy Fight Materials" Is Unfounded.....183

H.     The Government Mischaracterizes JetBlue's Revenue Synergies And Other Deal Modeling Exercises ........................................................................191

    1.     The Purpose Of JetBlue's Deal Modeling Was To Support JetBlue's Valuation And Offer For Spirit.............................................................191

    2.     JetBlue's Deal Models Are Not Business Plans .......................................193

    3.     The Customer Experience Premium Is Not A Price Increase...................195

    4.     The Relevance Revenue Synergy Reflects JetBlue's Ability To Attract A Wider Array Of Customers .........................................................198

    5.     The Network Optimization Synergy Work Was Not a Combined Network Plan .............................................................................................199

    6.     The Competitive O&D Synergy Does Not Mean JetBlue Will Become A Hub-And-Spoke Airline .......................................................................201

    7.     JetBlue's Cost Dis-Synergies Show Spirit's Costs Coming Up To JetBlue's Costs.......................................................................................202

I.     The Government's "Fleet Rationalization" Theory Is Unfounded ....................203

J.     The Government's Interim Operating Covenant Theory Is Similarly Unfounded..........................................................................................................206

K.     Spirit Deferred A Significant Part Of Its Order Book In July 2023 ..................208

L.     The Government's Capacity Reduction Arguments Based On Reconfiguring The Spirit Aircraft To JetBlue Specifications Are Significantly Overstated.......209

    1.     The Reconfiguration Of Spirit Aircraft Is Not Likely To Be Completed Until 2029..............................................................................209

    2.     The Merger Will Allow JetBlue To Increase Utilization In Ways That Will Mitigate The Effect Of Seat Reductions From Reconfiguring Spirit's Aircraft ......................................................................................211

VIII.   THE GOVERNMENT HAS NOT PROVEN A SUBSTANTIAL LESSENING OF COMPTITION BY COORDINATED EFFECTS ..........................................................216

A.     JetBlue Is A Maverick And Its Incentives Will Not Meaningfully Change As A Result Of The Merger .................................................................................216

B.     Dr. Gowrisankaran's Opinion That JetBlue Will No Longer Be Incentivized To Remain A Maverick Is Unsupported By The Facts.......................................219

C.     The Government's Reliance On Spirit Not "Following The Herd" Or Not Having As Visible Pricing Are Not Borne Out By The Evidence......................220

D.     The Government's Evidence Of Airline Coordination Is Anecdotal And Stale..223

1.     Hundreds Of Millions Of Fares Are Distributed Through ATPCO Each Year.................................................................................................223

2.     Out Of The Millions Of Fares Filed By JetBlue Each Year, Only Six Form The Basis Of The Government's Coordination Theory.................226

3.     The Fares Filed On ATPCO Do Not Paint A Complete Picture Of The Fares Ultimately Made Available For Sale By Each Airline..................228

## I.     TRANSACTION BACKGROUND

1.      As the Government has recognized for years, including during trial, "since its founding, JetBlue has grown organically and delivered benefits for customers based on that organic growth."  Tr. 11/6/23 (Hayes) 137:14–17 ("Q. And over—since its founding, JetBlue has grown organically and delivered benefits for customers based on that organic growth; right? A. Yes."); TX 912 ¶ 45 (Gov't Proposed Findings of Fact in the JetBlue/American Northeast Alliance ("NEA") litigation).[1]

2.      Although JetBlue is one of the youngest major airlines and accounts for only 5% of domestic airline revenue, JetBlue has, in the Government's own words, "saved travelers billions of dollars" by competing head-to-head with the dominant legacy carriers (American Airlines, United Airlines, and Delta Airlines). TX 912 ¶ 45 ("In total, competition between JetBlue and the legacy airlines has saved travelers billions of dollars."), ¶ 43 ("Consumers benefited from competition between JetBlue and the legacy airlines."), p. 5 ("JetBlue disrupted the airline industry, leading to better outcomes for consumers.").  Indeed, as highlighted on the Government's opening slides in the NEA litigation, in Boston alone, JetBlue has saved customers "about $3 billion over the past fifteen years."  TX 668.

3.      The Government has in the past recognized that JetBlue provides those billions of dollars of consumer savings as a result of "the decrease in fares that occurs after JetBlue enters a

---

[1] Citations to "Tr." refer to the trial transcripts, dated October 31, 2023 through December 5, 2023, in the above-captioned action.  Citations to "Dep." refer to the deposition transcripts submitted to the Court on October 31, 2023.  All cited depositions are personal depositions taken in the above-captioned matter unless otherwise noted.  Citations to "TX" refer to trial exhibits.

The full names, employers, and titles of all witnesses whose testimony is cited herein can be found in Table 1 of Appendix A.  Appendix A also includes a list of airport codes (Table B), airline codes (Table C), and industry terms (Table D).

market, or the increase in fares that occurs after JetBlue exits a market." TX 912 ¶ 46.  This pro-consumer phenomenon is known as the "JetBlue Effect," and it benefits all air travelers "whether or not they fl[y] on JetBlue." *Id.* ¶ 53 ("Travelers benefited from the JetBlue Effect whether or not they flew on JetBlue."), ¶ 23 (quoting the NEA defendants' expert for the proposition that "a traveler does not 'need to fly on a low-cost carrier to receive the competitive benefits of it' because 'their very presence on a route puts downward pressure on the fares of all the carriers."). The JetBlue Effect also "stimulate[s] demand," which means more people choose to fly, *id.* ¶ 24, and it results in "higher quality service on routes where JetBlue competes," *id.* at p. 12.

4.     These proven consumer benefits are the product of JetBlue's unique value proposition, which affords all customers a high-quality product and award-winning customer service (superior to what they would get on a legacy airline) at prices that compete with low-cost carriers ("LCCs") and ultra-low-cost carriers ("ULCCs")  across the board.  TX 912 ¶ 24 ("JetBlue differentiated itself from other low-cost airlines by offering not only low fares, but also high-quality service."); *id.* ("JetBlue also offered superior service to many airlines, including legacies."); *see also* Dep. 6/9/23 (O'Brien) 219:12–17 ("[W]e are the only one that really offers that sweet spot of low fares . . . a good product at a good price. . . . we offer value."); Tr. 11/6/23 (Hayes) 52:6–16 ("[JetBlue's] vision . . . is that fundamentally a customer should not have to choose between a low fare and a great service.").

5.     Unlike other airlines, *everyone* who flies JetBlue—regardless of fare class—has access to industry-leading legroom, Wi-Fi, seatback T.V.s, live T.V. and premium entertainment, and brand-name snacks and beverages.  Dep. 6/9/23 (O'Brien) 246:23–247:17; Tr. 11/3/23 (Hayes) 160:15–17.  They also have access to JetBlue's award-winning customer service.  *See,*

*e.g.*, TX 613 at '5565 (listing JetBlue's customer experience awards from J.D. Power, Travel + Leisure, and others).

6.      As a result, "JetBlue's high quality of service [has] allowed it to compete effectively against the legacy airlines in ways other LCCs and ULCCs could not."  TX 912 ¶ 27; Dep. 4/21/22 (Clark) 37:19–38:1 ("My understanding, from the independent research, is that we have a larger downward impact on pricing than any other carrier"); Dep. 7/17/23 (Neeleman) 135:21–136:7 ("[W]hen JetBlue goes into a market, their competitive response is a lot more aggressive against JetBlue than it is against Spirit because . . . JetBlue is seen as more of a threat because the product is so much better. There's a lot of people that just won't fly on Spirit. . . . And ***there's no one that I know of that wouldn't fly on JetBlue***." (emphasis added)).

7.      Because 80% of the country is traveling on one of the Big Four airlines (the legacies plus Southwest), JetBlue's disciplining force benefits the vast majority of domestic air travelers.  Tr. 11/6/23 (Hayes) 56:4–57:16 ("[B]ecause we compete for all different types of customers, legacy airlines respond to our arrival in the route by lowering fares . . . and given their size, right, about four of them control about 80 percent of the market, the reality is most people are always going to fly on a legacy airline and most people are going to benefit with our presence when they fly on another airline"); Tr. 11/16/23 (Hurley) 151:3–6 ("[T]hrough the JetBlue Effect . . . we bring consumer benefit across the board when we enter markets and go head-to-head against these legacy airlines."); TX 912 at 13.

8.      Despite its broad appeal, JetBlue remains a primarily East Coast airline.  Tr. 11/2/23 (Clark) 122:22–24 ("We're very concentrated in the East and in the Northeast right now and we'd like to have a national presence."); Tr. 11/9/23 (Friedman) 116:24–117:4 (JetBlue is "mostly an east coast airline at this point").  Only one of JetBlue's six "focus cities" (Los

3

Angeles) is on the West Coast, where JetBlue is a small player (7% of revenue share and passenger share).  Tr. 11/2/23 (Clark) 112:9–12; TX 665.  JetBlue has no focus city in the Midwest.  Tr. 11/2/23 (Clark) 112:13–15.

9.      JetBlue currently lacks the scale and relevance to be a true national competitor to the dominant Big Four carriers.  TX 883; Tr. 11/6/23 (Hayes) 88:7–17; Tr. 11/16/23 (Hurley) 143:7–14 ("[A merger] gives [JetBlue] scalability.  Right?  It allows us to be a national competitor against these four carriers, and it closes the gap overnight in terms of size.  We're still going to be small.  Right?  But it allows us a platform where we can better compete over time."); 11/2/23 (Clark) 122:25–123:15 ("Customers, whether that's an individual person or a corporation, they want to work with an airline that can get them to most of the places they want to go.  So if we can't bring customers to the Midwest or the West, we're just not as relevant to them and they're going to be less likely to choose us.  Plus customers move around.  Right?  They move cities."); Tr. 11/9/23 (Friedman) 145:13–146:14 (comparing Delta's average daily departures in Atlanta alone (800+) to the total number of departures JetBlue has in its entire network on an average Saturday); TX 174 at '1111–1113 (explaining how JetBlue's fleet retirements limit its network growth).

10.     JetBlue is unable to grow organically at a sufficient rate to catch up to the scale of the Big Four.  Tr. 11/6/23 (Hayes) 85:14–18 ("So you'd never get to the size that [the legacies] are based on organic growth.  And by the way, let's recall that they didn't get there through organic growth either, they got there through mergers and acquisitions."), 137:18–138:6 (explaining how "the path of organic growth [in the post-COVID world] is just more challenging than it has been in the past"); Tr. 11/16/23 (Hurley) 139:8–143:14 (describing JetBlue's historical growth rate of roughly ten planes per year and its inability to grow to the scale of the

Big Four); Dep. 6/14/23 (Biffle) 161:5–20 ("A. So absent a merger, when will we have a fifth

formidable carrier? . . . A. Left to only grow organically? Q. Correct. A. Wow. I mean, 20 years.

I mean, it's -- if you take compound growth, it would take a long, long time.").

11.     A merger with Spirit would afford JetBlue the scale, relevance, and fleet needed

to compete more fiercely against all airlines, including the dominant legacies, by expanding its

low fares and industry-leading customer service to more geographies, thus providing more

consumers an affordable option for high-quality air travel.  *See infra* § VI.A; Tr. 11/6/23 (Hayes)

107:22–108:6 (explaining how the merger will build JetBlue's national presence, create new

focus cities, and allow JetBlue to "fly more into other airline hubs and bring more low-fare

service, and also fly to some underserved markets"); 11/16/23 (Hurley) 139:8–143:14

(comparing size of JetBlue fleet to fleets of the Big Four and describing the acquisition of Spirit

as "transformational" in part because "[i]t allows [JetBlue] to be a national competitor against

these four carriers, and it closes the gap overnight in terms of size"); Tr. 11/9/23 (Friedman)

138:2–18 (describing a key strategy of JetBlue's Combined Network Plan as "creating relevance

across the country"); TX 362 at '9882  (JetBlue Combined Network Plan explaining how

"JetBlue and Spirit will merge to become a truly *national* low fare competitor" (emphasis in

original)).

   **A.     Since 2015, JetBlue Has Considered A Merger To Better Compete With The
          Big Four**

12.     Since 2015 JetBlue has sought a transaction to grow its scale and better compete

with the Big Four carriers.  Tr. 11/6/23 (Hayes) 88:7–89:5.  It first unsuccessfully sought to

acquire Virgin America in 2015 and 2016.  *Id.*  At the time, JetBlue felt the transaction would be

beneficial because it "wanted to build a more national presence."  *Id.*

13.     In 2017, JetBlue again considered a potential M&A transaction, this time focusing

on Spirit and another airline as potential candidates.  Tr. 11/6/23 (Hayes) 88:3–5; 90:4–12.  The rationale for a potential acquisition at that time was to "build a stronger platform to compete against the Big Four" including allowing JetBlue to build an increased presence, scale, and customer base.  *Id.* 90:4–92:4; TX 616 at '0863–0865.

14.     As part of its exploration of a potential transaction in 2017, JetBlue spent roughly two to three weeks investigating the potential synergies that could be generated through a transaction with the two carriers that were being considered at the time (Spirit and the other airline).  TX 616 at '0870, '0875–0888; Tr. 11/14/23 (Friedman) 32:15–33:6.

15.     JetBlue ultimately did not pursue a transaction with Spirit in 2017 primarily because it felt it could not afford to purchase Spirit in light of its then-current share price and the expected premium to be paid based on Alaska Airlines' acquisition of Virgin America.  Tr. 11/6/23 (Hayes) 92:5–19.

16.     JetBlue again considered acquiring Spirit in late 2019.  Tr. 11/6/23 (Hayes) 92:20–23.  As was the case in 2017, JetBlue's primary rationale for considering an acquisition of Spirit in late 2019 was to address "the growing dominance of the legacy airlines."  *Id.* 99:20–100:1.  JetBlue again spent roughly two to three weeks investigating the potential cost and revenue synergies that could be generated by an acquisition of Spirit.  TX 617 at '2757–2766; Tr. 11/14/23 (Friedman) 32:15–33:6.

17.     In a presentation to JetBlue's Board of Directors in late 2019, JetBlue's management conveyed that the transaction rationale was to "unleash a sustainable challenger brand to legacy airlines."  TX 617 at '2738.

18.      JetBlue believed that Spirit was the ideal partner because of its fleet and engine commonality, which would allow for cost savings and efficient operations.  Tr. 11/6/23 (Hayes)

100:5–11; TX 617 at '2738.

19.    JetBlue also believed the merger would produce substantial consumer benefits by "[e]xpand[ing] [JetBlue's] award-winning customer service to a multitude of new markets" and "[p]rovid[ing] a Customer-centric alternative to Legacy hub networks."  TX 617 at '2738, '2782 ("Keys to Success[:] Fiercely protect our unique culture as we grow[,] Know our customers and deliver the experiences they want."), '2758 ("Proposed [Spirit] transaction enables JetBlue to continue its mission to inspire humanity and elevate competition while driving value for shareholders.").

20.    Ultimately, in February 2020, JetBlue's Board of Directors authorized its CEO, Robin Hayes, to approach Spirit about a potential merger.  Tr. 11/6/23 (Hayes) 105:12–106:1.  However, the COVID-19 pandemic intervened and no approach was made.  *Id.*

**B.    <u>JetBlue Agreed To Purchase Spirit In July 2022</u>**

21.    JetBlue's interest in acquiring Spirit was sparked again in February 2022 when Frontier and Spirit announced their intent to merge.  Tr. 11/6/23 (Hayes) 106:6–25; Tr. 11/16/23 (Hurley) 91:19–92:13; TX 82 at '7907.

22.    JetBlue's rationale for pursuing Spirit in 2022 was the same as the rationale underlying the potential transactions in 2017 and 2019:  "to create a national . . . low fare, high-quality challenger to the legacy airlines."  Tr. 11/6/23 (Hayes) 107:5–13; TX 669 at '1148.  In addition to the fleet commonalities and consumer benefits, JetBlue believed a merger with Spirit would "diversify revenue concentration away from Northeast airports and improve operational performance."  TX 669 at '1149.  Eliminating Spirit as a competitor was not a consideration in JetBlue's decision to pursue an acquisition of Spirit.  Tr. 11/6/23 (Hayes) 104:20–105:11.

23.    Accordingly, in late March 2022, JetBlue made a competing offer to acquire Spirit with an all-cash transaction at a value of $33 per share.  Tr. 11/16/23 (Hurley) 92:20–22;

Tr. 10/31/23 (Christie) 117:24–118:4.

24.     Spirit determined that it was "reasonably likely that [JetBlue's offer] could lead to a superior proposal" to Frontier's offer, engaged Barclays and Morgan Stanley as financial advisors, and began evaluating JetBlue's proposed acquisition. *See infra* § VII.G (discussing Spirit's 2022 negotiations with JetBlue); Tr. 10/31/23 (Christie) 118:8–119:7.

25.     In April 2022, Spirit conveyed to JetBlue that it was concerned that JetBlue's Northeast Alliance with American Airlines could impede the regulatory process for a potential merger between JetBlue and Spirit and requested additional protections for Spirit shareholders including a reverse termination fee. *See infra* § VII.G; Tr. 11/1/23 (Christie) 61:17–65:21.

26.     In late April 2022, before Spirit could respond to JetBlue's original proposal, JetBlue sent Spirit a revised offer that included additional regulatory clearance commitments and a reverse termination fee of $200 million. *See infra* § VII.G; Tr. 10/31/23 (Christie) 118:24–119:16; Tr. 11/1/23 (Christie) 66:14–67:14.

27.     Spirit rejected JetBlue's April 2022 proposal, believing it still did not completely address its regulatory concerns. Tr. 11/1/23 (Christie) 66:14–68:18. In mid-May 2022, JetBlue launched a tender offer to buy Spirit's outstanding shares at a value of $30 per share. Tr. 10/31/23 (Christie) 126:7–24.

28.     Following the JetBlue tender offer, Spirit's management continued to support its transaction with Frontier and in May 2022 sought shareholder votes to approve the Frontier transaction. *See infra* § VII.G; Tr. 10/31/23 (Christie) 126:25–127:8.

29.     JetBlue subsequently revised its tender offer, increasing the per-share price, increasing the reverse termination fee, and committing to divest assets to obtain regulatory clearance. *See infra* § VII.G; Tr. 10/31/23 (Christie) 143:15–145:11; TX 127 at '1470-1471.

30.     It subsequently became clear that Spirit's shareholders were not likely to vote in favor of its merger with Frontier, but the vote never reached a final tally.  Tr. 10/31/23 (Christie) 145:12–20; Tr. 11/1/23 (Christie) 122:12–124:3.

31.     On June 20, 2022, JetBlue submitted a further revised offer that included "an express obligation to litigate and to divest assets of JetBlue and Spirit up to a material adverse effect on the combined JetBlue/Spirit with a limited carve-out to this divestiture obligations for actions that would be reasonably likely to materially and adversely affect the anticipated benefits under JetBlue's Northeast Alliance."  *See infra* § VII.G; Tr. 11/1/23 (Christie) 77:25–79:5; TX 218 at '1519.

32.     Spirit management rejected JetBlue's further revised offer because they were concerned that they had "no visibility" into the size of the divestiture carve-out, as they did not know the anticipated benefits under the NEA.  *See infra* § VII.G; Tr. 11/1/23 (Christie) 79:6–81:5.

33.     In light of Spirit management's desire for additional information on the nature of the proposed divestiture carve-out, JetBlue and Spirit engaged in discussions with respect to regulatory matters, and Spirit's management eventually became comfortable that it "did in fact have a significant covenant" and that it "had satisfied [Spirit's] concerns with regard to the regulatory matters."  *See infra* § VII.G; Tr. 11/1/23 (Christie) 81:6–82:22.

34.     On July 28, 2022, JetBlue and Spirit signed a definitive merger agreement.  *See* TX 32.  The merger would combine the sixth largest carrier (JetBlue) and the seventh largest carrier (Spirit), which would become the fifth largest carrier in the country.  TX 634.  The combined airline would amount to approximately 8% combined market share, measured by revenue, which is less than half the size of the smallest Big 4 carrier.  *Id.*

C.    **JetBlue Agreed To Divest Valuable Airport Assets To Address Regulatory Concerns**

35.    Divestitures have historically been used in airline industry mergers to address competitive concerns raised by the Government.  *See* Tr. 11/6/23 (Hayes) 108:15–22; Tr. 11/27/23 (Hill) 79:4–80:10.

36.    JetBlue itself has been the beneficiary of prior DOJ-mandated divestitures.  When American and U.S. Airways merged, JetBlue acquired a number of slot pairs at DCA that allowed it to expand its service to Washington, D.C.  Tr. 11/6/23 (Hayes) 108:23–110:1.  By acquiring these slots, JetBlue was able to offer up to 30 flights per day to Washington, D.C. and serve new routes including Boston-Washington, D.C.  *Id.* at 109:24–110:12.

37.    JetBlue was not required to fly specific routes as a condition of obtaining the DCA slots.  Tr. 11/6/23 (Hayes) 110:13–21.  According to JetBlue's CEO, it would never have agreed to accept the slots on that basis because "it's a very dynamic industry" and "[p]rofitability on different routes comes and goes, and [a carrier would] want the ability to fly those to where you think you can have the most consumer benefit."  *Id.*

38.    JetBlue also acquired slots at LGA as a result of a slot swap by Delta and U.S. Airways.  Tr. 11/6/23 (Hayes) 110:22–111:4.  By acquiring divested LGA slots, JetBlue was able to fly new routes and add new flights, including to Boston and LaGuardia.  *Id.* at 111:5–11.  Again, JetBlue was not required to fly specific routes as a condition of obtaining the DCA slots.  *Id.* at 111:12–14.

39.    Given the history of using divestitures to address potential competitive concerns with airline mergers, JetBlue's prior advocacy for divestitures as a means of providing access to smaller carriers, and anticipated regulatory scrutiny of its acquisition of Spirit, JetBlue agreed with Spirit to make robust divestitures.  Tr. 11/6/23 (Hayes) 112:5–113:9; TX 218 at '1518–

1519; TX 32 at '0081–0082.

40.     Under its agreement with Spirit, JetBlue is required to divest assets of JetBlue and Spirit up to a material adverse effect on the combined JetBlue and Spirit (putting aside an exception that is no longer relevant, related to the NEA).  *See infra* ¶¶ 803, 805 (discussing "material adverse effect" provision); Tr. 11/6/23 (Hayes) 114:24–115:16; TX 218 at '1519; TX 79 at '4774. This is "a very high bar" and a "very significant commitment on [JetBlue's] part." Tr. 11/6/23 (Hayes) 114:24–115:16.

41.     In addition to this broad divestiture commitment, JetBlue specifically agreed with Spirit to make a "proactive offer" to the DOJ of select assets in Boston, New York, and Fort Lauderdale.  Tr. 11/6/23 (Hayes) 114:4–23; TX 218 at '1519.

42.     JetBlue expected that after it made a proactive offer there would be a discussion with DOJ on what they wanted to include in a final divestiture package.  Tr. 11/6/23 (Hayes) 115:25–116:8.  No additional divestitures occurred as a result of any discussions with the DOJ. *Id.* 116:9–11.

43.     Consistent with its contractual obligations, JetBlue sought buyers for the divestiture assets in Boston, New York, and Fort Lauderdale, focusing on ULCCs.  Tr. 11/6/23 (Hayes) 117:23–118:14; Tr. 11/2/23 (Clark) 106:21–107:2.

44.     Ultimately JetBlue selected two ULCC buyers for the divestiture assets: Frontier and Allegiant.  *See* TX 360 (Frontier Divestiture Agreement); TX 246 (Allegiant Divestiture Agreement).

45.     Frontier agreed to acquire Spirit's 22 slots, six gates, and the associated ground facilities at LGA.  Tr. 11/6/23 (Hayes) 119:2–24; TX 360 at '1763; Tr. 11/14/2023 (Biffle) 62:15–18; 101:16–22.  These assets will allow Frontier to begin service to many new routes out

11

of New York.  *See infra* ¶¶ 534–540; Tr. 11/6/23 (Hayes) 119:25–120:8; Tr. 11/14/2023 (Biffle) 72:13–73:2; 103:7–16 (indicating divestitures will allow Frontier to grow at a constrained airport offering increased opportunities for growth).

46.     Allegiant agreed to acquire (1) Spirit's two gates and the associated ground facilities at BOS; (2) Spirit's 43 runway authorizations, two gates, and the associated ground facilities at EWR; and (3) fives of JetBlue's gates and the associated ground facilities at FLL. Tr. 11/6/23 (Hayes) 120:9–122:9; TX 246 at '8890–8891; Tr. 11/14/2023 (Wells) 122:20–123:2. These assets would allow Allegiant to establish a meaningful presence at FLL of 30-45 daily departures.  *See infra* ¶¶ 520–521, 527–532, 541–542, 545–548; Tr. 11/6/23 (Hayes) 121:17–121:22; Tr. 11/15/2023 (Wells) 25:16–26:6; 11/14/23 (Wells) 149:3–12 (indicating that Allegiant plans on serving unserved and underserved routes and that "everything is fair game, including international").

47.     The transfer of the divestiture assets is subject to approval by the local airport authorities.  *See infra* ¶¶ 529–532; Tr. 11/6/23 (Hayes) 122:10–18.  Historically, these authorities have approved divestitures associated with airline mergers and other transactions.  Tr. 11/6/23 (Hayes) 122:19–123:2 ("I would tell you, in all my experience, getting the other airline to divest them is the hard part. I've always found airports and local authorities, you know, very supportive in, you know, making sure that you can then operate them. And indeed they have a requirement to get airlines the service.").

48.     If a local airport authority were to reject the transfer for any reason, JetBlue is nonetheless contractually bound to return the divestiture assets to the airport, and the airport would reallocate the assets to another airline consistent with what is good for competition.  *See infra* ¶¶ 529–532; Tr. 11/6/23 (Hayes) 123:3–17; Tr. 11/15/23 (Gale) 81:22–82:2.

## II.   AIRLINE INUDSTRY BACKGROUND

### A.   <u>Air Travel And How It Is Delivered To Consumers</u>

#### 1.   Air Travel Preferences Vary By The Individual

49.     Customers choose air travel for many reasons that can vary from flight to flight. *See, e.g.*, TX 417 at '7476 (describing "purchase priorities" of JetBlue's nine distinct customer segments); Dep. 6/9/23 (O'Brien) 225:10–13 ("[D]ifferent [customers] will have different behaviors and will make different purchase decisions and value different things.")

50.     While airlines tend to categorize customers as "leisure" and "business" travelers, customers exist on a "continuum" and there are no "firm boundaries" around customer segments. Tr. 11/20/23 (Gowrisankaran) 126:14–17; Dep. 6/28/23 (Johns) 103:22–104:12 ("[Price] sensitivity is a relative term, so there's higher sensitive and lower sensitive.").

51.     The same person can be a "business" traveler on one flight and a "leisure" traveler on the next. *See* Dep. 1/18/23 (Clark) 32:15–12 ("Q. Mr. Clark, at a high level, would you agree that business and leisure passengers tend to have different characteristics?  A. It can depend. At times, they do. At times, they don't. And *oftentimes, they're the same person, so it's very hard to say that they're different*. It could be the same person on different occasions." (emphasis added)); Tr. 11/20/23 (Gowrisankaran) 126:18–127:3.

52.     Thus, even within the "business" and "leisure" categories, consumer preferences differ.  For example, some business customers—*i.e.*, people traveling for work or corporate clients—are cost-conscious.  *See* Dep. 1/18/23 (Clark) 33:1–12 ("Q.  So would you agree that, generally speaking, business passengers, or passengers traveling for business purposes tend to be less price sensitive than customers traveling for leisure purposes A. *It certainly varies by the individual*, but I think since it's not their own money they're spending, in a lot of cases, the

average business customer is probably a bit less price sensitive than a leisure one. But, again, if you're a small business owner, it might be your money also, and you might be equally price sensitive." (emphasis added)); Tr. 11/6/23 (Hayes) 53:18–54:1 (explaining JetBlue's business customers include smaller, medium-sized, and larger companies—"really everybody"). Conversely, many leisure and "visiting family and relatives" (VFR) customers do not purchase the lowest-price fare option. Dep. 1/18/23 (Clark) 33:18–34:3; Tr. 11/1/23 (Clark) 131:11–12 ("[T]here's all sorts of leisure passengers, many of which book premium leisure products.").

53.     JetBlue has "a broad mix of customers who on different occasions and at different times will want a different product offer or a different price point." Dep. 6/9/23 (O'Brien) 220:20–221:2. Given these varying customer preferences, JetBlue seeks to maximize customer choice through the products and services it offers. Tr. 11/2/23 (Clark) 21:22–22:11 ("[T]hat's one of the benefits of more choices, more customers find a choice that they're comfortable with or find attractive.").

54.     For instance, JetBlue offers five fare classes: Blue Basic (its unbundled, ultra-low fare), Blue (economy), Blue Extra, Blue Plus, and Mint (its premium offering with lie-flat seats). Tr. 11/2/23 (Clark) 161:12–18; Dep. 6/9/23 (O'Brien) 221:19–25 ("[JetBlue gives] customers a choice of different product options. Some might want to fly in Mint or even more space. Others won't and they'll want the great low fare. So we offer that choice.").

55.     The legacy carriers (Delta, American, and United) also "segment" their onboard products, offering fares ranging from a lower-end "basic economy" product—an unbundled offering with ancillary fees, similar to a typical ULCC fare—to premium products like business class or first class, while also offering a traditional main cabin ticket. Tr. 11/28/23 (Nocella) 10:10–25; TX 130 at '4740; TX 189 at '8036.

56.     This "segmentation" allows the legacies to compete for a complete range of customers, including price-sensitive consumers, leisure travelers, business travelers, and higher end premium passengers.  Tr. 11/28/23 (Nocella) 10:10–25; TX 130 at '4740, '4796.

57.     ULCCs, in contrast, compete for a more limited set of customers, primarily those who want "the absolute lowest fare."  *See, e.g.*, TX 347 at '2962.

58.     Customer preferences also affect how airlines plan their networks.  *See, e.g.,* Tr. 11/1/23 (Clark) 131:16–132:1 (explaining that customer mix and customer preferences are "input[s] in [] flight scheduling").  For example, the legacies offer global networks with significant amounts of frequency on large, business-oriented routes.  *See* Tr. 11/29/23 (Nocella) 16:12–19 (United's hubs are located in areas with "a lot of premium business, business travel or high-end leisure travel, or global travel").  Other carriers fill a more niche role, offering networks that focus on key leisure destinations and less frequent service.  Tr. 11/3/23 (Klein) 76:6–14 ("Q. And you say that Spirit's product may not be for everyone, correct?  A.  That's correct. . . Our target would definitely be leisure customers."); Dep. 6/27/23 (Klein) 248:7–22 ("Spirit doesn't go out of its way to compete for corporate travelers" as it doesn't have the "infrastructure in place" and legacies and LCCs compete for corporate travelers); TX 706 at '3230 (map of Allegiant's network titled, "A very large niche"); Tr. 11/14/23 (Wells) 156:13–21.  JetBlue's network seeks to appeal to all customers, offering service to all types of markets with frequencies and schedule options that are convenient for a wide array of customers.  *See, e.g.*, Tr. 11/9/23 (Friedman) 123:25–124:7 ("[O]ur strategy on customer segments is really tied to the focus city strategy . . . By building out a focus city, by building out the right routes, serving those routes correctly, we are able to tap into as many customer segments as we can.").

59.     In short, fare price is one of many factors that influence customer choice.  *See,*

*e.g.*, TX 70 at '4010 (Allegiant 2022 10-K explaining, "The principal competitive factors in the airline industry are price, nonstop flights, schedule, customer service, routes served, types of aircraft, safety record and reputation, code-sharing relationships, and frequent flyer or loyalty programs."); TX 71 at '4108 (Frontier 2022 10-K saying same); TX 69 at '3795 (Southwest 2022 10-K saying same).  A JetBlue "Customer: Analysis & Insights" presentation from February 2022 explains that JetBlue's "preference drivers" namely, its brand awareness, schedule, fare price, and customer experience—"have different roles throughout the customer journey; ***price and network guide choice, brand and product seal the deal***."  TX 417 at '7402 (emphasis added); *see also id.* at '7364 (listing internal and external sources for qualitative and quantitative customer data used in TX 417).

60.     Even within the ultra-low-cost carrier space, most customers are not looking for the most bare-bone experience:  as Spirit's CEO, Ted Christie, testified, two-thirds of Spirit's customers purchase at least one "ancillary" offering, meaning they choose to pay for baggage, WiFi, seat selection, or other amenities that are not included in a basic Spirit fare.  Tr. 11/1/23 (Christie) 14:17–15:2.

### 2.     As Consumer Demand Evolves, So Does Air Travel

61.     The products and services offered by airlines have evolved over time to meet demand.  For instance, while the legacies introduced basic economy fare packages in response to the offerings of the ultra-low cost airlines, basic economy has now become a permanent part of these and other carriers' fare structures.  *See infra* § V.E.5 (discussing Basic Economy); Tr. 11/28/23 (Nocella) 23:8–24:4; TX 39 at '0461 ("In 2015, Delta Air Lines began to market and sell a 'Basic Economy' product which was designed in part to provide its customers with a low base fare similar to Spirit.  In 2017, American Airlines and United Airlines announced their own

'Basic Economy' product and beginning in late 2019, other airlines like Alaska Airlines and JetBlue, have followed suit."). Currently, legacy airlines' basic economy product is "widely available across their entire network." Tr. 11/1/23 (Christie) 13:23–14:8; Tr. 11/28/23 (Nocella) 25:17–26:2, 27:21–28:4 (United's Chief Commercial Officer, Andrew Nocella: United's "United Next" plan "allows us to accommodate more and more Basic Economy passengers profitably").

62. Airlines have also instituted business strategies or recognized opportunities to attract customers seeking a premium product. *See* Tr. 11/28/23 (Nocella) 10:18–25 ("So from United's perspective, we desire to create a business plan strategy that includes customers of all types and flying for all reasons. And so sometimes a customer wants to fly in a very premium experience[.]"); TX 148 at '3814 (explaining how "[t]he premium market is evolving in short to medium haul markets" and JetBlue has the opportunity "to disrupt [this] segment of the market and create value for our customers (the JetBlue way)").

63. When JetBlue introduced its premium lie-flat Mint service from Boston to the west coast in 2016, "customers loved it" and competitors reacted quickly. Tr. 11/2/23 (Clark) 154:16–155:9. In the near term, the legacies took planes from international markets and moved them to Boston to start flying west coast routes. *Id.* Since then, the legacies have developed domestic aircraft configurations that include lie-flat seating. *Id.*; *see also* Tr. 11/28/23 (Scheff) 55:10–16 (Defendants' industry expert, Richard Scheff, explaining JetBlue's A321 Mint aircraft "has a premium configuration . . . designed to compete effectively with Delta, American, and United, in markets like New York to Los Angeles or Boston to Los Angeles").

64. Additionally, the demand impacts stemming from the COVID-19 pandemic drastically affected air travel. *See* Tr. 11/2/23 (Clark) 137:22–138:5 ("[W]ith demand changing more rapidly than usual, it led to pricing to change more rapidly than usual, and lead to unique

circumstances I'd never seen before in my fourteen years.").

65.     The "shifts in customer preferences" resulting from the pandemic forced airlines to reevaluate their product offerings and networks.  *See, e.g.*, TX 652 at '5874 (Nov. 2020 JetBlue deck explaining, "The world has changed and so have Customer priorities. Health and Safety have moved front and center, along with economic uncertainty. . . . In order to meet the moment, JetBlue will now offer more flexible experiences . . . Whether you're price conscious or want a more premium experience, we have an option for you."); TX 189 at '8068.

66.     In the midst of the pandemic, the legacy airlines significantly increased their capacity (including basic economy) in leisure markets, impacting demand for ultra-low-cost carriers' unbundled product.  *See* TX 334 at '4858 (March 2021 Spirit deck noting that, on certain routes, the "combined legacy mix increase on 2019 ASMs is the equivalent of adding another Spirit ***and*** Frontier-size airline" (emphasis in original)); Tr. 11/3/23 (Klein) 122:16–123:11 (explaining that during COVID, the legacies added "basically, two airlines into the entire industry by themselves").

67.     Since the pandemic, demand for leisure travel has continued to increase.  Tr. 11/3/23 (Klein) 117:5–118:4 (options available to price-conscious customers have changed "a lot" since the pandemic including "a lot more capacity" given other airlines' "move towards large aircraft").  Accordingly, airlines have continued to shift capacity to leisure markets following the pandemic.  *Id.* 124:12–125:6 (explaining leisure capacity is "definitely more than what we saw in March 2021" which has "an impact on [Spirit's] ability to generate the fares that we need in order to be profitable").

B.     **Airline Business Models**

1.     **Legacy Carriers**

(1)     *Characteristics Of Legacy Carriers*

68.     The legacy airlines enjoy tremendous scale and scope advantages over other airlines: beyond their extensive national and international networks and connections to thousands of destinations, the legacies also utilize vast fleets of aircraft, enormous stables of pilots, strong frequent flyer and co-branded credit card programs, and outsized access to gates, slots, and other critical assets at key airports. *See, e.g.*, Tr. 11/1/23 (Christie) 25:16–26:10; Tr. 11/2/23 (Clark) 146:24–147:5; TX 189 at '8034–8041.

(a)     **Vast Networks And Fleets**

69.     American, Delta, and United are known as the "legacy carriers" or "network carriers." The legacies operate "hub-and-spoke" networks that consolidate operations at specific airports or "hubs" from which many "spoke" cities are served, thus allowing the legacies to offer more connecting flight options than carriers that utilize a point-to-point network. Tr. 10/31/23 (Christie) 86:11–19; TX 268 at '5875 ("Hubs provide Delta a significant competitive advantage: JetBlue's weakest overlap markets are at DL's big hubs, particularly in the BOS business markets."); TX 189 at '8047.

70.     The connectivity of those "hub-and-spoke" networks are a key differentiator for the legacy carriers and enable their vast networks, which allow them to take customers from anywhere to everywhere by connecting passengers over their hubs in ways other airlines cannot. Tr. 11/16/23 (Hurley) 146:6–16 ("The legacies, in general, have diversified networks and they're very good at attracting very different types of customers based on their product offering. They, because of the breadth of their networks, they can capitalize on certain regions in terms of customer and demand outperforming, versus others."); Tr. 11/1/23 (Christie) 29:7–17 ("[G]iven

[the legacies'] breadth and their size, the network itself drives significant value for consumers

and for the airline itself . . . But network airlines largely deploy hub-and-spoke type structures,

and they use that to offer connecting service to a broad array of passengers throughout their

network.  And that gives them . . . diversified revenue opportunities throughout their network

and allows them to effectively compete against point-to-point networks."); TX 49 at '1642

(United 2022 10-K explaining  hub and spoke system allows United "to transport passengers

between a large number of destinations with substantially more frequent service than if each

route were served directly" and "add service to a new destination from a large number of cities

using only one or a limited number of aircraft").

71.     Capacity across the legacy airlines is expanding at a rapid rate, as legacy carriers

have hundreds of aircraft on order.  Tr. 11/28/23 (Nocella) 13:15–18.

72.     United is also "upgauging" its planes, *i.e*., increasing seats per departure by

buying and flying larger planes on domestic routes.  Tr. 11/28/23 (Nocella) 13:24–14:4; TX 911

at '0325.

73.     Upgauging allows the legacies to lower their costs, which in turn allows them to

offer more basic economy tickets.  Tr. 11/28/23 (Nocella) 17:16–18:5 ("So, um, gauge is a really

important thing, it drives a lot of consumer benefits, but it also drives our costs down. … You

know it's not very often in a business where you can enhance your product and lower your unit

costs at the same time."), 29:12–13 ("[T]he upgauging of the airline has allowed us to offer more

seats in [the basic economy] class of service."); Dep. 7/12/23 (Beck 30(b)(6)) 19:2–17.

### (b)     Differentiated Fare Offerings

74.     The legacies' segmented cabins and differentiated fare offerings allows them to

compete for a complete range of customers.  *See supra* § II.A.1 (discussing legacy

segmentation); Tr. 11/28/23 (Nocella) 10:10–25; TX 130 at '4740, '4796; TX 189 at '8036.

75.     The legacies offer unbundled fare options designed to resemble ULCC-type products and compete for customers focused on price.  *See infra* § V.E.5 (discussing Basic Economy); Tr. 11/1/23 (Christie) 13:4–13; TX 39 at '0461; TX 130 at '4796; Dep. 7/12/23 (Beck 30(b)(6)) 14:15–15:3; Tr. 11/28/23 (Nocella) 24:22–25:8.  Since the pandemic, the legacies have continued to add capacity (including basic economy) in leisure markets.  *See infra* § V.E.5; Tr. 11/3/23 (Klein) 122:16–123:11; TX 334 at '4858.

(c)     <strong>Billion-Dollar Loyalty Programs</strong>

76.     The legacies reinforce their network advantages with their loyalty programs; frequent flyer programs and co-branded credit cards essentially subsidize their ability to grow. Tr. 11/1/23 (Christie) 26:3–9 ("[The legacies] have very lucrative, um, credit card affinity programs and loyalty programs, and all of those things give them significant revenue diversity. And so that when any one particular piece of their geography or their revenue base is suffering, they're able to offset those losses with other forms."); Tr. 11/6/23 (Hayes) 68:2–6 ("[L]oyalty particularly is a huge source of revenue and, um, profit growth for these legacy airlines, and really allows them to cross-subsidize their airline operations because of all the profits they're making from loyalty."); TX 189 at '8041 (2021 American slide titled "Our scale and loyalty program acts as a multiplier to generate additional revenue from passengers and partners across industries.").

77.     The legacies' loyalty programs have two key components:  (1) a frequent flyer or similar point-based loyalty program that allows consumers to accrue points and redeem them for tickets or services, and (2) a co-branded credit card, issued by a bank that buys points from the airline and gives them to the credit card holders as they spend.  Tr. 11/1/23 (Christie) 26:11–27:14 (explaining cobrand cards "further increase[] the hold on those customers as to their loyalty.  They continue to spend more on those credit cards to achieve more loyalty status.  And

it's a very virtuous cycle in that regard").  Both components are highly valuable sources of revenue and growth, particularly for the legacies.  *Id*.; Tr. 11/6/23 (Hayes) 72:9–73:5.

78.     Delta's loyalty program alone is worth billions of dollars.  *See* TX 138 at '4379 (in the first six months of 2023, Delta's loyalty program revenue was over $1.5 billion).  Delta's CEO recently boasted that "nearly 1 percent of U.S. GDP is being spent on the Delta AMEX credit card."  Tr. 11/6/23 (Hayes) 72:9–73:5.

79.     These loyalty programs are significant drivers of legacy airline relevance, as they incentivize "significant attachment to individual brands."  Tr. 11/1/23 (Christie) 28:17–29:3.

80.     Smaller airlines struggle to compete with the legacies' loyalty programs because the value of a loyalty program is driven to a large degree by the airline's network.  *See, e.g*., Tr. 11/6/23 (Hayes) 72:9–22 ("I think most Americans are in a loyalty program, and these things are massive. . . . And clearly if you are in an airline's loyalty program, I think you first check their flights to see 'Do they fly where I want to go?'"); Tr. 11/7/23 (Gardner) 70:6–12 (Spirit's Chairman of the Board, Mac Gardner: "[O]ne of the reasons that Basic Economy was, um, has been such a, um, challenge, is that while we have a loyalty program, these other airlines have, um, a much larger loyalty program, they've got people walking around with their credit cards.").

### (d)     Advantages Of Scale

81.     Since Congress's de-regulation of the airline industry in 1978, each of the legacy carriers has been able to achieve significant scale, in substantial part through mergers.  TX 130 at '4676; Dep. 6/28/23 (Nocella) 29:12–30:5 (merger with Continental allowed United "to create a nationwide and global air system"); Dep. 6/23/23 (Znotins) 103:24–104:23 (American's merger with US Airways enabled "more connecting options," "more stability," and the ability to "buy more airplanes"); *see* Airline Deregulation Act (ADA), Pub. L. No. 95-504, 92 Stat. 1705-54 (1978) (codified as amended at 49 U.S.C. §§ 1301-1552 (1982)).

82.     The legacies wield these structural advantages against JetBlue and other low-cost airlines. *See, e.g.*, Tr. 11/3/23 (Hayes) 168:4–8; TX 676 at '2626 (explaining how the legacies have tried to "drive the ultra-low-cost carriers out" of the market by lowering prices to below-cost levels).

83.     The legacies also use their massive fleets and dense presence at their "fortress hubs," which they use to "make life difficult" for smaller airlines.   Tr. 11/6/23 (Hayes) 86:12–87:24 ("Fortress Hub' is where you're flying 70, 80 flights a day and you have 60, 70, 80 percent market share."); Tr. 11/14/23 (Biffle) 41:21–25, 60:1–6 (explaining the legacies "typically work, um, feverishly with the airport authority to slow down, thwart, and knock down competition" at fortress hubs).  Fortress hubs include Newark, Boston, Atlanta, Charlotte, Chicago O'Hare, Dallas Fort Worth, Dulles, and Houston.  Tr. 11/3/23 (Yealy) 17:7–13; Tr. 11/8/23 (Kirby) 36:1–11; Tr. 11/14/23 (Wells) 133:1–24.

84.     Smaller airlines, without these inherent advantages, generally have difficulty competing with the legacies' networks because they cannot offer anywhere near the number of options for travelers.  Tr. 11/6/23 (Hayes) 86:22–87:24; Tr. 11/1/23 (Christie) 25:5–13 ("Well it's very challenging, um, in the market to compete with these large dominant airlines.  The Big 4. . . . control 75 percent of the capacity, 80 percent of the revenue in the market, and they offer a broad array of products to consumers that give them access to a number of people that Spirit could never serve, and they use that and their various forms of diversified revenue to compete effectively against the smaller airlines.").

85.     All of these factors have contributed to a world in which just two of the legacy carriers, Delta and United, made up "90 percent" of the profits earned in the airline industry in the third quarter of 2023.  Tr. 11/7/23 (Gardner) 71:11–17; Tr. 11/1/23 (Christie) 25:18–26:1; Tr.

11/28/23 (Nocella) 31:9–11, 31:17–32:1 (United and Delta account for approximately 90% of incremental revenue in the industry year over year as of third quarter 2023); Tr. 11/16/23 (Hurley) 145:6–9 (Delta and United made pre-tax profit of over $1.5 billion in Q3 2023).

### (2)   *Legacy Competitors*

86.     Along with Southwest Airlines, the three legacy carriers—American Airlines, Delta Airlines, and United Airlines—collectively control approximately 80% of domestic airline market share when measured by revenue.  TX 884; *see also* Tr. 11/27/23 (Hill) 11:11–24 ("[TX 884 shows] The Big 4 are indeed the Big 4.")

### (a)   **American (AA)**

87.     American Airlines is the largest airline in the United States by revenue with a 23% market share.  TX 883.

88.     In 2019, American's network consisted of approximately 20,000 domestic routes and, as of 2021, American's global route network contained nearly 55,000+ total routes globally across its partner airlines, serving 370 destinations over ten hubs.  TX 189 at '8029, '8037, '8039.

89.     American flew 260,226,000,000 available seat miles in 2022.  TX 47 (American Airlines 2022 10-K) at '5632.

90.     American's fleet is the largest among the legacies, Southwest, Spirit, and JetBlue with approximately 1,400 total aircraft.  Tr. 11/6/23 (Hayes) 86:12–86:21.

91.     American has "definitive purchase agreements" in place for the delivery of 182 new aircraft by 2027.  TX 47 at '5617.

92.     American merged with U.S. Airways.  Tr. 11/7/23 (Kirby) 87:9–1.

### (b)   **Delta (DL)**

93.     Delta Airlines is the second largest domestic airline in the United States by

revenue, accounting for 22% of revenue shares in the national airline market.  TX 883.

94.     At the end of 2022, Delta offered more than 4,000 daily flights to more than 275

destinations on six continents.  TX 48 at 7064.  Collectively with its alliance partners, Delta

served "over 130 countries and territories and over 800 destinations around the world."  *Id.*

95.     Delta's fleet is comprised of approximately 1,150 total aircraft (800 mainline jets

and 325 regional jets).  Dep. 7/12/23 (Beck 30(b)(6)) 22:19–23:3.

96.     Delta has "[a]ircraft purchase commitments" to receive 176 aircraft by 2025, and

152 additional aircraft after 2025.  TX 48 at '7099.

97.     Delta, too, has merged with other airlines, acquiring Northwest Airlines.  Tr.

11/7/23 (Kirby) 87:5–6.

### (c)     United (UA)

98.     United Airlines has a 17% revenue market share in the United States.  TX 883.

99.     As of this year, United's domestic route network included 619 nonstop routes,

thousands more connecting routes, amounting to "4,200, 4,300 [domestic] flights per day."  Tr.

11/28/23 (Nocella) 12:21–13:1; TX 185; TX 49 (United Airlines 2022 10-K); *see also* Tr.

11/28/23 (Nocella) 29:19–30:5 ("Well we're trying to bring a broad network out of the 7 hubs

that we fly to from the United States to make sure that passengers in those cities . . . have an

opportunity . . . to get where they want to go.").

100.     United Airlines flew 144,300,000 scheduled service passengers and

247,858,000,000 available seat miles in 2022.  TX 49 at '1680.

101.     United's fleet is "catching up quickly" to American's fleet—with 1338 aircraft.

Tr. 11/6/23 (Hayes) 86:12–86:21; Tr. 11/28/23 (Nocella) 19:2–8.

102.     United is currently executing a strategic plan known as "United Next," where it

has made three large aircraft orders amounting to approximately 800 new aircraft.  Tr. 11/28/23

(Nocella) 13:13–23; TX 911 at '0325.  United expects delivery of 115 to 120 aircraft in 2024, and an additional 650 or so aircraft left to deliver from 2025-2032 with options to acquire more. Tr. 11/28/23 (Nocella) 19:24–20:13

103.    United acquired Continental Airlines.  Dep. 6/28/23 (Nocella) 29:24–30:5; Tr. 11/7/23 (Kirby) 86:18–25.

### 2.    Low-Cost Carriers ("LCCs")

#### (1)    Characteristics Of LCCs

104.    JetBlue Airways, Southwest Airlines, and Alaska Airlines are known as "low-cost carriers" ("LCC").  TX 615 at '7879, '7897, '7902.

105.    LCCs are generally characterized as having low operating costs, which allow them to offer lower fares than the legacies while offering a better-quality product than ultra-low-cost carriers. Tr. 11/6/23 (Hayes) 58:1–18; Tr. 11/16/23 (Hurley) 155:8–11; TX 615 at '7879; TX 136 at '2722 ("One of [Southwest's] advantages is that we offer low fares and a premium value product and experience.").

106.    Alaska and JetBlue have introduced basic economy-like fare classes that offer a traditional unbundled ULCC product at a price competitive with the ULCCs while still offering the substantial competitive and product advantages possessed by these larger carriers.  TX 39 at '0461; Tr. 11/3/23 (Hayes) 169:15–18.  Southwest uses a slightly different model with four fare classes, all of which include two free checked bags and no cancellation or change fees.  TX 69 at '3765.

107.    One way JetBlue and Southwest keep costs low is through their "point-to-point" networks, which are characterized by flying a greater proportion of passengers on nonstop rather than connecting itineraries.  Tr. 11/2/23 (Clark) 150:9–18 ("Only about 10 to 15 percent of [JetBlue's] customer connect, and 80 or 90 percent of them fly . . . nonstop from their beginning point to their end point.");  TX 69 at '3761, '3763.  That is, point-to-point networks take customers

26

from "A to B," while hub-and-spoke carriers take customers "from A to B via C."  Tr. 11/6/23 (Hayes) 71:18–72:1.

108.    LCCs also keep costs low is by operating fewer models of aircraft in their fleet, which enable labor, maintenance, and other cost efficiencies.  Tr. 11/6/23 (Hayes) 100:16–20 ("So for every different type of airplane you have, you have to have different pilots trained to fly it. You have to have different -- you have to buy different maintenance parts. You have to enter into different maintenance agreements. You have to enter into different engine agreements. There's a complexity that comes with having three different types of pilots."); Tr. 11/16/23 (Hurley) 138:12–21 (explaining the "financial benefit and efficiency to engine and aircraft commonality"); TX 69 at '3763 ("Southwest's use of a single aircraft type has historically allowed for simplified scheduling, maintenance, flight operations, safety management, and training activities." ); TX 615 at '7884 ("Alaska focuses on fleet simplification with plans to phase out most of its Airbus fleet from the Virgin America acquisition by 2023.")

109.    LCCs can further reduce costs by operating at smaller or less costly airports that compete with legacy hub airports.  TX 69 at '3763.  These smaller, "secondary" airports are still convenient but "typically less congested than other airlines' hub airports," which allow for greater utilization "because aircraft can be scheduled to minimize the amount of time they are on the ground." *Id.*

110.    These savings allow LCCs to offer low prices while still being profitable. *See* Tr. 11/6/23 (Hayes) 58:3–10 (explaining JetBlue's strategy of keeping costs low in order to offer "lower fares and still be profitable"); Tr. 11/16/23 (Hurley) 157:18–24. ("The JetBlue business model is built around having a lower cost structure than the legacies so that we can enter these markets and be competitive from a fare perspective."); TX 136 at '2722–2723 ("[Alaska's] strong

financial position and low cost advantage have historically enabled us to offer competitive fares while still earning returns for our shareholders.").

### (2)   JetBlue (B6)

111.    JetBlue, the sixth largest airline by revenue, has an approximately 5% market share on a revenue basis. TX 883.

112.    JetBlue primarily serves the East Coast, with 93% of its routes touching at least one of its six focus cities, New York, Boston, Miami/Fort Lauderdale, Orlando, Los Angeles, and San Juan. TX 59 at '0964–0966; Tr. 11/16/23 (Hurley) 144:4–11.

113.    50% of JetBlue's routes touch New York, where JetBlue is only the fourth largest carrier on a revenue basis (following Delta, American, and United).  *See* Tr. 11/16/23 (Hurley) 144:4-11 ("50 percent of JetBlue's network today is exposed to New York."); TX 661 (showing market shares of NYC airports); *see also* TX 59 at '0964 (JetBlue 2022 10-K; "JetBlue[] is New York's Hometown Airline™").

### (a)   The JetBlue Value Proposition

114.    JetBlue was founded as a low-cost carrier in 1998 and commenced operations in 2000 with the mission to "bring humanity back to air travel." TX 612 at '1226–1227; TX 59 at '0964; Tr. 11/6/23 (Hayes) 51:7–23 ("[O]ur founders wanted quite a very different type of airline that put humanity at its core for both customers and also crew members"); Dep. 7/17/23 (Neeleman) 183:2–4 ("When I started JetBlue, I said it was going to be a customer-service company that just happens to fly airplanes").

115.    JetBlue differentiated itself from other airlines by carving out a "sweet spot" in the industry, offering a better on-board experience as the legacies but with a price tag that competes with LCC and ULCC offerings.  Dep. 6/9/23 (O'Brien) 219:12–17 (JetBlue is "the only one that really offers that sweet spot of low fares and a good product, a good product at a

good price. You've got some that may just do low price and some that have more product that is more costly, so we offer value."), 219:1–5 ("[Sweet spot is] what we refer to as our unique position that we believe is unique and beneficial to customers which is offering low fares, good product, great service."); Dep. 6/1/23 (Klinka) 176:2–16 (JetBlue's IMO Value Capture Lead, Derek Klinka, describing JetBlue's "value proposition" as "a differentiated customer experience, a low-cost profile that enables us to enter markets and establish the JetBlue effect and then a great competitive position relative to our peers"); Tr. 11/6/23 (Hayes) 52:6–16 ("our vision for the industry is that fundamentally a customer should not have to choose between a low fare and a great service"); TX 612 at '1227–1228; TX 613 at '5545.

116.    JetBlue's "business model was essentially built around having a lower cost structure than the legacies." Tr. 11/16/23 (Hurley) 155:8–10; TX 368 at '9388 (JetBlue's strengths include "lower cost structure (has enabled ~$3B in customer savings)"); TX 175 at '8777 ("JetBlue has historically maintained a CASM ex-fuel 'sweet spot' between Legacy carriers and other Low-cost carriers.").

117.    JetBlue has implemented innovative cost-saving strategies that help enable it to profit without increases in fares. Tr. 11/16/23 (Hurley) 155:6–156:3 ("we have a history of putting in place what we call structural cost programs, which identify initiatives throughout the organization to gain scale and efficiency to take costs out of the business"); TX 649 at '1606 (showing that JetBlue's balance sheet "remains among the strongest in the industry"); TX 613 at '5566 (showing that JetBlue has a significantly lower cost than legacy carriers). As explained by Mr. Hayes, "it's very important for [JetBlue] to continue to [offer] lower fares . . . there aren't many routes out there that a legacy airline isn't flying, right, they're so big and massive. And so when we grow and we look to come onto a new market, we need to then lower fares and also be

29

profitable.  And so this means the importance of keeping our costs down, that allows us to lower fares and still be profitable." Tr. 11/6/23 (Hayes) 58:3–10.

118.    Despite its lower cost base and lower fares, JetBlue's product offerings and service are, in the words of the Government, "superior . . . to many airlines, including legacies."  TX 912 at '6; *see also* Dep. 6/9/23 (O'Brien) 226:2–3 ("And our product is very highly rated, sometimes above legacy carriers."); TX 613 at '5563 (overview of JetBlue's superior core amenities in comparison to other airlines).

119.    JetBlue offers the most legroom in coach, with a seat pitch of at least 32 inches, and, in some of its airplanes, it offers the widest seat in coach.  TX 613 at '5562; TX 627; Tr. 11/6/23 (Hayes) 73:19–24, 76:22–25 ("we offer 32 inches, which is […] between 1 to 4 inches above our competitors"), 77:19–78:5 ("the [JetBlue coach seat] actually is one of the widest seats on the market"); *see also* Tr. 11/6/23 (Seat Viewing) 173:25–174:24 (seat viewing in Court comparing JetBlue's 32-inch core seats to Spirit's 28-inch core seats).

120.    JetBlue is the only U.S. airline that offers seatback entertainment on every seat. TX 613 at '5563.  JetBlue is also the only airline that offers up to 100 channels of free live TV at the back of every seat, as well as a library of recorded TV shows and movies, available for all customers free of charge.  *Id*.; Tr. 11/6/23 (Hayes) 78:19–79:9. Most seats also include power outlets.  Tr. 11/6/23 (Seat Viewing) 174:20–21; TX 613 at '5549.

121.    JetBlue was the first airline in the world to provide free high-speed Wi-Fi on its domestic flights and is still the only U.S. airline offering free high-speed Wi-Fi across the entire fleet.  TX 613 at '5549; Tr. 11/6/23 (Hayes) 73:25–74:6, 79:10–14, 79:10–23.

122.    JetBlue offers all its customers free unlimited brand-name snacks and soft drinks. Tr. 11/6/23 (Hayes) 80:8–13; TX 613 at '5549; Dep. 6/9/23 (O'Brien) 88:21–25.

123.    JetBlue also consistently ranks at or near the top in customer satisfaction and first-choice rankings.  Tr. 11/6/23 (Hayes) 81:14–83:5; TX 613 at '5565; TX 59 at '0966 (JetBlue 2022 10-K explaining, "Our customers have repeatedly indicated the distinctive JetBlue Experience is an important reason why they select us over other carriers.").  In 2019 alone, JetBlue received awards from *Travel + Leisure* (#1 Domestic Airline), J.D. Power (Highest in Customer Satisfaction among LCCs), the Points Guy (Best Domestic Economy Class & Best Domestic Business Class), and AirlineRatings (Top Rating in Safety and Product Offerings). TX 613 at '5565.

124.    2019 is not an outlier; JetBlue is a 13-time J.D. Power Award winner for customer satisfaction and its high-quality product and customer service have been recognized throughout the industry since inception.  TX 59 at '0966 (JetBlue 2022 10-K, stating, "Our customers have repeatedly indicated the distinctive JetBlue Experience is an important reason why they select us over other carriers."); TX 54 at '0120 (JetBlue 2017 10-K listing JetBlue's awards for "industry leading customer service"); TX 55 at '0238 (JetBlue 2018 10-K listing same).  JetBlue also takes the number one spot in customer experience studies. TX 613 at '5565.

125.    JetBlue continues to invest in innovations that differentiate itself from competing airlines. TX 612 at '1258.

### (b)    JetBlue Serves All Air Travelers

126.    JetBlue competes across the cabin by offering multiple classes of services across its aircraft: an unbundled, basic economy seat (called Blue Basic), a main cabin seat (called Blue), an "Even More Space" option, and Mint, its premium offering.  Tr. 11/2/23 (Clark) 163:11–18; Dep. 6/9/23 (O'Brien) 221:19–25  ("[W]e're giving customers a choice of different product options . . . we've got different things for different people, not one size fits all."), 223:21  ("We serve all customers."); Dep. 6/28/23 (Nocella) 61:17–20 ("Q And so fair to say United competes with

JetBlue in, sort of, multiple passenger segments, Mr. Nocella? A We do.").

127.    Blue Basic, JetBlue's unbundled fare, comes at JetBlue's "lowest price point," with customers having the option to purchase ancillary services like carry-on luggage and seat selection for an additional fee.  Dep. 6/9/23 (O'Brien) 246:23–247:2.  Even on Blue Basic, however, customers "get the whole JetBlue experience;" they have access to free seatback televisions, free entertainment, free unlimited premium food and beverages, free WiFi, and industry-leading legroom.  *Id.* 246:23–25, 247:5–11 ("There's a lot included in Blue Basic. So you get the free wifi. You get the TV. You get all the films. You get the free snacks. You've got the extra leg room. So it's really those ancillaries themselves . . .  like baggage, checking on board [that are not included].").

128.    Blue Basic is available on all JetBlue flights.  Tr. 11/2/23 (Clark) 9:8–15.

129.    The Mint product further distinguishes JetBlue from every domestic LCC and ULCC carrier (all of which offer a single class of service).  TX 912 ¶¶ 25–26.  JetBlue's lie-flat seats are the longest on a domestic premium flight. TX 613 at '5549.

130.    In addition to its various fare and high-quality product offerings, JetBlue also appeals to the full array of customer segments because it offers a diversified network that includes both business- and leisure-oriented routes and scheduling options that appeal to leisure, VFR, and business travelers.  Tr. 11/6/23 (Hayes) 55:6–14 ("JetBlue competes for [price-sensitive leisure customers, but we're also competitive for other segments of customers too, whether that's a family taking their kids on vacation, a small medium-sized company, or people visiting relatives on a trip."); Tr. 11/9/23 (Friedman) 123:25–124:7 ("[O]ur strategy on customer segments is really tied to the focus city strategy . . . By building out a focus city, by building out the right routes, serving those routes correctly, we are able to tap into as many customer

segments as we can."); Tr. 11/28/23 (Scheff) 60:5–19 (describing JetBlue as "very active for both leisure passengers and business passengers").

        **(c)**     **JetBlue's Loyalty Program Is Not Just For Frequent Flyers**

131.    Unlike other airlines' "frequent flyer" programs, JetBlue's TrueBlue loyalty program allows all customers, regardless how frequently they fly, to accrue and redeem points for various benefits (or "tiles") throughout the booking and flight experience.  Dep. 6/9/23 (O'Brien) 90:6–91:21 (explaining how "every customer, not just frequent flyers . . . can earn points more easily and get benefits without being . . . an elite status customer"), 91:16–21 ("JetBlue offers benefits through its loyalty program to infrequent leisure travelers, more frequent leisure travelers and business flyers, so it's for everyone. Many other programs you have to be a frequent flyer."); Tr. 11/16/23 (Hurley) 149:5–19 ("[W]e value customers spending any dollar with JetBlue and we reward them for that.").

132.    JetBlue offers a co-branded credit card with Barclays, which allows customers to earn points for every dollar they spend.  Dep. 6/9/23 (O'Brien) 92:21–93:2 ("You can earn rewards through spend on the [credit] card, on flights, on other travel products, such as cars, hotels."); Tr. 11/6/23 (Hayes) 67:6–15 ("We have a loyalty program that our customers can be part of which conveys benefits, you know, outside of just JetBlue."); TX 613 at '5552 (overview of TrueBlue "cash flows and customer benefits").

        **(d)**     **JetBlue's Primary Competitors Are The Legacies**

133.    Delta, American, United, and Southwest are JetBlue's biggest competitors.  *See infra* § VII.A.1 (discussing JetBlue's competitors); TX 660 (showing revenue, passenger, and seat share of domestic U.S. airlines on city pairs that JetBlue flew from Q2 2022–Q1 2023); *see also* Tr. 11/9/23 (Friedman) 105:18–106:23 (describing American as the "800-pound gorilla" in South

Florida but, beyond American, South Florida's competitive environment is "fairly fractured and pretty dynamic between Delta, Spirit, United, Southwest, and Frontier").

134.    JetBlue's high-quality service allows it to compete "closely with the legacy airlines and . . . constrain their pricing" and to compete "effectively against the legacy airlines in ways other LCCs and ULCCs could not."  TX 912 at 7, 9, 11; Dep. 7/17/23 (Neeleman) 135:22–136:2 ("[W]hen JetBlue goes into a market, their competitive response is a lot more aggressive against JetBlue than it is against Spirit because they're just -- JetBlue is seen as more of a threat because the product is so much better"); Tr. 11/27/23 (Hill) 25:1-9.

135.    JetBlue's primary focus is on its competition with the legacy airlines.  TX 368 at '9362, '9388 (showing JetBlue's plan to maximize its Boston performance in response to accelerating growth from Delta in Boston and SWOT analysis including competition with Delta in Boston); Tr. 11/2/23 (Clark) 157:17–21 ("Our biggest focus of competition is against Delta, specifically, throughout our network, and in Boston particularly.")

### (e)    JetBlue's Value Proposition Is Uniquely Disruptive

136.    JetBlue's value proposition has had a uniquely disruptive effect on the airline industry.  *See* Tr. 11/6/23 (Hayes) 126:11–127:1 (explaining that JetBlue has demonstrated for over 23 years that it will remain a maverick).  The Government recognized that JetBlue has "disrupted the airline industry, leading to better outcomes for consumers."  TX 912 at 5.  This Court also touted JetBlue as a "maverick" that challenges the legacy airlines. *United States v. Am. Airlines Grp*., No. 21-11558-LTS, 2023 WL 3560430, at *34 n.81 (D. Mass. May 19, 2023) ("The parties all agree, and the Court finds, that JetBlue has played a unique role in the domestic air travel industry and qualifies as a 'maverick' competitor for present purposes.")

137.    Most indicative of JetBlue's maverick status is the "JetBlue Effect," which refers to

JetBlue's ability to discipline legacy carriers' prices through its combination of disruptive fares and quality service on routes where JetBlue competes.  TX 612 at '1229; TX 912 at 12–14; 11/6/23 (Hayes) 38:23–39:8. The term was coined by an MIT study that determined that when JetBlue enters a market, competing airlines lower their fares and passenger demand increases.  TX 912 at 12; Dep. 1/18/23 (Clark) 261:20–262:4.

138.    The JetBlue Effect describes the decrease in fares that occurs after JetBlue enters a market, or the increase in fares that occurs after JetBlue exits a market, due to other airlines response to JetBlue's combination of quality and low fares.  TX 912 at 12–14; TX 668.

139.    Because the JetBlue Effect forces *other* airlines to lower their fares, air travelers do not need to be JetBlue customers to benefit from the JetBlue Effect.  Tr 11/6/23 (Hayes) 57:9–16 (explaining that the "JetBlue Effect" means that when JetBlue "come[s] into a market with lower fares, our legacy airline competitors will lower their fares in response to what we're doing, and given their size, right, about four of them control about 80 percent of the market, the reality is most people are always going to fly on a legacy airline and most people are going to benefit with our presence when they fly on another airline"); Tr. 11/16/23 (Hurley) 151:3–6 ("I mean, we've shown historically, right, through the JetBlue Effect that we bring consumer benefit across the board when we enter markets and go head-to-head against these legacy airlines."); TX 912 at 13–14.

140.    Indeed, the Government has recognized that travelers have benefited from the JetBlue Effect "whether or not they flew on JetBlue."  TX 912 at 13.

141.    For example, when JetBlue entered BOS-LGA in 2016, average fares dropped 36 percent and customer traffic increased by 41 percent. TX 612 at '1230; Tr. 11/6/23 (Hayes) 61:3–14.  Average fares dropped by 29 percent when JetBlue entered BOS-DCA, 53 percent when it entered BOS-CLE, 35 percent when it entered BOS-DTW, 48 percent when it entered BOS-EWR,

and 38 percent when it entered BOS-Minneapolis-St.Paul. TX 668; *see also* TX 912 at 13; Tr. 11/2/23 (Clark) 152:16–22.

142.    On the transatlantic market, JetBlue's entry caused average fares in the economy cabin to drop 15 percent across major transatlantic carriers. TX 614 at '9602; Tr. 11/2/23 (Clark) 162:14–19.

143.    When JetBlue entered New York City-Savannah, average fares for Delta and United dropped about 30 percent and customer traffic increased by roughly 70 percent. Tr. 11/27/23 (Hill) 35:23–36:2, 52:12–18; TX 891; TX 894.

144.    When JetBlue enters markets, rival carriers drop their fares by an average of 13 percent.  Tr. 11/27/23 (Hill) 36:6–16; TX 892.

145.    The JetBlue Effect increases with JetBlue's "entry intensity," i.e., "the ratio of JetBlue's planes that it enters with to the number of planes that are already on the route and the planes with which JetBlue entered."  *See infra* § VI.A.1; Tr. 11/27/23 (Hill) 37:20–24; TX 892.  In short, the more JetBlue, the more JetBlue Effect.

146.    Similarly, when JetBlue exits a market, prices increase. For example, when JetBlue exited JFK-Richmond, fares increased by 65 percent and passenger counts fell by 49 percent.  TX 912 at 14; *see also* Tr. 11/6/23 (Hayes) 62:5–19 (explaining that fares increased with 67 percent when JetBlue exited JFK-Pittsburgh).

147.    Competition from JetBlue's Mint product has also been successful in forcing legacies to lower business class fares in transcontinental and transatlantic markets. TX 612 at '1232 (on JFK-LAX, JetBlue entered with $599 flight, 79 percent lower than cheapest business class ticket in the market); Tr. 11/6/23 (Hayes) 62:23–63:19.  After JetBlue entered with its low-fare Mint product in London, peak fares and walk-up fares dropped by about 50 percent, and

across the industry, business class fares dropped by about 30 percent compared to pre-Mint prices.

. 11/2/23 (Clark) 161:10–162:3; TX 614 at '9602.

148.     The JetBlue Effect also refers to how competitors improve their quality of service

or product in response to entry by JetBlue.  Tr. 11/6/23 (Hayes) 64:10–20 ("JetBlue is probably

more responsible for the improvements and enhancements in airline service and product quality

that we've seen from anyone else in the last 10 or 15 years."); TX 912 at 12; TX 612 at 1258

("JetBlue became famous for challenging the status quo in areas where Customers felt left behind

by other airlines.  Now, our competitors are upping their game with improved onboard amenities

and strong operational performance.").

149.     JetBlue has long offered free Wi-Fi and in-flight entertainment; other airlines

have reacted to JetBlue's product offering by providing the same service.  Tr. 11/6/23 (Hayes)

64:6-20, 73:17–74:6.

150.     In 2016, when JetBlue began offering its domestic lie-flat experience between

Boston and West Coast destinations, competitors reacted by increasing lie-flat seating capacity

and developing their own "domestic aircraft configuration that include lie-flat seating."  *See*

*supra* § II.A.3; Tr. 11/2/23 (Clark) 154:13–155:9; TX 614 at '9604 ("JetBlue prices are

consistently 40%-50% lower than competitors for close-in business travel to New York."); TX

912 ¶ 37 ("Legacy airlines offered more fare options for business class customers after JetBlue

introduced Mint."), ¶ 38 ("Competition from Mint resulted in an increase in the number of

business class seats."), ¶  41 ("Competitors have copied elements of JetBlue's Mint product.").

151.     In June 2020, JetBlue initiated $0 change fees; shortly after, Delta and United

matched, and an American Airlines executive noted that it had no "choice but to match."  TX

912 at 10.

152.     Recently, Delta made significant changes to its loyalty program and JetBlue was "pretty successful" in "convert[ing] some of those [Delta] loyalists over to JetBlue," which resulted in Delta rolling back some of the changes it made to its loyalty program.  Tr. 11/16/23 (Hurley) 149:24–150:17.

153.     The Government has recognized that "[i]n total, competition between JetBlue and the legacy airlines has saved travelers billions of dollars." TX 912 at 12; TX 668 (DOJ's opening slide in NEA noting: "JetBlue has saved customers flying to and from Boston about $3 billion over the past fifteen years").

### *(3)     Other LCCs*

### (a)     Southwest (WN)

154.     Southwest Airlines is the largest low-cost carrier in the United States and the world, TX 615 at '7947, with an 18% revenue share on all routes. TX 883.

155.     As of December 31, 2022, Southwest served 121 destinations in 42 states.  TX 69 at '3759 (Southwest 2022 10-K).   As of December 31, 2022, Southwest served 825 nonstop city pairs.  *Id.* at '3761.

156.     Southwest flew 126,586,000 scheduled service passengers and 148,467,000,000 available seat miles in 2022, at an average fare of $169.12 per passenger.  TX 69 at '3857–3859.

157.     Southwest's fleet is comprised of approximately 770 planes. TX 69 at '3759; Tr. 11/6/23 (Hayes) 86:12–87:24.  Southwest "came out in October and placed a 100-aircraft order."  Tr. 11/16/23 (Hurley) 143:2–3.

158.     As of December 31, 2022, Southwest's order book consisted of a total of 417 Boeing MAX firm orders through 2030 and 147 MAX options for the years 2024 through 2027.  TX 69 at '3865.

159.     In 2011, Southwest acquired AirTran.  Tr. 11/7/23 (Kirby) 88:2–5.

**(b)     Alaska (AS)**

160.     Alaska Airlines is a smaller LCC that is the fifth largest airline in the U.S., with an approximately 6% market share on a revenue basis on all routes. TX 136 at '2715–2716 (Alaska 2022 10-K); TX 883.

161.     Alaska is a primarily West Coast carrier that serves 120 destinations throughout North America.  TX 136 at '2716.

162.     Alaska flew 41,648,000 scheduled service passengers and 60,773,000,000 available seat miles in 2022. TX 136 at '2746.

163.     Alaska has approximately 225 aircraft in its fleet.  TX 136 at '2717.

164.     As of year-end 2022, Alaska had firm orders for 105 Boeing B737 aircraft to be delivered through 2027, with rights for 105 additional aircraft through 2030.  TX 136 at '2716.

165.     In 2016, Alaska acquired Virgin America, which was formally merged into the Alaska brand in 2018. TX 136 at '2716;  Tr. 11/7/23 (Kirby) 88:18–20.

**3.     Ultra-Low-Cost Carriers ("ULCCs")**

*(1)     Characteristics Of ULCCs*

166.     Spirit, Frontier, Allegiant, Sun Country, Allegiant, and Avelo are the primary domestic ultra-low-cost carriers.  *See* Tr. 11/6/23 (Hayes) 54:22–55:5.  Breeze considers itself an LCC but offers an unbundled product that competes with the ULCCs.  Dep. 7/17/23 (Neeleman) 17:22–18:11 ("Breeze is an airline, low-cost airline. We like – we call it an NLCC, a nice low-cost carrier. . . . We charge really low fares, charge for bags.")

167.     ULCCs make up a small fraction of the market overall, with approximately 7% of total revenue attributable to ULCCs.  TX 883.

168.     ULCCs are known for offering low base fares and a single class, "unbundled" product, allowing passengers to pay more for amenities included in typical legacy airline and

LCC fares, such as printed tickets, WiFi, in-flight entertainment, in-flight food and drinks, online bookings, and carry-on bags.  Tr. 10/31/23 (Christie) 89:12–90:3; Tr. 11/1/23 (Christie) 7:12–8:17; Tr. 11/3/23 (Hayes) 160:8–17; TX 347 at '2963.

169.   ULCCs generally do not offer traditional "premium product[s]" on their flights, as the legacies and some LCCs, like JetBlue, do.  *See* Dep. 7/12/23 (Beck 30(b)(6)) 10:3–15 (explaining that "American, United, Alaska, and JetBlue on a portion of their fleet" have premium products, but not identifying any ULCCs).

170.   ULCCs generally maintain low unit cost structures, which allow them to offer low base fares.  *See, e.g.*, TX 347 at '2960 (2022 Spirit slide showing Spirit, Sun Country, and Frontier maintained the lowest cost structures of all airlines as of Q3 2022).

171.   ULCCs generally target leisure and VFR customers.  *See, e.g.*, TX 347 at '2962.

172.   These airlines typically operate point-to-point networks—meaning an "aircraft is leaving any individual city and going to its next," and as opposed to a legacy "hub and spoke model"—that move aircraft "as quickly as possible to its next destination."  Tr. 10/31/23 (Christie) 86:3–87:1; *see also* Tr. 11/7/23 (Kirby) 89:21–25 ("[Spirit's] network is predominantly point-to-point. We only schedule for connectivity in Fort Lauderdale.").

173.   Other hallmarks of ULCC airlines, including Spirit, include high seat density and relatively high utilization.  TX 39 at '0446–0447; Tr. 10/31/23 (Christie) 85:5–24 (explaining that "seat density" and higher asset utilization—"the number of hours that airplane is in revenue service every day"—contribute to "lowering your unit cost").

174.   ULCCs tend to have larger passenger shares than revenue shares for two reasons. For one, there is less "willingness to pay" for an unbundled product with "less leg room, no snacks, no drinks, no TV, no Wi-Fi."  Tr. 11/2/23 (Clark) 99:13–24.  Additionally, when

accounting for ancillary fees, the gap between passenger and revenue shares generally narrows. *Id.*

175.   ULCCs maintain nimble network plans that allow for rapid entry and expansion into routes that are either unserved or underserved by other ULCCs.  *See, e.g.*, Tr. 11/8/23 (Kirby) 99:4–12 ("But what I observed since we loaded our suspensions, Frontier has backfilled the Orlando Aguadilla route with a second daily trip, and they've backfilled our Orlando Ponce capacity with additional weekly frequencies."); Tr. 11/14/23 (Biffle) 88:20–25 (explaining Frontier considers itself "one of the most" nimble carriers, based in part on the inherent mobility of aircraft).

### (2)   Spirit (NK)

### (a)   Spirit's Business Model

176.   Spirit changed its business model in the mid-2000s, after it was purchased by a private equity company.  Tr. 11/1/23 (Christie) 6:16–7:2.  Spirit introduced the ULCC concept to the United States, implementing a model that had been adopted by other airlines in Europe and Asia.  Tr. 11/1/23 (Christie) 7:3–11 ("Q. Did Spirit invent the ULCC model?  A. We did not. … [the management and investment team] looked to Europe and looked to Asia at a few airlines that had this idea of a more unbundled service, and decided to apply that here in the United States.").

177.   Spirit's model is characterized by offering "unbundled" base fares, which remove components traditionally included in the price of an airline ticket, such as checked and carry-on bags, advance seat assignments, priority boarding, and refreshments on board, which Spirit calls "non-fare" or "ancillary" products.  TX 39 (Spirit 2022 10-K) at '0444.

178.   Approximately half of Spirit's revenue in 2022 came from ancillary products (as opposed to the fare for travel).  Tr. 11/1/23 (Christie) 15:6–12 ("it's approaching about an even

split these days, so about 50 percent of our revenues comes from the ticket and 50 percent come

from ancillary products.").

179.    Approximately two-thirds of Spirit's customers choose to add one or more

ancillary products.  Tr. 11/1/23 (Christie) 14:25–15:5.

180.    Spirit uses several strategies to keep costs low, for example, by offering high-

density seating configurations on its aircraft, a "simplified" onboard product, operating an all-

Airbus fleet, and "opportunistic outsourcing of operating functions."  TX 39 (Spirit 2022 10-K)

at '0447.

181.    However, Spirit is not the lowest-cost airline in the industry.  In 2022, Frontier's

unit cost structure was lower than Spirit's.  *Compare* TX 39 (Spirit 2022 10-K) at '0447

(showing Spirit's Cost Per Available Seat Mile, or CASM, to be 11.67 cents in 2022) *with* TX 71

(Frontier 2022 10-K) at '4167 (showing Frontier's CASM to be 10.62 cents in 2022).

182.    While Spirit's "unit cost advantage enables" it "to offer some of the lowest base

fares in our markets," TX 39 (Spirit 2022 10-K) at '0447, Spirit does not set prices for fares and

ancillaries just above its costs.  It prices to maximize its revenue.  Tr. 11/3/23 (Klein) 106:23–

107:18 ("we don't price at all and control revenue at all based on costs.  Our job is to maximize

revenue on the aircraft . . . While [costs] matter[] in the long run, it has nothing to do with what

we're doing in the short or medium term trying to get as much revenue on board as possible.").

183.    Spirit's customers are principally leisure travelers.  It typically does not carry

business travelers or those seeking a more premium experience.  Tr. 11/3/23 (Klein) 76:6–14

("Q.  And you say that Spirit's product may not be for everyone, correct?  A.  That's correct. . .

Our target would definitely be leisure customers."); Dep. 6/27/23 (Klein) 248:7–22 ( "Spirit

doesn't go out of its way to compete for corporate travelers" it doesn't have  the "infrastructure

in place" and legacies and LCCs are competing for corporate travelers); TX 302 at '9590 (Sept. 16, 2020 Investor Presentation noting that Spirit has "low exposure to business . . . travel").

184.    Today, Spirit has just over 200 aircraft in its fleet.  TX 39 (Spirit 2022 10-K) at '0491 ("During 2022, we grew our fleet of Airbus single-aisle aircraft from 173 to 194 aircraft"); TX 625 (as of August 2023, Spirit had a fleet of 204 Airbus aircraft, with firm orders to grow to 234 aircraft by year end 2025).

185.    Despite its growth over the past decade, Spirit remains a small player in the industry, with less than four percent of the market measured in revenue.  Tr. 11/1/23 (Christie) 21:18–22:6 ("Q. Do you know what percentage Spirit's $5.1 billion in 2022 comprise of all airline revenues in the United States? A. I think we were about 3 percent or just under 3 percent of the total revenue in the industry. Q. Okay. And do you know how this $5.1 billion compares to the revenues of 2022 of the Big 4 airlines combined, American, Delta, United, and Southwest? . . . A. The large four airlines are the biggest part of the industry, they're about 80-plus percent of the total revenue in the industry. If I'm not mistaken, in '22 they had between $165 and $170 billion in revenue.").

186.    Spirit remains the seventh largest airline in the United States based on available seat miles.  Tr. 11/1/23 (Christie) 18:12–16; TX 293 at '4250.

### (b)    Spirit Has Many Competitors Offering "Unbundled" Fares Today

187.    Although Spirit was the first domestic airline to adopt the ULCC model, it now has many imitators.  Tr. 11/1/23 (Christie) 7:3–11.  Today, at least four other airlines—Frontier, Sun Country, Allegiant, Avelo, and Breeze—use unbundled fare structures similar to Spirit's. *Id.* at 7:12–9:14.

188.    The number of ULCCs in the domestic market, and the number of routes served

by those ULCCs, has increased significantly over the past decade.  Tr. 10/31/23 (Christie) 114:21–115:5 ("THE COURT: Well, the same, low-cost – ultra low-cost carriers are growing faster than low-cost carriers, or low-cost carriers are growing faster than legacy? I didn't get the comparison. THE WITNESS: I don't have all the data right at my – but my – but my experience would tell me that the ultra low-cost segment is growing, on percentage terms, faster than the low-cost segment. And the low-cost segment is growing, on percentage terms, faster than the legacy segment."); Tr. 11/1/23 (Christie) 9:12–14 ("Frontier has been a rapid-growing airline over the last 5 or 6 years, and I think it may have almost doubled over that period of time.").

189.    That growth is spurred in part by the ULCC's significant fleet orderbooks and options to acquire additional planes.  ULCCs (excluding Spirit) expect to receive approximately 156 new aircraft in 2024 and 2025.  *See* TX 194 at '0007 (Breeze plans to add 18 aircraft in 2024 and 18 aircraft in 2025); TX 702 at '1650 (Frontier to add 23 aircraft in 2024 and 42 aircraft in 2025); Tr. 11/3/23 (Yealy) 41:15–25 (Avelo plans to acquire 5 aircraft in 2024); Tr. 11/15/23 (Wells) 21:6–8, 22:4–16 (Allegiant expects to add 50 aircraft in 2024 and 2025); *see also* Tr. 11/27/23 (Hill) 22:3–16 ("So here we're taking the [ULCC's] order book and subtracting off planned retirements. And you can see there would be a significant growth in capacity for each of these firms.").

190.    In addition, other airlines—including United, American, Delta, Alaska, and JetBlue—have introduce unbundled basic economy fares similar to Spirit's product offering.  *See infra* § V.E.5; Tr. 11/1/23 (Christie) 12:11–13:22; TX 679 at '5006.

191.    Today, the larger airlines are expanding their Basic Economy offerings, presenting Spirit with more competition—and travelers in search of unbundled fares with more choices.  *See infra* § V.E.5; Tr. 11/28/23 (Nocella) 27:2–28:4 ("millions of passengers" flew

Basic Economy on United in Q3 2023); Tr. 11/1/23 (Christie) 13:14–14:8.

192.    As a result of these market changes, Spirit now has more competitors than ever before that are offering low, "unbundled" fares to leisure travelers. Tr. 11/1/23 (Christie) 13:4–22; Dep. 6/27/23 (Klein) 71:12–72:4 (explaining that, although Spirit's model has been successful, it's "niche . . . has now been also competed with by airlines with similar models" and that "[n]early all airlines, off the top of my head, have added products or have added aspects to their business model to mimic the Spirit business model").

193.    This increased competition has created headwinds for Spirit.  As Spirit disclosed in its annual securities filing in 2022, replication of its business model by new, and better-resourced, competitors has presented existential risks in the "extremely competitive" airline industry: "Our growth and the success of our ULCC business model could stimulate competition in our markets through our competitors' development of their own ULCC strategies, new pricing policies designed to compete with ULCCs or new market entrants. Any such competitor may have greater financial resources and access to less expensive sources of capital than we do, which could enable them to operate their business with a lower cost structure, or enable them to operate with lower marginal revenues without substantial adverse effects, than we can.  If these competitors adopt and successfully execute a ULCC business model, we could be materially adversely affected."  TX 39 (Spirit 2022 10-K) at '0460–0461.

194.    Spirit has had difficulty competing against the larger airlines.  Because the legacies cater to a larger number of destinations and more customer segments, they have diversified revenue streams that they have been able to deploy strategically to compete against Spirit and other ULCCs.  *See supra* § II.B.1(1)(d); Tr. 11/1/23 (Christie) 25:1–15, 29:4–17 ("[G]iven [the Big Four's] breadth and their size, the network itself drives significant value for

consumers and for the airline itself").

### (c)    Spirit's Network Strategy And Plans

195.    When deciding where to fly, Spirit—like other airlines—primarily seeks
profitability.  Tr. 11/1/23 (Christie) 23:16–24:3; Tr. 11/3/23 (Klein) 86:13–22 ("Q. Now, in the
airline business, what is the overarching strategy for network planning?  A. Really what you're
trying to do is seek out profits.  You're looking to see where you can move your aircraft."); Tr.
11/8/23 (Kirby) 51:2–6 ("We try to maximize profitability while maintaining long-term
sustainability.'").

196.    One consideration in deciding where to fly is the extent to which Spirit can
stimulate demand in the marketplace by offering lower fares—the so-called "Spirit Effect."  Ted
Christie, Spirit's CEO, uses this term as a general matter to describe stimulating demand, rather
than lowering rivals' fares through competitive pressure:  "We describe the Spirit Effect insofar
as it's basic economics. We're in a supply-demand environment, which means that there is
demand for product, and there is a corresponding supply of that product, and the clearing price of
that product shows you where those two curves intersect. And the Spirit Effect basically says if
you can lower fares, you're stimulating additional demand into the marketplace. So more people
travel more frequently with lower fares."  Tr. 10/31/23 (Christie) 102:22–103:16 ("Q. So, in
other words, there's a component of the Spirit Effect that is driving fares down on a route; is that
right? A. To be clear, it's trying to come into a market with lower fares than existed prior to our
existence. However, we are actively managing the revenue on our aircraft so that we can charge
the highest amount we can to achieve our target margins, yes.").

197.    Stimulation in demand on a route does not always lead to a profit for Spirit.
Sometimes to stimulate demand, Spirit has to lower fares to an unsustainable level, causing Spirit
to exit that route.  Tr. 11/3/23 (Klein) 119:10–21 ("Q.  Have there been occasions when Spirit

has been able to stimulate demand on a route but that has not translated into a profit for Spirit?

A. Yeah, sure. . . we'll try to rehab the market . . . [but i]f we can't do that, and if lower fares are

too low and we're not profitable, then we will ultimately have to exit.").

     198.    Spirit recognizes that low prices are not the only thing that can stimulate demand

on a route.  Dep. 6/13/23 (Bartolotta) 130:24–131:3 ("Q. Is it fair to say that stimulation of

demand can also occur by offering more leg room or more onboard amenities, but at a higher

price point? A. If that is valuable to consumers and it's something that they can afford to do, then

yes.").

     199.    Spirit has not attempted to quantify the Spirit Effect since 2019.  Tr. 11/3/23

(Klein) 119:22–120:12.

     200.    Although Spirit aims to stay on a route indefinitely, it will exit a route if it is not

profitable.  Tr. 11/8/23 (Kirby) 58:23–59:17 74:1–7; Tr. 11/3/23 (Klein) 91:24–92:14; Tr.

11/1/23 (Christie) 23:16–24:3 ("[T]he primary determinant is profitability. So we're in constant

review of our network and where we see routes that are underperforming, um, from a

profitability standpoint, we start to make adjustments to those routes in the form of the level of

capacity we are serving in the market.").

     201.    Like all airlines, Spirit makes changes to its network "constantly."  Tr. 11/8/23

(Kirby) 52:21–53:1; *see also* Tr. 11/3/23 (Klein) 100:23–101:2 ("[I]s Spirit unusual in how often

it changes its network?  Oh, no. Not at all.  We're – every airline is changing their network all

the time.").

     202.    Spirit can add routes to its network in as little as five weeks (or three months if it

is not already present at an airport).  Tr. 11/3/23 (Klein) 90:20–91:23.

     203.    Spirit can exit a route in as little as five weeks as well, if the route is not

profitable.  Tr. 11/3/23 (Klein) 98:14–22.

204.    Approximately once per year, Spirit's management prepares "flexible" five-year

network plans for its Board of Directors, identifying potential opportunities for new flying. TX

285 at '6074; Tr. 10/31/23 (Christie) 112:6–11 (Spirit is "constantly iterating [its five-year

network] plan throughout the course of the year").

205.    Spirit has presented three five-year network plans to its Board of Directors over

the last four years.  *See generally* TX 285 (May 2019); TX 307 (May 2021); TX 331 (May

2023).

206.    Reflecting the dynamic nature of the industry, Spirit's network plans are "never

really set in stone."  Tr. 11/3/23 (Klein) 94:2–95:1 ("They're plans, and then we immediately

adjust as necessary.… depending on what we're seeing in the marketplace, it can inform us as to

whether or not we need to adjust off of what we think we want to be doing in the near future.");

Tr. 11/8/23 (Kirby) 60:4–9, 61:20–62:11 ("Q: Why do you need to prepare it annually if it's a 5-

year plan? A. Because this is a very dynamic industry that's constantly changing. Quite frankly,

even by the time we get to the budget plan, which is only a month or two later, it's already stale.

… competition, economies, pandemics, there's always something that derails a plan."); TX 285

at '6074 (stating that the May 2019 five-year network plan was "constructed to be flexible, as

market conditions change… refreshed annually").

### (d)    Spirit's Prior History Of Seeking A Merger Partner

207.    Spirit began to explore the idea of a merger with another airline as early as 2016.

Over the years, it has considered Frontier, Sun Country, Viva Colombia, Allegiant, and JetBlue

as potential merger partners.  Tr. 11/1/23 (Christie) 51:7–52:24; TX 297 at '1933–1940

(Spirit/Frontier Merger Proxy outlining history of Spirit's negotiations with Frontier preceding

the February 2022 signed agreement, including discussions that occurred as far back as 2016).

208.    Spirit has consistently considered a merger to be advantageous because it did not believe it could achieve competitive significance by independent growth alone.  Tr. 11/1/23 (Christie) 51:7–52:24 (the "primary issue here is we recognized the dominance of the larger airlines in the space. We were concerned that, um, our independent growth would not be significant enough to be able to become a relevant player, a relevant fifth challenger in the U.S. base, and so we began exploring this idea in 2016 as a way to kind of combine and create that more viable fifth competitor."), 53:2–11 (explaining the "primary benefit" of potential merger explored with JetBlue in 2018 was "identical to what we evaluated in [Spirit's eventual merger agreement with Frontier," which was to "create a national fifth challenger to the large four airlines, creating an opportunity for us to achieve some relevance and scale and be a more effective competitor against those four airlines"), 87:6–88:10 ("Well since the beginning of our investigations into various mergers, which dates back to initial conversations back into 2016, so for the better part of 7 years, we've been exploring different combinations with different airlines in an effort to achieve that scale and be a viable fifth competitor, yes."); Tr. 11/7/23 (Gardner) 60:14–62:3 ("We've always, um, looked at and thought that scale and size was important. Most of the reason -- when we would do these strategic reviews -- and the last one in the course of this case, the first one that sort of shows up is 2018, but I'm pretty sure we were doing it before that.").

### (3)    Other ULCCs

### (a)    Frontier (F9)

209.    Frontier is an ultra-low cost carrier with an approximately 2% market share.  Tr. 11/14/23 (Biffle) 36:23–25; TX 883.

210.    Frontier has rapidly grown over the last half decade, doubling in size and steadily

increasing its overlap on Spirit's routes.  Tr. 11/1/23 (Christie) 9:10–14.  Spirit and Frontier

overlap on approximately 50% of the airlines' respective overall capacity.  *Id.* at 8:20–9:9

("Frontier I believe we overlap on about 50 percent of our capacity.").

211.    Frontier offers a broad network spanning the majority of the United States.  Tr.

11/14/23 (Biffle) 74:19–22 ("Q. Is it true that as of today Frontier serves, within 90 minutes of

driving, 90 percent of the U.S. population?  A. That's correct.").

212.    Frontier has increasingly expanded into numerous primary airports through the

past several years, and has bases in Orlando International (MCO), Harry Reid Las Vegas Airport

(LAS), Denver International (DEN), Dallas-Fort Worth (DFW), Phoenix (PHX), Tampa Bay

(TPA), Atlanta (ATL), Philadelphia (PHL) and Miami (MIA).  Tr. 11/14/23 (Biffle) 36:12–15.

Tr. 11/1/23 (Christie) 11:1-13.

213.    Frontier flew 25,486,000 scheduled service passengers and 31,746,000,000

available seat miles in 2022.  TX 71 (Frontier Airlines 2022 10-K) at '4184.

214.    Frontier offers "roughly daily" flight frequencies.  Tr. 11/14/23 (Biffle) 77:21–

78:1 ("Q. In fact what is Frontier's average frequency nationally?  A. We are roughly daily

now.").

215.    Frontier has continued to invest in its growth, including "acquir[ing] aircraft,"

"parts," "pilots, flight attendants, mechanics," and is "making significant investments acquiring,

you know, hangars, real estate gates, all types of things to invest in growth."  Tr. 11/14/23

(Biffle) 42:25–43:8.

216.    Frontier's current fleet comprises 134 planes, Tr. 11/14/23 (Biffle) 89:19–25, TX

702 at '1647, and it held a significant order book of 214 planes as September 30, 2023, TX 702

at '1650.

217.    Even after accounting for aircraft delivery delays, Frontier expects to receive another 4 planes this year, 23 planes in 2024, 42 planes by 2025, 41 planes by 2026, and 42 by 2027.  Frontier will also receive another 62 new planes after 2027.  Tr. 11/14/23 (Biffle) 93:12–94:4 ("Q. Now this timeline is accurate to Frontier's best knowledge as of the date of the filing, correct? A. That's correct."); TX 702 at '1650.

218.    Frontier expects only a "minimal impact" from the Pratt & Whitney's turbo-geared engine issues grounding much of Spirit's fleet.  *See infra* § V.A.1 (discussing engine issues); Tr. 11/14/23 (Biffle) 47:7–48:1 ("Q. Are you familiar with the recent issues facing operators at Pratt & Whitney's turbo-geared engine? A. Yes. Q. How has Frontier's performance been impacted with that issue? A. We have not been impacted.").

219.    Frontier's fleet is also the youngest of any major U.S. carrier.  *See* TX 347 at '2964 (as of Nov. 2022, Frontier's average fleet age was 4 years).

220.    Frontier has a "great desire to grow in international" markets.  Tr. 11/14/23 (Biffle) 99:22–100:22.  It currently offering service internationally to numerous locations, including Punta Cana, Santa Domingo, St. Thomas, St. Martin, Cancun, Casa Mora, El Salvador, Guatemala, Jamaica, the Bahamas, and the Dominican Republic.  Tr. 11/14/23 (Biffle) 99:22–100:22 (listing current international destinations, and noting Frontier is "looking at" opportunities in Aruba and Haiti.

221.    Frontier does not have any apparent constraints on its ability to recruit and train pilots.  Tr. 11/14/23 (Biffle) 118:7–119:2 ("We've looked at … for example, like, I could train like three times as many pilots as those I'm currently training.").

### (b)    Allegiant (G4)

222.    Allegiant is an ultra-low-cost carrier with a revenue share between 1 and 2 percent.  TX 883.

223.     Allegiant serves the third-highest number of destinations (125) out of any U.S. airline, and serves close to 600 unique routes based on its network diversification strategy.  Tr. 11/14/23 (Wells) 138:7–17 ("Into the pandemic we actually served more domestic cities than any other airline, including legacies.  American and Delta, as they've gone to main-line service on the bigger aircraft to some of the smaller cities, have passed us. But it's third among all in the U.S. industry."); Dep. 6/22/23 (Wells) 181:24-182:3 ("Q.  And how many routes does Allegiant currently serve?  A.  Approximately 570.").

224.     Allegiant serves 24 bases, 6 of which are located in Florida, as Allegiant serves "leisure customer[s] and Florida is a very strong leisure-oriented state."   Tr. 11/14/23 (Wells) 156:13–21.

225.     Allegiant flew 16,630,138 scheduled service passengers and 18,419,045,000 available seat miles in 2022.  TX 70 at '4045.

226.     Allegiant's business model has evolved in recent years.  *See infra* § II.C.1; Tr. 11/14/23 (Wells) 157:10–25.  Pursuant to that evolving business plan, Allegiant more regularly serves routes that compete with other airlines.  Tr. 11/15/23 (Wells) 33:27–24 ("[W]e've gone from about 0 percent [competitive routes] at the beginning to 25 percent where we are today."); *see also* Dep. 6/22/23 (Wells) 37:4–11 ("[O]ur model has evolved to include many larger cities around the country, including Chicago, Houston, Boston, the New York area, and the DC area.").

227.     Allegiant is "[n]ot afraid" to compete with legacy carriers on their routes.  *Compare* Tr. 10/31/23 (Gov't Opening) 21:24–22:5 ("Spirit is not afraid to compete against legacies, but that's not true for many other ULCCs. . . . THE COURT: That's Allegiant, right? MS. MARKEL: That is, your Honor, yes.") *and* Tr. 10/31/23 (Gov't Opening) 24:23–24 ("As you'll hear at trial, Allegiant purposely shies away from competition . . ."), *with* Tr. 11/15/23

(Wells) 15:10–13 ("[THE COURT:] You're afraid to compete with legacies?  THE WITNESS: Not afraid, no, sir.  THE COURT: Well that takes care of it. I mean that's his testimony.").

228.    Allegiant also effectively competes in metro regions by providing service to secondary airports that compete with primary airports in the same area.  Tr. 11/15/23 (Wells) 8:24–9:5; Dep. 6/22/23 (Wells) 57:24-58:5 (explaining "proxy airports" are "generally … the same geographic region and predominantly would have influence – potential influence on … price or demand in – in an area").

229.    Allegiant currently has 127 aircraft in its fleet, and estimates having 230 aircraft by 2029.  Tr. 11/15/23 (Wells) 22:19–21, 23:18–24:9.

230.    A portion of that estimate is an option to receive an additional 80 planes, which would have a "meaningful impact" on Allegiant's growth and "was almost entirely dedicated to the growth of the airline."  Tr. 11/15/23 (Wells) 20:24–21:17 ("We'll certainly have some retirements of older aircraft, but this order was almost entirely dedicated to the growth of the airline.").

231.    Allegiant anticipates receiving approximately two aircraft a month for the next two years, beginning in early 2024, until it receives 50 total aircraft.  Tr. 11/15/23 (Wells) 22:4–16.

232.    Allegiant generally tries to "match the capacity" of its routes with "the level of demand that exists" and will increase frequency on that route if it identifies an uptick in demand.  Tr. 11/14/23 (Wells) 129:2–9, 137:4–25; Tr. 11/15/23 (Wells) 8:12–23.

233.    Allegiant's current fleet utilization is around 7 hours per day.  Tr. 11/15/23 (Wells) 19:3–5.  Allegiant is actively seeking to improve its fleet utilization metrics using its new fleet.  Id. at 19:6–9, 19:15–20:7 ("Q. And would that utilization increase with your new fleet

coming in?  A. Certainly. The Boeing Max has 20 percent less fuel burn, which produces a better economic outcome for us to fly more.  Q. And so how much higher would you anticipate it to be with the new planes? A. Um, we believe we should fly those probably 10 to 20 percent more than we would the Airbus.").

234.    Allegiant does not currently offer international service, but it plans to and has an "application out to do so" through a joint venture with VivaAerobus in Mexico.  If that application had been approved as requested, Allegiant would be providing service to Mexico today.  Tr. 11/14/23 (Wells) 134:19–135:8; Tr. 11/15/23 (Wells) 24: 12-18.

235.    If that application were approved, Allegiant currently "believe[s it] can be selling within probably 30 days with about a 3-month window to begin operations" in international markets.  Tr. 11/15/23 (Wells) 24:12–22; *see also id.* at 24:23–25:4 ("Q. Now in addition to Mexico, are, um – are the Caribbean and Latin America natural extensions of your offerings?  A. Very much so, yeah.  Q. And so those would be natural next steps for your international expansion?  A. Correct.").  After approval of that application, Allegiant plans to serve other countries.  *Id.* at 38:2–8 ("First things first, getting across the finish line with our joint venture…before, um, moving past that to other countries.").

236.    Apart from that pending approval, and "some IT development" that Allegiant has outsourced to a third-party vendor, Allegiant has no unique constraints or barriers preventing the airline from offering international service.  Tr. 11/15/23 (Wells) 25:5–11, 37:1-38:8.

237.    There is no record evidence that Allegiant currently has any constraints on its ability to recruit and train pilots.

### (c)      Avelo (XP)

238.    Avelo is an ultra-low-cost carrier that began commercial service on April 28, 2021.  Tr. 11/3/23 (Yealy) 8:19–23.  In 2021, Avelo operated 3 planes; now, only two years

later, it operates 16 airplanes and 68 routes.  Tr. 11/3/23 (Yealy) 8:24–25, 37:17–18, 41:4–9.

239.    Avelo's executives are seasoned and experienced; they have founded and led the growth of other ULCCs, including Allegiant, and have worked at many other airlines as well. Tr. 11/3/23 (Yealy) 43:16–44:8 (Avelo's CEO was co-founder of Allegiant and CFO of United, and other Avelo executives have experience from "Allegiant, United, Delta, JetBlue, and others").

240.    Avelo, like Allegiant, minimizes costs and maintains network flexibility by returning its aircraft to "bases" each night, which reduces the need for certain infrastructure at airports at which Avelo operates.  Tr. 11/3/23 (Yealy) 12:24–13:17.

241.    Avelo generally targets routes and categories of passengers similar to Spirit, including "leisure and visiting-friends-and-relatives customers."  Tr. 11/3/23 (Yealy) 9:21–10:4.

242.    Avelo plans to acquire 5 more planes in 2024, and intends to continue growing its fleet in the future.  Tr. 11/3/23 (Yealy) 41:18–42:5.

243.    Avelo already has "all of the regulatory approvals and designations it needs to fly commercially internationally" and "could support flights, for instance, to Mexico or the Caribbean."  Tr. 11/3/23 (Yealy) 38:25–39:20.

### (d)    Breeze (MX)

244.    Breeze Airways operated its first flight on May 27, 2021, with a fleet of 8 aircraft. TX 194 at '0009.  Since then, Breeze has grown rapidly to a fleet of 31 aircraft and 150 routes, as of July 2023. Dep. 7/17/23 (Neeleman) 17:23–18:5

245.    Breeze is the fifth low-cost carrier founded by David Neeleman, also the founder of JetBlue.  Dep. 7/17/23 (Neeleman) 143:24–144:1.

246.    Although Breeze considers itself an LCC, it uses a ULCC-style unbundled approach to fares, charging "a lower fare with the option to purchase individual ancillary services (including

fares bundled with certain supplemental services)." TX 194 at '0012.

247. Breeze targets leisure and VFR customers; it does not market its product to business travelers and "does not operate a schedule attractive to business customers." TX 194 at '0015; Dep. 7/17/23 (Neeleman) 154:11–16.

248. Breeze is expecting to grow significantly in the next couple of years, adding up to 120 aircraft. Dep. 7/17/23 (Neeleman) 17:23–18:5. As of September 6, 2022, Breeze had plans to add the following aircraft to its fleet: twelve in 2023, eighteen in 2024, eighteen in 2025, and ten in 2026. TX 194 at '0007. It has no plans to remove aircraft from its fleet prior to 2026. *Id.*

249. Breeze also has plans to add international routes in the near future. Dep. 7/17/23 (Neeleman) 46:11–16 (explaining that Breeze would like to commence international service by this winter).

### (e)     Sun Country (SY)

250. Sun Country brands itself a "hybrid low-cost carrier" that offers a higher-quality product than ULCCs "primarily [for] leisure and VFR travelers," but maintains lower costs than Southwest and JetBlue. TX 72 at '4271. Sun Country charges for baggage, seat selection and upgrades, priority check-in and boarding, itinerary service, and onboard sales. *Id.*

251. While Sun Country markets its product as higher-quality than other ULCCs, offering "generous legroom, complimentary beverages, in-flight entertainment, and in-seat power," they still provide low-fares "designed to stimulate demand from price-sensitive travelers seeking a superior product to ULCCs." TX 72 at '4271.

252. In 2022, Sun Country operated 73 markets out of Minneapolis-St. Paul International Airport (MSP). TX 72 at '4273. Sun Country increased its non-MSP markets from 8 in 2017 to 29 in 2022. *Id.*

253. Sun Country flew 3,598,584 passengers and 5,637,233,000 available seat miles in

2022.  TX 72 at '4370.

254.     As of December 31, 2022, Sun Country operated a single-family fleet of 54 aircraft, including 42 aircraft for passenger service and 12 cargo aircraft.  TX 72 at '4271.

**C.**     **The Airline Industry Is Inherently Dynamic**

**1.**     **Airlines' Business Models Evolve**

255.     Airlines' business models are dynamic and evolve to meet consumer demand. Frontier, for example, transitioned to an ultra-low-cost model to enable the airline "to reduce the seasonality of our revenue, improve utilization, lower unit costs, increase revenues and enhance profitability from 2013 through 2019."  TX 71 at '4105.

256.     Allegiant's business model has also evolved over time.  Allegiant "started as an airline very much focused on the smallest cities that were generally unserved going to Vegas and Orlando, the biggest destinations."  Tr. 11/14/23 (Wells) 157:10–16.  Around 2014, Allegiant began to enter "midsized cities" like Austin and Cincinnati.  *Id*. 157:16–25.

257.     Allegiant refers to its evolution over the past several years as "Allegiant 2.0."  Tr. 11/15/23 (Wells) 6:1–5, 7:13–15.  Starting in 2016, Allegiant shifted its focus to "bigger northeast cities," expanding to Newark, Boston, Houston, and Chicago—cities that Allegiant "typically hadn't been in but represented a big opportunity" due to their "underserved demand profile."  Tr. 11/14/23 (Wells) 157:10–25.

258.     Allegiant 2.0 also involved a revamped fleet strategy:  while Allegiant previously flew used planes, it recently ordered a "brand new Boeing Max fleet" that will be delivered beginning in 2024.  Tr. 11/15/23 (Wells) 6:20–7:1.  Allegiant's Chief Revenue Officer, Drew Wells, explained this new fleet "will serve as a backbone for [Allegiant 2.0's] growth moving forward."  *Id*.

259.    Avelo's business model has likewise evolved in its relatively short lifespan.  The "current incarnation of Avelo" was founded in late 2018 when Andrew Levy, Avelo's founder, acquired a charter airline called Xtra Airways.  Tr. 11/3/23 (Yealy) 8:8–13.  In April 2021, Avelo launched its first flight as a ULCC.  *Id*. at 8:19–21.  Avelo is now "the U.S.'s most ultra-low-cost carrier," operating six bases throughout the United States.  *Id*. at 8:22–23, 18:2–6.

260.    Breeze's model has also shifted since its first flight in 2021.  While its initial focus was on city pairs without existing non-stop competition, as Breeze is growing and becoming more profitable, it is adding service on routes in competition with other airlines, including Spirit and JetBlue, as well as entering routes between larger airports.  Dep. 7/17/23 (Neeleman) 44:22–45:22 ("[O]ur original plan was just to fly where there wasn't nonstop service, but we've started adding service on cities [where] we're competing with other airlines. When we see the fares get high, […] we add, and those cities are doing well."), 66:5–17 ("[O]nce you start making money, then you can be more aggressive against the competition. And so that's why, as we've approached profitability, we're starting to compete more and more with the airlines").

261.    Similarly, Spirit has not always been a ULCC.  As Mr. Christie explained, "Spirit was founded in the '80s and ran a traditional two-class airline with a business class product and a coach product and a traditional bundled service offering" until the mid-2000s, when it was purchased by a private equity firm and transitioned to a ULCC model.  Tr. 11/1/23 (Christie) 6:20–7:2.

262.    As a result of its current financial difficulties, Spirit is considering making "strategic shifts," including changes to its cost structure, its product, and its network.  *See infra* § V.A.4; Tr. 11/1/23 (Christie) 48:3–25 ("If the business isn't making money, you can't justify deploying additional capital for growth, so we're going to have to evaluate that going forward.

We're going to have to take a hard look at our cost structure and whether or not we can make any changes to that to influence profitability."); TX 678 at 1 (Spirit Press Release Reporting Q3 2023 Results, stating, "We are prepared to make the necessary strategic shifts to enable Spirit to compete effectively in this new demand backdrop.").

263.    The legacy carriers, too, have been forced to adapt their businesses to changing demand.  Between 2015 and 2017, Delta, United, and American introduced Basic Economy offerings intended to compete with the ULCC model.  *See infra* § V.E.5; TX 39 at '0461.

### 2.    Networks Constantly Evolve; Route-Level Market Shares Change Frequently

264.    As recognized by all parties, including the Government, the airline industry is "dynamic and volatile."  Tr. 11/1/23 (Christie) 105:9–20 ("Q. And, in fact, that's because the airline industry is a dynamic and volatile industry; right? A. It is. … Q. And, in fact, to some degree in the airline industry it's always something, right, that's impacting operations in one way or the other?"); Tr. 11/6/23 (Hayes) 110:18–21 ("[I]t's a very dynamic industry.  Profitability on different routes comes and goes . . ."); Tr. 11/16/23 (Hurley) 137:21–138:3 ("[W]e live in an ever-dynamic industry and sector and things can change on a dime."); Tr. 11/8/23 (Kirby) 62:6–8 ("[I]ndustry dynamics change all the time, competition, economies, pandemics, there's always something that derails a plan.").

265.    Entry, repositioning, and exit on routes are common in the airline industry given that dynamism.  *See, e.g.*, TX 885; TX 886; Tr. 11/27/23 (Hill) 10:20–21, 14:3–24 ("'[E]ntry' will be a carrier beginning to serve a route it was not previously present on, and 'repositioning' will be a carrier changing the frequency with which it serves a route.").

### (1)    *Network Plans Are Fluid And Constantly Changing*

266.    Airplanes are "portable assets" that are "easily" moved from one route or airport

to another route or airport in search of profitability.  Tr. 11/14/23 (Biffle) 79:14–21 ("[I]t's not

like a hotel. If you build a hotel and it doesn't work well, you're stuck."); Tr. 11/1/23 (Christie)

22:1–23:11 ("[B]ecause the assets are mobile, they are in constant rotation throughout the

network, and . . . individual routes are in flux at any given point."); Tr. 11/27/23 (Hill) 16:4–17:3

("[R]oughly 20 percent of the [Government's alleged] nonstop presumption routes changed so

that they were no longer presumption routes due to entry or exit and 7 new ones appeared. So

what it's showing is the dynamism in the industry, the extent to which routes evolve and carriers

move their aircraft around to serve new routes.").

      267.    Accordingly, "all airlines" engage in "continuous optimization" of their networks

to ensure "aircraft are deployed as productively as possible." Tr. 11/2/23 (Clark) 125:8–126:8;

Tr. 11/3/23 (Klein) 100:23–101:2 ("[E]very airline is changing their network all the time."); Tr.

11/14/23 (Wells) Tr. 144:18–21 (explaining the "fluid environment" in which airlines plan their

networks); Tr. 11/14/23 (Biffle) 76:6–19 (testifying about Frontier's growth and entry into new

routes); Tr. 11/3/23 (Yealy) 37:3–5 ("[W]e're always looking at opportunities to add new routes

to our network."); *see also* TX 189 at '8029 (explaining how American is "evolving [its] network

growth strategy"); TX 69 at '3761 ("[Southwest] continually works to optimize its route network

and schedule through the adjustment of frequencies in its existing markets and the addition of

new markets and itineraries, while also pruning less profitable flights from its schedule.").

      268.    When consumer demand or competitive conditions change, airlines must adapt

their networks accordingly.  Tr. 11/16/23 (Hurley) 137:21–138:3; Tr. 11/3/23 (Klein) 125:24–

126:1 ("And as the competitive dynamics change, airlines have to assess what's happening and

then also change along with it."); Tr. 11/6/23 (Hayes) 110:18–21 ("[I]t's a very dynamic

industry. Profitability on different routes comes and goes, and you'd want the ability to fly those

[planes] to where you think you can have the most consumer benefit.").

269.    Airlines are constantly monitoring competitors' capacity and schedule changes in order to capitalize on new opportunities as quickly as possible.  For instance, JetBlue sends weekly "Competitive Schedule Change" reports summarizing capacity changes both inside and outside the JetBlue network in order to monitor competition in adjacent markets and better understand other airlines' network strategies.  Tr. 11/2/23 (Clark) 127:11–16, 129:17–130:18.  Spirit does the same with its weekly "change tape."  Tr. 11/3/23 (Klein) 101:18–102:7.

270.    JetBlue's network planners also prepare "Quarterly Network Reviews" to update senior leaders on JetBlue's network performance, optimization strategies, and growth initiatives, including new route and other network opportunities.  Tr. 11/2/23 (Clark) 57:7–18; TX 257 at '0888–0890 (discussing "new" and "second chance" opportunities in legacy markets during COVID-19 pandemic); TX 268 at '5866–5867 (discussing network optimization plans through closures and redeploys); TX 276 at '7096 ("Next Mint deliveries will prioritize existing routes to keep fares low while expanding profits.").

271.    When an airline exits or reduces capacity on a "proven" route, other airlines seek to quickly enter or expand to fill any unmet demand.  Tr. 11/14/23 (Biffle) 104:3–13 (explaining that if Spirit exits routes, Frontier "would look [to enter] those probably first because they're proven"); Tr. 11/3/23 (Yealy) 39:21–40:18 (explaining Avelo began commercial service from Dubuque, Iowa following American's exit from the airport); Dep. 7/17/23 (Neeleman) 215:21–216:18 (explaining Breeze monitors Frontier's entries and exits because "those are potential markets that we can go in. These are all, you know, either backfill opportunities or areas that we have to take a look at").

272.    Airlines also monitor capacity and competition *outside* their network, including

potential entrants on routes.  *See* Tr. 11/2/23 (Clark) 129:17–130:18 (explaining JetBlue tracks

changes outside of its network in order to monitor (1) competitors' strategies and (2) "adjacent

markets" that touch an airport JetBlue serves or "an airport near an airport" that JetBlue serves);

Tr. 11/9/23 (Friedman) 120:18–22 (JetBlue monitors "out-of-network changes" that it

"consider[s] to be interesting changes that are happening across the industry but don't

necessarily touch a route that JetBlue flies"); Tr. 11/3/23 (Klein) 102:13–103:17 ("Q. To what

extent does Spirit consider the potential entry by airlines that are not currently flying on a route

in making decisions about network planning? A. It's very important for us . . . if we know that

airlines are going to start to see our data, and we start to see changes being made through the

weekly review of network changes, then we may think about should we be adding more service

into a route that we already serve . . .  I would assume, so are other airlines . . . And it doesn't

take a long time for another airline to figure that out and go in if they want to."); Tr. 11/8/23

(Kirby) 54:14–55:21 (explaining Spirit considers potential entrants in making its own entry

decisions and describing two specific examples involving Hartford-Nashville and New York

City-Oakland); Tr. 11/3/23 (Yealy) 36:7–22 (explaining that when Avelo considered a

Wilmington to San Juan route, it looked at demand for flights from Philadelphia to San Juan to

"see what the existing traffic looked like that the carriers, the incumbent carriers were able to

achieve"); Dep. 6/23/23 (Znotins) 38:2–11 (American's SVP of Network Planning, Brian

Znotins: "When we were building our schedules and looking to attract passengers, we take into

account other flights operated into a city that are not going to the same airport that we are

evaluating."); TX 172 at '8212–8213 (JetBlue lowered fares, increased capacity, and increased

frequency on JFK-PSE in order to "remain the carrier of choice even as ULCCs play a larger role

in other mutual PR and DR markets"); TX 174 at '1117 ("Reduced capacity and stronger

margins vs system make BOS susceptible to competitive incursion[.] JetBlue must remain vigilant . . .”).

273.     Airlines’ network strategies are necessarily nimble, as natural disasters, pandemics, and other environmental factors can affect demand for air travel—on a specific route, in a particular geographic region, or the country as a whole—in an instant.  *See, e.g.*, Tr. 11/2/23 (Clark) 137:22–138:4; TX 189 at ‘8068; TX 12 at ‘0041; TX 189 at ‘8068 (July 2021 American deck stating, “Similar to previous crises, COVID-19 will act as a ‘reset’ for the industry creating material transformations.”); TX 12 at ‘0041 (noting demand impacts of Hurricane Ian in South Florida markets).

### (2)     *Low Route- And Airport-Level Barriers Enable Frequent Entry, Expansion, And Repositioning*

274.     In the ordinary course, entry, exit, and expansion are everyday occurrences.  Dr. Chipty, one of the Government’s economic experts, identified 4,701 entry events by just four ULCCs in five years.  *See infra* ¶¶ 414–417; Tr. 11/21/23 (Chipty) 133:21–134:24, 138:7–9.

275.     JetBlue’s competitive schedule change reports include tens if not hundreds of capacity changes every week.  Tr. 11/2/23 (Clark) 131:17–24 (50–70 changes is a “fairly typical week”).

276.     Indeed, in a span of only ten months (July 5, 2022–May 2, 2023), JetBlue’s weekly reports showed 19 entry events had occurred on the 51 nonstop overlap routes identified by the Government’s other economic expert, Dr. Gowrisankaran, as the “heart” of this case.  *See* TX 696; Tr. 11/9/23 (Friedman) 161:11–15 (“From the July 5th through May 2nd period[, t]here were 19 entry events across those 51routes, and those 19 entry events occurred on 16 different routes.”).  When exits, seasonal flying, and frequency changes are included, those 51 routes alone saw over 700 total competitive schedule changes during the same period.  *See* TX 697; Tr.

11/9/23 (Friedman) 163:14–18.

277.     These rapid and frequent capacity changes are possible because the vast majority

of airports in the United States are unconstrained.  *See infra* § V.B (discussing airport

constraints); Tr. 11/8/23 (Kirby) 86:5–10 (explaining that all airports at issue in this case except

LaGuardia have available common-use capacity); Dep. 6/28/23 (Nocella) 95:9–11 ("[T]he vast

majority of the airports in the United States are -- you're free to go or free to come whenever

you'd like."); Tr. 11/9/23 (Friedman) 156:3–158:21 (discussing lack of constraints in Florida

airports).

*(3)     Order Books Enable Dynamic Network Planning*

278.     In light of the dynamic nature of the industry, order books are necessarily flexible.

Tr. 11/16/23 (Hurley) 137:21–138:3 ("You know, we live in an ever-dynamic industry and sector

and things can change on a dime. And so building in any flexibility to our fleet planning is very

beneficial.").

279.     Airlines throughout the industry use "options," i.e., planes reserved by a

manufacturer for a specific carrier, which the carrier can choose to "convert" into a firm

commitment at a later date.  Tr. 11/16/23 (Hurley) 94:9–12, 100:6–10, 130:1–7 ("[A]n option is

an option.  Right?  So you have the ability to determine whether you want to turn that into a firm

aircraft or not."); Tr. 11/16/23 (Roeschke) 59:9–12 (an option is "the right to acquire an aircraft

at a later date").

280.     Options "allow[] an airline to assess the economic backdrop and the supply-and-

demand dynamics" when determining whether to acquire aircraft.  Tr. 11/16/23 (Hurley) 130:1–

7.

281.     JetBlue's CFO, Ursula Hurley explained that because of the "dynamic

environment" in which airlines operate, JetBlue decides whether to exercise options and acquire

planes based "on the market dynamics at that point in time."  Tr. 11/16/23 (Hurley) 101:20–23,

115:21–23 ("We live in a dynamic environment and so I don't want to have to make decisions

prior to when is necessary."); *see also* TX 175 at '8795–796 (ordinary course example of JetBlue

discussing "pros" and "cons" of exercising options and "accelerating retirements").

282.    Options also enable more flexible growth plans.  *See, e.g.*, Tr. 11/15/23 (Wells)

21:9–24 (explaining how Allegiant's 80 options "would have a meaningful impact to growth"

and would allow Allegiant to "fly more often in lower-demand environments, while still

maintaining the ability to park the aircraft if we need to continue to match capacity with demand

. . ."); TX 69 at '3764 ("[Southwest] retains significant flexibility to manage its fleet size . . . if

growth opportunities do not materialize.").

## III.    DEFINING THE RELEVANT MARKET

### A.    <u>The Relevant Product Market Includes All Air Travelers</u>

283.    The relevant product market is scheduled air passenger service.  Joint Proposed

Pretrial Order at Uncontested Facts, p. 8, ¶ 12, ECF No. 191.

284.    The Government did not define a separate market for scheduled air passenger

service for cost-conscious customers.  Tr. 11/20/23 (Gowrisankaran) 126:11–13.

285.    Dr. Gowrisankaran did not calculate shares for this group of consumers or analyze

whether a market of scheduled air passenger service for cost-conscious customers would be too

narrow to pass the Hypothetical Monopolist Test.  Tr. 11/20/23 (Gowrisankaran) 127:14–17.

286.    People have different preferences at different times:  there is no firm, objective

boundary between cost-conscious consumers and other consumers.  *See supra* § II.A.1

(discussing customer segments and preferences); Tr. 11/20/23 (Gowrisankaran) 126:14–17 ("Q.

You agree there's no firm objective boundary between cost-conscious consumers and other

consumers; correct? A. That's right. I'm not here to offer an opinion that there's a firm boundary, rather it's a continuum.").

287.    The same customer could be cost-conscious for some flights, but not others.  *See supra* § II.A.1; Tr. 11/20/23 (Gowrisankaran) 126:18–127:3 ("Q. In fact, the same customer could be cost-conscious for some flights but not for others; correct? A. Sure.").

288.    An analysis of average income data shows that customers purchasing Blue Basic fares (JetBlue's unbundled, lowest fare offering) and Spirit fares have similar average annual incomes. Tr. 11/27/23 (Hill) 27:4-19; TX 888 at 13 (in 2022, the average annual income of JetBlue Blue Basic and Spirit passengers on nonstop overlap routes, based on a review of median income in those passengers' zip codes, was $108,292 and $105,395 respectively).

### B.    The Relevant Geographic Market Is The United States

#### 1.    Market Definition Is Intended To Illuminate The Competitive Effects Of The Merger

289.    The ultimate goal of market definition is to "illuminate the evaluation of competitive effects." Tr. 11/17/23 (Gowrisankaran) 61:13–18 ("And so that under the merger guidelines, the way that we choose among markets that pass the Hypothetical Monopolist Test is that we want to look at markets that 'illuminate the evaluation of competitive effects' . . . ").

290.    A "necessary condition in defining [a] market" is to pass the Hypothetical Monopolist Test.  Tr. 11/20/23 (Gowrisankaran) 97:8–11 ("Q. You'd agree, Doctor, that passing the Hypothetical Monopolist Test is a necessary condition in defining market; correct? A. Yes, I would.").

291.    The Hypothetical Monopolist Test is intended to identify markets that are too narrow.  Tr. (Gowrisankaran) 11/20/23 93:7–11.  However, the goal of market definition is not to select the narrowest market that passes the Hypothetical Monopolist Test, but to choose the

market that most illuminates the competitive effects of the merger.  *Id.* at 93:16–19.  Choosing narrower or broader markets is akin to "zooming in or zooming out on the competition at issue." *Id.* at 93:20–25.

### 2.    Dr. Gowrisankaran's Route-Level Market Definition Is Unreliable

292.    Dr. Gowrisankaran implements the Hypothetical Monopolist Test by relying on a "critical elasticity" test.  Tr. 11/20/23 (Gowrisankaran) 97:15–19.

293.    The "critical elasticity" is the elasticity at which a 5% price increase by a hypothetical monopolist would become unprofitable.  Tr. 11/20/23 (Gowrisankaran) 98:10–13. A proposed market would pass the Hypothetical Monopolist Test if the actual elasticity of the proposed market is below the critical elasticity and would fail the Hypothetical Monopolist Test if it were above the critical elasticity.  *Id.* at 99:2–98:12.

294.    Here, Dr. Gowrisankaran identifies the critical elasticity as 1.82.  Tr. 11/20/23 (Gowrisankaran) 98:17–20.

#### *(1)    The Article On Which Dr. Gowrisankaran Himself Relies For Elasticity Estimates Itself Shows That His Proposed Markets Fail The Hypothetical Monopolist Test And Are Therefore Too Narrow*

295.    Dr. Gowrisankaran sources one of his estimates of actual elasticity from a 2010 article by Drs. Steven Berry and Panle Jia.  Tr. 11/20/23 (Gowrisankaran) 102:22–103:1.  Dr. Gowrisankaran considers Drs. Berry and Jia's article to be "well-published" and "one of the seminal articles in economics."  *Id.* at 103:2–8.

296.    Dr. Gowrisankaran's city-pair routes would fail the Hypothetical Monopolist Test using Drs. Berry and Jia's elasticity estimate of 2.01 for city-pair routes.  Tr. 11/20/23 (Gowrisankaran) 104:5–12 ("Q. [Drs. Berry and Jia] did give an estimate for city pairs which are your geographic market; correct? A. Yes . . . . Q. And that estimate was 2.01; right, Doctor? A. Right, yes. Q. And that is above your 1.82 critical elasticity; correct? A. Yes, it is.").  Dr.

Gowrisankaran's proposed markets of city-pair routes therefore fail the Hypothetical Monopolist Test, and so are too narrow of a market. *Id.* at 99:8–12 ("Q. And, by contrast, if the actual elasticity were, say, 1.9, that would be above your critical elasticity and it would fail the Hypothetical Monopolist Test because it's too narrow; right? A. Yes, that's right.").

297.    Dr. Gowrisankaran's claim that his city-pair route markets pass the Hypothetical Monopolist Test is based on an elasticity estimate of 1.67, which comes from Drs. Berry and Jia's paper for airport-pair routes. Tr. 11/20/23 (Gowrisankaran) 103:9–15. But Dr. Gowrisankaran's proposed relevant market are city pair-routes, not airport-pair routes. Tr. 11/17/23 (Gowrisankaran) 62:14–24.

### (2)    Dr. Gowrisankaran Did Not Apply The Hypothetical Monopolist Test To Individual Routes

298.    The elasticity estimates that Dr. Gowrisankaran relied on from academic articles were not estimates of any individual route's elasticity; they were aggregates across many different routes. Tr. 11/20/23 (Gowrisankaran) 99:21–100:2.

299.    Dr. Gowrisankaran did not analyze whether routes that were included in aggregate estimates that he relied on were representative of the routes relevant to this case. Tr. 11/20/23 (Gowrisankaran) 100:22–101:1. The articles that Dr. Gowrisankaran relied on did not report all of the routes that were included in their sample. *Id.*

300.    The route elasticities that were aggregated may not be representative of the routes at issue in this case because elasticities vary across individual routes. Tr. 11/20/23 (Gowrisankaran) 100:3–5 ("Q. And you agree that there's going to be some variation in demand elasticity across routes; right? A. Sure."). Some routes may have a higher elasticity than the aggregate estimate. *Id.* at 100:3–9. For example, Dr. Gowrisankaran agrees that routes with a high share of leisure travelers are likely to have a higher demand elasticity than routes with a

high share of business travelers.  *Id.* at 100:6–14.

> **(3)**   ***Dr. Gowrisankaran's Estimate Of Actual Elasticity Does Not Account For Changes Over Time***

301.    The aggregate elasticity that Dr. Gowrisankaran relied on in his report was gathered during and prior to 2006.  Tr. 11/20/23 (Gowrisankaran) 104:20–23.

302.    One of the papers that Dr. Gowrisankaran relies on also reported an aggregate elasticity estimate from 1999 and concluded that the aggregate elasticity had increased over time. Tr. 11/20/23 (Gowrisankaran) 105:1–11 ("Q. And, in particular, they found that it had been 1.55 in 1999 for airport pairs, and 1.68 in 1999 for city pairs; correct? A. Yes, that's right.").

303.    Dr. Gowrisankaran did not analyze whether the aggregate elasticity estimate had increased over the past 15 years.  Tr. 11/20/23 (Gowrisankaran) 105:14–17.

304.    The actual elasticity of airline travel is likely higher today than during or before 2006 because ULCCs that have grown in recent years often fly out of smaller airports, also known as "proxy" or "secondary" airports.  *See, e.g.*, Tr. 11/15/23 (Wells) 8:24–9:5 ("Q. Now you mentioned sometimes providing service through smaller airports in a city. You sometimes refer to those as 'proxy airports'? A. Yes. Q. And do you believe those proxy airports compete with the larger airports in the region? A. Yes, absolutely."); TX 231 at '0028 (showing Avelo growth at New Haven airport (HVN)).

305.    Additionally, Dr. Gowrisankaran admitted that at least one source found that the number of competitors per domestic trip has risen from 3.33 to 3.47 between 2000 and 2022.  Tr. 11/20/23 (Gowrisankaran) 110:4–10.

306.    Moreover, the share of leisure travelers has increased as a share of all travelers since the COVID-19 pandemic, *see supra* ¶¶ 65–67; Tr. 11/3/23 (Klein) 117:5–23; 124:12–125:6, and leisure travelers are likely to have a higher demand elasticity than all travelers, Tr.

11/20/23 (Gowrisankaran) 100:10–12.

### (4)   *The Government's Route-Level Markets Fail To Group Endpoints That Are Obvious Substitutes*

307.   Dr. Gowrisankaran's groupings of particular airports into endpoints is inconsistent with trial testimony.

308.   Mr. Clark of JetBlue and Mr. Yealy of Avelo testified that Hartford, CT's airport and New Haven, CT's airport compete with each other.  Tr. 11/02/23 (Clark) 130:13–15 ("New Haven competes against Bradley, which is Hartford's airport."); Tr. 11/03/23 (Yealy) 33:4–7 ("Q. And New Haven and Hartford are in the same metro area? A. They are very close.").  However, Dr. Gowrisankaran did not group these airports into the same endpoint.  Tr. 11/20/23 (Gowrisankaran) 101:16–24.

309.   Mr. Friedman of JetBlue testified that Orlando International Airport and Orlando Sanford Airport are "perfectly substitutable" with each other.  Tr. 11/9/23 (Friedman) 122:13–14 ("A. Again, Sanford Orlando Airport is a perfectly substitutable airport to get to the Orlando area.").  However, Dr. Gowrisankaran did not group together these airports into the same endpoint.  Tr. 11/20/23 (Gowrisankaran) 101:7–11.

310.   Mr. Wells of Allegiant also testified that the airports in Punta Gorda and Ft. Myers compete with one another.  Tr. 11/15/23 (Wells) 12:6–8 ("Q. And what about Punta Gorda, does that compete with Fort Meyers? A. Yes.").  However, Dr. Gowrisankaran did not group these airports together into the same endpoint.  Tr. 11/20/23 (Gowrisankaran) 101:25–102:2.

### 3.   The Appropriate Geographic Market Is The National Market

311.   The relevant geographic market for analyzing the possible effects of this transaction is the United States.  Airlines compete at several levels, not just for passengers on

specific routes, but through loyalty programs, relevance at certain airports that serve as an endpoint to numerous routes, and on the supply-side through frequent entry and repositioning. *See infra*.

312.    The Government's route-level markets ignore that an airline's network design and adjustments, business model and strategy, corporate, loyalty and frequent flyer programs, aspects of pricing and fare structure, labor, and airport and city presence are top-down, system-wide decisions.  *See infra.*

313.    These aspects of national competition affect route-level competition.  A customer may choose to fly one airline over another on a particular route because she prefers, for example, her chosen airline's loyalty program, legroom, or on-board experience.  *See supra* § II.A.1 (discussing customer preferences).

### (1)    Airlines Compete For Customers At The National And Regional Level

314.    Many strategic decisions driving competition in the airline industry are made at the network or national level.  *See* Tr. 11/6/23 (Hayes) 83:14–84:1 ("[JetBlue is an airline that is registered to operate in the United States and so our market is the U.S. . . . we build a national brand, we have a national network, we have a national loyalty program, we fly the same product across the whole country . . . we have one workforce with one set of labor agreements across the country. . .  and we have a network . . . We couldn't tomorrow go to Canada and operate there, you know, we are a U.S. registered airline."); *see also* Tr. 11/27/23 (Hill) 13:16–14:2 ("[I]t's useful here to see that in the national picture there are a large number of other competitors who are more a focus of JetBlue's competitive intensity, and to the extent that the transaction allows JetBlue to compete more effectively, it can compete more effectively with those carriers.").

### (a)      Network And Fleet Planning

315.     Airlines design their networks to achieve national relevance.  Mr. Kirby explained that building "relevance on a national level" is a "very important part" of Spirit's network strategy.  Tr. 11/8/23 (Kirby) 51:7–52:6 ("So the more … important dots in a map that we serve in the U.S. and in Latin America, we're better able to compete with other airlines, other national airlines."); Tr. 11/6/23 (Hayes) 83:14–84:1; Tr. 11/1/23 (Christie) 23:1–11.  Similarly, Mr. Friedman testified that adding routes and frequencies to JetBlue's network allows JetBlue to "compete better with the Big 4 on the national basis and take more incremental customers that we've had trouble getting in the past."  Tr. 11/9/23 (Friedman) 76:4–9; *see also id.* at 99:16–100:3 ("By gaining more share and expanding the network and becoming more relevant, we're able to tap into those customer segments, drive incremental traffic and, frankly, high, well-paying incremental traffic as well.").

316.     Airlines monitor other airlines' capacity changes both inside and outside their network.  *See supra* § II.C.2; Tr. 11/9/23 (Friedman) 120:9–22; TX 232.

317.     Airlines purchase and design their aircraft at the system level.  Spirit, for example, is a ULCC no matter where it flies—its aircraft are designed with lower seat pitch, no screens, and with no premium offering beyond slightly larger seats at the front of the cabin (the "Big Seat").  Tr. 11/3/23 (Klein) 129:24–130:2, 131:10–21, 134:19–135:2; Tr. 11/1/23 (Christie) 7:22–8:55.

### (b)      Airline And Corporate Partnerships

318.     Airlines compete at the national level for partnerships with large corporations and other airlines.  The three legacy carriers are founding members of large international "alliances" that provide numerous benefits, including the potential for hundreds of new international routes and point sharing arrangements that improve the value of legacy loyalty programs.  Tr. 11/2/23

(Clark) 146:21–148:10; *see, e.g*., TX 189 at '8041, '8056; TX 130 at '4785; TX 69 at '3795 ("More extensive route structures, as well as alliance and code-sharing arrangements, not only provide additional route flexibility for participating airlines, they can also allow these airlines to offer their customers more opportunities to earn and redeem loyalty miles or points."); TX 189 at '8041 (2021 American slide titled "Our scale and loyalty program acts as a multiplier to generate additional revenue from passengers and partners across industries"); *id.* at '8056 (depicting American's "global network of hubs and partnerships").

319.    Delta's SkyTeam Alliance, United's Star Alliance, and American's Oneworld Alliance enable the legacies' customers to use their frequent flyer points on flights all over the world.  Tr. 11/2/23 (Clark) 147:17–18; TX 130 at '4785; TX 136 at '2722 ("Through oneworld, guests can travel to more than 900 destinations in 170 territories and can enjoy privileges on member airlines including upgrades, lounge access, priority boarding, and more.").

320.    These international alliances are a centerpiece of the legacies' global strategies. Tr. 11/2/23 (Clark) 147:17–18; TX 189 at '8041; TX 130 at '4785.

321.    Smaller airlines struggle to compete with the legacies with respect to airline partnerships.  As explained by David Clark, JetBlue's Head of Revenue and Planning, "there's a fixed cost in setting up a partnership. You need to build the relationship, negotiate the agreement, go through all the IT work to put the execution of the agreement in place. All that takes time and money. So it's not worthwhile to do that for a small carrier or small partner who can only get you maybe a handful of routes and a small number of customers. You want to do it with as big a carrier as you can who can provide you more customers and more geographic coverage."  Tr. 11/2/23 (Clark) 146:21–148:10.  For this reason, partners and potential partners often decline to work with JetBlue in favor of "a larger partner who can give them a bigger benefit than [JetBlue]

can, given [its] limited network size." *Id.* at 146:21–148:10.

322.     The legacies enter into arrangements and partnerships with large corporate clients.
*See, e.g.*, TX 200 at '9003.  For those types of customers, a national carrier is much more
valuable than an East Coast-focused airline, like JetBlue.  Tr. 11/2/23 (Clark) 122:25–123:15.

### (c)     On-Board Product And Fees

323.     Airlines make decisions about on-board products and services at the system level.
*See, e.g.*, Tr. 11/6/23 (Hayes) 73:17–74:11 (access to seat-back entertainment, free WiFi,
industry-leading legroom is consistent across JetBlue's entire fleet); TX 136 at '2723 ("[Alaska]
compete[s] with other airlines in areas of customer service such as . . . guest amenities –
including first class and other premium seating, quality of on-board products, aircraft type and
comfort."); TX 69 at '3796 ("Southwest also competes with other airlines with respect to
customer service . .  product offerings, and passenger amenities.").

324.     Airlines compete on the standard legroom they offer to customers across their
fleets.  *See* Tr. 11/6/23 (Hayes) 76:18–25.  The legroom offered on an aircraft is measured by
"seat pitch," which is the distance between one point on a seat and the corresponding point on
the seat in front.  *Id.* 76:5–10.

325.     As displayed in Hayes Demonstrative A, the standard seat pitch in the core of
most JetBlue planes is 32 inches, and the seats on certain JetBlue aircraft go up to 33 or 34
inches.  Tr. 11/6/23 (Hayes) 76:11–15 ("Q. And is this a standard seat pitch in the core of most
JetBlue planes? A. Yes, we have 32 inches. We do go up to 33 or 34 inches on certain fleet
types. But I would say 32 is the, you know, what you would find most frequently."). JetBlue's
standard 32-inch seat pitch is the largest among domestic carriers. Tr. 11/6/23 (Hayes) 76:22–25.

326.     Airlines compete on other dimensions of seat quality across their fleet, such as
seat width.  Tr. 11/6/23 (Hayes) 77:19–78:5 ("So, you know, there's a lot of focus on the seat

pitch, because that is something that I think a lot of people are frustrated over the years, that airlines have been taking leg room away, but I think it's also important to, um, think about, um, seat width.").

327.     Similarly, airlines compete with respect to other on-board product offerings, such as the availability of seat back entertainment options.  *See* Tr. 11/6/23 (Hayes) 78:17–79:6 (explaining seat back entertainment options provided by JetBlue and the Big 4 competitors). JetBlue's Big Four competitors vary in the prevalence of seat back entertainment, while Spirit does not offer this amenity.  *Id.*

328.     JetBlue offers one of the widest standard seats on the market, Tr. 11/6/23 (Hayes) 78:2–5, and seat back entertainment on all seats, *id.* at 73:25–74:6 ("You know we offer, um, have offered free live TV in the back of seats since the early days[.]").

329.     Similarly, airlines determine their strategies regarding ancillary fees at the national level.  *See, e.g.*, TX 69 at '3767 (explaining Southwest's systemwide pricing model for ancillary fees).  For example, when JetBlue initiated $0 change fees in June 2020, Delta and United matched.  TX 912 at 10 ("Competition from JetBlue resulted in legacy airlines reducing ancillary fees.").

### (d)     Loyalty Programs And Brand

330.     Airlines' loyalty programs are designed and deployed on a national level, and they compete with the loyalty programs of other airlines systemwide.  *See supra* § II.B.1(1)(c); Tr. 11/3/23 (Hayes) 83:19–20; TX 136 at '2722 ("[Alaska] compete[s] with other airlines based on markets served, the frequency of service to those markets and frequent flyer opportunities."); TX 69 at '3795; TX 47 at '5584; *see also* Tr. 11/3/23 (Hayes) 72:9–22 ("[M]ost Americans are in a loyalty program, and these things are massive.").

331.     Airlines similarly develop their brands on the national level.  Tr. 11/6/23 (Hayes)

83:14–84:1; *see, e.g.*, TX 71 at '4110 (explaining Frontier's national marketing strategy using its "Low Fares Done Right" brand).

### (2)   The Airline Industry Is Characterized By Supply-Side Substitution

332.    A route-level market definition inaccurately predicts the merger's probable effect on future competition because airlines are likely to provide rapid supply responses if prices on a specific route increase. *See, e.g.*, Tr. 11/27/23 (Hill) 20:18–23.  Other airlines that do not currently operate on particular routes, or other airlines that have some capacity on a particular route already, would likely provide rapid supply responses in the event of a price increase. *See, e.g.*, *id.* at 21:12–23:3.

333.    Dr. Gowrisankaran's market definition used the principle of supply-side substitution to aggregate routes that are not consumer substitutes.  Tr. 11/20/23 (Gowrisankaran) 94:11–17 ("Q. But you aggregate travel between two endpoints in either direction; correct? A. That's right."), 94:22–97:2 (explaining that his justification for aggregating travel in this manner is based on the concept of supply-side substitution).

334.    In 2023 alone, domestic airlines have entered approximately 400 routes combined.  TX 885.

335.    Dr. Hill's application of Dr. Chipty's ULCC entry analysis suggests that without contemplating a price increase, there is a 40% probability of ULCC entry in the ordinary course on the nonstop "presumption" routes in one year where both Spirit and JetBlue compete.  Tr. 11/27/23 (Hill) 17:4–18:3 (discussing Hill Exhibits, Slide 7 and Hill Rebuttal Report, Figure 99 and noting "we see significant probabilities of entry by ULCCs on these routes. And if you expand it to two years or three years, these probabilities will increase significantly").

336.    Airlines move capacity to different routes based on the profitability of those routes.  Tr. 11/14/23 (Biffle) 79:24–80:5 ("Q. If a route is underperforming, what do you do with

the assets if you're forced to exit? A. You move to somewhere you think is going to do better. Q. So fair to say you'll redeploy the planes to a more profitable route? A. Correct."), 81:6–15 ("Q. How does Frontier decide if a route is a good entry opportunity? A. If we believe we can, um, profitably deploy the asset over a sustained period of time, then we would rank it against other opportunities before you make a decision, and you would deploy the asset when you believed it was the best of those current options."), 87:10–16 ("[T]here's plenty of loss-making routes and capacity that can be redeployed pretty quickly"); Tr. 11/3/23 (Klein) 86:13–22 ("Q. Now, in the airline business, what is the overarching strategy for network planning?  A. Really what you're trying to do is seek out profits.  You're looking to see where you can move your aircraft."); Dep. 7/17/23 (Neeleman) 66:7–17 ("[A]s we've approached profitability, we're starting to compete more and more with the airlines").

337.    Dr. Hill has concluded that the likelihood of entry would increase from these ordinary course estimates if prices on a particular route were to increase.  Tr. 11/27/23 (Hill) 20:18–23 ("[W]e saw a lot of entry in the ordinary course, but here we're saying that if these price increases were to occur as predicted, there would be even more entry because those routes would become more profitable than average and attract new entrants.").

338.    Entry onto a route is rapid.  Once a carrier decides to enter a route, it can do so within 2 weeks or up to 6 months, depending on whether it already has a presence at an endpoint. *See infra* § VI.E; Tr. 11/14/23 (Biffle) 83:22–85:4, 89:5–10; Tr. 11/15/23 (Wells) 18:15–22.

> **(4)    The Government's Experts Agree The Merger Can Be Analyzed In A Nationwide Market**

339.    Dr. Gowrisankaran agrees that a nationwide market would pass the "Hypothetical Monopolist Test."  Tr. 11/20/23 (Gowrisankaran) 93:7–11.

340.    Similarly, Dr. Gowrisankaran agrees that it is possible to analyze the effect of the

JetBlue-Spirit transaction in a nationwide market for scheduled air passenger service.  Tr. 11/20/23 (Gowrisankaran) 93:12–15.

341.     Nor is it Dr. Gowrisankaran's opinion that one must always choose the narrowest market that passes the Hypothetical Monopolist Test.  Tr. 11/20/23 (Gowrisankaran) 93:16–19. Rather, the goal of choosing a market is to select the one that "illuminates competition."  *Id.* at 93:20–25.

342.     The Government's other expert, Dr. Tasneem Chipty, agreed that competition occurs at different levels of the industry.  Her analysis considered, among other things, the viability of entry to replace Spirit one-for-one on a national basis and replacing Spirit's capacity on international routes, the vast majority of which are not at issue, as shown on Slide 15 of Dr. Chipty's Direct Demonstratives.  Tr. 11/21/23 (Chipty) 28:5–18 (explaining she calculated how much other ULCCs would have to grow to replace Spirit on "all routes on a nationwide basis and all Spirit routes").

343.     Dr. Chipty similarly identifies national competitive factors throughout her analysis, including fleet configuration, pilots, and overall network fit.  For example, Dr. Chipty explained that one factor relevant to analyzing entry is the availability of pilots.  Tr. 11/21/23 (Chipty) 37:2–8.  Similarly, Dr. Chipty agrees that "airlines decide which routes to operate based on sophisticated systemwide network optimization, *id.* at 114:12–15, that there are "layers of consideration" at the route, endpoint, and network levels when making entry decisions, *id.* at 114:16-21, and that airlines don't make entry decisions on a "simple route-by-route basis," *id.* at 118:11–15.

### (5)     The Government Asserts A Nationwide Theory Of Harm

344.     Both the Government and Defendants allege that this merger will have significant system-wide effects.

345. The evidence has shown that the merger will give JetBlue the scale and scope needed to mount a national challenge to the legacy airlines, which will redound to the benefit of millions of consumers across the country. *See infra* § VI.A; *see, e.g.,* TX 669 at '1016 (The transaction "positions JetBlue as a more relevant LCC player in a Legacy-dominated domestic market"); Tr. 11/9/23 (Friedman) 55:3–13 (explaining that the merger will increase JetBlue's "relevance to generate incremental traffic onto aircraft from customer segments that the Big 4 have been able to serve because of their position," and would allow JetBlue "to go after those incremental customer segments and generate incremental traffic alongside Spirit customers that we otherwise would be challenged to do because of the position of the Big 4.").

346. The Government focuses on the decision to eliminate Spirit's business model, which is a top-down, network-wide decision, alleging that when JetBlue replaces the Spirit business model nationwide, customers across Spirit's current and future network will be harmed. *See* Am. Compl., ¶¶ 30, 57–60, ECF No. 69.

347. The Government's theory of harm is not dependent on the loss of head-to-head competition on any individual route. Dr. Gowrisankaran acknowledged the net harm number that he has proffered on those routes where JetBlue and Spirit do not currently compete reflects his calculation of the net effect of JetBlue replacing Spirit's planes with JetBlue planes, rather than the loss of head-to-head competition on those routes because there is no head-to-head competition. Tr. 11/20/23 (Gowrisankaran) 135:5–12 ("Q. . . . So you would agree that for both of these routes what you're measuring with your regression is not the loss of head-to-head competition, but simply the effect from substituting Spirit planes for JetBlue planes; correct? A. In these two routes, because they are not nonstop overlaps, that's accurate, yes."). Dr. Gowrisankaran also agreed the net harm on these routes is "decoupled" from the Government's

analysis of the competitive incentives of this merger.  *Id.* at 131:22–132:3 ("Q. [Y]ou're estimating harm on these nonoverlap routes? A. Yes, that's right. Q. Because they're -- the places where harm is felt are decoupled from the places where incentives are created; is that right? A. Yes. I think I already answered that.").

348.   Moreover, Dr. Gowrisankaran concedes that he is "less sure" about the reliability of his net harm analysis at the route-level.  Tr. 11/20/23 (Gowrisankaran) 134:16–18. Specifically, Dr. Gowrisankaran acknowledged that "if you're looking at it in any one route you're going to be less sure about what the harm is," and instead, "if you're looking at [net harm] nationally, you have pretty good degrees of significance."  *Id.* at 134:12–19.  Dr. Gowrisankaran reiterated that his net harm estimates have "a lot less precision" when applied to particular routes than the overall estimates.  *Id.* at 137:23–138:7 ("THE COURT: . . . [D]id I understand you correctly that you can't give a, with any precision, an estimate, a reliable estimate of the harm when you isolate a particular route? Did I understand that correctly? THE WITNESS: I wouldn't say with no precision, your Honor, but I'd say it's a lot less precision than overall.").

349.   Dr. Gowrisankaran opined that the exact set of routes on which the merger may result in net harm may change over time because even though the parties have exited routes on which he calculates net harm, "there are going to be new routes where they've entered and where there's going to be net harm."  Tr. 11/20/23 (Gowrisankaran) 136:21–137:3 ("Q. Are you still opining that there will be $70.9 million of harm on these routes after the merger? A. No. I mean, the New York-to-San Juan route I'm happy to opine that there will be harm there because they only had weekly service to LaGuardia. But those others, they're not going to be necessarily net harm in exactly those routes, but there are going to be new routes where they've entered and where there's going to be net harm.").

350.     The Government's coordination theory similarly relies on a nationwide theory of harm.  One of Dr. Gowrisankaran's three factors that he alleges makes the industry susceptible to coordination is "multimarket contact," where "airlines compete with each other in many different routes, and some of those routes are important to one airline and other routes are important to another airline," such that they may "punish" each other's "important" routes in response to price cuts.  Tr. 11/17/23 (Gowrisankaran) 117:16–118:19.  He concludes that the merger will increase JetBlue's multimarket contact because "they would be more of a hub-and-spoke airline" post-merger.  *Id.* at 119:14–19.

351.     Dr. Gowrisankaran also relied on "cross-market initiatives" to conclude that there is evidence of past coordination, *see infra* § VIII.D, which is by definition pricing conduct that occurs across multiple routes.  Tr. 11/17/23 (Gowrisankaran) 120:16–122:6.

## IV.   THE GOVERNMENT'S 562 ROUTES ALLEGEDLY SUFFERING HARM ARE UNLIKELY TO SEE A SUBSTANTIAL LESSENING OF COMPETITION AS A RESULTOF THE MERGER

352.     Dr. Gowrisankaran asserts 562 individual routes will allegedly suffer harm because of this merger.  These routes fall into six categories: (1) "Spirit-only" routes, (2) "Spirit-entry" routes, (3) "econometric" routes, (4) connect routes, (5) mixed routes, and (6) nonstop overlap routes.

353.     The Government alleges that there are 183 routes where the parties' combined market shares "are sufficiently high that this acquisition is presumptively illegal."  Plaintiffs' Pretrial Brief at 2, ECF No. 289.

354.     These "presumption routes" include 117 "connect" routes, 15 "mixed" routes, and 51 nonstop overlap routes.  The Government asserts that presumption based on market concentration statistics prepared by Dr. Gowrisankaran, which assessed JetBlue and Spirit's service on those routes from Q3 2021 to Q2 2022.  *See* TX 839 (Dr. Gowrisankaran's market

share and concentration statistics).

355.     These 562 routes are unlikely to see a substantial lessening of competition for the following reasons, as explained further below.

356.     On the routes in which JetBlue and Spirit do not meaningfully compete, replacing Spirit with JetBlue will result "in an increase in competition," as "it's going to lower the fares charged by rival carriers, and that's going to benefit consumers."  Tr. 11/27/23 (Hill) 59:19–24.

357.     This is because JetBlue's entry has a larger downward effect on rival carrier' fares compared to Spirit.  TX 893; Tr. 11/27/23 (Hill) 39:17–40:3 (explaining that for "each of the entry-intensity bins, JetBlue has a larger impact than does Spirit").

358.     There is also unlikely to be a substantial lessening of competition on these routes because they are likely to experience entry or expansion by other ULCCs or carriers offering unbundled service, as explained *supra*.  Tr. 11/27/23 (Hill) 57:5–19.

###     A.     JetBlue And Spirit Do Not Compete On The 115 "Spirit-Only" Routes

359.     Dr. Gowrisankaran identifies 115 Spirit-only routes in his analysis.  Tr. 11/27/23 (Hill) 58:3–7.

360.     A Spirit-only route is a route on which "Spirit is present and JetBlue is not," meaning there is no current competition between JetBlue and Spirit.  Tr. 11/27/23 (Hill) 57:23–58:14; Tr. 11/20/23 (Gowrisankaran) 54:20–23.

361.     The Government does not assert a structural presumption on the 115 Spirit-only routes.  Tr. 11/27/23 (Hill) 58:8-11.

362.     Dr. Gowrisankaran agrees that the merger will not result in any loss of head-to-head competition on Spirit-only routes.  Tr. 11/20/23 (Gowrisankaran) 54:18–55:5 ("And you agree that Spirit and JetBlue do not compete on these routes, correct? A. Um, yes, I agree that

they don't compete on those routes.").

363.    Dr. Gowrisankaran estimates net harm will occur on Spirit-only routes, but agrees this alleged harm is not connected to any merger-related "competitive incentives."  Tr. 11/20/23 (Gowrisankaran) 131:15–132:3 ("Q. But you still calculate harm on the merger from these routes because your opinion is that harm from the merger … the places where there is harm from the merger are decoupled from the places where the merger creates any competitive incentives; correct? A. Yes. And just to be clear, I estimate both harm and net harm there.").

364.    Dr. Gowrisankaran's predictions of net harm on the Spirit-only routes are unreliable, as replacing Spirit on the Spirit-only routes will result in lower fares charged by rival carriers, which will benefit consumers and increase competition.  Tr. 11/27/23 (Hill) 59:12–24.

365.    As Dr. Hill explained, passenger traffic on Spirit-only routes will likely be stimulated when JetBlue enters: consumers will have the option to fly JetBlue, customers that prefer unbundled fares can purchase Blue Basic tickets, and new ULCCs may enter or expand service to take advantage of a potential profit opportunity.  Tr. 11/27/23 (Hill) 59:25–60:14.

**B.    JetBlue And Spirit Do Not Compete On The 168 "Spirit-Entry" Routes, And Spirit's Entry On These Routes Is Highly Speculative**

366.    Dr. Gowrisankaran identifies 168 "Spirit-entry" routes in his analysis.  Tr. 11/27/23 (Hill) 63:18–20.

367.    As of November 2023, JetBlue was only present on 23 of the 168 Spirit-entry routes.  Tr. 11/27/23 (Hill) 63:18–20, 65:7–10.

368.    A Spirit-entry route is "a route that Spirit planned to enter [by 2027] according to its 2027 network plan" but that is not currently served by Spirit.  Tr. 11/27/23 (Hill) 63:10–17; *see also* TX 293 (Spirit's May 2023 Five Year Network Plan).

369.    The Government does not assert a structural presumption on the Spirit-entry

routes.  Tr. 11/27/23 (Hill) 63:21–24.

370.    Given its financial condition and other headwinds, it is highly unlikely that Spirit

actually *will* enter, or would be able to enter, the 168 routes identified in its 2027 network plan.

*See infra* § V.A.2; Tr. 11/8/23 (Kirby) 71:25–72:14 (describing Spirit's 2023 Five Year Network

Plan, and explaining that projections for anticipated departures and cities served in 2027 was

"incredibly unlikely" and "highly unlikely," respectively).

371.    Dr. Gowrisankaran did not update his analysis to reflect changes in Spirit's plans

since 2022.  Tr. 11/20/23 (Gowrisankaran) 52:18–21, 53:16–19.  Dr. Gowrisankaran also did not

evaluate whether other carriers would be present on these future nonstop overlap routes.  *Id.*

372.    Dr. Gowrisankaran did not quantify net harm on Spirit-entry routes.  Tr. 11/27/23

(Hill) 65:3–6.

373.    Dr. Gowrisankaran still alleges competitive effects on these routes, despite

acknowledging that "Spirit is unlikely to be able to enter everything it had planned by 2027."  Tr.

11/27/23 (Hill) 63:7–15.

374.    There is unlikely to be a substantial reduction in competition on the 168 Spirit-

entry routes because, if JetBlue replaced Spirit on these routes, there would be a more significant

competitive impact than if Spirit entered.  Tr. 11/27/23 (Hill) 65:11–18 ("So I think on balance

it's unlikely that there's going to be a substantial reduction of competition on these Spirit-entry

routes.").

C.    **There Is Unlikely To Be A Substantial Lessening Of Competition On The 96 "Econometric" Routes, As JetBlue Is A Stronger Competitor Than Spirit**

375.    There are 96 econometric routes in Dr. Gowrisankaran's analysis.  Tr. 11/27/23

(Hill) 61:18–21.

376.    An econometric route is nonstop overlap route on which the Government does not

assert a structural presumption, "but [Dr.] Gowrisankaran's model predicts that there will nevertheless be a significant reduction in competition." Tr. 11/27/23 (Hill) 61:11–17, 61:22–24.

377.    Dr. Gowrisankaran's estimates of net harm on these routes do not primarily stem from a loss of head-to-head competition, but rather JetBlue's business decision to substitute JetBlue planes for Spirit planes. Tr. 11/20/23 (Gowrisankaran) 59:3–11 (net harm on econometric routes will allegedly "occur because of JetBlue's decision to eliminate Spirit, not primarily because of the loss of head-to-head competition between Spirit and JetBlue").

378.    For example, Dr. Gowrisankaran's model estimates $25 million per year in harm on the San Francisco-Las Vegas route, even though a "large number of carriers serve this on a nonstop basis, including Southwest, Frontier, Spirit, Allegiant, Alaska" and JetBlue serves the route with connect service and a "very small" .04% share. Tr. 11/27/23 (Hill) 62:2–15, 63:2–7 ("Q. Then why does Professor Gowrisankaran's model predict $25 million per year of harm on this route? A. So his model predicts that Spirit is the more effective competitor and so he comes up with a prediction of significant harm here, because in his model replacing Spirit with JetBlue is a negative.").

379.    As with the Spirit-only and Spirit-entry routes, Dr. Gowrisankaran incorrectly predicts net harm on econometric routes because replacing Spirit with JetBlue will lead to more competition on these routes. *See infra* § VI.A.1; Tr. 11/27/23 (Hill) 62:2–63:9. The Government did not elicit any trial testimony—from either fact or expert witnesses—supporting the proposition that meaningful head-to-head competition occurs on the 96 econometric routes.

**D.    <u>There Is Unlikely To Be A Substantial Lessening Of Competition On The 117 "Connect" Routes Because JetBlue And Spirit Do Not Meaningfully Compete On Those Routes</u>**

380.    There are 117 connect routes in Dr. Gowrisankaran's analysis. Tr. 11/27/23 (Hill) 65:25–66:3.

381.    A connect route is one on which both JetBlue and Spirit are serving the route on a connect, not nonstop, basis.  Tr. 11/27/23 (Hill) 65:22–24.

382.    Dr. Gowrisankaran did not estimate net harm from the merger on any of the 117 connect routes. Tr. 11/27/23 (Hill) 66:8–10 ("Q. Did [Dr. Gowrisankaran's] model predict any harm on any of these routes? A. No, he didn't make predictions for these routes.").

383.    JetBlue and Spirit operate point-to-point networks with a small percentage of scheduled connecting itineraries.  *See supra* ¶¶ 107, 172; Tr. 11/27/23 (Hill) 66:23–67:3.  Only 6% and 9% of JetBlue and Spirit's domestic ticketed passengers fly connect service, respectively.  *Id.;* Tr. 11/7/23 (Kirby) 89:24–25.

384.    JetBlue and Spirit typically set fares for connect flights by summing the fares for the individual nonstop legs.  This method of setting fares is known as "sum-of-locals" pricing. Tr. 11/27/23 (Hill) 67:11–68:5, 68:23–69:2; TX 325 at '1683 (Apr. 7, 2022 Spirit slide deck explaining that "[a]lmost all connect passengers purchase sum of local fares," up to "97%" in Spirit's Top 20 markets).

385.    JetBlue and Spirit price most connect flights using a sum-of-locals approach.  TX 897; TX 325 at '1683.

386.    On all 117 connect routes at issue, at least half of the ticket fares are set using sum of locals pricing. TX 897; Tr. 11/27/23 (Hill) 70:17–71:9 ("So what [TX 897] is showing us is that by and large the fares on these routes are not likely to be the result of competition between JetBlue and Spirit.").  And, on the vast majority of the 117 connect routes (84%), either JetBlue or Spirit prices at least 80% of their fares using sum-of-locals pricing.  TX 897.

387.    Sum-of-locals pricing on connect routes is "being driven by underlying routes" and "not primarily [] driven by competition between connect carriers or nonstop carriers," as that

pricing structure simply adds together fares from two otherwise unrelated nonstop routes.  Tr. 11/27/23 (Hill) 69:3–10.  Fares priced using sum-of-locals therefore reflects competition on the underlying nonstop routes, or individual legs, rather than the connect route.  *Id.* 70:9–14.

388.     Many of the connect routes are also not a competitive focus for JetBlue and Spirit because they have low total passenger volume each year; seventy-five of the 117 routes have fewer than 5,000 passengers a year across *all* carriers.  Tr. 11/27/23 (Hill) 71:10–20 ("[T]hese are routes that have very low volume. … If you were to fly an A320 once a week, you could carry about 200 passengers. So if you did that, you'd get more than 10,000 passengers a year. These routes have half of that amount for all carriers on the route.").

389.     Given their predominantly sum-of-locals pricing and low passenger volume, the JetBlue and Spirit do not meaningfully compete on the Government's 117 "connect" routes and thus these routes are unlikely to see a substantial lessening of competition.  Tr. 11/27/23 (Hill) 71:23–72:1, 72:11–23.

390.     The Government did not elicit any trial testimony—from either fact or expert witnesses—supporting the proposition that meaningful head-to-head competition occurs on the 117 connect routes.

**E.     <u>There Is Unlikely To Be A Substantial Lessening Of Competition On The 15 "Mixed" Routes As JetBlue And Spirit Do Not Meaningfully Compete On Those Routes</u>**

391.     There are 15 "mixed" routes in Dr. Gowrisankaran's analysis.  Tr. 11/27/23 (Hill) 72:7–10.

392.     A mixed route is one on which either JetBlue or Spirit services the route on a nonstop basis while the other carrier services the route on a connect basis.  Tr. 11/27/23 (Hill) 72:2–13.

393.     The Government's experts did not estimate net harm on any of the mixed routes

for which Spirit provides connect service.  Tr. 11/20/23 (Gowrisankaran) 57:10–17; Tr. 11/27/23 (Hill) 73:10–12.

394.    On each of the 15 mixed routes, the connect carrier—either JetBlue or Spirit— serves less than 10% of total passengers. TX 898; Tr. 11/27/23 (Hill) 74:7–17.

395.    As explained in § IV.D, *supra*, when operating as the connect carrier, JetBlue and Spirit set most fares on these routes using sum-of-locals pricing.  Tr. 11/27/23 (Hill) 72:11–23.

396.    Accordingly, on the mixed routes where either JetBlue or Spirit flies a connecting itinerary, the connect carrier typically does not set its fares based on competition with the nonstop carriers.  Tr. 11/27/23 (Hill) 72:11–23.

397.    Further, on mixed routes for which the connect fare is significantly higher than the nonstop fare, it is unlikely that the connect fare was set with respect to the nonstop carriers' fares.  Tr. 11/27/23 (Hill) 74:18–75:5 ("So if we see a situation where the connect fare is significantly higher, it doesn't seem likely that that's a major competitive constraint on the nonstop route and it doesn't seem likely that that connect route was set with respect to the nonstop carriers' fares.").

398.    On these 15 mixed routes, when Spirit is the connect carrier, a high percentage of its passengers pay a sum-of-local fare, meaning Spirit sets the fare based on the competition of the underlying individual routes rather than the connect route itself.  TX 898; Tr. 11/27/23 (Hill) 74:7–17.

399.    On the mixed routes where JetBlue is the connect carrier, JetBlue "is charging a significantly higher fare than the nonstop carrier, which suggests there is not substantial competition between the connect carrier and the nonstop carrier."  TX 898; Tr. 11/27/23 (Hill) 74:7–17.

400.     Thus, JetBlue and Spirit do not meaningfully compete on these "mixed" routes. Tr. 11/27/23 (Hill) 71:21–72:1.

401.     The Government did not elicit any trial testimony—from either fact or expert witnesses—supporting the proposition that meaningful head-to-head competition occurs on the 15 mixed routes.

### F.     There Is Unlikely To Be A Substantial Lessening Of Competition On The 51 Nonstop "Presumption" Overlap Routes

402.     There Gowrisankaran's analysis includes 51 nonstop routes, which are those on which both JetBlue and Spirit offered nonstop service between Q3 2021 and Q2 2022.

403.     The Government asserts that a structural presumption applies to these routes.  Tr. 11/27/23 (Hill) 75:6–11.  Dr. Gowrisankaran deems these nonstop "presumption" routes the "heart of this matter."  *See* Tr. 11/20/23 (Gowrisankaran) 11:9–12:10.

404.     Annual market share figures could understate the competitive significance of a carrier if that carrier entered partway through the four-quarter period he uses to calculate market shares.  Tr. 11/20/23 (Gowrisankaran) 64:15–25.  Dr. Gowrisankaran makes no adjustments to his market share calculations to account for these occurrences.  *Id.* 65:1–4.

405.     Since Q2 2022, Spirit and JetBlue have exited a combined *14* of the Government's 51 nonstop "presumption" routes (i.e., nearly 30%).  *See* TX 837; Tr. Day 13 (Gowrisankaran) 73:9–13 (Dr. Gowrisankaran estimates that "a little less than 20 percent of the [nonstop presumption] routes changed from one year to another").

406.     Spirit has exited Ft. Myers-Hartford, Boston-New Orleans, LGA-San Juan, Hartford-Tampa, NYC-Tampa, New Orleans-NYC, Austin-Cancun, Orlando-Ponce, Orlando-Aguadilla, and Miami-Aguadilla.  Tr. 11/8/23 (Kirby) 75:8–21, 76:1–8.

407.     JetBlue has exited Cleveland-Miami, Aruba-Miami, Cartagena-Miami,

Philadelphia-San Juan, Austin-Cancun, and Miami-St. Maarten. Tr. 11/9/23 (Friedman) 153:15–21.

408.     Dr. Gowrisankaran agrees if JetBlue or Spirit has exited a route, that route is not entitled to a presumption of harm. Tr. 11/20/23 (Gowrisankaran) 77:13–19 ("Q. The question is that you agree that there's not a presumption going forward on Aruba to Miami due to JetBlue's exit on that route? A. I mean, yes, basically there's no presumption. ***If they did exit*** since the -- in the last year then, if you used today's data, there would not be -- ***there may not be a presumption or there wouldn't be one***." (emphasis added)); *see also* Tr. 11/8/23 (Kirby) 75:22–25 ("Q. When Spirit decided to enter or suspend those routes, was that decision in any way related to this litigation? A. None whatsoever."); Tr. 11/9/23 (Friedman) 153:25–154:13 ("Q. Did JetBlue's proposed acquisition of Spirit influence in any way your decision to have JetBlue discontinue service on any of these six routes? A. Absolutely not.").

409.     Consistent with the frequency of exit, entry, and expansion in the airline industry, many of the nonstop "presumption" routes have experienced exit, entry, and/or expansion by the parties or other carriers since Q2 2022.

410.     Thirty-five of the 51 nonstop "presumption" routes on which the Government either been exited by at least one party, or have experienced an entry or addition in service by another carrier during or after this time period.  *See* Table A *infra*; TX 697 (summary of competitive changes on 51 nonstop overlap routes from Q3 2022 to Q2 2023 as tracked by JetBlue)); Tr. 11/9/23 (Friedman) 157:11–20.

411.     None of these changes are captured in the Government's concentration statistics. *See* Tr. 11/20/23 (Gowrisankaran) 63:2–5 ("Q. Considering the prospects of entry in response to a merger is part of the full assessment of the competitive effects of a merger, correct? A. Yes, it

generally is."), 59:17–20 ("So your concentration analysis that reports HHIs and market shares throughout, that did not consider the impact of divestitures, correct? A. Yes, that's correct.").

412.    The Government highlighted eight of the 51 "presumption" routes with large passenger volumes.  Tr. 11/7/23 (Kirby) 111:2–113:17 (Boston, MA-San Juan, PR; Boston, MA-Orlando, FL; New York City, NY-San Juan, PR; Orlando, FL-San Juan, PR; Miami, FL-San Juan, PR; Boston, MA-Miami, FL; New York City, NY-Orlando, FL; Miami, FL-New York City, NY).  Seven of these eight routes have experienced partial exit by Spirit or an entry or addition in service in by another airline.  *See* Table A, *infra*.

413.    The Government contends these exits, entries, and expansions constitute "minor schedule and frequency adjustments."  Tr. 12/5/23 (Gov't Closing) 62:22–63:4.  Table A focuses exclusively on total entry by another carrier or an addition in service for greater than 6 months, extracted from the larger set of competitive change identified on the 51 nonstop presumption routes, as testified to by Mr. Friedman.  TX 697.  Table A more fully describes the exact nature of the competitive change for each route.

### Table A:  Competitive Changes On The Government's 51 Nonstop Presumption Routes

|   | Route | Competitive Change | "Popular" Route Identified by Gov't | Description |
|---|---|---|---|---|
| 1 | Orlando, FL – Ponce, PR | X | | • Exit by Spirit (Tr. 11/8/23 (Kirby) 76:1–8)<br>• Frontier entered with a 3 flights per week eff. May 2023 (TX 697, Row 668) |
| 2 | Aguadilla, PR – Miami, FL[2] | X | | • Exit by Spirit (Tr. 11/8/23 (Kirby) 76:1–8) |

---

[2] Dr. Gowrisankaran groups the Miami, Fort Lauderdale and Hollywood airports together in the "Miami, FL" endpoint.  Tr. 11/17/23 (Gowrisankaran) 63:3–6.

| | Route | Competitive Change | "Popular" Route Identified by Gov't | Description |
|---|---|---|---|---|
| 3 | Aguadilla, PR – Orlando, FL | X | | • Exit by Spirit (Tr. 11/8/23 (Kirby) 76:1–8)<br>• Frontier entered in 2022 Q2 and had a share greater than 21% in every quarter since 2022 Q2 (TX 802) |
| 4 | Fort Myers, FL – Hartford, CT | X | | • Exit by Spirit (Tr. 11/8/23 (Kirby) 75:8–21)<br>• Breeze entered eff. May 2023 and increased from 2 to 5 flights per week eff. Nov. 2023 (TX 697, Rows 190, 195)<br>• Avelo increased from 4 to 7 flights per week eff. Nov. 2022, and then extended this daily flight eff. Feb. 2023 (TX 697, Row 191) |
| 5 | Boston, MA (BOS) – New Orleans, LA | X | | • Exit by Spirit (Tr. 11/8/23 (Kirby) 75:8–21) |
| 6 | Hartford, CT – Tampa, FL | X | | • Exit by Spirit (Tr. 11/8/23 (Kirby) 75:8–21)<br>• Breeze entered eff. May 2023 (TX 697, Row 251) |
| 7 | Cleveland, OH – Miami, FL | X | | • Exit by JetBlue (Tr. 11/9/23 (Friedman) 153:10–21)<br>• Frontier entered eff. Nov. 2022 (TX 697, Row 189) |
| 8 | Aruba, Aruba – Miami, FL | X | | • Exit by JetBlue (Tr. 11/9/23 (Friedman) 153:10–21) |
| 9 | Cartagena, Colombia – Miami, FL | X | | • Exit by JetBlue (Tr. 11/9/23 (Friedman) 153:10–21)<br>• Avianca increased its share of passengers from less than 7% in the three quarters ending March 2022 to 13%–38% in the five quarters ending June 2023 (TX 802) |
| 10 | Philadelphia, PA – San Juan, PR | X | | • Exit by JetBlue (Tr. 11/9/23 (Friedman) 153:10–21) |

| | Route | Competitive Change | "Popular" Route Identified by Gov't | Description |
|---|---|---|---|---|
| 11 | New York City, NY (LGA/JFK/EWR) – Tampa, FL | X | | • Exit by Spirit (Tr. 11/8/23 (Kirby) 75:8–21)<br>• United increased from 8 to 9 flights per day eff. Feb. 2023 (TX 697, Row 663) |
| 12 | Austin, TX – Cancun, Mexico | X | | • Exit by Spirit (Tr. 11/8/23 (Kirby) 75:8–21)<br>• Exit by JetBlue (Tr. 11/9/23 (Friedman) 153:10–21)<br>• Sun Country entered eff. June 2023 (TX 697, Row 24) |
| 13 | Miami, FL – St. Maarten, Sint Maarten | X | | • Exit by JetBlue (Tr. 11/9/23 (Friedman) 153:10–21) |
| 14 | New York City, NY (LGA/JFK/EWR) – San Juan, PR | X | X | • Partial Exit by Spirit (Tr. 11/8/23 (Kirby) 75:8–21) |
| 15 | San Juan, PR – Tampa, FL | X | | • Frontier entered in 2022 Q2 with a 4% share and had a share greater than 23% in every quarter since 2022 Q3 (TX 802)<br>• Frontier increased flights from 6 to 7 per week flight eff. Apr. 2023 (TX 697, Row 718) |
| 16 | Boston, MA (BOS) – San Juan, PR | X | X | • Delta entered Dec. 2022 (TX 697, Row 126) |
| 17 | Lima, Peru – Miami, FL | X | | • Sky Peru entered in 2022 Q2 and had a 11%-20% share in the four quarters ending 2023 Q2 (TX 802) |
| 18 | Miami, FL – Washington, DC | X | | • Delta entered eff. Oct. 2023 (TX 697, Row 342) |
| 19 | Las Vegas, NV – Miami, FL | X | | • Frontier entered eff. Nov. 2022 (TX 697, Row 277) |
| 20 | Los Angeles, CA – Miami, FL | X | | • Delta entered eff. Dec. 2022 (TX 697, Row 304) |
| 21 | Miami, FL – Port-au-Prince, Haiti | X | | • Sunrise Airways entered (Tr. 11/9/23 (Friedman) 157:11–20) |

| | Route | Competitive Change | "Popular" Route Identified by Gov't | Description |
|---|---|---|---|---|
| 22 | Miami, FL – San Jose, Costa Rica | X | | • Frontier entered eff. May 2023 (TX 697, Row 528) |
| 23 | San Juan, PR – Washington, DC | X | | • Frontier entered eff. May 2023 (TX 697, Row 712) |
| 24 | Miami, FL – Santo Domingo, DR | X | | • Air Century entered eff. Dec. 2022 (TX 697, Row 551)<br>• Sky High Dominicana entered eff. Mar. 2023 (TX 697, Row 555)<br>• Frontier entered eff. Apr. 2023 (TX 697, Row 556) |
| 25 | Cancun, Mexico – Miami, FL | X | | • Frontier entered eff. Apr. 2023 (TX 697, Row162) |
| 26 | Miami, FL – Punta Cana, DR | X | | • Frontier entered eff. Apr. 2023 (TX 697, Row 516) |
| 27 | Miami, FL – Montego Bay, Jamaica | X | | • Frontier entered eff. Apr. 2023 (TX 697, Row 380) |
| 28 | Hartford, CT – Orlando, FL | X | | • Frontier increased from 1 to 2 flights per day eff. Apr. 2023 (TX 697 Row 240) |
| 29 | Miami, FL – San Juan, PR | X | X | • Frontier increased from 1 to 2 flights per day eff. June 2023 (TX 697, Row 530) |
| 30 | Bogota, Colombia – Miami, FL | X | | • LATAM increased from 4 to 7 flights per week eff. Mar. 2023 (TX 697, Row 29) |
| 31 | Orlando, FL – San Juan, PR | X | X | • Frontier increased from 3 to 4 flights per day eff. Feb. 2023 (TX 697, Row 695) |
| 32 | Montego Bay, Jamaica – Orlando, FL | X | | • Frontier increased from 3 to 4 flights per week eff. June 2023 (TX 697, Row 564) |
| 33 | Boston, MA (BOS) – Miami, FL | X | X | • Frontier increased from 5 to 7 flights per week eff. Apr. 2023 (TX 697 Row 90) |
| 34 | Miami, FL – New York City, NY (LGA/JFK/EWR) | X | X | • Delta increased from 4 to 5 flights per day eff. Oct. 2023 (TX 697, Row 434) |

| | Route | Competitive Change | "Popular" Route Identified by Gov't | Description |
|---|---|---|---|---|
| 35 | New York City, NY (LGA/JFK/EWR) – Orlando, FL | X | X | • United increased from 11 to 12 daily flights eff. Feb. 2023 (TX 697, Row 621) |
| 36 | Boston, MA (BOS) – Fort Myers, FL | | | – |
| 37 | Orlando, FL – Richmond, VA | | | – |
| 38 | Orlando, FL – San Jose, Costa Rica | | | – |
| 39 | Orlando, FL – Santo Domingo, DR | | | – |
| 40 | Kingston, Jamaica – Miami, FL | | | – |
| 41 | Hartford, CT – Miami, FL | | | – |
| 42 | Boston, MA (BOS) – Orlando, FL | | X | – |
| 43 | Cancun, Mexico – Orlando, FL | | | – |
| 44 | Boston, MA (BOS) – Las Vegas, NV | | | – |
| 45 | Boston, MA (BOS) – Tampa, FL | | | – |
| 46 | Miami, FL – Richmond, VA | | | – |
| 47 | Guayaquil, Ecuador – Miami, FL | | | – |
| 48 | Medellin, Colombia – Miami, FL | | | – |
| 49 | Las Vegas, NV – New York City, NY (LGA/JFK/EWR) | | | – |
| 50 | New Orleans, LA – New York City, NY (LGA/JFK/EWR) | | | – |
| 51 | Miami, FL – New Orleans, LA | | | – |

414.     The Government's market share statistics for the 51 nonstop "presumption" routes also do not account for the frequency of ULCC's ordinary course entry. Plaintiff's expert, Dr. Tasneem Chipty, prepared a regression model based on the 4,701 entry events she identified (by just four ULCCs) between Q1 2017 to Q2 2022.  Tr. 11/27/23 (Hill) 18:17–23; Tr. 11/21/23 (Chipty) 133:21–134:24, 138:7–9 ("So that means over 5 1/2 years one of these four ULCCs entered a route 4,701 times; correct? A. Yes, 4 percent of the total.").

415.     Dr. Chipty's model "can predict the probability of entry based on endpoint presence."  Tr. 11/27/23 (Hill) 130:5–11 ("Q. You understand Dr. Chipty's model was designed to understand the relationship between endpoint presence and entry as it had occurred in the past by ULCCs; correct? A. That's what she said, yes, but it can predict the probability of entry based on endpoint presence. The only way it can do that is if it can also predict the probability of entry.").

416.     Dr. Chipty's model shows that there is a significant probability that ULCCs will enter, within in one year, any one of the 51 nonstop overlap routes, as well as any one of JetBlue or Spirit's nonstop routes.  Tr. 11/27/23 (Hill) 17:24–18:3, 130:5–11 ("[U]sing Dr. Chipty's model and looking at one year, we see significant probabilities of entry by ULCCs on these routes.").

417.     Dr. Chipty's model predicts that 40% of the 51 nonstop presumption routes would expect to see ULCC entry within one year in the ordinary course of business. Tr. 11/27/23 (Hill) 17:4–18:16, 21:4–11 ("[T[he 40 percent [probability of entry], your Honor, is just in the ordinary course, so it's telling us that entry and repositioning are common.").  Dr. Chipty's model similarly predicts that there is a 34% probability of ULCC entry on any JetBlue nonstop routes within a year.  *Id.* at 17:18–23.

418.    The probability of ordinary course ULCC entry on the 51 nonstop overlap routes—as well as JetBlue and Spirit's other nonstop routes—increases significantly if the Government's analysis is expanded to two or three years.  Tr. 11/27/23 (Hill) 17:24–18:16 (explaining that on the 51 routes, "it's shown here that within one year 40 percent of them would expect to see entry by a ULCC in the ordinary course of business" and that "if you expand [Dr. Chipty's model] to two years or three years, these probabilities [of entry by ULCCs] will increase significantly.").

419.    Dr. Gowrisankaran predicts price increases would occur on these 51 nonstop "presumption" routes.  Should fares increase on these routes, ULCC entry is even more likely, as the routes would be substantially more profitable than in the ordinary course, as explained in § V.D, *infra*.  *See* Tr. 11/27/23 (Hill) 20:18–23 ("And so the point here is just we saw a lot of entry in the ordinary course, but here we're saying that if these price increases were to occur as predicted, there would be even more entry because those routes would become more profitable than average and attract new entrants.").

420.    ULCCs (as well as other carriers offering unbundled, no-frills fares) are driven toward profitable routes in making entry decisions, including routes in which other carriers have decreased capacity.  *See supra* § II.C.2(1); Tr. 11/27/23 (Hill) 19:4–8; Tr. 11/4/23 (Klein) 86:13–22.  ULCCs are therefore well positioned to enter or expand on each of the 51 nonstop presumption routes.  *See infra* § V.E; Tr. 11/14/23 (Biffle) 84:23–85:4; *see also* Tr. 11/27/23 (Hill) 75:22-76:3 (explaining Dr. Gowrisankaran's model "[does not] adequately take[] account of entry or the effect of the divestitures").

421. For example, both Frontier and Allegiant already operate on one or both endpoints of all 51 nonstop overlap routes identified in the Government's expert, and both carriers currently serve over 20 of those routes. *See infra* § V.E; TX 910.

422. In addition, 36 of the 51 nonstop presumption routes involve an endpoint at which JetBlue will be divesting assets. *See infra* §§ V.B–C; TX 910; Tr. 11/27/23 (Hill) 85:10–13 (explaining 15 nonstop presumption routes do not involve a divestiture endpoint).

423. Divestitures are a common method to ameliorate potential competitive harms in the airline industry; they have been used to resolve concerns with numerous prior airline mergers.   Tr. 11/6/23 (Hayes) 108:20–22; Tr. 11/27/23 (Hill) 79:4–14; *see also* Tr. 11/27/23 (Hill) 75:22–76:3 (explaining Dr. Gowrisankaran's model "[does not] adequately take[] account of … the effect of the divestitures").

424. These divestitures are "likely to maintain competition at those airports," Tr. 11/27/23 (Hill) 84:13–16, even if Allegiant and Frontier do not serve the exact same routes as Spirit and JetBlue because those carriers are "going to use them to compete aggressively," *id.* 84:17–85:9 ("Q. Why shouldn't the Court be concerned about that, if they are not committed to serving the same exact routes? A. So we've already seen significant evidence of route networks evolving over time and Spirit itself, if it continued to serve these routes, might have adjusted the routes it served. So I think if there is a profitable opportunity here, Allegiant and Frontier will investigate it. And they may also serve other routes. There may be routes that today could benefit from competition, that they can bring new competition too.").

425. There are 15 nonstop "presumption" routes that do not involve a divestiture airport.  TX 899.

426. Of the 15 remaining routes that do not involve a divestiture endpoint, 4 are no

98

longer nonstop overlap routes because either Spirit or JetBlue exited in the normal course of business.  Tr. 11/27/23 (Hill) 86:11–17; *see also* Tr. 11/8/23 (Kirby) 75:8–76:8 (explaining Spirit has exited Ft. Myers-Hartford, Hartford-Tampa, NYC-Tampa, and Orlando-Aguadilla).

427.    On the remaining 11 routes that do not involve a divestiture endpoint and where exit has not occurred—across which Spirit only has approximately 25 total departures per day—there are ULCCs and LCCs already present and/or with substantial presence at one or both endpoints of *each* of the 11 routes. TX 899; Tr. 11/27/23 (Hill) 86:3–19 ("[TX 899 is] showing us that the ultra-low-cost carriers are low-cost carriers are in a position to expand, to reposition, or to enter these routes.").

**G.    The Government's New Allegations Regarding "Consistent" Nonstop Overlap Routes Also Demonstrate the Dynamic Nature of Route-Level Markets**

428.    At closing, the Government focused its attention on the "35 [nonstop overlap] routes that have met the presumption consistently over the last 3 years."  Tr. 12/5/23 (Gov't Closing) 62:14–15; TX 882 (Rows 3–11, 13–38).

429.    These 35 routes are similarly affected by the competitive changes described above.  As shown in Table B, in the ordinary course, 16 of the Government's 35 nonstop presumption routes that have met the presumption consistently over the last 3 years have either been partially exited by at least one party or have experienced an entry or addition in service by another carrier during 2023.  Again, these changes are not captured in the Government's concentration statistics.  Tr. 11/20/23 (Gowrisankaran) 64:15–25.

430.    As shown in Table B, six of the eight routes the Government identified with high passenger volumes have experienced partial exit by Spirit or an entry or addition in service in 2023 by another airline.

431.    Twenty-seven of the 35 routes involve a divestiture endpoint. TX 910.  In

addition, 33 of these 35 "consistent" routes contain an endpoint in South Florida, Orlando, FL, or

San Juan, PR.  As discussed in § V.B *infra*, entry barriers into these airports are particularly low.

**Table B:  2023 Competitive Changes On The Government's 35 "Consistent" Nonstop Presumption Routes**

|  | Route | Competitive Change | "Popular" Route Identified by Gov't | Description |
|---|---|---|---|---|
| 1 | Miami, FL[3] – Port-au-Prince, Haiti | X |  | • Sunrise Airways entered (Tr. 11/9/23 (Friedman) 157:11–20) |
| 2 | Miami, FL – San Jose, Costa Rica | X |  | • Frontier entered eff. May 2023 (TX 697, Row 528) |
| 3 | San Juan, PR – Washington, DC | X |  | • Frontier entered eff. May 2023 (TX 697, Row 712) |
| 4 | Miami, FL – Santo Domingo, DR | X |  | • Sky High Dominicana entered eff. Mar. 2023 (TX 697, Row 555)<br>• Frontier entered eff. Apr. 2023 (TX 697, Row 556) |
| 5 | Cancun, Mexico – Miami, FL | X |  | • Frontier entered eff. Apr. 2023 (TX 697, Row 162) |
| 6 | Miami, FL – Punta Cana, DR | X |  | • Frontier entered eff. Apr. 2023 (TX 697, Row 516) |
| 7 | Miami, FL – Montego Bay, Jamaica | X |  | • Frontier entered eff. Apr. 2023 (TX 697, Row 380) |
| 8 | Hartford, CT – Orlando, FL | X |  | • Frontier increased from 1 to 2 flights per day eff. Apr. 2023 (TX 697 Row 240) |
| 9 | Miami, FL – San Juan, PR | X | X | • Frontier increased from 1 to 2 flights per day eff. June 2023 (TX 697, Row 530) |
| 10 | Bogota, Colombia – Miami, FL | X |  | • LATAM increased from 4 to 7 flights per week eff. Mar. 2023 (TX 697, Row 29) |

[3] Dr. Gowrisankaran groups the Miami, Fort Lauderdale and Hollywood airports together in the "Miami, FL" endpoint.  Tr. 11/17/23 (Gowrisankaran) 63:3–6.

| | Route | Competitive Change | "Popular" Route Identified by Gov't | Description |
|---|---|---|---|---|
| 11 | Orlando, FL – San Juan, PR | X | X | • Frontier increased flights from 3 to 4 per day eff. Feb. 2023 (TX 697, Row 695) |
| 12 | Boston, MA (BOS) – Miami, FL | X | X | • Frontier increased from 5 to 7 flights per week eff. Apr. 2023 (TX 697 Row 90) |
| 13 | Miami, FL – New York City, NY (LGA/JFK/EWR) | X | X | • Delta increased from 4 to 5 flights per day eff. Oct. 2023 (TX 697, Row 434) |
| 14 | San Juan, PR – Tampa, FL | X | | • Frontier increased flights from 6 to 7 per week flight eff. Apr. 2023 (TX 697, Row 718) |
| 15 | New York City, NY (LGA/JFK/EWR) – Orlando, FL | X | X | • United increased from 11 to 12 daily flights eff. Feb. 2023 (TX 697, Row 621) |
| 16 | New York City, NY (LGA/JFK/EWR) – San Juan, PR | X | X | • Partial Exit by Spirit (Tr. 11/8/23 (Kirby) 75:8–21) |
| 17 | Boston, MA (BOS) – San Juan, PR | | X | – |
| 18 | Boston, MA (BOS) – Fort Myers, FL | | | – |
| 19 | Orlando, FL – Richmond, VA | | | – |
| 20 | Orlando, FL – San Jose, Costa Rica | | | – |
| 21 | Orlando, FL – Santo Domingo, DR | | | – |
| 22 | Kingston, Jamaica – Miami, FL | | | – |
| 23 | Hartford, CT – Miami, FL | | | – |
| 24 | Boston, MA (BOS) – Orlando, FL | | X | – |

| | Route | Competitive Change | "Popular" Route Identified by Gov't | Description |
|---|---|---|---|---|
| 25 | Cancun, Mexico – Orlando, FL | | | – |
| 26 | Boston, MA (BOS) – Las Vegas, NV | | | – |
| 27 | Boston, MA (BOS) – Tampa, FL | | | – |
| 28 | Miami, FL – Richmond, VA | | | – |
| 29 | Las Vegas, NV – Miami, FL | | | – |
| 30 | Guayaquil, Ecuador – Miami, FL | | | – |
| 31 | Medellin, Colombia – Miami, FL | | | – |
| 32 | Las Vegas, NV – New York City, NY (LGA/JFK/EWR) | | | – |
| 33 | Los Angeles, CA – Miami, FL | | | – |
| 34 | New Orleans, LA – New York City, NY (LGA/JFK/EWR) | | | – |
| 35 | Miami, FL – New Orleans, LA | | | – |

432.    The Government's expert "knows" the presumption routes will change from year to year due to entries and exits.  Tr. 11/20/23 (Gowrisankaran) 74:5–9 ("Q. And you also can't rule out that the list of presumption routes here will change again in the next year, correct? A. That's right, in fact I know it will change because there's been some exits and some entries.").

V.  **THE GOVERNMENT'S MARKET SHARES ARE NOT RELIABLE PREDICTORS OF GOING-FORWARD COMPETITIVENESS**

A.  <u>**Spirit's Past Does Not Reflect Its Ability To Compete In The Future**</u>

1.  **Spirit Has Not Turned A Profit Since 2019**

433.    While Spirit's business model was successful in the past, 2023 will be its fourth money-losing year in a row, resulting in a cumulative net loss of close to $2 billion since the onset of the COVID-19 pandemic.  Tr. 11/1/23 (Christie) 30:17–31:4, 47:15–48:19; Tr. 11/7/23 (Gardner) 40:10–41:8; TX 39 at '0510 (Spirit 2022 10-K); TX 77 at '4632 (Spirit Q1 2023 8-K); TX 73 at '4500 (Spirit Q2 2023 10-Q); TX 337 at '2189 (Spirit Sept. 12, 2023 Investor Update); TX 633 at '1536 (Spirit Q3 2023 10-Q); TX 678 at 6–7.

434.    Despite an optimistic outlook at the end of 2022, Spirit's poor financial performance has continued and worsened in 2023, causing Spirit to repeatedly miss projections. *Compare* TX 299 at '0461–0462 (Dec. 2021 Spirit Board presentation predicting return to profitability in 2022) *and* TX 241 at '8897 (Dec. 2022 Spirit Board presentation predicting a return to profitability in 2023, with a projected net income of $242 million), *with* TX 678 at 6 (Spirit Q3 2023 Results Press Release, showing a net *loss* of $263 million so far in 2023) *and* TX 680 at 1 (Spirit Oct. 26, 2023 Investor Update, projecting further losses for Q4 2023); *see also* Tr. 11/1/23 (Christie) 36:20–37:11 ("we were optimistic [in December 2022] that a few things would start to move in our direction where we would begin to see normalized demand patterns in the domestic marketplace in the Latin international markets where we serve.  We were expecting to see a return to more normalized aircraft fleet utilization . . . and we were hoping that those things would give us some cost advantage and that we would be able to produce a profit as a result, albeit a modest profit with the net margin being 3.9 percent. But nonetheless, um, we were hoping at least a return to profitability."); Tr. 11/7/23 (Gardner) 51:3–7 ("So you know, we

started with an expectation at the end of April of 5 positive, August 3rd it was 5 negative, September 12 was 15 negative. So over the span of that 4-month period, um, our margin expectation declined 24 points.").

435.    Notably, in 2022 and early to mid-2023, Spirit predicted that certain cost and revenue patterns would be temporary or less severe than they turned out to be.  *See* TX 341 at '1965.

436.    Spirit had to revise down its guidance significantly, and eventually reported an operating margin that was dramatically lower than predicted.  *Compare* TX 76 at '4621 (Spirit forecasted an adjusted operating margin for Q3 2023 of negative 5.5% to negative 7.5%) *with* TX 678 at 1 (actual adjusted operating margin for Q3 2023 was negative 14.2%).

437.    Spirit missed its projected operating margin in the second quarter of 2023 as well. *Compare* TX 77 at '4639 (Spirit forecasted an adjusted operating margin of 4.5%–6.5% for Q2 2023) *with* TX 76 at '4611 (actual adjusted operating margin for Q2 2023 was 3.3%).

438.    The causes for Spirit's decline in financial outlook are complex, as various risks materialized, while opportunities did not.  TX 241 at '8931 (Dec. 2022 Spirit Board presentation; slide titled "Risks and Opportunities in 2023 Plan"); Tr. 11/1/23 (Christie) 37:12–46:16 (testimony about TX 241; risks materialized, opportunities did not).  Still, Spirit points to, and the evidence at trial showed, two overriding factors that have affected Spirit's ability to return to profitability.

439.    ***First***, since the COVID-19 pandemic, there has been a marked shift in demand patterns.  *See supra* § II.A.2.  Spirit's witnesses described an increase in leisure capacity—and, thus, an increase in leisure competition—from other airlines.  Tr. 11/3/23 (Klein) 117:5–118:4; TX 334 at '4858 (March 2021 Spirit Board presentation).

440.     The resulting surplus supply of leisure-focused, low-priced seats in the marketplace is impacting Spirit's ability to charge a profitable clearing price for its no-frills product.  *See* Tr. 11/1/23 (Christie) 33:6–34:23; Tr. 11/3/23 (Klein) 124:12–125:6; TX 678 at 1 (Spirit achieved an adjusted operating margin of negative 14.2% in Q3 2023; "Softer demand for our product and discounted fares in our markets led to a disappointing outcome for the third quarter 2023.").

441.     Although Spirit has been able to achieve reasonably high load factors (i.e., reasonably full planes) through 2023, it has only been able to do so by selling fares at unprofitable levels.  Tr. 11/7/23 (Gardner) 49:23–50:19 ("Q. And how do you reconcile the fact that she showed you that the load factor was in the 80-plus-percent range with the statement in this Earnings Release that there's been an 'acute reduction in demand'?  A. Well, um, not that I don't care about 'load factor,' but 'load factor' isn't actually — *we could fill the plane at a dollar, um, it — the issue for health and profitability is at what price are you selling seats?*  . . . in each of those quarters, the yield was going down, which means we were putting the same number of passengers on the plane, they were just paying less money for their seat." (emphasis added)).

442.     ***Second***, Spirit's financial outlook has been impacted significantly by issues with Pratt & Whitney's New Engine Option ("NEO") engines.  Over the course of the last year, Pratt & Whitney has identified several mechanical issues with its Geared Turbo Fan ("GTF") engines, which require maintenance events that ground Spirit's planes.  Tr. 11/1/23 (Christie) 40:16–41:18.

443.     Specifically, Pratt & Whitney has identified two issues:  contaminated powdered metal, and an issue with "teething," both of which required planes to be pulled from the schedule

for maintenance. The powdered-metal issue requires almost 300 days of maintenance per plane, as Pratt & Whitney has to remove engines for X-rays and reassembly. TX 341 at '1962–1963 (Spirit Q2 2023 Earnings Call; Christie discussing GTS engine issue); Tr. 11/8/23 (Kirby) 57:3–58:11 ("Q. And just so the record is clear, that powdered metal issue, is that referring to something you mentioned yesterday involving a Pratt & Whitney engine? A. It is. It's, um -- we've gone through challenges with Pratt & Whitney and quite frankly in the first half of the year we generally had about 5 or 6 aircraft on the ground in any given month because of the backup in the maintenance and overhaul realm. It typically would take about 120 days to do the maintenance and now it's taking about 300 days, because it's taking longer to end up, and then the maintenance is taking longer because of the backup. So that was an ongoing issue. But it was manageable. But this new issue is a lack of either records of the inspection or the inspection wasn't done. And so what they need to do is they need to remove these engines, take them apart, inspect the disk, I guess for cracks they have to take X-rays, and then they have to put it all back together.").

444.    At the beginning of 2023, Spirit had to "ground" (*i.e.*, not use) 3 of its 200-or-so aircraft; today, Spirit has 12 aircraft on the ground ("AOG"). Tr. 11/1/23 (Christie) 40:16–41:18; Tr. 11/8/23 (Kirby) 57:11–58:11; TX 341 at '1962. By the end of 2024, that number could grow to 40-45 AOG, and to 72 by the end of 2025. Tr. 11/8/23 (Kirby) 57:11–58:11.

445.    The issues with Pratt & Whitney's engines uniquely affect Spirit: Spirit is the largest operator of the impacted GTF-powered Pratt & Whitney NEO engines in the United States, with the highest number of engines produced during the 2015 to 2021 periods. Tr. 11/1/23 (Christie) 43:9–44:4 ("There are other, um, U.S.-based airlines that operate this engine variant, but Spirit is the largest, um, adopter of this engine in the United States, both in total

count and as a percent of the fleet, we're the second largest in the world. So it's having an outsized impact on Spirit … said quickly, we're [all] in on the airbus A320 family and all in on the Pratt varian[ts] and that has exposed us again to a lack of diversity."); TX 341 at '1962–1963 ("Spirit is the largest operator of GTF-powered NEOs in the United States with the highest number of engines produced during the 2015 to 2021 period.  Exposure to this issue is very unique and material for us and is having an impact on our margin.").

446.    Spirit's primary ULCC competitors, Frontier, Allegiant, and Sun Country, are not exposed to the Pratt & Whitney engine issues to the same degree. Tr. 11/14/23 (Biffle) 47:7–48:1 (Frontier has "not been impacted" by the Pratt & Whitney engine issue); Dep. 6/14/23 (Bendoraitis) 306:1–11 (Allegiant and Sun Country are not exposed to Pratt & Whitney engine delays and issues).

447.    While Pratt & Whitney has made public commitments to the extent they will "make" their customers "whole," as of the time of trial, Spirit has not seen any actual relief from Pratt & Whitney beyond its public comments. Tr. 11/1/23 (Christie) 108:23–109:5.

448.    In addition to these two challenges, several other issues, including disruptions flowing from understaffing at air traffic control centers in Jacksonville, Florida, and increased costs of pilots and flight attendants, have also squeezed Spirit's margins.  *See* TX 341 at '1962 (Spirit Q2 2023 Earnings Call Transcript; Christie: "our reported DOT operating metrics for the quarter were negatively impacted by all the weather events and a plethora of Air Traffic Control initiatives."); Dep. 6/14/23 (Bendoraitis) 158:23–159:25 (Explaining that Jacksonville ATC's challenges "disproportionately affect[]" Spirit "because of the amount of traffic that we have entering and exiting Florida air space through Jax center."); Tr. 11/1/23 (Christie) 44:5–45:1 (new contracts with pilots and flight attendant unions have a "combined impact" of $225-plus

million per year).

449.    Profitability is required for growth.  As noted by Mr. Christie, "if the business isn't making money, you can't justify deploying additional capital for growth."  Tr. 11/1/23 (Christie) 48:3–25; *see also* TX 341 at '1970 (Haralson: "I mean we got to earn that right to grow the airline. So we got a return utilization, return margin and cash reduction and then we can start to lean forward.").

450.    As a result of these cumulative operational and financial challenges, Spirit has already taken concrete steps to slow its growth, exit routes, and revise its business plans, as described *infra*.

451.    While the Government suggested that certain statements in Spirit's financial documents paint a rosy picture of its return to profitability—*see, e.g.*, TX 341; TX 678 at 2 (cited in Gov't Closing at Slide 17)—read in context, those statements tell a different story.  In August 2023, Mr. Christie acknowledged that the "dynamics of the airline business are constant," and that "things in the airline industry can change quickly and often," and that "our team is doing a great job adjusting as necessary, and I strongly believe our expected 3Q performance is an anomaly. Most important for us, as we trend towards a normalized utilization rate, we expect our cost structure to return to industry-leading levels and provide us margin tailwinds and a considerable advantage against the rest of the industry."  TX 341 at '1965.  But as Mr. Christie and Mr. Gardner later testified, these hopeful predictions as of August 2023 did not come to pass due to additional headwinds. Spirit's cost structure has not returned to where it needs to be, and Spirit has no prediction as to when it will return to profitability.  In order to accept the Government's story about Spirit's future, the Court would have to make an adverse finding as to Mr. Christie and Mr. Gardner's credibility, which there is no evidence to support. *Compare* Tr.

12/5/23 (Gov't Closing) 48:3–16 ("In every SEC filing, Spirit has continued to tout its ability to return to profitability") *with* Tr. 11/1/23 (Christie) 48:3–25 ("I don't have an estimate as to when we intend to return to profitability.").

### 2.   Spirit Is Changing Its Route Plans, Exiting Cities And Deviating From Its Five-Year Plan

452.   As a result of its financial performance and logistical issues, Spirit is exiting routes at a historic pace.  Tr. 11/3/23 (Klein) 124:12–125:6 ("Unfortunately, if we can't be profitable we end up having to exit city pairs."); Dep. 6/7/2023 (Haralson 30(b)(6)) 51:18–23 (Airbus delays require an evaluation of "what flying would have to be removed").

453.   In pre-pandemic years, Spirit tended to exit one or two dozen routes per year.  TX 338 at '7056 (Spirit discontinued 11 routes in 2017, 1.4% of its capacity); TX 339 at '6591 (Spirit discontinued 27 routes in the last twelve months before August 2018).

454.   By contrast, Spirit exited 70 routes in 2022, and 40 routes in the first half of 2023, representing more than 20% of its network. Tr. 11/3/23 (Klein) 98:23–101:2; *see also id.* 96:7–14 ("I would love to have this environment back where I'm only thinking about 27 routes being discontinued."); Tr. 11/8/23 (Kirby) 56:18–58:11 ("Q. And how if at all has the frequency of Spirit exiting a route changed more recently? A. Yeah, um, we're in very unique times.").

455.   Spirit also does not plan to enter the routes or cities it hoped to enter as recently as mid-2023.  Specifically, Spirit's Vice President of Network Planning, John Kirby, testified that Spirit has no plans to execute on its May 2023 Five-Year Network Plan, as that plan is not "realistic" in light of the company's current financial condition.  Tr. 11/8/23 (Kirby) 69:25–71:9 (testifying about TX 331, Spirit's 2023 Five Year Network Plan, at '2235: "[A]t this time we're not planning to enter any of [these cities]…with what I know about the GTF issue right now, I think opening new cities is going to be towards the bottom of our opportunity set."); Tr. 11/8/23

(Kirby) 21:10–18 (Spirit believed its growth forecasts "were realistic at the time that we developed the deck" in the Five Year Network Plan, but "knowing what we now know, I think it really isn't realistic. It isn't realistic."); Tr. 11/8/23 (Kirby) 71:10–72:14 (testifying, re: TX 331 at '2238: "And as you sit here today as Spirit's Vice President of Network Planning, what's your best judgment as to whether Spirit will average 1386 daily departures by 2027? A. I think it's incredibly unlikely. . . .Q. And . . .what is your best judgment as to whether Spirit will serve 115 cities by 2027? A. Again highly unlikely").

456.     Spirit is even giving up real estate, giving its competitors an opportunity to build up capacity—and making it harder for Spirit to re-enter in the future.  Tr. 11/8/23 (Kirby) 68:25–69:10.

457.     As a result of its difficulties—and of ordinary-course business decisions—Spirit has already exited a number of the Government's so-called "presumption" routes, rendering the Government's reliance on these routes outdated.  *See supra* ¶¶ 405–413; Tr. 11/8/23 (Kirby) 75:8–21, 76:1–8.

### 3.     Spirit Is Slowing The Growth Of Its Fleet, Which Will Result In Slower ASM Growth In The Future

458.     The Government has repeatedly pointed to Spirit's growth in available seat miles, or ASMs, as evidence that this transaction will eliminate a uniquely strong ULCC.  For example, Dr. Gowrisankaran, noted Spirit's "6-fold" growth in ASMs between 2010 and 2023.  Tr. 11/17/23 (Gowrisankaran) 51:13–17.

459.     But the evidence at trial demonstrates that Spirit is unlikely to grow at this pace in the future.  While Spirit still predicts modest positive ASM growth in 2024, that growth is in the single digits, in stark contrast to Spirit's historic double-digit year-over-year ASM growth. TX 680 at 1.  Moreover, ASM growth is mostly a function of taking additional aircraft.  Tr. 11/1/23

(Christie) 22:10–14 ("Q. What do you attribute this growth to with seat miles during this period in Demonstrative 1? A. Well we took delivery of a number of airplanes over that period of time and that provided us with, um, the capacity growth that's referenced here.").

460.     Spirit took delivery of additional aircraft during the pandemic, but its executives believe that that may have been a mistake in hindsight.  Tr. 11/1/23 (Christie) 110:2–23 ("I think what I specifically say here is that slower growth would have been more ideal during and coming out of pandemic. So probably for closer to the past three years we did pursue — we did continue to take delivery of aircraft during the pandemic, even though there was a drop-off in demand, and it looks like we probably outgrew the opportunity right now.").

461.     As a result of its financial difficulties, Spirit recently renegotiated its contract for aircraft deliveries with Aircraft to grow at a slower pace.  As noted by Mr. Christie, in late 2022, Spirit "reached out to our aircraft manufacturer, which is Airbus, and made a modification to our delivery stream to remove airplanes or defer airplanes out of 2023 and 2024 because we were cautious and fearful that we would not be able to justify that growth with profitability. We also were in the midst of evaluating a retirement schedule for our A319 fleet, which is the smallest aircraft in our fleet, and we decided to press ahead with that and move it as accelerated as we could, so we started to take aircrafts out of the current periods and push them down the line or take them out of service because the demand hasn't been there and our profitability hasn't been there." Tr. 11/1/23 (Christie) 46:18–47:14.

462.     The renegotiation of the contract was a product both of Spirit's desire to "take fewer [aircraft] in that near-term period of time," as well as Airbus's own supply-chain issues impacting deliveries. Tr. 11/6/23 (Gardner) 157:8–158:25.

463.     While the same total number of aircraft will be delivered, the renegotiated

contract slows the pace of growth by two years.  TX 861 at '4410 (Spirit Board's approval for Airbus Amendment 6, noting Spirit recently deferred aircraft scheduled to be delivered between 2024 and 2025).

464.     As a result of its renegotiated contract, as well as other constraints on the business, Spirit does not expect to continue to grow at its historic mid-teens ASM growth rate in the near future.  TX 341 at '1964–1965, '1973 ("Hard to know if we're going to be in the single digits or flat or low teens [for ASM growth], hard to tell at this point, but my guess would be somewhere in the single digits for '24."); Tr. 11/1/23 (Christie) 111:2–4 ("Q. And, in fact, you've already taken steps to try to moderate the pace of Spirit's growth going into the future? A. We have."); TX 678 at 2 ("For the full year 2024, Spirit estimates capacity will range between about flat to up mid-single digits compared to the full year 2023.").

### 4.     Spirit Is Reconsidering Its Business Model

465.     As a result of its current financial difficulties, Spirit is considering making changes to its cost structure, its product, and its network.

466.     As the Chairman of Spirit's Board, Mac Gardner, explained, "we can't just keep doing what we're doing and expect, um, the outcome to be dramatically different. If this environment stays the way it is, um, I guess the expression I'd use is 'hope is not a strategy.' So, um, we're going to do what we need to do to figure out, um, how to address this."  Tr. 11/7/23 (Gardner) 53:11–20.

467.     Spirit has recognized that it cannot maintain its business model at the current pace.  Tr. 11/7/23 (Gardner) 40:10–41:8 ("Q. So does Spirit sustain its business model losing $500 million a year?  A. Um, if we continue losing $500 million a year? Absolutely not."); TX 678 at 1 ("We are prepared to make the necessary strategic shifts to enable Spirit to compete

effectively in this new demand backdrop.").

468.    While Spirit does not have any concrete plans today, everything is on the table. Mr. Christie testified that Spirit is "evaluating our growth strategy in the moves we've made and I think that will be a continual evaluation, simply put. If the business isn't making money, you can't justify deploying additional capital for growth, so we're going to have to evaluate that going forward.  We're going to have to take a hard look at our cost structure and whether or not we can make any changes to that to influence profitability. And we'll have to review the revenue side of the business as well and take a look at our product and where we're flying and make continual changes."  Tr. 11/1/23 (Christie) 48:3–25.

### 5.    None Of Spirit's Changes Are Impacted By The Pendency Of This Merger Or Ongoing Litigation

469.    During trial, the Government insinuated that some of Spirit's recent difficulties, or business changes, should be discounted because they occurred in the "shadow of litigation," Tr. 11/17/23 31:1–9, or were due to "strategic malaise" brought on by the merger itself, Tr. 11/1/23 97:24–98:13. The evidence at trial does not support any inference that Spirit's financial problems, or the changes that it has been making to its business as a result, were at all impacted by this merger or done in order to improve the parties' litigation prospects.

470.    Spirit's witnesses were unanimous and adamant that Spirits' losses in the past year were driven by the industry "environment" and "economics," not by "strategic malaise" or merger-related disruption.  Tr. 11/1/23 (Christie) 125:24–126:8 ("[Strategic malaise] played no part in the losses that we've sustained to date. The losses that we're sustaining today are a product of the environment, and we've seen a fall in our revenue production as a result of less demand in the markets where we operate. And that's been the principal cause of the change in the economics in the business, in addition to the cost inflation that I explained earlier. But I

wouldn't ascribe any of it to a strategic malaise."); Tr. 11/7/23 (Gardner) 35:1–11 ("Q. From your perspective as the Chair of the board, has the JetBlue merger disrupted the operations of Spirit? A. No. . . . Q. In your view, is any part of the financial performance of Spirit since 2022 attributable to the pendency of the merger? A. Not at all.").

471.    In fact, Spirit negotiated for several provisions in the merger agreement, including interim operating covenants and retention agreements, to protect its ability to run an independent airline and prevent disruptions such as staff turnover from impacting its prospects.  Tr. 11/7/23 (Gardner) 56:5–57:8 (business interruptions from the merger were part of what Spirit was considering about when it negotiated for interim operating covenants and retention incentives); Tr. 11/1/23 (Christie) 83:8–84:8 (Spirit negotiated for things to "protect our business," including "retention packages for our management team during a longer review process" and "the ability to continue to execute as a standalone business").

472.    Spirit's management did not "take their eye off the ball" during the pendency of the merger.  Tr. 11/7/23 (Gardner) 55:23–56:4 ("Q. And in your view, as the Chair of Spirit's board, what impact did the pendency of a merger with JetBlue have on these results? A. Nothing. Q. Did management take its eye off the ball of running a standalone airline? A. No.").

473.    Spirit's decision to suspend service on the routes on which the Government relies to establish the "presumption" of a reduction in competition was not done for any reason related to this litigation.   Tr. 11/8/23 (Kirby) 75:22–25 ("Q. When Spirit decided to enter or suspend those routes, was that decision in any way related to this litigation? A. None whatsoever.").

474.    JetBlue did not cause Spirit to take fewer planes than it planned; Spirit acted independently in slowing its fleet growth by adjusting its contract with Airbus in 2023.  Tr. 11/16/23 (Hurley) 126:13–129:9 ("Spirit on their own has actually deferred aircraft"); Tr.

11/6/23 (Hayes) 32:10–34:24 ("I think [any conversation about Spirit's request to acquire incremental aircraft in late 2022 is] a moot point because since then Spirit, of its own accord, have deferred airplanes in a fairly significant way.").

475.   Instead, the evidence at trial is uniform that JetBlue has never properly turned down any request by Spirit to run its business as it sees fit. Tr. 11/6/23 (Hayes) 32:10–34:24 ("I will tell you that every time a request from Spirit to — under the interim operating covenants was brought to me, I approved it."); Dep. 6/22/2023 (Haralson) 373:24–374:6 ("Q. And do you know whether JetBlue ultimately approved the amendment that's being discussed here? A. I do not recall exactly, but I would assume they did, given that they have not rejected the 5.1 request of ours to date. So I would say yes."); Tr. 11/7/23 (Gardner) 57:9–22 ("Q. And are you aware of any requests of JetBlue under those covenants that were turned down by JetBlue? A. No.").

476.   While there appears to have been some confusion when Spirit sent over a blanket request to enter into agreements for incremental aircraft in November 2022, there is no evidence that JetBlue properly denied that request, and it was superseded by the Airbus amendment negotiations just a month later.  *See infra* § VII.I; Tr. 11/17/23 (Klinka) 39:3–10; Tr. 11/17/23 (Hurley) 8:6–13.

477.   Specifically, Spirit's request came at a time when there was no impending deadline to exercise options or enter into leases as of November 2022; JetBlue wanted to maintain flexibility for later, and did not see a need to agree at that time.  Tr. 11/16/23 (Hurley) 125:15–126:12.

478.   While Ursula Hurley thought that an "informal" denial of the request was communicated to Spirit by Derek Klinka, at the "working team" level, Mr. Klinka testified that he had, in fact, simply ***assumed*** someone did.  There is no trial testimony establishing that a

communication was ever actually made.  No Spirit witness testified that they heard a denial, and no JetBlue witness testified that they spoke to Spirit.  *See* Tr. 11/16/23 (Hurley) 119:4–25, 122:23–123:2 (noting that "working team" level informal communication occurred, likely by Derek Klinka or Dora Habachy); Tr. 11/17/23 (Klinka) 38:14–39:10 ("Q. Staying on Exhibit 801, Mr. Klinka. At the time you wrote this e-mail, were you aware of any written response to the IOC request from Spirit? A. I was not.  Q. Were you aware of any informal response? You said you had made an assumption. Were you aware of any [in]formal response? A. I was not.").

479.    In any event, any "informal" denial is not sufficient under the merger contract to operate as a denial of the request; instead, JetBlue needed to respond formally, in writing within 72 hours, which never happened.  TX 425 at '7676; Tr. 11/17/23 (Hurley) 21:15–22:2 ("This was one of the earlier IOC requests that we received from Spirit, and to be totally frank . . . we were not aware — I was not aware that we had a 72-hour constraint. . . . technically we had consented to that request.").  And Spirit witnesses testified that in late 2022—shortly after the November 2022 conversations at issue—it independently reached out to Airbus to renegotiate its contract, moving out its deadline to exercise options, rendering any confusion on this point moot.  Tr. 11/1/23 (Christie) 46:18–47:14 (Spirit reached out to Airbus "in late 2022" due to the financial condition of the firm); TX 861 (July 24, 2023 Unanimous Written Consent of Spirit's Board to enter into Airbus Amendment, describing option deferral).

### B.    Barriers To Entry Are Low

480.    Ordinary course entry and repositioning is common in the airline industry.  *See* *supra* § II.C.2, § IV.F, ¶¶ [415–419]. This "shows [] that [on] most routes there aren't significant barriers to entry."  Tr. 11/27/23 (Hill) 21:4–11; Dep. 6/28/23 (Nocella) 95:9–11 ("[T]he vast

majority of the airports in the United States are -- you're free to go or free to come whenever you'd like.").

481.    "[E]ach carrier has significant turnover in its route [networks] from year to year." Tr. 11/27/23 (Hill) 15:12–16:3.  In 2023, Spirit, for example, entered and exited approximately 33% of its 2022 route network.  TX 886; *see also* Tr. 11/27/23 (Hill) 15:12–24 ("What [TX 886] is saying is, for each carrier, as a percentage of its total routes in 2022, how many entries and exists did it have in 2023? That is in some sense how much did its network change?").

482.    Legacies, LCCs, and ULCCs have entered a significant number of routes in 2023. Tr. 11/27/23 (Hill) 15:1–7. In 2023 alone, the "aggregate total number of routes entered [by all carriers] is going to be somewhere between 300 or 400 routes." *Id.*; TX 885.

483.    Other ULCCs also had a high percentage of entries and exits in 2023 as compared to their 2022 networks: Breeze, Avelo, Sun Country, and Frontier entered and exited 110%, 81%, 45%, and 38% of their 2022 route networks, respectively.  TX 886.  Legacies entered and exited between 8% and 11% of their 2022 route networks this year.  *Id.*

484.    The Government's own experts confirmed entry and repositioning occur frequently.  *See supra* ¶¶ 414–418; Tr. 11/21/23 (Chipty) 138:3–13 (Dr. Chipty's analysis is based on 4,701 entry events by Spirit, Frontier, Allegiant, and Sun Country over a five-and-half-year period).

485.    Dr. Gowrisankaran similarly identified 597 entry events in a two-year period to calculate his estimates of the JetBlue and Spirit effects.  TX 845.  This number of entry events is more than *twice* the number of routes on which Dr. Gowrisankaran estimates the effect of the merger.  Tr. 11/20/23 (Gowrisankaran) 90:9–11.

486.    As the significant number of entry events described above makes clear, there are

generally no—or very few—barriers to entering a particular route, even when the airline lacks a significant presence in a particular metro area. *See, e.g.*, Tr. 11/8/23 (Kirby) 78:20–25, 86:5–10 ("[W]ith the exception of possibly LaGuardia, common-use [gate] capacity is available at every one of these airports.").

487.    For example, while an airline might optimally like a "preferential" gate at an airport—that is, a gate that allows the airline to control its operations so long as the airline uses that gate to a level required by the airport, *see* Tr. 11/7/23 (Kirby) 133:7–17—common-use gates are also available at most airports, which allow airlines to establish a presence and eventually grow. *See* Tr. 11/8/23 (Kirby) 79:7–81:25 (explaining Spirit's growth using common-use gates at Salt Lake City and San Antonio, as well as Frontier, Sun Country, and Allegiant's growth using common-use gates at Boston), 83:21–97:11 (describing opportunities for growth even at airports where "infrastructure" constrained Spirit's ability to obtain preferential use gates).

488.    Airports generally seek to incentivize entry from potential carriers. As John Kirby explained, airports will sometimes provide valuable cost incentives to potential entrants (such as "landing fee waivers," "rental waivers," or "some marketing dollars"), or incentivize carriers to serve "a list of nonstop destinations that they would like to see from their airport" with monetary rewards. Tr. 11/8/23 (Kirby) 82:1–83:20.

489.    Narrowing the aperture further to the airports serving as endpoints for the Government's 51 nonstop "presumption" routes exposes that there are few barriers to entry at most of the airports in question. Tr. 11/8/23 (Kirby) 86:5–10 ("[With the] exception of possibly LaGuardia, common-use capacity is available at every one of these airports.").

490.    The most frequent endpoints on these 51 routes are Miami/Ft. Lauderdale (25 routes), Puerto Rico (10 routes), Orlando (11 routes), Boston (7 routes), and New York City (6

routes), 42 of which have an endpoint in Florida.  Tr. 11/9/23 (Friedman) 155:5–11.

491.    As discussed *infra*, Miami/Fort Lauderdale, Orlando, and San Juan have no barriers to entry.  Although Boston and New York City are arguably constrained, JetBlue has committed to divesting assets at Newark, LaGuardia, and Boston airports, as well as the unconstrained Ft. Lauderdale airport.

### 1.    Orlando (MCO, SFB)

492.    There are two airports in the greater Orlando area:  Orlando International Airport ("MCO") and Orlando Sanford International Airport ("SFB").  Tr. 11/9/23 (Friedman) 121:5–8.

493.    SFB, a secondary airport to MCO, is located "about thirty to forty-five minutes away from [MCO] and about thirty to forty-five minutes away from the theme parks."  Tr. 11/9/23 (Friedman) 121:19–22.

494.    MCO is a competitive and fragmented market; no airline has a more than 21% share, and approximately seven airlines are at or above a 10% share.  Tr. 11/2/23 (Clark) 110:8–15.

495.    MCO is not slot or gate constrained.  Tr. 11/2/23 (Clark) 111:4–9; Tr. 11/9/23 (Friedman) 157:21–158:9.  It recently opened a brand-new terminal and is in the process of constructing even more gates.  Tr. 11/2/23 (Clark) 111:4–9; Tr. 11/9/23 (Friedman) 158:5 ("MCO has four runways.  It has a brand-new terminal.").

496.    Indeed, during the course of trial, Southwest "moved a significant amount of international flying from Fort Lauderdale, out of Fort Lauderdale into Orlando."  Tr. 11/9/23 (Friedman) 158:5–9.

497.    Low-cost carriers like Spirit, Frontier, Avianca, WestJet, Volaris, Norse, Lynx, Swoop and Avelo have increased passenger service volumes at MCO in the last few years.  Dep.

6/23/23 (Jaramillo) 16:11–28; Tr. 11/2/23 (Clark) 110:15–111:16 ("Orlando is sort of your

prototypical ULCC market. So there's a lot of ULCC competition here . . .  [T]his is a market

that has always been attractive to ULCCs, given the customer type.").

498.    Avelo, for example, operates a "base" in MCO, meaning that they "park [their]

aircraft" and employ essential personnel at the airport.  Tr. 11/3/23 (Yealy) 18:7–12, 18:21–19:4.

499.    Breeze initiated service at MCO in 2022, flying just one route, and now in 2023

flies nine routes.  Dep. 6/23/23 (Jaramillo) 12:19–13:2.  Breeze expanded service at MCO

because it saw an opportunity to "backfill a market that might have been left by another carrier."

*Id.* 16:19–17:3, 17:8–10; Dep. 7/17/23 (Neeleman) 172:9–20 (Breeze is "always looking" to add

routes out of "large cities" like Orlando "because we're known in those cities, and it makes sense

just to add them because they're big cities and a lot of customers like flying on us").

500.    Frontier has a 14% revenue share in Orlando.  TX 664.  Frontier operates at least

44 routes out of Orlando.  Tr. 11/14/23 (Biffle) 98:12–17.  Frontier served more destinations

than any other airline at MCO, as of June 2023.  Dep. 6/23/23 (Jaramillo) 31:1–20.

501.    Frontier also has a base in Orlando. Tr. 11/14/23 (Biffle) 36:12–16; Tr. 11/2/23

(Clark) 111:10–16 ("[Frontier has] a pilot base [in Orlando]").

502.    Allegiant has a base in SFB and recently announced that it would be offering

service to and from MCO.  Tr. 11/15/23 (Wells) 11:12–12:2 ("Q. And have you just recently

announced that you will expand at MCO?  A. Not officially or formally announced, but it is on

the website, um, to ensure it was working when we did intend to announce it. . . . Q. So now you

will compete out of both airports in Orlando?  A. Correct.").

503.    In the past, when carriers have vacated routes from MCO, other carriers have

stepped in and filled the route.  Dep. 6/23/23 (Jaramillo) 47:8–23 ("Q. What type of carriers have

stepped in? A. So, for example, when Delta vacated the Cancun route, both Spirit and Frontier stepped in. As I mentioned earlier, when JetBlue pulled out of BWI, Frontier stepped in. When Charleston, West Virginia was vacated by Spirit, then you had Avelo [sic] step in. When you had Huntsville, Alabama vacated by Frontier, Avelo stepped in. Those are just a few, but we do see that, again, other carriers will quickly backfill, because the other carrier had started to develop the market, so it's much easier for them to step in.").

### 2.    San Juan, Puerto Rico (SJU)

504.    In San Juan, Puerto Rico, there are no constraints on entry at Luis Muñoz Marin International Airport ("SJU").  Tr. 11/2/23 (Clark) 113:21–114:2.

505.    Even when capacity was historically "tight" at SJU, Spirit was able to "work with the airport authority there to get additional capacity."  Tr. 11/8/23 (Kirby) 88:23–25.

506.    San Juan is a fragmented and competitive market; six competitors have a roughly 10% share.  Tr. 11/2/23 (Clark) 113:11–20; TX 666.

507.    Several ULCCs have entered or expanded their presence in San Juan in recent years.  Frontier, for instance, has had "no issues growing in San Juan."  Tr. 11/14/23 (Biffle) 97:18–24.  Indeed, Frontier has made San Juan a focus city, offering 15 routes to and from the metro area—more than any other airline.  *Id.* at 99:5–18.

508.    Avelo currently flies from two destinations to San Juan, Puerto Rico and is evaluating opportunities to expand the routes it flies to San Juan.  Tr. 11/3/23 (Yealy) 32:10–14, 35:15–18, 37:1–5.

509.    Allegiant previously operated routes out of Puerto Rico and would consider returning to Puerto Rico if it were to become profitable.  Tr. 11/15/23 (Wells) 25:12–14.

### 3.      Miami/Ft. Lauderdale (MIA, FLL)

510.     There are two major airports in the greater Miami/Ft. Lauderdale area (referred to as "South Florida" throughout trial): Miami International Airport ("MIA") and Ft. Lauderdale/Hollywood International Airport ("FLL").

511.     MIA is not constrained.  Tr. 11/9/23 (Friedman) 56:25–157:3.

512.     Similarly, in MIA, ongoing construction projects will allow for "11 gates' worth of growth potential."  Tr. 11/8/23 (Kirby) 96:8–13.

513.     At FLL, there are minimal constraints for new entrants.  Tr. 11/9/23 (Friedman) 156:3–12 ("I think I would consider Fort Lauderdale constrained in certain aspects.  I think for a carrier like JetBlue that has a large presence, getting access to more gates in a contiguous fashion not spread out across all of the airport can be difficult.  That said, for a new carrier to gain access for an individual gate across any terminal may not be as challenging.").

514.     Broward County Aviation Department ("BCAD"), the controlling airport authority at FLL, has a "master plan" to expand the airport.  The plan includes the addition of 29 gates—for a total of 95 gates—over the course of a number of years, to ensure the airport can accommodate future demand.  TX 14 at '4605–4606 (FLL Airport "Competition Plan").

515.     FLL currently has enough gates to meet demand, but demand is projected to increase past the point where 66 gates will be sufficient.  TX 14 at '4605–4606 (FLL Airport "Competition Plan").

516.     Phase 1 of the Master Plan will add 11 gates. The first part of Phase 1 is to add Terminal 5, and it is already underway.  TX 14 (FLL Airport "Competition Plan") at '4605–4606; *see also* Tr. 11/15/23 (Gale) 74:3–7 ("[W]e've recently completed a … master plan forecast for the airport which identifies significant development improvements throughout the

airport over the course of the next 20 years to accommodate future growth.").

517.    Since 2016, BCAD has been able to accommodate every new entrant carrier that has requested access to FLL.  Tr. 11/15/23 (Gale) 72:23–73:2 ("Q. In the entire time, Mr. Gale, that you've been at Fort Lauderdale Airport, this is March 2016, you're not aware of any new entrant who has been denied access to the airport, is that right? A. I am not.").

518.    BCAD regularly solicits ULCCs to begin or expand service at FLL, with five domestic LCCs or ULCCs currently providing service at the airport.  TX 14 at '4595.

519.    Indeed, Frontier's "largest operation," with well over "80 routes collectively," is in Florida, approximately 19 of which fly from Miami or Fort Lauderdale.  *See* Tr. 11/14/23 (Biffle) 97:13–17, 98:24–99:4.

520.    Allegiant also has established operations at Fort Lauderdale, operating three gates at the airport.  Tr. 11/14/23 (Wells) 147:8–10; *see also* Tr. 11/15/23 (Wells) 26:3–6 ("In Fort Lauderdale we have a long track record of success and look forward to growing a bit more rapidly than we've been able to otherwise.").

521.    With the divestiture assets, Allegiant will be an even more robust competitor: Allegiant has "every bit of confidence that [it] can serve five additional gates with an ever expanding network."  Tr. 11/14/23 (Wells) 150:24–151:3 ("Fort Lauderdale, we've had no issue and continue to grow gates. I have every bit of confidence that we can serve five additional gates with an ever expanding network.").

522.     Fort Lauderdale has also been able to accommodate the entrance of four new international carriers, El Al from Israel, Flair from Canada, Porter Airlines from Canada, and Bermuda Air from Bermuda.  Tr. 11/15/23 (Gale) 73:3–18; *see also* Tr. 11/8/23 (Kirby) 104:20–105:1 (explaining that foreign airlines are an option for travelers flying from South Florida to the

Caribbean and/or Latin American, including Copa and Azul out of Fort Lauderdale, and LATAM, Air Mexico, Copa, and Avianca from Miami International).

523.    BCAD's lease agreements include a "use-it-or-lose-it" provision that allows BCAD to recapture preferential use gates if "the airline[] is not meeting the stated demand or the utilization of that particular gate."  Tr. 11/15/23 (Gale) 76:4–12.  This policy is applied on an aggregate, not route-by-route level:  if a carrier "has 10 preferential-use gates and after we run the formula at the year end and they only qualify for 9, we would look to recapture one of those gates, and, um, because of their shifting of their international traffic, we would look to, more likely than not, recapture one of the international-capable gates."  *Id.* at 77:20–78:8.

524.    Accordingly, the minimum use requirement operates to **remove** barriers on capacity—unlike at other airports, carriers cannot take a loss to sit on gates.  Tr. 11/15/23 (Gale) 58:2–10 ("It was the FAA's recommendation that the Airport, upon coming into receipt of any additional gates, um, including gates that might be recaptured from an airline that was no longer utilizing them on a preferential use basis, that we announce the availability of those gates in an accessible place … so that other potential airlines that might have an interest in serving our airport would be aware of those gates."); *see also* TX 783 at '0806–0807.

525.    During the course of this trial, new gates have freed up at FLL.  Southwest announced "that they're going to drop Fort Lauderdale down to only 35 flights and they're removing all of their international service," which leaves the potential for new entrants to capture some of Southwest's "10 preferential gates and then … 3 of the 5 international swing gates on [Terminal] 1."  Tr. 11/8/23 (Kirby) 85:13–24.

526.    Spirit does not view either of the South Florida airports as constrained and has identified opportunities for expansion.  Tr. 11/8/23 (Kirby) 87:13–15 (Spirit is "evaluating … the

impact of the new situation with Southwest" at FLL); TX 331 at '2227 (identifying MIA as airport with "[r]oom for significant growth").

527.   Notwithstanding these low barriers to entry, JetBlue has committed to divesting assets at FLL.  Tr. 11/6/23 (Hayes) 121:17–22, 123:3–6.

528.   Spirit's assets at Fort Lauderdale are "incredibly valuable"—although FLL is not a constrained airport, it is Spirit's "largest operation" and allows Spirit to operate "about 100-plus departures" every day.  Tr. 11/8/23 (Kirby) 103:16–104:4.

529.   BCAD has not yet approved the transfer of assets to Allegiant.  But if BCAD denies this request, it will undergo a process to determine whether the gates should be leased to a signatory airline or whether the gates should become common use gates in accordance with its FAA-approved Competition Plan.  Tr. 11/15/23 (Gale) 81:22–82:2 ("Q. Okay. But if JetBlue told you it is relinquishing these 5 gates, the County would decide how to allocate those gates, correct? A. The County would go through its allocation process, the announcement of availability, and its allocation process, yes.").

530.   Under BCAD's Competition Plan, BCAD will assign the gates in accordance with what it thinks is best for consumers who fly to/from the Fort Lauderdale airport.  Tr. 11/15/23 (Gale) 61:7–62:1 (explaining BCAD, "based upon the recommendation to the FAA and our response to them … it would be our position that the gate availability would need to be announced and then we would move through the process," but noting BCAD has not "had any … immediate request from airlines that they want a gate or additional gates").

531.   Put differently, BCAD's "position" has been that any airline—ULCC or not—"would be permissible to submit interest on those gates," though JetBlue's position has been that "in order to continue to promote . . . competition, particularly amongst low-fare carriers, that it

would make more sense if those gates went to low-fare carriers, um, low-cost carriers like Allegiant." Tr. 11/15/23 (Gale) 67:12–23, 80:1–4 (The "County will be making the best decision [with the divestiture assets] to ensure competition at Fort Lauderdale Airport").

532.    Regardless whether BCAD approves Allegiant's purchase of these assets, however, JetBlue will no longer have access to those preferential gates if this merger is approved.  As Mr. Gale explained: "If JetBlue comes to me and says they wish to relinquish the gates, um, with no other provisions, then it comes back immediately to the County and we would follow our established process to announce the availability of those gates. If JetBlue wants to request the assignment or consent of those gates to another airline, I think we would have to take a look at that, follow the competition plan as best we can." Tr. 11/15/23 (Gale) 81:5–21.

### 4.    New York City (LGA, EWR, JFK)

533.    Both LaGuardia and Newark are slot- and gate-constrained airports. *See, e.g.,* Tr. 11/14/23 (Biffle) 101:23–102:10.   Spirit has nonetheless been able to grow at both airports.  Tr. 11/8/23 (Kirby) 87:9–12, 87:20–88:18 (explaining Spirit was able to "secure a fourth gate" at Newark, and secured additional terminal space at LaGuardia by assuming leases and adding "more off-peak flying").

534.    JetBlue and Frontier have entered into a binding divestiture agreement, with Frontier set to acquire assets at LaGuardia—6 gates and 22 slot-pairs—that Frontier will "[a]bsolutely" use "to compete more aggressively out of" LaGuardia and bring its ULCC fares to numerous new destinations.  Tr. 11/14/23 (Biffle) 72:16–22.

535.    These assets are "[e]xtremely valuable," both because of the slot constraints at LGA and because the assets are located in the Marine Air Terminal, which allows the recipient to "keep [its] costs down." Tr. 11/8/23 (Kirby) 101:13–102:6.

536.     Frontier recognizes the LaGuardia assets are "highly desirable," as they are "the only near-term opportunity [Frontier is] aware of" for growth at LaGuardia.  Tr. 11/14/23 (Biffle) 101:23–102:10 ("Q. So La Guardia has a constrained airport?  A. The most.  Q. Hard to get the slots?  A. Impossible.").

537.     Frontier does not have firm plans for the LaGuardia assets because they "have no idea when [they] would get the slots."  Tr. 11/14/23 (Biffle) 66:8–22.  However, Frontier intends to put them to "the best and highest use."  Dep. 6/14/23 (Biffle) 172:11–14 ("I mean, you can be assured that we will find the best and highest use for those slots, which will provide the greatest consumer benefit. That is guaranteed."), 109:18–24 ("Q. When do you expect that Frontier would start that planning process? A. When the Spirit merger with JetBlue is completed. Q. Why not – why would Frontier not start the planning process sooner? A. Because we wouldn't waste our time.").

538.     Frontier estimates that it could operate "12, 13 [flights], no problem" from each of the divested gates.  Tr. 11/14/23 (Biffle) 102:14–103:9.

539.     Frontier envisions using the assets to "probably first" "fill Spirit's former routes out of New York."  Tr. 11/14/23 (Biffle) 105:18–23, 104:3–7 ("Q. And as we discussed earlier, some of these routes that Spirit may leave, those are also routes that would go to the top of your list, right?  A. Yeah, you would look at those probably first because they're proven."); Dep. 6/14/23 (Biffle) 110:19–23 ("Q. And what about the particular routes that Spirit currently serves in New York, does the merger make those Spirit routes more attractive to Frontier? A. Most likely.").

540.     Frontier, given its expansive order book and ongoing airplane deliveries, would not "have to pull from existing flying" to utilize the LGA divested assets effectively.  Tr.

11/14/23 (Biffle) 87:7–18 (Frontier will have "50 airplanes, brand new airplanes delivered at the time. So [we] don't have to pull from existing flying to do that."); *see also id.* at 96:8–14 (explaining Frontier has "the aircraft to chase" Spirit's routes post-merger while serving existing routes).

541.    Spirit's assets at Newark are likewise "extremely valuable."  Tr. 11/8/23 (Kirby) 102:7–19 (gates at Newark are "extremely valuable" to Spirit given they "can fully utilize the gates with the Newark capacity that Southwest gave back to the FAA"); Tr. 11/1/23 (Christie) 85:16–86:1 (Spirit's gates at Newark have "tremendous value" as Newark is "very difficult to gain access to").

542.    The Newark assets provide Allegiant an opportunity to expand its presence in an airport in which it has historically been unable to offer flights during preferred times of day.  Tr. 11/15/23 (Wells) 25:21-26:6 ("Q. … Can you explain to the Court why you purchased these assets? A. Sure . . . For Boston to Newark, it represents an opportunity to expand a presence, that in both airports we've been constrained to the international gates in a relatively tight time window, generally midmorning to early afternoon, as [we] have had an inability to get a preferential gate.").

### 5.    Boston (BOS)

543.    While Boston has some infrastructure constraints, Spirit has been able to grow and secure additional gates.  Tr. 11/8/23 (Kirby) 86:18–22 ("At Boston … we were able to add a third gate and that was because it had been … planned that Southwest would take those two gates, but they did not grow and we were able to secure that gate.").

544.    Other ULCCs, such as Allegiant and Sun Country, have similarly "tak[en] advantage of common use capacity to grow in Boston."  Tr. 11/8/23 (Kirby) 97:2–3.

545.    Allegiant has agreed to purchase two gates and related facilities at Boston Logan airport.  *See* TX 246.

546.    Allegiant has tried and failed to obtain additional preferential gates in Boston in the past.  Tr. 11/14/23 (Wells) 141:4–8; Tr. 11/14/23 (Wells) 144:4–8 (explaining Allegiant's "capability to grow beyond" certain common use gates is "severely hindered by that inability to gain a preferential gate").

547.    As Allegiant's Chief Revenue Officer agreed, Allegiant will be "poised and ready to seize any opportunities," including out of Boston, following the divestiture.  Tr. 11/15/23 (Wells) 28:21–29:3 ("Q. And are you confident that when the assets transfer, you will be poised and ready seize available opportunities?  A. Absolutely.  Q. And that will allow Allegiant to offer low-cost fares to consumers in Newark, South Florida, and Boston, correct?  A. Correct.").

548.    With the divestitures, Allegiant will become a stronger competitor.  Tr. 11/14/23 (Wells) 152:14–19 ("Q. And do you agree, sir, that those assets will increase your ability to compete out of Boston, Newark and Fort Lauderdale?  A. Certainly.  Q. And it will increase your flexibility to grow out of those airports; correct?  A. Correct.").

## C.    Divestitures Are Common And Effective Methods Of Facilitating Entry

549.    As explained above, JetBlue has agreed to divest substantial assets to facilitate the entry of future competitors at the few constrained airports at issue: 22 slots and 6 gates with associated ground facilities in LaGuardia (expected to go to Frontier), 2 gates and associated ground facilities in Boston, 43 runway authorizations and 2 gates with associated ground facilities in Newark, and 5 gates with associated ground facilities in Fort Lauderdale (all expected to go to Allegiant).  *See* TX 360; TX 246; Tr. 11/2/23 (Clark) 106:21–107:2 ("We have agreements, signed agreements that, contingent upon us closing the deal, the transaction in

purchasing Spirit, that we will sell all of Spirit's assets at Newark, LaGuardia, Boston, and then there's also divestiture in Fort Lauderdale, to another ULCC to ensure that the amount of ULCC competition at the airport does not decrease."); Tr. 11/6/23 (Hayes) 142:1–9 ("[THE COURT:] I'll ask the question, how good are the divestitures? . . . [A.] [T]he divestitures present a generational opportunity to get into some of these airports . . . It's extremely hard to get into. So these really are the treasure.").

550.    There is historical precedent for divestitures facilitating the entry of other ULCCs. Following the Southwest-Air Tran merger, for example, Allegiant "came in and backfilled … quite a bit of capacity."  Tr. 11/8/23 (Kirby) 105:23–107:1 ("Southwest or AirTran exited those cities and Allegiant either entered markets and backfilled or grew their service level at exited AirTran markets and backfilled the capacity, yes.").

551.    Mr. Wells of Allegiant confirmed as much: "When Southwest and AirTran merged . . . there was meaningful capacity, it was pulled out of -- more midsized cities on the East Coast that AirTran serviced and Southwest did not that we backfilled a meaningful amount of capacity in." Tr. 11/15/23 (Wells) 17:13–21.

552.    Mr. Biffle pointed to another example: following the failure of international airline Mexicana, other airlines such as Villares, Interjet, and Viva "swarmed the opportunity . . . within a year, a year and a half, like everything in the world was replaced. In fact [capacity] may have even been higher because they brought in planes from other parts of the world[.]"  Tr. 11/14/23 (Biffle) 84:2–11.

553.    The Government has recognized the power of divestitures to facilitate entry and competition following an airline merger, most recently in connection with the merger of American Airlines and U.S. Airways ("AA/US merger").  There, the merged firm divested 104

slots at DCA and 34 slots at LaGuardia, along with gates at several other airports.  Tr. 11/27/23 (Hill) 79:19–80:10.

554.    Post-divestiture data shows that the LCCs receiving the divested assets at Reagan National Airport—Southwest, JetBlue, and Virgin—used those assets "to significantly increase the number of passengers" they served, thereby leading "to a significant increase in competition."  Tr. 11/27/23 (Hill) 81:3–7, 81:18–23 (following the AA/US divestitures, "[w]e saw more passengers served by the divestiture buyers. And the existing carrier was able to continue to serve its customers.").

555.    The same pattern occurred at LaGuardia following the divestitures in the AA/US merger.  Tr. 11/27/23 (Hill) 81:24–82:2 ("Q. … Did you also look at La Guardia [sic]? A. I did, and the pattern at La Guardia [sic] is substantially the same.").

556.    The divestitures in the American Airlines-U.S. Airways merger did not include any aircraft.  Tr. 11/27/23 (Hill) 82:10–14.

557.    Divestitures should be therefore incorporated into the competitive effects analysis of a merger.  Tr. 11/27/23 (Hill) 78:22–79:3 ("A. Usually you want to build them into the competitive effects analysis. So is there likely to be a reduction in competition? If so, would the divestitures help to offset that or mitigate it entirely?").

558.    Notably, neither Dr. Gowrisankaran's calculations of market shares nor harm calculations account for the impact of the divestitures on the 51 nonstop overlap routes.  *See, e.g.,* Tr. 11/20/23 (Gowrisankaran) 59:15–20, 59:21–23.

### D.    Any Price Increases Will Further Incentivize And Enable Entry

559.    Dr. Gowrisankaran contends that following this merger, JetBlue is likely to raise its fares.  *See* Tr. 11/21/23 (Chipty) 142:24–143:10 ("Q. And you would agree with me that Dr.

Gowrisankaran has predicted that after the merger there will be an incentive for JetBlue to raise its fares; correct? A. Yes, that's right.").

560.     Both of the Government's experts contend that any fare increase is likely to incentivize further entry.  Tr. 11/21/23 (Chipty) 142:24–143:10 ("Q. And you would agree with me that all else equal, higher fares in a relevant antitrust market would incentivize entry; correct? A. All else equal, I think that's right. Q. So that would make the merger more attractive than it was before? A. Yes, all else equal, assuming lots of other things lining up."); Tr. 11/20/23 (Gowrisankaran) 63:2–5 ("Q. Considering the prospects of entry in response to a merger is part of the full assessment of the competitive effects of a merger, correct? A. Yes, it generally is.").

561.     Given that entry, expansion, and repositioning "are common" in the airline industry, "[i]f there were to be post-merger adverse competitive effects and fares would arise, that would likely attract additional entrants[,]" and "ultra-low-cost carriers and low-cost carriers [are] well positioned [to] ent[er] routes."  Tr. 11/27/23 (Hill) 24:9–15.

562.     Airlines chase profitability.  *See supra* § II.C.2(1).  The opportunity to assume "proven" routes is attractive to potential entrants, particularly as profitability increases on those routes Spirit vacates.   Tr. 11/14/23 (Biffle) 83:13–23 ("Q. So is it fair to say that Spirit creates proven routes?  A. Yeah, they've proven the demand. …. If Spirit were to pull out, we don't have to guess at the demand. So this would make this the easiest thing to go do."), 84:23–85:4 ("Q. And I believe you testified that if Spirit pulls out, it reduces the risk for another ULCC like Frontier, is that fair?  A. Well, yeah, so that's the second part, right, of the demand in the supply, right? You now have a proven demand profile and actually less competition. So, yeah, that would attract ourselves and others."); Tr. 11/15/23 (Wells) 17:5–12 ("Now if the merger goes through and there are certain routes on which Spirit exits, would Allegiant consider those to be

opportunities?  A. Yes.  Q. And if the merger should go through and the Department is correct that fares will go up, would Allegiant consider those routes potential opportunities?  A. We would certainly consider them, yes."); Tr. 11/27/23 (Hill) 20:18–23 ("And so the point here is just we saw a lot of entry in the ordinary course, but here we're saying that if these price increases were to occur as predicted, there would be even more entry because those routes would become more profitable than average and attract new entrants.")

563.    As explained below, many airlines are well-positioned and motived to enter Spirit's routes post-merger.

### E.    Many Airlines Are Well Positioned And Highly Motivated To Enter Routes That Spirit Was Previously Flying

564.    Because aircraft can be easily moved following a change in schedule, capacity flows to the greatest opportunities.  *See supra* § II.C.2.  As Mr. Klein explained, the airline industry "abhors a vacuum.  If there's a vacuum there, if something can get sucked into it, it will. And it doesn't take a long time for another airline to figure that out and go in if they want to." Tr. 11/3/23 (Klein) 103:13–17.

565.    All airlines engage in continuous network planning to determine how to deploy their fleets, which routes and destinations they will serve, and how they will serve them in order to maximize profits.  *See supra* § II.C.2; Tr. 11/4/23 (Klein) 86:13–22; Tr. 11/2/23 (Clark) 125:8–126:8; Tr. 11/8/23 (Kirby) 51:2–6.  Airlines therefore constantly monitor routes and competitors in order to capitalize on opportunities as quickly as possible.  *See supra* § II.C.2(1); Tr. 11/4/23 (Klein) 101:7–102:7.

566.    In determining whether enter, exit, increase, or decrease service on a route, ULCCs are driven by profitability.  *See* TX 10 at '8105 (being "highly profitable" is one of the core "pillars" of Allegiant's business model); Tr. 11/1/23 (Christie) 23:16–24:3.

567.     In that search for profitability, ULCCs recognize that planes can be redeployed to "somewhere you think is going to do better."  Tr. 11/14/23 (Biffle) 79:14–80:5 ("Q. But all airlines exit, that's part of the dynamic nature of the industry? A. *We're portable assets so we can move in easily and move out easily*. … Q. If a route is underperforming, what do you do with the assets if you're forced to exit? A. You move to somewhere you think is going to do better." (emphasis added)).

568.     Frontier, Allegiant, and other ULCCs are ready and waiting to capitalize on profit opportunities that emerge following this transaction.  In Mr. Biffle's words, the "airline market is extremely efficient. I mean we would be chasing [demand], Avelo would be chasing it, *I mean the scavengers would, you know, clean up this carcass within weeks*."  Tr. 11/14/23 (Biffle) 83:13–84:1, 84:2–11 ("Q. So your testimony is that Frontier and other ULCCs would chase the opportunities and quickly come in, correct? A. Yeah.").

569.     While no single ULCC would replace Spirit "flight for flight, seat for seat . . . the market would."  Tr. 11/14/23 (Biffle) 96:1–14; *see also* Tr. 11/21/23 (Chipty) 141:11–14 ("Q. And it's certainly not your position that one ULCC would need to come in and offset the harm itself? A. That's correct.").

570.     Allegiant and Frontier, together, have a larger fleet than Spirit.  Tr. 11/1/23 (Christie) 8:10-17.

571.     The ULCCs also understand that, in capturing any lost capacity, "speed matters."  Tr. 11/14/23 (Biffle) 84:12–22 ("Q. And so speed matters, is that fair?  A. Yeah, I mean that's what I say, there would be a frenzy, because, yes you'll want those. If they truly leave, yeah. . . . most of the domestic [Frontier would] be able to do pretty quick. And -- I have to think about the international. But, yes, we're in bases that could enable the international."); Tr. 11/15/23 (Wells)

18:3–22 ("[W]e do believe that there is a first-mover advantage when opportunities arise, and there are other ULCCs that have the same publicly-available information that we do that may or may not view the opportunity like we do.").

572.    Put differently, the ULCCs would "watch what JetBlue does with the assets" and "**start to make maneuvers to fill those voids.**"  Tr. 11/14/23 (Biffle) 120:2–8 (emphasis added), 96:1–14 ("And other [airlines] would get to those opportunities long before we ever could. But I think that we would probably have, um, our fair share if we moved fast enough.").

### 1.    Allegiant

573.    Allegiant explained that it was ready and willing to fill in any gaps left by the merger.  Tr. 11/15/23 (Wells) 16:18–17:12.

574.    Allegiant's business model has evolved to serve larger cities and seek out routes with increased competition.  *See supra* § II.C.1; Tr. 11/15/23 (Wells) 7:5–15.

575.    That expansion is consistent with their fleet growth, as Allegiant anticipates receiving approximately two aircraft a month for the next two year until it receives 50 total aircraft and holds an option for 80 more planes—an option it is more likely to exercise if profitable routes became opportunities.  Tr. 11/15/23 (Wells) 20:24–22:16.

576.    Part of that changing business model also includes increased flight frequencies. Tr. 11/8/23 (Kirby) 42:2-22; Tr. 11/7/23 (Kirby) 117:25-118:9 (observing that Allegiant has been "pretty stable in their service offering" in recent years, and increased the amount of daily frequency flights they offer).

577.    Dr. Chipty's analysis showed that Allegiant has presence at one or both endpoints of 18 of the 51 nonstop "presumption" routes.  TX 910.

578.    Indeed, "part of Allegiant's business model is to constantly monitor opportunities

for growth," and particularly "routes in which other airlines [including Spirit] have dropped capacity" for potential entry.  Tr. 11/14/23 (Wells) 151:20–152:3; Dep. 6/22/23 (Wells) 224:10-17 ("Q. Would you agree that if Spirit was on that route and then stopped serving it, that that route is low risk for other ULCCs? … THE WITNESS: It seems like the prevailing data showcasing low fares and -- and high demand would -- would pave the way for other ULCCs to be successful, yes.").

579.    Allegiant also recognizes that there is a "first-mover advantage" when new route opportunities arise.  Tr. 11/15/23 (Wells) 18:3–22 ("Q. Now when opportunities arise, is it important for Allegiant to move quickly?  A. Yes.  Q. Why is that?  A. Um, we do believe that there is a first-mover advantage when opportunities arise, and there are other ULCCs that have the same publicly-available information that we do that may or may not view the opportunity like we do.").

580.    Accordingly, Allegiant can enter a route within "2 to 4 weeks generally, depending on whether or not we exist in that city already."  Tr. 11/15/23 (Wells) 18:15–22.

581.    Should the merger occur, Allegiant would consider routes Spirit exits as potential opportunities, including to the extent fares rise. Tr. 11/15/23 (Wells) 17:5–12 ("Now if the merger goes through and there are certain routes on which Spirit exits, would Allegiant consider those to be opportunities?  A. Yes.  Q. And if the merger should go through and the Department is correct that fares will go up, would Allegiant consider those routes potential opportunities?  A. We would certainly consider them, yes."); Dep. 6/22/23 (Wells) 122:18-123:4 (following the merger Allegiant would be "very interested" in "any capacity and growth that we believe would be profitable").

582.    Allegiant also views the merger as an opportunity to further grow its fleet, as

"more open opportunities is obviously a good thing for us."  Tr. 11/15/23 (Wells) 41:4–42:2 ("Q. Mr. Wells, how if at all will the merger impact your decision whether to exercise your option for the additional 80 planes?  A. It certainly provides more runway for growth in three airports where we're currently constrained. I strongly believe in our network runway, um, in all situations, but having more open opportunities is obviously a good thing for us. . . . The number of opportunities we have that, um, have freed up constraints is certainly something we would consider.").

583.     Although Allegiant does not have concrete plans for how it will use the divestiture assets in Boston, Newark, or Fort Lauderdale, Allegiant agreed that its network would look "completely different" once it receives them. Tr. 11/15/23 (Wells) 26:24–27:21 ("Q. So with those assets in hand, you would expect those maps to look completely different, is that fair?  A. Absolutely."); *see also id.* at 144:16–21 ("It's a fluid environment.  We can certainly make calls based on what we know historically on the day that it exists, but I'm not in the business of speculating what may happen when the merger closes and what demand may look like.").

584.     Between July 2021 through December 2022, Allegiant also greatly expanded its pilot roster, establishing several new programs to recruit and retain pilots.  TX 8 at '3474, '3476; Dep. 6/22/23 (Wells) 147:18–25.

585.     Allegiant is also seeking to serve international routes through a joint venture with Mexican airline Viva Aerobus, which is pending regulatory approval.  Tr. 11/15/23 (Wells) 24:12–25:4  (explaining growth into Latin America and the Caribbean are "very much" "natural extensions of [Allegiant's] offerings" and are "natural next steps" for Allegiant's expansion abroad).

586.     Though the Government characterizes this partnership as "a limited codeshare in

Mexico," *see* ECF No. 289 at 32, it would in reality enable Allegiant to "serve transborder between the U.S. and Mexico together, [] fully cooperatively" with Viva.  Tr. 11/14/23 (Wells) 134:19–135:8.

587.    When that joint venture is approved, Allegiant plans to start "selling [flights abroad] within probably 30 days with about a 3-month window to begin operations."  Tr. 11/15/23 (Wells) 24:12–21; *see also* Tr. 11/14/23 (Wells) 134:19–135:8 (absent regulatory delays, Allegiant would have already begun "serving [routes abroad in partnership with Viva] in January of this year").

588.    The joint venture will give Allegiant "comprehensive US and Mexico coverage," and would empower Allegiant to exploit international route entry across Viva's existing Latin America and Caribbean network.  TX 9 at '4960.

### 2.    Frontier

589.    Frontier is well positioned to fill any loss of Spirit capacity, as the airline already overlaps on approximately 50% Spirit's overall capacity.  Tr. 11/1/23 (Christie) 9:6–9 ("And so when you look at all of our available seat miles, Frontier overlaps on about half of those today.").

590.    Frontier has an extensive orderbook of 234 planes, expecting to receive another 4 planes this year, 23 planes in 2024, 42 planes by 2025, 41 planes by 2026, and 42 by 2027. Frontier will also receive another 62 new planes after 2027.  Tr. 11/14/23 (Biffle) 90:5–11, 93:12–94:4.

591.    Frontier's orderbook also maintains "huge amounts of flexibility up or down.  We can go get more aircraft. We can lease more aircraft, not even a direct buy from them. We could get rid of planes. . . . If something changes, so in the marketplace if something changes, so a carrier fails, there's a merger that takes place, then we may go find and acquire a big growth,

step-function growth in airplanes."  Tr. 11/14/23 (Biffle) 117:15-118:6, 118:21–23 (noting that Frontier could "train like three times as many pilots as those I'm currently training" to accelerate growth).

592.    Frontier's fleet has "not been impacted" by the same Pratt & Whitney turbo-geared engine issues that have or will ground significant portions of Spirit's fleet.  Tr. 11/14/23 (Biffle) 47:7–16.

593.    Frontier actively monitors opportunities for entry and growth, including routes for which other carriers—like Spirit—have dropped capacity.  Tr. 11/14/23 (Biffle) 71:20–72:8.

594.    Frontier is "generally attracted to" entering routes that a Big Four airline operates because those routes "typically [] are where the highest fares are."  Tr. 11/14/23 (Biffle) 60:10–17.

595.    According to Dr. Chipty's analysis, between Q2 2021 and Q1 2022, Frontier operated or was present at one or both endpoints of 50 of the 51 nonstop "presumption" routes.  TX 910.

596.    Frontier can enter a route that touches one of its bases—including Orlando or Miami—and another existing Frontier endpoint within "three or four months," and within "six months" Frontier is not already at the other endpoint.  Tr. 11/14/23 (Biffle) 89:5–16.

597.    The merger will provide significant, "established" opportunities for Frontier to fill.  As Mr. Biffle explained: "Because Spirit has established the route, they've stimulated the market, um -- I think probably the best example, all right, and I doubt they would pull this, but let's just say Atlantic City to Myrtle Beach.  Right? They're the only one that flies that route.  Had they never flown it, ' don't know if the average airline would ever think to fly from Atlantic City to Myrtle Beach. But they have built that market over a period of decades. ***And if they were***

*to pull it back, I probably would be the first one to say 'load it.'"* Tr. 11/14/23 (Biffle) 83:3–12 (emphasis added); Dep. 6/14/23 (Biffle) 164:19–165:4 ("Q. Do you remember in your testimony with DOJ testifying that Frontier would be interested in entering all routes that JetBlue and Spirit materially reduced capability on should the merger go through? . . . A. I would agree with that.").

598.    Moreover, should the merger go through, Frontier "would grow much faster" by acquiring more aircraft.  Tr. 11/14/23 (Biffle) 65:10–66:1 (explaining that if Spirit "didn't exist," Frontier "could actually probably get the planes faster" and fill Spirit's capacity itself "inside of 5 years").

599.    Frontier would be interested in filling any lost Spirit capacity in the Caribbean post-merger.  Tr. 11/14/23 (Biffle) 88:6–14.

600.    Indeed, Frontier has already proven that they are "one of the most nimble carriers," backfilling Spirit's capacity following its exit from certain nonstop presumption routes. Tr. 11/14/23 (Biffle) 82:2–16 (describing Frontier's backfill of Spirit's exits from certain routes), 88:20–25 (explaining Frontier considers itself "one of the most" nimble carriers, based in part on the inherent mobility of aircraft).

601.    Spirit has "observed" Frontier backfilling routes Spirit suspended: "Frontier has backfilled the Orlando Aguadilla route with a second daily trip, and they've backfilled our Orlando Ponce capacity with additional weekly frequencies." Tr. 11/8/23 (Kirby) 99:4–12.

602.    Frontier has also proven to be "a lot stickier" in their service offerings over the past years and "even more sticky" in the last few months, increasing their daily flight frequency to "nearly 80 percent [of routes] … about as high as Spirit was" in March 2022.  Tr. 11/8/23 (Kirby) 42:2–22; Tr. 11/7/23 (Kirby) 117:25–118:9.

### 3. Avelo

603.    Avelo is another quickly growing airline who is well positioned to enter routes left behind by Spirit.  *See supra* ¶¶ 238–243.

604.    Avelo is able to enter routes quickly.  At larger airports Avelo can "turn on a route" within "a matter of a few months," and within a year at airports that have "not historically had commercial service."  Tr. 11/3/23 (Yealy) 37:19–38:3.

605.    Avelo already has a proven record of entering routes and airports following the exit or reduced capacity from other carriers.  Tr. 11/3/23 (Yealy) 39:21–40:18 (explaining Avelo began commercial service from Dubuque, Iowa following American's exit from the airport); Dep. 6/27/23 (Yealy) 23:4–19 ("Q. Are there recent examples of which airports Avelo has been considering entering because other carriers have left? A. . . . I would point to Tweed-New Haven Airports as a very good example of that. It's our largest base with five aircraft … But that was served historically sporadically by legacy airlines, most recently American Airlines, and they pulled out in 2021 just before we started service there, exited entirely.").

606.    Although Avelo serves relatively few origin and destination pairs flown by other airlines, it still serves multiple routes with direct competition from other airlines.  Tr. 11/3/23 (Yealy) 34:12–35:3 (Avelo has competed with Alaska, Southwest, JetBlue, Frontier, and Spirit on individual routes).

607.    Avelo also offers service between metro areas that compete with other airline service offerings, including Wilmington (which is in the Philadelphia metro area) to San Juan, and New Haven (which is in the Hartford metro area) to multiple locations in Florida.  Tr. 11/3/23 (Yealy) 32:10–34:11 (explaining JetBlue flies from Hartford to Orlando, Tampa, Fort Meyers, and South Florida).

608.    Avelo provides service to the areas Spirit and JetBlue most frequently overlap.  It already serves "[m]any of the large Florida cities," including Orlando (where they operate a base), Daytona Beach, Melbourne, West Palm Beach, and Fort Lauderdale. Tr. 11/3/23 (Yealy) 18:7–12, 33:21–34:4.  And Avelo flies two routes to San Juan, Puerto Rico and is evaluating opportunities to expand its routes to and from San Juan.  *Id.* at 32:10–14, 35:15–18, 37:1–5.

609.    Avelo already has "all of the regulatory approvals and designations it needs to fly commercially internationally" and flies from airports that "could support flights, for instance, to Mexico or the Caribbean."  Tr. 11/3/23 (Yealy) 38:25–39:20.

610.    Moreover, Avelo is not averse to entering new routes from which it does *not* currently serve either endpoint.  Tr. 11/3/23 (Yealy) 28:10–22 (explaining that Avelo entered routes to and from New Haven when it served neither endpoint, and that such entry "could very well happen again in the near future").  Generally, Avelo generally targets routes and categories of passengers similar to Spirit, including leisure and VFR customers.  *Id.* at 9:21–10:4.

### 4.    Other ULCCs

611.    Breeze's business model is built on identifying gaps in the market and entering underserved routes to stimulate traffic.  Dep. 7/17/23 (Neeleman) 150:22–152:4, 166:25–167:6 ("We just added -- it was either Frontier or Spirit, one of the two, dropped out of Charleston, West Virginia. And so we went in there. They pulled out, and they called and said, can you do it? We said, great. So we did. So we added service from Charleston to Charleston and Charleston to Orlando")

612.    Breeze considers routes exited by other ULCCs as "backfill opportunities."  Dep. 7/17/23 (Neeleman) 215:21–216:9 (explaining Breeze monitors Frontier's entries and exits because "those are potential markets that we can go in. These are all, you know, either backfill

142

opportunities or areas that we have to take a look at").

613.    Breeze's CEO, David Neeleman, said Breeze would consider entering a route that

Spirit exited "in a nanosecond."  Dep. Tr. (Neeleman) 158:15–160:3 ("Q. If JetBlue were to stop

flying a route that Spirit was previously flying, would you consider entering that route? A. In a

nanosecond. Absolutely. . . . Q. And what about on a route where Spirit and JetBlue are currently

both flying? If the Spirit flight went away, would you consider entering that route to compete

with JetBlue? A. Yeah. Absolutely").

614.    Sun Country has a "successful history of opening and closing stations to meet

seasonal demand." TX 72 at '4273 (Sun Country's 2022 10-K, describing its route network).

615.    Since 2019, Sun Country has launched ninety-nine new routes, thirty-six of which

were subsequently closed.  TX 72 at '4273.

616.    Although Sun Country is based primarily out of Minneapolis-St. Paul

International Airport (MSP), Sun Country has increased the routes that do not touch MSP over

the past six years.  TX 72 at '4273 (stating Sun Country has increased its non-MSP markets from

eight in 2017 to twenty-nine in 2022).

617.    In addition, foreign ULCCs could fill capacity left by Spirit, particularly "in and

out of Florida."  Tr. 11/14/23 (Biffle) 101:5–15 (describing foreign ULCCs).

618.    Domestic ULCCs like Frontier "monitor the entry and capacity of foreign

ULCCs"—such as Viva Aerobus, Volaris, and Avianca.  Tr. 11/14/23 (Biffle) 101:5–15.

### 5.    Basic Economy

619.    Unbundled offerings like Basic Economy are also a substitute product for

"commoditized" unbundled fares offered by Spirit.

620.    Because Basic Economy lacks some of the bundled "frills" of a standard ticket,

fares for the product are "very similar" to Spirit's.  Tr. 11/28/23 (Nocella) 24:19–23 ("We almost

always, if not always, price-match our competitors" with Basic Economy); Dep. 6/23/23

(Znotins) 121:4–14 ("Q. And how would you describe American's basic economy fare product?

A. It's an unbundled offering."); Tr. 11/1/23 (Christie) 13:4–13 ("Well fares in the airline

industry are quite dynamic, um, they change all the time, but I think on average the basic

economy product is intended to compete directly with a traditional ULCC-type product, so

they're very similar."); Tr. 11/7/23 (Gardner) 60:14–62:3 ("And Basic Economy in the majors is

basically our product offered at, on top of, or slightly more than our fare, but it unbundles the

product. … I've gotten on Delta, United, and American, I've gotten fares from places that we go

that are the same prices as ours.").

621.    The prevalence of Basic Economy has increased rapidly over the past decade, as

all of the legacies and some LCCs (including JetBlue and Alaska) now offer the option. Tr.

11/28/23 (Nocella) 20:19–21:8; Dep. 7/12/23 (Beck 30(b)(6)) 13:16–14:2, 13:15–15:3; TX 889

(Spirit 2022 10-K, explaining that approximately 30% of JetBlue seats sold are Blue Basic

unbundled fares); TX 39 at '0461 (Basic Economy is a "Risk[] Related to Our Industry," and

citing Alaska Airlines and JetBlue as offering competitive unbundled fares); Tr. 11/1/23

(Christie) 12:23–13:3 ("We identified [basic economy] as a competitive product to ours").

622.    Although unbundled fares were initially a competitive response by the legacies to

the ULCCs, the unbundled product is available across the entire networks of legacy and LCC

airlines—even in places where ULCCs do not fly.  Tr. 11/28/23 (Nocella) 25:17–26:2 (United

offers basic economy "across the network," even in "places like Hawaii where neither Spirit nor

Frontier fly"); Dep. 7/12/23 (Beck 30(b)(6)) 13:16–14:2 (Delta offers basic economy

"throughout our network, ubiquitously").

623.    JetBlue introduced Blue Basic as a response to the *legacy carriers'* basic economy, but the product competes with a "very broad number of competitors."  Tr. 11/1/23 (Clark) 159:25–160:5.

624.    The amount of Basic Economy capacity has grown rapidly since its debut. Legacy airlines and LCCs add millions of basic economy/unbundled fares into the market, and plan to add even more.  Tr. 11/28/23 (Nocella) 27:11–20 (Basic Economy being 12% of United's total sold seats in third quarter 2023 amounts to "millions of passengers that we have classified as Basic Economy."); Tr. 11/3/23 (Klein) 117:5–118:4 (options available to price-conscious customers have changed "a lot" since the pandemic including "a lot more capacity" given other airlines' "move towards large aircraft" and lessened corporate travel demand); Dep. 7/12/23 (Beck 30(b)(6)) 19:2–17; TX 889 (approximately 30% of JetBlue seats sold are Blue Basic unbundled fares).

625.    Additionally, basic economy offerings allow these carriers to offer an unbundled fare that competes on price with ULCCs while offering a better overall product.  TX 130 at '4796; Tr. 11/28/23 (Nocella) 20:22–21:8, 22:22–23:1, 24:15–23 ("We almost always, if not always, price-match our competitors" with basic economy); *see also* Tr. 11/7/23 (Gardner) 61:23–25 ("But certainly on – I've gotten on Delta, United, and American, I've gotten fares from places that we go that are the same prices as [Spirit's]."); Tr. 11/3/23 (Klein) 117:24–118:4 ("When there's a lot more seats, especially, say, airlines that have basic economy products have a lot more seats to sell, and they're reducing fares with basic economy in order to offer lower fares to customers"); Dep. 6/9/23 (O'Brien) 246:21–247:11 (Blue Basic comes with core "JetBlue Experience," including free WiFi, more legroom, free seatback entertainment, and free snacks and drinks).

626.    The Government's own expert recognizes that basic economy comprises a significant portion—"about 25 percent"—of the "no-frills, unbundled service" in the market.  Tr. 11/21/23 (Chipty) 149:2–15; *see also id.* at 16:21–17:4 (explaining the "right products" necessary to replace Spirit "involve no-frill unbundled service").

## VI.   THE TRANSACTION WILL INCREASE COMPETITION AND BENEFIT CONSUMERS

### A.    JetBlue Will Bring Competitive Fight To The Legacies, Benefitting Customers With Lower Prices And Improved Quality

627.    JetBlue is a uniquely disruptive airline that competes with the legacies across the entire cabin.  *See supra* § II.B.2(2); Tr. 11/6/23 (Hayes) 126:11–15; TX 912 ¶ 13 ("As a general matter, legacy airlines and hybrid LCCs [like JetBlue] compete for all passenger types since they provide a product that is attractive to business and other, higher-value passengers."), ¶ 24 ("JetBlue differentiated itself from other low-cost airlines by offering not only low fares, but also high-quality service."), ¶ 27 ("JetBlue's high quality of service allowed it to compete effectively against the legacy airlines in ways other LCCs and ULCCs could not"), ¶ 26 ("Mint differentiated JetBlue from other non-legacy airlines. No other non-legacy airline offers a similar premium product.")

628.    JetBlue's disruptive presence has led to better outcomes for consumers, including lower prices, better quality products, and more choice.  *See supra* § II.B.2(2); TX 912 at 5 ("JetBlue disrupted the airline industry, leading to better outcomes for consumers."), ¶ 43 ("Consumers benefited from competition between JetBlue and the legacy airlines."), 5 ("The JetBlue Effect produces lower prices and higher quality service on routes where JetBlue competes."), ¶ 35 ("JetBlue's Mint product contributed to JetBlue's success in constraining the pricing of legacy airlines."), ¶ 39 ("Competition from JetBlue resulted in legacy airlines reducing ancillary fees."), ¶ 40 ("Competition from JetBlue resulted in higher-quality service offered by

legacy airlines."); Tr. 11/6/23 (Hayes) 52:5–53:1 ("[T]he larger airlines have so many natural

advantages in terms of network and [breadth] and you know global reach, so we have to really

focus on the customer experience, because that is where we can win."); Tr. 11/16/23 (Hurley)

144:12–20 ("[W]e pride ourselves on offering an enhanced customer service and product at a

competitive fare.  And we've show very effectively that we can do that against the legacies.");

629.     JetBlue's unique blend of low fares and high quality produces the largest

competitive impact of any airline.  *See* Dep. 4/21/22 (Clark) 37:21–38:1 ("My understanding,

from the independent research, is that we have a larger downward impact on pricing than any

other carrier").

630.     JetBlue has historically focused on cost-management strategies that enable it to

profit without increasing fares and will continue to do so in order to effectively compete against

the legacies.  *See supra* § II.B.2(2); Tr. 11/16/23 (Hurley) 155:6–15; Tr. 11/6/23 (Hayes) 59:1–

13.

631.     JetBlue's uniquely disruptive effect makes it a "maverick" in the airline industry.

*See infra* § VIII.A; Tr. 11/6/23 (Hayes) 126:11–15; Tr. 11/27/23 (Hill) 90:13–91:2.[4]

632.     Without the merger, JetBlue could not organically grow to the size necessary to

compete with the legacies.  *See supra* ¶¶ 9–10; Tr. 11/6/23 (Hayes) 85:4–18 ("[W]e've spent 25

years now carving out 5 percent . . . So you'd never ever get to the size that [the legacies] are

---

[4] In the NEA litigation, Judge Sorokin recognized JetBlue's undisputed maverick status.  *See United States v. Am. Airlines Grp. Inc.*, No. 21-11558, 2023 WL 3560430, at *34 n.81 (D. Mass. May 19, 2023) ("***The parties all agree***, and the Court finds, ***that JetBlue has played a unique role in the domestic air travel industry and qualifies as a 'maverick' competitor*** for present purposes.  The Court finds JetBlue occupied such a role regardless of whether it remained an LCC or had migrated to a hybrid form somewhere between a traditional LCC and a GNC.  In either event, it was justifiably viewed by others— and it indisputably viewed itself—as a ***unique and disruptive force in the domestic air travel market***." (emphasis added) (citations omitted)).

based on organic growth."); Tr. 11/16/23 (Hurley) 139:8–143:14; Dep. 6/14/23 (Biffle) 161:13–20.

### 1. A Larger JetBlue Will Result in Substantial Competitive Benefits for Consumers

633. With the merger, JetBlue can bring even greater competitive pressure directly to the legacies. *See* Tr. 11/27/23 (Hill) 37:9–16 (explaining JetBlue's entry causes rival carriers to drop fares by an average of 13%), 87:22–25 ("Today we have a route on which Spirit is present and JetBlue will replace it, so then there's likely to be increased pressure on rival carriers and that will benefit consumers."). Indeed, when JetBlue enters with greater "intensity" (i.e., capacity), fares go down even more. *Id.* 37:6–38:20 (when JetBlue "enters with [intensity below 25%], it has about a 9 percent impact on average [rival] fares. If it enters with minor intensity, it has a 19 percent impact. And if it enters with more than 50 percent of the capacity, it has a 24 percent impact"); TX 892.

634. The combined company will stimulate additional passenger traffic compared to the standalone companies. Tr. 11/27/23 (Hill) 53:14–54:15 (explaining Dr. Gowrisankaran's econometric model predicts "that passenger volume will increase as a result of the transaction").

635. A merged JetBlue, with the benefits of further scale and growth, improved relevance, and increased ability to discipline the legacies, will deliver more value to passengers than does Spirit. *See infra*; Tr. 11/9/23 (Friedman) 136:3–17; Tr. 11/6/23 (Hayes) 107:25–108:6; 11/16/23 (Hurley) 139:8-143:14; Dep. 7/17/23 (Neeleman) 135:21–136:7; TX 362 at '9882.

#### (1) JetBlue Has A Substantial Impact On Rival Carriers' Fares

636. Measuring entry using rival carrier fares demonstrates how other airlines that are already present on a route respond to another carrier's entry. Tr. 11/27/23 (Hill) 29:24–31:1. An analysis of JetBlue's entry using rival carrier fares measures "the fares being charged on a route

by other carriers at the time JetBlue entered." *Id.*  This measure quantifies the benefit of JetBlue's entry on passengers flying other airlines.  *Id.*

637.    Based on Dr. Hill's assessment of all JetBlue entry events between 2010 and 2018, when JetBlue enters a route, rival carriers drop their fares on average by 13 percent.  Tr. 11/27/23 (Hill) 30:3–5, 37:9–25, 38:22–39:7.  JetBlue's entry on a route therefore benefits travelers flying on that route regardless of the airline they choose to fly, as they pay less than they would have paid prior to JetBlue's entry.  *Id.* at 37:9–25.

638.    Dr. Hill also assessed the impact of JetBlue's entry on rival fares based on the relative "intensity" of JetBlue's entry—that is, the amount of capacity JetBlue enters a route with.  Tr. 11/27/23 (Hill) 37:9–38:7; TX 892.  An analysis of "entry intensity" measures the ratio between the number of planes JetBlue enters a route with against the number of planes already on the route.  Tr. 11/27/23 (Hill) 37:17–38:7.

639.    When JetBlue enters with less than 25% of the capacity on the route, rivals' fares decrease by about 9%.  Tr. 11/27/23 (Hill) 38:15–20; TX 892.  When JetBlue enters with between 25% and 50% intensity, rivals fares decrease by about 19%.  Tr. 11/27/23 (Hill) 38:15–20.  When JetBlue enters with more than 50% of the capacity on a route, rivals' fares decrease by about 24%.  *Id.*

### (2)    *JetBlue Lowers Rival Fares More Significantly Than Spirit*

640.    The entry intensity model also shows that JetBlue's impact on rival carrier fares is larger than Spirit's.  Tr. 11/27/23 (Hill) 39:17–40:3; TX 893.

641.    Analyzing the relative impact of JetBlue and Spirit entry must study rival carrier fares to properly account for quality differences between the two product offerings.  Tr. 11/27/23 (Hill) 30:14–31:1. An analysis using all carrier fares—the approach used by Dr. Gowrisankaran—fails to account for quality differences between carriers on the route.  *Id.* at

32:12–16.

642.    Different types of carriers provide different quality products; their fares reflect these quality differences.  *See supra* § II.A.1; Tr. 11/27/23 (Hill) 30:14–31:1, 32:12–16.

643.    When assessing carriers with different quality products, an analysis that uses all carrier fares overvalues carriers with bare bones, unbundled products and undervalues carriers with a higher quality, more expensive product.  Tr. 11/27/23 (Hill) 32:12–16 ("[W]hat can go wrong with all carrier fares is if you have carriers of different qualities . . . often a measurer is going to overvalue carriers with low fares and not give credit to carriers who offer a higher-quality product.").  In other words, entry by a carrier with a higher quality product may raise the average price on a route; consumers, though, are not worse off because they have the option to pay for a higher quality product that they may prefer.  *Id.*

644.    If Delta, for example, serves a route and JetBlue enters, Delta may drop its fare by $50.  Consumers who want to continue flying Delta now benefit from a $50 cheaper Delta fare because of JetBlue's entry.  Tr. 11/27/23 (Hill) 30:19–31:1.  An analysis entry using *rival carrier fares* isolates the benefits to the Delta passengers—here, $50—and directly measures the benefits to consumers after JetBlue's entry.  *Id.*

645.    An analysis of entry using *all carrier fares* will average all fares on a route before and after a carrier's entry. If Delta entered a route served by Spirit, for example, average market-wide pricing would likely *increase*, as Delta typically offers a higher-fare, higher-quality product than does Spirit.  Tr. 11/27/23 (Hill) 31:8–22.  This approach, which the Government's expert adopts, suggests that consumers are *harmed* by that entry: average fares are now higher than before Delta entered, and any competitive impact Delta may have on Spirit's fares is construed as harm.  Dr. Gowrisankaran's approach would see harm in this scenario, even though

consumers in reality are better off, having "see[n] a little lowering in their fare and customers who like to fly on Delta now have the option of flying on Delta." *Id.* at 31:17–20.

646.   This approach is unreliable; Dr. Hill concluded that "if you use all fares, because of this level of differentiation, you can get turned around and reach conclusions about competition that are inaccurate." Tr. 11/27/23 (Hill) 31:2–22.

647.   Spirit's entry lowers average carrier fares more than JetBlue's because of Spirit's cheaper product, which lacks the higher quality amenities that come with a standard JetBlue fare. Tr. 11/27/23 (Hill) 25:1–26:3.  But isolating the impact of JetBlue and Spirit's entry on rival carrier fares—e.g., how *other* airlines react to entry, and more importantly, how consumers on that route will benefit from the JetBlue Effect—shows that JetBlue lowers rivals' fares more than Spirit because JetBlue has a higher-quality product that competes across the cabin, meaning JetBlue's entry leads to legacy airlines lowering prices by more than does Spirit's. *See id.*

648.   Given JetBlue's greater competitive effect, on routes on which Spirit competes nonstop and JetBlue transports less than one percent of passengers, 93 million passengers per year will benefit and see an estimated savings of $614 million per year.  Tr. 11/27/23 (Hill) 87:21–88:12, 89:2–9.

### (3)   *When JetBlue And Spirit Compete On A Given Route, More Consumers Choose JetBlue*

649.   Where JetBlue and Spirit compete head-to-head on nonstop overlap routes, JetBlue captures a larger share of passengers than does Spirit.  Tr. 11/27/23 (Hill) 28:24–29:11; TX 890.

650.   Dr. Gowrisankaran similarly analyzed consumer preference, and "found that JetBlue is the largest carrier on the routes it services more than 60 percent of the time," as compared to just "10 percent of the time" for Spirit.  Tr. 11/27/23 (Hill) 29:13–17.

651.    This suggests that—while there may be some passengers that prefer Spirit—on average, JetBlue attracts more passengers.  Tr. 11/27/23 (Hill) 29:9–11.  It also suggests that JetBlue appeals "to a broad demographic and Spirit is appealing to a more niche group," and by extension, that "[o]n average JetBlue is delivering more value to passengers."  *Id.* at 29:18–23.

652.    Even isolating the market to just unbundled, no-frills fare offerings, JetBlue is the preference among consumers.  As explained in § II.B.2(2), *supra*: "[JetBlue has] a Blue Basic fare class that takes away some of the features that are otherwise available on JetBlue."  Tr. 11/27/23 (Hill) 26:10–17.  "Blue Basic offers more of an unbundled-type fare that can compete effectively with the ultra-low-cost carriers."  *Id.* at 26:20–22.  For example, similar to a ULCC unbundled product, passengers flying Blue Basic are not allowed to have a carry-on.  *Id.* at 26:18–20.

653.    The share of passengers who purchase JetBlue Blue Basic tickets is similar regardless of whether Spirit is on a route, at least one other ULCC is on a route, or there is no ULCC present.  Tr. 11/27/23 (Hill) 27:20–28:9; TX 889.

654.    This shows that "Blue Basic is [] part of JetBlue's competitive package [and offering Blue Basic] does not seem to be driven by whether or not [JetBlue is] on a particular route competing with an ultra-low-cost carrier or whether it's competing with Spirit."  Tr. 11/27/23 (Hill) 28:17–21.

#### (4)    *JetBlue's Differentiated Fare Products And Higher Quality Allow It To Compete More Effectively With Higher-Priced Legacy Carriers*

655.    Because JetBlue offers a unique combination of high-quality features, low fares, and segmented products ranging from Blue Basic to its premium Mint cabin, JetBlue competes with all types of carriers across the entire cabin.  *See supra* § II.B.2(2); Tr. 11/27/23 (Hill) 24:21–25; TX 912 at 8 ("JetBlue competed successfully for both business and leisure

passengers.").  This, in part, is what makes JetBlue the "single most effective carrier disrupting competition."  Tr. 11/27/23 (Hill) 92:18–19.

656.    For instance, on JetBlue, all customers, regardless of fare class, have access to a seat with industry-leading legroom, free high-speed Wi-Fi, free unlimited premium food and beverages, seatback televisions for every seat, and free in-flight entertainment.  *See supra* § II.B.2(2)(b); Dep. 6/9/23 (O'Brien) 247:5–11.  A basic Spirit fare includes none of these things. *See supra* § II.B.3(2); TX 39 at '0444.

657.    In addition, customers who fly JetBlue can select from five fare classes that include an unbundled offering, a basic economy offering, and on some flights, a business class offering (Mint).  *See supra* § II.B.2(2); Tr. 11/2/23 (Clark) 161:12–18.  Spirit has no basic economy or business class offering.  *See supra* § II.B.3(2); TX 39 at '0444.

658.    Indeed, JetBlue touted the benefits of expanding its "differentiated customer offering" in its offer to Spirit, noting the merger would "provid[e] a larger number of customers with award winning service on an increased scale."  TX 113 at '8075.

### (5)    *More Passengers Will Fly Post-Merger*

659.    JetBlue's entry has a larger impact on passenger volume than does Spirit's entry. Tr. 11/27/23 (Hill) 53:1–13.  According to Dr. Gowrisankaran, Spirit entry increases passenger volume by 32%.  *Id.*  But, as Dr. Hill showed, JetBlue's entry increases passenger volume by 56%.  *Id.*

660.    Additionally, Dr. Gowrisankaran's own model (when used with an intercept) predicts an increase of 1.7 million total passengers as a result of the merger.  Tr. 11/27/23 (Hill) 53:14–54:4.  When used without an intercept, Dr. Gowrisankaran's model predicts 1.2 million in total passengers as a result of the merger.  *Id.*

## 2. The Combined Firm Will Have The Scale Needed To Compete With The Legacies

661. This merger, like the prospective mergers that came before it, is intended to address JetBlue's biggest competitive disadvantage: its lack of scale to match the legacies' systemwide offerings. *See supra* § I.A–B; Tr. 11/6/23 (Hayes) 91:16–92:4 (describing the scale benefits from JetBlue's contemplated 2017 transaction), 101:23–102:19 (discussing JetBlue's contemplated 2019 transaction and the attendant scale benefits that would give JetBlue the "ability to be a much more national competitor"); TX 210 at '4836–4837 (JetBlue's March 29, 2022 Initial Offer, which detailed the "compelling strategic rationale" of proposed combination, including enhanced scale to position the combined airline for "long-term viability as a strong competitor to the 'Big Four' carriers, translating into lower fares to customers"); TX 362 at '9882 (JetBlue Combined Network Plan explaining how "JetBlue and Spirit will merge to become a truly national low fare competitor").

662. The merger will dramatically improve and expand JetBlue's network such that it will be able to provide a national network that is a viable alternative to the legacies. Tr. 11/9/23 (Friedman) 136:3–17 (JetBlue's combined network will "unleash a national low fare competitor" through "multiple strategies" and "multiple new focus cities"); TX 362 at '9882 (JetBlue's 2027 Combined Network Plan; "The acquisition will combine the best of Spirit's breadth with JetBlue's commitment to depth; increasing competition, driving relevance and fostering operational redundancy and reliability across the country").

663. Following the merger, JetBlue plans to introduce "hundreds of new routes" and create "thousands of connecting opportunities" resulting in lower fares for more consumers. Tr. 11/9/23 (Friedman) 139:13–19 (because of these new routes, "the JetBlue Effect will be permeating the country"); TX 362. In other words, JetBlue's expanded network with bring the

JetBlue Effect to more routes. *See, e.g.*, Tr. 11/9/23 (Friedman) 146:16–20 (JetBlue's expansion in Atlanta will result in an expanded JetBlue Effect).

664.    JetBlue's expansion will bring enhanced options for consumers through 10 or more daily departures from nearly 50 cities nationwide, and over 30 daily departures in over 19 cities.  TX 362 at '9886–'9921 (19 airports with more than 30 daily departures), '9907–'9908, '9923 (additional airports with 10 or more daily departures).

665.    For over two decades, JetBlue has been talking about building a seventh focus city but has lacked the aircraft needed to achieve this goal or its growth goals in its six current focus cities.  Tr. 11/2/23 (Clark) 122:15–24.  With the merger, JetBlue will finally be able to establish new focus cities.  Tr. 11/6/23 (Hayes) 102:16–19, 132:24–133:6.

666.    JetBlue plans to establish a new focus city in an under-served, non-legacy strategic hub. Tr. 11/9/23 (Friedman) 138:2–18 (describing JetBlue's plan to create a geographically strategic, seventh focus city that will "create connecting opportunities for millions of customers around the country").  JetBlue also intends to grow significantly in Las Vegas and make it a new focus city.  *Id.* at 141:1–18.

667.    In addition to new focus cities, JetBlue will also expand service in many of its existing focus cities, including Boston, Tr. 11/9/23 (Friedman) 137:10–18, Los Angeles, 140:12–25, Fort Lauderdale, 147:4–15, and Orlando, 147:16–148:5.

668.    The merger will also allow JetBlue to achieve its focus city growth targets "with many planes left over for other network priorities," Tr. 11/2/23 (Clark) 156:14–19; Tr. 11/9/23 (Friedman) 148:16–149:9 (the combined network will support "adding service across the country to a number of other cities that aren't necessarily prioritized for growth but it makes sense to fly them from the focus city origin points.  As a result, there are a host of cities that receive

incremental frequency").  While many of JetBlue's future growth plans are not public, Mr.

Friedman testified that with the merger, JetBlue will be able to expand service in numerous

cities, including Atlanta.  *Id.* at 145:13–146:3; TX 362 at '9911.

669.    JetBlue's post-merger network will also bring service to underserved routes and

geographic areas.  Tr. 11/9/23 (Friedman) 142:5–21 (describing JetBlue's plans to bring

additional service to an underserved "major hub" where "prices are high" and JetBlue "will

certainly enable and unleash the JetBlue Effect"); TX 362 at '9882, '9898 (describing the same

plans).

670.    JetBlue's expanded network will also allow it to compete more intensely with

legacies in their hubs.  Tr. 11/9/23 (Friedman) 139:1–12 ("[By] combin[ing] the strong JetBlue

routes with the Spirit routes that already exist we'd actually be able to create a meaningful and

relevant network despite the sheer size differences in [legacy hubs]."), 145:13–146:14 (detailing

JetBlue's plans to expand in Atlanta, a Delta hub); TX 362 at '9910–9921 (noting various Delta,

United, and American hubs where JetBlue will have an increased presence).

### 3.    The Combined Firm Will Have The Relevance Needed To Compete With The Legacies

671.    JetBlue plans to increase the number of routes it flies, increase the number of

frequencies on its routes, and ensure flights are "at the right times of day" to make itself more

relevant to "multiple customer segments, whether it's a leisure customer, a customer visiting a

friend or a relative, a corporate customer, a customer that is a loyal frequent traveler." Tr.

11/9/23 (Friedman) 111:13-25, 99:10–100:3; *see also id.* at 111:16–25 (describing city-level

competition as "creating an ecosystem . . . where you're focused on building relevance to the

customers in that geography as a whole"); Tr. 11/6/23 (Hayes) 70:2–16 ("And what 'relevance'

means is if I live in Boston or I live in Orlando, how many of the places that people want to fly

am I living? . . . And so the idea is that we would add flights to provide a relevant network for those customers.").

672.    By building relevance, consumers "have a company that they can be loyal to as we help them for all their travel needs" and JetBlue can compete more vigorously with the legacies already present in that city. Tr. 11/9/23 (Friedman) 112:1–13 ("The more relevant you are, the stronger you are in selling your product within your geography. So the point of sale in a geography where you have more presence and more relevance will typically be stronger as a result"); 11/2/23 (Clark) 123:1–8 ("On the revenue side, the larger you are, the more relevant you are to customers.  Right?  Customers, whether that's an individual person or a corporation, they want to work with an airline that can get them to most of the places they want to go.").

673.    Consumers prefer to fly with carriers that are relevant in the cities in which they live.  As Mr. Friedman explained, when thinking about an origin and destination pair, an airline will generate more passengers on that route from the city in which it has a larger presence, as compared to the other city in the pair.  *See* TX 695 (public DB1B data demonstrating that customers choose more relevant carrier on select Boston routes and demonstrating point of origin gaps on select Boston routes); Tr. 11/9/23 (Friedman) 113:25–114:22 ("When you look at JetBlue . . . we have a relatively large focus city in Boston and have large relevance and presence here.  61 percent of the customers we carry on [Boston to Philadelphia] are coming from Boston, but only 38 percent are originating in Philadelphia.  So you can see how the point of origination or the point of sale is skewed to wherever the carrier has greater relevance").

674.    In places where JetBlue has greater relevance, it will be able to compete more effectively with incumbent legacy airlines and provide a better offering to customers, because "the greater relevance [JetBlue has] in a focus city, the more likely a customer will be to choose

[JetBlue] and be loyal to [JetBlue]."  Tr. 11/9/23 (Friedman) 114:23–115:2; Tr. 11/16/23 (Hurley) 147:15–21 ("And loyalty-program growth is really driven by customer relevance, right, and the credit card programs that we, us airlines, have.  And you can only become more relevant to customers the more you fly and the more diversification you have to drive customers into these programs."), 150:20–25 ("[L]oyalty is all about relevance and how do you become more relevant to more customers.  And so us gaining access to more aircraft so that we can fly to more cities and serve more customers is naturally an opportunity for us to continue to grow our loyalty program.").

675.    A carrier with nationwide relevance is also more appealing than a regional carrier because "customers move around."  Tr. 11/2/23 (Clark) 123:9–15.  People move between cities, and corporate customers may have offices across the country.  *Id.*  Following the merger, JetBlue's "ability to serve other parts of the country [will] make [it] much more valuable" to these customers.  *Id.*

676.    By building nationwide relevance, JetBlue will enhance competition against the Big Four both in the air (with increased penetration of the JetBlue Effect) and on the ground (with more consumer options for JetBlue's loyalty and credit card programs).  *See* Tr. 11/6/23 (Hayes) 102:20–103:15 ("[The merger] would give us a more national presence. It would give us more loyalty customers in that market because now they have a reason to join our loyalty program and to get the credit card."); Tr. 11/16/23 (Hurley) 143:10–14 ("[The merger] allows us to be a national competitor against these four carriers, and it closes the gap overnight in terms of size.  We're still going to be small.  Right?  But it allows us a platform where we can better compete over time."); Tr. 11/9/23 (Friedman) 136:13–17 ("There are multiple strategies that we're going to pursue, multiple new focus cities, and we're going to see just the JetBlue Effect

permeate through the national landscape, lowering fares for millions of customers."); TX 362 at '9882 (JetBlue Combined Network Plan explaining how "JetBlue and Spirit will merge to become a truly national low fare competitor").

> **4.     The Combined Fleet Will Enable Growth That Would Take Decades To Achieve Organically**

677.     As of December 31, 2022, JetBlue had a fleet of 290 aircraft, consisting of 230 Airbus and 90 Embraer aircraft.  TX 59 at '1000.  As of the same date, Spirit had a fleet of 204 Airbus aircraft.  TX 39 at '0484.

678.     Notably, JetBlue and Spirit share fleet and engine commonalities:  both carriers fly an all or mostly Airbus fleet and use the same Pratt & Whitney engine type.  Tr. 11/16/23 (Hurley) 138:4–139:1.  These fleet and engine commonalities were one of the main reasons JetBlue identified Spirit as an attractive merger partner as early as 2017.  *Id.*; Tr. 11/6/23 (Hayes) 100:6–11.

679.     Fleet commonality is one way JetBlue keeps its costs low.  11/6/23 (Hayes) 100:10–11.  As explained by Mr. Hayes, "for every different type of airplane you have, you have to have different pilots trained to fly it.  You have to . . . buy different maintenance parts.  You have to enter into different maintenance agreements.  You have to enter into different engine agreements."  *Id.* at 100:15–21.

680.     Accordingly, the merger between JetBlue and Spirit will enable significant cost savings, creating training, safety, and procurement efficiencies across the combined fleet.  *See* Tr. 11/16/23 (Hurley) 138:12–139:7 (explaining "cost efficiencies" and "benefits" of fleet and engine commonality); Tr. 11/6/23 (Hayes) 100:6–101:10 (same).

681.     These commonalities will also streamline the JetBlue/Spirit integration process, as the combined company can use the same pilots, maintenance parts, and maintenance and engine

agreements across the combined fleet.  Tr. 11/6/23 (Hayes) 100:12–101:2.

682.    Without the merger, JetBlue will have approximately 335 aircraft in 2027, but with the merger, JetBlue will have 600 aircraft in 2027.  Tr. 11/16/23 (Hurley) 140:2–6, 141:4–7.

683.    JetBlue's ability to nearly double its fleet size with the merger give it "scalability," "allows [it] to be a national competitor" against United, Southwest, Delta, and American, and "closes the gap overnight" by giving JetBlue "a platform where [it] can better compete over time."  Tr. 11/16/23 (Hurley) 143:7–14.

### B.    Post-Pandemic Industry Conditions Reinforce The Need For A Disruptive Competitor To The Big Four

684.    Following the pandemic, the legacies have returned to profitability while the smaller carriers, like JetBlue and Spirit, have struggled.  Tr. 11/1/23 (Christie) 25:1–26:10 ("[As we've witnessed as we've come out of the pandemic, the larger airlines have returned to profitability and the smaller low-cost airlines have not, and I think that is a product of the successes that we've talked about earlier with their transformation to basic economy."); Tr. 11/16/23 (Hurley) 144:21–146:16 (in the post-pandemic world, the legacies airlines are profitable because they have "have scale, they have size, they have customer diversification, and then they have these ancillary-type programs that deliver for them"); *see also* TX 185 at X (United Airlines Q2 2023 Form 10-Q showing profitability); TX 138 at X (Delta Airlines Q2 2023 Form 10-Q showing profitability).

685.    During and following the pandemic, legacy airlines significantly increased their capacity (including Basic Economy) in leisure markets, which has continued to impact demand for Spirit's unbundled product.  *See supra* ¶¶ 65–67; Tr. 11/3/23 (Klein) 122:16–123:11; TX 334 at '4857–4860.

686.    United, for example, has been acquiring larger, more cost-effective aircraft to

lower its unit cost structure.  Tr. 11/28/23 (Nocella) 13:13–14:4, 22:3–17 ("Generally the larger the aircraft, the more unit cost-effective it is . . . so as we replace the little aircraft with the big aircraft, our unit cost structure tends to improve").

687.    Driving down its unit cost structure erases the foundational ULCC cost advantage versus the legacy airlines, which—along with Basic Economy—reduces the competitive pressure from ULCCs in the post-pandemic environment.  *See supra* ¶¶ 72–73; Tr. 11/28/23 (Nocella) 22:3–16, 24:15–18.

688.    Spirit has struggled to achieve the financial success it experienced prior to the pandemic due to a variety of factors, including engine maintenance and availability issues, pilot attraction and retention issues, elevated fuel and servicing costs, changes in demand, aircraft delivery delays, and restrictions on flying due to ATC staff shortages.  *See supra* § V.A; Tr. 11/1/23 (Christie) 31:18–33:5; Tr. 11/6/23 (Gardner) 156:2–23; TX 241 at '8931.

689.    Despite an optimistic outlook at the end of 2022, Spirit's poor financial performance has continued and gotten worse throughout 2023.  *See supra* § V.A; Tr. 11/1/23 (Christie) 30:17–31:4.

690.    JetBlue has also struggled to achieve sustained financial success after the pandemic, albeit to a lesser degree than Spirit.  Tr. 11/16/23 (Hurley) 131:1–132:9 (JetBlue has not made a profit in 2021, 2022, or 2023), 143:23–144:3 (characterizing the COVID pandemic as a "shock" and one of the many "volatility aspects that we have to deal with"); Tr. 11/6/23 (Hayes) 7:2–6 (JetBlue was still trying to return to "some sense of normalcy" in the summer of 2021).

691.    JetBlue's network is also uniquely exposed to geographic areas of the United States where weather and air traffic control constraints cause frequent cancellations. Tr. 11/16/23

(Hurley) 144:4–11 (explaining 50% of JetBlue's network is "exposed to New York" which was "severely" impacted by "weather and air traffic control constraints" in summer 2023 and "was one of the big reasons" that JetBlue did not make a profit in the third quarter of 2023).

## VII. THE GOVERNMENT HAS NOT PROVEN A SUBSTANTIAL LESSENING OF COMPETITION BY UNILATERAL EFFECTS

### A. JetBlue And Spirit Are Not Particularly Close Competitors

#### 1. JetBlue's Main Competitors Are Delta, United, And American

692.    JetBlue's principal competitors are the Big Four.  TX 660 (showing revenue, passenger, and seat share of domestic U.S. airlines on JetBlue's network from Q2 2022–Q1 2023); TX 884 (pie chart showing JetBlue primarily competed with the legacies on its 2022 nonstop routes); Tr. 11/2/23 (Clark) 97:14–98:13, 102:19–103:13.

693.    On a revenue basis, the three legacies account for "78% of [JetBlue's] competition"; adding Southwest to the mix, the Big Four comprise "just under 90 percent" of JetBlue's competition in the United States.  Tr. 11/2/23 (Clark) 102:19–103:3; TX 660.

694.    Delta was JetBlue's number one competitor by revenue share (28%), passenger share (25%) and seat share (25%) across all routes served by JetBlue from Q2 2022 to Q1 2023.  TX 660.

695.    United was JetBlue's second-largest competitor by revenue share (26%) and passenger share (21%), and third largest by seat share (20%) from Q2 2022 to Q1 2023.  TX 660.

696.    American was JetBlue's third-largest competitor by revenue share (24%) and passenger share (20%), and second largest by seat share (22%) from Q2 2022 to Q1 2023.  TX 660.

697.    Southwest was JetBlue's fourth-largest competitor by revenue share (10%), passenger share (16%) and seat share (16%) from Q2 2022 to Q1 2023.  TX 660.

698.     Alaska was JetBlue's fifth-largest competitor by revenue share (6%), and sixth by passenger share (5%) and seat share (5%) from Q2 2022 to Q1 2023.  TX 660.

699.     Spirit was JetBlue's sixth-largest competitor by revenue share (5%), and fifth by passenger share (10%) and seat share (9%) from Q2 2022 to Q1 2023. TX 660; *see also* TX 884 (pie chart showing Spirit had 4% revenue shares on JetBlue nonstop routes in 2022).

### 2.     JetBlue Monitors All Competitor Fares And Sets Fares To Remain Competitive

700.     As a general matter, JetBlue monitors all competitors' fare actions and prices its fares on a route-by-route basis to remain competitive.  TX 278 at '0051–0052; TX 421 at '4545 ("The Pricing team regularly monitors for change activity, evaluates the landscape against business needs and trends to make an independent decision about how to adjust its fares accordingly."); TX 611 at '8220–8222 (explaining how JetBlue uses data on customer behavior, historical trends, competitor trends, and economic conditions "in order to sell the right product to the right customer at the right time" and "maximize revenue").

701.     While JetBlue monitors Spirit and will "match one-off fares as needed," JetBlue typically "ignore[s] Spirit's pricing" and "do[es] not let [Spirit or Frontier] drive pricing structures."  Tr. 11/2/23 (Clark) 135:7–11, 135:23–136:10 (quoting TX 648 at '4715); TX 171 (Aug. 2019 ordinary course MCO-SJU route summary email stating, "Ignore NK"); TX 172 at '8209 (Dec. 2019 ordinary course market summary email and attachment stating, "We compete with NK in [MCO-SDQ] and we currently do not match their fares."); TX 261 at '0062 (May 2019 ordinary course market summary email and attachment stating, "we ignore [NK] in [the RIC-MCO] market"); TX 273 at '3315 (Jan. 2020 ordinary course market summary email and attachment, "NK does fly [the MSY-FLL] market, but we do not match them.").

702.     JetBlue does not tend to match Spirit's prices because the carriers offer

differentiated products.  Tr. 11/8/23 (Hillyard) 163:13–16 ("Q. And why do you typically not match Spirit's fares? A. We typically don't mainly because the product differentiation. We feel that our product is better than Spirit's, so worth the . . . difference in fare value."); TX 265 at '9538 ("Given our better product and the long stage we do not wish to match NK on this route.").

703.    In contrast, "for the legacy carriers that [JetBlue] compete[s] against much more heavily, [JetBlue is] often very attuned to their pricing and . . . will not let them price below [JetBlue]."  Tr. 11/2/23 (Clark) 135:23–136:10; TX 369 at '5507_1.17.20 (ordinary course compilation of Revenue Management Market Summaries showing numerous instances of price matching the Big Four: "Pricing Strategy: Match DL/AA/UA"; "Pricing Strategy: Match WN, ignore NK").

### 3.    Spirit's Main Competitors Are Southwest, Frontier, And American

704.    Spirit competes principally with Southwest, Frontier, and American.  TX 39 at '0449 (Spirit 2022 10-K stating, "As of December 31, 2022, our top three largest network overlaps, as measured by overlapping available seat miles in metro markets, are with Southwest Airlines, American Airlines and Frontier Airlines.").

705.    Spirit's overlap with JetBlue has decreased over the last four years.  Tr. 11/3/23 (Klein) 133:1–13 ("Q. And what are the top three airlines that Spirit's network overlap with by ASMs? A. Sure. So American, Southwest and Frontier. Q. Where does JetBlue rank in the list of Spirit's main competitors in terms of the degree of network overlap by ASMs? A. Sure. So out of the main competitors that we overlap with the most, JetBlue is the lowest of overlap. Q. Is the degree of that overlap higher or lower than it was in 2019? A. It's, I'd say, directionally about the same, although it is lower, but not -- I would say -- to answer directly, it's lower.").

### 4.    Other Airlines Offer The Same Unbundled Product As Spirit

706.    While Spirit was the first domestic carrier to adopt an unbundled model, it now

finds itself in a crowded space.  *See supra* § II.B.3(2)(b) (examining ULCC and basic economy competitors to Spirit's unbundled offering); Tr. 11/28/23 (Nocella) 20:19–21:13 (referring to the Basic Economy product as "very commoditized" for "a consumer that's simply looking for the lowest possible price.").

707.    Frontier, Allegiant, Avelo, Breeze, Sun Country, Delta, American, United, Alaska, and JetBlue offer low-fare, unbundled products comparable to Spirit's.  *See supra* ¶¶ 106, 187–194; Tr. 11/6/23 (Hayes) 54:25–55:5; Dep. 6/14/23 (Biffle) 27:3–8; Tr. 11/1/23 (Christie) 7:12–8:8; Dep. 7/17/23 (Neeleman) 19:3–13; TX 130 at '4796; Tr. 11/28/23 (Nocella) 22:18–23:1; 35:23–36:8; Dep. 7/12/23 (Beck 30(b)(6)) 14:15–15:2, 19:2–17; Dep. 6/23/23 (Znotins) 121:4–10.

708.    Dr. Gowrisankaran analyzed Spirit's prices as compared to other competitors.  TX 816; Tr. 11/17/23 (Gowrisankaran) 52:3–22, However, Dr. Gowrisankaran did not compare prices of the same fare class against each other and, as a result the fares of non-ULCC airlines are inflated.  *See* Tr. 11/20/23 (Gowrisankaran) 114:24–115:18 (explaining his analysis [summarized in TX 816] of JetBlue fares includes Blue Extra tickets), 116:8–15 (explaining his analysis [summarized in TX 816] of United's, American's, and Delta's fares would include first class tickets).  Dr. Gowrisankaran's analysis summarized in TX 816 also inflates Frontier's all-inclusive price.  *Id.* 115:19–116:7 ("Q. And the explanation for that is that all the lines on your right side exclude taxes except for Frontier; correct? A. Yes. My team wasn't able to exclude taxes for Frontier because of how they produce the data. Q. And not excluding taxes would make the Frontier number larger than it really is; correct? A. Right, relative -- it would make it not an apples-to-apples comparison, which is why I put a star there.").

709.    Indeed, one of Spirit's primary competitive advantages—its low operating costs—

has been weakened by recent "cost convergence in the industry." Tr. 11/1/23 (Clark) 132:7–14; *see supra* ¶¶ 72–73 (explaining how the legacy airlines have been able to narrow the cost gap between themselves and the ULCCs by upgauging their planes).

710.    Other factors contributing to the diminishing cost gap between the legacies and Spirit include increased labor rates "that drove a tremendous change in [Spirit's] overall cost structure," lower ULCC utilization as "the U.S. domestic industry has shifted towards a more premium traffic and international traffic, which Spirit does not necessarily have," and "the dominance of the larger airlines and their ability to use that size to flex their revenue sources and change the competitive dynamics." *See* Tr. 11/1/23 (Christie) 31:13–33:5.

## 5.    JetBlue And Spirit Compete In Different Geographic Areas

711.    While Spirit and JetBlue do overlap geographically, there are significant differences in their network focus.  Tr. 11/2/23 (Clark) 114:7–18.

712.    As of 2020, there was no ULCC competition on approximately 73% of JetBlue's routes on an airport basis and approximately 58% of routes on a metro basis.  Tr. 11/2/23 (Clark) 120:8–16; TX 648 at '4712.

713.    In New York, JetBlue's largest focus city, the legacy carriers had a combined revenue share of 76% from Q2 2022 to Q1 2023; Spirit had a 2% revenue share during this time period.  TX 661; Tr. 11/2/23 (Clark) 104:4–23. JetBlue does not compete with Spirit at JFK, JetBlue's largest airport in the New York area.  Tr. 11/2/23 (Clark) 104:17–23.  JetBlue competes with Spirit at LaGuardia and Newark—two of the four airports where JetBlue has pledged to divest assets.  *Id.*; *see supra* § V.B.4.

714.    In Boston, JetBlue's second largest focus city, the legacy carriers had a combined revenue share of 64% from Q2 2022 to Q1 2023; Spirit, again, had a 2% revenue share. TX 662;

Tr. 11/2/23 (Clark) 105:25–106:6 ("[A]s a low single digit player [Spirit is] not a significant competitor to [JetBlue] in Boston."). JetBlue has also "committed to divesting Spirit's gates in Boston." Tr. 11/2/23 (Clark) 106:7–13; *see supra* § V.B.5.

715. In South Florida, which includes MIA and FLL and is JetBlue's third largest focus city, American is "by far the largest airline" with a 45% revenue share from Q2 2022 to Q1 2023, followed by five other airlines: Delta (14%), JetBlue (12%), United (9%), Spirit (9%) and Southwest (8%). Tr. 11/2/23 (Clark) at 108:23–109:9; TX 663. JetBlue also has "an agreement to divest five gates at Fort Lauderdale to ensure there's ample room for ULCC competition." Tr. 11/2/23 (Clark) 109:10–14; *see supra* § V.B.3.

716. In Orlando, JetBlue's fourth largest focus city, the Big Four had a combined revenue share of 71% at MCO from Q2 2022 to Q1 2023; Spirit had a 9% revenue share, the sixth-largest. TX 664; Tr. 11/2/23 (Clark) 109:17–23. Orlando is "a very competitive, very fragmented market . . . [with] a lot of ULCC competition" including Frontier, Sun Country, and Avelo. Tr. 11/2/23 (Clark) 110:15–25; *see supra* § V.B.1.

717. In Los Angeles, the legacy carriers had a combined revenue share of 74% at LAX from Q2 2022 to Q1 2023. TX 665. JetBlue and Southwest each had 7% revenue shares, followed by Alaska (6%) and Spirit (4%). *Id.*

718. In San Juan, JetBlue's sixth largest focus city, JetBlue was the largest airline with 26% revenue share at SJU, American was second largest 22%, followed by United (13%), Southwest (11%), Delta (11%), Spirit (9%), and Frontier (6%) from Q2 2022 to Q1 2023. TX 666; Tr. 11/2/23 (Clark) 113:11–20; *see supra* § V.B.2.

719. JetBlue has increasingly been adding transatlantic flying, where its main domestic competitors are again the legacies. Tr. 11/2/23 (Clark) 159:24–160:7. Spirit has no similar

offering.  Tr. 11/1/23 (Christie) 45:8-46:16 (noting Spirit "does not fly . . . transatlantic").

720.     Given Spirit's near exclusive focus on leisure travel, the route-level competition that does exist between JetBlue and Spirit is primarily in areas like Florida and the Caribbean, where ULCC competition is the strongest and entry barriers are low.  Tr. 11/2/23 (Clark) 114:7–18; *see supra* § V.B.1–3.

**B.     Dr. Gowrisankaran's GUPPI Analysis Is Not Reliable For The Same Reasons His Market Shares Are Not Reliable**

721.     Dr. Gowrisankaran estimates the upward pricing pressure caused by this merger by calculating a "Gross Upward Pricing Pressure Index" (or GUPPI) for each nonstop presumption route.  Tr. 11/17/23 (Gowrisankaran) 94:20–95:13.  Dr. Gowrisankaran calculates that the merger will create an incentive to raise Spirit's prices by at least 10 percent on 35 of the 51 nonstop presumption routes.  *Id.* 95:14–96:1.

722.     Dr. Gowrisankaran's GUPPI analysis does not account for the impact the proposed divestitures may have on pricing incentives.  Tr. 11/20/23 (Gowrisankaran) 92:9–11 ("Q. And as we discussed before, your GUPPI analysis does not account for divestitures; correct? A. Yes, that's correct.").

723.     Nor does Dr. Gowrisankaran's GUPPI analysis account for the post-merger incentives of other airlines to enter or reposition capacity onto a route where both JetBlue and Spirit operate.  Tr. 11/20/23 (Gowrisankaran) 92:12–22.

724.     Additionally, Dr. Gowrisankaran's GUPPI analysis is based on the assumption that customers will respond to a price increase by switching to other airlines proportionally to those airlines' share of passengers.  Tr. 11/20/23 (Gowrisankaran) 90:17–20 ("Q. Your GUPPI analysis, Doctor, is based on diversion proportional to market shares; is that right? A. Yes, that's right, within airlines, not for the outside, just to be technically complete.").

725.    Dr. Gowrisankaran agrees that if the shares for individual routes change, the GUPPI calculations would change.  Tr. 11/20/23 (Gowrisankaran) 90:25–91:2 ("Q. And if the market shares changed, then your GUPPI calculations would change as well; right? A. Yes, that's right.").

726.    In fact, the vast majority of Dr. Gowrisankaran's GUPPI calculations have changed because of changing competitive conditions on the nonstop presumption routes.  In total, 47 of the 51 routes Dr. Gowrisankaran identifies in his initial set of presumption routes— and 31 of the 35 routes where Dr. Gowrisankaran calculates an incentive to raise Spirit's prices by at least 10%—either (a) have experienced an exit or partial exit by at least one of the parties, (b) have experienced an entry by another carrier or addition in service by another carrier for six months or with no specified end date, or (c) have at least one endpoint that contains a divestiture airport.  Tr. 11/20/23 (Gowrisankaran) 91:22–8 ("And just as we saw earlier with your first set of shares, only four routes [on Gowrisankaran Demonstrative H] are unmarked by one of these factors; correct, Doctor? A. Yes. It's the same set of routes, of course."); *see also* Table A.

## C.    Dr. Gowrisankaran's Net Harm Model Is Not Reliable

727.    Dr. Gowrisankaran uses a relative capacity model to analyze the impacts of the merger and which forms the primary basis for his conclusion that the merger is likely to result in competitive harm.

728.    Dr. Gowrisankaran's model is not reliable for the following reasons: (1) it relies on significantly less data than Defendants' expert's model; (2) it predicts that more aggressive entry leads to higher fares; (3) it is sensitive to small and reasonable changes in its assumptions; (4) it gives credit to lower fares but not higher quality; (5) it assumes Spirit's impact is unaffected by JetBlue; (6) it does not adequately account for entry and divestitures; and (7) it is inconsistent with other evidence in this case.  Tr. 11/27/23 (Hill) 40:10–41:8.

### 1. Dr. Gowrisankaran's Net Harm Estimates Are Not Based On Sufficient Data

729.    Dr. Gowrisankaran's model is not reliable because it has too few entry events. Dr. Gowrisankaran's model only relies on 18 JetBlue and 62 Spirit entry events from 2017 to Q1 2019.  Tr. 11/17/23 (Gowrisankaran) 98:22–99:18; Tr. 11/27/23 (Hill) 41:12–42:2.

730.    In economic modeling, using more data provides more confidence that a model identifies "a real effect" and not noise in the data.  Tr. 11/27/23 (Hill) 41:12–42:2.  Dr. Gowrisankaran agreed it is a "basic premise of statistics, that if you want the most accurate effects, what you want to do it take the most points that are there."  Tr. 11/20/2023 (Gowrisankaran) 148:16–149:2 ("And that's the basic premise of statistics, that if you want the most accurate effects, what you want to do is take the most points that are there. You don't want to take just one route and extrapolate from it, you want to look at all the routes that are there. And then you get as close to possible as getting the complete answer because you've taken the average across a whole bunch of different markets, each with slightly different conditions.").

731.    Dr. Hill's model, by contrast, relies on 55 JetBlue and 125 Spirit entry events from 2010 to 2019.  Tr. 11/27/23 (Hill) 38:25–39:11, 40:18–21, 41:12–42:2 ("[Dr. Gowrisankaran] has significantly less entry events that he uses to estimate the relationship, and I think my additional data gives my model more power.").

732.    The difference in data points used between Dr. Hill and Dr. Gowrisankaran makes Dr. Hill's model more reliable than Dr. Gowrisankaran's.  Tr. 11/27/23 (Hill) 42:1–2 ("The more entry events you have, the more you can be confident that you're identifying a real effect.").

### 2. Dr. Gowrisankaran's Model Is Based On Unreliable Methods Because It Predicts Price Increases As JetBlue Or Spirit Enter With Greater Intensity

733.    Dr. Gowrisankaran's model puts forth an implausible relationship between an

entrant's capacity and fares, predicting that more aggressive entry (i.e., entry with higher capacity) will lead to higher fares.  Tr. 11/27/23 (Hill) 42:6–43:12 (explaining Dr. Gowrisankaran's model indicates that if a carrier enters with high enough capacity, "fares on the route actually go up").

734.     In fact, Dr. Gowrisankaran's model predicts that carriers entering with large enough "relative capacity" would cause prices to increase.  Tr. 11/20/23 (Gowrisankaran) 129:21–130:5 ("Q. . . So around, say, 0.058 your regression line actually predicts that prices would go up if you entered by flooding the market with capacity; right? A. Yeah. I mean, that's - - I mean, it would predict that but it's not something I would want to use, as an economist.").

735.     Dr. Gowrisankaran's estimates of the JetBlue and Spirit effects also predicts that once a carrier enters a route with a certain level of capacity (in excess of 0.3 relative capacity), that would result in smaller decreases in price.  Tr. 11/20/23 (Gowrisankaran) 128:9–129:7 ("Q. And as Spirit adds more capacity, you testified, we see a larger impact on the price charged in that market; correct? A. Yes, for almost all of the sample. Q. But around 0.03 here your estimation stops going down; correct? A. Yes, that's right. Q. And it starts going up? A. Yes. I would say the regression line starts going up.").

736.     For example, Dr. Gowrisankaran predicts that a carrier entering a route with a relatively small relative capacity of 0.015 (equivalent to 4 daily flights on a route containing approximately 267 daily passengers) would cause an equivalent price decrease to a carrier that enters a route with a relative capacity of 0.04 (equivalent to 4 daily flights on a route containing approximately 100 daily passengers).  Tr. 11/20/23 (Gowrisankaran) 129:8–11; TX 817 (Note 2). And if the relative capacity of entry exceeds approximately 0.058 (equivalent to 4 daily flights on a route containing approximately 69 daily passengers), Dr. Gowrisankaran predicts that such

an entry would actually cause prices to *increase*.  Tr. 11/20/23 (Gowrisankaran) 129:21–130:5.

737.    These outcomes are implausible because, if a carrier enters a route with a large amount of capacity, it would need to lower fares to compete effectively.  Tr. 11/27/23 (Hill) 43:13–18 ("[I]f a carrier enters a route and adds a large amount of capacity, it's going to have to have people flying on those planes, and the only way you're going to do that is by lowering fares.").

738.    Dr. Gowrisankaran ignores these implausible outcomes by applying his model to only a restricted range of relative capacity values when making predictions of alleged harm, rather than the complete data set.  Tr. 11/27/23 (Hill) 43:13–45:4.

739.    Dr. Gowrisankaran argues that he can ignore the portion of the relative capacity curve that slopes upwards and apply his model only to smaller values, because "as an economist what we want to do is . . . use predictions in sample."  Tr. 11/20/23 (Gowrisankaran) 129:21–130:5.

740.    But Dr. Gowrisankaran's model "equally" makes predictions for all values of relative capacity.  Tr. 11/27/23 (Hill) 44:10–23.  The model's "strange predictions" at high relative capacity values suggests the model itself "doesn't really fit industry reality." *Id.*

741.    As just one example, Dr. Gowrisankaran's model predicts *trillions* of dollars in harm on the Philadelphia, PA-Aguadilla, PR route because of Spirit's high relative capacity on the route.  Tr. 11/27/23 (Hill) 43:22–44:23 (explaining this route produces implausible outcomes on this route because "it's a high-relative capacity route [for Spirit] and it gets into this part [of Dr. Gowrisankaran's model] where the curves are starting to do very very strange things").

742.    As Dr. Hill explained, the conclusion that "you can fly a huge amount of additional planes, raise prices, and still be able to compete effectively" is implausible.  Tr.

11/27/23 (Hill) 43:13–21.

### 3. Dr. Gowrisankaran's Model Is Based On Unreliable Methods Because It Is Sensitive To Small, Reasonable Changes In Assumptions

743. Dr. Gowrisankaran's model is vulnerable to small changes in its assumptions in that it predicts that an airline entering a route with relative low capacity can cause large price effects. Tr. 11/27/23 (Hill) 45:6–46:1 ("So, for example, if you take a very busy route, like Miami to New York, Professor Gowrisankaran's model is saying that on that route, with many competitors, lots of capacity, if Spirit entered with one flight a week, say a flight on Thursday, all fares would go down by 10 percent on that route. And this is not plausible, that that small level of entry intensity is going to have that impact.").

744. For example, Dr. Gowrisankaran's model predicts that a relative capacity of *zero* would cause a ten percent decrease in fares across a route. Tr. 11/27/23 (Hill) 45:12–18.

745. Dr. Hill found that making a small change to Dr. Gowrisankaran's model so that "if you have 0 relative capacity, you have 0 price change" would "make[] a big difference in the predictions of the model" regarding the benefits and purported harm to consumers. Tr. 11/27/23 (Hill) 45:5–47:14.

746. When Dr. Hill adjusted Dr. Gowrisankaran's model to reflect that at zero relative capacity there would also be a zero change in prices, Dr. Gowrisankaran's "weighted model predicts that the transaction will generate $161 million in benefit for consumers." Tr. 11/27/23 (Hill) 46:24–47:14 (discussing Hill Demonstrative at Slide 23).

747. A similar phenomenon occurs with Dr. Gowrisankaran's unweighted model: after Dr. Hill made this same "small tweak" to Dr. Gowrisankaran's model it resulted in "very different predictions" and "the amount of harm dropped by $2 billion." *Id.*

### 4. Dr. Gowrisankaran's Model Is Based On Unreliable Methods Because It Does Not Give Credit To JetBlue's Higher Quality

748.    Dr. Gowrisankaran's use of all carrier fares, instead of rival fares, does not adequately account for JetBlue and Spirit's quality differences.  *See supra* ¶¶ 640–647; Tr. 11/27/23 (Hill) 31:2–22 ("[I]f you use all fares, because of this level of differentiation, you can get turned around and reach conclusions about competition that are inaccurate.").

> ### 5.    Dr. Gowrisankaran's Model Is Not Reliably Applied To The Facts Or Data Because It Assumes That Spirit's Impact Is Unaffected By JetBlue's Presence On A Route

749.    Dr. Gowrisankaran does not consider whether JetBlue's presence on a route affects the impact of Spirit's entry on fares on that route and assumes that Spirit's entry is equally impactful regardless of JetBlue's presence on a route.  Tr. 11/27/23 (Hill) 48:1–49:4.

750.    Dr. Hill showed that Spirit's entry has a smaller effect on rival fares if JetBlue is already present on a route: "When JetBlue is not present and Spirit enters, rival fares drop by 10 percent on average. When JetBlue is present, rival fares drop on average by 6 percent. . . . JetBlue's presence means that Spirit has a smaller marginal effect." Tr. 11/27/23 (Hill) 48:1– 49:4 ("[W]hat we can see is if JetBlue is present, it mitigates the impact of losing Spirit as a competitor or of Spirit entering as a competitor.").

> ### 6.    Dr. Gowrisankaran's Net Harm Results Are Unreliable Because They Are Inconsistent With The Other Evidence In The Case
>
> #### (1)    *Dr. Gowrisankaran Predicts That There Will Be Harm On Routes Either JetBlue Or Spirit Have Exited, Despite His Acknowledgement That Those Harms Will Not Materialize*

751.    JetBlue and/or Spirit have exited 14 of the nonstop presumption routes identified by Dr. Gowrisankaran.  *See supra* ¶¶ 405–408; TX 837.

752.    Dr. Gowrisankaran agrees that there will not be net harm resulting from the merger on routes either JetBlue or Spirit no longer flies.  Tr. 11/20/23 (Gowrisankaran) 136:6– 137:3 (agreeing that on routes JetBlue or Spirit have exited, "[there's] not going to be necessarily

net harm in exactly those routes but there are going to be new routes where they've entered and where there's going to be net harm").

753.    Dr. Gowrisankaran's estimates of net harm, however, still include routes which JetBlue or Spirit have exited.  In total, Dr. Gowrisankaran estimates $70.9 million in net harm from nonstop presumption routes that either JetBlue or Spirit have exited since June 2022, based on Dr. Gowrisankaran's preferred unweighted estimates of net harm.  TX 843 (Rows 87–88, 126–129, 142–145, 188, 193–196, 209–212, 213–216, 242–243, 244–247, 251–252, 254–257, 258–259, 260–261).  As shown on Gowrisankaran Demonstrative F, Dr. Gowrisankaran estimates that there would be $41.7 million in net harm on these routes based on Dr. Gowrisankaran's weighted estimates.  TX 842 (Rows 59–60, 132, 165–168, 194–195, 200–203, 204–207, 217–220, 228–231, 232–233, 238–241, 242–243, 244–245, 246–249).

### (2)    *Dr. Gowrisankaran Predicts Net Harm On Highly Competitive Routes Where JetBlue And Spirit Do Not Compete And Spirit Plays A Limited Role*

754.    Dr. Gowrisankaran's model estimates net harm on certain routes where competition is intense and Spirit plays a limited, if any, role.

755.    Dr. Gowrisankaran calculates $18 million in net harm on the Spirit-only route between Atlanta, GA–Chicago, IL, despite Spirit having only a 7% share of passengers, JetBlue not being present, and four other carriers providing nonstop service: Delta (43% share), Southwest (24%), American (13%), and Frontier (2%).  Tr. 11/27/23 (Hill) 58:19–59:11.

756.    Dr. Gowrisankaran calculates $7.33 million in net harm (and a 9.1% price increase) for the Spirit-only route between Chicago, IL–Phoenix, AZ, despite Spirit having a 3.6% share of passengers, JetBlue not being present, and four other carriers providing nonstop service: American (35% share), Southwest (34%), United (19%), and Frontier (7%).  TX 848 (reporting unweighted net harm results for Q1 2022 and share calculations for the four quarters

ending in Q2 2022).

757.   In each of his routes on which JetBlue and Spirit do not compete, Dr. Gowrisankaran states that the net harm he is measuring is not the result of lost head-to-head competition, but rather the effect of substituting Spirit planes for JetBlue planes.  Tr. 11/20/23 (Gowrisankaran) 135:5–13 ("Q. . . . So you would agree that for both of these routes what you're measuring with your regression is not the loss of head-to-head competition, but simply the effect from substituting Spirit planes for JetBlue planes; correct? A. In these two routes, because they are not nonstop overlaps, that's accurate, yes.").

### 7.   Dr. Gowrisankaran Net Harm Model Is Not Reliable In Light Of The Likelihood Of Entry By Other Carriers Post-Merger

758.   Dr. Gowrisankaran's model does not reliably account for the divestitures or entry in response to the merger.  *See infra*; *see also supra* ¶¶ 43–48, 274–277, 335–338 (explaining the frequency of entry and defendants' divestiture commitments).

759.   Dr. Gowrisankaran agrees that "considering the prospects of entry in response to a merger is part of the full assessment of the [merger's] competitive effects."  Tr. 11/20/23 (Gowrisankaran) 63:2–5.

760.   Divestitures should also be incorporated into the competitive effects analysis of a merger.  Tr. 11/27/23 (Hill) 78:22–79:3 ("Usually you want to build [divestitures] into the competitive effects analysis. So is there likely to be a reduction in competition? If so, would the divestitures help to offset that or mitigate it entirely?").

761.   Dr. Gowrisankaran asserts that his model accounts for entry by other carriers by capturing other carriers' historical entry events.  Tr. 11/20/23 (Gowrisankaran) 49:2–20 ("So when I calculated the -- all of the entry of Spirit and the entry of JetBlue, um, in my analysis I kept the data after they entered regardless of what other airlines did. . . . And in doing that I'm

fully accounting for the fact that other airlines may adjust their capacity or may enter or exit in response to Spirit or JetBlue entering.").

762.     Dr. Gowrisankaran's analysis does not reliably account, however, for other carriers' post-merger entry.  As Dr. Hill explained, "in this case we're asking a separate question . . . were there to be an anticompetitive effect, would you see increased entry and repositioning? And that is not something that was captured in [Dr. Gowrisankaran's] study." Tr. 11/27/23 (Hill) 78:1–14.  According to Dr. Hill, because he does not capture entry and repositioning, "[Dr. Gowrisankaran is] not, in my view, properly controlling for entry and repositioning."  *Id.*

763.     Dr. Gowrisankaran did not perform an analysis of entry post-merger. Tr. 11/20/23 (Gowrisankaran) 142:10–20 ("I haven't done an entry analysis….").  Rather, he just assumed that the ordinary-course responses to Spirit's historical exits were "quite similar" to what would occur in response to the merger.  Tr. 11/20/23 (Gowrisankaran) 145:16–23 ("Q. You would agree, Doctor, that exits are not necessarily motivated by the same factors as entries; correct? A. They're not, but in this particular case I'm looking at exits caused by the merger, and that means all Spirit routes are going to exit. And that's quite similar to the identification that I used here, the natural experiment of Spirit entry being driven by Spirit's big growth plans over the last 13 years."); *see also* Tr. 11/27/23 (Hill) 77:14–25 ("[Dr. Gowrisankaran's] argument was, your Honor, he looked at entry events, as I did, and he argued that in his entry study there were some exits. And so those exists were capturing sort of the inverse of entry.").

764.     Nor did Dr. Gowrisankaran's analysis account for the impact of the divestitures on potential entry.  Tr. 11/20/23 (Gowrisankaran) 9:14–10:3 (explaining that "I'm not here to testify about divestitures, the next witness, Dr. Chipty will testify about divestitures.")

765.    This failure to account for the impact of post-merger entry and effect of the divestitures renders Dr. Gowrisankaran's model unreliable.  Tr. 11/27/23 (Hill) 75:22–76:3 ("Q. What is your evaluation of Professor Gowrisankaran's assessment of the likelihood of adverse competitive effects on these routes? A. I don't think it's reliable. Q. And what is the basis for that opinion, Dr. Hill? A. I don't think he adequately takes account of entry or the effect of the divestitures.").

D.    **Dr. Hill's Model Of Competitive Effectiveness Is Reliable And Predicts That The Merger Will Benefit Consumers**

766.    To more accurately calculate the net effect of this transaction, Dr. Hill corrected for the flaws in Dr. Gowrisankaran's model described above and used it to weigh potential benefits and harms. Tr. 11/27/23 (Hill)  50:13–51:2 ("Q. And could you give a final summary for the Court of what you did to adjust the model to get these green results that we have here? A. Yes. So what I did was I adjusted for this fact that Spirit's impact may vary depending on whether or not JetBlue is present. I adjusted for the presence of other carriers. I used the data from 2011 to, um, 2018. I used, um, as I said, one year before and one year after. So I used a consistent window to look at each of the events. I dropped a small number of entry events where Professor Gowrisankaran had one carrier enter and it exited before one year. I don't think those ones are the best basis. And then I used my entry-intensity model [measure] rather than his relative capacity model [measure].").

767.    Using Dr. Gowrisankaran's model to predict harms and benefits ensures that Dr. Hill's estimates "take account of the effect [of the merger] on Spirit passengers."  Tr. 11/27/23 (Hill) 33:20–34:11, 49:12–22 ("So I'm going to use Professor Gowrisankaran's measure and I'm going to do that to be conservative, that measure is going to tend to overstate potential harm.").

768.    After adjusting for the critiques of Dr. Gowrisankaran's analysis, Dr. Hill found

that Dr. Gowrisankaran's unweighted model predicts $274 million in benefits and his weighted model predicts $708 million in benefits.  Tr. 11/27/23 (Hill) 49:12–50:12 ("Q. And you talked about various critiques. Did they all result in adjustments going in the same direction when you did the revised run of the model? A. No, so Professor Gowrisankaran noted in his testimony that some of my critiques tend to increase harm and some of them tend to decrease harm. And I don't find that surprising. I didn't make those changes to affect harm, I made them because I thought they were the right way to estimate the model.").

769.    Dr. Hill also used Dr. Gowrisankaran's estimate of harm of $108 million for the 15 holdout routes, even though it "is an overestimate and it doesn't account for entry and repositioning."  Tr. 11/27/23 (Hill) 88:24–89:21; *see supra* ¶¶ 425–426 (describing the 15 "holdout" nonstop presumption routes where are not affected by a divestiture).

770.    As discussed *supra*, Dr. Hill used his entry-intensity model to analyze the impact of the merger on 199 increased competition routes, which are "routes on which Spirit is present today, but JetBlue is either not present or has less than 1 percent market share, or route share." Tr. 11/27/23 (Hill) 88:1–12.  Dr. Hill predicts $614 million in benefits on the 199 increased competition routes, which outweighs Dr. Gowrisankaran's own estimate of harm on the 15 remaining nonstop "holdout" routes.  *Id.* at 88:24–89:14.

771.    Dr. Gowrisankaran proposed an alternative model (which he called a "Continuous Line Segment Model") in response to Dr. Hill's entry-intensity model which in fact predicts greater benefits ($659 million) on these increased competition routes than does Dr. Hill's model. Tr. 11/27/2023 (Hill) 89:22–90:8 ("Yes, he criticized the entry-intensity model and he proposed instead a [spline] model that he called a "Continuous Line Segment Model" …. And you'll see that his model actually ends up increasing -- predicting slightly increased benefits relative to

mine.").

     **E.**    **Entry Is Robust And Will Discipline Any Attempted Anticompetitive Price Increases**

772.    Despite the ample evidence that entry, expansion, and repositioning occurs constantly in the airline industry, *see supra* §§ II.C.2, V.B, the Government relies on Dr. Chipty for the conclusion that other ULCCs will be unable to "replace Spirit with entry or expansion at sufficient scale." Tr. 11/21/23 (Chipty) 76:2–14.

773.    Dr. Chipty's own regression model identified 4,701 entry events by just four ULCCs (Spirit, Frontier, Allegiant, and Sun Country) over a five and half year period. *See supra* ¶¶ 414–417; Tr. 11/21/23 (Chipty) 138:3–13.  Those 4,701 entry events Dr. Chipty identified also did not account for the entries of Avelo and Breeze, which Dr. Chipty agreed would push that number "even higher." *See supra* ¶¶ 414–417; Tr. 11/21/23 (Chipty) 138:10–13.

774.    Although Dr. Chipty agrees that multiple entrants may collectively offset any lost capacity left by Spirit, , her analysis does not systematically consider what level of entry would need to occur from *all* such entrants to ameliorate any negative competitive effects.  Tr. 11/21/23 (Chipty) 141:11–14, 147:12–18 ("Q. And you didn't do a similar adjustment factor analysis looking at all the ULCCs collectively, did you? A. No, I did not.").

775.    Dr. Chipty also did not "look at entry for each individual route" in which the Government alleges harm. Tr. 11/21/23 (Chipty) 117:1–3.

776.    Nor did Dr. Chipty's regression model measure the likelihood of potential *expansion* on any particular route. Tr. 11/21/23 (Chipty) 136:5–8 ("Q. . . . So we can't use the regression to really understand anything about expansion; correct? A. I would agree with that.").

777.    Dr. Chipty agrees that "higher fares in a relevant antitrust market would incentivize entry," thereby making routes "more attractive" for entry post-merger. Tr. 11/21/23

(Chipty) 142:24–143:10; *see also* Tr. 11/21/23 (Chipty) 142:13–22 ("Q. And you would agree with me that a firm's growth plans may change if they learn about a merger? A. Yes. Q. And that's because they might change their anticipated plans if they perceive new opportunities; correct? A. Correct. Correct.").

778.    Dr. Chipty's analysis, however "doesn't take into account the greater incentives [for entry] from this merger," relying entirely on historical ordinary course entry events. Tr. 11/21/23 (Chipty) 143:11–19 ("Q. So [your analysis] doesn't take into account that there may be a higher incentive for ULCCs to enter after the merger; correct? A. It doesn't take into account the greater incentives from this merger, but it doesn't preclude the possibility of other incentives over the many years that I studied.").

779.    None of the growth plans Dr. Chipty relied upon in reaching her conclusions accounted for post-merger plans or opportunities.  Tr. 11/21/23 (Chipty) 142:13–22 ("Q. Okay. And the growth plans that you looked at, none of them took the merger into account; fair? A. I think the ones I described didn't. They predate the merger.").

780.    Dr. Chipty's also agrees that presence (that is, existing operations at a given endpoint) at one or both endpoints of a route is "[s]tatistically correlated" with a "high level of statistical significance" to the decision to enter a route in the future. Tr. 11/21/23 (Chipty) 134:8–135:7 ("Q. . . . And what that means is that an airline's presence at one or both endpoints is highly correlated with the decision to enter a route; correct? A. Statistically correlated, in an economic sense, both is better.").

781.    Despite her conclusion that presence is correlated with likelihood of entry, Dr. Chipty contends that ULCCs collective networks—which span the entire country—are "pretty uninformative" in answering whether entry is likely or not. Tr. 11/21/23 (Chipty) 141:3–21 ("Q.

And you would agree with me, just looking at this map on the right, that the ULCCs collectively have route coverage at a network level all over the country; is that correct? A. Well, I'm not sure how to process 'all over the country.' I find this map pretty uninformative. There are definitely lines everywhere . . . .").

782.     That is implausible given Dr. Chipty's other analyses.  By Dr. Chipty's own admission, there are ULCCs present at one or both endpoints (or already serving) all but one of the 51 nonstop overlap presumption routes.  TX 910; Tr. 11/21/23 (Chipty) 131:1–10.  In other words, Dr. Chipty's analysis agrees that on each of the 51 nonstop presumption routes, ULCCs are either already flying or are statistically more likely to enter the route than if they had no presence at all.

F.     **The Academic Literature Supports JetBlue Being A More Effective Competitor Than Spirit**

783.     A recent, reliable academic study finds that LCCs impact legacy airlines fares across all fare levels more durably than does Spirit.  Dr. Gowrisankaran cites an article written by Dr. Brad Shrago in his opening report, which estimates the effect of different carriers' presence on the fares of legacy carriers in different percentiles.  Tr. 11/20/23 (Gowrisankaran) 139:3–7.

784.     Dr. Gowrisankaran agrees that Dr. Shrago's analysis is reliable.  Tr. 11/20/23 (Gowrisankaran) 137:18–19 ("Q.  And you agree that Dr. Shrago's work is reliable? A. Yeah, generally. Yeah.").

785.     Dr. Shrago's paper shows that the presence of LCCs on a route has a larger impact on legacy airlines' fares than does Spirit at all fare levels other than the tenth percentile of fares, where the impact of LCCs and Spirit is similar.  Tr. 11/20/23 (Gowrisankaran) 140:7–12.

786.     Dr. Gowrisankaran agrees that Dr. Shrago found that Allegiant's impact on legacy

fares is similar to Spirit's.  Tr. 11/20/23 (Gowrisankaran) 141:17–21 ("And, again, at every point the confidence intervals for his estimate of the Allegiant Effect and his estimate of the Spirit Effect, those overlap; correct?  A.  Yes, that's right."), 140: 18–22 ("Q.  And if the 95 percent confidence intervals for these overlap, it would be a rough first cut of saying that they are not statistically distinguishable from one another; correct?  A.  Yes, that's right.").

787.    Dr. Shrago also found Frontier's effects to be similar to Spirit's effect.  Tr. 11/20/23 (Gowrisankaran) 141:8–10 ("Q.  And at every point the confidence intervals for Spirit and Frontier, those are touching; correct?  A.  Yes.").

### G.    The Government's Reliance On The "Proxy Fight Materials" Is Unfounded

788.    Spirit's statements made during a "proxy fight" in May 2022, when JetBlue bypassed Spirit's management to seek agreement to merge directly from Spirit's shareholders, are not evidence that this merger will lead to anticompetitive effects.

789.    Spirit received its first unsolicited offer from JetBlue on March 29, 2022.  TX 210 (March 29, 2022 email from Robin Hayes to Ted Christie attaching initial offer from JetBlue).

790.    At the time, Spirit had entered into a merger agreement with Frontier.  Tr. 10/31/23 (Christie) 72:7–12.

791.    The merger agreement with Frontier required Spirit to pursue and defend the Frontier transaction—but if it received a competing offer to merge, it could consider that proposal if it was a "Superior Proposal," that is, both (1) reasonably likely to be consummated and (2) economically superior.  Tr. 11/1/23 (Christie) 60:9–61:1.

792.    JetBlue's initial offer identified several compelling benefits of the deal, but contained only vague statements about regulatory clearance.  TX 210 at '4836–4838 (deal would "position[] the combined JetBlue/Spirit for long-term viability as a strong competitor to the 'Big Four' carriers, translating into lower fares for customers. . . . [W]e are confident that we will be

able to agree to terms in the definitive agreement that give you comfort with respect to both the actions to be taken that are reasonably designed to address any antitrust concerns . . . .").

793.    Initially, Spirit's Board was skeptical as to whether JetBlue had a genuine interest in a deal.  Tr. 10/31/23 (Christie) 139:22–140:3 ("We were concerned as to whether or not their offer was -- was sincere or not. We did have those concerns at that time."); Tr. 11/7/23 (Gardner) 20:10–22:4 ("[I]t crossed your mind that JetBlue's hostile bid could be an attempt to tank the Spirit, Frontier deal, right?  A.  We were skeptical at that time.").

794.    Nonetheless, on April 7, 2023, Spirit's Board of Directors found that JetBlue's offer "could reasonably be likely to lead to a Superior Proposal" and instructed Spirit to begin negotiations with JetBlue.  TX 211 at '3376; Tr. 10/31/23 (Christie) 118:24–119:12.

795.    Spirit knew that JetBlue's fares were on average higher than Spirit's when it decided to negotiate with JetBlue, and that JetBlue had said that it planned to reconfigure Spirit's higher-density planes to JetBlue's lower-density layout. Tr. 11/1/23 (Christie) 61:2–16; Tr. 11/7/23 (Gardner) 60:14–62:3.  Mac Gardner, the Chairman of Spirit's Board of Directors, explained that Spirit nevertheless continued to negotiate with JetBlue because "scale and size [are] important"; whether JetBlue had higher average fares "wasn't the test for whether or not this was a transaction that would make sense."  Tr. 11/7/23 (Gardner) 60:14–62:3.

796.    From April 7 until the final agreement in July, Spirit continued to negotiate with JetBlue, including for a more robust commitment to do whatever necessary to ensure that the deal made it through antitrust review.  TX 226 at '0789–0800 (JetBlue-Spirit merger proxy, "Background of the Merger" section listing dozens of phone calls and other negotiations); TX 212 at '3372 (Apr. 24, 2022 Spirit Board Minutes); TX 124 (April 29, 2022 JetBlue revised offer); TX 216 at '3353 (May 31, 2022 Spirit Board Minutes); TX 127 (June 6, 2022 JetBlue

revised offer); TX 218 (June 20, 2022 JetBlue revised offer); TX 336 at '3348 (June 21, 2022 Spirit Board Minutes); Tr. 11/1/23 (Christie) 59:4–61:1 (describing negotiations); Tr. 11/7/23 (Gardner) 65:12–66:5 ("[T]here was a constant, um, stream of service – this is a lot of meetings, behind the meetings, um, conversations between professionals of both sides.  But in effect it's the amount of 'engagement,' for lack of a better term, between the two sides, in getting to, um, a place where we could unanimously support this merger.").

797.     In late April 2022, Spirit, through its CEO Ted Christie, conveyed primary "guiding principles" for JetBlue to craft a revised proposal to address Spirit's regulatory concerns.  TX 295 at '3374 (Apr. 21, 2022 Spirit Board Minutes noting, "Mr. Christie suggested that the Company revert to JetBlue without turning down the proposal but setting forth guiding principles, namely flexibility in regulatory remedies, retention and significant shareholder protection provisions"); TX 226 at '0790 ("On April 25, 2022, Mr. Christie called Robin Hayes, JetBlue's Chief Executive Officer, to convey the foregoing package of contractual protections."); Tr. 11/1/23 (Christie) 61:17–62:5 ("[T]he primary thrust of our discussions with JetBlue was around [the regulatory process] and their strategy as to how they intended to approach the regulators and overcome any of those concerns."), 62:6–63:22 ("We outlined for JetBlue, um, a path that we felt would help us resolve any concerns that we had with regard to the regulatory review process, um, and instructed them to give us feedback on that in an alternate proposal, um, in the hopes that they would be able to see our—agree with us, and then we could pursue perhaps further discussions.").

798.     Mr. Christie spoke to JetBlue CEO Robin Hayes in late April 2022.  He conveyed to Mr. Hayes "the regulatory path" envisioned by Spirit, "which was focused around a few primary components."  Tr. 11/1/23 (Christie) 62:6–63:22, 64:21–66:12.  The first was a

commitment that JetBlue "would do anything in their power to achieve regulatory approval in the form of divestitures and other manners," referred to as a "'Come hell or high water' clause, which means [JetBlue] would do anything, come hell or high water, um, to achieve regulatory approval up to and including the abandonment of the Northeast Alliance with American." *Id.* at 65:3–21. Second, Spirit requested that JetBlue consider a "reverse termination fee that would be put in place as both [an] offering [of] their conviction in the process, and as offsetting the risks to our shareholders" from the "protracted regulatory review process"). *Id.*; *see also* Tr. 11/7/23 (Gardner) 62:4–63:17 ("[W]e had the road map in front of them from the very beginning, we said 'This is what we need.'").

799.    Spirit's chief concern was the implications of the existence of the Northeast Alliance, which has since been disbanded. Tr. 11/1/23 (Christie) 70:8–71:8 (the NEA agreement and litigation was Spirit's "primary concern"), 119:16–22 ("[T]he presence of the Alliance and, more importantly, the fact that that Alliance was being challenged in court, had us concerned that it would lengthen the review process of our potential transaction.").

800.    After some additional negotiation, *see* TX 124 at '5924 (April 29, 2022 JetBlue revised offer with revised regulatory covenant), JetBlue made a non-solicited tender offer directly to Spirit's shareholders.

801.    Spirit's public statements in late May 2022—during this hostile period—are statements of opinion; viewed in context, they are largely predictions of what an antitrust regulator might do or think. In particular, those statements reflected Spirit's attempt to educate its shareholders about its regulatory concerns with the deal on the table, which did not include sufficient regulatory protections, in Spirit's view, rendering a final deal unacceptably uncertain. Tr. 11/1/23 (Christie) 71:9–72:23 ("[O]ur primary concern, um, was that the—the regulators

would interpret certain things with regard to a transaction between Spirit and JetBlue that could lead to a longer review process and a longer regulatory process, and so all of the themes in our presentation about the regulatory process were intended to reflect that we wanted our shareholders to be aware of that risk . . . . [W]e were advising our shareholders about this risk and why we had rejected their last proposal"), 72:24–74:5 ("[W]e were, um, advising our shareholders that, um, while we had concerns, there was a path by which we could see engaging in a transaction with JetBlue and we outlined to JetBlue that path, um, to satisfy our concerns with regard to the regulatory review process. And as of the date of this presentation they had not satisfied us."), 119:16–22 ("[T]he presence of the Alliance and, more importantly, the fact that that Alliance was being challenged in court, had us concerned that it would lengthen the review process of our potential transaction.").

802.    Despite initiating a hostile tender offer, JetBlue and Spirit quickly recommenced negotiations in early June 2022, including a revised proposal from JetBlue sent to Spirit on June 6, 2022 that contained improved regulatory commitments. *See* TX 127 at '1471 (June 6, 2022 JetBlue revised offer including "More regulatory protections through our divestiture commitments and a $350 million reverse breakup fee, $100 million greater than the amount being offered by Frontier.").

803.    On June 20, 2022—the date on which Spirit requested a "best and final" offer, *see* Tr. 11/1/23 (Christie) 76:5–77:24—JetBlue sent a revised offer to Spirit that contained a new regulatory covenant that Spirit considered a "very very significant move towards what we were requesting." *Id.* at 79:6–10; TX 218 at '1519 (June 20, 2022 Revised Offer from JetBlue including "Stronger regulatory commitment which includes: [a]n express obligation to litigate and to divest assets of JetBlue and Spirit up to a material adverse effect on the combined

JetBlue-Spirit, with a limited carve-out to this divestiture obligation for actions that would be reasonably likely to materially and adversely affect the anticipated benefits under JetBlue's Northeast Alliance. This commitment significantly enhances our prior proposal and meaningfully exceeds the divestiture commitment from Frontier."); Tr. 11/1/23 (Christie) 78:15–80:14 ("Now when you received this new offer with this new regulatory commitment, what was the view of Spirit?  A.  Well we viewed this as a very very significant move towards what we were requesting of JetBlue to resolve our concerns regarding the regulatory review process. . . . Their private covenant was that they would agree to litigate and divest assets of JetBlue and Spirit up to a material and adverse effect on Spirit. So what they've done here is that by combining the businesses, they've increased the total size of the amount of divestitures that they would be willing to commit, nearly more than doubling that commitment, because JetBlue is larger than Spirit. So the combination of JetBlue makes it a much more significant offer.").

804.    Initially, Spirit did not understand the full scope of the provision, because it referred to the "benefits under JetBlue's Northeast Alliance," which Spirit could not know.  *See* TX 218 at '1519.  However, Spirit got comfortable after the end of June 2022 and into July 2022 that the regulatory commitment that JetBlue offered on June 20, 2022 was significant.

805.    Specifically, JetBlue's June 20 proposal offered to divest assets up to a level that would "materially and adversely affect the anticipated benefits" under the Northeast Alliance, its then-existing relationship with American Airlines.  *Id.*  At the time, Spirit did not have access to information that would allow it to understand the size of the "potential benefits" of the NEA, and so could not evaluate the extent to which JetBlue was offering to divest assets.  Tr. 11/1/23 (Christie) 80:15–81:8 ("[T]here is this carve-out for something that could reasonably likely materially and adversely affect the anticipated benefits under the Northeast Alliance, we had no

visibility and JetBlue was, due to confidentiality, reasons unwilling to share with us, what the anticipated benefits were under the Northeast [Alliance] and we could not arrive at a reliable estimate at this time.  And so for that reason we were unable to pursue or move forward with JetBlue at this time."); Tr. 11/7/23 (Gardner) 66:6–67:21 ("We had concerns about the NEA, um, and -- which was the Northeast Alliance, um, and we had concerns about it in large part because we didn't understand the magnitude and the scope of it because we hadn't ever seen the agreement, and they were unwilling to share it with us, I'm sure for their own good reasons. So it was hard for us to understand, um, just how far they were prepared to go. Their initial offer said they would put it together, a divestiture remedy package up to the size of -- until it had a material adverse effect on Spirit as a whole. Over the course of these 15 pages, that got expanded to being -- having a material adverse effect on both Spirit and JetBlue, the combined enterprise, which was at least double the size. So that got even larger."); TX 336 at '3348 (Mr. Christie "reviewed the revised JetBlue proposal" "which proposal included . . . a commitment to divest assets up to a material adverse effect on the <u>combined</u> business (instead of Spirit's business only, as before), subject to a limit if such divestitures would be reasonably likely to adversely affect the anticipated benefits of the NEA to the parties thereto").

806.    After JetBlue's offer, in and around early July, Spirit came to learn more about the size of the anticipated benefits of the NEA, and came to believe that JetBlue's commitment to divestitures was robust. Tr. 11/1/23 (Christie) 82:3–22 ("Q. With respect to the regulatory covenant that was contained in that June 20th -- July 20th -- no, June 20th, did there come a time when Spirit agreed to accept that proposal?  A.  We did, yes.  Q.  Why?  A.  We, um, over time and beginning in the early parts of July, um, started to get some information on what the—the size of this carve-out would mean with regard to the anticipated benefits under JetBlue's

Northeast Alliance, and over the course of that understanding we became aware that the anticipated benefits were very large and that meant that it gave JetBlue significant latitude to, um, to offer very significant divestitures with regard to this transaction. And that gave us comfort over the period of that time that we—that we did in fact have a significant covenant that JetBlue was willing to make, and that gave us comfort that we had satisfied our concerns with regard to the regulatory matters."); Tr. 11/7/23 (Gardner) 66:6–67:21 ("And then over the course of I would say from the end of June, maybe late June through to—through to most of July, we, um, came to have an understanding—a better understanding of the size of what that NEA carve-out was, how big that was, and we concluded that the skin in the game that JetBlue had was significant, was substantial enough for us to believe that they were going to do whatever it is they needed to do to get to a closing on this transaction, whatever sort of remedies that they would need to offer up to the Government and to the regulators in order to make that happen. Which is how, um, as I understand it—and I'm not a lawyer, but as I understand the bulk of the mergers that have happened over the last 20 years have been solved with, um, with those type of divestiture remedies. So we felt that, um, that the package that was together was, um, it insulated us from the risk of a no-deal.").

807. By July 2022, Spirit was comfortable with the improved regulatory commitment, and believed that a merger with JetBlue was superior to pursing its ongoing standalone business plan. TX 296 at '3319–3321 (approving JetBlue merger after "determin[ing] that it is fair to, advisable and in the best interests of the Company and its stockholders to enter into the JetBlue Merger Agreement"). On July 28, 2023, the merger agreement was unanimously approved by Spirit's Board. Tr. 11/7/23 (Gardner) 67:22–68:8.

808. As explained by Mr. Christie, Spirit's goal was to "establish a fifth viable

competitor in what is a very dominated space by the Big 4 airlines, and in order to do that you have to gain scale, and while the independent airlines have grown over that period of time, we're still relatively insignificant and small. So it has been our view over that period of time, that in order to effectively compete against the Big 4 airlines, we must find someone that together we can create a fifth challenger that can have the scale and have the relevance in the market to attract travelers, and in doing so benefit travelers that today are traveling on the larger four airlines in the United States." Tr. 11/1/23 (Christie) 86:25–87:24.

809.    Mr. Gardner testified that he would "never" have signed the deal if he thought there "was no reasonable path for regulatory approval." Tr. 11/7/23 (Gardner) 67:22–68:8.

810.    The merger agreement not only provides for significant, valuable divestitures at Newark, Boston, Fort Lauderdale, and Miami, but also contemplated that JetBlue would offer "considerably more" divestitures after discussions with DOJ. Tr. 10/31/23 (Christie) 144:3–19 (the divestitures included Spirit's assets at EWR, LGA, BOS, and FLL, and "the covenant that they committed to allows them to considerably more pursuant to that covenant."), 84:9–86:24 (the divestitures are a "pretty valuable package"); Tr. 11/8/23 (Kirby) 101:13–104:4 (the divested assets are "extremely valuable").

811.    Other airline mergers have been solved with divestitures, which have resulted in lower-cost competitors backfilling routes—part of what made Spirit comfortable with divestitures as a regulatory remedy. *See supra* § V.C; Tr. 11/8/23 (Kirby) 50:11–22.

### H.    The Government Mischaracterizes JetBlue's Revenue Synergies And Other Deal Modeling Exercises

#### 1.    The Purpose Of JetBlue's Deal Modeling Was To Support JetBlue's Valuation And Offer For Spirit

812.    As discussed above, when Frontier and Spirit announced in February 2022 that they had entered into a merger agreement, JetBlue decided to reengage with its own potential

transaction with Spirit.  *See supra* § I.B; Tr. 11/6/23 (Hayes) 106:6–25.  Unlike when it

considered a transaction with Spirit in 2017 and in 2019-2020, this time, given the signed merger

agreement between Frontier and Spirit, JetBlue knew it had to act very quickly.  Tr. 11/16/23

(Hurley) 91:19–92:13.

813.    Accordingly, as it had done in the past when considering a potential offer for

Spirit, JetBlue investigated the potential synergies that could be generated by an acquisition of

Spirit to inform the deal valuation.  Tr. 11/9/23 (Friedman) 128:9–11 (describing the preliminary

network overview completed in support of the "network optimization" synergy as being

completed over a "one- to two-week period"); TX 669 at '0996, '1018–1020.

814.    Members of JetBlue's Strategy and Business Development ("SBD") team

collected, reviewed, and analyzed information regarding Spirit to prepare deal modeling

documents (the "Deal Models") to evaluate the financial benefits of that potential acquisition.

*See infra* § VII.H.2; Tr. 11/16/23 (Roeschke) 57:3–10; Tr. 11/2/23 (Clark) 70:25–71:13; Tr.

11/17/23 (Klinka) 26:20–27:15.

815.    The Deal Models included projections as to each of the individual companies on a

standalone basis, Tr. 11/16/23 (Roeschke) 56:24–57:7 (explaining that the SBD team provided

JetBlue's financial advisor Goldman Sachs the financial models called the "Spirit Standalone

Model" and the "JetBlue Standalone Model"), and forecasts that demonstrated the synergies the

combined company could achieve. Dep. 6/1/23 (Klinka) 137:11–20 (explaining the role of the

synergy model as looking toward the future "performance . . . differential between the JetBlue

stand-alone and Spirit stand-alone").

816.    The SBD team consulted with a member of JetBlue's network planning team, Eric

Friedman, to assess certain potential "revenue synergies," which fed into the Deal Models.  Tr.

11/9/23 (Friedman) 8:3–15.  Revenue synergies are additional revenue that JetBlue expects it could earn from the Spirit assets it was considering buying, compared to revenue that Spirit earned with those assets.  *Id.* (revenue synergies are "increase[d] revenues relative to what Spirit would have created" as a standalone entity); Tr. 11/2/23 (Clark) 71:20–72:1.

817.    Goldman Sachs served as a financial advisor to JetBlue in connection with the potential acquisition of Spirit, analyzing information relating to the potential transaction and providing its opinion to JetBlue's Board as to the fairness of the transaction from a financial point of view. Tr. 11/16/23 (Roeschke) 54:25–56:10.

818.    After JetBlue's SBD team prepared the Deal Models, Goldman Sachs combined them into a "pro forma" model that forecasted certain financial outputs for the combined company.  Tr. 11/16/23 (Roeschke) 60:3–14 (describing Goldman Sachs' process of combining JetBlue's various deal modeling documents into a forecast for the combined company).  Goldman Sachs' pro forma assumed the transaction closed by January 1, 2024 and thus prepared five-year synergies projections for 2024-2028.  TX 437 at '2398.

819.    After, Goldman Sachs used the Deal Model and "pro forma" model to issue a fairness opinion that was provided to JetBlue's Board of Directors.  Tr. 11/16/23 (Roeschke) 55:6–56:10.  JetBlue's Board of Directors used Goldman's fairness opinion in its evaluation of the merger with Spirit.  *Id.*

### 2.    JetBlue's Deal Models Are Not Business Plans

820.    The Deal Models were built by a "limited set of people with a limited set of information" to "valu[e] the combined transaction and business plan."  Tr. 11/16/23 (Roeschke) 81:12–20.  They were not, and were not intended to be, an operational plan for the combined entity.  *Id.* (describing JetBlue's modeling of Spirit's fleet and noting that JetBlue "had not set

out a business plan for this company yet."); Tr. 11/16/23 (Hurley) 101–15:23 (explaining that she—not JetBlue's Deal Models—determined whether to exercise aircraft options "depending on the market dynamics at that point in time").

821.    When JetBlue does strategic planning in the ordinary course of business—such as developing a five-year financial model or forward-looking network plan—the process takes many months, requires input, feedback, and revisions from groups across JetBlue, and requires sign-off from JetBlue's management or Board of Directors.  *See* Dep. 6/6/23 (Clark) 53:2–17 (JetBlue's five-year network plan is an input to its five-year financial plan, which forecasts revenues, costs, and profits and explaining that if "the numbers aren't as good as [we] think, we may go back and iterate the network plan" before finalizing the five-year financial plan), 55:1– 13 (explaining the ongoing process of creating a three-year financial plan for an upcoming Board of Directors meeting).  In contrast, the revenue synergies work took no more than one or two weeks and was never intended to be anything more than financial modeling.  *See* Tr. 11/9/23 (Friedman) 128:9–16 (describing the "five to seven business day" process over a "one- to two- week period" during which the "high-level preliminary network overview" was prepared in 2022 to "sanity check . . . assumptions" in the modeling); *see also* Tr. 11/14/23 (Friedman) 32:6–33:11 (confirming he spent two to three weeks on the revenue synergies modeling in 2017 and 2019, compared to "4, 4 ½ months creating the Combined Network Plan.").

822.    As discussed above, one part of the Deal Models focused on revenue synergies. Tr. 11/9/23 (Friedman) 8:3–15.  Those revenue synergies included the customer experience premium, increased relevance, competitive origin and destination network, and network optimization.  Tr. 11/9/23 (Friedman) 89:9–13, 99:4–9, 55:18–56:2, 26:23–27:9.  Another part of the Deal Models focused on cost dis-synergies, which are cost changes associated with

implementing the JetBlue experience across the Spirit enterprise.  Tr. 11/6/23 (Hayes) 59:14–60:7.

### 3.     The Customer Experience Premium Is Not A Price Increase

823.    The customer experience premium revenue synergy ("CEP") is intended to estimate the additional total revenue JetBlue can generate from Spirit's assets based on the relative value consumers place on the JetBlue experience as compared to the Spirit experience. Tr. 11/9/23 (Friedman) 91:2–7 (describing the calculations for the CEP as part of the "overarching process to try to hone in on the product differential premium between JetBlue's product and Spirit's product").

824.    The CEP is not a price increase—it is a reflection of the fact that consumers will be getting a superior product from JetBlue compared to what they received from Spirit and that JetBlue is able to generate more revenue from loyalty and other non-flying services than Spirit. Tr. 11/9/23 (Friedman) 95:23–96:2 ("Q. And so you talked about this a bit, but just so the record's clear, does the modeling you did on the customer experience premium synergy predict or demonstrate that fares will increase by 24 percent after the merger? A. No, that's not how I would characterize it.").

825.    Likewise, the limited modeling Mr. Friedman performed to calculate the CEP was not designed to—and does not—predict what will happen to fares in the future. Tr. 11/9/23 (Friedman) 89:14–19 ("Q. . . .But just so that the record is clear, does the modeling that you did on the customer experience premium synergy predict that fares will increase by 30 percent as a result of this merger? A. No"), 96:23–97:3 ("Q. . . Does your customer experience premium modeling suggest that there will be a fare increase for the average customer after the merger? A. For the average customer I think it would be quite the opposite.").

826.     To calculate the CEP, Mr. Friedman looked at twelve instances where Spirit exited a route between 2014 and 2018.  Tr. 11/9/23 (Friedman) 89:22–90:3. He observed impacts to average fare and passenger counts on those routes after Spirit's exit, averaged those observations, and observed a 30% increase in average fares and a decrease in passenger counts in the twelve months after exit; based on those changes to average fares and passenger counts, he calculated an average elasticity.  *Id.* at 89:20–90:19 (describing the steps taken to calculate the CEP), 21:25–22:10 (discussing the negative elasticity on the routes Spirit exited).

827.     Mr. Friedman then took those observations as inputs to a QSI model, which is typically used by airlines to "forecast what share of a market size a carrier would be quote/unquote entitled to as a result of their capacity and frequency levels." Tr. 11/9/23 (Friedman) 91:2–7, 91:18–92:3.  The QSI model was used to calculate the "JetBlue-Spirit product differential premium" at the higher average fare and the decreased number of passengers.  *Id.* at 90:12–19.

828.     Critically, unlike in ordinary course route forecasting, Mr. Friedman's CEP modeling did ***not*** account for JetBlue's ability to lower fares and stimulate demand through the JetBlue Effect.  Tr. 11/9/23 (Friedman) 92:10–18.  Mr. Friedman was "trying to get to a conservative assumption" and including JetBlue's lower fares and stimulating effect as inputs to the QSI model would have resulted in higher revenue synergies (even though it would have also meant the model would have predicted lower average fare and higher passenger counts).  *Id.* at 92:10–93:22.  The CEP modeling also did not account for entry of ULCCs or other carriers into the routes Spirit exited, because "the purpose of the model was not to be a Magic 8 Ball that would predict all of the competitive environment changes . . . it was simply to hone in on what the value difference between the Spirit product and JetBlue product would be." *Id.* at 95:8–18.

829.     Mr. Friedman was clear at trial that he did not include the JetBlue Effect and entry by other carriers as inputs into the QSI model because he wanted to create a "low-end baseline conservative" revenue forecast.  Tr. 11/9/23 (Friedman) 92:23–93:5, 95:8–18 (explaining he not include entry as an input into the QSI model because the purpose of the model was to "hone in on the value difference between the Spirit and JetBlue product," not "predict all the competitive environment changes").   It does **not** mean JetBlue thinks the JetBlue Effect or entry will cease to exist after the merger.  To the contrary, the merger and the 2027 combined network are expected to expand the JetBlue Effect nationwide, and carriers regularly enter and exit routes in this dynamic industry.  *Id.* at 94:25–95:7 (Mr. Friedman is confident that the JetBlue Effect will remain and will occur after the merger); *supra* § II.C.2(2), § IV.F.

830.     In addition, both of the Government's expert economists testified these factors -- the JetBlue Effect and entry by other carriers -- **must** be accounted for in any reliable analysis of future competitive conditions.  *See* Tr. 11/20/23 (Gowrisankaran) 63:2–5 (agreeing that a full assessment of the competitive effects of a merger required considering the prospect of entry), 7:15–16 (confirming Dr. Gowrisankaran included the JetBlue Effect in his economic calculations); Tr. 11/21/23 (Chipty) 10:24–11:3 (explaining Dr. Chipty was tasked by the Government with studying entry for purposes of determining the competitive effects of the merger), 99:17–25 (noting that the JetBlue Effect will spread when JetBlue "fl[ies] either more on some of the routes it currently serves or enter some new routes that it might not be currently serving with those Spirit planes").

831.     Based on the limited inputs assigned by Mr. Friedman and his team, the QSI model identified that JetBlue could generate a 24% TRASM premium.  Tr. 11/9/23 (Friedman) 95:19–22, 96:3–5.   TRASM measures total revenue from all revenue streams, including ticketed

197

fares, ancillaries, checked baggage, on-board food, and non-flown ancillaries, like renting a car, commissions from JetBlue Travel Products sales, and payments from "Barclays for our credit card where we issue points." *Id.* at 96:6–19.

832. Dr. Gowrisankaran explained that JetBlue was unlikely to have sufficient data to accurately measure price sensitivity, suggesting that JetBlue's revenue synergy analysis is not a reliable estimate of post-merger price increases. *See* Tr. 11/20/23 (Gowrisankaran) 107:17– 108:2 ("I know that JetBlue has very reliable information on elasticities" because JetBlue "didn't create . . . natural experiments"), 97:23–25 ("Q. And demand elasticity measures how much a quantity changes in response to a price change; is that right? A. Yeah, it's basically right").

833. Further, Dr. Gowrisankaran explained that estimating price sensitivity was "very much in the wheelhouse of economists rather than firms," and would "rather rely" on peer-reviewed economic studies. Tr. 11/20/23 (Gowrisankaran) 108:3–10 ("Q. Okay. And you'd want to investigate that before you relied on it? A. Yeah. I mean, in general, I would rather rely, for an elasticity estimate, on – that's the thing that's very much in the wheelhouse of economists rather than firms. And I want to rely on studies that are peer-reviewed or that, you know, where I can say that this is variation that makes sense to use").

### 4. The Relevance Revenue Synergy Reflects JetBlue's Ability To Attract A Wider Array Of Customers

834. JetBlue's relevance synergy measures JetBlue's ability to generate additional revenue by increasing the "number of routes you fly, increasing the number of frequencies you fly on those routes, [and] ensuring that you serve those routes with good patterns of service across the day." Tr. 11/9/23 (Friedman) 99:10–24. With a more attractive network, JetBlue will be relevant to "multiple customers segments, whether it's a leisure customer, a customer visiting a friend or a relative, a corporate customer, a customer that is a loyal frequent traveler." *Id.*

835.    The relevance synergy represents "driv[ing] incremental traffic, and frankly, high, well-paying incremental traffic," that often pays a higher average fare than other customer segments.  Tr. 11/9/23 (Friedman) 99:24–100:7.

836.    The relevance synergy was calculated by studying the legacy airlines and Southwest's ability to generate incremental revenue in certain hubs.  Tr. 11/9/23 (Friedman) 100:12–18.  While the Government argued that the relevance synergy shows that JetBlue will be able to emulate the legacies' market power, *id.* at 54:2–55:13, this comparison is inapt— JetBlue's largest focus city, Fort Lauderdale, will be significantly smaller than any of the legacy airlines' hubs, *id.* at 100:19–101:11 (JetBlue will have 250 daily departures in Fort Lauderdale, while American currently has 350 daily departures in Miami and "nearly a thousand" daily departures in Dallas, Delta has "800 flights a day" from Atlanta, and United has between 400 and 450 daily departures from Newark).

837.    In addition, the evidence shows that relevance is good not just for airlines but also for consumers.  In particular, the Department of Transportation data shows that consumers prefer to fly on airlines that are relevant in the cities and regions in which they live.  TX 695 (demonstrating on select Boston routes that travelers originated more frequently in the city in which a carrier had a larger presence); *see also* Tr. 11/9/23 (Friedman) 111:13–25, 114:23–115:2 ("The greater relevance you have in a focus city, the more likely a customer will be to choose you and be loyal to you" because customers can "fly the most relevant routes, fly those routes correctly, at the right times of day, at the right frequency levels").

### 5.    The Network Optimization Synergy Work Was Not a Combined Network Plan

838.    JetBlue's network optimization synergy calculated incremental revenue from the "potential redeploy" of Spirit's aircraft in the combined companies' network.  Tr. 11/9/23

(Friedman) 34:19–35:1. JetBlue estimated that it would "redeploy 1/6th of [Spirit's] network," and that those reallocated planes would generate revenue equivalent with the 25th percentile of revenue generated by all routes in JetBlue's network. *Id.* at 28:3–9. The work that was performed in connection with calculating this potential revenue synergy was not ordinary course and was not a network plan. *Id.* at 27:10–16 (explaining that the network optimization synergy was "theoretical modeling" which "ended up being different from what the Combined Network Plan is moving forward").

839. The network optimization synergy was a "high-level approach to calculate … the potential revenue synergies from redeployment." Tr. 11/9/23 (Friedman) 31:19–32:4. Mr. Friedman characterized the synergy as "very simplistic, very formulaic … our attempt to quickly identify what the value could be." *Id.*

840. JetBlue validated the network optimization synergy by identifying "potential routes" that could be reallocated. Tr. 11/9/23 (Friedman) 42:4–16. This validation exercise occurred over "5 to 7 business days" and was conducted to "sanity check the assumptions" about the "redeploy [synergy] that was built into the original synergy deal model." *Id.*

841. In contrast to the limited valuation-oriented work that went into the network optimization synergy, Mr. Friedman and his team engaged in a multi-month process to prepare a combined network plan. Tr. 11/9/23 (Friedman) 72:14–25. The combined network plan did not estimate a redeploy of Spirit aircraft, as JetBlue first wanted to better understand "how [JetBlue's and Spirit's] routes would interplay in a full combined network . . . before [it] make[s] any decisions." *Id.* (explaining JetBlue "will continue to optimize" once it understands the full interaction of JetBlue's and Spirit's routes).

842. To accurately determine which Spirit aircraft it may deploy, JetBlue would need

information that is impossible to obtain today, including the carriers that will serve JetBlue's and Spirit's routes in 2027 and the demand environment on those routes in 2027.  Tr. 11/9/23 (Friedman) 132:4–20.  Mr. Friedman testified that it would be "a lot of work and an exercise in false precision" to attempt to predict the demand environment or carriers serving those routes in 2027.  *Id.* at 132:21–133:2

### 6. The Competitive O&D Synergy Does Not Mean JetBlue Will Become A Hub-And-Spoke Airline

843.    JetBlue's competitive origin and destination ("O&D") synergy is additional revenue that JetBlue expects to earn from "growing Fort Lauderdale and being able to offer incremental connectivity as a result of" the merger.  Tr. 11/9/23 (Friedman) 56:3–8.  This connectivity will allow Fort Lauderdale to be an "alternative" to legacy airline hubs like Miami (where American Airlines has 350 flights per day) and Atlanta (where Delta has 800 flights per day).  *Id.* at 56:9–20; *see also id.* at 100:19-101:11 (explaining JetBlue expects to reach will have 250 daily departures in Fort Lauderdale at steady state).

844.    JetBlue's competitive O&D represents the "very strong network" that will allow customers to both originate from and connect through Fort Lauderdale to reach "Central America, Latin America, and South America" on a nonstop basis.  Tr. 11/9/23 (Friedman) 56:23–57:11. Mr. Friedman noted that JetBlue is "not trying to model [itself] after Delta or American" and instead "drive more competition to the duopoly that exists in Miami and Atlanta today."  *Id.*

845.    JetBlue does not plan to evolve into a hub-and-spoke airline like the legacy airlines, where "more than half, often two-thirds or maybe even three-quarters of their customers could be on a connecting itinerary."  Tr. 11/2/23 (Clark) 150:19–25.  Indeed, JetBlue's combined

network plan forecasts the combined company to be an "80 percent nonstop" carrier. Tr. 11/9/23 (Friedman) 138:19–25.

### 7.    JetBlue's Cost Dis-Synergies Show Spirit's Costs Coming Up To JetBlue's Costs

846.    JetBlue modeled cost dis-synergies to capture areas where JetBlue "pay[s] more than . . . Spirit." Tr. 11/6/23 (Hayes) 59:17-60:1.  These include paying JetBlue rates to Spirit's pilots and insourcing labor that Spirit previously outsourced at certain airports.  *Id.*  Other cost dis-synergies contemplated by JetBlue are "bringing up the Spirit flying experience to the JetBlue experience," such as offering "live TV and free WiFi and free snacks and drinks."  Tr. 11/17/23 (Hurley) 19:3–10.

847.    JetBlue's cost dis-synergies do not reflect an increase in JetBlue's costs, but instead, bringing Spirit's costs up to JetBlue's costs. Tr. 11/6/23 (Hayes) 60:2–4.  JetBlue expects that it will "maintain the JetBlue unit cost trajectory" after the merger with Spirit.  *Id.* at 60:8–14.

848.    JetBlue's cost dis-synergies model is net of cost savings.  In other words, the cost dis-synergies model reflects bringing Spirit's costs up to JetBlue's costs, minus the "$325 million in fixed costs savings" identified by JetBlue to date.  Tr. 11/16/23 (Hurley) 156:4–12; Tr. 11/6/23 (Hayes) 60:2–4.  Importantly, JetBlue only conducted a "very high-level analysis with a limited amount of information" but once the transaction closes, it "will be able to go through the nth level of detail . . . and identify opportunities."  Tr. 11/16/23 (Hurley) 156:13–19.

849.    The cost dis-synergies that JetBlue forecasted in summer 2022 have already changed—JetBlue expects cost dis-synergies to be lower than initially forecasted.  Tr. 11/16/23 (Hurley) 157:3–10.  Spirit entered a new pilot contract with rates "now closer to" JetBlue, meaning "that dyssynergy number has come down."  *Id.* at 157:5–10; *see also* Tr. 11/6/23

(Hayes) 24:24–25:6 (explaining the net cost dis-synergy number is "lower now because of significant … adjustments in compensation at Spirit for … people like pilots").

I.      **The Government's "Fleet Rationalization" Theory Is Unfounded**

850.    At the start of the deal modeling process in April 2022, Spirit sent JetBlue two primary documents related to its orderbook for aircraft—what were termed internally at Spirit "the fleet plan" and "the five-year financial plan." *See generally* TX 618 (Spirit fleet plan); TX 397 at '4563_ 1.28 +Actuals (copy of Spirit's five-year financial plan); Tr. 11/16/23 (Roeschke) 58:4–7; Tr. 11/16/23 (Roeschke) 58:4–7 ("Q…Spirit sent JetBlue its ordinary-course 5-year financial plan sometime in the spring of 2022, is that right? A. Yes.").

851.    The fleet plan showed Spirit's contractually committed orders and anticipated retirements through 2027, and options through 2028.  TX 618.

852.    The five-year financial plan showed a total "Aircraft at End of Period" for each year from 2022 through 2026 but did not identify the source of each of the aircraft assumed to be part of Spirit's fleet at the end of each year.  TX 397 at '4563_ 1.28 +Actuals; Dep. 6/1/23 (Klinka) 142:9–21 (Spirit's five-year financial plan assumed "aircraft would be delivered that weren't firm orders to solve for growth").  The five-year financial plan therefore did not identify how each of the aircraft would be added to Spirit's fleet (e.g., through existing contractual commitments, unexercised options, or third-party leasing).  6/1/23 Dep. (Klinka) 142:9–21 ("They were just solving for growth, meaning like just solving capacity without firm orders to back them up.").

853.    Spirit's five-year financial plan assumed more aircraft delivered to Spirit than the firm orders found in Spirit's fleet plan.  *Compare* TX 397 (accounting for 251 aircraft in 2025, and 270 aircraft in 2026), *with* TX 618 (projecting 277 aircraft in 2025, and projecting 313

aircraft in 2026); Tr. 11/16/23 (Roeschke) 69:2–7 ("Q…So based on this analysis -- again still focused on the text above the tables here, you determined that Spirit's internal 5-year financial plan assumed a plug for aircraft that were not yet represented in Spirit's order book for the year 2025, right? A. Correct, it included noncommitted aircraft").

854.    JetBlue's SBD team made an assumption for purposes of their analysis that the difference between the financial plan and the fleet plan was comprised of unexercised options and "uncommitted" leases—i.e., leases that did not exist at the time.  Tr. 11/16/23 (Roeschke) at 69:19–70:1 (describing the 21 plugged aircraft in Spirit's five-year financial plan); 6/1/23 Dep. (Klinka) 141:21–142:16 (Spirit's five-year financial plan was "plugging growth in the outer years" with planes that were neither firm orders nor exercised options).  JetBlue's SBD team thus understood that Spirit's five-year financial plan included aircraft that were referred to as "plugs"—put differently, aircraft for which there was "no real line of sight into [how] that aircraft [was] coming" to Spirit.  Tr. 11/17/23 (Klinka) 35:15.

855.    Because the purpose of the deal modeling was to value the assets JetBlue would be acquiring, the SBD team chose to include only aircraft that they believed were reasonably likely to be part of Spirit's fleet at the time of closing (early 2024) and thus accounted only for aircraft that was contractually committed at the beginning of 2024 to Spirit.  Tr. 11/16/23 (Roeschke) 61:3–9.

856.    The Deal Model accordingly did not include Spirit's unexercised options in 2026 or other "uncommitted" leases because SBD did not view those additional aircraft to be firmly committed at the time of the assumed close.  Tr. 11/16/23 (Roeschke) at 61:3–9 ("Q. . .  Spirit's own internal 5-year financial plan had additional aircraft that JetBlue did not account for in the deal model, right? A. They had additional aircraft, correct, that we did not account for, because

when looking at the valuation of this deal, we felt that firm commitments were the best way and most conservative way to model."); 6/1/23 Dep. (Klinka) 144:14–145:3 (JetBlue's deal modeling documents account for fleet plans reflected in Spirit's five-year financial plan because it "did not reconcile with the order book [Spirit] produced").

857.    The Deal Model ultimately shared with the Board—218 Spirit aircraft in 2023, 241 in 2024, 266 in 2025, and 285 in 2026—consisted of all firm orders from Spirit's fleet plan as well as an additional 15 aircraft (5 options and 10 additional leases) that the SBD team assumed Spirit would enter between signing and closing and thus would be firm orders at the time of closing. Tr. 11/16/23 (Roeschke) 80:1–81:3 (JetBlue's Deal Model "assumed on top of the committed fleet plan … the five options. We did assume that they would exercise those on their own before we had closed the deal, and so that was included in our 2025 fleet plan to them. And we also assumed that they would contract an additional 10 aircraft, um, between signing and closing, and as if they were a standalone company, because Spirit still has to assume that that could be an outcome… So not just the fleet plan, but fleet plan-plus").

858.    Claire Roeschke, a member of the SBD team, testified at trial that the decision to account for only firm orders plus an additional 15 aircraft was not motivated by a desire to optimize the combined entity or because JetBlue wanted to forego those additional aircraft.  Tr. 11/16/23 (Roeschke) 81:12–20 ("Q. Because in order to optimize for the combined entity, you didn't want these additional plugged aircraft, right? A. That's not true . . . ").  She testified that the reason to account only for the firm orders plus an additional 15 aircraft was because the purpose of the deal modeling was to "value the combined transaction." *Id*.  She further explained as to the unexercised options and uncommitted leases, that JetBlue is "continuing to explore" whether to acquire those aircraft in the future because the Deal Model is "not set[ting] out a

business plan" for the combined company.  *Id.*

859.     The only person to testify that JetBlue has some plan to decrease Spirit's aircraft or rationalize its orderbook is Dr. Chipty, who has no firsthand knowledge of the Deal Model. Tr. 11/21/23 (Chipty) 108:22–109:3 ("[B]y fleet rationalization I'm referring to JetBlue's plans to taper the growth of the combined firm to 5 percent. The documents that I reviewed refer to this tapering as fleet rationalization. JetBlue planned to accomplish this by acquiring fewer aircraft relative to Spirit's standalone financial plan").

### J.     The Government's Interim Operating Covenant Theory Is Similarly Unfounded

860.     Section 5.1 of the Merger Agreement outlines procedures for both JetBlue and Spirit in connection with Spirit's continued business pending closing referred to as Interim Operating Covenants ("IOCs").  TX 44 at '2025–2031.

861.     The IOCs require Spirit seek JetBlue's consent for certain changes to its business, including amending Spirit's company charter or company bylaws, entering into any new lines of business, or leasing additional aircraft.  Tr. 11/16/23 (Hurley) 102:24–103:6, 159:2–161:17; TX 44 at '2025–2031.

862.     IOCs are typical in the context of mergers.  Tr. 11/16/23 (Hurley) 104:13–19 ("A. . . . I mean, these are typical covenants that exist in, from what I understand, many merger and acquisition transactions").

863.     Section 5.1 of the Merger Agreement requires that Spirit provide written notice to JetBlue of the proposed changes that are required to be consented to by JetBlue.  TX 44 at '2025–2031.  JetBlue is then required to respond within 72 hours in a written email responding to Spirit's initial request.  *Id.*  That written response must come from one of the Parent Consent Persons.  TX 425 at '7749.  Per the Merger Agreement's plain language, if JetBlue does not

respond in writing within 72 hours of Spirit's request, JetBlue is "deemed to have consented solely to the action specified in such IOC request."  TX 44 at '2031; *see also* Tr. 11/17/23 (Hurley) 7:3–8:5 (testifying to understanding that Merger Agreement required written response within 72 hours to IOC requests and failure to respond in writing within 72 hours is consent).

864.    On November 3, 2022 at 2:38 pm, Leticia Lemarque of Spirit emailed Dora Habachy, Ursula Hurley, Derek Klinka, Tracy Lawlor, Brandon Nelson at JetBlue pursuant to Section 5.1 of the Merger Agreement seeking JetBlue's consent for Spirit to (1) acquire or lease aircraft and engines subject to firm orders or commitments before July 28, 2022 and (2) acquire or purchase "up to 21 additional aircraft for delivery in 2025 through direct lease . . . up to 6 additional aircraft for delivery in 2026 through either direct leases or exercising aircraft purchase options with Airbus . . . and any associate spare engines"  TX 798.

865.    After internal consideration and discussions regarding how to respond to Spirit's November 3, 2022 IOC request for incremental aircraft, TX 799, on November 7 (more than 72 hours after Spirit's request was made), Derek Klinka recommended to Ursula Hurley that JetBlue dissent.  TX 799 at '2987.

866.    No witness recalled if that informal dissent was ever communicated to Spirit.  Tr. 11/17/23 (Klinka) 39:3–10 ("Q. . . At the time you wrote this e-mail, were you aware of any written response to the IOC request from Spirit? A. I was not. Q. Were you aware of any informal response? You said you had made an assumption. Were you aware of any formal response? A. I was not.").

867.    JetBlue did not provide a formal written response within 72 hours as required by the Merger Agreement.  Tr. 11/17/23 (Hurley) 8:6–13 (Q. Ms. Hurley, did anyone from JetBlue send a response in writing, within 72 hours, affirming or denying the request from November

that we discussed yesterday? A. No. Q. Would you, as CFO of JetBlue, been aware if somebody sent an e-mail in response within 72 hours affirming or denying such a request? A. Yes."); Tr. 11/17/23 (Klinka) 38:15–20, 39:3–10 ("By November 17th of 2022, JetBlue had communicated to Spirit that JetBlue was denying Spirit's IOC request for incremental aircraft, right? A. I'm assuming that at this time.").  Under the terms of the Merger Agreement, JetBlue was "deemed to have consented" to Spirit's request to (1) acquire or lease aircraft and engines subject to firm orders or commitments before July 28, 2022 and (2) acquire or purchase "up to 21 additional aircraft for delivery in 2025 through direct lease…up to 6 additional aircraft for delivery in 2026 through either direct leases or exercising aircraft purchase options with Airbus…and any associate spare engines."  TX 798.

### K.        Spirit Deferred A Significant Part Of Its Order Book In July 2023

868.    Regardless, Spirit independently deferred a significant number of aircraft from its own orderbook in July 2023, which effectively mooted the IOC request.  Tr. 11/6/23 (Hayes) 32:10–34:24 ("I think [any conversation about Spirit's request to acquire incremental aircraft in late 2022 is] a moot point because since then Spirit, of its own accord, have deferred airplanes in a fairly significant way."); Tr. 11/16/23 (Hurley) 126:13–129:9 ("Well, to be totally frank, much of this discussion, from my perspective, is moot. What has happened since we signed the merger agreement, and since November of 2022, when Spirit was asking us for additional aircraft, Spirit on their own has actually deferred aircraft").

869.    As it stands now, JetBlue has more aircraft in every year in its deal modeling than Spirit has in its actual orderbook.  *Compare* TX 398 (JetBlue's Spirit Standalone Model showing 197 aircraft in 2022, 218 in 2023, 241 in 2024, 266 in 2025, 285 in 2026) *with* TX 622 at '4195 (Spirit's July 2023 Airbus Amendment showing 204 aircraft in 2023, 215 in 2024, 234 in 2025,

and additional aircraft in 2026).

**L.**      **The Government's Capacity Reduction Arguments Based On Reconfiguring The Spirit Aircraft To JetBlue Specifications Are Significantly Overstated**

**1.**      **The Reconfiguration Of Spirit Aircraft Is Not Likely To Be Completed Until 2029**

870.      After the merger closes and certain regulatory hurdles have been cleared, JetBlue plans to retrofit Spirit's aircraft to match JetBlue's higher-quality, less-dense layout.  Dep. 1/19/23 (Friedman 30(b)(6)) 95:11–96:3; TX 627 (photographs of JetBlue's and Spirit's seats).

871.      Spirit has a 28-inch standard seat pitch (i.e., 28 inches of legroom) compared to JetBlue's 32-inch standard seat pitch. Tr. 11/6/23 (Hayes) 75:25-76:15; 77:1-3; Tr. 11/3/23 (Klein) 131:8-24.  JetBlue's standard seat pitch provides a competitive advantage because it is "between 1 and 4 inches above [its] competitors." Tr. 11/6/23 (Hayes) 75:25–77:13; Tr. 11/3/23 (Klein) 80:21–81:7.

872.      JetBlue's planned retrofit of Spirit's planes will allow it to continue offering its "superior service" across its entire fleet of aircraft.  TX 912 ¶ 24 (describing JetBlue's service as "superior" to other airlines, including the legacies, because it offered "the most legroom in coach of any airline in the United States").

873.      JetBlue will not begin the retrofit process until after it obtains a Single Operating Certificate from the FAA.  Tr. 11/17/23 (Hurley) 14:2–8.  It will take 12 to 18 months to "achieve the Single Operating Certificate," and "in that timeframe Spirit aircraft will still be flying around in Spirit configuration." *Id.*; Dep. 1/24/23 (Hayes) 270:4–15 ("[I]t's another year plus to get a single operating certificate. While you're doing that, you're running them as separate businesses. Even after that, it's going to take up to -- you know, three to five years to put the airplanes through. And you can't move to a new network until you have moved the airplane over."); *see also* Dep. 6/6/2023 (Clark) 40:3–10 ("[S]ome of the synergies are

dependent on when you start retrofitting Spirit aircraft from their interior configuration to the JetBlue interior configuration.").

874.    JetBlue expects the retrofit process to take between 4 and 5 years to complete, starting from the time the FAA provides JetBlue with the Single Operating Certificate.  Tr. 11/17/23 (Hurley) 13:21–14:1; TX 800 at '0320 (describing "[m]ulti-year integration journey"); Dep. 6/9/23 (O'Brien) 202:5–10; Dep. 6/27/2023 (Gardner) 115:1–3 ("It would take several years to replace – to retrofit our 200 plus – 200 or so aircraft.").  JetBlue modeled that each aircraft would take approximately 30 to 35 days to retrofit.  Dep. 1/12/2023 (Klinka 30(b)(6)) 300:12–18.

875.    In other words, "nothing is going to change on Day 1." Tr. 11/17/23 (Hurley) 14:15–20 ("We're really, on Day 1, going to be operating as two separate entities. So from a customer perspective, really nothing is going to change on Day 1. We need the regulatory approval, which is the Single Operating Certificate, before we can start to combine as one entity.").  JetBlue's intention is that it "won't sell [tickets for Spirit aircraft] as JetBlue until it has a JetBlue product and experience."  Dep. 6/9/23 (O'Brien) 202:19–203:1.

876.    Given the regulatory requirements and the amount of time needed to reconfigure the Spirit aircraft to JetBlue's specifications, there will not be any seat reductions until at least early 2025, and the capacity reductions that are central to the Government's arguments (i.e., seat reductions of approximately 11% across Spirit's fleet) are unlikely to occur before 2029.  Tr. 11/17/23 (Hurley) 13:21–14:9 (explaining that obtaining the mandatory single operating certificate will take 12-18 months and, retrofitting the aircraft will take 4-5 years, meaning all Spirit's aircraft will not be converted for five to six and a half years after closing); Dep.

6/27/2023 (Gardner) 115:5–8 ("while [the retrofit is] happening there's more capacity coming into the marketplace. So I'm not sure whether net-net there's less flying capacity overall.").

> ### 2. The Merger Will Allow JetBlue To Increase Utilization In Ways That Will Mitigate The Effect Of Seat Reductions From Reconfiguring Spirit's Aircraft

877. As an airline's fleet and network grows larger, the airline gains additional flexibility in its network that allows it to increase aircraft utilization. Tr. 11/28/23 (Scheff) 51:10–25. Accordingly, after the merger, JetBlue will have the ability and incentive to increase utilization to mostly, if not entirely, offset the reduction in seats. *Id.* ("[A]fter analyzing the networks and fleets, my opinion is that the combination of JetBlue and Spirit would likely enable the firm to increase capacity using seat departures as a measure in a variety of ways."), 52:13–23 ("My overall opinion is that the overall seats available for departure after the merger would very likely increase compared to the seats that would be available without the merger."); TX 909 (Scheff Report Figure 18 showing waterfall of seat departure changes); *see also* Dep. 6/14/23 (Hayes) 246:1–19 (explaining "[JetBlue's] goal would really be to make sure that [JetBlue] didn't take capacity out of the market as a result of the transaction" by, for example, upgauging Spirit's aircraft, increasing utilization by flying "more per day," and adding additional red-eye flying); Tr. 11/9/23 (Friedman) 150:20–152:8 ( explaining there "absolutely could be" opportunities to increase utilization post-merger, including "additional red-eye flying" and flying "more throughout the year" rather than seasonally).

878. Defendants' industry expert, Richard Scheff – who has nearly 40 years of experience in the airline industry – explained at trial that Spirit's seasonal and day-of-week flying patterns in 2019 were more varied than JetBlue's, meaning that Spirit reduced its flying in 2019 more in off-peak seasons and days-of-week than did JetBlue. Tr. 11/28/23 (Scheff) 45:8–46:20, 47:12-48:7 (describing Mr. Scheff's experience in the airline industry), 59:18–60:4

(explaining that JetBlue's seasonal "reduction from peak is less than what you see from Spirit");
TX 902 (same); Tr. 11/28/23 (Scheff) 63:7–64:8 (describing differences in day-of-week flying
between JetBlue and Spirit); TX 904 (same).

879.    Mr. Friedman testified that JetBlue intends to retain its seasonality strategy after
its merger with Spirit.  Tr. 1/9/23 (Friedman) 125:16-19.

880.    By flying the way JetBlue flies today and using JetBlue's seasonal and day-of-
week patterns, JetBlue has the incentive to, and will in fact, increase the number of seats
available for departure by reducing the amount of capacity taken down during off-peak periods
on the formerly-Spirit aircraft.  *See* Tr. 11/28/23 (Scheff) 60:21–61:21 (describing the
methodology used to calculate more seat departures from increased monthly flying), 73:16–20
(Mr. Scheff calculated approximately 1.35 million additional yearly seats, based on 2019 data,
from increased monthly flying); TX 903 (Scheff Report Figure 4 showing seasonal seat
production by month); Tr. 11/28/23 (Scheff) 65:4–15 (describing the methodology used to
calculate more seat departures from increased day-of-week flying), 69:16–23 (Mr. Scheff
calculated approximately 250,000 additional yearly seats, based on 2019 data, from increased
day-of-week flying); TX 905 (Scheff Report Figure 6 showing daily seat production by day); Tr.
11/28/23 (Scheff) 67:4–11 ("THE COURT: You're not saying that JetBlue would increase its
capacity above the blue lines on your charts, what you're saying is that where Spirit is lower than
those blue lines, JetBlue would have the incentive to, after they've reconfigured the Spirit planes,
fly the Spirit planes up to the blue line percentage, is that right? THE WITNESS: Yes, your
Honor, that's correct").  The evidence at trial showed that this modification—adjusted to each
airline's 2023 fleet size—would likely increase seat departures by approximately 2.16 million
seats per year.  Tr. 11/28/23 (Scheff) 74:1–11 (Mr. Scheff scaled the 2019 seat gains to JetBlue's

and Spirit's 2023 fleet sizes and calculated 2.16 million additional seats per year); TX 909 (Scheff Report Figure 18 showing 2.16 million additional seats per year in the "Schedule Changes" category).

881.    The merger will also allow JetBlue to increase the utilization of the merged firm's aircraft—and thus the number of seats available for departure—through fleet optimization.  Tr. 11/28/23 (Scheff) 83:16–20 ("Q. . . . And this time when you ran the model over the combined schedule, the pooled fleets and the retimings you just mentioned, did the FAM model in essence identify that the combined schedule could be flown with fewer aircraft? A. Yes, it did."); TX 906 (fleet assignment model output demonstrating that the combined schedule could be flown with fewer aircraft); TX 907 (fleet assignment model output converted to seat departures).

882.    At trial, Mr. Scheff explained how he used a fleet assignment model[5] to analyze whether and to what extent pooling[6] the combined JetBlue and Spirit fleets would allow the current schedules to be flown more efficiently (i.e., using fewer aircraft) compared to the standalone firms.  Tr. 11/28/23 (Scheff) 83:6–15 ("So what I did is I combined the complementary fleets, so the A320 fleets for the two airlines and, separately, the A321 fleets for

---

[5] Tr. 11/28/23 (Scheff) 82:6–16, 46:8–47:6 (describing the fleet assignment model Mr. Scheff developed in 1998 and has used since then).  Mr. Scheff explained that the fleet assignment model works by "putting together blocks of time to put an airplane on the ground," and "if you have an airplane at a station on the ground for 24 hours, essentially you've pulled that from the schedule and you can use that to do whatever you want."  *Id.* at 84:25–86:7.

[6] Mr. Scheff testified that he placed limitations on his fleet optimization analysis.  For example, he did not allow for regauging, which would have permitted the fleet assignment model to swap Airbus A320s for Airbus A321s.  Tr. 11/28/23 (Scheff) 88:22–89:7.  If Mr. Scheff had allowed for regauging, the fleet assignment model could potentially allocate "more capacity where there's higher demand."  *Id*.  Had Mr. Scheff not applied these limitations, there may have been "more opportunities to create those blocks that would allow you to potentially schedule even more efficiently."  *Id.*  Mr. Scheff did not include JetBlue's Airbus A220s or Spirit's A319s in his analysis, which would have allowed for a "bigger pool" of planes for the fleet assignment model to optimize.  *Id.*  Mr. Scheff also limited retiming, but noted that the "merged airline" may "do substantial retiming if they could improve their schedules."  *Id.* at 89:8–20.

the two airlines. And by combining the schedules, as well as the fleets, ran that through the model to see if -- along with some modest retiming, to see if there were opportunities to fly the schedules with fewer airplanes.").

883.     After pooling and allowing modest retiming[7] in the fleet assignment model, Mr. Scheff concluded that JetBlue and Spirit's July 2023 schedules could be flown with 15 fewer aircraft than the standalone companies used during July 2023.  Tr. 11/28/23 (Scheff) 86:15–84:6 (discussing the retiming he conducted on JetBlue and Spirit's July 2023 schedules), 90:22-91:9 (describing the output from the fleet assignment model as "every flight is flown, there is no change in seats, there's a modest retiming, but essentially those 15 airplanes are freed up and they can used for other purposes"); TX 906 (fleet assignment model output).  Mr. Scheff calculated that those 15 aircraft would generate approximately 3.65 million annual seat departures.  Tr. 11/28/23 (Scheff) 91:16–92:4; TX 907 (fleet assignment model output converted to seat departures); TX 909 (Scheff Report Figure 18 showing 3.65 million additional seats per year in the "Fleet Optimization" category).

884.     In addition, the post-merger airline is likely to make additional seats available for departure through additional red-eye flying, reducing the number of spares needed by the

---

[7] Mr. Scheff permitted modest retiming of the combined schedule while not allowing retiming of the standalone schedules because, in his experience, airline network planning teams spend significant time and resources determining their schedules, and therefore he determined that the existing standalone schedules reflected the flights that each airline wanted to fly.  Tr. 11/28/23 (Scheff) 86:25–87:14 ("The standalone schedules are exactly what the airlines chose to fly, what the available fleet, with all their, you know, many weeks and months of analysis. So the -- I thought the appropriate baseline of what the standalone airlines would do was what they did do with their data, their information, their staff.").  On the other hand, he determined that slight retiming of the combined schedule was appropriate because a network planner who inherited two separate schedules that had not been optimized together would make–hanges.  *Id.*  ("My intent was to compare what could happen in the case of the merged and combined airline.  Now, certainly in that case they would optimize the schedules together and make, you know, substantial changes that would be retiming and other factors.").  He was therefore attempting to compare a world without the merger to a world with the merger.

combined airline relative to the standalone carriers, and by using Spirit's A321-CEO fleet on longer stage-length missions.  Tr. 11/28/23 (Scheff) 92:18–93:7.

885.    For example, Spirit's A321-CEO density creates performance limitations that "limit the length of their flights," but after the retrofit, Mr. Scheff expects JetBlue to fly Spirit's A321-CEOs on "very long and transcontinental routes" (as JetBlue currently does with its own A321-CEOs).  Tr. 11/28/23 (Scheff) 93:12–94:14.  After the merger, Mr. Scheff expects the combined company to potentially reduce the number of spares in "airports where they have significant overlap."  *Id.* 96:12–23.  Mr. Scheff determined that JetBlue's 2027 combined network plan includes "extensive additional red-eye flying" and that JetBlue's future focus on "west coast cities that can be paired with east coast cities" gives JetBlue "more and more opportunities to fly a red-eye successfully."  *Id.* 99:5–24; *see also* Tr. 11/9/23 (Friedman) 150:23–151:16 (describing ways JetBlue's combined network plan could result in increased red-eye flying).

886.    At trial, Mr. Scheff testified that the anticipated seat reduction due to the retrofit of Spirit's aircraft was essentially offset by the two categories of increased utilization that he quantified (i.e., service pattern standardization, fleet optimization), and that the small negative number shown in his analysis was immaterial.  Tr. 11/28/23 (Scheff) 75:11–14, 92:11–15; TX 909 (Scheff Report Figure 18 showing waterfall of seat departure changes); Tr. 11/28/23 (Scheff) 102:1–18 (explaining the small seat reduction estimate was "a wash" and "pretty close to zero" because it was "less than one-half of 1 percent" of the total number of seats flown on JetBlue and Spirit's A320 and A321 fleets.)

887.    In addition, Mr. Scheff recognized that there is "substantial opportunity through fleet optimization, with regauging and other methods to increase there, and certainly additional

red-eye flying, better use of the A321 CEO fleet" to further increase utilization and produce additional seats available for departure.  Tr. 11/28/23 (Scheff) 102:1–18 (small negative seat loss is "basically break-even or indistinguishable from zero" because it did not "account for the other potential seat increases that I have, you know, described"), 104:20–105:11 (explaining one additional A320 red-eye roundtrip would produce 118,000 additional yearly seats, one additional A321 red-eye roundtrip would produce 146,000 additional yearly seats, and the reduction in one A320 spare would generate 232,000 additional yearly seats).

## VIII.  THE GOVERNMENT HAS NOT PROVEN A SUBSTANTIAL LESSENING OF COMPTITION BY COORDINATED EFFECTS

### A.  JetBlue Is A Maverick And Its Incentives Will Not Meaningfully Change As A Result Of The Merger

888.    JetBlue has long been recognized as a "maverick"—i.e., a uniquely disruptive force—in the airline industry.  *See supra* ¶¶ 1–7, 136–153, § VI.A; TX 912 at 6 ("JetBlue is unique among airlines"), ¶ 37 ("JetBlue has always been, in its own words, 'an innovative company.'"); *see also* TX 612 at '1229 (identifying "differentiated product & culture," "competitive costs," and "high-value geography" as "unique attributes [that have] allowed [JetBlue] to compete effectively and benefit the Customer, resulting in the 'JetBlue Effect'").

889.    JetBlue's status as a "maverick" is grounded in two key tenets:  (i) undercutting competitors, specifically the legacy airlines, on price and (ii) offering high-quality, industry-leading service.  *See supra* ¶¶ 1–7, 136–153, § VI.A; TX 912 ¶ 24 ("JetBlue differentiated itself from other low-cost airlines by offering not only low fares, but also high-quality service."); 11/27/23 (Hill) 24:21–25 ("I'd say JetBlue is a disruptive competitor and has a combination of quality features and lower fares that allow it to compete with all other types of carriers ranging from the legacy carriers down to the ultra-low-cost carriers."); Tr. 11/6/23 (Hayes) 126:19–21 ("We've kept fares low, we've improved the quality of service of flying in the United States."),

52:7–11 ("[O]ur vision for the industry is that fundamentally a customer should not have to choose between a low fare and a great service. We think that that is what most people want and we think that we are uniquely placed to do that."); Dep. 1/24/23 (Hayes) 37:23–38:15 ("[H]istorically, if you go back in time, the legacies would manage the market by keeping fares high and having lower load factors. . . . JetBlue's approach has always been different. . . . We undercut fares. . . ."); Dep. 4/21/22 (Clark) 97:12–98:22 (discussing JetBlue's "transatlantic disruption" strategy).

890.     As a business strategy, JetBlue seeks to offer low fares—that is, fares lower than the legacy carriers—and stimulate demand. *See supra* § VII.A.2 (discussing JetBlue's price-matching strategy); TX 912 ¶ 24 ("Consistent with the LCC business model, JetBlue's pricing strategy was to stimulate demand by offering lower fares."); Tr. 11/8/23 (Hillyard) 165:8–10 ("We wouldn't want to choose to be uncompetitive on price given that would contradict our general pricing strategy."); Dep. 6/27/23 (Hillyard) 19:15–20:3 ("A.  A competitive fare means if their—if [legacies] filed a fare that would be cheaper than we have, we—there's the chance we would need to file a fare to match them on price.  Q.  And if a legacy airline files a fare that's more expensive than JetBlue has, does that also result in JetBlue filing a fare to match them on that higher price?  A. Every case is different but it would be—you know, we would always pursue the lower prices.  We wouldn't—a higher fare might not be relevant at all, so we wouldn't match that in all likelihood.").

891.     JetBlue has forged its identity and business model on being a disruptor, and its incentives to remain a disruptive force in the airline industry will not change post-merger. *See* Tr. 11/6/23 (Hayes) 126:16–127:1 ("Q.  [I]f this transaction were approved, would anything about JetBlue's maverick status change?  A.  No. I believe, you know, we've demonstrated this

consistently over 23 years.  We've kept fares low, we've improved the quality of service of flying in the United States, and it's how we compete. . . . Most people are always going to be flying on the legacy airlines, and this is how we get those customers a better deal as well."); Tr. 11/9/23 (Friedman) 95:5–7 ("Q. Okay.  And are you confident that the JetBlue Effect will remain and will occur after the merger?  A. Yes, absolutely."), 96:24–97:7 ("Q.  Does your customer experience premium modeling suggest that there will be a fare increase for the average customer after the merger?  A. For the average customer I think it would be quite the opposite.  I think the reality is fares right now are mostly led by the big four carriers who control 80 percent of the marketplace, and I think the JetBlue Effect has demonstrated that we will go into these markets, reduce fares, and reduce fares for millions of customers."); *see also* Tr. 11/27/23 (Hill) 169:4–7 (testifying it was not likely that the merger would change JetBlue's incentives such that it would no longer be as disruptive as it is today).

892.    Following the merger, the combined airline will only comprise 8% of the national airline market, less than half the size of United (17%), Southwest (18%), Delta (22%), and American (23%).  TX 883; Tr. 11/6/23 (Hayes) 126:18–127:1 ("We could never become a legacy airline.  We are a fraction of the size.  And the reality is JetBlue and Spirit together is a small part of the market.  Most people are always going to be flying on the legacy airlines, and this is how we get those customers a better deal as well.").

893.    Following the merger, JetBlue's fleet of approximately 500 aircraft will still be less than half the size of American's (1,461), United's (1,338), and Delta's (1,254).  TX 677 at 36 (JetBlue); TX 622 at '4195 (Spirit); TX 48 at '7098 (Delta); TX 47 at '5616 (American); TX 49 at '1674 (United).

894.     There is no evidence that the merger will afford JetBlue a billion-dollar loyalty program, membership in an international alliance, or the advantages of a "fortress hub."

895.     Under these circumstances, JetBlue will remain incentivized to vigorously compete with its significantly larger competitors (the legacies), undercut their prices, and offer a better product—the same incentives that have driven JetBlue since its inception.

**B.     Dr. Gowrisankaran's Opinion That JetBlue Will No Longer Be Incentivized To Remain A Maverick Is Unsupported By The Facts**

896.     Dr. Gowrisankaran neither disputes JetBlue's current status as a maverick nor opines that JetBlue will shed that status post-merger. Tr. 11/20/23 (Gowrisankaran) 117:21–118:2 ("Q. And is it your opinion that JetBlue will no longer be a maverick after the merger? A. That's not how I think about it as an economist. How I think about it as an economist is however much JetBlue is a disruptive force now, they'll have incentives to be less of a disruptive force after the merger if it were to go forward.").

897.     Dr. Gowrisankaran does not estimate the probability that JetBlue would or could coordinate post-merger. *See* Tr. 11/17/23 (Gowrisankaran) 117:7–126:3.

898.     Dr. Gowrisankaran bases his opinion that JetBlue's incentives to coordinate will change post-merger on the conclusion that JetBlue is "going to become more like a legacy" because it will be "bigger on many routes" and will be "more like a hub-and-spoke carrier." Tr. 11/17/23 (Gowrisankaran) 125:15–22. However, JetBlue's combined network plan predicts that the airline will go from 85% to 80% nonstop service post-merger, which is similar to Spirit's level of nonstop service today. Tr. 11/9/23 (Friedman) 138:19–25 ("[I]s JetBlue becoming a hub-and-spoke carrier after the transaction? A. No, absolutely not. I think the forecasts that we have associated with this combined network plan have us going from being 85% percent nonstop to 80 percent nonstop in line with where Spirit is today.").

899.     Dr. Gowrisankaran testified that even *organic* growth by JetBlue could make it more likely to coordinate.  Tr. 11/20/23 (Gowrisankaran) 117:14–20 ("Q. But your opinion is also that if JetBlue grows organically, meaning without the merger, and has more connecting routes and more breadth nationally, that JetBlue will be more likely to engage in coordination over time; correct? A. Sure, that's definitely possible. It depends how it grows.").

## C.     The Government's Reliance On Spirit Not "Following The Herd" Or Not Having As Visible Pricing Are Not Borne Out By The Evidence

900.     In its opening statement, the Government claimed that "the evidence will show that Spirit's pricing philosophy is that it is under no obligation to follow the herd" and that "Spirit is harder to punish" because not all Spirit fares are distributed in ATPCO.  Tr. 10/31/23 (Gov't Opening) 19:18–20.

901.     While the phrase "follow the herd" appears once in a Spirit document of unknown authorship, *see* TX 330, the phrase in full says, "No obligation to 'follow the herd' ***when it comes to large industry initiatives*.""  TX 330 at '5840 (emphasis added).  Spirit's Chief Commercial Officer, Matt Klein, who manages Spirit's pricing department, explained that a "large industry initiative" could be, for example, a large sale fare, where Spirit decides ***not*** to reduce fares to match sales from other airlines.  Tr. 11/3/23 (Klein) 110:1–24.

902.     More to the point, Mr. Klein explained that "follow the herd" is not a term used at Spirit, and Spirit does not have any policy about not "follow[ing] the herd" with respect to pricing.  Tr. 11/3/23 (Klein) 109:3–10 ("Q.  Is the phrase 'follow the herd' a term that you use at Spirit?  A. It is not.  Q. Does Spirit have a policy not to follow the herd when it comes to pricing?  A. No.  We don't have – we don't have a policy like that at all.").  Instead, Spirit will, if it deems it advantageous, do what other airlines are doing, matching fares in the marketplace— including for "large industry initiatives"—if it determines that doing so is best for Spirit at that

point in time. *Id.* 109:6–109:20 ("You know, when other airlines make pricing changes, we determine, for us, what we think is the best thing for us to do. Sometimes that might be do what other airlines do, for sure. Sometimes it's don't do what other airlines do. Sometimes it's do a little bit of what other airlines do. Sometimes it's do a lot of what other airlines do. It really just depends on what we think is the best thing for Spirit to do to maximize revenue.").

903.    Other evidence similarly shows that Spirit closely tracks its competitors' fare activities and commonly makes changes in reaction or response to what other airlines do. Another slide in the same document on which the Government relies (TX 330), titled "Selecting a Price – Competitive monitoring," explains that Spirit monitors other airlines' fare changes and lists three ways in which Spirit can respond:  "Do nothing," "Match change," or "Partially match change using different terms & conditions or fare level."  TX 330 at '5852.

904.    Leo Lage, Senior Pricing Manager at Spirit, also explained that his job duties require him to carefully monitor activity by Spirit's competitors that could have an impact on the routes that Spirit serves, looking for "trends and information on our competitors" in order to "make recommendations" to Spirit's pricing and revenue management team.  Tr. 11/15/23 (Lage) 148:6–24, 153:8–19, 154:13–21.

905.    Yet, even after this testimony, Dr. Gowrisankaran offered the opinion that Spirit disrupts coordination by not "follow[ing] the herd."  *See* Tr. 11/17/23 (Gowrisankaran) 119:10 – 13 ("And also Spirit doesn't -- they just don't engage in coordination as much as other rivals do. They don't follow the herd, in their own words.").

906.    The evidence at trial also did not support the notion that Spirit's fares are less visible to other airlines' than its competitors.  Although Spirit files fares on its website, Spirit.com, those fares are still public.  Tr. 11/8/23 (Hillyard) 129:1–11; Tr. 11/3/23 (Klein)

58:5–59:7.

907.   Spirit and JetBlue witnesses explained that it is not necessarily more difficult or more complex to view fares on an airline's website as opposed to through ATPCO—particularly given so-called "scraping" tools that automatically collect fares from airline websites.  Tr. 11/3/23 (Klein) 58:5–59:7 ("Q.  So it takes other airlines more effort to see the fares that are only on Spirit's website, right? . . . Um, I don't necessarily think that's accurate today.  Q.  They have to go through a process of scraping Spirit's website to see those fares, right?  A. Yes, they do, but that doesn't make it harder or more complicated in my opinion."); Tr. 11/8/23 (Hillyard) 127:3–11, 129:1–11 ("Q. You found that it's challenging to connect the fares on ATPCO with the Spirit website fares; right? A. It's -- I wouldn't use the word challenging, … So we certainly can review what Spirit files publicly, but we can also review their website to see -- you know, they sell fares to customers, so that's public as well. We can kind of triangulate and get a sense of what they're selling and pricing and theorize how it all ties together."); Tr. 11/16/23 (Lage) 37:21–38:11 (scraping tools "allow [pricing analysts] to see anything, public or private as well. Anything that was in the other airlines' website for the customer to purchase would be seen on that scraping tool, yes."); Tr. 11/2/23 (Clark) 145:11–22 ("Q. And are there ways other than ATPCO for you to monitor Spirit's prices? A. Yes, there are. Q. And do you systematically use those other ways to monitor Spirit's prices? A. Yes. We pay for a web scraping service that, you know, frequently scrapes. It looks at the fare that other airlines are charging on their website and then records that. And we have that data available. Q. Okay. And how often does your pricing team consult that data? A. Regularly, is my understanding."); Dep. 6/27/23 (Hillyard) 124:20–125:2 ("Q Would you agree that compared to other carriers, it's harder to determine what price Spirit is actually filing in the market? . . . THE WITNESS: No. As we discussed, Spirit files a lot

of its fares publicly, so the fare they file is easy to review.").

908.   The documentary evidence at trial also demonstrates that airlines monitor and react to Spirit's website prices.  TX 856 at '4586 ("B6, we have concluded, monitors our web / private pricing."); TX 338 at '7043 (Oct. 2017 Spirit Board presentation summarizing United, Southwest, and American's monitoring of Spirit fares).

### D.   The Government's Evidence Of Airline Coordination Is Anecdotal And Stale

#### 1.   Hundreds Of Millions Of Fares Are Distributed Through ATPCO Each Year

909.   ATPCO is the airline industry clearinghouse and distribution platform for fares. Tr. 11/2/23 (Clark) 39:20–22; Tr. 11/15/23 (Jarashow) 135:12–15; Dep. 6/28/23 (Johns) 72:4–6 (ATPCO "is the centralized repository for airline fares").

910.   While the Government set forth a 1994 ATPCO consent decree as evidence of past coordination, JetBlue was not implicated in that settlement.  Tr. 11/20/23 (Gowrisankaran) 108:17–25.

911.   Today, ATPCO is used by most airlines to distribute filed fares to various sales channels and ultimately make them available for purchase.  Tr. 11/15/23 (Jarashow) 135:16–25 ("Q.  Could you explain some of the places that the ATP[CO] data goes out in the world?  A. Sure.  It might be, like, travel agencies, you know, traditional travel agency that you might stop into to buy a ticket, an online travel agency, and the reservation system that drives our own website.  Q.  And so the fare information that you put into ATPCO is then distributed from ATPCO to all the places that you just mentioned so that customers can book tickets; is that right? A.  Yeah, that's about right."); Dep. 2/8/23 (Jarashow) 120:4–8 ("Q.  Just stepping back more generally, why does JetBlue file fares on ATPCO?  A.  Well, that's our—I guess the industry standard clearinghouse.  It's how we distribute fares and make them available.").

912.    Each fare filed on ATPCO is associated with a specific alphanumeric code ("Fare Basis Code").  Tr. 11/8/23 (Hillyard) 132:4–8; TX 611 at '8233 ("FBC (Fare Basis Code) – Character string to define various characteristic of a fare").

913.    Fare Basis Codes provide information regarding the specific terms and conditions of that fare, including days of travel and last purchase date.  Tr. 11/8/23 (Hillyard) 132:14–16; TX 611 at '8233.

914.    Each airline independently assigns meaning to the unique characters that can comprise a Fare Basis Code.  Tr. 11/8/23 (Hillyard) 138:15–21, 132:12–20; Tr. 11/16/23 (Lage) 6:2–5.

915.    However, "not every character triggers something"; some characters are used "administratively" for an airline's own internal purposes.  Tr. 11/8/23 (Hillyard) 136:16-138:1 ("But certainly in the case of JetBlue, again, not every character triggers something.  So we do use some to sort of broadly, just for our own awareness, sort of like administratively.  But that still has to be part of the chain, it just doesn't have a public meaning, per se. . . . THE COURT: And the reason for doing that is since you're going to—you, JetBlue, that you're familiar with, you and your team are going to be scanning this daily, constantly, you build in some of your codes simply because this is a convenient way to tab them to the data which really interests you?  THE WITNESS: So any one of our analysts would be responsible, particularly on the JetBlue side, to sort of manage, maintain, understand, frankly, thousands of fares. . . . Maybe we're doing a high-level analysis and we want to know where, you know, we're selling JetBlue fares versus more match fares.  It does have administrative sort of value.").

916.    Fares on ATPCO can also be filed with footnotes, which can reflect certain date ranges on which those fares are valid.  Dep. 6/8/23 (Weiner) 64:5–11 ("Footnotes are an attribute

within a fare. Sometimes they will denote a specific travel restriction, date range the fare is valid for, selling period that the fare is valid for. These are all part and parcel of the fare."); Dep. 2/8/23 (Jarashow) 119:19–120:3; Tr. 11/8/23 (Hillyard) 145:21; Tr. 11/15/23 (Jarashow) 98:21–99:3.

917.    Domestic fares can be filed or updated up to four times a day on ATPCO while international fares can filed or updated hourly.  Tr. 11/15/23 (Jarashow) 136:13–15.

918.    On average, JetBlue files between hundreds and thousands of fares on ATPCO daily, Tr. 11/8/23 (Hillyard) 155:13–17; Tr. 11/15/23 (Jarashow) 136:16–21, and anywhere from five to ten million fares on ATPCO annually.  Tr. 11/8/23 (Hillyard) 155:18–21.

919.    At any given time, there are between one million to three million fares filed by JetBlue on ATPCO.  Tr. 11/15/23 (Jarashow) 136:9–12; Tr. 11/8/23 (Hillyard) 156:3–4.

920.    There are over one million fares filed in each ATPCO window.  Tr. 11/15/23 (Lage) 165:9–18 ("[There are] on average over a million fares filed for each report that ATPCO sends. That's four times a day.").

921.    At any given time, there are approximately hundreds of millions of published fares on ATPCO for all airlines.  Tr. 11/8/23 (Hillyard) 156:5–8.

922.    To update a filed fare on ATPCO, the Fare Basis Code associated with an individual filed fare can be manually changed, Tr. 11/8/23 (Hillyard) 157:13–18, or changed using an "add/cancel" function, which is a technical action that has broad applicability, Tr. 11/15/23 (Jarashow) 137:16–19 ("Add/cancel is a shorthand reference for the technical process that happens several times a day for a variety of reasons where a fare has to be canceled, an attribute of it is changed, and then it's refiled."), 137:20–23 ("Q. Could you give a specific example of why you might need to file an and/cancel[sic] to change a fare?  A. Sure.  If you

wanted to change the travel dates on fare.").

923.     At JetBlue, the "add/cancel" function is used to efficiently make bulk changes in ATPCO that "would take far too long and be far too prone to error" if done individually.  Tr. 11/8/23 (Hillyard) 157:2–18 ("Q. What is add and then the cancel of a fare in ATPCO used for? A. Yeah, so it's just describing, frankly, as it sounds. . . . assuming we're sort of changing a bulk amount of things, we would do so perhaps outside of ATPCO and import it in, which would be adding a lot of fares. . . . We change the fares manually when it's sort of a very, very, very small scope.  But, you know, if I asked an analyst on the team to tweak, you know, tens or hundreds of thousands of fares at once, that would take far too long and be far too prone to error.").

### 2.     Out Of The Millions Of Fares Filed By JetBlue Each Year, Only Six Form The Basis Of The Government's Coordination Theory

924.     In the airline industry, "flashing" generally means price signaling.  Tr. 11/15/23 (Jarashow) 85:16–21; 11/8/23 (Hillyard) 140:21–25 ("Flashing would describe the act . . . of filing and unfiling a fare, perhaps in, rapid succession with . . . the overall intent of communicating something between carriers.").

925.     The Government has identified four instances of alleged flashing by JetBlue, all of which occurred nearly four years ago in early 2020.  *See* TX 370; TX 389; TX 785; TX 786.

926.     A "cross-market initiative," or "CMI," generally refers to a competitive pricing scenario where one carrier adopts a fare by another carrier from one route and extends that fare to another route with the intent of calling attention to that fare.  *See* Tr. 11/8/23 (Hillyard) 151:10–14; Tr. 11/15/23 (Jarashow) 105:11–14.

927.     CMIs, as a general matter, are rare.  Tr. 11/16/23 (Lage) 41:18–23 ("Q. So in the well-over 1500 Pricing Activity Reports you have prepared, how often have you noted the existence of what you believe to be a distinct cross-market initiative? A. Very rarely. I would say

I've come across maybe once a month.").

928.    It is not always clear what is a CMI and what is not.  Tr. 11/16/23 (Lage) 38:24–

39:8 ("Q. And what firsthand knowledge, if any, do you have about why the legacies and

Southwest engage in fare actions that you perceive to be cross-market initiatives? A. No

firsthand knowledge, it's basically based on my observations and experience.  Q. Have you ever

attempted to contact any other airline to confirm that their fare action was a cross-market

initiative? A. That's a 'No.'"), 39:9–18 (Q. "Have you ever changed your mind about whether a

fare action was a cross-market initiative? A. Many times. Q. And why would you change your

mind? A. Again because in the original filing the first impression, um, is that it appears to be a

cross-market initiative and at times I've analyzed deeper into the initiative filed by that airline,

and eventually, um, they -- they're buying those fares remain as part of a specific structure or

substructure in the market.").

929.    The Government has identified two instances of JetBlue allegedly engaging in a

CMI, once in 2016 and once in 2019.  *See* Tr. 11/8/23 (Hillyard) 158:3–9; TX 789; TX 790.

930.    All of the witnesses responsible for pricing at JetBlue testified that these alleged

fare actions are outliers and inconsistent with JetBlue's policy not to flash or engage in CMIs.

Tr. 11/8/23 (Hillyard) 156:9–15 ("Q.  And during your seven-year tenure at JetBlue have you

ever flashed a fare?  A.  I never have, no.  Q.  Okay. You were asked a couple questions in some

e-mails about flashing, and you explained to the judge what it means. Is fare flashing permitted

at JetBlue?  A.  No."), 158:10–11 (Q.  Are CMIs permitted at JetBlue? A.  CMIs are not."); Tr.

11/15/23 (Jarashow) 138:2–9, 138:13–16, 139:6–10.

931.    All of the witnesses responsible for pricing at JetBlue testified that they are not

aware of JetBlue engaging in any flashing or CMIs in 2021, 2022 or 2023.  Tr. 11/8/23

(Hillyard) 157:19–158:2, 158:12–15; Tr. 11/15/23 (Jarashow) 138:17–139:5.

932.    The Government asked Mr. Lage of Spirit about a single incident in his six years working in pricing at Spirit in which he believed that JetBlue participated in a CMI, but Mr. Lage testified that he was mistaken, because JetBlue's fare was not a temporary reduction but rather became a part of JetBlue's competitive fare structure.  Tr. 11/16/23 (Lage) 17:21–18:5, 42:1–19.

933.    In his time at Spirit, Mr. Lage has only observed the legacies and Southwest file CMIs.  Tr. 11/16/23 (Lage) 38:16–23 ("Q. Okay, turning now to a subject the Government's asked you a lot about today and yesterday, cross-market initiatives. So I want to cover some ground again. In your 6-plus years at Spirit, what airlines have you observed engaged in what you believe to be cross-market initiatives? A. They would be the legacy carriers and Southwest Airlines.").

934.    Notably, Dr. Gowrisankaran did not do a systematic study of the frequency of CMIs.  Tr. 11/20/23 (Gowrisankaran) 119:9–11.   Nor did Dr. Gowrisankaran investigate whether any alleged examples of CMIs discussed at trial actually were CMIs.  *Id.* at 120:5–8.

935.    Dr. Gowrisankaran also did not do a systematic study of the frequency of flashing.  Tr. 11/20/23 (Gowrisankaran) 119:19–21.

### 3.    The Fares Filed On ATPCO Do Not Paint A Complete Picture Of The Fares Ultimately Made Available For Sale By Each Airline

936.    Fares that are filed on ATPCO also only reflect fares that could be available for purchase—not what fares are actually available for purchase at any given time.  Dep. 6/28/23 (Johns) 76:3-23 ("Q  And so ATPCO will include other airlines' fares at different fare classes that are available for a given flight on a given day, right?  A  Yes, but to clarify, it is showcasing what we call their fare structure, and so only the price points and their association with a fare

class. Q  Right. So you'd be able to see the particular fare that's offered at each class that is available for sale? . . . THE WITNESS: Not available to sell. It's not—it's any fare that could be available to sell. Q Gotcha. So it could be that there's a fare class that there's no tickets available, but ATPCO will still show you what the fare is for that particular class?  A  Yes."); Tr. 11/15/23 (Jarashow) 122:14–20) ("You can see underlying rules and attributes [in ATPCO].  I would also point out, though, that the data we get from our—by looking at airline websites is richer in a different way because it tells you what is actually selling."); Tr. 11/16/23 (Lage) 30:21–31:12 ("Q.  So if you could expand a little bit, because I think it would be helpful, what's the difference between a 'filed fare' and a 'selling fare'?  A.  So the best way I can describe that is, um, if you as a consumer, are walking into a store to purchase a specific product, the file fare would be equivalent to you walking into the store and there's 10 shelves of the same product, each shelf price, let's say it's $10 every shelf, from 10 to 100, that is the file fare. You may walk in and find that only the bottom three shelves do not have the product, meaning that that store wants to charge you $40 for their product. You may come back 2 hours later and that $10 shelf may be stocked and you'll be able to buy it for $10. So that's as basic as—I just wanted to explain the complexity of filing a fare as opposed to making a fare available for purchase by a consumer.").

937.    The prices that are ultimately offered to customers thus depend on the inventory, i.e., seat allocation, that is made available by an airline.  Tr. 11/8/23 (Hillyard) 111:23–112:1; *see also* Dep. 2/8/23 (Jarashow) 19:10–20:17 (explaining that the pricing team is responsible for creating the "menu of fares" across all its booking classes, while the yield management or "inventory" team determines "how many seats to sell" for each booking class of service); Tr. 11/16/23 (Lage) 30:14–31:20 ("So in most of the airlines that I've worked, there are two specific

groups.  One group handles the filing of fares structure for a specific market, and the—what the other group is responsible for is deciding, out of those fare levels that are filed in a specific market, the structure, what fare levels to make available for the customer to purchase."); TX 278 at '0058–0059 (discussing relationship between pricing and inventory; "Inventory controls available space on any given flight.  Pricing controls available fares and selling conditions.").

938.     For example, while JetBlue files 14 fares for each of its 14 booking classes on ATPCO, TX 611 at '8232, not all 14 price points that are filed may be made available for sale. *See* Tr. 11/8/23 (Hillyard) 111:23–112:1; Dep. 2/8/23 (Jarashow) 19:10–20:17.  What is made available for sale will depend on the allocation of seats made available for each booking class and for certain classes and certain times, there may be zero seats made available.  Dep. 2/8/23 (Jarashow) 29:11–30:1.

939.     While the fares filed on ATPCO are publicly available, airlines notably do not have visibility on ATPCO into how other airlines allocate the number of seats for each price point and what seats are actually selling.  Dep. 2/28/23 (Johns) 51:16–19 ("Q. Are you able to see how many tickets at a given fare class is available for a particular flight offered by another airline? A. No."), 68:15–69:1 ("Q. And will one set of data they have available be the prices that other airlines are offering at particular fare classes for a given flight?  A. So for clarification, we do not know what the fare classes are for other airlines, for their availability of their demand and where they are bucketing certain, you know, how many tickets are in each fare class and at what price points. What we do see is what is the selling fare at that point in time and what fare class that is selling in.").

940.     Dr. Gowrisankaran's analysis of Spirit's ATPCO reports ("0-3-7 AP reports") does not indicate how frequently JetBlue prices similarly to the legacy airlines.  Tr. 11/20/23

(Gowrisankaran) 125:17–126:3  (explaining that Southwest is included in Dr. Gowrisankaran's analysis, and that Southwest is a low-cost carrier).

941.    Nor does Dr. Gowrisankaran's analysis reflect fares actually purchased by or available to customers.  Tr. 11/16/23 (Lage) 30:14–31:20; Tr. 11/20/23 (Gowrisankaran) 121:11–21 ("Q. And you heard [Mr. Lage] testify that these [ATPCO] reports reflected only the lowest filed fare on each route; correct? A. Absolutely. Q. And not the fares that were actually sold on these routes? A. Not necessarily what was sold, the lowest filed fares. Q. Or even if they were available; correct? A. Right.").  Dr. Gowrisankaran's analysis also does not account for fare restrictions that may limit the availability of some fares to particular customers.  *Id.* at 122:8–12.

Dated: December 13, 2023                     Respectfully submitted,

                                             */s/ Elizabeth M. Wright*
                                             Zachary R. Hafer (MA BBO #569389)
                                             Elizabeth M. Wright (MA BBO #569387)
                                             Zachary Sisko (MA BBO #705883)
                                             Cooley LLP
                                             500 Boylston Street, 14th Floor
                                             Boston, MA 02116-3736
                                             Tel: 617-937-2300
                                             zhafer@cooley.com
                                             ewright@cooley.com
                                             zsisko@cooley.com

                                             Ethan Glass (*Pro Hac Vice*)
                                             Deepti Bansal (*Pro Hac Vice*)
                                             Matt K. Nguyen (*Pro Hac Vice*)
                                             Cooley LLP
                                             1299 Pennsylvania Avenue NW, Suite 700
                                             Washington, DC 2004-2400
                                             Tel: 202-842-7800
                                             Fax: 202-842-7899
                                             eglass@cooley.com
                                             dbansal@cooley.com

                                             Ryan A. Shores (*Pro Hac Vice*)
                                             David I. Gelfand (*Pro Hac Vice*)

Daniel P. Culley (*Pro Hac Vice*)
Cleary Gottlieb Steen & Hamilton, LLP 2112
Pennsylvania Avenue, NW
Washington, DC 20037
Tel: 202-974-1500
rshores@cgsh.com
dgelfand@cgsh.com
dculley@cgsh.com

Michael Mitchell (*Pro Hac Vice*)
Brian Hauser (*Pro Hac Vice*)
Shearman & Sterling LLP
401 9th Street, N.W., Suite 800
Washington, DC 20004
Tel: 202-508-8005
Fax: 202-661-7480
michael.mitchell@shearman.com
brian.hauser@shearman.com

Jessica K. Delbaum (*Pro Hac Vice*)
Leila Siddiky (*Pro Hac Vice*)
Elizabeth Robinson (*Pro Hac Vice*)
Shearman & Sterling LLP
599 Lexington Avenue
New York, NY 10022-6069
Tel: 212-848-4000
Fax: 212-848-7179
jessica.delbaum@shearman.com
leila.siddiky@shearman.com
liz.robinson@shearman.com

Rachel Mossman Zieminski (*Pro Hac Vice*)
Shearman & Sterling LLP
2601 Olive Street, 17th Floor
Dallas, TX 75201
Tel: 214-271-5385
rachel.zieminski@shearman.com

*Attorneys for Defendant JetBlue Airways
Corporation*

Jay Cohen (*Pro Hac Vice*)
Andrew C. Finch (*Pro Hac Vice*)
Eyitayo St. Matthew-Daniel (*Pro Hac Vice*)
Jared P. Nagley (*Pro Hac Vice*)
Kate Wald (*Pro Hac Vice*)

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY 10019
Tel: 212-373-3000
Fax: 212-757-3990
afinch@paulweiss.com
tstmatthewdaniel@paulweiss.com
jcohen@paulweiss.com
jnagley@paulweiss.com
kwald@paulweiss.com

Meredith R. Dearborn (*Pro Hac Vice*)
Paul, Weiss, Rifkind, Wharton & Garrison LLP 535
Mission Street, 24th Floor
San Francisco, CA 94105
Tel: 628-432-5100
Fax: 628-232-3101
mdearborn@paulweiss.com

*Attorneys for Defendant Spirit Airlines, Inc.*

# APPENDIX A

## Table 1:  Witnesses Cited in Defendants' Proposed Findings of Fact

| WITNESS | EMPLOYER | CURRENT TITLE |
|---|---|---|
| Nicholas Bartolotta | Spirit Airlines | Vice President, Operations and Crew Planning |
| Eric Beck | Delta Airlines | Managing Director, Domestic Network Planning |
| John Bendoraitis | Spirit Airlines | Executive Vice President and Chief Operating Officer |
| Barry Biffle | Frontier Airlines | Chief Executive Officer |
| Dr. Tasneem Chipty | Chipty Economics | Plaintiffs' Economic Expert |
| Edward Christie | Spirit Airlines | President and Chief Executive Officer |
| David Clark | JetBlue Airways | Head of Revenue and Planning |
| Eric Friedman | JetBlue Airways | Director of Route Planning |
| Mark Gale | Broward County Aviation Department | Chief Executive Officer and Director of Aviation |
| H. McIntyre Gardner | Spirit Airlines | Chairman of the Board of Directors |
| Dr. Gautam Gowrisankaran | Columbia University | Plaintiffs' Economic Expert |
| Scott Haralson | Spirit Airlines | Chief Financial Officer |
| Robin Hayes | JetBlue Airways | Chief Executive Officer |
| Nicholas Hill | Bates White Economic Consulting | Defendants' Economic Expert |
| Michael Hillyard | JetBlue Airways | Manager, Revenue Management Department, Pricing Team |
| Ursula Hurley | JetBlue Airways | Chief Financial Officer |
| Vicki Jaramillo | Greater Orlando Aviation Authority | Chief Development Officer |

| WITNESS | EMPLOYER | CURRENT TITLE |
|---|---|---|
| Evan Jarashow | JetBlue Airways | Manager, Revenue Management Department, International Pricing Team |
| Rich Johns | JetBlue Airways | Director of Revenue Management |
| John Kirby | Spirit Airlines | Vice President of Network Planning |
| Matthew Klein | Spirit Airlines | Executive Vice President and Chief Commercial Officer |
| Derek Klinka | JetBlue Airways | Value Capture Lead, Integration Management Office |
| Leonardo Lage | Spirit Airlines | Senior Pricing Manager |
| David Neeleman | Breeze Airways | Chief Executive Officer |
| Andrew Nocella | United Airlines | Chief Commercial Officer |
| Jayne O'Brien | JetBlue Airways | Head of Marketing and Loyalty |
| Claire Roeschke | JetBlue Airways | Manager, Integration Management Office |
| Richard Scheff | Airline Strategy Group | Defendants' Industry Expert |
| Jonathan Weiner | JetBlue Airways | Vice President of Sales and Revenue Management |
| Drew Wells | Allegiant Air | Senior Vice President and Chief Revenue Officer |
| Trevor Yealy | Avelo Airlines | Head of Commercial |
| Brian Znotins | American Airlines | Senior Vice President of Network Planning |

**Table 2:  Airport Codes**

| AIRPORT NAME | COMMON NAME | IATA CODE |
|---|---|---|
| Rafael Hernandez Airport | Aguadilla, PR | BQN |
| Hartsfield-Jackson Atlanta International Airport | Atlanta | ATL |
| Austin-Bergstrom International Airport | Austin | AUS |
| Baltimore/Washington International Thurgood Marshall Airport | Baltimore | BWI |
| El Dorado International Airport | Bogota, Colombia | BOG |
| Logan International Airport | Boston Logan | BOS |
| Rafael Núñez International Airport | Cartagena, Colombia | CTG |
| Cancun International Airport | Cancun, Mexico | CUN |
| Cleveland Hopkins International Airport | Cleveland | CLE |
| Dallas/Fort Worth International Airport | Dallas Fort Worth | DFW |
| Dulles International Airport | Dulles | IAD |
| Fort Lauderdale-Hollywood International Airport | Fort Lauderdale | FLL |
| Southwest Florida International Airport | Fort Myers | RSW |
| José Joaquín de Olmedo International Airport | Guayaquil, Ecuador | GYE |
| Bradley International Airport | Hartford | BDL |
| George Bush Intercontinental/Houston Airport | Houston | IAH |
| John F. Kennedy International Airport | JFK | JFK |
| Norman Manley International Airport | Kingston, Jamaica | YGK |
| LaGuardia Airport | LaGuardia | LGA |
| Harry Reid International Airport | Las Vegas | LAS |
| Jorge Chávez International Airport | Lima, Peru | LIM |
| Los Angeles International Airport | Los Angeles | LAX |
| Dallas Love Field Airport | Love Field | DAL |

| AIRPORT NAME | COMMON NAME | IATA CODE |
|---|---|---|
| José María Córdova International Airport | Medellin, Colombia | MDE |
| Miami International Airport | Miami International | MIA |
| Minneapolis-St Paul International Airport | Minneapolis | MSP |
| Sangster International Airport | Montego Bay, Jamaica | MBJ |
| Nashville International Airport | Nashville | BNA |
| Newark Liberty International Airport | Newark | EWR |
| Tweed New Haven Airport | New Haven | HVN |
| Louis Armstrong New Orleans Airport | New Orleans | MSY |
| Chicago O'Hare International Airport | O'Hare | ORD |
| Orlando International Airport | Orlando | MCO |
| Orlando Sanford International Airport | Orlando Sanford | SFB |
| Philadelphia International Airport | Philadelphia | PHL |
| Mercedita Airport | Ponce, PR | PSE |
| Toussaint Louverture International Airport | Port-au-Prince, Haiti | PAP |
| Punta Cana International Airport | Punta Cana, Dominican Republic | PUJ |
| Punta Gorda Airport | Punta Gorda | PGD |
| Richmond International Airport | Richmond | RIC |
| Salt Lake City International Airport | Salt Lake City | SLC |
| San Francisco International Airport | San Francisco | SFO |
| Juan Santamaría International Airport | San Jose, Costa Rica | SJO |
| Luis Munoz Marin International Airport | San Juan, PR | SJU |

| AIRPORT NAME | COMMON NAME | IATA CODE |
|---|---|---|
| Las Américas International Airport | Santo Domingo, Dominican Republic | SDQ |
| Princess Juliana International Airport | St Maarten, Sint Maarten | SXM |
| Savannah/Hilton Head International Airport | Savannah | SAV |
| Tampa International Airport | Tampa | TPA |
| Ronald Reagan Washington National Airport | Washington National | DCA |
| Wilmington Airport | Wilmington | ILG |

**Table 3:  Airline Codes**

| IATA Code | Airline |
|-----------|---------|
| 2T | BermudAir |
| 3M | Silver Airways |
| 9K | Cape Air |
| AA | American Airlines |
| AD | Azul Brazilian Airlines |
| AM | Aeroméxico |
| AS | Alaska Airlines |
| AV | Avianca |
| B6 | JetBlue Airlines |
| CM | Copa Airlines |
| DL | Delta Air Lines |
| F8 | Flair Airlines |
| F9 | Frontier Airlines |
| FL | AirTran (now part of Southwest Airlines) |
| G4 | Allegiant Air |
| HA | Hawaiian Airlines |
| LA | LATAM Airlines |
| LY | El Al Israel Airlines |
| MX | Breeze Airways |
| NK | Spirit Airlines |
| NO | Norse Atlantic Airways |
| PD / P3 | Porter Airlines |
| SY | Sun Country Airlines |
| UA | United Airlines |

| IATA Code | Airline |
|---|---|
| US | US Airways (now part of American Airlines) |
| VB | Viva Aerobus |
| VX | Virgin America (now part of Alaska Airlines) |
| WN | Southwest Airlines |
| WO | Swoop (now part of WestJet Airlines) |
| WS | WestJet Airlines |
| XP | Avelo Airlines |
| Y4 | Volaris |
| Y9 | Lynx Air |

**Table 4: Airline Industry Terms**

| TERM | DEFINITION |
|---|---|
| A220<br>A319<br>A320<br>A321 | Types of aircraft manufactured by Airbus and used by JetBlue and Spirit. The numbers that follow the "A" reflect the model number of the aircraft. Additional codes can follow the model number to identify certain additional attributes of the aircraft (*e.g.*, A321-LR is an extended range aircraft, and A321-NEO is an A321 with the "new engine option") |
| AOG | Acronym that stands for Aircraft on the Ground. |
| ASM | Acronym that stands for Available Seat Miles. This is a method of measuring an airline's passenger carrying capacity on a unit basis, calculated as the number of miles an airplane will be flying during a certain period multiplied by the number of seats in that airplane's configuration. |
| ATPCO | Acronym that stands for Airline Tariff Publishing Company, which is an industry clearinghouse and distribution platform for fares and other terms and conditions of travel services offered by airlines. |
| BCAD | Acronym that stands for Broward County Aviation Department. |
| Big 4 or Big Four | Reference to four largest carriers in the United States: American Airlines, Delta Airlines, Southwest Airlines, and United Airlines |
| Blue City | A city in which JetBlue has an arrival or departure |
| CASM | An acronym that stands for Cost Per Available Seat Mile, which is the standard measure of unit costs in the airline industry. |
| CM or Crewmember | A term that JetBlue uses to refer to employees |
| Codeshare | When an airline that operates a flight allows another airline to market and sell seats on its flight under the marketing airline's code. A codeshare allows passengers to book multi-segment itineraries on one airline's code that have flights operated by multiple airlines. |
| Direct | A flight from an origin to a destination where the airplane and flight number do not change but the airplane makes one or more stops before the destination. |
| Down-gauge or Downguage | Decreasing the number of seats (usually by flying a smaller aircraft) on a given route compared to the aircraft currently operating the route. |
| E190 | Type of aircraft manufactured by Embraer, which is currently used by JetBlue but slated to be retired from JetBlue's fleet in the coming years. |

| TERM | DEFINITION |
|------|------------|
| FAA | Federal Aviation Authority |
| FBC (ATPCO) | Acronym that stands for Fare Basis Code. This is a character string used in ATPCO to define various characteristic of a fare of a particular airline. |
| Focus city | A city from which an airline operates a significant number of point-to-point routes.  JetBlue and Southwest are two carriers with focus cities. |
| Footnote (ATPCO) | In ATPCO, footnotes are added to a fare to reflect certain attributes such as date ranges on which those fares are valid. |
| Gauge | Term referring to the size (number of seats) of an aircraft. |
| GTF | Acronym that stands for Geared Turbo Fan.  This is a type of engine used on Pratt & Whitney Airbus A320neo aircraft. |
| Hub | Part of a hub-and-spoke network used as a connection point for the network. |
| IATA | The International Air Transport Association, which publishes industry codes to identify airports and airlines. |
| IOC | Interim Operating Covenant, which is a standard provision in a merger agreement defining certain events that could occur in a seller's business during the time between signing a merger agreement and closing, and which often require consent from the buyer before they are undertaken by the seller |
| JBLU | JetBlue's stock ticker symbol. |
| LCC | Low-cost-carrier. |
| Legacy Airlines | American Airlines, Delta Airlines, and United Airlines. |
| MAT | Marine Air Terminal at LaGuardia airport. |
| Metal | A term used when referring to the owner of an airplane (e.g., "JetBlue metal"). |
| Mint | JetBlue's premium cabin offering, offering lay-flat seating and industry-leading amenities. |
| O&D | Origin and destination. |
| NEA | Acronym for the now-dissolved Northeast Alliance between American Airlines and JetBlue |
| Network | The systems of routes and connections operated by an airline. |

| TERM | DEFINITION |
|---|---|
| Non-stop or nonstop | A flight from an origin to a destination with no stops. |
| OA / OAL | Other airline(s). |
| Pax | Passengers. |
| PDEW | Acronym that stands for Per-Day Each Way and reflects a route's daily non-directional passenger volume. |
| PRASM | Acronym that stands for Passenger Revenue Per Available Seat Mile, which is a unit measure of passenger revenue. |
| Project Exchange | Codename for JetBlue's contemplated merger with Spirit in 2019.  In 2022, JetBlue reused Project Exchange as the codename for the current merger with Spirit. |
| Project Henri | Codename for JetBlue's contemplated merger with Spirit in 2017. |
| Project Revere | Name of JetBlue's strategy to better compete with Delta in Boston. |
| QNR | JetBlue's Quarterly Network Review.  A strategic document produced by JetBlue's network planning group on a quarterly basis. |
| RASM | Acronym that stands for Revenue Per Available Seat Mile, which is a unit measure of total revenue used in the airline industry.  RASM is often used interchangeably with TRASM. |
| Runway authorizations | A specific type of takeoff and landing control—similar to aslot—that is used at EWR |
| SBD | JetBlue's Strategy and Business Development team. |
| Shell | Term used to refer to an aircraft. |
| Shop or SHOP | Codename used for Spirit Airlines in some JetBlue documents. |
| Slots | A specific day and time during which an airport and the FAA grant permission to an airline to take off or land a flight. |
| SLT | JetBlue's Senior Leadership Team |
| Stage length | The length of a flight segment from takeoff to landing, measured in miles. |
| TATL | Transatlantic – a reference to a nonstop, transatlantic flight. |
| TCON | Transcontinental – a reference to a nonstop, transcontinental flight. |

| TERM | DEFINITION |
|---|---|
| TRASM | Acronym that stands for Total Revenue Per Available Seat Mile, which is a unit measure of total revenue used in the airline industry. |
| TrueBlue | JetBlue's customer loyalty (FFP) program. |
| ULCC | Ultra-low-cost-carrier. |
| Up-gauge or upguage | Increasing the number of seats flown (often by flying larger aircraft) on a given route. |
| VFR | Passengers who are visiting friends and relatives. |

## **<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that the foregoing Proposed Findings of Fact, which was filed with the

Court through the ECF system on December 13, 2023, will be sent electronically to the

registered participants as identified on the Notice of Electronic Filing (NEF).


*/s/ Elizabeth M. Wright*
Elizabeth M. Wright