# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA, *et al.,* | ) |
| | ) |
| *Plaintiff,* | ) |
| | ) |
| v. | ) Civil Action No. 1:23-cv-10511-WGY |
| | ) |
| JETBLUE AIRWAYS CORPORATION and SPIRIT AIRLINES, INC., | ) |
| | ) |
| *Defendants.* | ) |
| | ) |

## <u>DEFENDANTS' PROPOSED CONCLUSIONS OF LAW</u>

**TABLE OF CONTENTS**

<strong>Page</strong>

I.    **THE LEGAL FRAMEWORK** ........................................................ 1

    A.   THE KEY PRINCIPLES OF SECTION 7 ................................ 1

    B.   THE BAKER HUGHES FRAMEWORK APPLIES ............................. 2

II.   **THE GOVERNMENT HAS FAILED TO ESTABLISH ITS PRIMA FACIE CASE** ................................................................................ 4

    A.   THE GOVERNMENT'S PROPOSED GEOGRAPHIC MARKET DEFINITION IGNORES THE MOBILITY AND DYNAMISM IN THE INDUSTRY ............................................................ 6

    B.   A NATIONAL MARKET IS THE APPROPRIATE GEOGRAPHIC MARKET FOR ASSESSING THE COMPETITIVE EFFECTS OF THIS MERGER, AS AIRLINES COMPETE VIGOROUSLY AT THE NATIONAL LEVEL ............................................. 10

    C.   EVEN THE GOVERNMENT'S THEORY OF HARM MILITATES IN FAVOR OF A NATIONAL MARKET ........................... 15

    D.   WHEN VIEWED NATIONALLY, THE GOVERNMENT IS NOT ENTITLED TO A PRESUMPTION OF HARM ............................. 16

    E.   THE GOVERNMENT'S SUGGESTION OF HARM TO THE AMORPHOUS GROUP OF "COST-CONSCIOUS" TRAVELERS IS NOT A WELL-DEFINED MARKET .............................. 16

III.  **EVEN IF THE GOVERNMENT HAS ESTABLISHED A PRIMA FACIE CASE, DEFENDANTS HAVE REBUTTED THE PRESUMPTION** ................. 17

    A.   THE GOVERNMENT'S PERIPHERAL MARKETS ARE NOT VALID ........ 17

    B.   DEFENDANTS HAVE A LOW BURDEN TO REBUT THE PRESUMPTION ........................................................ 19

    C.   BECAUSE OF THE EASE OF ENTRY, THE TRANSACTION IS UNLIKELY TO SUBSTANTIALLY LESSEN COMPETITION ................ 22

        1.   The History of Entry Suggests the Likelihood of Future Entry .............. 24

        2.   Barriers to Entry Are Low in the Airline Industry .................................. 25

        3.   ULCCs Are Poised to Grow in the Short and Long Term ...................... 27

        4.   Legacy and Low Cost Carriers Intend to Grow their Unbundled Fare Options ........................................................... 29

        5.   The Proposed Divestitures Will Help Ensure Barriers to Entry Remain Low at Key Airports ...................................... 29

        6.   Entry Does Not Need to Be on the Same Exact Routes that Spirit Flies Today ............................................................ 31

# TABLE OF CONTENTS
(continued)

Page

D.   THE GOVERNMENT'S MARKET SHARE DATA ARE UNRELIABLE AND DO NOT ACCURATELY PREDICT THE COMPETITIVE EFFECTS OF THE MERGER ........................................................ 32

   1.   The Government's Route-Level, Static Market Share Statistics Ignore the Particularities of the Airline Industry .................................... 33

   2.   The Government's Route-Level Market Share Statistics Ignore Potential Entrants .......................................................................... 34

   3.   The Government's Route-Level Market Share Statistics Are Otherwise Unreliable. ......................................................................... 35

E.   SPIRIT'S PAST MARKET SHARE IS NOT PREDICTIVE OF ITS FUTURE COMPETITIVE SIGNIFICANCE GIVEN THE COMPANY'S FINANCIAL OUTLOOK .................................................................. 37

F.   THE MERGER IS PROCOMPETITIVE AND WILL RESULT IN SUBSTANTIAL BENEFITS FOR CONSUMERS ACROSS THE COUNTRY ................................................................................. 38

   1.   The Department of Justice Has Long Recognized the Importance of Procompetitive Benefits in Merger Enforcement .............................. 40

   2.   Defendants Have Presented Ample Evidence of Procompetitive Benefits to Consumers ................................................................... 41

IV.   THE GOVERNMENT HAS FAILED TO ESTABLISH THAT THE MERGER WILL LIKELY CAUSE A SUBSTANTIAL DECREASE IN COMPETITION ............................................................................. 42

A.   THE GOVERNMENT HAS NOT PROVEN ANY UNILATERAL EFFECTS OF THE MERGER .................................................................. 43

   1.   The Government Has Not Shown that Loss of Head-to-Head Competition Will Result in a Substantial Lessening of Competition in Any Relevant Market ................................................................ 44

   2.   The Government Has Not Demonstrated that Unilateral Effects Will Cause Lower Capacity and Higher Prices in Any Markets ............ 46

   3.   The Government Has Not Demonstrated that the Elimination of Spirit Will Cause Adverse Unilateral Effects .......................................... 48

B.   THE GOVERNMENT HAS NOT SHOWN THE MERGER WILL LEAD TO ADVERSE COORDINATED EFFECTS ..................................... 49

   1.   The Government Has Presented No Market Specific Evidence of Coordination ................................................................................. 50

   2.   JetBlue Is a Maverick and Its Incentives Will Not Meaningfully Change as a Result of the Merger .......................................................... 51

**TABLE OF CONTENTS**
(continued)

Page

3. The Government Has Not Shown JetBlue Has a History of Coordination .............................................................. 55

4. The Government Has Not Shown the Elimination of Spirit Will Increase the Risk of Adverse Coordinated Effects ................................ 55

5. The Government Drastically Overstates the Likelihood of Coordination for Various Other Reasons.................................................. 56

V.   SHOULD THE COURT DETERMINE THE MERGER LIKELY VIOLATES SECTION 7, IT MAY ORDER FURTHER REMEDIES—INCLUDING FURTHER DIVESTITURES—TO PROTECT AGAINST THAT HARM................................................................................................ 57

A.   THE COURT SHOULD NOT BLOCK THIS PROCOMPETITIVE MERGER AND INSTEAD SHOULD USE ITS BROAD EQUITABLE POWERS TO ADDRESS ANY RESIDUAL CONCERNS .............................. 57

B.   THE COURT HAS BROAD DISCRETION TO CRAFT AN APPROPRIATE REMEDY SHORT OF A FULL-STOP INJUNCTION.......... 58

C.   A NARROWER REMEDY COULD BE APPROPRIATE HERE.................... 60

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*1-800 Contacts, Inc. v. FTC*,
  1 F.4th 102 (2d Cir. 2021) ......................................................................41

*In re Air Passenger Comput. Rsrvs. Sys. Antitrust Litig.*,
  694 F. Supp. 1443 (C.D. Cal. 1988), *aff'd sub nom. Alaska Airlines, Inc. v.
  United Airlines, Inc.*, 948 F.2d 536 (9th Cir. 1991)..............................13

*In re AMR Corp.*,
  2023 WL 2563897 (2d Cir. Mar. 20, 2023), *cert. denied sub nom. Fjord v.
  Am. Airlines Grp., Inc.*, 2023 WL 6377970 (U.S. Oct. 2, 2023) ..........................3, 22

*In re AMR Corp.*,
  625 B.R. 215 (Bankr. S.D.N.Y. 2021), *aff'd, In re AMR Corp.*, 2023 WL
  2563897 (2d Cir. Mar. 20, 2023) ....................................................... *passim*

*Ball Mem'l Hosp., Inc. v. Mut. Hosp. Ins., Inc.*,
  784 F.2d 1325 (7th Cir. 1986) ........................................................8, 11

*Bio-Rad Lab'ys, Inc. v. 10X Genomics, Inc.*,
  483 F. Supp. 3d 38 (D. Mass. 2020) (Young, J.) ...................................27

*Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*,
  65 F.3d 1406 (7th Cir. 1995), *as amended on denial of reh'g* (Oct. 13, 1995) ....................8, 9

*Brantley v. NBC Universal, Inc.*,
  675 F.3d 1192 (9th Cir. 2012) .............................................................35

*Brown Shoe Co. v. United States*,
  370 U.S. 294 (1962)........................................................5, 8, 10, 11

*Cargill, Inc. v. Monfort of Colo., Inc.*,
  479 U.S. 104 (1986)..........................................................................27

*Chi. Pro. Sports Ltd. P'ship v. Nat'l Basketball Ass'n*,
  95 F.3d 593 (7th Cir. 1996) ...............................................................42

*Chicago Bridge & Iron Co. v. FTC*,
  534 F.3d 410 (5th Cir. 2008) .................................................. 20, 22-23

*Cia. Petrolera Caribe, Inc. v. Arco Caribbean, Inc.*,
  754 F.2d 404 (1st Cir. 1985)......................................................... 58-59

*Coastal Fuels of P.R., Inc. v. Caribbean Petroleum Corp.*,
  79 F.3d 182 (1st Cir. 1996)................................................................11

# TABLE OF AUTHORITIES
(continued)

Page(s)

*Flovac, Inc. v. Airvac, Inc.*,
   817 F.3d 849 (1st Cir. 2016) ............................................................................7

*Ford Motor Co. v. United States*,
   405 U.S. 562 (1972) ........................................................................................58

*Fraser v. Major League Soccer, L.L.C.*,
   284 F.3d 47 (1st Cir. 2002) ..............................................................................1

*FTC v. Arch Coal, Inc.*,
   329 F. Supp. 2d 109 (D.D.C. 2004) ....................................................... *passim*

*FTC v. Atl. Richfield Co.*,
   549 F.2d 289 (4th Cir. 1977) ..........................................................................31

*FTC v. Cardinal Health Inc.*,
   12 F. Supp. 2d 34 (D.D.C. 1998) ....................................................................24

*FTC v. Foster*,
   2007 WL 1793441 (D.N.M. May 29, 2007) .......................................... 6-7, 9, 51

*FTC v. Freeman Hosp.*,
   69 F.3d 260 (3d Cir. 1995) ..............................................................................17

*FTC v. Lab'y Corp. of Am.*,
   2011 WL 3100372 (C.D. Cal. Feb. 22, 2011) ..................................................38

*FTC v. Lundbeck, Inc.*,
   650 F.3d 1236 (8th Cir. 2011) ........................................................................36

*FTC v. Microsoft Corp.*,
   2023 WL 4443412 (N.D. Cal. July 10, 2023) ............................................30, 52

*FTC v. Occidental Petroleum Corp.*,
   1986 WL 952 (D.D.C. Apr. 29, 1986) .....................................................22, 34, 50

*FTC v. PepsiCo, Inc.*,
   477 F.2d 24 (2d Cir. 1973) ........................................................................59, 60

*FTC v. Qualcomm Inc.*,
   969 F.3d 974 (9th Cir. 2020) ..........................................................................24

*FTC v. RAG-Stiftung*,
   436 F. Supp. 3d 278 (D.D.C. 2020) ....................................................... *passim*

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*FTC v. Staples, Inc.*,
  970 F. Supp. 1066 (D.D.C. 1997) ..........................................................................39

*FTC v. Tenet Health Care Corp.*,
  186 F.3d 1045 (8th Cir. 1999) .......................................................................17, 39

*FTC v. Thomas Jefferson Univ.*,
  505 F. Supp. 3d 522 (E.D. Pa. 2020) .....................................................................17

*FTC v. Tronox Ltd.*,
  332 F. Supp. 3d 187 (D.D.C. 2018) .........................................................................4

*FTC v. Univ. Health, Inc.*,
  938 F.2d 1206 (11th Cir. 1991) .............................................................................23

*Gulf States Reorganization Grp. v. Nucor Corp.*,
  822 F. Supp. 2d 1201 (N.D. Ala. 2011) ...................................................................9

*Hospital Corp. of America v. FTC*,
  807 F.2d 1381 (7th Cir. 1986) (Posner, J.) ............................................................42

*Hunt-Wesson Foods, Inc. v. Ragu Foods, Inc.*,
  627 F.2d 919 (9th Cir. 1980) .................................................................................32

*Kaiser Aluminum & Chem. Corp. v. FTC*,
  652 F.2d 1324 (7th Cir. 1981) ...............................................................................36

*Lektro-Vend Corp. v. Vendo Co.*,
  660 F.2d 255 (7th Cir. 1981) .................................................................................37

*Luxottica Grp. S.p.A. v. Bausch & Lomb Inc.*,
  160 F. Supp. 2d 552 (S.D.N.Y. 2001) ....................................................................46

*In re Nat'l Collegiate Athletic Ass'n Athletic Grant-in-Aid Cap Antitrust Litig.*,
  958 F.3d 1239 (9th Cir. 2020) (M. Smith, J., concurring) ......................................40

*New York v. Deutsche Telekom AG*,
  439 F. Supp. 3d 179 (S.D.N.Y. 2020)............................................................ *passim*

*O.F.I. Imports Inc. v. Gen. Elec. Cap. Corp.*,
  2016 WL 5376208 (S.D.N.Y. Sept. 26, 2016).......................................................46

*Ohio v. Am. Express Co.*,
  138 S. Ct. 2274 (2018).....................................................................................7, 42

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Olin Corp. v. FTC*,
  986 F.2d 1295 (9th Cir. 1993) ..................................................................................23

*Pennsylvania v. Russell Stover Candies, Inc.*,
  1993 WL 145264 (E.D. Pa. May 6, 1993) ....................................................................28

*ProMedica Health Sys., Inc. v. FTC*,
  749 F.3d 559 (6th Cir. 2014) ....................................................................................38

*Rambus Inc. v. FTC*,
  522 F.3d 456 (D.C. Cir. 2008) ..................................................................................35

*Rebel Oil Co. v. Atl. Richfield Co.*,
  51 F.3d 1421 (9th Cir. 1995) ............................................................................7-8, 8-9

*Spirit Airlines, Inc. v. Northwest Airlines, Inc.*,
  431 F.3d 917 (6th Cir. 2005) ....................................................................................14

*Stanley Works v. FTC*,
  469 F.2d 498 (2d Cir. 1972)......................................................................................57

*State v. Kraft Gen. Foods, Inc.*,
  926 F. Supp. 321 (S.D.N.Y. 1995)............................................................................57

*Sterling Merch., Inc. v. Nestle, S.A.*,
  724 F. Supp. 2d 245 (D.P.R. 2010), *aff'd* 656 F.3d 112 (1st Cir. 2011) ................................27

*In re Super Premium Ice Cream Distrib. Antitrust Litig.*,
  691 F. Supp. 1262 (N.D. Cal. 1988), *aff'd sub nom. Haagen-Dazs Co. v.*
  *Double Rainbow Gourmet Ice Creams, Inc.*, 895 F.2d 1417 (9th Cir. 1990)..........................4

*U.S. Healthcare, Inc. v. Healthsource, Inc.*,
  986 F.2d 589 (1st Cir. 1993)......................................................................................8

*United Air Lines, Inc. v. C.A.B.*,
  766 F.2d 1107 (7th Cir. 1985) ..............................................................................13-14

*United States v. Aetna Inc.*,
  240 F. Supp. 3d 1 (D.D.C. 2017)..............................................................................30

*United States v. Airline Tariff Publ'g Co.*,
  836 F. Supp. 9 (D.D.C. 1993)....................................................................................56

*United States v. Am. Airlines Grp.*,
  ---- F. Supp. 3d ----, 2023 WL 3560430 (D. Mass. May 19, 2023) (Sorokin, J.)..............14, 51

**TABLE OF AUTHORITIES**
(continued)

<b>Page(s)</b>

*United States v. Anthem, Inc.*,
   236 F. Supp. 3d 171 (D.D.C. 2017), *aff'd*, 855 F.3d 345 (D.C. Cir. 2017) ..................... *passim*

*United States v. Archer-Daniels-Midland Co.*,
   781 F. Supp. 1400 (S.D. Iowa 1991) .................................................................................57

*United States v. AT&T Inc.*,
   310 F. Supp. 3d 161 (D.D.C. 2018), *aff'd sub nom. United States v. AT&T,*
   *Inc.*, 916 F.3d 1029 (D.C. Cir. 2019) ........................................................................49, 50, 54

*United States v. AT&T, Inc.*,
   916 F.3d 1029 (D.C. Cir. 2019) ................................................................................43, 49

*United States v. AT&T Inc.*,
   No. 17-02511 (D.D.C. May 8, 2018), ECF No. 126,
   https://www.justice.gov/media/951891/dl?inline .................................................................60

*United States v. Baker Hughes Inc.*,
   731 F. Supp. 3 (D.D.C.), *aff'd*, 908 F.2d 981 (D.C. Cir. 1990) ..................................... *passim*

*United States v. Baker Hughes Inc.*,
   908 F.2d 981 (D.C. Cir. 1990) ................................................................................... *passim*

*United States v. Booz Allen Hamilton Inc.*,
   2022 WL 9976035 (D. Md. Oct. 17, 2022) ............................................................................5

*United States v. Citizens & S. Nat'l Bank*,
   422 U.S. 86 (1975) ...............................................................................................................19

*United States v. Columbia Steel Co.*,
   334 U.S. 495 (1948) ............................................................................................................26

*United States v. Country Lake Foods, Inc.*,
   754 F. Supp. 669 (D. Minn. 1990) ............................................................................24, 31, 39

*United States v. E. I. Du Pont De Nemours & Co.*,
   353 U.S. 586 (1957) ............................................................................................................58

*United States v. First Nat'l State Bancorporation*,
   499 F. Supp. 793 (D.N.J. 1980) ...........................................................................................28, 29

*United States v. Gen. Dynamics Corp.*,
   415 U.S. 486 (1974) ........................................................................................................ *passim*

*United States v. Grinnell Corp.*,
   384 U.S. 563 (1966) ........................................................................................................ 11-12, 15

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*United States v. Int'l Harvester Co.,*
  564 F.2d 769 (7th Cir. 1977) ........................................................................ 37-38

*United States v. Ivaco, Inc.,*
  704 F. Supp. 1409 (W.D. Mich. 1989) ..................................................................21

*United States v. Long Island Jewish Med. Ctr.,*
  983 F. Supp. 121 (E.D.N.Y. 1997) ......................................................................17

*United States v. M.P.M., Inc.,*
  397 F. Supp. 78 (D. Colo. 1975)..........................................................................39

*United States v. Marine Bancorporation, Inc.,*
  418 U.S. 602 (1974)....................................................................1, 20, 21, 43

*United States v. Oracle Corp.,*
  331 F. Supp. 2d 1098 (N.D. Cal. 2004) ..............................................5, 17, 43, 45

*United States v. Reed Roller Bit Co.,*
  274 F. Supp. 573 (W.D. Okla. 1967) ...................................................................59

*United States v. Standard Oil Co. (N.J.),*
  253 F. Supp. 196 (D.N.J. 1966) ...........................................................................1

*United States v. SunGard Data Sys., Inc.,*
  172 F. Supp. 2d 172 (D.D.C. 2001) ....................................................................17

*United States v. Syufy Enters.,*
  903 F.2d 659 (9th Cir. 1990) ..................................................................... *passim*

*United States v. Tracinda Inv. Corp.,*
  477 F. Supp. 1093 (C.D. Cal. 1979) .....................................................................5

*United States v. U.S. Sugar Corp.,*
  2022 WL 4544025 (D. Del. Sept. 28, 2022), *aff'd*, 73 F.4th 197 (3d Cir. 2023) ........... *passim*

*United States v. U.S. Sugar Corp.,*
  73 F.4th 197 (3d Cir. 2023) ......................................................................1, 5, 11

*United States v. UnitedHealth Grp.,*
  630 F. Supp. 3d 118 (D.D.C. 2022), *appeal dismissed*, 2023 WL 2717667
  (D.C. Cir. Mar. 27, 2023)........................................................................ *passim*

*United States v. US Airways Grp., Inc.,*
  38 F. Supp. 3d 69 (D.D.C. 2014) ...................................................................32, 61

# TABLE OF AUTHORITIES
(continued)

Page(s)

*United States v. Waste Mgmt., Inc.,*
    743 F.2d 976 (2d Cir. 1984)............................................................................. *passim*

*Virtual Maint. Inc. v. Prime Comput.,*
    957 F.2d 1318 (6th Cir. 1992) ..................................................................................9

*Weeks Dredging & Contracting, Inc. v. Am. Dredging Co.,*
    451 F. Supp. 468 (E.D. Pa. 1978) .............................................................................7

I.    **THE LEGAL FRAMEWORK**

1.    Section 7 of the Clayton Act prohibits mergers only if "the effect of such acquisition may be substantially to lessen competition, or tend to create a monopoly."  15 U.S.C. § 18; *Fraser v. Major League Soccer, L.L.C.*, 284 F.3d 47, 69 (1st Cir. 2002).

A.    **The Key Principles of Section 7**

2.    There are three key principles underlying Section 7: the analysis must be industry-specific, forward looking, and focused on whether the merger will ***substantially*** lessen competition.  First, "only a further examination of the particular market—its structure, history and probable future—can provide the appropriate setting for judging the probable anticompetitive effect of the merger."  *United States v. Gen. Dynamics Corp.*, 415 U.S. 486, 498-503 (1974) (internal quotation marks and citation omitted).

3.    Second, "remote possibilities are not sufficient to satisfy the test set forth in [Section] 7."  *United States v. Marine Bancorporation, Inc.*, 418 U.S. 602, 623 n.22 (1974) (internal quotation marks and citation omitted).  The Government must show that the "loss of competition" is "sufficiently probable and imminent" in order to succeed.  *Id.*  "[O]nly an acquisition which in the long run may reasonably be expected to substantially lessen competition within a relevant market[ ] will violate [Section 7]."  *United States v. U.S. Sugar Corp.*, 2022 WL 4544025, at *19 (D. Del. Sept. 28, 2022), *aff'd*, 73 F.4th 197 (3d Cir. 2023) (citation omitted); *United States v. Baker Hughes Inc.*, 731 F. Supp. 3, 12 (D.D.C.), *aff'd*, 908 F.2d 981 (D.C. Cir. 1990) (holding acquisition would not substantially lessen competition "either immediately or long-term"); *United States v. Standard Oil Co. (N.J.)*, 253 F. Supp. 196, 227 (D.N.J. 1966) ("[S]hort term evaluation of anticompetitive effect on [the market at issue] is not consistent with the objectives of Section 7.").  Accordingly, "antitrust theory and speculation cannot trump facts; the Government must make its case on the basis of the record evidence relating to the market and its

probable future" rather than what could potentially occur. *United States v. UnitedHealth Grp., Inc.* 630 F. Supp. 3d 118, 151 (D.D.C. 2022), *appeal dismissed*, 2023 WL 2717667 (D.C. Cir. Mar. 27, 2023) (internal quotation marks and citation omitted); *FTC v. Arch Coal, Inc.*, 329 F. Supp. 2d 109, 116-17 (D.D.C. 2004) (same); *see also* Plaintiffs' Pretrial Brief, ECF No. 289 at 23 (explaining that entry is "rapid enough to deter or render insignificant the anticompetitive effects of the merger ***within two to three years***") (emphasis added).

4.       Third, to prove a Section 7 violation, the Government must demonstrate that "the proposed merger is likely to ***substantially*** lessen competition." *UnitedHealth Grp.*, 630 F. Supp. 3d at 129 (internal quotation marks and citation omitted). The "essential question" is whether, at the time of trial, there exists a substantial likelihood of future harm. *Gen. Dynamics*, 415 U.S. at 505. The inquiry under Section 7 is flexible, considering the "***totality-of-the-circumstances***" to determine the "effects of particular transactions on competition." *United States v. Baker Hughes Inc.*, 908 F.2d 981, 984 (D.C. Cir. 1990) (emphasis added).

### B.       The *Baker Hughes* Framework Applies

5.       The parties do not dispute that the well-established three-step burden-shifting framework set forth by the D.C. Circuit in *Baker Hughes* applies to this case. *Baker Hughes*, 908 F.2d at 983.

6.       Under the *Baker Hughes* framework, the Government retains "the ultimate burden of persuasion . . . at all times." *Baker Hughes*, 908 F.2d at 983; *see also* Fed. R. Evid. 301 ("In a civil case, unless a federal statute or these rules provide otherwise, the party against whom a presumption is directed has the burden of producing evidence to rebut the presumption. But this rule does not shift the burden of persuasion, which remains on the party who had it originally."). The Government has "the burden on every element of their Section 7 challenge, and a failure of proof *in any respect* will mean the transaction should not be enjoined." *Arch Coal*, 329 F. Supp.

2d at 116 (emphasis added).

7.     At Step One, the Government must establish the relevant product and geographic markets and "show[] that a transaction will lead to undue concentration in the market for a particular product in a particular geographic area," thereby establishing "a presumption that the transaction will substantially lessen competition." *Baker Hughes*, 908 F.2d at 982.  Market concentration statistics are only a "convenient starting point" for the analysis, and large changes in market share "cannot guarantee litigation victories." *Id.*

8.     At Step Two, the burden shifts to defendants, and defendants must produce evidence rebutting the presumption either by "(1) affirmatively showing why a given transaction is unlikely to substantially lessen competition, or (2) by discrediting the data underlying the initial presumption in the Government's favor." *Id.* at 991.  Defendants' burden at Step Two is to "show that the prima facie case inaccurately predicts the relevant transaction's probable effect on future competition." *Id.*

9.     At Step Two, Defendants can rely on a variety of factors, including the dynamic nature of industry, ease of entry, divestitures, supply-side substitution, and the benefits of transaction.  *See, e.g*, *id.*; *New York v. Deutsche Telekom AG*, 439 F. Supp. 3d 179, 207, 210 (S.D.N.Y. 2020) (relevant evidence on rebuttal "may include unique economic circumstances and nonstatistical evidence that undermines the predictive value of market share statistics, such as ease of entry into the market, the trend of the market toward or away from concentration, and the continuation of active price competition," as well as increased efficiencies flowing "to the ultimate benefit of all consumers"); *In re AMR Corp.*, 625 B.R. 215, 252 (Bankr. S.D.N.Y. 2021), *aff'd*, *In re AMR Corp.*, 2023 WL 2563897 (2d Cir. Mar. 20, 2023) (listing "supply and demand elasticities" as rebuttal points).  The burden on Defendants at this step is "relatively low."  *United States v.*

*Anthem, Inc.*, 236 F. Supp. 3d 171, 213 (D.D.C. 2017), *aff'd*, 855 F.3d 345 (D.C. Cir. 2017). Defendants do not need to "rebut a probability with a certainty." *Baker Hughes*, 908 F.2d at 992.

10.     At Step Three, if the defendants successfully rebut the presumption, the burden shifts back to the Government to produce "additional evidence of anticompetitive effect[s]," which merges with the Government's ever-present burden of persuasion. *Id.* at 983. That means the Government must show, without any presumption, that the merger is likely to cause substantial anticompetitive effects.

## II.     THE GOVERNMENT HAS FAILED TO ESTABLISH ITS PRIMA FACIE CASE

11.     To establish a prima facie case, the Government must both demonstrate the relevant product market and geographic market and prove that the transaction will lead to increased concentration in the relevant market. *FTC v. RAG-Stiftung*, 436 F. Supp. 3d 278, 291 (D.D.C. 2020) (citing *Baker Hughes*, 908 F.2d at 982); *see also FTC v. Tronox Ltd.*, 332 F. Supp. 3d 187, 197 (D.D.C. 2018) (Government bears burden of defining the appropriate product and geographic market). The relevant *product* market is undisputed—scheduled airline passenger service.

12.     Though the Government repeatedly invoked "cost-conscious consumers" who would allegedly suffer harm from this merger, the Government has neither identified a sub-market of such consumers nor attempted to define a market of customers who would only fly ULCCs. *See* Tr. 12/5/23 (Gov't Closing) 66:19–21 ("[W]e haven't defined a market around only cost-conscious or price-sensitive travelers."); *see infra* Section II.E. Nor would such a submarket be valid, given that courts "have repeatedly rejected efforts to define markets by price variances or product quality variances. Such distinctions are economically meaningless where the differences are actually a spectrum of price and quality differences." *In re Super Premium Ice Cream Distrib. Antitrust Litig.*, 691 F. Supp. 1262, 1268 (N.D. Cal. 1988), *aff'd sub nom. Haagen-Dazs Co. v. Double Rainbow Gourmet Ice Creams, Inc.*, 895 F.2d 1417 (9th Cir. 1990).

4

13.     The parties disagree on the applicable geographic market.  The Government contends that a discrete set of individual origin and destination pairs (or routes), viewed in isolation, constitute the relevant geographic market.  Defendants assert that a national geographic market more accurately captures the dynamic airline industry and the likely competitive effects of the proposed merger.

14.     Geographic market definition requires a "pragmatic, factual approach to the definition of the relevant market and not a formal legalistic one."  *United States v. Tracinda Inv. Corp.*, 477 F. Supp. 1093, 1105 (C.D. Cal. 1979).  A properly defined geographic market must "both 'correspond to the commercial realities' of the industry and be economically significant."  *Brown Shoe Co. v. United States*, 370 U.S. 294, 336 (1962) (citation omitted).

15.     Consequently, identifying the relevant market calls for a fact-intensive inquiry into both consumer demand and supply within an industry's specific context.  *Brown Shoe*, 370 U.S. at 325; *see also United States v. U.S. Sugar Corp.*, 73 F.4th 197, 203 (3d Cir. 2023) ("[T]he determination of a relevant market is composed of the articulation of a legal test which is then applied to the factual circumstances of each case." (citation omitted)).

16.     The Government bears the burden of establishing the relevant geographic market— and defendants have no obligation to prove any alternative definition.  *See, e.g.*, *United States v. Booz Allen Hamilton Inc.*, 2022 WL 9976035, at *5 (D. Md. Oct. 17, 2022) (Section 7 claims failed where Government failed to "sufficiently define[] a relevant market," rendering "allegations about Booz Allen's 'market power' . . . analytically incomplete"); *U.S. Sugar*, 2022 WL 4544025, at *16 (Government's proposed geographic market was too narrow.  If the Government fails "to meet their burden of proving the relevant market," it is "not entitled to a presumption of illegality" and must "come forward with evidence of actual anticompetitive effects."  *United States v. Oracle*

*Corp.*, 331 F. Supp. 2d 1098, 1165, 1175 (N.D. Cal. 2004) (declining to accept the Government's proposed geographic market, adopting a "worldwide market," and holding that Government failed to make out its prima facie case and failed to prove a Section 7 violation).

> **A.      The Government's Proposed Geographic Market Definition Ignores the Mobility and Dynamism in the Industry**

17.     Throughout this trial, the Court heard witness after witness testify that the airline industry is highly dynamic.  *See, e.g.*, Defendants' Proposed Findings of Fact, ECF No. 444 (hereinafter "PFOF") ¶¶ 275-276, 413, 431 (airline change reports); ¶ 567 (Frontier CEO explaining airlines have "portable assets, so we can move in easily and move out easily"); ¶¶ 37, 264 (JetBlue and Spirit executives explaining it is a dynamic industry).

18.     That consistent testimony comports with common sense.  Airplanes are highly mobile assets that move between different cities and routes with ease.  *See, e.g.*, PFOF § II.C.2. Static route-based geographic markets do not account for the inherent mobility of aircraft, constant repositioning of aircraft, real-time entry and expansion by rivals, and rapidly changing route networks in response to competitive pressures nationwide.  If Spirit were to exit or raise prices on any route post-merger, multiple potential entrants—including "scavenger" ULCCs, legacy airlines with their Basic Economy offerings, and other LCCs—will be poised to rapidly deploy new planes, lease additional planes, and deploy aircraft from unprofitable routes to fill any competitive vacuum, particularly within the Government's proposed 2- to 3-year time frame.  PFOF §§ V.B, V.E.

19.     The mobility of airplanes and the airlines poised for entry supports a national geographic market.  *See, e.g.*, *FTC v. Foster*, 2007 WL 1793441, at *17-18, *58 (D.N.M. May 29, 2007) (denying preliminary injunction for proposed merger, explaining narrow relevant market was "inadequate" where relevant product (gasoline) was regularly transported in and out of

proposed geographic area and "the prospect of entry by new competitors is not speculative, but likely"); *Weeks Dredging & Contracting, Inc. v. Am. Dredging Co.*, 451 F. Supp. 468, 492 (E.D. Pa. 1978) (declining to find narrower geographic markets because, inter alia, the "dredging business was fully mobile; dredging companies move where the work is and are not limited to one port or harbor").

20.     The Government's market definition ignores this dynamism and mobility.  Instead, the Government focuses on the demand side of the ledger, arguing that individual routes are not adequate substitutes for one-off consumer travel.  Tr. 10/31/23 (Gov't Opening) at 12:24-13:2 ("Let's say a college student in Boston wants to travel to San Juan to visit her parents.  A flight to Las Vegas is not a substitute for that new Bostonian who wants to visit her mom in San Juan.").  Among other things, the Government's myopic view also ignores the reality that consumers may fly many different routes over time—so while a flight to Las Vegas may not work for the Government's hypothetical new Bostonian wanting to visit family, it may be a desirable vacation destination for that same consumer.  *See* PFOF ¶¶ 49-51, 675 (explaining customers choose air travel based on different criteria for different flights and "customers move around").

21.     The Government asserted in closing argument that it is "the consumer's options and the consumer's choices" that determine the relevant market, citing *Flovac, Inc. v. Airvac, Inc.*, 817 F.3d 849, 854-55 (1st Cir. 2016).  *See* Gov't Closing Demonstratives at Slide 7.  But in *Flovac*, the parties agreed on the relevant geographic market; only the relevant product market was at issue.  817 F.3d at 853-54.  Setting aside this misplaced reliance, the Government's sole focus on the demand side of the market is legally wrong.  "[D]efining a market on the basis of demand considerations alone is erroneous."  *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1436 (9th Cir. 1995); *see also Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2285 (2018) (explaining in Sherman

Act context that the "area of effective competition" is typically the "arena within which significant substitution in consumption *or* production occurs" (emphasis added)); *see also U.S. Healthcare, Inc. v. Healthsource, Inc.*, 986 F.2d 589, 599 (1st Cir. 1993) ("Usage patterns, customer surveys, actual profit levels, comparison of features, ease of entry, and many other facts are pertinent in answering the question [of market definition].").

22.     The Government ignores that the supply and demand sides of the market are inextricably intertwined.  Judge Easterbrook's opinion for the Seventh Circuit in *Ball Memorial Hospital* explains it well.  *Ball Mem'l Hosp., Inc. v. Mut. Hosp. Ins., Inc.*, 784 F.2d 1325, 1336 (7th Cir. 1986).  That antitrust case against Blue Cross of Indiana concerned options for health insurance in Indiana.  The Seventh Circuit affirmed a regional or even national market because new insurance suppliers from elsewhere could enter Indiana and sell insurance there, eliminating any attempt by Blue Cross to raise prices to Indiana consumers.  As Judge Easterbrook succinctly put it: "The Blue's rivals, whose mobility is not restricted, protect consumers, whose mobility is restricted."  *Id.* at 1336-1337.

23.     Courts recognize that the movement of supply across geographies to satisfy customers—supply-side substitution—is critical in determining the relevant market.   Just last year, the district court in *U.S. Sugar* rejected the Government's proposed regional market because "sugar flows easily across the country from areas of surplus to deficit in response to prices and demand."  *U.S. Sugar*, 2022 WL 4544025, at *24; *see also, e.g.*, *Brown Shoe*, 370 U.S. at 325 n.42; *Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*, 65 F.3d 1406, 1410 (7th Cir. 1995), *as amended on denial of reh'g* (Oct. 13, 1995) ("[T]he definition of a market depends on substitutability on the supply side as well as on the demand side."); *Rebel Oil*, 51 F.3d at 1436 ("[D]efining a market on the basis of demand considerations alone is erroneous. . . . A

reasonable market definition must also be based on supply elasticity") (citation omitted); *Virtual Maint. Inc. v. Prime Comput.*, 957 F.2d 1318, 1327 (6th Cir. 1992) ("The relevant product market cannot be determined without considering the cross-elasticity of supply."); *Gulf States Reorganization Grp. v. Nucor Corp.*, 822 F. Supp. 2d 1201, 1236-1237 (N.D. Ala. 2011) (discussing need to consider supply-side substitution in defining relevant markets); *Foster*, 2007 WL 1793441, at *24, *58 ("[T]he existing and potential flow of trucked Gulf Coast product . . . must be included as a supply source in the relevant markets.").

24.     In the airline industry, supply-side substitution occurs routinely as airlines redeploy planes across their networks in response to changing consumer demand.  It is therefore critical to account for this substitution in defining the relevant market.  *Blue Cross & Blue Shield*, 65 F.3d at 1410 ("[T]he definition of a market depends on substitutability on the supply side as well as on the demand side.").

25.     The district court's decision in *U.S. Sugar* exemplifies the connection between supply-side substitution and the relevant geographic market.  There, the court found that the Government failed to identify a relevant market because the Government-proposed "regional" market relied "on customer locations, rather than supplier locations."  2022 WL 4544025, at *24. Although the merging parties in that case overlapped in the narrower proposed markets, the Government's proposed geographic market failed to account for "large volumes of sugar coming in from states outside the proposed geographic markets."  *Id.*  In other words, because the Government's "proposed geographic markets ignore the commercial realities of the sugar industry in this country – namely, that sugar flows freely and over long distances in response to market forces," regional geographic markets failed to embrace the competitive impact of the proposed merger.  *Id.*

26.     The same is true here where, just as in *U.S. Sugar*, supply can easily replace any lost demand and respond to increased fares post-merger.  As explained in Defendants' Proposed Findings of Fact (*see, e.g.*, PFOF §§ V.B, V.E) and further below, barriers to entry are low, meaning that supply can be easily replaced.  Frequently shifting among routes in response to nationwide competitive dynamics represents a form of supply-side substitution and must be accounted for in defining the relevant market.  *Arch Coal*, 329 F. Supp. 2d at 123 ("The Supreme Court has emphasized that the relevant geographic market must both 'correspond to the commercial realities of the industry and be economically significant.'" (quoting *Brown Shoe*, 370 U.S. at 336-37)).

**B.     A National Market Is the Appropriate Geographic Market for Assessing the Competitive Effects of This Merger, as Airlines Compete Vigorously at the National Level**

27.     Airlines compete at multiple levels, including both the route and national levels. The question before the Court is which geographic market best illuminates the competitive effects of the merger and thus is the ***relevant*** geographic market(s) through which this merger should be analyzed.  *U.S. Sugar*, 2022 WL 4544025, at *19 (explaining a "properly identified relevant market must correspond to the commercial realities of the industry," and the "failure to properly define either a product or geographic market is fatal to a plaintiff's case" (citations omitted)).

28.     The Government's route-level market definition—which would have this Court review each challenged route in isolation—does not capture the competitive realities of the industry or the likely effects of this merger.  Airlines compete nationally in numerous ways: among other things, routes and flight frequencies change constantly in accordance with nationally planned route networks, airlines choose their business model and on-board product offerings at the national level, and airlines compete nationwide through valuable customer loyalty programs.  *See* PFOF § III.B.3.  And, importantly, the quality and breadth of an airline's offering and their "relevance" to

10

consumers operate through nationwide loyalty programs, airport presence, comprehensive route networks, and product offerings, drive consumer purchasing decisions. *Id.*

29.     Defendants do not dispute that competition exists at the route level.  But that does not compel the Court to adopt the Government's proposed approach of defining the market by viewing each route-level market in isolation.  Indeed, the Court need not choose the narrowest market if that demarcation "does not aid [the court] in analyzing the effects of [a] merger." *U.S. Sugar*, 73 F.4th at 207 (quoting *Brown Shoe*, 370 U.S. at 327); *see also U.S. Sugar*, 2022 WL 4544025, at *24-25 (explaining that the purpose of the market definition requirement is not to "figure out which market allows the Government to prevail and then to use that market").

30.     Even when local competition exists, courts routinely apply broader geographic markets if a narrow geographic scope fails to capture the holistic competitive effects of the relevant transaction. *See, e.g., Ball Mem'l Hosp.*, 784 F.2d at 1336 (affirming district court's finding that the relevant "geographic market is regional, if not national" because narrower markets disregarded "new entry and expanded sales by rivals" (internal quotation marks and citation omitted)); *Coastal Fuels of P.R., Inc. v. Caribbean Petroleum Corp.*, 79 F.3d 182, 196 (1st Cir. 1996) (reversing jury finding that relevant geographic market was narrow, single-city market, where "the mobility of the ultimate consumers" supported a broader relevant market).

31.     In *United States v. Grinnell Corp.*, 384 U.S. 563 (1966), for example, the Supreme Court agreed that the market for security systems, while "in a sense local," "operated on a national level." *Id.* at 575.  In reaching that conclusion, the Court pointed to the industry's "national planning," business agreements covering multiple states, and "national schedule[s] of prices, rates, and terms" (even as those rates varied to "meet local conditions"). *Id.*  In short, the Supreme Court

11

selected the "broader national market" because it best "reflects the reality of the way in which [defendants] built and conduct their business." *Id.* at 576.

32.     In other cases involving airlines, the Government has posited broader geographic markets encompassing, for example, all flights in and out of certain airports regardless of the other endpoint. *See, e.g.*, Compl. at ¶¶ 31-32, *United States v. United Continental Holdings, Inc.*, No. 2:15-cv-07992 (D.N.J. Nov. 10, 2015), ECF No. 1 (Government asserting that all air passenger service "to and from Newark [Liberty Airport] constitutes a relevant antitrust market," and that "it is appropriate to aggregate all routes that either originate or terminate in Newark for the purpose of defining a relevant market in which the transaction will cause anticompetitive harm"); Am. Compl. at ¶ 31, *United States v. US Airways Grp., Inc.*, Case No. 1:13-cv-01236 (D.D.C. Sep. 5, 2013), ECF No. 73 (defining a geographic market for slots at Reagan National Airport in Washington, D.C.).

33.     The Government's expert, Dr. Gowrisankaran, concedes that a national market would pass the hypothetical monopolist test, such that it would constitute a relevant geographic market. PFOF ¶ 339. And the Government's other expert, Dr. Chipty, conceded that "there are layers of consideration" in how airlines make entry decisions: the "route level," the "endpoint level," and "then there's the overall network strategy." PFOF ¶ 343. When the Government has made similar concessions in other cases, courts have rejected the Government's proposed market definition as "simply not credible." *See U.S. Sugar*, 2022 WL 4544025, at *24 (rejecting Government expert's assertion of narrower geographic market where national market "would each pass the hypothetical monopolist test," as the contention that "a market that is merely six states in the southeastern U.S. is as relevant a geographic market as the entire U.S. . . . is simply not credible").

34.     Some cases involving airlines similarly applied a national market.  For example, in *In re Air Passenger Comput. Rsrvs. Sys. Antitrust Litig.,* 694 F. Supp. 1443, 1450 (C.D. Cal. 1988), *aff'd sub nom. Alaska Airlines, Inc. v. United Airlines, Inc.*, 948 F.2d 536 (9th Cir. 1991), the court assessed an alleged monopoly claim involving ticket reservation systems, which were then owned and operated by major airlines, and found that a national—not local—geographic market best reflected the competitive dynamics in the airline industry.

35.     Even though market shares for the airlines' ticket reservation systems varied by location, with some airlines having outsized shares in particular cities, the court in *Air Passenger Computer Reservations Systems* rejected the argument that cities were relevant markets and instead applied a national market.  As the court explained, despite some "evidence supporting a finding that the relevant geographic market is local," local market shares were "far from static" and "must be balanced by erosion of such market shares through competition" at the national level.  *Id.* at 1467.  Further, in assessing claims that local air transportation markets were relevant to the analysis, the court explained "that the only relevant air transportation market is the national market," in part due to the lack of "entry barriers" for rival airlines.  *Id.* at 1471-72 ("Plaintiffs have not presented evidence showing that competition in the CRS market is anything but national in scope.").

36.     Likewise, in *United Air Lines, Inc. v. C.A.B.*, 766 F.2d 1107, 1109 (7th Cir. 1985), the Seventh Circuit observed that air travel exemplifies a national market given airlines' ability to rapidly reposition airplanes between routes based on changes in price and capacity.  As the court explained, although "[f]rom a consumer standpoint the airline market consists of a series of discrete city pairs," in reality, the "airplanes and other capital equipment of the airline industry are highly mobile, and now that the industry has been deregulated there no longer are legal barriers to

13

airlines' redeploying their equipment, and swiftly too, to any city pair in which ticket prices are above marginal costs." *Id.* at 1115.  Given this high supply elasticity—"meaning that a slight increase in price will evoke a large increase in output"—that supply must be considered in assessing the geographic market. *Id.*  The court thus concluded that "airplanes flying between Des Moines and Salt Lake City are in the 'market' for air transportation between Newark and Atlanta." *Id.*

37.     Although the Government's pre-trial briefing relied on a handful of cases applying route-level geographic markets in the airline industry, those cases are inapposite here.  In *Spirit Airlines, Inc. v. Northwest Airlines, Inc.*, 431 F.3d 917, 933 (6th Cir. 2005), for example, the court had no occasion to consider a national geographic market given "the parties' agreement" that only two routes were at issue in the case.  In *In re AMR Corp.*, 625 B.R. at 247 n.26, the court noted that the plaintiffs in that case had been "deficient" in developing evidence supporting a national geographic market.  Finally, in *United States v. Am. Airlines Grp.*, ---- F. Supp. 3d ----, 2023 WL 3560430, at *36 (D. Mass. May 19, 2023) (Sorokin, J.), the court had no reason to consider a national geographic market because "the parties agree[d]" that the Government's allegations solely concerned routes in the Boston and New York metropolitan areas.  As the Government is aware, that case focused entirely on an alliance between American Airlines (a legacy carrier) and JetBlue focused on two metro areas.

38.     In contrast to those cases, here (1) the Government's case spans the nation and alleges harm well beyond its proffered geographic market, and (2) the Government's experts expressly concede that airlines compete at the national level and assert that this merger will have national or systemwide effects.

14

C.   **Even the Government's Theory of Harm Militates in Favor of a National Market**

39.     Beyond doctrinal and factual considerations, the Government's own misguided theory of harm lends further support for defining a national geographic market.

40.     Throughout trial, the Government has alleged post-merger harm based on the "elimination" of Spirit nationally.  *See, e.g.*, ECF No. 69 ¶ 30 (asserting "JetBlue's purchase of Spirit would hurt . . . travelers in at least three ways," including by "abandon[ing] Spirit's business model"); Tr. 10/31/23 (Gov't Opening) at 14:5-6 ("Now I'm going to turn to what is at the core of this case, that this deal would eliminate Spirit."); Tr. 12/5/23 (Gov't Closing) 69:6–10 ("[T]his loss of a particular product is something independent and apart of the average fare that the Court absolutely can consider in, um, analyzing whether this transaction will result in harm.").

41.     At the same time that the Government's theory of harm spans the nation and calls for a holistic assessment of post-merger competition nationwide, the Government claims that this Court must artificially limit its evaluation of post-merger competition to a small fraction of routes. But the Government cannot have it both ways.  *See Grinnell Corp.*, 384 U.S. at 575-76 (affirming national geographic market notwithstanding local service and holding that "relevant market . . . is not the several local areas which the individual stations serve").

42.     Similarly, even as the Government asserts injury on its handpicked list of routes, its experts expressly admit that individual route-level harm analyses are imprecise, and that achieving any measure of economic reliability requires aggregation—*i.e.*, for the purposes of their fare regressions, net harm calculations, and estimation of rival entry and expansion.  *See, e.g.*, PFOF ¶ 348. In other words, a holistic analysis of competitive effects aggregated far above the route level is appropriate, even as the Government seeks to preclude Defendants' compelling evidence of procompetitive benefits in the aggregate.

15

43.     Likewise, in arguing the merger will result in coordinated effects, the Government has relied on evidence of so-called "cross-market initiatives," or CMIs.   PFOF ¶¶ 926-934; *see infra* Section IV.B.   In asserting this theory of harm, the Government is positing that airlines' pricing decisions are not limited to individual routes.   Yet again, the Government is using a national market when it suits it, at the same time that it argues the Court should be constrained in its analysis to looking at individual routes in isolation.

**D.     When Viewed Nationally, the Government Is Not Entitled to a Presumption of Harm**

44.     After determining the relevant product and geographic market, "the Court may assess the presumptive competitive impact of the Proposed Merger by reviewing two different measures." *Deutsche Telekom*, 439 F. Supp. 3d at 205.

45.     When viewed nationally, the Government does not contend that either market concentration threshold is met, nor could this merger support a presumption for the Government. A combined JetBlue and Spirit would amount to approximately 8% of the domestic airline market, measured by revenue.   PFOF ¶ 34.   This is a merger between the sixth and seventh largest carriers in the country, which would become the fifth largest carrier in the country—still less than half the size of the smallest Big 4 carrier.   *Id.*

**E.     The Government's Suggestion of Harm to the Amorphous Group of "Cost-Conscious" Travelers Is Not a Well-Defined Market**

46.     In its pretrial briefing and its opening statement, and closing argument at trial, the Government argued that this merger will hurt "cost-conscious" travelers.   *See, e.g.*, Tr. 12/5/23 (Gov't Closing) 59:17–20 ("[A]ll these [Spirit] routes we see harm that will manifest in the loss of the Spirit effects or the significant decline on fares market-wide that would result from the elimination of Spirit, or the loss of the Spirit product itself on which cost-conscious customers depend.").   But as the Government conceded: "We haven't defined a market around only cost-

conscious or price-sensitive travelers." *Id.* at 66:19–21.

47.    This failure to properly define a market involving "cost-conscious" travelers renders the Government's argument related to those consumers nothing more than window-dressing.  The Government bears the burden of proof in defining the relevant market, and where it has not carried that burden, it has not made out its prima facie case.  *See, e.g.*, *RAG-Stiftung*, 436 F. Supp. 3d at 292; *FTC v. Thomas Jefferson Univ.*, 505 F. Supp. 3d 522, 557 (E.D. Pa. 2020); *Oracle*, 331 F. Supp. 2d at 1109; *United States v. SunGard Data Sys., Inc.,* 172 F. Supp. 2d 172, 182-83 (D.D.C. 2001); *United States v. Long Island Jewish Med. Ctr.*, 983 F. Supp. 121, 137-140 (E.D.N.Y. 1997).  "Without a well-defined relevant market, a merger's effect on competition cannot be evaluated[,]" *FTC v. Tenet Health Care Corp.*, 186 F.3d 1045, 1051 (8th Cir. 1999), because the market definition "dictates the analysis of market power and the merger's anticompetitive effects." *RAG-Stiftung*, 436 F. Supp. 3d at 291; *see also FTC v. Freeman Hosp.*, 69 F.3d 260, 268 (3d Cir. 1995).

## III.    EVEN IF THE GOVERNMENT HAS ESTABLISHED A PRIMA FACIE CASE, DEFENDANTS HAVE REBUTTED THE PRESUMPTION

48.    Because "market shares and HHIs establish only a presumption," and "presumptions are not self-executing," *Deutsche Telekom*, 439 F. Supp. 3d at 206, the Court must next make a "broader inquiry into future competitiveness," *Baker Hughes*, 908 F.2d at 984.

49.    Defendants have produced ample evidence to meet their burden to rebut the Government's alleged presumption either by "affirmatively showing why a given transaction is unlikely to substantially lessen competition" or "discrediting the data underlying the initial presumption in the government's favor." *Id.* at 991.

### A.    The Government's Peripheral Markets Are Not Valid

50.    The Government identified 51, and now 35, markets at the "heart" of its case.  These

are nonstop overlaps that meet the screen for a "presumption" in the Government's own Merger Guidelines.

51.     Apart from these routes, the Government identified the following route categories that are not relevant antitrust markets.  First, there are 115 "Spirit-only routes."  PFOF ¶ 359. These are routes on which there is no existing competition between Spirit and JetBlue because JetBlue is not present.  These novel "markets" are not relevant under Section 7, which only is concerned with a "substantial lessening of competition" between the merging parties.  These routes do not meet the Government's own screen in its Guidelines for a presumption, and any harm on these routes is implausible.  No factual evidence was elicited at trial by the Government about these routes.

52.     Second, there are 168 "Spirit-entry routes."  PFOF ¶ 366.  Spirit is not present on any of these routes; these are routes Spirit considered entering under its now "incredibly unlikely" five-year plan.  PFOF ¶ 370.  Any harm on these routes is speculative because Spirit may not even enter them.  No factual evidence was elicited at trial by the Government about these routes.

53.     Third, there are 96 "econometric routes."  PFOF ¶ 375.  These are routes on which JetBlue and Spirt compete to a minor extent, but their shares fall below even the low thresholds that the Government articulates in its Guidelines.  PFOF ¶ 376.  No factual evidence was elicited at trial by the Government about these routes, and the Government's expert's calculations of alleged harm are speculative.  PFOF ¶¶ 377-379.

54.     Fourth, there are 117 "connect routes."  PFOF ¶ 380.  No factual evidence was elicited by the Government at trial about these routes.  Because the parties generally use "sum of locals" pricing, there is not material competition on these routes in terms of pricing.  PFOF ¶¶ 384-389.  For similar reasons, the Government's claim on the 15 "mixed routes" is not viable.  PFOF

¶¶ 391-401.

     **B.    Defendants Have a Low Burden to Rebut the Presumption**

     55.    The "quantum of evidence defendants must produce to shift the burden back is relatively low." *Anthem*, 236 F. Supp. 3d at 213 (citing *Baker Hughes*, 908 F.2d at 991 ("[D]efendants are not required to 'clearly disprove anticompetitive effect,' but rather to make 'a showing.'").

     56.    Defendants' burden is necessarily low because "[i]f the burden of production imposed on a defendant is unduly onerous, the distinction between that burden and the ultimate burden of persuasion—always an elusive distinction in practice—disintegrates completely." *Baker Hughes*, 908 F.2d at 991. "A defendant required to produce evidence 'clearly' disproving future anticompetitive effects must essentially persuade the trier of fact on the ultimate issue in the case—whether a transaction is likely to lessen competition substantially. Absent express instructions to the contrary, we are loath to depart from settled principles and impose such a heavy burden." *Id.*

     57.    Defendants need only produce evidence indicating that "the market-share statistics gave an inaccurate account of the acquisitions' probable effects on competition." *United States v. Citizens & S. Nat'l Bank*, 422 U.S. 86, 120 (1975); *see also Gen. Dynamics*, 415 U.S. at 498 (while "statistics concerning market share and concentration" may be significant, they are "not conclusive indicators of anticompetitive effects").

     58.    Defendants can rely on a wide array of evidence to show market shares are not representative. *Baker Hughes*, 908 F.2d at 991; *Gen. Dynamics*, 415 U.S. at 501. The Court's inquiry under Section 7 is flexible, always considering the "***totality-of-the-circumstances***" to determine the "effects of the particular transactions on competition." *Baker Hughes*, 908 F.2d at 984 (emphasis added). In assessing the totality of the circumstances, courts should review

evidence "that undermines the predictive value of market share statistics, such as ease of entry into the market, the trend of the market toward or away from concentration, and the continuation of active price competition." *Deutsche Telekom*, 439 F. Supp. 3d at 207.

59.     In closing argument, the Government cited *Chicago Bridge & Iron Co. v. FTC*, 534 F.3d 410, 426 (5th Cir. 2008), for the proposition that where the Government's prima facie case is "very compelling" then "the respondent's burden of production on rebuttal is also heightened." But by closing, the Government's case focused on just 35 nonstop overlap routes at the "heart" of its case.  Tr. 12/5/23 (Gov't Closing) 62:11-15.  As discussed further below, the Government's prima facie case here falls far short of that mark because, as to those alleged "markets," the case rests on static market share statistics that are stale, misleading, and fail to account for the dynamism and competitive nature of the airline industry.  The Government has presented no other evidence that would make its prima facie case "very compelling."   And even if the Government had presented such evidence, it would not change the standard at Step Two of *Baker Hughes*.  *See Deutsche Telekom*, 439 F. Supp. 3d at 207 ("The more compelling the prima facie case, the more evidence the defendant must present to rebut it successfully, but because the burden of persuasion ultimately lies with the plaintiff, the burden to rebut must not be unduly onerous." (quoting *Anthem*, 855 F.3d at 349-50)).

60.     The Government asserted at closing (without citation) that "defendants . . . must come forward with significant evidence that mandates the conclusion that the merger does not threaten a substantial lessening of competition."  Tr. 12/5/23 (Gov't Closing) 51:10-15.  The Government invents this standard by stitching together language from two separate cases.  *See* Plaintiffs' Pretrial Brief, ECF No. 289 at 11 (stating "the burden is on Defendants to rebut that prima facie case through 'significant evidence,' *United States v. Marine Bancorp., Inc.*, 418 U.S.

602, 631 (1974), that 'mandate[s] a conclusion' that it does not threaten 'a substantial lessening of competition,' *Gen'l Dynamics*, 415 U.S. at 497–98").

61.     Neither case supports the Government's proposed standard.  In *General Dynamics*, the court explained that the question before it was "whether the District Court was justified" in reaching its conclusion "that no substantial lessening of competition occurred or was threatened" by the proposed acquisition. *Gen. Dynamics*, 415 U.S. at 498 ("[T]he question before us is whether the District Court was justified in finding that other pertinent factors affecting the coal industry and the business of the appellees mandated a conclusion that no substantial lessening of competition occurred or was threatened by the acquisition of United Electric.").  Defendants are aware of just one district court case even mentioning this "mandate[s] a conclusion" language in the nearly fifty years since *General Dynamics* was decided.  *See United States v. Ivaco, Inc.*, 704 F. Supp. 1409, 1421 (W.D. Mich. 1989).

62.     *General Dynamics* also makes no mention of "significant evidence."  That language is drawn from *United States v. Marine Bancorporation*, 418 U.S. 602, 631 (1974), which held that defendants "introduced no significant evidence" supporting their rebuttal case.  *Id.* at 631-32 ("On this aspect of the case, the burden was then upon appellees to show that the concentration ratios, which can be unreliable indicators of actual market behavior did not accurately depict the economic characteristics of the Spokane market. . . . Appellees introduced no significant evidence of the absence of parallel behavior in the pricing or providing of commercial bank services in Spokane.") (citation omitted).  Defendants are aware of no case applying the combined standard the Government endorses.

21

**C.      Because of the Ease of Entry, the Transaction Is Unlikely to Substantially Lessen Competition**

63.      Courts have long held that "entry by potential competitors may be considered in appraising whether a merger will 'substantially lessen competition.'" *United States v. Waste Mgmt., Inc.*, 743 F.2d 976, 983 (2d Cir. 1984). "Whether entry is included as part of the market definition or in the ease of entry evaluation, practically, is of no consequence. In either event, the result is the same. The exercise of market power will be thwarted and collusive behavior will not be possible." *FTC v. Occidental Petroleum Corp.*, 1986 WL 952, at *8 (D.D.C. Apr. 29, 1986); *see also Deutsche Telekom*, 439 F. Supp. 3d at 207 (courts should review "ease of entry into the market" in assessing the totality of the circumstances under Step Two of *Baker Hughes*).

64.      Contrary to the Government's suggestion during its summation, Defendants need not show competitors *will* enter the relevant markets or precisely when the entry will occur. *Baker Hughes*, 908 F.2d at 983 ("The government argues that, as a matter of law, section 7 defendants can rebut a prima facie case *only by a clear showing that entry into the market by competitors would be quick and effective*. . . . We find no merit in the legal standard propounded by the government."); *United States v. Syufy Enters.*, 903 F.2d 659, 667 n.13 (9th Cir. 1990) ("We cannot and should not speculate as to the details of a potential competitor's performance; we need only determine whether there were barriers to the entry of new faces into the market.").

65.      Multiple courts have addressed entry within the *Baker Hughes* framework— including the Second Circuit, Fifth Circuit, Ninth Circuit, Eleventh Circuit, and D.C. Circuit—and have focused on whether entry barriers exist that would impede the ease of entry. *See, e.g.*, *In re AMR Corp.*, 2023 WL 2563897, at *2 (2d Cir. Mar. 20, 2023), *cert. denied sub nom. Fjord v. Am. Airlines Grp., Inc.*, 2023 WL 6377970 (U.S. Oct. 2, 2023) ("In this Circuit, even before *Baker Hughes*, we have rejected Plaintiffs' rigid interpretation of Section 7 in favor of a more nuanced

22

burden-shifting framework that allows defendants to rebut the contention that increased market share necessarily reflects 'lessen[ed] competition' . . . . [such as] by showing that the barriers to entry in the relevant market [are] low."); *Chi. Bridge & Iron Co.*, 534 F.3d at 428 (5th Cir. 2008) (defendant failed to rebut presumption based on "substantial evidence of barriers to entry and substantial evidence that they will continue to exist in the near future"); *Olin Corp. v. FTC*, 986 F.2d 1295, 1305 n.10 (9th Cir. 1993) ("Ease of market entry is relevant in antitrust cases because even a monopolist will not be able to exercise power over price in a market that is easily entered by potential competitors."); *FTC v. Univ. Health, Inc.*, 938 F.2d 1206, 1225 (11th Cir. 1991) (affirming preliminary injunction in part because of "evidence that there is substantial barrier to entry into the relevant market"); *Baker Hughes*, 908 F.2d at 987-88 (explaining that although "a defendant may successfully rebut a prima facie case by showing quick and effective entry," that "does not mean that successful rebuttal requires such a showing" and holding presumption was rebutted where "entry barriers to [relevant market] were not high enough to impede future entry").

66.     While the Government relies on the language in the 2010 Horizontal Merger Guidelines (stating that entry should be "timely, likely, and sufficient"), the Guidelines "are not ultimately binding upon the courts" and should not be given any "talismanic force." *Deutsche Telekom*, 439 F. Supp. 3d at 226, 232.  In all events, whatever this rubric means, as the D.C. Circuit held in *Baker Hughes*, there is no requirement for entry to be "quick and effective."  908 F.2d at 988 (rejecting the Government's "quick and effective" proposed standard).  And there is no requirement to prove entry will replace Spirit one-for-one.  *UnitedHealth Grp.*, 630 F. Supp. at 133-34.

67.     The evidence on entry is consistent with or stronger in this case than many of the other cases that have found entry sufficient to offset or deter any anticompetitive effects.  In those

cases, the courts found mergers did not violate Section 7 based on evidence of low barriers to entry and some evidence of historical entry that showed competitors were able to chase profit opportunities. *Baker Hughes*, 908 F.2d at 988-89 (no section 7 violation where some entry barriers existed but were not high enough to deter entry in the event of "supracompetitive pricing" given evidence of recent entry into the market and other competitors that could potentially enter); *Syufy Enters.*, 903 F.2d at 665 (no Section 7 violation where there were low barriers to entry and significant expansion by remaining competitor); *Waste Mgmt.*, 743 F.2d at 983 (no Section 7 violation where there were low barriers to entry, assets were mobile, and there was evidence of a competitor from a neighboring city entering the market).

68.     Defendants in this case proved that entry barriers on routes are very low, aircraft are mobile, and entry onto routes, including the 35 routes on which the Government focused, happen almost constantly. *See, e.g.*, PFOF §§ IV.G, V.B, V.E. Not only that, but Defendants adduced evidence directly from potential entrants who cogently testified that they had both the ability and incentive to enter profitable routes vacated by Spirit. PFOF §§ V.B, V.D, V.E. Defendants are unaware of any cases where entry happens at the frequency it does in the airline industry *and* the main potential entrants testified that they are likely to enter the markets if a profit opportunity presents itself, yet the court still found a Section 7 violation. *Cf. United States v. Country Lake Foods, Inc.*, 754 F. Supp. 669, 672-73 (D. Minn. 1990) (no Section 7 violation where there were low barriers to entry and potential entrants submitted evidence that they "would not hesitate" to enter if prices increased after the merger).

### 1.     The History of Entry Suggests the Likelihood of Future Entry

69.     While the Court is tasked with a forward-looking exercising, recent entry by competitors can undermine claims of competitive harms. *FTC v. Qualcomm Inc.*, 969 F.3d 974, 996 (9th Cir. 2020). This "**history of entry** into the relevant market is *a central factor* in assessing

the likelihood of entry in the future." *FTC v. Cardinal Health Inc.*, 12 F. Supp. 2d 34, 56 (D.D.C. 1998) (emphasis added).

70.     The Government's own expert, Dr. Chipty, evaluated more than 4,700 entry events from just four ULCC's that she identified over the course of five-and-a-half years, from 2017 to 2022.  PFOF ¶ 773.  Numerous fact witnesses also confirmed the large number of entries and exits that regularly occur in the airline industry as airlines chase profitable routes.  *See, e.g.*, PFOF ¶¶ 200, 266, 268, 336.

71.     In just 2023—at the time Defendants' expert issued his report in August 2023— domestic carriers had already entered approximately 400 nonstop routes.  PFOF ¶ 482.  That is unsurprising given the significant changes in carriers' networks every year.  PFOF ¶ 481.  Further, the record reflects that ULCCs have already started entering routes that Spirit exited this year.  PFOF ¶¶ 600-601.  There is no evidence in the record that suggests that this recent history of entry will not continue in the future.

### 2.     Barriers to Entry Are Low in the Airline Industry

72.     Courts have found that mergers are unlikely to substantially lessen competition when "potential entry into the relevant [] market by new firms or by firms now operating in [a nearby market] is so easy as to constrain the prices charged." *Waste Mgmt.*, 743 F.2d at 979.  "The explanation is simple: where entry barriers are low, market share does not accurately reflect the party's market power." *Syufy Enters.*, 903 F.2d at 664 n.6 (citation omitted).

73.     In *Waste Management*, the defendant argued "that the presumption is rebutted by the fact that competitors can enter the Dallas waste hauling market with such ease that the finding of a 48.8% market share does not accurately reflect market power." *Waste Mgmt.*, 743 F.2d at 981.  The Second Circuit agreed: "entry into the trash collection business is relatively easy, and the barriers to entry not great." *Id.* at 982.

25

74.     The Second Circuit found entry was relatively easy both for new entrants ("individuals operating out of their homes") and for larger companies ("Fort Worth haulers could easily establish themselves in Dallas if the price of trash collection rose above the competitive level"). *Id.* at 983. The Second Circuit held: "there is no barrier to Fort Worth haulers' acquiring garage facilities in Dallas permitting them to station some of their trucks there," and that recent entry by a Fort Worth firm into a Dallas suburb confirmed as much. *Id.* "The existence of haulers in Fort Worth, therefore, constrains prices charged by Dallas haulers, much as Falstaff constrained pricing by northeast breweries." *Id. See also United States v. Columbia Steel Co.*, 334 U.S. 495, 530 (1948) (emphasizing "the ability of out-of-the-area fabricators to compete because of the specialized character of structural steel production").

75.     The record here is replete with evidence that barriers to entry are low—both as a general matter, and specifically on the 35 "enduring" routes that the Government deems the "heart" of this matter. For example:

(a)     Two new airlines, Avelo and Breeze, have started offering commercial service since 2021. PFOF ¶¶ 238, 244.

(b)     Airlines constantly reallocate planes to other routes to maximize profitability. *See, e.g.*, PFOF ¶¶ 200, 266, 268, 336.

(c)     Airlines have expansive orderbooks, notwithstanding the aircraft delivery slowdowns, that will increase available seats, as well as options; they can also lease planes and redeploy planes from underperforming routes. PFOF ¶¶ 189, 217, 229-230, 336, 591.

(d)     Most of the airports in the cities on the Government's 51 (now 35) "presumption routes" have no barriers to entry at all, and the divestitures remove barriers at key constrained airports. PFOF §§ V.B, V.C.

26

76.     While the Government pointed in its pre-trial briefing to pilot and plane shortages as constraints on entry (Plaintiffs' Pretrial Brief, ECF No. 289 at 24), testimony at trial revealed that pilot constraints had dissipated, and the engine issue primarily affected Spirit.  PFOF ¶¶ 221, 446, 584.

77.     All of this evidence demonstrates that the airline industry does not have "significant" barriers that "prevent[] another firm from entering." *Bio-Rad Lab'ys, Inc. v. 10X Genomics, Inc.*, 483 F. Supp. 3d 38, 66 (D. Mass. 2020) (Young, J.); *see also Sterling Merch., Inc. v. Nestle, S.A.*, 724 F. Supp. 2d 245, 268 (D.P.R. 2010), *aff'd* 656 F.3d 112 (1st Cir. 2011) ("It is established in antitrust law that an entry barrier is a cost that is greater for a new competitor than for established rivals.").

78.     The lack of entry barriers matters because it renders high market shares less meaningful: "A high market share, though it may ordinarily raise an inference of monopoly power, will not do so in a market with low entry barriers or other evidence of a defendant's inability to control prices or exclude competitors." *Syufy Enters.*, 903 F.2d at 664 (quotation omitted); *see also id.* ("If there are no significant barriers to entry, however, eliminating competitors will not enable the survivors to reap a monopoly profit; any attempt to raise prices above the competitive level will lure into the market new competitors able and willing to offer their commercial goods or personal services for less.").

### 3.     ULCCs Are Poised to Grow in the Short and Long Term

79.     Because Section 7 is a forward-looking inquiry, courts must focus on entry barriers after the merger occurs.  *See, e.g.*, *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 119 n.15 (1986); *Baker Hughes*, 908 F.2d at 989 n.9; *Waste Mgmt.*, 743 F.2d at 983-84.  The Court should look at long-term prospects for entry to determine if "entry would likely be timely enough to replace the competitive impact of" Spirit.  *Deutsche Telekom*, 439 F. Supp. 3d at 233 (rejecting

any "hard limit" on the timeframe for which entry would be sufficient); *see Baker Hughes*, 908
F.2d at 988 (rejecting the Government's proposed "quick and effective" rule for evaluating entry).

80.     In *Baker Hughes*, the district court found that "while competition is likely to be
lessened immediately if the proposed acquisition is completed, ***long-range prospects*** in the
market, while uncertain, are favorable to new entry which will ensure continued vigorous
competition." *Baker Hughes*, 731 F. Supp. at 11 (emphasis added).  Indeed, in its pretrial brief, the
Government conceded that entry is timely if it is "rapid enough to deter or render insignificant the
anticompetitive effects of the merger within two to three years."  Plaintiffs' Pretrial Brief, ECF
No. 289 at 23.

81.     When there is a "substantial pool of potential [] entrants into the relevant markets,"
the loss of a competitor can be "an insignificant competitive event." *United States v. First Nat'l
State Bancorporation*, 499 F. Supp. 793, 814 (D.N.J. 1980).  This is particularly true where other
market participants "situated on the fringe of the market will fulfill whatever competitive
responsibilities [Spirit] once held." *Id.*  In other words, when competitors are "ready, willing and
able to enter the market," a court can find no significant barriers to entry. *Pennsylvania v. Russell
Stover Candies, Inc.*, 1993 WL 145264, at *15 (E.D. Pa. May 6, 1993).

82.     ULCCs are a "substantial pool" of potential entrants, and the evidence shows that
they are "ready, willing and able" to enter markets where there is demand.  The record here
demonstrates that other ULCCs would "chase" routes that Spirit exits, that those routes would go
to the top of the list for potential ULCC entry, and "the scavengers would . . . clean up this carcass
within weeks."  PFOF ¶ 568.  Indeed, the evidence shows that other ULCCs have recently entered
routes that Spirit exited or reduced capacity on.  PFOF ¶ 601.  And these ULCCs—Frontier,
Allegiant, Avelo, Breeze, Sun Country—will have the planes needed to enter new routes, as they

expect more than 150 planes to be delivered through 2025 and many more to come after that. PFOF ¶ 189.

### 4. Legacy and Low Cost Carriers Intend to Grow their Unbundled Fare Options

83.     The significant evidence of ULCC entry is sufficient to show the "new entry" that will "ensure continued vigorous competition." *Baker Hughes*, 731 F. Supp. at 11.  But, as the court explained in *Waste Management*, entry both by new companies and established market participants must be considered.  *Waste Mgmt.*, 743 F.2d at 983.  Here, there is evidence that other carriers, including JetBlue, American, Delta, and United, have unbundled fare options that compete with ULCCs and that will continue to grow.  *See, e.g.*, PFOF ¶ 621.  Indeed, legacy airlines have thousands of planes on order that will include "Basic Economy" options; and by 2025, JetBlue will have more than 500 planes in service with about 30 percent of seats that go to Blue Basic.  PFOF ¶¶ 621, 893.

84.     As discussed *supra* at Section II.E, the Government chose not to define a market consisting only of cost-conscious customers or only of ULCCs.  The Government's proposed market includes all airlines, and its market share calculations include all airlines.  As such, the Government cannot credibly argue that entry by legacy and low cost carriers should be ignored. The Government's proposed market includes those carriers, and so too must the entry analysis.

### 5. The Proposed Divestitures Will Help Ensure Barriers to Entry Remain Low at Key Airports

85.     Even if an industry has high entry barriers, remedies designed for a particular transaction may be structured to mitigate those barriers. *Deutsche Telekom*, 439 F. Supp. 3d at 228 (noting the mobile wireless network market has high barriers but the proposed remedies and the new entrant's own positioning "will greatly reduce the time normally required to build a mobile

wireless network"); *see also First Nat'l State Bancorporation*, 499 F. Supp. at 814 (divestitures "provide an incentive for [rivals] to enter the markets immediately").

86.     Defendants need not prove the divestitures will identically replicate pre-merger competition on the relevant routes.  *UnitedHealth Grp.*, 630 F. Supp. at 133. "By requiring that [the defendant] prove that the divestiture would preserve exactly the same level of competition that existed before the merger, the government's proposed standard would effectively erase the word 'substantially' from Section 7." *Id.*; *see also FTC v. Microsoft Corp.*, 2023 WL 4443412, at *15 (N.D. Cal. July 10, 2023) (rejecting FTC's argument that "binding" "written offer" made by defendants "has [no] relevance to its *prima facie* burden").

87.     Nor do the divestitures, as the Government suggests, need to be "iron clad for a court to consider it." *United States v. Aetna Inc.*, 240 F. Supp. 3d 1, 60 (D.D.C. 2017); *compare* Plaintiffs' Pretrial Brief, ECF No. 289 at 28 (claiming "it is highly uncertain whether the divestitures will occur at all").  Rather, the divestiture need only be "sufficiently non-speculative" for "the court to evaluate its effects on future competition, then further evidence about the likelihood of the divestiture goes to the weight of the evidence regarding the divestiture's effects." *Aetna*, 240 F. Supp. 3d at 60.

88.     Indeed, the Government has itself acknowledged that divestitures in the airline industry need not identically replicate competition to be effective.  In responding to public comments regarding the proposed divestiture in the merger between American Airlines and US Airways, the Government conceded that "the proposed remedy does not purport to replicate the precise form of competition that will be lost as a result of the merger" but it will "result in the expansion of LCC competition across the nation and the delivery of substantial consumer benefits."  Response of Plaintiff United States to Public Comments on the Proposed Final

Judgment at 27-28, *United States v. US Airways Grp., Inc.*, No. 1:13-cv-01236 (D.D.C. Mar. 10, 2014), ECF No. 159.

89.     The divestiture buyers here, Frontier and Allegiant, testified that they will use the valuable assets to compete vigorously and to offer service on routes where there is demand.  PFOF ¶¶ 537, 548.   And the divestitures here are significant—they touch an endpoint on 36 of 51 presumption routes.  PFOF ¶ 422.  Twenty-seven of the Government's 35 "enduring" presumption routes touch a divestiture endpoint.  PFOF ¶ 431.

90.     In addition, regardless of whether the divestitures go to the ultimate buyers JetBlue expects them to, those divestitures are still going to happen – JetBlue will not be using those assets following the merger.  PFOF ¶¶ 48, 532; *see also FTC v. Atl. Richfield Co.*, 549 F.2d 289, 299 (4th Cir. 1977) (crediting defendants' executives' testimony they were exiting the market when evaluating divestitures).

### 6.     Entry Does Not Need to Be on the Same Exact Routes that Spirit Flies Today

91.     Defendants need not prove that entry will occur on the same routes, to the same degree, in a set time frame.  There is similarly no requirement for Defendants to show that other airlines will replace Spirit one-to-one on the same routes, with the same flight frequencies.  *See, e.g.*, *Baker Hughes*, 908 F.2d at 988 ("[A] defendant seeking to rebut a prima facie case certainly need not show that any firm *will* enter the relevant market."); *Deutsche Telekom*, 439 F. Supp. 3d at 233 (finding entry likely even when a single rival "alone did not completely replace [the merging entity's] competitive impact").  "We cannot and should not speculate as to the details of a potential competitor's performance; we need only determine whether there were barriers to the entry of new faces into the market."  *Syufy Enters.*, 903 F.2d at 667 n.13; *cf. Country Lake Foods*, 754 F. Supp. at 679-80 (defendants rebutted presumption in part by showing the "threat or occurrence of

31

subsequent entry by" other competitors and low entry barriers, and holding Government's claim

entry was "speculative" was "unpersuasive" in light of the record).

92.     Indeed, the Government has already acknowledged—in blessing a separate airline

merger—that complete replacement is not a necessary or practical outcome.  *United States v. US*

*Airways Grp., Inc.*, 38 F. Supp. 3d 69, 79 (D.D.C. 2014) (endorsing Government's view that

"mandating that the merged airline continue specific routes or requiring an LCC to undertake a

specific route would represent a solution that is neither feasible nor desirable," as even absent the

merger, there was no "guaranteed continued competition between the merging airlines on specific

routes") (citation omitted); *Baker Hughes*, 908 F.2d at 987 (explaining a "defendant cannot

realistically be expected to prove that new competitors will 'quickly' or 'effectively' enter,"  as it

"would require of defendants a degree of clairvoyance alien to section 7").

### D.     The Government's Market Share Data Are Unreliable and Do Not Accurately Predict the Competitive Effects of the Merger

93.     Market shares are only "a convenient proxy for appraising the danger of monopoly

power." *Waste Mgmt.*, 743 F.2d at 981, 984 (concluding that "the 48.8% market share attributed

to WMI does not accurately reflect future market power").  When market share statistics are

"misleading as to actual future competitive effects," they are "insufficient to void a merger." *Id.* at

982.

94.     Market share statistics are a starting point that should be interrogated closely.

"Blind reliance upon market share, divorced from commercial reality, [can] give a misleading

picture of a firm's actual ability to control prices or exclude competition." *Hunt-Wesson Foods,*

*Inc. v. Ragu Foods, Inc.*, 627 F.2d 919, 924 (9th Cir. 1980); *see also Gen. Dynamics*, 415 U.S. at

501 (explaining "the District Court was justified in viewing the statistics relied on by the

government as insufficient to sustain its case" as they were of "considerably less significance" in

a rapidly changing market).

95.    It is "simple common sense" that a "high market share" will not raise antitrust concerns "in a market with low entry barriers or other evidence of a defendant's inability to control prices or exclude competitors."  *Syufy Enters.*, 903 F.2d at 664-66 ("The Justice Department correctly points out that Syufy still has a large market share, but attributes far too much importance to this fact. In evaluating monopoly power, it is not market share that counts, but the ability to *maintain* market share.").

96.    Here, as in other cases, "the concentration and market share statistics associated with the Proposed Merger do not accurately reflect the variety of ways in which the Proposed Merger is not likely to substantially lessen competition."  *Deutsche Telekom*, 439 F. Supp. 3d at 233.  That is why large changes in HHI "cannot guarantee litigation victories."  *Baker Hughes*, 908 F.2d at 992.  "The government does not maximize its scarce resources when it allows statistics alone to trigger its ponderous enforcement machinery."  *Id.* at 992 n.13.

### 1.    The Government's Route-Level, Static Market Share Statistics Ignore the Particularities of the Airline Industry

97.    High market shares "may not be as informative as they might first appear in light of complexities particular to" the airline industry.  *See Deutsche Telekom*, 439 F. Supp. 3d at 206. The "HHI thresholds prescribed by the Merger Guidelines are generic as to the markets being evaluated," and therefore may not be particularly helpful because "[a]ntitrust analysis must always be attuned to the particular structure and circumstances of the industry at issue."  *Id.*; *see also Gen. Dynamics*, 415 U.S. at 498 ("Congress indicated plainly that a merger has to be functionally viewed, in the context of its particular industry.").

98.    Relying solely on "simple, static" market share in "a complex and dynamic industry" such as the airline industry therefore says little about the competitive dynamics in that

industry.  *Deutsche Telekom*, 439 F. Supp. 3d at 245.  Indeed, "depending on the affirmative

practices and actions taken by market participants, ***highly concentrated markets can nevertheless

be quite competitive***."  *Id.* at 206 (emphasis added).

99.    Here, both the everchanging nature of the airline industry—with routes shifting

weekly, if not daily—and the existence of potential entrants render the Government's route-level

market shares misleading.  PFOF §§ III.B.2, IV, V.  The evidence has shown that route-level

competition is robust and changes constantly.  *Id.*  "Static model[s]" measuring past market share

is "alien to modern economic theory, as well as common sense, which teach us that things change."

*Syufy Enters.*, 903 F.2d at 667 n.13.

100.    Because of these constant changes, "it cannot be concluded from market statistics

alone that an acquisition will lessen competition*." Occidental Petroleum*, 1986 WL 952, at *7–8

(holding that ongoing "vigorous price competition" and ease of entry for potential competitors

"lessen[ed] the probative value of the Commission's market concentration statistics").

## 2.    The Government's Route-Level Market Share Statistics Ignore Potential Entrants

101.    Ignoring potential entrants also results in misleading market shares.  "In the present

case, a market definition artificially restricted to existing firms competing at one moment may

yield market share statistics that are not an accurate proxy for market power when substantial

potential competition able to respond quickly to price increases exists."  *Waste Mgmt.*, 743 F.2d

at 982.  The "appraisal of the impact of a proposed merger upon competition ***must take into

account potential competition from firms not presently active*** in the relevant product and

geographic markets."  *Id.* (emphasis added).

102.    As the Second Circuit explained, "the Supreme Court concluded [in *United States

v. Falstaff Brewing*] that the very existence of Falstaff as a potential entrant might constrain

brewers in the northeast to maintain competitive price levels as a means of forestalling entry by Falstaff. Under that decision, therefore, potential entrants must be considered in appraising a merger." *Id.*

103.     Because of low barriers to entry, airlines regularly consider potential entry or potential capacity increases by a competing airline on a route as a competitive constraint. Numerous witnesses testified that they consider potential competition when considering entry or expansion on a route.  PFOF ¶ 272.  Likewise, the evidence shows that airlines closely watch and respond to their competitors' pricing and other actions on nearby routes   *Id.*

104.     The Government and its experts do not take that potential competition into account in their calculation of market shares on routes, and that calls into question the predictive value of current shares and undermines their reliance on the presumption.  *Waste Mgmt.*, 743 F.2d at 982.

### 3.     The Government's Route-Level Market Share Statistics Are Otherwise Unreliable.

105.     It is well-established that "only an acquisition which in the long run may reasonably be expect to substantially lessen competition within a relevant market" will violate Section 7.  *U.S. Sugar Corp.*, 2022 WL 4544025, at \*19 (citation omitted, cleaned up).

106.     Accordingly, even if a merger would result in higher prices or less consumer choice, if that harm does not result from lessening of competition in the relevant markets as a result of the transaction, there is no antitrust violation.  *See, e.g.*, *Rambus Inc. v. FTC*, 522 F.3d 456, 464 (D.C. Cir. 2008) (in Sherman Act case, rejecting Government's monopolization claim where Commission failed to "carr[y] its burden of proving that [challenged] conduct had an anticompetitive effect" in the relevant market); *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1202-1203 (9th Cir. 2012) (in Sherman Act case, holding Government's argument as to harm was "unavailing" because any agreements with "the effect of reducing choice and increasing prices"

did not result from "injury to competition"). The same principle applies fully in the Section 7 context. *See FTC v. Lundbeck, Inc.*, 650 F.3d 1236, 1240 (8th Cir. 2011) (affirming district court's finding that two drugs "are not in the same product market"). The law therefore does not support the notion that any harm on the Government's proposed markets, individually, are sufficient to support a Section 7 violation.

107. Courts recognize that where the relevant industry is both complex and dynamic, it "[can]not be examined solely according to traditional economic models or based narrowly on the simpler business calculus that may be more fitting in evaluating competitive effects in relatively simpler and stable product markets." *Deutsche Telekom*, 439 F. Supp. 3d at 243 (noting the "extreme complexity and dynamism characterizing" the relevant industry "would justify treating the industry as unusual for the purposes of antitrust analysis"); *see also Kaiser Aluminum & Chem. Corp. v. FTC*, 652 F.2d 1324, 1341 (7th Cir. 1981) ("Nonstatistical evidence which casts doubt on the persuasive quality of the statistics to predict future anticompetitive consequences may be offered to rebut the prima facie case made out by the statistics.").

108. Indeed, other courts have found that route-level market shares do not predict future competitive conditions for the airline industry. *See In re AMR*, 625 B.R. at 253-55. The *AMR* court examined various academic studies and expert work showing that prices dropped and traffic increased after airline mergers on nonstop overlap routes that were allegedly presumptively unlawful—which is the opposite of what the presumption would predict. *Id.*

109. Evidence showing that a competitor is "unable to compete effectively" in the relevant geographic market is relevant to the question of "whether future lessening of competition was probable." *Gen. Dynamics*, 415 U.S. at 506 (explaining "the District Court was fully justified

36

in using" evidence from industry showing merger subject was "unable to compete effectively for future contracts" to rebut presumption).

### E.   Spirit's Past Market Share Is Not Predictive of Its Future Competitive Significance Given the Company's Financial Outlook

110.   While the Government has focused on Spirit's historic levels of growth, "[e]vidence of past production does not, as a matter of logic, necessarily give a proper picture of a company's future ability to compete." *Id.* at 503 (evidence of past performance not probative of future competition where forward-looking coal reserve and production projections were weak, such that the company was "a far less significant factor in the coal market than the Government contended, or the production statistics seemed to indicate"); *cf. Lektro-Vend Corp. v. Vendo Co.*, 660 F.2d 255, 276-77 (7th Cir. 1981) (holding district court properly relied on merging party's "deteriorating market position prior to the acquisition" as well as post-acquisition performance to reject Section 7 claims).

111.   In other words, there is "small comfort" in a firm's historic performance when "a stable market share would be misleading as to [the firm's] future competitive position." *Deutsche Telekom*, 439 F. Supp. 3d at 221 n.19 (citations omitted) ("Without quantifying exactly how much Sprint's market share will drop in the future, the Court concludes that such loss would very likely be great enough to undermine the value of Plaintiff States' statistics.").

112.   That is precisely the case here.  Numerous Spirit witnesses explained at trial that Spirit is struggling financially—including that Spirit anticipates a $467 million loss for 2023 (on top of prior losses over $1 billion) and has not been profitable since 2019.  PFOF § V.A.  The Government has touted Spirit as an "innovative" airline.  Plaintiffs' Pretrial Brief, ECF No. 289 at 19.  But while Spirit did pioneer the domestic ULCC model—now commoditized by nearly the entire airline industry—that historical fact does not guarantee its future financial performance or

demand any "special scrutiny" for the transaction. *See United States v. Int'l Harvester Co.*, 564 F.2d 769, 776, 776 n.13 (7th Cir. 1977) (affirming dismissal of Section 7 claims in part based on acquisition target's "weakened financial condition" over past years, and rejecting Government's position that "[target's] leadership in design made it a 'pioneer' that deserved special scrutiny").

113.    As part of its analysis at Step Two of the *Baker Hughes* framework, the Court can consider whether the Government's static market shares overstate Spirit's competitive significance in the future in light of its current performance. The Court does not need to reach the question of whether Spirit is a "weakened competitor" to consider Spirit's recent financial performance in the totality-of-the-circumstances analysis under *Baker Hughes*. The Government has suggested that a "weakened competitor" defense is merely a "Hail-Mary pass." *See ProMedica Health Sys., Inc. v. FTC*, 749 F.3d 559, 572 (6th Cir. 2014). But the Court need not resolve that issue. Spirit's current situation is relevant because it is one of a "variety of conditions that may render statistical market share evidence misleading, including a firm's lack of resources required to compete long-term, *financial difficulties that constrain the firm from improving its competitive position*, and poor brand image and sales performance." *Deutsche Telekom*, 439 F. Supp. 3d at 217 (emphasis added).

## F.    The Merger Is Procompetitive and Will Result in Substantial Benefits for Consumers Across the Country

114.    Under Section 7's totality-of-the-circumstances analysis, it has become "hornbook law" that "a variety of other factors" including the "prospect of efficiencies" "can rebut a prima facie case." *Baker Hughes*, 908 F.2d at 985; *In re AMR Corp.*, 625 B.R. at 259 (collecting cases where courts have "considered a merger's efficiencies when evaluating an antitrust claim"); *cf. FTC v. Lab'y Corp. of Am.*, 2011 WL 3100372, at *20 (C.D. Cal. Feb. 22, 2011) ("Mergers may enhance competition by combining complementary assets, eliminating duplicative assets, or achieving scale economies.").

38

115.    The Government may attempt to cast any consideration of consumer benefits as a "defense" to justify an illegal merger.  *See* Plaintiffs' Pretrial Brief, ECF No. 289 at 29-30.  But "the trend among lower courts" has been to consider consumer benefits "not as justification for an illegal merger but as evidence that a merger would not actually be illegal." *See Deutsche Telekom*, 439 F. Supp. 3d at 207-08 (collecting cases).  Thus, the proper place in the *Baker Hughes* framework to consider consumer benefits is in analyzing whether Defendants have rebutted the Government's prima facie case (*i.e.*, Step Two).

116.    Said differently, evidence of efficiencies "is relevant to the competitive effects analysis of the market required to determine whether the proposed transaction will substantially lessen competition." *Arch Coal*, 329 F. Supp. 2d at 151 (citing *Tenet Health Care*, 186 F.3d at 1054); *FTC v. Staples, Inc.*, 970 F. Supp. 1066, 1088 (D.D.C. 1997).

117.    Courts have recognized efficiencies in several forms.  The merged firms' ability to offer new or enhanced services is itself a procompetitive benefit.  *See, e.g., Deutsche Telekom*, 439 F. Supp. 3d at 207-09 (recognizing efficiencies such as the accelerated introduction of cellular service based on new technology); *United States v. M.P.M., Inc.*, 397 F. Supp. 78, 93 (D. Colo. 1975) ("service offered" by the new firm "was superior to that offered by either of the previously independent companies alone"); *Tenet Health Care*, 186 F.3d at 1054-55 (explaining that in analysis of "the competitive effects of the merger" the district court should have considered evidence that the merger of two smaller hospitals would create "a hospital that is larger and more efficient" than the standalone hospitals and that "will provide better medical care than either of those hospitals could separately").  Cost savings and increased output are also cognizable benefits that demonstrate a merger is procompetitive.  *See Country Lake Foods*, 754 F. Supp. at 674 (the merger would allow the combined company to "increase its capacity substantially," "lower []

39

costs," and achieve "other savings," enabling it to "compete head-to-head" with its "top selling" rival).

118.    Even outside of the merger context, courts have considered procompetitive benefits when assessing competitive harm under other antitrust laws. *See In re Nat'l Collegiate Athletic Ass'n Athletic Grant-in-Aid Cap Antitrust Litig.*, 958 F.3d 1239, 1268 (9th Cir. 2020) (M. Smith, J., concurring) (explaining how the Supreme Court has not held that "courts categorically cannot consider procompetitive benefits outside the defined market").

### 1.    The Department of Justice Has Long Recognized the Importance of Procompetitive Benefits in Merger Enforcement

119.    While recent merger jurisprudence makes clear that efficiencies should be considered in analyzing the competitive effects of a merger, the Department of Justice's own guidelines also describe the importance of procompetitive benefits in evaluating the effects of a merger. *See* Department of Justice, 2010 Horizontal Merger Guidelines, § 10 ("[A] primary benefit of mergers to the economy is their potential to generate significant efficiencies and thus enhance the merged firm's ability and incentive to compete, which may result in lower prices, improved quality, enhanced service, or new products.").

120.    The Department of Justice also has declined to challenge the mergers of several different airlines—Southwest and AirTran, Delta and Northwest, and US Airways and American—at-least in part because the overall consumer benefits of the merger outweighed the harms felt by customers on specific routes.[1]

---

[1] DOJ Antitrust Div., Statement of the Department of Justice Antitrust Division on Its Decision to Close Its Investigation of Southwest's Acquisition of Airtran (Apr. 26, 2011) ("[T]he division has determined that the merger is not likely to substantially lessen competition.  The merged firm will be able to offer new service on routes that neither serves today, including new connecting service through [ATL] from cities currently served by Southwest to cities currently served by AirTran … Although there are overlaps on certain nonstop routes, the division did not challenge the acquisition after considering the consumer benefits from the new service."); DOJ Antitrust Div.,

### 2. Defendants Have Presented Ample Evidence of Procompetitive Benefits to Consumers

121.     Product quality is an important dimension of competition.  *See, e.g.*, *In re AMR Corp.*, 625 B.R. at 235-36; *Deutsche Telekom*, 439 F. Supp. 3d at 190.  Therefore, looking only at the price differential between two products of different quality—as the Government has done throughout its case—is a woefully incomplete antitrust analysis.  *See 1-800 Contacts, Inc. v. FTC*, 1 F.4th 102, 118 (2d Cir. 2021) (finding that price difference between higher priced competitor and lower priced competitor did not constitute evidence of anticompetitive harm).  Since its founding, JetBlue has had a business model devoted to serving a "sweet spot," providing customers with a high quality product at a price lower than its primary competitors.  PFOF ¶ 4.

122.     The record contains ample evidence of the robust benefits consumers will enjoy resulting from the merger of JetBlue and Spirit.  PFOF § VI. The expansion of all aspects of JetBlue's business—including network, fleet, and loyalty program—will allow for more vigorous competition with the legacies, which carry most passengers in the country.  *Id.*  Numerous witnesses described JetBlue's plan to grow its fleet, cater to more customer segments, and expand its network—thereby delivering more benefits to consumers.  PFOF ¶¶ 635, 671, 674.  Similarly, the Court heard expert testimony about the various levers available to JetBlue to increase utilization for the combined company.  PFOF ¶¶ 877-887.  As a result, more consumers will have

---

2008–2009 Year-in-Review at 7–8 (discussing the 2008 merger of Delta Airlines and Northwest Airlines, DOJ noted that "[b]ecause there were so few nonstop overlap markets and the volume of commerce on these routes was relatively small, potential harm in these city-pairs was predicted to be modest at most. . . . Our best estimates of the likely increases in consumer welfare significantly exceeded the feared harm to consumers in the overlap routes served by the two carriers. On this basis we concluded that the merger was likely procompetitive and ought not be challenged."); DOJ Antitrust Div., 2013–2014 Year-in-Review at 6 (DOJ did not challenge the 2013 merger of U.S. Airways and American, because "[t]he consumer benefits of [the divestitures] will extend beyond the passengers who are directly served at those airports. Given the importance of the airports to business travelers, the LCCs that are acquiring the slots and gates will have a more robust product for business and corporate travel.").

access to JetBlue's low-cost, high-quality product when choosing to fly.

123.     The Court also heard testimony that when JetBlue enters a new market, rival carriers' fares decrease and passenger traffic increases: this is the JetBlue Effect.  *See, e.g.*, PFOF ¶¶ 3-7; § VI.A.  The record evidence also shows that JetBlue forces other airlines to improve the quality of their products, so a larger JetBlue would result in higher quality for consumers at JetBlue and at other airlines.  PFOF ¶¶ 3, 148.  Thus, consumers will benefit from the JetBlue Effect, and are likely to fly at lower prices with better service whether they choose to fly on JetBlue or one of the Big Four.

124.     Finally, as Dr. Hill explained, Dr. Gowrisankaran's own model predicts more people will fly after the merger.  PFOF ¶¶ 659-660.  Greater output is a recognized benefit under the antitrust laws.  *See Am. Express*, 138 S. Ct. at 2288-89; *see, e.g.*, *Chi. Pro. Sports Ltd. P'ship v. Nat'l Basketball Ass'n*, 95 F.3d 593, 597 (7th Cir. 1996) ("The core question in antitrust is output.  Unless a contract reduces output . . . there is no antitrust problem.").

## IV.     THE GOVERNMENT HAS FAILED TO ESTABLISH THAT THE MERGER WILL LIKELY CAUSE A SUBSTANTIAL DECREASE IN COMPETITION

125.     At the third stage of the *Baker Hughes* framework, the Government—without the benefit of any structural presumptions—must produce "additional evidence of anticompetitive effect."  *Baker Hughes*, 908 F.2d at 983.

126.     Though the Government contended in closing arguments that it must only show "an appreciable danger of such consequences in the future" to enjoin this merger, citing *Hospital Corp. of America v. FTC*, 807 F.2d 1381, 1389 (7th Cir. 1986) (Posner, J.), modern Section 7 jurisprudence provides the context needed to interpret Judge Posner's general formulation.

127.     As *Baker Hughes* explains, to succeed at the third step, the Government must "produce . . . additional evidence showing a probability of substantially lessened competition."

42

*Baker Hughes*, 908 F.2d at 983.

128.    Accordingly, although Section 7 "does not require proof of certain harm . . . the government must show that the proposed merger is likely to *substantially* lessen competition, which encompasses a concept of 'reasonable probability.'" *United States v. AT&T, Inc.*, 916 F.3d 1029, 1032 (D.C. Cir. 2019) (citation omitted); *Oracle*, 331 F. Supp. 2d at 1109 ("To establish a section 7 violation, plaintiffs must show that a pending acquisition is reasonably likely to cause anticompetitive effects."); *Marine Bancorporation*, 418 U.S. at 623 n.22 (the Government must show that the "loss of competition" in relevant market is "sufficiently probable and imminent" in order to succeed on a Section 7 claim); *see Arch Coal*, 329 F. Supp. 2d at 115 (same).

129.    In analyzing the harms at Step Three, courts will examine "two types of effects that may arise from mergers: coordinated effects and unilateral effects." *Anthem*, 236 F. Supp. 3d at 215-16.

130.    As explained below, neither theory supports a reasonable probability that competition will be substantially lessened by this merger.

### A.    The Government Has Not Proven Any Unilateral Effects of the Merger

131.    "Unilateral effects refer to '[t]he elimination of competition between two firms that results from their merger.'" *Deutsche Telekom*, 439 F. Supp. 3d at 237 (citation omitted).  The relevant inquiry for unilateral effects is not whether the merging parties compete in some manner or whether prices may increase for "*some* customers," but rather whether the merger "as a whole" will substantially lessen competition. *RAG- Stiftung*, 436 F. Supp. 3d at 318 (emphasis in original).

132.    To prevail on a unilateral effects claim, "a plaintiff must prove a relevant market in which the merging parties would have essentially a monopoly or dominant position." *Oracle*, 331 F. Supp. 2d at 1123.

133.    Unilateral effects theories are unlikely to be persuasive in circumstances where one

of the merging parties is in a "poor condition" and there is little evidence that it will be a "disruptive" competitive force in the future. *Deutsche Telekom*, 439 F. Supp. 3d at 239.

134.    Applying these criteria to the facts presented at trial, the Government has failed to prove critical elements necessary to support a unilateral effects theory of anticompetitive effects resulting from the merger.

> **1.    The Government Has Not Shown that Loss of Head-to-Head Competition Will Result in a Substantial Lessening of Competition in Any Relevant Market**

135.    In the absence of the presumption, the Government has not met its burden to put forward other evidence to show that the merger will have unilateral effects and tend to substantially lessen competition on any individual routes. *Baker Hughes*, 908 F.2d at 983.  Importantly, the Government did not show that the loss of head-to-head competition between JetBlue and Spirit would have substantial and adverse unilateral effect on any single specific route, particularly given the likelihood of entry.

136.    JetBlue and Spirit do not meaningfully compete across the vast majority of their route networks.  Spirit accounted for just ***four percent*** of the revenue shares on JetBlue total nonstop overlap routes in 2022.  PFOF ¶ 699.  On nonstop routes from JetBlue's two largest focus cities (New York and Boston), Spirit has just ***two percent*** of revenue shares in both cities.  *See* PFOF ¶¶ 713-714.

137.    The most substantial overlap between the parties on JetBlue's nonstop routes comes in the Florida markets, South Florida (comprised of Miami and Fort Lauderdale) and Orlando.  But even there, competition between all carriers is robust.  PFOF ¶¶ 715-716 (in South Florida, JetBlue has 12% of the revenue shares compared to Spirit's 9%, and in Orlando, JetBlue has 10% of revenue shares, and Spirit has 9%).

138.    Numerous ULCCs serve those Florida markets given their focus on "leisure

customers." PFOF ¶¶ 497-503, 518-522. There are similarly low barriers to entry in both South Florida and Orlando, with JetBlue's divestitures in Fort Lauderdale lowering those barriers even further. PFOF §§ V.B.1, V.B.3.

139. Even on individual routes, the Government's economists could not provide the Court with a reliable route-level analysis of potential harm. Dr. Gowrisankaran conceded that his calculations of harm, viewed at the route level, were "a lot less [precise]" than an aggregate result. PFOF ¶ 348. Dr. Chipty did not even attempt to address individual routes. PFOF ¶ 775.

140. The Government's contention that the elimination of "head-to-head" competition between JetBlue and Spirit will result in consumer harm (*see* Plaintiffs' Pretrial Brief, ECF No. 289 at 18) therefore lacks a reliable economic basis. *See Oracle*, 331 F. Supp. 2d at 1172 (rejecting Government's unilateral effects theory where Government's "attempt[s] to show localized competition based upon customer and expert testimony was flawed and unreliable"); *RAG-Stiftung*, 436 F. Supp. 3d at 318 (declining to enjoin merger, explaining that while loss of head to head competition "may lead to a price increase for *some* customers," the question "is whether the proposed merger, as a whole, is likely to 'substantially . . . lessen competition' and economic "evidence does not show that to be so") (emphasis in original) (citation omitted).

141. The Government ignores the substantial evidence of entry and repositioning from other airlines—ULCCs, LCCs, and the legacy airlines' Basic Economy offerings—likely to resolve any potential anticompetitive post-merger effects on overlapping routes. *See* PFOF § V.E. Without any further qualitative evidence of harm on any individual routes, the Government cannot show that the loss of head-to-head competition between Spirit and JetBlue is likely to result in a substantial lessening of competition in the long run. *See Deutsche Telekom*, 439 F. Supp. 3d at 188 (in assessing the likely effects of a merger, "courts rely less on the equipoise of mathematical

45

computations, technical data, analytical modeling, and adversarial scientific assumptions that the litigants proffer" but rather "actions and inactions drawn from the factual evidence").

### 2. The Government Has Not Demonstrated that Unilateral Effects Will Cause Lower Capacity and Higher Prices in Any Markets

142.    The Government asserts that prices will increase post-merger, relying primarily on the economic analysis of Dr. Gowrisankaran.   But as explained above, Dr. Gowrisankaran's estimates of harm on particular routes lack precision and on "any one route you're going to be less sure about what the harm is."  PFOF ¶ 348.  Dr. Gowrisankaran's analysis also did not account adequately for entry, and did not account for divestitures at all.  PFOF ¶¶ 758-765.

143.    The Government's reliance on JetBlue's deal modeling similarly does not prove anticompetitive, route-level price increases will occur.   Deal modeling is, at its core, simply an exercise in valuing the assets a company will purchase, as courts that have handled M&A disputes have routinely recognized. *O.F.I. Imports Inc. v. Gen. Elec. Cap. Corp.*, 2016 WL 5376208, at *2 (S.D.N.Y. Sept. 26, 2016); *Luxottica Grp. S.p.A. v. Bausch & Lomb Inc.*, 160 F. Supp. 2d 552, 553-54 (S.D.N.Y. 2001).  The Government boldly claims that a "30% fare increase is on the way" post-merger based on JetBlue's deal modeling.  *See* Gov't Closing Demonstratives at Slide 49. But as JetBlue's witness (and the Government's own closing slides) explained, that figure "was one input into [JetBlue's deal] model," based on certain Spirit exit events, and did not reflect an anticipated wholesale fare increase.  *Id.*; PFOF ¶¶ 824-825.  The modeling also did not take into account factors, like the JetBlue effect and ease of entry, that the Government's experts identified as relevant to any analysis of future competitive effects.  PFOF ¶¶ 828-830.

144.    The Government also did not show that output (*i.e.*, seat capacity) was likely to decrease on any Spirit routes following the merger.  Indeed, Dr. Gowrisankaran's own analysis showed that more passengers would fly after the merger than did before the merger.  PFOF ¶¶ 659-

660. That overall output (capacity) will *increase* after the acquisition is particularly telling because evidence of an expansion in output and increase in quality, even if accompanied by a price increase, does not support an inference of market power or anticompetitive effects.

145.    The Government is correct that JetBlue's plans to convert Spirit aircraft to JetBlue-style cabin layouts, which will result in fewer seats per plane.  But those conversions are expected to take a number of years (PFOF ¶ 876) and does not prove that the acquisition itself will cause lower capacity and higher prices in any Spirit markets.  And as Defendants' industry expert opined, "the overall seats available for departure" post-merger "would very likely increase compared to the seats that would be available without the merger." PFOF ¶ 877.  Moreover, the reason for removing seats is to provide consumers more legroom and better quality, which allows JetBlue to discipline the dominant legacy carriers, as the Government recognized in the NEA matter.  PFOF ¶ 148.

146.    Nor can the Government carry its burden by pointing to isolated statements that Spirit made in and around May–June 2022, in response to specific regulatory proposals in JetBlue's early offers to purchase Spirit.  PFOF § VII.G.  The evidence at trial demonstrated that, though JetBlue's early proposals fell short of what Spirit believed was required to gain antitrust approval of the proposed transaction, JetBlue later satisfied Spirit's concerns, agreeing to robust divestitures and a promise for more.  *Id.*  Further, circumstances have changed since those early proposals were made; for example, JetBlue is no longer in the Northeast Alliance with American, and divestiture agreements are now signed with Frontier and Allegiant.  PFOF ¶¶ 44-46, 799.  The Court must rest its decision on a full consideration of the evidence, including economic analysis, and not on soundbites divorced from their context.  This is particularly true when the statements on which the Government relies were reacting to a proposal that was mooted by later events.

### 3. The Government Has Not Demonstrated that the Elimination of Spirit Will Cause Adverse Unilateral Effects

147. The Government also has not established a substantial lessening of competition due to the elimination of Spirit. *See* Gov't Closing Demonstratives at Slide 9 (claiming harm due to loss "consumer choice and variety").

148. The Government ignores that Spirit's business model is no longer unique. Consumers have the option to choose low-fare, unbundled products comparable to Spirit's from at least ten other carriers. *See* PFOF ¶ 707 (explaining JetBlue, Frontier, Allegiant, Avelo, Breeze, Sun Country, Delta, American, and United each offer unbundled fare options). The Government cannot dispute that "ULCC-type" unbundled fare options are available from the vast majority of domestic carriers. *See UnitedHealth Grp.*, 630 F. Supp. 3d at 141 (rejecting Government's theory of harm where it "rest[ed] on speculation rather than real-world evidence that events are likely to unfold as the Government predicts," as "antitrust theory and speculation cannot trump facts") (internal quotation marks and citation omitted).

149. To the extent the Government attempts to apply its "loss of choice" theory to any particular route—something it failed to do through trial evidence—its economic evidence is similarly unreliable. *See, e.g.*, PFOF ¶¶ 346-348. This theory of harm also (again) ignores that other ULCCs (as well as other carriers) are well-positioned to enter Spirit's routes and offer the same unbundled fare option Spirit provides today. *See* PFOF § V.E.

150. Finally, is well established that "[e]vidence of past production does not, as a matter of logic, necessarily give a proper picture of a company's future ability to compete." *Gen. Dynamics*, 415 U.S. at 501. The record evidence here demonstrates that Spirit's business and its prospects have dramatically declined, undermining its ability to compete effectively going forward. *See* PFOF § V.A; *UnitedHealth Grp.*, 630 F. Supp. 3d at 129 (assessing future

competitive effects requires court to make a "predictive judgment . . . informed by real-world evidence") (citations omitted).  The Government also contended in closing that the loss of Spirit would result in the loss of "innovation" that would harm consumers.  *See* Gov't Closing Demonstratives at Slide 9.  But because "the Government provided zero real-world evidence" that this merger was "likely to reduce innovation," that theory of harm is inapplicable.  *UnitedHealth Grp.*, 630 F. Supp. 3d at 151 (rejecting Dr. Gowrisankaran's claims of harm based on lack of innovation).

**B.      The Government Has Not Shown the Merger Will Lead to Adverse Coordinated Effects**

151.    While proof of actual coordinated effects is not required, the Government "must show 'an appreciable danger' of future coordinated interaction based on a 'predictive judgment.'" *Arch Coal*, 329 F. Supp. 2d at 116 (citation omitted).  A "theoretical 'possibility' of coordination" is not enough.  *United States v. AT&T Inc.*, 310 F. Supp. 3d 161, 246 (D.D.C. 2018), *aff'd sub nom. United States v. AT&T, Inc.*, 916 F.3d 1029 (D.C. Cir. 2019).

152.    An industry's "vulnerability to coordinated conduct" is only one part of the Section 7 inquiry; the Court must also assess whether the merger will "enhance that vulnerability."  *RAG-Stiftung*, 436 F. Supp. 3d at 313, 317.

153.    Even where industry "factors and conditions make post-merger coordinated activity . . . feasible, whether anticompetitive coordination is likely requires closer examination of such factors as the past history of coordinated interaction, the [relevant] market structure and dynamics, and the roles of 'fringe' or 'maverick' producers."  *Arch Coal*, 329 F. Supp. 2d at 138; *AT&T*, 310 F. Supp. 3d at 246 ("In order to assess whether a merger will lead to an unacceptable risk of competition-stifling coordination, courts evaluate various 'market conditions, on the whole.'") (citation omitted).

49

154.   The Government asserts that the merger is likely to increase the risk of anticompetitive coordination because (1) market conditions in the industry are conducive to coordination, (2) there is a history of coordination in the industry, (3) the merger will eliminate Spirit's coordination-disrupting effect, and (4) a bigger JetBlue is more likely to coordinate. Plaintiffs' Pretrial Brief, ECF No. 289 at 20.  None of these theories is supported by the law.

### 1.   The Government Has Presented No Market Specific Evidence of Coordination

155.   The Government's coordination theory fails at the outset in light of the ease of entry.  *See, e.g.*, *Deutsche Telekom*, 439 F. Supp. 3d at 237; *Occidental Petroleum*, 1986 WL 952, at *8 ("Whether entry is included as part of the market definition or in the ease of entry evaluation, practically, is of no consequence. In either event, the result is the same. The exercise of market power will be thwarted and collusive behavior will not be possible.").

156.   This theory also fails at the threshold because it is entirely disconnected from the route-level markets at issue in this case.  At Step Three of the *Baker Hughes* framework, the Government must show the merger "enable[s] or encourage[s] post-merger coordinated interaction among firms in the relevant market."  *AT&T*, 310 F. Supp. 3d at 246; *Deutsche Telekom*, 439 F. Supp. 3d at 234 ("coordinated effects analysis considers whether the relevant market shows signs of vulnerability to coordinated conduct") (cleaned up).

157.   The Government has presented no evidence of past or likely future coordination on the original 51 nonstop overlap routes.  The handful of "flashing" and CMI examples in the record, discussed *infra*, do not touch an overlap route.  Nor has the Government shown that market conditions on their "enduring" 35 presumption routes are particularly "conducive" to coordination. The Government has not met its burden.

50

### 2. JetBlue Is a Maverick and Its Incentives Will Not Meaningfully Change as a Result of the Merger

158. "[T]he concept of a maverick is used in cases premised on tacit or coordinated behavior to describe competitors that, because of structural conditions or unique incentives, can prevent or limit anti-competitive coordinated interaction by other firms and are unusually disruptive and competitive influences in the market." *Foster*, 2007 WL 1793441, at *49 (citation omitted); *see also* Department of Justice, 2010 Horizontal Merger Guidelines § 2.15 (defining "maverick" as "a firm that plays a disruptive role in the market to the benefit of customers").

159. JetBlue's status as an industry "maverick" is undisputed. JetBlue views itself as a maverick, and other airlines view JetBlue as a maverick. PFOF ¶ 888-895. Less than four months before it filed the instant lawsuit, the Government touted the "billions of dollars" in consumer benefits stemming from JetBlue's uniquely disruptive business model. PFOF ¶ 136, 153, 627. And months after this lawsuit was filed, Judge Sorokin recognized JetBlue's undisputed "maverick" status:

> **The parties all agree**, and the Court finds, **that JetBlue has played a unique role in the domestic air travel industry and qualifies as a "maverick" competitor** for present purposes. The Court finds JetBlue occupied such a role regardless of whether it remained an LCC or had migrated to a hybrid form somewhere between a traditional LCC and a GNC. In either event, it was justifiably viewed by others— and it indisputably viewed itself—as a **unique and disruptive force in the domestic air travel market**.

*Am. Airlines Grp.*, 2023 WL 3560430, at *34 n.81 (citations omitted) (emphasis added).

160. The Government asserts—with no economic support—that notwithstanding JetBlue's ability to lower prices, improve product quality, increase consumer choice, and reduce ancillary fees (*see, e.g.*, PFOF § VI.A), this merger must be enjoined because a post-merger JetBlue will "have incentives to be less of a disruptive force after the merger." PFOF ¶ 896.

161.    The Government's unsubstantiated theory is insufficient as a matter of law.  It is well-established that Section 7 plaintiffs "must have an independent basis to conclude that a merger will increase the likelihood of coordination, apart from whatever evidence it offers to show undue market concentration." *RAG-Stiftung*, 436 F. Supp. 3d at 317.

162.    The question before the Court is whether the transaction will substantially lessen competition by enabling airlines to restrict output and increase prices, not whether JetBlue's incentives may change following the merger. *Microsoft*, 2023 WL 4443412, at *13 ("That the combined firm has more of an incentive [to foreclose rivals] than an independent Activision says nothing about whether the combination will 'substantially' lessen competition.").

163.    On this point, *Deutsche Telekom* is instructive.  The plaintiffs in that case relied on similarly meager anecdotal evidence of coordination to argue that T-Mobile would be more likely to coordinate prices with AT&T and Verizon following its acquisition of Sprint.  439 F. Supp. 3d at 235–36.  While Judge Marrero found this evidence unpersuasive and non-credible, his rejection of the plaintiffs' coordinated effects theory rested primarily on T-Mobile's disruptive business model.  Specifically, Judge Marrero held:

> Even putting aside the infirmities that undermine the value of the [plaintiffs' coordination] evidence, the Court has spent two full weeks assessing the credibility of each witness and their claims regarding whether coordination would be more or less likely . . . . The Court finds that the fact of aggressive competition over the past decade is not so easily reversed . . . . T-Mobile has **built its identity and business strategy on insulting, antagonizing, and otherwise challenging AT&T and Verizon** to offer pro-consumer packages and lower pricing, and the Court finds it highly unlikely that New T-Mobile will simply rest satisfied with its increased market share after the intense regulatory and public scrutiny of this transaction. . . . The evidence indicated that the same executive team that has brought T-Mobile success will continue to lead New T-Mobile, and **the merger will provide T-Mobile with the increased capacity that enabled it to pursue the Un-carrier strategy in the first place.**  Having heard Defendants emphasize the asymmetric capacity advantage that New T-Mobile would have over AT&T and Verizon, the Court concludes that New T-Mobile would **likely make use of that advantage by cutting prices to take market share from its biggest competitors**.

*Id.* at 236–37.

164.    Judge Marrero rejected the Government's unsupported argument that T-Mobile—an "ambitious and aggressive small-time wannabe"—would use its merger to "passively fold and follow or collude with" the "two industry giants" to "rais[e] prices and hurt[] consumers."  *Id.* at 245.  The Government's argument simply did not comport with "what the Court observed at trial," which was evidence of "a company . . . chomping to take on its new market peers and rivals in head-on competition."  *Id.*

165.    So too here.  Various witnesses testified that JetBlue's strategy of undercutting legacy prices—the strategy that has allowed JetBlue to succeed over the last 23 years—will be enhanced, not diminished, by the merger.  PFOF ¶ 888-891.

166.    The Court heard ample evidence that, following the merger, the asymmetries between JetBlue and the legacies will persist.  Even with this transaction, JetBlue remains "a fraction of the size" of the legacies.  PFOF ¶ 892.  JetBlue will still be a low-cost, point-to-point carrier with a significantly smaller market share even the smallest legacy carrier.  The combined fleet of approximately 500 aircraft will still be dwarfed by those of Delta (1,254), American (1,461), and United (1,338).  PFOF ¶ 893. And the combined airline will only comprise 8% of the national airline market, less than half the size of United (17%), Southwest (18%), Delta (22%), and American (23%).  PFOF ¶ 892.

167.    Perhaps even more significant is the evidence the Court did *not* see.  JetBlue produced tens of millions of pages to the Government in the course of this litigation, spanning years; the Government failed to identify a single one that even remotely suggests JetBlue plans to change its strategy of undercutting legacy prices following this merger.  Nor did Dr. Gowrisankaran or Dr. Chipty attempt to quantify the likelihood or impact of post-merger

coordination harms.  While there is no per se "requirement that the Government make a numbers-based showing on coordinated effects . . . the Government cannot evade its burden of proof on the ultimate issue of whether the challenged acquisition is likely to facilitate collusion by simply stating that it does not need to quantify the potential harm."  *AT&T*, 310 F. Supp. 3d at 246 n.55 (cleaned up).

168.    Within this context, a post-merger JetBlue will be strongly incentivized to vigorously compete with its significantly larger competitors (the legacies), undercut their prices, and offer a better product—the same incentives that have driven JetBlue since its inception.  *See, e.g.*, PFOF ¶¶ 2-6, 888-891.  A decision to abandon JetBlue's maverick status would require JetBlue do to "a commercial about-face, and instead pursue anticompetitive strategies." *Deutsche Telekom*, 439 F. Supp. 3d at 245.  On this record, the Government's amorphous and unsupported theory "would be at odds with predictions of what objectively reasonable individual and corporate behavior would embrace in a complex and dynamic market under the factual circumstances presented here." *Id*. at 246.

169.    In short, any incentives JetBlue may have to coordinate fares with another airline on a particular route will still be—as they are now—drastically outweighed by JetBlue's incentives to use its post-merger fleet and network "to take market share from its biggest competitors"—the legacies.  *See id.* at 237, 245 ("Anticompetitive results such as higher prices and lower quality produced by coordinated or unilateral effects of a merger do not just 'happen'; they are not self-executing outcomes spontaneously set in motion upon the creation of a presumed level of market concentration of fewer competitors, or the large market shares amassed by particular participants.").

### 3.   The Government Has Not Shown JetBlue Has a History of Coordination

170.   The Government called three witnesses (Michael Hillyard, Evan Jarashow, and Leo Lage) for the sole purpose of establishing that JetBlue has engaged in coordination with other airlines.   But their testimony showed the opposite.   PFOF § VIII.D.   The handful of potential flashing and CMI examples relied upon by the Government do not change this conclusion.

171.   As an initial matter, the Government's purported evidence of past JetBlue coordination includes instances where JetBlue's pricing team declined to flash or file a CMI.   *See* PFOF ¶ 925.

172.   The Government's theory rests on, at most, six pricing actions in the span of seven years, the most recent of which occurred nearly four years ago:  (1) Mr. Hillyard's testimony that in 2016, he was directed by someone no longer employed at JetBlue to file a CMI; (2) two emails from early 2020 where JetBlue analysts indicated they "flashed" another airline; and (3) a single instance in which JetBlue appeared to engage in a CMI with American.   *See* PFOF § VIII.D.2.

173.   This evidence comes nowhere close to proving JetBlue has a "history of coordination."   *See* PFOF ¶¶ 930-932.   When viewed in context of the billions of pricing actions that have occurred during this time period, two CMIs and two instances of flashing are de minimis.   *See RAG-Stiftung*, 436 F. Supp. 3d at 317 (rejecting FTC's argument that a "few instances" of apparent coordination supported Section 7 injunction); *Deutsche Telekom*, 439 F. Supp. 3d at 236 (four emails that suggested T-Mobile was "signaling" competitors "are hardly probative of the market's vulnerability to coordination").

### 4.   The Government Has Not Shown the Elimination of Spirit Will Increase the Risk of Adverse Coordinated Effects

174.   The Government overstates Spirit's ability to operate as a maverick in the future, given its financial condition. *Deutsche Telekom*, 439 F. Supp. 3d at 239 ("The Court's conclusion

in this regard is also bolstered by Sprint's poor condition and DISH's likely entry.  While unilateral effects analysis appears particularly concerned with the potential loss of an aggressive maverick firm, there is very little evidence to support a reliable finding that Sprint can be an aggressive and disruptive maverick in the future.  On the contrary, the evidence suggests that Sprint will instead be forced to raise its prices.").  The Government presented no evidence that Spirit's fares deter coordination.  *See* PFOF § VIII.C.  JetBlue and the legacies treat Spirit the same as any ULCC: they monitor Spirit's activity and match Spirit's prices when it is profitable to do so.  *Id.*

> **5.      The Government Drastically Overstates the Likelihood of Coordination for Various Other Reasons**

175.     Even if the Government's generalized evidence of purported coordination were relevant under Section 7, it does not support the Government's theory that the airline industry is conducive to coordination.

176.     First, the Government overstates the utility and transparency of fares filed on ATPCO.  *See also United States v. Airline Tariff Publ'g Co.*, 836 F. Supp. 9, 12-13 (D.D.C. 1993).  ATPCO shows only an airline's filed fares in each fare class, but not the fares it is charging to customers at any given time.  PFOF ¶¶ 936-937.  An airline does not need to make any seats available in the fare classes for which it files prices, and ATPCO has no information about an airline's inventory of seats available in any given fare class.  PFOF ¶ 939.

177.     Additionally, filed fare prices are only one dimension on which airlines compete.  Airlines typically have no visibility—through ATPCO or otherwise—into other airlines' network planning strategies, overall fare strategies, marketing techniques, or other key components of airline competition.  PFOF ¶¶ 936-939.  *See Deutsche Telekom*, 439 F. Supp. 3d at 235 ("[T]he RMWTS industry is not particularly vulnerable to coordination. As both sides acknowledge, price is not the only dimension on which competition occurs. The non-price . . . strategies that

competitors in the market might pursue, draw[] . . . into question whether the firms' pricing is truly so transparent."); *State v. Kraft Gen. Foods, Inc.*, 926 F. Supp. 321, 342 (S.D.N.Y. 1995) ("Manufacturers of RTE cereals compete on the basis of price, quality, new product introductions, consumer promotions, trade promotions, and advertising. . . . For collusion to be successful, it would have to control most or all of these forms of competition."); *United States v. Archer-Daniels-Midland Co*., 781 F. Supp. 1400, 1420 (S.D. Iowa 1991) ("There are significant differences in costs and product mix among firms in the HFCS industry, a factor that makes coordination among those in an industry more difficult.").

178.     The actual and potential entry of ULCCs, LCCs, and Basic Economy also "undermines the notion that there will be fewer firms in the market and that coordination will thus be more likely." *Deutsche Telekom*, 439 F. Supp. 3d at 237.  Even if other airlines "initially enter the market at a relatively small scale, the tendency toward anticompetitive coordination 'may well be thwarted by the presence of small but significant competitors.'" *Id.* (quoting *Stanley Works v. FTC*, 469 F.2d 498, 507 (2d Cir. 1972)); *Kraft Gen. Foods*, 926 F. Supp. at 346–47 ("The continual introduction of new RTE cereal products is pro-competitive and makes coordination more difficult.").

## V.     SHOULD THE COURT DETERMINE THE MERGER LIKELY VIOLATES SECTION 7, IT MAY ORDER FURTHER REMEDIES—INCLUDING FURTHER DIVESTITURES—TO PROTECT AGAINST THAT HARM

### A.     The Court Should Not Block this Procompetitive Merger and Instead Should Use its Broad Equitable Powers to Address Any Residual Concerns

179.     For the reasons set forth above, the Government has failed to carry its ultimate burden of proving that the transaction "may tend to substantially lessen competition" under Section 7 of the Clayton Act, so judgment for Defendants is appropriate.  If, however, this Court concludes that the transaction is unlawful, it should use its broad equitable powers to craft an order granting

57

appropriate relief short of a full-stop injunction.   Such an order would permit the merger to

proceed—and thereby enable the merged entity to provide substantial procompetitive benefits to

millions of consumers nationwide—while addressing concerns the Court may have about potential

anticompetitive effects.

**B.     The Court Has Broad Discretion to Craft an Appropriate Remedy Short of a Full-Stop Injunction**

180.    "The relief in an antitrust case must be effective to redress the violations and to

restore competition." *Ford Motor Co. v. United States*, 405 U.S. 562, 573 (1972) (internal

quotations and citation omitted).   When crafting equitable remedies under the Clayton Act, district

courts "are clothed with large discretion to model their judgments to fit the exigencies of the

particular case." *United States v. E. I. Du Pont De Nemours & Co.*, 353 U.S. 586, 607-08 (1957)

(internal quotation marks and citation omitted).

181.    A Section 7 remedy—like all aspects of the Court's Section 7 analysis—must be

tailored to the particular industry.   *Deutsche Telekom*, 439 F. Supp. 3d at 230 ("[B]ecause of the

particularities that characterize different industries, what may be practical and realistically

achievable in one product market may not be so in another. This observation is no less true for

remedies, which 'necessarily must fit the exigencies of the particular case.'" (quoting *Ford Motor

Co.*, 405 U.S. at 575)).

182.    As the First Circuit recognized in *Cia. Petrolera Caribe, Inc. v. Arco Caribbean,

Inc.*, 754 F.2d 404 (1st Cir. 1985), various remedies short of an injunction can satisfy the Clayton

Act:

> The combination's market power could effectively be dissolved by a prohibitory
> injunction forbidding the corporation from engaging in interstate commerce, with
> the result that the offending combination partitions itself, sells assets, or otherwise
> restricts itself in a manner that recreates a competitive market. Or, the court could
> take a more active role as by appointing a receiver to sell assets in such a manner
> as to restore market conditions. Or, in lieu of either of these two drastic remedies,

the court could encourage the formulation of a consent decree under the direction of the court. ***All of these approaches may be called dissolutions—dissolutions of market power, of combinations of assets, or of the corporation itself***. Today, as then, we would say that dissolutions achieved through the use of any of these mechanisms were achieved by use of the injunctive power according to principles of equity. ***Forcing a corporation to divest itself of some of its assets, as by a sale, is one means through which the remedy of dissolution could be achieved, but it plainly is not the only means***.

*Id.* at 421 (emphasis added).

183.    In other Section 7 cases, courts have rejected the Government's requested relief of an injunction in favor of more limited asset divestitures.  *See, e.g.*, *FTC v. PepsiCo, Inc.*, 477 F.2d 24, 29-31 (2d Cir. 1973) (declining to enjoin PepsiCo from acquiring control of another company and instead issuing an injunction that applied more narrowly); *United States v. Reed Roller Bit Co.*, 274 F. Supp. 573, 586 (W.D. Okla. 1967) (declining to include "noncompeting lines of commerce" in the remedy and ordering a narrower divestiture than the Government requested).

184.    The Government has confirmed that this Court has the authority to craft a narrower remedy as an alternative to a full-stop injunction.[2]  During closing arguments, the Government specifically acknowledged that discretion.  *See* Tr. 12/5/23 (Gov't Closing) 85:21-24 (Mr. Duffy: "Procedurally, of course, if the Court found that there was liability here and the Court wanted to discuss a remedy, that would obviously be at the Court's discretion.")  Notably, the Government itself proposed such a narrower remedy in *United States v. AT&T Inc.*, when the Government sued to block AT&T's acquisition of Time Warner Inc.  While the Government's preferred remedy was to have the court enjoin the transaction in its entirety, the Government's Proposed Conclusions of Law nonetheless specifically stated that "[t]he Court may order alternative structural remedies." Proposed Conclusions of Law of the United States ¶ 122, *United States v. AT&T Inc.*, No. 17-

---

[2] Indeed, the Government's Prayer for Relief in this matter expressly includes a request for "such other relief as the Court may deem just and proper."  Am. Compl., ECF No. 69 at 35.

59

02511 (D.D.C. May 8, 2018), ECF No. 127, https://www.justice.gov/media/_962011/dl?inline (citing *PepsiCo* and *Anthem*).[3]   The Government then explained that "[t]he evidence at trial demonstrated that the bulk of the anticompetitive effects flow from the proposed combination of Turner with DirecTV. . . . Accordingly, this Court *could find that a structural remedy that prevents the combination of those two assets* within one corporate entity would significantly reduce the likelihood of anticompetitive effects." *Id.* (emphasis added).  The Government went on to propose two potential remedies that were alternatives to "blocking the acquisition in its entirety." *Id.* at ¶¶ 123-24, n. 41.

### C.    A Narrower Remedy Could Be Appropriate Here

185.    Notably, in prior airline mergers, the Government has accepted divestitures of slots, gates, and ground facilities to resolve its competitive concerns.  For example, the Government resolved its 2013 lawsuit seeking to block the merger of American and US Airways by accepting divestitures of slots, gates, and ground facilities at seven airports.  In its announcement, the Government stated that the divestitures would "enhance *system-wide competition* in the airline industry, resulting in more choices and more competitive airfares for consumers."  Press Release, U.S. Dep't of Justice, "Justice Department Requires US Airways and American Airlines to Divest Facilities at Seven Key Airports to Enhance System-wide Competition and Settle Merger Challenge," (Nov. 12, 2013) (emphasis added), https://www.justice.gov/opa/pr/justice-department-requires-us-airways-and-american-airlines-divest-facilities-seven-key.  As discussed *supra* at ¶ 88, in its response to public comments, the Government explained that the "proposed remedy does not purport to replicate the precise form of competition that will be lost as a result of

---

[3] *See also* Post-Trial Brief of the United States at 23, *United States v. AT&T Inc.*, No. 17-02511 (D.D.C. May 8, 2018), ECF No. 126, https://www.justice.gov/media/951891/dl?inline.

the merger. Rather, it requires the divestiture of significant assets at key airports to LCCs, a divestiture that will result in the expansion of LCC competition across the nation and the delivery of substantial consumer benefits." Response of Plaintiff United States to Public Comments on the Proposed Final Judgment at 27-28, *United States v. US Airways Grp., Inc.*, No. 13-01236 (D.D.C. Mar. 10, 2014), ECF No. 159. The United States District Court for the District of Columbia subsequently reviewed the Government's proposed Final Judgment and found that it was in the public interest. *United States v. US Airways Grp., Inc*., 38 F. Supp. 3d 69, 80, 85 (D.D.C. 2014).

186.    Similarly here, if this Court determines that the proposed transaction is unlawful, it is not required to issue an order blocking the acquisition in its entirety. Rather, if the Court has concerns about any of the 35 routes at the "heart" of the Government's case, it could order the parties to provide additional briefing or conduct a remedies hearing in order to address that concern. That would be much more equitable than a full-stop injunction, particularly since the Government's concern resolves around less than 1% of nonstop routes in this country—35 out of over 6,000 non-stop routes.

Dated: December 13, 2023            Respectfully submitted,

                                    */s/ Elizabeth M. Wright*
                                    Zachary R. Hafer (MA BBO #569389)
                                    Elizabeth M. Wright (MA BBO #569387)
                                    Zachary Sisko (MA BBO #705883)
                                    Cooley LLP
                                    500 Boylston Street, 14th Floor
                                    Boston, MA 02116-3736
                                    Tel: 617-937-2300
                                    zhafer@cooley.com
                                    ewright@cooley.com
                                    zsisko@cooley.com

                                    Ethan Glass (*Pro Hac Vice*)
                                    Deepti Bansal (*Pro Hac Vice*)

Matt K. Nguyen (*Pro Hac Vice*)
Cooley LLP
1299 Pennsylvania Avenue NW, Suite 700
Washington, DC 2004-2400
Tel: 202-842-7800
Fax: 202-842-7899
eglass@cooley.com
dbansal@cooley.com

Ryan A. Shores (*Pro Hac Vice*)
David I. Gelfand (*Pro Hac Vice*)
Daniel P. Culley (*Pro Hac Vice*)
Cleary Gottlieb Steen & Hamilton, LLP 2112
Pennsylvania Avenue, NW
Washington, DC 20037
Tel: 202-974-1500
rshores@cgsh.com
dgelfand@cgsh.com
dculley@cgsh.com

Michael Mitchell (*Pro Hac Vice*)
Brian Hauser (*Pro Hac Vice*)
Shearman & Sterling LLP
401 9th Street, N.W., Suite 800
Washington, DC 20004
Tel: 202-508-8005
Fax: 202-661-7480
michael.mitchell@shearman.com
brian.hauser@shearman.com

Jessica K. Delbaum (*Pro Hac Vice*)
Leila Siddiky (*Pro Hac Vice*)
Shearman & Sterling LLP
599 Lexington Avenue
New York, NY 10022-6069 Tel: 212-848-4000
Fax: 212-848-7179
jessica.delbaum@shearman.com
leila.siddiky@shearman.com

Rachel Mossman Zieminski (*Pro Hac Vice*)
Shearman & Sterling LLP
2601 Olive Street, 17th Floor
Dallas, TX 75201
Tel: 214-271-5385
rachel.zieminski@shearman.com

*Attorneys for Defendant JetBlue Airways Corporation*

Jay Cohen (*Pro Hac Vice*)
Andrew C. Finch (*Pro Hac Vice*)
Eyitayo St. Matthew-Daniel (*Pro Hac Vice*)
Jared P. Nagley (*Pro Hac Vice*)
Kate Wald (*Pro Hac Vice*)
Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY 10019
Tel: 212-373-3000
Fax: 212-757-3990
afinch@paulweiss.com
tstmatthewdaniel@paulweiss.com
jcohen@paulweiss.com
jnagley@paulweiss.com
kwald@paulweiss.com

Meredith R. Dearborn (*Pro Hac Vice*)
Paul, Weiss, Rifkind, Wharton & Garrison LLP 535
Mission Street, 24th Floor
San Francisco, CA 94105
Tel: 628-432-5100
Fax: 628-232-3101
mdearborn@paulweiss.com

*Attorneys for Defendant Spirit Airlines, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing Defendants' Proposed Conclusions of Law, which was filed with the Court through the ECF system on December 13, 2023, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

/s/ Elizabeth M. Wright
Elizabeth M. Wright