## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA et al.,

    *Plaintiffs*,

v.

JETBLUE AIRWAYS CORPORATION and
SPIRIT AIRLINES, INC.,

    *Defendants*.

Case No. 1:23-cv-10511-WGY

---

## PLAINTIFFS' PROPOSED CONCLUSIONS OF LAW

---

## TABLE OF CONTENTS

I.   Liability Framework for Section 7 of the Clayton Act ........................................................... 1

   A.   Section 7 is prophylactic and requires a probabilistic assessment.....................................1

   B.   Section 7 prohibits acquisitions that threaten competition ................................................2

   C.   Plaintiffs' ultimate burden layers one probabilistic standard over another .......................3

   D.   A "substantial" lessening of competition means more than a *de minimis* lessening ..........4

   E.   Courts evaluate whether an acquisition violates Section 7 of the Clayton Act using a flexible burden-shifting framework ........................................................................................5

      1.   Plaintiffs' initial burden to establish a *prima facie* case .............................................5

      2.   Defendants' rebuttal burden increases with the strength of Plaintiffs' *prima facie* case.7

   F.   Reasonable probability of anticompetitive effects in any relevant market establishes a transaction's illegality ........................................................................................................10

   G.   Benefits outside relevant markets cannot justify harms within a relevant market ...........11

II.   The Relevant Markets and the Structural Presumption ......................................................... 12

   A.   Defining relevant markets is a flexible exercise that illuminates competition from the perspective of consumers....................................................................................................12

      1.   Markets are defined from the perspective of consumers .............................................13

      2.   Markets need not be defined with scientific precision.................................................16

      3.   The relevant geographic markets are origin-and-destination pairs..............................18

   B.   A proposed acquisition is presumptively illegal if it would substantially increase market concentration in any highly concentrated market .............................................................22

   C.   An unrebutted presumption is sufficient to enjoin a merger.............................................25

III.   Direct Evidence May Also Establish a *Prima Facie* Case that a Proposed Acquisition May Substantially Lessen Competition.......................................................................................... 25

   A.   Sources of anticompetitive effects ....................................................................................26

      1.   Eliminating head-to-head competition harms competition..........................................26

      2.   Eliminating a uniquely disruptive competitor harms competition...............................28

      3.   Reducing product innovation harms competition ........................................................29

      4.   Restricting consumer choice harms competition .........................................................30

      5.   Enhancing the risk of coordinated effects in a highly concentrated industry harms competition .......................................................................................................................30

      6.   Industry trends towards concentration further bolsters the likelihood that a proposed acquisition may substantially lessen competition .................................................................35

   B.   Sources of evidence ...........................................................................................................36

      1.   Ordinary course business documents carry more weight than self-serving testimony or evidence subject to manipulation.........................................................................................36

2.   Analysis and testimony by economic experts help to illuminate the competitive consequences of the proposed acquisition ..................................................................38

IV.   Defendants Must Rebut the Presumption with Significant Evidence ....................................39

A.   Defendants must demonstrate that entry or expansion will counteract the anticompetitive effects of the proposed acquisition in each relevant market ......................................39

1.   Entry must be timely, likely, and sufficient ...............................................................39

2.   Entry must be fast enough to offset anticompetitive harm ..........................................42

3.   Entry must be likely to occur in order to offset anticompetitive harm .........................43

4.   Entry must be of a magnitude and scope sufficient to offset anticompetitive harm ......44

5.   Expansion or repositioning must satisfy the same requirements as entry to rebut the *prima facie* case ................................................................................................46

B.   Purported efficiencies must be merger-specific, verifiable, offset the acquisition's harm, and not arise from anticompetitive conduct ....................................................................47

1.   Purported efficiencies must be passed on to consumers in the relevant markets at a sufficient level that they would offset the harm from the proposed acquisition...................49

2.   Purported efficiencies must be merger specific ...........................................................51

3.   Purported efficiencies must be verifiable ...................................................................52

4.   Purported efficiencies must not arise from anticompetitive reductions in output or service .....................................................................................................................54

C.   Anticompetitive harm to consumers in one relevant market cannot be justified by pointing to purported benefits to consumers in a different relevant market ..............................54

D.   Defenses related to the financial weakness of a merging party are disfavored and have demanding requirements that are rarely satisfied ................................................................58

1.   The failing firm defense has "strict limits" ...............................................................58

2.   The requirements of the weakened competitor defense are demanding and rarely satisfied ...................................................................................................................59

V.   The Divestitures Will Not Remedy the Proposed Acquisition's Anticompetitive Effects ... 61

A.   Defendants bear the burden to establish that the divestitures would restore competition in the relevant markets ......................................................................................................61

B.   Restoring competition requires that the divestiture replace the competitive intensity lost as a result of the acquisition ...............................................................................................62

C.   Defendants bear the burden to show the divestitures are likely to occur ............................63

VI.   The Proposed Acquisition Should Be Permanently Enjoined .............................................64

VII. Jurisdiction and Venue ..................................................................................................65

A.   The Court has jurisdiction over this action and over each of the Defendants ...................65

B.   Venue is proper in this Court ....................................................................................65

# TABLE OF AUTHORITIES

## Cases

*Ball Mem'l Hosp., Inc. v. Mutual Hosp. Ins., Inc.,*
   784 F.2d 1325 (7th Cir. 1986) ................................................................. 22

*Baxley-DeLamar v. American Cemetery Assn.,*
   938 F.2d 846 (8th Cir. 1991) ............................................................. 13, 18

*Bio-Rad Lab'ys, Inc. v. 10X Genomics, Inc.,*
   483 F. Supp. 3d 38 (D. Mass. 2020) ......................................................... 33

*Brown Shoe Co. v. United States,*
   370 U.S. 294 (1962) .................................................................... passim

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,*
   429 U.S. 477 (1977) ........................................................................ 1

*California v. Am. Stores Co.,*
   495 U.S. 271 (1990) .................................................................... 2, 61

*Chi. Bridge & Iron Co. N.V. v. FTC,*
   534 F.3d 410 (5th Cir. 2008) ........................................................... passim

*Citizen Publ'g Co. v. United States,*
   394 U.S. 131 (1969) ...................................................................... 59

*Coastal Fuels of P.R., Inc. v. Caribbean Petroleum Corp.,*
   79 F.3d 182 (1st Cir. 1996) .................................................. 13, 14, 18, 21

*Diaz-Alarcon v. Flandez-Marcel,*
   944 F.3d 303 (1st Cir. 2019) ............................................................... 4

*Dr. Pepper/Seven-Up Cos. v. FTC,*
   991 F.2d 859 (D.C. Cir. 1993) ............................................................ 59

*Eastman Kodak Co. v. Image Tech. Servs., Inc.,*
   504 U.S. 451 (1992) ...................................................................... 12

*Emigra Grp., LLC v. Fragomen, Del Rey, Bernsen & Loewy, LLP,*
   612 F. Supp. 2d 330 (S.D.N.Y. 2009) ...................................................... 15

*Flovac, Inc. v. Airvac, Inc.,*
   817 F.3d 849 (1st Cir. 2016) .............................................................. 13

*Ford Motor Co. v. United States,*
   405 U.S. 562 (1972) .................................................................. 28, 62

*FTC v. Advocate Health Care Network,*
   841 F.3d 460 (7th Cir. 2016) .............................................................. 24

*FTC v. Arch Coal, Inc.,*
   329 F. Supp. 2d 109 (D.D.C. 2004) .................................................... 24, 61

*FTC v. Cardinal Health, Inc.,*
   12 F. Supp. 2d 34 (D.D.C. 1998) ....................................................... passim

*FTC v. CCC Holdings Inc.,*
   605 F. Supp. 2d (D.D.C. 2009) ........................................................ 40, 46

*FTC v. Consol. Foods Corp.,*
   380 U.S. 592 (1965) ...................................................................... 37

*FTC v. Elders Grain, Inc.,*
   868 F.2d 901 (7th Cir. 1989) ........................................................... passim

*FTC v. H.J. Heinz Co.*,
  246 F.3d 708 (D.C. Cir. 2001) ............................................................... passim
*FTC v. Hackensack Meridian Health, Inc.*,
  30 F.4th 160 (3d Cir. 2022) ................................................................... passim
*FTC v. Hackensack Meridian Health, Inc.*,
  2021 WL 4145062 (D.N.J. Aug. 4, 2021) ...................................................... 5
*FTC v. Indiana Federation of Dentists*,
  476 U.S. 447 (1986) ..................................................................................... 30
*FTC v. Libbey, Inc.*,
  211 F. Supp. 2d 34 (D.D.C. 2002) ............................................. 10, 27, 63
*FTC v. Penn State Hershey Med. Ctr.*,
  838 F.3d 327 (3d Cir. 2016) .................................................................. passim
*FTC v. PPG Indus., Inc.*,
  798 F.2d 1500 (D.C. Cir. 1986) ............................................................ passim
*FTC v. Procter & Gamble Co.*,
  386 U.S. 568 (1967) ..................................................................................... 47
*FTC v. ProMedica Health Sys., Inc.*,
  2011 WL 1219281 (N.D. Ohio Mar. 29, 2011) ..................................... passim
*FTC v. RAG-Stiftung*,
  436 F. Supp. 3d 278 (D.D.C. 2020) ...................................................... 16, 63
*FTC v. Sanford Health, Sanford Bismarck*,
  926 F.3d 959 (8th Cir. 2019) ................................................................. passim
*FTC v. Sanford Health, Sanford Bismarck*,
  2017 WL 10810016 (D.N.D. Dec. 15, 2017) ................................................. 4
*FTC v. Staples, Inc.*,
  190 F. Supp. 3d 100 (D.D.C. 2016), (*"Staples II"*) ............................... passim
*FTC v. Staples, Inc.*,
  970 F. Supp. 1066 (D.D.C. 1997), (*"Staples I"*) ................................... passim
*FTC v. Swedish Match*,
  131 F. Supp. 2d 151 (D.D.C. 2000) ...................................................... passim
*FTC v. Sysco Corp.*,
  113 F. Supp. 3d 1 (D.D.C. 2015) .......................................................... passim
*FTC v. Tronox Ltd.*,
  332 F. Supp. 3d 187 (D.D.C. 2018) ...................................................... passim
*FTC v. Univ. Health, Inc.*,
  938 F.2d 1206 (11th Cir. 1991) ............................................................. passim
*FTC v. Warner Commc'ns, Inc.*,
  742 F.2d 1156 (9th Cir. 1984) ..................................................................... 59
*FTC v. Weyerhaeuser Co.*,
  665 F.2d 1072 (D.C. Cir. 1981) .................................................................. 62
*FTC v. Wilh. Wilhelmsmen Holding ASA*,
  341 F. Supp. 3d 27 (D.D.C. 2018) ........................................................ passim
*George R. Whitten, Jr. v. Paddock Pool Builders, Inc.*,
  508 F.2d 547 (1st Cir. 1974) ........................................................................ 15
*Glen Holly Ent., Inc. v. Tektronix Inc.*,
  352 F.3d 367 (9th Cir. 2003) ........................................................................ 30

*Home Placement Service, Inc. v. Providence Journal Co.*,
   682 F.2d 274 (1st Cir. 1982) ............................................................... 14, 18

*Hosp. Corp. of Am. v. FTC*,
   807 F.2d 1381 (7th Cir. 1986) ............................................................. passim

*In re Airline Ticket Comm'n Antitrust Litig.*,
   953 F. Supp. 280 (D. Minn. 1997) ............................................................. 34

*In re AMR Corp.*,
   625 B.R. 215 (Bankr. S.D.N.Y. 2021) .................................................. 34, 36

*In re AMR Corp.*,
   502 B.R. 23 (Bankr. S.D.N.Y. 2013) ......................................................... 19

*In re Delta/AirTran Baggage Fee Antitrust Litig.*,
   733 F. Supp. 2d 1348 (N.D. Ga. 2010) ................................................ 34, 35

*In re Domestic Airline Travel Antitrust Litig.*,
   2023 WL 5930973 (D.D.C. Sept. 12, 2023) ............................................... 34

*In re High Fructose Corn Syrup Antitrust Litig.*,
   295 F.3d 651 (7th Cir. 2002) ...................................................................... 57

*In re Nw. Airlines Corp. Antitrust Litig.*,
   197 F. Supp. 2d 908 (E.D. Mich. 2002) ..................................................... 20

*Kaiser Alum. & Chem. Corp. v. FTC*,
   652 F.2d 1324 (7th Cir. 1981) .................................................................... 59

*Kiefer-Stewart Co. v. Joseph E. Seagram & Sons*,
   340 U.S. 211 (1950) .................................................................................... 54

*Kottaras v. Whole Foods Market, Inc.*,
   281 F.R.D. 16 (D.D.C. 2012) ...................................................................... 56

*Kyles v. Whitley*,
   514 U.S. 419 (1995) ...................................................................................... 3

*MacDermid Printing Solutions LLC v. Cortron Corp.*,
   833 F.3d 172 (2d Cir. 2016) ....................................................................... 30

*Malaney v. UAL Corp.*,
   2010 WL 3790296 (N.D. Cal. Sept. 27, 2010) .......................................... 20

*Miss. River Corp. v. FTC*,
   454 F.2d 1083 (8th Cir. 1972) .................................................................... 56

*New York v. Deutsche Telekom AG*,
   439 F. Supp. 3d 179 (S.D.N.Y. 2020) ................................................. passim

*Ohio v. Am. Express Co.*,
   585 U.S. ---, 138 S. Ct. 2274 (2018) .......................................................... 12

*Olin Corp. v. FTC*,
   986 F.2d 1295 (9th Cir. 1993) ...................................................................... 9

*ProMedica Health Sys., Inc. v. FTC*,
   749 F.3d 559 (6th Cir. 2014) ................................................................ passim

*Prosterman v. Am. Airlines, Inc.*,
   2016 WL 7157667 (N.D. Cal. Dec. 8, 2016) .............................................. 35

*Realcomp II, Ltd. v. FTC*,
   635 F.3d 815 (6th Cir. 2011) ...................................................................... 30

*Rebel Oil Co. v. Atl. Richfield Co.*,
   51 F.3d 1421 (9th Cir. 1995) ......................................................................

*Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*,
  792 F.2d 210 (D.C. Cir. 1985) ................................................................... 1

S*EC v. Sargent*,
  589 F. Supp. 3d 173 (D. Mass. 2022) ......................................................... 8

*Spirit Airlines, Inc. v. Nw. Airlines, Inc.*,
  431 F.3d 917 (6th Cir. 2005) ..................................................................... 19

*St. Alphonsus Med. Ctr.-Nampa, Inc. v. St. Luke's Health Sys., Ltd.*,
  778 F.3d 775 (9th Cir. 2015) ............................................................... passim

*St. Alphonsus Med. Ctr.-Nampa, Inc. v. St. Luke's Health Sys.,Ltd.*,
  2014 WL 407446 (D. Idaho Jan. 24, 2014) ............................................... 41

*Stanley Works v. FTC*,
  469 F.2d 498 (2d Cir. 1972) ................................................................... 2, 4

*Steves & Sons, Inc. v. JELD-WEN, Inc.*,
  988 F.3d 690 (4th Cir. 2021) ..................................................................... 57

*Steves & Sons, Inc. v. JELD-WEN, Inc.*,
  290 F. Supp. 3d 507 (E.D. Va. 2018) ................................................... 59, 61

*Steward Health Care Sys., LLC v. Blue Cross & Blue Shield of R.I.*,
  311 F. Supp. 3d 468 (D.R.I. 2018) ............................................................ 28

*Strickler v. Greene*,
  527 U.S. 263 (1999) ..................................................................................... 3

*Sullivan v. Nat'l Football League*,
  34 F.3d 1091 (1st Cir. 1994) ..................................................................... 55

*Tampa Elec. Co. v. Nashville Coal Co.*,
  365 U.S. 320 (1961) ................................................................................... 13

*Terry v. Elec. Data Sys. Corp.*,
  940 F. Supp. 378 (D. Mass. 1996) ............................................................... 8

*U.S. ex rel. El-Amin v. George Washington Univ.*,
  533 F. Supp. 2d 12 (D.D.C. 2008) ............................................................. 57

*United States v. Aetna Inc.*,
  240 F. Supp. 3d 1 (D.D.C. 2017) ........................................................ passim

*United States v. Airline Tariff Publ'g Co.*,
  836 F. Supp. 9 (D.D.C. 1993) ................................................................... 33

*United States v. Alcoa*,
  377 U.S. 271 (1964) ................................................................................... 28

*United States v. Am. Airlines Grp. Inc.*,
  -- F. Supp. 3d --, 2023 WL 3560430 (D. Mass. May 19, 2023) ...................... passim

*United States v. Anthem, Inc.*,
  236 F. Supp. 3d 171 (D.D.C. 2017) ..................................................... passim

*United States v. Anthem, Inc.*,
  855 F.3d 345 (D.C. Cir. 2017) ............................................................. passim

*United States v. Bazaarvoice, Inc.*,
  2014 WL 203966 (N.D. Cal. Jan. 8, 2014) .......................................... 38, 41, 43, 51

*United States v. Baker Hughes Inc.*,
  908 F.2d 983 (D.C. Cir. 1990) ..................................................................... 8

*United States v. Bertelsmann SE & Co. KgaA*,
  646 F. Supp. 3d 1 (D.D.C. 2022) ........................................................ passim

*United States v. Brown Univ.*,
5 F.3d 658 (3rd Cir. 1993) ................................................................. 55

*United States v. Conn. Nat'l Bank*,
418 U.S. 656 (1974)........................................................................... 17

*United States v. Cont'l Can Co.*,
378 U.S. 441 (1964)...................................................................... 22, 23

*United States v. Dairy Farmers of Am., Inc.*,
426 F.3d 850 (6th Cir. 2005) ............................................................. 28

*United States v. Dentsply Int'l, Inc.*,
399 F.3d 181 (3d Cir. 2005)............................................................... 30

*United States v. Dominguez Benitez*,
542 U.S. 74 .......................................................................................... 3

*United States v. E. I. du Pont de Nemours & Co.*,
366 U.S. 316 (1961), ("*du Pont III*") ........................................... 62, 64

*United States v. E.I. du Pont de Nemours & Co.*,
353 U.S. 586 (1957), ("*du Pont II*") .............................................. 2, 62

*United States v. E. I. du Pont de Nemours & Co.*,
351 U.S. 377 (1956), ("*du Pont I*")................................................... 13

*United States v. Energy Sols., Inc.*,
265 F. Supp. 3d 415 (D. Del. 2017)............................................. passim

*United States v. Falstaff Brewing Corp.*,
410 U.S. 526 (1973)........................................................................... 37

*United States v. Franklin Elec. Co.*,
130 F. Supp. 2d 1025 (W.D. Wis. 2000) ........................................... 63

*United States v. Gen. Dynamics Corp.*,
415 U.S. 486 (1974)..................................................................... passim

*United States v. Grinnell*,
384 U.S. 563 (1966).................................................................... 13, 21

*United States v. H & R Block, Inc.*,
833 F. Supp. 2d 36 (D.D.C. 2011) .............................................. passim

*United States v. Hebshie*,
549 F.3d 30 (1st Cir. 2008)................................................................. 3

*United States v. Ivaco*,
704 F. Supp. 1409 (W.D. Mich. 1989) .............................................. 56

*United States v. Jessup*,
757 F.2d 378 (1st Cir. 1985)................................................................ 8

*United States v. Marine Bancorporation, Inc.*,
418 U.S. 602 (1974)........................................................................ 7, 8

*United States v. Marrero-Ortiz*,
160 F.3d 768 (1st Cir. 1998).............................................................. 57

*United States v. O'Brien*,
895 F.2d 810 (1st Cir. 1990)................................................................ 8

*United States v. Pabst Brewing Co.*,
384 U.S. 546 (1966)..................................................................... passim

*United States v. Phila. Nat'l Bank*,
374 U.S. 321 (1963)..................................................................... passim

*United States v. Phillipsburg Nat. Bank & Tr. Co.*,
  399 U.S. 350 (1970)......................................................................... 5
*United States v. Rockford Mem'l Corp.*,
  898 F.2d 1278 (7th Cir. 1990) ................................................... 16, 17
*United States v. U.S. Gypsum Co.*,
  340 U.S. 76 (1950)......................................................................... 62
*United States v. U.S. Gypsum Co.*,
  333 U.S. 364 (1948)....................................................................... 37
*United States v. U.S. Sugar Corp.*,
  2022 WL 4544025  (D. Del. 2022) ................................................. 22
*United States v. Visa U.S.A., Inc.*,
  163 F. Supp. 2d 322 (S.D.N.Y. 2001).......................................... 41, 42
*Vazquez-Ramos v. Triple-S Salud, Inc.*,
  55 F.4th 286 (1st Cir. 2022).......................................................... 12
*Viamedia, Inc. v. Comcast Corp.*,
  951 F.3d 429 (7th Cir. 2020) ......................................................... 29

## Statutes

15 U.S.C. § 16.................................................................................... 57
15 U.S.C. § 18............................................................................. passim
15 U.S.C. § 25......................................................................... 62, 64, 65
15 U.S.C. § 26.................................................................................... 65

## Other Authorities

S. Rep. No. 81-1777 (1950) ................................................................ 2
Jonathan B. Baker & Joseph Farrell, *Oligopoly Coordination, Economic Analysis, and the Prophylactic Role of Horizontal Merger Enforcement*,
  168 U. Pa. L. Rev. 1985 (2020) ..................................................... 32
Derek C. Bok, *Section 7 of the Clayton Act and the Merging of Law and Economics*,
  74 Harv. L. Rev. 226 (1960)............................................................ 3
Randy Chugh, Andrew J. Ewalt, and Nicholas Hill, *Supply Substitution and Market Definition: Lessons from FTC v. RAG-Stiftung*, The Antitrust Source………………………....……16
Phillip Areeda & Herbert Hovenkamp, *Antitrust Law,* (4th ed. 2016)..…………………… passim
D. Daniel Sokol & Sean P. Sullivan, *The Decline of Coordinated Effects Enforcement and How to Reverse It,* Fla L. Rev. (forthcoming 2024)………………………………………….. 31

# I.     LIABILITY FRAMEWORK FOR SECTION 7 OF THE CLAYTON ACT

## A.     Section 7 is prophylactic and requires a probabilistic assessment

1.     Section 7 of the Clayton Act forbids corporate acquisitions when their effect "*may be* substantially to lessen competition." 15 U.S.C. § 18 (emphasis added). Assessing what the consequences of an acquisition "may be" after it is consummated entails a "predictive judgment, necessarily probabilistic and judgmental rather than demonstrable." *Hosp. Corp. of Am. v. FTC*, 807 F.2d 1381, 1389 (7th Cir. 1986); *see also United States v. Phila. Nat'l Bank*, 374 U.S. 321, 362 (1963) (Section 7 "requires not merely an appraisal of the immediate impact of the merger upon competition, but a prediction of its impact upon competitive conditions in the future"); *Brown Shoe Co. v. United States*, 370 U.S. 294, 323 (1962) ("Congress used the words 'may be substantially to lessen competition' . . . to indicate that its concern was with probabilities, not certainties."). Given that "the statute requires a prediction," any "doubts are to be resolved against the transaction." *FTC v. Elders Grain, Inc.*, 868 F.2d 901, 906 (7th Cir. 1989) (Posner, J.).

2.     Section 7 is a "prophylactic measure," *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 485 (1977), that Congress designed to "arrest anticompetitive tendencies in their 'incipiency,'" *Phila. Nat'l Bank*, 374 U.S. at 362; *see also United States v. Gen. Dynamics Corp.*, 415 U.S. 486, 505 n.13 (1974) (Section 7 "was designed to arrest the creation of monopolies 'in their incipiency'"); *Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 220 (D.C. Cir. 1985) (Bork, J.) (The Clayton Act is "a statute aimed at halting 'incipient monopolies and trade restraints outside the scope of the Sherman Act.'") (quoting *Brown Shoe*, 370 U.S. at 318 n. 32). The Celler-Kefauver Act of 1950, Pub. L. 81-899, amended the Clayton Act to expand its reach, in response to "a rising tide of economic concentration in the American

economy." *Brown Shoe*, 370 U.S. at 316. The Celler-Kefauver Act was designed as a "barrier" to this rising tide, a "keystone" of which was the "provision of authority for arresting mergers at a time when the trend to a lessening of competition in a [market] was still in its incipiency." *Id*. at 317. The legislative history of the Act confirmed that the words "may be" in the statutory text convey "[t]he concept of reasonable probability," which "is a necessary element in any statute which seeks to arrest restraints of trade in their incipiency and before they develop into full-fledged restraints violative of the Sherman Act." S. Rep. No. 81-1777 at 6 (1950).

**B.      Section 7 prohibits acquisitions that threaten competition**

3.      Section 7 creates "a relatively expansive definition of antitrust liability," *California v. Am. Stores Co.*, 495 U.S. 271, 284 (1990), and the words "may be" are intentional to show that the statute is concerned with "probabilities, not certainties." *Brown Shoe*, 370 U.S. at 323; *see also*, *e.g.*, *FTC v. Hackensack Meridian Health, Inc.*, 30 F.4th 160, 166 (3d Cir. 2022). Accordingly, an acquisition violates Section 7 if it has a "reasonable probability" of substantially lessening competition in a relevant market. *United States v. E.I. du Pont de Nemours & Co.*, 353 U.S. 586, 607 (1957) ("*du Pont II*").

4.      Courts have interpreted "reasonable probability" to be synonymous with a "threat" or "danger" to competition. *See*, *e.g.*,  *United States v. Pabst Brewing Co.*, 384 U.S. 546, 549 (1966) (through Section 7, Congress "simply intended to outlaw mergers which threatened competition in any or all parts of the country"); *du Pont II* , 353 U.S. at 597 (acquisition that "contain[s] a threat that it may lead to" a substantial lessening of competition is unlawful under Section 7); *Hosp. Corp.*, 807 F.2d at 1389 ("All that is necessary is that the merger create an appreciable danger of [harm to competition] in the future."); *Stanley Works v. FTC*, 469 F.2d

2

498, 505 (2d Cir. 1972) (a merger should be enjoined if it "threatens substantial anti-competitive consequences").

### C.     Plaintiffs' ultimate burden layers one probabilistic standard over another

5.     Showing that there would be a "reasonable probability" of substantial harm to competition, *Brown Shoe*, 370 U.S. at 325, is less exacting than showing such effects are more likely than not. Courts have consistently held that a "reasonable probability" does not require "more likely than not" proof because "the adjective is important." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995) (in *Brady* disclosure context); *Strickler v. Greene*, 527 U.S. 263, 264 (1999) (clarifying that "reasonable probability" is less demanding than "more likely than not"); *United States v. Hebshie*, 549 F.3d 30, 44 (1st Cir. 2008) (reasonable probability standard "is not the same as, and should not be confused with" a more-likely-than-not standard) (citing *United States v. Dominguez Benitez*, 542 U.S. 74, 83 n. 9 (2004)); *see also Strickler*, 527 U.S. at 300 & n.3 (Souter, J., concurring in part) (observing that "significant possibility" better captures concept intended by "reasonable probability," and noting Clayton Act's "reasonable probability" standard). "[I]t is hard to believe that 'reasonable probability' should be construed to mean a 51 per cent likelihood . . . . Pushed to its logical extreme, [that interpretation would] give the [Clayton Act] very little significance apart from the Sherman Act." Derek C. Bok, *Section 7 of the Clayton Act and the Merging of Law and Economics*, 74 Harv. L. Rev. 226, 255 (1960) (cited favorably by, inter alia, *Phila. Nat'l Bank*, 374 U.S. at 362, and *Brown Shoe*, 370 U.S. at 312 n.19 & 343 n.71).

6.     Plaintiffs have "the ultimate burden of proving a Section 7 violation by a preponderance of the evidence." *See, e.g.*, *United States v. Aetna Inc.*, 240 F. Supp. 3d 1, 19 (D.D.C. 2017) (quoting *United States v. H & R Block, Inc.*, 833 F. Supp. 2d 36, 49 (D.D.C.

2011)). A "preponderance of the evidence" means "more likely than not." *E.g.*, *Diaz-Alarcon v. Flandez-Marcel*, 944 F.3d 303, 305 n.2 (1st Cir. 2019). And because an acquisition violates Section 7 if it threatens a substantial lessening of competition, *see supra* Section I.C, Plaintiffs' ultimate burden is to prove that an acquisition more likely than not threatens a substantial lessening of competition. Therefore, Plaintiffs' ultimate burden layers one probabilistic standard (preponderance of evidence) on top of "Section 7's already probabilistic standard." *United States v. Bertelsmann SE & Co. KgaA*, 646 F. Supp. 3d 1, 22 n.15 (D.D.C. 2022). The combination of the two probabilistic standards amounts to something less than a 50 percent chance of harm.

**D.     A "substantial" lessening of competition means more than a *de minimis* lessening**

7.      Section 7's requirement that an acquisition threaten a "substantial lessening of competition" does not set a high bar for the quantum of competition that must be in danger. Competition is "substantial" under the Clayton Act when it is more than *de minimis*. *Stanley Works*, 469 F.2d at 506 (competition "sufficiently insubstantial to purge it of illegality under the Clayton Act" when it is "*de minimis*"); *accord Brown Shoe*, 370 U.S. at 329 ("[F]oreclosure of a de minimis share of the market will not tend 'substantially to lessen competition.'"); *see also Pabst Brewing*, 384 U.S. at 551–52.

8.      There is no minimum price increase—or amount of economic harm—required to meet the threshold for substantiality. Courts have enjoined acquisitions where the dollar-value of harm to competition threatened by an acquisition was less than $30 million total. *See, e.g., FTC v. Swedish Match*, 131 F. Supp. 2d 151, 169 (D.D.C. 2000) ($24 million estimated harm); *FTC v. Sanford Health, Sanford Bismarck*, 2017 WL 10810016, at *13 (D.N.D. Dec. 15, 2017), *aff'd*, 926 F.3d 959 (8th Cir. 2019) ($16 million to $27 million annually); *FTC v. Wilh. Wilhelmsen*

4

*Holding ASA*, 341 F. Supp. 3d 27, 65 (D.D.C. 2018) ($14.4–23 million). Courts have also found

single-digit percentage price increase estimates to be substantial enough to enjoin a merger. *See,*

*e.g., FTC v. Hackensack Meridian Health, Inc.*, 2021 WL 4145062, at *22 & n.26 (D.N.J. Aug.

4, 2021), *aff'd*, 30 F.4th 160 (3d Cir. 2022) (5.7 percent price effect for the merging parties'

patients amounting to $31 million harm); *H & R Block*, 833 F. Supp. 2d at 87 (2.2–2.5 percent

price effect for the acquiring firm's customers and a 10.5–12.2 percent price effect for the

acquired firm's customers).

9.      A geographic area is large enough to qualify as a "'section' of the country" under

Section 7 if it is "economically significant." *Brown Shoe*, 370 U.S. at 320. The Supreme Court

has held that "cities with a population exceeding 10,000 and their environs" are sufficiently

"economically significant" to qualify as geographic markets. *Id*. at 339; *see also United States v.*

*Phillipsburg Nat. Bank & Tr. Co*., 399 U.S. 350, 365 (1970) (holding that area with "population

of almost 90,000 in 1960" was "clearly an economically significant section of the country for the

purposes of [Section] 7"); *infra* Section II.A (discussing market definition principles).

### E.      Courts evaluate whether an acquisition violates Section 7 of the Clayton Act using a flexible burden-shifting framework

#### 1.      Plaintiffs' initial burden to establish a *prima facie* case

10.      Plaintiffs bear the initial burden to establish a *prima facie* case that the proposed

acquisition violates Section 7. *Hackensack*, 30 F.4th at 166. Plaintiffs can meet that burden in

multiple ways. One way is by showing that the acquisition results in a firm controlling an undue

percentage share of a relevant market and a significant increase in concentration of firms in that

market. *Id*. at 172–73. Such increases lead to a presumption, based on the altered market

structure alone, that the proposed acquisition is anticompetitive and violates Section 7. *See, e.g.*,

*Phila. Nat'l Bank*, 374 U.S. at 364 (shares above 30 percent in a relevant market establish

presumption); *Hackensack*, 30 F.4th at 172–73 (combined post-merger share of 47 percent

established presumption); *see also infra* Sections II.B and II.C (discussing structural presumption

in more detail).

11.     Alternatively, or in addition to evidence about the structure of the affected

markets, Plaintiffs may establish a *prima facie* case through direct evidence of threatened

anticompetitive effects. *Hackensack*, 30 F.4th at 173; *Chi. Bridge & Iron Co. N.V. v. FTC*, 534

F.3d 410, 431–33 (5th Cir. 2008). Evidence of threatened anticompetitive effects is "an

independent reason for a *prima facie* case of presumptive illegality." *Chi. Bridge*, 534 F.3d

at 421, 432.

12.     The threats to competition shown through direct evidence may include both

"unilateral" and "coordinated" effects. *See, e.g.*, *ProMedica Health Sys., Inc. v. FTC*, 749 F.3d

559, 568–69 (6th Cir. 2014); *H & R Block*, 833 F. Supp. 2d at 77–84 (evaluating direct evidence

relating to potential coordinated and unilateral effects). "Unilateral effects" refer to the loss of

competition between direct competitors and "coordinated effects refer to markets with few

competitors, in which firms may 'coordinate their behavior, either by overt collusion or implicit

understanding in order to restrict output and achieve profits above competitive levels.'" *United

States v. Anthem, Inc.*, 236 F. Supp. 3d 171, 215–16 (D.D.C. 2017) (quoting *ProMedica Health

Sys.*, 749 F.3d at 568); *see also infra* Section III.A (discussing principles relating to competitive

effects). Evidence of such effects may establish or strengthen Plaintiffs' *prima facie* case and

may also inform the ultimate question of whether the effect of the transaction may be

substantially to lessen competition. *See Chi. Bridge*, 534 F.3d at 433 ("other evidence" beyond

market concentration "suffices to establish a *prima facie* case"); *Anthem*, 236 F. Supp. 3d at 215–16 (plaintiff carried ultimate burden of persuasion through evidence of anticompetitive effects).

### 2. Defendants' rebuttal burden increases with the strength of Plaintiffs' *prima facie* case

13.     After Plaintiffs have established a *prima facie* case that the proposed acquisition is illegal, Defendants then bear the burden to rebut that *prima facie* case by producing "significant evidence," *United States v. Marine Bancorporation, Inc.*, 418 U.S. 602, 631–32 (1974), which "mandate[s] a conclusion that no substantial lessening of competition" is "threatened" by the acquisition.[1] *Gen. Dynamics*, 415 U.S. at 498; *see also Hackensack*, 30 F.4th 160 at 175 (defendants must "show either that the combination would not have anticompetitive effects or that the anticompetitive effects of the merger will be offset by extraordinary efficiencies resulting from the merger") (quoting *FTC v. Penn State Hershey Med. Ctr.*, 838 F.3d 327, 347 (3d Cir. 2016).

14.     The magnitude of the evidence that Defendants must produce to rebut Plaintiffs' *prima facie* case depends on the strength of the likely adverse competitive effects of a merger. The stronger Plaintiffs' *prima facie* case is, the heavier Defendants' rebuttal burden becomes. *ProMedica*, 749 F.3d at 571 (where plaintiff "did not merely rest upon the presumption, but instead discussed a wide range of evidence that buttresses it," that additional evidence "makes [defendants'] task more difficult still"); *Chi. Bridge*, 534 F.3d at 426 (when plaintiff presents "very compelling" *prima facie* case that "anticipates and addresses [defendants'] rebuttal evidence," defendants' "burden of production on rebuttal is also heightened"). Defendants' burden includes the need to "rebut the normal presumption that increases in concentration will

---

[1] This citation addresses the Court's question during closing arguments about the source of the phrase "mandates a conclusion." *See* Trial Tr. at 55:10-17 (Dec. 5, 2023).

increase the likelihood of tacit collusion," and demonstrate that the industry in question possesses unique "structural barriers to collusion" otherwise threatened by tacit coordination in oligopolies. *FTC v. H.J. Heinz Co.*, 246 F.3d 708, 724–25 (D.C. Cir. 2001).

15.     Because evidence establishing a *prima facie* case carries forward even if the presumption is rebutted, *prima facie* evidence establishes a "presumption of the middle ground," meaning that it establishes the presumed fact "unless credible evidence is introduced which tends to rebut" that fact. *Terry v. Elec. Data Sys. Corp.*, 940 F. Supp. 378, 381–82 (D. Mass. 1996) (Young, J.); *accord United States v. Jessup*, 757 F.2d 378, 382–83 (1st Cir. 1985) (Breyer, J.), *abrogated on other grounds by United States v. O'Brien*, 895 F.2d 810 (1st Cir. 1990) (discussing this "middle ground position"). Such presumptions arise because of "fairness, social policy, and probability." *SEC v. Sargent*, 589 F. Supp. 3d 173, 196 & n.16 (D. Mass. 2022) (Young, J.). Thus, "even when contrary evidence is presented, *prima facie* evidence maintains its force and is accorded any weight that the fact-finder sees fit." *Id.*

16.     When a plaintiff relies only on the structural presumption and does not adduce "any additional evidence" of harm beyond it, defendants need not "'clearly' disprove" harm on rebuttal. *United States v. Baker Hughes Inc.*, 908 F.2d 983, 991 (D.C. Cir. 1990) (citing *Phila. Nat'l Bank*, 374 U.S. at 363 and *Marine Bancorporation*, 418 U.S. at 631); *id.* at 992 ("Imposing a heavy burden of production on a defendant would be particularly anomalous where, as here, it is easy to establish a *prima facie* case."); *accord Anthem*, 236 F. Supp. 3d at 213 (following *Baker Hughes* on this point). But both *Baker Hughes* and *Anthem* also held, like many other courts, *see supra* ¶ 14, that the height of the proverbial "bar" defendants must clear on rebuttal is set by the strength of plaintiffs' *prima facie* case. *Baker Hughes*, 908 F.2d at 991 ("The more

compelling the *prima facie* case, the more evidence the defendant must present to rebut it successfully."); *Anthem*, 236 F. Supp. 3d at 213 (same).

17.     In *Baker Hughes*, the court reasoned that the defendants' rebuttal bar was relatively low in that instance because the plaintiff in that case relied only on a structural presumption, *Baker Hughes*, 908 F.2d at 983, but that reasoning "does not control" when a plaintiff bolsters its *prima facie* case by taking on the defendants' rebuttal arguments in its *prima facie* case. *Olin Corp. v. FTC*, 986 F.2d 1295, 1305 (9th Cir. 1993). Rather, "if a Government's *prima facie* case anticipates and addresses the respondent's rebuttal evidence, the *prima facie* case is very compelling and significantly strengthened," and "the [defendant's] burden of production on rebuttal is also heightened." *Chi. Bridge*, 534 F.3d at 426; *see also Hackensack*, 30 F.4th at 173 ("[D]irect evidence strengthens the probability that the merger will likely lead to anticompetitive effects and, thus, the [plaintiff's] *prima facie* case."); *ProMedica*, 749 F.3d at 571; *Heinz*, 246 F.3d at 717 (evidence of head-to-head competition "bolster[s]" plaintiff's *prima facie* case).

18.     If Defendants fail to rebut Plaintiffs' *prima facie* case, then a violation of Section 7 is established, and no further analysis is necessary. *Hackensack*, 30 F.4th at 179; *Chi. Bridge*, 534 F.3d at 424–25 (plaintiff "preserve[s] the *prima facie* presumption if the [defendant] fails to satisfy the burden of production"); *Olin Corp.*, 986 F.2d at 1305 (where plaintiff has addressed rebuttal evidence in *prima facie* case, court can determine that defendant has failed to meet its burden of production and need not shift burden back to the plaintiff). Defendants' failure to rebut the *prima facie* presumption has been dispositive in many Section 7 cases. *See, e.g., Heinz*, 246 F.3d at 725; *Wilh. Wilhelmsen*, 341 F. Supp. 3d at 74; *FTC v. Tronox Ltd.*, 332 F. Supp. 3d 187, 212 (D.D.C. 2018); *Aetna*, 240 F. Supp. 3d at 74, 99; *FTC v. Staples, Inc.*, 190 F. Supp. 3d

100, 138 (D.D.C. 2016) ("*Staples II*"); *FTC v. Sysco Corp.*, 113 F. Supp. 3d 1, 86 (D.D.C. 2015); *United States v. H & R Block, Inc.*, 833 F. Supp. 2d 36, 92 (D.D.C. 2011); *Swedish Match*, 131 F. Supp. 2d at 172–73; *FTC v. Libbey, Inc.*, 211 F. Supp. 2d 34, 53 (D.D.C. 2002)

19.     But even if Defendants successfully rebut the *prima facie* case, the Court then carefully considers all available evidence—including substantial increases in concentration in relevant markets, loss of head-to-head competition, loss of innovation, loss of consumer choice and variety, trends toward concentration, and evidence of susceptibility to coordination—to determine if Plaintiffs have proven by a preponderance of the evidence that the acquisition threatens competition. *See, e.g.*, *Chi. Bridge*, 534 F.3d at 424 (noting how evidence can both establish a *prima facie* case and "serve[] as a redoubt" against rebuttal evidence offered by defendants); *Anthem*, 236 F. Supp. 3d at 214–16 (even where defendant successfully rebutted the presumption with evidence of entry, plaintiff successfully carried ultimate burden of persuasion through evidence of anticompetitive effects).

20.     While the burden-shifting framework described above provides a useful roadmap for analysis, it is a "flexible framework rather than an air-tight rule." *Chi. Bridge*, 534 F.3d at 424. Ultimately, the focus remains on whether the effect of the transaction may be to substantially lessen competition in any relevant market.

### F.      Reasonable probability of anticompetitive effects in any relevant market establishes a transaction's illegality

21.     A merger is unlawful under Section 7 if it is reasonably probable to result in a substantial lessening of competition in "*any* line of commerce" in "*any* section of the country." 15 U.S.C. § 18 (emphasis added). Thus, "if anticompetitive effects of a merger are probable in 'any' significant market," the merger violates Section 7. *Brown Shoe*, 370 U.S. at 337; *see also United States v. Anthem, Inc.*, 855 F.3d 345, 368 (D.C. Cir. 2017) (threat of anticompetitive

effects in one local market "provides an independent basis for the injunction" prohibiting merger); 4A Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 972a (4th ed. 2016) (hereinafter "Areeda & Hovenkamp") ("[Section 7] plainly contemplates that mergers may involve more than one market, yet it bases legality on a separate market-by-market appraisal."). "The Government may introduce evidence which shows that as a result of a merger competition may be substantially lessened throughout the country, or on the other hand it may prove that competition may be substantially lessened only in one or more sections of the country. In either event a violation of § 7 would be proved." *Pabst Brewing*, 384 U.S. at 549.

22.     Because the statute commands that a transaction be enjoined whenever there may be a substantial lessening of competition in any relevant market, a threat of substantial harm in a local relevant market is sufficient to enjoin a transaction in its entirety—even when alternative, broader markets exist. For example, in *Anthem*, the United States sought to enjoin Anthem's proposed acquisition of Cigna in multiple markets, including: (1) a market for sales of health insurance to national accounts in fourteen states, and (2) a market for sales of health insurance to large group employers in Richmond, Virginia. *Anthem*, 855 F.3d at 348, 351, 367–68. The appeals court affirmed a permanent injunction of the transaction as to both markets but also held that a threat of harm "in the Richmond, Virginia large group employer market" alone was "an independent basis for the injunction, "even absent a finding of anticompetitive harm in the fourteen-state national accounts market." *Id.* at 368.

### G.     Benefits outside relevant markets cannot justify harms within a relevant market

23.     As detailed in Section IV.C below, when there is a threat of substantial "anticompetitive effects in one market," that threat of harm "could [not] be justified by procompetitive consequences in another" market. *Phila. Nat'l Bank*, 374 U.S. at 370; *see also*

*infra* ¶¶ 111–113 (describing rationale of this holding in more detail); *see also* Memorandum in Support of Pls. Mot. in Limine Regarding Purported Out-of-Market Benefits, ECF No. 181. This prohibition on cross-market balancing is grounded in the text of Section 7 and in considerations of judicial restraint. *See infra* ¶¶ 112–113; *see also Phila. Nat'l Bank*, 374 U.S. at 370 (cautioning that it is "beyond the ordinary limits of judicial competence" to make an "ultimate reckoning of social or economic debits and credits"). Courts reject invitations by merging parties to justify in-market harms with out-of-market benefits. *See infra* ¶ 114 (collecting cases).

## II.   THE RELEVANT MARKETS AND THE STRUCTURAL PRESUMPTION

### A.   Defining relevant markets is a flexible exercise that illuminates competition from the perspective of consumers

24.     Relevant markets are the "area of effective competition" in which competition may be lessened. *Brown Shoe*, 370 U.S. at 324. They are defined "by reference to a product market (the 'line of commerce') and a geographic market (the 'section of the country')." *Id.* Defining relevant markets helps ascertain where "the effect of the merger on competition will be direct and immediate." *Phila. Nat'l Bank*, 374 U.S. at 357; *see Vazquez-Ramos v. Triple-S Salud, Inc.*, 55 F.4th 286, 296 (1st Cir. 2022) ("The relevant market is 'the area of effective competition . . ..'") (quoting *Ohio v. Am. Express Co.*, 585 U.S. ---, 138 S. Ct. 2274, 2285 (2018)); United States Dep't of Justice & Fed. Trade Comm'n, *Horizontal Merger Guidelines* § 4.1.1 (2010) (hereinafter "Horizontal Merger Guidelines") ("[T]he purpose of defining the market and measuring market shares is to illuminate the evaluation of competitive effects.").

25.     Courts should apply "a pragmatic, factual approach to definition of the relevant market and not a formal, legalistic one." *Brown Shoe*, 370 U.S. at 336. Market definition is a factual determination that must consider the "commercial realities" of the marketplace. *Eastman*

*Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 482 (1992) (quoting *United States v. Grinnell*, 384 U.S. 563, 572 (1966)).

26.     The parties agree that the relevant product market for assessing the competitive effects of the proposed acquisition is scheduled air passenger service. Proposed Final Pretrial Order ¶ 12, ECF No. 191.

### 1.     Markets are defined from the perspective of consumers

27.     Markets must be defined from "the perspective of consumers" because "[i]t is the consumer's options and the consumer's choices among them on which relevant market analysis depends." *Flovac, Inc. v. Airvac, Inc.*, 817 F.3d 849, 855 (1st Cir. 2016); *see also United States v. E. I. du Pont de Nemours & Co.*, 351 U.S. 377, 395 (1956) ("*du Pont I*") ("In considering what is the relevant market for determining the control of price and competition, no more definite rule can be declared than that commodities reasonably interchangeable by consumers . . . ."); Horizontal Merger Guidelines § 4 ("Market definition focuses solely on demand substitution factors, i.e., on customers' ability and willingness to substitute away from one product to another in response to a price increase or a corresponding non-price change such as a reduction in product quality or service.").

28.     These consumer-centric principles apply specifically in defining the relevant geographic market. A relevant geographic market "consists of 'the geographic area in which the defendant faces competition and to which consumers can practically turn for alternative sources of the product.'" *Coastal Fuels of P.R., Inc. v. Caribbean Petroleum Corp.*, 79 F.3d 182, 198 (1st Cir. 1996) (quoting *Baxley-DeLamar v. American Cemetery Assn.*, 938 F.2d 846, 850 (8th Cir. 1991); *accord Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327 (1961) (geographic market is the "area in which the seller operates, and to which the purchaser can practically turn

for supplies"). Therefore, if customers "would not consider [a firm] a viable alternative" because it operates exclusively outside the geographic area to which the customers can practically turn for the relevant product, then that firm is outside the relevant geographic market. *Home Placement Services, Inc. v. Providence Journal Co.*, 682 F.2d 274, 280 (1st Cir. 1982).

29.     A tool commonly consulted in defining a relevant market (product or geographic) is the so-called "hypothetical monopolist" test. Under that test, "[a] market may be any grouping of sales whose sellers, if unified by a hypothetical cartel or merger, could profitably raise prices significantly above the competitive level." *Coastal Fuels*, 79 F.3d at 197. If a firm controlling the entire supply of a product in a geographic area could profitably raise prices because consumers in that area "have nowhere else to turn" for the product, then that area is a relevant geographic market for that product. *Id.* at 198. Alternatively, if a price increase in that area "would repel the ultimate consumers, who would seek other suppliers" across a broader geographic area, then that broader area is the relevant geographic market. *Id.*

30.     The hypothetical monopolist test may not necessarily identify a single relevant market. *United States v. Aetna, Inc.*, 240 F. Supp. 3d 1, 39–40 (D.D.C. 2017). Instead, its purpose is to ensure "that markets are not defined too narrowly." *Id.* (quoting Horizontal Merger Guidelines § 4.1.1). The United States may evaluate a transaction in "any relevant market satisfying the [hypothetical monopolist] test." *Id.* at 40 (quoting Horizontal Merger Guidelines § 4.1.1).

31.     If a smaller market satisfies the hypothetical monopolist test, a larger one will necessarily satisfy it as well. That is why the purpose of the hypothetical monopolist test is simply to ensure that a relevant market is not defined "too narrowly." *Aetna*, 240 F. Supp. 3d at 39–40 (citing Horizontal Merger Guidelines § 4.1.1).

32.     Another test courts employ to assess market definition and a consumers'
reasonable interchangeability is "practical indicia," sometimes also called "*Brown Shoe* factors."
*Brown Shoe*, 370 U.S. at 325, 336 (considering indicia and defining multiple relevant markets);
*see, e.g.*, *Aetna*, 240 F. Supp. 3d at 21, 23–29 (referring to these indicia as "*Brown Shoe*
factors"). These factors include "industry or public recognition of the [product market] as a
separate economic entity, the product's peculiar characteristics and uses, unique production
facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized
vendors." *Brown Shoe*, 370 U.S. at 325; *see also George R. Whitten, Jr. v. Paddock Pool
Builders, Inc.*, 508 F.2d 547, 552–53 (1st Cir. 1974) (quoting *Brown Shoe* and noting that "[t]he
market for a product must be defined not by focusing on a single factor alone but by evaluating
the reasonable limits of that product's effective competition with other products"). "Courts
consistently find sensitivity to price changes"—one of the *Brown Shoe* factors—"to be a critical
factor in evaluating an alleged market." *Emigra Grp., LLC v. Fragomen, Del Rey, Bernsen &
Loewy, LLP*, 612 F. Supp. 2d 330, 358 (S.D.N.Y. 2009). In *FTC v. Staples, Inc.*, 970 F. Supp.
1066 (D.D.C. 1997), for example, to determine the contours of the market the court considered
"pricing evidence" showing that prices differed depending on which competitors were present.
970 F. Supp. at 1075 ("*Staples I*").

33.     Defendants advocate for a national market citing the mobility of aircraft. ECF No.
290 at 32–33. To the extent cross-elasticity of supply is relevant, however, it is properly
addressed in the Court's analysis of competitive effects and entry. *See FTC v. Penn State
Hershey Med. Ctr.*, 838 F.3d 327, 351–52 (3d Cir. 2016) (treating possibility of competitive
"repositioning" by other firms into the relevant market as defense rebuttal factor); *Chi. Bridge &*

15

*Iron Co. N.V. v. FTC*, 534 F.3d 410, 424, 427, 435–36 (5th Cir. 2008) (treating entry as defense rebuttal factor).

34.     In limited circumstances, where courts find that suppliers of other goods constrain prices within a market, it may be appropriate to consider supply-side substitution in addition to demand-side substitution. *See FTC v. RAG-Stiftung*, 436 F. Supp. 3d 278, 295–96 (D.D.C. 2020); *see also Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995) ("If the sales of other producers substantially constrain the price-increasing ability of the monopolist or hypothetical cartel, these other producers must be included in the market."). However, in those limited circumstances, courts have employed rigorous screens, which are clearly inapplicable in this case, to justify this departure from the norm. *See e.g.*, *RAG-Stiftung*, 436 F. Supp. 3d at 292 (requiring a showing that *actual* switching between production of the products to be included in the market is: (1) "nearly universal among the firms selling one or more of a group of products," (2) "easy," and (3) "profitable") (internal citations omitted). Defendants' own expert, Dr. Hill, has himself written that "aggregating markets on the basis of supply substitution is allowable only as a matter of convenience and *only when doing so does not alter the conclusion that would be reached if market definition was based on demand substitution alone.*" Randy Chugh, Andrew J. Ewalt, and Nicholas Hill, *Supply Substitution and Market Definition: Lessons from* FTC v. RAG-Stiftung at 1, The Antitrust Source (Oct. 2020), available at

https://www.bateswhite.com/media/publication/202_Supply_Substitution_and_Market_Definitio n.pdf (emphasis added).

### 2.     Markets need not be defined with scientific precision

35.     The bounds of the relevant geographic market generally depend on whether enough customers could turn to suppliers outside the market to make the price increase

unprofitable, even if certain customers remained within the market. *See, e.g.*, *United States v. Rockford Mem'l Corp.*, 898 F.2d 1278, 1284–85 (7th Cir. 1990) (affirming market definition of "the provision of inpatient services by acute-care hospitals in Rockford and its hinterland" even though some "people who live in Rockford . . . use hospitals outside the area"); *St. Alphonsus Med. Ctr.-Nampa, Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775, 784 (9th Cir. 2015) (explaining that the inquiry is whether "*enough* consumers would respond to a [small but significant non-transitory increase in price] by purchasing the product from outside the proposed geographic market" (emphasis added)); *FTC v. ProMedica Health Sys., Inc.*, 2011 WL 1219281, at *10 (N.D. Ohio Mar. 29, 2011) (concluding that relevant geographic market for hospital services was limited to a single county, even though some patients left the county for service, because "a hypothetical monopolist controlling every hospital in Lucas County could increase the price of inpatient general acute-care services and obstetrics services in Lucas County by at least 5–10 percent").

36.     The fact that some customers may switch outside the market in response to a price increase does not undermine a market definition. *See*, *e.g.*, *Tronox*, 332 F. Supp. 3d at 202–06 (reasoning that, in product market "characterized by considerable global trade," the relevant geographic market was North America because not enough customers in North America could "increas[e] imports from foreign sources" to defeat a price increase there).

37.     The relevant geographic market "need not be defined with 'scientific precision,'" since an 'element of 'fuzziness would seem inherent in any attempt to delineate the relevant geographic market.'" *Anthem*, 236 F. Supp. 3d at 202 (quoting *United States v. Conn. Nat'l Bank*, 418 U.S. 656, 669 (1974)). Parties defending a proposed merger "can usually contend plausibly that something relevant was left out, that too much was included, or that dividing lines

between inclusion and exclusion were arbitrary," but that does not mean an antitrust plaintiff has

not met its burden. *Tronox*, 332 F. Supp. 3d at 202 (quoting 2B Areeda & Hovenkamp § 530d.

38.     Moreover, market shares and concentration increases need not be estimated with

precision, a "reliable, reasonable, close approximation" is sufficient. *United States v. H & R

Block, Inc.*, 833 F. Supp. 2d 36, 72 (D.D.C. 2011); *see also FTC v. PPG Indus., Inc.*, 798 F.2d

1500, 1505 (D.C. Cir. 1986) (Bork, J.) (explaining that the "closest available approximation" of

calculation HHIs is sufficient) (citation omitted); *FTC v. Sysco Corp.*, 113 F. Supp. 3d 1, 54

(D.D.C. 2015) ("The [Government] need not present market shares and HHI estimates with the

precision of a NASA scientist.").

### 3.     The relevant geographic markets are origin-and-destination pairs

39.     The relevant geographic markets for analyzing the competitive effects of the

proposed acquisition are origin-and-destination pairs. Origin-and-destination pairs are the

geographic areas within which "consumers can practically turn for alternative sources of"

scheduled air passenger service. *Coastal Fuels*, 79 F.3d at 198 (quoting *Baxley-DeLamar v.

American Century Assn.*, 938 F.2d 846, 850 (8th Cir. 1991)). The purpose of scheduled air

passenger service is to travel from one place to another. For consumers originating in one

metropolitan area and purchasing scheduled air passenger service to travel to another

metropolitan area, such consumers "would not consider it a viable alternative" to purchase

scheduled air passenger service between a different origin-and-destination pair. *Home Placement

Service*, 682 F.2d at 280.

40.     Other common factors that courts use to assess market definition confirm that

origin-and-destination pairs are relevant markets. For instance, route-level markets are supported

by the fact that prices vary at the route level and are impacted by the entry and exit of airlines at

the route level. *See, e.g.*, *Staples I*, 970 F. Supp. at 1075 (considering "pricing evidence" showing that prices differed depending on which competitors were in a market to determine the contours of the markets).

### a. Defendants and courts agree that airlines compete in origin-and-destination pairs

41. Defendants do not seriously contest that origin-and-destination pairs may constitute relevant geographic markets. As they conceded before trial even began, "Defendants do not dispute that airlines also compete at the route level." ECF No. 290 at 31. And on other occasions, Defendants have admitted origin-and-destination pairs are relevant geographic markets. For example, last year, JetBlue agreed that origin-and-destination pairs are relevant geographic markets for evaluating competition between airlines in the market for scheduled air passenger service. *United States v. Am. Airlines Grp. Inc.*, -- F. Supp. 3d --, 2023 WL 3560430, at *36 (D. Mass. May 19, 2023) ("Here the parties agree, and the Court finds, that the relevant product market is 'scheduled air passenger service,' and the relevant geographic markets are O&Ds 'in which Defendants compete or would likely compete absent the NEA.'"). Spirit has likewise argued successfully in the past that origin-and-destination pairs are relevant geographic markets for evaluating competition between airlines in the market for scheduled air passenger service. *Spirit Airlines, Inc. v. Nw. Airlines, Inc.*, 431 F.3d 917, 933 (6th Cir. 2005) (accepting Spirit's position that routes are relevant geographic markets: "It is at the route level, after all, that airlines actually compete with one another.") (internal citation omitted).

42. Other courts have also recognized that origin-and-destination pairs are the relevant geographic markets for evaluating competition to provide scheduled air passenger service. *See, e.g.*, In re *AMR Corp.*, 502 B.R. 23, 40 (Bankr. S.D.N.Y. 2013) (noting that both parties accepted that "city-pairs are the properly defined market," and rejecting a national market

19

because "[a] product market contemplates products that are viable substitutes for each other" and plaintiffs had not explained how "a flight from Los Angeles to New York would compete with a flight from Detroit to Seattle"); *Malaney v. UAL Corp.*, 2010 WL 3790296, at *12 (N.D. Cal. Sept. 27, 2010), *aff'd*, 434 F. App'x 620 (9th Cir. 2011) (adopting city-pair markets and rejecting national market because "plaintiffs have not shown how, for example, a flight from San Francisco to Newark would compete with a flight from Seattle to Miami"); In re *Nw. Airlines Corp. Antitrust Litig.*, 197 F. Supp. 2d 908, 915 (E.D. Mich. 2002) ("[C]ity-pairs seem to comport with the ordinary and natural understanding of consumers as they contemplate the purchase of this industry's product—namely, such a consumer typically would survey the options for travel between the desired origin and destination cities.").

    **b.**    **The existence of other markets does not make route-level markets legally irrelevant**

43.    Even if a national market exists, as Defendants claim, it would exist in addition to properly defined origin-and-destination pair markets.[2] A substantial lessening of competition in one or more origin-and-destination pairs is an adequate, independent basis to enjoin the proposed acquisition. *See, e.g.*, *Pabst Brewing,* 384 U.S. at 549 (reasoning that a Section 7 plaintiff may show threat of substantial harm "throughout the country" or "in one or more sections of the country," and "[i]n either event a violation of [Section] 7 would be proved"); *see also Anthem*, 855 F.3d at 345 (concluding that a finding of anticompetitive effects in one local market "provides an independent basis for the injunction [against the transaction], even absent a finding of anticompetitive harm in" a broader geographic market). The Clayton Act prohibits

---

[2] Defendants note that a national market would also pass the hypothetical monopolist test. ECF No. 290 at 31. That is not surprising, nor is it informative. Economically, it always follows that, if a smaller geographic market satisfies the hypothetical monopolist test, a larger one will satisfy it as well. That is why the purpose of the hypothetical monopolist test is simply to ensure that a relevant market is not "defined too narrowly." *Aetna*, 240 F. Supp. 3d at 39–40 (citing Horizontal Merger Guidelines § 4.1.1).

acquisitions that may result in a substantial lessening of competition in *any* market. *See supra* Section I.F.

44.     "[D]efining a relevant market is not an end unto itself; rather, it is an analytical tool used to ascertain the 'locus of competition.'" *Bertelsmann*, 646 F. Supp. 3d at 24 (quoting *Brown Shoe*, 370 U.S. at 320–21); *see also* Horizontal Merger Guidelines § 4.1.1 ("The Agencies may evaluate a merger in any relevant market satisfying the [hypothetical monopolist] test, guided by the overarching principle that the purpose of defining the market and measuring market shares is to illuminate the evaluation of competitive effects."). The purpose of market definition is not to determine "where the parties to the merger do business or even where they compete, but where, within the area of competitive overlap, the effect of the merger on competition will be direct and immediate." *Phila. Nat'l Bank*, 374 U.S. at 357.

45.     The potential existence of a broader, national market is legally irrelevant because the existence of a national market does not preclude the existence of smaller local markets. *See Brown Shoe*, 370 U.S. at 325, 336 (explaining that, within a broader market, "well-defined submarkets may exist, which, in themselves, constitute [relevant markets] for antitrust purposes") (internal citation omitted); *see also Pabst Brewing*, 384 U.S. at 552 (finding that a merger may violate the Clayton Act in three overlapping relevant markets). Any argument that a court should ignore a properly defined relevant market in favor of a broader relevant market not alleged by a plaintiff is, therefore, entirely unpersuasive.

46.     Courts have sometimes rejected narrow geographic markets. But such rejections are irrelevant to this case because those markets, unlike origin-and-destination pairs, failed the legal standard for identifying relevant markets. *See Coastal Fuels*, 79 F.3d at 198 (rejecting San Juan market as "too narrow" because it failed hypothetical monopolist test); *United States v.*

*Grinnell*, 384 U.S. 563, 575 (1966) (rejecting several local areas as the relevant markets because prices were set nationally and "on the basis of nationwide contracts"); *Ball Mem'l Hosp., Inc. v. Mutual Hosp. Ins., Inc.*, 784 F.2d 1325, 1336 (7th Cir. 1986) (rejecting Indiana market because out-of-state providers could constrain prices offered in Indiana); *United States v. U.S. Sugar Corp.*, 2022 WL 4544025, at *24 (D. Del. 2022) (rejecting narrow markets because evidence showed "customers already looked beyond the Government's proposed markets for competitive alternatives").

47.     *New York v. Deutsche Telekom AG*, 439 F. Supp. 3d 179, 204 (S.D.N.Y. 2020) does not require a different result. There, the court analyzed harm in local geographic markets, in addition to a national market, notwithstanding evidence that many business decisions were made at a national level, because customers valued certain attributes of competition which varied at the local level. 439 F. Supp. 3d at 203–04. Therefore, in *Deutsche Telekom AG*, the court did not reject plaintiffs' choice of local geographic markets in favor of a broader national one, but merely agreed with plaintiffs' argument that there were multiple relevant markets, local and national, for the purposes of analyzing the transaction and evaluated the transaction's probable impact to competition in each. *Id.* at 204 ("While Defendants' contention regarding the national scope of carriers' decision-making processes is both accurate and relevant, Section 7 also recognizes and focuses on the realistic choices available to consumers.") (internal citations omitted).

**B.     A proposed acquisition is presumptively illegal if it would substantially increase market concentration in any highly concentrated market**

48.     Courts have long held that "a merger which produces a firm controlling an undue percentage share of the relevant market, and results in a significant increase in the concentration of firms in that market is" presumed to violate Section 7. *Phila. Nat'l Bank*, 374 U.S. at 363; *see*

*also United States v. Cont'l Can Co.*, 378 U.S. 441, 458 (1964) ("Where a merger is of such a

size as to be inherently suspect, elaborate proof of market structure, market behavior and

probable anticompetitive effects may be dispensed with in view of [Section] 7's design to

prevent undue concentration."). The Supreme Court created this presumption based on

"Congress' design in [Section] 7 to prevent undue concentration," and "economic theory," which

provides that "competition is likely to be greatest when there are many sellers, none of which has

any significant market share." *Phila. Nat'l Bank*, 374 U.S. at 363 (internal citations omitted).

49.     In a Section 7 case, a plaintiff may establish the presumption of anticompetitive

effects based on undue concentration. A plaintiff may do so "by showing that the merged entity

will have a significant percentage of the relevant market."[3] *FTC v. Swedish Match*, 131 F. Supp.

2d 151, 166 (D.D.C. 2000); *see also FTC v. Hackensack Meridian Health*, 30 F. 4th 160, 172

(3rd Cir. 2022) (holding that a court may presume anticompetitive harm based on increased

market concentration in an already highly concentrated market); *Bertelsmann*, 646 F. Supp. 3d at

37 ("The substantial market share of the proposed combined entity justifies a strong presumption

of anticompetitive effects."). While the Supreme Court has not identified a minimum threshold

for an "undue percentage share of the market" under Section 7, it has held that a post-

combination market shares of 30 percent or lower and significant increase in market

concentration triggers the presumption of illegality. *Phila. Nat'l Bank*, 374 U.S. at 364 ("Without

attempting to specify the smallest [resulting] market share which would still be considered to

threaten undue concentration, we are clear that 30% presents that threat."); *see also United States*

*v. Cont'l Can Co.*, 378 U.S. 441, 461 (1964) (holding a merger presumptively anticompetitive

---

[3] Unit sales rather than revenue provide the "more accurate picture" of competition in the airline industry and are
therefore used as the basis for market share calculations. *Brown Shoe*, 370 U.S. at 341 n.69; *see also* Horizontal
Merger Guidelines § 5.2 ("In cases where one unit of a low-priced product can substitute for one unit of a higher-
priced product," unit sales, rather than revenue, may be a better measure of market shares).

where the acquiring firm's market share increased from 21.9 percent to 25 percent and the number of significant market competitors reduced from five to four); *Heinz*, 246 F.3d at 712, 716 (applying a presumption of anticompetitive effects where the combined firm would have a market share of 32.8 percent); *Bertelsmann*, 646 F. Supp. 3d at 37 ("The 49-percent share that the post-merger PRH would hold is far above the levels deemed too high in other cases."); *United States v. H & R Block, Inc.*, 833 F. Supp. 2d 36, 72 (D.D.C. 2011) (finding 28.4 percent combined market share "high enough to create a presumption of anticompetitive effects").

50.     "Market concentration is a function of the number of firms in a market and their respective market shares." *FTC v. Staples Corp.*, 190 F. Supp. 3d 100, 128 (D.D.C. 2016) ("*Staples II*") (quoting *FTC v. Arch Coal, Inc.*, 329 F. Supp. 2d 109, 123 (D.D.C. 2004)). A common and "useful" method that courts use for analyzing market concentration is the Herfindahl-Hirschman Index ("HHI"). *Hackensack*, 30 F.4th at 172; *FTC v. Advocate Health Care Network*, 841 F.3d 460, 466 (7th Cir. 2016) (noting that the HHI is "common method for assessing a transaction's competitive effects"); *Bertelsmann*, 646 F. Supp. 3d at 37 ("The post-merger market also would be unduly concentrated under the Herfindahl-Hirschman Index . . ., a measure commonly used to evaluate market concentration."). A market's HHI is "calculated by summing the squares of the market shares of each market participant." *Hackensack*, 30 F.4th at 172; Horizontal Merger Guidelines § 5.3. A market is considered "highly concentrated" if it has a post-merger HHI of over 2,500. *Aetna*, 240 F. Supp. 3d at 42; Horizontal Merger Guidelines § 5.3. If the agreement "would produce a highly concentrated market and 'involve an increase in the HHI of more than 200 points,' then it 'will be presumed to be likely to enhance market power.'" *Aetna*, 240 F. Supp. 3d at 42 (quoting Horizontal Merger Guidelines § 5.3).

51.     "Courts have adopted the[] thresholds [from the Horizontal Merger Guidelines] in determining whether a merger is presumptively unlawful." *Aetna*, 240 F. Supp. 3d at 42; *see ProMedica*, 749 F.3d at 568 (noting that a 1,078-point increase to 4,391 and a 1,323-point increase to 6,854 "blew through [the presumption] barriers in spectacular fashion"); *Heinz*, 246 F.3d at 716–17 (510-point increase from 4,775 created a presumption of illegality "by a wide margin"); *FTC v. Sysco Corp.*, 113 F. Supp. 3d 1, 61 (D.D.C. 2015) (economic and other evidence "has shown that a merged Sysco-USF will significantly increase concentrations" and that the Government "therefore has made its *prima facie* case and established a rebuttable presumption that the merger will lessen competition in the local markets"); *H & R Block*, 833 F. Supp. 2d at 71–72 (enjoining a transaction that would have given the combined firm only a 28.4 percent market share because the transaction would have resulted in an increase in the HHI of more than 200 and a post-acquisition HHI that would have exceeded 2,500).

### C.     An unrebutted presumption is sufficient to enjoin a merger

52.     Triggering the presumption is outcome-determinative where, as here, defendants are unable to rebut it. *See supra* ¶ 18. Defendants bear the burden of showing that the market shares and market concentration—and the associated presumption of illegality— inaccurately reflect competitive reality. *Anthem*, 855 F.3d at 349–50; *see also supra* ¶ 13.

## III.     DIRECT EVIDENCE MAY ALSO ESTABLISH A *PRIMA FACIE* CASE THAT A PROPOSED ACQUISITION MAY SUBSTANTIALLY LESSEN COMPETITION

53.     In addition to, or in lieu of, the structural evidence of anticompetitive effects based on market concentration, Plaintiffs may also present direct evidence to bolster their *prima facie* case. *See, e.g.*, *Hackensack*, 30 F.4th at 166 ("direct evidence" presented by FTC "strengthens the probability that the merger will likely lead to anticompetitive effects and, thus, the FTC's *prima facie* case"); *St. Alphonsus*, 778 F.3d at 785–86 ( "[P]laintiffs in § 7 cases

generally present other evidence as part of their *prima facie* case."); *ProMedica*, 749 F.3d at 571 (explaining that the plaintiff "did not merely rest upon the presumption, but instead discussed a wide range of [additional] evidence that buttresses it"); *Chi. Bridge*, 534 F.3d at 432 (noting that "other indicators of the market structure and history of the market" and "evidence of high entry barriers" "clearly bolster what the HHIs already indicate"); *Heinz*, 246 F.3d at 716–17 (*prima facie* case "bolstered by" evidence of head-to-head competition); *Univ. Health*, 938 F.2d at 1220 (plaintiff "bolstered this *prima facie* case with evidence that substantial barriers to entry into the relevant market exist"); *Sysco*, 113 F. Supp. 3d at 61 (noting that the Government offered "additional evidence to strengthen its *prima facie* case").

### A.  Sources of anticompetitive effects

#### 1.  Eliminating head-to-head competition harms competition

54.    Mergers and acquisitions may cause unilateral anticompetitive effects. *Anthem*, 236 F. Supp. 3d at 215–16; *see also Sysco*, 113 F. Supp. 3d at 65–66 ("Evidence of probable unilateral effects strengthens the . . . *prima facie* case that the merger will lessen competition . . . ."); *see supra* ¶ 12 12. Effects resulting from this loss of head-to-head competition are analyzed in addition to, and need not rely solely upon, increases in market shares or concentration. *Anthem*, 236 F. Supp. 3d at 216; Horizontal Merger Guidelines § 6.

55.    "The extent of direct competition between the products sold by the merging parties is central to the evaluation of unilateral effects." *ProMedica*, 749 F.3d at 569 (quoting Horizontal Merger Guidelines § 6.1). Acquisitions "that eliminate head-to-head competition between close competitors often result in a lessening of competition." *Staples II*, 190 F. Supp. 3d at 131 (citing Horizontal Merger Guidelines § 6); *see also, e.g.*, *Heinz*, 246 F.3d at 716–17 (finding that the Government's *prima facie* case was "bolstered by the indisputable fact that the

merger will eliminate competition between the two merging parties"); *H & R Block*, 833 F. Supp. 2d at 81–82 (noting the likelihood of unilateral anticompetitive effects given evidence of H & R Block lowering its prices in response to direct competition from TaxACT, including H & R Block documents that "appear to acknowledge that TaxACT has put downward pressure on HRB's pricing ability").

56.     If the collaborating parties are particularly close competitors, the unilateral effects are especially acute. *See Bertelsmann*, 646 F. Supp. 3d at 39 ("The analysis of unilateral effects focuses on how closely the merging firms currently compete, in order to extrapolate the effects of eliminating that competition."); *Libbey*, 211 F. Supp. 2d at 47 (discussing evidence of head-to-head competition between the merging parties, including taking customers from each other); *Swedish Match*, 131 F. Supp. 2d at 169 ("[T]he weight of the evidence demonstrates that a unilateral price increase by Swedish Match is likely after the acquisition because it will eliminate one of Swedish Match's primary direct competitors."); Horizontal Merger Guidelines § 6.1 ("Unilateral price effects are greater, the more the buyers of products sold by one merging firm consider products sold by the other merging firm to be their next choice.").

57.     The parties need not be each other's *closest* competitors to raise a threat to competition; being *close* competitors is enough for an acquisition to result in upward pricing pressure. *Anthem*, 236 F. Supp. 3d at 216 ("Anthem's insistence that United, not Cigna, is its 'closest' competitor, is beside the point. The acquired firm need not be the other's closest competitor to have an anticompetitive effect; the merging parties only need to be close competitors.").

## 2. Eliminating a uniquely disruptive competitor harms competition

58.     "Anticompetitive effects are more likely still when 'the merger would result in the elimination of a particularly aggressive competitor in a highly concentrated market.'"[4] *Aetna*, 240 F. Supp. 3d at 43, 74 (quoting In *FTC v. Staples, Inc.*, 970 F. Supp. 1066, 1083 (D.D.C. 1997) ("*Staples I*")) (enjoining merger in part because Aetna was a "particularly aggressive" Medicare Advantage competitor); *Am. Airlines*, 2023 WL 3560430, at *34, 36 (finding that anticompetitive effects of joint venture between direct competitors JetBlue and American Airlines were amplified because "JetBlue has sacrificed a degree of its independence and weakened its status as an important 'maverick' competitor in the [highly concentrated airlines] industry."); *United States v. Alcoa*, 377 U.S. 271, 281 (1964) ("The record shows indeed that Rome was an aggressive competitor. . . . Preservation of Rome, rather than its absorption by one of the giants, will keep it 'as an important competitive factor' . . . . Rome seems to us the prototype of the small independent that Congress aimed to preserve by § 7."); *Steward Health Care Sys., LLC v. Blue Cross & Blue Shield of R.I.*, 311 F. Supp. 3d 468, 509 (D.R.I. 2018) ("[I]t is both legally and factually important to the antitrust analysis that Steward—a hospital owner that wanted to bring change and to eventually compete to potentially minimize or displace the modern and traditional role of insurance companies—was swapped out with a hospital system that concededly had no—and was even arguably troubled by—such aspirations."); *Staples I*, 970

---

[4] Section 7 protects competition in markets even where the transacting parties do not compete directly or the transaction does not change the number of competitors. Section 7, for example, prohibits anticompetitive vertical mergers, i.e. mergers between firms that compete at different levels of the supply chain. *See, e.g.*, *Ford Motor Co. v. United States*, 405 U.S. 562, 571 (1972); *Brown Shoe*, 370 U.S. at 328-34. And many harms to competition recognized by courts, in addition to those described in this subsection, such as the reduction in innovation and restriction of consumer choice can arise from a transaction that combines two companies that do not compete head-to-head. *See infra* Section III.A. Similarly, courts have also held that competition can be diminished when firms' incentives change, even if the number of competitors is preserved. *See, e.g.*, *United States v. Dairy Farmers of Am., Inc.*, 426 F.3d 850, 862 (6th Cir. 2005) (holding that change in economic incentives created by agreement could lessen competition, even though number of competitors was unchanged).

F. Supp. at 1083 (enjoining merger in part because it would eliminate "a particularly aggressive competitor in a highly concentrated market").

59.    Such "particularly aggressive competitors" are sometimes referred to as "mavericks." *H & R Block*, 833 F. Supp. 2d at 79; Horizontal Merger Guidelines § 2.1.5. Mavericks typically "play[] a disruptive role in the market to the benefit of customers," such as by "tak[ing] the lead in price cutting" or "resist[ing] otherwise prevailing industry norms to cooperate on price setting or other terms of competition." *H & R Block*, 833 F. Supp. 2d at 79 (internal citations omitted) (quoting Horizontal Merger Guidelines § 2.1.5).

60.    The key question in determining whether a transaction may substantially lessen competition by dampening the maverick's disruptive force is whether the firm "play[s] a special role in th[e] market that constrains prices." *H & R Block*, 833 F. Supp. 2d at 80. *Cf. Hackensack*, 30 F.4th at 172 (recognizing that anticompetitive effects can include reduced product innovation); Horizontal Merger Guidelines § 6.4 ("withdraw[al] of a product that a significant number of customers strongly prefer to those that would remain available" in the market can constitute a harm to customers).

### 3.    Reducing product innovation harms competition

61.    A reduction in product innovation resulting from an acquisition is a cognizable harm to competition. *See*, *e.g.*, *Hackensack*, 30 F.4th at 172 (recognizing that anticompetitive effects can include reduced product innovation); *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 475 (7th Cir. 2020) (same); *Anthem*, 855 F.3d at 361 (a "threat to innovation is anticompetitive in its own right").

### 4.    Restricting consumer choice harms competition

62.    A merger's elimination of a product option that consumers value is a cognizable harm to competition. *See*, *e.g.*, *Anthem*, 855 F.3d at 366 ("[I]f merging firms would withdraw a product that a significant number of customers strongly prefer to those products that would remain available, this can constitute a harm to customers over and above any effects on the price or quality of any given product.") (internal citations omitted) (quoting Horizontal Merger Guidelines § 6.4); *see also FTC v. Indiana Federation of Dentists*, 476 U.S. 447, 459 (1986) (finding that consumers can be harmed by an agreement to "withhold from customers a particular service that they desire" since it "limit[s] consumer choice by impeding the ordinary give and take of the market place") (internal citations omitted); *MacDermid Printing Solutions LLC v. Cortron Corp.*, 833 F.3d 172, 183 (2d Cir. 2016) ("[A]ctions that reduce consumer choice are inherently anticompetitive."); *Realcomp II, Ltd. v. FTC*, 635 F.3d 815, 829–31 (6th Cir. 2011) (affirming finding that "restrictions on consumer choice," specifically "restricting consumer access to discount listings," is "likely to have an adverse impact on competition"); *United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 194 (3d Cir. 2005); *Glen Holly Ent., Inc. v. Tektronix Inc.*, 352 F.3d 367, 374 (9th Cir. 2003); Horizontal Merger Guidelines § 6.4 (transaction may cause anticompetitive harm if the "merged firm would withdraw a product that a significant number of customers strongly prefer" and there is evidence that "the reduction in variety is largely due to a loss of competitive incentives attributable to the merger.").

### 5.    Enhancing the risk of coordinated effects in a highly concentrated industry harms competition

63.    In assessing the competitive effects of an acquisition, courts have long blocked mergers because of the threat they posed of coordination in the relevant markets. *See*, *e.g.*, *Bertelsmann*, 646 F. Supp. 3d at 24 (coordinated effects "occur when market participants

mutually decrease competition in the relevant market"). As Judge Posner explained, "[t]he theory of competition and monopoly that has been used to give concrete meaning to section 7 teaches that an acquisition which reduces the number of significant sellers in a market already highly concentrated and prone to collusion by reason of its history and circumstances is unlawful in the absence of special circumstances." *FTC v. Elders Grain, Inc.*, 868 F.2d 901, 906 (7th Cir. 1989). For this reason, the risk of coordinated effects is a firmly established basis to enjoin an anticompetitive merger. *See Heinz*, 246 F.3d at 715 ("Merger law 'rests upon the theory that, where rivals are few, firms will be able to coordinate their behavior, either by overt collusion or implicit understanding, in order to restrict output and achieve profits above competitive levels.'") (internal citation omitted); *see also* Horizontal Merger Guidelines § 7; 2023.

64.    Indeed, Section 7 is the "principal method by which the law has sought to deal with collusive pricing that is not considered deterrable by the rule against price fixing."[5] Richard A. Posner, ANTITRUST LAW, (2d ed. 2001) at 118. Merger enforcement serves this special role because parallel accommodating conduct, also sometimes referred to as interdependent oligopoly behavior or tacit collusion, does not involve reaching a prior agreement (either explicit or implicit), which is a pre-requisite for a Section 1 violation. 4 Areeda & Hovenkamp ¶ 916 at p. 162–63. As one court noted: "Tacit coordination is 'feared by antitrust policy even more than express collusion, for tacit coordination, even when observed, cannot easily be controlled directly by the antitrust laws.'" *Heinz*, 246 F.3d at 725 (quoting 4 Areeda & Hovenkamp

---

[5] *See also* D. Daniel Sokol & Sean P. Sullivan, *The Decline of Coordinated Effects Enforcement and How to Reverse It*, FLA L. REV. (forthcoming 2024) (manuscript at 21–22) *available at* https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4400678 ("The importance of coordinated effects enforcement in the broader framework of antitrust law is not that this is the main way antitrust law addresses oligopolistic coordination; it is that this is the *only* way antitrust law addresses oligopolistic coordination. Setting aside the rare case of a consummated merger that can be effectively challenged and unwound after the fact, the opportunity to challenge a proposed merger under Section 7 of the Clayton act is usually the last opportunity to prevent oligopolistic coordination from taking off, or to preserve opportunities for coordination to destabilize and fall apart.") (internal citations omitted).

¶ 901b2. Accordingly, "[I]t is a central object of merger policy to obstruct the creation or reinforcement by merger of such oligopolistic market structures in which tacit coordination can occur." *Id*.

65.     By policing undue concentration, Section 7 of the Clayton Act halts transactions that risk enabling tacit coordination that would otherwise escape the reaches of antitrust enforcement. The Clayton Act's concern, therefore, is not simply that an acquisition may facilitate express agreements that violate the antitrust laws: the Act also condemns mergers that facilitate tacit collusion. Courts recognize that "[t]he fewer competitors there are in a market, the easier it is for them to coordinate their pricing without committing detectable violations of section 1 of the Sherman Act, which forbids price fixing." *Hosp. Corp. of Am. v. FTC*, 807 F.2d 1381, 1387 (7th Cir. 1986) (Posner, J.); *see also Elders Grain*, 868 F.2d at 905 (recognizing that reducing the number of competitors in a highly concentrated industry will make it easier to collude on price and output without committing a detectable violation of the antitrust laws); *Univ. Health*, 938 F.2d at 1218 n.24 (noting that concentrated markets make it easier to collude tacitly, not just expressly); *PPG Indus.*, 798 F.2d at 1503 (same); *Tronox*, 332 F. Supp. 3d at 208–09 ("[A] core purpose of antitrust law is to scrutinize mergers that may make it easier for firms to collectively reduce output, and indeed, to prevent mergers that are likely to do so."); Jonathan B. Baker & Joseph Farrell, *Oligopoly Coordination, Economic Analysis, and the Prophylactic Role of Horizontal Merger Enforcement*, 168 U. Pa. L. Rev. 1985 (2020).

66.     The likelihood that a transaction would increase the risk of coordination "depends on whether market conditions, on the whole, are conducive to reaching terms of coordination and detecting and punishing deviations from those terms," *H & R Block*, 833 F. Supp. 2d at 77 (internal citations omitted), and not simply on whether the transaction would increase the size of

a competitor.[6] *See also Hosp. Corp.*, 807 F.2d at 1386 ("When an economic approach is taken in

a section 7 case, the ultimate issue is whether the challenged acquisition is likely to facilitate

collusion. In this perspective the acquisition of a competitor has no economic significance in

itself; the worry is that it may enable the acquiring firm to cooperate (or cooperate better) with

other leading competitors on reducing or limiting output, thereby pushing up the market price.");

*see generally* Horizontal Merger Guidelines § 7.2.

    67.    Market conditions that increase the risk of coordination include:

- ***A highly concentrated market with few competitors***. *See, e.g.*, *Elders Grain*, 868 F.2d at

    905 (holding that an already highly concentrated market will make coordination more

    likely post-acquisition); *Univ. Health*, 938 F.2d at 1218 n.24 ("Significant market

    concentration makes it 'easier for firms in the market to collude, expressly or tacitly, and

    thereby force price above or farther above the competitive level.'") (citation omitted);

    *Heinz*, 246 F.3d at 715 (recognizing that the existence of only a few competitors allows

    those competitors to better coordinate) (quoting *FTC v. PPG Indus., Inc.*, 798 F.2d 1500,

    1503 (D.C. Cir. 1986) (Bork, J.)).

- ***A history of collusion***.[7] *See, e.g.*, *Hosp. Corp.*, 807 F.2d at 1389 (holding that "history of

    collusion in the industry" supports finding that transaction will enable coordination);

    *Bertelsmann*, 646 F. Supp. 3d at 45 (stating that a "history of collusion or attempted

---

[6] Contrary to Defendants' claim, it is also irrelevant that organic growth, not just growth through acquisition, would make JetBlue more likely to coordinate. ECF No. 290 at 51. It is well accepted in antitrust law that how an outcome comes to be is relevant. For example, "[n]ot all monopolies are necessarily anticompetitive. . . . The additional element required to prove a violation of the Sherman Act is called 'predatory' or 'exclusionary' conduct." *Bio-Rad Lab'ys, Inc. v. 10X Genomics, Inc.*, 483 F. Supp. 3d 38, 63 (D. Mass. 2020) (Young, J.). Thus, the fact that JetBlue would become more likely to coordinate as a result of changed incentives *caused by the transaction* is a merger-specific result relevant to the antitrust analysis.

[7] The airline industry has already engaged in just the type of coordinated interaction that violates the antitrust laws. *See, e.g.*, *United States v. Airline Tariff Publ'g Co.*, 836 F. Supp. 9, 12 (D.D.C. 1993) (court entry of final judgment designed to prevent airlines from continuing to "use[] the ATP fare dissemination system in a manner that enables them to reach price-fixing agreements or unnecessarily to facilitate fare coordination").

collusion is *highly probative* of likely harm from a merger.") (emphasis added) (citing *Hosp. Corp.*, 807 F.2d at 1388).

- **Price transparency.**[8] *See, e.g.*, *H & R Block*, 833 F. Supp. 2d at 78 (noting "the importance of price transparency to the likelihood of coordinated effects"); *see also* Horizontal Merger Guidelines § 7.2 ("A market typically is more vulnerable to coordinated conduct if each competitively important firm's significant competitive initiatives can be promptly and confidently observed by that firm's rivals."); *Bertelsmann*, 646 F. Supp. 3d 46 n.33.

- **Awareness of the benefits of coordination**. *See, e.g.*, *Tronox*, 332 F. Supp. 3d at 209 (crediting evidence that market participants, and particularly the parties to the agreement, "have already shown an awareness that implicit coordination would be beneficial").

- **Small and frequent transactions, frequent updates to pricing, competition across many markets, and few firms to monitor and track**. *See Bertelsmann*, 646 F. Supp. 3d 46 n.33; Horizontal Merger Guidelines § 7.2. .

68.     Courts have already recognized that the airline industry is susceptible to coordination. *See, e.g.*, *In re Domestic Airline Travel Antitrust Litig.*, 2023 WL 5930973, at *33 (D.D.C. Sept. 12, 2023) (in denying summary judgment, finding that domestic airlines "admittedly and openly" engaged in the parallel conduct of capacity discipline for many years "with the effect that diminished capacity resulted in higher industry profits"); *In re Airline Ticket Comm'n Antitrust Litig.*, 953 F. Supp. 280, 283 (D. Minn. 1997) ("[I]n an oligopolistic market, such as that in which the airlines operate, rapid price coalescence is the norm . . . ."); *see also In*

---

[8] In a recent case involving the airline industry, the court rejected the airline defendants' arguments that the industry was not prone to coordination, pointing to evidence of exceptional price transparency in the industry. *In re AMR Corp.*, 625 B.R. 215, 259–60 (Bankr. S.D.N.Y. 2021).

*re Delta/AirTran Baggage Fee Antitrust Litig.*, 733 F. Supp. 2d 1348, 1363 (N.D. Ga. 2010);

*Prosterman v. Am. Airlines, Inc.*, 2016 WL 7157667, at \*3 (N.D. Cal. Dec. 8, 2016), *aff'd*, 747

F. App'x 458 (9th Cir. 2018).

69.     The elimination of a maverick also increases the risk of increased coordination.

*See H & R Block*, 833 F. Supp. 2d at 79 ("The Court notes that the 'merger would result in the

elimination of a particularly aggressive competitor in a highly concentrated market, a factor

which is certainly an important consideration when analyzing possible anti-competitive

effects.'") (quoting *Staples I*, 970 F. Supp. at 1083). Courts have also recognized that a

competitor's changed incentives can make them less likely to act as a maverick. As this court

found in enjoining the Northeast Alliance between JetBlue and American, "by aligning its

interests with a powerful [global network carrier], JetBlue has sacrificed a degree of its

independence and weakened its status as an important 'maverick' in the industry." *Am. Airlines*,

2023 WL 3560430, at \*34; *see also id.* at \*20 (finding that the "spirit of partnership" between

JetBlue and American Airlines created by the Northeast Alliance diminished competition outside

the routes covered by the Alliance as well).

70.     Increases in concentration create an "ordinary presumption of collusion," which

defendants may only rebut by showing "structural market barriers to collusion" are "unique" to

the industry in question, meaning that they are "so much greater in the [relevant] industry than in

other industries that they rebut the normal presumption." *See Heinz*, 246 F.3d at 724–25.

### 6.     Industry trends towards concentration further bolsters the likelihood that a proposed acquisition may substantially lessen competition

71.     A trend towards concentration bolsters the other evidence that the transaction is

likely to produce anticompetitive effects. *Pabst Brewing*, 384 U.S. at 552–53 (holding that "a

trend toward concentration in an industry, whatever its causes, is a highly relevant factor in

deciding how substantial the anti-competitive effect of a merger may be."); *Bertelsmann*, 646 F.

Supp. 3d at 37 ("Moreover, the high concentration must be considered in the context of an

undeniable trend in consolidation in the . . . industry."). Over the past two decades, the domestic

airline industry has trended towards concentration as a result of mergers among large passenger

airlines. *See Am. Airlines*, 2023 WL 3560430, at *6 (noting a "backdrop of industry

consolidation"); *In re AMR Corp.*, 625 B.R. at 252 ("[T]here is a 'clear general trend towards

concentration' in the domestic airline industry.").

**B.     Sources of evidence**

**1.     Ordinary course business documents carry more weight than self-
serving testimony or evidence subject to manipulation**

72.     When evaluating the competitive effects of a proposed acquisition, ordinary-

course-of-business documents and the testimony of non-interested industry participants are

particularly informative in revealing the competitive consequences of the transaction. *See, e.g.*,

*Anthem*, 236 F. Supp. 3d at 216 (providing that "[r]elevant evidence" includes "the merging

companies' ordinary course of business documents, testimony of industry participants, and the

history of head-to-head competition" between the merging parties); *see also Aetna*, 240 F. Supp.

3d at 21 ("Ordinary course of business documents reveal the contours of competition from the

perspective of the parties . . . ."). "[E]vidence indicating the purpose of the merging parties,

where available, is an aid in predicting the probable future conduct of the parties and thus the

probable effects of the merger." *Brown Shoe*, 370 U.S. at 329 n.48. Evidence of intent is highly

probative. *Univ. Health*, 938 F.2d at 1220 n.27 (relying on evidence showing that "appellees, *by

their own admissions*, intend[ed] to eliminate competition through the proposed acquisition")

(emphasis in original); *FTC v. Cardinal Health, Inc.*, 12 F. Supp. 2d 34, 63–64 (D.D.C. 1998)

(relying on statements of senior executives that the merger would curb downward pricing

36

pressure to block proposed transaction); *see also* Areeda & Hovenkamp ¶ 964a ("[E]vidence of anticompetitive intent cannot be disregarded, as it is clearly pertinent to the basic issue in any horizontal merger case.").

73.     Courts are especially reluctant to rely on evidence from the merging parties created after merger agreement was signed. *See United States v. Falstaff Brewing Corp.*, 410 U.S. 526, 567–68 (1973) (Marshall, J., concurring) ("[S]ubjective evidence" of a "firm's future intent" "should obviously be given no weight if it is not credible. But it is in the very nature of such evidence that it is usually not worthy of credit. . . [A]ny statement of future intent will be inherently self-serving."). This includes self-serving trial testimony that "is in conflict with contemporaneous documents[.]" *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948). Any "postacquisition evidence tending to diminish the probability or impact of anticompetitive effects" has "extremely limited" probative value. *Gen. Dynamics*, 415 U.S. at 504. That minimal weight is appropriate because "violators could stave off [Section 7] actions merely by refraining from aggressive or anticompetitive behavior when such suit was threatened or pending." *Id*. at 504–05; *see also FTC v. Consol. Foods Corp.*, 380 U.S. 592, 598 (1965) ("If the post-acquisition evidence were given conclusive weight or allowed to override all probabilities, then acquisitions would go forward willy-nilly . . . ."). Therefore, courts disregard or discount "a firm's behavior undertaken with the aim of persuading a court or the Government regarding the legality of a merger." *Aetna*, 240 F. Supp. 3d at 80; *Heinz*, 246 F.3d at 721 (expressing skepticism regarding defendants' "mere speculation and promises about post-merger behavior," particularly "given the high concentration levels").

74.     The reason self-serving testimony from executives is entitled to little weight is that "[i]f a court incorrectly relies on post-merger testimony that a merged entity has not raised

prices and the court blesses the transaction, there is little to prevent the merged entity from creating anticompetitive effects at a later time." *United States v. Bazaarvoice, Inc.*, 2014 WL 203966, at \*73 (N.D. Cal. Jan. 8, 2014); *H & R Block*, 833 F. Supp. 2d at 82 (declining to rely on "promise" that defendants would not raise prices because "this type of guarantee cannot rebut a likelihood of anticompetitive effects") (citations omitted).

75.     The principle that evidence created by defendants after a merger is significantly less reliable than pre-merger evidence has been applied to include any evidence that could *arguably* be manipulated by defendants. *Chi. Bridge*, 534 F.3d at 435 ("The probative value of such evidence is deemed limited not just when evidence is actually subject to manipulation, but rather is deemed of limited value whenever such evidence *could arguably* be subject to manipulation.") (emphasis in original); *Hosp. Corp.*, 807 F.2d at 1384 ("Post-acquisition evidence that is subject to manipulation by the party seeking to use it is entitled to little or no weight."). The Court need not make a finding that Defendants *have* manipulated such evidence; it is enough that it is arguably subject to such manipulation. *See Chi. Bridge*, 534 F.3d at 435; *Hosp. Corp.*, 807 F.2d at 1384.

### 2.     Analysis and testimony by economic experts help to illuminate the competitive consequences of the proposed acquisition

76.     The testimony and analysis of an expert economist may also help illuminate the competitive effects of a merger. *See, e.g.*, *Am. Airlines*, 2023 WL 3560430, at \*23 (crediting economic model offered by the United States's economist in studying competitive effects); *Sysco* 113 F. Supp. 3d at 63–64, 66–68 (same); *H & R Block*, 833 F. Supp. 2d at 86–88 (same). For example, courts have considered gross upward pricing pressure analyses (e.g., *Am. Airlines*, 2023 WL 3560430 at \*23; *Wilh. Wilhelmsen*, 341 F. Supp. 3d at 64–65), merger simulations, and other economic analyses (e.g., *Sysco*, 113 F. Supp. 3d at 66–67). Economic analysis based on

reasonable assumptions can assist the court in reaching the conclusion that there is a "reasonable probability" of anticompetitive effects. *See, e.g.*, *Sysco*, 113 F. Supp. 3d at 66–67, 87; *H & R Block*, 833 F. Supp. 2d at 86–88.

## IV.  DEFENDANTS MUST REBUT THE PRESUMPTION WITH SIGNIFICANT EVIDENCE

### A.  Defendants must demonstrate that entry or expansion will counteract the anticompetitive effects of the proposed acquisition in each relevant market

#### 1.  Entry must be timely, likely, and sufficient

77.  Barriers to entry can affect "whether market concentration statistics accurately reflect the pre- and likely post-merger competitive picture." *Heinz*, 246 F.3d at 717 n.13. The existence of barriers to entry can be demonstrated by the existence of sustained supracompetitive prices in markets prior to entry because absent such barriers, incumbents would likely not have been able to maintain higher prices for any length of time. *Id.* Where Defendants argue that low barriers to entry rebut Plaintiffs' *prima facie* case, "Defendants bear the burden of demonstrating ease of entry into the relevant market." *Anthem*, 236 F. Supp. 3d at 222. Conversely, if Plaintiffs demonstrate high barriers to entry, that fact "further enhance[s]" Plaintiffs' other proof of "the anticompetitive effect of the merger." *Heinz*, 246 F.3d at 717.

78.  Evidence regarding entry must be consistent with market realities and the documents and testimony from the record. *See Wilh. Wilhelmsen*, 341 F. Supp. 3d at 68 (rejecting entry argument because it was "at odds with inferences drawn from the state of the current market and with documentary and testimonial evidence from customers and suppliers"). In assessing the presence of entry barriers, a defendant's admission regarding the presence of barriers to entry is given substantial weight. *See, e.g.*, *Bertelsmann*, 646 F. Supp. 3d at 52 ("Industry insiders, including [the acquiring firm's] executives, candidly acknowledged in trial

testimony and ordinary-course documents that barriers to entry are high in the publishing business."); *FTC v. CCC Holdings*, 605 F. Supp. 2d 26, 49–50 (D.D.C. 2009) (noting that the acquiring firm and its owner "have repeatedly noted high barriers to entry in these markets"). To take account of economic realities facing potential entrants, a court must consider not just barriers to entry unique to new entrants but also those barriers already faced by incumbent firms. *See* Areeda & Hovenkamp ¶ 420c; *accord Am. Airlines*, 2023 WL 3560430, at *33 (identifying airport gates and runway timings as "scarce and valuable resources" that "creat[e] significant— and in some instances insurmountable—barriers to entry"); *id.* at *38 (similar for "substantial constraints on access and infrastructure"); *United States v. Energy Sols., Inc.*, 265 F. Supp. 3d 415, 443 (D. Del. 2017) (crediting entry barriers faced by incumbent firms, including "legislative approval, a radioactive waste license from the environmental protection agency, a multi-million dollar upfront capital investment, a site with unique geological features, and employees trained in a multitude of subjects").

79.     Merely pointing to the existence of potential entrants or other airlines that might expand is insufficient for Defendants to meet their burden to rebut the presumption of illegality. *See Chi. Bridge*, 534 F.3d at 436 ("The mere existence of potential entrants does not by itself rebut the anti-competitive nature of an acquisition."); *Anthem*, 236 F. Supp. 3d at 222 (evidence of entry insufficient where defendants "established the mere existence" of potential entrants). For example, in *H & R Block*, defendants identified 18 competitors who could potentially expand in response to the merger. 833 F. Supp. 2d at 73. But the court did not accept these 18 potential entrants at face value. Instead, it rigorously scrutinized the ability of these potential entrants to offset competitive harm from the transaction and found at least one reason to determine entry by each of them was unlikely to counteract any potential anticompetitive effects. *Id.* The court first

dismissed most of them as "very small-time operators." *Id.* Of the remaining two with larger

scale, the court dismissed one because it was a "very different company" than the acquired firm,

noting its "decision to prioritize a relaxed lifestyle over robust competition and innovation." *Id.*

at 74. For the remaining potential entrant, despite specific testimony from one of its executives

that it would pursue opportunities created by price increases caused by the merger, *id.* at 75, the

court nevertheless concluded that barriers to entry made sufficient entry and expansion unlikely.

*Id.* at 76–77. In short, the mere existence of potential rivals to the merged firm—even ones who

promise to pursue opportunities created by the competitive void left by the merger—is not

enough.

80.     To meet their burden of production and successfully rebut Plaintiffs' *prima facie*

case, Defendants must demonstrate that entry into the relevant markets would be "timely, likely,

and sufficient in its magnitude, character, and scope to deter or counteract the competitive effects

of concern." *FTC v. Sanford Health*, 926 F. 3d 959, 965 (8th Cir. 2019) (internal citations

omitted) (quoting Horizontal Merger Guidelines § 9). Numerous courts across the country have

adopted this "timely, likely, and sufficient" standard for entry in Section 7 cases. *See*, *e.g.*, *FTC*

*v. Penn State Hershey Med. Ctr.*, 838 F. 3d 327, 351–52 (3d Cir. 2016); *Chi. Bridge*, 534 F.3d at

429–30; *Bertelsmann*, 646 F. Supp. 3d at 51; *Deutsche Telekom*, 439 F. Supp. 3d at 226; *Wilh.*

*Wilhelmsen*, 341 F. Supp. 3d at 66–67; *Energy Sols.*, 265 F. Supp. 3d at 443; *Aetna*, 240 F. Supp.

3d at 52–53; *St. Alphonsus Med. Ctr.-Nampa, Inc. v. St. Luke's Health Sys., Ltd.*, 2014 WL

407446, at *19 (D. Idaho Jan. 24, 2014), *aff'd*, 778 F.3d 775 (9th Cir. 2015); *Bazaarvoice*, 2014

WL 203966, at *39; *FTC v. ProMedica Health Sys.*, No. 3:11 CV 47, 2011 WL 1219281, at *57

(N.D. Ohio Mar. 29, 2011; *United States v. Visa U.S.A., Inc.*, 163 F. Supp. 2d 322, 342

(S.D.N.Y. 2001); *FTC v. Cardinal Health*, *Inc.,* 12 F. Supp. 2d 34, 54–58 (D.D.C. 1998). To

satisfy this standard, entry must "fill the competitive void." *Anthem*, 236 F. Supp. 3d at 222.

2.       **Entry must be fast enough to offset anticompetitive harm**

81.     Entry is "timely" when it is "soon enough to offset anticompetitive effects of the

merger." *Sanford Health*, 926 F.3d at 965; *accord Energy Sols.*, 265 F. Supp. 3d at 443 (entry

must be "rapid enough to deter or render insignificant the anticompetitive effects of the merger")

(citing *Anthem*, 236 F. Supp. 3d at 221–22); *see also* Horizontal Merger Guidelines § 9.1. When

entry will take a period of several years, it will likely not deter anticompetitive activity by the

merged firm. *See FTC v. Elders Grain Inc.*, 868 F.2d 901, 905 (7th Cir. 1989) (Posner, J.) ("And

since entry into the [dry corn] industry is slow—it takes three to nine years to design, build, and

start operating a new mill—colluding sellers need not fear that any attempt to restrict output in

order to drive up price would be promptly nullified by new production."); *Visa*, 163 F. Supp. 2d

at 342 ("The higher the barriers to entry, and the longer the lags before new entry, the less likely

it is that potential entrants would be able to enter the market in a timely, likely, and sufficient

scale to deter or counteract any anticompetitive restraints.").

82.     Predicting the appropriate timeframe for evaluating whether future competitive

entry would "offset anticompetitive effects of the merger" is a fact- and market-specific inquiry

that depends on how quickly the merger would manifest anticompetitive effects. Here, entry

would need to be relatively rapid because, in the airline industry, prices change quickly, such that

upward pressure on prices resulting from the merger can quickly manifest in anticompetitive

price increases. *See Sanford Health*, 926 F.3d at 965; *Energy Sols.*, 265 F. Supp. 3d at 443.

Likewise, the elimination of Spirit as a choice to consumers would be fast, possibly immediate,

and entry would have to be quick enough to offset that independent harm too. *See supra* Section

42

III.A.4. In some markets, this may mean entry has to occur within weeks or months, and in other markets, entry could be timely within one-to-two years, but entry in this case that takes longer than two years to occur would not be timely.

>**3.**     **Entry must be likely to occur in order to offset anticompetitive harm**

83.     Entry is "likely" only "if it would be profitable and feasible, accounting for all the attendant costs and difficulties." *Energy Sols.*, 265 F. Supp. 3d at 443; *accord Anthem*, 236 F. Supp. 3d at 222 ("[E]ntry must be profitable, accounting for the assets, capabilities, and capital needed and the risks involved, including the need for the entrant to incur costs that would not be recovered if the entrant later exits."); *see also* Horizontal Merger Guidelines § 9.2. "As a matter of economic reality, companies do not simply enter any market they can." *Bazaarvoice*, 2014 WL 203966, at *71. The likelihood of entry depends on whether entrants "have the requisite ability" to enter, whether entry into the relevant markets is "within their strategy," and whether entry would be financially attractive to entrants, taking into account the risks of entry and the economic trade-offs of entering the relevant markets compared to using those same resources to enter other markets or pursue other business opportunities. *Id.*; Horizontal Merger Guidelines § 9.2.

84.     The "mere threat of entry" is insufficient. *Chi. Bridge*, 534 F.3d at 430 n.10. Rather, "there is a high threshold applied to assertions as to whether a company can be considered a potential entrant," and Defendants "must provide evidence that the likelihood of entry reaches a threshold ranging from 'reasonable probability' to 'certainty.'" *Id*.

85.     To be "likely," entry must also be "tied to the relevant geography" because entry outside the relevant markets cannot "counteract a merger's anticompetitive effects." *Anthem*, 236 F. Supp. 3d at 222; *see also Cardinal Health*, 12 F. Supp. 2d at 56 ("The history of entry *into the*

*relevant market* is a central factor in assessing the likelihood of entry in the future.") (emphasis

added); *infra* Section IV.C (discussing prohibition on cross-market balancing).

### 4. Entry must be of a magnitude and scope sufficient to offset anticompetitive harm

86.     To be "sufficient" "entry has to be of a 'sufficient scale' adequate to constrain

prices and break entry barriers." *Chi. Bridge*, 534 F.3d at 429; *accord Penn State Hershey*, 838

F.3d at 352 (entrants must "have the ability to constrain post-merger prices" in the relevant

markets); *Energy Sols.*, 265 F. Supp. 3d at 443 ("[E]ntry is sufficient only if it can 'affect

pricing' and 'scale to compete on the same playing field' as the merged firm."); *see also Wilh.*

*Wilhelmsen*, 341 F. Supp. 3d at 67 (entry is sufficient where "the entering competitors provide

products that 'are close enough substitutes to the products offered by the merged firm to render a

price increase unprofitable' and there are limited constraints on entrants' 'competitive

effectiveness,' such that one firm can replicate the scale and strength of a merging firm, or one or

more firms can operate without competitive disadvantage") (cleaned up) (citing Horizontal

Merger Guidelines §§ 9.1–9.3); *Cardinal Health*, 12 F. Supp. 2d at 58 (lack of another national

wholesaler after the merger was "too great a competitive loss—which the regional wholesalers

cannot sufficiently replace"); Horizontal Merger Guidelines § 9.3.

87.     When assessing the sufficiency of entry, the relevant question is whether the

potential entrants would enter and expand beyond their own existing growth plans to replace the

void created by the elimination of the competitive intensity of the acquired firm. *See FTC v.*

*Tronox, Ltd.*, 332 F. Supp. 3d 187, 214 (D.D.C. 2018) (rejecting argument regarding entry by

foreign producers because proposed entrants would need to expand rapidly and, even if they did,

would first fulfill existing and unmet domestic demand before entering the relevant (foreign)

markets); *cf. FTC v. Sysco Corp.*, 113 F. Supp. 3d 1, 80–81 (D.D.C. 2015) (rejecting entry and

expansion arguments because, despite evidence of competitors opening new facilities and having existing plans to grow, distributors had no plans to reposition or increase planned expansion to compete in the relevant markets that would be harmed by the merger).

88.     Entry must build upon, rather than supersede, potential entrants' existing business plans, because merger analysis considers the future world with and without the merger. *Anthem*, 236 F. Supp. 3d at 191 ("In essence, in a merger trial, the Court is making a prediction about the future."); Horizontal Merger Guidelines § 1 ("Most merger analysis is necessarily predictive, requiring an assessment of what will likely happen if a merger proceeds as compared to what will happen if it does not."). Potential entrants' existing plans to compete are already baked into the world *without* the merger—therefore, those pre-existing growth or entry plans do not count toward filling the void *created by* the merger. If entrants try to enter relevant markets without growing beyond their pre-existing plans, they would need to abandon existing markets or markets where they would have otherwise entered or grown but-for the merger. That entry cannot offset anticompetitive effects of the merger because it would create new harms to competition. *Sanford Health*, 926 F.3d at 965 (to offset anticompetitive effects, entry must "counteract the competitive effects of concern"). *Cf. FTC v. Hackensack Meridian Health, Inc.*, 30 F.4th 160, 176 (3d Cir. 2022) (for efficiencies to rebut a *prima facie* case they must "not arise from anticompetitive reductions in output or service").

89.     Because the sufficiency and timeliness of entry matters, simply pointing to prior instances of *some* entry in *some* markets over *some* period is not enough. *Anthem*, 236 F. Supp. 3d at 224 (rejecting expert's testimony "emphasizing that the *number* of entrants—both coming and going—showed 'dynamism'" because "mere movement in the market" is not enough) (emphasis in original).

90.    Entry by members of an industry's existing oligopoly may not be sufficient to fill a competitive void left by the elimination of a disruptive competitor that had historically disciplined those larger firms. *See Bertelsmann*, 646 F. Supp. 3d at 53 (rejecting argument that expansion of existing "Big Five" would be sufficient due to lack of evidence that others in the Big Five "could or would compete more aggressively with the merged company"). Likewise, entry by competitors unable to replicate the competitive intensity of the acquired firm is insufficient. *FTC v. Staples Corp.*, 190 F. Supp. 3d 100, 133-37 (D.D.C. 2016) ("*Staples II*") (rejecting potential entrants who lack the existing ability to compete of the acquired firm); *Cardinal Health*, 12 F. Supp. 2d at 58 (regional competitors unlikely to replicate the competitive vigor of national competitors).

### 5.    Expansion or repositioning must satisfy the same requirements as entry to rebut the *prima facie* case

91.    Like entry, any claimed expansion or repositioning of existing competitors in response to the acquisition must also be timely, likely, and sufficient. *See Penn State Hershey*, 838 F.3d at 351–52 ("repositioning" must be timely, likely, and sufficient); *Wilh. Wilhelmsen*, 341 F. Supp. 3d at 67 ("The expansion of current competitors is regarded as essentially equivalent to new entry, and is therefore evaluated according to the same criteria.") (citations omitted); *CCC Holdings*, 605 F. Supp. 2d at 47 ("[E]xpansion must be timely, likely, and sufficient in its magnitude, character and scope to deter or counteract the competitive effects that otherwise may be likely to result from a merger that significantly enhances market concentration") (quotations omitted); *H & R Block, Inc.*, 833 F. Supp. 2d at 73–74 ("[T]he Court's ease of expansion analysis will focus on whether these two competitors are poised to expand in a way that is timely, likely, and sufficient in its magnitude, character, and scope to deter or counteract any potential anticompetitive effects resulting from the merger.") (citations

46

omitted); *Id.* at 73 ("[T]he defendants carry the burden to show that ease of expansion is sufficient 'to fill the competitive void that will result if [defendants are] permitted to purchase' their acquisition target.") (quoting *FTC v. Swedish Match*, 131 F. Supp. 2d 151, 169 (D.D.C. 2000); *Sysco,* 113 F. Supp. 3d at 81 (finding that "expansion by regional players [would] not be timely, likely, and of sufficient magnitude to counteract anticompetitive harm"); *see also Cardinal Health*, F. Supp. 2d at 55, 57–58 (evaluating expansion together with, and according to the same criteria, as entry).

### B. Purported efficiencies must be merger-specific, verifiable, offset the acquisition's harm, and not arise from anticompetitive conduct

92.     The Supreme Court has never recognized efficiencies as a defense to an otherwise illegal merger. *See Anthem*, 855 F.3d at 353–54. In fact, it explained that "[p]ossible economies cannot be used as a defense to illegality" because "Congress was aware that some mergers which lessen competition may also result in economies, but it struck the balance in favor of protecting competition." *FTC v. Procter & Gamble Co.*, 386 U.S. 568, 580 (1967); *see also Brown Shoe*, 370 U.S. at 344 ("Congress appreciated that occasional higher costs and prices might result from the maintenance of fragmented industries and markets. It resolved these competing considerations in favor of decentralization.").

93.     Lower courts faced with an efficiencies defense have expressed skepticism about its availability and have often rejected it on the facts of the particular case. *See, e.g.*, *Anthem*, 855 F.3d at 353–55 (nothing "it is not at all clear that [efficiencies] offer a viable legal defense to illegality under Section 7" but stating it would "assume the availability of an efficiencies defense" because the defendant had failed to establish it); *Penn State Hershey*, 838 F.3d at 348–49 (stating "we are skeptical that such an efficiencies defense even exists"); *St. Alphonsus Med. Ctr.-Nampa, Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775, 788–89 (9th Cir. 2015) ("[N]one

of the reported appellate decisions [recognizing the defense] have actually held that a § 7 defendant has rebutted a *prima facie* case with an efficiencies defense."); *see also F.T.C. v. Univ. Health, Inc.*, 938 F.2d 1206, 1222–23 & n.29 (11th Cir. 1991) (recognizing that "once it is determined that a merger *would* substantially lessen competition, expected economies, however great, will not insulate the merger from a section 7 challenge," and holding that defendants failed to "present[] sufficient evidence to support their claim that the intended acquisition would generate efficiencies benefiting consumers").

94.     To whatever extent efficiencies can be raised to try to rebut a *prima facie* case, the efficiencies must "(1) 'offset the anticompetitive concerns in highly concentrated markets'; (2) 'be merger-specific' (*i.e.*, the efficiencies cannot be achieved by either party alone); (3) 'be verifiable, not speculative'; and (4) 'not arise from anticompetitive reductions in output or service.'" *Hackensack*, 30 F.4th at 176 (citing *Penn State Hershey,* 838 F.3d at 348–49); *see also* Horizontal Merger Guidelines § 10.

95.     Evidence that a proposed transaction has procompetitive benefits is considered as part of Defendants' efficiencies defense, rather than as part of Plaintiffs' anticompetitive effects case and must, therefore, meet the requirements of an efficiencies defense. *See Hackensack*, 30 F.4th at 176 ("The existence of procompetitive benefits does not mean the absence of anticompetitive harms. [Defendants' argument that there would be procompetitive benefits] is merely a different way of saying there would not likely be a substantial lessening of competition because the procompetitive effects offset the anticompetitive effects of the merger. Thus, [defendants'] procompetitive effects argument is an efficiencies defense."]

**1.    Purported efficiencies must be passed on to consumers in the relevant markets at a sufficient level that they would offset the harm from the proposed acquisition**

96.    An efficiencies defense fails unless the claimed efficiencies are sufficiently large that they reverse the threatened harm to competition in the relevant markets. *Hackensack*, 30 F.4th at 176 (explaining that the "magnitude of the efficiencies needed to overcome a *prima facie* case depends on the strength of the likely adverse competitive effects of a merger"); *St. Alphonsus*, 778 F.3d at 791 (The "claimed efficiencies . . . must show that the prediction of anticompetitive effects from the *prima facie* case is inaccurate" and must offset harm to competition, as opposed to providing some other benefit); *see also supra* Section I.E.2 (weight of rebuttal burden depends on strength of *prima facie* case). Where the levels of market concentration are high, "proof of extraordinary efficiencies" is required to meet this bar. *Heinz*, 246 F.3d at 720.

97.    In addition, Defendants must show that the claimed efficiencies "would ultimately be passed on to consumers" in the relevant markets. *Penn State Hershey*, 838 F.3d at 351; *accord Anthem*, 855 F.3d at 362 (claimed efficiencies "only improve consumer welfare to the extent that they are actually passed through to consumers, rather than simply bolstering [defendants'] profit margin"); *ProMedica*, 749 F.3d at 571 (efficiencies arguments only cognizable when "merger would benefit consumers (as opposed to only the merging parties themselves)"); *Univ. Health*, 938 F.2d at 1223 (efficiencies must "ultimately . . . benefit competition and, hence, consumers" and therefore must be "passed on to consumers"). Moreover, any claimed efficiencies must be based on more than "speculative assurances that a benefit enjoyed by the [defendants] will also be enjoyed by the public." *Penn State Hershey*, 838 F.3d at 351. Indeed, Defendants must proffer

"clear evidence showing that the merger will result in efficiencies that will . . . ultimately benefit consumers." *Id.*, 838 F.3d at 350.

98.     Merger efficiencies must also provide benefits to competition in the relevant markets in which the harm is threatened. *See, e.g.*, *Anthem*, 855 F.3d at 363–64 (rejecting cost-savings efficiencies because they were based on a different market than the relevant market that was defined, so they were "unmoored from the actual market at issue"); *Deutsche Telekom*, 439 F. Supp. 3d at 207 (crediting efficiencies that would "cause [the merged firm] to compete more vigorously with its rivals in the [relevant] Markets"); *see also infra* Section IV.C.

99.     An efficiency premised on the principle that "bigger is better" and that a merger will "strengthen [the firms'] own position against one or two rivals" is "not a valid justification" for an anticompetitive deal. *Am. Airlines*, 2023 WL 3560430, at *39; *see also*, *United States v. H & R Block, Inc.*, 833 F. Supp. 2d 36, 80–81 (D.D.C. 2011) (rejecting argument that merger of H & R Block and TaxAct was justified by better ability to compete with market leader Intuit); *FTC v. H.J. Heinz Co.*, 246 F.3d 708, 720–21 (D.C. Cir. 2001) (rejecting argument that merger of Heinz and Beech-Nut was justified by better ability to compete with market leader Gerber). "Federal antitrust law does not concern itself with which competitor wins the largest share of a market." *Am. Airlines*, 2023 WL 3560430, at *39.

100.     "Synergies" are not synonymous with "efficiencies," and many things that might qualify as "synergies" do not qualify as "efficiencies." *H & R Block*, 833 F. Supp. 2d at 89 n.41. "'Synergies' refer more generally to any business performance benefits that result from the merger of two companies." *Id*. "Cognizable efficiencies are a subset of synergies." *Id*.

101.     Requiring consumers to accept a larger product bundle for a higher price or a smaller product bundle for a lower price "is not an efficiency; it is evidence of the

anticompetitive consequences of reducing competition and eliminating an innovative competitor in a highly concentrated market." *Anthem*, 855 F.3d at 370 (Millett, J., concurring).

### 2.   Purported efficiencies must be merger specific

102.    Merging firms cannot claim credit for benefits that they would or could have achieved anyway by competing with each other and growing organically. Rather, even where efficiencies are considered, they must be "merger-specific, meaning that it cannot be achieved by either company alone," to qualify as rebuttal evidence. *Anthem*, 855 F.3d at 356 (quoting *Heinz*, 246 F.3d at 721); *accord Hackensack Meridian Health*, 30 F.4th at 176; *Sanford Health*, 926 F.3d at 965; *Penn State Hershey*, 838 F.3d at 348; *St. Alphonsus*, 778 F.3d at 790–91; *see also*, *e.g.*, *Bazaarvoice*, 2014 WL 203966, at *64 (enjoining merger and holding that "there is no evidence that the merger caused increased innovation or that, absent the merger, the efficiencies and innovation claimed would not have been realized"); Horizontal Merger Guidelines § 10. Courts require merger-specificity in merger cases because otherwise, anticompetitive mergers might be allowed even when the benefits "can be achieved without the concomitant loss of a competitor." *Heinz*, 246 F.3d at 722.

103.    Efficiencies are merger-specific if "they represent a type of cost saving that could not be achieved without the merger." *Sysco*, 113 F. Supp. 3d at 82 (internal quotations omitted) (quoting *H & R Block*, 833 F. Supp. 2d at 89). Stated differently, an efficiency is "'merger-specific' if it is a unique consequence of the merger—that is, if it could not readily be attained by other means or if the social cost of attaining it by other means is at least as high as the social cost of the merger." Areeda & Hovenkamp ¶ 973a; Horizontal Merger Guidelines § 10 n.13 (efficiencies are not "merger-specific if they could be attained by practical alternatives that mitigate competitive concerns").

104.    For example, in *Heinz*, Heinz (a baby food manufacturer) defended its acquisition

of a competitor by arguing that the acquisition would allow it to use the competitor's superior

recipes. 246 F.3d at 722. The appellate court reversed the district court's finding that the

efficiency was merger specific, because neither the district court nor the defendants had

considered whether Heinz could have developed a comparable product without acquiring its

competitor. *Id.*

105.    Similarly, in *Anthem*, the D.C. Circuit held that a purported efficiency arising

from "rebranding" the acquired firm's assets was not a merger-specific efficiency because it

"simply involve[d]" the acquiring firm (Anthem) "offering [the acquired firm's (Cigna)]

customers Cigna products in a manner that is no different than Anthem selling new business in

the market." 855 F.3d at 357 (internal quotation omitted). "[T]hat is not a merger-specific

outcome; that is just more successful marketing of the existing Anthem product." *Id*. In other

words, the court held that simply "swallowing up" a competitor's product and re-labeling it as

the acquirer's product is not a consumer benefit or a cognizable efficiency. *Id*.

### 3.    Purported efficiencies must be verifiable

106.    "[B]oth prior to and when defending a merger firms tend to exaggerate the

magnitude of efficiencies that can be realized from a merger." Areeda & Hovenkamp ¶ 970a.

Accordingly, a defendant asserting the efficiencies defense must "specifically explain . . . how

[the claimed] efficiencies would be created and maintained." *Univ. Health*, 938 F.2d at 1223; *see

also Penn State Hershey*, 838 F.3d at 350 ("We . . . require that the [defendants] provide clear

evidence showing that the merger will result in [the claimed] efficiencies . . . ."); *Heinz*, 246 F.3d

at 721 ("[T]he court must undertake a rigorous analysis of the kinds of efficiencies being urged

by the parties in order to ensure that those 'efficiencies' represent more than mere speculation and promises about post-merger behavior.").

107.    For an efficiency to be verifiable, it must be "reasonably verifiable by an independent party." *H & R Block*, 833 F. Supp. 2d at 89. To the extent that estimates of efficiencies are based on the subjective judgments of the parties, courts will not credit them. *See, e.g.*, *id.* at 91 (finding that reliance on "managers experiential judgment" in calculating cost-savings efficiencies rendered the claimed efficiencies not verifiable and therefore not cognizable). "The difficulty in substantiating efficiency claims in a verifiable way is one reason why courts 'generally have found inadequate proof of efficiencies to sustain a rebuttal of the Government's case.'" *Id.* (quoting *Heinz*, 246 F.3d at 720). For example, general arguments about reducing "unnecessary duplication" and even quantitative estimates of those duplications cannot verify claimed efficiencies. *Univ. Health*, 938 F.2d at 1223; *see also Anthem*, 236 F. Supp. 3d at 243–49 (finding claimed efficiencies unverifiable despite expert testimony in support of the efficiencies).

108.    The longer it takes for an efficiency to be realized, the more speculative (and correspondingly, less verifiable) it is. *See Anthem*, 855 F.3d at 360 ("The longer it takes for an efficiency to materialize, the more speculative it can be, *see* Horizontal Merger Guidelines § 10 & n.15, so the district court was on solid ground to give less weight to the claimed renegotiation savings."). In *Anthem*, for example, the appeals court approved of the district court's finding that efficiencies that would only be achieved over a three-to-five-year period were speculative and entitled to less weight. *Id.*

### 4. Purported efficiencies must not arise from anticompetitive reductions in output or service

109.    Efficiencies "must not arise from any anticompetitive reduction in output or service." *Penn State Hershey*, 838 F.3d at 349; *Hackensack*, 30 F.4th at 176; *United States v. Aetna Inc.*, 240 F. Supp. 3d 1, 94 (D.D.C. 2017); *H & R Block*, 833 F. Supp. 2d at 89; Horizontal Merger Guidelines § 10; *see also Anthem*, 855 F.3d at 427 (Millet, J. concurring) ("[T]here is no dispute that, to have any legal relevance, a proffered efficiency cannot arise from anticompetitive effects."). For example, in *Penn State Hershey*, the Third Circuit found that abandoning pre-merger plans to build 100 additional hospital beds was a reduction in output and, therefore, not a cognizable efficiency. *Penn State Hershey*, 838 F.3d at 350.

### C. Anticompetitive harm to consumers in one relevant market cannot be justified by pointing to purported benefits to consumers in a different relevant market

110.    The Supreme Court has rejected the proposition that the "anticompetitive effects in one market could be justified by procompetitive consequences in another." *Phila. Nat'l Bank*, 374 U.S. at 370.

111.    In *Philadelphia National Bank*, the Supreme Court considered arguments very similar to those Defendants make here. In that case, the United States sought to enjoin a merger of two major Philadelphia banks that would have harmed banking customers in Philadelphia. The banks sought to justify the merger on the grounds that the merged bank would be large enough to increase its lending limit and thereby compete with New York banks for issuing "very large loans." *Phila. Nat'l Bank*, 374 U.S. at 334, 370. The Supreme Court emphatically "reject[ed] this application of the concept of 'countervailing power,'" and restricted its consideration of benefits to those that would allow the merged firm "to compete more successfully with the leading firms in *that* [local] market," *i.e.,* Philadelphia. *Id.* at 370–71 (emphasis added) (quoting *Kiefer-Stewart*

54

*Co. v. Joseph E. Seagram & Sons*, 340 U.S. 211 (1950)). The Court also explained that a merger "is not saved because, on some ultimate reckoning of social or economic debits and credits, it may be deemed beneficial." *Id*. at 371. Congress "proscribed anticompetitive mergers, the benign and the malignant alike, fully aware, we must assume, that some price might have to be paid." *Id*.

112.    *Philadelphia National Bank*'s prohibition on cross-market balancing stems directly from the text of Section 7 of the Clayton Act, which prohibits acquisitions that may substantially lessen competition in *any* market.[9] *See supra* Section I.F. If a merger threatens competition in one "section of the country," 15 U.S.C. § 18, then potentially improving competition in a different "section of the country" does not ameliorate the threat to competition in the first. The putative out-of-market benefits do not negate the in-market harms because competition and consumers in the first market are still harmed, and the statute is therefore still violated.

113.    The prohibition on cross-market balancing also has pragmatic justifications. As the Supreme Court observed, "the logical upshot" of permitting cross-market balancing is that Section 7 would facilitate, rather than guard against, consolidation: "every firm in an industry could, without violating [Section] 7, embark on a series of mergers that would make it in the end as large as the industry leader." *Phila. Nat'l Bank*, 374 U.S. at 370. Additionally, making "value choice[s]" about which groups of consumers in which areas of the country should win and which

---

[9] In deciding a non-merger antitrust case under Section 1 of the Sherman Act, the First Circuit has explained that it is generally improper to "validate a practice that is decidedly in restraint of trade simply because the practice produces some unrelated benefits to competition in another market." *Sullivan v. Nat'l Football League*, 34 F.3d 1091, 1112 (1st Cir. 1994). In the context of Section 1, but not for Clayton Act Section 7, courts have sometimes accounted for out-of-market benefits if the relevant market in which those benefits accrue is sufficiently "closely related to the relevant market . . . such that the procompetitive benefits in one [market] can be compared to the anticompetitive harms in the other [market]." *Id*. at 1112; *see also United States v. Brown Univ.,* 5 F.3d 658, 675 (3d Cir. 1993) (rejecting cross-market balancing in a Section 1 case where colleges agreed to eliminate price competition and justified their behavior by pointing to benefits in curriculum, campus activities, and student-faculty interaction.)

should lose from mergers "is beyond the ordinary limits of judicial competence." *Id*. at 371.

Congress did not intend courts to be central planners, calculating "some ultimate reckoning of

social or economic debits and credits" when evaluating acquisitions under Section 7; it simply

tasked courts with "preserv[ing] our traditionally competitive economy." *Id*.

114.    For these reasons, courts reject invitations by merging parties to serve as social

engineers who balance harms to a group of customers in one part of the country against

purported benefits for customers in another. *See, e.g.*, *Miss. River Corp. v. FTC*, 454 F.2d 1083,

1089 (8th Cir. 1972) ("While an acquisition is to be measured functionally within the market

structure of the particular market, the anticompetitive effects of an acquisition in one market

cannot be justified by procompetitive effects in another market. Honest intentions, business

purposes and economic benefits are not a defense to violations of an antimerger law.") (internal

citations omitted); *Aetna*, 240 F. Supp. 3d at 94 ("[T]he companies must demonstrate that their

claimed efficiencies would benefit customers, and, more particularly, the customers in the

challenged markets.") (internal citations omitted); *Kottaras v. Whole Foods Market, Inc.*, 281

F.R.D. 16, 25 (D.D.C. 2012) ("[A] merger that substantially decreases competition in one

place—injuring consumers there—is not saved because it benefits a separate group of consumers

by creating competition elsewhere.");[10] *United States v. Ivaco*, 704 F. Supp. 1409, 1427 (W.D.

Mich. 1989) ("Procompetitive effects outside the relevant geographic market cannot be used to

offset anticompetitive effects in the relevant market.") (citations omitted). *See also* Areeda &

---

[10]The court in *Kottaras* explicitly acknowledged the continued force of *Philadelphia National Bank*. 281 F.R.D., at 24–25. The relevant markets alleged by plaintiffs in that case were not "individual products," as Defendants have contended (ECF No. 196 at 24), but the "market for premium, natural, and organic supermarkets," of which different grocery items were all in. *See* Compl., *Kottaras v. Whole Foods Mkt., Inc.*, Case No. 08 Civ. 01832 (D.D.C., filed Oct. 27, 2008), ¶ 39.

Hovenkamp ¶ 972a ("The statute . . . plainly contemplates that mergers may involve more than one market, yet *it bases legality on a separate market-by-market appraisal*.") (emphasis added).

115.    That the United States, in its role as an enforcer of the antitrust statutes, has considered out-of-market effects is not inconsistent with courts abiding by the statutory requirement of not engaging in cross-market balancing under Section 7. The United States has considered out-of-market benefits in the context of negotiated settlements under the Tunney Act, 15 U.S.C. § 16(b)–(h), which flows from different congressional imperatives and is governed by a broad and flexible "public interest" legal standard, rather than the risk-averse, market-specific liability standard found in Section 7 of the Clayton Act. *See id*. § 16(e). Regardless, any calculus that a party makes in *settling* a case is no basis to ignore statutory text and Supreme Court precedent when *adjudicating* a case. *Cf. In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 664–65 (7th Cir. 2002) (Justice Department's decision not to bring civil price-fixing case, which could have been motivated by many factors, does not justify dismissal of claims). Moreover, it is hardly novel for parties to consider factors and evidence during settlements that may be irrelevant to the merits of a claim. *See, e.g.*, *United States v. Marrero-Ortiz*, 160 F.3d 768, 775 (1st Cir. 1998) ("[Evidence of dropped charges] ordinarily does not prove innocence. After all, cases are dismissed for a variety of reasons, many of which are unrelated to culpability."); *see also Steves & Sons, Inc. v. JELD-WEN, Inc.*, 988 F.3d 690, 714 (4th Cir. 2021) (finding that the district court did not abuse its discretion by excluding evidence that DOJ had twice investigated merger without challenging it, since DOJ's decision to not pursue matter was not probative as to merger's legality) (citations omitted); *U.S. ex rel. El-Amin v. George Washington Univ.*, 533 F. Supp. 2d 12, 20 (D.D.C. 2008) (holding evidence relating to the DOJ's decision not to intervene in a False Claims Act case inadmissible under Rules 401 and 402

"because it is not probative of any of the 'elements to be proved' at trial" since the Government "may have had 'numerous reasons' for electing not to intervene in this case") (internal citations omitted).

116.     For the reasons provided in Section II.A above, the relevant markets in which to assess the competitive effects of the proposed acquisition are scheduled air passenger service between origin-and-destination pairs. Thus, if the transaction may substantially lessen competition on a particular route, it is of no moment whether it creates any purported benefits on a *different* route; if the net effect on a particular route is that the transaction is anticompetitive, then the transaction violates Section 7 within that relevant market.

### D.     Defenses related to the financial weakness of a merging party are disfavored and have demanding requirements that are rarely satisfied

117.     In the few weeks leading up to trial and over the course of trial, Defendants attempted to introduce evidence that Spirit has recently faced financial difficulties that, they contend, suggest that Spirit will not be the formidable competitor it has been for more than a decade. To the extent that Defendants are attempting to wield this evidence as a defense to a Clayton Act violation, it is subject to strict legal requirements, as outlined below.

#### 1.     The failing firm defense has "strict limits"

118.     One legal doctrine that can be relevant to an acquired firm's financial performance is the "'failing firm'" defense. This defense takes a "lesser of two evils approach." *Gen. Dynamics*, 415 U.S. at 507. The rationale is that, if a firm is on the brink of failing, "the possible threat to competition resulting from an acquisition is deemed preferable to the adverse impact on competition and other losses if the company goes out of business." *Id*.; *accord Energy Sols., Inc.*, 265 F. Supp. 3d at 444; *see also* Horizontal Merger Guidelines § 11 ("[A] merger is

not likely to enhance market power if imminent failure . . . of one of the merging firms would cause the assets of that firm to exit the relevant market.").

119.    A defendant asserting the failing firm defense bears the "burden of proving" three distinct elements: (1) the acquired firm "face[s] the grave probability of a business failure,'" (2) "[t]he prospects of reorganization" under the bankruptcy laws are "dim or nonexistent," and (3) "the company that acquires the failing company . . . is the only available purchaser." *Citizen Publ'g Co. v. United States*, 394 U.S. 131, 137–38 (1969) (internal citations omitted); *accord Dr. Pepper/Seven-Up Cos. v. FTC*, 991 F.2d 859, 864–65 (D.C. Cir. 1993); *Steves & Sons, Inc. v. JELD-WEN, Inc.*, 290 F. Supp. 3d 507, 511–12 (E.D. Va. 2018). These requirements reflect "strict limits placed on [the] defense" by the Supreme Court in several of its cases. *See Gen. Dynamics*, 415 U.S. at 506 (citing cases).

### 2.    The requirements of the weakened competitor defense are demanding and rarely satisfied

120.    A second doctrine that can be relevant to an acquired firm's financial performance is the so-called "weakened competitor" or "flailing firm" defense. Courts view such a defense skeptically, in part because a "'weak company' defense would expand the failing company doctrine, a defense which has strict limits," *FTC v. Warner Commc'ns, Inc.*, 742 F.2d 1156, 1164 (9th Cir. 1984) (citations omitted). One court has described this defense as "probably the weakest ground of all for justifying a merger," *Kaiser Alum. & Chem. Corp. v. FTC*, 652 F.2d 1324, 1339–41 (7th Cir. 1981), and another dismissed it as "the Hail-Mary pass of presumptively doomed mergers," *ProMedica*, 749 F.3d at 572.

121.    Courts credit the weakened-competitor defense "only in rare cases, when the defendant makes a substantial showing that the acquired firm's weakness, which cannot be resolved by any competitive means, would cause that firm's market share to reduce to a level

that would undermine the Government's *prima facie* case." *Univ. Health*, 938 F.2d at 1221.

"This argument is disfavored because it fails to account for the fact that 'financial difficulties not raising a significant threat of failure are typically remedied in a moderate length of time,' whereas a merger is a relatively permanent action that eliminates the potential for future competition between the merging parties." *Aetna*, 240 F. Supp. 3d at 92 (citing Areeda & Hovenkamp ¶ 963a3).

122.   The weakened competitor doctrine originated in the Supreme Court's decision in *General Dynamics*, 415 U.S. 486, the facts of which illustrate the narrowness of the doctrine. That case involved a merger in the coal industry, and the Court held that the "best measure of a company's ability to compete" was its coal reserves, rather than its past production, because competition focused on securing long-term production contracts. 415 U.S. at 501–02. Based on these market-specific factors, the Court was permitted to consider the fact that the acquired firm "did not have sufficient reserves to compete effectively for long-term contracts," since that lack of assets "went directly to the question of whether future lessening of competition was probable." *Id*. at 506, 508. And, importantly, the acquired firm had "neither the possibility of acquiring more (reserves) nor the ability to develop deep coal reserves, and thus was not in a position to increase its reserves." *Id*. at 503 (internal citations omitted). In other words, the acquired firm was stuck with the weak reserves it had and could not acquire more through "any competitive means," which is why *General Dynamics* was one of the "rare" cases in which the weakened-competitor defense was available.

123.   The requirement that an acquired firm's weakness "cannot be resolved by any competitive means," *Univ. Health*, 938 F.2d at 1221, means that the weakness cannot merely involve poor financial performance. It must involve a firm no longer able to access resources that

are necessary to compete. *See, e.g.*, *Gen. Dynamics*, 415 U.S. at 501–04 (coal producer had "neither the possibility of acquiring more reserves nor the ability to develop deep coal reserves, and thus was not in a position to increase its reserves"); *Arch Coal*, 329 F. Supp. 2d at 155–57 (noting that the acquired firm's mines would produce less than they had in the past, and there were not good prospects for acquiring new mines); *Deutsche Telekom*, 439 F. Supp. 3d at 218–24 (wireless provider had "no clear path to obtaining" necessary assets, including no alternative acquirer, and therefore had "no convincing prospects for improvement") (internal citations omitted).

124.    A barebones, "conceptual" contention that weakened financial status suggests a lack of future competitiveness, without more, is not enough to rebut plaintiff's *prima facie* case. *Steves & Sons*, 290 F. Supp. 3d at 517 (despite evidence of poor financial performance, holding that "evidence of [the acquired firm's] weak financial state could conceptually be probative . . . [b]ut, the record does not take [it] beyond the conceptual"). Instead, an "'imminent, steep plummet' [is] required to make a 'substantial showing' of statistical unreliability." *Id.* at 516 (quoting *FTC v. ProMedica Health Sys.*, No. 3:11 CV 47, 2011 WL 1219281, at *58 (N.D. Ohio Mar. 29, 2011)).

## V.    THE DIVESTITURES WILL NOT REMEDY THE PROPOSED ACQUISITION'S ANTICOMPETITIVE EFFECTS

### A.    Defendants bear the burden to establish that the divestitures would restore competition in the relevant markets

125.    The presumptive remedy for an acquisition that would violate Section 7 is a "full stop injunction" that prohibits the acquisition from proceeding. *FTC v. PPG Indus., Inc.*, 798 F.2d 1500, 1506 (D.C. Cir. 1986); *accord Cal. v. Am. Stores Co.*, 495 U.S. 271, 280–81 (1990) ("preferred remedy"); *Phila. Nat'l Bank*, 374 U.S. at 323–24 (unlawful acquisition "must be

enjoined"); *United States v. E.I. du Pont de Nemours & Co.*, 366 U.S. 316, 329–31 (1961) ("*du Pont III*") ("natural remedy" that is "simple" and "sure"); *see also* 15 U.S.C. § 25 (contemplating that violations "be enjoined or otherwise prohibited").

126.     In a Section 7 case, a divestiture of assets made to try to cure the anticompetitive effects of the acquisition is evaluated as a "remedy." *Sysco*, 113 F. Supp. 3d at 773.

127.     An antitrust remedy "must be effective to redress the violations and to restore competition," *i.e.*, to "restor[e] . . . the *status quo ante*." *Ford*, 405 U.S. at 573 & n.8. A full-stop injunction does so simply and certainly, *see du Pont III*, 366 U.S. at 331, and any remedy short of full-stop injunction must similarly "eliminate the effects of the [illegal] acquisition." *See also United States v. E.I. du Pont de Nemours Co.*, 353 U.S. 586, 607 (1957) ("*du Pont II*"); *Ford*, 405 U.S. at 576 (remedy ought to "restore the pre-acquisition competitive structure of the market"); *United States v. U.S. Gypsum Co.*, 340 U.S. 76, 88 (1950) (remedy must "cure the ill effects of the illegal conduct, and assure the public freedom from its continuance"); *FTC v. Weyerhaeuser Co.*, 665 F.2d 1072, 1086 (D.C. Cir. 1981) (merger remedy must "fully restore competition").

128.     It is not the United States' burden to show that a remedy other than full-stop injunction "would violate § 7," *du Pont III*, 366 U.S. at 331 (citation omitted), and "all doubts as to the remedy are to be resolved in [the Government's] favor," *id*. at 334 & n.18.

**B.     Restoring competition requires that the divestiture replace the competitive intensity lost as a result of the acquisition**

129.     When Section 7 defendants propose a remedy, they bear the burden to show that the remedy will restore competition. *See*, *e.g.*, *id*. at 331–34; *Aetna*, 240 F. Supp. 3d at 60 (citations omitted); *Sysco*, 113 F. Supp. 3d at 72. In other words, they must show that their divestiture remedy would "replace the competitive intensity lost as a result of the [challenged] merger." *Aetna*, 240 F. Supp. 3d at 60; *see id*. at 72 (divestiture must "replace fully the

competition lost by the merger"); *Sysco*, 113 F. Supp. 3d at 78 (divestiture must "remedy the anticompetitive effects of the merger"); *RAG-Stiftung*, 436 F. Supp. 3d at 304 (divestiture must "replace the merging firm's competitive intensity") (citation omitted); *see also FTC v. Staples Corp.* ("*Staples II*"), 190 F. Supp. 3d 100, 137 n.15 (D.D.C. 2016) ("*Staples II*") (defendants must show that "any proposed remedy would negate any anticompetitive effects of the merger").

130.    To "replace the competitive intensity lost as a result of the merger," *Aetna*, 240 F. Supp. 3d at 60 (internal citations omitted), a divestiture must, *inter alia*, (1) include all assets necessary to enable the buyer to compete as effectively as the seller, in both the short run and the long run; (2) create a new competitor capable of using and operating the divested assets as effectively as the seller does; and (3) leave the buyer with the incentive to compete as effectively as the seller does. *See, e.g.*, *id.* at 64–74; *Sysco*, 113 F. Supp. 3d at 73–77; *FTC v. Libbey, Inc.*, 211 F. Supp. 2d 34, 48 (D.D.C. 2002); *United States v. Franklin Elec. Co.*, 130 F. Supp. 2d 1025, 1033–34 (W.D. Wis. 2000). In other words, the divestiture buyer(s) must be "on equal competitive footing with the merged firm" "on day one." *Sysco*, 113 F. Supp. 3d at 74, 76.

### C.    Defendants bear the burden to show the divestitures are likely to occur

131.    To carry its burden to establish an effective divestiture remedy, Defendants must also show that the divestiture is "likely to occur." *Aetna*, 240 F. Supp. 3d at 60. The assessment of likelihood includes whether approval by third parties, including regulators, is needed. *Id.* at 63. But even in cases where obtaining approvals does "not appear to be an insurmountable barrier to the divestiture proceeding," that evidence may nevertheless be relevant, because "it [may] raise[] some doubt" about whether the divestiture will be effective and is therefore "a factor going to the *weight* of the evidence." *Id.*

63

## VI.    THE PROPOSED ACQUISITION SHOULD BE PERMANENTLY ENJOINED

132.    This Court has the authority "to prevent and restrain violations" of Section 7 of the Clayton Act. 15 U.S.C. § 25. Such a "violation" occurs when a specific acquisition ("such acquisition") threatens a substantial lessening of competition in any relevant market. *Id*. § 18; *see supra* Section I (describing Section 7 liability standard).

133.    A court's presumptive remedy for a violation of Section 7 is a "full stop injunction." *PPG Indus*, 798 F.2d at 1506; *see also Phila. Nat'l Bank*, 374 U.S. at 363 (stating that if the United States's claim succeeds, the merger "must be enjoined"); *du Pont III*, 366 U.S. at 329 ("The very words of § 7 suggest than an undoing of an acquisition is a natural remedy"). Courts routinely issue full-stop injunctions when Government plaintiffs have established a Section 7 violation. *United States v. Anthem, Inc.*, 855 F.3d 345, 368 (D.C. Cir. 2017) (affirming lower court granting of an injunction for Section 7 violation); *ProMedica Health Sys., Inc. v. FTC*, 749 F.3d 559, 573 (6th Cir. 2014) (same); *FTC v. Penn State Hershey Med. Ctr.*, 838 F.3d 327, 352–53 (3d Cir. 2016) (reversing lower court's denial of injunction for Section 7 violation and remanding for entry of injunction); *FTC v. H.J. Heinz Co.*, 246 F.3d 708, 727 (D.C. Cir. 2001) (same); *FTC v. Wilh. Wilhelmsen Holding ASA*, 341 F. Supp. 3d 27, 74 (D.D.C. 2018) (granting injunction as a remedy in a Section 7 case); *Tronox*, 332 F. Supp. 3d 187 at 217 (same); *Aetna*, 240 F. Supp. 3d at 74, 99 (same); *Staples II*, 190 F. Supp. 3d at 138; *Sysco*, 113 F. Supp. 3d at 86–88 (same); *H & R Block, Inc.*, 833 F. Supp. 2d at 92 (same).

134.    Once Plaintiffs have established that an acquisition violates Section 7 of the Clayton Act, it is not Plaintiffs' burden to show that a remedy other than a full-stop injunction would redress the violation, and "it is well settled that . . . all doubts as to the remedy are to be resolved in [the United States's] favor," *du Pont III*, 366 U.S. at 334; *see also id.* at 326

("[C]ourts are authorized, indeed *required*, to decree relief effective to redress the violations, whatever the adverse effect of such a decree on private interests.") (emphasis added).

## VII.   JURISDICTION AND VENUE

### A.   The Court has jurisdiction over this action and over each of the Defendants

135.   The Court has subject-matter jurisdiction over this action pursuant to Section 15 of the Clayton Act, 15 U.S.C. § 25, which provides that "[t]he several district courts of the United States are invested with jurisdiction to prevent and restrain violations of" Section 7 of the Clayton Act, 15 U.S.C. § 18.

136.   The United States has standing to bring this action pursuant to 15 U.S.C. § 25, which charges the United States with the "duty . . . to institute proceedings in equity to prevent and restrain . . . violations" of Section 7 of the Clayton Act.

137.   The States of California, Maryland, New Jersey, New York, and North Carolina, the Commonwealth of Massachusetts, and the District of Columbia ("Plaintiff States") have standing to bring this action pursuant to 15 U.S.C. § 26, as *parens patriae* on behalf of and to protect their general economies and the health and welfare of their residents.

138.   Defendants have also consented to the Court's personal jurisdiction over them. Scheduling and Case Management Order ¶ 5, ECF No. 79 (hereinafter "CMO").

### B.   Venue is proper in this Court

139.   Defendants have consented to venue in this Court. CMO ¶ 5.

65

Dated: December 13, 2023

Respectfully submitted,

/s/ Edward W. Duffy
Edward W. Duffy
Michael B. DeRita
Daniel A. Loevinsohn
James L. Moore III
United States Department of Justice, Antitrust Division
450 Fifth Street, NW, Suite 8000
Washington, DC 20530
Telephone: (202) 812-4723
Fax: (202) 307-5802
Email: edward.duffy@usdoj.gov

*Attorneys for Plaintiff United States of America*

/s/ William T. Matlack
William T. Matlack (MA Bar No. 552109)
Daniel H. Leff  (MA BBO No. 689302)
Office of the Attorney General
One Ashburton Place, 18th Floor
Boston, MA 02108
Telephone: (617) 727-2200
Email: William.Matlack@mass.gov

*Attorneys for Plaintiff Commonwealth of Massachusetts*

/s/ Olga Kogan
Olga Kogan (*admitted pro hac vice*)
New York State Office of the Attorney General
28 Liberty Street, 20th Floor
New York, NY 10005
Telephone: (212) 416-8262
Email: olga.kogan@ag.ny.gov

*Attorney for Plaintiff State of New York*

/s/ C. William Margrabe
C. William Margrabe (*admitted pro hac vice*)
Office of the Attorney General
400 6th Street NW, Suite 10100
Washington, DC 20001
Telephone: (202) 727-6294
Email: will.margrabe@dc.gov

*Attorney for Plaintiff District of Columbia*

/s/ Schonette J. Walker
Schonette J. Walker (*admitted pro hac vice*)
Gary Honick (*admitted pro hac vice*)
Byron Warren (*admitted pro hac vice*)
Maryland Office of the Attorney General
200 St. Paul Place, 19th Floor
Baltimore, MD 21202
410-576-6470
swalker@oag.state.md.us
ghonick@oag.state.md.us
bwarren@oag.state.md.us

*Attorneys for Plaintiff State of Maryland*

/s/ Jamie L. Miller
Jamie L. Miller (*admitted pro hac vice*)
Supervising Deputy Attorney General
Office of the California Attorney General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA  94102
Tel: (415) 510-3565
Email:  Jamie.Miller@doj.ca.gov

*Attorney for Plaintiff State of California*

/s/ Ana Atta-Alla
Ana Atta-Alla (*admitted pro hac vice*)
State of New Jersey - Office of the Attorney General
Division of Law
124 Halsey Street – 5th Floor
Newark, NJ 07102
Telephone: (973) 648-6835
Ana.Atta-Alla@law.njoag.gov

*Attorney for Plaintiff State of New Jersey*

/s/ Jessica V. Sutton
Jessica V. Sutton (*admitted pro hac vice*)
Special Deputy Attorney General
North Carolina Department of Justice
Post Office Box 629
Raleigh, NC 27602
Tel: 919-716-6000

E-mail: jsutton2@ncdoj.gov

*Attorney for Plaintiff State of North Carolina*

**CERTIFICATE OF SERVICE**

I hereby certify that I have caused a true and correct copy of the foregoing document to be served via CM/ECF to all parties to this litigation.

Dated: December 13, 2023                                   <u>/s/ Edward W. Duffy</u>