## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA, *et al.,* | ) |
| | ) |
| *Plaintiff*, | ) |
| | ) |
| v. | ) Civil Action No. 1:23-cv-10511-WGY |
| | ) |
| JETBLUE AIRWAYS CORPORATION and SPIRIT AIRLINES, INC., | ) |
| | ) |
| *Defendants*. | ) |
| | ) |

## <u>DEFENDANTS' POST-TRIAL BRIEF</u>

# TABLE OF CONTENTS

**Page**

INTRODUCTION ............................................................................................. 1

ORGANIZATION OF BRIEF............................................................................. 6

LEGAL STANDARD......................................................................................... 6

ARGUMENT .................................................................................................. 10

I.    THE VAST MAJORITY OF THE GOVERNMENT'S CASE IS UNTETHERED TO A LESSENING OF COMPETITION UNDER SECTION 7.................................. 10

II.    THE GOVERNMENT CANNOT ESTABLISH A PRESUMPTION OF ILLEGALITY ON ITS PROPOSED ROUTE-LEVEL MARKETS ............................. 14

    A.    Mobile Supply and Ease of Entry Support a National Market ........................... 16

    B.    National-Level Competition Supports a Nationwide Geographic Market .......... 18

III.    EVEN IF MARKETS ARE DEFINED AT THE ROUTE LEVEL, DEFENDANTS HAVE SUCCESSFULLY REBUTTED ANY PRESUMPTION........ 20

    A.    Barriers to Entry and Expansion on the 35 Routes Identified by the Government are Low .................................................................................. 22

        1.    A presumption is rebutted by showing no significant entry barriers ....... 22

        2.    The record demonstrates low entry barriers in the airline industry ........ 23

        3.    Divestitures will enhance ULCC airport access and future growth........ 29

        4.    Rivals are eager to seize any profit opportunities created by the merger .................................................................................................. 32

        5.    The relevant focus is long-term prospects for rival entry and expansion .............................................................................................. 36

        6.    There are no significant entry barriers on the Government's 35 routes .................................................................................................... 38

        7.    Defendants Have No Burden to Show that Entry Would Be "Timely, Likely, And Sufficient" but the Record Evidence Meets that Standard ............................................................................................. 42

    B.    The Government's Backward-looking Market Shares Overstate Spirit's Future Competitive Significance .................................................................. 43

    C.    The Merger Will Lead to Substantial Consumer Benefits Systemwide .............. 49

IV.    THE GOVERNMENT FAILED TO PROVE BY A PREPONDERANCE OF THE EVIDENCE THAT THE MERGER IS LIKELY TO SUBSTANTIALLY LESSEN COMPETITION ............................................................................... 51

    A.    The Government Failed To Refute Defendants' Evidence That Entry And Expansion Are Easy And Frequent...................................................... 52

# TABLE OF CONTENTS
(continued)

**Page**

B.     Expert Testimony from Dr. Gowrisankaran Fell Woefully Short of Carrying the Government's Burden of Proof ........................................................ 54

C.     The Government's Attempt to Prove a Substantial Lessening of Competition Was Not Tailored to their 35 Routes ............................... 56

D.     The Government's Failed Attempts to Prove a Substantial Lessening of Competition Through Defendants' Early Deal Discussions and Analyses ......... 58

     1.     Statements in the Proxy Fight Decks Are Not Probative ........................ 58

     2.     JetBlue's Synergy Modeling .................................................... 59

     3.     "Fleet Rationalization" .......................................................... 60

     4.     Consumer-Friendly Airplane Layout ........................................ 60

E.     The Government Has Not Met Its Burden Of Showing The Merger Will Increase The Risk of Industry Coordination ......................................... 63

V.     IF THE COURT HAS ANY RESIDUAL CONCERNS ON ONE OR MORE ROUTES, THE COURT SHOULD USE ITS EQUITABLE POWERS TO NARROWLY ADDRESS THOSE CONCERNS .......................................... 65

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re AMR Corp.*,
625 B.R. 215 (Bankr. S.D.N.Y. 2021), *aff'd*, 2023 WL 2563897 (2d Cir. Mar. 20, 2023) ......................................................................................................8, 9, 25, 61

*Ball Mem'l Hosp., Inc. v. Mut. Hosp. Ins., Inc.*,
784 F.2d 1325 (7th Cir. 1986) .......................................................................16, 18

*Bio-Rad Lab'ys, Inc. v. 10X Genomics, Inc.*,
483 F. Supp. 3d 38 (D. Mass. 2020) (Young, J.) ............................................5, 12, 28

*Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*,
65 F.3d 1406 (7th Cir. 1995) ...................................................................................16

*Brown Shoe Co. v. United States*,
370 U.S. 294 (1962) .............................................................................................16, 44

*Chi. Bridge & Iron Co. N.V. v. FTC*,
534 F.3d 410 (5th Cir. 2008) ...................................................................................42

*Chi. Pro. Sports Ltd. P'ship v. Nat'l Basketball Ass'n*,
95 F.3d 593 (7th Cir. 1996) .....................................................................................50

*Coastal Fuels of P.R., Inc. v. Caribbean Petroleum Corp.*,
79 F.3d 182 (1st Cir. 1996) .................................................................................16, 17

*Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*,
2023 WL 5747882 (S.D.N.Y. Sept. 5, 2023) ..........................................................62

*Flovac, Inc. v. Airvac, Inc.*,
817 F.3d 849 (1st Cir. 2016) ....................................................................................16

*Ford Motor Co. v. United States*,
405 U.S. 562 (1972) ..................................................................................................65

*FTC v. Arch Coal, Inc.*,
329 F. Supp. 2d 109 (D.D.C. 2004) ...............................................................7, 10, 56

*FTC v. Cardinal Health Inc.*,
12 F. Supp. 2d 34 (D.D.C. 1998) .......................................................................38, 41

*FTC v. Foster*,
2007 WL 1793441 (D.N.M. May 29, 2007) ...........................................................18

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*FTC v. Great Lakes Chem. Corp.*,
    528 F. Supp. 84 (N.D. Ill. 1981) ...................................................................34, 41

*FTC v. H.J. Heinz Co.*,
    246 F.3d 708 (D.C. Cir. 2001) ......................................................................12, 22

*FTC v. Occidental Petroleum Corp.*,
    1986 WL 952 (D.D.C. Apr. 29, 1986) ..............................................4, 18, 52, 63

*FTC v. Penn State Hershey Med. Ctr.*,
    838 F.3d 327 (3d Cir. 2016) ...............................................................................43

*FTC v. Qualcomm Inc.*,
    969 F.3d 974 (9th Cir. 2020) ..............................................................................39

*FTC v. RAG-Stiftung*,
    436 F. Supp. 3d 278 (D.D.C. 2020) ................................................................7, 18

*FTC v. Sanford Health*,
    926 F.3d 959 (8th Cir. 2019) ..............................................................................42

*FTC v. Tronox Ltd.*,
    332 F. Supp. 3d 187 (D.D.C. 2018) .................................................................8, 15

*New York v. Deutsche Telekom AG*,
    439 F. Supp. 3d 179 (S.D.N.Y. 2020) ........................................................ *passim*

*Pennsylvania v. Russell Stover Candies, Inc.*,
    1993 WL 145264 (E.D. Pa. May 6, 1993) ..........................................................40

*Rebel Oil Co. v. Atl. Richfield Co.*,
    51 F.3d 1421 (9th Cir. 1995) ..............................................................................16

*Sterling Merch., Inc. v. Nestle, S.A.*,
    724 F. Supp. 2d 245 (D.P.R. 2010), *aff'd* 656 F.3d 112 (1st Cir. 2011) ................28

*U.S. Healthcare, Inc. v. Healthsource, Inc.*,
    986 F.2d 589 (1st Cir. 1993) ..............................................................................18

*United Air Lines, Inc. v. Civil Aeronautics Bd.*,
    766 F.2d 1107 (7th Cir. 1985) ............................................................................17

*United States v. Airline Tariff Pub. Co.*,
    836 F. Supp. 9 (D.D.C. 1993) .............................................................................65

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*United States v. Am. Airlines Grp.*,
2023 WL 3560430 (D. Mass. May 19, 2023) .................................................................1, 63

*United States v. Anthem, Inc.*,
236 F. Supp. 3d 171 (D.D.C. 2017), *aff'd*, 855 F.3d 345 (2017) ..............................3, 4, 20, 22

*United States v. AT&T Inc.*,
310 F. Supp. 3d 161 (D.D.C. 2018), *aff'd sub nom. United States v. AT&T,
Inc.*, 916 F.3d 1029 (D.C. Cir. 2019) ................................................................ *passim*

*United States v. Atl. Richfield Co.*,
297 F. Supp. 1061 (S.D.N.Y. 1969), *aff'd sub nom.* 401 U.S. 986 (1971) ..............................29

*United States v. Baker Hughes*,
908 F.2d 981 (D.C. Cir. 1990) ........................................................................ *passim*

*United States v. Baker Hughes Inc.*,
731 F. Supp. 3 (D.D.C. 1990), *aff'd*, 908 F.2d 981 (D.C. Cir. 1990) ...........................7, 36, 43

*United States v. Columbia Steel Co.*,
334 U.S. 495 (1948) .............................................................................................17

*United States v. E. I. Du Pont De Nemours & Co.*,
353 U.S. 586 (1957) .............................................................................................65

*United States v. First Nat'l State Bancorporation*,
499 F. Supp. 793 (D.N.J. 1980) ...........................................................................8, 30

*United States v. Gen. Dynamics Corp.*,
415 U.S. 486 (1974) ........................................................................................ *passim*

*United States v. Grinnell Corp.*,
384 U.S. 563 (1966) .......................................................................................15, 19

*United States v. Ivaco, Inc.*,
704 F. Supp. 1409 (W.D. Mich. 1989) ......................................................................20

*United States v. Marine Bancorp., Inc.*,
418 U.S. 602 (1974) .............................................................................................20

*United States v. Oracle Corp.*,
331 F. Supp. 2d 1098 (N.D. Cal. 2004) ......................................................................4

*United States v. Standard Oil Co.*,
253 F. Supp. 196 (D.N.J. 1966) ..............................................................................36

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*United States v. Syufy Enters.*,
  903 F.2d 659 (9th Cir. 1990) ........................................................................... *passim*

*United States v. U.S. Sugar Corp.*,
  2022 WL 4544025 (D. Del. Sept. 28, 2022), *aff'd*, 73 F.4th 197 (3d Cir. 2023) ........... *passim*

*United States v. UnitedHealth Grp. Inc.*,
  630 F. Supp. 3d 118 (2022) ............................................................................ *passim*

*United States v. US Airways Grp., Inc.*,
  38 F. Supp. 3d 69 (D.D.C. 2014) ..................................................................... *passim*

*United States v. Waste Mgmt., Inc.*,
  743 F.2d 976 (2d Cir. 1984) ............................................................................ *passim*

*Vázquez-Ramos v. Triple-S Salud, Inc.*,
  55 F.4th 286 (1st Cir. 2022) ....................................................................................16

*Weeks Dredging & Contracting, Inc. v. Am. Dredging Co.*,
  451 F. Supp. 468 (E.D. Pa. 1978) ....................................................................9, 16, 17

**Statutes**

15 U.S.C. § 18 ...............................................................................................7, 23

49 U.S.C. §§ 1301-1552 (1982) ...........................................................................12

Airline Deregulation Act ....................................................................................12

Clayton Act ........................................................................................... *passim*

Pub. L. No. 95-504, 92 Stat. 1705-54 (1978) ...........................................................12

Sherman Act ................................................................................................65

**Other Authorities**

*Consumers*, Office of Public Affairs, U.S. Dep't of Justice (Nov. 12, 2013),
  https://www.justice.gov/opa/pr/justice-department-requires-us-airways-and-
  american-airlines-divest-facilities-seven-key; .......................................................31

Fed. R. Evid. 301 ..........................................................................................8, 9

N.Y. State Bar Ass'n Antitrust Section (Jan. 24, 2022),
  https://www.justice.gov/opa/speech/assistant-attorney-general-jonathan-
  kanter-antitrust-division-delivers-remarks-new-york ................................................66

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

U.S. Dep't of Justice & Fed. Trade Comm'n, Horizontal Merger Guidelines § 1
(2010) ................................................................................................................... *passim*

## INTRODUCTION

This is an unprecedented challenge to a merger of the country's sixth- and seventh-largest airlines in a market indisputably dominated by the "Big Four," particularly the legacies.  As the Government touted and this Court expressly found earlier this year, JetBlue is a "maverick" that offers a "unique" blend of low fares and high quality, which enables it "to compete effectively against the legacy airlines in ways other LCCs and ULCCs could not."  TX 912 ¶ 27 (DOJ's Proposed Findings of Fact in the Northeast Alliance ("NEA")); TX 668; *United States v. Am. Airlines Grp.*, 2023 WL 3560430, at *34 n.81 (D. Mass. May 19, 2023).  Because of this JetBlue effect, consumers have saved billions of dollars.  TX 912 ¶ 45.  Through this transaction, JetBlue would become a viable, long-term, national challenger to the dominant legacies, spreading the JetBlue effect – along with the billions in consumer savings – across the country.

To halt this merger, "the Government has the burden of proof to demonstrate that the merger is likely to lessen competition substantially."  *United States v. AT&T Inc.*, 310 F. Supp. 3d 161, 165 (D.D.C. 2018), *aff'd sub nom. United States v. AT&T, Inc.*, 916 F.3d 1029 (D.C. Cir. 2019).  As a matter of law, the Government cannot satisfy that burden through evidence of short-term market adjustments, or even temporary price increases, post-merger.  Instead, the Section 7 inquiry asks whether competition is likely to be substantially reduced "in the long run*.*"  *United States v. U.S. Sugar Corp.*, 2022 WL 4544025, at *19 (D. Del. Sept. 28, 2022), *aff'd*, 73 F.4th 197 (3d Cir. 2023).

In its Complaint and again in its Pretrial Brief, the Government promised to meet its burden with proof of harm across hundreds of routes or "markets," primarily by showing the merger would harm "cost-conscious customers" as a quickly-growing Spirit left the market and through exacerbation of price coordination through ATPCO.  Am. Complaint ¶ 30, ECF No. 69; Plaintiffs' Pretrial Brief at 20-23, ECF No. 289.  The Government also promised proof that entry

and expansion by rivals would not "deter the proposed acquisition's anticompetitive effects." ECF No. 69 ¶ 73.

But the Government failed to deliver on these promises at trial.  Instead, the evidence showed a financially-deteriorating Spirit unilaterally reducing its future growth plans, grounding its fleet for inspections, and rapidly exiting routes; sporadic, allegedly nefarious pricing actions that were immaterial in the context of the millions of fares filed on ATPCO each year; and clear testimony from ULCC executives *called by the Government* that the industry is dynamic, that entry barriers are low, and that they are eager and poised to replace demand left by Spirit.

The Government also failed to provide an evidentiary foundation for fundamental tenets of its case.  For example, the Government chose not to define a product market around "cost-conscious customers," despite referring to them conceptually and repeatedly.  And the Government offered virtually no route-specific evidence on the 35 routes at the "heart" of the Government's case, apart from unreliable route-level share statistics.  *See* Tr. 11/20/23 (Gowrisankaran) 11:9-12:10; Tr. 12/5/23 (Gov't Closing) 62:11-62:18; Gov't Closing Slides at 14 ("35 Nonstop Overlap Presumption Markets Where JetBlue and Spirit Compete Today").  For example, the Government elicited practically no testimony from fact witnesses about these specific route-level "markets."

As to economic evidence, the Government offered economist Dr. Chipty, who conceded she did not examine each of the allegedly affected routes or measure post-merger incentives, but instead purported to analyze whether a partial list of ULCCs could replace each and every Spirit route and seat nationwide at some undefined point under some undefined standard.  Tr. 11/21/23 (Chipty) 117:1-3, 147:16-18.  The Government also offered Dr. Gowrisankaran, another economist who touted the supposed reliability of his model at the national level, but confessed he

2

was "less sure" about its reliability at the route level.  Tr. 11/20/23 (Gowrisankaran) 134:12–19; 137:23–138:7.  The Government cannot have it both ways:  either competition must be analyzed nationally as part of a national antitrust market, in which case there is no conceivable concern with the merger of these two relatively small airlines, or the markets are routes, in which case the Government failed to offer route-specific evidence for the Court to "judge the likelihood of anticompetitive effects in the context of the 'structure, history, and probable future' *of the particular markets that the merger will affect.*"  *New York v. Deutsche Telekom AG*, 439 F. Supp. 3d 179, 198 (S.D.N.Y. 2020) (emphasis added) (citation omitted).

Having failed to build a record to support its case, the Government at closing tried to shift the burden to Defendants by propounding a newfound legal standard that would require Defendants to disprove a Section 7 violation after the Government merely gets out of the gate at *Baker Hughes* Step One:

> MR. DUFFY:  Now where the structural presumption applies, the Defendants have a particular burden, they must come forward with *significant evidence that mandates the conclusion that the merger does not threaten a substantial lessening of competition.*
>
> THE COURT:  And the language "that mandates the conclusion" comes from?
>
> MR. DUFFY:  That is from, I believe, um – I'll have it for you in a moment, your Honor.

Tr. 12/5/23 (Gov't Closing) 55:10-19 (emphasis added).  But the Government never followed up in closing.  In any event, "by stating that the defendant can rebut a prima facie case only by a *clear* showing, the standard in effect shifts the government's ultimate burden of persuasion to the defendant."  *United States v. Baker Hughes*, 908 F.2d 981, 983 (D.C. Cir. 1990) (emphasis in original).  Rather, the "quantum of evidence defendants must produce to shift the burden back is relatively low."  *United States v. Anthem, Inc.*, 236 F. Supp. 3d 171, 213 (D.D.C. 2017), *aff'd*, 855 F.3d 345 (2017); *see also Baker Hughes*, 908 F.2d at 992 ("Imposing a heavy burden of

production on a defendant would be particularly anomalous where . . . [t]he government . . . can carry its initial burden of production simply by presenting market concentration statistics.").

All the law requires at *Baker Hughes* Step 2 is that Defendants make a showing why the "Government's prima facie case inaccurately predicts the relevant transaction's probable effect on future competition." *Id.* at 991.  On this record, reflecting unrefuted evidence of everyday route entries and exits, low barriers to entry, divestitures facilitating further entry, and enormous consumer benefits from the merger, it is hard to imagine a case that more clearly satisfies this "relatively low" bar.  *Anthem*, 236 F. Supp. 3d at 213.  Indeed, low barriers to entry do not just rebut the Government's prima facie case: they conclusively disprove any possibility the merged firm could exercise market power, as Section 7 liability requires.[1]  In yet another attempt to rewrite the law to eliminate its own burden, the Government asserted at closing that "defendants bear the burden of production" to prove rival entry "in a timely, likely, and sufficient manner." Tr. 12/5/23 (Gov't Closing) 75:14-77:11, even though the law clearly provides that plaintiffs bear the burden to "demonstrate that the non-merging firms are unlikely" to enter at Step Three. *United States v. Oracle Corp.*, 331 F. Supp. 2d 1098, 1118 (N.D. Cal. 2004).

The Government did not meet its burden at *Baker Hughes* Step 3*, which was to show by a preponderance of the evidence "the proposed merger is likely to *substantially* lessen competition, which encompasses a concept of reasonable probability."  *United States v.*

---

[1] *United States v. Syufy Enters.*, 903 F.2d 659, 664–65 (9th Cir. 1990) (finding absence of "significant barriers to entry" conclusive); *Baker Hughes*, 908 F.2d at 987–88, 992 (same); *United States v. Waste Mgmt., Inc.*, 743 F.2d 976, 983 (2d Cir. 1984) (same); *see also FTC v. Occidental Petroleum Corp.*, 1986 WL 952, at *8 (D.D.C. Apr. 29, 1986) ("Whether entry is included as part of the market definition or in the ease of entry evaluation, practically, is of no consequence.  In either event, the result is the same.  The exercise of market power will be thwarted and collusive behavior will not be possible.") (citations omitted).

*UnitedHealth Grp. Inc.*, 630 F. Supp. 3d 118, 129 (2022) (emphasis in original) (citations omitted); *see also Bio-Rad Lab'ys, Inc. v. 10X Genomics, Inc.*, 483 F. Supp. 3d 38, 58 (D. Mass. 2020) (Young, J.) ("A claimant must show a 'reasonable probability' of violation, rather than a 'mere *possibility*.'") (emphasis in original) (citation omitted).  Far from meeting that burden on any of the 35 routes, the Government focused its case on unremarkable industry facts, like some people prefer unbundled fares; anecdotal competition between JetBlue and Spirit, ignoring that Spirit makes up less than 5% of revenues on nonstop routes flown by JetBlue; unsupported theories like "coordinated effects" and "fleet rationalization"; a proxy fight where Spirit predicted correctly, consistent with the Government's current anti-merger policy, there would be regulatory scrutiny; and an 18-month old deal valuation based on stale data collected from 2014-18, which the Government unsuccessfully tried to paint as a post-merger "plan" to raise prices by 30%, despite unrebutted testimony that this analysis was simply meant to measure the quality difference between JetBlue and Spirit, and it did not even purport to account for JetBlue's downward pressure on fares or likely rival entry.

In the end, the Government asks this Court to block the merger of two relatively small airlines facing severe financial headwinds since the pandemic, while the dominant legacy airlines are making billions in profits and pulling away.  And the Government does so based on a case that, at its "heart," is about just 35 routes out of over 6,000 nationally.  To justify that extreme result, the Government had the burden to prove with "real-world evidence that events are likely to unfold as the Government predicts[,]" since "'antitrust theory and speculation cannot trump facts.'"  *UnitedHealth Grp.*, 630 F. Supp. 3d at 141 (citation omitted).  The Government failed to produce those facts, and so Defendants respectfully request that the Court deny the injunction.

## **ORGANIZATION OF BRIEF**

The remainder of this brief is organized as follows.  We begin with a description of the applicable legal standard.  We then explain why the overwhelming majority of routes the Government attempted to put at issue should be set aside.  We explain the most relevant level at which to analyze this merger is the national market, and at that level, there is no conceivable issue under Section 7.  We then address the "heart" of the Government's case:  the 51 nonstop overlap "presumption" routes, reduced by the Government to 35 during closing argument.

We explain why, even if these are relevant antitrust markets, the Government failed to prove a substantial lessening of competition is likely on any of them.  In so doing, we walk through each of the three steps in the *Baker Hughes* burden-shifting framework.  We focus on the overwhelming rebuttal evidence demonstrating ease and frequency of rival route entry and expansion, divestitures that eliminate entry barriers at key airports, Spirit's declining business in light of financial and operational headwinds, and the nationwide consumer benefits that accrue when JetBlue becomes a more formidable competitor to the Big Four.  In light of this evidence, Defendants easily rebutted any presumption of illegality the Government might have established through route-level shares while showing why this merger is unlikely to lead to a substantial lessening of competition.  And the sporadic evidence offered by the Government in an attempt to carry its burden of proof at the last step of *Baker Hughes* neither relates to the routes that the Government chose to litigate nor proves anything about future competition on those routes.

We conclude with a brief discussion of possible relief if the Court were to have concerns about particular routes at issue in this case.

## **LEGAL STANDARD**

Section 7 of the Clayton Act prohibits acquisitions whose effect "may be substantially to

lessen competition."  15 U.S.C. § 18.  "To prove a Section 7 violation, 'the government must

show,' by a preponderance of the evidence, 'that the proposed merger is likely to *substantially*

lessen competition, which encompasses a concept of reasonable probability.'"  *UnitedHealth*

*Grp.*, 630 F. Supp. 3d at 129 (emphasis in original) (citations omitted); *see also AT&T*, 310 F.

Supp. 3d at 165 (under Section 7, "the Government has the burden of proof to demonstrate that

the merger is likely to lessen competition substantially"); *FTC v. RAG-Stiftung*, 436 F. Supp. 3d

278, 318 (D.D.C. 2020) ("[T]he question for the Court is whether the proposed merger, as a

whole, is likely to 'substantially . . . lessen competition,'" not whether it "may lead to a price

increase for *some* customers") (quoting 15 U.S.C. § 18) (emphasis in original).

Section 7 requires courts to look forward, not to the past, to evaluate a transaction.  Courts

ask whether the future with the merger will be substantially less competitive than the future

without the merger.  *United States v. Gen. Dynamics Corp.*, 415 U.S. 486, 501, 505 (1974).  As

such, merger challenges demand "[n]othing less than a comprehensive inquiry into future

competitive conditions."  *AT&T*, 310 F. Supp. 3d at 165; *see also FTC v. Arch Coal, Inc.*, 329 F.

Supp. 2d 109, 116 (D.D.C. 2004) ("[A]ntitrust theory and speculation cannot trump facts.").  The

question is not whether the merger might cause short-term competitive adjustments, as mergers

often do, but whether competition will be substantially lessened in the long run.  *United States v.*

*Baker Hughes Inc.*, 731 F. Supp. 3, 11 (D.D.C. 1990), *aff'd*, 908 F.2d 981 (D.C. Cir. 1990)

("[W]hile competition is likely to be lessened immediately if the proposed acquisition is

completed, long-range prospects in the market, while uncertain, are favorable to new entry which

will ensure continued vigorous competition."); *see* ECF No. 289 at 23 (concession by the

Government that rival entry is timely if it is "rapid enough to deter or render insignificant the

anticompetitive effects of the merger within *two to three years*." (emphasis added)).

To evaluate the likely competitive effects of a merger under Section 7, courts turn to the three-step, burden-shifting framework laid out in *Baker Hughes*, and the parties agree that this is the appropriate framework here.  908 F.2d at 982–83; *see Deutsche Telekom*, 439 F. Supp. 3d at 198–99 ("Courts generally assess Section 7 cases through [this] three-part burden-shifting framework.").  Under this framework, "the ultimate burden of persuasion . . . remains with the government at all times."  *Baker Hughes*, 908 F.2d at 983; *see also* Fed. R. Evid. 301.  At the first step, the Government may establish "a presumption that the transaction will substantially lessen competition" by "showing that [it] will lead to undue concentration in the market for a particular product in a particular geographic area."  *Baker Hughes*, 908 F.2d at 982; *FTC v. Tronox Ltd.*, 332 F. Supp. 3d 187, 197 (D.D.C. 2018).

At the second step, a defendant can rebut the presumption by proffering evidence that the Government's prima facie case "'inaccurately predicts the relevant transaction's probable effect on future competition.'"  *UnitedHealth Grp.*, 630 F. Supp. 3d at 129–30 (citation omitted); *Baker Hughes*, 908 F.2d at 991.  "[A] variety of factors can rebut a prima facie case."  *Baker Hughes*, 908 F.2d at 984.  For example, the presumption may be rebutted with the following categories of evidence:

- **Entry barriers are not significant**.  *See, e.g., Syufy Enters.*, 903 F.2d at 664–65 (relying on absence of "significant barriers to entry" as conclusive); *Baker Hughes*, 908 F.2d at 987–88 ("the absence of significant barriers"); *Waste Mgmt.*, 743 F.2d at 983 (ease of "entry into the relevant product and geographic market by new firms or by existing firms"); *In re AMR Corp.*, 625 B.R. 215, 252 (Bankr. S.D.N.Y. 2021), *aff'd*, 2023 WL 2563897 (2d Cir. Mar. 20, 2023) ("ease of entry" as a rebuttal point);

- **Divestures will promote entry**.  *See, e.g., Deutsche Telekom*, 439 F. Supp. 3d at 226–29 (crediting that divestitures lower entry barriers); *United States v. First Nat'l State Bancorporation*, 499 F. Supp. 793, 814 (D.N.J. 1980) (divestitures "provide an incentive for [rivals] to enter the markets immediately"); *see also United States v. US Airways Grp., Inc.*, 38 F. Supp. 3d 69, 78 (D.D.C. 2014) ("[T]he United States predicts that these

divestitures to LCCs will provide increased incentives for these carriers to invest in new capacity and to expand into additional markets, providing more meaningful competition system-wide to legacy carriers.");

- **Mobility of supply**. *See, e.g.*, *In re AMR*, 625 B.R. at 252 (listing "supply and demand elasticities" as rebuttal evidence); *see also U.S. Sugar*, 73 F.4th at 201–02 (discussing "high mobility of sugar throughout the country"); *Weeks Dredging & Contracting, Inc. v. Am. Dredging Co.*, 451 F. Supp. 468, 492 (E.D. Pa. 1978) (noting boats in the "dredging business [are] fully mobile");

- **A merging entity's "future ability to compete" is weak relative to past performance**. *Gen. Dynamics*, 415 U.S. at 503–08, 510–11; *Deutsche Telekom*, 439 F. Supp. 3d at 218–19 (noting that lowering prices in a "desperate and ultimately unsuccessful effort to stay relevant" is not the same as a "sustainable long-term business strategy"); and

- **The merger will enhance competition and benefit consumers**. *See, e.g.*, *Deutsche Telekom*, 439 F. Supp. 3d at 207–10 (finding that "efficiencies arising from the Proposed Merger will lead [the merged entity] to compete more aggressively to the ultimate benefit of all consumers").

Modern merger analysis requires a "totality-of-the-circumstances approach" encompassing an "overall assessment of future competitiveness" to determine the probable effects of a merger. *Baker Hughes,* 908 F.2d at 984, 988; *In re AMR*, 625 B.R. at 246–47. So while each of these points, and others, are independently sufficient, they should also be considered in combination to rebut any presumption. *See, e.g.*, *Deutsche Telekom*, 439 F. Supp. 3d at 233 (relying on several factors including divestiture, entry, declining competitive significance of defendant, and efficiencies to find that defendants carried their Step Two burden).

At the third and final step, once defendants have successfully rebutted, "the burden of producing additional evidence of anticompetitive effect shifts to the government, and merges with the ultimate burden of persuasion, which remains with the government at all times." *Baker Hughes*, 908 F.2d at 983; *see also* Fed. R. Evid. 301. Since the Government retains the "burden on every element of their Section 7 challenge, . . . a failure of proof in any respect will mean the

transaction should not be enjoined." *Arch Coal*, 329 F. Supp. 2d at 116.

<u>**ARGUMENT**</u>

I. **THE VAST MAJORITY OF THE GOVERNMENT'S CASE IS UNTETHERED TO A LESSENING OF COMPETITION UNDER SECTION 7**

According to the Government, the nonstop overlap "presumption" routes sit at the "heart" of its case.  Tr. 11/20/23 (Gowrisankaran) 11:9-12:10.  When Dr. Gowrisankaran served his report months ago, he identified 51 routes.  By closing, however, the Government pared those down to 35.  Tr. 12/5/23 (Gov't Closing) 62:11-62:18; Gov't Closing Slide at 14.

Even assuming these 35 routes are antitrust markets in this case, an issue we discuss *infra* at Section II (explaining why the Court should adopt a national market as the *relevant* antitrust market), they at least are fair ground for debate under Section 7.  Defendants compete with each other to one extent or another, as well as many other carriers, and the shares are high enough to satisfy the low thresholds the Government set for itself in the Horizontal Merger Guidelines. U.S. Dep't of Justice & Fed. Trade Comm'n, Horizontal Merger Guidelines § 1 (2010) ("Guidelines").  So they are at least worthy of further factual inquiry.

Before discussing why the Government failed to satisfy its burden of proof on the 35 nonstop overlap "presumption" routes at the "heart" of the Government's case, we briefly address the Government's other route categories on the periphery.  For each, the Government has concocted one theory or another to claim the merger will substantially lessen competition on every route Spirit flies or might fly in the future regardless of whether JetBlue competes on the route, regardless of who else competes on the route, regardless of shares, regardless of likely rival entry, regardless of divestitures, and regardless of competitive dynamics on the route.  The Government's claims with respect to these categories should be quickly rejected.

First, there are 115 "Spirit-only routes."  Tr. 11/27/23 (Hill) 57:13-58:7.  These are routes on which there is no existing competition between Spirit and JetBlue because JetBlue is not present.  Until this case, neither the Government, nor any other plaintiff in an airline merger case, has ever taken the position that a merger may "substantially lessen competition" on routes where the merging parties do not compete.  And the trial showed the implausibility of that novel claim. For example, Dr. Gowrisankaran claims the merger will cause $18 million of net harm annually on the Atlanta, GA-Chicago, IL route even though Spirit has only a 7% share of passengers, does not compete with JetBlue, is the fifth-largest airline on this route, and also competes with Frontier.  Tr. 11/27/23 (Hill) 58:19–59:11.  Even under its own Guidelines, the Government has no presumption of illegality on these routes.  It made no attempt at trial to provide evidence about the characteristics of these routes, much less an adequate record for the Court to conduct "a comprehensive inquiry into future competitive conditions."  *AT&T*, 310 F. Supp. 3d at 165. Instead, the Government relies wholly on its novel theory that upgrading Spirit planes to the more consumer-friendly JetBlue model itself violates Section 7, even with no loss in competition between JetBlue and Spirit.  Tr. 11/20/23 (Gowrisankaran) 135:7–13.

Even within the four corners of the Government's theory, far from harming consumers, Dr. Hill explained at trial that consumers will see significant benefits from the merger on these routes because it will enhance competition between JetBlue and the Big Four – with consumer savings that will exceed $600 million and benefit over 90 million passengers annually.  Tr. 11/27/23 (Hill) 88:1-12; 88:24-89:9.  More fundamentally, acquiring assets and improving them to benefit consumers is not in itself a violation of Section 7, even if the new business model leads to fares commensurate with the higher product quality.  To hold otherwise would transform Government enforcers into price and service regulators and central planners for the economy,

empowering them to block mergers simply because they believe a certain business model is superior or appropriate, irrespective of competition.  This was never the intent of Section 7, and it is why Congress deregulated the airline industry in 1978 and sunset its regulator.  Pub. L. No. 95-504, 92 Stat. 1705-54 (1978) (codified as amended at 49 U.S.C. §§ 1301-1552 (1982)).

The intent of Section 7 is to prevent the accumulation and exercise of market power.[2] Even the Government's Guidelines recognize that Section 7 only prohibits mergers that enable a firm "to create, enhance, or entrench market power or to facilitate its exercise."  Guidelines § 1. The Government presented no evidence at trial and has no basis to argue that converting Spirit planes to roomier JetBlue planes on routes where the parties do not compete will somehow create, enhance, or entrench market power.  To the contrary, the merger will allow JetBlue to disrupt Big Four dominance across these routes and many more, all to the benefit of consumers.

Second, there are 168 "Spirit-entry routes."  Tr. 11/27/23 (Hill) 63:10-20.  Spirit is not present on any of these routes; these are routes that Spirit contemplated entering before its dramatic business decline changed its plans.  Tr. 11/8/23 (Kirby) 21:10–18; 69:25–70:21, 71:10–72:14 (Spirit's five-year plan "isn't realistic" and its 2027 projections are "highly unlikely.").  JetBlue is present on very few of those routes.  Again, the Government has no presumption under its own Guidelines and made no attempt to elicit specific facts about these routes.  Even its expert did not attempt to predict shares or calculate harm on these routes.  Tr.

---

[2] *FTC v. H.J. Heinz Co.*, 246 F.3d 708, 713 (D.C. Cir. 2001) ("Merger enforcement, like other areas of antitrust, is directed at market power.") (citation omitted); *10X Genomics*, 483 F. Supp. 3d at 59-60 (granting motion to dismiss and rejecting as implausible a claim under Section 7 of the Clayton Act that the merger enabled the exercise market power in DSCP market despite alleged higher prices since parties had not competed in that market, while denying motion to dismiss for DGAT and ddPCR markets because the merger plausibly eliminated competition and resulted in monopolies in those two markets).

11/17/23 (Gowrisankaran) 90:20-91:8.  Instead, the Government asks the Court to assume, despite unrefuted testimony to the contrary, that Spirit will enter those routes but for the merger; that it will remain on those routes and have a substantial impact on competition; and that retrofitting its planes to the superior JetBlue model will substantially lessen competition.  Piling speculation upon speculation cannot carry the Government's burden of proof.

Third, there are 96 "econometric routes."  Tr. 11/27/23 (Hill) 61:18-21.  These are routes on which JetBlue and Spirt compete to a minor extent but their combined shares fall below even the low thresholds the Government articulated in its Guidelines.  Under its proposed route-level market approach, the Government must carry its burden of proof without relying on any presumption, but once again the Government failed to provide evidence about the characteristics of these individual routes beyond Dr. Gowrisankaran's flawed modeling.  Dr. Gowrisankaran's "less" precise harm predictions for these routes are implausible and cannot satisfy the Government's burden.  For example, Dr. Gowrisankaran claims the merger will result in $25 million of annual net harm on the Las Vegas-San Francisco route despite JetBlue's 0.04% passenger share (which it serves via a connection through Los Angeles), Spirit's 7% share, competition from six other airlines flying nonstop service (with Southwest as the largest carrier), and Frontier and Allegiant also flying.  *Id.* at 62:2–19; *see also* TX 848.

Fourth, there are 117 "connect routes" that neither Defendant flies nonstop.  Tr. 11/27/23 (Hill) 65:19–66:3.  Sticking with their pattern, the Government presented no factual evidence at trial about the characteristics of these connect routes, and estimated no harm.  Tr. 11/20/23 (Gowrisankaran) 55:6–13, 56:14–17.  If it had, the Government would have needed to confront the fact that JetBlue and Spirit generally do not set fares based on connecting itineraries.  Rather, such itineraries offer customers the ability to book two legs of a connection back-to-back, with

the customer charged the sum of the fares for each leg.  This predominant "sum of locals" pricing means carriers do not meaningfully compete on the connect routes, as they would on nonstop routes.  TX 896; Tr. 11/27/23 (Hill) 67:6-70:14; TX 325 at '1683 (Apr. 7, 2022 Spirit slide deck explaining that "[a]lmost all connect passengers purchase sum of local fares," up to "97%" in Spirit's Top 20 markets).[3]  Although the Government mustered shares on these routes under the Guidelines thresholds, such shares are neither indicative of competition nor sufficient to carry the Government's burden of proof.  And beyond tabulating shares, the Government produced no evidence to support that competition will be substantially lessened.

Fifth, there are 15 "mixed routes."  Tr. 11/27/23 (Hill) 72:2-10.  These are routes where one Defendant flies nonstop and the other flies connect.  Because one Defendant flies connect, these routes suffer from the same shortcomings as the connect routes.  Moreover, Dr. Hill explained that sum of locals pricing on connections is generally *higher* than on the nonstop routes, which means that connecting service does not meaningfully compete with nonstop service.  *Id.* at 72:11-23.  As with the connect routes, the Government introduced no evidence about these routes and fell far short of carrying its burden of proof.

After eliminating these meritless route categories, that just leaves "the heart" of the Government's case:  what began as 51 nonstop overlap "presumption" routes, but by the time of the closing, had been whittled down to just 35 routes.  These are addressed below.

## II.   THE GOVERNMENT CANNOT ESTABLISH A PRESUMPTION OF ILLEGALITY ON ITS PROPOSED ROUTE-LEVEL MARKETS

To make out a prima facie case, the Government must first define "the appropriate

---

[3] *See* TX 897; Tr. 11/27/23 (Hill) 70:17-71:9 ("So what [TX 897] is showing us is that by and large the fares on these routes are not likely to be the result of competition between JetBlue and Spirit.").

product market" and "the appropriate geographic market" in which to analyze the merger.

*Tronox*, 332 F. Supp. 3d at 197.  If the Government fails to define a valid relevant market, by

definition it cannot show the merger "will lead to undue concentration in the market" and cannot

obtain a presumption.  *See Baker Hughes*, 908 F.2d at 982; *Tronox*, 332 F. Supp. 3d at 197.

       If the Court agrees with Defendants that the appropriate level to analyze the transaction is

national, the case ends there because the Government did not carry its burden of proof at the

national level.  There is no dispute that JetBlue and Spirit are relatively small carriers nationally

– even combined, they would still be *half* the size of the smallest of the Big Four.  TX 883; Tr.

11/6/23 (Hayes) 57:9-13.  But it bears emphasis that, despite the Government's hyperbole at

closing,[4] the outcome of this case does not turn on the market definition adopted by the Court.

Even if the Court finds that individual routes are the relevant antitrust markets, the Government

still failed to carry its burden of proof for the reasons below.

       Airlines compete at the route, airport, city, regional, and national levels.  The Court must

choose the relevant market that best illuminates the merger's likely effect on competition.  *U.S.*

*Sugar*, 73 F.4th at 207 (in choosing the relevant market, "[t]he standard is what aid[s] a district

court in analyzing the facts") (citation omitted).  Where a broader geographic market better

illustrates a merger's competitive effects, and narrower "division does not aid [the court]," the

broader market should be adopted.  *See id.* at 207; *United States v. Grinnell Corp.*, 384 U.S. 563,

575–76 (1966) (affirming district court finding that "the relevant market for determining whether

the defendants have monopoly power is not the several local areas which the individual stations

serve, but the broader national market that reflects the reality of the way in which they built and

---

[4] *See* Tr. 12/5/23 (Gov't Closing) 68:13-16 ("[D]efendants have no hope of winning this case if
the markets are defined around particular origin and destination pairs.").

conduct their business"); *Coastal Fuels of P.R., Inc. v. Caribbean Petroleum Corp.*, 79 F.3d 182,

198 (1st Cir. 1996) (rejecting narrow geographic market that failed to capture industry

dynamics); *Ball Mem'l Hosp., Inc. v. Mut. Hosp. Ins., Inc.*, 784 F.2d 1325, 1336 (7th Cir. 1986)

(affirming finding of broader market since narrower one failed to capture competitive effects).

### A.  Mobile Supply and Ease of Entry Support a National Market

The Government initially errs by suggesting that defining the relevant geographic market

turns exclusively on demand-side substitution – *i.e.*, the "perspective of consumers" on whether

routes are substitutes.  ECF No. 289 at 14.[5]  But it is settled law that fluidity of supply across

geographies in response to competition – *i.e.*, supply-side substitution – must be considered too.[6]

In other words, the Court cannot simply ask whether a consumer views a flight from

Boston to Las Vegas as a substitute to a flight from Boston to San Juan, as the Government

demands.  Tr. 11/5/23 (Gov't Closing) 58:4-6.  The Court must also consider whether airlines

can move planes, and capacity, between these routes – or to routes from elsewhere in their

---

[5] In closing, the Government asserted that *Flovac, Inc. v. Airvac, Inc.*, 817 F.3d 849 (1st Cir. 2016) bars any consideration of supply side substitution in market definition.  Tr. 12/5/23 (Gov't Closing) 57:23-58:3.  But *Flovac* simply recognized that a market cannot be defined solely around products sold and that consumer perspective must also be considered.  *Flovac*, 817 F.3d at 854-55.  *Flovac* did not address whether suppliers could easily enter the market.  Cases decided after *Flovac* continue to refer to "ease of entry" as bearing on market definition.  *Vázquez-Ramos v. Triple-S Salud, Inc.*, 55 F.4th 286, 297 (1st Cir. 2022).

[6] *See, e.g.*, *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 n.42 (1962) ("The cross-elasticity of production facilities may also be an important factor" when defining the relevant market.); *Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*, 65 F.3d 1406, 1410–11 (7th Cir. 1995) ("[T]he definition of a market depends on substitutability on the supply side as well as on the demand side."); *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1436 (9th Cir. 1995) ("[D]efining a market on the basis of demand considerations alone is erroneous. . . .  A reasonable market definition must also be based on 'supply elasticity.'") (citations omitted); *Weeks Dredging*, 451 F. Supp. at 492 (rejecting narrow market as boats in the "dredging business [are] fully mobile").

networks – as conditions change.  Planes are among the most mobile capacity imaginable.  Tr.

11/14/23 (Biffle) 79:14-21 ("We're portable assets, so we can move in easily and move out

easily. . . . [I]t's not like a hotel.  If you build a hotel and it doesn't work well, you're stuck.").

Airlines regularly move planes into, out of, and between routes as profitability conditions evolve.

*See* Tr. 11/6/23 (Hayes) 110:18-21 ("[I]t's a very dynamic industry.  Profitability on different

routes comes and goes, and you'd want the ability to fly those [planes] to where you think you

can have the most consumer benefit."); *see United Air Lines, Inc. v. Civil Aeronautics Bd.*, 766

F.2d 1107, 1115 (7th Cir. 1985) ("[A]irplanes and other capital equipment of the airline industry

are highly mobile, and . . . airlines [may] redeploy[] their equipment, and swiftly too, to any city

pair in which ticket prices are above marginal costs.").

Thus, this case is one, like many others, where courts have recognized that any relevant

antitrust market must account for supply mobility.  *See, e.g.*, *United States v. Columbia Steel*

*Co.*, 334 U.S. 495, 530 (1948) (emphasizing "the ability of out-of-the-area fabricators to compete

because of the specialized character of structural steel production"); *Coastal Fuels*, 79 F.3d at

198–99.  In *Coastal Fuels*, for example, the First Circuit focused on the fact that boats, like

airplanes, are mobile.  The First Circuit found that the relevant geographic market extended far

beyond San Juan to encompass the Caribbean and Southeastern United States as well.  79 F.3d at

198–99.  Similarly, in *Weeks Dredging*, the district court rejected local harbors as the relevant

markets because boating in the "dredging business was fully mobile" along the East Coast.  451

F. Supp. at 491–92.  And just last year in *U.S. Sugar*, the district court rejected the Government's

proposed regional market as unduly narrow because "sugar flows easily across the country from

areas of surplus to deficit in response to prices and demand."  *See* 2022 WL 4544025, at *24.

Just recently, the Government litigated a recent case on the theory that the market should be

defined by supply-side substitution.  *RAG-Stiftung*, 436 F. Supp. 3d at 293–94.

Mobility of supply highlights the dynamism of the airline industry and the corresponding ease of entry.  Ease of entry "expand[s] the market definition."[7]  The Government's failure to account for entry means it failed to carry its burden of proving the relevant geographic market.  *Ball Mem'l Hosp.*, 784 F.2d at 1336–37 (rejecting narrow state-level market that "d[id] not capture the possibility of new entry and expanded sales by rivals").

The critical point, under the law and as a matter of economics, is the demand and supply are inextricably intertwined.  As Judge Easterbrook explained in *Ball Memorial Hospital*, a "larger market may not seem useful from the perspective of consumers" – like the Government's anecdotal Bostonian traveling to San Juan – but the larger market best reflects how rivals "whose mobility is not restricted, protect consumers, whose mobility is restricted."  *Id.* at 1336–37.

### B.    National-Level Competition Supports a Nationwide Geographic Market

The Government's alleged route-level markets also ignore the undisputed evidence that airlines compete vigorously at the national level.  For example, there is no dispute that an airline's business model and strategy, network design, fleet deployment, and loyalty and frequent flyer programs are all set and administered nationally.[8]  Given these crucial nationwide elements of competition, it is unsurprising that airlines regularly assess competitors at the national level.[9]

---

[7] *Occidental Petroleum Corp.*, 1986 WL 952, at *8; *see U.S. Healthcare, Inc. v. Healthsource, Inc.*, 986 F.2d 589, 599 (1st Cir. 1993) ("Usage patterns, customer surveys, actual profit levels, comparison of features, ease of entry, and many other facts are pertinent in answering the question [of market definition]."); *FTC v. Foster*, 2007 WL 1793441, at *22-24 (D.N.M. May 29, 2007) (the "potential flow [of rivals] . . . must be included . . . in the relevant market").

[8] PFOF § III.B.3 (explaining airlines compete for customers at the national and regional levels through network planning, partnerships, on-board services, and loyalty programs).

[9] For example, Spirit often analyzes competitors based on "network overlap[]."  TX 39 at '0449 (Spirit 10-K discussing competition with rivals); *see also* Tr. 11/09/23 (Friedman) 76:4–9

While the Government makes much of route-specific elements of fare setting, local variations in pricing are not a barrier to defining a market for a business operated at a national level. *Grinnell*, 384 U.S. at 575.  Non-price elements of competition, often related to overall business strategy, influence purchase decisions.  The quality and breadth of an airline's offering – for example, through loyalty programs, airport presence, and fare class offerings – often drive ticket purchase decisions. *See* PFOF § II.B.3(2) ("Spirit's Business Model"); TX 39 at '0444 (Spirit's national model is characterized by "unbundled" fares and "non-fare," "ancillary" purchases.).  And in any event, business-wide strategy necessarily affects prices cross-country.  For example, when JetBlue eliminated its ancillary fee for changing flights systemwide, the legacies soon followed.[10]  The Government's proposed route-level markets also ignore that routes are interconnected at the network level.  Even the Government's economic expert Dr. Chipty admitted that route entry decisions are driven by "sophisticated systemwide network optimization" with "layers of consideration" – not "a simple route-by-route basis."  Tr. 11/21/23 (Chipty) 114:4-21.

---

(adding more routes and frequencies to JetBlue's network allows it to "compete better with the Big Four on the national basis and take more incremental customers that we've had trouble getting in the past"); Tr. 11/2/23 (Clark) 157:17–21 (JetBlue's "focus of competition is against Delta, specifcally, throughout our network, and in Boston particularly.").

[10] TX 912 ¶ 39 ("Competition from JetBlue resulted in legacy airlines reducing ancillary fees.  In June 2020, JetBlue initiated $0 change fees – which Delta and United matched – leading American's Vice President of Revenue Management Jim Fox to note, "We don't really have a choice but to match."); *see* PFOF § III.B.3(1)(c) ("Network and Fleet Planning") (explaining that "[a]irlines make decisions about on-board product and services at the system level"); PFOF § II.B ("Airline Business Models") (desribing airline fare offerings and ancillary fee strategies).

III.   **EVEN IF MARKETS ARE DEFINED AT THE ROUTE LEVEL, DEFENDANTS HAVE SUCCESSFULLY REBUTTED ANY PRESUMPTION**

Market share statistics are merely a "convenient starting point" for competitive analysis. *Baker Hughes,* 908 F.2d at 984, 990–92; *see Gen. Dynamics*, 415 U.S. at 498 (while "statistics concerning market share and concentration" may be relevant, they are "not conclusive indicators of anticompetitive effects").

"[T]he quantum of evidence defendants must produce to shift the burden back is relatively low . . . .  Defendants are not required to clearly disprove anticompetitive effect, but rather to make merely a showing."  *Anthem*, 236 F. Supp. 3d at 213 (cleaned up).  As noted above, the Government ignores this settled law and claims Defendants may rebut only through "significant evidence that mandates the conclusion the merger does not threaten a substantial lessening of competition."  Tr. 12/5/23 (Gov't Closing) 55:10-20.  This standard does not exist.[11] The Government's attempt to impose a new, "unduly onerous" standard on Defendants lacks merit and should be rejected – just as it was in *Baker Hughes*.  908 F.2d at 989–92.

To be sure, as *Baker Hughes* said, the "more compelling the prima facie case, the more evidence the defendant must present to rebut it successfully."  *Baker Hughes*, 908 F.2d at 991.  Based on the Government's closing, it appears the Government will argue this unremarkable

---

[11] It appears the Government has invented this "standard" by grafting unrelated phrases from two separate cases that predated *Baker Hughes* and the modern advent of its framework.  *See* ECF No. 289 at 11 (stating "the burden is on Defendants to rebut that prima facie case through 'significant evidence,' *United States v. Marine Bancorp., Inc.*, 418 U.S. 602, 631 (1974), that 'mandate[s] a conclusion' that it does not threaten 'a substantial lessening of competition,' *Gen'l Dynamics*, 415 U.S. at 497–98").  Neither case supports the Government's proposed standard.  Indeed, in the many merger cases litigated in the half century since *General Dynamics* was decided, Defendants could only find one where a court has even mentioned the "mandate[s] a conclusion" language.  *United States v. Ivaco, Inc.*, 704 F. Supp. 1409, 1421 (W.D. Mich. 1989).  No court has ever applied the standard the Government advances here.

principle, combined with what the Government calls "direct evidence," means Defendants here have to disprove a Section 7 violation at Step Two. *See* Tr. 12/5/2023 (Gov't Closing) 55:3-9. But this is not the law. And in any event, as discussed below, the Government's so-called "direct evidence" rests on JetBlue's plans to upgrade Spirit's planes to offer more consumer-friendly seating, and on its theories involving deal modeling, fleet rationalization, coordinated effects. *See infra* Section IV.D.

More fundamentally, the Government presented *no factual evidence* – apart from share statistics used for Herfindahl-Hirschman Index calculations – about any of the 35 routes. But the "*Herfindahl–Hirschman Index cannot guarantee litigation victories*." *Baker Hughes*, 908 F.2d at 992 (emphasis added). And even if the Government could muster anything beyond market shares at Step One on its core "markets," that does not mean Defendants have to disprove a Section 7 violation at Step Two. As *Baker Hughes* said:

> If the burden of production imposed on a defendant is unduly onerous, the distinction between that burden and the ultimate burden of persuasion – always an elusive distinction in practice – disintegrates completely. A defendant required to produce evidence "clearly" disproving future anticompetitive effects must essentially persuade the trier of fact on the ultimate issue in the case – whether a transaction is likely to lessen competition substantially. Absent express instructions to the contrary, we are loath to depart from settled principles and impose such a heavy burden.

*Id.* at 991; *see also Deutsche Telekom*, 439 F. Supp. 3d at 207 ("The more compelling the prima facie case, the more evidence the defendant must present to rebut it successfully, but because the burden of persuasion ultimately lies with the plaintiff, the burden to rebut must not be unduly onerous." (citation omitted)).

The burden on Defendants is "relatively low," or "merely a showing." *Anthem*, 236 F. Supp. 3d at 213. For the reasons below, Defendants have more than met that burden.

**A.      Barriers to Entry and Expansion on the 35 Routes Identified by the Government are Low**

*1.      A presumption is rebutted by showing no significant entry barriers*

It is well established that Defendants may rebut the Government's prima facie case by showing the absence of significant entry barriers in the relevant market.  *Baker Hughes*, 908 F.2d at 984; *see Syufy Enters.*, 903 F.2d at 664 ("[Absent] significant barriers to entry, . . . rais[ing] prices above the competitive level will lure into the market new competitors able . . . to offer their commercial goods . . . for less."); *Waste Mgmt.*, 743 F.2d at 983 (when entry is "relatively easy," then any "impact of the merger before us would be eliminated more quickly by such competition than by litigation").

Defendants need not prove entry will actually occur.  *Baker Hughes*, 908 F.2d at 988 ("[A] defendant seeking to rebut a prima facie case certainly need not show that any firm *will* enter the relevant market." (emphasis in original)); *see FTC v. H.J. Heinz Co.*, 246 F.3d 708, 717 n.13 (D.C. Cir. 2001) ("Low barriers to entry enable [rivals] to deter anticompetitive behavior by firms within the market simply by [their] ability to enter the market.").  This is consistent with the parties' respective burdens under Section 7:  The Government must show a probability of future harm.  So to require Defendants to prove entry will occur "would move far toward forcing [Defendants] to rebut a probability with a certainty."  *Baker Hughes*, 908 F.2d at 992.

Nor must Defendants show that entry and repositioning will replicate the same level of competition that Spirit provides today.  As the district court in *UnitedHealth Group* recently held in finding for Defendants in another merger:

> [T]he text of Section 7 is concerned only with mergers that *'substantially* . . . lessen competition.' 15 U.S.C. 18 (emphasis added).  By requiring that UHG prove that the divestiture would preserve exactly the same level of competition that existed

> before the merger, the Government's proposed standard would effectively erase the
> word 'substantially' from Section 7.

630 F. Supp. 3d at 133.  Thus, Defendants need not show that rivals will replace Spirit one-for-

one on the same routes that Spirit chooses to fly today.  *See Deutsche Telekom AG*, 439 F. Supp.

3d at 233 (finding entry likely even when a rival "alone did not completely replace [the merging

entity's] competitive impact"); Tr. 11/14/23 (Biffle) 77:14-17; *see also* Tr. 11/21/23 (Chipty)

146:8-22 (agreeing rivals may not need to replace Spirit one-for-one to preserve competition).

Such a burden would in any event make no sense here since airlines constantly reevaluate routes

and adjust their networks in the ordinary course.  Tellingly, in resolving its concerns with prior

airline mergers, the Government has not held itself to such an unrealistic standard.[12]

### 2. The record demonstrates low entry barriers in the airline industry

The record adduced at trial demonstrates that barriers to entry and expansion in the airline

industry, including on the 35 routes, are low.  Multiple airline executives testified that entry, exit,

and expansion at the route-level are everyday occurrences in the airline industry,[13] such that

airlines constantly track rival entries, exits, and "competitive schedule changes," including on the

---

[12] *See, e.g.*, Response of Plaintiff United States to Public Comments on the Proposed Final
Judgment at 30, *United States v. US Airways Grp., Inc.*, No. 1:13-cv-01236 (D.D.C. Mar. 10,
2014), ECF No. 159 ("[T]he United States' primary concerns with this transaction were broad in
nature and the proposed remedy reasonably addresses those broad competitive issues even if it
does not seek to precisely match harm on a route-by-route basis."); *US Airways Grp.*, 38 F.
Supp. 3d at 78 (noting the Government's prior position that divestitures will "provid[e] more
meaningful competition system-wide").

[13] *See, e.g.*, Tr. 11/14/23 (Biffle) 76:6-19, 79:14-80:3; Tr. 11/14/23 (Wells) 138:7-17 (Allegiant
has entered so many cities and routes that it ranks "third among all in the U.S. industry" in
airport served.); Tr. 11/3/23 (Yealy) 37:3-5 ("[W]e're always looking at opportunities to add new
routes to our network."); Tr. 11/1/23 (Christie) 105:9-11 (confirming "the airline industry is []
dynamic and volatile"); Dep. (Neeleman) 18:2-5 (Within two years of starting service, Breeze
now operates in "35 cities . . . [and] 150 routes throughout the United States.").

35 routes.  TX 697.  Dr. Hill presented data showing that the ULCC segment is highly dynamic with a proven history of rapid entry and expansion.  TX 886.  Indeed, the Government's own expert Dr. Chipty claimed that just four ULCCs (Spirit, Frontier, Allegiant, and Sun Country) had 4,701 entry events from 2017 to 2022 alone, and she acknowledged that number would be higher if she had included Breeze and Avelo in her analysis.  Tr. 11/21/23 (Chipty) 138:3-12.

In short, one is hard-pressed to identify an industry that is *more* accommodating of entry and expansion than the airline industry, where new routes can be served simply by moving the primary productive asset from one place to another.  As Mr. Biffle of Frontier put it:  "We're portable assets, so we can move in easily and move out easily."  Tr. 11/14/23 (Biffle) 79:14-21; Tr. 11/6/23 (Hayes) 110:18-21 ("[I]t's a very dynamic industry.  Profitability on different routes comes and goes, and you'd want the ability to fly those [planes] to where you think you can have the most consumer benefit.").  Even brand new entry into commercial air passenger service is possible.  Two new airlines, Breeze and Avelo, started commercial service in the midst of the pandemic's challenging demand environment and have entered over 200 routes in just two years.  Tr. 11/3/23 (Yealy) 37:17-18, 41:7-9; Dep. (Neeleman) 18:2-5; TX 195 at '2571.

This dynamism led the most recent court to adjudicate an airline merger challenge to expressly find low route-level entry barriers as one reason (among many) that the plaintiffs' alleged presumption was rebutted:

> While there are substantial capital costs for new entrants into the airline industry generally, barriers to entry for existing airline carriers into new routes are relatively low, suggesting that the further expansion of LCCs and ULCCs remains a possibility.

*In re AMR*, 625 B.R. at 258.[14]

The Government nevertheless asserted in its opening that rival ULCCs "face significant growth constraints, such as aircraft delivery delays, engine issues, and pilot shortages" that preclude rival entry onto Spirit routes. Tr. 10/31/23 (Gov't Opening) 22:12-15; ECF No. 289 at 30. Contrary to these claims, however, the Government's own witnesses testified that rivals are actively investing in growth and could enter Spirit routes. *See, e.g.*, Tr. 11/14/23 (Biffle) 43:4-8 (Frontier is "continu[ing] to acquire aircraft, [] parts, [] we have pilots, flight attendants, mechanics, we're making significant investments acquiring, you know, hangars, real estate gates, all types of things to invest in growth.").

**No Aircraft Constraints.** The evidence established that there are planes available to support growth by ULCCs and other rival airlines now and over the next several years. Focusing on *new* aircraft orders, the Government ignores that, under their massive *existing* orders, ULCCs (Frontier, Allegiant, Breeze, and Avelo) are collectively projected to take delivery of at least 156 planes through 2025, with hundreds more thereafter. *See* TX 194; TX 702; TX 703; Tr. 11/14/23 (Biffle) 43:9-11, 89:19-23, 93:12-94:4; Tr. 11/15/23 (Wells) 22:22-23:2; Tr. 11/3/23 (Yealy) 41:18-25.

ULCC rivals testified they can also exercise existing options. Tr. 11/14/23 (Biffle) 117:19-118:3; Tr. 11/15/23 (Wells) 41:4-11. For example, Allegiant alone can exercise options for 80 more planes through 2029 on top of the 50 planes it will acquire by 2025. Tr. 11/15/23

---

[14] The *In re AMR* court also found that route-level shares do not predict future competitive conditions. The court examined various studies and expert work showing that prices dropped and traffic increased after airline mergers on nonstop overlap routes that allegedly satisfied the presumption – the opposite of what the presumption would predict. 625 B.R. at 253-55.

(Wells) 41:4-11. Mr. Wells further confirmed new post-merger opportunities could favorably inform Allegiant's decision to exercise those options. *Id.*

ULCC rivals also testified they can buy or lease used aircraft from third-party lessors. Tr. 11/14/23 (Biffle) 117:19-118:3; TX 9 at '4967. Ignoring this entirely, the Government said in closing that "Mr. Hayes testified, with respect to leasing, that maybe you could get an aircraft in 2027. So the leasing market is tight as well." Tr. 12/5/23 (Gov't Closing) 74:19-23. But, unlike the ULCCs, JetBlue does not lease aircraft so Mr. Hayes had no "direct knowledge of that." Tr. 11/3/23 (Hayes) 171:1-5 ("Q. And you would agree that an airline is not able to enter into a lease, a new lease for a new aircraft until at least 2027; correct? A. I – I don't have direct knowledge of that. I haven't talks to any of the lessors recently.") By contrast, ULCC executives who *do* lease aircraft, made clear that leasing is an option, among many, they could use to meet any unmet demand left by Spirit.

In addition, there are ample opportunities to increase utilization or redeploy planes from "loss-making routes" to seize any profit opportunities post-merger. Tr. 11/15/23 (Wells) 19:6-12 (Allegiant is "absolutely" in the process of increasing fleet utilization); Tr. 11/14/23 (Biffle) 46:24-47:2, 87:10-16 ("[T]here's plenty of loss-making routes and capacity that can be redeployed pretty quickly."). The record did not support the Government's contention that any entry would come at the expense of other routes. For example, Mr. Biffle emphasized that Frontier need not "ignore our existing routes . . . to chase something that Spirit flew." 11/14/23 (Biffle) 118: 7-119:2. Rather, Frontier could "acquire more aircraft above our normal growth in order to exploit a near term opportunity. Absolutely, I mean, we would ramp up." *Id.*; *see also* 11/14/23 (Biffle) 96:15-97:2.

26

In short, between existing aircraft orderbooks, options, leases, higher utilization, and redeployment from loss-making routes, the unrebutted testimony showed that rivals have ample capacity to seize post-merger routes, *without compromising existing profitable routes or growth plans*.  *See* Tr. 11/14/23 (Biffle) 117:19-118:3 ("We have huge amounts of flexibility up or down.  We can get more aircraft.  We can lease more aircraft, not even a direct sale. . . .  [I]f a carrier fails, there's a merger that takes place, then we may go find and acquire a big growth, step-function growth in airplane.").

*No Pilot Shortages.*  The evidence at trial showed the industry has recovered from pilot shortages.  Between July 2021 through December 2022, Allegiant established several new programs to recruit and retain pilots and greatly expanded its pilot roster.  TX 8 at '3474, '3476.  Tellingly, when the Government asked whether Frontier could enter Spirit routes post-merger, Mr. Biffle confirmed Frontier "could train like three times as many pilots as those I'm currently training" to exploit post-merger entry.  Tr. 11/14/23 (Biffle) 118:21-23.  In its closing, the Government partially quoted Mr. Kirby as saying: Spirit "**went through a challenging**, I would say, **first half of the year with pilot attrition**."  Gov't Closing Slides at 16 (emphasis in original).  But the Government omitted the rest of Mr. Kirby's testimony, where he explained that any pilot shortage was temporary, and no longer a challenge.  Tr. 11/8/23 (Kirby) 108:24-109:3.

*No Engine Issues For Airlines Other Than Spirit.*  The Government likewise failed to show that the Pratt & Whitney engine problem affects any ULCC other than Spirit, which will ground a sizable portion of its fleet in the coming years.  Tr. 11/1/23 (Christie) 43:9-44:4; *see* Dep. 6/14/23 (Bendoraitis) 306:1-11 (Allegiant and Sun Country not affected by engine issues.).  When the Government asked Frontier, Mr. Biffle explained that Frontier has "a later generation

of the gear-turbo plan and with a fresh engine you don't need any of the inspections" required for

Spirit's older Pratt & Whitney engines.  Tr. 11/14/23 (Biffle) 47:18-48:1.  As a result, Frontier

will "never be impacted by" the engine issues uniquely facing Spirit.  *Id.*  Mr. Biffle still

anticipates that "in the second half of 2024 [Frontier] will have some inspections that will begin,

but we expect it to be a minimal impact to the airline."  Tr. 11/14/23 (Biffle) 47:7-16.

**No Airport Access Concerns.**  Nearly all airports in the United States are unconstrained.

Tr. 11/8/23 (Kirby) 78:20-25, 86:5-10.  There are no constraints at the key airports at issue:

Orlando, Miami/Fort Lauderdale, and San Juan.  Tr. 11/2/23 (Clark) 111:4–9 (same); Tr. 11/9/23

(Friedman) 156:25–157:3 (no entry barriers in Miami airport); Tr. 11/15/23 (Gale) 72:3-6,

72:23–73:2 (no entrant turned down for gates at Fort Lauderdale from 2016 to 2023); Tr. 11/2/23

(Clark) 113:24-114:1 (no entry barriers in San Juan).  There are no constraints at all but a few of

the airports that serve as endpoints for the 35 routes.  For those few airports, as discussed below,

Defendants have entered into binding contracts to divest highly valuable assets to ULCCs at the

handful of airports that are plausibly constrained.  TX 246; TX 360.

Of course, in the airline business, like every business, there are ordinary steps to enter a

new geography.  But ordinary steps are not enough; for a barrier to be "significant," it must

"prevent[] another firm from entering."  *Bio-Rad Lab'ys*, 483 F. Supp. 3d at 66; *see also Sterling

Merch., Inc. v. Nestle, S.A.*, 724 F. Supp. 2d 245, 268 (D.P.R. 2010), *aff'd* 656 F.3d 112 (1st Cir.

2011) ("It is established in antitrust law that an entry barrier is a cost that is greater for a new

competitor than for established rivals.").  Thus, ordinary steps that a rival takes to enter a new

airport or route do not constitute "significant barriers" under Section 7.

All of this is to say nothing of entry and expansion of the legacies' basic economy fares,

which must be considered in the rival entry analysis too.  The Government alleges a presumption

of harm at *Baker Hughes* Step One and, in doing so, specifically chose to define a market that includes *all* airlines and to estimate shares based on competition from *all* rivals. That means, at the rebuttal stage, the Government cannot assume away entry from those rivals.  To be sure, the Government has talked extensively about cost-conscious customers, and *implied* some may not choose legacy basic economy or, indeed, any option other than a ULCC.  But the Government offered no proof to support its implication, which proves too much:  If those customers would only choose a ULCC, there is no competition between JetBlue and Spirit for those customers. Instead, the Government and its experts specifically chose not to define a market limited to cost-conscious customers, much less ones who would choose only a ULCC.  As discussed below, in addition to ULCCs, basic economy, JetBlue's Blue Basic, and other unbundled fares remain readily available for customers post-merger.

### 3.   *Divestitures will enhance ULCC airport access and future growth*

Defendants' binding commitments to divest preferential gates, takeoff and landing slots, runway authorizations, and ground facilities to Frontier and Allegiant at Boston Logan, LaGuardia, Newark, and Fort Lauderdale – the only plausibly "constrained" airports affected by the merger – will ease any barriers to ULCCs serving these airports.

In the context of mergers, divestitures are a well-recognized method to eliminate rival entry barriers and bolster competition.  *See, e.g.*, *United States v. Atl. Richfield Co.*, 297 F. Supp. 1061, 1069 (S.D.N.Y. 1969), *aff'd sub nom.* 401 U.S. 986 (1971) (divestitures can proactively "cure possible anticompetitive effects by a sale of a portion of the assets to a third party"); Tr. 11/6/23 (Hayes) 108:20-22 (divestitures "have historically been used in our industry in relation to some of the mergers that have gone on in the past").  Simply put, divestitures lower barriers to entry at constrained airports and "provide an incentive for [rivals] to enter [new routes]

immediately." *First Nat'l State Bancorporation*, 499 F. Supp. at 814; *US Airways Grp.*, 38 F.

Supp. 3d at 78 ("[T]he United States predicts that these divestitures to LCCs will provide

increased incentives for these carriers to invest in new capacity and to expand into additional

markets, providing more meaningful competition system-wide to legacy carriers.").

　　For example, JetBlue benefited from a "slot divestiture at LaGuardia when Delta and

U.S. Airways went through a slot-swap. . . . [A]s a result of that, [JetBlue] add[ed] flights

between Boston and LaGuardia, which had suffered from very high fares in the past, it was

flown by Delta and U.S. Airways at the time. . . .  [JetBlue] started flying and fares fell by 36

percent and also we stimulated more demand and traffic rose by 41 percent."  Tr. 11/6/23

(Hayes) 61:7-14; *see US Airways Grp.*, 38 F. Supp. 3d at 78-79 (stating "LCCs will also enjoy a

substantially increased presence at LaGuardia" through the divestitures, and finding that, "after

JetBlue began service from Reagan National to Boston in 2010, average fares dropped by thirty-

nine percent and passengers nearly doubled.").  Similarly, before the American/U.S. Airways

merger, JetBlue initially "had a very small presence in Washington, D.C.," but pursuant to

Government-backed divestitures, JetBlue bought a "number of slot pairs at DCA airport that

allowed us to expand our service" to new routes and serve new customers JetBlue had never

"flown out of D.C. before."  Tr. 11/6/23 (Hayes) 109:24-110:12.

　　Here, Frontier and Allegiant offered substantial sums of money to purchase valuable

assets at Boston Logan, Newark, LaGuardia, and Fort Lauderdale.  TX 246; TX 360.  These

divestitures will eliminate entry barriers, "unlock [ULCC] growth," and enable them to enter

new routes to "compete out of Boston, [New York,] and Fort Lauderdale."  Tr. 11/14/23 (Biffle)

72:19-73:2, 102:14-25, 105:12-17; Tr. 11/14/23 (Wells) 152:14-17; Tr. 11/15/23 (Wells) 26:20-

23, 28:21-29:3.  Indeed, these rivals will use the assets to their "best and highest use" to offer

more low-cost flights to consumers out of those airports than they do today.  Tr. 11/14/23 (Biffle) 103:21-23; *accord* Tr. 11/15/23 (Wells) 28:21-29:3.

While the Government sought to sow uncertainty by implying that airport authorities may not approve the transfers, in the American/US Airways merger, the Government endorsed a divestiture settlement before even identifying all potential buyers for the assets and without requiring them to fly any specific routes.[15]  In any event, Frontier and Allegiant agreed to buy the assets knowing that airport authorities must first approve the transfer.  Tr. 11/14/23 (Biffle) 105:3-9; Tr. 11/14/23 (Wells) 139:8-17 (Allegiant is engaging "the airport authorities to obtain the consents").  And even if, for some reason, the airport authority in Fort Lauderdale does not approve transfer of the five leased gates to Allegiant, JetBlue is obligated under the merger agreement to relinquish them to the airport authority.  TX 31 at '8470, '8471, '8533.  Thereafter, the airport authority would allocate the gates in the manner it believes will best serve competition and the community.  Tr. 11/15/23 (Gale) 80:1-4 ("County will be making the best decision [with the divested gates] to ensure competition at Fort Lauderdale Airport."); *see* Tr. 11/15/23 (Wells) 26:3-6 (noting Allegiant's "long track record of success" at FLL).

---

[15] Press Release No. 13-1202, *Justice Department Requires US Airways and American Airlines to Divest Facilities at Seven Key Airports to Enhance System-wide Competition and Settle Merger Challenge: Divestitures at Airports in Boston, Chicago, Dallas, Los Angeles, Miami, New York and Near Washington, D.C. Opens Door for Low Cost Carriers to Compete Resulting in More Choices and More Competitive Airfares for Consumers*, Office of Public Affairs, U.S. Dep't of Justice (Nov. 12, 2013), https://www.justice.gov/opa/pr/justice-department-requires-us-airways-and-american-airlines-divest-facilities-seven-key; Tr. 11/6/23 (Hayes) 110:13-15 ("Q. Were you required, as a condition of obtaining those divestitures to fly specific routes from Washington, D.C.?  A. No."); *see also US Airways Grp., Inc.*, 38 F. Supp. 3d at 83 (agreeing with the Government that "requiring [divestiture buyers] to undertake a specific route would represent a solution that is neither feasible nor desirable").

#### 4.     *Rivals are eager to seize any profit opportunities created by the merger*

Not only are other airlines poised to meet any unmet demand left by Spirit, particularly with the divestitures, but they are also motivated to do so.  Airlines constantly monitor rivals, reassess their networks, and redeploy planes to exploit profit opportunities left by rivals in the ordinary course.[16]  For example, just recently, when Spirit suspended service from Orlando to Ponce and Orlando to Aguadilla – two of the Government's original 51 routes – Frontier took "advantage of Spirit's dropping capacity" by "expand[ing] its service on those routes," effectively replacing Spirit's presence within days.[17]  Spirit's hypothetical exit from any route creates a particularly attractive opportunity for ULCCs, as Mr. Biffle of Frontier bluntly put it:

> If Spirit were to pull out, we don't have to guess at the demand.  So this would make this the easiest thing to go do. I mean – and we wouldn't be alone, right?  The airline market is extremely efficient. . . .  I mean, the scavengers would, you know, clean up this carcass within weeks.

Tr. 11/14/23 (Biffle) 83:19-84:1.

---

[16] *See, e.g.*, Tr. 11/15/23 (Wells) 17:13-21 (testifying that, post-Southwest-AirTran merger in 2014, Allegiant took advantage of the opportunity to quickly enter airports and routes formerly serviced by AirTran); *see* Tr. 11/14/23 (Wells) 151:20-152:3 ("Q.  And part of Allegiant's business model is to constantly monitor opportunities for growth; correct? A. Correct.  Q. And in doing so, you often look at routes in which other airlines have dropped capacity; correct?  A. Correct.  Q.  And that would include routes in which Spirit has dropped capacity; correct?  A. Yes."); Tr. 11/14/23 (Biffle) 71:20-72:8 (same).

[17] Tr. 11/14/23 (Biffle) 82:2-16 ("Q. For example, did Frontier at some point become aware of Spirit's announcement that it was exiting routes between Orlando and Ponce?  A. Yes.  Q. And that it was pulling out of routes from Orlando to Aguadilla?  A. Yes.  Q. And those are routes that Frontier flies?  A. Yes.  Q. And after Spirit's announcement that it was exiting, did Frontier expand its service on those routes?  A. Yes.  Q. Is this an example of Frontier taking advantage of Spirit's dropping capacity?  A. Yes."); *see* Tr. 11/8/23 (Kirby) 99:9-12 ("[W]hat I observed since we [Spirit] loaded our suspensions, Frontier has backfilled the Orlando-Aguadilla route with a second daily trip, and they've backfilled our Orlando-Ponce capacity with additional weekly frequencies.").

Other rivals echoed Mr. Biffle, testifying they will eagerly exploit profit opportunities post-merger. [18] ULCC rivals will closely "watch what JetBlue does with the [Spirit] assets" and, if profit opportunities arise, quickly "maneuver[] to fill those voids." Tr. 11/14/23 (Biffle) 120:3-8. So if Spirit exits routes, reduces capacity, or raises fares post-merger, rivals are likely to rapidly enter and capture Spirit customers. That means "any anti-competitive impact of the merger before us would be eliminated more quickly by such competition than by litigation." *Waste Mgmt.*, 743 F.2d at 983.

In short, as Mr. Biffle testified post-merger, "there would be a frenzy, because, yes, you'll want those [routes] if they truly leave." Tr. 11/14/23 (Biffle) 84:12-22; *id.* at 84:2-11 ("Q. So your testimony is that Frontier and other ULCCs would chase the opportunities and quickly come in, correct? A. Yeah."); Tr. 11/15/23 (Wells) 18:15-17 ("Q. And so when opportunity arises, if Allegiant is interested in that opportunity, it has to move fast? A. We believe so, yes."). Given their "proven demand," Spirit routes will naturally jump to "the top of [their] lists" for rapid post-merger entry. Tr. 11/14/23 (Biffle) 84:23-85:4, 105:18-23.

Indeed, as a matter of basic economics and as the law recognizes, if the Government's predicted price increases from the merger were to occur, that would substantially increase the

---

[18] *See, e.g.*, Tr. 11/15/23 (Wells) 18:3-22 (It is "important for Allegiant to move quickly" as "there is a first-mover advantage when opportunities arise, and there are other ULCCs that have the same publicly-available information that we do."); Tr. 11/14/23 (Biffle) 84:19-22 (Given its "bases," Frontier could enter "most of the domestic" and "international" Spirit routes "pretty quick."); Dep. (Neeleman) 158:15-160:3 ("Q. If JetBlue were to stop flying a route that Spirit was previously flying, would you consider entering that route? A. In a nanosecond. Absolutely. [...] Q. And what about on a route where Spirit and JetBlue are currently both flying? If the Spirit flight went away, would you consider entering that route to compete with JetBlue? A. Yeah. Absolutely"); *see also* Tr. 11/14/23 (Biffle) 84:2-11 (When "Mexicana failed [in 2010], [] Villares, Interjet, Viva [Aerobus], [] just swarmed the opportunity. . . . [W]ithin a year, a year and a half, [Mexicana's entire route network] was replaced" by rivals.").

attractiveness and likelihood of rival entry.[19]  Dr. Chipty admitted that rival entry incentives

would increase if the price increases predicted by Dr. Gowrisankaran were to occur – and yet,

she failed to account for these incentives or evaluate likelihood of entry *after* the merger.  Dr.

Hill, using Dr. Chipty's own model, calculated a 40% likelihood of ULCC entry in the ordinary

course on the 51 routes in *just* a single year.  Tr. 11/27/23 (Hill) 18:4-11.  He further testified that

this probability would increase if fares go up, as the Government alleges, and would increase

even more over the Government's "two or three"-year timeframe for entry.  *Id.* at 17:9-19:13

(discussing Hill Exhibits, Slide 7 and Hill Rebuttal Report, Figure 99 and noting that, within one

year, "significant probabilities of entry by ULCCs on these routes.  And if you expand it to two

years or three years, these probabilities will increase significantly").  Thus, although Defendants

have no burden to make this showing, the record shows that ULCC entry is likely on each of

these routes within the relevant timeframe, especially if fares were to increase.

In addition to the ULCCs, legacy airlines also compete aggressively for consumers

seeking unbundled fares, regardless of whether ULCCs also service the route.[20]  The evidence at

---

[19] Tr. 11/14/23 (Biffle) 84:23-85:4 (noting that Spirit route exits would "attract ourselves and others"); Tr. 11/15/23 (Wells) 17:5-12 (same); *see See Waste Mgmt.*, 743 F.2d at 983 (finding "any anti-competitive impact of the merger before us would be eliminated more quickly by such competition than by litigation"); *Syufy Enters.*, 903 F.2d at 664 ("If there are no significant barriers to entry, however, eliminating competitors will not enable the survivors to reap a monopoly profit; any attempt to raise prices above the competitive level will lure into the market new competitors able and willing to offer their commercial goods or personal services for less."); *FTC v. Great Lakes Chem. Corp.*, 528 F. Supp. 84, 94 (N.D. Ill. 1981) ("[I]f the price [] increased significantly, entry by new companies would be likely.  These circumstances demonstrate that, if prices increased, collusively or otherwise, companies now poised to enter the market would do so; those already in the market, and operating substantially below capacity, would increase output . . . ." (citations omitted)).

[20] The Government has no grounds to artificially exclude the Big Four and other rivals who could also enter or expand capacity on Spirit routes post-merger – particularly since Government elicited no evidence that the Big Four face any entry barriers.  *See Waste Mgmt.*, 743 F.2d at 983 (noting that "entry by larger companies is also relatively easy").  Several executives – including

trial established that "millions" of customers choose the legacy basic economy over ULCCs.  Tr. 11/28/23 (Nocella) 17:20-21, 27:19-28:7, 30:17-23.  The Government itself has touted that legacy basic economy was created to compete with the ULCCs' unbundled product.  ECF No. at 9.  And as Mr. Nocella testified, United plans to match other airlines, including ULCCs, on price and "aggressively" grow basic economy to capture demand for unbundled fares.  Tr. 11/28/23 (Nocella) 25:4-8, 25:17-26:2.  United is upgauging its planes, which will allow United to both reduce costs and increase quality.  Tr. 11/28/23 (Nocella) 17:16-18:5.  Mr. Nocella also testified that United offers basic economy on its network, regardless of whether ULCCs also serve those routes.  Tr. 11/28/23 (Nocella) 25:17-26:2 (United offers basic economy "across the network," even in places "where neither Spirit nor Frontier fly"); Dep. 7/12/23 (Beck 30(b)(6)) 13:16-14:2 (Delta offers basic economy "throughout our network, ubiquitously").  Notably, United is specifically targeting the geographic areas where ULCCs compete – like the leisure destinations in Florida, which were the Government's focus in this case, by adding "20 percent capacity . . . into major Florida cities like Fort Meyers, Orlando, and Miami/Fort Lauderdale area."  Tr. 11/28/23 (Nocella) 17:20-21, 27:19-28:7, 30:17-23.

So while Defendants have no burden to make this showing, the record shows that rival entry is likely on the 35 routes.

---

Mr. Christie, Mr. Biffle, and Mr. Nocella – testified that basic economy competes directly with ULCCs.  *See, e.g.*, Tr. 11/14/23 (Biffle) 82:17-23 ("[T]he legacies compete with Frontier using their Basic Economy offering."); Tr. 11/1/23 (Christie) 11:18-21 (identifying basic economy product from American, Delta, and United as a competitive risk in Spirit's 10-K because it "mirrors the product that we [Spirit] offer"); Tr. 11/28/23 (Nocella) 27:19-28:7.

### 5. The relevant focus is long-term prospects for rival entry and expansion

In its Pretrial Brief, the Government asserted that Defendants must demonstrate that rival entry will likely occur within "two to three years," ECF No. 289 at 29, a standard that itself has little support as an outer boundary. *See Deutsche Telekom*, 439 F. Supp. 3d at 232 (noting "the Court would disagree that the two-year standard once specified by the Merger Guidelines should carry any talismanic force here," in recognizing entry that would occur over seven years). In implicit recognition that Defendants adduced ample evidence to support entry in this window, the Government in its closing equivocated and tried to walk this back. Tr. 12/5/23 (Gov't Closing) 76:12-17 (insisting the timeframe "really is less than 2 years"). The Court should not adopt an entry timeframe shorter than the Government claimed was supported by case law at the beginning of the case. Nor should the Court take up the Government's invitation to impose a special burden on Defendants. *See Baker Hughes*, 908 F.2d at 988 (rejecting the Government's "quick and effective" entry standard).

The focus under Section 7 is on the "long-range prospects" for entry and expansion. *Baker Hughes Inc.*, 731 F. Supp. at 11. This is so even where a merger affects competition in the short run. *Id*. ("Moreover, while the competition is likely to be lessened immediately if the proposed acquisition is completed, long-range prospects in the market, while uncertain, are favorable to new entry which will ensure continued vigorous competition."); *see also United States v. Standard Oil Co.*, 253 F. Supp. 196, 227 (D.N.J. 1966) ("[S]hort term evaluation of anticompetitive effect on [the market at issue] is not consistent with the objectives of Section 7 . . . ."). This makes good sense as most mergers result in some short-term dislocation but only a fraction of mergers arguably violate Section 7.

The evidence shows that rivals quickly enter routes, and are certainly likely to do so within two to three years when all sources of competition are viewed collectively.  As detailed above, the ULCCs nimbly enter and expand on routes to seize profit opportunities, and they have the gates, planes, and personnel needed for this growth.  Further, because "there is a first-mover advantage when opportunities arise" particularly among the ULCCs, rivals race to enter routes first.  Tr. 11/15/23 (Wells) 18:3-22; Tr. 11/14/23 (Biffle) 87:21-88:5, 96:1-14.  Allegiant can announce new routes in "2 to 4 weeks generally, depending on whether or not we exist in that city already.  And then of course we want a, you know, 2 to 4 months, depending on how long the flight is, for a booking curve to develop."  Tr. 11/15/23 (Wells) 18:15-22.  Frontier can start serving on new routes within 3-6 months, even if it does not operate at both endpoints.   Tr. 11/14/23 (Biffle) 89:5-16.  Avelo too can start new routes from "larger airports, . . . fairly quickly, it could be a matter of a few months."  Tr. 11/3/23 (Yealy) 37:20-38:3.

While Mr. Biffle testified that Frontier alone could replace each and every Spirit route and seat "inside of five years," Tr. 11/14/23 (Biffle) 65:18-19, the focus under Section 7 is on the collective response of rivals.  *See Deutsche Telekom*, 439 F. Supp. 3d at 233 (finding entry likely even when a rival "alone did not completely replace [the merging entity's] competitive impact").  That includes not just other ULCCs, but the legacies and foreign carriers as well.  *See* Tr. 11/14/23 (Biffle) 101:5-15 (noting that Viva Aerobus, Volaris, Avianca, and other foreign carriers already operate routes "in and out of Florida" to Latin America and the Caribbean); Tr. 11/9/23 (Friedman) 157:15-20 (discussing foreign carriers like Sunrise Airways and Sky Peru that also serve Florida routes to Latin America and the Caribbean).  When viewed collectively, rival entry and expansion on just 35 routes is highly likely within the Government's own two-to-three-year timeframe.

Moreover, it is important to keep in mind that all Spirit planes will continue flying in their current configuration for at least 12-18 months post-merger while JetBlue works to obtain an FAA certificate in advance of the retrofit process.  Tr. 11/17/23 (Hurley) 13:10-14:8.  Even after that certificate is obtained, JetBlue plans to gradually upgrade Spirit planes to the roomier JetBlue model over several years.  *Id.*  In this way, JetBlue's "multi-year integration journey" naturally gives rivals, including ULCCs, ample runway to make route entry announcements, deploy new planes from their ongoing orderbook deliveries, lease planes, make plans to redeploy planes from loss-making routes, and ramp up capacity as they enter and expand on Spirit routes. *Id.*

### 6. There are no significant entry barriers on the Government's 35 routes

Although the Government has focused on entry at the national level, implying Defendants have a burden to "replace Spirit" everywhere, the Government's case rests at its "heart" on just 35 routes.  The bottom-line question, then, is whether there are significant barriers to entry on *these* routes – the Government's antitrust "markets."

Consistent with the fluidity and dynamism of the airline industry, the evidence at trial has shown that competing airlines, ranging from ULCCs to legacies, are poised and ready to enter the nonstop overlap "presumption" routes post-merger and have an established history of doing so pre-merger.  *FTC v. Cardinal Health Inc.*, 12 F. Supp. 2d 34, 56 (D.D.C. 1998) (The "history of entry into the relevant market is a central factor in assessing the likelihood of entry in the future.").

Focusing first on the Government's original 51 routes, at least 20 domestic and foreign rivals recorded 19 entry events, 30 exits, and 713 service changes between July 5, 2022 to May 2, 2023 alone – the 10 months following Dr. Gowrisankaran's static route-level share tabulation.

TX 696 & 697.  These changes in the ordinary course demonstrates the absence of significant route-level entry barriers.  Tr. 11/20/23 (Gowrisankaran) 72:3-9; *see Baker Hughes*, at 988-89 (affirming district court finding of no significant entry barriers where "two companies, Cannon and Ingersoll–Rand, had entered the United States HHUDR market in 1989, and were poised for future expansion"); *FTC v. Qualcomm Inc.*, 969 F.3d 974, 996 (9th Cir. 2020) (finding that two rival "entries into the [] markets" undermined the Government's claims).



Given these dynamic changes, in closing arguments, the Government belatedly retreated from 51 to 35 routes.  Tr. 12/5/23 (Gov't Closing) 62:11-15 (stating only "35 routes [] have met the presumption consistently over the last 3 years").  As an initial matter, the fact that the

Government dropped nearly a third of its 51 "presumption" routes due to routine entry, exits, and share instability is strong evidence that static route-level market shares inaccurately depict the likely effects of this merger and should not constitute the basis for any presumption.

In any event, there are no significant barriers to entry and expansion on these remaining 35 routes.  There is no dispute that 27 of the 35 routes touch city endpoints where Defendants are divesting assets to Frontier and Allegiant, which plan to compete "aggressively" with the assets. Tr. 11/14/23 (Biffle) 72:19-73:2, 102:14-103:9, 105:18-20 (Frontier plans to compete "aggressively out of LaGuardia" by entering 12 or 13 new routes, and its "first" preference is "using the slots to fill Spirit's former routes out of New York."); *see* Tr. 11/15/23 (Wells) 28:21-29:3 (Allegiant "absolutely" "will be poised and ready [to] seize available opportunities . . . to offer low-cost fares to consumers in Newark, South Florida, and Boston"); *see Pennsylvania v. Russell Stover Candies, Inc.*, 1993 WL 145264, at *15 (E.D. Pa. May 6, 1993) (finding entry barriers not significant when rivals testified they "would be ready, willing and able to enter the market").  Although they have not yet determined which routes they will serve since the assets have yet to transfer, any routes exited by Spirit will jump to the "top of [their] lists."  Tr. 11/14/23 (Biffle) 84:23-85:4, 105:18-23; *accord* Tr. 11/15/23 (Wells) 17:5-12.  As for the Spirit routes they would consider entering post-merger, "everything is fair game, including international."[21]  Tr. 11/14/23 (Wells) 149:5-12; *see* Tr. 11/14/23 (Biffle) 88:6-16.

---

[21] The Government sought to downplay Allegiant's joint venture with Viva Aerobus, which is pending Government approval, by mischaracterizing it as "a limited codeshare in Mexico."  ECF No. 289 at 32.  In reality, this joint venture allows Allegiant to partner fully with Viva to achieve "comprehensive U.S. and Mexico coverage," and to exploit route entry across Viva's existing Latin America and Caribbean network.  TX 9 at '4960; Tr. 11/14/23 (Wells) 134:19-135:8; *see* Tr. 11/15/23 (Wells) 37:7-38:1 (no unique barriers to Allegiant entering international routes now that Allegiant implemented the Navitaire IT system).

Six of the remaining eight routes have Orlando as an endpoint.  Orlando is unconstrained because two airports, Orlando (MCO) and Orlando/Sanford (SFB), service the region and MCO opened a new terminal in 2022.  *See* Tr. 11/8/23 (Kirby) 95:23-96:7 (new MCO terminal is "going to add a lot of capacity" and "room to grow" for rivals).  Thanks to the new terminal, Allegiant announced it will enter MCO in early 2024 while still serving neighboring SFB, such that Allegiant will soon serve both Orlando airports and a total of 11 airports in Florida.  Tr. 11/15/23 (Wells) 11:12-12:2; *see* Tr. 11/14/23 (Wells) 155:19-156:1 (Allegiant provides service out of "ten" airports in Florida.); *Cardinal Health*, 12 F. Supp. 2d at 56 (The "history of entry into the relevant market is a central factor in assessing the likelihood of entry in the future.").  Moreover, Frontier and Avelo have bases, and substantial route presence, out of Orlando and the rest of Florida as well.  Tr. 11/14/23 (Biffle) 98:2-6, 98:12-17 (Frontier flies at least "44 routes out of Orlando."); Tr. 11/3/23 (Yealy) 18:6-12.

The remaining two routes touch San Juan, which is also unconstrained.  *See, e.g.*, Tr. 11/14/23 (Biffle) 97:18-24 ("Q. And do you face any gate constraints in San Juan?  A.  No. . . . Q. In fact you've had no issues growing in San Juan [], right?  A.  No."); Tr. 11/2/23 (Clark) 113:24-114:1.  Frontier serves the most "routes in and out of Puerto Rico" and regards San Juan as a "focus city" for further growth, Tr. 11/14/23 (Biffle) 98:7-9, 99:5-18; Avelo serves routes to San Juan, Tr. 11/3/23 (Yealy) 32:12-14, 35:15-24; and Allegiant would "consider returning to Puerto Rico if were profitable."  Tr. 11/15/23 (Wells) 25:12-14; *see Great Lakes Chem.*, 528 F. Supp. at 94 ("The reason new companies have not come into the [] business . . . is that the return on investment is low. . . [But] if the price [] increased significantly, entry by new companies would be likely.").

###### 7.      *Defendants Have No Burden to Show that Entry Would Be "Timely, Likely, And Sufficient" but the Record Evidence Meets that Standard*

In its closing, the Government asserted that Defendants bear the burden at Step Two of showing that entry and expansion will be "timely, likely, and sufficient."  Tr. 12/5/23 (Gov't Closing) 75:14-19.  This misstates Defendants' burden.  While some courts have cited this rubric – taken from the Government's own Guidelines, Guidelines § 9 – the seminal circuit court cases on rival entry and expansion impose no such burden.  *See Syufy Enters.*, 903 F.2d at 664–65; *Baker Hughes*, 908 F.2d at 987–88; *Waste Mgmt.*, 743 F.2d at 983.

In any event, even under the Government's rubric, Defendants are not required to show "quick and effective entry," *Baker Hughes*, 908 F.2d at 987–88, nor that entry and expansion will replace Spirit's entire fleet or even Spirit's entire capacity on the Government's 35 routes. *UnitedHealth Group*, 630 F. Supp. 3d at 133 (need not "preserve exactly the same level of competition that existed before the merger").  The question is whether other airlines *collectively* would be poised to exploit unmet need for ULCC services on at most the Government's 35 routes within two to three years – a evidentiary hurdle Defendants easily clear, as detailed above. *See supra* Section III.A.5.  Significantly, the Government elicited no testimony that entry barriers would prevent other airlines from introducing or expanding unbundled service on the 35 routes, nor did it refute the evidence at trial that entry is a common occurrence in this industry. In this way, the facts here differ fundamentally from *Chicago Bridge, Sanford Health, and Penn State Hershey*.[22]

---

[22] *See FTC v. Sanford Health*, 926 F.3d 959, 965 (8th Cir. 2019) (affirming district court's crediting of testimony by the merging parties' sole rival "that it could not timely compete with [the merged entity] in the Bismarck-Mandan market"); *Chi. Bridge & Iron Co. N.V. v. FTC*, 534 F.3d 410, 420-21 (5th Cir. 2008) (noting the two merging parties "were the only firms that had built any large, field-erected TVCs in the United States since 1960" and "entry into the relevant

Instead, the entry evidence here is far more consistent with, and even greater than, cases where courts found mergers did not violate Section 7 based on evidence of low barriers to entry and evidence of historical entry showing that competitors are poised to chase post-merger profit opportunities.  *See, e.g., Baker Hughes Inc.*, 908 F.2d at 988-89 (no Section 7 violation where entry barriers not significant enough to deter entry given evidence of recent entry, evidence of other competitors that could potentially enter, and increased incentives to enter in the event of "supracompetitive pricing"); *United States v. Waste Mgmt., Inc.*, 743 F.2d 976, 983 (2d Cir. 1984) (no Section 7 violation where there were low barriers to entry, assets were mobile, and there was evidence of a rival entry from a neighboring city).

## B.     The Government's Backward-looking Market Shares Overstate Spirit's Future Competitive Significance

The Government has rested its case on the notion that Spirit's past growth and prior plans are predictive of where, and how, Spirit will compete in the future.  But as the Supreme Court has recognized, "[e]vidence of past production does not, as a matter of logic, necessarily give a proper picture of a company's future ability to compete."  *United States* v. *Gen. Dynamics Corp.*, 415 U.S. 486, 501 (1974).  As the Defendants established at trial, the Government's share statistics fail to account for Spirit's declining financial performance, substantial operational headwinds over the next several years, and the commoditization of unbundled service that has erased Spirit's first-mover advantage.  These commercial realities, reflected in Spirit's public financial guidance and the undisputed testimony of witnesses at trial, will substantially affect

---

markets is exceedingly difficult"); *FTC v. Penn State Hershey Med. Ctr.*, 838 F.3d 327, 352 (3d Cir. 2016) (crediting "extensive testimony" that rivals could not operate competitive standalone hospital networks in the Harrisburg area separate from the merging parties).

Spirit's ability to compete on the routes predicted by the Government going forward – a fact the Government stubbornly refuses to acknowledge.

Instead, the Government baldly asserted in its opening that Spirit has a "viable economic model," "a healthy standalone plan," and "will continue to be profitable." Tr. 10/31/23 (Gov't Opening) 17:2–8, 26:14–17. And in closing, the Government held up an isolated statement from Spirit's Q2 2023 earnings call in which Mr. Christie conveyed his hope that Spirit's expected Q3 2023 performance would be an "anomaly." Gov't Closing Slides, at 17. In hindsight, as Mr. Christie testified, Spirit's third-quarter losses were no anomaly. Tr. 11/1/23 (Christie) 111:18-112:5. As it stands, Spirit anticipates a $467 million loss for 2023, on par with losses it has recorded in each of the last three years. In short, Spirit's past is not prologue, and its "potential to compete" with other airlines "in the future" is "far weaker" than "statistics relied on by the Government might otherwise have indicated." *Gen. Dynamics*, 415 U.S. at 493; *see id.* at 498 ("[O]nly a further examination of the particular market – its structure, history and probable future – can provide the appropriate setting for judging the probable anticompetitive effect of the merger.") (quoting *Brown Shoe*, 370 U.S. at 322 n.38).

To be clear, this Court need not resolve whether there is an applicable "weakened competitor defense," which the Government called a "Hail Mary" in closing. Tr. 12/5/23 (Gov't Closing) 49:5-10. That is a defense under which a presumptively unlawful merger is saved because of the seller's dire financial circumstances. Defendants' point is that Spirit's ever-worsening finances show that its past competition and growth are not indicative of how it will compete or grow in the future. That type of evidence is commonly considered at Step Two of the *Baker Hughes* framework and, more generally, to show a merger will not result in a substantial lessening of competition. *Deutsche Telekom*, 439 F. Supp. 3d at 217-18 (collecting

cases).  And it makes particular sense to consider here, since the Government predicated its case on the myth of an ever-growing Spirit.

Spirit's business and prospects have declined dramatically since the pandemic.  Although Spirit predicted a return to profitability in 2022, it has missed numerous forecasts since[23] and has not been profitable since 2019.  TX 241 at '8922 (forecasting a positive 2023 financial outlook that was not realized); TX 77 at '4629; TX 76 at '4611; TX 678 at 1 (extrapolated results obtained through multiplying forecasted revenues by expected operating margin); Tr. 11/7/23 (Gardner) 40:10–41:8.  Mr. Gardner, the chair of Spirit's board, testified that since early 2020, Spirit's "cumulative losses are approaching a billion and a half dollars," with annual losses ranging from $400 million to $500 million.  *Id.*  And Spirit's financial condition has only worsened in 2023.  In October 2023, Spirit announced negative 14.2% in actual adjusted operating margin for Q3 2023.  TX 678 at 2.  Spirit does not know when or if it will return to profitability, Tr. 11/1/23 (Christie) 48:3–25, and, as Spirit executives explained to their shareholders and the Court, Spirit cannot grow if it is unprofitable.  Tr. Day 2 (Christie) at 48:16-19 ("If the business isn't making money, you can't justify deploying additional capital for growth, so we're going to have to evaluate that going forward.").

The causes of Spirit's outlook decline are complex.  Tr. 11/7/23 (Gardner) 53:11-20.  However, at least two particularly important forces affect Spirit's ability to return to profitability.

First, demand for Spirit's service has deteriorated, driven in part by a dramatic increase over the past few years in the number of airlines offering unbundled fares to compete with Spirit.

---

[23] For example, Spirit missed its forecasted operating margin for Q2 2023 by between 1.2% and 3.2%.  *See* TX 77 at '4639 (forecasting an adjusted operating margin of 4.5%-6.5%); TX 76 (Spirit 8-K Q2 2023) at '4611 (actual adjusted operating margin for Q2 2023 was 3.3%).

While it was once a first mover, Spirit's low-cost, unbundled business model is now ubiquitous. Today, Spirit faces robust competition from virtually all other domestic airlines, including ULCCs like Frontier, Allegiant, Sun Country, Avelo, and Breeze, Tr. 11/1/23 (Christie) 7:12–8:8;[24] and other rivals including legacies, Alaska, and JetBlue with their unbundled offerings. Tr. 11/1/23 (Christie) 13:4–22; Tr. 11/28/23 (Nocella) 23:8-15, 24:19-23, 25:4-8. Legacies now offer basic economy widely, regardless of whether a ULCC is also on that route. Tr. 11/1/23 (Christie) 13:4–14:8; Tr. 11/28/23 (Nocella) at 25:17–26:2; 26:22-27:1; 27:21-28:7. As Mr. Nocella testified, United currently sells millions of basic economy tickets each quarter – accounting for 12% of its customers in Q2 2023 – and is upgauging its fleet to compete "even more aggressively in the [unbundled] space in the future." Tr. 11/28/23 (Nocella) at 26:22-28:7. These trends, combined with a downturn in corporate travel due to the pandemic and rivals upgauging their aircraft,[25] have resulted in an overwhelmingly competitive unbundled segment and an "acute reduction in demand" for Spirit's service. TX 76 (Spirit August 3, 2023 Q2 2023 earnings release), at '14612. To respond, Spirit has had to dramatically lower its fares to fill its planes, often at unsustainable price points. Tr. 11/7/23 (Gardner) 49:23–50:19.

---

[24] Moreover, the evidence of the effect that Spirit had on competition when it entered a route was based on data from 2001 to 2017, before Spirit faced this level of robust competition from other ULCCs and the widespread adoption of "basic economy." TX 318.

[25] TX 334 at '4858, '4860 (since the pandemic, the "combined legacy mix on 2019 ASMs in the equivalent of adding another Spirit and Frontier-size airline" with capacity "shifting into leisure markets traditionally left to LCC/ULCCs."); Tr. 11/3/23 (Klein) 117:5-118:4 ("[T]here's been a move towards larger aircraft for other airlines. . . . So there's a lot more seats. When there's a lot more seats, especially, say, airlines that have basic economy products have a lot more seats to sell, and they're reducing fares with basic economy in order to offer lower fares to customers"); Tr. 11/3/23 (Klein) 124:12–125:6 (increased leisure capacity adversely affects Spirit's "ability to generate the fares that we need in order to be profitable").

Second, Spirit is experiencing significant issues with its aircrafts' engines that will force it to ground as much as 30% of its forecasted fleet through at least 2025.  Tr. 11/8/23 (Kirby) 56:18-58:11 (by the end of 2025, Spirit may have up to 72 aircraft on ground).  In mid-2023, Pratt & Whitney notified Spirit that the geared turbofan ("GTF") NEO engines in Spirit's fleet, including the engines in its future aircraft, needed to be inspected and possibly replaced.  TX 678 at 2.  As the "largest . . . adopter of the [GTF-powered NEO] engine in the United States," Spirit is uniquely impacted by this engine issue.  Tr. 11/1/23 (Christie) 43:9-44:4; TX 341 at '1962, '1963; Dep. 6/14/23 (Bendoraitis) 306:1-11; Tr. 11/14/23 (Biffle) 47:7-16.   Because an airline's fleet is its primary asset and productive capacity, this engine issue will substantially handicap Spirit for years to come.

As a result of these substantial challenges, Spirit independently slowed its growth, reduced scheduled aircraft deliveries for 2024, and "smoothed the delivery of firm order aircraft" through the end of the decade.[26]  While the Government relied on Spirit's May 2023 five-year network plan to identify routes where Spirit might like to enter, those plans are no longer realistic.  Spirit cancelled plans to begin serving all five cities it had targeted for new service in 2024 in its latest five-year network plan.  Tr. 11/8/23 (Kirby) 69:25-71:8.  And Spirit is unlikely to add many new cities to its network over the next two years due to the engine issue.  Tr. 11/8/23 (Kirby) 68:10-24.  Finally, while Spirit has historically exited routes with some frequency owing to the dynamic nature of the airline industry, Spirit's has dramatically increased

---

[26] Tr. 11/1/23 (Christie) 111:2-4 ("Q. And, in fact, you've already taken steps to try to moderate the pace of Spirit's growth going into the future? A. We have."); TX 341 (Spirit Q2 2023 Earnings Call Transcript), at 6-7; TX 678 at 1 ("We have already taken the first steps by modifying the cadence of our aircraft deliveries through the end of the decade and slowing our capacity growth in the near term."); TX 861 at '4410.

its pace of exits in response to these challenges.[27]  Spirit exited 70 routes in 2022, which

accounts for approximately 20% to 25% of its current network; and Spirit exited 40 more routes

in the first half of 2023, including several of the Government's alleged "presumption" routes,

putting it on the same pace as the prior year.  Tr. 11/3/23 (Klein) 98:23-101:9; Tr. 11/8/23

(Kirby) at 75:8-76:8.  By comparison, Spirit exited 11 routes in 2017, a mere 1.4% of its total

network capacity at the time.  TX 338 at '7056.  Additional changes are likely. As Mr. Christie

testified, Spirit is considering a variety of dramatic options to address these mounting challenges,

including changing its cost structure, its network, and its product.  Tr. 11/1/23 (Christie) 48:3-25;

Tr. 11/7/23 (Gardner) 53:11-20.

　　　All these changes point to one thing: Spirit's past performance as reflected in the

Government's stale share statistics is not a reliable indicator of its future performance.  *See*

*Deutsche Telekom*, 439 F. Supp. 3d at 217 ("Courts have identified a variety of conditions that

may render statistical market share evidence misleading, including a firm's lack of resources

required to compete long-term, financial difficulties that constrain the firm from improving its

competitive position, and poor brand image and sales performance."); *see also* Tr. 11/8/23

(Kirby) 75:8–21, 76:1–8 (testifying that Spirit has exited Ft. Myers-Hartford, Boston-New

Orleans, LGA-San Juan, Hartford-Tampa, NYC-Tampa, New Orleans-NYC, Austin-Cancun,

Orlando-Ponce, Orlando-Aguadilla, and Miami-Aguadilla). The Government's static share

statistics and view of Spirit's business overstate Spirit's future competitive significance.

---

[27] Tr. 11/8/23 (Kirby) 58:23-59:17 (noting that because of the GTF engine issue, Spirit "tried to maintain year-round service, and now [it's] going to have to look at seasonal service.").

### C.   The Merger Will Lead to Substantial Consumer Benefits Systemwide

In analyzing the likely effects of a merger, courts consider whether the merger will lead to more competition and benefit consumers. *See, e.g.*, *Deutsche Telekom*, 439 F. Supp. 3d at 207–10 (finding that "efficiencies arising from the Proposed Merger will lead [the merged firm] to compete more aggressively to the ultimate benefit of all consumers"); *Baker Hughes*, 908 F.2d at 984, 986 (requiring a "totality-of-the-circumstances approach" encompassing an "overall assessment of future competitiveness" to determine the competitive effects of the merger).

This merger will substantially increase competition and benefit consumers nationwide, including on the Government's 35 routes. Specifically, while JetBlue primarily operates on the East Coast today, through the merger, JetBlue will nearly double the size of its fleet and expand its network nationwide – all while maintaining its cost advantage relative to the legacies. Tr. 11/6/23 (Hayes) 100:12-101:10 (describing how fleet commonality reduces post-merger costs); Tr. 11/16/23 (Hurley) 156:4-12, 157:15-24 (estimating $325 million in annual cost savings post-merger while maintaining cost gap relative to legacies). The merger therefore will empower JetBlue to (1) add flights to nearly a hundred new locations that neither JetBlue nor Spirit currently fly across the country; (2) establish a new mid-continent focus city enabling significant connectivity and flight options for consumers across the country; (3) expand its presence in over 15 cities nationwide to be equivalent in size to JetBlue's existing focus cities; and (4) expand JetBlue's presence at fortress hubs to challenge legacy dominance and offer consumers greater choice across the cabin. TX 362; Tr. 11/9/23 (Friedman) 139:1-12.

Overall, the merger will create a nationwide challenger with nationwide relevance ready to broadly challenge the industry's dominant Big Four. Tr. 11/9/23 (Friedman) 139:13-19. That is not just good for competition, it is also good for consumers. First, it will reduce prices

for the vast majority of passengers, as the Big Four react to the powerful JetBlue effect.  As the

Government represented in the NEA case, JetBlue "uniquely" disciplines the fares of the

dominant legacy carriers because, unlike Spirit, JetBlue offers a higher-quality product and

competes for all customers across the cabin – from those seeking an "unbundled" or "basic

economy" fare to those seeking a premium product.  Tr. 11/27/23 (Hill) 26:7-22.  At trial, Dr.

Hill confirmed that the combined JetBlue will benefit consumers more than a standalone Spirit.

Tr. 11/27/23 (Hill) 88:24-89:14.  Specifically, Dr. Hill estimated that, owing to JetBlue's

outsized competitive impact, the merger will benefit 93 million consumers by $614 million on

routes that Spirit, but not JetBlue, flies today.  *Id.*

    Second, a bigger JetBlue will empower more consumers to fly.  The model created by

one of the Government's own economic experts to analyze this merger predicts that over a

million more people will travel with the merger than without it.  Tr. 11/27/23 (Hill) 51:21-52:3,

53:14-54:4.  As Dr. Hill testified, this predicted stimulation of consumer demand is yet another

"bellwether" of the merger's likely consumer benefit.  *Id.*  It also squarely undermines the notion

that the merger is anticompetitive under standard antitrust principles.  *See, e.g.*, *Chi. Pro. Sports*

*Ltd. P'ship v. Nat'l Basketball Ass'n*, 95 F.3d 593, 597 (7th Cir. 1996) ("The core question in

antitrust is output.  Unless a contract reduces output . . . there is no antitrust problem.").

    Third, a bigger JetBlue will improve the quality of air travel.  For over two decades,

JetBlue has been a leader in product quality and service – with the most legroom in coach, free

Wi-Fi, free seatback entertainment, and an innovative loyalty program.  Tr. 11/3/23 (Klein) 74:7-

16; Tr. 11/6/23 (Hayes) 54:10-18; 73:17-74:11; 76:11-77:3; 78:19-80:20.  In attempting to fend

off competition from JetBlue, other airlines have mimicked various aspects of JetBlue's of

consumer-friendly model.  *See, e.g.*, Tr. 11/17/23 (Hurley) 150:3-17 (discussing how Delta a

"rolled back some of the [negative] changes that they had actually made to their loyalty program" after competition from JetBlue); Tr. 11/6/23 (Hayes) 62:25-64:20; 79:18-21.  Armed with a nationwide presence and nationwide relevance, JetBlue can bring even more pro-consumer change on product and service quality, loyalty programs, and other strategic decisions that are made by airlines at the national level.  Significantly, these benefits will redound to consumers nationwide regardless of the route or airline they fly.  Tr. 11/27/23 (Hill) 35:23-36:2; 36:15-22; 37:6-16; 52:21-53:13.

As with the rest of Defendants' rebuttal evidence – spanning dynamism, entry, the divestitures, and Spirit's worsening prospects – the Government ignores this evidence in favor of share statistics that fail to account for commercial realities.  But the Court's charge under Section 7 is to evaluate the effects of this merger under the "totality of the circumstances," accounting for the "commercial realities" of the airline industry and the specifics of this proposed merger.  *See Deutsche Telekom*, 439 F. Supp. 3d at 203, 206.  Defendants have more than met their relatively low burden at *Baker Hughes* Step Two.

## IV.   THE GOVERNMENT FAILED TO PROVE BY A PREPONDERANCE OF THE EVIDENCE THAT THE MERGER IS LIKELY TO SUBSTANTIALLY LESSEN COMPETITION

Because Defendants amply rebutted the presumption, "the burden of producing additional evidence of anticompetitive effect shifts to the government, and merges with the ultimate burden of persuasion, which remains with the government at all times."  *Baker Hughes*, 908 F.2d at 983.  The Government failed to produce evidence satisfying that burden.

### A.     The Government Failed To Refute Defendants' Evidence That Entry And Expansion Are Easy And Frequent

Ease of entry and expansion is relevant across all steps of the *Baker Hughes* framework. Given likely entry and expansion by rivals, the merged firm cannot exercise market power, as required for Section 7 liability.[28]   As discussed above, the airline industry is dynamic, route-level entry barriers are low, route entry and expansion are everyday occurrences, and any profitable routes Spirit flies will "attract" rivals post-merger.  Tr. 11/14/23 (Biffle) 84:23-85:4.  Therefore, to satisfy its ultimate burden at Step Three, as well as the burden of persuasion it carries at all times, the Government must refute this evidence, but it failed to do so.  *Baker Hughes*, 908 F.2d at 983; *Waste Mgmt.*, 743 F.2d at 983-84 (rejecting Government attempt to refute ease of entry).

The Government primarily turned to Dr. Chipty, who offered no reliable analysis on entry.  First, she acknowledged her model did not address the operative question under the law: whether there will be future entry if the price increases hypothesized by the Government were to occur.[29]  Instead, Dr. Chipty just analyzed route entry in the ordinary course, ignoring that companies have even greater incentives to enter where there are heightened prices and profit opportunities, which Dr. Gowrisankaran predicted here.  Tr. 11/21/23 (Chipty) 143:11–19.

---

[28] *See, e.g.*, *Syufy Enters.*, 903 F.2d at 661 (affirming no substantial lessening of competition "because there are no barriers to entry – others could and did enter the market – and . . . Syufy therefore did not have the power to control prices or exclude the competition"); *Occidental Petroleum*, 1986 WL 952, at *8 ("exercise of market power will be thwarted" where entry is easy).

[29] Tr. 11/21/23 (Chipty) 143:11-19; *see Waste Mgmt.*, 714 F.2d at 982 ("In any event, entry by larger companies is also relatively easy.  At existing prices most Fort Worth and Dallas haulers operate within their own cities, but it is clear from the record that Fort Worth haulers could easily establish themselves in Dallas if the price of trash collection rose above the competitive level."); *Baker Hughes*, 908 F.2d at 989 n.9 ("[I]f prices reach supracompetitive levels, a company that has failed to enter in the past could become competitive." (citation omitted)).

Second, even though the Government centers this case on only 35 routes, Dr. Chipty did not "look at entry for each individual route" in which the government alleges harm.  Tr. 11/21/23 (Chipty) 117:1-3.  Instead, Dr. Chipty focused on ULCCs' ability to replace Spirit one-for-one nationwide, exposing a fundamental contradiction in the Government's case: denying there is a national market, while demanding proof that other airlines will "replace Spirit" nationwide.  And third, even on its own terms, Dr. Chipty's analysis was incomplete.  Dr. Chipty agreed that legacies' Basic Economy product competes with ULCCs, but she did not study the competitive significance of Basic Economy fares nor did she include them in her model.[30]  Nor did she include Avelo, Breeze, or foreign ULCCs.  Tr. 11/21/23 (Chipty) 129:23-25 ("Q.  And you also don't see any international ULCCs in [TX 910]; correct?  A.  That's correct…"); TX 910; *see also* Tr. 11/14/23 (Biffle) 101:5-15 (discussing foreign ULCC competition).

At bottom, if anything can be drawn from Dr. Chipty's incomplete analysis, it is merely that entry is exceedingly commonplace.  Tr. 11/21/23 (Chipty) 138:3-9 (identifying 4,701 entry events by just four ULCCs in five and a half years); Tr. 11/27/23 (Hill) 17:4–18:16 (explaining that Dr. Chipty's model predicts that 40% of the 51 nonstop routes would expect to see ULCC entry within one year in the ordinary course of business.).

---

[30] Tr. 11/21/23 (Chipty) 128:20-129:22 ("Q. And would you – you didn't study the competitive significance of those legacy carriers and their basic economy fares; correct? A. No. I think that's Dr. Gowrisankaran's provenance.  I studied the question of entry and he studied the importance on competitive effects."); TX 910; *see also* Tr. 11/28/23 (Nocella) 26:22-28:7 (discussing United's plans to "aggressively" compete for Basic Economy passengers).

**B.     Expert Testimony from Dr. Gowrisankaran Fell Woefully Short of Carrying the Government's Burden of Proof**

The supposed harm modeling that Dr. Gowrisankaran testified about likewise cannot satisfy the Government's burden of proving a likely substantial lessening of competition in its chosen route-level markets.

First, as Dr. Hill explained, Dr. Gowrisankaran's economic model is unreliable.  Among other things, it relies on a fairly small number of route entries; implausibly predicts price increases from higher-capacity entry; it is sensitive to small and reasonable changes in assumptions; it gives credit for low fares but not for higher quality; and it incorrectly assumes that Spirit's impact is unaffected by JetBlue's presence on a route.  Tr. 11/27/23 (Hill) 40:10–41:8.  Dr. Gowrisankaran also applied his harm model uniformly across all routes regardless of what shares JetBlue and Spirit have and regardless of who else competes, which led to absurd results like the Las Vegas, NV-San Francisco, CA route discussed above with $25 million of alleged harm even though JetBlue has a tiny 0.04% share on connecting flights, and nonstop competition exists from six other airlines including Frontier (which had a larger share than Spirit) and Allegiant.[31]  TX 848; *see, e.g.*, Tr. 11/27/23 (Hill) 45:6–46:8, 62:2–19.  Based on these glaring defects alone, the Court should not credit Dr. Gowrisankaran's unreliable analysis.

Second, Dr. Gowrisankaran recognized that his model lacks reliability at the route level. Dr. Gowrisankaran testified that the "way you want to think of an economic model is if you're looking at it nationally, you have pretty good degrees of significance," but "if you're looking at it

---

[31] *See also* Tr. 11/27/23 (Hill) 45:6–46:8 ("So, for example, if you take a very busy route, like Miami to New York, Professor Gowrisankaran's model is saying that on that route, with many competitors, lots of capacity, if Spirit entered with one flight a week, say a flight on Thursday, all fares would go down by 10 percent on that route. And this is not plausible, that that small level of entry intensity is going to have that impact.").

in any one route you're going to be *less sure* about what the harm is."  Tr. 11/20/23

(Gowrisankaran) 134:12–19 (emphasis added), 137:23–138:7 (responding to the Court's

question and conceding that his model has "a lot less precision" at the route level).  In other

words, like his colleague Dr. Chipty, Dr. Gowrisankaran conducted an analysis ill-fitted to the

route-level markets the Government alleged.

 Third, Dr. Gowrisankaran simply disregarded the possibility of future entry in his

analysis, despite his convoluted explanation to the contrary, and he failed to address whether

entry was likely if the increased prices and profit he predicted came to pass.[32]  He also ignored

the role of divestitures in facilitating entry.  Tr. 11/20/23 (Gowrisankaran) 9:14–10:3.  In this

way, he committed the same error as he did in another recent merger challenge, where the district

court rejected his testimony as "at odds with the unrebutted testimony of various [rival]

executives."  *UnitedHealth Grp.*, 630 F. Supp. 3d at 154-55.  Here, rivals unequivocally testified

they are eager to exploit any routes vacated by Spirit and they *will* use the divestitures to enter

---

[32] *Compare* Tr. 11/20 (Gowrisankaran) 49:2-20 ("Q. . . . The Court asked you a question earlier about airlines entering new markets.  In what ways does your net harm model account for entry by other airlines?  A.  So my net harm model, it allows for the fact that other airlines will enter.  So when I calculated the – all of the entry of Spirit and the entry of JetBlue, um, in my analysis I kept the data after they entered regardless of what other airlines did.  And so my model fully accounts for the fact that Spirit and JetBlue, when they enter, that maybe more airlines enter or maybe some airlines exit, but whatever happens, those events are in my data.  I'm keeping the prices.  I'm treating the shock that's a natural experiment as Spirit or JetBlue is entering in markets.  And in doing that I'm fully accounting for the fact that other airlines may adjust their capacity or may enter or exit in response to Spirit or JetBlue entering.") *with* Tr. 11/27/23 (Hill) 78:1-14 ("Q.  What is your evaluation of that argument by Professor Gowrisankaran [that his model accounts for entry]?  A.  I don't think it's entirely reliable.  So in this case we're asking a separate question, we're not thinking so much about ordinary course entry, we're asking more particularly were there to be an anticompetitive effect, would you see increased entry and repositioning?  And that is not something that was captured in his study.").

and expand route service.  *See, e.g.*, Tr. 11/14/23 (Biffle) 66:8-12, 82:24-84:1, 84:23-85:4; Tr.

11/15/23 (Wells) 17:5-21, 28:21-29:3.

Taking both Government experts into consideration, aside from a single question at the

end of hours of testimony, the Government deliberately avoided asking Dr. Gowrisankaran about

entry and divestitures because they farmed that out to Dr. Chipty.  Dr. Gowrisankaran purported

to project harm without accounting for post-merger entry and divestitures, Tr. 11/20/23

(Gowrisankaran) 9:14–10:3, 49:2-20, 142:10–20; *see also* Tr. 11/27/23 (Hill) 75:22–76:3, and

Dr. Chipty conducted an incomplete entry analysis that did not consider how her colleague's

alleged fare hikes would spur rival entry.  In short, the Government artificially bifurcated the

intertwined questions of harm and rival entry between two experts.  As a result, the Government

had no expert to opine on the likelihood of rival entry post-merger *if the alleged competitive

harm were realized* and no reliable harm analysis that accounted for entry and divestitures.

### C.    The Government's Attempt to Prove a Substantial Lessening of Competition Was Not Tailored to their 35 Routes

In antitrust merger challenges, "[c]ourts must judge the likelihood of anticompetitive

effects in the context of the 'structure, history, and probable future' *of the particular markets that

the merger will affect*."  *Deustche Telekom*, 439 F. Supp. 3d at 198 (emphasis added) (citation

omitted).  Having chosen to litigate this case on the basis of alleged route-level markets –

specifically, the 35 routes – it was incumbent on the Government to put on evidence related to

the structure, history, and probable future of those markets.  *See Arch Coal*, 329 F. Supp. 2d at

116 ("[A]ntitrust theory and speculation cannot trump facts.").  But putting aside unreliable static

share calculations, *see supra* Section III.A.6, the Government effectively offered no factual

evidence of competitive effects on these 35 routes.

Instead, the Government dedicated its trial time towards documents and testimony that related to the overall airline business and the general adoption of unbundled products; evidence that some people like unbundled fares; anecdotal evidence, mostly pre-COVID, about pricing decisions that have no bearing on what is likely to happen on the specific routes at issue – all apparently intended to show the unremarkable fact that JetBlue competes with Spirit, at least to a limited degree; outdated and unproven anecdotes about pricing conduct related to ATPCO that had nothing to do with JetBlue or Spirit or any of the 35 routes at issue; and evidence that suggested, as this case proves, there would be regulatory scrutiny of this transaction.

But over a four-week trial in which it called almost 20 witnesses, the Government did not provide the Court facts *about the specific route-level markets* where it wants the Court to find a substantial lessening of competition is likely.  And it doubled down on this error by offering two experts who likewise provided no reliable economic analysis on a route-by-route basis.  That is fatal to the Government's case.  Trials under Section 7 of the Clayton Act involve "[n]othing less than a comprehensive inquiry into future competitive conditions" of each market in question. *AT&T*, 310 F. Supp. 3d at 165; *see Baker Hughes*, 908 F.2d at 984 ("The Supreme Court has adopted a totality-of-the-circumstances approach to the statute, weighing a variety of factors to determine the effects of particular transactions on competition.").  There is simply no sufficient factual record for the Court to conduct that "totality-of-the-circumstances" route-specific analysis on any of the Government's 35 routes, and so there is no way for the Court to find a likely substantial lessening of competition on those routes in the future.

D.     **The Government's Failed Attempts to Prove a Substantial Lessening of Competition Through Defendants' Early Deal Discussions and Analyses**

1.     *Statements in the Proxy Fight Decks Are Not Probative*

The Government also spent considerable time at trial on Spirit's 2022 statements regarding the regulatory outlook of a deal with JetBlue.  Understood in context, those statements do not bear the weight the Government puts on them.  Put simply, Spirit's views were assuaged by later events, including increased commitments from JetBlue to divest assets at key airports, which Spirit believed would pave the way for antitrust clearance of the deal.

The evidence shows that less than a month after receiving JetBlue's initial offer in March 2022, Mr. Christie conveyed to JetBlue "guiding principles" intended to provide a path to regulatory and address Spirit's concerns, including a significant regulatory covenant.  TX 295 (Spirit BOD Meeting Minutes April 21, 2022), at '3374; Tr. 11/1/23 (Christie) 62:6-63:22, 64:21-66:12.  But JetBlue's initial offers did not resolve Spirit's regulatory concerns, and thus— in the statements on which the Government now relies—Spirit explained to its shareholders in and around May 2022 that JetBlue's proposals fell short of what Spirit believed was required to gain antitrust approval of the proposed transaction.  *See, e.g.*, TX 351 at '0187, '0189; Tr. 11/1/23 (Christie) 71:9-72:23 ("[W]e were advising our shareholders about this risk and why we had rejected their last proposal.").

Later, in June 2022, JetBlue made a revised offer that would obligate it to divest Spirit assets "up to a material adverse effect on the combined JetBlue-Spirit, with a limited carve-out to this divestiture obligation for actions that would be reasonably likely to materially and adversely affect the anticipated benefits under JetBlue's Northeast Alliance," TX 218 (Revised Offer from JetBlue (6/20/22)) at '1519; Tr. 11/1/23 (Christie) at 78:15–82:22, in addition to enumerated

divestitures at Boston Logan, LaGuardia, Newark, and Fort Lauderdale, TX 79, at '4774.  Once

it fully understood the scope of JetBlue's commitment, Spirit concluded that a merger with

JetBlue had a reasonable path to regulatory approval, and Spirit's board unanimously supported

it.  *See* Tr. 11/7/12 (Gardner) 67:22–68:8 (Spirit's board would "never" have voted for the

merger without a path to regulatory clearance).

### 2.        *JetBlue's Synergy Modeling*

The Government's reliance on JetBlue's deal modeling, and particularly the "customer

experience premium," is likewise misplaced.  The unrebutted testimony at trial showed that the

synergy modeling, done 18 months ago using limited data from 2014-2018, was emphatically not

a plan for a 30% price increase after the merger closes in 2024, as the Government repeatedly

insinuated.  Rather, it was designed simply to provide JetBlue with an estimate of the difference

in value between the JetBlue and Spirit products for the purpose of calculating synergies.  Tr.

11/9/23 (Friedman) 89:14-19.   It was not intended to predict future competitive dynamics, nor

would it have been suited for this purpose.  For example, in doing this work, Eric Friedman from

JetBlue did not include any estimate of JetBlue downward fare pressure on pricing or of the

likelihood of other airlines entering and expanding on routes.  Tr. 11/9/23 (Friedman) 92:10-18,

95:8-18.  The Government's own experts agree these factors impact pricing.  At bottom, to adopt

this model as "evidence" of harm, the Court would have to ignore the Government's own experts

and assume no existing or likely rivals would compete on the Government's 35 routes.  That not

only contradicts the evidence, including unrebutted testimony from rivals called by the

Government, but it is completely implausible.  *See, e.g.*, Tr. 11/14/23 (Biffle) 84:12-22; Tr.

11/15/23 (Wells) 17:5-12; *see supra* Section III.A.4 (discussing unrebutted testimony that other

ULCCs plan to enter routes exited by Spirit).

### 3. *"Fleet Rationalization"*

The Government's "rationalization" story based on the deal modeling fares no better. Even though it is undisputed that JetBlue sought to purchase Spirit, in part, to greatly expand its fleet, grow faster, and compete nationally with the Big Four, the Government suggested that "JetBlue's plans for the combined airline reveal a preference to slow the acquisition of aircraft." ECF No. 289 at 31. This makes no sense. The Government's theory was that JetBlue's deal modeling, which used the number of aircraft as a hypothetical input, included fewer aircraft than in Spirit's 2022 financial plan. At trial, the Government claimed that Spirit planned to acquire many more aircraft in 2025 and 2026 beyond their orderbook, and that JetBlue demonstrated its intent to throttle future growth by excluding those aircraft in the deal modeling. Unrefuted witness testimony to the contrary proves this theory false. Tr. 11/16/23 (Roeschke) 77:19-78:4.

JetBlue's early deal modeling was never intended as a business plan or aircraft acquisition strategy. Tr. 11/16/23 (Roeschke) 81:12-20 ("[W]e had not set out a business plan for this company yet."). It simply included the aircraft that Spirit was contractually committed to take (*i.e.*, firm orders) plus fifteen more aircraft that JetBlue assumed Spirit could acquire between signing and closing. Tr. 11/16/23 (Roeschke) 80:1-81:3. When the Government asked Ms. Roeschke whether it showed that JetBlue wanted fewer aircraft, she testified, "that's not true." Tr. 11/16/23 (Roeschke) 81:12-15. That is the end of the matter.

### 4. *Consumer-Friendly Airplane Layout*

The Court also should reject the Government's attempt to cast as anticompetitive harm JetBlue's plans to upgrade Spirit planes so passengers will have more legroom. Although the Government frames this as an anticompetitive capacity reduction scheme, Tr. 12/5/23 (Gov't Closing) 69:10-18 (calling the retrofit a "harm" without reference to product quality), because

planes are inherently space-limited, any increase in legroom necessarily requires somewhat fewer seats.  But that does mean consumers will be harmed.

As the Government emphasized in the NEA case, JetBlue's high quality, especially its legroom, is a key feature enabling it to "compete effectively against the legacy airlines in ways other LCCs and ULCCs could not."  TX 912 ¶¶ 24, 27; *see also* Tr. 11/6/23 (Hayes) 73:17-74:11 (discussing unique JetBlue features, including the most legroom and better on-board product). Nevertheless, with this theory and throughout this case, the Government and its experts closed their eyes to JetBlue's quality and the benefits it brings to competition.  Tr. 11/27/23 (Hill) 34:12-16 (explaining Dr. Gowrisankaran's model does not account for quality differences between JetBlue's and Spirit's products).  In short, there is no dispute that, after the retrofit, JetBlue's planes will have more legroom and fewer seats than the denser Spirit planes, but that does not show any lessening in competition.  *See In re AMR*, 625 B.R. at 253-55, 264 (rejecting expert that did not account for quality increase caused by airline merger and crediting expert that modeled higher quality).  Any complete analysis must account for JetBlue's higher quality offering, which the Government ignored altogether.

The Government also does not seriously dispute that with a larger fleet and network, JetBlue will have significant flexibility in its operations to increase utilization in a way that would offset, if not entirely eliminate, the reduction in seats.  Defendants' expert Richard Scheff – the only expert in this case who has worked at an airline and who has nearly 40 years' of experience in the airline industry – demonstrated how the combined entity would have the ability and incentive to increase its utilization.  First, he explained that a large portion of the seat reduction would be offset simply by JetBlue flying the Spirit planes on the seasonal and day-of-week patterns that JetBlue flies its own planes.  Tr. 11/28/23 (Scheff) 69:16-23, 73:16-20; TX

909 (third, fourth, and fifth columns).  Second, he showed that the merged entity could fly the combined schedule of the two airlines using fewer planes, which would offset virtually all of the remaining seat reduction.  Tr. 11/28/23 (Scheff) 83:16-20, 90:22-91; TX 909 (sixth and seventh columns).  Third, he explained that other opportunities exist for JetBlue to increase the number of seats in the market, including by flying more redeyes (as is planned in JetBlue's combined network plan, TX 362), reducing the number of spares relative to the fleet size, and better deploying Spirit's A321ceo aircraft.[33]  Tr. 11/28/23 (Scheff) 92:18-93:7, 102:1-18, 104:20-105:11.

The Government did not dispute the core premise of Mr. Scheff's opinion:  the larger fleet and network provides more flexibility and opportunity to increase utilization.  Instead, the Government primarily complained that Mr. Scheff did not do the impossible task of predicting exactly which routes and times JetBlue would add flying in four to five years after the retrofit is complete.  *See* Tr. 11/28/23 (Scheff) 125:4-23 (explaining that the data needed to make specific predictions does not yet exist).  A crystal ball is not required for an expert's opinion to be accepted by a court.  *Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 2023 WL 5747882, at *20 (S.D.N.Y. Sept. 5, 2023).  Particularly in light of Mr. Scheff's testimony, it is clear the Government cannot simply count the number of seats removed from the Spirit aircraft, multiply that by the number of flights, and count that as "harm."

---

[33] Mr. Scheff's opinions are consistent with testimony from JetBlue witnesses explaining that they plan to optimize the combined fleet and add additional flying. *See, e.g.*, Tr. 11/9/23 (Friedman) 125:9-19 (JetBlue plans to continue its flatter seasonal pattern in the future), 144:13-24 (new focus city allows optimization of spares to add more flights), 150:23-151:16 (significant opportunities for red-eye flying in combined network plan).

**E.   The Government Has Not Met Its Burden Of Showing The Merger Will Increase The Risk of Industry Coordination**

The Government's coordinated effects theory fails for numerous reasons.  As an initial matter, the ease of route-level entry is, standing alone, a complete response to the Government's argument that this merger will increase the risk that industry participants will coordinate.[34]

Setting aside entry, it is surprising the Government is pressing its coordination argument in the first place.  One year ago in this Court, the Government in the NEA litigation argued – and successfully convinced Judge Sorokin – that JetBlue was a "maverick" that served as the foil to the legacy airlines and disrupted the legacies' attempts to coordinate.[35]  As Mr. Hayes testified, JetBlue has been a "maverick" since its founding over 20 years ago, and JetBlue intends to compete fiercely for consumers post-merger.  Tr. 11/6/23 (Hayes) 126:11-127:1.  Companies do not just abandon their maverick status to pursue coordination because they undergo a merger, as the Government suggests here.  *Deutsche Telekom*, 439 F.Supp.3d at 245 (rejecting claim that T-Mobile will abandon its maverick status in favor of collusion post-merger and explaining: "[t]hat analysis would depict a picture of the ambitious and aggressive small-time wannabe who cannot wait to join the lofty club of the two industry giants, only to passively fold and follow or collude with them in raising prices and hurting consumers").

---

[34] *See, e.g.*, *Deutsche Telekom*, 439 F. Supp. 3d at 237; *Occidental Petroleum*, 1986 WL 952, at *8 ("Whether entry is included as part of the market definition or in the ease of entry evaluation, practically, is of no consequence.  In either event, the result is the same.  The exercise of market power will be thwarted and collusive behavior will not be possible." (citations omitted)).

[35] *Am. Airlines Grp.*, 2023 WL 3560430, at *34 n.81; *see also* TX 912 ¶ 27, DOJ Proposed FOF in NEA ("JetBlue's high quality of service allowed it to compete effectively against the legacy airlines in ways other LCCs and ULCCs could not.").

Notably, the Government's about-face here is not somehow based on discovery of new evidence. Most of the documents supposedly evidencing the sporadic attempts by JetBlue to allegedly "flash" or participate in a cross-market initiative (or "CMI") were part of the record in the NEA case, even as the Government publicly lauded JetBlue's uniquely disruptive effect on industry coordination.[36] Indeed, the Government practically admits here that this handful of documents out of the "hundreds of millions" of filed fares each year do not show an increased likelihood of coordination. Tr. 11/8/23 (Hillyard) 156:5-15.

In closing, the Government pivoted to a new claim that changes in "market structures" alone can "facilitate" coordination. Tr. 12/5/23 (Gov't Closing) 73:5-8. Whatever the validity of that concept as an economic matter, it begs the question of what *market* structure the Government is referring to here. At Step Three of the *Baker Hughes* framework, the Government must show the merger "enable[s] or encourage[s] post-merger coordinated interaction among firms *in the relevant market*." *AT&T Inc.*, 310 F. Supp. 3d at 246; *Deutsche Telekom*, 439 F. Supp. 3d at 234 ("[C]oordinated effects analysis considers whether the *relevant market* shows signs of vulnerability to coordinated conduct." (emphasis added and cleaned up)). The Government's coordination theory is divorced from its 35 alleged route-level markets and therefore cannot be proven as a matter of law. While the Government contends that JetBlue's national network growth will increase risk of coordination,[37] that claim relies on a relevant

---

[36] The following exhibits were all admitted as evidence in the NEA case (NEA exhibit numbers in parentheses): TX 785 (PX0616), TX 786 (PX0607), TX 788 (PX0521), TX 789 (PX0612), and TX 790 (PX0613).

[37] *Compare* Tr. 11/17/23 (Gowrisankaran) 125:9–22 (contending JetBlue is likely to coordinate post-merger because will "become more like a legacy," be "bigger on many routes" and be "more like a hub-and-spoke carrier"), *with* Tr. 11/20/23 (Gowrisankaran) 117:14–20 ("Q. But your opinion is also that if JetBlue grows organically, meaning without the merger, and has more connecting routes and more breadth nationally, that JetBlue will be more likely to engage in

national market – not the Government's alleged route-level markets.  But it is implausible that a merger of two airlines with such small national market shares is likely to increase coordination to the point of substantially lessening competition.

In the end, the Government's apparent concern with price coordination through ATPCO has little do with its alleged markets or even this case.  The original Sherman Act case against the major airlines related to ATPCO is now three decades old, and the last of the ATPCO consent decrees expired in 2011.  *United States v. Airline Tariff Pub. Co.*, 836 F. Supp. 9 (D.D.C. 1993).  None of those proceedings involved JetBlue; in fact, JetBlue was not even founded when the original case was decided.  But if the Government has any lingering concerns, it has tools – like the Sherman Act – to address those concerns separate and apart from this case. It has no basis to thwart the merger of two relatively small airlines under the Clayton Act.

## V.   IF THE COURT HAS ANY RESIDUAL CONCERNS ON ONE OR MORE ROUTES, THE COURT SHOULD USE ITS EQUITABLE POWERS TO NARROWLY ADDRESS THOSE CONCERNS

For all these reasons, the Government failed to prove its case at trial and its request for an injunction should be denied.  But if the Court concludes some relief may be necessary to address concerns on one or more routes, there are several ways the Court could proceed, including by tailoring a narrow remedy, requesting further briefing on remedy, or scheduling a remedy hearing.  There is no dispute the Court has this authority.  *United States v. E. I. Du Pont De Nemours & Co.*, 353 U.S. 586, 607-08 (1957) (courts "are clothed with large discretion to model their judgments to fit the exigencies of the particular case." (internal quotation marks and citation omitted)); *Ford Motor Co. v. United States*, 405 U.S. 562, 573 (1972) (same); *see* Tr. 12/5/23

---

coordination over time; correct?  A.  Sure, that's definitely possible.  It depends how it grows.").

(Defendants' Closing) 28:4-23 (agreeing that, if the Court finds liability, it may hold "an evidentiary hearing" to "narrowly tailor a remedy"); Tr. 12/5/23 (Gov't Closing) 85:21-24 ("[I]f the Court found that there was liability here and the Court wanted to discuss a remedy, that would obviously be at the Court's discretion.").

Given the enormous consumer benefits that will flow from this merger to tens of millions of passengers on routes throughout the country, it would be disproportionate and contrary to the public interest to enjoin the transaction in its entirety based on a handful of routes. After all, the "heart" of the Government's case is now just 35 routes out of over 6,000 nonstop routes in this country – less than 1% of all routes. In the past, the Government has found ways to address these relatively small concerns – including through divestitures. *See, e.g.*, *US Airways Grp.*, 38 F. Supp. 3d at 78 ("[T]he United States predicts that these divestitures to LCCs will provide increased incentives for these carriers to invest in new capacity and to expand into additional markets, providing more meaningful competition system-wide to legacy carriers.").

But the Division announced a new policy position recently that favors all-or-nothing litigation and full-stop injunctions as opposed to divestitures to cure any discrete alleged harms. *See, e.g.*, Jonathan Kanter, Assistant Attorney General of the Antitrust Division, Dep't of Just., Remarks to the N.Y. State Bar Ass'n Antitrust Section (Jan. 24, 2022), https://www.justice.gov/opa/speech/assistant-attorney-general-jonathan-kanter-antitrust-division-delivers-remarks-new-york. Against this backdrop, a narrow Court-ordered remedy would do what has historically been done in merger cases involving narrow concerns, including airline cases: address any narrow concerns while allowing the merger to proceed.

Any relief that may be appropriate would depend on the routes and issues that the Court identifies, if any, and could be determined through a process determined by the Court. In that

process, there are established merger remedies that could be considered.  In the American

Airlines/US Airways merger, for example, the Government endorsed divestitures of slots, gates,

and ground facilities to resolve competitive concerns.  Response of Plaintiff United States to

Public Comments on the Proposed Final Judgment at 30, *United States v. US Airways Grp., Inc.*,

No. 1:13-cv-01236 (D.D.C. Mar. 10, 2014), ECF No. 159 (noting the Government's

representation that a divestiture remedy "reasonably addresses those broad competitive issues,"

such that the merger should proceed).  Defendants already have committed to similar divestitures

here.  The Court could memorialize Defendants' contractual obligations to complete their agreed

divestitures in an order, and oversee the process to ensure that it is carried out successfully.  The

Court could also appoint a monitor to facilitate compliance.  There are many precedents for this

in consent orders entered into by the Government, including the American Airlines/US Airways

merger. *See* Final Judgment at § VII, *United States v. US Airways Grp,* 1:13-cv-01236 (D.D.C.

April 25, 2014), ECF No. 170.

    The Government has suggested that the transfer of divestiture assets might not occur due

to, for example, a failure to obtain necessary airport approvals.  To address that concern, the

Court could employ a standard provision that the Government has agreed to many times:

appointment of a divestiture trustee, who takes over the divestiture process and may find an

alternative buyer at no minimum price. *See, e.g.*, *id.* at § V.

    The Court also could consider additional divestitures tailored to any particularized route-

level concern.  For example, the Government at trial raised divestitures at the San Juan airport,

which is an endpoint for two of the 35 routes. *See* Tr. 11/2/2023 (Clark) 171:19-23 ("Q. . . .

JetBlue is not offering any divestitures at San Juan airport; correct, sir?  A.  That's correct.").

Even though the trial record demonstrated that rivals have no entry barriers in San Juan, Tr.

11/14/23 (Biffle) 97:18-24; Tr. 11/2/23 (Clark) 113:24-114:1, if the Court were to conclude, for example, that assets should be divested at San Juan to facilitate entry into those two routes, that would be in line with past practice.

These or other narrowly-tailored remedies would allow the Court to exercise its equitable powers to address any route-specific concerns while allowing this procompetitive merger to go forward. Defendants respectfully submit, however, that no relief is needed. The Government failed to prove a violation of Section 7 of the Clayton Act on any route anywhere.

## **CONCLUSION**

For the foregoing reasons and those presented at trial, the Court should deny the Government's request for a permanent injunction and enter judgment in favor of Defendants.

Dated: December 13, 2023                    Respectfully submitted,

*/s/ Elizabeth M. Wright*
Zachary R. Hafer (MA BBO #569389)
Elizabeth M. Wright (MA BBO #569387)
Zachary Sisko (MA BBO #705883)
Cooley LLP
500 Boylston Street, 14th Floor
Boston, MA 02116-3736
Tel: 617-937-2300
zhafer@cooley.com
ewright@cooley.com
zsisko@cooley.com

Ethan Glass (*Pro Hac Vice*)
Deepti Bansal (*Pro Hac Vice*)
Matt K. Nguyen (*Pro Hac Vice*)
Cooley LLP
1299 Pennsylvania Avenue NW, Suite 700
Washington, DC 2004-2400
Tel: 202-842-7800
Fax: 202-842-7899
eglass@cooley.com
dbansal@cooley.com

Ryan A. Shores (*Pro Hac Vice*)
David I. Gelfand (*Pro Hac Vice*)
Daniel P. Culley (*Pro Hac Vice*)
Cleary Gottlieb Steen & Hamilton, LLP 2112
Pennsylvania Avenue, NW
Washington, DC 20037
Tel: 202-974-1500
rshores@cgsh.com
dgelfand@cgsh.com
dculley@cgsh.com

Michael Mitchell (*Pro Hac Vice*)
Brian Hauser (*Pro Hac Vice*)
Shearman & Sterling LLP
401 9th Street, N.W., Suite 800
Washington, DC 20004
Tel: 202-508-8005
Fax: 202-661-7480
michael.mitchell@shearman.com
brian.hauser@shearman.com

Jessica K. Delbaum (*Pro Hac Vice*)
Leila Siddiky (*Pro Hac Vice*)
Shearman & Sterling LLP
599 Lexington Avenue
New York, NY 10022-6069 Tel: 212-848-4000
Fax: 212-848-7179
jessica.delbaum@shearman.com
leila.siddiky@shearman.com

Rachel Mossman Zieminski (*Pro Hac Vice*)
Shearman & Sterling LLP
2601 Olive Street, 17th Floor
Dallas, TX 75201
Tel: 214-271-5385
rachel.zieminski@shearman.com

*Attorneys for Defendant JetBlue Airways
Corporation*

Jay Cohen (*Pro Hac Vice*)
Andrew C. Finch (*Pro Hac Vice*)
Eyitayo St. Matthew-Daniel (*Pro Hac Vice*)
Jared P. Nagley (*Pro Hac Vice*)
Kate Wald (*Pro Hac Vice*)

69

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY 10019
Tel: 212-373-3000
Fax: 212-757-3990
afinch@paulweiss.com
tstmatthewdaniel@paulweiss.com
jcohen@paulweiss.com
jnagley@paulweiss.com
kwald@paulweiss.com

Meredith R. Dearborn (*Pro Hac Vice*)
Paul, Weiss, Rifkind, Wharton & Garrison LLP 535
Mission Street, 24th Floor
San Francisco, CA 94105
Tel: 628-432-5100
Fax: 628-232-3101
mdearborn@paulweiss.com

*Attorneys for Defendant Spirit Airlines, Inc.*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that the foregoing Defendants' Post-Trial Brief, which was filed with the

Court through the ECF system on December 13, 2023, will be sent electronically to the

registered participants as identified on the Notice of Electronic Filing (NEF).


*/s/ Elizabeth M. Wright*
Elizabeth M. Wright