**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| UNITED STATES OF AMERICA et al., <br><br> *Plaintiffs*, <br><br> v. <br><br> JETBLUE AIRWAYS CORPORATION and <br> SPIRIT AIRLINES, INC., <br><br> *Defendants*. | Case No. 1:23-cv-10511-WGY |

## PLAINTIFFS' POST-TRIAL BRIEF

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................... iii

INTRODUCTION .............................................................................................................. 1

LEGAL STANDARD......................................................................................................... 4

ARGUMENT ..................................................................................................................... 5

I.    Scheduled Air Passenger Service Between Origin-and-Destination Pairs Are the Relevant Markets for Evaluating the Proposed Acquisition ........................................................... 5

II.   Plaintiffs Have Established a Strong *Prima Facie* Case that the Proposed JetBlue-Spirit Deal Is Anticompetitive .......................................................................................................... 7

    A.    This Acquisition Is Presumptively Illegal in 183 Markets Where JetBlue and Spirit Compete, Including 51 Nonstop Overlap Markets ...................................................... 8

    B.    The Proposed Acquisition Would Eliminate Head-to-Head Competition That Has Lowered Fares, Expanded Choices, and Allowed More Passengers to Fly.............................. 9

    C.    There is a Reasonable Probability that the Proposed Acquisition Would Result in Higher Prices and Fewer Passengers on All Spirit Routes ....................................... 10

        1.    JetBlue expects fares to rise and the number of passengers flying to fall as a result of the transaction ............................................................................................... 11

        2.    This deal is a "high-cost, high-fare" carrier acquiring and eliminating "low-cost, low-fare" carrier, and JetBlue would incur significant costs as a result of the transaction ......... 12

        3.    Before accepting JetBlue's offer, Spirit acknowledged the proposed transaction was anticompetitive.................................................................................................... 12

    D.    The Proposed Acquisition Would Result in Fewer Seats on Planes and Threatens to Result in Fewer Planes.......................................................................................... 13

    E.    The Elimination of Spirit Would Reduce Consumer Choice ........................................ 14

    F.    The Proposed Transaction Would Eliminate a Maverick, Spirit, and Weaken the Disruptive Impact of JetBlue ..................................................................................... 15

    G.    The Proposed Acquisition Would Increase the Risk of Anticompetitive Coordination in All Spirit Markets ....................................................................................................... 16

    H.    The Proposed Acquisition Is Conservatively Projected to Cause Nearly $1 Billion of Harm Each Year to American Consumers in the Relevant Markets ....................................... 18

III.  Defendants Have Failed to Produce Sufficient Evidence to Rebut Plaintiffs' Strong *Prima Facie* Case........................................................................................................................ 19

    A.    Defendants' Speculation About Other Airlines' Potential Entry and Expansion Fail to Rebut Plaintiffs' *Prima Facie* Case ......................................................................... 20

        1.    Defendants' argument about entry or expansion by any airline faces significant hurdles that Defendants cannot overcome .......................................................... 21

2.      Defendants have failed to produce evidence that timely and sufficient entry or expansion by other ULCCs is likely to prevent harm .......................................................... 23

    a.      Other ULCCs cannot grow large enough, fast enough to fix the harm from this transaction ...................................................................................................................... 23

    b.      Other ULCCs' business and network strategies undermine the prospect of their entry in the relevant markets ...................................................................................... 24

    c.      ULCCs are unlikely to enter the routes in enough time or with sufficient scale to fix the harm from this transaction ...................................................................................... 26

    d.      Defendants' additional arguments about ULCC entry are contrary to the evidence and the law and should be rejected ........................................................................ 28

3.      Defendants have not shown that timely and sufficient entry or expansion by the Big Four airlines is likely to prevent harm .......................................................................... 29

B.      Defendants' Proposed Divestitures Are Too Narrow and Uncertain to Restore Spirit's Competitive Intensity ............................................................................................ 30

C.      Defendants Have Not Shown That Any Purported Efficiencies Would Offset the Harms Threatened by the Proposed Deal ............................................................................ 32

D.      Spirit's Recent Financial Results Do Not Save This Acquisition .................................. 34

IV.   The Proposed Acquisition's Threat to Competition in the Relevant Markets Cannot Be Justified By Putative Benefits in Other Markets ............................................................ 38

V.   A Permanent Injunction of the Proposed Deal is the Proper Remedy ................................. 39

CONCLUSION .......................................................................................................................... 40

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Brown Shoe Co. v. United States*,
  370 U.S. 294 (1962)...................................................................................... 5, 6, 7

*Chi. Bridge & Iron Co. N.V. v. FTC*,
  534 F.3d 410 (5th Cir. 2008) ............................................................................. 23, 29

*Citizen Publ'g Co. v. United States*,
  394 U.S. 131 (1969)............................................................................................. 35

*Flovac, Inc. v. Airvac, Inc.*,
  817 F.3d 849 (1st Cir. 2016)................................................................................... 5

*FTC v. Elders Grain, Inc.*,
  868 F.2d 901 (7th Cir. 1989) ................................................................................ 18

*FTC v. H.J. Heinz Co.*,
  246 F.3d 708 (D.C. Cir. 2001) ....................................................... 9, 16, 18, 32, 34

*FTC v. Hackensack Meridian Health, Inc.*,
  30 F.4th 160 (3d Cir. 2022) ...................................................................... 7, 11, 19

*FTC v. Procter & Gamble Co.*,
  386 U.S. 568 (1967).............................................................................................. 32

*FTC v. Sanford Health*,
  926 F. 3d 959 (8th Cir. 2019) ......................................................................... 20, 23

*FTC v. Univ. Health, Inc.*,
  938 F.2d 1206 (11th Cir. 1991) ........................................................................... 35

*Home Placement Servs., Inc. v. Providence J. Co.*,
  682 F.2d 274 (1st Cir. 1982).................................................................................. 6

*Home v. Flores*,
  557 U.S. 433 (2009).............................................................................................. 39

*Kaiser Aluminum & Chem. Corp. v. FTC*,
  652 F.2d 1324 (7th Cir. 1981) ............................................................................. 37

*N. Pac. Ry. Co. v. United States*,
  356 U.S. 1 (1956).................................................................................................. 39

*ProMedica Health Sys., Inc. v. FTC*,
  749 F.3d 559 (6th Cir. 2014) ............................................................................... 35

*St. Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*,
  778 F.3d 775 (9th Cir. 2015) ............................................................................... 33

*United States v. Aetna Inc.*,
  240 F. Supp. 3d 1 (D.D.C. 2017).................................................................... 30, 36

*United States v. Am. Airlines Grp. Inc.*,
  -- F. Supp. 3d --, 2023 WL 3560430 (D. Mass. May 19, 2023) ......................... 5, 16

*United States v. Anthem, Inc.*,
  236 F. Supp. 3d 171 (D.D.C. 2017).................................................................. 28, 37

*United States v. Anthem, Inc.*,
  855 F.3d 345 (D.C. Cir. 2017) ...................................................... 7, 14, 28, 34, 39

*United States v. E.I. du Pont de Nemours Co.*,
  *353 U.S. 586 (1957)* .................................................................. 4
*United States v. E.I. du Pont de Nemours Co.*,
  *366 U.S. 316 (1961)* .................................................................. 39
*United States v. Gen. Dynamics Corp.*,
  415 U.S. 486 (1974) ..................................................................... 19
*United States v. H&R Block, Inc.*,
  833 F. Supp. 2d 36 (D.D.C. 2011) ................................................. 26
*United States v. Marine Bancorp., Inc.*,
  418 U.S. 602 (1974) ..................................................................... 19
*United States v. Phila. Nat'l Bank*,
  374 U.S. 321 (1963) .............................................................. 4, 38

## Statutes

15 U.S.C. § 18 ............................................................................. 4, 6, 38
15 U.S.C. § 25 ................................................................................. 39

## Rules

Fed. R. Civ. P. 60(b) ........................................................................ 39

## Other Authorities

Richard A. Posner, ANTITRUST LAW (2d ed. 2001)......................................16

## INTRODUCTION

The evidence at trial laid bare that JetBlue's proposed acquisition of Spirit threatens significant harm to competition and consumers—higher fares, fewer seats, fewer options, and less innovation on hundreds of routes that 135 million passengers travel each year. That harm would be most pronounced on the dozens of routes where Spirit and JetBlue have fiercely competed for years. And it would fall hardest on those least able to bear it—millions of Americans who, because of this deal, would face hard choices about how often they can travel or whether they can travel at all.

The facts that illuminate this harm are simple, clear, and, in many cases, undisputed: As a crucial disruptor, Spirit drives all prices in a market lower and creates new and innovative options for everyone. When Spirit leaves a market, harm follows—prices go up, output goes down, and travelers have fewer options. JetBlue knows this. Indeed, JetBlue is *counting* on this. To justify the nearly $8 billion of debt and the higher cost structure it must adopt to secure this deal, JetBlue has made plans to capitalize on its elimination of Spirit by raising fares and eliminating millions of seats per year. Allowing a "high cost, high fare" airline to extinguish a vital source of low-cost competitive disruption along more than 375 routes would be reason enough to block this deal, but JetBlue's plans to go further are a red blinking light. This case falls squarely in the heartland of illegal acquisitions that Congress intended to be enjoined under Section 7 of the Clayton Act.

In the face of compelling evidence of harm, Defendants have tried to change the subject. Rather than grapple with the consumer harm their deal threatens, Defendants have instead focused on "the airline[] haves and have nots."[1] Defendants have also tried to write off consumer

---

[1] Oct. 31, 2023, Tr. Vol. 1, 34:22-23 (Defs.' Opening Statement).

harm as the cost of doing business—the price of JetBlue attaining "relevance" in a so-called

national market for air travel. But the antitrust laws prize competition to protect the public. And

from the perspective of the flying public, traveling the routes served by Spirit, an airline-centered

national or aggregated market is a fiction. The evidence at trial showed that consumers buy

airline tickets to travel from their origin to a destination. And even Defendants' own expert was

unwilling to define a broader market. There is no dispute that evidence of a national character is

relevant, but only for limited, practical purposes—namely, how that evidence impacts

competition on routes consumers travel, such as how national factors like plane and pilot

shortages affect the ability of other ULCCs to enter markets now served by Spirit.

Chasing "relevance" (market power) and more business customers might pad JetBlue's

bottom line, but Defendants could not square the purported benefits of their proposed transaction

with the serious harms it causes. The best they could do is ask this Court to trust that higher fares

for consumers on the affected routes would transform into benefits to travelers who do not fly

those routes, but that is far from enough. As an initial matter, Supreme Court precedent prohibits

the justification of fare hikes imposed on consumers flying in a particular market by pointing to

benefits accruing to consumers in other markets. More fundamentally, Defendants have

presented vague assertions, rather than evidence, of "national" benefits from the transaction, and

such benefits, if any, would exist alongside the certainty that the acquisition would reduce

capacity, eliminate Spirit's superior ability to lower average market prices, and change JetBlue's

incentives—harms that substantially outweigh any such benefit. Defendants also cannot, at the

eleventh hour, justify their anticompetitive acquisition with Spirit's recent financial results.

While Defendants were trying to persuade the Court that Spirit's demise is inevitable, Spirit's

management was telling its investors that the company is "committed to returning . . . to

sustained profitability" and that its third-quarter losses are "an anomaly." Plaintiffs' Proposed Findings of Fact ("PFOF") ¶ 251. That makes sense because Spirit's competitive vitality remains strong, it continues to grow, and its near-term challenges can be met without being acquired.

Recognizing the strength of Plaintiffs' evidence of harm, Defendants focused their trial presentation on hypothesizing how other factors might chip away at that harm. That effort also failed. Defendants presented no credible evidence that other ULCCs could or would quickly double in size and fundamentally change their networks and business strategies, which is what would be needed to fill the competitive void left by this proposed acquisition. The resources needed to grow—planes, pilots, and infrastructure—are in short supply, let alone available in the amounts needed to grow at unprecedented rates. In fact, if entry were as easy and likely as Defendants claim, the evidence would not have shown (as it did) that Spirit's actual entry on a route has dramatic benefits or that JetBlue is planning to grow its post-deal revenue on the back of unabated 30% fare increases.

Acknowledging that the prospect of timely, likely, and sufficient entry is more atmospheric than real, Defendants also proposed partial asset divestitures at four airports. But those divestitures raise more questions than they answer. They do not include the planes and crew that would give other ULCCs a realistic shot at restoring the competition that would be lost by eliminating Spirit. And they also would not change each ULCC's long-held strategies, which differ in fundamental ways from Spirit's and would therefore further dim the prospect of any ULCC stepping into Spirit's shoes.

In practical terms, the question before the Court is simple: is it reasonably probable that this deal would cause consumers to pay higher fares, lead fewer passengers to fly, or otherwise substantially diminish competition in the relevant markets? The evidence at trial demonstrated

3

that the answer is yes. And that answer should surprise no one, least of all Spirit, which told the world this deal is anticompetitive, or JetBlue, which justified the deal's price tag on the premise of fare increases. In fact, it would be surprising if such effects do *not* occur.

This case is about harm—significant harm to more than millions of real people trying to get where they need to be. Defendants had both the opportunity and the responsibility to propose a deal that does not threaten harm—a deal that does not violate the law. Instead, they chose to champion the deal before the Court, an illegal merger that they attempted to salvage through incomplete divestitures and fanciful predictions about the future. But those attempts could not save a deal that threatens real harm to ordinary Americans, which is a cost the Clayton Act deems too great to bear. The Court should enjoin the transaction.

## LEGAL STANDARD

Section 7 prohibits any acquisition when its effect "*may be* substantially to lessen competition" in "*any* section of the country." 15 U.S.C. § 18 (emphases added). In other words, Plaintiffs need only show by a preponderance of the evidence that the proposed acquisition has a "reasonable probability" of substantially lessening competition in any relevant market. *United States v. E.I. du Pont de Nemours Co.*, 353 U.S. 586, 607 (1957); *see also* Plaintiffs' Proposed Conclusions of Law ("PCOL") ¶¶ 21-22. A threat of substantial lessening of competition in one market should not be weighed against the putative benefits of the acquisition in another. *United States v. Phila. Nat'l Bank*, 374 U.S. 321, 370 (1963); *see also* PCOL ¶¶ 23, 110-116; *infra* Part IV.

## ARGUMENT

**I.** **Scheduled Air Passenger Service Between Origin-and-Destination Pairs Are the Relevant Markets for Evaluating the Proposed Acquisition**

Courts define relevant markets to illuminate the competitive effects of a transaction—those markets are defined from the perspective of consumers and consist of both a product market and a geographic market. *Brown Shoe Co. v. United States*, 370 U.S. 294, 324 (1962); PCOL ¶¶ 24-28. The parties agree that scheduled air passenger service constitutes a relevant product market for purposes of analyzing the competitive effects of the acquisition. ECF No. 191 ¶ 12.

Here, the relevant geographic markets are the origin-and-destination ("O&D") pairs—in other words, flight routes between origins and destinations—comprising (1) markets where both JetBlue and Spirit fly today (the "overlap markets" or "overlap routes"); (2) nonstop routes Spirit flies today and JetBlue does not; and (3) nonstop routes that Spirit plans to fly soon. The law, the evidence, and common sense all show that O&D pairs are the relevant geographic markets to analyze this acquisition. Because the "consumer's options and the consumer's choices among them" are what "relevant market analysis ultimately depends" on, the law demands that relevant antitrust markets be defined from "the perspective of consumers." *Flovac, Inc. v. Airvac, Inc.*, 817 F.3d 849, 855 (1st Cir. 2016); PCOL ¶¶ 27-40. Therefore, courts have often concluded that O&D pairs are the relevant geographic markets for evaluating competition in the airline industry. PCOL ¶¶ 41-42; *see, e.g., United States v. Am. Airlines Grp. Inc.*, -- F. Supp. 3d --, 2023 WL 3560430, at *36 (D. Mass. May 19, 2023), *appeal docketed*, No. 23-1802 (1st Cir. Oct. 5, 2023) (holding "relevant geographic markets are O&Ds" in challenge to JetBlue's illegal Northeast Alliance with American Airlines).

Consumers are unlikely to view routes with different end points as reasonable substitutes for a route that they are intending to fly. For example, a family planning a trip from their home in Boston to visit relatives in Miami would not consider a trip to or from another city as "a viable alternative." *See Home Placement Servs., Inc. v. Providence J. Co.*, 682 F.2d 274, 280 (1st Cir. 1982); PFOF ¶ 332. Indeed, ordinary-course documents show, and Defendants' executives testified, that JetBlue and Spirit use the words "routes," "markets," and "origin-and-destination pairs" interchangeably as part of their work. *See* PFOF ¶¶ 333-334. This common-sense approach also recognizes the economic reality that airlines compete and set prices for air passenger service at the *route* level. PFOF ¶ 334.

Defendants' arguments in favor of a broad national market confined to the perspective of airlines and based on "supply-side substitution" fall flat. PCOL ¶¶ 33-34. The goal of geographic market definition is to illuminate where consumers can practically turn to seek alternatives. PCOL ¶¶ 24, 44. Defining a separate national market does not advance that goal because consumers seeking to travel a specific route do not have any reason to consider airlines that do not serve that route, and Defendants have failed to present any facts, legal principles, or expert testimony that would justify using supply-side substitution to support a national market. PCOL ¶¶ 33-34, 41-42; PFOF ¶¶ 347-348.

Further, given that Defendants do not seriously dispute that O&D pairs are relevant markets, *see* PCOL ¶ 41, whether there is also a broader market for air travel is beside the point. An acquisition is unlawful under Section 7 if it is reasonably probable to result in a substantial lessening of competition in "*any* line of commerce" and in "*any* section of the country." 15 U.S.C. § 18 (emphasis added). Thus, "if anticompetitive effects of a merger are probable in 'any' significant market," the merger violates Section 7. *Brown Shoe*, 370 U.S. at 337; *see also*

*United States v. Anthem, Inc.*, 855 F.3d 345, 368 (D.C. Cir. 2017) ("*Anthem II*") (harm in a single local market "is an independent basis for enjoining the merger," even "absent a finding of anticompetitive harm in" other markets); PCOL ¶¶ 43-47.

The Court should consider all evidence through the lens of each "area of effective competition." *Brown Shoe*, 370 U.S. at 336. What matters is how the evidence illuminates competition in each of the more than 375 relevant markets at issue in this case. Evidence that is "national" in character can be relevant only in evaluating whether the proposed acquisition may result in harm in each relevant market—that is, O&D pair markets. But the broader aspects of competition Defendants have emphasized—such as loyalty programs, credit card programs, and justifying higher prices on the basis of "relevance"—do not negate the importance of O&D pair markets, nor do they address the harms that the proposed deal threatens in those markets.

## II.     Plaintiffs Have Established a Strong *Prima Facie* Case that the Proposed JetBlue-Spirit Deal Is Anticompetitive

Plaintiffs established a strong *prima facie* case that the proposed acquisition poses a danger to competition. The evidence showed that the merger is presumptively illegal under controlling Supreme Court precedent in 183 overlap markets based on market concentration statistics alone. PFOF ¶ 351; PCOL ¶¶ 48-51. But Plaintiffs have not rested on that structural presumption. Plaintiffs bolstered that presumption (and, in non-presumption markets, made their *prima facie* case) with a mountain of additional, direct evidence proving that the acquisition threatens harm to competition in several ways, not only in markets where the presumption exists but in all markets where Spirit flies or plans to fly. *See FTC v. Hackensack Meridian Health, Inc.*, 30 F.4th 160, 173 (3d Cir. 2022); *see also* PCOL ¶¶ 11-12 (discussing significance of direct evidence to strengthen or establish *prima facie* case). In all overlap markets, the proposed acquisition would eliminate important head-to-head competition between Defendants. PFOF

¶¶ 373-409; PCOL ¶¶ 54-57. And in all current or planned Spirit markets, the proposed acquisition threatens substantial harm to competition by (1) increasing fares; (2) reducing the number of planes and seats available to meet demand; (3) removing Spirit's uniquely disruptive market presence; (4) eliminating a valued low-cost option for cost-conscious consumers; and (5) increasing the risk of tacit coordination among the remaining airlines.

### A. This Acquisition Is Presumptively Illegal in 183 Markets Where JetBlue and Spirit Compete, Including 51 Nonstop Overlap Markets

The proposed acquisition is presumptively illegal based on Defendants' combined market shares in 183 overlap markets ("presumption markets"), including 51 nonstop overlaps, where JetBlue and Spirit both compete. PFOF ¶¶ 349-358; PCOL ¶¶ 48-51. The threat of harm is especially pronounced in the 51 nonstop presumption markets, as evidenced by the magnitude of harm projected there (at least $750 million per year) and the number of passengers affected there (55 million). *See* PFOF ¶¶ 472, 482; *infra* Part II.H (discussing harm projections). These significant numbers reflect the fact that many of these 51 routes serve large, densely populated cities with a higher degree of frequency. PFOF ¶ 362. But the proposed deal is also presumptively illegal on more than 100 other routes, some of which serve less populated areas that have fewer options for air travel, such that eliminating Spirit as an option there would be an especially significant loss. PFOF ¶¶ 351-356.

Evaluating market concentration at a set point in time is a practical necessity of antitrust analysis. Changes around the precise edges of the routes where Defendants compete head-to-head are to be expected. Notwithstanding ordinary fluctuation, the breadth and depth of head-to-head competition between JetBlue and Spirit has remained steady or increased for many years. Even with some route changes since the deal was announced, the number of nonstop overlap routes meeting the presumption has changed only slightly (51 then, 49 today). PFOF ¶ 367.

Further, there is a large and unchanging core of dozens of nonstop presumption markets: Defendants' combined shares on 35 of those presumption markets have exceeded the threshold for a presumption for each of the past three years; those routes account for more than 80% of the passengers traveling on the nonstop presumption markets, and Defendants have continuously served most of those routes for many years—sometimes decades. PFOF ¶¶ 362-368.

**B.    The Proposed Acquisition Would Eliminate Head-to-Head Competition That Has Lowered Fares, Expanded Choices, and Allowed More Passengers to Fly**

Plaintiffs' *prima facie* case is "bolstered by the indisputable fact that the merger will eliminate competition between the two merging parties." *FTC v. H.J. Heinz Co.*, 246 F.3d 708, 716-17 (D.C. Cir. 2001) ("*Heinz*"). Ample evidence proved that head-to-head competition between Defendants has benefited consumers in the form of lower prices, increased choice, and innovation, and that the proposed acquisition would eliminate those benefits.

Head-to-head competition between Spirit and JetBlue lowers fares for consumers in three distinct ways, as the evidence showed. *First*, Spirit offers its own lower fares, which are lower on average than its competitors' fares, including JetBlue's. PFOF ¶¶ 131-132. This is shown by Spirit's own analysis and confirmed by Plaintiffs' expert. PFOF ¶¶ 340, 418. Those low Spirit fares also stimulate demand, enabling more consumers to travel. PFOF ¶¶ 200-211. *Second*, competition from Spirit, according to JetBlue, places "extreme fare pressure" on JetBlue (Tr. Ex. 644 at -460) and therefore causes JetBlue to reduce its prices. PFOF ¶¶ 373-409. The evidence showed that JetBlue responds to Spirit competition by reducing or declining to raise its fares in response to Spirit's ultra-low fares (sometimes matching Spirit dollar-for-dollar), and competition from JetBlue sometimes also leads Spirit to lower its fares even more. PFOF ¶¶ 396, 399-407. Even when JetBlue tries to "ignore Spirit," it cannot; it still has to offer lower fares. PFOF ¶ 381. Indeed, when Spirit enters a JetBlue-served market, JetBlue reduces fares by 10.5

to 15.5 percent, controlling for other factors. *See* PFOF ¶ 409. *Third*, Spirit's presence on a route also causes the Big Four airlines to offer lower fares, which makes it even harder for JetBlue to raise prices, and which ultimately "drives savings for all travelers even those who do not fly Spirit." Nov. 3, 2023 Tr. Vol. 1, 76:15-24 (Klein/Spirit); *see* PFOF ¶¶ 410-414.[2]

Head-to-head competition between Spirit and JetBlue has also resulted in greater innovation and consumer choice. Spirit was the first domestic carrier to introduce an à la carte product that allowed passengers to choose which features of their flight to pay for, and competition from that unbundled Spirit product caused legacy airlines and then JetBlue to introduce their own relatively unbundled offerings, like JetBlue's Blue Basic. PFOF ¶¶ 110, 113-118. And the evidence showed that many customers prefer Spirit over Blue Basic—even in the unusual circumstance when Spirit's prices are higher than JetBlue's—and many do not place much value on JetBlue's supposedly higher quality product amenities. PFOF ¶¶ 659-660; *see also infra* Part II.E.

## C.  There is a Reasonable Probability that the Proposed Acquisition Would Result in Higher Prices and Fewer Passengers on All Spirit Routes

The evidence demonstrates that the proposed acquisition would be reasonably probable to increase prices to consumers and decrease the number of passengers who fly, not only on overlap routes but on all routes Spirit flies or plans to fly soon. The reason is simple: when Spirit flies a route, prices go down and flying (demand) increases; when Spirit leaves a route, prices go back up and fewer people fly (demand decreases). PFOF ¶¶ 196-211, 498. This is the essence of the "Spirit Effect." Eliminating Spirit threatens to erase the lowest fares, increase average fares

---

[2] Defendants' expert, Dr. Hill, acknowledged that his preferred method for evaluating the impact of JetBlue and Spirit on the markets they enter—by only analyzing each carrier's impact on rivals' fares and not considering the value each provides to their own customers—would fail to capture the full harm that would be felt by passengers in the nonstop overlap markets. *See* Nov. 27, 2023, Tr. Vol. 2, 101:1-8 (Hill/Defs. Expert).

significantly, and reduce the number of passengers flying on routes Spirit currently serves. These

are quintessential anticompetitive effects that Section 7 was designed to combat. *See, e.g.*,

*Hackensack*, 30 F.4th at 172 (identifying "price increases and reduced product quality, product

variety, service, or innovation" as examples of anticompetitive effects); PCOL ¶¶ 54-71.

### 1. JetBlue expects fares to rise and the number of passengers flying to fall as a result of the transaction

JetBlue itself expects fares to increase and the number of people flying to fall as a result

of its proposed acquisition of Spirit. In justifying the proposed deal to its board of directors,

JetBlue projected that, after it acquired Spirit, fares would increase market-wide by 30% on

average and fewer passengers would fly on routes that Spirit currently serves. PFOF ¶¶ 491-92,

498. JetBlue based its assessment on real-world evidence of price increases and lower customer

demand when Spirit exits a market. PFOF ¶ 498. Critically, and as the evidence showed at trial,

this modeled fare increase was a necessary input to a 24% projected revenue increase, which

JetBlue relied on to make representations to its board of directors, shareholders, and other

stakeholders about the value of the deal to JetBlue and to justify both the exorbitant purchase

price and the billions of dollars of debt used to pay it. PFOF ¶¶ 328, 490-502. JetBlue did not

present any ordinary-course evidence disavowing this analysis or projecting a different outcome.

In addition to these projected market-wide fare increases, JetBlue separately forecasted that

absorbing Spirit would allow it to gain "pricing power" at certain airports, resulting in additional

targeted price increases on consumers who rely on those airports to travel. PFOF ¶ 510. JetBlue's

projected price increases and output reduction after it completes the acquisition are the very

definition of an anticompetitive effect. More importantly, they demonstrate that this acquisition

is in the heartland of acquisitions that Section 7 was enacted, and subsequently strengthened, to

stop in their incipiency.

2. **This deal is a "high-cost, high-fare" carrier acquiring and eliminating "low-cost, low-fare" carrier, and JetBlue would incur significant costs as a result of the transaction**

Spirit has lower operating costs than JetBlue, and those lower operating costs are what give Spirit the flexibility to operate profitably at lower fare levels. PFOF ¶¶ 48, 54, 151, 154-155. Defendants concede that Spirit's assets would no longer operate as a ULCC after the acquisition. PFOF ¶¶ 515-519. And JetBlue's internal calculations indicate that JetBlue expects to incur significant costs as a result of the transaction. PFOF ¶¶ 515-517. The higher costs of the merged firm belie any suggestion that this deal could somehow result in *lower* fares than JetBlue offers today.

3. **Before accepting JetBlue's offer, Spirit acknowledged the proposed transaction was anticompetitive**

Before Spirit's shareholders' accepted JetBlue's offer, Spirit also understood that this acquisition would increase prices and reduce traffic. PFOF ¶¶ 286, 304-313. Spirit management repeatedly sounded the alarm to its board of directors, its shareholders, its customers, and the public at large about the threat the deal posed to consumers. Spirit pointed to JetBlue's own statements indicating that "it would raise fares and reduce capacity." PFOF ¶ 304. And it drew its own conclusion that the deal would "reduce[] capacity and increase fares," eliminating "a key competitor" of JetBlue's. PFOF ¶ 286. Spirit projected these dire consequences independent of other market conditions, such as JetBlue's then-participation in the Northeast Alliance with American Airlines. PFOF ¶ 312. These concerns did not disappear. Spirit management continued to press these concerns until they were ultimately overruled by Spirit's shareholders who preferred JetBlue's all-cash proposal. PFOF ¶¶ 299-300.[3]

---

[3] Frontier also concluded that the proposed JetBlue/Spirit deal would lead to "an admitted, immediate and substantial *output reduction*" and "an admitted, immediate and substantial *price increase*" based on

### D. The Proposed Acquisition Would Result in Fewer Seats on Planes and Threatens to Result in Fewer Planes

The proposed acquisition threatens harm to consumers by reducing airline capacity in every market Spirit flies or plans to fly soon. The evidence is undisputed that JetBlue plans to remove more than 10% of seats (6.1 million seats on flights each year) from all Spirit aircraft by converting them to the JetBlue layout. PFOF ¶¶ 629-696. Defendants offered no persuasive response to this evidence. Their principal answer was Mr. Scheff's opinion that the combined firm could partially offset the lost seats by flying aircraft more frequently. Mr. Scheff's analysis is divorced from JetBlue's ordinary-course documents, does not include any evaluation of whether the supposed utilization increases would be profitable, uses inconsistent methods to evaluate the standalone and combined fleets, and ignores the fact that Spirit already flies its aircraft more hours per day than does JetBlue. PFOF ¶¶ 692-696. Thus, it is unreliable and should not be credited.

Further, the deal may result in the loss of even more than the 6.1 million seats caused by converting Spirit planes to JetBlue planes because a post-transaction JetBlue would also have an incentive to reduce the size of its aircraft fleet and taper its growth. PFOF ¶¶ 520-535, 695. This is because a post-transaction JetBlue would need to manage the enormous debt load the transaction is adding to its balance sheet, which is why JetBlue plans for the combined airline to grow slower than either Spirit or JetBlue plan to grow on their own. PFOF ¶¶ 324-330, 533-534. The acquisition would increase JetBlue's debt significantly, bringing its debt-to-capital ratio to a level comparable to the legacy airlines, and reducing its long-term flexibility. PFOF ¶ 329.

---

JetBlue's own statements to investors. Tr. Ex. 705 at -475, -476. At trial, Frontier's CEO explained Frontier's view that JetBlue would raise fares by approximately 40 percent after the acquisition.  Nov. 14, 2023, Tr. Vol. 1, 68:1-15 (Biffle/Frontier).

E.      The Elimination of Spirit Would Reduce Consumer Choice

The proposed deal would also reduce consumer choice by "withdraw[ing] a product that a significant number of customers strongly prefer," which is "a harm to customers over and above any effects on the price or quality of any given product." *Anthem II*, 855 F.3d at 366; *see also* PCOL ¶ 62. The evidence showed that millions of cost-conscious travelers prefer the no-frills product offered by Spirit and other ULCCs generally because they purchase a ticket primarily to reach a destination, and they place little or no economic value on features not needed for that purpose, such as Wi-Fi, extra legroom, or in-flight refreshments. PFOF ¶¶ 129-143, 362, 364-366, 472. They reveal that preference with their purchase decisions—approximately 30% of Spirit passengers purchase just a seat, with no add-ons at all, and approximately 40% of Spirit customers are repeat customers within the previous 12 months. PFOF ¶¶ 134, 142.

The option to choose Spirit's low fares and unbundled product is particularly important for cost-conscious passengers because Spirit's entry on a route most acutely pulls down the lowest fares that such travelers depend upon. PFOF ¶ 416-417. JetBlue neither serves nor benefits cost-conscious travelers to the same degree as Spirit, in part because it has higher costs and higher average fares than Spirit. PFOF ¶¶ 47-48, 54-55, 416-417.

The proposed deal would not only eliminate Spirit as an option for these cost-conscious travelers, but it would also eliminate half of the ULCC capacity in the United States, substantially reducing the availability of a ULCC option for air travel. PFOF ¶¶ 3, 305, 311. For many travelers, having that ULCC option is the difference between being able to fly—to see a loved one or to make it to an important event—and being priced out of the market. Other options, like Blue Basic or legacy carriers' basic economy fares, are not fully unbundled and require customers to pay for features that cost-conscious travelers do not want to buy. PFOF

14

¶118; *see also infra* Part IV.B (discussing differences between Spirit fares and basic economy fares).

> **F.      The Proposed Transaction Would Eliminate a Maverick, Spirit, and Weaken the Disruptive Impact of JetBlue**

In addition to the threats to competition described above, the proposed acquisition would eliminate Spirit as an independent "maverick" in highly concentrated markets. Anticompetitive effects are more likely when a proposed acquisition would eliminate a so-called "maverick" that is a particularly aggressive competitor in a highly concentrated market. PCOL ¶¶ 58-60. The evidence proved that this acquisition would do just that by eliminating Spirit's uniquely disruptive competitive influence on the marketplace. Spirit is a maverick not only because of its aggressively low fares, but also because Spirit brings that disruptive competition to the backyards of dominant market incumbents, forcing them to respond, to the benefit of consumers. PFOF ¶¶ 181-195. Spirit is unique among ULCCs for having a track record of going toe-to-toe with the Big Four in major metropolitan markets and persisting in providing service in those markets. PFOF ¶¶ 191-195. Beyond price, Spirit also acts as a disruptor by innovating new product offerings that consumers value, to which competing airlines must also respond. Spirit was the first domestic carrier in the United States to offer unbundled fares and self-bag drop machines, the first ULCC to introduce Wi-Fi across its entire fleet, and it plans to be the first to introduce seats that provide more useable leg room without eliminating any seats. PFOF ¶¶ 123-128.

Spirit is not the only maverick that would be affected by this transaction. Although JetBlue has historically acted as its own kind of maverick, *see* PFOF ¶¶ 465-469, JetBlue would have increased incentive to behave more like a higher-fare, higher-cost legacy airline after it acquires Spirit. Being a maverick is not an immutable characteristic, and that status can shift

based on changed incentives and structures. JetBlue's acknowledged plans to become more reliant on business travelers, and connecting service, *see* PFOF ¶¶ 262-268, 507-512, reflect JetBlue's plan to use this acquisition to embrace more aspects of a legacy business model. The court in the Northeast Alliance case raised a similar concern when it observed that the agreement with American Airlines "diminish[ed] JetBlue's independence and incentive to pursue disruptive strategies." *Am. Airlines Grp.*, 2023 WL 3560430, at *38.

### G. The Proposed Acquisition Would Increase the Risk of Anticompetitive Coordination in All Spirit Markets

The proposed acquisition would also increase the likelihood of anticompetitive coordination among airlines, which would be an independent, insidious harm to competition. *See Heinz*, 246 F.3d at 725 ("It is a central object of merger policy to obstruct the creation or reinforcement by merger" of oligopolies featuring tacit coordination) (citation omitted); *see also* PCOL ¶¶ 63-65. Indeed, Section 7 is the "principal method by which the law has sought to deal with collusive pricing that is not considered deterrable by the rule against price fixing." Richard A. Posner, ANTITRUST LAW 118 (2d ed. 2001); *see also* PCOL ¶¶ 63-65. As such, it is left to Section 7 enforcement to prevent acquisitions from creating or reinforcing conditions that would enable such coordination. It does so by targeting for prohibition acquisitions that threaten to exacerbate coordination in industries that are already susceptible to it. PCOL ¶ 66.

Here, the evidence establishes both that the airline industry is prone to coordination in the relevant markets and that this proposed acquisition particularly threatens to increase the risk of that coordination. Courts have identified market characteristics that play a role in making those markets susceptible to oligopolistic coordination. PCOL ¶ 67. The airline industry shares many of those characteristics, as other courts have held. PCOL ¶ 68; *see also* PFOF ¶¶ 422-423. *First*, the acquisition results in substantial increases in concentration in already highly concentrated

markets. PFOF ¶ 456; *see also* PFOF ¶¶ 349-356; PCOL ¶ 70. *Second*, airline fares are unusually transparent to other industry participants because they are filed publicly through the Airline Tariff Publishing Company, or ATPCO. PFOF ¶¶ 440; *see also* PFOF ¶¶ 424-428. In addition to the visibility of the fare itself, airlines can use ATPCO to make the strategic purpose of a fare clearer to its rivals. Airline pricing analysts are trained to interpret and understand other airlines' fare actions, including how those rivals use tags in filings that are irrelevant to consumers. Thus, while the world may wonder what those parts of the fare basis codes and footnotes mean, rival airlines already know. PFOF ¶¶ 428, 451, 453-455. *Third*, consumer transactions in the airline industry are small and rapid, making coordination more sustainable because if one airline deviates from coordination, its rivals can quickly respond. PFOF ¶ 432. *Fourth*, there are a small number of competitors in each market, meaning that there are few firms to monitor and that the gains of coordination are greater. PFOF ¶ 433. *Fifth*, the airline industry involves "multi-market contact." This means that airlines encounter one another in many markets, which in turn facilitates parallel accommodating conduct and use of disciplinary mechanisms such as cross-market initiatives to encourage rivals to raise prices. PFOF ¶ 422. *Finally*, the airline industry has a history of coordination, including a history of airlines using ATPCO to communicate with each other, and in some instances using ATPCO to reach agreements on pricing. PFOF ¶¶ 437-439. Accordingly, the acquisition substantially increases the risk of coordination by removing a competitor from already concentrated markets that are susceptible to coordination.

This acquisition would increase the risk of coordination for two additional reasons. *First*, it would eliminate Spirit, which plays an important role as a maverick in disrupting coordination. *See supra* Part II.F; PCOL ¶ 69. Spirit plays that disruptive role by filing very low fares, making its fares less transparent to competitors, and having a low-cost structure and unique business

strategy that insulate it from retaliation. PFOF ¶¶ 457-464; *see also* PFOF ¶¶ 430-431. *Second*, the proposed acquisition would make JetBlue more like a legacy airline by becoming bigger on more routes and operating more like a hub-and-spoke carrier, making it more susceptible to cross-market retaliation. PFOF ¶¶ 465, 469. JetBlue also has post-acquisition plans to cater more to less price-sensitive corporate traffic, to create greater loyalty among higher-paying passengers, and to command a revenue premium from having a larger presence at select airports, all of which would increase JetBlue's incentives to coordinate more closely with the Big Four. PFOF ¶¶ 507-510, 513-514.

Defendants have not pointed to any evidence that there are "special circumstances," *FTC v. Elders Grain, Inc.*, 868 F.2d 901, 906 (7th Cir. 1989), extraordinary structural barriers to coordination in the airline industry, or that this acquisition somehow creates such barriers, especially in the large number of markets where the deal is presumed to be anticompetitive. *See Heinz*, 246 F.3d at 725; PCOL ¶ 70. On the contrary, they failed to refute Plaintiffs' showing that the transaction will enhance the risk of anticompetitive coordinated effects. Their economic expert, Dr. Hill, acknowledged that there have been periods when coordination has occurred in the airline industry, and he agreed that Spirit is a "disruptive force" that "lowers the risk of coordination in the markets where it competes today." Nov. 27, 2023, Tr. Vol. 2, 167:8-11, 168:16-22 (Hill/Defs. Expert). Thus, the elimination of Spirit's uniquely disruptive force through the proposed acquisition would increase the risk of coordination that harms consumers.

## H.   The Proposed Acquisition Is Conservatively Projected to Cause Nearly $1 Billion of Harm Each Year to American Consumers in the Relevant Markets

Expert economic analysis presented at trial projected, conservatively, that the transaction would cause nearly $1 billion of net harm each year to consumers in more than 175 relevant markets where Spirit flies today. PFOF ¶¶ 470-483. That analysis was based on real-world

evidence of the significant effect that Spirit's entry has on average fares in a market. PFOF ¶¶ 470.

The almost $1 billion of annual net harm, calculated on a route level and summed across nonstop overlap and Spirit-only nonstop markets, is a conservative estimate because it does not include all relevant markets that would be affected by the transaction. PFOF ¶¶ 344, 475. It is also conservative because it assumes *arguendo* and despite contrary evidence that the combined firm (1) would not move aircraft out of the relevant markets (it is likely to do so), and (2) that whatever "JetBlue Effect" bears on market fares would not decrease despite JetBlue's changed incentives as a result of the deal. PFOF ¶¶ 465-469, 680-683. Plaintiffs' route-level harm calculations gave Defendants the benefit of the doubt on both of these issues, which Defendants claim as efficiencies and therefore bear the burden of demonstrating. PCOL ¶¶ 92-95. Even crediting these assumptions for the sake of argument, the proposed acquisition is still projected to inflict significant harm from price increases because Spirit lowers market-wide average fares more than JetBlue on a per-plane basis, such that replacing Spirit with JetBlue is expected to increase fares on average. PFOF ¶¶ 479-482.

## III.   Defendants Have Failed to Produce Sufficient Evidence to Rebut Plaintiffs' Strong *Prima Facie* Case

Defendants bear the burden to rebut Plaintiffs' *prima facie* case by producing "significant evidence," *United States v. Marine Bancorp., Inc.*, 418 U.S. 602, 631 (1974), that "mandate[s] a conclusion" that their transaction does not threaten "a substantial lessening of competition," *United States v. Gen. Dynamics Corp.*, 415 U.S. 486, 497-98 (1974); PCOL ¶ 13. The stronger the *prima facie* case, the greater the evidence Defendants must offer to rebut it. *Hackensack*, 30 F.4th at 176; PCOL ¶ 14. Because Plaintiffs presented a strong *prima facie* case indicative of a serious threat to competition, *see supra* Part II, Defendants' production burden in this case is

significant. If Defendants fail to rebut Plaintiffs' prima facie case, then a violation of Section 7 is established. PCOL ¶ 18.

Defendants presented four rebuttal arguments: (1) potential entry and expansion by other carriers into the relevant markets will offset the proposed deals harms, (2) partial asset divestitures of some gates and landing slots at four airports will allow Frontier and Allegiant to replace Spirit's competitive intensity, (3) argumentation that a bigger JetBlue will create consumer benefits that outweigh any harm the deal would cause, and (4) Spirit allegedly has unresolvable competitive weaknesses. The record demonstrates that these arguments lack evidentiary support, and none of them, collectively or individually, rebut Plaintiffs' strong *prima facie* case.

### A.   Defendants' Speculation About Other Airlines' Potential Entry and Expansion Fail to Rebut Plaintiffs' *Prima Facie* Case

Entry or expansion by other airlines—or what is sometimes called "backfilling"—is unlikely to deter or counteract the significant harms that this transaction threatens to inflict on consumers. Defendants bear the burden to show that entry or expansion into each of the more than 375 relevant markets at issue in this case would be "timely, likely, and sufficient in its magnitude, character, and scope to deter or counteract the competitive effects of concern." *FTC v. Sanford Health*, 926 F. 3d 959, 965 (8th Cir. 2019); *see* PCOL ¶ 80.

Entry into the relevant markets is *timely* if it can occur quickly enough to deter or offset harm that would otherwise result from the acquisition in those relevant markets. PCOL ¶¶ 81-82. Entry is *likely* if other firms will have the financial incentive and practical ability to enter the relevant markets, accounting for attendant costs and risks of entry and any barriers to entry. PCOL ¶¶ 83-85. And entry is *sufficient* if it is at a scale and scope that is big enough to offset any harm to competition. PCOL ¶¶ 86-90. As to the sufficiency of entry, the key question is whether

20

the potential entrants would enter and expand beyond their own preexisting growth plans to offset the reduction in competition caused by the deal. PCOL ¶¶ 87-88. Merely identifying potential entrants, pointing to examples of historical entry that are anecdotal or outside the relevant markets, or positing the mere threat of entry or generalized incentive to enter are not enough to meet Defendants' burden. PCOL ¶¶ 78-79, 89, 110-116.

As shown below, (1) Defendants cannot overcome the significant hurdles to showing that entry and expansion by *any* airline is likely to occur in a timely and sufficient manner; (2) Defendants' claims about potential entry and expansion by other ULCCs fail; and (3) Defendants' claims about potential entry and expansion by the Big Four carriers also fail.

### 1. Defendants' argument about entry or expansion by any airline faces significant hurdles that Defendants cannot overcome

Any argument that entry and expansion will ameliorate the anticompetitive effects of this acquisition is contrary to the evidence for two primary reasons.

*First*, Defendants have a high burden to show that entry and expansion would be timely in light of the imminent harm threatened by the proposed acquisition. Because their proposed transaction would erase Spirit from more than 375 relevant markets and give JetBlue the power to control Spirit's business overnight, the harm threatened by the acquisition is likely to be widespread and to occur relatively quickly. *See* PCOL ¶ 82. As soon as the transaction closes, JetBlue will begin making all pricing, network, scheduling, and other competitive decisions for the assets controlled by the former Spirit, regardless of what color the planes are painted. PFOF ¶¶ 481, 491. Immediately after closing and eliminating Spirit as an independent rival, JetBlue no longer would have the incentive to offer the low prices that Spirit offers today on both overlap and non-overlap routes, and JetBlue would face strong incentives to remove Spirit planes from the overlap routes. PFOF ¶¶ 359-361, 421, 477. Tangible harms, in the form of higher prices,

would likely manifest within weeks or months of the transaction's closing by consumers purchasing tickets for travel in the near future. *See* PFOF ¶¶ 481, 491; *see also id.* ¶¶ 211, 498, 505.

*Second*, Defendants would also have to show that entry and expansion would be sufficient to offset significant and widespread consumer harm, despite the lack of real-world evidence substantiating the prospect of entry on that scale. PCOL ¶¶ 86-90. Entry on a route by Spirit, and to a lesser extent JetBlue, significantly reduces fares. PFOF ¶¶ 58, 199-210, 272-278, 408-409, 667-668. Their significant impact suggests entry is difficult. *See id.*; PCOL ¶¶ 77-78; *see also id.* ¶¶ 87-91. Further, these companies have preexisting plans to grow and enter new markets. PFOF ¶¶ 59, 63-70, 251-255, 553-568. The market opportunities for entry (*i.e.*, consumer demand) already exceed the capacity of ULCC carriers to address them. This is true today regardless of the proposed acquisition. Eliminating Spirit will simply add to that shortfall because Spirit accounts for nearly 50% of ULCC capacity. PFOF ¶ 305. Given this surplus of unmet opportunities for growth that already exists, Defendants cannot meet their burden to show that airlines are somehow likely to enter on all routes (markets) at issue in this case.

The parties' appeal to entry is also refuted by JetBlue's own assessment of its post-transaction plans. In its own analysis, JetBlue found that fares increased 30% *after* Spirit exited. PFOF ¶¶ 211, 498-499. Defendants have not identified any entry that was induced by the substantial fare increase that occurred following Spirit's exit from these routes. Indeed, Defendants' current arguments about the ease of entry are refuted by the central premise of JetBlue's ordinary-course analysis: that it would enjoy a durable 30% average fare increase after the acquisition.

> ### 2.   Defendants have failed to produce evidence that timely and sufficient entry or expansion by other ULCCs is likely to prevent harm

There are several reasons why the Court cannot count on Frontier, Allegiant, or any other ULCC to replace Spirit: (a) other ULCCs, which lack the scale of Spirit, would not be able to grow rapidly enough to replace Spirit in a timely and sufficient manner; (b) other ULCCs' network strategies are inconsistent with timely and sufficient entry into the relevant markets; and (c) ULCCs lack the planes and pilots to enter with sufficient speed and scale.

> ### a.   Other ULCCs cannot grow large enough, fast enough to fix the harm from this transaction

Today, Spirit is the largest ULCC, accounting for roughly half of all ULCC domestic capacity. PFOF ¶ 305. By any reasonable measure, it would take remaining ULCCs collectively many years just to replicate Spirit's scale today. The evidence showed that ULCCs would have to grow at the historic and unprecedented rate of 85%, over the course of five years, just to replicate Spirit's *current* size. PFOF ¶¶ 566. Factoring in Spirit's and other ULCCs' current standalone plans to grow in the coming years, as is required for entry to be sufficient, PCOL ¶¶ 86-88, it would take ULCCs even longer than five years to replace Spirit. PFOF ¶ 566.

The relevant benchmark for whether ULCC entry could be both timely and sufficient is (1) how long it would take ULCCs to grow to replicate Spirit's scale and (2) whether that amount of time is fast enough to offset harm. Entry must be "of a 'sufficient scale' adequate to constrain prices and break entry barriers," *Chi. Bridge & Iron Co. N.V. v. FTC*, 534 F.3d 410, 429 (5th Cir. 2008); *see* PCOL ¶ 86, and "soon enough to offset anticompetitive effects of the merger," *Sanford Health*, 926 F.3d at 965; PCOL ¶ 81. The harm threatened by the proposed deal is likely to manifest quickly, *see supra* Part III.A.1, and ULCCs would have to collectively grow to Spirit's size no slower than two years after the deal closes. *See, e.g.*, PFOF ¶¶ 481, 491; *see* PCOL ¶¶ 81-82. Defendants presented no evidence to support the plausibility, let alone the

likelihood, of that kind of ULCC growth occurring in two years, and Plaintiffs' evidence demonstrates that such a scenario is borderline fanciful. *See, e.g.*, PFOF ¶ 566; *see generally id.* ¶¶ 537-598. More realistically, and as witnesses testified, that kind of growth would take a minimum of five years, perhaps much longer. PFOF ¶¶ 547, 566. That would come much too late to offset the harm the proposed deal threatens because, five years out from this deal closing, billions of dollars of price increases are likely to have already occurred. *See* PFOF ¶¶ 470-483.

It is no solution to this anticompetitive merger for Defendants to claim that other ULCCs might scramble their existing network strategies in response to this acquisition and somehow quickly redeploy their fleets to serve the more than 375 relevant markets Spirit serves today. What other carriers "might do" does not satisfy Defendants' burden to produce evidence that entry would be timely, likely, and sufficient. No evidence suggests that any ULCC—let alone all ULCCs collectively—would likely take such drastic measures in response to JetBlue's acquisition of Spirit. Moreover, as the Court observed, reshuffling existing ULCC capacity would necessarily have to come at the expense of the ULCC passengers flying routes that ULCCs would have to abandon in favor of the relevant markets in this case, creating new harms to competition. Nov. 6, 2023, Tr. Vol. 2 141:12-142:2 ("[W]ith a limited fleet [other ULCCs will] have to take air[planes] from someplace they fly now to fly out of these more attractive gates, thus impacting the consumers that fly ultra low-cost carriers.").

> **b.    Other ULCCs' business and network strategies undermine the prospect of their entry in the relevant markets**

Entry or expansion by other ULCCs into the relevant markets is also unlikely to occur or to be timely or sufficient because it would be incompatible with their existing networks and contrary to their business and network strategies. *See* PFOF ¶¶ 569-574; *see also id.* ¶¶ 575-592; PCOL ¶¶ 87-88.

As a general matter, other ULCCs are not well positioned to enter most of the relevant markets because they do not serve many of those markets' endpoints. In other words, while those ULCCs may be able to get a foothold in a city origin, they may not serve the relevant destination. Serving both endpoints of a route reduces the costs of adding service, shortens the ramp-up period for offering such service, and lowers the operational risks of entry. PFOF ¶¶ 67-70, 570. For these reasons, significant presence at both endpoints of a route (*i.e.*, serving five or more routes from each endpoint) is correlated with a much higher rate of entry than is less or no service at the endpoints. PFOF ¶ 570. And for about half of Spirit's routes, including 32 of the 51 nonstop presumption markets, no ULCC has significant presence at both endpoints and is thus not well positioned to enter in a manner that can be credited under the antitrust laws. PFOF ¶¶ 571-573.

The business and network strategies of other ULCCs are also not compatible with timely, likely, and sufficient entry on many Spirit routes. Frontier is unlikely to enter some Spirit routes at all because its network strategy is generally to fly routes that touch one of its "bases." PFOF ¶ 70. And if Frontier were to enter a Spirit route, such entry is unlikely to be sufficient because Frontier flies less often than Spirit and is more than twice as likely as Spirit to exit a route. PFOF ¶¶ 185, 588, 594-595. Because Frontier, unlike Spirit, enters routes with small capacity and is much more likely to exit quickly after entering, it is not a strong candidate to replace the competitive intensity Spirit brings to markets. *See id.*; *see also* PFOF ¶¶ 184, 576-577.

Allegiant's business strategy makes it even less likely to replace Spirit than Frontier. A core aspect of that strategy is to *avoid* competition with other airlines, which is why it faces no competition on 75% of its routes. PFOF ¶¶ 559, 578-579. Allegiant has focused on routes without competition for many years, and its chief revenue officer, Drew Wells, testified that it

has no plans to change its strategy. PFOF ¶ 579; *see also id.* ¶ 559. While that "decision to prioritize a relaxed lifestyle over robust competition," *United States v. H&R Block, Inc.*, 833 F. Supp. 2d 36, 74 (D.D.C. 2011), may serve Allegiant's interests, it cannot be counted on to protect Spirit's customers from harm. Allegiant is also poorly suited to enter the international and Puerto Rico routes that Spirit serves today. Allegiant has never flown international routes, has a history of exiting Puerto Rico routes because they were unprofitable, and has no concrete plans to offer international or Puerto Rico service, other than a proposed joint venture with a Mexican airline that has no imminent prospects of beginning service and only hopes to cover a limited set of routes. PFOF ¶ 598.

The remaining airlines described as ULCCs—Avelo, Breeze, and Sun Country—are not serious candidates to fill the competitive void Spirit would leave in the marketplace. Individually or collectively, these three airlines are dwarfed by Spirit's scale, and so they are only large enough to nibble around the edges of Spirit's existing network. PFOF ¶¶ 552-553, 566-567. Their network and business strategies are also poor fits to fill the void. Avelo, like Allegiant, has a strategy of avoiding competition; the vast majority of Sun Country's routes touch Minneapolis-St. Paul, making it incompatible with Spirit's routes; and Breeze is not a ULCC at all. PFOF ¶¶ 46, 70, 582-586.

### c. ULCCs are unlikely to enter the routes in enough time or with sufficient scale to fix the harm from this transaction

ULCCs, like other airlines, are vulnerable to the shortages in aircraft and pilots that have constrained industry growth. PFOF ¶¶ 85-90, 95-98. Yet Defendants also claim that ULCCs will overcome the shortages JetBlue faces to grow and enter new routes at an historic pace and in a manner that would replicate the competition that will be lost by eliminating Spirit from the market. Aside from its internal inconsistency, this claim has no evidentiary support.

26

ULCCs, like any other airline, have order books for new aircraft, but those order books do not suggest timely, likely, or sufficient entry for at least two reasons. *First*, those order books existed before this deal was announced, and those additional aircraft are already earmarked to fuel ULCCs' pre-existing growth plans. PFOF ¶¶ 543, 563. They do not account for any of the additional growth that would be needed to offset the proposed deal's threatened harms. *Second*, even if those order books contained all the aircraft needed to offset harm (they do not), they will trickle out aircraft over the remainder of this decade and would not be able to deliver aircraft quickly enough to offset harm. *See generally* PFOF ¶¶ 544-568. And there is no reasonable prospect of the ULCC order books growing any time soon. Boeing and Airbus, the two primary manufacturers of aircraft, are delayed in their aircraft deliveries, and it will be difficult for airlines to acquire additional aircraft from them for several years. PFOF ¶¶ 85-90. And few, if any, new planes will become available to lease until at least 2027. PFOF ¶ 90. Any hope of acquiring additional aircraft in the next two years that is above and beyond existing order books and fleet plans, is just that—a speculative hope, and nothing more.

ULCCs, like other airlines, are also affected by the shortage of the pilots that would be needed to offset the proposed deal's threatened harms. PFOF ¶¶ 95-98. Spirit also struggled to grow its pilot ranks alongside its aircraft deliveries, with pilots constraining growth more than aircraft until the middle of this year. PFOF ¶¶ 96.

Airlines can only expand to fill the competitive void to the extent they have the resources to do so. JetBlue says it needs this deal allegedly to overcome significant barriers to its growth, and no evidence suggests that ULCCs will fare any better against those barriers than JetBlue.[4]

---

[4] ULCCs are also affected by infrastructure limitations at airports, particularly at the most constrained airports. Defendants' contention that the limited set of proposed divestitures at four airports would allow Frontier and Allegiant to overcome these limitations has its own shortcomings. *See infra* Part III.B.

> **d.      Defendants' additional arguments about ULCC entry are contrary to the evidence and the law and should be rejected**

Notwithstanding all the foregoing, significant evidence that undercuts the prospects of timely, likely, and sufficient ULCC entry in the relevant markets, Defendants posit three reasons why such entry might still occur. Each of these reasons falls flat.

*First*, Defendants rely heavily on generalized evidence of entry and the abstract concept that planes are mobile. But that gauzy view of a free-flowing airline market "fall[s] to pieces in a stiff breeze." *Anthem II*, 855 F.3d at 364. For example, Defendants tried to suggest that more than 700 meaningful entry and exit events had occurred in one year on the 51 nonstop presumption markets, but cross-examination revealed that only a small fraction of them were actual entries or exits. PFOF ¶ 62. Moreover, Defendants focused on the bare fact of entry—any entry at all—without accounting for the scale or location of the entry. But "mere movement in the market," especially movement that is "anecdotal, and not necessarily tied to the relevant geography," is not enough to show timely, likely, and sufficient entry. *United States v. Anthem, Inc.*, 236 F. Supp. 3d 171, 222, 224 (D.D.C. 2017) ("*Anthem I*"); PCOL ¶ 89.

*Second*, Defendants rely on statements from two ULCC executives (Mr. Biffle of Frontier and Mr. Wells of Allegiant) that they would *consider* serving routes that Spirit exits. The law demands more than the mere possibility of what might or could occur. It requires evidence suggesting that these ULCCs are likely to actually enter Spirit's routes. PCOL ¶¶ 83-85. These two witnesses—who stand to benefit from the divestiture assets they may receive if the proposed acquisition is permitted—could not identify any specific routes they would consider entering, could not describe any concrete plans to enter any Spirit route where this deal threatens harm, and could not articulate where they would obtain the planes and pilots they would need to fill the void. PFOF ¶¶ 556, 627-629; 636-637. Defendants did not even attempt to show any ordinary-

28

course entry plans from Frontier, Allegiant, or any other airline. This dearth of substantiated evidence is striking, and off-the-cuff musings from optimistic business executives is not a substitute for credible and compelling evidence.

*Third*, to the extent that Defendants are suggesting that the mere threat of entry is enough to prevent price increases, that fails on both the law and the facts. The "mere threat of entry" is insufficient. *Chi. Bridge*, 534 F.3d at 430 n.10.; *see* PCOL ¶ 84. And if the mere threat of entry were enough to keep markets competitive, then prices would not go down so dramatically in response to *actual* entry. PCOL ¶¶ 83-85; PFOF ¶¶ 187-190, 196-210, 275, 479. Defendants offered no contrary evidence at trial.

> **3.   Defendants have not shown that timely and sufficient entry or expansion by the Big Four airlines is likely to prevent harm**

Defendants' hypothesized expansion of "basic economy" fares by legacy carriers and expansion of service by Southwest Airlines require no different conclusions. Defendants called only a single witness from the Big Four airlines, and they did not present evidence that legacy carriers have actually expanded basic economy fares or that Southwest has actually expanded service in response to Spirit exits in the past. *First*, as the evidence shows, legacy carriers offer basic economy primarily as a tool to compete with ULCCs, and to fill seats on planes that could not be sold as bundled, main cabin economy tickets. PFOF ¶¶ 113, 120-122. With Spirit, the largest ULCC, gone, legacy airlines would have much less incentive to offer basic economy or to offer it at the low prices it uses to compete against Spirit today. Moreover, the quantity of basic economy fares in a market is dialed up or down based on overall demand, and legacy airlines sometimes withdraw basic economy fares from a market entirely. PFOF ¶¶ 120-122. At bottom, legacy airlines' basic economy fares are ephemeral and can be wiped away with a few keystrokes. A seat that is sold as a basic economy ticket today can just as easily be sold as a more

expensive economy ticket tomorrow. PFOF ¶ 120. That is no substitute for Spirit, whose entire offering is low, fully unbundled fares.

*Second*, neither the legacy airlines' basic economy product nor Southwest's product is the same as Spirit's. Legacy basic economy passengers, unlike Spirit passengers, must pay for food and drink service and in-flight entertainment as part of their ticket, whether they want to or not. PFOF ¶ 118. As a result, legacy carriers charge more for their fares, on average, to cover the costs of those additional amenities. PFOF ¶¶ 24-25. And Southwest's product is even more bundled than basic economy, and it is also more expensive than the ULCC product because Southwest has a higher cost structure than ULCCs . PFOF ¶¶ 31-34, 539. Moreover, Defendants have put forward no evidence to suggest that, when Southwest or a legacy carrier offering basic economy enters a new market, either one is as effective as Spirit at lowering market-wide average fares.

**B.     Defendants' Proposed Divestitures Are Too Narrow and Uncertain to Restore Spirit's Competitive Intensity**

Defendants' proposal to divest assets to Frontier at LaGuardia and to Allegiant at Boston, Fort Lauderdale, and Newark is not a remedy for their unlawful deal. Defendants have failed to meet their burden to show that those divestitures are (1) "likely to occur" and (2) would "replace the competitive intensity lost by the merger." *United States v. Aetna Inc.*, 240 F. Supp. 3d 1, 60 (D.D.C. 2017); *see* PCOL ¶¶ 129-131. Replacing competitive intensity is no easy feat, particularly in a regulated industry with high infrastructure costs and significant barriers to entry. It requires a divestiture to (1) include all assets necessary to enable the buyer to compete as effectively as the seller, in both the short run and the long run; (2) create a new competitor capable of using and operating the divested assets as effectively as the seller does; and (3) leave the buyer with the incentive to compete as effectively as the seller does. PCOL ¶ 130. When

asked by the Court whether further assets *could* be divested, Defendants failed to identify any. Dec. 5, 2023, Tr., 25:14-26:20 (Defs.' Closing Arg.). Defendants' proposed divestitures are fundamentally incapable of satisfying this standard because they attempt to address only one of the many barriers that ULCCs face to replacing Spirit's competitive intensity. *See supra* Part III.A. The divestitures fail even to touch many of the affected relevant markets, and they are therefore insufficient regardless of the legal standard applied. Divestiture of airport-level assets—which Defendants do not even control—is simply not a good solution to the myriad barriers ULCCs face. Indeed, it is unlikely that any divestiture remedy could overcome them.

Defendants have failed to show that their proposed divestitures would replace the competitive intensity lost by the acquisition. The divestitures do not provide Allegiant or Frontier with the planes, engines, or pilots that would be required to fuel the growth needed for these airlines to step into Spirit's shoes. PFOF ¶¶ 321, 556, 626. The divestitures do not modify Allegiant's or Frontier's business models and network limitations, they do not obligate Allegiant or Frontier to fly any Spirit routes, and neither airline has specific plans to do so. PFOF ¶¶ 625, 628, 636. Nor is it likely either would do so based on their existing business strategies. *See supra* Part III.A.4 For example, Spirit serves international locations from Fort Lauderdale, but Allegiant offers no international service. PFOF ¶ 630. And in addition to all the other aspects of Frontier's business that are mismatched with Spirit routes, *see supra* Part III.A.4, Frontier would not be able to use LaGuardia gates to serve Spirit routes between the New York metro area and destinations more than 1,500 miles away (such as San Juan and Las Vegas) because of LaGuardia's perimeter rule, and Allegiant is unlikely to use its Newark assets to serve these heavily-trafficked routes served by multiple other airlines. PFOF ¶¶ 578-580, 628, 634-635.

It is also uncertain whether the proposed divestitures will occur as proposed. Allegiant paid less for the divestiture assets it seeks because of this uncertainty. PFOF ¶ 641. As the testimony of Broward County's Mr. Gale made clear, many of the purported divestiture assets are not even Defendants to sell, but instead require specific processes to determine which airlines will gain the assets after JetBlue "relinquishes" them. PFOF ¶¶ 643-645.

For all of the foregoing reasons, Defendants' partial asset divestitures, which touch only a fraction of the more than 375 individual routes (relevant markets) where this acquisition is illegal, cannot save this deal.

### C. Defendants Have Not Shown That Any Purported Efficiencies Would Offset the Harms Threatened by the Proposed Deal

The Supreme Court has cautioned that "[p]ossible economies cannot be used as a defense to illegality" under Section 7, *FTC v. Procter & Gamble Co.*, 386 U.S. 568, 580 (1967), and therefore many courts have expressed skepticism that "efficiencies" merging parties claim will result from their transaction are a viable defense to a Section 7 claim. PCOL ¶¶ 92-95. If efficiencies can be raised to try to rebut a *prima facie* case, they must (1) offset the anticompetitive concerns: (2) be merger-specific (*i.e.*, the efficiencies cannot be achieved by either party alone); (3) be verifiable, not speculative; and (4) not arise from anticompetitive reductions in output or service. PCOL ¶ 94. And where, as here, the relevant markets are highly concentrated, "proof of extraordinary efficiencies" is required. *Heinz*, 246 F.3d at 720. Defendants' "efficiencies" claims fail to satisfy these demanding standards.

Here, Defendants have principally argued: (1) converting Spirit to JetBlue will benefit consumers because JetBlue is a more effective competitor than Spirit; (2) consumers flying Spirit today will be better off flying JetBlue; and (3) enabling a bigger JetBlue would unlock new consumer benefits. None of these purported efficiencies is supported by reliable evidence or

qualifies as a cognizable efficiency under governing legal principles. *See*, *e.g.*, *St. Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775, 791-92 (9th Cir. 2015) (finding an increase in care for some patients is not "weighed" if there is an overall heightening of prices in the market).

The evidence shows that, on a plane-for-plane basis, Spirit is more effective at lowering average market fares than JetBlue, not the other way around. PFOF ¶ 479. Defendants' conception of "more effective competitor," as only relating to the impact of each company on rivals' fares, is cramped and irrelevant because it ignores the fares that Spirit and JetBlue themselves use to compete. PFOF ¶¶ 665-668. More critically, Defendants' conception of a "more effective competitor" is a red herring. Recognizing they cannot overcome the serious evidence of harm that is likely to flow from the elimination of Spirit in the more than 375 markets at issue in this case, Defendants attempt to redefine competition as measuring each firm's respective effect on competition and invite the Court to choose one. This is a false choice, and the Court should see this invitation for what it is. The evidence shows that consumers are better off when they can choose between and among an independent JetBlue and an independent Spirit both of which benefit competition and consumers in distinct and complementary ways. PFOF ¶¶ 272-278, 380-383, 408-414.

Consumers flying Spirit today value that Spirit's product gives them choices and only requires them to pay for what they want. PFOF ¶¶ 130-135. Consumers who value that kind of optionality would not be better off flying JetBlue, where they would be forced to pay for features they do not want. PFOF ¶¶ 656-664.

The evidence shows this clearly. About 85% of Spirit passengers choose not to pay for a carry-on bag, about 74% choose not to pay for the ability to select their seat, and more than 30%

choose not to pay for any "ancillary" services at all. PFOF ¶ 134. Defendants' claims to the contrary are unsupported. Requiring a Spirit customer to pay for features she does not value amounts to a price increase, not a cognizable efficiency. PCOL ¶¶ 96-101. And on the overlap routes, where harm is projected to be particularly acute and extensive, and where consumers already have the option of choosing JetBlue, converting Spirit to JetBlue is even less likely to benefit consumers because of the loss of head-to-head competition, and consumers will simply have fewer options than they had before. That is a harm to consumers, not an efficiency. *Anthem II*, 855 F.3d at 357; *id*. at 370 (Millett, J., concurring); PCOL ¶ 101.

Finally, the growth that JetBlue plans post-deal is not a cognizable efficiency because it is neither merger-specific nor a benefit to consumers in the relevant markets. JetBlue plans for the combined firm to grow slower and be smaller than JetBlue and Spirit would likely be together absent the acquisition. PFOF ¶¶ 526-535, 684-691. Therefore, the growth that JetBlue plans post-deal is not only achievable without the deal, but the deal actually slows down the growth that would otherwise occur. Defendants also have not presented any evidence that a bigger JetBlue would create concrete benefits for consumers in the relevant markets, let alone the kind of "extraordinary" benefits that would be needed to cancel out the harm that the proposed deal threatens for them. *Heinz*, 246 F.3d at 720.

### D. Spirit's Recent Financial Results Do Not Save This Acquisition

Spirit's recent negative financial performance is not a basis to allow this proposed acquisition. Defendants have not come close to demonstrating the kind of irredeemable downturn that is required by the "failing firm" and "weakened competitor" defenses, described below. To the extent that Defendants are attempting to argue more generally, without resorting to these doctrines, that Spirit will be a less vigorous competitor than it has been in the past, the record

does not support that forecast. Rather, the evidence shows that Spirit's recent negative financial results are an "anomaly," not the new normal.

Two legal doctrines can be relevant in addressing claims that an acquired firm's financial performance justifies consolidation. Under the "failing firm" defense, merging parties bear the burden of proving that (1) the acquired firm "face[s] the grave probability of a business failure,'" (2) "[t]he prospects of reorganization" under the bankruptcy laws are "dim or nonexistent," and (3) "the company that acquires the failing company . . . is the only available purchaser." *Citizen Publ'g Co. v. United States*, 394 U.S. 131, 137-38 (1969); PCOL ¶¶ 118-119. And courts only credit the "weakened competitor" doctrine "in rare cases, when the [Defendants] make[] a substantial showing that the acquired firm's weakness, which cannot be resolved by any competitive means, would cause that firm's market share to reduce to a level that would undermine the government's *prima facie* case." *FTC v. Univ. Health, Inc.*, 938 F.2d 1206, 1221 (11th Cir. 1991); PCOL ¶¶ 120-24. Both doctrines have demanding requirements and narrow applicability, PCOL ¶¶ 118-24, and the weakened competitor defense is "the Hail-Mary pass of presumptively doomed mergers," *ProMedica Health Sys., Inc. v. FTC*, 749 F.3d 559, 572 (6th Cir. 2014).

Defendants have not even attempted to satisfy any of the rigorous requirements of the failing-firm defense, nor could they. Spirit is not on the verge of failure, PFOF ¶¶ 251-255, and, even if it were, Defendants have made no showing that Spirit lacks other strategic options beyond this acquisition.

Nor have Defendants satisfied requirements of the weakened competitor defense because they have not presented any evidence that Spirit suffers from any fundamental "weakness" that is (1) unresolvable through competitive means, and (2) would cause Spirit's market share to drop to

a level that would make the proposed transaction permissible. PCOL ¶¶ 120-122. The first of

these requirements is especially demanding because "financial difficulties not raising a

significant threat of failure are typically remedied in a moderate length of time," *Aetna*, 240 F.

Supp. 3d at 92, and therefore weaknesses have only been found unresolvable through

competitive means when the firm is no longer able to access resources that are necessary to

compete. *See* PCOL ¶¶ 122-123.

There is no evidence to suggest that Spirit cannot access resources necessary to compete;

on the contrary, the evidence shows that Spirit has a large order book, growing revenues, a

growing network, and plans to return to profitability. PFOF ¶¶ 252-255. Indeed, only a few days

before this trial began, Spirit's CFO told the marketplace that Spirit's team remains "resilient and

nimble" and "committed to returning Spirit to sustained profitability." PFOF ¶ 251. That positive

outlook is no surprise because much of Spirit's recent financial performance has been

attributable to headwinds arising from problems with Pratt & Whitney engines used in many

Spirit aircraft. PFOF ¶¶ 100-102, 105. Those challenges are significant, but they are temporary

and unrelated to the viability of Spirit's business model. PFOF ¶¶ 99-105. Most importantly,

those challenges are clearly resolvable through competitive means, and the evidence suggests

that they will be—Pratt & Whitney has promised compensation for the losses, and Spirit has told

its investors to consider the losses "neutralized" due to that promise. PFOF ¶¶ 106. Defendants'

attempt to seize on these events to push their deal through is long on rhetoric and short on facts.

Their claim in closing argument that a few quarters of Spirit underperformance mean that

Plaintiffs' market share evidence "won't hold up on a going-forward basis," Dec. 5, 2023, Tr.,

46:3-9, is opportunistic speculation.

Additionally, the weakened competitor defense is premised on a "financially strong" company acquiring a "financially weak" company to resolve, through consolidation, the weakness that cannot be resolved by competitive means. *Kaiser Aluminum & Chem. Corp. v. FTC*, 652 F.2d 1324, 1339 (7th Cir. 1981). But the proposed acquisition would not resolve the source of Spirit's financial challenges. On the contrary, JetBlue suffers from many of the same challenges, including, to some degree, the Pratt & Whitney engine issue, PFOF ¶ 104, and the large amount of debt it would need to take on to finance the acquisition would only starve the combined firm of capital it could otherwise use to invest its way through these headwinds.

Beyond the "failing firm" and "weakened competitor" lines of argument, there is no basis to doubt Spirit's strength as a standalone competitor going forward. As noted above, many of its difficulties are attributable to unique circumstances with Pratt & Whitney engines, and its negative third quarter 2023 financial results were both expected and characterized by Spirit's own management as an "anomaly." PFOF ¶ 251. There is also nothing wrong with or inherently vulnerable about the ULCC business model. The CEO of Frontier refuted that notion when he testified that Frontier was "committed" to the ULCC business model and expected to get back to profitability. Nov 14, 2023, Tr. Vol. 1, 50:19-25 (Biffle/Frontier); *see also* PFOF ¶ 253. Moreover, even JetBlue appears not to doubt the viability of the ULCC business model given that it has staked its defense, in large part, on the theory that other ULCCs will replicate the competition that will be lost by eliminating Spirit from the market.[5]

---

[5] Even if Defendants successfully rebut the *prima facie* case (which they haven't), the Court should then carefully consider the totality of the circumstances—including market structure, head-to-head competition, and evidence of potential coordination—to determine if Plaintiffs have proven by a preponderance of the evidence that there is a reasonable probability that the transaction threatens competition. *See* PCOL ¶¶ 19-20. As demonstrated above and at trial, Plaintiffs have done so. *See, e.g.*, *Anthem I*, 236 F. Supp. 3d at 214-16 (even where defendant successfully rebutted the presumption with evidence of entry, plaintiff successfully carried ultimate burden of persuasion through evidence of anticompetitive effects); PCOL ¶ 19.

## IV.    The Proposed Acquisition's Threat to Competition in the Relevant Markets Cannot Be Justified By Putative Benefits in Other Markets

The record shows that the proposed acquisition threatens harm to consumers and competition in hundreds of markets. *See supra* Part II. During closing arguments, the Court questioned how to weigh that evidence of likely harm against evidence of possible benefits to other customers. Dec. 5, 2023, Tr., 11:10-18. To the extent Defendants invite this Court to balance the harms in the more than 375 relevant markets at issue in this case against benefits in other markets not at issue in this case, the answer as a matter of law is clear: the Supreme Court has prohibited that sort of cross-market balancing in Section 7 cases, holding that "anticompetitive effects in one market could [not] be justified by procompetitive consequences in another" market. *Phila. Nat'l Bank*, 374 U.S. at 370; PCOL ¶¶ 23, 110-116. That holding stems from the plain text of Section 7, which provides that acquisitions must be prohibited where "the effect of such acquisition may be substantially to lessen competition" "in any section of the country." 15 U.S.C. § 18.

Rebuttal arguments that point to putative benefits in one "section of the country" do not negate harms in other markets because competition and consumers in those other markets are still threatened with harm, and the statute is therefore still violated. PCOL ¶¶ 110-114. This rule is prudent and acknowledges the limited role of the judiciary. Making "value choice[s]" about which groups of consumers in which areas of the country should win and which should lose from acquisition "is beyond the ordinary limits of judicial competence." *Phila. Nat'l Bank*, 374 U.S. at 371. Congress did not intend courts to be central planners, calculating "some ultimate reckoning of social or economic debits and credits" when evaluating acquisitions under Section 7; it simply tasked courts with "preserv[ing] out traditional competitive economy." *Id*. This is also consistent

with our national commitment to "free and unfettered competition" as the "rule of trade" in this country. *See N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 4 (1956).

**V.**      **A Permanent Injunction of the Proposed Deal is the Proper Remedy**

The preferred remedy for an unlawful acquisition is to enjoin it outright. PCOL ¶¶ 125-127, 132-134. That is because a full-stop injunction is the only remedy that "assure[s] effective relief" and "promise[s] elimination of" the threat that an unlawful acquisition poses to competition. *United States v. E.I. du Pont de Nemours & Co.*, 366 U.S. 316, 326, 331 (1961) ("*du Pont II*"). What that means in practice is a "permanent injunction," *Anthem II*, 855 F.3d at 369, prohibiting Defendants from consummating the acquisition they proposed in July 2022 and that Plaintiffs challenged. PCOL ¶¶ 132-134 (identifying legal standard and listing cases in which enforcers obtained a permanent injunction). It is that proposed acquisition that Plaintiffs allege violates Section 7, and it is therefore that acquisition that represents the "violation[]" that Plaintiffs are asking the Court to "prevent and restrain." 15 U.S.C. § 25; PCOL ¶¶ 132-134. Such an injunction would not extend to or preclude acquisitions that might be proposed in the future. And even if the Court were to issue a broader injunction, which it has the authority to do, the Federal Rules of Civil Procedure afford parties the right to request modification or vacatur of injunctions for various reasons, including due to "a significant change either in factual conditions or in law." *Home v. Flores*, 557 U.S. 433, 447 (2009); *see* Fed. R. Civ. P. 60(b).

Once the government has established that an acquisition violates Section 7 of the Clayton Act, "all doubts as to the remedy are to be resolved in [the government's] favor." *du Pont II*, 366 U.S. at 334. The partial divestitures Defendants have proposed, even if completed, are inadequate to restore Spirit's competitive intensity. *See supra* Part III.C. If Defendants want to

avoid a full-stop injunction of their acquisition, it is their burden to come forward with a remedy that would restore competition, and they have failed to do so. PCOL ¶¶ 126-131.

Nor would another bite at the apple change that reality. Defendants cannot provide Frontier and Allegiant the assets they would need to compete as effectively as Spirit—including pilots, planes, and additional airport infrastructure. And in any event, divesting those kinds of assets would require the involvement of non-parties not before the Court. Nor do Defendants have any assets to sell Frontier or Allegiant that would change their business or network strategies to increase the likelihood of entering Spirit routes with sufficient capacity to replace the competitive intensity that would be lost as a result of Spirit's elimination. Nor would an injunction directing Frontier and Allegiant, who are not before the Court, to modify their business or network strategies be administrable. The facts presented at trial do not reflect a marginal Section 7 violation in this case. This merger is plainly anticompetitive and cannot be saved. Given the obvious threat this acquisition poses to competition, any risks here must be borne by JetBlue and Spirit, not the American public. As a result, the only adequate remedy here is a full-stop injunction barring Defendants from consummating the merger agreement underlying this action.

## **CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request that the Court conclude that JetBlue's proposed acquisition of Spirit violates Section 7 of the Clayton Act and therefore enjoin that acquisition from being consummated.

Dated: December 13, 2023          Respectfully submitted,

/s/ Edward W. Duffy
Edward W. Duffy
Arianna Markel
John M. Briggs
James L. Moore III
Aaron M. Teitelbaum
John R. Thornburgh II
United States Department of Justice, Antitrust Division
450 Fifth Street, NW, Suite 8000
Washington, DC 20530
Telephone: (202) 812-4723
Fax: (202) 307-5802
Email: edward.duffy@usdoj.gov

*Attorneys for Plaintiff United States of America*

/s/ William T. Matlack
William T. Matlack (MA Bar No. 552109)
Daniel H. Leff (MA BBO No. 689302)
Office of the Attorney General
One Ashburton Place, 18th Floor
Boston, MA 02108
Telephone: (617) 727-2200
Email: William.Matlack@mass.gov

*Attorneys for Plaintiff Commonwealth of Massachusetts*

/s/ Olga Kogan
Olga Kogan (*admitted pro hac vice*)
New York State Office of the Attorney General
28 Liberty Street, 20th Floor
New York, NY 10005
Telephone: (212) 416-8262
Email: olga.kogan@ag.ny.gov

*Attorney for Plaintiff State of New York*

/s/ C. William Margrabe
C. William Margrabe (*admitted pro hac vice*)
Office of the Attorney General
400 6th Street NW, Suite 10100
Washington, DC 20001

41

Telephone: (202) 727-6294
Email: will.margrabe@dc.gov

*Attorney for Plaintiff District of Columbia*

/s/ Schonette J. Walker
Schonette J. Walker (*admitted pro hac vice*)
Gary Honick (*admitted pro hac vice*)
Byron Warren (*admitted pro hac vice*)
Maryland Office of the Attorney General
200 St. Paul Place, 19th Floor
Baltimore, MD 21202
410-576-6470
swalker@oag.state.md.us
ghonick@oag.state.md.us
bwarren@oag.state.md.us

*Attorneys for Plaintiff State of Maryland*

/s/ Jamie L. Miller
Jamie L. Miller (*admitted pro hac vice*)
Supervising Deputy Attorney General
Office of the California Attorney General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA  94102
Tel: (415) 510-3565
Email:  Jamie.Miller@doj.ca.gov

*Attorney for Plaintiff State of California*

/s/ Ana Atta-Alla
Ana Atta-Alla (*admitted pro hac vice*)
State of New Jersey - Office of the Attorney General
Division of Law
124 Halsey Street – 5th Floor
Newark, NJ 07102
Telephone: (973) 648-6835
Ana.Atta-Alla@law.njoag.gov

*Attorney for Plaintiff State of New Jersey*

/s/ Jessica V. Sutton
Jessica V. Sutton (*admitted pro hac vice*)
Special Deputy Attorney General
North Carolina Department of Justice
Post Office Box 629

42

Raleigh, NC 27602
Tel: 919-716-6000
E-mail: jsutton2@ncdoj.gov

*Attorney for Plaintiff State of North Carolina*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing document was filed through the ECF system and will be sent electronically to the registered participants on the Notice of Electronic Filing.

Dated: December 13, 2023                    */s/ Edward W. Duffy*