UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
_____
                               )
UNITED STATES OF AMERICA,       )
COMMONWEALTH OF MASSACHUSETTS,   )
DISTRICT OF COLUMBIA,           )
STATE OF CALIFORNIA,            )
STATE OF MARYLAND,              )
STATE OF NEW JERSEY,            )
STATE OF NEW YORK, and          )
STATE OF NORTH CAROLINA,        )
                               )
          Plaintiffs,           )
                               )
               v.               )    CIVIL ACTION
                               )    NO. 23-10511-WGY
JETBLUE AIRWAYS CORPORATION, and )
SPIRIT AIRLINES, INC.,          )
                               )
          Defendants.           )
_____)
```

YOUNG, D.J.                                January 16, 2024

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

I.   INTRODUCTION ............................................. 2

II.  FINDINGS OF FACT ........................................ 6

  A. The Industry ........................................... 6

  B. The Defendants ........................................ 15

    1. JetBlue ............................................. 15

    2. Spirit .............................................. 20

  C. The Relevant Airports ................................. 26

    1. Orlando, Florida – Orlando(MCO) and Sanford(SFB) ....... 26

    2. San Juan, Puerto Rico - San Juan(SJU) .................. 27

    3. Miami/Fort Lauderdale – Miami(MIA) and Fort
    Lauderdale(FLL) ......................................... 28

      4. New York City - LaGuardia(LGA) and Newark(EWR) ........ 30

      5. Boston, Massachusetts - Boston(BOS) ................... 30

  D.  The Merger Agreement .................................. 30

E.   The Divestitures Offered ............................... 36

  1. Divestitures to Allegiant ............................. 38

  2. Divestitures to Frontier ............................. 40

F.   The Potential Effects of the Proposed Merger .......... 41

  1. Decreased Airline Seats ............................. 41

  2. Increased Concentration ............................. 43

    a.  "Spirit-Only" Routes ............................. 44

    b.  "Spirit-Entry" Routes ............................. 44

    c.  "Econometric" Routes ............................. 45

    d.  Connect Routes ................................... 45

    e.  Mixed Routes ..................................... 46

    f.  Nonstop Overlap Routes ........................... 47

  3. Increased Debt for JetBlue ........................... 49

  4. Increased Prices for Customers ....................... 50

    a.  Loss of Spirit's Prices as an Option for Consumers .. 50

    b.  Loss of Spirit's Discipline on Other Airline's Prices 50

G.   The Experts ........................................... 53

  1. Dr. Gowrisankaran ................................... 53

  2. Dr. Chipty ......................................... 55

  3. Dr. Hill ........................................... 56

  4. Mr. Scheff ......................................... 59

H.   The Litigation ........................................ 61

III. CONCLUSIONS OF LAW .................................... 62

A.   The Clayton Act ....................................... 62

B.   Mode of Analysis ...................................... 63

C.   Market Definition ..................................... 66

  1. Legal Framework ..................................... 66

  2. Defining the Market ................................. 68

D.   Prima Facie Case ...................................... 73

  1. Presumption of Illegality ........................... 73

  2. Direct Evidence of Anticompetitive Effects ........... 76

    a.  Elimination of Head-to-Head Competition Between JetBlue
    and Spirit............................................ 76

    b.  Elimination of Spirit's Competition with Other Airlines
    78

     c.  Elimination of Spirit's as a Choice for Consumers ... 80

   3. The Government Has Established a Prima Facie Case ...... 81

  E.  The Defendant Airlines' Rebuttal ...................... 81

   1. Ease of Entry ........................................ 83

    a.  Timely Entry ....................................... 85

    b.  Likely Entry ....................................... 88

    c.  Sufficient Entry ................................... 91

   2. The Government's Data ............................... 95

   3. Pro-competitive Effects of the Proposed Acquisition .... 97

  F.  Additional Anticompetitive Effect .................... 103

IV.  THE INJUNCTIVE REMEDY .................................. 107

V.  CONCLUSION ............................................. 108

VI.  ORDER .................................................. 109

"[I]t's 'tough to make predictions, especially about the future.'"  Saint Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd., 778 F.3d 775, 783 (9th Cir. 2015).  Perhaps apocryphal, this statement has been attributed to New York Yankees catcher Yogi Berra, the physicist Niels Bohr, and others.[1]  The statement, however, also rings true when attempting to predict the future of the airline industry; as a fast-moving enterprise, with portable assets and dynamic growth cycles, the industry's potential responses to changes in economic conditions are almost impossible to predict.  Yet, federal antitrust law aims to preserve the free functioning of markets and participation of diverse competitors by attempting to do just that: predict the future.  Here, based on a robust review of evidence presented over four weeks of trial, this Court makes its best attempt.

There are no "bad guys" in this case.  The two corporations are -- as they are expected to -- seeking to maximize shareholder value.  The Department of Justice is -- as the law requires -- speaking for consumers who otherwise would have no

---

[1] As Judge Hurwitz notes in St. Alphonsus, "[t]his quotation is not included in the definitive book of Berra quotations, see Yogi Berra, The Yogi Book: "I Really Didn't Say Everything I Said!" (1998), and its provenance is at best unclear, see, e.g., The Yale Book of Quotations 92 (Fred R. Shapiro ed., 2006) (attributing a variant to Niels Bohr, but noting that the exact authorship is disputed)."  778 F.3d at 783 n.7.

voice.  Their forthrightness, civility, and zealous advocacy have immeasurably assisted the Court in reaching out for justice.

## I.  INTRODUCTION

On July 28, 2022, Jet Blue Airways Corporation ("JetBlue") and Spirit Airlines, Inc. ("Spirit") (collectively, the "Defendant Airlines") executed a final merger agreement. JetBlue, the sixth largest airline in the United States, agreed to pay $3.8 billion to acquire Spirit, the seventh largest airline in the United States.  The proposed merger would create the nation's fifth largest airline, accounting for 10.2% of the domestic market.  Immediately after the merger agreement was signed, speculation began regarding the merger's antitrust implications.[2]

JetBlue is a so-called low-cost carrier ("LCC"), relying on point-to-point flying using fewer types of aircraft.  Spirit is known as an "Ultra-Low-Cost Carrier" ("ULCC"), meaning that its offerings target budget-conscious passengers with low-cost, often unbundled flight options.  The proposed merger would

---

[2] See, e.g., Mary Schlangenstein & Leah Nylen, JetBlue's $3.8 Billion Spirit Deal Faces Tricky Antitrust Review, Bloomberg News (July 29, 2022), https://www.bnnbloomberg.ca/jetblue-s-3-8-billion-spirit-deal-faces-tricky-antitrust-review-1.1798883.

transfer all Spirit's assets to JetBlue and remove Spirit from the market.

Invoking the Clayton Act, 15 U.S.C. § 18, the United States Department of Justice, joined by the District of Columbia, the Commonwealth of Massachusetts, and the states of California, Maryland, New Jersey, New York, and North Carolina (collectively hereinafter, "the Government"), filed this action to enjoin the Defendant Airlines from proceeding with the merger.  The resulting 17-day bench trial on the merits featured testimony by twenty-two witnesses, over 900 exhibits, and thousands of pages of evidence.  The Court also traveled to a nearby location to take in a view of both Defendant Airlines' seat configurations. The trial transcript exceeds 2,500 pages, accompanied by over eighty binders containing exhibits presented to witnesses. Post-trial submissions exceed 700 pages.[3]

The parties' thorough presentation, as well as a careful review of the parties' voluminous submissions, illumines certain key findings:  The airline industry is an oligopoly that has become more concentrated due to a series of mergers in the first decades of the twenty-first century, with a small group of firms in control of the vast majority of the market.  See In re Dom.

---

[3] The Court also received submissions from amici, including the Association of Flight Attendants-CWA, Transport Workers Union Local 570, and Travelers United.  The Court is grateful for these helpful, educational submissions.

<u>Airline Travel Antitrust Litig.</u>, No. MC 15-1404 (CKK), 2023 WL 5930973, at *10 (D.D.C. Sept. 12, 2023).  JetBlue and Spirit are not two of the largest airlines, though were they to merge, they would grow in size to further compete with the larger airlines.

From the Defendant Airlines' perspective, organic growth is too slow, as there are too few new aircraft available to meet industry demand.  JetBlue's inorganic growth through acquisition of Spirit's sizable fleet of retrofittable aircraft –- of the same type -- largely solves this problem and is a tried-and-true growth strategy in this industry.

A post-merger, combined firm of JetBlue and Spirit would likely place stronger competitive pressure on the larger airlines in the country.  At the same time, however, the consumers that rely on Spirit's unique, low-price model would likely be harmed.  The Defendant Airlines currently compete head-to-head throughout the country, and that competition, particularly Spirit's downward pressure on prices, benefits all consumers.  Spirit's unique position in the domestic scheduled passenger airline industry would be exceedingly difficult for another airline, or a combination of other airlines, to replicate, even with low barriers to entry and the dynamic nature of the industry inasmuch as they face the same, industry-wide aircraft sourcing issues.

[4]

The Clayton Act was designed to prevent anticompetitive harms for consumers by preventing mergers or acquisitions the effect of which "may be substantially to lessen competition, or tend to create a monopoly."  15 U.S.C. § 18.  Summing it up, if JetBlue were permitted to gobble up Spirit –- at least as proposed –- it would eliminate one of the airline industry's few primary competitors that provides unique innovation and price discipline.  It would further consolidate an oligopoly by immediately doubling JetBlue's stakeholder size in the industry. Worse yet, the merger would likely incentivize JetBlue further to abandon its roots as a maverick, low-cost carrier.  While it is understandable that JetBlue seeks inorganic growth through acquisition of aircraft that would eliminate one of its primary competitors, the proposed acquisition, in this Court's attempt to predict the future in murky times, does violence to the core principle of antitrust law: to protect the United States' markets –- and its market participants –- from anticompetitive harm.

Accordingly, for the reasons below, the Court rules that the proposed merger, as it stands, would substantially lessen competition in violation of the Clayton Act.  The July 28, 2022 proposed merger, therefore, is enjoined.

## II.  FINDINGS OF FACT[4]

### A. The Industry

The United States passenger airline industry is dominated by four major airlines, often referred to as the "Big Four": Delta Airlines ("Delta"), American Airlines ("American"), United Airlines ("United"), and Southwest Airlines ("Southwest"). These four airlines control 80% of the industry (with the next largest airline, Alaska Airlines, garnering 6% of airline revenue in the United States).  The Big Four have built their strength over the past two decades through a series of mergers and consolidations of the industry.[5]

The largest three carriers, Delta, United, and American are what the industry refers to as "legacy carriers" (or "network carriers"), having been in operation prior to the 1978 deregulation of the airline industry.  See In re Dom. Airline Travel Antitrust Litig., 2023 WL 5930973, at *5 (describing legacy carriers as "airlines that existed prior to the Airline Deregulation Act of 1978[] in the United States domestic airline industry[,] includ[ing] . . . American, Delta, and United . . .

---

[4] The findings of fact are largely taken from the parties' respective proposed findings of fact; citations and quotations are omitted for readability.

[5] For example, between 2001 and 2013, Delta absorbed Northwest Airlines; United absorbed Continental Airlines; American merged with TWA, America West, and U.S. Airways; and Southwest bought Air-Tran Airways.

.").  These legacy carriers utilize global networks based upon a "hub-and-spoke" model, concentrating operations in "hub" cities in order to then offer travelers connecting flights to numerous domestic and international destinations.  Legacy carriers offer multiple classes of service (basic economy, economy, premium economy, business class, first class, etc.) and a broad range of amenities to cater to as many different types of travelers as possible.  Legacy carriers have wide-ranging membership, frequent-flyer, and loyalty programs, with connected credit card and travel partners, in order to attract and retain customers.  These programs alone are worth billions of dollars.  Legacy carriers also often hold contracts with large businesses throughout the country to ensure their business travel needs are covered.

Southwest, though a member of the Big Four, is not a legacy carrier.  Instead, it is commonly referred to as a "low-cost carrier" ("LCC").  Other LCCs include New Pacific Airlines and JetBlue.[6]  A low-cost carrier is able to offer lower fares than its competitors by keeping its operating costs lower, typically through the use of fewer types of aircraft (enabling labor, maintenance, training, and other cost efficiencies), operating

---

[6] Alaska Airlines has sometimes been referred to as a low-cost carrier.  See *infra* p. 8 (discussion of Alaska Airline's offerings).

out of less-costly airports, and through the use of a smaller point-to-point network.  A point-to-point network is characterized by flying a greater proportion of passengers on nonstop rather than connecting itineraries.  With lower overall operating costs, low-cost carriers are also sometimes able to offer more or better quality amenities; JetBlue, for instance, offers free Wi-Fi for all customers, seatback entertainment in all seats, and free, name-brand refreshment offerings for all customers to enjoy.

Some airlines, such as Alaska Airlines and Hawaiian Airlines,[7] operate as hybrids of the low-cost model and the legacy model (commonly referred to as "hybrid carriers").  JetBlue has, at times, also been referred to as a hybrid carrier, though it views itself as a "maverick" and "uniquely disruptive" low-cost carrier.  Tr. 11/6/23 (Robin Hayes) 124:23 – 125:1-4; 126:11-15.  Hybrid carriers often operate a hub-and-spoke network at the regional level and are thereby able to keep costs down while offering the level of service generally

---

[7] On December 3, 2023, Alaska Airlines and Hawaiian Airlines announced their agreement to combine, with Alaska Airlines to acquire Hawaiian Airlines.  As per their agreement, both airlines would continue to operate as separate brands.  The merger agreement is valued at approximately $1,900,000,000.  See Niraj Chokshi & Ivan Penn, Alaska Airlines Plans to Buy Hawaiian Airlines, N.Y. Times (Dec. 3, 2023), https://www.nytimes.com/2023/12/03/business/alaska-airlines-hawaiian-airlines-deal.html.

attributed to the legacies.  For example, Alaska Airlines and Hawaiian Airlines both have a "first-class" product, and JetBlue has, in certain markets, a "Mint" product, comparable to a first-class product.

ULCCs include Spirit, Frontier Airlines ("Frontier"),[8] Allegiant Air ("Allegiant"),[9] Avelo Airlines ("Avelo"),[10] Breeze

---

[8] Frontier has approximately a 2% market share of domestic airline travel.  It currently has bases in Orlando International ("Orlando (MCO)"), Harry Reid International Airport ("Las Vegas (LAS)"), Denver International Airport ("Denver (DEN)"), Dallas-Fort Worth International Airport ("Dallas (DFW)"), Phoenix Sky Harbor International Airport ("Phoenix (PHX)"), Tampa International Airport ("Tampa (TPA)"), Hartsfield-Jackson Atlanta International Airport ("Atlanta (ATL)"), Philadelphia International Airport ("Philadelphia (PHL)") and Miami International Airport ("Miami (MIA)").  For ease of reference, the three letter Federal Aviation Administration ("FAA") location identifier codes of airports are included throughout.  See Encodes/Decodes, FAA, https://www.faa.gov/air_traffic/flight_info/aeronav/aero_data/loc_id_search/Encodes_Decodes/ (last visited Dec. 29, 2023).  Frontier's current fleet comprises 134 planes, and as of September 30, 2023, it had an order book of 214 planes.  Frontier is the lowest cost -- as in, it has the lowest operating cost -- airline in the United States.  Frontier's CEO estimated it would take Frontier five to eight years to replace Spirit and operate its existing schedule based on its current plan of 15-20 percent annual growth.  This estimate does not, however, include maintaining Frontier's pre-existing growth plan in addition to serving Spirit's routes.
[9] Allegiant has a revenue share approximately between 1% and 2%.  Allegiant serves the third-highest number of destinations (125) out of any U.S. airline and serves close to 600 unique routes based on its network diversification strategy.  Allegiant also competes in metropolitan regions by providing service to secondary airports that compete with primary airports in the same area.  Allegiant currently has 127 aircraft in its fleet and estimates having 230 aircraft by 2029.
[10] In 2021, Avelo operated 3 planes; now, only two years later, it operates 16 airplanes and 68 routes.  Avelo has "all

Airways ("Breeze"),[11] and Sun Country Airlines ("Sun Country").[12]
ULCCs make up a small fraction of the market overall, with
approximately 7% of total revenue attributable to ULCCs.  ULCCs
tend to offer travelers even lower fares than low-cost carriers
by lowering their cost structures further (often through the use
of a single type of aircraft), offering simplified onboard
experiences, and removing some features traditionally included
in the price of an airline ticket.  A passenger on an ULCC might
pay extra to check or even carry-on a bag, access Wi-Fi in the
air, receive basic refreshments (food or drink) on the plane, or
to receive additional legroom.  These types of basic fares, with
add-on costs for additional amenities, are referred to as
"unbundled fares."[13]  Like LCCs, ULCCs generally operate point-

---

of the regulatory approvals and designations it needs to fly
commercially internationally" and "could support flights, for
instance, to Mexico or the Caribbean."  Tr. 11/3/23 (Trevor
Yealy/Avelo) 38:25-39:20.

[11] Breeze Airways operated its first flight on May 27, 2021,
with a fleet of eight aircraft.  Since then, Breeze has grown
rapidly, and as of September 6, 2022, had a fleet of 21 aircraft
and 150 routes.  As of September 6, 2022, Breeze had plans to
add the following aircraft to its fleet: 12 in 2023, 18 in 2024,
18 in 2025, and 10 in 2026.

[12] Sun Country's aircraft are almost entirely based out of
Minneapolis-St. Paul International Airport ("Minneapolis
(MSP)"); over 70% of its routes include MSP in the city pair.

[13] Spirit recognizes that one way this unbundled fare
structure generates revenue is through these ancillary
amenities; Spirit estimates that two-thirds of Spirit's
customers purchase at least one.  Approximately half of Spirit's
revenue in 2022 came from ancillary amenities (as opposed to the
fare for travel).

to-point networks, and ULCCs are often characterized by high seat density (number of seats on a plane) and high utilization (how many flights a plane might make per day).  ULCCs are the fastest growing segment of the domestic airline industry.  In attempting to compete with ULCCs, other airlines (legacies, LCCs, and hybrid carriers) have introduced unbundled fare options, known as "basic economy."

The different airline types generally cater to different types of customers.  While airlines tend to categorize customers as "leisure" and "business" travelers (some leisure customers are even further categorized as "visiting friends and relatives" ("VFR")), customers exist on a "continuum" and there are no "firm boundaries" around customer segments.  Thus, even within the "business" and "leisure" categories, consumer preferences

---

Such offerings bring to mind the classic farce "Master of the House," from the musical Les Miserables:

Reasonable charges
Plus some little extras on the side!
Charge 'em for the lice
Extra for the mice
Two percent for looking in the mirror twice
Here a little slice
There a little cut
Three percent for sleeping with the window shut
When it comes to fixing prices
There are a lot of tricks he knows
How it all increases
All those bits and pieces
Jesus!  It's amazing how it grows!

Les Miserables, Lyrics by Herbet Kretzmer.

differ.  For example, some business customers -- i.e., people traveling for work or corporate clients -- are cost-conscious, particularly if traveling on behalf of a small business or for self-employment.

The legacy carriers segment their onboard offerings in order to cater to as many different types of customers as possible, offering fares ranging from a lower-end basic economy product to premium products like business class or first class, while also offering a traditional main cabin ticket.  JetBlue similarly offers a segmented product, with five fare classes. ULCCs, in comparison, target cost-conscious, often leisure and VFR customers, with their unbundled, less differentiated product.  A carrier's network plan is designed with its target consumer in mind; a ULCC might focus more on leisure destinations like Orlando, Florida, while a legacy carrier or even a LCC will have a more expansive network to cater to a broader range of consumers.

Since the COVID-19 pandemic, demand for leisure travel has increased.  Accordingly, airlines have continued to shift capacity to leisure markets following the COVID-19 pandemic.  As a dynamic industry, airlines are constantly responding to consumer demand and frequently shift route plans based on which

[12]

they believe will be the most profitable.[14]  Entry onto a route
is rapid.[15]  Once a carrier decides to enter a route, it can do
so within two weeks or up to six months, depending on whether it
already has a presence at an endpoint (one of the airports on
the route).

Multiple industry-wide problems are constraining the growth
of individual airlines.  First, airlines are experiencing
significant delays in delivery of aircraft from manufacturers
following the pandemic.[16]  Airbus, the manufacturer for both
Spirit and JetBlue, is facing significant delivery delays and

---

[14] "[E]ach carrier has significant turnover in its route
structure from year to year."  Tr. 11/27/23 (Nicholas Hill)
15:12-16:3.  In 2023, Spirit, for example, entered and exited
approximately 33% of its 2022 route network structure.
Legacies, LCCs, and ULCCs have entered a significant number of
routes in 2023.  In 2023 alone, the "aggregate total number of
routes entered [by all carriers] is going to be somewhere
between 300 or 400 routes."  Tr. 11/27/23 (Nicholas Hill) 15:1-
7.  Other ULCCs also had a high percentage of entries and exits
in 2023 as compared to their 2022 networks: Breeze, Avelo, Sun
Country, and Frontier entered and exited 110%, 81%, 45%, and 38%
of their 2022 route networks, respectively.  Tr. Ex. 886.
Legacies entered and exited between 8% and 11% of their 2022
route networks this year.  Id.

[15] "Route" refers to a one-way, scheduled airline passenger
service origin and destination ("O&D") pair.  For instance, a
direct flight from Boston, Massachusetts to San Diego,
California is a "route."

[16] The recent grounding of all Boeing 737 Max 9 planes by
the FAA, in response to an emergency landing on Friday, January
5th, 2024, is likely to exacerbate aircraft shortages.  See
Christopher F. Schuetze, Keith Bradsher & Melissa Eddy, What to
Know About Boeing's 737 Max 9 and the Alaska Airlines Grounding,
N.Y. Times (Jan. 8, 2024),
https://www.nytimes.com/2024/01/06/business/alaska-airlines-
boeing-737-max-9.html.

[13]

does not expect to allow airlines to add to their order books prior to 2029.[17]  Engine issues have resulted in smaller growth plans for multiple Airbus customers in the industry including JetBlue, Hawaiian Airlines, Frontier, and Spirit.  Second, and similarly, engine issues have also forced airlines, including Spirit, to prematurely and temporarily ground aircraft in their fleets to accommodate inspections.  JetBlue expects its number of temporarily grounded aircraft to increase in 2024.

Third, the Federal Aviation Administration ("FAA") is facing a dire shortage of Air Traffic Controllers.[18]  During the COVID-19 pandemic, many of the FAA's experienced Air Traffic Controllers retired.  As air travel demand rebounded, Air Traffic Control ("ATC") centers could not keep up with the increased flying capacity across the country.  As a result, ATC centers have struggled to support scheduled air traffic, at

---

[17] Airbus' delays stem mostly from engine problems.  Pratt & Whitney, the manufacturer of the engines for the Airbus new engine option aircraft ("NEO"), has had engine issues since 2016.  In July 2023, Pratt & Whitney announced that the geared turbo engine fans ("GTFs") of the NEOs had new problems requiring accelerated engine inspections.  Specifically, one issue concerns contaminated powdered metal, which required planes to be pulled prematurely from the schedule for maintenance.  The powdered-metal issue requires almost 300 days of maintenance per plane, as Pratt & Whitney has to remove engines for X-rays and reassembly.

[18] See, e.g., Emily Steel & Sydney Ember, Drunk and Asleep on the Job: Air Traffic Controllers Pushed to the Brink, N.Y. Times (Dec. 3, 2023), https://www.nytimes.com/2023/12/02/business/air-traffic-controllers-safety.html.

[14]

times forcing airlines to limit the number of flights operating certain routes to/from affected airports.

Finally, pilot staffing issues have recently artificially constrained airlines' growth.  As with ATC, during the COVID-19 pandemic, many legacy airline pilots retired; as demand bounced back, legacy airlines scrambled to hire pilots, including recruiting pilots from competing airlines.  This pilot shortage caused pilot attrition issues for Spirit and other airlines in 2022, which persisted until at least the first half of 2023.  In late 2022 and the first half of 2023, pilot attrition was described by Spirit executives as one of, if not the "main driver[s]" of constraints Spirit faced to increasing its utilization.

### B. The Defendants

The Defendant Airlines in this litigation, JetBlue and Spirit, are two of the fastest growing airlines in the nation. JetBlue is the sixth largest airline by revenue in the United States, with an approximately 5% market share based on revenue. Spirit is the seventh largest airline in the United States as measured by available seat miles, with an approximately 4% market share based upon revenue.

### 1. JetBlue

JetBlue primarily serves the East Coast, with 93% of its routes touching at least one of its six focus cities: New York,

Boston, Miami/Fort Lauderdale,[19] Orlando, Los Angeles, and San Juan.  JetBlue's focus cities differ from the hubs of legacy carriers by catering primarily to travel by the local population of the city as opposed to connecting customers.  As of December 31, 2022, JetBlue served 108 cities in 32 states, the District of Columbia, the Commonwealth of Puerto Rico, the U.S. Virgin Islands, and 24 countries in the Caribbean and Latin America, Canada, and Europe.  Fifty percent of JetBlue's routes touch New York, where JetBlue is only the fourth largest carrier on a revenue basis (following Delta, American, and United).  At Boston Logan International Airport ("Boston(BOS)"), JetBlue and Delta are the two largest airlines by total passengers carried; at Fort Lauderdale(FLL), JetBlue and Spirit are the two largest airlines by passengers carried.

JetBlue was founded in 1998 and commenced operations in 2000 with the mission to "bring humanity back to air travel."

---

[19] Airlines often refer to a metropolitan area as one city for the purposes of network planning because customers in those markets have the choice to fly out of more than one airport. For instance, the Miami/Fort Lauderdale "market" includes flights departing from both Miami(MIA) and flights departing from Fort Lauderdale (FLL).  Other common examples include the New York City metropolitan area, where customers could choose to fly out of LaGuardia Airport ("LaGuardia(LGA)"), Newark Liberty International Airport ("Newark(EWR)"), and John F. Kennedy International Airport ("New York (JFK)"), and the Orlando metropolitan area, where customers could choose to fly out of either Orlando(MCO) or Orlando Sanford International Airport ("Sanford (SFB)").

Tr. Ex. 612 at 1226–27.  JetBlue has implemented innovative cost-saving strategies that help enable it to profit without increases in fares.  JetBlue prides itself as a "maverick" and "unique disruptor" in the airline industry, often taking an aggressive approach to competing with legacy and other low-cost carriers.  When JetBlue enters a market, fares tend to decrease, and when JetBlue exits a market, fares tend to increase.  This pro-consumer phenomenon is known as the "JetBlue Effect," a term coined by an academic study from the Massachusetts Institute of Technology.  Because the JetBlue Effect forces other airlines to lower their fares, air travelers do not need to be JetBlue customers to benefit from the JetBlue Effect.

Despite its lower cost base and lower fares, JetBlue offers the most legroom in coach, with a seat pitch (the space between rows of seats, generally referred to as legroom by passengers) of at least 32 inches, and, in some of its airplanes, it offers the widest seat in coach.  JetBlue is the only domestic airline offering seatback entertainment on every seat, including up to 100 channels of free live TV, and a library of recorded video media, available for all customers free of charge.  JetBlue was the first airline to provide free high-speed Wi-Fi on its domestic flights and is still the only U.S. airline offering free high-speed Wi-Fi across its entire fleet.  Finally, JetBlue

offers all its customers free, unlimited brand-name snacks and soft drinks.

JetBlue's business model has evolved over time and continues to evolve today.  It originally offered a coach-only product, but by 2014 was offering the first domestic lie-flat business class product, called "Mint".  Since 2014, JetBlue has expanded Mint to international routes.  During November 2019, JetBlue also adjusted its offerings to introduce an unbundled product called "Blue Basic," which unbundles the JetBlue base fare from other ancillary items, to better compete with Spirit's and other ULCCs' standard products as well as with legacy airlines' basic economy products.[20]  In total, JetBlue offers five classes of service: an unbundled, basic economy seat ("Blue Basic"), a main cabin seat ("Blue"), a main cabin seat with priority security and boarding ("Blue Extra"), an "Even More Space" option (with, as the name suggests, an increased seat pitch for even more space), and Mint, its premium offering. Blue Basic is available on all JetBlue flights.

As of December 31, 2022, JetBlue had a fleet of 290 aircraft, consisting of 230 Airbus and 60 Embraer aircraft.

---

[20] Not surprisingly, the same customers that fly ULCCs, including Spirit, tend to purchase Blue Basic fares.  An analysis of average income data shows that customers purchasing Blue Basic fares (JetBlue's unbundled, lowest fare offering) and Spirit fares have similar average annual incomes.

Without the merger, JetBlue will have approximately 335 aircraft in 2027, but with the merger, JetBlue would have 600 aircraft in 2027.  JetBlue asserts that in order to increase its relevance and scale, and therefore compete with larger airlines, it must merge with another airline.[21]

Since 2015, JetBlue has sought a merger transaction to grow its scale and better compete with the Big Four carriers.  It first unsuccessfully sought to acquire Virgin America in 2015 and 2016.  In 2017, JetBlue again considered a potential acquisition transaction, this time focusing on Spirit and one other airline as potential candidates.  As part of its exploration of a potential transaction in 2017, JetBlue spent roughly two to three weeks investigating the potential synergies that could be generated through a transaction with either of the two carriers.  JetBlue ultimately did not pursue a transaction with Spirit in 2017, primarily because it determined that it could not afford to purchase Spirit in light of its then-current share price and the expected premium to be paid based on Alaska Airlines' acquisition of Virgin America.

JetBlue, however, was undeterred, and again considered acquiring Spirit as soon as late 2019.  JetBlue viewed Spirit as

---

[21] JetBlue Chief Executive Officer Robin Hayes testified that Jetblue would "never get to the size that [the legacies] are based on organic growth."  Tr. 11/6/23 (Robin Hayes/JetBlue) 85:14–18.

an ideal target because of its fleet and engine commonality, which would allow for cost savings and efficient operations. Ultimately, in February 2020, JetBlue's Board of Directors authorized its CEO, Robin Hayes, to approach Spirit about a potential merger.  However, the COVID-19 pandemic intervened, and no approach was made.

### 2. Spirit

Spirit is the largest ULCC in the United States in terms of both seat capacity, measured in available seat miles ("ASMs") and number of aircraft.[22]  Spirit has grown faster on a percentage basis than legacy carriers and low-cost carriers, and is among the fastest growing ULCCs.  Today, Spirit accounts for about 46% of domestic ULCC capacity (as measured in ASMs) and Spirit accounts for 71% of domestic ULCC capacity on the routes it serves.  As of year-end 2022, Spirit "served 92 destinations in 16 countries throughout the United States, Latin America[,] and the Caribbean."  Spirit "offers low-fare service across the lower 48 [states of the United States] and Latin America." Christie (Spirit) Lit. Dep. 6/6/2023, 17:20-22.  Spirit's network is primarily comprised of routes in the Eastern half of the

---

[22] Capacity in the airline industry is generally measured in terms of "available seat miles," or "ASMs."  One ASM is one seat on one plane flying one mile.  Thus, an airline can increase its ASMs by operating more planes, offering more seats, or flying longer routes.

United States, but Spirit is working toward becoming "a more national carrier" by serving cities in the West.  Tr. 11/7/23 (John Kirby/Spirit) 130:12-25.  Spirit's three largest cities, called "core" cities, are Fort Lauderdale, Florida; Orlando, Florida; and Las Vegas, Nevada -- all major leisure destinations.  In addition, Spirit identifies Los Angeles, California and the metropolitan area of New York City, New York ("New York City") as part of its growing network "foundation."

Spirit's "objective is to deliver low fares so that more people have the ability to travel," and Spirit "strive[s] to be recognized by [its] guests and potential guests as the low-fare leader in the markets [it] serves."  Christie (Spirit) Dep. 6/6/23, 18:5-6,; Tr. Ex. 39 at 447.  Specifically, Spirit's 2022 10-K explains that Spirit focuses on "price-sensitive travelers," for whom Spirit's "low fares and unbundled service offering" are particularly appealing.  Tr. Ex. 39 at 448. Spirit's "business model allows [Spirit] to compete principally by offering customers unbundled base fares that remove components traditionally included in the price of an airline ticket."  Id. at 444.

Spirit is known as an innovator in the airline industry, both in terms of pioneering the ULCC business model (Spirit was the first airline to introduce unbundled fares to the United States) and through its innovation in technology (Spirit was the

[21]

first domestic airline to introduce self-check baggage and handicap-accessible lavatories on most aircraft).

When deciding where to fly, Spirit -- like other airlines -- primarily seeks profitability.  One consideration in deciding where to fly is the extent to which Spirit can stimulate demand in the marketplace by offering lower fares -- the so-called "Spirit Effect."[23]  When deciding which new routes to enter, Spirit typically looks to enter high-fare markets with fares that are lower than the pre-Spirit average fare to stimulate or increase passenger demand.  Increased passenger demand can mean either "more travelers or more frequent travelers" on not just Spirit flights on a route, but across all carriers flying that route.  Tr. 10/31/23 (Edward Christie/Spirit) 103:22-25; 104 1-8.  Spirit has found that, typically, once Spirit enters a route, passenger demand increases and the average fare on that route decreases.

The Spirit Effect on a route does not always lead to a profit for Spirit.  Sometimes to stimulate demand, Spirit has to lower fares to an unsustainable level, causing Spirit to exit that route.  Like all airlines, Spirit makes changes to its network "constantly."  Tr. 11/8/23 (John Kirby/Spirit) 52:21-

---

[23] The Spirit Effect is similar to the JetBlue Effect.  Much of this litigation, in fact, centered on whether the JetBlue Effect is as strong as the Spirit Effect.

53:1.  Spirit can add routes to its network in as little as five weeks (or three months if it is not already present in at least one of the airports in the origin-destination pair).

Spirit's unbundled model means the base price of an airline ticket is separate from the price of additional items.  These additional items, called "ancillaries," include things like checked and carry-on bags, advance seat assignments, priority boarding, and refreshments.  Customers can also pay for an ancillary titled the "Big Front Seat", Spirit's front-of-cabin, larger seating most similar to the domestic first-class seat product on legacy airlines.[24]

Spirit typically has higher aircraft -- and gate -- utilization rates than its competitors.  Spirit operates its aircraft for more hours each day (13.7 hours on average), allowing the airline to attain more ASMs out of a single aircraft.  Spirit's predominately point-to-point network helps Spirit increase the daily use of its aircraft as Spirit's planes do not have to wait for connecting flights, as with a hub network.  Spirit also lowers its costs by highly utilizing its gates; Spirit strives to turn a higher number of airplanes per

---

[24] Though the seats are larger, "Big Front Seat" accommodation does not include the added amenities common in a first class cabin, such as free premium refreshments and tailored service.  By foregoing such amenities, Spirit lowers costs further.

day per gate than "an average airline."  Tr. 10/31/23 (Edward Christie/Spirit) 88:16-23.  Spirit's current goal is to operate eight flights per day, per gate at the airports it serves. Spirit, therefore, strongly prefers to enter an airport using a preferential gate versus a common-use gate, in order to have more flexibility and control over gate use.[25]  Spirit's utilization is also increased by operating higher-density aircraft; its narrower seat pitch allows for more seats, and therefore more customers, per aircraft.

As of December 31, 2022, Spirit operated a fleet of 194 Airbus aircraft.  Between 2010 and 2023, Spirit's ASMs grew 6-fold.  Such growth has slowed, however, and Spirit does not expect its historic ASM growth rate to continue in the near future.

Spirit has not been profitable since 2019, resulting in a cumulative net loss of close to $2,000,000,000 since the onset of the COVID-19 pandemic.  The causes for Spirit's decline in financial outlook are complex, as various risks materialized, while opportunities did not.  First, since the COVID-19 pandemic, as the increase in demand for leisure capacity has

---

[25] Preferential gates are typically leased by an airport to a specific carrier, which is then free to use the gates as desired, provided the carrier does not underutilize the gate. In contrast, common-use gates are not exclusive to a given carrier and can be used by any airline.

grown, so has the increase in competition for leisure travelers from other airlines. Second, Spirit's financial outlook has been impacted significantly by issues with Pratt & Whitney's NEO engines. At the beginning of 2023, Spirit had to ground three of its 200-or-so aircraft; today, Spirit has twelve grounded aircraft. The issues with Pratt & Whitney's engines uniquely affect Spirit: Spirit is the largest operator of the impacted GTF-powered Pratt & Whitney NEO engines in the United States. Other challenges that have affected Spirit's profitability have included disruptions flowing from understaffing at air traffic control centers in Jacksonville, Florida, and increased costs of pilots and flight attendants.

As a result of these cumulative operational and financial challenges, Spirit has already taken steps to slow its growth, exit routes, and revise its business plans. Spirit currently has no prediction as to when it will return to profitability. In pre-pandemic years, Spirit tended to exit one or two dozen routes per year. By contrast, Spirit exited 70 routes in 2022, and 40 routes in the first half of 2023, representing more than 20% of its network. Spirit also does not plan to enter the routes or cities it hoped to enter as recently as mid-2023. As a result of its financial difficulties, Spirit recently renegotiated its contract for aircraft deliveries with Airbus, Spirit's manufacturer, to grow at a slower pace.

Spirit began to explore the idea of merging with another airline as early as 2016.  Over the years, it has considered Frontier, Sun Country, Viva Colombia, Allegiant, and JetBlue as potential merger partners.  Spirit has consistently considered a merger to be advantageous because it does not believe it could achieve competitive significance by independent growth alone.

### C. The Relevant Airports

The airports that Spirit flies from most frequently are Fort Lauderdale(FLL); Orlando, Florida (Orlando(MCO)); Las Vegas(LNV); Los Angeles(LAX); the New York City, New York metropolitan area (including LGA and EWR); and San Juan, Puerto Rico (San Juan(SJU)).  On the 73 nonstop routes on which JetBlue and Spirit currently overlap, the most common cities to fly out of are Miami/Fort Lauderdale, Orlando, San Juan, Boston, and New York City.

#### 1. Orlando, Florida – Orlando(MCO) and Sanford(SFB)

There are two airports in the greater Orlando area: Orlando(MCO) and Sanford(SFB).  Sanford(SFB), a secondary airport to Orlando(MCO), is located approximately thirty to forty-five minutes away by ground transportation from MCO and about thirty to forty-five minutes away from the theme parks in Orlando.  Orlando(MCO) is a competitive and fragmented market; no airline has a more than 21% share, and approximately seven airlines are at or above a 10% share.  Orlando(MCO) is not slot

or gate constrained.[26]  It recently opened a new terminal and is in the process of constructing even more gates.

Low-cost carriers like Spirit, Frontier, Avianca, WestJet, Volaris, Norse, Lynx, Swoop and Avelo have increased passenger service volumes at Orlando(MCO) in the last few years.  Avelo, for example, operates a "base" in Orlando(MCO), meaning that it parks its aircraft and employs essential personnel at the airport.  Frontier also has a base at Orlando(MCO).  Frontier has a 14% revenue share in Orlando(MCO) and operates at least 44 routes out of Orlando(MCO).  As of June 2023, Frontier served more destinations than any other airline at Orlando(MCO). Breeze initiated service at Orlando(MCO) in 2022, flying just one route, and in 2023 flies nine routes.  Allegiant flies out of Sanford(SFB) and recently announced that it would be offering service to and from Orlando(MCO).

### 2. San Juan, Puerto Rico - San Juan(SJU)

In San Juan, Puerto Rico, there are no constraints on entry at Luis Muñoz Marin International Airport(SJU).  San Juan is a fragmented and competitive market; six competitors have a

_____

[26] "Slots" are specific day and time authorizations during which certain airports and the FAA grant permission to an airline to take off or land a flight.  Slots can be sold or leased by the carriers holding the rights to them.  It is possible to operate to some extent at an airport without obtaining slots, but only during limited (and often unappealing) time periods.

roughly 10% share.  Several ULCCs have entered or expanded their presence in San Juan in recent years.  Frontier, for instance, has had "no issues growing in San Juan."  Tr. 11/14/23 (Barry Biffle/Frontier) 97:18-24.  Indeed, Frontier has made San Juan a focus city, offering 15 routes to and from the metro area -- more than any other airline.  Avelo currently flies from two destinations to San Juan, Puerto Rico and is evaluating opportunities to expand the routes it flies to San Juan.  Allegiant previously operated routes out of Puerto Rico and would consider returning to Puerto Rico if it were to become profitable.

### 3. Miami/Fort Lauderdale – Miami(MIA) and Fort Lauderdale(FLL)

There are two major airports in the greater Miami/Fort Lauderdale area (referred to as "South Florida" throughout trial): Miami(MIA) and Fort Lauderdale(FLL).  Miami(MIA) is not constrained and has an ongoing construction project that, when completed, will allow for "11 gates' worth of growth potential." Tr. 11/8/23 (John Kirby/Spirit) 96:8-13.

At Fort Lauderdale(FLL), there are minimal constraints for new entrants.  Broward County Aviation Department ("BCAD"), the controlling airport authority at FLL, has a plan ("Master Plan") to expand the airport.  The Master Plan includes the addition of 29 gates -- for a total of 95 gates -- over the course of a

number of years, to ensure the airport can accommodate future demand.  Fort Lauderdale(FLL) currently has enough gates to meet demand, but demand is projected to increase past beyond the airport's current capacity of 66 gates.  Phase 1 of the Master Plan will add 11 gates.  The initial part of Phase 1 is to add Terminal 5, and it is already underway.  Since 2016, BCAD has been able to accommodate every new entrant carrier that has requested access to FLL.

BCAD regularly solicits ULCCs to begin or expand service at FLL, with five domestic LCCs or ULCCs currently providing service at the airport.  Indeed, Frontier's "largest operation," with well over "80 routes collectively," is in Florida, approximately 19 of which fly from Miami(MIA) or Fort Lauderdale(FLL).  See Tr. 11/14/23 (Barry Biffle/Frontier) 97:13-17, 98:24-99:4.  Allegiant also has established operations at Fort Lauderdale(FLL), operating three gates at the airport. Fort Lauderdale(FLL) has also been able to accommodate the entrance of four new international carriers, El Al from Israel, Flair from Canada, Porter Airlines from Canada, and Bermuda Air from Bermuda.

BCAD's lease agreements include a "use-it-or-lose-it" provision that allows BCAD to recapture preferential-use gates if "the airline[] is not meeting the stated demand or the utilization of that particular gate."  Tr. 11/15/23 (Mark

[29]

Gale/BCAD) 76:4-12.  This policy is applied on an aggregate, not route-by-route level: if a carrier "has 10 preferential-use gates and after [BCAD] run[s] the formula at the year end and they only qualify for 9, [BCAD] would look to recapture one of those gates, and . . . , because of their shifting of their international traffic, [BCAD] would look to, more likely than not, recapture one of the international-capable gates."  Id. at 77:20-78:8.  Accordingly, the minimum use requirement operates to remove barriers on capacity by ensuring turnover of underutilized gates to other airlines -- unlike at other airports, carriers flying out of Fort Lauderdale(FLL) cannot take a loss of revenue in order to keep control of their gates.

### 4. New York City - LaGuardia(LGA) and Newark(EWR)

Both LaGuardia and Newark are slot- and gate-constrained airports.

### 5. Boston, Massachusetts - Boston(BOS)

While Boston(BOS) has some infrastructure constraints, Spirit has been able to grow and secure additional gates.  Other ULCCs, such as Allegiant and Sun Country, have similarly "tak[en] advantage of common use capacity to grow in Boston." Tr. 11/8/23 (John Kirby/Spirit) 97:2-3.

### D. The Merger Agreement

In the summer of 2021, Spirit's and Frontier's respective management teams became involved in negotiations which

culminated in a merger agreement signed on February 5, 2022, and publicly announced on February 7, 2022.  Spirit's Board of Directors and Chief Executive Officer, Ted Christie, supported the proposed transaction with Frontier in February 2022.  After learning about Frontier's bid to acquire Spirit, JetBlue CEO Robin Hayes had discussions with JetBlue's Board of Directors, as well as Mr. Christie, about making a competing bid for Spirit.

On March 29, 2022, JetBlue submitted a proposal to acquire Spirit, offering Spirit shareholders a cash bid of $33 per share, amounting to $3,600,000,000.  JetBlue indicated in its March 29, 2022, offer letter a willingness to agree to a reverse break-up fee payable to Spirit if an acquisition by JetBlue were not consummated for antitrust reasons, but JetBlue did not propose a dollar figure for that fee.  In April 2022, Spirit conveyed to JetBlue that it was concerned that JetBlue's Northeast Alliance with American Airlines could impede the regulatory process for a potential merger between JetBlue and Spirit, and requested additional protections for Spirit shareholders including a reverse termination fee.  Toward the end of April 2022, before Spirit publicly responded to the March 29 offer, JetBlue sent Spirit a revised acquisition offer.  This revised offer included a reverse break-up fee of $200,000,000, representing the amount JetBlue would pay Spirit's shareholders

if the contemplated deal ultimately did not pass regulatory scrutiny.

Spirit first determined that it was "reasonably likely that [JetBlue's offer] could lead to a superior proposal" to Frontier's offer, and with the assistance of Barclays and Morgan Stanley as financial advisors, Spirit began evaluating JetBlue's proposed acquisition.  Tr. 10/31/23 (Edward Christie/Spirit) 118:8-119:7.  On May 2, 2022, however, Spirit's Board of Directors unanimously rejected JetBlue's revised proposal to purchase Spirit for $33 per share.  On that same day, Spirit issued a press release attaching a letter from Mr. Christie and H. McIntyre Gardner, the Chairman of Spirit's Board, to Mr. Hayes, setting forth Spirit's concerns about a JetBlue acquisition of Spirit.  Shortly thereafter, on May 5, 2022, Spirit held an earnings call and filed with the SEC a related presentation titled "Rejected Proposal from JetBlue Is Illusory and Not Superior".

On May 16, 2022, JetBlue responded to the Spirit Board of Directors' rejection of its proposal by going directly to Spirit's shareholders with a tender offer to buy outstanding Spirit shares.  Spirit's Board continued to oppose an acquisition by JetBlue and to support the proposed transaction with Frontier.

Throughout June 2022, JetBlue made a series of revised offers to acquire Spirit, with increases in per-share price, increases in the reverse termination fee, and commitments to divestitures.  Spirit continued to resist, citing continued concerns about the anticompetitive nature of such an acquisition.  On June 6, 2022, Mr. Christie received an email from Mr. Hayes with an attached new, revised offer for Spirit Airlines.  On June 27, 2022, JetBlue made a further amended offer to purchase Spirit; the Spirit Board did not view this amended offer as better and did not accept it.  Instead, Spirit issued another press release on June 28, 2022, reaffirming its commitment to the transaction with Frontier and noting that the "[l]atest offer from JetBlue does nothing to address our Board's serious concerns that a combination with [JetBlue] would not receive regulatory approval."  Tr. Ex. 93 at 998.

As late as July 12, 2022, Spirit's Board was still unanimously in favor of the Frontier-Spirit transaction.  Nevertheless, seeing the direction its shareholders were likely to vote, Spirit chose to resume negotiations with JetBlue on a potential acquisition of Spirit,[27] and on July 27, 2022, Spirit

---

[27] In light of Spirit management's desire for additional information on the nature of the proposed divestitures, JetBlue and Spirit engaged in discussions with respect to regulatory matters, and Spirit's management eventually became comfortable that it "did in fact have a significant covenant" and that it

and Frontier terminated their merger agreement.  This was done before Spirit shareholders could participate in a much-delayed final vote on the deal.  By then, however, it was clear Spirit shareholders would not vote in favor of the Frontier-Spirit agreement.

On July 28, 2022, JetBlue and Spirit entered into the merger agreement at issue here ("merger agreement" or "acquisition agreement").  The final per-share price JetBlue agreed to pay for Spirit represented a more than 50-percent premium over the trading price of Spirit's shares just before the Frontier bid.  The proposed merger cost totals approximately $3,800,000,000.  JetBlue will pay Spirit's shareholders $33.50 per share in cash.

If the proposed acquisition is not consummated by or before December 2023, the amount JetBlue will pay Spirit shareholders will increase over time to an ultimate $34.15 per share, so long as the proposed acquisition is consummated by July 24, 2024.  At the time of the trial, Spirit shareholders had already received a $2.50-per-share prepayment in cash upon their approval of the proposed acquisition.  Since January 2023, Spirit shareholders

---

"had satisfied [Spirit's] concerns with regard to the regulatory matters."  Tr. 11/1/23 (Edward Christie/Spirit) 81:6–82:22.

have also received payment in the form of a $0.10-per-month ticking fee, which will continue until closing.[28]

The acquisition agreement contains a combined reverse break-up fee (a combination of both the fee paid to Spirit and to its shareholders) of $470,000,000. The reverse break-up fee compensates Spirit shareholders if the proposed acquisition is not consummated for antitrust reasons. The acquisition agreement includes a retention program, which uses monetary awards to incentivize Spirit management to remain at the company through the course of the transaction-review process. The retention program covers senior executives as well as other persons deemed critical to the management team. Mr. Christie expects to receive over $1,000,000 in additional payments through the retention program if he remains employed at Spirit through the closing of the proposed acquisition. Other Spirit

---

[28] A "ticking fee" is an "increase in the per-share cash consideration payable to seller stockholders as the time period between signing and closing passes certain milestones. Classic ticking fees are flexible devices that can be tailored to the specific circumstances at hand—for example, the increase can start at signing, at a later specified date or upon the occurrence (or non-occurrence) of a specified event. Similarly, the amount can go up on a straight line basis over the course of the relevant period or can be structured to fluctuate over time as certain dead-lines are passed or events occur." Daniel Wolf, Time is Money-Ticking Fees, Harvard L. Sch. F. on Corp. Governance (Oct. 18, 2013), https://corpgov.law.harvard.edu/2013/10/18/time-is-money-ticking-fees/.

executives also have bonus agreements through the retention
program, including many who testified at trial.

### E. The Divestitures Offered

Divestitures have historically been used in airline
industry mergers to address competitive concerns raised by the
Government.  JetBlue itself has been the beneficiary of prior
DOJ-mandated divestitures.  For instance, when American and U.S.
Airways merged, JetBlue acquired a number of slot pairs at
Ronald Reagan International Airport ("Reagan(DCA)") that allowed
it to expand its service to Washington, D.C.  JetBlue also
acquired slots at LaGuardia(LGA) as a result of a slot swap by
Delta and U.S. Airways.  In order to attempt to obtain
regulatory approval for the proposed merger here, JetBlue has
agreed with Spirit to make robust divestitures.  Under its
agreement with Spirit, JetBlue is required to divest assets of
JetBlue and Spirit up to a material adverse effect on the
potential combined JetBlue and Spirit airline.

In addition to this broad commitment, JetBlue specifically
agreed to certain proactive divestiture commitments (the
"Divestiture Agreements") of select assets in Boston, the New
York metropolitan area, and Fort Lauderdale.  Frontier, another
ULCC, agreed to acquire Spirit's 22 slots, 6 gates, and the
associated ground facilities at LaGuardia(LGA).  Allegiant, yet
another ULCC, agreed to acquire (1) Spirit's 2 gates and the

associated ground facilities at Boston(BOS); (2) Spirit's 43 runway authorizations, 2 gates, and the associated ground facilities at Newark(EWR);[29] and, (3) 5 of JetBlue's gates and the associated ground facilities at Fort Lauderdale(FLL).

The transfer of the divestiture assets is subject to approval by the local airport authorities.  Historically, these authorities have approved divestitures associated with airline mergers and other transactions; such approval, however, has not yet been obtained and is not guaranteed.  For Fort Lauderdale(FLL), in particular, the BCAD, the actual owner of the gates, will not consent to JetBlue's request to transfer or sublease the gates to Allegiant, per BCAD's current policy and agreement with the FAA.  Rather, under both BCAD's Competition Plan and agreement with the FAA, after JetBlue relinquishes the gates and other FLL assets to BCAD, the availability of the gates will be advertised for any interested airline "so that other potential airlines that might have an interest in serving [Fort Lauderdale(FLL)] would be aware of those gates."  Tr. 11/15/23 (Mark Gale/BCAD) 58:2-10.  Mark Gale, the CEO and Director of Aviation at BCAD, acknowledged that the gates could

---

[29] Runway authorizations are a specific type of takeoff and landing control, similar to a slot, that is used at Newark(EWR) to limit the amount of aircraft flying in and out of the airport at any specific time of day.

be awarded to a legacy carrier such as American, Delta, or United, instead of Allegiant or another ULCC.

The Divestiture Agreements do not include a commitment to replace Spirit's capacity on all routes that it would stop serving should the merger be consummated, nor does it require Frontier or Allegiant to maintain a particular level of service from the divestiture airports.[30]  The Divestiture Agreements also only pertain to airport-level assets; through the agreements, Allegiant and Frontier are not provided with, for example, additional aircraft or pilots to use on their new routes.

### 1. Divestitures to Allegiant

As just stated, under the Divestiture Agreements Allegiant would acquire (1) Spirit's 2 gates and the associated ground facilities at Boston(BOS); (2) Spirit's 43 runway authorizations, 2 gates, and the associated ground facilities at Newark(EWR); and (3) 5 of JetBlue's gates and the associated ground facilities at Fort Lauderdale(FLL).  With the divestiture assets at Fort Lauderdale(FLL), Allegiant would more than double its presence at the airport.  At Newark(EWR), the runway authorizations, in particular, would provide Allegiant with the

---

[30] Each airline executive questioned about this possibility bristled at such an idea; for a divestiture agreement to <u>require</u> an airline only to utilize certain routes or timelines would be deeply out of pace with the fast-changing dynamics of the industry.

ability not only to access a highly constrained airport, but also expand its presence on preferred flight times.  Finally, Allegiant's divestiture acquisitions at Boston(BOS) would provide the airline with gates it has previously failed to obtain.

Allegiant, as a planned recipient of some divestitures, has acknowledged that it may not be able to use all of the divestitures to their fullest capacity, particularly right away. First, Allegiant might not be able to use all of the runway authorizations it is attempting to acquire at Newark because some of "the earliest time slots are a challenge" for Allegiant, which does not currently have aircraft or crew based in Newark. (Drew Wells/Allegiant) Tr. 11/14/23 145-12-19.  Second, Allegiant does not currently fly internationally or to Puerto Rico.  Spirit currently serves international destinations out of Fort Lauderdale(FLL) and serves destinations in Puerto Rico out of Fort Lauderdale(FLL), Newark(EWR), and Boston(BOS). Allegiant's business model is not, as of now, equipped to replace these routes, but it plans to add international service and has an "application out to do so" through a joint venture with VivaAerobus in Mexico.  Tr. 11/14/23 (Drew Wells/Allegiant) 134:19-135:8.  Allegiant currently "believe[s it] can be selling within probably 30 days with about a 3-month window to begin operations" in international markets.  Tr. 11/15/23 (Drew

Wells/Allegiant) 24:12–22.  Finally, Allegiant's business model
generally focuses on unserved or underserved markets, with less
overlap with other airlines, unlike Spirit, which competes
directly on routes with legacy airlines and low-cost carriers.

### 2. Divestitures to Frontier

Frontier and JetBlue have entered into a binding
divestiture agreement that provides Frontier with six gates and
22 slot-pairs at LaGuardia(LGA).  These assets are "[e]xtremely
valuable," both because of the slot constraints at
LaGuardia(LGA) and because the assets are located in the Marine
Air Terminal, which allows the recipient to "keep [its] costs
down."  Tr. 11/8/23 (John Kirby/Spirit) 101:13–102:6.  Frontier
envisions using the assets to "probably first" "fill Spirit's
former routes out of New York."  Tr. 11/14/23 (Barry
Biffle/Frontier) 104:3–7, 105:18–23.  At trial, a Frontier
executive testified that the airline would not "have to pull
from existing flying" to utilize the LGA divested assets due to
Frontier's expansive order book.  Tr. 11/14/23 (Barry
Biffle/Frontier) 87:7–9 (Frontier will have "50 airplanes, brand
new airplanes delivered at the time.  So [we] don't have to pull
from existing flying to do that."); see also id. at 96:8–14
(explaining Frontier has "the aircraft to chase" Spirit's routes
post-merger while serving existing routes).

Concerns also exist, however, regarding Frontier's ability to use its proposed divestitures at LaGuardia(LGA) to their full potential.  Spirit flies more frequently than Frontier, on average, with two to three more average flights per day in New York City alone.

### F. The Potential Effects of the Proposed Merger

#### 1. Decreased Airline Seats

As the proposed merger stands, JetBlue would acquire, and thereby eliminate, Spirit from the market.  Although Spirit's yellow aircraft livery would not immediately be repainted as JetBlue planes, at the moment the merger is consummated, Spirit and JetBlue would no longer be competitors.  Instead, JetBlue would have the ability and incentive to reconfigure Spirit pricing and network planning to support JetBlue's profitability. At trial, JetBlue executives testified that "nothing is going to change on Day 1," but rather the Defendant Airlines would still "be operating as two separate entities."  Tr. 11/17/23 (Ursula Hurley/JetBlue) 14:15-20.  That might be true for the customer experience, as airline websites and plane configurations would not change immediately.  In reality, however, Spirit pricing and route decisions are immediately likely to shift.

As for those more obvious changes, JetBlue estimates that the process of retrofitting Spirit aircraft to JetBlue specifications would take between four and five years to

complete.  As the JetBlue aircraft configuration involves less seats per plane, total seat reductions across Spirit's fleet are estimated to total 11%.  JetBlue will not, however, begin the retrofit process until after it obtains a Single Operating Certificate from the FAA.[31]  JetBlue estimates that each aircraft would take approximately 30-35 days to retrofit.  Given the regulatory requirements and the amount of time needed to reconfigure the Spirit aircraft to JetBlue's specifications, there would not be any seat reductions until at least early 2025, with reconfigurations complete no earlier than 2029.

JetBlue argues that after the merger it will have the ability and incentive to increase utilization of its aircraft to offset this seat reduction.  This could be done by upgauging the Spirit aircraft,[32] increasing aircraft utilization through more flights per day, reducing seasonal changes in flight schedules,

---

[31] A Single Operating Certificate is a mandatory safety-related FAA regulatory clearance only received after the FAA undergoes an in-depth examination of an airline's operation.  This examination is designed to ensure an effective transition of the merged entities and that one set of management personnel is in place with operational control of the entire new organization.  See How Does That Work?  The FAA's Safety Role in Airline Mergers, FAA, https://www.faa.gov/sites/faa.gov/files/2022-07/Airline-Merger-Fact-Sheet_0.pdf (last visited Dec. 29, 2023).  JetBlue estimates receiving a Single Operating Certificate 12-18 months after the merger closes.

[32] "Upgauging" is the process by which an airline increases seats per departure by acquiring and flying larger aircraft on domestic routes.

and adding additional red-eye flights.  Some of these changes
are likely, as JetBlue's strategy regarding seasonality results
in more flights than Spirit's current strategy, and it is likely
JetBlue would increase Spirit's seasonal offerings to match
those of the JetBlue fleet.  There is no credible evidence --
rather only speculation -- that JetBlue has any plans to
implement the other options, such as increased redeye flights
and upgauging.  Once the reconfiguration of Spirit's aircraft is
complete, annual seat departures will decrease by more than
6,100,000.

### 2. Increased Concentration

The Defendant Airlines already have high combined market
shares in numerous markets.  As measured by metropolitan area,
JetBlue and Spirit have 99 nonstop overlap routes; between 30%
and 40% of JetBlue and Spirit's nonstop routes overlap.  The
Government argues that due to the increase in concentration that
would occur should the merger be allowed, JetBlue's market power
would increase past a "presumptively anticompetitive" threshold
on 183 passenger routes, including 51 nonstop overlap routes
that both JetBlue and Spirit serve.[33]  Among these 183 routes the

---

[33] A merger or an acquisition that produces certain changes
in concentration and ultimately results in concentration levels
above a certain threshold is presumed likely to enhance market
power.  This threshold is measured in post-transaction "HHI"
(amount on the Herfindahl-Hirschman Index) greater than 2,500; a
transaction resulting in change of HHI greater than 200 in a

Government identifies, the post-merger HHI would be greater than 1,500, with a change in HHI of at least 200.  Overall, the Government asserts that there are 562 routes that will suffer harm due to the proposed transaction.  These routes fall into six categories: (1) "Spirit-only" routes, (2) "Spirit-entry" routes, (3) "econometric" routes, (4) connect routes, (5) mixed routes, and (6) nonstop overlap routes.

### a. "Spirit-Only" Routes

The Government identifies 115 Spirit-only routes.  A Spirit-only route is a route on which "Spirit is present and JetBlue is not," meaning there is no current competition between JetBlue and Spirit. Tr. 11/27/23 (Dr. Nicholas Hill) 57:23 – 58:1-7.  The Government does not assert a structural presumption on the 115 Spirit-only routes, and does not assert, nor could it, that the merger would result in any loss of head-to-head competition on these routes.

### b. "Spirit-Entry" Routes

---

highly concentrated market is also considered presumptively anticompetitive.  HHI is "a commonly accepted measure of market concentration.  The HHI is calculated by squaring the market share of each firm competing in the market and then summing the resulting numbers.  For example, for a market consisting of four firms with shares of 30, 30, 20, and 20 percent, the HHI is 2,600 ($30^2$ + $30^2$ + $20^2$ + $20^2$ = 2,600)."  See Herfindahl-Hirschman Index, U.S. Dep't of Just., Antitrust Div., https://www.justice.gov/atr/herfindahl-hirschman-index (last visited Dec. 29, 2023).

The Government identifies 168 Spirit-entry routes; as of November 2023, JetBlue was present on 23 of these 168.  A Spirit-entry route is "a route that Spirit planned to enter [by 2027] according to its 2027 network plan" but that is not currently served by Spirit.  Tr. (Dr. Nicholas Hill) 63:10-24. Again, the Government does not assert a structural presumption on the Spirit-entry routes.  Given its financial condition and other headwinds, it is highly unlikely that Spirit would be able to enter all of the 168 routes identified in its 2027 network plan.

### c. "Econometric" Routes

The Government asserts 96 "econometric" routes, which it defines as a nonstop overlap route on which the Government does not assert a structural presumption but does anticipate a significant reduction in competition.  Primarily, such harm is anticipated due to the substitution of JetBlue's aircraft configuration for Spirit's aircraft configuration, not from a loss of head-to-head competition.

### d. Connect Routes

The Government also asserts 117 connect routes, which it defines as a route on which both JetBlue and Spirit serve on a connecting, but not nonstop, basis.  JetBlue and Spirit typically set fares for connect flights by summing the fares for the individual nonstop legs.  This method of setting fares is

[45]

known as "sum-of-locals" pricing.  On all 117 connect routes at issue, at least half of the ticket fares are set using sum of locals pricing; on the vast majority of the 117 connect routes (84%), either JetBlue or Spirit prices at least 80% of their fares using sum-of-locals pricing.  Sum-of-locals pricing on connect routes is "driven by underlying routes" and "not primarily [] driven by competition between connect carriers or nonstop carriers," as that pricing structure simply adds together fares from two otherwise unrelated nonstop routes.  Tr. 11/27/23 (Dr. Nicholas Hill) 69:3-10.  Many of the connect routes are also not a competitive focus for JetBlue and Spirit because they have low total passenger volume each year; seventy-five of the 117 routes have fewer than 5,000 passengers a year across all carriers.  Given their predominantly sum-of-locals pricing and low passenger volume, JetBlue and Spirit do not meaningfully compete on the Government's 117 connect routes, and thus these routes are unlikely to see a substantial lessening of competition.

### e. Mixed Routes

The Government identifies 15 "mixed" routes, which it defines as a route on which either JetBlue or Spirit provides nonstop service while the other carrier provides connecting service.  On each of the 15 mixed routes, the connect carrier -- either JetBlue or Spirit -- serves less than 10% of total

[46]

passengers.  As explained above, when operating as the connect
carrier, JetBlue and Spirit set most fares on these routes using
sum-of-locals pricing.  Accordingly, on the mixed routes where
either JetBlue or Spirit flies a connecting itinerary, the
connect carrier typically does not set its fares based on
competition with the nonstop carriers.  Further, on mixed routes
for which the connect fare is significantly higher than the
nonstop fare, it is unlikely that the connect fare was set with
respect to the nonstop carriers' fares.  On these 15 mixed
routes, when Spirit is the connect carrier, a high percentage of
its passengers pay a sum-of-local fare, meaning Spirit sets the
fare based on the competition of the underlying individual
routes rather than the connect route itself.  On the mixed
routes where JetBlue is the connect carrier, JetBlue "is
charging a significantly higher fare than the nonstop carrier,
which is a sign there's unlikely to be substantial competition
[] between the connect carrier and the nonstop carrier."  Tr.
11/27/23 (Dr. Nicholas Hill) 74:7-17.

### f. Nonstop Overlap Routes

Finally, the Government identifies 51 nonstop overlap
routes, which are the most potent of those it challenges.  These
routes are identified as those on which both Defendant Airlines
offered nonstop service between Q3 2021 and Q2 2022.  As
previously stated, the Government asserts that a structural

[47]

presumption applies to these routes.  Since Q2 2022, Spirit and JetBlue have exited a combined 14 of the Government's 51 nonstop "presumption" routes (i.e., nearly 30%).[34]  The Government and the Defendant Airlines agree that those routes where a Defendant Airline has exited are no longer facing harm should the merger occur.

Consistent with the frequency of exit, entry, and expansion in the airline industry, many of the nonstop "presumption" routes have experienced exit, entry, or expansion by the parties or other carriers since Q2 2022.  Thirty-five of the 51 nonstop "presumption" routes on which the Government relies have either been exited by at least one party or have experienced an entry or addition in service by another carrier during or after this time period.  Both Frontier and Allegiant already operate on one or both endpoints of all 51 nonstop overlap routes identified by the Government, and both carriers currently serve over 20 of these routes.  In addition, 36 of the 51 nonstop presumption routes involve an endpoint at which JetBlue has proposed divestitures of assets.  Of the 15 remaining routes that do not involve a divestiture endpoint, four are no longer nonstop

---

[34] Spirit has exited Fort Myers-Hartford, Boston-New Orleans, LaGuardia-San Juan, Hartford-Tampa, New York City-Tampa, New Orleans-New York City, Austin-Cancun, Orlando-Ponce, Orlando-Aguadilla, and Miami-Aguadilla.  JetBlue has exited Cleveland-Miami, Aruba-Miami, Cartagena-Miami, Philadelphia-San Juan, Austin-Cancun, and Miami-St. Maarten.

overlap routes because either Spirit or JetBlue exited in the
normal course of business.  On the remaining 11 routes that do
not involve a divestiture endpoint and where exit has not
occurred -- across which Spirit only has approximately 25 total
departures per day -- there are ULCCs and LCCs that are either
already present or have substantial presence at one or both
endpoints of each of the 11 routes.

### 3. Increased Debt for JetBlue

Should the merger be consummated, JetBlue would also take
on significant debt.  JetBlue has, historically, managed its
debt and liquidity levels very conservatively, and it
historically targeted a debt-to-capital ("debt-to-cap") ratio of
30% to 40%.  This conservatism has enabled JetBlue to borrow and
raise money and to secure better financing terms for new
aircraft acquisitions.  JetBlue's debt-to-cap ratio has
increased recently, however, rising to approximately 50% in
2022.  Without the proposed merger, in 2022, JetBlue planned to
reduce its debt-to-cap ratio closer to its historical targets:
about 44% in 2023, 40% by 2024, and roughly 30% from 2025 to
2027.  If the proposed acquisition is consummated, JetBlue's
indebtedness will increase.  JetBlue's current debt-to-cap ratio
stands at 56%, and, if the proposed acquisition proceeds,
JetBlue not only plans to raise about $3,500,000,000 in debt to
fund the acquisition of Spirit but will also take on Spirit's

nearly $4,000,000,000 in debt.  As such, should the proposed acquisition occur, JetBlue's post-acquisition debt-to-cap ratio will rise to between 83% and 111%.  This debt-to-cap ratio is most similar to those of the legacy airlines.

### 4. Increased Prices for Customers

The proposed merger has the potential to increase prices for customers in two ways: 1) with the elimination of Spirit from the market, consumers would no longer have Spirit's low prices as an option; 2) with the elimination of Spirit from the market, consumers would no longer benefit from Spirit's downward pressure on other airline's prices.

### a. Loss of Spirit's Prices as an Option for Consumers

As discussed above, cost-conscious travelers are the core of Spirit's target market, and many such travelers would not be able to fly with higher-priced fares.  JetBlue plans to convert Spirit's planes to the JetBlue layout and charge JetBlue's higher average fares to its customers.  The elimination of Spirit would harm cost-conscious travelers who rely on Spirit's low fares.  Spirit has, since 2017, offered prices consistently lower than JetBlue and the legacy airlines.

### b. Loss of Spirit's Discipline on Other Airline's Prices

As Spirit has grown over the years, it has posed an increasingly competitive threat to JetBlue and the Big Four

airlines, to the benefit of Spirit passengers and other
traveling consumers alike.  Consumers have benefitted both
directly from Spirit's low prices and indirectly because
Spirit's prices place downward pressure on JetBlue's and other
airlines' prices.  If the proposed acquisition proceeds, these
consumer benefits would not only disappear from Spirit's
existing routes, but also not reach consumers in markets in
which Spirit planned to enter in the foreseeable future.

First, consumers will lose the benefit they had received
from head-to-head competition between Spirit and JetBlue, as
JetBlue's prices would rise after Spirit's removal from the
market.  Many of Spirit and JetBlue's overlap routes are to/from
Los Angeles, New York City, San Juan, and Boston, given Spirit's
recent growth in these cities.  JetBlue and Spirit's overlaps
have also increased significantly on routes touching Florida and
Latin America.  By October 2019, Spirit's growing competitive
threat to JetBlue in markets between New York City and the
Caribbean was also "raising a red flag" within the JetBlue
Pricing Team.[35]  Tr. 11/1/2023 (David Clark/JetBlue) 134:15-
135:16.  The aggressive response of legacy airlines to Spirit's
low fares compounds the pressure that Spirit puts on JetBlue.

---

[35] Eventually, in late 2019, JetBlue began developing an
integrated strategy specifically to compete more effectively
with Spirit, titled the "Spirit Competitive Strategy."

For example, in 2019, low ULCC fares led United Airlines to take "aggressive" action in lowering its fares to protect its markets, such as by filing "extraordinarily low" $29 walkup fares from Newark to Santo Domingo.[36]  Tr. Ex. 644 at 461; Tr. 11/1/2023 (David Clark/JetBlue) 135:22-136:1.  Delta, in turn, matched those $29 fares from JFK airport, and JetBlue, which served the market from JFK, matched in turn and was "unsuccessful[]" in raising those low fares.  Tr. Ex. 644 at 461; Tr. 11/1/2023 (David Clark/JetBlue) 136:10-20.  As a result, JetBlue's walkup fares were more than $100 lower than before Spirit entered the market.  Overall, JetBlue has found that, when Spirit enters a market in which JetBlue operates, JetBlue's fares and revenue decrease by more than 10%.  When JetBlue lowers its fares to match Spirit's, Spirit generally lowers its fares even further.

Spirit's presence -- the Spirit Effect -- also lowers other airline's fares.  The record contains numerous examples of Spirit undercutting and putting other pressure legacy airlines' and other LCC's fares.  When Spirit enters a market, its rivals reduce their prices by between 7% and 11%, on average.[37]

---

[36] "Walkup fares" are fares with no advance purchase restriction, called walkup because a customer could literally walk up to the airline desk at the airport and buy a ticket at this fare.

[37] The Government argues that the proposed acquisition would also increase the risk of coordination.  Such coordination can

### G. The Experts

Each party presented the testimony of two experts: for the Government, Dr. Gautam Gowrisankaran ("Dr. Gowrisankaran") and Dr. Tasneem Chipty ("Dr. Chipty"); and for the Defendant Airlines, Dr. Nicholas Hill ("Dr. Hill") and Mr. Richard Scheff ("Mr. Scheff"). Throughout the trial, the Court carefully observed and assessed each witness, considering their credibility generally and as to the specific matters about which they testified. The Court's in-person evaluation of these witnesses, as well as an evaluation of the substance of their testimony and reports, influences the weight accorded to each.

### 1. Dr. Gowrisankaran

---

arise in multiple ways, including parallel accommodating conduct, resulting from a history of observing rivals' reactions, or implicit agreements reached through signaling or punishments. For example, an airline can accommodate one airline's price increase by increasing its own prices, and if a third airline refuses to play along, one of the coordinating airlines can punish that airline by reducing its prices on a separate route, undercutting the uncooperative airline. As airline pricing is largely transparent, airlines engage with one another across many markets, and there are only a small number of dominant competitors, the industry is vulnerable to coordination. The Government points to four instances of such alleged coordination by JetBlue in 2019 and 2020 that it argues demonstrate the airline's willingness to coordinate with other airlines, hurting consumers (unlike Spirit, which tends to disrupt coordination). Such evidence is unpersuasive, however, particularly when combined with the testimony of multiple JetBlue pricing employees who credibly testified that such coordinating actions were against JetBlue policy.

The Government's primary expert was Dr. Gowrisankaran, a
Professor of Economics at Columbia University.  He received his
Ph.D. in Economics from Yale University, where his dissertation
was titled "A Dynamic Analysis of Mergers," and specializes in
industrial organization, health and education, applied
econometrics,[38] and energy economics.  Dr. Gowrisankaran's
preparation included an examination of ordinary course documents
produced by the Defendant Airlines, industry participants'
testimony, and his own analyses.  Dr. Gowrisankaran provided the
market definition on which the Government bases its case.  He
also analyzed the competitive effects of the merger, including
by identifying the "harmed routes" upon which the Government
relies for anticompetitive effects, though he did not take into
account the effects of any divestitures proposed by the
Defendant Airlines.[39]

Dr. Gowrisankaran's testimony was thoughtful and credible,
and he was a well-credentialed witness who candidly responded to
questions from the Government, the Defendant Airlines, and the
Court.  He was also methodical and articulate in explaining his
analysis and the conclusions that he drew from it.  The
Defendant Airlines raise some limitations that exist in his

---

[38] Econometrics is the application of statistical methods to
economics.
[39] This analysis was left to Dr. Chipty.

analysis and their objections are correct; Dr. Gowrisankaran
failed to 1) group airports from the same metropolitan area for
the purpose of comparing routes, 2) update his analysis to
reflect changes in Spirit's plans since 2022, 3) evaluate
whether other carriers, particularly ULCCs, would, post-merger,
enter any routes he identified as harmed, and 4) compare prices
of the same fare class against each other (for instance,
comparing specifically an unbundled "Blue Basic" fare with a
ULCC fare).  Overall, however, Dr. Gowrisankaran's testimony was
useful to the Court in understanding the effects of the proposed
merger; the Court finds that his opinions are entitled to
significant weight.

### 2. Dr. Chipty

Dr. Tanseeem Chipty is the founder and managing principal
of Chipty Economics, where she provides expertise in industrial
organization, antitrust economics, and econometrics.  Dr. Chipty
received her Ph.D. in Economics from the Massachusetts Institute
of Technology.  Dr. Chipty examined the Defendant Airlines'
current networks and standalone growth plans, the current
networks and standalone growth plans of the divestiture buyers
and other ULCCs, JetBlue's combined network plan for the firm
post-merger, JetBlue's deal modeling, and the deposition
testimony of multiple industry participants.  Dr. Chipty
analyzed whether entry of other airlines into the harmed routes

would be likely, timely, and sufficient to offset the anticipated anticompetitive effects of the merger. She also analyzed whether JetBlue's post-merger plans for the management of the combined company's assets suggest that the merger will produce efficiencies that might enhance competition and create benefits for consumers, thereby reversing the merger's potential harms.

Though Dr. Chipty is also well-credentialed, her testimony was less thorough or methodical than that of Dr. Gowrisankaran, and her credibility suffered accordingly. This was in large part due to the questions the Government asked her to answer. Much of Dr. Chipty's testimony was a recital of evidence already in the record and was thus notably lacking analysis. It would be a stretch to refer to such testimony as "expert." Instead, her analysis was, in large part, a collection of inferences derived from the evidence assembled for presentation to the Court, oftentimes from JetBlue's ordinary-course documents. Dr. Chipty's calculations regarding the growth other airlines would need to exhibit in order to backfill the removal of Spirit from the market is, however, most useful to the Court and shall be given its due weight. The rest of her testimony lacks evidentiary value, and therefore is entitled to no weight.

### 3. Dr. Hill

Dr. Nicholas Hill is a partner with Bates White Economic Consulting, where he provides expertise in antitrust issues.  He received his Ph.D. in Economics from Johns Hopkins University. Dr. Hill has testified on behalf of the Department of Justice in multiple antitrust cases, most recently in 2022.[40]  Dr. Hill was the Defendant Airlines' expert economist, and his testimony mostly responded to that of Dr. Gowrisankaran.  Dr. Hill's charge was to evaluate the likely competitive effects of the merger, and he examined data and documents produced through discovery, legal filings, deposition transcripts, industry research, and other publicly available data.

Like Dr. Gowrisankaran, Dr. Hill was a well-credentialed, credible, and thoughtful witness, who thoroughly and candidly answered every question posed to him by the Government, the Defendant Airlines, and the Court.  Perhaps unsurprisingly, unlike Dr. Gowrisankaran, Dr. Hill's analysis focused on the national market,[41] demonstrating how the proposed acquisition

---

[40] The Defendant Airlines were quick to highlight this fact, likely due to the deficiencies found in other experts hired in a previous antitrust litigation involving the airline industry, where one of the Defendant Airlines was a party.  See United States v. American Airlines Grp. Inc., No. CV 21-11558-LTS, 2023 WL 3560430, at *23 (D. Mass. May 19, 2023) (Sorokin, J.) ("Based on the combination of their historical ties to powerful airlines and the manner in which they expressed their opinions from the witness stand, the Court finds as a general matter that the defense experts' testimony . . . was tainted by bias.").

[41] To be clear, Dr. Hill did not propose a national market as the relevant market upon which the Court ought analyze the

would allow JetBlue to increase competition with the Big Four,
providing benefits to consumers.  Unlike Dr. Chipty, Dr. Hill
also found through his analysis that entry by other carriers is
likely to ameliorate any anticompetitive effects, should they
occur.  The Government argues that Dr. Hill's opinions are
flawed, both because his model ignores nonstop overlap markets
in which JetBlue and Spirit currently compete and because Dr.
Hill did not do any significant quantitative analysis to
determine the ability of ULCCs to fulfill their standalone
network plans while also replacing the competition that would be
lost post-merger.  Dr. Hill also did not undertake any empirical
analysis to understand how much consumers value any of the
individual JetBlue product amenities (legroom, Wi-Fi,
refreshments, seatback screens, etc.), and his model assumed
that JetBlue would continue to fly its new, post-merger acquired
aircraft on the same routes Spirit flies today.  The Government
is correct that these limitations on Dr. Hill's data exist; he
acknowledged them and was honest in his testimony about the
reasons for them.  Overall, however, Dr. Hill's testimony and
report were useful to the Court in understanding the effects of

---

merger; instead, he focused on the aggregate of all routes the
Government alleged harms, as well as an analysis of the
competitive effects of the merger outside of JetBlue and
Spirit's head-to-head competition.

this merger; the Court finds that his opinions are entitled to
significant weight.

### 4. Mr. Scheff

Finally, the Defendant Airlines' second expert was Mr.
Richard Scheff.  Mr. Scheff is the Managing Director at Airline
Strategy Group, Inc., a strategic global airline consulting
firm.  Mr. Scheff has more than thirty years of experience in
the airline industry, working for both domestic and
international airlines.  His expertise is in network planning,
fleet planning, demand forecasting, and operations research.
Mr. Scheff holds a M.S. in Industrial Engineering from the
Georgia Institute of Technology.  In preparation, Mr. Scheff
reviewed both publicly available and proprietary airline data,
deposition testimony, discovery materials, and financial filings
from both JetBlue and Spirit.  Mr. Scheff was retained to
evaluate whether the combined, post-merger airline is likely to
have a higher utilization than JetBlue or Spirit has on a
standalone basis, and if so, to what extent will any such
increased utilization affect the output of the combined airline,
as measured by seats available for departure.

Like Dr. Chipty, much of Mr. Scheff's analysis and
testimony lacked credibility or usefulness for the Court.  Faced
with the decrease in seats guaranteed by the proposed
reconfiguration of Spirit aircraft, Mr. Scheff attempted to

calculate two utilization changes that he speculated the
combined airline would make, both of which might offset the harm
from the seat loss.  First, Mr. Scheff calculated how increasing
Spirit's flying patterns to match those of JetBlue's would
increase utilization.  Second, Mr. Scheff calculated how using
aircraft more efficiently, through "pooling", would increase
utilization.  Mr. Scheff did not rely on any evidence that
JetBlue plans to implement either utilization changes (though,
as stated previously, increasing Spirit's flying patterns to
match those of JetBlue's current fleet is more likely than
others).  Mr. Scheff also suggested that the combined airline
would increase utilization by: 1) increasing route length for
larger aircraft, 2) reducing its number of operational spares,[42]
and 3) increasing redeye service.  Again, however, Mr. Scheff
did not rely on any support for these claims.  Although Mr.

---

[42] Operational spares are aircraft that airlines keep in
reserve at base airports in case there is a mechanical issue
with an aircraft currently in use.  Fact witnesses did testify
that with a combined fleet, a post-merger JetBlue would have
incentive to keep less operational spares than the standalone
JetBlue and Spirit because, instead of each airline separately
keeping spares ready, the combined airline could use fewer to
support more planes.  This comports with the economic principle
of economies of scale; an airline with more planes would need
less spares per plane, because the risk that multiple planes
would need spares at once is likely low, the airline can spread
that risk across more planes.  Mr. Scheff's analysis, however,
simply speculates that a decrease in operational spares would
occur; he relies on no evidence to support that contention and
provides no specificity in the number of operational spares the
combined airline would keep.

Scheff's analysis provides the Court with a potential plan for JetBlue post-merger, because Mr. Scheff cannot cite any evidence to support the likelihood of such plans, his testimony lacks credibility, and therefore must be given no weight.

### H. The Litigation

The Department of Justice, joined by the Plaintiff States, filed this lawsuit on March 7, 2023.  See Compl., ECF No. 1.  An amended complaint followed on March 31, 2023, adding more Plaintiff States.  See Am. Compl., ECF No. 69.  The amended complaint alleges that the proposed merger violates Section 15 of the Clayton Act, as amended, 15 U.S.C. § 25, and requests that the Court restrain the Defendant Airlines from consummating the merger.[43]  Less than a week later, the parties submitted a joint proposal for case management, see Joint Mot. Entry Case Management Order, ECF No. 77, which the Court adopted in its entirety, see Scheduling Order, ECF No. 79.  Trial was originally scheduled to begin on October 16, 2023.[44]

Trial commenced on October 31, 2023 and ran for seventeen days.  Twenty-two witnesses appeared and testified at trial. The list included five executives of Spirit, eight executives

---

[43] The United States brings this action under Section 15 of the Clayton Act.  The Plaintiff States bring this action under Section 16 of the Clayton Act as parens patriae on behalf of their residents.

[44] The Court, however, was forced to delay the start of trial by two weeks due to other matters.

from JetBlue, executives from Avelo, Frontier, Allegiant, and United, as well as the Chief Executive Officer of the BCAD and the expert witnesses.  The parties supplemented their live testimony with excerpts from depositions from a number of additional witnesses.  Closing arguments occurred on December 5, 2023, and the parties submitted post-trial submissions on December 13, 2023.

### III. CONCLUSIONS OF LAW[45]

#### A. The Clayton Act

Section 7 of the Clayton Act prohibits mergers and acquisitions "where in any line of commerce or in any activity affecting commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition." 15 U.S.C. § 18.  The "fundamental purpose" of Section 7 is "to arrest the trend toward concentration, the tendency to monopoly -, before the consumer's alternatives disappear[ ] through merger ...."  United States v. Philadelphia Nat'l Bank, 374 U.S. 321, 367 (1963).  Congress therefore "sought to assure ... the courts the power to brake this force at its outset and before it gathered momentum."  Brown Shoe Co. v. United States, 370 U.S. 294, 317–18 (1962).

---

[45] Portions of both parties' proposed conclusions of law are adopted and incorporated herein; citations and quotations are omitted for readability.

"Congress used the words 'may be substantially to lessen competition' ... to indicate that its concern was with probabilities, not certainties." F.T.C. v. Hackensack Meridian Health, Inc., 30 F.4th 160, 166 (3rd Cir. 2022) (quoting Brown Shoe Co., 370 U.S. at 323).   "Section 7 does not require proof that a merger or other acquisition has caused higher prices in the affected market.  All that is necessary is that the merger create an appreciable danger of such consequences in the future."  Saint Alphonsus Med. Ctr.-Nampa Inc., 778 F.3d at 788 (quoting Hospital Corp. of Am. v. F.T.C., 807 F.2d 1381, 1389 (7th Cir. 1986)).  Section 7's probabilistic standard "creates a relatively expansive definition of antitrust liability" and "subjects mergers to searching scrutiny."  California v. American Stores Co., 495 U.S. 271, 284-285 (1990).  Courts, however, must judge the likelihood of anticompetitive effects in the context of the "structure, history, and probable future" of the particular markets that the merger will affect.  United States v. General Dynamics Corp., 415 U.S. 486, 498 (1974) (quoting Brown Shoe Co., 370 U.S. 294, 322 n.38 (1962)).

### B. Mode of Analysis

In United States v. Baker Hughes, Inc., 908 F.2d 981, 982-83 (D.C. Cir. 1990), the Court of Appeals for the District of Columbia Circuit established a three-part, burden-shifting

framework for evaluating antitrust cases under Section 7 of the

Clayton Act.  As one court recently described the framework:

> Typically the [plaintiff] establishes a prima facie
> case by showing that the transaction in question will
> significantly increase market concentration, thereby
> creating a presumption that the transaction is likely
> to substantially lessen competition.  Once the
> [plaintiff] establishes the prima facie case, the
> [defendant] may rebut it by producing evidence to cast
> doubt on the accuracy of the [plaintiff]'s evidence as
> predictive of future anti-competitive effects.
> Finally, if the [defendant] successfully rebuts the
> prima facie case, the burden of production shifts back
> to the [plaintiff] and merges with the ultimate burden
> of persuasion, which is incumbent on the [plaintiff]
> at all times.

New York v. Deutsche Telekom AG, 439 F. Supp. 3d 179, 198-99

(S.D.N.Y. 2020) (quoting Chicago Bridge & Iron Co. N.V. v.

F.T.C., 534 F.3d 410, 423 (5th Cir. 2008) (internal citations

omitted)).[46]

---

[46] Of course, this framework, at first blush appears "somewhat
artificial" and the "shifting of the burdens of production, with
the ultimate burden of persuasion remaining always with the
government, conjures up images of a tennis match, where the
government serves up its prima facie case, the defendant returns
with evidence undermining the government's case, and then the
government must respond to win the point."  Illumina, Inc. v.
Fed. Trade Comm'n, 88 F.4th 1036, 1057 (5th Cir. 2023).  As the
Fifth Circuit and others have observed -- and as the case was
tried to this Court -- "[i]n practice, . . . the government
usually introduces all of its evidence at one time, and the
defendant responds in kind.  Thus, the evidence is often
considered all at once and the burdens are often analyzed
together."  Id. (citations and quotations omitted).

"To establish a prima facie case, the Government must (1) propose the proper relevant market and (2) show that the effect of the merger in that market is likely to be anticompetitive." Fed. Trade Comm'n v. Penn State Hershey Med. Ctr., 838 F.3d 327, 337–338 (3d Cir. 2016). If the Government establishes a prima facie case, the burden of production falls to the Defendant Airlines to rebut that case, by showing "either that the combination would not have anticompetitive effects or that the anticompetitive effects of the merger will be offset by extraordinary efficiencies resulting from the merger." Id. at 347 (citing F.T.C. v. H.J. Heinz Co., 246 F.3d 708, 718 (D.C. Cir. 2001)). The burden of production on the Defendant Airlines at this step is "relatively low." United States v. Anthem, Inc., 236 F. Supp. 3d 171, 213 (D.D.C. 2017), aff'd, 855 F.3d 345 (D.C. Cir. 2017). If the Defendant Airlines successfully rebut the prima facie case, the burden shifts back to the Government in the third step "and merges with the ultimate burden of persuasion, which remains with the government at all times." United States v. Bertelsmann SE & Co. KGaA, 646 F. Supp. 3d 1, 23 (D.D.C. 2022) (quoting Baker Hughes, 908 F.2d at 983). "The [G]overnment has the ultimate burden of proving a Section 7 violation by a preponderance of the evidence." See, e.g., United States v. Aetna Inc., 240 F. Supp. 3d 1, 19 (D.D.C. 2017) (quoting United States v. H & R Block, Inc., 833 F. Supp.

2d 36, 49 (D.D.C. 2011)).  A "'preponderance of the evidence'
means 'more likely true than not.'"  Diaz-Alarcon v. Flandez-
Marcel, 944 F.3d 303, 305 n.2 (1st Cir. 2019) (quoting United
States v. Marino, 833 F.3d 1, 8 (1st Cir. 2016)).  An
acquisition violates Section 7 if it the result "may be
substantially to lessen competition."  15 U.S.C. § 18.  The
Government's ultimate burden, therefore, is to prove that a
merger or acquisition more likely than not "may be substantially
to lessen competition."  Id.; see Illumina, Inc., 88 F.4th at
1059.

### C. Market Definition

#### 1. Legal Framework

Relevant markets are the "area of effective competition"
within which competition may be lessened.  Brown Shoe, 370 U.S.
at 324.  They are defined "by reference to a product market (the
'line of commerce') and a geographic market (the 'section of the
country')."  Id. (citation and quotation omitted).  Defining
relevant markets helps ascertain where "the effect of the merger
on competition will be direct and immediate."  Philadelphia
Nat'l Bank, 374 U.S. at 357; see Vazquez-Ramos v. Triple-S
Salud, Inc., 55 F.4th 286, 296 (1st Cir. 2022) ("The relevant
market is 'the area of effective competition....'") (quoting
Ohio v. American Express Co., 585 U.S. ---, 138 S. Ct. 2274,
2285 (2018)).

Courts should apply "a pragmatic, factual approach to definition of the relevant market and not a formal, legalistic one."  Brown Shoe, 370 U.S. at 336.  Market definition is a factual determination that must consider the "commercial realities" of the marketplace.  Eastman Kodak Co. v. Image Tech. Servs., Inc., 504 U.S. 451, 482 (1992) (quoting United States v. Grinnell, 384 U.S. 563, 572 (1966)).  Markets may be defined from "the perspective of consumers" because "[i]t is the consumer's options and the consumer's choices among them on which relevant market analysis depends."  Flovac, Inc. v. Airvac, Inc., 817 F.3d 849, 855 (1st Cir. 2016); see also United States v. E. I. du Pont de Nemours & Co., 351 U.S. 377, 395 (1956) ("In considering what is the relevant market for determining the control of price and competition, no more definite rule can be declared than that commodities reasonably interchangeable by consumers . . . .").

These consumer-centric principles apply specifically in defining the relevant geographic market.  A relevant geographic market "consists of 'the geographic area in which the defendant faces competition and to which consumers can practically turn for alternative sources of the product.'" Coastal Fuels of P.R., Inc. v. Caribbean Petroleum Corp., 79 F.3d 182, 196 (1st Cir. 1996) (quoting Baxley-DeLamar v. American Cemetery Assn., 938 F.2d 846, 850 (8th Cir. 1991)); accord Tampa Elec. Co. v.

[67]

Nashville Coal Co., 365 U.S. 320, 327 (1961) (geographic market is the "area in which the seller operates, and to which the purchaser can practically turn for supplies").  Therefore, if customers "would not consider [a firm] a viable alternative" because it operates exclusively outside the geographic area to which the customers can practically turn for the relevant product, then that firm is outside the relevant geographic market.  Home Placement Servs., Inc. v. Providence J. Co., 682 F.2d 274, 280 (1st Cir. 1982).

Of course, in defining the relevant market, the Court may and should also consider the competitive effects on industry participants -- it would be "erroneous" to "defin[e] a market on the basis of demand considerations alone."  Rebel Oil Co. v. Atlanta Richfield Co., 51 F.3d 1421, 1436 (9th Cir. 1995); see also American Express Co., 138 S. Ct. at 2285 (explaining in the Sherman Act context that the "area of effective competition" is typically the "arena within which significant substitution in consumption or production occurs" (emphasis added)); see also United States Healthcare, Inc. v. Healthsource, Inc., 986 F.2d 589, 599 (1st Cir. 1993) ("Usage patterns, customer surveys, actual profit levels, comparison of features, ease of entry, and many other facts are pertinent in answering the question [of market definition].").

## 2. Defining the Market

[68]

Although the parties here agree that the relevant service market for assessing the competitive effects of the proposed acquisition is scheduled air passenger service, the parties dispute the appropriate geographic scope of the market: the Government argues that every route on which Spirit or JetBlue currently flies (or intends to fly absent the merger) is, in isolation, a relevant market; the Defendant Airlines advocate for a national geographic market.  Both parties make a compelling case.

As previously explained, the airline industry is incredibly dynamic, with mobile assets (aircraft, pilots, crews, etc.) and constant exit and entry of new routes by airlines.  Participants in the airline industry also compete vigorously at the national level: among other things, routes and flight frequencies change constantly in accordance with nationally planned route networks, airlines choose their business model and on-board product offerings at the national level, and airlines compete nationwide through valuable customer loyalty programs.  An airline's relevance and value to consumers often hinges not just on the price and specific route, but also its nationwide loyalty program, airport presence, national and international route network, and product offerings.

Airlines also make many of their decisions on the route-by-route level, themselves oftentimes referring to an O&D pair as a

"market."  Airlines consistently plan pricing and network
planning at the route level, and decisions to enter or exit a
route are made with the specific, local customers in mind.  The
Defendant Airlines concede that airlines compete at the route
level and that they track other airlines' actions on a route-by-
route level.

Origin-and-destination pairs are the geographic areas
within which "consumers can practically turn for alternative
sources of" scheduled air passenger service.  Coastal Fuels, 79
F.3d at 198 (quoting Baxley-DeLamar, 938 F.2d at 850).  The
purpose of scheduled air passenger service is to travel from one
place to another.  For consumers originating in one metropolitan
area and purchasing scheduled air passenger service to travel to
another metropolitan area, such consumers "would not consider it
a viable alternative" to purchase scheduled air passenger
service between a different origin-and-destination pair.  Home
Placement Servs., 682 F.2d at 280.

Historically, O&D pairs have also been considered relevant
geographic markets for evaluating competition between airlines
in the market for scheduled air passenger service.  See United
States v. American Airlines Grp. Inc., 2023 WL 3560430, at *36
("Here the parties agree, and the Court finds, that the relevant
product market is 'scheduled air passenger service,' and the
relevant geographic markets are O&Ds 'in which Defendants

compete or would likely compete absent the NEA.'"); see also
Spirit Airlines, Inc. v. Northwest Airlines, Inc., 431 F.3d 917,
933 (6th Cir. 2005) (accepting Spirit's position that routes are
relevant geographic markets: "It is at the route level, after
all, that airlines actually compete with one another.")
(internal citation omitted); Fjord v. AMR Corp., 502 B.R. 23, 40
(Bankr. S.D.N.Y. 2013) (noting that both parties accepted that
"city-pairs are the properly defined market," and rejecting a
national market because "[a] product market contemplates
products that are viable substitutes for each other" and
plaintiffs had not explained how "a flight from Los Angeles to
New York would compete with a flight from Detroit to Seattle");
Malaney v. UAL Corp., No. 3:10-CV-02858-RS, 2010 WL 3790296, at
*12 (N.D. Cal. Sept. 27, 2010), aff'd, 434 F. App'x 620 (9th
Cir. 2011) (finding city-pair markets persuasive and rejecting
national market because "plaintiffs have not shown how, for
example, a flight from San Francisco to Newark would compete
with a flight from Seattle to Miami"); In re Nw. Airlines Corp.
Antitrust Litig., 197 F. Supp. 2d 908, 915 (E.D. Mich. 2002)
("[C]ity-pairs seem to comport with the ordinary and natural
understanding of consumers as they contemplate the purchase of
this industry's product—namely, such a consumer typically would

[71]

survey the options for travel between the desired origin and destination cities.").[47]

This Court, therefore, defines the relevant geographic market in this case as each individual O&D pair, otherwise known as a route, on which the Defendant Airlines currently compete. In doing so, the Court will continue to consider the impact of the national geographic market and those factors relevant to it.

In ruling the relevant market as the individual O&D pairs upon which the Defendant Airlines compete, the Court dismisses as immaterial, for the purposes of the Government's prima facie case, the "Spirit-entry routes" that the Government has put forth. Spirit is not currently present on these routes and instead has only considered entering these routes absent the merger. Neither of the merging Defendant Airlines currently

---

[47] The Defendant Airlines cite to previous airline antitrust cases in which the Government has posited broader geographic markets than O&D pairs. In both cases cited, however, the market proposed by the Government was still not a national market, but instead a market encompassing all flights in and out of a certain airport. See, e.g., Compl. ¶¶ 31-32, United States v. United Continental Holdings, Inc., No. 2:15-cv-07992 (D.N.J. Nov. 10, 2015), ECF No. 1 (Government asserting that all air passenger service "to and from Newark [Liberty Airport] constitutes a relevant antitrust market," and that "it is appropriate to aggregate all routes that either originate or terminate in Newark for the purpose of defining a relevant market in which the transaction will cause anticompetitive harm"); Am. Compl. ¶ 31, United States v. US Airways Grp., Inc., Case No. 1:13-cv-01236 (D.D.C. Sep. 5, 2013), ECF No. 73 (defining a geographic market for slots at Reagan National Airport in Washington, D.C.).

compete on these routes, and therefore they are not relevant under Section 7.[48]   See, e.g., Philadelphia Nat'l Bank, 374 U.S. at 357 ("The proper question to be asked in this case is not where the parties to the merger do business or even where they compete, but where, within the area of competitive overlap, the effect of the merger on competition will be direct and immediate.").

The Court accepts as relevant markets the following routes: nonstop overlap routes that both JetBlue and Spirit currently fly (both those identified by the Government as "presumptively illegal" and those identified by the Government as "econometric"); "connect routes", which are the routes on which both Spirit and JetBlue fly connecting service; "mixed routes", which are the routes on which one of the Defendant Airlines flies direct service and the other provides connective service, and "Spirit-only routes", which are routes that Spirit currently flies, but JetBlue does not.

**D. Prima Facie Case**

**1. Presumption of Illegality**

---

[48] The Government cannot request a geographic market of specific O&D pairs and then simultaneously request the inclusion of markets in which Spirit only competes with non-party airlines.  To do so would be to amplify the national geographic market in which both Spirit and JetBlue compete -- the Government cannot have its cake and eat it too.

The Government argues that the proposed acquisition at bar is "presumptively illegal" because it results in "a merger which produces a firm controlling an undue percentage share of the relevant market, and results in a significant increase in the concentration of firms in that market." Philadelphia Nat'l Bank, 374 U.S. at 363; see also United States v. Continental Can Co., 378 U.S. 441, 458 (1964) ("Where a merger is of such a size as to be inherently suspect, elaborate proof of market structure, market behavior and probable anticompetitive effects may be dispensed with in view of [Section] 7's design to prevent undue concentration."). As previously stated, see supra Section II.F.2., the proposed acquisition would result in a combined firm market share of either over 2,500 HHI, or an increase in HHI of over 200, in multiple relevant markets. An HHI over 2,500, or an increase in HHI of over 200, is considered "highly concentrated" and has been presumed illegal. Aetna, 240 F. Supp. 3d at 42; see also ProMedica Health System, Inc. v. F.T.C., 749 F.3d 559, 568 (6th Cir. 2014) (noting that a 1,078-point increase to 4,391 and a 1,323-point increase to 6,854 "blew through [the presumption] barriers in spectacular fashion"); Heinz, 246 F.3d at 716–17 (510-point increase from 4,775 created a presumption of illegality "by a wide margin"); F.T.C. v. Sysco Corp., 113 F. Supp. 3d 1, 61 (D.D.C. 2015) (economic and other evidence "has shown that a merged Sysco-USF

will significantly increase concentrations" and that the Government "therefore has made its prima facie case and established a rebuttable presumption that the merger will lessen competition in the local markets"); H & R Block, 833 F. Supp. 2d at 71-72 (enjoining a transaction that would have given the combined firm only a 28.4 percent market share because the transaction would have resulted in an increase in the HHI of more than 200 and a post-acquisition HHI that would have exceeded 2,500).

The Government identifies 183 relevant routes, each of which is its own relevant market, in which this presumption applies.[49]  The Court finds that this presumption, spurred by the Department of Justice's own Horizontal Merger Guidelines, does not, on its own, sustain a prima facie case.  "[P]resumptions are not self-executing." Deutsche Telekom, 439 F. Supp. 3d at 206.  The Court, therefore, moves on to the direct evidence of anticompetitive effects presented by the Government.  See Saint Alphonsus, 778 F.3d at 785-86 ("[P]laintiffs in [Section] 7 cases generally present other evidence as part of their prima facie case.").

---

[49] The 183 routes can be broken down into: 51 nonstop overlap routes, 15 mixed overlap routes, and 117 connect overlap routes.  The Government does not, nor could it, identify any routes on which the presumption applies in the "Spirit-only" category.  Of these 51 nonstop routes, 35 have met the presumption of illegality consistently over the last 3 years.

### 2. Direct Evidence of Anticompetitive Effects

#### a. Elimination of Head-to-Head Competition Between JetBlue and Spirit

First, the Government has clearly demonstrated that the merger will cause unilateral anticompetitive effects, as JetBlue and Spirit currently compete head-to-head on multiple routes. "The extent of direct competition between the products sold by the merging parties is central to the evaluation of unilateral effects." ProMedica, 749 F.3d at 569 (quoting Horizontal Merger Guidelines § 6.1).[50] Acquisitions "that eliminate head-to-head competition between close competitors often result in a lessening of competition." F.T.C. v. Staples, Inc., 190 F. Supp. 3d 100, 131 (D.D.C. 2016) ("Staples II") (citing Horizontal Merger Guidelines § 6); see also, e.g., Heinz, 246 F.3d at 716-17 (ruling that the Government's prima facie case was "bolstered by the indisputable fact that the merger will eliminate competition between the two merging parties"); H & R Block, 833 F. Supp. 2d at 81-82 (noting the likelihood of

---

[50] The Court is aware that after the trial concluded, on December 18, 2023, the F.T.C. and DOJ issued a revised set of Merger Guidelines. See Justice Department and Federal Trade Commission Release 2023 Merge Guidelines, U.S. Dep't of Just., Off. of Pub. Affs., https://www.justice.gov/opa/pr/justice-department-and-federal-trade-commission-release-2023-merger-guidelines (last visited Jan. 12, 2024); 2023 Merger Guidelines, U.S. Dep't of Just., Antitrust Div., https://www.justice.gov/atr/2023-merger-guidelines (last visited Jan. 12, 2024).

unilateral anticompetitive effects given evidence of H & R Block lowering its prices in response to direct competition from TaxACT, including H & R Block documents that "appear to acknowledge that TaxACT has put downward pressure on HRB's pricing ability").

If the collaborating parties are particularly close competitors, the unilateral effects are especially acute.  See Bertelsmann, 646 F. Supp. 3d at 39 ("The analysis of unilateral effects focuses on how closely the merging firms currently compete, in order to extrapolate the effects of eliminating that competition."); F.T.C. v. Libbey, 211 F. Supp. 2d 34, 47-48 (D.D.C. 2002) (discussing evidence of head-to-head competition between the merging parties, including taking customers from each other); F.T.C. v. Swedish Match, 131 F. Supp. 2d 151, 169 (D.D.C. 2000) ("[T]he weight of the evidence demonstrates that a unilateral price increase by Swedish Match is likely after the acquisition because it will eliminate one of Swedish Match's primary direct competitors.").  The parties need not be each other's closest competitors to raise a threat to competition; being close competitors is enough for an acquisition to result in upward pricing pressure.  Anthem, 236 F. Supp. 3d at 216 ("Anthem's insistence that United, not Cigna, is its 'closest' competitor, is beside the point.  The acquired firm need not be the other's closest competitor to have an anticompetitive

[77]

effect; the merging parties only need to be close competitors.").

The loss of Spirit's influence on JetBlue as a head-to-head competitor would likely result in less competition to both discipline the prices and spur the innovation of JetBlue as a smaller, maverick -- more competitive -- market participant.

### b. Elimination of Spirit's Competition with Other Airlines

Along with Spirit's influence on JetBlue as a competitor in the scheduled airline passenger market, the proposed acquisition would eliminate Spirit as a competitor to all other airlines in the market, resulting in less pressure on all other airlines to compete. Spirit, as the first domestic ULCC, is a uniquely disruptive competitor that consistently puts pressure on other airlines, both to lower their prices and to innovate (whether through the introduction of basic economy fares or other cost-saving measures). "Anticompetitive effects are more likely still when 'the merger would result in the elimination of a particularly aggressive competitor in a highly concentrated market.'" Aetna, 240 F. Supp. 3d at 43, 74 (quoting F.T.C. v. Staples, Inc., 970 F. Supp. 1066, 1083 (D.D.C. 1997) ("Staples I")) (enjoining merger in part because Aetna was a "particularly aggressive" Medicare Advantage competitor); see also United States v. Alcoa, 377 U.S. 271, 281 (1964) ("The record shows

[78]

indeed that Rome was an aggressive competitor. . . .
Preservation of Rome, rather than its absorption by one of the
giants, will keep it 'as an important competitive factor' . . .
. Rome seems to us the prototype of the small independent that
Congress aimed to preserve by [Section] 7."); American Airlines,
2023 WL 3560430, at *34, 36 (finding that anticompetitive
effects of joint venture between direct competitors JetBlue and
American Airlines were amplified because "JetBlue has sacrificed
a degree of its independence and weakened its status as an
important 'maverick' competitor in the [highly concentrated
airlines] industry").

   The loss of Spirit's innovation, in particular, would be a
loss for all consumers in the national scheduled airline
passenger market.  A reduction in product innovation resulting
from an acquisition is a cognizable harm to competition.  See,
e.g., Hackensack, 30 F.4th at 172 (recognizing that
anticompetitive effects can include reduced product innovation);
Viamedia, Inc. v. Comcast Corp., 951 F.3d 429, 475 (7th Cir.
2020) (same); Anthem, 855 F.3d at 361 (a "threat to innovation
is anticompetitive in its own right").

   The key question in determining whether a transaction may
substantially lessen competition by dampening the firm's
disruptive force is whether the firm "play[s] a special role in
th[e] market that constrains prices." H & R Block, 833 F. Supp.

2d at 80; see also Hackensack, 30 F.4th at 172 (recognizing that anticompetitive effects can include reduced product innovation). In eliminating Spirit from the marketplace, the proposed transaction would, by definition, dampen Spirit's disruptive force.  As Spirit plays a special role in the market, both to constrain prices and spur innovation, the proposed transaction would substantially lessen competition among other, non-party airlines.

### c. Elimination of Spirit's as a Choice for Consumers

A merger's elimination of a product option that consumers value is a cognizable harm to competition.  See, e.g., Anthem, 855 F.3d at 366 ("[I]f merging firms would withdraw a product that a significant number of customers strongly prefer to those products that would remain available, this can constitute a harm to customers over and above any effects on the price or quality of any given product.") (internal citations omitted) (quoting Horizontal Merger Guidelines § 6.4); see also F.T.C. v. Indiana Fed'n of Dentists, 476 U.S. 447, 459 (1986) (ruling that consumers can be harmed by an agreement to "withhold from customers a particular service that they desire" since it "limit[s] consumer choice by impeding the ordinary give and take of the market place") (internal citations omitted); MacDermid Printing Sols. LLC v. Cortron Corp., 833 F.3d 172, 183 (2d Cir.

2016) ("We have suggested that actions that reduce consumer
choice are inherently anticompetitive."); Realcomp II, Ltd. v.
F.T.C., 635 F.3d 815, 829-31 (6th Cir. 2011) (affirming finding
that "restrictions on consumer choice," specifically
"restricting consumer access to discount listings," is "likely
to have an adverse impact on competition"); United States v.
Dentsply Int'l, Inc., 399 F.3d 181, 194 (3d Cir. 2005); Glen
Holly Ent., Inc. v. Tektronix Inc., 352 F.3d 367, 374 (9th Cir.
2003).

The Government has demonstrated that consumers value Spirit
flights as a unique, economical product option.  The removal of
Spirit as an option for consumers, therefore, would constitute a
cognizable harm.

### 3. The Government Has Established a Prima Facie Case

The increased concentration that would occur in relevant
markets if proposed acquisition were to succeed, as well as the
other anticompetitive effects demonstrated by the Government --
each independently sufficient -- establishes a prima facie case
of harm under Section 7.

### E. The Defendant Airlines' Rebuttal

The "quantum of evidence defendants must produce to shift
the burden back is relatively low."  Anthem, 236 F. Supp. 3d at
213 ("[D]efendants are not required to 'clearly disprove

[81]

anticompetitive effect,' but rather to make 'a showing.'")
(citing Baker Hughes, 908 F.2d at 991).  The Defendant Airlines'
burden is necessarily low because "[i]f the burden of production
imposed on a defendant is unduly onerous, the distinction
between that burden and the ultimate burden of persuasion --
always an elusive distinction in practice -- disintegrates
completely."  Baker Hughes, 908 F.2d at 991.  "A defendant
required to produce evidence 'clearly' disproving future
anticompetitive effects must essentially persuade the trier of
fact on the ultimate issue in the case—whether a transaction is
likely to lessen competition substantially.  Absent express
instructions to the contrary, [the Court is] loath to depart
from settled principles and impose such a heavy burden."  Id.

     Though a defendant's burden is low, the stronger a
plaintiff's prima facie case, the heavier the rebuttal burden
becomes.  In Baker Hughes, the court reasoned that the
defendants' rebuttal bar was relatively low in that instance
because the plaintiff in that case relied only on a structural
presumption, Baker Hughes, 908 F.2d at 983, but that reasoning
"does not control" when a plaintiff, like the Government here,
bolsters its prima facie case by taking on the defendants'
rebuttal arguments in its prima facie case.  Olin Corp. v.
F.T.C., 986 F.2d 1295, 1305 (9th Cir. 1993).  Rather, "if a
Government's prima facie case anticipates and addresses the

respondent's rebuttal evidence, . . . the prima facie case is very compelling and significantly strengthened," and "the [defendants'] burden of production on rebuttal is also heightened." Chicago Bridge, 534 F.3d at 426; see also Hackensack, 30 F.4th at 173 ("[D]irect evidence strengthens the probability that the merger will likely lead to anticompetitive effects and, thus, the [plaintiff's] prima facie case."); ProMedica, 749 F.3d at 571; Heinz, 246 F.3d at 717 (evidence of head-to-head competition "bolster[s]" plaintiff's prima facie case).

Defendants may meet their burden to rebut the Government's prima facie case either by "affirmatively showing why a given transaction is unlikely to substantially lessen competition, or by discrediting the data underlying the initial presumption in the government's favor." Baker Hughes, 908 F.2d at 991. The Defendant Airlines here attempt to do both and have also provided other evidence regarding the potential pro-competitive effects of the proposed acquisition.

## 1. Ease of Entry

The Defendant Airlines first point to the ease of entry by potential competitors into the relevant markets that may be harmed, particularly other ULCCs (but also LCCs and legacy airlines with unbundled, basic economy offerings). Courts have long held that "entry by potential competitors may be considered

in appraising whether a merger will 'substantially lessen competition.'" United States v. Waste Mgmt., Inc., 743 F.2d 976, 983 (2d Cir. 1984). "Whether entry is included as part of the market definition or in the ease of entry evaluation, practically, is of no consequence. In either event, the result is the same. The exercise of market power will be thwarted and collusive behavior will not be possible." F.T.C. v. Occidental Petroleum Corp., No. 86-900, 1986 WL 952, at *8 (D.D.C. Apr. 29, 1986) (internal citation omitted); see also Deutsche Telekom, 439 F. Supp. 3d at 207 (courts may include "ease of entry into the market" in assessing the totality of the circumstances under Step Two of Baker Hughes).

The Defendant Airlines need not show competitors will enter the relevant markets or precisely when the entry will occur. Baker Hughes, 908 F.2d at 983 ("The government argues that, as a matter of law, section 7 defendants can rebut a prima facie case only by a clear showing that entry into the market by competitors would be quick and effective. . . . We find no merit in the legal standard propounded by the government. It is devoid of support in the statute, in the case law, and in the government's own Merger Guidelines."); United States v. Syufy Enters., 903 F.2d 659, 667 n.13 (9th Cir. 1990) ("We cannot and should not speculate as to the details of a potential competitor's performance; we need only determine whether there

were barriers to the entry of new faces into the market."). Instead, a defendant need only show that potential competitors could enter relevant markets, and that barriers to that entry are low.

There is no requirement, therefore, to prove that entry would replace Spirit one-for-one, on each route that it may exit post-merger.  The Government is correct that the Defendant Airlines must demonstrate that entry into the relevant markets would be "timely, likely, and sufficient in its magnitude, character, and scope to deter or counteract the competitive effects of concern."  F.T.C. v. Sanford Health, 926 F. 3d 959, 965 (8th Cir. 2019) (quoting Horizontal Merger Guidelines § 9).[51] The Defendant Airlines, however, have done that successfully, as explained below.

### a. Timely Entry

---

[51] See also, e.g., Penn State Hershey, 838 F. 3d at 351–52; Chicago Bridge, 534 F.3d at 429–30; Bertelsmann, 646 F. Supp. 3d at 51; Deutsche Telekom, 439 F. Supp. 3d at 226; F.T.C. v. Wilh. Wilhelmsen Holding ASA, 341 F. Supp. 3d 27, 66–67 (D.D.C. 2018); United States v. Energy Sols., Inc., 265 F. Supp. 3d 415, 443 (D. Del. 2017); Aetna, 240 F. Supp. 3d at 52–53; Saint Alphonsus Med. Ctr.-Nampa, Inc. v. St. Luke's Health Sys., Ltd., Nos. 1:12-CV-00560-BLW; 1:13-CV-00116-BLW, 2014 WL 407446, at *19 (D. Idaho Jan. 24, 2014), aff'd, 778 F.3d 775 (9th Cir. 2015); United States v. Bazaarvoice, Inc., No. 13-cv-00133, 2014 WL 203966, at *39 (N.D. Cal. Jan. 8, 2014); F.T.C. v. ProMedica Health Sys., No. 3:11 CV 47, 2011 WL 1219281, at *57 (N.D. Ohio Mar. 29, 2011); United States v. Visa U.S.A., Inc., 163 F. Supp. 2d 322, 342 (S.D.N.Y. 2001); F.T.C. v. Cardinal Health, Inc., 12 F. Supp. 2d 34, 54–58 (D.D.C. 1998).

Entry is "timely" when it is "soon enough to offset anticompetitive effects of the merger." Sanford Health, 926 F.3d at 965; accord Energy Sols., 265 F. Supp. 3d at 443 ("Entry is timely only if it rapid enough to deter or render insignificant the anticompetitive effects of the merger") (citing Anthem, 236 F. Supp. 3d at 221–22).  When entry will take a period of several years, it likely will not deter anticompetitive activity by the merged firm.  See F.T.C. v. Elders Grain Inc., 868 F.2d 901, 905 (7th Cir. 1989) ("And since entry into the [dry corn] industry is slow -- it takes three to nine years to design, build, and start operating a new mill -- colluding sellers need not fear that any attempt to restrict output in order to drive up price would be promptly nullified by new production."); Visa, 163 F. Supp. 2d at 342 ("The higher the barriers to entry, and the longer the lags before new entry, the less likely it is that potential entrants would be able to enter the market in a timely, likely, and sufficient scale to deter or counteract any anticompetitive restraints.").

The Government argues that here the appropriate timeframe to evaluate future competitive entry is as fast as possible, "possibly immediate," due to the dynamic characteristics of the airline industry.  See Pls.' Proposed Conclusions of Law ¶ 82, ECF No. 448 ("In some markets, this may mean entry has to occur within weeks or month....").  Such a timeframe is both

unrealistic and a walk-back from the Government's concession in its pretrial brief that entry is timely if it is "rapid enough to deter or render insignificant the anticompetitive effects of the merger within two to three years."  Pls.' Pretrial Br. at 23, ECF No. 289.  Two-to-three years is the timeline the Defendant Airlines propose.  Considering the parties at one time agreed and based upon the record of this case –- including the unique circumstances of the post-pandemic's profound effects on the airline industry -- the Court rules that a two-to-three year timeframe of reference controls.

Using two-to-three years as the timeframe in which to situate the Court's analysis, the Defendant Airlines demonstrated that entry would be "timely."  In particular, entry barriers on routes are very low, aircraft are mobile, and entry onto routes, including the 35 routes on which the Government most focused, happens almost constantly.  Not only that, but the Defendant Airlines adduced evidence directly from potential entrants who cogently testified that they had both the ability and incentive to enter profitable routes vacated by Spirit.[52]

---

[52] For instance, when an airline exits or reduces capacity on a "proven" route, other airlines seek quickly to enter or expand to fill any unmet demand.  Tr. 11/14/23 (Biffle/Frontier) 104:3–13 (explaining that if Spirit exits routes, Frontier "would look [to enter] those probably first because they're proven"); Tr. 11/3/23 (Yealy/Avelo) 39:21–40:18 (explaining Avelo began commercial service from Dubuque, Iowa following American's exit from the airport); Dep. 7/17/23

Two-to-three years after the merger would likely be just as JetBlue is making headway in converting Spirit aircraft, as the Defendant Airlines expect it to take 18 months simply to receive their FAA Combined Operating Certificate.  Within that timeframe, the Court could reasonably expect some entry by other ULCCs, LCCs, and/or legacy airlines with unbundled, basic economy offerings into almost any of the markets vacated by Spirit.

### b. Likely Entry

Entry is "likely" only "if it would be profitable and feasible, accounting for all the attendant costs and difficulties." Energy Sols., 265 F. Supp. 3d at 443; accord Anthem, 236 F. Supp. 3d at 222 ("[E]ntry must be 'profitable, accounting for the assets, capabilities, and capital needed and the risks involved, including the need for the entrant to incur costs that would not be recovered if the entrant later exits.'" (quoting Horizontal Merger Guidelines § 9.2)).  "As a matter of economic reality, companies do not simply enter any market they can." Bazaarvoice, 2014 WL 203966, at *71.  The likelihood of entry depends on whether entrants "have the requisite ability"

---

(Neeleman/Breeze) 215:21– 216:18 (explaining Breeze monitors Frontier's entries and exits because "those are potential markets that we can go in. These are all, you know, either backfill opportunities or areas that we have to take a look at").

to enter, whether entry into the relevant markets is "within their strategy," and whether entry would be financially attractive to entrants, considering the risks of entry and the economic trade-offs of entering the relevant markets compared to using those same resources to enter other markets or pursue other business opportunities.  Id.

The "mere threat of entry" is insufficient.  Chicago Bridge, 534 F.3d at 430 n.10.  Rather, "there is a high threshold applied to assertions as to whether a company can be considered a potential entrant," and Defendants "must provide evidence that the likelihood of entry reaches a threshold ranging from 'reasonable probability' to 'certainty.'"  Id.  To be "likely," entry must also be "tied to the relevant geography" because entry outside the relevant markets cannot "counteract a merger's anticompetitive effects."  Anthem, 236 F. Supp. 3d at 222; see also Cardinal Health, 12 F. Supp. 2d at 56 ("The history of entry into the relevant market is a central factor in assessing the likelihood of entry in the future.").

Again, the Defendant Airlines have successfully demonstrated that entry by other airlines is likely.  As referenced previously, see footnote 50, supra, other ULCCs would likely consider previous Spirit routes immediately, as they are proven to be profitable.  The proposed divestitures would particularly assist in this entry; of the five cities in which

[89]

Spirit and JetBlue currently compete most heavily, either low barriers to entry and the already strong presence of other airlines (Orlando, San Juan) or divestitures (Miami/Fort Lauderdale, Boston, New York City) make such entry exceedingly likely.  The evidence on entry is consistent with or stronger in this case than many of the other cases that have found entry sufficient to offset or deter any anticompetitive effects.  In those cases, the courts found mergers did not violate Section 7 based on evidence of low barriers to entry and some evidence of historical entry that showed competitors were able to chase profit opportunities.  See Baker Hughes, 908 F.2d at 988-89 (no Section 7 violation where some entry barriers existed but were not high enough to deter entry in the event of "supracompetitive pricing" given evidence of recent entry into the market and other competitors that could potentially enter); Syufy Enters., 903 F.2d at 665 (no Section 7 violation where there were low barriers to entry and significant expansion by remaining competitor); Waste Mgmt., 743 F.2d at 983 (no Section 7 violation where there were low barriers to entry, assets were mobile, and there was evidence of a competitor from a neighboring city entering the market).

While the Court is tasked with a forward-looking exercise, recent entry by competitors can undermine claims of competitive harms.  See F.T.C. v. Qualcomm Inc., 969 F.3d 974, 996 (9th Cir.

2020).  This "history of entry into the relevant market is a central factor in assessing the likelihood of entry in the future." <u>Cardinal Health Inc.</u>, 12 F. Supp. 2d at 56.  The Government's expert, Dr. Chipty, evaluated more than 4,700 entry events from just four ULCCs that she identified over the course of five-and-a-half years, from 2017 to 2022.  Numerous fact witnesses also confirmed the large number of entries and exits that regularly occur in the airline industry as airlines chase profitable routes.  Evidence in the record even reflects that other ULCCs have started already entering routes that Spirit exited this year.  There is no evidence in the record that suggests that this recent history of entry will not continue in the future.  The Court, therefore, finds that entry of other ULCCs is likely, particularly under the low burden of proof the Defendant Airlines currently face.

### c. Sufficient Entry

The closer question before the Court, therefore, is whether entry by other ULCCs, as well as LCCs and unbundled offerings from the legacy airlines, will be <u>sufficient</u> to replace Spirit.  It is this issue that the Defendant Airlines have the most difficult time grappling, though the Court recognizes that at this, the second step of the <u>Baker Hughes</u> framework, a defendant's burden is low.

To be "sufficient," "entry has to be of a 'sufficient scale' adequate to constrain prices and break entry barriers." Chicago Bridge, 534 F.3d at 429; accord Penn State Hershey, 838 F.3d at 352 (entrants must "have the ability to constrain post-merger prices" in the relevant markets) (citation omitted); Energy Sols., 265 F. Supp. 3d at 443 ("[E]ntry is sufficient only if it can 'affect pricing' and 'scale to compete on the same playing field' as the merged firm.") (citation omitted); see also Wilh. Wilhelmsen, 341 F. Supp. 3d at 67 (entry is sufficient where "the entering competitors provide products that 'are close enough substitutes to the products offered by the merged firm to render a price increase unprofitable' and there are limited constraints on entrants' 'competitive effectiveness,' such that one firm can replicate the scale and strength of a merging firm, or one or more firms can operate without competitive disadvantage") (cleaned up) (citing Horizontal Merger Guidelines §§ 9.1-9.3); Cardinal Health, 12 F. Supp. 2d at 58 (lack of another national wholesaler after the merger was "too great a competitive loss --which the regional wholesalers cannot sufficiently replace").

When assessing the sufficiency of entry, the relevant question is whether the potential entrants would enter and expand beyond their own existing growth plans to replace the void created by the elimination of the competitive intensity of

the acquired firm.  See F.T.C. v. Tronox, Ltd., 332 F. Supp. 3d
187, 214 (D.D.C. 2018) (rejecting argument regarding entry by
foreign producers because proposed entrants would need to expand
rapidly and, even if they did, would first fulfill existing and
unmet domestic demand before entering the relevant (foreign)
markets); see also Sysco Corp., 113 F. Supp. 3d at 80–81
(rejecting entry and expansion arguments because, despite
evidence of competitors opening new facilities and having
existing plans to grow, distributors had no plans to reposition
or increase planned expansion to compete in the relevant markets
that would be harmed by the merger).

Entry must build upon, rather than supersede, potential
entrants' existing business plans, because merger analysis
considers the future world with and without the merger.  Anthem,
236 F. Supp. 3d at 191 ("In essence, in a merger trial, the
Court is making a prediction about the future.").  Potential
entrants' existing plans to compete are already baked into the
world without the merger; therefore, those pre-existing growth
or entry plans do not count toward filling the void created by
the merger.  If entrants try to enter relevant markets without
growing beyond their pre-existing plans, they would need to
abandon existing markets or markets where they would have
otherwise entered or grown but-for the merger.  That entry
cannot offset anticompetitive effects of the merger because it

[93]

would create new harms to competition.  Sanford Health, 926 F.3d
at 965 (to offset anticompetitive effects, entry must
"counteract the competitive effects of concern"); cf.
Hackensack, 30 F.4th at 176 (for efficiencies to rebut a prima
facie case they must "not arise from anticompetitive reductions
in output or service").

Sufficient entry is even more difficult to prove when, as
here, the competitor being eliminated is a unique disruptor in
the industry.  Entry by members of an industry's existing
oligopoly may not be sufficient to fill a competitive void left
by the elimination of a disruptive competitor that had
historically disciplined those larger firms.  See Bertelsmann,
646 F. Supp. 3d at 53 (rejecting argument that expansion of
existing "Big Five" would be sufficient due to lack of evidence
that others in the Big Five "could or would compete more
aggressively with the merged company").  Likewise, entry by
competitors unable to replicate the competitive intensity of the
acquired firm is insufficient.  Staples II, 190 F. Supp. 3d at
133-37 (rejecting potential entrants who lack the existing
ability to compete of the acquired firm); Cardinal Health, 12 F.
Supp. 2d at 58 (regional competitors unlikely to replicate the
competitive vigor of national competitors).

With the elimination of Spirit, it would fall to other
ULCCs not only to backfill Spirit routes, but also both to

[94]

continue their own growth and to succeed in disciplining other,
larger airlines as to both price and innovation  -- a tough row
to hoe.  As explained above, see supra Section II.A., airlines
are facing obstacles to growth in the post-pandemic world.
Aircraft manufacturing delays, ATC issues, pilot staffing
issues, and engine problems are currently making airline growth
more difficult.  Frontier's CEO estimated that it would take
Frontier at least five to eight years to replace Spirit and
operate its existing schedule, and this estimate does not even
include maintaining Frontier's pre-existing growth plan.  See
Supra n.8.  These constraints on airline growth suggest that
although other airlines are likely to enter markets left by
Spirit and might even enter some within two to three years, such
entry might not be sufficient to replace Spirit's current
presence in the industry.  The Court, therefore, must continue
its analysis before it can determine whether the Defendant
Airlines have successfully rebutted the Government's prima facie
case.

### 2. The Government's Data

The Defendant Airlines attempt to undermine the
Government's market share data as unreliable, arguing: 1) such
route-level, static market share statistics ignore the
particularities of the airline industry; and 2) such statistics
ignore potential entrants.  The Defendant Airlines are correct

that the airline industry is dynamic, with routes shifting

weekly, if not daily, and this dynamism does lead to robust,

ever-changing competition on routes.  Due to these constant

changes, "it cannot be concluded from market statistics alone

that an acquisition will lessen competition."  Occidental

Petroleum, 1986 WL 952, at *7-8 (holding that ongoing "vigorous

price competition" and ease of entry for potential competitors

"lessen[ed] the probative value of the Commission's market

concentration statistics").

Ignoring potential entrants can also result in misleading

market shares.  "In the present case, a market definition

artificially restricted to existing firms competing at one

moment may yield market share statistics that are not an

accurate proxy for market power when substantial potential

competition able to respond quickly to price increases exists."

Waste Mgmt., 743 F.2d at 982.  The "appraisal of the impact of a

proposed merger upon competition must take into account

potential competition from firms not presently active in the

relevant product and geographic markets."  Id.  The Government

and its experts do not fully take that potential competition

into account in their calculation of market shares on routes,

and that calls into question the predictive value of current shares and undermines their reliance on the presumption.[53]   Id.

### 3. Pro-competitive Effects of the Proposed Acquisition

Finally, the Defendant Airlines present various pieces of evidence to establish that the proposed acquisition is in fact pro-competitive.  Again, they do this in two ways: 1) with evidence that Spirit is struggling financially, suggesting that the proposed acquisition would in fact protect consumers from facing a weakened, failing Spirit; and 2) with evidence that the combined firm would provide a stronger competitive counterpart to the Big Four, who control 80% of the market, than either JetBlue or Spirit could do on its own.

There are two legal doctrines relevant to an acquired firm's financial performance.  The first is the "failing company" doctrine.  This defense, as explained above, takes a "lesser of two evils approach."  General Dynamics, 415 U.S. at 507.  The rationale is that, if a company is on the brink of failing, "the possible threat to competition resulting from an acquisition is deemed preferable to the adverse impact on

---

[53] In calculating the number of presumptively anticompetitive routes, the Government's experts also were looking at data that, by the time of trial, was out of date. Further demonstrating the dynamism of the airline industry, by the time of trial either Spirit or JetBlue had exited some of the routes the Government's experts originally identified.

competition and other losses if the company goes out of business." Id.; accord Energy Sols., Inc., 265 F. Supp. 3d at 444. Numerous Spirit witnesses explained at trial that Spirit is struggling financially -- including that Spirit anticipates a $467,000,000 loss for 2023 (on top of prior losses over $1,000,000,000) and has not been profitable since 2019. These losses, though significant, do not, on their own, provide an affirmative defense to the Government's prima facie case.

A defendant asserting the failing firm defense bears the "burden of proving" three distinct elements: (1) the acquired firm "face[s] the grave probability of a business failure," (2) "[t]he prospects of reorganization" under the bankruptcy laws are "dim or nonexistent," and (3) "the company that acquires the failing company . . . is the only available purchaser." Citizen Publ'g Co. v. United States, 394 U.S. 131, 137-38 (1969) (internal citations and quotations omitted); accord Dr. Pepper/Seven-Up Cos. v. F.T.C., 991 F.2d 859, 864-65 (D.C. Cir. 1993); Steves & Sons, Inc. v. JELD-WEN, Inc., 290 F. Supp. 3d 507, 511-12 (E.D. Va. 2018). These requirements reflect the "strict limits placed on [the] defense" by the Supreme Court in several of its cases. See General Dynamics, 415 U.S. at 506 (citing cases). Although Spirit is struggling, its executives testified that the airline had a long-term plan to return to profitability. See, e.g., Tr. Ex. 678 at 2; Tr. 11/7/2023

[98]

(Gardner/Spirit) 75:2-10.  JetBlue is also far from the only
available purchaser, should Spirit find itself in dire need.

     The second doctrine that can be relevant to an acquired
firm's financial performance is the so-called "weakened
competitor" or "flailing firm" defense.  Courts view such a
defense skeptically, in part because a "'weak company' defense
would expand the failing company doctrine, a defense which has
strict limits."  F.T.C. v. Warner Commc'ns, Inc., 742 F.2d 1156,
1164 (9th Cir. 1984) (citations omitted).  One court has
described this defense as "probably the weakest ground of all
for justifying a merger," Kaiser Alum. & Chem. Corp. v. F.T.C.,
652 F.2d 1324, 1339-41 (7th Cir. 1981), and another dismissed it
as "the Hail-Mary pass of presumptively doomed mergers,"
ProMedica, 749 F.3d at 572.  Courts credit the weakened-
competitor defense "only in rare cases, when the defendant makes
a substantial showing that the acquired firm's weakness, which
cannot be resolved by any competitive means, would cause that
firm's market share to reduce to a level that would undermine
the Government's prima facie case."  University Health, 938 F.2d
at 1221.  "This argument is disfavored because it fails to
account for the fact that 'financial difficulties not raising a
significant threat of failure are typically remedied in a
moderate length of time,' whereas a merger is a relatively
permanent action that eliminates the potential for future

competition between the merging parties." <u>Aetna</u>, 240 F. Supp.
3d at 92 (citing Phillip E. Areeda & Herbert Hovenkamp,
Antitrust Law ¶ 963a3 (4th ed. 2016) ("Areeda & Hovenkamp")).

The Defendant Airlines argue that because Spirit is
struggling financially, its "market share [is reduced] to a
level that would undermine the Government's prima facie case."
<u>University Health</u>, 938 F.2d at 1221.  But as the <u>ProMedica</u> Court
observed, this argument is a "Hail-Mary pass," and it misses the
mark.  The requirement that an acquired firm's weakness "cannot
be resolved by any competitive means," <u>University Health</u>, 938
F.2d at 1221, means that the weakness cannot merely involve poor
financial performance.  It must involve a firm no longer able to
access resources that are necessary to compete.  <u>See, e.g.</u>,
<u>General Dynamics</u>, 415 U.S. at 501–04 (coal producer had "neither
the possibility of acquiring more reserves nor the ability to
develop deep coal reserves, and thus was not in a position to
increase its reserves"); <u>F.T.C.</u> v. <u>Arch Coal, Inc.</u>, 329 F. Supp.
2d 109, 155–57 (D.D.C. 2004) (noting that the acquired firm's
mines would produce less than they had in the past, and there
were not good prospects for acquiring new mines); <u>Deutsche
Telekom</u>, 439 F. Supp. 3d at 218–24 (wireless provider had "no
clear path to obtaining" necessary assets, including no
alternative acquirer, and therefore had "no convincing prospects
for improvement") (internal citations omitted).  The Defendant

Airlines presented no evidence that Spirit was in such a dire
financial situation that it had no hope for the future; instead,
multiple Spirit executives testified that the airline had a plan
to return to profitability.

Though their arguments regarding Spirit's profitability
lack merit, the Defendant Airlines provide strong evidence that
the combined, post-merger airline would be procompetitive and
result in substantial benefits for consumers.  This is a so-
called efficiency defense.  As one court has noted,

> It remains unclear whether and how a court may
> consider evidence of a merger's efficiencies. While
> the Supreme Court has previously stated that
> "[p]ossible economies cannot be used as a defense to
> illegality," F.T.C. v. Procter & Gamble Co., 386 U.S.
> 568, 580 (1967), lower courts have since considered
> whether possible economies might serve not as
> justification for an illegal merger but as evidence
> that a merger would not actually be illegal. The trend
> among lower courts has thus been to recognize or at
> least assume that evidence of efficiencies may rebut
> the presumption that a merger's effects will be
> anticompetitive, even if such evidence could not be
> used as a defense to an actually anticompetitive
> merger.

Deutsche Telekom, 439 F. Supp. 3d at 207.

Courts have recognized efficiencies in several forms.  The
merged firms' ability to offer new or enhanced services is
itself a procompetitive benefit.  See, e.g., Deutsche Telekom,
439 F. Supp. 3d at 207-209 (recognizing efficiencies such as the
accelerated introduction of cellular service based on new

technology); <u>United States</u> v. <u>M.P.M., Inc.</u>, 397 F. Supp. 78, 93 (D. Colo. 1975) ("service offered" by the new firm "was superior to that offered by either of the previously independent companies alone"); <u>F.T.C.</u> v. <u>Tenet Health Care Corp.</u>, 186 F.3d 1045, 1054-55 (8th Cir. 1999)(explaining that in analysis of "the competitive effects of the merger" the district court should have considered evidence that the merger of two smaller hospitals would create "a hospital that is larger and more efficient" than the standalone hospitals and that "will provide better medical care than either of those hospitals could separately."). Cost savings and increased output are also cognizable benefits that demonstrate a merger is procompetitive. <u>See</u> <u>United States</u> v. <u>Country Lake Foods, Inc.</u>, 754 F. Supp. 669, 674 (D. Minn. 1990) (the merger would allow the combined company to "increase its capacity substantially," "lower [] costs," and achieve "other savings," enabling it to "compete head-to-head" with its "top selling" rival).

The Defendant Airlines have demonstrated that an expansion of all aspects of JetBlue's business -- including network, fleet, and loyalty program -- would allow for more vigorous competition with the Big Four, which carry most passengers in the country. The size of an airline, the number of routes it serves, the number of options it offers to consumers -- all of these aspects add to an airline's relevance to consumers, and

were JetBlue to become more relevant, it would immediately place more pressure on its greatest competitors, the Big Four.  This pressure would benefit consumers.  The Defendant Airlines have also demonstrated that the product JetBlue offers, though more expensive on average, is higher quality, and provides consumers with an enhanced flying experience.  Were JetBlue to expand via the proposed acquisition, not only would that product become more widely available to more consumers, but the increased revenue available could also allow JetBlue to innovate further and create an even stronger customer experience.

Overall, the Defendant Airlines have successfully met their relatively low burden to rebut the Government's prima facie case.  The combination of the likely, timely entrants into the harmed markets and the potential procompetitive benefits of the proposed merger provides the Court with enough substantial evidence to conclude that the prima facie case may inaccurately predict the proposed acquisition's probable effect on future competition.  See Baker Hughes, 908 F.2d at 991.

### F. Additional Anticompetitive Effect

The evidence establishing a prima facie case carries forward even if the presumption is rebutted.  The evidence constituting the prima facie case establishes a "presumption of the middle ground," meaning that it establishes the presumed fact "unless credible evidence is introduced which tends to

[103]

rebut" that fact.  Terry v. Electronic Data Sys. Corp., 940 F.
Supp. 378, 381-82 (D. Mass. 1996); accord United States v.
Jessup, 757 F.2d 378, 382-83 (1st Cir. 1985), abrogated on other
grounds by United States v. O'Brien, 895 F.2d 810 (1st Cir.
1990) (discussing this "middle ground position").  Thus, "even
when contrary evidence is presented, prima facie evidence
maintains its force and is accorded any weight that the fact-
finder sees fit."  SEC v. Sargent, 589 F. Supp. 3d 173, 196 &
n.16 (D. Mass. 2022).  The Court, therefore, must now carefully
consider all available evidence to determine whether the
Government has proven by a fair preponderance of the evidence
that the acquisition threatens competition.  See, e.g., Chicago
Bridge, 534 F.3d at 424 (noting how evidence can both establish
a prima facie case and "serve[] as a redoubt" against rebuttal
evidence offered by defendants); Anthem, 236 F. Supp. 3d at 214-
16 (even where defendant successfully rebutted the presumption
with evidence of entry, plaintiff successfully carried ultimate
burden of persuasion through evidence of anticompetitive
effects).

A merger is unlawful under Section 7 if it is reasonably
probable that it will result in a substantial lessening of
competition in "any line of commerce or in any section of the
country."  15 U.S.C. § 18.  Thus, "if anticompetitive effects of
a merger are probable in 'any' significant market," the merger

violates Section 7.  <u>Brown Shoe</u>, 370 U.S. at 337; <u>see also</u>
<u>Anthem</u>, Inc., 855 F.3d at 368 (threat of anticompetitive effects
in one local market "provides an independent basis for the
injunction" prohibiting merger); Areeda & Hovenkamp ¶ 972a
("[Section 7] plainly contemplates that mergers may involve more
than one market, yet it bases legality on a separate market-by-
market appraisal.").  "The Government may introduce evidence
which shows that as a result of a merger competition may be
substantially lessened throughout the country, or on the other
hand it may prove that competition may be substantially lessened
only in one or more sections of the country.  In either event a
violation of [Section] 7 would be proved." <u>United States</u> v.
<u>Pabst Brewing Co.</u>, 384 U.S. 546, 549 (1966).

     Although the Defendant Airlines provide ample evidence at
the rebuttal stage that the anticompetitive harms of the
proposed acquisition will be offset, both by new entries into
the harmed markets and potential pro-competitive benefits, this
evidence fails to establish that the proposed merger would not
substantially lessen competition in at least some of the
relevant markets.  Throughout trial, the Government invoked the
experience of the average Spirit consumer: a college student in
Boston hoping to visit her parents in San Juan, Puerto Rico; a
large Boston family planning a vacation to Miami that can only
afford the trip at Spirit's prices.  It is this large category

consumers, those who must <u>rely</u> on Spirit, that this merger would harm; the Defendant Airlines, though exceedingly well-represented, simply cannot demonstrate that these consumers would avoid harm.  Even if other ULCCs entered former Spirit routes at an unprecedented rate of growth (which, given the current restraints on airline growth, is unlikely), their entry is unlikely to be sufficient to protect every consumer, in every relevant market from harm.

As Dr. Chipty's analysis demonstrates, it would take five years for other ULCCs to replace Spirit's capacity nationally. Were other ULCCs to attempt to replace Spirit's capacity specifically on Spirit routes (and thereby serve Spirit customers), it would take over fifteen years to do so.  To replace just half of Spirit's capacity on its Boston routes, Allegiant, which is receiving Spirit divestitures at Boston(BOS), would have to grow by 412%.  That number rises to 757% for Miami(MIA).  Allegiant's average annual growth rate from 2013-2022 was 10%; it is not only unlikely, but practically impossible that its growth rate would increase to the 249% annual rate Dr. Chipty estimates would be necessary.  Frontier's average growth rate is not much higher; at 12.8%, the odds of Frontier growing even over 100% are minimal.  Even with other, new ULCCs growing and expanding and legacy airline expanding

their basic offerings, there is simply no way such astronomical need could be supplied.

The Government, therefore, has proven by a fair preponderance of the evidence that the merger would substantially lessen competition in a relevant market.

## IV.   THE INJUNCTIVE REMEDY

In its amended complaint, the Government requested, as a remedy, that the "Defendants be permanently enjoined and restrained from carrying out this acquisition, or any other transaction in any form that would combine JetBlue and Spirit." Am. Compl. at 35, ECF No. 69.  Such a broad injunction would prevent not only the proposed merger of JetBlue and Spirit as it currently stands, but also any future merger of the two companies.  At closing arguments, upon question from the Court, the Government properly recognized that such a request asks too much.  See Tr. 12/7/2023 51:3-10.[54]  Today's decision, therefore, narrowly applies only to the proposed merger of JetBlue and Spirit as it currently stands as agreed to by the Defendant Airlines on July 28, 2022.

---

[54] "GOVERNMENT COUNSEL: [T]he injunction would be limited to the deal that is presently in front of the Court....
THE COURT: So another deal is another case?
GOVERNMENT COUNSEL: Another deal would be another case, right, your Honor, I think that's definitely fair to say."

The Government argues that "another bite at the apple" would be of no use to the Defendant Airlines, and that therefore, the Court ought enjoin any future combination of the two airlines.  Pl.'s Post-Tr. Br. at 45, ECF No. 451.  To rule in such a way, however, would be prospectively to interfere with the free market with unknown, and perhaps harmful, competitive effects.  Indeed, the Defendant Airlines and others in the market, in the context of the unique and dynamic market forces of the airline industry may decide to take another run at a merger at any time.  The Government will no doubt make its determination -- as it is duty-bound to do -- as to whether such a proposed merger sufficiently protects competition.  Of course, while the Court always encourages parties to resolve their differences without judicial intervention, the courthouse doors remain open should the Defendant Airlines decide to try again, and the Government then wishes to prevent such an attempt.

V.   **CONCLUSION**

In sum, the Court has made its best attempt, applying the law to the evidence in this case, to predict the future of a dynamic market recovering from the COVID-19 pandemic, in markedly uncertain times.[55]  For the reasons set forth above,

---

[55] As the Court expressed to the parties at the conclusion of trial, this case is an exceptional example of how a complex antitrust case ought be tried.  The Court is grateful and commends counsel and their staff for their professionalism in

therefore, the Court rules that the proposed acquisition violates Section 7 of the Clayton Act.

Spirit is a small airline.

But there are those who love it.

To those dedicated customers of Spirit, this one's for you.

Why?

Because the Clayton Act, a 109-year-old statute requires this result -- a statute that continues to deliver for the American people.

**VI.  ORDER**

In light of the foregoing Findings of Fact and Conclusions of Law, it is hereby **ORDERED** that the Defendant Airlines, their agents, servants, employees, and all persons acting in concert with either of them, are **PERMANENTLY ENJOINED** from executing the proposed merger as agreed on July 28, 2022.


**SO ORDERED.**


/s/ William G. Young

WILLIAM G. YOUNG
JUDGE
of the
UNITED STATES[56]

_____

robustly and efficiently presenting their respective cases to the Court.

[56] This is how my predecessor, Peleg Sprague (D. Mass. 1841-1865), would sign official documents.  Now that I'm a Senior

[109]

---

District Judge I adopt this format in honor of all the judicial
colleagues, state and federal, with whom I have had the
privilege to serve over the past 45 years.